1  BRADLEY S. PHILLIPS (State Bar No. 85263)
   brad.phillips@mto.com
2  GRANT A. DAVIS-DENNY (State Bar No. 229335)
   grant.davis-denny@mto.com
3  EMILY R.D. MURPHY (State Bar No. 291022)
   emily.murphy@mto.com
4  MUNGER, TOLLES & OLSON LLP
   355 South Grand Avenue
5  Los Angeles, California 90071-1560
   Telephone:  (213) 683-9100
6  Facsimile:   (213) 687-3702

7  MARK D. ROSENBAUM (SBN 59940)
   mrosenbaum@publiccounsel.org
8  GARY BLASI (SBN 70190)
   gblasi@publiccounsel.org
9  ANNE RICHARDSON (SBN 151541)
   arichardson@publiccounsel.org
10 ADELAIDE ANDERSON (SBN 270966)
   aanderson@publiccounsel.org
11 ALISA HARTZ (SBN 285141)
   ahartz@publiccounsel.org
12 PUBLIC COUNSEL LAW CENTER
   610 S. Ardmore Avenue
13 Los Angeles, California 90005
   Telephone:  (213) 385-2977
14 Facsimile:   (213) 385-9089

15 Attorneys for Plaintiff-Intervenors

16            UNITED STATES DISTRICT COURT

17      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| 18 UNITED STATES OF AMERICA, | Case No. 15-cv-05903 |
| 19                Plaintiff, | **NOTICE OF MOTION AND MOTION TO INTERVENE AS PLAINTIFFS BY TERESA POWERS, ET AL AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
| 20                vs. | |
| 21 COUNTY OF LOS ANGELES AND LOS ANGELES COUNTY | |
| 22 SHERIFF JIM MCDONNELL, in his Official Capacity, | **Filed concurrently with INDEX OF EVIDENCE IN SUPPORT OF MOTION TO INTERVENE** |
| 23                Defendants. | |
| 24 | **And concurrently lodged [PROPOSED] COMPLAINT IN INTERVENTION** |
| 25 TERESA POWERS, DAVID PENN, TIMOTHY POLK, MARK SARNI, | |
| 26 DERRICK THOMAS, DARSEL WHITFIELD, ROYAL WILLIAMS, | Judge:  Hon. Dean D. Pregerson |
| 27 AND LEPRIEST VALENTINE, | Date: October 26, 2015 |
| 28                Movants. | Time: 10:00 am |

## NOTICE OF MOTION AND MOTION TO INTERVENE

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on October 26, 2015, at 10:00 am or as soon thereafter as may be heard in Courtroom 4 of the above-entitled court, located at 312 North Spring Street, Los Angeles, California 90012, Teresa Powers, David Penn, and Timothy Polk, Mark Sarni, Derrick Thomas, Darsel Whitfield, Royal Williams, Lepriest Valentine (collectively "Plaintiff-Intervenors") will and hereby do move this Court for entry of an order permitting Plaintiff-Intervenors to intervene as a matter of right in the above-captioned matter for the purpose of seeking amendment of the Joint Settlement Agreement Regarding the Los Angeles County Jails and Stipulated Proposed Order of Resolution. Alternatively, in the event the Court finds that Plaintiff-Intervenors are not entitled to intervention as a matter of right, Plaintiff-Intervenors seek permissive intervention.

This motion is made pursuant to Federal Rules of Civil Procedure Rule 24(a)(2) for mandatory intervention on the grounds that 1) this motion is timely, 2) Plaintiff-Intervenors claim a significant protectable interest relating to the subject of the action, 3) disposition of the action may impair or impede Plaintiff-Intervenors' ability to protect their interests, and 4) the existing parties do not adequately represent the Plaintiff-Intervenors' interests.

Alternatively, this motion is made pursuant to Federal Rules of Civil Procedure Rule 24(b)(1)(B) for permissive intervention on the grounds that 1) Plaintiff-Intervenors have a claim or defense that shares with the main action a common question of law or fact, 2) there exist independent grounds for jurisdiction, and 3) this motion is timely.

This motion is based upon this Notice of Motion; the supporting Memorandum of Points and Authorities; the supporting declarations of Plaintiff-Intervenors Teresa Powers, David Penn, and Timothy Polk, Mark Sarni, Derrick Thomas, Darsel Whitfield, Royal Williams, Lepriest Valentine, the supporting

1   expert declarations of Dr. Suzanne Wenzel, Dr. James Rosenberg, and Julie DeRose,

2   the supporting declarations of Pete White, Darrell Steinberg, Alisa Hartz, and Jenee

3   Barnes; the concurrently-lodged Complaint in Intervention setting out the claim for

4   which intervention is sought as required by Federal Rule of Civil Procedure 24(c);

5   all documents and pleadings on file in this action; and on such other oral and

6   documentary evidence as may be presented at the hearing on this motion. This

7   motion is made following the conference of counsel pursuant to Local Rule 7-3

8   which took place seven or more days prior to the date of filing of this motion.

9

10   DATED: September 28, 2015

11                    MUNGER, TOLLES & OLSON LLP

12                     BRADLEY S. PHILLIPS

13                     GRANT A. DAVIS-DENNY

                       EMILY R.D. MURPHY

14

15              By:      /s/ Grant Davis-Denny

16                  GRANT A. DAVIS-DENNY

17              Attorneys for Plaintiff-Intervenors

18

19              By:      /s/ Emily Murphy

20                  EMILY R.D. MURPHY

21              Attorneys for Plaintiff-Intervenors

22

23

24

25

26

27

28

NOTICE OF MOTION AND MOTION TO INTERVENE BY POWERS ET AL AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PUBLIC COUNSEL
    MARK ROSENBAUM
    GARY BLASI
    ANNE RICHARDSON
    ADELAIDE ANDERSON
    ALISA HARTZ


By:     /s/ Mark Rosenbaum
    MARK ROSENBAUM
Attorneys for Plaintiff-Intervenors


By:     /s/ Alisa Hartz
    ALISA HARTZ
Attorneys for Plaintiff-Intervenors

NOTICE OF MOTION AND MOTION TO INTERVENE BY POWERS ET AL AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

# TABLE OF CONTENTS

**Page**

NOTICE OF MOTION AND MOTION TO INTERVENE ........................................ 2

MEMORANDUM OF POINTS AND AUTHORITIES ...................................... 1

I. INTRODUCTION ....................................................................................... 1

II. FACTS ...................................................................................................... 3

    A.    The Settlement Provisions At Issue .................................................. 3

    B.    Plaintiff-Intervenors ......................................................................... 5

III. ARGUMENT ............................................................................................ 8

    A.    Plaintiff-Intervenors Are Entitled to Intervene As A Matter of Right ................................................................................................... 8

        1.    The Motion Is Timely ........................................................... 9

        2.    Intervenors Have a Significant Protectable Interest ................ 11

            (a)    Paragraph 34 Facially Discriminates Against Persons With Certain Mental Disabilities And Persons In Jail Seven Days Or Fewer ............................. 12

                (i)    The Settlement Excludes Certain Disabled Persons Who Also Need Discharge Planning Services ................................................... 12

                (ii)    The Settlement Excludes Disabled Persons Who Have Been In Jail for Seven Days or Fewer ......................................................... 14

            (b)    The Settlement Violates The ADA's Mandate To Provide Meaningful Access To Programs And Services ................................................................. 15

            (c)    The Settlement Violates The ADA's Integration Mandate. ................................................................. 21

        3.    The Proposed Settlement Will Practically Impair Plaintiff-Intervenors' Ability To Protect Their Interests ......................... 23

        4.    The Parties Do Not Adequately Represent The Interveners' Interests ..................................................... 24

    B.    Plaintiff-Intervenors Should Be Permitted to Intervene ...................... 25

IV. CONCLUSION ......................................................................................... 25

1

## TABLE OF AUTHORITIES

2

**Page(s)**

3

**FEDERAL CASES**

4

*Alexander v. Choate,*

5
    469 U.S. 287 (1985) ..................................................................... 11, 16

6

*Arakaki v. Cayetano,*

7
    324 F.3d 1078 (9th Cir. 2003) ..................................................... 24, 25

8

*Brantley v. Maxwell-Jolly,*

9
    656 F. Supp. 2d 1161 (N.D. Cal. 2009) ............................................. 22

10

*Citizens for Balanced Use v. Montana Wilderness Ass'n,*
    647 F.3d 893 (9th Cir. 2011) ....................................................... 10, 24

11

12

*Crowder v. Kitagawa,*
    81 F.3d 1480 (9th Cir. 1996) ....................................................... 11, 16

13

*Disability Advocates, Inc. v. Patterson,*

14
    653 F. Supp. 2d 184 (E.D.N.Y. 2009)

15
    *vacated for lack of associational standing, Disability Advocates,*
    *Inc. v. New York Coal. for Quality Assisted Living, Inc.,* 675 F.3d

16
    149 (2d Cir. 2012) ............................................................................. 22

17

*Donnelly v. Glickman,*

18
    159 F.3d 405 (9th Cir. 1998) .............................................................. 25

19

*Greene v. United States,*

20
    996 F.2d 973 (9th Cir. 1993) ................................................................ 9

21

*Kenneth R. ex rel. Tri-County CAP, Inc./GS v. Hassan*

22
    293 F.R.D. 254 (D. N.H. 2013). .......................................................... 23

23

*League of United Latin Am. Citizens v. Wilson,*
    131 F.3d 1297 (9th Cir. 1997) ............................................................ 10

24

*Lovell v. Chandler,*

25
    303 F.3d 1039 (9th Cir. 2002) ............................................... 12, 14, 15

26

*Mark H. v. Lemahieu,*

27
    513 F.3d 922 (9th Cir. 2008) .............................................................. 17

28

15-cv-05903

**TABLE OF AUTHORITIES**
(continued)

Page(s)

*McGary v. City of Portland,*
   386 F.3d 1259 (9th Cir. 2004) .......................................................... 16

*Olmstead v. L.C. ex rel. Zimring,*
   527 U.S. 581 (1999) ......................................................... 16, 21, 23

*Pierce v. Cnty. of Orange,*
   526 F.3d 1190 (9th Cir. 2008) .......................................................... 11

*Sw. Ctr. for Biological Diversity v. Berg,*
   268 F.3d 810 (9th Cir. 2001) ......................................................... 9, 24

*Thompson v. Davis,*
   295 F.3d 890 (9th Cir. 2002) .......................................................... 13

*United States v. City of Los Angeles,*
   288 F.3d 391 (9th Cir. 2002) ..................................................... 9, 11, 24

**FEDERAL STATUTES**

28 U.S.C. § 1331 ............................................................................ 25

42 U.S.C. §§ 1997-1997j ..................................................................... 3

42 U.S.C. § 12102(1) ....................................................................... 13

42 U.S.C. § 12102(2) ....................................................................... 13

42 U.S.C. § 12132 .......................................................................... 11

42 U.S.C. § 12182(b)(2)(A) ............................................................... 2, 16

42 U.S.C. § 14141
   (Violent Crime Control and Law Enforcement Act of 1994) ............................... 3

**FEDERAL RULES**

Fed. R. Civ. P. 24 ................................................................... 9, 24, 25

**FEDERAL REGULATIONS**

28 C.F.R. § 34(b)(iii) ....................................................................... 2

NOTICE OF MOTION AND MOTION TO INTERVENE BY POWERS ET AL AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

**TABLE OF AUTHORITIES**
(continued)

Page(s)

28 C.F.R. § 35.104(1)(ii) ................................................................................. 13

28 C.F.R. § 35.104(5)(iii) ................................................................................ 13

28 C.F.R. § 35.130 .......................................................................................... 12

28 C.F.R. § 35.130(b)(1)(i) .......................................................................... 1, 12

28 C.F.R. § 35.130(b)(1)(iv) .............................................................................. 1

28 C.F.R. § 35.130(d) ............................................................................ 2, 21, 22

NOTICE OF MOTION AND MOTION TO INTERVENE BY POWERS ET AL AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. __INTRODUCTION__

Plaintiff-Intervenors are individuals with mental illnesses and disabilities whom Los Angeles County frequently cycles between its jails and streets. They seek to intervene in this matter to remedy violations of the Americans with Disabilities Act ("ADA") in the County's and Department of Justice's Joint Settlement Agreement ("Settlement"). Paragraph 34 of the Settlement dictates how the seriously mentally ill will be discharged from the County's jails—the most important stage of the County's jail-to-streets-to-jail cycle. Left uncorrected, these discharge provisions will lead to pervasive ADA violations in at least three ways:

*First*, the Settlement facially discriminates against people with certain mental disabilities by limiting the class of individuals who are eligible for discharge planning to those who have a "serious mental illness" as defined in the Settlement. Settlement ¶ 34. That definition expressly *excludes* those individuals whose mental disabilities are the result of personality disorders (except when "associated with serious or recurrent significant self-harm"), substance abuse and dependence disorders, dementia, or developmental disabilities. *Id.* ¶ 15(aa). The Settlement also excludes from most discharge planning those who have been in jail for seven days or fewer. *Id*. ¶ 34(a). These arbitrary exclusions violate the ADA's prohibition on "[p]roviding different or separate … services …to any class of individuals with disabilities than is provided to others …." 28 C.F.R. § 35.130(b)(1)(i), (iv).

*Second*, the discharge provisions in Paragraph 34 run afoul of the ADA because they deny disabled persons meaningful access to public services and benefits in at least two ways: (1) the Settlement's plan for connecting released prisoners with needed medication and services—that is, merely handing out a prescription or a referral—is meaningless for many people with serious mental disabilities because, due to their disabilities, they have no realistic hope of navigating to those who can fulfill their medication or service needs; and (2) the

NOTICE OF MOTION AND MOTION TO INTERVENE BY POWERS ET AL
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

Settlement allows the County to refer seriously mentally ill individuals to services without requiring that the County confirm that such services are available. The Settlement therefore contravenes the ADA's prohibition on "failure[s] to make reasonable modifications in … procedures … necessary to afford … services … to individuals with disabilities." 42 U.S.C. § 12182(b)(2)(A).

*Third*, the Settlement violates the integration mandate of the ADA to deliver "services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). Paragraph 34(b)(iii) of the Settlement contemplates that the County will provide "direct linkage" to restrictive institutional settings for persons with "intense need for assistance" (a category that is undefined within the Settlement). This provision, if implemented, would lead to the placement of certain disabled individuals in non-integrated environments in violation of the ADA's integration mandate.

As a result, under the terms of the Settlement, the County will be able to continue its current practices of discharging mentally disabled individuals from the County jails without their medication and without ensuring that they obtain desperately needed medical and psychiatric services to ameliorate their mental illnesses. Severely mentally disabled people will continue to be left to wander and attempt to survive our community's meanest streets in no state to do so. The mentally disabled can still be handed referral lists to services that they may be incapable of deciphering, with no resources to access them even if they could. However well-intentioned the decree, it does not reflect the daily lives of the mentally disabled who lives on our streets for lack of anywhere else to reside, or the service providers and community advocates who work heroically to try to make the lives of the mentally disabled more tolerable.

The narratives of the Intervenors illustrate the harsh consequences of no or inadequate discharge planning. Each is severely mentally disabled: schizophrenic, bipolar, manic depressive, addicted, often with co-occurring disabilities. They have

at best minimal financial or family resources to draw upon and, as a result, get by as they must on the streets. In the past, they have been discharged many times with, as under the Settlement, no or functionally no access to the care and services their conditions require. Their conditions only deteriorate further, their chances for survival diminished with each discharge, unless they have a lucky break of getting connected with a caring individual who will navigate them through the complex web of existing services and benefits. Making it back to mental health and a stable living situation becomes all but impossible without individualized assistance.

In short, as individuals whose rights under the ADA will be impaired by Paragraph 34 of the Settlement, Plaintiff-Intervenors have significant interests related to the subject of this case, which they have timely asserted less than two months after this action was filed. And Plaintiff-Intervenors cannot rely on the parties, which are contractually committed to defending Paragraph 34's unlawful discharge provisions, to assert Plaintiff-Intervenors' rights under the ADA. Plaintiff-Intervenors thus satisfy the standard for intervention as a matter of right. Alternatively, the Court should grant Plaintiff-Intervenors' motion under the standard for permissive intervention.

## II. <u>FACTS</u>

### A.   <u>The Settlement Provisions At Issue</u>

On August 5, 2015, the United States filed a Complaint against the County of Los Angeles and Sheriff Jim McDonnell in his official capacity (collectively, "the County") for violations of 42 U.S.C. §§ 1997-1997j (the Civil Rights of Institutionalized Persons Act or "CRIPA") and 42 U.S.C. § 14141 (the Violent Crime Control and Law Enforcement Act of 1994). ECF Doc. 1. At the same time, the United States and the County filed the Settlement, ECF Doc. 4-1, and a Joint Stipulation and Proposed Order seeking the Court's approval of the Settlement. ECF Doc 4. While the undersigned were diligently investigating, collecting evidence, and

NOTICE OF MOTION AND MOTION TO INTERVENE BY POWERS ET AL AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

preparing intervention papers, the Court approved the Settlement on September 3, 2015. ECF Docs. 13, 14.

A key aspect of the United States' investigation and the resulting Complaint and Settlement is the need for appropriate discharge planning and services for mentally disabled prisoners. The United States alleges in its Complaint that the County has "repeatedly failed to provide adequate mental health services, including psychological and psychiatric services, to prisoners with serious psychiatric needs that are known or obvious due to, but not limited to, insufficient and inadequate … *discharge planning*." ECF Doc. 1, Compl. ¶ 23 (emphasis added).

The Settlement purports to address the County's inadequate discharge planning in Paragraph 34, which provides in full:

34.   The County and the Sheriff will conduct discharge planning and linkage to community mental health providers and aftercare services for all prisoners with serious mental illness as follows:

a.   For prisoners who are in Jail seven days or less, a preliminary treatment plan, including discharge information, will be developed.

b.   For prisoners who are in Jail more than seven days, a QMHP [Qualified Mental Health Professional] will also make available:

i.   For prisoners who are receiving psychotropic medications, a 30-day prescription for those medications will be offered either through the release planning process, through referral to a re-entry resource center, or through referral to an appropriate community provider, unless clinically contraindicated;

ii.   In person consultation to address housing, mental health/medical/substance abuse treatment, income/benefits establishment, and family/community/social supports. This consultation will also identify specific action to be taken and identify individuals responsible for each action;

iii.   If the prisoner has an intense need for assistance, as described in [County Department of Mental Health] policies, the prisoner will further be provided direct linkage to an Institution for Mental Disease ("IMD"),[1] IMD-Step-down facility, or appropriately licensed hospital;

---

[1] IMDs are "long term care psychiatric facilities which may be locked, similar to hospital beds." *See* concurrently lodged Complaint in Intervention ¶ 71.

NOTICE OF MOTION AND MOTION TO INTERVENE BY POWERS ET AL AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

    iv. If the prisoner has a moderate need for assistance, as described in [County Department of Mental Health] policies, and as clinically appropriate to the needs of the prisoner, the prisoner will be offered enrollment in Full Service Partnership or similar program, placement in an Adult Residential Facility ("Board and Care") or other residential treatment facility, and direct assistance accessing community resources;

    v. If the prisoner has minimal needs for assistance, as described in [County Department of Mental Health] policies, the prisoner will be offered referrals to routine services as appropriate, such as General Relief, Social Security, community mental health clinics, substance abuse programs, and/or outpatient care/support groups.

  c. The County will provide a re-entry resource center with QMHPs available to all prisoners where they may obtain information about available mental health services and other community resources.

Settlement ¶ 34.

## B. Plaintiff-Intervenors

  Plaintiff-Intervenors are six men and two women with mental illnesses and disabilities and/or serious, chronic, or disabling physical conditions who share a common story.[2] Plaintiff-Intervenors' shared experience involves being cycled between the County's jails and streets. As an experienced community care provider succinctly describes the problem:

  I see the same scenario over and over: a mentally ill homeless person is arrested for a quality of life offense such as drinking in public or disorderly conduct, behaviors which are often linked to mental illness. That person is incarcerated, and may or may not receive mental health treatment in jail. . . . [After release], [w]hen they have not been engaged by supportive services staff, individuals often find themselves in cycle of going in an out of jail, a cycle that in itself can increase

---

[2] Powers ¶¶ 3, 5 (paranoid schizophrenia, bipolar disorder, manic depressive disorder, cancer and heart problems); Williams ¶ 5 ("bipolar schizophrenia," depression, asthma, sleep disorder); Valentine ¶¶ 4, 8 (depression, schizophrenia, bipolar disorder); Sarni ¶¶ 3, 4, 16 (bipolar disorder, paranoid schizophrenia, depression, anxiety, kidney failure); Thomas ¶¶ 6, 7, 9 (paranoid schizophrenia, post-traumatic stress disorder, traumatic brain injury); Whitfield ¶ 4 (manic depression, bipolar disorder, anxiety, schizoaffective disorder); Penn ¶¶ 7, 15 (bipolar disorder, depression, schizoaffective disorder); Polk ¶¶ 5, 6 (traumatic brain injury, epilepsy, bipolar disorder, schizoaffective disorder).

symptoms and exacerbate trauma. These individuals become marked as high utilizers of police and jail services when they should actually be individuals utilizing mental health and housing services.

DeRose ¶ 6. Plaintiff-Intervenors know this cycle well. They have cycled in and out of jail for years or even decades.[3]

This jail-to-streets-to-jail cycle is fueled by the County's denial of reasonable access to psychiatric care, substance abuse programs, and other social services when it releases the mentally ill from its jails.

Substance abuse, for example, is often a symptom of untreated mental illness, as individuals attempt to cope with the circumstances that often accompany life lived partly on Skid Row and partly in the County jails. *See* Wenzel ¶ 14 ("[M]ental illness and addiction disease are for many different reasons frequently co-occurring disorders."); DeRose ¶ 8 ("Drinking, in particular, is often a mode of self-medication to help manage symptoms related to mental health disorders, including anxiety, depression, post-traumatic stress disorder and psychotic disorders."). This substance abuse feeds the jail-to-streets-to-jail cycle because it frequently results in arrest and re-incarceration in County jails.[4]

---

[3] Powers ¶¶ 6-8 (incarcerated at least four times, most recently in the Century Regional Detention Center; arrested four times in the past year); Williams ¶¶ 7-10 (five to seven arrests in the last 20 years, released from County jails at least twice, including in 2015); Valentine ¶¶ 2, 11, 14, 15 (three sentences served in County facilities, at least two other arrests in Los Angeles County); Sarni ¶¶ 6-12 (hundreds of arrests over a period of 35 years, three sentences served in County facilities since 2013); Thomas ¶¶ 4, 10-12 (approximately 20 arrests, served four sentences in County facilities since 2010); Whitfield ¶¶ 4, 6, 9 (approximately seven sentences served in County facilities since 1987); Penn ¶ 9 (five jail term and four prison terms, most recently released from a County facility in February 2015); Polk ¶¶ 4, 7, 8 (first incarcerated as a teenager, seven prison terms and "dozens and dozens" of County jail terms, most recently in June 2015).

[4] Powers ¶ 6; Williams ¶ 7; Sarni ¶¶ 5, 7; Thomas ¶ 10 (at least four sentences for drug-related offenses); Whitfield ¶ 9.

NOTICE OF MOTION AND MOTION TO INTERVENE BY POWERS ET AL AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

Another facet of the County's cycling approach is its pattern of arresting Plaintiff-Intervenors and others for probation violations,[5] notwithstanding the fact that, left untreated, mental illness will often make navigating the County's probation requirements significantly more difficult. Royal Williams, for example, was sitting in front of a tent on Skid Row when a police officer pulled up and asked if he was on probation. Williams ¶ 9. He was then arrested for having failed to report to his probation officer. *Id.* ¶ 8. This practice is common in the Skid Row area. White ¶ 7.

Two other frequent consequences of untreated mental illness—homelessness and lack of resources—factor into the jail-to-streets-to-jail cycle. All Plaintiff-Intervenors are homeless, an unsurprising fact given that at least one-third of the homeless suffer from mental illnesses. Steinberg ¶ 3.[6] An unfortunate reality of life for many mentally ill homeless persons is a lack of access to basic necessities that most take for granted. And desperation sometimes leads to petty theft. David Penn, for example, was recently arrested and incarcerated for stealing toiletries for her personal use. Penn ¶ 9.[7]

---

[5] Powers ¶ 8 (recently released from prison and re-incarcerated a month later for failing to report to her parole officer); Sarni ¶¶ 7, 8 (three sentences for probation violations since 2013); Thomas ¶¶ 10-12 (four three-month sentences in County facilities for parole violations since 2012); Polk ¶ 8 (arrested in 2015 for a probation violation).

[6] *See also* Powers ¶¶ 6, 11 (living on the streets); Williams ¶¶ 9, 12, 15 (living in a tent prior to last arrest, slept under cardboard after release from jail, has a shelter bed); Valentine ¶¶ 7, 8, 16 (slept on street, "bounc[ed] between shelters," has a shelter bed); Sarni ¶ 18 (has shelter bed); Thomas ¶ 21; Whitfield ¶ 15; Penn ¶ 14; Polk ¶ 13.

[7] *See also* Valentine ¶ 10 (arrested four times for stealing small items such as batteries and shampoo, which he intended to sell in order to obtain money for food); Valentine ¶ 19 (outstanding warrant for riding the Metro with no fare); *see also* White ¶ 8 (noting frequent arrests on Skid Row for collecting recyclable materials from trash cans or littering).

Plaintiff-Intervenors' untreated mental illnesses, of course, also directly limit their major life activities. They are or have been prevented from working,[8] experience or exhibit anti-social behaviors,[9] and are unable to care for or maintain relationships with their families.[10] Due to the County's frequent interactions with Plaintiff-Intervenors, the County is and has been on notice that Plaintiff-Intervenors suffer from mental disabilities.[11]

## III. ARGUMENT

The Court should grant Plaintiff-Intervenors leave to intervene in this action for the limited purpose of correcting the ADA violations in Paragraph 34 of the Settlement.

### A.   Plaintiff-Intervenors Are Entitled to Intervene As A Matter of Right

Federal Rule 24(a) of the Federal Rules of Civil Procedure is construed liberally in favor of intervenors, and the Court's decision is guided primarily by

---

[8] Valentine ¶ 4 (depression and anxiety caused him to lose his job and prevented him from obtaining a new job); Whitfield ¶ 7 (a 25-year career in healthcare ended by inability to be around other people, depression and inability to control her emotional responses).

[9] Powers ¶ 3 (constantly hears voices, talks to trees, voices make it hard for her to communicate with people); Williams ¶ 13 (without medication his mental illness causes him to abuse drugs, fight and steal), Thomas ¶ 7 (cannot be in crowds, potentially violent reactions to perceived threats).

[10] Powers ¶ 2 (has not spoken to her children in 13 years); Williams ¶¶ 3, 6 (mother has custody of his son; his family does not trust him); Valentine ¶ 4 (onset of mental illness when withdrawing from his family).

[11] Powers ¶¶ 4, 7, 8, 10 (approximately 15 involuntary psychiatric holds; mental health treatment in County facilities); Williams ¶¶ 6, 10 (involuntary psychiatric hold, housed in mental health unit at a County facility); Valentine ¶¶ 8, 10 (mental illness diagnosed by the DMH, housed in mental health unit at a County facility); Sarni ¶¶ 9-11 (housed in mental health unit at a County facility); Thomas ¶¶ 13, 15, 16 (notified County officials of psychiatric needs); Whitfield ¶¶ 4, 9 (mental illness diagnosed in jail); Penn ¶ 9 (spoke to County mental health physician while in custody); Polk ¶¶ 6, 9 (housed in mental health unit at a County facility).

practical considerations rather than technical distinctions. *Sw. Ctr. for Biological Diversity v. Berg*, 268 F.3d 810, 817 (9th Cir. 2001). "A liberal policy in favor of intervention serves both efficient resolution of issues and broadened access to the courts. By allowing parties with a *practical* interest in the outcome of a particular case to intervene, we often prevent or simplify future litigation involving related issues; at the same time, we allow an additional interested party to express its views before the court." *United States v. City of Los Angeles*, 288 F.3d 391, 397-98 (9th Cir. 2002) (quoting *Greene v. United States*, 996 F.2d 973, 979-80 (9th Cir. 1993) (Reinhardt, J., dissenting)). A district court is required to accept as true the non-conclusory allegations made in support of an intervention motion, particularly where the propriety of intervention must be determined before discovery. *Berg*, 268 F.3d at 819-20.

Federal Rule 24(a)(1) provides for intervention as of right when intervenors satisfy a four-part test: (1) the application for intervention is timely; (2) the applicant has a "significantly protectable" interest relating to the property or transaction that is the subject of the action; (3) the applicant is so situated that the disposition of the action may, as a practical matter, impair or impede the applicant's ability to protect that interest; and (4) the applicant's interest is not adequately represented by the existing parties in the lawsuit. *Id.*

### 1.      The Motion Is Timely

Courts consider three factors in determining whether a motion to intervene is timely: (1) the stage of the proceeding, (2) the prejudice to other parties, and (3) the reason for and length of the delay. *League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1302 (9th Cir. 1997).

All three factors here weigh heavily in favor of the timeliness of this motion. Plaintiff-Intervenors are moving to intervene *less than two months* after the action was filed and Plaintiff-Intervenors first learned of the unlawful Settlement provisions. Unsurprisingly, motions to intervene filed later in the life of a suit than

this one have been deemed timely. *See, e.g.*, *Citizens for Balanced Use v. Montana Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011) (motion to intervene filed three months after suit filed and two weeks after answer).

Notably, Plaintiff-Intervenors had no prior notice of the negotiations leading up to the Settlement. Hartz ¶ 7; *see also Wilson*, 131 F.3d at 1304 (noting that the "crucial date in assessing the timeliness of an intervention motion" is the date that the intervenor should have been aware of the inadequacy of the parties' representation of its interests). Although the undersigned diligently investigated and prepared to intervene to address the illegality of Paragraph 34, the Court approved the Settlement less than a month after the undersigned first learned of its existence. Hartz ¶ 8. Just two weeks later, Plaintiff-Intervenors notified the parties of their intention to bring this motion to intervene, and they have since engaged in correspondence and discussions in a good faith attempt to resolve their request for intervention. *Id.* ¶ 9. In short, Plaintiff-Intervenors have intervened expeditiously and without delay at the earliest practicable stage of the proceedings.

Moreover, the DOJ and County cannot in fairness claim prejudice from the timing of this targeted motion to intervene, filed so soon after the unlawful terms of their agreement became public. The DOJ and County of course have no legitimate interest in pursuing a course of conduct that violates the terms of the ADA, and cannot be prejudiced by litigation that remedies such conduct before its implementation commences. Moreover, Plaintiff-Intervenors only seek to intervene for the limited purpose of addressing the unlawful provisions of Paragraph 34 of the Settlement. Implementation of the remainder of the Settlement can proceed apace. While Plaintiff-Intervenors intend to work with the parties and the Court to bring Paragraph 34 in line with the ADA if intervention is granted, even Paragraph 34 will not be immediately affected by a mere grant of intervention.

**2.     Intervenors Have a Significant Protectable Interest**

"An applicant has a 'significant protectable interest' in an action if (1) it asserts an interest that is protected under some law, and (2) there is a 'relationship' between its legally protected interest and the plaintiff's claims." *City of Los Angeles*, 288 F.3d at 398.

Plaintiff-Intervenors' interest in avoiding disability discrimination that will be caused directly by the Settlement of the DOJ's claims easily satisfies this test.

"Pursuant to Title II of the ADA, a 'qualified individual with a disability' cannot, 'by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by such entity.'" *Pierce v. Cnty. of Orange*, 526 F.3d 1190, 1214 (9th Cir. 2008) (quoting 42 U.S.C. § 12132).

Importantly, a public entity can violate Title II of the ADA even if it did not intend to discriminate against persons with disabilities. The ADA "protect[s] disabled persons from discrimination arising out of both discriminatory animus and 'thoughtlessness,' 'indifference,' or 'benign neglect.'" *Crowder v. Kitagawa*, 81 F.3d 1480, 1484 (9th Cir. 1996). "Rather than attempt to classify a type of discrimination as either 'deliberate' or 'disparate impact,' the court determined it more useful to assess whether disabled persons were denied 'meaningful access' to state-provided services." *Id.* (quoting *Choate*, 469 U.S. at 302). Thus, when evaluating whether or not a discrimination, exclusion, or denial has occurred on the basis of disability, the proper inquiry is whether under the Settlement the County provides Plaintiff-Intervenors with "meaningful access" to its otherwise available benefits, services, and programs.

Here, absent intervention and subsequent modification, Paragraph 34 of the Settlement will impair Plaintiff-Intervenors' significant protectable interests in avoiding discrimination prohibited by Title II of the ADA in at least three ways.

> (a)    *Paragraph 34 Facially Discriminates Against Persons With Certain Mental Disabilities And Persons In Jail Seven Days Or Fewer*

A public entity can violate the ADA's "meaningful access" requirement by adopting facially discriminatory policies that categorically exclude disabled persons from a public program. *Lovell v. Chandler*, 303 F.3d 1039, 1057 (9th Cir. 2002). A public entity may not "[d]eny a qualified individual with a disability the opportunity to participate in or benefit from the aid, benefit, or service" or "[p]rovide different or separate aids, benefits, or services to individuals with disabilities or to any class of individuals with disabilities than is provided to others unless such action is necessary to provide qualified individuals with disabilities with aids, benefits, or services that are as effective as those provided to others." 28 C.F.R. § 35.130(b)(1)(i), (iv).[12] Here, the Settlement directly violates the ADA by impermissibly discriminating among categories of disabled individuals.

> (i)    The Settlement Excludes Certain Disabled Persons Who Also Need Discharge Planning Services

One way that a public entity may facially discriminate is by excluding people with disabilities of a specific type or origin. An individual is disabled within the meaning of the ADA if he or she has a "physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1). The statute goes on to enumerate a non-exhaustive list of "major life activities" that includes concentrating, thinking, and communicating. *Id.* § 12102(2). The etiology or causal origin of an individual's impairment is irrelevant to the question of whether that individual is disabled within the meaning of the statute. An individual

---

[12] See also 28 C.F.R. § 35.130: "A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered."

who is substantially limited in the ability to concentrate, think, or communicate is thus protected by the ADA regardless of whether the impairment is caused by a psychotic disorder, dementia, or a developmental disability.

Here, Paragraph 34 only offers discharge planning to persons with mental disabilities of some specified origins but expressly excludes others protected by the ADA. It provides these government services only to persons with "serious mental illness," while denying discharge planning to those with "substance abuse and dependence disorders,[13] dementia, and developmental disability." Settlement ¶¶ 15(aa), 34. Under the Settlement, it is not clear that persons with "substance abuse and dependence disorders, dementia, and developmental disabilit[ies]" would receive any discharge planning services at all.[14]

Significant numbers of disabled individuals will be impacted by the Settlement's arbitrary discrimination among classes of disabled persons. Suzanne Wenzel, Ph.D., the Chair of the Department of Adults and Healthy Aging at the University of Southern California, explains that "[t]he limited scope of the

---

[13] The exclusion of those with substance abuse disorders is unlawful under the ADA. "Physical and mental impairment" specifically includes drug addiction and alcoholism. 28 C.F.R. § 35.104(1)(ii). Although the term "disability" does not include "[p]sychoactive substance use disorders resulting from current illegal use of drugs," *id.* at § 35.104(5)(iii) and while a public entity may withhold services from someone currently engaging in illegal drug use, the Ninth Circuit recognizes that both alcoholism and drug addiction may qualify as a disability by virtue of substantially limiting a person's major life activities. *Thompson v. Davis,* 295 F.3d 890, 896 (9th Cir. 2002) (holding that pro se prisoner plaintiffs had adequately pled that they were disabled within the meaning of the ADA by alleging that they were rehabilitated drug addicts whose past drug addiction substantially limited major life activities including their ability to learn and work).

[14] Indeed, Paragraph 34(c)'s provision of a "re-entry resource center … available to *all* prisoners where they may obtain information about available mental health services and community resources" (emphasis added) strongly suggests that Paragraph 34 represents the sum total of discharge planning services to be available in County jails.

-13-                                                        15-cv-05903

Settlement Agreement's category of 'serious mental illness' will exclude a large number of quite seriously disabled persons…. The fact that a prisoner with a developmental disability might require a different type of discharge plan and different housing than a prisoner diagnosed with schizophrenia does not mean that a discharge plan is not just as critical for that individual." Wenzel ¶ 14.

This exclusion of a significant number of disabled individuals from the benefits of Paragraph 34's discharge planning services plainly violates the ADA. "The [public entity's] appropriate treatment of some disabled persons does not permit it to discriminate against other disabled people under any definition of 'meaningful access.'" *Lovell*, 303 F.3d at 1054.[15]

            (ii)    The Settlement Excludes Disabled Persons Who Have Been In Jail for Seven Days or Fewer

Relatedly, the Settlement facially discriminates against certain persons with mental disabilities by virtue of the length of time they are incarcerated. Settlement ¶ 34(a). Prisoners who are in jail for seven days or fewer are excluded from most of

---

[15] In other matters, the DOJ has not sanctioned such discrimination and has pursued CRIPA enforcement efforts on behalf of prisoners and institutionalized persons who serious mental illness *and* on behalf of those who have intellectual disabilities. *See* Hartz Exh. A, Findings Letter Re: Investigation of the Pennsylvania Department of Corrections' Use of Solitary Confinement on Prisoners with Serious Mental Illness and/or Intellectual Disabilities, February 24, 2014. The letter concluded that the Pennsylvania Department of Corrections was violating the rights of prisoners under the Eights Amendment and the ADA. *See also* Hartz Exh. B, Findings Letter, Re: United States' Investigation of the State of Mississippi's Service System for Persons with Mental Illness and Developmental Disabilities, December 22, 2011. The DOJ investigation in Mississippi under CRIPA and the ADA also concluded that the Mississippi had failed to meet its ADA obligations by "unnecessarily institutionalizing persons with mental illness or [developmental disabilities] … and failing to ensure that they are offered a meaningful opportunity to live in integrated community settings consistent with their needs."

the discharge planning services, and are entitled only to a "preliminary treatment plan, including discharge information." *Id.*

This line-drawing is arbitrary and will exclude from services many mentally disabled persons. Dr. Wenzel states that "[t]he length of the stay in jail has no bearing on the prisoner's treatment requirements." Wenzel ¶ 15. Moreover, this arbitrary exclusion may harm the most vulnerable individuals. "[I]t is possible," writes Dr. Wenzel, "that prisoners in jail for seven days or less will be less stable upon release because they will have received less treatment while in jail." *Id.* ¶ 16.

This exclusion, moreover, is not mandated by any apparent practical necessities. The Settlement requires prisoners to be screened for mental health needs within 12 hours after their arrival, and to receive a mental health assessment within 24 hours, or 72 hours on weekends and legal holidays, if not sooner.[16] *Id.* ¶¶ 27, 29. That is, under the Settlement, *all* prisoners with mental health needs should be identified and assessed within 24 hours (or 72 hours on weekends and holidays) from arrival in jail. Once these persons are identified and their mental health needs assessed, they should be eligible for discharge planning services congruent to their level of needs, irrespective of the time they are incarcerated.

        (b)    *The Settlement Violates The ADA's Mandate To Provide Meaningful Access To Programs And Services*

Paragraph 34 also infringes upon Plaintiff-Intervenors' interests under the ADA by denying them reasonable accommodations that would, if not unlawfully withheld, provide disabled persons with meaningful access to government services upon their release from the County's jails.

Congress identified as a form of discrimination prohibited by the ADA those "failure[s] to make reasonable modifications in policies, practices, or procedures,

---

[16] Prisoners with "emergent or urgent mental health needs" must be evaluated "as soon as possible but no later than four hours from the time of identification." Settlement ¶ 26.

1  when such modifications are necessary to afford such goods, services, facilities,

2  privileges, advantages or accommodations to individuals with disabilities, unless the

3  entity can demonstrate that making such modifications would fundamentally alter

4  the nature of such goods, services, facilities, privileges, advantages, or

5  accommodations." 42 U.S.C. § 12182(b)(2)(A).

6      As described above, the touchstone in evaluating whether or not a

7  discrimination, exclusion, or denial has occurred on the basis of disability is whether

8  under the Settlement the County provides Plaintiff-Intervenors with "meaningful

9  access" to its otherwise available benefits, services, and programs. *Crowder*, 81 F.3d

10  at 1484. A "reasonable accommodation" is one that gives the otherwise qualified

11  plaintiff with disabilities "meaningful access" to the program or services sought.

12  *Alexander v. Choate*, 469 U.S. 287, 301 (1985).[17] That is, reasonable

13  accommodations are the means to the end of meaningful access to benefits and

14  services. Importantly, in order to raise a reasonable accommodation claim, "[a]

15  plaintiff need not allege either disparate treatment or disparate impact." *McGary v.*

16  *City of Portland*, 386 F.3d 1259, 1266 (9th Cir. 2004). The ADA prohibits actions

17  that deny "meaningful access" to benefits and services, or deny "reasonable

18  accommodations" for disabilities. *Mark H. v. Lemahieu*, 513 F.3d 922, 938 (9th Cir.

19  2008).

20      Paragraph 34 violates these ADA requirements by denying meaningful access

21  to medication and services that disabled persons with mental health issues depend

22  _____

23  [17] Of course, a public entity's obligation under the ADA "is not boundless."

24  *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 603 (1999). If such an entity can
   show that the accommodation at issue would "fundamentally alter" the services

25  provided—i.e., "that, in the allocation of available resources, immediate relief for
   the plaintiffs would be inequitable, given the responsibility the state has undertaken

26  for the care and treatment of a large and diverse population of persons with mental

27  disabilities," *id*. at 604—then the entity has not discriminated by failing to offer
   such an accommodation.

28

on for the basic necessities of life. Paragraph 34(b)(i), for example, denies the mentally ill who the County releases from its jails meaningful access to psychotropic medication. Under this provision, the County need provide no more than a slip of paper with a prescription for short-term medication or a referral to "reentry resource center." For the seriously mentally ill, this is inadequate.

First, the prescription-only approach simply ignores the basic realities of life for many of the seriously mentally ill who cycle through the County's jails. As Dr. Wenzel describes in her declaration, "To fill a prescription, the released prisoner must keep track of the paper in the chaos of the release process, find the location of a free pharmacy, find a bus or other transportation to the pharmacy, and find the time to do this while also taking care of other needs such as finding food or a shelter bed, which can require hours of standing in lines." Wenzel ¶ 18.

Paragraph 34's alternative attempt to address the seriously mentally ill's medication needs—a "referral to a re-entry resource center, or … to an appropriate community provider," Settlement ¶ 34(b)(i)—will be even less likely to succeed, for it, as Dr. Wenzel describes,

> poses all the challenges of filling the prescription described above, and adds the additional hurdles of having to find a phone to make an appointment with a provider, waiting days or often weeks for the appointment, remembering the appointment, finding transportation to the appointment, having the appropriate insurance for the provider, and obtaining a diagnosis that results in the appropriate medication being prescribed. Each of these steps can be extremely challenging for an individual whose illness—the very illness for which he requires the medication—disrupts his ability to follow through on a logical thought process.

Wenzel ¶ 19.

Dr. Wenzel's concern about the inability of many mentally disabled individuals to obtain medication through the procedures outlined in the Settlement are borne out in the experience of Plaintiffs-Intervenors. For example, Plaintiff-Intervenor Royal Williams was given a prescription for Risperdal but did not fill it

because his MediCal had been suspended and he did not know that he could fill the prescription at a free pharmacy. Williams ¶ 13.

The Settlement's approach puts people in danger. Leaving prison without needed medications subjects released prisoners to a greater risk of suicide or of experiencing symptoms including "auditory hallucinations telling them to hurt themselves, or paranoid delusions that convince them they need to stand in the middle of a busy street or at the edge of a bridge over a freeway." Wenzel ¶ 17. As Plaintiff-Intervenor Royal Williams describes it, "Without my medication I was doing things I wasn't supposed to be doing: substance abuse, fighting and stealing. I felt really lonely without my medication, and unworthy. That's when the suicidal thoughts come…." Williams ¶ 13. *See also* Polk ¶ 10 (lack of medication causes "unnecessary anxiety and depression"); ; Thomas ¶¶ 14,16-17 (denied medication in jail and experienced "heightened paranoia" and "got to the point where I wanted to kill myself"); Valentine ¶ 11 ("Without my medications, I hear voices, I can't sleep, I have no appetite, my anxiety kicks in."); Whitfield ¶¶ 9-10 (without medication, she was "scared and frantic, pacing and crying").

In short, Paragraph 34 denies the seriously mentally ill meaningful access to needed psychotropic medications, in violation of the ADA.

Similar problems undermine Paragraph 34's approach to accessing government services. The Settlement requires no more than that the County "make available" a "consultation," "linkage," *or* "referral" to various services. These vague terms, which lack any substantive requirements, would appear to allow the County to simply hand a person suffering from disorganized thinking or hallucinations a pamphlet with a list of service providers (or worse yet, to "make available" such pamphlets by leaving a stack near the jail's exit door).

The distribution of pamphlets does not qualify as providing meaningful access to government services. For people with serious mental illnesses that impede organized thinking, such a list of referrals is "of no value" because "those persons

-18-

who can take full advantage of a referral may have demonstrated that they did not need it in the first place." Wenzel ¶ 11. As psychiatrist Dr. James Rosenberg explains in his declaration, mere referrals offer no "realistic hope" to most with serious mental illnesses due to multiple factors, including:

1.  cognitive impairments, such as reduced executive function, memory, and information processing capabilities;

2.  "negative" symptoms of mental illness, such as a lack of motivation, which psychotropic medication generally cannot treat; and

3.  co-occurring conditions, such as substance abuse, homelessness, and lack of adherence to medication. Rosenberg ¶ 18.

The result is that people with mental disabilities often cannot arrange and remember an appointment, determine the location, arrange transportation, and tolerate the long waits and paperwork requirements to finally have the appointment. Wenzel ¶ 11. As experienced community services provider Julie DeRose puts it, "A homeless clinically disorganized person is typically unable to take a referral and follow through without the assistance of a caseworker or advocate to help ensure that the person becomes linked." DeRose ¶ 16; *see also id.* ¶ 13; White ¶ 6; Rosenberg ¶ 18.

The experiences of Plaintiff-Intervenors bear out the insufficiency of the referral model. Royal Williams was given a list of resources, but could not make any use of it: "There were maybe fifty places on the list, and I didn't know which ones would be good for me. Mentally, I wasn't in a place where I could figure out who to call or where to go. I threw the lists away." Williams ¶ 11. Lepriest Valentine's explanation of why he missed a court date echoes the same problem: "I didn't go because I was depressed and caught up in the voices I was hearing. Between my mental health and worrying about where to eat and sleep, going to court was not a priority for me." Valentine ¶ 14.

1    Relying on mere referrals can have dangerous consequences. A County

2    employee informed Mark Sarni—who has been diagnosed with bipolar disorder,

3    paranoid schizophrenia, severe depression, anxiety, and substance abuse— just prior

4    to his release that there was "something seriously wrong" with his blood. But the

5    County failed to connect Mr. Sarni to immediate medical care. Sarni ¶¶ 3, 13. Ten

6    hours later, his heart stopped. *Id.* ¶¶ 14-15.

7    Paragraph 34, moreover, does not even require the County to confirm that the

8    particular services it chooses to refer the mentally ill to—which the County has

9    complete discretion to select under the Settlement—have services available for the

10   person being released. The risk that the County's chosen referrals will be

11   oversubscribed is significant. As Dr. Wenzel explains, "There are very few service

12   providers that assist indigent persons with mental disabilities that do not operate at

13   close to 100% capacity on a consistent basis. An adequate process that reasonably

14   accommodated the needs of these individuals would insure that discharged prisoners

15   are connected to actually available services." Wenzel ¶ 13; *see also* DeRose ¶ 13

16   (often "if they do go to the referring agency, the agency does not have the capacity

17   to provide them with services." ).

18   Paragraph 34's approach of allowing the County to refer Plaintiff-Intervenors

19   and others with disabilities to services that are not available is a harm over and

20   above the harm caused by the lack of services. As Suzanne Wenzel puts it, "giving

21   someone a referral to a place that turns him away is a net negative because he uses

22   his scarce psychological and physical reserves in search of something that does not

23   exist." Wenzel ¶ 25.

24   In short, Paragraph 34's prescription and service-access provisions fall

25   woefully short of providing the *meaningful* access that Title II of the ADA requires.

26   Plaintiff-Intervenors have an obvious protectable interest in ensuring that their right

27   to access government services is not denied by Paragraph 34, and therefore should

28   be granted leave to intervene.

1

                   *(c)*    *The Settlement Violates The ADA's Integration Mandate.*

2

3         The ADA's integration mandate provides that: "A public entity shall

4 administer services, programs, and activities in the most integrated setting

5 appropriate to the needs of qualified persons with disabilities." 28 C.F.R.

6 § 35.130(d). "Integrated" means in a setting that "enables individuals with

7 disabilities to interact with nondisabled persons to [the] fullest extent possible." *Id.*

8 § Pt. 35, App. B; *see also Olmstead*, 527 U.S. at 597 (applying the ADA's

9 integration mandate and noting that the "Department of Justice has consistently

10 advocated" that "undue institutionalization qualifies as discrimination 'by reason of

11 disability'"). The integration mandate serves at least two critical purposes: (1) it

12 avoids "perpetuat[ing] unwarranted assumptions that persons so isolated are

13 incapable or unworthy of participating in community life"; and (2) it allows for the

14 mentally disabled to participate in "the everyday life activities of individuals,

15 including family relations, social contacts, work options, economic independence,

16 educational advancement, and cultural enrichment." *Id.* at 600-01.

17         The post-release institutionalizations contemplated in Paragraph 34 of the

18 Settlement are not the most integrated setting appropriate to Plaintiff-Intervenors'

19 needs. Specifically, Paragraph 34(b)(iii) contemplates providing prisoners with an

20 "intense need for assistance" with "direct linkage to an Institutional for Mental

21 Disease ('IMD'), IMD-Step-down facility, or appropriately licensed hospital." Dr.

22 Suzanne Wenzel explains that

> 23    this paragraph may result in mentally ill individuals not being placed in
> an integrated environment. While IMDs and other residential treatment
> 24    programs are sometimes appropriate short-term placements, individuals
> with intense need for assistance can often flourish in a community
> 25    placement with intensive community services…. There are many
> gradations of need that should be evaluated on a case-by-case basis to
> 26    ensure that each person is placed in the most integrated environment."

27 Wenzel ¶ 28.

28

NOTICE OF MOTION AND MOTION TO INTERVENE BY POWERS ET AL AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

1    The IMDs or "similarly restrictive facilities" contemplated in Paragraph

2    34(b)(iii) of the Settlement would unnecessarily segregate and isolate Plaintiff-

3    Intervenors when reasonable alternatives, such as permanent supportive housing, are

4    available and are required to be provided to those for whom they are clinically

5    appropriate. 28 C.F.R. § 35.130(d).[18] Even with respect to the alternative

6    community-based placements contemplated by Paragraph 34 (such as Full Service

7    Partnership or placement in Adult Residential Facilities), the County bears the

8    burden of specifying how such services satisfy its obligations under the integration

9    mandate, and it "certainly bear[s] the burden of ensuring more than a 'theoretical'

10   availability of such services," particularly where the Plaintiff-Intervenors face a risk

11   of institutionalization if their condition worsens due to a lack of adequate care.

12   *Brantley v. Maxwell-Jolly*, 656 F. Supp. 2d 1161, 1174 (N.D. Cal. 2009).

13   Indeed, the Civil Rights Division of the U.S. Department of Justice has

14   investigated state mental health care systems across the country and concluded that

15   some of those states violated Title II's integration mandate by unnecessarily

16   segregating persons with mental disabilities and failing to provide them with more

17   integrated and community-based support and services, including housing. For

18   instance, in *Kenneth R. ex rel. Tri-County CAP, Inc./GS v. Hassan*, the United States

19   intervened in a putative class action brought by people with serious mental illnesses

20   in New Hampshire who alleged that their institutionalization violated, *inter alia*, the

21   ADA's integration mandate. 293 F.R.D. 254, 258-60 (D. N.H. 2013). In that case,

22   

23   [18] *Disability Advocates, Inc. v. Patterson*, 653 F. Supp. 2d 184 (E.D.N.Y. 2009), is
an instructive case. There, the district court concluded that state institutions in New
24   York City for adults with mental disabilities were "not the most integrated setting
appropriate to the needs of [individuals with mental illness], especially compared to
25   supported housing, in which individuals with mental illness live in apartments and
26   receive flexible support services as needed." *Id.* at 314, *vacated for lack of
associational standing*, *Disability Advocates, Inc. v. New York Coal. for Quality
27   Assisted Living, Inc.*, 675 F.3d 149, 162 (2d Cir. 2012)).

28

the United States supported the plaintiffs' motion for class certification, *id.* at 258, which the district court granted and which eventually led to a settlement with the State of New Hampshire. [19]

Moreover, the Settlement does not describe whether or how mental health professionals or public health professionals will determine whether community placement is appropriate. *Olmstead*, 527 U.S. at 607. The Settlement refers to institutionalizing prisoners who have an "intense need for assistance" or a "moderate need for assistance, as described in DMH policies." Settlement ¶¶ 34(b)(iii)-(iv). These categories of need are not defined in the Settlement or in DMH policies or glossaries that are accessible to the public. [20] Nor are they known by subject matter experts who are familiar with DMH policies. Wenzel ¶ 27(noting that the terms are not terms she recognizes and that the Settlement does not indicate who will make the critical determination, what credentials that person will have, and what evaluative instrument will be used). This, together with the institutionalization provisions themselves, violates the ADA's integration mandate.

### 3. The Proposed Settlement Will Practically Impair Plaintiff-Intervenors' Ability To Protect Their Interests

The relevant inquiry for the third prong of the test for intervention as of right is whether a "consent decree 'may' impair rights 'as a practical matter' rather than whether the decree will 'necessarily' impair them." *City of Los Angeles*, 288 F.3d at

---

[19] *See, e.g.*, Hartz Exh. C, Findings Letter, Re: United States' Investigation of the New Hampshire Mental Health System Pursuant to the Americans with Disabilities Act, April 7, 2011. The letter concludes that the State of New Hampshire "fails to provide services to qualified individuals with mental illness in the most integrated setting appropriate to their needs, in violation of the ADA. This has led to the needless and prolonged institutionalization of individuals with disabilities who could be served in more integrated settings in the community with adequate services and supports." *Id.* at 2.

[20] Putative intervenors requested those documents from the parties but to date have not received them. Hartz ¶ 10.

401; *see also Berg*, 268 F.3d at 822 ("We follow the guidance of Rule 24 advisory committee notes that state that '[i]f an absentee would be substantially affected in a practical sense by the determination made in an action, he should, as a general rule, be entitled to intervene.'").

Regardless, any distinction here between consent decrees that "may impair" and those that "necessarily impair" is academic. For the reasons explained in the prior section, Paragraph 34 will in fact impair Plaintiff-Intervenors' right to be free from Paragraph 34's numerous ADA violations.

### 4.    The Parties Do Not Adequately Represent The Interveners' Interests

There are three factors determining the adequacy of representation: "(1) whether the interest of a present party is such that it will undoubtedly make all of a proposed intervener's arguments; (2) whether the present party is capable and willing to make such arguments; and (3) whether a proposed intervener would offer any necessary elements to the proceeding that other parties would neglect." *Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003). "The burden of showing inadequacy of representation is 'minimal' and satisfied if the applicant can demonstrate that representation of its interests 'may be' inadequate." *Citizens for Balanced Use*, 647 F.3d at 898.

Plaintiff-Intervenors easily satisfy this prong of the intervention-as-of-right test. Both the United States and the County have signed on to a Settlement that itself violates Plaintiff-Intervenors' rights under Title II of the ADA. Neither can even arguably be deemed an adequate representative of those whose rights the parties have chosen to ignore. More specifically, the parties will not "undoubtedly make" the ADA challenge to their own Settlement that Plaintiff-Intervenors seek to raise; they will are not "capable and willing to make such arguments." To the contrary, the parties have mutually agreed to "defend the provisions" of the Settlement. Settlement ¶ 120. Consequently, Plaintiff-Intervenors will "offer … necessary

-24-

1 | elements to the proceeding that the other parties would neglect." *See Arakaki*, 324

2 | F.3d at 1086.

3 | **B.      Plaintiff-Intervenors Should Be Permitted to Intervene**

4 |     Alternatively, Plaintiff-Intervenors move for permissive intervention under

5 | Federal Rule of Civil Procedure Rule 24(b)(1)(B). The Ninth Circuit applies three

6 | threshold requirements to a motion for permissive intervention: (1) the intervenor's

7 | claim must share a common question of law or fact with the main action; (2) the

8 | motion must be timely; and (3) the court must have an independent basis for

9 | jurisdiction over the applicant's claims. *Donnelly v. Glickman*, 159 F.3d 405, 412

10 | (9th Cir. 1998). The district court also considers whether intervention will "unduly

11 | delay the main action or will unfairly prejudice the existing parties." *Id.*

12 |     All of these requirements are satisfied here, as described above in Section

13 | III.A. Plaintiff-Intervenors raise cognizable ADA claims, as described above in

14 | Section III.A.2 and in the accompanying Complaint in Intervention. The motion is

15 | timely as explained above in Section III.A.1, and permitting intervention at this

16 | early stage of the lawsuit, less than two months after the Complaint and Settlement

17 | papers were filed and as soon as possible after Plaintiff-Intervenors learned of the

18 | action, would work no prejudice against the parties that is not outweighed by

19 | Plaintiff-Intervenors' interests. Finally, the Court has an independent basis for

20 | jurisdiction over the Plaintiff-Intervenors' ADA claims under 28 U.S.C. § 1331.

21 | **IV.CONCLUSION**

22 |     Plaintiff-Intervenors respectfully request that this Court grant Plaintiff-

23 | Intervenors' Motion to Intervene as a matter of right or, alternatively, permissively.

24 |

25 |

26 |

27 |

28 |

NOTICE OF MOTION AND MOTION TO INTERVENE BY POWERS ET AL AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

1   DATED: September 28, 2015

2                           MUNGER, TOLLES & OLSON LLP
3                               BRADLEY S. PHILLIPS
                                GRANT A. DAVIS-DENNY
4                               EMILY R.D. MURPHY

5

6                           By:        /s/ Grant Davis-Denny
7                               GRANT A. DAVIS-DENNY
                               Attorneys for Plaintiff-Intervenors
8

9

10                          By:        /s/ Emily Murphy
11                              EMILY R.D. MURPHY
                               Attorneys for Plaintiff-Intervenors
12

13

14                          PUBLIC COUNSEL
15                              MARK ROSENBAUM
                                GARY BLASI
16                              ANNE RICHARDSON
17                              ADELAIDE ANDERSON
                                ALISA HARTZ
18

19

20                          By:        /s/ Mark Rosenbaum
21                              MARK ROSENBAUM
                               Attorneys for Plaintiff-Intervenors
22

23

24                          By:        /s/ Alisa Hartz
25                              ALISA HARTZ
                               Attorneys for Plaintiff-Intervenors
26

27

28

NOTICE OF MOTION AND MOTION TO INTERVENE BY POWERS ET AL AND
MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF