1  BRADLEY S. PHILLIPS (State Bar No. 85263)
   brad.phillips@mto.com
2  GRANT A. DAVIS-DENNY (State Bar No. 229335)
   grant.davis-denny@mto.com
3  EMILY R.D. MURPHY (State Bar No. 291022)
   emily.murphy@mto.com
4  MUNGER, TOLLES & OLSON LLP
   355 South Grand Avenue
5  Los Angeles, California 90071-1560
   Telephone:  (213) 683-9100
6  Facsimile:   (213) 687-3702

7  MARK D. ROSENBAUM (SBN 59940)
   mrosenbaum@publiccounsel.org
8  GARY BLASI (SBN 70190)
   gblasi@publiccounsel.org
9  ANNE RICHARDSON (SBN 151541)
   arichardson@publiccounsel.org
10 ADELAIDE ANDERSON (SBN 270966)
   aanderson@publiccounsel.org
11 ALISA HARTZ (SBN 285141)
   ahartz@publiccounsel.org
12 PUBLIC COUNSEL LAW CENTER
   610 S. Ardmore Avenue
13 Los Angeles, California 90005
   Telephone:  (213) 385-2977
14 Facsimile:   (213) 385-9089

15 Attorneys for Plaintiff-Intervenors

16              UNITED STATES DISTRICT COURT

17        CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 15-cv-05903 |
| Plaintiff, | **NOTICE OF LODGING OF COMPLAINT IN INTERVENTION** |
| vs. | **Filed concurrently with** |
| COUNTY OF LOS ANGELES AND LOS ANGELES COUNTY SHERIFF JIM MCDONNELL, in his Official Capacity, | **NOTICE OF MOTION AND MOTION TO INTERVENE AS PLAINTIFFS BY TERESA POWERS, ET AL.** |
| Defendants. | Judge:  Hon. Dean D. Pregerson |
| TERESA POWERS, DAVID PENN, TIMOTHY POLK, MARK SARNI, DERRICK THOMAS, DARSEL WHITFIELD, ROYAL WILLIAMS, AND LEPRIEST VALENTINE | Date:    October 26, 2015<br>Time:   10:00 am |
| Movants. | |

1          PLEASE TAKE NOTICE that Plaintiffs-Intervenors lodge herewith the

2  attached Complaint in Intervention.

3  DATED:  September 28, 2015

4                                      MUNGER, TOLLES & OLSON LLP
5                                          GRANT A. DAVIS-DENNY
                                           BRADLEY S. PHILLIPS
6                                          EMILY R.D. MURPHY

7

8

9                             By:      /s/ Grant Davis-Denny
                                   _____
10                                     GRANT A. DAVIS-DENNY
                                   Attorneys for Plaintiff-Intervenors
11

12

13                            By:      /s/ Emily Murphy
                                   _____
14                                     EMILY R.D. MURPHY
                                   Attorneys for Plaintiff-Intervenors
15

16  PUBLIC COUNSEL

17                                         MARK ROSENBAUM
                                           GARY BLASI
18                                         ANNE RICHARDSON
                                           ADELAIDE ANDERSON
19                                         ALISA HARTZ

20

21

22                            By:      /s/ Mark Rosenbaum
                                   _____
23                                     MARK ROSENBAUM
                                   Attorneys for Plaintiff-Intervenors
24

25

26                            By:      /s/ Alisa Hartz
                                   _____
27                                     ALISA HARTZ
                                   Attorneys for Plaintiff-Intervenors
28

# [PROPOSED] COMPLAINT IN INTERVENTION

1  BRADLEY S. PHILLIPS (State Bar No. 85263)
   brad.phillips@mto.com
2  GRANT A. DAVIS-DENNY (State Bar No. 229335)
   grant.davis-denny@mto.com
3  EMILY R.D. MURPHY (State Bar No. 291022)
   emily.murphy@mto.com
4  MUNGER, TOLLES & OLSON LLP
   355 South Grand Avenue
5  Los Angeles, California 90071-1560
   Telephone:  (213) 683-9100
6  Facsimile:   (213) 687-3702

7  MARK D. ROSENBAUM (SBN 59940)
   mrosenbaum@publiccounsel.org
8  GARY BLASI (SBN 70190)
   gblasi@publiccounsel.org
9  ANNE RICHARDSON (SBN 151541)
   arichardson@publiccounsel.org
10 ADELAIDE ANDERSON (SBN 270966)
   aanderson@publiccounsel.org
11 ALISA HARTZ (SBN 285141)
   ahartz@publiccounsel.org
12 PUBLIC COUNSEL LAW CENTER
   610 S. Ardmore Avenue
13 Los Angeles, California 90005
   Telephone:  (213) 385-2977
14 Facsimile:   (213) 385-9089

15 Attorneys for Plaintiff-Intervenors

16              UNITED STATES DISTRICT COURT

17     CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

18 UNITED STATES OF AMERICA,            Case No. 15-cv-05903

19              Plaintiff,               **[Proposed] COMPLAINT IN
                                         INTERVENTION**
20        vs.
                                         Judge:  Hon. Dean D. Pregerson
21 COUNTY OF LOS ANGELES AND LOS
   ANGELES COUNTY SHERIFF JIM
22 MCDONNELL, in his Official Capacity,

23              Defendants.

24 ─────────────────────────────────

25 TERESA POWERS, DAVID PENN,
   TIMOTHY POLK, MARK SARNI,
26 DERRICK THOMAS, DARSEL
   WHITFIELD, ROYAL WILLIAMS, AND
27 LEPRIEST VALENTINE,

28              Plaintiff-Intervenors.

                                              15-cv-05903

# **INTRODUCTION**

1. Plaintiff-Intervenors are individuals with mental illnesses and disabilities whom Los Angeles County frequently cycles between its jails and streets. They seek to intervene in this matter to remedy violations of the Americans with Disabilities Act ("ADA") in the County and Department of Justices' Joint Settlement Agreement ("Settlement"). Paragraph 34 of the Settlement dictates how persons with mental disabilities will be discharged from the County's jails—the most important stage of the County's jail-to-streets-to-jail cycle. Left uncorrected, these discharge provisions will lead to pervasive ADA violations in at least three ways:

2. *First*, the Settlement facially discriminates against people with certain mental disabilities by limiting the class of individuals who are eligible for discharge planning to those who have a "serious mental illness" as defined in the Settlement. Settlement ¶ 34. That definition expressly *excludes* those individuals whose mental disabilities are the result of personality disorders (except when "associated with serious or recurrent significant self-harm"), substance abuse and dependence disorders, dementia, or developmental disabilities. *Id.* ¶ 15(aa). The Settlement also excludes from most discharge planning those who have been in jail for seven days or fewer. *Id.* ¶ 34(a). These arbitrary exclusions violate the ADA's prohibition on "[p]rovid[ing] different or separate … services …to any class of individuals with disabilities than is provided to others …." 28 C.F.R. § 35.130(b)(1)(i), (iv).

3. *Second*, the discharge provisions in Paragraph 34 run afoul of the ADA because they deny disabled persons meaningful access to public services and benefits in at least two ways: (1) the Settlement's plan for connecting released prisoners with needed medication and services—that is, by merely handing out a prescription or a referral—is meaningless for many people with serious mental disabilities because, owing to their disabilities, they have no realistic hope of finding their way to those who can fulfill their medication or service needs; and (2) the

Settlement allows the County to refer seriously mentally ill individuals to services without requiring that the County confirm that such services are available. The Settlement therefore contravenes the ADA's prohibition on "failure[s] to make reasonable modifications in … procedures … necessary to afford … services … to individuals with disabilities." 42 U.S.C. § 12182(b)(2)(A).

4.      *Third*, the Settlement violates the integration mandate of the ADA to deliver "services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). Paragraph 34(b)(iii) of the Settlement contemplates that the County will provide "direct linkage" to restrictive institutional settings for persons with "intense need for assistance" (a category that is undefined within the Settlement). This provision, if implemented, would lead to the placement of certain disabled individuals in non-integrated environments in violation of the ADA's integration mandate.

5.      As a result, under the terms of the Settlement, the County will be able to continue its current practices of discharging mentally disabled individuals from the County jails without their medication and without ensuring that they obtain desperately needed medical and psychiatric services to ameliorate their mental illnesses. Severely mentally disabled people will continue to be left to wander and attempt to survive our community's meanest streets in no state to do so. The mentally disabled can still be handed referral lists to services that they may be incapable of deciphering, with no resources to access them even if they could. However well-intentioned the decree, it does not reflect the daily lives of the mentally disabled who live on our streets for lack of anywhere else to reside, or the service providers and community advocates who work heroically to try to make the lives of the mentally disabled more tolerable.

6.      The narratives of the Intervenors illustrate the harsh consequences of nonexistent or inadequate discharge planning. Each is severely mentally disabled: schizophrenic, bipolar, manic depressive, addicted, often with co-occurring

disabilities. They have at best minimal financial or family resources to draw upon and, as a result, get by as they must on the streets. In the past, they have been discharged many times with, as under the Settlement, no or functionally no access to the care and services their conditions require. Their conditions only deteriorate further, their chances for survival diminished with each discharge, unless they have a lucky break of getting connected with a caring individual who will navigate them through the complex web of existing services and benefits. Making it back to mental health and a stable living situation becomes all but impossible without individualized assistance.

## JURISDICTION AND VENUE

7.     The Court has subject matter jurisdiction over this case pursuant to 28 U.S.C. § 1331 because it arises under the laws of the United States.

8.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)-(c).

## PARTIES

9.     Plaintiff is the United States of America.

10.     Plaintiff-Intervenor Teresa Powers is a 45 year-old homeless woman who lives in the County of Los Angeles. She has been incarcerated at least four times, most recently in the Century Regional Detention Center, and she has been arrested over 15 times (primarily for drug offenses), including four times in the past year. She is on probation and lives on the streets. She suffers from paranoid schizophrenia, bipolar disorder, manic depressive disorder, cancer and heart problems. Because of the number and nature of her offenses, her continued homelessness, her mental illness, and her history of substance abuse, she has a very high chance of being incarcerated again at which point the discharge language in the Settlement Agreement makes it not only likely but certain that she will again suffer injury in violation of the ADA.

11.     Plaintiff-Intervenor Royal Williams is 44 year-old a homeless man who lives in the County of Los Angeles. He has been arrested five to seven times

(primarily for drug offenses), including once this year, and is on probation. He has been homeless or incarcerated for 20 years; he currently has a bed at a shelter. He suffers from "bipolar schizophrenia," depression, and asthma and has a history of substance abuse. Because of the number and nature of his offenses, his continued homelessness, his mental illness and his history of substance abuse, he has a very high chance of being incarcerated again at which point the discharge language in the Settlement Agreement makes it not only likely but certain that he will again suffer injury in violation of the ADA.

12.     Plaintiff-Intervenor Lepriest Valentine is a 42 year-old homeless man who lives in the County of Los Angeles. He has been incarcerated at least three times for petty thefts of small items he could sell to buy food and was last released in November 2014. He is on probation. He has lived in Skid Row since 2013 and currently has a bed at a shelter. He suffers from depression, schizophrenia, and bipolar disorder and has a history of substance abuse. Because of the nature of his offenses, his continued homelessness, his mental illness, and his history of substance abuse, he has a very high chance of being incarcerated again at which point the discharge language in the Settlement Agreement makes it not only likely but certain that he will again suffer injury in violation of the ADA.

13.     Plaintiff-Intervenor Mark Sarni is a 54 year-old homeless man who lives in the County of Los Angeles. He has been arrested hundreds of times, primarily for drug offenses. He currently has a bed at a shelter. He suffers from paranoid schizophrenia, bipolar disorder, depression, anxiety, and kidney failure. He was addicted to heroin for forty years and still struggles with addiction to crack cocaine. Because of the number and nature of his offenses, his continued homelessness, his mental illness, and his history of substance abuse, he has a very high chance of being incarcerated again at which point the discharge language in the Settlement Agreement makes it not only likely but certain that he will again suffer injury in violation of the ADA.

14.     Plaintiff-Intervenor Derrick Thomas is a 55 year-old homeless man who lives in the County of Los Angeles. He has been arrested about 20 times, primarily for drug offenses. He has served four jail terms since 2013 and is on probation. He currently has a bed at a shelter. He suffers from paranoid schizophrenia, post-traumatic stress disorder, and traumatic brain injury and has a history of substance abuse. Because of the number and nature of his offenses, his continued homelessness, his mental illness, and his history of substance abuse, he has a very high chance of being incarcerated again at which point the discharge language in the Settlement Agreement makes it not only likely but certain that he will again suffer injury in violation of the ADA.

15.     Plaintiff-Intervenor Darsel Whitfield is a 50 year-old homeless woman who lives in the County of Los Angeles. She has been in County jail about seven times, primarily for drug offenses, most recently in 2014. She is on probation. She currently has a bed at a shelter. She suffers from manic depression, bipolar disorder, anxiety, and schizoaffective disorder and has a history of substance abuse. Because of the nature of her offenses, her continued homelessness, her mental illness, and her history of substance abuse, she has a very high chance of being incarcerated again at which point the discharge language in the Settlement Agreement makes it not only likely but certain that she will again suffer injury in violation of the ADA.

16.     Plaintiff-Intervenor David Penn is a 46 year-old homeless man who lives in the County of Los Angeles. He has served five sentences in jail and four sentences in prison, primarily for drug offenses. He began using crack cocaine as a teenager and continued until earlier this year. He was last released from Los Angeles County jail in February 2015. He currently has a bed at a shelter. He suffers from bipolar disorder, depression, and schizoaffective disorder. Because of the number and nature of his offenses, his continued homelessness, his mental illness, and his history of substance abuse, he has a very high chance of being incarcerated again at

COMPLAINT IN INTERVENTION

which point the discharge language in the Settlement Agreement makes it not only likely, but certain that he will again suffer injury in violation of the ADA.

17.     Plaintiff-Intervenor Timothy Polk is a 54 year-old homeless man who lives in the County of Los Angeles. He has been to Los Angeles County jail "dozens and dozens" of times, most recently in June 2015. He currently has a bed at a shelter. He suffers from epilepsy, bipolar disorder, and schizoaffective disorder. Because of the number of his offenses, his continued homelessness, and his mental illness, he has a very high chance of being incarcerated again at which point the discharge language in the Settlement Agreement makes it not only likely, but certain that he will again suffer injury in violation of the ADA.

18.     Because of their status as mentally ill persons with no permanent home, some of whom have substance abuse issues, Plaintiff-Intervenors are at serious risk of being arrested and re-incarcerated for any of the numerous municipal code sections that outlaw certain behaviors in public, such as public urination, possession of an open container of alcohol, keeping property on the sidewalk, violations of probation, and similar infractions.

19.     Defendant LOS ANGELES COUNTY (the "County") is a governmental subdivision created under the laws of the State of California and governed by the Los Angeles County Board of Supervisors. The County owns and, through Defendant LOS ANGELES COUNTY SHERIFF JIM MCDONNELL (the "Sheriff"), operates, the Jails, which consist of eight facilities located throughout the County. The County, through the Los Angeles County Board of Supervisors, has responsibility for funding the operation of the Jails.

20.     Defendant LOS ANGELES COUNTY SHERIFF JIM MCDONNELL is the Los Angeles County Sheriff, an independently elected constitutional officer not under the County Board of Supervisors. CA. Const. Art. 11, § 1(b). The Sheriff has responsibility for the security and custody operations of the Jails and for

1  protecting the safety of prisoners in the Jails. The Sheriff is sued in his official

2  capacity only.

3      21.     The County and The Sheriff are together responsible for the conditions

4  of confinement and health and safety of persons incarcerated at the Jails. The

5  County, through its Department of Mental Health, provides mental health services to

6  prisoners in the Jails.

7      22.     Defendants are legally responsible, in whole or in part, for the

8  operation and conditions of the Jails and for the health and safety of persons

9  incarcerated there. The County owns the Jails; the Sheriff is responsible for

10  maintaining the Jails; the Sheriff is responsible for the security and custody

11  operations of the Jails; the County, through its Department of Mental Health, is

12  responsible for providing mental health care services to prisoners in the Jails; and

13  the County is responsible for funding the operations and maintenance of the Jails.

14  This action concerns the administration of persons confined at the Jails, which

15  houses adult male and female prisoners who are felons, gross misdemeanants,

16  misdemeanants, pre-trial detainees, witnesses, or others being detained in protective

17  custody. Hereinafter, both Defendants shall be collectively referred to as "the

18  County."

19      23.     At all relevant times, Defendants or their predecessors in office have

20  acted or failed to act, as alleged herein, under color of state law.

21                          **INTERVENTION**

22      24.     Plaintiffs-Intervenors satisfy the Fed. R. Civ. P. 24(a) standard for

23  intervention as a matter of right: as set forth more fully below, (1) the request is

24  timely; (2) Plaintiffs-Intervenors claim a significant protectable interest relating to

25  the property or transaction that is the subject of the action; (3) Plaintiffs-Intervenors

26  are so situated that disposition of the action may as a practical matter impair or

27  impede their ability to protect their interests; and (4) Plaintiffs-Intervenors interests

28  are not adequately represented by the parties to the action.

25.     Plaintiff-Intervenors are moving to intervene less than two months after the action was filed, when Plaintiff-Intervenors first learned of the unlawful settlement provisions.

26.     Prior to the filing of this action and the Settlement, Plaintiff-Intervenors had no notice of the negotiations leading to the Settlement. Upon learning of it, Plaintiff-Intervenors diligently investigated and prepared to intervene to address the illegality of Paragraph 34 of the Settlement. The Court approved the Settlement, however, less than a month after the undersigned first learned of its existence. Plaintiff-Intervenors have intervened expeditiously and without delay at the earliest practicable stage of the proceedings.

27.     Plaintiff-Intervenors have significant interests in meaningful and integrated access to public services that are protected by the ADA, which are implicated by the Complaint in this matter, but which are impaired by Paragraph 34 of the Settlement. Absent intervention and subsequent modification, Paragraph 34 of the Settlement will impair Plaintiff-Intervenors' significant protected interests in avoiding discrimination prohibited by Title II of the ADA, as set forth in paragraphs 73-89 of this Complaint.

28.     Plaintiff-Intervenors' right to be free from ADA violations will be impaired as a practical matter by Paragraph 34 of the Settlement.

29.     The present parties do not adequately represent Plaintiff-Intervenors. Both the United States and the County have agreed to a Settlement that itself violates Plaintiff-Intervenors' rights under Title II of the ADA. Neither is an adequate representative of the very persons whose rights are impaired by the Settlement to which they agreed. The parties are also bound by Paragraph 120 of the Settlement to defend its terms, including Paragraph 34, and thus each is bound to dispute that the Settlement violates Plaintiff-Intervenors' rights under the ADA.

30.     Alternatively, Plaintiffs-Intervenors satisfy the Fed. R. Civ. P. 24(b)(1)(B) standard for permissive intervention. Plaintiff-Intervenors raise

cognizable ADA claims. The motion is timely, and permitting intervention at this early stage of the lawsuit, less than two months after the Complaint and Settlement papers were filed and as soon as possible after Plaintiff-Intervenors learned of the action, would work no prejudice against the parties. Finally, the Court has an independent basis for jurisdiction over the Plaintiff-Intervenors' ADA claims under 28 U.S.C. § 1331.

## PLAINTIFF-INTERVENORS

### Teresa Powers

31.     Plaintiff-Intervenor Teresa Powers ("Ms. Powers") is 45 years old and has not spoken to her children in 13 years. She has been diagnosed with paranoid schizophrenia, bipolar disorder, and manic depressive disorder. Ms. Powers is an alcoholic. Her other medical conditions include cancer and heart problems. Ms. Powers constantly hears voices and sometimes talks to trees. She has been placed on involuntary psychiatric holds pursuant to Welfare and Institutions Code § 5150 approximately 15 times. She has been arrested between 10 and 15 times during the 14 years that she has lived on the streets of Los Angeles—mostly for drug offenses—including four times in the past year for alleged probation violations.

32.     Earlier this year, Ms. Powers was incarcerated in the Century Regional Detention Facility ("Lynwood"). She received psychotropic medications while she was in jail. Upon release, she was given 15 pills, which she lost, and was not referred to any medical, mental health, or social services. Ms. Powers has not had access to medication since her release from jail, except during subsequent hospitalizations, which were harrowing experiences for her. Ms. Powers self-medicates with alcohol when she does not have access to medication. Ms. Powers knows that she can get medication if she goes to Exodus, Eastside Urgent Care Center, which is a psychiatric urgent-care center, but she is afraid to go there because she does not want to be locked up again.

33.     Ms. Powers currently lives on the streets. Her mental health and physical conditions continue to worsen.

**Royal Williams**

34.     Plaintiff-Intervenor Royal Williams ("Mr. Williams") has been homeless or incarcerated for over 20 years. He is 44 years old, and has been arrested five to seven times. He has been released from County jails at least twice, including in 2015. Mr. Williams has been living on Skid Row since 2013. He has lived in a tent and slept under cardboard.

35.     Mr. Williams has been diagnosed with "bipolar schizophrenia" and depression, and he takes psychotropic medications including Risperdal and Atarax. In 2014, he was detained under an involuntary psychiatric hold pursuant to Welfare and Institutions Code § 5150 after he tried to commit suicide. Mr. Williams believes that his family does not trust him, and his mother has custody of his eight-year-old son.

36.     In approximately April of 2015, Mr. Williams was sitting in front of his tent on Fifth Street near Crocker Street. A police car pulled up, and an officer asked if he was on probation or parole. When the officers determined that Mr. Williams was in violation of his probation, they arrested him. Mr. Williams was forced to leave behind all of his belongings, including his medications.

37.     In jail, Mr. Williams was housed in the mental health unit.

38.     Upon release, Mr. Williams was handed several pamphlets with referrals on them. He estimates that the pamphlets listed 50 referrals in total. Mr. Williams did not know which referrals would be relevant to him or how to access the services, so he threw the pamphlets away.

39.     The jail provided Mr. Williams with a prescription for Risperdal, but Mr. Williams did not have any money, his MediCal coverage had been suspended, and he did not know that there are places where he could fill the prescription for free. As a result, Mr. Williams went without necessary psychotropic medication for

COMPLAINT IN INTERVENTION

over six weeks. Without his medications and the discharge care he required, Mr. Williams experienced suicidal ideation and sank into substance abuse, fighting, and stealing.

40.    Luckily, another homeless person told Mr. Williams about the Lamp Community shelter. Mr. Williams then worked with his probation officer to obtain a bed at Lamp Community. Mr. Williams is currently living at Lamp but has only a shelter bed.

**Lepriest Valentine**

41.    Plaintiff-Intervenor Lepriest Valentine ("Mr. Valentine") is 42 years old. He was about 35 years old when he began to experience debilitating depression and anxiety and to hear his father's voice telling him that he was worthless. Mr. Valentine withdrew from his family and became homeless when he could no longer work as a result of his mental condition. He has slept in shelters and on the street.

42.    Mr. Valentine has been diagnosed with depression, schizophrenia, and bipolar disorder, for which he takes or has taken Lithium, Risperdal, and Remeron. When Mr. Valentine does not take his medications, he hears voices, cannot sleep, cannot eat, and experiences anxiety.

43.    Mr. Valentine has served three sentences in County facilities and been arrested at least twice more in Los Angeles County. During his time in Skid Row, Mr. Valentine has cycled in and out of jail for petty thefts: he stole batteries and toiletries from drug stores so that he could sell them and use the money to buy food. He has not been given discharge planning services on his release from jail. In fact, on one occasion, he failed to appear in court because battling the symptoms of his mental illness and needing to find food and shelter meant that court was not a priority for him.

44.    The County housed Mr. Valentine in the mental health unit of Twin Towers Correctional Facility ("Twin Towers") and provided him with psychotropic medication while he was incarcerated. The County did not provide Mr. Valentine

with any referrals, medications, or prescriptions when he was released. Mr. Valentine simply asked another inmate how to get back to Skid Row and walked there.

45.     A cousin who is also homeless told Mr. Valentine about Lamp Community. With a bed at Lamp Community, Mr. Valentine now takes his medications regularly. He attends mental health classes, including a class on how to be a peer advocate to other people with co-occurring disorders. After taking that class, Mr. Valentine obtained a part-time job at a drop-in center, and he is saving up for an apartment. Next spring, Mr. Valentine plans to enroll in a course to become a certified substance abuse counselor.

46.     Mr. Valentine has been cited for riding the Metro without paying a fare, and he fears that he may have outstanding warrants as a result. He stays indoors at night and avoids certain streets, in the hope that no police officers will stop him and ask him if he is on probation or parole. He fears that, if he answers yes, they will run his ID, find the warrants, and take him back to jail.

**Mark Sarni**

47.     Plaintiff-Intervenor Mark Sarni ("Mr. Sarni") is 54 years old and has been homeless most of his life. He has been arrested hundreds of times in the past 35 years. In the 1990s, Mr. Sarni was diagnosed with paranoid schizophrenia, bipolar disorder, depression, and anxiety. He now takes Thorazine, Remeron, Seroquel, and Buspar.

48.     Mr. Sarni was a heroin addict for forty years. He has served at least three sentences in County facilities since 2013, all for violating his probation. In 2014, Mr. Sarni served 90 days in County jail. The County housed Mr. Sarni in the mental health unit at the Twin Towers and provided him with psychotropic medications. While he was incarcerated, the County did blood tests on Mr. Sarni. Just before his release, Mr. Sarni was told that there was something "seriously wrong" with his blood and that he needed to go to an emergency room. The County

then released Mr. Sarni with only a prescription for his necessary psychotropic medications.

49.     Ten hours after his release onto the streets, Mr. Sarni flatlined. He had gone to Pershing Square station to panhandle. The security guards kept telling him to leave, and he kept falling down. Then Mr. Sarni died for four minutes. He was revived by emergency medical services. Mr. Sarni is now on dialysis because of his failed kidneys and likely has less than two years to live.

50.     Mr. Sarni was given a referral to a housing program for which he did not qualify.

51.     Mr. Sarni has stopped using heroin. He is staying at Lamp Community and is saving up for an apartment; he hopes to have stable housing in the next few months. He has just been taken off probation. Lamp Community has helped Mr. Sarni with matters such as obtaining ID and a copy of his birth certificate. Mr. Sarni tries to be independent but appreciates that someone will assist him when he needs help.

**Derrick Thomas**

52.     Plaintiff-Intervenor Derrick Thomas ("Mr. Thomas") is a 55-year-old veteran of the Gulf War, in which he served two tours as a First Sergeant in the Army. Mr. Thomas has been diagnosed with Post Traumatic Stress Disorder and 10 years ago was diagnosed with paranoid schizophrenia. Mr. Thomas is a former boxer who has suffered numerous head injuries. He takes psychotropic medications, including Seroquel and Celexa. Without his medications, Mr. Thomas cannot be in crowds and may have potentially violent reactions to perceived threats.

53.     Mr. Thomas has been arrested approximately 20 times and served four sentences in County facilities since 2010. At least four of his sentences were for drug-related offenses, and several others were for probation violations. He has never received mental health treatment while in jail, despite having prescriptions with him upon arrest and telling County officials how to contact his previous health providers.

1  Without his medications, Mr. Thomas's symptoms became unbearable to the point

2  that he wants to kill himself.

3       54.    Mr. Thomas was released from jail earlier this year around 2:00 a.m.

4  without being offered any services. He had no help and did not know where to go. It

5  was cold out and he had only a t-shirt; none of his belongings, including his

6  identification and prescription medications, had been returned to him on his release.

7  For six weeks, he slept either under cardboard or in a shelter. He was unable to get

8  medication because he had no identification. Without identification he could not

9  prove who he was, and without money he could not get new identification. It took

10  Mr. Thomas 10 weeks to obtain more medication after he was released.

11       55.    Mr. Thomas is saving up for an apartment and is working hard not to

12  come into contact with the police, so that he can be taken off probation at his next

13  hearing on October 28.

14  **Darsel Whitfield**

15       56.    Plaintiff-Intervenor Darsel Whitfield ("Ms. Whitfield") is 50 years old.

16  Ms. Whitfield has three daughters. She worked for over 25 years as a nursing

17  assistant and in other healthcare positions. Then, in 2010, her mental illness

18  overwhelmed her. She was depressed, could no longer be around other people, and

19  lost control of her emotional responses. In 1994, Ms. Whitfield was diagnosed with

20  manic depression, bipolar disorder, anxiety, and schizoaffective disorder. Since

21  then, she has taken Prozac, Seroquel, and various anxiety medications.

22       57.    Ms. Whitfield has been in County jails about seven times. In fact, her

23  mental illness was first diagnosed while she was in jail. In early 2014, she spent a

24  month in Lynwood. Lynwood officials placed Ms. Whitfield in the mental health

25  unit but would not give her any of her medications. They would give her only

26  Tylenol and even denied her Benadryl when she asked for it to help her sleep. Ms.

27  Whitfield was scared and frantic, and she paced and cried.

28

58.    Upon release, Ms. Whitfield was not given any medications, prescriptions, or information about where to go. She found herself living between shelters and the streets. She felt completely desolate. A few months later, someone in her Alcoholics Anonymous group happened to tell Ms. Whitfield about Lamp Community. She has stayed at Lamp Community since June and is in the process of obtaining a Single Room Occupancy unit. Lamp Community has also helped her apply for Supplemental Security Income, and she is waiting for a response. This is not the first time Ms. Whitfield has applied, but it is the first time she has been stable and supported enough to be able to follow through with the application. Ms. Whitfield hopes to move into her own apartment in the next few weeks.

**David Penn**

59.    Plaintiff-Intervenor David Penn ("Mr. Penn") is 46 years old and began using drugs when he was nine years old. He has lived in Skid Row since 2010, sleeping on the streets, in tents, and under trees. In 2011, Mr. Penn was diagnosed with bipolar disorder and depression. While he was living on the street, Mr. Penn often forgot to take his medication (Abilify and Zoloft) and had it stolen from him while he slept. More recently, he was diagnosed with schizoaffective disorder, and he now takes Seroquel.

60.    Mr. Penn has been to jail five times and prison four times. In January 2015 he was arrested when he allegedly shoplifted toiletries for personal use. He was housed in the mental health unit at Twin Towers for three weeks and then abruptly released at 11:00 p.m. onto the street with no referrals or other assistance. Mr. Penn immediately sought out drugs to help him forget the experience of being incarcerated, including the fresh memories of another inmate trying to hang himself and the sounds of him choking. He had nowhere to stay and walked the streets all night.

61.    Since March 2015, Mr. Penn has had more stable housing. He stayed at the Weingart Center for 90 days, slept on the streets for a few weeks, and then

COMPLAINT IN INTERVENTION

1 obtained a bed at Lamp Community. He has been drug-free and sober since March.
2 As a result, he has reconnected with his family.

3     62.    Mr. Penn is about to start learning a trade as an underwater welder, and
4 he writes poetry. He would like to make a documentary about Skid Row.

5 **Timothy Polk**

6     63.    Plaintiff-Intervenor Timothy Polk ("Mr. Polk") is 54 years old. He was
7 first institutionalized as a teenager and has been to prison seven times. He has been
8 incarcerated in County jails dozens of times.

9     64.    Mr. Polk has been homeless for approximately 20 years and has been
10 diagnosed with epilepsy, bipolar disorder, and schizoaffective disorder. He has also
11 suffered traumatic brain injuries. He takes Depakote, Paxil, and Risperdal. Without
12 his medication, Mr. Polk experiences heightened anxiety and depression.

13     65.    Most recently, Mr. Polk was arrested in June of 2015 for allegedly
14 violating his probation. He was released without medication or any connection to
15 community resources. He had no possessions because he had been forced to leave
16 them all—including his medications, ID, and tent—behind on the sidewalk. As a
17 result, he was worse off than when he was arrested and had to begin the exhausting
18 process of rebuilding his life from scratch. He still lacks ID.

19     66.    Mr. Polk spent 10 days in the mental health unit at Twin Towers, where
20 he did not receive his psychotropic medications. The County did not provide Mr.
21 Polk with any assistance when he was released, and it took him several days to
22 obtain medication from Exodus. Mr. Polk relies on Exodus for most of his mental
23 health treatment.

24     **THE SETTLEMENT PROVISIONS AT ISSUE**

25     67.    On August 5, 2015, the United States filed a Complaint against the
26 County of Los Angeles and Sheriff Jim McDonnell in his official capacity
27 (collectively, "the County") for violations of 42 U.S.C. §§ 1997-1997j (the Civil
28 Rights of Institutionalized Persons Act or "CRIPA") and 42 U.S.C. § 14141 (the

Violent Crime Control and Law Enforcement Act of 1994). ECF Doc. 1. At the same time, the United States and the County filed the Settlement, ECF Doc. 4-1, and a Joint Stipulation and Proposed Order seeking the Court's approval of the Settlement. ECF. Doc 4. While Plaintiff-Intervenors were diligently investigating, collecting evidence, and preparing intervention papers, the Court approved the Settlement on September 3, 2015. ECF Docs. 13, 14.

68.     A key aspect of the United States' investigation and the resulting Complaint and Settlement is the need for appropriate discharge planning and services for mentally disabled prisoners. The United States alleges in its Complaint that the County has "repeatedly failed to provide adequate mental health services, including psychological and psychiatric services, to prisoners with serious psychiatric needs that are known or obvious due to, but not limited to, insufficient and inadequate … *discharge planning*." ECF Doc. 1, Compl. ¶ 23 (emphasis added).

69.     The Settlement purports to address the County's inadequate discharge planning in Paragraph 34, which provides in full:

> The County and the Sheriff will conduct discharge planning and linkage to community mental health providers and aftercare services for all prisoners with serious mental illness as follows:
>
> a.     For prisoners who are in Jail seven days or less, a preliminary treatment plan, including discharge information, will be developed.
>
> b.     For prisoners who are in Jail more than seven days, a QMHP [Qualified Mental Health Professional] will also make available:
>
> i.     For prisoners who are receiving psychotropic medications, a 30-day prescription for those medications will be offered either through the release planning process, through referral to a re-entry resource center, or through referral to an appropriate community provider, unless clinically contraindicated;
>
> ii.     In person consultation to address housing, mental health/medical/substance abuse treatment, income/benefits establishment, and

family/community/social supports. This consultation will also identify specific action to be taken and identify individuals responsible for each action;

    iii. If the prisoner has an intense need for assistance, as described in [County Department of Mental Health] policies, the prisoner will further be provided direct linkage to an Institution for Mental Disease ("IMD"), IMD-Step-down facility, or appropriately licensed hospital;

    iv. If the prisoner has a moderate need for assistance, as described in [County Department of Mental Health] policies, and as clinically appropriate to the needs of the prisoner, the prisoner will be offered enrollment in Full Service Partnership or similar program, placement in an Adult Residential Facility ("Board and Care") or other residential treatment facility, and direct assistance accessing community resources;

    v. If the prisoner has minimal needs for assistance, as described in [County Department of Mental Health] policies, the prisoner will be offered referrals to routine services as appropriate, such as General Relief, Social Security, community mental health clinics, substance abuse programs, and/or outpatient care/support groups.

    c. The County will provide a re-entry resource center with QMHPs available to all prisoners where they may obtain information about available mental health services and other community resources.

    70. Paragraph 15(aa) defines "serious mental illness" as follows: "'Serious mental illness' includes psychotic disorders, major mood disorders (including major depression and bipolar disorders), and any other condition (excluding personality disorders, substance abuse and dependence disorders, dementia, and developmental disability) that is associated with serious or recurrent significant self-harm, suicidal ideation, imminent danger to others, current grave disability, or substantially impaired ability to understand routine instructions, or that prevents access to available programs. Although personality disorders alone generally do not qualify as

1  serious mental illness, personality disorders associated with serious or recurrent

2  significant self-harm do qualify as serious mental illness."

3       71.    According to the County's Criminal Justice Mental Health Advisory

4  Board Report "A Blueprint for Change," ("MHAB Report"),[1] Institutions for Mental

5  Disease ("IMD") are "Licensed long term care psychiatric facilities which may be

6  locked, and are similar to hospital beds."

7       72.    The Settlement does not conform with applicable law because it

8  violates the ADA and Section 504 of the Rehabilitation Act.

9                    **FACTUAL ALLEGATIONS**

10                **Exclusion of Certain Disabled Persons**

11       73.    Paragraph 34 offers discharge planning only to persons with mental

12  disabilities of certain specified origins but expressly excludes others protected by

13  the ADA. It provides government services only to persons with "serious mental

14  illness," while denying discharge planning to those with "substance abuse and

15  dependence disorders, dementia, and developmental disability." Settlement

16  ¶¶ 15(aa), 34. Under the Settlement, it is not clear that persons with "substance

17  abuse and dependence disorders, dementia, and developmental disabilit[ies]" or with

18  personality disorders (except when "associated with serious or recurrent significant

19  self-harm") would receive any discharge planning services at all.

20       74.    Significant numbers of disabled individuals will be affected by the

21  Settlement's arbitrary discrimination among classes of disabled persons.

22  **Exclusion of Disabled Persons Who Have Been In Jail for Seven or Fewer Days**

23       75.    Prisoners who are in jail for seven or fewer days are excluded from

24  most of the Settlement's discharge planning services and are entitled only to a

25  "preliminary treatment plan, including discharge information." Settlement ¶ 34(a).

26  _____

27  [1] *See* MHAB Report, published summer 2015, available at

28  http://da.co.la.ca.us/about/reports.

                                -19-                        15-cv-05903

1  This line-drawing is arbitrary and will exclude from services many mentally

2  disabled persons. In fact, it may harm some of the most vulnerable individuals

3  because they will not have been stabilized through treatment in jail.

4        76.    This exclusion is not mandated by any apparent practical necessities.

5  The Settlement requires prisoners to be screened for mental health needs within 12

6  hours after their arrival and to receive a mental health assessment within 24 hours or

7  within 72 hours on weekends and legal holidays, if not sooner. *Id.* ¶¶ 27, 29.

8  Prisoners with "emergent or urgent mental health needs" must be evaluated "as soon

9  as possible but no later than four hours from the time of identification." *Id.* ¶ 26.

10 Thus, under the Settlement, all prisoners with mental health needs should be

11 identified and assessed within 24 hours (or 72 hours on weekends and holidays)

12 from arrival in jail. Once these persons are identified and their mental health needs

13 assessed, they should be eligible for discharge planning services congruent to their

14 level of needs, irrespective of the length of time they are incarcerated.

15 **The Discharge Planning In Paragraph 34 Does Not Provide Meaningful Access**

16 **To The Benefits It Purports To Offer**

17       77.    Paragraph 34(b) of the Settlement Agreement provides that prisoners

18 should be released either with a prescription for 30 days' worth of psychotropic

19 medications or with a referral to obtain such a prescription. For many mentally

20 disabled individuals, including Plaintiff-Intervenors, this does not provide

21 meaningful access to necessary medication. Such individuals are often clinically

22 disorganized, meaning that their thoughts do not follow a logical progression. A

23 series of many successive steps must be taken in order to turn a prescription into

24 medication, posing significant barriers for individuals with mental disability.

25       78.    Paragraph 34(b) also allows mentally disabled prisoners to be

26 discharged not with a prescription but with a referral to a "re-entry resource center,

27 or . . . to an appropriate community provider." This erects still more barriers that

28

1  prevent the mentally disabled from accessing the medications that they require to

2  treat their condition.

3      79.    The failure to provide reasonable access to medications poses a grave

4  danger to released prisoners with mental disabilities. Without medication, they are

5  likely to become psychotic, manic, or depressive, which are conditions that pose

6  risks to the individuals suffering from them and to others nearby.

7      80.    The Settlement's vague terms of "linkage," "referral," and "making

8  available" a "consultation" appear to allow the County simply to hand a mentally

9  disabled person a pamphlet with a list of service providers. Handing a piece of paper

10  with a list of addresses or phone numbers to mentally disabled individuals such as

11  Plaintiff-Intervenors does not provide those persons with a meaningful discharge

12  plan or with meaningful access to services. People with serious mental disabilities

13  that impede organized thinking do not have the ability to navigate the complex

14  systems of services outside jail without individualized assistance.

15      81.    In addition, there is no requirement that the County confirm that the

16  places to which it chooses to refer people in fact have services that are available and

17  appropriate for the person being released. Providing a mentally disabled person with

18  a discharge plan consisting of instructions that he or she cannot follow to services

19  that may or may not be available is not a meaningful discharge plan. In fact, it

20  causes an independent harm, over and above the harm from the lack of services. If

21  an individual attempts to seek services recommended to her and finds the door shut

22  in her face, she is much less likely to continue to seek essential services and obtain

23  the treatment she requires.

24      82.    Because they are ineffective and do not immediately provide access to

25  needed medication and services, the discharge-planning protocols established by

26  Paragraph 34 of the Settlement actually set up barriers to released prisoners with

27  mental illness, particularly for those who are homeless. While a list of referrals and

28  tasks may be an effective discharge plan for some people, for many mentally

disabled people being released from jail, such a list amounts to no discharge plan at all. Such individuals often do not have the ability to navigate the complex system of care outside of the jail. They need to be engaged by an individual case manager or a service provider who is in a position to accommodate the released prisoner's illness and to help him or her to navigate the system.

83. Reasonable accommodations exist that will provide Plaintiff-Intervenors meaningful access to the services contemplated by the Settlement Agreement.

84. For example, County jails can connect a mentally disabled person upon release with an individual in the community who has the capacity to address the person's essential needs. County jails can facilitate this process by providing this service connector with essential medical, legal, and other information about the released prisoner.

85. Models of this "warm handoff" have been implemented around the country. For instance, the Critical Time Intervention ("CTI") model is an evidence-based practice, used around the world, that supports vulnerable people, such as mentally disabled people being released from jail, during time-limited periods of transition.[2] In the model, a community-based caseworker builds a trusting relationship with a vulnerable client to help him or her navigate a complex and fragmented system of care over a limited period of time. Supportive housing has also been shown to be an effective accommodation to improve and promote physical and mental health, reduce substance abuse, decrease incarceration, and lower overall costs for services.

86. Defendants have direct experience with one such model. Project 50, a housing-first project with the goal of permanently housing 50 of Skid Row's most chronic homeless individuals, successfully decreased incarceration rates, emergency

---

[2] http://sssw.hunter.cuny.edu/cti/cti-model/

health care usage, and County costs.[3] Los Angeles County Department of Health Services' pilot project called Housing for Health, which provides housing as part of its health services, has also proven successful in improving outcomes and cutting costs.[4]

## **Violation Of The ADA's Integration Mandate**

87.     The post-release institutionalizations contemplated in Paragraph 34 of the Settlement are not the most integrated setting appropriate to Plaintiff-Intervenors' needs. Specifically, Paragraph 34(b)(iii) provides prisoners with an "intense need for assistance" with "direct linkage to an Institutional for Mental Disease ('IMD'), IMD-Step-down facility, or appropriately licensed hospital."

88.     The IMDs or "similarly restrictive facilities" contemplated in Paragraph 34(b)(iii) of the Settlement would unnecessarily segregate and isolate Plaintiff-Intervenors when reasonable alternatives, such as permanent supportive housing, are available and are thus required to be provided to those for whom they are clinically appropriate.

89.     The Settlement does not describe whether or how mental health professionals or public health professionals will determine whether community placement is appropriate. The Settlement refers to institutionalizing prisoners who have an "intense need for assistance" or a "moderate need for assistance, as described in DMH policies." Settlement ¶¶ 34(b)(iii)-(iv). These categories of need are not defined in the Settlement or in DMH policies or glossaries that are readily accessible to the public, and they are not terms familiar to experts who work in relevant fields. The Settlement does not indicate who will make the critical

---

[3] L.A. Times, Housing project for hard-core homeless pays off, http://articles.latimes.com/2012/jun/08/local/la-me-0608-homeless-savings-20120608
[4] Los Angeles County Department of Health Services, Housing for Health, http://file.lacounty.gov/dhs/cms1_217171.pdf

1 determination, what credentials that person will have, and what evaluative
2 instrument will be used.

3 ## FIRST CLAIM FOR RELIEF

4 ## (Violation of the Americans with Disabilities Act of 1990)

5      90.    Plaintiff-Intervenors hereby re-allege and incorporate Paragraphs 1
6 through 89as if fully set forth herein.

7      91.    Defendants are a public entity under Title II of the Americans with
8 Disabilities Act.

9      92.    Plaintiff-Intervenors each suffer from mental illnesses or disabilities
10 that substantially impair major life functions such as thinking, communicating, and
11 concentrating.

12      93.    Plaintiff-Intervenors were and are qualified to participate in and receive
13 the benefit of discharge planning services upon release from a County jail facility
14 that would link them to critical benefits and services such as mental and medical
15 health treatment, housing assistance, and substance abuse treatment.

16      94.    Defendants are or were on actual or constructive notice that Plaintiff-
17 Intervenors are disabled.

18      95.    Plaintiff-Intervenors' mental disabilities cause impairments that can
19 limit their abilities to access existing County benefits and services absent reasonable
20 accommodations. The discharge-planning services offered by Defendants under the
21 Settlement to seriously mentally ill individuals being released from jail do not
22 reasonably accommodate these disabilities.

23      96.    Solely by reason of their mental disabilities, each of the Plaintiff-
24 Intervenors has been denied and under the Settlement terms will continue to be
25 denied the benefit of discharge planning and services by Defendants, which impairs
26 their meaningful access to post-discharge benefits and services.

27      97.    Defendants' entry into and implementation of the Settlement violate the
28 rights of Plaintiff-Intervenors under Title II of the ADA, 42, U.S.C. § 12132, and its

implementing regulations, 28 U.S.C. § 35.130, in a number of ways, including but not limited to the following:

a.    providing different or separate services to a certain class of individuals with disabilities than are provided to others (28 C.F.R. § 35.130(b)(1));

b.    utilizing criteria or methods of administration that subject qualified individuals with disabilities to discrimination (28 C.F.R. § 35.130(b)(3));

c.    failing to make reasonable modifications to its policies, practice, and procedures to connect released prisoners with medication and services (28 C.F.R. § 35.130(b)(7)); and/or

d.    placing certain disabled individuals in non-integrated environments (28 C.F.R. § 35.130(d)).

98.    There are effective reasonable accommodations that Defendants could implement by modifying the Settlement and that would provide Plaintiff-Intervenors meaningful access to post-discharge benefits and services, including but not limited to the following:

a.    providing discharge planning to all prisoners with mental disabilities, without regard to the length of time they are incarcerated;

b.    providing discharge planning to all prisoners with a mental disability, regardless of the type of disability;

c.    providing a reasonable supply of psychotropic medication where clinically appropriate;

d.    providing the released prisoner with the types of services or programs described in paragraphs 84-86 of this Complaint that are reasonably calculated to give them meaningful access to essential medical and mental health services;

e.    ensuring that released prisoners with mental disabilities are offered placement in the most integrated post-release environment that is clinically appropriate; and

   f.   ensuring that released prisoners with mental disabilities are connected with post-discharge services that are not oversubscribed and are actually available in a timely fashion.

99.   Defendants have failed to implement any reasonable accommodations that would allow the Plaintiff-Intervenors to enjoy the benefits of the jail's discharge plan and access to post-discharge benefits and services.

100.   Because of this failure, Plaintiff-Intervenors have been denied benefits and services solely on the basis of their disability.

### SECOND CLAIM FOR RELIEF

### (Violation of Section 504 of the Rehabilitation Act)

101.   Plaintiff-Intervenors hereby re-allege and incorporate by reference Paragraphs 1 through 100 as if fully set forth herein.

102.   Defendants receive federal funding.

103.   Plaintiff-Intervenors each suffer from mental illnesses or disabilities that substantially impair major life functions such as thinking, communicating, and concentrating.

104.   Plaintiff-Intervenors were and are qualified to participate in and receive the benefit of discharge-planning services upon release from a County jail facility that would link them to critical benefits and services such as mental and medical health treatment, housing assistance, and substance abuse treatment.

105.   Defendants are or were on actual or constructive notice that Plaintiff-Intervenors are disabled.

106.   Plaintiff-Intervenors' mental disabilities cause impairments that can limit their abilities to access post-discharge benefits and services under the discharge-planning services offered by Defendants under the Settlement to prisoners being released from jail.

107.   Solely by reason of their mental disabilities, each of the Plaintiff-Intervenors has been denied and under the Settlement terms will continue to be

COMPLAINT IN INTERVENTION

denied the benefit of discharge planning and services, which impairs their meaningful access to post-discharge benefits and services.

108.   Defendants' entry into and implementation of the Settlement violate the rights of Plaintiff-Intervenors under 29 U.S.C. §§ 794 in a number of ways, including but not limited to the following:

a.   providing different or separate services to a certain class of individuals with disabilities than are provided to others (28 C.F.R. § 35.130(b)(1));

b.   utilizing criteria or methods of administration that subject qualified individuals with disabilities to discrimination (28 C.F.R. § 35.130(b)(3));

c.    failing to make reasonable modifications to its policies, practice, and procedures to connect released prisoners with medication and services (28 C.F.R. § 35.130(b)(7)); and/or

d.   placing certain disabled individuals in non-integrated environments (28 C.F.R. § 35.130(d)).

109.   There are effective reasonable accommodations that Defendants could implement by modifying the Settlement that would provide Plaintiff-Intervenors meaningful access to post-discharge benefits and services, including but not limited to the following:

a.   providing discharge planning to all prisoners with mental disabilities, without regard to the length of time they are incarcerated;

b.   providing discharge planning to all prisoners with a mental disability, regardless of the type of disability;

c.   providing a reasonable supply of psychotropic medication where clinically appropriate;

d.   providing the released prisoner with the types of services or programs described in paragraphs 84-86 of this Complaint that are reasonably calculated to give them meaningful access to essential medical and mental health services;

e.       ensuring that released prisoners with mental disabilities are offered placement in the most integrated post-release environment that is clinically appropriate; and

f.       ensuring that released prisoners with mental disabilities are connected with post-discharge services that are not oversubscribed and are actually available in a timely fashion.

110.   Defendants have failed to implement reasonable accommodations that would allow the Plaintiff-Intervenors to enjoy the benefits of the jail's discharge plan and access to post-discharge benefits and services.

111.   Because of this failure, Plaintiff-Intervenors have been denied benefits and services solely on the basis of their disability.

## **REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs-Intervenors request the following relief:

112.   A declaration that Defendants' actions and omissions and their policies and procedures complained of violate the Americans with Disabilities Act and/or Section 504 of the Rehabilitation Act;

113.   Appropriate injunctive relief requiring Defendants, among other things:

a.       to implement reasonable accommodations in the form of policies and procedures that will ensure that Plaintiff-Intervenors receive adequate discharge planning, including but not limited to providing meaningful discharge planning to all prisoners with mental disabilities;

b.       to provide mentally disabled prisoners with a discharge plan that is reasonably calculated to give them meaningful access to essential medical and mental health services upon their release; and

c.       to ensure that released prisoners with mental disabilities are offered placement in the most integrated post-release environment that is clinically appropriate.

114. Modification of the Settlement in accordance with the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

115. An award of costs and attorney's fees and expenses pursuant to 29 U.S.C. § 794a and any other applicable provisions of law; and

116. Such other relief as this Court deems just and proper.

DATED: September 28, 2015

MUNGER, TOLLES & OLSON LLP
BRADLEY S. PHILLIPS
GRANT A. DAVIS-DENNY
EMILY R.D. MURPHY

By:      /s/ Grant Davis-Denny
GRANT A. DAVIS-DENNY
Attorneys for Plaintiff-Intervenors

By:      /s/ Emily Murphy
EMILY R.D. MURPHY
Attorneys for Plaintiff-Intervenors

COMPLAINT IN INTERVENTION

PUBLIC COUNSEL
    MARK ROSENBAUM
    GARY BLASI
    ANNE RICHARDSON
    ADELAIDE ANDERSON
    ALISA HARTZ


By:     /s/ Mark Rosenbaum
    MARK ROSENBAUM
Attorneys for Plaintiff-Intervenors


By:     /s/ Alisa Hartz
    ALISA HARTZ
Attorneys for Plaintiff-Intervenors

15-cv-05903
COMPLAINT IN INTERVENTION