1   BRADLEY S. PHILLIPS (State Bar No. 85263)
    brad.phillips@mto.com
2   GRANT A. DAVIS-DENNY (State Bar No. 229335)
    grant.davis-denny@mto.com
3   EMILY R.D. MURPHY (State Bar No. 291022)
    emily.murphy@mto.com
4   MUNGER, TOLLES & OLSON LLP
    355 South Grand Avenue
5   Los Angeles, California 90071-1560
    Telephone:  (213) 683-9100
6   Facsimile:  (213) 687-3702

7   MARK D. ROSENBAUM (SBN 59940)
    mrosenbaum@publiccounsel.org
8   GARY BLASI (SBN 70190)
    gblasi@publiccounsel.org
9   ANNE RICHARDSON (SBN 151541)
    arichardson@publiccounsel.org
10  ADELAIDE ANDERSON (SBN 270966)
    aanderson@publiccounsel.org
11  ALISA HARTZ (SBN 285141)
    ahartz@publiccounsel.org
12  PUBLIC COUNSEL LAW CENTER
    610 S. Ardmore Avenue
13  Los Angeles, California 90005
    Telephone:  (213) 385-2977
14  Facsimile:  (213) 385-9089

15  Attorneys for Plaintiff-Intervenors

16               UNITED STATES DISTRICT COURT

17      CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

18  UNITED STATES OF AMERICA,            Case No. 15-cv-05903

19            Plaintiff,                 **DECLARATION OF
                                         BRADLEY S. PHILLIPS IN
20       vs.                             RESPONSE TO STATUS
                                         REPORT BY COUNTY OF
21  COUNTY OF LOS ANGELES AND LOS        LOS ANGELES**
    ANGELES COUNTY SHERIFF JIM
22  MCDONNELL, in his Official Capacity, Judge:  Hon. Dean D. Pregerson

23            Defendants.

24

25  TERESA POWERS, DAVID PENN,
    TIMOTHY POLK, MARK SARNI,
26  DERRICK THOMAS, DARSEL
    WHITFIELD, ROYAL WILLIAMS, AND
27  LEPRIEST VALENTINE,

28            Plaintiff-Intervenors.

                                                        15-cv-05903

# DECLARATION OF BRADLEY S. PHILLIPS

I, Bradley S. Phillips, hereby declare:

1.      I am a partner in the law firm of Munger, Tolles & Olson LLP ("MTO") and co-counsel of record for Plaintiff-Intervenors in this action.  I have personal knowledge of the facts set forth below and would testify competently thereto if called as a witness.

2.      I make this declaration in response to the Status Report by Defendant County of Los Angeles to the Court re Conflict Issues, filed by the County of Los Angeles on the afternoon of October 8, and the Status Report filed by the United States of America, also on the afternoon of October 8.   In those reports, the County and the U.S. object to MTO's representation of Plaintiff-Intervenors in this matter, based upon the firm's prior representation of the Citizens' Commission on Jail Violence ("CCJV"), a Commission of the County created by the Board of Supervisors.  Neither the County nor the U.S. has provided the Court with any declaration or any of the documents relevant to the issue whether MTO has a conflict here based on that representation.

3.      My former partner  Richard E. Drooyan served as General Counsel to the CCJV while he was at MTO and my current partner Tamerlin J. Godley served as a Deputy General Counsel to the CCJV.  MTO is currently not providing legal services to the CCJV.

4.      While at MTO, Mr. Drooyan also served as Implementation Monitor on behalf of the County in connection with implementation of the recommendations made by the CCJV.  Mr. Drooyan left MTO on December 31, 2013.  MTO is currently not providing any services to the County with respect to implementation of the recommendations of the CCJV.

5.      I have communicated with both Mr. Drooyan and Ms. Godley with respect to the scope of their work on behalf of the CCJV.  Both have confirmed to me that their work did not include issues related to discharge or release planning or practices with respect to mentally disabled inmates.  Both have confirmed that, in the course of their work for the CCJV, they did not evaluate facts or circumstances related to discharge or release planning or practices with respect to mentally disabled inmates.

6.      As reflected in the proposed Complaint in Intervention and the Motion to Intervene, as well as Mr. Rosenbaum's remarks to the Court on October 1, 2015, the sole subject matters that Plaintiff-Intervenors seek to address in this matter are the discharge planning and practices of Defendants, which are the subject of a single paragraph—Paragraph 34—of the Settlement Agreement.

7.      Attached here to as Exhibit A is a true and correct copy of the Agreement for Special Legal Services to Citizens' Commission on Jail Violence, entered into by the County and MTO as of March 2012.  Although this is an unsigned copy, it is my understanding, based on communications with Mr. Drooyan and Ms. Godley, that this is the final version that was signed by the parties.  Mr. Drooyan was traveling in Europe this week and was therefore unable to provide me with a signed version.

8.      Exhibit A relates to MTO's agreement to "provide pro bono legal services, including the services of the General Counsel Richard E. Drooyan (the 'General Counsel'), Deputy General Counsels, and Counsels (collective, 'Munger Tolles') to the CCJV."  (Ex. A at 1.)  Paragraphs 1.1 and 1.2 of Exhibit A provide that "[MTO's] representation relates only to advising the CCJV about the nature, depth and cause of inappropriate use of force in Los Angeles County Jails (the 'Subject Matter')," and that "[MTO] shall have an attorney-client relationship only with the CCJV in its representation pursuant to this Agreement." (*Id.*)

9.     Paragraph 2.1 of Exhibit A provides that the agreement would terminate on December 31, 2012, unless extended prior to that date.

10.     Paragraph 4.0 of Exhibit A, titled "Conflict of Interest," provides that the County waives "any and all actual or potential conflicts of interest that [MTO] may now have, or in the future may have … to the extent that such conflict is based solely on [MTO's] work under this Agreement," with two exceptions.  The first, contained in paragraph 4.1(i) applies only "during the duration of this Agreement" and is therefore irrelevant here.  The second, in paragraph 4.1(ii) provides that, "for five years after the termination of this Agreement, the County is not waiving any conflicts in any matter in which [MTO] represents a client that is adverse to a County entity and the matter is substantially related to the Subject Matter.  Any [MTO] attorneys who serve as General Counsel, Deputy General Counsel or Counsel to the CCJV shall not work on a matter that is substantially related to the Subject Matter and shall be ethically screened from an such [MTO] matter in the future."  (Ex. A at 4.)

11.     Paragraph 4.3 of Exhibit A provides that the "County agrees that should a County entity contend that, except for a conflict under 4.1(i), a conflict exists as a result of [MTO's] work under this Agreement …, [MTO] may terminate this Agreement immediately and may continue the representations at issue notwithstanding the purported conflict."  (Ex. A at 5.)

12.  Attached hereto as Exhibit B is a true and correct copy of an Agreement For Special Legal Services Related to Implementation of Recommendations Made by Citizens' Commission on Jail Violence, entered into by the County and MTO as of January 7, 2013.  Attached hereto as Exhibit C is a true and correct copy of an Amendment to that Agreement entered into as of November 18, 2013, and extending the term of Exhibit B until January 1, 2014.

DECLARATION OF BRADLEY S. PHILLIPS

13.     Paragraph 4.1 of Exhibit B provides that "the County agrees to waive and hereby waives any actual or potential conflicts that [MTO] may now have, or in the future may have," with two exceptions.  (Ex. B at 5.)  The first exception, in paragraph 4.1(i) again applies only during the duration of the Agreement and is therefore irrelevant here.  The second exception, in paragraph 4.1(ii), relates to "any matter arising out of facts or circumstances that Drooyan evaluated in his service as Implementation Monitor."  (*Id.*)

14.     Attached hereto as Exhibit D is a true and correct copy of the Executive Summary of the Report of the Citizens' Commission on Jail Violence, dated September 12, 2012, which is available at www.http://ccjv.lacounty.gov.   The Executive Summary contains no mention of discharge or release planning or practices with respect to mentally disabled inmates.

15.     Tamerlin Godley has been screened from any involvement in MTO's representation of Plaintiff-Intervenors in this matter.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 9th day of October, 2015, at Los Angeles, California.

_____
Bradley S. Phillips

# Exhibit A

## AGREEMENT FOR SPECIAL LEGAL SERVICES TO
## CITIZENS' COMMISSION ON JAIL VIOLENCE

This Agreement for Special Legal Services ("Agreement") is entered into as of March ____, 2012 by and between the County of Los Angeles ("County") and Munger, Tolles & Olson LLP for the purpose of providing special legal services to the Citizens' Commission on Jail Violence ("CCJV"), a Commission of the County created by the Board of Supervisors.

<u>RECITALS</u>

WHEREAS, the Board of Supervisors created the CCJV to conduct a review of the nature, depth, and cause of the problem of inappropriate deputy use of force in the jails; and

WHEREAS, the CCJV is directed to provide a report of recommendations for corrective action to the Board of Supervisors; and

WHEREAS, Munger, Tolles & Olson LLP has agreed to provide pro bono legal services, including the services of the General Counsel Richard E. Drooyan (the "General Counsel"), Deputy General Counsels, and Counsels (collectively "Munger, Tolles") to the CCJV for all work to be performed pursuant to this Agreement; and

WHEREAS, General Counsel shall also coordinate and supervise the work of other Deputy General Counsels and Counsels who are employed by other law firms:

NOW THEREFORE, in consideration of the mutual covenants contained herein, the County, Munger, Tolles, and the General Counsel agree as follows:

**1.0**   **GENERAL SCOPE OF SERVICES**

    1.1    Munger, Tolles representation relates only to advising the CCJV about the nature, depth and cause of  inappropriate use of force in Los Angeles County jails (the "Subject Matter").

    1.2    Munger, Tolles shall have an attorney-client relationship only with the CCJV in its representation pursuant to this Agreement.

    1.3    Except as otherwise specifically set forth in this Agreement, only the County through the Board of Supervisors, or the County Counsel acting on behalf of the Board of Supervisors, can waive any privilege or conflict relating to Munger, Tolles' work under this Agreement.

    1.4    The General Counsel shall oversee and coordinate the independent review process and functions of the CCJV and shall perform such specialized legal

services as are necessary to accomplish such oversight and coordination on a pro bono basis.

1.5   The General Counsel shall serve as lead counsel for CCJV and shall coordinate, and be responsible for supervising, the work of Deputy General Counsels and Counsels.

1.6   Other attorneys at Munger, Tolles will serve as Deputy General Counsel and Counsel to the CCJV under the direction of the General Counsel. The General Counsel, each Deputy General Counsel and Counsel will execute a Confidentiality Agreement, the form of which is attached hereto as Exhibit "A".

1.7   General Counsel shall collect and maintain the originals of all executed Confidentiality Agreements from Deputy General Counsels and Counsels who are employed by Munger, Tolles or by other law firms, and any investigators. All original, executed Confidentiality Agreements shall be forwarded by General Counsel to County Counsel within ten (10) business days following the date of expiration or termination of this Agreement.

## 2.0   TERM

2.1   The term of this Agreement shall commence on March 1, 2012, and shall terminate on December 31, 2012, unless sooner terminated or extended as provided herein.

2.2   Either Munger, Tolles or the County may, at its sole option and discretion, terminate this Agreement, for any or no reason whatsoever, by giving the other party no less than thirty (30) days advance written notice of such termination. Termination by either party shall not affect the conflict of interest waiver agreed to by the County herein which shall remain in force and effect.

2.3   Munger, Tolles and the County may extend the term of this Agreement for such period of time that they mutually agree is necessary by written amendment.

## 3.0   ACCESS TO RECORDS AND CONFIDENTIALITY

3.1   County and Sheriff Department records, and information in such records, received by Munger, Tolles and the General Counsel will be utilized solely for the purpose of the Subject Matter of this Agreement and the report of the CCJV, and for no other purpose. County and Sheriff's Department records and information identified in writing or marked as confidential and/or privileged by the County Counsel or the Sheriff's Department shall not be publicly disclosed without the

HOA.864316.1                                    - 2 -

prior written consent of County Counsel or pursuant to a final court order. Nothing shall preclude, or require the approval of County Counsel, for the public disclosure of information that is obtained from other sources.  Notwithstanding the preceding sentence, Munger, Tolles and the General Counsel recognize that they have a duty to preserve the confidentiality of personnel and disciplinary records and personnel or disciplinary information regarding the identification of specific Sheriff's deputies and employees regardless of how the records and information are obtained.

3.2     To the extent that Munger, Tolles or the General Counsel receives information/records identified by the County Counsel or the Sheriff's Department in writing or marked as personnel or disciplinary records of Sheriff's deputies or employees, Munger, Tolles and the General Counsel shall not disclose such records, or any personnel or disciplinary information in such records regarding the identification of specific Sheriff's deputies or employees, to anyone other than CCJV Commissioners or to Deputy General Counsels, Counsels, Investigators and/or the Executive Director of the CCJV or her staff who have executed a confidentiality agreement, except pursuant to a final court order.  Any such personnel and disciplinary records received by Munger Tolles or the General Counsel shall be securely stored by the General Counsel in hard copy in the space occupied by the Executive Director and her staff, and shall not duplicated.

3.3     County and Sheriff's Department documents that are not identified in writing or marked by the County Counsel or the Sheriff's Department as confidential and/or privileged or as personnel or disciplinary records shall not be publicly disclosed except as authorized by General Counsel.

3.4     In addition to the other obligations contained in this Section 3, the General Counsel shall use his best efforts to preserve the confidentiality of personnel and disciplinary information regarding specific Sheriff's Department deputies and employees in any public reports of the CCJV.  No public report of the CCJV shall be released without prior review by the General Counsel.

3.5     The work product generated by Munger, Tolles and the General Counsel under this Agreement shall belong to the County and shall be subject to any applicable privileges the County may hold.  All hard copies and discs of County records obtained by Munger, Tolles and the General Counsel shall within ten (10)

business days from the date of expiration or termination of this Agreement be delivered to the County Counsel.

3.6     These confidentiality obligations shall survive this Agreement's termination or expiration.

## 4.0     CONFLICT OF INTEREST

4.1     The County acknowledges that Munger, Tolles and the General Counsel have clients who may now be, or in the future may be, adverse to the Board of Supervisors, the County, or its departments, subdivisions, commissions, agencies or employees or other County entities (each of which is a "County Entity") in transactions, litigation or other matters handled by Munger, Tolles, and the County specifically consents to these other known or future engagements and agrees to waive any and all actual or potential conflicts of interest that Munger, Tolles and General Counsel may now have, or in the future may have, including but not limited to conflicts based upon litigation or transactions in which Munger, Tolles represents one or more clients adverse to a County Entity, or investigations by the Sheriff's Department in which Munger, Tolles represents one or more clients, to the extent that such conflict is based solely upon Munger, Tolles' work under this Agreement, except as follows:

(i) during the duration of this Agreement, the County is not waiving any conflicts in any matters in which Munger, Tolles represents a client adverse to a County Entity that arises out of or is based upon any alleged actions or inactions by the Sheriff's Department, or any Sheriff's Department deputy or employee, or that arises out of or is based upon the operations of any Los Angeles County Jail facility; and

(ii) for five years after the termination of this Agreement, the County is not waiving any conflicts in any matter in which Munger, Tolles represents a client that is adverse to a County Entity and the matter is substantially related to the Subject Matter.

Any Munger, Tolles attorneys who serves as General Counsel, Deputy General Counsel or Counsel to the CCJV shall not work on a matter that is substantially related to the Subject Matter and shall be ethically screened from any such Munger Tolles matter in the future.

4.2     Munger, Tolles shall have no obligation to disclose to the County any confidential information that it obtains in the course of representing other clients.

4.3     County agrees that should a County Entity contend that, except for a conflict under 4.1(i), a conflict exists as a result of Munger, Tolles' work under this Agreement or that this waiver is not effective, Munger, Tolles may terminate this Agreement immediately and may continue the representations at issue notwithstanding the purported conflict.

## 5.0     NO ASSIGNMENT OR DELEGATION

5.1     This Agreement shall not be assignable by Munger, Tolles and General Counsel, either in whole or in part.  Any attempt to assign this Agreement shall be void and confer no rights on any third parties.

5.2     All services and duties of the Munger, Tolles and the General Counsel pursuant to this Agreement shall be the sole responsibility of the Munger, Tolles and General Counsel, and such services and duties may not be delegated without the prior written consent of the County.  Notwithstanding the foregoing, it is understood that CCJV staff and Investigators will assist Munger, Tolles in conjunction with its work under this Agreement.

5.3     No person employed by Munger, Tolles who provides services to the CCJV under this Agreement shall have a criminal record of conviction of a felony or any crime of moral turpitude.

## 6.0     INDEPENDENT CONTRACTOR STATUS

6.1     Munger, Tolles is not, nor shall any of its attorneys, employees or agents be deemed for any purposes, an employee of the County; nor shall Munger, Tolles, its attorneys, employees or agents, be entitled to any rights, benefits, or privileges of County employees, except as specified in Section 7 below.

## 7.0     INDEMNIFICATION

7.1     In consideration of the benefit to the County of the specialized legal services to be provided by General Counsel pursuant to this Agreement, the County agrees to indemnify, defend, and hold Munger, Tolles (including, but not limited to, the General Counsel) harmless from all claims of liability resulting from acts and omissions of  Munger, Tolles  within the scope of the services provided pursuant to this Agreement, to the same extent as if the attorneys and employees of

Munger, Tolles were County employees under Sections 995 *et seq.* of the California Government Code.

**8.0   COMPLETE AGREEMENT AND INTERPRETATION**

8.1   This Agreement supersedes all prior communications and all previous written and oral agreements, and shall constitute the complete and exclusive statement of understanding between County and Munger, Tolles and the General Counsel relating to the subject matter of this Agreement.  No provision of this Agreement is to be interpreted for or against either party because that party's legal representative drafted such provision.

**9.0   NOTICES**

9.1   Notices required or permitted pursuant to this Agreement shall be given in writing by personal delivery or deposit in the United States mail first class postage prepaid, addressed as follows:

<table>
<tr><td>To County:</td><td>Office of County Counsel<br>648 Kenneth Hahn Hall of Administration<br>500 West Temple Street<br>Los Angeles, CA  90012</td></tr>
<tr><td>To Munger, Tolles   :</td><td>Richard E. Drooyan<br>Munger, Tolles & Olson  LLP<br>355 South Grand Avenue, 35th Floor<br>Los Angeles, CA  90071</td></tr>
</table>

IN WITNESS WHEREOF Munger, Tolles has executed this Agreement, and the County of Los Angeles, by the Office of County Counsel, has caused this Agreement to be executed the day and year first above written.

COUNTY OF LOS ANGELES

By_____
     John F. Krattli
     Acting County Counsel

MUNGER, TOLLES & OLSON LLP

By_____
     Richard E. Drooyan,
     A partner

# Exhibit B

## AGREEMENT FOR SPECIAL LEGAL SERVICES RELATED TO IMPLEMENTATION OF RECOMMENDATIONS MADE BY CITIZENS' COMMISSION ON JAIL VIOLENCE

This Agreement for Special Legal Services ("Agreement") is entered into as of January 7, 2013 by and between the County of Los Angeles ("County") and Munger, Tolles & Olson LLP ("Munger, Tolles") for the purpose of providing services to the Board of Supervisors of the County of Los Angeles related to implementation of the recommendations made by the Citizens' Commission on Jail Violence ("CCJV").

## RECITALS

WHEREAS, the Los Angeles County Board of Supervisors created the CCJV to conduct a review of the nature, depth, and cause of the problem of inappropriate deputy use of force in the jails; and

WHEREAS, following its investigation, the CCJV issued a comprehensive report containing 63 recommendations intended to address various aspects of the problem of use of force in the jails; and

WHEREAS, the Sheriff has publicly committed to implement all of the CCJV recommendations that are within his purview; and

WHEREAS, the Board of Supervisors has decided to retain an independent Implementation Monitor to oversee the implementation of the CCJV's recommendations; and

WHEREAS, for this purpose, Munger, Tolles has agreed to provide legal services, primarily through the services of Richard E. Drooyan ("Drooyan"), who will serve as the Implementation Monitor and an associate attorney or paralegal to assist Mr. Drooyan with the work to be performed pursuant to this Agreement;

NOW THEREFORE, in consideration of the mutual covenants contained herein, the County, Munger, Tolles, and Drooyan agree as follows:

## 1.0    GENERAL SCOPE OF SERVICES

1.1   Drooyan shall independently review and report to the Board of Supervisors on the progress made by the Sheriff's Department in implementing the recommendations made by the CCJV, and shall perform such specialized legal services as are necessary to accomplish the purposes of the CCJV recommendations.

1.2   Drooyan shall consult with the County Counsel, County staff, and appropriate County consultants, as he deems appropriate in the performance of his work tasks.

1.3   Drooyan shall also consult with the Sheriff's Department as appropriate regarding implementation of the CCJV recommendations.

1.4   Drooyan shall report to the Board of Supervisors monthly, and as otherwise necessary or appropriate, beginning in December 2012, on the implementation of the CCJV's recommendations.

1.5   One other attorney and/or paralegal from Munger, Tolles may assist Drooyan with his work under this Agreement.  Both Mr. Drooyan and any associate or paralegal performing work under this Agreement shall execute a Confidentiality Agreement, the form of which is attached hereto as Exhibit "A".

1.6   Munger Tolles' and Drooyan's client in this representation shall be the following, and no other person or entity:  The County of Los Angeles and the Board of Supervisors.

**2.0**   **TERM**

2.1   The term of this Agreement shall commence on November 1, 2012 and shall terminate on November 1, 2013, unless sooner terminated or extended as provided herein.

2.2   Either party may, at its sole option and discretion, terminate this Agreement, for any or no reason whatsoever, by giving the other party no less than thirty (30) days advance written notice of such termination.

2.3   The parties may extend the term of this Agreement for such period of time that they mutually agree is necessary by written amendment.

**3.0**   **ACCESS TO RECORDS AND CONFIDENTIALITY**

3.1   Munger, Tolles and Drooyan shall have an attorney-client relationship with the County of Los Angeles and the Board of Supervisors, when performing the special legal services provided pursuant to this Agreement.

3.2   County and Sheriff Department records, and information in such records, reviewed or received by Munger, Tolles and Drooyan will be utilized solely for the purpose of monitoring implementation of the CCJV recommendations, and for no other purpose. County records and information identified as confidential and/or privileged by the County Counsel or the Sheriff's Department shall not be publicly disclosed without the prior written consent of County Counsel. Nothing shall preclude, or require the approval of County Counsel, for the public disclosure of information that is obtained from other sources. Notwithstanding the preceding sentence, Munger, Tolles and Drooyan recognize that they have a duty to preserve the confidentiality of personnel and disciplinary records and

personnel or disciplinary information regarding specific Sheriff's deputies and employees regardless of how the records and information are obtained.

3.3   To the extent that Munger, Tolles or Drooyan receives information/records identified by the County Counsel or the Sheriff's Department as personnel or disciplinary records of Sheriff's deputies or employees, Munger, Tolles and Drooyan shall not disclose such records, or any personnel or disciplinary information in such records regarding specific Sheriff's deputies or employees, to anyone not otherwise authorized to receive such information without the prior written consent of County Counsel.  Any such personnel and disciplinary records received by Munger, Tolles or Drooyan shall be securely stored by Drooyan in hard copy and shall not duplicated without the express permission of County Counsel.

3.4   Documents that are not marked "confidential" by the Sheriff's Department or that do not contain privileged or confidential information of the County may be publicly disclosed as deemed necessary by Drooyan in order to complete his work tasks as set forth herein and report publicly to the Board of Supervisors.

3.5   In addition to the other obligations contained in this Section 3, Munger, Tolles and Drooyan shall use their best efforts to preserve the confidentiality of personnel and disciplinary information regarding specific Sheriff's Department deputies and employees in any public reports regarding the status of the CCJV recommendations.

3.6   The work generated by Munger, Tolles and Drooyan shall belong to the County and shall be subject to any applicable privileges the County may hold.  All

County records obtained by Munger, Tolles and the Drooyan shall within ten (10) business days from the date of expiration or termination of this Agreement be delivered to the County Counsel.

3.7   These confidentiality obligations shall survive this Agreement's termination or expiration.

## 4.0   CONFLICT OF INTEREST

4.1   The County acknowledges that Munger, Tolles and Drooyan have clients who may now be, or in the future may be, adverse to the County in transactions or litigation, and the County agrees to waive and hereby waives any actual or potential conflicts of interest that Munger, Tolles and Drooyan may now have, or in the future may have, including but not limited to conflicts based upon litigation or transactions in which Munger, Tolles represents one or more clients adverse to the County or in investigations by the Sheriff's Department in which Munger, Tolles represents one or more clients, except that the County is not waiving any such conflicts (i) during the duration of Munger Tolles' services under this Agreement in any pending or future matter arising out of

    (a)   alleged actions or inactions of the Sheriff's Department, or

    (b)   the operations of any Los Angeles County Jail

and in which the County, the Sheriff's Department, or the Board of Supervisors is a party and has interests adverse to those of Munger Tolles' client; and (ii) for five years after the termination of Munger Tolles' services pursuant to this Agreement in any matter arising out of facts or circumstances that Drooyan evaluated in his service as Implementation Monitor and in which the County, the

Sheriff's Department, or the Board of Supervisors is a party and has interests adverse to those of Munger, Tolles' client.

**5.0**   **NO ASSIGNMENT OR DELEGATION**

5.1   This Agreement shall not be assignable by Munger, Tolles and Drooyan, either in whole or in part.  Any attempt to assign this Agreement shall be void and confer no rights on any third parties.

5.2   All services and duties of Munger, Tolles and Drooyan pursuant to this Agreement shall be the sole responsibility of Munger, Tolles and Drooyan, and such services and duties may not be delegated without the prior written consent of the County.

5.3   No person assisting Munger, Tolles or Drooyan shall have a criminal record of conviction of a felony or any crime of moral turpitude.

**6.0**   **INDEPENDENT CONTRACTOR STATUS**

6.1   Neither Munger, Tolles nor Drooyan are, nor shall they or any of their employees or agents be deemed for any purposes, an employee of the County; nor shall any Munger, Tolles employees or agents (including Drooyan), be entitled to any rights, benefits, or privileges of County employees.

**7.0**   **COMPENSATION & BILLING REQUIREMENTS**

7.1   All charges by Munger, Tolles, whether for fees for attorney work, or for reimbursement for expenses incurred shall be in accordance with the County Counsel Billing Requirements, except that this Agreement shall control in the event of inconsistencies with its provisions.  Said Billing Requirements will be made available to Munger, Tolles and may be amended by County at any time.

County shall provide Munger, Tolles with any amended Billing Requirements promptly after they are promulgated.  Whenever amended Billing Requirements are made available to Munger, Tolles, Munger, Tolles shall immediately conform all future services and invoices to said amended Billing Requirements and acknowledge acceptance of the Billing Requirements of the County's electronic billing system, Tymetrix 360 (T360).

7.2   Fees:

    7.2.1   Munger, Tolles shall provide legal services at the hourly billing rates for attorneys and paralegals at the following rates:

| | |
|---|---|
| Richard Drooyan: | $495/hour |
| Associate Attorney: | not to exceed $350/hour |
| Paralegal: | not to exceed $210/hour |

7.3   Expenses:

    7.3.1   Non-Reimbursable Expenses:  Certain expenses incurred by Munger, Tolles in providing services under this Agreement shall be considered Munger, Tolles' overhead which shall not be reimbursed by County, but which shall be borne by Munger, Tolles as expenses included within the hourly billing rates set forth in Section 7.2.1 above.  Expenses which will not be reimbursed and which should not be billed are the following:

        1.   Postage.

2. Telephone charges (both local and long distance).

3. Facsimile/Telecopier charges.

4. Mileage/Parking expenses incurred by Munger, Tolles and Drooyan within the counties of Los Angeles, Orange, Riverside, San Bernardino and Ventura.

5. On-line subscription, connection or other costs for computerized research. (Attorney and paralegal time incurred conducting such research may be billed.)

6. Document reproduction. (See below for large volume exception.)

7. Staff time or overtime for performing secretarial, clerical, or word processing functions.

8. Time spent complying with County audits or billing inquiries.

9. Charges for services or expenses incurred which have not been authorized by County.

7.3.2 Reimbursable Ordinary Expenses: County shall reimburse Munger, Tolles for its actual out-of-pocket expenses, but without any additional costs for having advanced the funds, for the following, as applicable:

021

1.    Deposition costs (other than video taping unless approved as set forth below).

2.    Transcript fees.

3.    Filing fees for which the County is not exempt.

4.    Messenger service if specifically requested by the County's Supervising Attorney, if required because of an emergency over which the Munger, Tolles has no control, or if necessary to ensure the safekeeping of sensitive documents or materials.

5.    Process service fees.

7.3.3  Reimbursable Extraordinary Expenses:  County shall reimburse Munger, Tolles for its actual out-of-pocket expenses, but without any additional costs for having advanced the funds, for the following, as applicable, but only if Munger, Tolles has obtained prior approval from County:

1.    Outside vendor document reproductions which, because of the volume or format requirements, are impractical to complete in-house.

2.    Consultants.

3.    Experts.

4.    Investigative services.

HOA.935532.3                                  - 9 -

022

5.  Expenses for travel outside the Counties of Los Angeles, Orange, Riverside, San Bernardino and Ventura. Reimbursement for such travel expenses will be limited to the amount County's employees may claim for such travel. Information on such limits will be made available to Munger, Tolles upon request at the time Munger, Tolles seeks permission for such travel.

6.  Videotaping of depositions.

7.  Extraordinary computerized research requirements meeting the criteria set forth in the County Counsel Billing Requirements.

8.  Parking reimbursement for Sheriff's Department and County personnel and consultants retained by the County.

9.  Other extraordinary expenses for which Munger, Tolles has obtained prior approval from County.

## 8.0   INVOICES AND PAYMENTS

8.1   Electronic Billing (E-Billing):

Munger, Tolles shall submit all invoices for attorney fees and reimbursable expenses in accordance with the County's electronic billing system, Tymetrix 360 (T360).

8.2   E-Bills:

8.2.1   Munger, Tolles shall submit invoices for services and for reimbursable expenses monthly in arrears, or quarterly in arrears if approved by County, in accordance with the County Counsel Billing Requirements.

8.2.2   Each e-bill must also include a signed dated declaration of Munger, Tolles Supervising Attorney with the following statement:

"I have personally examined this e-bill.  All entries are in accordance with the AGREEMENT for Professional Legal Services, are correct and reasonable for the services performed and the cost incurred, and no item on this statement has been previously billed to County."

8.2.3   Each e-bill shall be itemized to include:

1.   Staffing level(s), hourly rates and specific activities for each attorney and/or paralegal.

   a.   Each activity shall be coded using the appropriate Universal Task Based Management System (UTBMS) legal fees and expense code for electronic billing.

   b.   Each billing entry shall include a detailed description of specific activities for each attorney and/or paralegal.

   c.   All receipts for expenses shall be scanned and attached to the e-bill submitted to T360.

HOA.935532.3                          - 11 -

024

     d.     No attorney or paralegal may be utilized on a matter until an hourly billing rate for that person has been approved by the County.  All time must be billed at the approved hourly rate.

8.2.4    Munger, Tolles shall maintain in a form subject to audit, and in accordance with generally accepted accounting principles, backup documentation to support all entries included in the monthly billing statement.  Such documentation shall be available to County upon request.

8.3    Payments

8.3.1    County shall make payment(s) for services rendered under this Agreement monthly (quarterly if approved by County) in arrears based on the itemized billing statement(s) Munger, Tolles submits to County.

8.3.2    County's legal and accounting staff shall review all billing statements for reasonableness of the time billed as well as full compliance with this Agreement and all County Counsel Billing Requirements.

8.3.3    County shall make its best effort to process payments promptly after receiving Munger, Tolles' e-bill.  However, County shall not pay interest or finance charges on any outstanding balance(s).

8.3.4    Payments to Munger, Tolles are conditioned upon Munger, Tolles compliance with all provisions of this Agreement.

## 9.0    INDEMNIFICATION

9.1   Munger, Tolles shall indemnify County from and against any and all judgments
against County for Munger, Tolles' or Drooyan's negligent or reckless acts and/or
negligent or reckless omissions arising from Munger, Tolles and Drooyan's
services to be provided under this Agreement.

## 10.0    INSURANCE

10.1  Without limiting Munger, Tolles' indemnification of County and its officers,
agents and employees, Munger, Tolles shall provide and maintain at its own
expense the following programs of insurance covering Munger, Tolles' operations
during the term of this Agreement.  Munger, Tolles shall deliver a certificate of
insurance coverage satisfactory to the County to the County's Chief Executive
Office on or before the effective date of this Agreement, which shall name the
County as an additional insured and shall contain express conditions that County
is to be given written notice by registered mail at least thirty (30) days in advance
of any modification or termination of any program insurance.

10.1.1  Liability:  Such insurance shall be primary to and not contributing with
any other insurance maintained by County, and shall include, but not be
limited to:

a.     Comprehensive General Liability insurance endorsed for
Premises-Operations, Products/Completed Operations,
Broad Form Contractual, Broad Form Property Damage,
non-owned and hired automobile coverage and Personal
Injury with a combined single limit of not less than

$2,000,000 per occurrence and in an annual aggregate.

If the above insurance is written on a Claims Made Form, the insurance shall be endorsed to provide an extended reporting period of not less than five years following termination of this Agreement.

b.   Professional liability insurance with a liability limit of at least $2,000,000 per claim and $4,000,000 in the annual aggregate; provided, however, Munger, Tolles shall not require that County be named as an additional insured.

c.   Comprehensive Auto Liability endorsed for all owned vehicles with a combined single limit of at least $1,000,000 per occurrence. Auto liability insurance shall not be required if the firm has no owned vehicles.

10.1.2  Workers' Compensation:  A program of Workers' Compensation insurance in an amount and form to meet all applicable requirements of the Labor Code of the State of California, including Employers Liability with a $1,000,000 limit, covering all persons providing services on behalf of Munger, Tolles and all risks to such persons under this Agreement.

10.1.3  Failure to Procure Insurance:  Failure on the part of Munger, Tolles to procure or maintain required insurance shall constitute a material breach for which County may immediately terminate or suspend this Agreement.

10.1.4  Deductibles:  Munger, Tolles' policies shall not obligate the County to pay any portion of any deductible.

**11.0   COMPLETE AGREEMENT AND INTERPRETATION**

11.1   This Agreement supersedes all prior communications and all previous written and oral agreements, and shall constitute the complete and exclusive statement of understanding between County and Munger, Tolles and Drooyan relating to the subject matter of this Agreement.  No provision of this Agreement is to be interpreted for or against either party because that party's legal representative drafted such provision.

**12.0   NOTICES**

12.1   Notices required pursuant to this Agreement shall be given in writing by personal delivery or deposit in the United States mail first class postage prepaid, addressed as follows:

To County:                     Office of County Counsel

648 Kenneth Hahn Hall of Administration

500 West Temple Street

Los Angeles, CA  90012

To Munger, Tolles:        Richard E. Drooyan

                          Munger, Tolles & Olsen

                          355 South Grand Avenue, 35th Floor

                          Los Angeles, CA 90071

IN WITNESS WHEREOF Munger, Tolles has executed this Agreement, and the County of

Los Angeles, by the Office of County Counsel, has caused this Agreement to be executed the day

and year first above written.

COUNTY OF LOS ANGELES

By _____
John F. Krattli
County Counsel

MUNGER, TOLLES & OLSON LLP

By _____
Sandra Seville-Jones
Managing Partner

IMPLEMENTATION MONITOR

_____
Richard E. Drooyan

**Exhibit A**

**CONFIDENTIALITY AGREEMENT**

I, _____*Richard Drooyen*_____, in my

capacity as monitoring implementation of the recommendations made by Los Angeles County

Citizens' Commission on Jail Violence (CCJV), acknowledge that I may have access to and

review confidential records of the County, its departments, and its employees, as may be material

and relevant to the performance of my duties.  As to such Confidential Information/Records I

understand and agree:

     a.     that I will use the utmost discretion and care to maintain the integrity of such

while executing all of my monitoring duties;

     b.     that I will exercise the utmost care to preserve all statutory and constitutional

requirements of confidentiality with regard to such;

     c.     that such information/records acquired in my monitoring shall be considered as

information/records acquired in confidence by a public employee in the course of my

duties, and not open, or officially disclosed, to the public within the meaning of Evidence

Code Section 1040;

d.      that in my monitoring capacity, I may be permitted to review privileged and confidential information/records, and that I am bound by any and all applicable privileges and confidentiality provisions provided in California law and that unauthorized disclosure of the information may result in liability and that I cannot disclose such confidential information/records at any time, unless allowed by law.

Signature: _____

Date: _____1 / 7 /13_____

# Exhibit C

## AMENDMENT TO AGREEMENT FOR SPECIAL LEGAL SERVICES RELATED TO IMPLEMENTATION OF RECOMMENDATIONS MADE BY CITIZENS' COMMISSION ON JAIL VIOLENCE

This Amendment to Agreement for Special Legal Services is entered into as of November 18, 2013, by and between the County of Los Angeles ("County") and Munger, Tolles & Olson LLP ("Munger, Tolles").

## RECITALS

WHEREAS, the County and Munger, Tolles entered into an Agreement for Special Legal Services ("Agreement") as of January 7, 2013, for the purpose of providing services to the Board of Supervisors of the County of Los Angeles related to implementation of the recommendations made by the Citizens' Commission on Jail Violence;

WHEREAS, the Agreement provides that it "shall terminate on November 1, 2013, unless sooner terminated or extended as provided herein;"

WHEREAS, the Agreement provides that the "parties may extend the term of this Agreement for such period of time that they mutually agree is necessary by written amendment;" and

WHEREAS, the parties desire to extend the Agreement for a period of two months until January 1, 2014;

NOW THEREFORE, the parties and the Implementation Monitor Richard E. Drooyan agree that Section 2.1 of the Agreement shall be amended so that the term of the Agreement shall terminate on January 1, 2014.

033

All of the other terms of the Agreement shall remain the same and in full force and effect.

IN WITNESS WHEREOF Munger, Tolles has executed this Agreement, and the County of Los Angeles, by the Office of County Counsel, has caused this Amendment to be executed the day and year first above written.

COUNTY OF LOS ANGELES

By _____ ( For )
     John Krattli
     County Counsel


MUNGER, TOLLES & OLSON LLP


By _____
     Sandra Seville-Jones
     Managing Partner

IMPLEMENTATION MONITOR

_____
     Richard E. Drooyan

034

# Exhibit D



# Report of the Citizens' Commission on Jail Violence

## *Executive Summary*

## September 2012

http://ccjv.lacounty.gov

September 28, 2012

The Honorable Board of Supervisors
County of Los Angeles
383 Kenneth Hahn Hall of Administration
500 West Temple Street
Los Angeles, CA 90012

Dear Supervisors:

We are pleased to submit this Report of the Citizens' Commission on Jail Violence for your consideration. This Report is the culmination of many months of investigation and public hearings regarding allegations of excessive use of force in the Los Angeles County jails.

As you know, the Board of Supervisors formed our Commission last October with a mandate "to conduct a review of the nature, depth and cause of the problem of inappropriate deputy use of force in the jails, and to recommend corrective action as necessary." In the ensuing months, we have endeavored to conduct as thorough an investigation as possible with the assistance of pro bono attorneys from some of the most respected law firms in Los Angeles, as well as staff, interns, and volunteers under the leadership of the Executive Director.

Throughout our process, Commission staff spoke with a wide array of individuals and reviewed thousands of documents. We appreciate those individuals who were willing to share their candid perspectives and recognize that it has not been easy for many of them. We also thank the Sheriff and his staff for their cooperation throughout this investigation.

It has been an honor for each of us to serve on the Commission. We believe that our diverse perspectives -- as well as the careful analysis and comprehensive review conducted by our staff -- have resulted in a thoughtful, objective and thorough Report. We also believe that our recommendations, if implemented, can bring about lasting and meaningful changes within the Los Angeles County jails. We urge the Board and the Sheriff to adopt our recommendations with all deliberate speed and further urge the Board to establish a mechanism periodically to assess progress in implementing our recommendations.

Very truly yours,


Hon. Lourdes G. Baird, Chair          Rev. Cecil L. Murray, Vice Chair


Hon. Robert C. Bonner     Mr. Alexander Busansky     Chief Jim McDonnell


Hon. Carlos R. Moreno      Hon. Dickran M. Tevrizian

038

# Citizens' Commission on Jail Violence

## COMMISSIONERS

Hon. Lourdes G. Baird, Chair
Rev. Cecil L. Murray, Vice Chair

Hon. Robert C. Bonner
Mr. Alexander Busansky
Chief Jim McDonnell

Hon. Carlos R. Moreno
Hon. Dickran M. Tevrizian

## EXECUTIVE DIRECTOR

Miriam Aroni Krinsky

## GENERAL COUNSEL

Richard E. Drooyan

## DEPUTY GENERAL COUNSEL

Douglas A. Axel
Nancy Sher Cohen
Bert H. Deixler
Sharon Dolovich
Kimberly A. Dunne

Tamerlin J. Godley
Carolyn J. Kubota
Marcellus McRae
Aaron Murphy
Fernando L. Aenlle-Rocha

James Sanders
David Schindler
Daniel N. Shallman
Maurice Suh

## COUNSEL

Seth Baglin
Aaron Bloom
Cristyn Chadwick
Michelle Cheng
Yunah Chung
Rachel Feldman
Lauren Fujiu
Jared Goldstein
Ronald K. Gorsich
Michael Guitar
Hilary Jay

Chris J. Jung
Patrick E. Kennell III
Poonam Kumar
Shawn S. Ledingham, Jr.
Matthew A. Macdonald
Gabe D. Miller
Molly Moeser
Cisca Mok
Mina Noroozkhani
Kimberly Nortman
Yolanda Ochoa

Cassie D. Palmer
Hema Patel
George E. Pence
Antonio Raimundo
Nicholas C. Soltman
Robert M. Swerdlow
Brent W. Wilner
Dan Weiss
Michael H. Weiss
William Yu

## PROJECT MANAGERS

Julie Quinn
Katherine Williams

## INVESTIGATOR

Adam Dawson

## PROJECT ASSISTANT

Tia Britt

## INTERNS, VOLUNTEERS AND SUPPORT STAFF

Gregory Bok
Lily Bu
Alicia Castro
Maxwell Cohen
Teresa Cotsirilos
John Given
Adam Grant
David Issa
Brie Jefferson

Joshua Krebs
Nancy Leu
Dustin Linden
Samuel Liu
Teresa Magula
Melissa Nadal
David Nealy
Kathleen O' Connell
Erica Quitana

Susan Reimers
Andrew Roach
Arash Sadat
Ali Al-Sarraf
David Simson
Jonathan Soleimani
Alisa Sommer
Roisin Ward

040

# Citizens' Commission on Jail Violence

### Thanks to the following law firms

Gibson, Dunn & Crutcher LLP
Kendall, Brigg &Klieger LLP
Latham & Watkins LLP
Munger, Tolles & Olson LLP
O'Melveny & Myers LLP
Proskauer Rose LLP
Reed Smith LLP
Sidley Austin LLP
White & Case LLP

We would like to express our thanks to Munger Tolles & Olsen LLP and staff
for hosting and housing the Commission and its staff.

041

# GLOSSARY OF TERMS

| | |
|---|---|
| ACLU | American Civil Liberties Union |
| ADP | Average Daily Inmate Population |
| ALADS | Association for Los Angeles Deputy Sheriffs |
| BIU | Background Investigation Unit |
| CARS | Command Accountability Reporting System |
| CCJV | Citizens' Commission on Jail Violence |
| CDCR | California Department of Corrections and Rehabilitation |
| CFRC | Custody Force Review Committee |
| CFRT | Custody Force Response Team |
| CMTF | Commander Management Task Force |
| CRIPA | Civil Rights of Institutionalized Persons Act |
| DOJ | United States Department of Justice |
| EFRC | Executive Force Review Committee |
| EPC | Executive Planning Committee |
| ERCOM | Los Angeles County Employees' Relations Committee |
| FAST | Facility Automated Statistical Tracking |
| IAB | Internal Affairs Bureau |
| ICIB | Internal Criminal Investigations Bureau |
| IRC | Inmate Reception Center |
| JMET | Jail Mental Health Evaluation Team |
| LASD | Los Angeles Sheriff's Department |
| LJN | Large Jail Network |
| MCJ | Men's Central Jail |
| MOA | Memorandum of Agreement |
| MOU | Memorandum of Understanding |
| MPP | Manual of Policy and Procedure |
| OIG | Office of Inspector General |
| OIR | Office of Independent Review |
| POST | Peace Officer Standards and Training |
| PPI | Personnel Performance Index |
| PPOA | Professional Peace Officers Association |
| SCIF | Sheriff's Critical Incident Forum |

042

# EXECUTIVE SUMMARY

## Introduction

There has been a persistent pattern of unreasonable force in the Los Angeles County jails that dates back many years.  Notwithstanding a litany of reports and recommendations to address the problem of violence in the County jails issued by multiple bodies over more than two decades, it was only recently that the Los Angeles County Sheriff's Department ("LASD" or the "Department") began to implement changes that significantly reduced the level of force used by Deputy Sheriffs in the jails.  Both the responsibility for, and the solutions to, the problem of excessive force in the County jails lies with the Department's leadership.  Significantly, the Department failed to identify, monitor and address force problems until the Sheriff began to take action last year in the wake of a series of scathing reports, the glare of adverse publicity, actions by the County Board of Supervisors (the "Board") including creating the Citizens' Commission on Jail Violence (the "Commission" or "CCJV"), and a series of public hearings by both the Commission and the Board.

As a result of the recent attention of the Sheriff and the reforms he instituted, the number of force incidents, and in particular Significant Force incidents, in the jails has dropped dramatically.  Yet even with these recent reductions, troubling indicia of a force problem remain.  Whether recent force reductions will be sustained over time when public attention recedes, and whether the entire Department is truly committed to the Sheriff's stated vision for the jails and the implementation of these reforms, remains to be seen.

The Department provides a myriad of services and is a very complex organization with 17,000 sworn and non-sworn civilian employees.  It patrols the unincorporated areas of one of the largest counties in the United States with a population of over 9.8 million, provides police services to over 40 cities in Los Angeles County plus unincorporated areas, operates the Los Angeles Regional Crime Laboratory, provides security for the courts throughout the County, and runs the largest jail system in the country.  The jail system includes eight geographically distant facilities that house some of the most dangerous and violent inmates and rival gang members in the nation.   In addition to operating the jails, the Department transports prisoners to and from the courts and runs the Custody facilities in the courts.

The Los Angeles County jail system has been plagued by many problems over the years, from overcrowded and substandard jail conditions to allegations that deputies used excessive or unnecessary force on inmates and facilitated inmate on inmate violence. These problems have been the subject of numerous reports, starting with the Kolts Report in 1992, and detailed in periodic reports by Special Counsel Merrick Bobb and the Office of Independent Review ("OIR"). Last fall, the American Civil Liberties Union (the "ACLU") issued a scathing report entitled "Cruel and Unusual Punishment: How a Savage Gang of Deputies Control LA County Jails" detailing mounting concerns with violence in the jails. It was soon followed by a critical report from OIR, stating in no uncertain terms that "deputies sometimes use unnecessary force against inmates in the jails, to either exact punishment or to retaliate for something the inmate is perceived to have done" and expressed concern that "the times in which deputies 'get away' with using excessive force may be on the rise." At the same time, the *Los Angeles Times* published a series of articles recounting allegations of excessive force, a "code of silence" among Custody deputies, deputy misconduct in the jails, and the existence of an on-going federal criminal investigation into abuses in the jails.

With a bright spotlight placed squarely on the Department and its jails, the Sheriff created a Commander Management Task Force ("CMTF" or the "Task Force") last fall to "[t]ransform the culture of our custody facilities into a safe and secure learning environment for staff and inmates, and provide a level of service and professionalism consistent with our Core Values." At the same time, the Board of Supervisors created this Commission with a mandate "to conduct a review of the nature, depth and cause of the problem of inappropriate deputy use of force in the jails, and to recommend corrective action as necessary." The Board also directed the Commission to "hold[] this Board and the Sheriff accountable for their speedy and effective implementation" of necessary reforms.

The Commission recognizes that there are concerns about the credibility of inmates, just as in some cases the credibility of deputies involved in a force incident may also be at issue. As such, this report does not rest on the credibility of any one witness, but is based upon the totality of the information provided to the Commission, the corroboration of that information, and the common themes and patterns that emerged.

The problem of excessive and unnecessary force in the Los Angeles County jails was the result of many factors, beginning most fundamentally with a failure of leadership in the Department. Simply stated, the Sheriff did not pay enough attention to the jails until external events forced him to do so. Further, his senior leaders failed to monitor conditions in the jails and elevate use of force issues so that they received the necessary attention by the Sheriff, and the Undersheriff engaged in conduct that undermined supervision of aggressive deputies and promoted an environment of lax and untimely discipline of deputy misconduct. With multiple command layers between the jails and the Sheriff, there was no one in the Department who was responsible *and* accountable to the Sheriff for addressing the force problems in the jails. Nor was there an experienced, professional corrections leader in place to capably run the County's vast and challenging jail system.

Through the formation of the CMTF last fall, the Sheriff has been personally engaged in efforts to reform the jails, and the Department has now taken a number of steps to address the use of force problems, including promulgating long-overdue Force Prevention and Anti-Retaliation policies and enhancing (at least for the time being) supervision in the jails. As a result, the Department has been able to dramatically reduce the number of force incidents throughout the jails while, at the same time, reducing the number of inmate assaults on deputies. These statistics reinforce the testimony of current and former Department personnel, inmates, jail chaplains and monitors that much of the force used by deputies prior to the formation of the CMTF and over a series of years was unnecessary, excessive, and in violation of the Department's policies. As Special Counsel Merrick Bobb observed in testimony before the Commission earlier this year, when "the word went out [from the Sheriff that]… 'I want to see those numbers down'" the deputies "responded" and force incidents dropped significantly.

Notwithstanding the recent reforms, the Commission does not believe that the problem of excessive use of force in the jails has been "fixed." Some of the high level leaders who allowed force problems to continue unabated have not been held accountable, thereby sending a troubling message to a Department in need of a clear directive that accountability is expected and will be enforced at *all* levels. Ultimately, true reform of the jails will depend upon the committed leadership and engagement of the Sheriff and the Department's senior leaders, as well as institutionalized structural reforms within the Department and strong independent oversight.

In order to have lasting reform in the jails, the Department needs to be re-structured to ensure accountability for the operation of the jails. There should be a new Assistant Sheriff for the Custody Division who is a professional and experienced corrections leader, reports directly to the Sheriff, and is directly accountable for jail operations.

The Commission recommends that the Department adopt a "dual track" system whereby Deputy Sheriffs are recruited and trained for careers in Custody assignments with opportunities for promotions from within the Custody Division. The Commission also recommends increased use of Custody Assistants, who are less expensive than deputies and trained for Custody assignments.

The Department's disciplinary system needs to be simplified. All cases involving injuries to inmates should be investigated by trained Internal Affairs investigators (or the Internal Criminal Investigations Bureau if there are allegations of criminal conduct) in a newly created Investigations Division under the leadership of a Chief, and all but the most serious cases should be determined by Unit Commanders with oversight by their Commanders and Chiefs. Penalties for excessive use of force and dishonesty should be enhanced. There should also be a newly created Internal Audits and Inspection Division under a Chief to ensure that there is compliance with the Department's policies and procedures governing the Custody Division.

Finally, the existing oversight entities -- Special Counsel, OIR, and the Ombudsman -- should be absorbed and consolidated into a single Office of Inspector General reporting to the Board of Supervisors with responsibility for providing independent oversight of the Department, including its jail operations and discipline system; conducting its own investigations in a limited number of particularly sensitive cases; monitoring jail conditions and inmate grievances; and reviewing the Department's internal audits and inspections.

The Commission considered whether the responsibility for operating the County's jails should be taken away from the Sheriff altogether, but rejected this alternative approach for two reasons: (1) it would take legislation that would require time to pass (assuming passage could be achieved); and more importantly (2) it would diffuse accountability for operating the jails. If the jails are taken away from the Sheriff, the first questions that need to be answered would be: how is the head of the new Custody Division going to be selected and to whom is that person going to

report?  Unless the head of the Custody Division is to be elected, which would politicize a position that requires extensive professional experience, he or she would have to be selected by the Board of Supervisors.  That person would thus be accountable to five Supervisors, who need a majority vote to act and are likely to have different views on the operation of the jails, instead of reporting to a single elected County Sheriff.

As the Sheriff noted in his testimony, he is accountable to the voters who can choose not to re-elect him if they are not satisfied with how he is doing his job, including running the jails. The Commission believes that accountability is an absolute necessity and the best system would be for the Sheriff to appoint an experienced corrections expert to be accountable directly and singularly to him for running the jails while he is, in turn, accountable to the voters.

While much has been accomplished by the Sheriff's Department in the last year, more remains to be done to ensure that needed reforms are implemented and the reduction in force incidents continues on into the future.  The Department and the Board find themselves at a moment of immense challenges, but also have a real opportunity to move forward in a constructive and positive manner.  This will require an ongoing commitment by the Sheriff, new and accountable leadership over Custody, empowered independent oversight and ongoing engagement by the Board.

## A History of Recommended Reforms

The Citizens' Commission on Jail Violence is not the first body to investigate the issue of excessive force in Los Angeles County jails and recommend reforms in the operation of the Department's Custody Division.  For nearly two decades, respected oversight groups, experts, and advocates have identified a broad range of troubling issues that go to the core of the Department's culture, management and operation of its jails.  Some of these recommendations have cycled through numerous reports, often with nearly identical language, the same factual predicate, and at times increasing levels of frustration.

The failure to address aggressive deputy behavior within the jails has been a recurring theme in many of these reports.  Over *twenty years* ago concerns about these issues were raised by the Kolts Report, which found "deeply disturbing evidence of excessive force and lax discipline."  Yet the Department continues to finds itself plagued by the same force and

discipline concerns and a problematic culture that resulted in excessive force in the County jails over many years.

It is particularly troubling that suggested changes in personnel, culture, management, and discipline in the ensuing two decades have met with little response from the Department. Indeed, had these changes been implemented, even in part, the County might well have avoided years of litigation costs, injured inmates, and adversely impacted deputy careers.

At a fundamental level, the failure to heed recommendations made -- and advanced repeatedly over time -- is a failure of leadership in the Department. As the Sheriff has acknowledged, it was *his* responsibility to ensure that reforms recommended by these oversight and advocacy groups were implemented and that problems of excessive force in the County jails were addressed. Yet, his response has been insufficient.

## Use of Force

Statements and testimony from inmates, current and former Sheriff's Department personnel, jail chaplains and monitors, as well as the Sheriff's Department's own records, demonstrate that there has been a persistent pattern of unnecessary and excessive use of force in the Los Angeles County jails.

Most of the force in the last five years has been Significant Force or force that was not directed or supervised. In addition, multiple witnesses, both inmates and non-inmates, described numerous instances in which LASD personnel used force when no threat was present, used force disproportionate to the threat posed, used force after the threat had ended, or enabled inmates to assault other inmates.

Although the Department has taken steps to remediate this problem since public scrutiny intensified in the fall of 2011 -- efforts that have resulted in a significant drop in the number of reported use of force incidents -- use of excessive force remains a concern. This conclusion is supported by anecdotal evidence, as well as available statistical evidence, which shows that, as recently as last year, the majority of force incidents, including many involving Significant Force, were not in response to inmate assaults. It is likely that the force used in a number of these incidents was, at the very least, unnecessary.

The Commission based some of its analysis on data provided by the Sheriff's Department, but the Department's force records are not entirely reliable and likely underreport the use of force. The reliability of the tracking systems is undermined by disparities between the two main Department databases tracking force, which has led to inconsistent reporting of the number of use of force incidents. In addition, even when incidents are reported, there have been lags of months or even years before key information is entered into the Department's tracking databases, which means the information is not always current. Furthermore, the system designed to assess employee performance does not track inmate complaints by deputy name, thereby diminishing the ability to identify and correlate patterns of misconduct by employee.

More troubling are the data and witness accounts considered by the Commission showing that the existing systems underreport the use of force. Specifically, this evidence indicates that LASD personnel who use or witness force, and inmates who are the recipients of force, may not report all force incidents. This underreporting suggests that the nature and extent of the use of force in the jails are likely greater than the statistics demonstrate.

The Department's Use of Force Policy is also problematic. There is no single, comprehensive Use of Force Policy that is readily identifiable, available in one place, or easy to understand. Remarkably, until last November, the Department did not have a force prevention policy directing LASD personnel that force should be used only as "a last resort" and that, if necessary, they should only use the least amount of force that is "objectively reasonable" to maintain safety in the jails. Even now, the existing policies do not reflect an overall philosophy of preventing and limiting force, and are based upon a force options chart that is confusing and does not reflect the well-established "objectively reasonable" standard articulated by the United States Supreme Court.

Moreover, notwithstanding the volume of force incidents and the number of inmate complaints of which the Department is aware, the Department rarely finds a use of force to be "unreasonable." That track record casts doubt on whether the Department is correctly and consistently applying its stated policy that "unnecessary force" is "unreasonable."

## Management

The excessive force over a period of years in Los Angeles County jails -- and in particular Men's Central Jail -- was due, in no small part, to significant failures of the senior leadership in the Sheriff's Department.  Both Sheriff Baca and Undersheriff Tanaka have, in different ways, enabled or failed to remediate overly aggressive deputy behavior as well as lax and untimely discipline of deputy misconduct in the jails for far too long.  It is the Commission's view that absent strong, engaged and informed leadership over Custody -- and a more direct line of authority and accountability emanating from the Sheriff -- the Department is unlikely to achieve a lasting reduction in excessive force within its jails.

The Sheriff has claimed that he "did not know" of the problems in the jails until last fall, when the ACLU issued its report on jail violence and the *Los Angeles Times* published a high-profile series of critical articles.  Yet these problems are nothing new.  Issues with the jails have been detailed for decades in reports by Judge Kolts, Special Counsel, and OIR.

The Sheriff has faulted his senior staff for failing to keep him fully informed about these matters and, without absolving him of responsibility, the Commission concurs.   The Department's chain of command -- from the Chief of Custody Operations to the Assistant Sheriff for Custody to the Undersheriff -- failed to address the use of excessive and unnecessary force by Department personnel even though the Captain of MCJ raised concerns about deputy misconduct as early as 2006, a Commander overseeing MCJ from 2009 to 2010 warned of similar problems, and there were internal reports and data identifying troubling trends and a sharp increase in Significant Force in 2009.  These lapses allowed problems to continue for years.

Management's failure to address these problems has led the Sheriff to lose confidence in his senior leadership's ability to address the problem of excessive force.  This lack of confidence is reflected by the Sheriff's decision to form the Commander Management Task Force -- a body that circumvents those charged with responsibility for overseeing Custody operations -- to carry out his directives and implement his reforms.  He has also relieved the Undersheriff and the two Assistant Sheriffs of responsibility for deciding the appropriate discipline in the most serious cases of deputy misconduct.  And yet the Sheriff has failed to hold Department leaders accountable for their actions or the excessive force in the jails that occurred between 2005 and

2010, when those leaders had responsibility for oversight of the Department's Custody operations.

The Sheriff's proposed long term solution to the communication breakdowns and failures among his top leadership, as reflected in his submission to the Commission, is to seek $10 million in permanent funding from the Board of Supervisors for the Task Force to "continue inspections" throughout the entire Department, including Custody operations. The Commission agrees that the Department needs -- and the Board should fund as necessary -- a separate internal audit and inspections division. Our concern, however, is that to the extent the Sheriff uses the Task Force to continue to manage Custody operations and implement his directives, it would institutionalize a second and parallel chain of command over Custody and result in increased confusion, diffuse accountability and further opportunities for miscommunication. More fundamentally, it would do nothing to address the need for a capable, experienced and strong leader to oversee Custody with direct reporting responsibility to the Sheriff.

The troubling role of Undersheriff Tanaka cannot be ignored. Not only did he fail to identify and correct problems in the jails, he exacerbated them. The Commission learned about his ill-advised statements and decisions from a wide array of witnesses and sources. Over the course of several years, the Undersheriff encouraged deputies to push the legal boundaries of law enforcement activities and created an environment that discouraged accountability for misconduct. His repeated statements that deputies should work in an undefined "grey" area contributed to a perception by some deputies that they could use excessive force in the jails and that their aggressive behavior would not result in discipline. The Undersheriff also made numerous statements disparaging the Internal Affairs Bureau ("IAB") and the disciplinary process -- remarks that undermined the authority of IAB and the ability of Department supervisors to control or remediate inappropriate deputy behavior.

Undersheriff Tanaka specifically derailed efforts to address excessive force in MCJ when he vetoed a job rotation plan in 2006. After the plan was announced, he held a meeting with deputies without the knowledge or presence of supervisors, and in a subsequent meeting berated supervisors who attempted to hold deputies accountable for their conduct. These actions undermined the authority of supervisors, resulted in a breakdown in the chain of command, and perpetuated an environment of aggressive deputy conduct. Ultimately, this set the stage for a

sharp increase in the number of force incidents later in 2006 and for the reemergence of use of force problems later on.

Additional leadership and management problems at MCJ contributed to the problems of excessive force. The Captain of MCJ from 2008 to 2010 refused to adhere to the chain of command or report force problems to his Commander. He also failed to monitor the completion of use of force packages and personnel reports, and encouraged aggressive behavior by deputies.

The Commission heard repeated and consistent accounts of leadership failings in the Department over a period of years. Thus, it is not surprising that supervisors struggled to control deputy insubordination, inappropriate treatment of inmates, and aggressive conduct both on and off duty by deputies working in Custody.

## Culture

Although most of the Deputy Sheriffs assigned to Los Angeles County jails are hard-working and dedicated professionals, there are some who do not share the Department's Core Values and who have contributed disproportionately to the use of force problems that have plagued the jails over time. These deputies are reflective of a disturbing mindset that promotes a lack of respect for inmates, an aggressive view that force is best used early and often to control the inmate population, and a disdain for those supervisors who have endeavored to enforce contrary principles. The existence of these negative influences has created a troubling culture in Custody that resulted in the excessive use of force in the jails.

Over the years, some deputies have viewed force as a way to signal their authority over inmates and to establish "who is running the jails," rather than as a last resort in response to problematic inmate behavior. These deputies have adopted a confrontational approach in their interactions with inmates, thereby heightening disrespect among deputies and inmates and increasing tensions in the jails. Management, in turn, has sent the wrong message by failing to address excessive force and a deputy culture resistant to supervision.

Against this backdrop, new deputies have not received adequate training on ethical decision making or how to de-escalate force, nor have deputies learned -- or seen by management's example -- that reporting misconduct is an important and expected part of their

duties.  The Department also has failed to address with appropriate rigor the "code of silence" that is an inherent concern among law enforcement agencies.  It rarely finds or meaningfully punishes dishonesty and failure to report force incidents, and it takes months (or even years) to address deputy misbehavior.  Moreover, for years management has known about and condoned deputy cliques and their destructive subcultures that have undermined the Core Values articulate by the Sheriff.  These factors have contributed to force problems in the jails as well as numerous off-duty force incidents involving deputies.

The Sheriff has acknowledged the important role that the Department's culture has played in contributing to the use of excessive force in the Los Angeles County jails and the need to change that culture to achieve a lasting reduction in levels of force.  The "Sheriff's Department Strategy For Jail Reform," announced when he formed the Commander Management Task Force last fall, seeks to "[t]ransform the culture of [the Department's] custody facilities into a safe and secure learning environment for staff and inmates, and provide a level of service and professionalism consistent with our 'Core Values.'"

The Sheriff's approach is consistent with the views of experts that the widespread use of excessive force is both indicative of, and often precipitated by, a problematic organizational culture.  As one jail head who was able to improve a troubled jail aptly observed: "Without a unified effort to change culture, an organization is only addressing the symptoms of [force] problems and not the root cause."  Yet a lasting transformation of the culture in Custody will not be easy.  It will require capable and committed supervisors; strong and clear communication of policies and Core Values; timely and strict enforcement action evidencing zero tolerance for misconduct and dishonesty; and engaged and visible leadership in regard to these issues at the highest level of the Department.

Although some positive reforms have been achieved through the Commander Management Task Force, the recent Custody Division Working Group Report issued by the Association for Los Angeles Deputy Sheriffs (ALADS) suggests that a troubling mindset in Custody remains in place.  In responding to what it described as a "perceived problem" of excessive force in the jails, the ALADS Report reflects a fundamentally different view about the nature of existing concerns and how to fix them.  According to ALADS, the reforms the Sheriff has implemented -- including a Force Prevention Policy, an Anti-retaliation Policy, Town Hall

meetings with inmates, enhanced supervision and Education Based Incarceration programs -- have caused deputies to "feel that they have largely 'lost control' of the jails, with a sense that 'inmates are running the jails.'" The implicit suggestion of the ALADS Report -- more force and inmate discipline to show inmates who is "running the jails" -- underscores the ongoing cultural challenges the Department faces in addressing its use of force issues in a meaningful and lasting way.

## Personnel

The Department's personnel and training policies and practices do not adequately address the needs of the Custody Division and the safe, sound and effective operation of its jails. There is a strong consensus among deputies that the Department views its primary role as law enforcement and Patrol operations, and that Custody is perceived to be of secondary importance. That mindset is reinforced by the Department's stated Mission, which makes no mention of Custody or the operation of the jails. Deputies are recruited and hired largely for Patrol, resulting in a mindset from the outset that Patrol is the primary work of the Department. Deputies interviewed by the Commission often referred to the Custody Division as a "step child," and repeatedly articulated the view that Custody work experience is not respected, years in Custody are viewed as "lost time," and only Patrol experience counts towards promotion and advancement. The Department's personnel and training policies and practices both reflect and reinforce the second class status of Custody.

Among the policies and practices that communicate and perpetuate this view that Custody is not the "real" work of the Department are the following examples:

- The Department's Academy for new recruits spends a total of only *two hours* out of a total of 18 weeks of instruction on Custody specific training;

- The Department's Leadership & Training Division does not oversee any training for Custody beyond the two hours in the Academy and a newly-added 10 days of "Nobility Policing" post-Academy that includes some Custody-related scenarios;

- Custody has been used as a place for the Department to place deputies who have encountered problems in their Patrol assignments or are under investigation for misconduct;

- Deputies cannot be promoted without Patrol experience and, while technically a Sergeant could be promoted to Lieutenant while assigned to Custody, in practice it virtually never occurs; and

- According to the long-standing supervisorial assignment practices, Custody has historically received "who's left" after the highest rated new supervisors are chosen by Patrol and specialty units.

The Commission believes that there needs to be an organization-wide recognition of the importance of the work of the Custody Division in the Department's overall mission. In particular, there should be a re-thinking of the Department's mission, training, personnel policies and practices to reflect Custody's valued function and address the needs of Custody with a long-term goal of establishing a stand-alone Custody Division.

## <u>Discipline</u>

Timely investigations and discipline commensurate with the nature of the misconduct are essential to sustaining a reduction in the use of excessive and unnecessary force and ameliorating a code of silence in the jails. So too is a discipline system that severely punishes false reports and failures to report such incidents. There are, however, many impediments to the swift and certain imposition of appropriate discipline for the improper use of force and dishonesty in the Los Angeles Sheriff's Department. Some of these impediments are structural. They arise from the unduly complex, multi-layered, and at times disjointed system the Department employs to review force incidents, investigate policy violations, and impose discipline, as well as from the appeals process from misconduct findings by the Department. This system gives rise to poorly performed investigations and long delays between the use of force incident and the ultimate discipline determination. It has resulted in missed opportunities to remediate deputy misconduct at the first sign of trouble, instead allowing problems in some cases to go unaddressed and deputy misbehavior to reach more serious levels before action results. Further, the system does not assure that inmate grievances are sufficiently addressed or that inmates are able to submit their grievances without fear of retaliation.

Other impediments are cultural. There is evidence of the Department's failure to acknowledge the problem of inappropriate use of force in the jails and to take the necessary steps to ensure that the disciplinary system actually addresses this problem. Although the punishment

for excessive force is often severe, some force incidents appear to be underreported and not addressed through the discipline process.  The Department has found very few force incidents overall to be unreasonable, it has been too lenient about imposing discipline for dishonesty or omissions in reporting the use of force, and there have been well-documented lapses in the processing of use of force packages, lengthy lags in completing pending investigations, and delays in disciplining problematic personnel.

Further, senior LASD officials have undermined the discipline system, which has led to the perception that improper use of force in the jails will not always be subject to punishment. There is a need for strong leadership dedicated to ensuring that the Department thoroughly investigates any improper uses of force as well as dishonesty about these incidents and that the Department timely imposes appropriate discipline for any misconduct.

## Oversight

Effective oversight is critical to any ongoing effort to address excessive force issues in the County jail system.  Although the County has multiple oversight entities with different mandates, force issues in the jail have continued to plague the Department over time and the Department has taken too long to implement needed reforms and ignored critical recommendations.

The Department has multiple oversight mechanisms, staffed by numerous dedicated public servants, for providing civilian review: Special Counsel, the Office of Independent Review and the Office of the Ombudsman.  Their efficacy, as well as the limits and barriers they face, necessarily has a significant impact on the issues and proposed reforms addressed throughout this Report.  Over the course of many years, these watchdogs have identified numerous problems in the jails, investigated force incidents, monitored the integrity of Department investigations into use of force, responded to inmate and citizen complaints, and issued dozens of reports calling for important reforms.

For all their contributions, each of the existing oversight bodies has significant limitations on what it monitors and what it does with the information it receives.  Special Counsel has repeatedly identified critical issues related to use of force, yet it lacks the resources to timely follow up on its recommendations.  The Office of Independent Review scrutinizes major force

incidents on a micro level, but exercises little oversight over unit level investigations and lacks a mandate to oversee macro policy issues. There is also a gap between the policy level review by Special Counsel and the case review by OIR with respect to the review and identification of trends, tactical issues, and overlapping problems. And the Ombudsman, despite serving as the clearinghouse for public complaints, does not regularly review the totality of inmate complaints to identify systemic patterns and problems or evaluate the Department's progress in resolving these issues.

Even when each entity performs its own functions effectively, the overall result is undermined by the lack of an overarching, consolidated strategy that marshals and leverages their collective strengths. As separate units, with different mandates and different protocols, these oversight bodies suffer from too many gaps among them to be able to effectuate comprehensive and lasting changes in the Department. Too often the Department has paid lip service to recommendations of these oversight bodies knowing that there has not been sustained follow-up to ensure that their recommendations are carried out.

To ensure that there is an effective mechanism for overseeing the Department, the Commission recommends the formation of a single watchdog entity that would streamline and strengthen civilian oversight. This centralized body would subsume and consolidate all of the existing important oversight functions of Special Counsel, OIR and the Ombudsman's office and utilize their existing expertise and knowledge of the Department. It would also monitor conditions in county jails; review use of force investigations and the disciplinary process; conduct its own investigations in particularly sensitive cases; and both review and conduct audits and inspections. It would ensure that the Board of Supervisors and the public are kept informed of conditions in the jails, that problems are identified promptly and visibly, and that necessary reforms are implemented in a timely and transparent manner.

Finally, the Sheriff should be required to respond publicly -- both in person and in writing -- to the recommendations in this Report, as well as the future recommendations propounded by the new oversight entity, and submit regular reports to the Board of Supervisors on the implementation of all of these recommendations.

# FINDINGS

## Previously Recommended Reforms

1. Both Special Counsel and OIR have recommended numerous reforms aimed at addressing excessive force in the jails that have not been implemented.

2. The ACLU has also raised repeated concerns about mistreatment of inmates by deputies in County jails.

3. The Department of Justice similarly expressed concerns regarding treatment of mentally ill inmates and inadequate training in handling this population.

## Use of Force

1. LASD personnel have used force against inmates when the force was disproportionate to the threat posed or there was no threat at all.

2. The drop in use of force incidents following public scrutiny of LASD corroborates the anecdotal evidence of a historical use of force problem.

3. The majority of force used in Los Angeles County jails has been Significant Force.

4. Most force in Los Angeles County Jails is non-directed and unsupervised.

5. Most force incidents in 2011 were not in response to inmate assaults.

6. LASD imposed discipline for unreasonable force violations in less than 1% of force incidents from 2006 to 2011.

7. Deputies have enabled inmates to use force against other inmates.

8. Deputies have used humiliation as a tool to harass inmates.

9. Use of heavy flashlights as impact weapons leads to unnecessary injuries.

10. LASD's statistics on use of force are not reliable.

11. Evidence suggests that the use of force is underreported.

12. LASD does not have a comprehensive, integrated and understandable Use of Force Policy, nor does it ensure that deputies understand its policies.

13. LASD did not have a policy that set forth basic force avoidance principles prior to November 2011.

14. The Situational Use of Force Options Chart is not an adequate or well-founded use of force guide.

15. LASD policies concerning the reporting of force are confusing and fail to clearly articulate the timeline and process for reporting.

## **Management**

1. The Sheriff failed to monitor and control the use of force in Los Angeles County jails.

2. LASD senior management failed to investigate the excessive use of force problems at MCJ.

3. LASD management has known about and failed to address the longstanding problem of deputy cliques.

4. The Undersheriff has made statements and engaged in conduct that are inconsistent with the Department's Core Values and that have undermined the authority of IAB and supervisors to address deputy misconduct.

5. Several key Department leaders ignored deputy aggression and discouraged discipline at Men's Central Jail.

6. There was a break-down in the chain of command at Men's Central Jail.

7. The Sheriff has failed to hold senior management accountable for the excessive use of force in Los Angeles County jails.

8. The Sheriff's recent decisions reflect a lack of confidence in senior management's ability to address excessive use of force problems.

9. The Sheriff's recent personal engagement has reduced force incidents in Los Angeles County jails.

10. The Assistant Sheriff for Custody Division is responsible for managing other divisions only minimally related to Custody operations and is not an experienced corrections leader.

11. Despite having succeeded in holding LASD Captains accountable for the performance of their Stations, the "Sheriff's Critical Incident Forum" has been downgraded and de-emphasized.

12. There is a perception that promotions in LASD are based upon loyalty, not merit.

13. Campaign contributions accepted by Tanaka from many Department employees furthered perceptions of patronage and favoritism in promotion and assignment decisions.

14. The Department has no formal policy governing the acceptance of campaign contributions.

15. The Department's operational staffing model fails to account for jail facility size.

16. The Department has no Audit and Inspections unit.

## Culture

1. Force too often has been viewed as a means to control the inmate population and establish deputy authority in the jails.

2. The Department condoned a deputy-versus-inmate culture.

3. The Department's tolerance of deputy cliques contributed to the excessive use of force in the jails.

4. The Department's tolerance of a code of silence impeded its ability to prevent, detect, and discipline the use of excessive force.

5. Off duty deputy misconduct reflects a confrontational and aggressive culture among some in the jails.

6. The Department has lacked sufficient training and guidance on ethical behavior and de-escalation techniques.

7. Poor leadership has contributed to the troubling culture in the jails.

8. The Department's failure to appropriately value Custody positions contributed to a negative and unprofessional culture in the jails.

9. ALADS response to the Sheriff's reforms reflects an entrenched and problematic culture.

## Personnel

1. While the Department's hiring policies and procedures are generally consistent with industry standards, application of these policies has at times been problematic.

2. The Department's cyclical hiring has resulted in the hiring of lesser qualified deputies.

3. Department training for Custody is far below both industry best practices and training standards in other corrections systems.

4. The Department's promotion and supervisorial assignment process reinforce the second class nature of Custody service.

5. Custody has a history of deficient supervisory performance.

6. The ratio of supervisors to deputies in Custody is inadequate.

7. Staffing the jails primarily with inexperienced deputies, and keeping them in Custody for a lengthy time period, has a host of negative consequences.

8. Some of the newest Custody deputies have been assigned to the most difficult floors or modules.

9. The Department fails adequately to monitor the performance of deputies in Custody assignments.

10. The Department's lack of a rotation policy contributed to the growth of cliques, a culture of silence, and problems of insubordination.

11. The Department has used Custody as a place to assign problem deputies.

12. The Department underutilizes Custody Assistants.

## Discipline

1. There have been well-documented lapses in reporting, investigating and disciplining use of force in the jails.

2. The Department has a multi-layered, complicated and at times ineffective process for reviewing and investigating force incidents.

3. The investigative process often takes too long to complete.

4. There are multiple deficiencies in LASD's investigatory process.

5. The Department's unit level investigations are not always rigorous or thorough.

6. The Department is considering a new policy regarding deputies' reviews of video tapes before writing reports or submitting to formal interviews.

7. The exceedingly low number of unreasonable force incidents casts doubt on the integrity of the investigatory process.

8. The cumbersome and time consuming discipline and appeal procedure undermines the effectiveness of the discipline system.

9. The inmate grievance procedure does not ensure that inmate grievances are addressed or that inmates may submit grievances without fear of retaliation.

10. The Department does not adequately pursue or impose discipline for false statements about use of force.

11. The Department has missed opportunities to remediate problematic force concerns.

12. LASD's disciplinary guidelines for both use of force and dishonesty are too broad, overly lenient, and at times ignored.

13. Leadership in the Department has undermined the efficacy of the disciplinary process.

14. The Sheriff has taken steps to remove the Undersheriff from oversight of internal investigations and discipline for misconduct.

## <u>Oversight</u>

1.    There is no single entity that provides comprehensive monitoring of the Los Angeles County Sheriff's Department and its jails.

2.    The Department has failed to address critical issues or implement key recommendations that have been identified over time by Special Counsel and OIR.

3.    There is insufficient oversight of LASD force incidents handled at the unit level.

4.    There is insufficient oversight of the Department's inmate complaint process and the Office of the Ombudsman lacks the authority and resources to adequately oversee it.

5.    None of the existing oversight entities regularly reviews force statistics.

6.    The Department has relied on the ACLU, an adversary in litigation, to act as a *de facto* jail monitor and has no independent monitor responsible for Custody.

7.    The Board of Supervisors has recently become more engaged in oversight of the jails, which has helped propel reforms and maintain visibility of jail issues.

8.    The Board has oversight and budgetary authority over LASD.

# RECOMMENDATIONS

## Use of Force

3.1     LASD should promulgate a comprehensive and easy-to-understand Use of Force Policy in a single document.

3.2     LASD personnel should be required to formally acknowledge, in writing, that they have read and understand the Department's Use of Force Policy.

3.3     All LASD Custody personnel should be provided training on a new comprehensive and easy to understand Use of Force Policy and how it applies in Custody.

3.4     The Department's Use of Force Policy should reflect a commitment to the principles of the Force Prevention Policy and prohibit inmate retaliation or harassment.

3.5     LASD's Use of Force Policy should be based upon the objectively reasonable standard rather than the Situational Use of Force Options Chart.

3.6     The Use of Force Policy should articulate a strong preference for planned, supervised, and directed force.

3.7     The Use of Force Policy should account for special needs populations in the jails.

3.8     PPI and FAST should be replaced with a single, reliable, and comprehensive data tracking system.

3.9     Inmate grievances should be tracked in PPI by the names of LASD personnel.

3.10    LASD should analyze inmate grievances regarding use of force incidents.

3.11    Statistical data regarding use of force incidents needs to be vigilantly tracked and analyzed in real time by the highest levels of LASD management.

3.12    The Board of Supervisors should provide funding so that the Department can purchase additional body scanners.

## Management

4.1     The Sheriff must be personally engaged in oversight of the jails.

4.2     The Sheriff must hold his high level managers accountable for failing to address use of force problems in the jails.

4.3     The Undersheriff should have no responsibility for Custody operations or the disciplinary system.

4.4     The Department should create a new Assistant Sheriff for Custody position whose sole responsibility would be the management and oversight of the jails.

4.5     The Sheriff should appoint as the new Assistant Sheriff over Custody an individual with experience in managing a large corrections facility or running a corrections department.

4.6     The Assistant Sheriff for Custody should report directly to the Sheriff.

4.7     The Commander Management Task Force should not be a permanent part of Custody management.

4.8     The Sheriff must regularly and vigilantly monitor the Department's use of force in the jails.

4.9     The Department should implement SCIF on the Custody side to improve the accountability of jail supervisors.

4.10    Senior management needs to be more visible and engaged in Custody.

4.11    Management staff should be assigned and allocated based on the unique size and needs of each facility.

4.12    LASD should create an internal Audit and Inspections Division.

4.13    The Department should have a formal policy to address campaign contributions.

4.14    LASD should participate in collaborations such as the Large Jail Network that would enable it to learn about best practices and approaches in other systems.

## Culture

5.1     The Department must continue to implement reforms that emphasize respect for, engagement of, and communication with inmates.

5.2     The Department's Force Prevention Policy should be stressed in Academy training and reiterated in continuing Custody Division training.

5.3     The Department should enhance its ethics training and guidance in the Academy as well as in continuing Custody Division training.

5.4     The Department must make Custody a valued and respected assignment and career.

5.5     Senior leaders must be more visible in the jails.

5.6     LASD must have a firm policy and practice of zero tolerance for acts of dishonesty that is clearly communicated and enforced.

5.7     The Department should have a sensible rotation policy to protect against the development of troubling cliques.

5.8     LASD should discourage participation in destructive cliques.

## Personnel

6.1     The Department should review and revise its personnel and training policies and procedures to reflect Custody's status as a valued and important part of the Department.

6.2     The Department should develop and implement a long-range and steady hiring plan based upon normal attrition.

6.3     Deputies and supervisors should receive significantly more Custody specific training overseen by the Department's Leadership &Training division.

6.4     There should be a meaningful probationary period for new deputies in Custody.

6.5     The number of supervisors to deputies should be increased and the administrative burdens on Custody supervisors should be minimized.

6.6     The Department should allow deputies to have a career in Custody and take steps in the interim to decrease the length of new deputy assignments to Custody.

6.7     The Department should utilize more Custody Assistants.

6.8     Rotations within and among proximate facilities should be implemented.

6.9     The Department's Mission Statement should be changed to reflect the importance of Custody.

6.10    The Department should create a separate Custody Division with a professional jail workforce.

## Discipline

7.1     The investigative and disciplinary system should be revamped.

7.2     CFRC should monitor Force Packages for trends and concerns and the performance of supervisors.

7.3     Deputies should be required to provide a timely written report of force incidents and not be allowed to review video tape footage prior to completion of that report or any interviews.

7.4     Deputies involved in Significant Force incidents should be separated and not permitted to talk to each other until they have provided a written statement or been interviewed by investigators.

7.5     IAB and ICIB should be part of an Investigations Division under a Chief who would report directly to the Sheriff.

7.6     IAB should be appropriately valued and staffed by personnel that can effectively carry out the sensitive and important work of that bureau.

7.7    The Discipline Guidelines should be revised to establish increased penalties for excessive force and dishonesty.

7.8    Each jail should have a Risk Manager to track and monitor use of force investigations.

7.9    Force investigations should not be conducted by deputies' supervisors.

7.10    Captains should not reduce charges or hold penalties in abeyance for use of force, dishonesty, or failure to report force incidents.

7.11    The Department should vigorously investigate and discipline off-duty misconduct.

7.12    The Department should implement an enhanced and comprehensive system to track force reviews and investigations.

7.13    Inmate complaints should be tracked by deputies' names in PPI.

7.14    The inmate grievance process should be improved and include added checks and oversight.

7.15    The use of lapel cameras as an investigative tool should be broadened.

### Oversight

8.1    The Board of Supervisors should create an independent Inspector General's Office to provide comprehensive oversight and monitoring of the Department and its jails.

8.2    The Department should report regularly to the Board of Supervisors on use of force and the status of Custody reform recommendations.

8.3    OIR should review unit level investigations for fairness and accuracy.

8.4    The OIG should review the Department's data for trends, spikes, and patterns in the jails.