O

1

2

3

4

5

6

7

8                   UNITED STATES DISTRICT COURT

9                   CENTRAL DISTRICT OF CALIFORNIA

10

11  UNITED STATES AMERICA,        )  Case No. CV 15-05903 DDP (JEMx)
                                  )
12                  Plaintiff,    )
                                  )  **ORDER DENYING DEFENDANTS' MOTION**
13        v.                      )  **FOR JUDGMENT ON THE PLEADINGS**
                                  )
14  COUNTY OF LOS ANGELES et      )
    al.,                          )  [Dkt. 84]
15                                )
                    Defendants.   )
16  _____ )

17

18      Presently before the court is Defendants' Motion for Judgment

19  on the Pleadings of Intervenors' First Amended Complaint in

20  Intervention ("FACI").  The FACI alleges that a portion of an

21  executed settlement agreement between Plaintiff ("the government")

    and Defendant ("the County") violates the Americans with
22
    Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act,
23
    and Intervenors' Eighth and Fourteenth Amendment rights.  Having
24
    considered the submissions of the parties and heard oral argument,
25
    the court denies the motion and adopts the following Order.
26
        **I.   Background**
27
        On August 5, 2015, the government filed a Complaint against
28
    the County under the Civil Rights of Institutionalized Persons Act

1   ("CRIPA"), 42 U.S.C. §§ 1997-1997j, and the Violent Crime Control

2   and Law Enforcement Act of 1994, 42 U.S.C. § 14141.[1]  The Complaint

3   alleged repeated and systemic violations of prisoners' constitional

4   rights in the Los Angeles County jail system.  The alleged

5   violations included constitutionally deficient mental health care

6   and related services, such as suicide prevention, psychological and

7   pyschiatric services, and discharge planning, as well as inadequate

8   housing and sanitation practices and a pattern of excessive force

9   against prisoners.  (Complaint ¶¶ 22-26.)

10        The same day the Complaint was filed, the government and the

11  County filed a stipulated settlement of this matter.  The

12  stipulated Settlement Agreement ("Agreement"), which spans 125

13  paragraphs and nearly sixty pages, provides for a series of new or

14  enhanced policies and practices across nineteen subject areas

15  intended to ensure that the County will provide "prisoners at the

16  Jails with safe and secure conditions and ensure their reasonable

17  safety from harm, including serious risk from self-harm and

18  excessive force, and ensure adequate treatment for their serious

19  mental health needs."  (Agreement ¶ 16.)  Among the stipulated

20  terms is a provision regarding inmate discharge planning

21  ("Paragraph 34").  That provision states:

22        34.  The County and the Sheriff will conduct discharge
             planning and linkage to community mental health
23           providers and aftercare services for all prisoners
             with serious mental illness as follows:
24
             (a)  For prisoners who are in Jail seven days or
25                less, a preliminary treatment plan, including
                  discharge information, will be developed.
26

27  _____

28        [1] The Complaint also named Los Angeles County Sheriff Jim
    McDonnell as a Defendant, in his official capacity.

2

(b) For prisoners who are in Jail more than seven days, a [Qualified Mental Health Professional] will also make available:

(i)     for prisoners who are receiving psychotropic medications, a 30-day prescription for those medications will be offered either through the release planning process, through referral to a re-entry resource center, or through referral to an appropriate community provider, unless clinically contraindicated;

(ii)    in-person consultation to address housing, mental health/medical/substance abuse treatment, income/benefits establishment, and family/community/social supports. This consultation will also identify specific action to be taken and identify individuals responsible for each action;

(iii)   if the prisoner has an intense need for assistance, as described in [County Mental Health] policies, the prisoner will further be provided direct linkage to an Institution for Mental Disease ("IMD"), IMD-Step-down facility, or appropriately licensed hospital;

(iv)    if the prisoner has a moderate need for assistance, as described in [County Mental Health] policies, and as clinically appropriate to the needs of the prisoner, the prisoner will be offered enrollment in Full Service Partnership or similar program, placement in an Adult Residential Facility ("Board and Care") or other residential treatment facility, and direct assistance accessing community resources;

(v)     if the prisoner has minimal needs for assistance, as described in [County Mental Health] policies, the prisoner will be offered referrals to routine services as appropriate, such as General Relief, Social Security, community mental health clinics,

3

1                                substance abuse programs, and/or
                                 outpatient care/support groups.
2
               (c)  The County will provide a re-entry resource
3                   center with QMHPs available to all prisoners
                    where they may obtain information about
4                   available mental health services and other
                    community resources.
5
(Agreement ¶ 34.)
6
       Intervenors intervened and later filed the FACI, which alleges
7
that Paragraph 34 violates the ADA, Section 504 of the
8
Rehabilitation Act, and the Eighth and Fourteenth Amendments.
9
Intervenors allege, for example, that Paragraph 34 facially
10
discriminates against disabled prisoners whose disability stems
11
from personality disorders, substance abuse and dependence
12
disorders, dementia, or developmental disabilities, as well as all
13
disabled prisoners who spend seven days or fewer in jail.[2]
14
(Agreement ¶ 34, 34(a); FACI ¶ 101.)  The FACI also alleges that
15
Paragraph 34 discriminates against disabled inmates, fails to
16
reasonably accommodate Intervenors' disabilities, and places
17
certain inmates in non-integrated environments in violation of the
18
ADA's integration mandate.  (FACI ¶¶ 101, 112.)  Intervenors
19
further allege, in essence, that Paragraph 34's discharge
20
procedures do not allow Intervenors to access medical and
21
psychiatric services, and that Paragraph 34's failings constitute
22
deliberate indifference to Intervenors' serious medical needs.
23
Defendants now move for judgment on the pleadings.
24
       **II.  Legal Standard**
25

26
_____
27     [2] The Agreement's definition of "serious mental illness"
expressly excludes these substantive categories, with the exception
28 of personality disorders that are "associated with serious or
recurrent significant self-harm."  (Agreement ¶ 15(aa).)

1   A party may move for judgment on the pleadings "[a]fter the

2   pleadings are closed [] but early enough as not to delay the

3   trial." Fed. R. Civ. P. 12(c). Judgment on the pleadings is

4   proper when the moving party clearly establishes that no material

5   issue of fact remains to be resolved and that it is entitled to

6   judgment as a matter of law. <u>Hal Roach Studios, Inc. v. Richard</u>

7   <u>Feiner & Co.</u>, 896 F.2d 1542, 1550 (9th Cir. 1990); <u>Doleman v. Meiji</u>

8   <u>Mut. Life Ins. Co.</u>, 727 F.2d 1480, 1482 (9th Cir. 1984). The

9   standard applied on a Rule 12(c) motion is essentially the same as

10  that applied on a Rule 12(b)(6) motion to dismiss for failure to

11  state a claim, with the court accepting all of the non-moving

12  party's allegations as true. <u>Lyon v. Chase Bank USA, N.A.</u>, 656

13  F.3d 877, 883 (9th Cir. 2011).

14  **III. Discussion**

15      A.   Standing

16  Defendants contend first that Intervenors lack standing to

17  bring their claims. It is well established that the "imminent"

18  invasion of a concrete, legally protectable interest is sufficient

19  to constitute an injury for purposes of standing. <u>See Lujan v.</u>

20  <u>Defenders of Wildlife</u>, 540 U.S. 555, 560, 564 n.2 (1992).

21  Defendants argue that it is uncertain whether Intervenors will be

22  incarcerated again, and that even if they are incarcerated, it is

23  unclear whether they will be adversely affected by the policies set

24  forth in Paragraph 34. Intervenors need only show, however, a

25  credible threat of future injury. <u>Ibrahim v. Dep't of Homeland</u>

26  <u>Security</u>, 669 F.3d 983, 992 (9th Cir. 2012).

27  As this court noted in allowing intervention in this case,

28  "Intervenors have presented evidence that they are caught up in a

5

tragic cycle of homelessness and incarceration perpetuated and
punctuated by manifestations of mental illness and unbroken by any
adequate treatment." (Dkt. 75 at 8 n.4).  The FACI alleges that
some Intervenors have been detained in Los Angeles County jail
facilities dozens of times, while others have been arrested
hundreds of times.  All suffer from at least one mental illness,
and most have histories of substance abuse.  In some cases, it
appears that Intervenors have entered the jail system largely as a
result of their mental health conditions, and that those conditions
have then been aggravated by incarceration and, in some cases, the
denial of medication.  Intervenors have then been released onto the
streets, often in a more vulnerable, less stable state than when
they entered the jail system.  Under these circumstances, there
appears to be little doubt that there is a credible threat that
Intervenors will again find themselves incarcerated and subject to
the policies set forth in Paragraph 34.

Defendants also argue that Intervenors lack standing as a
matter of law because the threat of future injury to Intervenors is
entirely dependent on their engaging in illegal conduct in the
future.  The Ninth Circuit has held that "standing is inappropriate
where the future injury could be inflicted only in the event of
future illegal conduct by the plaintiff." Armstrong v. Davis, 275
F.3d 849, 865 (9th Cir. 2001).  In other words, standing should be
denied where it is "contingent upon [plaintiffs'] violating the
law, getting caught, and being convicted." Hodgers-Durgin v. de la
Vina, 199 F.3d 1037, 1041 (9th Cir. 1999) (en banc) (quoting
Spencer v. Kemna, 523 U.S. 1, 15 (1983).

1    Defendants appear to assume that Intervenors are only caught
2    up in the jail system when they violate the law and are convicted
3    of a crime.  Granted, some Intervenors acknowledge that they have
4    been incarcerated for drug offenses stemming from addiction
5    problems, or for shoplifting food, soap, shampoo, toothpaste, and
6    deodorant, or for other petty offenses often associated with
7    homelessness.  Some have outstanding warrants for failure, or
8    inability, to pay fines incurred after riding public transportation
9    without a valid fare.  It is unclear at this stage, however,
10   whether or how often Intervenors have been convicted of criminal
11   offenses.  In addition, criminal activities of the type described
12   above may be closely entwined with mental health issues and
13   potential defenses related thereto.  Furthermore, a person may be
14   subjected to unlawful practices by law enforcement or custodial
15   personnel without having ever engaged in illegal conduct.  See,
16   e.g. Armstrong, 275 F.3d at 866; Hodgers-Durgin, 199 F.3d at 1041.
17   Some Intervenors, including veterans, appear to have been
18   incarcerated after exhibiting symptoms of mental illness, including
19   schizophrenic episodes, periods of confusion related to post-
20   traumatic stress disorder, hearing voices, and talking to trees,
21   without any facially apparent tie to any illegal activity.  (Dkt.
22   27.)

23   Nor is the court persuaded that the standing principle
24   articulated in Armstrong is applicable to the mental health-focused
25   circumstances here.  The Hodgers-Durgin court, citing the same
26   Supreme Court cases as did the Armstrong court, explained that the
27   Supreme Court's approach to the denial of standing was "based on
28   the plaintiff's ability to avoid engaging in illegal conduct."

1    Hodgers-Durgin, 199 F.3d at 1041 (discussing City of Los Angeles v.
2    Lyons, 461 U.S. 95, 105 (1983) and Spencer v. Kemna, 523 U.S. 1, 15
3    (1998)) (emphasis added).  This court has serious questions whether
4    mentally ill, homeless, and possibly addicted or chemically
5    dependent individuals can realistically be said to have the ability
6    to avoid engaging in the type of minor infractions that appear to
7    result in repeated incarcerations, particularly where the very fact
8    of incarceration may disrupt ongoing care, exacerbate the effects
9    of disabilities, and impede future treatment.

10        At this stage, it appears to the court that the threat of
11   future harm to Intervenors is not dependent on their conscious
12   decisions to purposefully engage in unlawful activity in the
13   future.  Rather, the very nature of Intervenors' disabilities and
14   concomitant symptoms and behaviors, which may be aggravated by the
15   types of practices challenged here, are likely to lead to repeated
16   incarcerations and exposure to the harms alleged.  Intervenors,
17   therefore, have standing.

18        B.   ADA and Rehabilitation Act Claims
19        A plaintiff bringing a discrimination claim under Title II of
20   the ADA or Section 504 of the Rehabilitation Act must allege "(1)
21   the plaintiff is an individual with a disability; (2) the plaintiff
22   is otherwise qualified to participate in or receive the benefit of
23   some public entity's services, programs, or activities; (3) the
24   plaintiff was either excluded from participation in or denied the
25   benefits of the public entity's services, programs, or activities,
26   or was otherwise discriminated against by the public entity; and
27   (4) such exclusion, denial of benefits, or discrimination was by
28   reason of the plaintiff's disability." Thompson v. Davis, 295 F.3d

1  890, 895 (9th Cir. 2002); <u>Melton v. Dallas Area-Rapid Transit</u>, 391

2  F.3d 669, 676 (9th Cir. 2004).

3       Much of the parties' argument here is colored by differences

4  in the characterization of the FACI's claims.  Defendants seek to

5  cast the claims in terms of discrimination between groups of

6  disabled inmates; namely, those who qualify for extra discharge

7  planning under Paragraph 34 and those who do not.  Although

8  acknowledging that they did take this position earlier, Intervenors

9  appear to concede that benefits extended to one group of disabled

10 individuals need not necessarily be provided to all disabled

11 people.  <u>See</u> <u>Traynor v. Turnage</u>, 485 U.S. 535, 548-49 (1988) ( . .

12 . [T]he central purpose of [the Rehabilitation Act] . . . is to

13 assure that handicapped individuals receive 'evenhanded treatment'

14 in relation to nonhandicapped individuals. . . .  There is nothing

15 in the Rehabilitation Act that requires that any benefit extended

16 to one category of handicapped persons also be extended to all

17 other categories of handicapped persons.").

18      Intervenors' main contention, however, is different.

19 Intervenors argue that Paragraph 34 results in a denial of

20 meaningful, state-provided discharge planning services with respect

21 to Intervenors.  (Opposition at 16.)  That denial, in turn, "bars

22 [Intervenors] from meaningful access to County and other services

23 based on their disability."  (Opp. at 18:14-15.)

24      Hewing closely to <u>Traynor</u>, Defendants argue that Intervenors

25 cannot possibly be discriminated against because non-disabled

26 inmates do not receive any discharge planning services that are not

27 available to disabled inmates, including Intervenors.  (Reply at 13

28 ("Although Intervenors argue that non-disabled persons receive

1  discharge planning in the form of being 'processed, released, and
2  walked out the door,' they do not allege that disabled persons are
3  not processed and released.").)  In other words, even if discharge
4  planning is considered a "service," all inmates are processed and
5  released in the same, evenhanded way.  Thus, the argument goes, the
6  fact that Paragraph 34 provides some additional benefits to some,
7  but not all, disabled people is immaterial, as the provision of
8  those extra benefits to a select disabled few does not deny any
9  disabled person a service available to a nondisabled person.
10 (Reply at 13 ("Non-disabled persons do not need or receive any of
11 the services set forth in paragraph 34.").)  This argument is not
12 persuasive.

13     The ADA and Rehabilitation Act cover both intentional
14 discrimination and facially neutral practices that
15 disproportionately impact disabled people.  Crowder v. Kitagawa, 81
16 F.3d 1480, 1484 (9th Cir. 1996).  The Ninth Circuit has counseled
17 that courts should not dwell on distinctions between intentionally
18 discriminatory practices and those that are merely "thoughtless,"
19 but should instead "assess whether disabled persons were denied
20 'meaningful access' to state-provided services."  Id. (discussing
21 Alexander v. Choate, 469 U.S. 287, 302 (1985).)  A policy that
22 denies disabled persons meaningful access to state services by
23 reason of their disability discriminates against disabled
24 individuals in violation of the ADA.  Crowder, 81 F.3d at 1485.

25     It is somewhat unclear whether the parties consider discharge
26 planning itself to be a state-provided service.  Defendants
27 implicitly suggest that it is, albeit a very basic one that is
28 provided in the same way to every inmate.  At this stage of the

1    proceedings, the nature and scope of Defendants' "processing and

2    release" procedures are not yet factually developed.  Any

3    characterization, however, of discharge policy as mere, and

4    uniformly-applied, guidance toward the jailhouse door strikes the

5    court as an oversimplification.  Defendants' discharge policies are

6    designed to achieve certain goals, which may or may not be limited

7    to constitutional or other floors.[3]  Defendants presumably do not,

8    and could not, for example, simply show a severely ill inmate to an

9    exit without any concern for what might befall that inmate on the

10   other side of the door.  See, e.g. Wakefield v. Thompson, 177 F.3d

11   1160, 1164 (9th Cir. 1999) ("A state's failure to provide

12   medication sufficient to cover [a post-incarceration] transitional

13   period amounts to an abdication of its responsibility to provide

14   medical care to those, who by reason of incarceration, are unable

15   to provide for their own medical needs.").  Indeed, Defendants

16   acknowledged at argument that the discharge process does account

17   for disabilities to some extent.  Defendants do not dispute, for

18   example, that a jail cannot discharge a wheelchair-bound inmate by

19   simply wheeling her out the door onto an elevated, ramp-less

20   entryway without running afoul of the ADA.

21       Although factual questions abound, it appears to the court

22   that inmates may receive some form of discharge planning services.[4]

23   For a non-disabled person, the procedure necessary to satisfy

24   Defendants' goals may not entail anything more than directing the

25   ─────────────

26       [3] The court recognizes that further factual development may be
     required before these goals can be delineated.

27       [4] It is unclear, for example, whether Paragraph 34 represents
28   the entirety of Defendants' discharge policy even regarding those
     disabled persons to whom it applies.

1  inmate to the exit stairs.  That does not mean, however, that no

2  service is provided, or that the same discharge service would prove

3  meaningful to a person in a wheelchair, or to mentally ill persons

4  such as Intervenors.  Intervenors argue that Defendants discharge

5  non-disabled people and, as a result of Paragraph 34, some disabled

6  people, in a manner and condition that enables those persons to

7  perform life activities such as arranging transportation, obtaining

8  medical care, accessing food and shelter, and seeking other public

9  services.  Intervenors, in contrast, are not discharged in that

10  same manner or condition.  At this stage, Intervenors have

11  adequately alleged that, as a result of their particular

12  disabilities, they are denied meaningful access to discharge

13  planning services.  Whether that is the case, and if so, whether

14  any or all of the modifications to Paragraph 34 Intervenors seek

15  are reasonable or necessary to afford them meaningful access to

16  such services, are questions for another day.

17       Even if discharge planning is not itself a service, Defendants

18  are not entitled to judgment as a matter of law.  Defendants'

19  position is premised upon "the assumption that no violation of the

20  ADA occurs unless a service or benefit of the state is provided in

21  a manner that discriminates against disabled individuals."

22  Crowder, 81 F.3d at 1483.  As the Ninth Circuit stated in Crowder,

23  however, "[t]his simply is not so."  Crowder, 81 F.3d at 1483.  In

24  addition to "outright discrimination" of the type upon which

25  Defendants focus, the ADA also prohibits "those forms of

26  discrimination which deny disabled persons public services

27  disproportionately due to their disability."  Id.

28

1    In _Crowder_, disabled plaintiffs brought an ADA challenge to
2  the State of Hawaii's policy of quarantining all carnivorous
3  animals entering the state.  _Crowder_, 81 F.3d at 1482-83.  The same
4  120-day quarantine procedures were imposed on all dogs, including
5  guide dogs for the visually impaired.  _Id._  In finding against the
6  visually-imparied plaintiffs on summary judgment, the district
7  court concluded that even though Hawaii's quarantine policy did not
8  allow plaintiffs to make meaningful use of state-provided services,
9  plaintiffs could not show an ADA violation because they had not
10 been denied any state services on the basis of a disability.  _Id._
11 at 1483-84.

12   The Ninth Circuit, focusing on "meaningful access" to public
13 services rather than intentional denial of them, reversed.
14 _Crowder_, 81 F.3d at 1484-85.  The court held that, notwithstanding
15 the fact that the state applied the quarantine evenhandedly, the
16 policy disproportionately burdened the visually disabled,
17 effectively denying them access to public services such as
18 transportation, parks, and government facilities.  _Id._  Such
19 denials of meaningful access, the court held, constitute
20 discrimination on the basis of disability in violation of the ADA.
21 _Id._ at 1485.

22   Intervenors here allege discrimination similar to that in
23 _Crowder_.  Certain inmates are released, whether under Paragraph 34
24 or not, in a manner that allows them to access state services,
25 programs, and activities.  Intervenors, whose manner of release is
26 allegedly determined by their particular disabilities, are not
27 afforded that same access.  See _Crowder_, 81 F.3d at 1484 ("Hawaii's
28 quarantine effectively denies . . . the plaintiffs in this case[]

13

1   meaningful access to state services . . . while such services . . .

2   remain open and easily accessible by others.").

3        Defendants argue in a footnote that <u>Crowder</u> is inapt because

4   it involved taking something away from a disabled person.  (Reply

5   at 13 n. 3.)  That distinction is not persuasive.  The <u>Crowder</u>

6   court's reasoning had nothing to do with the state's active taking

7   of disabled individuals' guide dogs.  To the contrary, the court's

8   "meaningful access" approach moved away from an emphasis on

9   intentional acts in an attempt to better capture instances of

10  discriminatory "benign neglect, apathy, and indifference."[5]

11  <u>Crowder</u>, 81 F.3d at 1484 (internal quotation marks and citation

12  omitted).  The court analogized Hawaii's quarantine not to any form

13  of active deprivation, but to other facially neutral barriers, such

14  as stairs or a refusal to communicate by spoken word.  <u>Id.</u> at 1483-

15  84.  To the extent Defendants contend that "meaningful access"

16  cannot, as a matter of law, require Defendants to provide

17  Intervenors with "extra" accommodations, that argument is no more

18  persuasive than asserting that wheelchair-bound people need not be

19  provided "extra" ramps or elevators to access government buildings

20  accessible by staircase.  <u>See</u> <u>Crowder</u>, 81 F.3d at 1483-84.

21       Intervenors have adequately alleged that they are denied

22  meaningful access to public services on the basis of their

23

24  ─────────────

25       [5] Even if some sort of active intrusion were required,
    Defendants provide no explanation why the deprivation of
26  Intervenors' liberty, which denies them the ability to seek out or
    continue mental health treatment of their choosing, and may
27  disproportionately exacerbate the deleterious effects of certain
    disabilities, in part as a result of the loss of the ability to
28  access community resources, would not constitute an affirmative
    deprivation on par with the quarantining of a guide dog.

                                  14

1  disabilities.   Accordingly, judgment on the pleadings is not

2  warranted.

3           1.   Integration Mandate

4       Paragraph 34(b)(iii) provides that certain prisoners with an

5  "intense need for assistance" will be provided a "direct linkage to

6  an Institution for Mental Disease ("IMD"), IMD-Step-down facility,

7  or appropriately licensed hospital."   Intervenors allege that this

8  provision does not adequately define "intense need," and thus

9  violates the ADA's integration mandate, which requires public

10  entities to "administer services, programs, and activities in the

11  most integrated setting appropriate to the needs of qualified

12  individuals with disabilities."[6]  28 C.F.R. § 35.130(d).

13       In Olmstead v. L.C. ex rel. Zimrinq, the Supreme Court

14  concluded that the integration mandate requires community-based, as

15  opposed to hospital or institutional, treatment when "[1] the

16  State's treatment professionals determine that such placement is

17  appropriate, [2] the affected persons do not oppose such treatment,

18  and [3] the placement can be reasonably accommodated, taking into

19  account the resources available to the State and the needs of

20  others with mental disabilities."  Olmstead v. L.C. ex rel.

21  Zimrinq, 527 U.S. 581, 607 (1999).  The Ninth Circuit subsequently

22  addressed an integration mandate claim in Townshend v. Quasim, 328

23  F.3d 511 (9th Cir. 2003).  There, although citing to both the

24  integration mandate regulation and Olmstead, the court nevertheless

25  applied the traditional ADA pleading standard.  Townshend v.

26

27       [6] This mandate is patterned on one set forth in the
   Rehabilitation Act's implementing regulations.  See 28 C.F.R. §
28  41.51(d).

15

1  Quasim, 328 F.3d at 516 ("To prove that a public service or program

2  violates Title II of the ADA, a plaintiff must show (1) he is a

3  qualified individual with a disability; (2) he was either excluded

4  from participation in or denied the benefits of a public entity's

5  services, programs, or activities or was otherwise discriminated

6  against by the public entity; (3) such exclusion, denial of

7  benefits, or discrimination was by reason of his disability.")

8  (internal quotation and citation omitted).

9      Here, the arguments regarding the integration mandate claims

10 are focused primarily on the parties' conflicting views of the

11 appropriate pleading standard, and are otherwise not fully

12 developed.  At this juncture, Intervenors' integration mandate

13 claim appears sufficiently pleaded under Townshend.  Defendants'

14 motion is therefore denied with respect to the integration mandate

15 claim, without prejudice.

16     B.   Constitutional Claims

17     The FACI alleges that Intervenors "have a known and obvious

18 need for medical care after release from custody," that inadequate

19 discharge planning under Paragraph 34 threatens to deny them that

20 medical care as a matter of policy, and that adoption of Paragraph

21 34 constitutes deliberate indifference to Intervenors' medical

22 needs in violation of the Eighth and Fourteenth Amendments.

23 Defendants argue that Intervenors' constitutional claims fail as a

24 matter of law.

25     Defendants, citing to the Supreme Court of Massachusetts,

26 argue that homeless, mentally ill people have no constitutional

27 rights to follow-up medical care after incarceration.  (Motion at

28 21, citing Williams v. Sec'y of the Exec. Office of Human Servs.,

414 Mass. 551, 566 (1993). The court disagrees. In the Ninth

Circuit, "the state must provide an outgoing prisoner who is

receiving and continues to require medication with a supply

sufficient to ensure that he has that medication available during

the period of time reasonably necessary to permit him to consult a

doctor and obtain a new supply. A state's failure to . . . cover

this transitional period amounts to an abdication of its

responsibility to provide medical care to those, who by reason of

incarceration, are unable to provide for their own medical needs."

Wakefield, 177 F.3d at 1164. The court sees no reason why this

principle should not apply to mental illness.[7]

Next, Defendants contend that Intervenors fail to allege

deliberate indifference. Defendants are correct that the FACI

inartfully makes reference to the deliberate indifference standard

with respect to both the Fourteenth and Eighth Amendment claims. A

pre-trial detainee need not show deliberate indifference to prevail

on a Fourteenth Amendment claim. See, e.g. Jones v. Blanas, 393

F.3d 918, 934 (9th Cir. 2004). In any event, however, the FACI

does allege deliberate indifference. Intervenors allege that their

disabilities and serious medical needs are apparent and known to

Defendants, and that Defendants not only ignore those needs, but do

so as an explicit matter of policy, i.e. Paragraph 34.

As with the integration mandate claim, the constitutional

claims are not the focus of either party's briefing. As presented

thus far, Intervenors' constitutional claims are adequately

---

[7] If anything, a public entity may be more responsible for mental health treatment where the incarceration itself has aggravated or exacerbated the harmful symptoms of mental illness.

17

1  alleged.   Defendants' motion is therefore denied with respect to

2  the constitutional claims, without prejudice.

3  **IV.   Conclusion**

4       For the reasons stated above, Defendants' motion is DENIED.

5

6  IT IS SO ORDERED.

7

8

9  Dated: May 17, 2016

10                                        DEAN D. PREGERSON
                                          United States District Judge