**SCHEPER KIM & HARRIS LLP**
RICHARD E. DROOYAN (Bar No. 65672)
601 West Fifth Street, 12th Floor
Los Angeles, CA  90071-2025
Telephone: (213) 613-4655
Facsimile:  (213) 613-4656
Email:  rdrooyan@scheperkim.com

**Monitor**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 15-cv-05903 DDP (JEMx) |
| Plaintiff, | |
| v. | **MONITOR'S SIXTH REPORT** |
| COUNTY OF LOS ANGELES AND LOS ANGELES COUNTY SHERIFF JIM MCDONNELL, in his Official Capacity, | |
| Defendants. | |

Pursuant to the Paragraph 109 of the Joint Settlement Agreement Regarding Los Angeles County Jails, the Monitor appointed by this Court hereby submits the attached Report "describing the steps taken" by the County of Los Angeles and the Los Angeles County Sheriff during the six-month period from January 1, 2018, through June 30, 2018, "to implement the Agreement and evaluating the extent to which they have complied with this Agreement." This Report takes into consideration the advice and assistance I have received from the Subject Matter Experts appointed by this Court and the comments from the parties in accordance with Paragraph 110 of the Agreement. I am available to answer any questions the Court may have regarding my Report at such times as are convenient for the Court and the parties.

DATED: August 31, 2018          Respectfully submitted,

SCHEPER KIM & HARRIS LLP
RICHARD E. DROOYAN

By:  /s/ Richard E. Drooyan
     Richard E. Drooyan
     Monitor

## MONITOR'S SIXTH REPORT

This Sixth Report sets forth the Monitor's assessments of the implementation of the Settlement Agreement (the "Agreement") between the County of Los Angeles (the "County") and the United States Department of Justice ("DOJ") for the treatment of mentally ill inmates in the County's jail facilities by the Los Angeles Sheriff's Department (the "Department") and the County's Department of Health Services ("DHS").[1]  It covers the County's reported results for the period from January 1, 2018, through June 30, 2018 (the "Sixth Reporting Period").

As used herein, "Substantial Compliance" means that the County has "achieved compliance with the material components of the relevant provisions of this Agreement in accordance with the [agreed-upon Compliance Measures for assessing Substantial Compliance]," which it must maintain for twelve-consecutive months; "Partial Compliance" means that the County has achieved "compliance on some, but not all, of the material components of the relevant provision of this Agreement;" and "Non-Compliance" means that the County has not met "most or all of the material components of the relevant provisions of this Agreement."

This Sixth Report is based upon the Monitor's review of the policies, procedures, and directives proposed and/or implemented by the Department and Correctional Health Services ("CHS") in the Sixth Reporting Period; assessments and observations of the Subject Matter Expert; tours of the jails by the Monitor, the Subject Matter Expert, and the two clinicians retained by the Monitor; the County's Self-Assessment Status Report (the "Sixth Self-Assessment"), which was received on June 15, 2018; and the augmented Self-Assessment Status Report (the "augmented Sixth Self-Assessment"), which was received on July 16, 2018, and results reported through that date.  It also takes into consideration the comments the Monitor received from the County and DOJ on the draft of this Report that was submitted to the parties on August 1, 2018, and the County's responses to DOJ's comments.

During the Sixth Reporting Period, the Mental Health Subject Matter Expert, with the assistance of the clinicians, conducted additional qualitative assessments of the County's compliance with certain Substantive Provisions in the Settlement Agreement, and they again used different methodologies to test some of the County's reported results. The Monitor's determination of the County's compliance, with the advice of the Subject Matter Expert, is based upon the quantitative thresholds in the Compliance Measures (and any other applicable requirements in the Compliance Measures), unless the quality of the County's performance as determined by the qualitative assessment is plainly inadequate or the results reported by Subject Matter Expert vary significantly from the results reported by the Department.

During the Sixth Reporting period, the County established compliance with additional provisions of the Settlement Agreement, and made progress in addressing the

---

[1] The Department of Health Services includes Correctional Health Services, which is responsible for Medical and Mental Health Services in the Los Angeles County jails.

1

significant challenges to achieving and maintaining Substantial Compliance with respect to its quality improvement plans.  It still faces those challenges with respect to therapeutic services and out-of-cell time, in particular.  The County is also facing challenges in privately screening inmates at IRC and CRDF and timely identifying inmates with mental health needs.  A pilot program intended to have nurses do all of the screenings in private appears to have unintended consequences of delaying the initial screenings and, consequently, the identification of inmates with mental health needs, including in some cases urgent or emergent mental health needs.  The County is in the process of revamping the program to address this problem.

As in prior reports, this Sixth Report reflects the results of audits by the Monitor's auditors to verify results reported by the County.  The Monitor has deemed the County to be in Substantial Compliance "as of" the beginning of the quarter reported by the County if the auditors have verified that the County has met the thresholds in the Compliance Measures.  If the auditors were not able to verify the results reported by the County, the twelve-month period for maintaining Substantial Compliance will commence in a future period when the County's reported results are verified by the auditors.  If the County maintains Substantial Compliance with a provision for twelve consecutive months, pursuant to Paragraph 111 of the Agreement, the Monitor and Subject Matter Experts will "no longer. . .assess or report on that provision" in future reporting periods.

Some of the Substantial Compliance results reported by the County in the Sixth Reporting Period have not been audited by the Monitor's auditors and cannot be considered final until verified by the auditors.  The County will not be deemed to be in Substantial Compliance as of the County's reported date for purposes of determining the twelve-month compliance period if the results are not verified by the auditors.

Appendix A to this Sixth Report shows the status of each of the 69 provisions of the Agreement that are subject to monitoring and the twelve-month triggering dates where the County is deemed to be in Substantial Compliance.  Appendix B shows the County's progress from the Initial Reporting Period through the Sixth Reporting Period in achieving Substantial Compliance and in maintaining Substantial Compliance for twelve consecutive months on provisions that are no longer subject to monitoring.

As has been the case since the beginning of the Initial Reporting Period, the County cooperated completely with the Monitor and the Subject Matter Experts during the Sixth Reporting Period.  The Department, DHS, and County Counsel facilitated our visits and inmate interviews, answered our questions, and responded to our requests for documents and information.  We appreciate their responsiveness, transparency, professionalism, and courtesy in handling our monitoring requests.

Richard Drooyan, Monitor
August 31, 2018

2

## EXECUTIVE SUMMARY

There are 69 provisions in the Settlement Agreement that are subject to monitoring by the Monitor and Subject Matter Experts.  As of the date of this Report, the County and the Department are in Substantial Compliance with 32 provisions, in Partial Compliance with 22 provisions, and in Non-Compliance with 7 provisions.  In addition, there are 5 provisions in which the Department is in Substantial Compliance at some facilities and in Partial Compliance or Non-Compliance at other facilities.  There is also one provision (Paragraph 34), that remains stayed pending litigation initiated by third party intervenors, one provision (Paragraph 41) that is Not Rated, and one provision (Paragraph 39) for which the Department is in Substantial Compliance at certain facilities, Partial Compliance at other facilities, and Not Rated at other facilities.  There are 38 provisions for which the County and the Department are in Substantial Compliance at some or all of the facilities.[2]

There are 18 provisions that are no longer subject to monitoring because the County and Department maintained Substantial Compliance for twelve consecutive months as required by Paragraph 111 of the Settlement Agreement.  There are another 9 provisions for which some facilities are no longer subject to monitoring because those facilities maintained Substantial Compliance for the required twelve consecutive months.[3]

As of the date of this Report, and subject to verification by the Monitor's auditors and qualitative assessments in some cases, the County and the Department are in Substantial Compliance at some or all of the facilities with the following provisions of the Settlement Agreement:

The County has provided documentation reflecting that the County has achieved Substantial Compliance at Men's Central Jail ("MCJ") and Pitchess Detention Center ("PDC") South as of October 1, 2017, at North County Correctional Facility ("NCCF") as of September 1, 2017, at PDC East as of December 1, 2017, at Twin Towers Correctional Facility ("TTCF"), the Inmate Reception Center ("IRC") and PDC North as of April 1, 2018, and at Century Regional Detention Facility ("CRDF") as of June 1, 2018, with Paragraph 18, which requires the training of Deputy Sheriffs and Custody Assistants on suicide prevention.  The results are subject to verification by the Monitor's auditors.

The County has achieved Substantial Compliance at PDC East, PDC North, NCCF, and CRDF as of August 1, 2017 and at PDC South as of October 1, 2017, with Paragraph 20, which requires the training of Deputy Sheriffs on Crisis Intervention and Conflict Resolution and on working with mentally ill prisoners.

The County has maintained Substantial Compliance for twelve consecutive

---

[2] Under Paragraph 111 of the Agreement, the twelve-month period for which the County is required to maintain Substantial Compliance can be determined on a facility-by-facility basis.

[3] The provisions that are no longer subject to monitoring at some are all of the facilities are highlighted in bold in Appendix A.

months at PDC East, PDC South, PDC North, NCCF, IRC, and TTCF with Paragraph 21, which requires Custody personnel to maintain CPR certifications.  The County also has maintained Substantial Compliance for six consecutive months at MCJ.  The results for MCJ are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive months with Paragraph 22, which requires the County and the Sheriff to provide instructional material on the use of arresting and booking documents to ensure the sharing of known relevant and available information on prisoners' mental health status and suicide risk.

The County has maintained Substantial Compliance for twelve consecutive months as of January 1, 2018, with Paragraph 23, which requires that the Department conduct a systematic review of prisoner housing to reduce the risk of self-harm and to identify and address suicide hazards, and to develop plans to reasonably mitigate suicide hazards identified in the review.

The County has achieved Substantial Compliance as of October 1, 2017, with Paragraph 24, which requires the Department to conduct annual reviews and inspections of prisoner housing to identify suicide hazards.

The County has achieved Substantial Compliance as of October 1, 2017, through March 31, 2018 with Paragraph 27, which requires the Department ensure that all prisoners are screened by Qualified Medical Staff or trained custody personnel as soon as possible upon arrival to the Jails to identify a prisoner's need for mental health care and risk for suicide or self-injurious behavior.  These results are subject to verification by the Monitor's auditors.

The County has achieved Substantial Compliance at IRC as of April 1, 2017, through March 31, 2018 and at CRDF as of January 1, 2018, through March 31, 2018, with Paragraph 28, which requires the Department to expedite inmates having urgent or emergent mental health needs through the booking process.

The County has provided documentation reflecting that, as of April 1, 2017, through March 31, 2018, it achieved Substantial Compliance with Paragraph 29, which requires mental health assessments of prisoners with non-emergent mental health needs within 24 hours of the intake nursing assessment.  The reported results are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive months with Paragraph 32, which requires that a serious suicide attempt be entered in the prisoner's electronic medical record in a timely manner.

The County has provided documentation reflecting that, as of July 1, 2016, through June 30, 2017, it achieved Substantial Compliance with Paragraph 33, which requires mental health supervisors to review electronic medical records on a quarterly

4

basis to assess their accuracy.  These results are subject to verification by the Monitor's auditors and a qualitative assessment by the Subject Matter Expert.

The County has achieved Substantial Compliance as of November 1, 2017, through March 31, 2018 with Paragraph 35, which requires the Department ensure that custody staff refer prisoners who are demonstrating a potential need for routine mental health care to a QMHP or a Jail Mental Evaluation Team.

The County has maintained Substantial Compliance for twelve consecutive months with Paragraph 38, which requires mental health staff or JMET teams to make weekly cell-by-cell rounds in restricted non-mental health housing modules to identify prisoners with mental illnesses and grant prisoner's requests for out-of-cell interviews.

 The County has provided documentation reflecting that it achieved Substantial Compliance at NCCF as of July 1, 2017 through March 31, 2018, and at CRDF as of October 1, 2017 through March 31, 2018, with Paragraph 39, which requires the County to use a confidential self-referral system for prisoners to request mental health care.  The results are subject to verification by the Monitor's auditors and a qualitative assessment by the Subject Matter Expert.

The County has achieved Substantial Compliance at NCCF and PDC North as of October 1, 2017, through March 31, 2018, with Paragraph 43, which requires the Department to develop and implement policies for discipline of prisoners with serious mental illnesses.

The County has maintained Substantial Compliance for twelve consecutive months with Paragraph 44, which requires the Department to install protective barriers in High Observation Housing and other mental health housing areas.

The County has maintained Substantial Compliance for twelve consecutive months with Paragraph 45, which requires Suicide Prevention Kits and first-aid kits in control booths in all facilities.

The County has maintained Substantial Compliance for twelve consecutive months with Paragraph 48, which requires the Department to have written housekeeping, sanitation, and inspection plans to ensure proper cleaning.

The County has maintained Substantial Compliance for twelve consecutive months with Paragraph 49, which requires the Department to have maintenance plans to respond to routine and emergency maintenance needs.

The County has maintained Substantial Compliance for twelve consecutive months with Paragraph 50, which requires pest control in the jails.

The County has maintained Substantial Compliance for twelve consecutive months with Paragraph 51, which requires the Department to ensure that all prisoners

5

have access to basic hygiene supplies in accordance with state regulations.

The County has maintained Substantial Compliance for twelve consecutive months at CRDF and PDC North with Paragraph 55, which requires custody, medical and mental health staff to meet daily in High Observation Housing and weekly in Moderate Observation Housing. The County also has provided documentation reflecting it achieved Substantial Compliance as of April 1, 2018, through June 30, 2018, at MCJ and TTCF. The results are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive months with Paragraph 56, which requires custody, medical, and mental health staff to communicate regarding any change in a housing assignment following a suicide attempt or serious change in mental health condition.

The County has maintained Substantial Compliance from April 1, 2017, through March 31, 2018, at MCJ with Paragraph 57, which requires safety checks in mental health housing.

The County has maintained Substantial Compliance for twelve consecutive months at PDC South, PDC North, and PDC East with Paragraph 58, which requires safety checks in non-mental health housing. The County also has maintained Substantial Compliance as of July 1, 2017, through March 31, 2018 at CRDF, and as of October 1, 2017, through March 31, 2018, at IRC.

The County has maintained Substantial Compliance for twelve consecutive months at MCJ, PDC East, and NCCF with Paragraph 59, which requires unannounced daily supervisory rounds to verify safety checks. The County also has maintained Substantial Compliance from January 1, 2018, through June 30, 2018, at PDC North and PDC South, from October 1, 2017, through June 30, 2018, at CRDF, and from April 1, 2018, through June 30, 2018, at TTCF.

The County has maintained Substantial Compliance for twelve consecutive months at MCJ, NCCF, PDC East, PDC North, and PDC South with Paragraph 68, which requires staggered contraband searches in housing units. The County also has provided documentation reflecting that it has maintained Substantial Compliance for twelve consecutive months at TTCF. These results are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive months with Paragraph 71, which requires the County and the Sheriff to ensure that any prisoner subjected to clinical restraints in response to a mental health crisis receives therapeutic services to remediate any effects from the episode(s) of restraint.

The County has maintained Substantial Compliance for twelve consecutive months with Paragraph 72, which requires the Department and the County to report on meetings to review suicides and incidents of serious self-injurious behavior.

6

The County has achieved Substantial Compliance as of October 1, 2017, through March 31, 2018 with Paragraph 73, which requires the Department prepare detailed reports of prisoners who threaten or exhibit self-injurious behavior.

The County has maintained Substantial Compliance for twelve consecutive months with Paragraph 74, which requires the Department to have an objective law enforcement investigation of every suicide that occurs in the jails.

The County has achieved Substantial Compliance as of October 1, 2017, through March 31, 2018 with Paragraph 75, which requires the Department and the County to review every serious suicide attempt that occurs in the jails. The results are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive months with Paragraph 76, which requires the Department to follow certain procedures whenever there is an apparent or suspected suicide.

The County has maintained Substantial Compliance for twelve consecutive months with Paragraph 78, which requires the Suicide Prevention Advisory Committee to meet twice a year.

The County has maintained Substantial Compliance for twelve consecutive months with Paragraph 82, which requires the Department to co-locate personnel responsible for collecting prisoners' grievances at CRDF.

The County has maintained Substantial Compliance for twelve consecutive months at MCJ and IRC from July 1, 2015, through June 30, 2016; at TTCF from October 1, 2015, through September 30, 2016, at CRDF from April 1, 2016, through March 31, 2017, with Paragraph 83, which requires it to install closed circuit security cameras throughout all of the common areas in the jails  The County has also achieved Substantial Compliance at NCCF and PDC North as of April 1, 2018, through June 30, 2018, and at PDC South as of July 1, 2018.

The County has provided documentation showing that it has maintained Substantial Compliance as of July 1, 2017, through March 31, 2018, with Paragraph 84, which requires investigations of force incidents and administrative actions to be completed timely.

The County has maintained Substantial Compliance for twelve consecutive months at MCJ, CRDF, PDC North, PDC South, PDC East, NCCF, and IRC with Paragraph 86, which requires inventory policies and control of weapons.  It has also maintained Substantial Compliance as of April 1, 2018 through June 30, 2018 at TTCF.

7

**SIXTH REPORT**

18.    Within three months of the Effective Date, the County and the Sheriff will develop, and within six months of the Effective Date will commence providing:  (1) a four-hour custody-specific, scenario-based, skill development training on suicide prevention, which can be part of the eight-hour training described in paragraph 4.8 of the Implementation Plan in *Rosas* to all new Deputies as part of the Jail Operations Continuum and to all new Custody Assistants at the Custody Assistants academy; and (2) a two-hour custody-specific, scenario-based, skill development training on suicide prevention to all existing Deputies and Custody Assistants at their respective facilities, which can be part of the eight-hour training described in paragraph 4.7 of the Implementation Plan in *Rosas*, through in-service Intensified Formatted Training, which training will be completed by December 31, 2016.

These trainings will include the following topics:

(a)    suicide prevention policies and procedures, including observation and supervision of prisoners at risk for suicide or self-injurious behavior;

(b)    discussion of facility environments and staff interactions and why they may contribute to suicidal behavior;

(c)    potential predisposing factors to suicide;

(d)    high-risk suicide periods and settings;

(e)    warning signs and symptoms of suicidal behavior;

(f)    case studies of recent suicides and serious suicide attempts;

(g)    emergency notification procedures;

(h)    mock demonstrations regarding the proper response to a suicide attempt, including a hands-on simulation experience that incorporates the challenges that often accompany a jail suicide, such as cell doors being blocked by a hanging body and delays in securing back-up assistance;

(i)    differentiating between suicidal and self-injurious behavior; and

(j)    the proper use of emergency equipment.

8

**STATUS (18):**          **SUBSTANTIAL COMPLIANCE (as of October 1, 2017 (unverified) at MCJ and PDC South)**

**SUBSTANTIAL COMPLIANCE (as of September 1, 2017 (unverified) at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of December 1, 2017 (unverified) at PDC East)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018) (unverified) at TTCF, IRC, and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of June 1, 2018 (unverified) at CRDF)**

The Monitor, in consultation with the Mental Health Subject Matter Expert, concluded in the First Reporting Period that the Department's training on suicide prevention, together with the Department's De-escalation and Verbal Resolution Training ("DeVRT"), meets the requirements of Paragraph 18. The DeVRT curriculum was approved by the *Rosas* Monitors and the Monitor, in consultation with the Mental Health Subject Matter Expert, on November 4, 2015. On May 30, 2017, the Monitor, in consultation with the Subject Matter Expert, approved a revision to the two-hour course on suicide prevention for existing Deputy Sheriffs and Custody Assistants.

The County's Initial Self-Assessment Status Report delivered on December 14, 2015, reported that the Department commenced its suicide prevention training for new Deputy Sheriffs and Custody Assistants on July 1, 2015, and for existing Deputy Sheriffs and Custody Assistants before the Effective Date of the Settlement Agreement.

Substantial Compliance is achieved when the Department reaches the 85% threshold for existing personnel at a facility, provided that it has achieved the 95% threshold for new personnel during the entire time from July 1, 2015 until it has reached the 85% threshold for existing personnel. The County's Sixth Self-Assessment reiterates that "the Department has continuously provided the required training for new Deputies in the Jail Operations Continuum and new Custody Assistants in the Custody Assistants Academy," but the Self-Assessment only reports results for new deputies from July 1, 2015, through June 30, 2016, which is before the Department achieved the Substantial Compliance threshold for existing personnel at any of the facilities. The Department needs to report the results for new deputies through March 31, 2018. The Substantial Compliance finding is subject to verification that existing deputies have continued to receive the required training through that date.

In the Fifth Reporting Period, the County reported that the Department achieved Substantial Compliance at MCJ, and PDC South as of October 1, 2017, and at NCCF as of September 1, 2017.[4]  The County's augmented Fifth Self-Assessment reported

---

[4] This is the first day of the month after the Department reached the required 85% threshold.

9

Substantial Compliance at PDC East as of November 1, 2017.[5]  The County's Sixth Self-Assessment reports that the County achieved Substantial Compliance at TTCF (98% of existing personnel), IRC (97%), and PDC North (98%) as of April 1, 2018.  The County's posted results report that it achieved Substantial Compliance at CRDF (85%) as of June 1, 2018.  These  results are subject to verification by the Monitor's auditors.[6]

---

[5] All of the two-hour training of existing Deputy Sheriffs and Custody Assistants occurred after the revision of the suicide prevention course was approved by the Monitor on May 30, 2017.

[6] The County's recently posted results, which reflect the Monitor's approved definition of  "unavailable," see p. 12, supra, have not been taken into consideration in this report. Those results will reflected in the Monitor's next report if verified by the Monitor's auditors.

10

19.    Commencing July 1, 2015, the County and the Sheriff will provide:

(a)    Custody-specific, scenario-based, skill development training to new Deputies during their Jail Operations training, and to existing Deputies assigned to Twin Towers Correctional Facility, Inmate Reception Center, Men's Central Jail, the Mental Health Housing Units at Century Regional Detention Facility, and the Jail Mental Evaluation Teams ("JMET") at North County Correctional Facility as follows:

(i)    32 hours of Crisis Intervention and Conflict Resolution as described in paragraphs 4.6 and 4.9 of the Implementation Plan in *Rosas* to be completed within the time frames established in that case (currently December 31, 2016). Deputies at these facilities will receive an eight-hour refresher course consistent with paragraph 4.6 of the Implementation Plan in *Rosas* every other year until termination of court jurisdiction in that case and then a four-hour refresher course every other year thereafter.

(ii)    Eight hours identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas* to be completed by December 31, 2016. This training requirement may be a part of the 32-hour training described in the previous subsection. Deputies at these facilities will receive a four-hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

(b)    Commencing July 1, 2015, the County and the Sheriff will ensure that new Custody Assistants receive eight hours of training in the Custody Assistant academy, and that all existing Custody Assistants receive eight hours of training related to identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas*. This training will be completed by December 31, 2016. Custody Assistants will receive a four-hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

11

**STATUS (19):          PARTIAL COMPLIANCE**

As of November 4, 2015, the Monitor, in consultation with the Mental Health Subject Matter Expert and the *Rosas* Monitors, approved the curriculum for DeVRT, which provides for 32 hours of Crisis Intervention and Conflict Resolution training and includes eight hours identifying and working with mentally ill prisoners.  The DeVRT curriculum meets the requirements of Paragraph 19 of the Settlement Agreement and paragraphs 4.6, 4.7 and 4.9 of the *Rosas* Implementation Plan.  The Mental Health Subject Matter Expert and the *Rosas* Monitors approved the training materials developed by the Department for the DeVRT on March 4, 2016.

Substantial Compliance requires the County to show that 95% of the new deputies hired after July 1, 2015 and 85% of the existing deputies as of that date received the required DeVRT training.  It also requires that 95% of the new Custody Assistants hired after that date and 85% of the existing Custody Assistants as of that date received the required training in working with mentally ill inmates.

The County's Sixth Self-Assessment reports that the Department achieved Substantial Compliance at all facilities for new Deputies and new Custody Assistants through the first quarter of 2018.  The County's augmented Fifth Self-Assessment submitted in January 2018, reported that the Department maintained Substantial Compliance at all facilities for new Deputies and new Custody Assistants through September 30, 2017.

The County's Sixth Self-Assessment reports that the Department achieved Substantial Compliance with respect to the training of existing Deputies and Custody Assistants at IRC, MCJ, CRDF, TTCF, and NCCF(JMET) in the first quarter of 2018. The Department trained 95% of the existing Deputy Sheriffs and 89% of the existing Custody Assistants at TTCF by the end of the First Quarter of 2018; 100% of existing Deputies and 98% of existing Custody Assistants at IRC; 99% of existing Deputies and 92% of existing Custody Assistants at MCJ, and 100% of the existing Deputies in the JMET unit at NCCF.[7]

The Department's posted results exclude "unavailable" deputies who are not available "during the relevant month" due to, for example Injured On Duty.  These deputies should not, however, be excluded unless they were "unavailable" to attend the DeVRT during a substantial period, since the training has been offered since March 4, 2016.  Accordingly, deputies and Custody Assistants will not be deemed "unavailable" unless they have been on leave or otherwise unavailable for more than six months as of the date of the assessment.[8]

Although the Department reached the 85% threshold for the training of "existing" deputies at CRDF in the Third Quarter of 2017, the results for Custody Assistants at

---

[7] There were no Custody Assistants assigned to the unit.
[8] As noted, the County's recently posted results reflecting this approved definition of "unavailable" have not been taken into consideration in this report.

12

CRDF reported in the Fifth Self-Assessment were based upon a misinterpretation of Paragraph 19(b).  The 85% threshold for existing deputies at CRDF is based upon the number of deputies assigned to the Mental Health Units at CRDF as of July 1, 2015, but the threshold for existing Custody Assistants is based upon the total number of Custody Assistants assigned to any unit at CRDF as of July 1, 2015.  The Department's posted results for the First Quarter of 2018 indicate that, once again, it is not counting Custody Assistants "who were not assigned to Mental Health Housing Units" at CRDF.

13

20.     Commencing no later than July 1, 2017, the County and the Sheriff will provide:

(a)     Custody-specific, scenario-based, skill development training to existing Deputies assigned to North County Correctional Facility, Pitchess Detention Center, and the non-Mental Health Housing Units in Century Regional Detention Facility as follows:

(i)     32 hours of Crisis Intervention and Conflict Resolution as described in paragraphs 4.6 and 4.9 of the Implementation Plan in *Rosas* to be completed by December 31, 2019.  Deputies at these facilities will receive an eight-hour refresher course consistent with paragraph 4.6 of the Implementation Plan in *Rosas* every other year until termination of court jurisdiction in that case and then a four-hour refresher course every other year thereafter.

(ii)    Eight hours identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas* to be completed by December 31, 2019.  This training requirement may be a part of the 32-hour training described in the previous subsection.  Deputies at these facilities will receive a four-hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

14

**STATUS (20):**     **SUBSTANTIAL COMPLIANCE (as of August 1, 2017 (verified) at CRDF, PDC East, PDC North, and NCCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017 (verified) at PDC South)**

As of November 4, 2015, the Monitor, in consultation with the Subject Matter Experts and the *Rosas* Monitors, approved the curriculum for the Department's De-escalation and Verbal Resolution Training ("DeVRT"), which provides for 32 hours of Crisis Intervention and Conflict Resolution training that meets the requirements of Paragraph 20 of the Settlement Agreement.

Substantial Compliance requires that 85% of deputies at the facilities designated in Paragraph 20(a) as of July 1, 2017, receive the required DeVRT training. The County reports that as of August 1, 2017, 85% of the deputies assigned to PDC East, 89% of the deputies assigned to PDC North, 85% of the deputies assigned to NCCF, and 91% of the deputies assigned to the non-mental housing units at CRDF, had received the required training, and as of October 1, 2017, 96% of the deputies assigned to PDC South had received the training. The results at CRDF, PDC East, PDC North, PDC South, and NCCF have been verified by the Monitor's auditors, and these facilities are no longer subject to monitoring.[9]

---

[9] While the Department has achieved Substantial Compliance with the thresholds for the initial training of deputies at these facilities and Paragraph 20 is no longer subject to monitoring, the Monitor expects the Department to show that the deputies have attended the required refresher courses through the duration of the Settlement Agreement.

15

21.     Consistent with existing Sheriff's Department policies regarding training requirements for sworn personnel, the County and the Sheriff will ensure that existing custody staff that have contact with prisoners maintain active certification in cardiopulmonary resuscitation and first aid.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of October 1, 2015, through September 30, 2016 (verified) at PDC East and South)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at NCCF, PDC North and IRC)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 (verified) at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through  March 31, 2018 (verified) at MCJ)**

**PARTIAL COMPLIANCE (at CRDF)**

The Compliance Measures provide that the Department will demonstrate Substantial Compliance when 95% of the designated custody staff have the required CPR and first aid certifications for 12 consecutive months.

Pursuant to paragraph 111 of the Settlement Agreement, PDC South, PDC East, PDC North, NCCF, IRC, and TTCF were not subject to monitoring for Substantial Compliance with Paragraph 21 in the Sixth Reporting Period.

The County's Fifth Self-Assessment reported that the Department failed to achieve Substantial Compliance at MCJ in the Second Quarter of 2017 through August 2017, but achieved Substantial Compliance again in October 2017.  These results have been verified by the Monitor's auditors.

The County's Sixth Self-Assessment reports that the Department continued to maintain Substantial Compliance at MCJ through the First Quarter of 2018.  These results have been verified by the Monitor's auditors.  The results for CRDF in the First Quarter of 2018 were in the range from 81% to 87%, which is sufficient for a finding of Partial Compliance.

16

22.     Within six months of the Effective Date and at least annually thereafter, the County and the Sheriff will provide instructional material to all Sheriff station personnel, Sheriff court personnel, custody booking personnel, and outside law enforcement agencies on the use of arresting and booking documents, including the Arrestee Medical Screening Form, to ensure the sharing of known relevant and available information on prisoners' mental health status and suicide risk.  Such instructional material will be in addition to the training provided to all custody booking personnel regarding intake.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017)**

The Justice Data Interface Controller ("JDIC") message the Department has been using since June 29, 2016, is sufficient to establish Substantial Compliance with Paragraph 22, and the County maintained Substantial Compliance for twelve consecutive through June 30, 2017.  Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring for Substantial Compliance with Paragraph 22 in the Sixth Reporting Period.

23.    Within three months of the Effective Date, the County and the Sheriff will commence a systematic review of all prisoner housing, beginning with the Mental Health Unit of the Correctional Treatment Center, all High Observation Housing areas, all Moderate Observation Housing areas, single-person discipline, and areas in which safety precautions are implemented, to reduce the risk of self-harm and to identify and address suicide hazards.  The County and the Sheriff will utilize a nationally-recognized audit tool for the review.  From this tool, the County and the Sheriff will:

(a)    develop short and long term plans to reasonably mitigate suicide hazards identified by this review; and

(b)    prioritize planning and mitigation in areas where suicide precautions are implemented and seek reasonable mitigation efforts in those areas.

**STATUS:    SUBSTANTIAL COMPLIANCE**

The Monitor has verified, with the advice of the Subject Matter Expert, that the Department's Suicide Hazard Inspection Check List tool is a nationally recognized audit tool for this review.  The Department reports that it inspected all of the housing units by January 14, 2016, and it has provided the Monitor with completed checklists documenting the inspections.

The County submitted an updated Suicide Hazard Mitigation plan to the Monitor on January 18, 2018.  After consultation with the Mental Health Subject Matter Expert, the Monitor concluded that the updated Plan satisfies the requirements of Paragraph 23.

The Department submitted another updated plan to the Monitor on July 12, 2018. After consultation with the Mental Health Subject Matter Expert, the Monitor concluded that the updated Plan satisfies the requirements of Paragraph 23.  The County has now maintained Substantial Compliance with Paragraph 23 for twelve consecutive months and it is no longer subject to monitoring with this provision.  Nevertheless, the Monitor and the Mental Health Subject Matter Expert encourage the County to submit in future reporting periods updated plans reflecting the Department's efforts to remediate additional suicide hazards it has identified in the jails.

18

24.    The County and the Sheriff will review and inspect housing areas on at least an annual basis to identify suicide hazards.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of October 1, 2017)**

CDM 3-06/020.00 FACILITIES INSPECTIONS requires Custody Support Services (CSS) to "review and inspect housing areas on a least an annual basis to identify suicide hazards."

The Monitor and Subject Matter reviewed a revised annual suicide hazard inspection tool that was submitted by the Department on December 13, 2016, and approved it with the caveat that, in order to achieve Substantial Compliance, the sample sizes of randomly selected cells must be large enough to ensure that the cells are representative of each housing type at a facility. Further, if a problem is found in the randomly selected cells, a complete inspection or remediation of the area or setting should then be conducted. An updated tool was submitted by the Department on February 9, 2017; it also was approved with the same caveats.

The Department conducted an Annual Suicide Hazard Inspection at each of its jail facilities during the Fifth Reporting Period. The Monitor, after consultation with the Mental Health Subject Matter Expert, approved the sufficiency of Department's reports and concluded that the County had achieved Substantial Compliance as of October 1, 2017.

The County will have maintained Substantial Compliance when it submits annual reports for each of its facilities for 2018 that are approved by the Monitor after consultation with the Mental Health Subject Matter Expert. The County's Sixth Self-Assessment reports that the "Department anticipates that the second annual inspection for each facility will be completed within the next few quarters."

19

25.     The County and the Sheriff will ensure that any prisoner in a Sheriff's Department station jail who verbalizes or who exhibits a clear and obvious indication of current suicidal intent will be transported to IRC, CRDF, or a medical facility as soon as practicable.  Pending transport, such prisoners will be under unobstructed visual observation, or in a suicide resistant location with safety checks every 15 minutes.

**STATUS:     PARTIAL COMPLIANCE**

The Proposed Revision of the Station Jail Manual requires that any arrestee who "displays obvious suicidal ideation or exhibits unusual behavior that clearly manifest[s] self-injurious behavior or other clear indication of mental health crisis shall be transported to the Inmate Reception Center (IRC), Century Regional Detention Facility (CRDF), or a medical facility as soon as practicable.  Pending transport, such inmates . . . shall be under unobstructed visual observation or in a suicidal restraint location with safety checks every 15 minutes."

The Compliance Measures require the Department to randomly select and analyze Arrestee Medical Screening Forms from station jails identifying prisoners who verbalize or exhibit a clear and obvious indication of current suicidal intent to determine compliance with Paragraph 25 of the Agreement.  The County's Sixth Self-Assessment reports that 60% of the records reviewed for the Fourth Quarter of 2017, and 62.9% of the records reviewed for the First Quarter of 2018 reflect the information required to establish Substantial Compliance with Paragraph 25.  While short of the required 95%, this is an improvement over the Fifth Reporting Period and a significant improvement from the Fourth Reporting Period.

Both the County and DOJ expressed concerns about "documentation and record keeping" at the station jails.  In addition, the Mental Health Subject Matter Expert has expressed some concern, however, about the number of safety checks that were at exactly 15 minutes, particularly since staggering is an important aspect of the checks.

On September 19, 2017, the Monitor visited five randomly selected station jails to observe where the inmates are housed pending transportation to IRC, CRDF, or a medical facility; to inspect for suicide hazards; and to interview Department personnel about the handling of suicidal inmates.  Each of the facilities had closed circuit cameras in the booking cells, and each of the facilities that conducts 15-minute checks maintains a log of the checks.  Custody personnel in each of the facilities were knowledgeable about the requirements of Paragraph 25.  They all indicated that it is standard procedure to expedite the transfer of suicidal inmates to IRC, CRDF, or a medical facility.

20

26.     Consistent with existing Sheriff's Department policies, the County and the Sheriff will follow established screening procedures to identify prisoners with emergent or urgent mental health needs based upon information contained in the Arrestee Medical Screening Form (SH-R-422) or its equivalent and the Medical/Mental Health Screening Questionnaire and to expedite such prisoners for mental health evaluation upon arrival at the Jail Reception Centers and prior to routine screening.  Prisoners who are identified as having emergent or urgent mental health needs, including the need for emergent psychotropic medication, will be evaluated by a QMHP as soon as possible but no later than four hours from the time of identification.

**STATUS:     PARTIAL COMPLIANCE**

The Compliance Measures require the Department to "review Arrestee Medical Screening Forms (SH-R-422) (or its equivalent) and the Medical/Mental Health Screening Questionnaires of 100 randomly selected prisoners during one randomly selected week per quarter at CRDF and at IRC."  Substantial Compliance requires that (1) 95% of the forms "include the required mental health information" and (2) 90% of the prisoners having urgent or emergent needs were "seen by a QMHP within four hours."

The County's posted results for the one randomly selected week in the Fourth Quarter of 2017 reflect that 90% of the screening forms reviewed had the required mental health information, and 64% of the prisoners were seen by a QMHP within four hours.  The posted results for the First Quarter of 2018, reflect that 95% of the forms had the required information and 71% of the prisoners were seen within four hours.  The timeliness of the responses by QMHP is significantly below the 90% threshold.

During the Sixth Reporting Period, the Mental Health Subject Matter Expert and the clinicians looked for "important inconsistences or obvious errors" in the intake records, and reviewed "subsequent records" to assess whether they were inconsistent with the screening or "cast doubt on the accuracy of the screening."  They found that "36% of the cases [they] reviewed should have been detected at screening" and commented that "we continue to see instances where non-clinicians appear to be missing cases of serious mental illness at intake."  In "spot check[ing]" data for Paragraph 29 for CRDF, the Mental Health Subject Matter Expert expressed concern that "some cases were categorized as routine that should have been expedites.  Moving to nursing staff from Custody Assistants [to do the initial screening] may help,"[10] but the Mental Health Subject Matter Expert and clinicians "continue to have concerns about the adequacy of the screening as conducted by nurses."

The County is still considering how to address the concerns expressed by the Mental Health Subject Matter Expert to ensure that all inmates with mental health needs are evaluated in private by the QMHP and all inmates are privately screened initially to determine if they have such needs as required by Paragraph 27.

---

[10] As noted below, see p. 22, infra, "CHS has developed a new IRC screening form and changed the workflow from two to possibly three separate evaluations to one evaluation by a registered nurse to address" factors that impacted the timeliness of mental health evaluations of suicidal inmates in IRC.

27.     Consistent with existing Sheriff's Department policies, the County and the Sheriff will ensure that all prisoners are individually and privately screened by Qualified Medical Staff or trained custody personnel as soon as possible upon arrival to the Jails, but no later than 12 hours, barring an extraordinary circumstance, to identify a prisoner's need for mental health care and risk for suicide or self-injurious behavior.  The County and the Sheriff will ensure that the Medical/Mental Health Screening Questionnaire, the Arrestee Medical Screening Form (SH-R-422), or its equivalent, and/or the Confidential Medical Mental Health Transfer Form are in the prisoner's electronic medical record or otherwise available at the time the prisoner is initially assessed by a QMHP.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through December 31, 2017 (verified) and through March 31, 2018 (unverified))**

The Compliance Measures require the Department to review the records of "randomly selected prisoners who were processed for intake during one randomly selected week at CRDF and at IRC" to determine compliance with this provision. Substantial Compliance requires that 90% of the records reviewed reflected that the prisoners were screened for mental health needs within 12 hours and that the required documentation was available to the QMHP for 90% of the mental health assessments conducted by the QMHP.

The County's Sixth Self-Assessment reports that in the Fourth Quarter of 2017, Qualified Medical Personnel or trained custody staff filled out a Medical/Mental Health Screening Questionnaire for all of the 100 randomly selected prisoners within 12 hours of their arrivals in the jails, and that the required documents were available to QMHPs who assessed all of the 35 inmates identified as having mental health needs.  In the First Quarter of 2018, the required forms were filled out for all 100 of the prisoners within 12 hours and the required documentation was available to the QMHP's who assessed the 32 of the 33 (96%) of the inmates identified as having mental health needs.

The CHS Semi-Annual Report on Quality Improvement/Assurance submitted pursuant to Paragraph 62 notes that "CHS has developed a new IRC screening form and changed the workflow from two- to possibly three separate evaluations to one evaluation by a registered nurse, in an effort to address" factors that impacted the timeliness of mental health evaluations of suicidal inmates in the IRC.  Based upon the pilot program that began on May 28, 2018, CHS noted "an unintended result of the change in workflow, which is that patients are waiting longer in the IRC for their initial screening by a nurse" from an average time of one hour from a "Random Sample of Suicidal Bookings" in the first quarter of 2018 to 7.47 hours and 8.58 hours for Suicidal Books in two separate weeks in June 2018.  The Maximum Time to Initial Screening After Booking went from seven hours in the first quarter of 2018 to 51 and 65 hours in June.  This raises serious concerns about whether the County is continuing to meet the 90% threshold for Substantial Compliance with Paragraph 27 in the Second Quarter of 2018 and is timely identifying inmates with urgent or emergent mental health needs.

22

During the Sixth Reporting Period, the Mental Health Subject Matter Expert and the clinicians again looked for "important inconsistences or obvious errors" in the intake records, and reviewed "subsequent records" to assess whether they were inconsistent with the screening or "cast doubt on the accuracy of the screening." They found "that 100% of the intake documentation was complete and available,"[but that] 29% of routine cases that should have been detected were not," which is significantly higher than in a prior period.[11] The Subject Matter Experts, notes that "[i]n general. . . the screening process itself seems to be detecting routine cases at a reasonable level; this is much lower risk than detecting those with emergent and urgent needs. Subsequent surveillance is detecting these cases fairly quickly as well. In our opinion, the process is adequate, and the periodic problems can be remedied by effective supervision staff."

Notwithstanding the percentage of routine cases not detected at intake, the County has achieved, and maintained for six months from October 1, 2017 through March 31, 2018, Substantial Compliance with Paragraph 27. In this case, the County met the quantitative requirements for Paragraph 27 during the six months from October 1, 2017, through March 31, 2018.[12] The agreed upon Compliance Measures do not measure whether the routine cases are being detected, and the Mental Health Subject Matter opined that "the process is adequate." As noted in the Introduction to this Report, "the Monitor's determination of the County's compliance. . . is based upon the quantitative thresholds in the Compliance Measures" "unless the quality of the County's performance . . . is plainly inadequate or the results reported by Subject Matter Expert vary significantly from the results reported by the Department."

In order to satisfy the requirements of Paragraph 27, inmates must be privately screened. The windows in the intake-triage area where the Medical/Mental Health Screening Questionnaire is administered at CRDF are not sufficiently private to satisfy this requirement. As noted above, the County has begun a pilot program to restructure the booking at IRC and CRDF so that nurses conduct the assessments in the IRC clinic and in the nursing room at CRDF rather than having custody assistants conduct the initial assessments at the time of booking. To address a backlog that has been created in the IRC clinic from the pilot program, the Department is looking to move the nurses' assessments back to the booking area and is considering suggestions on how to make the process more private in that area. Assuming the Department is able to address the privacy concerns expressed by the Monitor and the Mental Health Subject Matter Expert, the County has now achieved Substantial Compliance with Paragraph 27, which it has maintained for six consecutive months through March 31, 2018. This finding is subject to an additional qualitative assessment by the Mental Health Subject Matter Expert finding "no deterioration in our qualitative assessment of false negatives" and verification of the results by the Monitor's auditors.

---

[11] See Monitor's Fifth Report, p. 20, n. 12.

[12] As noted above, the Monitor has serious concerns about whether the County has reached the quantitative thresholds required to maintained Substantial Compliance in the Second Quarter of 2018 and beyond.

28.     The County and the Sheriff will ensure that any prisoner who has been identified during the intake process as having emergent or urgent mental health needs as described in Paragraph 26 of this Agreement will be expedited through the booking process.  While the prisoner awaits evaluation, the County and the Sheriff will maintain unobstructed visual observation of the prisoner when necessary to protect his or her safety, and will conduct 15-minute safety checks if the prisoner is in a cell.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at IRC)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2018, through March 31, 2018 (verified) at CRDF)**

The Compliance Measures require the Department to review the records of randomly selected prisoners at CRDF and IRC who have urgent or emergent mental health needs to determine whether they were expedited through the booking process.

The County's Sixth Self-Assessment reports that the results for IRC for the Fourth Quarter of 2017 and First Quarter of 2018 (at 87% and 92%) are at or above the 85% threshold for expediting inmates through the booking process, and all inmates having urgent or emergent needs were under unobstructed visual observation and/or checked every 15 minutes during unannounced visits as required by Paragraph 28.

The CRDF results for these quarters reflect that the Department did not achieve Substantial Compliance in the Fourth Quarter of 2017, but achieved it in the First Quarter of 2018 when 87% of the inmates who had urgent or emergent mental health needs were expedited through the booking process, and all of the inmates identified as having urgent or emergent mental health needs were observed or checked as required by Paragraph 28.

The results at CRDF for the First Quarter of 2018 and at IRC for the Fourth Quarter of 2017 and the First Quarter of 2018 have been verified  by the Monitor's auditors.[13]  The County has maintained Substantial Compliance with Paragraph 28 at IRC for twelve consecutive months, and IRC is  no longer subject to monitoring for compliance with this provision.

The Mental Health Subject Matter Expert has expressed reservations about the County's Self-Assessment.  He notes that "the county is only reviewing cases based on expression of current thoughts of suicide on the 15Q [initial intake form]; this is a much narrower universe than described in 26 (referred to in 28).  Given our concerns about [the

---

[13] DOJ expressed concerns about the IRC results because "[m]ovement histories. . .show that several inmates listed as expedited waited hours to be transported from booking to clinic."  In response, the County indicated to the Monitor's auditors that delays may be "due to the inmate being uncooperative and hostile towards custody and nursing."  DOJ also stated that "at least one inmate listed as expedited was moved from booking to classification before being sent to the clinic, which would suggest he was not properly expedited[.]"  The auditors marked such records as "non-compliant," but noted that this "does not affect the overall compliance" rate.

24

County] missing some cases [at intake] of those who are acutely psychotic. . . the county must expand the expedited case review."  Further, the available video footage of inmates under unobstructed observation at CRDF was limited to two inmates.  Going forward, the County should expand the universe of cases at CRDF to include "patients who are grossly psychotic and patients who are a danger to others due to mental illness" and provide a great number of videos confirming unobstructed observation.

25

29.     The County and the Sheriff will ensure that a QMHP conducts a mental health assessment of prisoners who have non-emergent mental health needs within 24 hours (or within 72 hours on weekends and legal holidays) of a registered nurse conducting an intake nursing assessment at IRC or CRDF.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through September 30, 2017 (verified) and through March 31, 2018 (unverified))**

The Compliance Measures require the Department to review randomly selected records of the prisoners identified in the intake nursing assessment as having non-emergent mental health needs to determine if the Department completed mental health assessments for 85% of the prisoners within the required time periods.

The County's Sixth Self-Assessment reports that in the Fourth Quarter of 2017 the County completed mental health assessments for 99% of the inmates at CRDF and IRC[14] within the required time periods, and in the First Quarter of 2018, it completed 95% of the assessments within the required time periods.

Based on "spot check[ing]" the data for CRDF, the Mental Health Subject Matter Expert has expressed concerns that "some cases were categorized as routine that should have been expedites;" and "there were many instances where there was an unreasonable delay between custody assistants' [initial screenings at intake] and nurse assessments," which is what triggers the 24-hour requirement of Paragraph 29.[15]  These concerns are not, however, specifically applicable to the requirements of Paragraph 29 or the corresponding Compliance Measures, which measure the time between a nurse's assessment and the QMHP's mental health assessment of those inmates with non-emergent mental health needs.

These results are subject to verification by the Monitor's auditors.  If the results are verified by the auditors, the Department will have maintained Substantial Compliance for twelve consecutive months and will no longer be subject to monitoring for compliance with Paragraph 29.

---

[14] The County's Fifth Self-Assessment reported that mental health assessments were completed 93% of the time in the Fourth Quarter of 2017.  A subsequently posted amended Self-Assessment reflects that 99% were completed timely.  In either case, the results exceeded the 85% threshold.

[15] This gap will disappear if the nurses do all screenings, but the County still needs to address the significant increases in time for the combined initial screening and nurses' assessment under the pilot program, which impacts when mental health assessments are required to be conducted pursuant to Paragraph 29.  See p. 22, supra.

26

30.     Consistent with existing DMH policies, the initial mental health assessment will include a brief initial treatment plan.  The initial treatment plan will address housing recommendations and preliminary discharge information.  During the initial assessment, a referral will be made for a more comprehensive mental health assessment if clinically indicated.  The initial assessment will identify any immediate issues and determine whether a more comprehensive mental health evaluation is indicated.  The Monitor and SMEs will monitor whether the housing recommendations in the initial treatment plan have been followed.

### STATUS:     PARTIAL COMPLIANCE

The Compliance Measures require the Department to review randomly selected initial mental health assessments and report on (1) the percentage of assessments that have (i) included an initial treatment plan that addresses housing recommendations and preliminary discharge information and (ii) identified any immediate issues and whether a more comprehensive evaluation was indicated; and (2) whether the housing recommendations were followed.

The County's Sixth Self-Assessment reports that 100% of the housing assignments reviewed in the Fourth Quarter of 2017 followed the housing recommendations in the initial treatment plans, which exceeds the 95% threshold for Substantial Compliance, but only 80% of the initial mental health assessments had the information required by Paragraph 30, which is below the 85% threshold for the initial assessment component.  The Self-Assessment reports that 100% of housing assignments and 62% of the initial assessments complied with the requirements of Paragraph 30 in the First Quarter of 2018.

The Mental Health Subject Matter Expert and the clinicians again evaluated "whether the determination of immediate issues [in random sample of mental health assessments] was reasonable in light of available information. . . [and] whether the initial treatment plan covered the elements required by existing County policy, which goes beyond the content of the formal compliance measure."  They found that 85% of the cases "identified immediate issues," and that the determination of the immediate issues "was reasonable from a qualitative perspective" in 76% of the cases.  The Subject Matter Expert concludes that the "County remains on the cusp of substantial compliance."

27

31.     Consistent with existing DMH and Sheriff's Department policies, the County and the Sheriff will maintain electronic mental health alerts in prisoners' electronic medical records that notify medical and mental health staff of a prisoner's risk for suicide or self-injurious behavior.  The alerts will be for the following risk factors:

(a)     current suicide risk;

(b)     hoarding medications; and

(c)     prior suicide attempts.

**STATUS:     PARTIAL COMPLIANCE**

The Compliance Measures require the Department to review randomly selected electronic medical records for prisoners in certain at-risk groups to determine if the required mental health alerts are in 85% of the records reviewed, which is the threshold for Substantial Compliance, for prisoners who report suicidal thoughts during the intake process; were removed from risk precautions in the prior quarter; or were identified as hoarding medicine.

The County's Sixth Self-Assessment reports that for the Fourth Quarter of 2017, 88% of the records reviewed at TTCF, 94% of the records at CRDF, and 0% of the records at MCJ had the required mental health alerts.  The County's augmented Sixth Self-Assessment reports that for the First Quarter of 2018, 91% of the records reviewed at TTCF, 94% of the records at CRDF, and 100% of the records at MCJ had the required mental health alerts.

The augmented Self-Assessment also reports that the County "continues to have difficulty with documenting and tracking inmates known to hoard medication."  It reports, however, that it has achieved Substantial Compliance "at TTCF where nursing and mental health have demonstrated a record of coordinating with custody staff to accurately identify inmates who are hoarding medication."  The posted Self-Assessment reported that the County reviewed 24 records of prisoners at TTCF who were identified as hoarding medicine, and found that 22 (or 91%) contained the required mental health alerts.[16]

In comments to the Monitor's draft report, DOJ noted that "source documents provided by the County show that required suicide alerts may have been missing in multiple cases that the County listed as compliant."  In the course of reviewing the County's audit tool and source documents with the auditors in light of these comments,

---

[16] The Monitor notes that the County reported an aggregate Compliance Percentage of 91% for the three required alerts, but that the Compliance Percentage of alerts for "prisoners who were removed from risk precautions in the prior quarter" was 84%, which is just below the required 85% for Substantial Compliance.  The Monitor and Mental Health Subject Matter Expert believe that the County must satisfy the 85% threshold for Substantial Compliance for each of the required alert categories.

28

the Monitor has a number of questions about the County's reported results regarding alerts for the group of prisoners removed from risk precautions at TTCF.  The Monitor and auditors will meet with the parties during the next reporting period to discuss DOJ's concerns; the understandings of the parties with respect to the Paragraph 31 and Compliance Measure 31.1(b); and the Monitor's questions regarding the County's results.

The Mental Health Subject Matter Expert has expressed some concerns about the County's methodology in determining compliance with Paragraph 31.  He notes that "[i]t is unclear how the county is finding cases of those placed on R[isk] P[recautions].  To be able to judge the accuracy of the findings, it is important to know the methodology." With respect to hoarding, "[t]he county is finding some cases by finding referrals that include hoarding.  It is not clear how they are finding other cases; again, it is important to know the methodology."  For example, if "[t]he county is not using custody cell search data to find cases of hoarding, that is likely part of the reason few cases are being detected for this measure.  Only 5 hoarding cases were detected at CRDF for 2018Q1, which is much lower than would be expected."[17]

---

[17] In contrast, for Paragraph 65, the County noted 53 medications found in 165 unannounced searches at CRDF during the First Quarter of 2018.  Substantial amounts of medications were found during unannounced searches at the other facilities as well.  See p. 76 infra.

29

32.     Information regarding a serious suicide attempt will be entered in the prisoner's electronic medical record in a timely manner.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified))**

The Compliance Measures require that 95% of the electronic medical records of prisoners who had a serious suicide attempt reflect information regarding the attempt, and 85% of the records reflect that the information was entered into the record within one day of the attempt.

The County maintained Substantial Compliance with Paragraph 32 for twelve consecutive months as of December 31, 2016, and this provision was not subject to monitoring in the Sixth Reporting Period.

33.    The County will require mental health supervisors in the Jails to review electronic medical records on a quarterly basis to assess their accuracy as follows:

(a)    Supervisors will randomly select two prisoners from each clinician's caseload in the prior quarter;

(b)    Supervisors will compare records for those prisoners to corroborate clinician attendance, units of service, and any unusual trends, including appropriate time spent with prisoners, recording more units of service than hours worked, and to determine whether contacts with those prisoners are inconsistent with their clinical needs;

(c)    Where supervisors identify discrepancies through these reviews, they will conduct a more thorough review using a DMH-developed standardized tool and will consider detailed information contained in the electronic medical record and progress notes; and

(d)    Serious concerns remaining after the secondary review will be elevated for administrative action in consultation with DMH's centralized Human Resources.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017 (unverified))**

The Compliance Measures require the County to provide the Monitor and the Subject Matter Experts with the DMH-developed standardized tool required by Paragraph 33(c), and to report the results of its analysis of the electronic medical records of two randomly selected prisoners from each clinician's caseload.  The County has provided the required tool, and previously reported Substantial Compliance for the Third and Fourth Quarters of 2016, and the First Quarter of 2017.

All of the results previously reported by the County in its Self-Assessments are subject to verification by the Monitor's auditors, which will include verifying that the supervisors' reviews of the clinicians include the content required by Paragraph 33(b). The County's Augmented Sixth Self-Assessment reports "that 100% -- 15% more than the required 85% -- of the mental health supervisors complied with the requirements of this Provision for Fourth Quarter 2017." The County also reported the same results for the Third Quarter 2017.  These results will be subject to verification by the Monitor's auditors if the results previously reported for the prior twelve months cannot be verified by the auditors and the Department is required to extend its Substantial Compliance into the Third Quarter of 2017.

The Mental Health Subject Matter Expert has concluded the County is doing an "adequate job meeting the requirements of [Paragraph] 33."

31

34. The County and the Sheriff will conduct discharge planning and linkage to community mental health providers and aftercare services for all prisoners with serious mental illness as follows:

(a) For prisoners who are in Jail seven days or less, a preliminary treatment plan, including discharge information, will be developed.

(b) For prisoners who are in Jail more than seven days, a QMHP will also make available:

(i) for prisoners who are receiving psychotropic medications, a 30-day prescription for those medications will be offered either through the release planning process, through referral to a re-entry resource center, or through referral to an appropriate community provider, unless clinically contraindicated;

(ii) in-person consultation to address housing, mental health/medical/substance abuse treatment, income/benefits establishment, and family/community/social supports. This consultation will also identify specific actions to be taken and identify individuals responsible for each action;

(iii) if the prisoner has an intense need for assistance, as described in DMH policies, the prisoner will further be provided direct linkage to an Institution for Mental Disease ("IMD"), IMD-Step-down facility, or appropriately licensed hospital;

(iv) if the prisoner has a moderate need for assistance, as described in DMH policies, and as clinically appropriate to the needs of the prisoner, the prisoner will be offered enrollment in Full Service Partnership or similar program, placement in an Adult Residential Facility ("Board and Care") or other residential treatment facility, and direct assistance accessing community resources; and

(v) if the prisoner has minimal needs for assistance, as described in DMH policies, the prisoner will be offered referrals to routine services as appropriate, such as General Relief, Social Security, community mental health clinics, substance abuse programs, and/or outpatient care/support groups.

(c) The County will provide a re-entry resource center with QMHPs available to all prisoners where they may obtain information about available mental health services and other community resources.

32

**STATUS (34):          STAYED PENDING LITIGATION**


Paragraph 34 is the subject of on-going litigation as a result of a First Amended
Complaint in Intervention challenging the provisions relating to discharge planning.  The
County's Sixth Self-Assessment reports that the litigation "is on-going" and,
"[a]ccordingly, the Department has stayed its collection of compliance data with respect
to this [p]rovision."

33

35.     Consistent with existing DMH and Sheriff's Department policies, the County and the Sheriff will ensure that custody staff, before the end of shift, refer prisoners in general or special populations who are demonstrating a potential need for routine mental health care to a QMHP or a Jail Mental Evaluation Team ("JMET") member for evaluation, and document such referrals.  Custody staff will utilize the Behavior Observation and Referral Form.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of November 1, 2017,[18] through March 31, 2018 (verified))**

The Compliance Measures require the Department to review, for a randomly selected month each quarter, the Behavior Observation and Mental Health Referral ("BOMHR") records for prisoners referred by custody staff to a QMHP or JMET member for "routine" mental health care to determine the timeliness of the referrals.  Substantial Compliance requires that "85% of the BOHMR forms reflect that the referral occurred before the end of the shift in which the potential need for mental health care is identified."

The County's Sixth Self- Assessment reports that the Department "has developed an electronic version of the BOHMR" and it has "concluded that 100% -- 15% more than the required 85% -- of BOHMR forms reflected that referrals occurred prior to the end of the shift in which the potential need for mental health care is identified" in both the Fourth Quarter of 2017 and the First Quarter of 2018.  The Mental Health Subject Matter Expert reviewed the majority of the posted BOHMRs, which included "the time of the incident and the time the BOHMR was submitted," and he commented that Custody staff "are to be commended" for "including good comments and important information on the BOHMRs[.]"  The results have been verified by the Monitor's auditors.

---

[18] The County implemented the electronic version of the BOHMR as of November 6, 2017 and reported results for the Fourth Quarter of 2017 for the month of November.

36.     Consistent with existing DMH policies, the County and the Sheriff will ensure that a QMHP performs a mental health assessment after any adverse triggering event, such as a suicide attempt, suicide threat, self-injurious behavior, or any clear de-compensation of mental health status.  For those prisoners who repeatedly engage in such self-injurious behavior, the County will perform such a mental health assessment only when clinically indicated, and will, when clinically indicated, develop an individualized treatment plan to reduce, and minimize reinforcement of, such behavior.  The County and the Sheriff will maintain an on-call system to ensure that mental health assessments are conducted within four hours following the notification of the adverse triggering event or upon notification that the prisoner has returned from a medical assessment related to the adverse triggering event.  The prisoner will remain under unobstructed visual observation by custody staff until a QMHP has completed his or her evaluation.

### STATUS:     PARTIAL COMPLIANCE

The Compliance Measures require the Department to review randomly selected records of prisoners newly admitted to mental health housing from a lower level of care due to an adverse triggering event during two randomly selected weeks per quarter; and provide a staffing schedule for on-call services.  The County's Sixth Self-Assessment reports that 78% of the prisoners identified in the two randomly selected weeks in the Fourth Quarter of 2017 and 72% of the identified prisoners in the First Quarter of 2018 received an assessment by a QMHP within four hours.[19]

DOJ and the County have agreed that, instead of unannounced quarterly visits, "the Department will randomly select five BOMHRS" from a randomly selected date, to "review videos to determine how the inmate was being observed while waiting for the QMHP," and "produce screen shots and movement records as part of their self-assessment."

The County reports that in  the Fourth Quarter of 2017 all five selected prisoners at CRDF, and four of the five at TTCF were on the videos "under unobstructed visual observation pending assessment."  In the First Quarter of 2018, only one of the five prisoners at CRDF and all the five inmates at TTCF were under the required observation.

The Sixth Self-Assessment reports that the County achieved 100% compliance with a staffing schedule that provides on-call services 24 hours a day, 7 days a week in both the Fourth Quarter of 2017 and the First Quarter of 2018 pursuant to Compliance Measure 36.2.  This Compliance Measure does not, however, simply require 24/7 coverage.  It requires the Monitor, in consultation with the Subject Matter Experts, to "review" the staffing schedule "to verify the adequacy of the on-call system."  The

---

[19] The Mental Health Subject Matter Expert previously noted that many cases may not be true emergencies because the inmates are using the threat of suicide "to secure exit from NCCF."  He indicated  that it "might be reasonable to exclude" from the four-hour assessment requirement those inmates in general population at NCCF who are transferred to IRC as a result of threatening to commit suicide rather than engaging in self-injurious behavior.  The parties have agreed to exclude these NCCF inmates from the four-hour assessment requirement.

35

Mental Health Subject Matter Expert commented that "unless the county has another explanation for its inability to respond to adverse triggering events within 4 hours, it is likely that inadequate staffing is the problem."[20]

He also noted that "the county is generally doing a good job of detecting adverse triggering events; using the methodology of our qualitative assessments to detect false negatives, the county was performing well. . . .The problem is that the clinical response is generally marginal or poor and there is almost no meaningful attempt to address recurrent self-harm"

---

[20] As noted above, the County reported that only 78% and 72% of the inmates received an assessment by a QMHP within four hours during the Fourth Quarter of 2017 and the First Quarter of 2018.  In reporting results for Paragraph 43, the County's Sixth Self-Assessment notes that staffing shortages impacted "the County's ability to achieve Substantial Compliance" with the requirement that QMHP's be consulted prior to transferring inmates from mental health housing locations to discipline.

37.     Sheriff's Court Services Division staff will complete a Behavioral Observation and Mental Health Referral ("BOMHR") Form and forward it to the Jail's mental health and/or medical staff when the Court Services Division staff obtains information that indicates a prisoner has displayed obvious suicidal ideation or when the prisoner exhibits unusual behavior that clearly manifests self-injurious behavior, or other clear indication of mental health crisis.  Pending transport, such prisoner will be under unobstructed visual observation or subject to 15-minute safety checks.

**STATUS:    PARTIAL COMPLIANCE**

The Compliance Measures require the Department to randomly select nine courts from among the three Court Divisions each quarter, review written communications and orders that refer to a suicide risk or serious mental health crisis for a prisoner and incident reports for self-injurious behavior by prisoners appearing in the selected courts, and determine if these incidents are reflected in BOMHR forms completed by the Court Services Division staff in the selected courts.

The County's Sixth Self-Assessment reports that 68% of the incidents covered by Paragraph 37 in six randomly selected courts were reflected on BOMHRs in the Fourth Quarter of 2017 and 52% of the incidents in six other courts were reflected on BOMHRs in the First Quarter of 2018.  These results are well below the 93% and 87% results in the prior two quarters.[21]

During the Sixth Reporting Period, the Monitor conducted random checks of courthouse lock-ups to determine where these prisoners are housed and if they are "under unobstructed visual observation or subject to 15-minute checks."  There no issues with respect to housing of prisoners who display "obvious suicidal ideation" or "unusual behavior that clearly manifests self-injurious behavior, or other clear indication of mental health crisis."  The Court Services Division personnel explained that these prisoners were kept under direct observation or subjected to 15-minute checks; they completed the new electronic BOMHR forms to notify Custody personnel of observed mental health issues; and they undertook, with the cooperation of the courts, to expedite court appearances of inmates with mental health issues so that they could be transported to back to the Downtown Jail Complex or CRDF as soon as possible.  Most of the cells in the randomly selected Courts had cameras in the cells and the Court Services Division personnel indicated that inmates with mental health issues were housed in those cells.  With the exception a few cells in the Central Arraignment Court at Bauchert Street, there were no concerns about visibility into the cells, and the Department has now addressed the problem at the Central Arraignment Court.  Although the reported results are lower than in the last reporting period, based upon the Monitors' observations and the results, the Monitor has concluded that the Department achieved Partial Compliance with Paragraph 37 during the Sixth Reporting Period.

---

[21] Although Compliance Measure 37-2 requires the Department to "select different courts so that all 35 courts are selected at least once per year," only twenty-five of the Courts have lock-ups and handle defendants in custody.

38.     Consistent with existing DMH policies and National Commission on Correctional Health Care standards for jails, the County and the Sheriff will ensure that mental health staff or JMET teams make weekly cell-by-cell rounds in restricted non-mental health housing modules (e.g., administrative segregation, disciplinary segregation) at the Jails to identify prisoners with mental illness who may have been missed during screening or who have decompensated while in the Jails.  In conducting the rounds, either the clinician, the JMET deputy, or the prisoner may request an out-of-cell interview. This request will be granted unless there is a clear and documented security concern that would prohibit such an interview or the prisoner has a documented history of repeated, unjustified requests for such out-of-cell interviews.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified))**

The Compliance Measures require the Department to review the documentation of the weekly cell-by-cell rounds and the JMET Logs for a randomly selected week each quarter to confirm that the required cell-by-cell checks were conducted and out-of-cell interviews were handled in accordance with this provision.

The County's reported results, which were verified by the Monitor's auditors, showed that it had maintained Substantial Compliance with Paragraph 38 for twelve consecutive months as of December 31, 2016.  Accordingly, pursuant to Paragraph 111 of the Settlement Agreement, Paragraph 38 was not subject to monitoring in the Sixth Reporting Period.

38

39.    The County and the Sheriff will continue to use a confidential self-referral system by which all prisoners can request mental health care without revealing the substance of their requests to custody staff or other prisoners.

**STATUS        SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through March 31, 2018, (unverified) at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2017, through March 31, 2018 (unverified) at NCCF)**

**PARTIAL COMPLIANCE (at TTCF and MCJ)**

**NOT RATED (PDC North, PDC East and PDC South)**

Substantial Compliance requires the Department to (a) verify that housing areas have the required forms and (b) review randomly selected self-referrals for mental health care from prisoners to confirm that (i) the referrals "were forwarded to DMH" by the Department, and (ii) that "DMH documented the timeliness and nature of DMH's response to the self-referrals[.]"  The thresholds for Substantial Compliance are that 90% of the self-referrals must be forwarded by the Department to the Department of Health Services – Custody Health Services (DHS-CHS) and 90% must contain the required documentation of DHS-CHS's response.

During tours of the jail facilities in the Sixth Reporting Period, the Monitor observed that healthcare referral forms for prisoners requesting medical or mental health care and envelopes were available either in the modules or at the Deputies' stations adjacent to these housing areas, and prisoners are able to ask staff for the forms and envelopes if they do not have access to the box or it is empty.  In some areas in Men's Central Jail where the inmates are in single cells in rows (e.g., for K-10 inmates), the forms are in boxes outside of the rows and must be obtained from the Deputies and Custody Assistants assigned to the areas.

Based upon a review of the County's policies and procedures, multiple tours of the facilities, interviews, and the County's Sixth Self-Assessment, the Monitor is satisfied that the Department has adequate processes and procedures for inmates to make confidential self-referrals for mental health care.

The County's Sixth Self-Assessment reports that it achieved Substantial Compliance with Compliance Measure 39.4(a) in the Fourth Quarter of 2017 and the First Quarter of 2018 in that more than 85% of the housing areas in all of the facilities had the self-referral forms.

The County's Sixth Self-Assessment also reports that in the Fourth Quarter of 2017, 100% of the self-referrals from CRDF, TTCF, MCJ, and NCCF were forwarded by the Department to DHS-CHS as required by Compliance Measure 39.4(b), and DHS-CHS documented the timeliness and nature of its response in 90% of the CRDF referrals

39

and 100% of the NCCF referrals, but that only 66% of the TTCF referrals and 68% of the MCJ referrals had the documentation as required by Compliance Measure 39.4(c).  The Self-Assessment also reports that "the County was unable to assess PDC South, PDC East, and PDC North during this quarter" due to their delay in adopting referral guidelines implemented in July 2017.

The County's Augmented Sixth Self-Assessment reports that for the First Quarter of 2018, 100% of the self-referrals reviewed by the Department at CRDF were forwarded to CHS and that 91% of the time "CHS documented the timeliness and nature of CHS' response to the self-referrals received from the Department."[22]  The results for the other facilities were as follows:  100% and 77% for self-referrals at MCJ; 100% and 60% for TTCF;[23] and 100% and 100% for NCCF.  The "County determined that it had not reached substantial compliance at PDC North (Buildings 1, 3 and 4); PDC South and PDC East during this quarter as it was unable to assess those facilities" for the same reasons stated above.

As noted in prior reports, absent extenuating circumstances, Mental Health Services clinicians must respond to self-referrals within seven days.  In prior periods, the County counted from when Mental Health Services received the self-referral from Medical Services rather than from when the inmate made the self-referral that was collected by the Sheriff's Department.  The County's approach would be reasonable if Medical Services promptly forwarded the self-referral to Mental Health Services, but this was not always the case.  As a result of a County reorganization, both Mental Health and Medical Services are now under "Correctional Health Services" (CHS), which is part of the Department of Health Services (DHS).  Since there is no distinction between Mental Health and medical care in Correctional Health Services, it is reasonable to count the seven day-response time from CHS' receipt of the self-referral from the Sheriff's Department.  This is based upon the assumption that the Department is promptly forwarding the referral to the CHS within 24 hours of collecting the self-referral.[24]

The Mental Health Subject Matter Expert has expressed a concern that the County is "counting as compliant cases where MH does not ever see the patient but has placed the patient on a list to be seen.  What typically happens is that the patient is placed on a list to see JMET or a psychiatrist but is released before being seen. . . .While technically there is a MH response, it is not a clinical response – it is a plan to respond. . . [I]t is

---

[22] The Monitor's auditors have been unable to verify these results because in some cases the inmate was seen by a clinician before he or she submitted a self-referral for mental health services and the documentation is insufficient to determine if the mental health services addressed the inmates' requests.
[23] The County noted "that staffing difficulties impacted compliance at TTCF in implementing this provision."
[24] If this assumption is not correct, it may be necessary to revisit the start date once again to ensure that the self-referrals are being addressed within a reasonable amount of time.  Per DOJ's request, the Monitor and the auditors will review the referrals to verify that the Department is promptly forwarding the referrals to CHS.

highly questionable to say that there has been a timely response to a request when a patient is never actually seen or waits over a month to be seen."[25]

When compliance is measured from the date the self-referral form is received by Correctional Health Services, the Monitor's auditors determined that the County was not in Substantial Compliance at CRDF for the Third Quarter of 2017.

The reported results for CRDF for the Fourth Quarter of 2017 and First Quarter of 2018, and for NCCF for the Third and Fourth Quarters of 2017 and the First Quarter of 2018, are subject to verification by the Monitor's auditors, based upon an assessment of the timeliness of Mental Health Services' responses from the date the inmate's self-referral was received by Correctional Health Services and a qualitative assessment by Mental Health Subject Matter Expert and the clinicians.

---

[25] He notes that not every request requires a patient contact (e.g., a medication refill), "but if the determination is made that a patient needs to been seen, the timeliness of the response should be based on when the patient was seen."

41

40.    The County and the Sheriff will ensure a QMHP will be available on-site, by transportation of the prisoner, or through tele-psych 24 hours per day, seven days per week (24/7) to provide clinically appropriate mental health crisis intervention services.

**STATUS:    PARTIAL COMPLIANCE**

Substantial Compliance requires the County (1) to provide the Monitor with on-call schedules for two randomly selected weeks reflecting that a QMHP was assigned 24 hours a day, seven days per week, and (2) randomly select referrals for mental health crisis intervention received by a QMHP per quarter to verify that a QMHP responded to all referrals, and 90% of the referrals within four hours.

The County's Sixth Self-Assessment reports that for the Fourth Quarter of 2017 and the First Quarter of 2018, a QMHP responded 100% of the time and 94% of the responses were within four hours.

During a March 2018 site visit, the Mental Health Subject Matter Expert and the clinicians found that the response by a QMHP was within four hours in 18 out of 23 cases (78%).  The Mental Health Expert noted the County's "sample was larger [and] more representative.  So it is likely that they are meeting time lines."  He stated, however, that "the real issue for us is that the quality of the response is very often not 'clinically appropriate;'" in this quarter the services were clinically appropriate in only 54% of the cases.  He views this as "a substantial problem;" QMHP's often order housing changes or precautions, but "[t]here is rarely a clinical response that addresses the crisis itself."  Based upon this finding, and notwithstanding the quantitative results, the County has achieved Partial Compliance with Paragraph 40 rather than Substantial Compliance.

The County voiced concerns about what it considers to be an expansion of paragraph 40 and an undefined and subjective standard.  The County also asserts that this relates to crisis intervention services provided quickly to identify safety concerns and mental health care is covered by other provisions.  The Mental Health Subject Matter Expert observes, however, that "a crisis response would, at a minimum, characterize the cause of the crisis, conduct a relevant risk assessment, and create a plan of action based on that assessment."

42

41.     Consistent with existing DMH policies, the County and the Sheriff will implement step-down protocols that provide clinically appropriate transition when prisoners are discharged from FIP after being the subject of suicide watch.  The protocols will provide:

(a)     intermediate steps between highly restrictive suicide measures (e.g., clinical restraints and direct constant observation) and the discontinuation of suicide watch;

(b)     an evaluation by a QMHP before a prisoner is removed from suicide watch;

(c)     every prisoner discharged from FIP following a period of suicide watch will be housed upon release in the least restrictive setting deemed clinically appropriate unless exceptional circumstances affecting the facility exist; and

(d)     all FIP discharges following a period of suicide watch will be seen by a QMHP within 72 hours of FIP release, or sooner if indicated, unless exceptional circumstances affecting the facility exist.

**STATUS:     NOT RATED**

Substantial Compliance requires DMH to review the medical records of all prisoners on suicide watch in FIP for one randomly selected month each quarter, and submit a report regarding the implementation of the step-down protocols and the results of its review of the medical records.  In the Fourth Reporting Period, the Monitor did not rate the County's compliance with Paragraph 41 because all of the FIP patients on suicide watch during the period either remained on suicide watch at the end of the period or they "did not remain in the system (they were transferred to prison), and therefore did not go through the protocols."

During the Fifth Reporting Period, the parties agreed to revisions to the Compliance Measures that will increase the number of inmates subject to the step-down protocols of Paragraph 41 and ensure that the County's implementation of step-down protocols for FIP patients on suicide watch "ameliorate the impact of the restrictions" and have the necessary "level of precautions based upon individual assessment[s]" of the patients.  The revised Compliance Measures were reviewed by the Mental Health Subject Matter Expert.

The County's Sixth Self-Assessment reports that the "County is in the process of finalizing an EMR template to meaningfully, and sufficiently, assess the County's compliance with the application of this Compliance Measure to the relevant universe of patients and affiliated step-down protocols," which are expected to be in place during the next reporting period.

43

42.    Consistent with existing DMH policies, the County and the Sheriff will implement step-down protocols to ensure that prisoners admitted to HOH and placed on risk precautions are assessed by a QMHP.  As part of the assessment, the QMHP will determine on an individualized basis whether to implement "step-down" procedures for that prisoner as follows:

(a)    the prisoner will be assessed by a QMHP within three Normal business work days, but not to exceed four days, following discontinuance of risk precautions;

(b)    the prisoner is counseled to ameliorate the negative psychological impact that any restrictions may have had and in ways of dealing with this impact;

(c)    the prisoner will remain in HOH or be transferred to MOH, as determined on a case-by-case basis, until such assessment and counseling is completed, unless exceptional circumstances affecting the facility exist; and

(d)    the prisoner is subsequently placed in a level of care/housing as determined by a QMHP.

### STATUS:    PARTIAL COMPLIANCE

The County's Sixth Self-Assessment reports that for the Fourth Quarter of 2017 at CRDF, 100% of the medical records reviewed reflected that "inmates in HOH and placed on risk precautions were assessed by a QMHP"; "47% -- instead of the required 90% -- of the records reflected that the QMHP determined on an individualized basis whether to implement step-down procedures;" and "100% -- 15% more than the  required 85% -- of the records reflected that step-down procedures were implemented per the QMHP assessment, where applicable."  For this quarter at TTCF, the results in these categories were 100%, 38%, and 100%.

For the First Quarter of 2018 at CRDF, 100% of the records "reflected that inmates in HOH and placed on risk precautions were assessed by a QMHP"; 60% "of the records reflected that the QMHP determined on an individualized basis whether to implement step-down procedures;" and 70% "of the records reflected that step-down procedures were implemented per the QMHP assessment, where applicable."  For this quarter at TTCF, the results in these categories were 100%, 68% and 33%.

The most recent results reported by the County show an improvement from prior reporting period, particularly at TTCF.  The Mental Health Subject Matter Expert notes, however, that the QMHPs decisions regarding step-down "are not always individualized" and the reasons for not placing an inmate on step-down procedures are not stated.

44

43.     Within six months of the Effective Date, the County and the Sheriff will develop and implement written policies for formal discipline of prisoners with serious mental illness incorporating the following:

(a)     Prior to transfer, custody staff will consult with a QMHP to determine whether assignment of a prisoner in mental health housing to disciplinary housing is clinically contraindicated and whether placement in a higher level of mental health housing is clinically indicated, and will thereafter follow the QMHP's recommendation;

(b)     If a prisoner is receiving psychotropic medication and is placed in disciplinary housing from an area other than mental health housing, a QMHP will meet with that prisoner within 24 hours of such placement to determine whether maintenance of the prisoner in such placement is clinically contraindicated and whether transfer of the prisoner to mental health housing is clinically appropriate, and custody staff will thereafter follow the QMHP's recommendation;

(c)     A QMHP will participate in weekly walks, as specified in paragraph 38, in disciplinary housing areas to observe prisoners in those areas and to identify those prisoners with mental health needs; and

(d)     Prior to a prisoner in mental health housing losing behavioral credits for disciplinary reasons, the disciplinary decision-maker will receive and take into consideration information from a QMHP regarding the prisoner's underlying mental illness, the potential effects of the discipline being considered, and whether transfer of the prisoner to a higher level of mental health housing is clinically indicated.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through March 31, 2018 at NCCF and PDC North (verified))**

**PARTIAL COMPLIANCE (at CRDF, MCJ, and TTCF)**

In response to comments by the Monitor and DOJ, the Department submitted proposed revisions to its discipline policies on May 30, 2017.  After consulting with the Subject Matter Experts, the Monitor provided his written comments to the Department on June 29, 2017.  The DOJ provided its comments to the Department the same day.  The County's Sixth Self-Assessment reports that the Department is "currently in the process of reviewing and approving the revised policies," which were shared with the Monitor and DOJ in May of last year.

The Sixth Self-Assessment reports the County "made changes in housing arrangements to develop mental health discipline pods, and implemented new guidelines and policy which reduce the number of patients eligible for discipline at TTCF and CRDF."

45

The County's Sixth Self-Assessment reports on the current practices regarding the discipline for inmates with P2, P3, and P4 designations in mental health housing locations.  The Self-Assessment again reports that "the County continues to experience staffing shortages which impact the County's ability to achieve Substantial Compliance with this Provision and is taking steps to address this issue."

The County's Sixth Self-Assessment also reports that it achieved Substantial Compliance at NCCF and PDC North in the Fourth Quarter of 2017 where "100% -- equal to the required 100% of the required weekly row walks through disciplinary units occurred pursuant to Compliance Measure 43.9(d)."  Although not stated in the Self-Assessment, it appears that the other Compliance Measures are not applicable because NCCF and PDC North did not have any prisoners transferred to disciplinary housing from mental health housing.  For example, the results for CRDF and TTCF also showed that 100% of the weekly row walks occurred, but these facilities did not achieve Substantial Compliance because the consultations with QMHPs required pursuant to Compliance Measure 43-9(b) did not occur "prior to transfers from mental health housing to discipline housing."  As acknowledged in the Self-Assessment, "the County continues to experience systematic problems with QMHP discipline clearance for inmates in mental health housing."

The County's Augmented Sixth Self-Assessments again reports that it achieved Substantial Compliance at NCCF and PDC North in the First Quarter of 2018.  It did not, however, achieve Substantial Compliance at the remaining facilities with mentally ill inmates, although it did report improvements in compliance with consultations with QMHPs prior to transfers from mental health housing to discipline housing.  These results have been verified by the Monitor's auditors.

46

44.    Within six months of the Effective Date, the County and the Sheriff will install protective barriers that do not prevent line-of-sight supervision on the second floor tier of all High Observation Housing areas to prevent prisoners from jumping off of the second floor tier.  Within six months of the Effective Date, the County and the Sheriff will also develop a plan that identifies any other areas in mental health housing where such protective barriers should be installed.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016)**

The County has maintained Substantial Compliance with Paragraph 44 of the Agreement since January 1, 2016.  Pursuant to Paragraph 111 of the Settlement Agreement, Paragraph 44 was not subject to monitoring during the Sixth Reporting Period.

47

45.    Consistent with existing Sheriff's Department policies, the County and the Sheriff will provide both a Suicide Intervention Kit that contains an emergency cut-down tool and a first-aid kit in the control booth or officer's station of each housing unit.  All custody staff who have contact with prisoners will know the location of the Suicide Intervention Kit and first-aid kit and be trained to use their contents.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of October 1, 2015, through September 30, 2016 (verified) at CRDF, NCCF, PDC EAST, PDC SOUTH, and TTCF)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at MCJ and PDC North)**

The County has maintained Substantial Compliance with Paragraph 45 for twelve consecutive months at all facilities as of December 31, 2016.  Pursuant to Paragraph 111 of the Settlement Agreement, Paragraph 45 was not subject to monitoring during the Sixth Reporting Period.

48

46.    The County and the Sheriff will immediately interrupt, and if necessary, provide appropriate aid to, any prisoner who threatens or exhibits self-injurious behavior.

### STATUS:    PARTIAL COMPLIANCE

Substantial Compliance requires the Department to review the documentation from randomly selected incidents involving prisoners who threaten or exhibit self-injurious behavior, and include an assessment of the timeliness and appropriateness of the Department's responses to these incidents in its semi-annual Self-Assessment.

Prior to this Sixth Reporting period, the Department had been unable to collect the universe of incidents when an inmate *threatened* self-injurious behavior as opposed to when an inmate *exhibited* such behavior.  The County's Sixth Self-Assessment reports that, with the implementation of the electronic BOMHRs at all facilities,"[b]eginning with the First Quarter of 2018, the Department is able to provide data as to inmates who threaten self-injurious behavior."

The County's Sixth Self-Assessment reports that for the Fourth Quarter of 2017, "94% -- rather than the required 95% -- of the records reviewed . . . reflected that appropriate aid and (when necessary) immediate interruption of self-injurious behavior was provided by the Department."  In the First Quarter of 2018, 97% of the records reflected that the appropriate aid and necessary interruption was provided by the Department.

The County is relying almost entirely on the BOHMRs to determine if there was "immediate interruption" of the self-injurious behavior and if "appropriate aid" was provided in compliance with this Paragraph.  Although the BOHMRs show when the inmate engaged in the self-injurious behavior, when the inmate was seen by a medical provider, and when a mental health clinician made an assessment, the BOHMRs do not always show what the County did to "interrupt" the behavior or what aid the County provided to the inmate.

The County notes that "[t]he purpose of this provision is to ensure that custody staff and QMHP's are immediately and properly responding to an inmate who threatens or exhibits behavior to prevent self-harm or further self-harm.  In this regard, the BOHMRs have been effectively used to ensure the prevention of suicides and suicide attempts."  While this may be true, Paragraph 46 requires the Department to "immediately interrupt" self-injurious behavior and provide "appropriate aid."  Without more information, the BOHMRs do not always document what the Department did to address these requirements in specific cases.

To establish Substantial Compliance, the County must either provide more detail in the BOHMRs (e.g., what the deputy did to interrupt on-going self-injurious behavior) or rely on additional documentation reflecting the information required by this provision.

49

47.      The County and the Sheriff will ensure there are sufficient custodial, medical, and mental health staff at the Jails to fulfill the terms of this Agreement.  Within six months of the Effective Date, and on a semi-annual basis thereafter, the County and the Sheriff will, in conjunction with the requirements of Paragraph 92 of this Agreement, provide to the Monitor and DOJ a report identifying the steps taken by the County and the Sheriff during the review period to implement the terms of this Agreement and any barriers to implementation, such as insufficient staffing levels at the Jails, if any.  The County and the Sheriff will retain staffing records for two years to ensure that for any critical incident or non-compliance with this Agreement, the Monitor and DOJ can obtain those records to determine whether staffing levels were a factor in that critical incident and/or non-compliance.

**STATUS:      NON-COMPLIANCE**

The County's posted Self-Assessment sets forth the number of Critical Incidents in each category during the Third and Fourth Quarters of 2017 using the definition of Critical Incidents in the revised Compliance Measures.  There were a total of 81 Critical Incidents in those two quarters.  The County's Self-Assessment does not assess whether staffing was a factor in these incidents because the County is still "working to develop the methodology to determine and assess whether staffing was a factor in any non-compliance with the Agreement, any critical incident, or the Department's handling of the incident."

50

48.      Within three months of the Effective Date, the County and the Sheriff will have written housekeeping, sanitation, and inspection plans to ensure the proper cleaning of, and trash collection and removal in, housing, shower, and medical areas, in accordance with California Code of Regulations ("CCR") Title 15 § 1280: Facility Sanitation, Safety, and Maintenance.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016)**

The County maintained Substantial Compliance with Paragraph 48 of the Agreement at all facilities for twelve consecutive months as of  December 31, 2016. Pursuant to Paragraph 111 of the Settlement Agreement, Paragraph 48 was not subject to monitoring in the Sixth Reporting Period.  Nevertheless, during inspections in the Sixth Reporting Period, the Monitor and Subject Matters Experts observed "an acceptable level of cleanliness, sanitation, repair and safety" in each facility.

49.    Within three months of the Effective Date, the County and the Sheriff will have a maintenance plan to respond to routine and emergency maintenance needs, including ensuring that shower, toilet, sink, and lighting units, and heating, ventilation, and cooling system are adequately maintained and installed.  The plan will also include steps to treat large mold infestations.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of March 1, 2016, through February 28, 2017)**

The County maintained Substantial Compliance with Paragraph 49 of the Agreement at all facilities for twelve consecutive months as of February 28, 2017. Pursuant to Paragraph 111 of the Settlement Agreement, Paragraph 49 was not subject to monitoring during the Sixth Reporting Period.  Nevertheless, during inspections in the Sixth Reporting Period, the Monitor noted that the lighting systems, heating, ventilation and cooling systems in each facility were "adequately maintained and installed."

52

50.    Consistent with existing Sheriff's Department policies regarding control of vermin, the County and the Sheriff will provide pest control throughout the housing units, medical units, kitchen, and food storage areas.

STATUS:    **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at all facilities other than PDC South and PDC East)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 (verified) at PDC South and PDC East)**

The County maintained Substantial Compliance with Paragraph 50 of the Agreement at all facilities for twelve consecutive months as of March 31, 2017.  Pursuant to Paragraph 111 of the Settlement Agreement, Paragraph 50 was not subject to monitoring during the Sixth Reporting Period.

53

51.     Consistent with existing Sheriff's Department policies regarding personal care items and supplies for inmates, the County and the Sheriff will ensure that all prisoners have access to basic hygiene supplies, in accordance with CCR Title 15 § 1265: Issue of Personal Care Items.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) for all facilities other than CRDF)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2016 through June 30, 2017 (verified) at CRDF)**

The County maintained Substantial Compliance with Paragraph 51 of the Agreement at all facilities for twelve consecutive months as of June 30, 2017. Pursuant to Paragraph 111 of the Settlement Agreement, Paragraph 51 was not subject to monitoring during the Sixth Reporting Period.

54

52.    The County and the Sheriff will implement policies governing property restrictions in High Observation Housing that provide:

(a)    Except when transferred directly from FIP, upon initial placement in HOH:

   (i)    Suicide-resistant blankets, gowns, and mattresses will be provided until the assessment set forth in section (a)(ii) below is conducted, unless clinically contraindicated as determined and documented by a QMHP.

   (ii)    Within 24 hours, a QMHP will make recommendations regarding allowable property based upon an individual clinical assessment.

(b)    Property restrictions in HOH beyond 24 hours will be based on clinical judgment and assessment by a QMHP as necessary to ensure the safety and well-being of the prisoner and documented in the electronic medical record.

**STATUS:    PARTIAL COMPLIANCE**

Substantial Compliance requires the Department to (1) randomly inspect the cells of prisoners placed in HOH (except from FIP) within the previous 24 hours to confirm that they have been provided with suicide-resistant blankets, gowns and mattresses unless clinically contraindicated, and document the results of the inspection; (2) randomly inspect the cells of prisoners placed in HOH (except from FIP) for more than 24 hours to confirm that they have been provided with allowable property as recommended by a QMHP; and (3) review the electronic medical records of prisoners assigned to HOH on the days of those inspections to verify compliance with the provisions of Paragraph 52. All of the Compliance Measures have a 95% threshold for Substantial Compliance.

The County's Sixth Self-Assessment reports that in the Fourth Quarter of 2017 at CRDF, 69% of the inmates initially placed in HOH were provided the property required by Paragraph 52; 6% "of the electronic medical records for inmates assigned to HOH reflected a recommendation by a QMHP regarding allowable property;" 66% "of electronic medical records for inmates assigned to HOH reflect that property restrictions were based upon the clinical judgment of a QMHP;" and 85% of the inmates placed in HOH "for more than 24 hours" had "allowable property as recommended by a QMHP[.]"

In the First Quarter of 2018 at CRDF 50% of the inmates initially placed in HOH were provided the property required by Paragraph 52; 8% of the electronic medical records "reflected a recommendation by a QMHP regarding allowable property;" 91.6% of electronic medical records "reflect that property restrictions were based upon the clinical judgment of a QMHP;" and 94% of the inmates in HOH "for more than 24 hours" had "allowable property as recommended by a QMHP[.]"

55

For the Fourth Quarter of 2017 at TTCF, the County reports that 73% of the inmates initially placed in HOH were provided the property required by Paragraph 52; 52% of the electronic medical records "reflected a recommendation by a QMHP regarding allowable property;" 95% of the electronic medical records "reflect that property restrictions were based upon the clinical judgment of a QMHP"; and 93% of the inmates placed in HOH "for more than 24 hours" had "allowable property as recommended by a QMHP[.]"

For the First Quarter of 2017 at TTCF, the results were 87% of the inmates initially placed in HOH were provided the property required by Paragraph 52; 44% of the electronic medical records "reflected a recommendation by a QMHP regarding allowable property," 100% of the electronic medical records "reflect that property restrictions were based upon the clinical judgment of a QMHP;" and 97% of the inmates placed in HOH "for more than 24 hours" had "allowable property as recommended by a QMHP[.]"

During an April 2018 qualitative assessment, the Mental Health Subject Matter Expert and the clinicians found that

> in 20/25 cases (80%) [at CRDF and TTCF], a QMHP provided an initial assessment (identical to last year). A QMHP saw the patient within 24 hours 18/25 times (72%), a modest improvement from 64%. There was a significant improvement in subsequent assessment of property restrictions with 16/25 (64%) current. The recommendations were followed 20/25 (80%) that we could determine the property in the cell, an improvement of over 20%. Determining whether other allowable property was in the cell was difficult, but we found it present in 16/19 (84%) of cases. The qualitative evaluation of whether the allowable property was based on relevant risks remained poor with only 5/25 (20%) of initial assessments and 8/25 (32%) of current assessment demonstrating a link between identified risks and property restrictions.

The Mental Health Subject Matter Expert commented that

> [t]here was often no discussion of why certain items were restricted or even why restrictions were needed at all, most notable in cases where there was no identified risk on the formal risk assessment tool.

> These results demonstrate a slight improvement in this measure from previous assessments, but the lack of improvement in the quality of the assessments is concerning. In many instances, it appears that prisoners are transferred to HOH after expressing suicidal ideation and have property substantially limited with little consideration of the nature and degree of risk. While some degree of conservatism is understandable, the best risk reduction strategy is to conduct adequate assessments and then act on the basis of the findings.

56

53.     If otherwise eligible for an education, work, or similar program, a prisoner's mental health diagnosis or prescription for medication alone will not preclude that prisoner from participating in said programming.

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance requires the Department to audit the records of prisoners who were eligible, but rejected or disqualified, for education and work programs to confirm that they were not rejected or disqualified because of a mental health diagnosis or prescription for medication alone.

The County reports that in the Fourth Quarter of 2017 and the First Quarter of 2018, 74% and 80% respectively of the mentally ill prisoners who were eligible for and denied work were not denied the work due to a mental health diagnosis or prescription for psychotropic medication alone.  The results for the Fourth Quarter of 2017 do not seem to capture the number of prisoners at CRDF who asked for, but were denied, programing in the quarter.  The CRDF data was, however, captured in the First Quarter of 2018.

The Mental Health Subject Matter Expert and clinicians reviewed the documents posted by the County and noted that "[i]t is difficult to determine if . . . denials reflect lack of eligibility due to mental health diagnosis alone, or issues relating to housing placement of patients as a class, rather than individual determinations of eligibility."

57

54.    Prisoners who are not in Mental Health Housing will not be denied privileges and programming based solely on their mental health status or prescription for psychotropic medication.

**STATUS:    PARTIAL COMPLIANCE**

Substantial Compliance requires the Department to audit the records of a maximum of 100 randomly selected prisoners who were eligible and denied privileges or programs to confirm that they were not rejected or disqualified because of a mental health diagnosis or prescription for psychotropic medication alone.  In the Fifth Reporting Period, the County reported that it achieved and maintained Substantial Compliance for the period from March 1, 2016 through December 31, 2016.  The results were verified by the Monitor's auditors.

The Mental Health Subject Matter Expert then expressed a concern that the randomly selected population "does not pre-select for patients on [mental health] rolls or on medication, so it is possible that all cases reviewed had no mental health problem that might have resulted in a denial."  To address this concern, with the approval of the parties, the Monitor revised the Compliance Measures for Paragraph 54, effective January 1, 2018, to reflect an alternative pool of inmates proposed by the County.  Because Monitor's auditors had verified that the County has maintained Substantial Compliance under the existing Compliance Measures, the parties agreed that the County will only be required to maintain Substantial Compliance under the revised Compliance Measures for two additional quarters.

The County's Sixth Self-Assessment reports Substantial Compliance as of the First Quarter of 2018.  This is based upon posted results showing that during two random weeks in the quarter, only two out of 43 inmates who requested programing were denied their requests solely due to their prescriptions for psychotropic medication or mental health status.  This report of 96% compliance does not, however, indicate whether any inmates were denied "privileges." [26]  Accordingly, the County has achieved Partial Compliance rather than Substantial Compliance.

---

[26] The County's posted results show the "[n]umber of incidents of inmates solely denied [their request for programing] due to their prescription for psychotropic medication or mental health status," but Paragraph 54 and the revised Compliance Measures provide that a prisoners cannot be denied "privileges or programing" solely because of either their "mental health status" or a "prescription for psychotropic medication."  See Revised Compliance Measure 54.5(b).  As noted by the Mental Health Subject Matter Expert, "the essential privileges that should be considered are access to the dayroom, recreation, and visitation."

55.     Relevant custody, medical, and mental health staff in all High Observation Housing units will meet on Normal business work days and such staff in all Moderate Observation Housing units will meet at least weekly to ensure coordination and communication regarding the needs of prisoners in mental health housing units as outlined in Custody Services Division Directive(s) regarding coordination of mental health treatment and housing.  When a custody staff member is serving as a member of a treatment team, he or she is subject to the same confidentiality rules and regulations as any other member of the treatment team, and will be trained in those rules and regulations.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of October 1, 2016, through September 30, 2017 (verified) at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2017 through March 31, 2018 (verified) at PDC North)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through June 30, 2018 (unverified) at MCJ and TTCF)**

During the Sixth Reporting Period, the Monitor and a DOJ representative attended a daily HOH meeting at CRDF, which included custody, medical, and mental health personnel who appeared to be very knowledgeable about the condition and issues of individual HOH inmates.  The Mental Health Subject Matter Expert also attended a number of meetings for HOH and MOH units at both CRDF and TTCF, which were well attended, and the staff actively participated and addressed salient issues.

The County's Sixth Self-Assessment reports that the Department has maintained Substantial Compliance for twelve consecutive months through the Third Quarter of 2017 at CRDF.  These results have been verified by the Monitor's auditors and CRDF is no longer subject to monitoring for compliance with Paragraph 55.

The County's Sixth Self-Assessment also reports that the Department has maintained Substantial Compliance for twelve consecutive months through the First Quarter of 2018 at PDC North.  These results have been verified by the Monitor's auditors and PDC North will no longer be subject to monitoring for compliance with Paragraph 55.

The results for the First Quarter of 2018 at MCJ and TTCF show only Partial Compliance because one of the five weekly MOH meetings did not have representatives from each of the units (i.e., custody, medical and mental health).  The results for the Second Quarter of 2018 at MCJ and TTCF show Substantial Compliance.  These results have not been verified by the Monitor's auditors.

On July 12, 2018, the Department provided a semi-annual report "verifying the coordination and communication at the staff meetings" in HOH and/or MOH units during the first six months of 2018 as required by Compliance Measures 55.2, 55.4 and 55.6(c).

59

56.     Consistent with existing DMH and Sheriff's Department policies, the County and the Sheriff will ensure that custody, medical, and mental health staff communicate regarding any change in a prisoner's housing assignment following a suicide threat, gesture, or attempt, or other indication of an obvious and serious change in mental health condition.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified))**

Substantial Compliance requires the Department to review in randomly selected periods the electronic medical records of (1) prisoners admitted to HOH following a suicide threat, gesture, or attempt, or other indication of an obvious and serious change in mental health condition to determine if the medical and/or mental health staff approved the placement of the prisoner in HOH; and (2) prisoners who were the subject of a suicide attempt notification to determine if the prisoners were clinically assessed and that clinical staff approved the post-incident housing.

The County's Sixth Self-Assessment reports that it has achieved Substantial Compliance for the First and Second quarters of 2017, which means that it has maintained Substantial Compliance for 18 consecutive months.  The results for the twelve months from January 1, 2016 through December 31, 2016 have been verified by the Monitor's auditors, and the County is no longer subject to monitoring for compliance with Paragraph 56.

60

57.    Within three months of the Effective Date, the County and the Sheriff will revise and implement their policies on safety checks to ensure a range of supervision for prisoners housed in Mental Health Housing.  The County and the Sheriff will ensure that safety checks in Mental Health Housing are completed and documented in accordance with policy and regulatory requirements as set forth below:

(a)    Custody staff will conduct safety checks in a manner that allows staff to view the prisoner to assure his or her well-being and security.  Safety checks involve visual observation and, if necessary to determine the prisoner's well-being, verbal interaction with the prisoner;

(b)    Custody staff will document their checks in a format that does not have pre-printed times;

(c)    Custody staff will stagger checks to minimize prisoners' ability to plan around anticipated checks;

(d)    Video surveillance may not be used to replace rounds and supervision by custodial staff unless new construction is built specifically with constant video surveillance enhancements and could only be used to replace 15 minute checks in non-FIP housing, subject to approval by the Monitor;

(e)    A QMHP, in coordination with custody (and medical staff if necessary), will determine mental health housing assignments; and

(f)    Supervision of prisoners in mental health housing will be conducted at the following intervals:

(i)    FIP:  Custody staff will perform safety checks every 15 minutes. DMH staff will perform direct constant observation or one-to-one observation when determined to be clinically appropriate;

(ii)    High Observation Housing:  Every 15 minutes;

(iii)    Moderate Observation Housing:  Every 30 minutes.

61

STATUS (57):          SUBSTANTIAL COMPLIANCE (as of April 1, 2017,
                      through March 31, 2018 (verified) at MCJ)

                      PARTIAL COMPLIANCE (at TTCF, CRDF, and
                      PDC North)

Substantial Compliance requires the Department to audit the Title 15 Dashboard records (or UDAL records if the Title 15 scanner was not working) for all shifts for each module in each mental health housing unit in two randomly selected weeks to determine if the safety checks were staggered and conducted as required by Paragraph 57 of the Agreement, and to audit the housing records for each mental health housing unit for one randomly selected week to determine if a QMHP approved the new mental health housing assignments as required by Paragraph 57(e). The thresholds for achieving Substantial Compliance with these two Compliance Measures is 95%.

The County's Sixth Self-Assessment reports that it has maintained Substantial Compliance with Compliance Measure 57.5(b) in the Fourth Quarter of 2017 and the First Quarter of 2018 in the MOH unit at MCJ (the "Hope Dorm") where 98% and 97% of the safety checks were in compliance. It also reports that "100% -- 5% more than the required 95% -- of inmates [at MCJ] analyzed pursuant to Compliance Measure 57-5(c) had received QMHP approval for their housing assignments" in both quarters. The results have been verified by the Monitor's auditors and MCJ is no longer be subject to monitoring for compliance with Paragraph 57.[27]

The Sixth Self-Assessment reports that the County achieved Partial Compliance in the HOH and MOH units at TTCF (92% and 92%) and CRDF (89% and 92%), and in the MOH units at PDC North (82% and 84%).

The Self-Assessment also reports that in the Fourth Quarter of 2017 83% of the new mental health housing assignments in CRDF and 98% of the assignments in TTCF were approved by a QMHP. In the First Quarter of 2018, 100% of the new mental housing assignments at both TTCF and CRDF were approved by a QMHP.[28]

---

[27] Although the cell checks in the Hope Dorm are not well-staggered, as previously noted, "significant variations are less important in the Hope Dorm because it is a direct observation dorm with Department personnel stationed inside the dorm 24 hours per day." See Monitor's Fifth Report, 57 at n. 27.

[28] In order to satisfy Compliance Measure 57.5(c), inmates must be moved expeditiously after a QMHP approves a new housing assignment within 48 hours of the QMHPs' approvals of new housing assignments. Placements in FIP should be as soon as possible.

58.     Within three months of the Effective Date, the County and the Sheriff will revise and implement their policies on safety checks.  The County and the Sheriff will ensure that safety checks in non-mental health housing units are completed and documented in accordance with policy and regulatory requirements as set forth below:

(a)     At least every 30 minutes in housing areas with cells;

(b)     At least every 30 minutes in dormitory-style housing units where the unit does not provide for unobstructed direct supervision of prisoners from a security control room;

(c)     Where a dormitory-style housing unit does provide for unobstructed direct supervision of prisoners, safety checks must be completed inside the unit at least every 60 minutes;

(d)     At least every 60 minutes in designated minimum security dormitory housing at PDC South, or other similar campus-style unlocked dormitory housing;

(e)     Custody staff will conduct safety checks in a manner that allows staff to view the prisoner to assure his or her well-being and security.  Safety checks involve visual observation and, if necessary to determine the prisoner's well-being, verbal interaction with the prisoner;

(f)     Custody staff will document their checks in a format that does not have pre-printed times;

(g)     Custody staff will stagger checks to minimize prisoners' ability to plan around anticipated checks; and

(h)     Video surveillance may not be used to replace rounds and supervision by custodial staff.

63

**STATUS (58):**     **SUBSTANTIAL COMPLIANCE (as of January 1, 2016
through December 31, 2016 (verified) at PDC South,
PDC North, and PDC East)**

**SUBSTANTIAL COMPLIANCE ( as of July 1, 2017,
through March 31, 2018 (verified) at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of October 1,
2017, through March 31, 2018 (verified) at IRC)**

**PARTIAL COMPLIANCE (at NCCF, TTCF, and
MCJ)**

Substantial Compliance requires the Department to audit the Title 15 Dashboard
records (or UDAL records) for all shifts for each module in each housing unit to
determine if the safety checks were staggered and conducted as required by Paragraph 58.
The thresholds for achieving Substantial Compliance is 90%.

The County maintained Substantial Compliance with Paragraph 58 for twelve
consecutive months at PDC South, PDC North, and PDC East as of December 31, 2016.
Pursuant to Paragraph 111, those facilities were not subject to monitoring in the Sixth
Reporting Period.

The County's Sixth Self-Assessment also reports that for the Fourth Quarter of
2017 and the First Quarter of 2018, the following percentages of safety checks were in
compliance with Paragraph 58: CRDF (93% and 90%);[29] TTCF (95% and 97%); MCJ
(94% and 92%); NCCF (82% and 58.5% ) and IRC (95% and 92%). Based upon the
audit by the Monitor's auditors, it does not appear that the cell checks at MCJ and TTCF
were staggered as required by Paragraph 58.

In order to stagger the safety checks at NCCF, the Department has installed door
tags in centralized locations that deputies use to start their safety check rounds. By
starting at the same location, they are then able to stagger the order in which they check
the dorms in each unit.

In the Fifth Report, the Monitor expressed concerns that deputies are more
concerned about the timeliness, as opposed to the quality, of the cell checks in mental
health housing, which have tighter 15- and 30-minute requirements. This remains a
concern. The videos reviewed during the death review of a death in MCJ showed a
Custody Assistant conducting cell checks in a row of cells without ever looking in any of
the cells. The Department personnel at the death review acknowledged that these safety
checks were wholly inadequate.

---

[29] Substantial Compliance requires achieving the 90% threshold based upon the aggregate data for the two
randomly selected weeks.

64

59.    Consistent with existing Sheriff's Department policies regarding uniform daily activity logs, the County and the Sheriff will ensure that a custodial supervisor conducts unannounced daily rounds on each shift in the prisoner housing units to ensure custodial staff conduct necessary safety checks and document their rounds.

**STATUS:**    **SUBSTANTIAL COMPLIANCE (as of January 1, 2017, through December 31, 2017 (verified) at PDC East and MCJ)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through June 30, 2018 (verified) at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2018, through June 30, 2018 (verified) at PDC North and PDC South)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through June 30, 2018 (verified) at TTCF)**

Substantial Compliance requires the Department to audit e-UDAL records for housing units in each facility to determine if the supervisors are conducting unannounced daily rounds in accordance with Paragraph 59. In response to the Monitor's comments, the Department's e-UDAL forms were modified to include a specific notation that the Supervisor verified that the safety checks were conducted.

The County's Sixth Self-Assessment reports that the Department has maintained Substantial Compliance at PDC East and MCJ for twelve consecutive months from January 1, 2017 through December 31, 2017 (and continuing to March 31, 2018). It also reports that the Department has maintained Substantial Compliance at NCCF for twelve consecutive months from April 1, 2017 through March 31, 2018. The results have been verified by the Monitor's auditors and these facilities are no longer subject to monitoring for compliance with Paragraph 59.

The County's posted results show that it has maintained Substantial Compliance for the period from October 1, 2017 through June 30, 2018 at CRDF; for the period from January 1, 2018 through June 30, 2018 at PDC North and PDC South; and for the period from April 1, 2018 through June 30, 2018, at TTCF . These results have also been verified by the Monitor's auditors.

65

60.     Within six months of the Effective Date, the Department of Mental Health, in cooperation with the Sheriff's Unit described in Paragraph 77 of this Agreement, will implement a quality improvement program to identify and address clinical issues that place prisoners at significant risk of suicide or self-injurious behavior.

**STATUS:     PARTIAL COMPLIANCE**

Compliance Measures 60.2 and 60.3(b) require the County to prepare semi-annual reports setting forth (a) any identified clinical issues in the areas identified in Paragraph 61 that place prisoners at significant risk of suicide or self-injurious behavior; (b) corrective actions and systemic improvements taken by DMH and the Department to address any such issues during the previous six months; and (c) an assessment of the effectiveness of steps taken by the Department to address issues identified during earlier reporting periods.

The Mental Health Subject Matter Expert has stated that "CHS is clearly developing a sound QM system.  It is based on well-established principles and methods of QM.  They are taking appropriate and measured steps to implement their plan."  The Monitor and Mental Health Subject Matter Expert note the Department has continued to enhance its participation in the quality management process as required by Paragraphs 60 and 77.

On July 12, 2018, the County submitted a CHS Semi-Annual Report on Quality Improvement/Assurance.  It reports that the "QI redesign team continues to meet on a weekly basis [to] cover topical QI issues, granular patient cases, as well as serve a planning platform for ongoing redesign work" and on the "shift" in CIRC and Joint Quality Improvement Committee ("JQIC") meetings to "discussion of system root causes. . .rather than simply cataloging issues for future workgroups."  The Mental Health Subject Matter Expert notes that this is "an important advance."

As in the past, the report includes aggregate data on incidents of Self-Directed Violence ("SDV") broken down on a monthly basis by age, race/ethnicity, gender, facility, days in custody, method of attempt, and risk rating.  It also includes aggregate data on CIRC meetings in the Sixth Reporting Period.  It also includes "a summary table of 16 individual case presentations" at CIRC meetings that breaks down each incident by the categories set forth in Paragraph 61(a)(i) through (vi) and then assesses issues identified per Paragraph 61(b) through (e).

The Semi-Annual Report also includes sections that "review, collect, and aggregate data" and, to an extent, recommend improvements in the areas required by Paragraph 61(b) through (e).[30]  It also includes a summary of "Quality Improvement Processes/Projects," including the efforts of the compliance team "to meet with individual program managers and supervisors in an effort to provide better understanding of the progress toward meeting compliance expectation for the provision under their area of responsibility" and to "problem solve barriers related to provision non-compliance" in

---

[30] See p. 68, infra.

lieu of relying on Quality Management and Program Staff Meetings to achieve compliance with the provisions of the Settlement Agreement.

The Mental Health Subject Matter Expert notes that "[c]onjoint QM [with custody] and analysis (rather than the mere presentation) of aggregate data are the primary developments that remain." The County is "providing some reasonable. . .data and analysis on suicide and self-harming," but it has not provided sufficient detail on the elements detailed in Paragraph 61(a) through (e):

> "While some of the [County's] studies. . .are very good targeted [quality improvement] projects, there is as yet no systematic approach or overarching analysis of aggregate data regarding these required elements. It is especially important for the county to develop and maintain on-going tracking (typically using a dashboard format) of aggregate data measuring critical aspects of these measures. . . .In each area, there needs to be an on-going analysis of key measures[.]"

The County reports that it "is committed to improving and sustaining its sound QI Program and expects to develop more detailed metrics, benchmarks, and patterns in future reports."

67

61.     The quality improvement program will review, collect, and aggregate data in the following areas and recommend corrective actions and systemic improvements:

    (a)     Suicides and serious suicide attempts:

        (i)      Prior suicide attempts or other serious self-injurious behavior
        (ii)     Locations
        (iii)    Method
        (iv)     Lethality
        (v)      Demographic information
        (vi)     Proximity to court date;

    (b)     Use of clinical restraints;

    (c)     Psychotropic medications;

    (d)     Access to care, timeliness of service, and utilization of the Forensic In-patient Unit; and

    (e)     Elements of documentation and use of medical records.

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance requires the County's semi-annual reports to (a) review, collect, and aggregate data in the areas set forth in paragraph 61; (b) recommend corrective actions and systemic improvements in those areas; and (c) assess the effectiveness of actions and improvements in prior reporting periods.

The CHS Semi-Annual Report includes aggregate data on incidents of Self-Directed Violence ("SDV") broken down on a monthly basis by age, race/ethnicity, gender, facility, days in custody, method of attempt, and CIRC risk rating score. It also includes aggregate data on CIRC meetings in the Sixth Reporting Period, broken down by these categories and also by prior suicide attempts and proximity to court dates. Although this satisfies the requirement to review, collect, and aggregate data as required by Paragraph 61(a)(i) through (vi), there is no discussion about possible corrective actions or systemic improvements based upon this information.

The Semi-Annual Report also includes sections that "review, collect, and aggregate data" and, to an extent, recommend improvements in the areas required by Paragraph 61(b) through (e):

- aggregate data on the use of clinical restraints in the Mental Health Unit of the CTC reflecting a high level of compliance with Paragraph 69 of the Settlement Agreement;

68

- "a summary of a quality improvement study" relating to the "Renewal of Psychotropic Medication by the Mental Health Nursing Staff" that was instituted to address the shortage of available psychiatrists and recommendations of "possible actions."[31]

- the work of a multidisciplinary workgroup that "has been systematically working to align our pill call procedure with best practices" to address the requirements of Paragraph 65.

- a summary of "interventions" to address root causes for problems with the "timely evaluation of suicidal patients" during the intake process; an analysis of the factors that "Negatively Impacted the Timeliness of MH Evaluations of Suicidal Inmates in the IRC;" and aggregate data on IRC evaluations completed within four hours to meet the requirements of Paragraph 26.

- a study "to better understand the primary drug use of the population served and to prioritize the implementation of additional services/protocols needed to improve patient care" and a summary of current and future "efforts to treat addiction within the Los Angeles County Jail system[.]"

- "admission and discharge data" for the Mental Health Unit of the Correctional Treatment Center.

- the work of a Hoarding Workgroup that is "trying to formulate a clear and more consistent definition of hoarding and examine issues related to identifying hoarding behavior within the jail system" to address the requirements of Paragraph 31, and that identified a potential problem with the removal of the *Suicide Risk/Hoarding Medication Alert* in patients' medical records.

- the development of a new form that "clearly defines the step-down protocols" required by Paragraph 41 and "helps to inform patient care through improved documentation of patient status."

- a summary of the work to develop "risk precaution training" for the clinical staff that is "focused on risk assessment, risk precaution criteria, step-down protocols, . . .mental health alerts, [and] the [Suicide Risk Precaution Checklist] SRAC" to address the requirements of Paragraph 42 and to revise the SRAC.

---

[31] The study concluded that while the "project has assisted in ensuring continuity of medication administration for the majority of patients," there "is room for improvement in that a minority of patients had their medications renewed numerous consecutive times by nursing without a face-to-face evaluation, and a small minority had their medications expire without further renewal." It recommended possible actions to "[i]nstruct nursing staff to directly request high-priority assignment of a psychiatry appointment" in certain circumstances and "[i]mprove the system to identify all medications about to expire[.]"

69

The Mental Health Subject Matter describes these activities as "[a]ll good targeted QI projects," but they do not "represent an on-going collection and analysis" of aggregate data, "which would set benchmarks and look at trends and patterns of usage."

62.     The County and the Sheriff's Unit described in Paragraph 77 of this Agreement will develop, implement, and track corrective action plans addressing recommendations of the quality improvement program.

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance requires the County's semi-annual Self-Assessments to set forth (a) the "development of corrective action plans to address the most recent recommendations of the quality improvement program;" and (b) the "implementation and tracking of corrective action plans to address recommendations of the program in prior quarters."

The CHS Semi-Annual Report on Quality Improvement/Assurance was submitted to the Monitor on July 12, 2018.  The most recent CHS Semi-Annual Report on Quality Improvement/Assurance again sets forth "responses" to issues identified in CIRC meetings about specific Self-Directed Violence incidents, but it does not separately set forth "recommendations of the quality improvement program" or describe or track corrective action plans to address such recommendations and there "are no CAPs based upon other QM findings such as an analysis of aggregate data."

The Semi-Annual Report on the activities of the Custody Compliance and Sustainability Bureau ("CCSB") describes the corrective action plans identified during the Executive Inmate Death Reviews of suicides that occurred in May and July of last year and the status of those CAPs as of January 2018, and also describes other corrective actions the Department has taken.

71

63.    The County and the Sheriff will maintain adequate High Observation Housing and Moderate Observation Housing sufficient to meet the needs of the jail population with mental illness, as assessed by the County and the Sheriff on an ongoing basis.  The County will continue its practice of placing prisoners with mental illness in the least restrictive setting consistent with their clinical needs.

**STATUS:    NON-COMPLIANCE**

The Compliance Measures require that the County's Self-Assessment set forth (a) the average daily populations in HOH and MOH units in TTCF and CRDF during the reporting period; (b) the average number of beds in those units during the reporting period; (c) the number of days in which there was a waiting list for HOH or MOH housing; and (d) the average number of step-downs per week (i) from HOH to MOH and (ii) from MOH to the least restrictive setting consistent with the prisoners' clinical needs. In addition, for two random weeks, the Department is required to review the count sheets documenting the number of occupied and available beds in the MOH and HOH units at TTCF and CRDF.  Substantial Compliance requires "the immediate availability of HOH and MOH beds at TTCF and CRDF 95% of the time."

The County reports the number of days in which the total number of HOH and MOH available beds was equal to or more than the number of HOH and MOH inmates for the two randomly selected weeks in the Fourth Quarter of 2017 are as follows:

|  | MOH | HOH |
|---|---|---|
| TTCF | 100% | 100% |
| CRDF | 0% | 50% |

The County also reports the number of days in which the total number of HOH and MOH available beds was equal to or more than the number of HOH and MOH inmates for the two randomly selected weeks in the First Quarter of 2018 are as follows:

|  | MOH | HOH |
|---|---|---|
| TTCF | 100% | 0% |
| CRDF | 0% | 100%[32] |

The average Daily Population in HOH[33] at TTCF increased from 836 in the two randomly selected weeks in the Fourth Quarter of 2017 to 918 in the two randomly selected weeks in the First Quarter of 2018.  Yet, the average number of HOH Beds decreased from 883 in the Fourth Quarter of 2017 to 763.5 in the First Quarter of 2018. Despite an almost 9.8% increase in number of HOH inmates at TTCF, there was a 9%

---

[32] The Department reports that the "[a]vailability of beds in HOH was 13 of 14 days = 92%," but the daily posted figures for the two random weeks show that HOH beds were available on all 14 days.

[33] This includes inmates in HOH and "the number of inmates awaiting evaluation in the intake module."  It is not clear if this includes all of the inmates "awaiting evaluation;" presumably some of the inmates awaiting evaluations will not be designated for HOH following their evaluations.

72

decrease in the number of HOH beds.[34]

The County's Augmented Sixth Self-Assessment reports that the Department is unable to assess electronically information about the availability of HOH and MOH beds. Accordingly, the County was unable to report on the immediate availability of beds (that is, more beds than prisoners) during the reporting period as required by the Compliance Measure 63.3

---

[34]Some of the HOH beds may have become MOH beds to address a significant increase in the number of MOH patients at TTCF.

73

64.      Within six months of the Effective Date, the County and the Sheriff will develop a short-term plan addressing the following 12-month period, and within 12 months of the Effective Date, the County and the Sheriff will develop a long-term plan addressing the following five-year period, to reasonably ensure the availability of licensed inpatient mental health care for prisoners in the Jails.  The County and the Sheriff will begin implementation of each plan within 90 days of plan completion.  These plans will describe the projected capacity required, strategies that will be used to obtain additional capacity if it is needed, and identify the resources necessary for implementation.  Thereafter, the County and the Sheriff will review, and if necessary revise, these plans every 12 months.

### STATUS:    PARTIAL COMPLIANCE

Substantial Compliance requires the Department to (1) develop a short-term plan that will address the availability of licensed inpatient mental health care for prisoners in an initial 12-month period; (2) commence to implement the plan within 90 days after it is developed; (3) develop a long-term plan within 12 months after the short term plan that will address the availability of licensed inpatient mental health care for prisoners in the following five-year period; and (4) commence to implement the long-term plan within 90 days after it is developed.

On July 14, 2017, the County submitted to the Monitor a Plan Regarding Availability of Licensed Inpatient Mental Health Care (Long Term and Short Term Plans) to provide "an update regarding the County's current efforts to meet the needs of the acutely mentally ill."  The County reiterates in its Sixth Self-Assessment, "the County is pursuing a dual strategy to increase inpatient beds and the resources necessary to obviate the need for these beds.  With increased services to address the underlying mental health needs (both through appropriate medication and clinical treatment), and the County's strong effort to divert people from the jails the need for inpatient services should decline."

The County's Sixth Self-Assessment reports that "the County has opened 18 inpatient beds at Olive View-UCLA Medical Center.  These beds will house individuals who are diverted from the County Jail, either pre-trial or once they have been brought into the jail and are awaiting trial.  The County's Office of Diversion will manages these beds beginning in early July 2018, and will be responsible for identifying appropriate individuals for these beds."  As previously noted, the County needs to "report on the effectiveness of the measures in the updated [plans], including any reductions in the number of patients on the FIP waiting list and who are incompetent to stand trial," and also "the effectiveness of initiatives to divert MIST patients and involuntary medicate incompetent patients in the jail."

The County's Sixth Self-Assessment reports that "[c]urrently, the FIP waitlist consists of 64 patients.[35]  Eleven of these individuals are taking medications on a

---

[35] This is an increase from 36 inmates on the FIP waitlist in the prior reporting period.

voluntary basis and are, therefore, not prioritized for admission to the FIP."[36]  Further, "the current average time from referral to admission for the most acute is approximately two days, and can be more than 20 days for those on the FIP waitlist that are less acute."[37]  It appears that the County's plans are not sufficient to "reasonably ensure the availability of licensed inpatient mental health care for prisoners in the Jails."

The Monitor's Fourth Report stated that the County's long-term "plans must have a reasonable basis for projecting need in order to establish Substantial Compliance with Paragraph 64."  In response, the County's Fifth Self-Assessment described the County's "new level of care system that designates patients into categories based on acuity and treatment needs" and "tracking system to monitor the number of patients who meet this criteria on any given day."  As noted in the Monitor's Fifth Report, this "may provide a reasonable basis for projecting 'the number of licensed inpatient mental health beds necessary to serve the inmate population,'" but the County needs to use this "methodology" to determine "the projected capacity required" in the long term and project how many beds will be required over several years.  Without using this  (or some other) methodology to project the number of FIP patients in the future, it is not possible to assess whether the County's plans for adding FIP beds are reasonable and sufficient.

---

[36] The Mental Health Subject Matter Expert notes that "[w]hether [the patient is] taking medication or not is not the issue.  The issue is whether the patient is a danger to self or others or gravely disabled, whether or not they are taking medications."

[37] As noted by the Mental Health Subject Matter Expert, the reasons for the wide range are "not clear since all of the patients are at the same acuity level" (i.e., P4).  He reports that he is unable to ascertain the methodology for these figures.

65.      Consistent with existing Sheriff's Department policies, the County and the Sheriff will ensure that psychotropic medications are administered in a clinically appropriate manner to prevent misuse, hoarding, and overdose.

**STATUS:      PARTIAL COMPLIANCE**

Substantial Compliance requires that (1) the County's Self-Assessments set forth the (a) the results of weekly medication audits documenting the visual observation of the administration of medication during the quarter; (b) unauthorized medications found as a result of cell searches during the reporting period; and (c) incidents involving confirmed prescription drug overdoses; and that (2) "the Monitor concludes, after consulting with the Subject Matter Expert, that psychotropic medications have been administered in a clinically appropriate manner 85% of the time."

During the Sixth Reporting Period, the Monitor and DOJ representatives again observed pill calls at CRDF and TTCF.  Although improved from prior reporting periods, the pill calls were still not sufficiently rigorous to ensure that inmates take the medication provided by the nurses.  Once again, there were occasions when inmates turned away before swallowing the medication and neither the nurse nor the deputy verified that that the inmates had swallowed the medication before returning to their cells or bunks.

On April 6, the County provided a flow chart entitled "Provision 65 Pill Call – Ideal State Pod-Front Pill Call Procedures" (excluded HOH cell-to-cell procedure) that is the product of a work group convened to develop a "new method and practice of administering medications."  The Monitor and Mental Health Subject Matter Expert concluded that the flow chart is a "reasonable approach," but that the "primary issue will be the nature of the interventions adopted by custody and healthcare staff in response to lack of cooperation" and "what happens if they are not able to verify that the inmate ingested the pills," which the flow chart partially addresses.

In the County's posted Self-Assessment, the "County acknowledges ongoing issues regarding the reporting and compliance with [Compliance Measure 65-1(a)]" and it has found "inconsistencies. . .with the current auditing practice" for this measure. Accordingly, "the County and Department have temporarily paused reporting for 65-1(a)."  Once again, medication was found during a significant number of cell or module searches during the First and Second Quarters of 2018.[38]  There were also nine confirmed drug overdoses during the First Quarter of 2018.

---

[38] During the First Quarter of 2018, 53 medications "not appropriately possessed by inmates" were found during 165 unannounced searches at CRDF, 390 medications were found during 118 searches at TTCF, 1580 medications during 400 searches at MCJ, and 42 medications during 670 searches at NCCF and 30 medications during 154 searches at PDC North.  There were no medications found during searches at PDC South and PDC East.  There was a significant reduction in the number of medications found at MCJ and PDC North in the Second Quarter of 2018, but similar results were reported for the other facilities.

66.     Consistent with existing DMH policies, prisoners in High Observation Housing and Moderate Observation Housing, and those with a serious mental illness who reside in other housing areas of the Jails, will remain on an active mental health caseload and receive clinically appropriate mental health treatment, regardless of whether they refuse medications.

**STATUS:     NON-COMPLIANCE**

Substantial Compliance requires the Department to review, on a random basis, the electronic medical records of prisoners in HOH and MOH or with a Serious Mental Illness ("SMI") to assess whether they have remained on an active mental health caseload and that 95% of HOH prisoners, 90% of MOH prisoners, and 85% of other prisoners with a serious mental illness been offered "clinically appropriate structured mental health treatment" and been seen by a QMHP at least monthly, regardless of whether they refuse medications.

For the Fourth Quarter of 2017, the County posted results show that 14% of prisoners in HOH, 12% in MOH, and 41% with serious mental illness who reside in other housing areas were "offered clinically appropriate structured mental health treatment and were seen by a QMHP at least once a month."

The Sixth Self-Assessment reports, in part, that:

The County continues to work towards improved uniformity and standardization of the intake assessment process performed in the reception centers. The County has continued to hire staff to replace those departing service in the jails, along with creation of fourteen new clinical social worker positions. . . . CHS' training department is also in the process of gaining authorization to provide continuing education credits to social workers and psychologists. The County believes that doing so will help ensure that strengthened training programs are provided to staff on topics relevant to working with the jail population and to ensure patients receive clinically appropriate mental health treatments.

77

67.     Within three months of the Effective Date, the County and the Sheriff will implement policies for prisoners housed in High Observation Housing and Moderate Observation Housing that require:

(a)     documentation of a prisoner's refusal of psychotropic medication in the prisoner's electronic medical record;

(b)     discussion of a prisoner's refusal in treatment team meetings;

(c)     the use of clinically appropriate interventions with such prisoners to encourage medication compliance;

(d)     consideration of the need to transfer non-compliant prisoners to higher levels of mental health housing; and

(e)     individualized consideration of the appropriateness of seeking court orders for involuntary medication pursuant to the provisions of California Welfare and Institutions Code sections 5332-5336 and/or California Penal Code section 2603(a).

**STATUS:     NON-COMPLIANCE**

Substantial Compliance requires the County to "review the electronic medical records of 25% of the prisoners in HOH and MOH who refused psychotropic medication during the quarter to verify that the records [of 85% of the prisoners] reflect the documentation and consideration of the matters required by the terms of Paragraph 67."

The Sixth Self-Assessment reports acknowledges that the County "has historically experienced challenges implementing and assessing compliance with this Provision."  It also reports that "[a]t this time it is not possible to extract this information from the Powerchart system.  We continue to work with Cerner to obtain a report of those individuals who refuse 50% of any psychotropic medication within a seven day period. Until this occurs, support staff are able to generate lists of patients who refuse three doses of a medication in one week.  These lists are being forwarded to clinicians for follow-up attention."

78

68.     Within six months of the Effective Date, the County and the Sheriff will develop and implement a procedure for contraband searches on a regular, but staggered basis in all housing units.  High Observation Housing cells will be visually inspected prior to initial housing of inmates with mental health issues.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at MCJ, NCCF, PDC East, PDC South, and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2017 through December 31, 2017 (unverified) at TTCF)**

**PARTIAL COMPLIANCE (at CRDF)**

Substantial Compliance requires that "85% of the housing units are searched for contraband at least once in the previous quarter; and 95% of the HOH units visually inspected prior to housing prisoners in these units."  Self-Assessments to include a summary of searches conducted in the second Quarter of the last reporting period and the first quarter of the current reporting period and to randomly select and review 25 Checklist forms for HOH units to confirm that the units were visually inspected prior to initial housing of prisoners in these units.

The County's posted Self-Assessments report that in the Fourth Quarter of 2017, 88% of the housing units at CRDF were searched at least once in the quarter, and 80% of the randomly selected HOH cells at CRDF were visually inspected before housing prisoners in these units.  During the First Quarter of 2018, 93% of the housing units at CRDF were searched at least once in the quarter, and 92% of the randomly selected HOH cells at CRDF were visually inspected before housing prisoners in these units.

During the Sixth Reporting Period, the County provided additional records and screen shots of CCTV footage to show that the HOH cells at TTCF were visually inspected more than 95% of the time in the Third Quarter of 2017.[39]  In cases where there was a date discrepancy in the source documents, CCTV footage showed that the HOH cells were visually inspected before the prisoners were housed in these units.  In the Fourth Quarter of 2017, 96% of the housing units at TTCF were searched at least once in the quarter, and 96% of the randomly selected HOH cells at TTCF were visually inspected before housing prisoners in these units.  These results are subject to verification by the Monitor's auditors.  If verified, TTCF will have maintained Substantial Compliance with Paragraph 68 for more than 12 consecutive months.

The County previously maintained Substantial Compliance for twelve consecutive months at MCJ, NCCF, PDC East, PDC South, and PDC North, which do not have HOH cells, and these facilities were not subject to monitoring for compliance with Paragraph 68 during the Sixth Reporting Period.

---

[39] In its comments to the Monitor's Draft Report, DOJ indicated that it "believes that CCTV footage is a valuable tool for confirming whether cell inspections occur as documented[.]"

69.    Consistent with existing DMH policies regarding use of clinical restraints, the County and the Sheriff will use clinical restraints only in the Correctional Treatment Center and only with the approval of a licensed psychiatrist who has performed an individualized assessment and an appropriate Forensic Inpatient order.  Use of clinical restraints in CTC will be documented in the prisoner's electronic medical record.  The documentation will include the basis for and duration of the use of clinical restraints and the performance and results of the medical welfare checks on restrained prisoners.  When applying clinical restraints, custody staff will ensure a QMHP is present to document and monitor the condition of the prisoner being placed in clinical restraints.

**STATUS:    PARTIAL COMPLIANCE**

Substantial Compliance requires the Department to review the electronic medical records of all prisoners placed in clinical restraints to verify that the restraints were used, approved,[40] and documented, and that the results of medical welfare checks on restrained prisoners were also documented.

The County's Sixth Self-Assessment reports that for the Fourth Quarter of 2017, 100% "of electronic medical records reviewed. . .reflected that, for inmates placed in clinical restraints for psychiatric purposes, the restraints were used, approved and documented as required by this Provision."  The County's Sixth Self-Assessment also reports that, for the First Quarter of 2018, 86% of the medical records reviewed "reflected that, for inmates placed in clinical restraints for psychiatric purposes, the restraints were used, approved and documented as required by this Provision."  This is below the 95% threshold for Substantial Compliance.

The Mental Health Subject Matter Expert and the clinicians "assessed the formal elements of the measure, including whether a psychiatrist timely approved the restraints and performed an assessment, whether a QMHP was present at the time of restraint, and whether the myriad monitoring requirements were met.  [They] continued to have difficulty finding all the information on restraint[s], though it was more available than previously.  The logs do not address all the monitoring requirements and associated notes may or may not address them, so it was not possible to find documentation of all the requirements."

The Mental Health Subject Matter Expert believes that "the requirements of [this Compliance Measure] are excessive and do not match standards published by organizations such as the Centers for Medicare and Medicaid Services (CMS)[.]"  He would allow for "telephonic orders for restraint by psychiatrists" and assessments within 24 hours.  Based upon these standards, the Subject Matter Expert believes that "restraints are being managed well, but proof of practice is challenging."

---

[40] Per agreement of the parties, with the concurrence of the Monitor and Subject Matter Expert, "a non-psychiatrist physician can order medical/clinical restraints as long as it is for medical reasons."

70.     Within three months of the Effective Date, the County and the Sheriff will have policies and procedures regarding the use of Security Restraints in HOH and MOH. Such policies will provide that:

(a)     Security Restraints in these areas will not be used as an alternative to mental health treatment and will be used only when necessary to insure safety;

(b)     Security Restraints will not be used to punish prisoners, but will be used only when there is a threat or potential threat of physical harm, destruction of property, or escape;

(c)     Custody staff in HOH and MOH will consider a range of security restraint devices and utilize the least restrictive option, for the least amount of time, necessary to provide safety in these areas; and

(d)     Whenever a prisoner is recalcitrant, as defined by Sheriff's Department policy, and appears to be in a mental health crisis, Custody staff will request a sergeant and immediately refer the prisoner to a QMHP.

**STATUS:     PARTIAL COMPLIANCE**

The Mental Health Subject Matter Expert and DOJ have expressed concern about the Department's Substantial Compliance with paragraph 70(c) if all inmates in HOH are routinely handcuffed when they are out of their cells "in a housing pod at the same time." One of the clinicians observed that "[o]ur recent onsite observations suggested that not all patients required such restraints all the time."[41]  The Mental Health Subject Matter Expert is of the view that the Department's own "policies impose other requirements for review of restraints that the Department is not following for this population."

As the County "previously reported[,] the Department routinely handcuffs inmates in HOH and HOH_MIST housing when more than one HOH inmates is out of the cell in a housing pod at the same time.  This category of inmates, as a whole, is a safety concern as they are deemed unpredictable and potentially dangers."  Nevertheless, in response to the concerns expressed by the Mental Health Subject Matter Expert and DOJ, the Department has developed a pilot program "whereby each patient begins and ends their mental health treatment in the same module. . .[T]he HOH inmates enter in one pod and gradually step-down to the next pod, which allows more and more privileges as their behavior improves."[42]  The program started in one module in January 2018 and is planned "to expand to a second module in July 2018."  Based upon a recent site visit to

---

[41] The Mental Health Subject Matter Expert notes that paragraph 70(b) is also implicated because it required that restraint's "will be used only when there is a threat or potential threat of physical harm, destruction of property, or escape."

[42] Although the County does not agree that paragraph 70(c) requires individualized assessments of HOH inmates, who are often unpredictable and dangerous, the County agreed to establish a progressive stepdown program to address the concerns expressed by the Mental Health Subject Matter Expert and DOJ.

81

TTCF by the Monitor, it appears that the program is more fluid than a formal step-down from pod to pod in a module.  The Monitor and Mental Health Subject Matter Expert will observe the pilot program during the next Reporting Period to assess whether it satisfies the requirements of Paragraph 70(c).[43]  To achieve Substantial Compliance with Paragraph 70(c), the County needs to adopt some means of conducting individual assessments to determine which inmates need to be restrained, throughout HOH.

---

[43] The County also reports that it "conducts daily huddle meeting to assess whether HOH inmates are suitable for a double man cell, or transfers to Enhanced Mental Health Housing or MOH.  Notably, most inmates are moved to [a] lower level."

71.     The County and the Sheriff will ensure that any prisoner subjected to clinical restraints in response to a mental health crisis receives therapeutic services to remediate any effects from the episode(s) of restraint.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017 (verified))**

Substantial Compliance requires the Department to review the electronic medical records of all prisoners placed in clinical restraints to verify that the prisoners received therapeutic services as required by Paragraph 71.

The County maintained Substantial Compliance with Paragraph 71 for twelve consecutive months during a prior reporting period and Paragraph 71 was not subject to monitoring in the Sixth Reporting Period.

72.     The County and the Sheriff will develop and implement policies and procedures that ensure that incidents involving suicide and serious self-injurious behavior are reported and reviewed to determine:  (a) whether staff engaged in any violations of policies, rules, or laws; and (b) whether any improvements to policy, training, operations, treatment programs, or facilities are warranted.  These policies and procedures will define terms clearly and consistently to ensure that incidents are reported and tracked accurately by DMH and the Sheriff's Department.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of January 1, 2017, through December 31, 2017)**

Substantial Compliance requires the Self-Assessments to report on (a) suicide review meetings and (b) CIRC meetings that review incidents of serious self-injurious behavior in the reporting period.

The Monitor's Fifth Report noted that "[n]either the posted audit source document nor the synopsis of each review in CHS' semi-annual report are. . . , sufficient for the Monitor to assess, as requested by DOJ, 'whether the County is adequately reviewing potential non-custody staff misconduct.'"  In response, the County explained that "in light of confidentiality issues," review of non-custody staff misconduct would not be "part of the public discussion or documentation that takes place in the Critical Incident Review Committee (CIRC)/Death Review meetings.  The review process itself would occur as an administrative or human resources process."

The County reports that "DHS-CHS tracks on an ongoing basis the number of CHS staff whose conduct is under review for possible misconduct. . . .As of May 10, 2018, 42 staff  were "under review/investigation, with anticipated interventions ranging from additional training to removal from regular duties. . . . .The investigations involve a variety of conduct, not all of which is related to the performance of their clinical/patient care duties. . . .[and] include, but are not limited to, reviews of conduct related to critical incidents (CIRCs) or suicides."[44]

The Mental Health Subject Matter Expert and the clinicians conducted a qualitative assessment of eight CIRC reviews in February to April 2018.  They concluded that all "clearly addressed whether staff engaged in any violations;"[45] 7 of the 8 "addressed whether any improvements to policy, training, operations, treatment programs, or facilities are warranted;" and determinations "to seek improvements" were reasonable in every case.  The Subject Matter Expert notes that the "county is diligently conducting these reviews and in almost all cases doing a thorough job."

---

[44] While this report gives the Monitor some confidence that the County is investigating and addressing non-custody staff misconduct, it does not indicate the results of any disciplinary hearings (without disclosing the names of the personnel under investigation) or the discipline imposed, or otherwise provide sufficient information for the Monitor "to assess" "whether the County is *adequately* reviewing potential non-custody staff misconduct."  The Monitor agrees with DOJ that "more information about the disposition of individual investigations involving non-custody staff" is needed, without disclosing the names of the non-custody staff.

[45] In the reviews conducted by one of the clinicians, this included "both custody and non-custody staff."

73.    Depending on the level of severity of an incident involving a prisoner who threatens or exhibits self-injurious behavior, a custody staff member will prepare a detailed report (Behavioral Observation and Mental Health Referral Form, Inmate Injury Report, and/or Incident Report) that includes information from individuals who were involved in or witnessed the incident as soon as practicable, but no later than the end of shift.  The report will include a description of the events surrounding the incident and the steps taken in response to the incident.  The report will also include the date and time that the report was completed and the names of any witnesses.  The Sheriff's Department will immediately notify the County Office of Inspector General of all apparent or suspected suicides occurring at the Jails.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through March 31, 2018 (verified))**

Substantial Compliance requires the Department to review quarterly a random sample of reports of any threats or exhibitions of self-injurious behavior to verify that the reports have the information required by Paragraph 73; and to provide the Monitor with the notifications to the Inspector General of all incidents involving an apparent or suspected suicide during the reporting period.

The County's Sixth Self-Assessment reports that for the Fourth Quarter of 2017, "98% -- 8% more  than the required 90% -- of reports reviewed have all of the information required by paragraph 73 of the Settlement Agreement."  It also reports "no incidents involving an apparent or suspected suicide occurred," and thus no notifications to the Office of Inspector General was required during this quarter.

The County's Sixth Self-Assessment also reports that for the First Quarter of 2018, "94% -- 4% more the required 90% -- of reports reviewed have all of the information required by paragraph 73 of the Settlement Agreement" and that "100% -- equal to the required standard of 100% -- of incidents involving an apparent or suspected suicide were reported to the Inspector General[.]"  The Mental Health Subject Matter Expert reports that the "electronic BOHMRs are being filled out well with a good deal of quality observations."[46]  The County's reported results during the First Quarter of 2018 have been verified by the Monitor's auditors.

---

[46] The County may be underreporting its compliance rate with Paragraph 73 since it found six of the reports it reviewed to be non-compliant because it was unable to locate the injury report that had been prepared even though posted results indicate that the BOHMR had all of the required information.  Paragraph 73 provides, however, that the required "detailed report" may be a BOHMR, Inmate Injury Report *and/or* an Incident Report.

74.     The Sheriff's Department will ensure that there is a timely, thorough, and objective law enforcement investigation of any suicide that occurs in the Jails. Investigations shall include recorded interviews of persons involved in, or who witnessed, the incident, including other prisoners.  Sheriff's Department personnel who are investigating a prisoner suicide or suspected suicide at the Jails will ensure the preservation of all evidence, including physical evidence, relevant witness statements, reports, videos, and photographs.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of September 1, 2016, through December 31, 2017)**

Substantial Compliance requires the Department to provide the Monitor with an Executive Suicide Death Review reflecting the results of the Department's investigation of any suicide in the Jails within six months of the suicide.  The review must reflect steps taken to preserve all of the evidence; and list the interviews of persons involved in, or who witnessed, the incident, and whether the interviews were recorded.

Although this provision was not subject to monitoring during the Sixth Reporting Period, the County provided the Monitor with the Executive Inmate Death Review for the suicide that occurred during the Fifth Reporting Period.  The Homicide Report that was submitted for the suicide satisfied the requirements of Paragraph 74.  In addition, the County continued to notify the Monitor of all inmate deaths, including suicides, and the subsequent death reviews.  The Monitor attended the suicide death reviews for the suicides that occurred on January 26, 2018, March 26, 2018, and April 1, 2018.

86

75.    Within three months of the Effective Date, the County and the Sheriff will review every suicide attempt that occurs in the Jails as follows:

(a)    Within two working days, DMH staff will review the incident, the prisoner's mental health status known at the time of the incident, the need for immediate corrective action if any, and determine the level of suicide attempt pursuant to the Centers for Disease Control and Prevention's Risk Rating Scale;

(b)    Within 30 working days, and only for those incidents determined to be a serious suicide attempt by DMH staff after the review described in subsection (a) above, management and command-level personnel from DMH and the Sheriff's Department (including Custody Division and Medical Services Bureau) will meet to review relevant information known at that time, including the events preceding and following the incident, the prisoner's incarceration, mental health, and health history, the status of any corrective actions taken, and the need for additional corrective action if necessary;

(c)    The County and the Sheriff will document the findings that result from the review of serious suicide attempts described in subsection (b) above; and

(d)    The County and the Sheriff will ensure that information for all suicide attempts is input into a database for tracking and statistical analysis.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of October 1, 2017 through March 31, 2018) (unverified)**

Substantial Compliance requires (a) DMH to review documentation of randomly selected suicide attempts during the previous quarter to verify that the prisoner's mental health status and need for immediate corrective action were considered timely by the DMH staff and that the staff determined whether the suicide attempt was serious; (b) that the Department and DMH reviewed the relevant information known at that time and the status of any corrective actions taken, and they considered the need for additional corrective action if necessary; and (c) that the information is reflected in the Department's database for tracking and statistical analysis.

The County's Fifth Self-Assessment reported that for the Third Quarter of 2017, "93% -- 8% more than the required 85% -- of documents reviewed showed DMH staff considered the inmate's mental health status and need for immediate corrective action;" "100% -- 5% more than the required 95% -- of suicide attempts are reflected in the Department's database;" and "100% -- more  than the required 95% of the suicide attempts" were reviewed by "management and command-level personnel" from Custody, mental health, and medical as required by Compliance Measure 75-5(b).

87

Although the results reported by the County met the quantitative thresholds for
Substantial Compliance, the County's Fifth Self-Assessment noted that the "County is
aware of concerns with the reporting system, which is why [its] self-assessment reflects
only Partial Compliance."  As explained in the Sixth Self-Assessment, "the County
determined that in certain patient charts there were instances were an [Self-Directed
Violence] SDV notification was not received via email as it should have been."

The County's Sixth Self-Assessment reports that the "County has now conducted
a two part review and analysis of the data collected and determined that in addition to the
email alerts, there are multiple checks and balances within the system that serve as
additional alerts for SDV incidents including incident reports, a Chief's Memo regarding
significant incidents, and BOMHRs. . . .As part of its review, the County conducted an
audit of Third and Fourth Quarters, 2017 data and has confirmed that it met the
thresholds for [the previously reported] Substantial Compliance for Third Quarter,
2017."[47]

The County's Sixth Self-Assessment reported that for the Fourth Quarter of 2017,
"94% -- 9% more than the required 85% -- of documents reviewed showed DMH staff
considered the inmate's mental health status and need for immediate corrective action;"
"100% -- 5% more than the required 95% -- of suicide attempts are reflected in the
Department's database;" and "100% -- more  than the required 95% of the suicide
attempts" were reviewed by "management and command-level personnel" from Custody,
mental health, and medical as required by Compliance Measures 75-5(b) and (c).  The
County's augmented Sixth Self-Assessment reports for the First Quarter of 2018 "that
95%—10% more than the required 85%—of documents reviewed showed CHS staff
considered the inmate's mental health status and need for immediate corrective action. .
.pursuant to Compliance Measure 75-5(a).  The County also concluded that 100% - 5%
more than the required 95% - of the suicide attempts reviewed were compliant with
Compliance Measure 75-5(b) [and] that 100% -- 5% more than the required 95%— of
suicide attempts are reflected in the Department's database for tracking and statistical
analysis pursuant to Compliance Measure 75-5(c)."  The results are subject to verification
by the Monitor's auditors.

The Mental Health Subject Matter Expert and the clinicians reviewed seven cases
that were the subject of CIRC reviews during the First Quarter of 2018 and one case in
the Second Quarters of 2018, and concluded as follows:  In 88% of the cases,[48] "the
DMH 2-day review demonstrated that the mental health status of the patient at the time of
the incident was reviewed" and "that the need for corrective action plans was
considered."  In 88% of the cases, the 30-day review demonstrated that "the events
preceding and following the incident, the prisoner's incarceration history, the prisoner's

---

[47] The County also submitted a separate "Note to Monitor re Provision 75" that described the County's two-
part review and analysis collected for Third and Fourth Quarters 2017[.]"
[48] The one case that was out of compliance was in the First Quarter of 2018, which reduces the compliance
percentage for the First Quarter to 85.7%.  Nevertheless, given the small size of the sample of the
qualitative review, the Monitor is of the view that the County is in Substantial Compliance "based upon the
quantitative thresholds in the Compliance Measures."  See p. 1, supra.

mental health history, and the prisoner's health status history" were reviewed and the required content was addressed.[49]

The Mental Health Subject Matter Expert concludes that;

In general, the county is doing a good job of these reviews.  They continue to streamline and organize the process and are developing better mechanisms for focusing reviews and tracking CAPs.  In our view, the 2-day reviews (chart reviews) are more extensive than needed and should focus on identifying critical clinical problems, urgent need for corrective action, and determination of the severity of the event.  The continued work on CQIP in general is bringing better organization to the whole process.  In short, we see solid progress here.

---

[49] The Mental Health Subject Matter Expert and clinicians also found that in only 62% of cases, the "30-day review clearly demonstrated consideration of the need for additional corrective action."  The County notes, however, that "[p]articipants at every CIRC are asked whether there are additional corrective actions or other items to be considered."

76.     The County and the Sheriff will review every apparent or suspected suicide that occurs in the Jails as follows:

(a)     Within no more than two working days, management and command-level personnel from DMH and the Sheriff's Department (including Custody Division and Medical Services Bureau) will meet to review and discuss the suicide, the prisoner's mental health status known at the time of the suicide, and the need for immediate corrective or preventive action if any;

(b)     Within seven working days, and again within 30 working days, management and command-level personnel from DMH and the Sheriff's Department (including Custody Division and Medical Services Bureau) will meet to review relevant information known at that time, including the events preceding and following the suicide, the prisoner's incarceration, mental health, and health history, the status of any corrective or preventive actions taken, and the need for additional corrective or preventive action if necessary; and

(c)     Within six months of the suicide, the County and the Sheriff will prepare a final written report regarding the suicide. The report will include:

(i)     time and dated incident reports and any supplemental reports with the same Uniform Reference Number (URN) from custody staff who were directly involved in and/or witnessed the incident;

(ii)    a timeline regarding the discovery of the prisoner and any responsive actions or medical interventions;

(iii)   copies of a representative sample of material video recordings or photographs, to the extent that inclusion of such items does not interfere with any criminal investigation;

(iv)    a reference to, or reports if available, from the Sheriff's Department Homicide Bureau;

(v)     reference to the Internal Affairs Bureau or other personnel investigations, if any, and findings, if any;

(vi)    a Coroner's report, if it is available at the time of the final report, and if it is not available, a summary of efforts made to obtain the report;

(vii)   a summary of relevant information discussed at the prior review meetings, or otherwise known at the time of the final report, including analysis of housing or classification issues if relevant;

(viii)  a clinical mortality review;

(ix)    a Psychological Autopsy utilizing the National Commission on Correctional Health Care's standards; and

(x)     a summary of corrective actions taken and recommendations regarding additional corrective actions if any are needed.

**STATUS (76):**          **SUBSTANTIAL COMPLIANCE (as of September 1, 2016, through December 31, 2017)**

The County previously maintained Substantial Compliance with Paragraph 76 for twelve consecutive months and this provision was no longer subject to monitoring during the Sixth Reporting Period.  Nonetheless, the County continued to conduct the reviews required by Paragraph 76 for the suicides that occurred during this period and invited the Monitor to attend these meetings.

91

77.     The County and the Sheriff will create a specialized unit to oversee, monitor, and audit the County's jail suicide prevention program in coordination with the Department of Mental Health.  The Unit will be headed by a Captain, or another Sheriff's Department official of appropriate rank, who reports to the Assistant Sheriff for Custody Operations through the chain of command.  The Unit will be responsible for:

(a)     Ensuring the timely and thorough administrative review of suicides and serious suicide attempts in the Jails as described in this Agreement;

(b)     Identifying patterns and trends of suicides and serious suicide attempts in the Jails, keeping centralized records and inputting data into a unit database for statistical analysis, trends, and corrective action, if necessary;

(c)     Ensuring that corrective actions are taken to mitigate suicide risks at both the location of occurrence and throughout the concerned system by providing, or obtaining where appropriate, technical assistance to other administrative units within the Custody Division when such assistance is needed to address suicide-risk issues;

(d)     Analyzing staffing, personnel/disciplinary, prisoner classification, and mental health service delivery issues as they relate to suicides and serious suicide attempts to identify the need for corrective action where appropriate; and recommend remedial measures, including policy revisions, re-training, or staff discipline, to address the deficiencies and ensure implementation; and

(e)     Participating in meetings with DMH to develop, implement, and track corrective action plans addressing recommendations of the quality improvement program.

**STATUS:     PARTIAL COMPLIANCE**

The Semi-Annual Report of CCSB Activities reports that during the Sixth Reporting Period, "there were three (3) suicides, twelve (12) suicide attempts, and [306] self-injurious behavior incidents identified in the jails."  16 of the 306 incidents were discussed during six CIRC meetings.  The Semi-Annual Report indicates that "[o]f the potential issues discussed, a total of fifty (50) Correction Action Plan/Issues (CAP) items were created. . . Some of the issues identified in the CIRCs have been sufficiently addressed by the CAPs implemented and are unlikely to occur again.  However, other issues remain that involve factors such as mental health, systemic issues and facility layout/construction projects, and will likely require longer-term solutions. Custody Compliance and Sustainability Bureau (CCSB) is responsible for monitoring the implementation and tracking of CAPs to address the issues identified."

92

The Semi-Annual Report includes the following sections:

(a)    "Administrative Review of Suicides."  This summarizes the 24-hour, 7-day, and 30-day reviews of the three suicides that occurred during the Sixth Reporting Period.  It also cross-references CHS' semi-annual report, which summarizes the reviews of serious suicide attempts by the CIRC.  The Monitor remains satisfied that CCSB is ensuring that CHS and the Department are timely and thoroughly conducting administrative review of suicides and serious suicide attempts in the jails as required by Compliance Measure 77-2(a).

(b)    "Patterns and trends and statistical analysis of suicides and serious suicide attempts in jails."  This section breaks down the 16 incidents self-injurious behavior incidents reviewed at CIRC meetings[50] by age, race, day of the week, method, mental health housing, and relationship to time of arrest and appearance in court.  There is, however, no statistical analysis of this data.

(c)    "Corrective actions taken by the department to mitigate suicide risks" section.  This section describes the corrective actions taken by the Department to mitigate suicide risks at the jails, in addition to the cross-referenced CAPs discussed at the Executive Inmate Review Committee meetings under the "Administrative Review of Suicides" section and the responses to issues discussed by CIRC in its reviews of serious suicide attempts and other incidents involving self-directed violence.  Taken together, the report on CCSB's activities and CHS's Semi-Annual Report satisfy the requirements of Compliance Measures 77-2(c).

(d)    "Technical issues provided to, or obtained for other administrative units within the Custody Division to address suicide-risk issues."  This section describes the roll-out and training of the use of the electronic form by the Court Services Division and the "improvements in communications."  This was largely done in the prior reporting period and "[f]uture plans are to include [station jails] and outside agencies."  It does not appear, however, that CCSB provided any technical assistance to other administrative units within the Custody Division in this reporting period.

(e)    "Analysis of staffing, personnel/disciplinary, prisoner classification, and mental health service delivery issues as they relate to suicides and serious suicide attempts."  This section reports that the Executive Inmate Death Review Committee meetings reviewed each of the three suicides during the Sixth Reporting Period and "determined that staffing levels had no bearing on the ability to discover the inmate in distress, or on the subsequent life saving measures."  It does not analyze whether staffing levels had any bearing on the 16 incidents of serious suicide attempts/self-directed violence that were analyzed by the CIRC.  A sub-section reports that "it was determined each of the three inmates who committed suicide during the period were correctly classified and housed, based upon criteria known at the time."  Another sub-section on Employee Performance reports that "[d]uring each Executive Death Review and CIRC

---

[50] The report does not include the three suicides reviewed during Executive Inmate Death Review meetings in the breakdown.

meeting, employee performance is discussed," and "no employee's action resulted in disciplinary action during the reviews," although "there were noted shortcomings in documentation or process that resulted in additional CAPs, counseling, or training."

(f)    "Remedial measures, including policy revisions, re-training, or staff discipline, to address issues related to suicide and serious suicide attempts." This describes a series of the remedial measures taken to address process and procedure issues such as protocol for completing a SRC, "the use of the 'Red Book' . . .to assist nursing in prioritizing referrals, and changes in P- levels." None of the issues addressed appeared to be significant.

(g)    "Summaries of meeting with DMH to develop, implement, and track corrective action plans." This section reports that "Corrective Action Plans are primarily identified and discussed at CIRC meetings. At the JQIC meetings there is follow up to verify that the CAPs have been addressed and verify their effectiveness. CCSB tracks all suicide-related CAPs, whether they are CHS or LASD CAPs, and does so continuously outside the CIRC and JQIC context." The CIRC meetings are summarized in the CHS semi-annual report, *see* pp. 66-8, *supra,* and this section of the CCSB report summarizes JQIC meetings during the Sixth Reporting Period the status of the corrective actions plans that were discussed by staff members from CHS, CCSB, and the involved jail facilities at the JQIC meetings.

CCSB is to be commended for the work it has done to facilitate the implementation of various provisions of the Settlement Agreement. Paragraph 77 also requires the unit "to oversee the County's jail suicide prevention program in coordination with [CHS]" and Paragraphs 60 and 62 impose obligations on CCSB to work with CHS to "implement a quality improvement plan to identify and address clinical issues that place prisoners at significant risk of suicide and self-injurious behavior" and "develop, implement and track corrective action plans addressing recommendations of the quality improvement program." As noted by the Mental Health Subject Matter Expert, it is not clear that there is an "overarching Q[uality] M[anagement] approach at the Department" that is fully integrated with CHS's program.

94

78.     The County and the Sheriff will maintain a county-level Suicide Prevention Advisory Committee that will be open to representatives from the Sheriff's Department Custody Division, Court Services, Custody Support Services, and Medical Services Bureau; the Department of Mental Health; the Public Defender's Office; County Counsel's Office; the Office of the Inspector General; and the Department of Mental Health Patients' Rights Office.  The Suicide Prevention Advisory Committee will meet twice per year and will serve as an advisory body to address system issues and recommend coordinated approaches to suicide prevention in the Jails.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of May 11, 2016, through May 18, 2017)**

Substantial Compliance requires (1) the Committee to meet twice per year and (2) "recommend coordinated approaches to suicide prevention in the Jails."

The County  maintained Substantial Compliance with paragraph 78 for twelve consecutive months as of May 18, 2017, and this provision was not subject to monitoring in the Sixth Reporting Period.

79.    (a)    Unless clinically contraindicated, the County and the Sheriff will offer prisoners in mental health housing:

    (i)    therapeutically appropriate individual visits with a QMHP; and

    (ii)    therapeutically appropriate group programming conducted by a QMHP or other appropriate provider that does not exceed 90 minutes per session;

    (b)    The County and the Sheriff will provide prisoners outside of mental health housing with medication support services when those prisoners are receiving psychotropic medications and therapeutically appropriate individual monthly visits with a QMHP when those prisoners are designated as Seriously Mentally Ill; and

    (c)    The date, location, topic, attendees, and provider of programming or therapy sessions will be documented.  A clinical supervisor will review documentation of group sessions on a monthly basis.

### STATUS:    NON-COMPLIANCE

Substantial Compliance requires the Department to maintain records of therapeutically appropriate individual visits and group programming, and the names of the clinical supervisors who reviewed the documentation of group sessions; describe the medication support services available for prisoners not in mental health housing who are receiving psychotropic medications; and review electronic medical records of such to confirm that medication support services were provided to these prisoners.

The County's posted results show that in the Fourth Quarter of 2017, 54% of the prisoners who resided outside of mental health housing and were receiving psychotropic medications were "provided with medication support services," which is below the 85% threshold required by Compliance Measure 79.5(d) for Substantial Compliance.[51]  The Sixth Self-Assessment reports that the County has "determined that a shortage of medical doctors treating patients in the general population has hindered its ability to comply with this provision."

The qualitative assessments by the Mental Health Subject Matter Expert and the clinicians "have continued to reveal little substantial progress in the provision of therapeutically appropriate treatment. . . . Group activities are generic and seldom appear based on individual patient need."  As acknowledged in the County's Self-Assessment, "the County is not yet able to render structured treatment according to sound treatment methods reflect in treatment plans."

---

[51] As in the past, the Sixth Self-Assessment does not address Compliance Measures 79.1(a)-(c) and 79.5(b), which require the County to maintain records of "therapeutically appropriate individual visits and group programming, and the names of supervisors who reviewed the documentation of group sessions"

80.    (a)    The County and the Sheriff will continue to make best efforts to provide appropriate out-of-cell time to all prisoners with serious mental illness, absent exceptional circumstances, and unless individually clinically contraindicated and documented in the prisoner's electronic medical record.  To implement this requirement, the County and the Sheriff will follow the schedule below:

(i)    By no later than six months after the Effective Date, will offer 25% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week;

(ii)    By no later than 12 months after the Effective Date, will offer 50% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week; and

(iii)    By no later than 18 months after the Effective Date, will offer 100% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week.

(b)    No later than six months after the Effective Date, the County and the Sheriff will record at the end of each day which prisoners in HOH, if any, refused to leave their cells that day.  That data will be presented and discussed with DMH staff at the daily meeting on the following Normal business workday.  The data will also be provided to the specialized unit described in Paragraph 77 and to DMH's quality improvement program to analyze the data for any trends and to implement any corrective action(s) deemed necessary to maximize out-of-cell time opportunities and avoid unnecessary isolation.

97

**STATUS (80):        NON-COMPLIANCE**

Paragraph 80 requires that, "no later than 18 months after the Effective Date [July 1, 2015]," 100% of the prisoners in HOH receive "ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week." The parties have agreed that up to five hours of the structured time can consist of education or work programs, but at least five hours of the time must be therapeutic.

The County's posted results for the First Quarter of 2018 shows that 50% of the prisoners at CRDF and 71% of the prisoners at TTCF were offered 10 or more hours of unstructured, out-of-cell recreational time. The County's Sixth Self-Assessment reports that "[w]ith respect to the structured out-of-cell time, [County Health Services] is in the process of developing an electronic system so that clinicians, and not custody staff, will be able to track the structured out-of-cell time offered." It did not, however, report on the percentage of prisoners who were offered 10 or more hours of structured therapeutic or programmatic time per week.[52]

The Mental Health Subject Matter Expert and the two clinicians "observed and coded the out-of-cell time for each inmate" in two HOH pods at CRDF and TTCF during the period from December 17, 2017, through January 18, 2018. They were "on the units for 8-10 hours each day" and they coded various activities (e.g., yard, mental health groups). They report that "[s]everal important observations stood out to us:" "almost half of the inmates did not come our during the day shift;" CRDF had "much less out of cell time than at TTCF;" and "the progressive [Living Module] unit at TTCF (161) is doing a good job of getting inmates out of their cells[.]" Overall, "the county is far short of getting even an hour of structured out of cell time daily (there is little to no structured out of cell time in the evenings). Unstructured time is highly variable but averages only an hour and a half daily(excluding evening hours which are likely to be substantial."

---

[52] The Mental Health Subject Matter Expert notes that the County's "data is difficult to interpret." The out-of-cell hours on the sheets do not add up in many instances and numbers are reported that are clearly - erroneous. The County appears to have collapsed refusals and those deemed ineligible into a single category but are using notes to distinguish them. This is at least a beginning. However, the County is still counting both as out of cell time."

81.    Except as specifically set forth in Paragraphs 18-20 of this Agreement, and except as specifically identified below, the County and the Sheriff will implement the following paragraphs of the Implementation Plan in *Rosas* at all Jails facilities, including the Pitchess Detention Center and the Century Regional Detention Facility, by no later than the dates set forth in the Implementation Plan or as revised by the *Rosas* Monitoring Panel:  Paragraphs 2.2-2.13 (use of force policies and practices); 3.1-3.6 (training and professional development); 4.1-4.10 (use of force on mentally ill prisoners); 5.1-5.3 (data tracking and reporting of force); 6.1-6.20 (prisoner grievances and complaints); 7.1-7.3 (prisoner supervision); 8.1-8.3 (anti-retaliation provisions); 9.1-9.3 (security practices); 10.1-10.2 (management presence in housing units); 11.1 (management review of force); 12.1-12.5 (force investigations, with the training requirement of paragraph 12.1 to be completed by December 31, 2016); 13.1-13.2 (use of force reviews and staff discipline); 14.1-14.2 (criminal referrals and external review); 15.1-15.7 (documentation and recording of force); 16.1-16.3 (health care assessments); 17.1-17.10 (use of restraints); 18.1-18.2 (adequate staffing); 19.1-19.3 (early warning system); 20.1-20.3 (planned uses of force); and 21.1 (organizational culture).

**STATUS:    PARTIAL COMPLIANCE**

Policies approved by the *Rosas* Monitors and adopted by the Department in the First Reporting Period implemented the following provisions of the *Rosas* Implementation Plan:  Paragraphs 2.2-2.13 (use of force policies and practices); 3.6 (training and professional development); 4.1-4.5 (use of force on mentally ill prisoners); 5.1-5.3 (data tracking and reporting of force); 7.1-7.3 (prisoner supervision); 8.1-8.3 (anti-retaliation provisions); 9.2-9.3 (security practices); 10.1-10.2 (management presence in housing units); 11.1 (management review of force); 12.2-12.5 (force investigations); 14.1-14.2 (criminal referrals and external review); 15.1-15.7 (documentation and recording of force); 16.1-16.3 (health care assessments); 17.1-17.10 (use of restraints); 18.1-18.2 (adequate staffing); 20.1-20.3 (planned uses of force); and 21.1 (organizational culture).

In the Second Reporting Period, the *Rosas* Monitors approved policies to implement the following provisions of the *Rosas* Implementation Plan:  Paragraphs 6.1-6.20 (grievance system); Paragraph 8.2 (combining "Complaints of Retaliation").  They also approved revised policies to implement Paragraphs 13.1-13.2 (discipline for PREA violations, dishonesty, and failure to report force incidents).

Paragraphs 3.1-3.4, 4.6-4.9, and 12.1 of the *Rosas* Implementation Plan reflect training requirements that were supposed to be, but were not, completed by December 31, 2016.  This is due in part to the delays that have occurred in the review and approval of the Department's use of force and investigations training program.  The Monitor has retained auditors to review the Department's training records and verify the Department's compliance with the training requirement of the *Rosas* plan at CRDF, NCCF, PDC North, PDC South, and PDC East.

On July 10, 2018, the Department presented to the *Rosas* Monitors its Custody

99

Operations Employee Review System it has implemented "to facilitate the identification, tracking, analysis, and review of specific employee-related incidents and issues."  The system generates monthly reports reflecting use of force, grievances against staff, and Watch Commander Service Comment Reports for individual employees over a three month period to identify potentially problematic employees.  The *Rosas* Monitors concluded that this system addresses the requirements of Paragraphs 19.1, 19.2, and 19.3 of the *Rosas* plan for an Early Warning System.

Paragraphs 4.10 and 9.1 of the *Rosas* Implementation are moot since the Settlement Agreement requires the Crisis Intervention and Conflict Resolution training to be extended to the remaining deputies and Custody Assistants, and it specifies the required cell checks in the Jails.  Accordingly, the Department has implemented all of the provisions of the *Rosas* Implementation Plan.

In the Sixth Reporting Period, the Monitor reviewed 24 randomly selected completed force packages for CRDF, NCCF, and PDC North.  These packages were not reviewed by a Use of Force Subject Matter Expert because the parties did not agree on a replacement for the Use of Force Subject Matter Expert who tragically passed away in Los Angeles on November 3, 2017, after touring CRDF with the Monitor.  Overall, the Monitor concluded that the Department is complying with its policies regarding the use of force and documentation of force incidents at CRDF and PDC North jail facilities, and that the force investigations are thorough and complete.  There were no cases in which the Monitor concluded that the force was not in compliance with the applicable provisions of the *Rosas* Plan, and only one case in which reporting and investigation of force was not in compliance with the other applicable provisions of the plan.  Once again, however, the Monitor was unable to determine whether the Department was in compliance with policies pertaining to the timeliness of reports and the interviews of inmate witness.

All of the force incidents at CRDF and PDC North reviewed by the Monitor and Subject Matter Expert were captured on fixed closed circuit television cameras at CRDF and PDC North.  Although the closed circuit camera televisions is not required to be fully operational at NCCF until July 1, 2018, all of the force incidents at NCCF reviewed by the Monitor during the Sixth Reporting Period were captured on the CCTV's that have been installed at NCCF.

During the Sixth Reporting Period, the Monitor met with the Inmate Grievance Teams at CRDF and NCCF on March 27 and April 4, 2018, respectively.  The Monitor also met again with the Division Inmate Grievance Coordinator who has oversight responsibility for the implementation of the new grievance system to discuss improvements to the tracking system that are being implemented throughout the Custody Division.  The grievance teams at both CRDF and NCCF have made significant improvements in the tracking of inmate grievances, reducing the back-log of overdue grievance investigations and closing out investigations that had been opened for more than 30 days at their institutions.

82.    With respect to paragraph 6.16 of the *Rosas* Implementation Plan, the County and the Sheriff will ensure that Sheriff's Department personnel responsible for collecting prisoners' grievances as set forth in that paragraph are also co-located in the Century Regional Detention Facility.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of July 15, 2016, through December 31, 2017)**

The *Rosas* Monitors have approved a de-centralized inmate grievance system, which includes an Inmate Grievance Team co-located at Century Regional Detention Facility.  The Department published its new grievance policies on July 15, 2016.

CRDF has its own Inmate Grievance Team with the staffing required by CDM 8-01.020.00.  The Monitor met with CRDF's Inmate Grievance Team during the Sixth Reporting Period and reviewed the operation of the grievance system at CRDF.

Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring for Substantial Compliance with Paragraph 82 in the Sixth Reporting Period.

101

83.    The County and the Sheriff will install closed circuit security cameras throughout all Jails facilities' common areas where prisoners engage in programming, treatment, recreation, visitation, and intra-facility movement ("Common Areas"), including in the Common Areas at the Pitchess Detention Center and the Century Regional Detention Facility.  The County and the Sheriff will install a sufficient number of cameras in Jails facilities that do not currently have cameras to ensure that all Common Areas of these facilities have security-camera coverage.  The installation of these cameras will be completed no later than June 30, 2018, with TTCF, MCJ, and IRC completed by the Effective Date; CRDF completed by March 1, 2016; and the remaining facilities completed by June 30, 2018.  The County and the Sheriff will also ensure that all video recordings of force incidents are adequately stored and retained for a period of at least one year after the force incident occurs or until all investigations and proceedings related to the use of force are concluded.

**STATUS:**    **SUBSTANTIAL COMPLIANCE (as of July 1, 2015, through June 30, 2016 at MCJ and IRC)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2015, through September 30, 2016 at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31 2017 at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, though June 30, 2018, at NCCF and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2018 at PDC South)**

The Monitor visited NCCF and PDC North on April 4, 2018, and confirmed that the closed circuit security cameras were operational in Common Areas at those facilities, although the Department has ordered an additional eight cameras to cover blind spots at PDC North and is waiting for new computers that will allow supervisors to view all of the cameras at NCCF on large monitors in sergeants offices.[53]  As of April 4, the Department was in the process of finishing the installation of cameras at PDC South.  On July 12, 2018, the Department submitted a report showing all of the cameras requested and operational at each of these facilities.

Paragraph 83 also requires the Department to provide evidence that all video recordings of force incidents were adequately stored and retained for a period of at least one year after the force incident occurs.  The County's Sixth Self-Assessment reports that it has achieved Substantial Compliance for this measure at CRDF in the Fourth Quarter of 2017.  NCCF and PDC North are still subject to this requirement of Paragraph 83 until March 31, 2020, and PDC South is subject to it until June 30, 2020.

---

[53] The cameras can, however, be viewed on desktops in the sergeants offices.

102

The County previously maintained Substantial Compliance with Paragraph 83 at IRC, MCJ, and TTCF for twelve consecutive months and were not subject to monitoring during the Sixth Reporting Period. Further, CRDF is no longer subject to monitoring with Paragraph 83.

84.    The Sheriff will continue to maintain and implement policies for the timely and thorough investigation of alleged staff misconduct related to use of force and for timely disciplinary action arising from such investigations.  Specifically:

(a)    Sworn custody staff subject to the provisions of California Government Code section 3304 will be notified of the completion of the investigation and the proposed discipline arising from force incidents in accordance with the requirements of that Code section; and

(b)    All non-sworn Sheriff's Department staff will be notified of the proposed discipline arising from force incidents in time to allow for the imposition of that discipline.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of July 1, 2017, through March 31, 2018 (verified))**

Substantial Compliance under the Compliance Measures requires the Department to demonstrate that 95% of the investigations of force incidents in which sworn custody staff and non-sworn custody staff were found to have violated Department policy or engaged in misconduct were completed and administrative action, which could include discipline, was taken within the time frames provided for in Government Code Section 3304 and relevant Department policies.  Although Paragraph 84 requires the Department to implement policies for the "timely and thorough" investigation of force incidents, the subparagraphs and the Compliance Measures are focused on the timeliness of the completion of the investigations resulting in the imposition of discipline.  The Monitor's determination of the Department's compliance with Paragraph 84 will be largely based upon the timeliness of the completion of the investigations, but the Monitor also has randomly selected and reviewed several internal investigations, which appeared to be thorough and unbiased.

The County's Sixth Self-Assessment reports that the Department achieved Substantial Compliance in the Fourth Quarter of 2017 and the First Quarter of 2018.  The Department concluded that all of the randomly selected "investigations of force incidents which involved a violation of policy or misconduct [in the Fourth Quarter of 2017 and the First Quarter of 2018] were completed and administrative action was timely taken pursuant to 84-2."  The reported results have been verified by the Monitor's auditors.

104

85.    The County and the Sheriff will ensure that Internal Affairs Bureau management and staff receive adequate specialized training in conducting investigations of misconduct.

**STATUS:    NON-COMPLIANCE**

Substantial Compliance requires the Department to provide the Monitor and Subject Matter Experts with (1) the curriculum/syllabus for the three specialized courses given to IAB management, and (2) a list of the sworn personnel assigned to IAB and proof that such personnel successfully completed the training.  The County's posted results show that only 57.5% of the IAB investigators completed all three of the required courses as of the end of the Second Quarter of 2018.

86.     Within three months of the Effective Date, the County and the Sheriff will develop and implement policies and procedures for the effective and accurate maintenance, inventory, and assignment of chemical agents and other security equipment. The County and the Sheriff will develop and maintain an adequate inventory control system for all weapons, including OC spray.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 at MCJ and CRDF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2016, through December 31, 2017 at PDC North)**

**SUBSTANTIAL COMPLIANCE (as of February 1, 2017, through March 31, 2018 at PDC South and PDC East)**

**SUBSTANTIAL COMPLIANCE (as of March 1, 2017 through March 31, 2018 at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2017 through March 31, 2018 at IRC)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through June 30, 2018, at TTCF)**

CDM 7-08/080 ACCOUNTABILITY OF SPECIALWEAPONS, effective October 14, 2016, requires each facility to have unit orders that "establish procedures for the storage, issuance, reissuance, accountability, maintenance, and periodic inventory of all weapons. . . stored at, or issued from, the facility," which includes detailed requirements for the "Inventory, Control, and Accountability of Aerosol Chemical Agents."

In addition to providing written policies and procedures for the effective and accurate maintenance, inventory, and assignment of chemical agents and other security equipment, Substantial Compliance requires the Department to provide the Monitor and Subject Matter Experts with up-to-date Unit Orders for each jail requiring the inventory and inspection of special weapons, and armory audit logs documenting the inventory and control of armory-level weapons.

The Monitor and Use of Force Subject Matter Expert inspected the armories at TTCF on March 28, 2018.  The Monitor inspected the armories and sub-armories at NCCF and PDC South on April 4, 2018, and checked the available inventory logs.  The Monitor inspected the armories at IRC on April 10, 2018.

The inventory logs were checked daily in the IRC, PDC North, and TTCF armories, and weekly in the PDC South armory. [54]  The main armory and the sub-

---

[54] Because PDC East is a fire camp with very few inmates, weapons in the armory are almost never used.

106

armories at NCCF are checked daily and the inventories matched the weapons in the sub-armories.  Each of these facilities has reasonably up-to-date unit orders and all weapons were accounted for during recent inspections.  The Department submitted the required armory audit logs for all of the facilities that were subject to monitoring for Fourth Quarter of 2017 and the First Quarter of 2018.

The Department previously maintained Substantial Compliance with Paragraph 86 for twelve consecutive months at MCJ, CRDF, and PDC North.  Pursuant to Paragraph 111, the armories at MCJ, CRDF, and PDC North were not subject to monitoring in the Sixth Reporting Period.  The Department has maintained Substantial Compliance with Paragraph 86 for twelve consecutive months at NCCF, PDC South, PDC East, and IRC and will no longer be subject to monitoring in future periods.

The Monitor noted significant improvement in the armories at TTCF.  Although there were a few days when the inventory logs were only checked in two of the three shifts, the inventory lists checked by the deputies accurately reflected what was in the armory and sub-armories, the facilities were well-organized, and it was easy to locate the weapons and rounds of ammunition.  The Monitor is of the view that the Department has achieved Substantial Compliance with Paragraph 86 at TTCF as of April 1, 2018.

107

**APPENDIX A**

| NO. | PROVISION | STATUS | SUBSTANTIAL COMPLIANCE DATES |
|---|---|---|---|
| 18 | Suicide Prevention Training | Substantial Compliance (MCJ, NCCF, PDC South, PDC East, TTCF, IRC, PDC North, & CRDF) | (10/1/17 at MCJ & PDC South) (9/1/17 at NCCF) (12/1/17 at PDC East) (4/1/18 at TTCF, IRC, & PDC North) (6/1/18 at CRDF) |
| 19 | Crisis Intervention & Conflict Resolution Training | Partial Compliance | |
| 20 | Training at NCCF, PDC and CRDF | Substantial Compliance (PDC East, PDC North, PDC South, NCCF, & CRDF) | **(8/1/17 at PDC East, PDC North, NCCF, & CRDF)[1]** **(10/1/17 at PDC South)** |
| 21 | CPR Certification | Substantial Compliance (NCCF, PDC East, PDC North, PDC South, TTCF, IRC, & MCJ) Partial Compliance (CRDF) | **(10/1/15 – 9/30/16 at PDC East, & PDC South)** **(1/1/16 – 12/31/16 at NCCF, PDC North, & IRC)** **(4/1/16 – 3/31/17 at TTCF)** (10/1/17 – 3/31/18 at MCJ) |
| 22 | Use of Arresting and Booking Documents | Substantial Compliance | **(7/1/16 – 6/30/17)** |
| 23 | Suicide Hazard Mitigation Plans | Substantial Compliance | **(1/1/18 & 7/1/18)** |

---

[1] Substantial Compliance Dates in **bold** reflect that the Department has achieved Substantial Compliance with the training requirements or maintained Substantial Compliance for twelve consecutive months with the other requirements; the results were verified by the Monitor's auditors when required; and the County or designated facilities are no longer subject to monitoring of this provision pursuant to paragraph 111 of the Settlement agreement.

**APPENDIX A**

| | | | |
|---|---|---|---|
| 24 | Suicide Hazard Inspection | Substantial Compliance | (10/1/17) |
| 25 | Transportation of Suicidal Inmates (station jails) | Partial Compliance | |
| 26 | Identification and Evaluation of Suicidal Inmates | Partial Compliance | |
| 27 | Screening for Mental Health Care and Suicide Risk | Substantial Compliance | (10/1/17 – 3/31/18) |
| 28 | Expedited Booking of Suicidal Inmates | Substantial Compliance (IRC & CRDF) | **(4/1/17 – 3/31/18 at IRC)** (1/1/18 – 3/31/18 at CRDF) |
| 29 | Mental Health Assessments (of non-emergent mental health needs) | Substantial Compliance | (4/1/17 – 3/31/18) |
| 30 | Initial Mental Health Assessments & Treatment Plans | Partial Compliance | |
| 31 | Electronic Medical Records Alerts | Partial Compliance | |
| 32 | Electronic Medical Records – Suicide Attempts | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 33 | Supervisor Reviews of Electronic Medical Records | Substantial Compliance | (7/1/16 – 6/30/17) |
| 34 | Discharge Planning | Stayed Pending Litigation | |
| 35 | Referral for Mental Health Care | Substantial Compliance | (11/1/17 – 3/31/18) |
| 36 | Assessments After Triggering Events | Partial Compliance | |
| 37 | Court Services Division Referrals | Partial Compliance | |
| 38 | Weekly Rounds in Restricted Housing Modules | Substantial Compliance | **(1/1/16 – 12/31/16)** |

**APPENDIX A**

| 39 | Confidential Self-Referral | Substantial Compliance (NCCF & CRDF) Partial Compliance (MCJ & TTCF) Not Rated (PDC South, PDC East, & PDC North) | (10/1/17 – 3/31/18 at CRDF) (7/1/17 – 3/31/18 at NCCF) |
|----|----|----|----|
| 40 | Availability of QMHPs | Partial Compliance | |
| 41 | FIP Step-Down Protocols | Not Rated | |
| 42 | HOH Step-Down Protocols | Partial Compliance | |
| 43 | Disciplinary Policies | Substantial Compliance (NCCF & PDC North) Partial Compliance (CRDF, MCJ, & TTCF) | (10/1/17 – 3/31/18 at NCCF & PDC North) |
| 44 | Protective Barriers | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 45 | Suicide Intervention and First Aid Kits | Substantial Compliance | **(10/1/15 – 9/30/16 at CRDF, NCCF, TTCF, PDC East, & PDC South)** **(1/1/16 – 12/31/16 at MCJ & PDC North)** |
| 46 | Interruption of Self-Injurious Behavior | Partial Compliance | |
| 47 | Staffing Requirements | Non-Compliance | |
| 48 | Housekeeping and Sanitation | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 49 | Maintenance Plans | Substantial Compliance | **(3/1/16 – 2/28/17)** |
| 50 | Pest Control | Substantial Compliance | **(1/1/16 – 12/31//16 at MCJ, NCCF, PDC North, TTCF, & CRDF)** **(4/1/16 – 3/31/17 at PDC South & PDC East)** |

## APPENDIX A

| 51 | Personal Care & Supplies | Substantial Compliance | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC East, PDC North, PDC South, & TTCF)** **(7/1/16 – 6/30/17 at CRDF)** |
|----|--------------------------|------------------------|------|
| 52 | HOH Property Restrictions | Partial Compliance | |
| 53 | Eligibility for Education, Work and Programs | Partial Compliance | |
| 54 | Privileges and Programs[2] | Partial Compliance | |
| 55 | Staff Meetings | Substantial Compliance (CRDF, PDC North, MCJ, & TTCF) | **(10/1/16 – 9/30/17 at CRDF)** **(4/1/17 – 3/31/18 at PDC North)** (4/1/18 – 6/30/18 at MCJ & TTCF) |
| 56 | Changes in Housing Assignments | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 57 | Inmate Safety Checks in Mental Housing | Substantial Compliance (MCJ) Partial Compliance (TTCF, CRDF, & PDC North) | **(4/1/17 – 3/31/18 at MCJ)** |
| 58 | Inmate Safety Checks in Non-Mental Housing | Substantial Compliance (PDC South, PDC North, PDC East, CRDF, & IRC ) Partial Compliance (NCCF, MCJ, & TTCF) | **(1/1/16 – 12/31/16 at PDC South, PDC North, & PDC East)** (7/1/17 – 3/31/18 at CRDF) 10/1/17 – 3/31/18 at IRC) |

---

[2] Per agreement of the parties, the County must maintain Substantial Compliance for two additional quarters under the revised Compliance Measures.

**APPENDIX A**

| | | | |
|---|---|---|---|
| 59 | Supervisor Rounds | Substantial Compliance (at PDC North, PDC East, MCJ, CRDF, PDC South, NCCF, & TTCF) | **(1/1/17 – 12/31/17 at PDC East & MCJ)** **(4/1/17 – 3/31/18 at NCCF)** (10/1/17 – 6/30/18 at CRDF) (1/1/18 – 6/30/18 at PDC North & PDC South) (4/1/18 – 6/30/18 at TTCF) |
| 60 | Implementation of Quality Improvement Program | Partial Compliance | |
| 61 | Requirements of Quality Improvement Program | Partial Compliance | |
| 62 | Tracking of Corrective Action Plans | Partial Compliance | |
| 63 | Sufficient HOH and MOH Housing | Non-Compliance | |
| 64 | Plans for Availability of Inpatient Health Care | Partial Compliance | |
| 65 | Administration of Psychotropic Medication | Partial Compliance | |
| 66 | Active Mental Health Caseloads | Non-Compliance | |
| 67 | Prisoner Refusals of Medication | Non-Compliance | |
| 68 | Contraband Searches | Substantial Compliance (MCJ, NCCF, PDC East, PDC South PDC North, & TTCF) Partial Compliance (CRDF) | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC East, PDC South, & PDC North)** (1/1/17 – 12/31/17 at TTCF) |
| 69 | Clinical Restraints in CTC | Partial Compliance | |

**APPENDIX A**

| | | | |
|---|---|---|---|
| 70 | Security Restraints in HOH and MOH | Partial Compliance | |
| 71 | Therapeutic Services for Inmates in Clinical Restraints | Substantial Compliance | **(7/1/16 – 6/30/17)** |
| 72 | Administrative Reviews | Substantial Compliance | **(1/1/17 – 12/31/17)** |
| 73 | Reporting of Self-Injurious Behavior and Threats | Substantial  Compliance | (10/1/17 – 3/31/18) |
| 74 | Law Enforcement Investigations of Suicides | Substantial Compliance | **(9/1/16 – 12/31/17)** |
| 75 | Management Reviews of Suicide Attempts | Substantial Compliance | (10/1/17 – 3/31/18) |
| 76 | Management Reviews of Suicides | Substantial Compliance | **(9/1/16 – 12/31/17)** |
| 77 | Custody Compliance and Sustainability Bureau | Partial Compliance | |
| 78 | Suicide Prevention Advisory Committee | Substantial Compliance | **(5/11/16 – 5/18/17)** |
| 79 | Therapeutic Services in Mental Health Housing | Non-Compliance | |
| 80 | Out-of-Cell Time in HOH | Non-Compliance | |
| 81 | Implementation of *Rosas* Recommendations | Partial Compliance | |
| 82 | Collection of Grievances at CRDF | Substantial Compliance | **(7/15/16 – 12/31/17)** |
| 83 | Closed Circuit Cameras | Substantial Compliance (MCJ, TTCF, IRC, CRDF, NCCF, PDC North, & PDC South) | **(7/1/15 – 6/30/16 at MCJ & IRC)** **(10/1/15 – 9/30/16 at TTCF**) **(4/1/16 – 3/31/17 at CRDF**) (4/1/18 – 6/30/18 at NCCF & PDC North) (7/1/18 at PDC South) |

**APPENDIX A**

| 84 | Investigation of Staff Misconduct | Substantial Compliance | (7/1/17 – 3/31/18) |
|---|---|---|---|
| 85 | Internal Affairs Bureau Training | Non-Compliance | |
| 86 | Maintenance and Inventory of Security Equipment | Substantial Compliance (MCJ, CRDF, PDC North, PDC South, PDC East, NCCF, IRC, & TTCF) | **(4/1/16 – 3/31/17 at MCJ & CRDF)** **(10/1/16 – 12/31/17 at PDC North)** **(2/1/17 – 3/31/18 at PDC South & PDC East)** **(3/1/17 – 3/31/18 at NCCF)** **(4/1/17 – 3/31/18 at IRC)** (4/1/18 – 6/30/18 at TTCF) |

**APPENDIX B**

|  | Substantial Compliance (Provisions) | Partial Compliance[1] | Non-Compliance | Substantial Compliance (Facilities)[2] | No Longer Subject To Monitoring[3] |
|---|---|---|---|---|---|
| First[4] | 5 | 16 |  | 10 |  |
| Second | 14 | 30 | 13 | 24 |  |
| Third | 22 | 27(1) | 10 | 29 | 4(2) |
| Fourth | 24 | 26(1) | 10 | 29 | 10(2) |
| Fifth | 23 | 24(2) | 7 | 34 | 15(5) |
| Sixth | 32 | 22 | 7 | 38 | 18(9) |

---

[1] The figure in parenthesis under Partial Compliance is the number of additional provisions where some facilities were in Partial Compliance and other facilities were in Non-Compliance.

[2] This represents the number of provisions where the Department is in Substantial Compliance at all or some of the facilities.

[3] The figure in parenthesis under No Longer Subject to Monitoring is the number of additional provisions where some facilities are no longer subject to monitoring.

[4] During the First Reporting Period, 43 provisions were not subject to monitoring.