**SCHEPER KIM & HARRIS LLP**
RICHARD E. DROOYAN (Bar No. 65672)
601 West Fifth Street, 12th Floor
Los Angeles, CA 90071-2025
Telephone: (213) 613-4655
Facsimile: (213) 613-4656

**Monitor**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>          v.<br><br>COUNTY OF LOS ANGELES AND LOS ANGELES COUNTY SHERIFF JIM MCDONNELL, in his Official Capacity,<br><br>                    Defendants. | CV No. 15-05903 DDP (JEMX)<br><br>**MONITOR'S SEVENTH REPORT** |

Pursuant to the Paragraph 109 of the Joint Settlement Agreement Regarding Los Angeles County Jails, the Monitor appointed by this Court hereby submits the attached Report "describing the steps taken" by the County of Los Angeles and the Los Angeles County Sheriff during the six-month period from July 1, 2018, to December 31, 2018, "to implement the Agreement and evaluating the extent to which they have complied with this Agreement."  This Report takes into consideration the advice and assistance I have received from the Subject Matter Experts appointed by this Court and the comments from the parties in accordance with Paragraph 110 of the Agreement.  I am available to answer any questions the Court may have regarding my Report at such times as are convenient for the Court and the parties.

DATED:  February 28, 2019          Respectfully submitted,

                                   SCHEPER KIM & HARRIS LLP
                                   RICHARD E. DROOYAN


                                   By:  /s/ Richard E. Drooyan
                                        Richard E. Drooyan
                                        Monitor

# MONITOR'S SEVENTH REPORT

This Seventh Report sets forth the Monitor's assessments of the implementation of the Settlement Agreement (the "Agreement") between the County of Los Angeles (the "County") and the United States Department of Justice ("DOJ") for the treatment of mentally ill inmates in the County's jail facilities by the Los Angeles Sheriff's Department (the "Department") and the County's Department of Health Services ("DHS").[1]  It covers the County's reported results for the period from July 1, 2018, through December 31, 2018 (the "Seventh Reporting Period").

As used herein, "Substantial Compliance" means that the County has "achieved compliance with the material components of the relevant provisions of this Agreement in accordance with the [agreed-upon Compliance Measures for assessing Substantial Compliance]," which it must maintain for twelve-consecutive months; "Partial Compliance" means that the County has achieved "compliance on some, but not all, of the material components of the relevant provision of this Agreement;" and "Non-Compliance" means that the County has not met "most or all of the material components of the relevant provisions of this Agreement."

This Seventh Report is based upon the Monitor's review of the policies, procedures, and directives proposed and/or implemented by the Department and Correctional Health Services ("CHS") in the Seventh Reporting Period; assessments and observations of the Subject Matter Expert; and multiple tours of the jails by the Monitor, the Subject Matter Experts, and the two clinicians retained by the Monitor to assist the Mental Health Subject Matter Expert.  It is also takes into consideration the County's Self-Assessment Status Report (the "Seventh Self-Assessment"), which was received on December16, 2018; the Semi-Annual Report of the Department's Custody Compliance and Sustainability Bureau ("CCSB"), which was received on January 3, 2019; the County's Augmented Self-Assessment Status Report (the "Augmented Seventh Self-Assessment") and the CHS's Semi-Annual Report on Quality Improvement/Assurance, which were received on January 14, 2019 and results reported by the County through that date.  Finally, it takes into consideration the comments the Monitor received from the County and DOJ on the draft of this Report that was submitted to the parties on February 1, 2019.

During the Seventh Reporting Period, the Mental Health Subject Matter Expert, with the assistance of the clinicians, conducted additional qualitative assessments of the County's compliance with certain Substantive Provisions in the Settlement Agreement, and they again used different methodologies to test some of the County's reported results. The Monitor's determination of the County's compliance, with the advice of the Subject Matter Expert, is based upon the quantitative thresholds in the Compliance Measures (and any other applicable requirements in the Compliance Measures), unless the quality of the County's performance as determined by the qualitative assessment is plainly inadequate or the results reported by Subject Matter Expert vary significantly from the

---

[1] The Department of Health Services includes Correctional Health Services, which is responsible for Medical and Mental Health Services in the Los Angeles County jails.

results reported by the Department.

During the Seventh Reporting period, the County established compliance with additional provisions of the Settlement Agreement, and made progress in addressing the significant challenges to achieving and maintaining Substantial Compliance with respect to its quality improvement plans and the private screening of inmates at IRC and CRDF. It still faces significant challenges with respect to therapeutic services and out-of-cell time.

As in prior reports, this Seventh Report reflects the results of audits by the Monitor's auditors to verify results reported by the County.  The Monitor has deemed the County to be in Substantial Compliance "as of" the beginning of the quarter reported by the County if the auditors have verified that the County has met the thresholds in the Compliance Measures.  If the auditors were not able to verify the results reported by the County, the twelve-month period for maintaining Substantial Compliance will commence in a future period when the County's reported results are verified by the auditors.  If the County maintains Substantial Compliance with a provision for twelve consecutive months, pursuant to Paragraph 111 of the Agreement, the Monitor and Subject Matter Experts will "no longer. . .assess or report on that provision" in future reporting periods.

Some of the Substantial Compliance results reported by the County in the Seventh Reporting Period have not been audited by the Monitor's auditors and cannot be considered final until verified by the auditors.  The County will not be deemed to be in Substantial Compliance as of the County's reported date for purposes of determining the twelve-month compliance period if the results are not verified by the auditors.

Appendix A to this Seventh Report shows the status of each of the 69 provisions of the Agreement that are subject to monitoring and the twelve-month triggering dates where the County is deemed to be in Substantial Compliance.  Appendix B shows the County's progress from the Initial Reporting Period through the Seventh Reporting Period in achieving Substantial Compliance and in maintaining Substantial Compliance for twelve consecutive months on provisions that are no longer subject to monitoring.

As has been the case since the beginning of the Initial Reporting Period, the County cooperated completely with the Monitor and the Subject Matter Experts during the Seventh Reporting Period.  The Department, CHS, and County Counsel facilitated our visits and inmate interviews, answered our questions, and responded to our requests for documents and information.  We appreciate their responsiveness, transparency, professionalism, and courtesy in handling our monitoring requests.

Richard Drooyan, Monitor
February 28, 2019

## EXECUTIVE SUMMARY

There are 69 provisions in the Settlement Agreement that are subject to monitoring by the Monitor and Subject Matter Experts.  As of the date of this Report, the County and the Department are in Substantial Compliance with 31 provisions, in Partial Compliance with 22 provisions, and in Non-Compliance with 7 provisions.  In addition, there are 7 provisions in which the Department is in Substantial Compliance at some facilities and in Partial Compliance or Non-Compliance at other facilities.  There is also one provision (Paragraph 34), that remained stayed pending litigation initiated by third party intervenors, and one provision (Paragraph 39) for which the Department is in Substantial Compliance at certain facilities, Partial Compliance at other facilities, and Not Rated at other facilities.  There are 39 provisions for which the County and the Department are in Substantial Compliance at some or all of the facilities.[2]

There are 23 provisions that are no longer subject to monitoring because the County and Department maintained Substantial Compliance for twelve consecutive months as required by Paragraph 111 of the Settlement Agreement as verified by the Monitor's auditors as required.  There are another 11 provisions for which some facilities are no longer subject to monitoring because those facilities maintained Substantial Compliance for the required twelve consecutive months.[3]

As of the date of this Report, and subject to verification by the Monitor's auditors and qualitative assessments in some cases, the County and the Department are in Substantial Compliance at some or all of the facilities with the following provisions of the Settlement Agreement:

The County has achieved Substantial Compliance with Paragraph 18, which requires the training of Deputy Sheriffs and Custody Assistants on suicide prevention as follows: at Men's Central Jail ("MCJ") and Pitchess Detention Center ("PDC") South as of October 1, 2017, at North County Correctional Facility ("NCCF") as of September 1, 2017, at PDC East as of December 1, 2017, at Twin Towers Correctional Facility ("TTCF"), the Inmate Reception Center ("IRC") and PDC North as of April 1, 2018.  The County has provided documentation reflecting that the County has achieved Substantial Compliance with Paragraph 18 at Century Regional Detention Facility ("CRDF") as of June 1, 2018.  The results at CRDF are subject to verification by the Monitor's auditors.

The County has provided documentation reflecting that the County has achieved Substantial Compliance at MCJ, NCCF, and IRC as of April 1, 2018, and at TTCF as of July 1, 2018, with Paragraph 19, which requires the training of Deputy Sheriffs on Crisis Intervention and Conflict Resolution and the training of Deputy Sheriffs and Custody Assistants in working with mentally ill prisoners.  The results are subject to verification by the Monitor's auditors.

---

[2] Under Paragraph 111 of the Agreement, the twelve-month period for which the County is required to maintain Substantial Compliance can be determined on a facility-by-facility basis.
[3] The provisions that are no longer subject to monitoring at some or all of the facilities are highlighted in bold in Appendix A.

The County has achieved Substantial Compliance at PDC East, PDC North, NCCF, and CRDF as of August 1, 2017 and at PDC South as of October 1, 2017, with Paragraph 20, which requires the training of additional Deputy Sheriffs on Crisis Intervention and Conflict Resolution and on working with mentally ill prisoners.

The County has maintained Substantial Compliance for twelve consecutive months at PDC East, PDC South, PDC North, NCCF, IRC, and TTCF with Paragraph 21, which requires Custody personnel to maintain CPR certifications.  The County also has provided documentation that it has maintained Substantial Compliance for twelve consecutive months at MCJ and for three consecutive months at CRDF.  The results for MCJ and CRDF are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive months with Paragraph 22, which requires the County and the Sheriff to provide instructional material on the use of arresting and booking documents to ensure the sharing of known relevant and available information on prisoners' mental health status and suicide risk.

The County has maintained Substantial Compliance for twelve consecutive months as of July 12, 2018, with Paragraph 23, which requires that the Department conduct a systematic review of prisoner housing to reduce the risk of self-harm and to identify and address suicide hazards, and to develop plans to reasonably mitigate suicide hazards identified in the review.

The County has maintained Substantial Compliance for twelve consecutive months as of September 30, 2018, with Paragraph 24, which requires the Department to conduct annual reviews and inspections of prisoner housing to identify suicide hazards.

The County has maintained Substantial Compliance for twelve consecutive months at IRC as of March 31, 2018, with Paragraph 28, which requires the Department to expedite inmates having urgent or emergent mental health needs through the booking process.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2018, with Paragraph 29, which requires mental health assessments of prisoners with non-emergent mental health needs within 24 hours of the intake nursing assessment.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 32, which requires that a serious suicide attempt be entered in the prisoner's electronic medical record in a timely manner.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2017, with Paragraph 33, which requires mental health supervisors to review electronic medical records on a quarterly basis to assess their accuracy.

The County has maintained Substantial Compliance as of November 1, 2017, through September 30, 2018, with Paragraph 35, which requires the Department to ensure that custody staff refer prisoners who are demonstrating a potential need for routine mental health care to a QMHP or a Jail Mental Evaluation Team.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 38, which requires mental health staff or JMET teams to make weekly cell-by-cell rounds in restricted non-mental health housing modules to identify prisoners with mental illnesses and grant prisoner's requests for out-of-cell interviews.

The County has provided documentation reflecting that it achieved Substantial Compliance at NCCF as of July 1, 2017, through June 30, 2018, and at PDC North as of July 1, 2018, through September 30, 2018, with Paragraph 39, which requires the County to use a confidential self-referral system for prisoners to request mental health care.  The results are subject to verification by the Monitor's auditors and a qualitative assessment by the Subject Matter Expert.

The County has maintained Substantial Compliance at NCCF and PDC North for twelve consecutive months, as of September 30, 2018, with Paragraph 43, which requires the Department to develop and implement policies for discipline of prisoners with serious mental illnesses.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 44, which requires the Department to install protective barriers in High Observation Housing and other mental health housing areas.

The County has maintained Substantial Compliance for twelve consecutive months with Paragraph 45, which requires Suicide Prevention Kits and first-aid kits in control booths in all facilities.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 48, which requires the Department to have written housekeeping, sanitation, and inspection plans to ensure proper cleaning.

The County has maintained Substantial Compliance for twelve consecutive months as of February 28, 2017, with Paragraph 49, which requires the Department to have maintenance plans to respond to routine and emergency maintenance needs.

The County has maintained Substantial Compliance for twelve consecutive months with Paragraph 50, which requires pest control in the jails.

The County has maintained Substantial Compliance for twelve consecutive months with Paragraph 51, which requires the Department to ensure that all prisoners have access to basic hygiene supplies in accordance with state regulations.

The County has maintained Substantial Compliance for twelve consecutive
months at CRDF and PDC North with Paragraph 55, which requires custody, medical and
mental health staff to meet daily in High Observation Housing and weekly in Moderate
Observation Housing.  The County also has provided documentation reflecting that it
achieved Substantial Compliance as of April 1, 2018, through September 30, 2018, at
MCJ.  The results at MCJ are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive
months as of December 31, 2016, with Paragraph 56, which requires custody, medical,
and mental health staff to communicate regarding any change in a housing assignment
following a suicide attempt or serious change in mental health condition.

The County has maintained Substantial Compliance for twelve consecutive
months as of March 31, 2018, at MCJ with Paragraph 57, which requires safety checks in
mental health housing.

The County has maintained Substantial Compliance for twelve consecutive
months at PDC South, PDC North, and PDC East as of December 31, 2016, with
Paragraph 58, which requires safety checks in non-mental health housing.  The County
also has maintained Substantial Compliance as of July 1, 2017, through March 31, 2018
at CRDF; and as of October 1, 2017, through March 31, 2018, at IRC.  The County has
provided documentation that it has maintained Substantial Compliance as of April 1,
2018, through June 30, 2018 at CRDF; and April 1, 2018, through September 30, 2018 at
IRC.  The results at CRDF and IRC are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive
months at MCJ, PDC East, NCCF, and CRDF with Paragraph 59, which requires -
unannounced daily supervisory rounds to verify safety checks.  The County also
has achieved and maintained Substantial Compliance from January 1, 2018, through
September 30, 2018, at PDC North and PDC South, and from April 1, 2018, through
September 30, 2018, at TTCF.

The County has maintained Substantial Compliance for twelve consecutive
months at MCJ, NCCF, PDC East, PDC North, PDC South, and TTCF with Paragraph
68, which requires staggered contraband searches in housing units.

The County has achieved Substantial Compliance as of July 1, 2018, through
September 30, 2018, with Paragraph 69, which requires the County and the Sheriff to use
clinical restraints only in the Correctional Treatment Center with the approval of a
licensed psychiatrist who performed an individualized assessment.  The results are
subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive
months as of June 30, 2017, with Paragraph 71, which requires the County and the
Sheriff to ensure that any prisoner subjected to clinical restraints in response to a mental
health crisis receives therapeutic services to remediate any effects from the episode(s) of

restraint.

Subject to further verification, the County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 72, which requires the Department and the County to report on meetings to review suicides and incidents of serious self-injurious behavior.

The County has maintained Substantial Compliance for twelve consecutive months as of September 30, 2018, with Paragraph 73, which requires the Department to prepare detailed reports of prisoners who threaten or exhibit self-injurious behavior.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 74, which requires the Department to have an objective law enforcement investigation of every suicide that occurs in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of September 30, 2018, with Paragraph 75, which requires the Department and the County to review every serious suicide attempt that occurs in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 76, which requires the Department to follow certain procedures whenever there is an apparent or suspected suicide.

The County has maintained Substantial Compliance for twelve consecutive months as of May 18, 2017, with Paragraph 78, which requires the Suicide Prevention Advisory Committee to meet twice a year.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 82, which requires the Department to co-locate personnel responsible for collecting prisoners' grievances at CRDF.

The County has maintained Substantial Compliance for twelve consecutive months at MCJ, IRC, TTCF, and CRDF, with Paragraph 83, which requires it to install closed circuit security cameras throughout all of the common areas in the jails.  The County has also achieved Substantial Compliance at NCCF and PDC North as of April 1, 2018, through September 30, 2018, and at PDC South as of July 1, 2018, through September 30, 2018.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2018, with Paragraph 84, which requires investigations of force incidents and administrative actions to be completed timely.

The County has maintained Substantial Compliance for twelve consecutive months at MCJ, CRDF, PDC North, PDC South, PDC East, NCCF, and IRC with Paragraph 86, which requires inventory and control of weapons.  It has also maintained Substantial Compliance as of April 1, 2018, through December 31, 2018, at TTCF.

## SEVENTH REPORT

18.     Within three months of the Effective Date, the County and the Sheriff will develop, and within six months of the Effective Date will commence providing:  (1) a four-hour custody-specific, scenario-based, skill development training on suicide prevention, which can be part of the eight-hour training described in paragraph 4.8 of the Implementation Plan in *Rosas* to all new Deputies as part of the Jail Operations Continuum and to all new Custody Assistants at the Custody Assistants academy; and (2) a two-hour custody-specific, scenario-based, skill development training on suicide prevention to all existing Deputies and Custody Assistants at their respective facilities, which can be part of the eight-hour training described in paragraph 4.7 of the Implementation Plan in *Rosas*, through in-service Intensified Formatted Training, which training will be completed by December 31, 2016.

These trainings will include the following topics:

(a)     suicide prevention policies and procedures, including observation and supervision of prisoners at risk for suicide or self-injurious behavior;

(b)     discussion of facility environments and staff interactions and why they may contribute to suicidal behavior;

(c)     potential predisposing factors to suicide;

(d)     high-risk suicide periods and settings;

(e)     warning signs and symptoms of suicidal behavior;

(f)     case studies of recent suicides and serious suicide attempts;

(g)     emergency notification procedures;

(h)     mock demonstrations regarding the proper response to a suicide attempt, including a hands-on simulation experience that incorporates the challenges that often accompany a jail suicide, such as cell doors being blocked by a hanging body and delays in securing back-up assistance;

(i)     differentiating between suicidal and self-injurious behavior; and

(j)     the proper use of emergency equipment.

**STATUS (18):**     **SUBSTANTIAL COMPLIANCE (as of October 1, 2017 (verified) at MCJ and PDC South)**

**SUBSTANTIAL COMPLIANCE (as of September 1, 2017 (verified) at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of December 1, 2017 (verified) at PDC East)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018 (verified) at TTCF, IRC, and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of June 1, 2018 (unverified) at CRDF)**

The Monitor, in consultation with the Mental Health Subject Matter Expert, concluded in the First Reporting Period that the Department's training on suicide prevention, together with the Department's De-escalation and Verbal Resolution Training ("DeVRT"), meets the requirements of Paragraph 18.  The DeVRT curriculum was approved by the *Rosas* Monitors and the Monitor, in consultation with the Mental Health Subject Matter Expert, on November 4, 2015.  On May 30, 2017, the Monitor, in consultation with the Subject Matter Expert, approved a revision to the two-hour course on suicide prevention for existing Deputy Sheriffs and Custody Assistants.

The County's Initial Self-Assessment Status Report delivered on December 14, 2015, reported that the Department commenced its suicide prevention training for new Deputy Sheriffs and Custody Assistants on July 1, 2015, and for existing Deputy Sheriffs and Custody Assistants before the Effective Date of the Settlement Agreement.

Substantial Compliance is achieved when the Department reaches the 85% threshold for existing personnel at a facility, provided that it has achieved the 95% threshold for new personnel during the entire time from July 1, 2015 until it has reached the 85% threshold for existing personnel.

In the Fifth Reporting Period, the County reported that the Department achieved Substantial Compliance at MCJ and PDC South as of October 1, 2017.[4]  The County's Augmented Fifth Self-Assessment reported Substantial Compliance at PDC East as of November 1, 2017.[5]  The results at MCJ, PDC South, and NCCF have been verified by the Monitor's auditors.

The County's Sixth Self-Assessment reported that the County had achieved Substantial Compliance at TTCF (91% of existing personnel), IRC (93%), and PDC North (97%) as of April 1, 2018.  The results at TTCF, IRC, and PDC North have been

---

[4] This is the first day of the month after the Department reached the required 85% threshold.
[5] All two-hour training of existing Deputy Sheriffs and Custody Assistants occurred after the revision of the suicide prevention course was approved by the Monitor on May 30, 2017.

verified by the Monitor's auditors.

The County's posted results report for the Seventh Reporting Period reflect that it achieved Substantial Compliance at CRDF (85%) as of June 1, 2018.  The results at CRDF are subject to verification by the Monitor's auditors.

The County's Seventh Self-Assessment reiterates that "the Department continuously provides the required training for new Deputies in the Jail Operations Continuum and new Custody Assistants in the Custody Assistants Academy" and that the Department has now reported the results for new Deputies and new Custody Assistants through March 31, 2018.  These results have been verified by the Monitor's auditors. Accordingly, the Department will no longer be subject to monitoring for the training of new Deputies in the Jail Operations Continuum and new Custody Assistants in the Custody Assistant Academy as required by Paragraph 18, although the Monitor expects that the Department will continue to provide this training to new Deputies and Custody Assistants hired in the future.

19.     Commencing July 1, 2015, the County and the Sheriff will provide:

(a)     Custody-specific, scenario-based, skill development training to new Deputies during their Jail Operations training, and to existing Deputies assigned to Twin Towers Correctional Facility, Inmate Reception Center, Men's Central Jail, the Mental Health Housing Units at Century Regional Detention Facility, and the Jail Mental Evaluation Teams ("JMET") at North County Correctional Facility as follows:

(i)     32 hours of Crisis Intervention and Conflict Resolution as described in paragraphs 4.6 and 4.9 of the Implementation Plan in *Rosas* to be completed within the time frames established in that case (currently December 31, 2016).  Deputies at these facilities will receive an eight-hour refresher course consistent with paragraph 4.6 of the Implementation Plan in *Rosas* every other year until termination of court jurisdiction in that case and then a four-hour refresher course every other year thereafter.

(ii)    Eight hours identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas* to be completed by December 31, 2016.  This training requirement may be a part of the 32-hour training described in the previous subsection.  Deputies at these facilities will receive a four-hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

(b)     Commencing July 1, 2015, the County and the Sheriff will ensure that new Custody Assistants receive eight hours of training in the Custody Assistant academy, and that all existing Custody Assistants receive eight hours of training related to identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas*.  This training will be completed by December 31, 2016.  Custody Assistants will receive a four-hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

**STATUS (19):**      **SUBSTANTIAL COMPLIANCE (as of April 1, 2018, (unverified) at NCCF, MCJ, and IRC)**

                                        **SUBSTANTIAL COMPLIANCE (as of July 1, 2018, (unverified) at TTCF)**

                                        **PARTIAL COMPLIANCE (at CRDF)**

As of November 4, 2015, the Monitor, in consultation with the Mental Health Subject Matter Expert and the *Rosas* Monitors, approved the curriculum for DeVRT, which provides for 32 hours of Crisis Intervention and Conflict Resolution training and includes eight hours identifying and working with mentally ill prisoners.  The DeVRT curriculum meets the requirements of Paragraph 19 of the Settlement Agreement and Paragraphs 4.6, 4.7 and 4.9 of the *Rosas* Implementation Plan.  The Mental Health Subject Matter Expert and the *Rosas* Monitors approved the training materials developed by the Department for the DeVRT on March 4, 2016.

Substantial Compliance requires the County to show that 95% of the new Deputies hired after July 1, 2015 and 85% of the existing Deputies as of that date received the required DeVRT training.  It also requires that 95% of the new Custody Assistants hired after that date and 85% of the existing Custody Assistants as of that date received the required training in working with mentally ill inmates.

The County's Seventh Self-Assessment reported that the Department achieved Substantial Compliance at all facilities for new Deputies and new Custody Assistants through the Third Quarter of 2018.  These reported results are subject to verification by the Monitor's auditors.

The County's Sixth Self-Assessment also reported that the Department achieved Substantial Compliance with respect to the training of existing Deputies and Custody Assistants at IRC, MCJ, CRDF, TTCF, and NCCF (JMET) in the First Quarter of 2018. The Department trained 95% of the existing Deputy Sheriffs and 89% of the existing Custody Assistants at TTCF by the end of the First Quarter of 2018; 100% of existing Deputies and 98% of existing Custody Assistants at IRC; 99% of existing Deputies and 92% of existing Custody Assistants at MCJ; and 100% of the existing Deputies in the JMET unit at NCCF.[6]

The Department initially posted results for the First Quarter of 2018 that excluded "unavailable" Deputies who were not available "during the relevant month" due to, for example, Injured On Duty.  These deputies should not, however, be excluded unless they were "unavailable" to attend the DeVRT during a substantial period, since the training has been offered since March 4, 2016.  Accordingly, Deputies and Custody Assistants are not deemed "unavailable" unless they have been on leave or otherwise unavailable for more than six months as of the date of the assessment.[7]

---

[6] There were no Custody Assistants assigned to the unit.

[7] There were no "unavailable" existing deputies in the JMET unit at NCCF.

Using the Monitor's approved definition of "unavailable" personnel, the
Department's revised results show that it trained 98% of the existing Deputies and 88% of
the existing Custody Assistants at IRC through March 2018; 99% of the existing
Deputies and 85% of the existing Custody Assistants at MCJ through March 2018; and
95% of existing Deputies and 89% of existing Custody Assistants at TTCF through June
2018.  These results are subject to verification by the Monitor's auditors.  If verified by
the Monitors, the Department will no longer be subject to monitoring at these facilities
for the initial training required by Paragraph 19.  It will, however, be subject to
monitoring in future periods for Substantial Compliance with the refresher course
requirements.

The Department reports that it trained 96% of the "existing" Deputies at CRDF
through the Second Quarter of 2018, using the approved definition of "unavailable
personnel," but only 21% of the existing Custody Assistants.  This is because the
Department previously interpreted Paragraph 19(b) to apply only to Custody Assistants
assigned to the Mental Health Unit at CRDF rather than all Custody Assistants at CRDF.
These results are sufficient, however, to establish Partial Compliance at CRDF.

13

20.    Commencing no later than July 1, 2017, the County and the Sheriff will
provide:

(a)    Custody-specific, scenario-based, skill development training to existing
       Deputies assigned to North County Correctional Facility, Pitchess
       Detention Center, and the non-Mental Health Housing Units in Century
       Regional Detention Facility as follows:

       (i)    32 hours of Crisis Intervention and Conflict Resolution as
              described in paragraphs 4.6 and 4.9 of the Implementation Plan in
              *Rosas* to be completed by December 31, 2019.  Deputies at these
              facilities will receive an eight-hour refresher course consistent with
              paragraph 4.6 of the Implementation Plan in *Rosas* every other
              year until termination of court jurisdiction in that case and then a
              four-hour refresher course every other year thereafter.

       (ii)   Eight hours identifying and working with mentally ill prisoners as
              described in paragraph 4.7 of the Implementation Plan in *Rosas* to
              be completed by December 31, 2019.  This training requirement
              may be a part of the 32-hour training described in the previous
              subsection.  Deputies at these facilities will receive a four-hour
              refresher course consistent with paragraph 4.7 of the
              Implementation Plan in *Rosas* every other year thereafter.

14

**STATUS (20):**          **SUBSTANTIAL COMPLIANCE (as of August 1,
2017 (verified) at CRDF, PDC East, PDC North, and
NCCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1,
2017 (verified) at PDC South)**

As of November 4, 2015, the Monitor, in consultation with the Subject Matter
Experts and the *Rosas* Monitors, approved the curriculum for the Department's De-
escalation and Verbal Resolution Training ("DeVRT"), which provides for 32 hours of
Crisis Intervention and Conflict Resolution training that meets the requirements of
Paragraph 20 of the Settlement Agreement.

Substantial Compliance requires that 85% of Deputies at the facilities designated
in Paragraph 20(a) as of July 1, 2017, receive the required DeVRT training.  The County
reports that as of August 1, 2017, 85% of the Deputies assigned to PDC East, 89% of the
Deputies assigned to PDC North, 85% of the Deputies assigned to NCCF, and 91% of the
Deputies assigned to the non-mental housing units at CRDF, had received the required
training, and as of October 1, 2017, 96% of the Deputies assigned to PDC South had
received the training.  The results at CRDF, PDC East, PDC North, PDC South, and
NCCF have been verified by the Monitor's auditors, and these facilities were not subject
to monitoring for the initial training courses during the Seventh Reporting Period.

While the Paragraph 20 is no longer subject to monitoring for the initial training
courses, the Monitor expects the Department to show that the Deputies and Custody
Assistants have attended the refresher courses required by this provision through the
duration of the Settlement Agreement.

15

21.     Consistent with existing Sheriff's Department policies regarding training requirements for sworn personnel, the County and the Sheriff will ensure that existing custody staff that have contact with prisoners maintain active certification in cardiopulmonary resuscitation and first aid.

**STATUS:**          **SUBSTANTIAL COMPLIANCE (as of October 1, 2015, through September 30, 2016 (verified) at PDC East and South)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at NCCF, PDC North, and IRC)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 (verified) at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through March 31, 2018 (verified) and through September 30, 2018 (unverified) at MCJ)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2018, through September 30, 2018 (unverified) at CRDF)**

The Compliance Measures provide that the Department will demonstrate Substantial Compliance when 95% of the designated custody staff have the required CPR and first aid certifications for twelve consecutive months.

Pursuant to Paragraph 111 of the Settlement Agreement, PDC South, PDC East, PDC North, NCCF, IRC, and TTCF were not subject to monitoring for Substantial Compliance with Paragraph 21 in the Seventh Reporting Period.

The County's Fifth Self-Assessment reported that it achieved Substantial Compliance at MCJ in October 2017, which it maintained through the remainder of 2017. These results have been verified by the Monitor's auditors.

The County's Sixth Self-Assessment reported that the Department continued to maintain Substantial Compliance at MCJ through the First Quarter of 2018. These results have been verified by the Monitor's auditors. The County's Seventh Self-Assessment reports that it continued to maintain Substantial Compliance at MCJ through the Third Quarter of 2018. These results are subject to verification by the Monitor's auditors. If verified, Paragraph 21 is no longer subject to monitoring at MCJ.

The County's Seventh Self-Assessment reflects that it achieved Substantial Compliance with Paragraph 21 at CRDF in June 2018. These results are subject to verification by the Monitor's auditors.

16

22.     Within six months of the Effective Date and at least annually thereafter, the County and the Sheriff will provide instructional material to all Sheriff station personnel, Sheriff court personnel, custody booking personnel, and outside law enforcement agencies on the use of arresting and booking documents, including the Arrestee Medical Screening Form, to ensure the sharing of known relevant and available information on prisoners' mental health status and suicide risk.  Such instructional material will be in addition to the training provided to all custody booking personnel regarding intake.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017)**

The Justice Data Interface Controller ("JDIC") message the Department has been using since June 29, 2016, is sufficient to establish Substantial Compliance with Paragraph 22, and the County maintained Substantial Compliance for twelve consecutive through June 30, 2017.  Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring for Substantial Compliance with Paragraph 22 in the Seventh Reporting Period.

23.     Within three months of the Effective Date, the County and the Sheriff will commence a systematic review of all prisoner housing, beginning with the Mental Health Unit of the Correctional Treatment Center, all High Observation Housing areas, all Moderate Observation Housing areas, single-person discipline, and areas in which safety precautions are implemented, to reduce the risk of self-harm and to identify and address suicide hazards.  The County and the Sheriff will utilize a nationally-recognized audit tool for the review.  From this tool, the County and the Sheriff will:

(a)     develop short and long term plans to reasonably mitigate suicide hazards identified by this review; and

(b)     prioritize planning and mitigation in areas where suicide precautions are implemented and seek reasonable mitigation efforts in those areas.

**STATUS:        SUBSTANTIAL COMPLIANCE**

The Monitor has verified, with the advice of the Subject Matter Expert, that the Department's Suicide Hazard Inspection Check List tool is a nationally recognized audit tool for this review.  The Department reports that it inspected all of the housing units by January 14, 2016, and it has provided the Monitor with completed checklists documenting the inspections.

The County submitted an updated Suicide Hazard Mitigation plan to the Monitor on January 18, 2018.  After consultation with the Mental Health Subject Matter Expert, the Monitor concluded that the updated Plan satisfies the requirements of Paragraph 23.

The Department submitted another updated plan to the Monitor on July 12, 2018. After consultation with the Mental Health Subject Matter Expert, the Monitor concluded that the updated Plan satisfies the requirements of Paragraph 23.  The County has maintained Substantial Compliance with Paragraph 23 for twelve consecutive months and this provision is no longer subject to monitoring.

24.     The County and the Sheriff will review and inspect housing areas on at least an annual basis to identify suicide hazards.

**STATUS:        SUBSTANTIAL COMPLIANCE (as of October 1, 2017,
                 through September 30, 2018)**

CDM 3-06/020.00 FACILITIES INSPECTIONS requires Custody Support Services (CSS) to "review and inspect housing areas on a least an annual basis to identify suicide hazards."

The Monitor and Subject Matter reviewed a revised annual suicide hazard inspection tool that was submitted by the Department on December 13, 2016, and approved it with the caveat that, in order to achieve Substantial Compliance, the sample sizes of randomly selected cells must be large enough to ensure that the cells are representative of each housing type at a facility.  Further, if a problem is found in the randomly selected cells, a complete inspection or remediation of the area or setting should then be conducted.  An updated tool was submitted by the Department on February 9, 2017; it also was approved with the same caveats.

The Department conducted an Annual Suicide Hazard Inspection at each of its jail facilities during the Sixth and Seventh Reporting Periods.  As noted by the Mental Health Subject Matter Expert, "the County is doing a good job of inspections, but remediation and follow-through are not clearly demonstrated and tracked."  The second Annual Suicide Hazard Inspection reports are sufficient "to identify suicide hazards" for purposes of Paragraph 24, and the Department has maintained Substantial Compliance with this provision for twelve consecutive months.  Accordingly, Paragraph 24 is no longer subject to monitoring.  Corrective action implementation and tracking must, however, be addressed by the Custody Compliance and Sustainability Bureau ("CCSB") under Paragraph 77(c), which requires CCSB to "ensure that corrective actions are taken to mitigate suicide risk. . . obtaining where appropriate, technical assistance. . .when such assistance is needed to address suicide-risk issues."

19

25.     The County and the Sheriff will ensure that any prisoner in a Sheriff's Department station jail who verbalizes or who exhibits a clear and obvious indication of current suicidal intent will be transported to IRC, CRDF, or a medical facility as soon as practicable.  Pending transport, such prisoners will be under unobstructed visual observation, or in a suicide resistant location with safety checks every 15 minutes.

**STATUS:        PARTIAL COMPLIANCE**

A provision of the Station Jail Manual adopted in March 2018 requires that any arrestee who "displays obvious suicidal ideation or exhibits unusual behavior that clearly manifest[s] self-injurious behavior or other clear indication of mental health crisis shall be transported to the Inmate Reception Center (IRC), Century Regional Detention Facility (CRDF), or a medical facility as soon as practicable.  Pending transport, such inmates . . . shall be under unobstructed visual observation or in a suicidal restraint location with safety checks every 15 minutes."

The Compliance Measures require the Department to randomly select and analyze Arrestee Medical Screening Forms from station jails identifying prisoners who verbalize or exhibit a clear and obvious indication of current suicidal intent to determine compliance with Paragraph 25 of the Agreement.  The County's Seventh Self-Assessment reported that 71% of the records reviewed for the Second Quarter of 2018 and 75% of the records reviewed for the Third Quarter of 2018 reflect the information required to establish Substantial Compliance with Paragraph 25.  While once again short of the 95% threshold for Substantial Compliance, the Department continued to show improvement in the Seventh Reporting Period.  The Mental Health Subject Matter Expert reviewed "a number of the source documents from 2018Q3" and is of the opinion that the "County is making progress on this provision and is nearing substantial compliance."

26.     Consistent with existing Sheriff's Department policies, the County and the
Sheriff will follow established screening procedures to identify prisoners with emergent
or urgent mental health needs based upon information contained in the Arrestee Medical
Screening Form (SH-R-422) or its equivalent and the Medical/Mental Health Screening
Questionnaire and to expedite such prisoners for mental health evaluation upon arrival at
the Jail Reception Centers and prior to routine screening.  Prisoners who are identified as
having emergent or urgent mental health needs, including the need for emergent
psychotropic medication, will be evaluated by a QMHP as soon as possible but no later
than four hours from the time of identification.

**STATUS:     PARTIAL COMPLIANCE**

The Compliance Measures require the Department to "review Arrestee Medical
Screening Forms (SH-R-422) (or its equivalent) and the Medical/Mental Health
Screening Questionnaires of 100 randomly selected prisoners during one randomly
selected week per quarter at CRDF and at IRC."  Substantial Compliance requires that (1)
95% of the forms "include the required mental health information" and (2) 90% of the
prisoners having urgent or emergent needs were "seen by a QMHP within four hours."

The County's Seventh Self-Assessment reports that for the one randomly selected
week in the Second Quarter of 2018, 93% of the screening forms reviewed had the
required mental health information, and 55% of the prisoners were seen by a QMHP
within four hours.  For the Third Quarter of 2018, 88% of the forms had the required
information and 45% of the prisoners were seen within four hours.  The timeliness of the
responses by QMHPs remains significantly below the 90% threshold.  The County has
adopted a pilot program that requires it to "conduct the [initial and nursing] assessments
at the windows in the IRC clinic, and in the nursing room at CRDF," which the County
believes "will improve compliance."

The Mental Health Subject Matter Expert and the clinicians did a qualitative
assessment of the "completeness of intake documentation" and "whether patients with
emergent or urgent needs were missed at intake[.]"  They "found that 96% of the intake
documentation was complete and available," only 9% "of urgent/emergent cases that
should have been detected at admission were not," and there was "much less
inconsistency and errors in the records."  They "continue[d] to see very clear
improvement in the screening and detection processes.  Assuming some of the logistical
challenges of having nurses do all intake screenings are solved, [they] are confident that
the intake process is working well for detecting urgent and emergent cases."  As is
evident from the Department's reported results, the "primary problem is the timeliness of
the QMHP assessments."

27.     Consistent with existing Sheriff's Department policies, the County and the Sheriff will ensure that all prisoners are individually and privately screened by Qualified Medical Staff or trained custody personnel as soon as possible upon arrival to the Jails, but no later than 12 hours, barring an extraordinary circumstance, to identify a prisoner's need for mental health care and risk for suicide or self-injurious behavior.  The County and the Sheriff will ensure that the Medical/Mental Health Screening Questionnaire, the Arrestee Medical Screening Form (SH-R-422), or its equivalent, and/or the Confidential Medical Mental Health Transfer Form are in the prisoner's electronic medical record or otherwise available at the time the prisoner is initially assessed by a QMHP.

**STATUS:        PARTIAL COMPLIANCE**

The Compliance Measures require the Department to review the records of "randomly selected prisoners who were processed for intake during one randomly selected week at CRDF and at IRC" to determine compliance with this provision. Substantial Compliance requires that 90% of the records reviewed reflected that the prisoners were screened for mental health needs within 12 hours and that the required documentation was available to the QMHP for 90% of the mental health assessments conducted by the QMHP.

As noted in the Monitor's Sixth Report, the County achieved, and maintained Substantial Compliance with Paragraph 27 for six months from October 1, 2017, through March 31, 2018.  The County's Seventh Self-Assessment reflects that the County maintained Substantial Compliance with Paragraph 27 in the Second Quarter of 2018, but only achieved Partial Compliance in the Third Quarter of 2018, when the required forms were filled out for only 67 of the 100 of the randomly selected prisoners within 12 hours. The County attributes this to "an unintended consequence of the restructuring" of the "IRC booking front to provide privacy during the screening process[.]"[8]

The Mental Health Subject Matter Expert and the clinicians did a qualitative assessment of the "completeness of intake documentation" and "whether patients with routine needs were missed at intake[.]"  They found "that 100% of the intake documentation was completed and available," and 25% "of routine cases that should have been detected were not."  The Subject Matter Expert notes that, "[i]n general. . .the screening process itself seems to be detecting routine cases at a reasonable level, especially in light of the improvements in detecting urgent and emergent cases."

In order to satisfy the requirements of Paragraph 27, inmates must be privately screened.  Nurses at CRDF now conduct the assessments in a room off a hallway near the booking front and nurses at IRC now conduct the assessments at windows behind the inmate seating areas in the IRC clinic.  The room at CRDF is completely private and satisfies the requirements of Paragraph 27.  Although the windows in the IRC clinic are

---

[8] This unintended consequence was first noticed by CHS in the pilot program that began on May 28, 2018. As noted in the Monitor's Sixth Report, this "raises serious concerns about whether the County is continuing to meet the 90% threshold for Substantial Compliance with Paragraph 27 in the Second Quarter of 2018[.]"  See Monitor's Sixth Report, pp. 22 and 23, note 12.

not as private as the room at CRDF, the Monitor stood in the inmate seating area while inmates were interviewed by the nurses in IRC and could not hear the conversations between the nurses and the inmates.  The Monitor is of the view that these windows are sufficiently private to satisfy the requirements of Paragraph 27.  If the County decides to add windows to expedite the assessments, it must ensure that those windows are also far enough away from the inmate seating area to ensure inmate privacy.

28.     The County and the Sheriff will ensure that any prisoner who has been identified during the intake process as having emergent or urgent mental health needs as described in Paragraph 26 of this Agreement will be expedited through the booking process.  While the prisoner awaits evaluation, the County and the Sheriff will maintain unobstructed visual observation of the prisoner when necessary to protect his or her safety, and will conduct 15-minute safety checks if the prisoner is in a cell.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at IRC)**

**PARTIAL COMPLIANCE (at CRDF)**

The Compliance Measures require the Department to review the records of randomly selected prisoners at CRDF and IRC who have urgent or emergent mental health needs to determine whether they were expedited through the booking process.

The County's Seventh Self-Assessment reflects that 100% of the inmates with urgent or emergent mental health needs were expedited through the booking process at CRDF in the Second Quarter of 2018 and 85% were expedited in the Third Quarter of 2018.  These results were at or above the threshold for Substantial Compliance.  All of the inmates identified as having urgent or emergent mental health needs were observed or checked as required by Paragraph 28 in the Second Quarter of 2018, but only 60% were observed or checked in the Third Quarter of 2018, which was below the 95% threshold for Substantial Compliance.

The County previously had maintained Substantial Compliance with Paragraph 28 at IRC for twelve consecutive months, and IRC was not subject to monitoring for compliance with Paragraph 28 in the Seventh Reporting Period.

29.     The County and the Sheriff will ensure that a QMHP conducts a mental health assessment of prisoners who have non-emergent mental health needs within 24 hours (or within 72 hours on weekends and legal holidays) of a registered nurse conducting an intake nursing assessment at IRC or CRDF.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified))**

The Compliance Measures require the Department to review randomly selected records of the prisoners identified in the intake nursing assessment as having non-emergent mental health needs to determine if the Department completed mental health assessments for 85% of the prisoners within the required time periods.

The County's Sixth Self-Assessment reports that in the Fourth Quarter of 2017 the County completed mental health assessments for 99% of the inmates at CRDF and IRC within the required time periods, and in the First Quarter of 2018, it completed 95% of the assessments within the required time periods.

The Monitor and Mental Health Subject Matter Expert have concerns about how the County defines "weekends."  It was using the 72-hour time frames for the QMHP mental health assessment if the nursing assessment occurred less than 24 hours before the start of the weekend, which is reasonable because the 24-hour time frame expires on the weekend, but it was also using the 72-hour time frame if the nursing assessment occurred less than 24 hours before the end of the weekend so that the 24-hour time frame expires during the regular work week.[9]  Accordingly, the County has maintained Substantial Compliance for twelve consecutive months and will no longer be subject to monitoring for compliance with Paragraph 29.[10]

---

[9] The Monitor's auditors verified the County's results using the extended 72-hour time frame for conducting the QMHP mental health assessments of the prisoners only if the nursing assessment is less than 24 hours before the weekend starts and then only if it is less than 24 hours before the weekend ends.
[10] DOJ has expressed concern that "the substantial and unexplained drop" in the compliance rating posted by the County for CRDF in "the very next quarter" after CRDF had maintained Substantial Compliance for twelve consecutive months "suggests that the timeliness of QMHP assessments may be an ongoing issue." The Monitor and Mental Health Subject Matter Expert share this concern.  The County should continue to review the timeliness of the assessments and post the results of its reviews.

30.     Consistent with existing DMH policies, the initial mental health assessment will include a brief initial treatment plan.  The initial treatment plan will address housing recommendations and preliminary discharge information.  During the initial assessment, a referral will be made for a more comprehensive mental health assessment if clinically indicated.  The initial assessment will identify any immediate issues and determine whether a more comprehensive mental health evaluation is indicated.  The Monitor and SMEs will monitor whether the housing recommendations in the initial treatment plan have been followed.

**STATUS:     PARTIAL COMPLIANCE**

The Compliance Measures require the Department to review randomly selected initial mental health assessments and report on (1) the percentage of assessments that have (i) included an initial treatment plan that addresses housing recommendations and preliminary discharge information and (ii) identified any immediate issues and whether a more comprehensive evaluation was indicated; and (2) whether the housing recommendations were followed.

The County's Seventh Self-Assessment reports that 100% of the housing assignments reviewed in the Second Quarter of 2018 followed the housing recommendations in the initial treatment plans, which exceeds the 95% threshold for Substantial Compliance, but only 69% of the initial mental health assessments included an initial treatment plan that had the information required by Paragraph 30, which is below the 85% threshold for Substantial Compliance.  The results for the Third Quarter of 2018 were that 98% of the housing assignments followed the housing recommendations and 63% of the initial mental health assessments had the required information.[11]

The Mental Health Subject Matter Expert and the clinicians again evaluated "whether the determination of immediate issues [in random sample of mental health assessments] was reasonable in light of available information. . . [and] whether the initial treatment plan covered the elements required by existing County policy, which goes beyond the content of the formal compliance measure."  They found that 100% of the cases "identified immediate issues," and that the determination of the immediate issues "was reasonable from a qualitative perspective" in 95% of the cases.  The Subject Matter Expert concludes that "[t]his is a notable improvement."[12]

---

[11] One of the clinicians notes that the "County's reporting methodology does not identify what elements of the required information are missing in those instances determined to be non-compliant. . . .For performance improvement purposes, this level of information will be important."

[12] The Subject Matter Expert and clinicians also found that 65% of the cases at CRDF and 90% of the cases at TTCF had preliminary discharge information and that 74% of the cases at CRDF and 85% of the cases at TTCF met the County's "policy requirements regarding discharge planning[.]"  Although the Revised Paragraph 34 will govern the requirements for discharge planning going forward, the Subject Matter Expert notes that "it is clear that there has been greater attention to these issues at intake."

31.     Consistent with existing DMH and Sheriff's Department policies, the
County and the Sheriff will maintain electronic mental health alerts in prisoners'
electronic medical records that notify medical and mental health staff of a prisoner's risk
for suicide or self-injurious behavior.  The alerts will be for the following risk factors:

(a)     current suicide risk;

(b)     hoarding medications; and

(c)     prior suicide attempts.

**STATUS:     PARTIAL COMPLIANCE**

The Compliance Measures require the Department to review randomly selected
electronic medical records for prisoners in certain at-risk groups to determine if the
required mental health alerts are in 85% of the records reviewed, which is the threshold
for Substantial Compliance, for prisoners who report suicidal thoughts during the intake
process; were removed from risk precautions in the prior quarter; or were identified as
hoarding medicine.

The County's Seventh Self-Assessment reports that for the Second Quarter of
2018, 86% of the records at CRDF had the required mental health alerts, 78% of the
records at TTCF had the alerts, and 100% of the records at MCJ had the alerts.  As
previously noted,  the County must satisfy the 85% threshold for Substantial Compliance
for each of the required alert categories.

The County's Augmented Seventh Self-Assessment reports the following results
for the Third Quarter of 2018: at CRDF, 80% (current suicide risk), 96% (removed from
risk precautions),[13] and 40% (hoarding) of the records had the required mental health
alerts; at TTCF, 79% (current suicide risk), 92% (removal from risk precautions), and
76% (hoarding) of the records had the alerts; at MCJ, 77% of the records had the alerts
for hoarding; and at NCCF, 100% of the records had the alerts for hoarding.[14]

The County's Seventh Self-Assessment reports that the "County continues to work
on ways to improve its documentation and tracking of inmates known to hoard

---

[13] DOJ has expressed concerns about how the County is making determinations that no alerts are necessary
for some inmates, noting that "several inmates [at TTCF] on risk precautions for suicidal ideation [in 3Q18]
have no corresponding suicide risk alerts," and the County's internal audit states "None required."  While
the County's response explains when inmates are placed on risk precautions and reviews each case
referenced by DOJ, it does not address DOJ's concern about how the determinations are made.  In order to
achieve Substantial Compliance, the County will need to provide some explanation for the clinical
judgment that no alert is required for an inmate who has been removed from risk precautions.
[14] The County did not report any results for mental health alerts for prisoners at MCJ or NCCF because
"Compliance Measures 31-1(a) and 31-1(b) refer to the intake and HOH populations respectively."  As
noted by the Mental Health Subject Matter Expert, however, "[w]hile the events qualifying an inmate for
[each] measure may occur in those settings, the measure still applies upon transfer to another setting,
including MCJ and NCCF."

medications" and has "expanded the categories of information included in its audit
universe for inmates potentially hoarding medications" to include "referrals from nursing
to mental health related to hoarding, the list of suspected or confirmed overdoses from
medication, and inmate segregation reports that refer to inmates disciplined for having
contraband pills."  The Mental Health Subject Matter Expert concurs that "[e]xpanding
the universe is needed," but questions "[w]hether limiting custody identification of
hoarding to those instances when a [disciplinary] segregation report is done will capture a
significant number of hoarding cases[.]"  Anytime Custody finds contraband pills (i.e.,
pills in excess of what is ordered or that are not ordered for an inmate), "there should be a
determination of hoarding and medication non-adherence by qualified clinical staff."
DOJ concurs and adds that "[h]oarding alerts should also be entered for inmates any time
that an inmate has been found to have overdosed."  The County agrees that hoarding
alerts should be entered under these circumstances.

32.     Information regarding a serious suicide attempt will be entered in the prisoner's electronic medical record in a timely manner.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified))**

The Compliance Measures require that 95% of the electronic medical records of prisoners who had a serious suicide attempt reflect information regarding the attempt, and 85% of the records reflect that the information was entered into the record within one day of the attempt.

The County maintained Substantial Compliance with Paragraph 32 for twelve consecutive months as of December 31, 2016, and this provision was not subject to monitoring in the Seventh Reporting Period.

33.     The County will require mental health supervisors in the Jails to review
electronic medical records on a quarterly basis to assess their accuracy as follows:

(a)     Supervisors will randomly select two prisoners from each clinician's
caseload in the prior quarter;

(b)     Supervisors will compare records for those prisoners to corroborate
clinician attendance, units of service, and any unusual trends, including
appropriate time spent with prisoners, recording more units of service than
hours worked, and to determine whether contacts with those prisoners are
inconsistent with their clinical needs;

(c)     Where supervisors identify discrepancies through these reviews, they will
conduct a more thorough review using a DMH-developed standardized
tool and will consider detailed information contained in the electronic
medical record and progress notes; and

(d)     Serious concerns remaining after the secondary review will be elevated for
administrative action in consultation with DMH's centralized Human
Resources.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through
June 30, 2017 (verified))**

The Compliance Measures require the County to provide the Monitor and the
Subject Matter Experts with the DMH-developed standardized tool required by Paragraph
33(c), and to report the results of its analysis of the electronic medical records of two
randomly selected prisoners from each clinician's caseload.  The County has provided the
required tool, and previously reported Substantial Compliance for the Third and Fourth
Quarters of 2016, and the First and Second Quarters of 2017.

The Monitor's auditors have verified the County's results previously reported in
its Self-Assessment.  Accordingly, the County has maintained Substantial Compliance for
twelve consecutive months and will no longer be subject to monitoring for compliance
with Paragraph 33.

34 **(Revised).**  Consistent with existing Correctional Health Services policy, the County and the Sheriff will conduct clinically appropriate release planning for all prisoners who are being released to the community and who have been identified by a QMHP as having a mental illness and needing mental health treatment, or as having a DSM-5 major neuro-cognitive disorder that caused them to be housed in the Correctional Treatment Center at any time during their current incarceration.  For prisoners with mental illness and needing mental health treatment, the release planning services will be guided by the prisoner's level of care.  Specifically, prisoners who any time during their incarceration meet mental health level of P3, or P4 will be presumptively referred for release planning services, and prisoners who meet mental health level of care P2 will receive release planning services upon referral by a clinician or upon their request. Prisoners who have a DSM-5 major neuro-cognitive disorder that caused them to be housed in the Correctional Treatment Center will also be referred for release planning services consistent with the Correctional Health Services policy applying to prisoners with mental illness.

> (a) Release planning will consider the need of the prisoner for housing; transportation to the prisoner's community-based provider, residence, or shelter within the County; bridge psychotropic medications; medical/mental health/substance abuse services; income/benefits establishment; and family/community/social supports ("Release Planning Areas").

> (b) Release planning will be based on an individualized assessment of the prisoner's needs and, unless the prisoner is unable or unwilling to participate, will be undertaken in collaboration with the prisoner.  For prisoners referred for release planning services, those services will include:

>> (i) An Initial Release Plan that will be created at intake or no later than ten days after the referral for release planning, which referral shall normally occur at the time of intake.  The Initial Release Plan will include preliminary identification of needs in each of the Release Planning Areas and preliminary recommendations for services to address those needs, and a referral for assistance in obtaining California identification when needed and when the prisoner is eligible; and/or

>> (ii) A Comprehensive Release Plan that will be initiated no later than thirty days after the referral for release planning.  The Comprehensive Release Plan will include (A) collecting information regarding the prisoner's needs; (B) coordinating with community-based providers to identify available services that meet the prisoner's needs; (C) facilitating the transition of care to community-based providers, and (D) assisting in obtaining identification and/or benefits when needed, when the prisoner is eligible, and as offered by the Sheriff's Community Transition Unit.

> (c) The County will maintain a re-entry resource center with staff supervised by a QMHP.  The re-entry resource center will:

31

(i) Provide information appropriate to the released prisoner about available housing, transportation, medical/mental health/substance abuse services, income/benefits establishment, community/social supports, and other community resources; and

(ii) Provide released prisoners with copies of their release plans, as available.

(d) All prisoners who are receiving and continue to require psychotropic medications will be offered a clinically appropriate supply of those medications upon their release from incarceration.  Unless contraindicated, this will be presumed to be a 14-day supply or a supply with a prescription sufficient so that the prisoner has the psychotropic medication available during the period of time reasonably necessary to permit the prisoner to consult with a doctor and obtain a new supply.

(e) Nothing in Paragraph 34 will require prisoners to accept or participate in any of the services provided under this Paragraph.

(f) Neither the County nor the Sheriff shall be in violation of this paragraph if after reasonable efforts as set forth in Correctional Health Services Policy M380.01, Release Planners are unable to identify available post-release services.

**STATUS (34):**          **STAYED PENDING LITIGATION**

During the Seventh Reporting Period, the parties and the Intervenors reached an agreement on the revised Paragraph 34 ("Revised Paragraph 34") set forth above.  They also agreed on revised Compliance Measures and a revised policy to implement Revised Paragraph 34.

On December 10, 2018, the Court issued an order pursuant to the parties' joint stipulation revising Paragraph 34.  The County is expected to report the status of its compliance with Revised Paragraph 34 beginning in January 2020.

35.     Consistent with existing DMH and Sheriff's Department policies, the County and the Sheriff will ensure that custody staff, before the end of shift, refer prisoners in general or special populations who are demonstrating a potential need for routine mental health care to a QMHP or a Jail Mental Evaluation Team ("JMET") member for evaluation, and document such referrals.  Custody staff will utilize the Behavior Observation and Referral Form.

**STATUS:**        **SUBSTANTIAL COMPLIANCE (as of November 1, 2017, through September 30, 2018 (verified))**

The Compliance Measures require the Department to review, for a randomly selected month each quarter, the Behavior Observation and Mental Health Referral ("BOMHR") records for prisoners referred by custody staff to a QMHP or JMET member for "routine" mental health care to determine the timeliness of the referrals.  Substantial Compliance requires that "85% of the BOHMR forms reflect that the referral occurred before the end of the shift in which the potential need for mental health care is identified."

The County's Sixth Self-Assessment reported that the Department "has developed an electronic version of the BOHMR" and it "concluded that 100% -- 15% more than the required 85% -- of BOHMR forms reflected that referrals occurred prior to the end of the shift in which the potential need for mental health care is identified" in both the Fourth Quarter of 2017 and the First Quarter of 2018.  These results were verified by the Monitor's auditors.

The County's Seventh Self-Assessment reports that the 100% of BOHMR forms reviewed in both the Second and Third Quarters of 2018 "reflected that referrals occurred prior to the end of the shift in which the potential need for mental health care is identified."  The Mental Health Subject Matter Expert reviewed a number of the BOHMR forms and found that those that reflect mental health events "are being completed promptly."  These results have been verified by the Monitor's auditors.

36.     Consistent with existing DMH policies, the County and the Sheriff will ensure that a QMHP performs a mental health assessment after any adverse triggering event, such as a suicide attempt, suicide threat, self-injurious behavior, or any clear de-compensation of mental health status.  For those prisoners who repeatedly engage in such self-injurious behavior, the County will perform such a mental health assessment only when clinically indicated, and will, when clinically indicated, develop an individualized treatment plan to reduce, and minimize reinforcement of, such behavior.  The County and the Sheriff will maintain an on-call system to ensure that mental health assessments are conducted within four hours following the notification of the adverse triggering event or upon notification that the prisoner has returned from a medical assessment related to the adverse triggering event.  The prisoner will remain under unobstructed visual observation by custody staff until a QMHP has completed his or her evaluation.

**STATUS:     PARTIAL COMPLIANCE**

The Compliance Measures require the Department to review randomly selected records of prisoners newly admitted to mental health housing from a lower level of care due to an adverse triggering event during two randomly selected weeks per quarter; and provide a staffing schedule for on-call services.  The County's Seventh Self-Assessment reports that 82% of the prisoners identified in the two randomly selected weeks in the Second Quarter of 2018 received an assessment by a QMHP within four hours as required by Compliance Measure 36-4(a).[15]  The County's Augmented Seventh Self-Assessment reports that 84% of the prisoners identified in the two weeks in the Third Quarter of 2018 received the assessment within four hours.

DOJ and the County have agreed that "the Department will randomly select five BOMHRS" from a randomly selected date, to "review videos to determine how the inmate was being observed while waiting for the QMHP," and "produce screen shots and movement records as part of their self-assessment."

The County's Seventh Self-Assessment reports that in both the Second and Third Quarters of 2018, 80% of the selected prisoners at CRDF, and 100% at TTCF were on the videos "under unobstructed visual observation pending assessment."

The Seventh Self-Assessment also reports that the County achieved 100% compliance with a staffing schedule that provides on-call services 24 hours a day, 7 days a week in the Second Quarter of 2018.  The County's posted results show the same results for the Third Quarter of 2018.  Compliance Measure 36.2 does not, however, simply require 24/7 coverage.  It requires the Monitor, in consultation with the Subject Matter Experts, to "review" the staffing schedule "to verify the adequacy of the on-call system."  The Mental Health Subject Matter Expert previously commented that "unless the county has another explanation for its inability to respond to adverse triggering events within 4 hours, it is likely that inadequate staffing is the problem."

---

[15]  The Mental Health Subject Matter Expert and clinicians found that 79% of the identified prisoners received an assessment by a QMHP within four hours, "64% had an adequate assessment of the event and 36% had an adequate plan."

37.     Sheriff's Court Services Division staff will complete a Behavioral Observation and Mental Health Referral ("BOMHR") Form and forward it to the Jail's mental health and/or medical staff when the Court Services Division staff obtains information that indicates a prisoner has displayed obvious suicidal ideation or when the prisoner exhibits unusual behavior that clearly manifests self-injurious behavior, or other clear indication of mental health crisis.  Pending transport, such prisoner will be under unobstructed visual observation or subject to 15-minute safety checks.

**STATUS:     PARTIAL COMPLIANCE**

The Compliance Measures require the Department to randomly select nine courts from among the three Court Divisions each quarter, review written communications and orders that refer to a suicide risk or serious mental health crisis for a prisoner and incident reports for self-injurious behavior by prisoners appearing in the selected courts, and determine if these incidents are reflected in BOMHR forms completed by the Court Services Division staff in the selected courts.

The County's Seventh Self-Assessment reports that 100% of the incidents covered by Paragraph 37 in six randomly selected courts were reflected on BOMHRs in the Second Quarter of 2018 and 88% of the incidents in six other courts were reflected on BOMHRs in the Third Quarter of 2018.  These results are well above the 68% and 52% results in the prior two quarters.  The Mental Health Subject Matter Expert notes that "most locations are doing much better with notifications and monitoring."

38.     Consistent with existing DMH policies and National Commission on Correctional Health Care standards for jails, the County and the Sheriff will ensure that mental health staff or JMET teams make weekly cell-by-cell rounds in restricted non-mental health housing modules (e.g., administrative segregation, disciplinary segregation) at the Jails to identify prisoners with mental illness who may have been missed during screening or who have decompensated while in the Jails.  In conducting the rounds, either the clinician, the JMET Deputy, or the prisoner may request an out-of-cell interview. This request will be granted unless there is a clear and documented security concern that would prohibit such an interview or the prisoner has a documented history of repeated, unjustified requests for such out-of-cell interviews.

**STATUS:        SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified))**

The Compliance Measures require the Department to review the documentation of the weekly cell-by-cell rounds and the JMET Logs for a randomly selected week each quarter to confirm that the required cell-by-cell checks were conducted and out-of-cell interviews were handled in accordance with this provision.

The County's reported results, which were verified by the Monitor's auditors, showed that it had maintained Substantial Compliance with Paragraph 38 for twelve consecutive months as of December 31, 2016.  Accordingly, pursuant to Paragraph 111 of the Settlement Agreement, Paragraph 38 was not subject to monitoring in the Seventh Reporting Period.

39.     The County and the Sheriff will continue to use a confidential self-referral system by which all prisoners can request mental health care without revealing the substance of their requests to custody staff or other prisoners.

STATUS     **SUBSTANTIAL COMPLIANCE (as of July 1, 2018, through September 30, 2018 (unverified) at PDC North)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2017, through June 30, 2018 (unverified) at NCCF)**

**PARTIAL COMPLIANCE (at TTCF, CRDF and MCJ)**

**NOT RATED (PDC East and PDC South)**

Substantial Compliance requires the Department to (a) verify that housing areas have the required forms and (b) review randomly selected self-referrals for mental health care from prisoners to confirm that (i) the referrals "were forwarded to DMH" by the Department, and (ii) that "DMH documented the timeliness and nature of DMH's response to the self-referrals[.]"  The thresholds for Substantial Compliance are that 90% of the self-referrals must be forwarded by the Department to the Department of Health Services – Custody Health Services (DHS-CHS) and 90% must contain the required documentation of DHS-CHS's response.

Based upon a review of the County's policies and procedures, multiple tours of the facilities, interviews, and the County's Seventh Self-Assessment, the Monitor is satisfied that the Department has adequate processes and procedures for inmates to make confidential self-referrals for mental health care.

The County's Seventh Self-Assessment reports that it achieved Substantial Compliance with Compliance Measure 39.4(a) in the Second and Third Quarters of 2018 in that more than 85% of the housing areas in all of the facilities had the self-referral forms.

The County's Seventh Self-Assessment also reports that in the Second Quarter of 2018, 100% of the self-referrals from CRDF, TTCF, MCJ, and NCCF were forwarded by the Department to DHS-CHS as required by Compliance Measure 39.4(b), and DHS-CHS documented the timeliness and nature of its response in 83% of the CRDF referrals, 100% of the NCCF referrals, 67% of the TTCF referrals, and 63% of the MCJ referrals as required by Compliance Measure 39.4(c).[16]

---

[16] Absent extenuating circumstances, Mental Health Services clinicians must respond to self-referrals within seven days of CHS's receipt of the self-referral from the Sheriff's Department.  This is based upon the assumption that the Department is promptly forwarding the referral to the CHS within 24 hours of collecting the self-referral.  In reviewing cases at CRDF, however, the Mental Health Subject Matter Expert found that the electronic health record on the self-referral form averaged 3.5 days after the patients dated the forms.  If the inmate's self-referral is not forwarded to CHS within 24 hours of collection, CHS clinicians must respond within seven days of the inmate's self-referral.

The County's Seventh Self-Assessment also reports that 100% of the self-referrals from three of the four buildings at PDC North in the Second Quarter of 2018 were forwarded and documented as required by this Compliance Measure, but there were no results for the MOH Building because "there were no designated Mental Health staff processing self-referrals in Second Quarter 2018, as the contracted staff previously responsible for this task no longer work at PDC."[17]  Finally, it reports that the County was unable to assess PDC South and PDC East during this quarter because "County records indicate that there were no self-referrals for these facilities" in this quarter, which is not surprising because, as the County notes, "those facilities have specialized pre-selected populations, and as such the County rarely, if ever, receives self-referrals from those facilities."

The County's Seventh Self-Assessment reports that for the Third Quarter of 2018, 100% of the self-referrals reviewed by the Department at CRDF were forwarded to CHS and that 88% of the time "CHS documented the timeliness and nature of CHS' response to the self-referrals received from the Department."  The results for the other facilities were as follows: 100% and 46% for self-referrals at MCJ; 100% and 90% for TTCF; and 100% and 95% for PDC North.  The County was unable to assess PDC South and PDC East for the same reasons as stated above.

The Substantial Compliance results reported by the County for NCCF for the Second Quarter of 2018 and for TTCF and PDC North for the Third Quarter of 2018 are subject to verification by the Monitor's auditors based upon an assessment of the timeliness of Mental Health's responses from the date the inmate's self-referral was received by Correctional Health Services and a qualitative assessment by the Mental Health Subject Matter Expert.  As requested by DOJ, the auditors will also "examine whether self-referrals are being promptly forwarded to CHS" by Custody within 24 hours of collecting the self-referral and, if not, whether the CHS has responded timely within seven days of the inmate's self-referral (rather than from the CHS receipt of the self-referral).  See p. 39, n. 16, supra.

The Mental Health Subject Matter Expert and the clinicians conducted a qualitative assessment of the County's compliance with Paragraph 39 at TTCF in August 2018.  They report that the County's response to self-referrals at TTCF "is disorganized, incomplete, and frequently lacks any meaningful clinical response.  Nursing staff frequently do not enter the self-referrals into the medical record, instead interpreting what they perceive the patient's intent to be, often excluding important information and thereby rendering the medical record incomplete or inaccurate.  There is rarely any notation in the medical record about which self-referrals are being responded to and notes rarely include any information from the self-referrals.  In many cases, there is no clinical response at all, merely an appointment which may or may not be timely and may or may

---

[17] In the County's response to the Monitor's draft of this Seventh Report, the County subsequently clarified that "there were no audited referrals *during the randomly selected week*" in the MOH Building, which the County believes "may be the result of temporary staffing issues."  The County reported that "there were staff processing referrals for the MOH building during the Second Quarter of 2018."

not result in an actual contact with the patient."[18]  For these reasons, the Monitor is of the view that the Department has only achieved Partial Compliance at TTCF.

The Mental Health Subject Matter Expert reports that "response times and ability to track what the QMHP did and how it was tied to the [patient's self-referrals] was better at NCCF. . . likely due to lower volume."  He reports that "the clinical responses are generally timely. . .and the response to real concerns was generally adequate."  In light of the Department's reported results, the Monitor is of the view that the Department has maintained Substantial Compliance at NCCF for twelve consecutive months, subject to verification by the Monitor's auditors based upon an assessment of the timeliness of Custody's referrals and CHS's responses.[19]

---

[18] In addition, the Mental Health Subject Matter Expert believes that too many of the responses are to staff driven requests (i.e., based upon a BOHMR or nurse referrals) rather than patient self-referrals.  He also strongly recommends that County scan the actual self-referrals into the inmate's medical record "to assure the appropriate clinical data is getting to the QMHP."

[19] The reported results for NCCF for the Third and Fourth Quarters of 2017 and the First Quarter of 2018, are also subject to verification by the Monitor's auditors and an assessment of the timeliness of the referrals and responses.

40.     The County and the Sheriff will ensure a QMHP will be available on-site, by transportation of the prisoner, or through tele-psych 24 hours per day, seven days per week (24/7) to provide clinically appropriate mental health crisis intervention services.

**STATUS:        PARTIAL COMPLIANCE**

Substantial Compliance requires the County (1) to provide the Monitor with on-call schedules for two randomly selected weeks reflecting that a QMHP was assigned 24 hours a day, seven days per week, and (2) randomly select referrals for mental health crisis intervention received by a QMHP per quarter to verify that a QMHP responded to all referrals, and 90% of the referrals within four hours.

The County's Seventh Self-Assessment reports that for the Second Quarter of 2018, a QMHP responded 100% of the time and 90% of the responses were within four hours.  The Augmented Seventh Self-Assessment reports that for the Third Quarter of 2018, a QMHP responded 100% of the time and 97% of the responses were within four hours.

The County's Substantial Compliance finding is subject to a qualitative review by the Mental Health Subject Matter Expert and the clinicians to assess whether the QMHP's are providing "clinically appropriate" services.[20]  The Mental Health Subject Matter Expert notes that "the County is meeting the timeliness for crisis response," but indicates that "the nature of the crisis response is not clinically adequate in the majority of cases.  Most responses consist of placement in a new housing and/placement on risk precautions or other monitoring status.  There is almost never any evidence of a clinical response to the crisis itself or a plan to follow-up or manage the crisis.  In many cases, the notes refer to treatment being provided per the new unit staff, but there is rarely any subsequent treatment plan or follow-up of the crisis."  Accordingly, the County has achieved Partial Compliance rather Substantial Compliance with Paragraph 40.

---

[20] The County has voiced concerns about an expansion of Paragraph 40 and an undefined and subjective standard, but the Mental Health Subject Matter Expert has observed that "a crisis response would, at a minimum, characterize the cause of the crisis, conduct a relevant risk assessment, and create a plan of action based on that assessment."

41.     Consistent with existing DMH policies, the County and the Sheriff will
implement step-down protocols that provide clinically appropriate transition when
prisoners are discharged from FIP after being the subject of suicide watch.  The protocols
will provide:

(a)     intermediate steps between highly restrictive suicide measures (e.g.,
        clinical restraints and direct constant observation) and the discontinuation
        of suicide watch;

(b)     an evaluation by a QMHP before a prisoner is removed from suicide
        watch;

(c)     every prisoner discharged from FIP following a period of suicide watch
        will be housed upon release in the least restrictive setting deemed
        clinically appropriate unless exceptional circumstances affecting the
        facility exist; and

(d)     all FIP discharges following a period of suicide watch will be seen by a
        QMHP within 72 hours of FIP release, or sooner if indicated, unless
        exceptional circumstances affecting the facility exist.

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance requires DMH to review the medical records of all
prisoners on suicide watch in FIP for one randomly selected month each quarter, and
submit a report regarding the implementation of the step-down protocols and the results
of its review of the medical records.  Previously, the Monitor did not rate the County's
compliance with Paragraph 41 because all FIP patients on suicide watch during the
period either remained on suicide watch at the end of the period or "did not remain in the
system (they were transferred to prison), and therefore did not go through the protocols."

During the Fifth Reporting Period, the parties agreed to revise the Compliance
Measures to increase the number of inmates subject to the step-down protocols of
Paragraph 41 and ensure that the implementation of step-down protocols for FIP patients
on suicide watch "ameliorate the impact of the restrictions" and have the necessary "level
of precautions based upon individual assessment[s]" of the patients.  The revised
Compliance Measures were reviewed by the Mental Health Subject Matter Expert.

The County's Seventh Self-Assessment reports that the "County recently finalized
an EMR template to meaningfully assess the County's compliance with the application of
this Compliance Measure to the relevant universe of patients and affiliated step-down
protocols."  The Augmented Self-Assessment reports that "68% -- rather than the
required 95% -- of the inmates discharged from FIP during the [Third Quarter of 2018]
after having been on suicide watch" met the Compliance Measures requirements.  The
Mental Health Subject Matter Expert noted "numerous problems in the documentation
and scoring, some where the County did not give itself credit where it should have. . .and

counting as compliant situations where they should not have."  Further, "the
documentation is often not clear and the nature of the precautions is often poorly
characterized," and sometimes the County is relying on a nursing note with "no
documentation of a QMHP assessment for step-down."

42.     Consistent with existing DMH policies, the County and the Sheriff will
implement step-down protocols to ensure that prisoners admitted to HOH and placed on
risk precautions are assessed by a QMHP.  As part of the assessment, the QMHP will
determine on an individualized basis whether to implement "step-down" procedures for
that prisoner as follows:

(a)     the prisoner will be assessed by a QMHP within three Normal business
work days, but not to exceed four days, following discontinuance of risk
precautions;

(b)     the prisoner is counseled to ameliorate the negative psychological impact
that any restrictions may have had and in ways of dealing with this impact;

(c)     the prisoner will remain in HOH or be transferred to MOH, as determined
on a case-by-case basis, until such assessment and counseling is
completed, unless exceptional circumstances affecting the facility exist;
and

(d)     the prisoner is subsequently placed in a level of care/housing as
determined by a QMHP.

**STATUS:     PARTIAL COMPLIANCE**

The County's Seventh Self-Assessment reports that for the Second Quarter of
2018 at CRDF, 100% of the medical records reviewed reflected that "inmates in HOH
and placed on risk precautions were assessed by a QMHP"; "45% -- instead of the
required 90% -- of the records reflected that the QMHP determined on an individualized
basis whether to implement step-down procedures;" and "0% -- rather than the required
85% -- of the records reflected that step-down procedures were implemented per the
QMHP assessment, where applicable."  For this quarter at TTCF, the results in these
categories were 100%, 62%, and 25%.

The County's Augmented Seventh Self-Assessment reports that for the Third
Quarter of 2018 at CRDF, 100% of the records "reflected that inmates in HOH and
placed on risk precautions were assessed by a QMHP;" 40% "of the records reflected that
the QMHP determined on an individualized basis whether to implement step-down
procedures;" and 33% "of the records reflected that step-down procedures were
implemented per the QMHP assessment, where applicable."  For this quarter at TTCF,
the results in these categories were 100%, 73%, and 12%.

As noted by the Mental Health Subject Matter Expert, the County has a working
group developing "more individual risk-based approaches to removal and restoration of
property that should improve compliance."

43.     Within six months of the Effective Date, the County and the Sheriff will develop and implement written policies for formal discipline of prisoners with serious mental illness incorporating the following:

(a)     Prior to transfer, custody staff will consult with a QMHP to determine whether assignment of a prisoner in mental health housing to disciplinary housing is clinically contraindicated and whether placement in a higher level of mental health housing is clinically indicated, and will thereafter follow the QMHP's recommendation;

(b)     If a prisoner is receiving psychotropic medication and is placed in disciplinary housing from an area other than mental health housing, a QMHP will meet with that prisoner within 24 hours of such placement to determine whether maintenance of the prisoner in such placement is clinically contraindicated and whether transfer of the prisoner to mental health housing is clinically appropriate, and custody staff will thereafter follow the QMHP's recommendation;

(c)     A QMHP will participate in weekly walks, as specified in paragraph 38, in disciplinary housing areas to observe prisoners in those areas and to identify those prisoners with mental health needs; and

(d)     Prior to a prisoner in mental health housing losing behavioral credits for disciplinary reasons, the disciplinary decision-maker will receive and take into consideration information from a QMHP regarding the prisoner's underlying mental illness, the potential effects of the discipline being considered, and whether transfer of the prisoner to a higher level of mental health housing is clinically indicated.

STATUS (43):          SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 at NCCF and PDC North (verified))

                      PARTIAL COMPLIANCE (at CRDF, MCJ, and TTCF)

In response to comments by the Monitor and DOJ, the Department submitted proposed revisions to its discipline policies on May 30, 2017.  After consulting with the Subject Matter Experts, the Monitor provided his written comments to the Department on June 29, 2017.  The DOJ provided its comments to the Department the same day.  The County's Seventh Self-Assessment reports that the Department is still "currently in the process of finalizing the revised policies related to discipline and the mentally ill," which were reviewed by the Monitor and DOJ nearly 18 months earlier.

The County's Sixth Self-Assessment reported the County "made changes in housing arrangements to develop mental health discipline pods, and implemented new guidelines and policy which reduce the number of patients eligible for discipline at TTCF and CRDF."

The County's Sixth Self-Assessment also reported on the practices regarding the discipline for inmates with P2, P3, and P4 designations in mental health housing locations.  The Seventh Self-Assessment reports that the County has "continued its previously reported development of mental health discipline pods" and a "revised process for receiving notice of P1 inmates residing in General Population," but reiterates that "the County continues to experience staffing shortages that impact its ability to achieve Substantial Compliance" with this Provision.

The County's Seventh Self-Assessment reports that it achieved Substantial Compliance at NCCF in the Second Quarter of 2018 where a QMHP met with the one inmate receiving psychotropic medications who was transferred to disciplinary housing from an area outside mental health housing within 24 hours of the transfer as required by Compliance Measure 43-9(c) and "100% -- equal to the required 100% of the required weekly row walks through disciplinary units occurred pursuant to Compliance Measure 43.9(d)."[21]  Similarly, it achieved Substantial Compliance at PDC North where 100% of the required weekly walks through disciplinary units took place.

The results for MCJ also showed that 100% of the weekly row walks occurred, but MCJ did not achieve Substantial Compliance because only 41% of the meetings required pursuant to Compliance Measure 43-9(c) occurred, which is well-below the 90% threshold for Substantial Compliance when inmates receiving psychotropic medications are transferred to disciplinary housing from areas other than mental health housing.

Although not stated in the Self-Assessment, it appears that Compliance Measures

---

[21] The County's Augmented Sixth Self-Assessment reported that it achieved Substantial Compliance at NCCF and PDC North in the First Quarter of 2018.  These results were verified by the Monitor's auditors.

43.9(b) and 43.9(e) are not applicable for NCCF, PDC North, and MCJ because these facilities did not have any prisoners transferred to disciplinary housing from mental health housing.  In addition, it appears that Compliance Measure 43.9(c) is not applicable for PDC North because it did not have any inmates who were receiving psychotropic medications transferred from areas other than mental health housing.

The results for CRDF and TTCF for the Second Quarter of 2018 also showed that 100% of the weekly row walks occurred, but these facilities did not achieve Substantial Compliance because the consultations with QMHPs required pursuant to Compliance Measure 43-9(b) and the meetings required pursuant to Compliance Measure 43-9(c) did not meet the thresholds for Substantial Compliance.

The County's Augmented Seventh Self-Assessment reports that the County achieved Substantial Compliance at NCCF and PDC North in the Third Quarter of 2018 where "100% -- equal to the required 100% of the required weekly row walks through disciplinary units occurred pursuant to Compliance Measure 43.9(d)."  There "were no inmate-patients falling within the parameters of Compliance Measure 43-9(c) (prisoners receiving psychotropic medications transferred to disciplinary housing from areas other than mental health housing) at NCCF during the relevant period."  Apparently, this is also the case at PDC North.  These results have been verified by the Monitor's auditors and NCCF and PDC North will no longer be subject to monitoring for compliance with Paragraph 43.

The County's Augmented Seventh Self-Assessment also reports that for the Third Quarter of 2018, 59% of the required consultations at CRDF "occurred prior to transfers from mental health housing;" 75% of the required meetings occurred when inmates receiving psychotropic medications are transferred to disciplinary housing from areas other than mental health housing; and 100% of the weekly row walks through disciplinary units occurred.  The results for TTCF were 58%, 81%, and 100%.  For MCJ, 50% of the required meetings and 100% of the row walks occurred.

The Mental Health Subject Matter Expert and the clinicians reviewed random samples of inmates in HOH and MOH at CRDF and TTCF and concluded that a QMHP evaluated the inmate before discipline was imposed in 67% of the cases at CRDF, but only 10% of the cases at TTCF.  The results for inmates in General Population on psychotropic medications were significantly better: 88% from CRDF and 92% from TTCF were evaluated by a QMHP prior to imposing discipline.

The Subject Matter Expert reports that he and clinicians "found no instances where a QMHP's recommendation was not followed.  As before, no QMHP ever made a finding that discipline was contraindicated, and only occasionally did a QMHP recommend a higher level of care; a recommendation for a lower level of care was much more common, though these recommendations seemed reasonable."  In addition, he notes that:

It does not seem that QMHPs have a clear sense of what might constitute a

below-average

contraindication to discipline.[22]  While they address the patients' mental
health condition, there is rarely any discussion of the nature of discipline
proposed and how this might affect the mental health of the patient.  At
TTCF, it was uncommon for a patient to be assessed prior to imposing
discipline in MOH/HOH but there was more evidence of attending to
contraindications, though it was usually just a statement that the patient
could serve discipline.

* * * *

The focus of these evaluations needs to be on the welfare and needs of the
patient in light of proposed discipline (the nature of which was almost
never discussed), not on whether mental illness contributed to the
behavior.  Many of these evaluations were done at cell front,
compromising the quality of the assessment and making it unlikely that
patients (especially when able to be heard by other inmates in the
disciplinary setting) will be comfortable sharing their problems.

---

[22] The County "strongly disagrees" with this assessment and asserts that "QMHPs engage in a detailed
analysis and evaluation of inmate-patients whom custody is seeking to discipline and significant discussion
with custody staff regarding the appropriateness of the discipline sought."  It notes, however, that "there
was some confusion among clinicians regarding how that analysis and evaluation should be documented."

44.     Within six months of the Effective Date, the County and the Sheriff will install protective barriers that do not prevent line-of-sight supervision on the second floor tier of all High Observation Housing areas to prevent prisoners from jumping off of the second floor tier.  Within six months of the Effective Date, the County and the Sheriff will also develop a plan that identifies any other areas in mental health housing where such protective barriers should be installed.

**STATUS:        SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016)**

The County has maintained Substantial Compliance with Paragraph 44 of the Agreement since January 1, 2016.  Pursuant to Paragraph 111 of the Settlement Agreement, Paragraph 44 was not subject to monitoring during the Seventh Reporting Period.

45.    Consistent with existing Sheriff's Department policies, the County and the
Sheriff will provide both a Suicide Intervention Kit that contains an emergency cut-down
tool and a first-aid kit in the control booth or officer's station of each housing unit.  All
custody staff who have contact with prisoners will know the location of the Suicide
Intervention Kit and first-aid kit and be trained to use their contents.

> **STATUS:**    **SUBSTANTIAL COMPLIANCE (as of October 1, 2015,
> through September 30, 2016 (verified) at CRDF, NCCF, PDC
> EAST, PDC SOUTH, and TTCF)**
>
> **SUBSTANTIAL COMPLIANCE (as of January 1, 2016,
> through December 31, 2016 (verified) at MCJ and PDC North)**

The County has maintained Substantial Compliance with Paragraph 45 for twelve
consecutive months at all facilities as of December 31, 2016.  Pursuant to Paragraph 111
of the Settlement Agreement, Paragraph 45 was not subject to monitoring during the
Seventh Reporting Period.

46.     The County and the Sheriff will immediately interrupt, and if necessary, provide appropriate aid to, any prisoner who threatens or exhibits self-injurious behavior.

**STATUS:        PARTIAL COMPLIANCE**

Substantial Compliance requires the Department to review the documentation from randomly selected incidents involving prisoners who threaten or exhibit self-injurious behavior, and include an assessment of the timeliness and appropriateness of the Department's responses to these incidents in its semi-annual Self-Assessment.  The County's Seventh Self-Assessment reports that for the Second Quarter of 2018, "96% -- 1% more  than the required 95% -- of the records reviewed . . . reflected that appropriate aid and (when necessary) immediate interruption of self-injurious behavior was provided by the Department."  In the Third Quarter of 2018, 95% of the records reflect that the Department provided appropriate aid and necessary interruption.

The County Seventh Self-Assessment notes that the "adaptation of the electronic BOMHR has ensured that staff immediately interrupt and provide appropriate aid to inmates who threaten or exhibit self-injurious behavior as required by this Provision[.]"  The Monitor's Sixth Report noted that "[a]lthough the BOHMRs show when the inmate engaged in the self-injurious behavior, when the inmate was seen by a medical provider, and when a mental health clinician made an assessment, the BOHMRs do not always show what the County did to 'interrupt' the behavior or what aid the County provided to the inmate."  In response, the County stated that "[t]he purpose of this provision is to ensure that the custody staff and QMHP's are immediately and properly responding to an inmate who threatens or exhibits self-injurious behavior to prevent self-harm or further self-harm.  In this regard, the BOMHRs have been effectively used to ensure the prevention of suicides and suicide attempts. . . . Any information beyond what is provided in the BOHMHR can be found in response to other provisions."

The Mental Health Subject Matter Expert indicates that most of the BOHMRs involved expression of suicidal ideation, which do not involve threatened self-injurious behavior and thus "required no interruption. . . .The problem here is capturing a universe of patients where some custody intervention was needed."  To establish Substantial Compliance, the County must either provide more detail in the BOHMRs what the Deputy did to interrupt the self-injurious behavior or rely on additional documentation reflecting the required information.  By "capturing" a universe of inmates who actually threatened or engaged in self-injurious behavior,[23] it may be possible to rely on BOHMRs to show what the Department did.

---

[23] The Mental Health Subject Matter Expert suggests looking at the actual self-harm cases reviewed by CIRC, which are "more likely to be cases where some intervention may have been indicated," and then relying on BOHMRs or other documentation to show what Custody did to interrupt the behavior.  DOJ "believes that the universe should include all instances of self-directed violence, and not be limited to those instances reviewed at the CIRC meeting based on their risk-rating score," but the County asserts that "[i]ncluding all incidents of self-directed violence. . .would be unduly burdensome" as there "roughly 800" such incidents in 2018.  The Monitor agrees this would be unduly burdensome, but as noted by the Mental Health Subject Matter Expert, other cases may be needed "[i]f the CIRC cases are not sufficient in number."

47.     The County and the Sheriff will ensure there are sufficient custodial, medical, and mental health staff at the Jails to fulfill the terms of this Agreement.  Within six months of the Effective Date, and on a semi-annual basis thereafter, the County and the Sheriff will, in conjunction with the requirements of Paragraph 92 of this Agreement, provide to the Monitor and DOJ a report identifying the steps taken by the County and the Sheriff during the review period to implement the terms of this Agreement and any barriers to implementation, such as insufficient staffing levels at the Jails, if any.  The County and the Sheriff will retain staffing records for two years to ensure that for any critical incident or non-compliance with this Agreement, the Monitor and DOJ can obtain those records to determine whether staffing levels were a factor in that critical incident and/or non-compliance.

**STATUS:     NON-COMPLIANCE**

The County's Seventh Self-Assessment states that the County has "provided a list of each critical incident between January 1 and June 30, 2018," for a total of 54 critical incidents during that period.  It reiterates that the "County continues to work to develop a methodology to determine and assess whether staffing was a factor in any non-compliance with the Agreement, any critical incident, or the Department's handling of an incident."

48.     Within three months of the Effective Date, the County and the Sheriff will have written housekeeping, sanitation, and inspection plans to ensure the proper cleaning of, and trash collection and removal in, housing, shower, and medical areas, in accordance with California Code of Regulations ("CCR") Title 15 § 1280: Facility Sanitation, Safety, and Maintenance.

**STATUS:        SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016)**

The County maintained Substantial Compliance with Paragraph 48 of the Agreement at all facilities for twelve consecutive months as of December 31, 2016. Pursuant to Paragraph 111 of the Settlement Agreement, Paragraph 48 was not subject Seventh Reporting Period, the Monitor observed "an acceptable level of cleanliness, sanitation, repair and safety" in each facility.

49.      Within three months of the Effective Date, the County and the Sheriff will
have a maintenance plan to respond to routine and emergency maintenance needs,
including ensuring that shower, toilet, sink, and lighting units, and heating, ventilation,
and cooling system are adequately maintained and installed.  The plan will also include
steps to treat large mold infestations.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of March 1, 2016,
through February 28, 2017)**

The County maintained Substantial Compliance with Paragraph 49 of the
Agreement at all facilities for twelve consecutive months as of February 28, 2017.
Pursuant to Paragraph 111 of the Settlement Agreement, Paragraph 49 was not subject to
monitoring during the Seventh Reporting Period.  Nevertheless, during inspections in the
Seventh Reporting Period, the Monitor noted that the lighting systems, heating,
ventilation and cooling systems in each facility were "adequately maintained and
installed."

50.     Consistent with existing Sheriff's Department policies regarding control of vermin, the County and the Sheriff will provide pest control throughout the housing units, medical units, kitchen, and food storage areas.

> **STATUS:**     **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at all facilities other than PDC South and PDC East)**
>
> **SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 (verified) at PDC South and PDC East)**

The County maintained Substantial Compliance with Paragraph 50 of the Agreement at all facilities for twelve consecutive months as of March 31, 2017.  Pursuant to Paragraph 111 of the Settlement Agreement, Paragraph 50 was not subject to monitoring during Seventh Reporting Period.

51.     Consistent with existing Sheriff's Department policies regarding personal care items and supplies for inmates, the County and the Sheriff will ensure that all prisoners have access to basic hygiene supplies, in accordance with CCR Title 15 § 1265: Issue of Personal Care Items.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) for all facilities other than CRDF)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2016 through June 30, 2017 (verified) at CRDF)**

The County maintained Substantial Compliance with Paragraph 51 of the Agreement at all facilities for twelve consecutive months as of June 30, 2017. Pursuant to Paragraph 111 of the Settlement Agreement, Paragraph 51 was not subject to monitoring during the Seventh Reporting Period.

52.     The County and the Sheriff will implement policies governing property restrictions in High Observation Housing that provide:

(a)     Except when transferred directly from FIP, upon initial placement in HOH:

   (i)     Suicide-resistant blankets, gowns, and mattresses will be provided until the assessment set forth in section (a)(ii) below is conducted, unless clinically contraindicated as determined and documented by a QMHP.

   (ii)    Within 24 hours, a QMHP will make recommendations regarding allowable property based upon an individual clinical assessment.

(b)     Property restrictions in HOH beyond 24 hours will be based on clinical judgment and assessment by a QMHP as necessary to ensure the safety and well-being of the prisoner and documented in the electronic medical record.

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance requires the Department to (1) randomly inspect the cells of prisoners placed in HOH (except from FIP) within the previous 24 hours to confirm that they have been provided with suicide-resistant blankets, gowns and mattresses unless clinically contraindicated, and document the results of the inspection; (2) randomly inspect the cells of prisoners placed in HOH (except from FIP) for more than 24 hours to confirm that they have been provided with allowable property as recommended by a QMHP; and (3) review the electronic medical records of prisoners assigned to HOH on the days of those inspections to verify compliance with the provisions of Paragraph 52. All of the Compliance Measures have a 95% threshold for Substantial Compliance.

The County's Seventh Self-Assessment reports that in the Second Quarter of 2018, 58% of the inmates initially placed in HOH at CRDF were provided the property required by Paragraph 52; 8% "of the electronic medical records for inmates assigned to HOH reflected a recommendation by a QMHP regarding allowable property;" 6% "of electronic medical records for inmates assigned to HOH reflect that property restrictions were based upon the clinical judgment of a QMHP;" and 95% of the inmates placed in HOH "for more than 24 hours" had "allowable property as recommended by a QMHP[.]" For the Second Quarter of 2018, the County reports that 94% of the inmates initially placed in HOH at TTCF were provided the property required by Paragraph 52; 50% of the electronic medical records "reflected a recommendation by a QMHP regarding allowable property;" 89% of the electronic medical records "reflect that property restrictions were based upon the clinical judgment of a QMHP"; and 94% of the inmates placed in HOH "for more than 24 hours" had "allowable property as recommended by a QMHP[.]"

In the Third Quarter of 2018, 71% of the inmates initially placed in HOH at
CRDF were provided the property required by Paragraph 52; and 97% of the inmates in
HOH "for more than 24 hours" had "allowable property as recommended by a QMHP[.]"
For TTCF, the Third Quarter results were 92% of the inmates initially placed in HOH
were provided the property required by Paragraph 52; and 97% of the inmates placed in
HOH "for more than 24 hours" had "allowable property as recommended by a QMHP[.]"

The County's Augmented Seventh Self-Assessment reports for the Third Quarter
of 2018, "22% -- rather than the required 95% -- of the electronic medical records for
inmates assigned to HOH reflected a recommendation by a QMHP" at CRDF, and 18%
of the electronic medical records "reflect that property restrictions were based upon the
clinical judgment of a QMHP[.]"  The results for TTCF were 48% and 73%.

The Mental Health Subject Matter Expert and the clinicians reviewed the
County's compliance with this provision in July and concluded that "the County
continues to struggle with conducting and/or documenting assessments for property
restrictions that are based on relevant risk factors."  The Mental Health Subject Matter
Expert notes that the basis (i.e., the risk assessment) for the property restrictions "is often
absent or sorely lacking."  The Department "is doing a reasonable job at providing
property consistent with the recommendations of the QMHP's, but the quality of the
assessments underlying these recommendations remains poor."

53.     If otherwise eligible for an education, work, or similar program, a prisoner's mental health diagnosis or prescription for medication alone will not preclude that prisoner from participating in said programming.

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance requires the Department to audit the records of prisoners who were eligible, but rejected or disqualified, for education and work programs to confirm that they were not rejected or disqualified because of a mental health diagnosis or prescription for medication alone.

The County's Seventh Self-Assessment reports that 95% and 97% of the mentally ill prisoners who were eligible for and denied work in the Second and Third Quarters of 2018 were not denied the work due to a mental health diagnosis or prescription for psychotropic medication alone.  Accordingly, the County concludes that it has achieved Substantial Compliance with Paragraph 53 as of the Second Quarter of 2018, and it maintained Substantial Compliance through the Third Quarter of 2018.

As noted in the Monitor's Sixth Report, the Mental Health Subject Matter Expert and clinicians previously reviewed documents posted by the County and noted that "[i]t is difficult to determine if . . . denials reflect lack of eligibility due to mental health diagnosis alone, or issues relating to housing placement of patients as a class, rather than individual determinations of eligibility."  These concerns remained during the Seventh Reporting Period.

While the Mental Health Subject Matter Expert and the clinicians reviewed the County's "table of those refused programing and agreed with the County's 'scoring' of the individual cases selected for Compliance Measure 53-3(b)," they have found "it hard to assess [the County's] compliance based on the [available] documentation" and "have not been able to find a description of the [County's] methodology."

From a qualitative perspective, the Mental Health Subject Matter notes that "[t]he main problem is that those in HOH are effectively barred from programming because they are often too ill to go to settings where such programming is offered and yet no programming is being brought to them that some could avail themselves of.  We have seen no HOH patients engaged in any programming, including on unit jobs (which some could do).  Review of the movement history for those in HOH does not show attendance in any programming that I could find."

54.     Prisoners who are not in Mental Health Housing will not be denied privileges and programming based solely on their mental health status or prescription for psychotropic medication.

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance requires the Department to audit the records of a maximum of 100 randomly selected prisoners who were eligible and denied privileges or programs to confirm that they were not rejected or disqualified because of a mental health diagnosis or prescription for psychotropic medication alone.  In the Fifth Reporting Period, the County reported that it achieved and maintained Substantial Compliance for the period from March 1, 2016 through December 31, 2016.  The results were verified by the Monitor's auditors.

The Mental Health Subject Matter Expert then expressed a concern that the randomly selected population "does not pre-select for patients on [mental health] rolls or on medication, so it is possible that all cases reviewed had no mental health problem that might have resulted in a denial."  To address this concern, with the approval of the parties, the Monitor revised the Compliance Measures for Paragraph 54, effective January 1, 2018, to provide for an alternative pool of inmates proposed by the County.  Because the Monitor's auditors had verified that the County has maintained Substantial Compliance under the existing Compliance Measures, the parties agreed that the County will only be required to maintain Substantial Compliance under the revised Compliance Measures for two additional quarters.

The County's Seventh Self-Assessment reports Substantial Compliance in the Second and Third Quarters of 2018.  This is based upon posted results showing that, during two random weeks in the Second Quarter, none of the 18 inmates who requested, and were denied, programing were denied programing solely due to their prescriptions for psychotropic medication or mental health status.  In the two random weeks in the Third Quarter of 2018, none of the five inmates who requested and were denied programing (e.g., work or education) were denied programing for these reasons.

In response to the Monitor's concerns that the County's results do not address whether inmates on psychotropic medications or mental health status were denied "privileges," the County's provided visitation records showing that none of the 36 inmates on psychotropic medication who received visits during these random weeks were denied visits for these reasons.  The visitation records reflect inmates who *received* visits, rather than inmates who were *denied* visits, which is insufficient to determine if any inmates were denied this privilege because of their medications or mental health status.  Further, the visitation records do not address whether these inmates were denied other privileges such as access to the dayroom and recreation.  The County must either show that no inmates on psychotropic medications or mental health status (1) were denied privileges during the random weeks for any reasons or (2) were denied privileges during those weeks because of their medications or mental health status.

60

55.     Relevant custody, medical, and mental health staff in all High Observation
Housing units will meet on Normal business work days and such staff in all Moderate
Observation Housing units will meet at least weekly to ensure coordination and
communication regarding the needs of prisoners in mental health housing units as
outlined in Custody Services Division Directive(s) regarding coordination of mental
health treatment and housing.  When a custody staff member is serving as a member of a
treatment team, he or she is subject to the same confidentiality rules and regulations as
any other member of the treatment team, and will be trained in those rules and
regulations.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of October 1, 2016,
through September 30, 2017 (verified) at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2017
through March 31, 2018 (verified) at PDC North)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through
June 30, 2018 (verified) and September 30, 2018 (unverified) at
MCJ)**

**PARTIAL COMPLIANCE (at TTCF)**

The County's Sixth Self-Assessment reported that the Department had maintained
Substantial Compliance for twelve consecutive months through the Third Quarter of 2017
at CRDF and through the First Quarter of 2018 at PDC North.  These results were
verified by the Monitor's auditors and CRDF and PDC North were not subject to
monitoring for compliance with Paragraph 55 in the Seventh Reporting Period.

The County's Seventh Self-Assessment reports Substantial Compliance for the
Second and Third Quarters of 2018 at MCJ and for the Third Quarter of 2018 at TTCF
for Compliance Measure 55-2.  The Augmented Self-Assessment reports, however, that
the Department only achieved Partial Compliance at TTCF; while the required TTCF
staff attended all of the HOH meetings, they attended only 75% of the MOH meetings
pursuant to Compliance Measures 55-6(a) and (b).  The results at MJC for the Second
Quarter of 2018 have been verified by the Monitor's auditors.  The results at MCJ for the
Third Quarter of 2018 are subject to verification by the Monitor's auditors.

On January 8, 2019, the Department provided a semi-annual report "verifying the
coordination and communication at the staff meetings" in HOH and/or MOH units at
TTCF and MCJ during the first six months of 2018 as required by Compliance Measures
55.2, 55.4 and 55.6(c).  DOJ is concerned "about the level of detail" in some huddle
meeting minutes, and the Mental Health Subject Matter Expert notes that "it is very
difficult to know [from the minutes] whether problem cases are being detected and
discussed."  The Monitor and Mental Health Subject Matter Expert will continue to
attend huddle meetings during site visits to assess the efficacy of the meetings.

56.     Consistent with existing DMH and Sheriff's Department policies, the County and the Sheriff will ensure that custody, medical, and mental health staff communicate regarding any change in a prisoner's housing assignment following a suicide threat, gesture, or attempt, or other indication of an obvious and serious change in mental health condition.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of January 1, 2016,
through December 31, 2016 (verified))**

Substantial Compliance requires the Department to review in randomly selected periods the electronic medical records of (1) prisoners admitted to HOH following a suicide threat, gesture, or attempt, or other indication of an obvious and serious change in mental health condition to determine if the medical and/or mental health staff approved the placement of the prisoner in HOH; and (2) prisoners who were the subject of a suicide attempt notification to determine if the prisoners were clinically assessed and that clinical staff approved the post-incident housing.

The County's Substantial Compliance results for the twelve months from January 1, 2016, through December 31, 2016, were verified by the Monitor's auditors, and the County was not subject to monitoring for compliance with Paragraph 56 during the Seventh Reporting Period.

57.     Within three months of the Effective Date, the County and the Sheriff will revise and implement their policies on safety checks to ensure a range of supervision for prisoners housed in Mental Health Housing.  The County and the Sheriff will ensure that safety checks in Mental Health Housing are completed and documented in accordance with policy and regulatory requirements as set forth below:

(a)     Custody staff will conduct safety checks in a manner that allows staff to view the prisoner to assure his or her well-being and security.  Safety checks involve visual observation and, if necessary to determine the prisoner's well-being, verbal interaction with the prisoner;

(b)     Custody staff will document their checks in a format that does not have pre-printed times;

(c)     Custody staff will stagger checks to minimize prisoners' ability to plan around anticipated checks;

(d)     Video surveillance may not be used to replace rounds and supervision by custodial staff unless new construction is built specifically with constant video surveillance enhancements and could only be used to replace 15 minute checks in non-FIP housing, subject to approval by the Monitor;

(e)     A QMHP, in coordination with custody (and medical staff if necessary), will determine mental health housing assignments; and

(f)     Supervision of prisoners in mental health housing will be conducted at the following intervals:

(i)     FIP:  Custody staff will perform safety checks every 15 minutes. DMH staff will perform direct constant observation or one-to-one observation when determined to be clinically appropriate;

(ii)    High Observation Housing:  Every 15 minutes;

(iii)   Moderate Observation Housing:  Every 30 minutes.

STATUS (57):          **SUBSTANTIAL COMPLIANCE (as of April 1, 2017,
through March 31, 2018 (verified) at MCJ)**

**PARTIAL COMPLIANCE (at PDC North, TTCF, and
CRDF)**

Substantial Compliance requires the Department to audit the Title 15 Dashboard
records (or UDAL records if the Title 15 scanner was not working) for all shifts for each
module in each mental health housing unit in two randomly selected weeks to determine
if the safety checks were staggered and conducted as required by Paragraph 57 of the
Agreement, and to audit the housing records for each mental health housing unit for one
randomly selected week to determine if a QMHP approved the new mental health
housing assignments as required by Paragraph 57(e).  The thresholds for achieving
Substantial Compliance with these two Compliance Measures is 95%.

The County's Sixth Self-Assessment reported that it maintained Substantial
Compliance with Compliance Measure 57.5(b) in the Fourth Quarter of 2017 and the
First Quarter of 2018 in the MOH unit at MCJ (the "Hope Dorm").  It also reported that
all of the inmates at MCJ "analyzed pursuant to Compliance Measure 57-5(c) had
received QMHP approval for their housing assignments" in both quarters.  The results
were verified by the Monitor's auditors and MCJ was not subject to monitoring for
compliance with Paragraph 57 in the Seventh Reporting Period.

The County's Seventh Self-Assessment reports that the County achieved Partial
Compliance in the HOH and MOH units at TTCF (88% and 83%) and CRDF (89% and
80%) in the Second and Third Quarters of 2018.  It also reports that the County achieved
Partial Compliance in the MOH units at PDC North in the Second Quarter of 2018 (93%)
and Substantial Compliance in the Third Quarter of 2018 (99%).  As noted by DOJ, and
confirmed by the auditors, however, the safety checks at PDC North were not staggered
as "custody staff [took] the same route through Module 2's four doors (A,B,C and D) in
the same order every time they conduct[ed] the checks at almost identically spaced
intervals."  The County reports that the "Department expects the facility to show
improved staggering by module in forthcoming audits."

The Self-Assessment also reports that 100% of the new mental health housing
assignments in CRDF and in TTCF were approved by a QMHP in the Second and Third
Quarters of 2018.  This is consistent with the observations of the Mental Health Subject
Matter Expert who notes that "a QMHP is almost always involved in MOH/HOH
placement or release."

58.     Within three months of the Effective Date, the County and the Sheriff will
revise and implement their policies on safety checks.  The County and the Sheriff will
ensure that safety checks in non-mental health housing units are completed and
documented in accordance with policy and regulatory requirements as set forth below:

(a)     At least every 30 minutes in housing areas with cells;

(b)     At least every 30 minutes in dormitory-style housing units where the unit
        does not provide for unobstructed direct supervision of prisoners from a
        security control room;

(c)     Where a dormitory-style housing unit does provide for unobstructed direct
        supervision of prisoners, safety checks must be completed inside the unit
        at least every 60 minutes;

(d)     At least every 60 minutes in designated minimum security dormitory
        housing at PDC South, or other similar campus-style unlocked dormitory
        housing;

(e)     Custody staff will conduct safety checks in a manner that allows staff to
        view the prisoner to assure his or her well-being and security.  Safety
        checks involve visual observation and, if necessary to determine the
        prisoner's well-being, verbal interaction with the prisoner;

(f)     Custody staff will document their checks in a format that does not have
        pre-printed times;

(g)     Custody staff will stagger checks to minimize prisoners' ability to plan
        around anticipated checks; and

(h)     Video surveillance may not be used to replace rounds and supervision by
        custodial staff.

| STATUS (58): | **SUBSTANTIAL COMPLIANCE (as of January 1, 2016 through December 31, 2016 (verified) at PDC South, PDC North, and PDC East)** |
|---|---|
| | **SUBSTANTIAL COMPLIANCE ( as of July 1, 2017, through March 31, 2018 (verified) and through June 30, 2018 (unverified) at CRDF)** |
| | **SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through March 31, 2018 (verified) and through September 30, 2018 (unverified) at IRC)** |
| | **PARTIAL COMPLIANCE (at TTCF, NCCF, and MCJ)** |

Substantial Compliance requires the Department to audit the Title 15 Dashboard records (or UDAL records) for all shifts for each module in each housing unit to determine if the safety checks were staggered and conducted as required by Paragraph 58. The thresholds for achieving Substantial Compliance is 90%.

The County maintained Substantial Compliance with Paragraph 58 for twelve consecutive months at PDC South, PDC North, and PDC East as of December 31, 2016. Pursuant to Paragraph 111, those facilities were not subject to monitoring in the Seventh Reporting Period.

The County's Sixth Self-Assessment reported that for the Fourth Quarter of 2017 and the First Quarter of 2018, the following percentages of safety checks were in compliance with Paragraph 58: CRDF (93% and  90%);[24] TTCF (95% and 97%); MCJ (94% and 92%); NCCF (82% and 58.5%); and IRC (95% and 92%).  Based upon the audit by the Monitor's auditors, however, it did not appear that the cell checks at MCJ and TTCF were staggered as required by Paragraph 58.

The County's Seventh Self-Assessment reports that 88% of the safety checks at CRDF and 89% of the checks at IRC in the Second Quarter of 2018 were in compliance with Paragraph 58, which is slightly below the 90% threshold for Substantial Compliance.  It nevertheless requests a Substantial Compliance finding because "the safety checks on the relevant dates were timely conducted under Compliance Measure 58-2, however, there were technical difficulties uploading the scans from iPods" during the random weeks at both facilities.  Excluding the one day (June 19, 2018) that the UDAL Main Report shows a problem with uploading iPod scans at CRDF, which accounted for 40 of the 42 missed rounds during the two random weeks, the percentage of compliant rounds at CRDF goes from 88.5% to 94.7%.

There was no single day with as significant a spike in missed (or non-compliant)

---

[24] Substantial Compliance requires achieving the 90% threshold based upon the aggregate data for the two randomly selected weeks.

rounds at IRC, but excluding the one day (May 12, 2018) on which it appears from the
UDAL Main Report that the Title 15 scanner was not working, the percentage of
compliance in the Second Quarter of 2018 goes from 89.4% to 91%.  The Seventh Self-
Assessment reports that 92% of the safety checks in the Third Quarter of 2018 at IRC
were in compliance with Paragraph 58.

     The County's Seventh Self-Assessment also reports that for the Second and Third
Quarters of 2018, the following percentages of safety checks were in compliance with
Paragraph 58 at the remaining facilities:  MCJ (90% and 88%); TTCF (96% and 95%);
and NCCF (60% and 54%).  Based upon the audit by the Monitor's auditors, however, it
does not appear that the cell checks at TTCF are staggered in the Second and Third
Quarters of 2018 as required by Paragraph 58.

     The Substantial Compliance results at CRDF and IRC are subject to verification
by the Monitor's auditors.  If the results at CRDF and IRC (excluding the results for the
days when the scanners were not working properly) are verified by the auditors,[25] these
facilities will no longer be subject to monitoring for compliance with Paragraph 58.

---

[25] The Monitor's auditors will review a few randomly selected videos for those days when the scanners
were not working properly to verify that the safety checks occurred.

59.     Consistent with existing Sheriff's Department policies regarding uniform daily activity logs, the County and the Sheriff will ensure that a custodial supervisor conducts unannounced daily rounds on each shift in the prisoner housing units to ensure custodial staff conduct necessary safety checks and document their rounds.

**STATUS:**      **SUBSTANTIAL COMPLIANCE (as of January 1, 2017, through December 31, 2017 (verified) at PDC East and MCJ)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2018, through September 30, 2018 (verified) at PDC North and PDC South)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through September 30, 2018 (verified) at TTCF)**

Substantial Compliance requires the Department to audit e-UDAL records for housing units in each facility to determine if supervisors are conducting unannounced daily rounds in accordance with Paragraph 59.  In response to the Monitor's comments, the Department's e-UDAL forms were modified to include a specific notation that the Supervisor verified that the safety checks were conducted.  The threshold for achieving and maintaining Substantial Compliance is that 90% of the supervisor daily rounds were in compliance with the requirements of Paragraph 59.

The County's Sixth Self-Assessment reported that the Department had maintained Substantial Compliance at PDC East and MCJ for twelve consecutive months from January 1, 2017 through December 31, 2017 (and continuing to March 31, 2018).  It also reported that the Department had maintained Substantial Compliance at NCCF for twelve consecutive months from April 1, 2017 through March 31, 2018.  The results were verified by the Monitor's auditors and these facilities were not subject to monitoring for compliance with Paragraph 59 during the Seventh Reporting Period.

The County's Seventh Self-Assessment reports that the following percentage of rounds were in compliance with the provision in the Second and Third Quarters of 2018: CRDF (98% and 91%), PDC North (97% and 97%), PDC South (93% and 99%), and TTCF (98% and 91%).  These results have been verified by the Monitor's auditors.  CRDF has maintained Substantial Compliance for twelve consecutive months and is no longer subject to monitoring for compliance with Paragraph 59.

60.    Within six months of the Effective Date, the Department of Mental Health, in cooperation with the Sheriff's Unit described in Paragraph 77 of this Agreement, will implement a quality improvement program to identify and address clinical issues that place prisoners at significant risk of suicide or self-injurious behavior.

**STATUS:      PARTIAL COMPLIANCE**

Compliance Measures 60.2 and 60.3(b) require the County to prepare semi-annual reports setting forth (a) any identified clinical issues in the areas identified in Paragraph 61 that place prisoners at significant risk of suicide or self-injurious behavior; (b) corrective actions and systemic improvements taken by DMH and the Department to address any such issues during the reporting period; and (c) an assessment of the effectiveness of steps taken to address issues identified during earlier reporting periods.

The Mental Health Subject Matter Expert has stated that "CHS is clearly developing a sound QM system.  It is based on well-established principles and methods of QM.  They are taking appropriate and measured steps to implement their plan."  The Monitor and Subject Matter Expert note the Department has continued to enhance its participation in the quality management process as required by Paragraphs 60 and 77.

On January 14, 2019, the County submitted CHS's Semi-Annual Report on Quality Improvement/Assurance, which covers the Second and Third Quarters of 2018. The Report discusses a number of items that will be implemented in the future.  For example,

> "[Custody Health Services] Compliance Team is currently developing a Mental Health Compliance Dashboard, which it expects to be in place by the first quarter of 2019. The new dashboard will track summary reports by facility, and nursing and mental health service, and outline trends, thresholds, and barriers to compliance and plans to resolve such barriers, as well as current and past compliance rates.  The Mental Health Compliance Dashboard is expected to significantly improve CHS's analysis of systemic data, ability to evaluate and compare current performance, identify key priorities, and focus on areas with the greatest need.  Additionally, the dashboard will serve as a vehicle to improve communication with all levels of staff concerning our progress toward achieving compliance expectations."[26]

* * * *

---

[26] As the Mental Health Subject Matter Expert previously observed, "[i]t is especially important for the county to develop and maintain on-going tracking (typically using a dashboard format) of aggregate data measuring critical aspects of these measures. . . .In each area, there needs to be an on-going analysis of key measures[.]"  See Monitor's Sixth Report, p. 67.

"CHS is in the process of revamping its Quarterly QI committee[;], beginning in 2019, the Committee will meet monthly with the purpose of promoting collaboration among facilities and service lines and improving quality of care and patient safety.  The main focus will be to align the organizational quality and safety priorities, identify opportunities for improvement, and share best practices."

"Representatives from CHS Mental Health services will participate in these committee meetings on a quarterly basis beginning in January 2019. Mental Health services' participation is expected to focus on reports relating to quality and safety issues, as well as pertinent findings from the Critical Incident Review Committee ('CIRC') and Joint Quality Improvement Committee ('JQIC')."

* * * *

"Going forward CCSB and CHS Compliance Team will work collaboratively to prepare reports and improve data analysis, including in monthly meetings expected to begin in 2019 to ensure that data used and parameters are identical."

* * * *

"[I]n January 2019, the County plans to start collecting additional readmission data, including discharge location, medication, compliance, use of long acting injectable (LAI), and whether appropriate dosages of psychotropic medications were given prior to discharge.  The County's goal in collecting the data is to develop methods to evaluate whether or not patients were on the inpatient unit long enough to receive appropriate treatment, whether or not the percentage of medication compliance was adequate for discharge, and whether the patient was stable upon discharge[.]"

The County reports that the "shift" in the CIRC and JQIC meetings in the last reporting period to "discussion of system root causes" has "helped identify systemic concerns related to CIRC events.. . .rather than simply cataloging issues for future workgroups." The Mental Health Subject Matter Expert notes that:

The Department and CHS are collaborating in conducting sound investigations of episodes of serious self-harm.  CHS is collecting aggregate data, though the scope needs to be expanded to cover essential aspects of the elements laid out in Provision 61.  The Department is beginning to collect and analyze aggregate data but the integration of (or collaboration in developing) aggregate analytics jointly between CHS and LASD is just beginning.

70

The County also reports that 12 staff members, including two from mental health have graduated from a Quality Academy at LAC+USC; "significant progress has been made in updating, customizing, and training staff in Safety Intelligence, CHS's patient safety incident reporting system;" "nearly all" CHS managers and supervisors and 78% of the "front-line staff" have been trained in Just Culture, which the County has adopted to replace "the historical custodial-style approach to medical and mental health care;" and it has established "a steering committee" and trained thirteen staff member as peer supporters in "the Helping Healers Heal (H3) program."

CHS's Semi-Annual Report summarizes the issues presented at the November 7, 2018 Bi-Annual Suicide Prevention meeting, including the access that mental health and medical staff now have to the County's "integrated behavior health information system," which "allows mental and medical health staff to more quickly and accurately care for inmates when they arrive at County jail facilities;" the access they are in the process of obtaining to the County's electronic medical records, which "is critical to the continuity of care" for inmates who go back and forth between County hospitals and jails; and the efforts of the Office of Diversion and Reentry (ODR) to divert inmates from jail.  While reflecting the efforts that the County is making to improve the care of mentally ill inmates, it is not clear that these improvements are part of an integrated "quality improvement program to identify and address clinical issues that place prisoners at significant risk of suicide and self-injurious behavior."

The report discusses the efforts to "improve the use" of CIRC meetings "to identify and address systemic issues;" the changes in JQIC meetings introduced in November 2018 to "serve as a venue to present data on trends and/or themes in SDVs [Self-Directed Violence] and CIRCs that may inform system-wide improvements related to suicide prevention;" the efforts of CCSB and CHS to use the same data on SDV events; and the use of a new SDV review template by QMHP's "that streamlined the process and allowed raters to focus on the most salient information needed to determine the severity [of the SDV event] and the need for any immediate corrective action."

The County's report includes aggregate data on Suicides going back to 2014, and SDV incidents and CIRC incidents broken down on a monthly basis by age, race/ethnicity, gender, facility, proximity to court date  method of attempt, prior SDV incidents, and risk rating.  It also includes aggregate data on CIRC meetings  and describes the efforts to "focus" the meetings "on improving overall identification of systemic issues, the process of tracking those issues, and analyzing trends and patterns," including the "categorization of issues" in CIRC summary tables to move "the County's analysis of issues toward detecting patterns and/or themes in [the] case reviews."

The Semi-Annual Report includes the following new sections:

- the Correctional Treatment Center – Mental Health Unit (CTC-MHU), including the significant decrease in use of clinical restraints in the unit, and its impact on

71

staffing;[27] admission and limited re-admission data; and the development of "a new Step-Down Assessment form that more clearly identifies the step-down process and helps inform patient care through improved documentation of patient status through treatment on the unit."

- Psychotropic Medication, including the STEP FORWARD program at CRDF "to provide early psychiatric intervention beginning at intake for those patients with severe mental illness (SMI)" and "Initial Psychiatric Evaluation and Medication Management for New Arrestees in MOH;" the tracking of patients refusing psychotropic mediations in MOH at TTCF; and the work of the Pill Call Working Group to revise and improve pill call procedures in all facilities.

- Other QI projects and health care services, including a summary of timelines of assessments and housing as a result of the new medical and mental health screening process at IRC; a summary of substance use services, including withdrawal management pods at TTCF and CRDF and group treatment sessions led by substance use disorder providers; mandatory training for suicide risk assessment, which commenced on August 23, 2018; and the work of an expanded Risk Precautions working group to address concerns about "the need for more individualized decisions regarding step down[.]"

The Monitor and Subject Matter Expert appreciate the many efforts that the Department and CHS have made to improve the quality of care afforded to address the needs of mentally ill inmates and prevent suicides and acts of self-directed violence in the jails.  They believe that the County has made significant progress in the areas discussed in CHS's Semi-Annual Report, and is beginning to use aggregate data to recommend corrective action or systemic improvements.  The quality management program is more organized with less fragmentation of processes, working groups, and projects, and CHS staff has benefitted from being trained in quality management.

Many of the elements of the quality improvement program were recently implemented or are scheduled to begin in the next reporting period.  The County recognizes that much of the program is in the early stages, noting that "[i]n future reporting periods the County expects to demonstrate a more organized and structured approach to these types of work groups.  The plan is to follow quality improvement principles that require a more formal approach and accountability."  As stated by one of the clinicians, however, "developing the system is not the same as implementing and effectively using a QI program."

The Monitor and Mental Health Subject Matter Expert believe that the County will be able to achieve Substantial Compliance with a more formal approach and the implementation of the elements of the program set to begin in this next reporting period.

[27] The County attributes this, in part, to changes in Custody's use of force policies and "an increase in using discussion and negotiation techniques to gain compliance from inmates/patients" and, in part, to the early use of "long-acting injectable (LAI) psychotropic mediations in CTC-MHU."

It "will require the continued buildout of data collection and aggregation, analysis of aggregate data, general outcome measures (e.g., the dashboard), and coordination and engagement in these processes by the Department."

61.     The quality improvement program will review, collect, and aggregate data
in the following areas and recommend corrective actions and systemic improvements:

(a)     Suicides and serious suicide attempts:

(i)     Prior suicide attempts or other serious self-injurious behavior
(ii)    Locations
(iii)   Method
(iv)    Lethality
(v)     Demographic information
(vi)    Proximity to court date;

(b)     Use of clinical restraints;

(c)     Psychotropic medications;

(d)     Access to care, timeliness of service, and utilization of the Forensic In-
patient Unit; and

(e)     Elements of documentation and use of medical records.

**STATUS:      PARTIAL COMPLIANCE**

Substantial Compliance requires the County's semi-annual reports to (a) review,
collect, and aggregate data in the areas set forth in Paragraph 61; (b) recommend
corrective actions and systemic improvements in those areas; and (c) assess the
effectiveness of actions and improvements in prior reporting periods.

The CHS Semi-Annual Report sets forth aggregate data for suicides for the period
2014 through the Third Quarter of 2018, broken down by prior attempts or other serious
self-injurious behavior, facility, method, demographics (age, ethnicity, and gender), and
proximity to court date, which are the areas identified in Paragraph 61(a)(i) through (vi).
Other than some very general conclusions, this section of the report does not analyze the
data, recommend actions and improvements, or assess the effectiveness of prior actions
and improvements.

The CHS Report also summarizes the process for QMHP reviews of SDV and the
CIRC reviews of "moderate and high risk" cases at its monthly meetings.  It reports that
"[i]n August 2018, CHS officially began using the new template which streamlined the
process and allowed raters to focus on the most salient information needed to determine
severity and the need for any immediate corrective action."  It then sets forth aggregate
data for:

(1)     SDV incidents for the second and third quarters of 2018 broken
down by prior suicide attempts or other serious self-injurious behavior,
ethnicity, gender, proximity to court date, and, on a monthly basis, by

facility, method, CDC Risk Rating Score, and age; and

(2)      serious self-injurious incidents that were reviewed at CIRC
meetings broken down by systemic issues identified in each quarter, and
by prior suicide attempts, facility, method, lethality (risk rating scores),
age, ethnicity, gender, and proximity to court date.

As with the suicide data, with the exception of general conclusions regarding some of the
aggregate data, the CHS Report does not set forth any analysis of the data, recommended
"corrective actions and systemic improvements" in the areas in Paragraph 61, or "assess
the effectiveness of actions and improvements in prior reporting periods."[28]  The report
indicates that CHS intends to improve its analysis of the data in the future.[29]

Attached to the CHS Report is a summary for each of the 18 cases that breaks
down each incident by the categories in Paragraph 61(a)(i) through (vi) of the Settlement
Agreement, and then sets forth "issues" assigned by the categories in Paragraph 61(b)
through (e), and the "response/status" of the issues.

The Semi-Annual Report also includes sections that "review, collect, and
aggregate data" and in the areas required by Paragraph 61(b) through (e):

- aggregate data on the decrease in the use of clinical restraints in the Mental Health
  Unit of the CTC and analysis of the cause and effect of the decrease;

- aggregate comparative data on the admission, discharge, and readmission of
  patients in the CTC-MHU for the Second and Third Quarters of 2018 and
  historical data for admissions from 2014 through the Third Quarter of 2018.

- the development of a new Step-Down Assessment that more clearly identifies the
  step-down process and helps to inform patient care through improved
  documentation of patient status as they progress through treatment on the [CTC-
  MHU].

- a summary of the quality improvement projects relating to the use of psychotropic
  medication, including the STEP FORWARD program at CRDF that addresses
  system shortcomings;

---

[28] There is a cross-reference to the report of CCSB's activities, which provides a fairly detailed analysis of
SDV incidents by age.  See CHS Report, p. 25.

[29] For example, based upon SDV incidents in the Second and Third Quarters of 2018, the CHS Report
concludes that "a history of prior suicide attempts does not appear to be a significant factor as to whether or
not inmates will engage in self-directed violence."  It notes, however, that "this result may change when
analyzing this category over a longer period of time and/or in conjunction with other categories[.]"
Elsewhere, it notes that "[a]lthough the QI Category data [for CIRC incidents] provides only a very broad
description it is a starting point for further analysis."

- the implementation of a MOH intake team approach that has significantly reduced the wait time for patients/inmates with a P2 level of care housed in MOH to be see a psychiatrist;

- the development of a medication refuser list to track patients refusing psychotropic medications at MOH in TTCF;

- a pill call pilot program "to align pill call procedures with best practices" and address concerns expressed by the Monitor regarding these procedures;

- summaries of other quality improvement projects, including tracking the timeliness of suicidal patients being seen by mental health clinicians in IRC, and data showing a significant improvement in the flow of suicidal patients through IRC;

- comparative "admission," "discharge," and "re-admission" data for the Mental Health Unit of the Correctional Treatment Center for the Second and Third Quarters of 2017 and 2018.

Some of these targeted QI projects, such as the STEP FORWARD program and the pill call pilot program, may "be considered a CAP for an identified problem," but the Mental Health Subject Matter Expert notes that they do not reflect a "sufficient breadth of analysis of aggregate data to develop CAPs, which would set benchmarks and look at trends and patterns of usage." For example, there is no "analysis of general prescribing patterns or medication monitoring, both critical aspects of quality management of psychotropic prescribing." The Mental Health Subject Matter Expert notes:

> The initiatives involving MOH psychiatric encounters, IRC QMHP assessments by QMHPs, and CTC utilization are good beginnings to assessing access to care. It will be important for the County to assess more general access to care such as individual contacts by patients with QMHPs and psychiatrists and group dosage according to established benchmarks. As access to care is determined by both CHS and the Department, collaboration on the analysis and correction of problems related to access to care are essential.

The most recent CHS semi-annual report is "a significant step forward."

62.     The County and the Sheriff's Unit described in Paragraph 77 of this Agreement will develop, implement, and track corrective action plans addressing recommendations of the quality improvement program.

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance requires the County's semi-annual Self-Assessments to set forth (a) the "development of corrective action plans to address the most recent recommendations of the quality improvement program;" and (b) the "implementation and tracking of corrective action plans to address recommendations of the program in prior quarters."

The reviews of the incidents discussed at CIRC meetings that are attached to CHS's Semi-Annual Report provide data responsive to the requirements of Paragraph 61(a)(i) through (vi), which is the basis of the aggregate data reported elsewhere, and set forth "issues" identified and assigned in the meetings about SDV incidents broken down by the categories set forth in Paragraph 61(b) through (e) and the "response/status" of those issues.

CCSB's Semi-Annual Report describes all of the corrective action plans identified during the Executive Inmate Death Reviews of suicides that occurred in the first six months of 2018 and the status of those CAPs as of December 2019.[30]

The Mental Health Subject Matter Expert reviewed these reports and has the following observations:

There is no central tracking of CAPs and progress towards their completion.  The CIRC reviews track case-specific CAPs, although some CAPs address repeated problems having broader impact (such as closing gaps between furniture and walls and repairing speaker grates).  The CHS Semi-Annual Report does not track CAPs in a well-organized manner and it generally limited to tracking "project" outcomes that may considered to be CAPs that address repeated defects.[31]  The CCSB semi-annual report does not separately track system-wide CAPs that are generated from aggregate data or on-going, system-wide problems (such as contraband being used for self-harm).

---

[30] The CCSB Report also summarizes generally the CAP/Issues related to the serious suicide attempts reviewed during the CIRC meetings, broken down by CAP items issued to the Sheriff's Department and those issued to Correction Health Services.  While the description of the CAPs at the suicide review meetings satisfies the requirements of Paragraph 77 for suicides, the general summary of the CAPs does not provide any specific information about the CAPs for the serious suicide attempts.  The specific information is provided in the CIRC reviews attached to CHS's report.

[31] Examples of this include the work on the intake process and the timeliness of MOH (P2) psychiatric encounters, which are also "important examples in that they reflect the use of aggregate data to identify systematic problems."

Further, the County's reports do not discuss whether these CAPS/Issues raise systemic
issues, recommend systemic improvements, or assess the effectiveness of such
improvements from prior reporting periods.  The County is clearly doing a good job in
addressing specific CAPS/Issues; what appears to be missing is a programmatic analysis
of these CAPS/Issues and the systemic impact on the quality of care provided to inmates.
The Mental Health Subject Matter Expert states that "the steps the County is taking to
improve the organization of the quality management program, the collaboration between
CHS and the Department, and the development and use of more global aggregate data
and its posting on a dashboard are appropriate next steps to achieve substantial
compliance."

63.     The County and the Sheriff will maintain adequate High Observation Housing and Moderate Observation Housing sufficient to meet the needs of the jail population with mental illness, as assessed by the County and the Sheriff on an ongoing basis.  The County will continue its practice of placing prisoners with mental illness in the least restrictive setting consistent with their clinical needs.

**STATUS:     NON-COMPLIANCE**

The Compliance Measures require that the County's Self-Assessment set forth (a) the average daily populations in HOH and MOH units in TTCF and CRDF during the reporting period; (b) the average number of beds in those units during the reporting period; (c) the number of days in which there was a waiting list for HOH or MOH housing; and (d) the average number of step-downs per week (i) from HOH to MOH and (ii) from MOH to the least restrictive setting consistent with the prisoners' clinical needs. In addition, for two random weeks, the Department is required to review the count sheets documenting the number of occupied and available beds in the MOH and HOH units at TTCF and CRDF.  Substantial Compliance requires "the immediate availability of HOH and MOH beds at TTCF and CRDF 95% of the time."

The County reports the number of days in which the total number of HOH and MOH available beds was equal to or more than the number of HOH and MOH inmates for the two randomly selected weeks in the Second Quarter of 2018 are as follows:

|       | MOH  | HOH  |
|-------|------|------|
| TTCF  | 100% | 0%   |
| CRDF  | 0%   | 100% |

The County also reports the number of days in which the total number of HOH and MOH available beds was equal to or more than the number of HOH and MOH inmates for the two randomly selected weeks in the Third Quarter of 2018 are as follows:

|       | MOH  | HOH  |
|-------|------|------|
| TTCF  | 100% | 0%   |
| CRDF  | 0%   | 50%  |

The average Daily Population in HOH at TTCF increased from 918 in the two randomly selected weeks in the Second Quarter of 2018 to 968 in the two randomly selected weeks in the Third Quarter of 2018, while the average number of HOH Beds was relatively constant  (763.5 in the Second Quarter of 2018 to 759.7 in the Third Quarter).

The County's Augmented Seventh Self-Assessment reports that the Department "is not able to accurately assess bed availability electronically without reflecting erroneous results, and as such, the Department is not able to provide an accurate semi-annual report at this time."  The Mental Health Subject Matter Expert suggests a simple methodology using P levels as a proxy (P4 means FIP, P3 means HOH, P2 means MOH).

64.     Within six months of the Effective Date, the County and the Sheriff will develop a short-term plan addressing the following 12-month period, and within 12 months of the Effective Date, the County and the Sheriff will develop a long-term plan addressing the following five-year period, to reasonably ensure the availability of licensed inpatient mental health care for prisoners in the Jails.  The County and the Sheriff will begin implementation of each plan within 90 days of plan completion.  These plans will describe the projected capacity required, strategies that will be used to obtain additional capacity if it is needed, and identify the resources necessary for implementation.  Thereafter, the County and the Sheriff will review, and if necessary revise, these plans every 12 months.

**STATUS:      PARTIAL COMPLIANCE**

Substantial Compliance requires the Department to (1) develop a short-term plan that will address the availability of licensed inpatient mental health care for prisoners in an initial 12-month period; (2) commence to implement the plan within 90 days after it is developed; (3) develop a long-term plan within 12 months after the short term plan that will address the availability of licensed inpatient mental health care for prisoners in the following five-year period; and (4) commence to implement the long-term plan within 90 days after it is developed.

On July 14, 2017, the County submitted to the Monitor a Plan Regarding Availability of Licensed Inpatient Mental Health Care (Long Term and Short Term Plans) to provide "an update regarding the County's current efforts to meet the needs of the acutely mentally ill."  The County reiterates in its Seventh Self-Assessment that "the County continues to pursue a dual strategy to increase inpatient beds and the resources necessary to obviate the need for these beds.  With increased services to address the underlying mental health needs (both through appropriate medication and clinical treatment), and the County's strong effort to divert people from the jails, the need for inpatient services should decline."

The County's Seventh Self-Assessment reports that "the County also operates 18 inpatient beds at Olive View-UCLA Medical Center.  These beds house individuals who are diverted from the County Jail, either pre-trial or once they have been brought into the jail and are awaiting trial.  The County's Office of Diversion [began] managing these beds in early July 2018, and is responsible for identifying appropriate individuals for them."  In addition, the Seventh Self-Assessment reports that the "County also continues to operate its Mental Health Unit-Correctional Treatment Center Inpatient Step-Down Unit, which increased the capacity of FIP-related housing to 64 beds."

The County's Seventh Self-Assessment also reports that the FIP waitlist "[c]urrently consists of approximately 46 patients," down from 64 patients reported for the Sixth Reporting Period.  "Fourteen of these individuals are taking medications on a voluntary basis and are, therefore, not prioritized for admission to the FIP."  Further, as in the prior reporting period, "the current average time from referral to admission for the most acute is approximately two days, and can be roughly 20 days for those on the FIP

waitlist that are less acute."  It appears that the County's plans are still not sufficient to
"reasonably ensure the availability of licensed inpatient mental health care for prisoners
in the Jails."

      The Monitor's Fourth Report stated that the County's long-term "plans must have
a reasonable basis for projecting need in order to establish Substantial Compliance with
Paragraph 64."  As noted in the Monitor's Fifth Report, the County's "new level of care
system that designates patients into categories based on acuity and treatment needs" and
its "tracking system to monitor the number of patients who meet this criteria on any given
day" "may provide a reasonable basis for projecting 'the number of licensed inpatient
mental health beds necessary to serve the inmate population.'"  The County needs to use
this "methodology" to determine "the projected capacity required" in the long term and
project how many beds will be required over several years.  Without using this (or some
other) methodology to project the number of FIP patients in the future, it is not possible
to assess whether the County's plans for adding FIP beds are reasonable and sufficient.
This remains an issue that needs to be addressed to achieve Substantial Compliance with
Paragraph 64.

65.     Consistent with existing Sheriff's Department policies, the County and the Sheriff will ensure that psychotropic medications are administered in a clinically appropriate manner to prevent misuse, hoarding, and overdose.

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance requires that (1) the County's Self-Assessments set forth the (a) the results of weekly medication audits documenting the visual observation of the administration of medication during the quarter; (b) unauthorized medications found as a result of cell searches during the reporting period; and (c) incidents involving confirmed prescription drug overdoses; and that (2) "the Monitor concludes, after consulting with the Subject Matter Expert, that psychotropic medications have been administered in a clinically appropriate manner 85% of the time."

On April 6, 2018, the County provided a flow chart entitled "Provision 65 Pill Call – Ideal State Pod-Front Pill Call Procedures" (excluded HOH cell-to-cell procedure) that is the product of a work group convened to develop a "new method and practice of administering medications."  The Monitor and Mental Health Subject Matter Expert concluded that the flow chart is a "reasonable approach," but that the "primary issue will be the nature of the interventions adopted by custody and healthcare staff in response to lack of cooperation" and "what happens if they are not able to verify that the inmate ingested the pills," which the flow chart partially addresses.

The County's Seventh Self-Assessment reports that a working group of representatives from Custody, Mental Health, and Nursing "initiated a pilot program in two modules at TTCF designed to test and improve pill call administration methods.  To date, the pilot has increased cooperation between Custody and nursing through education, briefing, and increased supervision with the goal of increasing medication compliance by inmates and more quickly and more accurately identifying inmates who do not allow staff to verify medication ingestion and may be hoarding medication."  The Mental Health Subject Matter Expert notes that this "is a good example of using quality management principles to improve system function[.]"

As in the past, medication was found during a significant number of searches during the Second [32] and Third Quarters[33] of 2018.  There were also six confirmed drug overdoses during the Third Quarter of 2018.

---

[32] During the Second Quarter of 2018, 141 medications "not appropriately possessed by inmates" were found during 159 unannounced searches at CRDF, 456 medications were found during 89 searches at TTCF, 11 medications during 275 searches at MCJ, and 166 medications during 615 searches at NCCF.  There were no medications found during searches at PDC South, PDC North, and PDC East.
[33] During the Third Quarter of 2018, 181 medications "not appropriately possessed by inmates" were found during 160 unannounced searches at CRDF, 635 medications were found during 79 searches at TTCF, 193 medications during 200 searches at MCJ, 10 medications during 502 searches at NCCF, and 51 mediations during 196 searches at PDC North.  There were no medications found at PDC South and PDC East.

66.     Consistent with existing DMH policies, prisoners in High Observation Housing and Moderate Observation Housing, and those with a serious mental illness who reside in other housing areas of the Jails, will remain on an active mental health caseload and receive clinically appropriate mental health treatment, regardless of whether they refuse medications.

**STATUS:     NON-COMPLIANCE**

Substantial Compliance requires the Department to review, on a random basis, the electronic medical records of prisoners in HOH and MOH or with a Serious Mental Illness ("SMI") to assess whether they have remained on an active mental health caseload and that 95% of HOH prisoners, 90% of MOH prisoners, and 85% of other prisoners with a serious mental illness been offered "clinically appropriate structured mental health treatment" and been seen by a QMHP at least monthly, regardless of whether they refuse medications.

For the Second Quarter of 2018, the County posted results show that 22% of prisoners in HOH, 10% in MOH, and 41% with serious mental illness who reside in other housing areas were "offered clinically appropriate structured mental health treatment and were seen by a QMHP at least once a month."  For the Third Quarter of 2018, the posted results for these categories are 28% of HOH prisoners, 6% of MOH prisoners, and 50% of others with serious mental illness.

The County's Seventh Self-Assessment reports that "[t]he County continues to work towards increasing its capacity to offer clinically appropriate treatment, including structured mental health treatment" and "improved standardization of the intake assessment process performed in the reception centers" to better identify "inmates at intake who have a serious mental illness."  The County also "continues to hire staff to replace those departing service in the jails, some 18 psychiatric social workers started at the jails during quarters two and three."

67.    Within three months of the Effective Date, the County and the Sheriff will implement policies for prisoners housed in High Observation Housing and Moderate Observation Housing that require:

(a)    documentation of a prisoner's refusal of psychotropic medication in the prisoner's electronic medical record;

(b)    discussion of a prisoner's refusal in treatment team meetings;

(c)    the use of clinically appropriate interventions with such prisoners to encourage medication compliance;

(d)    consideration of the need to transfer non-compliant prisoners to higher levels of mental health housing; and

(e)    individualized consideration of the appropriateness of seeking court orders for involuntary medication pursuant to the provisions of California Welfare and Institutions Code sections 5332-5336 and/or California Penal Code section 2603(a).

**STATUS:     NON-COMPLIANCE**

Substantial Compliance requires the County to "review the electronic medical records of 25% of the prisoners in HOH and MOH who refused psychotropic medication during the quarter to verify that the records [of 85% of the prisoners] reflect the documentation and consideration of the matters required by the terms of Paragraph 67."

The County's Seventh Self-Assessment reports acknowledges that the County "has historically experienced challenges implementing and assessing compliance with this Provision."  It also reports that "[t]he County continues to work on ways to use technology to better and more accurately identify and assess compliance where patients have refused 50% of psychotropic medication within a seven day period."

The Mental Health Subject Matter Expert and the clinicians evaluated 15 cases from CRDF and 24 cases from TTCF for compliance with Paragraph 67.  They found that a QMHP considered whether a higher level of care was indicated in 53% of the cases at CRDF and 25% of the cases at TTCF.  They also found that 50% of the cases at CRDF and 22% of the cases at TTCF included "a reasonable determination of the reason for the recommendation for housing change."  They were "concern[ed] to see that the interventions to improve adherence were rarely clinically appropriate at TTCF.  There was also very rare consideration of whether involuntary treatment or FIP placement was indicated, even in severely ill patients with documentation strongly suggestive of dangerousness or grave disability.  Many of these patients were being isolated in their cells in HOH with some refusing medical care."

The County "strongly disagrees" with the Mental Health Subject Matter Expert's findings and conclusions.  Although not directly addressing the Subject Matter Expert's qualitative assessment of the clinical judgements, the County notes that inmates in HOH

> are frequently engaged by custody staff and psychiatric technicians, seen weekly by mental health clinicians, and are seen at least once a month by a psychiatrist. Inmate-patients who are of a P4 status are seen by a psychiatrist every other week. Moreover, psychiatrists evaluating inmate-patients in mental health housing who are refusing medications are trained to specifically consider FIST Orders, involuntary medication orders under Penal Code 2603, and/or admission to the mental health inpatient unit. In MOH, psychiatric technicians compile lists of inmate-patients refusing medication, and those lists are circulated and reviewed weekly by doctors and clinicians. The clinicians and psychiatrists evaluating inmate-patients in MOH regularly evaluate the patient's behavior regarding medication adherence in their assessments of P levels and other clinical matters.

The Mental Health Subject Matter Expert notes, however, that "[t]here are rarely specific interventions targeting medication adherence; when adherence is mentioned, it is primarily encouragement to take medications, which is rarely a sufficient clinical intervention."

68.     Within six months of the Effective Date, the County and the Sheriff will develop and implement a procedure for contraband searches on a regular, but staggered basis in all housing units.  High Observation Housing cells will be visually inspected prior to initial housing of inmates with mental health issues.

> **STATUS:**        **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at MCJ, NCCF, PDC East, PDC South, and PDC North)**
>
> **SUBSTANTIAL COMPLIANCE (as of January 1, 2017 through December 31, 2017 (verified) at TTCF)**
>
> **PARTIAL COMPLIANCE (at CRDF)**

Substantial Compliance requires that "85% of the housing units are searched for contraband at least once in the previous quarter; and 95% of the HOH units visually inspected prior to housing prisoners in these units."  Self-Assessments are to include a summary of searches conducted in the Second Quarter of the last reporting period and the First Quarter of the current reporting period and to randomly select and review 25 Checklist forms for HOH units to confirm that the units were visually inspected prior to initial housing of prisoners in these units.

The County's posted results reflect that in the Fourth Quarter of 2017, 88% of the housing units at CRDF were searched at least once in the quarter, and 80% of the randomly selected HOH cells at CRDF were visually inspected before housing prisoners in these units.  During the First Quarter of 2018, 93% of the housing units at CRDF were searched at least once in the quarter, and 92% of the randomly selected HOH cells at CRDF were visually inspected before housing prisoners in these units.

During the Sixth Reporting Period, the County provided additional records and CCTV footage to show that the HOH cells at TTCF were visually inspected more than 95% of the time in the Third Quarter of 2017.  Where there was a date discrepancy in the source documents, the CCTV footage showed that the HOH cells were visually inspected before the prisoners were housed in these units.  In the Fourth Quarter of 2017, 96% of the housing units at TTCF were searched at least once in the quarter, and 96% of the randomly selected HOH cells at TTCF were visually inspected before housing prisoners in these units.  These results have been verified by the Monitor's auditors.  The County has maintained Substantial Compliance with Paragraph 68 at TTCF for more than 12 consecutive months, and is no longer subject to monitoring with this provision at that facility.  The County previously maintained Substantial Compliance for twelve consecutive months at MCJ, NCCF, PDC East, PDC South, and PDC North, and these facilities were not subject to monitoring for compliance with Paragraph 68 during this reporting period.  As noted by DOJ, however, the "failure to conduct effective contraband searches as required by this provision, may implicate the County's ability to comply with other provisions related to medication hoarding, chiefly provisions 31 and 65."

69.     Consistent with existing DMH policies regarding use of clinical restraints, the County and the Sheriff will use clinical restraints only in the Correctional Treatment Center and only with the approval of a licensed psychiatrist who has performed an individualized assessment and an appropriate Forensic Inpatient order.  Use of clinical restraints in CTC will be documented in the prisoner's electronic medical record.  The documentation will include the basis for and duration of the use of clinical restraints and the performance and results of the medical welfare checks on restrained prisoners.  When applying clinical restraints, custody staff will ensure a QMHP is present to document and monitor the condition of the prisoner being placed in clinical restraints.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of July 1, 2018,
                        through September 30, 2018 (unverified))**

Substantial Compliance requires the Department to review the electronic medical records of all prisoners placed in clinical restraints to verify that the restraints were used, approved, and documented, and that the results of medical welfare checks on restrained prisoners were also documented.

The County's Seventh Self-Assessment reports that for the Second Quarter of 2018, "77%. . . of electronic medical records reviewed. . .reflected that, for inmates placed in clinical restraints for psychiatric purposes, the restraints were used, approved and documented as required by this Provision."  The County's Seventh Self-Assessment also reports that, for the Third Quarter of 2018, five of the six (83%) of the medical records reviewed "reflected that, for inmates placed in clinical restraints for psychiatric purposes, the restraints were used, approved, and documented as required by this Provision."  The County's Self-Assessment notes that the "County has significantly reduced the number of times it uses clinical restraints" and that the "County tracks roughly 11 separate categories of information to assess compliance for each use of clinical restraints."  It reports that it "failed to meet *only* 4 of the 198 items tracked—an effective compliance rate of more than 97%" in the Second Quarter of 2018, and "*only* 1" of 66 items tracked in the Third Quarter of 2018, or 98%."

The Monitor's Sixth Report notes that the Mental Health Subject Matter Expert believes that "the requirements of [this Compliance Measure] are excessive and do not match standards published by organizations such as the Centers for Medicare and Medicaid Services (CMS)[.]"  For example, he "reviewed the one case that the County marked as non-compliant, which appeared to be because the patient was not seen by a psychiatrist prior to restraint even though the nurse obtained a proper telephone order.  The psychiatrist assess the patient within 24 hours as well, in my view this should count as compliant."  Based upon the Mental Health Subject Matter Expert's assessment, and with DOJ's concurrence, the County achieved Substantial Compliance in the Third Quarter of 2018,[34] subject to verification by the Monitor's auditors.

---

[34] The Mental Health Subject Matter Expert still recommends that the Compliance Measures be revised to allow for telephonic approval followed by a psychiatric assessment within 24 hours and that the County restructure its approach to the placement of inmates in clinical restraints as well as the monitoring of those in restraints.

70.     Within three months of the Effective Date, the County and the Sheriff will have policies and procedures regarding the use of Security Restraints in HOH and MOH. Such policies will provide that:

(a)     Security Restraints in these areas will not be used as an alternative to mental health treatment and will be used only when necessary to insure safety;

(b)     Security Restraints will not be used to punish prisoners, but will be used only when there is a threat or potential threat of physical harm, destruction of property, or escape;

(c)     Custody staff in HOH and MOH will consider a range of security restraint devices and utilize the least restrictive option, for the least amount of time, necessary to provide safety in these areas; and

(d)     Whenever a prisoner is recalcitrant, as defined by Sheriff's Department policy, and appears to be in a mental health crisis, Custody staff will request a sergeant and immediately refer the prisoner to a QMHP.

**STATUS:       PARTIAL COMPLIANCE**

The Mental Health Subject Matter Expert and DOJ have expressed concern about the Department's Substantial Compliance with paragraph 70(c) if all inmates in HOH are routinely handcuffed when they are out of their cells "in a housing pod at the same time." One of the clinicians observed that "[o]ur recent onsite observations suggested that not all patients required such restraints all the time."[35]  The Mental Health Subject Matter Expert is of the view that the Department's own "policies impose other requirements for review of restraints that the Department is not following for this population."

As the County "previously reported[,] the Department routinely handcuffs inmates in HOH and HOH_MIST housing when more than one HOH inmates is out of the cell in a housing pod at the same time.  This category of inmates, as a whole, is a safety concern as they are deemed unpredictable and potentially dangers."

In response to concerns expressed by the Mental Health Subject Matter Expert and DOJ, the County's Seventh Self-Assessment reports that:

Department has developed and continues to use alternative types of mental health housing with the goal of housing inmates with mental health concerns in the least restrictive manner appropriate, these models include Step-Down modules, the HOPE Dorm and the Living Module.  As

---

[35] The Mental Health Subject Matter Expert notes that paragraph 70(b) is also implicated because it required that restraint's "will be used only when there is a threat or potential threat of physical harm, destruction of property, or escape."

previously reported, the 'Living Module' concept at TTCF, whereby each patient begins their mental health treatment in an HOH pod and transitions into an MOH pod as their mental health improves.  With each stage in the transition, the inmate-patient gains privileges and is less restricted in their movement.  The Living Module now operates in two pods. Inmates in the Step-down modules and HOPE Dorm are not restrained when out of cell.

The County's Seventh Self-Assessment also reports that "[t]he County continues to conduct weekly assessments of inmates in HOH housing.  During those assessments, clinicians consider, among other things, whether an inmate is able to cohabitate with others.  In addition, the County conducts daily huddle meetings to assess whether HOH inmates are suitable for a double man cell, or transfers to Enhanced Mental Health Housing or MOH."  The Mental Health Subject Matter Expert notes, however, that while housing in a double-man cell is relevant, some inmates who need single-cell housing may still be able to come out unrestrained.

The Subject Matter Expert notes that the "County has made some progress in implementing step-down units and the Living Module approach, but it is far from universally implemented and there is no formal policy or procedure in place to govern this and to reasonably assure continuation."  To achieve Substantial Compliance with Paragraph 70(c), the County needs to conduct individual assessments to determine which inmates need to be restrained, throughout HOH and which inmates can be housed in less restrictive settings, as long as there are adequate beds at each level.

71.     The County and the Sheriff will ensure that any prisoner subjected to clinical restraints in response to a mental health crisis receives therapeutic services to remediate any effects from the episode(s) of restraint.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017 (verified))**

Substantial Compliance requires the Department to review the electronic medical records of all prisoners placed in clinical restraints to verify that the prisoners received therapeutic services as required by Paragraph 71.

The County maintained Substantial Compliance with Paragraph 71 for twelve consecutive months during a prior reporting period and Paragraph 71 was not subject to monitoring in the Seventh Reporting Period.

72.     The County and the Sheriff will develop and implement policies and procedures that ensure that incidents involving suicide and serious self-injurious behavior are reported and reviewed to determine:  (a) whether staff engaged in any violations of policies, rules, or laws; and (b) whether any improvements to policy, training, operations, treatment programs, or facilities are warranted.  These policies and procedures will define terms clearly and consistently to ensure that incidents are reported and tracked accurately by DMH and the Sheriff's Department.

>           **STATUS:**          **SUBSTANTIAL COMPLIANCE (as of January 1,
>                               2017, through December 31, 2017) (subject to further
>                               verification)**

Substantial Compliance requires the Self-Assessments to report on (a) suicide review meetings and (b) CIRC meetings that review incidents of serious self-injurious behavior in the reporting period.

The Monitor's Sixth Report found that the County had maintained Substantial Compliance with Paragraph 72 for the twelve month period ending on December 31, 2018, but expressed the Monitor's concern that the information provided by the County was insufficient "for the Monitor 'to assess' whether the County is *adequately* reviewing potential non-custody staff misconduct."[36]  To address this concern, the County submitted a list of 2017 Performance Management cases reflecting the status and/or results of investigations Custody Health Services personnel in 2017.  In includes whether the allegations were "substantiated" and, if so, the "Final Administrative and/or Disciplinary Action," but does not, as DOJ notes, "indicate to which suicides or suicide attempts the investigation and discipline listed correspond" or "how many of the investigations or disciplinary actions listed arose due to suicides or suicide attempts." The Monitor agrees that this information is needed to assess whether the County maintained Substantial Compliance for twelve consecutive months during the Fifth and Sixth Reporting Periods and, therefore, was not subject to monitoring for compliance with this provision during the Seventh Reporting Period.

---

[36] See Monitor's Sixth Report, p. 84, note 44.

73.     Depending on the level of severity of an incident involving a prisoner who threatens or exhibits self-injurious behavior, a custody staff member will prepare a detailed report (Behavioral Observation and Mental Health Referral Form, Inmate Injury Report, and/or Incident Report) that includes information from individuals who were involved in or witnessed the incident as soon as practicable, but no later than the end of shift.  The report will include a description of the events surrounding the incident and the steps taken in response to the incident.  The report will also include the date and time that the report was completed and the names of any witnesses.  The Sheriff's Department will immediately notify the County Office of Inspector General of all apparent or suspected suicides occurring at the Jails.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified))**

Substantial Compliance requires the Department to review quarterly a random sample of reports of any threats or exhibitions of self-injurious behavior to verify that the reports have the information required by Paragraph 73; and to provide the Monitor with the notifications to the Inspector General of all incidents involving an apparent or suspected suicide during the reporting period.

The County's Seventh Self-Assessment reports that for the Second Quarter of 2018, "96% -- 6% more  than the required 90% -- of reports reviewed have all of the information required by Compliance Measure 73-4(a)."  It also reports that the Office of Inspector General was notified of the one apparent or suspected suicide that occurred during this quarter.

The County's Seventh Self-Assessment also reports that for the Third Quarter of 2018, "99% -- 9% more the required 90% -- of reports reviewed have all of the information required by Compliance Measure 73-4(a)" and there were "no incidents involving an apparent or suspected suicide" during the quarter.  The Monitor's auditors have verified the County's results.  Accordingly, the County has maintained Substantial Compliance for twelve consecutive months and will no longer be subject to monitoring for compliance with Paragraph 73.

74.     The Sheriff's Department will ensure that there is a timely, thorough, and objective law enforcement investigation of any suicide that occurs in the Jails. Investigations shall include recorded interviews of persons involved in, or who witnessed, the incident, including other prisoners.  Sheriff's Department personnel who are investigating a prisoner suicide or suspected suicide at the Jails will ensure the preservation of all evidence, including physical evidence, relevant witness statements, reports, videos, and photographs.

**STATUS:        SUBSTANTIAL COMPLIANCE (as of September 1, 2016, through December 31, 2017)**

Substantial Compliance requires the Department to provide the Monitor with an Executive Suicide Death Review reflecting the results of the Department's investigation of any suicide in the Jails within six months of the suicide.  The review must reflect steps taken to preserve all of the evidence; and list the interviews of persons involved in, or who witnessed, the incident, and whether the interviews were recorded.

The County previously maintained Substantial Compliance with this provision for twelve consecutive months and it was not subject to monitoring during the Seventh Reporting Period.  The County nevertheless continued to notify the Monitor of all inmate deaths, including suicides, and the subsequent death reviews.  The Monitor continued to attend death reviews during the Seventh Reporting Period.

75.     Within three months of the Effective Date, the County and the Sheriff will review every suicide attempt that occurs in the Jails as follows:

(a)     Within two working days, DMH staff will review the incident, the prisoner's mental health status known at the time of the incident, the need for immediate corrective action if any, and determine the level of suicide attempt pursuant to the Centers for Disease Control and Prevention's Risk Rating Scale;

(b)     Within 30 working days, and only for those incidents determined to be a serious suicide attempt by DMH staff after the review described in subsection (a) above, management and command-level personnel from DMH and the Sheriff's Department (including Custody Division and Medical Services Bureau) will meet to review relevant information known at that time, including the events preceding and following the incident, the prisoner's incarceration, mental health, and health history, the status of any corrective actions taken, and the need for additional corrective action if necessary;

(c)     The County and the Sheriff will document the findings that result from the review of serious suicide attempts described in subsection (b) above; and

(d)     The County and the Sheriff will ensure that information for all suicide attempts is input into a database for tracking and statistical analysis.

**STATUS (75):          SUBSTANTIAL COMPLIANCE (as of October 1,
2017, through September 30, 2018 (verified))**

Substantial Compliance requires (a) DMH to review documentation of randomly
selected suicide attempts during the previous quarter to verify that the prisoner's mental
health status and need for immediate corrective action were considered timely by the
DMH staff and that the staff determined whether the suicide attempt was serious; (b) that
the Department and DMH reviewed the relevant information known at that time and the
status of any corrective actions taken, and they considered the need for additional
corrective action if necessary; and (c) that the information is reflected in the Department's
database for tracking and statistical analysis.

The County's Seventh Self-Assessment reported that for the Second Quarter of
2018, "85% -- equal to the required 85% -- of documents reviewed showed CHS staff
considered the inmate's mental health status and need for immediate corrective action;"
"100% -- 5% more than the required 95% -- of suicide attempts are reflected in the
Department's database;" and "90% rather than the required 95% -- of the suicide
attempts" were reviewed by "management and command-level personnel" from Custody,
mental health, and medical.  The County did not meet the 95% threshold for management
and command level reviews of suicide attempts as required by Compliance Measure 75-
5(b) because "due to a miscalculation," one of the ten serious suicide attempts "was
reviewed 31 days after its occurrence – failing to meet the compliance requirement *by
only 1 day.*"  Because the delay was minimal and the "County is in Substantial
Compliance with the other requirements of this Provision in the Second Quarter, the
County requests a finding of Substantial Compliance."  The Mental Health Subject
Matter Expert concurs, and notes that the County is "doing a good job on these reviews,
including some meaningful CAPs."

The County's Augmented Seventh Self-Assessment reports for the Third Quarter
of 2018 "that 91%—6% more than the required 85%—of documents reviewed showed
CHS staff considered the inmate's mental health status and need for immediate corrective
action."  The County also concluded that 100% - 5% more than the required 95% - of the
suicide attempts were reviewed by "management and command-level personnel" from
Custody, mental health, and medical; and 100% -- 5% more than the required 95%— of
suicide attempts are reflected in the Department's database for tracking and statistical
analysis.  The Monitor's auditors have verified the County's results.  Accordingly, the
County has maintained Substantial Compliance for twelve consecutive months and will
no longer be subject to monitoring for compliance with Paragraph 75.

76.     The County and the Sheriff will review every apparent or suspected
suicide that occurs in the Jails as follows:

(a)     Within no more than two working days, management and command-level
        personnel from DMH and the Sheriff's Department (including Custody
        Division and Medical Services Bureau) will meet to review and discuss
        the suicide, the prisoner's mental health status known at the time of the
        suicide, and the need for immediate corrective or preventive action if any;

(b)     Within seven working days, and again within 30 working days,
        management and command-level personnel from DMH and the Sheriff's
        Department (including Custody Division and Medical Services Bureau)
        will meet to review relevant information known at that time, including the
        events preceding and following the suicide, the prisoner's incarceration,
        mental health, and health history, the status of any corrective or preventive
        actions taken, and the need for additional corrective or preventive action if
        necessary; and

(c)     Within six months of the suicide, the County and the Sheriff will prepare a
        final written report regarding the suicide.  The report will include:

        (i)     time and dated incident reports and any supplemental reports with
                the same Uniform Reference Number (URN) from custody staff
                who were directly involved in and/or witnessed the incident;
        (ii)    a timeline regarding the discovery of the prisoner and any
                responsive actions or medical interventions;
        (iii)   copies of a representative sample of material video recordings or
                photographs, to the extent that inclusion of such items does not
                interfere with any criminal investigation;
        (iv)    a reference to, or reports if available, from the Sheriff's
                Department Homicide Bureau;
        (v)     reference to the Internal Affairs Bureau or other personnel
                investigations, if any, and findings, if any;
        (vi)    a Coroner's report, if it is available at the time of the final report,
                and if it is not available, a summary of efforts made to obtain the
                report;
        (vii)   a summary of relevant information discussed at the prior review
                meetings, or otherwise known at the time of the final report,
                including analysis of housing or classification issues if relevant;
        (viii)  a clinical mortality review;
        (ix)    a Psychological Autopsy utilizing the National Commission on
                Correctional Health Care's standards; and
        (x)     a summary of corrective actions taken and recommendations
                regarding additional corrective actions if any are needed.

**STATUS (76):**       **SUBSTANTIAL COMPLIANCE (as of
September 1, 2016, through December 31, 2017)**

The County previously maintained Substantial Compliance with Paragraph 76 for twelve consecutive months and this provision was no longer subject to monitoring during the Seventh Reporting Period.  Nonetheless, the County continued to conduct the reviews required by Paragraph 76 for the suicides that occurred during this period and invited the Monitor to attend these meetings.

77.     The County and the Sheriff will create a specialized unit to oversee, monitor, and audit the County's jail suicide prevention program in coordination with the Department of Mental Health.  The Unit will be headed by a Captain, or another Sheriff's Department official of appropriate rank, who reports to the Assistant Sheriff for Custody Operations through the chain of command.  The Unit will be responsible for:

(a)     Ensuring the timely and thorough administrative review of suicides and serious suicide attempts in the Jails as described in this Agreement;

(b)     Identifying patterns and trends of suicides and serious suicide attempts in the Jails, keeping centralized records and inputting data into a unit database for statistical analysis, trends, and corrective action, if necessary;

(c)     Ensuring that corrective actions are taken to mitigate suicide risks at both the location of occurrence and throughout the concerned system by providing, or obtaining where appropriate, technical assistance to other administrative units within the Custody Division when such assistance is needed to address suicide-risk issues;

(d)     Analyzing staffing, personnel/disciplinary, prisoner classification, and mental health service delivery issues as they relate to suicides and serious suicide attempts to identify the need for corrective action where appropriate; and recommend remedial measures, including policy revisions, re-training, or staff discipline, to address the deficiencies and ensure implementation; and

(e)     Participating in meetings with DMH to develop, implement, and track corrective action plans addressing recommendations of the quality improvement program.

**STATUS:      PARTIAL COMPLIANCE**

CCSB's Semi-Annual Report for the Second and Third Quarters of 2018[37] reports that "there were two (2) suicides within the jail facilities,  nineteen (19) suicide attempts, and four hundred and twenty-six (426) Self-Directed Violence notifications in the jails. Each suicide was discussed in a Preliminary (24 hr), 7 and 30 Day Executive Review" as required by Paragraph 76. A third suicide that occurred at the end of the First Quarter of 2018 was also discussed within these timeframes in the Second Quarter of 2018.[38]  19 of the SDV incidents "were deemed serious suicide attempts."  Of those 19, only nine of the serious incidents were discussed during six (6) Critical Incident Review Committee (CIRC) meetings.

---

[37] Because the CCSB report covers the Second and Third Quarters of 2018, there is some overlap with CCSB's report for the Sixth Reporting Period, which covered the First and Second Quarters of 2018.
[38] All of the suicides occurred in the Second Quarter of 2018 and were covered in CCSB's prior report.

The Semi-Annual Report includes the following sections:

(a)      "Administrative Review of Suicides."  This summarizes the 24-hour, 7-day, and 30-day suicide reviews that occurred during the Second and Third Quarters of 2018, which includes the corrective actions the Department took to mitigate suicide risks following these reviews.  Based upon CCSB's Report and CHS's Semi-Annual Report, the Monitor remains satisfied that CCSB is ensuring that CHS and the Department are timely and thoroughly conducting administrative review of suicides and serious suicide attempts in the jails as required by Paragraphs 76 and Compliance Measure 77-2(a).

(b)      "Patterns and trends and statistical analysis of suicides and serious suicide attempts in the jails."  This section breaks down the suicides reviewed in the Second and Third Quarters of 2018 by age, ethnicity, days from arrest, time of day, location, method, and prior self-directed violence.  Age and ethnicity are also reported as the rate per 100,000 inmates.  In this report, CCSB "compare[s] the age distribution of inmates who committed or engaged in self-directed violence to that of the inmate population overall both by acts of self-directed violence more generally, and specifically, acts of self-directed violence deemed to be 'critical incidents' by the Correctional Health Services (CHS) self-directed violence review team," and also calculates rates per thousand inmates in various age groups to "develop benchmarks by which incidents of self-directed violence can be tracked according to the age of the inmate[.]"  The report analyzes the three suicides in the Second and Third Quarter of 2018, the 426 SDV incidents, and 18 CIRC incidents by age, compared to the inmate populations in each age group and per thousand inmates.[39]  It concludes "that inmates in the age categories 26-34 and 35-39 years old are at a higher risk of self-directed violence."  This more detailed statistical analysis satisfies the requirements of Compliance Measure 77(b), but it is limited to age groups.[40]

(c)      "Corrective actions taken by the department to mitigate suicide risks."  This section summarizes the status of "a total of 74 CAP/Issues related to 19 serious suicide attempts that were reviewed during a Critical Incident Meeting,"[41] and 24 corrective actions related to three suicides reviewed during the Second and Third Quarters of 2018.  CCSB's report of the CAPs discussed at the Executive Inmate Review Committee meetings under the "Administrative Review of Suicides" section above and the CHS's Summary of Recent CIRC Incidents and Data in its Semi-Annual Report reflect that corrective actions are being "taken to mitigate suicide risks."  The Mental Health Subject Matter Expert notes that "none of these CAPs were based on analysis of aggregate data or "patterns and trends and statistical analysis of suicides and serious suicide attempts."

---

[39] As CCSB notes, since the CIRC sample size is only 18, "it is difficult to draw any conclusions as the margin of error is about 23%."  Since the sample size of the suicides is only three, it is not possible to draw any conclusions from this data.

[40] The report indicates that the County is continuing to develop its ability to "track trends and patterns in the area of inmate age groups and future reports may include analysis based on factors such as:  the nature of the crime committed, . . . marital status, known gang affiliation and/or other identifying criteria."

[41] See CCSB Report, p. 28.  The County subsequently noted that there was an error in the CCSB Report and "[t]here were 18 CIRCs during the relevant period, each of which was reviewed in the normal course."

(d)　　"Technical issues provided to, or obtained for other administrative units within the Custody Division to address suicide-risk issues." This section vaguely references "[v]arious projects and programs [that] have been developed to help address some of the [undefined] concerns" and notes that there are "incidents that include factors such as mental health, systemic issues, and facility layout/construction projects that will likely result in repeated behaviors until more long-term solutions are put into place." CCSB will be "responsible for monitoring the implementation and tracking of CAPs to address the issues identified." It does not appear, however, that CCSB provided any technical assistance to other administrative units within the Custody Division in this reporting period.

(e)　　"Analysis of staffing, personnel/disciplinary, prisoner classification, and mental health service delivery issues as they relate to suicides and serious suicide attempts." This section summarizes, without any analysis, issues in these categories that were identified for the three suicides reviewed during the Second and Third Quarters of 2018.

(f)　　"Remedial measures, including policy revisions, re-training, or staff discipline, to address issues related to suicide and serious suicide attempts." This section consists of a table that summarizes the measures taken to address issues related to the three suicides reviewed during the Second and Third Quarters.

(g)　　"Summaries of meeting with DMH to develop, implement, and track corrective action plans." This section reports that "CCSB, and CHS (Mental and Medical Health) are involved in the CIRC and Joint Quality Improvement Committee ("JQIC") meetings. Corrective action plans are primarily identified and discussed at CIRC meetings. At every JQIC meeting, there is follow up to verify that the CAP(s) have been addressed and assigned, also the individual assigned to the CAP should verify their effectiveness. CCSB tracks all suicide-related CAPs, whether they are CHS or LASD CAPs, and does so continuously outside of the CIRC and JQIC context." There were a total of 6 JQIC meetings during the Second and Third Quarters of 2018 that discussed 74 CAP/Issues identified during CIRC meetings.

Because the County is no longer subject to monitoring for compliance with Paragraph 24, which requires the County and the Sheriff "to review and inspect housing areas on at least an annual basis to identify suicide hazards," it is incumbent on CCSB to track the County's implementation of its Suicide Hazard Mitigation Plans and the corrective actions to address suicide hazards identified in the annual inspections. This is not, however, captured in either of CCSB's Semi-Annual Reports or other postings.

CCSB is to be commended for the work it has done to facilitate the implementation of various provisions of the Settlement Agreement. Paragraph 77 also requires the unit "to oversee the County's jail suicide prevention program in coordination with [CHS]" and Paragraphs 60 and 62 impose obligations on CCSB to work with CHS to "implement a quality improvement plan to identify and address clinical issues that

100

place prisoners at significant risk of suicide and self-injurious behavior" and "develop, implement and track corrective action plans addressing recommendations of the quality improvement program."

Coordination between CCSB and CHS is improving, and they are tracking and sharing data related to suicides and self-directed violence, but not other measures. They are beginning to share and track suicide-related data (as per Paragraphs 61(a) and 77(b)), but not data related to other areas in which custody has some role, such as access to care, administration of psychotropic medications, and clinical restraints (as per Paragraph 61(b), (c), and (d)). Further, Custody's focus is primarily a matter of investigation and fixing case-specific problems, rather than gathering and analyzing aggregate data to detect system-wide problems. For example, the determination of whether an inmate can be brought out of his or her cell for therapy or must be seen by the clinician at the cell front instead is an access to care issue. While Custody necessarily has an important role in facilitating this clinical determination, there are HOH inmates who do not come out of their cells because they are deemed too dangerous, and therefore they are not receiving the access to care they need to treat their mental illness. The extent to which HOH inmates are not coming out of their cells and the reasons they are not coming out are not being tracked and assessed by Custody and CHS to ascertain the extent to which this is a significant access to care problem, and what systemic improvements can be identified, implemented and measured.

While CAPS identified at the CIRC and JQIC meetings are reviewed on a case-by-case basis, there is, as noted by the Mental Health Subject Matter Expert, "no evidence that aggregate data are being used to determine whether there are system-wide problems." He observes that:

> There has been continued improvement in the tracking, coordination and follow through of case-specific CAPs. The use of Longitudinal Improvement Projects (LIPs) is also a sound development, but there needs to be more focused and targeted measures associated with these projects. A good example is the repeated problem of contraband associated with self-directed violence. The only reference to any effort to address this is repeated cell searches, but there are no targets, no method to determine efficacy, and no evidence that this problem has been reduced, despite being repeatedly identified as a problem.

78.     The County and the Sheriff will maintain a county-level Suicide
Prevention Advisory Committee that will be open to representatives from the Sheriff's
Department Custody Division, Court Services, Custody Support Services, and Medical
Services Bureau; the Department of Mental Health; the Public Defender's Office; County
Counsel's Office; the Office of the Inspector General; and the Department of Mental
Health Patients' Rights Office.  The Suicide Prevention Advisory Committee will meet
twice per year and will serve as an advisory body to address system issues and
recommend coordinated approaches to suicide prevention in the Jails.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of May 11, 2016, through
May 18, 2017)**

Substantial Compliance requires (1) the Committee to meet twice per year and (2)
"recommend coordinated approaches to suicide prevention in the Jails."

The County maintained Substantial Compliance with Paragraph 78 for twelve
consecutive months as of May 18, 2017, and this provision was not subject to monitoring
in the Seventh Reporting Period.  The County has continued the Bi-Annual Suicide
Prevention meetings and reports that 73 participants from various County departments
attended the most recent meeting on November 7, 2018.

79.   (a)    Unless clinically contraindicated, the County and the Sheriff will offer prisoners in mental health housing:

    (i)    therapeutically appropriate individual visits with a QMHP; and

    (ii)    therapeutically appropriate group programming conducted by a QMHP or other appropriate provider that does not exceed 90 minutes per session;

  (b)    The County and the Sheriff will provide prisoners outside of mental health housing with medication support services when those prisoners are receiving psychotropic medications and therapeutically appropriate individual monthly visits with a QMHP when those prisoners are designated as Seriously Mentally Ill; and

  (c)    The date, location, topic, attendees, and provider of programming or therapy sessions will be documented. A clinical supervisor will review documentation of group sessions on a monthly basis.

**STATUS:**    **NON-COMPLIANCE**

Substantial Compliance requires the Department to maintain records of therapeutically appropriate individual visits and group programming, and the names of the clinical supervisors who reviewed the documentation of group sessions; describe the medication support services available for prisoners not in mental health housing who are receiving psychotropic medications; and review electronic medical records of such to confirm that medication support services were provided to these prisoners.

The County's Seventh Self-Assessment reports that in the Second Quarter of 2018, 56% of the prisoners who resided outside of mental health housing and were receiving psychotropic medications were "provided with medication support services," which is below the 85% threshold required by Compliance Measure 79.5(d) for Substantial Compliance. The County's Augmented Seventh Self-Assessment reports that in the Third Quarter of 2018, 51% of these prisoners were provided with medication support services.

As in the past, the County has "determined that a shortage of medical doctors treating patients in the general population hindered its ability to comply with this Provision." The County also acknowledges that, "[a]s noted in previous reports by the Monitor, the Subject Matter Expert determined that Compliance Measures 79-1(a-c) and 79-5(b), governing therapeutically appropriate treatment to inmates in HOH and MOH units, are not yet ripe for evaluation as the County is not yet able to render structured treatment according to methods reflected in treatment plans. The County continues to dedicate resources to improving treatment planning and the quality of individual and group therapeutic services."

80.      (a)      The County and the Sheriff will continue to make best efforts to provide appropriate out-of-cell time to all prisoners with serious mental illness, absent exceptional circumstances, and unless individually clinically contraindicated and documented in the prisoner's electronic medical record.  To implement this requirement, the County and the Sheriff will follow the schedule below:

(i)      By no later than six months after the Effective Date, will offer 25% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week;

(ii)      By no later than 12 months after the Effective Date, will offer 50% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week; and

(iii)      By no later than 18 months after the Effective Date, will offer 100% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week.

(b)      No later than six months after the Effective Date, the County and the Sheriff will record at the end of each day which prisoners in HOH, if any, refused to leave their cells that day.  That data will be presented and discussed with DMH staff at the daily meeting on the following Normal business workday.  The data will also be provided to the specialized unit described in Paragraph 77 and to DMH's quality improvement program to analyze the data for any trends and to implement any corrective action(s) deemed necessary to maximize out-of-cell time opportunities and avoid unnecessary isolation.

**STATUS (80):         NON-COMPLIANCE**

Paragraph 80 requires that, "no later than 18 months after the Effective Date [July 1, 2015]," 100% of the prisoners in HOH receive "ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week." The parties have agreed that up to five hours of the structured time can consist of education or work programs, but at least five hours of the time must be therapeutic.

The County's Seventh Self-Assessment reports that in the Second Quarter of 2018, 26% of the prisoners at CRDF and 84% of the prisoners at TTCF were offered the required 10 or more hours of unstructured, out-of-cell recreational time, which is well-below the 100% threshold for both unstructured recreational time and structured therapeutic or programming.

The County's Seventh Self-Assessment also reports that "[w]ith respect to the structured out-of-cell time, CHS is in the process of piloting an electronic system that allows clinicians, and not Custody staff, to track structured out-of-cell time offered. . . . The County also continues to work on expanding staffing so that it may offer additional group therapy sessions and a wider variety of group sessions such that patients receive clinically appropriate offerings."

The Mental Health Subject Matter Expert and the clinicians observed HOH pods at CRDF and TTCF in the Seventh Reporting Period, and they "coded" out-of-cell time for inmates in the pods.  The Mental Health Subject Matter Expert "continues to have substantial concerns with the tracking of this data," and he also reports that:

> Virtually all the structured out-of-cell activities were mental health groups and occasional meetings with mental health clinicians.  The unstructured out-of-cell time mostly consisted of unstructured dayroom time with a minority of the time being constituted by showers, yard time, and stray activities.

> As before, about half of the inmates did not come out of their cells, at all. . . .On average, out-of-cell time for structured activities remained about the same as [in the prior reporting period] at only about 25 minutes but unstructured time increased from an average of 88 minutes to 142 minutes per day.

The Department believes that increasing the "numbers of HOH pods allowing inmates out unrestrained. . .will likely continue to afford more unstructured out of cell time."

81.     Except as specifically set forth in Paragraphs 18-20 of this Agreement, and except as specifically identified below, the County and the Sheriff will implement the following paragraphs of the Implementation Plan in *Rosas* at all Jails facilities, including the Pitchess Detention Center and the Century Regional Detention Facility, by no later than the dates set forth in the Implementation Plan or as revised by the *Rosas* Monitoring Panel:  Paragraphs 2.2-2.13 (use of force policies and practices); 3.1-3.6 (training and professional development); 4.1-4.10 (use of force on mentally ill prisoners); 5.1-5.3 (data tracking and reporting of force); 6.1-6.20 (prisoner grievances and complaints); 7.1-7.3 (prisoner supervision); 8.1-8.3 (anti-retaliation provisions); 9.1-9.3 (security practices); 10.1-10.2 (management presence in housing units); 11.1 (management review of force); 12.1-12.5 (force investigations, with the training requirement of paragraph 12.1 to be completed by December 31, 2016); 13.1-13.2 (use of force reviews and staff discipline); 14.1-14.2 (criminal referrals and external review); 15.1-15.7 (documentation and recording of force); 16.1-16.3 (health care assessments); 17.1-17.10 (use of restraints); 18.1-18.2 (adequate staffing); 19.1-19.3 (early warning system); 20.1-20.3 (planned uses of force); and 21.1 (organizational culture).

## STATUS:     PARTIAL COMPLIANCE

Policies approved by the *Rosas* Monitors and adopted by the Department in the First Reporting Period implemented the following provisions of the *Rosas* Implementation Plan:  Paragraphs 2.2-2.13 (use of force policies and practices); 3.6 (training and professional development); 4.1-4.5 (use of force on mentally ill prisoners); 5.1-5.3 (data tracking and reporting of force); 7.1-7.3 (prisoner supervision); 8.1-8.3 (anti-retaliation provisions); 9.2-9.3 (security practices); 10.1-10.2 (management presence in housing units); 11.1 (management review of force); 12.2-12.5 (force investigations); 14.1-14.2 (criminal referrals and external review); 15.1-15.7 (documentation and recording of force); 16.1-16.3 (health care assessments); 17.1-17.10 (use of restraints); 18.1-18.2 (adequate staffing); 20.1-20.3 (planned uses of force); and 21.1 (organizational culture).

In the Second Reporting Period, the *Rosas* Monitors approved policies to implement the following provisions of the *Rosas* Implementation Plan:  Paragraphs 6.1-6.20 (grievance system); Paragraph 8.2 (combining "Complaints of Retaliation").  They also approved revised policies to implement Paragraphs 13.1-13.2 (discipline for PREA violations, dishonesty, and failure to report force incidents).

Paragraphs 3.1-3.4, 4.6-4.9, and 12.1 of the *Rosas* Implementation Plan reflect training requirements that were supposed to be, but were not, completed by December 31, 2016.  This is due in part to the delays that have occurred in the review and approval of the Department's use of force and investigations training program.  The Monitor's auditors will review the Department's training records and verify the Department's compliance with the training requirement of the *Rosas* plan at CRDF, NCCF, PDC North, PDC South, and PDC East.

On July 10, 2018, the Department presented to the *Rosas* Monitors its Custody

Operations Employee Review System it has implemented "to facilitate the identification, tracking, analysis, and review of specific employee-related incidents and issues." The system generates monthly reports reflecting use of force, grievances against staff, and Watch Commander Service Comment Reports for individual employees over a three month period to identify potentially problematic employees. The *Rosas* Monitors concluded that this system addresses the requirements of Paragraphs 19.1, 19.2, and 19.3 of the *Rosas* plan for an Early Warning System. The Department implemented the Employee Review System as a pilot program at the Downtown Jail Facilities on July 27, 2018, and expanded it throughout Custody Operations on October 25, 2018. As a result, the Department implemented all of the provisions of the *Rosas* Plan at NCCF, CRDF, PDC North, and PDC South and achieved Substantial Compliance with Paragraph 81 as of October 25, 2018. The Department is subject to monitoring of its compliance with the *Rosas* Plan at these facilities for the 18-month period required under the *Rosas* Settlement Agreement.

Paragraphs 4.10 and 9.1 of the *Rosas* Implementation Plan are moot since the Settlement Agreement requires the Crisis Intervention and Conflict Resolution training to be extended to the remaining deputies and Custody Assistants, and it specifies the required cell checks in the Jails. Accordingly, the Department has implemented all of the provisions of the *Rosas* Implementation Plan.

In the Seventh Reporting Period, the Monitor reviewed 31 randomly selected completed force packages for CRDF, NCCF, PDC North, and PDC South. Packages that the Monitor concluded raised an issue were also reviewed by the recently retained Use of Force Subject Matter Expert Susan McCampbell. Overall, the Monitor concluded that the Department is complying with its policies regarding the use and reporting of force incidents at NCCF, CRDF, PDC North, and PDC South,[42] and that the force investigations are thorough and complete. There were two cases in which the Monitor concluded that the force was not in compliance with the applicable provisions of the *Rosas* Plan,[43] and one case in which reporting and investigation of the force was not in compliance with the other applicable provisions of the plan. Of the two cases in which the Monitor concluded that the force was out of policy, one involved the use of a chemical spray against a naked inmate during the intake process and the other punches to the head of a restrained inmate. In the first case, the Monitor concluded that the reporting and investigation were also out of policy because the reports were not consistent with the video footage of the incident.[44] In the latter case, the Department also found that the force was out of policy, but the Department determined that the Deputy Sheriff should receive additional training rather than discipline for the violation. Given that over 93%

---

[42] With the exception of one force incident at South, all of the other force incidents reviewed by the Monitor during the Seventh Reporting Period were captured on the CCTVs at CRDF, NCCF, and PDC North.

[43] In a third case at PDC South, the Monitor was not able to reach a conclusion regarding the force as the accounts of the involved deputy and the inmate were in conflict and the incident was not captured on the CCTV.

[44] The Monitor's finding regarding the reporting and investigation of the force used in this case does not affect the Substantial Compliance finding with respect to Provision 84, which focuses on the timeliness of the completion of the investigations.

of the force incidents complied with the *Rosas* use of force provisions and over 96% of the reports and investigations complied with the *Rosas* reporting and investigation provisions, the Monitor concluded that the Department achieved Substantial Compliance with these provisions at the facilities outside of the Downtown Jail Complex during the Seventh Reporting Period.

During the Seventh Reporting Period, the Monitor met with the Inmate Grievance Teams at CRDF and NCCF and with the Division Inmate Grievance Coordinator who has oversight responsibility for the implementation of the new grievance system.  The grievance teams at both CRDF and NCCF have made significant improvements in the tracking of inmate grievances, reducing the back-log of overdue grievance investigations and closing out investigations that had been open for more than 30 days at their institutions.  The Division Inmate Grievance Coordinator provided the Monitor with his Executive Reports: Statistical Analysis and Trends  through the Third Quarter of 2018 (with a comparison to the Second Quarter of 2018) and for the months of November and December 2018, broken down by facility and with response times in compliance with the 15-day response required by the *Rosas* Plan.  The Division Inmate Grievance Coordinator has done an outstanding job creating a new system for handling inmate grievances and in tracking and reporting on the effectiveness of this new system.  The Monitor believes that the Department has achieved Substantial Compliance with the grievance provisions of the *Rosas* Plan at NCCF, CRDF, PDC North, and PDC South, which are the facilities covered by Paragraph 81.

82.    With respect to paragraph 6.16 of the *Rosas* Implementation Plan, the County and the Sheriff will ensure that Sheriff's Department personnel responsible for collecting prisoners' grievances as set forth in that paragraph are also co-located in the Century Regional Detention Facility.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of July 15, 2016, through December 31, 2017)**

The *Rosas* Monitors have approved a de-centralized inmate grievance system, which includes an Inmate Grievance Team co-located at Century Regional Detention Facility.  The Department published its new grievance policies on July 15, 2016.

CRDF has its own Inmate Grievance Team with the staffing required by CDM 8-01.020.00.  The Monitor met with CRDF's Inmate Grievance Team during the Sixth Reporting Period and reviewed the operation of the grievance system at CRDF.

Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring for Substantial Compliance with Paragraph 82 in the Seventh Reporting Period.

83.     The County and the Sheriff will install closed circuit security cameras
throughout all Jails facilities' common areas where prisoners engage in programming,
treatment, recreation, visitation, and intra-facility movement ("Common Areas"),
including in the Common Areas at the Pitchess Detention Center and the Century
Regional Detention Facility.  The County and the Sheriff will install a sufficient number
of cameras in Jails facilities that do not currently have cameras to ensure that all
Common Areas of these facilities have security-camera coverage.  The installation of
these cameras will be completed no later than June 30, 2018, with TTCF, MCJ, and IRC
completed by the Effective Date; CRDF completed by March 1, 2016; and the remaining
facilities completed by June 30, 2018.  The County and the Sheriff will also ensure that
all video recordings of force incidents are adequately stored and retained for a period of
at least one year after the force incident occurs or until all investigations and proceedings
related to the use of force are concluded.

> **STATUS:     SUBSTANTIAL COMPLIANCE (as of July 1, 2015, through
> June 30, 2016 at MCJ and IRC)**
>
> **SUBSTANTIAL COMPLIANCE (as of October 1, 2015,
> through September 30, 2016 at TTCF)**
>
> **SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through
> March 31, 2017 at CRDF)**
>
> **SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through
> September 30, 2018, at NCCF and PDC North)**
>
> **SUBSTANTIAL COMPLIANCE (as of July 1, 2018, through
> September 30, 2018 at PDC South)**

The Monitor visited NCCF and PDC North on April 4, 2018, and confirmed that
the closed circuit security cameras were operational in Common Areas at those facilities.
The Department subsequently ordered and installed an additional eight cameras to cover
blind spots at PDC North.  On July 12, 2018, the Department submitted a report showing
all of the cameras requested were installed and operational at NCCF, PDC North, and
PDC South.

Paragraph 83 also requires the Department to provide evidence that all video
recordings of force incidents were adequately stored and retained for a period of at least
one year after the force incident occurs.  The County's Sixth Self-Assessment reported
that it has achieved Substantial Compliance for this measure at CRDF in the Fourth
Quarter of 2017.

The County's posted results for NCCF, PDC North, and PDC South reflect that
the Department achieved Substantial Compliance at these facilities in that all of the video
recordings of all force incidents at PDC North and South of randomly selected force
incidents at NCCF in the Second and Third Quarters of 2018 "were stored and retained

by the Department."  The Monitor reviewed the video recordings and confirmed that the Department's videos depict the force incidents on the Department's inventory.[45]

In order to maintain Substantial Compliance, however, the Department must show that "90% of the force incidents on the quarterly lists. . . are on the inventory provided by the Department one year after the force incident."  This requires the Department to show that force incidents that occurred in the first year after the cameras were installed be on the inventory one year after the incident.  This means that NCCF and PDC North are subject to this requirement of Paragraph 83 until March 31, 2020, and PDC South is subject to it until June 30, 2020.

The County previously maintained Substantial Compliance with Paragraph 83 at IRC, MCJ, TTCF, and CRDF for twelve consecutive months and was not subject to monitoring at these facilities during the Seventh Reporting Period.

---

[45] One force incident at PDC South in the Second Quarter was, however, too blurry to be able to see what actually happened.  Since this was before all of the cameras were installed at PDC South, it occurred before the Department achieved Substantial Compliance at South.

84.     The Sheriff will continue to maintain and implement policies for the timely and thorough investigation of alleged staff misconduct related to use of force and for timely disciplinary action arising from such investigations.  Specifically:

(a)     Sworn custody staff subject to the provisions of California Government Code section 3304 will be notified of the completion of the investigation and the proposed discipline arising from force incidents in accordance with the requirements of that Code section; and

(b)     All non-sworn Sheriff's Department staff will be notified of the proposed discipline arising from force incidents in time to allow for the imposition of that discipline.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of July 1, 2017, through June 30, 2018 (verified))**

Substantial Compliance under the Compliance Measures requires the Department to demonstrate that 95% of the investigations of force incidents in which sworn custody staff and non-sworn custody staff were found to have violated Department policy or engaged in misconduct were completed and administrative action, which could include discipline, was taken within the time frames provided for in Government Code Section 3304 and relevant Department policies.[46]

The County's Seventh Self-Assessment reports that the Department maintained Substantial Compliance in the Second Quarter of 2018.  The Department concluded that "100% -- rather than the required 95% -- of investigations of force incidents which involved a violation of policy or misconduct were completed and administrative action was timely taken pursuant to 84-2."  The reported results have been verified by the Monitor's auditors.  As a result, the Department has maintained Substantial Compliance with Paragraph 84 for twelve months and is no longer subject to monitoring for compliance with this provision.

---

[46] The Monitor's determination of the Department's compliance with Paragraph 84 is largely based upon the timeliness of the completion of the investigations, but the Monitor also previously reviewed several internal investigations, which appeared to be thorough and unbiased.

85.     The County and the Sheriff will ensure that Internal Affairs Bureau management and staff receive adequate specialized training in conducting investigations of misconduct.

**STATUS:     NON-COMPLIANCE**

Substantial Compliance requires the Department to provide the Monitor and Subject Matter Experts with (1) the curriculum/syllabus for the three specialized courses given to IAB management, and (2) a list of the sworn personnel assigned to IAB and proof that such personnel successfully completed the training.  The County's posted results show that only 63% of the IAB investigators completed all three of the required courses as of the end of the Third Quarter of 2018.

86.     Within three months of the Effective Date, the County and the Sheriff will develop and implement policies and procedures for the effective and accurate maintenance, inventory, and assignment of chemical agents and other security equipment. The County and the Sheriff will develop and maintain an adequate inventory control system for all weapons, including OC spray.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 at MCJ and CRDF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2016, through December 31, 2017 at PDC North)**

**SUBSTANTIAL COMPLIANCE (as of February 1, 2017, through March 31, 2018 at PDC South and PDC East)**

**SUBSTANTIAL COMPLIANCE (as of March 1, 2017, through March 31, 2018 at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 at IRC)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through December 31, 2018 at TTCF)**

CDM 7-08/080 ACCOUNTABILITY OF SPECIALWEAPONS, effective October 14, 2016, requires each facility to have unit orders that "establish procedures for the storage, issuance, reissuance, accountability, maintenance, and periodic inventory of all weapons. . . stored at, or issued from, the facility," which includes detailed requirements for the "Inventory, Control, and Accountability of Aerosol Chemical Agents."

In addition to providing written policies and procedures for the effective and accurate maintenance, inventory, and assignment of chemical agents and other security equipment, Substantial Compliance requires the Department to provide the Monitor and Subject Matter Experts with up-to-date Unit Orders for each jail requiring the inventory and inspection of special weapons, and armory audit logs documenting the inventory and control of armory-level weapons.

The Monitor and Use of Force Subject Matter Expert inspected the armories at TTCF on September 17, 2018, and noted the continued improvement and that the inventory logs were checked daily in the TTCF armories.

The Department previously maintained Substantial Compliance with Paragraph 86 for twelve consecutive months at MCJ, CRDF, PDC North, PDC South, PDC East, IRC, and NCCF.  Pursuant to Paragraph 111, these were not subject to monitoring in the Seventh Reporting Period.

114

## APPENDIX A

| NO. | PROVISION | STATUS | SUBSTANTIAL COMPLIANCE DATES |
|---|---|---|---|
| 18 | Suicide Prevention Training | Substantial Compliance (MCJ, NCCF, PDC South, PDC East, TTCF, IRC, PDC North, & CRDF) | **(10/1/17 at MCJ & PDC South)[1]** **(9/1/17 at NCCF)** **(12/1/17 at PDC East)** **(4/1/18 at TTCF, IRC, & PDC North)** (6/1/18 at CRDF) |
| 19 | Crisis Intervention & Conflict Resolution Training | Substantial Compliance (MCJ, NCCF, IRC, & TTCF) Partial Compliance (CRDF) | (4/1/18 at MCJ, NCCF & IRC) (7/1/18 at TTCF) |
| 20 | Training at NCCF, PDC and CRDF | Substantial Compliance (PDC East, PDC North, PDC South, NCCF, & CRDF) | **(8/1/17 at PDC East, PDC North, NCCF, & CRDF)** **(10/1/17 at PDC South)** |
| 21 | CPR Certification | Substantial Compliance (NCCF, PDC East, PDC North, PDC South, TTCF, IRC, MCJ, & CRDF) | **(10/1/15 – 9/30/16 at PDC East & PDC South)** **(1/1/16 – 12/31/16 at NCCF, PDC North, & IRC)** **(4/1/16 – 3/31/17 at TTCF)** (10/1/17 – 9/30/18 at MCJ) (7/1/18 – 9/30/18 at CRDF) |
| 22 | Use of Arresting and Booking Documents | Substantial Compliance | **(7/1/16 – 6/30/17)** |

---

[1] Substantial Compliance Dates in **bold** reflect that the Department has achieved Substantial Compliance with the training requirements or maintained Substantial Compliance for twelve consecutive months with the other requirements; the results were verified by the Monitor's auditors when required; and the County or designated facilities are no longer subject to monitoring of this provision pursuant to Paragraph 111 of the Settlement agreement.

## APPENDIX A

| | | | |
|---|---|---|---|
| 23 | Suicide Hazard Mitigation Plans | Substantial Compliance | **(7/12/18)** |
| 24 | Suicide Hazard Inspection | Substantial Compliance | **(10/1/17 – 9/30/18)** |
| 25 | Transportation of Suicidal Inmates (station jails) | Partial Compliance | |
| 26 | Identification and Evaluation of Suicidal Inmates | Partial Compliance | |
| 27 | Screening for Mental Health Care and Suicide Risk | Partial Compliance | |
| 28 | Expedited Booking of Suicidal Inmates | Substantial Compliance (IRC) Partial Compliance (CRDF) | **(4/1/17 – 3/31/18 at IRC)** |
| 29 | Mental Health Assessments (of non-emergent mental health needs) | Substantial Compliance | **(4/1/17 – 3/31/18)** |
| 30 | Initial Mental Health Assessments & Treatment Plans | Partial Compliance | |
| 31 | Electronic Medical Records Alerts | Partial Compliance | |
| 32 | Electronic Medical Records – Suicide Attempts | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 33 | Supervisor Reviews of Electronic Medical Records | Substantial Compliance | **(7/1/16 – 6/30/17)** |
| 34 | Discharge Planning | Stayed Pending Litigation | |
| 35 | Referral for Mental Health Care | Substantial Compliance | (11/1/17 – 9/30/18) |
| 36 | Assessments After Triggering Events | Partial Compliance | |
| 37 | Court Services Division Referrals | Partial Compliance | |

## APPENDIX A

| 38 | Weekly Rounds in Restricted Housing Modules | Substantial Compliance | **(1/1/16 – 12/31/16)** |
|---|---|---|---|
| 39 | Confidential Self-Referral | Substantial Compliance (NCCF & PDC North)<br>Partial Compliance (TTCF, MCJ, & CRDF)<br>Not Rated (PDC South & East) | (7/1/17 – 6/30/18 at NCCF)<br>(7/1/18 – 9/30/18 at PDC North) |
| 40 | Availability of QMHPs | Partial Compliance | |
| 41 | FIP Step-Down Protocols | Partial Compliance | |
| 42 | HOH Step-Down Protocols | Partial Compliance | |
| 43 | Disciplinary Policies | Substantial Compliance (NCCF & PDC North)<br>Partial Compliance (CRDF, MCJ, & TTCF) | **(10/1/17 – 9/30/18 at NCCF & PDC North)** |
| 44 | Protective Barriers | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 45 | Suicide Intervention and First Aid Kits | Substantial Compliance | **(10/1/15 – 9/30/16 at CRDF, NCCF, TTCF, PDC East, & PDC South)**<br>**(1/1/16 – 12/31/16 at MCJ & PDC North)** |
| 46 | Interruption of Self-Injurious Behavior | Partial Compliance | |
| 47 | Staffing Requirements | Non-Compliance | |
| 48 | Housekeeping and Sanitation | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 49 | Maintenance Plans | Substantial Compliance | **(3/1/16 – 2/28/17)** |
| 50 | Pest Control | Substantial Compliance | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC North, TTCF, & CRDF)**<br>**(4/1/16 – 3/31/17 at PDC South & PDC** |

# APPENDIX A

| | | | |
|---|---|---|---|
| | | | **East)** |
| 51 | Personal Care & Supplies | Substantial Compliance | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC East, PDC North, PDC South, & TTCF)** **(7/1/16 – 6/30/17 at CRDF)** |
| 52 | HOH Property Restrictions | Partial Compliance | |
| 53 | Eligibility for Education, Work and Programs | Partial Compliance | |
| 54 | Privileges and Programs[2] | Partial Compliance | |
| 55 | Staff Meetings | Substantial Compliance (CRDF, PDC North, & MCJ) Partial Compliance (TTCF) | **(10/1/16 – 9/30/17 at CRDF)** **(4/1/17 – 3/31/18 at PDC North)** (4/1/18 – 9/30/18 at MCJ) |
| 56 | Changes in Housing Assignments | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 57 | Inmate Safety Checks in Mental Housing | Substantial Compliance (MCJ) Partial Compliance (PDC North, TTCF, & CRDF) | **(4/1/17 – 3/31/18 at MCJ)** |
| 58 | Inmate Safety Checks in Non-Mental Housing | Substantial Compliance (PDC South, PDC North, PDC East, CRDF, & IRC) Partial Compliance (TTCF, NCCF, & MCJ) | **(1/1/16 – 12/31/16 at PDC South, PDC North, & PDC East)** (7/1/17 – 6/30/18 at CRDF) (10/1/17 – 9/30/18 at IRC) |

---

[2] Per agreement of the parties, the County must maintain Substantial Compliance for two additional quarters under the revised Compliance Measures.

## APPENDIX A

| | | | |
|---|---|---|---|
| 59 | Supervisor Rounds | Substantial Compliance (at PDC North, PDC East, MCJ, CRDF, PDC South, NCCF, & TTCF) | **(1/1/17 – 12/31/17 at PDC East & MCJ)** **(4/1/17 – 3/31/18 at NCCF)** **(10/1/17 – 9/30/18 at CRDF)** (1/1/18 – 9/30/18 at PDC North & PDC South) (4/1/18 – 9/30/18 at TTCF) |
| 60 | Implementation of Quality Improvement Program | Partial Compliance | |
| 61 | Requirements of Quality Improvement Program | Partial Compliance | |
| 62 | Tracking of Corrective Action Plans | Partial Compliance | |
| 63 | Sufficient HOH and MOH Housing | Non-Compliance | |
| 64 | Plans for Availability of Inpatient Health Care | Partial Compliance | |
| 65 | Administration of Psychotropic Medication | Partial Compliance | |
| 66 | Active Mental Health Caseloads | Non-Compliance | |
| 67 | Prisoner Refusals of Medication | Non-Compliance | |
| 68 | Contraband Searches | Substantial Compliance (MCJ, NCCF, PDC East, PDC South PDC North, & TTCF) Partial Compliance (CRDF) | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC East, PDC South, & PDC North)** **(1/1/17 – 12/31/17 at TTCF)** |

## APPENDIX A

| | | | |
|---|---|---|---|
| 69 | Clinical Restraints in CTC | Substantial Compliance | (7/1/18 – 9/30/18) |
| 70 | Security Restraints in HOH and MOH | Partial Compliance | |
| 71 | Therapeutic Services for Inmates in Clinical Restraints | Substantial Compliance | **(7/1/16 – 6/30/17)** |
| 72 | Administrative Reviews | Substantial Compliance | (1/1/17 – 12/31/17)[3] |
| 73 | Reporting of Self-Injurious Behavior and Threats | Substantial  Compliance | **(10/1/17 – 9/30/18)** |
| 74 | Law Enforcement Investigations of Suicides | Substantial Compliance | **(9/1/16 – 12/31/17)** |
| 75 | Management Reviews of Suicide Attempts | Substantial Compliance | **(10/1/17 – 9/30/18)** |
| 76 | Management Reviews of Suicides | Substantial Compliance | **(9/1/16 – 12/31/17)** |
| 77 | Custody Compliance and Sustainability Bureau | Partial Compliance | |
| 78 | Suicide Prevention Advisory Committee | Substantial Compliance | **(5/11/16 – 5/18/17)** |
| 79 | Therapeutic Services in Mental Health Housing | Non-Compliance | |
| 80 | Out-of-Cell Time in HOH | Non-Compliance | |
| 81 | Implementation of *Rosas* Recommendations | Partial Compliance | |
| 82 | Grievances at CRDF | Substantial Compliance | **(7/15/16 – 12/31/17)** |

---

[3] Subject to further verification.

<u>APPENDIX A</u>

| 83 | Closed Circuit Cameras | Substantial Compliance (MCJ, TTCF, IRC, CRDF, NCCF, PDC North, & PDC South) | **(7/1/15 – 6/30/16 at MCJ & IRC**) **(10/1/15 – 9/30/16 at TTCF)** **(4/1/16 – 3/31/17 at CRDF**) (4/1/18 – 9/30/18 at NCCF & PDC North) (7/1/18 –9/30/18 at PDC South |
|---|---|---|---|
| 84 | Investigation of Staff Misconduct | Substantial Compliance | **(7/1/17 – 6/30/18)** |
| 85 | Internal Affairs Bureau Training | Non-Compliance | |
| 86 | Maintenance and Inventory of Security Equipment | Substantial Compliance (MCJ, CRDF, PDC North, PDC South, PDC East, NCCF, IRC, & TTCF) | **(4/1/16 – 3/31/17 at MCJ & CRDF)** **(10/1/16 – 12/31/17 at PDC North)** **(2/1/17 – 3/31/18 at PDC South & PDC East**) **(3/1/17 – 3/31/18 at NCCF)** **(4/1/17 – 3/31/18 at IRC**) (4/1/18 – 12/31/18 at TTCF) |

## APPENDIX B

|  | Substantial Compliance (Provisions) | Partial Compliance[1] | Non-Compliance | Substantial Compliance (Facilities)[2] | No Longer Subject To Monitoring[3] |
|---|---|---|---|---|---|
| First[4] | 5 | 16 |  | 10 |  |
| Second | 14 | 30 | 13 | 24 |  |
| Third | 22 | 27(1) | 10 | 29 | 4(2) |
| Fourth | 24 | 26(1) | 10 | 29 | 10(2) |
| Fifth | 23 | 24(2) | 7 | 34 | 15(5) |
| Sixth | 32 | 22 | 7 | 38 | 18(9) |
| Seventh | 31 | 22 | 7 | 39 | 23(11) |

---

[1] The figure in parenthesis under Partial Compliance is the number of additional provisions where some facilities were in Partial Compliance and other facilities were in Non-Compliance.

[2] This represents the number of provisions where the Department is in Substantial Compliance at all or some of the facilities.

[3] The figure in parenthesis under No Longer Subject to Monitoring is the number of additional provisions where some facilities are no longer subject to monitoring.

[4] During the First Reporting Period, 43 provisions were not subject to monitoring.