**SCHEPER KIM & HARRIS LLP**
RICHARD E. DROOYAN (Bar No. 65672)
601 West Fifth Street, 12th Floor
Los Angeles, CA  90071-2025
Telephone: (213) 613-4655
Facsimile:  (213) 613-4656

**Monitor**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>        v.<br><br>COUNTY OF LOS ANGELES AND LOS ANGELES COUNTY SHERIFF JIM MCDONNELL, in his Official Capacity,<br><br>                Defendants. | CV No. 15-05903 DDP (JEMX)<br><br>**MONITOR'S EIGHTH REPORT** |

Pursuant to the Paragraph 109 of the Joint Settlement Agreement Regarding Los Angeles County Jails, the Monitor appointed by this Court hereby submits the attached Report "describing the steps taken" by the County of Los Angeles and the Los Angeles County Sheriff during the six-month period from January 1, 2019, through June 30, 2019, "to implement the Agreement and evaluating the extent to which they have complied with this Agreement."  This Report takes into consideration the advice and assistance I have received from the Subject Matter Experts appointed by this Court and the comments from the parties in accordance with Paragraph 110 of the Agreement.  I am available to answer any questions the Court may have regarding my Report at such times as are convenient for the Court and the parties.

DATED:  August 30, 2019          Respectfully submitted,

                                SCHEPER KIM & HARRIS LLP
                                RICHARD E. DROOYAN


                                By:  /s/ Richard E. Drooyan
                                     Richard E. Drooyan
                                     Monitor

# MONITOR'S EIGHTH REPORT

This Eighth Report sets forth the Monitor's assessments of the implementation of the Settlement Agreement (the "Agreement") between the County of Los Angeles (the "County") and the United States Department of Justice ("DOJ") for the treatment of mentally ill inmates in the County's jail facilities by the Los Angeles Sheriff's Department (the "Department") and the County's Department of Health Services ("DHS").[1]  It covers the County's reported results for the period from January 1, 2019, through June 30, 2019 (the "Eighth Reporting Period").

As used herein, "Substantial Compliance" means that the County has "achieved compliance with the material components of the relevant provisions of this Agreement in accordance with the [agreed-upon Compliance Measures for assessing Substantial Compliance]," which it must maintain for twelve-consecutive months; "Partial Compliance" means that the County has achieved "compliance on some, but not all, of the material components of the relevant provision of this Agreement;" and "Non-Compliance" means that the County has not met "most or all of the material components of the relevant provisions of this Agreement."

This Eighth Report is based upon the Monitor's review of the policies, procedures, and directives proposed and/or implemented by the Department and Correctional Health Services ("CHS") in the Eighth Reporting Period; tours of the jails by the Monitor; and assessments and observations of the Subject Matter Experts and the two clinicians retained by the Monitor to assist the Mental Health Subject Matter Expert.  It takes into consideration the County's Self-Assessment Status Report (the "Eighth Self-Assessment"), which was received on June 14, 2019; the Semi-Annual Report of the Department's Custody Compliance and Sustainability Bureau ("CCSB"), which was received on July 11, 2019; the County's Augmented Self-Assessment Status Report (the "Augmented Eighth Self-Assessment"), which was received on July 15, 2019; CHS's Semi-Annual Report on Quality Improvement/Assurance, which was received on July 15, 2019; and results reported by the County through July 15, 2019.  It also takes into consideration the comments the Monitor received from the County and DOJ on the draft of this Report that was submitted to the parties on August 1, 2019.

During the Eighth Reporting Period, the Mental Health Subject Matter Expert, with the assistance of the clinicians, conducted additional qualitative assessments of the County's compliance with certain Substantive Provisions in the Settlement Agreement, and they again used different methodologies to test some of the County's reported results. The Monitor's determination of the County's compliance, with the advice of the Subject Matter Expert, is based upon the quantitative thresholds in the Compliance Measures (and any other applicable requirements in the Compliance Measures), unless the quality of the County's performance as determined by the qualitative assessment is plainly inadequate or the results reported by the Subject Matter Expert vary significantly from the results reported by the Department.

---

[1] The Department of Health Services includes Correctional Health Services, which is responsible for Medical and Mental Health Services in the Los Angeles County jails.

During the Eighth Reporting period, the County established compliance with additional provisions of the Settlement Agreement, and made progress in addressing the challenges to achieving and maintaining Substantial Compliance with respect to its quality improvement plans.  It still faces significant challenges with respect to therapeutic services and out-of-cell time.

As in prior reports, this Eighth Report reflects the results of audits by the Monitor's auditors to verify results reported by the County.  The Monitor has deemed the County to be in Substantial Compliance "as of" the beginning of the quarter reported by the County if the auditors have verified that the County has met the thresholds in the Compliance Measures.  If the auditors were not able to verify the results reported by the County, the twelve-month period for maintaining Substantial Compliance will commence in a future period when the County's reported results are verified by the auditors.  If the County maintains Substantial Compliance with a provision for twelve consecutive months, pursuant to Paragraph 111 of the Agreement, the Monitor and Subject Matter Experts will "no longer. . .assess or report on that provision" in future reporting periods.

Some of the Substantial Compliance results reported by the County in the Eighth Reporting Period have not been audited by the Monitor's auditors and cannot be considered final until verified by the auditors.  The County will not be deemed to be in Substantial Compliance as of the County's reported date for purposes of determining the twelve-month compliance period if the results are not verified by the auditors.

Appendix A to this Eighth Report shows the status of each of the 69 provisions of the Agreement that are subject to monitoring and the twelve-month triggering dates where the County is deemed to be in Substantial Compliance.  Appendix B shows the County's progress from the Initial Reporting Period through the Eighth Reporting Period in achieving Substantial Compliance and in maintaining Substantial Compliance for twelve consecutive months on provisions that are no longer subject to monitoring.

As has been the case since the beginning of the Initial Reporting Period, the County cooperated completely with the Monitor and the Subject Matter Experts during the Eighth Reporting Period.  The Department, CHS, and County Counsel facilitated our visits and inmate interviews, answered our questions, and responded to our requests for documents and information.  We appreciate their responsiveness, transparency, professionalism, and courtesy in handling our monitoring requests.

Richard Drooyan, Monitor
August 30, 2019

## EXECUTIVE SUMMARY

There are 69 provisions in the Settlement Agreement that are subject to monitoring by the Monitor and Subject Matter Experts.  As of the date of this Report, the County and the Department are in Substantial Compliance with 36 provisions, in Partial Compliance with 18 provisions, and in Non-Compliance with seven provisions.  In addition, there are six provisions in which the Department is in Substantial Compliance at some facilities and in Partial Compliance or Non-Compliance at other facilities.  There is also one provision (Paragraph 34), that remained stayed pending litigation initiated by third party intervenors, and one provision (Paragraph 39) for which the Department is in Substantial Compliance at certain facilities, Partial Compliance at other facilities, and Not Rated at other facilities.  There are 42 provisions for which the County and the Department are in Substantial Compliance at some or all of the facilities.[2]

There are 28 provisions that are no longer subject to monitoring because the County and Department maintained Substantial Compliance for twelve consecutive months as required by Paragraph 111 of the Settlement Agreement as verified by the Monitor's auditors as required.[3]  There are another nine provisions for which some facilities are no longer subject to monitoring because those facilities maintained Substantial Compliance for the required twelve consecutive months.[4]

As of the date of this Report, and subject to verification by the Monitor's auditors and qualitative assessments in some cases, the County and the Department are in Substantial Compliance at some or all of the facilities with the following provisions of the Settlement Agreement:

The County has achieved Substantial Compliance with Paragraph 18, which requires the training of Deputy Sheriffs and Custody Assistants on suicide prevention as follows: at Men's Central Jail ("MCJ") and Pitchess Detention Center ("PDC") South as of October 1, 2017, at North County Correctional Facility ("NCCF") as of September 1, 2017, at PDC East as of December 1, 2017; and at Twin Towers Correctional Facility ("TTCF"), the Inmate Reception Center ("IRC"), and PDC North as of April 1, 2018.  The County has provided documentation reflecting that the County has achieved Substantial Compliance with Paragraph 18 at Century Regional Detention Facility ("CRDF") as of June 1, 2018.  The results at CRDF are subject to verification by the Monitor's auditors.

The County has achieved Substantial Compliance at NCCF, MCJ, and IRC as of April 1, 2018; at TTCF as of July 1, 2018; at CRDF, PDC East, and PDC North as of December 1, 2018; and at PDC South as of March 1, 2019, with Paragraph 19, which

---

[2] Under Paragraph 111 of the Agreement, the twelve-month period for which the County is required to maintain Substantial Compliance can be determined on a facility-by-facility basis.

[3] This includes the initial training required by Paragraphs 19 and 20, which has been completed and is no longer subject to monitoring.  The refresher training requirements are, however, still subject to monitoring.

[4] The provisions that are no longer subject to monitoring at some or all of the facilities are highlighted in bold in Appendix A.

requires the training of Deputy Sheriffs on Crisis Intervention and Conflict Resolution
and the training of Deputy Sheriffs and Custody Assistants in working with mentally ill
prisoners.

The County has achieved Substantial Compliance at PDC East, PDC North,
NCCF, and CRDF as of August 1, 2017 and at PDC South as of October 1, 2017, with
Paragraph 20, which requires the training of additional Deputy Sheriffs on Crisis
Intervention and Conflict Resolution and on working with mentally ill prisoners.

The County has maintained Substantial Compliance for twelve consecutive
months at PDC East, PDC South, PDC North, NCCF, IRC, and TTCF with Paragraph 21,
which requires Custody personnel to maintain CPR certifications.  The County also has
provided documentation that it has maintained Substantial Compliance for twelve
consecutive months at MCJ and for nine consecutive months at CRDF.  The results for
MCJ and CRDF are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive
months with Paragraph 22, which requires the County and the Sheriff to provide
instructional material on the use of arresting and booking documents to ensure the
sharing of known relevant and available information on prisoners' mental health status
and suicide risk.

The County has maintained Substantial Compliance for twelve consecutive
months as of July 12, 2018, with Paragraph 23, which requires that the Department
conduct a systematic review of prisoner housing to reduce the risk of self-harm and to
identify and address suicide hazards, and to develop plans to reasonably mitigate suicide
hazards identified in the review.

The County has maintained Substantial Compliance for twelve consecutive
months as of September 30, 2018, with Paragraph 24, which requires the Department to
conduct annual reviews and inspections of prisoner housing to identify suicide hazards.

The County has achieved Substantial Compliance as of October 1, 2018, through
March 31, 2019, with Paragraph 27, which requires that all prisoners are individually and
privately screened within 12 hours of their arrival at the jails.

The County has maintained Substantial Compliance for twelve consecutive
months at IRC as of March 31, 2018, and for three consecutive months at CRDF as of
March 31, 2019, with Paragraph 28, which requires the Department to expedite inmates
having urgent or emergent mental health needs through the booking process.  The results
at CRDF are subject to further verification.

The County has maintained Substantial Compliance for twelve consecutive
months as of March 31, 2018, with Paragraph 29, which requires mental health
assessments of prisoners with non-emergent mental health needs within 24 hours of the
intake nursing assessment.

The County has provided documentation that it has maintained Substantial Compliance as of January 1, 2019, through March 31, 2019, with Paragraph 30, which requires initial mental health assessments.  The results are subject to verification by the Monitor's auditors.

The County achieved Substantial Compliance at NCCF as of January 1, 2019, through March 31, 2019, with Paragraph 31, which requires that all prisoners are individually and privately screened within 12 hours of their arrival at the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 32, which requires that a serious suicide attempt be entered in the prisoner's electronic medical record in a timely manner.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2017, with Paragraph 33, which requires mental health supervisors to review electronic medical records on a quarterly basis to assess their accuracy.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2018, with Paragraph 35, which requires the Department to ensure that custody staff refer prisoners who are demonstrating a potential need for routine mental health care to a QMHP or a Jail Mental Evaluation Team.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 38, which requires mental health staff or JMET teams to make weekly cell-by-cell rounds in restricted non-mental health housing modules to identify prisoners with mental illnesses and grant prisoner's requests for out-of-cell interviews.

The County has maintained Substantial Compliance at NCCF as of July 1, 2017, through March 31, 2018, and at PDC South as of October 1, 2018 through March 31, 2019, with Paragraph 39, which requires the County to use a confidential self-referral system for prisoners to request mental health care.  The County has also provided documentation reflecting that it achieved Substantial Compliance at NCCF as of April 1, 2018 through June 30, 2018 and at PDC North as of July 1, 2018, through March 31, 2019.  The results NCCF and PDC North are subject to verification by the Monitor's auditors and a qualitative assessment by the Subject Matter Expert.

The County has maintained Substantial Compliance at NCCF and PDC North for twelve consecutive months, as of September 30, 2018, with Paragraph 43, which requires the Department to develop and implement policies for discipline of prisoners with serious mental illnesses.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 44, which requires the Department to install protective barriers in High Observation Housing and other mental health housing

areas.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 45, which requires Suicide Prevention Kits and first-aid kits in control booths in all facilities.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 48, which requires the Department to have written housekeeping, sanitation, and inspection plans to ensure proper cleaning.

The County has maintained Substantial Compliance for twelve consecutive months as of February 28, 2017, with Paragraph 49, which requires the Department to have maintenance plans to respond to routine and emergency maintenance needs.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2017, with Paragraph 50, which requires pest control in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2017, with Paragraph 51, which requires the Department to ensure that all prisoners have access to basic hygiene supplies in accordance with state regulations.

The County has maintained Substantial Compliance for twelve consecutive months at CRDF and PDC North with Paragraph 55, which requires custody, medical and mental health staff to meet daily in High Observation Housing and weekly in Moderate Observation Housing.  The County has also maintained Substantial Compliance as of April 1, 2018, through September 30, 2018 at MCJ.  The County also has provided documentation reflecting that it achieved Substantial Compliance as of October 1, 2018, through March 31, 2019, at MCJ.  The results at MCJ are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 56, which requires custody, medical, and mental health staff to communicate regarding any change in a housing assignment following a suicide attempt or serious change in mental health condition.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2018, at MCJ with Paragraph 57, which requires safety checks in mental health housing.

The County has maintained Substantial Compliance for twelve consecutive months at PDC South, PDC North, and PDC East as of December 31, 2016, at CRDF as of June 30, 2018, and at IRC as of September 30, 2018, with Paragraph 58, which requires safety checks in non-mental health housing.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2019, with Paragraph 59, which requires unannounced daily supervisory rounds to verify safety checks.

The County has achieved Substantial Compliance with Paragraph 60, which requires the implementation of a quality improvement plan.

The County has maintained Substantial Compliance for twelve consecutive months at MCJ, NCCF, PDC East, PDC North, PDC South, and TTCF with Paragraph 68, which requires staggered contraband searches in housing units.

The County has achieved Substantial Compliance as of July 1, 2018, through March 31, 2019, with Paragraph 69, which requires the County and the Sheriff to use clinical restraints only in the Correctional Treatment Center with the approval of a licensed psychiatrist who performed an individualized assessment.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2017, with Paragraph 71, which requires the County and the Sheriff to ensure that any prisoner subjected to clinical restraints in response to a mental health crisis receives therapeutic services to remediate any effects from the restraints.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 72, which requires the Department and the County to report on meetings to review suicides and incidents of serious self-injurious behavior.

The County has maintained Substantial Compliance for twelve consecutive months as of September 30, 2018, with Paragraph 73, which requires the Department to prepare detailed reports of prisoners who threaten or exhibit self-injurious behavior.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 74, which requires the Department to have an objective law enforcement investigation of every suicide that occurs in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of September 30, 2018, with Paragraph 75, which requires the Department and the County to review every serious suicide attempt that occurs in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 76, which requires the Department to follow certain procedures whenever there is an apparent or suspected suicide.

The County has maintained Substantial Compliance for twelve consecutive months as of May 18, 2017, with Paragraph 78, which requires the Suicide Prevention Advisory Committee to meet twice a year.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 82, which requires the Department to co-locate personnel responsible for collecting prisoners' grievances at CRDF.

The County has maintained Substantial Compliance for twelve consecutive months at MCJ, IRC, TTCF, and CRDF with Paragraph 83, which requires it to install closed circuit security cameras throughout all of the common areas in the jails. The County has also achieved Substantial Compliance at NCCF and PDC North as of April 1, 2018, through March 31, 2019, and at PDC South as of July 1, 2018, through March 31, 2019.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2018, with Paragraph 84, which requires investigations of force incidents and administrative actions to be completed timely.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2019, with Paragraph 86, which requires inventory and control of weapons.

## EIGHTH REPORT

18.    Within three months of the Effective Date, the County and the Sheriff will
develop, and within six months of the Effective Date will commence providing:  (1) a
four-hour custody-specific, scenario-based, skill development training on suicide
prevention, which can be part of the eight-hour training described in paragraph 4.8 of the
Implementation Plan in *Rosas* to all new Deputies as part of the Jail Operations
Continuum and to all new Custody Assistants at the Custody Assistants academy; and (2)
a two-hour custody-specific, scenario-based, skill development training on suicide
prevention to all existing Deputies and Custody Assistants at their respective facilities,
which can be part of the eight-hour training described in paragraph 4.7 of the
Implementation Plan in *Rosas*, through in-service Intensified Formatted Training, which
training will be completed by December 31, 2016.

These trainings will include the following topics:

(a)     suicide prevention policies and procedures, including observation and
supervision of prisoners at risk for suicide or self-injurious behavior;

(b)     discussion of facility environments and staff interactions and why they
may contribute to suicidal behavior;

(c)     potential predisposing factors to suicide;

(d)     high-risk suicide periods and settings;

(e)     warning signs and symptoms of suicidal behavior;

(f)     case studies of recent suicides and serious suicide attempts;

(g)     emergency notification procedures;

(h)     mock demonstrations regarding the proper response to a suicide attempt,
including a hands-on simulation experience that incorporates the
challenges that often accompany a jail suicide, such as cell doors being
blocked by a hanging body and delays in securing back-up assistance;

(i)     differentiating between suicidal and self-injurious behavior; and

(j)     the proper use of emergency equipment.

**STATUS (18):**      **SUBSTANTIAL COMPLIANCE (as of October 1, 2017 (verified) at MCJ and PDC South)**

**SUBSTANTIAL COMPLIANCE (as of September 1, 2017 (verified) at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of December 1, 2017 (verified) at PDC East)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018 (verified) at TTCF, IRC, and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of June 1, 2018 (unverified) at CRDF)**

The Monitor, in consultation with the Mental Health Subject Matter Expert, concluded in the First Reporting Period that the Department's training on suicide prevention, together with the Department's De-escalation and Verbal Resolution Training ("DeVRT"), meets the requirements of Paragraph 18. The DeVRT curriculum was approved by the *Rosas* Monitors and the Monitor, in consultation with the Mental Health Subject Matter Expert, on November 4, 2015. On May 30, 2017, the Monitor, in consultation with the Subject Matter Expert, approved a revision to the two-hour course on suicide prevention for existing Deputy Sheriffs and Custody Assistants.

The County's Initial Self-Assessment Status Report delivered on December 14, 2015, reported that the Department commenced its suicide prevention training for new Deputy Sheriffs and Custody Assistants on July 1, 2015, and for existing Deputy Sheriffs and Custody Assistants before the Effective Date of the Settlement Agreement.

Substantial Compliance is achieved when the Department reaches the 85% threshold for existing personnel at a facility, provided that it has achieved the 95% threshold for new personnel during the entire time from July 1, 2015 until it has reached the 85% threshold for existing personnel.

In the Fifth Reporting Period, the County reported that the Department achieved Substantial Compliance at MCJ and PDC South as of October 1, 2017, and at NCCF as of September 1, 2017. The County's Augmented Fifth Self-Assessment reported Substantial Compliance at PDC East as of November 1, 2017.[5] The results at MCJ, PDC South, and NCCF have been verified by the Monitor's auditors.

The County's Sixth Self-Assessment reported that the County had achieved Substantial Compliance at TTCF (91% of existing personnel), IRC (93%), and PDC North (97%) as of April 1, 2018. The results at TTCF, IRC, and PDC North have been verified by the Monitor's auditors.

---

[5] All two-hour training of existing Deputy Sheriffs and Custody Assistants occurred after the revision of the suicide prevention course was approved by the Monitor on May 30, 2017.

The County's posted results report for the Seventh Reporting Period reflected that it had achieved Substantial Compliance at CRDF as of June 1, 2018.  The results at CRDF are still subject to verification by the Monitor's auditors.

The Department is no longer subject to monitoring for the training of new Deputies in the Jail Operations Continuum and new Custody Assistants in the Custody Assistant Academy as required by Paragraph 18.  The County's Eighth Self-Assessment reiterates, however, that "the Department continuously provides the required training for new Deputies in the Jail Operations Continuum and new Custody Assistants in the Custody Assistants Academy."

19.     Commencing July 1, 2015, the County and the Sheriff will provide:

(a)     Custody-specific, scenario-based, skill development training to new Deputies during their Jail Operations training, and to existing Deputies assigned to Twin Towers Correctional Facility, Inmate Reception Center, Men's Central Jail, the Mental Health Housing Units at Century Regional Detention Facility, and the Jail Mental Evaluation Teams ("JMET") at North County Correctional Facility as follows:

(i)     32 hours of Crisis Intervention and Conflict Resolution as described in paragraphs 4.6 and 4.9 of the Implementation Plan in *Rosas* to be completed within the time frames established in that case (currently December 31, 2016).  Deputies at these facilities will receive an eight-hour refresher course consistent with paragraph 4.6 of the Implementation Plan in *Rosas* every other year until termination of court jurisdiction in that case and then a four-hour refresher course every other year thereafter.

(ii)    Eight hours identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas* to be completed by December 31, 2016.  This training requirement may be a part of the 32-hour training described in the previous subsection.  Deputies at these facilities will receive a four-hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

(b)     Commencing July 1, 2015, the County and the Sheriff will ensure that new Custody Assistants receive eight hours of training in the Custody Assistant academy, and that all existing Custody Assistants receive eight hours of training related to identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas*.  This training will be completed by December 31, 2016.  Custody Assistants will receive a four-hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

**STATUS (19):**        **SUBSTANTIAL COMPLIANCE (as of April 1, 2018, (verified) at NCCF, MCJ, and IRC)**

                                              **SUBSTANTIAL COMPLIANCE (as of July 1, 2018, (verified) at TTCF)**

                                              **SUBSTANTIAL COMPLIANCE (as of December 1, 2018 (verified) at CRDF, PDC East, and PDC North)**

                                              **SUBSTANTIAL COMPLIANCE (as of March 1, 2019 (verified) at PDC South)**

As of November 4, 2015, the Monitor, in consultation with the Mental Health Subject Matter Expert and the *Rosas* Monitors, approved the curriculum for DeVRT, which provides for 32 hours of Crisis Intervention and Conflict Resolution training and includes eight hours identifying and working with mentally ill prisoners. The DeVRT curriculum meets the requirements of Paragraph 19 of the Settlement Agreement and Paragraphs 4.6, 4.7, and 4.9 of the *Rosas* Implementation Plan. The Mental Health Subject Matter Expert and the *Rosas* Monitors approved the training materials developed by the Department for the DeVRT on March 4, 2016.

Substantial Compliance requires the County to show that 95% of the new Deputies hired after July 1, 2015 and 85% of the existing Deputies as of that date received the required DeVRT training. It also requires that 95% of the new Custody Assistants hired after that date and 85% of the existing Custody Assistants as of that date received the required training in working with mentally ill inmates.

The County's Sixth Self-Assessment reported that the Department had achieved Substantial Compliance with respect to the training of existing Deputies and Custody Assistants at IRC, MCJ, CRDF, TTCF, and NCCF (JMET) in the First Quarter of 2018. The Department trained 95% of the existing Deputy Sheriffs and 89% of the existing Custody Assistants at TTCF by the end of the First Quarter of 2018; 100% of existing Deputies and 98% of existing Custody Assistants at IRC; 99% of existing Deputies and 92% of existing Custody Assistants at MCJ; and 100% of the existing Deputies in the JMET unit at NCCF.[6]

Using the Monitor's approved definition of "unavailable" personnel,[7] the Department's revised results for the Sixth Reporting Period reflected that it had trained 98% of the existing Deputies and 88% of the existing Custody Assistants at IRC through March 2018; 99% of the existing Deputies and 85% of the existing Custody Assistants at MCJ through March 2018; and 95% of existing Deputies and 89% of existing Custody Assistants at TTCF through June 2018. These results have been verified by the Monitor's auditors and the Department is no longer subject to monitoring at these Downtown Jail

---

[6] There were no Custody Assistants assigned to the unit.
[7] Deputies and Custody Assistants are not deemed "unavailable" unless they have been on leave or otherwise unavailable for more than six months as of the date of the assessment.

facilities for the initial training required by Paragraph 19.

The County's Seventh Self-Assessment reported that the Department achieved Substantial Compliance at all facilities for new Deputies and new Custody Assistants through the Third Quarter of 2018.  The Eighth Self-Assessment reports that it has achieved Substantial Compliance for the training of new Deputies and new Custody Assistants through the First Quarter of 2019.[8]  These reported results have been verified by the Monitor's auditors.

The County's Eighth Self-Assessment reports that it trained 100% of the "existing" Deputies at CRDF through the October of 2018, using the approved definition of "unavailable" personnel, and 94% of the existing Custody Assistants through November 2018.  These results have been verified by the Monitor's auditors and the Department is no longer subject to monitoring at CRDF for the initial training required by Paragraph 19.

Finally, the Department reports that it trained 93% of the existing Custody Assistants at PDC South as of February 2019, and 94% at PDC North, 100% at PDC East, and 97% at NCCF as of January 2019.  These results have been verified by the Monitor's auditors and the Department is no longer subject to monitoring at NCCF, PDC East, PDC South, or PDC North for the initial training of existing Custody Assistants required by Paragraph 19.

The Department is still subject to monitoring in future periods for Substantial Compliance with the refresher course requirements; the Department's reported results will be subject to verification by the Monitor's auditors.

---

[8] The Eighth Self-Assessment reports that "PDC East, South, North and NCCF did not have any staff required to be audited under the [relevant] Compliance Measures[.]"

14

20.     Commencing no later than July 1, 2017, the County and the Sheriff will provide:

(a)     Custody-specific, scenario-based, skill development training to existing Deputies assigned to North County Correctional Facility, Pitchess Detention Center, and the non-Mental Health Housing Units in Century Regional Detention Facility as follows:

(i)     32 hours of Crisis Intervention and Conflict Resolution as described in paragraphs 4.6 and 4.9 of the Implementation Plan in *Rosas* to be completed by December 31, 2019.  Deputies at these facilities will receive an eight-hour refresher course consistent with paragraph 4.6 of the Implementation Plan in *Rosas* every other year until termination of court jurisdiction in that case and then a four-hour refresher course every other year thereafter.

(ii)    Eight hours identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas* to be completed by December 31, 2019.  This training requirement may be a part of the 32-hour training described in the previous subsection.  Deputies at these facilities will receive a four-hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

**STATUS (20):**        **SUBSTANTIAL COMPLIANCE (as of August 1,
2017 (verified) at CRDF, PDC East, PDC North, and
NCCF)**

                                                **SUBSTANTIAL COMPLIANCE (as of October 1,
2017 (verified) at PDC South)**

As of November 4, 2015, the Monitor, in consultation with the Subject Matter
Experts and the *Rosas* Monitors, approved the curriculum for the Department's De-
escalation and Verbal Resolution Training ("DeVRT"), which provides for 32 hours of
Crisis Intervention and Conflict Resolution training that meets the requirements of
Paragraph 20 of the Settlement Agreement.

Substantial Compliance requires that 85% of existing Deputies at the facilities
designated in Paragraph 20(a) as of July 1, 2017, receive the required DeVRT training.
The County reported that as of August 1, 2017, 85% of the Deputies assigned to PDC
East, 89% of the Deputies assigned to PDC North, 85% of the Deputies assigned to
NCCF, and 91% of the Deputies assigned to the non-mental housing units at CRDF, had
received the required training, and as of October 1, 2017, 96% of the Deputies assigned
to PDC South had received the training.  The results at CRDF, PDC East, PDC North,
PDC South, and NCCF have been verified by the Monitor's auditors, and these facilities
were not subject to monitoring for the initial training for existing Deputies during the
Eighth Reporting Period.

While Paragraph 20 is no longer subject to monitoring for the initial training
courses, the Department is still subject to monitoring in future periods for Substantial
Compliance with the refresher course requirements; the Department's reported results for
the refresher course will be subject to verification by the Monitor's auditors.

21.     Consistent with existing Sheriff's Department policies regarding training
requirements for sworn personnel, the County and the Sheriff will ensure that existing
custody staff that have contact with prisoners maintain active certification in
cardiopulmonary resuscitation and first aid.

**STATUS:**      **SUBSTANTIAL COMPLIANCE (as of October 1, 2015,
through September 30, 2016 (verified) at PDC East and South)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2016,
through December 31, 2016 (verified) at NCCF, PDC North,
and IRC)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through
March 31, 2017 (verified) at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017,
through March 31, 2018 (verified) and through September 30,
2018 (unverified) at MCJ)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2018, through
September 30, 2018 (verified) and through March 31, 2019
(unverified) at CRDF)**

The Compliance Measures provide that the Department will demonstrate
Substantial Compliance when 95% of the designated custody staff have the required CPR
and first aid certifications for twelve consecutive months.

Pursuant to Paragraph 111 of the Settlement Agreement, PDC South, PDC East,
PDC North, NCCF, IRC, and TTCF were not subject to monitoring for Substantial
Compliance with Paragraph 21 in the Eighth Reporting Period.

The County's Fifth Self-Assessment reported that it achieved Substantial
Compliance at MCJ in October 2017, which it maintained through the remainder of 2017.
These results have been verified by the Monitor's auditors.  The County's Sixth Self-
Assessment reported that the Department continued to maintain Substantial Compliance
at MCJ through the First Quarter of 2018.  These results have been verified by the
Monitor's auditors.  The County's Seventh Self-Assessment reported that it continued to
maintain Substantial Compliance at MCJ through the Third Quarter of 2018.  These
results are subject to verification by the Monitor's auditors.  If verified, Paragraph 21 is
no longer subject to monitoring at MCJ.

The County's Seventh Self-Assessment reflected that it achieved Substantial
Compliance with Paragraph 21 at CRDF in June 2018.  The County's Eighth Self-
Assessment reflects that it has maintained Substantial Compliance with Paragraph 21 at
CRDF through the end of the First Quarter of 2019.  These results are subject to
verification by the Monitor's auditors.

22.     Within six months of the Effective Date and at least annually thereafter, the County and the Sheriff will provide instructional material to all Sheriff station personnel, Sheriff court personnel, custody booking personnel, and outside law enforcement agencies on the use of arresting and booking documents, including the Arrestee Medical Screening Form, to ensure the sharing of known relevant and available information on prisoners' mental health status and suicide risk.  Such instructional material will be in addition to the training provided to all custody booking personnel regarding intake.

**STATUS:        SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017)**

The Justice Data Interface Controller ("JDIC") message the Department has been using since June 29, 2016, is sufficient to establish Substantial Compliance with Paragraph 22, and the County maintained Substantial Compliance for twelve consecutive through June 30, 2017.  Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring for Substantial Compliance with Paragraph 22 in the Eighth Reporting Period.

23.     Within three months of the Effective Date, the County and the Sheriff will commence a systematic review of all prisoner housing, beginning with the Mental Health Unit of the Correctional Treatment Center, all High Observation Housing areas, all Moderate Observation Housing areas, single-person discipline, and areas in which safety precautions are implemented, to reduce the risk of self-harm and to identify and address suicide hazards.  The County and the Sheriff will utilize a nationally-recognized audit tool for the review.  From this tool, the County and the Sheriff will:

(a)     develop short and long term plans to reasonably mitigate suicide hazards identified by this review; and

(b)     prioritize planning and mitigation in areas where suicide precautions are implemented and seek reasonable mitigation efforts in those areas.

**STATUS:       SUBSTANTIAL COMPLIANCE**

The Monitor has verified, with the advice of the Subject Matter Expert, that the Department's Suicide Hazard Inspection Check List tool is a nationally recognized audit tool for this review.  The Department reports that it inspected all of the housing units by January 14, 2016, and it has provided the Monitor with completed checklists documenting the inspections.

The County submitted an updated Suicide Hazard Mitigation plan to the Monitor on January 18, 2018.  After consultation with the Mental Health Subject Matter Expert, the Monitor concluded that the updated Plan satisfies the requirements of Paragraph 23.

The Department submitted another updated plan to the Monitor on July 12, 2018. After consultation with the Mental Health Subject Matter Expert, the Monitor concluded that the updated Plan satisfies the requirements of Paragraph 23.  The County has maintained Substantial Compliance with Paragraph 23 for twelve consecutive months and this provision is no longer subject to monitoring.

24.     The County and the Sheriff will review and inspect housing areas on at least an annual basis to identify suicide hazards.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018)**

CDM 3-06/020.00 FACILITIES INSPECTIONS requires Custody Support Services (CSS) to "review and inspect housing areas on a least an annual basis to identify suicide hazards."

The Monitor and Subject Matter reviewed a revised annual suicide hazard inspection tool that was submitted by the Department on December 13, 2016, and approved it with the caveat that, in order to achieve Substantial Compliance, the sample sizes of randomly selected cells must be large enough to ensure that the cells are representative of each housing type at a facility.  Further, if a problem is found in the randomly selected cells, a complete inspection or remediation of the area or setting should then be conducted.  An updated tool was submitted by the Department on February 9, 2017; it also was approved with the same caveats.

The Department conducted an Annual Suicide Hazard Inspection at each of its jail facilities during the Sixth and Seventh Reporting Periods.  The Department maintained Substantial Compliance with this provision for twelve consecutive months in the Sixth and Seventh Reporting Periods, and it was not subject to monitoring during the Eighth Reporting Period.  As the Monitor has noted, however, implementation and tracking of corrective actions must be addressed by the Custody Compliance and Sustainability Bureau ("CCSB") under Paragraph 77(c), which requires CCSB to "ensure that corrective actions are taken to mitigate suicide risk. . . obtaining where appropriate, technical assistance. . .when such assistance is needed to address suicide-risk issues."

25.     The County and the Sheriff will ensure that any prisoner in a Sheriff's Department station jail who verbalizes or who exhibits a clear and obvious indication of current suicidal intent will be transported to IRC, CRDF, or a medical facility as soon as practicable.  Pending transport, such prisoners will be under unobstructed visual observation, or in a suicide resistant location with safety checks every 15 minutes.

**STATUS:        PARTIAL COMPLIANCE**

A provision of the Station Jail Manual adopted in March 2018 requires that any arrestee who "displays obvious suicidal ideation or exhibits unusual behavior that clearly manifest[s] self-injurious behavior or other clear indication of mental health crisis shall be transported to the Inmate Reception Center (IRC), Century Regional Detention Facility (CRDF), or a medical facility as soon as practicable.  Pending transport, such inmates . . . shall be under unobstructed visual observation or in a suicidal restraint location with safety checks every 15 minutes."

The Compliance Measures require the Department to randomly select and analyze Arrestee Medical Screening Forms from station jails identifying prisoners who verbalize or exhibit a clear and obvious indication of current suicidal intent to determine compliance with Paragraph 25 of the Agreement.  The County's Eighth Self-Assessment reports that 71% of the records reviewed for the Fourth Quarter of 2018, and 65% of the records reviewed for the First Quarter of 2019 reflect the information required to establish Substantial Compliance with Paragraph 25, which is slightly lower than the previous three quarters.[9]

---

[9] As noted by the Mental Health Subject Matter Expert, "[s]ome station jails are doing a good job of monitoring, but others continue to show 15 minute checks exactly every 15 minutes over several hours. This raises questions about the accuracy of the data and/or reflects poor practice as it is important to vary the time of checks somewhat."

26.     Consistent with existing Sheriff's Department policies, the County and the
Sheriff will follow established screening procedures to identify prisoners with emergent
or urgent mental health needs based upon information contained in the Arrestee Medical
Screening Form (SH-R-422) or its equivalent and the Medical/Mental Health Screening
Questionnaire and to expedite such prisoners for mental health evaluation upon arrival at
the Jail Reception Centers and prior to routine screening.  Prisoners who are identified as
having emergent or urgent mental health needs, including the need for emergent
psychotropic medication, will be evaluated by a QMHP as soon as possible but no later
than four hours from the time of identification.

**STATUS:      PARTIAL COMPLIANCE**

The Compliance Measures require the Department to "review Arrestee Medical
Screening Forms (SH-R-422) (or its equivalent) and the Medical/Mental Health
Screening Questionnaires of 100 randomly selected prisoners during one randomly
selected week per quarter at CRDF and at IRC."  Substantial Compliance requires that (1)
95% of the forms "include the required mental health information" and (2) 90% of the
prisoners having urgent or emergent needs were "seen by a QMHP within four hours."

The County's Eighth Self-Assessment reports that for the one randomly selected
week in the Fourth Quarter of 2018, 94% of the screening forms reviewed had the
required mental health information, and 72% of the prisoners were seen by a QMHP
within four hours, which is a significant improvement from the Third Quarter of 2018,
when only 45% of the prisoners were seen within four hours.  The County "believes these
improvements are the result of the IRC restructuring" whereby the initial and nursing
assessments are conducted at the windows in the IRC clinic.  For the First Quarter of
2019, 89% of the forms had the required information and 86% of the prisoners were seen
within four hours, a continued improvement.[10]

The Mental Health Subject Matter Expert and the clinicians did a qualitative
assessment of the Department's results during a site visit in March 2019.  They assessed
the "completeness of intake documentation" and "whether patients with emergent or
urgent needs were missed at intake[.]"  They "found that 95% of the intake
documentation was complete and available," and that only 5% "of urgent/emergent cases
that should have been detected at admission were not."  They reported "seeing consistent
sound performance in the screening and detection processes for urgent and emergent
cases.  It appears that the change to having nurses conduct initial screening has been
effective."

[10] The Mental Health Subject Matter Expert notes, however, that Paragraph 26 encompasses patients with
"emergent or urgent mental health needs, including the need for emergent psychotropic medications," and
is not limited to suicidal patients.

27.     Consistent with existing Sheriff's Department policies, the County and the Sheriff will ensure that all prisoners are individually and privately screened by Qualified Medical Staff or trained custody personnel as soon as possible upon arrival to the Jails, but no later than 12 hours, barring an extraordinary circumstance, to identify a prisoner's need for mental health care and risk for suicide or self-injurious behavior.  The County and the Sheriff will ensure that the Medical/Mental Health Screening Questionnaire, the Arrestee Medical Screening Form (SH-R-422), or its equivalent, and/or the Confidential Medical Mental Health Transfer Form are in the prisoner's electronic medical record or otherwise available at the time the prisoner is initially assessed by a QMHP.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of October 1, 2018, through March 31, 2019 (verified)).**

The Compliance Measures require the Department to review the records of "randomly selected prisoners who were processed for intake during one randomly selected week at CRDF and at IRC" to determine compliance with this provision. Substantial Compliance requires that 90% of the records reviewed reflected that the prisoners were screened for mental health needs within 12 hours and that the required documentation was available to the QMHP for 90% of the mental health assessments conducted by the QMHP.

The County's Eighth Self-Assessment reflects that it achieved Substantial Compliance with Paragraph 27 in the Fourth Quarter of 2018, when "90% -- equal to the required 90% -- of inmates" were timely assessed by qualified personnel, and "93% -- 3% more than the required 90% -- of required documents were available for assessments conducted by QMHPs[.]"  It maintained Substantial Compliance through the First Quarter of 2019, when 96% of the inmates were timely assessed and 100% "of the required documents were available for [the] assessments."  These results are a significant improvement over the results in the Third Quarter of 2018, and have been verified by the Monitor's auditors.

The Mental Health Subject Matter Expert and the clinicians did a qualitative assessment of the "completeness of intake documentation" and "focused on whether patients with routine needs were missed at intake[.]"  They found "that 96% of the intake documentation was completed and available," and only 12% "of routine cases that should have been detected were not."  The Subject Matter Expert reports that they "found the inconsistencies and errors in intake materials were less than previously" and that this "demonstrates clear improvement in the process."[11]

---

[11]As noted in the Monitor's Seventh Report, see p. 21, nurses at CRDF now conduct the assessments in a room off a hallway near the booking front and nurses at IRC now conduct the assessments at windows behind the inmate seating areas in the IRC clinic.

28.     The County and the Sheriff will ensure that any prisoner who has been
identified during the intake process as having emergent or urgent mental health needs as
described in Paragraph 26 of this Agreement will be expedited through the booking
process.  While the prisoner awaits evaluation, the County and the Sheriff will maintain
unobstructed visual observation of the prisoner when necessary to protect his or her
safety, and will conduct 15-minute safety checks if the prisoner is in a cell.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of April 1, 2017,
through March 31, 2018 (verified) at IRC)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2019,
through March 31, 2019 (subject to further verification) at
CRDF)**

The Compliance Measures require the Department to review the records of
randomly selected prisoners at CRDF and IRC who have urgent or emergent mental
health needs to determine whether they were expedited through the booking process.

The County's Eighth Self-Assessment reflects that in the Fourth Quarter of 2018,
55% of the inmates with urgent or emergent mental health needs were expedited through
the booking process at CRDF as required by Compliance Measure 28.2 and 80% of the
inmates identified as having urgent or emergent mental health needs were observed or
checked as required by Compliance Measure 28.4.  In the First Quarter of 2019, 100% of
these inmates were expedited through booking and 100% were observed or checked.  The
Substantial Compliance results for the First Quarter of 2019 are subject to further
verification by the Monitor's auditors.[12]

Although Compliance Measure 28.2 requires the County to "review the records of
25 randomly selected prisoners at CRDF. . .who have been identified as having urgent or
emergent mental health needs" in one randomly selected week per quarter, there were
only seven such prisoners identified in the week selected for the First Quarter of 2018.
The County reported that all seven inmates were expedited through booking and it posted
supporting source documents for all seven.  The County then reported on video reviews
of a randomly selected sample of five of these seven prisoners to establish that they were
observed or checked as required by Compliance Measure 28.4.[13]

---

[12] The County's posted summary suggests that it is assessing whether the inmates were "under unobstructed
observation" or checked until they were expedited to Module 1200, where they were evaluated by mental
health clinicians.  The second sentence of Paragraph 28, however, requires that inmates remain under
unobstructed observation or be subject to 15 minute checks in 1200 "[w]hile [they] await[] evaluation[s]"
by the clinicians.  The County's report "that inmates housed, even temporarily, in CRDF Module 1200 are
placed under 15 minute checks as the module is an HOH-type unit" is subject to verification by the
Monitor's auditors.

[13] In August 2017, the Monitor agreed that the County could review three (later five) randomly selected
videos in lieu of unannounced visits because inmates with urgent or emergent mental health needs were
rarely in the CRDF reception center during the visits.  This is similar to what the parties agreed could be
used for Compliance Measures 36.3 and 36.4(a).  Accordingly, the County is only required to post the

The County previously maintained Substantial Compliance with Paragraph 28 at
IRC for twelve consecutive months, and IRC was not subject to monitoring for
compliance with Paragraph 28 in the Eighth Reporting Period.

---

source documents for five randomly selected inmates to establish compliance with Compliance Measure
28.2

29.     The County and the Sheriff will ensure that a QMHP conducts a mental health assessment of prisoners who have non-emergent mental health needs within 24 hours (or within 72 hours on weekends and legal holidays) of a registered nurse conducting an intake nursing assessment at IRC or CRDF.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified))**

The Compliance Measures require the Department to review randomly selected records of the prisoners identified in the intake nursing assessment as having non-emergent mental health needs to determine if the Department completed mental health assessments for 85% of the prisoners within the required time periods.

The County's Sixth Self-Assessment reported that in the Fourth Quarter of 2017 the County completed mental health assessments for 99% of the inmates at CRDF and IRC within the required time periods, and in the First Quarter of 2018, it completed 95% of the assessments within the required time periods.  The Monitor's auditors verified the County's results.  Accordingly, the County previously maintained Substantial Compliance for twelve consecutive months and was not subject to monitoring for compliance with Paragraph 29 in the Eighth Reporting Period.

30.     Consistent with existing DMH policies, the initial mental health assessment will include a brief initial treatment plan.  The initial treatment plan will address housing recommendations and preliminary discharge information.  During the initial assessment, a referral will be made for a more comprehensive mental health assessment if clinically indicated.  The initial assessment will identify any immediate issues and determine whether a more comprehensive mental health evaluation is indicated.  The Monitor and SMEs will monitor whether the housing recommendations in the initial treatment plan have been followed.

**STATUS:        SUBSTANTIAL COMPLIANCE (as of January 1, 2019, through March 31, 2019 (unverified))**

The Compliance Measures require the Department to review randomly selected initial mental health assessments and report on (1) the percentage of assessments that have (i) included an initial treatment plan that addresses housing recommendations and preliminary discharge information and (ii) identified any immediate issues and whether a more comprehensive evaluation was indicated; and (2) whether the housing recommendations were followed.

The County's Eighth Self-Assessment reports that 100% of the housing assignments reviewed in the Fourth Quarter of 2018 followed the housing recommendations in the initial treatment plans, which exceeds the 95% threshold for Substantial Compliance, but only 68% of the initial mental health assessments included an initial treatment plan that had the information required by Paragraph 30, which is below the 85% threshold for Substantial Compliance.  The results for the First Quarter of 2019 were that 100% of the housing assignments followed the housing recommendations and 90% of the initial mental health assessments had the required information.[14]  The results for the First Quarter of 2019 are subject to verification by the Monitor's auditors.

The Mental Health Subject Matter Expert and the clinicians again evaluated "whether the determination of immediate issues [in the random sample of mental health assessments] was reasonable in light of available information. . . [and] whether the initial treatment plan covered the elements required by existing County policy, which goes beyond the content of the formal compliance measure."  They found that 96% of the cases "identified immediate issues," and that the determination of the immediate issues "was reasonable from a qualitative perspective" in 96% of the cases.  The Subject Matter Expert concludes that the County has shown continued "improvement" and "should achieve substantial compliance," if the County's Self-Assessment shows that it has satisfied the required quantitative thresholds.

---

[14] The County reports that "[d]uring the Fourth Quarter, the County created a quality improvement project related to improving its initial mental health assessments and provided three separate targeted training sessions to IRC staff at TTCF[.]"

31.     Consistent with existing DMH and Sheriff's Department policies, the County and the Sheriff will maintain electronic mental health alerts in prisoners' electronic medical records that notify medical and mental health staff of a prisoner's risk for suicide or self-injurious behavior.  The alerts will be for the following risk factors:

(a)     current suicide risk;

(b)     hoarding medications; and

(c)     prior suicide attempts.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of January 1, 2019
through March 31, 2019 at NCCF (unverified))**

**PARTIAL COMPLIANCE (at CRDF, TTCF, MCJ and PDC
North)**

The Compliance Measures require the Department to review randomly selected electronic medical records for prisoners in certain at-risk groups to determine if the required mental health alerts are in 85% of the records reviewed, which is the threshold for Substantial Compliance, for prisoners who report suicidal thoughts during the intake process; were removed from risk precautions in the prior quarter; or were identified as hoarding medicine.

The County's Eighth Self-Assessment reports the following results for the Fourth Quarter of 2018: at CRDF, 60% (current suicide risk), 96% (removed from risk precautions),[15] and 33% (hoarding) of the records had the required mental health alerts; at TTCF, 75% (current suicide risk), 92% (removal from risk precautions), and 54% (hoarding) of the records had the alerts; at MCJ, 57% of the records had the alerts for hoarding; at NCCF, 66% of the records had the alerts for hoarding, and at PDC North, 100% of the records had the alerts for hoarding.[16]

The County's Eighth Self-Assessment reports that the County has "previously changed its universe [of inmates who may be hoarding medication], which now includes. . . . inmate segregation reports that refer to inmates disciplined for having contraband pills."  The report states that the County "is concerned with the consistency with which those inmates are referred to nursing for consideration of whether a hoarding alert is

---

[15]  As noted in the Monitor's Seventh Report, p. 27, n. 13, in order to achieve Substantial Compliance, the County will need to provide some explanation for the clinical judgment that no alert is required for an inmate who has been removed from risk precautions or that the inmate "did not meet the clinical criteria for risk precautions in the first place."

[16] The County did not report any results for the other mental health alerts for prisoners at MCJ, NCCF or PDC North because "Compliance Measures 31-1(a) and 31-1(b) refer to the intake and HOH populations respectively."  Although mental health alerts are required for all prisoners who have a "risk of suicide or self-injurious behavior," the County does not have to randomly select prisoners at MCJ, NCCF, or PDC North as long as it can show that these "alerts are not being discontinued inappropriately" or it has "processes that are likely to prevent that from occurring."

appropriate or necessary" and it "anticipates revising its assessment approach, with a particular focus on how suspected instances of hoarding are communicated between medical and custody staff."  The Mental Health Subject Matter Expert indicates that County's reliance, in part, on segregation reports is "reasonable," "as long as it is understood that any detection of contraband medications [by Custody] must result in notice to healthcare staff."  The County's Augmented Eighth Self-Assessment reports, however, that in the First Quarter of 2019, "the County experienced documentation concerns regarding communications between custody staff and medical staff when inmates are disciplined for having contraband pills and whether sufficient information is provided to medical staff to enable them to accurately identify inmates who might be hoarding medications."

The County's Augmented Eighth Self-Assessment reports the following results for the First Quarter of 2019: at CRDF, 92% (current suicide risk), 88% (removed from risk precautions), and 88% (hoarding) of the records had the required mental health alerts; at TTCF, 93% (current suicide risk), 84% (removal from risk precautions), and 81% (hoarding) of the records had the alerts; at MCJ, 63% of the records had the alerts for hoarding; at NCCF, 100% of the records had the alerts for hoarding, and at PDC North, none of the records had the alerts for hoarding.[17]

---

[17] Where the County experienced documentation concerns discussed above, the County counted those instances as non-compliant.  It reports that it did not experience these documentation issues at NCCF.

32.     Information regarding a serious suicide attempt will be entered in the prisoner's electronic medical record in a timely manner.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified))**

The Compliance Measures require that 95% of the electronic medical records of prisoners who had a serious suicide attempt reflect information regarding the attempt, and 85% of the records reflect that the information was entered into the record within one day of the attempt.

The County maintained Substantial Compliance with Paragraph 32 for twelve consecutive months as of December 31, 2016, and this provision was not subject to monitoring in the Eighth Reporting Period.

33.     The County will require mental health supervisors in the Jails to review electronic medical records on a quarterly basis to assess their accuracy as follows:

    (a)     Supervisors will randomly select two prisoners from each clinician's caseload in the prior quarter;

    (b)     Supervisors will compare records for those prisoners to corroborate clinician attendance, units of service, and any unusual trends, including appropriate time spent with prisoners, recording more units of service than hours worked, and to determine whether contacts with those prisoners are inconsistent with their clinical needs;

    (c)     Where supervisors identify discrepancies through these reviews, they will conduct a more thorough review using a DMH-developed standardized tool and will consider detailed information contained in the electronic medical record and progress notes; and

    (d)     Serious concerns remaining after the secondary review will be elevated for administrative action in consultation with DMH's centralized Human Resources.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017 (verified))**

The Compliance Measures require the County to provide the Monitor and the Subject Matter Experts with the DMH-developed standardized tool required by Paragraph 33(c), and to report the results of its analysis of the electronic medical records of two randomly selected prisoners from each clinician's caseload.  The County has provided the required tool, and previously reported Substantial Compliance for the Third and Fourth Quarters of 2016, and the First and Second Quarters of 2017.

The Monitor's auditors have verified the County's  previously reported results. Accordingly, the County maintained Substantial Compliance for twelve consecutive months and was no longer subject to monitoring for compliance with Paragraph 33 during the Eighth Reporting Period.

34 **(Revised).**  Consistent with existing Correctional Health Services policy, the County and the Sheriff will conduct clinically appropriate release planning for all prisoners who are being released to the community and who have been identified by a QMHP as having a mental illness and needing mental health treatment, or as having a DSM-5 major neuro-cognitive disorder that caused them to be housed in the Correctional Treatment Center at any time during their current incarceration.  For prisoners with mental illness and needing mental health treatment, the release planning services will be guided by the prisoner's level of care.  Specifically, prisoners who any time during their incarceration meet mental health level of P3, or P4 will be presumptively referred for release planning services, and prisoners who meet mental health level of care P2 will receive release planning services upon referral by a clinician or upon their request.  Prisoners who have a DSM-5 major neuro-cognitive disorder that caused them to be housed in the Correctional Treatment Center will also be referred for release planning services consistent with the Correctional Health Services policy applying to prisoners with mental illness.

> (a) Release planning will consider the need of the prisoner for housing; transportation to the prisoner's community-based provider, residence, or shelter within the County; bridge psychotropic medications; medical/mental health/substance abuse services; income/benefits establishment; and family/community/social supports ("Release Planning Areas").

> (b) Release planning will be based on an individualized assessment of the prisoner's needs and, unless the prisoner is unable or unwilling to participate, will be undertaken in collaboration with the prisoner.  For prisoners referred for release planning services, those services will include:

>> (i) An Initial Release Plan that will be created at intake or no later than ten days after the referral for release planning, which referral shall normally occur at the time of intake.  The Initial Release Plan will include preliminary identification of needs in each of the Release Planning Areas and preliminary recommendations for services to address those needs, and a referral for assistance in obtaining California identification when needed and when the prisoner is eligible; and/or

>> (ii) A Comprehensive Release Plan that will be initiated no later than thirty days after the referral for release planning.  The Comprehensive Release Plan will include (A) collecting information regarding the prisoner's needs; (B) coordinating with community-based providers to identify available services that meet the prisoner's needs; (C) facilitating the transition of care to community-based providers, and (D) assisting in obtaining identification and/or benefits when needed, when the prisoner is eligible, and as offered by the Sheriff's Community Transition Unit.

> (c) The County will maintain a re-entry resource center with staff supervised by a QMHP.  The re-entry resource center will:

(i) Provide information appropriate to the released prisoner about available housing, transportation, medical/mental health/substance abuse services, income/benefits establishment, community/social supports, and other community resources; and

(ii) Provide released prisoners with copies of their release plans, as available.

(d) All prisoners who are receiving and continue to require psychotropic medications will be offered a clinically appropriate supply of those medications upon their release from incarceration.  Unless contraindicated, this will be presumed to be a 14-day supply or a supply with a prescription sufficient so that the prisoner has the psychotropic medication available during the period of time reasonably necessary to permit the prisoner to consult with a doctor and obtain a new supply.

(e) Nothing in Paragraph 34 will require prisoners to accept or participate in any of the services provided under this Paragraph.

(f) Neither the County nor the Sheriff shall be in violation of this paragraph if after reasonable efforts as set forth in Correctional Health Services Policy M380.01, Release Planners are unable to identify available post-release services.

**STATUS (34):**         **STAYED PENDING LITIGATION**

During the Seventh Reporting Period, the parties and the Intervenors reached an
agreement on the provisions of revised Paragraph 34 ("Revised Paragraph 34") set forth
above.  They also agreed on revised Compliance Measures and a revised policy to
implement Revised Paragraph 34.

On December 10, 2018, the Court issued an order pursuant to the parties' joint
stipulation revising Paragraph 34.  The County expects to report the status of its
compliance with Revised Paragraph 34 beginning in January 2020.

35.     Consistent with existing DMH and Sheriff's Department policies, the County and the Sheriff will ensure that custody staff, before the end of shift, refer prisoners in general or special populations who are demonstrating a potential need for routine mental health care to a QMHP or a Jail Mental Evaluation Team ("JMET") member for evaluation, and document such referrals.  Custody staff will utilize the Behavior Observation and Referral Form.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of November 1, 2017, through December 31, 2018 (verified))**

The Compliance Measures require the Department to review, for a randomly selected month each quarter, the Behavior Observation and Mental Health Referral ("BOMHR") records for prisoners referred by custody staff to a QMHP or JMET member for "routine" mental health care to determine the timeliness of the referrals.  Substantial Compliance requires that "85% of the BOMHR forms reflect that the referral occurred before the end of the shift in which the potential need for mental health care is identified."

The County's Sixth Self-Assessment reported that the Department "has developed an electronic version of the BOMHR" and it "concluded that 100% -- 15% more than the required 85% -- of BOMHR forms reflected that referrals occurred prior to the end of the shift in which the potential need for mental health care is identified" in the last two months of the Fourth Quarter of 2017 and in the First Quarter of 2018.  These results were verified by the Monitor's auditors.

The County's Seventh Self-Assessment reported that the 100% of BOMHR forms reviewed in both the Second and Third Quarters of 2018 "reflected that referrals occurred prior to the end of the shift in which the potential need for mental health care is identified."  These results have been verified by the Monitor's auditors.

The County's Eighth Self-Assessment reports that 100% of BOMHR forms reviewed in the Fourth Quarter of 2018 reflected timely referrals.  These results have been verified by the Monitor's auditors and the County is no longer subject to monitoring for compliance with Paragraph 35.

36.     Consistent with existing DMH policies, the County and the Sheriff will ensure that a QMHP performs a mental health assessment after any adverse triggering event, such as a suicide attempt, suicide threat, self-injurious behavior, or any clear de-compensation of mental health status.  For those prisoners who repeatedly engage in such self-injurious behavior, the County will perform such a mental health assessment only when clinically indicated, and will, when clinically indicated, develop an individualized treatment plan to reduce, and minimize reinforcement of, such behavior.  The County and the Sheriff will maintain an on-call system to ensure that mental health assessments are conducted within four hours following the notification of the adverse triggering event or upon notification that the prisoner has returned from a medical assessment related to the adverse triggering event.  The prisoner will remain under unobstructed visual observation by custody staff until a QMHP has completed his or her evaluation.

**STATUS:     PARTIAL COMPLIANCE**

The Compliance Measures require the Department to review randomly selected records of prisoners newly admitted to mental health housing from a lower level of care due to an adverse triggering event during two randomly selected weeks per quarter; and provide a staffing schedule for on-call services.

The County's Eighth Self-Assessment reports that during the Fourth Quarter of 2018, (a) "86%  -- rather than the required 95% -- of inmates" identified in the two randomly selected weeks received an assessment by a QMHP within four hours as required by Compliance Measure 36-4(a); (b) 80% of the selected prisoners at CRDF, and 80% at TTCF were on videos "under unobstructed visual observation pending assessment," which is also below the 95% threshold for Substantial Compliance;[18] and (c) the County achieved 100% compliance with a staffing schedule that provides on-call services 24 hours a day, 7 days a week.

The County's Augmented Eighth Self-Assessment reports that during the First Quarter of 2019, (a) "85% of the inmates" identified in the two randomly selected weeks received an assessment by a QMHP within four hours; (b) 100% of the selected prisoners at CRDF and TTCF were on videos "under unobstructed visual observation pending assessment," and (c) the County achieved 100% compliance with a staffing schedule that provides on-call services 24 hours a day, 7 days a week.

Based upon a January 2019 site visit, the Mental Health Subject Matter Expert and clinicians found that 77% of the identified prisoners received an assessment by a QMHP within four hours, and 47% had an adequate assessment of the event, but "in only 38% was there a safety plan or crisis response to address those risk factors."  He reports that the "County is detecting cases reasonably reliably, but response times are falling a bit short.  Adequate risk assessments are being done about half the time but a corresponding

---

[18] DOJ and the County previously agreed that "the Department will randomly select five BOMHRS" from a randomly selected date, to "review videos to determine how the inmate was being observed while waiting for the QMHP," and "produce screen shots and movement records as part of their self-assessment."

response or plan to address those risks is present in only a minority of cases."[19]   Based
upon record reviews and discussions with staff, the Mental Health Subject Matter Expert
and clinicians note that there are times when the mental health staff cannot go to the
housing unit to conduct the mental health assessment.[20]   Thus, while the County may
have a "staffing schedule that provides on-call services 24 hours a day, 7 days a week," as
reflected in the County's own reported results, it is not clear that the system is adequate.[21]

---

[19] The County's response to the draft of this Eighth Report notes that the Compliance Measures "establish
quantitative thresholds" while the related provision in Paragraph 40 "contains a qualitative element[.]"
Accordingly, the "County's view is that Substantial Compliance with Provision 36 should be determined
according to the County's ability to meet the qualitative thresholds[.]"  The Monitor does not disagree
unless, as noted earlier, "the quality of the County's performance as determined by the qualitative
assessment is plainly inadequate or the results reported by the Subject Matter Expert vary significantly
from the results reported by the Department."  See p. 1, *supra.*
[20] DOJ recommends that the County "consider targeted staffing interventions to address these challenges."
[21] Compliance Measure 36-2 requires the Monitor, in consultation with the Subject Matter Experts, to
"review" the staffing schedule "to verify the adequacy of the on-call system."

37.     Sheriff's Court Services Division staff will complete a Behavioral Observation and Mental Health Referral ("BOMHR") Form and forward it to the Jail's mental health and/or medical staff when the Court Services Division staff obtains information that indicates a prisoner has displayed obvious suicidal ideation or when the prisoner exhibits unusual behavior that clearly manifests self-injurious behavior, or other clear indication of mental health crisis.  Pending transport, such prisoner will be under unobstructed visual observation or subject to 15-minute safety checks.

**STATUS:**       **PARTIAL COMPLIANCE**

The Compliance Measures require the Department to randomly select nine courts from among the three Court Divisions each quarter, review written communications and orders that refer to a suicide risk or serious mental health crisis for a prisoner and incident reports for self-injurious behavior by prisoners appearing in the selected courts, and determine if these incidents are reflected in BOMHR forms completed by the Court Services Division staff in the selected courts.

The County's Eighth Self-Assessment reports that 100% of the incidents covered by Paragraph 37 in six randomly selected courts were reflected on BOMHRs in the Fourth Quarter of 2018, but only 71% of the incidents in six other courts were reflected on BOMHRs in the First Quarter of 2019, which is below the 90% threshold for Substantial Compliance.

38.     Consistent with existing DMH policies and National Commission on Correctional Health Care standards for jails, the County and the Sheriff will ensure that mental health staff or JMET teams make weekly cell-by-cell rounds in restricted non-mental health housing modules (e.g., administrative segregation, disciplinary segregation) at the Jails to identify prisoners with mental illness who may have been missed during screening or who have decompensated while in the Jails.  In conducting the rounds, either the clinician, the JMET Deputy, or the prisoner may request an out-of-cell interview.  This request will be granted unless there is a clear and documented security concern that would prohibit such an interview or the prisoner has a documented history of repeated, unjustified requests for such out-of-cell interviews.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified))**

The Compliance Measures require the Department to review the documentation of the weekly cell-by-cell rounds and the JMET Logs for a randomly selected week each quarter to confirm that the required cell-by-cell checks were conducted and out-of-cell interviews were handled in accordance with this provision.

The County's reported results, which were verified by the Monitor's auditors, showed that it had maintained Substantial Compliance with Paragraph 38 for twelve consecutive months as of December 31, 2016.  Accordingly, pursuant to Paragraph 111 of the Settlement Agreement, Paragraph 38 was not subject to monitoring in the Eighth Reporting Period.

39.     The County and the Sheriff will continue to use a confidential self-referral system by which all prisoners can request mental health care without revealing the substance of their requests to custody staff or other prisoners.

> STATUS     **SUBSTANTIAL COMPLIANCE (as of July 1, 2017, through March 31, 2018 (verified) and through June 30, 2018 (unverified) at NCCF)**
>
> **SUBSTANTIAL COMPLIANCE (as of July 1, 2018, through March 31, 2019 (unverified) at PDC North)**
>
> **SUBSTANTIAL COMPLIANCE (as of October 1, 2018, through March 31, 2019 (verified) at PDC South)**
>
> **PARTIAL COMPLIANCE (at TTCF, CRDF, and MCJ)**
>
> **NOT RATED (PDC East)**

Substantial Compliance requires the Department to (a) verify that housing areas have the required forms and (b) review randomly selected self-referrals for mental health care from prisoners to confirm that (i) the referrals "were forwarded to DMH" by the Department, and (ii) that "DMH documented the timeliness and nature of DMH's response to the self-referrals[.]"  The thresholds for Substantial Compliance are that 85% of the housing areas have the required forms and 90% of the self-referrals must be forwarded by the Department to the Department of Health Services – Custody Health Services (DHS-CHS) and 90% must contain the required documentation of DHS-CHS's response.

The County's Eighth Self-Assessment reports that it achieved Substantial Compliance with Compliance Measure 39.4(a) in the Fourth Quarter of 2018 and the First Quarter of 2019 in that more than 85% of the housing areas in all of the facilities had the self-referral forms.  Based upon a review of the County's policies and procedures, multiple tours of the facilities by the Monitor, site visits by the Subject Matter Expert and the clinicians, interviews, and the County's Eighth Self-Assessment, the Monitor is satisfied that the Department has adequate processes and procedures for inmates to make confidential self-referrals for mental health care.

The County previously reported Substantial Compliance with Compliance Measures 39.4(b) and 4(c) at NCCF for twelve consecutive months from July 1, 2017, through June 30, 2018. The results for the three-month period ending on June 30, 2018 have not been verified by the Monitor's auditors.[22]

---

[22] Notwithstanding that the County's previously reported Substantial Compliance at NCCF for twelve consecutive months, the County's Eighth Self-Assessment reports Substantial Compliance at NCCF for the Fourth Quarter of 2018 and the First Quarter of 2019.  The County reports that in the Fourth Quarter of 2018, 100% of the self-referrals from NCCF were forwarded to CHS as required by Compliance Measure 39.4(b) and CHS documented 94% of the NCCF referrals.  It also reports that, in the First Quarter of 2019,

The Mental Health Subject Matter Expert and clinicians conducted a qualitative assessment of the County's handling of self-referrals at NCCF as part of a January 2019 site visit that raises concerns about the adequacy of the QMHP responses.  They report that there was a QMHP response in 88% of the cases; the response was timely in 85% of the cases, but clinically appropriate in only 48% of the cases.  They found that "many of the responses consisted of a brief assessment and a transfer to a higher level of care and/or placement on restrictive conditions, but with almost no evidence of a clinical crisis intervention."  They also found that "QMHPs place inmates on 'risk precautions,' despite assessments finding low suicide risk and without explaining why such restrictive conditions were necessary."[23]

The County's Eighth Self-Assessment reports Substantial Compliance at PDC North and PDC South in the Fourth Quarter of 2018 in that 100% of the self-referrals from each facility were forwarded to CHS as required by Compliance Measure 39.4(b) and DHS-CHS documented 95% of the PDC North referrals and 100% of the PDC South referrals as required by Compliance Measure 39.4(c).  It reports that there were no relevant referrals from PDC East during the period as "inmates are pre-screened for mental health issues before being housed there."

The Eighth Self-Assessment also reports Substantial Compliance at PDC North and PDC South for the First Quarter of 2019 as follows: 100% and 95% for PDC North; and 100% and 100% for PDC South.  The County was again unable to assess PDC East for the same reasons.[24]

The Substantial Compliance results reported by the County for NCCF for the Second Quarter of 2018 and for PDC North are subject to verification by the Monitor's auditors to whether self-referrals are being promptly forwarded to CHS by Custody within 24 hours of collecting the self-referral and, if so, whether CHS has responded within seven days.  If the self-referral is not promptly forwarded by Custody, CHS must respond within seven days of the inmate's self-referral (rather than CHS's receipt of the self-referral from Custody).  See Monitor's Seventh Report, p. 38, n. 16.

The County's Eighth Self-Assessment reports that in the Fourth Quarter of 2018, 100% of the self-referrals from CRDF, TTCF, and MCJ, were forwarded by the Department to DHS-CHS, and DHS-CHS documented the timeliness and nature of its

---

100% of the referrals were forwarded to CHS and CHS documented all of the referrals.  The County's posted results for the Third Quarter of 2018 reflects that 100% of the referrals were forwarded to CHS and CHS documented 100% of the referrals.

[23] DOJ has expressed a concern about the Substantial Compliance rating for NCCF in light of the findings of the Subject Matter Expert and the clinicians.  Subject to verification by the auditors, NCCF maintained Substantial Compliance with Paragraph 39 for twelve consecutive months as of June 30, 2018, which is over six months before the Qualitative Assessment by the Subject Matter Expert and the clinicians.  The Monitor does not believe that he can retroactively downgrade the Substantial Compliance finding under these circumstance.  If, however, the auditors are unable to verify the County's reported results at NCCF for the three months ending on June 30, 2018, the County will have to achieve and maintain for twelve consecutive months Substantial Compliance at NCCF after the First Quarter of 2019.

[24] If there are no relevant referrals from PDC East, it will deemed to be in Substantial Compliance once the other PDC facilities have maintained Substantial Compliance for twelve consecutive months.

response in 80% of the CRDF referrals, 76% of the TTCF referrals, and 40% of the MCJ referrals.  These results were below the 90% threshold for Substantial Compliance.  The County's Eighth Self-Assessment reports that for the First Quarter of 2019, 100% of the self-referrals reviewed by the Department at CRDF were forwarded to CHS, but "CHS documented the timeliness and nature of CHS' response to the self-referrals received from the Department" only 46% of the time.  The results were 100% and 60% for MCJ and 100% and 56% for TTCF.

The Mental Health Subject Matter Expert and the clinicians conducted a qualitative assessment of the County's compliance with Paragraph 39 at TTCF and CRDF, in March 2019.  They report that it "was very difficult to track the response to self-referrals [at CRDF and TTCF], with CRDF being the most well-organized. . . . [C]linical notes often did not address the content of the self-referral, [the] self-referrals are often not scanned into the record, [and the summaries of the self-referrals are sometimes] inaccurate or [do] not include important information."  The Mental Health Subject Matter Expert and the clinicians found a "QMHP response in 89% of cases; the response was timely in 67% of the cases, and clinically adequate in 74% of the cases."

40.     The County and the Sheriff will ensure a QMHP will be available on-site, by transportation of the prisoner, or through tele-psych 24 hours per day, seven days per week (24/7) to provide clinically appropriate mental health crisis intervention services.

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance requires the County (1) to provide the Monitor with on-call schedules for two randomly selected weeks reflecting that a QMHP was assigned 24 hours a day, seven days per week, and (2) randomly select referrals for mental health crisis intervention received by a QMHP per quarter to verify that a QMHP responded to all referrals, and 90% of the referrals within four hours.

The County's Eighth Self-Assessment reports that for the Fourth Quarter of 2018, a QMHP responded 100% of the time and 93% of the responses were within four hours and that for the First Quarter of 2019, a QMHP responded 100% of the time and 95% of the responses were within four hours.

As in prior reporting periods, the County's Substantial Compliance finding is subject to a qualitative review by the Mental Health Subject Matter Expert and the clinicians to assess whether the QMHP's are providing "clinically appropriate" services. They conducted their review during a March 2019 site visit, in which they found that a QMHP responded in 98% of the cases and the response was also within four hours in 98% of the cases. They found, however, that there was a "clinically appropriate crisis response" in only 35% of the cases. They are of the "view that both of [these] measures address potentially high risk situations" and they "found that the majority of responses are inadequate, often consisting only in transfer and/or imposing restrictive conditions on patients with little or no evidence of a clinical crisis intervention."[25]  What is needed is "evidence that the clinician assessed the nature of the crisis and made a reasonable attempt to work with the patient to resolve the crisis."[26]  Accordingly, the County has achieved Partial Compliance rather Substantial Compliance with Paragraph 40.[27]

---

[25] The Mental Health Subject Matter Expert has observed that "a crisis response would, at a minimum, characterize the cause of the crisis, conduct a relevant risk assessment, and create a plan of action based on that assessment."

[26] The Mental Health Subject Matter Expert and clinicians have "seen some limited improvement," with one clinician noting that "they provided some support, problem-solving, or other limited short-term intervention."  The County reports that it "is currently developing a template for clinicians to use as a guide in documenting their crisis intervention to ensure more thorough clinical responses and better document the same."

[27] DOJ has expressed a concern about the number of exclusions from the randomly selected referrals in the First Quarter of 2019 (27) as opposed to the Fourth Quarter of 2018 (seven).  In response, the County notes the number of exclusions is less than in the Second and Third Quarters of 2018.  The County also explained that it "has excluded from its assessment, items initially captured in the universe that do not relate to crisis intervention services and that extraction evaluations "are separate and distinct" from a mental health crisis evaluation that is done if the inmate is "being extracted as a result of a mental health crisis."

41.     Consistent with existing DMH policies, the County and the Sheriff will implement step-down protocols that provide clinically appropriate transition when prisoners are discharged from FIP after being the subject of suicide watch.  The protocols will provide:

(a)     intermediate steps between highly restrictive suicide measures (e.g., clinical restraints and direct constant observation) and the discontinuation of suicide watch;

(b)     an evaluation by a QMHP before a prisoner is removed from suicide watch;

(c)     every prisoner discharged from FIP following a period of suicide watch will be housed upon release in the least restrictive setting deemed clinically appropriate unless exceptional circumstances affecting the facility exist; and

(d)     all FIP discharges following a period of suicide watch will be seen by a QMHP within 72 hours of FIP release, or sooner if indicated, unless exceptional circumstances affecting the facility exist.

**STATUS:     NON-COMPLIANCE**

Substantial Compliance requires DMH to review the medical records of all prisoners on suicide watch in FIP for one randomly selected month each quarter, and submit a report regarding the implementation of the step-down protocols and the results of its review of the medical records.  Previously, the Monitor did not rate the County's compliance with Paragraph 41 because all FIP patients on suicide watch during the period either remained on suicide watch at the end of the period or "did not remain in the system (they were transferred to prison), and therefore did not go through the protocols."

During the Fifth Reporting Period, the parties agreed to revise the Compliance Measures to increase the number of inmates subject to the step-down protocols of Paragraph 41 and ensure that the implementation of step-down protocols for FIP patients on suicide watch "ameliorate the impact of the restrictions" and have the necessary "level of precautions based upon individual assessment[s]" of the patients.  The revised Compliance Measures were reviewed by the Mental Health Subject Matter Expert.

The County's Eighth Self-Assessment reports that the "County finalized a revised EMR template to more meaningfully assess the County's compliance with this [revised] Compliance Measure."  It reports that "56% -- rather than the required 95% -- of the prisoners discharged from FIP during the [Fourth Quarter of 2018 after having been on suicide watch] met the requirements set forth in Compliance Measure 41-4."  The County's Augmented Eighth Self-Assessment reports that only 27% of the prisoners discharged from FIP during the First Quarter of 2019 met these requirements.

44

42.     Consistent with existing DMH policies, the County and the Sheriff will implement step-down protocols to ensure that prisoners admitted to HOH and placed on risk precautions are assessed by a QMHP.  As part of the assessment, the QMHP will determine on an individualized basis whether to implement "step-down" procedures for that prisoner as follows:

(a)     the prisoner will be assessed by a QMHP within three Normal business work days, but not to exceed four days, following discontinuance of risk precautions;

(b)     the prisoner is counseled to ameliorate the negative psychological impact that any restrictions may have had and in ways of dealing with this impact;

(c)     the prisoner will remain in HOH or be transferred to MOH, as determined on a case-by-case basis, until such assessment and counseling is completed, unless exceptional circumstances affecting the facility exist; and

(d)     the prisoner is subsequently placed in a level of care/housing as determined by a QMHP.

**STATUS:       PARTIAL COMPLIANCE**

The County's Eighth Self-Assessment reports that for the Fourth Quarter of 2018 at CRDF, 100% of the medical records reviewed reflected that "inmates in HOH and placed on risk precautions were assessed by a QMHP;" "23% -- instead of the required 90% -- of the records reflected that the QMHP determined on an individualized basis whether to implement step-down procedures;" and "75% -- rather than the required 85% -- of the records reflected that step-down procedures were implemented per the QMHP assessment, where applicable."  For this quarter at TTCF, the results in these categories were 98%, 68%, and 25%.  There was a slight overall improvement at both facilities from the prior quarter.

The County's Augmented Eighth Self-Assessment reports that for the First Quarter of 2019 at CRDF, 100% of the records "reflected that inmates in HOH and placed on risk precautions were assessed by a QMHP;" 34% "of the records reflected that the QMHP determined on an individualized basis whether to implement step-down procedures;" and 33% "of the records reflected that step-down procedures were implemented per the QMHP assessment, where applicable."  For this quarter at TTCF, the results in these categories were 100%, 89%, and 60%.

The Eighth Self-Assessment reports that a working group has

met frequently, and also met specifically with the Mental Health Subject Matter Expert during the Reporting Period, to ensure the County follows a clear and clinically sound approach [to risk precaution step-down

protocols].  Among other things, the County's new risk precaution process incorporates additional supervisory consultation and input, required implementation of the step-down process for all inmates being removed from risk precaution and the establishment of a clearer treatment plans and goals. The County also revised the Risk Assessment for Suicide tool (formerly the SRAC) to ensure risk precaution criteria were consistent with that tool and allowed for risk assessment independent of risk precaution criteria and P-level.

The Mental Health Subject Matter Expert noted that the County has "taken appropriate steps to improve the criteria, process, and management of risk precautions." Notwithstanding the quantitative results at CRDF, the Monitor finds that the County is in Partial Compliance at both facilities based upon the Mental Health Subject Matter Expert's assessment.

43.     Within six months of the Effective Date, the County and the Sheriff will develop and implement written policies for formal discipline of prisoners with serious mental illness incorporating the following:

(a)     Prior to transfer, custody staff will consult with a QMHP to determine whether assignment of a prisoner in mental health housing to disciplinary housing is clinically contraindicated and whether placement in a higher level of mental health housing is clinically indicated, and will thereafter follow the QMHP's recommendation;

(b)     If a prisoner is receiving psychotropic medication and is placed in disciplinary housing from an area other than mental health housing, a QMHP will meet with that prisoner within 24 hours of such placement to determine whether maintenance of the prisoner in such placement is clinically contraindicated and whether transfer of the prisoner to mental health housing is clinically appropriate, and custody staff will thereafter follow the QMHP's recommendation;

(c)     A QMHP will participate in weekly walks, as specified in paragraph 38, in disciplinary housing areas to observe prisoners in those areas and to identify those prisoners with mental health needs; and

(d)     Prior to a prisoner in mental health housing losing behavioral credits for disciplinary reasons, the disciplinary decision-maker will receive and take into consideration information from a QMHP regarding the prisoner's underlying mental illness, the potential effects of the discipline being considered, and whether transfer of the prisoner to a higher level of mental health housing is clinically indicated.

**STATUS (43):**          **SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at NCCF and PDC North)**

                          **PARTIAL COMPLIANCE (at CRDF, MCJ, and TTCF)**

In response to comments by the Monitor and DOJ, the Department submitted proposed revisions to its discipline policies on May 30, 2017.  After consulting with the Subject Matter Experts, the Monitor provided his written comments to the Department on June 29, 2017.  The DOJ provided its comments to the Department the same day.  The County's Eighth Self-Assessment reports that the Department is still "in the process of finalizing the revised policies related to discipline and the mentally ill."

The County's Eighth Self-Assessment reports "no inmates with mental illness lost behavioral credits for disciplinary reasons" during the Fourth Quarter of 2018 or the First Quarter of 2019.  The Eighth Self-Assessment again summarizes the practices regarding the discipline for inmates with P2, P3, and P4 designations in mental health housing locations.[28]  It also reports that the County "continues to use its revised process for receiving notice of P1 inmates residing in General Population who are scheduled to receive discipline," but reiterates that "the County continues to experience staffing shortages that impact its ability to achieve Substantial Compliance" with this provision.

The County previously reported that that it had achieved Substantial Compliance at NCCF and PDC for twelve consecutive months.  These results were verified by the Monitor's auditors, and NCCF and PDC North were not subject to monitoring in the Eighth Reporting Period.

The Eighth Self-Assessment reports that for the Fourth Quarter of 2018, 100% of the weekly row walks required by Compliance Measure 43-9(d) occurred at MCJ, but only 70% of the meetings required pursuant to Compliance Measure 43-9(c) occurred, which is well-below the 90% threshold for Substantial Compliance when inmates receiving psychotropic medications are transferred to disciplinary housing from areas other than mental health housing.[29]

The County's Eighth Self-Assessment reports that for the Fourth Quarter of 2018, 58% of the required consultations at CRDF "occurred prior to transfers from mental health housing;" 87% of the required meetings occurred when inmates receiving psychotropic medications are transferred to disciplinary housing from areas other than mental health housing; and 100% of the weekly row walks through disciplinary units occurred.  The results for TTCF were 81%, 95%, and 100%.  For MCJ, 70% of the required meetings and 100% of the row walks occurred.

---

[28] The Mental Health Subject Matter Expert and clinicians report that they "have not seen any evidence of mentally ill [inmates] transferred from HOH to disciplinary housing[.]"

[29] It appears that Compliance Measure 43.9(b) was not applicable to MCJ during this period because it did not have any prisoners transferred to disciplinary housing from mental health housing.

The County's Eighth Self-Assessment also reports that for the First Quarter of 2019, 70% of the required consultations at CRDF "occurred prior to transfers from mental health housing;" 88% of the required meetings occurred when inmates receiving psychotropic medications are transferred to disciplinary housing from areas other than mental health housing; and 100% of the weekly row walks through disciplinary units occurred.  The results for TTCF were 89%, 88%, and 100%[30] and for MCJ were 100%, 47%, and 80%.

During a May 2019 site visit, the Mental Health Subject Matter Expert and the clinicians reviewed the records of inmates in HOH and MOH at CRDF and TTCF who were subject to discipline to assess the Department's compliance with Paragraph 43.  They found that in 67% of the cases the QMHP evaluated the inmate before discipline was imposed; in 61% of the cases "the QMHP considered whether a higher level of housing was indicated;" and 67% of the cases "demonstrated evidence of the recommendations being based on the clinical condition of the patient."  They also found that in 74% of the cases, the QMPH considered "whether discipline was contraindicated." They also reviewed the records of inmates in General Population on psychotropic medication who were subject to discipline and found that 88% of the inmates "were evaluated by a QMHP" before discipline was imposed; 76% were seen by the QMHP within 24 hours; and "89% were considered for a higher level of mental health housing." They also found that in 81% of the cases the QMHP considered "contraindications to discipline" and in 85% of the cases there was evidence that the QMHP's recommendations were "based on the clinical condition of the [inmate]."

In conclusion, the Subject Matter Expert and clinicians found that "Some QMHP's are doing a good job addressing [the requirements of Paragraph 43], especially those who are assigned this task specifically."  Nevertheless,

> there are still many cases where QMHP's are assessing whether the patient's mental health condition contributed to the problem behavior, which is not what they should be doing.  It is also highly concerning that there are no instances where contraindications to discipline were identified, despite a number of those assessed having very severe mental illnesses.  It does not seem that QMHPs have a clear sense of what might constitute a contraindication to discipline.  While they address the patient's mental health condition, there is rarely any discussion of the nature of discipline proposed and how it might affect the patient's mental health.

Moreover, "the nature of the discipline is unclear in most instances.  It is also not being addressed by the QMHPs conducting these assessments."

---

[30] The Mental Health Subject Matter Expert and the clinicians have expressed a concern that the County's compliance "methodology may still be a mechanical exercise in determining whether contacts were made and documented rather than whether they are conducting a meaningful mental health assessment pertaining to their disciplinary practices."

44.     Within six months of the Effective Date, the County and the Sheriff will install protective barriers that do not prevent line-of-sight supervision on the second floor tier of all High Observation Housing areas to prevent prisoners from jumping off of the second floor tier.  Within six months of the Effective Date, the County and the Sheriff will also develop a plan that identifies any other areas in mental health housing where such protective barriers should be installed.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016)**

The County has maintained Substantial Compliance with Paragraph 44 of the Agreement since January 1, 2016.  Pursuant to Paragraph 111 of the Settlement Agreement, Paragraph 44 was not subject to monitoring during the Eighth Reporting Period.

45.     Consistent with existing Sheriff's Department policies, the County and the Sheriff will provide both a Suicide Intervention Kit that contains an emergency cut-down tool and a first-aid kit in the control booth or officer's station of each housing unit.  All custody staff who have contact with prisoners will know the location of the Suicide Intervention Kit and first-aid kit and be trained to use their contents.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of October 1, 2015, through September 30, 2016 (verified) at CRDF, NCCF, PDC East, PDC South, and TTCF)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at MCJ and PDC North)**

The County maintained Substantial Compliance with Paragraph 45 for twelve consecutive months at all facilities as of December 31, 2016.  Pursuant to Paragraph 111 of the Settlement Agreement, Paragraph 45 was not subject to monitoring during the Eighth Reporting Period.

46.     The County and the Sheriff will immediately interrupt, and if necessary, provide appropriate aid to, any prisoner who threatens or exhibits self-injurious behavior.

**STATUS:        PARTIAL COMPLIANCE**

Substantial Compliance requires the Department to review the documentation from randomly selected incidents involving prisoners who threaten or exhibit self-injurious behavior, and include an assessment of the timeliness and appropriateness of the Department's responses to these incidents in its semi-annual Self-Assessment.  The County's Eighth Self-Assessment reports that for the Fourth Quarter of 2018, "96% -- 1% more than the required 95% -- of the records reviewed . . . reflected that appropriate aid and (when necessary) immediate interruption of self-injurious behavior was provided by the Department."  It also reports that for the First Quarter of 2019, 97% of the records reflect that the Department provided appropriate aid and necessary interruption.

The County's Eighth Self-Assessment notes that the "Department has continuously reported Substantial Compliance with this Provision beginning in Second Quarter 2018" based upon the use of the electronic BOMHR.  The Monitor and the Mental Health Subject Matter reviewed the source documents posted by the County for the randomly selected incidents involving prisoners who threatened or exhibited self-injurious behavior in Fourth Quarter of 2018 and the First Quarter of 2019.  Many of the BOMHRs involved expression of suicidal ideation, which, as previously noted by the Mental Health Subject Matter Expert,[31] do not involve threatened self-injurious behavior and thus "required no interruption."

For many of the cases involving inmates who threatened or exhibited self-injurious behavior (i.e., more than suicidal ideation), the BOMHRs reflect what the Department did to "interrupt" the behavior and what aid the County healthcare personnel provided to the prisoners.  In some cases where the BOMHR does not specifically state what the Department did to interrupt the behavior, it can be inferred what the Department did.  And in some cases where the BOMHR does not specifically state what aid was provided, the County provided additional documentation consisting of medical records, incident reports, or injury assessments that provided this information.  In a number of cases, however, it is not possible to tell from the BOMHR if the interruption was "immediate."

With additional information regarding the timing and the nature of the "interruption," the BOMHRs (as supplemented by medical records if necessary) can be used to achieve Substantial Compliance with Paragraph 46, subject to random reviews of videos to confirm the information on the BOMHRs.[32]

---

[31] See Monitor's Seventh Report, p. 51.

[32] The Monitor suggests that the Department revise the BOMHR as follows:  delete the OBERVED BEHAVIORS LINE under **OBSERVATIONS,** change the COMMENTS block to INMATE'S BEHAVOR, and add a block entitled TIME AND NATURE OF DEPARTMENT'S RESPONSE.  It will then be readily apparent from the BOMHR what the Department did to interrupt the behavior and the timing of the interruption.  In the alternative, the Department could rely on other source documents such as incident reports

47.    The County and the Sheriff will ensure there are sufficient custodial, medical, and mental health staff at the Jails to fulfill the terms of this Agreement.  Within six months of the Effective Date, and on a semi-annual basis thereafter, the County and the Sheriff will, in conjunction with the requirements of Paragraph 92 of this Agreement, provide to the Monitor and DOJ a report identifying the steps taken by the County and the Sheriff during the review period to implement the terms of this Agreement and any barriers to implementation, such as insufficient staffing levels at the Jails, if any.  The County and the Sheriff will retain staffing records for two years to ensure that for any critical incident or non-compliance with this Agreement, the Monitor and DOJ can obtain those records to determine whether staffing levels were a factor in that critical incident and/or non-compliance.

**STATUS:      NON-COMPLIANCE**

The County has provided a list of each critical incident during the Eighth Reporting Period, but has not assessed "whether staffing was a factor in any non-compliance with the Agreement, any critical incident, or the Department's handling of an incident."  The County's Augmented Eighth Self-Assessment reports that CCSB has "developed a program to assist facilities in identifying how staffing levels may have impacted assaults on staff and/or Category 3 uses of force[.]"

48. Within three months of the Effective Date, the County and the Sheriff will have written housekeeping, sanitation, and inspection plans to ensure the proper cleaning of, and trash collection and removal in, housing, shower, and medical areas, in accordance with California Code of Regulations ("CCR") Title 15 § 1280: Facility Sanitation, Safety, and Maintenance.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016)**

The County maintained Substantial Compliance with Paragraph 48 of the Agreement at all facilities for twelve consecutive months as of December 31, 2016. Pursuant to Paragraph 111 of the Settlement Agreement, Paragraph 48 was not subject to monitoring during the Eighth Reporting Period, but the Monitor did observe "an acceptable level of cleanliness, sanitation, repair and safety" during tour of each facility. The Monitor and the Use of Force Subject Matter Expert were impressed with the conditions and cleanliness in TTCF and NCCF during this period.

49.     Within three months of the Effective Date, the County and the Sheriff will have a maintenance plan to respond to routine and emergency maintenance needs, including ensuring that shower, toilet, sink, and lighting units, and heating, ventilation, and cooling system are adequately maintained and installed.  The plan will also include steps to treat large mold infestations.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of March 1, 2016, through February 28, 2017)**

The County maintained Substantial Compliance with Paragraph 49 of the Agreement at all facilities for twelve consecutive months as of February 28, 2017. Pursuant to Paragraph 111 of the Settlement Agreement, Paragraph 49 was not subject to monitoring during the Eighth Reporting Period.  Nevertheless, during inspections in the Eighth Reporting Period, the Monitor noted that inmates at NCCF in particular complained about the heating and cooling systems at that facility.

50.     Consistent with existing Sheriff's Department policies regarding control of
vermin, the County and the Sheriff will provide pest control throughout the housing units,
medical units, kitchen, and food storage areas.

> **STATUS:**     **SUBSTANTIAL COMPLIANCE (as of January 1, 2016,
> through December 31, 2016 (verified) at all facilities other than
> PDC South and PDC East)**
>
> **SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through
> March 31, 2017 (verified) at PDC South and PDC East)**

The County maintained Substantial Compliance with Paragraph 50 of the
Agreement at all facilities for twelve consecutive months as of March 31, 2017.  Pursuant
to Paragraph 111 of the Settlement Agreement, Paragraph 50 was not subject to
monitoring during Eighth Reporting Period.

51.     Consistent with existing Sheriff's Department policies regarding personal care items and supplies for inmates, the County and the Sheriff will ensure that all prisoners have access to basic hygiene supplies, in accordance with CCR Title 15 § 1265: Issue of Personal Care Items.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) for all facilities other than CRDF)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017 (verified) at CRDF)**

The County maintained Substantial Compliance with Paragraph 51 of the Agreement at all facilities for twelve consecutive months as of June 30, 2017.  Pursuant to Paragraph 111 of the Settlement Agreement, Paragraph 51 was not subject to monitoring during the Eighth Reporting Period.

52.     The County and the Sheriff will implement policies governing property restrictions in High Observation Housing that provide:

(a)     Except when transferred directly from FIP, upon initial placement in HOH:

(i)     Suicide-resistant blankets, gowns, and mattresses will be provided until the assessment set forth in section (a)(ii) below is conducted, unless clinically contraindicated as determined and documented by a QMHP.

(ii)    Within 24 hours, a QMHP will make recommendations regarding allowable property based upon an individual clinical assessment.

(b)     Property restrictions in HOH beyond 24 hours will be based on clinical judgment and assessment by a QMHP as necessary to ensure the safety and well-being of the prisoner and documented in the electronic medical record.

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance requires the Department to (1) randomly inspect the cells of prisoners placed in HOH (except from FIP) within the previous 24 hours to confirm that they have been provided with suicide-resistant blankets, gowns and mattresses unless clinically contraindicated, and document the results of the inspection; (2) randomly inspect the cells of prisoners placed in HOH (except from FIP) for more than 24 hours to confirm that they have been provided with allowable property as recommended by a QMHP; and (3) review the electronic medical records of prisoners assigned to HOH on the days of those inspections to verify compliance with the provisions of Paragraph 52. All of the Compliance Measures have a 95% threshold for Substantial Compliance.

The County's Eighth Self-Assessment reports that in the Fourth Quarter of 2018, 100% of the inmates initially placed in HOH at CRDF were provided the property required by Paragraph 52 and 100% of the inmates placed in HOH "for more than 24 hours" had "allowable property as recommended by a QMHP[.];" but only 14% "of the electronic medical records for inmates assigned to HOH reflected a recommendation by a QMHP regarding allowable property;" and 16% "of electronic medical records for inmates assigned to HOH reflect that property restrictions were based upon the clinical judgment of a QMHP."

Also for the Fourth Quarter of 2018, the County reports that 89% of the inmates initially placed in HOH at TTCF were provided the property required by Paragraph 52; and 96% of the inmates placed in HOH "for more than 24 hours" had "allowable property as recommended by a QMHP;" 35% of the electronic medical records "reflected a recommendation by a QMHP regarding allowable property;" and 77% of the records "reflect that property restrictions were based upon the clinical judgment of a QMHP."

The County's Augmented Eighth Self-Assessment reports that for the First Quarter of 2019, 95% of the inmates initially placed in HOH at CRDF were provided the property required by Paragraph 52; 28% "of the electronic medical records for inmates assigned to HOH reflected a recommendation by a QMHP;" 15% of the records "reflect that property restrictions were based upon the clinical judgment of a QMHP;" and 93% of the inmates in HOH "for more than 24 hours" had "allowable property as recommended by a QMHP[.]"

For TTCF, in the First Quarter of 2019, 92% of the inmates initially placed in HOH were provided the property required by Paragraph 52; 44% of the records "reflected a recommendation by a QMHP;" 71% of the records reflect that the "property restrictions were based upon the clinical judgment of a QMHP;" and 92% of the inmates placed in HOH "for more than 24 hours" had "allowable property as recommended by a QMHP[.]"

During a January 2019 site visit, the Mental Health Subject Matter Expert and the clinicians reviewed "[w]hether there was an assessment by a QMHP within 24 hours" and "qualitatively evaluated whether the restrictions were based on an analysis of relevant risks." They found that a QMHP provided an initial assessment in 96% of the cases reviewed, and within 24 hours in 84% of those cases. The Subject Matter Expert reports that their qualitative evaluation showed that the allowable property was based on the relevant risks in 50% of the cases. While this is "an improvement," he notes that "there was often no discussion of why certain items were restricted or even why restrictions were needed at all. Restrictions were often put in place when the structured suicide risk assessment indicated low risk and there was no documentation or analysis demonstrating that restrictions were needed." They also found that there were "current assessments" in 78% of the cases. They concluded that "the County is doing a reasonable job at providing property consistent with the recommendations of the QMHPs, but that the quality of the assessments underlying these recommendations remains inconsistent and often poor." Based upon the qualitative assessment by the Mental Health Subject Matter Expert and the clinicians, the Monitor is of the view that the Department has achieved Partial Compliance with Paragraph 52.

53.    If otherwise eligible for an education, work, or similar program, a prisoner's mental health diagnosis or prescription for medication alone will not preclude that prisoner from participating in said programming.

**STATUS:**    **PARTIAL COMPLIANCE**

Substantial Compliance requires the Department to audit the records of prisoners who were eligible, but rejected or disqualified, for education and work programs to confirm that they were not rejected or disqualified because of a mental health diagnosis or prescription for medication alone.

The County's Eighth Self-Assessment reports that 80% and 61% of the mentally ill prisoners who were eligible for and denied work in the Fourth Quarter of 2018 and the First Quarter of 2019 were not denied the work due to a mental health diagnosis or prescription for psychotropic medication alone.

The County's Eighth Self-Assessment also reports that in the First Quarter of 2019 "staffing and other issues caused a number of requests to be unanswered in a timely manner per Department policy.  The Department counted requests that were not answered in a timely manner as 'denied' for purposes of its assessment whether or not those requests were ultimately granted or denied for a reason unrelated to an inmates mental health diagnosis or prescription medication.  The Department hopes to have these timeliness issues resolved in the coming quarters."[33]

---

[33] The Mental Health Subject Matter Expert and clinicians noted that "[o]verall, the organization of the information posted [by the Department] remains somewhat difficult to follow and interpret."  They suggest using aggregate data (e.g., comparing the rate of denials for the mentally ill with the denials for the non-mentally ill) to establish "proof of practice."

54.     Prisoners who are not in Mental Health Housing will not be denied privileges and programming based solely on their mental health status or prescription for psychotropic medication.

**STATUS:      PARTIAL COMPLIANCE**

Substantial Compliance requires the Department to audit the records of a maximum of 100 randomly selected prisoners who were eligible and denied privileges or programs to confirm that they were not rejected or disqualified because of a mental health diagnosis or prescription for psychotropic medication alone. In the Fifth Reporting Period, the County reported that it achieved and maintained Substantial Compliance for the period from March 1, 2016 through December 31, 2016. The results were verified by the Monitor's auditors.

The revised Compliance Measures for Paragraph 54, effective January 1, 2018, provide for an alternative pool of inmates proposed by the County. Because the Monitor's auditors had verified that the County has maintained Substantial Compliance under the original Compliance Measures, the parties agreed that the County will only be required to maintain Substantial Compliance under the revised Compliance Measures for two additional quarters.

The County's Eighth Self-Assessment reports Substantial Compliance in the Fourth Quarter of 2018, but only Partial Compliance in the First Quarter of 2019. The Self-Assessment reports that "[n]o inmates were denied requests based on their mental health status or receipt of a prescribed psychotropic medication" in the Fourth Quarter of 2018. Similarly, no inmates were denied visits for those reasons in the First Quarter of 2019.

According to the results posted by the Department, 40% of the inmate requests that were denied in the in the First Quarter of 2019 were deemed to be non-compliant because they "were not answered timely or not answered and have no disposition." The results also reflect that no inmates were denied visits solely due to their medications or mental health status.

55.     Relevant custody, medical, and mental health staff in all High Observation Housing units will meet on Normal business work days and such staff in all Moderate Observation Housing units will meet at least weekly to ensure coordination and communication regarding the needs of prisoners in mental health housing units as outlined in Custody Services Division Directive(s) regarding coordination of mental health treatment and housing.  When a custody staff member is serving as a member of a treatment team, he or she is subject to the same confidentiality rules and regulations as any other member of the treatment team, and will be trained in those rules and regulations.

> **STATUS:**       **SUBSTANTIAL COMPLIANCE (as of October 1, 2016, through September 30, 2017 (verified) at CRDF)**
>
> **SUBSTANTIAL COMPLIANCE (as of April 1, 2017 through March 31, 2018 (verified) at PDC North)**
>
> **SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through September 30, 2018 (verified) and through March 31, 2019 (unverified) at MCJ)**
>
> **PARTIAL COMPLIANCE (at TTCF)**

The Department maintained Substantial Compliance for twelve consecutive months through the Third Quarter of 2017 at CRDF and through the First Quarter of 2018 at PDC North.  These results were verified by the Monitor's auditors, and CRDF and PDC North were not subject to monitoring for compliance with Paragraph 55 in the Eighth Reporting Period.

The County's Eighth Self-Assessment reports Substantial Compliance for the Fourth Quarter of 2018 and for the First Quarter of 2019 at MCJ for Compliance Measures 55-2, 55-6(a) and 55-6(b), which require daily staff meetings in HOH and weekly meetings in MOH attended by representatives from custody, medical, and mental health.  The County posted results for TTCF reflect that only 80% of the required meetings in MOH were held during the randomly selected month, which is below the thresholds for Substantial Compliance required by Compliance Measures 55-6(a) and 55-6(b).  The results at MCJ for the Fourth Quarter of 2018 and the First Quarter of 2019 are subject to verification by the Monitor's auditors.

The County has submitted a report "verifying the coordination and communication at the staff meetings" in HOH and/or MOH units at TTCF and MCJ during the last six months of 2018.[34]  If the results for MCJ for the Fourth Quarter of 2018 and the First Quarter of 2019 are verified by the Monitor's auditors, MCJ will no longer be subject to monitoring for compliance with Paragraph 55.

---

[34] Although, as noted by DOJ, some of the MOH minutes from MCJ are lacking in detail, the County's report of the meetings attended by CCSB "verify the coordination and communication" between the Department and DHS personnel at those meetings as required under the Settlement Agreement.

56.     Consistent with existing DMH and Sheriff's Department policies, the County and the Sheriff will ensure that custody, medical, and mental health staff communicate regarding any change in a prisoner's housing assignment following a suicide threat, gesture, or attempt, or other indication of an obvious and serious change in mental health condition.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified))**

Substantial Compliance requires the Department to review in randomly selected periods the electronic medical records of (1) prisoners admitted to HOH following a suicide threat, gesture, or attempt, or other indication of an obvious and serious change in mental health condition to determine if the medical and/or mental health staff approved the placement of the prisoner in HOH; and (2) prisoners who were the subject of a suicide attempt notification to determine if the prisoners were clinically assessed and that clinical staff approved the post-incident housing.

The County's Substantial Compliance results for the twelve months from January 1, 2016, through December 31, 2016, were verified by the Monitor's auditors, and the County was not subject to monitoring for compliance with Paragraph 56 during the Eighth Reporting Period.

57. Within three months of the Effective Date, the County and the Sheriff will revise and implement their policies on safety checks to ensure a range of supervision for prisoners housed in Mental Health Housing.  The County and the Sheriff will ensure that safety checks in Mental Health Housing are completed and documented in accordance with policy and regulatory requirements as set forth below:

(a)     Custody staff will conduct safety checks in a manner that allows staff to view the prisoner to assure his or her well-being and security.  Safety checks involve visual observation and, if necessary to determine the prisoner's well-being, verbal interaction with the prisoner;

(b)     Custody staff will document their checks in a format that does not have pre-printed times;

(c)     Custody staff will stagger checks to minimize prisoners' ability to plan around anticipated checks;

(d)     Video surveillance may not be used to replace rounds and supervision by custodial staff unless new construction is built specifically with constant video surveillance enhancements and could only be used to replace 15 minute checks in non-FIP housing, subject to approval by the Monitor;

(e)     A QMHP, in coordination with custody (and medical staff if necessary), will determine mental health housing assignments; and

(f)     Supervision of prisoners in mental health housing will be conducted at the following intervals:

(i)      FIP:  Custody staff will perform safety checks every 15 minutes.  DMH staff will perform direct constant observation or one-to-one observation when determined to be clinically appropriate;

(ii)     High Observation Housing:  Every 15 minutes;

(iii)    Moderate Observation Housing:  Every 30 minutes.

STATUS (57):   **SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at MCJ)**

         **PARTIAL COMPLIANCE (at PDC North, TTCF and CRDF)**

  Substantial Compliance requires the Department to audit the Title 15 Dashboard records (or UDAL records if the Title 15 scanner was not working) for all shifts for each module in each mental health housing unit in two randomly selected weeks to determine if the safety checks were staggered and conducted as required by Paragraph 57 of the Agreement, and to audit the housing records for each mental health housing unit for one randomly selected week to determine if a QMHP approved the new mental health housing assignments as required by Paragraph 57(e).  The thresholds for achieving Substantial Compliance with these two Compliance Measures is 95%.

  The County's Sixth Self-Assessment reported that it maintained Substantial Compliance with Compliance Measure 57.5(b) in the Fourth Quarter of 2017 and the First Quarter of 2018 in the MOH unit at MCJ (the "Hope Dorm").  It also reported that all of the inmates at MCJ "analyzed pursuant to Compliance Measure 57-5(c) had received QMHP approval for their housing assignments" in both quarters.  The results were verified by the Monitor's auditors and MCJ was not subject to monitoring for compliance with Paragraph 57 in the Eighth Reporting Period.

  The County's Eighth Self-Assessment reports that the County achieved Partial Compliance with the safety checks in the mental health housing units at TTCF (63% and 48%) and CRDF (69% and 66%) in the Fourth Quarter of 2018 and the First Quarter of 2019.  These results are significantly below the results in the prior reporting period.  The Self-Assessment also reports that 100% of the new mental health housing assignments in CRDF were approved by a QMHP in the Fourth Quarter of 2018, but only 93% in the First Quarter of 2019, which is below the 95% threshold for Substantial Compliance.  The results for TTCF were 98% and 96% in these quarters.

  The Self-Assessment also reports that the County achieved Substantial Compliance in the MOH units at PDC North in the Fourth Quarter of 2018 (96%) which it maintained in the First Quarter of 2019 (98%).  As noted by DOJ, and confirmed by the auditors, the safety checks at PDC North were not staggered as "safety checks have been almost always in Module 2's A-dorm and end in the D-dorm, and the safety checks begin almost on the dot every 24 minutes."

58.     Within three months of the Effective Date, the County and the Sheriff will
revise and implement their policies on safety checks.  The County and the Sheriff will
ensure that safety checks in non-mental health housing units are completed and
documented in accordance with policy and regulatory requirements as set forth below:

(a)     At least every 30 minutes in housing areas with cells;

(b)     At least every 30 minutes in dormitory-style housing units where the unit
does not provide for unobstructed direct supervision of prisoners from a
security control room;

(c)     Where a dormitory-style housing unit does provide for unobstructed direct
supervision of prisoners, safety checks must be completed inside the unit
at least every 60 minutes;

(d)     At least every 60 minutes in designated minimum security dormitory
housing at PDC South, or other similar campus-style unlocked dormitory
housing;

(e)     Custody staff will conduct safety checks in a manner that allows staff to
view the prisoner to assure his or her well-being and security.  Safety
checks involve visual observation and, if necessary to determine the
prisoner's well-being, verbal interaction with the prisoner;

(f)     Custody staff will document their checks in a format that does not have
pre-printed times;

(g)     Custody staff will stagger checks to minimize prisoners' ability to plan
around anticipated checks; and

(h)     Video surveillance may not be used to replace rounds and supervision by
custodial staff.

**STATUS (58):**     **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at PDC South, PDC North, and PDC East)**

**SUBSTANTIAL COMPLIANCE ( as of July 1, 2017, through June 30, 2018 (verified) at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through  September 30, 2018 (verified) at IRC)**

**PARTIAL COMPLIANCE (at TTCF, NCCF, and MCJ)**

Substantial Compliance requires the Department to audit the Title 15 Dashboard records (or UDAL records) for all shifts for each module in each housing unit to determine if the safety checks were staggered and conducted as required by Paragraph 58. The threshold for achieving Substantial Compliance with each of the Compliance Measures is 90%.

The County maintained Substantial Compliance with Paragraph 58 for twelve consecutive months at PDC South, PDC North, and PDC East as of December 31, 2016. Pursuant to Paragraph 111, those facilities were not subject to monitoring in the Eighth Reporting Period.

The County's Sixth Self-Assessment reported that for the Fourth Quarter of 2017 and the First Quarter of 2018, the following percentages of safety checks were in compliance with Paragraph 58: CRDF (93% and 90%); TTCF (95% and 97%); MCJ (94% and 92%); NCCF (82% and 58.5%); and IRC (95% and 92%).  Based upon the audit by the Monitor's auditors, however, it did not appear that the cell checks at MCJ and TTCF were staggered as required by Paragraph 58.

The County's Seventh Self-Assessment reported that 88% of the safety checks at CRDF and 89% of the checks at IRC in the Second Quarter of 2018 were in compliance with Paragraph 58, which is slightly below the 90% threshold for Substantial Compliance.  It nevertheless requested a Substantial Compliance finding because "the safety checks on the relevant dates were timely conducted under Compliance Measure 58-2, however, there were technical difficulties uploading the scans from iPods" during the random weeks at both facilities.  Excluding the one day (June 19, 2018) that the UDAL Main Report showed a problem with uploading iPod scans at CRDF,  the percentage of compliant rounds at CRDF was 94.7%.

Excluding the one day (May 12, 2018) on which it appears from the UDAL Main Report that the Title 15 scanner was not working at IRC, the percentage of compliance in the Second Quarter of 2018 was 91%.  The Seventh Self-Assessment reported that 92% of the safety checks in the Third Quarter of 2018 at IRC were in compliance with Paragraph 58.  The County's Eighth Self-Assessment also reports that for the Fourth

Quarter of 2018 and the First Quarter of 2019, the following percentages of safety checks were in compliance with Paragraph 58 at the remaining facilities: MCJ (78% and 75%); TTCF (92% and 73%); and NCCF (74% and 75%).

The Substantial Compliance results at IRC have been confirmed by the Monitor's auditors and IRC was not subject to monitoring for compliance with Paragraph 58 in the Eighth Reporting Period.

The Substantial Compliance results at CRDF have been by the Monitor's auditors,[35] and CRDF was not subject to monitoring for compliance with Paragraph 58 in the Eighth Reporting Period.

---

[35] The Monitor's auditors reviewed a few randomly selected videos for those days when the scanners were not working properly and verified that the safety checks occurred.

59.     Consistent with existing Sheriff's Department policies regarding uniform daily activity logs, the County and the Sheriff will ensure that a custodial supervisor conducts unannounced daily rounds on each shift in the prisoner housing units to ensure custodial staff conduct necessary safety checks and document their rounds.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of January 1, 2017, through December 31, 2017 (verified) at PDC East and MCJ)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2018, through December 31, 2018 (verified) at PDC North and PDC South)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018. through March 31, 2019 (verified) at TTCF)**

Substantial Compliance requires the Department to audit e-UDAL records for housing units in each facility to determine if supervisors are conducting unannounced daily rounds in accordance with Paragraph 59.  In response to the Monitor's comments, the Department's e-UDAL forms were modified to include a specific notation that the Supervisor verified that the safety checks were conducted.  The threshold for achieving and maintaining Substantial Compliance is that 90% of the supervisor daily rounds were in compliance with the requirements of Paragraph 59.

The County's Sixth Self-Assessment reported that the Department had maintained Substantial Compliance at PDC East and MCJ for twelve consecutive months from January 1, 2017 through December 31, 2017 (and continuing to March 31, 2018).  It also reported that the Department had maintained Substantial Compliance at NCCF for twelve consecutive months from April 1, 2017 through March 31, 2018.  The results were verified by the Monitor's auditors and these facilities were not subject to monitoring for compliance with Paragraph 59 during the Eighth Reporting Period.

The County's Seventh Self-Assessment reported that the following percentage of rounds were in compliance with the provision in the Second and Third Quarters of 2018: CRDF (98% and 91%), PDC North (97% and 97%), PDC South (93% and 99%), and TTCF (98% and 91%).  These results were verified by the Monitor's auditors and CRDF was not subject to monitoring for compliance with Paragraph 59 during the Eighth Reporting Period.

The County's Eighth Self-Assessment reports that the following percentage of rounds were in compliance with the provision in the Fourth Quarter of 2018 for PDC

North (100%) and PDC South (96%), and for the Fourth Quarter of 2018 and the First
Quarter of 2019 for TTCF (95% and 94%).  These results have been verified by the
Monitor's auditors.  PDC North, PDC South, TTCF, and NCCF have maintained
Substantial Compliance for twelve consecutive months and are no longer subject to
monitoring for compliance with Paragraph 59.

60.      Within six months of the Effective Date, the Department of Mental
Health, in cooperation with the Sheriff's Unit described in Paragraph 77 of this
Agreement, will implement a quality improvement program to identify and address
clinical issues that place prisoners at significant risk of suicide or self-injurious behavior.

**STATUS:      SUBSTANTIAL COMPLIANCE**

Paragraph 60 requires the County to "implement a quality improvement program
to identify and address clinical issues that place prisoners at significant risk of suicide or
self-injurious behavior."  This is, as the County notes, "separate and distinct" from the
requirements of Paragraphs 61 and 62 (although related to the requirements of Paragraph
77).  The Compliance Measures for Paragraph 60, however, require the County to
"identify and address . . . clinical issues" in the areas identified in Paragraph 61 of the
Agreement" and corrective actions are taken to address "such issues."  See Compliance
Measures 60.1, 60.2(a), and 60.3(b).

On July 15, 2019, the County submitted CHS's Semi-Annual Report on Quality
Improvement/Assurance, which includes data through the end of the First Quarter of
2019.[36]  The Report discusses "components" of a "multipronged plan to improve quality"
that were developed or in use during these quarters as follows:"

> "15 staff members graduated from the Quality Academy at LAC+USC
> . . . .Graduates of this program serve as QI leads and advisors at their
> home CHS facilities and service lines[.]"[37]

* * * *

> CHS's Quality Improvement Committee ("QIC") now "meets monthly to
> work on improving the quality of care delivered across ICHS [Integrated
> Correctional Health Services].  Members represent departments, facilities,
> and service lines across ICHS."  The "purpose" of the QIC "is to promote
> collaborative relationships" and "align organizational priorities[.]"

* * * *

> CHS's Department of Quality Improvement and Patient Safety ("QIPS")
> expanded its monthly Quality Dashboard so that it "now covers 41
> metrics."  CHS's Mental Health management is "in the process of
> reviewing" the metrics "that are specific to mental health matters to ensure
> that essential components of mental health service delivery are represented
> and tracked and that trends are established from which point QI projects
> are generated."

---

[36] CHS submitted an amended report on July 18, 2019.
[37] This report does not indicate how many of these graduates are from mental health.

QIPS "developed a QI project template" that "serves as a road map to
ensure all aspects of QI work are captured and reported."  The Custody
Health Services "Compliance Team developed a Mental Health
Compliance Dashboard that tracks compliance with relevant DOJ
Settlement Agreement provisions."  It is "used at monthly [Quality
Improvement Committee] QIC meetings to communicate progress towards
compliance and assist with identifying key priorities."[38]

\* \* \* \*

CHS also invested "significant resources in updating, customizing, and
training staff in its Safety Intelligence program, a patient safety incident
reporting system."

The CHS Report includes recent activities of the Critical Incident Review
Committee ("CIRC") and the Joint Quality Improvement Committee ("JQIC").  CHS's
compliance team conducts "reviews of all self-directed violence (SDV) incidents
occurring within the jail system and from those reviews [it] selects serious self-harm
incidents and quality improvement cases to be presented at monthly CIRC meetings."[39]
Recently, SDV's with a lower "risk rating score" with "potentially systemic issues" have
been reviewed at CIRC meetings and "tracked in the same manner as issues identified in
standard CIRC cases."  In addition, "standardized categories of terms" have been
developed "to better identify and prioritize similar and repeated systematic issues," and
"better enable [the County] to aggregate data and identify trends over a longer period of
time."

Beginning in November 2018, JQIC meetings included reviews of "aggregate data
in addition to follow-up and review of matters identified in the previous month's CIRC."
The purpose is "to improve data analysis and the identification of trends" that could
"inform QI projects or [CAPs] to address clinical or systemic issues placing inmates at
risk for suicide or serious self-injurious behaviors."  The CHS Compliance Team and
CCSB, including "command level staff," meet monthly, "to discuss issues and data
analysis to be presented to JQIC."

The Semi-Annual Report includes the following sections:

- the Correctional Treatment Center – Mental Health Unit (CTC-MHU), which
  reports a continuing decrease in use of clinical restraints in the unit through the
  First Quarter of 2019, which has "reduced demands on staffing" and "concerns for
  medical complications that may occur when an inmate/patient is placed in
  restraints."

---

[38] CHS previously indicated that the dashboard would "track summary reports by facility, and nursing and
mental health service, and outline trends, thresholds, and barriers to compliance and plans to resolve such
barriers, as well as current and past compliance rates."  See Monitor's Seventh Report, p. 69.
[39] Summaries of the 11 cases reviewed at the monthly CIRC meetings in the Fourth Quarter of 2018 and
First Quarter of 2019 are attached to the CHS Report.

- A summary of the results of the STEP FORWARD program at CRDF that provides "early psychiatric intervention at intake for patient[s] with severe mental illness," which has resulted in a significant drop in the number of post-intake referrals for psychiatric services over the First Quarter of 2019, although it does not appear that the wait times between the date of the remaining post-intake referrals until the date the patient is seen have been reduced;

- the results of the MOH intake approach that has continued to reduce the wait time for patients/inmates with a P2 level of care housed in MOH to see a psychiatrist;

- a Pill Call Pilot program "to align pill call procedures with best practices" that has been expanded to cover all MOH housing units at TTCF in February 2019; and[40]

- Other QI projects and health care services, which reports on (a) a "significant improvement in the timeliness of processing patients with urgent/emergent needs through IRC" beginning in the Fourth Quarter of 2018; (b) substance use services, including withdrawal management pods at TTCF and CRDF and aggregate alcohol withdrawal management/detoxification data collected during the Fourth Quarter of 2018 and the First Quarter of 2019;[41] (c) the County's "effort to establish a clear and clinically sound approach in addressing risk precaution (sic) and inmates at increased risk for serious self-harm and/or suicide," which included the development of a "new Risk Assessment for Suicide" that was activated on June 11, 2019; (d) a Quality Improvement Project that involved the creation of "a teaching tool" designed "to assist clinicians to better understand the intention of the Release Planning Section" of the Initial Mental Health Evaluation form, which resulted in a reported reduction "in non-compliant bookings" from 26 in the Third Quarter of 2018 to eight in the First Quarter of 2019; and (e) an analysis of aggregate data, identifying systemic issues and developing corrective action plans relating to "(i) transitions of care involving inmates returning to jail on a 5150 and (ii) an evaluation of individuals with multiple SDVs in TTCF pod 132F."[42]

---

[40] The report does not indicate what impact, if any, improvements from the Pill Call Pilot Program had on addressing the problem of inmates hoarding medication.  The County did, however, report a significant reduction from discovering 1,023 unauthorized medications found as a result of searches in the Fourth Quarter of 2018 at TTCF to 381 medications in the First Quarter of 2019, which was when the Pill Call Pilot program was expanded.  See p. 84, n. 52 and n. 53, *infra*.  It is also not clear what the County's plan is for expanding the program to CRDF.

[41] The report does not, however, analyze this data or draw any conclusions regarding the efficacy of the services or the specialized pods.

[42] The County's trend analysis shows "marked improvements" in its Compliance with Paragraph 30 of the Settlement Agreement, although the charts (Figures 5.3 and 5.4) provided in the report are somewhat difficult to understand and appear to show nine non-compliant bookings in the First Quarter of 2019.

CHS's Semi-Annual Report summarizes the subjects presented at the May 8, 2019 Bi-Annual Suicide Prevention meeting, which was attended by 60 representatives of various County departments.

The CHS Semi-Annual Report sets forth aggregate data for 13 suicides[43] in the period 2014 through the First Quarter of 2019, broken down by prior attempts or other serious self-injurious behavior, facility, method, demographics (age,[44] ethnicity, and gender), and proximity to court date.[45]  It also includes aggregate data summaries of 941 incidents of Self-Directed Violence ("SDV") by 588 inmates from January 2018 through March 2019, and the cases that "met criteria for CIRC" in 2018 and in the First Quarter of 2019.  The serious self-injurious incidents that were reviewed at CIRC meetings are broken down, by prior suicide attempts, facility, method, lethality (risk rating scores), age, ethnicity, gender, and proximity to court date.[46]  For the most part, the County's analysis of the aggregate data does not go beyond these breakdowns to identify clinical issues "that place prisoners at significant risk of suicide or self-injurious behavior," propose corrective actions or systemic improvements to address these issues, or state whether any such issues were addressed by "corrective actions and systemic improvements" during the reporting period.  Nor does the report propose any further analysis of the data to identify any such issues or find opportunities for systemic improvements.

The Mental Health Subject Matter Expert previously noted that "CHS is clearly developing a sound QM System.  It is based on well-established principles and methods of QM."[47]  CHS's Report is a comprehensive description of the County's overall efforts to "implement a quality improvement program," and it reflects that the County continued to enhance its QM program in the Eighth Reporting Period.  It is also analyzing aggregate data in almost all of the areas required by the subparts of Paragraph 61.  The Monitor and Mental Health Subject Matter Expert agree with the County that the assessment of the County's compliance with Paragraph 60 "should be driven by the ability of the Department to demonstrate a sound quality improvement process and the ability to demonstrate that process through specific quality improvement projects directed by management."

Given the significant enhancements in the County's quality improvement program, the Monitor and the Mental Health Subject Matter have concluded that it has

---

[43] Two of the suicides occurred in station jails; the rest were in TTCF or MCJ.

[44] The range of the age groups are different from a high of nine years (26-34) to a low of five years (35-39), which makes it difficult to draw meaningful comparisons among the age groups even when analyzing rates per 100,000 inmates per year.

[45] The proximity to court data is for the Third Quarter of 2018 through the First Quarter of 2019.  See Amended Report, Fig. 7.19.

[46] The introduction to Section E refers to the 11 cases reviewed at CIRC meetings between October 2018 and March 2019, but then summarizes data from 2018 CIRC meetings that was reviewed at the June 2019 JQIC meeting.  See p. 70.  The subparts of Section E break down the CIRCs for the period January 2018 through the First Quarter 2019, see Amended Report, pp. 71-80, although there is an inconsistency in the number of CIRC incidents reviewed (either 36 or 35).  Compare, Amended Report, pp. 71, 73, and 75 with pp. 72, 76, 78, and 80.

[47] See Monitor's Seventh Report, p. 69.

achieved Substantial Compliance with Paragraph 60.  To maintain Substantial
Compliance with Paragraph 60, CHS's next two annual reports must reflect that it has
used the analysis of aggregate data to identify clinical issues in the areas set forth in
Paragraph 61; "recommend" and "implement" corrective actions and systemic
improvements in these areas; and measure the effectiveness of the actions and
improvements in the prior reporting period.[48]

---

[48] To achieve Substantial Compliance with the companion provisions of Paragraphs 61 and 62, the County
needs to use its analysis of aggregate data to "recommend," "implement," and "track" and measure the
effectiveness of corrective actions and systemic improvements.

61.     The quality improvement program will review, collect, and aggregate data in the following areas and recommend corrective actions and systemic improvements:

    (a)     Suicides and serious suicide attempts:

            (i)     Prior suicide attempts or other serious self-injurious behavior
            (ii)    Locations
            (iii)   Method
            (iv)    Lethality
            (v)     Demographic information
            (vi)    Proximity to court date;

    (b)     Use of clinical restraints;

    (c)     Psychotropic medications;

    (d)     Access to care, timeliness of service, and utilization of the Forensic In-patient Unit; and

    (e)     Elements of documentation and use of medical records.

    **STATUS:      PARTIAL COMPLIANCE**

    Substantial Compliance requires the County's semi-annual reports to (a) review, collect, and aggregate data in the areas set forth in Paragraph 61; (b) recommend corrective actions and systemic improvements in those areas; and (c) assess the effectiveness of actions and improvements in prior reporting periods.

    As noted above, the CHS Semi-Annual Report sets forth aggregate data for suicides for the period 2015 through the First Quarter of 2019; Self-Directed Violence ("SDV") incidents from January 2018 through the end of March 2019; and serious self-injurious incidents that were reviewed at CIRC meetings during the reporting period and also incidents from January 2018.  Albeit somewhat limited, the CHS Report reflects that the County is starting to analyze and use aggregate data in its quality improvement program "to identify and address clinical issues that place prisoners at significant risk of suicide or self-injurious behavior."

    With respect to the SDV incidents, the report indicates some corrective actions and systemic improvements have resulted from aggregate SDV data.  For example, JQIC analyzed the SDV data and created "a list of the top ten inmates responsible for the highest number of SDVs."  It then "checked with CIRC and CCC [the Complex Case Committee] to ensure inmates with high numbers of SDVs received the highest level of review and if indicated were placed on the CCC to ensure there was an individual treatment plan with collaborative input from nursing, mental health, and medical

services."[49]  The Mental Health Subject Matter Expert notes that "[p]art of the review of
the effectiveness of the corrective action plans would be both to determine whether
treatment plans are improved (an interim outcome measure) and then whether SDV
incidents were reduced in frequency or severity in the high utilizer group (the final
outcome measure)."

The CHS report also describes the QI "interventions" that were developed to
address issues related to patients returning to jail from LAC+USC on a 5150 hold.[50]  The
report also notes that the HOH units "with the lowest number of SDVs were found in
those areas designated for specialized programming, including FIP Step Down and The
Living Module," which "suggests that more concentrated programming and services
contribute to patient stabilization and a decrease in self-injurious behavior[.]"  Although
not framed as a "recommendation," it should lead to an expansion of the modules with
such programming and services or "further analysis to determine whether there are any
systematic differences between the populations in specialized and non-specialized HOH
units that might bear on expanding these program."  In addition, based upon a review of
SDV data from Module 132 in TTCF and a walk through in the Sterile Pod 132F, the
County identified two "structural" issues that will be addressed by the Custody Facility
Services Bureau.

The CHS Report includes two sections that "review, collect, and aggregate data"
in the areas required by Paragraph 61(b) and (d):

- aggregate data on the significant decrease in the use of clinical restraints in the
  Mental Health Unit of the CTC over the period from 2015 through the First
  Quarter of 2019 and an analysis of the cause and effect of the decrease; and

- aggregate data on the admission, discharge, and readmission of patients in the
  CTC-MHU for admissions, discharges, and readmissions from 2014-15 through
  the First and Second Quarters of 2019.

With respect to the use of clinical restraints, CHS attributes this, in part, to changes in
Custody's use of force policies and "an increase in using discussion and negotiation
techniques to gain compliance from inmates/patients" and, in part, to the early use of
"long-acting injectable (LAI) psychotropic mediations in CTC-MHU."  With respect to
the CTC admission-related data, CHS reports that its "goal in collecting this data is to
develop methods to evaluate whether or not patients were on the inpatient service long
enough to receive appropriate treatment, whether or not the percentage of medication
compliance was adequate for discharge, and whether the patient was stable upon

---

[49] The Mental Health Subject Matter Expert and clinicians note, however, that they have not seen any "real
treatment plans" outside of FIP that outline clear, measurable goals and objectives and specify intervention
to meet those goals.
[50] The Mental Health Subject Matter Expert and clinicians note that the County has done this "very well,"
with a "true PSDA model" and "on-going tracking."

discharge[.]"  There are, however, no conclusions or proposed corrective actions or systemic improvements based upon this data in the CHS Report.

The Department and CHS have enhanced the analysis of aggregate data, but have not always connected the analysis to corrective actions or systemic improvements in each of the areas required by the subparts of Paragraph 61.  The Mental Health Subject Matter Expert previously noted some of these projects do not reflect a "sufficient breadth of analysis of aggregate data to develop CAPs, which would set benchmarks and look at trends and patterns of usage."  For example, there is no "analysis of general prescribing patterns or medication monitoring, both critical aspects of quality management of psychotropic prescribing."  He also notes that the "'QI Projects Relating to the Use of Psychotropic Medication' are not really about psychotropic medications" under Paragraph 61(c).  Rather, they concern access to and timeliness of care under Paragraph 61(d) and "hoarding/diversion and medication adherence.  All are important, but none are really about the proper use of psychotropic medications."

The Monitor and Mental Health Subject Matter Expert do not disagree with the County's assertion that QI "projects should be driven by management, by management's priorities, and with management's evaluation and understanding of available resources in mind."  In order to achieve Substantial Compliance with Paragraph 61, however, the County must  "review, collect and aggregate data" in each of the areas set forth in the subparts of the paragraph **and** "recommend corrective actions and systemic improvements" where appropriate.  While the County has analyzed aggregate data in most of these areas. it still needs to show that the analysis is driving corrective actions and systemic improvements and that it is measuring the actions and improvements against established benchmarks.  The County will need to analyze data in each of the areas, implement corrective actions and systemic improvements, and measure their impact to achieve Substantial Compliance with Paragraph 61.

62.     The County and the Sheriff's Unit described in Paragraph 77 of this Agreement will develop, implement, and track corrective action plans addressing recommendations of the quality improvement program.

**STATUS:      PARTIAL COMPLIANCE**

Substantial Compliance requires the County's semi-annual Self-Assessments to set forth (a) the "development of corrective action plans to address the most recent recommendations of the quality improvement program;" and (b) the "implementation and tracking of corrective action plans to address recommendations of the program in prior quarters."

CCSB's Semi-Annual Report describes all of the corrective action plans identified during the Executive Inmate Death Reviews of suicides that occurred in Fourth Quarter of 2018 and the First Quarter of 2019 and the status of those CAPs as of the end of the quarter.  It reports that CCSB "tracks all suicide-related CAPs," and the Department attended all six of the JQIC meetings "to discuss CAP/Issues that were developed during the CIRC meetings."  It does not, however, provide any discussion of these CAPs.  It also provides summaries of the information that CHS and CCSB collected from incidents of self-directed violence, but without showing how this information was used to "develop, implement, and track corrective action plans addressing recommendations of the quality improvement plan."  The Department needs to set forth more information regarding the tracking of CAPs and the progress towards completion in order for the Monitor and Mental Health Subject Matter Expert to be able to evaluate the County's compliance with the requirements of Paragraph 62.  It also needs to discuss whether these CAPS/Issues raise systemic issues, recommend systemic improvements, or assess the effectiveness of such improvements from prior reporting periods.

63.     The County and the Sheriff will maintain adequate High Observation Housing and Moderate Observation Housing sufficient to meet the needs of the jail population with mental illness, as assessed by the County and the Sheriff on an ongoing basis.  The County will continue its practice of placing prisoners with mental illness in the least restrictive setting consistent with their clinical needs.

**STATUS:     NON-COMPLIANCE**

The Compliance Measures require that the County's Self-Assessment set forth (a) the average daily populations in HOH and MOH units in TTCF and CRDF during the reporting period; (b) the average number of beds in those units during the reporting period; (c) the number of days in which there was a waiting list for HOH or MOH housing; and (d) the average number of step-downs per week (i) from HOH to MOH and (ii) from MOH to the least restrictive setting consistent with the prisoners' clinical needs. In addition, for two random weeks, the Department is required to review the count sheets documenting the number of occupied and available beds in the MOH and HOH units at TTCF and CRDF.  Substantial Compliance requires "the immediate availability of HOH and MOH beds at TTCF and CRDF 95% of the time."

The County reports the number of days in which the total number of HOH and MOH available beds was equal to or more than the number of HOH and MOH inmates for the two randomly selected weeks in the Fourth Quarter of 2018 are as follows:

|       | MOH  | HOH  |
|-------|------|------|
| TTCF  | 100% | 0%   |
| CRDF  | 0%   | 92%  |

The County also reports the number of days in which the total number of HOH and MOH available beds was equal to or more than the number of HOH and MOH inmates for the two randomly selected weeks in the First Quarter of 2019 are as follows:

|       | MOH  | HOH  |
|-------|------|------|
| TTCF  | 100% | 0%   |
| CRDF  | 0%   | 0%   |

The County's Eighth Self-Assessment reports that the Department "is considering alternative ways to accurately capture [detailed breakdowns relating to bed availability required by Compliance Measure 63-1,] but it is not able to do so currently due to limitations in the technologies involved in capturing and reporting that information."

64.     Within six months of the Effective Date, the County and the Sheriff will develop a short-term plan addressing the following 12-month period, and within 12 months of the Effective Date, the County and the Sheriff will develop a long-term plan addressing the following five-year period, to reasonably ensure the availability of licensed inpatient mental health care for prisoners in the Jails.  The County and the Sheriff will begin implementation of each plan within 90 days of plan completion.  These plans will describe the projected capacity required, strategies that will be used to obtain additional capacity if it is needed, and identify the resources necessary for implementation.  Thereafter, the County and the Sheriff will review, and if necessary revise, these plans every 12 months.

**STATUS:       NON-COMPLIANCE**

Substantial Compliance requires the Department to (1) develop a short-term plan that will address the availability of licensed inpatient mental health care for prisoners in an initial 12-month period; (2) commence to implement the plan within 90 days after it is developed; (3) develop a long-term plan within 12 months after the short term plan that will address the availability of licensed inpatient mental health care for prisoners in the following five-year period; and (4) commence to implement the long-term plan within 90 days after it is developed.

On July 14, 2017, the County submitted to the Monitor a Plan Regarding Availability of Licensed Inpatient Mental Health Care (Long Term and Short Term Plans) to provide "an update regarding the County's current efforts to meet the needs of the acutely mentally ill."

The County's Eighth Self-Assessment reiterates that "the County continues to pursue a dual strategy to increase inpatient beds and the resources necessary to obviate the need for these beds.  With increased services to address the underlying mental health needs (both through appropriate medication and clinical treatment), and the County's strong effort to divert people from the jails, the need for inpatient services should decline."[51]

The County's Eighth Self-Assessment also reiterates that "the County also operates 18 inpatient beds at Olive View-UCLA Medical Center.  These beds house individuals who are diverted from the County Jail, either pre-trial or once they have been brought into the jail and are awaiting trial.  The County's Office of Diversion [began] managing these beds in early July 2018, and is responsible for identifying appropriate individuals for them."  In addition, the Eighth Self-Assessment reiterates that the "County also continues to operate its Mental Health Unit-Correctional Treatment Center Inpatient Step-Down Unit, which increased the capacity of FIP-related housing to 64 beds."

The County's Eighth Self-Assessment reports that the "FIP waitlist changes daily" and "consisted of approximately fourteen patients" as of June 10, 2019.  "Four were considered high priority and were scheduled to be admitted within 24 hours."  "The

---

[51] The County should test this hypothesis and report the results to the Monitor.

current average time from referral to admission for the that are less acute varies but averages about 30 days."

The County's plans are still not sufficient to "reasonably ensure the availability of licensed inpatient mental health care for prisoners in the Jails."  As the Monitor has repeatedly noted, the County's long-term "plans must have a reasonable basis for projecting need in order to establish Substantial Compliance with Paragraph 64."  Instead of using a reasonable methodology to project the number of prisoners who will need licensed inpatient mental health care in the future, the County again relies on the "most recent update submitted on or about July 14, 2017," and what it is currently doing to provide that health care.

Paragraph 64 requires the County and the Sheriff "to review, and if necessary revise, these plans every 12 months."  Neither the 2017 Plan nor any of the County's Self-Assessments "'describe the projected capacity required' or project how many beds will be required over the long term (several years)."  See Monitor's Fifth Report, p. 69.  The County presumably has data regarding the number of FIP patients and the number and duration of patients on the FIP waiting list over the nearly four years since it entered into the Settlement Agreement with DOJ that could be used to assess the quantitative impacts of the steps that it has taken, project the capacity required in the future, and develop (or update) a plan to that will meet its future needs.  It may be that, going forward, the capacity in the CTC, Olive View, and the Step-Down Unit is sufficient, but this cannot be determined without a reasonable basis for projecting the future needs.

65.     Consistent with existing Sheriff's Department policies, the County and the Sheriff will ensure that psychotropic medications are administered in a clinically appropriate manner to prevent misuse, hoarding, and overdose.

**STATUS:       PARTIAL COMPLIANCE**

Substantial Compliance requires that (1) the County's Self-Assessments set forth the (a) the results of weekly medication audits documenting the visual observation of the administration of medication during the quarter; (b) unauthorized medications found as a result of cell searches during the reporting period; and (c) incidents involving confirmed prescription drug overdoses; and that (2) "the Monitor concludes, after consulting with the Subject Matter Expert, that psychotropic medications have been administered in a clinically appropriate manner 85% of the time."

On April 6, 2018, the County provided a flow chart entitled "Provision 65 Pill Call – Ideal State Pod-Front Pill Call Procedures" (excluded HOH cell-to-cell procedure) that is the product of a work group convened to develop a "new method and practice of administering medications."  The Monitor and Mental Health Subject Matter Expert concluded that the flow chart is a "reasonable approach," but that the "primary issue will be the nature of the interventions adopted by custody and healthcare staff in response to lack of cooperation" and "what happens if they are not able to verify that the inmate ingested the pills," which the flow chart partially addresses.

The County's Seventh Self-Assessment reported that a working group of representatives from Custody, Mental Health, and Nursing "initiated a pilot program in two modules at TTCF designed to test and improve pill call administration methods." The Eighth Self-Assessment reports that

> [i]n February 2019, the pill call pilot program was expanded to all MOH areas at TTCF, and recently, to all of TTCF. Significantly, the pilot increased cooperation and communication among stakeholders through education, briefing, and hands on training with the goal of increasing medication compliance by inmates and more quickly and accurately identifying inmates who do not allow staff to verify medication ingestion and may be hoarding. Significant changes were also made to custody and nursing pill call audit forms and practices. Access To Care lieutenants significantly increased the number of custody audits being conducted on a regular basis. Nursing staff now routinely use the newly developed "medication given/ingestion unverified" alerts when an inmate takes medication, walks away and refuses to return it to nursing staff or allow verification. Separately, nursing staff also email a supervisor when an inmate engages in those practices to ensure that senior providers are quickly notified.

With respect to the requirements of the Compliance Measures, the County reports that "[d]ue to inconsistencies found with past auditing practices, the County and Department have temporarily paused reporting [the results of weekly Administration Audits] for [Compliance Measure] 65-1(a)."  As in the past, medication was found during a significant number of searches during the Fourth Quarter of 2018[52] and First Quarter of 2019,[53] with wide variations in the number of medications found from one quarter to the next (e.g., TTCF went from 1,023 to 381 while PDC North went from eight to 184).  There were also five confirmed drug overdoses during the Fourth Quarter of 2018 and four confirmed in the First Quarter of 2019.

---

[52] During the Fourth Quarter of 2018, 122 medications "not appropriately possessed by inmates" were found during 147 unannounced searches at CRDF, 1,023 medications were found during 90 searches at TTCF, 693 medications during 226 searches at MCJ, and 90 medications during 572 searches at NCCF. There were eight medications found during searches at PDC North and none at PDC South and PDC East. The number of medications found at TTCF is obviously of concern.

[53] During the First Quarter of 2019, 23 medications "not appropriately possessed by inmates" were found during 149 unannounced searches at CRDF, 381 medications were found during 112 searches at TTCF, 159 medications during 210 searches at MCJ, eight medications during 490 searches at NCCF, 184 mediations during 237 searches at PDC North, and nine medications during 305 searches at PDC South.  There were no medications found at PDC East.

66.     Consistent with existing DMH policies, prisoners in High Observation Housing and Moderate Observation Housing, and those with a serious mental illness who reside in other housing areas of the Jails, will remain on an active mental health caseload and receive clinically appropriate mental health treatment, regardless of whether they refuse medications.

**STATUS:     NON-COMPLIANCE**

Substantial Compliance requires the Department to review, on a random basis, the electronic medical records of prisoners in HOH and MOH or with a Serious Mental Illness ("SMI") to assess whether they have remained on an active mental health caseload and that 95% of HOH prisoners, 90% of MOH prisoners, and 85% of other prisoners with a serious mental illness been offered "clinically appropriate structured mental health treatment" and been seen by a QMHP at least monthly, regardless of whether they refuse medications.

For the Fourth Quarter of 2018, the County posted results show that 24% of prisoners in HOH, 4% in MOH, and 20% with serious mental illness who reside in other housing areas were "offered clinically appropriate structured mental health treatment and were seen by a QMHP at least once a month."  For the First Quarter of 2019, the posted results for these categories are 30% of HOH prisoners, 6% of MOH prisoners, and 22% of others with serious mental illness.

The County's Eighth Self-Assessment reiterates that "[t]he County continues to work towards increasing its capacity to offer clinically appropriate treatment, including structured mental health treatment" and "improved standardization of the intake assessment process performed in the reception centers" to better identify "inmates at intake who have a serious mental illness."  The County reports that during the reporting period, it "provided no fewer than nine trainings, relating to appropriate suicide assessment, clinical supervision, law and ethics, assessing and documenting for mental health, conservatorship and competency, incorporating community mental health history, assessing and treating personality disorders, mental health treatment in corrections and engaged leadership."

The Mental Health Subject Matter Expert and clinicians conducted a review of cases involving mentally ill inmates to assess the County's compliance with Paragraph 66.  They found "limited evidence of treatment that qualifies as structured in HOH or MOH" and "occasional clinically appropriate treatment."  They note that "[t]his is not unexpected.  It is wise for the County to first develop the infrastructure and improve access to care before focusing on treatment content."  Further, a "major challenge for the County will be consistency of clinical contacts.  Because of rapid, sometimes unpredictable inmate turnover due to release, frequent patient movement within the jail, and changes in providers, it will be difficult to define and deliver a structured, clinically appropriate treatment based on individual patient needs."

67.     Within three months of the Effective Date, the County and the Sheriff will implement policies for prisoners housed in High Observation Housing and Moderate Observation Housing that require:

(a)     documentation of a prisoner's refusal of psychotropic medication in the prisoner's electronic medical record;

(b)     discussion of a prisoner's refusal in treatment team meetings;

(c)     the use of clinically appropriate interventions with such prisoners to encourage medication compliance;

(d)     consideration of the need to transfer non-compliant prisoners to higher levels of mental health housing; and

(e)     individualized consideration of the appropriateness of seeking court orders for involuntary medication pursuant to the provisions of California Welfare and Institutions Code sections 5332-5336 and/or California Penal Code section 2603(a).

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance requires the County to "review the electronic medical records of 25% of the prisoners in HOH and MOH who refused psychotropic medication during the quarter to verify that the records [of 85% of the prisoners] reflect the documentation and consideration of the matters required by the terms of Paragraph 67."

The County's Eighth Self-Assessment reiterates that the County "has historically experienced challenges implementing and assessing compliance with this Provision."  It also reports that "[t]he County also continues to work towards better uses of technology to identify patients refusing medication 50% of the time for that week.  Nursing staff then follow up with these inmates and consult with a psychiatrist assigned to the patient." Unfortunately, the "documentation of the information sought by some of the sub-sections of this Provision is not consistently included in the same place and [in the] same level of detail in the relevant records."

The Mental Health Subject Matter Expert and the clinicians evaluated 23 cases for compliance with Paragraph 67.  They found that a QMHP considered whether a higher level of care was indicated in 35% of the cases, and 35% of the cases at CRDF and 22% of the cases at TTCF included "a reasonable determination of the reason for the recommendation for housing change."  They also found "consideration of FIP and involuntary medication" in 67% of the cases "where there was evidence of possible dangerousness or grave disability. . . .[and the]  assessments of this element were reasonable in all cases where an assessment was done."  They believe that "the County is poised to achieve substantial compliance; when clinicians remember to address the issues, their work is generally adequate and they are already meeting with patients."

Based upon the qualitative assessment by the Subject Matter Expert and the clinicians, the Monitor is of the view that the County has achieved Partial Compliance with Paragraph 67.

68.     Within six months of the Effective Date, the County and the Sheriff will develop and implement a procedure for contraband searches on a regular, but staggered basis in all housing units.  High Observation Housing cells will be visually inspected prior to initial housing of inmates with mental health issues.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at MCJ, NCCF, PDC East, PDC South, and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2017, through December 31, 2017 (verified) at TTCF)**

**PARTIAL COMPLIANCE (at CRDF)**

Substantial Compliance requires that "85% of the housing units are searched for contraband at least once in the previous quarter; and 95% of the HOH units visually inspected prior to housing prisoners in these units."  Self-Assessments are to include a summary of searches conducted and a review of 25 randomly selected Checklist forms for HOH units to confirm that the units were visually inspected prior to initial housing of prisoners in these units.

The County previously maintained Substantial Compliance for twelve consecutive months at TTCF, MCJ, NCCF, PDC East, PDC South, and PDC North, and these facilities were not subject to monitoring for compliance with Paragraph 68 during this reporting period.

The County's posted results reflect that in the Fourth Quarter of 2018, all of the housing units at CRDF were searched at least once in the quarter, and 92% of the randomly selected HOH cells at CRDF were visually inspected before housing prisoners in these units, which is slightly below the 95% threshold for Substantial Compliance. During the First Quarter of 2019, all of the housing units at CRDF were searched at least once in the quarter, and 92% of the randomly selected HOH cells at CRDF were visually inspected before housing prisoners in these units.[54]

---

[54] The Department has been "within three percent of Substantial Compliance with Compliance Measure 68-5(c) at CRDF" for four consecutive quarters.  Because the Department has achieved Substantial Compliance with Compliance Measure 68-5(b) during these quarters, it requests "a finding that it has satisfied all of its monitoring obligations at CRDF for this Provision."  As noted by DOJ, however, being "within 3% of substantial compliance for four consecutive periods is not tantamount to being in substantial compliance for the same time period."

69.     Consistent with existing DMH policies regarding use of clinical restraints, the County and the Sheriff will use clinical restraints only in the Correctional Treatment Center and only with the approval of a licensed psychiatrist who has performed an individualized assessment and an appropriate Forensic Inpatient order.  Use of clinical restraints in CTC will be documented in the prisoner's electronic medical record.  The documentation will include the basis for and duration of the use of clinical restraints and the performance and results of the medical welfare checks on restrained prisoners.  When applying clinical restraints, custody staff will ensure a QMHP is present to document and monitor the condition of the prisoner being placed in clinical restraints.

**STATUS:        SUBSTANTIAL COMPLIANCE (as of July 1, 2018, through March 31, 2019 (verified))**

Substantial Compliance requires the Department to review the electronic medical records of all prisoners placed in clinical restraints to verify that the restraints were used, approved, and documented, and that the results of medical welfare checks on restrained prisoners were also documented.

The County's Eighth Self-Assessment reports that for the Fourth Quarter of 2018, "100%. . . of electronic medical records reviewed. . .reflected that, for inmates placed in clinical restraints for psychiatric purposes, the restraints were used, approved and documented as required.  Importantly, clinical restraints were only used on four patients in the Fourth Quarter of 2018."

The County's Eighth Self-Assessment also reports that, for the First Quarter of 2018, 100% of the medical records reviewed "reflected that, for inmates placed in clinical restraints for psychiatric purposes, the restraints were used, approved, and documented as required by this Provision. . . .Importantly, clinical restraints were used on only two patients in the First Quarter of 2019."  The County's results have been verified by the Monitor's auditors.

The Mental Health Subject Matter Expert and the clinicians conducted a qualitative assessment that evaluated "whether a psychiatrist timely approved the restraints and performed an assessment, whether a QMHP was present at the time of restraint, and whether the myriad monitoring requirements were met."  Based upon "standard published by organizations such as the Centers for Medicare and Medicaid Services (CMS)," which "allow for telephonic orders for restraints by psychiatrists," they "scored as compliant cases where psychiatrists gave telephone orders and assess the patient within 24 hours."  They "found that there were timely and sound psychiatric assessments and orders for restraints in almost all cases," "episodes of restraint continued to be very brief with most less than two hours," and "frequent contact and clinical assessment of those in restraint."  In conclusion, it was their "impression that restraints are being well-managed and used only when necessary and for a short time."

70.     Within three months of the Effective Date, the County and the Sheriff will
have policies and procedures regarding the use of Security Restraints in HOH and MOH.
Such policies will provide that:

(a)     Security Restraints in these areas will not be used as an alternative to
mental health treatment and will be used only when necessary to insure
safety;

(b)     Security Restraints will not be used to punish prisoners, but will be used
only when there is a threat or potential threat of physical harm, destruction
of property, or escape;

(c)     Custody staff in HOH and MOH will consider a range of security restraint
devices and utilize the least restrictive option, for the least amount of time,
necessary to provide safety in these areas; and

(d)     Whenever a prisoner is recalcitrant, as defined by Sheriff's Department
policy, and appears to be in a mental health crisis, Custody staff will
request a sergeant and immediately refer the prisoner to a QMHP.

**STATUS:      PARTIAL COMPLIANCE**

The Mental Health Subject Matter Expert and DOJ have expressed concern about
the Department's Substantial Compliance with paragraph 70(c) if all inmates in HOH are
routinely handcuffed when they are out of their cells "in a housing pod at the same
time."[55]

In response to concerns expressed by the Mental Health Subject Matter Expert
and DOJ, the County's Eighth Self-Assessment reports that:

The Department continues to use alternative types of mental health
housing with the goal of housing inmates with mental health concerns in
the least restrictive manner appropriate, these models include Step-Down
modules, the HOPE Dorm and the Living Module.  At CRDF, these
programs operate using the FRESH program, which is a FIP step-down
type model, and the LIFE program, which is a Living Module model.  As
previously reported, under the 'Living Module' concept, patients begin
their mental health treatment in an HOH pod and transition into an MOH
pod as their mental health improves.  With each stage in the transition, the
inmate-patient gains privileges and is less restricted in their movement.
The Living Module now operates in six pods at TTCF and three pods at
CRDF.  Inmates in the Step-down modules and HOPE Dorm are not

---

[55] The Mental Health Subject Matter Expert notes that paragraph 70(b) is also implicated because it
required that restraint's "will be used only when there is a threat or potential threat of physical harm,
destruction of property, or escape."

restrained when out of cell.  There are three FIP Step-Down pods at TTCF and CRDF.

Significantly, beginning in March 2019, the Department began a pilot program, aimed to provide P3/HOH inmates with significant unrestrained out of cell time. . .The pilot is currently available to inmates in five HOH pods at TTCF, and three HOH pods at CRDF.

The County continues to conduct weekly assessments of inmates in HOH housing.  During those assessments, clinicians consider, among other things, whether an inmate is able to cohabitate with others.  In addition, the County conducts daily huddle meetings to assess whether HOH inmates are suitable for a double man cell, or transfers to Enhanced Mental Health Housing or MOH.  Separate from clinician assessments, inmates that are able to cohabitate are often trusted to be unrestrained when out of their cells together.

The Mental Health Subject Matter Expert notes, however, that while housing in a double-man cell is relevant, some inmates who need single-cell housing may still be able to come out of their cells unrestrained.  After consulting with the Mental Health Subject Matter Expert, the Monitor is of the view that the County has not yet achieved Substantial Compliance with Paragraph 70(c) as many HOH settings do not have these programs.  In order to achieve Substantial Compliance, the County has to demonstrate that it is continuing to conduct individual assessments in weekly and daily meetings, expanding the use of Living Modules and FIP step-down pods (or other less restrictive housing arrangements), and articulating policies for these programs.  As expressed by one of the clinicians, the County "appear[s] to have made progress in the implementation of their various progressive housing units, which do contribute to less restrictive environments for some mental health inmates. . . .Whether the step-down initiatives are sufficiently established, and the reassessment of inmates identified as hostile is adequate, remain a concern related to the intent of this provision."

71.     The County and the Sheriff will ensure that any prisoner subjected to
clinical restraints in response to a mental health crisis receives therapeutic services to
remediate any effects from the episode(s) of restraint.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through
June 30, 2017 (verified))**

Substantial Compliance requires the Department to review the electronic medical
records of all prisoners placed in clinical restraints to verify that the prisoners received
therapeutic services as required by Paragraph 71.

The County maintained Substantial Compliance with Paragraph 71 for twelve
consecutive months during a prior reporting period and Paragraph 71 was not subject to
monitoring in the Eighth Reporting Period.

72.     The County and the Sheriff will develop and implement policies and procedures that ensure that incidents involving suicide and serious self-injurious behavior are reported and reviewed to determine:  (a) whether staff engaged in any violations of policies, rules, or laws; and (b) whether any improvements to policy, training, operations, treatment programs, or facilities are warranted.  These policies and procedures will define terms clearly and consistently to ensure that incidents are reported and tracked accurately by DMH and the Sheriff's Department.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of January 1, 2017, through December 31, 2017)**

Substantial Compliance requires the Self-Assessments to report on (a) suicide review meetings and (b) CIRC meetings that review incidents of serious self-injurious behavior in the reporting period.

The Monitor's Sixth Report found that the County had maintained Substantial Compliance with Paragraph 72 for the twelve month period ending on December 31, 2018, but expressed a concern that the information provided by the County was insufficient "for the Monitor 'to assess' whether the County is *adequately* reviewing potential non-custody staff misconduct.'"[56]  To address this concern, the County submitted a list of 2017 Performance Management cases reflecting the status and/or results of investigations Custody Health Services personnel in 2017.  It includes whether the allegations were "substantiated" and, if so, the "Final Administrative and/or Disciplinary Action," but does not, as DOJ noted, "indicate to which suicides or suicide attempts the investigation and discipline listed correspond" or "how many of the investigations or disciplinary actions listed arose due to suicides or suicide attempts." The Monitor agreed that additional information was needed to assess whether the County maintained Substantial Compliance for twelve consecutive months during the Fifth and Sixth Reporting Periods.[57]

The County has provided a listing that identifies which of the cases involved suicides or deaths and additional information that describes what CHS personnel did in relation to a particular death or suicide, the results of the investigation, and the status of any disciplinary proceedings.  Based upon this information, the Monitor is of the opinion that the Department was in Substantial Compliance with Paragraph 72 for twelve consecutive months in 2017 and was not subject to monitoring in the Eighth Reporting Period. [58]

---

[56] See Monitor's Sixth Report, p. 84, n. 44.

[57] See Monitor's Seventh Report, p. 91.

[58] The Mental Health Subject Matter Expert and the clinicians reviewed eight cases that were the subject of CIRC reviews during the First Quarter of 2018, and found that all of the cases "clearly addressed whether staff engaged in any violations of policies, rules or laws."

73.     Depending on the level of severity of an incident involving a prisoner who threatens or exhibits self-injurious behavior, a custody staff member will prepare a detailed report (Behavioral Observation and Mental Health Referral Form, Inmate Injury Report, and/or Incident Report) that includes information from individuals who were involved in or witnessed the incident as soon as practicable, but no later than the end of shift.  The report will include a description of the events surrounding the incident and the steps taken in response to the incident.  The report will also include the date and time that the report was completed and the names of any witnesses.  The Sheriff's Department will immediately notify the County Office of Inspector General of all apparent or suspected suicides occurring at the Jails.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified))**

Substantial Compliance requires the Department to review quarterly a random sample of reports of any threats or exhibitions of self-injurious behavior to verify that the reports have the information required by Paragraph 73; and to provide the Monitor with the notifications to the Inspector General of all incidents involving an apparent or suspected suicide during the reporting period.

The County's Seventh Self-Assessment reported that it had maintained Substantial Compliance with Paragraph 73 for twelve consecutive months through September 30, 2018, and the Monitor's auditors have verified the County's results. Accordingly, the County was not subject to monitoring for compliance with Paragraph 73 during the Eighth Reporting Period.

74.     The Sheriff's Department will ensure that there is a timely, thorough, and objective law enforcement investigation of any suicide that occurs in the Jails. Investigations shall include recorded interviews of persons involved in, or who witnessed, the incident, including other prisoners.  Sheriff's Department personnel who are investigating a prisoner suicide or suspected suicide at the Jails will ensure the preservation of all evidence, including physical evidence, relevant witness statements, reports, videos, and photographs.

**STATUS:**      **SUBSTANTIAL COMPLIANCE (as of September 1, 2016, through December 31, 2017)**

Substantial Compliance requires the Department to provide the Monitor with an Executive Suicide Death Review reflecting the results of the Department's investigation of any suicide in the Jails within six months of the suicide.  The review must reflect steps taken to preserve all of the evidence; and list the interviews of persons involved in, or who witnessed, the incident, and whether the interviews were recorded.

The County previously maintained Substantial Compliance with this provision for twelve consecutive months and it was not subject to monitoring during the Eighth Reporting Period.  The County nevertheless continued to notify the Monitor of all inmate deaths, including suicides, and the subsequent death reviews.  The Monitor continued to attend death reviews during the Eighth Reporting Period.

75.     Within three months of the Effective Date, the County and the Sheriff will review every suicide attempt that occurs in the Jails as follows:

(a)     Within two working days, DMH staff will review the incident, the prisoner's mental health status known at the time of the incident, the need for immediate corrective action if any, and determine the level of suicide attempt pursuant to the Centers for Disease Control and Prevention's Risk Rating Scale;

(b)     Within 30 working days, and only for those incidents determined to be a serious suicide attempt by DMH staff after the review described in subsection (a) above, management and command-level personnel from DMH and the Sheriff's Department (including Custody Division and Medical Services Bureau) will meet to review relevant information known at that time, including the events preceding and following the incident, the prisoner's incarceration, mental health, and health history, the status of any corrective actions taken, and the need for additional corrective action if necessary;

(c)     The County and the Sheriff will document the findings that result from the review of serious suicide attempts described in subsection (b) above; and

(d)     The County and the Sheriff will ensure that information for all suicide attempts is input into a database for tracking and statistical analysis.

**STATUS (75):**          **SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified))**

Substantial Compliance requires (a) DMH to review documentation of randomly selected suicide attempts during the previous quarter to verify that the prisoner's mental health status and need for immediate corrective action were considered timely by the DMH staff and that the staff determined whether the suicide attempt was serious; (b) that the Department and DMH reviewed the relevant information known at that time and the status of any corrective actions taken, and they considered the need for additional corrective action if necessary; and (c) that the information is reflected in the Department's database for tracking and statistical analysis.

The County's Seventh Self-Assessment reported that for the Second Quarter of 2018, "85% -- equal to the required 85% -- of documents reviewed showed CHS staff considered the inmate's mental health status and need for immediate corrective action;" "100% -- 5% more than the required 95% -- of suicide attempts are reflected in the Department's database;" and "90% rather than the required 95% -- of the suicide attempts" were reviewed by "management and command-level personnel" from Custody, mental health, and medical.  The County did not meet the 95% threshold for management and command level reviews of suicide attempts as required by Compliance Measure 75-5(b) because "due to a miscalculation," one of the ten serious suicide attempts "was reviewed 31 days after its occurrence – failing to meet the compliance requirement *by only 1 day*."  Because the delay was minimal and the "County is in Substantial Compliance with the other requirements of this Provision in the Second Quarter, the County requests a finding of Substantial Compliance."  The Mental Health Subject Matter Expert concurs, and notes that the County is "doing a good job on these reviews, including some meaningful CAPs."

The County's Augmented Seventh Self-Assessment reported that for the Third Quarter of 2018 "that 91% -- 6% more than the required 85% -- of documents reviewed showed CHS staff considered the inmate's mental health status and need for immediate corrective action."  The County also concluded that 100% -- 5% more than the required 95% -- of the suicide attempts were reviewed by "management and command-level personnel" from Custody, mental health, and medical; and 100% -- 5% more than the required 95% -- of suicide attempts are reflected in the Department's database for tracking and statistical analysis.  The County's Seventh Self-Assessment reported that it had maintained Substantial Compliance with Paragraph 75 for twelve consecutive months through September 30, 2018, and the Monitor's auditors have verified the County's results.  Accordingly, the County was not subject to monitoring for compliance with Paragraph 75 during the Eighth Reporting Period.

76.     The County and the Sheriff will review every apparent or suspected suicide that occurs in the Jails as follows:

(a)     Within no more than two working days, management and command-level personnel from DMH and the Sheriff's Department (including Custody Division and Medical Services Bureau) will meet to review and discuss the suicide, the prisoner's mental health status known at the time of the suicide, and the need for immediate corrective or preventive action if any;

(b)     Within seven working days, and again within 30 working days, management and command-level personnel from DMH and the Sheriff's Department (including Custody Division and Medical Services Bureau) will meet to review relevant information known at that time, including the events preceding and following the suicide, the prisoner's incarceration, mental health, and health history, the status of any corrective or preventive actions taken, and the need for additional corrective or preventive action if necessary; and

(c)     Within six months of the suicide, the County and the Sheriff will prepare a final written report regarding the suicide.  The report will include:

(i)      time and dated incident reports and any supplemental reports with the same Uniform Reference Number (URN) from custody staff who were directly involved in and/or witnessed the incident;

(ii)     a timeline regarding the discovery of the prisoner and any responsive actions or medical interventions;

(iii)    copies of a representative sample of material video recordings or photographs, to the extent that inclusion of such items does not interfere with any criminal investigation;

(iv)    a reference to, or reports if available, from the Sheriff's Department Homicide Bureau;

(v)     reference to the Internal Affairs Bureau or other personnel investigations, if any, and findings, if any;

(vi)    a Coroner's report, if it is available at the time of the final report, and if it is not available, a summary of efforts made to obtain the report;

(vii)   a summary of relevant information discussed at the prior review meetings, or otherwise known at the time of the final report, including analysis of housing or classification issues if relevant;

(viii)  a clinical mortality review;

(ix)    a Psychological Autopsy utilizing the National Commission on Correctional Health Care's standards; and

(x)     a summary of corrective actions taken and recommendations regarding additional corrective actions if any are needed.

**STATUS (76):**            **SUBSTANTIAL COMPLIANCE (as of
September 1, 2016, through December 31, 2017)**

       The County previously maintained Substantial Compliance with Paragraph 76 for
twelve consecutive months and this provision was no longer subject to monitoring during
the Eighth Reporting Period.  Nonetheless, the County continued to conduct the reviews
required by Paragraph 76 for the suicides that occurred during this period and invited the
Monitor to attend these meetings.

77.     The County and the Sheriff will create a specialized unit to oversee, monitor, and audit the County's jail suicide prevention program in coordination with the Department of Mental Health.  The Unit will be headed by a Captain, or another Sheriff's Department official of appropriate rank, who reports to the Assistant Sheriff for Custody Operations through the chain of command.  The Unit will be responsible for:

(a)     Ensuring the timely and thorough administrative review of suicides and serious suicide attempts in the Jails as described in this Agreement;

(b)     Identifying patterns and trends of suicides and serious suicide attempts in the Jails, keeping centralized records and inputting data into a unit database for statistical analysis, trends, and corrective action, if necessary;

(c)     Ensuring that corrective actions are taken to mitigate suicide risks at both the location of occurrence and throughout the concerned system by providing, or obtaining where appropriate, technical assistance to other administrative units within the Custody Division when such assistance is needed to address suicide-risk issues;

(d)     Analyzing staffing, personnel/disciplinary, prisoner classification, and mental health service delivery issues as they relate to suicides and serious suicide attempts to identify the need for corrective action where appropriate; and recommend remedial measures, including policy revisions, re-training, or staff discipline, to address the deficiencies and ensure implementation; and

(e)     Participating in meetings with DMH to develop, implement, and track corrective action plans addressing recommendations of the quality improvement program.

**STATUS:     PARTIAL COMPLIANCE**

CCSB's Semi-Annual Report for the Fourth Quarter of 2018 and the First Quarter of 2019 reports that "there were two (2) suicides within the jail facilities,[59] eighteen (18) suicide attempts, and three hundred and fifty (350) Self-Directed Violence notifications in the jails.  Each suicide was discussed in a Preliminary (24 hr), 7 and 30 Day Executive Review" as required by Paragraph 76.  Of the 18 suicide attempts, only six were discussed during six (6) Critical Incident Review Committee (CIRC) monthly meetings.[60]

The Semi-Annual Report includes the following sections:

(a)     "Administrative Review of Suicides."  This summarizes the 24-hour, 7-

---

[59] One was in MCJ and one was in a patrol station jail.
[60] Section B of the Report, "Administrative Review of Serious Suicide Attempts" identifies 17 suicide attempts, of which six were deemed serious.  One of the six appears to be the actual suicide that occurred at MCJ in the First Quarter of 2018.

day, and 30-day suicide reviews that occurred during the Fourth Quarter of 2018 and
First Quarter of 2019, which includes the corrective actions the Department took to
mitigate suicide risks following these reviews.  Based upon CCSB's Report and CHS's
Semi-Annual Report, the Monitor remains satisfied that CCSB is continuing to ensure
that CHS and the Department are timely and thoroughly conducting administrative
review of suicides and serious suicide attempts in the jails as required by Paragraphs 76
and Compliance Measure 77-2(a).

(b)     "Patterns and trends and statistical analysis of suicides and serious suicide
attempts in the jails."  This section breaks down the incidents of Self-Directed Violence
in the Fourth Quarter of 2018 and First Quarter of 2019 by age group (by incident and
unique inmates and per 100,000 inmates) and it concludes that inmates in the 26-34 age
group, who made up 33% of the inmate population, had 43% of the acts of self-directed
violence.  Inmates in this age group also had a disproportionate number of the 11 serious
self-directed violence incidents and the six serious suicide attempts reviewed at CIRCs.
In this report, CCSB also compared the inmate population by security level and age,
which shows that as "the age group increases, the proportion of inmates who have a high
security level decreases," and the percentage of inmates in the 26-34 age group who have
a high security level (8-9) is slightly higher than the percentage of the total population.
The County analyzed the "distribution of self-directed violence incidents by security
level" and found that a disproportionate number were committed by inmates with high
security levels (8-9) and the rate per 100,000 inmates was much higher than the rates for
inmates at lower security levels, although the rates of *serious* SDV incidents reviewed at
CIRCs and *serious* suicide attempts are just slightly above average (and roughly the same
as the rates for inmates with medium security levels (5-7)).  The County does not,
however, analyze the inmates who committed the 11 incidents reviewed by CIRC or the
six suicide attempts[61] to see if there is a correlation with the general conclusions that
inmates in the 26-34 age group "are at a higher risk of self-directed violence" and
"[i]nmates with a high-security level are at a much higher risk to engage in self-harm
compared to inmates at low or medium security levels."  Although this statistical analysis
satisfies the requirements of Compliance Measure 77(b), it is limited to age groups and
security level.  The Mental Health Subject Matter notes that while these are "important
variables to consider, especially the impact of security level, which is a known risk factor
for SDV, further (and on-going) analysis is part of a sound quality improvement
program."

(c)     "Corrective actions taken by the department to mitigate suicide risks."
This section summarizes matters the Department and CHS are "collaborating on."  It
describes (1) suicide prevention measures in IRC 231 (the "Detox Unit"); (2) expansion
of the Living Modules in TTCF; (3) the status of "a total of twenty CAP/Issues related to
6 serious suicide attempts that were reviewed during the Critical Incident Review
Meetings,"[62] and eleven corrective actions related to the two suicides reviewed during the
Reporting Period; (4) an Informational Bulletin informing patrol stations of a suicide

---

[61] Inmates in the 26-34 age group committed six of the 11 incidents review by the CIRC, but the report
does not indicate the security levels of these inmates.
[62] See CCSB Report, p. 25.

hazard that was identified in a station jail cell; and (5) the installation of mats in the IRC
booking front and security chairs in IRC 231 to "reduce the risk of self-injurious
behavior."  CCSB's report of the CAPs discussed at the Executive Inmate Review
Committee meetings under the "Administrative Review of Suicides" section above and
the CHS's Summary of Recent CIRC Incidents and Data in its Semi-Annual Report
reflect that corrective actions are being "taken to mitigate suicide risks."  As in the past,
the Mental Health Subject Matter Expert notes that "none of these CAPs were based on
analysis of aggregate data or patterns and trends and statistical analysis of suicides and
serious suicide attempts.  While CAPs based upon reviews of individual cases are an
important part of QI, it is essential to use aggregate data to drive CAPs and determine if
CAPs derived from reviews of individual cases are effective."[63]

(d)     "Technical assistance provided to, or obtained for other administrative
units within the Custody Division to address suicide-risk issues."  This section describes
the briefings and training for the pill call pilot program that has been activated in MOH
units; and briefings in May 2018 to a class of new Deputies assigned to TTCF and CRDF
on requirements of some of the most challenging provisions of the DOJ Settlement
Agreement.[64]

(e)     "Analysis of staffing, personnel/disciplinary, prisoner classification, and
mental health service delivery issues as they relate to suicides and serious suicide
attempts."  This section analyzes the issues in these categories for the two suicides that
were reviewed during the Eighth Reporting Period, and concludes that staffing was an
issue in both suicides, and safety checks was an issue in one of the cases.  This led the
Department to request additional station jail positions and preclude overtime personnel
from conducting Title 15 checks.  The section also sets forth conclusions, without much
analysis, regarding these categories as they related to the six serious suicide attempts
during the period.

(f)     "Remedial measures, including policy revisions, re-training, or staff
discipline, to address issues related to suicide and serious suicide attempts."  This section
consists of a table that summarizes the policy revisions, re-training, and staff discipline
measures taken to address issues related to the two suicides reviewed during the Eighth
Reporting Period.  This section does not, however, discuss the serious suicide attempts
during the period.

(g)     "Summaries of meeting with DMH to develop, implement, and track
corrective action plans."  This section reports that in "January, CCSB and CHS
began meeting once a month prior to the CIRC meeting to discuss every inmate"
who was going to be reviewed at the meeting:  It reiterates that "[a]t every [Joint
Quality Improvement Committee] JQIC meeting, there is follow up to verify that

---

[63] In response, the County notes that the "revamped" JQIC process provides the "forum at which both [CHS
and the Department] present aggregate data for the development of corrective actions and resulting
evaluations."
[64] DOJ 36 (adverse triggering events), 52 (property), 57 (safety checks), 68 (searches), and 80 (out-of-cell
time).

the CAP(s) have been addressed and assigned, also the individual assigned to the
CAP should verify their effectiveness.  CCSB tracks all suicide-related CAPs,
whether they are CHS or LASD CAPs, and does so continuously outside of the
CIRC and JQIC context."  There were a total of 6 JQIC meetings during the Eighth
Reporting Period "to discuss CAP/Issues that were developed during the CIRC
meetings."  The section also sets forth one example of the "aggregated data" that
CCSB presented at the JQIC meetings,[65] "to identify patterns and trends related to
suicides and self-directed violence."  From the data, the group identified the module
and pod in TTCF as the most common location of self-directed violence among
high-risk inmates and focused "on this subpopulation as a way to identify discrete
corrective action or quality improvement projects that can be put in place through
JQIC."  Based on the data, the report analyzes the severity and frequency of self-
directed violence incidents; compares incidents of self-directed violence in the
sterile pod as opposed with other pods; and analyzes methods of self-harm.  It does
not, however, identify any systemic issues, corrective actions, or quality
improvement projects that resulted from the analysis.  As the Mental Health Subject
Matter Expert has noted, the aggregate data must be "tracked and assessed by
Custody and CHS" to "determine whether there are system-wide problems" and
"what systemic improvements can be identified, implemented, and measured."[66]

        As previously noted, "it is incumbent on CCSB to track the County's
implementation of its Suicide Hazard Mitigation Plans [required by Paragraph 24] and
the corrective actions to address suicide hazards identified in the annual inspections."[67]
CCSB's Report refers to DOJ Provision 24 "[f]or corrective actions taken by the
Department to mitigate suicide risks."[68]   The most recent Facility Suicide Hazard
Inspections posted by the Department for that provision were in July and August last
year, and there is nothing in CCSB's Report indicating what steps the Department has
taken to address the risks identified in those inspection reports.[69]

        The Monitor and Subject Matter Expert note the Department has continued to
enhance its participation in the quality management process as required by Paragraphs 60
and 77.  We appreciate all of the work that CCSB has done to facilitate the
implementation of the various provisions of the Settlement Agreement, and note that it
continues to make progress in gathering, tracking, and assessing aggregate data related to
suicides and self-directed violence, although  the County is not consistently using the data

---

[65] This involved inmates with multiple incidents involving self-directed violence in Module 132 at TTCF.
The data showed that 50 out of 266 (19%) inmates accounted for nearly 50% of the incidents of self-
directed violence and 72% of the incidents in the one "sterile" pod.
[66] See Monitor's Seventh Report, p. 101.
[67] Id., p. 100.
[68] See CCSB Report, p. 25.
[69] The Monitor agrees with the Department that it is not subject to "re-monitoring" of Paragraph 24 through
the "quality improvement provisions" of Paragraphs 60-62 and 77.  The Department has established
Substantial Compliance with Paragraph 24 by conducting annual inspections that identified suicide risks.  It
is, however, CCSB's responsibility under the Settlement Agreement to track and report on the
implementation of the recommendations in the inspection reports.  See Paragraph 77(c) (providing that
CCSB is responsible for "ensuring that corrective actions are taken to mitigate suicide risk.").

to identify systemic problems or solutions to those problems.  The County's response to
the Monitor's draft of this Report notes that it "continues to expand its data analysis and
reporting capabilities and expects to demonstrate as much in future reports."

78.     The County and the Sheriff will maintain a county-level Suicide
Prevention Advisory Committee that will be open to representatives from the Sheriff's
Department Custody Division, Court Services, Custody Support Services, and Medical
Services Bureau; the Department of Mental Health; the Public Defender's Office; County
Counsel's Office; the Office of the Inspector General; and the Department of Mental
Health Patients' Rights Office.  The Suicide Prevention Advisory Committee will meet
twice per year and will serve as an advisory body to address system issues and
recommend coordinated approaches to suicide prevention in the Jails.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of May 11, 2016, through
May 18, 2017)**

Substantial Compliance requires (1) the Committee to meet twice per year and (2)
"recommend coordinated approaches to suicide prevention in the Jails."

The County maintained Substantial Compliance with Paragraph 78 for twelve
consecutive months as of May 18, 2017, and this provision was not subject to monitoring
in the Eighth Reporting Period.  Nevertheless, the County has continued to hold Bi-
Annual Suicide Prevention meetings.  The last meeting was held on May 8, 2019, and
provided a comprehensive overview of the County's efforts to prevent suicides in the
County's jails and treat to inmates suffering from mental illness.[70]  The Monitor attended
this most recent meeting.

---

[70] The overview noted an increase in the number of suicides in 2018 (five) over the prior three years (a total
of seven), which trend continued during the first six months of 2019 (three).

79.     (a)     Unless clinically contraindicated, the County and the Sheriff will offer prisoners in mental health housing:

    (i)     therapeutically appropriate individual visits with a QMHP; and

    (ii)    therapeutically appropriate group programming conducted by a QMHP or other appropriate provider that does not exceed 90 minutes per session;

    (b)     The County and the Sheriff will provide prisoners outside of mental health housing with medication support services when those prisoners are receiving psychotropic medications and therapeutically appropriate individual monthly visits with a QMHP when those prisoners are designated as Seriously Mentally Ill; and

    (c)     The date, location, topic, attendees, and provider of programming or therapy sessions will be documented.  A clinical supervisor will review documentation of group sessions on a monthly basis.

**STATUS:**     **NON-COMPLIANCE**

Substantial Compliance requires the Department to maintain records of therapeutically appropriate individual visits and group programming, and the names of the clinical supervisors who reviewed the documentation of group sessions; describe the medication support services available for prisoners not in mental health housing who are receiving psychotropic medications; and review electronic medical records of such to confirm that medication support services were provided to these prisoners.

The County's Eighth Self-Assessment reports that in the Fourth Quarter of 2018, 41% of the prisoners who resided outside of mental health housing and were receiving psychotropic medications were "provided with medication support services," which is well-below the 85% threshold required by Compliance Measure 79.5(d) for Substantial Compliance.  It also reports that "a shortage of medical doctors treating patients hindered its ability to better comply with this Provision."

The County's Augmented Eighth Self-Assessment reports that in the First Quarter of 2019, 65% of the prisoners who resided outside of mental health housing and were receiving psychotropic medications were "provided with medication support services," which is still below the 85% threshold required by Compliance Measure 79.5(d) for Substantial Compliance.

The Department's posted results also reflect the names of the clinical supervisors who reviewed the documentation of group sessions as required by Compliance Measure 79.1(d), but the County did not provide records of therapeutically appropriate individual visits and group programming by QMHPs to prisoners in mental health housing.

80. (a) The County and the Sheriff will continue to make best efforts to provide appropriate out-of-cell time to all prisoners with serious mental illness, absent exceptional circumstances, and unless individually clinically contraindicated and documented in the prisoner's electronic medical record.  To implement this requirement, the County and the Sheriff will follow the schedule below:

(i) By no later than six months after the Effective Date, will offer 25% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week;

(ii) By no later than 12 months after the Effective Date, will offer 50% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week; and

(iii) By no later than 18 months after the Effective Date, will offer 100% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week.

(b) No later than six months after the Effective Date, the County and the Sheriff will record at the end of each day which prisoners in HOH, if any, refused to leave their cells that day.  That data will be presented and discussed with DMH staff at the daily meeting on the following Normal business workday.  The data will also be provided to the specialized unit described in Paragraph 77 and to DMH's quality improvement program to analyze the data for any trends and to implement any corrective action(s) deemed necessary to maximize out-of-cell time opportunities and avoid unnecessary isolation.

**STATUS (80):          NON-COMPLIANCE**

Paragraph 80 requires that, "no later than 18 months after the Effective Date [July 1, 2015]," 100% of the prisoners in HOH receive "ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week." The parties have agreed that up to five hours of the structured time can consist of education or work programs, but at least five hours of the time must be therapeutic.

The County's Eighth Self-Assessment reports that in the Fourth Quarter of 2018, 48.2% of the prisoners at CRDF and 45.6% of the prisoners at TTCF were offered the required 10 or more hours of unstructured, out-of-cell recreational time, which is well-below the 100% threshold for unstructured recreational time.  The results for the First Quarter of 2019 were 33% and 80% for CRDF and TTCF,[71] respectively.

The County's Eighth Self-Assessment also reports that "[w]ith respect to the structured out-of-cell time, CHS is in the process of piloting an electronic system [at both TTCF and CRDF] to track structured out-of-cell time."  There are, however, no reported results for structured therapeutic or programming time.

---

[71] The County reports that it has undercounted unstructured out of cell time for Living Modules pods that "facilitate housing for inmates transitioning from High Observation Housing (HOH) to less restrictive forms of hosing as their mental health improves."  By utilizing "iPod devices to document unstructured out of cell time for [these] pods," the County "expect[s] to see a compliance increase reflected in the data for upcoming quarters."

81.     Except as specifically set forth in Paragraphs 18-20 of this Agreement, and except as specifically identified below, the County and the Sheriff will implement the following paragraphs of the Implementation Plan in *Rosas* at all Jails facilities, including the Pitchess Detention Center and the Century Regional Detention Facility, by no later than the dates set forth in the Implementation Plan or as revised by the *Rosas* Monitoring Panel:  Paragraphs 2.2-2.13 (use of force policies and practices); 3.1-3.6 (training and professional development); 4.1-4.10 (use of force on mentally ill prisoners); 5.1-5.3 (data tracking and reporting of force); 6.1-6.20 (prisoner grievances and complaints); 7.1-7.3 (prisoner supervision); 8.1-8.3 (anti-retaliation provisions); 9.1-9.3 (security practices); 10.1-10.2 (management presence in housing units); 11.1 (management review of force); 12.1-12.5 (force investigations, with the training requirement of paragraph 12.1 to be completed by December 31, 2016); 13.1-13.2 (use of force reviews and staff discipline); 14.1-14.2 (criminal referrals and external review); 15.1-15.7 (documentation and recording of force); 16.1-16.3 (health care assessments); 17.1-17.10 (use of restraints); 18.1-18.2 (adequate staffing); 19.1-19.3 (early warning system); 20.1-20.3 (planned uses of force); and 21.1 (organizational culture).

**STATUS:       PARTIAL COMPLIANCE**

In the First Reporting Period, the *Rosas* Monitors approved polices adopted by the Department to implement the following provisions of the *Rosas* Implementation Plan: Paragraphs 2.2-2.13 (use of force policies and practices); 3.6 (training and professional development); 4.1-4.5 (use of force on mentally ill prisoners); 5.1-5.3 (data tracking and reporting of force); 7.1-7.3 (prisoner supervision); 8.1-8.3 (anti-retaliation provisions); 9.2-9.3 (security practices); 10.1-10.2 (management presence in housing units); 11.1 (management review of force); 12.2-12.5 (force investigations); 14.1-14.2 (criminal referrals and external review); 15.1-15.7 (documentation and recording of force); 16.1-16.3 (health care assessments); 17.1-17.10 (use of restraints); 18.1-18.2 (adequate staffing); 20.1-20.3 (planned uses of force); and 21.1 (organizational culture).

In the Second Reporting Period, the *Rosas* Monitors approved Department policies to implement the following provisions of the *Rosas* Plan:  Paragraphs 6.1-6.20 (grievance system); Paragraph 8.2 (combining "Complaints of Retaliation").  They also approved revised policies to implement Paragraphs 13.1-13.2 (discipline for PREA violations, dishonesty, and failure to report force incidents).  The Department has now implemented 104 of 106 provisions of the *Rosas* Plan; the other two provisions pertaining to the extension of Crisis Intervention training and safety checks are covered by Paragraphs 19-20 and 57-58 of the Settlement Agreement in the DOJ case.

Paragraphs 3.1-3.4, 4.6-4.9, and 12.1 of the *Rosas* Implementation Plan reflect training requirements in use of force, ethics, dealing with mentally ill inmates, and investigations of force incidents.  The curriculum and lesson plans to implement these training requirements have been approved by the *Rosas* Monitors.  The Department has achieved Substantial Compliance with the training required by Paragraphs 4.6 through 4.9 of the *Rosas* Plan at CRDF, NCCF, and the PDC facilities.[72]  Going forward,

---

[72] See pp. 12-16, *supra*.  Some of these results are subject to verification by the Monitor's auditors.

personnel at these facilities must undergo the refresher training required under the *Rosas* Plan.  The Department needs to provide Self-Assessments reflecting the training of personnel at these facilities in the use of force and ethics and professionalism required by Paragraphs 3.1 and 3.2 of the *Rosas* Plan to achieve Substantial Compliance with these provisions.

In the Eighth Reporting Period, the Monitor reviewed 37 randomly selected completed force packages for CRDF, NCCF, PDC North, and PDC South.  Most of these packages were also reviewed by the Use of Force Subject Matter Expert.  The Monitor concluded that the Department's use of force was reasonable in all but four of the cases.  In one case, the force appeared to be excessive because an inmate was slammed to the ground and in another the inmate was punched in the face while on the ground.  Fortunately, these cases were rare, and other problematic cases involved minimal force might have been avoided entirely with better communications, calling a supervisor, or taking advantage of time plus distance.  With respect to specific provisions of the *Rosas* Action Plan pertaining to the use of force, the Monitor concluded that the Department was not in compliance with Paragraph 9.2, which requires uninvolved Custody personnel to escort inmates against whom force was used, and Paragraph 17.5, which requires Custody personnel to minimize the risk of medical distress.

The Monitor concluded that the Department's reporting and investigation of force incidents was reasonable in over 85% of the cases.  Although there were no specific provisions of the Action Plan pertaining to the reporting or investigation of force incidents that were particularly problematic, the Department's Commanders should do a better job analyzing tactical issues and assessing how the force incident could possibly have been avoided or handled with less force, and conveying any lessons learned to line personnel and supervisors.

The Department needs to submit Self-Assessments that will be subject to verification by the Monitor's auditors to establish that it has *maintained* Substantial Compliance with other reporting and investigation provisions of the *Rosas* Plan at CRDF, NCCF, and the Pitchess Detention Center facilities.[73]

The Monitor previously reported that the Department had *achieved* Substantial Compliance with the grievance provisions of the *Rosas* Plan at NCCF, CRDF, PDC North, and PDC South.[74]  During the Eighth Reporting Period, the Monitor met with the Inmate Grievance Teams at CRDF and NCCF and with the Division Inmate Grievance Coordinator who has oversight responsibility for the implementation of the new grievance system.  The Division Inmate Grievance Coordinator provided the Monitor

---

[73] Paragraphs 5.1, 8.3, 11.1, 13.1, 13.2, 14.1, 14.2.  As noted by DOJ, Paragraph 13.1 requires the Sheriff's Department to have a "firm policy of zero tolerance for acts of dishonesty or failure to report uses of force." The Monitor has expressed his concern to the Sheriff that recent actions by the Department to reinstate terminated deputies and deactivate internal investigations "sends the wrong message to members of the Department responsible for Custody Operations, many of whom have embraced the reforms that have been implemented" and "undermine [his] ability to hold Department personnel accountable for such misconduct in the future."

[74] See Monitor's Seventh Report, p., 108.

with his Executive Reports: Statistical Analysis and Trends for each month through May
in the Eighth Reporting Period (with comparisons to the Fourth Quarter of 2018),
broken down by facility and with response times in compliance with the 15-day response
required by Paragraphs 6.9, 6.13, 6.14, and 6.15 of the *Rosas* Plan.  In addition to
providing these reports in the future, the Department needs to provide Self-Assessments
of other provisions to demonstrate that it has *maintained* Substantial Compliance with the
grievance provisions of the *Rosas* Plan for the periods required.[75]

On July 10, 2018, the Department presented to the *Rosas* Monitors its Custody
Operations Employee Review System "to facilitate the identification, tracking, analysis,
and review of specific employee-related incidents and issues."  The *Rosas* Monitors
concluded that this system addresses the requirements of Paragraphs 19.1, 19.2, and 19.3
of the *Rosas* plan for an Early Warning System.  The Department implemented the
Employee Review System as a pilot program at the Downtown Jail Facilities on July 27,
2018, and expanded it throughout Custody Operations on October 25, 2018.[76]

Paragraphs 4.10 and 9.1 of the *Rosas* Implementation Plan are moot since the
Settlement Agreement requires the Crisis Intervention and Conflict Resolution training to
be extended to the remaining deputies and Custody Assistants, and it specifies the
required cell checks in the Jails.  Accordingly, the Department has implemented all of the
provisions of the *Rosas* Implementation Plan.

---

[75] Paragraphs 6.4, 6.5, 6.7, 6.8, 6.10, 6.11, 6.12, 6.17-6.20, 7.2, 7.3 and 8.1.
[76] The Department needs to submit Self-Assessments to demonstrate that it has maintained Substantial
Compliance with Paragraphs 19.2 and 19.3 of the *Rosas* Plan.

82.     With respect to paragraph 6.16 of the *Rosas* Implementation Plan, the
County and the Sheriff will ensure that Sheriff's Department personnel responsible for
collecting prisoners' grievances as set forth in that paragraph are also co-located in the
Century Regional Detention Facility.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of July 15, 2016, through
December 31, 2017)**

The *Rosas* Monitors have approved a de-centralized inmate grievance system,
which includes an Inmate Grievance Team co-located at Century Regional Detention
Facility.  The Department published its new grievance policies on July 15, 2016.

CRDF has had its own Inmate Grievance Team with the staffing required by
CDM 8-01.020.00 since July 2016.

Pursuant to Paragraph 111 of the Settlement Agreement, the County was not
subject to monitoring for Substantial Compliance with Paragraph 82 in the Eighth
Reporting Period.

83.     The County and the Sheriff will install closed circuit security cameras throughout all Jails facilities' common areas where prisoners engage in programming, treatment, recreation, visitation, and intra-facility movement ("Common Areas"), including in the Common Areas at the Pitchess Detention Center and the Century Regional Detention Facility.  The County and the Sheriff will install a sufficient number of cameras in Jails facilities that do not currently have cameras to ensure that all Common Areas of these facilities have security-camera coverage.  The installation of these cameras will be completed no later than June 30, 2018, with TTCF, MCJ, and IRC completed by the Effective Date; CRDF completed by March 1, 2016; and the remaining facilities completed by June 30, 2018.  The County and the Sheriff will also ensure that all video recordings of force incidents are adequately stored and retained for a period of at least one year after the force incident occurs or until all investigations and proceedings related to the use of force are concluded.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of July 1, 2015, through June 30, 2016 at MCJ and IRC)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2015, through September 30, 2016 at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 at NCCF and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2018, through March 31, 2019 at PDC South)**

The Monitor visited NCCF and PDC North on April 4, 2018, and confirmed that the closed circuit security cameras were operational in Common Areas at those facilities. The Department subsequently ordered and installed an additional eight cameras to cover blind spots at PDC North.  On July 12, 2018, the Department submitted a report showing all of the cameras requested were installed and operational at NCCF, PDC North, and PDC South.

Paragraph 83 also requires the Department to provide evidence that all video recordings of force incidents were adequately stored and retained for a period of at least one year after the force incident occurs.

The County's posted results for NCCF, PDC North, and PDC South reflect that the Department maintained Substantial Compliance at these facilities in that all of the video recordings of all force incidents at PDC North and South and randomly selected force incidents at NCCF in the Fourth Quarter of 2018 and the First Quarter of 2019 "were stored and retained by the Department."  The Monitor reviewed the video recordings and confirmed that the Department's videos depict the force incidents on the

Department's inventory.

In order to maintain Substantial Compliance, however, the Department must show that "90% of the force incidents on the quarterly lists. . . are on the inventory provided by the Department one year after the force incident."  NCCF and PDC North are subject to this requirement of Paragraph 83 until March 31, 2020, and PDC South is subject to it until June 30, 2020.

The County previously maintained Substantial Compliance with Paragraph 83 at IRC, MCJ, TTCF, and CRDF for twelve consecutive months and was not subject to monitoring at these facilities during the Eighth Reporting Period.

On a recent visit to MCJ the Monitor noted the absence of cameras in the "sally ports"[77] leading to the rows of cells in 3100 and 3300.[78]  This is where a Category 3 force incident with serious injuries to an inmate took place last year.  The absence of a camera made it very difficult to determine what happened in the sally port.  It is also possible that the force might not have happened if the inmate and/or the Deputy had been aware of a camera in the sally port.  Although MCJ is no longer subject to monitoring for compliance with Paragraph 83, the Monitor strongly urges the County to put cameras in all of the sally ports in MCJ.

---

[77]The sally ports are cage areas with an inner door facing the row and an outer door on the opposite side facing a hallway.  There are Deputy stations for monitoring the rows outside the ends of the sally port.  Because of the age of MCJ, Deputies must enter into the sally ports to unlock the inner doors to the row in order to enable inmates to enter or exit the rows (escorted or unescorted).  Since it appears that MCJ is not going to be replaced with a new facility at least for now, the County should consider automating the inner doors to the sally ports for the protection of Department personnel.

[78] The Monitor was informed that there are other sally ports in MCJ that do not have cameras.

84.     The Sheriff will continue to maintain and implement policies for the timely and thorough investigation of alleged staff misconduct related to use of force and for timely disciplinary action arising from such investigations.  Specifically:

(a)     Sworn custody staff subject to the provisions of California Government Code section 3304 will be notified of the completion of the investigation and the proposed discipline arising from force incidents in accordance with the requirements of that Code section; and

(b)     All non-sworn Sheriff's Department staff will be notified of the proposed discipline arising from force incidents in time to allow for the imposition of that discipline.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of July 1, 2017, through June 30, 2018 (verified))**

Substantial Compliance under the Compliance Measures requires the Department to demonstrate that 95% of the investigations of force incidents in which sworn custody staff and non-sworn custody staff were found to have violated Department policy or engaged in misconduct were completed and administrative action, which could include discipline, was taken within the time frames provided for in Government Code Section 3304 and relevant Department policies.

The Department previously maintained Substantial Compliance with Paragraph 84 for twelve months and was not longer subject to monitoring for compliance with this provision in the Eighth Reporting Period.

85.     The County and the Sheriff will ensure that Internal Affairs Bureau
management and staff receive adequate specialized training in conducting investigations
of misconduct.

**STATUS:**     **PARTIAL COMPLIANCE**

Substantial Compliance requires the Department to provide the Monitor and
Subject Matter Experts with (1) the curriculum/syllabus for the three specialized courses
given to IAB management, and (2) a list of the sworn personnel assigned to IAB and
proof that such personnel successfully completed the training.  The County's Eighth Self-
Assessment reports that 80% of the IAB investigators completed all three of the required
courses as of the end of the Fourth Quarter of 2018 and 75% as of the end of the First
Quarter of 2019.

86.     Within three months of the Effective Date, the County and the Sheriff will develop and implement policies and procedures for the effective and accurate maintenance, inventory, and assignment of chemical agents and other security equipment. The County and the Sheriff will develop and maintain an adequate inventory control system for all weapons, including OC spray.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 at MCJ and CRDF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2016, through December 31, 2017 at PDC North)**

**SUBSTANTIAL COMPLIANCE (as of February 1, 2017, through March 31, 2018 at PDC South and PDC East)**

**SUBSTANTIAL COMPLIANCE (as of March 1, 2017, through March 31, 2018 at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 at IRC)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 at TTCF)**

CDM 7-08/080 ACCOUNTABILITY OF SPECIALWEAPONS, effective October 14, 2016, requires each facility to have unit orders that "establish procedures for the storage, issuance, reissuance, accountability, maintenance, and periodic inventory of all weapons. . . stored at, or issued from, the facility," which includes detailed requirements for the "Inventory, Control, and Accountability of Aerosol Chemical Agents."

In addition to providing written policies and procedures, Substantial Compliance requires the Department to provide up-to-date Unit Orders for each jail requiring the inventory and inspection of special weapons, and armory audit logs documenting the inventory and control of armory-level weapons.

The Monitor and Use of Force Subject Matter Expert inspected the armories at TTCF on March 15, 2019, and again noted the continued improvement and that the inventory logs were checked daily in the TTCF armories.  The Department provided an armory log for the First Quarter of 2019.  The Department has now maintained Substantial Compliance with Paragraph 86 for twelve consecutive months at TTTC, and it is no longer subject to monitoring at TTCF for compliance with that paragraph.

The Department previously maintained Substantial Compliance with Paragraph 86 for twelve consecutive months at MCJ, CRDF, PDC North, PDC South, PDC East, IRC, and NCCF, and were not subject to monitoring in the Eighth Reporting Period.

117

## APPENDIX A

| NO. | PROVISION | STATUS | SUBSTANTIAL COMPLIANCE DATES |
|-----|-----------|--------|------------------------------|
| 18 | Suicide Prevention Training | Substantial Compliance (MCJ, NCCF, PDC South, PDC East, TTCF, IRC, PDC North, & CRDF) | **(10/1/17 at MCJ & PDC South)[1]** **(9/1/17 at NCCF)** **(12/1/17 at PDC East)** **(4/1/18 at TTCF, IRC, & PDC North)** (6/1/18 at CRDF) |
| 19 | Crisis Intervention & Conflict Resolution Training | Substantial Compliance (MCJ, NCCF, IRC, TTCF, CRDF, & PDC North, South, and East) | **(4/1/18 at MCJ, NCCF, & IRC)** **(7/1/18 at TTCF)** **(12/1/18 at CRDF, PDC East, & PDC North)** **(3/1/19 at PDC South)** |
| 20 | Training at NCCF, PDC and CRDF | Substantial Compliance (PDC East, PDC North, PDC South, NCCF, & CRDF) | **(8/1/17 at PDC East, PDC North, NCCF, & CRDF)** **(10/1/17 at PDC South)** |
| 21 | CPR Certification | Substantial Compliance (NCCF, PDC East, PDC North, PDC South, TTCF, IRC, MCJ, & CRDF) | **(10/1/15 – 9/30/16 at PDC East & PDC South)** **(1/1/16 – 12/31/16 at NCCF, PDC North, & IRC)** **(4/1/16 – 3/31/17 at TTCF)** (10/1/17 – 9/30/18 at MCJ) (7/1/18 – 3/31/19 at CRDF) |

---

[1] Substantial Compliance Dates in **bold** reflect that the Department has achieved Substantial Compliance with the training requirements or maintained Substantial Compliance for twelve consecutive months with the other requirements; the results were verified by the Monitor's auditors when required; and the County or designated facilities are no longer subject to monitoring of this provision pursuant to Paragraph 111 of the Settlement Agreement.

## APPENDIX A

| 22 | Use of Arresting and Booking Documents | Substantial Compliance | **(7/1/16 – 6/30/17)** |
|---|---|---|---|
| 23 | Suicide Hazard Mitigation Plans | Substantial Compliance | **(7/12/18**) |
| 24 | Suicide Hazard Inspection | Substantial Compliance | **(10/1/17 – 9/30/18)** |
| 25 | Transportation of Suicidal Inmates (station jails) | Partial Compliance | |
| 26 | Identification and Evaluation of Suicidal Inmates | Partial Compliance | |
| 27 | Screening for Mental Health Care and Suicide Risk | Substantial Compliance | (10/1/18 – 3/31/19) |
| 28 | Expedited Booking of Suicidal Inmates | Substantial Compliance (IRC & CRDF) | **(4/1/17 – 3/31/18 at IRC)** (1/1/19 – 3/31/19 at CRDF) |
| 29 | Mental Health Assessments (of non-emergent mental health needs) | Substantial Compliance | **(4/1/17 – 3/31/18)** |
| 30 | Initial Mental Health Assessments & Treatment Plans | Substantial Compliance | (1/1/19 – 3/31/19) |
| 31 | Electronic Medical Records Alerts | Substantial Compliance (NCCF) Partial Compliance (CRDF, TTCF, MCJ, & PDC North) | (1/1/19 – 3/31/19 at NCCF) |
| 32 | Electronic Medical Records – Suicide Attempts | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 33 | Supervisor Reviews of Electronic Medical Records | Substantial Compliance | **(7/1/16 – 6/30/17)** |
| 34 | Discharge Planning | Stayed Pending Litigation | |
| 35 | Referral for Mental Health Care | Substantial Compliance | **(11/1/17 – 12/31/18)** |
| 36 | Assessments After Triggering Events | Partial Compliance | |

## APPENDIX A

| 37 | Court Services Division Referrals | Partial Compliance | |
|----|----|----|----|
| 38 | Weekly Rounds in Restricted Housing Modules | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 39 | Confidential Self-Referral | Substantial Compliance (NCCF, PDC North, & PDC South)<br>Partial Compliance (TTCF, MCJ, & CRDF)<br>Not Rated (PDC East) | (7/1/17 – 6/30/18 at NCCF)<br>(7/1/18 – 3/31/19 at PDC North)<br>(10/1/18 – 3/31/19 at PDC South) |
| 40 | Availability of QMHPs | Partial Compliance | |
| 41 | FIP Step-Down Protocols | Non-Compliance | |
| 42 | HOH Step-Down Protocols | Partial Compliance | |
| 43 | Disciplinary Policies | Substantial Compliance (NCCF & PDC North)<br>Partial Compliance (CRDF, MCJ, & TTCF) | **(10/1/17 – 9/30/18 at NCCF & PDC North)** |
| 44 | Protective Barriers | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 45 | Suicide Intervention and First Aid Kits | Substantial Compliance | **(10/1/15 – 9/30/16 at CRDF, NCCF, TTCF, PDC East, & PDC South)**<br>**(1/1/16 – 12/31/16 at MCJ & PDC North)** |
| 46 | Interruption of Self-Injurious Behavior | Partial Compliance | |
| 47 | Staffing Requirements | Non-Compliance | |
| 48 | Housekeeping and Sanitation | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 49 | Maintenance Plans | Substantial Compliance | **(3/1/16 – 2/28/17)** |

## APPENDIX A

| 50 | Pest Control | Substantial Compliance | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC North, TTCF, & CRDF)**<br>**(4/1/16 – 3/31/17 at PDC South & PDC East)** |
|----|--------------|------------------------|---|
| 51 | Personal Care & Supplies | Substantial Compliance | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC East, PDC North, PDC South, & TTCF)**<br>**(7/1/16 – 6/30/17 at CRDF)** |
| 52 | HOH Property Restrictions | Partial Compliance | |
| 53 | Eligibility for Education, Work and Programs | Partial Compliance | |
| 54 | Privileges and Programs[2] | Partial Compliance | |
| 55 | Staff Meetings | Substantial Compliance (CRDF, PDC North, & MCJ)<br>Partial Compliance (TTCF) | **(10/1/16 – 9/30/17 at CRDF)**<br>**(4/1/17 – 3/31/18 at PDC North)**<br>(4/1/18 – 3/31/19 at MCJ) |
| 56 | Changes in Housing Assignments | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 57 | Inmate Safety Checks in Mental Housing | Substantial Compliance (MCJ)<br>Partial Compliance (PDC North, TTCF, & CRDF) | **(4/1/17 – 3/31/18 at MCJ)** |

---

[2] Per agreement of the parties, the County must maintain Substantial Compliance for two additional quarters under the revised Compliance Measures.

## APPENDIX A

| | | | |
|---|---|---|---|
| 58 | Inmate Safety Checks in Non-Mental Housing | Substantial Compliance (PDC South, PDC North, PDC East, CRDF, & IRC)<br>Partial Compliance (TTCF, NCCF, & MCJ) | **(1/1/16 – 12/31/16 at PDC South, PDC North, & PDC East)**<br>**(7/1/17 – 6/30/18 at CRDF)**<br>**(10/1/17 – 9/30/18 at IRC)** |
| 59 | Supervisor Rounds | Substantial Compliance (at PDC North, PDC East, MCJ, CRDF, PDC South, NCCF, & TTCF) | **(1/1/17 – 12/31/17 at PDC East & MCJ)**<br>**(4/1/17 – 3/31/18 at NCCF)**<br>**(10/1/17 – 9/30/18 at CRDF)**<br>**(1/1/18 – 12/31/18 at PDC North & PDC South)**<br>**(4/1/18 – 3/31/19 at TTCF)** |
| 60 | Implementation of Quality Improvement Program | Substantial Compliance | |
| 61 | Requirements of Quality Improvement Program | Partial Compliance | |
| 62 | Tracking of Corrective Action Plans | Partial Compliance | |
| 63 | Sufficient HOH and MOH Housing | Non-Compliance | |
| 64 | Plans for Availability of Inpatient Health Care | Non-Compliance | |
| 65 | Administration of Psychotropic Medication | Partial Compliance | |
| 66 | Active Mental Health Caseloads | Non-Compliance | |
| 67 | Prisoner Refusals of Medication | Partial Compliance | |

## APPENDIX A

| 68 | Contraband Searches | Substantial Compliance (MCJ, NCCF, PDC East, PDC South PDC North, & TTCF) Partial Compliance (CRDF) | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC East, PDC South, & PDC North) (1/1/17 – 12/31/17 at TTCF)** |
|---|---|---|---|
| 69 | Clinical Restraints in CTC | Substantial Compliance | (7/1/18 – 3/31/19) |
| 70 | Security Restraints in HOH and MOH | Partial Compliance | |
| 71 | Therapeutic Services for Inmates in Clinical Restraints | Substantial Compliance | **(7/1/16 – 6/30/17)** |
| 72 | Administrative Reviews | Substantial Compliance | **(1/1/17 – 12/31/17)** |
| 73 | Reporting of Self-Injurious Behavior and Threats | Substantial Compliance | **(10/1/17 – 9/30/18)** |
| 74 | Law Enforcement Investigations of Suicides | Substantial Compliance | **(9/1/16 – 12/31/17)** |
| 75 | Management Reviews of Suicide Attempts | Substantial Compliance | **(10/1/17 – 9/30/18)** |
| 76 | Management Reviews of Suicides | Substantial Compliance | **(9/1/16 – 12/31/17)** |
| 77 | Custody Compliance and Sustainability Bureau | Partial Compliance | |
| 78 | Suicide Prevention Advisory Committee | Substantial Compliance | **(5/11/16 – 5/18/17)** |
| 79 | Therapeutic Services in Mental Health Housing | Non-Compliance | |
| 80 | Out-of-Cell Time in HOH | Non-Compliance | |
| 81 | Implementation of *Rosas* Recommendations | Partial Compliance | |
| 82 | Grievances at CRDF | Substantial Compliance | **(7/15/16 – 12/31/17)** |

## APPENDIX A

| | | | |
|---|---|---|---|
| 83 | Closed Circuit Cameras | Substantial Compliance (MCJ, TTCF, IRC, CRDF, NCCF, PDC North, & PDC South) | **(7/1/15 – 6/30/16 at MCJ & IRC)** **(10/1/15 – 9/30/16 at TTCF)** **(4/1/16 – 3/31/17 at CRDF**) (4/1/18 – 3/31/19 at NCCF & PDC North) (7/1/18 –3/31/19 at PDC South) |
| 84 | Investigation of Staff Misconduct | Substantial Compliance | **(7/1/17 – 6/30/18)** |
| 85 | Internal Affairs Bureau Training | Partial Compliance | |
| 86 | Maintenance and Inventory of Security Equipment | Substantial Compliance (MCJ, CRDF, PDC North, PDC South, PDC East, NCCF, IRC, & TTCF) | **(4/1/16 – 3/31/17 at MCJ & CRDF)** **(10/1/16 – 12/31/17 at PDC North)** **(2/1/17 – 3/31/18 at PDC South & PDC East**) **(3/1/17 – 3/31/18 at NCCF)** **(4/1/17 – 3/31/18 at IRC**) **(4/1/18 – 3/31/19 at TTCF)** |

## APPENDIX B

| | Substantial Compliance (Provisions) | Partial Compliance[1] | Non-Compliance | Substantial Compliance (Facilities)[2] | No Longer Subject To Monitoring[3] |
|---|---|---|---|---|---|
| First[4] | 5 | 16 | | 10 | |
| Second | 14 | 30 | 13 | 24 | |
| Third | 22 | 27(1) | 10 | 29 | 4(2) |
| Fourth | 24 | 26(1) | 10 | 29 | 10(2) |
| Fifth | 23 | 24(2) | 7 | 34 | 15(5) |
| Sixth | 32 | 22 | 7 | 38 | 18(9) |
| Seventh | 30 | 23 | 7 | 39 | 21(10) |
| Eighth | 36 | 18 | 7 | 42 | 28(9) |

---

[1] The figure in parenthesis under Partial Compliance is the number of additional provisions where some facilities were in Partial Compliance and other facilities were in Non-Compliance.

[2] This represents the number of provisions where the Department is in Substantial Compliance at all or some of the facilities.

[3] The figure in parenthesis under No Longer Subject to Monitoring is the number of additional provisions where some facilities are no longer subject to monitoring.

[4] During the First Reporting Period, 43 provisions were not subject to monitoring.