**SCHEPER KIM & HARRIS LLP**
RICHARD E. DROOYAN (Bar No. 65672)
601 West Fifth Street, 12th Floor
Los Angeles, CA  90071-2025
Telephone: (213) 613-4655
Facsimile:  (213) 613-4656

**Monitor**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                  Plaintiff,<br><br>          v.<br><br>COUNTY OF LOS ANGELES AND LOS ANGELES COUNTY SHERIFF JIM MCDONNELL, in his Official Capacity,<br><br>                  Defendants. | CV No. 15-05903 DDP (JEMX)<br><br>**MONITOR'S NINTH REPORT** |

1        Pursuant to the Paragraph 109 of the Joint Settlement Agreement Regarding

2    Los Angeles County Jails, the Monitor appointed by this Court hereby submits the

3    attached Report "describing the steps taken" by the County of Los Angeles and the

4    Los Angeles County Sheriff during the six-month period from July 1, 2019, through

5    December 31, 2019, "to implement the Agreement and evaluating the extent to

6    which they have complied with this Agreement."  This Report takes into

7    consideration the advice and assistance I have received from the Subject Matter

8    Experts appointed by this Court and the comments from the parties in accordance

9    with Paragraph 110 of the Agreement.  I am available to answer any questions the

10    Court may have regarding my Report at such times as are convenient for the Court

11    and the parties.

12

13    DATED:  February 28, 2020      Respectfully submitted,

14                               SCHEPER KIM & HARRIS LLP

15                               RICHARD E. DROOYAN

16

17

18                             By:  */s/ Richard E. Drooyan*

19                                Richard E. Drooyan

20                                 Monitor

21

22

23

24

25

26

27

28

### MONITOR'S NINTH REPORT

This Ninth Report sets forth the Monitor's assessments of the implementation of the Settlement Agreement (the "Agreement" or "DOJ Agreement") between the County of Los Angeles (the "County") and the United States Department of Justice ("DOJ") for the treatment of mentally ill inmates in the County's jail facilities by the Los Angeles Sheriff's Department (the "Department") and the County's Department of Health Services ("DHS").[1]  It also reports on the Department's compliance with the provisions of the Implementation Plan in the settlement of *Alex Rosas, et al., v. Leroy Baca,* No. CV 12-00428 DDP, that were extended under the terms of the DOJ Agreement to the facilities not covered by the *Rosas* case.[2]  It covers the County's reported results for the period from July 1, 2019, through December 31, 2019 (the "Ninth Reporting Period").

As used herein, "Substantial Compliance" means that the County has "achieved compliance with the material components of the relevant provisions of this Agreement in accordance with the [agreed-upon Compliance Measures for assessing Substantial Compliance]," which it must maintain for twelve-consecutive months; "Partial Compliance" means that the County has achieved "compliance on some, but not all, of the material components of the relevant provision of this Agreement;" and "Non-Compliance" means that the County has not met "most or all of the material components of the relevant provisions of this Agreement."

This Ninth Report is based upon the Monitor's review of the policies, procedures, and directives proposed and/or implemented by the Department and Correctional Health Services ("CHS") in the Ninth Reporting Period; tours of the jails by the Monitor; and assessments and observations of the Subject Matter Experts and two clinicians retained by the Monitor to assist the Mental Health Subject Matter Expert.  It takes into consideration the County's Self-Assessment Status Report (the "Ninth Self-Assessment"); CHS's Report on Plans (Long Term and Short Term) for Licensed Inpatient Mental Health Care; the Semi-Annual Report of the Department's Custody Compliance and Sustainability Bureau ("CCSB"); the County's Augmented Self-Assessment Status Report (the "Augmented Ninth Self-Assessment"); CHS's Semi-Annual Report on Quality Improvement/Assurance; and results reported by the County through January 17, 2020.  It also takes into consideration the comments from the County and DOJ on the draft of this Report that was submitted to the parties on January 31, 2020. Finally, it takes into consideration the comments from the Intervenors on the draft of this Report on amended Paragraph 34, which governs release planning.

During the Ninth Reporting Period, there was a considerable turnover in the leadership of the Department's Custody Operations.  There were Acting Commanders at

---

[1] The Department of Health Services includes Correctional Health Services, which is responsible for Medical and Mental Health Services in the Los Angeles County jails.
[2] The Rosas case involved allegations of excessive force in Men's Central Jail (MCJ), the Twin Towers Correctional Facility (TTCF), and the Inmate Reception Center (IRC) (collectively the "Downtown Jail Complex").  The DOJ Agreement extends provisions of the Implementation Plan to the Century Regional Detention Facility (CRDF), the North County Correctional Facility (NCCF), and the jails in the Pitchess Detention Center (PDC).

NCCF and the PDC facilities, two Acting Chiefs, and a new Assistant Sheriff, who took over the leadership of Custody in December 2019.  The Sheriff has appointed new Commanders and Chiefs in Custody as of the beginning of 2020.

As in the past, during the Ninth Reporting Period, the Mental Health Subject Matter Expert, with the assistance of the clinicians, conducted additional qualitative assessments of the County's compliance with certain Substantive Provisions in the Settlement Agreement, and they again used different methodologies to test some of the County's reported results.  The Monitor's determination of the County's compliance, with the advice of the Subject Matter Expert, is based upon the quantitative thresholds in the Compliance Measures (and any other applicable requirements in the Compliance Measures) for achieving Substantial Compliance, unless the quality of the County's performance as determined by the qualitative assessment is plainly inadequate or the results reported by the Subject Matter Expert vary significantly from the results reported by the Department.

During the Ninth Reporting period, the County achieved and maintained Substantial Compliance with a few additional provisions of the Settlement Agreement, and continued to make some progress in addressing the challenges to achieving and maintaining Substantial Compliance with respect to its quality improvement program.  The County has achieved and maintained for twelve consecutive months Substantial Compliance with 31 out of the 69 provisions that are subject to monitoring under the Settlement Agreement, and it is no longer subject to monitoring for compliance with these 31 provisions.  In addition, it has achieved and maintained Substantial Compliance with an additional 8 provisions in some (but not all) of the jail facilities.

The Monitor and Mental Health Subject Matter Expert believe that the County still faces significant challenges with respect to mental health services and out-of-cell time.  In the four years since the Monitor's First Report to the Court (for the period from July 1, 2015, through December 31, 2015), the County has not been able to achieve Partial or Substantial Compliance with provisions relating to the Adequate Staffing (Paragraph 47), the sufficiency of High Observation Housing (HOH) and Medium Observation Housing (MOH) units (Paragraph 63), active mental health caseloads (Paragraph 66), and out-of-cell time in HOH units (Paragraph 80).  Although the County has improved its compliance status on "at least seven provisions," DOJ notes that the County's progress with some "provisions appears to have slowed, halted, or even reversed."[3]  The Monitor agrees with DOJ's suggestions that the County should consider developing Corrective Action Plans (CAPs) to address those provisions for which it has struggled to achieve Substantial Compliance.

Of particular concern is its compliance with the out-of-cell time requirements of Paragraph 80.  Based upon assessments by the Mental Health Subject Matter Expert and the clinicians, there are significant issues regarding the credibility of the Department's documentation and the extent to which the County is actually offering out-of-cell time to HOH inmates.  The County reports that it intends to "perform a detailed review of its

---

[3] Citing Provisions 25, 26, 39, 57, 58, and 63.

2

processes to capture and calculate out-of-cell time during the next reporting period."

Given the County's incremental progress in recent reporting periods, and the challenges it faces in addressing some of the mental health provisions, it is apparent that the County has a way to go before it achieves and maintains for twelve consecutive months Substantial Compliance with all of the 69 provisions at all facilities. Consequently, it is likely that the County will remain subject to monitoring under the DOJ Agreement for several years.

The County has improved the conditions and reduced restraints for the seriously mentally ill inmate populations in some HOH units.  At TTCF, the Living Modules transition HOH inmates to less restrictive settings such as MOH housing.  At CRDF, the LIFE pods consists of two HOH pods with a limited 30-day stay where patients have un-cuffed out-of-cell time in preparation for transition to MOH units.  Both TTCF and CRDF have Step-down units, which house inmates returning from the Correctional Treatment Center-Mental Health Unit (CTC-MHU) (known as the Forensic Inpatient (FIP) unit) and some other seriously mentally ill inmates from other HOH units.  Patients in these units are also afforded somewhat more therapeutic interaction, largely because they have more unrestrained, out-of-cell time, but the treatment remains limited and is not targeted at the specific needs of the patients.

Based upon conversations with Custody and CHS staff, the Monitor and Mental Health Subject Matter Expert believe that, with some additional staffing, the FIP step-down unit at TTCF could be expanded to encompass at least two additional pods with as many as 64 more beds for HOH inmates who currently meet the criteria for admission to the step-down units, and the FIP Step-down unit at CRDF could be expanded to fill at least an entire pod with additional chronically mentally ill HOH inmates whose behavior is manageable without the use of restraints for out-of-cell recreation and treatment and who are generally adherent to medication therapy.  Custody and CHS staff believe that there are additional HOH inmates who could benefit from graded transitions from more restrictive units to units designed to prepare inmates for the substantially less restrictive units such as the Living and LIFE Modules.  Ultimately, the goal should be to expand these approaches to include inmates who must come out of their cells restrained because they are in "a decompensated and potentially agitated state," and transition them to less restrictive pods as their behavior improves.

The FIP stepdown units have utilized a slightly higher level of custody and mental health staffing and the Living Modules at TTCF have required modestly enhanced mental health staffing.  Although CHS anticipated that it would have an additional 120 positions over a three year period, only 40 positions have been allocated and filled.  Some of the unallocated positions could facilitate the expansion of the Living Modules and step-down units.  The County reports that the Chief Executive Office will be reviewing proposed plans of both CHS and the Department and "will work to identify needed resources to formally submit a funding request to the Board of Supervisors for final approval."

Although the Department is no longer subject to monitoring for compliance with

3

provisions relating to Housekeeping and Sanitation (Paragraph 48), Maintenance (Paragraph 49), Pest Control (Paragraph 50), and Personal Care & Supplies (Paragraph 51), during site visits in the most recent reporting period, the Monitor and the Use of Force Subject Matter Experts heard complaints from inmates at NCCF and CRDF in particular about lack of clean linens and clothes, cleaning supplies, and personal care items, and about heating/air conditioning and plumbing problems.  In addition, both Subject Matter Experts had some concerns about cleanliness in some of the facilities.  As in the recent reporting periods, we did not hear complaints about excessive use of force by Department personnel.  Although not the core mental health concerns at issue in the DOJ case or the use of force issues in the *Rosas* case, these quality-of-life issues can affect the mental health of inmates and create tensions that can lead to force incidents. The Monitor and Use of Force Subject Matter Expert discussed these inmate complaints with the new leadership in the Custody Division, and emphasized the importance of addressing these issues at NCCF.  The Monitor and Mental Health Subject Matter Expert also observed a noticeable improvement in cleanliness during a recent site visit to CRDF.

As in prior reports, this Ninth Report reflects the results of audits by the Monitor's auditors to verify results reported by the County.  The Monitor has deemed the County to be in Substantial Compliance "as of" the beginning of the quarter reported by the County if the auditors have verified that the County has met the thresholds in the Compliance Measures.  If the auditors were not able to verify the results reported by the County, the twelve-month period for maintaining Substantial Compliance will commence in a future period when the County's reported results are verified by the auditors.  If the County maintains Substantial Compliance with a provision for twelve consecutive months, pursuant to Paragraph 111 of the Agreement, the Monitor and Subject Matter Experts will "no longer. . .assess or report on that provision" in future reporting periods.

Some of the Substantial Compliance results reported by the County in the Ninth Reporting Period have not been audited by the Monitor's auditors and cannot be considered final until verified by the auditors.  The County will not be deemed to be in Substantial Compliance as of the County's reported date for purposes of determining the twelve-month compliance period if the results are not verified by the auditors.

Appendix A to this Ninth Report shows the status of each of the 69 provisions of the Agreement that are subject to monitoring and the twelve-month triggering dates where the County is deemed to be in Substantial Compliance.  Appendix B shows the County's progress from the Initial Reporting Period through the Ninth Reporting Period in achieving Substantial Compliance and in maintaining Substantial Compliance for twelve consecutive months on provisions that are no longer subject to monitoring.

Notwithstanding the significant turn over in the leadership of the Custody Operations, the Department and the County continued to cooperate with the Monitor and the Subject Matter Experts during the Ninth Reporting Period.  Based upon interactions with the new leadership, the Monitor expects that the Department will continue to

cooperate in future reporting periods.  The Department, CHS, and County Counsel facilitated our visits and inmate interviews, answered our questions, and responded to our requests for documents and information.  We appreciate their responsiveness, transparency, professionalism, and courtesy in handling our monitoring requests.

Richard Drooyan, Monitor
February 28, 2020

## EXECUTIVE SUMMARY

There are 69 provisions in the Settlement Agreement that are subject to monitoring by the Monitor and Subject Matter Experts.  As of the date of this Report, the County and the Department are in Substantial Compliance with 36 provisions, in Partial Compliance with 22 provisions, and in Non-Compliance with four provisions.  In addition, there are six provisions in which the Department is in Substantial Compliance at some facilities and in Partial Compliance at other facilities.  There is one provision (Paragraph 39) for which the Department is in Substantial Compliance at certain facilities, Partial Compliance at other facilities, Non-Compliance at other facilities, and Not Rated at other facilities.  There are 43 provisions for which the County and the Department are in Substantial Compliance at some or all of the facilities.[4]

There are 31 provisions that are no longer subject to monitoring because the County and Department maintained Substantial Compliance for twelve consecutive months as required by Paragraph 111 of the Settlement Agreement as verified by the Monitor's auditors as required.[5]  There are another eight provisions for which some facilities are no longer subject to monitoring because those facilities maintained Substantial Compliance for the required twelve consecutive months.[6]

As of the date of this Report, and subject to verification by the Monitor's auditors and qualitative assessments in some cases, the County and the Department are in Substantial Compliance at some or all of the facilities with the following provisions of the Settlement Agreement:

The County has achieved Substantial Compliance with Paragraph 18, which requires the training of Deputy Sheriffs and Custody Assistants on suicide prevention as follows: at Men's Central Jail ("MCJ") and Pitchess Detention Center ("PDC") South as of October 1, 2017; at North County Correctional Facility ("NCCF") as of September 1, 2017; at PDC East as of December 1, 2017; at Twin Towers Correctional Facility ("TTCF"), the Inmate Reception Center ("IRC"), and PDC North as of April 1, 2018; and at Century Regional Detention Facility ("CRDF") as of August 1, 2018.

The County has achieved Substantial Compliance at NCCF, MCJ, and IRC as of April 1, 2018; at TTCF as of July 1, 2018; at CRDF, PDC East, and PDC North as of December 1, 2018; and at PDC South as of March 1, 2019, with Paragraph 19, which requires the training of Deputy Sheriffs on Crisis Intervention and Conflict Resolution and the training of Deputy Sheriffs and Custody Assistants in working with mentally ill prisoners.

---

[4] Under Paragraph 111 of the Agreement, the twelve-month period for which the County is required to maintain Substantial Compliance can be determined on a facility-by-facility basis.

[5] This includes the initial training required by Paragraphs 19 and 20, which has been completed and is no longer subject to monitoring.  The refresher training requirements are, however, still subject to monitoring.

[6] The provisions that are no longer subject to monitoring at some or all of the facilities are highlighted in bold in Appendix A.

The County has achieved Substantial Compliance at PDC East, PDC North, NCCF, and CRDF as of August 1, 2017 and at PDC South as of October 1, 2017, with Paragraph 20, which requires the training of additional Deputy Sheriffs on Crisis Intervention and Conflict Resolution and on working with mentally ill prisoners.

The County has maintained Substantial Compliance for twelve consecutive months at PDC East, PDC South, PDC North, NCCF, IRC, TTCF, CRDF, and MCJ with Paragraph 21, which requires Custody personnel to maintain CPR certifications.  The County has maintained Substantial Compliance for twelve consecutive months with Paragraph 22, which requires the County and the Sheriff to provide instructional material on the use of arresting and booking documents to ensure the sharing of known relevant and available information on prisoners' mental health status and suicide risk.

The County has maintained Substantial Compliance for twelve consecutive months as of July 12, 2018, with Paragraph 23, which requires that the Department conduct a systematic review of prisoner housing to reduce the risk of self-harm and to identify and address suicide hazards, and to develop plans to reasonably mitigate suicide hazards identified in the review.

The County has maintained Substantial Compliance for twelve consecutive months as of September 30, 2018, with Paragraph 24, which requires the Department to conduct annual reviews and inspections of prisoner housing to identify suicide hazards.

The County has maintained Substantial Compliance for twelve consecutive months at IRC as of March 31, 2018, with Paragraph 28, which requires the Department to expedite inmates having urgent or emergent mental health needs through the booking process.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2018, with Paragraph 29, which requires mental health assessments of prisoners with non-emergent mental health needs within 24 hours of the intake nursing assessment.

The County has provided documentation reflecting that it maintained Substantial Compliance as of January 1, 2019, through September 30, 2019, with Paragraph 30, which requires the County to provide an initial mental health assessment that includes a brief initial treatment plan that addresses housing recommendations and preliminary discharge information."  The results are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 32, which requires that a serious suicide attempt be entered in the prisoner's electronic medical record in a timely manner.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2017, with Paragraph 33, which requires mental health supervisors to review electronic medical records on a quarterly basis to assess their accuracy.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2018, with Paragraph 35, which requires the Department to ensure that custody staff refer prisoners who are demonstrating a potential need for routine mental health care to a QMHP or a Jail Mental Evaluation Team.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 38, which requires mental health staff or JMET teams to make weekly cell-by-cell rounds in restricted non-mental health housing modules to identify prisoners with mental illnesses and grant prisoner's requests for out-of-cell interviews.

The County has maintained Substantial Compliance at NCCF as of July 1, 2017, through June 30, 2018, and at PDC South as of October 1, 2018 through June 30, 2019, with Paragraph 39, which requires the County to use a confidential self-referral system for prisoners to request mental health care.  The County has also provided documentation reflecting that it achieved Substantial Compliance at PDC South as of July 1, 2019, through September 30, 2019.  The results at PDC South are subject to verification by the Monitor's auditors.

The County has achieved Substantial Compliance at TTCF, as of July 1, 2019, through September 30, 2019, with Paragraph 42, which requires the Department to develop and implement step-down protocols to ensure that prisoners admitted to HOH and placed on risk precautions are assessed by a QMHP.

The County has maintained Substantial Compliance at NCCF and PDC North for twelve consecutive months, as of September 30, 2018, with Paragraph 43, which requires the Department to develop and implement policies for discipline of prisoners with serious mental illnesses.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 44, which requires the Department to install protective barriers in High Observation Housing and other mental health housing areas.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 45, which requires Suicide Prevention Kits and first-aid kits in control booths in all facilities.

The County has achieved Substantial Compliance for twelve consecutive months as of July 1, 2019,through September 30, 2019, with Paragraph 46, which requires the Sheriff's Department to immediately interrupt, and if necessary, provide appropriate aid to, any prisoner who threatens or exhibits self-injurious behavior.  These results are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 48, which requires the Department to

8

have written housekeeping, sanitation, and inspection plans to ensure proper cleaning.

The County has maintained Substantial Compliance for twelve consecutive months as of February 28, 2017, with Paragraph 49, which requires the Department to have maintenance plans to respond to routine and emergency maintenance needs.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2017, with Paragraph 50, which requires pest control in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2017, with Paragraph 51, which requires the Department to ensure that all prisoners have access to basic hygiene supplies in accordance with state regulations.

The County has maintained Substantial Compliance for twelve consecutive months at CRDF and PDC North with Paragraph 55, which requires custody, medical and mental health staff to meet daily in High Observation Housing and weekly in Moderate Observation Housing.  The County has also maintained Substantial Compliance as of April 1, 2018, through December 31, 2018, at MCJ.  The County has maintained Substantial Compliance as of July 1, 2019, through September 30, 2019, at TTCF.  The County also has provided documentation reflecting that it maintained Substantial Compliance as of January 1, 2019, through March 31, 2019, at MCJ.  The results at MCJ are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 56, which requires custody, medical, and mental health staff to communicate regarding any change in a housing assignment following a suicide attempt or serious change in mental health condition.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2018, at MCJ with Paragraph 57, which requires safety checks in mental health housing.

The County has maintained Substantial Compliance for twelve consecutive months at PDC South, PDC North, and PDC East as of December 31, 2016, at CRDF as of June 30, 2018, and at IRC as of September 30, 2018, with Paragraph 58, which requires safety checks in non-mental health housing.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2019, with Paragraph 59, which requires unannounced daily supervisory rounds to verify safety checks.

The County has achieved Substantial Compliance with Paragraph 60, as of July 1, 2019, through December 31, 2019, which requires the implementation of a quality improvement plan.

The County has maintained Substantial Compliance for twelve consecutive
months at MCJ, NCCF, PDC East, PDC North, PDC South, and TTCF with Paragraph
68, which requires staggered contraband searches in housing units.

The County has maintained Substantial Compliance for twelve consecutive
months as of June 30, 2019, with Paragraph 69, which requires the County and the
Sheriff to use clinical restraints only in the Correctional Treatment Center with the
approval of a licensed psychiatrist who performed an individualized assessment.

The County has maintained Substantial Compliance for twelve consecutive
months as of June 30, 2017, with Paragraph 71, which requires the County and the
Sheriff to ensure that any prisoner subjected to clinical restraints in response to a mental
health crisis receives therapeutic services to remediate any effects from the restraints.

The County has maintained Substantial Compliance for twelve consecutive
months as of December 31, 2017, with Paragraph 72, which requires the Department and
the County to report on meetings to review suicides and incidents of serious self-injurious
behavior.

The County has maintained Substantial Compliance for twelve consecutive
months as of September 30, 2018, with Paragraph 73, which requires the Department to
prepare detailed reports of prisoners who threaten or exhibit self-injurious behavior.

The County has maintained Substantial Compliance for twelve consecutive
months as of December 31, 2017, with Paragraph 74, which requires the Department to
have an objective law enforcement investigation of every suicide that occurs in the jails.

The County has maintained Substantial Compliance for twelve consecutive
months as of September 30, 2018, with Paragraph 75, which requires the Department and
the County to review every serious suicide attempt that occurs in the jails.

The County has maintained Substantial Compliance for twelve consecutive
months as of December 31, 2017, with Paragraph 76, which requires the Department to
follow certain procedures whenever there is an apparent or suspected suicide.

The County has maintained Substantial Compliance for twelve consecutive
months as of May 18, 2017, with Paragraph 78, which requires the Suicide Prevention
Advisory Committee to meet twice a year.

The County has maintained Substantial Compliance for twelve consecutive
months as of December 31, 2017, with Paragraph 82, which requires the Department to
co-locate personnel responsible for collecting prisoners' grievances at CRDF.

The County has maintained Substantial Compliance for twelve consecutive
months as of June 30, 2019, with Paragraph 83, which requires it to install closed circuit
security cameras throughout all of the common areas in the jails.  NCCF and PDC North

must maintain inventory records as required by Paragraph 83 until March 31, 2020, and PDC South is subject to this requirement until June 30, 2020.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2018, with Paragraph 84, which requires investigations of force incidents and administrative actions to be completed timely.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2019, with Paragraph 86, which requires inventory and control of weapons.

### NINTH REPORT

18.      Within three months of the Effective Date, the County and the Sheriff will develop, and within six months of the Effective Date will commence providing:  (1) a four-hour custody-specific, scenario-based, skill development training on suicide prevention, which can be part of the eight-hour training described in paragraph 4.8 of the Implementation Plan in *Rosas* to all new Deputies as part of the Jail Operations Continuum and to all new Custody Assistants at the Custody Assistants academy; and (2) a two-hour custody-specific, scenario-based, skill development training on suicide prevention to all existing Deputies and Custody Assistants at their respective facilities, which can be part of the eight-hour training described in paragraph 4.7 of the Implementation Plan in *Rosas*, through in-service Intensified Formatted Training, which training will be completed by December 31, 2016.

These trainings will include the following topics:

(a)      suicide prevention policies and procedures, including observation and supervision of prisoners at risk for suicide or self-injurious behavior;

(b)      discussion of facility environments and staff interactions and why they may contribute to suicidal behavior;

(c)      potential predisposing factors to suicide;

(d)      high-risk suicide periods and settings;

(e)      warning signs and symptoms of suicidal behavior;

(f)      case studies of recent suicides and serious suicide attempts;

(g)      emergency notification procedures;

(h)      mock demonstrations regarding the proper response to a suicide attempt, including a hands-on simulation experience that incorporates the challenges that often accompany a jail suicide, such as cell doors being blocked by a hanging body and delays in securing back-up assistance;

(i)      differentiating between suicidal and self-injurious behavior; and

(j)      the proper use of emergency equipment.

**STATUS (18):**          **SUBSTANTIAL COMPLIANCE (as of October 1, 2017 (verified) at MCJ and PDC South)**

**SUBSTANTIAL COMPLIANCE (as of September 1, 2017 (verified) at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of December 1, 2017 (verified) at PDC East)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018 (verified) at TTCF, IRC, and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of August 1, 2018 (verified) at CRDF)**

The Monitor, in consultation with the Mental Health Subject Matter Expert, concluded in the First Reporting Period that the Department's training on suicide prevention, together with the Department's De-escalation and Verbal Resolution Training ("DeVRT"), meets the requirements of Paragraph 18.  The DeVRT curriculum was approved by the *Rosas* Monitors and the Monitor, in consultation with the Mental Health Subject Matter Expert, on November 4, 2015.  On May 30, 2017, the Monitor, in consultation with the Subject Matter Expert, approved a revision to the two-hour course on suicide prevention for existing Deputy Sheriffs and Custody Assistants.

The County's Initial Self-Assessment Status Report delivered on December 14, 2015, reported that the Department commenced its suicide prevention training for new Deputy Sheriffs and Custody Assistants on July 1, 2015, and for existing Deputy Sheriffs and Custody Assistants before the Effective Date of the Settlement Agreement.

Substantial Compliance is achieved when the Department reaches the 85% threshold for existing personnel at a facility, provided that it has achieved the 95% threshold for new personnel during the entire time from July 1, 2015 until it has reached the 85% threshold for existing personnel.

In the Fifth Reporting Period, the County reported that the Department achieved Substantial Compliance for the training of existing personnel at MCJ and PDC South as of October 1, 2017, and at NCCF as of September 1, 2017.  The County's Augmented Fifth Self-Assessment reported Substantial Compliance at PDC East as of November 1, 2017.  The results at MCJ, PDC South, and NCCF have been verified by the Monitor's auditors.

The County's Sixth Self-Assessment reported that the County had achieved Substantial Compliance at TTCF (91% of existing personnel), IRC (93%), and PDC North (97%) as of April 1, 2018.  The results at TTCF, IRC, and PDC North have been verified by the Monitor's auditors.

The County's posted results report for the Seventh Reporting Period reflected that it had achieved Substantial Compliance for the training of existing personnel at CRDF as of June 1, 2018.  The Monitor's auditors were unable to verify the results in June 2018.  However, the Monitor's auditors were able to verify the results at CRDF as of August 1, 2018.  The Department is no longer subject to monitoring at CRDF for the initial training of required by Paragraph 18.

The Department is no longer subject to monitoring for the training of new Deputies in the Jail Operations Continuum and new Custody Assistants in the Custody Assistant Academy as required by Paragraph 18.  The County's Ninth Self-Assessment reiterates, however, that "the Department continuously provides the required training for new Deputies in the Jail Operations Continuum and new Custody Assistants in the Custody Assistant Academy."

The Department is still subject to monitoring in future periods for Substantial Compliance with the refresher course requirements; the Department's reported results for the refresher courses will be subject to verification by the Monitor's auditors.

19.     Commencing July 1, 2015, the County and the Sheriff will provide:

(a)     Custody-specific, scenario-based, skill development training to new Deputies during their Jail Operations training, and to existing Deputies assigned to Twin Towers Correctional Facility, Inmate Reception Center, Men's Central Jail, the Mental Health Housing Units at Century Regional Detention Facility, and the Jail Mental Evaluation Teams ("JMET") at North County Correctional Facility as follows:

(i)     32 hours of Crisis Intervention and Conflict Resolution as described in paragraphs 4.6 and 4.9 of the Implementation Plan in *Rosas* to be completed within the time frames established in that case (currently December 31, 2016).  Deputies at these facilities will receive an eight-hour refresher course consistent with paragraph 4.6 of the Implementation Plan in *Rosas* every other year until termination of court jurisdiction in that case and then a four-hour refresher course every other year thereafter.

(ii)    Eight hours identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas* to be completed by December 31, 2016.  This training requirement may be a part of the 32-hour training described in the previous subsection.  Deputies at these facilities will receive a four-hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

(b)     Commencing July 1, 2015, the County and the Sheriff will ensure that new Custody Assistants receive eight hours of training in the Custody Assistant academy, and that all existing Custody Assistants receive eight hours of training related to identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas*.  This training will be completed by December 31, 2016.  Custody Assistants will receive a four-hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

**STATUS (19):**    **SUBSTANTIAL COMPLIANCE (as of April 1, 2018, (verified) at NCCF, MCJ, and IRC)**

        **SUBSTANTIAL COMPLIANCE (as of July 1, 2018, (verified) at TTCF)**

        **SUBSTANTIAL COMPLIANCE (as of December 1, 2018 (verified) at CRDF, PDC East, and PDC North)**

        **SUBSTANTIAL COMPLIANCE (as of March 1, 2019 (verified) at PDC South)**

As of November 4, 2015, the Monitor, in consultation with the Mental Health Subject Matter Expert and the *Rosas* Monitors, approved the curriculum for DeVRT, which provides for 32 hours of Crisis Intervention and Conflict Resolution training and includes eight hours identifying and working with mentally ill prisoners.  The DeVRT curriculum meets the requirements of Paragraph 19 of the Settlement Agreement and Paragraphs 4.6, 4.7, and 4.9 of the *Rosas* Implementation Plan.  The Mental Health Subject Matter Expert and the *Rosas* Monitors approved the training materials developed by the Department for the DeVRT on March 4, 2016.

Substantial Compliance requires the County to show that 95% of the new Deputies hired after July 1, 2015 and 85% of the existing Deputies as of that date received the required DeVRT training.  It also requires that 95% of the new Custody Assistants hired after that date and 85% of the existing Custody Assistants as of that date received the required training in working with mentally ill inmates.

The County's Sixth Self-Assessment reported that the Department had achieved Substantial Compliance with respect to the training of existing Deputies and Custody Assistants at IRC, MCJ, CRDF, TTCF, and NCCF (JMET) in the First Quarter of 2018. The Department trained 95% of the existing Deputy Sheriffs and 89% of the existing Custody Assistants at TTCF by the end of the First Quarter of 2018; 100% of existing Deputies and 98% of existing Custody Assistants at IRC; 99% of existing Deputies and 92% of existing Custody Assistants at MCJ; and 100% of the existing Deputies in the JMET unit at NCCF.[7]

Using the Monitor's approved definition of "unavailable" personnel,[8] the Department's revised results for the Sixth Reporting Period reflected that it had trained 98% of the existing Deputies and 88% of the existing Custody Assistants at IRC through March 2018; 99% of the existing Deputies and 85% of the existing Custody Assistants at MCJ through March 2018; and 95% of existing Deputies and 89% of existing Custody Assistants at TTCF through June 2018.  These results have been verified by the Monitor's auditors and the Department was not subject to monitoring at these Downtown Jail

---

[7] There were no Custody Assistants assigned to the unit.
[8] Deputies and Custody Assistants are not deemed "unavailable" unless they have been on leave or otherwise unavailable for more than six months as of the date of the assessment.

facilities for the initial training required by Paragraph 19 during the Ninth Reporting
Period.

The County's Eighth Self-Assessment reported that it trained 100% of the
"existing" Deputies at CRDF through October 2018, using the approved definition of
"unavailable" personnel, and 94% of the existing Custody Assistants through November
2018.  These results have been verified by the Monitor's auditors and the Department was
not subject to monitoring at CRDF for the initial training of existing personnel at CRDF
required by Paragraph 19 during the Ninth Reporting Period.

Finally, the Department reported that it had trained 93% of the existing Custody
Assistants at PDC South as of February 2019, and 94% at PDC North, 100% at PDC
East, and 97% at NCCF as of January 2019.  These results have been verified by the
Monitor's auditors and the Department was not subject to monitoring at NCCF, PDC
East, PDC South, or PDC North for the initial training of existing Custody Assistants
required by Paragraph 19 during the Ninth Reporting Period.

The County's Seventh Self-Assessment reported that the Department achieved
Substantial Compliance at all facilities for the training of new Deputies and new Custody
Assistants through the Third Quarter of 2018.  The Eighth Self-Assessment reported that
it has achieved Substantial Compliance for the training of new Deputies and new Custody
Assistants through the First Quarter of 2019.  These reported results have been verified
by the Monitor's auditors, and the Department is no longer subject to monitoring for the
training of new Deputies in the Jail Operations Continuum and new Custody Assistants in
the Custody Assistant Academy as required by Paragraph 19.

The Department is still subject to monitoring in future periods for Substantial
Compliance with the refresher course requirements; the Department's reported results
will be subject to verification by the Monitor's auditors.  The Department reports that it
"will submit the results of its assessments [of refresher training] on [an] annual basis."

20.     Commencing no later than July 1, 2017, the County and the Sheriff will provide:

(a)     Custody-specific, scenario-based, skill development training to existing Deputies assigned to North County Correctional Facility, Pitchess Detention Center, and the non-Mental Health Housing Units in Century Regional Detention Facility as follows:

(i)     32 hours of Crisis Intervention and Conflict Resolution as described in paragraphs 4.6 and 4.9 of the Implementation Plan in *Rosas* to be completed by December 31, 2019.  Deputies at these facilities will receive an eight-hour refresher course consistent with paragraph 4.6 of the Implementation Plan in *Rosas* every other year until termination of court jurisdiction in that case and then a four-hour refresher course every other year thereafter.

(ii)     Eight hours identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas* to be completed by December 31, 2019.  This training requirement may be a part of the 32-hour training described in the previous subsection.  Deputies at these facilities will receive a four-hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

**STATUS (20):**          **SUBSTANTIAL COMPLIANCE (as of August 1, 2017 (verified) at CRDF, PDC East, PDC North, and NCCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017 (verified) at PDC South)**

As of November 4, 2015, the Monitor, in consultation with the Subject Matter Experts and the *Rosas* Monitors, approved the curriculum for the Department's De-escalation and Verbal Resolution Training ("DeVRT"), which provides for 32 hours of Crisis Intervention and Conflict Resolution training that meets the requirements of Paragraph 20 of the Settlement Agreement.

Substantial Compliance requires that 85% of existing Deputies at the facilities designated in Paragraph 20(a) as of July 1, 2017, receive the required DeVRT training. The County reported that as of August 1, 2017, 85% of the Deputies assigned to PDC East, 89% of the Deputies assigned to PDC North, 85% of the Deputies assigned to NCCF, and 91% of the Deputies assigned to the non-mental housing units at CRDF, had received the required training, and as of October 1, 2017, 96% of the Deputies assigned to PDC South had received the training.  The results at CRDF, PDC East, PDC North, PDC South, and NCCF have been verified by the Monitor's auditors, and these facilities were not subject to monitoring for the initial training for existing Deputies during the Ninth Reporting Period.

The Department is still subject to monitoring in future periods for Substantial Compliance with the refresher course requirements; the Department's reported results for the refresher course will be subject to verification by the Monitor's auditors.

21.     Consistent with existing Sheriff's Department policies regarding training requirements for sworn personnel, the County and the Sheriff will ensure that existing custody staff that have contact with prisoners maintain active certification in cardiopulmonary resuscitation and first aid.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of October 1, 2015, through September 30, 2016 (verified) at PDC East and South)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at NCCF, PDC North, and IRC)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 (verified) at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at MCJ)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2018, through June 30, 2019 (verified) at CRDF)**

The Compliance Measures provide that the Department will demonstrate Substantial Compliance when 95% of the designated custody staff have the required CPR and first aid certifications for twelve consecutive months.

Pursuant to Paragraph 111 of the Settlement Agreement, PDC South, PDC East, PDC North, NCCF, IRC, and TTCF were not subject to monitoring for Substantial Compliance with Paragraph 21 in the Ninth Reporting Period.

The County's Fifth Self-Assessment reported that it achieved Substantial Compliance at MCJ in October 2017, which it maintained through the remainder of 2017. These results have been verified by the Monitor's auditors. The County's Sixth Self-Assessment reported that the Department continued to maintain Substantial Compliance at MCJ through the First Quarter of 2018. The County's Seventh Self-Assessment reported that it continued to maintain Substantial Compliance at MCJ through the Third Quarter of 2018. These results have been verified by the Monitor's auditors and Paragraph 21 is no longer subject to monitoring at MCJ.

The County's Ninth Self-Assessment reflects that it has maintained Substantial Compliance with Paragraph 21 at CRDF for twelve consecutive months through the end of the Second Quarter of 2019. These results have been verified by the Monitor's auditors and Paragraph 21 is no longer subject to monitoring at CRDF.

22.     Within six months of the Effective Date and at least annually thereafter, the County and the Sheriff will provide instructional material to all Sheriff station personnel, Sheriff court personnel, custody booking personnel, and outside law enforcement agencies on the use of arresting and booking documents, including the Arrestee Medical Screening Form, to ensure the sharing of known relevant and available information on prisoners' mental health status and suicide risk.  Such instructional material will be in addition to the training provided to all custody booking personnel regarding intake.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017)**

The Justice Data Interface Controller ("JDIC") message the Department has been using since June 29, 2016, is sufficient to establish Substantial Compliance with Paragraph 22, and the County maintained Substantial Compliance for twelve consecutive through June 30, 2017.  Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring for Substantial Compliance with Paragraph 22 in the Ninth Reporting Period.

23.     Within three months of the Effective Date, the County and the Sheriff will commence a systematic review of all prisoner housing, beginning with the Mental Health Unit of the Correctional Treatment Center, all High Observation Housing areas, all Moderate Observation Housing areas, single-person discipline, and areas in which safety precautions are implemented, to reduce the risk of self-harm and to identify and address suicide hazards.  The County and the Sheriff will utilize a nationally-recognized audit tool for the review.  From this tool, the County and the Sheriff will:

(a)     develop short and long term plans to reasonably mitigate suicide hazards identified by this review; and

(b)     prioritize planning and mitigation in areas where suicide precautions are implemented and seek reasonable mitigation efforts in those areas.

**STATUS:        SUBSTANTIAL COMPLIANCE**

The Monitor has verified, with the advice of the Subject Matter Expert, that the Department's Suicide Hazard Inspection Check List tool is a nationally recognized audit tool for this review.  The Department reports that it inspected all of the housing units by January 14, 2016, and it has provided the Monitor with completed checklists documenting the inspections.

The County submitted an updated Suicide Hazard Mitigation plan to the Monitor on January 18, 2018.  After consultation with the Mental Health Subject Matter Expert, the Monitor concluded that the updated Plan satisfies the requirements of Paragraph 23.

The Department submitted another updated plan to the Monitor on July 12, 2018.  After consultation with the Mental Health Subject Matter Expert, the Monitor concluded that the updated Plan satisfies the requirements of Paragraph 23.  The County maintained Substantial Compliance with Paragraph 23 for twelve consecutive months and this provision was not subject to monitoring during the Ninth Reporting Period.

24.     The County and the Sheriff will review and inspect housing areas on at least an annual basis to identify suicide hazards.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018)**

CDM 3-06/020.00 FACILITIES INSPECTIONS requires Custody Support Services (CSS) to "review and inspect housing areas on a least an annual basis to identify suicide hazards."

The Monitor and Subject Matter reviewed a revised annual suicide hazard inspection tool that was submitted by the Department on December 13, 2016, and approved it with the caveat that, in order to achieve Substantial Compliance, the sample sizes of randomly selected cells must be large enough to ensure that the cells are representative of each housing type at a facility.  Further, if a problem is found in the randomly selected cells, a complete inspection or remediation of the area or setting should then be conducted.  An updated tool was submitted by the Department on February 9, 2017; it also was approved with the same caveats.

The Department conducted an Annual Suicide Hazard Inspection at each of its jail facilities during the Sixth and Seventh Reporting Periods.  The Department maintained Substantial Compliance with this provision for twelve consecutive months in the Sixth and Seventh Reporting Periods, and it was not subject to monitoring during the Ninth Reporting Period.  As the Monitor has noted, however, implementation and tracking of corrective actions must be addressed by the Custody Compliance and Sustainability Bureau ("CCSB") under Paragraph 77(c), which requires CCSB to "ensure that corrective actions are taken to mitigate suicide risk. . . obtaining where appropriate, technical assistance. . .when such assistance is needed to address suicide-risk issues."

25.     The County and the Sheriff will ensure that any prisoner in a Sheriff's Department station jail who verbalizes or who exhibits a clear and obvious indication of current suicidal intent will be transported to IRC, CRDF, or a medical facility as soon as practicable.  Pending transport, such prisoners will be under unobstructed visual observation, or in a suicide resistant location with safety checks every 15 minutes.

**STATUS:       PARTIAL COMPLIANCE**

A provision of the Station Jail Manual adopted in March 2018 requires that any arrestee who "displays obvious suicidal ideation or exhibits unusual behavior that clearly manifest[s] self-injurious behavior or other clear indication of mental health crisis shall be transported to the Inmate Reception Center (IRC), Century Regional Detention Facility (CRDF), or a medical facility as soon as practicable.  Pending transport, such inmates . . . shall be under unobstructed visual observation or in a suicidal restraint location with safety checks every 15 minutes."

The Compliance Measures require the Department to randomly select and analyze Arrestee Medical Screening Forms from station jails identifying prisoners who verbalize or exhibit a clear and obvious indication of current suicidal intent to determine compliance with Paragraph 25 of the Agreement.  The County's Ninth Self-Assessment reports that 83%, "rather than the required 95%" of the records reviewed for the Second Quarter of 2019 reflect the information required to establish Substantial Compliance with Paragraph 25, and a drop-off to 69% for the Third Quarter of 2019.  The Mental Health Subject Matter Expert noted that, unlike in past reporting periods, there were many fewer cases where the cell checks occurred exactly every 15 minutes, "though still more than desirable."

26.     Consistent with existing Sheriff's Department policies, the County and the
Sheriff will follow established screening procedures to identify prisoners with emergent
or urgent mental health needs based upon information contained in the Arrestee Medical
Screening Form (SH-R-422) or its equivalent and the Medical/Mental Health Screening
Questionnaire and to expedite such prisoners for mental health evaluation upon arrival at
the Jail Reception Centers and prior to routine screening.  Prisoners who are identified as
having emergent or urgent mental health needs, including the need for emergent
psychotropic medication, will be evaluated by a QMHP as soon as possible but no later
than four hours from the time of identification.

**STATUS:       PARTIAL COMPLIANCE**

The Compliance Measures require the Department to "review Arrestee Medical
Screening Forms (SH-R-422) (or its equivalent) and the Medical/Mental Health
Screening Questionnaires of 100 randomly selected prisoners during one randomly
selected week per quarter at CRDF and at IRC."  Substantial Compliance requires that (1)
95% of the forms "include the required mental health information" and (2) 90% of the
prisoners having urgent or emergent needs were "seen by a QMHP within four hours."

The County's Ninth Self-Assessment reports that for the one randomly selected
week in the Second Quarter of 2019, 82% of the screening forms reviewed had the
required mental health information, and 74% of the prisoners were seen by a QMHP
within four hours.  For the Third Quarter of 2019, 85% of the forms had the required
information and 76% of the prisoners were seen within four hours.  The results in the
Ninth Reporting period were somewhat below the results for the First Quarter of 2019.

The Mental Health Subject Matter Expert and the clinicians did a qualitative
assessment of the Department's results during a site visit in September 2019.  They
assessed the "completeness of intake documentation" and "whether patients with
emergent or urgent needs were missed at intake[.]"  They "found that 95% of the intake
documentation was complete and available," and that 86% "of urgent/emergent cases that
should have been detected were identified."  They believe that the County is "generally
doing well at detecting people with urgent and emergent needs and remains very close to
Substantial Compliance with the mental health intake process."  Nevertheless, in light of
the reported results, DOJ suggests that the County should examine "why a QMHP is not
seeing inmates who require an evaluation within four hours, and consider making this a
CAP as part of its CQI process."  The Mental Health Subject Matter Expert agrees with
this suggestion.

27.     Consistent with existing Sheriff's Department policies, the County and the Sheriff will ensure that all prisoners are individually and privately screened by Qualified Medical Staff or trained custody personnel as soon as possible upon arrival to the Jails, but no later than 12 hours, barring an extraordinary circumstance, to identify a prisoner's need for mental health care and risk for suicide or self-injurious behavior.  The County and the Sheriff will ensure that the Medical/Mental Health Screening Questionnaire, the Arrestee Medical Screening Form (SH-R-422), or its equivalent, and/or the Confidential Medical Mental Health Transfer Form are in the prisoner's electronic medical record or otherwise available at the time the prisoner is initially assessed by a QMHP.

**STATUS:      PARTIAL COMPLIANCE**

The Compliance Measures require the Department to review the records of "randomly selected prisoners who were processed for intake during one randomly selected week at CRDF and at IRC" to determine compliance with this provision. Substantial Compliance requires that 90% of the records reviewed reflected that the prisoners were screened for mental health needs within 12 hours and that the required documentation was available to the QMHP for 90% of the mental health assessments conducted by the QMHP.

The County's Ninth Self-Assessment reflects that it maintained Substantial Compliance with Paragraph 27 in the Second Quarter of 2019, when "93% -- 3% more than the required 90% -- of inmates" were assessed by qualified personnel within 12 hours, and 100% of the required documents were available to a QMHP prior to the assessment.  The County's amended posted results reflect that 89% of the inmates were timely assessed, which falls below the 90% threshold for Substantial Compliance, and that the "required documents were available" for 96% of the assessments.

During a September site visit, the Mental Health Subject Matter Expert and the clinicians did a qualitative assessment of the "completeness of intake documentation" and "focused on whether patients with routine needs were missed at intake[.]"  They found "that 93% of the intake documentation was completed and available," and 89% "of routine cases that should have been detected were detected."  This is similar to previous findings.

28.     The County and the Sheriff will ensure that any prisoner who has been identified during the intake process as having emergent or urgent mental health needs as described in Paragraph 26 of this Agreement will be expedited through the booking process.  While the prisoner awaits evaluation, the County and the Sheriff will maintain unobstructed visual observation of the prisoner when necessary to protect his or her safety, and will conduct 15-minute safety checks if the prisoner is in a cell.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at IRC)**

**PARTIAL COMPLIANCE (at CRDF)**

The Compliance Measures require the Department to review the records of randomly selected prisoners at CRDF and IRC who have urgent or emergent mental health needs to determine whether they were expedited through the booking process and under visual observation or checked every 15 minutes.

The County's posted Self-Assessment reflects that in the Second Quarter of 2019, only 20% of the inmates (two out of 10 in the randomly selected week) with urgent or emergent mental health needs were expedited through the booking process at CRDF as required by Compliance Measure 28.2[9] and only 40% of the inmates (two out of five) identified as having urgent or emergent mental health needs were observed or checked as required by Compliance Measure 28.4.[10]  In the Third Quarter of 2019, 66% of these inmates were expedited through booking and 40% were observed or checked as required.  The results at CRDF are disappointing, and are significantly below the results for the First Quarter of 2019, when CRDF achieved Substantial Compliance.

The County has acknowledged the "shortcomings" at CRDF "with respect to unobstructed observation and 15 minute safety checks."  It reports that "CRDF is renovating a key housing area. . . to ensure that inmates requiring unobstructed observation and expedited mental health or medical care are so observed and quickly evaluated.  CRDF expects the renovations to be completed early in Second Quarter 2020."

The County previously maintained Substantial Compliance with Paragraph 28 at IRC for twelve consecutive months, and IRC was not subject to monitoring for compliance with Paragraph 28 in the Ninth Reporting Period.

---

[9] Although Compliance Measure 28.2 requires the County to "review the records of 25 randomly selected prisoners at CRDF. . .who have been identified as having urgent or emergent mental health needs" in one randomly selected week per quarter, there were only ten such prisoners identified in the week selected for the Second Quarter of 2019.

[10] In August 2017, the Monitor agreed that the County could review three (later five) randomly selected videos in lieu of unannounced visits because inmates with urgent or emergent mental health needs were rarely in the CRDF reception center during the visits.

29.     The County and the Sheriff will ensure that a QMHP conducts a mental health assessment of prisoners who have non-emergent mental health needs within 24 hours (or within 72 hours on weekends and legal holidays) of a registered nurse conducting an intake nursing assessment at IRC or CRDF.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified))**

The Compliance Measures require the Department to review randomly selected records of the prisoners identified in the intake nursing assessment as having non-emergent mental health needs to determine if the Department completed mental health assessments for 85% of the prisoners within the required time periods.

The County's Sixth Self-Assessment reported that in the Fourth Quarter of 2017 the County completed mental health assessments for 99% of the inmates at CRDF and IRC within the required time periods, and in the First Quarter of 2018, it completed 95% of the assessments within the required time periods.  The Monitor's auditors verified the County's results.  Accordingly, the County previously maintained Substantial Compliance for twelve consecutive months and was not subject to monitoring for compliance with Paragraph 29 in the Ninth Reporting Period.

30.     Consistent with existing DMH policies, the initial mental health assessment will include a brief initial treatment plan.  The initial treatment plan will address housing recommendations and preliminary discharge information.  During the initial assessment, a referral will be made for a more comprehensive mental health assessment if clinically indicated.  The initial assessment will identify any immediate issues and determine whether a more comprehensive mental health evaluation is indicated.  The Monitor and SMEs will monitor whether the housing recommendations in the initial treatment plan have been followed.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of January 1, 2019, through September 30, 2019 (unverified))**

The Compliance Measures require the Department to review randomly selected initial mental health assessments and report on (1) the percentage of assessments that have (i) included an initial treatment plan that addresses housing recommendations and preliminary discharge information and (ii) identified any immediate issues and whether a more comprehensive evaluation was indicated; and (2) whether the housing recommendations were followed.

The County's Ninth Self-Assessment reports that 100% of the housing assignments reviewed in the Second Quarter of 2019 followed the housing recommendations in the initial treatment plans and 88% of the initial mental health assessments included an initial treatment plan that had the information required by Paragraph 30, which is above the 85% threshold for Substantial Compliance.  The results for the Third Quarter of 2019 were that 100% of the housing assignments followed the housing recommendations and 90% of the initial mental health assessments had the required information.

The Monitor's auditors were unable to verify the Substantial Compliance results because in many cases the Initial Release Plan did not indicate whether the inmate was asked if he or she had a California ID.  Because the Initial Release Plan is covered by amended Paragraph 34, the parties have agreed that the County's compliance with Paragraph 30 will require an assessment of preliminary discharge information at intake that includes "housing, mental health and/or substance abuse treatment, a discussion of benefits or income, physical health care issues, and whether the patient needs assistance with release planning."

DOJ expressed concern about inmates "dropped [by the County] from the sample because they were released before they were housed . . . [who] failed measures 30-1(a) and 33-3 (Pt. 1) (sic), and it is therefore likely they would have failed 30-3(Pt. 2) had they been included."  These inmates were included in the universe of inmates who were required to have "an initial treatment plan that addressed housing recommendations and preliminary discharge information" required by 30-1(a) and 30-3(Pt 1), but were excluded from the inmates subject to Compliance Measure 30-3(Pt 2) because they were released before being housed.[11]  Compliance Measure 30-3(Pt 2) requires that "the

---

[11] The Monitor is not aware of any other "inmates being excluded from review."

housing assignments *follow* the recommendations," and it is not  applicable to inmates
who are discharged from IRC before they were housed.  To the extent that DOJ has other
concerns about "initial treatment plans that the County marked compliant," the County's
reported results are subject to verification by the Monitor's auditors.

 During a September 2019 site visit, the Mental Health Subject Matter Expert and
the clinicians again evaluated "whether the determination of immediate issues [in the
random sample of mental health assessments] was reasonable in light of available
information. . . [and] whether the initial treatment plan covered the elements required by
existing County policy, which goes beyond the content of the formal compliance
measure."  They again found that 96% of the cases "identified immediate issues," and that
the determination of the immediate issues "was reasonable from a qualitative perspective"
in 98% of the cases.  The Subject Matter Expert again concludes that the County "should
achieve substantial compliance," if the County's Self-Assessment shows that it has
satisfied the required quantitative thresholds.

31.     Consistent with existing DMH and Sheriff's Department policies, the County and the Sheriff will maintain electronic mental health alerts in prisoners' electronic medical records that notify medical and mental health staff of a prisoner's risk for suicide or self-injurious behavior.  The alerts will be for the following risk factors:

(a)     current suicide risk;

(b)     hoarding medications; and

(c)     prior suicide attempts.

**STATUS:     PARTIAL COMPLIANCE**

The Compliance Measures require the Department to review randomly selected electronic medical records for prisoners in certain at-risk groups to determine if the required mental health alerts are in 85% of the records reviewed, which is the threshold for Substantial Compliance, for prisoners who report suicidal thoughts (at suicide risk) during the intake process; were removed from risk precautions in the prior quarter; or were identified as hoarding medicine.

The County's Ninth Self-Assessment reports the following results for the Second Quarter of 2019: at CRDF, 96% (current suicide risk), and 72% (removed from risk precautions), of the records had the required mental health alerts; at TTCF, 96% (current suicide risk), and 64% (removal from risk precautions) had the alerts.  The County's subsequently posted results for the Third Quarter of 2019 reflect that at CRDF 92% had the alerts for current suicide risk, and 87% for removal from risk precautions; and at TTCF 92% had alerts for current suicide risk and 58% for removal from risk precautions.

The County's Ninth Self-Assessment reports that the County continued "to have concerns regarding the consistency with which those inmates [disciplined for having contraband pills] are referred to nursing by custody staff for consideration of whether a hoarding alert is appropriate or necessary."  Accordingly, the County did not post any completed hoarding results at any of the facilities housing mentally ill inmates at risk of suicide or self-injurious behavior,[12] although it did post partial results based upon "referrals from nursing to mental health related to hoarding" and "suspected or confirmed overdoes from medication" as follows: at CRDF, 100% had the alerts in the Second Quarter of 2019, and 50% in the Third Quarter of 2019; at TTCF 90% and 65% had the alerts in the Second and Third Quarters respectively; at MCJ 50% and 58% had the alerts; and at PDC North 0% and 54% had the alerts.  For NCCF, the County posted results showing 66% had the alerts in the Second Quarter, but there were no results for the Third Quarter.

---

[12] As suggested by DOJ, the Monitor and Mental Health Subject Matter Expert concur that the County needs to "explain its plan for addressing the concerns regarding the consistency with which those inmates [disciplined for having contraband pills] are referred to nursing by custody staff for consideration of whether a hoarding alert is appropriate or necessary."

Although mental health alerts are required for all prisoners who have a "risk of suicide or self-injurious behavior," the County did not report any results for current suicide risk or removal from risk precautions for the inmates at MCJ, NCCF or PDC North because "Compliance Measures 31-1(a) and 31-1(b) refer to the intake and HOH populations respectively."  While the County does not have to randomly select prisoners at MCJ, NCCF, or PDC North to achieve Substantial Compliance, it must still show that these "alerts [for current suicide risk or removal from risk precautions] are not being discontinued inappropriately" or it has "processes that are likely to prevent that from occurring."

In response to the draft of this Report that the Monitor circulated to the parties for comment, the County reports that if inmates at these facilities are

identified as being appropriate for risk precautions they are transported to TTCF for evaluation and placement in mental health housing with the appropriate level of supervision and care.  The removal of risk precautions (Compliance Measure 31-1(b)) for inmates who are removed from risk precautions and later transported to MCJ, NCCF or PDC is the same process that would be followed if any such inmate was taken off risk precautions and moved from HOH to MOH within TTCF.

To achieve Substantial Compliance at MCJ, NCCF, or the PDC facilities, however, the County needs to provide evidence that medical alerts are in the medical records of inmates who were removed from risk precautions prior to being transferred to these facilities.  Further, the County should indicate whether there are any inmates housed at these facilities who are deemed to be a "current suicide risk" and, if so, whether the required alerts are in their medical records.

32.      Information regarding a serious suicide attempt will be entered in the prisoner's electronic medical record in a timely manner.

**STATUS:**       **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified))**

The Compliance Measures require that 95% of the electronic medical records of prisoners who had a serious suicide attempt reflect information regarding the attempt, and 85% of the records reflect that the information was entered into the record within one day of the attempt.

The County maintained Substantial Compliance with Paragraph 32 for twelve consecutive months as of December 31, 2016, and this provision was not subject to monitoring in the Ninth Reporting Period.

33.     The County will require mental health supervisors in the Jails to review electronic medical records on a quarterly basis to assess their accuracy as follows:

(a)     Supervisors will randomly select two prisoners from each clinician's caseload in the prior quarter;

(b)     Supervisors will compare records for those prisoners to corroborate clinician attendance, units of service, and any unusual trends, including appropriate time spent with prisoners, recording more units of service than hours worked, and to determine whether contacts with those prisoners are inconsistent with their clinical needs;

(c)     Where supervisors identify discrepancies through these reviews, they will conduct a more thorough review using a DMH-developed standardized tool and will consider detailed information contained in the electronic medical record and progress notes; and

(d)     Serious concerns remaining after the secondary review will be elevated for administrative action in consultation with DMH's centralized Human Resources.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017 (verified))**

The Compliance Measures require the County to provide the Monitor and the Subject Matter Experts with the DMH-developed standardized tool required by Paragraph 33(c), and to report the results of its analysis of the electronic medical records of two randomly selected prisoners from each clinician's caseload. The County has provided the required tool, and previously reported Substantial Compliance for the Third and Fourth Quarters of 2016, and the First and Second Quarters of 2017.

The Monitor's auditors have verified the County's previously reported results. Accordingly, the County maintained Substantial Compliance for twelve consecutive months and was no longer subject to monitoring for compliance with Paragraph 33 during the Ninth Reporting Period.

34 **(Revised).**  Consistent with existing Correctional Health Services policy, the
County and the Sheriff will conduct clinically appropriate release planning for all
prisoners who are being released to the community and who have been identified by a
QMHP as having a mental illness and needing mental health treatment, or as having a
DSM-5 major neuro-cognitive disorder that caused them to be housed in the Correctional
Treatment Center at any time during their current incarceration.  For prisoners with
mental illness and needing mental health treatment, the release planning services will be
guided by the prisoner's level of care.  Specifically, prisoners who any time during their
incarceration meet mental health level of P3, or P4 will be presumptively referred for
release planning services, and prisoners who meet mental health level of care P2 will
receive release planning services upon referral by a clinician or upon their request.
Prisoners who have a DSM-5 major neuro-cognitive disorder that caused them to be
housed in the Correctional Treatment Center will also be referred for release planning
services consistent with the Correctional Health Services policy applying to prisoners
with mental illness.

(a) Release planning will consider the need of the prisoner for housing;
transportation to the prisoner's community-based provider, residence, or shelter
within the County; bridge psychotropic medications; medical/mental
health/substance abuse services; income/benefits establishment; and
family/community/social supports ("Release Planning Areas").

(b) Release planning will be based on an individualized assessment of the
prisoner's needs and, unless the prisoner is unable or unwilling to participate, will
be undertaken in collaboration with the prisoner.  For prisoners referred for
release planning services, those services will include:

(i) An Initial Release Plan that will be created at intake or no later than ten
days after the referral for release planning, which referral shall normally
occur at the time of intake.  The Initial Release Plan will include
preliminary identification of needs in each of the Release Planning Areas
and preliminary recommendations for services to address those needs, and
a referral for assistance in obtaining California identification when needed
and when the prisoner is eligible; and/or

(ii) A Comprehensive Release Plan that will be initiated no later than
thirty days after the referral for release planning.  The Comprehensive
Release Plan will include (A) collecting information regarding the
prisoner's needs; (B) coordinating with community-based providers to
identify available services that meet the prisoner's needs; (C) facilitating
the transition of care to community-based providers, and (D) assisting in
obtaining identification and/or benefits when needed, when the prisoner is
eligible, and as offered by the Sheriff's Community Transition Unit.

(c) The County will maintain a re-entry resource center with staff supervised by a
QMHP.  The re-entry resource center will:

35

(i) Provide information appropriate to the released prisoner about available housing, transportation, medical/mental health/substance abuse services, income/benefits establishment, community/social supports, and other community resources; and

(ii) Provide released prisoners with copies of their release plans, as available.

(d) All prisoners who are receiving and continue to require psychotropic medications will be offered a clinically appropriate supply of those medications upon their release from incarceration.  Unless contraindicated, this will be presumed to be a 14-day supply or a supply with a prescription sufficient so that the prisoner has the psychotropic medication available during the period of time reasonably necessary to permit the prisoner to consult with a doctor and obtain a new supply.

(e) Nothing in Paragraph 34 will require prisoners to accept or participate in any of the services provided under this Paragraph.

(f) Neither the County nor the Sheriff shall be in violation of this paragraph if after reasonable efforts as set forth in Correctional Health Services Policy M380.01, Release Planners are unable to identify available post-release services.

36

**STATUS (34):**          **PARTIAL COMPLIANCE**

During the Seventh Reporting Period, the parties and the Intervenors reached an agreement on the provisions of revised Paragraph 34 ("Revised Paragraph 34") set forth above.  They also agreed on revised Compliance Measures and a revised policy to implement Revised Paragraph 34.  On December 10, 2018, the Court issued an order pursuant to the parties' joint stipulation revising Paragraph 34.

The County's Augmented Ninth Self-Assessment reports that the during the first reporting period for Revised Paragraph 34, "the County's, and the Department's, efforts to date have involved significant revision and restructuring of the release, and release planning, processes as required by the Revised Provision and related Compliance Measures."

On April 17, 2019, the Monitor and Mental Health Subject Matter Expert met with the Director of Care Transitions and other staff involved in the release planning and release processes, the Department, the Department of Justice, and Intervenors' counsel to review the County's "oversight" of the Release Planning Process as required by Compliance Measure 34-3.

During the Ninth Reporting Period, the Monitor approved the Department's signage and pamphlet regarding the Community Re-Entry Resource Center ("CRRC"); and the signage regarding availability of delayed release under Penal Code section 4024(b)(1) as required by Compliance Measure 34-4.  The Monitor approved the Department's placement of the signage at TTCF on December 20, 2019 and the placement of the signage at CRDF during a site visit on January 14, 2020, as required by Compliance Measure 34-5.

On January 3, 2020, "the County circulated revised formats for preliminary release information, Initial Release Plan, Comprehensive Release Plan, as well as a template of its proposed Exit Checklist for review and approval by the Monitor."  After consulting with the Mental Health Subject Matter Expert and taking into consideration the comments of DOJ, on February 10, 2020, the Monitor approved the revised formats of these documents, subject to one addition to the Exit Checklist.

The County also reports that it "established a mechanism by which community-based providers can communicate with Release Planners, as required by Compliance Measure 3-7.  On or about December 26, 2019, the County mailed a letter to more than 500 such community-based providers informing them of that mechanism and providing relevant phone numbers, email addresses and other contact information for providers to gather release information or contact a Release Planner."

35.     Consistent with existing DMH and Sheriff's Department policies, the County and the Sheriff will ensure that custody staff, before the end of shift, refer prisoners in general or special populations who are demonstrating a potential need for routine mental health care to a QMHP or a Jail Mental Evaluation Team ("JMET") member for evaluation, and document such referrals.  Custody staff will utilize the Behavior Observation and Referral Form.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of November 1, 2017, through December 31, 2018 (verified))**

The Compliance Measures require the Department to review, for a randomly selected month each quarter, the Behavior Observation and Mental Health Referral ("BOMHR") records for prisoners referred by custody staff to a QMHP or JMET member for "routine" mental health care to determine the timeliness of the referrals.  Substantial Compliance requires that "85% of the BOMHR forms reflect that the referral occurred before the end of the shift in which the potential need for mental health care is identified."

The Monitor's auditors verified the County's previously reported result and the County was not subject to monitoring for compliance with Paragraph 35 in the Ninth Reporting Period.

36.     Consistent with existing DMH policies, the County and the Sheriff will ensure that a QMHP performs a mental health assessment after any adverse triggering event, such as a suicide attempt, suicide threat, self-injurious behavior, or any clear decompensation of mental health status.  For those prisoners who repeatedly engage in such self-injurious behavior, the County will perform such a mental health assessment only when clinically indicated, and will, when clinically indicated, develop an individualized treatment plan to reduce, and minimize reinforcement of, such behavior.  The County and the Sheriff will maintain an on-call system to ensure that mental health assessments are conducted within four hours following the notification of the adverse triggering event or upon notification that the prisoner has returned from a medical assessment related to the adverse triggering event.  The prisoner will remain under unobstructed visual observation by custody staff until a QMHP has completed his or her evaluation.

**STATUS:     PARTIAL COMPLIANCE**

The Compliance Measures require the Department to review randomly selected records of prisoners newly admitted to mental health housing from a lower level of care due to an adverse triggering event during two randomly selected weeks per quarter; and provide a staffing schedule for on-call services.

The County's Ninth Self-Assessment reports that during the Second Quarter of 2019, (a) "86% -- rather than the required 95% -- of inmates" identified in the two randomly selected weeks received an assessment by a QMHP within four hours as required by Compliance Measure 36-4(a); (b) 100% of the selected prisoners at both CRDF and TTCF were seen on videos "under unobstructed visual observation pending assessment;" and (c) the County achieved 100% compliance with a staffing schedule that provides on-call services 24 hours a day, 7 days a week.

The County's Augmented Ninth Self-Assessment also reports that during the Third Quarter of 2019, (a) 88% of the inmates identified in the two randomly selected weeks received an assessment by a QMHP within four hours; (b) 100% of the selected prisoners at CRDF and 80% at TTCF were seen on videos "under unobstructed visual observation pending assessment;"[13] and (c) the County achieved 100% compliance with a staffing schedule that provides on-call services 24 hours a day, 7 days a week.

During an August 2019 site visit, the Mental Health Subject Matter Expert and clinicians conducted a qualitative assessment to determine "whether the County was detecting adverse triggering events and repeated self-harm and assuring prompt assessment by a QMHP or that a plan was in place for those with repeated self-harm." They found that 97% of the identified prisoners with a single adverse triggering event were seen within 4 hours by a QMHP; in 64% of these cases "the QMHP adequately evaluated risk factors, which was an improvement from 47% during the previous qualitative assessment, but still below an earlier finding of 85%.  In only 36% was there a safety plan or crisis response to address those risk factors, which is similar to the 38%

---

[13] The results at TTCF were below the required 95% for Substantial Compliance due to an apparent miscommunication between JMET and CHS Mental Health.

during the previous qualitative assessment."  The Mental Health Subject Matter Expert
and the clinicians also found that "[w]ith regard to repeated self-harm, there were
treatment plans to address this behavior in 2/6 = 33% of cases, and the two plans did not
adequately address 'recurrent' self-harm behavior."

Based upon County's Self-Assessments, the Monitor is of the view that the
County has achieved Partial Compliance at both CRDF and TTCF.  As noted by the
Mental Health Subject Matter Expert, however,

the quantitative aspect of this Provision is improved but the qualitative
aspect, assessing the clinical adequacy of the response, remains
problematic.  The crisis responses primarily consist of brief assessments,
transfers, and placement on property restrictions.  This is not adequate in
most cases; a crisis intervention and/or brief safety plan are part of a basic
crisis response.

Compliance Measure 36-2 requires the Monitor, in consultation with the Subject
Matter Experts, to "review" the staffing schedule "to verify the adequacy of the on-call
system."  As previously noted, "while the County may have a 'staffing schedule that
provides on-call services 24 hours a day, 7 days a week,' as reflected in the County's own
reported results, it is not clear that the system is adequate."  See Monitor's Eighth Report,
p. 37.  The County reports that "[e]xecutives from DHS-CHS concur with the suggestion
that additional staffing among the clinicians who respond to these crisis calls would
reduce clinician caseloads, [and] improve the detail and quality of clinician's responses.
With respect to staffing, both TTCF and CRDF have a team of on-call clinicians
available seven days a week, with a team of on-call clinicians in the inmate reception
center during evening and overnight shifts."

37.    Sheriff's Court Services Division staff will complete a Behavioral Observation and Mental Health Referral ("BOMHR") Form and forward it to the Jail's mental health and/or medical staff when the Court Services Division staff obtains information that indicates a prisoner has displayed obvious suicidal ideation or when the prisoner exhibits unusual behavior that clearly manifests self-injurious behavior, or other clear indication of mental health crisis.  Pending transport, such prisoner will be under unobstructed visual observation or subject to 15-minute safety checks.

**STATUS:    PARTIAL COMPLIANCE**

The Compliance Measures require the Department to randomly select six courts from among the three Court Divisions each quarter, review written communications and orders that refer to a suicide risk or serious mental health crisis for a prisoner and incident reports for self-injurious behavior by prisoners appearing in the selected courts, and determine if these incidents are reflected in BOMHR forms completed by the Court Services Division staff in the selected courts.

The County's Ninth Self-Assessment reports that "90% -- equal to the required 90% -- of the incidents" involving the behavior covered by Paragraph 37 in six randomly selected courts were reflected on BOMHRs in the Second Quarter of 2019, but only 83% of the incidents in six courts were reflected on BOMHRs in the Third Quarter of 2019.  In reviewing the Department's documentation, the Monitor notes that it is not clear why safety checks were required in some cases and not in others, and why the "unobstructed visual observations or 15-minute safety checks" requirement is marked "N/A" in some cases that are, as noted by DOJ, "counted as compliant in the County's self-assessments." Paragraph 37 requires the safety checks or unobstructed visual observation in every case where "a prisoner has displayed obvious suicidal ideation or when the prisoner exhibits unusual behavior that clearly manifests self-injurious behavior, or other clear indication of mental health crisis."  The County has acknowledged these concerns and reports that it "will incorporate additional details in future assessments addressing and clarifying these situations."

38.     Consistent with existing DMH policies and National Commission on Correctional Health Care standards for jails, the County and the Sheriff will ensure that mental health staff or JMET teams make weekly cell-by-cell rounds in restricted non-mental health housing modules (e.g., administrative segregation, disciplinary segregation) at the Jails to identify prisoners with mental illness who may have been missed during screening or who have decompensated while in the Jails.  In conducting the rounds, either the clinician, the JMET Deputy, or the prisoner may request an out-of-cell interview. This request will be granted unless there is a clear and documented security concern that would prohibit such an interview or the prisoner has a documented history of repeated, unjustified requests for such out-of-cell interviews.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified))**

The Compliance Measures require the Department to review the documentation of the weekly cell-by-cell rounds and the JMET Logs for a randomly selected week each quarter to confirm that the required cell-by-cell checks were conducted and out-of-cell interviews were handled in accordance with this provision.

The County's reported results, which were verified by the Monitor's auditors, showed that it had maintained Substantial Compliance with Paragraph 38 for twelve consecutive months as of December 31, 2016.  Accordingly, pursuant to Paragraph 111 of the Settlement Agreement, Paragraph 38 was not subject to monitoring in the Ninth Reporting Period.

39.     The County and the Sheriff will continue to use a confidential self-referral system by which all prisoners can request mental health care without revealing the substance of their requests to custody staff or other prisoners.

STATUS        **SUBSTANTIAL COMPLIANCE (as of July 1, 2017, through June 30, 2018 (verified) at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2018, through June 30, 2019 (verified) and through September 30, 2019 (unverified) at PDC South)**

**PARTIAL COMPLIANCE (at PDC North and MCJ)**

**NON-COMPLIANCE (at TTCF and CRDF)**

**NOT RATED (PDC East)**

Substantial Compliance requires the Department to (a) verify that housing areas have the required forms and (b) review randomly selected self-referrals for mental health care from prisoners to confirm that (i) the referrals "were forwarded to DMH" by the Department, and (ii) that "DMH documented the timeliness and nature of DMH's response to the self-referrals[.]"  The thresholds for Substantial Compliance are that 85% of the housing areas have the required forms and 90% of the self-referrals must be forwarded by the Department to the Department of Health Services – Custody Health Services (DHS-CHS) and 90% must contain the required documentation of DHS-CHS's response.

The County's Ninth Self-Assessment reports that it achieved Substantial Compliance with Compliance Measure 39.4(a) in the Second and Third Quarters of 2019 in that more than 85% of the housing areas in all of the facilities had the self-referral forms.  Based upon a review of the County's policies and procedures, multiple tours of the facilities by the Monitor, site visits by the Subject Matter Expert and the clinicians, interviews, and the County's Ninth Self-Assessment, the Monitor remains satisfied that the Department has adequate processes and procedures for inmates to make confidential self-referrals for mental health care.

The County previously reported Substantial Compliance with Compliance Measures 39.4(b) and 4(c) at NCCF for twelve consecutive months from July 1, 2017, through June 30, 2018.  These results have been verified by the Monitor's auditors and NCCF is no longer subject to monitoring for compliance with Paragraph 39.

The County's Ninth Self-Assessment reports that 100% of the self-referrals from PDC North, CRDF, TTCF, and MCJ, were forwarded by the Department to DHS-CHS in the Second Quarter of 2019, and that DHS-CHS documented the timeliness and nature of its response in 92% of the PDC North referrals, 86% of the CRDF referrals, 18% of the TTCF referrals, and 68% of the MCJ referrals.  The County subsequently "provided

revised results reflecting that the correct compliance result [for PDC North] is 88%, just short of Substantial Compliance."[14]  The results for the other facilities were below the 90% threshold for Substantial Compliance, and the results at TTCF are not sufficient to establish Partial Compliance.  The County reports that the results for TTCF "reflect challenges in staff specifically documenting that they were seeing a patient in response to a self-referral, as a result many of the assessments items were found to be non-compliant notwithstanding the fact that the patient was seen in a timely manner because the documentation did not specifically refer to the underlying self-referral."

For the Third Quarter of 2019, the County's posted results reflect that 100% of the self-referrals from CRDF, TTCF, MCJ, and PDC North, were forwarded to DHS-CHS and that DHC-CHS documented the timeliness and nature of its response in 27% of the CRDF referrals, 42% of the TTCF referrals, 64% of the MCJ referrals, and 65% of the PDC North referrals.  These results at CRDF are not sufficient to establish Partial Compliance, particularly in light of the findings of the Mental Health Subject Matter Expert and the clinicians.[15]  They found that the self-referral system is "highly dysfunctional," particularly at CRDF and TTCF, "where the volume is more substantial." They also found that self-referrals "are not being collected and put in the record timely or reliably.  Responses to [self-referrals] are hit and miss" and many "are not actual responses, but placing a patient on a list to be seen later, which is not a response to a clinical need. . . .[T]here is often a response, but the patient needs to be seen by psychiatry, which may take up to months.  It is highly questionable to call such responses timely."[16]  In response to the Monitor's draft of this Report, "CHS reports that during the Reporting Period, TTCF experienced a specific staffing shortage among the nurse and psych techs previously assigned to review and process health causing initial delays in their handling."

---

[14] The Monitor disagrees with the County that PDC North is no longer subject to monitoring.

[15] The County reports that there were no relevant referrals from PDC South in the Second Quarter of 2019 or from PDC East in the Second or Third Quarters of 2019.  Inmates are pre-screened for mental health issues before being housed at PDC East.  If there are no relevant referrals from PDC East, it will be deemed to be in Substantial Compliance once the other PDC facilities have maintained Substantial Compliance for twelve consecutive months.

[16] Further, the Monitor and Mental Health Subject Matter Expert agree with DOJ that "appointments or actions predating self-referrals may not be counted as responses to them."

40.     The County and the Sheriff will ensure a QMHP will be available on-site, by transportation of the prisoner, or through tele-psych 24 hours per day, seven days per week (24/7) to provide clinically appropriate mental health crisis intervention services.

**STATUS:      PARTIAL COMPLIANCE**

Substantial Compliance requires the County (1) to provide the Monitor with on-call schedules for two randomly selected weeks reflecting that a QMHP was assigned 24 hours a day, seven days per week, and (2) randomly select referrals for mental health crisis intervention received by a QMHP per quarter to verify that a QMHP responded to all referrals, and 90% of the referrals within four hours.

The County's Ninth Self-Assessment reports that in the Second Quarter of 2019, a QMHP responded 100% of the time and 91% of the responses were within four hours. The Augmented Ninth Self-Assessment reports that, for the Third Quarter of 2019, the "County determined that 99% of the referrals for mental health crisis intervention services received a documented QMHP response," which is below the 100% threshold for Substantial Compliance, and 91% of the responses were within four hours, which is above the 90% threshold.[17]   The Mental Health Subject Matter Expert notes that "the County is doing much better at making timely responses to crisis calls."

During an August 2019 site visit, the Mental Health Subject Matter Expert and the clinicians found that a QMHP responded in 95% of the cases and the response was within four hours in 84% of the cases.[18]   They found that there was a "clinically appropriate crisis response" in only 51% of the cases, which is not sufficient to show Substantial Compliance with Paragraph 40.   They observed that while "most crisis responses continued to consist of change of placement and/or implementation of property restrictions, some clinicians are beginning to document crisis intervention."   The County reports that "CHS has also developed a crisis intervention template, which it expects to roll out during the next reporting period" and which it expects "will result in improved responses and supporting documentation."

---

[17] DOJ has reiterated its concerns about the number of inmates excluded from the reviews, which it notes could affect "the County's compliance percentages."   The County has explained the basis for its exclusions (many of which are not mental health crises) and indicates that "[i]n future reporting periods, additional detail will be provided for any bookings excluded from audit."

[18] They were unable to determine the timeliness in five of the cases due to a lack of time stamps.

41.     Consistent with existing DMH policies, the County and the Sheriff will implement step-down protocols that provide clinically appropriate transition when prisoners are discharged from FIP after being the subject of suicide watch.  The protocols will provide:

(a)     intermediate steps between highly restrictive suicide measures (e.g., clinical restraints and direct constant observation) and the discontinuation of suicide watch;

(b)     an evaluation by a QMHP before a prisoner is removed from suicide watch;

(c)     every prisoner discharged from FIP following a period of suicide watch will be housed upon release in the least restrictive setting deemed clinically appropriate unless exceptional circumstances affecting the facility exist; and

(d)     all FIP discharges following a period of suicide watch will be seen by a QMHP within 72 hours of FIP release, or sooner if indicated, unless exceptional circumstances affecting the facility exist.

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance requires DMH to review the medical records of all prisoners on suicide watch in FIP for one randomly selected month each quarter, and submit a report regarding the implementation of the step-down protocols and the results of its review of the medical records.  During the Fifth Reporting Period, the parties agreed to revise the Compliance Measures to increase the number of inmates subject to the step-down protocols of Paragraph 41 and ensure that the implementation of step-down protocols for FIP patients on suicide watch "ameliorate the impact of the restrictions" and have the necessary "level of precautions based upon individual assessment[s]" of the patients.

The County's Ninth Self-Assessment reports the "County finalized a revised EMR template to more meaningfully assess the County's compliance with this [revised] Compliance Measure," provided additional training, and addressed a "technological error in the Electronic Medical Record."  The County reports that only 17% of the prisoners discharged from FIP during the Second Quarter of 2019 after having been on suicide watch met the requirements in Compliance Measure 41-4.  DOJ notes that the "big issue driving noncompliance in 2Q19 seemed to be missing QMHP evaluations before inmates were removed from suicide watch."  73% of the prisoners discharged during the Third Quarter of 2019 met these requirements, which is a significant improvement.  The Mental Health Subject Matter Expert notes that "[t]here is more consistent effort to restore property on an individualized basis."

42.     Consistent with existing DMH policies, the County and the Sheriff will implement step-down protocols to ensure that prisoners admitted to HOH and placed on risk precautions are assessed by a QMHP.  As part of the assessment, the QMHP will determine on an individualized basis whether to implement "step-down" procedures for that prisoner as follows:

(a)     the prisoner will be assessed by a QMHP within three Normal business work days, but not to exceed four days, following discontinuance of risk precautions;

(b)     the prisoner is counseled to ameliorate the negative psychological impact that any restrictions may have had and in ways of dealing with this impact;

(c)     the prisoner will remain in HOH or be transferred to MOH, as determined on a case-by-case basis, until such assessment and counseling is completed, unless exceptional circumstances affecting the facility exist; and

(d)     the prisoner is subsequently placed in a level of care/housing as determined by a QMHP.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of July 1, 2019, through September 30, 2019, at TTCF)**

**PARTIAL COMPLIANCE (at CRDF)**

The County's Ninth Self-Assessment reports that for the Second Quarter of 2019 at CRDF, 100% of the medical records reviewed reflected that "inmates in HOH and placed on risk precautions were assessed by a QMHP;" but only "25% -- instead of the required 90% -- of the records reflected that the QMHP determined on an individualized basis whether to implement step-down procedures;" and "16% -- rather than the required 85% -- of the records reflected that step-down procedures were implemented per the QMHP assessment, where applicable."  At TTCF, the results in these categories for the Second Quarter of 2019 were 100%, 65%, and 14%.  There was a decrease in the overall improvement at both facilities from the prior quarter.

The County's Augmented Ninth Self-Assessment reports that in the randomly selected month for the Third Quarter of 2019, there were "no patients removed from Risk Precautions" at CRDF.  It reports that at TTCF, 100% of the records "reflected that inmates in HOH and placed on risk precautions were assessed by a QMHP;" 100% "of the records reflected that the QMHP determined on an individualized basis whether to implement step-down procedures;" and 100% "of the records reflected that step-down procedures were implemented per the QMHP assessment, where applicable."[19]

---

[19] DOJ expressed concern that during the random month in the Third Quarter of 2019 (which was picked by the Monitor, not the County), only one patient was removed from risk precautions at TTCF and none at CRDF, and therefore "the County should select another month in 3Q19 to evaluate these facilities under

The Ninth Self-Assessment reports that

> [d]uring the Ninth Reporting Period, as part of a quality improvement project, the County began tracking the disposition of high-risk inmates to determine whether they are being seen in a timely manner, whether they are being identified for and sent to higher levels of care when warranted, and if there are inmates who appear that they should have been placed on risk precaution but were not. This project follows inmates in several categories, including those: on the FIP Waitlist, the P4 list, designated for next day follow up, and those on risk precaution. During the Fourth Quarter of 2019, CHS-CPM also met with CHS psychiatrists to provide additional training regarding Provision 42 and related matters.

Based upon a review of medical records of "high risk patients," the Mental Health Subject Matter Expert notes that "the County is generally doing a good job of identifying and monitoring the high risk population despite cutting back those identified as needing Risk Precautions."

---

provision 42."  Given that the County must still maintain Substantial Compliance at TTCF for nine more months and that it must achieve Substantial Compliance and maintain it for twelve consecutive months at CRDF, there should be enough patients removed from risk precautions in future periods to ensure meaningful self-assessments from the County.  If not, it may be necessary "to expand the pool" or "specify a minimum and maximum number."

43.     Within six months of the Effective Date, the County and the Sheriff will develop and implement written policies for formal discipline of prisoners with serious mental illness incorporating the following:

(a)     Prior to transfer, custody staff will consult with a QMHP to determine whether assignment of a prisoner in mental health housing to disciplinary housing is clinically contraindicated and whether placement in a higher level of mental health housing is clinically indicated, and will thereafter follow the QMHP's recommendation;

(b)     If a prisoner is receiving psychotropic medication and is placed in disciplinary housing from an area other than mental health housing, a QMHP will meet with that prisoner within 24 hours of such placement to determine whether maintenance of the prisoner in such placement is clinically contraindicated and whether transfer of the prisoner to mental health housing is clinically appropriate, and custody staff will thereafter follow the QMHP's recommendation;

(c)     A QMHP will participate in weekly walks, as specified in paragraph 38, in disciplinary housing areas to observe prisoners in those areas and to identify those prisoners with mental health needs; and

(d)     Prior to a prisoner in mental health housing losing behavioral credits for disciplinary reasons, the disciplinary decision-maker will receive and take into consideration information from a QMHP regarding the prisoner's underlying mental illness, the potential effects of the discipline being considered, and whether transfer of the prisoner to a higher level of mental health housing is clinically indicated.

**STATUS (43):**   **SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at NCCF and PDC North)**

**PARTIAL COMPLIANCE (at CRDF, MCJ, and TTCF)**

In response to comments by the Monitor and DOJ, the Department submitted proposed revisions to its discipline policies on May 30, 2017. After consulting with the Subject Matter Experts, the Monitor provided his written comments to the Department on June 29, 2017. DOJ provided its comments to the Department the same day. On April 24, 2019, the Department submitted a proposed policy for discipline of mental health inmates, disabled inmates, and inmates with special needs. The Monitor and DOJ responded with written comments on May 30, 2019. On November 7, 2019, the Department submitted proposed policy revisions for inmate disciplinary procedures and disciplinary guidelines. The Monitor and DOJ responded on December 5 and 6, 2019. The County's Ninth Self-Assessment reports that the Department "continues to finalize revised policies related to discipline and the mentally ill. . .and is working to incorporate feedback from stakeholders before finalizing these revisions."

The County's Ninth Self-Assessment reports that "if a P2 inmate is disciplined, that P2 inmate is transferred from dorm housing to cell-housing within mental health, and evaluated afterwards as to whether discipline can be imposed." This appears to be in violation of Paragraph 43(a), to the extent that it constitutes the imposition of discipline (e.g., more restrictive housing) by Custody personnel prior to consulting "with a QMHP to determine whether assignment of a prisoner in mental health housing to disciplinary housing is clinically contraindicated and whether placement in a higher level of mental health housing is clinically indicated." This is sometimes reasonable if the patient needs to be separated because of his behavior, but not in every case. The County reports that it "will reevaluate its process and practices to ensure compliance with this Provision."

The Self-Assessment reports that

Inmates who have been designated as P3 or P4 do not get moved from their housing assignment when they commit an infraction. The County also evaluates P3 inmates before any other discipline is imposed. Inmates designated as P4 are not disciplined. Instead, P4-level inmates are written up for informational purposes so that this can be addressed through a treatment plan.

It also reports that the County "continues to use its revised process for receiving notice of P1 inmates residing in General Population housing who are scheduled to receive discipline," but it reiterates that "the County continues to experience staffing shortages that impact its ability to achieve Substantial Compliance" with this provision. Finally, it reports that "no inmates with mental illness lost behavioral credits for disciplinary reasons during the Second Quarter, 2019 or Third Quarter, 2019."

The County previously reported that that it had achieved Substantial Compliance at NCCF and PDC for twelve consecutive months.  These results were verified by the Monitor's auditors, and NCCF and PDC North were not subject to monitoring in the Ninth Reporting Period.

The County's Ninth Self-Assessment reports that for the Second Quarter of 2019, 62% of the required consultations at CRDF "occurred prior to transfers from mental health housing;" 81% of the required meetings occurred when inmates receiving psychotropic medications are transferred to disciplinary housing from areas other than mental health housing; and 100% of the weekly row walks through disciplinary units occurred.  The results for TTCF were 92%, 82%, and 100% and for MCJ were 100%, 36%, and 100%.

The County's Augmented Ninth Self-Assessment reports that for the Third Quarter of 2019, 81% of the required consultations at CRDF "occurred prior to transfers from mental health housing;" 58% of the required meetings occurred when inmates receiving psychotropic medications are transferred to disciplinary housing from areas other than mental health housing; and 100% of the weekly row walks through disciplinary units occurred.  The results for TTCF were 95%, 89%, and 100% and for MCJ were 66%, 43%, and 100%.

The Mental Health Subject Matter Expert notes that in one of the cases that the County found compliant, the patient was never seen by a clinician and two of the cases the patients were seen by a clinician, but there was "no mention of discipline or contraindications to discipline."  In addition,

> [i]n many of the other cases, there was mention of being cleared for discipline or similar language, but the analysis was commonly that psychosis did not cause the problem behavior rather than a consideration of whether discipline was clinically contraindicated, similar to what we found in our qualitative reviews.  There is no evidence that mental health is considering the type of discipline to be imposed.

The County reports that during the Reporting Period, it

> developed revised forms to assist clinicians in their review, consideration of clinically appropriate matters – including contraindications to discipline, and in their documentation of the same. . . . Further, CHS's training staff recently provided training to the staff at both TTCF and CRDF with detailed guidance on completing appropriate assessments that encourages clinicians to look at the overall picture, address symptoms of mental illness and the potential impact of discipline-related restrictions on an inmate's mental health.  The training also reviewed determining

contraindications for discipline housing and how to formulate an appropriate clinical impression and plan.[20]

---

[20] The County discussed these matters with the Mental Health Subject Matter Expert, who "agreed with what they are proposing to develop and the underlying principles."

44.     Within six months of the Effective Date, the County and the Sheriff will install protective barriers that do not prevent line-of-sight supervision on the second floor tier of all High Observation Housing areas to prevent prisoners from jumping off of the second floor tier.  Within six months of the Effective Date, the County and the Sheriff will also develop a plan that identifies any other areas in mental health housing where such protective barriers should be installed.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016)**

The County has maintained Substantial Compliance with Paragraph 44 of the Agreement since January 1, 2016.  Pursuant to Paragraph 111 of the Settlement Agreement, Paragraph 44 was not subject to monitoring during the Ninth Reporting Period.

45.     Consistent with existing Sheriff's Department policies, the County and the Sheriff will provide both a Suicide Intervention Kit that contains an emergency cut-down tool and a first-aid kit in the control booth or officer's station of each housing unit.  All custody staff who have contact with prisoners will know the location of the Suicide Intervention Kit and first-aid kit and be trained to use their contents.

**STATUS:**          **SUBSTANTIAL COMPLIANCE (as of October 1, 2015, through September 30, 2016 (verified) at CRDF, NCCF, PDC East, PDC South, and TTCF)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at MCJ and PDC North)**

The County maintained Substantial Compliance with Paragraph 45 for twelve consecutive months at all facilities as of December 31, 2016.  Pursuant to Paragraph 111 of the Settlement Agreement, Paragraph 45 was not subject to monitoring during the Ninth Reporting Period.

46.     The County and the Sheriff will immediately interrupt, and if necessary, provide appropriate aid to, any prisoner who threatens or exhibits self-injurious behavior.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of July 1, 2019, through September 30, 2019 (unverified))**

Substantial Compliance requires the Department to review the documentation from randomly selected incidents involving prisoners who threaten or exhibit self-injurious behavior, and include an assessment of the timeliness and appropriateness of the Department's responses to these incidents in its semi-annual Self-Assessment.  The County's Ninth Self-Assessment reports that for the Second Quarter of 2019, 92% "of the records reviewed . . . reflected that appropriate aid and (when necessary) immediate interruption of self-injurious behavior was provided by the Department," which is slightly below the 95% threshold for Substantial Compliance.[21]  It also reports that for the Third Quarter of 2019, it achieved Substantial Compliance with 98% of the records reflecting that the Department provided appropriate aid and necessary interruption.  The Substantial Compliance results are subject to verification by the Monitor's auditors.

The Mental Health Subject Matter Expert previously noted that "[m]any of the BOMHRs involved expression of suicidal ideation, which do not involve threatened self-injurious behavior and thus 'required no interruption.'"[22]  Going forward, the parties have agreed on a proposed revision to the Compliance Measures that includes incidents evaluated by the CIRC or involve self-directed violence in addition to threats of self-directed violence reflected on BOMHRs.  In most cases, the BOMHR reflected what the Department did to interrupt the inmate's problematic behavior, it was possible to infer what the Department did, or the Department provided medical records that provided the information.  In some cases, however, it was not possible to tell from the BOMHR if the interruption was immediate.  The Department should direct its personnel to specifically state on the BOMHR what they did to interrupt the inmate's behavior to ensure that it documents its compliance with Paragraph 46.

---

[21] The Department reported in excess of 95% at TTCF, MCJ, NCCF, and PDC North.
[22] See Monitor's Seventh Report, p. 51; Monitor's Eighth Report, p. 52.

47.     The County and the Sheriff will ensure there are sufficient custodial, medical, and mental health staff at the Jails to fulfill the terms of this Agreement.  Within six months of the Effective Date, and on a semi-annual basis thereafter, the County and the Sheriff will, in conjunction with the requirements of Paragraph 92 of this Agreement, provide to the Monitor and DOJ a report identifying the steps taken by the County and the Sheriff during the review period to implement the terms of this Agreement and any barriers to implementation, such as insufficient staffing levels at the Jails, if any.  The County and the Sheriff will retain staffing records for two years to ensure that for any critical incident or non-compliance with this Agreement, the Monitor and DOJ can obtain those records to determine whether staffing levels were a factor in that critical incident and/or non-compliance.

**STATUS:      NON-COMPLIANCE**

The County reported that 31 critical incidents[23] occurred during the First and Second Quarters of 2019, but did not assess "whether staffing was a factor in any non-compliance with the Agreement, any critical incident, or the Department's handling of an incident."  The County's Ninth Self-Assessment reports that the "County continues to work to develop a methodology to determine and assess whether staffing was a factor in any non-compliance with the Agreement,[24] any critical incident, or the Department's handling of an incident," and it has developed a Force Packet Review form to assist the facilities to identify any factors in staffing levels regarding assaults on staff (excluding gassings) and Category 3 uses of force.

---

[23] 13 Inmate Deaths, three Serious Suicide Attempts, 14 Assaults on Staff by Mentally Ill Inmates (not including gassings), and one Category 3 Use of Force.
[24] Staffing is, however, a factor reported by the County for its non-compliance with, *inter alia*, Paragraphs 39, 43, 53, 54 and 70.

48.    Within three months of the Effective Date, the County and the Sheriff will
have written housekeeping, sanitation, and inspection plans to ensure the proper cleaning
of, and trash collection and removal in, housing, shower, and medical areas, in
accordance with California Code of Regulations ("CCR") Title 15 § 1280: Facility
Sanitation, Safety, and Maintenance.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of January 1, 2016,
through December 31, 2016)**

The County maintained Substantial Compliance with Paragraph 48 of the
Agreement at all facilities for twelve consecutive months as of December 31, 2016.
Pursuant to Paragraph 111 of the Settlement Agreement, Paragraph 48 was not subject to
monitoring during the Ninth Reporting Period, but the Monitor did observe "an
acceptable level of cleanliness, sanitation, repair and safety" during tour of each facility.
The Monitor and the Use of Force Subject Matter Expert were impressed with the
cleanliness in TTCF and NCCF during this period, and with the recent improvements
observed at CRDF during a January 2020 site visit.

49.     Within three months of the Effective Date, the County and the Sheriff will have a maintenance plan to respond to routine and emergency maintenance needs, including ensuring that shower, toilet, sink, and lighting units, and heating, ventilation, and cooling system are adequately maintained and installed.  The plan will also include steps to treat large mold infestations.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of March 1, 2016, through February 28, 2017)**

The County maintained Substantial Compliance with Paragraph 49 of the Agreement at all facilities for twelve consecutive months as of February 28, 2017. Pursuant to Paragraph 111 of the Settlement Agreement, Paragraph 49 was not subject to monitoring during the Ninth Reporting Period.  Nevertheless, during site visits in the Ninth Reporting Period, the Monitor and Subject Matter Experts noted that inmates at NCCF and CRDF, in particular, complained about the heating and cooling systems and plumbing problems at that facility.

50.     Consistent with existing Sheriff's Department policies regarding control of
vermin, the County and the Sheriff will provide pest control throughout the housing units,
medical units, kitchen, and food storage areas.

>   **STATUS:**     **SUBSTANTIAL COMPLIANCE (as of January 1, 2016,**
>                   **through December 31, 2016 (verified) at all facilities other than**
>                   **PDC South and PDC East)**
>
>                   **SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through**
>                   **March 31, 2017 (verified) at PDC South and PDC East)**

The County maintained Substantial Compliance with Paragraph 50 of the
Agreement at all facilities for twelve consecutive months as of March 31, 2017.  Pursuant
to Paragraph 111 of the Settlement Agreement, Paragraph 50 was not subject to
monitoring during Ninth Reporting Period.

51.     Consistent with existing Sheriff's Department policies regarding personal care items and supplies for inmates, the County and the Sheriff will ensure that all prisoners have access to basic hygiene supplies, in accordance with CCR Title 15 § 1265: Issue of Personal Care Items.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) for all facilities other than CRDF)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017 (verified) at CRDF)**

The County maintained Substantial Compliance with Paragraph 51 of the Agreement at all facilities for twelve consecutive months as of June 30, 2017.  Pursuant to Paragraph 111 of the Settlement Agreement, Paragraph 51 was not subject to monitoring during the Ninth Reporting Period.  The Monitor and Subject Matter Experts did note, however, complaints by inmates at NCCF and CRDF during site visits regarding their access to basic hygiene supplies.

52.     The County and the Sheriff will implement policies governing property restrictions in High Observation Housing that provide:

(a)     Except when transferred directly from FIP, upon initial placement in HOH:

    (i)     Suicide-resistant blankets, gowns, and mattresses will be provided until the assessment set forth in section (a)(ii) below is conducted, unless clinically contraindicated as determined and documented by a QMHP.

    (ii)     Within 24 hours, a QMHP will make recommendations regarding allowable property based upon an individual clinical assessment.

(b)     Property restrictions in HOH beyond 24 hours will be based on clinical judgment and assessment by a QMHP as necessary to ensure the safety and well-being of the prisoner and documented in the electronic medical record.

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance requires the Department to (1) randomly inspect the cells of prisoners placed in HOH (except from FIP) within the previous 24 hours to confirm that they have been provided with suicide-resistant blankets, gowns and mattresses unless clinically contraindicated, and document the results of the inspection; (2) randomly inspect the cells of prisoners placed in HOH (except from FIP) for more than 24 hours to confirm that they have been provided with allowable property as recommended by a QMHP; and (3) review the electronic medical records of prisoners assigned to HOH on the days of those inspections to verify compliance with the provisions of Paragraph 52. All of the Compliance Measures have a 95% threshold for Substantial Compliance.

The County's Ninth Self-Assessment reports that in the Second Quarter of 2019, 97% of the inmates initially placed in HOH at CRDF were provided the property required by Paragraph 52, and 100% of the inmates placed in HOH for more than 24 hours had "allowable property as recommended by a QMHP[.];" but only 33% "of the electronic medical records for inmates assigned to HOH reflected a recommendation by a QMHP regarding allowable property;" and only 19% "of electronic medical records for inmates assigned to HOH reflect that property restrictions were based upon the clinical judgment of a QMHP."

Also for the Second Quarter of 2019, the County reports that 88% of the inmates initially placed in HOH at TTCF were provided the property required by Paragraph 52; and 91% of the inmates placed in HOH for more than 24 hours had "allowable property as recommended by a QMHP;" 41% of the electronic medical records "reflected a recommendation by a QMHP regarding allowable property;" and 71% of the records "reflect that property restrictions were based upon the clinical judgment of a QMHP."

The County's Ninth Self-Assessment reports that for the Third Quarter of 2019, 100% of the inmates initially placed in HOH at CRDF were provided the property required by Paragraph 52; and 100% of the inmates in HOH for more than 24 hours had "allowable property as recommended by a QMHP."  The County has not yet reported on what percentage "of the electronic medical records for inmates assigned to HOH reflected a recommendation by a QMHP;" and what percentage reflected that the "property restrictions were based upon the clinical judgment of a QMHP."

Also in the Third Quarter of 2019, 86% of the inmates initially placed in HOH at TTCF were provided the property required by Paragraph 52; and 97% of the inmates placed in HOH for more than 24 hours had "allowable property as recommended by a QMHP."  Again, the County has not yet reported on what percentage of the records "reflected a recommendation by a QMHP;" and what percentage reflected that the "property restrictions were based upon the clinical judgment of a QMHP."

During an August 2019 site visit, the Mental Health Subject Matter Expert and the clinicians again reviewed records to determine "[w]hether there was an assessment by a QMHP within 24 hours" and they "qualitatively evaluated whether the restrictions were based on an analysis of relevant risks."  They found that a QMHP provided an initial assessment in 95% of the cases reviewed, and within 24 hours in 84% of those cases, but that the allowable property was based on the relevant risks in only 27% of the cases, which is a reduction from previous improvements.  They also found that there were "current assessments" in 81% of the cases, which was based on relevant risks in 73% of the cases.  The Mental Health Subject Matter Expert notes that "there was still often no discussion of why certain items were restricted or even why restrictions were needed at all.  Restrictions were often put in place when the structured suicide risk assessment indicated low risk and there was no documentation or analysis demonstrating that restrictions were needed."

In a December 2019 site visit, the Subject Matter Expert and the clinician found that in the HOH units at CRDF, 91% of the patients had allowable property in the cell and 92% did not have restricted property in the cell.  In the HOH units at TTCF, the results were 74% and 77%.  They noted that primarily at TTCF, some inmates reported not being allowed to use utensils "regardless of what the door sign said," and a "number of patients at TTCF had no mattresses or mattresses without covers."

53.     If otherwise eligible for an education, work, or similar program, a prisoner's mental health diagnosis or prescription for medication alone will not preclude that prisoner from participating in said programming.

**STATUS:        PARTIAL COMPLIANCE**

Substantial Compliance requires the Department to audit the records of prisoners who were eligible, but rejected or disqualified, for education and work programs to confirm that they were not rejected or disqualified because of a mental health diagnosis or prescription for medication alone.

The County's Ninth Self-Assessment reports that 42% and 75% of the eligible mentally ill prisoners who were denied education or work in the Second and Third Quarters of 2019 "were not rejected or disqualified from education or work programs solely because of a mental health diagnosis or prescription medication." The County reports that, "in an abundance of caution, [it] has reported as non-compliant all requests the responses to which were not responded to within the time period required by Department policy, whether or not the response was related to the inmate's mental health diagnosis or receipt of prescription medications." As a result, "the Department believes it is under reporting its compliance with respect to whether or not requests are denied because of an inmate's mental health status or medications. The Department believes staffing challenges are limiting its ability to timely respond to these requests."

54.     Prisoners who are not in Mental Health Housing will not be denied privileges and programming based solely on their mental health status or prescription for psychotropic medication.

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance requires the Department to audit the records of a maximum of 100 randomly selected prisoners who were eligible and denied privileges or programs to confirm that they were not rejected or disqualified because of a mental health diagnosis or prescription for psychotropic medication alone.

The revised Compliance Measures for Paragraph 54, effective January 1, 2018, provide for an alternative pool of inmates proposed by the County.  Because the Monitor's auditors had verified that the County has maintained Substantial Compliance under the original Compliance Measures, the parties agreed that the County will only be required to maintain Substantial Compliance under the revised Compliance Measures for two additional quarters.

The County's Ninth Self-Assessment is confusing.  It reports that "the Department counted as non-compliant requests that were not timely responded to according to Department policy, even where the request was granted or denied for a reason unrelated to the inmate's mental health status or receipt of psychotropic medications."  As a result, "[t]he Department concluded 38% of inmates were denied requests for purposes of this Provision [in the Second Quarter of 2019]."  It notes, however, that "no inmates were denied privilege or programs solely because of their prescription for psychotropic medications or mental health status."  Further, no inmates are denied visitation privileges based on either their medications or mental health status.  This suggests that the Department has achieved Substantial Compliance with the requirements of Paragraph 54.

In the Third Quarter of 2019, only 13% of inmates were denied requests; the 87% of inmates who were not denied because of their medications or mental health status is slightly below the 90% threshold for Substantial Compliance.  Again, however, no inmates were denied privileges, programming or visits solely because of prescriptions or mental health status, which is what Paragraph 54 requires for Substantial Compliance.

As with Paragraph 53, the County reports that, "in an abundance of caution, [it] has reported as non-compliant all requests the responses to which were not responded to within the time period required by Department policy, whether or not the response was related to the inmate's mental health diagnosis or receipt of prescription medications."  The County "believes that it is under reporting its compliance" and that "staffing challenges are limiting its ability to timely respond to these requests."

55.     Relevant custody, medical, and mental health staff in all High Observation Housing units will meet on Normal business work days and such staff in all Moderate Observation Housing units will meet at least weekly to ensure coordination and communication regarding the needs of prisoners in mental health housing units as outlined in Custody Services Division Directive(s) regarding coordination of mental health treatment and housing.  When a custody staff member is serving as a member of a treatment team, he or she is subject to the same confidentiality rules and regulations as any other member of the treatment team, and will be trained in those rules and regulations.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of October 1, 2016, through September 30, 2017 (verified) at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2017 through March 31, 2018 (verified) at PDC North)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through December 31, 2018 (verified) and through March 31, 2019 (unverified) at MCJ)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2019 through September 30, 2019 (verified) at TTCF)**

The Department maintained Substantial Compliance for twelve consecutive months through the Third Quarter of 2017 at CRDF and through the First Quarter of 2018 at PDC North with Compliance Measures 55-2, 55-6(a) and 55-6(b), which require daily staff meetings in HOH and weekly meetings in MOH attended by representatives from custody, medical, and mental health.  These results were verified by the Monitor's auditors, and CRDF and PDC North were not subject to monitoring for compliance with Paragraph 55 in the Ninth Reporting Period.

The County's Ninth Self-Assessment reports Substantial Compliance for the Second and Third Quarters of 2019 at MCJ.[25]  The County had previously submitted reports showing Substantial Compliance at MCJ for twelve consecutive months through the end of the First Quarter of 2019.  The results at MCJ for the First Quarter of 2019 are subject to verification by the Monitor's auditors.  If verified, MCJ was not subject to monitoring for Compliance with Paragraph 55 during the Ninth Reporting Period.  If the results are not verified, the twelve month period for Substantial Compliance will begin to run in the Second Quarter of 2019, subject to the auditors' verification of the County's results for the Second and Third Quarters of 2019.

The County's posted results for TTCF reflect that 86% of the required meetings in HOH were held during the randomly selected month in the Second Quarter of 2019,

_____

[25] The County reports that "there are no HOH inmates housed at Men's Central Jail, therefore an HOH staff meeting is not required."

which is slightly above the 85% threshold for Substantial Compliance required by
Compliance Measures 55-6(a) and 55-6(b), and 75% of the required meetings in MOH
were held during the randomly selected month, which is below the 90% threshold for
Substantial Compliance.  The results also reflect that 90% of the required HOH meetings
and 100% of the required MOH meetings were held in the randomly selected month for
the Third Quarter of 2019.  The Substantial Compliance results for TTCF for the Third
Quarter of 2019 have been verified by the Monitor's auditors.

The County has submitted a report "verifying the coordination and
communication at the staff meetings" in HOH and/or MOH units at TTCF and MCJ
during the last six months of 2019.  DOJ has expressed a concern "about the level of
detail recorded in many huddle meeting minutes."  The County reports that "[b]ecause of
the consistency of those communications , and the ability to address issues as they arise
[in the Hope Dorm/MOH areas at MCJ], they are not documented at later meetings in the
same level of detail.  The County is working to improve the MOH meetings and the
related documentation at TTCF."

56.     Consistent with existing DMH and Sheriff's Department policies, the County and the Sheriff will ensure that custody, medical, and mental health staff communicate regarding any change in a prisoner's housing assignment following a suicide threat, gesture, or attempt, or other indication of an obvious and serious change in mental health condition.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified))**

Substantial Compliance requires the Department to review in randomly selected periods the electronic medical records of (1) prisoners admitted to HOH following a suicide threat, gesture, or attempt, or other indication of an obvious and serious change in mental health condition to determine if the medical and/or mental health staff approved the placement of the prisoner in HOH; and (2) prisoners who were the subject of a suicide attempt notification to determine if the prisoners were clinically assessed and that clinical staff approved the post-incident housing.

The County's Substantial Compliance results for the twelve months from January 1, 2016, through December 31, 2016, were verified by the Monitor's auditors, and the County was not subject to monitoring for compliance with Paragraph 56 during the Ninth Reporting Period.

57.     Within three months of the Effective Date, the County and the Sheriff will
revise and implement their policies on safety checks to ensure a range of supervision for
prisoners housed in Mental Health Housing.  The County and the Sheriff will ensure that
safety checks in Mental Health Housing are completed and documented in accordance
with policy and regulatory requirements as set forth below:

(a)     Custody staff will conduct safety checks in a manner that allows staff to
view the prisoner to assure his or her well-being and security.  Safety
checks involve visual observation and, if necessary to determine the
prisoner's well-being, verbal interaction with the prisoner;

(b)     Custody staff will document their checks in a format that does not have
pre-printed times;

(c)     Custody staff will stagger checks to minimize prisoners' ability to plan
around anticipated checks;

(d)     Video surveillance may not be used to replace rounds and supervision by
custodial staff unless new construction is built specifically with constant
video surveillance enhancements and could only be used to replace 15
minute checks in non-FIP housing, subject to approval by the Monitor;

(e)     A QMHP, in coordination with custody (and medical staff if necessary),
will determine mental health housing assignments; and

(f)     Supervision of prisoners in mental health housing will be conducted at the
following intervals:

(i)     FIP:  Custody staff will perform safety checks every 15 minutes.
DMH staff will perform direct constant observation or one-to-one
observation when determined to be clinically appropriate;

(ii)    High Observation Housing:  Every 15 minutes;

(iii)   Moderate Observation Housing:  Every 30 minutes.

**STATUS (57):**  **SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at MCJ)**

**PARTIAL COMPLIANCE (at PDC North, TTCF, and CRDF)**

Substantial Compliance requires the Department to audit the Title 15 Dashboard records (or UDAL records if the Title 15 scanner was not working) for all shifts for each module in each mental health housing unit in two randomly selected weeks to determine if the safety checks were staggered and conducted as required by Paragraph 57 of the Agreement, and to audit the housing records for each mental health housing unit for one randomly selected week to determine if a QMHP approved the new mental health housing assignments as required by Paragraph 57(e).  The thresholds for achieving Substantial Compliance with these two Compliance Measures is 95%.

The County's Sixth Self-Assessment reported that it maintained Substantial Compliance with Compliance Measure 57.5(b) in the Fourth Quarter of 2017 and the First Quarter of 2018 in the MOH unit at MCJ (the "Hope Dorm").  It also reported that all of the inmates at MCJ "analyzed pursuant to Compliance Measure 57-5(c) had received QMHP approval for their housing assignments" in both quarters.  The results were verified by the Monitor's auditors and MCJ was not subject to monitoring for compliance with Paragraph 57 in the Ninth Reporting Period.

The County's Ninth Self-Assessment reports that the County achieved Partial Compliance with the safety checks in the mental health housing units at TTCF (55% and 51%) and CRDF (70% and 48%) in the Second and Third Quarters of 2019, but they are on a downward trend that is well-below the 95% threshold.  The County reports that it has taken steps, including "significant changes in technology" at TTCF and a countdown clock and radio announcements at CRDF "to improve compliance in this area."  The Self-Assessment also reports that 100% of the new mental health housing assignments in CRDF and TTCF were approved by a QMHP in the Second and Third Quarters of 2019.

The Self-Assessment also reports that the County achieved Substantial Compliance in the MOH units at PDC North in the Second Quarter of 2019 (98%) which it maintained in the Third Quarter of 2019 (95%).  The County's Substantial Compliance report for PDC North in the Second and Third Quarters of 2019 could not be verified by the Monitor's auditors because the safety checks were not staggered.  The auditors report that "[t]he safety checks again begin almost always in the A-dorm and end in the D-dorm. The County did sometimes change the order of the dorm checks between the first and last, but often the alternative order was the same . . . . leading to checks that were in the same order of dorms and occurring almost every 27 minutes."  As noted by DOJ, this is a continuing issue that has not been addressed by the County.  While the Monitor acknowledges the efforts that the Department has made to brief the staff at PDC North on the "staggering" requirement and that PDC North has a unique dorm environment, it must still demonstrate more than occasional changes in the order to establish the required staggering of the Title 15 checks.

58.     Within three months of the Effective Date, the County and the Sheriff will revise and implement their policies on safety checks.  The County and the Sheriff will ensure that safety checks in non-mental health housing units are completed and documented in accordance with policy and regulatory requirements as set forth below:

(a)     At least every 30 minutes in housing areas with cells;

(b)     At least every 30 minutes in dormitory-style housing units where the unit does not provide for unobstructed direct supervision of prisoners from a security control room;

(c)     Where a dormitory-style housing unit does provide for unobstructed direct supervision of prisoners, safety checks must be completed inside the unit at least every 60 minutes;

(d)     At least every 60 minutes in designated minimum security dormitory housing at PDC South, or other similar campus-style unlocked dormitory housing;

(e)     Custody staff will conduct safety checks in a manner that allows staff to view the prisoner to assure his or her well-being and security.  Safety checks involve visual observation and, if necessary to determine the prisoner's well-being, verbal interaction with the prisoner;

(f)     Custody staff will document their checks in a format that does not have pre-printed times;

(g)     Custody staff will stagger checks to minimize prisoners' ability to plan around anticipated checks; and

(h)     Video surveillance may not be used to replace rounds and supervision by custodial staff.

**STATUS (58):**  **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at PDC South, PDC North, and PDC East)**

**SUBSTANTIAL COMPLIANCE ( as of July 1, 2017, through June 30, 2018 (verified) at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at IRC)**

**PARTIAL COMPLIANCE (at TTCF, NCCF, and MCJ)**

Substantial Compliance requires the Department to audit the Title 15 Dashboard records (or UDAL records) for all shifts for each module in each housing unit to determine if the safety checks were staggered and conducted as required by Paragraph 58. The threshold for achieving Substantial Compliance with each of the Compliance Measures is 90%.

The County maintained Substantial Compliance with Paragraph 58 for twelve consecutive months at PDC South, PDC North, and PDC East as of December 31, 2016, at CRDF as of June 30, 2018, and at IRC as of September 30, 2018.  These results have been verified by the Monitor's auditors.  Pursuant to Paragraph 111, those facilities were not subject to monitoring in the Ninth Reporting Period.

The County's Ninth Self-Assessment reports that for the Second and Third Quarters of 2019 the following percentages of safety checks were in compliance with Paragraph 58 at the remaining facilities: MCJ (66% and 62%); TTCF (71% and 78%); and NCCF (76% and 71%).

59.     Consistent with existing Sheriff's Department policies regarding uniform daily activity logs, the County and the Sheriff will ensure that a custodial supervisor conducts unannounced daily rounds on each shift in the prisoner housing units to ensure custodial staff conduct necessary safety checks and document their rounds.

**STATUS:**      **SUBSTANTIAL COMPLIANCE (as of January 1, 2017, through December 31, 2017 (verified) at PDC East and MCJ)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2018, through December 31, 2018 (verified) at PDC North and PDC South)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018. through March 31, 2019 (verified) at TTCF)**

Substantial Compliance requires the Department to audit e-UDAL records for housing units in each facility to determine if supervisors are conducting unannounced daily rounds in accordance with Paragraph 59.  In response to the Monitor's comments, the Department's e-UDAL forms were modified to include a specific notation that the Supervisor verified that the safety checks were conducted.  The threshold for achieving and maintaining Substantial Compliance is that 90% of the supervisor daily rounds were in compliance with the requirements of Paragraph 59.

The County's Substantial Compliance results were verified by the Monitor's auditors, and the County was not subject to monitoring for compliance with Paragraph 59 during the Ninth Reporting Period.

60.     Within six months of the Effective Date, the Department of Mental Health, in cooperation with the Sheriff's Unit described in Paragraph 77 of this Agreement, will implement a quality improvement program to identify and address clinical issues that place prisoners at significant risk of suicide or self-injurious behavior.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of July 1, 2019 through December 31, 2019)**

Paragraph 60 requires the County to "implement a quality improvement program to identify and address clinical issues that place prisoners at significant risk of suicide or self-injurious behavior."  The Compliance Measures for Paragraph 60 require the County to "identify and address . . . clinical issues" in the areas identified in Paragraph 61 of the Agreement" and corrective actions are taken to address "such issues."  See Compliance Measures 60.1, 60.2(a), and 60.3(b).

On January 14, 2020, the County submitted CHS's Semi-Annual Report on Quality Improvement/Assurance, which includes data through the end of the Third Quarter of 2019.  The Mental Health Subject Matter Expert notes that the "overall introduction reflects CHS's growing sophistication in quality management."  The Report describes how "CHS is integrating mental health services in its [Quality Improvement and Patient Safety (QIPS) program] approach to system change in the following ways:"

QIPS program staff are working with mental health management to revise some of the metrics in the QPIS-maintained Quality Dashboard "to better represent essential components of mental health service delivery."  These revisions are anticipated in the first quarter of 2020.

* * * *

"Over the last year, CHS changed its QI practice from a quality assurance to a quality improvement-based approach. . . . QI monitoring in CHS is focused on prevention and problem solving in order to achieve excellent outcomes."

* * * *

"22 staff members from various facilities and departments have graduated from the Quality Academy [at LAC+USC]. . . .Graduates of this program serve as QI Leads and advisors at their home CHS facilities and service lines[.]"

* * * *

On June 20, 2010, "CHS launched the Correctional Health Improvement Program (CHIP)" to develop "effective leaders in QI who can accomplish improvement strategies in their areas."

73

* * * *

CHS's Quality Improvement Committee ("QIC") of senior CHS executives
continue to meet "monthly to work on improving the quality of care
delivered and the quality of health care services provided across CHS."  Since
January 2019, Mental Health has participated in quarterly meetings that
discussed "quality and safety issues along with pertinent finding from CIRC
and JQIC" and QI projects.

* * * *

"The reporting of events within the [Safety Intelligence] system has more
than doubled since its inception [in January]."  The system provides "front
line staff with a non-punitive mechanism to report a variety of events
some of which may include mistakes or near misses."  It allows for the
"aggregation of date so that error trends and patterns can be more easily
notice and remedied."  "CHS Compliance staff are working with DHS and
SI administrators to develop a customized page so that behavioral events that
involve patient SDVs are designated as such and forwarded separately to
CHS Compliance staff for review."[26]

As in the past, the CHS Report includes recent activities of the Critical Incident
Review Committee ("CIRC") and the Joint Quality Improvement Committee ("JQIC"),
which includes what the County describes as a "robust review of aggregate data for
SDVs, CIRCs, and Suicides."  CHS's compliance team "conducts reviews of all self-
directed violence (SDV) incidents occurring within the jail system and from those
reviews [it] selects the SDV incidents and QI cases[27] to be presented at monthly CIRC
meetings."[28]  The "team continues to improve the categorization of issues identified from
CIRC and QI reviews [by domains and sub-domains] to assist with identification of
trends/themes."[29]  The report indicates that the "use of standardized categories continues
to improve the ability to organize and aggregate data to inform and prioritize further QI
projects, staff trainings, and guide system-wide priorities."  While the report identifies the
"most frequent" domains and sub-domains "represented," it does not draw any
connections to QI projects, staff trainings, or system-wide priorities.

The CHS report indicates that "[t]he County continues to include presentations on
aggregate data and system-wide changes in addition of follow-up and review of issues
identified in the previous month's CIRC at JQIC monthly meetings."  "Command Level
Staff and the Director of CHS Mental Health have joined the monthly meetings attended
by the CHS Compliance Team and CCSB in an effort to help guide data analysis and QI
projects that align with organizational goals."  Unfortunately, "[t]he capacity to build

---

[26] The Mental Health Subject Matter Expert observes that this "should help substantially."
[27] SDV incidents have the highest risk rating scores while the QI cases with lower risk rating scores have
"facts surrounding an SDV incident [that] highlight systemic issues."
[28] Summaries of the 7 cases reviewed at the monthly CIRC meetings in the Second and Third Quarters of
2019 are attached to the CHS Report.
[29] The report describes the six main domains (e.g., Access to Care) and lists the sub-domains.

upon the data analysis which began during the previous reporting period remains limited
due to staff availability and the continued challenge of having to extract data manually."
The County has "yet to find a replacement" for the recently promoted statistical analyst
who previously "provided much of the data support for JQIC presentations" through the
"first part of 2019."

The CHS Report provides summaries of the data presented at JQIC meetings, but
it is not clear to what end.  For example, there was an analysis of 14 inmates who had
"some of the highest numbers of repeated SDV incidents" "to see if they were referred to
Complex Case Committee" or if the SDV incidents were "serious enough that the
incident was reviewed at CIRC," but there is no explanation of the significance of this
analysis.  A comparison of the inmates who committed the highest numbers of SDV
incidents in HOH units and the 132 F Pod (sterile pod) was conducted, presumably to
determine the degree of overlap between the two populations, though the purpose of this
comparison was not entirely clear.  There was also an analysis of SDV incidents above a
certain risk score to identify the top three methods of committing the SDVs (i.e., the tools
used broken down by housing area), but as noted by the Mental Health Subject Matter
Expert, there "was no analysis or consideration of CAPs to, for example, reduce the SDV
by the most common means."  The data generated "inquiries some of which were
presented in future JQIC presentations," but other than a "finding that the first 10 days
following arrest is a critical time period where risk of SDV may be heightened,"[30] it is not
clear that the data were used to "identify or address clinical issues that place prisoners at
significant risk of suicide or self-injurious behavior," or that the analysis resulted in
corrective actions or systemic improvements.[31]  As stated by the Mental Health Subject
Matter Expert, there is "some qualitative use of data, but there is no evidence of them
making any concrete changes to processes or plans to make different measurements to
better understand the problems."  Further, there were several important findings without
any attempt to explain or use the findings.

The Semi-Annual Report again includes the following sections:

- The Correctional Treatment Center – Mental Health Unit (CTC-MHU), reports an
  increase in admissions and discharges over the period 2014 to 2019, with largest
  increase in 2017, and a general downward trend in re-admissions to the unit
  within 30 days of admission, and a continuing decrease in use of clinical restraints
  in the unit through the Third Quarter of 2019.  It is notable that in 2015, clinical
  restraints were used 154 times; during the first three quarters of 2019, they were
  used a total of three times.

- A summary of the results of the STEP FORWARD program at CRDF that
  provides early use of Long Acting Injectable (LAI) psychotropic medications.

---

[30] The CHS report also found a correlation between an increase in SDV incidents and an increase in the
mental health population, although the Fig. 2.18 suggests that this may not be the case in 2019.
[31] Some of the charts present essentially the same information.  For example, Figure 2.15 presented at the
May meeting has the same data as in Figure 2.5 and 2.6 presented in the April meeting.

The study shows an "improvement in the usual time it takes for LAI delivery to inmates," which appears to show reductions in P levels of care at the time of the patients release.

- A report of an assessment of the wait time for patients/inmates with a P2 level of care housed in MOH to see a psychiatrist. CHS concludes that "patients assigned to the P2 level of care continue to be seen promptly and medications are prescribed as indicated in a time manner;"[32]

- The results of the Pill Call Pilot program that CHS concludes has resulted in significant improvements in medication administration in HOH areas of TTCF;[33] and

- Other QI projects and health care services, which reports on (a) the timeliness of the evaluation of suicidal patients in the IRC; (b) the effectiveness of the specialized pods to provide medically monitored withdrawal from alcohol for inmates with alcohol dependence and other substance abuse treatment services; (c) the Provision 30 QI project and training "to improve accuracy and consistency in documentation and to capture a more complete release plan for each patient interviewed," which resulted in "improvements of the IRC Initial Mental Health Assessments in regard to release planning;" (d) the implementation of new risk precaution process and protocols that were implemented at the end of the last reporting period, which has resulted in a significant reduction in the number of inmates on the Risk Precaution Lists for CRDF and TTCF;[34] and (e) CHS staff training over the past year.

The CHS Report also includes Summaries of the results of "10 Key QIC Projects"[35] in which measurable results reflect that CHS either met the goals of the

---

[32] The Mental Health Subject Matter Expert notes that this is a "great result," but asks "what was the remedy and how did the data drive the adoption of that remedy."

[33] The Mental Health Subject Matter Expert cites this as "a good example of a QM project" that has good measures, but lacks identifiable "targets." There was a significant reduction from 1,023 unauthorized medications found as a result of searches in the Fourth Quarter of 2018 at TTCF to 381 medications in the First Quarter of 2019, which was when the Pill Call Pilot program was expanded. See Monitor's Eighth Report, p. 84, n. 52 and n. 53. There was a continuing decrease in the Second Quarter of 2019 to 339, but a fairly significant increase in the number found in the Third Quarter to 557. These numbers are for all of TTCF and not restricted to the HOH units.

[34] Under the new process and protocols, CHS reports that the "data is reassuring that those inmates who are identified as being at higher risk for significant self-harm or suicide are generally being seen and identified early and are receiving follow-up in a timely manner."

[35] Increase Self-Med/Keep on Person (KOP) Orders; Increase Safety Intelligence Data Entry at Men's Central Jail; Proper Handoff of 5150 Returning from LAC+USC; Wait Time Reduction for Medical Evaluations of Patients in TTCF HOH; Wait Time Reduction of Initial Urgent Care (UC) Referrals in TTCF HOH; TTCF HOH Food and Fluid Intake Monitoring; Wait Time Reduction for Second Medical Evaluation Completion and Wait Time Reduction for New Admissions in ADA Module; Processing of Urgent HSRFs; Laboratory Technician Errors; and PM shift passes issued and number of escorted patients to Radiology Department.

project or there was a substantial improvement.  Although it does not appear that aggregate data was used to identify the clinical issues that generated these QI projects, data was used to measure the effectiveness of these projects.

CHS's Report summarizes the subjects presented at the November 13, 2019 Bi-Annual Suicide Prevention meeting, which was attended by over 70 representatives of various County departments, along with representatives of the Department of Justice, the Monitor, and the Mental Health Subject Matter Expert.

CHS's Report sets forth aggregate data for 15 suicides[36] in the period 2015 through the Third Quarter of 2019, broken down by prior attempts or other serious self-injurious behavior, facility/location, method, demographics (age, ethnicity, and gender), and proximity to court date.[37]  The Report also provides "a detailed summary of the Inmate Death Corrective Action Plan that were completed for each suicide."

CHS's Report states that there were 329 SDV incidents by 276 inmates during the Second and Third Quarters of 2019.  There were 462 SDV incidents in the first three quarters of the year, which on an annualized basis is a fairly significant decrease from 2018, when there were 808 SDV incidents.  The report also includes an analysis of 1270 SDV incidents in 2018 through September 2019 by prior attempts, facilities, method, lethality (risk rating score),[38] age, ethnicity, gender, and proximity to court date, and an analysis of 41 incidents (by 40 inmates)[39] that were presented at CIRC meetings in 2018 through the Third Quarter of 2019, broken by the same categories.

Although the CHS Report states that the "new format [of JQIC meetings] continues to evolve with a focus on improving data analysis and identification of trends to inform QI projects or corrective action plans to address clinical or systemic issues placing inmates at risk for suicide or serious self-injurious behaviors," the analysis of the aggregate data in CHS's Report does not go beyond these breakdowns to identify clinical issues or reflect that the data was used to propose corrective actions or systemic improvements.  For example, the report does not draw a connection between the analysis of the aggregate SDV and CIRC data and the "10 Key QIC Projects" generated by the QIC Committee to address clinical and other issues that placed prisoners at risk.

Nevertheless, given the continued enhancements in the County's quality improvement program, the QIC projects undertaken during the reporting period, and the use of data to measure the results of those projects and to identify some other issues, the Monitor and the Mental Health Subject Matter agree that the Department has demonstrated "a sound quality improvement process and the ability to demonstrate that

---

[36] Two of the suicides occurred in station jails; the rest were in TTCF or MCJ.
[37] The proximity to court data is for the Second Quarter of 2018 through the Third Quarter of 2019.  See Fig. 7.19.
[38] Over 98% were Low Risk or Low Moderate risk.
[39] 22 cases had high risk rating scores that "met criteria for CIRC" and additional 19 Low Moderate cases were "QI cases" considered by CIRC.  There were five cases that met the criteria for CIRC and 2 QI cases presented at CIRC meetings in the Second and Third Quarters of 2019 (CHS Report pp. 130 – 134.

process through specific quality improvement projects directed by management."[40] Accordingly, they have concluded that the County has demonstrated that it maintained Substantial Compliance with Paragraph 60.  To achieve Substantial Compliance with the companion provisions of Paragraphs 61 and 62, however, the County needs to use its analysis of aggregate data to "recommend," "implement," "track," and measure the effectiveness of corrective actions and systemic improvements.

---

[40] See Monitor's Eighth Report, p. 74.

61.     The quality improvement program will review, collect, and aggregate data in the following areas and recommend corrective actions and systemic improvements:

     (a)    Suicides and serious suicide attempts:

           (i)     Prior suicide attempts or other serious self-injurious behavior
           (ii)    Locations
           (iii)   Method
           (iv)   Lethality
           (v)    Demographic information
           (vi)   Proximity to court date;

     (b)    Use of clinical restraints;

     (c)    Psychotropic medications;

     (d)    Access to care, timeliness of service, and utilization of the Forensic Inpatient Unit; and

     (e)    Elements of documentation and use of medical records.

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance requires the County's semi-annual reports to (a) review, collect, and aggregate data in the areas set forth in Paragraph 61; (b) recommend corrective actions and systemic improvements in those areas; and (c) assess the effectiveness of actions and improvements in prior reporting periods.

As noted above, the CHS Semi-Annual Report sets forth aggregate data for the 15 suicides during the period 2015 through the Third Quarter of 2019; 1,270 SDV incidents from January 2018 through September 2019; and 41 SDV incidents that were reviewed at CIRC meetings during the same period broken down by the subparts of Paragraph 61(a). Although the CHS Report reflects that this analysis of the aggregate data was presented and discussed at JQIC meetings, it is not clear that it was used "to identify and address clinical issues that place prisoners at significant risk of suicide or self-injurious behavior" or to propose corrective actions or systemic improvements.

To some extent, it appears that JQIC is repeating the same analyses over time without implementing corrective actions or systemic improvements.  For example, CHS's July 2019 report indicates that JQIC analyzed the SDV data and created "a list of the top ten inmates responsible for the highest number of SDVs" during the last reporting period. It then "checked with CIRC and CCC [the Complex Case Committee] to ensure inmates with high numbers of SDVs received the highest level of review and if indicated were placed on the CCC to ensure there was an individual treatment plan with collaborative

input from nursing, mental health, and medical services."[41]  There is, however, nothing in the report verifying that treatment plans were developed, or that the quality of the plans was evaluated.

At the April 2019 meeting, JQIC reviewed 14 inmates with the highest SDV counts in HOH and the 14 inmates with the highest counts in 132F "to see if they were referred to Complex Case Committee (CCC) and found 10 of the 14 identified inmates (71%) had been referred to the CCC in 2018" and "6 of the 14 inmates (43%) engaged in an SDV that was serious enough that the incident was reviewed at CIRC."  It is not clear why this analysis was conducted during the last reporting period or why it would have been necessary if the prior analysis had generated systemic improvements to address any clinical issues identified by JQIC.  One of the clinicians supporting the Mental Health Subject Matter Expert observes: "What would make this sustainable is if they ran a regular report on inmates with [some specific number] of SDV incidents, or a serious SDV incident every week and ensured treatment plans were developed and implemented."  As explained by the Mental Health Subject Matter Expert: "Essentially, this is creating a dashboard item with a regular follow-up until treatment plans meet an established target.  This would be a simple, small scale project that would satisfy a CAP related to SDV and could help them make progress on treatment planning, which is part of a larger initiative for CHS."

The CHS Report includes two sections that "review, collect, and aggregate data" in the areas required by Paragraph 61(b), (c), and (d):

- Aggregate data on the significant decrease in the use of clinical restraints in the Mental Health Unit of the CTC over the period from 2015 through the Third Quarter of 2019 and an analysis of the cause and effect of the decrease; and

- Aggregate data on the admission, discharge, and readmission of patients in the CTC-MHU for admissions, discharges, and readmissions from 2014-15 through the Third Quarter of 2019.

- An analysis of the STEP FORWARD program at CRDF that provides early use of Long Acting Injectable (LAI) psychotropic medications showing an "improvement in the usual time it take for LAI delivery to inmates," appears to show reductions in P levels of care at the time of the patients release.[42]

- An assessment of the wait time for patients/inmates with a P2 level of care housed in MOH to see a psychiatrist that concludes "patients assigned to the P2 level of

---

[41] See Monitor's Eighth Report, pp. 77-8, n. 49.

[42] The Mental Health Subject Matter Expert notes, however, that "there is no appropriate baseline or comparison measure to make this assertion."

care continue to be seen promptly and medications are prescribed as indicated in a time manner."[43]

CHS attributes the reduction in the use of clinical restraints to changes in "custody policy regarding the 'use of force;'" "an increase in using discussion and negotiation techniques to gain compliance from inmates/patients;" "more time taken to manage highly emotional interactions between mental and medical health staff, custody staff, and inmate/patients;" and, to the early use of "long-acting injectable (LAI) psychotropic mediations in CTC-MHU."

With respect to the CTC admission-related data, CHS reports that

[i]n order to better understand our readmission data, in July 2019, the County began collecting additional readmission data, including discharge location, medication compliance, and use of long acting injectable (LAI) medication.  The County's goal in collecting this data is to develop methods to evaluate whether or not patients were on the inpatient service long enough to receive appropriate treatment, whether or not the percentage of medication compliance was adequate for discharge, and whether the patient was stable upon discharge[.]

There are, however, no conclusions or proposed corrective actions or systemic improvements based upon this data in the CHS Report.

With respect to Psychotropic medications, as the Mental Health Subject Matter Expert has pointed out in the past, there needs to be an "analysis of general prescribing patterns or medication monitoring, both critical aspects of quality management of psychotropic prescribing."  The STEP FORWARD program involves the injection of Psychotropic Medications to inmate/patients at CRDF, and the data analyzed by CHS shows that average wait time for the LAI and compares P levels of care at referral and at the time of release for patients who received an LAI.  It is hard to draw any conclusions from the data since there are no benchmark or baseline comparisons to TTCF or to prior periods at CRDF.[44]

The evaluation of Psych-Line Waiting Days under "QI Projects Relating to the Use of Psychotropic Medication" is not really about psychotropic medications" under Paragraph 61(c).  As in the past, the Department and CHS are analyzing aggregate data,

---

[43] In this instance, the Mental Health Subject Matter Experts notes that "there are no targets," and reports that "the data do not demonstrate that 'medications are prescribed as indicated.'"

[44] As explained by one of the clinicians: "[T]he report does not say how they reduced wait times, whether there was a corrective action associated with this.  It cannot be sustainable if they can't articulate how they made a positive change."

but have not connected the analysis to corrective actions or systemic improvements in each of the areas required by the subparts of Paragraph 61.[45]

In order to achieve Substantial Compliance with Paragraph 61, however, the County must "review, collect and aggregate data" in each of the areas set forth in the subparts of the paragraph and "recommend corrective actions and systemic improvements" where appropriate.  While the County has analyzed aggregate data in most of these areas, it still needs to show that the analysis is driving corrective actions and systemic improvements, and that it is measuring the actions and improvements against established benchmarks.

By way of example, the Risk Precautions (RP) project to reduce the number of patients on RP status was not executed as a quality management project.  As explained by the Mental Health Subject Matter Expert,

> none of the data is looking at the impact of changing RP, such as changes in SDV, increased FIP admissions, changes in access to care, or any of a number of outcome measures of interest.  The articulated reason for changing RP was sensible (it was being used excessively and for unintended reasons), but the project needed to look at outcome measures other than how many are on these lists. . . .[T]he project should have considered whether it increased access to care (presumably the intended outcome) or, at the very least, examined whether the change in RP led to changes in SDV, as that would be the clear risk of reducing the number on RP.

---

[45] The Mental Health Subject Matter Expert notes that the pill call project is "a good example of using quality management principles."

62.     The County and the Sheriff's Unit described in Paragraph 77 of this Agreement will develop, implement, and track corrective action plans addressing recommendations of the quality improvement program.

**STATUS:      PARTIAL COMPLIANCE**

Substantial Compliance requires the County's semi-annual Self-Assessments to set forth (a) the "development of corrective action plans to address the most recent recommendations of the quality improvement program;" and (b) the "implementation and tracking of corrective action plans to address recommendations of the program in prior quarters."

CCSB's Semi-Annual Report describes all of the corrective action plans identified during the Executive Inmate Death Reviews of the two suicides that occurred in the Second Quarter of 2019 and the corrective action taken and status of those CAPs as of time of the 30-day death review.  It reports that CCSB "tracks and provides updates to any CAP/Issue that was created at the CIRC" and provides updates to a larger group that includes Access to Care, CHS, DHS, LASD Command Staff."  It again provides findings based upon the aggregate data that CHS and CCSB collected from incidents of self-directed violence, which is very similar to the finding during the last reporting period, but without showing how data and findings was used to "develop, implement, and track corrective action plans addressing recommendations of the quality improvement plan."

To achieve Substantial Compliance with subpart (b) of Paragraph 62,the Department and CHS need to assess whether the CAPs generated at the death reviews or at the CIRC or JQIC meetings raise systemic issues and, if so, set forth the steps undertaken by the Department and CHS to addressing those issues.  They also need to assess the effectiveness of such improvements from prior reporting periods.

63.     The County and the Sheriff will maintain adequate High Observation
Housing and Moderate Observation Housing sufficient to meet the needs of the jail
population with mental illness, as assessed by the County and the Sheriff on an ongoing
basis.  The County will continue its practice of placing prisoners with mental illness in
the least restrictive setting consistent with their clinical needs.

**STATUS:     NON-COMPLIANCE**

The Compliance Measures require that the County's Self-Assessment set forth (a)
the average daily populations in HOH and MOH units in TTCF and CRDF during the
reporting period; (b) the average number of beds in those units during the reporting
period; (c) the number of days in which there was a waiting list for HOH or MOH
housing; and (d) the average number of step-downs per week (i) from HOH to MOH and
(ii) from MOH to the least restrictive setting consistent with the prisoners' clinical needs.
In addition, for two random weeks, the Department is required to review the count sheets
documenting the number of occupied and available beds in the MOH and HOH units at
TTCF and CRDF.  Substantial Compliance requires "the immediate availability of HOH
and MOH beds at TTCF and CRDF 95% of the time."

The County reports the number of days in which the total number of HOH and
MOH available beds was equal to or more than the number of HOH and MOH inmates
for the two randomly selected weeks in the Second Quarter of 2019 are as follows:

|      | MOH  | HOH |
|------|------|-----|
| TTCF | 100% | 0%  |
| CRDF | 50%  | 0%  |

The County also reports the number of days in which the total number of HOH
and MOH available beds was equal to or more than the number of HOH and MOH
inmates for the two randomly selected weeks in the Third Quarter of 2019 are as follows:

|      | MOH  | HOH |
|------|------|-----|
| TTCF | 100% | 0%  |
| CRDF | 100% | 7%  |

The County reiterates that the Department "is considering
alternative ways to accurately capture [detailed breakdowns relating to bed availability
required by Compliance Measure 63-1,] but it is not able to do so currently due to
limitations in the technologies involved in capturing and reporting that information."

DOJ has expressed concern about "the apparent lack of improvement in the
County's ability to meet the shortfall of HOH beds over time."  While the Mental Health
Subject Matter Expert agrees this is "a chronic problem," he believes that "the  more
important problems underlying this ongoing need for HOH beds are lack of FIP beds,
inadequate treatment, and inability to find a path to involuntary treatment in the jail
(outside MIST, FIST, and FIP)."

64.     Within six months of the Effective Date, the County and the Sheriff will develop a short-term plan addressing the following 12-month period, and within 12 months of the Effective Date, the County and the Sheriff will develop a long-term plan addressing the following five-year period, to reasonably ensure the availability of licensed inpatient mental health care for prisoners in the Jails.  The County and the Sheriff will begin implementation of each plan within 90 days of plan completion.  These plans will describe the projected capacity required, strategies that will be used to obtain additional capacity if it is needed, and identify the resources necessary for implementation.  Thereafter, the County and the Sheriff will review, and if necessary revise, these plans every 12 months.

**STATUS:      PARTIAL COMPLIANCE**

Substantial Compliance requires the Department to (1) develop a short-term plan that will address the availability of licensed inpatient mental health care for prisoners in an initial 12-month period; (2) commence to implement the plan within 90 days after it is developed; (3) develop a long-term plan within 12 months after the short term plan that will address the availability of licensed inpatient mental health care for prisoners in the following five-year period; and (4) commence to implement the long-term plan within 90 days after it is developed.

The Department of Health Services submitted a January 2020 "Update to Plan Regarding Availability of Licensed Inpatient Mental Health Care (Long Term and Short Term Plans) " to reflect the "significant steps taken by CHS, and by the Board of Supervisors more broadly, impacting the availability of care for inmate-patients in need of inpatient care with and without the jail system."  CHS's Update reports:

The County currently operates 46 licensed inpatient beds in the CTC-MHU (FIP) at TTCF.  On average, in light of concerns related to security classification, acuity of mental health status and related symptoms, approximately 32 of those beds are in service at any point in time.

Because of this limited capacity, the County operates a wait list of inmates who would be better served by inpatient mental health care but for which there is no immediate space available.  As of January 7, 2020, there were 33 inmates waiting for admission (20 men, 13 women).

Elsewhere CHS's Update states that it has "a newly developed tool to track the number of inmate-patients meeting the criteria for P4 level of care, the level of care at which the County believes the inmate would be best served by inpatient care. . . .Between September 25, 2019, and December 18, 2019, an average of 84 inmates were identified as meeting criterial for P4 level of care. . . .During this period, the largest number of patients so identified was 95, and the lowest was 69."

The Mental Health Subject Matter Expert notes that it is difficult to reconcile the number on the FIP waiting list (33) with the number of patients meeting the criteria for P4 level of care who "would be best served by inpatient care" (between 69 and 95), and

the wait times do not reflect "the wait times of P4 patients (who meet civil commitment criteria) that are not on the FIP list" and who may wait for a considerable period of time before being admitted to FIP.  He and the clinicians "continue to see very seriously ill patients that are not getting inpatient services both on our tours and in our reviews of medical records.  It is clear to us that the County is not meeting the need here."

The County's Augmented Ninth Self-Assessment reports that the "time from referral to admission [currently] averages about 16 days for men and 2 days for women," but as noted by the Mental Health Subject Matter Expert, "it does not report on the average time and range of those on the waiting list.  Not all those on the waiting list are admitted to FIP and these are the cases that are most likely to be on the waiting list a long time."

The Augmented Ninth Self-Assessment again reports that "the County also continues to operate 18 inpatient beds at Olive View-UCLA Medical Center.  These beds house individuals who are diverted from the County Jail, either pre-trial or once they have been brought into the jail and are awaiting trial."  With respect to these beds at Olive View-UCLA, the "patients come from [FIP], or those in High Observation Housing whose needs are more suited to inpatient mental health care."  The Office of Diversion and Reentry (ODR) "collaborates with the County's justice partners to facilitate diversion from custody to [its] care" and is "responsible to the patient and the courts to [facilitate] appropriate community placement."

The County's Augmented Ninth Self-Assessment reports that the "County also continues to operate its Mental Health Unit-Correctional Treatment Center Inpatient Step-Down Unit, which operates in one pod at CRDF, with a maximum of 22 beds, and two pods at TTCF, with a maximum capacity of 64 beds."  CHS reports that inmates in these pods "receive programming, and supervision by a psychiatric technician and assigned social worker, not available to inmates in other areas of mental health housing." CHS Update reports that

> Staffing for the CTC-MHU step-down unit currently includes a Psychiatric Technician and Licensed Clinical Social Worker who provide regular follow up and programming.  Additionally, group providers, clinicians, psychiatrists, and LASD personnel who have been oriented to the goals of the unit are assigned there.  The unit has seen significant improvements in the patient population by reducing the likelihood of a return to FIP shortly after discharge, as well as providing an enhanced therapeutic environment for those how are on the list waiting to be admitted to FIP.[46]

The Monitor and Mental Health Subject Matter Expert agree that the step-down units appear to have been successful in better addressing the needs of a seriously mentally ill

---

[46] The Mental Health Subject Matter Expert notes that this "is consistent with clinician reports, but cannot be verified."

inmate population.[47]  Based upon conversations with Custody and CHS staff during a
recent site visit, the Monitor and Mental Health Subject Matter Expert believe that with
staffing CHS staff,[48] the step-down units at both TTCF and CRDF could be expanded "to
better meet the needs of the chronically mentally ill population, maintaining them in an
augmented HOH setting that helps reduce the need for inpatient services."[49]

The CHS Update also includes sections on the MIST Program, which seeks to
reduce the demand for inpatient beds by treating inmates facing misdemeanors charges
who have been determined to be incompetent to stand trial "outside of the inpatient
setting;" the efforts led by ODR "to reduce the jail's MIST population. . .by identifying
inmates who are eligible for diversion into several different levels of community care
based upon individual need, including inpatient psychiatric hospitalization;"[50] and other
diversion and alternative to custody programs to further reduce "the need for acute
inpatient beds in the jails."

As the Monitor has previously noted, the County's long-term "plans must have a
reasonable basis for projecting need in order to establish Substantial Compliance with
Paragraph 64."  In the past, the County has failed to use a reasonable methodology to
project the number of prisoners who will need licensed inpatient mental health care in the
future, and relied instead on what it is currently doing to provide that health care.

CHS's Update includes a section entitled "Projecting Inpatient Mental Health
Housing Demand," which explains that

> CHS is now tracking the number of patients meeting P4 criteria on a
> weekly basis to develop data-based projections for its estimated inpatient
> mental health housing needs. . . .As a preliminary matter, CHS mental
> health management expects that roughly 200 inpatient beds are required
> that ensure that inmates best served by inpatient health care have their
> need met immediately without waiting in light of the continually growing
> population of severely mentally ill inmates.  CHS will continue to develop
> its data in this area to improve it projections.

Although the basis for CHS's preliminary projection that 200 inpatient beds are required,

---

[47] The Monitor agrees with DOJ that the County should "track whether inmates are returning to inpatient
mental health housing after being housed in" step-down units to be able to assess the effectiveness of those
units.
[48] Although CHS anticipated that it would receive 120 positions in three phases over 18 months from
March 2016, only the first 40 of those positions have been allocated by the County and filled by CHS.
[49] During a site visit in January 2020, the Monitor and Mental Health Subject Matter Expert were advised
that there were only three inmates in the FIP Step-Down Unit at CRDF.  Pursuant to the suggestion of the
Mental Health Subject Matter Expert, "CRDF recently changed its intake and admission criteria for the
FRESH program (CRDF's FIP Step-Down) to include for consideration all patients eligible to participate in
un-cuffed programming and out-of-cell time," which is also the practice at TTCF.
[50] Since 2015, 1,680 MIST patients have been diverted "out of the jail into community-based treatment."
260 FIST patients facing felony charges have also been diverted.

and when these beds will be required, are not clear,[51] the tracking of patients to develop data-based projections may be a reasonable basis for projecting future inpatient needs if it also takes historical data and demographic trends into consideration.[52]

---

[51] Currently, the County has 32 inpatient beds in the CTC.  The number of patients meeting the criteria for P4 level of care who "would be best served by inpatient care" during the most recent period was between 69 and 95. See p. 85, *supra.*

[52] As the Monitor previously noted, the "County presumably has data regarding the number of FIP patients and the number and duration of patients on the FIP waiting lists" since it entered into the Settlement Agreement with DOJ, See Monitor's Eighth Report, p. 82, that could be used, along with population projections and data about increases in the mentally ill population in the jails and the community at large, to develop projections of the County's future inpatient bed needs.

65.     Consistent with existing Sheriff's Department policies, the County and the Sheriff will ensure that psychotropic medications are administered in a clinically appropriate manner to prevent misuse, hoarding, and overdose.

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance requires that (1) the County's Self-Assessments set forth the (a) the results of weekly medication audits documenting the visual observation of the administration of medication during the quarter; (b) unauthorized medications found as a result of cell searches during the reporting period; and (c) incidents involving confirmed prescription drug overdoses; and that (2) "the Monitor concludes, after consulting with the Subject Matter Expert, that psychotropic medications have been administered in a clinically appropriate manner 85% of the time."

The County's Ninth Self-Assessment reports that "[d]uring the Ninth Reporting Period, among other things, the pill call pilot workgroup developed a script for a training video to be used jointly by nursing and custody staff to illustrate how pill call should be conducted, common scenarios, and appropriate responses to common events to increase compliance with CHS and LASD policy, communication among the departments and their line staff, and reduce risks related to the use or abuse of prescription medications." The County reports that a "Pill Call Pilot" has resulted in significant improvements in medication administration at TTCF and was the result of a major effort across Custody, Medical and Mental Health staff.  More specifically, during the reporting period each of LASD, nursing, and mental health staff at TTCF invested significant time and resources into improving medication administration services and documentation."  The Mental Health Subject Matter Expert notes that the pill call project is "a good example of using quality management principles."

The County's posted results for the Second Quarter of 2019 state that "[d]ue to inconsistencies found with past auditing practices, the County and Department have temporarily paused reporting [the results of Administrative Audits] for 65-1(a) to establish a more consistent and clinically appropriate process. . . .[T]he County is also working on identifying a reliable and effective tool to audit 65-1(a) for future reporting."

The County reports there were six confirmed and 22 unconfirmed overdoses in the Second Quarter of 2019, seven confirmed and 10 unconfirmed overdoses in the Third Quarter of 2019.  As in the past, the County's posted results reflect medication was found during a significant number of searches in the Second[53] and Third[54] Quarters of 2019.

---

[53] During the Second Quarter of 2019, 68 medications not "appropriately possessed by inmates" were found during 135 unannounced searches at CRDF, 339 medications were found during 120 searches at TTCF, 146 medications during 180 searches at MCJ, 5 medications during 525 searches at NCCF, 41 medications during 198 searches at PDC North, two medications found during 279 searches at PDC South, and no medications during five searches at PDC East.

[54] During the Third Quarter of 2019, 41 medications not "appropriately possessed by inmates" were found during 141 unannounced searches at CRDF, 577 medications were found during 122 searches at TTCF, 130 medications during 163 searches at MCJ, no medications during 658 searches at NCCF, 241 mediations

66.     Consistent with existing DMH policies, prisoners in High Observation Housing and Moderate Observation Housing, and those with a serious mental illness who reside in other housing areas of the Jails, will remain on an active mental health caseload and receive clinically appropriate mental health treatment, regardless of whether they refuse medications.

**STATUS:     NON-COMPLIANCE**

Substantial Compliance requires the Department to review, on a random basis, the electronic medical records of prisoners in HOH and MOH or with a Serious Mental Illness ("SMI") to assess whether they have remained on an active mental health caseload and that 95% of HOH prisoners, 90% of MOH prisoners, and 85% of other prisoners with a serious mental illness been offered "clinically appropriate structured mental health treatment" and been seen by a QMHP at least monthly, regardless of whether they refuse medications.

The County's posted results reflect that, for the Second Quarter of 2019, 14% of the records reviewed reflected that an HOH inmate was offered clinically appropriate treatment at least weekly and seen by a QMHP at least once a month; 10% of the records reviewed reflected that a MOH inmate was offered clinically appropriate mental health treatment and seen by a QMPH at least once a month; and 53% of the records reflected that mentally ill inmates residing in other housing areas were offered clinically appropriate mental health treatment at least weekly, and were seen by a QMHP at least once a month.[55]  No results for the Third Quarter of 2019 were posted.

During a December 2019 site visit, the Mental Health Subject Matter Expert and the clinicians reviewed cases from the MOH and HOH units at both TTCF and CRDF as well as cases involving seriously mentally ill inmates in the general populations at both facilities.  They found "limited evidence of treatment that qualified as structured in any setting," although "[t]reatment was more often clinically appropriate for the GP Patients[.]  Only 8% of the cases received structured treatment and 54% received clinically appropriate treatment," which was higher than previous findings because they "reviewed a higher proportion of GP cases than during our previous review."

The County is struggling to ensure that seriously mentally ill inmates receive the clinically mental health treatment they need and is required by Paragraph 66.  Over four years after entering into the Settlement Agreement, the County's Ninth Self-Assessment repeats that "[t]he County continues to work towards increasing its capacity to offer clinically appropriate treatment, including structured mental health treatment" and "improved standardization of the intake assessment process performed in the reception centers" to better identify "inmates at intake who have a serious mental illness."[56]

---

during 215 searches at PDC North, and no medications during 166 searches at PDC South and five searches at PDC East.

[55] Compliance Measure 66-4(c) does not require that prisoners having a serious mental illness who reside in other housing areas of the jail be offered clinically appropriate treatment "at least weekly."

[56] See Monitor's Eighth Report, p. 85, quoting the County's Eighth Self-Assessment.

67.     Within three months of the Effective Date, the County and the Sheriff will implement policies for prisoners housed in High Observation Housing and Moderate Observation Housing that require:

(a)     documentation of a prisoner's refusal of psychotropic medication in the prisoner's electronic medical record;

(b)     discussion of a prisoner's refusal in treatment team meetings;

(c)     the use of clinically appropriate interventions with such prisoners to encourage medication compliance;

(d)     consideration of the need to transfer non-compliant prisoners to higher levels of mental health housing; and

(e)     individualized consideration of the appropriateness of seeking court orders for involuntary medication pursuant to the provisions of California Welfare and Institutions Code sections 5332-5336 and/or California Penal Code section 2603(a).

**STATUS:      PARTIAL COMPLIANCE**

Substantial Compliance requires the County to "review the electronic medical records of 25% of the prisoners in HOH and MOH who refused psychotropic medication during the quarter to verify that the records [of 85% of the prisoners] reflect the documentation and consideration of the matters required by the terms of Paragraph 67."

The County's Ninth Self-Assessment states that the County "continues to experience challenges implementing and assessing compliance with this Provision."  It also reiterates that "[t]he County also continues to work towards better uses of technology to identify patients in MOH.  A report is run weekly that identifies inmates refusing medications 50% of the time for the week.  Nursing staff then follow up with these inmates and consult with a psychiatrist assigned to the patient."  Historically, the "documentation of the information sought by some of the sub-sections of this Provision is not consistently included in the same place and [in the] same level of detail in the relevant records."  Its Augmented Ninth Self-Assessment "acknowledges that difficulties [the County] is having in formally assessing this Provision, but hopes to provide a formal self-assessment in the next reporting period that illustrates consistent, reliable, and clinically sound practices in data."

During a December 2019 site visit, the Mental Health Subject Matter Expert and the clinicians found that "a QMHP considered whether placement at a higher level of case was indicated" in 50% of the cases they reviewed; there was "a reasonable determination of the reasons for the recommendation for housing changes" in 56% of the cases; there were "[a]ppropriate measures to secure compliance were undertaken" in 77% of the cases; and "consideration of FIP and involuntary medication" in 67% of the cases

where there "was evidence of possible dangerousness or grave disability[.]"  They observed that "when clinicians remember to address the issues, there work is generally adequate and they are already meeting with patients."  Notwithstanding the County's inability to report any results, the Monitor is satisfied, based upon the qualitative assessment by the Mental Health Subject Matter Expert and the clinicians that the County has achieved Partial Compliance.

68.     Within six months of the Effective Date, the County and the Sheriff will
develop and implement a procedure for contraband searches on a regular, but staggered
basis in all housing units.  High Observation Housing cells will be visually inspected
prior to initial housing of inmates with mental health issues.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of January 1, 2016,
through December 31, 2016 (verified) at MCJ, NCCF,
PDC East, PDC South, and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2017,
through December 31, 2017 (verified) at TTCF)**

**PARTIAL COMPLIANCE (at CRDF)**

Substantial Compliance requires that "85% of the housing units are searched for
contraband at least once in the previous quarter; and 95% of the HOH units visually
inspected prior to housing prisoners in these units."  Self-Assessments are to include a
summary of searches conducted and a review of 25 randomly selected Checklist forms
for HOH units to confirm that the units were visually inspected prior to initial housing of
prisoners in these units.

The County previously maintained Substantial Compliance for twelve consecutive
months at TTCF, MCJ, NCCF, PDC East, PDC South, and PDC North, and these
facilities were not subject to monitoring for compliance with Paragraph 68 during this
reporting period.

The County's posted results reflect that in the Second Quarter of 2019, 89% of the
housing units at CRDF were searched at least once in the quarter, and 96% of the
randomly selected HOH cells at CRDF were visually inspected before housing prisoners
in these units.  During the Third Quarter of 2019, 96% of the housing units at CRDF were
searched at least once in the quarter, and 92% of the randomly selected HOH cells at
CRDF were visually inspected before housing prisoners in these units, which is slightly
below the 95% threshold for Substantial Compliance.

69.     Consistent with existing DMH policies regarding use of clinical restraints, the County and the Sheriff will use clinical restraints only in the Correctional Treatment Center and only with the approval of a licensed psychiatrist who has performed an individualized assessment and an appropriate Forensic Inpatient order.  Use of clinical restraints in CTC will be documented in the prisoner's electronic medical record.  The documentation will include the basis for and duration of the use of clinical restraints and the performance and results of the medical welfare checks on restrained prisoners.  When applying clinical restraints, custody staff will ensure a QMHP is present to document and monitor the condition of the prisoner being placed in clinical restraints.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of July 1, 2018, through June 30, 2019 (verified))**

Substantial Compliance requires the Department to review the electronic medical records of all prisoners placed in clinical restraints to verify that the restraints were used, approved, and documented, and that the results of medical welfare checks on restrained prisoners were also documented.

The County's Self-Assessments report that for the Second Quarter of 2019, "100%. . . of electronic medical records reviewed. . .reflected that, for inmates placed in clinical restraints for psychiatric purposes, the restraints were used, approved and documented as required.  Importantly, clinical restraints were used only on one patient in the Second Quarter of 2018" and no patients were place in such restraints in the Third Quarter of 2019.  The County's results have been verified by the Monitor's auditors and the County is no longer subject to monitoring for Substantial Compliance with Paragraph 69.[57]

---

[57] These results have also been confirmed by the Mental Health Subject Matter Expert and clinicians during their qualitative assessments.

70.     Within three months of the Effective Date, the County and the Sheriff will have policies and procedures regarding the use of Security Restraints in HOH and MOH. Such policies will provide that:

(a)     Security Restraints in these areas will not be used as an alternative to mental health treatment and will be used only when necessary to insure safety;

(b)     Security Restraints will not be used to punish prisoners, but will be used only when there is a threat or potential threat of physical harm, destruction of property, or escape;

(c)     Custody staff in HOH and MOH will consider a range of security restraint devices and utilize the least restrictive option, for the least amount of time, necessary to provide safety in these areas; and

(d)     Whenever a prisoner is recalcitrant, as defined by Sheriff's Department policy, and appears to be in a mental health crisis, Custody staff will request a sergeant and immediately refer the prisoner to a QMHP.

**STATUS:     PARTIAL COMPLIANCE**

The Monitor's Eighth Report noted that "[t]he Mental Health Subject Matter Expert and DOJ have expressed concern about the Department's Substantial Compliance with paragraph 70(c) if all inmates in HOH are routinely handcuffed when they are out of their cells 'in a housing pod at the same time.'"[58]

In response to concerns expressed by the Mental Health Subject Matter Expert and DOJ, the County's Eighth Self-Assessment reported that:

The Department continues to use alternative types of mental health housing with the goal of housing inmates with mental health concerns in the least restrictive manner appropriate, these models include Step-Down modules, the HOPE Dorm and the Living Module.  At CRDF, these programs operate using the FRESH program, which is a FIP step-down type model, and the LIFE program, which is a Living Module model.  As previously reported, under the 'Living Module' concept, patients begin their mental health treatment in an HOH pod and transition into an MOH pod as their mental health improves.  With each stage in the transition, the inmate-patient gains privileges and is less restricted in their movement. The Living Module now operates in six pods at TTCF and three pods at CRDF.  Inmates in the Step-down modules and HOPE Dorm are not restrained when out of cell.  There are three FIP Step-Down pods at TTCF and CRDF.

---

[58] See Monitor's Eighth Report, p. 90.

Significantly, beginning in March 2019, the Department began a pilot program, aimed to provide P3/HOH inmates with significant unrestrained out of cell time. . .The pilot is currently available to inmates in five HOH pods at TTCF, and three HOH pods at CRDF.

The County continues to conduct weekly assessments of inmates in HOH housing.  During those assessments, clinicians consider, among other things, whether an inmate is able to cohabitate with others.  In addition, the County conducts daily huddle meetings to assess whether HOH inmates are suitable for a double man cell, or transfers to Enhanced Mental Health Housing or MOH.  Separate from clinician assessments, inmates that are able to cohabitate are often trusted to be unrestrained when out of their cells together.

After considering the County's Eighth Self-Assessment and consulting with the Mental Health Subject Matter Expert, the Monitor expressed the view in the Eighth Report that "[i]n order to achieve Substantial Compliance, the County has to demonstrate that it is continuing to conduct individual assessments in weekly and daily meetings, expanding the use of Living Modules and FIP step-down pods (or other less restrictive housing arrangements), and articulating policies for these programs."[59]  The County's Ninth Self-Assessment essentially repeats the descriptions set forth in the Eighth Self-Assessment and again explains that "security and space limitations prevent the County from expanding its alternative housing models in HOH housing."  After consulting with the Subject Matter Expert, observing the specialized units at TTCF and CRDF, and talking with Custody and CHS staff, the Monitor believes that, with additional CHS staffing,[60] the County could expand the Living and LIFE Modules and the Step-down units to provide enhanced mental health care treatment to additional HOH inmates who currently satisfy the criteria for housing in those specialized units.[61]  This could be done by transferring inmates who reside in other HOH units and do not have a history of violence to additional pods in the same modules or on the same floors as the existing special units.  The ultimate goal should be that the "concept of progressive movement towards less restrictive settings be available to all but the most high risk patients."

The Monitor does not believe that "security and space limitations" are insurmountable bars to expanding these units.  Stating that the "Department continues to work hard to house inmates in the least restrictive manner appropriate in light of mental health condition and security concerns" is not sufficient to achieve Substantial Compliance.  The Monitor agrees with DOJ that "the County must show that clinicians routinely make individualized assessments for all HOH inmates about whether [the special housing units] would be appropriate, and that inmates are not being denied access to those housing units due to space or capacity constraints."

---

[59] See Monitor's Eighth Report, p. 91.
[60] The County reports that "CHS has developed a plan to request 80 [additional] positions to address the staffing of mental health services and is working with the CEO's office and LASD to determine if additional custody staffing is required to expand the Living Modules and LIFE modules."
[61] See p. 87, n. 50, *supra.*

71.     The County and the Sheriff will ensure that any prisoner subjected to clinical restraints in response to a mental health crisis receives therapeutic services to remediate any effects from the episode(s) of restraint.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017 (verified))**

Substantial Compliance requires the Department to review the electronic medical records of all prisoners placed in clinical restraints to verify that the prisoners received therapeutic services as required by Paragraph 71.

The County maintained Substantial Compliance with Paragraph 71 for twelve consecutive months during a prior reporting period and Paragraph 71 was not subject to monitoring in the Ninth Reporting Period.

72.     The County and the Sheriff will develop and implement policies and procedures that ensure that incidents involving suicide and serious self-injurious behavior are reported and reviewed to determine:  (a) whether staff engaged in any violations of policies, rules, or laws; and (b) whether any improvements to policy, training, operations, treatment programs, or facilities are warranted.  These policies and procedures will define terms clearly and consistently to ensure that incidents are reported and tracked accurately by DMH and the Sheriff's Department.

**STATUS:         SUBSTANTIAL COMPLIANCE (as of January 1, 2017, through December 31, 2017)**

Substantial Compliance requires the Self-Assessments to report on (a) suicide review meetings and (b) CIRC meetings that review incidents of serious self-injurious behavior in the reporting period.

The County  previously maintained Substantial Compliance with Paragraph 72 for twelve consecutive months in 2017, and it was not subject to monitoring in the Ninth Reporting Period.

73.     Depending on the level of severity of an incident involving a prisoner who threatens or exhibits self-injurious behavior, a custody staff member will prepare a detailed report (Behavioral Observation and Mental Health Referral Form, Inmate Injury Report, and/or Incident Report) that includes information from individuals who were involved in or witnessed the incident as soon as practicable, but no later than the end of shift. The report will include a description of the events surrounding the incident and the steps taken in response to the incident. The report will also include the date and time that the report was completed and the names of any witnesses. The Sheriff's Department will immediately notify the County Office of Inspector General of all apparent or suspected suicides occurring at the Jails.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified))**

Substantial Compliance requires the Department to review quarterly a random sample of reports of any threats or exhibitions of self-injurious behavior to verify that the reports have the information required by Paragraph 73; and to provide the Monitor with the notifications to the Inspector General of all incidents involving an apparent or suspected suicide during the reporting period.

The County's Seventh Self-Assessment reported that it had maintained Substantial Compliance with Paragraph 73 for twelve consecutive months through September 30, 2018, and the Monitor's auditors have verified the County's results. Accordingly, the County was not subject to monitoring for compliance with Paragraph 73 during the Ninth Reporting Period.

74.     The Sheriff's Department will ensure that there is a timely, thorough, and objective law enforcement investigation of any suicide that occurs in the Jails. Investigations shall include recorded interviews of persons involved in, or who witnessed, the incident, including other prisoners.  Sheriff's Department personnel who are investigating a prisoner suicide or suspected suicide at the Jails will ensure the preservation of all evidence, including physical evidence, relevant witness statements, reports, videos, and photographs.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of September 1, 2016,
            through December 31, 2017)**

Substantial Compliance requires the Department to provide the Monitor with an Executive Suicide Death Review reflecting the results of the Department's investigation of any suicide in the Jails within six months of the suicide.  The review must reflect steps taken to preserve all of the evidence; and list the interviews of persons involved in, or who witnessed, the incident, and whether the interviews were recorded.

The County previously maintained Substantial Compliance with this provision for twelve consecutive months and it was not subject to monitoring during the Ninth Reporting Period.  The County nevertheless continued to notify the Monitor of all inmate deaths, including suicides, and the subsequent death reviews.

75.     Within three months of the Effective Date, the County and the Sheriff will review every suicide attempt that occurs in the Jails as follows:

(a)     Within two working days, DMH staff will review the incident, the prisoner's mental health status known at the time of the incident, the need for immediate corrective action if any, and determine the level of suicide attempt pursuant to the Centers for Disease Control and Prevention's Risk Rating Scale;

(b)     Within 30 working days, and only for those incidents determined to be a serious suicide attempt by DMH staff after the review described in subsection (a) above, management and command-level personnel from DMH and the Sheriff's Department (including Custody Division and Medical Services Bureau) will meet to review relevant information known at that time, including the events preceding and following the incident, the prisoner's incarceration, mental health, and health history, the status of any corrective actions taken, and the need for additional corrective action if necessary;

(c)     The County and the Sheriff will document the findings that result from the review of serious suicide attempts described in subsection (b) above; and

(d)     The County and the Sheriff will ensure that information for all suicide attempts is input into a database for tracking and statistical analysis.

**STATUS (75):**          **SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified))**

Substantial Compliance requires (a) DMH to review documentation of randomly selected suicide attempts during the previous quarter to verify that the prisoner's mental health status and need for immediate corrective action were considered timely by the DMH staff and that the staff determined whether the suicide attempt was serious; (b) that the Department and DMH reviewed the relevant information known at that time and the status of any corrective actions taken, and they considered the need for additional corrective action if necessary; and (c) that the information is reflected in the Department's database for tracking and statistical analysis.

The County's Seventh Self-Assessment reported that it had maintained Substantial Compliance with Paragraph 75 for twelve consecutive months through September 30, 2018, and the Monitor's auditors verified the County's results.  Accordingly, the County was not subject to monitoring for compliance with Paragraph 75 during the Ninth Reporting Period.

76.     The County and the Sheriff will review every apparent or suspected suicide that occurs in the Jails as follows:

(a)     Within no more than two working days, management and command-level personnel from DMH and the Sheriff's Department (including Custody Division and Medical Services Bureau) will meet to review and discuss the suicide, the prisoner's mental health status known at the time of the suicide, and the need for immediate corrective or preventive action if any;

(b)     Within seven working days, and again within 30 working days, management and command-level personnel from DMH and the Sheriff's Department (including Custody Division and Medical Services Bureau) will meet to review relevant information known at that time, including the events preceding and following the suicide, the prisoner's incarceration, mental health, and health history, the status of any corrective or preventive actions taken, and the need for additional corrective or preventive action if necessary; and

(c)     Within six months of the suicide, the County and the Sheriff will prepare a final written report regarding the suicide.  The report will include:

(i)     time and dated incident reports and any supplemental reports with the same Uniform Reference Number (URN) from custody staff who were directly involved in and/or witnessed the incident;

(ii)    a timeline regarding the discovery of the prisoner and any responsive actions or medical interventions;

(iii)   copies of a representative sample of material video recordings or photographs, to the extent that inclusion of such items does not interfere with any criminal investigation;

(iv)    a reference to, or reports if available, from the Sheriff's Department Homicide Bureau;

(v)     reference to the Internal Affairs Bureau or other personnel investigations, if any, and findings, if any;

(vi)    a Coroner's report, if it is available at the time of the final report, and if it is not available, a summary of efforts made to obtain the report;

(vii)   a summary of relevant information discussed at the prior review meetings, or otherwise known at the time of the final report, including analysis of housing or classification issues if relevant;

(viii)  a clinical mortality review;

(ix)    a Psychological Autopsy utilizing the National Commission on Correctional Health Care's standards; and

(x)     a summary of corrective actions taken and recommendations regarding additional corrective actions if any are needed.

**STATUS (76):**          **SUBSTANTIAL COMPLIANCE (as of September 1, 2016, through December 31, 2017)**

The County previously maintained Substantial Compliance with Paragraph 76 for twelve consecutive months and this provision was no longer subject to monitoring during the Ninth Reporting Period.  Nonetheless, the County continued to conduct the reviews required by Paragraph 76 for the suicides that occurred during this period and invited the Monitor to attend these meetings.

77.     The County and the Sheriff will create a specialized unit to oversee, monitor, and audit the County's jail suicide prevention program in coordination with the Department of Mental Health.  The Unit will be headed by a Captain, or another Sheriff's Department official of appropriate rank, who reports to the Assistant Sheriff for Custody Operations through the chain of command.  The Unit will be responsible for:

    (a)    Ensuring the timely and thorough administrative review of suicides and serious suicide attempts in the Jails as described in this Agreement;

    (b)    Identifying patterns and trends of suicides and serious suicide attempts in the Jails, keeping centralized records and inputting data into a unit database for statistical analysis, trends, and corrective action, if necessary;

    (c)    Ensuring that corrective actions are taken to mitigate suicide risks at both the location of occurrence and throughout the concerned system by providing, or obtaining where appropriate, technical assistance to other administrative units within the Custody Division when such assistance is needed to address suicide-risk issues;

    (d)    Analyzing staffing, personnel/disciplinary, prisoner classification, and mental health service delivery issues as they relate to suicides and serious suicide attempts to identify the need for corrective action where appropriate; and recommend remedial measures, including policy revisions, re-training, or staff discipline, to address the deficiencies and ensure implementation; and

    (e)    Participating in meetings with DMH to develop, implement, and track corrective action plans addressing recommendations of the quality improvement program.

**STATUS (77):**        **PARTIAL COMPLIANCE**

CCSB's Semi-Annual Report for the Second and Third Quarters of 2019 reports that "there were two (2) suicides within the jail facilities, thirteen (13) suicide attempts and three hundred and twenty-nine (329) Self-Directed Violence notifications in the jails. Each suicide was discussed in a Preliminary (24 hr), 7 and 30 Day Executive Review" as required by Paragraph 76.  Of the 13 suicide attempts, only two were discussed during Critical Incident Review Committee (CIRC) monthly meetings.[62]

The Semi-Annual Report includes the following sections:

(a)        "Administrative Review of Suicides."  This summarizes the 24-hour, 7-day, and 30-day suicide reviews that occurred during the Second and Third Quarters of 2019, which includes the corrective actions the Department took to mitigate suicide risks following these reviews.  Based upon CCSB's Report and CHS's Semi-Annual Report, the Monitor remains satisfied that CCSB is continuing to ensure that CHS and the Department are timely and thoroughly conducting administrative review of suicides and serious suicide attempts in the jails as required by Paragraphs 76 and Compliance Measure 77-2(a), although CAPs often consist of an "inquiry" with little or no follow-up to actually address the problem identified in the reviews.  Further, as noted by the Mental Health Expert and the clinicians, the summaries "do not really identify problems," the concerns with clinical care, or the outcomes of peer reviews.

(b)        "Patterns and trends and statistical analysis of suicides and serious suicide attempts in the jails."  This section breaks down the incidents of Self-Directed Violence in the Second and Third Quarters of 2019[63] by age group (by incident and unique inmates and per 100,000 inmates) and it concludes that (as in the past) inmates in the 26-34 age group, who made up 33% of the inmate population, had 43% of the acts of self-directed violence.[64]  Inmates in this age group also had a disproportionate number of the 6 serious self-directed violence incidents (one of which was deemed a serious suicide attempt)[65] that were reviewed at CIRCs.  In this report, CCSB also compared the inmate population by security level and age, which again shows that as "the age group increases, the proportion of inmates who have a high security level decreases," and the percentage of inmates in the 26-34 age group who have a high security level (8-9) is slightly higher

---

[62] Section B of the Report, "Administrative Review of Serious Suicide Attempts" includes a Reporting Period Comparison that appears to compare the data from the Second and Third Quarters of 2019 (although it erroneously references the Fourth Quarter of 2018 and the First Quarter of 2019, and compares it to different data for the Second and Third Quarters of 2019.

[63] The report refers to the distribution of inmates by age in the Third Quarter of 2018.  Elsewhere, it states that the County assumes that "the age distribution of the inmate population did not change substantially during the second and third quarters of 2019."

[64] This is based upon the number of separate incidents.  Counting inmates rather than incidents, this group accounted for 41% of the inmates who engaged in one or more acts of Self-Directed Violence.

[65] As the County notes "[s]ince the sample size of critical incidents is only 6, it is difficult to draw any conclusions as the margin of error is very large."

than the percentage of the total population.  The County analyzed the "distribution of self-directed violence incidents by security level" and found that "33% of the SDVs were by inmates at high security level [8-9], much higher than the proportion of all inmates that are high security of 13%," and "inmates at the high security level have self-directed violence rates that are almost three times that of the medium security level and more than six times that of the low security level."[66]  The percentage of *serious* SDV incidents involving inmates in high security that were reviewed at CIRCs are just slightly above the percentage of inmates in high security.  As in the past, the County concludes that "[i]nmates with a high-security level are at a much higher risk to engage in self-harm compared to inmates at low or medium security level."  Although this statistical analysis satisfies the requirements of Compliance Measure 77(b), it is again limited to age groups and security level.  The CCSB Report does not, however, include any "further (and on-going) analysis" that the Mental Health Subject Matter Expert previously observed "is part of a sound quality improvement program,"[67] nor is there any indication that the County has undertaken any projects based upon the data.  "In short, [CHS and CCSB] have some repeated findings, but again they do not appear to be acting on the information, yet continue to collect it."

(c)     "Corrective actions taken by the department to mitigate suicide risks."  This section summarizes matters the Department and CHS are "collaborating on."  It describes (1) clear vinyl mattresses that "make it easy to identify contraband and reduce the likelihood the cover will be fashioned as a ligature" have been manufactured at the PDC Laundry Services Facility and distributed to custody facilities beginning on July 12, 2019; and (2) the construction of new Deputy work stations in TTCF that face the dayrooms and cells so that Deputies and Custody Assistants will be able to observe what is happening in the housing areas while performing other tasks.[68]  CCSB's report of the CAPs discussed at the Executive Inmate Review Committee meetings under the "Administrative Review of Suicides" section above and the CHS's Summary of Recent CIRC Incidents and Data in its Semi-Annual Report reflect that corrective actions are being "taken to mitigate suicide risks."  As in the past, the Mental Health Subject Matter Expert notes that "[a]ll the CAPS are coming from investigations, none from analysis of aggregated data. . .  or patterns and trends and statistical analysis of suicides and serious suicide attempts.  While CAPs based upon reviews of individual cases are an important part of QI, it is essential to use aggregate data to drive CAPs and determine if CAPs derived from reviews of individual cases are effective."

(d)     "Technical assistance provided to, or obtained for other administrative units within the Custody Division to address suicide-risk issues."  This section describes "a new program located inside" an HOH unit in which "[m]ultiple inmates of different Mental Health Levels of Care are given dayroom or outdoor recreational time unhand-cuffed."  The County reports that "[s]ince the implementation of the out of cell program, there has been a decrease in UOF, SDV's and suicide attempts in HOH double man housing areas."  There is, however, "no conclusion or plan articulated to consider the

---

[66] The Mental Health Subject Matter Experts observes that this "is a significant finding deserving inquiry."
[67] See Monitor's Eighth Report, p. 101.
[68] "Material was budgeted and purchased for 14 new work stations."

expansion of such units."

(e)     "Analysis of staffing, personnel/disciplinary, prisoner classification, and mental health service delivery issues as they relate to suicides and serious suicide attempts."  This section analyzes the issues in these categories for the two suicides that were reviewed during the Ninth Reporting Period, and concludes that staffing was an issue in one of the suicides where "a delay in referral time. . . was caused by staffing levels being unallocated."  The section does not include any conclusions or analysis of the one serious suicide attempt during the period.

(f)     "Remedial measures, including policy revisions, re-training, or staff discipline, to address issues related to suicide and serious suicide attempts."  This section consists of a table that summarizes the policy revisions and re-training (there was no discipline) taken to address issues related to the two suicides reviewed during the Ninth Reporting Period.  This section does not, however, discuss the serious suicide attempts during the period.

(g)     "Summaries of meetings with DMH to develop, implement, and track corrective action plans."  This section reports that in "January, CCSB and CHS – Compliance Team began meeting once a month prior to the CIRC meeting to "bring up past CAP items and have the Access to Care Lieutenants from their respective facilities test/grade their effectiveness."  It reiterates that "[a]t every [Joint Quality Improvement Committee] JQIC meeting, there is follow up to verify that the CAP(s) have been addressed, also the individual or facility who was assigned to the CAP should verify their effectiveness.  CCSB tracks all suicide-related CAPs, whether they are CHS or LASD CAPs, and does so continuously outside of the CIRC and JQIC context."  During the Ninth Reporting Period, the Department and CHS "participated in a total of 5 meetings (JQIC) to discuss CAP/Issues that were developed during the CIRC meetings and 10 Pre JQIC Planning meetings."  With respect to comments by the Mental Health Subject Matter Expert regarding the use of aggregate data in a quality improvement program, "CCSB began to provide aggregate data to the group" and the "JQIC meetings have included discussions about the requirement to use data to identify patterns and trends related to suicides and self-directed violence."

The CCSB report provides "a sample of the graphs and charts presented and discussed during the reporting period," including data from 2018 discussed in the April 2019 JQIC meeting on inmates with the highest number of SDV incidents in HOH and Module 132 F-Pod (the "Sterile Pod") and data on SDV incidents and SDV incidents by method in HOH, MOH, 132 F-Pod, and general population.  In a subsection entitled "2018 Review of CIRC's," CCSB reports on the number of serious SDV incidents by location; the risk rating scores of the inmates with the most frequent SDV incidents in HOH and 132 F-Pod (the incidents were slightly less severe in 132 F-Pod); and the number of CIRCs and Suicides by location and within days of arrest.  Finally, there were summaries of the JQIC meeting that discussed the results of a working group that studied "problems with the timely and appropriate process of patients returning from hospitals on a 5150;" the Substance Treatment and Re-Entry (START) Program, the alcohol

withdrawal protocol; the "Waiting Days" for the MOH Psych-Line, which showed a significant reduction of the wait time during the first six months of 2019 (65% within seven days in comparison to 29% in 2018) and average wait times for HOH, MOH, and General Population inmates and for the Step Forward program in February through July 2019.  Although CCSB reports that "[t]he County continues to include presentations on aggregate data and system-wide changes in addition to follow-up and review of issues identified in the previous month's CIRC at month JQIC," once again its report, "does not identify what it has done to identify and address any systemic issues, or to undertake any quality improvement projects that resulted from the analysis."[69]

As  noted above with respect to risks identified during Facility Suicide Hazard Inspections, CCSB must "ensure that corrective actions are taken to mitigate suicide risk . . . obtaining where appropriate, technical assistance. . .when such assistance is needed to address suicide-risk issues."[70]  CCSB's Report does not indicate what steps the Department has taken to address the risks identified in the last inspection report posted by the Department for July and August of 2019.  Further, it does not indicate whether the Department has continued to conduct those critical inspections (notwithstanding that it is no longer subject to monitoring for the requirement of Paragraph 24), and if so, what the Department has done to address any additional risks identified in those inspections.

---

[69] See Monitor's Eighth Report, p. 103.
[70] See p. 22, *supra*.

78.     The County and the Sheriff will maintain a county-level Suicide Prevention Advisory Committee that will be open to representatives from the Sheriff's Department Custody Division, Court Services, Custody Support Services, and Medical Services Bureau; the Department of Mental Health; the Public Defender's Office; County Counsel's Office; the Office of the Inspector General; and the Department of Mental Health Patients' Rights Office.  The Suicide Prevention Advisory Committee will meet twice per year and will serve as an advisory body to address system issues and recommend coordinated approaches to suicide prevention in the Jails.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of May 11, 2016, through May 18, 2017)**

Substantial Compliance requires (1) the Committee to meet twice per year and (2) "recommend coordinated approaches to suicide prevention in the Jails."

The County maintained Substantial Compliance with Paragraph 78 for twelve consecutive months as of May 18, 2017, and this provision was not subject to monitoring in the Ninth Reporting Period.  Nevertheless, the County has continued to hold Bi-Annual Suicide Prevention meetings.  The last meeting, which the Monitor attended, was held on November 13, 2019, and provided a comprehensive overview of the County's efforts to prevent suicides in the County's jails and treat to inmates suffering from mental illness.[71]

---

[71] The overview noted an increase in the number of suicides in 2018 (five) over the prior three years (a total of seven), which trend continued during the first six months of 2019 (three).

79. (a) Unless clinically contraindicated, the County and the Sheriff will offer prisoners in mental health housing:

  (i) therapeutically appropriate individual visits with a QMHP; and

  (ii) therapeutically appropriate group programming conducted by a QMHP or other appropriate provider that does not exceed 90 minutes per session;

 (b) The County and the Sheriff will provide prisoners outside of mental health housing with medication support services when those prisoners are receiving psychotropic medications and therapeutically appropriate individual monthly visits with a QMHP when those prisoners are designated as Seriously Mentally Ill; and

 (c) The date, location, topic, attendees, and provider of programming or therapy sessions will be documented.  A clinical supervisor will review documentation of group sessions on a monthly basis.

**STATUS:** **PARTIAL COMPLIANCE**

Substantial Compliance requires the Department to maintain records of therapeutically appropriate individual visits and group programming, and the names of the clinical supervisors who reviewed the documentation of group sessions; describe the medication support services available for prisoners not in mental health housing who are receiving psychotropic medications; and review electronic medical records of such to confirm that medication support services were provided to these prisoners.

The County's Ninth Self-Assessment reports that in the Second Quarter of 2019, 62% of the prisoners who resided outside of mental health housing and were receiving psychotropic medications were "provided with medication support services," which is an improvement, although still below the 85% threshold required by Compliance Measure 79.5(d) for Substantial Compliance.

The County's Augmented Ninth Self-Assessment reports that in the Third Quarter of 2019, 56% of the prisoners who resided outside of mental health housing and were receiving psychotropic medications were "provided with medication support services."

The Department's posted results also reflect which clinical supervisors reviewed the documentation of group sessions as required by Compliance Measure 79.1(d),[72] but the County did not provide records of therapeutically appropriate individual visits and group programming by QMHPs to prisoners who reside in mental health housing, which

---

[72] The Mental Health Subject Matter Expert reviewed "every assessment of group providers by their supervisors. . . .Given the lack of evidence-basis and the highly variable groups [they] have seen," he believes that "supervisors are not doing an adequate job of overseeing the groups."

is required by Compliance Measure 79.1(a) and (b) and 79.5(b).  During a December 2019, site visit, the Mental Health Subject Matter Expert and clinicians concluded that the "County is not yet conducting treatment according to a treatment plan."  They found that there was "some individual treatment" in 63% of the cases, but "none according to treatment plan," only 6% "could be said to be evidence-based" and only 8% "were therapeutically appropriate."  "51% were offered group therapy, none according to a treatment plan," and only "21% of the groups were evidence-based" and only "23% of all patients received therapeutically appropriate group treatment."  They also observed that "that more patients in HOH were in groups than in MOH.  This reflects a commitment to serve the more seriously ill; this is a more challenging population to serve and the County should be commended for making this effort.  That said, many in MOH need a higher level of treatment."

80.     (a)     The County and the Sheriff will continue to make best efforts to provide appropriate out-of-cell time to all prisoners with serious mental illness, absent exceptional circumstances, and unless individually clinically contraindicated and documented in the prisoner's electronic medical record.  To implement this requirement, the County and the Sheriff will follow the schedule below:

(i)      By no later than six months after the Effective Date, will offer 25% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week;

(ii)     By no later than 12 months after the Effective Date, will offer 50% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week; and

(iii)    By no later than 18 months after the Effective Date, will offer 100% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week.

(b)     No later than six months after the Effective Date, the County and the Sheriff will record at the end of each day which prisoners in HOH, if any, refused to leave their cells that day.  That data will be presented and discussed with DMH staff at the daily meeting on the following Normal business workday.  The data will also be provided to the specialized unit described in Paragraph 77 and to DMH's quality improvement program to analyze the data for any trends and to implement any corrective action(s) deemed necessary to maximize out-of-cell time opportunities and avoid unnecessary isolation.

**STATUS (80):**          **NON-COMPLIANCE**

Paragraph 80 requires that, "no later than 18 months after the Effective Date [July 1, 2015]," 100% of the prisoners in HOH receive "ten hours of unstructured out-of-cell recreational time *and* ten hours of structured therapeutic or programmatic time per week." The parties have agreed that up to five hours of the structured time can consist of education or work programs, but at least five hours of the time must be therapeutic.

The County's Ninth Self-Assessment reports that in the Second Quarter of 2019, 17% of the prisoners at CRDF and 93% of the prisoners at TTCF were offered the required 10 or more hours of unstructured, out-of-cell recreational time. It also reports that "the Department believes these results under-report compliance with these measures and it is working to develop [a] better system for documenting and reporting compliance with this Provision." The results for the Third Quarter of 2019 were 89% and 91% for CRDF and TTCF, respectively.

Notwithstanding the results for unstructured out-of-cell time, the Monitor finds that the County is not in compliance with Paragraph 80 because the County's Ninth Self-Assessment does not reflect any results for "structured therapeutic or programming time." It reports that "[w]ith respect to the structured out-of-cell time, CHS is piloting an electronic system [at both TTCF and CRDF] that allows clinicians. . .to track structured out-of-cell time offered. . . .The County also continues to work on expanding staffing so that it may offer additional group therapy sessions such that patients receive clinically appropriate offerings."

The Mental Health Subject Matter Expert and the clinicians assessed the accuracy of the County's reporting of the out-of-cell time offered to inmates by comparing out-of-cell time records to videos of the HOH units over the same time periods. Among the issues they identified were the following: 78% of the County's recorded offers of outdoor recreation time were marked as "refusing" or "ineligible" (in some cases, the Department's reflect both ineligible and refusing); offers of outdoor recreation time in the evening were marked as ineligible because "no space available" at CRDF; there were refusals of outdoor recreation during evening and night time hours at TTCF, even though the Subject Matter Expert and clinicians were told by Custody staff that inmates were back in their cells by 5:30 at the latest; and no inmates at TTCF and very few at CRDF were denied out-of-cell time because of behavior issues (e.g., hostility), even though this was commonly reported as being the reason why inmates were denied out-of-cell time.

By way of example, the Mental Health Subject Matter Expert and the clinicians found that

> County reports of indoor recreation (dayroom time) are closer to what we can verify, but County reports of Indoor Rec often do not correspond to observed [Out of Cell] OOC time on the unit; sometimes the County is over-reporting indoor recreation and sometimes it is not reporting it when patients are actually out. While there were some cases where the County

failed to record OOC time, the County's reports of OOC time were much longer than observed times in almost all instances.  In short, we find the County's data highly unreliable.

The Monitor and the Mental Health Subject Matter view this as a very serious problem for the Department and the County, both in terms of the accuracy of the Department's records and the conditions in HOH units.

The County reports that

CCSB is investigating these issues and, specifically, looking into potential errors in the Department technology used to capture out-of-cell time and the way the technology is used by staff.  CCSB expects that its efforts will be reflected in a quality improvement process during the next reporting period designed to improve accuracy in the Department's reported out-of-cell numbers and identify potential challenges in the process by which it offers and provides out-of-cell time.

The Monitor and the Mental Health Subject Matter Expert encourage the Department to use Quality Improvement methods to address these issues.

81.     Except as specifically set forth in Paragraphs 18-20 of this Agreement, and except as specifically identified below, the County and the Sheriff will implement the following paragraphs of the Implementation Plan in *Rosas* at all Jails facilities, including the Pitchess Detention Center and the Century Regional Detention Facility, by no later than the dates set forth in the Implementation Plan or as revised by the *Rosas* Monitoring Panel:  Paragraphs 2.2-2.13 (use of force policies and practices); 3.1-3.6 (training and professional development); 4.1-4.10 (use of force on mentally ill prisoners); 5.1-5.3 (data tracking and reporting of force); 6.1-6.20 (prisoner grievances and complaints); 7.1-7.3 (prisoner supervision); 8.1-8.3 (anti-retaliation provisions); 9.1-9.3 (security practices); 10.1-10.2 (management presence in housing units); 11.1 (management review of force); 12.1-12.5 (force investigations, with the training requirement of paragraph 12.1 to be completed by December 31, 2016); 13.1-13.2 (use of force reviews and staff discipline); 14.1-14.2 (criminal referrals and external review); 15.1-15.7 (documentation and recording of force); 16.1-16.3 (health care assessments); 17.1-17.10 (use of restraints); 18.1-18.2 (adequate staffing); 19.1-19.3 (early warning system); 20.1-20.3 (planned uses of force); and 21.1 (organizational culture).

**STATUS:     PARTIAL COMPLIANCE**

Because Paragraph 81 of the Settlement Agreement incorporates 100 provisions in the Implementation Plan adopted in the *Rosas* case, the parties agreed in the Compliance Measures adopted in this case that "Substantial Compliance with respect to the substance of the policies required by the *Rosas* Implementation Plan would be determined by the *Rosas* Monitors."  With the exception of the Early Warning System required by Section 19 of the plan, all of the required policies were approved by the *Rosas* Monitors by the Second Reporting Period in this case, and the Early Warning System was approved in the Seventh Reporting Period.

The Compliance Measures in this case then provide that "[o]nce the policies have been approved by the *Rosas* Monitors, the Monitor and Subject Matter Expert will confirm and assess the implementation of these policies in the [DOJ facilities]."  In assessing the Department's compliance with Paragraph 81, the Monitor has grouped the 100 provisions into seven categories and, with input from the Subject Matter Experts, has assessed Department's compliance on a category-by-category basis.  With the exception of the Training category, which is assessed when certain percentages are reached, the Department will no longer be subject to monitoring for the provisions in a particular category once the Monitor has determined that it has achieved and maintained for twelve consecutive months Substantial Compliance with the intent and purpose of the overall category.  The Department will no longer be subject to monitoring for compliance with Paragraph 81 once it has achieved and maintained for twelve consecutive months Substantial Compliance with each of the categories.

**Training**

Paragraphs 3.1-3.4, 4.6-4.9, and 12.1 of the *Rosas* Implementation Plan reflect training requirements in use of force, ethics, dealing with mentally ill inmates, and

investigations of force incidents.  The curriculum and lesson plans to implement these training requirements have been approved by the *Rosas* Monitors.

The Department has posted Self-Assessments for the refresher training of personnel at the DOJ facilities in the use of force and ethics and professionalism required by Paragraphs 3.1 and 3.2 of the *Rosas* Plan.  The Department has posted results showing that, based upon 50 randomly selected Deputies and/or Custody Assistants, the Department has met the 90% Substantial Compliance threshold for the required refresher training for Paragraphs 3.1 and 3.2 in the Third Quarter of 2019.[73]  These results are subject to verification by the Monitor's auditors.  The Department has not, however, demonstrated that 90% of the existing personnel received the initial training at these facilities.[74]

The Department has posted results reflecting as of October 2018 through 2019 it maintained Substantial Compliance at the DOJ facilities with Paragraph 3.3, which requires new Deputy Sheriffs and Custody Assistants to receive the use of force and ethics training in the Academies or Jail Ops Continuum.  These results are subject to verification by the Monitor's auditors.  The Department has not, however, demonstrated that 95% of new Deputy Sheriffs and Custody Assistants received the initial training from July 1, 2016 through September 30, 2018.  If verified by the Monitor's auditors, the Monitor is satisfied that the Department has achieved Substantial Compliance with Paragraph 3.3 at the DOJ facilities.  The new Deputy Sheriffs and Custody Assistants are subject to the refresher requirement in Paragraphs 3.1 and 3.2.

The Department has established Substantial Compliance with Paragraph 3.4, which requires "custody-based, use of force scenarios" in the use of force training.  The Department reported that there were no use of force investigations resolved with a finding that it "Appears Employee Conduct Could Have Been Better," the predicate for the additional training, counseling or mentoring required under Paragraph 3.5.

The Department previously achieved Substantial Compliance with the initial training required by Paragraphs 4.6 through 4.9 of the *Rosas* Plan at CRDF, NCCF, and the PDC facilities, and it posted results reflecting the new Deputy Sheriffs and Custody Assistants have continued to receive the required training through the end of the Third Quarter of 2019.[75]  These results are subject to verification by the Monitor's auditors.  The Department has not, however, demonstrated that 95% of new Deputy Sheriffs and Custody Assistants received the initial training from July 1, 2016 through September 30, 2018 as required by Paragraphs 4.6 through 4.9.  Going forward, personnel at these facilities must undergo the refresher training required under Paragraphs 4.6 and 4.7 of the *Rosas* Plan.

---

[73] Because Paragraph 81 incorporates all 104 provisions of the *Rosas* Implementation Plan in a single provision, the Monitor agreed to the use of random samples in some cases instead of requiring assessments of all personnel or incidents, which the Monitor believes would be unduly burdensome for the Department.
[74] The Department did, however, post training records reflecting that personnel at CRDF, NCCF, and the PDC facilities did receive the required training.
[75] See pp. 13-17, *supra*.

The Department has posted Self-Assessments for the refresher training of Sergeants at the DOJ facilities in conducting use of force investigations required by Paragraphs 12.1 of the *Rosas* Plan. The Department has posted results showing that, based upon 50 randomly selected Sergeants, the Department has met the 90% Substantial Compliance threshold for the required refresher training in the Third Quarter of 2019 and that all Sergeants promoted in Custody in the Third Quarter of 2019, received the required training. These results have been verified by the Monitor's auditors. The Department has not, however, demonstrated that 90% of the remaining Sergeants who were in Custody as of October 1, 2016, or that 95% of the Sergeants promoted after that date and prior to the Third Quarter of 2019 received the initial training.[76]

**Use of Force (Partial Compliance)**

In the Ninth Reporting Period, the Monitor reviewed 30 randomly selected completed force packages for the DOJ facilities. Problematic force incidents were also reviewed by the Use of Force Subject Matter Expert. The Monitor concluded that the Department's use of force was reasonable in over 80% of the cases. It should be noted that the cases reviewed by the Monitor were almost all Category 2 cases. The vast majority of the Department's force involves lower level Category 1 cases and minor non-categorical incidents (NCI)[77] in which relatively minor uses of force are almost always reasonable and in compliance with the *Rosas* requirements and the Department's use of force policies.

In two of the cases reviewed by the Monitor, it appeared that the use of chemical spray was unnecessary (because one inmate was in her cell and another inmate had already stopped fighting). In one case a Deputy escorting an inmate in handcuffs overreacted by shoving the inmate into a wall when the inmate turned around. In one case, a Deputy used a 40 MM weapon to stop an inmate who ran across the housing module after the Deputies had quelled a riot. Given the number of inmates and Deputies who were in the module at the time, the use of such a weapon when the Department had effectively separated the inmates was problematic. In other cases a Taser was used on an inmate who was walking away from the Deputy, and a Deputy punched an inmate in the face while taking her to the ground.

The Department's Use of Force Statistics reflect a 28% increase in force incidents at CRDF from 266 incidents in 2018 to 340 incidents in 2019. Excluding minor non-categorical incidents (NCIs) there was a 36% increase at CRDF from 190 to 259. At NCCF, there was a 14% decrease from 250 to 215 for all incidents; excluding NCIs, there was a somewhat lower 5.5% decrease from 200 to 189. PDC North had an overall increase from 10 force incidents in 2018 to 17 in 2019, and PDC South had a decrease from 8 to 5 incidents.

---

[76] The Department did, however, post training records reflecting that Sergeants at CRDF, NCCF, and the PDC facilities received the required training.

[77] During the two-year period from January 1, 2018, through December 31, 2019, 84.25% of the force incidents were either Category 1 cases or NCIs.

**Reporting and Investigation of Force (Partial Compliance)**

The Monitor concluded that the Department's reporting and investigation of force incidents was reasonable in 90% of the cases.  The main issue was again that the Department's Commanders need to do a better job analyzing tactical issues and discrepancies and contradictions in the evidence, and in assessing how the force incident could possibly have been avoided or handled without force.

The Department has submitted a Self-Assessment together with supporting documents reflecting that, based upon force incidents randomly selected by the Monitor, 95% of the incidents were timely entered into the Department Database and it achieved Substantial Compliance with Paragraph 5.1 at the DOJ facilities in the Third Quarter of 2019.[78]

The Department reports that "[t]here were no founded investigations in the Third Quarter of 2019 that met the criteria of Provisions 13.1 and 13.2," which require the Department to "have a firm policy of zero tolerance for acts of dishonesty or failure to report uses of force."  If the Department does not terminate a member who is found to have been dishonest, used excessive force, or violated PREA, it is supposed to "closely monitor the member's performance" and notify the Office of Inspector General.

Of some concern is the reduction in the number of Internal Affairs investigations first noted by the Office of Inspector General.  For the nine-month period ending September 30, 2019, the Department reports that for the entire Department there were 226 investigations by the Internal Affairs Bureau in comparison to 414 investigations during the same nine-month period in 2018.  This is by far the fewest such investigations for any year going back to 2010 (and is even significantly fewer than in the two years prior to the Citizen's Commission on Jail Violence investigation).

With respect to the Custody Division, there were 170 administrative investigations initiated in 2018 and 108 in 2019.  Although, as explained by the Department, there was "a significant outlier in the 2018 cases initiated" because 20 administrative investigations were initiated in response to a single incident at NCCF in March, there was still a drop-off of more than 20% in the number of administrative investigations from 2018 to 2019.  It should be noted, however, that there were 53 internal affairs investigations initiated in the period from July through December 2018 and 64 investigations initiated in the same period in 2019.   The Department reports that all of the "referrals of an inmate for criminal prosecution for assaulting a staff member, or related charges, arising from an incident involving the use of force by a Department member" were reviewed by the Unit Commander at CRDF in the Third Quarter of 2019 as required by Paragraph 14.1 of the *Rosas* Plan, and that its self-assessment "captures all relevant facilities."  The Department also timely referred one case involving a

---

[78] There were no use of force incidents reviewed by the Custody Force Response Team (CFRT) where there was a finding of a policy violation or misconduct, which is the predicate for assessing compliance with Paragraph 11.1 of the *Rosas* Plan.

Department member to the District Attorney's Office in the Third Quarter of 2019 as
required by Paragraph 14.2.

**Grievances (Partial Compliance)**

The Department's grievance forms have the check boxes for use of force,
harassment/retaliation, and the right to appeal required by Paragraphs 6.4, 6.5 and 6.6 of
the *Rosas* Plan.  The Department's Self-Assessment and the supporting documentation
reflects that all of the use of force and harassment/retaliation grievances in the randomly
selected month of September 2019 were brought to the attention of the Unit Commanders
at the DOJ facilities within 10 days of collection as required by Paragraphs 6.4 and 6.5 of
the *Rosas* Plan.

The Self-Assessment reflects that only 33% of the grievances marked
"emergency" were properly reviewed and handled as an emergency in the random month
of September as required by Paragraph 6.7.[79]  The Self-Assessment and the back-up
documentation reflect that in the month of September 2019, 100% of the grievances
marked "emergency" that were downgraded by the Department to a "non-emergency"
were properly downgraded and the inmate was notified of the downgrade within five
days as required by Paragraph 6.8; 95% of the randomly selected grievances were
collected and reviewed within 24 hours as required by Paragraph 6.10;[80] and 100% of the
randomly selected grievances were entered and tracked in the inmate grievance database
as required by Paragraph 6.12.

During the Ninth Reporting Period, the Department provided the Monitor with its
Executive Reports:  Statistical Analysis and Trends for each month through May 2019 in
the Ninth Reporting Period (with comparisons to the Fourth Quarter of 2018), broken
down by facility and with response times in compliance with the 15-day response
required by Paragraphs 6.9, 6.13, 6.14, and 6.15 of the *Rosas* Plan.

The Department's Self-Assessments reflect that there were no use of force, PREA
grievances, or appeals deemed untimely under Paragraphs 6.17, 6.18,[81] and 6.20.  The
Department responded to 69% of inmate grievances against staff (below the 90%
threshold for Substantial Compliance) and 100% of the grievances not against staff
within 15 days as required by Paragraph 6.19, and it notified inmates of the results of
grievances against staff within 10 days of the adjudication in 71% of the cases (which is
also below the 90% threshold) as required by Paragraph 7.2.

The Department reported that four inmates and Department personnel participated
in conflict resolution meetings as per Paragraph 7.1 during the Third Quarter of 2019.

---

[79] There was no back-up documentation for Paragraph 6.7 so it is not clear why the percentage is so low.
[80] There were no grievances in the Third Quarter of 2019 against any Deputies at the DOJ facilities for
failing to properly process any grievances, which is the predicate for disciplinary action per Paragraph 6.11.
[81] The County's Self-Assessment reports it determined that only 25% of the PREA grievances were
"handled appropriately and timely."  The County subsequently clarified that "all PREA grievances are
thoroughly investigated," but it "marked non-compliant" those instances in which a facility "failed to
provide a written response to an inmate within 15 calendar days as required by Department policy[.]"

The Department maintained logs of all Town Hall meetings and each jail conducted such meeting for inmates in general populations and special units in the month of September 2019.

There were no founded violations of the Department's anti-retaliation policy and Paragraph 8.1 of the *Rosas* Implementation Plan in the random month of September 2019[82] or that were received and approved during the Third Quarter of 2019.[83]  The Department reports that only 75% of the grievances alleging force was used as retaliation were timely reviewed by the Custody Force Review Committee in the Third Quarter of 2019, which is below the 100% threshold for Substantial Compliance in Compliance Measure 8.3-3 for the *Rosas* plan.

### Management and Administration (Partial Compliance)

The Department's Self-Assessment reports that Unit Commanders, Commanders, Chiefs, and the Assistant Sheriff toured and inspected all of the DOJ facilities during the Third Quarter of 2019 as required by applicable Compliance Measures for Paragraph 10.1, but the Sheriff did not visit the facilities during the quarter.  It also reports that visits to the facilities by Department managers above the rank of Sergeant were documented in electronic records or visitor logs in compliance with Paragraph 10.2.[84]

### Security Restraints (Substantial Compliance as of September 30, 2019)

Security Restraints subject to the provisions in Section 17 of the *Rosas* Plan generally are not used at the DOJ facilities.  It is the Monitor's understanding that the County and the Department do not use "multi-point restraints," which are subject to Paragraphs 17.6 through 17.9 of the plan, at any of the County's jail facilities.  Further, NCCF and the PDC facilities report that they did not use the safety chair or fixed restraints during the Third Quarter of 2019.

---

[82] Because there are relatively few completed investigations approved by Unit Commanders each month, in the future the Department should assess the first 10 approved investigations of inmate grievances alleging violations of the anti-retaliation policy **in the quarter** rather than in the randomly selected month.

[83] The Monitor identified a number of issues with the Department's handling of one of the investigations. The inmate's grievance was dated October 22, 2018 and marked as an "emergency," but the date and time of collection were not stamped on the grievance form.  The grievance was shown in the Department's database as collected on December 20, 2018 (in apparent violation of Paragraph 6.10 of the *Rosas* plan), when the Watch Commander downgraded the grievance and the inmate was notified that it would be handled as a "routine complaint" (in apparent violation of Paragraphs 6.7 and 6.8).  The investigation appears to have been completed by the handling Sergeant on or about April 22, 2019, but the Watch Commander did not approve the finding until August 20, 2019, the Unit Commander was not notified until August 29, 2019 (in apparent violation of Paragraph 6.5), and she did not approve it until September 2, 2019.  Finally, the inmate was not notified of the results until September 3, 2019, over nine and a half months after submitting the complaint.  Although the Monitor does not disagree with the finding that "exonerated" the Deputy, the Department's processing of the grievance is of considerable concern.

[84] The Department did not, however, provide back-up documentation to support these findings.  In addition, the Department has not posted any results of the rotations and audits required by Paragraphs 18.1 and 18.2 of the *Rosas* Plan.

There were twelve uses of the Safety Chair at CRDF and no uses of fixed restraints during the Third Quarter of 2019.  With one exception where a Safety Chair log was incomplete, the Monitor found that the Department complied with the safety checks required by Paragraph 17.4 and that force was not used to put the inmate in the chair.

Finally, the Department provided logs reflecting all of the involuntary medications administered in the Third Quarter of 2019.  All of the medications were administered per court orders to restore the competency of those deemed incompetent to stand trial and none were solely for security purposes in compliance with Paragraph 17.10 of the *Rosas* Plan.

### Early Warning System (Substantial Compliance as of September 30, 2019)

The Department implemented an Employee Review System that was approved by the *Rosas* Monitors as a pilot program at the Downtown Jail Facilities on July 27, 2018, and expanded it to the DOJ facilities on October 25, 2018.

The Department's Self-Assessments and the supporting documentation reflect that Compliance Lieutenants made the required notifications to the Unit Commanders at CRDF and NCCF[85] and the Assistant Sheriff for Custody; that the Unit Commanders' consulted with the a Custody Operations Chief regarding whether a non-disciplinary mentoring program was appropriate and documented the reasons for the decision in each instance, and the decisions were reasonable.

---

[85] The Department reports that there were no required notifications at PDC North or South.

82.     With respect to paragraph 6.16 of the *Rosas* Implementation Plan, the County and the Sheriff will ensure that Sheriff's Department personnel responsible for collecting prisoners' grievances as set forth in that paragraph are also co-located in the Century Regional Detention Facility.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of July 15, 2016, through December 31, 2017)**

The *Rosas* Monitors have approved a de-centralized inmate grievance system, which includes an Inmate Grievance Team co-located at Century Regional Detention Facility.  The Department published its new grievance policies on July 15, 2016.

CRDF has had its own Inmate Grievance Team with the staffing required by CDM 8-01.020.00 since July 2016.

Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring for Substantial Compliance with Paragraph 82 in the Ninth Reporting Period.

83.     The County and the Sheriff will install closed circuit security cameras throughout all Jails facilities' common areas where prisoners engage in programming, treatment, recreation, visitation, and intra-facility movement ("Common Areas"), including in the Common Areas at the Pitchess Detention Center and the Century Regional Detention Facility.  The County and the Sheriff will install a sufficient number of cameras in Jails facilities that do not currently have cameras to ensure that all Common Areas of these facilities have security-camera coverage.  The installation of these cameras will be completed no later than June 30, 2018, with TTCF, MCJ, and IRC completed by the Effective Date; CRDF completed by March 1, 2016; and the remaining facilities completed by June 30, 2018.  The County and the Sheriff will also ensure that all video recordings of force incidents are adequately stored and retained for a period of at least one year after the force incident occurs or until all investigations and proceedings related to the use of force are concluded.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of July 1, 2015, through June 30, 2016 at MCJ and IRC)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2015, through September 30, 2016 at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 at NCCF and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2018, through June 30, 2019 at PDC South)**

The Monitor previously determined that as of July 12, 2018, requested cameras for the common areas at NCCF, PDC North, and PDC South were installed and operational.

Paragraph 83 also requires the Department to provide evidence that all video recordings of force incidents were adequately stored and retained for a period of at least one year after the force incident occurs.  In order to maintain Substantial Compliance the Department must also show that "90% of the force incidents on the quarterly lists provided by the Department are on the inventory provided by the Department one year after the force incident."

The County's posted results for NCCF, PDC North, and PDC South reflect that video recordings of randomly selected force incidents at PDC North and South and randomly selected force incidents at NCCF in the Second and Third Quarters of 2019 "were stored and retained by the Department" for one year.  NCCF and PDC North remain subject to this requirement of Paragraph 83 until March 31, 2020, and PDC South is subject to it until June 30, 2020.

124

The County previously maintained Substantial Compliance with Paragraph 83 at IRC, MCJ, TTCF, and CRDF for twelve consecutive months and was not subject to monitoring at these facilities during the Ninth Reporting Period.

On a visit to MCJ during the Reporting Period, the Monitor noted the absence of cameras in the "sally ports"[86] leading to the rows of cells in 3100 and 3300.[87] This is where a Category 3 force incident with serious injuries to an inmate took place last year. The absence of a camera made it very difficult to determine what happened in the sally port. It is also possible that the force might not have happened if the inmate and/or the Deputy had been aware of a camera in the sally port. In December 2019, the Department added additional cameras to the entries to the 2000 and 3000 floors of Men's Central Jail. The Department did not, however, add cameras in the sally ports as recommended by the Monitor.

---

[86]The sally ports are cage areas with an inner door facing the row and an outer door on the opposite side facing a hallway. There are Deputy stations for monitoring the rows outside the ends of the sally port. Because of the age of MCJ, Deputies must enter into the sally ports to unlock the inner doors to the row in order to enable inmates to enter or exit the rows (escorted or unescorted). Since it appears that MCJ is not going to be replaced with a new facility, at least for now, the County should automate the inner doors to the sally ports for the protection of Department personnel.

[87] The Monitor was informed that there are other sally ports in MCJ that do not have cameras.

84.     The Sheriff will continue to maintain and implement policies for the timely and thorough investigation of alleged staff misconduct related to use of force and for timely disciplinary action arising from such investigations.  Specifically:

(a)     Sworn custody staff subject to the provisions of California Government Code section 3304 will be notified of the completion of the investigation and the proposed discipline arising from force incidents in accordance with the requirements of that Code section; and

(b)     All non-sworn Sheriff's Department staff will be notified of the proposed discipline arising from force incidents in time to allow for the imposition of that discipline.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of July 1, 2017, through June 30, 2018 (verified))**

Substantial Compliance under the Compliance Measures requires the Department to demonstrate that 95% of the investigations of force incidents in which sworn custody staff and non-sworn custody staff were found to have violated Department policy or engaged in misconduct were completed and administrative action, which could include discipline, was taken within the time frames provided for in Government Code Section 3304 and relevant Department policies.

The Department previously maintained Substantial Compliance with Paragraph 84 for twelve months and was not longer subject to monitoring for compliance with this provision in the Ninth Reporting Period.

85.     The County and the Sheriff will ensure that Internal Affairs Bureau management and staff receive adequate specialized training in conducting investigations of misconduct.

**STATUS:      PARTIAL COMPLIANCE**

Substantial Compliance requires the Department to provide the Monitor and Subject Matter Experts with (1) the curriculum/syllabus for the three specialized courses given to IAB management, and (2) a list of the sworn personnel assigned to IAB and proof that such personnel successfully completed the training.  The County's Ninth Self-Assessment reports that 83% of the IAB investigators completed all three of the required courses as of the end of the Second Quarter of 2019 and 84% as of the end of the Third Quarter of 2019.

86.     Within three months of the Effective Date, the County and the Sheriff will develop and implement policies and procedures for the effective and accurate maintenance, inventory, and assignment of chemical agents and other security equipment. The County and the Sheriff will develop and maintain an adequate inventory control system for all weapons, including OC spray.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 at MCJ and CRDF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2016, through December 31, 2017 at PDC North)**

**SUBSTANTIAL COMPLIANCE (as of February 1, 2017, through March 31, 2018 at PDC South and PDC East)**

**SUBSTANTIAL COMPLIANCE (as of March 1, 2017, through March 31, 2018 at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 at IRC)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 at TTCF)**

CDM 7-08/080 ACCOUNTABILITY OF SPECIALWEAPONS, effective October 14, 2016, requires each facility to have unit orders that "establish procedures for the storage, issuance, reissuance, accountability, maintenance, and periodic inventory of all weapons. . . stored at, or issued from, the facility," which includes detailed requirements for the "Inventory, Control, and Accountability of Aerosol Chemical Agents."

In addition to providing written policies and procedures, Substantial Compliance requires the Department to provide up-to-date Unit Orders for each jail requiring the inventory and inspection of special weapons, and armory audit logs documenting the inventory and control of armory-level weapons.

The Monitor and Use of Force Subject Matter Expert inspected the armories at TTCF on March 15, 2019, and again noted the continued improvement and that the inventory logs were checked daily in the TTCF armories.  The Department provided an armory log for the First Quarter of 2019.  The Department has now maintained Substantial Compliance with Paragraph 86 for twelve consecutive months at TTCF, and it is no longer subject to monitoring at TTCF for compliance with that paragraph.

The Department previously maintained Substantial Compliance with Paragraph 86 for twelve consecutive months at MCJ, CRDF, PDC North, PDC South, PDC East, IRC, and NCCF, and were not subject to monitoring in the Ninth Reporting Period.

## APPENDIX A

| NO. | PROVISION | STATUS | SUBSTANTIAL COMPLIANCE DATES |
|---|---|---|---|
| 18 | Suicide Prevention Training | Substantial Compliance | **(10/1/17 at MCJ & PDC South)[1]**<br>**(9/1/17 at NCCF)**<br>**(12/1/17 at PDC East)**<br>**(4/1/18 at TTCF, IRC, & PDC North)**<br>**(8/1/18 at CRDF)** |
| 19 | Crisis Intervention & Conflict Resolution Training | Substantial Compliance | **(4/1/18 at MCJ, NCCF, & IRC)**<br>**(7/1/18 at TTCF)**<br>**(12/1/18 at CRDF, PDC East, & PDC North)**<br>**(3/1/19 at PDC South)** |
| 20 | Training at NCCF, PDC and CRDF | Substantial Compliance | **(8/1/17 at PDC East, PDC North, NCCF, & CRDF)**<br>**(10/1/17 at PDC South)** |
| 21 | CPR Certification | Substantial Compliance | **(10/1/15 – 9/30/16 at PDC East & PDC South)**<br>**(1/1/16 – 12/31/16 at NCCF, PDC North, & IRC)**<br>**(4/1/16 – 3/31/17 at TTCF)**<br>**(10/1/17 – 9/30/18 at MCJ)**<br>**(7/1/18 – 6/30/19 at CRDF)** |

---

[1] Substantial Compliance Dates in **bold** reflect that the Department has achieved Substantial Compliance with the training requirements or maintained Substantial Compliance for twelve consecutive months with the other requirements; the results were verified by the Monitor's auditors when required; and the County or designated facilities are no longer subject to monitoring of this provision pursuant to Paragraph 111 of the Settlement Agreement.

## APPENDIX A

| | | | |
|---|---|---|---|
| 22 | Use of Arresting and Booking Documents | Substantial Compliance | **(7/1/16 – 6/30/17)** |
| 23 | Suicide Hazard Mitigation Plans | Substantial Compliance | **(7/12/18**) |
| 24 | Suicide Hazard Inspection | Substantial Compliance | **(10/1/17 – 9/30/18)** |
| 25 | Transportation of Suicidal Inmates (station jails) | Partial Compliance | |
| 26 | Identification and Evaluation of Suicidal Inmates | Partial Compliance | |
| 27 | Screening for Mental Health Care and Suicide Risk | Partial Compliance | |
| 28 | Expedited Booking of Suicidal Inmates | Substantial Compliance (IRC) Partial Compliance (CRDF) | **(4/1/17 – 3/31/18 at IRC)** |
| 29 | Mental Health Assessments (of non-emergent mental health needs) | Substantial Compliance | **(4/1/17 – 3/31/18)** |
| 30 | Initial Mental Health Assessments & Treatment Plans | Substantial Compliance | (1/1/19 – 9/30/19) |
| 31 | Electronic Medical Records Alerts | Partial Compliance | |
| 32 | Electronic Medical Records – Suicide Attempts | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 33 | Supervisor Reviews of Electronic Medical Records | Substantial Compliance | **(7/1/16 – 6/30/17)** |
| 34 | Discharge Planning | Partial Compliance | |
| 35 | Referral for Mental Health Care | Substantial Compliance | **(11/1/17 – 12/31/18)** |
| 36 | Assessments After Triggering Events | Partial Compliance | |

## APPENDIX A

| 37 | Court Services Division Referrals | Partial Compliance | |
|----|----|----|----|
| 38 | Weekly Rounds in Restricted Housing Modules | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 39 | Confidential Self-Referral | Substantial Compliance (NCCF & PDC South)<br>Partial Compliance (MCJ & PDC North)<br>Non-Compliance (TTCF and CRDF)<br>Not Rated (PDC East) | **(7/1/17 – 6/30/18 at NCCF)**<br>(10/1/18 – 9/30/19 at PDC South) |
| 40 | Availability of QMHPs | Partial Compliance | |
| 41 | FIP Step-Down Protocols | Partial Compliance | |
| 42 | HOH Step-Down Protocols | Substantial Compliance (TTCF)<br>Partial Compliance (CRDF) | (7/1/19 – 9/30/19 TTCF) |
| 43 | Disciplinary Policies | Substantial Compliance (NCCF & PDC North)<br>Partial Compliance (CRDF, MCJ, & TTCF) | **(10/1/17 – 9/30/18 at NCCF & PDC North)** |
| 44 | Protective Barriers | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 45 | Suicide Intervention and First Aid Kits | Substantial Compliance | **(10/1/15 – 9/30/16 at CRDF, NCCF, TTCF, PDC East, & PDC South)**<br>**(1/1/16 – 12/31/16 at MCJ & PDC North)** |
| 46 | Interruption of Self-Injurious Behavior | Substantial Compliance | (7/1/19 – 9/30/19) |
| 47 | Staffing Requirements | Non-Compliance | |
| 48 | Housekeeping and Sanitation | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 49 | Maintenance Plans | Substantial Compliance | **(3/1/16 – 2/28/17)** |

### APPENDIX A

| 50 | Pest Control | Substantial Compliance | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC North, TTCF, & CRDF)** **(4/1/16 – 3/31/17 at PDC South & PDC East)** |
|---|---|---|---|
| 51 | Personal Care & Supplies | Substantial Compliance | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC East, PDC North, PDC South, & TTCF)** **(7/1/16 – 6/30/17 at CRDF)** |
| 52 | HOH Property Restrictions | Partial Compliance | |
| 53 | Eligibility for Education, Work and Programs | Partial Compliance | |
| 54 | Privileges and Programs[2] | Partial Compliance | |
| 55 | Staff Meetings | Substantial Compliance | **(10/1/16 – 9/30/17 at CRDF)** **(4/1/17 – 3/31/18 at PDC North)** (4/1/18 – 3/31/19 at MCJ) (7/1/19 – 9/30/19 at TTCF) |
| 56 | Changes in Housing Assignments | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 57 | Inmate Safety Checks in Mental Housing | Substantial Compliance (MCJ) Partial Compliance (PDC North, TTCF, & CRDF) | **(4/1/17 – 3/31/18 at MCJ)** |

---

[2] Per agreement of the parties, the County must maintain Substantial Compliance for two additional quarters under the revised Compliance Measures.

## APPENDIX A

| | | | |
|---|---|---|---|
| 58 | Inmate Safety Checks in Non-Mental Housing | Substantial Compliance (PDC South, PDC North, PDC East, CRDF, & IRC)<br>Partial Compliance (TTCF, NCCF, & MCJ) | **(1/1/16 – 12/31/16 at PDC South, PDC North, & PDC East)**<br>**(7/1/17 – 6/30/18 at CRDF)**<br>**(10/1/17 – 9/30/18 at IRC)** |
| 59 | Supervisor Rounds | Substantial Compliance | **(1/1/17 – 12/31/17 at PDC East & MCJ)**<br>**(4/1/17 – 3/31/18 at NCCF)**<br>**(10/1/17 – 9/30/18 CRDF)**<br>**(1/1/18 – 12/31/18 at PDC North & PDC South)**<br>**(4/1/18 – 3/31/19 at TTCF)** |
| 60 | Implementation of Quality Improvement Program | Substantial Compliance | (7/1/19 – 12/31/19) |
| 61 | Requirements of Quality Improvement Program | Partial Compliance | |
| 62 | Tracking of Corrective Action Plans | Partial Compliance | |
| 63 | Sufficient HOH and MOH Housing | Non-Compliance | |
| 64 | Plans for Availability of Inpatient Health Care | Partial Compliance | |
| 65 | Administration of Psychotropic Medication | Partial Compliance | |
| 66 | Active Mental Health Caseloads | Non-Compliance | |
| 67 | Prisoner Refusals of Medication | Partial Compliance | |

## APPENDIX A

| 68 | Contraband Searches | Substantial Compliance (MCJ, NCCF, PDC East, PDC South PDC North, & TTCF)<br>Partial Compliance (CRDF) | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC East, PDC South, & PDC North)<br>(1/1/17 – 12/31/17 at TTCF)** |
|---|---|---|---|
| 69 | Clinical Restraints in CTC | Substantial Compliance | **(7/1/18 – 6/30/19)** |
| 70 | Security Restraints in HOH and MOH | Partial Compliance | |
| 71 | Therapeutic Services for Inmates in Clinical Restraints | Substantial Compliance | **(7/1/16 – 6/30/17)** |
| 72 | Administrative Reviews | Substantial Compliance | **(1/1/17 – 12/31/17)** |
| 73 | Reporting of Self-Injurious Behavior and Threats | Substantial Compliance | **(10/1/17 – 9/30/18)** |
| 74 | Law Enforcement Investigations of Suicides | Substantial Compliance | **(9/1/16 – 12/31/17)** |
| 75 | Management Reviews of Suicide Attempts | Substantial Compliance | **(10/1/17 – 9/30/18)** |
| 76 | Management Reviews of Suicides | Substantial Compliance | **(9/1/16 – 12/31/17)** |
| 77 | Custody Compliance and Sustainability Bureau | Partial Compliance | |
| 78 | Suicide Prevention Advisory Committee | Substantial Compliance | **(5/11/16 – 5/18/17)** |
| 79 | Therapeutic Services in Mental Health Housing | Partial Compliance | |
| 80 | Out-of-Cell Time in HOH | Non-Compliance | |
| 81 | Implementation of *Rosas* Recommendations | Partial Compliance | |
| 82 | Grievances at CRDF | Substantial Compliance | **(7/15/16 – 12/31/17)** |

## APPENDIX A

| 83 | Closed Circuit Cameras | Substantial Compliance | **(7/1/15 – 6/30/16 at MCJ & IRC)** **(10/1/15 – 9/30/16 at TTCF)** **(4/1/16 – 3/31/17 at CRDF)** (4/1/18 – 3/31/19 at NCCF & PDC North) (7/1/18 –6/30/19 at PDC South) |
| 84 | Investigation of Staff Misconduct | Substantial Compliance | **(7/1/17 – 6/30/18)** |
| 85 | Internal Affairs Bureau Training | Partial Compliance | |
| 86 | Maintenance and Inventory of Security Equipment | Substantial Compliance | **(4/1/16 – 3/31/17 at MCJ & CRDF)** **(10/1/16 – 12/31/17 at PDC North)** **(2/1/17 – 3/31/18 at PDC South & PDC East)** **(3/1/17 – 3/31/18 at NCCF)** **(4/1/17 – 3/31/18 at IRC)** **(4/1/18 – 3/31/19 at TTCF)** |

**APPENDIX B**

|  | Substantial Compliance (Provisions) | Partial Compliance[1] | Non-Compliance | Substantial Compliance (Facilities)[2] | No Longer Subject To Monitoring[3] |
|---|---|---|---|---|---|
| First[4] | 5 | 16 |  | 10 |  |
| Second | 14 | 30 | 13 | 24 |  |
| Third | 22 | 27(1) | 10 | 29 | 4(2) |
| Fourth | 24 | 26(1) | 10 | 29 | 10(2) |
| Fifth | 23 | 24(2) | 7 | 34 | 15(5) |
| Sixth | 32 | 22 | 7 | 38 | 18(9) |
| Seventh | 30 | 23 | 7 | 39 | 21(10) |
| Eighth | 35 | 20 | 6 | 42 | 27(9) |
| Ninth | 36 | 22 | 4 | 43 | 31(8) |

---

[1] The figure in parenthesis under Partial Compliance is the number of additional provisions where some facilities were in Partial Compliance and other facilities were in Non-Compliance.

[2] This represents the number of provisions where the Department is in Substantial Compliance at all or some of the facilities.

[3] The figure in parenthesis under No Longer Subject to Monitoring is the number of additional provisions where some facilities are no longer subject to monitoring.

[4] During the First Reporting Period, 43 provisions were not subject to monitoring.