**SCHEPER KIM & HARRIS LLP**
RICHARD E. DROOYAN (Bar No. 65672)
601 West Fifth Street, 12th Floor
Los Angeles, CA  90071-2025
Telephone: (213) 613-4655
Facsimile:  (213) 613-4656

**Monitor**

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF LOS ANGELES AND LOS ANGELES COUNTY SHERIFF JIM MCDONNELL, in his Official Capacity,<br><br>Defendants. | CV No. 15-05903 DDP (JEMX)<br><br>**MONITOR'S TENTH REPORT** |

Pursuant to the Paragraph 109 of the Joint Settlement Agreement Regarding Los Angeles County Jails, the Monitor appointed by this Court hereby submits the attached Report "describing the steps taken" by the County of Los Angeles and the Los Angeles County Sheriff during the six-month period from January 1, 2020, through June 30, 2020, "to implement the Agreement and evaluating the extent to which they have complied with this Agreement."  This Report takes into consideration the advice and assistance I have received from the Subject Matter Experts appointed by this Court and the comments from the parties in accordance with Paragraph 110 of the Agreement.  I am available to answer any questions the Court may have regarding my Report at such times as are convenient for the Court and the parties.

DATED:  August 31, 2020          Respectfully submitted,

SCHEPER KIM & HARRIS LLP
RICHARD E. DROOYAN


By:  _/s/ Richard E. Drooyan_
       Richard E. Drooyan
       Monitor

# MONITOR'S TENTH REPORT

This Tenth Report sets forth the Monitor's assessments of the implementation of the Settlement Agreement (the "Agreement" or "DOJ Agreement") between the County of Los Angeles (the "County") and the United States Department of Justice ("DOJ") for the treatment of mentally ill inmates in the County's jail facilities by the Los Angeles Sheriff's Department (the "Department") and the County's Department of Health Services ("DHS").[1]  It also reports on the Department's compliance with the provisions of the Implementation Plan in the settlement of *Alex Rosas, et al., v. Leroy Baca,* No. CV 12-00428 DDP, that were extended under the terms of the DOJ Agreement to the facilities not covered by the *Rosas* case.[2]  It covers the County's reported results for the period from January 1, 2020, through June 30, 2020 (the "Tenth Reporting Period").

As used herein, "Substantial Compliance" means that the County has "achieved compliance with the material components of the relevant provisions of this Agreement in accordance with the [agreed-upon Compliance Measures for assessing Substantial Compliance]," which it must maintain for twelve-consecutive months; "Partial Compliance" means that the County has achieved "compliance on some, but not all, of the material components of the relevant provision of this Agreement;" and "Non-Compliance" means that the County has not met "most or all of the material components of the relevant provisions of this Agreement."

This Tenth Report is based upon the Monitor's review of the policies, procedures, and directives proposed and/or implemented by the Department and Correctional Health Services ("CHS") in the Tenth Reporting Period; and assessments and observations of the Subject Matter Experts and two clinicians retained by the Monitor to assist the Mental Health Subject Matter Expert.  It takes into consideration the County's Self-Assessment Status Report (the "Tenth Self-Assessment"); CHS's Report on Plans (Long Term and Short Term) for Licensed Inpatient Mental Health Care; the Semi-Annual Report of the Department's Custody Compliance and Sustainability Bureau ("CCSB"); the County's Augmented Self-Assessment Status Report (the "Augmented Tenth Self-Assessment"); CHS's Semi-Annual Report on Quality Improvement/Assurance; and results reported by the County through July 15, 2020.  It also takes into consideration the comments from the County and DOJ on the draft of this Report that was submitted to the parties on July 31, 2020.  Finally, it takes into consideration the comments from the Intervenors on the draft of this Report on amended Paragraph 34, which governs release planning.

The Monitor toured CRDF and the mental health housing units at TTCF with the Mental Health Subject Matter Expert in January, but was not able to tour any of the jail facilities once the COVID-19 pandemic began in March 2020.  For the same reason, the

---

[1] The Department of Health Services includes Correctional Health Services, which is responsible for Medical and Mental Health Services in the Los Angeles County jails.

[2] The *Rosas* case involved allegations of excessive force in Men's Central Jail (MCJ), the Twin Towers Correctional Facility (TTCF), and the Inmate Reception Center (IRC) (collectively the "Downtown Jail Complex").  The DOJ Agreement extends provisions of the Implementation Plan to the Century Regional Detention Facility (CRDF), the North County Correctional Facility (NCCF), and the Pitchess Detention Center (PDC).

Subject Matter Expert and the clinicians were not able to conduct any qualitative assessments during site visits after March 2 and 3, 2020.

Because of the COVID-19 pandemic, the Monitor was not able to talk informally with inmates or staff regarding conditions in the jails and the treatment of inmates with mental illnesses during most of the Tenth Reporting Period.  Similarly, other third parties such as clergy and the *Rosas* monitors have not had access to the jails or been able to talk with inmates or staff to assess conditions in the jails.  This lack of access, while understandable, has made it more difficult for the Monitor and the Subject Matter Experts to assess the County's compliance with some of the provisions concerning the treatment of inmates with mental illnesses and the use of force and grievance provisions of the *Rosas* Implementation Plan applicable to CRDF and the North County facilities in the Pitchess Detention Center.

There was considerable disruption to the County's Custody Operations during the Tenth Reporting Period due to the COVID-19 pandemic.  Although the jail population was reduced by 30% from mid-March through May of this year, the County reports that "because of COVID-19-related changes, CHS temporarily suspended most group mental health treatment, which provides a significant amount of the structured out-of-cell time inmates in HOH" and which "will likely result in a decrease in structured out of cell time[.]"  A pilot program that was "aimed to provide P3/HOH inmates with significant unrestrained out of cell time. . .was temporarily suspended at TTCF during COVID-19 due to social distancing requirements, changes to housing modules due to quarantines and isolation, and staffing changes."  The Monitor also has heard reports that HOH inmates are only seen by clinicians at cell doors with minimal programming or out of cell time – effectively a form of solitary confinement – and MOH inmates are not being seen by clinicians except at the time of release.  Recognizing that the pandemic may impact Custody operations for some period of time, the County must still address the needs of inmates suffering from serious mental illnesses during the pandemic while at the same time protecting inmates and staff from the COVID-19 virus.

Where the COVID-19 pandemic impacted the County's ability to implement certain provisions of the Settlement Agreement during this reporting period, this Report reflects that the County's Compliance was Suspended lieu of finding either Non Compliance or Partial Compliance.  If the County had achieved Substantial Compliance with these provisions through the end of the Ninth Report Period, these provisions remain subject to monitoring under Paragraph 111 of the Settlement Agreement with credit for the consecutive months of Substantial Compliance before the pandemic.

As in the past, during the Tenth Reporting Period, the Mental Health Subject Matter Expert, with the assistance of the clinicians, conducted additional qualitative assessments of the County's compliance with certain Substantive Provisions in the Settlement Agreement, and they again used different methodologies to test some of the County's reported results.  Largely due to the COVID-19 pandemic, they were only able to qualitatively assess a limited number of the provisions during their one site visit in the reporting period.  The County was able to provide the "clinicians remote access to certain

County databases in July 2020 to assist in their retailed review of medical records as part
of their ongoing qualitative assessments of the County's performance under the
Settlement Agreement."

Unfortunately, the Mental Health Subject Matter Expert was diagnosed with a
serious health problem during this reporting period.  As a result, he was unable to provide
the input and critical analysis that the Monitor has relied upon in preparing these reports
to the Court, and he is not likely going to be able to continue to serve as the Subject
Matter Expert in the future.  The clinicians have ably filled in for the Subject Matter
Expert in reviewing drafts of this report, the County's Self-Assessments, and the parties'
comments.  The Monitor and the clinicians – and the parties – recognize, however, the
Mental Health Subject Matter Expert has provided invaluable analysis and advice that has
enhanced the County's treatment of mentally ill inmates in its Custody.  His expertise and
collegiality will be missed.

The Monitor's determination of the County's compliance is based upon the
quantitative thresholds in the Compliance Measures (and any other applicable
requirements in the Compliance Measures) for achieving Substantial Compliance, unless
the quality of the County's performance as determined by the qualitative assessment is
plainly inadequate or the results reported by the Subject Matter Expert and the clinicians
vary significantly from the results reported by the Department.

During the Tenth Reporting period, the County achieved and maintained
Substantial Compliance with a few additional provisions of the Settlement Agreement,
and continued to make some progress in addressing the challenges to achieving and
maintaining Substantial Compliance with respect to its quality improvement program.
The County has achieved and maintained for twelve consecutive months Substantial
Compliance with 33 out of the 69 provisions that are subject to monitoring under the
Settlement Agreement, and it is no longer subject to monitoring for compliance with
these provisions.  In addition, it has achieved and maintained Substantial Compliance
with an additional eight provisions in some (but not all) of the jail facilities.

The Monitor and Mental Health Subject Matter Expert believe that the County
still faces significant challenges with respect to mental health services and out-of-cell
time.  In the five years since the Monitor's First Report (for the period from July 1, 2015,
through December 31, 2015), the County has not achieved Partial or Substantial
Compliance with provisions relating to the sufficiency of High Observation Housing
(HOH) and Medium Observation Housing (MOH) (Paragraph 63), active mental health
caseloads (Paragraph 66), and out-of-cell time in HOH units (Paragraph 80).

As noted in the Ninth Report, the Monitor and Mental Health Subject Matter
Expert were particularly concerned about the County's compliance with the out-of-cell
time requirements of Paragraph 80.  Based upon assessments by the Mental Health
Subject Matter Expert and the clinicians, there were significant issues regarding the
credibility of the Department's documentation and the extent to which the County is
actually offering out-of-cell time to HOH inmates.  The County reports that it "piloted an

electronic system that allows clinicians, and not Custody staff, to track structured out-of-cell time offered" and that it "began to [an] approach to tracking and evaluating out-of-cell time based on feedback provided by the Monitor and Subject Matter Expert. . .using the Joint Quality Improvement Committee to explore ways to improve its data and assessment in this area.  Unfortunately, the COVID-19 pandemic is "likely to impact the Department, and CHS's, efforts to continue quality improvement project in this area[.]"  The Monitor appreciates the County's efforts to update the Monitor and DOJ on operational changes in the jails "in response to COVID-19, and related public health guidance."

Given the County's incremental progress in recent reporting periods, and the challenges it faces in addressing some of the mental health provisions, it is apparent that the County still has a way to go before it achieves and maintains for twelve consecutive months Substantial Compliance with all of the 69 provisions at all facilities.  Consequently, it is likely that the County will remain subject to monitoring under the DOJ Agreement for several years.

Again as noted in the Monitor's Ninth Report, the Monitor and Mental Health Subject Matter Expert believed that, with some additional staffing, the FIP step-down unit at TTCF could be expanded to encompass at least two additional pods with as many as 64 more beds for HOH inmates who currently meet the criteria for admission to the step-down units, and the FIP Step-down unit at CRDF could be expanded to fill at least an entire pod with additional chronically mentally ill HOH inmates whose behavior is manageable without the use of restraints for out-of-cell recreation and treatment and who are generally adherent to medication therapy.  Because of the multiple changes the County has made to reduce the number of inmates in order to mitigate the impact the COVID-19 in the jails, the average daily population has been reduced from 17,054 in February to 11,867 in May.  With fewer inmates and additional available space, it may be possible for the County to provide a higher percentage of the remaining inmates with mental illnesses with the critical out-of-cell recreation time and structured treatment without the need for additional CHS staffing once the virus is under control.  Although some of the "available space at TTCF has been temporarily reduced by the COVID-19 pandemic as TTCF modules have been used to house and isolate COVID-positive patients," this additional space eventually will be available if the County adheres to the Board of Supervisors' mandated reduction in the jail population.

During site visits in the beginning of the Tenth Reporting Period, the Monitor and Mental Health Subject Matter Expert observed a noticeable improvement in cleanliness during their site visit to CRDF.  The Use of Force Subject Matter Expert still had some concerns about cleanliness at NCCF and there were still inmate complaints about the lack of clean linens and clothes at that facility.  The Monitor and Use of Force Subject Matter Expert met with the leadership in the Custody Division and NCCF, and emphasized the importance of addressing these issues at NCCF.

As in prior reports, this Tenth Report reflects the results of audits by the Monitor's auditors to verify results reported by the County.  The Monitor has deemed the

County to be in Substantial Compliance "as of" the beginning of the quarter reported by the County if the auditors have verified that the County has met the thresholds in the Compliance Measures.  If the auditors were not able to verify the results reported by the County, the twelve-month period for maintaining Substantial Compliance will commence in a future period when the County's reported results are verified by the auditors.  If the County maintains Substantial Compliance with a provision for twelve consecutive months, pursuant to Paragraph 111 of the Agreement, the Monitor and Subject Matter Experts will "no longer. . .assess or report on that provision" in future reporting periods. Some of the Substantial Compliance results reported by the County in the Tenth Reporting Period have not been audited by the Monitor's auditors and cannot be considered final until verified by the auditors.  The County will not be deemed to be in Substantial Compliance as of the County's reported date for purposes of determining the twelve-month compliance period if the results are not verified by the auditors.

Appendix A to this Tenth Report shows the status of each of the 69 provisions of the Agreement that are subject to monitoring and the twelve-month triggering dates where the County is deemed to be in Substantial Compliance.  Appendix B shows the County's progress from the Initial Reporting Period through the Tenth Reporting Period in achieving Substantial Compliance and in maintaining Substantial Compliance for twelve consecutive months on provisions that are no longer subject to monitoring.

There was a significant turn over in the leadership of Custody during the first year of Sheriff Villanueva's leadership of the Department.  The Department's new leadership in Custody and the County continued to cooperate with the Monitor and the Subject Matter Experts during the Tenth Reporting Period.  The Department, CHS, and County Counsel facilitated our visits and inmate interviews, and responded to our requests for documents and information.  We appreciate their responsiveness, transparency, professionalism, and courtesy in handling our requests.

Richard Drooyan, Monitor
August 31, 2020

# EXECUTIVE SUMMARY

There are 69 provisions in the Settlement Agreement that are subject to monitoring by the Monitor and Subject Matter Experts.  As of the date of this Report, the County and the Department are in Substantial Compliance with 38 provisions, in Partial Compliance with 19 provisions, and in Non-Compliance with five provisions.  In addition, there are six provisions in which the Department is in Substantial Compliance at some facilities and in Partial Compliance at other facilities.  There is one provision (Paragraph 39) for which the Department is in Substantial Compliance at certain facilities, Partial Compliance at other facilities, Non-Compliance at other facilities, and Not Rated at other facilities.  There are 45 provisions for which the County and the Department are in Substantial Compliance at some or all of the facilities.[3]

There are 33 provisions that are no longer subject to monitoring because the County and Department maintained Substantial Compliance for twelve consecutive months as required by Paragraph 111 of the Settlement Agreement as verified by the Monitor's auditors as required.[4]  There are another eight provisions for which some facilities are no longer subject to monitoring because those facilities maintained Substantial Compliance for the required twelve consecutive months.[5]

As of the date of this Report, and subject to verification by the Monitor's auditors and qualitative assessments in some cases, the County and the Department are in Substantial Compliance at some or all of the facilities with the following provisions of the Settlement Agreement:

The County has achieved Substantial Compliance with Paragraph 18, which requires the (initial) training of Deputy Sheriffs and Custody Assistants on suicide prevention as follows: at Men's Central Jail ("MCJ") and Pitchess Detention Center ("PDC") South as of October 1, 2017; at North County Correctional Facility ("NCCF") as of September 1, 2017; at PDC East as of December 1, 2017; at Twin Towers Correctional Facility ("TTCF"), the Inmate Reception Center ("IRC"), and PDC North as of April 1, 2018; and at Century Regional Detention Facility ("CRDF") as of August 1, 2018.

The County has achieved Substantial Compliance at NCCF, MCJ, and IRC as of April 1, 2018; at TTCF as of July 1, 2018; at CRDF, PDC East, and PDC North as of December 1, 2018; and at PDC South as of March 1, 2019, with Paragraph 19, which requires the (initial) training of Deputy Sheriffs on Crisis Intervention and Conflict Resolution and the training of Deputy Sheriffs and Custody Assistants in working with

---

[3] Under Paragraph 111 of the Agreement, the twelve-month period for which the County is required to maintain Substantial Compliance can be determined on a facility-by-facility basis.

[4] This includes the initial training required by Paragraphs 18, 19 and 20, which has been completed and is no longer subject to monitoring.  The refresher training requirements for each of these provisions are, however, still subject to monitoring.

[5] The provisions that are no longer subject to monitoring at some or all of the facilities are highlighted in bold in Appendix A.

mentally ill prisoners.  The Department has achieved Substantial Compliance at CRDF, IRC, NCCF, MCJ, PDC East, PDC North, PDC South, and TTCF as of December 2019 with the refresher training requirements of Paragraph 19.

The County has achieved Substantial Compliance at PDC East, PDC North, NCCF, and CRDF as of August 1, 2017 and at PDC South as of October 1, 2017, with Paragraph 20, which requires the (initial) training of additional Deputy Sheriffs on Crisis Intervention and Conflict Resolution and on working with mentally ill prisoners.

The County has maintained Substantial Compliance for twelve consecutive months at PDC East, PDC South, PDC North, NCCF, IRC, TTCF, CRDF, and MCJ with Paragraph 21, which requires Custody personnel to maintain CPR certifications.

The County has maintained Substantial Compliance for twelve consecutive months with Paragraph 22, which requires the County and the Sheriff to provide instructional material on the use of arresting and booking documents to ensure the sharing of known relevant and available information on prisoners' mental health status and suicide risk.

The County has maintained Substantial Compliance for twelve consecutive months as of July 12, 2018, with Paragraph 23, which requires that the Department conduct a systematic review of prisoner housing to reduce the risk of self-harm and to identify and address suicide hazards, and to develop plans to reasonably mitigate suicide hazards identified in the review.

The County has maintained Substantial Compliance for twelve consecutive months as of September 30, 2018, with Paragraph 24, which requires the Department to conduct annual reviews and inspections of prisoner housing to identify suicide hazards.

The County has achieved Substantial Compliance as of October 1, 2019, through March 31, 2020, with Paragraph 27, which requires that all prisoners are individually and privately screened within 12 hours of their arrival at the jails.

The County has maintained Substantial Compliance for twelve consecutive months at IRC as of March 31, 2018, with Paragraph 28, which requires the Department to expedite inmates having urgent or emergent mental health needs through the booking process.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2018, with Paragraph 29, which requires mental health assessments of prisoners with non-emergent mental health needs within 24 hours of the intake nursing assessment.

The County has maintained Substantial Compliance as of January 1, 2019, through December 31, 2019, with Paragraph 30, which requires the County to provide an initial mental health assessment that includes a brief initial treatment plan that addresses

"housing recommendations and preliminary discharge information."

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 32, which requires that a serious suicide attempt be entered in the prisoner's electronic medical record in a timely manner.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2017, with Paragraph 33, which requires mental health supervisors to review electronic medical records on a quarterly basis to assess their accuracy.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2018, with Paragraph 35, which requires the Department to ensure that custody staff refer prisoners who are demonstrating a potential need for routine mental health care to a QMHP or a Jail Mental Evaluation Team.

The County has achieved Substantial Compliance as of January 1, 2020, through March 31, 2020, with Paragraph 37, which requires that Court Services Division staff document suicidal ideation or self-injurious behavior that occurs in the courts.  These results are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 38, which requires mental health staff or JMET teams to make weekly cell-by-cell rounds in restricted non-mental health housing modules to identify prisoners with mental illnesses and grant prisoner's requests for out-of-cell interviews.

The County has maintained Substantial Compliance at NCCF for twelve consecutive months as of June 30, 2018, with Paragraph 39, which requires the County to use a confidential self-referral system for prisoners to request mental health care.

The County has achieved Substantial Compliance at TTCF, as of July 1, 2019, through September 30, 2019, and January 1, 2020, through March 31, 2020, with Paragraph 42, which requires the Department to develop and implement step-down protocols to ensure that prisoners admitted to HOH and placed on risk precautions are assessed by a QMHP.

The County has maintained Substantial Compliance at NCCF and PDC North for twelve consecutive months, as of September 30, 2018, with Paragraph 43, which requires the Department to develop and implement policies for discipline of prisoners with serious mental illnesses.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 44, which requires the Department to install protective barriers in High Observation Housing and other mental health housing.

The County has maintained Substantial Compliance for twelve consecutive

months as of December 31, 2016, with Paragraph 45, which requires Suicide Prevention
Kits and first-aid kits in control booths in all facilities.

The County has maintained Substantial Compliance for twelve consecutive
months as of December 31, 2016, with Paragraph 48, which requires the Department to
have written housekeeping, sanitation, and inspection plans to ensure proper cleaning.

The County has maintained Substantial Compliance for twelve consecutive
months as of February 28, 2017, with Paragraph 49, which requires the Department to
have maintenance plans to respond to routine and emergency maintenance needs.

The County has maintained Substantial Compliance for twelve consecutive
months as of March 31, 2017, with Paragraph 50, which requires pest control in the jails.

The County has maintained Substantial Compliance for twelve consecutive
months as of June 30, 2017, with Paragraph 51, which requires the Department to ensure
that all prisoners have access to basic hygiene supplies in accordance with state
regulations.

The County has provided documentation showing that it has achieved Substantial
Compliance as of October 1, 2019, through March 31, 2020, with Paragraph 54, which
requires the Department to ensure that prisoners who are not in mental health housing are
"not denied privileges and programming based solely on their mental health status or
prescription for psychotropic medication."  The reported results are subject to verification
by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive
months at CRDF, PDC North, and MCJ with Paragraph 55, which requires custody,
medical and mental health staff to meet daily in High Observation Housing and weekly in
Moderate Observation Housing.  The County has maintained Substantial Compliance as
of July 1, 2019, through March 31, 2020, at TTCF.

The County has maintained Substantial Compliance for twelve consecutive
months as of December 31, 2016, with Paragraph 56, which requires custody, medical,
and mental health staff to communicate regarding any change in a housing assignment
following a suicide attempt or serious change in mental health condition.

The County has maintained Substantial Compliance for twelve consecutive
months as of March 31, 2018, at MCJ with Paragraph 57, which requires safety checks in
mental health housing.

The County has maintained Substantial Compliance for twelve consecutive
months at PDC South, PDC North, and PDC East as of December 31, 2016, at CRDF as
of June 30, 2018, and at IRC as of September 30, 2018, with Paragraph 58, which
requires safety checks in non-mental health housing.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2019, with Paragraph 59, which requires unannounced daily supervisory rounds to verify safety checks.

The County has achieved Substantial Compliance with Paragraph 60, as of April 1, 2019, through March 31, 2020, which requires the implementation of a quality improvement plan.

The County has maintained Substantial Compliance for twelve consecutive months at MCJ, NCCF, PDC East, PDC North, PDC South, and TTCF with Paragraph 68, which requires staggered contraband searches in housing units.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2019, with Paragraph 69, which requires the County and the Sheriff to use clinical restraints only in the Correctional Treatment Center with the approval of a licensed psychiatrist who performed an individualized assessment.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2017, with Paragraph 71, which requires the County and the Sheriff to ensure that any prisoner subjected to clinical restraints in response to a mental health crisis receives therapeutic services to remediate any effects from the restraints.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 72, which requires the Department and the County to report on meetings to review suicides and incidents of serious self-injurious behavior.

The County has maintained Substantial Compliance for twelve consecutive months as of September 30, 2018, with Paragraph 73, which requires the Department to prepare detailed reports of prisoners who threaten or exhibit self-injurious behavior.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 74, which requires the Department to have an objective law enforcement investigation of every suicide that occurs in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of September 30, 2018, with Paragraph 75, which requires the Department and the County to review every serious suicide attempt that occurs in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 76, which requires the Department to follow certain procedures whenever there is an apparent or suspected suicide.

The County has maintained Substantial Compliance for twelve consecutive months as of May 18, 2017, with Paragraph 78, which requires the Suicide Prevention Advisory Committee to meet twice a year.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 82, which requires the Department to co-locate personnel responsible for collecting prisoners' grievances at CRDF.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2019, with Paragraph 83, which requires it to install closed circuit security cameras throughout all of the common areas in the jails.  NCCF and PDC North maintained inventory records as required by Paragraph 83 through March 31, 2020.  PDC South is subject to this requirement until June 30, 2020.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2018, with Paragraph 84, which requires investigations of force incidents and administrative actions to be completed timely.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2019, with Paragraph 86, which requires inventory and control of weapons.

**TENTH REPORT**

18.     Within three months of the Effective Date, the County and the Sheriff will
develop, and within six months of the Effective Date will commence providing:  (1) a
four-hour custody-specific, scenario-based, skill development training on suicide
prevention, which can be part of the eight-hour training described in paragraph 4.8 of the
Implementation Plan in *Rosas* to all new Deputies as part of the Jail Operations
Continuum and to all new Custody Assistants at the Custody Assistants academy; and (2)
a two-hour custody-specific, scenario-based, skill development training on suicide
prevention to all existing Deputies and Custody Assistants at their respective facilities,
which can be part of the eight-hour training described in paragraph 4.7 of the
Implementation Plan in *Rosas*, through in-service Intensified Formatted Training, which
training will be completed by December 31, 2016.

These trainings will include the following topics:

(a)     suicide prevention policies and procedures, including observation and
supervision of prisoners at risk for suicide or self-injurious behavior;

(b)     discussion of facility environments and staff interactions and why they
may contribute to suicidal behavior;

(c)     potential predisposing factors to suicide;

(d)     high-risk suicide periods and settings;

(e)     warning signs and symptoms of suicidal behavior;

(f)     case studies of recent suicides and serious suicide attempts;

(g)     emergency notification procedures;

(h)     mock demonstrations regarding the proper response to a suicide attempt,
including a hands-on simulation experience that incorporates the
challenges that often accompany a jail suicide, such as cell doors being
blocked by a hanging body and delays in securing back-up assistance;

(i)     differentiating between suicidal and self-injurious behavior; and

(j)     the proper use of emergency equipment.

**STATUS:**          **SUBSTANTIAL COMPLIANCE (as of October 1, 2017
(verified) at MCJ and PDC South)**

**SUBSTANTIAL COMPLIANCE (as of September 1, 2017
(verified) at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of December 1, 2017
(verified) at PDC East)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018
(verified) at TTCF, IRC, and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of August 1, 2018
(verified) at CRDF)**

The Department was not subject to monitoring during the Tenth Reporting Period
for the initial training of existing Deputy Sheriffs or Custody Assistants or of new
Deputies in the Jail Operations Continuum and new Custody Assistants in the Custody
Assistant Academy as required by Paragraph 18.  Virtually all of the Deputy Sheriffs and
Custody Assistants in the custody facilities received the initial training because they were
assigned to the jails as of the Existing Date of the Settlement Agreement or they received
the training new Deputies or new Custody Assistants.

The Department is still subject to monitoring in future periods for Substantial
Compliance with the refresher course requirements.  The Department reports that it "will
submit its annual assessment for the refresher courses related to this Provision in the next
Reporting Period."[6]  The Department's reported results for the refresher courses will be
subject to verification by the Monitor's auditors.

---

[6] The Department reports that "[g]oing forward, [it] will submit refresher assessments on an annual basis in
a staggered manner such that the refresher assessments are not all due at the same time."

19.   Commencing July 1, 2015, the County and the Sheriff will provide:

(a)   Custody-specific, scenario-based, skill development training to new Deputies during their Jail Operations training, and to existing Deputies assigned to Twin Towers Correctional Facility, Inmate Reception Center, Men's Central Jail, the Mental Health Housing Units at Century Regional Detention Facility, and the Jail Mental Evaluation Teams ("JMET") at North County Correctional Facility as follows:

(i)   32 hours of Crisis Intervention and Conflict Resolution as described in paragraphs 4.6 and 4.9 of the Implementation Plan in *Rosas* to be completed within the time frames established in that case (currently December 31, 2016). Deputies at these facilities will receive an eight-hour refresher course consistent with paragraph 4.6 of the Implementation Plan in *Rosas* every other year until termination of court jurisdiction in that case and then a four-hour refresher course every other year thereafter.

(ii)   Eight hours identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas* to be completed by December 31, 2016. This training requirement may be a part of the 32-hour training described in the previous subsection. Deputies at these facilities will receive a four-hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

(b)   Commencing July 1, 2015, the County and the Sheriff will ensure that new Custody Assistants receive eight hours of training in the Custody Assistant academy, and that all existing Custody Assistants receive eight hours of training related to identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas*. This training will be completed by December 31, 2016. Custody Assistants will receive a four-hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

14

**STATUS:** **SUBSTANTIAL COMPLIANCE (as of April 1, 2018,
(verified) at NCCF, MCJ, and IRC)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2018,
(verified) at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of December 1,
2018 (verified) at CRDF, PDC East, and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of March 1,
2019 (verified) at PDC South)**

The Department was not subject to monitoring during the Tenth Reporting Period
for the training of existing and new Deputy Sheriffs required by and Custody Assistants
required by Paragraph 19.

The Department is still subject to monitoring in future periods for Substantial
Compliance with the refresher course requirements; the Department's reported results
will be subject to verification by the Monitor's auditors.

The Department's posted results reflect that as of December 2019 it achieved
Substantial Compliance with respect to the refresher training of Deputies and Custody
Assistants at CRDF, IRC, MCJ, NCCF, PDC East, PDC North, PDC South, and TTCF.
These results have been verified by the Monitor's auditors.

20.     Commencing no later than July 1, 2017, the County and the Sheriff will provide:

(a)     Custody-specific, scenario-based, skill development training to existing Deputies assigned to North County Correctional Facility, Pitchess Detention Center, and the non-Mental Health Housing Units in Century Regional Detention Facility as follows:

(i)     32 hours of Crisis Intervention and Conflict Resolution as described in paragraphs 4.6 and 4.9 of the Implementation Plan in *Rosas* to be completed by December 31, 2019.  Deputies at these facilities will receive an eight-hour refresher course consistent with paragraph 4.6 of the Implementation Plan in *Rosas* every other year until termination of court jurisdiction in that case and then a four-hour refresher course every other year thereafter.

(ii)    Eight hours identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas* to be completed by December 31, 2019.  This training requirement may be a part of the 32-hour training described in the previous subsection.  Deputies at these facilities will receive a four-hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

**STATUS:**        **SUBSTANTIAL COMPLIANCE (as of August 1, 2017 (verified) at CRDF, PDC East, PDC North, and NCCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017 (verified) at PDC South)**

The Department was not subject to monitoring for the initial training for existing Deputies required by Paragraph 20 during the Tenth Reporting Period.

The Department is still subject to monitoring in future periods for Substantial Compliance with the refresher course requirements.  The Department reports that it "will submit its annual assessment for the refresher courses related to this Provision in the next Reporting Period."

16

21.     Consistent with existing Sheriff's Department policies regarding training requirements for sworn personnel, the County and the Sheriff will ensure that existing custody staff that have contact with prisoners maintain active certification in cardiopulmonary resuscitation and first aid.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of October 1, 2015, through September 30, 2016 (verified) at PDC East and South)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at NCCF, PDC North, and IRC)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 (verified) at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at MCJ)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2018, through June 30, 2019 (verified) at CRDF)**

The Compliance Measures provide that the Department will demonstrate Substantial Compliance when 95% of the designated custody staff have the required CPR and first aid certifications for twelve consecutive months.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 21 in the Tenth Reporting Period.

22.     Within six months of the Effective Date and at least annually thereafter, the County and the Sheriff will provide instructional material to all Sheriff station personnel, Sheriff court personnel, custody booking personnel, and outside law enforcement agencies on the use of arresting and booking documents, including the Arrestee Medical Screening Form, to ensure the sharing of known relevant and available information on prisoners' mental health status and suicide risk.  Such instructional material will be in addition to the training provided to all custody booking personnel regarding intake.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017)**

The Justice Data Interface Controller ("JDIC") message the Department has been using since June 29, 2016, is sufficient to establish Substantial Compliance with Paragraph 22, and the County maintained Substantial Compliance for twelve consecutive through June 30, 2017.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 22 in the Tenth Reporting Period.

23.     Within three months of the Effective Date, the County and the Sheriff will commence a systematic review of all prisoner housing, beginning with the Mental Health Unit of the Correctional Treatment Center, all High Observation Housing areas, all Moderate Observation Housing areas, single-person discipline, and areas in which safety precautions are implemented, to reduce the risk of self-harm and to identify and address suicide hazards.  The County and the Sheriff will utilize a nationally-recognized audit tool for the review.  From this tool, the County and the Sheriff will:

(a)     develop short and long term plans to reasonably mitigate suicide hazards identified by this review; and

(b)     prioritize planning and mitigation in areas where suicide precautions are implemented and seek reasonable mitigation efforts in those areas.

**STATUS:        SUBSTANTIAL COMPLIANCE**

The Monitor has verified, with the advice of the Subject Matter Expert, that the Department's Suicide Hazard Inspection Check List tool is a nationally recognized audit tool for this review.  The Department provided the Monitor with completed checklists documenting inspections of all housing units by January 14, 2016.

The Department submitted updated Suicide Hazard Mitigation plans to the Monitor on January 18, 2018 and July 12, 2018.  After consultations with the Mental Health Subject Matter Expert, the Monitor concluded that the plans satisfied the requirements of Paragraph 23 and that the Department had achieved and maintained Substantial Compliance with the provision.  Accordingly, pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 23 in the Tenth Reporting Period.

24.     The County and the Sheriff will review and inspect housing areas on at least an annual basis to identify suicide hazards.

**STATUS:        SUBSTANTIAL COMPLIANCE (as of October 1, 2017,
                through September 30, 2018)**

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 24 in the Tenth Reporting Period.  As the Monitor has noted, however, implementation and tracking of corrective actions must be addressed by the Custody Compliance and Sustainability Bureau ("CCSB") under Paragraph 77(c), which requires CCSB to "ensure that corrective actions are taken to mitigate suicide risk. . .obtaining where appropriate, technical assistance. . .when such assistance is needed to address suicide-risk issues."

25.     The County and the Sheriff will ensure that any prisoner in a Sheriff's Department station jail who verbalizes or who exhibits a clear and obvious indication of current suicidal intent will be transported to IRC, CRDF, or a medical facility as soon as practicable.  Pending transport, such prisoners will be under unobstructed visual observation, or in a suicide resistant location with safety checks every 15 minutes.

**STATUS:     PARTIAL COMPLIANCE**

A provision of the Station Jail Manual adopted in March 2018 requires that any arrestee who "displays obvious suicidal ideation or exhibits unusual behavior that clearly manifest[s] self-injurious behavior or other clear indication of mental health crisis shall be transported to the Inmate Reception Center (IRC), Century Regional Detention Facility (CRDF), or a medical facility as soon as practicable.  Pending transport, such inmates. . .shall be under unobstructed visual observation or in a suicidal restraint location with safety checks every 15 minutes."

The Compliance Measures require the Department to randomly select and analyze Arrestee Medical Screening Forms from station jails identifying prisoners who verbalize or exhibit a clear and obvious indication of current suicidal intent to determine compliance with Paragraph 25 of the Agreement.  The County's Tenth Self-Assessment reports that 71%, of the records reviewed for the Fourth Quarter of 2019 and 84% of the records for the First Quarter of 2020 reflect the information required to establish Substantial Compliance with Paragraph 25, which is an improvement from the 69% for the Third Quarter of 2019, although still below the 95% threshold for Substantial Compliance.

DOJ notes that "certain station jails have struggled to demonstrate compliance with the provision more than others," and it "suggest[s] that the County consider whether a targeted intervention, such as increased training, might be warranted at particular stations."

26.     Consistent with existing Sheriff's Department policies, the County and the Sheriff will follow established screening procedures to identify prisoners with emergent or urgent mental health needs based upon information contained in the Arrestee Medical Screening Form (SH-R-422) or its equivalent and the Medical/Mental Health Screening Questionnaire and to expedite such prisoners for mental health evaluation upon arrival at the Jail Reception Centers and prior to routine screening.  Prisoners who are identified as having emergent or urgent mental health needs, including the need for emergent psychotropic medication, will be evaluated by a QMHP as soon as possible but no later than four hours from the time of identification.

**STATUS:       PARTIAL COMPLIANCE**

The Compliance Measures require the Department to "review Arrestee Medical Screening Forms (SH-R-422) (or its equivalent) and the Medical/Mental Health Screening Questionnaires of 100 randomly selected prisoners during one randomly selected week per quarter at CRDF and at IRC."  Substantial Compliance requires that (1) 95% of the forms "include the required mental health information" and (2) 90% of the prisoners having urgent or emergent needs were "seen by a QMHP within four hours."

The County's Tenth Self-Assessment reports that for the one randomly selected week in the Fourth Quarter of 2019, 93% of the screening forms reviewed had the required mental health information, and 93% of the prisoners were seen by a QMHP within four hours.

The County reports that "[a]s a result of COVID-19, inmate intakes reduced significantly during First Quarter of 2020, at the same time CHS staffing shifted to address COVID-19-related needs and precautions."  The County's Augmented Tenth Self-Assessment reports that for the First Quarter of 2020, 96% of the forms had the required information, but only 76% of the prisoners were seen within four hours.  As noted by DOJ, "the challenges posed by COVID-19. . .have adversely affected the County's compliance with [this requirement of Paragraph 26]."

The Mental Health Subject Matter Expert and the clinicians did a qualitative assessment of the Department's results during a site visit in March 2020.  They assessed the "completeness of intake documentation" and "whether patients with emergent or urgent needs were missed at intake[.]"  They "found that 95% of the intake documentation was complete and available," and that 80% "of urgent/emergent cases that should have been detected were identified," which is down slightly from the 86% in the September 2019 site visit.  They "found more cases where the subsequent medical record demonstrated clear evidence of mental illness that was likely present at intake, but found that it was likely that these cases might reasonably have been missed."  Although this "raised some concerns that the quality of the nursing screening may have diminished," overall they "continue[d] to see consistently sound performance in the screening and detection process for urgent and emergent cases," and "little inconsistency or errors in the intake process."

27.     Consistent with existing Sheriff's Department policies, the County and the Sheriff will ensure that all prisoners are individually and privately screened by Qualified Medical Staff or trained custody personnel as soon as possible upon arrival to the Jails, but no later than 12 hours, barring an extraordinary circumstance, to identify a prisoner's need for mental health care and risk for suicide or self-injurious behavior.  The County and the Sheriff will ensure that the Medical/Mental Health Screening Questionnaire, the Arrestee Medical Screening Form (SH-R-422), or its equivalent, and/or the Confidential Medical Mental Health Transfer Form are in the prisoner's electronic medical record or otherwise available at the time the prisoner is initially assessed by a QMHP.

> **STATUS:     SUBSTANTIAL COMPLIANCE (as of October 1, 2019, through March 31, 2020 (verified))**[7]

The Compliance Measures require the Department to review the records of "randomly selected prisoners who were processed for intake during one randomly selected week at CRDF and at IRC" to determine compliance with this provision. Substantial Compliance requires that 90% of the records reviewed reflected that the prisoners were screened for mental health needs within 12 hours and that the required documentation was available to the QMHP for 90% of the mental health assessments conducted by the QMHP.

The County's Tenth Self-Assessment reports that it achieved Substantial Compliance with Paragraph 27 in the Fourth Quarter of 2019 with 98% of the inmates assessed timely, and the required documents were available for 97% of the assessments. The County's Augmented Tenth Self-Assessment report that in the First Quarter of 2020, 99% were assessed timely and the documents were available for 97% of the assessments. These Substantial Compliance results in the Fourth Quarter of 2019 and the First Quarter of 2020 have been verified by the Monitor's auditors.

During a March 2020 site visit, the Mental Health Subject Matter Expert and the clinicians did a qualitative assessment of the "completeness of intake documentation" and "focused on whether patients with routine needs were missed at intake[.]"  They found "that 93% of the intake documentation was completed and available," and 87% "of routine cases that should have been detected were detected," which "is similar to [their] previous findings."  In addition, they found "fewer inconsistencies and errors in intake materials than last time."

---

[7] As noted in the County's Augmented Tenth Self-Assessment, "the County achieved Substantial Compliance with this provision in *5 of the last 6 quarters,*" just missing in the Third Quarter of 2019 by 1%.  Notwithstanding the "County's consistently high quantitative performance," it is still subject to monitoring for compliance with this provision until it maintains Substantial Compliance for twelve consecutive months.

28.     The County and the Sheriff will ensure that any prisoner who has been identified during the intake process as having emergent or urgent mental health needs as described in Paragraph 26 of this Agreement will be expedited through the booking process.  While the prisoner awaits evaluation, the County and the Sheriff will maintain unobstructed visual observation of the prisoner when necessary to protect his or her safety, and will conduct 15-minute safety checks if the prisoner is in a cell.

**STATUS:**      **SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at IRC)**

**PARTIAL COMPLIANCE (at CRDF)**

The Compliance Measures require the Department to review the records of randomly selected prisoners at CRDF and IRC who have urgent or emergent mental health needs to determine whether they were expedited through the booking process and under visual observation or checked every 15 minutes.

The County's Tenth Self-Assessment reflects that in the Fourth Quarter of 2019, only 40% of the inmates with urgent or emergent mental health needs were expedited through the booking process at CRDF in the randomly selected week as required by Compliance Measure 28.2[8] and only 40% of the inmates were observed or checked as required by Compliance Measure 28.4.[9]  In the First Quarter of 2020, 60% of these inmates were expedited through booking and 60% were observed or checked as required. This is sufficient to establish Partial Compliance at CRDF in the First Quarter of 2020.

The County previously reported that "CRDF is renovating a key housing area. . . to ensure that inmates requiring unobstructed observation and expedited mental health or medical care are so observed and quickly evaluated.  CRDF expects the renovations to be completed early in Second Quarter 2020."[10]  The County's response to the Monitor's draft of this report states that "[c]onstruction began in April 2020 but is currently on hold due precautions put in place related to COVID-19."

The County previously maintained Substantial Compliance with Paragraph 28 at IRC for twelve consecutive months, and IRC was not subject to monitoring for Substantial Compliance with Paragraph 28 in the Tenth Reporting Period.

---

[8] Although Compliance Measure 28.2 requires the County to "review the records of 25 randomly selected prisoners at CRDF. . .who have been identified as having urgent or emergent mental health needs" in one randomly selected week per quarter, there were only five such prisoners identified in the randomly selected week for the Fourth Quarter of 2019 and five in the randomly selected week for the First Quarter of 2020.
[9] In August 2017, the Monitor agreed that the County could review three (later five) randomly selected videos in lieu of unannounced visits because inmates with urgent or emergent mental health needs were rarely in the CRDF reception center during the visits.
[10] Defendant's Response to Monitor's Draft Ninth Report, p. 5

29.     The County and the Sheriff will ensure that a QMHP conducts a mental health assessment of prisoners who have non-emergent mental health needs within 24 hours (or within 72 hours on weekends and legal holidays) of a registered nurse conducting an intake nursing assessment at IRC or CRDF.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified))**

The Compliance Measures require the Department to review randomly selected records of the prisoners identified in the intake nursing assessment as having non-emergent mental health needs to determine if the Department completed mental health assessments for 85% of the prisoners within the required time periods.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 29 in the Tenth Reporting Period.

30.     Consistent with existing DMH policies, the initial mental health assessment will include a brief initial treatment plan.  The initial treatment plan will address housing recommendations and preliminary discharge information.  During the initial assessment, a referral will be made for a more comprehensive mental health assessment if clinically indicated.  The initial assessment will identify any immediate issues and determine whether a more comprehensive mental health evaluation is indicated.  The Monitor and SMEs will monitor whether the housing recommendations in the initial treatment plan have been followed.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of January 1, 2019, through December 31, 2019 (verified))**

The Compliance Measures require the Department to review randomly selected initial mental health assessments and report on (1) the percentage of assessments that have (i) included an initial treatment plan that addresses housing recommendations and preliminary discharge information and (ii) identified any immediate issues and whether a more comprehensive evaluation was indicated; and (2) whether the housing recommendations were followed.

The County's Tenth Self-Assessment reports that in the Fourth Quarter of 2019 95% of the initial mental health assessments reviewed included an initial treatment plan that had the information required by Paragraph 30, which is above the 85% threshold for Substantial Compliance, and 100% of the housing assignments followed the housing recommendations in the initial treatment plans.[11]  The County's Substantial Compliance results for the Fourth Quarter of 2019 have been verified by the Monitor's auditors.  The County has maintained Substantial Compliance for twelve consecutive months and is no longer subject to monitoring for Compliance with Paragraph 30.

During a March 2020 site visit, the Mental Health Subject Matter Expert and the clinicians again evaluated "whether the determination of immediate issues [in the random sample of mental health assessments] was reasonable in light of available information. . . [and] whether the initial treatment plan covered the elements required by existing County policy, which goes beyond the content of the formal compliance measure."  They found that 95% of the cases "identified immediate issues," and that the determination of the immediate issues "was reasonable from a qualitative perspective" in 88% of the cases.  The Subject Matter Expert again concludes that the County "should achieve substantial compliance," if County's Self-Assessment shows that it has satisfied the required quantitative thresholds.

---

[11] As in the past, inmates who were discharged from IRC before they were housed were excluded because Compliance Measure 30-3(Pt 2) is applicable where "the housing assignments *follow* the recommendations."

31.     Consistent with existing DMH and Sheriff's Department policies, the County and the Sheriff will maintain electronic mental health alerts in prisoners' electronic medical records that notify medical and mental health staff of a prisoner's risk for suicide or self-injurious behavior.  The alerts will be for the following risk factors:

(a)     current suicide risk;

(b)     hoarding medications; and

(c)     prior suicide attempts.

**STATUS:     PARTIAL COMPLIANCE**

The Compliance Measures require the Department to review randomly selected electronic medical records for prisoners in certain at-risk groups to determine if the required mental health alerts are in 85% of the records reviewed, which is the threshold for Substantial Compliance, for prisoners who report suicidal thoughts (at suicide risk) during the intake process; were removed from risk precautions in the prior quarter; or were identified as hoarding medicine.

The County's Tenth Self-Assessment reports the following results for the Fourth Quarter of 2019: at CRDF, 84% of the records for current suicide risk, 100% for removal from risk precaution (in the prior quarter), and 23% for hoarding[12] had the required mental health alerts.  At TTCF, 84% of the records for current suicide risk, 0% for removal from risk precautions,[13] and 48% for hoarding had the required alerts.  The County also reported that 40% of the records reviewed for MCJ and 40% of the records reviewed for PDC North reflect a hoarding alert, and the one relevant record reviewed for NCCF did not reflect the required hoarding alert.[14]

As in the past, the County did not report any results for current suicide risk or removal from risk precautions for the inmates at MCJ, NCCF, or PDC North because "Compliance Measures 31-1(a) and 31-1(b) refer to the intake and HOH populations respectively."  While the County does not have to randomly select prisoners at MCJ, NCCF, or PDC North to achieve Substantial Compliance, it must still show that the "alerts [for current suicide risk][15] are not being discontinued inappropriately" or it has "processes that are likely to prevent that from occurring."  As the Monitor has previously explained, "the County needs to provide evidence that medical alerts are in the medical

---

[12] The County continues to have "difficulty assessing" all of the required populations for hoarding and the reported hoarding results are only partial for each of the facilities.  It reports that it "is currently discussing how we can improve our processes" for addressing this problem, but without any specifics.

[13] There was only one inmate at TTCF who was removed from risk precautions in the prior quarter and the record for that inmate did not have the required mental health alert.

[14] The County reports that "the patient was assessed and moved to a higher level of care at TTCF after a suicide attempt, and a Suicide Risk alert was placed in the EMR."

[15] The County reports that an inmate at MCJ, NCCF, or PDC North cannot be placed on Risk Precautions unless he is being transferred to a facility with HOH housing.  Accordingly, no inmates should be *removed* from Risk Precautions *while at these facilities*.

records of inmates who were removed from risk precautions prior to being transferred to these facilities.  Further, the County should indicate whether there are any inmates housed at these facilities who are deemed to be a 'current suicide risk' and, if so, whether the required alerts are in their medical records."[16]

The County's Augmented Tenth Self-Assessment reports the following results for the First Quarter of 2020: at CRDF, 96% of the records for current suicide risk, 75% for removal from risk precaution (in the prior quarter), and 25% for hoarding had the required mental health alerts.  At TTCF, 96% of the records for current suicide risk, and 58% for hoarding had the alerts.[17]  The County also reported that 20% of the records reviewed for MCJ and 50% of the records reviewed for PDC North reflect a hoarding alert, and the one relevant record reviewed for NCCF did not reflect the required hoarding alert.

---

[16] See Monitor's Ninth Report, p. 32.
[17] Due to changes in the Risk Precaution procedures, there were no inmates at TTCF who were removed from risk precautions in the prior quarter.

32.     Information regarding a serious suicide attempt will be entered in the prisoner's electronic medical record in a timely manner.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified))**

The Compliance Measures require that 95% of the electronic medical records of prisoners who had a serious suicide attempt reflect information regarding the attempt, and 85% of the records reflect that the information was entered into the record within one day of the attempt.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 32 in the Tenth Reporting Period.

33.     The County will require mental health supervisors in the Jails to review electronic medical records on a quarterly basis to assess their accuracy as follows:

(a)     Supervisors will randomly select two prisoners from each clinician's caseload in the prior quarter;

(b)     Supervisors will compare records for those prisoners to corroborate clinician attendance, units of service, and any unusual trends, including appropriate time spent with prisoners, recording more units of service than hours worked, and to determine whether contacts with those prisoners are inconsistent with their clinical needs;

(c)     Where supervisors identify discrepancies through these reviews, they will conduct a more thorough review using a DMH-developed standardized tool and will consider detailed information contained in the electronic medical record and progress notes; and

(d)     Serious concerns remaining after the secondary review will be elevated for administrative action in consultation with DMH's centralized Human Resources.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017 (verified))**

The Compliance Measures require the County to provide the Monitor and the Subject Matter Experts with the DMH-developed standardized tool required by Paragraph 33(c), and to report the results of its analysis of the electronic medical records of two randomly selected prisoners from each clinician's caseload.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 33 in the Tenth Reporting Period.

34 **(Revised).**  Consistent with existing Correctional Health Services policy, the County and the Sheriff will conduct clinically appropriate release planning for all prisoners who are being released to the community and who have been identified by a QMHP as having a mental illness and needing mental health treatment, or as having a DSM-5 major neuro-cognitive disorder that caused them to be housed in the Correctional Treatment Center at any time during their current incarceration.  For prisoners with mental illness and needing mental health treatment, the release planning services will be guided by the prisoner's level of care.  Specifically, prisoners who at any time during their incarceration meet mental health level of P3 or P4 will be presumptively referred for release planning services, and prisoners who meet mental health level of care P2 will receive release planning services upon referral by a clinician or upon their request.  Prisoners who have a DSM-5 major neuro-cognitive disorder that caused them to be housed in the Correctional Treatment Center will also be referred for release planning services consistent with the Correctional Health Services policy applying to prisoners with mental illness.

> (a) Release planning will consider the need of the prisoner for housing; transportation to the prisoner's community-based provider, residence, or shelter within the County; bridge psychotropic medications; medical/mental health/substance abuse services; income/benefits establishment; and family/community/social supports ("Release Planning Areas").

> (b) Release planning will be based on an individualized assessment of the prisoner's needs and, unless the prisoner is unable or unwilling to participate, will be undertaken in collaboration with the prisoner.  For prisoners referred for release planning services, those services will include:

>> (i) An Initial Release Plan that will be created at intake or no later than ten days after the referral for release planning, which referral shall normally occur at the time of intake.  The Initial Release Plan will include preliminary identification of needs in each of the Release Planning Areas and preliminary recommendations for services to address those needs, and a referral for assistance in obtaining California identification when needed and when the prisoner is eligible; and/or

>> (ii) A Comprehensive Release Plan that will be initiated no later than thirty days after the referral for release planning.  The Comprehensive Release Plan will include (A) collecting information regarding the prisoner's needs; (B) coordinating with community-based providers to identify available services that meet the prisoner's needs; (C) facilitating the transition of care to community-based providers, and (D) assisting in obtaining identification and/or benefits when needed, when the prisoner is eligible, and as offered by the Sheriff's Community Transition Unit.

> (c) The County will maintain a re-entry resource center with staff supervised by a QMHP.  The re-entry resource center will:

(i) Provide information appropriate to the released prisoner about available housing, transportation, medical/mental health/substance abuse services, income/benefits establishment, community/social supports, and other community resources; and

(ii) Provide released prisoners with copies of their release plans, as available.

(d) All prisoners who are receiving and continue to require psychotropic medications will be offered a clinically appropriate supply of those medications upon their release from incarceration.  Unless contraindicated, this will be presumed to be a 14-day supply or a supply with a prescription sufficient so that the prisoner has the psychotropic medication available during the period of time reasonably necessary to permit the prisoner to consult with a doctor and obtain a new supply.

(e) Nothing in Paragraph 34 will require prisoners to accept or participate in any of the services provided under this Paragraph.

(f) Neither the County nor the Sheriff shall be in violation of this paragraph if after reasonable efforts as set forth in Correctional Health Services Policy M380.01, Release Planners are unable to identify available post-release services.

**STATUS (34):**          **PARTIAL COMPLIANCE**

During the Seventh Reporting Period, the parties and the Intervenors reached an agreement on the provisions of revised Paragraph 34 ("Revised Paragraph 34") set forth above.  They also agreed on revised Compliance Measures and a revised policy to implement Revised Paragraph 34.  On December 10, 2018, the Court issued an order pursuant to the parties' joint stipulation revising Paragraph 34.

The County's Tenth Self-Assessment reports that "[a]s part of its ongoing effort to significantly expand release planning, CHS submitted a budget including a significant expansion of staffing."  It "was granted half of its requested Paragraph 34-related budget, with the expectation that the remaining funding would be considered for approval for FY 2020-2021."  Hiring fairs were held in December 2019 and February 2020, and the hiring process began with 16 positions offered and two "internal promotions/transfers."  The Tenth Assessment reports that the majority "are currently in the onboarding process." The County's response to the Monitor's draft of this report states that five staff members, including three Psychiatric Social Workers, "were on-boarded and started on or before June 15, 2020," but they "were offset by the departure of two Psychiatric Social Workers during the same period."  The County "also recently on-boarded three Medical Case Workers[.]"

The County's Tenth Self-Assessment reports that

[t]he COVID-19 pandemic significantly affected release planning operations starting in March 2020.  Early release orders were issued for many inmates, with only a short period provided for mental health staff and release planners to review cases and develop plans for coordinated releases to programs or interim housing.[18]  These cases were given the highest priority, over new cases entering the jails.  Available placements simultaneously became more scarce because of the time frames required for referrals to Full Service Partnerships and Enriched Residential Services placements, the inability of those programs' staff to enter the jails to interview clients, and reduced program capacity[19]. . . . Also due to COVID-19, both of the Care Transitions drivers, that typically transport inmates from their release to third party programs, went out on leave starting in the middle of March 2020, decreasing the availability of transportation from jail to programs.

In response to the challenges presented by the COVID-19 pandemic, during the Tenth Reporting Period the County developed "a resource packet for distribution to all inmates leaving the jails."

Pursuant to Paragraph 34 of the Settlement Agreement and Compliance Measure 34-1(c), (d), and (e), and Compliance Measure 34-6, after consulting with the Mental Subject Matter Expert, and considering the comments of the Department of Justice, on February 10, 2020, the Monitor approved the County's Initial Release Plan, the Mental Health Assessment and Addendum (Preliminary Release Information), Comprehensive Release Plan Handout, and Exit Checklist, subject to one addition to the checklist.[20]

The County's posted self-assessment reports that, as required by Compliance Measure 34-10, a representative of CCSB made a number of unannounced quarterly visits in the First Quarter of 2020 "to CCRC to confirm the presence of staff representing the Health Agency, Probation and Sheriff's Department."  Sheriff's Department staff were always present as were Probation staff except for one occasion when its representative was on a lunch break.  Unfortunately, Health Agency staff were only present 66.7% of the time and representatives from all three agencies/departments were present only 55.5% of the time, which does not constitute Substantial Compliance under Compliance Measures 34-10 and 13(b).[21]

Compliance Measures 34-1 and 2 require the County to review on a quarterly

---

[18] The County also noted in its response to the draft of this report that "service providers who might normally accept patients exiting the jails may themselves have had to close to new patients if they experienced a positive COVID-19 case among their existing patients or staff[.]"

[19] The Office of Diversion and Reentry (ODR) received funding for an additional 211 treatment and housing beds for early release clients, which allowed the County to fill some of this gap.

[20] The County posted an amended Checklist on August 12, 2020.

[21] The County 's amended Self-Assessment for this provision recognizes that, as stated by the Intervenors, "[i]t is necessary but not sufficient that a CCSB employee visits to see which agencies are represented." Substantial Compliance is determined by the presence of the agencies' representatives in the CRRC.

basis "randomly selected records of 85 prisoners released in a randomly selected week"
who had been identified as having a need for mental health care to determine if the
requirements of the County's Release Planning Policy were satisfied and state for each
prisoner who did not receive a Comprehensive Release Plan why a plan was not
completed, whether repeated efforts were made to offer the prisoner comprehensive
release planning, and whether an Initial Release Plan was completed.  Compliance
Measure 34-13(c) sets forth the Substantial Compliance thresholds (85% or 80%) for the
various subparts of Compliance Measure 34-1(a)-(e) for prisoners who had Initial
Release Plans and prisoners who had Comprehensive Release Plans.

The County's posted Self-Assessment for the First Quarter of 2020 reports that
for the 24 prisoners with an Initial Release Plan, none of the plans met the compliance
requirements.  For the 43 prisoners with Comprehensive Release Plans, only 6% of the
plans met the compliance requirements.  For the 39 prisoners with a Comprehensive
Release Plan who required psychotropic medications, 100% were offered their
medications.

Compliance Measure 34-12 requires the County to "review randomly selected
records of 50 prisoners released in a randomly selected week who had been identified by
a QMHP as meeting a mental health level of care P2" and evaluate "whether the QMHP
considered the factors in the Release Planning Policy when determining whether to refer
the prisoner." The County's posted results for the Fourth Quarter of 2019 and the First
Quarter of 2020 report that 97% of the records indicate that "there was consideration [by
the QMHP] of the criteria in the Release Planning Policy."

DOJ expressed concern about the County's self-assessment for this subpart of
Paragraph 34 because some records were deemed "compliant even though the
documentation provided did not reflect consideration of required factors for those
inmates."  The County acknowledged that there are "challenges in the Measure 34-12
areas identified by DOJ relat[ing] to its build-out of the release planning program" and
agreed that records for one of the two inmates identified by DOJ should have been
marked non-compliant.

The County previously complied with Compliance Measures 34-3 (meeting with
County representative responsible for oversight), 4 (CRRC signage), 5 (delayed release
signage), 7 (communication with Release Planners to community-based providers), and 8
(identification of community-based providers).  In its response to the draft of this report,
the County provided "the Monitor with semi-annual updates on efforts to make a
[Community Re-entry Resource Center] CRRC available at or outside" CRDF as
required by Compliance Measure 34-9.

The Monitor has determined that the County has achieved Partial Compliance
with Paragraph 34 because it has complied with the Compliance Measures for
establishing the program.  The Monitor agrees with DOJ, however, that the County has
not achieved Partial Compliance with Compliance Measures 34-1 and 2.  Given the
importance of Compliance Measures 34-1 and 2, the County should receive a rating of

Non-Compliance with Paragraph 34 in the future if the results for these measures do not
improve significantly.

35.     Consistent with existing DMH and Sheriff's Department policies, the County and the Sheriff will ensure that custody staff, before the end of shift, refer prisoners in general or special populations who are demonstrating a potential need for routine mental health care to a QMHP or a Jail Mental Evaluation Team ("JMET") member for evaluation, and document such referrals.  Custody staff will utilize the Behavior Observation and Referral Form.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of November 1, 2017, through December 31, 2018 (verified))**

The Compliance Measures require the Department to review, for a randomly selected month each quarter, the Behavior Observation and Mental Health Referral ("BOMHR") records for prisoners referred by custody staff to a QMHP or JMET member for "routine" mental health care to determine the timeliness of the referrals, and that  85% of the referrals "occurred before the end of the shift in which the potential need for mental health care is identified."

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 35 in the Tenth Reporting Period.

36.     Consistent with existing DMH policies, the County and the Sheriff will ensure that a QMHP performs a mental health assessment after any adverse triggering event, such as a suicide attempt, suicide threat, self-injurious behavior, or any clear decompensation of mental health status.  For those prisoners who repeatedly engage in such self-injurious behavior, the County will perform such a mental health assessment only when clinically indicated, and will, when clinically indicated, develop an individualized treatment plan to reduce, and minimize reinforcement of, such behavior.  The County and the Sheriff will maintain an on-call system to ensure that mental health assessments are conducted within four hours following the notification of the adverse triggering event or upon notification that the prisoner has returned from a medical assessment related to the adverse triggering event.  The prisoner will remain under unobstructed visual observation by custody staff until a QMHP has completed his or her evaluation.

**STATUS:      PARTIAL COMPLIANCE**

The County's Tenth Self-Assessment reports that "[d]uring the Tenth Reporting Period, CHS significantly expanded its use of telepsychiatry to reduce the amount of time patients at the PDC facilities wait to be seen after a crisis event when PDC Mental Health staff are unable to respond to the inmate's location."  This allows mental health staff at IRC "to evaluate suicidal patients [who are] housed at PDC-North, building 2," transferred to that location from other PDC facilities, or housed at PDC-South.  It reports that the County anticipates telepsychiatry will be expanded to NCCF in the next reporting period.  The use of telepsychiatry increases "the number of inmates experiencing a crisis that can be seen within four hours, . . .assists mental health staff in determining more quickly whether inmates need to be moved for direct admission to HOH, or other higher levels of care, and allows LASD to reduce the number of custody staff engaged in transporting inmates to mental health services in response to a crisis."

The Compliance Measures require the Department to review randomly selected records of prisoners newly admitted to mental health housing from a lower level of care due to an adverse triggering event during two randomly selected weeks per quarter and provide a staffing schedule for on-call services.

The County's Tenth Self-Assessment reports that during the Fourth Quarter of 2019, (a) "85% -- rather than the required 95% -- of inmates" identified in the two randomly selected weeks received an assessment by a QMHP within four hours as required by Compliance Measure 36-4(a); and (b) 100% of the selected prisoners at TTCF and 80% at CRDF were seen on videos "under unobstructed visual observation pending assessment."  For one of the inmates at TTCF, however, there was a period of time following a medical check, but before a QMHP assessment, when an inmate was in a cell subject to 15 minute checks rather than "under unobstructed visual observation" as required by Paragraph 36.

The County reports that during the First Quarter of 2020, "CHS staffing was shifted to address COVID 19-related needs and precautions" and some "transitioned to partial telework or other alternative work schedules that may impact on-call coverage and

the ability to meet 4 hour crisis response timeliness" beginning as of March 13, 2020.  In addition, "JMET suspended row walks to shift staff towards responding to crisis calls and high priority referrals.  On April 20, 2020, all clinician JMET row walks resumed in all areas, including areas under quarantine."

The County's Augmented Tenth Self-Assessment also reports that during the First Quarter of 2020, (a) 88% of the inmates identified in the two randomly selected weeks received an assessment by a QMHP within four hours; (b) 100% of the selected prisoners at TTCF and 60% at CRDF were seen on videos "under unobstructed visual observation pending assessment;" and (c) the County achieved 100% compliance with a staffing schedule that provides on-call services 24 hours a day, 7 days a week.

During a March 2020 site visit, the Mental Health Subject Matter Expert and clinicians conducted a qualitative assessment to determine "whether the County was detecting adverse triggering events and repeated self-harm and assuring prompt assessment by a QMHP or that a plan was in place for those with repeated self-harm." They found that 89% of the identified prisoners with a single adverse triggering event were seen within 4 hours by a QMHP; in 51% of these cases "the QMHP adequately evaluated risk factors, which is still below an earlier finding of 85%.  In only 22% was there a safety plan or crisis response to address those risk factors, which is less than the 36% during the previous qualitative assessment."  The Mental Health Subject Matter Expert and the clinicians also found that "[w]ith regard to repeated self-harm, there were treatment plans to address this behavior in 2/7 = 27% of cases [and] there continued to be no evidence that the mental health providers determined that a treatment plan was not indicated in the remaining. . .cases or that a behavior management plan was put in place."

As noted by DOJ, the "Subject Matter Expert's qualitative assessments continue to raise serious concerns with the quality of treatment planning for inmates who engage in repeated self-harm, despite progress in other areas[.]"  The Monitor agrees that's the County should "pay focused attention to the quality of treatment planning and take corrective action to ensure that adequate treatment or behavior plans are in place for inmates who engage in repeated self-harm."

The County's response to the draft of this report states that it "has developed an on-call crisis intervention template, which it is in the process of rolling out.  It has also developed. . .a training and powerpoint presentation that will be rolled out – first to clinicians that regularly provide on-call services, and then to all mental health clinicians."

37.     Sheriff's Court Services Division staff will complete a Behavioral Observation and Mental Health Referral ("BOMHR") Form and forward it to the Jail's mental health and/or medical staff when the Court Services Division staff obtains information that indicates a prisoner has displayed obvious suicidal ideation or when the prisoner exhibits unusual behavior that clearly manifests self-injurious behavior, or other clear indication of mental health crisis.  Pending transport, such prisoner will be under unobstructed visual observation or subject to 15-minute safety checks.

**STATUS:        SUBSTANTIAL COMPLIANCE (as of  January 1, 2020, through March 31, 2020 (unverified))[22]**

The Compliance Measures require the Department to randomly select six courts from among the three Court Divisions each quarter, review written communications and orders that refer to a suicide risk or serious mental health crisis for a prisoner and incident reports for self-injurious behavior by prisoners appearing in the selected courts, and determine if these incidents are reflected in BOMHR forms completed by the Court Services Division staff in the selected courts.

The County's Tenth Self-Assessment reported that 90% of the incidents involving problematic behavior identified by the judges and court clerks in six randomly selected courts were reflected on BOMHRs in the Fourth Quarter of 2019.  These incidents were not limited to the behavior covered by Paragraph 37, but covered all communications received by the Department from judges and court clerks about the behavior of inmates.  The amended posted Self-Assessment reports that in the Fourth Quarter only 47% of the inmates who engaged in suicidal behavior, self-injurious behavior, or a mental health crisis were subject to visual observations or 15-minute safety checks.

The County's amended posted Self-Assessment reflects that in the First Quarter of 2020, 100% of the communications from the judges and court clerks in the six courts about the behavior of inmates were reflected on BOMHRs and 100% of the inmates who engaged in suicidal behavior, self-injurious behavior, or a mental health crisis were subject to visual observations or 15-minute safety checks.  These results are subject to verification by the Monitor's auditors.

---

[22] The County's Augmented Tenth Self-Assessment reflects a finding of Partial Compliance in the First Quarter of 2020, but the posted amended results reflect Substantial Compliance.

38.     Consistent with existing DMH policies and National Commission on Correctional Health Care standards for jails, the County and the Sheriff will ensure that mental health staff or JMET teams make weekly cell-by-cell rounds in restricted non-mental health housing modules (e.g., administrative segregation, disciplinary segregation) at the Jails to identify prisoners with mental illness who may have been missed during screening or who have decompensated while in the Jails.  In conducting the rounds, either the clinician, the JMET Deputy, or the prisoner may request an out-of-cell interview. This request will be granted unless there is a clear and documented security concern that would prohibit such an interview or the prisoner has a documented history of repeated, unjustified requests for such out-of-cell interviews.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified))**

The Compliance Measures require the Department to review the documentation of the weekly cell-by-cell rounds and the JMET Logs for a randomly selected week each quarter to confirm that the required cell-by-cell checks were conducted and out-of-cell interviews were handled in accordance with this provision.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 38 in the Tenth Reporting Period.

39.     The County and the Sheriff will continue to use a confidential self-referral system by which all prisoners can request mental health care without revealing the substance of their requests to custody staff or other prisoners.

STATUS          **SUBSTANTIAL COMPLIANCE (as of July 1, 2017, through June 30, 2018 (verified) at NCCF)**

**PARTIAL COMPLIANCE (at PDC North, PDC South, TTCF, and MCJ)**

**NON-COMPLIANCE (at CRDF)**

**NOT RATED (PDC East)**

Substantial Compliance requires the Department to (a) verify that housing areas have the required forms and (b) review randomly selected self-referrals for mental health care from prisoners to confirm that (i) the referrals "were forwarded to DMH" by the Department, and (ii) that "DMH documented the timeliness and nature of DMH's response to the self-referrals[.]"  The thresholds for Substantial Compliance are that 85% of the housing areas have the required forms and 90% of the self-referrals must be forwarded by the Department to the Department of Health Services – Custody Health Services (DHS-CHS) and 90% must contain the required documentation of DHS-CHS's response.

The County's Tenth Self-Assessment reports that it achieved Substantial Compliance with Compliance Measure 39.4(a) in the Fourth Quarter of 2019 "at all applicable" facilities.  Due to the COVID-19 Pandemic, CHS staff "transitioned to partial telework or alternative staffing arrangements" and CCSB "suspended its on-site assessments related to this Provision[.]"  Accordingly, the Monitor determined that the County's Compliance with this Compliance Measure was suspended for the First Quarter of 2020.

The County previously reported Substantial Compliance with Compliance Measures 39.4(b) and 4(c) at NCCF for twelve consecutive months from July 1, 2017, through June 30, 2018.  These results have been verified by the Monitor's auditors and NCCF is no longer subject to monitoring for compliance with Paragraph 39.[23]

The County's Tenth Self-Assessment reports that 100% of the self-referrals from PDC North, CRDF, TTCF, and MCJ, were forwarded by the Department to DHS-CHS in the Fourth Quarter of 2019, and that DHS-CHS documented the timeliness and nature of its response in 70% of the PDC North referrals, 16% of the CRDF referrals, 66% of the

---

[23] Notwithstanding that NCCF was no longer subject to monitor for compliance with Paragraph 39, the County's Tenth Self-Assessment reports that 100% of the referrals were forwarded by the Department to CHS at NCCF in the Tenth Reporting Period, but CHS only documented the timeliness and nature of its responses in 50% of the referrals in the Fourth Quarter of 2019 and 78% of the referrals in the First Quarter of 2020.

TTCF referrals, and 68% of the MCJ referrals.

For the First Quarter of 2020, the County's posted results reflect that 100% of the self-referrals from TTCF, MCJ, PDC North, and PDC South were forwarded to DHS-CHS and that DHC-CHS documented the timeliness and nature of its response in 64% of the TTCF referrals, 64% of the MCJ referrals, 53% of the PDC North referrals, and neither of the two PDC South referrals.[24]

The County's Tenth Self-Assessment regarding CRDF's compliance with Paragraph 39 is confusing.  It reports that CRDF was only "missing the required compliance by one item" in each of the quarters, even though its posted results report that CHS documented the timeliness and nature of CHS's response in only six out of 36 referrals (16%) in the Fourth Quarter of 2019 and one out of 32 referrals (3%) in the First Quarter of 2020.  Of the self-referrals that were forwarded by the Department to CHS in the First Quarter of 2020 only one was referred timely (i.e., within 24 hours of collection), although 30 of the 32 referrals "were seen by a clinician in a timely manner" (i.e., within seven days of CHS's receipt of the referral).[25]  These results are not sufficient to establish Partial Compliance at CRDF in the Tenth Reporting Period.[26]  While the County reports that CRDF "has made changes to the way it process [sic] self-referrals that should improve compliance, and the related documentation, in future periods," the results nevertheless reflect a continuation of the problems at CRDF in the prior reporting period.[27]

---

[24] PDC South was in Partial Compliance because it had achieved 100% Compliance in the three previous quarters in which there were referrals and "both patients were seen by a clinician within two days of the referral."  As in the past, there were no referrals from PDC East in this reporting period because inmates are pre-screened for mental health issues before being housed at PDC East.

[25] The timeliness of CHS's response is measured from the date of its receipt of the self-referral only if the Department forwards the self-referral within 24 hours of its receipt from the inmate.  Otherwise, it is measured from the date of the Department's self-referral.  As noted by DOJ, and acknowledged by the County, the County did not identify some instances in which custody staff did "not forward forms until days after the self-referral dates."

[26] The Monitor also agrees with DOJ that "[p]lacement on a list to be seen later is not a[n adequate] response."

[27] See Monitor's Ninth Report, p. 44.

40.     The County and the Sheriff will ensure a QMHP will be available on-site, by transportation of the prisoner, or through tele-psych 24 hours per day, seven days per week (24/7) to provide clinically appropriate mental health crisis intervention services.

**STATUS:       PARTIAL COMPLIANCE**

Substantial Compliance requires the County (1) to provide the Monitor with on-call schedules for two randomly selected weeks reflecting that a QMHP was assigned 24 hours a day, seven days per week, and (2) randomly select referrals for mental health crisis intervention received by a QMHP per quarter to verify (i) that a QMHP responded to all referrals, and (ii) responses to 90% of the referrals were within four hours.

The County's Tenth Self-Assessment reports that in the Fourth Quarter of 2019, a QMHP responded to 100% of the referrals for mental health crisis intervention services and 88% of the responses were within four hours, which is below the 90% threshold.  The Augmented Tenth Self-Assessment reports that for the First Quarter of 2020 the County determined that a QMHP responded to 97% of the referrals and 88% of the responses were within four hours.[28]

The County reports that as a result of "changes put in place because of COVID-19" in the First Quarter of 2020,

> CHS temporarily changed its approach to routine mental health care, including significantly reducing the number of group therapy meetings. Individual appointments are continuing, however, there is a sense that they may be fewer than normal due to COVID-19 related precautions and staffing changes.  These changes were designed with P-level in mind to reduce the impact on those with the most severe mental illnesses, but there may be an increase in crisis or unexpected mental health referrals as a result.

The County previously reported that "CHS has also developed a crisis intervention template, which it expects to roll out during the next reporting period" and which it expects "will result in improved responses and supporting documentation."[29] The template was revised during the Tenth Reporting Period "in response to feedback from the relevant programs," and CHS now expects "to implement the template system-wide in Third Quarter 2020, along with training to illustrate its use."

---

[28] The Mental Health Subject Matter Expert and the clinicians have some concerns about the quality of the evaluations because they do not address "crisis issues by documenting a clinically meaningful intervention."
[29] See Monitor's Ninth Report, p. 45.

41.     Consistent with existing DMH policies, the County and the Sheriff will implement step-down protocols that provide clinically appropriate transition when prisoners are discharged from FIP after being the subject of suicide watch.  The protocols will provide:

(a)     intermediate steps between highly restrictive suicide measures (e.g., clinical restraints and direct constant observation) and the discontinuation of suicide watch;

(b)     an evaluation by a QMHP before a prisoner is removed from suicide watch;

(c)     every prisoner discharged from FIP following a period of suicide watch will be housed upon release in the least restrictive setting deemed clinically appropriate unless exceptional circumstances affecting the facility exist; and

(d)     all FIP discharges following a period of suicide watch will be seen by a QMHP within 72 hours of FIP release, or sooner if indicated, unless exceptional circumstances affecting the facility exist.

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance requires DMH to review the medical records of all prisoners on suicide watch in FIP for one randomly selected month each quarter, and submit a report regarding the implementation of the step-down protocols and the results of its review of the medical records.  During the Fifth Reporting Period, the parties agreed to revise the Compliance Measures to increase the number of inmates subject to the step-down protocols of Paragraph 41 and ensure that the implementation of step-down protocols for FIP patients on suicide watch "ameliorate the impact of the restrictions" and have the necessary "level of precautions based upon individual assessment[s]" of the patients.

The County's Tenth Self-Assessment reports that the County met the requirements in Compliance Measure 41-4 for 59% of the prisoners discharged from FIP during the Fourth Quarter of 2019 after having been on suicide watch, which is below the 73% in the Third Quarter of 2019.  The Augmented Tenth Self-Assessment reports that the County met these requirements for 40% of the prisoners discharged during the First Quarter of 2020.  Although the results are well below the 95% threshold for Substantial Compliance, the Monitor deems the County to be in Partial Compliance (rather than Non-Compliance) because it is in compliance with all but one of the applicable sub-parts of Compliance Measure 41-4 in 14 of the 15 cases in the First Quarter of 2020.

42.     Consistent with existing DMH policies, the County and the Sheriff will implement step-down protocols to ensure that prisoners admitted to HOH and placed on risk precautions are assessed by a QMHP.  As part of the assessment, the QMHP will determine on an individualized basis whether to implement "step-down" procedures for that prisoner as follows:

(a)     the prisoner will be assessed by a QMHP within three Normal business work days, but not to exceed four days, following discontinuance of risk precautions;

(b)     the prisoner is counseled to ameliorate the negative psychological impact that any restrictions may have had and in ways of dealing with this impact;

(c)     the prisoner will remain in HOH or be transferred to MOH, as determined on a case-by-case basis, until such assessment and counseling is completed, unless exceptional circumstances affecting the facility exist; and

(d)     the prisoner is subsequently placed in a level of care/housing as determined by a QMHP.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of July 1, 2019, through September 30, 2019, and January 1, 2020, through March 31, 2020, at TTCF)**

**PARTIAL COMPLIANCE (at CRDF)**

The County's Tenth Self-Assessment reports that for the Fourth Quarter of 2019 at CRDF, 100% of the medical records reviewed reflected that all four of the "inmates in HOH and placed on risk precautions were assessed by a QMHP" in the quarter; "75% -- instead of the required 90% -- of the records reflected that the QMHP determined on an individualized basis whether to implement step-down procedures;" and "33% -- rather than the required 85% -- of the records reflected that step-down procedures were implemented per the QMHP assessment."  The County's Tenth Self-Assessment reports that "[t]here were no relevant patients" during the Fourth Quarter of 2019 at TTCF.[30]

The County's Augmented Tenth Self-Assessment reports that there was one inmate in HOH at CRDF who was placed on risk precautions in the First Quarter of 2020, and she was assessed by a QMHP.  The records do not, however, reflect that "the QMHP determined on an individualized basis whether to implement step-down procedures," although the records reflected that "step-down procedures were implemented per the QMHP assessment."  At TTCF, there was also one inmate in HOH who was placed on risk precautions in the quarter, and he was assessed by a QMHP, who "determined on an individualized basis whether to implement step-down procedures;" and that "step-down

---

[30] For this reason, the Monitor has excluded this three-month period in determining the consecutive months that the County has maintained Substantial Compliance with this provision.

procedures were implemented per the QMHP assessment."[31]

The County reports that it "undertook significant efforts to improve the Risk Precaution process and the patient care associated with it during the Reporting Period," which resulted in a reduction in the number of inmates on Risk Precautions. The "impetus for some of these changes was a recognition that the RP designation was being applied in an overly broad manner with requirements which led to intensive staff time commitments and did not allow the programs to focus attention on those most at risk."

The Tenth Self-Assessment reports that

the County's new risk precaution process incorporates additional supervisory consultation and input, required implementation of the step-down process for all inmates being removed from risk precaution and the establishment of a clearer treatment plans and goals. The County also revised the Risk Assessment for Suicide tool (formerly the SRAC) to ensure risk precaution criteria were consistent with that tool and allowed for risk assessment independent of risk precaution criteria and P-level.

* * *

During the Tenth Reporting Period, CHS expanded upon the quality improvement project it began in the Ninth Reporting Period. Specifically, the County continued to track the disposition of high-risk inmates to determine whether they are being seen in a timely manner, whether they are being identified for and sent to higher levels of care when warranted, and if there are inmates who appear that they should have been placed on risk precaution but were not. This project follows inmates in several categories, including those on the FIP waitlist for danger to self, patients designated for next day follow up, and those on risk precaution.

DOJ has expressed concern that "these new procedures may not be effective enough to allow the County to claim substantial compliance in the absence of a meaningful sample of patients to monitor."[32]  Accordingly, DOJ "suggest[s] that the County expand the pool of patients reviewed for provision 42 before being found in substantial compliance."  In response, the County "submits that it cannot expand the sample size for this very specific category of patients without expanding it to patients who do not clinically require the same level of care," which it asserts "would defeat the objectives of the overall of the RP process."  The Monitor encourages the parties to discuss with the Mental Health Subject Matter Expert whether the pool of patients needs to be expanded to address DOJ's concerns and, if so, how it should be expanded.

---

[31] The Mental Health Subject Matter Expert and the clinicians should consider auditing future results reported by the County for Paragraph 42.

[32] The County assessed the records of all HOH inmates placed in risk precautions and subject to step-down procedures in each quarter because of the limited number of such inmates in the designated months. Nevertheless, there was only one HOH inmate at TTCF and five at CRDF in the entire reporting period.

43.     Within six months of the Effective Date, the County and the Sheriff will develop and implement written policies for formal discipline of prisoners with serious mental illness incorporating the following:

(a)     Prior to transfer, custody staff will consult with a QMHP to determine whether assignment of a prisoner in mental health housing to disciplinary housing is clinically contraindicated and whether placement in a higher level of mental health housing is clinically indicated, and will thereafter follow the QMHP's recommendation;

(b)     If a prisoner is receiving psychotropic medication and is placed in disciplinary housing from an area other than mental health housing, a QMHP will meet with that prisoner within 24 hours of such placement to determine whether maintenance of the prisoner in such placement is clinically contraindicated and whether transfer of the prisoner to mental health housing is clinically appropriate, and custody staff will thereafter follow the QMHP's recommendation;

(c)     A QMHP will participate in weekly walks, as specified in paragraph 38, in disciplinary housing areas to observe prisoners in those areas and to identify those prisoners with mental health needs; and

(d)     Prior to a prisoner in mental health housing losing behavioral credits for disciplinary reasons, the disciplinary decision-maker will receive and take into consideration information from a QMHP regarding the prisoner's underlying mental illness, the potential effects of the discipline being considered, and whether transfer of the prisoner to a higher level of mental health housing is clinically indicated.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at NCCF and PDC North)**

**PARTIAL COMPLIANCE (at CRDF, MCJ, and TTCF)**

In response to comments by the Monitor and DOJ, the Department submitted proposed revisions to its discipline policies on May 30, 2017. After consulting with the Subject Matter Experts, the Monitor provided his written comments to the Department on June 29, 2017. DOJ provided its comments to the Department the same day. On April 24, 2019, the Department submitted a proposed policy for discipline of mental health inmates, disabled inmates, and inmates with special needs. The Monitor and DOJ responded with written comments on May 30, 2019. On November 7, 2019, the Department submitted proposed policy revisions for inmate disciplinary procedures and disciplinary guidelines. The Monitor and DOJ responded on December 5 and 6, 2019.

The County's Tenth Self-Assessment reports that the Department "continues to finalize revised policies related to discipline and the mentally ill. . .and is working to incorporate feedback from stakeholders before finalizing these revisions."  It is difficult to understand why the Department has not been able to "implement written policies for formal discipline of prisoners with serious mental illness incorporating [the requirements of Paragraph 43]" nearly five years after the Effective Date of the Settlement Agreement.

The County's Tenth Self-Assessment reports that "at TTCF, if a P2 inmate is disciplined, that P2 inmate is transferred from dorm housing to cell-housing within mental health, and evaluated afterwards as to whether discipline can be imposed."[33]  That is because there is "not sufficient facility space to evaluate these inmates while they are in dorm housing" and there is no "pre-discipline dorm housing module."  The County's response to the draft of this report explains that the inmates "are typically in this pre-discipline area for less than 24 hours. . . .to allow LASD and CHS to conduct the required investigation and evaluation in a safe environment," and they "continue to have privileges. . .until they are evaluated by the DRB clinician."  Further, "P2 inmates who are able to serve discipline after being evaluated by a clinician. . .serve their time in a normal TTCF housing unit[.]"

Notwithstanding the County's explanations, this practice appears to be in violation of Paragraph 43(a), to the extent that it constitutes the imposition of discipline (e.g., more restrictive housing) by Custody personnel prior to consulting "with a QMHP to determine whether assignment of a prisoner in mental health housing to disciplinary housing is clinically contraindicated and whether placement in a higher level of mental health housing is clinically indicated."[34]  This is sometimes reasonable if the patient needs to be separated because of his behavior, but not in every case.

Given that the number of inmates has been reduced due to the COVID-19 pandemic, the draft of this report expressed the view that there should be sufficient space for these evaluations at TTCF for P2 inmates at some time in the future.[35]  In response, the County states that CHS Mental Health leadership "does not expect the reduction in overall inmate population to increase the amount of space available" at TTCF "because the reduction in total population has not impacted mental health housing at the same rate that it has general population" and "the amount of available space at TTCF has been temporarily reduced. . . as TTCF modules have been used to house and isolate COVID" patients.  Even if the rate of reduction of inmates with mental illnesses is lower than the rate for the general population, there is still a reduction in the total number of mentally ill inmates.  Further, recognizing the immediate impact that the COVID-19 pandemic may

---

[33] This is not the practice at CRDF where inmates "are not moved prior to their evaluation[.]"
[34] One of the clinicians has expressed the view that "it is important for [CHS] clinicians to at least make a brief note to the effect that the proposed discipline is not likely to adversely affect the patient's mental health functioning, even if the patient is currently observed to be free of symptoms."
[35] The Average Daily Inmate Population at TTCF was reduced by over 17% from 3,208 in January 2020 to 2,649 in May.  There is reason to believe that the efforts to release and not book non-violent pre-trial detainees may continue even after the pandemic is no longer impacting jail operations.  At the Board of Supervisors June 9, 2020 meeting, the Board "passed a motion directing the County to develop a plan to cap the jail population at approximately 12,000 going forward."

be having on available space, assuming the reduction in the number of inmates contemplated by the Board of Supervisors in the future, that space will be available when it is no longer needed for COVID-19 patients.

The Self-Assessment again reports that

> Inmates who have been designated as P3 or P4 are not moved from their housing assignment when they commit an infraction. The County also evaluates P3 inmates before any other discipline is imposed. Inmates designated as P4 are not disciplined. Instead, P4-level inmates are written up for informational purposes so that this can be addressed through a treatment plan.

> During the Reporting Period, in response to feedback provided in prior reports, the County added additional elements of qualitative care to its assessment of Compliance Measure 43-9(b) and (c), as suggested by the Mental Health SME. The following qualitative factors were added: (i) if the discipline proposed was specifically considered by the QMHP during their evaluation, (ii) whether duration of that discipline was considered by the QMHP, (iii) whether or not placement in discipline housing was clinically contraindicated, and (iv) whether placement in a higher level of care was clinically indicated as a result of the assessment. In considering these factors, the County is applying a higher *qualitative* standard to the records being evaluated.

The County notes that its "effort to improve its qualitative compliance. . . effectively raise[s]the threshold for compliance and require additional training and staff education[.]" It is "working to roll out a revised DRB Assessment Template that will address the additional qualitative factors[.]"

The County previously achieved Substantial Compliance at NCCF and PDC North for twelve consecutive months and these facilities were not subject to monitoring for compliance with Paragraph 43 during the Tenth Reporting Period.

The County's Tenth Self-Assessment reports that for the Fourth Quarter of 2019, 44% of the required consultations at CRDF "occurred prior to transfers from mental health housing;"[36] 18% of the required meetings occurred when inmates receiving psychotropic medications are transferred to disciplinary housing from areas other than mental health housing; and 100% of the weekly row walks through disciplinary units occurred. The results for TTCF were 61%, 0%, and 100% and for MCJ were 50%, 0%, and 75%.[37] The County reports that CRDF and TTCF received additional training on this

---

[36] The County believes that the lower results reflect "changes in the level of documentation expected on the part of clinicians, as a result of suggestions by the Monitor and Mental Health SME" and it "expects these results to improve with additional training."

[37] The clinicians report that it was "difficult to determine [in their reviews] when the referral was made or discipline imposed." In addition, "in a number of recent cases (primarily at CRDF), the specific form of

provision in the Reporting Period.

The County's Augmented Tenth Self-Assessment, as amended, reports that for the First Quarter of 2020, 55% of the required consultations at CRDF "occurred prior to transfers from mental health housing;" 74% (21 out of 29) of the required meetings occurred when inmates receiving psychotropic medications are transferred to disciplinary housing from areas other than mental health housing;[38] and 100% of the weekly row walks through disciplinary units occurred.  The results for TTCF were 73%, 0% (one out of 41), and 100% and for MCJ were 50%, 0% (one out of 33), and 100%.

The Compliance Measure pertaining to the meetings that are required when inmates receiving psychotropic medications are transferred to disciplinary housing from areas other than mental health housing has three sub-parts.  In most of the cases, the County complied with at least one, and often two, of the applicable subparts, and therefore achieved Partial Compliance at these facilities.

---

discipline to be imposed was not available from custody at the time of the QMHP evaluation.  This makes it difficult if not impossible to evaluate for the potential impact of the discipline on the patient's mental health functioning if they don't know what the discipline will actually be."

[38] The County reports that "a revised audit reflects that the clinician did consider potential contraindications" in an additional 10 cases.

44.     Within six months of the Effective Date, the County and the Sheriff will install protective barriers that do not prevent line-of-sight supervision on the second floor tier of all High Observation Housing areas to prevent prisoners from jumping off of the second floor tier.  Within six months of the Effective Date, the County and the Sheriff will also develop a plan that identifies any other areas in mental health housing where such protective barriers should be installed.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016)**

The County has maintained Substantial Compliance with Paragraph 44 of the Agreement since January 1, 2016.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 44 in the Tenth Reporting Period.

45.     Consistent with existing Sheriff's Department policies, the County and the Sheriff will provide both a Suicide Intervention Kit that contains an emergency cut-down tool and a first-aid kit in the control booth or officer's station of each housing unit.  All custody staff who have contact with prisoners will know the location of the Suicide Intervention Kit and first-aid kit and be trained to use their contents.

> **STATUS:**     **SUBSTANTIAL COMPLIANCE (as of October 1, 2015, through September 30, 2016 (verified) at CRDF, NCCF, PDC East, PDC South, and TTCF)**
>
> **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at MCJ and PDC North)**

The County maintained Substantial Compliance with Paragraph 45 for twelve consecutive months at all facilities as of December 31, 2016.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 45 in the Tenth Reporting Period.

46.     The County and the Sheriff will immediately interrupt, and if necessary, provide appropriate aid to, any prisoner who threatens or exhibits self-injurious behavior.

**STATUS:        PARTIAL COMPLIANCE**

Substantial Compliance requires the Department to review the documentation from randomly selected incidents involving prisoners who threaten or exhibit self-injurious behavior, and include an assessment of the timeliness and appropriateness of the Department's responses to these incidents in its semi-annual Self-Assessment.

The County's Tenth Self-Assessment reports that for the Fourth Quarter of 2019, "85% -- rather than the required 95% -- of the records reviewed. . .reflected that appropriate aid and (when necessary) immediate interruption of self-injurious behavior was provided by the Department." It also reports that for the First Quarter of 2020, 88% of the records reflect that the Department provided appropriate aid and necessary interruption. The results, which are below the Substantial Compliance threshold, take into account an expanded universe that includes incidents evaluated by the CIRC or involve self-directed violence in addition to threats of self-directed violence reflected on BOMHRs to address concerns about the universe previously expressed by the Mental Health Subject Matter Expert.

47.     The County and the Sheriff will ensure there are sufficient custodial, medical, and mental health staff at the Jails to fulfill the terms of this Agreement.  Within six months of the Effective Date, and on a semi-annual basis thereafter, the County and the Sheriff will, in conjunction with the requirements of Paragraph 92 of this Agreement, provide to the Monitor and DOJ a report identifying the steps taken by the County and the Sheriff during the review period to implement the terms of this Agreement and any barriers to implementation, such as insufficient staffing levels at the Jails, if any.  The County and the Sheriff will retain staffing records for two years to ensure that for any critical incident or non-compliance with this Agreement, the Monitor and DOJ can obtain those records to determine whether staffing levels were a factor in that critical incident and/or non-compliance.

**STATUS:     NON-COMPLIANCE**

The County posted results report that 47 critical incidents[39] occurred during the Third and Fourth Quarters of 2019, and staffing was not a factor in any of the incidents. While the County provided backup documentation or explanations for some of the critical incidents involving inmate assaults on staff,[40] there was no support for the County's conclusion regarding the vast majority of the critical incidents.

The County's Tenth Self-Assessment reports that

in October 2019, the Department began using [a] template to help supervisors evaluate staffing factors in incidents relevant to this Provision. Similarly, in May 2020, the Department began using a related template in the course of its CIRC reviews to elicit similar information in support of its evaluation of this Provision. The Department believes these developments will improve compliance with the objectives of this provision in future periods.

Nevertheless, as noted by DOJ, the County still "has not addressed staffing shortage it identified previously as obstacles or barriers to implementation in other areas[.]"  The Monitor agrees with the County that Provision 47 does not contemplate "the Monitor conducting an independent review of County staffing models, but instead requires the County to do such a review" that is subject to the Monitor's assessment.

---

[39] 19 Inmate Deaths, seven Serious Suicide Attempts, 17 Assaults on Staff by Mentally Ill Inmates (not including gassings), and four Category 3 Uses of Force.

[40] The County reports that it has added a page to the force review checklist "to assist facilities identifying any factors in staffing levels regarding assaults on staff. . .and Category 3 uses of force."

48.     Within three months of the Effective Date, the County and the Sheriff will
have written housekeeping, sanitation, and inspection plans to ensure the proper cleaning
of, and trash collection and removal in, housing, shower, and medical areas, in
accordance with California Code of Regulations ("CCR") Title 15 § 1280: Facility
Sanitation, Safety, and Maintenance.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of January 1, 2016,
through December 31, 2016)**

The County maintained Substantial Compliance with Paragraph 48 of the
Agreement at all facilities for twelve consecutive months as of December 31, 2016.
Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject
to monitoring for Substantial Compliance with Paragraph 48 in the Tenth Reporting
Period. [41]

---

[41] Unfortunately, due to the COVID-19 pandemic, the Monitor was not able to visit the facilities after a
visit to TTCF and CRDF in January 2020.

49.     Within three months of the Effective Date, the County and the Sheriff will have a maintenance plan to respond to routine and emergency maintenance needs, including ensuring that shower, toilet, sink, and lighting units, and heating, ventilation, and cooling system are adequately maintained and installed.  The plan will also include steps to treat large mold infestations.

**STATUS:**        **SUBSTANTIAL COMPLIANCE (as of March 1, 2016, through February 28, 2017)**

The County maintained Substantial Compliance with Paragraph 49 of the Agreement at all facilities for twelve consecutive months as of February 28, 2017. Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 49 in the Tenth Reporting Period.

50.     Consistent with existing Sheriff's Department policies regarding control of vermin, the County and the Sheriff will provide pest control throughout the housing units, medical units, kitchen, and food storage areas.

**STATUS:**      **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at all facilities other than PDC South and PDC East)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 (verified) at PDC South and PDC East)**

The County maintained Substantial Compliance with Paragraph 50 of the Agreement at all facilities for twelve consecutive months as of March 31, 2017.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 50 in the Tenth Reporting Period.

51.     Consistent with existing Sheriff's Department policies regarding personal care items and supplies for inmates, the County and the Sheriff will ensure that all prisoners have access to basic hygiene supplies, in accordance with CCR Title 15 § 1265: Issue of Personal Care Items.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) for all facilities other than CRDF)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017 (verified) at CRDF)**

The County maintained Substantial Compliance with Paragraph 51 of the Agreement at all facilities for twelve consecutive months as of June 30, 2017.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 51 in the Tenth Reporting Period.

52.     The County and the Sheriff will implement policies governing property restrictions in High Observation Housing that provide:

(a)     Except when transferred directly from FIP, upon initial placement in HOH:

(i)     Suicide-resistant blankets, gowns, and mattresses will be provided until the assessment set forth in section (a)(ii) below is conducted, unless clinically contraindicated as determined and documented by a QMHP.

(ii)    Within 24 hours, a QMHP will make recommendations regarding allowable property based upon an individual clinical assessment.

(b)     Property restrictions in HOH beyond 24 hours will be based on clinical judgment and assessment by a QMHP as necessary to ensure the safety and well-being of the prisoner and documented in the electronic medical record.

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance requires the Department to (1) randomly inspect the cells of prisoners placed in HOH (except from FIP) within the previous 24 hours to confirm that they have been provided with suicide-resistant blankets, gowns and mattresses unless clinically contraindicated, and document the results of the inspection; (2) randomly inspect the cells of prisoners placed in HOH (except from FIP) for more than 24 hours to confirm that they have been provided with allowable property as recommended by a QMHP; and (3) review the electronic medical records of prisoners assigned to HOH on the days of those inspections to verify compliance with the provisions of Paragraph 52. All of the Compliance Measures have a 95% threshold for Substantial Compliance.

The County's Tenth Self-Assessment reports that in the Fourth Quarter of 2019, 89% of the inmates initially placed in HOH at CRDF were provided the property required by Paragraph 52, and 97% of the inmates placed in HOH for more than 24 hours had "allowable property as recommended by a QMHP[.];" but only 32% "of the electronic medical records for inmates assigned to HOH reflected a recommendation by a QMHP regarding allowable property;"[42] and only 19% "of electronic medical records for inmates assigned to HOH reflect that property restrictions were based upon the clinical judgment of a QMHP."

Also for the Fourth Quarter of 2019, the County reports that 92% of the inmates initially placed in HOH at TTCF were provided the property required by Paragraph 52;

---

[42] It is not clear how the County determined that 97% had "allowable property as recommended by a QMHP" if only 32% of the electronic medical records "reflected a recommendation by a QMHP."  As explained by the County, the Department and CHS use different universes and different methodologies, but the different approaches make it difficult to access the accuracy of the County's reported results.

and 97% of the inmates placed in HOH for more than 24 hours had "allowable property as recommended by a QMHP;" 66% of the electronic medical records "reflected a recommendation by a QMHP regarding allowable property;" and 76% of the records "reflect that property restrictions were based upon the clinical judgment of a QMHP."

The County's Augmented Tenth Self-Assessment reports that for the First Quarter of 2020, 97% of the inmates initially placed in HOH at CRDF were provided the property required by Paragraph 52; 98% of the inmates in HOH for more than 24 hours had "allowable property as recommended by a QMHP;" 33% of the electronic medical records "reflected a recommendation by a QMHP regarding allowable property;" and 19% of the records "reflect that property restrictions were based upon the clinical judgment of a QMHP."

Also in the First Quarter of 2020, 89% of the inmates initially placed in HOH at TTCF were provided the property required by Paragraph 52; 97% of the inmates placed in HOH for more than 24 hours had "allowable property as recommended by a QMHP;" 63% of the electronic medical records "reflected a recommendation by a QMHP regarding allowable property;" and 77% of the records "reflect that property restrictions were based upon the clinical judgment of a QMHP."

During a March 2020 site visit, the Mental Health Subject Matter Expert and the clinicians again reviewed records to determine "[w]hether there was an assessment by a QMHP within 24 hours" and they "qualitatively evaluated whether the restrictions were based on an analysis of relevant risks."  They found no significant differences between CRDF and TTCF, and in 95% of the cases, "a QMHP provided an assessment" and saw the patient within 24 hours in 89% of the cases, both "sustaining a substantial improvement."  50% of the cases reflected that "the allowable property was based on relevant risks[.]"  While an improvement from previous reviews, they noted that

> [t]here was still often no discussion of why certain items were restricted or even why restrictions were needed at all.  Restrictions were still often put in place when the structured suicide risk assessment indicated low risk and there was no documentation or analysis demonstrating that restrictions were needed.

Finally, they performed an "updated assessment" in 76% of cases that "was based on relevant risks" in 53% of the cases.

53.     If otherwise eligible for an education, work, or similar program, a prisoner's mental health diagnosis or prescription for medication alone will not preclude that prisoner from participating in said programming.

**STATUS:      PARTIAL COMPLIANCE**

Substantial Compliance requires the Department to audit the records of prisoners who were eligible, but rejected or disqualified, for education and work programs to confirm that they were not rejected or disqualified because of a mental health diagnosis or prescription for medication alone.

The County's Tenth Self-Assessment reports that 98% of the eligible mentally ill prisoners who were denied education or work in the Fourth Quarter of 2019 and 76% in the First Quarter of 2020 "were not rejected or disqualified from education or work programs solely because of a mental health diagnosis or prescription medication."  While the results for the Fourth Quarter of 2019 exceeded the 90% threshold for Substantial Compliance, the results in the First Quarter of 2020 were below the threshold.  The Department reports that it "expects, for reasons unrelated to mental health status, that fewer inmates will be able to participate in education or work programs during the public health crisis."

54.     Prisoners who are not in Mental Health Housing will not be denied privileges and programming based solely on their mental health status or prescription for psychotropic medication.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of October 1, 2019, through March 31, 2020 (unverified))**

Substantial Compliance under the revised Compliance Measures for Paragraph 54, effective January 1, 2018, requires the Department to audit the records of a maximum of 100 randomly selected prisoners identified on the Wednesday Pharmacy List as having received psychotropic medication to confirm that no more than 10% were rejected or disqualified because of a mental health diagnosis or prescription for psychotropic medication alone.  Because the Monitor's auditors had verified that the County has maintained Substantial Compliance under the original Compliance Measures, the parties agreed that the County will only be required to maintain Substantial Compliance under the revised Compliance Measures for two additional quarters.

In the Fourth Quarter of 2019, no more than 4% of the inmates were denied requests improperly for purposes of this Provision and no inmates were denied visitation for impermissible reasons.  In the First Quarter of 2020, no more than 5% of the inmates were improperly denied requests for privileges or programs and no inmates were denied visitation for impermissible reasons.  These results are subject to verification by the Monitor's auditors.  If verified, the County has now maintained Substantial Compliance under the revised Compliance Measures for two additional quarters and is no longer subject to monitoring for Substantial Compliance with Paragraph 54.

55.     Relevant custody, medical, and mental health staff in all High Observation Housing units will meet on normal business work days and such staff in all Moderate Observation Housing units will meet at least weekly to ensure coordination and communication regarding the needs of prisoners in mental health housing units as outlined in Custody Services Division Directive(s) regarding coordination of mental health treatment and housing.  When a custody staff member is serving as a member of a treatment team, he or she is subject to the same confidentiality rules and regulations as any other member of the treatment team, and will be trained in those rules and regulations.

> **STATUS:**     **SUBSTANTIAL COMPLIANCE (as of October 1, 2016, through September 30, 2017 (verified) at CRDF)**
>
> **SUBSTANTIAL COMPLIANCE (as of April 1, 2017 through March 31, 2018 (verified) at PDC North)**
>
> **SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 (verified) at MCJ)**
>
> **SUBSTANTIAL COMPLIANCE (as of July 1, 2019 through March 31, 2020 (verified) at TTCF)**

The Department maintained Substantial Compliance for twelve consecutive months through the Third Quarter of 2017 at CRDF and through the First Quarter of 2018 at PDC North with Compliance Measures 55-2, 55-6(a) and 55-6(b), which require daily staff meetings in HOH and weekly meetings in MOH attended by representatives from custody, medical, and mental health, and CRDF and PDC North were not subject to monitoring for compliance with Paragraph 55 in the Tenth Reporting Period.

The County previously submitted reports showing Substantial Compliance at MCJ for twelve consecutive months through the end of the First Quarter of 2019.  The results at MCJ have been verified by the Monitor's auditors, and the County is no longer subject to monitoring for Substantial Compliance with Paragraph 55.

The County's posted results for TTCF reflect that 100% of the required meetings were held in HOH and MOH units in the randomly selected month in the Fourth Quarter of 2019 and that 95% of the required meetings in HOH were held during the randomly selected month in the First Quarter of 2020, which is above the 85% threshold for Substantial Compliance required by Compliance Measures 55-6(a) and 55-6(b), and 100% of the required meetings in MOH were held during the randomly selected month. The results for TTCF have been verified by the Monitor's auditors.

The County has submitted a report of the meeting attended by CCSB to "verify the coordination and communication between Department of Health Services (DHS and TTCF custody personnel" at the staff meetings in HOH and/or MOH units in the Tenth Reporting Period as required by Compliance Measures 55-2, 55-4, and 55-6(c).

56.     Consistent with existing DMH and Sheriff's Department policies, the County and the Sheriff will ensure that custody, medical, and mental health staff communicate regarding any change in a prisoner's housing assignment following a suicide threat, gesture, or attempt, or other indication of an obvious and serious change in mental health condition.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified))**

Substantial Compliance requires the Department to review in randomly selected periods the electronic medical records of (1) prisoners admitted to HOH following a suicide threat, gesture, or attempt, or other indication of an obvious and serious change in mental health condition to determine if the medical and/or mental health staff approved the placement of the prisoner in HOH; and (2) prisoners who were the subject of a suicide attempt notification to determine if the prisoners were clinically assessed and that clinical staff approved the post-incident housing.

The County's Substantial Compliance results for the twelve months from January 1, 2016, through December 31, 2016, were verified by the Monitor's auditors.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 56 in the Tenth Reporting Period.

57.     Within three months of the Effective Date, the County and the Sheriff will revise and implement their policies on safety checks to ensure a range of supervision for prisoners housed in Mental Health Housing.  The County and the Sheriff will ensure that safety checks in Mental Health Housing are completed and documented in accordance with policy and regulatory requirements as set forth below:

(a)     Custody staff will conduct safety checks in a manner that allows staff to view the prisoner to assure his or her well-being and security.  Safety checks involve visual observation and, if necessary to determine the prisoner's well-being, verbal interaction with the prisoner;

(b)     Custody staff will document their checks in a format that does not have pre-printed times;

(c)     Custody staff will stagger checks to minimize prisoners' ability to plan around anticipated checks;

(d)     Video surveillance may not be used to replace rounds and supervision by custodial staff unless new construction is built specifically with constant video surveillance enhancements and could only be used to replace 15 minute checks in non-FIP housing, subject to approval by the Monitor;

(e)     A QMHP, in coordination with custody (and medical staff if necessary), will determine mental health housing assignments; and

(f)     Supervision of prisoners in mental health housing will be conducted at the following intervals:

(i)     FIP:  Custody staff will perform safety checks every 15 minutes. DMH staff will perform direct constant observation or one-to-one observation when determined to be clinically appropriate;

(ii)    High Observation Housing:  Every 15 minutes;

(iii)   Moderate Observation Housing:  Every 30 minutes.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at MCJ)**

**PARTIAL COMPLIANCE (at PDC North, TTCF, and CRDF)**

Substantial Compliance requires the Department to audit the Title 15 Dashboard records (or UDAL records if the Title 15 scanner was not working) for all shifts for each module in each mental health housing unit in two randomly selected weeks to determine if the safety checks were staggered and conducted as required by Paragraph 57 of the

Agreement, and to audit the housing records for each mental health housing unit for a randomly selected week to determine if QMHPs approved the new mental health housing assignments as required by Paragraph 57(e). The thresholds for achieving Substantial Compliance with these two Compliance Measures is 95%. The County reports that in the Tenth Reporting Period, the Department made "improvements to Wi-Fi and server issues to improve the accuracy of safety check scanning" and "also sent frequent briefings and reminders to staff about the importance of timely and quality safety checks[.]"

The County's Sixth Self-Assessment reported that it maintained Substantial Compliance with Compliance Measure 57.5(b) in the Fourth Quarter of 2017 and the First Quarter of 2018 in the MOH unit at MCJ (the "Hope Dorm"). It also reported that all of the inmates at MCJ "analyzed pursuant to Compliance Measure 57-5(c) had received QMHP approval for their housing assignments" in both quarters. The results were verified by the Monitor's auditors and MCJ was not subject to monitoring for compliance with Paragraph 57 in the Tenth Reporting Period.

The County's Tenth Self-Assessment reports that the County achieved Partial Compliance with the safety checks in the mental health housing units at TTCF (63% and 81%) and CRDF (77% and 75%) in the Fourth Quarter of 2019 and the First Quarter of 2020, which is a substantial improvement from the prior reporting period. The Self-Assessment also reports that 100% of the new mental health housing assignments in CRDF approved by a QMHP in the Fourth Quarter of 2019 and the First Quarter of 2020. The results for TTCF are 100% and 98%.

The Tenth Self-Assessment also reports that the County achieved Substantial Compliance in the MOH units at PDC North in the Fourth Quarter of 2019 (96%), which it maintained in the First Quarter of 2020 (98%). The County's report for PDC North could not be verified by the Monitor's auditors because the safety checks were not sufficiently staggered. The County reports that "in February 2020 the Department created mandatory PowerPoint training for staff regarding safety checks and the required staggering, [and that] leadership from PDC-North also consulted with CCSB regarding the importance [of] timely, and staggered, checks and related expectations." The County's posted results indicate that this training occurred on February 6, 2020, and the Monitor's auditors note that the days following the training showed increased staggering of checks.

58.     Within three months of the Effective Date, the County and the Sheriff will revise and implement their policies on safety checks.  The County and the Sheriff will ensure that safety checks in non-mental health housing units are completed and documented in accordance with policy and regulatory requirements as set forth below:

(a)     At least every 30 minutes in housing areas with cells;

(b)     At least every 30 minutes in dormitory-style housing units where the unit does not provide for unobstructed direct supervision of prisoners from a security control room;

(c)     Where a dormitory-style housing unit does provide for unobstructed direct supervision of prisoners, safety checks must be completed inside the unit at least every 60 minutes;

(d)     At least every 60 minutes in designated minimum security dormitory housing at PDC South, or other similar campus-style unlocked dormitory housing;

(e)     Custody staff will conduct safety checks in a manner that allows staff to view the prisoner to assure his or her well-being and security.  Safety checks involve visual observation and, if necessary to determine the prisoner's well-being, verbal interaction with the prisoner;

(f)     Custody staff will document their checks in a format that does not have pre-printed times;

(g)     Custody staff will stagger checks to minimize prisoners' ability to plan around anticipated checks; and

(h)     Video surveillance may not be used to replace rounds and supervision by custodial staff.

**STATUS:**  **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at PDC South, PDC North, and PDC East)**

**SUBSTANTIAL COMPLIANCE ( as of July 1, 2017, through June 30, 2018 (verified) at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at IRC)**

**PARTIAL COMPLIANCE (at TTCF, NCCF, and MCJ)**

Substantial Compliance requires the Department to audit the Title 15 Dashboard records (or UDAL records) for all shifts for each module in each housing unit to determine if the safety checks were staggered and conducted as required by Paragraph 58. The threshold for achieving Substantial Compliance with each of the Compliance Measures is 90%.

The County maintained Substantial Compliance with Paragraph 58 for twelve consecutive months at PDC South, PDC North, and PDC East as of December 31, 2016, at CRDF as of June 30, 2018, and at IRC as of September 30, 2018. These results have been verified by the Monitor's auditors. Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring at those facilities for Substantial Compliance with Paragraph 58 in the Tenth Reporting Period.

The County's Tenth Self-Assessment reports that for the Fourth Quarter of 2019 and the First Quarter of 2020 the following percentages of safety checks were in compliance with Paragraph 58 at the remaining facilities: MCJ (76% and 49%);[43] TTCF (82% and 88%); and NCCF (76% and 87%).

---

[43] As a result of the COVID-19 pandemic, "the Department temporarily placed MCJ Module 5800 on an alternative safety check schedule . . . As part of the alternative schedule, there were physical safety checks every 60 minutes, with visual checks from the booth every 30 minutes and CCTV/DVTEL checks to accompany those visual checks. This remained in place temporarily while the module was on quarantine."

59.     Consistent with existing Sheriff's Department policies regarding uniform daily activity logs, the County and the Sheriff will ensure that a custodial supervisor conducts unannounced daily rounds on each shift in the prisoner housing units to ensure custodial staff conduct necessary safety checks and document their rounds.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of January 1, 2017, through December 31, 2017 (verified) at PDC East and MCJ)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2018, through December 31, 2018 (verified) at PDC North and PDC South)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018. through March 31, 2019 (verified) at TTCF)**

Substantial Compliance requires the Department to audit e-UDAL records for housing units in each facility to determine if supervisors are conducting unannounced daily rounds in accordance with Paragraph 59. In response to the Monitor's comments, the Department's e-UDAL forms were modified to include a specific notation that the Supervisor verified that the safety checks were conducted. The threshold for achieving and maintaining Substantial Compliance is that 90% of the supervisor daily rounds were in compliance with the requirements of Paragraph 59.

The County's Substantial Compliance results were verified by the Monitor's auditors. Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 59 in the Tenth Reporting Period.

60.     Within six months of the Effective Date, the Department of Mental Health, in cooperation with the Sheriff's Unit described in Paragraph 77 of this Agreement, will implement a quality improvement program to identify and address clinical issues that place prisoners at significant risk of suicide or self-injurious behavior.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of April 1, 2019,[44] through March 31, 2020)**

Paragraph 60 requires the County to "implement a quality improvement program to identify and address clinical issues that place prisoners at significant risk of suicide or self-injurious behavior."  The Compliance Measures for Paragraph 60 require the County to "identify and address. . .clinical issues" in the areas identified in Paragraph 61 of the Agreement" and corrective actions are taken to address "such issues."  See Compliance Measures 60.1, 60.2(a), and 60.3(b).

On July 10, 2020, the County submitted CHS's Semi-Annual Report on Quality Improvement/Assurance, which includes data for the Fourth Quarter of 2019 and the First Quarter of 2020.  As in the past, the Report describes how "CHS is integrating mental health services into its [Quality Improvement and Patient Safety (QIPS) program] approach to system change in the following ways:"

> "The QIPS program staff continue to maintain and track a Quality Dashboard metrics. . . . [and it] continues to work in conjunction with mental health management to revise some of the metrics under mental health services, particularly metrics under 'Medication Management' and 'Mental Health Services.'"                     * * * *
> "In order to align department and unit-level improvement activities with overall LA County, DHS and CHS strategic priorities, CHS has adopted the Quality and Safety Goals to support organization-wide and guide quality improvement activities [for 2020-2023]. . . .Every 3 years or at the Director's discretion, CHS executive leadership, in collaboration with service lines and departments, will develop overarching CHS Quality and Safety goals for each domain."
>
> * * * *
>
> "25 staff members from various facilities and departments have graduated from the Quality Academy Program[at LAC+USC]. . . .Graduates of this program serve as QI Leads and advisors at their home CHS facilities and service lines[.]"  One of the clinicians notes that this is "a good start toward creating a culture in which QI is at the forefront, [but] it does not appear that custody staff are trained" since "the training has only been delivered to health care staff."

---

[44] CHS's Semi-Annual Report on Quality Improvement/Assurance, submitted on January 14, 2019, covered the Second and Third Quarters of 2019.

\* \* \* \*

On June 20, 2019, "CHS launched the Correctional Health Improvement Program (CHIP)" to develop "effective leaders in QI who can accomplish improvement strategies in their areas."  87 staff have attended the introductory course to basic concepts of quality improvement and 18 have attended a three-month course that "includes eight workshops designed to develop QI leaders and work on process improvement projects."

\* \* \* \*

Until the COVID-19 pandemic, CHS's Quality Improvement Committee ("QIC") of senior CHS executives continued to "meet monthly to work on improving the quality of care delivered and the quality of health care services provided across CHS.[45]  Representatives from sub-departments, facilities, and service lines across CHS participate in its meetings and are responsible for performing QI activities aligned with CHS Quality and Safety goals. . . .[Q]uality and safety issues along with pertinent finding from CIRC and JQIC were discussed among the QIC committee."[46]

\* \* \* \*

The Safety Intelligence(SI) system provides "front line staff with a non-punitive mechanism to report a variety of events some of which may include mistakes or near misses. . . .In its original state the SI system did not differentiate [Self-Directed Violence] events from all other types of behavioral events.  CHS Compliance staff worked with DHS and SI administrators to develop a customized page so that behavioral events that involve patient SDVs are designated as such and forwarded separately to CHS Compliance staff for review. . . .The CHS Compliance program developed a QI project referred to as 'Safety Intelligence Event Reporting Initiative' to monitor progress toward this transition to using exclusively the SI system to report SDVs."

---

[45] "The County intends to reestablish the QIC monthly meetings once the COVID-19 crisis has subsided to the degree which makes it manageable for staff to fully participate in these meetings."  Even in a prolonged pandemic, quality improvement projects cannot be suspended indefinitely.  As noted by one of the clinicians, these projects "should be reconvened with modified methods and projects appropriate to service delivery in the pandemic."  This does not require the County to reorganize its QI program "in response to temporary developments" or "change the standard by which the County is judged because of public health events well beyond its control."  Nor does it "demand" that the County "present quality pandemic-related QI projects[.]"  It is simply a recognition that the County still needs a QI program during, and adjusted for, pandemic-related conditions.

[46] In mid-March, "three full time nursing staff that were responsible for assisting with the monitoring of system-wide quality improvement projects and facilitating monthly meetings" were reassigned as "the priorities of CHS Nursing Management shifted to direct patient care and safety" during the pandemic crisis.

As in the past, CHS reports on the recent activities of the Critical Incident Review Committee ("CIRC") and the Joint Quality Improvement Committee ("JQIC").  It reports that CHS's compliance team

> "conducts reviews of all SDV incidents occurring within the jail system and from those reviews [it] selects SDV incidents and QI cases[47] to be presented at monthly CIRC meetings[48]. . . . The CHS Compliance team has improved the categorization of issues identified from CIRC and QI reviews [by domains and sub-domains] to assist with identification of trends/themes across reviews. . . .Given the sample size of CIRC cases remains small, it is difficult to identify specific trends in any-one [sic] reporting period.  For the next reporting period the County plans to develop a quality improvement project related to the highest sub domain category (mental health documentation)."

The CHS Report indicates that "[t]he County continues to develop the format of JQIC meetings to include presentations on both aggregate data and system-wide changes in addition of follow-up and review of the issues identified in CIRC meetings."  One of the clinicians notes that, "overall, the system [of CIRC reviews] is solid. . . .[S]ome issues were identified and assigned to staff to address, but it is not clear exactly how they are addressed or what the outcome is."  Moreover, the County has not replaced the CCSB analyst who previously had "provided much of the data support for JQIC presentations" since the analyst was promoted a year ago in July 2019.[49]

The CHS Report provides summaries of the JQIC meetings for the period of October 2019 through March 2020, but again it is not clear to what end.  For example, in January 2020 JQIC reviewed the "purpose and procedures" related to the housing of inmates who express suicidal ideation (SI) in Row 2E at PDC North.  Housing data for the Fourth Quarter of 2019 was presented at the JQIC meeting, but the summary of the meeting does not draw any conclusions or indicate how the data is used by JQIC.  The only analysis of aggregate data was during the February 2020 JQIC meeting.  In this meeting, there was an analysis of "aggregate SDV data" at MCJ "based on housing unit and type," and a conclusion that the "greatest frequency of this behavior occurred in K-10 housing," although the data seems to indicate that it occurs in K-10 disciplinary and K-6-B, T, 10 housing.  The proposed solutions were to increase JMET walks in some of the modules.

Perhaps due to the COVID-19 pandemic, there is no list of "Key QIC Projects" and less analysis of aggregate data than in previous reporting periods.  It does not appear that the data was used to "identify and address clinical issues that place prisoners at

---

[47] These are SDV incidents that have modest to high risk rating scores or QI cases with lower risk rating scores that are "clinically appropriate" or have "facts surrounding an SDV incident [that] highlight systemic issues."

[48] Summaries of the 12 cases reviewed at the monthly CIRC meetings in the Fourth Quarter of 2019 and the First Quarter of 2020 (through April 2, 2020) are attached to the CHS Report.

[49] See CHS Semi-Annual Report, dated January 14, 2020.

significant risk of suicide or self-injurious behavior" or that the analysis resulted in corrective actions or systemic improvements other than for additional JMET walks in some of the MCJ housing areas.

The Semi-Annual Report again includes the following sections:

- The Correctional Treatment Center – Mental Health Unit (CTC-MHU), reports an increase in admissions and discharges over the period 2014 through the First Quarter of 2020, with the largest increase in 2017, with a general downward trend in re-admissions to the unit within 30 days of admission through the end of 2019 but a significant spike in the First Quarter of 2020 that the report does not address.[50]  As stated by one of the clinicians, this is an "instance where drilling down further into the underlying case data may be informative."  There has also been a continuing decrease in use of clinical restraints in the unit through the First Quarter of 2020.  It is notable that in 2015, clinical restraints were used 314 times;[51] since January 2019, clinical restraints have only been used four times.  The County "believes that the decrease in the use of clinical restraints is partly the result of increased use of long-acting injectable (LAI) psychotropic medications in MHU-CTC," although there has been a downward trend since the Third Quarter of 2018.  Finally, the County concludes that "it is evident that with the rising inmate population with mental health disorders, it would be beneficial to utilize a HOH pod as temporary housing for P4 patients on the FIP list" or "who have been discharged from the transitional unit who still might need additional support before moving to a regular HOH pod."

- A summary of the results of a "pilot study" of inmates prescribed atypical antipsychotic medication to determine the percentage with orders for blood tests for lipids and hemoglobin, which are necessary to address increased risks associated with the atypical antipsychotic medication.  The pilot study of 50 inmates showed that "appropriate testing was ordered in 78% of the patients in the sample."  The County is planning to distribute a memo to all psychiatrists with a goal to obtain "at least 95% compliance."  One of the clinicians notes that '[t]his is a solid effort and well-conceived."

- A summary of the results of the STEP FORWARD program at CRDF that provides early use of Long Acting Injectable (LAI) psychotropic medications for the period of October 2019 through March 2020.  The

---

[50] There were 12 such readmissions in the First Quarter of 2020 as compared with 24 for all of 2019.
[51] CHS's January 2020 Semi-Annual Report mistakenly reported that clinically restraints were used 154 time in 2015, although the chart in that report reflected they were used 314 times.

study shows that the "waiting period from referral to delivery of LAI averages out to about 5.75 days," which is "an improvement upon the last report that averaged at 7.3." Moreover, "it continues to shorten the period from incarceration to LAI delivery that would have otherwise happened through court ordered LAI treatment[.]" The study shows reductions in P levels of care at the time of the patients release.

- A report of an assessment of the wait time for patients/inmates with a P2 level of care housed in MOH to see a psychiatrist, which one of the clinicians states is "a very well-done and thought out project." During the Fourth Quarter of 2019, "89% of patients with P2 level of care were seen by a psychiatrist within 14 days of referral and of that total 44% were seen with 7 days." In the First Quarter of 2020, the percentage of patients seen within 14 days dropped to 71%" and 19% wthn 7 days, due to a reduction in staffing levels for MOH. Two psychiatrists in IRC provide "bridge orders, psychotropic medication evaluations, and initial mental health evaluations to help ensure continuity of care," but "as of March 16, 2020 the full-time psychiatrist for IRC has been out due to COVID-19 related concerns." The County reports that it "will continue to monitor MOH psychiatric intakes for MOH on a monthly basis" and will develop a corrective action plan (CAP) "if the number of patients waiting greater than 14 days exceeds 10%," which was the case in both quarters in the Tenth Reporting Period; and

- A section on other QI projects and health care services, which reports on the following

    (a) The timeliness of the evaluation of suicidal patients within four hours in the IRC. CHS reports that its "analysis of the data across a variety of factors indicates that the [Complex Case Committee] process of utilizing creative problem-solving and a multi-disciplinary approach with individualized interventions is successful in reducing problematic behaviors from inmates with complex concerns," although "success is measured in very small incremental changes." It recommends the creation of a "CCC-specific treatment plan" that "would enhance the work of the CCC by identifying intervention goals, improving communication among treatment providers for these inmates, and establishing consistency for continued positive outcomes."

    One of the clinicians comments that the CCC's efforts to look into the group data "to identify subgroups who increased versus decreased rates of incidents in the Incident Report Tracking System is a good example of drilling down into the aggregate data to better understand different types of changes across a diverse set of inmates." The "treatment

plans are largely non-existent for patients unless they are in FIP. . . .The lack of treatment plans is likely to lead to numerous ineffective interventions rather than a few key, targeted interventions."  The other clinician echoes these points, noting that in their "qualitative reviews, we have encountered very few examples of documentation that would fit the definition of a structured treatment plan, other than for FIP patients, which are still overly generic and not sufficiently detailed or individualized." Further, "the lack of a standardized way to document interventions. . . remains a significant limitation that they have no way of knowing if the interventions in this study, considered 'recommendations,' were executed."

(b) The effectiveness in the Fourth Quarter of 2019 and the First Quarter of 2020 of the specialized pods to provide medically monitored withdrawal from alcohol for inmates with alcohol dependence and other substance abuse treatment services "where patients are examined for the severity of their alcohol withdrawal every four hours via a [Clinical Institute Withdrawal Assessment] CIWA score."

(c) The Provision 30 QI project and training "to improve accuracy and consistency in documentation and to capture a more complete release plan for each patient interviewed."[52]  This contributed to "Provision 30 reaching and maintaining Substantial Compliance" in 2019 and the First Quarter of 2020.

(d) Audits of the new risk precaution process and protocols that has resulted in a significant reduction in the number of inmates on the Risk Precaution Lists for CRDF and TTCF.  The audits evaluated "whether the Risk Precaution designation is being utilized appropriately," to ensure "clinically appropriate and timely follow-up for at risk inmates," and to see if inmates who "should have been on risk precautions" were missed.

(e) A study presented to JQIC on June 25, 2020, based upon "objective data" to evaluate the success of the Complex Case Committee (CCC) in working with "the most acutely impaired mental health patients and/or the most difficult to manage from a behavioral perspective" during the period from July 1, 2019 through March 31, 2020.

(f) CHS staff training in the Fourth Quarter of 2019 and the First Quarter of 2020, including work by the CHS Compliance program staff to

---

[52] See CHS Semi-Annual Report, dated January 14, 2020.

75

improve the understanding of requirements in the DOJ Settlement
Agreement.

CHS's Report sets forth aggregate data for 16 suicides[53] in the period 2015
through the First Quarter of 2020, broken down by prior attempts or other serious self-
injurious behavior, facility/location, method, demographics (age, ethnicity, and gender),
and proximity to court date.  With the addition of the one suicide in November 2019, this
is essentially the same information that was provided in CHS's Semi-Annual Report for
the prior period.

CHS's Report states that there were 280 SDV incidents by 228 inmates during the
Fourth Quarter of 2020 and the First Quarter of 2019.  The report notes that "[t]here was
a sharp decline in the number of self-directed violence incidents for 2019 as compared to
the previous year," which is the lowest since 2015, and this continued in the First Quarter
of 2019.  The report also includes an analysis of 742 SDV incidents involving 536
inmates in 2019 through March 2020 by prior attempts, facilities, method, lethality (risk
rating score), age, ethnicity, gender, and proximity to court date, and an analysis of 22
cases[54] that were presented at CIRC meetings in the Fourth Quarter of 2019 and the First
Quarter of 2020, broken down by the same categories.  As in the past, CHS's Report does
not go beyond these breakdowns to identify clinical issues or reflect that the data was
used to propose corrective actions or systemic improvements.

The Monitor and the Mental Health Subject Matter previously agreed that the
Department had demonstrated "a sound quality improvement process and the ability to
demonstrate that process through specific quality improvement projects directed by
management," and the Monitor finds that the County had demonstrated that it maintained
Substantial Compliance with Paragraph 60 for twelve consecutive months.  Although the
County is no longer subject to monitoring for compliance with Paragraph 60, it
"acknowledges that its ongoing Quality Improvement efforts will remain subject to
monitoring under other provisions" of the Settlement Agreement.

---

[53] Two of the suicides occurred in station jails; the rest were in TTCF or MCJ.
[54] The report indicates that there were "11 cases which met criteria for CIRC and 1 QI case presented at
CIRC meetings" between October 2019 and March 2020, but the graphs reflect that there were 21 CIRCs
presented, which apparently covers all of 2019 through March 2020.

61.     The quality improvement program will review, collect, and aggregate data in the following areas and recommend corrective actions and systemic improvements:

    (a)     Suicides and serious suicide attempts:

        (i)      Prior suicide attempts or other serious self-injurious behavior
        (ii)     Locations
        (iii)    Method
        (iv)     Lethality
        (v)      Demographic information
        (vi)     Proximity to court date;

    (b)     Use of clinical restraints;

    (c)     Psychotropic medications;

    (d)     Access to care, timeliness of service, and utilization of the Forensic In-patient Unit; and

    (e)     Elements of documentation and use of medical records.

**STATUS:        PARTIAL COMPLIANCE**

Substantial Compliance requires the County's semi-annual reports to (a) review, collect, and aggregate data in the areas set forth in Paragraph 61; (b) recommend corrective actions and systemic improvements in those areas; and (c) assess the effectiveness of actions and improvements in prior reporting periods.

As noted above, the CHS Semi-Annual Report sets forth aggregate data for the 16 suicides during the period 2015 through the Third Quarter of 2019; 742 SDV incidents from January 2019 through March 2020; and 22 SDV incidents that were reviewed at CIRC meetings during the Fourth Quarter of 2019 and the First Quarter of 2020 broken down by the subparts of Paragraph 61(a).  There is little that is new in the data,[55] and no indication that the data is used or useful to generate recommendations for corrective actions or systemic improvements.

Although the CHS Report states that "JQIC meetings are used to highlight system-wide updates and presentations of aggregate data for SDVs, CIRC, and Suicides," as in the past, it does not appear that JQIC used the data "to identify and address clinical issues that place prisoners at significant risk of suicide or self-injurious behavior" or to

---

[55] E.g., SDVs by Prior Attempts ("The data continues to show that a majority of inmates who engage in self-directed violence do not have a history of previous incidents in our system.  As mentioned in previous reports there remain a core group of inmate who continue to engage in self-directed violence incidents"); SDV Data by Lethality ("The data continues to show the majority of SDVs score in the low risk range"); SDV Data by Age ("The data for this reporting period is consistent with the previous report").

propose corrective actions or systemic improvements.  For example, the summary of the October 31, 2019 JQIC meeting reviews CIRC Corrective Action Plans resulting from an SDV in CRDF and another SDV in TTCF and sets forth a list of "Custody Topics of Discussion."  Although the "Topics" included "Develop, implement, and track corrective action plans" and "Gathering and analyzing aggregate data to detect system-wide problems," there is no presentation or analysis of any aggregate data or any corrective actions or systemic improvements proposed by JQIC.  Other JQIC meetings focus on reviews of CIRC Corrective Action Plans in response to SDV incidents.  Only the February 2020 JQIC meeting reviewed "2019 Men's Central Jail – Self Directed Violence Aggregated Data" and proposed solutions to increase JMET walks in some of the housing areas with the highest percentage of SDVs.  As noted by one of the clinicians, "in some cases an issue was identified and assigned in CIRC, but there is no indication of follow-up, even when the issue had recurred."

The CHS Report includes two sections that "review, collect, and aggregate data" in the areas required by Paragraph 61(b) (use of clinical restraints), (c) (Psychotropic medications), and (d) (access to care and utilization of FIP):

- Aggregate data on the significant decrease in the use of clinical restraints in the Mental Health Unit of the CTC (FIP) over the period from 2015 through the First Quarter of 2020 and an analysis of the cause and effect of the decrease.

- Aggregate data on the admission, discharge, and readmission of patients in the CTC-MHU for admissions, discharges, and readmissions from 2014-15 through the First Quarter of 2020 and an analysis of the change in the number of admissions and discharges.[56]

- An analysis of inmates who were "prescribed atypical antipsychotic medication" and the percentage "with an order for blood tests for lipids. . .and hemoglobin A1c. . .at the time of the initial medication prescription determined" with a goal of increasing "the rate of appropriate ordering" until there is at least 95% compliance.

- An analysis of the STEP FORWARD program at CRDF that provides early use of Long Acting Injectable (LAI) psychotropic medications.

- An assessment of the wait time for patients/inmates with a P2 level of care housed in MOH to see a psychiatrist during the Fourth Quarter of 2019 and an increase in the wait time in the First Quarter of 2020.

---

[56] The Monitor agrees with DOJ that the County should "track and monitor. . . admissions to FIP step-down unit(s) and re-admissions to FIP from step-down unit(s)."

CHS attributes the reduction in the use of clinical restraints to changes in
"custody policy regarding the 'use of force;'" "an increase in using discussion and
negotiation techniques to gain compliance from patients;" "more time taken to manage
highly emotionally charged interactions between mental and medical health staff, custody
staff, and patients;" and, to the early use of "long-acting injectable (LAI) psychotropic
mediations in MHU-CTC." The increase in CTC admissions and discharges is due to an
effort to use "beds in a more efficient manner" by stabilizing patients and discharging
them to a lower level of care rather than using FIP "as a long-term treatment setting for
patients with high-risk behavioral issues."

With respect to psychotropic medications, as the Mental Health Subject Matter
Expert has pointed out in the past, there needs to be an "analysis of general prescribing
patterns or medication monitoring, both critical aspects of quality management of
psychotropic prescribing." The data analyzed by CHS for STEP FORWARD shows a
reduction in the average wait time from referral to delivery of the LAI and from
incarceration to LAI delivery. This analysis addresses a need for comparison to prior
periods at CRDF, although there are still no benchmark or baseline comparisons to
TTCF, which does not have a STEP FORWARD program, and it still does explain how
they reduced the wait times.[57]

The evaluation of Initial Psychiatric Evaluation and Medication Management for
New Arrestees in MOH (P2) under "QI Projects Relating to the Use of Psychotropic
Medication" concerns "access to care" under Paragraph 61(d) (rather than "psychotropic
medications" under Paragraph 61(c)). The Report concludes that the increase in waiting
time from the Fourth Quarter of 2019 (when 89% were seen within 14 days) to the First
Quarter of 2020 (71%) "is attributed to changes in staffing levels" from the loss of a
number of psychiatrists, but that "triage by psychiatry in IRC helps to ensure continuity
of care. . .by providing early psychiatric intervention."[58] The County reports that it "has
recently recruited six contract psychiatrist which (sic) are in various stages of onboarding
to work in the jail."[59]

As in the past, the Department and CHS are analyzing aggregate data, but have
not connected the analysis to corrective actions or systemic improvements in each of the
areas required by the subparts of Paragraph 61. And as noted by DOJ, "where the County
is identifying systemic issues, it does not consistently draw conclusions or explain what
steps, if any, are being taken to address them, or how they are being or will be tracked."
In order to achieve Substantial Compliance with Paragraph 61, however, the County must
"review, collect and aggregate data" in each of the areas set forth in the subparts of the

---

[57] See Monitor's Ninth Report, p. 81, n. 44.
[58] Although the percentage of MOH Intake Psychiatric Evaluations in IRC was roughly the same (7% and
9%) in both quarters.
[59] The County also reports that it "will continue to monitor MOH psychiatric intakes for MOH on a
monthly basis and if the number of patients waiting greater than 14 days exceeds 10% a corrective action
plan (CAP) will be developed to address it." It is not clear why it does not already have a CAP since the
14-day waiting time exceeded 10% in both the Fourth Quarter of 2019 and the First Quarter of 2020.

paragraph and "recommend corrective actions and systemic improvements" where
appropriate.  While the County has analyzed aggregate data in most of these areas, it still
needs to show that the analysis is driving corrective actions and systemic improvements,
and that it is measuring the actions and improvements against established benchmarks.

62.     The County and the Sheriff's Unit described in Paragraph 77 of this
Agreement will develop, implement, and track corrective action plans addressing
recommendations of the quality improvement program.

**STATUS:**     **PARTIAL COMPLIANCE**

Substantial Compliance requires the County's semi-annual Self-Assessments to
set forth (a) the "development of corrective action plans to address the most recent
recommendations of the quality improvement program;" and (b) the "implementation and
tracking of corrective action plans to address recommendations of the program in prior
quarters."

As noted below, CCSB's Semi-Annual Report only describes two corrective
action plans (CAPs) identified in CIRC and JQIC meetings.[60]  It provides limited findings
based upon the aggregate data that CHS and CCSB collected from incidents of self-
directed violence without showing how data and findings were used to "develop,
implement, and track corrective action plans addressing recommendations of the quality
improvement plan."

To achieve Substantial Compliance with subpart (b) of Paragraph 62, the
Department and CHS need to assess whether the CAPs generated at the death reviews or
at the CIRC or JQIC meetings raise systemic issues and, if so, set forth the steps
undertaken by the Department and CHS to addressing those issues.  They also need to
assess the effectiveness of such improvements from prior reporting periods.

---

[60] In the February 2020 JQIC meeting, "CCSB presented MCJ aggregate SDV data."  The proposed
solution was to increase the JMET walks in some of the housing areas.  During the review of an incident at
NCCF in the March CIRC meeting, LASD Command Staff requested NCCF to explore the feasibility of
applying metal mesh barrier to the top tiers of the dorms at NCCF.

63.     The County and the Sheriff will maintain adequate High Observation Housing and Moderate Observation Housing sufficient to meet the needs of the jail population with mental illness, as assessed by the County and the Sheriff on an ongoing basis.  The County will continue its practice of placing prisoners with mental illness in the least restrictive setting consistent with their clinical needs.

**STATUS:     NON-COMPLIANCE**

The Compliance Measures require that the County's Self-Assessment set forth (a) the average daily populations in HOH and MOH units in TTCF and CRDF during the reporting period; (b) the average number of beds in those units during the reporting period; (c) the number of days in which there was a waiting list for HOH or MOH housing; and (d) the average number of step-downs per week (i) from HOH to MOH and (ii) from MOH to the least restrictive setting consistent with the prisoners' clinical needs. In addition, for two random weeks, the Department is required to review the count sheets documenting the number of occupied and available beds in the MOH and HOH units at TTCF and CRDF.  Substantial Compliance requires "the immediate availability of HOH and MOH beds at TTCF and CRDF 95% of the time."

The County's posted results report that the number of days in which the total number of HOH and MOH available beds was equal to or more than the number of HOH and MOH inmates for the two randomly selected weeks in the Fourth Quarter of 2019 are as follows:

|  | MOH | HOH |
|---|---|---|
| TTCF | 100% | 0% |
| CRDF | 100% | 14% |

The County's posted results also report that the number of days in which the total number of HOH and MOH available beds was equal to or more than the number of HOH and MOH inmates for the two randomly selected weeks in the First Quarter of 2020 are as follows:

|  | MOH | HOH |
|---|---|---|
| TTCF | 100% | 0% |
| CRDF | 92% | 0% |

The County states that "this Provision remains a challenge in light of physical limitations of the County's current facilities and the continued increase in jail population requiring mental health housing" and the Department "is considering alternative ways to accurately capture this information [reflecting "breakdowns relating to bed availability] in collaboration with DOJ."[61]  Understandably, DOJ "remain[s] concerned by the

---

[61] Notwithstanding the substantial reduction in the inmate population during the COVID-19 pandemic, the County reports that "Covid related changes also limited the amount of space available to house certain types of inmates."  In particular, "there was a reduction in the amount of total available housing at TTCF so that inmates who were on Covid-related isolation or quarantine could be housed properly."  Assuming that

County's ongoing difficulties addressing the shortfall of HOH beds," though it is
encouraged by the "reduction in the shortfall of HOH beds compared to the previous
monitoring period."  Accordingly, it "suggest[s] that the County more proactively address
mental health bed shortages in HOH and FIP as part of its CQI program."

---

the reduced jail population remains at or below the targets set by the Board of Supervisors, there should be
sufficient space in the future once it is no longer needed for COVID-19 patients.

64.      Within six months of the Effective Date, the County and the Sheriff will
develop a short-term plan addressing the following 12-month period, and within 12
months of the Effective Date, the County and the Sheriff will develop a long-term plan
addressing the following five-year period, to reasonably ensure the availability of
licensed inpatient mental health care for prisoners in the Jails.  The County and the
Sheriff will begin implementation of each plan within 90 days of plan completion.  These
plans will describe the projected capacity required, strategies that will be used to obtain
additional capacity if it is needed, and identify the resources necessary for
implementation.  Thereafter, the County and the Sheriff will review, and if necessary
revise, these plans every 12 months.

**STATUS:      PARTIAL COMPLIANCE**

Substantial Compliance requires the Department to (1) develop a short-term plan
that will address the availability of licensed inpatient mental health care for prisoners in
an initial 12-month period; (2) commence to implement the plan within 90 days after it is
developed; (3) develop a long-term plan within 12 months after the short term plan that
will address the availability of licensed inpatient mental health care for prisoners in the
following five-year period; and (4) commence to implement the long-term plan within 90
days after it is developed.

The Department of Health Services submitted a June 2020 "Update to Plan
Regarding Availability of Licensed Inpatient Mental Health Care (Long Term and Short
Term Plans). . .to update those efforts [to meet the obligations of Provision 64] where
needed to highlight those that continue to impact the availability of care for inmate-
patients in need of inpatient care within and without the jail system."  CHS's Update
reports:

> The most impactful recent change has been related to the use of the
> licensed inpatient beds.  Traditionally, FIP was used for long-term patients
> and lengths of stay was often several weeks or more.  In 2019 an effort
> was made to use the inpatient beds more efficiently for those requiring
> involuntary medication. . . .Instead of holding patients in inpatient beds for
> weeks they are often discharged to housing units such as the FIP stepdown
> unit where they can be more closely monitored than in traditional HOH
> housing but are no longer in need of an inpatient bed.  This allows for a
> greater number of those on the waitlist to be admitted to the FIP when
> compared to previous years when patients remained in the FIP longer.

This has resulted in an "increased efficiency" that "has served to reduce the total number
of beds needed for inpatient use."  There has been a "reduction in the readmission rate"
that "impacts the availability of beds for new admissions and allows for more patients
overall to access the FIP beds."

The Update includes a section entitled "Projecting Inpatient Mental Health Housing Demand" that explains that: the mental health population has grown approximately 9% per year to over 5000 patients in 2020." There were an average of 80 P4 patients by week in the three month period from October 2019 to January 2020, which

> is a reduction from the originally estimated 200 beds and is due to the current efficient use of the beds and the use of long-acting injectable medication that has become more widely available to the mental health population. . . .[T]he County believes that over time the continued monitoring of P4 levels of care will provide a good estimate of current bed need and recommends this practice to continue to monitor whether it remains stable at approximately 80 or changes within the next 18 months.

While the CHS report addressing the short-term "availability of licensed inpatient mental health care for prisoners in the Jails" that is sufficient to establish Partial Compliance with Paragraph 64, it does not set forth a long-term plan that is required by this provision.[62]

The County's Update notes that there is a significant push by the County to develop a plan "with the goal of reducing the jail population and placing those with mental health needs in community placements instead of jail" and that the Board of Supervisors has directed the County "to develop a plan to cap the jail population at approximately 12,000 going forward." Under these circumstances, the Update states that "it is not possible to definitely determine the number of inpatient beds that are needed within the jail," but the County "is confident" that its on-going efforts "will serve to reduce the overall inpatient bed need in the jail." The Monitor agrees with DOJ that "[t]here will always be uncertainty, but the County still has an obligation to create long-term plans including projections based on the best available data."

---

[62] The County's Augmented Tenth Self-Assessment notes that "due to COVID-19, the CHS Mental Health Program temporarily lost the use of the Mental Health Transitional Unit within the Correctional Treatment Center. In the normal course, these beds are used to transition patients from FIP to step-down of less significant care, while keeping them under heightened review, before they can step further down into HOH or other levels of care. During the pandemic, this space was transitioned for use by COVID-19 positive patients."

65.     Consistent with existing Sheriff's Department policies, the County and the Sheriff will ensure that psychotropic medications are administered in a clinically appropriate manner to prevent misuse, hoarding, and overdose.

**STATUS:      PARTIAL COMPLIANCE**

Substantial Compliance requires that (1) the County's Self-Assessments set forth the (a) the results of weekly medication audits documenting the visual observation of the administration of medication during the quarter; (b) unauthorized medications found as a result of cell searches during the reporting period; and (c) incidents involving confirmed prescription drug overdoses; and that (2) "the Monitor concludes, after consulting with the Subject Matter Expert, that psychotropic medications have been administered in a clinically appropriate manner 85% of the time."

The County's Tenth Self-Assessment reports that during the Tenth Reporting Period, "the County finalized and began the roll out of its Pill Call training video to all custody and nursing staff.  Each facility is tasked with training its employees in the proper procedures, relying in part on the video."  The County's posted results for the Tenth Reporting Period reflect the medications found during a number of searches in the Fourth Quarter of 2019[63] and First Quarter of 2020.[64]  The County also reported that there were five confirmed and seven unconfirmed overdoses in the Fourth Quarter of 2019 and four confirmed and nine unconfirmed overdoses in the First Quarter of 2020.  The County and Department previously "paused reporting" the result of Administrative Audits required by Compliance Measure 65-1(a) "to establish a more consistent and clinically appropriate process."

---

[63] During the Fourth Quarter of 2019, 59 medications not "appropriately possessed by inmates" were found during 109 unannounced searches at CRDF, 484 medications were found during 159 searches at TTCF, 515 medications during 107 searches at MCJ, 170 medications during 528 searches at NCCF, 232 medications during 232 searches at PDC North, 67 medications during 250 searches at PDC South, and no medications during seven searches at PDC East.
[64] During the First Quarter of 2020, 26 medications not "appropriately possessed by inmates" were found during 101 unannounced searches at CRDF, 147 medications were found during 94 searches at TTCF, 250 medications during 199 searches at MCJ, 30 medications during 142 searches at NCCF, 130 mediations during 134 searches at PDC North, one medication during 242 searches at PDC South and no medications during eleven searches at PDC East.

66.     Consistent with existing DMH policies, prisoners in High Observation Housing and Moderate Observation Housing, and those with a serious mental illness who reside in other housing areas of the Jails, will remain on an active mental health caseload and receive clinically appropriate mental health treatment, regardless of whether they refuse medications.

**STATUS:     NON-COMPLIANCE**

Substantial Compliance requires the Department to review, on a random basis, the electronic medical records of prisoners in HOH and MOH or with a Serious Mental Illness ("SMI") to assess whether they have remained on an active mental health caseload and that 95% of HOH prisoners, 90% of MOH prisoners, and 85% of other prisoners with a serious mental illness have been offered "clinically appropriate structured mental health treatment" and have been seen by a QMHP at least monthly, regardless of whether they refuse medications.

The County's posted results reflect that, for the Fourth Quarter of 2019, 14% of the records reviewed reflected that an HOH inmate was offered clinically appropriate treatment at least weekly and seen by a QMHP at least once a month; 10% of the records reviewed reflected that a MOH inmate was offered clinically appropriate mental health treatment and seen by a QMPH at least once a month; and 60% of the records reflected that inmates with serious mental illnesses residing in other housing areas were offered clinically appropriate mental health treatment at least weekly, and were seen by a QMHP at least once a month.[65]  The records reviewed for the First Quarter of 2020 reflect that 8% of the HOH inmates were offered weekly treatment, 6% of the MOH inmates were offered monthly treatment, and 85% of the other mentally ill inmates were offered weekly treatment.

The County continues to struggle to ensure that inmates with serious mental illnesses receive the clinically appropriate mental health treatment they need and that is required by Paragraph 66.  The County's Tenth Self-Assessment reports that "[t]he County also continues to work towards improved standardization of the intake assessment process performed in reception centers so that it continually improves the accuracy and efficiency of its process for identifying inmates at intake who have a serious mental illness.  Specifically, the County implemented a new process in which JMET clinicians and psychiatrists identify inmates as seriously mentally ill as they see them while performing normal job functions."  One of the clinicians notes that while this "may better identify inmates who need mental health treatment, it is unlikely to directly improve the delivery of clinically appropriate structured mental health treatment."  As noted by the Mental Health Subject Matter Expert's summary of a December 2019 site visit: "We continued to find limited evidence of treatment that qualified as structured in any setting. . . .The main struggle here is the same one we've seen all along – the lack of focused treatment planning that addresses targeted areas of need based on clinical

---

[65] Compliance Measure 66-4(c) does not specifically require that prisoners having a serious mental illness who reside in other housing areas of the jail be offered clinically appropriate treatment "at least weekly."

assessment, and the lack of consistent, structured treatment delivery guided by such treatment plans."[66]

---

[66] The County also states that HOH patients are seen twice a month by a psychiatrist, and four times a month by a clinician, and these patients "are also considered during huddle meetings and in response to regular contact by nurses and custody staff. . . .[T]he most seriously ill patients on the FIP wait list are seen even more often by psychiatrists and mental health clinicians as would be clinically appropriate, the most ill may be seen as often as daily."

67.     Within three months of the Effective Date, the County and the Sheriff will implement policies for prisoners housed in High Observation Housing and Moderate Observation Housing that require:

(a)     documentation of a prisoner's refusal of psychotropic medication in the prisoner's electronic medical record;

(b)     discussion of a prisoner's refusal in treatment team meetings;

(c)     the use of clinically appropriate interventions with such prisoners to encourage medication compliance;

(d)     consideration of the need to transfer non-compliant prisoners to higher levels of mental health housing; and

(e)     individualized consideration of the appropriateness of seeking court orders for involuntary medication pursuant to the provisions of California Welfare and Institutions Code sections 5332-5336 and/or California Penal Code section 2603(a).

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance requires the County to "review the electronic medical records of 25% of the prisoners in HOH and MOH who refused psychotropic medication during the quarter to verify that the records [of 85% of the prisoners] reflect the documentation and consideration of the matters required by the terms of Paragraph 67."

The County's posted results reflect that in the Fourth Quarter of 2019, 52% of the records of prisoners who refused psychotropic medication "reflected the documentation and consideration of the matters required by Paragraph 67." For the First Quarter of 2020, the County's posted results reflect that 72% of the records reflected the required documentation and consideration of these matters.[67]

During the Reporting Period, the County "completely revised the way it assesses this Provision in response to feedback received from the Monitor, Mental Health SME, and DOJ to consider: results in the Medication Administration Record (by nursing), clinical notes (by nursing), Progress Notes (by mental health clinicians and psych techs), and briefs of assessments (by Psychiatrists). . . .[T]he County's self-assessment reflects a tiered approach that tries to separate inmates' clinical needs based on their level of care and the resulting approach to meeting the qualitative requirements of the compliance measures."

---

[67] The County has acknowledged that "two assessment items identified by DOJ were in error and [it] will issue an amended self-assessment."

68.     Within six months of the Effective Date, the County and the Sheriff will
develop and implement a procedure for contraband searches on a regular, but staggered
basis in all housing units.  High Observation Housing cells will be visually inspected
prior to initial housing of inmates with mental health issues.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of January 1, 2016,
through December 31, 2016 (verified) at MCJ, NCCF,
PDC East, PDC South, and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2017,
through December 31, 2017 (verified) at TTCF)**

**PARTIAL COMPLIANCE (at CRDF)**

Substantial Compliance requires that "85% of the housing units are searched for
contraband at least once in the previous quarter; and 95% of the HOH units visually
inspected prior to housing prisoners in these units."  Self-Assessments are to include a
summary of searches conducted and a review of 25 randomly selected Checklist forms
for HOH units to confirm that the units were visually inspected prior to initial housing of
prisoners in these units.

The County previously maintained Substantial Compliance for twelve consecutive
months at TTCF, MCJ, NCCF, PDC East, PDC South, and PDC North.  Pursuant to
Paragraph 111 of the Settlement Agreement, the Department was not subject to
monitoring at those facilities for Substantial Compliance with Paragraph 68 in the Tenth
Reporting Period.

The County's posted amended results reflect that in the Fourth Quarter of 2019,
90% of the housing units at CRDF were searched at least once in the quarter, and 100%
of the randomly selected HOH cells at CRDF were visually inspected before housing
prisoners in these units.  The County's posted amended results reflect that in the First
Quarter of 2020, 92% of the housing units at CRDF were searched at least once in the
quarter, and 92% of the randomly selected HOH cells at CRDF were visually inspected
before housing prisoners in these units, which is short of the 95% threshold for
Substantial Compliance.

69.     Consistent with existing DMH policies regarding use of clinical restraints, the County and the Sheriff will use clinical restraints only in the Correctional Treatment Center and only with the approval of a licensed psychiatrist who has performed an individualized assessment and an appropriate Forensic Inpatient order.  Use of clinical restraints in CTC will be documented in the prisoner's electronic medical record.  The documentation will include the basis for and duration of the use of clinical restraints and the performance and results of the medical welfare checks on restrained prisoners.  When applying clinical restraints, custody staff will ensure a QMHP is present to document and monitor the condition of the prisoner being placed in clinical restraints.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of July 1, 2018,
                    through June 30, 2019 (verified))**

Substantial Compliance requires the Department to review the electronic medical records of all prisoners placed in clinical restraints to verify that the restraints were used, approved, and documented, and that the results of medical welfare checks on restrained prisoners were also documented.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring at those facilities for Substantial Compliance with Paragraph 69 in the Tenth Reporting Period.

70.     Within three months of the Effective Date, the County and the Sheriff will have policies and procedures regarding the use of Security Restraints in HOH and MOH. Such policies will provide that:

(a)     Security Restraints in these areas will not be used as an alternative to mental health treatment and will be used only when necessary to insure safety;

(b)     Security Restraints will not be used to punish prisoners, but will be used only when there is a threat or potential threat of physical harm, destruction of property, or escape;

(c)     Custody staff in HOH and MOH will consider a range of security restraint devices and utilize the least restrictive option, for the least amount of time, necessary to provide safety in these areas; and

(d)     Whenever a prisoner is recalcitrant, as defined by Sheriff's Department policy, and appears to be in a mental health crisis, Custody staff will request a sergeant and immediately refer the prisoner to a QMHP.

**STATUS:      PARTIAL COMPLIANCE**

The Monitor's Eighth Report noted that "[t]he Mental Health Subject Matter Expert and DOJ have expressed concern about the Department's Substantial Compliance with paragraph 70(c) if all inmates in HOH are routinely handcuffed when they are out of their cells 'in a housing pod at the same time.'"[68]

As stated in the Monitor's prior reports, to achieve Substantial Compliance with Paragraph 70(c), the County must demonstrate that "it is continuing to conduct individual assessments in weekly and daily meetings, expanding the use of Living Modules and FIP step-down pods (or other less restrictive housing arrangements), and articulating policies for these programs."[69]  Also, as previously expressed by DOJ, "the County must show that clinicians routinely make individualized assessments for all HOH inmates about whether [the special housing units] would be appropriate, and that inmates are not being denied access to those housing units due to space or capacity constraints."[70]

The County's Tenth Self-Assessment reports that

The County continues to frequently evaluate patients for placement in alternative housing modules.  As previously reported, the County conducts weekly assessments of inmates in HOH housing.  During those assessments, clinicians consider, among other things, whether an inmate is able to cohabitate with others and other considerations relevant to whether

---

[68] See Monitor's Eighth Report, p. 90.
[69] See Monitor's Eighth Report, p. 91; Ninth Report, p. 96.
[70] See Monitor's Ninth Report, p. 96.

they would be appropriate for housing in a Living Module or Step-Down concept.  In addition, the County conducts daily huddle meetings to assess whether HOH inmates are suitable for a double man cell, or transfers to Enhanced Mental Health Housing or MOH.  Communications among and between custody staff, clinicians, group providers and others also occur in less formal contexts via email, in person [sic] to report on a patient's progress, and when inmates themselves request to be considered to participate in the programs.  Separate from clinician assessments, inmates that are able to cohabitate are often trusted to be unrestrained when out of their cells together.

The County's Tenth Self-Assessment also reports that the "Living Module concept operated in six pods at TTCF and two pods at CRDF. . . .Inmates in the Step-down modules and HOPE Dorm are not restrained when out of cell.  There are three FIP Step-Down pods at TTCF and CRDF."[71]  Unfortunately, the "pilot program" that is "aimed to provide P3/HOH inmates with significant unrestrained out of cell time" in five HOH pods at TTCF, and three HOH pods at CRDF "was temporarily suspended at TTCF during COVID-19 due to social distancing requirements, changes to housing modules due to quarantines and isolation, and staffing changes.  CRDF was able to keep its unrestrained out of cell time operating during COVID-19."

As noted in the Monitor's Ninth Report, the Monitor believes, "with additional CHS staffing, the County could expand the Living and LIFE Modules and the Step-down units to provide enhanced mental health care treatment to additional HOH inmates who currently satisfy the criteria for housing in those specialized units."[72]  In light of the substantial reduction in the number of inmates in the County's jail facilities as a result of the COVID-19 pandemic, the County should have space readily available to expand the alternative mental health housing units that would provide additional non-violent inmates with a mental illness with increased unrestrained out of cell time, particularly if in the future the jail population remains at or below the reduced targets set by the Board of Supervisors.  Demolishing MCJ without replacing it with a correctional treatment facility may, however, impact how much space is available for these programs even for a reduced jail population.

---

[71] The County should issue written directives (if not polices as suggested by DOJ) setting forth "staffing and other operation needs" for these programs.

[72] See Ninth Report, p. 96.  The County previously reported that "CHS has developed a plan to request 80 [additional] positions to address the staffing of mental health services and is working with the CEO's office and LASD to determine if additional custody staffing is required to expand the Living Modules and LIFE modules."  The County's Tenth Self-Assessment does not report on the status of CHS's request.

71.     The County and the Sheriff will ensure that any prisoner subjected to
clinical restraints in response to a mental health crisis receives therapeutic services to
remediate any effects from the episode(s) of restraint.

**STATUS:**        **SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through
                    June 30, 2017 (verified))**

Substantial Compliance requires the Department to review the electronic medical
records of all prisoners placed in clinical restraints to verify that the prisoners received
therapeutic services as required by Paragraph 71.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not
subject to monitoring for Substantial Compliance with Paragraph 71 in the Tenth
Reporting Period.

72.     The County and the Sheriff will develop and implement policies and procedures that ensure that incidents involving suicide and serious self-injurious behavior are reported and reviewed to determine:  (a) whether staff engaged in any violations of policies, rules, or laws; and (b) whether any improvements to policy, training, operations, treatment programs, or facilities are warranted.  These policies and procedures will define terms clearly and consistently to ensure that incidents are reported and tracked accurately by DMH and the Sheriff's Department.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of January 1, 2017, through December 31, 2017)**

Substantial Compliance requires the Self-Assessments to report on (a) suicide review meetings and (b) CIRC meetings that review incidents of serious self-injurious behavior in the reporting period.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 72 in the Tenth Reporting Period.

73.     Depending on the level of severity of an incident involving a prisoner who
threatens or exhibits self-injurious behavior, a custody staff member will prepare a
detailed report (Behavioral Observation and Mental Health Referral Form, Inmate Injury
Report, and/or Incident Report) that includes information from individuals who were
involved in or witnessed the incident as soon as practicable, but no later than the end of
shift.  The report will include a description of the events surrounding the incident and the
steps taken in response to the incident.  The report will also include the date and time that
the report was completed and the names of any witnesses.  The Sheriff's Department will
immediately notify the County Office of Inspector General of all apparent or suspected
suicides occurring at the Jails.

**STATUS:        SUBSTANTIAL COMPLIANCE (as of October 1, 2017,
                through September 30, 2018 (verified))**

Substantial Compliance requires the Department to review quarterly a random
sample of reports of any threats or exhibitions of self-injurious behavior to verify that the
reports have the information required by Paragraph 73; and to provide the Monitor with
the notifications to the Inspector General of all incidents involving an apparent or
suspected suicide during the reporting period.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not
subject to monitoring for Substantial Compliance with Paragraph 73 in the Tenth
Reporting Period.

74.     The Sheriff's Department will ensure that there is a timely, thorough, and objective law enforcement investigation of any suicide that occurs in the Jails. Investigations shall include recorded interviews of persons involved in, or who witnessed, the incident, including other prisoners.  Sheriff's Department personnel who are investigating a prisoner suicide or suspected suicide at the Jails will ensure the preservation of all evidence, including physical evidence, relevant witness statements, reports, videos, and photographs.

**STATUS:         SUBSTANTIAL COMPLIANCE (as of September 1, 2016, through December 31, 2017)**

Substantial Compliance requires the Department to provide the Monitor with an Executive Suicide Death Review reflecting the results of the Department's investigation of any suicide in the Jails within six months of the suicide.  The review must reflect steps taken to preserve all of the evidence; and list the interviews of persons involved in, or who witnessed, the incident, and whether the interviews were recorded.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 74 in the Tenth Reporting Period.

75.    Within three months of the Effective Date, the County and the Sheriff will review every suicide attempt that occurs in the Jails as follows:

(a)    Within two working days, DMH staff will review the incident, the prisoner's mental health status known at the time of the incident, the need for immediate corrective action if any, and determine the level of suicide attempt pursuant to the Centers for Disease Control and Prevention's Risk Rating Scale;

(b)    Within 30 working days, and only for those incidents determined to be a serious suicide attempt by DMH staff after the review described in subsection (a) above, management and command-level personnel from DMH and the Sheriff's Department (including Custody Division and Medical Services Bureau) will meet to review relevant information known at that time, including the events preceding and following the incident, the prisoner's incarceration, mental health, and health history, the status of any corrective actions taken, and the need for additional corrective action if necessary;

(c)    The County and the Sheriff will document the findings that result from the review of serious suicide attempts described in subsection (b) above; and

(d)    The County and the Sheriff will ensure that information for all suicide attempts is input into a database for tracking and statistical analysis.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified))**

Substantial Compliance requires (a) DMH to review documentation of randomly selected suicide attempts during the previous quarter to verify that the prisoner's mental health status and need for immediate corrective action were considered timely by the DMH staff and that the staff determined whether the suicide attempt was serious; (b) that the Department and DMH reviewed the relevant information known at that time and the status of any corrective actions taken, and they considered the need for additional corrective action if necessary; and (c) that the information is reflected in the Department's database for tracking and statistical analysis.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 75 in the Tenth Reporting Period.

76.     The County and the Sheriff will review every apparent or suspected suicide that occurs in the Jails as follows:

(a)     Within no more than two working days, management and command-level personnel from DMH and the Sheriff's Department (including Custody Division and Medical Services Bureau) will meet to review and discuss the suicide, the prisoner's mental health status known at the time of the suicide, and the need for immediate corrective or preventive action if any;

(b)     Within seven working days, and again within 30 working days, management and command-level personnel from DMH and the Sheriff's Department (including Custody Division and Medical Services Bureau) will meet to review relevant information known at that time, including the events preceding and following the suicide, the prisoner's incarceration, mental health, and health history, the status of any corrective or preventive actions taken, and the need for additional corrective or preventive action if necessary; and

(c)     Within six months of the suicide, the County and the Sheriff will prepare a final written report regarding the suicide.  The report will include:

(i)     time and dated incident reports and any supplemental reports with the same Uniform Reference Number (URN) from custody staff who were directly involved in and/or witnessed the incident;

(ii)    a timeline regarding the discovery of the prisoner and any responsive actions or medical interventions;

(iii)   copies of a representative sample of material video recordings or photographs, to the extent that inclusion of such items does not interfere with any criminal investigation;

(iv)    a reference to, or reports if available, from the Sheriff's Department Homicide Bureau;

(v)     reference to the Internal Affairs Bureau or other personnel investigations, if any, and findings, if any;

(vi)    a Coroner's report, if it is available at the time of the final report, and if it is not available, a summary of efforts made to obtain the report;

(vii)   a summary of relevant information discussed at the prior review meetings, or otherwise known at the time of the final report, including analysis of housing or classification issues if relevant;

(viii)  a clinical mortality review;

(ix)    a Psychological Autopsy utilizing the National Commission on Correctional Health Care's standards; and

(x)     a summary of corrective actions taken and recommendations regarding additional corrective actions if any are needed.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of September 1, 2016, through December 31, 2017)**

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 76 in the Tenth Reporting Period.  Nonetheless, the County continued to conduct the reviews required by Paragraph 76 for the suicides that occurred during this period and invited the Monitor to attend these meetings.

77.     The County and the Sheriff will create a specialized unit to oversee, monitor, and audit the County's jail suicide prevention program in coordination with the Department of Mental Health.  The Unit will be headed by a Captain, or another Sheriff's Department official of appropriate rank, who reports to the Assistant Sheriff for Custody Operations through the chain of command.  The Unit will be responsible for:

(a)     Ensuring the timely and thorough administrative review of suicides and serious suicide attempts in the Jails as described in this Agreement;

(b)     Identifying patterns and trends of suicides and serious suicide attempts in the Jails, keeping centralized records and inputting data into a unit database for statistical analysis, trends, and corrective action, if necessary;

(c)     Ensuring that corrective actions are taken to mitigate suicide risks at both the location of occurrence and throughout the concerned system by providing, or obtaining where appropriate, technical assistance to other administrative units within the Custody Division when such assistance is needed to address suicide-risk issues;

(d)     Analyzing staffing, personnel/disciplinary, prisoner classification, and mental health service delivery issues as they relate to suicides and serious suicide attempts to identify the need for corrective action where appropriate; and recommend remedial measures, including policy revisions, re-training, or staff discipline, to address the deficiencies and ensure implementation; and

(e)     Participating in meetings with DMH to develop, implement, and track corrective action plans addressing recommendations of the quality improvement program.

**STATUS:      PARTIAL COMPLIANCE**

CCSB's Semi-Annual Report for the Fourth Quarter of 2019 and the First Quarter of 2020 reports that "there were no successful suicide attempts with the jail facilities," although one inmate who attempted suicide in November 2018 was pronounced dead a year later.  An Inmate Death Review was held to discuss the inmate's death and to review the "topics, issues, and concerns" during the review by the Critical Incident Review Committee (CIRC) at the time of the attempt.[73]  23 of the SDV incidents during this period were "deemed suicide attempts," of which five were reviewed during CIRC meetings.

The Semi-Annual Report includes the following sections:

---

[73] There were four suicides in 2019.  According to the bar chart set forth in the CCSB report, this is slightly above the average during the prior five-year period, but slightly below the five suicides in 2018, and well below the 10 suicides in 2013.

(a)     "Administrative Review of Suicides."  This sets forth the CIRC review of the attempted suicide in November 2018 that was discussed by the Inmate Death Review in December 2019.

(b)     "Administrative Review of Serious Suicide Attempts."  This is a general discussion of the CIRC and JQIC process for reviewing serious suicide attempts, lists the five attempts reviewed at the CIRC meetings, and states that "CCSB tracks and provides updates to any CAP or issue[s] that was created at the CIRC."  The updates are provided to LASD command staff, CHS, DHS, and Access to Care.  Based upon CCSB's Report and CHS's Semi-Annual Report, the Monitor remains satisfied that CCSB is continuing to ensure that CHS and the Department are timely and thoroughly conducting administrative review of serious suicide attempts in the jails as required by Paragraphs 76 and Compliance Measure 77-2(a).

(c)     "Patterns, trends and statistical analysis of suicides and serious suicide attempts in the jails."  This section breaks down the incidents of Self-Directed Violence in the Fourth Quarter of 2019 and the First Quarter of 2020 by age group (by incident and unique inmates and per 100,000 inmates) and notes that inmates in the 20-29 age group engaged in the highest number of SDVs in the Fourth Quarter of 2019 and inmates in the 18-19 age group engaged in the highest number in the First Quarter of 2020.  In the past, inmates in the 26-34 age group had the greatest number of self-directed violence.  There is, however, no effort to determine the reasons for what the Report notes is "a significant change."  In this report, CCSB also sets forth the SDV incidents by security level, location, and method, and a summary of suicides by year from 2010 to 2019 and by facility during that period.  Unlike in past reports, there is no analysis of the aggregate data.  Further, there is no indication that the County has undertaken any projects based upon this data.

(d)     "Corrective actions taken by the department to mitigate suicide risks."  This section begins by stating that "[f]or corrective actions taken by the department to mitigate suicide risks, please refer to DOJ Provision 24," which requires the County and the Sheriff to "review and inspect housing areas on at least an annual basis to identify suicide hazards."  The County was not, however, subject to monitoring for Paragraph 24 in the Tenth Reporting Period and it has not submitted inspection reports that identify suicide hazards in housing areas since August 2019.  CCSB's Report also does not indicate what steps the Department has taken to address the risks identified in the last inspection report posted by the Department and it does not indicate whether the Department has continued to conduct those critical inspections (notwithstanding that it is no longer subject to monitoring for the requirement of Paragraph 24).

The "corrective action" section also references "the corrective actions stemming" from the November 2018 suicide attempt of the inmate who eventually died during the Tenth Reporting Period, but those CAPs were discussed at the CIRC meeting that was held soon after the suicide attempt in 2018, and "[n]o new items were identified" at the Inmate Death Review in December 2019.  There is also a chart that sets forth the number of CHS and Custody CAPs resulting from the discussion of the suicide attempts

102

at the CIRC meetings during the Reporting Period, but no discussion of the CAPs.  In the February 2020 JQIC meeting, "CCSB presented aggregated data gathered from SDV's at Men's Central Jail (MCJ)," which proposed solutions to increase the JMET walks in some of the housing areas.[74]  CCSB's Report also notes that there was an attempted suicide by an inmate who jumped from an upper tier at NCCF in February 2020. "During the review of the incident at the March CIRC meeting, LASD Command Staff requested NCCF to explore the feasibility of applying metal mesh barrier[s] to the top tiers of the dorms at NCCF," which is something that was done at TTCF and CRDF in 2016 as required by Paragraph 44 of the Settlement Agreement.  The JMET walks and the mesh barriers are the only corrective action identified in this section of CCSB's report as having been taken by the department to mitigate suicide risk.

(e)      "Technical issues provided to, or obtained for other administrative units within the Custody Division to address suicide-risk issues."  This section reports that "CCSB and CHS have been working to strengthen the IT mechanism to facilitate the work of reporting and analyzing incidents using the Safety Intelligence (SI) System."[75]  On March 15, 2020, CCSB "began to track all self-injurious behaviors via the SI system."  There are also sections on the use of iPads by JMET deputies and new JMET uniforms without badges or patches, although it is not clear when these innovations took place.  There is also a list of "[e]fforts made and CCSB recommendations" to address the concerns expressed by the Monitor and Subject Matter Expert regarding the "Department's reported out-of-cell time[.]"  The Monitor appreciates the efforts of CCSB and the Department to address the concerns.  Finally, there is a summary of the "plan/project" that CCSB, the Correctional Innovative Technologies Unit (CITU), and custody executives are working on to purchase and distribute new Title 15 Safety Check Scanners.

(f)      "Analysis of staffing, personnel/disciplinary, prisoner classification, and mental health service delivery issues as they relate to suicides and serious suicide attempts."  This section references the creation of a new form to be filled out beginning in March 2020 for each serious suicide attempt to obtain more information to address the requirements of this subsection.

(g)      "Remedial measures, including policy revisions, re-training, or staff discipline, to address issues related to suicide and serious suicide attempts."  This section describes the Risk Assessment Management Program (RAMP) that is "monitored by the Field Mental Evaluation Team (MET)."  JMET is notified of patients who meet the criteria to be a RAMP patient "to ensure proper treatment and shared patient history."  Field MET "visits to ensure the continuance of care and look for signs of decompensation."

(h)      "Summaries of meetings with DMH to develop, implement, and track corrective action plans."  This section summarizes each of the JQIC meetings held during the Tenth Reporting Period and discusses, in particular, the Correctional Health

---

[74] See p. 73, *supra.*
[75] See p. 72, *supra.*

Improvement Program (CHIP); the 2E-Row procedures at PDN North; the MCJ SDV Location Data; and the pill call training timeline and video.[76]  There is also a summary of the Bi-Annual Suicide Prevention Meeting held on November 13, 2019.

The Monitor appreciates CCSB's efforts to enhance the Department's effectiveness in addressing the challenges posed by the mentally ill population in the County jails.  There still needs to a better analysis of the aggregate data on suicides and serious suicide attempts and a more robust discussion and follow-up of the corrective actions that the department has taken to mitigate suicide risks.

---

[76] See p. 72, *supra.*

78.     The County and the Sheriff will maintain a county-level Suicide
Prevention Advisory Committee that will be open to representatives from the Sheriff's
Department Custody Division, Court Services, Custody Support Services, and Medical
Services Bureau; the Department of Mental Health; the Public Defender's Office; County
Counsel's Office; the Office of the Inspector General; and the Department of Mental
Health Patients' Rights Office.  The Suicide Prevention Advisory Committee will meet
twice per year and will serve as an advisory body to address system issues and
recommend coordinated approaches to suicide prevention in the Jails.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of May 11, 2016, through
May 18, 2017)**

Substantial Compliance requires (1) the Committee to meet twice per year and (2)
"recommend coordinated approaches to suicide prevention in the Jails."

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not
subject to monitoring for Substantial Compliance with Paragraph 78 in the Tenth
Reporting Period.  Nevertheless, the County has continued to hold Bi-Annual Suicide
Prevention meetings through the last reporting period.  The last meeting, which the
Monitor attended, was held on November 13, 2019, and provided a comprehensive
overview of the County's efforts to prevent suicides in the County's jails and to treat
inmates suffering from mental illness.

79.   (a)   Unless clinically contraindicated, the County and the Sheriff will offer prisoners in mental health housing:

(i)   therapeutically appropriate individual visits with a QMHP; and

(ii)   therapeutically appropriate group programming conducted by a QMHP or other appropriate provider that does not exceed 90 minutes per session;

(b)   The County and the Sheriff will provide prisoners outside of mental health housing with medication support services when those prisoners are receiving psychotropic medications and therapeutically appropriate individual monthly visits with a QMHP when those prisoners are designated as Seriously Mentally Ill; and

(c)   The date, location, topic, attendees, and provider of programming or therapy sessions will be documented.  A clinical supervisor will review documentation of group sessions on a monthly basis.

**STATUS:      NON-COMPLIANCE**

Substantial Compliance requires the Department to maintain records of therapeutically appropriate individual visits and group programming, and the names of the clinical supervisors who reviewed the documentation of group sessions; describe the medication support services available for prisoners not in mental health housing who are receiving psychotropic medications; and review electronic medical records of such to confirm that medication support services were provided to these prisoners.

The County's Tenth Self-Assessment reports that in the Fourth Quarter of 2020, 58% of the prisoners who resided outside of mental health housing and were receiving psychotropic medications were "provided with medication support services," which is below the 85% threshold required by Compliance Measure 79.5(d) for Substantial Compliance with Paragraph 79(b).  In the First Quarter of 2020, 47% of the prisoners who resided outside of mental health housing and were receiving psychotropic medications were "provided with medication support services."

The County did not provide records of therapeutically appropriate individual visits and group programming by QMHPs to prisoners who reside in mental health housing because "the County is not yet able to render structured treatment according to methods reflected in treatment plans."  Notwithstanding the County's Partial Compliance with subpart (c) of Paragraph 79, the Monitor agrees with DOJ that the County's failure, "nearly five years after the effective date of the settlement" to provide "records of therapeutically appropriate individual visits and group programming" reflect its Non-Compliance with the entirety of Paragraph 79.

80.    (a)    The County and the Sheriff will continue to make best efforts to provide appropriate out-of-cell time to all prisoners with serious mental illness, absent exceptional circumstances, and unless individually clinically contraindicated and documented in the prisoner's electronic medical record.  To implement this requirement, the County and the Sheriff will follow the schedule below:

> (i)    By no later than six months after the Effective Date, will offer 25% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week;

> (ii)    By no later than 12 months after the Effective Date, will offer 50% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week; and

> (iii)    By no later than 18 months after the Effective Date, will offer 100% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week.

(b)    No later than six months after the Effective Date, the County and the Sheriff will record at the end of each day which prisoners in HOH, if any, refused to leave their cells that day.  That data will be presented and discussed with DMH staff at the daily meeting on the following Normal business workday.  The data will also be provided to the specialized unit described in Paragraph 77 and to DMH's quality improvement program to analyze the data for any trends and to implement any corrective action(s) deemed necessary to maximize out-of-cell time opportunities and avoid unnecessary isolation.

**STATUS:    NON-COMPLIANCE**

Paragraph 80 requires that, "no later than 18 months after the Effective Date [July 1, 2015]," 100% of the prisoners in HOH receive "ten hours of unstructured out-of-cell recreational time *and* ten hours of structured therapeutic or programmatic time per week."  The parties have agreed that up to five hours of the structured time can consist of education or work programs, but at least five hours of the time must be therapeutic.

The County's Tenth Self-Assessment reports that in the Fourth Quarter of 2019, 83% of the HOH prisoners at CRDF and 75% of the HOH prisoners at TTCF were offered the required "unstructured out-of-cell time by Custody staff."  For the First Quarter of 2020, 95% and 62% of HOH prisoners were offered unstructured out-of-cell time at CRDF and TTCF, respectively.

As in the past, County's Tenth Self-Assessment does not reflect any results for "structured therapeutic or programming time."  It reports that for "structured out-of-cell

time, CHS piloted an electronic system that allows clinicians, and not Custody staff, to track structured out-of-cell time offered.  CHS staff have continued to use the iPads where possible, in addition to collecting manual data on a module-by-module basis."[77]

The Mental Health Subject Matter Expert and the clinicians previously assessed the accuracy of the County's reporting of the out-of-cell time offered to inmates by comparing out-of-cell time records to videos of the HOH units over the same time periods, and they found the County's data to be "highly unreliable."  The Monitor and the Mental Health Subject Matter viewed this as a "very serious problem, . . . both in terms of the accuracy of the Department's records and the conditions in HOH units."[78]

> The County's response to the Monitor's Draft Ninth Report stated that
>
> CCSB is investigating these issues and, specifically, looking into potential errors in the Department technology used to capture out-of-cell time and the way the technology is used by staff.  CCSB expects that its efforts will be reflected in a quality improvement process during the next reporting period designed to improve accuracy in the Department's reported out-of-cell numbers and identify potential challenges in the process by which it offers and provides out-of-cell time.

The County's Tenth Self-Assessment does not report much progress.  During the Tenth Reporting Period,

> the Department began to approach to [sic] tracking and evaluating out-of-cell time based on feedback provided by the Monitor and Subject Matter Expert. More specifically, with the help of CCSB, the Department is using the Joint Quality Improvement Committee to explore ways to improve its data and assessments in this area.

Unfortunately, "CITU, the unit that provides the data underlying [the Department's] assessment for this Provision, has been shifted to work with emergency operations and may be less able to address questions or technological challenges that arise in gathering and reporting data.  These changes are also likely to impact the Department, and CHS's, efforts to continue quality improvement projects in this area during the pandemic."  Also due to the COVID-19 pandemic, "CHS temporarily suspended most group mental health treatment, which provides a significant amount of the structured out-of-cell time provided inmates in HOH."

---

[77] The County needs to explain how it will monitor the system to ensure that it accurately tracks the out-of-cell time offered, which has been an area of concern to the Monitor and the Mental Health Subject Matter Expert.

[78] The Monitor and Mental Health Subject Matter Expert also share DOJ's concern about the "high proportion of hours counted toward the unstructured 10-hour requirement where inmate are deemed ineligible or purportedly as having refused" and that inmates are too often deemed "hostile" or "uncooperative" "to avoid providing or even offering out-of-cell time to HOH inmates staff deem unpredictable or hard to manage."  The County notes that "these refusals are frequently discussed and documented in huddle meeting minutes," which provide more details regarding the refusals.

The County's Augmented Tenth Self-Assessment reports that "CHS is working to evaluate hand-tracked data to better understand challenges related to increasing and maximizing, the structured out-of-cell time offered to HOH inmates."  The County acknowledges that it "faces exceptional challenges in providing the required structured out of cell group time per week to some of the highest acuity forensic inmate patient population in the Los Angeles County Jail."  Based upon data for TTCF Module 151, 41% of the inmates were offered more than 10 hours of group therapy, but only 2% participated in more than 10 hours in the Fourth Quarter of 2019, and no inmates were offered more than 10 in the First Quarter of 2020, and only 15% were offered more than 6.5 hours.  It reports, however, that "face to face visits [at TTCF] for Q4 and Q1 were 97% and 98%" and 100% at CRDF.  The evaluation sets forth projects that are going to be undertaken at both facilities to enable the County to "make gains towards improvement and subsequently compliance."

81.     Except as specifically set forth in Paragraphs 18-20 of this Agreement, and except as specifically identified below, the County and the Sheriff will implement the following paragraphs of the Implementation Plan in *Rosas* at all Jails facilities, including the Pitchess Detention Center and the Century Regional Detention Facility, by no later than the dates set forth in the Implementation Plan or as revised by the *Rosas* Monitoring Panel:  Paragraphs 2.2-2.13 (use of force policies and practices); 3.1-3.6 (training and professional development); 4.1-4.10 (use of force on mentally ill prisoners); 5.1-5.3 (data tracking and reporting of force); 6.1-6.20 (prisoner grievances and complaints); 7.1-7.3 (prisoner supervision); 8.1-8.3 (anti-retaliation provisions); 9.1-9.3 (security practices); 10.1-10.2 (management presence in housing units); 11.1 (management review of force); 12.1-12.5 (force investigations, with the training requirement of paragraph 12.1 to be completed by December 31, 2016); 13.1-13.2 (use of force reviews and staff discipline); 14.1-14.2 (criminal referrals and external review); 15.1-15.7 (documentation and recording of force); 16.1-16.3 (health care assessments); 17.1-17.10 (use of restraints); 18.1-18.2 (adequate staffing); 19.1-19.3 (early warning system); 20.1-20.3 (planned uses of force); and 21.1 (organizational culture).

## STATUS:       PARTIAL COMPLIANCE

Because Paragraph 81 of the Settlement Agreement incorporates 100 provisions in the Implementation Plan adopted in the *Rosas* case, the parties agreed in the Compliance Measures adopted in this case that "Substantial Compliance with respect to the substance of the policies required by the *Rosas* Implementation Plan would be determined by the *Rosas* Monitors."  With the exception of the Early Warning System required by Section 19 of the plan, all of the required policies were approved by the *Rosas* Monitors by the Second Reporting Period in this case, and the Early Warning System was approved in the Seventh Reporting Period.

The Compliance Measures in this case then provide that "[o]nce the policies have been approved by the *Rosas* Monitors, the Monitor and Subject Matter Expert will confirm and assess the implementation of these policies in the [DOJ facilities]."  In assessing the Department's compliance with Paragraph 81, the Monitor has grouped the 100 provisions into seven categories and, with input from the Subject Matter Experts, has assessed Department's compliance on a category-by-category basis.  With the exception of the Training category, which is assessed when certain percentages are reached, the Department will no longer be subject to monitoring for the provisions in a particular category once the Monitor has determined that it has achieved and maintained for twelve consecutive months Substantial Compliance with the intent and purpose of the overall category.  The Department will no longer be subject to monitoring for compliance with Paragraph 81 once it has achieved and maintained for twelve consecutive months Substantial Compliance with each of the categories.

### Training (Substantial Compliance)

Paragraphs 3.1-3.4, 4.6-4.9, and 12.1 of the *Rosas* Implementation Plan reflect training requirements in use of force, ethics, dealing with mentally ill inmates, and

investigations of force incidents.  The curriculum and lesson plans to implement these training requirements have been approved by the *Rosas* Monitors.

The Department's Tenth Self-Assessment reports that the Department has met the 90% Substantial Compliance threshold for the required initial training for Paragraphs 3.1 and 3.2 as of the Fourth Quarter 2018 and the required refresher training in the Fourth Quarter of 2019.[79]  These results have been verified by the Monitor's auditors.

The Department's Tenth Self-Assessment reports that has posted results reflecting that in the Fourth Quarter of 2019 and the First Quarter of 2020 it maintained Substantial Compliance at the DOJ facilities with Paragraph 3.3, which requires new Deputy Sheriffs and Custody Assistants to receive the use of force and ethics training in the Academies or Jail Ops Continuum.  These results have been verified by the Monitor's auditors.  The Department's posted results reflect that 95% of new Deputy Sheriffs and Custody Assistants received the initial training from July 1, 2016 through September 30, 2018.  These results have been verified by the Monitor's auditors, and the Monitor is satisfied that the Department has achieved Substantial Compliance with Paragraph 3.3 at the DOJ facilities.  The new Deputy Sheriffs and Custody Assistants are subject to the refresher requirement in Paragraphs 3.1 and 3.2.

The Department has established Substantial Compliance with Paragraph 3.4, which requires "custody-based, use of force scenarios" in the use of force training.  The Department reported that there were no use of force investigations that were resolved in the Fourth Quarter of 2019 or the First Quarter of 2020 with a finding that it "Appears Employee Conduct Could Have Been Better," which is the predicate for the additional training, counseling or mentoring required under Paragraph 3.5.

The Department previously achieved Substantial Compliance with the initial training required by Paragraphs 4.6 through 4.9 of the *Rosas* Plan at CRDF, NCCF, and the PDC facilities, and it posted results reflecting that the new Deputy Sheriffs and Custody Assistants have continued to receive the required training through the end of the First Quarter of 2020.[80]  These results have been verified by the Monitor's auditors.  Going forward, personnel at these facilities must undergo the refresher training required under Paragraphs 4.6 and 4.7 of the *Rosas* Plan.  The Department has posted results that 98% of personnel through December 2019 have received the refresher training required under Paragraph 4.6 and 96% under Paragraph 4.7.  These results have been verified by the Monitor's auditors.

The Department's posted results reflect that all newly promoted Sergeants in the First Quarter of 2020 received training in conducting use of force investigations as required by Paragraph 12.1 of the *Rosas* Plan.[81] These results have been verified by the

---

[79] Because Paragraph 81 incorporates all 104 provisions of the *Rosas* Implementation Plan in a single provision, the Monitor agreed to the use of random samples in some cases instead of requiring assessments of all personnel or incidents, which the Monitor believes would be unduly burdensome for the Department.
[80] See pp. 13-17, *supra*.
[81] There were no newly promoted Sergeants in the Fourth Quarter of 2019.

Monitor's auditors.  The Department's posted results reflect that 90% of the remaining
Sergeants who were in Custody as of January 1, 2017 received the initial training.  These
results have been verified by the Monitor's auditors.  The Department's posted results
reflect that 96% of Sergeants who were required to receive refresher training in the
Fourth Quarter of 2019 received the training.  These results have been verified by the
Monitor's auditors.  The Department previously posted results showing that, based upon
50 randomly selected Sergeants, the Department has met the 90% Substantial
Compliance threshold for the required refresher training in the Third Quarter of 2019 and
that all Sergeants promoted in Custody in the Third Quarter of 2019 received the required
training.  These results have been verified by the Monitor's auditors.  The Department
has also demonstrated that 95% of the Sergeants promoted after January 1, 2017,
received the initial training.

### Use of Force (Partial Compliance)

The Department produced, and the Monitor reviewed, 25 randomly selected
completed force packages for the DOJ facilities during this reporting period.  Although
there was a slightly higher percentage of less complex Category 1 cases, most of the
incidents were Category 2 cases.[82]  The Monitor also reviewed three cases involving cell
extractions to cover additional provisions required under the *Rosas* Implementation Plan.
Problematic force incidents were also reviewed by the Use of Force Subject Matter
Expert.

As a result of objections by the plaintiffs in the *Rosas* case, the *Rosas* Monitors
revised their approach to assessing the Department's compliance with the use, reporting
and investigation of force provisions of the Implementation Plan.  Under the revised
approach, the Monitors do not determine the percentage of cases in which the
Department's use of force was reasonable, but instead assess the Department's
compliance with the specific provision of the use, reporting, and investigation of force
provisions of the Implementation Plan.  To maintain consistency across all of the jail
facility, the Monitor has adopted the same approach in the *DOJ* case.

There were three cases in which the Department members violated the force
prevention principles, although there are a few other cases in which there were
problematic tactics that resulted in a relatively minimal, but not unreasonable, use of
force.  Overall, the Monitor found improvement and concluded that, with the exception of
specific provisions that were not in compliance in these three cases and more generally
the requirement that Department members involved in a force incident not escort the
inmates against whom force was used from the scene, the Department achieved
Substantial Compliance with most of the use of force provisions of the Implementation
Plan at CRDF, NCCF, and the PDC facilities in the Tenth Reporting Period.

In the one particularly troublesome case, a Senior Deputy from outside Custody
who was working overtime seemingly provoked an inmate who initially obeyed his

---

[82] During the 18-month period from January 1, 2019, through June 30, 2020, over 79% of the force
incidents were either Category 1 cases or NCIs.

commands to move back in a line of other inmates and then subsequently to face the wall.
Instead of calling for a Sergeant, the Senior closed the distance and pushed the inmate
into the wall; when the inmate reacted, the Senior punched him in the face as he was
taking him to the ground.  While the Senior was on top of the inmate, he used a carotid
restraint to subdue the inmate even though he was much larger than the inmate and it did
not appear that the inmate was actively resisting.  Finally, the use of the carotid restraint
continued for several seconds after it appeared that the inmate had been rendered
unconscious.[83]  The Monitor and the Use of Force Subject Matter Expert believe that the
Senior's failure to call a sergeant, punching the inmate in the face, and using the carotid
restraint (both initially and after the inmate appeared to lose consciousness) *all* violated
the Department's Use of Force policies.

In the other two problematic cases, Deputies punched the inmates in the face; in
one case the punch was in reaction to a spitting incident by an HOH inmate in waist
chains and in the second case it was during a takedown of an assaultive inmate.
Although in both cases the use force was in response to the inmate's assaultive behavior,
punches to an inmate's face are "prohibited unless the inmate is assaultive *and* presents
an imminent danger of *serious injury* to a Department member or another person *and*
there are no other more reasonable means to avoid serious physical injury."

Due to the COVID-19 pandemic, it is not possible to draw any conclusions
regarding the Department's use of force in the DOJ facilities from the Department's Use
of Force Statistics through June 30, 2020.  The statistics reflect a 40% decrease in force
incidents at CRDF from 340 incidents in 2019 to 101 incidents during the first six months
of 2020 (202 on an annualized basis).  At NCCF, there was a 27% decrease from 215 in
2019 to 78 through June 30, 2020 (156 on an annualized basis).  It is likely that some of
the reduction in force is due to the reduction in the number of inmates at these facilities
during the pandemic.  The Average Daily Inmate (ADI) population went from 17,054 in
February 2020 to 11,867 in May 2020.  At CRDF the ADI went from 2,188 in February
to 1,147 in May (a 47% reduction) and at NCCF it went from 3,950 to 2,869 (a 27%
reduction).  Notably, while the percentage of the reductions were similar across all force
categories at NCCF, there was a much greater reduction in Category 2 cases at CRDF.

**Reporting and Investigation of Force (Partial Compliance)**

The Monitor concluded that, with the exception of the provision of the *Rosas*
Implementation Plan relating to Commander's Reviews, descriptions of use of force by
other members and visible injuries to inmates, and photographs of members injuries, the
Department had achieved Substantial Compliance with the reporting and investigation of
force provisions of the Plan at CRDF, NCCF, and the PDC facilities in the Tenth
Reporting Period.  The main issue was that the Department's Commanders need to assess
the reasonableness of the force in light of the Department's use of force policies.  They
often conclude the force was reasonable without considering the language of the
applicable policy.

---

[83] Fortunately, the inmate regained consciousness, was evaluated by the medical staff, and was able to
respond to the Watch Commander, although he said that he did not recall what happened.

In the most problematic case referenced above, the Custody Force Review Committee found that the Senior "should have utilized time and distance and made a better attempt to prevent force by adhering to the recalcitrant inmate policy and requesting for a sergeant."  It nevertheless found that the "applied force methods were consistent with the use of force policy" and that no corrective action was required notwithstanding the violation of the recalcitrant inmate policy.  The Commanders did not reference the policies applicable to punches to an inmate's face or the use of the carotid restraint after the inmate appeared to lose consciousness in concluding that these methods were reasonable.  In addition, they did not recommend discipline even though they did find a violation of the recalcitrant inmate policy.  The Monitor and the Use of Force Subject Matter Expert disagree with CFRC's conclusions about the force used by the Senior and with CFRC's failure to recommend discipline.

Although the County's response to the draft of this report sets forth some of the "robust discussion of this incident" at the CFRC meeting and the "*systemic* corrective actions designed to prevent this type of incident from happening again" (emphasis added), neither CFRC nor the County address the Monitor's and Subject Matter Expert's concerns about the punches to the inmate's face and the use of a carotid restraint that appeared to continue *after* the inmate lost consciousness and the failure to recommended any action against the Senior.  Following this incident, the Department did, however, restrict the use of the carotid restraint to instances involving "Life Threatening/Serious Bodily Injury."

The Monitor and the Use of Force Subject Matter Expert also believe that the Senior's report of the force incident was contradicted by the CCTV video.  As noted by DOJ, "this inconsistency implicates provision 13.1 of the *Rosas* implementation plan, which required the County to have a 'firm policy of zero tolerance for acts of dishonesty'[.]"

Pursuant to a request by DOJ, "[t]o the extent that the County identified non-punitive corrective action for policy violations or other tactical problems," the Monitor has confirmed that "the County, in fact took such corrective action."  Going forward, the Monitor should, as requested by DOJ, "consider whether other forms of corrective action, such as training or discipline, are warranted but omitted by command staff when conducting force reviews."

The Department has submitted a Self-Assessment together with supporting documents reflecting that, based upon force incidents randomly selected by the Monitor, it achieved Substantial Compliance with Paragraph 5.1, which requires force incidents to be timely entered into the Department's database, at the DOJ facilities in the First Quarter

of 2020,[84] but not in the Fourth Quarter of 2019.[85]

The Department reports that "[t]here were no founded investigations in the Fourth Quarter of 2019 that met the criteria of Provisions 13.1 and 13.2," which require the Department to "have a firm policy of zero tolerance for acts of dishonesty or failure to report uses of force." If the Department does not terminate a member who is found to have been dishonest, used excessive force, or violated PREA, it is supposed to "closely monitor the member's performance" and notify the Office of Inspector General. There was one founded investigation in which a Department Member who violated PREA resigned in January 2020 before he could be discharged by the Department. The OIG was notified of the resignation, albeit not until June 2020.

With respect to the Custody Division, there were 170 administrative investigations initiated in 2018, 108 in 2019 and 64 through the first six months of 2020, which is the same as in the last six months of 2019. While there was a significant drop-off in new administrative investigations in April 2020 after the beginning of the COVID-19 pandemic, there was still a 45% increase over the 44 investigations initiated during the first six months of 2019. Although still less, on an annualized basis, than the number of administrative investigations initiated under the prior administration in 2018, after accounting for the "significant outlier" of 20 investigations in response to a single incident, the difference is not that significant and there is less cause for concern about the Department's willingness to investigate allegations of misconduct by Custody personnel.

The Department's posted results reflect that all of the "referrals of an inmate for criminal prosecution for assaulting a staff member, or related charges, arising from an incident involving the use of force by a Department member" were reviewed by the Unit Commander at the DOJ facilities in the First Quarter of 2020 as required by Paragraph 14.1 of the *Rosas* Plan.[86] For the Fourth Quarter of 2019, only 90% of the referrals were reviewed by the Unit Commanders, which is below the 95% threshold for Substantial Compliance. The Department also timely referred one case involving a Department member to the District Attorney's Office in the Fourth Quarter of 2019, and one case in the First Quarter of 2020 as required by Paragraph 14.2.

### Grievances (Partial Compliance)

The Department's grievance forms have the check boxes for use of force, harassment/retaliation, and the right to appeal required by Paragraphs 6.4, 6.5 and 6.6 of the *Rosas* Plan. The Department's Self-Assessment and the supporting documentation reflects that all of the use of force and harassment/retaliation grievances in the randomly

---

[84] Although two of the force incidents were not timely entered in the database, the Monitor agrees that there were extenuating circumstances for one of the incidents because there were two major disturbances at NCCF, with the second almost immediately after the first, that involved substantial Department resources.
[85] There were no use of force incidents reviewed by the Custody Force Response Team (CFRT) where there was a finding of a policy violation or misconduct in the Fourth Quarter of 2019 or the First Quarter of 2020, which is the predicate for assessing compliance with Paragraph 11.1 of the *Rosas* Plan.
[86] There was, however, no back-up documentation from the District Attorney's Office showing when the referrals were received by that office.

selected months of November 2019 and February 2020, were brought to the attention of
the Unit Commanders at the DOJ facilities within 10 days of collection as required by
Paragraphs 6.4 and 6.5 of the *Rosas* Plan.

The posted Self-Assessment reflect that only 50% and 57% of the grievances
marked "emergency" were properly reviewed and handled as an emergency in the
random months of November 2019 and February 2020, which is well below the threshold
for Substantial Compliance with Paragraph 6.7.  The Self-Assessment and the back-up
documentation reflect that 93% and 100% of the grievances marked "emergency" that
were downgraded by the Department to a "non-emergency" in these random months were
properly downgraded and the inmate was notified of the downgrade within five days as
required by Paragraph 6.8; 100% of the randomly selected grievances in these months
were collected and reviewed within 24 hours as required by Paragraph 6.10;[87] and 100%
of the randomly selected grievances were entered and tracked in the inmate grievance
database as required by Paragraph 6.12.  The Department is in Substantial Compliance
with Paragraphs 6.8, 6.10, and 6.12.

During the Tenth Reporting Period, the Department provided the Monitor with its
Executive Reports:  Statistical Analysis and Trends for the months of October 2019 and
January 2020 (with comparisons to the prior quarters), broken down by facility and with
response times in compliance with the 15-day response required by Paragraphs 6.9, 6.13,
6.14, and 6.15 of the *Rosas* Plan.  Although the Monitor did not meet with the Inmate
Grievance Coordinator during the Tenth Reporting Period due to the COVID-19
pandemic, the Monitor is satisfied that the Department is in Substantial Compliance with
Paragraphs 6.9, 6.13, 6.14, and 6.15 of the plan.

The Department's posted Self-Assessments reflect that there were no use of force,
PREA grievances, or appeals deemed untimely under Paragraphs 6.17, 6.18, and 6.20.
The Self-Assessments report that there were no use of force grievances against staff in
the Fourth Quarter of 2019 and one in the First Quarter of 2020 that was investigated, but
not marked compliant because "the inmate was not notified of the status."  The Self-
Assessment also reports it determined that only 42% and 45% of the PREA grievances
were "handled appropriately and timely" in the Fourth Quarter of 2019 and the First
Quarter of 2020 as required by Paragraph 6.18.  Even though all the PREA grievances
were investigated, the Department "marked non-compliant" those instances in which a
facility failed to provide a written response to an inmate "within 15 calendar days after
submission of the grievance."  It appears that the Department is conflating the
requirements of Paragraphs and 6.17 and 6.18 with the requirements of Paragraph 6.19.
Separately, the Department's Self-Assessment reports that in the Fourth Quarter of 2019
and the First Quarter of 2020, it responded to 90% and 81% of inmate grievances against
staff (the threshold for Substantial Compliance is 90%) and 100% and 85% of the
grievances not against staff within 15 days as required by Paragraph 6.19.  Finally, it
reports that in the Fourth Quarter of 2019 and the First Quarter of 2020, it notified
inmates of the results of grievances against staff within 10 days of the adjudication in

---

[87] There were no grievances in the Tenth Reporting Period against any Deputies at the DOJ facilities for
failing to properly process any grievances, which is the predicate for disciplinary action per Paragraph 6.11.

54% and 77% of the cases (which is below the 90% threshold) as required by Paragraph
7.2.

The Department reported that one inmate and Department personnel participated
in conflict resolution meetings as per Paragraph 7.1 during the Fourth Quarter of 2019,[88]
but there were no meetings in the First Quarter of 2020.  The Department maintained logs
of all Town Hall meetings and each jail conducted such meeting for inmates in general
populations and special units in the months of November 2019 and February 2020.

There were no founded violations of the Department's anti-retaliation policy and
Paragraph 8.1 of the *Rosas* Implementation Plan in the random months of November
2019 and February 2020 or that were received and approved during the Fourth Quarter of
2019 or the First Quarter of 2020.  The Department reports that 100% of the grievances
alleging force used as retaliation were timely reviewed by the Custody Force Review
Committee in the Fourth Quarter of 2019, and that there were no force retaliation
grievances in the First Quarter of 2020.[89]

### Management and Administration (Substantial Compliance) (10.1 suspended)

The Department's posted Self-Assessment reports that Unit Commanders,
Commanders, Chiefs, the Assistant Sheriff, and the Sheriff toured and inspected all of the
DOJ facilities during the Fourth Quarter of 2019 as required by applicable Compliance
Measures for Paragraph 10.1.  Due to the COVID-19 pandemic, the Monitor has
determined that the Department's Compliance with Paragraph 10.1 for other than Unit
Commanders was suspended in the First Quarter of 2020.[90]

The supporting documents for the Tenth Self-Assessment reflect that in both the
Fourth Quarter of 2019 and the First Quarter of 2020 visits to the facilities by Department
managers above the rank of Sergeant were documented in electronic records or visitor
logs in compliance with Paragraph 10.2.  The posted Self-Assessment reflects that no
Department members were transferred to Custody as a sanction for misconduct or a
policy violation in either quarter as required by Paragraph 21.[91]  Finally, the Self-
Assessment reports that 88% of the available Department Members were rotated per
Department policy in the Third and Fourth Quarters of 2019, which is slightly below the
90% threshold for Substantial Compliance with Paragraphs 18.1 and 18.2.
Notwithstanding these reported results, in light of the percentage of members who were
rotated and the Department's compliance with the other provisions, the Monitor is of the
view that the Department was in Substantial Compliance with the Management and
Administration provisions.

---

[88] The supporting documents indicate that another inmate informally resolved a grievance against a Deputy.
[89] Although the applicable Compliance Measure requires CFRC to review the Unit Commander's decision
at the first meeting more than 30 days after the decision, all of the reviews in the Fourth Quarter were
within 30 days of the decision.  Since the Compliance Measure was intended to provide additional time in
which to review the decisions, an earlier decision is timely under the Paragraph 8.3.
[90] Each of the executive staff did, however, tour some or all of the facilities during the quarter.
[91] The vast majority were Deputies whose skills were more appropriate for Custody and were "eligible" to
return to Custody from Patrol.

**Security Restraints (Substantial Compliance as of September 30, 2019)**

Security Restraints are subject to the provisions in Section 17 of the *Rosas* Plan. It is the Monitor's understanding from County and the Department that the Department does not use "multi-point restraints," which are subject to Paragraphs 17.6 through 17.9 of the plan, at any of the County's jail facilities.  Further, NCCF and the PDC facilities report that they did not use the safety chair or fixed restraints during the Fourth Quarter of 2019 or the First Quarter of 2020.

It is not clear whether the WRAP restraint device, which was adopted by the Department after the *Rosas* Implementation Plan was drafted, constitutes a multi-point device.  The County acknowledges that it is a "security restraint," but submits that it is not a "multi-point restraint."  The Use of Force Subject Matter Expert is of the view that arguments can be made on either side of this issue, and one of the other *Rosas* Monitors is of the view that the WRAP is a multi-point restraint.  The parties (or the Monitor if the parties cannot agree) need to decide whether the WRAP device is a multi-point device that is subject to Paragraph 17.6 through 17.9 of the *Rosas* Plan.  The Monitor is of the view that the WRAP should not be subject to these provisions if it is used primarily for transportation and the Department's policies provide that, in the absence of extraordinary circumstances, an inmate is not in the WRAP for more than two hours.

The Monitor reviewed the Safety Chair Logs and Fixed Restraint Logs for CRDF in both Quarters, and is satisfied that CRDF is complying with the requirements of Paragraphs 17.3 and 17.4 of the *Rosas* Plan.

Finally, the Department provided logs reflecting all of the involuntary medications administered in the Fourth Quarter of 2019 and the First Quarter of 2020. All of the medications were administered per court orders to restore the competency of those deemed incompetent to stand trial and none were solely for security purposes in compliance with Paragraph 17.10 of the *Rosas* Plan.

**Early Warning System (Substantial Compliance as of September 30, 2019)**

The Department implemented an Employee Review System that was approved by the *Rosas* Monitors as a pilot program at the Downtown Jail Facilities on July 27, 2018, and expanded it to the DOJ facilities on October 25, 2018.

The Department's Self-Assessments and the supporting documentation reflect that Compliance Lieutenants made the required notifications to the Unit Commanders at CRDF, NCCF, and PDC North[92] and the Assistant Sheriff for Custody; that the Unit Commanders' consulted with a Custody Operations Chief regarding whether a non-disciplinary mentoring program was appropriate and documented the reasons for the decision in each instance, and the decisions were reasonable.

---

[92] The Department reports that there were no required notifications at PDC North or South in the Fourth Quarter of 2019 or at PDC South in the First Quarter of 2020.

82.     With respect to paragraph 6.16 of the *Rosas* Implementation Plan, the
County and the Sheriff will ensure that Sheriff's Department personnel responsible for
collecting prisoners' grievances as set forth in that paragraph are also co-located in the
Century Regional Detention Facility.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of July 15, 2016, through
December 31, 2017)**

Pursuant to Paragraph 111 of the Settlement Agreement, the County was not
subject to monitoring for Substantial Compliance with Paragraph 82 in the Tenth
Reporting Period.

83.     The County and the Sheriff will install closed circuit security cameras
throughout all Jails facilities' common areas where prisoners engage in programming,
treatment, recreation, visitation, and intra-facility movement ("Common Areas"),
including in the Common Areas at the Pitchess Detention Center and the Century
Regional Detention Facility.  The County and the Sheriff will install a sufficient number
of cameras in Jails facilities that do not currently have cameras to ensure that all
Common Areas of these facilities have security-camera coverage.  The installation of
these cameras will be completed no later than June 30, 2018, with TTCF, MCJ, and IRC
completed by the Effective Date; CRDF completed by March 1, 2016; and the remaining
facilities completed by June 30, 2018.  The County and the Sheriff will also ensure that
all video recordings of force incidents are adequately stored and retained for a period of
at least one year after the force incident occurs or until all investigations and proceedings
related to the use of force are concluded.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of July 1, 2015, through
                June 30, 2016 at MCJ and IRC)**

                **SUBSTANTIAL COMPLIANCE (as of October 1, 2015,
                through September 30, 2016 at TTCF)**

                **SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through
                March 31, 2017 at CRDF)**

                **SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through
                March 31, 2019 at NCCF and PDC North)**

                **SUBSTANTIAL COMPLIANCE (as of July 1, 2018, through
                June 30, 2019 at PDC South)**

The Monitor previously determined that as of July 12, 2018, requested cameras
for the common areas at NCCF, PDC North, and PDC South were installed and
operational.

Paragraph 83 also requires the Department to provide evidence that all video
recordings of force incidents were adequately stored and retained for a period of at least
one year after the force incident occurs.  In order to maintain Substantial Compliance the
Department must also show that "90% of the force incidents on the quarterly lists
provided by the Department are on the inventory provided by the Department one year
after the force incident."

The County's posted results for NCCF, PDC North, and PDC South reflect that
video recordings of randomly selected force incidents at PDC North, PDC South and
NCCF in the Fourth Quarter of 2019 and the First Quarter of 2020 "were stored and
retained by the Department" for one year.  NCCF and PDC North are no longer subject to
this requirement of Paragraph 83.  PDC South remains subject to this requirement of
Paragraph 83 until June 30, 2020.

The County previously maintained Substantial Compliance with Paragraph 83 at IRC, MCJ, TTCF, and CRDF for twelve consecutive months and was not subject to monitoring at these facilities during the Tenth Reporting Period.

On a visit to MCJ during the Ninth Reporting Period, the Monitor noted the absence of cameras in the "sally ports"[93] leading to the rows of cells in 3100 and 3300. In December 2019, the Department added additional cameras to the entries to the 2000 and 3000 floors of Men's Central Jail, but did not add cameras in the sally ports as recommended by the Monitor.  The County reports that it "is in the process of installing the additional cameras requested by the Monitors," but the "work is temporarily on hold due to the COVID-19 pandemic."

---

[93]The sally ports are cage areas with an inner door facing the row and an outer door on the opposite side facing a hallway.  There are Deputy stations for monitoring the rows outside the ends of the sally port.

84.     The Sheriff will continue to maintain and implement policies for the timely and thorough investigation of alleged staff misconduct related to use of force and for timely disciplinary action arising from such investigations.  Specifically:

(a)     Sworn custody staff subject to the provisions of California Government Code section 3304 will be notified of the completion of the investigation and the proposed discipline arising from force incidents in accordance with the requirements of that Code section; and

(b)     All non-sworn Sheriff's Department staff will be notified of the proposed discipline arising from force incidents in time to allow for the imposition of that discipline.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of July 1, 2017, through June 30, 2018 (verified))**

Substantial Compliance under the Compliance Measures requires the Department to demonstrate that 95% of the investigations of force incidents in which sworn custody staff and non-sworn custody staff were found to have violated Department policy or engaged in misconduct were completed and administrative action, which could include discipline, was taken within the time frames provided for in Government Code Section 3304 and relevant Department policies.

Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring for Substantial Compliance with Paragraph 84 in the Tenth Reporting Period.

85.     The County and the Sheriff will ensure that Internal Affairs Bureau management and staff receive adequate specialized training in conducting investigations of misconduct.

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance requires the Department to provide the Monitor and Subject Matter Experts with (1) the curriculum/syllabus for the three specialized courses given to IAB management, and (2) a list of the sworn personnel assigned to IAB and proof that such personnel successfully completed the training.  The County's Tenth Self-Assessment reports that 89% of the IAB investigators completed all three of the required courses as of the end of the Fourth Quarter of 2019 and 81% as of the end of the First Quarter of 2020.

86.     Within three months of the Effective Date, the County and the Sheriff will develop and implement policies and procedures for the effective and accurate maintenance, inventory, and assignment of chemical agents and other security equipment. The County and the Sheriff will develop and maintain an adequate inventory control system for all weapons, including OC spray.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 at MCJ and CRDF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2016, through December 31, 2017 at PDC North)**

**SUBSTANTIAL COMPLIANCE (as of February 1, 2017, through March 31, 2018 at PDC South and PDC East)**

**SUBSTANTIAL COMPLIANCE (as of March 1, 2017, through March 31, 2018 at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 at IRC)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 at TTCF)**

CDM 7-08/080 ACCOUNTABILITY OF SPECIAL WEAPONS, effective October 14, 2016, requires each facility to have unit orders that "establish procedures for the storage, issuance, reissuance, accountability, maintenance, and periodic inventory of all weapons. . . stored at, or issued from, the facility," which includes detailed requirements for the "Inventory, Control, and Accountability of Aerosol Chemical Agents."

In addition to providing written policies and procedures, Substantial Compliance requires the Department to provide up-to-date Unit Orders for each jail requiring the inventory and inspection of special weapons, and armory audit logs documenting the inventory and control of armory-level weapons.

The Monitor and Use of Force Subject Matter Expert inspected the armories at TTCF on March 15, 2019, and again noted the continued improvement and that the inventory logs were checked daily in the TTCF armories.  The Department provided an armory log for the First Quarter of 2019.  The Department has now maintained Substantial Compliance with Paragraph 86 for twelve consecutive months at TTCF, and it is no longer subject to monitoring at TTCF for compliance with that paragraph.

The Department previously maintained Substantial Compliance with Paragraph 86 for twelve consecutive months at all of the facilities, and it was not subject to monitoring with this provision in the Tenth Reporting Period.

124

## APPENDIX A

| NO. | PROVISION | STATUS | SUBSTANTIAL COMPLIANCE DATES |
|---|---|---|---|
| 18 | Suicide Prevention Training | Substantial Compliance | **(10/1/17 at MCJ & PDC South)[1]** **(9/1/17 at NCCF)** **(12/1/17 at PDC East)** **(4/1/18 at TTCF, IRC, & PDC North)** **(8/1/18 at CRDF)** |
| 19 | Crisis Intervention & Conflict Resolution Training | Substantial Compliance | **(4/1/18 at MCJ, NCCF, & IRC)** **(7/1/18 at TTCF)** **(12/1/18 at CRDF, PDC East, & PDC North)** **(3/1/19 at PDC South)** |
| 20 | Training at NCCF, PDC and CRDF | Substantial Compliance | **(8/1/17 at PDC East, PDC North, NCCF, & CRDF)** **(10/1/17 at PDC South)** |
| 21 | CPR Certification | Substantial Compliance | **(10/1/15 – 9/30/16 at PDC East & PDC South)** **(1/1/16 – 12/31/16 at NCCF, PDC North, & IRC)** **(4/1/16 – 3/31/17 at TTCF)** **(10/1/17 – 9/30/18 at MCJ)** **(7/1/18 – 6/30/19 at CRDF)** |

---

[1] Substantial Compliance Dates in **bold** reflect that the Department has achieved Substantial Compliance with the training requirements or maintained Substantial Compliance for twelve consecutive months with the other requirements; the results were verified by the Monitor's auditors when required; and the County or designated facilities are no longer subject to monitoring of this provision pursuant to Paragraph 111 of the Settlement Agreement.

## APPENDIX A

| 22 | Use of Arresting and Booking Documents | Substantial Compliance | **(7/1/16 – 6/30/17)** |
|----|----------------------------------------|------------------------|------------------------|
| 23 | Suicide Hazard Mitigation Plans | Substantial Compliance | **(7/12/18**) |
| 24 | Suicide Hazard Inspection | Substantial Compliance | **(10/1/17 – 9/30/18)** |
| 25 | Transportation of Suicidal Inmates (station jails) | Partial Compliance | |
| 26 | Identification and Evaluation of Suicidal Inmates | Partial Compliance | |
| 27 | Screening for Mental Health Care and Suicide Risk | Substantial Compliance | (10/1/19 – 3/31/20) |
| 28 | Expedited Booking of Suicidal Inmates | Substantial Compliance (IRC) Partial Compliance (CRDF) | **(4/1/17 – 3/31/18 at IRC)** |
| 29 | Mental Health Assessments (of non-emergent mental health needs) | Substantial Compliance | **(4/1/17 – 3/31/18)** |
| 30 | Initial Mental Health Assessments & Treatment Plans | Substantial Compliance | **(1/1/19 – 12/31/19)** |
| 31 | Electronic Medical Records Alerts | Partial Compliance | |
| 32 | Electronic Medical Records – Suicide Attempts | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 33 | Supervisor Reviews of Electronic Medical Records | Substantial Compliance | **(7/1/16 – 6/30/17)** |
| 34 | Discharge Planning | Partial Compliance | |
| 35 | Referral for Mental Health Care | Substantial Compliance | **(11/1/17 – 12/31/18)** |
| 36 | Assessments After Triggering Events | Partial Compliance | |

## APPENDIX A

| 37 | Court Services Division Referrals | Substantial Compliance | (1/1/20 – 3/31/20) |
|----|-----------------------------------|------------------------|---------------------|
| 38 | Weekly Rounds in Restricted Housing Modules | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 39 | Confidential Self-Referral | Substantial Compliance (NCCF) Partial Compliance (PDC South, TTCF, MCJ, & PDC North) Non-Compliance (CRDF) Not Rated (PDC East) | **(7/1/17 – 6/30/18 at NCCF)** |
| 40 | Availability of QMHPs | Partial Compliance | |
| 41 | FIP Step-Down Protocols | Partial Compliance | |
| 42 | HOH Step-Down Protocols | Substantial Compliance (TTCF) Partial Compliance (CRDF) | (7/1/19 – 9/30/19, 1/1/20 – 3/31/20 TTCF) |
| 43 | Disciplinary Policies | Substantial Compliance (NCCF & PDC North) Partial Compliance (CRDF, MCJ, & TTCF) | **(10/1/17 – 9/30/18 at NCCF & PDC North)** |
| 44 | Protective Barriers | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 45 | Suicide Intervention and First Aid Kits | Substantial Compliance | **(10/1/15 – 9/30/16 at CRDF, NCCF, TTCF, PDC East, & PDC South) (1/1/16 – 12/31/16 at MCJ & PDC North)** |
| 46 | Interruption of Self-Injurious Behavior | Partial Compliance | |
| 47 | Staffing Requirements | Non-Compliance | |
| 48 | Housekeeping and Sanitation | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 49 | Maintenance Plans | Substantial Compliance | **(3/1/16 – 2/28/17)** |

**APPENDIX A**

| 50 | Pest Control | Substantial Compliance | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC North, TTCF, & CRDF)** **(4/1/16 – 3/31/17 at PDC South & PDC East)** |
|---|---|---|---|
| 51 | Personal Care & Supplies | Substantial Compliance | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC East, PDC North, PDC South, & TTCF)** **(7/1/16 – 6/30/17 at CRDF)** |
| 52 | HOH Property Restrictions | Partial Compliance | |
| 53 | Eligibility for Education, Work and Programs | Partial Compliance | |
| 54 | Privileges and Programs[2] | Substantial Compliance | 10/1/19 – 3/31/20 |
| 55 | Staff Meetings | Substantial Compliance | **(10/1/16 – 9/30/17 at CRDF)** **(4/1/17 – 3/31/18 at PDC North)** **(4/1/18 – 3/31/19 at MCJ)** (7/1/19 – 3/31/20 at TTCF) |
| 56 | Changes in Housing Assignments | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 57 | Inmate Safety Checks in Mental Housing | Substantial Compliance (MCJ) Partial Compliance (PDC North, TTCF, & CRDF) | **(4/1/17 – 3/31/18 at MCJ)** |

---

[2] Per agreement of the parties, the County must maintain Substantial Compliance for two additional quarters under the revised Compliance Measures.

**APPENDIX A**

| | | | |
|---|---|---|---|
| 58 | Inmate Safety Checks in Non-Mental Housing | Substantial Compliance (PDC South, PDC North, PDC East, CRDF, & IRC) Partial Compliance (TTCF, NCCF, & MCJ) | **(1/1/16 – 12/31/16 at PDC South, PDC North, & PDC East) (7/1/17 – 6/30/18 at CRDF) (10/1/17 – 9/30/18 at IRC)** |
| 59 | Supervisor Rounds | Substantial Compliance | **(1/1/17 – 12/31/17 at PDC East & MCJ) (4/1/17 – 3/31/18 at NCCF) (10/1/17 – 9/30/18 at CRDF) (1/1/18 – 12/31/18 at PDC North & PDC South) (4/1/18 – 3/31/19 at TTCF)** |
| 60 | Implementation of Quality Improvement Program | Substantial Compliance | **(4/1/19 – 3/31/20)** |
| 61 | Requirements of Quality Improvement Program | Partial Compliance | |
| 62 | Tracking of Corrective Action Plans | Partial Compliance | |
| 63 | Sufficient HOH and MOH Housing | Non-Compliance | |
| 64 | Plans for Availability of Inpatient Health Care | Partial Compliance | |
| 65 | Administration of Psychotropic Medication | Partial Compliance | |
| 66 | Active Mental Health Caseloads | Non-Compliance | |
| 67 | Prisoner Refusals of Medication | Partial Compliance | |

## APPENDIX A

| 68 | Contraband Searches | Substantial Compliance (MCJ, NCCF, PDC East, PDC South PDC North, & TTCF) Partial Compliance (CRDF) | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC East, PDC South, & PDC North) (1/1/17 – 12/31/17 at TTCF)** |
|---|---|---|---|
| 69 | Clinical Restraints in CTC | Substantial Compliance | **(7/1/18 – 6/30/19)** |
| 70 | Security Restraints in HOH and MOH | Partial Compliance | |
| 71 | Therapeutic Services for Inmates in Clinical Restraints | Substantial Compliance | **(7/1/16 – 6/30/17)** |
| 72 | Administrative Reviews | Substantial Compliance | **(1/1/17 – 12/31/17)** |
| 73 | Reporting of Self-Injurious Behavior and Threats | Substantial Compliance | **(10/1/17 – 9/30/18)** |
| 74 | Law Enforcement Investigations of Suicides | Substantial Compliance | **(9/1/16 – 12/31/17)** |
| 75 | Management Reviews of Suicide Attempts | Substantial Compliance | **(10/1/17 – 9/30/18)** |
| 76 | Management Reviews of Suicides | Substantial Compliance | **(9/1/16 – 12/31/17)** |
| 77 | Custody Compliance and Sustainability Bureau | Partial Compliance | |
| 78 | Suicide Prevention Advisory Committee | Substantial Compliance | **(5/11/16 – 5/18/17)** |
| 79 | Therapeutic Services in Mental Health Housing | Non-Compliance | |
| 80 | Out-of-Cell Time in HOH | Non-Compliance | |
| 81 | Implementation of *Rosas* Recommendations | Partial Compliance | |
| 82 | Grievances at CRDF | Substantial Compliance | **(7/15/16 – 12/31/17)** |

## APPENDIX A

| 83 | Closed Circuit Cameras | Substantial Compliance | **(7/1/15 – 6/30/16 at MCJ & IRC)** **(10/1/15 – 9/30/16 at TTCF)** **(4/1/16 – 3/31/17 at CRDF)** **(4/1/18 – 3/31/19 at NCCF & PDC North)** (7/1/18 –6/30/19 at PDC South) |
|---|---|---|---|
| 84 | Investigation of Staff Misconduct | Substantial Compliance | **(7/1/17 – 6/30/18)** |
| 85 | Internal Affairs Bureau Training | Partial Compliance | |
| 86 | Maintenance and Inventory of Security Equipment | Substantial Compliance | **(4/1/16 – 3/31/17 at MCJ & CRDF)** **(10/1/16 – 12/31/17 at PDC North)** **(2/1/17 – 3/31/18 at PDC South & PDC East)** **(3/1/17 – 3/31/18 at NCCF)** **(4/1/17 – 3/31/18 at IRC)** **(4/1/18 – 3/31/19 at TTCF)** |

## APPENDIX B

| | Substantial Compliance (Provisions) | Partial Compliance[1] | Non-Compliance | Substantial Compliance (Facilities)[2] | No Longer Subject To Monitoring[3] |
|---|---|---|---|---|---|
| First[4] | 5 | 16 | | 10 | |
| Second | 14 | 30 | 13 | 24 | |
| Third | 22 | 27(1) | 10 | 29 | 4(2) |
| Fourth | 24 | 26(1) | 10 | 29 | 10(2) |
| Fifth | 23 | 24(2) | 7 | 34 | 15(5) |
| Sixth | 32 | 22 | 7 | 38 | 18(9) |
| Seventh | 30 | 23 | 7 | 39 | 21(10) |
| Eighth | 35 | 20 | 6 | 42 | 27(9) |
| Ninth | 36 | 22 | 4 | 43 | 31(8) |
| Tenth | 38 | 19 | 5 | 45 | 33(8) |

---

[1] The figure in parenthesis under Partial Compliance is the number of additional provisions where some facilities were in Partial Compliance and other facilities were in Non-Compliance.

[2] This represents the number of provisions where the Department is in Substantial Compliance at all or some of the facilities.

[3] The figure in parenthesis under No Longer Subject to Monitoring is the number of additional provisions where some facilities are no longer subject to monitoring.

[4] During the First Reporting Period, 43 provisions were not subject to monitoring.