Nicholas E. Mitchell
7575 E. 29th Place, Suite 4006
Denver, CO 80238
nmitchell@independentmonitor.com

**Monitor**

**FILED**
**CLERK, U.S. DISTRICT COURT**

09-08-2021

**CENTRAL DISTRICT OF CALIFORNIA**
**BY: _____PG_____ DEPUTY**

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

UNITED STATES OF AMERICA,

　　　　Plaintiff,

　　　　v.

COUNTY OF LOS ANGELES AND
LOS ANGELES COUNTY SHERIFF
ALEX VILLANUEVA, in his Official
Capacity,

　　　　Defendants.

CV No. 15-05903 DDP (JEMX)

**MONITOR'S TWELFTH REPORT AND REQUEST FOR A STATUS CONFERENCE**

Pursuant to Paragraph 109 of the Joint Settlement Agreement Regarding Los Angeles County Jails, the Monitor appointed by this Court hereby submits the attached Report "describing the steps taken" by the County of Los Angeles and the Los Angeles County Sheriff Department ("Department") during the six-month period from January 1, 2021, through June 30, 2021, "to implement the Agreement and evaluating the extent to which they have complied with this Agreement."  This Report takes into consideration the advice and assistance I have received from the Subject Matter Experts appointed by this Court and the comments from the Parties in accordance with Paragraph 110 of the Agreement.

As set forth in the Report, there are 69 provisions in the Agreement that are subject to monitoring.  Six years into the implementation of the Agreement, the County and the Department are in Substantial Compliance with 38 provisions, in Partial Compliance with 18 provisions, in Substantial Compliance with six provisions at some facilities, in Partial or Non-Compliance at other facilities, in Non-Compliance with six provisions at all facilities, and there is one provision for which compliance is suspended.

In or about January 2021, the Parties began to engage in discussions with the Monitor regarding the development of an Implementation Plan to address the provisions that remain Non-Compliant or Partially Compliant.  The Parties have continued to discuss this with the Monitor in good faith, however, as of the date of this Report, these discussions have not meaningfully progressed.  Concurrent with the filing of this Report, therefore, the Monitor respectfully requests a status conference with the Court in the hopes of furthering progress on the development and adoption of such a plan.  I am also available to answer any questions the Court may have regarding the Report at such times as are convenient for the Court.

1    DATED:  September 8, 2021        Respectfully submitted,

2

3

4                                        By:  */s/ Nicholas E. Mitchell*

5                                              Nicholas E. Mitchell

6                                              Monitor

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MONITOR'S TWELFTH REPORT

### INTRODUCTION

This Twelfth Report sets forth the Monitor's assessments of the implementation of the Settlement Agreement (the "Agreement" or "DOJ Agreement") between the County of Los Angeles (the "County") and the United States Department of Justice ("DOJ") for the treatment of inmates with mental illness in the County's jail facilities by the Los Angeles Sheriff's Department (the "Department" or "LASD") and the County's Correctional Health Services ("CHS").[1]  It also reports on the Department's compliance with the provisions of the Implementation Plan in the settlement of *Alex Rosas, et al., v. Leroy Baca,* No. CV 12-00428 DDP, that were extended under the terms of the DOJ Agreement to the facilities not covered by the *Rosas* case.[2]  This Report covers the County's reported results for the period from January 1, 2021, through June 30, 2021 (the "Twelfth Reporting Period").

This is the second report filed since the retirement of my predecessor, Rick Drooyan, and my appointment as the Monitor of this Agreement by joint stipulation of the Parties in July 2020.  Like the eleven reports filed previously in this case, the body of this Report reflects an assessment of the County's compliance with each substantive provision of the Agreement.  This Introduction, however, is different.  Given the recent appointments of a new Monitor and a new Mental Health Subject Matter Expert, Dr. Nicole Johnson, this Introduction is an opportunity for a new Monitoring Team to share a fresh perspective on the County's progress at implementing the Agreement, which has now been in effect for six years.[3]  The Introduction is presented in six parts:

- Part One includes a brief summary of the Agreement and the County's compliance to date, including its steady progress at bringing provisions into Substantial Compliance in the years 2015–2018 and its slowing pace from 2019 to the present;

---

[1] The Agreement generally makes references to the Department of Mental Health ("DMH"), which provided mental health services in the jails when the Agreement was executed.  However, those services are now provided by Correctional Health Services.  Pursuant to a joint stipulation filed on June 25, 2021, the Parties agreed to "replace references to the Department of Mental Health or 'DMH' with references to Correctional Health Services or 'CHS.'"

[2] The *Rosas* case involved allegations of excessive force in Men's Central Jail (MCJ), the Twin Towers Correctional Facility (TTCF), and the Inmate Reception Center (IRC) (collectively the "Downtown Jail Complex").  The DOJ Agreement extends provisions of the Implementation Plan to the Century Regional Detention Facility (CRDF), the North County Correctional Facility (NCCF), and the Pitchess Detention Center (PDC).

[3] The Parties filed joint stipulations to appoint Nicholas Mitchell as Independent Monitor and Dr. Nicole R. Johnson as Mental Health Subject Matter Expert on July 6, 2020, and March 2, 2021, respectively.  *United States v. County of Los Angeles, et. al*, No. CV 15-05903 DDP (Dkts. 157 and 159).  Use of Force Subject Matter Expert Susan McCampbell, and mental health clinicians Drs. James Vess and Amy Eargle also contributed to the analysis herein.

- <u>Parts Two and Three</u> highlight several key facts that the Monitor believes contributed to that slower progress, including the dramatic increase in the number of inmates with mental illness in the jails in the years after the Agreement was executed and the lagging funding appropriated for their treatment;

- <u>Part Four</u> summarizes the six provisions of the Agreement that remain Non-Compliant at all jail facilities as of the date of this Report;

- <u>Part Five</u> shares observations about relevant conditions in the jails from the Monitor's recent site visits; and

- <u>Part Six</u> highlights the sharp and troubling rise in the number of jail suicides in the First Quarter of 2021.

The Monitor thanks the County and the Department for their full cooperation during the Twelfth Reporting Period. The Department, CHS, and County Counsel facilitated the work of the Monitoring Team and responded transparently to our requests for documents and information. The Monitor appreciates their responsiveness, professionalism, and collegiality.

Part One: A Brief Summary of the Agreement and the County's Compliance to Date

The Agreement was filed by the Parties in August 2015 and entered as an order of this Court in September 2015.  It includes 69 substantive provisions that relate to LASD's jail facilities and its management of the inmate population, particularly inmates with mental illness.   The provisions govern subjects as wide-ranging as suicide prevention, inmate mental health treatment, creation of quality improvement systems, deputy training, facility sanitation and related environmental conditions, prevention of excessive force, and the development of sufficient mental health bed space to address the needs of the population of inmates with mental illness.

Since the Agreement became effective, the County engaged in a sustained and meaningful compliance effort—and it demonstrated considerable progress—particularly in the first three years.  This includes but is not limited to building a compliance team within LASD and CHS, training custody and clinical staff, creating new mental health programming, and developing new policies (or revising old ones) to effectuate the Agreement's requirements.  The reports filed by the Monitor between 2015 and 2018 are a testament to the County's early accomplishments, with each report assessing new provisions as being Substantially Compliant.  Indeed, by the filing of the Monitor's Sixth Report in August 2018, the County was in Substantial Compliance with a full 32 of 69 substantive provisions of the Agreement.

A. The County's Slower Progress Towards Substantial Compliance Between 2019 and 2021

Between 2019 and the filing of this Report, however, as reflected in the Monitor's Seventh, Eighth, Ninth, Tenth, and Eleventh Reports, the County's pace and progress at bringing provisions into Substantial Compliance slowed considerably.  During these years, the County achieved Substantial Compliance with only six additional provisions, prompting expressions of concern from the DOJ and the Monitor.  *See, e.g.*, Monitor's Eleventh Report (noting that "[i]n response to a draft of this Report, the DOJ observed that the County's progress has slowed considerably in recent Monitoring Periods, even asserting that the County's progress has 'slowed to a halt'").  The County's year-by-year pace of achieving Substantial Compliance with all provisions is reflected in the chart below:

*Figure 1: The County's Cumulative Substantial Compliance
with All Provisions by Reporting Period*



In various meetings during the past year, County personnel have suggested that several variables outside the County's control may be responsible for this slower pace between 2019 and 2021. This includes the fact that the remaining Non-Compliant provisions are among the most challenging in the Agreement and require significant investments in infrastructure and operational changes within the jails. In addition, the COVID-19 pandemic struck in 2020, which caused considerable disruption to the County's Custody and Mental Health Operations, and necessarily diverted staff and resources from the compliance effort. The Monitor agrees—in part—but does not believe these variables provide a complete explanation for the County's slowing progress.

Part Two: Growing Population of Inmates with Mental Illness, Increased Burdens on Mental Health Staff, and Lagging Treatment Funding

In the years after the Agreement became effective, the number of inmates with mental illness in the jails increased dramatically, and their illnesses became more acute. The Agreement itself also imposed new demands on mental health staff who became responsible for providing more intensive treatment to the inmates in their care. The funding for jail treatment, however, did not grow commensurate with these new demands on clinical staff.

According to data provided by CHS, in 2015 the Department's average daily inmate population was 17,049 inmates.[4]  Of that total number, there were 3,710 inmates with mental illness.  Thus, in 2015, inmates with mental illness represented just 22% of the Department's average daily inmate population.

Since that date, the Department's total jail population has shrunk while the number of inmates with mental illness has grown considerably.  The Department today houses a daily average of 14,072 inmates.  According to CHS, however, a full 5,620 of these inmates have diagnosed mental illnesses—a 51% increase from 2015.  These 5,620 inmates with mental illness make up 40% of today's average inmate population.  The two figures below demonstrate the year-by-year trend among male and female inmates, respectively:

*Figure 2: Male Inmates with Mental Illness in LASD Custody, 2012–2021*



---

[4] *See* LASD Mental Health Count Spreadsheet as of 6/8/21 provided by CHS (on file with author).  All numbers in this Section related to the growing population of mentally ill inmates are as of June 8, 2021.

*Figure 3: Female Inmates with Mental Illness in LASD Custody, 2012–2021*



These increases in mental illness occurred at multiple patient acuity levels in both
the male and female inmate populations.  For example, in 2015, the Department housed
an average of 641 male High Observation Housing ("HOH") inmates, who are among the
sickest patients in the Department's care.[5]  They demonstrate "significant impairment,"
with "gross impairment in communication," and they are in "persistent danger of hurting
self in less acute care setting."[6]  Today, that number has grown to 985 male HOH
inmates.

In 2015, the Department housed an average of 1,848 male Moderate Observation
Housing ("MOH") inmates, who are also mentally ill but not as acutely so.  MOH
inmates demonstrate "moderate impairment" with "recurrent episodes of mood
instability," "psychotic symptoms maintained by medication," "pervasive patterns of self-
injury (superficial lacerations/scratches)," and are "non-violent, but at risk of
victimization by others."[7]  Today, that number has grown to 2,303 male MOH inmates.

Similar increases occurred in the female inmate population.  In 2015, there were
199 female HOH inmates and 203 female MOH inmates.  Today, those numbers are 284

---

[5] These data, in the form in which they were presented by CHS to the Monitor, do not disaggregate inmates
who require Forensic Inpatient Program ("FIP") care from those in HOH housing, but instead include both
FIP and HOH inmates as part of the HOH population.

[6] *See* CHS policy #175.05, Mental Health Levels of Care (on file with author).

[7] *Id*.

and 250, respectively.  In summary, in the years after the Agreement became effective,
the male and female inmate populations became sicker—and dramatically so.  This
created substantial new challenges for the Department and CHS to assess, classify, house,
and treat the influx of new patients.  The chart below illustrates the percentage growth in
mentally ill inmates by acuity level and gender from 2015 to 2021:

*Figure 4: Percentage Growth of Inmates with Mental Illness in LASD Custody,
2015-2021*



The Agreement itself also imposed new requirements on mental health clinicians
to deepen the level of mental health care provided to the inmate population.  For
example, the Agreement requires clinicians to, among other things, provide initial
treatment planning for inmates with mental illness (Provision 30), conduct timely mental
health assessments after triggering events (Provision 36), provide clinically appropriate
mental health treatment (Provision 66), offer therapeutically appropriate care to prisoners
in mental health housing (Provision 79), and provide documented amounts of structured
therapeutic time to each patient per week (Provision 80).  Each of these new requirements
represented an increase in the workload of jail mental health staff and their supervisors.

However, the resources for CHS, which administers the medical and mental
health care for the inmate population, did not keep pace.  According to data provided by
CHS, in fiscal year 2017/2018, CHS' budget was approximately $315 million.[8]  The

---

[8] CHS provided the Monitor with budget data dating back to fiscal year 2017/2018, and indicated that
equivalent data are not available for fiscal years 2014/2015 or 2015/2016.

budget grew to approximately $380 million in fiscal year 2019/2020, and was then reduced to approximately $349 million in fiscal year 2020/2021.

Thus, between 2017/2018 and 2020/2021, CHS' budget increased by just 11%, which was not commensurate with the 21% increase in the mentally ill population during those same years.  According to CHS, in fact, much of that 11% budget increase was actually consumed by routine salary raises and other unavoidable operating expenses, rather than being used to create new clinical or supervisory positions to treat inmates with mental illness or manage clinicians.[9]  Nor was the budget increase likely commensurate with the heavier demands on clinical staff created by the Agreement itself.   Thankfully, CHS began hiring for 76 newly authorized clinical positions in July 2021.  The impacts of these new positions on the County's compliance with the Agreement are not yet clear.

Part Three: The County's Evolving Approach to Housing Inmates with Mental Illness

Amidst these increases in the mental health population, the County has also been engaged in a years-long political process to determine its approach for housing inmates with mental illness.  While the County was developing and serially revising its long-term plans, the provisions that require the County to ensure that there are sufficient treatment beds for inmates with mental illness have not been satisfactorily addressed.

In or about 2014, the County began drawing up plans to build a consolidated mental health jail (Consolidated Correctional Treatment Facility or "CCTF," also known as the Mental Health Treatment Center or "MHTC") specifically designed to treat inmates with mental illness.[10]  According to plans for this facility, it was to have nearly four thousand state-of-the-art mental health treatment beds for inmate patients at multiple acuity levels.

In subsequent years, and before the proposed mental health jail was constructed, the County's philosophies about housing inmates with mental illness evolved, and it began to embrace what it called a "Care First, Jail Last" approach.  Under this new thinking, the County would forgo construction of a new mental health facility, and jail would be deemphasized for inmates with mental illness in favor of developing a network of community-based mental health beds to house them.  For example:

- On August 14, 2018, the Board of Supervisors of Los Angeles County ("Board of Supervisors") approved a motion titled, "Scaling up Diversion and Reentry Efforts for People with Serious Clinical Needs."  This motion directed the Department of Health Services to analyze "how the County can continue to build and scale the appropriately sized and qualified network of community services to divert, treat and support inmates with serious clinical needs, as well as prevent

---

[9] CHS indicates that while it was able to add various positions to assist with release planning during these years, it actually lost 99 previously authorized positions between fiscal year 2019/2020 and 2020/2021.
[10] A timeline is available here http://file.lacounty.gov/SDSInter/bos/supdocs/123617.pdf.

their entry into the criminal justice system."[11]  When the results of that study were released, they suggested that "an estimated 61 percent of the jail mental health population were likely appropriate candidates for diversion from the jails; 7 percent were potentially appropriate; and 32 percent were likely not appropriate candidates for diversion."[12]

- On February 12, 2019, the Board of Supervisors passed a motion to develop a workgroup that would create a roadmap for diverting people from jail into care. That group, the Alternatives to Incarceration Workgroup, ultimately developed and approved a series of recommendations intended to, among other things, reimagine the current system of incarceration for mentally ill inmates in favor of a "decentralized, restorative and robust community-based system of care."

- On August 13, 2019, the Board of Supervisors formally abandoned its plans to create a new mental health jail, voting to cancel the construction contract because it was "apparent that the original project scope for the Mental Health Treatment Center, as specified by the County and reflected in the Design-Build Agreement . . . does not reflect the Board's present thinking, priorities, and strategies."[13]

- On September 9, 2019, the Board of Supervisors continued to explore diversion of inmates with mental illness from jail, and it received a Progress Report on Scaling up Diversion and Reentry Efforts for People with Serious Clinical Needs.  Among other things, the report provided a preliminary analysis of the "community-based capacity needed for persons with serious mental health conditions in the Los Angeles County jail system."[14]  That is, it reflected an estimate of the number of mental health beds, at all patient acuity levels, that would have to be created in the community to meet the needs of the jail population with mental illness.  With the existing bed supply subtracted, the report estimated that 8,144 total new community beds were needed (52 Acute Inpatient, 1,418 Subacute Inpatient, 2,579 Specialty Interim Housing, 117 Skilled Nursing Facility, 31 Medical Recuperative Care, and 3,947 Permanent Supportive Housing).

---

[11] *See Progress Report on Scaling up Diversion and Reentry Efforts for People With Serious Clinical Needs*, Dr. Christina Ghaly, M.D., dated September 9, 2019 (available at: http://file.lacounty.gov/SDSInter/bos/1061487_PROGRESSREPORTONSCALINGUPDIVERSIONAN DREENTRYEFFORTSFORPEOPLEWITHSERIOUSCLINICALNEEDS.pdf).
[12] *See Estimating the Size of the Los Angeles County Jail Mental Health Population Appropriate for Release into Community Services*, Rand Corp. (available at: https://www.rand.org/pubs/research_reports/RR4328.html).
[13] *See* Statement of Proceedings for the Regular Meeting of the Board of Supervisors, dated August 13, 2019 (available at: http://file.lacounty.gov/SDSInter/bos/sop/1060123_081319.pdf; http://file.lacounty.gov/SDSInter/bos/supdocs/139739.pdf).
[14] *See Progress Report on Scaling up Diversion and Reentry Efforts for People With Serious Clinical Needs* by Dr. Christina Ghaly, M.D., dated September 9, 2019 (available at: http://file.lacounty.gov/SDSInter/bos/1061487_PROGRESSREPORTONSCALINGUPDIVERSIONAN DREENTRYEFFORTSFORPEOPLEWITHSERIOUSCLINICALNEEDS.pdf).

- On July 7, 2020, the Board of Supervisors directed the formation of a workgroup to provide a plan for closing Men's Central Jail within one year.[15]  On March 30, 2021, the Board received that report, Developing a Plan for Closing Men's Central Jail as Los Angeles Reduces its Reliance on Incarceration.[16]  Among other things, the Report called for a reduction of the jail population by 4,500 inmates through diversion, and the creation of thousands of new mental health treatment beds in the community, providing a timeline for achieving these steps.

- On June 22, 2021, the Board of Supervisors formally voted to "depopulate and demolish" MCJ, and to form a "Jail Closure Implementation Team" to effectuate that decision.  The Board further determined "that is unnecessary to build any new County jail or custody facility."[17]

Notwithstanding the County's new plans for community-based treatment, according to CHS, only a small number of the new beds are slated to come online by the end of 2021, representing just a fraction of the space necessary to move the mentally ill population out of the jails.[18]  Further, the County has yet to provide a timeline in this case for achieving Substantial Compliance with the provisions of the Agreement that require the County to have sufficient bed space to house inmates with mental illness.

### Part Four: Non-Compliant Provisions in the Twelfth Monitoring Period

We now turn to an examination of the six provisions that remain Non-Compliant at all jail facilities in the Twelfth Monitoring Period.  There are 69 provisions in the Agreement that are subject to monitoring.  As of the date of this Report, the County and the Department are in Substantial Compliance with 38 provisions, in Partial Compliance with 18 provisions, in Substantial Compliance with six provisions at some facilities, in Partial or Non-Compliance at other facilities, in Non-Compliance with six provisions at all facilities, and there is one provision where compliance is suspended.  An analysis of each of the provisions is included in the body of the Report, and a brief overview of the provisions that remain Non-Compliant at all facilities appears below:

### A. Non-Compliant Provisions that Address Mental Health Treatment Bed Space

Several of the provisions that are Non-Compliant at all jail facilities address the need for sufficient bed space to properly house and serve the population of inmates with mental illness.

---

[15] See Developing a Plan for Closing Men's Central Jail as Los Angeles County Reduces its Reliance on Incarceration, Dr. Christina Ghaly, M.D., dated March 30, 2021 (available at: http://file.lacounty.gov/SDSInter/bos/bc/1104568_DEVELO_1.PDF)
[16] Id.
[17] See Statement of Proceedings for the Regular Meeting of the Board of Supervisors, dated June 22, 2021 (available at: http://file.lacounty.gov/SDSInter/bos/sop/1109496_062221.pdf)
[18] See email from CHS Director Tim Belavich dated June 28, 2021 (on file with author).

- Provision 63 requires the County to maintain adequate HOH and MOH housing "sufficient to meet the needs of the jail population with mental illness." To demonstrate its compliance with Provision 63, the relevant compliance measures require the County to show "the immediate availability of HOH and MOH beds at TTCF (for men) and CRDF (for women) 95% of the time" (parentheticals mine). Provision 63 was first tested for compliance in the Monitor's Second Report filed in 2016. In that document, the Monitor noted that during that reporting period, TTCF had 57% availability in HOH housing, and CRDF had 36% availability in HOH housing. While not sufficient to demonstrate Substantial Compliance, these results were promising enough to earn a rating of Partial Compliance.

  This is no longer true, and it has not been for several years. According to the Department's Twelfth Self-Assessment, in the Fourth Quarter of 2020, both TTCF and CRDF had 0% availability in HOH housing during the weeks selected for sampling. In the First Quarter of 2021, TTCF had 0% availability and CRDF had 42% availability in HOH housing.[19] Thus, for male HOH inmates, the Department had no bed availability whatsoever in the sampled weeks in either quarter. For female inmates the numbers were slightly better only in the First Quarter of 2021. These results for HOH inmates have not only worsened since 2018, they are worse than comparable results sampled just a year after the Agreement was executed.

- A similar problem exists with inpatient beds under Provision 64. Provision 64 requires that within six months of the Agreement's effective date, the County must develop a plan to "reasonably ensure the availability of licensed inpatient mental health care for prisoners in the jails." Under CHS policy, patients classified as "P4" are those who require inpatient care. P4 patients meet "LPS criteria for danger to self, others, or grave disability."[20] They demonstrate, among other things, "imminent risk of self-harm or harm to others secondary to mental illness," "severely disorganized thinking and behavior," "on-going refusal to engage in any form of treatment or intervention," and "symptomology that would require inpatient treatment in a community setting." In other words, P4s are the very sickest patients who may require involuntary medication for their own safety, which can only legally be provided in inpatient housing.

  According to data provided by CHS, as of June 2021, the Department was housing 120 P4 patients. The Department, however, only has 46 inpatient beds

---

[19] The results were considerably better in MOH housing for the Twelfth Monitoring Period. The County reports that TTCF and CRDF had 100% and 85% availability in the Fourth Quarter of 2020, respectively, and that both facilities had 100% availability in the First Quarter of 2021.
[20] See CHS policy #175.05, Mental Health Levels of Care (on file with author).

that are licensed and LPS Designated[21] to address the needs of the P4 population. The P4 patients who cannot be accommodated in inpatient housing are instead relegated to other kinds of mental health housing where they cannot usually be involuntarily medicated or, according to Subject Matter Expert Dr. Nicole Johnson, treated adequately given the severity of their illnesses.

B. <u>Non-Compliant Provisions that Address Staffing or Programmatic Needs</u>

Other Non-Compliant provisions address the intensity and quality of the clinical care necessary to properly serve the population of inmates with mental illness.

- <u>Provision 66</u> requires the County to ensure that HOH and MOH prisoners, and those with a serious mental illness who reside in other housing areas, "remain on an active mental health caseload and receive clinically appropriate mental health treatment, regardless of whether they refuse medications."[22] That is, it requires the County to ensure, among other things, that these patients are being seen by a Qualified Mental Health Professional ("QMHP") and offered structured mental health treatment. The County's compliance has been tested using quantitative and qualitative approaches in multiple reporting periods, with the assistance of the Mental Health Subject Matter Expert and clinicians, and has been found deficient. Indeed, in the Twelfth Reporting Period, the County reported that in the Fourth Quarter of 2020, just 12% of HOH inmates and 4% of MOH inmates were offered treatment in conformity with Provision 66. In the First Quarter of 2021, those numbers dropped to 8% and 4%, respectively.

- <u>Provision 79</u> requires the County and the Sheriff to offer prisoners in mental health housing "therapeutically appropriate individual visits with a QMHP; and therapeutically appropriate group programming conducted by a QMHP." In previous reports—and in this one—the Monitor has been unable to assess this provision, as "the County is not yet able to render structured treatment according to methods reflected in treatment plans." Therefore, six years into the implementation of the Agreement, this provision remains "not yet ripe for evaluation."

- <u>Provision 80</u> requires that, "no later than 18 months after the Effective Date," 100% of the prisoners in HOH receive "ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week." The County has, thus far, been unable to provide results for "structured therapeutic or programming time." Provision 80, therefore, continues to be rated

---

[21] *See* California Mental Health Act (Sections 5000 to 8000 of the Welfare and Institutions Code), also known as the "Lanterman-Petris-Short" or "LPS" Act.

[22] On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provisions 31, 57, 65, 66, and 79. These Provisions have been analyzed in this Report under the provision language that was operative during the Twelfth Reporting Period.

as Non-Compliant.

- Finally, <u>Provision 47</u> requires the County to "ensure there are sufficient custodial, medical, and mental health staff at the Jails to fulfill the terms of this Agreement. Within six months of the Effective Date, and on a semi-annual basis thereafter, the County and Sheriff will . . . provide to the Monitor and DOJ a report identifying steps taken by the County and the Sheriff during the review period to implement the terms of the Agreement and any barriers to implementation, such as insufficient staffing levels at the Jails, if any." The County has not provided the analysis required by this provision, and is again rated as Non-Compliant in the Twelfth Monitoring Period.

<u>Part Five: Key Facts and Observations from Monitor's June 2021 Site Visits</u>

These Non-Compliant provisions, and their possible impacts on the safety of inmates and staff, became much more real and visceral during the Monitor's recent site visits to the jails. In June 2021, the Monitor made the first of what will be recurring site visits. Dr. James Vess, a mental health clinician retained by the Monitor, also joined. During four days on site, the Monitor toured and inspected TTCF, MCJ, IRC, CRDF, PDC North, and NCCF. The Monitor also met with leaders and line staff within the Department and CHS, observed inmate intake and discharge, inspected mental health housing at all patient acuity levels, and spoke with inmates, deputies, and clinicians to hear first-hand accounts about conditions relevant to this Agreement. Some key observations:

- Some of the conditions identified in the early Monitoring Reports have visibly been corrected, such as sanitation in most, but not all, jails. The screening of inmates for mental illness has also improved dramatically. The Monitoring Team was impressed by the professionalism of the clinical and custody staff with whom we interacted, all of whom appeared committed to improving conditions in the jails and complying with the Agreement. These were encouraging findings.

- Not all observations, however, were as promising. During site visits to various HOH pods over several days, the Monitor and Dr. Vess observed that prolonged isolation is central to the County's current approach to the management of inmates in the HOH population. During almost every one of these visits, all inmates were in single-person cells, where they generally remain locked down until permitted out for their limited allotment of out-of-cell time. Most patients were sleeping, some were pacing back and forth in their cells, and few were responsive to us or able to answer, or even acknowledge, questions posed at their cell front windows. We observed no therapeutic group programming being offered during these visits to HOH pods. According to Mental Health Subject Matter Expert Dr. Johnson, prolonged isolation for acutely mentally ill inmates

can aggravate the severity of their illness, deepen their social isolation, and even result in medical complications and worsened recidivism rates.

- The out-of-cell time that we observed in these HOH pods was also concerning. During out-of-cell time, a small number of inmates, often 3–5, were handcuffed to individual metal "spider tables" in the shared dayroom while all other inmates remained locked in their cells. The out-of-cell inmates generally watched TV or sat at their tables doing nothing. They were not able to engage in the activities that generally characterize out-of-cell time in jail environments, such as moving around the dayroom, exercising, reading, using the telephone, showering, engaging in group activities, or interacting with other inmates. Conversations with custody and mental health staff reflected that there is no individualized risk assessment to determine whether inmates in HOH pods must be cuffed to these tables during out-of-cell time for safety reasons; they are all locked down as a matter of course given their status as acutely ill HOH patients.[23]

- In contrast, the small number of FIP Step-Down pods for HOH inmates present a notably different—and far better—living environment than standard HOH housing. FIP Step-Down pods are an innovation for patients who are acutely mentally ill. They are intended to improve the stability of these patients and reduce the likelihood of admission (or readmission) to inpatient housing. Although the population of inmates who could benefit from FIP Step-Down pods is very large, today there are only three FIP Step-Down pods at TTCF and CRDF, housing 16–32 patients each.

  Patients in FIP Step-Down pods have more out-of-cell time in the shared dayroom, and thus greater opportunities for social engagement than inmates in standard HOH housing. They have a shared whiteboard and, during site visits, the Monitor observed a community project and community rules written thereon. They have access to amenities such as a library and radio. These inmates were generally more responsive and engaged with the Monitor, and were better able to make eye contact and answer questions, than inmates in standard HOH pods, despite the fact that their mental illness is equally acute. According to Subject Matter Expert Dr. Johnson, greater social engagement can lead to improved functioning and decreased symptomatology, increased adherence to correctional rules, and decrease acting-out behavior.[24]

---

[23] In response to a draft of this Report, the County reported that it has "piloted an out of cell program in the HOH areas at both TTCF and CRDF that seeks to get inmates who are able to program together out of cell without being handcuffed. The pilot, however, was suspended during the pandemic due to a combination of public health concerns, facility space limitations, and staffing challenges."

[24] Conversations with clinical and custody staff revealed that inmate-on-inmate assaults and uses of force are extremely rare in the FIP Step-Down pods, which necessarily prompts questions about whether the prolonged lockdown and handcuffing to metal spider tables now routinely practiced in standard HOH pods are actually necessary to ensure inmate and staff safety.

- The Monitor and Dr. Vess had various discussions with clinical staff, both individually and in groups. Among other things, clinical staff described a good working relationship with custody personnel, which was encouraging. However, they also explained that the lack of inpatient beds creates a cascade of downward pressure on other types of mental health housing. For example, due to the insufficient number of inpatient beds, P4 inmates are forced to remain in HOH housing, which then creates a shortage of HOH beds. Amidst this scarcity, when new HOH patients are admitted into the jails, they are sometimes forced to wait for weeks, or even a month, in temporary housing assignments where limited mental health resources are available before they are admitted to HOH housing.

- The Monitor also must comment on the deplorable environmental and sanitation conditions in Men's Central Jail. During a site visit, the Monitor observed the cells to be small and poorly lit, and many were nearly overflowing with garbage. There was filth spread on the walls near various inmate tiers. At one point, the Monitor observed a large pile of used safety razor blades lying on the floor of a hallway. Thankfully, it was a locked hallway and not generally accessible to inmates. But blade control is fundamental in a jail environment where uncontrolled sharps present severe safety and infectious disease risks to both staff and inmates, and unaccounted for razor blades are extremely dangerous.[25] Although the Board of Supervisors has voted to close MCJ, its condition should be addressed by the County while it remains open, because thousands of staff members and inmates remain exposed to its risks.

Part Six: Rising Number of Inmate Suicides in the First Quarter of 2021

The Monitor believes that the information cited above and throughout this Report should, on its own, prompt the County to take swift corrective action. Yet another important fact drives home this point. This Agreement was reached, in part, to address the risks of suicide in the Los Angeles County jails. Indeed, the Agreement was intended to, among other things, "sustain systemic improvements that are designed to protect prisoners from conditions in custody that place them at unreasonable risk of harm from suicide, self-injurious behavior, or unlawful injury by others." *See* Agreement at Paragraph 4. Many of the Agreement's provisions, such as 18, 23, 24, 25, 32, 36, 45, 46, 56, 73, 75, 76, and 78, specifically address suicide prevention efforts.

In recent months, the number of suicides in the Los Angeles County jails has risen—sharply. In the year 2015, when the Agreement was executed, there was a single

---

[25] The County indicates that in response to the Monitor's concern, the Department is revising relevant policies on blade control and it has "ordered ten containers designed specifically to handle razors and related materials."

completed suicide in the jails.[26]  In fact, between 2015 and 2020, there was only a single year, 2018, in which there were five completed suicides.  In 2021, however, there were five completed suicides <u>in the First Quarter alone</u>.  The table below demonstrates these troubling numbers:

*Figure 5: Completed Suicides in LASD Jails, 2015–1Q 2021*



According to Mental Health Subject Matter Expert Dr. Nicole Johnson, rising rates of jail suicide can result from many factors, including changing characteristics of the inmate population, higher levels of drug abuse, rising rates of suicide in the non-incarcerated population, increasing levels of mental illness among inmates, and conditions within the jail environment itself, among others.  The point is well-taken.  There is no conclusive evidence that these higher suicide numbers are specifically caused by the issues discussed in this Report.  We are heartened that County and Department executives are taking the rising numbers very seriously and attempting to ascertain their cause(s) and develop corrective action plans through the Department's Quality Improvement process.

However, the Monitor believes that the rising number of suicides should be viewed as a pressing reminder that some of the problems discussed in this Report have

---

[26] *See* Correctional Health Services and Custody Compliance & Sustainability Bureau Combined Semi-Annual Report on Quality Improvement and Suicide Prevention Efforts – Quarter 4 2020 & Quarter 1 2021 (on file with author).

not yet been addressed by the County—but must be.  Given the centrality of suicide
prevention to the Agreement, the higher suicide numbers should be a call-to-action for
the County to redouble its efforts to improve jail conditions for inmates with mental
illness, cure the constitutional deficiencies that gave rise to the Agreement in 2015, and
achieve Substantial Compliance as expeditiously as possible.

## CONCLUSION

In or about January 2021, the Parties began to engage in discussions with the
Monitor regarding the development of an Implementation Plan to address the Non-
Compliant provisions addressed above and the Partially Compliant Provisions discussed
later in this report.  The Parties have continued to discuss this in good faith, however,
these discussions have not meaningfully progressed.  Concurrent with this filing,
therefore, the Monitor will respectfully request a status conference with the Court in the
hopes of furthering progress on the development and adoption of such a plan.


Nick Mitchell,
September 8, 2021

**EXECUTIVE SUMMARY**

There are 69 provisions in the Settlement Agreement that are subject to monitoring by the Monitor and Subject Matter Experts. As of the date of this Report, the County and the Department are in Substantial Compliance with 38 provisions, in Partial Compliance with 18 provisions, and Non-Compliance with six provisions. In addition, there are three provisions for which the Department is in Substantial Compliance at some facilities and in Partial Compliance at other facilities. There is one provision (Paragraph 39) for which the Department is in Substantial Compliance at certain facilities, Partial Compliance at other facilities, and Not Rated at other facilities. There is one provision (Provision 43) for which the Department is in Substantial Compliance at certain facilities and Non-Compliance at other facilities. There is one provision (Provision 58) for which the Department is in Substantial Compliance at certain facilities and in Partial Compliance or Non-Compliance at other facilities. There is one provision (Paragraph 42) for which compliance is suspended. There are 44 provisions for which the County and the Department are in Substantial Compliance at some or all facilities.[27]

The Monitor's determination of the County's compliance is based upon the quantitative thresholds in the Compliance Measures (and any other applicable requirements in the Compliance Measures) for achieving Substantial Compliance, unless the quality of the County's performance as determined by the qualitative assessment is plainly inadequate or the results reported by the clinician vary significantly from the results reported by the Department.[28] As used herein, "Substantial Compliance" means that the County has "achieved compliance with the material components of the relevant provisions of this Agreement in accordance with the [agreed-upon Compliance Measures for assessing Substantial Compliance]," which it must maintain for twelve-consecutive months; "Partial Compliance" means that the County has achieved "compliance on some, but not all, of the material components of the relevant provision of this Agreement;" and "Non-Compliance" means that the County has not met "most or all of the material components of the relevant provisions of this Agreement."

Appendix A to this Twelfth Report shows the status of each of the 69 provisions of the Agreement that are subject to monitoring and the twelve-month triggering dates

---

[27] Under Paragraph 111 of the Agreement, the twelve-month period for which the County is required to maintain Substantial Compliance can be determined on a facility-by-facility basis.

[28] As in prior reports, this Twelfth Report also reflects the results of audits by the Monitor's auditors to verify results reported by the County. The Monitor has deemed the County to be in Substantial Compliance "as of" the beginning of the quarter reported by the County if the auditors have verified that the County has met the thresholds in the Compliance Measures. If the auditors were not able to verify the results reported by the County, the twelve-month period for maintaining Substantial Compliance will commence in a future period when the County's reported results are verified by the auditors. If the County maintains Substantial Compliance with a provision for twelve consecutive months, pursuant to Paragraph 111 of the Agreement, the Monitor and Subject Matter Expert will "no longer. . .assess or report on that provision" in future reporting periods. Some of the Substantial Compliance results reported by the County in the Twelfth Reporting Period have not been audited by the Monitor's auditors and cannot be considered final until verified by the auditors. The County will not be deemed to be in Substantial Compliance as of the County's reported date for purposes of determining the twelve-month compliance period if the results are not verified by the auditors.

where the County is deemed to be in Substantial Compliance.  Appendix B shows the County's progress from the Initial Reporting Period through the Twelfth Reporting Period in achieving Substantial Compliance and in maintaining Substantial Compliance for twelve consecutive months on provisions that are no longer subject to monitoring.

There are 36 provisions that are no longer subject to monitoring because the County and Department maintained Substantial Compliance for twelve consecutive months as required by Paragraph 111 of the Settlement Agreement and verified by the Monitor's auditors as required.[29]  There are another six provisions for which some facilities are no longer subject to monitoring because those facilities maintained Substantial Compliance for the required twelve consecutive months.[30]

As of the date of this Report, and subject to verification by the Monitor's auditors and qualitative assessments in some cases, the County and the Department are in Substantial Compliance at some or all of the facilities with the following provisions of the Settlement Agreement:

The County has achieved Substantial Compliance with Paragraph 18, which requires the (initial) training of Deputy Sheriffs and Custody Assistants on suicide prevention as follows: at Men's Central Jail ("MCJ") and Pitchess Detention Center ("PDC") South as of October 1, 2017; at North County Correctional Facility ("NCCF") as of September 1, 2017; at PDC East as of December 1, 2017; at Twin Towers Correctional Facility ("TTCF"), the Inmate Reception Center ("IRC"), and PDC North as of April 1, 2018; and at Century Regional Detention Facility ("CRDF") as of August 1, 2018.  The County has posted results for the refresher training requirements under Provision 81 Rosas 4.6(b) and 4.7(b) reflecting that it has maintained compliance as of December 2020.  These results are subject to verification by the Monitor's auditors.

The County has achieved Substantial Compliance at NCCF, MCJ, and IRC as of April 1, 2018; at TTCF as of July 1, 2018; at CRDF, PDC East, and PDC North as of December 1, 2018; and at PDC South as of March 1, 2019, with Paragraph 19, which requires the (initial) training of Deputy Sheriffs on Crisis Intervention and Conflict Resolution and the training of Deputy Sheriffs and Custody Assistants in working with mentally ill prisoners.  The Department has achieved Substantial Compliance at CRDF, IRC, NCCF, MCJ, PDC East, PDC North, PDC South, and TTCF as of December 2019 with the refresher training requirements of Paragraph 19.  The County has posted results for the refresher training requirements under Provision 81 Rosas 4.6(b) and 4.7(b) reflecting that it has maintained compliance as of December 2020.  These results are subject to verification by the Monitor's auditors.

The County has achieved Substantial Compliance at PDC East, PDC North,

---

[29] This includes the initial training required by Paragraphs 18, 19 and 20, which has been completed and is no longer subject to monitoring.  The refresher training requirements for each of these provisions are, however, still subject to monitoring.

[30] The provisions that are no longer subject to monitoring at some or all of the facilities are highlighted in bold in Appendix A.

NCCF, and CRDF as of August 1, 2017 and at PDC South as of October 1, 2017, with
Paragraph 20, which requires the (initial) training of additional Deputy Sheriffs on Crisis
Intervention and Conflict Resolution and on working with mentally ill prisoners.  The
County has posted results for the refresher training requirements under Provision 81
Rosas 4.6(b) and 4.7(b) reflecting that it has maintained compliance as of December
2020.  These results are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive
months at PDC East, PDC South, PDC North, NCCF, IRC, TTCF, CRDF, and MCJ with
Paragraph 21, which requires Custody personnel to maintain CPR certifications.

The County has maintained Substantial Compliance for twelve consecutive
months with Paragraph 22, which requires the County and the Sheriff to provide
instructional material on the use of arresting and booking documents to ensure the
sharing of known relevant and available information on prisoners' mental health status
and suicide risk.

The County has maintained Substantial Compliance for twelve consecutive
months as of July 12, 2018, with Paragraph 23, which requires that the Department
conduct a systematic review of prisoner housing to reduce the risk of self-harm and to
identify and address suicide hazards, and to develop plans to reasonably mitigate suicide
hazards identified in the review.

The County has maintained Substantial Compliance for twelve consecutive
months as of September 30, 2018, with Paragraph 24, which requires the Department to
conduct annual reviews and inspections of prisoner housing to identify suicide hazards.

The County has maintained Substantial Compliance for twelve months as of
March 31, 2021, with Paragraph 27, which requires that all prisoners are individually and
privately screened within 12 hours of their arrival at the jails.

The County has maintained Substantial Compliance for twelve consecutive
months at IRC as of March 31, 2018, with Paragraph 28, which requires the Department
to expedite inmates having urgent or emergent mental health needs through the booking
process.

The County has maintained Substantial Compliance for twelve consecutive
months as of March 31, 2018, with Paragraph 29, which requires mental health
assessments of prisoners with non-emergent mental health needs within 24 hours of the
intake nursing assessment.

The County has maintained Substantial Compliance as of January 1, 2019,
through December 31, 2019, with Paragraph 30, which requires the County to provide an
initial mental health assessment that includes a brief initial treatment plan that addresses
"housing recommendations and preliminary discharge information."

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 32, which requires that a serious suicide attempt be entered in the prisoner's electronic medical record in a timely manner.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2017, with Paragraph 33, which requires mental health supervisors to review electronic medical records on a quarterly basis to assess their accuracy.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2018, with Paragraph 35, which requires the Department to ensure that custody staff refer prisoners who are demonstrating a potential need for routine mental health care to a QMHP or a Jail Mental Evaluation Team.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 38, which requires mental health staff or JMET teams to make weekly cell-by-cell rounds in restricted non-mental health housing modules to identify prisoners with mental illnesses and grant prisoner's requests for out-of-cell interviews.

The County has maintained Substantial Compliance at NCCF for twelve consecutive months as of June 30, 2018, with Paragraph 39, which requires the County to use a confidential self-referral system for prisoners to request mental health care.

The County has maintained Substantial Compliance at NCCF and PDC North for twelve consecutive months, as of September 30, 2018, with Paragraph 43, which requires the Department to develop and implement policies for discipline of prisoners with serious mental illnesses.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 44, which requires the Department to install protective barriers in High Observation Housing and other mental health housing.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 45, which requires Suicide Prevention Kits and first-aid kits in control booths in all facilities.

The County has achieved Substantial Compliance as of July 1, 2020, through September 30, 2020, with Paragraph 46, which requires the Department to interrupt, and if necessary, provide appropriate aid to any prisoner who threatens or exhibits self-injurious behavior.  The County has provided documentation showing that it has maintained Substantial Compliance as of October 1, 2020, through March 31, 2021. These results are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 48, which requires the Department to have written housekeeping, sanitation, and inspection plans to ensure proper cleaning.

The County has maintained Substantial Compliance for twelve consecutive months as of February 28, 2017, with Paragraph 49, which requires the Department to have maintenance plans to respond to routine and emergency maintenance needs.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2017, with Paragraph 50, which requires pest control in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2017, with Paragraph 51, which requires the Department to ensure that all prisoners have access to basic hygiene supplies in accordance with state regulations.

The County has provided documentation showing that it has achieved Substantial Compliance as of June 30, 2020, with Paragraph 54, which requires the Department to ensure that prisoners who are not in mental health housing are "not denied privileges and programming based solely on their mental health status or prescription for psychotropic medication." The reported results for the First Quarter of 2020 have been verified by the Monitor's auditors. The results for the Second Quarter of 2020 are still subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive months at CRDF, PDC North, MCJ, and TTCF with Paragraph 55, which requires custody, medical and mental health staff to meet daily in High Observation Housing and weekly in Moderate Observation Housing.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 56, which requires custody, medical, and mental health staff to communicate regarding any change in a housing assignment following a suicide attempt or serious change in mental health condition.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2018, at MCJ with Paragraph 57, which requires safety checks in mental health housing.

The County has maintained Substantial Compliance for twelve consecutive months at PDC South, PDC North, and PDC East as of December 31, 2016, at CRDF as of June 30, 2018, and at IRC as of September 30, 2018, with Paragraph 58, which requires safety checks in non-mental health housing. The County has achieved Substantial Compliance as of April 1, 2020, through September 30, 2020, at NCCF. The County has provided documentation showing that it has maintained Substantial Compliance at NCCF as of October 1, 2020, through March 31, 2021. These results are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2019, with Paragraph 59, which requires unannounced daily supervisory rounds to verify safety checks.

The County has achieved Substantial Compliance with Paragraph 60, as of April 1, 2019, through March 31, 2020, which requires the implementation of a quality improvement plan.

The County has maintained Substantial Compliance for twelve consecutive months at MCJ, NCCF, PDC East, PDC North, PDC South, and TTCF with Paragraph 68, which requires staggered contraband searches in housing units.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2019, with Paragraph 69, which requires the County and the Sheriff to use clinical restraints only in the Correctional Treatment Center with the approval of a licensed psychiatrist who performed an individualized assessment.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2017, with Paragraph 71, which requires the County and the Sheriff to ensure that any prisoner subjected to clinical restraints in response to a mental health crisis receives therapeutic services to remediate any effects from the restraints.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 72, which requires the Department and the County to report on meetings to review suicides and incidents of serious self-injurious behavior.

The County has maintained Substantial Compliance for twelve consecutive months as of September 30, 2018, with Paragraph 73, which requires the Department to prepare detailed reports of prisoners who threaten or exhibit self-injurious behavior.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 74, which requires the Department to have an objective law enforcement investigation of every suicide that occurs in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of September 30, 2018, with Paragraph 75, which requires the Department and the County to review every serious suicide attempt that occurs in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 76, which requires the Department to follow certain procedures whenever there is an apparent or suspected suicide.

The County has maintained Substantial Compliance for twelve consecutive months as of May 18, 2017, with Paragraph 78, which requires the Suicide Prevention Advisory Committee to meet twice a year.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 82, which requires the Department to co-locate personnel responsible for collecting prisoners' grievances at CRDF.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2019, with Paragraph 83, which requires it to install closed circuit security cameras throughout all of the common areas in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2018, with Paragraph 84, which requires investigations of force incidents and administrative actions to be completed timely.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2019, with Paragraph 86, which requires inventory and control of weapons.

## TWELFTH REPORT

18.    Within three months of the Effective Date, the County and the Sheriff will
develop, and within six months of the Effective Date will commence providing:  (1) a
four-hour custody-specific, scenario-based, skill development training on suicide
prevention, which can be part of the eight-hour training described in paragraph 4.8 of the
Implementation Plan in *Rosas* to all new Deputies as part of the Jail Operations
Continuum and to all new Custody Assistants at the Custody Assistants academy; and (2)
a two-hour custody-specific, scenario-based, skill development training on suicide
prevention to all existing Deputies and Custody Assistants at their respective facilities,
which can be part of the eight-hour training described in paragraph 4.7 of the
Implementation Plan in *Rosas*, through in-service Intensified Formatted Training, which
training will be completed by December 31, 2016.

These trainings will include the following topics:

(a)    suicide prevention policies and procedures, including observation and
supervision of prisoners at risk for suicide or self-injurious behavior;

(b)    discussion of facility environments and staff interactions and why they
may contribute to suicidal behavior;

(c)    potential predisposing factors to suicide;

(d)    high-risk suicide periods and settings;

(e)    warning signs and symptoms of suicidal behavior;

(f)    case studies of recent suicides and serious suicide attempts;

(g)    emergency notification procedures;

(h)    mock demonstrations regarding the proper response to a suicide attempt,
including a hands-on simulation experience that incorporates the
challenges that often accompany a jail suicide, such as cell doors being
blocked by a hanging body and delays in securing back-up assistance;

(i)    differentiating between suicidal and self-injurious behavior; and

(j)    the proper use of emergency equipment.

**STATUS (18):**        **SUBSTANTIAL COMPLIANCE (as of October 1, 2017 (verified) at MCJ and PDC South)**

**SUBSTANTIAL COMPLIANCE (as of September 1, 2017 (verified) at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of December 1, 2017 (verified) at PDC East)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018 (verified) at TTCF, IRC, and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of August 1, 2018 (verified) at CRDF)**

The Department was not subject to monitoring during the Twelfth Reporting Period for the initial training of existing Deputy Sheriffs or Custody Assistants or of new Deputies in the Jail Operations Continuum and new Custody Assistants in the Custody Assistant Academy as required by Paragraph 18.  Virtually all of the Deputy Sheriffs and Custody Assistants in the custody facilities received the initial training because they were assigned to the jails as of the Existing Date of the Settlement Agreement or they received the training as new Deputies or new Custody Assistants.

The Department is still subject to monitoring in future periods for Substantial Compliance with the refresher course requirements under Provision 81 Rosas 4.6(b) and 4.7(b).  The Department's posted results for 2020 reflect that it has maintained Substantial Compliance.  These results are subject to verification by the Monitor's auditors.

19.     Commencing July 1, 2015, the County and the Sheriff will provide:

(a)     Custody-specific, scenario-based, skill development training to new Deputies during their Jail Operations training, and to existing Deputies assigned to Twin Towers Correctional Facility, Inmate Reception Center, Men's Central Jail, the Mental Health Housing Units at Century Regional Detention Facility, and the Jail Mental Evaluation Teams ("JMET") at North County Correctional Facility as follows:

(i)     32 hours of Crisis Intervention and Conflict Resolution as described in paragraphs 4.6 and 4.9 of the Implementation Plan in *Rosas* to be completed within the time frames established in that case (currently December 31, 2016). Deputies at these facilities will receive an eight-hour refresher course consistent with paragraph 4.6 of the Implementation Plan in *Rosas* every other year until termination of court jurisdiction in that case and then a four-hour refresher course every other year thereafter.

(ii)    Eight hours identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas* to be completed by December 31, 2016. This training requirement may be a part of the 32-hour training described in the previous subsection. Deputies at these facilities will receive a four-hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

(b)     Commencing July 1, 2015, the County and the Sheriff will ensure that new Custody Assistants receive eight hours of training in the Custody Assistant academy, and that all existing Custody Assistants receive eight hours of training related to identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas*. This training will be completed by December 31, 2016. Custody Assistants will receive a four-hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

**STATUS (19):**     **SUBSTANTIAL COMPLIANCE (as of April 1, 2018, (verified) at NCCF, MCJ, and IRC)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2018, (verified) at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of December 1, 2018 (verified) at CRDF, PDC East, and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of March 1, 2019 (verified) at PDC South)**

The Department was not subject to monitoring during the Twelfth Reporting Period for the training of existing and new Deputy Sheriffs and Custody Assistants required by Paragraph 19.

The Department is still subject to monitoring in future periods for Substantial Compliance with the refresher course requirements under Provision 81 Rosas 4.6(b) and 4.7(b). The Department's posted results for 2020 reflect that it has maintained Substantial Compliance. These results are subject to verification by the Monitor's auditors.

20.     Commencing no later than July 1, 2017, the County and the Sheriff will provide:

(a)     Custody-specific, scenario-based, skill development training to existing Deputies assigned to North County Correctional Facility, Pitchess Detention Center, and the non-Mental Health Housing Units in Century Regional Detention Facility as follows:

(i)     32 hours of Crisis Intervention and Conflict Resolution as described in paragraphs 4.6 and 4.9 of the Implementation Plan in *Rosas* to be completed by December 31, 2019. Deputies at these facilities will receive an eight-hour refresher course consistent with paragraph 4.6 of the Implementation Plan in *Rosas* every other year until termination of court jurisdiction in that case and then a four-hour refresher course every other year thereafter.

(ii)    Eight hours identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas* to be completed by December 31, 2019. This training requirement may be a part of the 32-hour training described in the previous subsection. Deputies at these facilities will receive a four-hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

**STATUS (20):**  **SUBSTANTIAL COMPLIANCE (as of August 1, 2017 (verified) at CRDF, PDC East, PDC North, and NCCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017 (verified) at PDC South)**

The Department was not subject to monitoring for the initial training for existing Deputies as required by Paragraph 20 during the Twelfth Reporting Period.

The Department is still subject to monitoring in future periods for Substantial Compliance with the refresher course requirements.  The Department reports that it will submit refresher assessments on an annual basis, and specifically plans to do so in the next Reporting Period.  These requirements are monitored under Provision 81 Rosas 4.6(b) and 4.7(b), for which the Department posted its annual assessment for 2020.  The Department's posted results for 2020 reflect that it has maintained Substantial Compliance.  These results are subject to verification by the Monitor's auditors.

21.     Consistent with existing Sheriff's Department policies regarding training requirements for sworn personnel, the County and the Sheriff will ensure that existing custody staff that have contact with prisoners maintain active certification in cardiopulmonary resuscitation and first aid.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of October 1, 2015, through September 30, 2016 (verified) at PDC East and South)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at NCCF, PDC North, and IRC)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 (verified) at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at MCJ)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2018, through June 30, 2019 (verified) at CRDF)**

The Compliance Measures provide that the Department will demonstrate Substantial Compliance when 95% of the designated custody staff have the required CPR and first aid certifications for twelve consecutive months.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 21 in the Twelfth Reporting Period.

22.     Within six months of the Effective Date and at least annually thereafter, the County and the Sheriff will provide instructional material to all Sheriff station personnel, Sheriff court personnel, custody booking personnel, and outside law enforcement agencies on the use of arresting and booking documents, including the Arrestee Medical Screening Form, to ensure the sharing of known relevant and available information on prisoners' mental health status and suicide risk.  Such instructional material will be in addition to the training provided to all custody booking personnel regarding intake.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017)**

The Justice Data Interface Controller ("JDIC") message the Department has been using since June 29, 2016, is sufficient to establish Substantial Compliance with Paragraph 22, and the County maintained Substantial Compliance for twelve consecutive months through June 30, 2017.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 22 in the Twelfth Reporting Period.

23.     Within three months of the Effective Date, the County and the Sheriff will commence a systematic review of all prisoner housing, beginning with the Mental Health Unit of the Correctional Treatment Center, all High Observation Housing areas, all Moderate Observation Housing areas, single-person discipline, and areas in which safety precautions are implemented, to reduce the risk of self-harm and to identify and address suicide hazards.  The County and the Sheriff will utilize a nationally-recognized audit tool for the review.  From this tool, the County and the Sheriff will:

(a)     develop short and long term plans to reasonably mitigate suicide hazards identified by this review; and

(b)     prioritize planning and mitigation in areas where suicide precautions are implemented and seek reasonable mitigation efforts in those areas.

**STATUS:     SUBSTANTIAL COMPLIANCE**

The Monitor has verified, with the advice of the Subject Matter Expert, that the Department's Suicide Hazard Inspection Check List tool is a nationally recognized audit tool for this review.  The Department provided the Monitor with completed checklists documenting inspections of all housing units by January 14, 2016.

The Department submitted updated Suicide Hazard Mitigation plans to the Monitor on January 18, 2018 and July 12, 2018.  After consultations with the Mental Health Subject Matter Expert, the Monitor concluded that the plans satisfied the requirements of Paragraph 23 and that the Department had achieved and maintained Substantial Compliance with the provision.  Accordingly, pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 23 in the Twelfth Reporting Period.

24.     The County and the Sheriff will review and inspect housing areas on at least an annual basis to identify suicide hazards.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018)**

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 24 in the Twelfth Reporting Period.  As the Monitor has noted, however, implementation and tracking of corrective actions must be addressed by the Custody Compliance and Sustainability Bureau ("CCSB") under Paragraph 77(c), which requires CCSB to "ensur[e] that corrective actions are taken to mitigate suicide risk. . .obtaining where appropriate, technical assistance. . .when such assistance is needed to address suicide-risk issues."

25.     The County and the Sheriff will ensure that any prisoner in a Sheriff's Department station jail who verbalizes or who exhibits a clear and obvious indication of current suicidal intent will be transported to IRC, CRDF, or a medical facility as soon as practicable.  Pending transport, such prisoners will be under unobstructed visual observation, or in a suicide resistant location with safety checks every 15 minutes.

**STATUS:     PARTIAL COMPLIANCE**

A provision of the Station Jail Manual adopted in March 2018 requires that any arrestee who "displays obvious suicidal ideation or exhibits unusual behavior that clearly manifest[s] self-injurious behavior or other clear indication of mental health crisis shall be transported to the Inmate Reception Center (IRC), Century Regional Detention Facility (CRDF), or a medical facility as soon as practicable.  Pending transport, such inmates. . .shall be under unobstructed visual observation or in a suicidal restraint location with safety checks every 15 minutes."

The Compliance Measures require the Department to randomly select and analyze Arrestee Medical Screening Forms from station jails identifying prisoners who verbalize or exhibit a clear and obvious indication of current suicidal intent to determine compliance with Paragraph 25 of the Agreement.

The County's Augmented Twelfth Self-Assessment reports that 76% of the records reviewed for the Fourth Quarter of 2020, and 66% of the records reviewed for the First Quarter of 2021 reflect the information required by Paragraph 25, which are below the 95% threshold for Substantial Compliance.  The DOJ has noted that compliance with these requirements varies significantly between station jails, certain of which have repeatedly failed to demonstrate compliance with Paragraph 25.  The Monitor agrees.  Given the variation in results between station jails, the County should prioritize improving compliance in those station jails that have repeatedly struggled with this provision, including CRDF Booking, East Los Angeles, Lancaster, Malibu, and Lomita.

26.     Consistent with existing Sheriff's Department policies, the County and the Sheriff will follow established screening procedures to identify prisoners with emergent or urgent mental health needs based upon information contained in the Arrestee Medical Screening Form (SH-R-422) or its equivalent and the Medical/Mental Health Screening Questionnaire and to expedite such prisoners for mental health evaluation upon arrival at the Jail Reception Centers and prior to routine screening.  Prisoners who are identified as having emergent or urgent mental health needs, including the need for emergent psychotropic medication, will be evaluated by a QMHP as soon as possible but no later than four hours from the time of identification.

**STATUS:     PARTIAL COMPLIANCE**

The Compliance Measures require the Department to "review Arrestee Medical Screening Forms (SH-R-422) (or its equivalent) and the Medical/Mental Health Screening Questionnaires of 100 randomly selected prisoners during one randomly selected week per quarter at CRDF and at IRC."  Substantial Compliance requires that (1) 95% of the forms "include the required mental health information" and (2) 90% of the prisoners having urgent or emergent needs were "seen by a QMHP within four hours."

The County's Twelfth Self-Assessment reports that for the one randomly selected week in the Fourth Quarter of 2020, 82% of the screening forms reviewed had the required mental health information, and 91% of the prisoners with urgent or emergent mental health needs were seen by a QMHP within four hours.  The County's Twelfth Self-Assessment also reports that for the one randomly selected week in the First Quarter of 2021, 82% of the screening forms reviewed had the required mental health information, and 93% of the prisoners with urgent or emergent mental health needs were seen by a QMHP within four hours.

In July 2021, Drs. Johnson, Vess, and Eargle conducted a qualitative review of the County's compliance with Provision 26.  They assessed the completeness of intake documentation and sought to "determine whether patients with emergent or urgent needs were missed at intake" by examining the intake records and other associated documents. They found that in 100% of cases, the intake documentation was complete and available. They also found that in 65% of the cases sampled it was "highly likely that the condition leading to subsequent HOH or FIP placement was present at the time of the intake screening."  In 20% of cases, "an urgent or emergent condition was likely present at the time of the intake screening that should have been detected during a standard intake process" but it was not detected.  These results were generally consistent with prior qualitative findings.

27.     Consistent with existing Sheriff's Department policies, the County and the Sheriff will ensure that all prisoners are individually and privately screened by Qualified Medical Staff or trained custody personnel as soon as possible upon arrival to the Jails, but no later than 12 hours, barring an extraordinary circumstance, to identify a prisoner's need for mental health care and risk for suicide or self-injurious behavior. The County and the Sheriff will ensure that the Medical/Mental Health Screening Questionnaire, the Arrestee Medical Screening Form (SH-R-422), or its equivalent, and/or the Confidential Medical Mental Health Transfer Form are in the prisoner's electronic medical record or otherwise available at the time the prisoner is initially assessed by a QMHP.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of October 1, 2019, through March 31, 2020, and October 1, 2020 through March 31, 2021 (verified))[31]**

The Compliance Measures require the Department to review the records of "randomly selected prisoners who were processed for intake during one randomly selected week at CRDF and at IRC" to determine compliance with this provision. Substantial Compliance requires that 90% of the records reviewed reflected that the prisoners were screened for mental health needs within 12 hours and that the required documentation was available to the QMHP for 90% of the mental health assessments conducted by the QMHP.

In the Eleventh Monitoring Period, the County reported that it met the quantitative goals for achieving Substantial Compliance set forth in the Agreement and related Compliance Measure. Dr. James Vess, a mental health clinician retained by the Monitor, also performed a qualitative assessment of the County's compliance with Provision 27.[32] Dr. Vess sought to determine

> "whether patients with routine needs were missed at intake by examining the intake records of those initially sent to General Population without being seen by a QMHP and then transferred to MOH, HOH, or FIP 5-14 days after admission." The results of that assessment were that in 5 of 24 relevant cases, the documentation reflected that the inmate's serious mental health condition was likely present at intake, and that the condition should have been detected during the intake process—but wasn't. Thus, 19 of 24 cases, or 79% of the cases were compliant, which was a decrease from the prior qualitative review conducted in March 2020.

In discussing that finding, the Eleventh Report noted that

---

[31] As set forth in the Monitor's Eleventh Report, compliance was suspended with Provision 27 for the period between April 1, 2020, and September 30, 2020.

[32] Under Provision 109 of the Agreement, "the Monitor, the SMEs, and their staff will be responsible for independently verifying representations from the County or the Sheriff regarding progress towards compliance, and examining supporting documentation." One of the approaches taken by the Monitor to independently verifying the County's compliance since the earliest monitoring reports has been to assess both the County's numerical compliance with the Compliance Measures and to perform qualitative assessments.

to be relieved of its obligations under Paragraph 27, the County must achieve Substantial Compliance in four consecutive quarters. In order to determine whether the decrease in the compliance percentage from the recent qualitative assessment is an isolated data anomaly, or signals a more sustained problem, the Monitor has determined that compliance will be suspended for Paragraph 27 for the Eleventh Reporting Period. If the County achieves Substantial Compliance in both quantitative and qualitative reviews during the Twelfth Reporting Period, it will have achieved and maintained Substantial Compliance with this provision for four quarters and will no longer be subject to monitoring in future reporting periods.

In the Twelfth Monitoring Period, the Monitor again tested the County's compliance with Provision 27 by examining its reported results and relying upon a qualitative assessment conducted by Dr. Vess. The County's Twelfth Self-Assessment reports that in the Fourth Quarter of 2020, 100% of the inmates were screened timely and the required documents were available for 100% of the assessments. The County's Twelfth Self-Assessment also reports that in the First Quarter of 2021, 100% of the inmates were assessed timely and the required documents were available for 98% of the assessments. These are all above the thresholds set in the applicable Compliance Measures. These results have been verified by the Monitor's auditors.

In July 2021, Dr. Vess conducted a follow up qualitative assessment of Provision 27. He assessed 22 qualifying cases and found that in 95%, "the intake documentation was complete and available." In 76% of cases, "the condition leading to a subsequent mental health referral was highly likely to have been present at the time of intake." Most significantly, in 85% of the cases, the mental health condition was appropriately detected. This is close to the findings of previous qualitative assessments conducted of this provision before the Eleventh Monitoring Period.

The Monitor finds that the County has now maintained Substantial Compliance with Provision 27 for twelve months and is no longer subject to monitoring for this provision.

28.     The County and the Sheriff will ensure that any prisoner who has been identified during the intake process as having emergent or urgent mental health needs as described in Paragraph 26 of this Agreement will be expedited through the booking process.  While the prisoner awaits evaluation, the County and the Sheriff will maintain unobstructed visual observation of the prisoner when necessary to protect his or her safety, and will conduct 15-minute safety checks if the prisoner is in a cell.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at IRC)**

**PARTIAL COMPLIANCE (at CRDF)**

The Compliance Measures require the Department to review the records of randomly selected prisoners at CRDF and IRC who have urgent or emergent mental health needs to determine whether they were expedited through the booking process and under visual observation or checked every 15 minutes.

The County's Twelfth Self-Assessment reflects that in the Fourth Quarter of 2020, 60% of the inmates with urgent or emergent mental health needs were expedited through the booking process at CRDF in the randomly selected week, as required by the applicable Compliance Measures, and 60% of the inmates were observed or checked as is required.  The County's Augmented Twelfth Self-Assessment reports that in the First Quarter of 2021, 50% of the inmates with urgent or emergent mental health needs were expedited through the booking process at CRDF in the randomly selected week, and 60% of the inmates were observed or checked, as is required.

The County previously maintained Substantial Compliance with Paragraph 28 at IRC for twelve consecutive months, and IRC was not subject to monitoring for Substantial Compliance with Paragraph 28 in the Twelfth Reporting Period.

29.     The County and the Sheriff will ensure that a QMHP conducts a mental health assessment of prisoners who have non-emergent mental health needs within 24 hours (or within 72 hours on weekends and legal holidays) of a registered nurse conducting an intake nursing assessment at IRC or CRDF.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified))**

The Compliance Measures require the Department to review randomly selected records of the prisoners identified in the intake nursing assessment as having non-emergent mental health needs to determine if the Department completed mental health assessments for 85% of the prisoners within the required time periods.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 29 in the Twelfth Reporting Period.

30.     Consistent with existing DMH policies, the initial mental health assessment will include a brief initial treatment plan.  The initial treatment plan will address housing recommendations and preliminary discharge information.  During the initial assessment, a referral will be made for a more comprehensive mental health assessment if clinically indicated.  The initial assessment will identify any immediate issues and determine whether a more comprehensive mental health evaluation is indicated.  The Monitor and SMEs will monitor whether the housing recommendations in the initial treatment plan have been followed.

STATUS:     **SUBSTANTIAL COMPLIANCE (as of January 1, 2019, through December 31, 2019 (verified))**

The Compliance Measures require the Department to review randomly selected initial mental health assessments and report on (1) the percentage of assessments that have (i) included an initial treatment plan that addresses housing recommendations and preliminary discharge information and (ii) identified any immediate issues and whether a more comprehensive evaluation was indicated; and (2) whether the housing recommendations were followed.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 30 in the Twelfth Reporting Period.

31.     Consistent with existing DMH and Sheriff's Department policies, the County and the Sheriff will maintain electronic mental health alerts in prisoners' electronic medical records that notify medical and mental health staff of a prisoner's risk for suicide or self-injurious behavior.  The alerts will be for the following risk factors:

(a)     current suicide risk;

(b)     hoarding medications; and

(c)     prior suicide attempts.[33]

**STATUS:        PARTIAL COMPLIANCE**

The Compliance Measures require the Department to review randomly selected electronic medical records for prisoners in certain at-risk groups to determine if the required mental health alerts are in 85% of the records reviewed, which is the threshold for Substantial Compliance, for prisoners who report suicidal thoughts (at suicide risk) during the intake process; were removed from risk precautions in the prior quarter; or were identified as hoarding medicine.

The County's Twelfth Self-Assessment reports the following results for the Fourth Quarter of 2020: at CRDF, 96% of the records for current suicide risk, 50% for removal from risk precaution (in the prior quarter),[34] and 74% for hoarding had the required mental health alerts.  At TTCF, 92% of the records for current suicide risk, and 88% for hoarding had the required alerts.  The County reports that there were no patients removed from risk precautions at TTCF during the relevant period.[35]

The County also reported results for 31-1(c) at MCJ, PDC North, and NCCF. 60% of the records reviewed at MCJ, 83% of the records reviewed at PDC North, and 100% of the records reviewed at NCCF reflected the required alert.

The County's Augmented Twelfth Self-Assessment reports that for the First Quarter of 2021, at CRDF, 88% and 100% of the records reviewed contained the mental health alerts required by 31-1(a) and 31-1(b), and 57% of the records reviewed contained the mental health alerts required by 31-1(c).  At TTCF, 84% and 67% of the records

---

[33] On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provision 31.  Because it was filed after the Twelfth Reporting Period, Provision 31 has been analyzed in this Report under the language that was operative during the Twelfth Reporting Period.

[34] The County reports that there were only two patients removed from risk precautions during the relevant period, and that the patient whose electronic medical record did not contain the appropriate alert, "did in fact receive appropriate care" as reflected in other Department records.

[35] The Monitor understands that the County substantially revised its process for use of risk precautions in the years after the Agreement was executed.  Given those changes, Subject Matter Expert Dr. Johnson has concerns that sampling the population of patients removed from risk precautions, as required by Compliance Measure 31-1(b), may no longer be appropriate to measure compliance with Provision 31.  Dr. Johnson is engaged in discussions with CHS leadership to explore developing an alternative approach to sampling the patient population in light of CHS' changed practices on this issue.

reviewed contained the mental health alerts required by 31-1(a) and 31-1(b), respectively. For 31-1(c), 80% of the records reviewed contained the required mental health alerts.

Regarding 31-3(c) at MCJ and PDC North, the compliance percentages were 92% and 50%, respectively. At NCCF, for 31-3(c), there was only a single relevant record, and it did not contain the required alert.

As in the past, the County did not report any results for current suicide risk or removal from risk precautions for the inmates at MCJ, NCCF, or PDC North because Compliance Measures 31-1(a) and 31-1(b) refer to the intake and HOH populations respectively.[36]

---

[36] The County also reported that "inmates at [MCJ, NCCF and PDC North] are not on risk precaution, nor can they be removed from risk precaution. Instead, all decisions about risk precaution including their discontinuation are made at TTCF. . .. Similarly, CHS reports these facilities do not house inmates who are a current suicide risk."

32.      Information regarding a serious suicide attempt will be entered in the prisoner's electronic medical record in a timely manner.

**STATUS:**      **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified))**

The Compliance Measures require that 95% of the electronic medical records of prisoners who had a serious suicide attempt reflect information regarding the attempt, and 85% of the records reflect that the information was entered into the record within one day of the attempt.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 32 in the Twelfth Reporting Period.

33.     The County will require mental health supervisors in the Jails to review electronic medical records on a quarterly basis to assess their accuracy as follows:

(a)     Supervisors will randomly select two prisoners from each clinician's caseload in the prior quarter;

(b)     Supervisors will compare records for those prisoners to corroborate clinician attendance, units of service, and any unusual trends, including appropriate time spent with prisoners, recording more units of service than hours worked, and to determine whether contacts with those prisoners are inconsistent with their clinical needs;

(c)     Where supervisors identify discrepancies through these reviews, they will conduct a more thorough review using a DMH-developed standardized tool and will consider detailed information contained in the electronic medical record and progress notes; and

(d)     Serious concerns remaining after the secondary review will be elevated for administrative action in consultation with DMH's centralized Human Resources.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017 (verified))**

The Compliance Measures require the County to provide the Monitor and the Subject Matter Experts with the DMH-developed standardized tool required by Paragraph 33(c), and to report the results of its analysis of the electronic medical records of two randomly selected prisoners from each clinician's caseload.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 33 in the Twelfth Reporting Period.

45

34 **(Revised).**   Consistent with existing Correctional Health Services policy, the County and the Sheriff will conduct clinically appropriate release planning for all prisoners who are being released to the community and who have been identified by a QMHP as having a mental illness and needing mental health treatment, or as having a DSM-5 major neuro-cognitive disorder that caused them to be housed in the Correctional Treatment Center at any time during their current incarceration.  For prisoners with mental illness and needing mental health treatment, the release planning services will be guided by the prisoner's level of care.  Specifically, prisoners who at any time during their incarceration meet mental health level of P3 or P4 will be presumptively referred for release planning services, and prisoners who meet mental health level of care P2 will receive release planning services upon referral by a clinician or upon their request.  Prisoners who have a DSM-5 major neuro-cognitive disorder that caused them to be housed in the Correctional Treatment Center will also be referred for release planning services consistent with the Correctional Health Services policy applying to prisoners with mental illness.

(a) Release planning will consider the need of the prisoner for housing; transportation to the prisoner's community-based provider, residence, or shelter within the County; bridge psychotropic medications; medical/mental health/substance abuse services; income/benefits establishment; and family/community/social supports ("Release Planning Areas").

(b) Release planning will be based on an individualized assessment of the prisoner's needs and, unless the prisoner is unable or unwilling to participate, will be undertaken in collaboration with the prisoner.  For prisoners referred for release planning services, those services will include:

(i) An Initial Release Plan that will be created at intake or no later than ten days after the referral for release planning, which referral shall normally occur at the time of intake.  The Initial Release Plan will include preliminary identification of needs in each of the Release Planning Areas and preliminary recommendations for services to address those needs, and a referral for assistance in obtaining California identification when needed and when the prisoner is eligible; and/or

(ii) A Comprehensive Release Plan that will be initiated no later than thirty days after the referral for release planning.  The Comprehensive Release Plan will include (A) collecting information regarding the prisoner's needs; (B) coordinating with community-based providers to identify available services that meet the prisoner's needs; (C) facilitating the transition of care to community-based providers, and (D) assisting in obtaining identification and/or benefits when needed, when the prisoner is eligible, and as offered by the Sheriff's Community Transition Unit.

(c) The County will maintain a re-entry resource center with staff supervised by a QMHP.  The re-entry resource center will:

(i) Provide information appropriate to the released prisoner about available housing, transportation, medical/mental health/substance abuse services, income/benefits establishment, community/social supports, and other community resources; and

(ii) Provide released prisoners with copies of their release plans, as available.

(d) All prisoners who are receiving and continue to require psychotropic medications will be offered a clinically appropriate supply of those medications upon their release from incarceration.  Unless contraindicated, this will be presumed to be a 14-day supply or a supply with a prescription sufficient so that the prisoner has the psychotropic medication available during the period of time reasonably necessary to permit the prisoner to consult with a doctor and obtain a new supply.

(e) Nothing in Paragraph 34 will require prisoners to accept or participate in any of the services provided under this Paragraph.

(f) Neither the County nor the Sheriff shall be in violation of this paragraph if after reasonable efforts as set forth in Correctional Health Services Policy M380.01, Release Planners are unable to identify available post-release services.

**STATUS (34):**          **PARTIAL COMPLIANCE**

During the Seventh Reporting Period, the parties and the Intervenors reached an agreement on the provisions of revised Paragraph 34 ("Revised Paragraph 34") set forth above.  They also agreed on revised Compliance Measures and a revised policy to implement Revised Paragraph 34.  On December 10, 2018, the Court issued an order pursuant to the parties' joint stipulation revising Paragraph 34.

The County's Twelfth Self-Assessment reports that, as required by Compliance Measure 34-10, the Department's Compliance Team made six visits in the Fourth Quarter of 2020 to CRRC to confirm the presence of staff representing the Health Agency, Probation, and Sheriff's Departments.  The County concluded that it achieved 100% compliance with all departments being present at each visit.  The County's posted results reflect that in the First Quarter of 2021, the Department's Compliance team made six such visits, and that the County achieved 100% compliance for the Health Services and Sheriff's Departments, which were present at all such visits.  However, the Probation Department was present at none of the visits.[37]

Compliance Measures 34-1 and 2 require the County to review on a quarterly basis "randomly selected records of 85 prisoners released in a randomly selected week" who had been identified as having a need for mental health care to determine if the requirements of the County's Release Planning Policy were satisfied and state for each prisoner who did not receive a Comprehensive Release Plan why a plan was not completed, whether repeated efforts were made to offer the prisoner comprehensive release planning, and whether an Initial Release Plan was completed.  Compliance Measure 34-13(c) sets forth the relevant thresholds for Compliance Measure 34-1.

The County's Augmented Self-Assessment for the Fourth Quarter of 2020 reports that regarding Compliance Measure 13(c)(1), 88% of inmates received a referral for release planning, rather than the required 85%.  The County's posted results for the First Quarter of 2021 reflect that 91% of inmates received the required referral.  Regarding Compliance Measure 34-13(c)(2), which concerns inmates who only had Initial Release Plans, the County's Twelfth Self-Assessment reports that "42% of inmates receiv[ed] the required services and documentation, rather than the required 85%" during the Fourth Quarter of 2020.  The County's posted results for the First Quarter of 2021 reflect 71% compliance.

With respect to Compliance Measure 34-13(c)(3), which requires certain services and documentation relating to inmates who received a Comprehensive Release Plan, the County's Twelfth Self-Assessment reflects "40% of inmates receiving the required services and documentation, rather than the required 85%" during the Fourth Quarter of 2020.  The County's posted results for the First Quarter of 2021 reflect 16% compliance.

---

[37] The County reports that due to a surge in COVID-19 cases during the Reporting Period, Probation Department staff "remained available during the relevant hours, however, were not physically present at the Community Reentry and Resource Center (CRRC).  There was clearly posted signage indicating how inmates can reach out to the Probation Department until regular staff return."

For Compliance Measure 34-13(c)(4), which requires certain services and documentation relating to inmates requiring psychotropic medications, the County's Twelfth Self-Assessment reflects 91% compliance during the Fourth Quarter of 2020. The County's posted results for the First Quarter of 2021 reflect 96% compliance.

Compliance Measure 34-12 requires the County to "review randomly selected records of 50 prisoners released in a randomly selected week who had been identified by a QMHP as meeting a mental health level of care P2" and evaluate "whether the QMHP considered the factors in the Release Planning Policy when determining whether to refer the prisoner." The County's posted results reported that 90% of the mental health records included the required criteria during the relevant assessment weeks.

In the Eleventh Report, the Monitor noted that the County had adopted several methodological changes associated with its reporting on Provision 34. The Monitor and the auditors have continued to evaluate the appropriateness of these changes. Specifically, the Monitor and the auditors have discussed the language in Compliance Measure 34-13(c) and the implications of different methods for calculating compliance. On July 7, 2021, the Monitor met with the auditors and representatives of the CHS Compliance Team. In that meeting, the County provided clarification that the 80% threshold is only applied to Compliance Measures 34-13(c)(2) and 34-13(c)(3). This resolves the auditors' concerns expressed in the Eleventh Report regarding the appropriateness of using the 80% threshold when calculating compliance with Measure 34-13(c)(1).

The methodology the County has employed in applying the 80% threshold based on its interpretation of the language of the Compliance Measures for 34-13(c)(2) and 34-13(c)(3) is still under consideration. The Monitor plans to further discuss this issue with the County, DOJ, Intervenors, and auditors to resolve this issue by the end of the next Reporting Period.

Given the complication inherent in building the release planning program, and the progress demonstrated by the County to date, the Monitor believes that the County has demonstrated sufficient progress to keep its rating of Partial Compliance with Provision 34 for the Twelfth Reporting Period. However, the County must demonstrate improved results under Compliance Measures 34-13(c)(2) and 34-13(c)(3) or Provision 34 may be rated as Non-Compliant in future reporting periods.

35.     Consistent with existing DMH and Sheriff's Department policies, the County and the Sheriff will ensure that custody staff, before the end of shift, refer prisoners in general or special populations who are demonstrating a potential need for routine mental health care to a QMHP or a Jail Mental Evaluation Team ("JMET") member for evaluation, and document such referrals.  Custody staff will utilize the Behavior Observation and Referral Form.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of November 1, 2017, through December 31, 2018 (verified))**

The Compliance Measures require the Department to review, for a randomly selected month each quarter, the Behavior Observation and Mental Health Referral ("BOMHR") records for prisoners referred by custody staff to a QMHP or JMET member for "routine" mental health care to determine the timeliness of the referrals, and that 85% of the referrals "occurred before the end of the shift in which the potential need for mental health care is identified."

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 35 in the Twelfth Reporting Period.

36.     Consistent with existing DMH policies, the County and the Sheriff will ensure that a QMHP performs a mental health assessment after any adverse triggering event, such as a suicide attempt, suicide threat, self-injurious behavior, or any clear decompensation of mental health status.  For those prisoners who repeatedly engage in such self-injurious behavior, the County will perform such a mental health assessment only when clinically indicated, and will, when clinically indicated, develop an individualized treatment plan to reduce, and minimize reinforcement of, such behavior.  The County and the Sheriff will maintain an on-call system to ensure that mental health assessments are conducted within four hours following the notification of the adverse triggering event or upon notification that the prisoner has returned from a medical assessment related to the adverse triggering event.  The prisoner will remain under unobstructed visual observation by custody staff until a QMHP has completed his or her evaluation.

**STATUS:     PARTIAL COMPLIANCE**

The Compliance Measures require the Department to develop a staffing schedule to provide on-call services, and the County's Twelfth Self-Assessment reported that it has complied with this requirement.  The Compliance Measures also require the Department to review randomly selected records of prisoners newly admitted to mental health housing from a lower level of care due to an adverse triggering event during two randomly selected weeks per quarter.  The County's Twelfth Self-Assessment reports that during the Fourth Quarter of 2020, (a) "81% -- rather than the required 95% -- of inmates" identified in the two randomly selected weeks received an assessment by a QMHP within four hours, as required by Compliance Measure 36-4(a).  The County further reports that (b) 100% of the selected prisoners at TTCF and 100% at CRDF were seen on videos "under unobstructed visual observation pending assessment," as required by Compliance Measure 36-4(b).

The County further reports that

during the period, CHS's Director of Mental Health briefed staff on system-wide expectations for routine and mental health treatment visits and crisis calls, making clear to staff that crisis calls require face to face evaluations, regardless of whether patients were quarantined because of Covid or not. During the period, the County also continued its effort to improve the quality of crisis responses through the use of a new template and related trainings conducted on multiple days in the Fourth Quarter. Clinical staff were also sent a directive making the use of the new template mandatory for all on-call responses. CHS's compliance team is also working to review and evaluate the use of the new template to construct a baseline for monitoring going forward, as relevant to both Provisions 36 and 40. Following on these efforts, CHS is also in the process of developing a Complex Case Committee template for use for inmates who engage in repeated self-harm. The use of this template began in March 2021, and the County anticipates improved care and results going forward.

The County's Augmented Twelfth Self-Assessment reports that for the First Quarter of 2021, the Department complied with the staffing schedule requirement. The County further reports that during the First Quarter of 2021 "81% -- rather than the required 95% -- of inmates" identified in the two randomly selected weeks received an assessment by a QMHP within four hours, as required by Compliance Measure 36-4(a). The County further reports that 100% of the selected prisoners at TTCF and 100% at CRDF were "under unobstructed visual observation pending assessment," as is required by Compliance Measure 36-4(b).

In May 2021, mental health clinicians, Drs. Vess and Eargle, conducted a qualitative assessment of the County's compliance with Paragraph 36. In it, they sought to assess, among other things, "the County's methodology, specifically whether it sufficiently detects adverse triggering events and repeated self-harm" in order to assure prompt assessment by a QMHP and a plan for those who engage in repeated self-harm. For inmates who had a single adverse triggering event, they sought to determine "whether the assessment sufficiently addressed the adverse triggering event, including discussing relevant risk factors, and whether there was a crisis response, or a safety plan put in place or was already in place."

The clinicians noted that "response times are generally within required timeframes, returning to levels observed approximately a year ago. Adequate risk assessments are being done less than half of the time, although this is an improvement from the prior review. A corresponding plan to address those risks continues to be present in less than half of cases." Specifically, of 38 qualifying cases with a single adverse triggering event (six were indeterminate), 89% were seen within four hours by a QMHP. In 44% of cases with a single adverse triggering event, a QMHP adequately evaluated the apparent risk factors. This represents a slight improvement over the 27% found during the November 2020 qualitative review. In 42% of the cases (four were indeterminate) there was a safety plan or adequate crisis response undertaken to address the risk factors, which also represents an improvement from the prior qualitative review.

Concerningly, however, in cases of repeated self-harm, there were treatment plans to address the behavior in just 14% of cases (3 of 21). Even when treatment plans were created, they were generally "cursory and overly standardized rather than based on an individualized assessment and clinical case formulation." Given the increased risks of suicide among inmates who have engaged in repeated acts of self-harm, as well as the increased number of suicides in the Department's jails in the First Quarter of 2021, the County should prioritize treatment planning for these inmates in the future. If these results do not improve, the County may be rated as Non-Compliant with Provision 36 in the next Reporting Period.

37.     Sheriff's Court Services Division staff will complete a Behavioral
Observation and Mental Health Referral ("BOMHR") Form and forward it to the Jail's
mental health and/or medical staff when the Court Services Division staff obtains
information that indicates a prisoner has displayed obvious suicidal ideation or when the
prisoner exhibits unusual behavior that clearly manifests self-injurious behavior, or other
clear indication of mental health crisis.  Pending transport, such prisoner will be under
unobstructed visual observation or subject to 15-minute safety checks.

STATUS:     **PARTIAL COMPLIANCE**

The Compliance Measures require the Department to randomly select six courts
from among the three Court Divisions each quarter, review written communications and
orders that refer to a suicide risk or serious mental health crisis for a prisoner and incident
reports for self-injurious behavior by prisoners appearing in the selected courts, and
determine if these incidents are reflected in BOMHR forms completed by the Court
Services Division staff in the selected courts.

The County's Twelfth Self-Assessment reported that 70% of the incidents
involving problematic behavior identified by the judges and court clerks in seven
randomly selected courts were reflected on BOHMRs in the Fourth Quarter of 2020.
This falls below the 90% threshold for achieving Substantial Compliance reflected in
Compliance Measure 37-4(a).  The County's Augmented Twelfth Self-Assessment
reports that for the First Quarter of 2021, 71% of the relevant incidents were reflected on
BOHMRs, which falls below the relevant threshold.

38.     Consistent with existing DMH policies and National Commission on Correctional Health Care standards for jails, the County and the Sheriff will ensure that mental health staff or JMET teams make weekly cell-by-cell rounds in restricted non-mental health housing modules (e.g., administrative segregation, disciplinary segregation) at the Jails to identify prisoners with mental illness who may have been missed during screening or who have decompensated while in the Jails.  In conducting the rounds, either the clinician, the JMET Deputy, or the prisoner may request an out-of-cell interview. This request will be granted unless there is a clear and documented security concern that would prohibit such an interview or the prisoner has a documented history of repeated, unjustified requests for such out-of-cell interviews.

> **STATUS:**      **SUBSTANTIAL COMPLIANCE (as of January 1, 2016,
> through December 31, 2016 (verified))**

The Compliance Measures require the Department to review the documentation of the weekly cell-by-cell rounds and the JMET Logs for a randomly selected week each quarter to confirm that the required cell-by-cell checks were conducted and out-of-cell interviews were handled in accordance with this provision.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 38 in the Twelfth Reporting Period.

39.     The County and the Sheriff will continue to use a confidential self-referral system by which all prisoners can request mental health care without revealing the substance of their requests to custody staff or other prisoners.

STATUS     **SUBSTANTIAL COMPLIANCE (as of July 1, 2017, through June 30, 2018 (verified) at NCCF)**

**PARTIAL COMPLIANCE (at PDC North, CRDF, TTCF, and MCJ)**

**NOT RATED (at PDC East or PDC South)**

Substantial Compliance requires the Department to (a) verify that housing areas have the required forms and (b) review randomly selected self-referrals for mental health care from prisoners to confirm that (i) the referrals "were forwarded to DMH" by the Department, and (ii) that "DMH documented the timeliness and nature of DMH's response to the self-referrals[.]"  The thresholds for Substantial Compliance are that 85% of the housing areas have the required forms and 90% of the self-referrals must be forwarded by the Department to the Department of Health Services – Custody Health Services (DHS-CHS) and 90% must contain the required documentation of DHS-CHS's response.

The County's Twelfth Self-Assessment reports that it achieved Substantial Compliance with Compliance Measure 39-4(a) in the Fourth Quarter of 2020 and First Quarter of 2021 "at all applicable" facilities.

Regarding Compliance Measures 39-4(b) and 4(c), the County's Twelfth Self-Assessment reports that 100% of the self-referrals from PDC North, CRDF, TTCF, and MCJ, were forwarded by the Department to CHS in the Fourth Quarter of 2020, and that CHS documented the timeliness and nature of its response in 81% of the PDC North referrals, 56% of the CRDF referrals, 48% of the TTCF referrals, and 72% of the MCJ referrals.[38]

The County's Twelfth Self-Assessment also reports that 100% of the self-referrals from PDC North, CRDF, TTCF, and MCJ, were forwarded by the Department to CHS in the First Quarter of 2021, and that CHS documented the timeliness and nature of its response in 85% of the PDC North referrals, 53% of the CRDF referrals, 40% of the TTCF referrals, and 68% of the MCJ referrals.[39]

In July 2021, Drs. Vess and Eargle conducted a qualitative review of the County's compliance with Provision 39.  They reviewed 56 qualifying cases (15 from TTCF, 15

---

[38] According to the County's Twelfth Self-Assessment, "there were no relevant referrals from PDC East, the Department's Fire Camp operation, or PDC South, during the period."

[39] According to the County's Augmented Twelfth Self-Assessment, "there were no relevant referrals from PDC East, the Department's Fire Camp operation, during the period" and "there were no records to assess at PDC South."

from CRDF, 16 from MCJ, and 10 from PDC-North) and found some form of QMHP response in 78%.[40]

Regarding timeliness, in 64% of cases where the time of the response and the relative urgency of the self-referral could be determined, the response was timely (seven cases were indeterminate). In terms of clinical adequacy, 73% of cases reflected a clinically adequate response (five cases were indeterminate). As in the Eleventh Reporting period, the lack of a clinically adequate response was "most often due to the lack of specificity in the clinical notes in relation to the issues identified in the self-referral." Thus, some cases that were assessed as non-compliant could, potentially, be judged compliant with improved record-keeping by responding clinicians.

The County previously reported Substantial Compliance at NCCF for twelve consecutive months from July 1, 2017, through June 30, 2018. These results have been verified by the Monitor's auditors and NCCF is no longer subject to monitoring for compliance with Paragraph 39.

---

[40] A disproportionate number of cases without a QMHP response were at TTCF and MCJ, which suggests that the County should prioritize those facilities in its compliance efforts in the Thirteenth Monitoring Period.

40.     The County and the Sheriff will ensure a QMHP will be available on-site, by transportation of the prisoner, or through tele-psych 24 hours per day, seven days per week (24/7) to provide clinically appropriate mental health crisis intervention services.

**STATUS:       PARTIAL COMPLIANCE**

Substantial Compliance requires the County (1) to provide the Monitor with on-call schedules for two randomly selected weeks reflecting that a QMHP was assigned 24 hours a day, seven days per week, and (2) to randomly select referrals for mental health crisis intervention received by a QMHP per quarter to verify (i) that a QMHP responded to all referrals, and (ii) responses to 90% of the referrals were within four hours.

The County's Twelfth Self-Assessment reports that in the Fourth Quarter of 2020, a QMHP responded to 96% of the referrals for mental health crisis intervention services, which is below the 100% threshold for Substantial Compliance, and 93% of the responses were within four hours, which is above the 90% threshold for Substantial Compliance.

The County's posted self-assessment further reports

During this quarter, the County continued work on improving the qualitative response to crisis calls. CHS developed a crisis intervention template and training for all QMHPs responding to crisis calls. The CHS Compliance and Training team held meetings for clinical supervisors on October 6th and 7th to provide context for the trainings, relay crisis response expectations, and develop strategies for supervising and supporting staff as they begin to incorporate the training content into their practice and use the new template. CHS (CHS Mental Health Training in conjunction with the Compliance program) conducted four crisis response training sessions through video conferences, on September 10th, October 21st, and October 22nd (two sessions on this day). The training session on October 21st was recorded and made available to program managers for any staff who were unable to attend the training sessions. The training content included clinical crisis response expectations, an overview of crisis interventions and resolution plans, and examples of practical skills, such as de-escalation techniques.

The County's Augmented Twelfth Self-Assessment reports that in the First Quarter of 2021, a QMHP responded to 98% of the referrals for mental health crisis intervention services and 97% of the responses were within four hours, which exceeds the 90% threshold.

In May 2021, mental health clinicians, Drs. Vess and Eargle, performed a qualitative review of the County's compliance with Paragraph 40.  They reviewed 60 qualifying cases from IRC, TTCF, CRDF, NCCF, and MCJ.  A QMHP responded to the crisis in 98% of cases and the response was within four hours in 91% (with five unable to be determined due to lack of time stamps).  These responses were deemed to be clinically

appropriate in 42% of cases.  This is an improvement from the 15% found during the prior qualitative review conducted in November 2020.  The clinical notes reviewed were more detailed than during the prior qualitative review, though they still generally require improvement for many clinical staff.



41.     Consistent with existing DMH policies, the County and the Sheriff will implement step-down protocols that provide clinically appropriate transition when prisoners are discharged from FIP after being the subject of suicide watch.  The protocols will provide:

(a)     intermediate steps between highly restrictive suicide measures (e.g., clinical restraints and direct constant observation) and the discontinuation of suicide watch;

(b)     an evaluation by a QMHP before a prisoner is removed from suicide watch;

(c)     every prisoner discharged from FIP following a period of suicide watch will be housed upon release in the least restrictive setting deemed clinically appropriate unless exceptional circumstances affecting the facility exist; and

(d)     all FIP discharges following a period of suicide watch will be seen by a QMHP within 72 hours of FIP release, or sooner if indicated, unless exceptional circumstances affecting the facility exist.

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance requires CHS to review the medical records of all prisoners on suicide watch in FIP for one randomly selected month each quarter, and submit a report regarding the implementation of the step-down protocols and the results of its review of the medical records.  During the Fifth Reporting Period, the parties agreed to revise the Compliance Measures to increase the number of inmates subject to the step-down protocols of Paragraph 41 and ensure that the implementation of step-down protocols for FIP patients on suicide watch "ameliorate the impact of the restrictions" and have the necessary "level of precautions based upon individual assessment[s]" of the patients.

The County's Twelfth Self-Assessment reports that the County met the requirements in Compliance Measure 41-4 for 86% of the prisoners discharged from FIP during the Fourth Quarter of 2020 after having been on suicide watch, which is below the 95% threshold for Substantial Compliance.  The County's Twelfth Self-Assessment also reports that the County met the requirements in Compliance Measure 41-4 for 91% of the prisoners discharged from FIP during the First Quarter of 2021 after having been on suicide watch.  These are both improvements from the prior Monitoring Period, reflecting noteworthy progress by the County.

42.     Consistent with existing DMH policies, the County and the Sheriff will implement step-down protocols to ensure that prisoners admitted to HOH and placed on risk precautions are assessed by a QMHP.  As part of the assessment, the QMHP will determine on an individualized basis whether to implement "step-down" procedures for that prisoner as follows:

(a)     the prisoner will be assessed by a QMHP within three Normal business work days, but not to exceed four days, following discontinuance of risk precautions;

(b)     the prisoner is counseled to ameliorate the negative psychological impact that any restrictions may have had and in ways of dealing with this impact;

(c)     the prisoner will remain in HOH or be transferred to MOH, as determined on a case-by-case basis, until such assessment and counseling is completed, unless exceptional circumstances affecting the facility exist; and

(d)     the prisoner is subsequently placed in a level of care/housing as determined by a QMHP.

**STATUS:     COMPLIANCE SUSPENDED (at TTCF AND CRDF)**

The County's Twelfth Self-Assessment and posted results reflect that there were three relevant patients at CRDF in the Fourth Quarter of 2020, and 100% of the medical records reviewed reflected that the "inmates in HOH and placed on risk precautions were assessed by a QMHP" in the quarter.  "66% -- rather than the required 90% -- of the records reflected that the QMHP determined on an individualized basis whether to implement step-down procedures;" and "0% -- rather than the required 85% -- of the records reflected that step-down procedures were implemented per the QMHP assessment."

Regarding TTCF, the County's Twelfth Self-Assessment and posted results indicate that there were three relevant patients for the Fourth Quarter of 2020.  The County concluded that "100% -- more than the required 95%" of the records reflected that inmates in HOH and placed on risk precautions were assessed by a QMHP in the quarter. "66% -- rather than the required 90% -- of the records reflected that the QMHP determined on an individualized basis whether to implement step-down procedures;" and "33% -- rather than the required 85% -- of the records reflected that step-down procedures were implemented per the QMHP assessment."

For the First Quarter of 2021, the County's Twelfth Self-Assessment and posted results reflect that there were five relevant patients at CRDF.  The County concluded that "100% -- 5% more than the required 95%" of the records reflected that inmates in HOH and placed on risk precautions were assessed by a QMHP in the quarter. "100% -- more than the required 90% -- of the records reflected that the QMHP determined on an

individualized basis whether to implement step-down procedures;" and "100% -- more than the required 85% -- of the records reflected that step-down procedures were implemented per the QMHP assessment."

At TTCF, the County's Augmented Twelfth Self-Assessment and posted results reflect that there was one relevant patient during the First Quarter of 2021.  The County concluded that "100% -- more than the required 95%" reflected that inmates in HOH and placed on risk precautions were assessed by a QMHP in the quarter. "0% -- less than the required 90% -- of the records reflected that the QMHP determined on an individualized basis whether to implement step-down procedures;" and "0% -- less than the required 85% -- of the records reflected that step-down procedures were implemented per the QMHP assessment."

The Monitor understands that CHS substantially restricted its use of Risk Precautions in the years after the Agreement was executed.  This includes dramatically reducing the number of patients placed on Risk Precautions, and relying on other approaches for managing inmates admitted to HOH housing who are not deemed to pose an imminent risk of suicide.[41]  Given those changes, and the increasingly small number of eligible patients sampled for Provision 42 in each reporting period, it is no longer clear to the Monitor what is being measured by the current language of Provision 42.  The Monitor encourages the Parties to meet with Subject Matter Expert Dr. Johnson to determine whether changes need to be made to Provision 42 and its associated Compliance Measures in light of the County's revised policies on Risk Precautions. Compliance with Provision 42 is suspended for the Twelfth Reporting Period pending resolution of this issue.

---

[41] Risk Precautions are defined in the Agreement as "a level of watch, observation, or measures used to identify and safely maintain those prisoners who require heightened observation and daily re-evaluation, and require admission to HOH but are not considered to pose an imminent risk of suicide."  *See* Agreement at 15(ff).

43.     Within six months of the Effective Date, the County and the Sheriff will
develop and implement written policies for formal discipline of prisoners with serious
mental illness incorporating the following:

(a)     Prior to transfer, custody staff will consult with a QMHP to determine
whether assignment of a prisoner in mental health housing to disciplinary
housing is clinically contraindicated and whether placement in a higher
level of mental health housing is clinically indicated, and will thereafter
follow the QMHP's recommendation;

(b)     If a prisoner is receiving psychotropic medication and is placed in
disciplinary housing from an area other than mental health housing, a
QMHP will meet with that prisoner within 24 hours of such placement to
determine whether maintenance of the prisoner in such placement is
clinically contraindicated and whether transfer of the prisoner to mental
health housing is clinically appropriate, and custody staff will thereafter
follow the QMHP's recommendation;

(c)     A QMHP will participate in weekly walks, as specified in paragraph 38, in
disciplinary housing areas to observe prisoners in those areas and to
identify those prisoners with mental health needs; and

(d)     Prior to a prisoner in mental health housing losing behavioral credits for
disciplinary reasons, the disciplinary decision-maker will receive and take
into consideration information from a QMHP regarding the prisoner's
underlying mental illness, the potential effects of the discipline being
considered, and whether transfer of the prisoner to a higher level of mental
health housing is clinically indicated.

**STATUS (43):**          **SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at NCCF and PDC North)**

**NON-COMPLIANCE (at CRDF, MCJ, and TTCF)**

More than six years into its compliance with this Agreement, the Department has not adopted the policies on formal discipline of inmates with serious mental illness that are specifically required by Provision 43, despite repeated exhortations from the Monitor to do so. By way of history, the Department submitted proposed revisions to its discipline policies on May 30, 2017. After consulting with the Subject Matter Experts, the Monitor provided his written comments to the Department on June 29, 2017. DOJ provided its comments to the Department the same day. On April 24, 2019, the Department submitted a proposed policy for discipline of mental health inmates, disabled inmates, and inmates with special needs. The Monitor and DOJ responded with written comments on May 30, 2019. On November 7, 2019, the Department submitted proposed policy revisions for inmate disciplinary procedures and disciplinary guidelines. The Monitor and DOJ responded on December 5 and 6, 2019, respectively. The policies were never adopted by the Department in the subsequent two-and-a-half years.

In the Tenth Report, the Monitor noted that it was "difficult to understand why the Department ha[d] not been able to 'implement written policies for formal discipline of prisoners with serious mental illness incorporating [the requirements of Paragraph 43]' nearly five years after the Effective Date of the Settlement Agreement." The County's Eleventh Self-Assessment provided no further information about the delay in adopting the policies other than noting that the Department "continue[d] to finalize" revised policies and was "working to incorporate feedback from stakeholders before finalizing these revisions." It further stated that the Department was "looking to change its approach to address outstanding issues in finalizing these policies" and expected "to provide more information in the next Reporting Period."

In the Monitor's Eleventh Report, the Monitor was explicit that "if the policies required by Paragraph 43 of the Settlement Agreement are not finalized by the next reporting date, Paragraph 43 may be rated as non-compliant for those facilities that have not yet achieved Substantial Compliance for twelve consecutive months. The County's Twelfth Self-Assessment should either include a discussion of policies that have been adopted in satisfaction of Paragraph 43 or a particularized explanation of the reasons for the delay." The County Twelfth Self-Assessment does neither.[42] Given the centrality of these new policies to this provision—whose first line requires their adoption within six months of the Agreement's Effective Date—the County is rated as Non-Compliant with Provision 43 in the Twelfth Reporting Period at CRDF, MCJ, and TTCF.

---

[42] It instead states generally that the Department is "working to incorporate feedback from stakeholders before finalizing these revisions. During the Twelfth Reporting Period, the Department reassessed those prior comments and made further revisions to its draft policies on which it hopes to report in the near future."

The County previously achieved Substantial Compliance at NCCF and PDC North for twelve consecutive months and these facilities were not subject to monitoring for compliance with Paragraph 43 during the Twelfth Reporting Period.



44.     Within six months of the Effective Date, the County and the Sheriff will install protective barriers that do not prevent line-of-sight supervision on the second floor tier of all High Observation Housing areas to prevent prisoners from jumping off of the second floor tier.  Within six months of the Effective Date, the County and the Sheriff will also develop a plan that identifies any other areas in mental health housing where such protective barriers should be installed.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016)**

The County has maintained Substantial Compliance with Paragraph 44 of the Agreement since January 1, 2016.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 44 in the Twelfth Reporting Period.

45.     Consistent with existing Sheriff's Department policies, the County and the Sheriff will provide both a Suicide Intervention Kit that contains an emergency cut-down tool and a first-aid kit in the control booth or officer's station of each housing unit.  All custody staff who have contact with prisoners will know the location of the Suicide Intervention Kit and first-aid kit and be trained to use their contents.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of October 1, 2015, through September 30, 2016 (verified) at CRDF, NCCF, PDC East, PDC South, and TTCF)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at MCJ and PDC North)**

The County maintained Substantial Compliance with Paragraph 45 for twelve consecutive months at all facilities as of December 31, 2016.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 45 in the Twelfth Reporting Period.

46.     The County and the Sheriff will immediately interrupt, and if necessary, provide appropriate aid to, any prisoner who threatens or exhibits self-injurious behavior.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of July 1, 2020 through September 30, 2020 (verified), [43] and through March 31, 2021 (unverified))**

Substantial Compliance requires the Department to review the documentation from randomly selected incidents involving prisoners who threaten or exhibit self-injurious behavior, and include an assessment of the timeliness and appropriateness of the Department's responses to these incidents in its semi-annual Self-Assessment.

The County's Twelfth Self-Assessment reports that for the Fourth Quarter of 2020, 100% of the records reviewed "reflected that appropriate aid and (when necessary) immediate interruption of self-injurious behavior was provided by the Department."[44] For the First Quarter of 2021, the County reports that 96% of the records reviewed were compliant. The threshold for Substantial Compliance is 95%. These results are subject to verification by the Monitor's auditors.

---

[43] In the Eleventh Monitoring Period, for the Third Quarter of 2020, the Department reported that 94% of the records reviewed were compliant, missing the threshold for Substantial Compliance by just a single percentage point. The County self-assessed this provision as Partially Compliant. However, given the County's history of progress on Provision 46, as well as the extremely small margin with which the County missed the threshold for Substantial Compliance, the Monitor exercised his discretion to rate the County as Substantially Compliant for the Third Quarter of 2020. This decision appears justified given the County's recently reported results (which are subject to verification by the Monitor's auditors).

[44] The County notes that the Department expanded the number of cases beginning evaluated in this Provision in Third Quarter 2019 to include items from CIRCs, actual self-directed violence, and BOMHRs to address concerns raised by the Subject Matter Expert about the universe of cases being evaluated.

47.     The County and the Sheriff will ensure there are sufficient custodial, medical, and mental health staff at the Jails to fulfill the terms of this Agreement.  Within six months of the Effective Date, and on a semi-annual basis thereafter, the County and the Sheriff will, in conjunction with the requirements of Paragraph 92 of this Agreement, provide to the Monitor and DOJ a report identifying the steps taken by the County and the Sheriff during the review period to implement the terms of this Agreement and any barriers to implementation, such as insufficient staffing levels at the Jails, if any.  The County and the Sheriff will retain staffing records for two years to ensure that for any critical incident or non-compliance with this Agreement, the Monitor and DOJ can obtain those records to determine whether staffing levels were a factor in that critical incident and/or non-compliance.

**STATUS:     NON-COMPLIANCE**

The County's posted results for Provision 47 reflect the County's assessment of whether staffing levels were a factor in "any critical incident, or the Department's handling of the incident," as Compliance Measures 47-1 and 47-2 require.  The County's posted results report that 44 critical incidents[45] occurred during the Second Half of 2020, and the County's conclusion that staff was not a factor in any of the incidents.

However, Compliance Measure 47-3(a) also requires the County to report on "any barriers to implementation [of the Agreement] during the period," including staffing levels.  The Compliance Measures thus call for an assessment of the role that staffing levels played not only in the Department's handling of critical incidents, but in any lack of compliance with the Agreement itself.  In the Eleventh Report, the Monitor noted that

> To help drive progress forward, the Monitor and SMEs must understand, and be able to describe for the Court, any barriers that have impeded compliance to date.  Thankfully, the Agreement includes a specific provision that was designed to aid the Monitor in performing such an analysis.  Paragraph 47 requires the County to 'ensure there are sufficient custodial, medical, and mental health staff at the Jails to fulfill the terms of this Agreement.'  To help effectuate that promise, the County is required to 'provide to the Monitor and DOJ a report identifying the steps taken by the County and the Sheriff during the review period to implement the terms of this Agreement and *any barriers to implementation*, such as insufficient staffing levels at the Jails, if any' (italics mine).

> [I]n its Self-Assessments and associated documentation, the County has not provided the analysis of staffing deficits or other barriers to implementation that appears to be required by Paragraph 47.  The Monitor views Paragraph 47 as essential to the County's overall compliance effort.  A detailed, data-driven assessment of 'any barriers to implementation, such as insufficient staffing levels at the Jails, if any' would assist the

---

[45] 23 Inmate Deaths, 10 Serious Suicide Attempts, 9 Inmate Assaults on Staff, and 2 Category 3 Uses of Force.

Monitor and Subject Matter Experts in diagnosing any roadblocks to compliance, and allow the Parties to focus their collective efforts on addressing any identified gaps on a paragraph-by-paragraph basis. The County has not generated a report that satisfies Paragraph 47 in prior reporting periods, and is again Non-Compliant with Paragraph 47 in the Eleventh Monitoring Period. The County and the Department should prioritize compliance with Paragraph 47 in the Twelfth Reporting Period.

Notwithstanding this guidance, the County's Twelfth Self-Assessment is again devoid of the required analysis. It does not evaluate the role that staffing deficits played in the County's Non-Compliance with Provisions 66, 79, and 80, all of which appear to involve staffing deficits. Nor does it analyze the role that such deficits played in its Partial Compliance with other provisions that also appear to implicate staffing issues.[46] The County is again rated as Non-Compliant with Provision 47. The County should prioritize compliance with Paragraph 47 in the Thirteenth Reporting Period, including identifying its staffing needs to achieve Substantial Compliance with the Agreement and describing with specificity the steps it took to ensure that it has sufficient custodial, medical, and mental health staff to achieve Substantial Compliance with the Agreement.

---

[46] This includes, for example, provisions related to the quality of clinical assessments and care (36, 40, 41, 52, 66, and 79), provisions related to the proper administration of medication (65 and 67), provisions related to release planning (34), and provisions related to use of force investigation and review (81).

48.     Within three months of the Effective Date, the County and the Sheriff will
have written housekeeping, sanitation, and inspection plans to ensure the proper cleaning
of, and trash collection and removal in, housing, shower, and medical areas, in
accordance with California Code of Regulations ("CCR") Title 15 § 1280: Facility
Sanitation, Safety, and Maintenance.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of January 1, 2016,
through December 31, 2016)**

The County maintained Substantial Compliance with Paragraph 48 of the
Agreement at all facilities for twelve consecutive months as of December 31, 2016.
Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject
to monitoring for Substantial Compliance with Paragraph 48 in the Twelfth Reporting
Period.[47]

---

[47] During a site visit to MCJ in June 2021, the Monitor observed exceptionally dirty conditions in MCJ.
Many cells on one floor were nearly overflowing with garbage, with filth spread on the walls near various
housing areas.  Although Provision 48 is no longer subject to monitoring, the Monitor recommends that the
County and the Department endeavor to correct these conditions.

49.     Within three months of the Effective Date, the County and the Sheriff will have a maintenance plan to respond to routine and emergency maintenance needs, including ensuring that shower, toilet, sink, and lighting units, and heating, ventilation, and cooling system are adequately maintained and installed.  The plan will also include steps to treat large mold infestations.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of March 1, 2016, through February 28, 2017)**

The County maintained Substantial Compliance with Paragraph 49 of the Agreement at all facilities for twelve consecutive months as of February 28, 2017. Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 49 in the Twelfth Reporting Period.

50.     Consistent with existing Sheriff's Department policies regarding control of vermin, the County and the Sheriff will provide pest control throughout the housing units, medical units, kitchen, and food storage areas.

> **STATUS:**      **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at all facilities other than PDC South and PDC East)**
>
> **SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 (verified) at PDC South and PDC East)**

The County maintained Substantial Compliance with Paragraph 50 of the Agreement at all facilities for twelve consecutive months as of March 31, 2017. Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 50 in the Twelfth Reporting Period.

51.     Consistent with existing Sheriff's Department policies regarding personal care items and supplies for inmates, the County and the Sheriff will ensure that all prisoners have access to basic hygiene supplies, in accordance with CCR Title 15 § 1265: Issue of Personal Care Items.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) for all facilities other than CRDF)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017 (verified) at CRDF)**

The County maintained Substantial Compliance with Paragraph 51 of the Agreement at all facilities for twelve consecutive months as of June 30, 2017.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 51 in the Twelfth Reporting Period.

52.     The County and the Sheriff will implement policies governing property restrictions in High Observation Housing that provide:

(a)     Except when transferred directly from FIP, upon initial placement in HOH:

(i)     Suicide-resistant blankets, gowns, and mattresses will be provided until the assessment set forth in section (a)(ii) below is conducted, unless clinically contraindicated as determined and documented by a QMHP.

(ii)    Within 24 hours, a QMHP will make recommendations regarding allowable property based upon an individual clinical assessment.

(b)     Property restrictions in HOH beyond 24 hours will be based on clinical judgment and assessment by a QMHP as necessary to ensure the safety and well-being of the prisoner and documented in the electronic medical record.

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance requires the Department to (1) randomly inspect the cells of prisoners placed in HOH (except from FIP) within the previous 24 hours to confirm that they have been provided with suicide-resistant blankets, gowns and mattresses unless clinically contraindicated, and document the results of the inspection; (2) randomly inspect the cells of prisoners placed in HOH (except from FIP) for more than 24 hours to confirm that they have been provided with allowable property as recommended by a QMHP; and (3) review the electronic medical records of prisoners assigned to HOH on the days of those inspections to verify compliance with the provisions of Paragraph 52. All the Compliance Measures have a 95% threshold for Substantial Compliance.

During the Eleventh Reporting Period, the County acknowledged

the challenges it has in complying with this Provision.  During the Reporting Period, the CHS-Compliance team met with supervising staff at CRDF to review the provisions requirements, audit results, and explain how to conduct an audit to more timely assess compliance progress…CRDF, in particular received training in how to conduct its own internal assessments on June 24, 2020 and began conducting its own audits in late September 2020.  The results of those audits were then reviewed by the CHS Compliance Program for feedback and ideas for improvement.  CHS anticipates improved performance in future reporting periods.

These efforts appear to have borne fruit, as the County reports gradually improved compliance at CRDF in the Twelfth Reporting Period on several compliance measures. The County reports that in the Fourth Quarter of 2020, at CRDF "53%—rather than the required 95%—of the electronic medical records for inmates assigned to HOH reflected a

recommendation by a QMHP regarding allowable property pursuant to Compliance Measure 52-5(c)."[48]  Additionally, "44%—rather than the required 95%—of electronic medical records for inmates assigned to HOH reflect that property restrictions were based upon the clinical judgment of a QMHP pursuant to Compliance Measure 52-5(d)."  The County also reported that "100%—more than the required 95%—of inmates analyzed pursuant to Compliance Measure 52-5(e) had allowable property as recommended by a QMHP (unless refused by the inmate)."

The County also reports that at TTCF in the Fourth Quarter of 2020, "87%—rather than the required 95%—of inmates analyzed pursuant to Compliance Measure 52-5(b) were provided suicide-resistant blankets, gowns and mattresses as required by this Provision." "71%—rather than the required 95%—of the electronic medical records for inmates assigned to HOH reflected a recommendation by a QMHP regarding allowable property pursuant to Compliance Measure 52-5(c)." "84%—rather than the required 95%—of electronic medical records for inmates assigned to HOH reflect that property restrictions were based upon the clinical judgment of a QMHP pursuant to Compliance Measure 52-5(d)." "96%—more than the required 95%—of inmates analyzed pursuant to Compliance Measure 52-5(e) had allowable property as recommended by a QMHP (unless refused by the inmate)."

The County's Augmented Twelfth Self-Assessment reports that at CRDF in the First Quarter of 2021, "76%—rather than the required 95%—of the electronic medical records for inmates assigned to HOH reflected a recommendation by a QMHP regarding allowable property pursuant to Compliance Measure 52-5(c)." "68%—rather than the required 95%—of electronic medical records for inmates assigned to HOH reflect that property restrictions were based upon the clinical judgment of a QMHP." "100%—more than the required 95%—of inmates analyzed pursuant to Compliance Measure 52-5(e) had allowable property as recommended by a QMHP (unless refused by the inmate)."

The County reports that at TTCF in the First Quarter of 2021, "94%—rather than the required 95%—of inmates analyzed pursuant to Compliance Measure 52-5(b) were provided suicide-resistant blankets, gowns and mattresses as required by this Provision." "66%—rather than the required 95%—of the electronic medical records for inmates assigned to HOH reflected a recommendation by a QMHP regarding allowable property pursuant to Compliance Measure 52-5(c)." "74%—rather than the required 95%—of electronic medical records for inmates assigned to HOH reflect that property restrictions were based upon the clinical judgment of a QMHP pursuant to Compliance Measure 52-5(d)." "98%—more than the required 95%—of inmates analyzed pursuant to Compliance Measure 52-5(e) had allowable property as recommended by a QMHP (unless refused by the inmate)."

---

[48] Due to the COVID-19 pandemic, as in the Eleventh Reporting Period, the County's Self-Assessment does not report on its compliance with Compliance Measure 52-5(b) at CRDF in the Fourth Quarter of 2020 or the First Quarter of 2021.  The County also reports that at CRDF it conducted two inspections rather than three in the Fourth Quarter of 2020 and the First Quarter of 2021, due to a "rise in COVID-related quarantines and isolations."

In May 2021, Dr. Vess conducted a qualitative review of the County's compliance with Provision 52. He sought to evaluate "whether there was an assessment by a QMHP within 24 hours" and "whether any restrictions imposed were based upon a clinically appropriate evaluation of relevant risks." He found that in 100% of cases, a QMHP did provide an assessment, and it was within 24 hours in 93% of cases. However, in only 36% of cases (21 of 59) did the records reflect the risks determined to justify the property restrictions. "There was often no discussion of why certain items were restricted or even why any restrictions were needed. Restrictions were often put in place when the structured suicide risk assessment indicated 'low risk' and there was no documentation or analysis demonstrating that restrictions were needed, e.g., in the absence of current suicidal ideation or recent self-injurious behavior." He noted these issues more frequently in cases at TTCF than at CRDF.

53.    If otherwise eligible for an education, work, or similar program, a prisoner's mental health diagnosis or prescription for medication alone will not preclude that prisoner from participating in said programming.

STATUS:    **PARTIAL COMPLIANCE**

Substantial Compliance requires the Department to audit the records of prisoners who were eligible, but rejected or disqualified, for education and work programs to confirm that they were not rejected or disqualified because of a mental health diagnosis or prescription for medication alone.

The County's Augmented Twelfth Self-Assessment reports that 97% of the eligible mentally ill prisoners who were denied education or work in the Fourth Quarter of 2020 and 73% in the First Quarter of 2021 "were not rejected or disqualified from education or work programs solely because of a mental health diagnosis or prescription for medication."  The County has previously reported that due to the COVID-19 pandemic, "fewer inmates will be able to participate in education or work programs during the public health crisis."  Indeed, the populations of eligible inmates (48 inmates in the Fourth Quarter of 2020, and 23 inmates in the First Quarter of 2021) making requests for education or work programing were far smaller than during comparable periods before the COVID-19 pandemic.[49]  The County's results in the Twelfth Monitoring are therefore necessarily impacted by the smaller number of eligible, requesting inmates, and the decline in programming available during the pandemic.

---

[49] For example, there were 99 eligible, requesting inmates in the Fourth Quarter of 2019 and 114 eligible, requesting inmates in the First Quarter of 2020.

54.     Prisoners who are not in Mental Health Housing will not be denied privileges and programming based solely on their mental health status or prescription for psychotropic medication.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of January 1, 2020, through March 31, 2020 (verified), and through June 30, 2020 (unverified))**

Substantial Compliance under the revised Compliance Measures for Paragraph 54, effective January 1, 2018, requires the Department to audit the records of a maximum of 100 randomly selected prisoners identified on the Wednesday Pharmacy List as having received psychotropic medication to confirm that no more than 10% were rejected or disqualified because of a mental health diagnosis or prescription for psychotropic medication alone.  Because the Monitor's auditors had verified that the County has maintained Substantial Compliance under the original Compliance Measures, the parties agreed that the County will only be required to maintain Substantial Compliance under the revised Compliance Measures for two additional quarters.

The Monitor's auditors have verified the County's report of Substantial Compliance for the First Quarter of 2020, and are attempting to verify the County's report of Substantial Compliance for the Second Quarter of 2020.  If verified, the County will have maintained Substantial Compliance under the revised Compliance Measures for two additional quarters and will no longer subject to monitoring for Substantial Compliance with Paragraph 54.[50]

---

[50] A draft of this report indicated that the Monitor's auditors were attempting to verify the County's self-reported Substantial Compliance for Fourth Quarter 2019.  They were unable to do so.

55.     Relevant custody, medical, and mental health staff in all High Observation Housing units will meet on normal business work days and such staff in all Moderate Observation Housing units will meet at least weekly to ensure coordination and communication regarding the needs of prisoners in mental health housing units as outlined in Custody Services Division Directive(s) regarding coordination of mental health treatment and housing.  When a custody staff member is serving as a member of a treatment team, he or she is subject to the same confidentiality rules and regulations as any other member of the treatment team, and will be trained in those rules and regulations.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of October 1, 2016, through September 30, 2017 (verified) at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at PDC North)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 (verified) at MCJ)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2019, through June 30, 2020 (verified) at TTCF)**

The Department maintained Substantial Compliance for twelve consecutive months at all facilities as of June 30, 2020.  These results have now been verified by the Monitor's auditors.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 55 in the Twelfth Reporting Period.

56.     Consistent with existing DMH and Sheriff's Department policies, the County and the Sheriff will ensure that custody, medical, and mental health staff communicate regarding any change in a prisoner's housing assignment following a suicide threat, gesture, or attempt, or other indication of an obvious and serious change in mental health condition.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified))**

Substantial Compliance requires the Department to review in randomly selected periods the electronic medical records of (1) prisoners admitted to HOH following a suicide threat, gesture, or attempt, or other indication of an obvious and serious change in mental health condition to determine if the medical and/or mental health staff approved the placement of the prisoner in HOH; and (2) prisoners who were the subject of a suicide attempt notification to determine if the prisoners were clinically assessed and that clinical staff approved the post-incident housing.

The County's Substantial Compliance results for the twelve months from January 1, 2016, through December 31, 2016 were verified by the Monitor's auditors.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 56 in the Twelfth Reporting Period.

57.     Within three months of the Effective Date, the County and the Sheriff will revise and implement their policies on safety checks to ensure a range of supervision for prisoners housed in Mental Health Housing.  The County and the Sheriff will ensure that safety checks in Mental Health Housing are completed and documented in accordance with policy and regulatory requirements as set forth below:

(a)     Custody staff will conduct safety checks in a manner that allows staff to view the prisoner to assure his or her well-being and security.  Safety checks involve visual observation and, if necessary to determine the prisoner's well-being, verbal interaction with the prisoner;

(b)     Custody staff will document their checks in a format that does not have pre-printed times;

(c)     Custody staff will stagger checks to minimize prisoners' ability to plan around anticipated checks;

(d)     Video surveillance may not be used to replace rounds and supervision by custodial staff unless new construction is built specifically with constant video surveillance enhancements and could only be used to replace 15 minute checks in non-FIP housing, subject to approval by the Monitor;

(e)     A QMHP, in coordination with custody (and medical staff if necessary), will determine mental health housing assignments; and

(f)     Supervision of prisoners in mental health housing will be conducted at the following intervals:

(i)     FIP:  Custody staff will perform safety checks every 15 minutes.  DMH staff will perform direct constant observation or one-to-one observation when determined to be clinically appropriate;

(ii)    High Observation Housing:  Every 15 minutes;

(iii)   Moderate Observation Housing:  Every 30 minutes.[51]

---

[51] On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provision 57.  Because it was filed after the Twelfth Reporting Period, Provision 57 has been analyzed in this Report under the language that was operative during the Twelfth Reporting Period.

**STATUS (57):**      **SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at MCJ)**

**PARTIAL COMPLIANCE (at TTCF, PDC NORTH, and CRDF)**

Substantial Compliance requires the Department to audit the Title 15 Dashboard records (or e-UDAL records if the Title 15 scanner was not working) for all shifts for each module in each mental health housing unit in two randomly selected weeks to determine if the safety checks were staggered and conducted as required by Paragraph 57 of the Agreement, and to audit the housing records for each mental health housing unit for a randomly selected week to determine if QMHPs approved the new mental health housing assignments as required by Paragraph 57(e). The thresholds for achieving Substantial Compliance with these two Compliance Measures is 95%.

The County's Sixth Self-Assessment reported that it maintained Substantial Compliance with Compliance Measure 57-5(b) in the Fourth Quarter of 2017 and the First Quarter of 2018 in the MOH unit at MCJ (the "Hope Dorm"). It also reported that all of the inmates at MCJ "analyzed pursuant to Compliance Measure 57-5(c) had received QMHP approval for their housing assignments" in both quarters. The results were verified by the Monitor's auditors and MCJ was not subject to monitoring for compliance with Paragraph 57 in the Twelfth Reporting Period.

The County's Augmented Twelfth Self-Assessment reports that the results at PDC North: 95% in the Fourth Quarter of 2020 and 87% in the First Quarter of 2021. The County's Augmented Twelfth Self-Assessment also reports that the County achieved Partial Compliance with the safety checks at TTCF (85%) and CRDF (68%) in the Fourth Quarter of 2020. The County also reports that 100% and 98% of the new mental health housing assignments in CRDF and TTCF, respectively, were approved by a QMHP in the Fourth Quarter of 2020.[52]

For the First Quarter of 2021, the County reports that it achieved Partial Compliance with safety checks at PDC – North (87%), CRDF (72%) and TTCF (76%). The County also reports that 100% and 98% of the new mental health housing assignments in CRDF and TTCF, respectively, were approved by a QMHP in the First Quarter of 2021.

---

[52] The County has indicated that patients assigned to mental health housing at PDC – North first have their housing assignments approved by a QMHP at either TTCF or MCJ, which is why results are not separately reported for PDC – North for Compliance Measure 57-5(C).

58.     Within three months of the Effective Date, the County and the Sheriff will revise and implement their policies on safety checks.  The County and the Sheriff will ensure that safety checks in non-mental health housing units are completed and documented in accordance with policy and regulatory requirements as set forth below:

(a)     At least every 30 minutes in housing areas with cells;

(b)     At least every 30 minutes in dormitory-style housing units where the unit does not provide for unobstructed direct supervision of prisoners from a security control room;

(c)     Where a dormitory-style housing unit does provide for unobstructed direct supervision of prisoners, safety checks must be completed inside the unit at least every 60 minutes;

(d)     At least every 60 minutes in designated minimum security dormitory housing at PDC South, or other similar campus-style unlocked dormitory housing;

(e)     Custody staff will conduct safety checks in a manner that allows staff to view the prisoner to assure his or her well-being and security.  Safety checks involve visual observation and, if necessary to determine the prisoner's well-being, verbal interaction with the prisoner;

(f)     Custody staff will document their checks in a format that does not have pre-printed times;

(g)     Custody staff will stagger checks to minimize prisoners' ability to plan around anticipated checks; and

(h)     Video surveillance may not be used to replace rounds and supervision by custodial staff.

**STATUS (58):**　　　　**SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at PDC South, PDC North, and PDC East)**

**SUBSTANTIAL COMPLIANCE ( as of July 1, 2017, through June 30, 2018 (verified) at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at IRC)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2020, through September 30, 2020 (verified), and October 1, 2020 through March 31, 2021 (unverified) at NCCF)**

**PARTIAL COMPLIANCE (at TTCF)**

**NON-COMPLIANCE (at MCJ)**

Substantial Compliance requires the Department to audit the Title 15 Dashboard records (or e-UDAL records) for all shifts for each module in each housing unit to determine if the safety checks were staggered and conducted as required by Paragraph 58. The threshold for achieving Substantial Compliance with each of the Compliance Measures is 90%.

The County maintained Substantial Compliance with Paragraph 58 for twelve consecutive months at PDC South, PDC North, and PDC East as of December 31, 2016, at CRDF as of June 30, 2018, and at IRC as of September 30, 2018. These results have been verified by the Monitor's auditors. Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring at those facilities for Substantial Compliance with Paragraph 58 in the Twelfth Reporting Period.

The County's Augmented Twelfth Self-Assessment reports that NCCF achieved Substantial Compliance during the Fourth Quarter of 2020 and First Quarter of 2021 (94% and 93%). If verified by the Monitor's auditors, NCCF will have maintained Substantial Compliance with Provision 58 for twelve consecutive months and will no longer be subject to monitoring for this provision. The County's Augmented Twelfth Self-Assessment also reports that for the Fourth Quarter of 2020 and the First Quarter of 2021 the following percentages of safety checks were in compliance with Paragraph 58 at TTCF: 79% and 86%.

In the Eleventh Report, the Monitor said

The Monitor agrees with the DOJ that the results [for Provision 58] at MCJ are disappointing, particularly given the relative frequency of deaths at that facility. The Department should prioritize improving compliance at that facility in the Twelfth Reporting Period.

Unfortunately, the results again dropped at MCJ in the Twelfth Reporting Period, with the County reporting compliance percentages of 22% (Fourth Quarter of 2020) and 41% (First Quarter of 2021). By way of explanation, the County reports that "MCJ's compliance continues to be significantly impacted by technological challenges and also the inconsistency of staff identifying and documenting those issues as appropriate." Specifically, MCJ has continued to struggle with

> Wi-Fi and server configuration issues, which have continued to impact the BREAVA system. The Department relies on the BREAVA system to record the Title-15 check compliance in real-time. . . . A meeting occurred on 9/30/2020 with the Men's Central Jail (MCJ) Commander, Captain, and Operations team to discuss the issues surrounding the safety checks. A meeting also occurred on 10/20/2020 with the MCJ staff discussing their new plans to improve the safety checks. The plan is to hold personnel accountable, have the T-15 personnel conduct only safety checks, and make improvements on staggering. The line Lieutenants and Sergeants will also be held accountable by Operations for ensuring there are proper audits, and documentation of the safety checks. Operations will also ensure that the supervisors are conducting their mandatory walks. As of 3/2/2021, the MCJ Operations have returned all problematic scanners to the Correctional Innovative Technologies Unit (CITU) to be examined and re-programmed. Several T-15 teams were also created for each floor. The Custody Compliance and Sustainability Bureau will be meeting with the MCJ Operations periodically to discuss ways to achieve compliance.

Given its low compliance percentages, which have now dropped in several reporting periods, MCJ is rated as Non-Compliant with Provision 58 for the Twelfth Reporting Period.

59. Consistent with existing Sheriff's Department policies regarding uniform daily activity logs, the County and the Sheriff will ensure that a custodial supervisor conducts unannounced daily rounds on each shift in the prisoner housing units to ensure custodial staff conduct necessary safety checks and document their rounds.

**STATUS:** **SUBSTANTIAL COMPLIANCE (as of January 1, 2017, through December 31, 2017 (verified) at PDC East and MCJ)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2018, through December 31, 2018 (verified) at PDC North and PDC South)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 (verified) at TTCF)**

Substantial Compliance requires the Department to audit e-UDAL records for housing units in each facility to determine if supervisors are conducting unannounced daily rounds in accordance with Paragraph 59. In response to the Monitor's comments, the Department's e-UDAL forms were modified to include a specific notation that the Supervisor verified that the safety checks were conducted. The threshold for achieving and maintaining Substantial Compliance is that 90% of the supervisor daily rounds were in compliance with the requirements of Paragraph 59.

The County's Substantial Compliance results were verified by the Monitor's auditors. Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 59 in the Twelfth Reporting Period.

60.     Within six months of the Effective Date, the Department of Mental Health, in cooperation with the Sheriff's Unit described in Paragraph 77 of this Agreement, will implement a quality improvement program to identify and address clinical issues that place prisoners at significant risk of suicide or self-injurious behavior.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of April 1, 2019 through March 31, 2020)**

Paragraph 60 requires the County to "implement a quality improvement program to identify and address clinical issues that place prisoners at significant risk of suicide or self-injurious behavior."  The Compliance Measures for Paragraph 60 require the County to "identify and address. . .clinical issues" in the areas identified in Paragraph 61 of the Agreement" and corrective actions are taken to address "such issues."  See Compliance Measures 60.1, 60.2(a), and 60.3(b).

The Monitor and the Mental Health Subject Matter previously agreed that the Department had demonstrated "a sound quality improvement process and the ability to demonstrate that process through specific quality improvement projects directed by management," and the Monitor finds that the County demonstrated that it maintained Substantial Compliance with Paragraph 60.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 60 in the Twelfth Reporting Period.[53]

---

[53] The County has acknowledged that its ongoing Quality Improvement efforts will remain subject to monitoring under other provisions of the Settlement Agreement.

61.     The quality improvement program will review, collect, and aggregate data in the following areas and recommend corrective actions and systemic improvements:

(a)     Suicides and serious suicide attempts:

   (i)     Prior suicide attempts or other serious self-injurious behavior
   (ii)    Locations
   (iii)   Method
   (iv)    Lethality
   (v)     Demographic information
   (vi)    Proximity to court date;

(b)     Use of clinical restraints;

(c)     Psychotropic medications;

(d)     Access to care, timeliness of service, and utilization of the Forensic In-patient Unit; and

(e)     Elements of documentation and use of medical records.

**STATUS:       PARTIAL COMPLIANCE**

Substantial Compliance requires the County's semi-annual reports to (a) review, collect, and aggregate data in the areas set forth in Paragraph 61; (b) recommend corrective actions and systemic improvements in those areas; and (c) assess the effectiveness of actions and improvements in prior reporting periods.

On July 14, 2021, the County posted the Correctional Health Services and Custody Compliance & Sustainability Bureau Combined Semi-Annual Report on Quality Improvement and Suicide Prevention Efforts – Quarter 4 2020 & Quarter 1 2021 ("Combined Suicide Prevention Report"), which relates to Paragraphs 60, 61, 62, and 77. The Combined Suicide Prevention Report sets forth aggregate data for the 25 suicides that occurred between 2015 and the end of the First Quarter of 2021, and 145 critical incidents that occurred between 2016 and the end of the First Quarter of 2021, broken down by the subparts of Paragraph 61(a). The report also includes case-specific discussions of the six suicides that occurred during the Fourth Quarter of 2020 and First Quarter of 2021 at county jail facilities and one suicide at a station jail.

The Monitor reviewed the County's Combined Suicide Prevention Report in consultation with Drs. Johnson, Vess, and Eargle. Our view is that the Department has made recent progress in its Quality Improvement efforts. The Combined Suicide Prevention Report collects much of the data required by this provision and includes some analysis and interpretation of that data, both of which are positive developments. The Report discusses innovative analyses being conducted through the Joint Quality Improvement Committee. The greatest challenge, however, remains that the aggregate

data being captured by the County is only useful if it is mobilized to identify systemic performance issues and corrective actions that can be taken to ameliorate the risks of inmate self-directed violence.  The report needs to more clearly identify how the data collected are contributing to meaningful changes in policies or practices.[54]

In certain circumstances, for example, the Department notes potentially significant findings in the data but does not specifically address how they will lead to Department-wide, systemic changes.  The Combined Suicide Prevention Report notes, for example, that in a review of all suicides from 2015 – the First Quarter of 2021, 11 suicides, or 44% of the total, took place within the first two weeks of an inmate's incarceration.  "The time period shortly after incarceration appears to be a high-risk period, which is consistent with national data."  However, the Department does not suggest any policy, procedural or workflow changes in light of this data, nor does it specifically recommend any further investigation of time in custody to avert future suicides.[55]

The Combined Suicide Prevention Report does note four "corrective actions taken by the Department to mitigate suicide risks."  At least two, and possibly more, of these corrective actions appear to be responsive to risks identified in the death reviews of particular inmates.  This includes making information available to families of inmates about the ability to contact the Medical Command Center if they have concerns about the mental health of an incarcerated loved one, as well as deploying cut down tools to all Title 15 Safety Check teams.[56]  However, none of the identified corrective actions are obviously responsive to the aggregate data collected in the Quality Improvement program.  Furthermore, no follow-up of these interventions to determine if they are helpful in reducing self-directed violence was discussed.

In summary, the Combined Suicide Prevention Report describes the current approach to collecting data about incidents of self-directed violence and then notes, "the data has been integrated into various presentations given by both teams at JQIC meetings and may ultimately be useful in developing system-wide corrective actions and improvements."  Achieving Substantial Compliance will require the Department to specifically explain how the data has been used to develop those system-wide corrective actions and improvements, including following up to assess their outcomes and any subsequent revisions to policies, if needed.

---

[54] The Combined Suicide Prevention Report notes that the Department lost its statistical analyst for the QI program in July 2019, and that person has not yet been replaced.  "The lack of a statistician has continued to impact the County's ability to evaluate data at the level of detail that it would like."

[55] The DOJ also notes that the Combined Suicide Prevention Report generally lacks baseline data necessary for assessing the significance of the aggregate statistical information presented in the report.  The Monitor agrees that baseline data would better enable to the Department to use the aggregate data about suicide and self-harm that it collects in order to "recommend corrective actions and systemic improvements."

[56] The Combined Suicide Prevention Report also notes that on February 5, 2021, a new procedure was implemented "repurposing the Safety Check Team's responsibilities. . . .This new process ensures the Safety Check Team is conducting a timely check and good quality check."  The Combined Suicide Prevention Report also indicates that suicide prevention posters will be placed throughout the county jail facilities.

62.     The County and the Sheriff's Unit described in Paragraph 77 of this Agreement will develop, implement, and track corrective action plans addressing recommendations of the quality improvement program.

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance requires the County's semi-annual Self-Assessments to set forth (a) the "development of corrective action plans to address the most recent recommendations of the quality improvement program;" and (b) the "implementation and tracking of corrective action plans to address recommendations of the program in prior quarters."

On July 14, 2021, the County posted the Correctional Health Services and Custody Compliance & Sustainability Bureau Combined Semi-Annual Report on Quality Improvement and Suicide Prevention Efforts – Quarter 4 2020 & Quarter 1 2021 ("Combined Suicide Prevention Report"), which relates to Paragraphs 60, 61, 62, and 77. The Combined Suicide Prevention Report sets forth aggregate data for the 25 suicides that occurred between 2015 and the end of the First Quarter of 2021, and 145 critical incidents that occurred between 2016 and the end of the First Quarter of 2021, broken down by the subparts of Paragraph 61(a) and 61(b)(e). The report also includes case-specific discussions of the six suicides that occurred during the Fourth Quarter of 2020 and First Quarters of 2021 at county jail facilities and one suicide at a station jail.

Regarding the tracking of corrective action plans, the Combined Suicide Prevention Report notes

As part of the County's quality improvement process, CCSB and the Compliance team have continued to develop strategies for improving identification and follow-up related to Corrective Action Plans (CAPS) resulting from the CIRC review process. CCSB and Access to Care Bureau (ACB) have delegated the ACB Lieutenants to conduct a Quality Improvement Plan (QIP) as a follow-up on identified CIRC cases to gain additional information from the inmates regarding the incidents. This information is used to improve suicide prevention efforts and to develop a proactive plan that moves toward a reduction of self-harm cases. The compliance team previously developed a standardized system to organize issues identified at CIRC into meaningful categories. This system includes seven primary domains: Access to Care, Care Management, Medication Management, Availability of Patient Information, Documentation of Patient information, Custody Facility, and Other Inquires. Initially, the system developed also included sub-domains, however, as we began to further analyze this data, it was apparent this was not sufficient. During this past quarter, the system evolved to include a category and subcategory domain which more clearly delineates similar issues identified at CIRC into meaningful groupings. The Compliance team finalized the organizational system designed to categorize issues identified at CIRC.

The Monitor reviewed the County's Combined Suicide Prevention Report in consultation with Drs. Johnson, Vess, and Eargle.  They noted that the Report provides examples of several CAPS that resulted in positive changes throughout the jail facilities.  The development of a categorical system is a positive initial step, and is a prerequisite for an effective patient safety system. However, it is unclear how this system will be used to track CAPS.  They note that "the reporting on the CAPS is not systematic or clearly organized.  There is not much information included about follow up on previous QI projects."  Further, "it is difficult to verify a direct correlation between CAPS and the increased safety and care of patients" and also "difficult to determine if a CAP that was instituted prevented similar adverse events from occurring or if the issue that resulted in the CAP was a singular issue."

63.     The County and the Sheriff will maintain adequate High Observation Housing and Moderate Observation Housing sufficient to meet the needs of the jail population with mental illness, as assessed by the County and the Sheriff on an ongoing basis.  The County will continue its practice of placing prisoners with mental illness in the least restrictive setting consistent with their clinical needs.

**STATUS:     NON-COMPLIANCE**

The Compliance Measures require that the County's Self-Assessment set forth (a) the average daily populations in HOH and MOH units in TTCF and CRDF during the reporting period; (b) the average number of beds in those units during the reporting period; (c) the number of days in which there was a waiting list for HOH or MOH housing; and (d) the average number of step-downs per week (i) from HOH to MOH and (ii) from MOH to the least restrictive setting consistent with the prisoners' clinical needs. In addition, for two random weeks, the Department is required to review the count sheets documenting the number of occupied and available beds in the MOH and HOH units at TTCF and CRDF.  Substantial Compliance requires "the immediate availability of HOH and MOH beds at TTCF and CRDF 95% of the time."

The County's Twelfth Self-Assessment reports the number of days in which the total number of HOH and MOH available beds was equal to or more than the number of HOH and MOH inmates for the two randomly selected weeks in the Fourth Quarter of 2020:

|        | MOH  | HOH |
|--------|------|-----|
| TTCF   | 100% | 0%  |
| CRDF   | 85%  | 0%  |

The County's posted results for the First Quarter of 2021 show:

|        | MOH  | HOH |
|--------|------|-----|
| TTCF   | 100% | 0%  |
| CRDF   | 100% | 42% |

The results for HOH housing at TTCF dropped substantially from the prior monitoring period and remained extremely low for CRDF.  Notwithstanding this decline, the County has assessed itself as Partially Compliant with this provision, and notes that "the Department believes that facility, or physical space issues, are the driving force behind Partial Compliance for this provision, rather than staffing limitations."

The County has not described meaningful steps taken in the Twelfth Monitoring Period to correct its Non-Compliance with Provision 63.  In the Thirteenth Monitoring Period, the County should provide specific information about how it plans to attain Substantial Compliance with Provision 63, the steps it will take to further those plans, and any known timelines associated with their implementation.

64.     Within six months of the Effective Date, the County and the Sheriff will develop a short-term plan addressing the following 12-month period, and within 12 months of the Effective Date, the County and the Sheriff will develop a long-term plan addressing the following five-year period, to reasonably ensure the availability of licensed inpatient mental health care for prisoners in the Jails.  The County and the Sheriff will begin implementation of each plan within 90 days of plan completion.  These plans will describe the projected capacity required, strategies that will be used to obtain additional capacity if it is needed, and identify the resources necessary for implementation.  Thereafter, the County and the Sheriff will review, and if necessary revise, these plans every 12 months.

**STATUS:     NON-COMPLIANCE**

Substantial Compliance requires the Department to (1) develop a short-term plan that will address the availability of licensed inpatient mental health care for prisoners in an initial 12-month period; (2) commence to implement the plan within 90 days after it is developed; (3) develop a long-term plan within 12 months after the short term plan that will address the availability of licensed inpatient mental health care for prisoners in the following five-year period; and (4) commence to implement the long-term plan within 90 days after it is developed.

As set forth in the Introduction to this Report, patients classified by CHS as "P4s" are those who require inpatient care.  P4 patients meet "LPS criteria for danger to self, others, or grave disability."  They demonstrate, among other things, "imminent risk of self-harm or harm to others secondary to mental illness," "severely disorganized thinking and behavior," "on-going refusal to engage in any form of treatment or intervention," and "symptomology that would require inpatient treatment in a community setting."  In other words, P4s are the sickest, most vulnerable patients who may require involuntary medication, which can only legally be provided in inpatient housing.  According to data provided by CHS, as of June 2021, the Department was housing 120 P4 patients, yet only has only 46 licensed inpatient beds, which is insufficient to house the existing P4 population.

The County's Augmented Twelfth Self-Assessment does not describe with specificity efforts by the County to "reasonably ensure the availability of licensed inpatient mental health care for prisoners in the Jails."  Instead, the County reports

in lieu of expanding inpatient beds, CHS has continued to invest in the FIP Stepdown Program. During this reporting period, the FIP Stepdown at the Men's Program was expanded by an additional pod or approximately 30 beds. This program provides the highest level of care and is modeled after a day treatment program in a psychiatric hospital. Each pod of 16-32 patients is staffed by a deputy, which allows the patients to participate in activities and groups throughout the day. In addition to a clinician and psychiatrist providing care, a psychiatric technician works closely with the patients to increase medication compliance. Merit Masters, trained inmate

workers, voluntarily live in the pod and assist the patients with their daily
living, such as brushing their teeth and keeping their cell clean. This level
of attention and increased freedom bring significant improvement to
patients' mental health. ***Treating patients at this level of care prevents the
majority from requiring an inpatient bed.*** Moving forward, CHS and
LASD have planned to add an additional pod of 32 beds every three
months. Staffing has been committed for 6 pods (192 patients). At the
Women's Program, a new dorm is being assigned with increased custody
presence and cross training with the Men's Program. Continued expansion
beyond this point will be dependent on staffing. (emphasis mine)

The Monitor believes that FIP Step-Down pods present a very promising
alternative to standard HOH housing.  However, neither the Monitor nor Subject Matter
Expert Dr. Johnson believe that they properly replace inpatient treatment.  Only in
inpatient housing can patients generally receive involuntary medication to help to
stabilize them and alleviate the worst of their symptoms.  Developing additional FIP
Step-Down pods, which the Monitor supports, does not satisfy Provision 64, which
requires the County to ensure sufficient "licensed inpatient mental health care" in the
jails.

The County also reports that it

has focused its wider efforts on efforts on decreasing the jail population
and potentially closing jail facilities as a way to decrease the jail
population. It is the county's hope that these measures will obviate the
need for additional inpatient beds. The following work groups have been
focused on these reductions: Alternatives to Incarceration (ATI), Public
Safety Realignment Team (PSRT), Men's Central Jail Closure Work
Group, Board motion on Data Collection to Support Pretrial Reform, The
Measure J Re-Imagine LA Advisory Committee, and the Jail Population
Review Council. The impact of these work groups has not yet been
realized in terms of a decreased bed need within the jail for those most
acutely mentally ill.

As set forth in the Introduction to this Report, the County's efforts to decrease the
jail population have been embodied in a variety of proposals over the years.  Efforts to
decrease the jail population at some undefined future date also do not satisfy the County's
present legal obligation under Provision 64 to ensure that there is sufficient inpatient
housing for prisoners in the jails today.  The Monitor finds that the County has failed to
comply with Provision 64, which is rated as Non-Compliant for the Twelfth Reporting
Period.

65.     Consistent with existing Sheriff's Department policies, the County and the Sheriff will ensure that psychotropic medications are administered in a clinically appropriate manner to prevent misuse, hoarding, and overdose.[57]

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance requires that (1) the County's Self-Assessments set forth the (a) results of weekly medication audits documenting the visual observation of the administration of medication during the quarter; (b) unauthorized medications found as a result of cell searches during the reporting period; and (c) incidents involving confirmed prescription drug overdoses; and that (2) "the Monitor concludes, after consulting with the Subject Matter Expert, that psychotropic medications have been administered in a clinically appropriate manner 85% of the time."

The County's posted results reflect that the following unannounced searches were conducted in the Fourth Quarter of 2020: CRDF (23), TTCF (63), MCJ (85), NCCF (1,000), PDC North (71), PDC South (104), and PDC East (1). During these searches, the following medications and needles/syringes were found "that did not appear to be appropriately possessed by inmates": CRDF (2 medications), TTCF (163 medications), MCJ (50 medications), NCCF (14 medications), PDC North (13 medications), PDC South (0 medications), PDC East (0 medications). The County also reported 6 confirmed overdoses and 8 unconfirmed.

The County's posted results reflect that in the First Quarter of 2021, the following unannounced searches were conducted: CRDF (21), TTCF (72), MCJ (203), NCCF (1,182), PDC North (67), PDC South (161), and PDC East (2). During these searches, the following medications and needles/syringes were found "that did not appear to be appropriately possessed by inmates": CRDF (5 medications and one needle), TTCF (178 medications and two syringes), MCJ (179 medications and one syringe), NCCF (one syringe), PDC North (42 medications), PDC South (two needles and one syringe), PDC East (0 medications). For the First Quarter of 2021, the County reported 1 confirmed overdose and 12 unconfirmed.

As indicated in previous reports, the County and Department have "paused reporting" the result of the Administrative Audits required by Compliance Measure 65-1(a) "to establish a more consistent and clinically appropriate process."[58] By way of update, the County reports

The Director of Quality Improvement and Patient Safety (QI) has continued to spearhead efforts to revamp the Pill Call audit process during

---

[57] On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provision 65. Because it was filed after the Twelfth Reporting Period, Provision 65 has been analyzed in this Report under the language that was operative during the Twelfth Reporting Period.
[58] Given that the County has paused reporting on these Administrative Audits for several monitoring periods, in the Thirteenth Reporting Period, it should either resume reporting on them or provide a more detailed and specific description of the reasons for the prolonged delay.

Quarter 4. On 10/27/20 a meeting occurred with representatives from QI, custody, nursing, and Compliance to discuss updates and plan for next steps. During the quarter, QI has been in the process of obtaining and reviewing policies, conducting random audits, and planning to retrain supervisors and managers. Towards the end of 2020 there was some restructuring of executive level management and the Director of Quality Improvement and Patient Safety was reassigned to oversight of direct clinical services. This put the process on pause as we worked to regroup and figure out how to move forward. During Quarter 1, the CHS Mental Health Director met with the Chief Nursing Officer and it was determined that the CNO will take the lead and move forward with developing a more efficient and robust audit process.

66.     Consistent with existing DMH policies, prisoners in High Observation
Housing and Moderate Observation Housing, and those with a serious mental illness who
reside in other housing areas of the Jails, will remain on an active mental health caseload
and receive clinically appropriate mental health treatment, regardless of whether they
refuse medications.[59]

**STATUS:     NON-COMPLIANCE**

Substantial Compliance requires the Department to review, on a random basis, the
electronic medical records of prisoners in HOH and MOH or with a Serious Mental
Illness ("SMI") to assess whether they have remained on an active mental health caseload
and that 95% of HOH prisoners, 90% of MOH prisoners, and 85% of other prisoners with
a serious mental illness have been offered "clinically appropriate structured mental health
treatment" and have been seen by a QMHP at least monthly, regardless of whether they
refuse medications.

The County previously reported that "the provision of groups was modified and
ceased in March [2020] due to the COVID-19 pandemic."  "In lieu of group treatment,
the group providers were deployed to do cell front visits in the housing units in an effort
to ensure the safety and wellbeing of the patients who would not be receiving group
treatment.  Patients continued to receive their clinical visits by assigned clinicians
(QMHP) as well."  By way of update, the County reports that during the Twelfth
Monitoring Period "some small groups were started in select areas in TTCF and CRDF
on a limited trial basis.  However, the impact of the pandemic has continued to effect the
County's ability to offer groups at full capacity in all areas."

The posted results indicate that for the Fourth Quarter of 2020, 12% of the records
reviewed reflected that HOH inmates were offered clinically appropriate treatment at
least weekly and were seen by a QMHP at least once a month.  4% of the records
reviewed reflected that MOH inmates were offered clinically appropriate mental health
treatment and seen by a QMPH at least once a month.  71% of the records reflected that
mentally ill inmates residing in other housing areas were offered clinically appropriate
mental health treatment at least weekly, and were seen by a QMHP at least once a month.

The posted results indicate that for the First Quarter of 2021, 8% of the records
reviewed reflected that HOH inmates were offered clinically appropriate treatment at
least weekly and were seen by a QMHP at least once a month.  4% of the records
reviewed reflected that MOH inmates were offered clinically appropriate mental health
treatment and seen by a QMPH at least once a month.  100% of the records reflected that
mentally ill inmates residing in other housing areas were offered clinically appropriate
mental health treatment at least weekly, and were seen by a QMHP at least once a month.

---

[59] On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the
language of Provision 66.  Because it was filed after the Twelfth Reporting Period, Provision 66 has been
analyzed in this Report under the language that was operative during the Twelfth Reporting Period.

As noted in prior monitoring reports, the County continues to struggle to ensure
that inmates with serious mental illnesses receive the clinically appropriate structured
mental health treatment that is required by Paragraph 66.  In the Thirteenth Monitoring
Period, the County should provide specific information about how it plans to attain
Substantial Compliance with Provision 66, the steps it will take to further those plans,
and any proposed timelines associated with their implementation.



67.     Within three months of the Effective Date, the County and the Sheriff will implement policies for prisoners housed in High Observation Housing and Moderate Observation Housing that require:

(a)     documentation of a prisoner's refusal of psychotropic medication in the prisoner's electronic medical record;

(b)     discussion of a prisoner's refusal in treatment team meetings;

(c)     the use of clinically appropriate interventions with such prisoners to encourage medication compliance;

(d)     consideration of the need to transfer non-compliant prisoners to higher levels of mental health housing; and

(e)     individualized consideration of the appropriateness of seeking court orders for involuntary medication pursuant to the provisions of California Welfare and Institutions Code sections 5332-5336 and/or California Penal Code section 2603(a).

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance requires the County to "review the electronic medical records of 25% of the prisoners in HOH and MOH who refused psychotropic medication during the quarter to verify that the records [of 85% of the prisoners] reflect the documentation and consideration of the matters required by the terms of Paragraph 67."

The County's posted results reflect that in the Fourth Quarter of 2020, 40% of the records of prisoners who refused psychotropic medication "reflected the documentation and consideration of the matters required by Paragraph 67." For the First Quarter of 2021, the County's posted results reflect that 57% of the records reflected the required documentation and consideration of these matters.

68.     Within six months of the Effective Date, the County and the Sheriff will develop and implement a procedure for contraband searches on a regular, but staggered basis in all housing units.  High Observation Housing cells will be visually inspected prior to initial housing of inmates with mental health issues.

STATUS:        **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at MCJ, NCCF, PDC East, PDC South, and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2017, through December 31, 2017 (verified) at TTCF)**

**PARTIAL COMPLIANCE (at CRDF)**

Substantial Compliance requires that "85% of the housing units are searched for contraband at least once in the previous quarter; and 95% of the HOH units visually inspected prior to housing prisoners in these units."  Self-Assessments are to include a summary of searches conducted and a review of 25 randomly selected Checklist forms for HOH units to confirm that the units were visually inspected prior to initial housing of prisoners in these units.

The County previously maintained Substantial Compliance for twelve consecutive months at TTCF, MCJ, NCCF, PDC East, PDC South, and PDC North.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring at those facilities for Substantial Compliance with Paragraph 68 in the Twelfth Reporting Period.

The County's posted results reflect that in the Fourth Quarter of 2020, 30% of the housing units at CRDF were searched at least once in the quarter, and 88% of the randomly selected HOH cells at CRDF were visually inspected before housing prisoners in these units.[60]  During the First Quarter of 2021, 34% of the housing units at CRDF were searched at least once in the quarter, and 100% of the randomly selected HOH cells at CRDF were visually inspected before housing prisoners in these units.[61]

---

[60] The DOJ has disagreed with some of the County's self-ratings of individual records submitted in connection with Paragraph 68 and has suggested that the County "provide the CCTV videos themselves rather than the screenshots if they are necessary to demonstrate compliance in the face of conflicting documentation."  The County has indicated that submitting videos in every case "would require significant technological resources, burdensome and costly storage, and not add much more than the screenshots currently submitted."  The Monitor believes that the County need not provide CCTV videos for inspection in every case, which could indeed become burdensome.  However, where the screenshot is unclear or there is conflict among the records provided, the County should post the relevant CCTV to allow the Monitor make a determination of whether or not the case is compliant.

[61] The County's Twelfth Self-Assessment notes that the Department came near to, or exceeded, the relevant compliance thresholds for Paragraph 68 at CRDF in multiple prior Reporting Periods.  It further notes that "its current challenges in this area relate to precautions put in place as a result of the COVID-19 pandemic."

69.     Consistent with existing DMH policies regarding use of clinical restraints, the County and the Sheriff will use clinical restraints only in the Correctional Treatment Center and only with the approval of a licensed psychiatrist who has performed an individualized assessment and an appropriate Forensic Inpatient order.  Use of clinical restraints in CTC will be documented in the prisoner's electronic medical record.  The documentation will include the basis for and duration of the use of clinical restraints and the performance and results of the medical welfare checks on restrained prisoners.  When applying clinical restraints, custody staff will ensure a QMHP is present to document and monitor the condition of the prisoner being placed in clinical restraints.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of July 1, 2018, through June 30, 2019 (verified))**

Substantial Compliance requires the Department to review the electronic medical records of all prisoners placed in clinical restraints to verify that the restraints were used, approved, and documented, and that the results of medical welfare checks on restrained prisoners were also documented.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring at those facilities for Substantial Compliance with Paragraph 69 in the Twelfth Reporting Period.

70.     Within three months of the Effective Date, the County and the Sheriff will have policies and procedures regarding the use of Security Restraints in HOH and MOH. Such policies will provide that:

(a)     Security Restraints in these areas will not be used as an alternative to mental health treatment and will be used only when necessary to insure safety;

(b)     Security Restraints will not be used to punish prisoners, but will be used only when there is a threat or potential threat of physical harm, destruction of property, or escape;

(c)     Custody staff in HOH and MOH will consider a range of security restraint devices and utilize the least restrictive option, for the least amount of time, necessary to provide safety in these areas; and

(d)     Whenever a prisoner is recalcitrant, as defined by Sheriff's Department policy, and appears to be in a mental health crisis, Custody staff will request a sergeant and immediately refer the prisoner to a QMHP.

**STATUS:      PARTIAL COMPLIANCE**

The Monitor's Eighth Report noted that "[t]he Mental Health Subject Matter Expert and DOJ have expressed concern about the Department's Substantial Compliance with paragraph 70(c) if all inmates in HOH are routinely handcuffed when they are out of their cells 'in a housing pod at the same time.'"[62]

As stated in the Monitor's prior reports, to achieve Substantial Compliance with Paragraph 70, the County must demonstrate that "it is continuing to conduct individual assessments in weekly and daily meetings, expanding the use of Living Modules and FIP step-down pods (or other less restrictive housing arrangements), and articulating policies for these programs."[63]  Also, as previously expressed by DOJ, "the County must show that clinicians routinely make individualized assessments for all HOH inmates about whether [the special housing units] would be appropriate, and that inmates are not being denied access to those housing units due to space or capacity constraints."[64]

The County's Twelfth Self-Assessment reports that

the Department continues to use alternative types of mental health housing with the goal of housing inmates with mental health concerns in the least restrictive manner appropriate, these models include FIP and HOH Step-Down modules, Living Modules, and the HOPE Dorm.  At CRDF, these programs operate under the FRESH program, which is a FIP step-down

---

[62] See Monitor's Eighth Report, p. 90.
[63] See Monitor's Eighth Report, p. 91; Ninth Report, p. 96.
[64] See Monitor's Ninth Report, p. 96.

type model, and the LIFE program, which is a Living Module model. As previously reported, under the 'Living Module' concept, patients begin their mental health treatment in an HOH pod and transition into an MOH pod as their mental health improves.  With each stage in the transition, the inmate-patient gains privileges and is less restricted in their movement. Prior to COVID-19, the Living Module concept operated in six pods at TTCF and two pods at CRDF. It has been reduced to two pods at TTCF in part because of population reduction and COVID-19-related quarantines. Inmates in the Step-down modules and HOPE Dorm are not restrained when out of cell. There are three FIP Step-Down pods at TTCF and CRDF.

As noted in the Monitor's Ninth Report, the Monitor believes, "with additional CHS staffing, the County could expand the Living and LIFE Modules and the Step-down units to provide enhanced mental health care treatment to additional HOH inmates who currently satisfy the criteria for housing in those specialized units."  In light of the substantial reduction in the number of inmates in the County's jail facilities as a result of the COVID-19 pandemic, the County should have space readily available to expand the alternative mental health housing units that would provide additional non-violent inmates with a mental illness with "significant unrestrained out of cell time."

By way of update, the County reports

due to circumstances beyond the control of Los Angeles County, the jail population has not remained at its Second Quarter 2020 lows. To the contrary, due to COVID-19 related precautions of its own, the State prison system temporary stopped receiving inmates from County jails. Though, as of the date of this Self-Assessment, the State has increased the number of inmate transfers from the County jails those transfers are significantly fewer in number than in non-Covid times, leaving the County jail with a backlog of State prison inmates which it cannot release. As of June 15, 2021, for example, the total population in the County jail was at 14,829, with 3,484 inmates awaiting transfer to State prison.

The County also reports that it "continues to frequently evaluate patients for placement in alternative housing modules."  However, "security and space limitations continue to present a significant barrier to expanding the County's alternative housing modules in a way that would accommodate all, or nearly all, of the inmates who might otherwise qualify for such housing."

During recent site visits, the Monitor observed that HOH inmates are generally handcuffed to metal "spider tables" during their recreational out-of-cell time as a matter of course.  That is, security restraints continue to be routinely applied based upon prisoners' mental health classifications and housing assignments, rather than individual assessments of particular risks that they might pose.  The Monitor reiterates the guidance that has been given previously.  To attain Substantial Compliance, the County will need

to demonstrate that it is using security restraints based upon individualized assessments,
"only when necessary to ensure safety," rather than based upon housing assignments or
mental health classifications alone.[65]



---

[65] The County has indicated its belief that by adopting compliant policies and procedures, "it has satisfied
the obligations of this Provision" and should be found to be in Substantial Compliance with Provision 70.
The Monitor notes, however, that the relevant compliance measures not only require the County to adopt
compliant policies, but also to demonstrate the "implementation of such policies and procedures" and
"confirmation that the policies and procedures have been implemented."

71.     The County and the Sheriff will ensure that any prisoner subjected to clinical restraints in response to a mental health crisis receives therapeutic services to remediate any effects from the episode(s) of restraint.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017 (verified))**

Substantial Compliance requires the Department to review the electronic medical records of all prisoners placed in clinical restraints to verify that the prisoners received therapeutic services as required by Paragraph 71.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 71 in the Twelfth Reporting Period.

72.     The County and the Sheriff will develop and implement policies and procedures that ensure that incidents involving suicide and serious self-injurious behavior are reported and reviewed to determine:  (a) whether staff engaged in any violations of policies, rules, or laws; and (b) whether any improvements to policy, training, operations, treatment programs, or facilities are warranted.  These policies and procedures will define terms clearly and consistently to ensure that incidents are reported and tracked accurately by DMH and the Sheriff's Department.

> **STATUS:       SUBSTANTIAL COMPLIANCE (as of January 1, 2017, through December 31, 2017)**

Substantial Compliance requires the Self-Assessments to report on (a) suicide review meetings and (b) CIRC meetings that review incidents of serious self-injurious behavior in the reporting period.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 72 in the Twelfth Reporting Period.

73.     Depending on the level of severity of an incident involving a prisoner who threatens or exhibits self-injurious behavior, a custody staff member will prepare a detailed report (Behavioral Observation and Mental Health Referral Form, Inmate Injury Report, and/or Incident Report) that includes information from individuals who were involved in or witnessed the incident as soon as practicable, but no later than the end of shift.  The report will include a description of the events surrounding the incident and the steps taken in response to the incident.  The report will also include the date and time that the report was completed and the names of any witnesses.  The Sheriff's Department will immediately notify the County Office of Inspector General of all apparent or suspected suicides occurring at the Jails.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified))**

Substantial Compliance requires the Department to review quarterly a random sample of reports of any threats or exhibitions of self-injurious behavior to verify that the reports have the information required by Paragraph 73; and to provide the Monitor with the notifications to the Inspector General of all incidents involving an apparent or suspected suicide during the reporting period.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 73 in the Twelfth Reporting Period.

74.     The Sheriff's Department will ensure that there is a timely, thorough, and objective law enforcement investigation of any suicide that occurs in the Jails. Investigations shall include recorded interviews of persons involved in, or who witnessed, the incident, including other prisoners.  Sheriff's Department personnel who are investigating a prisoner suicide or suspected suicide at the Jails will ensure the preservation of all evidence, including physical evidence, relevant witness statements, reports, videos, and photographs.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of September 1, 2016, through December 31, 2017)**

Substantial Compliance requires the Department to provide the Monitor with an Executive Suicide Death Review reflecting the results of the Department's investigation of any suicide in the Jails within six months of the suicide.  The review must reflect steps taken to preserve all of the evidence; and list the interviews of persons involved in, or who witnessed, the incident, and whether the interviews were recorded.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 74 in the Twelfth Reporting Period.

75.    Within three months of the Effective Date, the County and the Sheriff will review every suicide attempt that occurs in the Jails as follows:

(a)    Within two working days, DMH staff will review the incident, the prisoner's mental health status known at the time of the incident, the need for immediate corrective action if any, and determine the level of suicide attempt pursuant to the Centers for Disease Control and Prevention's Risk Rating Scale;

(b)    Within 30 working days, and only for those incidents determined to be a serious suicide attempt by DMH staff after the review described in subsection (a) above, management and command-level personnel from DMH and the Sheriff's Department (including Custody Division and Medical Services Bureau) will meet to review relevant information known at that time, including the events preceding and following the incident, the prisoner's incarceration, mental health, and health history, the status of any corrective actions taken, and the need for additional corrective action if necessary;

(c)    The County and the Sheriff will document the findings that result from the review of serious suicide attempts described in subsection (b) above; and

(d)    The County and the Sheriff will ensure that information for all suicide attempts is input into a database for tracking and statistical analysis.

**STATUS (75):**       **SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified))**

Substantial Compliance requires (a) DMH to review documentation of randomly selected suicide attempts during the previous quarter to verify that the prisoner's mental health status and need for immediate corrective action were considered timely by the DMH staff and that the staff determined whether the suicide attempt was serious; (b) that the Department and DMH reviewed the relevant information known at that time and the status of any corrective actions taken, and they considered the need for additional corrective action if necessary; and (c) that the information is reflected in the Department's database for tracking and statistical analysis.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 75 in the Twelfth Reporting Period.

76.   The County and the Sheriff will review every apparent or suspected suicide that occurs in the Jails as follows:

(a)   Within no more than two working days, management and command-level personnel from DMH and the Sheriff's Department (including Custody Division and Medical Services Bureau) will meet to review and discuss the suicide, the prisoner's mental health status known at the time of the suicide, and the need for immediate corrective or preventive action if any;

(b)   Within seven working days, and again within 30 working days, management and command-level personnel from DMH and the Sheriff's Department (including Custody Division and Medical Services Bureau) will meet to review relevant information known at that time, including the events preceding and following the suicide, the prisoner's incarceration, mental health, and health history, the status of any corrective or preventive actions taken, and the need for additional corrective or preventive action if necessary; and

(c)   Within six months of the suicide, the County and the Sheriff will prepare a final written report regarding the suicide.  The report will include:

(i)   time and dated incident reports and any supplemental reports with the same Uniform Reference Number (URN) from custody staff who were directly involved in and/or witnessed the incident;

(ii)   a timeline regarding the discovery of the prisoner and any responsive actions or medical interventions;

(iii)   copies of a representative sample of material video recordings or photographs, to the extent that inclusion of such items does not interfere with any criminal investigation;

(iv)   a reference to, or reports if available, from the Sheriff's Department Homicide Bureau;

(v)   reference to the Internal Affairs Bureau or other personnel investigations, if any, and findings, if any;

(vi)   a Coroner's report, if it is available at the time of the final report, and if it is not available, a summary of efforts made to obtain the report;

(vii)   a summary of relevant information discussed at the prior review meetings, or otherwise known at the time of the final report, including analysis of housing or classification issues if relevant;

(viii)   a clinical mortality review;

(ix)   a Psychological Autopsy utilizing the National Commission on Correctional Health Care's standards; and

(x)   a summary of corrective actions taken and recommendations regarding additional corrective actions if any are needed.

**STATUS (76):**          **SUBSTANTIAL COMPLIANCE (as of September 1, 2016, through December 31, 2017)**

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 76 in the Twelfth Reporting Period.  Nonetheless, the County continued to conduct the reviews required by Paragraph 76 for the suicides that occurred during this period and invited the Monitor to attend these meetings.



77.     The County and the Sheriff will create a specialized unit to oversee, monitor, and audit the County's jail suicide prevention program in coordination with the Department of Mental Health.  The Unit will be headed by a Captain, or another Sheriff's Department official of appropriate rank, who reports to the Assistant Sheriff for Custody Operations through the chain of command.  The Unit will be responsible for:

(a)     Ensuring the timely and thorough administrative review of suicides and serious suicide attempts in the Jails as described in this Agreement;

(b)     Identifying patterns and trends of suicides and serious suicide attempts in the Jails, keeping centralized records and inputting data into a unit database for statistical analysis, trends, and corrective action, if necessary;

(c)     Ensuring that corrective actions are taken to mitigate suicide risks at both the location of occurrence and throughout the concerned system by providing, or obtaining where appropriate, technical assistance to other administrative units within the Custody Division when such assistance is needed to address suicide-risk issues;

(d)     Analyzing staffing, personnel/disciplinary, prisoner classification, and mental health service delivery issues as they relate to suicides and serious suicide attempts to identify the need for corrective action where appropriate; and recommend remedial measures, including policy revisions, re-training, or staff discipline, to address the deficiencies and ensure implementation; and

(e)     Participating in meetings with DMH to develop, implement, and track corrective action plans addressing recommendations of the quality improvement program.

**STATUS (77):**          **PARTIAL COMPLIANCE**

On July 14, 2021, the County posted the Correctional Health Services and
Custody Compliance & Sustainability Bureau Combined Semi-Annual Report on Quality
Improvement and Suicide Prevention Efforts – Quarter 4 2020 & Quarter 1 2021
("Combined Suicide Prevention Report"), which relates to Paragraphs 60, 61, 62, and 77.
The Combined Suicide Prevention Report sets forth aggregate data for the 25 suicides
that occurred between 2015 and the end of the First Quarter of 2021, and 145 critical
incidents that occurred between 2016 and the end of the First Quarter of 2021, broken
down by the subparts of Paragraph 61(a) and 61(b)(e).  The report also includes case-
specific discussions of the six suicides that occurred during the Fourth Quarter of 2020
and First Quarters of 2021 at county jail facilities and one suicide at a station jail.

The Monitor reviewed the County's Combined Suicide Prevention Report in
consultation with Drs. Johnson, Vess, and Eargle.  Our view is that the Department has
made recent progress in its Quality Improvement efforts.  In terms of specific results, the
Combined Suicide Prevention Report reflects that the Department is now complying with
several subparts of Provision 77, including ensuring the timely and thorough
administrative review of suicides and serious suicide attempts in the Jails (77(a));
analyzing staffing, personnel/disciplinary, prisoner classification, and mental health
service delivery issues as they relate to suicides and serious suicide attempts to identify
the need for corrective action where appropriate (77(d)); and participating in meetings
with DMH to develop, implement, and track corrective action plans addressing
recommendations of the quality improvement program (77(e)).

The greatest challenges relate to Provision 77(b) and (c).  The County has
gathered and analyzed aggregate data related to suicide attempts and SDV.  For example,
the County has reported extensively on demographic data, location, method, prior
attempts, days in custody, security level, single cell status, charges, medication, mental
health and inmate P-level, among other variables.  However, this data does not appear to
drive County decisions regarding quality improvement plans ("QIPs") designed to
address systemic issues.  According to the Monitor's Mental Health team, "QIPs continue
to be largely driven by the results of individual reviews of suicides or CIRC reviews of
SDV.  For example, Safety Check Teams are now required to carry a cut-down tool, but
this policy was created in response to a particular suicide. The County also notes changes
in how safety checks are performed but it is unclear what data drove this decision. The
County does not mention how often safety checks were missed in SDVs or suicides and
does not provide any information about whether compliance with safety checks is
regularly audited and if so, the results of those audits, and any operational changes
resulting from them."

As another example, "the County reported that the number of suicides and SDVs
are higher in Hispanic males.  What is needed to determine vulnerability for this
population is a comparison of suicide rates or rates of SDV for the various ethnic/racial

114

groups in the jails or a comparison of rates of suicide for Hispanic males in the jail versus the community.  If the rates are different, the County should consider what protective factors are present for Hispanic males in the community that do not exist in jails and any interventions that could be designed to replicate some of these protective factors.  In other words, aggregating data, which the County is now doing very well, should be the first step in a longer analytical process that results in well-articulated changes to policy and practice, where appropriate."



78.     The County and the Sheriff will maintain a county-level Suicide
Prevention Advisory Committee that will be open to representatives from the Sheriff's
Department Custody Division, Court Services, Custody Support Services, and Medical
Services Bureau; the Department of Mental Health; the Public Defender's Office; County
Counsel's Office; the Office of the Inspector General; and the Department of Mental
Health Patients' Rights Office.  The Suicide Prevention Advisory Committee will meet
twice per year and will serve as an advisory body to address system issues and
recommend coordinated approaches to suicide prevention in the Jails.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of May 11, 2016, through
May 18, 2017)**

Substantial Compliance requires (1) the Committee to meet twice per year and (2)
"recommend coordinated approaches to suicide prevention in the Jails."

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not
subject to monitoring for Substantial Compliance with Paragraph 78 in the Twelfth
Reporting Period.  Nevertheless, the County has continued to hold Bi-Annual Suicide
Prevention meetings through the last reporting period, which the Monitor endeavors to
attend.

79.    (a)    Unless clinically contraindicated, the County and the Sheriff will
offer prisoners in mental health housing:

(i)    therapeutically appropriate individual visits with a QMHP;
and

(ii)    therapeutically appropriate group programming conducted
by a QMHP or other appropriate provider that does not
exceed 90 minutes per session;

(b)    The County and the Sheriff will provide prisoners outside of
mental health housing with medication support services when
those prisoners are receiving psychotropic medications and
therapeutically appropriate individual monthly visits with a QMHP
when those prisoners are designated as Seriously Mentally Ill; and

(c)    The date, location, topic, attendees, and provider of programming
or therapy sessions will be documented.  A clinical supervisor will
review documentation of group sessions on a monthly basis.[66]

**STATUS:    NON-COMPLIANCE**

Substantial Compliance requires the Department to maintain records of
therapeutically appropriate individual visits and group programming, and the names of
the clinical supervisors who reviewed the documentation of group sessions; describe the
medication support services available for prisoners not in mental health housing who are
receiving psychotropic medications; and review electronic medical records of such to
confirm that medication support services were provided to these prisoners.

The County's Twelfth Self-Assessment reports that in the Fourth Quarter of 2020,
50% of the prisoners who resided outside of mental health housing and were receiving
psychotropic medications were "provided with medication support services."  The
County's Augmented Twelfth Self-Assessment reports that in the First Quarter of 2021,
47% of the prisoners who resided outside of mental health housing and were receiving
psychotropic medications were "provided with medication support services."  Both are
below the 85% threshold required by Compliance Measure 79.5(d) for Substantial
Compliance.

As the Mental Health Subject Matter Expert has noted during prior Reporting
Periods, the County did not provide records of therapeutically appropriate individual
visits and group programming by QMHPs to prisoners who reside in mental health
housing because Compliance Measure 79.1(a) and (b) and 79.5(b), which "govern[]
therapeutically appropriate treatment to inmates in HOH and MOH units, are not yet ripe

---

[66] On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the
language of Provision 79.  Because it was filed after the Twelfth Reporting Period, Provision 79 has been
analyzed in this Report under the language that was operative during the Twelfth Reporting Period.

for evaluation as the County is not yet able to render structured treatment according to methods reflected in treatment plans."



80. (a) The County and the Sheriff will continue to make best efforts to provide appropriate out-of-cell time to all prisoners with serious mental illness, absent exceptional circumstances, and unless individually clinically contraindicated and documented in the prisoner's electronic medical record. To implement this requirement, the County and the Sheriff will follow the schedule below:

(i) By no later than six months after the Effective Date, will offer 25% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week;

(ii) By no later than 12 months after the Effective Date, will offer 50% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week; and

(iii) By no later than 18 months after the Effective Date, will offer 100% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week.

(b) No later than six months after the Effective Date, the County and the Sheriff will record at the end of each day which prisoners in HOH, if any, refused to leave their cells that day. That data will be presented and discussed with DMH staff at the daily meeting on the following Normal business workday. The data will also be provided to the specialized unit described in Paragraph 77 and to DMH's quality improvement program to analyze the data for any trends and to implement any corrective action(s) deemed necessary to maximize out-of-cell time opportunities and avoid unnecessary isolation.

**STATUS (80):          NON-COMPLIANCE**

Paragraph 80 requires that, "no later than 18 months after the Effective Date [July 1, 2015]," 100% of the prisoners in HOH receive "ten hours of unstructured out-of-cell recreational time *and* ten hours of structured therapeutic or programmatic time per week."  The parties have agreed that up to five hours of the structured time can consist of education or work programs, but at least five hours of the time must be therapeutic.

The County's Twelfth Self-Assessment reports that in the Fourth Quarter of 2020, 95% of the HOH prisoners at CRDF and 68% of the HOH prisoners at TTCF were offered "unstructured out-of-cell time by Custody staff."  For the First Quarter of 2021, 100% and 74% of HOH prisoners were offered unstructured out-of-cell time at CRDF and TTCF, respectively.[67]

As in the past, County's Twelfth Self-Assessment does not reflect results for "structured therapeutic or programming time."  This data is essential to evaluating the Department's compliance with Paragraph 80.  The County previously reported that due to the COVID-19 pandemic, "CHS temporarily suspended most group mental health treatment, which provides a significant amount of the structured out-of-cell time provided inmates in HOH."  By way of update, in documents posted to SharePoint, the County reports

In November 2020, the HOH programs were tasked with restarting group programming, which was done slowly to slowly reintegrate group programming while taking all necessary precautions to mitigate the spread of COVID.  These groups, though limited, have gone well and the health risks have been sufficiently mitigated.  However, returning to group programming only highlighted one of the single most difficult challenges to CHS and that is data collection.  A sustained and reliable data collection process for participation and non-participation data on over 1100 inmates has proved to be unattainable without a robust IT solution.  The County is also aware that the current 2018 agreement for CHS to use the Sheriff's Department's eUDAL system to collect the data is insufficient to meet the IT needs as the system is WIFI dependent which is a technological resource that historically has not often been reliable for various reasons.

The County reports that the "long-term" solution to this technological problem

involves the data collection and tracking of participation and non-participation data to take place within ORCHID.  ORCHID is the new electronic medical record that CHS is scheduled to transition to by

---

[67] The Mental Health Subject Matter Expert and the clinicians previously assessed the accuracy of the County's reporting of the out-of-cell time offered to inmates by comparing out-of-cell time records to videos of the HOH units over the same time periods, and they found the County's data to be "highly unreliable."  The Monitor and the Mental Health Subject Matter viewed this as a "very serious problem, . . . both in terms of the accuracy of the Department's records and the conditions in HOH units."

Summer 2022.  Despite the recent technological updates, CHS does not expect to see any measurable results from these efforts until quarter 1 2022.  In quarters 3 and 4 of 2022, CHS Compliance will continue to work with the mental health programs and our custody partners to monitor the efficacy of the iPODS in tracking group programming data, the group programming schedule, and staffing levels to keep the DOJ abreast of our improvements.



81.     Except as specifically set forth in Paragraphs 18-20 of this Agreement, and except as specifically identified below, the County and the Sheriff will implement the following paragraphs of the Implementation Plan in *Rosas* at all Jails facilities, including the Pitchess Detention Center and the Century Regional Detention Facility, by no later than the dates set forth in the Implementation Plan or as revised by the *Rosas* Monitoring Panel:  Paragraphs 2.2-2.13 (use of force policies and practices); 3.1-3.6 (training and professional development); 4.1-4.10 (use of force on mentally ill prisoners); 5.1-5.3 (data tracking and reporting of force); 6.1-6.20 (prisoner grievances and complaints); 7.1-7.3 (prisoner supervision); 8.1-8.3 (anti-retaliation provisions); 9.1-9.3 (security practices); 10.1-10.2 (management presence in housing units); 11.1 (management review of force); 12.1-12.5 (force investigations, with the training requirement of paragraph 12.1 to be completed by December 31, 2016); 13.1-13.2 (use of force reviews and staff discipline); 14.1-14.2 (criminal referrals and external review); 15.1-15.7 (documentation and recording of force); 16.1-16.3 (health care assessments); 17.1-17.10 (use of restraints); 18.1-18.2 (adequate staffing); 19.1-19.3 (early warning system); 20.1-20.3 (planned uses of force); and 21.1 (organizational culture).

### STATUS:     PARTIAL COMPLIANCE

Because Paragraph 81 of the Settlement Agreement incorporates 100 provisions in the Implementation Plan adopted in the *Rosas* case, the parties agreed in the Compliance Measures adopted in this case that "Substantial Compliance with respect to the substance of the policies required by the *Rosas* Implementation Plan would be determined by the *Rosas* Monitors."  With the exception of the Early Warning System required by Section 19 of the plan, all of the required policies were approved by the *Rosas* Monitors by the Second Reporting Period in this case, and the Early Warning System was approved in the Seventh Reporting Period.

The Compliance Measures in this case then provide that "[o]nce the policies have been approved by the *Rosas* Monitors, the Monitor and Subject Matter Expert will confirm and assess the implementation of these policies in the [DOJ facilities]."  In assessing the Department's compliance with Paragraph 81, the Monitor has grouped the 100 provisions into seven categories and, with input from the Subject Matter Experts, has assessed Department's compliance on a category-by-category basis.  With the exception of the Training category, which is assessed when certain percentages are reached, the Department will no longer be subject to monitoring for the provisions in a particular category once the Monitor has determined that it has achieved and maintained for twelve consecutive months Substantial Compliance with the intent and purpose of the overall category.  The Department will no longer be subject to monitoring for compliance with Paragraph 81 once it has achieved and maintained for twelve consecutive months Substantial Compliance with each of the categories.

### Training (Partial Compliance)

Paragraphs 3.1-3.6, 4.6-4.9, and 12.1 of the *Rosas* Implementation Plan reflect training requirements on use of force, ethics, dealing with mentally ill inmates, and

investigations of force incidents. The curriculum and lesson plans to implement these training requirements have been approved by the *Rosas* Monitors.

The County's Twelfth Self-Assessment reports that the Department met the Substantial Compliance thresholds for the following Training provisions at the DOJ facilities during the Fourth Quarter of 2020: 3.5, 4.8, 4.9, and 12.1.[68] The Department's posted results reflect Substantial Compliance with Provisions 3.1, 3.2, 3.3, 4.6, and 4.7. The Monitor's auditors have verified the results for 3.3, 4.8, 4.9, and 12.1. The following provisions remain subject to verification by the Monitor's auditors: 3.1, 3.2, 4.6, and 4.7. The County reports that the Department did not reach the threshold for Substantial Compliance with 3.6 (performance reviews for probationary staff members).

The County's Augmented Twelfth Self-Assessment reports that the Department met the Substantial Compliance thresholds for the following Training provisions at the DOJ facilities during the First Quarter of 2021: 3.3, 3.5, 4.8, 4.9, and 12.1.[69] The County's posted results for 3.3, 4.8, 4.9, and 12.1 reflect that there were no applicable personnel for these training provisions.

### Use of Force (Partial Compliance)

The Department produced, and the Monitor reviewed, 26 completed force packages for the DOJ facilities during this Reporting Period. Some of these force incidents were also reviewed by Use of Force Subject Matter Expert Susan McCampbell.

As a result of objections by the plaintiffs in the *Rosas* case, the *Rosas* Monitors revised their approach to assessing the Department's compliance with the use, reporting and investigation of force provisions of the Implementation Plan. Under the revised approach, the *Rosas* Monitors do not determine the percentage of cases in which the Department's use of force was reasonable overall, but instead assess the Department's compliance with the specific provision on the use, reporting, and investigation of force provisions of the Implementation Plan. To maintain consistency across all of the jail facilities, the Monitor has adopted the same approach in the *DOJ* case.

In the uses of force reviewed during the Twelfth Monitoring Period, the Monitor determined that the Department was not in compliance with Paragraph 2.2. Regarding Paragraph 2.2(a) (force must be used as a last resort), Department members too readily engaged in uses of force before meaningful attempts were made to de-escalate using time, distance, the presence of a supervisor or mental health professional, and verbal attempts

---

[68] Because Paragraph 81 incorporates all 104 provisions of the *Rosas* Implementation Plan in a single provision, the Monitor agreed to the use of random samples in some cases instead of requiring assessments of all personnel or incidents, which the Monitor believes would be unduly burdensome for the Department.

[69] The County has previously reported that "assessments for certain Provisions are submitted during the Fourth Quarter, covering the entire year. These Provisions include: 3.1(a) (more than 90% of personnel received initial training); 3.1(b) (more than 90% of retained personnel received required refreshers); 3.2(a) (more than 90% of personnel received initial training); 3.2(b) (more than 90% of retained personnel received required refreshers); 4.6 (DeVRT initial training and refreshers); 4.7 (DeVRT initial training and refreshers)." Thus, no results have bene reported for these provisions for the First Quarter of 2021.

at persuasion.[70]  Regarding Paragraph 2.2(b) (must be the minimal amount of force
necessary and objectively reasonable to safely overcome the resistance), Department
members too often relied upon takedowns or headstrikes to overcome passive resistance
where other less dangerous techniques might have sufficed, such as handcuffing and
placing inmates against a wall.

### Reporting and Investigation of Force (Partial Compliance)

During the Twelfth Reporting Period, the Monitor identified several key issues
related to the Department's reporting and investigation of force.  First, as has been noted
in prior reports, the administrative review process is significantly delayed.  Command
reviews often happen many months after the underlying use of force incidents, which
necessarily compromises the ability of the Department to provide swift training or take
prompt disciplinary action, if necessary.

Second, the depth and quality of the command reviews of force incidents varied
significantly.  Sometimes Commanders made note of discrepancies among Deputy use of
force reports or between reports and available video, or flagged other issues that may
have given rise to the need to use force.  Yet, important, sometimes self-evident, issues
were not always identified.  In certain cases, supervisors identified inconsistencies in an
employee's initial use of force report and brought the employee back to submit a
supplemental report, which is generally consistent with Paragraph 15.5.  However, when
there was evidence of potential deception, the matter was not always referred for
additional investigation as it should have been.[71]

Further, Commanders should evaluate not only the specific moments in which
force was being used, but also the circumstances that gave rise to the need to use force,
including "unexplained tactical decisions."  Paragraph 5.3.  Subject Matter Expert Susan
McCampbell noted the high number of incidents in which "staff failed to perform basic
security actions such as cuffing an inmate before he/she was moved.  That's not to say
that all these events would have been avoided, but many might have been, including
those in which staff were injured."  A small number of the packages reviewed included
this level of analysis by Commanders.

---

[70] Note that simply ordering an inmate to comply is not de-escalation in most circumstances.

[71] For example, in one of the force packages the Monitor reviewed in connection with this Report, an
inmate had no mattress and was removed from his dorm for using profanity towards staff.  Once outside, he
was taken to the ground by multiple staff members and then placed into a WRAP restraint.  In a use of
force report filed on the day of the incident, the primary deputy alleged that the inmate displayed a high
level of resistance, including swinging his elbow forward and striking the deputy, "turning assaultive,"
using profanity, and attempting to turn around to run away or "swing on personnel."  These assertions were
not corroborated by video footage or the statements of other staff.  Almost seven months later, the
investigating sergeant was directed to have the deputy prepare a supplemental report in which the deputy
wrote "in my first memorandum . . . it was not my intention to convey that [the inmate] was trying to
assault me."  However, this was precisely what the deputy said in his attempts to justify the force used.
The command review of this incident should have referred both the force used and the statements of the
primary deputy for additional investigation as potential violations of Department policy, but it did not do
so.

Finally, when supervisors identify issues in a use of force or use of force report, they often report that the employee was "counseled" and "receptive." It is not clear what kind of follow up is contemplated, who is responsible for it, by what date, and what measures will determine whether the counseling is successful. Only occasionally did the command reviews note that a deputy had been sent for specific kinds of retraining.

Regarding the Department's quantitative results on the specific provisions, for the Fourth Quarter of 2020, the County's Twelfth Self-Assessment reports Substantial Compliance with the following provisions: 5.1 (timely database entry of force incidents); 11.1 (timely review of force packages by CFRT for potential employee discipline); 13.1 (zero tolerance and related investigations), 13.2 (notifications to OIG required by findings in 13.1); 14.1 (timely unit commander review re: prosecution for inmate assaults on staff); and 14.2 (timely referral of criminal inmate conduct to DA's Office). The County reports that the Department did not achieve Substantial Compliance with 8.3 (timely review of retaliation grievances).

For the First Quarter of 2021, the County reported Substantial Compliance with the following provisions: 5.1 (timely database entry of force incidents); 8.3 (timely review of retaliation grievances);; 11.1 (timely review of force packages by CFRT for potential employee discipline); 13.1 (zero tolerance and related investigations); 13.2 (notifications to OIG required by findings in 13.1); 14.1 (timely unit commander review re: prosecution for inmate assaults on staff); 14.2 (timely referral of criminal inmate conduct to DA's Office).

**Grievances (Partial Compliance)**

The County's Twelfth Self-Assessment reports that in the Fourth Quarter of 2020, the Department achieved Substantial Compliance with the following grievance provisions at the DOJ facilities: 6.4 (proper handling of force-related grievances), 6.5 (proper handling of harassment and retaliation grievances); 6.8 (inmate notification of downgraded grievances); 6.9 (proper handling of emergency grievances); 6.10 (timely collection of inmate grievances); 6.11 (review of complaints re: inmate grievance process); 6.12 (proper database entry of inmate grievances); 6.13 (proper tracking of handling of inmate grievances); 6.14 (monthly reports of grievance tracking); 6.15 (evaluation of trends in inmate grievance handling); 6.17 (time limit for filing force-related grievances); 6.20 (proper handling of inmate appeals); 7.1 (conflict resolution for inmate grievances); 7.3 (town hall meetings); and 8.1 (reporting of retaliation grievances).

The Department was not in Substantial Compliance with 6.7 (appropriate handling of grievances marked "emergency"); 6.18 (proper handling of PREA grievances); 6.19 (timely responses to inmate grievances); and 7.2 (timely notification of grievance investigation results).

The County's Augmented Twelfth Self-Assessment reports that in the First Quarter of 2021, the Department achieved Substantial Compliance with the following

grievance provisions at the DOJ facilities: 6.4 (proper handling of force-related grievances); 6.5 (proper handling of harassment and retaliation grievances); 6.8 (inmate notification of downgraded grievances); 6.9 (proper handling of emergency grievances); 6.10 (timely collection of inmate grievances); 6.11 (review of complaints re: inmate grievance process); 6.12 (proper database entry of inmate grievances); 6.13 (proper tracking of handling of inmate grievances); 6.14 (monthly reports of grievance tracking); 6.15 (evaluation of trends in inmate grievance handling); 6.17 (time limit for filing force-related grievances); 6.19 (timely responses to inmate grievances); 6.20 (proper handling of inmate appeals); 7.1 (conflict resolution for inmate grievances); 7.2 (timely notification of grievance investigation results); 7.3 (town hall meetings); and 8.1 (reporting of retaliation grievances).  The Department did not report Substantial Compliance with 6.7 (appropriate handling of grievances marked 'emergency') and 6.18 (proper handling of PREA grievances).

### Management and Administration  (Substantial Compliance as of October 1, 2020 through March 31, 2021)

The Department's posted documents reflect that senior managers from the rank of Unit Commanders and above toured and inspected all of the DOJ facilities during the Fourth Quarter of 2020 and First Quarter of 2021, as required by applicable Compliance Measures for Paragraph 10.1, and that they were documented in electronic records or visitor logs, as is required by Paragraph 10.2  The Department's posted results reflect that the Department achieved Substantial Compliance with Paragraphs 18.1 and 18.2.  The posted documents reflect that no Department members were transferred to Custody as a sanction for misconduct or a policy violation in either quarter, as required by Paragraph 21.1.

### Security Restraints (Partial Compliance)

Security Restraints are subject to the provisions in Section 17 of the *Rosas* Plan. It is the Monitor's understanding that the County and the Department do not use "multi-point restraints," which are subject to Paragraphs 17.6 through 17.9 of the plan, at any of the County's jail facilities.  The Monitor reviewed the Safety Chair Logs and Fixed Restraint Logs for both quarters, which reflect that the facilities that produced such logs are complying with the requirements of Paragraphs 17.3 and 17.4 of the *Rosas* Plan.

The Department posted logs of all of the involuntary medications administered in the Fourth Quarter of 2020 and First Quarters of 2021.  The records reflect that all of the medications were administered per court orders to restore the competency of those deemed incompetent to stand trial and none were solely for security purposes in compliance with Paragraph 17.10 of the *Rosas* Plan.

The Monitor noted in the Eleventh Report that the Wrap policy had not been yet finalized.  Further

During the Eleventh Reporting Period, the Department produced, and the

Monitor reviewed, 24 completed force packages for the DOJ facilities. Six of those packages included applications of the WRAP restraint. In a number of those incidents, the specific reason for the application of the WRAP was not articulated in the paperwork associated with the use of force, nor was a clear reason apparent from the accompanying evidence. Further, the duration for which the inmate was left in the WRAP restraint was also not generally noted in the documents accompanying each use of the WRAP. These issues should be corrected. Further, the Monitor has requested aggregated data documenting the frequency with which the WRAP restraint has been used, the circumstances prompting its use, and the duration (if known). The Department should make such data available before or concurrent with its Twelfth Self-Assessment.

On April 9, 2020, after consultation with Use of Force Subject Matter Expert Susan McCampbell, the Monitor provided comments on the Department's draft WRAP Restraint Policy. The DOJ also provided comments on this date. On June 23, 2021, the Department responded to the DOJ's comments and on July 6, 2021, the Department responded to the Monitor's comments. The policy remains outstanding.

The Monitor reviewed 26 completed force packages for the DOJ facilities during this Reporting Period. Some of these force incidents were also reviewed by Use of Force Subject Matter Expert Susan McCampbell. A high percentage of the incidents involved the use of the WRAP restraint. In the vast majority of these incidents, no specific justification was provided in use of force documentation regarding the reason for the application of the WRAP. When a justification was provided, it was often extremely general, noting, for example, that was being applied due to the inmate's "unpredictable behavior." This is not sufficient. To help avoid risks of overuse, supervisors should be trained to describe with particularity what specific threat required the use of the WRAP.

**Early Warning System**       **(Substantial Compliance as of September 30, 2019 through September 30, 2020)**

The Department implemented an Employee Review System that was approved by the *Rosas* Monitors as a pilot program at the Downtown Jail Facilities on July 27, 2018, and expanded it to the DOJ facilities on October 25, 2018. The Department achieved Substantial Compliance with the Early Warning Provisions at the DOJ facilities as of September 30, 2020, and these provisions were not subject to Monitoring during the Twelfth Reporting Period.

82.     With respect to paragraph 6.16 of the *Rosas* Implementation Plan, the County and the Sheriff will ensure that Sheriff's Department personnel responsible for collecting prisoners' grievances as set forth in that paragraph are also co-located in the Century Regional Detention Facility.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of July 15, 2016, through December 31, 2017)**

Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring for Substantial Compliance with Paragraph 82 in the Twelfth Reporting Period.

83.     The County and the Sheriff will install closed circuit security cameras throughout all Jails facilities' common areas where prisoners engage in programming, treatment, recreation, visitation, and intra-facility movement ("Common Areas"), including in the Common Areas at the Pitchess Detention Center and the Century Regional Detention Facility.  The County and the Sheriff will install a sufficient number of cameras in Jails facilities that do not currently have cameras to ensure that all Common Areas of these facilities have security-camera coverage.  The installation of these cameras will be completed no later than June 30, 2018, with TTCF, MCJ, and IRC completed by the Effective Date; CRDF completed by March 1, 2016; and the remaining facilities completed by June 30, 2018.  The County and the Sheriff will also ensure that all video recordings of force incidents are adequately stored and retained for a period of at least one year after the force incident occurs or until all investigations and proceedings related to the use of force are concluded.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of July 1, 2015, through June 30, 2016 at MCJ and IRC)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2015, through September 30, 2016 at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 at NCCF and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2018, through June 30, 2019 at PDC South)**

Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring for Substantial Compliance with Paragraph 83 in the Twelfth Reporting Period.

84.    The Sheriff will continue to maintain and implement policies for the timely and thorough investigation of alleged staff misconduct related to use of force and for timely disciplinary action arising from such investigations.  Specifically:

(a)    Sworn custody staff subject to the provisions of California Government Code section 3304 will be notified of the completion of the investigation and the proposed discipline arising from force incidents in accordance with the requirements of that Code section; and

(b)    All non-sworn Sheriff's Department staff will be notified of the proposed discipline arising from force incidents in time to allow for the imposition of that discipline.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of July 1, 2017, through June 30, 2018 (verified))**

Substantial Compliance under the Compliance Measures requires the Department to demonstrate that 95% of the investigations of force incidents in which sworn custody staff and non-sworn custody staff were found to have violated Department policy or engaged in misconduct were completed and administrative action, which could include discipline, was taken within the time frames provided for in Government Code Section 3304 and relevant Department policies.

Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring for Substantial Compliance with Paragraph 84 in the Twelfth Reporting Period.

85.     The County and the Sheriff will ensure that Internal Affairs Bureau
management and staff receive adequate specialized training in conducting investigations
of misconduct.

STATUS:     **PARTIAL COMPLIANCE**

Substantial Compliance requires the Department to provide the Monitor with (1)
the curriculum/syllabus for the three specialized courses given to IAB management, and
(2) a list of the sworn personnel assigned to IAB and proof that such personnel
successfully completed the training.  The County's Twelfth Self-Assessment reports that
56% of the IAB investigators completed all three of the required courses as of the end of
the Fourth Quarter of 2020 and 41% as of the end of the First Quarter of 2021.  The
County noted that "some of its challenges related to this Provision are closely tied to
changes in staffing and the inability to offer the relevant training due to precautions in
place to prevent the spread of COVID-19.  The Department anticipates improved
compliance, and the resumption of all relevant training, as public health allows."

86.     Within three months of the Effective Date, the County and the Sheriff will develop and implement policies and procedures for the effective and accurate maintenance, inventory, and assignment of chemical agents and other security equipment. The County and the Sheriff will develop and maintain an adequate inventory control system for all weapons, including OC spray.

**STATUS:**      **SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 at MCJ and CRDF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2016, through December 31, 2017 at PDC North)**

**SUBSTANTIAL COMPLIANCE (as of February 1, 2017, through March 31, 2018 at PDC South and PDC East)**

**SUBSTANTIAL COMPLIANCE (as of March 1, 2017, through March 31, 2018 at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 at IRC)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 at TTCF)**

CDM 7-08/080 ACCOUNTABILITY OF SPECIAL WEAPONS, effective October 14, 2016, requires each facility to have unit orders that "establish procedures for the storage, issuance, reissuance, accountability, maintenance, and periodic inventory of all weapons. . . stored at, or issued from, the facility," which includes detailed requirements for the "Inventory, Control, and Accountability of Aerosol Chemical Agents."

In addition to providing written policies and procedures, Substantial Compliance requires the Department to provide up-to-date Unit Orders for each jail requiring the inventory and inspection of special weapons, and armory audit logs documenting the inventory and control of armory-level weapons.  The Department previously maintained Substantial Compliance with Paragraph 86 for twelve consecutive months at all of the facilities, and it was not subject to monitoring with this provision in the Twelfth Reporting Period.

### APPENDIX A

| NO. | PROVISION | STATUS | SUBSTANTIAL COMPLIANCE DATES |
|---|---|---|---|
| 18 | Suicide Prevention Training | Substantial Compliance | **(10/1/17 at MCJ & PDC South)[1] (9/1/17 at NCCF) (12/1/17 at PDC East) (4/1/18 at TTCF, IRC, & PDC North) (8/1/18 at CRDF)** |
| 19 | Crisis Intervention & Conflict Resolution Training | Substantial Compliance | **(4/1/18 at MCJ, NCCF, & IRC) (7/1/18 at TTCF) (12/1/18 at CRDF, PDC East, & PDC North) (3/1/19 at PDC South)** |
| 20 | Training at NCCF, PDC and CRDF | Substantial Compliance | **(8/1/17 at PDC East, PDC North, NCCF, & CRDF) (10/1/17 at PDC South)** |
| 21 | CPR Certification | Substantial Compliance | **(10/1/15 – 9/30/16 at PDC East & PDC South) (1/1/16 – 12/31/16 at NCCF, PDC North, & IRC) (4/1/16 – 3/31/17 at TTCF) (10/1/17 – 9/30/18 at MCJ) (7/1/18 – 6/30/19 at CRDF)** |

---

[1] Substantial Compliance Dates in **bold** reflect that the Department has achieved Substantial Compliance with the training requirements or maintained Substantial Compliance for twelve consecutive months with the other requirements; the results were verified by the Monitor's auditors when required; and the County or designated facilities are no longer subject to monitoring of this provision pursuant to Paragraph 111 of the Settlement Agreement.

## APPENDIX A

| 22 | Use of Arresting and Booking Documents | Substantial Compliance | **(7/1/16 – 6/30/17)** |
|---|---|---|---|
| 23 | Suicide Hazard Mitigation Plans | Substantial Compliance | **(7/12/18)** |
| 24 | Suicide Hazard Inspection | Substantial Compliance | **(10/1/17 – 9/30/18)** |
| 25 | Transportation of Suicidal Inmates (station jails) | Partial Compliance | |
| 26 | Identification and Evaluation of Suicidal Inmates | Partial Compliance | |
| 27 | Screening for Mental Health Care and Suicide Risk | Substantial Compliance | **(10/1/19 – 3/31/20, 10/1/20 – 3/31/21)** |
| 28 | Expedited Booking of Suicidal Inmates | Substantial Compliance (IRC) Partial Compliance (CRDF) | **(4/1/17 – 3/31/18 at IRC)** |
| 29 | Mental Health Assessments (of non-emergent mental health needs) | Substantial Compliance | **(4/1/17 – 3/31/18)** |
| 30 | Initial Mental Health Assessments & Treatment Plans | Substantial Compliance | **(1/1/19 – 12/31/19)** |
| 31 | Electronic Medical Records Alerts | Partial Compliance | |
| 32 | Electronic Medical Records – Suicide Attempts | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 33 | Supervisor Reviews of Electronic Medical Records | Substantial Compliance | **(7/1/16 – 6/30/17)** |
| 34 | Discharge Planning | Partial Compliance | |
| 35 | Referral for Mental Health Care | Substantial Compliance | **(11/1/17 – 12/31/18)** |
| 36 | Assessments After Triggering Events | Partial Compliance | |

## APPENDIX A

| 37 | Court Services Division Referrals | Partial Compliance | |
|---|---|---|---|
| 38 | Weekly Rounds in Restricted Housing Modules | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 39 | Confidential Self-Referral | Substantial Compliance (NCCF)<br>Partial Compliance (PDC North, TTCF, MCJ, & CRDF)<br>Not Rated (PDC East & PDC South) | **(7/1/17 – 6/30/18 at NCCF)** |
| 40 | Availability of QMHPs | Partial Compliance | |
| 41 | FIP Step-Down Protocols | Partial Compliance | |
| 42 | HOH Step-Down Protocols | Compliance Suspended | |
| 43 | Disciplinary Policies | Substantial Compliance (NCCF & PDC North)<br>Non-Compliance (CRDF, MCJ, & TTCF) | **(10/1/17 – 9/30/18 at NCCF & PDC North)** |
| 44 | Protective Barriers | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 45 | Suicide Intervention and First Aid Kits | Substantial Compliance | **(10/1/15 – 9/30/16 at CRDF, NCCF, TTCF, PDC East, & PDC South)**<br>**(1/1/16 – 12/31/16 at MCJ & PDC North)** |
| 46 | Interruption of Self-Injurious Behavior | Substantial Compliance | (7/1/20 – 3/31/21) |
| 47 | Staffing Requirements | Non-Compliance | |
| 48 | Housekeeping and Sanitation | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 49 | Maintenance Plans | Substantial Compliance | **(3/1/16 – 2/28/17)** |

### APPENDIX A

| | | | |
|---|---|---|---|
| 50 | Pest Control | Substantial Compliance | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC North, TTCF, & CRDF) (4/1/16 – 3/31/17 at PDC South & PDC East)** |
| 51 | Personal Care & Supplies | Substantial Compliance | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC East, PDC North, PDC South, & TTCF) (7/1/16 – 6/30/17 at CRDF)** |
| 52 | HOH Property Restrictions | Partial Compliance | |
| 53 | Eligibility for Education, Work and Programs | Partial Compliance | |
| 54 | Privileges and Programs[2] | Substantial Compliance | (1/1/20 – 6/30/20) |
| 55 | Staff Meetings | Substantial Compliance | **(10/1/16 – 9/30/17 at CRDF) (4/1/17 – 3/31/18 at PDC North) (4/1/18 – 3/31/19 at MCJ) (7/1/19 – 6/30/20 at TTCF)** |
| 56 | Changes in Housing Assignments | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 57 | Inmate Safety Checks in Mental Housing | Substantial Compliance (MCJ) Partial Compliance (TTCF, PDC North, & CRDF) | **(4/1/17 – 3/31/18 at MCJ)** |

---

[2] Per agreement of the parties, the County must maintain Substantial Compliance for two additional quarters under the revised Compliance Measures.

**APPENDIX A**

| | | | |
|---|---|---|---|
| 58 | Inmate Safety Checks in Non-Mental Housing | Substantial Compliance (PDC South, PDC North, PDC East, CRDF, IRC, & NCCF) Partial Compliance (TTCF) Non-Compliance (MCJ) | **(1/1/16 – 12/31/16 at PDC South, PDC North, & PDC East) (7/1/17 – 6/30/18 at CRDF) (10/1/17 – 9/30/18 at IRC)** (4/1/20 – 3/31/21 at NCCF) |
| 59 | Supervisor Rounds | Substantial Compliance | **(1/1/17 – 12/31/17 at PDC East & MCJ) (4/1/17 – 3/31/18 at NCCF) (10/1/17 – 9/30/18 at CRDF) (1/1/18 – 12/31/18 at PDC North & PDC South) (4/1/18 – 3/31/19 at TTCF)** |
| 60 | Implementation of Quality Improvement Program | Substantial Compliance | **(4/1/19 – 3/31/20)** |
| 61 | Requirements of Quality Improvement Program | Partial Compliance | |
| 62 | Tracking of Corrective Action Plans | Partial Compliance | |
| 63 | Sufficient HOH and MOH Housing | Non-Compliance | |
| 64 | Plans for Availability of Inpatient Health Care | Non-Compliance | |
| 65 | Administration of Psychotropic Medication | Partial Compliance | |
| 66 | Active Mental Health Caseloads | Non-Compliance | |
| 67 | Prisoner Refusals of Medication | Partial Compliance | |

## APPENDIX A

| | | | |
|---|---|---|---|
| 68 | Contraband Searches | Substantial Compliance (MCJ, NCCF, PDC East, PDC South PDC North, & TTCF)<br>Partial Compliance (CRDF) | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC East, PDC South, & PDC North)**<br>**(1/1/17 – 12/31/17 at TTCF)** |
| 69 | Clinical Restraints in CTC | Substantial Compliance | **(7/1/18 – 6/30/19)** |
| 70 | Security Restraints in HOH and MOH | Partial Compliance | |
| 71 | Therapeutic Services for Inmates in Clinical Restraints | Substantial Compliance | **(7/1/16 – 6/30/17)** |
| 72 | Administrative Reviews | Substantial Compliance | **(1/1/17 – 12/31/17)** |
| 73 | Reporting of Self-Injurious Behavior and Threats | Substantial Compliance | **(10/1/17 – 9/30/18)** |
| 74 | Law Enforcement Investigations of Suicides | Substantial Compliance | **(9/1/16 – 12/31/17)** |
| 75 | Management Reviews of Suicide Attempts | Substantial Compliance | **(10/1/17 – 9/30/18)** |
| 76 | Management Reviews of Suicides | Substantial Compliance | **(9/1/16 – 12/31/17)** |
| 77 | Custody Compliance and Sustainability Bureau | Partial Compliance | |
| 78 | Suicide Prevention Advisory Committee | Substantial Compliance | **(5/11/16 – 5/18/17)** |
| 79 | Therapeutic Services in Mental Health Housing | Non-Compliance | |
| 80 | Out-of-Cell Time in HOH | Non-Compliance | |
| 81 | Implementation of *Rosas* Recommendations | Partial Compliance | |

**APPENDIX A**

| 82 | Grievances at CRDF | Substantial Compliance | **(7/15/16 – 12/31/17)** |
|----|---------------------|------------------------|--------------------------|
| 83 | Closed Circuit Cameras | Substantial Compliance | **(7/1/15 – 6/30/16 at MCJ & IRC)**<br>**(10/1/15 – 9/30/16 at TTCF)**<br>**(4/1/16 – 3/31/17 at CRDF)**<br>**(4/1/18 – 3/31/19 at NCCF & PDC North)**<br>**(7/1/18 –6/30/19 at PDC South)** |
| 84 | Investigation of Staff Misconduct | Substantial Compliance | **(7/1/17 – 6/30/18)** |
| 85 | Internal Affairs Bureau Training | Partial Compliance | |
| 86 | Maintenance and Inventory of Security Equipment | Substantial Compliance | **(4/1/16 – 3/31/17 at MCJ & CRDF)**<br>**(10/1/16 – 12/31/17 at PDC North)**<br>**(2/1/17 – 3/31/18 at PDC South & PDC East)**<br>**(3/1/17 – 3/31/18 at NCCF)**<br>**(4/1/17 – 3/31/18 at IRC)**<br>**(4/1/18 – 3/31/19 at TTCF)** |

**APPENDIX B**

| | Substantial Compliance (Provisions) | Partial Compliance[1] | Non-Compliance | Suspended (Some Or All Facilities) | Substantial Compliance (Facilities)[2] | No Longer Subject To Monitoring[3] |
|---|---|---|---|---|---|---|
| First[4] | 5 | 16 | | | 10 | |
| Second | 14 | 30 | 13 | | 24 | |
| Third | 22 | 27(1) | 10 | | 29 | 4(2) |
| Fourth | 24 | 26(1) | 10 | | 29 | 10(2) |
| Fifth | 23 | 24(2) | 7 | | 34 | 15(5) |
| Sixth | 32 | 22 | 7 | | 38 | 18(9) |
| Seventh | 30 | 23 | 7 | | 39 | 21(10) |
| Eighth | 35 | 20 | 6 | | 42 | 27(9) |
| Ninth | 36 | 22 | 4 | | 43 | 31(8) |
| Tenth | 39 | 21 | 3 | | 45 | 32(8) |
| Eleventh | 38 | 18 | 5 | 2 | 44 | 34(7) |
| Twelfth | 38 | 18 | 6 | 1 | 44 | 36(6) |

---

[1] The figure in parenthesis under Partial Compliance is the number of additional provisions where some facilities were in Partial Compliance and other facilities were in Non-Compliance.

[2] This represents the number of provisions where the Department is in Substantial Compliance at all or some of the facilities.

[3] The figure in parenthesis under No Longer Subject to Monitoring is the number of additional provisions where some facilities are no longer subject to monitoring.

[4] During the First Reporting Period, 43 provisions were not subject to monitoring.