Nicholas E. Mitchell
7575 E. 29th Place, Suite 4006
Denver, CO 80238
nmitchell@independentmonitor.com

**Monitor**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | CV No. 15-05903 DDP (JEMX) |
| Plaintiff, | **MONITOR'S THIRTEENTH REPORT** |
| v. |  |
| COUNTY OF LOS ANGELES AND LOS ANGELES COUNTY SHERIFF ALEX VILLANUEVA, in his Official Capacity, |  |
| Defendants. |  |

1      Pursuant to Paragraph 109 of the Joint Settlement Agreement Regarding Los

2  Angeles County Jails, the Monitor appointed by this Court hereby submits the

3  attached Report "describing the steps taken" by the County of Los Angeles and the

4  Los Angeles County Sheriff Department ("Department") during the six-month

5  period from July 1, 2021, through December 31, 2021, "to implement the

6  Agreement and evaluating the extent to which they have complied with this

7  Agreement."  This Report takes into consideration the advice and assistance I have

8  received from the Subject Matter Experts appointed by this Court and the comments

9  from the Parties in accordance with Paragraph 110 of the Agreement.  I am available

10  to answer any questions the Court may have regarding my Report at such times as

11  are convenient for the Court and the parties.

12

13  DATED:  March 3, 2022        Respectfully submitted,

14

15

16                  By:  */s/ Nicholas E. Mitchell*

17                      Nicholas E. Mitchell

18                      Monitor

19

20

21

22

23

24

25

26

27

28

## MONITOR'S THIRTEENTH REPORT

This Thirteenth Report sets forth the Monitor's assessments of the implementation of the Settlement Agreement (the "Agreement" or "DOJ Agreement") between the County of Los Angeles (the "County") and the United States Department of Justice ("DOJ") for the treatment of inmates with mental illness in the County's jail facilities by the Los Angeles Sheriff's Department (the "Department" or "LASD") and the County's Correctional Health Services ("CHS"). It also reports on the Department's compliance with the provisions of the Implementation Plan in the settlement of *Alex Rosas, et al., v. Leroy Baca,* No. CV 12-00428 DDP, that were extended under the terms of the DOJ Agreement to the facilities not covered by the *Rosas* case.[1] This Report covers the County's reported results for the period from July 1, 2021, through December 31, 2021 (the "Thirteenth Reporting Period").

This Thirteenth Report is based upon the Monitor's review of the policies, procedures, and directives proposed and/or implemented by the Department and CHS in the Thirteenth Reporting Period, and assessments and observations of the Mental Health and Use of Force Subject Matter Experts, and mental health clinicians and auditors retained by the Monitor. It takes into consideration the County's Self-Assessment Status Report ("Thirteenth Self-Assessment"); Correctional Health Services and Custody Compliance and Sustainability Bureau ("CCSB") Combined Semi-Annual Report on Quality Improvement and Suicide Prevention Efforts – Quarter 2 & Quarter 3 2021; the County's Augmented Self-Assessment Status Report ("Augmented Thirteenth Self-Assessment"); and results reported by the County through January 18, 2022.

The Monitor conducted site visits to the jails with Use of Force Subject Matter Expert Susan McCampbell and clinician Dr. James Vess in December 2021. The Monitoring Team toured Twin Towers Correctional Facility ("TTCF"), Men's Central Jail ("MCJ"), Century Regional Detention Facility ("CRDF"), Pitchess Detention Center North ("PDC North"), Inmate Reception Center ("IRC"), and North County Correctional Facility ("NCCF"). The Monitoring Team spoke with inmates, custody staff and supervisors, and mental health staff and supervisors during these visits, and inspected mental health housing at all patient acuity levels.

The rise of the Omicron variant of the COVID-19 pandemic caused considerable disruption to the County's Custody Operations during the Thirteenth Reporting Period. The Department was required to house a growing number of inmates in quarantine, which increased pressure on the Department's housing capacity. The impacts of the pandemic on staff were also significant. As of January 21, 2022, 969 sworn and unsworn personnel were quarantined across the Department's custody and patrol functions. According to the County, various custody and mental health personnel who work directly on compliance with the Agreement were quarantined during the Thirteenth Reporting Period.

---

[1] The *Rosas* case involved allegations of excessive force in Men's Central Jail (MCJ), the Twin Towers Correctional Facility (TTCF), and the Inmate Reception Center (IRC) (collectively the "Downtown Jail Complex"). The DOJ Agreement extends provisions of the Implementation Plan to the Century Regional Detention Facility (CRDF), the North County Correctional Facility (NCCF), and the Pitchess Detention Center (PDC).

In the Twelfth Report, the Monitor noted that the County had made considerable progress at implementing the Agreement in the years 2015 through 2018. However

> Between 2019 and the filing of this Report . . . as reflected in the Monitor's Seventh, Eighth, Ninth, Tenth, and Eleventh Reports, the County's pace and progress at bringing provisions into Substantial Compliance slowed considerably. During these years, the County achieved Substantial Compliance with only six additional provisions, prompting expressions of concern from the DOJ and the Monitor.

On November 5, 2021, the Court held a status conference to discuss the County's progress at implementing the Agreement. In the subsequent days and weeks, the Parties collaborated with the Monitor on a schedule to create implementation plans that will move the County expeditiously towards Substantial Compliance with the remaining provisions of the Agreement. Under that schedule, twenty-one implementation plans are to be finalized on a rolling basis, with all to be adopted by May 15, 2022. The County has committed to beginning to enact these plans within the jails as soon as they are finalized, if not before.

The Monitor expects that the execution of these plans will result in meaningful improvements in the County's performance in future reporting periods. This Report reflects limited progress by the County. During the Thirteenth Reporting Period, the County achieved Substantial Compliance with five additional provisions. However, three provisions either fell out of Substantial Compliance or transitioned from Partial Compliance to Non-Compliance during the period. The County has maintained Substantial Compliance for twelve consecutive months with 36 out of the 69 provisions, which are now no longer subject to monitoring.

A number of the Agreement's remaining provisions relate to the quality and consistency of mental health care in the jails. In the Thirteenth Reporting Period, the County launched a Mental Health Training Department to "provide a structured orientation to all new employees and on-going training to the mental health staff." The Training Department will be supervised by a psychologist and staffed by psychologists and social workers. It will aim to provide consistency and coaching to clinical staff in the jails. This is a proactive and commendable initiative by the County to address some of the deficiencies discussed throughout this Report.

A final note: during the Thirteenth Reporting Period, the County and the Department cooperated fully with the Monitoring Team. The Department, CHS, and County Counsel facilitated our work, and responded transparently to our requests for documents and information. The Monitor appreciates their responsiveness, professionalism, and collegiality.

Nicholas E. Mitchell, Monitor
March 3, 2022

2

# EXECUTIVE SUMMARY

There are 69 provisions in the Settlement Agreement that are subject to monitoring by the Monitor and Subject Matter Experts.  As of the date of this Report, the County and the Department are in Substantial Compliance with 42 provisions, in Partial Compliance with 14 provisions, and in Non-Compliance with six provisions.  In addition, there are four provisions for which the Department is in Substantial Compliance at some facilities and in Partial Compliance at other facilities.  There is one provision (Paragraph 39) for which the Department is in Substantial Compliance at certain facilities, Partial Compliance at other facilities, and Not Rated at other facilities.  There is one provision (Paragraph 63) for which the Department is in Partial Compliance at some facilities and Non-Compliance at other facilities.  There is one provision (Paragraph 42) for which compliance is suspended.  There are 47 provisions for which the County and the Department are in Substantial Compliance at some or all facilities.[2]

The Monitor's determination of the County's compliance is based upon the quantitative thresholds in the Compliance Measures (and any other applicable requirements in the Compliance Measures) for achieving Substantial Compliance, unless the quality of the County's performance as determined by the qualitative assessment is plainly inadequate or the results reported by the Monitor's mental health team vary significantly from the results reported by the Department.[3]  As used herein, "Substantial Compliance" means that the County has "achieved compliance with the material components of the relevant provisions of this Agreement in accordance with the [agreed-upon Compliance Measures for assessing Substantial Compliance]," which it must maintain for twelve-consecutive months; "Partial Compliance" means that the County has achieved "compliance on some, but not all, of the material components of the relevant provision of this Agreement;" and "Non-Compliance" means that the County has not met "most or all of the material components of the relevant provisions of this Agreement."

Appendix A to this Thirteenth Report shows the status of each of the 69 provisions of the Agreement that are subject to monitoring and the twelve-month triggering dates where the County is deemed to be in Substantial Compliance.  Appendix B shows the County's progress from the Initial Reporting Period through the Thirteenth

---

[2] Under Paragraph 111 of the Agreement, the twelve-month period for which the County is required to maintain Substantial Compliance can be determined on a facility-by-facility basis.

[3] As in prior reports, this Thirteenth Report also reflects the results of audits by the Monitor's auditors to verify results reported by the County.  The Monitor has deemed the County to be in Substantial Compliance "as of" the beginning of the quarter reported by the County if the auditors have verified that the County has met the thresholds in the Compliance Measures.  If the auditors were not able to verify the results reported by the County, the twelve-month period for maintaining Substantial Compliance will commence in a future period when the County's reported results are verified by the auditors.  If the County maintains Substantial Compliance with a provision for twelve consecutive months, pursuant to Paragraph 111 of the Agreement, the Monitor and Subject Matter Expert will "no longer. . .assess or report on that provision" in future reporting periods.  Some of the Substantial Compliance results reported by the County in the Thirteenth Reporting Period have not been audited by the Monitor's auditors and cannot be considered final until verified by the auditors.  The County will not be deemed to be in Substantial Compliance as of the County's reported date for purposes of determining the twelve-month compliance period if the results are not verified by the auditors.

Reporting Period in achieving Substantial Compliance and in maintaining Substantial Compliance for twelve consecutive months on provisions that are no longer subject to monitoring.

There are 36 provisions that are no longer subject to monitoring because the County and Department maintained Substantial Compliance for twelve consecutive months as required by Paragraph 111 of the Settlement Agreement and verified by the Monitor's auditors as required.[4]  There are another six provisions for which some facilities are no longer subject to monitoring because those facilities maintained Substantial Compliance for the required twelve consecutive months.[5]

As of the date of this Report, and subject to verification by the Monitor's auditors and qualitative assessments in some cases, the County and the Department are in Substantial Compliance at some or all of the facilities with the following provisions of the Settlement Agreement:

The County has achieved Substantial Compliance with Paragraph 18, which requires the (initial) training of Deputy Sheriffs and Custody Assistants on suicide prevention as follows: at Men's Central Jail ("MCJ") and Pitchess Detention Center ("PDC") South as of October 1, 2017; at North County Correctional Facility ("NCCF") as of September 1, 2017; at PDC East as of December 1, 2017; at Twin Towers Correctional Facility ("TTCF"), the Inmate Reception Center ("IRC"), and PDC North as of April 1, 2018; and at Century Regional Detention Facility ("CRDF") as of August 1, 2018.  The County has maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) and 4.7(b)  as of December 2020.

The County has achieved Substantial Compliance at NCCF, MCJ, and IRC as of April 1, 2018; at TTCF as of July 1, 2018; at CRDF, PDC East, and PDC North as of December 1, 2018; and at PDC South as of March 1, 2019, with Paragraph 19, which requires the (initial) training of Deputy Sheriffs on Crisis Intervention and Conflict Resolution and the training of Deputy Sheriffs and Custody Assistants in working with mentally ill prisoners.  The Department has achieved Substantial Compliance at CRDF, IRC, NCCF, MCJ, PDC East, PDC North, PDC South, and TTCF as of December 2019 with the refresher training requirements of Paragraph 19.  The County has maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) and 4.7(b) as of December 2020.

The County has achieved Substantial Compliance at PDC East, PDC North, NCCF, and CRDF as of August 1, 2017 and at PDC South as of October 1, 2017, with Paragraph 20, which requires the (initial) training of additional Deputy Sheriffs on Crisis Intervention and Conflict Resolution and on working with mentally ill prisoners.  The

---

[4] This includes the initial training required by Paragraphs 18, 19 and 20, which has been completed and is no longer subject to monitoring.  The refresher training requirements for each of these provisions are, however, still subject to monitoring under Provision 81 Rosas 4.6(b) and 4.7(b).

[5] The provisions that are no longer subject to monitoring at some or all of the facilities are highlighted in bold in Appendix A.

County has maintained compliance with the refresher training requirements under
Provision 81 Rosas 4.6(b) and 4.7(b) as of December 2020.

The County has maintained Substantial Compliance for twelve consecutive
months at PDC East, PDC South, PDC North, NCCF, IRC, TTCF, CRDF, and MCJ with
Paragraph 21, which requires Custody personnel to maintain CPR certifications.

The County has maintained Substantial Compliance for twelve consecutive
months with Paragraph 22, which requires the County and the Sheriff to provide
instructional material on the use of arresting and booking documents to ensure the
sharing of known relevant and available information on prisoners' mental health status
and suicide risk.

The County has maintained Substantial Compliance for twelve consecutive
months as of July 12, 2018, with Paragraph 23, which requires that the Department
conduct a systematic review of prisoner housing to reduce the risk of self-harm and to
identify and address suicide hazards, and to develop plans to reasonably mitigate suicide
hazards identified in the review.

The County has maintained Substantial Compliance for twelve consecutive
months as of September 30, 2018, with Paragraph 24, which requires the Department to
conduct annual reviews and inspections of prisoner housing to identify suicide hazards.

The County has achieved Substantial Compliance as of July 1, 2021, through
September 30, 2021, with Paragraph 26, which requires the that inmates identified at
intake as having emergent or urgent heath needs be evaluated by a QMHP within 4 hours
from the time of identification.

The County has maintained Substantial Compliance for twelve months as of
March 31, 2021, with Paragraph 27, which requires that all prisoners are individually and
privately screened within 12 hours of their arrival at the jails.

The County has maintained Substantial Compliance for twelve consecutive
months at IRC as of March 31, 2018, with Paragraph 28, which requires the Department
to expedite inmates having urgent or emergent mental health needs through the booking
process.  The County has achieved Substantial Compliance as of April 1, 2021, through
September 30, 2021, at CRDF.

The County has maintained Substantial Compliance for twelve consecutive
months as of March 31, 2018, with Paragraph 29, which requires mental health
assessments of prisoners with non-emergent mental health needs within 24 hours of the
intake nursing assessment.

The County has maintained Substantial Compliance as of January 1, 2019,
through December 31, 2019, with Paragraph 30, which requires the County to provide an
initial mental health assessment that includes a brief initial treatment plan that addresses

"housing recommendations and preliminary discharge information."

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 32, which requires that a serious suicide attempt be entered in the prisoner's electronic medical record in a timely manner.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2017, with Paragraph 33, which requires mental health supervisors to review electronic medical records on a quarterly basis to assess their accuracy.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2018, with Paragraph 35, which requires the Department to ensure that custody staff refer prisoners who are demonstrating a potential need for routine mental health care to a QMHP or a Jail Mental Evaluation Team.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 38, which requires mental health staff or JMET teams to make weekly cell-by-cell rounds in restricted non-mental health housing modules to identify prisoners with mental illnesses and grant prisoner's requests for out-of-cell interviews.

The County has maintained Substantial Compliance at NCCF for twelve consecutive months as of June 30, 2018, with Paragraph 39, which requires the County to use a confidential self-referral system for prisoners to request mental health care.  The County has achieved Substantial Compliance as of April 1, 2021, through September 30, 2021, at PDC South.

The County has provided documentation showing that it has achieved Substantial Compliance as of April 1, 2021, through September 30, 2021, with Paragraph 41, which requires the County to implement step-down protocols that provide a clinically appropriate transition when inmates are discharged from FIP after being the subject of suicide watch.  The reported results are subject to verification by the Monitor's auditors and Mental Health Subject Matter Experts.

The County has maintained Substantial Compliance at NCCF and PDC North for twelve consecutive months, as of September 30, 2018, with Paragraph 43, which requires the Department to develop and implement policies for discipline of prisoners with serious mental illnesses.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 44, which requires the Department to install protective barriers in High Observation Housing and other mental health housing.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 45, which requires Suicide Prevention Kits and first-aid kits in control booths in all facilities.

The County has achieved Substantial Compliance as of July 1, 2020, through December 31, 2020, with Paragraph 46, which requires the Department to interrupt, and if necessary, provide appropriate aid to any prisoner who threatens or exhibits self-injurious behavior.  The County has provided documentation showing that it has maintained Substantial Compliance as of January 1, 2021, through June 30, 2021.  These results are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 48, which requires the Department to have written housekeeping, sanitation, and inspection plans to ensure proper cleaning.

The County has maintained Substantial Compliance for twelve consecutive months as of February 28, 2017, with Paragraph 49, which requires the Department to have maintenance plans to respond to routine and emergency maintenance needs.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2017, with Paragraph 50, which requires pest control in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2017, with Paragraph 51, which requires the Department to ensure that all prisoners have access to basic hygiene supplies in accordance with state regulations.

The County has provided documentation showing that it has achieved Substantial Compliance as of July 1, 2021, through September 30, 2021, with Paragraph 53, which requires the Department to ensure that inmates are not rejected or disqualified from education and work programs based solely on their mental health diagnosis or prescription for medication alone.  These results are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive months at CRDF, PDC North, MCJ, and TTCF with Paragraph 55, which requires custody, medical and mental health staff to meet daily in High Observation Housing and weekly in Moderate Observation Housing.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 56, which requires custody, medical, and mental health staff to communicate regarding any change in a housing assignment following a suicide attempt or serious change in mental health condition.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2018, at MCJ with Paragraph 57, which requires safety checks in mental health housing.  The County has provided documentation showing that it has achieved Substantial Compliance as of July 1, 2021, through September 30, 2021, at PDC North.  These results are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive months at PDC South, PDC North, and PDC East as of December 31, 2016, at CRDF as of June 30, 2018, and at IRC as of September 30, 2018, with Paragraph 58, which requires safety checks in non-mental health housing.  The County has achieved Substantial Compliance at NCCF as of April 1, 2021, through September 30, 2021.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2019, with Paragraph 59, which requires unannounced daily supervisory rounds to verify safety checks.

The County has achieved Substantial Compliance with Paragraph 60, as of April 1, 2019, through March 31, 2020, which requires the implementation of a quality improvement plan.

The County has maintained Substantial Compliance for twelve consecutive months at MCJ, NCCF, PDC East, PDC North, PDC South, and TTCF with Paragraph 68, which requires staggered contraband searches in housing units.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2019, with Paragraph 69, which requires the County and the Sheriff to use clinical restraints only in the Correctional Treatment Center with the approval of a licensed psychiatrist who performed an individualized assessment.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2017, with Paragraph 71, which requires the County and the Sheriff to ensure that any prisoner subjected to clinical restraints in response to a mental health crisis receives therapeutic services to remediate any effects from the restraints.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 72, which requires the Department and the County to report on meetings to review suicides and incidents of serious self-injurious behavior.

The County has maintained Substantial Compliance for twelve consecutive months as of September 30, 2018, with Paragraph 73, which requires the Department to prepare detailed reports of prisoners who threaten or exhibit self-injurious behavior.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 74, which requires the Department to have an objective law enforcement investigation of every suicide that occurs in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of September 30, 2018, with Paragraph 75, which requires the Department and the County to review every serious suicide attempt that occurs in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 76, which requires the Department to follow certain procedures whenever there is an apparent or suspected suicide.

The County has maintained Substantial Compliance for twelve consecutive months as of May 18, 2017, with Paragraph 78, which requires the Suicide Prevention Advisory Committee to meet twice a year.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 82, which requires the Department to co-locate personnel responsible for collecting prisoners' grievances at CRDF.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2019, with Paragraph 83, which requires it to install closed circuit security cameras throughout all of the common areas in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2018, with Paragraph 84, which requires investigations of force incidents and administrative actions to be completed timely.

The County has achieved Substantial Compliance as of April 1, 2021, through September 30, 2021, with Paragraph 85, which requires Internal Affairs Bureau personnel to receive adequate specialized training in conducting investigations of misconduct.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2019, with Paragraph 86, which requires inventory and control of weapons.

## THIRTEENTH REPORT

18.     Within three months of the Effective Date, the County and the Sheriff will develop, and within six months of the Effective Date will commence providing:  (1) a four-hour custody-specific, scenario-based, skill development training on suicide prevention, which can be part of the eight-hour training described in paragraph 4.8 of the Implementation Plan in *Rosas* to all new Deputies as part of the Jail Operations Continuum and to all new Custody Assistants at the Custody Assistants academy; and (2) a two-hour custody-specific, scenario-based, skill development training on suicide prevention to all existing Deputies and Custody Assistants at their respective facilities, which can be part of the eight-hour training described in paragraph 4.7 of the Implementation Plan in *Rosas*, through in-service Intensified Formatted Training, which training will be completed by December 31, 2016.

These trainings will include the following topics:

(a)     suicide prevention policies and procedures, including observation and supervision of prisoners at risk for suicide or self-injurious behavior;

(b)     discussion of facility environments and staff interactions and why they may contribute to suicidal behavior;

(c)     potential predisposing factors to suicide;

(d)     high-risk suicide periods and settings;

(e)     warning signs and symptoms of suicidal behavior;

(f)     case studies of recent suicides and serious suicide attempts;

(g)     emergency notification procedures;

(h)     mock demonstrations regarding the proper response to a suicide attempt, including a hands-on simulation experience that incorporates the challenges that often accompany a jail suicide, such as cell doors being blocked by a hanging body and delays in securing back-up assistance;

(i)     differentiating between suicidal and self-injurious behavior; and

(j)     the proper use of emergency equipment.

**STATUS (18):**      **SUBSTANTIAL COMPLIANCE (as of October 1, 2017 (verified) at MCJ and PDC South)**

**SUBSTANTIAL COMPLIANCE (as of September 1, 2017 (verified) at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of December 1, 2017 (verified) at PDC East)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018 (verified) at TTCF, IRC, and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of August 1, 2018 (verified) at CRDF)**

The Department was not subject to monitoring during the Thirteenth Reporting Period for the initial training of existing Deputy Sheriffs or Custody Assistants or of new Deputies in the Jail Operations Continuum and new Custody Assistants in the Custody Assistant Academy as required by Paragraph 18.  Virtually all of the Deputy Sheriffs and Custody Assistants in the custody facilities received the initial training because they were assigned to the jails as of the Existing Date of the Settlement Agreement or they received the training as new Deputies or new Custody Assistants.

The Department is still subject to monitoring in future periods for Substantial Compliance with the refresher course requirements under Provision 81 Rosas 4.6(b) and 4.7(b).  The County has maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) and 4.7(b) as of December 2020.

19.     Commencing July 1, 2015, the County and the Sheriff will provide:

(a)     Custody-specific, scenario-based, skill development training to new Deputies during their Jail Operations training, and to existing Deputies assigned to Twin Towers Correctional Facility, Inmate Reception Center, Men's Central Jail, the Mental Health Housing Units at Century Regional Detention Facility, and the Jail Mental Evaluation Teams ("JMET") at North County Correctional Facility as follows:

(i)     32 hours of Crisis Intervention and Conflict Resolution as described in paragraphs 4.6 and 4.9 of the Implementation Plan in *Rosas* to be completed within the time frames established in that case (currently December 31, 2016). Deputies at these facilities will receive an eight-hour refresher course consistent with paragraph 4.6 of the Implementation Plan in *Rosas* every other year until termination of court jurisdiction in that case and then a four-hour refresher course every other year thereafter.

(ii)    Eight hours identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas* to be completed by December 31, 2016. This training requirement may be a part of the 32-hour training described in the previous subsection. Deputies at these facilities will receive a four-hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

(b)     Commencing July 1, 2015, the County and the Sheriff will ensure that new Custody Assistants receive eight hours of training in the Custody Assistant academy, and that all existing Custody Assistants receive eight hours of training related to identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas*. This training will be completed by December 31, 2016. Custody Assistants will receive a four-hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

**STATUS (19):**        **SUBSTANTIAL COMPLIANCE (as of April 1, 2018, (verified) at NCCF, MCJ, and IRC)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2018, (verified) at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of December 1, 2018 (verified) at CRDF, PDC East, and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of March 1, 2019 (verified) at PDC South)**

The Department was not subject to monitoring during the Thirteenth Reporting Period for the training of existing and new Deputy Sheriffs and Custody Assistants required by Paragraph 19.

The Department is still subject to monitoring in future periods for Substantial Compliance with the refresher course requirements under Provision 81 Rosas 4.6(b) and 4.7(b).   The County has maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) and 4.7(b) as of December 2020.

20.     Commencing no later than July 1, 2017, the County and the Sheriff will provide:

(a)     Custody-specific, scenario-based, skill development training to existing Deputies assigned to North County Correctional Facility, Pitchess Detention Center, and the non-Mental Health Housing Units in Century Regional Detention Facility as follows:

    (i)     32 hours of Crisis Intervention and Conflict Resolution as described in paragraphs 4.6 and 4.9 of the Implementation Plan in *Rosas* to be completed by December 31, 2019.  Deputies at these facilities will receive an eight-hour refresher course consistent with paragraph 4.6 of the Implementation Plan in *Rosas* every other year until termination of court jurisdiction in that case and then a four-hour refresher course every other year thereafter.

    (ii)    Eight hours identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas* to be completed by December 31, 2019.  This training requirement may be a part of the 32-hour training described in the previous subsection.  Deputies at these facilities will receive a four-hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

**STATUS (20):**      **SUBSTANTIAL COMPLIANCE (as of August 1, 2017 (verified) at CRDF, PDC East, PDC North, and NCCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017 (verified) at PDC South)**

The Department was not subject to monitoring for the initial training for existing Deputies as required by Paragraph 20 during the Thirteenth Reporting Period.

The Department is still subject to monitoring in future periods for Substantial Compliance with the refresher course requirements under Provision 81 Rosas 4.6(b) and 4.7(b).  The County has posted results for maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) and 4.7(b) reflecting that it has maintained compliance as of December 2020.

21.     Consistent with existing Sheriff's Department policies regarding training requirements for sworn personnel, the County and the Sheriff will ensure that existing custody staff that have contact with prisoners maintain active certification in cardiopulmonary resuscitation and first aid.

**STATUS:**      **SUBSTANTIAL COMPLIANCE (as of October 1, 2015, through September 30, 2016 (verified) at PDC East and South)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at NCCF, PDC North, and IRC)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 (verified) at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at MCJ)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2018, through June 30, 2019 (verified) at CRDF)**

The Compliance Measures provide that the Department will demonstrate Substantial Compliance when 95% of the designated custody staff have the required CPR and first aid certifications for twelve consecutive months.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 21 in the Thirteenth Reporting Period.

22.     Within six months of the Effective Date and at least annually thereafter, the County and the Sheriff will provide instructional material to all Sheriff station personnel, Sheriff court personnel, custody booking personnel, and outside law enforcement agencies on the use of arresting and booking documents, including the Arrestee Medical Screening Form, to ensure the sharing of known relevant and available information on prisoners' mental health status and suicide risk.  Such instructional material will be in addition to the training provided to all custody booking personnel regarding intake.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017)**

The Justice Data Interface Controller ("JDIC") message the Department has been using since June 29, 2016, is sufficient to establish Substantial Compliance with Paragraph 22, and the County maintained Substantial Compliance for twelve consecutive months through June 30, 2017.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 22 in the Thirteenth Reporting Period.

23.    Within three months of the Effective Date, the County and the Sheriff will commence a systematic review of all prisoner housing, beginning with the Mental Health Unit of the Correctional Treatment Center, all High Observation Housing areas, all Moderate Observation Housing areas, single-person discipline, and areas in which safety precautions are implemented, to reduce the risk of self-harm and to identify and address suicide hazards.  The County and the Sheriff will utilize a nationally-recognized audit tool for the review.  From this tool, the County and the Sheriff will:

(a)    develop short and long term plans to reasonably mitigate suicide hazards identified by this review; and

(b)    prioritize planning and mitigation in areas where suicide precautions are implemented and seek reasonable mitigation efforts in those areas.

**STATUS:      SUBSTANTIAL COMPLIANCE**

The Monitor has verified, with the advice of the Subject Matter Expert, that the Department's Suicide Hazard Inspection Check List tool is a nationally recognized audit tool for this review.  The Department provided the Monitor with completed checklists documenting inspections of all housing units by January 14, 2016.

The Department submitted updated Suicide Hazard Mitigation plans to the Monitor on January 18, 2018 and July 12, 2018.  After consultations with the Mental Health Subject Matter Expert, the Monitor concluded that the plans satisfied the requirements of Paragraph 23 and that the Department had achieved and maintained Substantial Compliance with the provision.  Accordingly, pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 23 in the Thirteenth Reporting Period.

24.     The County and the Sheriff will review and inspect housing areas on at least an annual basis to identify suicide hazards.

**STATUS:          SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018)**

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 24 in the Thirteenth Reporting Period.  As the Monitor has noted, however, implementation and tracking of corrective actions must be addressed by the Custody Compliance and Sustainability Bureau ("CCSB") under Paragraph 77(c), which requires CCSB to "ensur[e] that corrective actions are taken to mitigate suicide risk. . .obtaining where appropriate, technical assistance. . .when such assistance is needed to address suicide-risk issues."

25.     The County and the Sheriff will ensure that any prisoner in a Sheriff's Department station jail who verbalizes or who exhibits a clear and obvious indication of current suicidal intent will be transported to IRC, CRDF, or a medical facility as soon as practicable.  Pending transport, such prisoners will be under unobstructed visual observation, or in a suicide resistant location with safety checks every 15 minutes.

**STATUS:       PARTIAL COMPLIANCE (at Central, East, South, and North Patrol Divisions)**

A provision of the Station Jail Manual adopted in March 2018 requires that any arrestee who "displays obvious suicidal ideation or exhibits unusual behavior that clearly manifest[s] self-injurious behavior or other clear indication of mental health crisis shall be transported to the Inmate Reception Center (IRC), Century Regional Detention Facility (CRDF), or a medical facility as soon as practicable.  Pending transport, such inmates. . .shall be under unobstructed visual observation or in a suicidal restraint location with safety checks every 15 minutes."

Under the revised Compliance Measures, which were updated in 2021, the Department must randomly select and analyze Arrestee Medical Screening Forms from station jails identifying prisoners who verbalize or exhibit a clear and obvious indication of current suicidal intent to determine compliance with Paragraph 25.  Substantial Compliance requires that 90% of the selected records from each Patrol Division meet the requirements of Paragraph 25.  Each Patrol Division can achieve sustained compliance after twelve consecutive months of Substantial Compliance independent of the other divisions.

The County's Augmented Thirteenth Self-Assessment reports that 100% of the records from the East Patrol Division reviewed for the Second Quarter of 2021 and 60% of the records reviewed for the Third Quarter of 2021 reflect the information required by Paragraph 25.  For the North Patrol Division, 100% of the records reviewed for the Second Quarter of 2021 and 77% of the records reviewed for the Third Quarter of 2021 reflect the information required by Paragraph 25.

For the Central Patrol Division, 66% of the records reviewed for the Second Quarter of 2021 and 50% of the records reviewed for the Third Quarter of 2021 reflect the information required by Paragraph 25.  For the South Patrol Division 50% of the records reviewed for the Second Quarter of 2021, and 66% of the records reviewed for the Third Quarter of 2021 reflect the information required by Paragraph 25.

In December 2021, the Monitor toured and inspected Palmdale Station (in the North Patrol Division), which was the site of two relatively recent inmate suicides.  According to posted documents, the records from Palmdale Station were 100% compliant with the requirements of Paragraph 25 in both the Second and Third Quarters of 2021.  However, based upon the facts of these two inmate suicides, the Monitor had concerns about whether inmates with expressed suicidal ideation were being transported to IRC, CRDF, or a medical facility as soon as practicable, and maintained in suicide resistant

locations or under unobstructed visual observation pending such transport.  Following the
Monitor's inspection, the Department removed ligature points that had been used in both
recent suicides from two of the cells at Palmdale Station in order to make the cells more
suicide resistant.  The County should inspect station jail cells in the Department's other
patrol stations to ensure that these ligature points, which are a known suicide risk, are
addressed Department-wide.

26.     Consistent with existing Sheriff's Department policies, the County and the Sheriff will follow established screening procedures to identify prisoners with emergent or urgent mental health needs based upon information contained in the Arrestee Medical Screening Form (SH-R-422) or its equivalent and the Medical/Mental Health Screening Questionnaire and to expedite such prisoners for mental health evaluation upon arrival at the Jail Reception Centers and prior to routine screening.  Prisoners who are identified as having emergent or urgent mental health needs, including the need for emergent psychotropic medication, will be evaluated by a QMHP as soon as possible but no later than four hours from the time of identification.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of July 1, 2021, through September 30, 2021)**

The Compliance Measures require the Department to "review Arrestee Medical Screening Forms (SH-R-422) (or its equivalent) and the Medical/Mental Health Screening Questionnaires of 100 randomly selected prisoners during one randomly selected week per quarter at CRDF and at IRC."  Substantial Compliance requires that (1) 95% of the forms "include the required mental health information" and (2) 90% of the prisoners having urgent or emergent needs were "seen by a QMHP within four hours."

The County's Thirteenth Self-Assessment reports that for the one randomly selected week in the Second Quarter of 2021, 93% of the screening forms reviewed had the required mental health information, and 84% of the prisoners with urgent or emergent mental health needs were seen by a QMHP within four hours.  These are less than the thresholds set for Substantial Compliance.  The County's Thirteenth Self-Assessment also reports that for the one randomly selected week in the Third Quarter of 2021, 98% of the screening forms reviewed had the required mental health information, and 95% of the prisoners with urgent or emergent mental health needs were seen by a QMHP within four hours, which both exceeded the threshold for Substantial Compliance.

In November 2021, Drs. Johnson, Vess, and Eargle conducted a qualitative review of the County's compliance with Provision 26.  They assessed the completeness of intake documentation and sought to "determine whether patients with emergent or urgent needs were missed at intake" by examining the intake records and other associated documents.  They found that in 95% of cases, the intake documentation was complete and available.[6]  They also found that in 67% of the cases sampled it was "highly likely that the condition leading to subsequent HOH or FIP placement was present at the time of the intake screening."  In 19% of cases, "an urgent or emergent condition was likely present at the time of the intake screening that should have been detected during a standard intake process" but it was not detected.  These results were generally consistent with prior qualitative findings.

---

[6] While this number was very high overall, one case reviewed during the period, involving a person who sustained a gunshot during an apparent attempt to commit "suicide by cop" was cause for concern.  In that case, no information about the apparent "suicide by cop" was available during booking, thus no mental health evaluation was conducted in IRC despite the patient's history of mental illness and drug addiction. However, the case appears to be anomalous based upon the other records reviewed during the period.

27.     Consistent with existing Sheriff's Department policies, the County and the Sheriff will ensure that all prisoners are individually and privately screened by Qualified Medical Staff or trained custody personnel as soon as possible upon arrival to the Jails, but no later than 12 hours, barring an extraordinary circumstance, to identify a prisoner's need for mental health care and risk for suicide or self-injurious behavior.  The County and the Sheriff will ensure that the Medical/Mental Health Screening Questionnaire, the Arrestee Medical Screening Form (SH-R-422), or its equivalent, and/or the Confidential Medical Mental Health Transfer Form are in the prisoner's electronic medical record or otherwise available at the time the prisoner is initially assessed by a QMHP.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of October 1, 2019, through March 31, 2020, and October 1, 2020 through March 31, 2021 (verified))**

The Compliance Measures require the Department to review the records of "randomly selected prisoners who were processed for intake during one randomly selected week at CRDF and at IRC" to determine compliance with this provision. Substantial Compliance requires that 90% of the records reviewed reflected that the prisoners were screened for mental health needs within 12 hours and that the required documentation was available to the QMHP for 90% of the mental health assessments conducted by the QMHP.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 27 in the Thirteenth Reporting Period.

28.     The County and the Sheriff will ensure that any prisoner who has been identified during the intake process as having emergent or urgent mental health needs as described in Paragraph 26 of this Agreement will be expedited through the booking process.  While the prisoner awaits evaluation, the County and the Sheriff will maintain unobstructed visual observation of the prisoner when necessary to protect his or her safety, and will conduct 15-minute safety checks if the prisoner is in a cell.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at IRC)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2021, through September 30, 2021 (verified) at CRDF)**

The Compliance Measures require the Department to review the records of randomly selected prisoners at CRDF and IRC who have urgent or emergent mental health needs to determine whether they were expedited through the booking process and under visual observation or checked every 15 minutes.

The County's Thirteenth Self-Assessment reflects that in the Second Quarter of 2021, 100% of the inmates with urgent or emergent mental health needs were expedited through the booking process at CRDF in the randomly selected week, as required by the applicable Compliance Measures, and 100% of the inmates were observed or checked as is required.  The County's Thirteenth Self-Assessment also reported that in the Third Quarter of 2021, 100% of the inmates with urgent or emergent mental health needs were expedited through the booking process at CRDF in the randomly selected week, and 100% of the inmates were observed or checked, as is required.[7]  These results have been verified by the Monitor's auditors.

The County previously maintained Substantial Compliance with Paragraph 28 at IRC for twelve consecutive months, and IRC was not subject to monitoring for Substantial Compliance with Paragraph 28 in the Thirteenth Reporting Period.

---

[7] There were only five relevant inmates in the random weeks selected in the Second and Third Quarters of 2021, which is smaller than the sample size contemplated by the relevant Compliance Measure ("for one randomly selected week each quarter, the Department will review the records of 25 randomly selected prisoners at CRDF").  The Monitor finds that the County achieved Substantial Compliance for the Second and Third Quarters of 2021 on the basis of its reported results, which are subject to verification by the Monitor's auditors.  However, if the random weeks selected during the Fourteenth Monitoring Period do not contain 25 relevant inmates, the County should add additional random weeks until a population of 25 inmates can be measured per quarter.

29.     The County and the Sheriff will ensure that a QMHP conducts a mental health assessment of prisoners who have non-emergent mental health needs within 24 hours (or within 72 hours on weekends and legal holidays) of a registered nurse conducting an intake nursing assessment at IRC or CRDF.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified))**

The Compliance Measures require the Department to review randomly selected records of the prisoners identified in the intake nursing assessment as having non-emergent mental health needs to determine if the Department completed mental health assessments for 85% of the prisoners within the required time periods.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 29 in the Thirteenth Reporting Period.

30.     Consistent with existing DMH policies, the initial mental health assessment will include a brief initial treatment plan.  The initial treatment plan will address housing recommendations and preliminary discharge information.  During the initial assessment, a referral will be made for a more comprehensive mental health assessment if clinically indicated.  The initial assessment will identify any immediate issues and determine whether a more comprehensive mental health evaluation is indicated.  The Monitor and SMEs will monitor whether the housing recommendations in the initial treatment plan have been followed.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of January 1, 2019, through December 31, 2019 (verified))**

The Compliance Measures require the Department to review randomly selected initial mental health assessments and report on (1) the percentage of assessments that have (i) included an initial treatment plan that addresses housing recommendations and preliminary discharge information and (ii) identified any immediate issues and whether a more comprehensive evaluation was indicated; and (2) whether the housing recommendations were followed.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 30 in the Thirteenth Reporting Period.

31 (**Revised**).  Consistent with existing Correctional Health Services and Sheriff's
Department policies, the County and the Sheriff will maintain electronic mental health
alerts in prisoners' electronic medical records that notify medical and mental health staff
of a prisoner's risk for suicide or self-injurious behavior.  The alerts will be for the
following risk factors:

      (a)     current suicide risk; and

      (b)     prior suicide attempts.

**STATUS:**      **PARTIAL COMPLIANCE**

On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement
Agreement that amended the language of Provision 31 ("Revised Paragraph 31") as set
forth above.  They also agreed on Revised Compliance Measures.  The Revised
Compliance Measures require the Department to review randomly selected electronic
medical records for prisoners in certain at-risk groups to determine if the required mental
health alerts are in 85% of the records reviewed, which is the threshold for Substantial
Compliance, for prisoners who report suicidal thoughts (at suicide risk) during the intake
process; or were removed from risk precautions in the prior quarter.

The County's Thirteenth Self-Assessment reports that for the Second Quarter of
2021, at CRDF, 96% of the records reviewed contained the mental health alerts required
by 31-1(a).  100% of the records for the five patients removed from risk precaution
contained the mental health alerts required by 31-1(b).  At TTCF, 100% of the records
reviewed contained the mental health alerts required by 31-1(a).  The records of the
single patient removed from risk precautions did not contain the required alert.[8]

The County's Augmented Thirteenth Self-Assessment reports that for the Third
Quarter of 2021, at CRDF, 96% of the records reviewed contained the mental health
alerts required by 31-1(a).  The single patient removed from risk precaution contained the
mental health alerts required by 31-1(b).  At TTCF, 100% of the records reviewed
contained the mental health alerts required by 31-1(a).  There were no patients removed
from risk precaution and thus no records to review in connection with 31-1(b).

As in the past, the County did not report any results for current suicide risk or
removal from risk precautions for the inmates at MCJ, NCCF, or PDC North because
Compliance Measures 31-1(a) and 31-1(b) refer to the intake and HOH populations

---

[8] As the Monitor wrote in the Twelfth Report, the County "substantially revised its process for use of risk
precautions in the years after the Agreement was executed."  Given those changes, there was a need for an
"an alternative approach to sampling the patient population in light of CHS' changed practices on this
issue."  In a Joint Status Report filed on December 15, 2021, the Parties reported that "the County and the
United States are currently engaged in discussions regarding potential changes to the universe of source
documents used to assess compliance with provision 31."  Further, "the County and the United States will
complete discussions regarding changes to the source document universe for provision 31 by January 10,
2022."  As of the time of this filing, the Parties have agreed on those changes and the County will provide
an updated self-assessment for Provision 31 using the new methodology by March 15, 2022.

respectively.[9]

---

[9] The County has previously reported that "inmates at [MCJ, NCCF and PDC North] are not on risk precaution, nor can they be removed from risk precaution.  Instead, all decisions about risk precaution including their discontinuation are made at TTCF. . .. Similarly, CHS reports these facilities do not house inmates who are a current suicide risk."

32.     Information regarding a serious suicide attempt will be entered in the prisoner's electronic medical record in a timely manner.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified))**

The Compliance Measures require that 95% of the electronic medical records of prisoners who had a serious suicide attempt reflect information regarding the attempt, and 85% of the records reflect that the information was entered into the record within one day of the attempt.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 32 in the Thirteenth Reporting Period.

33.     The County will require mental health supervisors in the Jails to review electronic medical records on a quarterly basis to assess their accuracy as follows:

(a)     Supervisors will randomly select two prisoners from each clinician's caseload in the prior quarter;

(b)     Supervisors will compare records for those prisoners to corroborate clinician attendance, units of service, and any unusual trends, including appropriate time spent with prisoners, recording more units of service than hours worked, and to determine whether contacts with those prisoners are inconsistent with their clinical needs;

(c)     Where supervisors identify discrepancies through these reviews, they will conduct a more thorough review using a DMH-developed standardized tool and will consider detailed information contained in the electronic medical record and progress notes; and

(d)     Serious concerns remaining after the secondary review will be elevated for administrative action in consultation with DMH's centralized Human Resources.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017 (verified))**

The Compliance Measures require the County to provide the Monitor and the Subject Matter Experts with the DMH-developed standardized tool required by Paragraph 33(c), and to report the results of its analysis of the electronic medical records of two randomly selected prisoners from each clinician's caseload.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 33 in the Thirteenth Reporting Period.

34 **(Revised).**  Consistent with existing Correctional Health Services policy, the County and the Sheriff will conduct clinically appropriate release planning for all prisoners who are being released to the community and who have been identified by a QMHP as having a mental illness and needing mental health treatment, or as having a DSM-5 major neuro-cognitive disorder that caused them to be housed in the Correctional Treatment Center at any time during their current incarceration.  For prisoners with mental illness and needing mental health treatment, the release planning services will be guided by the prisoner's level of care.  Specifically, prisoners who at any time during their incarceration meet mental health level of P3 or P4 will be presumptively referred for release planning services, and prisoners who meet mental health level of care P2 will receive release planning services upon referral by a clinician or upon their request.  Prisoners who have a DSM-5 major neuro-cognitive disorder that caused them to be housed in the Correctional Treatment Center will also be referred for release planning services consistent with the Correctional Health Services policy applying to prisoners with mental illness.

> (a) Release planning will consider the need of the prisoner for housing; transportation to the prisoner's community-based provider, residence, or shelter within the County; bridge psychotropic medications; medical/mental health/substance abuse services; income/benefits establishment; and family/community/social supports ("Release Planning Areas").

> (b) Release planning will be based on an individualized assessment of the prisoner's needs and, unless the prisoner is unable or unwilling to participate, will be undertaken in collaboration with the prisoner.  For prisoners referred for release planning services, those services will include:

>> (i) An Initial Release Plan that will be created at intake or no later than ten days after the referral for release planning, which referral shall normally occur at the time of intake.  The Initial Release Plan will include preliminary identification of needs in each of the Release Planning Areas and preliminary recommendations for services to address those needs, and a referral for assistance in obtaining California identification when needed and when the prisoner is eligible; and/or

>> (ii) A Comprehensive Release Plan that will be initiated no later than thirty days after the referral for release planning.  The Comprehensive Release Plan will include (A) collecting information regarding the prisoner's needs; (B) coordinating with community-based providers to identify available services that meet the prisoner's needs; (C) facilitating the transition of care to community-based providers, and (D) assisting in obtaining identification and/or benefits when needed, when the prisoner is eligible, and as offered by the Sheriff's Community Transition Unit.

> (c) The County will maintain a re-entry resource center with staff supervised by a QMHP.  The re-entry resource center will:

31

(i) Provide information appropriate to the released prisoner about available housing, transportation, medical/mental health/substance abuse services, income/benefits establishment, community/social supports, and other community resources; and

(ii) Provide released prisoners with copies of their release plans, as available.

(d) All prisoners who are receiving and continue to require psychotropic medications will be offered a clinically appropriate supply of those medications upon their release from incarceration.  Unless contraindicated, this will be presumed to be a 14-day supply or a supply with a prescription sufficient so that the prisoner has the psychotropic medication available during the period of time reasonably necessary to permit the prisoner to consult with a doctor and obtain a new supply.

(e) Nothing in Paragraph 34 will require prisoners to accept or participate in any of the services provided under this Paragraph.

(f) Neither the County nor the Sheriff shall be in violation of this paragraph if after reasonable efforts as set forth in Correctional Health Services Policy M380.01, Release Planners are unable to identify available post-release services.

STATUS (34):          NON-COMPLIANCE

During the Seventh Reporting Period, the parties and the Intervenors reached an agreement on the provisions of revised Paragraph 34 ("Revised Paragraph 34") set forth above.  They also agreed on revised Compliance Measures and a revised policy to implement Revised Paragraph 34.  On December 10, 2018, the Court issued an order pursuant to the parties' joint stipulation revising Paragraph 34.

The County's Augmented Thirteenth Self-Assessment reports that, as required by Compliance Measure 34-10, the Department's Compliance Team made six visits in the Second and Third Quarters of 2021 to CRRC to confirm the presence of staff representing the Health Agency, Probation, and Sheriff's Departments.  The County concluded that it achieved 100% compliance with all departments being present at each visit.

Compliance Measures 34-1 and 2 require the County to review on a quarterly basis "randomly selected records of 85 prisoners released in a randomly selected week" who had been identified as having a need for mental health care to determine if the requirements of the County's Release Planning Policy were satisfied and state for each prisoner who did not receive a Comprehensive Release Plan why a plan was not completed, whether repeated efforts were made to offer the prisoner comprehensive release planning, and whether an Initial Release Plan was completed.  Compliance Measure 34-13(c) sets forth the relevant thresholds for Compliance Measure 34-1.

The County's Augmented Self-Assessment for the Second Quarter of 2021 reports that regarding Compliance Measure 13(c)(1), 96% of inmates received a referral for release planning, rather than the required 85%.  The County's posted results for the Third Quarter of 2021 reflect that 93% of inmates received the required referral.

For Compliance Measure 34-13(c)(4), which requires certain services and documentation relating to inmates requiring psychotropic medications, the County's Thirteenth Self-Assessment reflects 93% compliance during the Second Quarter of 2021.  The County's posted results for the Third Quarter of 2021 reflect 95% compliance.

Compliance Measure 34-12 requires the County to "review randomly selected records of 50 prisoners released in a randomly selected week who had been identified by a QMHP as meeting a mental health level of care P2" and evaluate "whether the QMHP considered the factors in the Release Planning Policy when determining whether to refer the prisoner."  The County's posted results reported that 92% of the mental health records included the required criteria during the relevant assessment weeks.

Certain results for Provision 34 have not materially improved and remain far below the thresholds for Substantial Compliance.  Given the complexities of developing an effective release planning program, and the County's good-faith efforts, the Monitor provided the County with notice of his concerns about these results and opportunities to address them.  In the Tenth Report, the Eleventh Report, and the Twelfth Report—over a

year-and-a-half period—the Monitor alerted the County that the results for Provision 34 must improve for the County to retain a rating of Partial Compliance.  Most recently, for example, in the Twelfth Report, the Monitor said

> the Monitor believes that the County has demonstrated sufficient progress to keep its rating of Partial Compliance with Provision 34 for the Twelfth Reporting Period.  However, the County must demonstrate improved results under Compliance Measures 34-13(c)(2) and 34-13(c)(3) or Provision 34 may be rated as Non-Compliant in future reporting periods.

Unfortunately, the results did not substantially improve in the Thirteenth Reporting Period.  The County's Thirteenth Self-Assessment reports that regarding Compliance Measure 34-13(c)(2), which concerns inmates who only had Initial Release Plans, "50% of inmates receiv[ed] the required services and documentation rather than the required 85%."  The County's posted results for the Third Quarter of 2021 reflect 60% compliance.  During the prior monitoring period, the numbers were 42% in the Fourth Quarter of 2020 and 71% in the First Quarter of 2021.

Similarly, regarding Compliance Measure 34-13(c)(3), which requires certain services and documentation relating to inmates who received a Comprehensive Release Plan, the County's Thirteenth Self-Assessment reports that "35% of inmates receiv[ed] the required services and documentation, rather than the required 85%" during the Second Quarter of 2021.  The County's posted results for the Third Quarter of 2021 reflect 26% compliance.[10]  During the prior monitoring period, the numbers were 40% in the Fourth Quarter of 2020 and 16% in the First Quarter of 2021.

The County is therefore rated as Non-Compliant with Provision 34 for the Thirteenth Reporting Period.

---

[10] The County's Thirteenth Augmented Self-Assessment included an inadvertent error, indicating that this number was 73%, which the County promptly corrected.  The County's posted results provide the accurate figure.

35.     Consistent with existing DMH and Sheriff's Department policies, the County and the Sheriff will ensure that custody staff, before the end of shift, refer prisoners in general or special populations who are demonstrating a potential need for routine mental health care to a QMHP or a Jail Mental Evaluation Team ("JMET") member for evaluation, and document such referrals.  Custody staff will utilize the Behavior Observation and Referral Form.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of November 1, 2017, through December 31, 2018 (verified))**

The Compliance Measures require the Department to review, for a randomly selected month each quarter, the Behavior Observation and Mental Health Referral ("BOMHR") records for prisoners referred by custody staff to a QMHP or JMET member for "routine" mental health care to determine the timeliness of the referrals, and that 85% of the referrals "occurred before the end of the shift in which the potential need for mental health care is identified."

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 35 in the Thirteenth Reporting Period.

36.     Consistent with existing DMH policies, the County and the Sheriff will ensure that a QMHP performs a mental health assessment after any adverse triggering event, such as a suicide attempt, suicide threat, self-injurious behavior, or any clear de-compensation of mental health status.  For those prisoners who repeatedly engage in such self-injurious behavior, the County will perform such a mental health assessment only when clinically indicated, and will, when clinically indicated, develop an individualized treatment plan to reduce, and minimize reinforcement of, such behavior.  The County and the Sheriff will maintain an on-call system to ensure that mental health assessments are conducted within four hours following the notification of the adverse triggering event or upon notification that the prisoner has returned from a medical assessment related to the adverse triggering event.  The prisoner will remain under unobstructed visual observation by custody staff until a QMHP has completed his or her evaluation.

**STATUS:     NON-COMPLIANCE**

The Compliance Measures require the Department to develop a staffing schedule to provide on-call services, and the County's Thirteenth Self-Assessment reported that it has complied with this requirement.  The Compliance Measures also require the Department to review randomly selected records of prisoners newly admitted to mental health housing from a lower level of care due to an adverse triggering event during two randomly selected weeks per quarter.  The County's Thirteenth Self-Assessment reports that during the Second Quarter of 2021, (a) "79% -- rather than the required 95% -- of inmates" identified in the two randomly selected weeks received an assessment by a QMHP within four hours, as required by Compliance Measure 36-4(a).  The County further reports that (b) 100% of the selected prisoners at TTCF and 100% at CRDF were seen on videos "under unobstructed visual observation pending assessment," as required by Compliance Measure 36-4(b).

The County's Augmented Thirteenth Self-Assessment reports that for the Third Quarter of 2021, the Department complied with the staffing schedule requirement.  The County further reports that during the Third Quarter of 2021 "78% -- rather than the required 95% -- of inmates" identified in the two randomly selected weeks received an assessment by a QMHP within four hours, as required by Compliance Measure 36-4(a).  The County further reports that 80% of the selected prisoners at TTCF and 100% at CRDF were "under unobstructed visual observation pending assessment," as is required by Compliance Measure 36-4(b).

The Monitoring Team also periodically conducts qualitative reviews of relevant patient files to determine if the County is adequately detecting adverse triggering events and repeated acts of self-harm and conducting prompt, clinically-adequate treatment planning in response.  In the last qualitative review, which was conducted in May 2021 and included in the Twelfth Report, the Team found that QMHP "response times are generally within required timeframes, returning to levels observed approximately a year ago."  However, "adequate risk assessments are being done less than half of the time, although this is an improvement from the prior review.  A corresponding plan to address those risks continues to be present in less than half of cases."

The Monitor therefore noted in the Twelfth Report

> In cases of repeated self-harm, there were treatment plans to address the behavior in just 14% of cases (3 of 21). Even when treatment plans were created, they were generally "cursory and overly standardized rather than based on an individualized assessment and clinical case formulation." Given the increased risks of suicide among inmates who have engaged in repeated acts of self-harm, as well as the increased number of suicides in the Department's jails in the First Quarter of 2021, the County should prioritize treatment planning for these inmates in the future. If these results do not improve, the County may be rated as Non-Compliant with Provision 36 in the next Reporting Period.

In November 2021, Drs. Johnson, Vess and Eargle, conducted a qualitative assessment of the County's compliance with Paragraph 36. In it, they sought to assess, among other things, "the County's methodology, specifically whether it sufficiently detects adverse triggering events and acts of repeated self-harm" in order to assure prompt assessment by a QMHP and a clinically-adequate treatment plan. They also sought to determine whether any assessment conducted "sufficiently addressed the adverse triggering event(s), including discussing relevant risk factors, and whether there was a clinically-adequate crisis response or safety plan put in place."

They noted that of 41 qualifying cases with a single adverse triggering event (five were indeterminate), 85% of the patients were seen within four hours by a QMHP. This is a slight improvement from the previous results. In 36% of the cases with a single adverse triggering event, a QMHP adequately evaluated the apparent risk factors. This is a decline from the 44% found during the previous review. Further, in only 18% of the cases was any safety plan or crisis response plan in place to address the risk factors, which represents a sharp decline from the 42% found during the prior review.

Regarding cases of repeated self-harm, the Team assessed 10 patients who were being followed by the Complex Case Committee who had engaged in repeated instances of self-injurious behavior. There was a treatment plan to address this behavior in just 10% of those cases. Of the lone case with a treatment plan, "it was marginal and not based upon an individualized case formulation to reduce and minimize the self-injurious behavior." Of the remaining cases in the sample, "there was no indication that clinicians determined that a treatment plan was not clinically indicated or that a behavior management plan was put in place instead." The County is therefore Non-Compliant with Provision 36 for the Thirteenth Reporting Period.[11]

---

[11] In its Correctional Health Services and Custody Compliance & Sustainability Bureau Combined Semi-Annual Report on Quality Improvement and Suicide Prevention Efforts – Quarter 2 2021 & Quarter 3 2021, the County indicated that a significant majority of inmates who had engaged in self-directed violence did have a competent treatment plan. *See* Combined Suicide Prevention Report at 72-79. These reported results starkly contrast with the findings of the Monitor's Mental Health Team. The County must closely examine the criteria it is using to evaluate treatment plans for this patient population given the findings discussed herein.

37.     Sheriff's Court Services Division staff will complete a Behavioral Observation and Mental Health Referral ("BOMHR") Form and forward it to the Jail's mental health and/or medical staff when the Court Services Division staff obtains information that indicates a prisoner has displayed obvious suicidal ideation or when the prisoner exhibits unusual behavior that clearly manifests self-injurious behavior, or other clear indication of mental health crisis.  Pending transport, such prisoner will be under unobstructed visual observation or subject to 15-minute safety checks.

**STATUS:     PARTIAL COMPLIANCE**

The Compliance Measures require the Department to randomly select six courts from among the three Court Divisions each quarter, review written communications and orders that refer to a suicide risk or serious mental health crisis for a prisoner and incident reports for self-injurious behavior by prisoners appearing in the selected courts, and determine if these incidents are reflected in BOMHR forms completed by the Court Services Division staff in the selected courts.

The County's Thirteenth Self-Assessment reported that 50% of the incidents involving problematic behavior identified by the judges and court clerks in seven randomly selected courts were reflected on BOHMRs in the Second Quarter of 2021. This falls below the 90% threshold for achieving Substantial Compliance reflected in Compliance Measure 37-4(a).  The County's Thirteenth Self-Assessment also reports that for the Third Quarter of 2021, 37% of the relevant incidents were reflected on BOHMRs, which falls below the relevant threshold.  These both reflect significant decreases from the numbers reported in the Twelfth Reporting Period.  These numbers must improve or the County may be rated Non-Compliant with Provision 37 in the next reporting period.

38.      Consistent with existing DMH policies and National Commission on
Correctional Health Care standards for jails, the County and the Sheriff will ensure that
mental health staff or JMET teams make weekly cell-by-cell rounds in restricted non-
mental health housing modules (e.g., administrative segregation, disciplinary segregation)
at the Jails to identify prisoners with mental illness who may have been missed during
screening or who have decompensated while in the Jails.  In conducting the rounds, either
the clinician, the JMET Deputy, or the prisoner may request an out-of-cell interview.
This request will be granted unless there is a clear and documented security concern that
would prohibit such an interview or the prisoner has a documented history of repeated,
unjustified requests for such out-of-cell interviews.

**STATUS:        SUBSTANTIAL COMPLIANCE (as of January 1, 2016,
                through December 31, 2016 (verified))**

The Compliance Measures require the Department to review the documentation of
the weekly cell-by-cell rounds and the JMET Logs for a randomly selected week each
quarter to confirm that the required cell-by-cell checks were conducted and out-of-cell
interviews were handled in accordance with this provision.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not
subject to monitoring for Substantial Compliance with Paragraph 38 in the Thirteenth
Reporting Period.

39.     The County and the Sheriff will continue to use a confidential self-referral system by which all prisoners can request mental health care without revealing the substance of their requests to custody staff or other prisoners.

STATUS          **SUBSTANTIAL COMPLIANCE (as of July 1, 2017, through June 30, 2018 (verified) at NCCF)**

                                         **SUBSTANTIAL COMPLIANCE (as of April 1, 2021, through September 30, 2021 (verified) at PDC South)**

                                         **PARTIAL COMPLIANCE (at CRDF, TTCF, MCJ, and PDC North)**

                                         **NOT RATED (at PDC East)**

Substantial Compliance requires the Department to (a) verify that housing areas have the required forms and (b) review randomly selected self-referrals for mental health care from prisoners to confirm that (i) the referrals "were forwarded to DMH" by the Department, and (ii) that "DMH documented the timeliness and nature of DMH's response to the self-referrals[.]"  The thresholds for Substantial Compliance are that 85% of the housing areas have the required forms and 90% of the self-referrals must be forwarded by the Department to the Department of Health Services – Custody Health Services (DHS-CHS) and 90% must contain the required documentation of DHS-CHS's response.

The County's Thirteenth Self-Assessment reports that it achieved Substantial Compliance with Compliance Measure 39-4(a) in the Second and Third Quarters of 2021 "at all applicable" facilities.

Regarding Compliance Measures 39-4(b) and 4(c), the County's Thirteenth Self-Assessment reports that 100% of the self-referrals from PDC South, PDC North, TTCF, and MCJ, and 48% of the self-referrals from CRDF, were forwarded by the Department to CHS in the Second Quarter of 2021.  It further reported that CHS documented the timeliness and nature of its response in 100% of the PDC South referrals, 80% of the PDC North referrals, 100% of the CRDF referrals, 40% of the TTCF referrals, and 62% of the MCJ referrals.[12]  The results at PDC South have been verified by the Monitor's auditors.

The County's Augmented Thirteenth Self-Assessment also reports that 100% of the self-referrals from PDC South, PDC North, CRDF, TTCF, and MCJ, were forwarded by the Department to CHS in the Third Quarter of 2021.  The County further reports that CHS documented the timeliness and nature of its response in 100% of the PDC South referrals, 90% of the PDC North referrals, 64% of the CRDF referrals, 34% of the TTCF referrals, and 50% of the MCJ referrals.  The results at PDC South have been verified by

---

[12] According to the County's Thirteenth Self-Assessment, "there were no relevant referrals from PDC East, the Department's Fire Camp operation," during the Second or Third Quarters of 2021.

the Monitor's auditors.  The results at PDC North could not be verified by the Monitor's auditors.

The County previously reported Substantial Compliance at NCCF for twelve consecutive months from July 1, 2017, through June 30, 2018.  These results have been verified by the Monitor's auditors and NCCF is no longer subject to monitoring for compliance with Paragraph 39.

40.     The County and the Sheriff will ensure a QMHP will be available on-site, by transportation of the prisoner, or through tele-psych 24 hours per day, seven days per week (24/7) to provide clinically appropriate mental health crisis intervention services.

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance requires the County (1) to provide the Monitor with on-call schedules for two randomly selected weeks reflecting that a QMHP was assigned 24 hours a day, seven days per week, and (2) to randomly select referrals for mental health crisis intervention received by a QMHP per quarter to verify (i) that a QMHP responded to all referrals, and (ii) responses to 90% of the referrals were within four hours.

The County's Thirteenth Self-Assessment reports that in the Second Quarter of 2021, a QMHP responded to 96% of the referrals for mental health crisis intervention services, which is below the 100% threshold for Substantial Compliance, and that 92% of the responses were within four hours, which is above the 90% threshold for Substantial Compliance.

The County's Augmented Thirteenth Self-Assessment reports that in the Third Quarter of 2021, a QMHP responded to 97% of the referrals for mental health crisis intervention services and that 95% of the responses were within four hours, which exceeds the 90% threshold.

In November 2021, Drs. Johnson, Vess, and Eargle, performed a qualitative review of the County's compliance with Paragraph 40.  They reviewed 60 qualifying cases from IRC, TTCF, CRDF, NCCF, and MCJ.  A QMHP responded to the crisis in 100% of cases and the response was within four hours in 85%.  These responses were deemed to be clinically appropriate in 48% of cases.  This represents continuing improvement from the 42% found in May 2021, and the 15% found in November 2020.

According to the Monitor's Mental Health Team, "what is typically missing is an indication that sound crisis interventions were attempted at the time of the initial clinical contact.  More explicit documentation is needed of attempts at de-escalation when needed, consideration of alternative behaviors, explicit attention to and instruction in specific coping strategies, communication and collaboration with custody, or other short-term interventions intended to ensure the safety of the patient until changes in housing and more explicit treatment planning can be enacted."

41.     Consistent with existing DMH policies, the County and the Sheriff will implement step-down protocols that provide clinically appropriate transition when prisoners are discharged from FIP after being the subject of suicide watch.  The protocols will provide:

(a)     intermediate steps between highly restrictive suicide measures (e.g., clinical restraints and direct constant observation) and the discontinuation of suicide watch;

(b)     an evaluation by a QMHP before a prisoner is removed from suicide watch;

(c)     every prisoner discharged from FIP following a period of suicide watch will be housed upon release in the least restrictive setting deemed clinically appropriate unless exceptional circumstances affecting the facility exist; and

(d)     all FIP discharges following a period of suicide watch will be seen by a QMHP within 72 hours of FIP release, or sooner if indicated, unless exceptional circumstances affecting the facility exist.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of April 1, 2021, through September 30, 2021 (unverified))**

Substantial Compliance requires CHS to review the medical records of all prisoners on suicide watch in FIP for one randomly selected month each quarter, and submit a report regarding the implementation of the step-down protocols and the results of its review of the medical records.  During the Fifth Reporting Period, the parties agreed to revise the Compliance Measures to increase the number of inmates subject to the step-down protocols of Paragraph 41 and ensure that the implementation of step-down protocols for FIP patients on suicide watch "ameliorate the impact of the restrictions" and have the necessary "level of precautions based upon individual assessment[s]" of the patients.

The County's Thirteenth Self-Assessment reports that the County met the requirements in Compliance Measure 41-4 for 100% of the prisoners discharged from FIP during the Second Quarter of 2021 after having been on suicide watch, which is above the 95% threshold for Substantial Compliance.  The County's Augmented Thirteenth Self-Assessment also reports that the County met the requirements in Compliance Measure 41-4 for 100% of the prisoners discharged from FIP during the Third Quarter of 2021 after having been on suicide watch.  These results are subject to verification by the Monitor's auditors and mental health team.

43

42.     Consistent with existing DMH policies, the County and the Sheriff will implement step-down protocols to ensure that prisoners admitted to HOH and placed on risk precautions are assessed by a QMHP.  As part of the assessment, the QMHP will determine on an individualized basis whether to implement "step-down" procedures for that prisoner as follows:

(a)     the prisoner will be assessed by a QMHP within three Normal business work days, but not to exceed four days, following discontinuance of risk precautions;

(b)     the prisoner is counseled to ameliorate the negative psychological impact that any restrictions may have had and in ways of dealing with this impact;

(c)     the prisoner will remain in HOH or be transferred to MOH, as determined on a case-by-case basis, until such assessment and counseling is completed, unless exceptional circumstances affecting the facility exist; and

(d)     the prisoner is subsequently placed in a level of care/housing as determined by a QMHP.

**STATUS:     COMPLIANCE SUSPENDED (at TTCF AND CRDF)**

The County's Thirteenth Self-Assessment and posted results reflect that there were no relevant patients at TTCF or CRDF in the Second or Third Quarters of 2021.[13] Compliance therefore remains suspended with Paragraph 42.  The County should use the revised sampling methodology for assessing its compliance with Paragraph 42 in the Fourteenth Reporting Period.

---

[13] As the Monitor wrote in the Twelfth Report, "the Monitor understands that CHS substantially restricted its use of Risk Precautions in the years after the Agreement was executed."  Given those changes, "and the increasingly small number of eligible patients sampled for Provision 42 in each reporting period…the Monitor encourages the Parties to meet with Subject Matter Expert Dr. Johnson to determine whether changes need to be made to Provision 42 and its associated Compliance Measures."  The Parties did, in fact, have such meetings during the Thirteenth Reporting Period and agreed upon a revised sampling methodology for Provision 42.

43.     Within six months of the Effective Date, the County and the Sheriff will develop and implement written policies for formal discipline of prisoners with serious mental illness incorporating the following:

(a)     Prior to transfer, custody staff will consult with a QMHP to determine whether assignment of a prisoner in mental health housing to disciplinary housing is clinically contraindicated and whether placement in a higher level of mental health housing is clinically indicated, and will thereafter follow the QMHP's recommendation;

(b)     If a prisoner is receiving psychotropic medication and is placed in disciplinary housing from an area other than mental health housing, a QMHP will meet with that prisoner within 24 hours of such placement to determine whether maintenance of the prisoner in such placement is clinically contraindicated and whether transfer of the prisoner to mental health housing is clinically appropriate, and custody staff will thereafter follow the QMHP's recommendation;

(c)     A QMHP will participate in weekly walks, as specified in paragraph 38, in disciplinary housing areas to observe prisoners in those areas and to identify those prisoners with mental health needs; and

(d)     Prior to a prisoner in mental health housing losing behavioral credits for disciplinary reasons, the disciplinary decision-maker will receive and take into consideration information from a QMHP regarding the prisoner's underlying mental illness, the potential effects of the discipline being considered, and whether transfer of the prisoner to a higher level of mental health housing is clinically indicated.

**STATUS (43):**      **SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at NCCF and PDC North)**

**PARTIAL COMPLIANCE (at CRDF, MCJ, and TTCF)**

In response to comments by the Monitor and DOJ, the Department submitted proposed revisions to its discipline policies on May 30, 2017.  After consulting with the Subject Matter Experts, the Monitor provided his written comments to the Department on June 29, 2017.  DOJ provided its comments to the Department the same day.  On April 24, 2019, the Department submitted a proposed policy for discipline of mental health inmates, disabled inmates, and inmates with special needs.  The Monitor and DOJ responded with written comments on May 30, 2019.  On November 7, 2019, the Department submitted proposed policy revisions for inmate disciplinary procedures and disciplinary guidelines.  The Monitor and DOJ responded on December 5 and 6, 2019, respectively.  In the Twelfth Report, the County was rated as Non-Compliant with Provision 43 in the Twelfth Reporting Period at CRDF, MCJ, and TTCF as those policies "were never adopted by the Department in the subsequent two-and-a-half years."

Between August 17, 2021, and October 5, 2021, the County produced eight draft policies related to inmate discipline to the Monitor and DOJ.  The DOJ provided comments on November 4, 2021, and the Monitor provided written feedback on November 7, 2021.  In the Thirteenth Self-Assessment, the County reported that it is "working diligently to review any such comments for revision and hopefully adoption in Quarter 1, 2022."  The County should prioritize the finalization of these policies before the date of its next self-assessment.

Regarding Compliance Measure 43-9(e), the Department posted a memo indicating that no inmates with mental illness lost behavioral credits for disciplinary reasons during the Second Quarter of 2021.  The County reports that in the Second Quarter of 2021, 26% of the required consultations at CRDF "occurred prior to transfers from mental health housing."  The County further reports that 71% of the required meetings occurred when inmates receiving psychotropic medications were transferred to disciplinary housing from areas other than mental health housing.  The County also reports that 80% of the weekly row walks through disciplinary units occurred at CRDF.

The results for MCJ were 46%, 76%, and 100%.  At TTCF, 69% of the required consultations "occurred prior to transfers from mental health housing," and "there were no patients to assess for Measure 43-9(c) during this quarter," since "[i]nstead of being used for discipline, these modules in TTCF were used for Covid-related quarantines during the reporting period."  Similarly, the County reports that regarding Compliance Measure 43-9(d), "there were no discipline row walks required during the random weeks as no inmates or patients were housed in TTCF discipline modules during the relevant weeks due to changes required to reduce the risk of spreading COVID-19."

The County's Augmented Thirteenth Self-Assessment reports that "no inmates with mental illness lost behavioral credits for disciplinary reasons during the Third Quarter of 2021." Further, 81% of the required consultations at CRDF "occurred prior to transfers from mental health housing." 81% of the required meetings occurred when inmates receiving psychotropic medications were transferred to disciplinary housing from areas other than mental health housing. The County also reports that 100% of the weekly row walks through disciplinary units occurred at CRDF. The results for TTCF were 71% (consultations before transfer), but there were no results to report for Compliance Measures 43-9(c) or 43-9(d) due to COVID-19 related population changes. For MCJ, the results were 88%, 80%, and 100% in the Third Quarter of 2021.

The County reports that CHS staff at CRDF are using "a new template to assist with compliance with this provision," which contributed to the substantial improvement in results between the Second and Third Quarters of 2021 at CRDF.

The County previously achieved Substantial Compliance at NCCF and PDC North for twelve consecutive months and these facilities were not subject to monitoring for compliance with Paragraph 43 during the Thirteenth Reporting Period.

44.     Within six months of the Effective Date, the County and the Sheriff will install protective barriers that do not prevent line-of-sight supervision on the second floor tier of all High Observation Housing areas to prevent prisoners from jumping off of the second floor tier.  Within six months of the Effective Date, the County and the Sheriff will also develop a plan that identifies any other areas in mental health housing where such protective barriers should be installed.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016)**

The County has maintained Substantial Compliance with Paragraph 44 of the Agreement since January 1, 2016.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 44 in the Thirteenth Reporting Period.

45.     Consistent with existing Sheriff's Department policies, the County and the
Sheriff will provide both a Suicide Intervention Kit that contains an emergency cut-down
tool and a first-aid kit in the control booth or officer's station of each housing unit.  All
custody staff who have contact with prisoners will know the location of the Suicide
Intervention Kit and first-aid kit and be trained to use their contents.

> **STATUS:**     **SUBSTANTIAL COMPLIANCE (as of October 1, 2015,
> through September 30, 2016 (verified) at CRDF, NCCF, PDC
> East, PDC South, and TTCF)**
>
> **SUBSTANTIAL COMPLIANCE (as of January 1, 2016,
> through December 31, 2016 (verified) at MCJ and PDC North)**

The County maintained Substantial Compliance with Paragraph 45 for twelve
consecutive months at all facilities as of December 31, 2016.  Pursuant to Paragraph 111
of the Settlement Agreement, the Department was not subject to monitoring for
Substantial Compliance with Paragraph 45 in the Thirteenth Reporting Period.

46.     The County and the Sheriff will immediately interrupt, and if necessary, provide appropriate aid to, any prisoner who threatens or exhibits self-injurious behavior.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of July 1, 2020 through December 31, 2020 (verified), and through June 30, 2021 (unverified))**

The parties agreed on Revised Compliance Measures in 2021.  Substantial Compliance requires the Department to review the documentation from randomly selected incidents involving prisoners who threaten or exhibit self-injurious behavior, and include an assessment of the timeliness and appropriateness of the Department's responses to these incidents in its semi-annual Self-Assessment.

The County's Thirteenth Self-Assessment reports that for the Second Quarter of 2021, 95% of the records reviewed "reflected that appropriate aid and (when necessary) immediate interruption of self-injurious behavior was provided by the Department."[14] The County's Augmented Thirteenth Self-Assessment reports that for the Third Quarter of 2021, 96% of the records reviewed "reflected that appropriate aid and (when necessary) immediate interruption of self-injurious behavior was provided by the Department."  These results are subject to verification by the Monitor's auditors.

---

[14] The County notes that the Department expanded the number of cases beginning evaluated in this Provision in Third Quarter 2019 to include items from CIRCs, actual self-directed violence, and BOMHRs to address concerns raised by the Subject Matter Expert about the universe of cases being evaluated.

47.     The County and the Sheriff will ensure there are sufficient custodial, medical, and mental health staff at the Jails to fulfill the terms of this Agreement.  Within six months of the Effective Date, and on a semi-annual basis thereafter, the County and the Sheriff will, in conjunction with the requirements of Paragraph 92 of this Agreement, provide to the Monitor and DOJ a report identifying the steps taken by the County and the Sheriff during the review period to implement the terms of this Agreement and any barriers to implementation, such as insufficient staffing levels at the Jails, if any.  The County and the Sheriff will retain staffing records for two years to ensure that for any critical incident or non-compliance with this Agreement, the Monitor and DOJ can obtain those records to determine whether staffing levels were a factor in that critical incident and/or non-compliance.

**STATUS:     NON-COMPLIANCE**

The County's posted results for Provision 47 reflect the County's assessment of whether staffing levels were a factor in "any critical incident, or the Department's handling of the incident," as Compliance Measures 47-1 and 47-2 require.  The County's posted results report that 58 critical incidents[15] occurred during the First Half of 2021, and the County's conclusion that staffing was not a factor in any of the incidents.

However, Compliance Measure 47-3(a) also requires the County to report on "any barriers to implementation [of the Agreement] during the period," including staffing levels.  The Compliance Measures thus call for an assessment of the role that staffing levels played not only in the Department's handling of critical incidents, but in any lack of compliance with the Agreement itself.  The County has not yet provided the analysis required by Provision 47, and has committed to do so by the end of March 2022.

---

[15] 31 Inmate Deaths, 4 Serious Suicide Attempts, 15 Inmate Assaults on Staff, and 8 Category 3 Uses of Force.

48.     Within three months of the Effective Date, the County and the Sheriff will have written housekeeping, sanitation, and inspection plans to ensure the proper cleaning of, and trash collection and removal in, housing, shower, and medical areas, in accordance with California Code of Regulations ("CCR") Title 15 § 1280: Facility Sanitation, Safety, and Maintenance.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016)**

The County maintained Substantial Compliance with Paragraph 48 of the Agreement at all facilities for twelve consecutive months as of December 31, 2016. Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 48 in the Thirteenth Reporting Period.

49.     Within three months of the Effective Date, the County and the Sheriff will
have a maintenance plan to respond to routine and emergency maintenance needs,
including ensuring that shower, toilet, sink, and lighting units, and heating, ventilation,
and cooling system are adequately maintained and installed.  The plan will also include
steps to treat large mold infestations.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of March 1, 2016,
                through February 28, 2017)**

The County maintained Substantial Compliance with Paragraph 49 of the
Agreement at all facilities for twelve consecutive months as of February 28, 2017.
Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject
to monitoring for Substantial Compliance with Paragraph 49 in the Thirteenth Reporting
Period.

50.     Consistent with existing Sheriff's Department policies regarding control of vermin, the County and the Sheriff will provide pest control throughout the housing units, medical units, kitchen, and food storage areas.

      **STATUS:**      **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at all facilities other than PDC South and PDC East)**

                        **SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 (verified) at PDC South and PDC East)**

The County maintained Substantial Compliance with Paragraph 50 of the Agreement at all facilities for twelve consecutive months as of March 31, 2017.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 50 in the Thirteenth Reporting Period.

51.     Consistent with existing Sheriff's Department policies regarding personal care items and supplies for inmates, the County and the Sheriff will ensure that all prisoners have access to basic hygiene supplies, in accordance with CCR Title 15 § 1265: Issue of Personal Care Items.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) for all facilities other than CRDF)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017 (verified) at CRDF)**

The County maintained Substantial Compliance with Paragraph 51 of the Agreement at all facilities for twelve consecutive months as of June 30, 2017.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 51 in the Thirteenth Reporting Period.

52.     The County and the Sheriff will implement policies governing property restrictions in High Observation Housing that provide:

(a)     Except when transferred directly from FIP, upon initial placement in HOH:

   (i)     Suicide-resistant blankets, gowns, and mattresses will be provided until the assessment set forth in section (a)(ii) below is conducted, unless clinically contraindicated as determined and documented by a QMHP.

   (ii)    Within 24 hours, a QMHP will make recommendations regarding allowable property based upon an individual clinical assessment.

(b)     Property restrictions in HOH beyond 24 hours will be based on clinical judgment and assessment by a QMHP as necessary to ensure the safety and well-being of the prisoner and documented in the electronic medical record.

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance requires the Department to (1) randomly inspect the cells of prisoners placed in HOH (except from FIP) within the previous 24 hours to confirm that they have been provided with suicide-resistant blankets, gowns and mattresses unless clinically contraindicated, and document the results of the inspection; (2) randomly inspect the cells of prisoners placed in HOH (except from FIP) for more than 24 hours to confirm that they have been provided with allowable property as recommended by a QMHP; and (3) review the electronic medical records of prisoners assigned to HOH on the days of those inspections to verify compliance with the provisions of Paragraph 52. All the Compliance Measures have a 95% threshold for Substantial Compliance.

During the Eleventh Reporting Period, the County acknowledged

the challenges it has in complying with this Provision. During the Reporting Period, the CHS-Compliance team met with supervising staff at CRDF to review the provisions requirements, audit results, and explain how to conduct an audit to more timely assess compliance progress…CRDF, in particular received training in how to conduct its own internal assessments on June 24, 2020 and began conducting its own audits in late September 2020. The results of those audits were then reviewed by the CHS Compliance Program for feedback and ideas for improvement. CHS anticipates improved performance in future reporting periods.

In its Thirteenth Self-Assessment, the County reports continuing improvement at CRDF in the Thirteenth Reporting Period. The County reports that in the Second Quarter of 2021, at CRDF "70%—rather than the required 95%—of the electronic medical records for inmates assigned to HOH reflected a recommendation by a QMHP regarding

allowable property pursuant to Compliance Measure 52-5(c)."[16]  Additionally, "46%—
rather than the required 95%—of electronic medical records for inmates assigned to HOH
reflect that property restrictions were based upon the clinical judgment of a QMHP
pursuant to Compliance Measure 52-5(d)."  The County also reported that "100%—more
than the required 95%—of inmates analyzed pursuant to Compliance Measure 52-5(e)
had allowable property as recommended by a QMHP (unless refused by the inmate)."

The County also reports that at TTCF in the Second Quarter of 2021, "90%—
rather than the required 95%—of inmates analyzed pursuant to Compliance Measure 52-
5(b) were provided suicide-resistant blankets, gowns and mattresses as required by this
Provision." "76%—rather than the required 95%—of the electronic medical records for
inmates assigned to HOH reflected a recommendation by a QMHP regarding allowable
property pursuant to Compliance Measure 52-5(c)."  "72%—rather than the required
95%—of electronic medical records for inmates assigned to HOH reflect that property
restrictions were based upon the clinical judgment of a QMHP pursuant to Compliance
Measure 52-5(d)."  "95%—equal to the required 95%—of inmates analyzed pursuant to
Compliance Measure 52-5(e) had allowable property as recommended by a QMHP
(unless refused by the inmate)."

The County's Augmented Thirteenth Self-Assessment reports that at CRDF in the
Third Quarter of 2021, "83%—rather than the required 95%—of the electronic medical
records for inmates assigned to HOH reflected a recommendation by a QMHP regarding
allowable property pursuant to Compliance Measure 52-5(c)."  "70%—rather than the
required 95%—of electronic medical records for inmates assigned to HOH reflect that
property restrictions were based upon the clinical judgment of a QMHP."  "98%—more
than the required 95%—of inmates analyzed pursuant to Compliance Measure 52-5(e)
had allowable property as recommended by a QMHP (unless refused by the inmate)."

The County reports that at TTCF in the Third Quarter of 2021, "90%—less than
the required 95%—of inmates analyzed pursuant to Compliance Measure 52-5(b) were
provided suicide-resistant blankets, gowns and mattresses as required by this Provision."
"61%—rather than the required 95%—of the electronic medical records for inmates
assigned to HOH reflected a recommendation by a QMHP regarding allowable property
pursuant to Compliance Measure 52-5(c)."  "66%—rather than the required 95%—of
electronic medical records for inmates assigned to HOH reflect that property restrictions
were based upon the clinical judgment of a QMHP pursuant to Compliance Measure 52-
5(d)."  "97%—more than the required 95%—of inmates analyzed pursuant to
Compliance Measure 52-5(e) had allowable property as recommended by a QMHP
(unless refused by the inmate)."

In November 2021, Drs. Johnson, Vess, and Eargle conducted a qualitative
review of the County's compliance with Provision 52.  They sought to evaluate "whether
there was an assessment by a QMHP within 24 hours" and "whether any restrictions

---

[16] Due to changes that result from the COVID-19 pandemic, as in the Twelfth Reporting Period, the
County's Self-Assessment does not report on its compliance with Compliance Measure 52-5(b) at CRDF in
the Second or Third Quarters of 2021.

imposed were based upon a clinically appropriate evaluation of relevant risks." They found that in 96% of cases, a QMHP did provide an assessment, and it was within 24 hours in 92% of cases. In 60% of cases (30 of 50) the records reflected the risks determined to justify the property restrictions. This was a substantial improvement from the 36% found during the last qualitative review. There was a current assessment in 79% of cases that was based on articulated, relevant risks in 53% of cases. The County is making commendable progress at implementing Provision 52 and with sufficient efforts, should be able to expeditiously achieve Substantial Compliance.

53.     If otherwise eligible for an education, work, or similar program, a prisoner's mental health diagnosis or prescription for medication alone will not preclude that prisoner from participating in said programming.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of July 1, 2021, through September 30, 2021 (unverified))**

Substantial Compliance requires the Department to audit the records of prisoners who were eligible, but rejected or disqualified, for education and work programs to confirm that they were not rejected or disqualified because of a mental health diagnosis or prescription for medication alone.

The County's Thirteenth Self-Assessment reports that 48% of the eligible mentally ill prisoners who were denied education or work in the Second Quarter of 2021 and 92% in the Third Quarter of 2021 "were not rejected or disqualified from education or work programs solely because of a mental health diagnosis or prescription for medication."  The Substantial Compliance results are subject to verification by the Monitor's auditors.

The County has previously reported that due to the COVID-19 pandemic, "fewer inmates will be able to participate in education or work programs during the public health crisis."  Indeed, the populations of eligible inmates (59 inmates in the Second Quarter of 2021, and 32 inmates in the Third Quarter of 2021) making requests for education or work programing were far smaller than during comparable periods before the COVID-19 pandemic.[17]  The County's results in the Thirteenth Monitoring are therefore necessarily impacted by the smaller number of eligible, requesting inmates, and the decline in programming available during the pandemic.

---

[17] For example, there were 99 eligible, requesting inmates in the Fourth Quarter of 2019 and 114 eligible, requesting inmates in the First Quarter of 2020.

54.      Prisoners who are not in Mental Health Housing will not be denied privileges and programming based solely on their mental health status or prescription for psychotropic medication.

**STATUS:       PARTIAL COMPLIANCE**

Substantial Compliance under the revised Compliance Measures for Paragraph 54, effective January 1, 2018, requires the Department to audit the records of a maximum of 100 randomly selected prisoners identified on the Wednesday Pharmacy List as having received psychotropic medication to confirm that no more than 10% were rejected or disqualified because of a mental health diagnosis or prescription for psychotropic medication alone.  Because the Monitor's auditors had verified that the County has maintained Substantial Compliance under the original Compliance Measures, the parties agreed that the County will only be required to maintain Substantial Compliance under the revised Compliance Measures for two additional quarters.[18]

The County's Thirteenth Self-Assessment reports that in the Second Quarter of 2021, 19% of inmates "were denied requests improperly for the purposes of this provision."  It further reports that in the Third Quarter of 2021, "17% of inmates were denied requests improperly for purposes of this provision.

---

[18] The Twelfth Report noted that the Monitor's auditors had verified the County's compliance in the First Quarter of 2020 and were attempting to verify compliance for the Second Quarter of 2020.  "If verified, the County will have maintained Substantial Compliance under the revised Compliance Measures for two additional quarters and will no longer [be] subject to monitoring for Substantial Compliance with Paragraph 54."  However, the Monitor's auditors were unable to verify the County's compliance for the Second Quarter of 2020.

55.    Relevant custody, medical, and mental health staff in all High Observation Housing units will meet on normal business work days and such staff in all Moderate Observation Housing units will meet at least weekly to ensure coordination and communication regarding the needs of prisoners in mental health housing units as outlined in Custody Services Division Directive(s) regarding coordination of mental health treatment and housing.  When a custody staff member is serving as a member of a treatment team, he or she is subject to the same confidentiality rules and regulations as any other member of the treatment team, and will be trained in those rules and regulations.

**STATUS:**      **SUBSTANTIAL COMPLIANCE (as of October 1, 2016, through September 30, 2017 (verified) at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at PDC North)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 (verified) at MCJ)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2019, through June 30, 2020 (verified) at TTCF)**

The Department maintained Substantial Compliance for twelve consecutive months at all facilities as of June 30, 2020.  These results have now been verified by the Monitor's auditors.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 55 in the Thirteenth Reporting Period.

56.     Consistent with existing DMH and Sheriff's Department policies, the County and the Sheriff will ensure that custody, medical, and mental health staff communicate regarding any change in a prisoner's housing assignment following a suicide threat, gesture, or attempt, or other indication of an obvious and serious change in mental health condition.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified))**

Substantial Compliance requires the Department to review in randomly selected periods the electronic medical records of (1) prisoners admitted to HOH following a suicide threat, gesture, or attempt, or other indication of an obvious and serious change in mental health condition to determine if the medical and/or mental health staff approved the placement of the prisoner in HOH; and (2) prisoners who were the subject of a suicide attempt notification to determine if the prisoners were clinically assessed and that clinical staff approved the post-incident housing.

The County's Substantial Compliance results for the twelve months from January 1, 2016, through December 31, 2016 were verified by the Monitor's auditors.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 56 in the Thirteenth Reporting Period.

57 (**Revised**).  Within three months of the Effective Date, the County and the Sheriff will revise and implement their policies on safety checks to ensure a range of supervision for prisoners housed in Mental Health Housing.  The County and the Sheriff will ensure that safety checks in Mental Health Housing are completed and documented in accordance with policy and regulatory requirements as set forth below:

(a)     Custody staff will conduct safety checks in a manner that allows staff to view the prisoner to assure his or her well-being and security.  Safety checks involve visual observation and, if necessary to determine the prisoner's well-being, verbal interaction with the prisoner;

(b)     Custody staff will document their checks in a format that does not have pre-printed times;

(c)     Custody staff will stagger checks to minimize prisoners' ability to plan around anticipated checks;

(d)     Video surveillance may not be used to replace rounds and supervision by custodial staff unless new construction is built specifically with constant video surveillance enhancements and could only be used to replace the required safety checks in non-FIP housing, subject to approval by the Monitor;

(e)     A QMHP, in coordination with custody (and medical staff if necessary), will determine mental health housing assignments; and

(f)     Supervision of prisoners in mental health housing will be conducted at the following intervals:

(i)     FIP:  Custody staff will perform safety checks every 15 minutes. DMH staff will perform direct constant observation or one-to-one observation when determined to be clinically appropriate;

(ii)    High Observation Housing:  Every 15 minutes;

(iii)   Moderate Observation Housing:  Every 30 minutes.

**STATUS (57):**          **SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at MCJ)**

                          **SUBSTANTIAL COMPLIANCE (as of July 1, 2021, through September 30, 2021 (verified) at PDC North)**

                          **PARTIAL COMPLIANCE (at TTCF and CRDF)**

On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provision 57 ("Revised Paragraph 57") as set forth above. The Parties also agreed on Revised Compliance Measures. Substantial Compliance requires the Department to audit the Title 15 Dashboard records (or e-UDAL records if the Title 15 scanner was not working) for all shifts for each module in each mental health housing unit in two randomly selected weeks to determine if the safety checks were staggered and conducted as required by Paragraph 57 of the Agreement, and to audit the housing records for each mental health housing unit for a randomly selected week to determine if QMHPs approved the new mental health housing assignments as required by Paragraph 57(e).

The County's Sixth Self-Assessment reported that it maintained Substantial Compliance with Compliance Measure 57-5(b) in the Fourth Quarter of 2017 and the First Quarter of 2018 in the MOH unit at MCJ (the "Hope Dorm"). It also reported that all of the inmates at MCJ "analyzed pursuant to Compliance Measure 57-5(c) had received QMHP approval for their housing assignments" in both quarters. The results were verified by the Monitor's auditors and MCJ was not subject to monitoring for compliance with Paragraph 57 in the Thirteenth Reporting Period.

The County's Thirteenth Self-Assessment reports that 58% of the safety checks were in compliance with Compliance Measure 57-5(b) (safety checks in FIP) in the Second Quarter of 2021 at TTCF. It also reports that 66% and 79% of the safety checks were in compliance with Compliance Measure 57-5(c) (safety checks in HOH) in the Second Quarter 2021 at TTCF and CRDF, respectively. The County also reports that 60% and 82% of the safety checks complied with Compliance Measure 57-5(d) (safety checks in MOH) at TTCF and CRDF, respectively. Further, 98% and 100% of the new mental health housing assignments at TTCF and CRDF, respectively, were approved by a QMHP in the Second Quarter of 2021.

The County's Augmented Thirteenth Self-Assessment reports that 65% of the safety checks were in compliance with Compliance Measure 57-5(b) (safety checks in FIP) in the Third Quarter of 2021 at TTCF. It also reports that 57% and 28% of the safety checks were in compliance with Compliance Measure 57-5(c) (safety checks in HOH) in the Third Quarter 2021 at TTCF and CRDF, respectively. The County's posted results indicate that 41% and 32% of the safety checks complied with Compliance Measure 57-5(d) (safety checks in MOH) at TTCF and CRDF, respectively. Further, 100% and 93% of the new mental health housing assignments at TTCF and CRDF, respectively, were approved by a QMHP in the Third Quarter of 2021.

The County's Augmented Thirteenth Self-Assessment also reports that 94% and 96% of the safety checks at PDC North were in compliance with Compliance Measure 57-5(d) in the Second and Third Quarters of 2021, respectively.[19]  The results for the Third Quarter of 2021 have been verified by the Monitor's auditors.

---

[19] The County has indicated that patients assigned to mental health housing at PDC North first have their housing assignments approved by a QMHP at either TTCF or MCJ, which is why results are not separately reported for PDC North for Compliance Measure 57-5(e).  PDC North also does not have HOH housing (57-5(c)) or a FIP (57-5(b)) hence the lack of results for those compliance measures.

58.     Within three months of the Effective Date, the County and the Sheriff will revise and implement their policies on safety checks.  The County and the Sheriff will ensure that safety checks in non-mental health housing units are completed and documented in accordance with policy and regulatory requirements as set forth below:

(a)     At least every 30 minutes in housing areas with cells;

(b)     At least every 30 minutes in dormitory-style housing units where the unit does not provide for unobstructed direct supervision of prisoners from a security control room;

(c)     Where a dormitory-style housing unit does provide for unobstructed direct supervision of prisoners, safety checks must be completed inside the unit at least every 60 minutes;

(d)     At least every 60 minutes in designated minimum security dormitory housing at PDC South, or other similar campus-style unlocked dormitory housing;

(e)     Custody staff will conduct safety checks in a manner that allows staff to view the prisoner to assure his or her well-being and security.  Safety checks involve visual observation and, if necessary to determine the prisoner's well-being, verbal interaction with the prisoner;

(f)     Custody staff will document their checks in a format that does not have pre-printed times;

(g)     Custody staff will stagger checks to minimize prisoners' ability to plan around anticipated checks; and

(h)     Video surveillance may not be used to replace rounds and supervision by custodial staff.

STATUS (58):    **SUBSTANTIAL COMPLIANCE (as of January 1,
2016, through December 31, 2016 (verified) at PDC
South, PDC North, and PDC East)**

**SUBSTANTIAL COMPLIANCE ( as of July 1, 2017,
through June 30, 2018 (verified) at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of October 1,
2017, through September 30, 2018 (verified) at IRC)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2021,
through September 30, 2021 (verified) at NCCF)**

**PARTIAL COMPLIANCE (at TTCF and MCJ)**

Substantial Compliance requires the Department to audit the Title 15 Dashboard
records (or e-UDAL records) for all shifts for each module in each housing unit to
determine if the safety checks were staggered and conducted as required by Paragraph 58.
The threshold for achieving Substantial Compliance with each of the Compliance
Measures is 90%.

The County maintained Substantial Compliance with Paragraph 58 for twelve
consecutive months at PDC South, PDC North, and PDC East as of December 31, 2016,
at CRDF as of June 30, 2018, and at IRC as of September 30, 2018.  These results have
been verified by the Monitor's auditors.  Pursuant to Paragraph 111 of the Settlement
Agreement, the County was not subject to monitoring at those facilities for Substantial
Compliance with Paragraph 58 in the Thirteenth Reporting Period.

The County's Augmented Thirteenth Self-Assessment reports that for the Second
Quarter of 2021 and the Third Quarter of 2021 the following percentages of safety checks
were in compliance with Paragraph 58 at TTCF: 67% and 66%, at MCJ: 44% and 64%,
and at NCCF: 91% and 93%.  The results at NCCF were verified by the Monitor's
auditors.[20]

---

[20] The Twelfth Report noted that the Monitor's auditors had verified the County's compliance at NCCF as
of April 1, 2020, through September 30, 2020.  The Monitor's auditors were also able to verify the reported
results for the Fourth Quarter of 2020.  However, the Monitor's auditors found that safety checks in
Module 911 were not sufficiently staggered in the First Quarter of 2021.  The Monitor's auditors found that
the safety checks were sufficiently staggered in the Second and Third Quarters of 2021.  However, the
County can consistently improve staggering by changing the sequence of checks within rounds.

59.    Consistent with existing Sheriff's Department policies regarding uniform daily activity logs, the County and the Sheriff will ensure that a custodial supervisor conducts unannounced daily rounds on each shift in the prisoner housing units to ensure custodial staff conduct necessary safety checks and document their rounds.

**STATUS:**    **SUBSTANTIAL COMPLIANCE (as of January 1, 2017, through December 31, 2017 (verified) at PDC East and MCJ)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2018, through December 31, 2018 (verified) at PDC North and PDC South)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 (verified) at TTCF)**

Substantial Compliance requires the Department to audit e-UDAL records for housing units in each facility to determine if supervisors are conducting unannounced daily rounds in accordance with Paragraph 59.  In response to the Monitor's comments, the Department's e-UDAL forms were modified to include a specific notation that the Supervisor verified that the safety checks were conducted.  The threshold for achieving and maintaining Substantial Compliance is that 90% of the supervisor daily rounds were in compliance with the requirements of Paragraph 59.

The County's Substantial Compliance results were verified by the Monitor's auditors.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 59 in the Thirteenth Reporting Period.

60.     Within six months of the Effective Date, the Department of Mental Health, in cooperation with the Sheriff's Unit described in Paragraph 77 of this Agreement, will implement a quality improvement program to identify and address clinical issues that place prisoners at significant risk of suicide or self-injurious behavior.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of April 1, 2019
                    through March 31, 2020)**

Paragraph 60 requires the County to "implement a quality improvement program to identify and address clinical issues that place prisoners at significant risk of suicide or self-injurious behavior."  The Compliance Measures for Paragraph 60 require the County to "identify and address. . .clinical issues" in the areas identified in Paragraph 61 of the Agreement" and corrective actions are taken to address "such issues."  See Compliance Measures 60.1, 60.2(a), and 60.3(b).

The Monitor and the Mental Health Subject Matter previously agreed that the Department had demonstrated "a sound quality improvement process and the ability to demonstrate that process through specific quality improvement projects directed by management," and the Monitor finds that the County had demonstrated that it maintained Substantial Compliance with Paragraph 60.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 60 in the Thirteenth Reporting Period.[21]

---

[21] The County has acknowledged that its ongoing Quality Improvement efforts will remain subject to monitoring under other provisions of the Settlement Agreement.

61.     The quality improvement program will review, collect, and aggregate data in the following areas and recommend corrective actions and systemic improvements:

(a)     Suicides and serious suicide attempts:

(i)     Prior suicide attempts or other serious self-injurious behavior
(ii)    Locations
(iii)   Method
(iv)    Lethality
(v)     Demographic information
(vi)    Proximity to court date;

(b)     Use of clinical restraints;

(c)     Psychotropic medications;

(d)     Access to care, timeliness of service, and utilization of the Forensic In-patient Unit; and

(e)     Elements of documentation and use of medical records.

**STATUS:        PARTIAL COMPLIANCE**

Substantial Compliance requires the County's semi-annual reports to (a) review, collect, and aggregate data in the areas set forth in Paragraph 61; (b) recommend corrective actions and systemic improvements in those areas; and (c) assess the effectiveness of actions and improvements in prior reporting periods.

On January 13, 2022, the County posted the Correctional Health Services and Custody Compliance & Sustainability Bureau Combined Semi-Annual Report on Quality Improvement and Suicide Prevention Efforts – Quarter 2 2021 & Quarter 3 2021 ("Combined Suicide Prevention Report"), which relates to Paragraphs 60, 61, 62, and 77. The Combined Suicide Prevention Report sets forth aggregate data for the 28 suicides that occurred between 2015 and the end of the Third Quarter of 2021, and 149 critical incidents that occurred between 2016 and the end of the Third Quarter of 2021, broken down by the subparts of Paragraph 61(a).  The report also includes case-specific discussions of the three suicides that occurred during the Second Quarter of 2021 and Third Quarter of 2021 at county jail facilities.

The Monitor analyzed the County's Combined Suicide Prevention Report in consultation with Drs. Johnson, Vess, and Eargle.  Our view is that the Department has continued to make progress in its Quality Improvement efforts.  The Combined Suicide Prevention Report collects much of the data required by this provision and includes some analysis and interpretation of that data.

70

For example, the Combined Suicide Prevention Report focuses on a "Covid Cohort" of 12 suicides that occurred between the Second Quarter of 2020 and the Third Quarter of 2021. The report evaluates patient, mental health, and facility-level characteristics of this "cohort," and attempts to draw certain conclusions about likely risk factors. This is a useful analysis, and the Department is to be commended for being responsive to changing conditions impacting suicidality through this proactive data analysis project.

The report lists several relatively recent corrective actions or initiatives implemented by the Department to mitigate suicide risk. This includes a (now suspended) JMET pilot program to address risks of self-harm after patient court dates, deployment of Narcan, training of "merit masters," changes to JMET's operations, and the deployment of therapy dogs. All of these are potentially useful initiatives. However, for most of them, it is unclear what data trends they are specifically responsive to.[22]

In the last reporting period, the County reported that it has a vacant position for a statistical analyst to work on data analysis in connection with the Department's suicide prevention efforts. In the most recent Combined Suicide Prevention Report, the County reports that the position continued to be vacant during the Thirteenth Reporting Period.

> As mentioned in the previous report, the statistical analyst at CCSB who assisted with much of the aggregate data gathering, analysis, and presentation was promoted (July 2019). Despite significant efforts to secure a replacement, the position continues to remain vacant due to a County-Wide hiring freeze. CCSB reports all professional staff positions have been frozen and they cannot backfill on lost civilian positions. The lack of a statistician has continued to impact the County's ability to evaluate data at the level of detail that it would like and to address the feedback received in previous Monitor's reports regarding the quality improvement provisions.

The County has made noteworthy progress on Provision 61 and Substantial Compliance is within its reach. Given the continuing gaps in the Department's ability to take its aggregated data about suicide and self-harm and tie it to specific corrective actions, the County should prioritize the hiring of a data analyst in the next reporting period. Achieving Substantial Compliance will require the Department to specifically explain how the data that it now effectively collects has been used to develop system-wide corrective actions and improvements, including following up to assess their outcomes and revising policies, if needed.

---

[22] The Combined Suicide Prevention Report does indicate that the JMET Pilot Program was implemented "due to the recent reports of acts of self-directed violence committed by inmates who had a court date within one week of their act of self-harm." However, the Pilot Program was initiated at the North County Facilities. The County does not explain what data it relied upon to launch the program at the North County Facilities, nor does the data in the report make this clear. Indeed, none of the suicides between 2015 and the Third Quarter of 2021, and only a very small number of the listed critical incidents, occurred at the North County facilities.

62.     The County and the Sheriff's Unit described in Paragraph 77 of this Agreement will develop, implement, and track corrective action plans addressing recommendations of the quality improvement program.

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance requires the County's semi-annual Self-Assessments to set forth (a) the "development of corrective action plans to address the most recent recommendations of the quality improvement program;" and (b) the "implementation and tracking of corrective action plans to address recommendations of the program in prior quarters."

On January 13, 2022, the County posted the Correctional Health Services and Custody Compliance & Sustainability Bureau Combined Semi-Annual Report on Quality Improvement and Suicide Prevention Efforts – Quarter 2 2021 & Quarter 3 2021 ("Combined Suicide Prevention Report"), which relates to Paragraphs 60, 61, 62, 72, and 77.  The Combined Suicide Prevention Report sets forth aggregate data for the 28 suicides that occurred between 2015 and the end of the Third Quarter of 2021, and 149 critical incidents that occurred between 2016 and the end of the Third Quarter of 2021. The report also includes case-specific discussions of the three suicides that occurred during the Second Quarter of 2021 and Third Quarter of 2021 at county jail facilities.

In the Twelfth Report, the Monitor noted

the [County's] reporting on the CAPS is not systematic or clearly organized.  There is not much information included about follow up on previous QI projects.  Further, it is difficult to verify a direct correlation between CAPS and the increased safety and care of patients and also difficult to determine if a CAP that was instituted prevented similar adverse events from occurring or if the issue that resulted in the CAP was a singular issue.

By way of update, the Combined Suicide Prevention Report stated

the County continues to make improvements with the tracking and organization of issues identified at CIRC meetings, however, taking this analysis further is limited at present given the bandwidth of our program. We anticipate the newly hired analyst for the Compliance program will be helpful with moving this analysis further to provide more meaningful data and next steps.

63.     The County and the Sheriff will maintain adequate High Observation Housing and Moderate Observation Housing sufficient to meet the needs of the jail population with mental illness, as assessed by the County and the Sheriff on an ongoing basis.  The County will continue its practice of placing prisoners with mental illness in the least restrictive setting consistent with their clinical needs.

**STATUS:     PARTIAL COMPLIANCE (TTCF)**

**NON-COMPLIANCE (CRDF)**

The Parties agreed on Revised Compliance Measures in 2021.  The Revised Compliance Measures require that 90% of inmates waited for permanent HOH and MOH housing for no more than 7 days, and that 100% of inmates waited for permanent HOH and MOH housing for no more than 30 days.

The County's Thirteenth Self-Assessment reported the number of days in which the total number of HOH and MOH available beds was equal to or more than the number of HOH and MOH inmates for the two randomly selected weeks in the Second Quarter of 2021 under the old compliance measures:

|      | MOH  | HOH |
|------|------|-----|
| TTCF | 100% | 0%  |
| CRDF | 92%  | 0%  |

The County's Augmented Thirteenth Augmented Self-Assessment reports results for the Third Quarter of 2021 under the Revised Compliance Measures.  It reports that in the relevant weeks, "55% of inmates at TTCF waited fewer than 7 days for permanent mental health housing."  The County further reported that 95% of inmates received permanent mental health housing within 30 days.  The County indicated that "the Department was not able to develop and submit data for CRDF but plans to do so in future periods."

64.     Within six months of the Effective Date, the County and the Sheriff will develop a short-term plan addressing the following 12-month period, and within 12 months of the Effective Date, the County and the Sheriff will develop a long-term plan addressing the following five-year period, to reasonably ensure the availability of licensed inpatient mental health care for prisoners in the Jails.  The County and the Sheriff will begin implementation of each plan within 90 days of plan completion.  These plans will describe the projected capacity required, strategies that will be used to obtain additional capacity if it is needed, and identify the resources necessary for implementation.  Thereafter, the County and the Sheriff will review, and if necessary revise, these plans every 12 months.

**STATUS:     NON-COMPLIANCE**

The parties agreed on Revised Compliance Measures in 2021.  Substantial Compliance requires the Department to develop a long-term plan that will address the availability of licensed inpatient mental health care for prisoners in the following five-year period; and provide an annual report describing the long-term plan and the steps taken to implement it, which must be deemed reasonable by the Monitor.

The County's Augmented Thirteenth Self-Assessment does not describe with specificity efforts by the County to "reasonably ensure the availability of licensed inpatient mental health care for prisoners in the Jails."  The County is therefore Non-Compliant with Provision 64 for the Thirteenth Reporting Period.

65 (**Revised**).  Consistent with existing Sheriff's Department policies, the County and the Sheriff will ensure that psychotropic medications are administered in a clinically appropriate manner to prevent misuse, hoarding, and overdose.  The County will maintain electronic mental health alerts in prisoners' electronic medical records that notify medical and mental health staff of a prisoner's risk for hoarding medications.

**STATUS:      PARTIAL COMPLIANCE**

On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provision 65 ("Revised Paragraph 65") as set forth above.  They also agreed on Revised Compliance Measures.  Under the Revised Compliance Measures, (1) the County's Self-Assessments must set forth the (a) results of weekly medication audits documenting the visual observation of the administration of medication during the quarter; (b) unauthorized medications found as a result of cell searches during the reporting period; and (c) incidents involving confirmed prescription drug overdoses.  Further, "the Monitor must conclude, after consulting with the Subject Matter Expert, that "psychotropic medications have been administered in a clinically appropriate manner 85% of the time."  Finally, "85% of the electronic medical records [must] contain the required alerts."

The County's posted documents for the Second and Third Quarters of 2021 indicate that it has "temporarily paused reporting for 65-1(a) in order to establish a more consistent and clinically appropriate process."  The County's posted results reflect that the following unannounced searches were conducted in the Second Quarter of 2021: CRDF (8), TTCF (54), MCJ (241), NCCF (1,047), PDC North (55), PDC South (192), and PDC East (5).  During these searches, the following medications and needles/syringes were found "that did not appear to be appropriately possessed by inmates": CRDF (0 medications), TTCF (197 medications), MCJ (128 medications and 40 syringes), NCCF (38 medications and 6 syringes), PDC North (8 medications and 1 syringe), PDC South (1 syringe), PDC East (0 medications).  The County also reported 1 confirmed overdose and 2 unconfirmed in the Second Quarter of 2021.

The County's posted results reflect that the following unannounced searches were conducted in the Third Quarter of 2021: CRDF (8), TTCF (37), MCJ (127), NCCF (1,097), PDC North (95), PDC South (230), and PDC East (2).  During these searches, the following medications and needles/syringes were found "that did not appear to be appropriately possessed by inmates": CRDF (0 medications), TTCF (157 medications), MCJ (125 medications, 1 syringe, and 1 damaged inhaler), NCCF (3 medications and 3 inhalers), PDC North (1 syringe), PDC South (0 medications), PDC East (0 medications). and 1 confirmed overdose and 5 unconfirmed in the Third Quarter of 2021.

Regarding hoarding alerts in electronic medical records, the County's posted documents indicate 75% compliance in the Second Quarter of 2021 and 85% in the Third Quarter of 2021.

66 (**Revised**).  Consistent with existing Correctional Health Services policies, prisoners with a serious mental illness who reside outside of mental health housing, will remain on an active mental health caseload regardless of whether they refuse medications. The County and the Sheriff will provide prisoners with a serious mental illness who reside outside of mental health housing with therapeutically appropriate individual monthly visits with a QMHP whether or not the prisoners are receiving or refusing psychotropic medications.  The County and the Sheriff will provide medication support services to prisoners who (i) have a mental illness, (ii) reside outside of mental health housing and (iii) are prescribed psychotropic medications.

STATUS:        PARTIAL COMPLIANCE

On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provision 66 ("Revised Paragraph 66") as set forth above.  They also agreed on Revised Compliance Measures.  Under the Revised Compliance Measures, Substantial Compliance requires that a) 85% of prisoners with a serious mental illness who resided outside of mental health housing were on an active mental health caseload; b) 85% of prisoners with a serious mental illness who resided outside of mental health housing are offered therapeutically appropriate structured mental health treatment and are seen by a QMHP at least once a month; and c) 85% of prisoners who resided outside of mental health housing and were prescribed psychotropic medications were offered medication support services.

The County has long-struggled with compliance with Provision 66 and, indeed, was Non-Compliant in the Twelfth Reporting Period.  However, Revised Provision 66 is narrower and focuses only on prisoners with serious mental illness who reside outside of mental health housing.  The County's posted results for Compliance Measures 66-5(a) and 66-5(b) indicate that the County only evaluated three patients for the Second Quarter of 2021 and three patients for the Third Quarter of 2021.  The County should clarify the methodology it is using to identify this universe of patients in its next Self-Assessment.

The County's posted results indicate that for Compliance Measure 66-5(a), for the Second Quarter of 2021, 100% of patients "with serious mental illness residing outside of mental health housing were on an active mental health caseload," which exceeds the 85% threshold.  For Compliance Measure 66-5(b), 100% of patients "with a serious mental illness who reside outside of mental health housing were offered therapeutically appropriate structured mental health treatment and were seen by a QMHP at least once a month," which also exceeds the 85% threshold.  Regarding Compliance Measure 66-5(c), 56% of patients "residing outside of mental health housing who were prescribed psychotropic medications during the randomly selected week were offered medication support services."

The County's Augmented Thirteenth Self-Assessment reports that for Compliance Measure 66-5(a), for the Third Quarter of 2021, 100% of patients "with serious mental illness residing outside of mental health housing were on an active mental health caseload."  For Compliance Measure 66-5(b), 66% of patients "with a serious mental

illness who reside outside of mental health housing were offered therapeutically appropriate structured mental health treatment and were seen by a QMHP at least once a month."  Regarding Compliance Measure 66-5(c), 38% of patients "residing outside of mental health housing who were prescribed psychotropic medications during the randomly selected week were offered medication support services."

The Monitor's mental health team reviewed the files for the universe of six patients evaluated by the County in connection with Compliance Measures 66-5(a) and 66-5(b) for the Second and Third Quarters of 2021.  The Team noted that "none of the patients had a specific, individualized treatment plan and none were provided treatment that would qualify as structured and 'therapeutically appropriate.'"  The County should consult with the Monitor's mental health team before the date of its next self-assessment to ensure that it is using an appropriate methodology for evaluating this provision, particularly Compliance Measure 66-5(b).

The County reports "significant staffing challenges in the area of psychiatry which have required the County to focus on higher acuity patients in mental health housing.  The County is actively exploring solutions to these staffing needs."

67.     Within three months of the Effective Date, the County and the Sheriff will implement policies for prisoners housed in High Observation Housing and Moderate Observation Housing that require:

(a)     documentation of a prisoner's refusal of psychotropic medication in the prisoner's electronic medical record;

(b)     discussion of a prisoner's refusal in treatment team meetings;

(c)     the use of clinically appropriate interventions with such prisoners to encourage medication compliance;

(d)     consideration of the need to transfer non-compliant prisoners to higher levels of mental health housing; and

(e)     individualized consideration of the appropriateness of seeking court orders for involuntary medication pursuant to the provisions of California Welfare and Institutions Code sections 5332-5336 and/or California Penal Code section 2603(a).

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance requires the County to "review the electronic medical records of 25% of the prisoners in HOH and MOH who refused psychotropic medication during the quarter to verify that the records [of 85% of the prisoners] reflect the documentation and consideration of the matters required by the terms of Paragraph 67."

The County's posted results reflect that in the Second Quarter of 2021, 56% of the records of prisoners who refused psychotropic medication "reflected the documentation and consideration of the matters required by Paragraph 67." For the Third Quarter of 2021, the County's posted results reflected 67% compliance.[23]

In November 2021, Drs. Johnson, Vess, and Eargle conducted a qualitative review of the County's compliance with Provision 67. They assessed, among other things, the "appropriateness of interventions to secure medication compliance in patients who refuse medications." They reviewed 60 cases (36 HOH and 24 MOH). In 55% of cases, a QMHP "considered whether placement at a higher level of care was indicated." They observed that due to inconsistencies in clinical notes, clinicians must more regularly document "when a higher level of care was considered and determined to be unnecessary." When the clinical notes reflected that the clinician considered a higher level of care, "the determination was reasonable in 100% of cases."

---

[23] These results were posted on January 31, 2022, which was too late to be included in the draft of this Report circulated to the Parties. While the Monitor will generally not accept results posted so late in the reporting cycle, the Monitor has made an exception in this case given that the County has satisfactorily explained the extenuating circumstances that caused its delay.

Drs. Johnson, Vess, and Eargle found that "appropriate measures to secure medication compliance were undertaken in 80% of cases." Clinicians considered FIP and involuntary medication in 76% of cases that included evidence of possible dangerousness or grave disability. Where such assessments were done, they were reasonable in 100% of cases.

68.     Within six months of the Effective Date, the County and the Sheriff will develop and implement a procedure for contraband searches on a regular, but staggered basis in all housing units.  High Observation Housing cells will be visually inspected prior to initial housing of inmates with mental health issues.

**STATUS:**      **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at MCJ, NCCF, PDC East, PDC South, and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2017, through December 31, 2017 (verified) at TTCF)**

**PARTIAL COMPLIANCE (at CRDF)**

Substantial Compliance requires that "85% of the housing units are searched for contraband at least once in the previous quarter; and 95% of the HOH units visually inspected prior to housing prisoners in these units."  Self-Assessments are to include a summary of searches conducted and a review of 25 randomly selected Checklist forms for HOH units to confirm that the units were visually inspected prior to initial housing of prisoners in these units.

The County previously maintained Substantial Compliance for twelve consecutive months at TTCF, MCJ, NCCF, PDC East, PDC South, and PDC North.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring at those facilities for Substantial Compliance with Paragraph 68 in the Thirteenth Reporting Period.

The County's posted results reflect that in the Second Quarter of 2021, 10% of the housing units at CRDF were searched at least once in the quarter, and 96% of the randomly selected HOH cells at CRDF were visually inspected before housing prisoners in these units.  During the Third Quarter of 2021, 14% of the housing units at CRDF were searched at least once in the quarter, and 88% of the randomly selected HOH cells at CRDF were visually inspected before housing prisoners in these units.[24]

---

[24] The County's Thirteenth Self-Assessment notes that the Department came near to, or exceeded, the relevant compliance thresholds for Paragraph 68 at CRDF in multiple prior Reporting Periods.  It further notes that "its current challenges in this area relate to precautions put in place as a result of the COVID-19 pandemic."  The County also notes that "regular module searches" were restored at CRDF in October 2021, thus the County's results for Provision 68 should presumably improve in the next reporting period.

69.     Consistent with existing DMH policies regarding use of clinical restraints, the County and the Sheriff will use clinical restraints only in the Correctional Treatment Center and only with the approval of a licensed psychiatrist who has performed an individualized assessment and an appropriate Forensic Inpatient order.  Use of clinical restraints in CTC will be documented in the prisoner's electronic medical record.  The documentation will include the basis for and duration of the use of clinical restraints and the performance and results of the medical welfare checks on restrained prisoners.  When applying clinical restraints, custody staff will ensure a QMHP is present to document and monitor the condition of the prisoner being placed in clinical restraints.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of July 1, 2018, through June 30, 2019 (verified))**

Substantial Compliance requires the Department to review the electronic medical records of all prisoners placed in clinical restraints to verify that the restraints were used, approved, and documented, and that the results of medical welfare checks on restrained prisoners were also documented.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring at those facilities for Substantial Compliance with Paragraph 69 in the Thirteenth Reporting Period.

70.     Within three months of the Effective Date, the County and the Sheriff will have policies and procedures regarding the use of Security Restraints in HOH and MOH. Such policies will provide that:

(a)     Security Restraints in these areas will not be used as an alternative to mental health treatment and will be used only when necessary to insure safety;

(b)     Security Restraints will not be used to punish prisoners, but will be used only when there is a threat or potential threat of physical harm, destruction of property, or escape;

(c)     Custody staff in HOH and MOH will consider a range of security restraint devices and utilize the least restrictive option, for the least amount of time, necessary to provide safety in these areas; and

(d)     Whenever a prisoner is recalcitrant, as defined by Sheriff's Department policy, and appears to be in a mental health crisis, Custody staff will request a sergeant and immediately refer the prisoner to a QMHP.

**STATUS:     PARTIAL COMPLIANCE**

The Monitor's Eighth Report noted that "[t]he Mental Health Subject Matter Expert and DOJ have expressed concern about the Department's Substantial Compliance with paragraph 70(c) if all inmates in HOH are routinely handcuffed when they are out of their cells 'in a housing pod at the same time.'"[25]

As stated in the Monitor's prior reports, to achieve Substantial Compliance with Paragraph 70, the County must demonstrate that "it is continuing to conduct individual assessments in weekly and daily meetings, expanding the use of Living Modules and FIP step-down pods (or other less restrictive housing arrangements), and articulating policies for these programs."[26] Also, as previously expressed by DOJ, "the County must show that clinicians routinely make individualized assessments for all HOH inmates about whether [the special housing units] would be appropriate, and that inmates are not being denied access to those housing units due to space or capacity constraints."[27]

The County's Thirteenth Self-Assessment reports that

Significantly, beginning in March 2019, the Department began a pilot program aimed to provide P3/HOH inmates with significant unrestrained out of cell time. The pilot alternates out of cell time between inmates who are in suicide gowns and those who are allowed clothes so that inmates do not have access to property which may allow them to self-harm. Prior

---

[25] See Monitor's Eighth Report, p. 90.
[26] See Monitor's Eighth Report, p. 91; Ninth Report, p. 96.
[27] See Monitor's Ninth Report, p. 96.

to COVID-19, this pilot program was available to inmates in five HOH
pods at TTCF, and three HOH pods at CRDF. This program was
temporarily suspended at TTCF during COVID-19 due to social
distancing requirements, changes to housing modules due to quarantines
and isolation, and staffing changes. CRDF was able to keep its
unrestrained out of cell time pilot operating during COVID-19. TTCF
plans to resume these activities as soon as it is able to safely do so.

As noted in the Monitor's Ninth Report, the Monitor believes, "with additional
CHS staffing, the County could expand the Living and LIFE Modules and the Step-down
units to provide enhanced mental health care treatment to additional HOH inmates who
currently satisfy the criteria for housing in those specialized units."

The County's Twelfth Self-Assessment reported

Prior to COVID-19, the Living Module concept operated in six pods at
TTCF and two pods at CRDF. It has been reduced to two pods at TTCF in
part because of population reduction and COVID-19-related quarantines.
Inmates in the Step-down modules and HOPE Dorm are not restrained
when out of cell. There are three FIP Step-Down pods at TTCF and
CRDF.

71.     The County and the Sheriff will ensure that any prisoner subjected to clinical restraints in response to a mental health crisis receives therapeutic services to remediate any effects from the episode(s) of restraint.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017 (verified))**

Substantial Compliance requires the Department to review the electronic medical records of all prisoners placed in clinical restraints to verify that the prisoners received therapeutic services as required by Paragraph 71.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 71 in the Thirteenth Reporting Period.

72.     The County and the Sheriff will develop and implement policies and
procedures that ensure that incidents involving suicide and serious self-injurious behavior
are reported and reviewed to determine:  (a) whether staff engaged in any violations of
policies, rules, or laws; and (b) whether any improvements to policy, training, operations,
treatment programs, or facilities are warranted.  These policies and procedures will define
terms clearly and consistently to ensure that incidents are reported and tracked accurately
by DMH and the Sheriff's Department.

**STATUS:        SUBSTANTIAL COMPLIANCE (as of January 1,
2017, through December 31, 2017)**

Substantial Compliance requires the Self-Assessments to report on (a) suicide
review meetings and (b) CIRC meetings that review incidents of serious self-injurious
behavior in the reporting period.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not
subject to monitoring for Substantial Compliance with Paragraph 72 in the Thirteenth
Reporting Period.

73.     Depending on the level of severity of an incident involving a prisoner who threatens or exhibits self-injurious behavior, a custody staff member will prepare a detailed report (Behavioral Observation and Mental Health Referral Form, Inmate Injury Report, and/or Incident Report) that includes information from individuals who were involved in or witnessed the incident as soon as practicable, but no later than the end of shift.  The report will include a description of the events surrounding the incident and the steps taken in response to the incident.  The report will also include the date and time that the report was completed and the names of any witnesses.  The Sheriff's Department will immediately notify the County Office of Inspector General of all apparent or suspected suicides occurring at the Jails.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified))**

Substantial Compliance requires the Department to review quarterly a random sample of reports of any threats or exhibitions of self-injurious behavior to verify that the reports have the information required by Paragraph 73; and to provide the Monitor with the notifications to the Inspector General of all incidents involving an apparent or suspected suicide during the reporting period.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 73 in the Thirteenth Reporting Period.

74.     The Sheriff's Department will ensure that there is a timely, thorough, and objective law enforcement investigation of any suicide that occurs in the Jails. Investigations shall include recorded interviews of persons involved in, or who witnessed, the incident, including other prisoners.  Sheriff's Department personnel who are investigating a prisoner suicide or suspected suicide at the Jails will ensure the preservation of all evidence, including physical evidence, relevant witness statements, reports, videos, and photographs.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of September 1, 2016, through December 31, 2017)**

Substantial Compliance requires the Department to provide the Monitor with an Executive Suicide Death Review reflecting the results of the Department's investigation of any suicide in the Jails within six months of the suicide.  The review must reflect steps taken to preserve all of the evidence; and list the interviews of persons involved in, or who witnessed, the incident, and whether the interviews were recorded.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 74 in the Thirteenth Reporting Period.

75.     Within three months of the Effective Date, the County and the Sheriff will review every suicide attempt that occurs in the Jails as follows:

(a)     Within two working days, DMH staff will review the incident, the prisoner's mental health status known at the time of the incident, the need for immediate corrective action if any, and determine the level of suicide attempt pursuant to the Centers for Disease Control and Prevention's Risk Rating Scale;

(b)     Within 30 working days, and only for those incidents determined to be a serious suicide attempt by DMH staff after the review described in subsection (a) above, management and command-level personnel from DMH and the Sheriff's Department (including Custody Division and Medical Services Bureau) will meet to review relevant information known at that time, including the events preceding and following the incident, the prisoner's incarceration, mental health, and health history, the status of any corrective actions taken, and the need for additional corrective action if necessary;

(c)     The County and the Sheriff will document the findings that result from the review of serious suicide attempts described in subsection (b) above; and

(d)     The County and the Sheriff will ensure that information for all suicide attempts is input into a database for tracking and statistical analysis.

**STATUS (75):**          **SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified))**

Substantial Compliance requires (a) DMH to review documentation of randomly selected suicide attempts during the previous quarter to verify that the prisoner's mental health status and need for immediate corrective action were considered timely by the DMH staff and that the staff determined whether the suicide attempt was serious; (b) that the Department and DMH reviewed the relevant information known at that time and the status of any corrective actions taken, and they considered the need for additional corrective action if necessary; and (c) that the information is reflected in the Department's database for tracking and statistical analysis.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 75 in the Thirteenth Reporting Period.

76.     The County and the Sheriff will review every apparent or suspected
suicide that occurs in the Jails as follows:

(a)     Within no more than two working days, management and command-level
        personnel from DMH and the Sheriff's Department (including Custody
        Division and Medical Services Bureau) will meet to review and discuss
        the suicide, the prisoner's mental health status known at the time of the
        suicide, and the need for immediate corrective or preventive action if any;

(b)     Within seven working days, and again within 30 working days,
        management and command-level personnel from DMH and the Sheriff's
        Department (including Custody Division and Medical Services Bureau)
        will meet to review relevant information known at that time, including the
        events preceding and following the suicide, the prisoner's incarceration,
        mental health, and health history, the status of any corrective or preventive
        actions taken, and the need for additional corrective or preventive action if
        necessary; and

(c)     Within six months of the suicide, the County and the Sheriff will prepare a
        final written report regarding the suicide.  The report will include:

        (i)     time and dated incident reports and any supplemental reports with
                the same Uniform Reference Number (URN) from custody staff
                who were directly involved in and/or witnessed the incident;
        (ii)    a timeline regarding the discovery of the prisoner and any
                responsive actions or medical interventions;
        (iii)   copies of a representative sample of material video recordings or
                photographs, to the extent that inclusion of such items does not
                interfere with any criminal investigation;
        (iv)    a reference to, or reports if available, from the Sheriff's
                Department Homicide Bureau;
        (v)     reference to the Internal Affairs Bureau or other personnel
                investigations, if any, and findings, if any;
        (vi)    a Coroner's report, if it is available at the time of the final report,
                and if it is not available, a summary of efforts made to obtain the
                report;
        (vii)   a summary of relevant information discussed at the prior review
                meetings, or otherwise known at the time of the final report,
                including analysis of housing or classification issues if relevant;
        (viii)  a clinical mortality review;
        (ix)    a Psychological Autopsy utilizing the National Commission on
                Correctional Health Care's standards; and
        (x)     a summary of corrective actions taken and recommendations
                regarding additional corrective actions if any are needed.

**STATUS (76):**  **SUBSTANTIAL COMPLIANCE (as of September 1, 2016, through December 31, 2017)**

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 76 in the Thirteenth Reporting Period.  Nonetheless, the County continued to conduct the reviews required by Paragraph 76 for the suicides that occurred during this period and invited the Monitor to attend these meetings.

77.     The County and the Sheriff will create a specialized unit to oversee, monitor, and audit the County's jail suicide prevention program in coordination with the Department of Mental Health.  The Unit will be headed by a Captain, or another Sheriff's Department official of appropriate rank, who reports to the Assistant Sheriff for Custody Operations through the chain of command.  The Unit will be responsible for:

(a)     Ensuring the timely and thorough administrative review of suicides and serious suicide attempts in the Jails as described in this Agreement;

(b)     Identifying patterns and trends of suicides and serious suicide attempts in the Jails, keeping centralized records and inputting data into a unit database for statistical analysis, trends, and corrective action, if necessary;

(c)     Ensuring that corrective actions are taken to mitigate suicide risks at both the location of occurrence and throughout the concerned system by providing, or obtaining where appropriate, technical assistance to other administrative units within the Custody Division when such assistance is needed to address suicide-risk issues;

(d)     Analyzing staffing, personnel/disciplinary, prisoner classification, and mental health service delivery issues as they relate to suicides and serious suicide attempts to identify the need for corrective action where appropriate; and recommend remedial measures, including policy revisions, re-training, or staff discipline, to address the deficiencies and ensure implementation; and

(e)     Participating in meetings with DMH to develop, implement, and track corrective action plans addressing recommendations of the quality improvement program.

**STATUS (77):**          **PARTIAL COMPLIANCE**

On January 13, 2022, the County posted the Correctional Health Services and Custody Compliance & Sustainability Bureau Combined Semi-Annual Report on Quality Improvement and Suicide Prevention Efforts – Quarter 2 2021 & Quarter 3 2021 ("Combined Suicide Prevention Report"), which relates to Paragraphs 60, 61, 62, 72, and 77.  The Combined Suicide Prevention Report sets forth aggregate data for the 28 suicides that occurred between 2015 and the end of the Third Quarter of 2021, and 149 critical incidents that occurred between 2016 and the end of the Third Quarter of 2021, broken down by the subparts of Paragraph 61(a).  The report also includes case-specific discussions of the three suicides that occurred during the Second Quarter of 2021 and Third Quarter of 2021 at county jail facilities.

The Monitor analyzed the County's Combined Suicide Prevention Report in consultation with Drs. Johnson, Vess, and Eargle.  Our view is that the Department has continued to make progress in its Quality Improvement efforts.  In terms of specific results, the Combined Suicide Prevention Report reflects that the Department is now complying with several subparts of Provision 77, including ensuring the timely and thorough administrative review of suicides and serious suicide attempts in the Jails (77(a)); identifying patterns and trends in suicides and serious suicide attempts and keeping centralized records (77(b));  analyzing staffing, personnel/disciplinary, prisoner classification, and mental health service delivery issues as they relate to suicides and serious suicide attempts to identify the need for corrective action where appropriate (77(d)); and participating in meetings with DMH to develop, implement, and track corrective action plans addressing recommendations of the quality improvement program (77(e)).

The greatest challenge relates to Provision 77(c).  The County has gathered and analyzed aggregate data related to suicide attempts and SDV.  For example, the County has reported extensively on demographic data, location, method, prior attempts, days in custody, security level, single cell status, charges, medication, mental health and inmate P-level, among other variables.

Provision 77(c) requires the Department to ensure that "corrective actions are taken to mitigate suicide risks at both the location of occurrence and throughout the concerned system by providing, or obtaining where appropriate, technical assistance to other administrative units within the Custody Division."  In the section on "Technical Issues Provided to or Obtained for Other Administrative Units within the Custody Division to Address Suicide Risk Issues," the County indicates that it provided therapy dogs within the Department.  But it does not indicate how it plans to address other suicide risks that are apparent from recent suicides.  For example, the County notes that "hanging remains the method most frequently used in suicides."  In December 2021, the Monitor toured and inspected Palmdale Station, which was the site of two relatively recent inmate suicides that both involved hanging from a common ligature point.  Following the

Monitor's inspection, the Department removed this ligature point from two of the cells at Palmdale Station.  Yet, the Monitor understands that this ligature point is in use at other of the Department's station jails.  The Consolidated Suicide Prevention Report does not provide any update about attempts to address this known suicide risk Department-wide. Using information from death reviews and analysis of aggregate self-harm data and articulating how known suicide risks are being addressed throughout the Department will be required to attain Substantial Compliance with Provision 77.

78.     The County and the Sheriff will maintain a county-level Suicide
Prevention Advisory Committee that will be open to representatives from the Sheriff's
Department Custody Division, Court Services, Custody Support Services, and Medical
Services Bureau; the Department of Mental Health; the Public Defender's Office; County
Counsel's Office; the Office of the Inspector General; and the Department of Mental
Health Patients' Rights Office.  The Suicide Prevention Advisory Committee will meet
twice per year and will serve as an advisory body to address system issues and
recommend coordinated approaches to suicide prevention in the Jails.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of May 11, 2016, through
May 18, 2017)**

Substantial Compliance requires (1) the Committee to meet twice per year and (2)
"recommend coordinated approaches to suicide prevention in the Jails."

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not
subject to monitoring for Substantial Compliance with Paragraph 78 in the Thirteenth
Reporting Period.  Nevertheless, the County has continued to hold Bi-Annual Suicide
Prevention meetings through the last reporting period, which the Monitor endeavors to
attend.

79 (**Revised**).  (a)   Unless clinically contraindicated, the County and the Sheriff will offer prisoners in mental health housing:

(i)   therapeutically appropriate individual visits with a QMHP;

(ii)   therapeutically appropriate group programming conducted by a QMHP or other appropriate provider that does not exceed 90 minutes per session;

(b)   The date, location, topic, attendees, and provider of programming or therapy sessions will be documented.  A clinical supervisor will review documentation of group sessions on a monthly basis.

**STATUS:      NON-COMPLIANCE**

On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provision 79 ("Revised Paragraph 79") as set forth above.  They also agreed on Revised Compliance Measures.  Under the Revised Compliance Measures, Substantial Compliance requires the Department to maintain records of therapeutically appropriate individual visits and group programming, and the names of the clinical supervisors who reviewed such records and the conclusions of their reviews.  It also requires that 95% of the prisoners in HOH are offered therapeutically appropriate structured mental health treatment, including at least a weekly QMHP visit and group programming, and that 90% of prisoners in MOH are provided visits by a QMHP at least once a month as well as therapeutically appropriate structured mental health treatment.

The County's Thirteenth Self-Assessment reports that in the Second Quarter of 2021, the names and conclusions of all supervisors who reviewed documentation of group sessions were recorded.  The County also reports that "for Measure 79-4(b), which requires that 95% of HOH patients be offered an individual visit by a QMHP and weekly group programming, the County achieved 16% compliance."  "For Measure 79-4(c), which requires that 90% of patients in MOH be offered individual monthly visits by a QMHP and therapeutically appropriate structured treatment, the County achieved 11% compliance."

The County's Augmented Thirteenth Self-Assessment reports that the County was unable to submit results for the Third Quarter of 2021 as "the timeline for that submission has been significantly impacted by staff absences related to the Covid-19 pandemic."

80.     (a)     The County and the Sheriff will continue to make best efforts to provide appropriate out-of-cell time to all prisoners with serious mental illness, absent exceptional circumstances, and unless individually clinically contraindicated and documented in the prisoner's electronic medical record.  To implement this requirement, the County and the Sheriff will follow the schedule below:

   (i)     By no later than six months after the Effective Date, will offer 25% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week;

   (ii)    By no later than 12 months after the Effective Date, will offer 50% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week; and

   (iii)   By no later than 18 months after the Effective Date, will offer 100% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week.

   (b)     No later than six months after the Effective Date, the County and the Sheriff will record at the end of each day which prisoners in HOH, if any, refused to leave their cells that day.  That data will be presented and discussed with DMH staff at the daily meeting on the following Normal business workday.  The data will also be provided to the specialized unit described in Paragraph 77 and to DMH's quality improvement program to analyze the data for any trends and to implement any corrective action(s) deemed necessary to maximize out-of-cell time opportunities and avoid unnecessary isolation.

**STATUS (80):** **NON-COMPLIANCE**

Paragraph 80 requires that, "no later than 18 months after the Effective Date [July 1, 2015]," 100% of the prisoners in HOH receive "ten hours of unstructured out-of-cell recreational time *and* ten hours of structured therapeutic or programmatic time per week."  The parties have agreed that up to five hours of the structured time can consist of education or work programs, but at least five hours of the time must be therapeutic.

The County's Thirteenth Self-Assessment reports that in the Second Quarter of 2021, 99% of the HOH prisoners at CRDF and 91% of the HOH prisoners at TTCF were offered "unstructured out-of-cell time by Custody staff."  The County's Augmented Thirteenth Self-Assessment reports that in the Third Quarter of 2021, 91% and 93% of HOH prisoners were offered unstructured out-of-cell time at CRDF and TTCF, respectively.[28]

As in the past, County's Thirteenth Self-Assessment does not reflect results for "structured therapeutic or programming time."  This data is essential to evaluating the Department's compliance with Paragraph 80.  The County previously reported that due to the COVID-19 pandemic, "CHS temporarily suspended most group mental health treatment, which provides a significant amount of the structured out-of-cell time provided inmates in HOH."

---

[28] The Mental Health Subject Matter Expert and the clinicians previously assessed the accuracy of the County's reporting of the out-of-cell time offered to inmates by comparing out-of-cell time records to videos of the HOH units over the same time periods, and they found the County's data to be "highly unreliable."  The Monitor and the Mental Health Subject Matter viewed this as a "very serious problem, . . . both in terms of the accuracy of the Department's records and the conditions in HOH units."

81.     Except as specifically set forth in Paragraphs 18-20 of this Agreement, and except as specifically identified below, the County and the Sheriff will implement the following paragraphs of the Implementation Plan in *Rosas* at all Jails facilities, including the Pitchess Detention Center and the Century Regional Detention Facility, by no later than the dates set forth in the Implementation Plan or as revised by the *Rosas* Monitoring Panel:  Paragraphs 2.2-2.13 (use of force policies and practices); 3.1-3.6 (training and professional development); 4.1-4.10 (use of force on mentally ill prisoners); 5.1-5.3 (data tracking and reporting of force); 6.1-6.20 (prisoner grievances and complaints); 7.1-7.3 (prisoner supervision); 8.1-8.3 (anti-retaliation provisions); 9.1-9.3 (security practices); 10.1-10.2 (management presence in housing units); 11.1 (management review of force); 12.1-12.5 (force investigations, with the training requirement of paragraph 12.1 to be completed by December 31, 2016); 13.1-13.2 (use of force reviews and staff discipline); 14.1-14.2 (criminal referrals and external review); 15.1-15.7 (documentation and recording of force); 16.1-16.3 (health care assessments); 17.1-17.10 (use of restraints); 18.1-18.2 (adequate staffing); 19.1-19.3 (early warning system); 20.1-20.3 (planned uses of force); and 21.1 (organizational culture).

### STATUS:        PARTIAL COMPLIANCE

Because Paragraph 81 of the Settlement Agreement incorporates 100 provisions in the Implementation Plan adopted in the *Rosas* case, the parties agreed in the Compliance Measures adopted in this case that "Substantial Compliance with respect to the substance of the policies required by the *Rosas* Implementation Plan would be determined by the *Rosas* Monitors."  With the exception of the Early Warning System required by Section 19 of the plan, all of the required policies were approved by the *Rosas* Monitors by the Second Reporting Period in this case, and the Early Warning System was approved in the Seventh Reporting Period.

The Compliance Measures in this case then provide that "[o]nce the policies have been approved by the *Rosas* Monitors, the Monitor and Subject Matter Expert will confirm and assess the implementation of these policies in the [DOJ facilities]."  In assessing the Department's compliance with Paragraph 81, the Monitor has grouped the 100 provisions into seven categories and, with input from the Subject Matter Experts, has assessed Department's compliance on a category-by-category basis.  With the exception of the Training category, which is assessed when certain percentages are reached, the Department will no longer be subject to monitoring for the provisions in a particular category once the Monitor has determined that it has achieved and maintained for twelve consecutive months Substantial Compliance with the intent and purpose of the overall category.  The Department will no longer be subject to monitoring for compliance with Paragraph 81 once it has achieved and maintained for twelve consecutive months Substantial Compliance with each of the categories.

### Training (Partial Compliance)

Paragraphs 3.1-3.6, 4.6-4.9, and 12.1 of the *Rosas* Implementation Plan reflect training requirements on use of force, ethics, dealing with mentally ill inmates, and

investigations of force incidents.  The curriculum and lesson plans to implement these training requirements have been approved by the *Rosas* Monitors.

The County's Thirteenth Self-Assessment reports that the Department met the Substantial Compliance thresholds for the following Training provisions at the DOJ facilities during the Second Quarter of 2021: 3.3, 3.5, 4.8, 4.9, and 12.1.[29]  The results for 3.3, 4.8, 4.9, and 12.1 have been verified by the Monitor's auditors.  The County reports that the Department did not reach the threshold for Substantial Compliance with 3.6 (performance reviews for probationary staff members).

The County's Augmented Thirteenth Self-Assessment reports that the Department met the Substantial Compliance thresholds for the following Training provisions at the DOJ facilities during the Third Quarter of 2021: 3.3, 3.5, 4.8, and 4.9.[30]  The County's posted results reflect the County maintained Substantial Compliance with 12.1.  The County's posted results for 3.3, 4.8, and 4.9 reflect that there were no applicable personnel for these training provisions.  The results for 3.3, 4.8, 4.9, and 12.1 have been verified by the Monitor's auditors.

**Use of Force (Partial Compliance)**

During the Thirteenth Reporting Period, the Monitor and the DOJ reviewed and provided feedback about several Departmental use of force policies.  This includes policies that address Prohibited Force (June 21, 2021); Planned Use of Force, Inmate Extraction Procedures, and Pregnant Inmates (October 31, 2021); and Electronic Immobilization Devices (November 19, 2021).  The Monitor and Use of Force Subject Matter Expert Susan McCampbell also toured the relevant facilities in December 2021 to speak with inmates and staff regarding use of force and other matters.

According to data provided by the Department, uses of force decreased at some of the DOJ facilities between 2020 and 2021 and increased at others.  Of particular significance, uses of force decreased at CRDF by 11% and increased at NCCF by 59%.  The Monitor is in discussions with the Department to determine the reasons for the significant rise in use of force incidents at NCCF.  A majority of the use of force incidents at the DOJ Facilities in 2021 were Category 1 incidents, such as takedowns, resisted control holds, or use of OC spray that resulted in no injury.[31]

The Monitor and Use of Force Expert Susan McCampbell reviewed 25

---

[29] Because Paragraph 81 incorporates all 104 provisions of the *Rosas* Implementation Plan in a single provision, the Monitor agreed to the use of random samples in some cases instead of requiring assessments of all personnel or incidents, which the Monitor believes would be unduly burdensome for the Department.

[30] The County has previously reported that "assessments for certain Provisions are submitted during the Fourth Quarter, covering the entire year. These Provisions include: 3.1(a) (more than 90% of personnel received initial training); 3.1(b) (more than 90% of retained personnel received required refreshers); 3.2(a) (more than 90% of personnel received initial training); 3.2(b) (more than 90% of retained personnel received required refreshers); 4.6 (DeVRT initial training and refreshers); 4.7 (DeVRT initial training and refreshers)."  Thus, no results were reported for these provisions for the Second or Third Quarters of 2021.

[31] *See* CDM 7-06-000.00, Use of Force Reporting Procedures.

completed force packages for the DOJ facilities during this Reporting Period.  As a result of objections by the plaintiffs in the *Rosas* case, the *Rosas* Monitors revised their approach to assessing the Department's compliance with the use, reporting and investigation of force provisions of the Implementation Plan.  Under the revised approach, the *Rosas* Monitors do not determine the percentage of cases in which the Department's use of force was reasonable overall, but instead assess the Department's compliance with the specific provision on the use, reporting, and investigation of force provisions of the Implementation Plan.  To maintain consistency across all of the jail facilities, the Monitor has adopted the same approach in the *DOJ* case.

In the uses of force reviewed during the Thirteenth Monitoring Period, the Monitor determined that the Department was not in compliance with Paragraph 2.2.  Regarding Paragraph 2.2(a) (force must be used as a last resort), Department members too readily engaged in uses of force before meaningful attempts were made to de-escalate using time, distance, the presence of a supervisor or mental health professional, and verbal attempts at persuasion.  A key advantage of the physical plant of many jail housing areas is that custody personnel are able to close the door and summon supervisors or mental health staff rather than entering a cell with an agitated inmate and initiating a use of force event.  The Department should ensure that supervisors and deputies are prepared to do so, when possible.[32]

The Monitor also determined that the Department was not in compliance with Paragraph 4.1, which requires that a mental health professional be summoned to help resolve a situation without force.  The Department was also not in compliance with Paragraph 9.2, which requires that uninvolved staff members be the ones to escort an inmate after a use of force event.

### Reporting and Investigation of Force (Partial Compliance)

During the Thirteenth Reporting Period, the Monitor identified several key issues related to the Department's reporting and investigation of force.  First, as in the past, the depth and quality of the command reviews of force incidents varied significantly.  Sometimes Commanders made note of discrepancies among Deputy use of force reports or between reports and available video, or flagged other issues that may have given rise to the need to use force.  Yet, important, sometimes self-evident, issues were not always identified.  Often, the de-escalation attempts made by deputies were not specifically described in the relevant reports.  Command reviewers should note those issues and require deputies to describe with particularity the attempts they made to de-escalate

---

[32] For example, in one incident reviewed during the Thirteenth Reporting Period, an agitated 120-pound female inmate was to be transferred to HOH housing.  When two deputies entered her cell, she threw a sock and a bible, striking one deputy in the face.  The deputies attempted to restrain her, she resisted, and they eventually took her to the ground.  She sustained a broken arm during the struggle.  The deputies could have retreated from the cell and summoned a supervisor, mental health staff, and a video camera operator, rather than immediately physically engaging her.  The command review of the incident was a one-page document that stated simply that "the force and tactics were within Department policy," without explaining the reasoning for that conclusion or exploring why the deputies did not back away, close the door, and wait for additional support before further engaging the patient.

incidents without force, when applicable.

Similarly, Commanders should evaluate not only the specific moments in which force was being used, but also the circumstances that gave rise to the need to use force, including "unexplained tactical decisions." Paragraph 5.3.

As has been noted in prior reports, the administrative review process for use of force incidents has been significantly delayed. However, in the Thirteenth Reporting Period, the Monitor noted that many force incidents completed command review within six or eight months, rather than twelve or more. This is a positive trend that the Department should endeavor to build upon.

Finally, when supervisors identify issues in a use of force or use of force report, they often report that the employee was "counseled" and "receptive." It is not clear what kind of follow up is contemplated, who is responsible for it, by what date, and what measures will determine whether the counseling is successful. Only occasionally did the command reviews note that a deputy had been sent for specific kinds of retraining.

Regarding the Department's quantitative results on the specific provisions, For the Second Quarter of 2021, the County reported Substantial Compliance with the following provisions: 5.1 (timely database entry of force incidents); 8.3 (timely review of retaliation grievances); 11.1 (timely review of force packages by CFRT for potential employee discipline); 13.1 (zero tolerance and related investigations); 13.2 (notifications to OIG required by findings in 13.1); 14.1 (timely unit commander review re: prosecution for inmate assaults on staff); 14.2 (timely referral of criminal inmate conduct to DA's Office).

For the Third Quarter of 2021, the County's Thirteenth Self-Assessment reports Substantial Compliance with the following provisions: 5.1 (timely database entry of force incidents); 8.3 (timely review of retaliation grievances); 11.1 (timely review of force packages by CFRT for potential employee discipline); 14.1 (timely unit commander review re: prosecution for inmate assaults on staff); and 14.2 (timely referral of criminal inmate conduct to DA's Office). The County posted results reflecting Substantial Compliance with Provisions 13.1 (zero tolerance and related investigations); and 13.2 (notifications to OIG required by findings in 13.1).

**Grievances (Partial Compliance)**

The County's Thirteenth Self-Assessment reports that in the Second Quarter of 2021, the Department achieved Substantial Compliance with the following grievance provisions at the DOJ facilities: 6.4 (proper handling of force-related grievances), 6.5 (proper handling of harassment and retaliation grievances); 6.7 (appropriate handling of grievances marked "emergency"); 6.8 (inmate notification of downgraded grievances); 6.9 (proper handling of emergency grievances); 6.11 (review of complaints re: inmate grievance process); 6.12 (proper database entry of inmate grievances); 6.13 (proper tracking of handling of inmate grievances); 6.14 (monthly reports of grievance tracking);

6.15 (evaluation of trends in inmate grievance handling); 6.17 (time limit for filing force-related grievances); 6.19 (timely responses to inmate grievances); 6.20 (proper handling of inmate appeals); 7.1 (conflict resolution for inmate grievances); 7.2 (timely notification of grievance investigation results); 7.3 (town hall meetings); and 8.1 (reporting of retaliation grievances).

The Department was not in Substantial Compliance with 6.10 (timely collection of inmate grievances) and 6.18 (proper handling of PREA grievances).

The County's posted results reflect that in the Third Quarter of 2021, the Department achieved Substantial Compliance with the following grievance provisions at the DOJ facilities: 6.5 (proper handling of harassment and retaliation grievances); 6.8 (inmate notification of downgraded grievances); 6.9 (proper handling of emergency grievances); 6.10 (timely collection of inmate grievances); 6.11 (review of complaints re: inmate grievance process); 6.13 (proper tracking of handling of inmate grievances); 6.14 (monthly reports of grievance tracking); 6.15 (evaluation of trends in inmate grievance handling); 6.17 (time limit for filing force-related grievances); 6.18 (proper handling of PREA grievances); 6.20 (proper handling of inmate appeals); 7.1 (conflict resolution for inmate grievances);7.3 (town hall meetings); and 8.1 (reporting of retaliation grievances).

The Department was not in Substantial Compliance with 6.4 (proper handling of force-related grievances); 6.7 (appropriate handling of grievances marked "emergency"); 6.12 (proper database entry of inmate grievances); 6.19 (timely responses to inmate grievances); 7.2 (timely notification of grievance investigation results).

### Management and Administration (Substantial Compliance as of October 1, 2020 through September 30, 2021)

The Department's posted documents reflect that senior managers from the rank of Unit Commanders and above toured and inspected all of the DOJ facilities during the Second Quarter of 2021 and Third Quarter of 2021, as required by applicable Compliance Measures for Paragraph 10.1, and that they were documented in electronic records or visitor logs, as is required by Paragraph 10.2  The Department's posted results reflect that the Department achieved Substantial Compliance with Paragraphs 18.1 and 18.2.  The posted documents reflect that no Department members were transferred to Custody as a sanction for misconduct or a policy violation in either quarter, as required by Paragraph 21.1.

### Security Restraints (Partial Compliance)

Security Restraints are subject to the provisions in Section 17 of the *Rosas* Plan. It is the Monitor's understanding that the County and the Department do not use "multi-point restraints," which are subject to Paragraphs 17.6 through 17.9 of the plan, at any of the County's jail facilities.  The Monitor reviewed the Safety Chair Logs and Fixed Restraint Logs for both quarters, which reflect that the facilities that produced such logs are complying with the requirements of Paragraphs 17.3 and 17.4 of the *Rosas* Plan.

The Department posted logs of all of the involuntary medications administered in the Second Quarter of 2021 and Third Quarters of 2021.  The records reflect that all of the medications were administered per court orders to restore the competency of those deemed incompetent to stand trial and none were solely for security purposes in compliance with Paragraph 17.10 of the *Rosas* Plan.

The Monitor noted in the Eleventh Report that the Wrap policy had not been yet finalized.  Further

> During the Eleventh Reporting Period, the Department produced, and the Monitor reviewed, 24 completed force packages for the DOJ facilities. Six of those packages included applications of the WRAP restraint.  In a number of those incidents, the specific reason for the application of the WRAP was not articulated in the paperwork associated with the use of force, nor was a clear reason apparent from the accompanying evidence. Further, the duration for which the inmate was left in the WRAP restraint was also not generally noted in the documents accompanying each use of the WRAP.  These issues should be corrected.  Further, the Monitor has requested aggregated data documenting the frequency with which the WRAP restraint has been used, the circumstances prompting its use, and the duration (if known).  The Department should make such data available before or concurrent with its Twelfth Self-Assessment.

On April 9, 2021, after consultation with Use of Force Subject Matter Expert Susan McCampbell, the Monitor provided comments on the Department's draft WRAP Restraint Policy.  The DOJ also provided comments on this date.  On June 23, 2021, the Department responded to the DOJ's comments and on July 6, 2021, the Department responded to the Monitor's comments.  On August 5, 2021, the DOJ provided additional feedback on the draft policy.  The policy remains outstanding.

The Monitor and Subject Matter Expert reviewed 25 completed force packages for the DOJ facilities during this Reporting Period.  A large number of incidents involved the use of the WRAP restraint.  In the majority of these incidents, no specific justification was provided in use of force documentation regarding the reason for the application of the WRAP.  When a justification was provided, it was often extremely general.  To help avoid risks of overuse, supervisors should be trained to describe with particularity what specific threat required the use of the WRAP.

**Early Warning System**          **(Substantial Compliance as of September 30, 2019 through September 30, 2020)**

The Department implemented an Employee Review System that was approved by the *Rosas* Monitors as a pilot program at the Downtown Jail Facilities on July 27, 2018, and expanded it to the DOJ facilities on October 25, 2018.  The Department achieved Substantial Compliance with the Early Warning Provisions at the DOJ facilities as of

September 30, 2020, and these provisions were not subject to Monitoring during the Thirteenth Reporting Period.

82.     With respect to paragraph 6.16 of the *Rosas* Implementation Plan, the County and the Sheriff will ensure that Sheriff's Department personnel responsible for collecting prisoners' grievances as set forth in that paragraph are also co-located in the Century Regional Detention Facility.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of July 15, 2016, through December 31, 2017)**

Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring for Substantial Compliance with Paragraph 82 in the Thirteenth Reporting Period.

83.     The County and the Sheriff will install closed circuit security cameras throughout all Jails facilities' common areas where prisoners engage in programming, treatment, recreation, visitation, and intra-facility movement ("Common Areas"), including in the Common Areas at the Pitchess Detention Center and the Century Regional Detention Facility.  The County and the Sheriff will install a sufficient number of cameras in Jails facilities that do not currently have cameras to ensure that all Common Areas of these facilities have security-camera coverage.  The installation of these cameras will be completed no later than June 30, 2018, with TTCF, MCJ, and IRC completed by the Effective Date; CRDF completed by March 1, 2016; and the remaining facilities completed by June 30, 2018.  The County and the Sheriff will also ensure that all video recordings of force incidents are adequately stored and retained for a period of at least one year after the force incident occurs or until all investigations and proceedings related to the use of force are concluded.

**STATUS:** **SUBSTANTIAL COMPLIANCE (as of July 1, 2015, through June 30, 2016 at MCJ and IRC)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2015, through September 30, 2016 at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 at NCCF and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2018, through June 30, 2019 at PDC South)**

Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring for Substantial Compliance with Paragraph 83 in the Thirteenth Reporting Period.

84.     The Sheriff will continue to maintain and implement policies for the timely and thorough investigation of alleged staff misconduct related to use of force and for timely disciplinary action arising from such investigations.  Specifically:

(a)     Sworn custody staff subject to the provisions of California Government Code section 3304 will be notified of the completion of the investigation and the proposed discipline arising from force incidents in accordance with the requirements of that Code section; and

(b)     All non-sworn Sheriff's Department staff will be notified of the proposed discipline arising from force incidents in time to allow for the imposition of that discipline.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of July 1, 2017, through June 30, 2018 (verified))**

Substantial Compliance under the Compliance Measures requires the Department to demonstrate that 95% of the investigations of force incidents in which sworn custody staff and non-sworn custody staff were found to have violated Department policy or engaged in misconduct were completed and administrative action, which could include discipline, was taken within the time frames provided for in Government Code Section 3304 and relevant Department policies.

Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring for Substantial Compliance with Paragraph 84 in the Thirteenth Reporting Period.

85.     The County and the Sheriff will ensure that Internal Affairs Bureau management and staff receive adequate specialized training in conducting investigations of misconduct.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of April 1, 2021, through September 30, 2021 (verified))**

The Parties agreed on Revised Compliance Measures in 2021.  Substantial Compliance requires the Department to provide the Monitor with (1) the curriculum/syllabus for the two specialized courses, Internal Affair Investigations and Interview and Interrogation, given to IAB management, and (2) a list of the sworn personnel assigned to IAB and proof that such personnel successfully completed the training.  Substantial Compliance requires the Department to demonstrate that 90% of the personnel assigned to IAB have successfully completed one course of the required training within 3 months of their start date, and the second course within 6 months of their start date.

The County's Thirteenth Self-Assessment reports that 94% of the IAB investigators completed both of the required courses as of the end of the Second Quarter of 2021 and 91% as of the end of the Third Quarter of 2021.  These results have been verified by the Monitor's auditors.[33]

---

[33] Because the Revised Compliance Measures went into effect during the Thirteenth Reporting Period, determining compliance for personnel who started in the Internal Affairs Bureau during the Thirteenth Reporting Period was somewhat complicated.  Going forward, to be counted as compliant, all personnel starting in the Internal Affairs Bureau must complete these trainings within 3 and 6 months of their actual start dates in Internal Affairs.

86.     Within three months of the Effective Date, the County and the Sheriff will develop and implement policies and procedures for the effective and accurate maintenance, inventory, and assignment of chemical agents and other security equipment. The County and the Sheriff will develop and maintain an adequate inventory control system for all weapons, including OC spray.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 at MCJ and CRDF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2016, through December 31, 2017 at PDC North)**

**SUBSTANTIAL COMPLIANCE (as of February 1, 2017, through March 31, 2018 at PDC South and PDC East)**

**SUBSTANTIAL COMPLIANCE (as of March 1, 2017, through March 31, 2018 at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 at IRC)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 at TTCF)**

CDM 7-08/080 ACCOUNTABILITY OF SPECIAL WEAPONS, effective October 14, 2016, requires each facility to have unit orders that "establish procedures for the storage, issuance, reissuance, accountability, maintenance, and periodic inventory of all weapons. . . stored at, or issued from, the facility," which includes detailed requirements for the "Inventory, Control, and Accountability of Aerosol Chemical Agents."

In addition to providing written policies and procedures, Substantial Compliance requires the Department to provide up-to-date Unit Orders for each jail requiring the inventory and inspection of special weapons, and armory audit logs documenting the inventory and control of armory-level weapons.  The Department previously maintained Substantial Compliance with Paragraph 86 for twelve consecutive months at all of the facilities, and it was not subject to monitoring with this provision in the Thirteenth Reporting Period.

## APPENDIX A

| NO. | PROVISION | STATUS | SUBSTANTIAL COMPLIANCE DATES |
|---|---|---|---|
| 18 | Suicide Prevention Training | Substantial Compliance | **(10/1/17 at MCJ & PDC South)[1] (9/1/17 at NCCF) (12/1/17 at PDC East) (4/1/18 at TTCF, IRC, & PDC North) (8/1/18 at CRDF)** |
| 19 | Crisis Intervention & Conflict Resolution Training | Substantial Compliance | **(4/1/18 at MCJ, NCCF, & IRC) (7/1/18 at TTCF) (12/1/18 at CRDF, PDC East, & PDC North) (3/1/19 at PDC South)** |
| 20 | Training at NCCF, PDC and CRDF | Substantial Compliance | **(8/1/17 at PDC East, PDC North, NCCF, & CRDF) (10/1/17 at PDC South)** |
| 21 | CPR Certification | Substantial Compliance | **(10/1/15 – 9/30/16 at PDC East & PDC South) (1/1/16 – 12/31/16 at NCCF, PDC North, & IRC) (4/1/16 – 3/31/17 at TTCF) (10/1/17 – 9/30/18 at MCJ) (7/1/18 – 6/30/19 at CRDF)** |

---

[1] Substantial Compliance Dates in **bold** reflect that the Department has achieved Substantial Compliance with the training requirements or maintained Substantial Compliance for twelve consecutive months with the other requirements; the results were verified by the Monitor's auditors when required; and the County or designated facilities are no longer subject to monitoring of this provision pursuant to Paragraph 111 of the Settlement Agreement.

**APPENDIX A**

| | | | |
|---|---|---|---|
| 22 | Use of Arresting and Booking Documents | Substantial Compliance | **(7/1/16 – 6/30/17)** |
| 23 | Suicide Hazard Mitigation Plans | Substantial Compliance | **(7/12/18)** |
| 24 | Suicide Hazard Inspection | Substantial Compliance | **(10/1/17 – 9/30/18)** |
| 25 | Transportation of Suicidal Inmates (station jails) | Partial Compliance | |
| 26 | Identification and Evaluation of Suicidal Inmates | Substantial Compliance | (7/1/21 – 9/30/21) |
| 27 | Screening for Mental Health Care and Suicide Risk | Substantial Compliance | **(10/1/19 – 3/31/20, 10/1/20 – 3/31/21)** |
| 28 | Expedited Booking of Suicidal Inmates | Substantial Compliance | **(4/1/17 – 3/31/18 at IRC)** (4/1/21 – 9/30/21 at CRDF) |
| 29 | Mental Health Assessments (of non-emergent mental health needs) | Substantial Compliance | **(4/1/17 – 3/31/18)** |
| 30 | Initial Mental Health Assessments & Treatment Plans | Substantial Compliance | **(1/1/19 – 12/31/19)** |
| 31 | Electronic Medical Records Alerts | Partial Compliance | |
| 32 | Electronic Medical Records – Suicide Attempts | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 33 | Supervisor Reviews of Electronic Medical Records | Substantial Compliance | **(7/1/16 – 6/30/17)** |
| 34 | Discharge Planning | Non-Compliance | |
| 35 | Referral for Mental Health Care | Substantial Compliance | **(11/1/17 – 12/31/18)** |
| 36 | Assessments After Triggering Events | Non-Compliance | |

## APPENDIX A

| 37 | Court Services Division Referrals | Partial Compliance | |
|----|----|----|----|
| 38 | Weekly Rounds in Restricted Housing Modules | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 39 | Confidential Self-Referral | Substantial Compliance (NCCF & PDC South)<br>Partial Compliance (TTCF, MCJ, CRDF, & PDC North)<br>Not Rated (PDC East) | **(7/1/17 – 6/30/18 at NCCF)**<br>(4/1/21 – 9/30/21 at PDC South) |
| 40 | Availability of QMHPs | Partial Compliance | |
| 41 | FIP Step-Down Protocols | Substantial Compliance | (4/1/21 – 9/30/21) |
| 42 | HOH Step-Down Protocols | Compliance Suspended | |
| 43 | Disciplinary Policies | Substantial Compliance (NCCF & PDC North)<br>Partial Compliance (CRDF, MCJ, & TTCF) | **(10/1/17 – 9/30/18 at NCCF & PDC North)** |
| 44 | Protective Barriers | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 45 | Suicide Intervention and First Aid Kits | Substantial Compliance | **(10/1/15 – 9/30/16 at CRDF, NCCF, TTCF, PDC East, & PDC South)**<br>**(1/1/16 – 12/31/16 at MCJ & PDC North)** |
| 46 | Interruption of Self-Injurious Behavior | Substantial Compliance | (7/1/20 – 6/30/21) |
| 47 | Staffing Requirements | Non-Compliance | |
| 48 | Housekeeping and Sanitation | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 49 | Maintenance Plans | Substantial Compliance | **(3/1/16 – 2/28/17)** |

## APPENDIX A

| 50 | Pest Control | Substantial Compliance | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC North, TTCF, & CRDF)** **(4/1/16 – 3/31/17 at PDC South & PDC East)** |
|----|---|---|---|
| 51 | Personal Care & Supplies | Substantial Compliance | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC East, PDC North, PDC South, & TTCF)** **(7/1/16 – 6/30/17 at CRDF)** |
| 52 | HOH Property Restrictions | Partial Compliance | |
| 53 | Eligibility for Education, Work and Programs | Substantial Compliance | (7/1/21 – 9/30/21) |
| 54 | Privileges and Programs[2] | Partial Compliance | |
| 55 | Staff Meetings | Substantial Compliance | **(10/1/16 – 9/30/17 at CRDF)** **(4/1/17 – 3/31/18 at PDC North)** **(4/1/18 – 3/31/19 at MCJ)** **(7/1/19 – 6/30/20 at TTCF)** |
| 56 | Changes in Housing Assignments | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 57 | Inmate Safety Checks in Mental Housing | Substantial Compliance (MCJ & PDC North) Partial Compliance (TTCF & CRDF) | **(4/1/17 – 3/31/18 at MCJ)** (7/1/21 – 9/30/21 at PDC North) |

---

[2] Per agreement of the parties, the County must maintain Substantial Compliance for two additional quarters under the revised Compliance Measures.

## APPENDIX A

| 58 | Inmate Safety Checks in Non-Mental Housing | Substantial Compliance (PDC South, PDC North, PDC East, CRDF, IRC, & NCCF) Partial Compliance (TTCF & MCJ) | **(1/1/16 – 12/31/16 at PDC South, PDC North, & PDC East) (7/1/17 – 6/30/18 at CRDF) (10/1/17 – 9/30/18 at IRC)** (4/1/21 – 9/30/21 at NCCF) |
| --- | --- | --- | --- |
| 59 | Supervisor Rounds | Substantial Compliance | **(1/1/17 – 12/31/17 at PDC East & MCJ) (4/1/17 – 3/31/18 at NCCF) (10/1/17 – 9/30/18 at CRDF) (1/1/18 – 12/31/18 at PDC North & PDC South) (4/1/18 – 3/31/19 at TTCF)** |
| 60 | Implementation of Quality Improvement Program | Substantial Compliance | **(4/1/19 – 3/31/20)** |
| 61 | Requirements of Quality Improvement Program | Partial Compliance | |
| 62 | Tracking of Corrective Action Plans | Partial Compliance | |
| 63 | Sufficient HOH and MOH Housing | Patrial Compliance (TTCF) Non-Compliance (CRDF) | |
| 64 | Plans for Availability of Inpatient Health Care | Non-Compliance | |
| 65 | Administration of Psychotropic Medication | Partial Compliance | |
| 66 | Active Mental Health Caseloads | Partial Compliance | |

## APPENDIX A

| | | | |
|---|---|---|---|
| 67 | Prisoner Refusals of Medication | Partial Compliance | |
| 68 | Contraband Searches | Substantial Compliance (MCJ, NCCF, PDC East, PDC South PDC North, & TTCF) Partial Compliance (CRDF) | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC East, PDC South, & PDC North) (1/1/17 – 12/31/17 at TTCF)** |
| 69 | Clinical Restraints in CTC | Substantial Compliance | **(7/1/18 – 6/30/19)** |
| 70 | Security Restraints in HOH and MOH | Partial Compliance | |
| 71 | Therapeutic Services for Inmates in Clinical Restraints | Substantial Compliance | **(7/1/16 – 6/30/17)** |
| 72 | Administrative Reviews | Substantial Compliance | **(1/1/17 – 12/31/17)** |
| 73 | Reporting of Self-Injurious Behavior and Threats | Substantial Compliance | **(10/1/17 – 9/30/18)** |
| 74 | Law Enforcement Investigations of Suicides | Substantial Compliance | **(9/1/16 – 12/31/17)** |
| 75 | Management Reviews of Suicide Attempts | Substantial Compliance | **(10/1/17 – 9/30/18)** |
| 76 | Management Reviews of Suicides | Substantial Compliance | **(9/1/16 – 12/31/17)** |
| 77 | Custody Compliance and Sustainability Bureau | Partial Compliance | |
| 78 | Suicide Prevention Advisory Committee | Substantial Compliance | **(5/11/16 – 5/18/17)** |
| 79 | Therapeutic Services in Mental Health Housing | Non-Compliance | |
| 80 | Out-of-Cell Time in HOH | Non-Compliance | |

## APPENDIX A

| 81 | Implementation of *Rosas* Recommendations | | |
|---|---|---|---|
| | Training | Partial Compliance | |
| | Use of Force | Partial Compliance | |
| | Reporting and Investigation of Force | Partial Compliance | |
| | Grievances | Partial Compliance | |
| | Management and Administration | Substantial Compliance | **(10/1/20 – 9/30/21)** |
| | Security Restraints | Partial Compliance | |
| | Early Warning System | Substantial Compliance | **(10/1/19 – 9/30/20)** |
| 82 | Grievances at CRDF | Substantial Compliance | **(7/15/16 – 12/31/17)** |
| 83 | Closed Circuit Cameras | Substantial Compliance | **(7/1/15 – 6/30/16 at MCJ & IRC)** **(10/1/15 – 9/30/16 at TTCF)** **(4/1/16 – 3/31/17 at CRDF)** **(4/1/18 – 3/31/19 at NCCF & PDC North)** **(7/1/18 –6/30/19 at PDC South)** |
| 84 | Investigation of Staff Misconduct | Substantial Compliance | **(7/1/17 – 6/30/18)** |
| 85 | Internal Affairs Bureau Training | Substantial Compliance | (4/1/21 – 9/30/21) |

<u>**APPENDIX A**</u>

| 86 | Maintenance and Inventory of Security Equipment | Substantial Compliance | **(4/1/16 – 3/31/17 at MCJ & CRDF)** **(10/1/16 – 12/31/17 at PDC North)** **(2/1/17 – 3/31/18 at PDC South & PDC East**) **(3/1/17 – 3/31/18 at NCCF)** **(4/1/17 – 3/31/18 at IRC**) **(4/1/18 – 3/31/19 at TTCF)** |

## APPENDIX B

|  | Substantial Compliance (Provisions) | Partial Compliance[1] | Non-Compliance | Suspended (Some Or All Facilities) | Substantial Compliance (Facilities)[2] | No Longer Subject To Monitoring[3] |
|---|---|---|---|---|---|---|
| First[4] | 5 | 16 |  |  | 10 |  |
| Second | 14 | 30 | 13 |  | 24 |  |
| Third | 22 | 27(1) | 10 |  | 29 | 4(2) |
| Fourth | 24 | 26(1) | 10 |  | 29 | 10(2) |
| Fifth | 23 | 24(2) | 7 |  | 34 | 15(5) |
| Sixth | 32 | 22 | 7 |  | 38 | 18(9) |
| Seventh | 30 | 23 | 7 |  | 39 | 21(10) |
| Eighth | 35 | 20 | 6 |  | 42 | 27(9) |
| Ninth | 36 | 22 | 4 |  | 43 | 31(8) |
| Tenth | 39 | 21 | 3 |  | 45 | 32(8) |
| Eleventh | 38 | 18 | 5 | 2 | 44 | 34(7) |
| Twelfth | 38 | 18 | 6 | 1 | 44 | 36(6) |
| Thirteenth | 42 | 14(1) | 6 | 1 | 47 | 36(6) |

---

[1] The figure in parenthesis under Partial Compliance is the number of additional provisions where some facilities were in Partial Compliance and other facilities were in Non-Compliance.

[2] This represents the number of provisions where the Department is in Substantial Compliance at all or some of the facilities.

[3] The figure in parenthesis under No Longer Subject to Monitoring is the number of additional provisions where some facilities are no longer subject to monitoring.

[4] During the First Reporting Period, 43 provisions were not subject to monitoring.