KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division
STEVEN H. ROSENBAUM, Chief
MAURA KLUGMAN, Deputy Chief
LUIS E. SAUCEDO, Trial Attorney
MAGGIE FILLER, Trial Attorney
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
       150 M. Street NE
       Washington, D.C.  20001
       Telephone: (202) 305-0053
       Email:  luis.e.saucedo@usdoj.gov
              maggie.filler@usdoj.gov
TRACY L. WILKISON
United States Attorney
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
KAREN P. RUCKERT
Assistant United States Attorney
Chief, Civil Rights Section, Civil Division
MATTHEW NICKELL (Cal. Bar No. 304828)
Assistant United States Attorney
       Federal Building, Suite 7516
       300 North Los Angeles Street
       Los Angeles, California 90012
       Telephone: (213) 894-8805
       Facsimile: (213) 894-7819
       Email: matthew.nickell@usdoj.gov
Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:15-cv-5903-DDP-JEM |
| Plaintiff, | |
| v. | **JOINT STATUS REPORT ON UNRESOLVED DISAGREEMENTS REGARDING IMPLEMENTATION PLANS** |
| COUNTY OF LOS ANGELES et al., | |
| Defendants. | Hon. Dean D. Pregerson<br>United States District Judge |

Pursuant to this Court's January 24, 2022 and April 15, 2022 orders, ECF Nos.
185 at 4, 189 at 1–2, the parties hereby submit this joint status report setting forth

unresolved disagreements regarding Defendants' proposed implementation plans to overcome barriers to compliance with the settlement agreement as ordered by this Court, ECF No. 14. The parties request that this Court assist in resolving these outstanding disagreements.

## I.   Procedural History

The United States and Defendants entered into the settlement agreement in this case over six years ago in August 2015. *See* ECF No. 14. The settlement required Defendants to "implement all provisions" of the settlement "within six months" after the effective date of July 1, 2015, "[u]nless otherwise agreed to under a specific provision." *Id.* at 53; *see also id.* at 7 (defining effective date). In January 2021, the United States began discussions with Defendants regarding the development of implementation plans to bring the remaining noncompliant provisions of the settlement agreement into substantial compliance. *See* Monitor's Corrected 12th Rep. ("12th Rep."), ECF No. 174-1, at 3–4, 17. On November 5, 2021, this Court held a status conference and issued an order requiring, *inter alia*, that implementation plans "be finalized and adopted no later than May 15, 2022." *See* ECF No. 176. Defendants agreed that they would develop and adopt implementation plans for settlement agreement provisions 25, 26, 31[1], 34, 36, 37, 39, 40, 42, 43, 52, 53, 57, 58, 63, 64, 65, 66, 67, 70, 79, 80, and 81. *See* ECF No. 185 at 2–3. The Court ordered implementation plans to include "short- and long-term goals with concrete steps to overcome barriers to compliance and achieve substantial compliance, the allocation of responsibilities to specific staff to ensure accountability, and timetables to achieve substantial compliance with all outstanding requirements of the settlement agreement within two years." *Id.* at 2.

---

[1] Defendants agreed to conduct an expedited self-assessment for provision 31 to determine if an implementation plan were necessary. ECF No. 185 at 3. Defendants subsequently determined that an implementation plan was necessary for provision 31 without a formal self-assessment. *See* ECF No. 188 at 2.

In adherence to the court-ordered process for reviewing the implementation plans, the United States and the Monitor provided written comments for each of Defendants' draft implementation plans.[2] *Id.* at 3. The parties met and conferred concerning those plans on January 25, March 9, March 18, March 24, and May 5, 2022.

The United States and the Monitor have reviewed and agree to the Defendants' final implementation plans for provisions 25, 26, 31, 37, 42, 43, 53, 57, and 58 of the settlement agreement. The United States and the Monitor have reached tentative agreement with the Defendants on the implementation plans for provisions 36, 39, 40, 52, 65, 66, 67, 70, 79, and 81 of the settlement agreement, subject to review of the revised plans consistent with the tentative agreement. Defendants have committed to provide the revised plans by May 18, 2022. The United States and the Monitor will review these revised plans promptly upon receipt to determine if there are any remaining disputes. The parties will inform the Court at the upcoming status conference on May 20, 2022, whether there are any new disputes arising from the revised plans that may require assistance from the Court to resolve.[3]

The parties have been unable to resolve disagreements regarding the following issues. The grounds for their positions are set forth below, along with proposed resolutions and the Monitor's positions on each of these contested issues.

---

[2] The parties agreed to a separate timeline for provision 34, pursuant to which the United States, the Monitor, and Intervenors reviewed Defendants' implementation plan, provided written comments, and participated in a meet and conferral. ECF No. 180 at 9. Defendants provided a final version of the implementation plan on March 10, 2022.

[3] In addition, the parties have not yet been able to reach tentative agreement about two proposed plans—those for provisions 39 and 67—because the United States and Monitor are awaiting information from the County necessary to consider those plans in full. The parties will provide the Court an update about the status of these plans at the May 20, 2022 status conference.

## II.     United States' Position Concerning the Disputed Issues

### A.     Relevance of Jail Depopulation Efforts and the County's Planned Closure of Men's Central Jail to Mental Health Housing Availability and Demand (Provisions 63, 64, and 80)

The parties have not reached agreement on Defendants' proposed implementation plans for provisions 63, 64, and 80. Provision 63 requires Defendants to ensure adequate mental health housing for individuals in custody with mental illness. *See* Settlement Agreement, ECF No. 14, at 31. Provision 64 relatedly requires Defendants to create short- and long-term plans to ensure there is sufficient licensed inpatient mental health care in the Jails for prisoners who require it. *Id.* at 31–32. And provision 80 requires Defendants to ensure that prisoners with serious mental illness in mental health housing receive adequate time out of their cells, including for group programming and recreation. *Id.* at 39–40.

Defendants are far from achieving compliance with any of these provisions. In his latest report filed on March 3, 2022, the Monitor rated all three in non-compliance. *See* Monitor's 13th Rep. ("13th Rep."), ECF No. 186, at 73–74, 98. In the third quarter of 2021, the most recent quarter reported, 45% of men waited longer than permitted under provision 63 for permanent mental health housing due to housing shortages, while no data were available for women. *See id.* at 73. While awaiting permanent mental health housing placements, prisoners are locked down in cells most of the day and receive no group programming, which is detrimental to their mental health. *See* 12th Rep., ECF No. 174-1, at 13–14 ("According to Mental Health Subject Matter Expert Dr. Johnson, prolonged isolation for acutely mentally ill inmates"—a feature "central to the County's current approach to the management of inmates in the HOH population"—"can aggravate the severity of their illness, deepen their social isolation, and even result in medical complications and worsened recidivism rates."). For provision 64, which requires Defendants to provide sufficient inpatient capacity for individuals with the most acute mental health needs, the Monitor found that, in the last monitoring period,

Defendants had failed to "describe with specificity" its efforts to ensure such capacity exists. 13th Rep., ECF No. 186, at 74. This is particularly troubling because the need for inpatient care vastly exceeds the existing capacity of the Jails' inpatient unit. *See* Defs.' May 4, 2022 Letter Re: Draft Implementation Plans for Provisions 31, 64, 70, and 81, Ex. 1 ("Defs.' May 4, 2022 Response"), at 5 (noting that, as of May 4, 2022, there were 34 individuals in the inpatient unit, compared to approximately 190 individuals with a level of care requiring inpatient treatment).[4] And Defendants are not reporting data regarding structured therapeutic and programming time that incarcerated individuals are supposed to receive under provision 80. *See* 13th Rep., ECF No. 186, at 98.

Defendants' ability to comply with these provisions turns on both the number of individuals with mental illness in custody, and the resources that Defendants have available to provide appropriate housing, programming, and other services for them. Trends in the prisoner population thus help explain why compliance remains far from reach. As the Monitor recently noted, the number of individuals with mental illness in the Jails has been rising for years, and has continued to rise even during the pandemic while the overall jail population decreased. *See* 12th Rep., ECF No. 174-1, at 4–8. In their draft plan for provision 63, Defendants noted that, since 2012, the proportion of prisoners in the Jails with mental illness has increased from 17% to 42%, and that the number of prisoners with the highest levels of care requiring the most needs increased from 460 to approximately 1,304 individuals. *See* Defs.' Draft Implementation Plan for Provision 63 ("Prov. 63 Draft Plan"), Ex. 2, at 1. Furthermore, despite increasing mental health needs among the population of those in custody, the mental health resources available to that population appear not to have kept pace. *See* 12th Rep., ECF No. 174-1, at 8 (noting that Correctional Health Services' budget has not grown at a rate

---

[4] Concurrent with this filing, Defendants are filing an unopposed application to have this joint report's exhibits filed under seal. The exhibits referenced in this joint report shall be included with that application rather than with this joint report.

commensurate to the increase in the proportion of individuals with mental illness in custody, especially considering the allocation of budget increases that have occurred).

Earlier in the implementation plan process, Defendants publicly linked their plans to overcome longstanding barriers to compliance with the settlement agreement and to provide care for individuals with mental illness in their custody to the planned closure of Men's Central Jail (MCJ) and depopulation of the Jails. For example, at the parties' November 5, 2021 status conference, counsel for Defendants emphasized that the mismatch between mental health housing needs and supply in the Jails was a "long-term problem . . . requir[ing] a long term fix," Excerpts from Nov. 5, 2021 Status Conf. Transcript ("Nov. 5, 2021 Transcript Excerpts"), Ex. 3, at 22:20–21, and that "*the only way* we're going to solve this problem is through depopulation of the jail as a whole to make additional space and depopulation specifically of inmates with mental health issues through diversion problems and the like," *id.* at 22:25–23:4 (emphasis added). Counsel for Defendants also stated that the "broad plan . . . to depopulate the jail[s]" was "in part because of the anticipated closure of the Men's Central Jail," and emphasized that "that plan [to close MCJ] will work within this plan to depopulate the mental health inmate population to a point where we can satisfy the provisions in this agreement." *Id.* at 23:4–11.

Defendants have not provided concrete information about how jail depopulation and MCJ's closure will improve their ability to provide appropriate housing and care for individuals who remain in custody. Defendants have not provided specifics about the community resources they plan to bring online to absorb the demand for mental health housing and resources in the Jails. Such specifics are especially important in light of reports that Defendants may be scaling back some of their diversion efforts, which could limit their impact on demand for mental health housing in custody.[5]

---

[5] *See* Emily Elena Dugdale, *This LA Jail Program Is a Huge Success. So Why Can't It Take on More People?*, LAist (Apr. 27, 2022), https://laist.com/news/criminal-

Defendants also have not provided details about MCJ's closure or even confirmed whether it is actually happening, even though the disposition of the four-thousand plus beds at MCJ will no doubt affect Defendants' ability to provide adequate housing for those who remain in custody. Indeed, Defendants have asserted they need not provide this information because the depopulation efforts are irrelevant to whether the Jails provide adequate mental health housing under provision 63. *See* Defs.' Apr. 21, 2022 Response to Comments Regarding Draft Implementation Plans for Provisions 63, 66, 79, and 80 ("Defs.' Apr. 21, 2022 Response"), Ex. 4, at 10. Although it is true that the settlement agreement itself does not require that Defendants close MCJ, the County has made public pronouncements for years regarding the need to close MCJ and has consistently linked MCJ's closure with Defendants' ability to provide humane conditions of confinement and meet the needs of the growing population of prisoners in custody who have mental illness.[6]

---

justice/this-la-jail-program-is-a-huge-success-so-why-cant-it-take-on-more-people ("Despite the glowing statistics — and the dire need — ODR Housing has not been able to take on any new clients in over a year. It has maxed out its funding and there's no money to expand the program in the proposed county budget for the next fiscal year.").

[6] There are signs that the Sheriff and the County have not seen eye-to-eye on this issue. The Sheriff wrote a letter to County Counsel earlier this year—published on the Sheriff's Department website—requesting conflict counsel in this case. *See* Letter from Sheriff Alex Villanueva Letter to then-L.A. Cnty. Counsel Rodrigo A. Castro-Silva (Jan. 31, 2022), https://lasd.org/wp-content/uploads/2022/02/Transparency_Sheriff_Response_Req_4_outside_counsel_2015_Settlement_Jails_013122.pdf. In the letter, the Sheriff wrote that he disagreed with the County's plans to close MCJ "without first establishing a modern mental healthcare facility or otherwise substantially improving alternative locations." *Id.* at 1–2. The Sheriff wrote in the same letter he believed the Board of Supervisors' actions—including decisions about staffing and resources for the Sheriff's Department—compromised the Sheriff's Department's ability to comply with this settlement agreement. *Id.* The United States has sought assurances that both Defendants support the implementation plans as solutions to compliance barriers. In response, County Counsel has assured the United States that both Defendants have been extensively involved in the creation of the

While Defendants publicly acknowledge the unsafe conditions at MCJ,[7] they are relying on it to house individuals with mental illness more than used to be the case. The United States has learned that, in the last few months, individuals with serious mental health needs that require housing in high observation housing (HOH) units[8] are, for the first time, being forced to live temporarily in MCJ. This decision appears to have contributed to a recent serious suicide attempt of an individual who should have been living in mental health housing at the Twin Towers Correctional Facility (TTCF). This new reliance on MCJ to house some of the Jails' most vulnerable prisoners is extremely troubling, especially following the spike in suicides concentrated at MCJ in 2021.

If Defendants are relying on depopulation efforts to address the increasing demand for mental health housing and resources among incarcerated individuals, then they must explain how much capacity they plan to develop in the community and the projected impact on the incarcerated population, and include timelines for when these changes are expected to occur. And they must be clear about how the closure of MCJ fits within those broader depopulation plans.[9] If, on the other hand, Defendants are no longer

_____

implementation plans and are committed to their execution upon agreement by the parties or approval by this Court.

[7] *See* L.A. Cnty. Dep't of Health Services, L.A. Cnty. Office of Diversion & Reentry, L.A. Cnty. Sheriff's Dep't, Men's Central Jail Closure Plan: Achieving a Care First Vision, L.A. Cnty. Men's Central Jail Closure Workgroup Final Rep., Mar. 30, 2021, at 4, http://file.lacounty.gov/SDSInter/bos/bc/1104568_DEVELO_1.PDF ("MCJ is an unsafe, crowded, crumbling jail facility . . . inadequate for the provision of essential medical and mental health care.").

[8] HOH units are intended for individuals with acute mental health needs. Custody staff conduct safety checks in such units every fifteen minutes, and there are additional safety precautions to minimize the likelihood of self-harm incidents. Individuals living in HOH units spend most of their time in their cells.

[9] Defendants commissioned a September 2021 report to project the impact of MCJ's closure. *See* James Austin et al., Estimated Cost Savings from a Reduced Jail Population and Closure of Men's Central Jail and Jail Population Projections (Sept. 2021),

committed to these depopulation efforts or to the closure of MCJ, then they must clarify this for the Court and the parties, and demonstrate how the other measures they describe—such as converting existing general population housing in some facilities to mental health housing, and opening a new psychiatric urgent care—will be sufficient to meet the needs of the growing population of incarcerated individuals with mental illness.[10]

The disagreements between the parties related to depopulation efforts in connection with each of these plans are as follows:

### 1. Provision 63: Lack of Sufficient Mental Health Housing

Defendants' draft implementation plan for provision 63 provided background information about efforts underway to depopulate the Jails through, e.g., the County's Alternatives to Incarceration (ATI) Office and the Jail Closure Implementation Team (JCIT), the latter of which is also planning for the closure of MCJ. Prov. 63 Draft Plan, Ex. 2, at 13–18. However, the information provided is cursory. It includes no details about the number of community beds in development, the number of incarcerated individuals Defendants project could be diverted to these programs within the next two or three years (or on any other timeline), or what impact the development of these programs would likely have on the demand for mental health housing in the Jails. *See* DOJ Apr. 11, 2022 Letter on Prov. 63 Draft Plan, Ex. 5, at 4–5.

To obtain more information about how the Defendants believe these efforts will

---

http://file.lacounty.gov/SDSInter/bos/bc/1113785_10.06.21JFAInstituteReportonCOVID-19andReducingJailPopulationandMCJClosure.pdf. Defendants enclosed this report with the staffing analysis they provided to the United States and Monitor in connection with this implementation planning process.

[10] It may be that Defendants can achieve compliance with the settlement without depopulating their jail facilities. But Defendants have not provided a roadmap for doing so. Regardless, the United States is skeptical of Defendants' ability to achieve compliance with the settlement agreement as long as the County continues to use MCJ to house prisoners with mental illness, given the unsafe and unhealthy conditions there.

enable them to address the demand for mental health housing in the Jails, the United States asked Defendants to provide details about efforts to expand such diversion and ATI programs, the barriers to or limitations on such expansion efforts, and the projected impact of each program on mental health housing needs in the Jails. *See id.* at 5. Defendants provided a response to the United States' letter that did not include this information. Instead, Defendants contend that these depopulation efforts are not essential to achieving compliance with provision 63. *See* Defs.' Apr. 21, 2022 Response, Ex. 4, at 10.

The parties met and conferred on May 5, 2022. During that meeting, Defendants stated they now believe that jail depopulation efforts are "irrelevant" to the availability of, and demand for, mental health housing in the Jails. They stated that such diversion and depopulation efforts were still underway, and that they hoped they could indirectly relieve pressure on mental health housing in the jails by reducing the total jail population. However, they stated they did not believe that existing programs to divert would be able to accommodate individuals in the Jails with acute mental health needs, including those who currently require inpatient care or those in the Jails' HOH units.[11] Regardless, they now assert that they can solve the mental health housing availability crisis through other efforts alone, including conversion of general population housing areas into mental health housing, and the creation of a new psychiatric urgent care unit.

Defendants have not explained how they can achieve compliance with provision 63 simply by converting additional space within the Jails to mental health housing and expanding programs that provide more robust services for individuals with mental illness within the Jails. During the parties' meeting on May 5, 2022, Defendants stated that they would start doing the math necessary to make such projections. However, they stated

---

[11] When the United States pressed for Defendants' rationale here, Defendants stated that individuals with acute mental health needs required a high level of care in a locked facility for security reasons.

that they would not have figures ready to share by the date of this filing.

Defendants' proposed implementation plan for provision 63 does not sufficiently explain how and when it will address the lack of mental health housing in the Jails.

### 2.    Provision 64: Lack of Sufficient Inpatient Capacity

Defendants' draft implementation plan for provision 64 focuses on three proposals to ease the burden on inpatient capacity: the creation of a psychiatric urgent care unit that could provide involuntary psychotropic medication outside of the inpatient unit; expansion of resource-intensive "step-down" units that provide more services and a better clinical environment than standard HOH units; and an expansion of medication assisted treatment (MAT) options. *See* Defs.' Draft Implementation Plan for Provision 64 ("Prov. 64 Draft Plan"), Ex. 6, at 1–6. However, as the United States explained in its comments, this draft plan does not say how Defendants would address the availability of licensed inpatient care itself, including by updating its five-year inpatient housing plan and describing steps it would take to implement that plan. *See* DOJ Apr. 18, 2022 Letter on Prov. 64 Draft Plan, Ex. 7, at 4.

Defendants' response, on May 4, 2022, provided some additional information about the three programs discussed in the draft plan, as well as additional reasons Defendants believed those programs would reduce the likelihood of decompensation and thus abate the demand for inpatient care. *See* Defs.' May 4, 2022 Response, Ex. 1, at 5–8. However, as was the case for provision 63, Defendants did not project the impact these programs are likely to have on inpatient needs, for example by indicating what reduction they would elicit in the number of incarcerated individuals requiring inpatient care.

The parties met and conferred about this plan on May 5, 2022. During that meeting, Defendants said—as they did for provision 63—that they believed diversion and depopulation efforts were irrelevant to this provision. And just as for provision 63, they said they would try to provide some numbers regarding the impact of certain proposals on inpatient housing availability, albeit not before the deadline for this filing.

However, they also acknowledged that, even after implementing the proposals discussed in the draft plan for this provision, the inpatient capacity issues would likely persist.

Defendants' plan does not present a clear pathway for how they will achieve compliance with provision 64.

### 3.      Provision 80: Lack of Adequate Out-of-Cell Time

In their proposed implementation plan to ensure that individuals with mental illness receive adequate structured and unstructured out-of-cell time under provision 80, Defendants said that there were no plans to provide additional out-of-cell time in "intake" housing areas where many individuals wait for weeks for a permanent housing placement because there is insufficient infrastructure in those units to allow for it. Defs.' Draft Implementation Plan for Provision 80 ("Prov. 80 Draft Plan"), Ex. 8, at 4–5.[12] In our comments on the draft plan, we noted that we wished to explore further with Defendants and the Monitor ways that additional structured and unstructured time could be provided in these areas. *See* DOJ Apr. 11, 2022 Letter on Prov. 80 Draft Plan, Ex. 9, at 4. Defendants responded that the intake areas lacked the staff and facilities to provide this out-of-cell time, and that "the only way this issue will be addressed is by minimizing the time HOH patients spend in an intake module, through executing the Implementation Plan for Provision 63, so HOH patients are placed in permanent housing as soon as possible that provides an opportunity for out-of-cell time required under Provision 80." *See* Defs.' Apr. 21, 2022 Response, Ex. 4, at 7. But as discussed above, it remains unclear how Defendants expect to execute the implementation plan for provision 63.

The parties met and conferred regarding this provision on May 5, 2022. As discussed above for provisions 63 and 64, Defendants insisted that diversion and depopulation efforts were irrelevant to the Jails' ability to provide sufficient mental health housing to meet the rising needs of the incarcerated population. But they have not

---

[12] Other aspects of Defendants' draft plan for provision 80 are discussed *infra* Section II.B.

demonstrated that the proposals discussed in the plans for those provisions will suffice to
ensure that incarcerated individuals who need mental health housing will be assigned to
it as soon as possible, and thus minimize the time such individuals spend in intake areas
where they receive virtually no opportunities to leave their cells.

Defendants' proposed plan for provision 80 does not chart a clear course for
Defendants to provide the required out-of-cell time for all individuals entitled to it.

### B.    Insufficient Staffing for Structured Therapeutic Time (Provision 80)

Defendants' implementation plan for provision 80 is not likely to result in
substantial compliance with regards to offering sufficient out-of-cell, structured,
appropriate, therapeutic programming for the HOH population.

Provision 80 requires Defendants to "offer 100% of the prisoners in HOH ten
hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic
or programmatic time per week." Settlement Agreement, ECF No. 14, at 39. The parties
have agreed that up to five hours of the structured time can consist of education or work
programs, while at least five hours must be therapeutic. 13th Rep., ECF No. 186, at 98.
The Monitor rated this provision as non-compliant in his Thirteenth Report, noting that
"[a]s in the past, [the] County's Thirteenth Self-Assessment does not reflect results for
'structured therapeutic or programming time.'" *Id.*

Defendants' plan for provision 80 identifies Correctional Health Services (CHS)
staffing as one of the key obstacles to offering structured therapeutic time in compliance
with this provision. Prov. 80 Draft Plan, Ex. 8, at 6–7. Defendants estimate that they
would need to hire 45 new group providers to adequately staff group programming for
the HOH population,[13] a prospect they dismiss as "not realistic." *Id.* at 8. According to

---

[13] Defendants' staffing analysis under provision 47 included slightly different numbers
for group providers. It stated that a total of 25 staff were currently allocated for groups
(versus the 26 indicated in this draft plan), and stated that 48 additional group providers
would be needed to provide the required structured out-of-cell time under provision 80
(versus the 45 indicated in this draft plan). *See* Apr. 1, 2022, Draft CHS Staffing

Defendants, even if there were a budget to hire this many group providers, there is not enough office space or parking to accommodate this swell in the workforce, nor enough supervisors to oversee it. *Id.*

In lieu of addressing the staffing shortage, Defendants offered a number of "short-term goals" to maximize the number of HOH patients receiving the therapeutic time required under the settlement without solving the problem. *See id.* at 7–9. These measures include expanding the responsibility for leading groups to clinicians, who do not currently lead groups as part of their job duties. *Id.* at 8. Defendants also represented that they have "begun discussions" with outside providers who could lead structured activities for the HOH population. *Id.* at 8–9. However, Defendants identified only one potential third-party provider and explained that they were not selected because there was no funding available. *Id.* at 9. Defendants expressed optimism that the third-party provider would be able to obtain grant funding to serve HOH patients, but acknowledged there is "no clear timeline" for bringing this agency on board. *Id.*

The United States asked Defendants to address the group provider shortfall in its comments. DOJ Apr. 11, 2022 Letter on Prov. 80 Draft Plan, Ex. 9, at 4–5. The United States expressed concern that "the County may be setting itself up for failure by placing this burden [of providing group programming] on clinicians whose workloads are already heavy." *Id.* at 4. The United States also asked why Defendants could not bring on the third-party provider identified, stating that "[g]iven the enormous staffing shortfall that the County has identified in connection with this provision, the County must be willing to take proactive steps to achieve compliance . . . . [s]uch steps may include the commitment of funding to these outside agencies, or the retention of other third-party contractors or volunteers[.]" *Id.* at 5. In written comments, the Monitor also asked Defendants to expand the measures to address "the sorely inadequate number of providers who are currently able to provide the group programming necessary to comply

_____

Analysis, Ex. 10, at 5–6.

with provision 80." Monitor Letter Regarding Implementation Plans for 63, 66, 79, and
80, Ex. 11, at 2. The Monitor also expressed concern about compounding demands on
CHS clinical staff by requiring them to conduct groups and asked Defendants to explore
further third-party providers. *Id.*

In response to comments regarding a related provision,[14] Defendants reiterated
that they do not intend to hire enough clinical staff to meet current requirements for
group programming, stating again that "it would not be realistic to expect, with the
current staffing model, that the mechanically-driven group programming requirements
the County currently faces can be satisfied[.]" Defs.' April 21, 2022 Response, Ex. 4, at
5. Defendants claim that they could comply with the requirements for group
programming if "allowed to offer group . . . therapy . . . based on what is therapeutically-
recommended according to . . . patients' individual treatment plans, rather than by
uniform expectations not necessarily linked to the level of care the County's patients
require[.]" *Id.* However, even if offering patients fewer hours of structured out-of-cell
time complied with the settlement agreement, which it does not, there is no evidence that
mental health staff would routinely omit group programming from patient treatment
plans in numbers to solve the staffing shortfall. The settlement agreement's requirement
that Defendants offer HOH patients ten hours of structured therapeutic time per week is
consistent with professional standards of care in corrections. *See* Jeffrey L. Metzner,
*Evolving Issues in Correctional Psychiatry*, Psychiatric Times (Sept. 1, 2007),
www.psychiatrictimes.com/view/evolving-issues-correctional-psychiatry ("For inmates
with a serious mental illness who require segregation housing for security reasons and
need a residential level of care, the specialized mental health program should offer 10 to

---

[14] Defendants' quoted responses were made in the context of provision 79, which also
requires group programming. Provisions 79 and 80 overlap with regard to provision of
group programming and structured, out-of-cell, therapeutic programming, and the
staffing issue came up in both provisions, with Defendants discussing staffing
constraints in greater detail in provision 80.

15 hours per week of out-of-cell structured therapeutic activities and at least 10 hours per week of unstructured exercise of recreation time."). Defendants themselves recognize that isolation has damaging effects on the mental health of HOH patients. *See* Defs.' Draft Implementation Plan for Provision 79 ("Prov. 79 Draft Plan"), Ex. 12, at 4 (acknowledging that the inability to socialize in HOH housing "[a]ffects the morale and stability of the patient and their ability to meaningfully engage in treatment.").[15] Accordingly, Defendants' position that many fewer patients clinically require group programming than must receive it under the settlement agreement is speculative and unpersuasive.[16]

Defendants further responded to the comments from DOJ and the Monitor by dismissing the idea of bringing in third-party contractors, even though Defendants had themselves raised it as a possible short-term measure. Defendants stated that they "do[] not object to the idea of having additional group services provided by a third party provider," but offered no plan for exploring the concept, and no commitment to fund it. Defs.' Apr. 21, 2022 Response, Ex. 4, at 5 n.2. Defendants stated that "setting up such a system would likely require a considerable devotion of resources and is not a program that would likely be operational any time in the future." *Id.*

Bringing in third parties to supplement group programming carries its own difficulties, but it is a measure that deserves serious consideration. Third parties may not require additional office space and may be able to provide much of their own supervision, both challenges identified by Defendants with bringing in more permanent

---

[15] *See also* Monitor Letter Regarding Implementation Plans for 63, 66, 79, and 80, Ex. 11, at 3 (advising that "[i]n correctional mental health literature, a substantial body of research supports the efficacy of group therapy as a treatment for people with severe mental illness.") (internal quotations omitted).

[16] Additionally, the settlement agreement already provides that Defendants do not need to provide structured therapeutic programming where "clinically contraindicated," i.e., if it is unsafe or contrary to the plan of care. Settlement Agreement, ECF No. 14, at 39.

staff. It is also reasonable to expect that third-party providers could be brought on more quickly to accommodate a rise in the HOH population, as Defendants represent that onboarding a new group provider "generally takes at least 6 months." Prov. 80 Draft Plan, Ex. 8, at 7 n.3.[17]

Finally, the United States believes that fewer additional group providers may be needed than the figures stated in Defendants' implementation plan for provision 80. Defendants' calculation assumes ten hours of structured therapeutic programming per patient. Prov. 80 Draft Plan, Ex. 8, at 6–7. However, the parties have agreed that only five of the ten hours of structured programming must be therapeutic; the remaining five hours could be provided with vocational or educational activities. 13th Rep., ECF. No. 186, at 98. Based on Defendants' staffing analyses, to provide one hour of group therapy, five days a week, for a total of five hours weekly, to the HOH population at Twin Towers Correctional Facility (TTCF) (assuming eight patients per group and with each provider offering a maximum of four, one-hour sessions per day, five days a week), Defendants would need an additional thirteen group providers. To provide one hour of group therapy, five days a week, for a total of five hours weekly, to the HOH population at the Century Regional Detention Facility (CRDF) (assuming eight patients per group and with each provider offering a maximum of three, one-hour sessions per day, five days a week), Defendants would need an additional six group providers. Thus, Defendants would need a total of nineteen additional group providers to cover both facilities.

In sum, Defendants should adopt an implementation plan for provision 80 that includes increasing the number of group providers to a level that will allow HOH patients ten hours of structured programming out of cell, including five hours of

---

[17] In the staffing analysis conducted pursuant to provision 47, Defendants further estimate that from canvassing to the clearance process, it is not unusual for it to take one year to fill a CHS position. *See* Apr. 1, 2022, Draft CHS Staffing Analysis, Ex. 10, at 7.

structured, therapeutic time, in compliance with the settlement agreement.

### C.   Sufficiency of Information Regarding Timelines and Benchmarks.

Defendants' draft implementation plans for provisions 63, 64, and 80[18] fall short of the Court's requirements that the plans "include specific elements to serve as a roadmap to achieve substantial compliance." ECF No. 185 at 2. In its January 24, 2022 Order, the Court adopted the parties' expectation that the implementation plans include, among other things, "concrete steps to overcome barriers to compliance and achieve substantial compliance . . . and timetables to achieve substantial compliance with all outstanding requirements of the settlement agreement within two years." *Id.*[19] The United States identifies the deficient portions of the implementation plans below, followed by the grounds for its position and a proposed resolution to remedy collectively the deficiencies in the draft plans.

### 1.   Provision 63: Lack of Sufficient Mental Health Housing

The draft implementation plan for provision 63 includes timelines and benchmarks in connection with some projects, such as the expansion of FIP Stepdown. *See* Prov. 63 Draft Plan, Ex. 2, at 11, n.6. However, it does not include timelines or benchmarks for other key proposed solutions, such as the expansion of Moderate Observation Housing at Pitchess Detention Center North or the creation of the psychiatric urgent care unit. *See*

---

[18] While the United States found that many draft implementation plans lacked details on steps and timetables to achieve substantial compliance, the United States focuses only on those plans that were most deficient and that were rated as non-compliant at one or more facilities in the Monitor's most recent compliance assessment. *See* 13th Rep., App. A, ECF No. 186, at 113–120.

[19] The Court also emphasized the need for specific timetables for the implementation of even the most complex requirements of the settlement agreement, such as the provision of adequate mental health housing, during the November 5, 2021, status conference: "I would expect that even the ones that are more complicated, that you will give me a date for the implementation of those. I just -- I cannot work in the never never world where there -- you know, they're aspirational. There has to be dates." Nov. 5, 2021 Transcript Excerpts, Ex. 3, at 25:3–8.

*id.* at 8–10. Because of the complexities of this provision, it is possible that Defendants may not achieve substantial compliance within two years, amplifying the need for interim benchmarks and timetables to determine whether Defendants are making sufficient progress to ensure that prisoners with serious mental illness are housed in appropriate settings. The United States notified Defendants about this deficiency in writing, and the parties have been unable to resolve the dispute. *See* DOJ Apr. 11, 2022 Letter on Prov. 63, Ex. 5, at 6–7.

### 2.    Provision 64: Lack of Sufficient Inpatient Capacity

Provision 64 requires that Defendants develop a five-year plan to ensure that there is sufficient inpatient capacity to meet prisoners' needs and that Defendants update the plan, as necessary, every twelve months. Defendants have not produced an adequate five-year plan, and their omission of timelines and benchmarks for key measures they plan to take to comply with provision 64, such as the creation of a new psychiatric urgent care unit, *see* Prov. 64 Draft Plan, Ex. 6, at 1–3, hinders compliance. Timelines and benchmarks for all proposed solutions in the draft implementation plan are essential to the development of an adequate five-year plan because they allow Defendants to make projections based on the intended results of their implementation plan. Timelines and benchmarks also facilitate compliance with the annual update requirements of provision 64 by providing a means of measuring progress as milestones are reached or for adjusting if they are not. The United States notified Defendants about this deficiency in writing, and the parties have been unable to resolve the dispute. *See* DOJ Apr. 18, 2022 Letter on Prov. 64, Ex. 7, at 4–5.

### 3.    Provision 80: Lack of Adequate Out-of-Cell Time

In their draft implementation plan for provision 80, Defendants provide timelines for some proposed solutions to ensure that prisoners with serious mental illness receive adequate time out of their cells. *See* Prov. 80 Draft Plan, Ex. 8, at 2–5. However, there are no timelines or benchmarks for other proposed solutions, such as onboarding new group providers (if any) to provide structured out-of-cell activities, *id.* 6–8, and requiring

clinicians and outside agencies to provide more group programming, *id*. 8–9. The United
States notified Defendants about this deficiency in writing, and the parties have been
unable to resolve the dispute. *See* DOJ Apr. 11, 2022 Letter on Prov. 80, Ex. 9, at 5.

### 4. Concrete Timelines and Benchmarks Are Critical for Accountability and Should be Included in the Final Plans.

Without appropriate benchmarks or associated timetables, it is difficult to gauge
whether Defendants are making meaningful progress toward substantial compliance or
whether they have stalled. This problem is most acute for the three non-compliant
provisions discussed above because they have a longer path to reach substantial
compliance under the performance targets agreed upon by the parties. It is critical for
Defendants to know whether their efforts are working, both for internal and external
accountability purposes, but also to permit Defendants to make necessary adjustments or
course corrections as early as possible. This exercise should not be mere guesswork.
Defendants are in a position to make informed projections about specific outcomes that
are expected over incremental periods, based on their performance since the Court
approved the settlement agreement in 2015 and the performance targets in the
compliance measures. The Monitor relies on these same compliance measures to
evaluate Defendants' compliance every six months, and they can be tailored readily into
specific benchmarks to help measure Defendants' progress.

To resolve this disagreement, the United States respectfully requests that the Court
require Defendants to revise the relevant sections of the implementation plans discussed
above within 14 days of the Court's order to include specific benchmarks and timetables
to measure whether Defendants are making sufficient progress to achieve substantial
compliance within two years. These benchmarks and timetables should consider
Defendants' past performance and the compliance measures used by the Monitor in his
semi-annual reports. The benchmarks and timetables should also assist the parties and
the Monitor in determining whether Defendants' efforts are producing intended results or
whether any changes are needed to re-direct Defendants toward substantial compliance.

### D.     Request for Relief

For the reasons stated above, the United States requests that this Court assist with resolving the above-stated disputes, and that it require Defendants to incorporate in their final implementation plans the information the United States has requested.

## III.   Defendants' Position Concerning the Disputed Issues

### A.     Introduction

The disputes regarding the 23 implementation plans Defendants agreed to prepare for those provisions of the Settlement Agreement where they have fallen short of substantial compliance to date have been chiefly whittled down to a handful of disputes involving implementation plans related to three provisions in the Settlement Agreement: Provision 63 (which requires Defendants to provide adequate mental health housing for individuals in custody who require what is termed "High Observation Housing" (or "HOH") and "Moderate Observation Housing" (or "MOH") due to the severity of their mental condition); Provision 64 (which requires Defendants to formulate a long-term plan to provide sufficient licensed in-patient mental health care for the most seriously mentally ill inmates in the LA County Jail System); and Provision 80 (which requires that inmates in HOH receive adequate time out of their cells for group programming and recreation).  Defendants have aimed to create plans for these provisions that focus on achievable, practical steps they believe can meaningfully move Defendants toward compliance with what these three provisions require, rather than less-detailed, less-concrete plans that would likely be responsive to some of the concerns raised by the Department of Justice ("DOJ").

As noted above, those concerns appear to be threefold:

First, the DOJ claims that the plans offered by Defendants insufficiently address how the County intends to close the Men's Central Jail ("MCJ") and fail to address with specificity the County's current efforts to lower the LA County Jail's population through diversion programs and other County initiatives aimed at jail depopulation.

The DOJ's position that a plan to address the closure of MCJ is integral to any of these plans is wrong.  Neither the Settlement Agreement, nor any of its terms, including Provisions 63, 64, and 80, require Defendants to close MCJ.  Moreover, <u>none</u> of the implementation plans for any of these provisions call for any of the inmates with severe mental illnesses who would be impacted by these plans to be housed at MCJ.  Indeed, these plans call for the exact opposite and detail steps Defendants intend to take to make sure inmates with severe mental conditions are not housed at MCJ.  Accordingly, it is difficult to understand the DOJ's insistence that an already complicated plan to address an enormously complicated problem must address another terribly complicated issue that has no direct impact on the inmate population these plans cover, namely, inmates who everyone agrees should not be housed at the MCJ.[20]

The DOJ's position that the County's jail depopulation efforts are a necessary part of Defendants' efforts to reach compliance with Provisions 63, 64, and 80 is also incorrect to the extent the DOJ imagines that these efforts provide a likely solution to bring Defendants into compliance with any of these provisions within the two-year timeframe the DOJ requested for the implementation plans in this case.  At present, these depopulation efforts—which are being spearheaded by Alternatives to Incarceration ("ATI") (a new County agency formed in September 2020), the Jail Closure Implementation Team ("JCIT") (a group created in June 2021 to develop an operational plan to close MCJ), and the County's Office of Diversion and Reentry ("ODR")—are in their relative infancy; and none of the jail depopulation programs currently offered by ATI, JCIT, or ODR are designed or equipped to house significant numbers of the types of inmates who are subject to Provisions 63, 64, or 80 in the near future.  The inmates subject to these provisions have serious, and in many cases debilitating, mental illness;

---

[20]  This is not to say that the County has backed away from its commitment to closing MCJ.  It has not.  But it is not true, for the reasons stated herein, that Defendants' efforts to obtain compliance with Provisions 63, 64, and 80, are dependent on MCJ closing.

they require substantial mental health care and close observation by mental health professionals; and, most clearly in the case of the P4 and HOH-housed inmates who are a focus of Provisions 63, 64, and 80, would pose an unacceptable risk to public safety and, for that matter, to themselves, if housed in the type of unlocked, community-based facilities that ATI, JCIT, and ODR are currently focused on utilizing as alternative bedspace to a jail environment.

In short, while there may be a day when these groups set up and oversee facilities in the community that can safely house and supervise the seriously mentally-ill HOH and MOH populations covered by Provisions 63, 64, and 80, offering the services these groups can <u>currently</u> provide as solutions for the present compliance challenges for these provisions would require the type of aspirational and speculative solutions this Court instructed Defendants to avoid, and there is certainly no realistic way the depopulation efforts currently being undertaken by ATI, JCIT, and ODR are likely to move Defendants meaningfully closer to compliance with any of these provisions in the two-year timespan that governs the implementation plans in this case.

Second, the DOJ complains that Defendants' plan to improve the out-of-cell programming services provided relevant to Provision 80 is insufficient because Defendants' plan would only obligate Defendants to provide the amount of out-of-cell programming for each inmate that is therapeutically-necessary for that particular inmate, rather than a fixed amount of out-of-cell programming that is not tailored to the individual inmate.[21]   In offering this solution, Defendants recognize practical difficulties in complying with Provision 80 the government ignores.  There is little chance, for example, that the County could hire, at least in a timely manner, the 45 group providers

---

[21]  As explained below, this plan also calls for the sizeable expansion of the Forensic Inpatient ("FIP") Stepdown program over time.  The beneficiaries of this resource-intensive program—which is described below—will live in a dorm-like environment and will be afforded the out-of-cell time required under anyone's definition of that time under Provision 80.

it would currently need to provide the degree of structured therapeutic programming demanded by the DOJ.  Moreover, even if the County could somehow retain dozens of new mental health professionals in the near future to oversee such group programming, Defendants lack the workspace (and even the necessary parking) to accommodate such an influx of additional staff.  Accordingly, in an effort to find a practical solution to the issues posed by Provision 80 that would not negatively impact the mental health needs of the inmates covered by this provision, Defendants proposed a plan that offers out-of-cell programming based on individual patient needs rather than a one-size-fits-all approach unrelated to an inmate's individual needs.  This is a sound foundation for both improved quality of care and improved compliance.

Finally, the DOJ complains that the implementation plans Defendants have offered for these provisions are flawed because they lack benchmarks and timelines. While it is certainly true that Defendants are not yet in a position to offer the five-year plan that Provision 64 requires, the Implementation Plans for Provisions 63 and 64 are centered on four new initiatives described in more detail below:  (1) the expansion of the Forensic In-Patient ("FIP") Stepdown Program[22]; (2) the relocation of a sizeable number of MOH inmates to the LACJ's PDC-North facility to move those MOH inmates to a better therapeutic environment and to expand permanent housing opportunities for HOH inmates; (3) the creation of a 48-bed Psychiatric Urgent Care Unit that will be used to provide more rapid, stabilizing mental health treatment for inmates with the most acute mental illnesses; and (4) an expansion of the jail's Medication Assistance Treatment Program (or "MAT Program"), which will provide proven, medication-based drug treatment to a sizeable number of inmates, including inmates whose otherwise untreated drug dependency issues do not allow for the proper treatment of their mental health conditions.  The last three of these programs require approximately $100 million in

---

[22]  The Implementation Plan for Provision 80 also relies, in large measure, on the expansion of the FIP Stepdown Program.

funding from the County and approval from the Board of Supervisors.  This funding must take place within a particular budget cycle for the County, and these programs were recently calendared for consideration and budgeting that will take place during the last week of June.  Assuming these projects are approved and funded, Defendants will be in a better position to create a timeline for when these initiatives will take effect and will be better able to address their scope.

In other respects, however, the government's insistence on timelines and benchmarks is premature.  Some of the solutions Defendants have crafted in their efforts to address the very difficult problems posed by this case are being attempted for the first time, such as the significant expansion of the MAT Program described below.  While the Defendants can say with reasonable certainty that programs like these are likely to have a significant positive impact in treating inmates with mental illnesses at the jails, until those programs are initiated and in place for some reasonable amount of time, it is not possible to project their impact with the precision the government appears to be demanding.  Accordingly, while Defendants, like the government, recognize the importance of benchmarks, goals, and timelines, they believe it would be both more practical and more useful to set these timelines and benchmarks once these programs gain their footing and their effectiveness can be better and more accurately projected; and, as addressed below, Defendants will modify these implementation plans when that time comes.

With this as an introduction, Defendants will address the following matters below: (1) the nature of the challenges posed by Provisions 63, 64, and 80; (2) Defendants' extensive, practical, and concrete short-term solutions to these problems; and (3) Defendants suggested path forward to address the difficult issues posed by Provisions 63, 64, and 80.

### B.     The Challenges Posed By Provisions 63, 64, and 80

In what is a sad and unfortunate state of affairs, after decades of failures and indifference by stakeholders at the State and Federal levels, when it has come to setting

up any workable semblance of a mental health system in this country, the LACJ is, by far, the largest purveyor of mental health services in the County of Los Angeles, and, quite possibly, the State of California.

In the past 10 years, the number of inmates in the LACJ System who have been diagnosed with a mental illness has skyrocketed from 3,135 to 5,651 as of March 15, 2022, an increase of more than 80%. During this same time period, the percentage of inmates with a mental illness in the LACJ System increased from approximately 17% of the population to at least 42% of the overall inmate population (a 140% increase), and the number of inmates with the most severe mental health profile that the LACJ System encounters (those classified as "P3" and "P4" inmates requiring HOH), has risen from 460 to 1,304 such inmates. In brief, over the past decade: (1) the number of inmates who require mental health services in the LACJ has risen dramatically; (2) the percentage of inmates who suffer from mental health issues in the LACJ System has grown to a point where such inmates now sit on the cusp of constituting a majority of the LACJ System's population; and (3) the number of inmates who require the most resource-intensive treatment due to the severity of their mental illness has tripled in size.

While Defendants would very likely be in compliance with Provisions 63, 64, and 80 had the number of inmates with severe mental health issues in the LASD's custody stayed the same as it was when the Settlement Agreement was signed, that has not been the case because of the explosion of mentally ill in the system. This is due to four main issues:

First, because of the severity of their mental health issues, inmates who require HOH housing cannot be housed in dorm-style housing, and, in fact, often cannot be celled with another person. With such space considerations in play, there is currently not enough permanent HOH in the LACJ System, and, as a consequence, when new inmates enter the LACJ System and require HOH , they are often assigned temporary housing in an "intake module" or "overflow module," until permanent HOH is available. Since the number of HOH inmates in the LACJ System currently exceeds the immediate

availability of permanent HOH, the County is frequently out of compliance with Provision 63.  Currently, the backlog of HOH inmates who do not have permanent housing and who are waiting for such housing in an "intake module" or "overflow module" is substantial, as there are currently over 100 HOH inmates facing this situation.[23]

Second, the growth in the number of inmates at the LACJ who have the most severe forms of mental illness and require in-patient psychiatric treatment—inmates designated with a "P4" status—has outpaced the availability of appropriate in-patient beds.  There are currently only 34 such beds available for P4 inmates and approximately 180 P4 inmates currently in the LASD's custody.

Third, those HOH inmates located in temporary "intake" or "overflow" housing are not in modules where regular out-of-cell time is available, and, as a result, for the period of time this group is in temporary housing, this group of inmates does not receive the mental health services required under Provision 80.

Fourth, the number of inmates with serious mental health conditions who are eligible for out-of-cell time and associated programming exceeds Defendants' capacity to provide such programming if it must include 10 hours of out-of-cell time each week irrespective of any clinical need for that amount of programming.  To deliver such programming, the County estimates it would have to hire an additional 45 group providers (individuals who can lead group therapy sessions for these inmates).  It is not practical to believe the County—which already struggles when it comes to hiring mental

---

[23]  The COVID-19 pandemic, and the resulting needs for social distancing and quarantines for infected inmates has made this acute housing shortage even worse, as a sizeable number of cells normally used to house HOH and MOH inmates at the Twin Towers Correctional Facility ("TTCF") have been utilized as quarantine space for the past two years, and required the LASD to move several hundred MOH inmates from TTCF to MCJ to make room for this quarantine space.  The Implementation Plan for Provision 63 makes it a priority to relocate those displaced from TTCF to the MCJ to a more suitable facility.

health professionals interested in working in a jail environment during a worldwide pandemic—would be able to recruit, hire, and retain dozens of additional group providers, and, even if it could, it has no workspace to accommodate such a sizeable influx of new employees at the jails.

### C. The Practical Steps Defendants Have Proposed to Improve Their Compliance with Provisions 63, 64, and 80

Mindful of the DOJ's insistence that Defendants' propose solutions to the issues described above that will move them toward compliance with the Settlement Agreement in the next two years, as well as the Court's admonishment that it wants Defendants to propose practical solutions to these problems, rather than "aspirational" plans, Defendants have offered Implementation Plans for Provisions 63, 64, and 80 that offer concrete, practical steps they believe will markedly improve their compliance with these provisions until more permanent solutions can be devised and implemented, such as the possibility the role of ATI, JCIT, and/or ODR will expand in the future to allow the safe placement of HOH and MOH-level inmates outside the LACJ System.

### 1. Provision 63

Provision 63 evaluates the availability of mental health housing. It obligates the County and the Sheriff to "maintain adequate [HOH] and [MOH] sufficient to meet the needs of the jail population with mental illness" and "to continue [the] practice of placing prisoners with mental illness in the least restrictive setting consistent with their clinical needs."

Defendants' key solutions for materially improving compliance with Provision 63 are twofold. The first is better optimizing existing space in the LACJ System to house such inmates, which involves: (1) relocating a sizeable number of MOH inmates to PDC-North; and (2) reclaiming quarantine space and space vacated by MOH inmates at TTCF for the HOH population.

The second is taking further steps to lessen, or at least stabilize, the level of care required of inmates in the HOH/MOH population by providing them with targeted

mental health treatment through expansion of the FIP Stepdown Program, the creation of a Psychiatric Urgent Care Unit in the LACJ, and the expansion of the MAT Program. Each of these new initiatives is discussed in detail below.

### (a)    Optimizing Existing Space

***Moving MOH Inmates to PDC-North.*** LASD and CHS have made a funding proposal that the County is set to act on at the end of June to relocate a significant number of MOH inmates to permanent housing located at PDC-North, with the anticipation that the large-scale movement of this more stable group of mentally-ill inmates to the more therapeutically-beneficial environment PDC-North provides, will create additional permanent housing at TTCF for HOH inmates who have the most severe mental health conditions and who require the more intensive mental health services TTCF provides.

Since June 2016, Defendants have housed approximately 320 MOH inmates at PDC-North. PDC-North has the capacity to house a total of approximately 1,280 MOH inmates. The LASD and CHS are proposing to transfer all of the MOH inmates who were displaced to MCJ as a result of the need to create quarantine space at TTCF, as well as some additional number of MOH inmates from TTCF, to PDC-North in order to make additional permanent housing space available for HOH inmates who are currently in the LACJ System and awaiting permanent housing.

The PDC-North facility is currently staffed as a "well facility," where the majority of inmates are healthy, and that facility does not currently have the significant mental and medical health services that would be required if there are a greater number of inmates with mental health issues moved to that facility. As a result, relocating a significant number of MOH inmates to the improved environment that PDC-North offers will require the renovation of a clinical space to ensure staff have a location to conduct necessary patient assessments and counseling; additional deputies will need to be hired and deployed to PDC-North to meet the security needs of this relocated group of inmates with mental health conditions; and new permanent staffing resources will need to be

allocated to PDC-North to address the nursing, medicine, and mental health needs that would accompany the larger size of the MOH population at that facility.  It is for these reasons that this proposal involves the commitment of a significant amount of funding that will have to be obtained in order move this plan forward.  And, as mentioned above, consideration of the request to fund this project is scheduled to take place at the end of June, just prior to the start of the County's next budget cycle.

Assuming the proposed relocation of MOH inmates to PDC-North moves forward, depending on its scope, it would free up some additional, permanent HOH space at TTCF for HOH inmates now located in temporary housing, and it would alleviate some of the pressures faced to ensure that newly-booked inmates with severe mental health issues and inmates who decompensate while in custody are treated quickly and in an appropriate setting.

***Reclaiming Quarantine Space.***  The availability of inmate housing in the LACJ System has been severely impacted over the last two years by COVID-19.  These impacts have most significantly affected the availability of MOH and HOH, as entire housing modules that formerly housed MOH inmates have been utilized over the past two years, and continue to be used today, as quarantine locations to mitigate COVID exposures and infections.  As a result, during the pandemic, as mentioned above, entire modules of MOH inmates were displaced from TTCF and moved to the MCJ.[24]  There are currently six pods at TTCF that are being utilized as quarantine space.  With the relocation of the MOH inmates who formerly occupied those pods to PDC-North, when these six pods are available (which admittedly is at an unknown date), they can be

---

[24]  In this status report, the DOJ references HOH inmates being housed at MCJ.  The only occasions when HOH inmates have been housed at MCJ have been situations where backlogs in the intake units have required HOH inmates to be housed at MCJ for no longer than 24 hours.  This is a rare occurrence the County is working to eliminate, and the LASD does not, as a matter of practice, house HOH inmates at MCJ.

utilized as HOH space to take in approximately one-third the number of the HOH

inmates currently waiting for permanent housing.

### (b)      Stabilizing the HOH/MOH Population

***FIP Stepdown.***  The FIP Stepdown Program, which began in TTCF Module 141

(pods E and F), has been serving acutely mentally ill inmates in a specialized dorm

setting for the past two years.  In FIP Stepdown, all cells are open during the day, and

inmates are free to engage in independent or community activities, or to participate in

group sessions.  It is the exception that an inmate is removed from the group setting and

returned to their cell.  This model, which has received strong support from the Monitors

in this case, was created to encourage a sense of community amongst an inmate

population recently discharged from FIP services and, in turn, to prevent isolation,

decompensation, and re-hospitalization among HOH inmates.

This program is resource intensive.  The pods utilized as part of this program must

be renovated to transform them into the dorm-like setting that is central to the program;

and staffing this program requires (1) twelve full-time psychiatric technicians to oversee

every six pods that are a part of the program; (2) two full-time Mental Health Clinician

Supervisors to oversee the program and the psychiatric technicians administering it; and

(3) one to two Mental Health Assistants (*i.e.*, inmates who live in the pod and who have

gone through significant education and training in order to assist with the daily

challenges faced by the inmates with mental health conditions who participate in the

program) for each pod.[25]

---

[25]  Additionally, a great deal of screening is required before inmates can be deemed
appropriate for such a program.  When considering whether an inmate should be placed
in FIP Stepdown, CHS currently considers (1) whether the patient's mental illness is
interfering with his daily functioning; (2) whether the patient has sporadic or consistent
medication compliance; (3) whether the patient is at a P3 or P2 level of care; (4) whether
the patient can be properly clothed; (5) whether the patient has any restrictions that do
not allow the patient to be placed with other inmates (K-10, G, B, or Y designations); (5)
whether the patient has a history of violence; (6) whether the inmate has been placed on

Despite the significant commitment of effort and resources involved, the FIP Stepdown Program has proven to be a successful model when it comes to stabilizing inmates with mental health conditions who participate in this program, and the expansion of this program is viewed as a means to better stabilize some portion of the LACJ's existing HOH population.  There are currently five pods of inmates with severe mental illness participating in the FIP Stepdown.  Defendants have set a goal of expanding that program by two pods every quarter until the program consists of 30 pods.  As each of these pods house an average of 23 inmates, this expansion is expected to accommodate the needs of as many as 690 inmates with severe mental illnesses.

***Psychiatric Urgent Care Unit.***  CHS is currently planning the creation of a new Psychiatric Urgent Care Unit that will provide additional bedspace for HOH inmates, allow for more rapid treatment of some of the LACJ System's more challenging inmates with severe mental health issues, and give CHS a space to conduct forced medications that can be used as one means to stabilize a segment of the HOH population and perhaps lower the level of care they need to the point where they do not require in-patient psychiatric care, or even HOH.

CHS currently operates a 44-bed LPS designated in-patient unit within the jail's larger Correctional Treatment Center (the "Mental Health Unit" or "MHU").  However, this facility does not include sufficient treatment space for the mental health population CHS serves.  The average length of stay in the MHU for the first three months of 2022 ranged from 14 to 20 days, and the waiting list to receive the services offered by the MHU currently consists of more than 100 individuals who have severe mental illnesses.

The newly-planned and proposed Psychiatric Urgent Care Unit would be in

the FIP waitlist, has had multiple prior FIP admissions, or has previously been discharged from the FIP Stepdown program; (7) whether the patient has had frequent prior movements between levels of care; (8) whether the patient is taking Clozaril medication; and (9) whether the patient is a member of, or cannot co-habitat with, a member of a fragile or vulnerable population.

operation 24 hours a day, 7 days a week, and would consist of a 48-bed unit staffed with
a minimum of 10 providers, one psychologist, four social workers, 15 nurses, and 25
other mental health personnel (with this latter group consisting primarily of psychiatric
technicians).  The vision for this unit is that it will function as an acute stabilization unit
that can be used to treat new P3 and P4 inmates within 24 hours of when they are booked
into custody to stabilize them before they are sent to the housing required for their level
of care.  As things currently stand at the LACJ, many new P3/P4 inmates who are newly-
booked into custody refuse medication, end up in HOH without having received
treatment that would stabilize their mental health issues, and then inevitably end up on
the waiting list for in-patient psychiatric care, leading to the large backlog for FIP
services, or at the very least HOH services, that currently exists.  The County believes
that, by providing mental health treatment to these new patients with acute mental health
issues early and stabilizing them through medication, that will reduce referrals to in-
patient psychiatric treatment and even the need for HOHfor some inmates.[26]

Before it can become operational, this proposed Psychiatric Urgent Care Unit
must be licensed by the State of California, and its cost will have to be approved by the
County CEO and the County Board of Supervisors.  Like the other new initiatives that
form the basis for the Implementation Plans for Provisions 63 and 64, the request to fund
this project will be considered by the County CEO and Board of Supervisors at the end
of June, near the start of the County's next budget cycle.  Assuming the administrative
and funding obstacles needed to approve this project can be overcome, it is expected that
the added bedspace and services this Psychiatric Urgent Care Unit would provide will

---

[26]  CHS estimates that the length of stay for inmates who enter the Psychiatric Urgent
Care Unit would be, on average, fewer than 72 hours, and, if an inmate requires longer
stabilization, the inmate will be admitted to FIP housing.  This way, the Psychiatric
Urgent Care Unit can service a larger number of inmates, which will increase the
likelihood of stabilizing more inmates who then will not require in-patient psychiatric
services, or perhaps even HOH.

help bring Defendants closer to compliance with Provision 63.

***Expansion of the MAT Program.***  During the last week of June, the County CEO and Board of Supervisors will also consider a proposal to significantly expand the LACJ's MAT Program to include up to 19 new positions and the use of injectable medication designed to treat substance abuse issues faced by LACJ inmates.  Since the LACJ currently treats substance abuse issues as mental health issues, and since substance abuse issues have a very high correlation with mental health issues in any event, the CHS and LASD believe that expanding the LACJ System's MAT services in the manner addressed below will have a significant impact on cutting the number of inmates in the LACJ System currently being treated for mental health problems, and this, in turn, will help lower the number of inmates who currently require MOH, and, to a lesser extent, HOH.

The MAT was first implemented in the LACJ System in Fiscal Year 2019-20 to ensure that inmates have access to treatment for opioid use disorders, and the initiation of this program has increased the number of inmates in the LACJ System who have access to the important components of any good drug treatment program, including substance abuse education, group and individual counseling, and community-based referrals upon release.

The LASD and CHS are proposing the expansion of the MAT to include the use of injectable medications that have proven to be an effective treatment for opioid dependence.  The County believes that a significant portion of inmates in the LACJ System with opioid use disorders could be effectively managed with Buprenorphine, which is a type of medication that, when combined with substance abuse disorder treatment services, has been shown to be effective in treating opioid withdrawal, improving patient survival, decreasing illicit opioid use, and increasing patients' ability to participate in counseling.

CHS and LASD's proposal to implement a long-acting injectable program for medication assisted treatment, if funded and approved, would involve several steps:

34

first, each inmate would face a five day induction period in which they take an oral form of the medication provided daily; second, at the conclusion of the five day induction period, the inmate would be subject to an evaluation by his or her provider; finally, every 30 days the inmate would receive a long-acting injectable medication, which provides sustained medicine levels of at least one month (as a opposed to the oral medication they took on a daily basis in the induction phase of the process).  The goal of this expanded version of the LACJ System's MAT services would be to provide long-acting, medication-based substance abuse treatment for up to 1,500 inmate-patients.

The cost of expanding the MAT services as proposed by CHS and LASD would be significant, close to $28 million alone for the injectable drugs that form the foundation of the program.  However, CHS and the LASD see significant benefits to this program, not only in terms of how a successful drug treatment program, such as the one they have proposed, will facilitate the treatment of inmates with mental health conditions that overlap with treatable substance abuse disorders, but also in terms of how this program can help to decrease the number of drug overdoses that inmates suffer upon being released from custody, to cut down the demand for illicit drugs smuggled into the LACJ System, and to improve overall inmate health care outcomes by addressing underlying drug dependency issues.

## 2.    Provision 64

Provision 64 requires the County and Monitor to directly evaluate available Mental Health Housing in the context of the sickest inmates in the system.  Specifically, it obligates the County and the Sheriff to craft short-term and long-term plans to reasonably ensure the availability of licensed inpatient mental health care for prisoners in the jails (referenced throughout this brief as "in-patient care" or "FIP services") and notes that such plans must describe "the projected capacity required," as well as the "strategies that will be used to obtain additional capacity if it is needed," and must "identify the resources necessary for implementation."

There are three key steps Defendants plan to take to improve compliance with Provision 64:  (1) create the 48-bed inpatient Psychiatric Urgent Care Unit referenced above; (2) expand the FIP Stepdown program over the next three years; and (3) expand the MAT program to include the use of long-lasting medications used to treat drug addictions which made it difficult or impossible to treat inmates with severe mental conditions.

Defendants believe these initiatives will provide better treatment for P4 inmates and other inmates who enter the LACJ with mental health issues and will move Defendants toward compliance with what Provision 64 requires by materially reducing the gap between available FIP services and the need for such services.  The new Psychiatric Urgent Care Unit can help accomplish the goal of reducing referrals for FIP services by stabilizing inmates with mental health issues when they first enter the LACJ System, through involuntary medication and other means, before they decompensate to the point where they require FIP services.  The expansion of the FIP Stepdown program will lessen the demand for FIP services by providing inmates exiting in-patient care with access to a program that helps to ensure they do not decompensate upon leaving in-patient care and need to return to a P4 level of care.  And lastly, with expansion of the MAT Program, and the early and effective drug treatment intervention that program is slated to provide, Defendants believe that they will be able to better combat the common situation where new inmates with untreated substance abuse and mental health disorders enter the jail, experience withdrawals and cravings that are not managed, engage in suicidal behaviors or seek to overdose on medications available in the jail, and ultimately require the type of in-patient care required under Provision 64.

Defendants believe that these programs, once approved and funded, are, at a minimum, concrete steps that can form the proper basis for a short-term plan to move toward compliance with Provision 64, while Defendants explore more long-term solutions to address the shortfall in in-patient treatment options that can form the basis for the five-year, long-term plan called for under this provision.

### 3.   Provision 80

Provision 80 instructs Defendants "to continue to make best efforts to provide appropriate out-of-cell time to all prisoners with serious mental illness."  Specifically, Provision 80 requires that 100% of the inmates in HOH be offered ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week.[27]

The primary long-term goal for moving closer toward sustained compliance with Provision 80 is to expand the FIP Stepdown Program, *see* discussion *supra*, to as many HOH inmates as possible.  In the meantime, there are also a number of short-term plans in motion for moving closer to compliance with this provision ,which are expected to be available to non-FIP Stepdown inmates and to continue long term while the County works to maximize participation in the FIP Stepdown Program.

#### (a)   Recreational Time

With respect to offering unstructured, out-of-cell recreational time, Defendants have made efforts to (1) ensure that sufficient offers of recreational time are being made, (2) maximize the number of inmates who actually accept those offers and participate, and (3) improve the accuracy of the tracking and documentation of these offers.

***Sufficient Offers.***  Custody staff are now required to offer recreational time to each HOH inmate twice per 8-hour AM and PM shift (excepting only the overnight shift).  Staff and supervisors are responsible for ensuring these offers are being made.  As an additional safeguard, as of March 2022, the Custody Watch Commander is

---

[27]  The DOJ suggests that this requirement may be less onerous than the Defendants suggest because five hours of this requirement can be fulfilled if the HOH inmates at issue participate in "work" or "education" programs.  This notion does not recognize the realities of how resource-intensive any out-of-cell time is with a population with the severity of mental illness HOH inmates have.  The simple fact is that there are not many meaningful work or education programs an HOH inmate can participate in that do not require a significant investment in staffing resources.

required to make a daily log entry addressing the offers made per HOH module, and identify and evaluate any shortcomings in time offered on a regular basis.

*Participation.*  Custody personnel are working to ensure that recreational time is not only offered, but also that HOH inmates actually accept the opportunity to leave their cells.  Custody has found that the most common reason inmates decline recreation time is the lack of variety of activities available to them.  Accordingly, Custody implemented two new types of programming at TTCF and CRDF, both of which are centered around well-established therapeutic modalities: animals and music.

The first, implemented in March 2022, uses the Pet Prescription Team Therapy Dog Program—a nonprofit organization that provides therapeutic animal visits to hospitals, nursing homes, rehabilitation facilities, and detention facilities. The Therapy Dog Program now visits the HOH modules at TTCF and CRDF on a weekly basis, and targets the HOH inmates with the lowest recreation time participation percentage during the prior week.  Inmate reception to the Therapy Dog Program has been very positive, for instance, one HOH module at CRDF increased the number of inmates who actually participated in 10 hours or more of recreational time from 33% to 58%.

The second, also implemented in March 2022, provides inmates access to music. Custody purchased 13 new boombox/CD players, and delivered 8 to TTCF and 5 to CRDF.  Now, per inmate request, Custody can put on music of the inmate's choosing to listen to in a given pod or even outside.

*Tracking.*  Custody uses iPods to document offers of recreational time and inmate participation.  These ultimately feed data into the electronic-Uniform Daily Activity Log ("e-UDAL") system.  There are generally 1-3 iPods available in each HOH module, through which individual Custody staff can document in real time.  When issues with the iPods arise (*e.g.*, poor Wi-Fi connection, short battery life, and delayed repairs—none of which are infrequent), custody staff instead will enter the relevant information directly into the e-UDAL (accessed through a computer).  All reports regarding Provision 80 are generated from the e-UDAL.

There have been two central issues affecting the accurate tracking of recreational time offered and inmate participation—the first is a technological error within the e-UDAL and the second appears to be poor communication.

First, in February 2022, command-level staff met to discuss the challenges concerning accurate tracking of recreational time offered and inmate participation in a series of meetings at TTCF and CRDF.  It was determined that the e-UDAL was erroneously pulling data from an entire module, even if some pods within that module were being used as non-HOH housing.  The denominator used to calculate compliance, therefore, included an overly broad population count, which caused an inaccurate calculation.  The Correctional Innovative Technologies Unit ("CITU") adjusted the e-UDAL algorithm such that specific pods may be selected when a report is generated to ensure an accurate calculation.

Second, Custody believes that certain staff may have been labeling HOH inmates who refused to participate in recreational time as "hostile" or "uncooperative," when in fact the inmates simply were not interested in recreational time.  As noted above, and below, Custody is in the process of adding activity programming in order to incentivize and increase actual participation time among the HOH population.

### (b)     Therapeutic Time

With respect to offering structured, out-of-cell therapeutic time ("therapeutic time"), significant barriers remain, including consistently high average monthly censuses over the past five years, inadequate custody and CHS staffing, and infrastructure limitations.  CHS has focused its compliance efforts by (1) improving the approach for offering therapeutic time; (2) incorporating incentives to participate in therapeutic time; (3) restructuring the duties of current CHS staff to accommodate additional group therapy sessions ("Group" or "Groups"); (4) obtaining outside providers to run group therapy sessions; (5) improving the accuracy of the tracking and documentation of offers participation; and (6) continuing to provide weekly, individualized inmate assessments.

***Sufficient Offers.***  Custody is in charge of offering Group to the inmates, as well as "pulling" the inmates who would like to participate from their cells.  Historically, custody has pulled from either the lower or upper tier within a pod—never both.  As there are generally only 8 inmates in a given tier (and 16 in a given pod), the custody officer would have had to obtain 100% participation from the tier to fill a Group with space for 8 inmates.  The result was that only 2-3 inmates would participate in most Group sessions.  Worse, only 8 inmates per Group session taking place were even being offered therapeutic time, thereby missing an opportunity to significantly improve compliance with Provision 80.

Under a revised approach, that is now being implemented, Custody must start the process of "pulling" from both the upper and lower tiers within the pod, and must inform the supervisor, then the Mental Health Program Manager, and the Sergeant to assist until the Group reaches 8 participants.  Only after the Sergeant is unable to maximize participation may the Group proceed with fewer than 8 inmates.

***Incentives.***  Defendants are also planning to use incentives that are available to it to encourage HOH patients to participate in out-of-cell time that is offered to them.  For instance, inmates have indicated that they enjoy coloring and similar activities during Group sessions.  Such items, therefore, are frequently provided to HOH areas that are intended to be used as tools to encourage HOH patients to participate in out-of-cell time.  The LASD also has historically used food incentives (*e.g.*, cookies or snacks) to coax HOH patients out of their cells.

***CHS Staff.***  In order to provide additional Groups in the face of a Group provider shortage, as well as the apparent issues with attracting candidates for the positions that are available, the County has sought to expand the responsibility for leading Groups to staff other than Group providers, such as clinicians.  At present, the clinician's job description includes doing intake assessments, weekly individual assessments of HOH and MOH inmates, handling crisis calls, and doing follow ups of those crises.  The

County hopes to require clinicians to take on leading Groups in addition to their other duties.

As part of this effort, the County would assign clinicians to a particular module and would assign their caseload based on that location.  The hope is that, by developing familiarity and expertise with respect to a particular population, the clinician can offer more tailored individual and group treatments based on the inmate's individuals needs and treatment plan.  The clinician would have the autonomy to determine the frequency of individual and Group session based on case conceptualization and treatment plan.

The County plans to develop a schedule of clinician-led Groups, and will being having clinicians attend ongoing Groups with supervisors and managers by June 1, 2022.  Clinician-led groups would then begin by June 15, 2022.

*Outside Providers.*  CHS has also begun discussions with outside providers to supplement the structured therapeutic time available to inmates.  This process is a slow one, however, because it requires significant due diligence and screening for both provider competency and security risks.

*Tracking.*  Presently, CHS manually tracks the data for Provision 80 by having Group providers use tank sheets to note offers, refusals, and participation, which contributes to assessment numbers that CHS believes under-count Group time offered.  In June 2022, CHS will be transitioning all of its documentation to an electronic records program called "Orchid."  Orchid will facilitate the documentation of both offers of and participation in therapeutic time, and will even permit a provider to write a Group note that automatically populates in the chart of each inmate who participated.  The hope is that this new system will vastly increase Defendants' ability to comply with Provision 80 and to accurately document that compliance.

*Weekly Assessments.*  CHS reports that all HOH inmates have been consistently receiving their weekly individual session with one of the clinicians.  As the documentation improves, for instance when Orchid launches, CHS believes that this

information will be better tracked and will contribute to Defendants' compliance with
Provision 80 as well.

### D.     The Defendants' Suggested Path Forward

No one would dispute that the issues posed by Provisions 63, 64, and 80 are
difficult, and it would be naïve of anyone to believe these issues can be properly
addressed on the two-year timeline suggested by the DOJ, given their magnitude.  With
this in mind, as well as the Court's caution against providing "aspirational" plans, the
Implementation Plans offered by Defendants with regard to Provisions 63, 64, and 80
offer significant, concrete, and practical steps Defendants can take in the short-term that
not only will move Defendants closer to compliance with these provisions, but will also
result in better outcomes for the mentally-ill inmates who are the subject of this action.

In order to reach workable, practical solutions to the problems posed by these
provisions, Defendants suggest that these specific plans should be considered iterative in
nature, with Defendants being required to update these plans every three months to
include a report on progress achieved with regard to the steps identified in the previous
plan, new solutions that have been devised to move Defendants toward compliance
under these plans, and the types of clearer timelines and benchmarks that the DOJ
complains are lacking in the current plans.  Defendants submit that this approach, rather
than mandating that Defendants immediately create new plans for these provisions that
incorporate non-concrete, aspirational aspects that will not necessarily lead to reliable
solutions, will best position Defendants to ultimately achieve substantial compliance
with these provisions of the Settlement Agreement on the fastest timeline possible.

## IV.     Monitor's Position

### A.     Introduction

Over the past several months, the County has worked diligently in collaboration
with the United States and the Monitor to craft implementation plans that effectively
chart a path for it to achieve substantial compliance with the majority of the outstanding
provisions in the agreement.  The relative success of the process is a credit to the parties,

and to the Court, whose direction and guidance has prompted the level of focused attention necessary to make this progress to date. Yet, several of the implementation plans remain in dispute for the reasons set forth above. As the Court-appointed monitor in this case, I conduct frequent site visits within the jails, regularly assess data regarding the County's compliance, and rely upon the expertise of the Court-appointed Subject Matter Experts in this case. With the benefit of this information, I share below my perspective on the disputed issues.

### B. The County's Plans for Provisions 63 and 64 are not yet Sufficient

Provision 63 and 64 are two of the most challenging provisions remaining in the Agreement. The County has proposed implementation plans that involve making programmatic, staffing, and operational changes that are likely to improve the County's compliance with these provisions. Yet, the specific impacts are unknown, and many of the proposed changes are contingent upon achieving funding and approvals that have not yet been secured. As such, the County's plans do not yet provide sufficient assurance that the County will be able timely achieve substantial compliance with these provisions.

#### 1. Provision 63

The County rightly notes that the potential investments it hopes to make in connection with the plan for provision 63 are substantial. Yet funding and approvals for several of these programs have not yet been secured. Moreover, the County has not yet projected how these new investments, *if* approved, will specifically relieve pressure within the HOH housing that is covered by provision 63. Given the scarcity of housing for HOH inmates at present, and the length of time that many such patients are waiting for suitable housing—often while in crisis—having specific projections about the impacts of these new programs to relieve pressure within HOH housing is essential. Moreover, the County has previously relied upon its nascent efforts to depopulate the jails in connection with its attempts to achieve substantial compliance in this case. Indeed, nearly a third of its original implementation plan for provision 63 constituted descriptions of these efforts, which were included, presumably, because they were

43

viewed as relevant to the County's efforts to comply with provision 63.  The County has now indicated that these efforts are, instead, not necessary for it to comply with provision 63.  If this is accurate, it is even more important that the County quantify how the programmatic and operational changes it proposes will specifically reduce pressure within HOH housing.

### 2. Provision 64

Provision 64 requires the County to provide sufficient inpatient mental health care for the prisoners who need it.  As such, assessing the County's compliance involves comparing the number of patients who require inpatient care, or P4 patients, against the number of inpatient beds that are available.  At present, there are 180 P4 patients and only 34 available inpatient beds.  Achieving substantial compliance will require the County to either reduce the number of P4 patients or to expand the number of beds available to treat them.

The County's plan proposes three key initiatives that the County believes will help it to reduce the number of P4 patients.  But several of these programs are not yet funded or approved.  Moreover, the County's arguments about how they will reduce the number of P4 patients are theoretical, somewhat speculative, and not tied to specific, numerical projections about how they will reduce demand for inpatient housing, and in what amounts.  Moreover, the County's plan focuses exclusively on reducing demand and does not explore any alternatives for expanding capacity.

### C. The Plan for Provision 80 does not Adequately Explain how the County will Provide Sufficient Structured Therapeutic Time to Prisoners in HOH Housing

Provision 80 requires the County to provide 10 hours a week of structured therapeutic time to prisoners in HOH housing.  The County has proposed various programmatic and operational changes that will aid it in achieving substantial compliance.  Yet, the County has recognized that even if these initiatives are successfully implemented, it will be unable to provide the required amount of group

programming.  As such, the County seeks to tailor the amount of structured therapeutic programming for HOH patients based upon "individual patient needs rather than a one-size-fits-all approach."  Presumably, this would mean offering less than 10 hours a week to some as-yet-unknown number of HOH patients.  The County has suggested that this would be a "sound foundation for both improved quality of care and improved compliance."  The United States disagrees.  So do I.

### 1.    10 hours is a Minimum Standard for this Population

In correctional mental health literature, a substantial body of research supports the efficacy of group therapy as a treatment for people with serious mental illness.  The benefits of such programming are manifold, and to achieve them, such programming must be regular and repeated.  As the literature makes clear, programming for inmates with serious mental illness "should include an additional 10 hours of out-of-cell structured therapeutic programming per week for each inmate."   *See* Kenneth L. Applebaum and Jeffrey L. Metzner, *Levels of Care*, Oxford Textbook of Correctional Psychiatry, (2015).  Of course, some inmates with serious mental illness are unable to participate in group programming because of the severity of their illness, or because they are a danger to themselves or others.  But such patients are a limited exception, they are not the rule.

Dr. Nicole Johnson is the Court-appointed Mental Health Subject Matter Expert in this case.  I have consulted with Dr. Johnson, who has made clear that 10 hours of structured therapeutic programming should be the minimum amount offered to this population, as the agreement requires.  While divergence from that expectation might be clinically appropriate in a limited number of cases, they are, again, the exception.  The County should therefore not rely upon a reduction in the amount of group programming expected as a key component of its plan to achieve compliance with provision 80.

### D.    Benchmarks, Timelines, and Iterative Implementation Plans

The United States asks that the County be required to revise its implementation plans for provisions 63, 64, and 80 after the upcoming status conference with "concrete

timelines and benchmarks" to enable more effective measurement of the County's progress at achieving substantial compliance within two years.  The County has suggested that its plans for provisions 63, 64, and 80 should be "iterative" in nature, to be updated every three months, as more information becomes available to it.

I believe that both requests are reasonable.  The County notes that many of the programs that are discussed in this filing have been "calendared for consideration and budgeting that will take place during the last week of June."  As such, after that date, the County should know whether or not the programs have been funded, in what amounts, and it will be in a better position to provide the information sought by the United States.  I respectfully recommend that the County be required to include that information, to the extent possible, in revised plans to be produced in the month of July 2022.  I also respectfully recommend that the County be permitted to update its plans for these provisions every three months, as it requests, which will enable an ongoing dialogue among the parties and the Monitoring Team about the County's pace and progress towards substantial compliance with these important provisions.  Future opportunities to confer with the Court about the County's progress at executing the plans, once they are

//
//
//
//
//
//
//
//
//
//
//
//

finalized, will also help to ensure the parties' continued focus and progress at meeting the agreement's goals.

Respectfully submitted,

Dated: May 13, 2022                  FOR THE UNITED STATES:

TRACY L. WILKISON                    KRISTEN CLARKE
United States Attorney               Assistant Attorney General
Central District of California       Civil Rights Division

DAVID M. HARRIS                      STEVEN H. ROSENBAUM
Assistant United States Attorney     Chief, Special Litigation Section
Chief, Civil Division                Civil Rights Division

/s/ Karen P. Ruckert                 MAURA KLUGMAN
KAREN P. RUCKERT                     Deputy Chief, Special Litigation Section
Assistant United States Attorney     Civil Rights Division
Chief, Civil Rights Section, Civil Division

                                     /s/ Luis E. Saucedo
/s/ Matthew Nickell                  LUIS E. SAUCEDO
MATTHEW NICKELL*                     Trial Attorney, Special Litigation Section
Assistant United States Attorney     Civil Rights Division
Civil Rights Section, Civil Division

                                     /s/ Maggie Filler
                                     MAGGIE FILLER
                                     Trial Attorney, Special Litigation Section
                                     Civil Rights Division

                                     *Attorneys for the United States of America*

Dated: May 13, 2022                  FOR DEFENDANTS:


                                     /s/ Robert Dugdale
                                     ROBERT DUGDALE
                                     Kendall Brill & Kelly LLP


                                     *Attorneys for the County of
                                     Los Angeles and Los Angeles
                                     County Sheriff*

* I hereby attest that all signatories listed, and on whose behalf this filing is submitted, concur in this filing's content and have authorized its filing.

47