James R. Touchstone, Esq., SBN 184584
jrt@jones-mayer.com
Krista MacNevin Jee, Esq., SBN 198650
kmj@jones-mayer.com
Richard Lucero, Esq., SBN 207011
JONES MAYER
3777 N. Harbor Blvd.
Fullerton, California 92835
Telephone: (714) 446-1400
Facsimile: (714) 446-1448

Attorneys for Sheriff Alex Villanueva

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF LOS ANGELES, et al.;<br><br>Defendants. | Case No. 2:15-cv-5903-DDP-JEM<br><br>*Hon. Dean D. Pregerson*<br><br>**MOTION FOR DECLARATION OF CONFLICT BETWEEN COUNTY OF LOS ANGELES AND LOS ANGELES COUNTY SHERIFF AND FOR AN ORDER APPOINTING CONFLICT COUNSEL**<br><br>DATE: October 3, 2022<br>TIME: 10:00 a.m.<br>CTRM: 9C |

TO THE COURT, PLAINTIFF, OTHER DEFENDANTS, AND THEIR

COUNSEL OF RECORD:

NOTICE IS HEREBY GIVEN that on October 3, 2022, at 10:00 a.m., or as

soon thereafter as the matter may be heard in Courtroom 9C of the above-entitled

Court, located at 350 West 1st Street, Los Angeles, California 90012, 9th Floor,

Defendant Los Angeles County Sheriff Alex Villanueva ("Villanueva" or the

"Sheriff") will and hereby does move the Court for a declaration of a conflict of

interest between himself and Defendant County of Los Angeles, and an order

- 1 -

1  appointing separate counsel, on the ground that Defendants are currently

2  represented by the same legal counsel in this matter, but the conflict of interest in

3  this matter faced by Defendants no longer permits such joint representation.  Such

4  joint legal representation is currently provided by Special Counsel in the above-

5  captioned matter, Robert Dugdale of Kendall Brill & Kelly LLP, as well as the

6  County Counsel's Office.  Thus, Sheriff Villanueva requests from this Court a

7  declaration of such conflict of interest between himself and the County in this

8  matter, and issue an order appointing separate legal counsel for him in this matter.

9

10   Dated: September 1, 2022                    Respectfully Submitted,

11                                              JONES MAYER

12

13                                              By:s/Krista MacNevin Jee

14                                                 James R. Touchstone,
                                                   Krista MacNevin Jee and
15                                                 Richard Lucero,
                                                   Attorneys for Sheriff Alex Villanueva
16

17

18

19

20

21

22

23

24

25

26

27

28

MOTION FOR DECLARATION OF CONFLICT BETWEEN COUNTY AND SHERIFF AND FOR AN ORDER
APPOINTING CONFLICT COUNSEL

1
2

# **TABLE OF CONTENTS**

3
4

MEMORANDUM OF POINTS AND AUTHORITIES ............................................ 6

5

I.      BACKGROUND STATEMENT OF FACTS ................................................ 6

6
7

    A.      Developmental Events and Recent Communications from
the Sheriff to the County Board of Supervisors ..................................... 6

8

    B.      May Hearing ........................................................................................ 14

9
10
11

II.     THIS COURT MAY DECLARE A CONFLICT
OF COUNSEL, AND MUST DO SO HERE
UNDER THE CIRCUMSTANCES. ............................................................. 16

12
13

    A.      Conflict and Disqualification ................................................................ 16

14

    B.      Next Steps ............................................................................................ 24

15

    C.      Board of Supervisors Vote and Materials ............................................ 28

16

    D.      Community Constituents ....................................................................... 28

17
18
19
20
21
22
23
24
25
26
27
28

MOTION FOR DECLARATION OF CONFLICT BETWEEN COUNTY AND SHERIFF AND FOR AN ORDER
APPOINTING CONFLICT COUNSEL

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Caruth v. Pinkney*,
   683 F.2d 1044 (7th Cir. 1982) ................................................................ 23

*Cookish v. Cunningham*,
   787 F.2d 1 (1st Cir. 1986) .................................................................... 22

*In re County of Los Angeles*,
   223 F.3d 990 (9th Cir. 2000) .......................................................... 16, 20

*EpicentRx v. Carter*,
   2021 U.S. Dist. LEXIS 187275 (S.D. Cal. 2021) ....................... 16, 17

*Hitachi, Ltd v. Tatung Co.*,
   419 F.Supp.2d 1158 (N.D. Cal. 2006) ............................................... 16

*In re Martin-Trigona*,
   737 F.2d 1254 (2d Cir. 1984) ....................................................... 22, 23

*Mickens v. Taylor*,
   535 U.S. 162 (2002) ............................................................................. 22

*Nichols Inst. Diag. v. Scantibodies Clinical Lab.*,
   2002 U.S. Dist. LEXIS 28406 (S.D. Cal. 2002) ......................... 26, 27

*Perillo v. Johnson*,
   205 F.3d 775 (5th Cir. 2000) .............................................................. 22

*Trone v. Smith*,
   621 F.2d 994 (9th Cir. 1980) .............................................................. 21

**State Cases**

*Board of Supervisors v. Superior Court*,
   33 Cal.App.4th 1724 (1995) .......................................................... 23, 24

*Brandt v. Board of Supervisors*,
   84 Cal. App. 3d 598 (1978) ................................................................ 19

MOTION FOR DECLARATION OF CONFLICT BETWEEN COUNTY AND SHERIFF AND FOR AN ORDER
APPOINTING CONFLICT COUNSEL

*Collins v. State of Cal.*,
   121 Cal. App. 4th 1112 (2004)...................................................................17

*County of Los Angeles v. Superior Court*,
   68 Cal. App. 4th 1166 (1998)...................................................................19

*People ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys.*,
   20 Cal. 4th 1135 (1999)...........................................................................17

*Flatt v. Superior Court*,
   9 Cal. 4th 275 (1994)...............................................................................22

*Hicks v. Board of Supervisors*,
   69 Cal. App. 3d 228 (1977).................................................................19, 20

*Klemm v. Superior Court*,
   75 Cal. App. 3d 893 (1977).......................................................................17

*La Jolla Cove Motel & Hotel Apartments, Inc. v. Superior Court*,
   121 Cal. App. 4th 773 (2004)...................................................................17

*People v. Langdon*,
   54 Cal. App. 3d 384 (1976).......................................................................19

*People v. Superior Court (Greer)*,
   19 Cal.3d 255 (1977)..........................................................................17, 23

*Scott v. Common Council*,
   44 Cal. App. 4th 684 (1996)......................................................................20

*Strong v. Sutter County Bd. of Supervisors*,
   188 Cal. App. 4th 482 (2010)...................................................................18

*In re Zamer G.*,
   153 Cal. App. 4th 1253 (2007)..................................................................22

**Federal Statutes**

28 U.S.C. § 1915........................................................................................23

**State Statutes**

Cal. Civ. Proc. Code § 128 (a)....................................................................17

Cal. Govt. Code § 995 ...............................................................................18

Cal. Govt. Code § 31000.6 (a) ........................................................................ 26

Cal. Govt. Code § 31000.6 (c), (e) ................................................................ 26

Cal. Gov. Code, § 29602 ............................................................................... 19

Cal. Pen. Code, § 4015 ................................................................................. 19

**Rules**

Rule 1.3 ........................................................................................................ 18

Rule 1.7 ........................................................................................................ 18

Rule 1.13 (a) ................................................................................................. 18

Rule 1.13 (g) ................................................................................................. 18

**Constitutional Provisions**

U.S. Const., 6th Amendment ........................................................................ 22

**Other Authorities**

80 Cal. Op. Atty. Gen. 127 (1997) ....................................................... 18, 19, 20, 21

MOTION FOR DECLARATION OF CONFLICT BETWEEN COUNTY AND SHERIFF AND FOR AN ORDER
APPOINTING CONFLICT COUNSEL

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.   BACKGROUND STATEMENT OF FACTS

*A.   Developmental Events and Recent Communications from the Sheriff to the County Board of Supervisors*

In August of 2015, the United States Department of Justice, the County of Los Angeles, and former Sheriff Jim McDonnell, in his official capacity as predecessor to Sheriff Villanueva, entered into a Joint Settlement Agreement regarding the Los Angeles County Jails in the above-captioned matter.  The Agreement built upon previous measures and was directed toward improving the care, treatment and protection of people who were in, or would be in, the County/Sheriff's custody and who suffered from mental illness.  *See* Joint Settlement Agreement Regarding the Los Angeles County Jails, filed August 5, 2015 [Docket No. 4-1] ("Agreement").

The Agreement recognized that "the United States acknowledges that some of the needed changes the County and the Sheriff seek to implement through this Agreement will require the allocation of additional resources to the Sheriff's Department and the Los Angeles County Department of Mental Health ("DMH")." *Id.* at 3.  The Agreement affirms that "[t]he Sheriff is an elected official who is responsible for operating and exercising authority over the Jails." *Id.* at 4.  It also dictated that "[t]he County and the Sheriff will ensure there are sufficient custodial, medical, and mental health staff at the Jails to fulfill the terms of this Agreement." *Id.*  at 26.  As it relates to specialized housing inventory, the settlement instructed that "[t]he County and the Sheriff will maintain adequate High Observation Housing and Moderate Observation Housing sufficient to meet the needs of the jail population with mental illness, as assessed by the County and the Sheriff on an ongoing basis." *Id.* at 32.  The County and the Sheriff also must each "ensure that all of the terms in this Agreement are implemented." *Id.* at 53.

1    Further, the Agreement provides that this "Court shall retain jurisdiction over

2  the implementation of this Agreement at the existing Jails or any other facility used

3  to replace or supplement the Jails for all purposes." *Id*.  In fact, this Court has, and

4  may continue, to retain and exercise jurisdiction in order "[t]o ensure that the

5  substantive provisions of this Agreement are implemented in accordance with the

6  terms of this Agreement," until "the County and the Sheriff have achieved and

7  maintained Substantial Compliance with each and every substantive provision of

8  this Agreement for a period of twelve (12) consecutive months" or "the Monitor,

9  with Court approval, determines that the overall objectives and goals of this

10  Agreement have been met." *Id*. at 54.  The United States has reserved the right to

11  enforce the Joint Settlement if the County or the Sheriff fail to substantially comply

12  with their obligations under the Agreement.  *Id*.  The parties may also stipulate to a

13  modification of the Agreement, or seek Court modification "if that Party establishes

14  by a preponderance of the evidence that a significant change in the law or factual

15  conditions warrant the modification and that the proposed modification is suitably

16  tailored to the changed circumstances."  *Id*. at 55.

17    Many of the obligations of the Agreement are held jointly between the

18  County and the Sheriff.  However, the County's Board of Supervisors has

19  increasingly -- especially in the last year or two, sought to utilize its budgetary

20  authority over the Sheriff in a very damaging manner consistent with the apparent

21  purpose of impairing the Sheriff's capacity to comply with his independent

22  obligations under the terms of the Agreement.  The consequence has been to

23  damage the Sheriff's ability to exercise penological and custodial authority over the

24  inmates within the County's custody in the jail facilities that the Sheriff manages to

25  the direct detriment of the Sheriff's ability to comply with his obligations under the

26  Agreement.

27    One recent, critical Board action particularly obstructs the Sheriff's ability to

28  comply with the Agreement.  Over the Sheriff's strenuous objections, the County's

1  Board of Supervisors made the sole determination to cancel planned construction of

2  the Consolidated Correctional Treatment Facility.  This capital investment had been

3  slated to become part of the Los Angeles County detention infrastructure, and

4  represented a distinct path forward in satisfaction of specific obligations of the

5  Agreement.

6        The design of the facility included in-house community mental health

7  providers in order to improve inmate care coordination and functional integration of

8  mental health services.  The configuration also incorporated a Reception Center

9  intended to provide mental health care starting from the moment of inmate/patient

10  arrival.

11        It is difficult to articulate within the confines of a legal brief the real-world

12  harm emanating from the County Board's decision to cancel construction in 2019.

13  The decision was and is catastrophic to the Sheriff's ability to comply with distinct

14  settlement obligations relating to the Sheriff's care of inmates' mental health.  The

15  decision also came after the County had already expended $80 million in design

16  costs.  *See https://file.lacounty.gov/SDSInter/bos/sop/1060123_ 081319.pdf.*

17        Moreover, the County Board's inexplicable decision to cut 1280 budgeted

18  positions from the Sheriff's Department is another key action contributing to the

19  Sheriff's adverse position with respect to the Board regarding implementation of

20  the terms of the Agreement.  The majority of these positions – 1024, were from the

21  Sheriff's Custody Operations -- the area of the Department tasked with caring for

22  inmates with mental health needs and therefore responsible for compliance of the

23  Sheriff's obligations under the Agreement.  *See* Letter from Sheriff Alex

24  Villanueva to the Honorable Board of Supervisors, "Los Angeles County Sheriff's

25  Department Notification of Negative Impacts to Custody Division Operations Due

26  to Staffing Reductions Proposed By the Chief Executive Officer," October 13,

27  2020, a true and correct copy of which is attached hereto as Exhibit A.

28        The Board has also perpetuated an absolute hiring freeze on the Sheriff's

MOTION FOR DECLARATION OF CONFLICT BETWEEN COUNTY AND SHERIFF AND FOR AN ORDER
APPOINTING CONFLICT COUNSEL

Department, which has not been continued County-wide, but has instead been

singularly maintained against *only* the Sheriff's Department.  *See* Letter from Chief

Executive Officer Fesia A. Davenport to Sheriff Alex Villanueva, "Los Angeles

County Sheriff's Department (LASD) Hiring Freeze and Purchasing Controls,"

October 4, 2021, a true and correct copy of which is attached hereto as Exhibit B.

This targeted hiring freeze has damaged the Department's ability to sustain even

reduced levels of staffing, particularly in the area of custody operations and has

damaged the Sheriff's ability to comply with his obligations under the Agreement.

The loss of the mental health facility foreclosed what had been a strategic approach

to achieving compliance.  This has been compounded by the reduction of

employment positions and the barriers to essential hiring.  These purposeful steps

by the Board have altogether left the Sheriff's Department understaffed and without

any realistic resources to achieve any minimal level of agreement compliance on a

long-term basis.

Similarly, the Board has continued a practice of embedding costs of

Workers' Compensation, Retiree Healthcare, and other benefits compensation

within fiscal appropriations for essential positions.  The Department's required

funding of these rising costs means it is now required to hold an estimated 1670

positions vacant.[1]  Although these positions remain in the Department's budget, and

thus appear to be fully funded positions, they are a sham because the positions

cannot be filled and cannot realistically be utilized to ensure the Department's

compliance with the terms of the Agreement, further degrading the Department's

actual capacity to respond to the needs dictated by the Agreement.  Concealing

these costs also misleads the community about the true number of personnel the

Board is actually providing to the Department.

Acting through the Offices of the County Counsel and Chief Executive, the

---

[1]  This estimate is based on a cost of $357.4 million and an estimated total expense per deputy of
$214,000.00

Board has also constrained the ability of the Sheriff to move budgeted and fully appropriated positions <u>within</u> the Department.  Specifically, the Sheriff has not been permitted to dictate the actual scope of work of his own budgeted employees, and has been procedurally constrained from allocating budgeted positions to certain operations, as needed by the Department, including to cover critical custodial facilities and operations.  These actions to constrain the Sheriff's use of his own Departmental staff has further impeded the Sheriff's ability to successfully or meaningfully comply with his obligations for jail management under the Agreement.

The specific impact of these combined actions has been to impair the ability of the Sheriff to weigh respective needs such as those existing within Custody Operations and prioritize where limited levels of staffing are optimally deployed. The consequences of what is taking place are real for line level personnel diligently serving the Los Angeles community, including excessive duty hours and number of shifts, fatigue, heightened risk of injury or illness, and damage to morale, as well as specifically complicating the Sheriff's inability to comply with the dictates of the Agreement.

The final key Board action blocking the Sheriff from complying with the Agreement in a consistent and long-term fashion is the Board's premature decision to simply close the Men's Central Jail ("MCJ").  Specifically, in March of 2021, the Men's Central Jail Closure Workgroup completed its final report, including Community Plan Recommendation No. 1, which was to expand existing residential programs by 4000 beds.  *See Men's Central Jail Closure Plan: Achieving A Care First Vision*, Los Angeles County Men's Central Jail Closure Workgroup, Final Report, March 30, 2021, at 9, a true and correct copy of which is attached hereto, as Exhibit C.  On June 22, 2021, the Board approved a motion to depopulate and demolish MCJ accompanied by a finding it was unnecessary to build any new County jail or custody facility in its place.  *See http://file.lacounty.gov/*

*SDSInter/bos /supdocs/159456.pdf*, a true and correct copy of which is attached hereto as Exhibit D.

The JFA Institute had been contracted to conduct a comprehensive study of the jail system prior to the Board's decision, which resulted in a written final report of JFA's findings.  When this report was transmitted to the Board, it had included a memorandum from the Chief Executive Officer ("CEO"), summarizing the report's findings and key problems that had been found.  The CEO's memo included the general conclusion that MCJ could be closed *only* if there was *also* construction of a new mental health facility, or some substantial renovation and update of existing facilities.  In other words, MCJ could not simply be closed – precisely contrary to what the Board actually decided to do prior to formal communication of the study results.

The memorandum had acknowledged that "MCJ provides the jail systems' majority of single cells for high-security inmates," and that, without appropriate management, "[t]ransferring these MCJ populations to other facilities will have a cascading impact as one jail population displaces another."  Letter from Chief Executive Officer Fesia A. Davenport, "JFA Institute Report on Covid-19 and Reduced Jail Population Cost Savings Estimate, Men's Central Jail Closure Fiscal Analysis, and Closure Population Projections (Item No. 2, Agenda of June 9, 2020 and Item No. 3, Agenda of July 7, 2020)," at p. 3, a true and correct copy of which is attached hereto, as Exhibit E.

The JFA report itself warned the Board that "the closure of MCJ will reduce the available single and double cells and specialized housing units which will significantly impact the safety, security, and service delivery to the people who remain inside the smaller jail system."  *See* "Estimated Cost Savings from a Reduced Jail Population and Closure of Men's Central Jail and Jail Population Projections," Final Report, JFA Institute, September 2021, p. 4.  Further, the report found that "[d]isplacing the mental health populations [from MCJ] to any other jail facilities

*would be incompatible* with the DOJ consent decree on services to the mentally ill
and would place the County at risk for additional litigation and penalties.  Otherwise,
the County would need to build a new dedicated mental health facility, which is
recommended, to meet the mandates of the DOJ consent decree."  *Id.* at pp. 13-14
(emphasis added).

 After the Board's decision to close MCJ, the Sheriff wrote a letter to the Board
of Supervisors, dated December 17, 2021, a true and correct copy of which is attached
hereto as Exhibit F.  This letter described the then-existing, and now continuing,
conflict of interest between the Sheriff and the Board from joint legal representation
in this matter, and the Sheriff's need for separate counsel.  He stated his unequivocal
judgment that the County would not be able to attain compliance with the Agreement
if the closure moved forward as approved, but without either construction of a
modern mental health facility or substantial improvement of existing locations
(which also is not planned), as dictated by the JFA Report.  The letter expressed clear
support for community-based care, but also cautioned that dependence on these
strategies as an immediate form of jail population reduction was not founded on
practical reality and did not provide a basis for closure of MCJ, without *first*
addressing the needs of the populations directly and imminently to be affected.  The
Sheriff emphasized the importance of considering community safety as part of this
dispute.  The County denied the Sheriff separate counsel in response to this request.

 The Sheriff sent another letter, addressed to the County Counsel, dated
January 31, 2022, a true copy of which is attached hereto as Exhibit G.  In this letter
the Sheriff again restated the importance of separate legal representation and his
disagreement with the Board's actions and the manner in which the Board and the
Sheriff should or could each successfully comply with the terms of the Agreement.
He noted the potential that he might have to testify in this action against the
compliance plan being proposed by the attorney that was jointly representing him
and the Board,  recognizing it was directly contrary to the manner in which the

Sheriff knew substantial compliance could actually be achieved.  County Counsel also denied this request for separate counsel.

Thereafter, agency-level communication took place regarding a possible meeting between the Board and a member of the Executive Command Staff from the Sheriff's Department, regarding potential development of a comprehensive resolution of the above issues and conflicts of interest.  In preparation for the anticipated meeting, Sheriff's Department staff prepared draft materials for a presentation to the Board.  However, despite the Sheriff's desire to proceed, the meeting never took place.

Following the May 20, 2022 hearing with the Court, discussed below, the Sheriff submitted a third letter to County Counsel, expressing disagreement with what was presented at the hearing, a true and correct copy of this letter is attached hereto and incorporated herein as Exhibit H.  Specifically, the letter stated the Sheriff's position that what County was now proposing as a solution to compliance with the terms of the Agreement consisted of potentially valid incremental adjustments, but was *completely insufficient* to meet treatment needs or attain any appreciable measure of long-term compliance with the Agreement.  The letter identified an additional threat of how all this delay means the County is exposed to the danger of other, additional critical facilities simultaneously reaching the end of service life.  Finally, the letter outlined a strategic framework for moving forward, founded on reinstatement of construction of a modern mental health facility and including a comprehensive data platform intended to accurately and timely inform future policy determination as to optimal methods of care, treatment, and therapeutic delivery.  The Sheriff's outlined approach also reflected the priority and value of community-based treatment providers.  This final letter went without any response whatsoever.

B.  *May Hearing*

As the Court may recall, at the May status hearing, Special Counsel Dugdale

- 14 -

1   offered a dramatically different strategy for the Board's plan toward compliance,

2   utilizing Pitchess Detention Center (PDC)-North, expansion of the Stepdown

3   Program, creation of a Psychiatric Urgent Care Unit, and expansion of the MAT

4   program.  *See* Joint Status Report on Unresolved Disagreements Regarding

5   Implementation Plans, Case No. 2:15-CV No. 5903, Doc. 190 at pg. 24, filed May

6   13, 2022 [Docket No. 190].  Contrarily, the Joint Status Report advised the Court

7   that "[t]here is certainly no realistic way the depopulation efforts currently being

8   undertaken by ATI, JCIT, and ODR are likely to move Defendants meaningfully

9   closer to compliance with any of these provisions in the two-year timespan that

10  governs the implementation plans in this case."  *Id.* at 23.  Special Counsel

11  Dugdale's new position apparently conveys the Board's assertion that community-

12  based alternatives are somehow now irrelevant to Agreement compliance, even

13  though this had previously been the Board's key foundation for mental health

14  solutions for the jail system's current and ongoing non-compliance.  *Id.* at 7.

15          During the hearing, the Court inquired why it was taking the County/Sheriff

16  six years to develop and implement a five-year plan.  Special Counsel Dugdale for

17  the County/Sheriff did not remind or inform the Court of how the Board of

18  Supervisors had cancelled construction of the modern mental health facility during

19  this time period, or the impact of that decision on continued non-compliance.

20  When the Court asked whether a replacement of MCJ was a commonsense

21  cornerstone of long-term planning, Special Counsel Dugdale acknowledged the

22  Sheriff adopted this view, but did not express the Sheriff's firm certainty regarding

23  the urgent need for this key capital investment.  The position asserted by Special

24  Counsel Dugdale for the County and the Sheriff represented only the County as to

25  what was a credible approach and did not thoroughly and comprehensively set forth

26  the Sheriff's position on these issues.

27          In other words, Special Counsel Dugdale has not represented the Sheriff's

28  position to this Court that a new mental health facility was, and is, immediately

necessary to achieve compliance.  However Special Counsel Dugdale did acknowledge at the hearing that the County Board's plan – short of a new mental health facility, will *not* achieve compliance with the Agreement.

During discussion at the hearing regarding the County's budget, Special Counsel Dugdale also did not share with the Court the potential extent to which AB109 revenue could be available for treatment needs and facility construction, and how budgetary decisions to allocate these available funds could help achieve substantial compliance with the Agreement.  This Court explicitly expressed the fact that the public-safety impact of the measures and solutions being discussed between the parties were an urgency – in line with the fact that the Sheriff does not believe that his current joint legal representative with the County is fully or accurately presenting his concerns, viewpoints or special custodial/penological knowledge to the Court and the parties.  Thus, the Sheriff believes and asserts that the Court is presently lacking critical information to the task at hand, necessitating this Motion.

## II.   THIS COURT MAY DECLARE A CONFLICT OF COUNSEL, AND MUST DO SO HERE UNDER THE CIRCUMSTANCES.

### A.   *CONFLICT AND DISQUALIFICATION*

Generally, "[i]n determining whether to disqualify counsel, the Court applies California law."  *EpicentRx v. Carter*, 2021 U.S. Dist. LEXIS 187275, at *5 (S.D. Cal. 2021) (citing *In re County of Los Angeles*, 223 F.3d 990, 995 (9th Cir. 2000) ("Because we apply state law in determining matters of disqualification, we must follow the reasoned view of the state supreme court when it has spoken on the issue.")).  *See also*, *In re County of Los Angeles*, 223 F.3d 990, 995 (9th Cir. 2000) ("we apply state law in determining matters of disqualification"); *Hitachi, Ltd v. Tatung Co.*, 419 F.Supp.2d 1158, 1160 (N.D. Cal. 2006).

In turn, California law recognizes that "'[t]he authority of a trial court to disqualify an attorney derives from the power inherent in every court to control in furtherance of justice, the conduct of its ministerial officers.'"  *EpicentRx, supra* (change omitted) (citing *City & County of San Fran. v. Cobra Solutions*, 38 Cal. 4th 839, 846, (2006) (citation and quotes omitted); *see also United States v. Wunsch*, 84 F.3d 1110, 1114 (9th Cir.1996)).  Courts generally have the inherent power to "control the proceedings to remedy the defect, and even disqualify an attorney if that appears necessary." *Klemm v. Superior Court*, 75 Cal. App. 3d 893, 901 n.4 (1977). Indeed, they have the authority "[t]o provide for the orderly conduct of proceedings before it, or its officers," including to control its own judicial proceedings and "[t]o compel obedience to its judgments, orders, and process." Cal. Civ. Proc. Code § 128 (a).  *See also, People v. Superior Court (Greer)*, 19 Cal.3d 255, 261 (1977) (recusal of prosecutor).

Ultimately, a court's decision must be focused on "[t]he paramount concern [which] must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar. The important right to counsel of one's choice must yield to ethical considerations that affect the fundamental principles of our judicial process." *People ex rel. Dep't of Corps. v. SpeeDee Oil Change Sys.*, 20 Cal. 4th 1135, 1145 (1999).  In fact, "[t]he attorney-client privilege is a hallmark of our jurisprudence that furthers the public policy of ensuring the right of every person to freely and fully confer and confide in one having knowledge of the law, and skilled in its practice, in order that the former may have adequate advice and a proper defense." *Collins v. State of Cal.*, 121 Cal. App. 4th 1112, 1126 (2004) (internal quotations omitted).

The obvious conflict here is notable for several reasons that are widely recognized under the law.  For instance, an attorney for a corporation generally cannot "simultaneously represent the corporation and [an] adverse officer, director or shareholder." *La Jolla Cove Motel & Hotel Apartments, Inc. v. Superior Court*,

- 17 -

121 Cal. App. 4th 773 (2004). Indeed, where there is a difference between a county board and an employee, there is a clear conflict. In *Strong v. Sutter County Bd. of Supervisors,* 188 Cal. App. 4th 482, 493-94 (2010) (changes in original), the court noted that it, in fact,

> strains credulity to believe the board here ever would have concluded county counsel could ethically represent both the board and Strong in a matter where Strong was questioning the board's decision to settle a tax refund claim over Strong's objection and where Strong sought 'counsel to represent [him] in [the] resolution of [his] disagreement with the [b]oard' on the matter. Obviously county counsel could not represent the board's interest and defend the board's decision to settle the claim and at the same time ethically advise Strong, as the board's potential adversary, on the same matter.

In fact, the Attorney General has recognized that "county counsel, with good reason, views his primary responsibility as being to the board of supervisors." 80 Cal. Op. Atty. Gen. 127, 136 (1997) (quoting *Civil Service Com. v. Superior Court,* 163 Cal. App. 3d 70, 84-85 (1984)).

Indeed, joint representation of officials/employees and a public entity are commonplace, but when such representation is taken on, it is still subject to potential conflicts of interest, and both joint clients must consent to joint representation. *See, e.g.*, Cal. Govt. Code § 995 ("a public entity shall provide for the defense of any civil action or proceeding brought against [a public employee], in his official or individual capacity or both, on account of an act or omission in the scope of his employment as an employee of the public entity"); Cal. Rules of Prof'l. Conduct, Rule 1.13 (g).

An attorney representing a client must "act with reasonable diligence in representing a client," which means that the lawyer must "act[ ] with commitment and dedication to the interests of the client." Cal. Rules of Prof'l. Conduct, Rule 1.3. Further, an attorney can only represent a client if he or she reasonably believes that he or she will be able to provide competent and diligent representation to *each client*. Cal. Rules of Prof'l. Conduct, Rule 1.7. When an organization is a client, a lawyer must represent "the organization itself, acting through its duly authorized directors, officers, [and] employees." Cal. Rules of Prof'l. Conduct, Rule 1.13 (a). Here,

- 18 -

however, both the Sheriff and the County are parties to this action.  More importantly, they each hold independent statutory and constitutional power and authority, and they are each directly elected.  In particular, these separate realms of authority are directly at play in each of their duties to implement and substantially comply with the terms of the Agreement and this Court's orders.

For instance, "the sheriff operates the jail pursuant to the sheriff's constitutional and statutory law enforcement powers," and the board "has no direct control over the sheriff in this regard."  *County of Los Angeles v. Superior Court*, 68 Cal. App. 4th 1166, 1177 (1998) (citing Cal. Govt. Code, § 25303; *Brandt v. Board of Supervisors*, 84 Cal. App. 3d 598, 602 (1978)).  *See also*, 80 Cal. Op. Atty. Gen. 127, 129 ("the sheriff 'shall take charge of and be the sole and exclusive authority to keep the county jail and the prisoners in it . . . .'") (quoting Cal. Govt. Code § 26605; *Board of Supervisors v. Superior Court*, 33 Cal.App.4th 1724, 1738-1739 (1995)). In fact, "[t]he only clear and present duty enjoined by law upon a board of supervisors with regard to a county jail is to provide the sheriff with food, clothing, and bedding for prisoners (Pen. Code, § 4015) and to pay as a county charge other expenses incurred in the keeping of prisoners (Gov. Code, § 29602)."  *Brandt*, at 601-602.

In the Attorney General's "view, it is clear that control by a board of supervisors over the manner in which funds allocated to the sheriff and district attorney are to be expended, including the assignment of personnel, would impair the exercise by those officers of their constitutionally and statutorily defined powers. Such supervisory control would directly conflict with the admonition that the board has no power to perform county officers' statutory duties for them or direct the manner in which duties are performed."  80 Cal. Op. Atty. Gen. 127, 130 (1997) (internal quotations omitted) (citing 77 Ops. Cal. Atty. Gen. 82 (1994); *Hicks v. Board of Supervisors*, 69 Cal. App. 3d 228, 242 (1977); *People v. Langdon*, 54 Cal. App. 3d 384, 388-390 (1976).  Similarly, the board of supervisors cannot "control, directly or indirectly, the manner in which the duties [of the county assessor] are

performed." 80 Cal. Op. Atty. Gen. 127, 130 (1997) (citing *Connolly v. County of Orange*, 1 Cal.4th 1105, 1113 n.9 (1992)). Despite these clear delineations of statutory authority directly implicated in this case, the Board continues to interfere with the Sheriff's ability to manage jail operations, as outlined above.

In certain instances, the Sheriff, and Department employees actually act "as a state officer performing state law enforcement duties, and not as a policymaker on behalf of the County of Los Angeles, as to "determining whether to release a person who may be subject to arrest on an outstanding warrant," which "is a law enforcement function." *County of Los Angeles*, at 1177-1178 (citing Cal. Govt. Code, §§ 26601, 26602; Cal. Penal Code § 816; *Pitts v. County of Kern*, 17 Cal. 4th 340, 362-363 (1998)).

In *Hicks*, a board exceeded its budgetary authority when it transferred investigators from the district attorney to the sheriff. (69 Cal. App. 3d at 237, 240.) A board's elimination of investigator positions for a city attorney also exceeded a city council's budgetary authority, since it eliminated a mandatory function of the city attorney. *Scott v. Common Council*, 44 Cal. App. 4th 684, 694-695 (1996). Since "investigators [were] absolutely necessary for the performance of the city attorney's function," the court found an improper budgetary or legislative exercise of authority by the city council. *Id.* Indeed, a legislative body cannot use "budget cuts [to] eliminate the ability of the government official to perform his mandated duties." *Id.* at 698. The *Scott* court also noted that "the power to specify employees by position within the city attorney's department may conflict with the city attorney's ability to allocate funds within his department as he sees fit." *Id.* at 689 n.9 (citing *Connolly v. County of Orange*, 1 Cal. 4th 1105, 1113, n. 9 (1992); 77 Ops. Cal. Atty. Gen. 82 (1994)).

In particular, since "the sheriff possesses independent authority as to his investigative function, jail-keeping duties, personnel assignments, and allocation of budgeted funds," a dispute can arise between the Board and the Sheriff on these

matters, and "the sheriff would be entitled to independent counsel for advice and representation," because, "[w]hen the sheriff asks the county counsel for legal advice pertaining to his actions or plans in one of these areas and such advice is rendered," there is a "separate and distinct" "attorney-client relationship" with the Sheriff "from the county counsel's relationship to the county as a whole."  80 Cal. Op. Atty. Gen. 127, 136-137 (1997).  And a conflict may arise "when a county counsel takes a position in favor of the interests of the county board of supervisors and adverse to the interests of the sheriff."  *Id.*  Indeed, "a conflict of interest on the part of the county counsel may make it 'necessary' for the sheriff to receive outside counsel when his independent authority would be impaired by the position taken by the county counsel."  *Id.*  at 139.  Further, "[i]f a request for the employment of such services at county expense is made by the sheriff, the board of supervisors has the statutory authority to comply with the request."  *Id.* (citing Cal. Govt. Code § 31000 and § 29601 (expenses of the sheriff which constitute county charges)).

In fact, "because of the sheriff's direct responsibility to the voters and his need for authority commensurate with that responsibility, he may be deemed to possess an inherent power to select private counsel in order to protect his ability and right to carry out the organic functions and responsibilities of his office."  *Id.*  And, "[w]here the county counsel is statutorily required but unable to provide the legal representation needed by the sheriff, the board of supervisors has an obligation and duty to pay the attorneys' fees of outside counsel selected by the sheriff."  *Id.* at 140.

The lawyer's role has long been recognized as that of a *zealous* advocate for its client(s).  "Both the lawyer and the client should expect that the lawyer will use every skill, expend every energy, and tap every legitimate resource in the exercise of independent professional judgment on behalf of the client and in undertaking representation on the client's behalf."  *Trone v. Smith*, 621 F.2d 994, 998 (9th Cir. 1980).  Generally, there is an actual conflict when an attorney "is compelled to compromise his or her duty of loyalty or zealous advocacy . . . by choosing between

or blending the divergent or competing interests of a former or current client." *Perillo v. Johnson*, 205 F.3d 775, 781 (5th Cir. 2000). An "'[a]dverse effect' may be established with evidence that 'some plausible alternative defense strategy or tactic' could have been pursued, but was not because of the actual conflict impairing counsel's performance." *Id.* This is precisely what is occurring here, because the Sheriff and the County Board are diametrically opposed as to the path, method, and urgency for substantial compliance with the Agreement governing the jail system and the allocation of personnel and budgeted resources to do so by the Sheriff.

Joint representation in the dependency realm can provide some further insight to the  issue of conflicts between clients. Specifically, "a conflict becomes 'actual' when an attorney's duties of loyalty, confidentiality, and zealous advocacy require the attorney to take or to refrain from taking some action to serve the 'best interests' of one minor client, but the attorney is unable to do so without violating a duty owed by the attorney to another client; or when the attorney is unable independently to evaluate the best interests of each minor client because of the minors' conflicting interests." *In re Zamer G.*, 153 Cal. App. 4th 1253, 1267 (2007).

Similarly, in the criminal context, divergent interests of joint defendants can present a clear conflict for an attorney due to "actively represent[ing] conflicting interests." *Mickens v. Taylor*, 535 U.S. 162, 166 (2002). Where there is "dual representation [it] is the attorney's duty--and the client's legitimate expectation--of loyalty" that is "[t]he primary value at stake." *Flatt v. Superior Court*, 9 Cal. 4th 275, 284 (1994). In fact, there is a constitutional right to counsel in criminal actions. U.S. Const., 6th Amend.  Of course, this is not a criminal action, and the "'[a]ppointment of counsel in a civil case is not a constitutional right.'" *Cookish v. Cunningham*, 787 F.2d 1, 3 (1st Cir. 1986) (quoting *Mekdeci v. Merrell National Laboratories*, 711 F.2d 1510, 1522 n.19 (11th Cir. 1983)). However, this right does also apply to "quasi-criminal proceedings." *In re Martin-Trigona*, 737 F.2d 1254, 1260 (2d Cir. 1984) (citing *Hannah v. Larche*, 363 U.S. 420, 440 n.16 (1960)).

Further, counsel may be appointed by a court in a civil action in "exceptional circumstances." In particular, counsel can be appointed to an indigent pro se litigant, pursuant to 28 U.S.C. § 1915. "The determination of whether appointment of counsel is necessary rests with the discretion of the court." *In re Martin-Trigona*, at 1260. Factors to be considered for appointment of counsel include "the complexity of the legal issues presented and the capability of the litigant to recognize and present the issues, the complexity and conflicting nature of the facts, the ability of the litigant to investigate his case, and the relative substantive value of the claims presented." *Caruth v. Pinkney*, 683 F.2d 1044, 1048 (7th Cir. 1982). As to the application of these factors, "each case is unique." *Id.*

In any event, there is the real possibility that the Sheriff could be held in contempt in this matter, if he were to continue to be hampered in his ability to comply with the terms of the Agreement due to the vastly divergent views between the Board and the Sheriff as to how the County can successfully bring itself into compliance. Seven years to implement a five-year Agreement is moving uncomfortably in the direction where the Court will eventually lose its patience. *See, e.g., People v. Superior Court (Greer)*, 19 Cal.3d 255, 261 (1977) ("The court may enforce its orders through the contempt power.").

Indeed, this is precisely what occurred in *Board of Supervisors v. Superior Court*, 33 Cal. App. 4th 1724, 1729 (1995), wherein the court had held both the board and the sheriff in San Diego in contempt for continuing violation of an order capping a jail population; however, the contempt order was found to have been properly rescinded as to the County where there was evidence that the Board appropriated to "the sheriff sufficient money to operate jails within the cap," the "sheriff had recently received the largest increase in his budget in the history of the County," and that "the sheriff's share [of the county budget] ha[d] increased." *Id.* at 1732-1733. The court also found that "[t]he Board has not been given direct authority over jail operations." *Id.* at 1743. Although the court recognized that there may be a basis for also holding

a board in contempt "where a board of supervisors has clearly failed to provide enough funding to enable the sheriff to carry out his duties," there remains the specter that the Sheriff, alone, could be found in contempt in these proceedings if there is any continuation of the long-standing failure to substantially comply with the Joint Settlement. *Id.* at 1744.

The fact that this action has not yet reached that point and there appears to be no imminent danger of such an order against the Sheriff at this precise moment, nonetheless, the danger is real, particularly if conditions continue on the present path, including the Board's decision to close MCJ and not to build the new mental health facility. The realistic possibility that the present divergence of opinions for the successful path forward toward compliance could result in the Sheriff, himself, being subject to contempt renders his need for loyal and devoted legal representation critical.

### B. *NEXT STEPS*

More importantly, this Court currently is being deprived of the Sheriff's perspective on jail management and public safety as it relates to the County's path toward compliance. This is particularly true because the Sheriff does not agree with the Board's decision to close MCJ without building the previously scheduled contemporary mental health facility. Under the circumstances of the present Board actions, the impact of the loss of MCJ capacity and the foreseeable resulting displacements and crowding will be enormously damaging to the safety and effectiveness of detention operations and public safety in general.

This is not merely a matter of budget. Indications are at least some consequential portion of the funds remain available for such a mental health facility. This is an area where separate counsel for the Sheriff could potentially assist the Court with developing additional information. Moreover, as discussed above, the Board has directly interfered with the Sheriff's ability to comply with his legal duties

and obligations, under the Agreement by the freezing of hiring and drastic reduction of custody positions.  Again, these are not merely budgetary decisions.  These Board actions are volitionally directed at the Sheriff's Department, and his custody operations, while currently the hiring freeze is not implemented against other County departments. This further highlights the direct conflict of interest between the Board and the Sheriff.  The Board has chosen to make decisions directly contrary to proper jail management, apparently due to differing objectives.  However, public safety and proper care of jail inmates suffering from mental illness should not be subservient to the political influences.

Further, the Board and/or Special Counsel Dugdale actually incorporate very little input from the Sheriff as to recent submittals to this Court in this matter.  Indeed, the Sheriff has consistently been relegated to communications with the Board only at public meetings and by way of the standard three minutes of public comments provided to general members of the public.  He has not been permitted to make presentations to the Board on matters relevant to this action, has not been included in closed session discussions with Special Counsel Dugdale and/or County Counsel on this matter, and the Board has otherwise not directly sought or fully considered the input of the Sheriff.  While Sheriff's Department Staff has been in periodic direct contact with Special Counsel Dugdale and/or County Counsel, it is clear that neither legal counsel may fully support before this Court any solution to the County's current and continuing lack of substantial compliance with the terms of the Agreement that deviates from the Board's policy positions.  This includes fair assessment of the immediate closure of MCJ and the unwillingness to construct a new mental health facility, even if the Sheriff has critical information for this Court relating to its evaluation of the feasibility, viability, and timeliness of options for the County to achieve compliance.

In addition, this is not a matter at all of the competency of the County Counsel or Special Counsel Dugdale in representing the County. This Motion is not intended

1    to undermine, question or interfere with the Board's independent authority from the

2    Sheriff.  Instead, this Motion sets forth the simple proposition that an attorney, no

3    matter how skilled, cannot serve two masters, particularly when the attorney's two

4    clients – which are separate, elected parties in this action and which have differing

5    realms of authority defined by law and practical expertise, have divergent positions

6    on how the County can comply with the Agreement.  "Ultimately, the decision to

7    disqualify counsel for conflict of interest is within the trial court's discretion."

8    *Nichols Inst. Diag. v. Scantibodies Clinical Lab.*, 2002 U.S. Dist. LEXIS 28406, at

9    *9 (S.D. Cal. 2002) (citing *Trone v. Smith*, 621 F.2d 994, 999 (9th Cir. 1980)).

10    The California Legislature has expressly determined that there is specific

11    justification for separate counsel for sheriffs when there is a conflict of interest with

12    the Board of Supervisors of a County.  Specifically, "[u]pon request of . . . the sheriff

13    of the county, the board of supervisors shall contract with and employ legal counsel

14    to assist . . . the sheriff in the performance of his or her duties in any case where the

15    county counsel or the district attorney would have a conflict of interest in

16    representing . . . the sheriff."  Cal. Govt. Code § 31000.6 (a).  When the sheriff and

17    the board do not concur on such conflict, the sheriff also has the right to seek a court

18    determination that such "conflict actually exists" and that "creation of an ethical wall

19    is inappropriate."  Cal. Govt. Code § 31000.6 (c), (e).

20    For all the reasons set forth above, the Sheriff is asking the Court to determine

21    there is a conflict of interest that presently exists as to the joint representation of the

22    County Board of Supervisors and the Sheriff in the above-captioned matter, and to

23    order that separate counsel be provided to the Sheriff.   Under the unique

24    circumstances in this matter, equity and fairness require that this finding and order

25    be made, so that the Sheriff's full view as to proper and necessary jail operations can

26    be represented to this Court, particularly as to public safety and how full compliance

27    can actually be achieved with the Agreement.  For instance, the Sheriff must be

28    permitted to have a seat at the table when critical decisions about implementation of

jail system plans are being put in place, staffing allocations are being determined, and security risks to staff, inmates and the general public are being affected by such plans.  As an illustration, all three plans proposed by the County have staffing and operational components to be met by the Sheriff's Department.  Further, the data that the Sheriff and the entirety of the Los Angeles County justice system needs to be able to give meaningful input into the County's short- and long-term planning process is not available to him; the County and community providers are either acting as gatekeeper to necessary data, or it does not exist in a coherent and collated usable form.  Examples of this information include diversion numbers, recidivism and victimization rates, treatment outcomes, projected housing success monitored over months, and other information that would lend evaluative value to the success of alternatives to custody.

As noted in the most recent Joint Status Report filed with this Court, "Defendants are far from achieving compliance" with the mental health requirements of the Joint Settlement. Joint Status Report, filed May 13, 2022 [Docket No. 190], at 4.  The Report further noted that "the need for inpatient care vastly exceeds the existing capacity of the Jails' inpatient unit." *Id.* at 5.  The parties have acknowledged that these issues are not resolved by the recent plan discussed at the most recent status conference with the Court on August 19, 2022.

The proposals put forth by the County are acknowledged as merely making steps to "improve" the County's compliance with the Agreement – to allow more time for the County to develop a workable plan.  The idea of needing more time at this juncture is confounding, both as to patient care and community impacts.  The solutions are apparent and not a mystery.  The Sheriff agrees that the measures proposed by the County in the Joint Status Report could be helpful, but not one of the parties regards these measures as any real solution to the present problems facing the jail system and the conditions barring its substantial compliance with the Agreement.  To be blunt, the measures currently proposed by the County Board

amount to nothing more than placing a Band-aid on a gaping wound. These half measures directly ignore what this Court previously has recognized concerning the need for a new mental health facility, which is a commonsense cornerstone of any meaningful plan for compliance -- and what the Sheriff, the Monitor (*see* Monitor's Twelfth Report, pp. 9-10), and the JFA Institute concurred was necessary. The Agreement required compliance in six months, and as this Court has commented, the County is now more than six years into what was supposed to be a five-year plan for *compliance* – not merely a few speculative steps in the right direction of even formulating a long-term plan.

### C. BOARD OF SUPERVISORS VOTE AND MATERIALS

As part of evaluating the validity of what the Sheriff is saying about the need for a modern facility and why he is seeking separate counsel, the Court may find it helpful to consider how the Board and County viewed the construction of the Consolidated Correction Treatment Facility at the time the investment was originally being approved. In 2018, at the time of Board's authorization, the project letter from the Public Works Director provided the following description of the initiative:

> Treatment-centric features incorporate emerging best practices in the medical and mental health fields to provide mental-health, substance-use disorders, medical treatment, and educational programs for both male and female inmate-patients.[2]

---

[2] Letter from Public Works Director Mark Pestrella to the Honorable Board of Supervisors, Construction-Related Contract, Public Buildings Core Services Area Proposed Consolidated Correctional Treatment Facility (Men's Central Jail Replacement Project), Certify the Final Environmental Impact Report Adopt, the Mitigation Monitoring and Reporting Program and Environmental Findings and Statement of Overriding Considerations, Approve Capital Project No. 69800, Approve the Payment of a Stipend, Approve and Establish Capital Project No. 87463, Approve Appropriation Adjustment, Authorize the Use of Job Order Contracting (Supervisorial Districts 1 And 5) (3 Votes),  June 19, 2018 at *http://file.lacounty.gov/SDSInter/bos/supdocs/123617.pdf*.

28

Specific to the legal action in which this Motion is made, the letter also informed the

Board as follows:

> In addition, these features will further the compliance requirements in the
> September 3, 2015, Joint Settlement Agreement between the County and the
> Department of Justice to meet the medical and mental health needs of
> inmate-patients and ensure their reasonable safety.[3]

A true and correct copy of this letter is attached, as Exhibit I.  The letter also contains

additional specific information about the planned care and treatment that would have

been available at the facility, but is not recited herein in its entirety.  The vote to

approve the project was unanimous.[4]

At the time of the vote, a statement attributed to Supervisor and Board Chair

Sheila Kuehl coherently expressed the basis and need for the Board's approval action:

> "The county has an opportunity — in fact, a responsibility — to replace the
> unacceptable Men's Central Jail with a facility that directly addresses the
> health and life-skill needs of our inmate-patients, placing them more
> quickly on a pathway to recovery and reentry."[5]

Despite these historical statements concerning the necessity for such a facility,

the Board has now taken a different perspective before this Court, to the detriment of

patient care and the safety of the residents of the County of Los Angeles.  The Board's

position is obviously something that the Sheriff completely disagrees with.   He

expressed his disagreement then, and reiterates his position now.

### D.  COMMUNITY CONSTITUENTS

At this point, the Los Angeles community is exceeding seven years of

enduring the harmful consequences of the County Defendants' collective failure to

---

[3] *Id.*

[4] Statement of Proceedings, June 19, 2018, at *http://file.lacounty.gov/SDSInter/
bos/sop/1039739_061918.pdf.*

[5] Nina Agrawal, "L.A. County supervisors approve $2.2 billion to build
replacement for Men's Central Jail," *Los Angeles Times*, June 19, 2018, at
https://www.latimes.com/local/lanow/la-me-ln-jail-replacement-20180619-
story.html

1  attain compliance with the pivotal mandates of the Agreement.  This unacceptable

2  level of public service emanates directly from the Board of Supervisors' current

3  failure to provide minimal and critical resources essential to attaining what is

4  required under the Agreement.  Now, non-compliance has existed over a protracted

5  period of time, and the County's collective, continued failure to achieve

6  compliance, or a cohesive plan toward achieving compliance, is essentially

7  guaranteed by the half-measures currently proposed by the Board.

8          Indeed, the actual and immediate conflict between the Sheriff and the Board

9  is a matter of fact and goes directly to the heart of the remaining issues of non-

10 compliance in this matter and this Court's supervision of the same.  Such conflict

11 exists both in terms of how the Sheriff believes the County can and must provide

12 care to the people for whom he is responsible and as to the way treatment strategies

13 are proposed in response to this litigation.  This conflict reaches directly to

14 achieving compliance with the terms of the Agreement and the ability of the

15 County, and the Sheriff in particular, to provide mental health housing, access to

16 licensed mental health care providers, and out of cell time (Provisions 63, 64, and

17 80).  *See* Monitor's Thirteenth Report, Document 186.

18         As one final point to consider, the Sheriff perceives this dispute to transcend

19 the manner and course of adversarial litigation.  The Sheriff views the role of the

20 parties not to try and prevail but to seek the best attainable outcome for all the

21 constituents involved in a way that regards the goals and contributions of all service

22 providers and collective commitment to every segment of the Los Angeles

23 community.  Treatment, facility security, community health, and public safety must

24 all be considered together.  The Sheriff asks the assistance of this Court by the

25 granting this Motion so that he may be an effective participant in this critical

26 dialogue, for the purpose of achieving the best benefit for the parties and the public

27 as to the Agreement, and for those intended to be the beneficiaries of the Agreement,

28 as well as in furtherance of this Court's role in maintaining jurisdiction to supervise

- 30 -

and oversee the fulfilment of the requirements in the Agreement.

Dated: September 1, 2022

Respectfully Submitted,

JONES MAYER

By: s/Krista MacNevin Jee

James R. Touchstone,
Krista MacNevin Jee and
Richard Lucero,
Attorneys for Sheriff Alex Villanueva

MOTION FOR DECLARATION OF CONFLICT BETWEEN COUNTY AND SHERIFF AND FOR AN ORDER
APPOINTING CONFLICT COUNSEL