Nicholas E. Mitchell
7575 E. 29th Place, Suite 4006
Denver, CO 80238
nmitchell@independentmonitor.com

**Monitor**

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF LOS ANGELES AND LOS ANGELES COUNTY SHERIFF ALEX VILLANUEVA, in his Official Capacity,<br><br>Defendants. | CV No. 15-05903 DDP (JEMX)<br><br>**MONITOR'S FOURTEENTH REPORT** |

Pursuant to Paragraph 109 of the Joint Settlement Agreement Regarding Los Angeles County Jails, the Monitor appointed by this Court hereby submits the attached Report "describing the steps taken" by the County of Los Angeles and the Los Angeles County Sheriff Department ("Department") during the six-month period from January 1, 2022, through June 30, 2022, "to implement the Agreement and evaluating the extent to which they have complied with this Agreement."  This Report takes into consideration the advice and assistance I have received from the Subject Matter Experts appointed by this Court and the comments from the Parties in accordance with Paragraph 110 of the Agreement.  I am available to answer any questions the Court may have regarding my Report at such times as are convenient for the Court and the parties.

DATED:  September 30, 2022          Respectfully submitted,


                                        By:  */s/ Nicholas E. Mitchell*
                                              Nicholas E. Mitchell
                                              Monitor

## MONITOR'S FOURTEENTH REPORT

This Fourteenth Report sets forth the Monitor's assessments of the implementation of the Settlement Agreement (the "Agreement" or "DOJ Agreement") between the County of Los Angeles (the "County") and the United States Department of Justice ("DOJ") for the treatment of inmates with mental illness in the County's jail facilities by the Los Angeles Sheriff's Department (the "Department" or "LASD") and the County's Correctional Health Services ("CHS"). It also reports on the Department's compliance with the provisions of the Implementation Plan in the settlement of *Alex Rosas, et al., v. Leroy Baca,* No. CV 12-00428 DDP, that were extended under the terms of the DOJ Agreement to the facilities not covered by the *Rosas* case.[1] This Report covers the County's reported results for the period from January 1, 2022, through June 30, 2022 (the "Fourteenth Reporting Period").

This Fourteenth Report is based upon the Monitor's review of the policies, procedures, and directives proposed and/or implemented by the Department and CHS in the Fourteenth Reporting Period, and assessments and observations of the Mental Health and Use of Force Subject Matter Experts, and mental health clinicians and auditors retained by the Monitor. It takes into consideration the County's Self-Assessment Status Report ("Fourteenth Self-Assessment"); Correctional Health Services and Custody Compliance and Sustainability Bureau ("CCSB") Combined Semi-Annual Report on Quality Improvement and Suicide Prevention Efforts – Quarter 4 & Quarter 1 2021/2022; the County's Augmented Self-Assessment Status Report ("Augmented Fourteenth Self-Assessment"); and results reported by the County through July 15, 2022.

The Monitor conducted site visits within the jails with Mental Health Subject Matter Expert Dr. Nicole Johnson, and clinicians Drs. James Vess and Amy Eargle in March 2022. During both visits, the Monitoring Team spoke with inmates, custody staff and supervisors, and mental health staff and supervisors during these visits, and inspected mental health housing at all patient acuity levels.

Over the past several months, the County has begun to more purposefully articulate a path towards Substantial Compliance with this Agreement. Following the Monitor's Twelfth Report, which documented the County's slowing pace of compliance with the Agreement in the years 2019 through 2021, the Court held a series of status conferences and issued an order establishing its expectations. Under the Court's guidance, the Parties worked with the Monitor to develop a series of detailed implementation plans for 23 provisions. The County has now begun to execute those

---

[1] The *Rosas* case involved allegations of excessive force in Men's Central Jail (MCJ), the Twin Towers Correctional Facility (TTCF), and the Inmate Reception Center (IRC) (collectively the "Downtown Jail Complex"). The DOJ Agreement extends provisions of the Implementation Plan to the Century Regional Detention Facility (CRDF), the North County Correctional Facility (NCCF), and the Pitchess Detention Center (PDC).

plans within the jails.[2]

These efforts were an important step, but they have not yet materially improved the County's results on the Agreement's provisions.  There are 69 provisions in the Agreement that are subject to monitoring by the Monitor and Subject Matter Experts.  As of the date of this Report, the County and the Department are in Substantial Compliance with 40 provisions, in Partial Compliance with 17 provisions, and in Non-Compliance with seven provisions.  This is similar to the County's results for the previous 4 Reporting Periods, and a decline from the Thirteenth Reporting Period.

*Figure 1:  The County's Cumulative Substantial Compliance with All Provisions by Reporting Period*



Achieving Substantial Compliance with the Agreement will require significant work by Custody and Mental Health personnel across all areas of the jails' operations to address all of the provisions that are not in Substantial Compliance.  While that work is ongoing, there are several specific areas of the Agreement that require the County's immediate, focused attention.  They are areas that have failed to materially improve in the

---

[2] Given the dates on which these implementation plans were finalized, the County's Fourteenth Self-Assessment and Augmented Self-Assessment included little detail about the execution of these implementation plans in the jails.  However, in future Reporting Periods, the County should include in its Self-Assessments specific details of the steps taken to execute the plans, successes and obstacles related to their execution, relevant data reflecting their impacts, explanation of any deadlines met or missed, and any corrective actions initiated by the County related to compliance with the plans.

years since the Agreement was executed, and/or that present significant, ongoing risks to safety in the jails or the community. The Monitor recommends that the County focus particular attention on correcting the following deficiencies in the next Reporting Period.

First, the Court has repeatedly made clear that the Agreement must be implemented in a manner that protects public safety inside the jails, and also outside them, for residents of and visitors to Los Angeles County. Provision 34, which governs the County's release planning program, should be a key cornerstone of that effort. Provision 34 helps to ensure that inmates with serious mental illness are released from the jails with appropriate reentry services. This includes but is not limited to connecting them with necessary psychiatric medications, mental health and substance abuse resources, and linkages with family, community, and social supports, all of which are protective against future offenses, including crimes of violence. While the County has made various improvements regarding its compliance with Provision 34, it is still in Non-Compliance nearly seven years after the Agreement was signed. The County has yet to create or fully staff a system to consistently provide inmates with comprehensive release and reentry planning services. In adherence to the Court's guidance, it must redouble its efforts to do so now.

Second, the County continues to struggle to appropriately intervene when inmates with mental illness engage in self-injurious behavior in jail. In this report, the reviews by the Monitor's Mental Health Team for both Provision 36 (performing mental health assessments and/or creating individualized treatment plans after adverse triggering events, such as suicide attempts) and Provision 40 (providing clinically appropriate crisis intervention services) reflect that the County remains seriously—possibly dangerously—unable to provide appropriate, tailored interventions when inmates with mental illness decompensate and engage in acts of self-harm. This represents a significant risk to inmate safety and to the County of Los Angeles as a whole. The County must ensure that it is expeditiously corrected.

Third, group therapy is a key component of effective mental health treatment in jail and has been validated by decades of research. Group treatment is also required by the Agreement under Provision 79 (requiring group treatment for inmates in mental health housing) and Provision 80 (requiring 10 hours per week of structured therapeutic programming for HOH inmates per week). The County remains unable to provide meaningful group programming to many inmates who require it, and is far from compliance with both provisions, largely because it has not hired (or contracted with) enough clinical staff to provide the required programming. It should correct these deficiencies now and build out the required staffing for the group therapy that it agreed was necessary in 2015.

Fourth, the County has yet to articulate plausible or realistic plans for attaining Substantial Compliance with two of the Agreement's key provisions. Provision 63 requires the County to have sufficient housing for the jail population with mental illness. Provision 64 requires the County to have sufficient licensed inpatient mental health beds. Given the Department's existing housing capacity and the population of inmates with

mental illness—which continued to balloon during the Fourteenth Reporting Period—the County remains far from Substantial Compliance with both provisions. To address this gap, the County has created implementation plans that propose a "phased approach" to compliance. The plans set forth an "Initial Phase," which involves expanding the County's Medication-Assisted Treatment Program, opening a new Psychiatric Urgent Care Unit, and relocating MOH inmates from MCJ to PDC North.[3]

The County has recognized that the initiatives in this Initial Phase, while undoubtedly useful, "will not, by themselves, bring the County and the LASD into full compliance…in the near future." The County is thus "currently exploring additional long-term steps it can take to achieve full compliance." To that end, the County is evaluating

> expanding the capacity of the Office of Diversion and Re-entry ('ODR') to divert inmates with mental illness from the LACJ, including the placement of P2, P3, or P4 inmates with severe mental illnesses in 'locked beds' under ODR's supervision where a need for public safety, and the safety of the inmate, require such placement, as well as in beds in unlocked facilities where such a placement is consistent with public safety.

There is no proposed timetable for this exploration, nor an estimated percentage of the existing P3 or P4 populations that would be eligible for such diversion, or how quickly the County would be able to create or obtain the necessary ODR beds or otherwise scale such an initiative. Thus, this is a "phased approach" that, today, only includes a single well-defined phase. Any additional phases are speculative, unarticulated, and as yet undefined.

At the risk of over-simplification, the County has a supply and demand problem. That is, the demand for mental health beds at the P3 and P4 levels has grown consistently since 2015 while the supply of such beds has remained static (for ease, I will call the gap between the growing demand for mental health beds and the static supply a "supply/demand imbalance"). This supply/demand imbalance has continued to grow for each of the last several years, and the bigger it gets, the greater are its detrimental impacts on inmate and staff safety and well-being inside the jails. Like any other supply/demand imbalance, the remedy is simple: demand must be reduced, supply increased, or some combination of the two. In this context, and for the avoidance of doubt, to comply with Provisions 63 and 64: *Los Angeles County must either reduce demand by lowering the number of incarcerated patients who require beds at the P3 and P4 levels, expand supply by increasing the number of beds available to treat such patients, or some combination of the two.*

The County has not yet informed the Monitor or the Court whether it plans to focus on reducing demand, increasing supply, or both, nor has it committed to a schedule for providing that information. It is time for it do so.

---

[3] *See* County's Supplemental Implementation Plans for Provisions 63 and 64 dated July 22, 2022.

We recognize that this is not a small task and will require aligning visions of a diverse body of stakeholders, including the County's Board of Supervisors, Chief Executive Officer, and Sheriff.  Notwithstanding the challenges, we urge the County to focus on determining the path it will take to resolve this supply/demand imbalance with all deliberate speed.

A final note: during the Fourteenth Reporting Period, the County and the Department cooperated fully with the Monitoring Team.  The Department, CHS, and County Counsel facilitated our work, and responded transparently to our requests for documents and information.  The Monitor continues to appreciate their responsiveness, professionalism, and collegiality.

Nicholas E. Mitchell, Monitor
September 30, 2022

# EXECUTIVE SUMMARY

There are 69 provisions in the Settlement Agreement that are subject to monitoring by the Monitor and Subject Matter Experts.  As of the date of this Report, the County and the Department are in Substantial Compliance with 40 provisions, in Partial Compliance with 17 provisions, and in Non-Compliance with seven provisions.  In addition, there are two provisions for which the Department is in Substantial Compliance at some facilities and in Partial Compliance at other facilities.  There is one provision (Paragraph 39) for which the Department is in Substantial Compliance at certain facilities, Partial Compliance at other facilities, and Not Rated at other facilities.  There is one provision (Paragraph 43) for which the Department is in Substantial Compliance at certain facilities and Non-Compliance at other facilities.  There is one provision (Paragraph 57) for which the Department is in Substantial Compliance at certain facilities, Partial Compliance at other facilities, and Non-Compliance at other facilities.  There are 45 provisions for which the County and the Department are in Substantial Compliance at some or all facilities.[4]

The Monitor's determination of the County's compliance is based upon the quantitative thresholds in the Compliance Measures (and any other applicable requirements in the Compliance Measures) for achieving Substantial Compliance, unless the quality of the County's performance as determined by the qualitative assessment is plainly inadequate or the results reported by the Monitor's mental health team vary significantly from the results reported by the Department.[5]  As used herein, "Substantial Compliance" means that the County has "achieved compliance with the material components of the relevant provisions of this Agreement in accordance with the [agreed-upon Compliance Measures for assessing Substantial Compliance]," which it must maintain for twelve-consecutive months; "Partial Compliance" means that the County has achieved "compliance on some, but not all, of the material components of the relevant provision of this Agreement;" and "Non-Compliance" means that the County has not met "most or all of the material components of the relevant provisions of this Agreement."

Appendix A to this Fourteenth Report shows the status of each of the 69 provisions of the Agreement that are subject to monitoring and the twelve-month

---

[4] Under Paragraph 111 of the Agreement, the twelve-month period for which the County is required to maintain Substantial Compliance can be determined on a facility-by-facility basis.

[5] As in prior reports, this Fourteenth Report also reflects the results of audits by the Monitor's auditors to verify results reported by the County.  The Monitor has deemed the County to be in Substantial Compliance "as of" the beginning of the quarter reported by the County if the auditors have verified that the County has met the thresholds in the Compliance Measures.  If the auditors were not able to verify the results reported by the County, the twelve-month period for maintaining Substantial Compliance will commence in a future period when the County's reported results are verified by the auditors.  If the County maintains Substantial Compliance with a provision for twelve consecutive months, pursuant to Paragraph 111 of the Agreement, the Monitor and Subject Matter Expert will "no longer. . .assess or report on that provision" in future reporting periods.  Some of the Substantial Compliance results reported by the County in the Fourteenth Reporting Period have not been audited by the Monitor's auditors and cannot be considered final until verified by the auditors.  The County will not be deemed to be in Substantial Compliance as of the County's reported date for purposes of determining the twelve-month compliance period if the results are not verified by the auditors.

triggering dates where the County is deemed to be in Substantial Compliance.  Appendix
B shows the County's progress from the Initial Reporting Period through the Fourteenth
Reporting Period in achieving Substantial Compliance and in maintaining Substantial
Compliance for twelve consecutive months on provisions that are no longer subject to
monitoring.

There are 38 provisions that are no longer subject to monitoring because the
County and Department maintained Substantial Compliance for twelve consecutive
months as required by Paragraph 111 of the Settlement Agreement and verified by the
Monitor's auditors as required.[6]  There are another six provisions for which some
facilities are no longer subject to monitoring because those facilities maintained
Substantial Compliance for the required twelve consecutive months.[7]

As of the date of this Report, and subject to verification by the Monitor's auditors
and qualitative assessments in some cases, the County and the Department are in
Substantial Compliance at some or all of the facilities with the following provisions of
the Settlement Agreement:

The County has achieved Substantial Compliance with Paragraph 18, which
requires the (initial) training of Deputy Sheriffs and Custody Assistants on suicide
prevention as follows: at Men's Central Jail ("MCJ") and Pitchess Detention Center
("PDC") South as of October 1, 2017; at North County Correctional Facility ("NCCF")
as of September 1, 2017; at PDC East as of December 1, 2017; at Twin Towers
Correctional Facility ("TTCF"), the Inmate Reception Center ("IRC"), and PDC North as
of April 1, 2018; and at Century Regional Detention Facility ("CRDF") as of August 1,
2018.  The County has maintained compliance with the refresher training requirements
under Provision 81 Rosas 4.6(b) as of December 2021.  The County was unable to
maintain compliance under Provision 81 Rosas 4.7(b) as of December 2021.

The County has achieved Substantial Compliance at NCCF, MCJ, and IRC as of
April 1, 2018; at TTCF as of July 1, 2018; at CRDF, PDC East, and PDC North as of
December 1, 2018; and at PDC South as of March 1, 2019, with Paragraph 19, which
requires the (initial) training of Deputy Sheriffs on Crisis Intervention and Conflict
Resolution and the training of Deputy Sheriffs and Custody Assistants in working with
mentally ill prisoners.  The Department has achieved Substantial Compliance at CRDF,
IRC, NCCF, MCJ, PDC East, PDC North, PDC South, and TTCF as of December 2019
with the refresher training requirements of Paragraph 19.  The County has maintained
compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) as
of December 2021.  The County was unable to maintain compliance under Provision 81
Rosas 4.7(b) as of December 2021.

---

[6] This includes the initial training required by Paragraphs 18, 19, and 20, which have been completed and
are no longer subject to monitoring.  The refresher training requirements for each of these provisions are,
however, still subject to monitoring under Provision 81 Rosas 4.6(b) and 4.7(b).
[7] The provisions that are no longer subject to monitoring at some or all of the facilities are highlighted in
bold in Appendix A.

The County has achieved Substantial Compliance at PDC East, PDC North, NCCF, and CRDF as of August 1, 2017 and at PDC South as of October 1, 2017, with Paragraph 20, which requires the (initial) training of additional Deputy Sheriffs on Crisis Intervention and Conflict Resolution and on working with mentally ill prisoners. The County has maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) as of December 2021. The County was unable to maintain compliance under Provision 81 Rosas 4.7(b) as of December 2021.

The County has maintained Substantial Compliance for twelve consecutive months at PDC East, PDC South, PDC North, NCCF, IRC, TTCF, CRDF, and MCJ with Paragraph 21, which requires Custody personnel to maintain CPR certifications.

The County has maintained Substantial Compliance for twelve consecutive months with Paragraph 22, which requires the County and the Sheriff to provide instructional material on the use of arresting and booking documents to ensure the sharing of known relevant and available information on prisoners' mental health status and suicide risk.

The County has maintained Substantial Compliance for twelve consecutive months as of July 12, 2018, with Paragraph 23, which requires that the Department conduct a systematic review of prisoner housing to reduce the risk of self-harm and to identify and address suicide hazards, and to develop plans to reasonably mitigate suicide hazards identified in the review.

The County has maintained Substantial Compliance for twelve consecutive months as of September 30, 2018, with Paragraph 24, which requires the Department to conduct annual reviews and inspections of prisoner housing to identify suicide hazards.

The County has achieved Substantial Compliance as of July 1, 2021, through March 31, 2022, with Paragraph 26, which requires that inmates identified at intake as having emergent or urgent heath needs be evaluated by a QMHP within 4 hours from the time of identification.

The County has maintained Substantial Compliance for twelve months as of March 31, 2021, with Paragraph 27, which requires that all prisoners are individually and privately screened within 12 hours of their arrival at the jails.

The County has maintained Substantial Compliance for twelve consecutive months at IRC as of March 31, 2018, with Paragraph 28, which requires the Department to expedite inmates having urgent or emergent mental health needs through the booking process.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2018, with Paragraph 29, which requires mental health assessments of prisoners with non-emergent mental health needs within 24 hours of the intake nursing assessment.

The County has maintained Substantial Compliance as of January 1, 2019, through December 31, 2019, with Paragraph 30, which requires the County to provide an initial mental health assessment that includes a brief initial treatment plan that addresses "housing recommendations and preliminary discharge information."

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 32, which requires that a serious suicide attempt be entered in the prisoner's electronic medical record in a timely manner.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2017, with Paragraph 33, which requires mental health supervisors to review electronic medical records on a quarterly basis to assess their accuracy.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2018, with Paragraph 35, which requires the Department to ensure that custody staff refer prisoners who are demonstrating a potential need for routine mental health care to a QMHP or a Jail Mental Evaluation Team.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 38, which requires mental health staff or JMET teams to make weekly cell-by-cell rounds in restricted non-mental health housing modules to identify prisoners with mental illnesses and grant prisoner's requests for out-of-cell interviews.

The County has maintained Substantial Compliance at NCCF for twelve consecutive months as of June 30, 2018, with Paragraph 39, which requires the County to use a confidential self-referral system for prisoners to request mental health care. The County has provided documentation reflecting that it achieved Substantial Compliance as of January 1, 2022, through March 31, 2022, at PDC South. These results have been verified by the Monitor's auditors.

The County has maintained Substantial Compliance at NCCF and PDC North for twelve consecutive months, as of September 30, 2018, with Paragraph 43, which requires the Department to develop and implement policies for discipline of prisoners with serious mental illnesses.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 44, which requires the Department to install protective barriers in High Observation Housing and other mental health housing.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 45, which requires Suicide Prevention Kits and first-aid kits in control booths in all facilities.

The County has maintained Substantial Compliance for twelve consecutive

months as of June 30, 2021, with Paragraph 46, which requires the Department to interrupt, and if necessary, provide appropriate aid to any prisoner who threatens or exhibits self-injurious behavior.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 48, which requires the Department to have written housekeeping, sanitation, and inspection plans to ensure proper cleaning.

The County has maintained Substantial Compliance for twelve consecutive months as of February 28, 2017, with Paragraph 49, which requires the Department to have maintenance plans to respond to routine and emergency maintenance needs.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2017, with Paragraph 50, which requires pest control in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2017, with Paragraph 51, which requires the Department to ensure that all prisoners have access to basic hygiene supplies in accordance with state regulations.

The County has maintained Substantial Compliance for twelve consecutive months at CRDF, PDC North, MCJ, and TTCF with Paragraph 55, which requires custody, medical and mental health staff to meet daily in High Observation Housing and weekly in Moderate Observation Housing.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 56, which requires custody, medical, and mental health staff to communicate regarding any change in a housing assignment following a suicide attempt or serious change in mental health condition.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2018, at MCJ with Paragraph 57, which requires safety checks in mental health housing.  The County has achieved Substantial Compliance as of July 1, 2021, through September 30, 2021, at PDC North.  The County has also provided documentation reflecting that it maintained Substantial Compliance as of September 30, 2021, through March 31, 2022, at PDC North.  These results have been verified by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive months at PDC South, PDC North, and PDC East as of December 31, 2016, at CRDF as of June 30, 2018, and at IRC as of September 30, 2018, with Paragraph 58, which requires safety checks in non-mental health housing.  The County has achieved Substantial Compliance at NCCF as of April 1, 2021, through September 30, 2021.  The County has provided documentation reflecting that it has maintained Substantial Compliance as of October 1, 2021, through March 31, 2022, at NCCF.  These results are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2019, with Paragraph 59, which requires unannounced daily supervisory rounds to verify safety checks.

The County has achieved Substantial Compliance with Paragraph 60, as of April 1, 2019, through March 31, 2020, which requires the implementation of a quality improvement plan.

The County has maintained Substantial Compliance for twelve consecutive months at MCJ, NCCF, PDC East, PDC North, PDC South, and TTCF with Paragraph 68, which requires staggered contraband searches in housing units.  The County has provided documentation reflecting that it has achieved Substantial Compliance at CRDF as of January 1, 2022, through March 31, 2022.  These results are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2019, with Paragraph 69, which requires the County and the Sheriff to use clinical restraints only in the Correctional Treatment Center with the approval of a licensed psychiatrist who performed an individualized assessment.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2017, with Paragraph 71, which requires the County and the Sheriff to ensure that any prisoner subjected to clinical restraints in response to a mental health crisis receives therapeutic services to remediate any effects from the restraints.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 72, which requires the Department and the County to report on meetings to review suicides and incidents of serious self-injurious behavior.

The County has maintained Substantial Compliance for twelve consecutive months as of September 30, 2018, with Paragraph 73, which requires the Department to prepare detailed reports of prisoners who threaten or exhibit self-injurious behavior.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 74, which requires the Department to have an objective law enforcement investigation of every suicide that occurs in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of September 30, 2018, with Paragraph 75, which requires the Department and the County to review every serious suicide attempt that occurs in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 76, which requires the Department to follow certain procedures whenever there is an apparent or suspected suicide.

The County has maintained Substantial Compliance for twelve consecutive months as of May 18, 2017, with Paragraph 78, which requires the Suicide Prevention Advisory Committee to meet twice a year.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 82, which requires the Department to co-locate personnel responsible for collecting prisoners' grievances at CRDF.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2019, with Paragraph 83, which requires it to install closed circuit security cameras throughout all of the common areas in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2018, with Paragraph 84, which requires investigations of force incidents and administrative actions to be completed timely.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2022, with Paragraph 85, which requires Internal Affairs Bureau personnel to receive adequate specialized training in conducting investigations of misconduct.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2019, with Paragraph 86, which requires inventory and control of weapons.

## FOURTEENTH REPORT

18.     Within three months of the Effective Date, the County and the Sheriff will develop, and within six months of the Effective Date will commence providing:  (1) a four-hour custody-specific, scenario-based, skill development training on suicide prevention, which can be part of the eight-hour training described in paragraph 4.8 of the Implementation Plan in *Rosas* to all new Deputies as part of the Jail Operations Continuum and to all new Custody Assistants at the Custody Assistants academy; and (2) a two-hour custody-specific, scenario-based, skill development training on suicide prevention to all existing Deputies and Custody Assistants at their respective facilities, which can be part of the eight-hour training described in paragraph 4.7 of the Implementation Plan in *Rosas*, through in-service Intensified Formatted Training, which training will be completed by December 31, 2016.

These trainings will include the following topics:

(a)     suicide prevention policies and procedures, including observation and supervision of prisoners at risk for suicide or self-injurious behavior;

(b)     discussion of facility environments and staff interactions and why they may contribute to suicidal behavior;

(c)     potential predisposing factors to suicide;

(d)     high-risk suicide periods and settings;

(e)     warning signs and symptoms of suicidal behavior;

(f)     case studies of recent suicides and serious suicide attempts;

(g)     emergency notification procedures;

(h)     mock demonstrations regarding the proper response to a suicide attempt, including a hands-on simulation experience that incorporates the challenges that often accompany a jail suicide, such as cell doors being blocked by a hanging body and delays in securing back-up assistance;

(i)     differentiating between suicidal and self-injurious behavior; and

(j)     the proper use of emergency equipment.

**STATUS (18):**     **SUBSTANTIAL COMPLIANCE (as of October 1, 2017 (verified) at MCJ and PDC South)**

**SUBSTANTIAL COMPLIANCE (as of September 1, 2017 (verified) at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of December 1, 2017 (verified) at PDC East)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018 (verified) at TTCF, IRC, and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of August 1, 2018 (verified) at CRDF)**

The Department was not subject to monitoring during the Fourteenth Reporting Period for the initial training of existing Deputy Sheriffs or Custody Assistants or of new Deputies in the Jail Operations Continuum and new Custody Assistants in the Custody Assistant Academy as required by Paragraph 18. Virtually all of the Deputy Sheriffs and Custody Assistants in the custody facilities received the initial training because they were assigned to the jails as of the Existing Date of the Settlement Agreement or they received the training as new Deputies or new Custody Assistants.

The Department is still subject to monitoring in future periods for Substantial Compliance with the refresher course requirements under Provision 81 Rosas 4.6(b) and 4.7(b). The County has maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) as of December 2021. The County has posted results reflecting that it was unable to maintain compliance with the refresher training requirements under Provision 81 Rosas 4.7(b) as of December 2021.

19.     Commencing July 1, 2015, the County and the Sheriff will provide:

(a)     Custody-specific, scenario-based, skill development training to new Deputies during their Jail Operations training, and to existing Deputies assigned to Twin Towers Correctional Facility, Inmate Reception Center, Men's Central Jail, the Mental Health Housing Units at Century Regional Detention Facility, and the Jail Mental Evaluation Teams ("JMET") at North County Correctional Facility as follows:

(i)     32 hours of Crisis Intervention and Conflict Resolution as described in paragraphs 4.6 and 4.9 of the Implementation Plan in *Rosas* to be completed within the time frames established in that case (currently December 31, 2016).  Deputies at these facilities will receive an eight-hour refresher course consistent with paragraph 4.6 of the Implementation Plan in *Rosas* every other year until termination of court jurisdiction in that case and then a four-hour refresher course every other year thereafter.

(ii)    Eight hours identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas* to be completed by December 31, 2016.  This training requirement may be a part of the 32-hour training described in the previous subsection.  Deputies at these facilities will receive a four-hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

(b)     Commencing July 1, 2015, the County and the Sheriff will ensure that new Custody Assistants receive eight hours of training in the Custody Assistant academy, and that all existing Custody Assistants receive eight hours of training related to identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas*.  This training will be completed by December 31, 2016.  Custody Assistants will receive a four-hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

**STATUS (19):**    **SUBSTANTIAL COMPLIANCE (as of April 1, 2018, (verified) at NCCF, MCJ, and IRC)**

                                              **SUBSTANTIAL COMPLIANCE (as of July 1, 2018, (verified) at TTCF)**

                                              **SUBSTANTIAL COMPLIANCE (as of December 1, 2018 (verified) at CRDF, PDC East, and PDC North)**

                                              **SUBSTANTIAL COMPLIANCE (as of March 1, 2019 (verified) at PDC South)**

The Department was not subject to monitoring during the Fourteenth Reporting Period for the training of existing and new Deputy Sheriffs and Custody Assistants required by Paragraph 19.

The Department is still subject to monitoring in future periods for Substantial Compliance with the refresher course requirements under Provision 81 Rosas 4.6(b) and 4.7(b). The County has maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) as of December 2021. The County has posted results reflecting that it was unable to maintain compliance with the refresher training requirements under Provision 81 Rosas 4.7(b) as of December 2021.

20.    Commencing no later than July 1, 2017, the County and the Sheriff will
provide:

(a)    Custody-specific, scenario-based, skill development training to existing
Deputies assigned to North County Correctional Facility, Pitchess
Detention Center, and the non-Mental Health Housing Units in Century
Regional Detention Facility as follows:

(i)    32 hours of Crisis Intervention and Conflict Resolution as
described in paragraphs 4.6 and 4.9 of the Implementation Plan in
*Rosas* to be completed by December 31, 2019. Deputies at these
facilities will receive an eight-hour refresher course consistent with
paragraph 4.6 of the Implementation Plan in *Rosas* every other
year until termination of court jurisdiction in that case and then a
four-hour refresher course every other year thereafter.

(ii)    Eight hours identifying and working with mentally ill prisoners as
described in paragraph 4.7 of the Implementation Plan in *Rosas* to
be completed by December 31, 2019. This training requirement
may be a part of the 32-hour training described in the previous
subsection. Deputies at these facilities will receive a four-hour
refresher course consistent with paragraph 4.7 of the
Implementation Plan in *Rosas* every other year thereafter.

**STATUS (20):**     **SUBSTANTIAL COMPLIANCE (as of August 1, 2017 (verified) at CRDF, PDC East, PDC North, and NCCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017 (verified) at PDC South)**

The Department was not subject to monitoring for the initial training for existing Deputies as required by Paragraph 20 during the Fourteenth Reporting Period.

The Department is still subject to monitoring in future periods for Substantial Compliance with the refresher course requirements under Provision 81 Rosas 4.6(b) and 4.7(b).  The County has posted results for maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) as of December 2021.  The County has posted results reflecting that it was unable to maintain compliance with the refresher training requirements under Provision 81 Rosas 4.7(b) as of December 2021.

21.     Consistent with existing Sheriff's Department policies regarding training requirements for sworn personnel, the County and the Sheriff will ensure that existing custody staff that have contact with prisoners maintain active certification in cardiopulmonary resuscitation and first aid.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of October 1, 2015, through September 30, 2016 (verified) at PDC East and South)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at NCCF, PDC North, and IRC)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 (verified) at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at MCJ)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2018, through June 30, 2019 (verified) at CRDF)**

The Compliance Measures provide that the Department will demonstrate Substantial Compliance when 95% of the designated custody staff have the required CPR and first aid certifications for twelve consecutive months.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 21 in the Fourteenth Reporting Period.

22.     Within six months of the Effective Date and at least annually thereafter, the County and the Sheriff will provide instructional material to all Sheriff station personnel, Sheriff court personnel, custody booking personnel, and outside law enforcement agencies on the use of arresting and booking documents, including the Arrestee Medical Screening Form, to ensure the sharing of known relevant and available information on prisoners' mental health status and suicide risk.  Such instructional material will be in addition to the training provided to all custody booking personnel regarding intake.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017)**

The Justice Data Interface Controller ("JDIC") message the Department has been using since June 29, 2016, is sufficient to establish Substantial Compliance with Paragraph 22, and the County maintained Substantial Compliance for twelve consecutive months through June 30, 2017.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 22 in the Fourteenth Reporting Period.

23.     Within three months of the Effective Date, the County and the Sheriff will commence a systematic review of all prisoner housing, beginning with the Mental Health Unit of the Correctional Treatment Center, all High Observation Housing areas, all Moderate Observation Housing areas, single-person discipline, and areas in which safety precautions are implemented, to reduce the risk of self-harm and to identify and address suicide hazards.  The County and the Sheriff will utilize a nationally-recognized audit tool for the review.  From this tool, the County and the Sheriff will:

(a)     develop short and long term plans to reasonably mitigate suicide hazards identified by this review; and

(b)     prioritize planning and mitigation in areas where suicide precautions are implemented and seek reasonable mitigation efforts in those areas.

**STATUS:        SUBSTANTIAL COMPLIANCE**

The Monitor has verified, with the advice of the Subject Matter Expert, that the Department's Suicide Hazard Inspection Check List tool is a nationally recognized audit tool for this review.  The Department provided the Monitor with completed checklists documenting inspections of all housing units by January 14, 2016.

The Department submitted updated Suicide Hazard Mitigation plans to the Monitor on January 18, 2018 and July 12, 2018.  After consultations with the Mental Health Subject Matter Expert, the Monitor concluded that the plans satisfied the requirements of Paragraph 23 and that the Department had achieved and maintained Substantial Compliance with the provision.  Accordingly, pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 23 in the Fourteenth Reporting Period.

24.     The County and the Sheriff will review and inspect housing areas on at
least an annual basis to identify suicide hazards.

**STATUS:        SUBSTANTIAL COMPLIANCE (as of October 1, 2017,
through September 30, 2018)**

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not
subject to monitoring for Substantial Compliance with Paragraph 24 in the Fourteenth
Reporting Period.  As the Monitor has noted, however, implementation and tracking of
corrective actions must be addressed by the Custody Compliance and Sustainability
Bureau ("CCSB") under Paragraph 77(c), which requires CCSB to "ensur[e] that
corrective actions are taken to mitigate suicide risk. . .obtaining where appropriate,
technical assistance. . .when such assistance is needed to address suicide-risk issues."

25.     The County and the Sheriff will ensure that any prisoner in a Sheriff's Department station jail who verbalizes or who exhibits a clear and obvious indication of current suicidal intent will be transported to IRC, CRDF, or a medical facility as soon as practicable.  Pending transport, such prisoners will be under unobstructed visual observation, or in a suicide resistant location with safety checks every 15 minutes.

**STATUS:       PARTIAL COMPLIANCE (at Central, East, South, and North Patrol Divisions)**

A provision of the Station Jail Manual adopted in March 2018 requires that any arrestee who "displays obvious suicidal ideation or exhibits unusual behavior that clearly manifest[s] self-injurious behavior or other clear indication of mental health crisis shall be transported to the Inmate Reception Center (IRC), Century Regional Detention Facility (CRDF), or a medical facility as soon as practicable.  Pending transport, such inmates. . .shall be under unobstructed visual observation or in a suicidal restraint location with safety checks every 15 minutes."

Under the revised Compliance Measures, which were updated in 2021, the Department must randomly select and analyze Arrestee Medical Screening Forms from station jails identifying prisoners who verbalize or exhibit a clear and obvious indication of current suicidal intent to determine compliance with Paragraph 25.  Substantial Compliance requires that 90% of the selected records from each Patrol Division meet the requirements of Paragraph 25.  Each Patrol Division can achieve sustained compliance after twelve consecutive months of Substantial Compliance independent of the other divisions.

In the Twelfth Report, the Monitor said

The DOJ has noted that compliance with these requirements varies significantly between station jails, certain of which have repeatedly failed to demonstrate compliance with Paragraph 25.  The Monitor agrees. Given the variation in results between station jails, the County should prioritize improving compliance in those station jails that have repeatedly struggled with this provision, including CRDF Booking, East Los Angeles, Lancaster, Malibu, and Lomita.

The County's Fourteenth Self-Assessment appeared to reflect promising results with respect to the County implementing this advice.  For example, it reported strong overall performance by three of the four Patrol Divisions for the Fourth Quarter of 2021 (80% for the East Patrol Division, 100% for the North Patrol Division, 100% for the Central Patrol Division, and 66% for the South Patrol Division).  Its posted documents also indicated that the station jails specifically identified by the Monitor in the Twelfth Report (CRDF Booking, East Los Angeles, Lancaster, Malibu, and Lomita) had either demonstrated markedly improved results or had an insufficient number of relevant patients upon which to base an assessment.

23

Unfortunately, these results did not hold for the First Quarter of 2022.  According to the County's Augmented Fourteenth Self-Assessment, the overall compliance percentages fell for each of the four Patrol Divisions in the First Quarter of 2022—in some cases substantially (75% for the East Patrol Division, 30% for the North Patrol Division, 60% for the Central Patrol Division, and 37% for the South Patrol Division).  Further, three of the station jails identified by the Monitor in the Twelfth Report all reported dramatic reductions in compliance for the First Quarter of 2022 (50% for CRDF Booking, 0% for East Los Angeles, 0% for Lancaster, 100% for Malibu, and no relevant records for Lomita).

Regarding these results, the County reports that

Over the last six months, the Department through CCSB has: (i) briefed all four Patrol Division Aides (Jan. 25, 2022), (ii) visited all station jails and personally briefed jail staff regarding their obligations, (iii) developed and posted a sign for jail staff to assist them with Keys to Compliance when they encounter relevant arrestees, [and] (iv) circulated email briefings to every Station Jail Operations unit regarding the self-assessments to be completed by station leadership.  CCSB also met with all four Division Aides and designed a benchmark for compliance by July 2023.  CCSB has also requested a corrective action plan for each station reporting partial compliance in First Quarter 2022.

The Monitor believes that these are useful steps towards improved compliance with this Provision.  If the County's results do not markedly improve, certain Patrol Divisions may be found Non-Compliant with Provision 25 in the next Reporting Period.

26.     Consistent with existing Sheriff's Department policies, the County and the Sheriff will follow established screening procedures to identify prisoners with emergent or urgent mental health needs based upon information contained in the Arrestee Medical Screening Form (SH-R-422) or its equivalent and the Medical/Mental Health Screening Questionnaire and to expedite such prisoners for mental health evaluation upon arrival at the Jail Reception Centers and prior to routine screening.  Prisoners who are identified as having emergent or urgent mental health needs, including the need for emergent psychotropic medication, will be evaluated by a QMHP as soon as possible but no later than four hours from the time of identification.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of July 1, 2021, through March 31, 2022)**

The Compliance Measures require the Department to "review Arrestee Medical Screening Forms (SH-R-422) (or its equivalent) and the Medical/Mental Health Screening Questionnaires of 100 randomly selected prisoners during one randomly selected week per quarter at CRDF and at IRC."  Substantial Compliance requires that (1) 95% of the forms "include the required mental health information" and (2) 90% of the prisoners having urgent or emergent needs were "seen by a QMHP within four hours."

The County's Fourteenth Self-Assessment reports that for the one randomly selected week in the Fourth Quarter of 2021, 93% of the screening forms reviewed had the required mental health information, which is less than the threshold for Substantial Compliance.  95% of the prisoners with urgent or emergent mental health needs were seen by a QMHP within four hours, which exceeds the relevant threshold.  The County's Fourteenth Self-Assessment also reports that for the one randomly selected week in the First Quarter of 2022, 96% of the screening forms reviewed had the required mental health information, and 100% of the prisoners with urgent or emergent mental health needs were seen by a QMHP within four hours, which both exceeded the threshold for Substantial Compliance.

In May 2022, Drs. Johnson, Vess, and Eargle conducted a qualitative review of the County's compliance with Provision 26.  They assessed the completeness of intake documentation and sought to "determine whether patients with emergent or urgent needs were missed at intake" by examining the intake records and other associated documents.  They found that in 100% of cases, the intake documentation was complete and available.  They also found that in 86% of the cases sampled it was "highly likely that the condition leading to subsequent HOH or FIP placement was present at the time of the intake screening."  This was a continued increase from recent prior results (67% in November 2021, 65% in July 2021, and 14% in November 2020).  In their view, this represented "a sustained increase in the percentage of inmates entering jail with existing mental health conditions."

In 18.5% of cases, "an urgent or emergent condition was likely present at the time of the intake screening that should have been detected during a standard intake process" but it was not detected.  These results were generally consistent with prior qualitative

findings.  The Team noted that for a number of these cases, the "documentation of the initial mental health contact was relatively sparse, and improved documentation might have led to some of these cases being deemed compliant."

The County's results for Compliance Measure 26-4(a) fell short of the relevant threshold by 2% for the Fourth Quarter of 2021.  Given the County's continued improvements with respect to Provision 26 and the Department's generally strong results, the Monitor has exercised his discretion and finds that the County was Substantially Compliant for the Fourteenth Reporting Period.  Of greater concern is the fact that the Monitoring Team has continued to find patients with urgent or emergent conditions that were likely present at the time of the intake screening that should have been detected during a standard intake process but were not detected.  This reflects a potentially serious weakness in the County's screening methodology that could impact patient safety.  These results must improve in the next Reporting Period for the County to retain its rating of Substantial Compliance.

In response to a draft of this Report, the DOJ noted that the implementation plan for Provision 26 requires that "going forward, intake nurses will be briefed on a quarterly basis as to cases involving emergent or urgent mental health needs that were missed by that nurse at intake, as a measure to help build their expertise and sensitivity to indicators of urgent and emergent mental health needs."  The Monitor agrees that this process, once implemented, could enhance the capacity of CHS staff to detect urgent and emergent mental health conditions and avoid errors in the screening process.  The Monitor and Mental Health Subject Matter Expert will meet with CHS officials during the next Reporting Period to discuss the cases that were missed during the Fourteenth Reporting Period, and the County should include a discussion of its briefings with intake nurses in its next Self-Assessment.

27.     Consistent with existing Sheriff's Department policies, the County and the Sheriff will ensure that all prisoners are individually and privately screened by Qualified Medical Staff or trained custody personnel as soon as possible upon arrival to the Jails, but no later than 12 hours, barring an extraordinary circumstance, to identify a prisoner's need for mental health care and risk for suicide or self-injurious behavior.  The County and the Sheriff will ensure that the Medical/Mental Health Screening Questionnaire, the Arrestee Medical Screening Form (SH-R-422), or its equivalent, and/or the Confidential Medical Mental Health Transfer Form are in the prisoner's electronic medical record or otherwise available at the time the prisoner is initially assessed by a QMHP.

**STATUS:**      **SUBSTANTIAL COMPLIANCE (as of October 1, 2019, through March 31, 2020, and October 1, 2020, through March 31, 2021 (verified))**

The Compliance Measures require the Department to review the records of "randomly selected prisoners who were processed for intake during one randomly selected week at CRDF and at IRC" to determine compliance with this provision. Substantial Compliance requires that 90% of the records reviewed reflected that the prisoners were screened for mental health needs within 12 hours and that the required documentation was available to the QMHP for 90% of the mental health assessments conducted by the QMHP.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 27 in the Fourteenth Reporting Period.

28.     The County and the Sheriff will ensure that any prisoner who has been identified during the intake process as having emergent or urgent mental health needs as described in Paragraph 26 of this Agreement will be expedited through the booking process.  While the prisoner awaits evaluation, the County and the Sheriff will maintain unobstructed visual observation of the prisoner when necessary to protect his or her safety, and will conduct 15-minute safety checks if the prisoner is in a cell.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at IRC)**

**PARTIAL COMPLIANCE (at CRDF)**

The Compliance Measures require the Department to review the records of randomly selected prisoners at CRDF and IRC who have urgent or emergent mental health needs to determine whether they were expedited through the booking process and under visual observation or checked every 15 minutes.

The County's Fourteenth Self-Assessment reflects that in the Fourth Quarter of 2021, 100% of the inmates with urgent or emergent mental health needs were expedited through the booking process at CRDF in the randomly selected week, as required by the applicable Compliance Measures, and 100% of the inmates were observed or checked as is required.  The County's Fourteenth Self-Assessment also reported that in the First Quarter of 2022, 90% of the inmates with urgent or emergent mental health needs were expedited through the booking process at CRDF in the randomly selected week, and 100% of the inmates were observed or checked, as is required.

Given these results, the County requests that it be found in Substantial Compliance and that "effective April 1, 2022, the County completed its obligations related to this provision and is no longer subject to monitoring."

However, the relevant Compliance Measures require the County to evaluate a population of 25 inmates to assess compliance in each quarter.  For the Thirteenth Reporting Period, the County presented a sample of only 5 inmates in the Second and Third Quarters of 2021.  In the Thirteenth Report, the Monitor noted

There were only five relevant inmates in the random weeks selected in the Second and Third Quarters of 2021, which is smaller than the sample size contemplated by the relevant Compliance Measure ("for one randomly selected week each quarter, the Department will review the records of 25 randomly selected prisoners at CRDF").  The Monitor finds that the County achieved Substantial Compliance for the Second and Third Quarters of 2021 on the basis of its reported results, which are subject to verification by the Monitor's auditors.  ***However, if the random weeks selected during the Fourteenth Monitoring Period do not contain 25 relevant inmates, the County should add additional random weeks until a population of 25 inmates can be measured per quarter*** [emphasis

added].

In the County's posted results, it identified populations of 7 inmates for the Fourth Quarter of 2021 and 10 inmates for the First Quarter of 2022. The County did not explain why it failed to add additional random weeks to this sample as the Monitor recommended. Upon request, the County posted amended results (using a larger sample size) for the Fourth Quarter of 2021 reflecting that 76%, less than the 85% required, of the inmates with urgent or emergent mental health needs were expedited through the booking process at CRDF in the randomly selected weeks, as required by the applicable Compliance Measures. The Monitor's auditors have also requested amended results for the First Quarter of 2022.

Given the County's results and Monitor's comments in the Thirteenth Report, the County is in Partial Compliance with Provision 28 for the Fourteenth Reporting Period. In the next Reporting Period, the County should expand the sample until a population of 25 relevant inmates is identified in each quarter, if again necessary, or it risks being found in Non-Compliance.

The County previously maintained Substantial Compliance with Paragraph 28 at IRC for twelve consecutive months, and IRC was not subject to monitoring for Substantial Compliance with Paragraph 28 in the Fourteenth Reporting Period.

29.     The County and the Sheriff will ensure that a QMHP conducts a mental health assessment of prisoners who have non-emergent mental health needs within 24 hours (or within 72 hours on weekends and legal holidays) of a registered nurse conducting an intake nursing assessment at IRC or CRDF.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified))**

The Compliance Measures require the Department to review randomly selected records of the prisoners identified in the intake nursing assessment as having non-emergent mental health needs to determine if the Department completed mental health assessments for 85% of the prisoners within the required time periods.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 29 in the Fourteenth Reporting Period.

30.     Consistent with existing DMH policies, the initial mental health assessment will include a brief initial treatment plan.  The initial treatment plan will address housing recommendations and preliminary discharge information.  During the initial assessment, a referral will be made for a more comprehensive mental health assessment if clinically indicated.  The initial assessment will identify any immediate issues and determine whether a more comprehensive mental health evaluation is indicated.  The Monitor and SMEs will monitor whether the housing recommendations in the initial treatment plan have been followed.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of January 1, 2019, through December 31, 2019 (verified))**

The Compliance Measures require the Department to review randomly selected initial mental health assessments and report on (1) the percentage of assessments that have (i) included an initial treatment plan that addresses housing recommendations and preliminary discharge information and (ii) identified any immediate issues and whether a more comprehensive evaluation was indicated; and (2) whether the housing recommendations were followed.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 30 in the Fourteenth Reporting Period.

31 (**Revised**).  Consistent with existing Correctional Health Services and Sheriff's
Department policies, the County and the Sheriff will maintain electronic mental health
alerts in prisoners' electronic medical records that notify medical and mental health staff
of a prisoner's risk for suicide or self-injurious behavior.  The alerts will be for the
following risk factors:

      (a)     current suicide risk; and

      (b)     prior suicide attempts.

**STATUS:**     **PARTIAL COMPLIANCE (at CRDF & TTCF)**

On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement
Agreement that amended the language of Provision 31 ("Revised Paragraph 31") as set
forth above.  They also agreed on Revised Compliance Measures.  The Revised
Compliance Measures require the Department to review randomly selected electronic
medical records for prisoners in certain at-risk groups to determine if the required mental
health alerts are in 85% of the records reviewed, which is the threshold for Substantial
Compliance, for prisoners who report suicidal thoughts (at suicide risk) during the intake
process; or were removed from risk precautions in the prior quarter.

The County's Fourteenth Self-Assessment reports that for the Fourth Quarter of
2021, at CRDF, 96% of the records reviewed contained the mental health alerts required
by 31-1(a).  There were no patients removed from risk precautions during the relevant
period, thus no records to review in connection with 31-1(b).  At TTCF, 96% of the
records reviewed contained the mental health alerts required by 31-1(a).  There were no
patients removed from risk precautions during the relevant period, thus no records to
review in connection with 31-1(b).

As the Monitor wrote in the Twelfth Report, the County "substantially revised its
process for use of risk precautions in the years after the Agreement was executed."
Given those changes, there was a need for an "an alternative approach to sampling the
patient population."  The County subsequently worked with the Monitor, Dr. Johnson,
and the DOJ to develop that revised methodology, which was implemented in connection
with the assessment of the First Quarter of 2022.

The County's Augmented Fourteenth Self-Assessment reports that under that
revised methodology, for the First Quarter of 2022, at CRDF, 100% of the records
reviewed contained the mental health alerts required by 31-1(a).[8]  Regarding 31-1(b),
87% of the relevant records contained the required alerts.  At TTCF, 84% of the records
reviewed contained the mental health alerts required by 31-1(a).  Regarding 31-1(b), 16%

---

[8] The DOJ has expressed concern regarding the large number of patients who were excluded from the
County's audits under Compliance Measure 31-1(a).  In the Fifteenth Reporting Period, the County should
explain the reasons for such exclusions, if any, in its posted results for all Compliance Measures under
Provision 31.

of the relevant records contained the required alerts.  However, the Monitor's auditors note that the methodology utilized by the County in its posted results differs from what is required by Compliance Measure 31-1(b).  The County is required to sample from a universe of inmates whose risk levels were lowered in the prior quarter. Yet, the County inadvertently sampled from a universe of inmates who were assigned a High or Imminent risk level during the prior quarter, which was then lowered in either the prior or current quarter.

The Monitor therefore finds the County in Partial Compliance.  In the next Reporting Period, the County's assessment should be based on a universe of inmates whose risk levels were lowered during the prior quarter, regardless of when the High or Imminent risk levels were initially assigned.

32.     Information regarding a serious suicide attempt will be entered in the prisoner's electronic medical record in a timely manner.

**STATUS:        SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified))**

The Compliance Measures require that 95% of the electronic medical records of prisoners who had a serious suicide attempt reflect information regarding the attempt, and 85% of the records reflect that the information was entered into the record within one day of the attempt.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 32 in the Fourteenth Reporting Period.

33.     The County will require mental health supervisors in the Jails to review electronic medical records on a quarterly basis to assess their accuracy as follows:

(a)     Supervisors will randomly select two prisoners from each clinician's caseload in the prior quarter;

(b)     Supervisors will compare records for those prisoners to corroborate clinician attendance, units of service, and any unusual trends, including appropriate time spent with prisoners, recording more units of service than hours worked, and to determine whether contacts with those prisoners are inconsistent with their clinical needs;

(c)     Where supervisors identify discrepancies through these reviews, they will conduct a more thorough review using a DMH-developed standardized tool and will consider detailed information contained in the electronic medical record and progress notes; and

(d)     Serious concerns remaining after the secondary review will be elevated for administrative action in consultation with DMH's centralized Human Resources.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017 (verified))**

The Compliance Measures require the County to provide the Monitor and the Subject Matter Experts with the DMH-developed standardized tool required by Paragraph 33(c), and to report the results of its analysis of the electronic medical records of two randomly selected prisoners from each clinician's caseload.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 33 in the Fourteenth Reporting Period.

34 **(Revised).**  Consistent with existing Correctional Health Services policy, the County and the Sheriff will conduct clinically appropriate release planning for all prisoners who are being released to the community and who have been identified by a QMHP as having a mental illness and needing mental health treatment, or as having a DSM-5 major neuro-cognitive disorder that caused them to be housed in the Correctional Treatment Center at any time during their current incarceration.  For prisoners with mental illness and needing mental health treatment, the release planning services will be guided by the prisoner's level of care.  Specifically, prisoners who at any time during their incarceration meet mental health level of P3 or P4 will be presumptively referred for release planning services, and prisoners who meet mental health level of care P2 will receive release planning services upon referral by a clinician or upon their request.  Prisoners who have a DSM-5 major neuro-cognitive disorder that caused them to be housed in the Correctional Treatment Center will also be referred for release planning services consistent with the Correctional Health Services policy applying to prisoners with mental illness.

(a) Release planning will consider the need of the prisoner for housing; transportation to the prisoner's community-based provider, residence, or shelter within the County; bridge psychotropic medications; medical/mental health/substance abuse services; income/benefits establishment; and family/community/social supports ("Release Planning Areas").

(b) Release planning will be based on an individualized assessment of the prisoner's needs and, unless the prisoner is unable or unwilling to participate, will be undertaken in collaboration with the prisoner.  For prisoners referred for release planning services, those services will include:

(i) An Initial Release Plan that will be created at intake or no later than ten days after the referral for release planning, which referral shall normally occur at the time of intake.  The Initial Release Plan will include preliminary identification of needs in each of the Release Planning Areas and preliminary recommendations for services to address those needs, and a referral for assistance in obtaining California identification when needed and when the prisoner is eligible; and/or

(ii) A Comprehensive Release Plan that will be initiated no later than thirty days after the referral for release planning.  The Comprehensive Release Plan will include (A) collecting information regarding the prisoner's needs; (B) coordinating with community-based providers to identify available services that meet the prisoner's needs; (C) facilitating the transition of care to community-based providers, and (D) assisting in obtaining identification and/or benefits when needed, when the prisoner is eligible, and as offered by the Sheriff's Community Transition Unit.

(c) The County will maintain a re-entry resource center with staff supervised by a QMHP.  The re-entry resource center will:

36

(i) Provide information appropriate to the released prisoner about available housing, transportation, medical/mental health/substance abuse services, income/benefits establishment, community/social supports, and other community resources; and

(ii) Provide released prisoners with copies of their release plans, as available.

(d) All prisoners who are receiving and continue to require psychotropic medications will be offered a clinically appropriate supply of those medications upon their release from incarceration.  Unless contraindicated, this will be presumed to be a 14-day supply or a supply with a prescription sufficient so that the prisoner has the psychotropic medication available during the period of time reasonably necessary to permit the prisoner to consult with a doctor and obtain a new supply.

(e) Nothing in Paragraph 34 will require prisoners to accept or participate in any of the services provided under this Paragraph.

(f) Neither the County nor the Sheriff shall be in violation of this paragraph if after reasonable efforts as set forth in Correctional Health Services Policy M380.01, Release Planners are unable to identify available post-release services.

STATUS (34):          NON-COMPLIANCE

During the Seventh Reporting Period, the parties and the Intervenors reached an agreement on the provisions of revised Paragraph 34 ("Revised Paragraph 34") set forth above.  They also agreed on revised Compliance Measures and a revised policy to implement Revised Paragraph 34.  On December 10, 2018, the Court issued an order pursuant to the parties' joint stipulation revising Paragraph 34.

The County's Fourteenth Self-Assessment reports that, as required by Compliance Measure 34-10, the Department's Compliance Team made six visits in the Fourth Quarter of 2021 and First Quarter of 2022 to CRRC to confirm the presence of staff representing the Health Agency, Probation, and Sheriff's Departments.  The County concluded that it achieved 100% compliance with all departments being present at each visit.

Compliance Measures 34-1 and 2 require the County to review on a quarterly basis "randomly selected records of 85 prisoners released in a randomly selected week" who had been identified as having a need for mental health care to determine if the requirements of the County's Release Planning Policy were satisfied and state for each prisoner who did not receive a Comprehensive Release Plan why a plan was not completed, whether repeated efforts were made to offer the prisoner comprehensive release planning, and whether an Initial Release Plan was completed.  Compliance Measure 34-13(c) sets forth the relevant thresholds for Compliance Measure 34-1.

The County's Self-Assessment for the Fourth Quarter of 2021 reports that regarding Compliance Measure 13(c)(1), 94% of inmates received a referral for release planning, rather than the required 85%.  The County's posted results for the First Quarter of 2022 reflect that 92% of inmates received the required referral.

For Compliance Measure 34-13(c)(4), which requires certain services and documentation relating to inmates requiring psychotropic medications, the County's Fourteenth Self-Assessment reflects 92% compliance during the Fourth Quarter of 2021. The County's posted results for the First Quarter of 2022 reflect 100% compliance.

Compliance Measure 34-12 requires the County to "review randomly selected records of 50 prisoners released in a randomly selected week who had been identified by a QMHP as meeting a mental health level of care P2" and evaluate "whether the QMHP considered the factors in the Release Planning Policy when determining whether to refer the prisoner."  The County's posted results reported that 98% of the mental health records included the required criteria during the relevant assessment weeks.[9]

The County has long-struggled with 34-13(c)(2), which concerns inmates who only had Initial Release Plans, and 34-13(c)(3), which requires certain services and

---

[9] In response to a draft of this Report, the DOJ raised several methodological concerns about the County's compliance audits under Provision 34.  The Monitor has instructed his auditors to conduct a detailed evaluation of the County's methods in the next Reporting Period, and the results will be shared with the Parties.

documentation relating to inmates who received a Comprehensive Release Plan—and the Fourteenth Reporting Period is no exception.  The County's Fourteenth Self-Assessment reports that regarding Compliance Measure 34-13(c)(2), "63% of inmates receiv[ed] the required services and documentation rather than the required 85%" in the Fourth Quarter of 2021.  The County's posted results for the First Quarter of 2022 reflect 70% compliance.

Similarly, regarding Compliance Measure 34-13(c)(3), the County's Fourteenth Self-Assessment reports that "33% of inmates receiv[ed] the required services and documentation, rather than the required 85%" during the Fourth Quarter of 2021.  The County's posted results for the First Quarter of 2022 reflect 45% compliance.

In response to a draft of this Report, the County pointed out a series of steps it has undertaken to improve its compliance during the Fourteenth Reporting Period.  This includes making offers to five psychiatric social workers and developing "an Excel case tracker tool," which is now in use by "the entire County team."  Further, the County reports that "an administrative staff member was assigned to handle release planning for people facing serious charges or high bail amounts" and it has created a "customized case tracker" for such matters.  The County also created a "custom case tracker" for Community Health Workers to track Initial Release Plan assignments.  Supervisors also enhanced their supervision by "randomly auditing selected closed cases" of their supervisees and conducting "monthly reviews of each staff member's caseload and a review of full documentation of five open cases."  The County suggests that these steps, and the others it is undertaking, will "bear concrete results in the next reporting period."

The Monitor hopes so, too.  Given its current performance, the County is rated as Non-Compliant with Provision 34 for the Fourteenth Reporting Period.

35.     Consistent with existing DMH and Sheriff's Department policies, the County and the Sheriff will ensure that custody staff, before the end of shift, refer prisoners in general or special populations who are demonstrating a potential need for routine mental health care to a QMHP or a Jail Mental Evaluation Team ("JMET") member for evaluation, and document such referrals.  Custody staff will utilize the Behavior Observation and Referral Form.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of November 1, 2017, through December 31, 2018 (verified))**

The Compliance Measures require the Department to review, for a randomly selected month each quarter, the Behavior Observation and Mental Health Referral ("BOMHR") records for prisoners referred by custody staff to a QMHP or JMET member for "routine" mental health care to determine the timeliness of the referrals, and that 85% of the referrals "occurred before the end of the shift in which the potential need for mental health care is identified."

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 35 in the Fourteenth Reporting Period.

36.     Consistent with existing DMH policies, the County and the Sheriff will ensure that a QMHP performs a mental health assessment after any adverse triggering event, such as a suicide attempt, suicide threat, self-injurious behavior, or any clear decompensation of mental health status.  For those prisoners who repeatedly engage in such self-injurious behavior, the County will perform such a mental health assessment only when clinically indicated, and will, when clinically indicated, develop an individualized treatment plan to reduce, and minimize reinforcement of, such behavior.  The County and the Sheriff will maintain an on-call system to ensure that mental health assessments are conducted within four hours following the notification of the adverse triggering event or upon notification that the prisoner has returned from a medical assessment related to the adverse triggering event.  The prisoner will remain under unobstructed visual observation by custody staff until a QMHP has completed his or her evaluation.

**STATUS:       NON-COMPLIANCE**

The Compliance Measures require the Department to develop a staffing schedule to provide on-call services, and the County's Fourteenth Self-Assessment reported that it has complied with this requirement for the Fourth Quarter of 2021.  The Compliance Measures also require the Department to review randomly selected records of prisoners newly admitted to mental health housing from a lower level of care due to an adverse triggering event during two randomly selected weeks per quarter.  The County's Fourteenth Self-Assessment reports that during the Fourth Quarter of 2021, (a) "71% -- rather than the required 95% -- of inmates" identified in the two randomly selected weeks received an assessment by a QMHP within four hours, as required by Compliance Measure 36-4(a).  The County further reports that (b) 100% of the selected prisoners at TTCF and 100% at CRDF were seen on videos "under unobstructed visual observation pending assessment," as required by Compliance Measure 36-4(b).

The County's Augmented Fourteenth Self-Assessment reports that for the First Quarter of 2022, the Department complied with the staffing schedule requirement.  The County further reports that during the First Quarter of 2022 "73% -- rather than the required 95% -- of inmates" identified in the two randomly selected weeks received an assessment by a QMHP within four hours, as required by Compliance Measure 36-4(a).  The County further reports that 100% of the selected prisoners at TTCF and CRDF were "under unobstructed visual observation pending assessment," as is required by Compliance Measure 36-4(b).

The Monitoring Team also periodically conducts qualitative reviews of relevant patient files to help assess the County's compliance with Provision 36.  In the Thirteenth Reporting Period, the County was in Non-Compliance with Provision 36 based upon its poor results in the qualitative review.  In May 2022, Drs. Johnson, Vess and Eargle, conducted a follow-up qualitative assessment of the County's compliance with Paragraph 36.  In it, they sought to assess, among other things, "the County's methodology, specifically whether it sufficiently detects adverse triggering events and acts of repeated self-harm" in order to assure prompt assessment by a QMHP and a clinically-adequate treatment plan.  They also sought to determine whether any assessment conducted

"sufficiently addressed the adverse triggering event(s), including discussing relevant risk factors, and whether there was a clinically-adequate crisis response or safety plan put in place."

They found that of 47 qualifying cases with a single adverse triggering event (13 were indeterminate), 91% of the patients were seen within four hours by a QMHP. This represents a consistent improvement over several monitoring periods from previous results. The team noted, however, that a substantially larger number of cases were indeterminate during this review "due to lack of clear documentation of time stamps for various steps in the process. Better documentation of the timeline in clinical notes is needed."[10]

In 65% of the cases with a single adverse triggering event, a QMHP adequately evaluated the apparent risk factors. This is an improvement from the 36% found during the prior reporting period. However, in only 34% of the cases was any safety plan or crisis response plan in place to address the identified risk factors.[11] This deficit represents a significant risk to inmate safety concerning Provision 36 and must receive prompt attention from the County. The first mental health contact with patients in these circumstances "should result in a simple and clear safety plan for the period prior to transfer to a higher level of care followed by more detailed treatment planning by an assigned clinician."[12]

Regarding cases of repeated self-harm, the Team assessed 18 patients who were being followed by the Complex Case Committee. Of those cases, only one was found to have engaged in repeated instances of self-injurious behavior. Three other cases of repeated self-harm were identified among hospital returnees. Of these four patients who had engaged in repeated self-harm in this sample, there was a treatment plan to address the behavior in only 25% of cases. Of the remaining cases in the sample, "there was no indication that clinicians determined that a treatment plan was not clinically indicated or that a behavior management plan was put in place instead." The lack of treatment planning for inmates who engage in repeated self-harming behavior is also a significant safety risk that must receive prompt attention by the County. The County is again Non-Compliant with Provision 36 for the Fourteenth Reporting Period.

---

[10] The Monitoring Team has not historically graded indeterminate cases as non-compliant for the purposes of its qualitative review of Provision 36. However, if the number of indeterminate cases continues to grow, the Monitor will direct that they be graded as non-compliant in future Reporting Periods.

[11] County personnel have noted that inmates are sometimes resistant, unwilling, or unable to participate in the safety planning process. In these circumstances, the efforts to engage in safety planning should be documented and the inmate's responses noted in the safety plan and elsewhere in the patient chart, if necessary.

[12] The Team noted that of the cases that included safety plans, some of them were "boilerplate bullet point lists" rather than individualized plans for each inmate. The County must ensure that its plans are individualized to the presentation and symptoms of each inmate.

37.      Sheriff's Court Services Division staff will complete a Behavioral Observation and Mental Health Referral ("BOMHR") Form and forward it to the Jail's mental health and/or medical staff when the Court Services Division staff obtains information that indicates a prisoner has displayed obvious suicidal ideation or when the prisoner exhibits unusual behavior that clearly manifests self-injurious behavior, or other clear indication of mental health crisis. Pending transport, such prisoner will be under unobstructed visual observation or subject to 15-minute safety checks.

**STATUS:      NON-COMPLIANCE**

The Compliance Measures require the Department to randomly select six courts from among the three Court Divisions each quarter, review written communications and orders that refer to a suicide risk or serious mental health crisis for a prisoner and incident reports for self-injurious behavior by prisoners appearing in the selected courts, and determine if these incidents are reflected in BOMHR forms completed by the Court Services Division staff in the selected courts.

For the prior Reporting Period, the County reported low compliance percentages with Provision 37 for the Second and Third Quarters of 2021 (50% and 37%, respectively). As such, in the Thirteenth Report, the Monitor instructed the County that its results "must improve or the County may be rated Non-Compliant with Provision 37 in the next reporting period."

In the County's Fourteenth Self-Assessment, it reported that the numbers did not improve. Instead, in the Fourth Quarter of 2021, the County reported that "37% – rather than the required 90% – of the incidents involving suicidal behavior, self-injurious behavior, or clear indications of mental health crises were identified in court communications or incident reports reflected on BOHMRs." In the First Quarter of 2022, the County achieved only 20% compliance.

Regarding these results, the County's Augmented Fourteenth Self-Assessment reports

> Over the last six months, the Department has engaged in several efforts to improve compliance for this Provision consistent with its implementation plans. The Department, with CCSB serving as a subject matter expert, briefed Court Services Division training on court services-specific issues affecting compliance. CCSB also created and provided a PowerPoint training on Provision 37 and common compliance issues as a training tool for use by Court Services Division Training. CCSB and Court Services Training hosted a train the trainer presentation on multiple days in January 2022. CCSB also specifically briefed the Court Services Division Commander and Captains regarding Provision 37, its obligations, and compliance issues. Further, CCSB issued Corrective Action Plan requests regarding non-compliant courts in Quarter 1 2022, specifically for Court Services East Division and West Division.

43

The Monitor looks forward to reviewing the results of these efforts in the future. The County is rated Non-Compliant with Provision 37 for the Fourteenth Reporting Period.

38.      Consistent with existing DMH policies and National Commission on
Correctional Health Care standards for jails, the County and the Sheriff will ensure that
mental health staff or JMET teams make weekly cell-by-cell rounds in restricted non-
mental health housing modules (e.g., administrative segregation, disciplinary segregation)
at the Jails to identify prisoners with mental illness who may have been missed during
screening or who have decompensated while in the Jails.  In conducting the rounds, either
the clinician, the JMET Deputy, or the prisoner may request an out-of-cell interview.
This request will be granted unless there is a clear and documented security concern that
would prohibit such an interview or the prisoner has a documented history of repeated,
unjustified requests for such out-of-cell interviews.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of January 1, 2016,
            through December 31, 2016 (verified))**

The Compliance Measures require the Department to review the documentation of
the weekly cell-by-cell rounds and the JMET Logs for a randomly selected week each
quarter to confirm that the required cell-by-cell checks were conducted and out-of-cell
interviews were handled in accordance with this provision.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not
subject to monitoring for Substantial Compliance with Paragraph 38 in the Fourteenth
Reporting Period.

39.     The County and the Sheriff will continue to use a confidential self-referral system by which all prisoners can request mental health care without revealing the substance of their requests to custody staff or other prisoners.

**STATUS**     **SUBSTANTIAL COMPLIANCE (as of July 1, 2017, through June 30, 2018 (verified) at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2022, through March 31, 2022 (verified) at PDC South)**

**PARTIAL COMPLIANCE (at CRDF, MCJ, and PDC North)**

**NON-COMPLIANCE (at TTCF)**

**NOT RATED (at PDC East)**

Substantial Compliance requires the Department to (a) verify that housing areas have the required forms and (b) review randomly selected self-referrals for mental health care from prisoners to confirm that (i) the referrals "were forwarded to DMH" by the Department, and (ii) that "DMH documented the timeliness and nature of DMH's response to the self-referrals[.]" The thresholds for Substantial Compliance are that 85% of the housing areas have the required forms and 90% of the self-referrals must be forwarded by the Department to the Department of Health Services – Custody Health Services (DHS-CHS) and 90% must contain the required documentation of DHS-CHS's response.

The County's Fourteenth Self-Assessment reports that it achieved Substantial Compliance with Compliance Measure 39-4(a) in the Fourth Quarter of 2021 and First Quarter of 2022 "at all applicable" facilities.

Regarding Compliance Measures 39-4(b) and 4(c), the County's Fourteenth Self-Assessment reports that 100% of the self-referrals from PDC South, PDC North, TTCF, MCJ, and CRDF were forwarded by the Department to CHS in the Fourth Quarter of 2021. It further reported that CHS documented the timeliness and nature of its response in 100% of the PDC South referrals, 75% of the PDC North referrals, 41% of the CRDF referrals, 40% of the TTCF referrals, and 41% of the MCJ referrals.[13] The reported results at PDC South for the Fourth Quarter of 2021 were unable to be verified by the Monitor's auditors.

The County's Augmented Fourteenth Self-Assessment also reports that 100% of the self-referrals from PDC South, PDC North, CRDF, TTCF, and MCJ, were forwarded by the Department to CHS in the First Quarter of 2022. The County further reports that CHS documented the timeliness and nature of its response in 100% of the PDC South

---

[13] According to the County's Augmented Fourteenth Self-Assessment, "there were no relevant referrals from PDC East, the Department's Fire Camp operation," during the Fourth Quarter of 2021 or First Quarter of 2022.

referrals, 77% of the PDC North referrals, 58% of the CRDF referrals, 24% of the TTCF
referrals, and 68% of the MCJ referrals.  The results at PDC South for the First Quarter of
2022 have been verified by the Monitor's auditors.  Given TTCF's results on Compliance
Measure 39-4(c), which fall well below the relevant threshold, TTCF is rated as Non-
Compliant for the Fourteenth Reporting Period.

The County previously reported Substantial Compliance at NCCF for twelve
consecutive months from July 1, 2017, through June 30, 2018.  These results have been
verified by the Monitor's auditors and NCCF is no longer subject to monitoring for
compliance with Paragraph 39.

40.     The County and the Sheriff will ensure a QMHP will be available on-site, by transportation of the prisoner, or through tele-psych 24 hours per day, seven days per week (24/7) to provide clinically appropriate mental health crisis intervention services.

**STATUS:      PARTIAL COMPLIANCE**

Substantial Compliance requires the County (1) to provide the Monitor with on-call schedules for two randomly selected weeks reflecting that a QMHP was assigned 24 hours a day, seven days per week, and (2) to randomly select referrals for mental health crisis intervention received by a QMHP per quarter to verify (i) that a QMHP responded to all referrals, and (ii) responses to 90% of the referrals were within four hours.

The County's Fourteenth Self-Assessment reports that in the Fourth Quarter of 2021, a QMHP responded to 98% of the referrals for mental health crisis intervention services, which is just below the 100% threshold for Substantial Compliance, and that 91% of the responses were within four hours, which is above the 90% threshold for Substantial Compliance.

The County's Augmented Fourteenth Self-Assessment reports that in the First Quarter of 2022, a QMHP responded to 99% of the referrals for mental health crisis intervention services and that 95% of the responses were within four hours, which exceeds the 90% threshold.

In May 2022, Drs. Johnson, Vess, and Eargle, performed a qualitative review of the County's compliance with Paragraph 40.  They reviewed 57 qualifying cases from IRC, TTCF, CRDF, NCCF, PDC North, and MCJ.  A QMHP responded to the crisis in 98% of cases and the response was within four hours in 93%.  These responses were deemed to be clinically appropriate in 31% of cases, a decline from the prior Reporting Period.  As with Provision 36, in many cases, the interventions "were rote and non-specific, and appeared to include boilerplate lists that did not obviously reflect consideration of the individualized presentation of each inmate.  A concise summary of the specific interventions attempted, and the inmate's response would be sufficient."  As with Provision 36, the quality and depth of the County's responses to mental health crises must improve.  If it does not, the County may be rated Non-Compliant with Provision 40 in future Reporting Periods.

41.     Consistent with existing DMH policies, the County and the Sheriff will implement step-down protocols that provide clinically appropriate transition when prisoners are discharged from FIP after being the subject of suicide watch.  The protocols will provide:

(a)     intermediate steps between highly restrictive suicide measures (e.g., clinical restraints and direct constant observation) and the discontinuation of suicide watch;

(b)     an evaluation by a QMHP before a prisoner is removed from suicide watch;

(c)     every prisoner discharged from FIP following a period of suicide watch will be housed upon release in the least restrictive setting deemed clinically appropriate unless exceptional circumstances affecting the facility exist; and

(d)     all FIP discharges following a period of suicide watch will be seen by a QMHP within 72 hours of FIP release, or sooner if indicated, unless exceptional circumstances affecting the facility exist.

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance requires CHS to review the medical records of all prisoners on suicide watch in FIP for one randomly selected month each quarter, and submit a report regarding the implementation of the step-down protocols and the results of its review of the medical records.  During the Fifth Reporting Period, the parties agreed to revise the Compliance Measures to increase the number of inmates subject to the step-down protocols of Paragraph 41 and ensure that the implementation of step-down protocols for FIP patients on suicide watch "ameliorate the impact of the restrictions" and have the necessary "level of precautions based upon individual assessment[s]" of the patients.

The County's Fourteenth Self-Assessment reports that the County met the requirements in Compliance Measure 41-4 for 94.4% of the prisoners discharged from FIP during the Fourth Quarter of 2021 after having been on suicide watch, which is just below the 95% threshold for Substantial Compliance.  The County's Fourteenth Self-Assessment also reports that the County met the requirements in Compliance Measure 41-4 for 93% of the prisoners discharged from FIP during the First Quarter of 2022 after

having been on suicide watch.  This is also below the 95% threshold for compliance.[14]

---

[14] The County has requested a rating of Substantial Compliance given that its results for both quarters came close to meeting the applicable thresholds.  The Monitor has, in limited circumstances, exercised his discretion to deem particular provisions Substantially Compliant when the County has a well-developed track record of successfully implementing the provision, and the results in a single quarter fell just short of meeting the relevant compliance threshold.  However, in this case, the County's results fell short in two consecutive quarters—and actually declined in the second quarter measured in this Reporting Period.  Therefore, the Monitor does not find the County to be Substantially Compliant with Provision 41 for the Fourteenth Reporting Period.

42.     Consistent with existing DMH policies, the County and the Sheriff will
implement step-down protocols to ensure that prisoners admitted to HOH and placed on
risk precautions are assessed by a QMHP.  As part of the assessment, the QMHP will
determine on an individualized basis whether to implement "step-down" procedures for
that prisoner as follows:

(a)     the prisoner will be assessed by a QMHP within three Normal business
work days, but not to exceed four days, following discontinuance of risk
precautions;

(b)     the prisoner is counseled to ameliorate the negative psychological impact
that any restrictions may have had and in ways of dealing with this impact;

(c)     the prisoner will remain in HOH or be transferred to MOH, as determined
on a case-by-case basis, until such assessment and counseling is
completed, unless exceptional circumstances affecting the facility exist;
and

(d)     the prisoner is subsequently placed in a level of care/housing as
determined by a QMHP.

**STATUS:     NON-COMPLIANCE**

The Monitor wrote in the Twelfth Report, "the Monitor understands that CHS
substantially restricted its use of Risk Precautions in the years after the Agreement was
executed."  Given those changes, "and the increasingly small number of eligible patients
sampled for Provision 42 in each reporting period…the Monitor encourages the Parties to
meet with Subject Matter Expert Dr. Johnson to determine whether changes need to be
made to Provision 42 and its associated Compliance Measures."  The Parties did, in fact,
have such meetings during the Thirteenth Reporting Period and agreed upon a revised
sampling methodology for Provision 42.

The County's posted results note that "there may be many challenges which will
need to be addressed throughout the process of implementing the revised approach to this
provision.  The County expects that the compliance levels will initially be well below the
required thresholds for Substantial Compliance until the relevant processes (i.e., staff
training, use of Daily Risk Reports, etc.) have been established in the clinical programs
but is hopeful that these changes will result in a more meaningful approach to risk
management and a more meaningful audit."

The County's Fourteenth Self-Assessment assesses the County's compliance
using that revised methodology.  It reflects that in the Fourth Quarter of 2021 at TTCF,
"100% of inmates with High or Imminent Risk Level on their RAS [Risk Assessment for
Suicide] were assessed by a QMHP pursuant to Measure 42-4(a)."  "8% of relevant
inmates received documentation reflecting that a QMHP determined on an individualized
basis whether to implement step-down procedures."  Further, the single assessment that

51

was deemed to require step-down procedures, "did in fact include the appropriate step-down procedures."  There were no responsive patient files at CRDF for the Fourth Quarter of 2021.

In the First Quarter of 2022, at TTCF "100% of inmates with High or Imminent Risk Level on their RAS [Risk Assessment for Suicide] were assessed by a QMHP pursuant to Measure 42-4(a)."  "4% of relevant inmates received documentation reflecting that a QMHP determined on an individualized basis whether to implement step-down procedures."  Further, the single assessment that was deemed to require step-down procedures, "did in fact include the appropriate step-down procedures."

At CRDF, there were only three responsive patient files in the First Quarter of 2022.  Of those files, "100% of inmates with High or Imminent Risk Level on their RAS [Risk Assessment for Suicide] were assessed by a QMHP pursuant to Measure 42-4(a)."  "0% of relevant inmates received documentation reflecting that a QMHP determined on an individualized basis whether to implement step-down procedures."  "None of the relevant assessments indicated [that] step-down procedures were appropriate."

43.     Within six months of the Effective Date, the County and the Sheriff will develop and implement written policies for formal discipline of prisoners with serious mental illness incorporating the following:

(a)     Prior to transfer, custody staff will consult with a QMHP to determine whether assignment of a prisoner in mental health housing to disciplinary housing is clinically contraindicated and whether placement in a higher level of mental health housing is clinically indicated, and will thereafter follow the QMHP's recommendation;

(b)     If a prisoner is receiving psychotropic medication and is placed in disciplinary housing from an area other than mental health housing, a QMHP will meet with that prisoner within 24 hours of such placement to determine whether maintenance of the prisoner in such placement is clinically contraindicated and whether transfer of the prisoner to mental health housing is clinically appropriate, and custody staff will thereafter follow the QMHP's recommendation;

(c)     A QMHP will participate in weekly walks, as specified in paragraph 38, in disciplinary housing areas to observe prisoners in those areas and to identify those prisoners with mental health needs; and

(d)     Prior to a prisoner in mental health housing losing behavioral credits for disciplinary reasons, the disciplinary decision-maker will receive and take into consideration information from a QMHP regarding the prisoner's underlying mental illness, the potential effects of the discipline being considered, and whether transfer of the prisoner to a higher level of mental health housing is clinically indicated.

**STATUS (43):**          **SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at NCCF and PDC North)**

**NON-COMPLIANCE (at CRDF, MCJ, and TTCF)**

In response to comments by the Monitor and DOJ, the Department submitted proposed revisions to its discipline policies on May 30, 2017.  After consulting with the Subject Matter Experts, the Monitor provided his written comments to the Department on June 29, 2017.  DOJ provided its comments to the Department the same day.  On April 24, 2019, the Department submitted a proposed policy for discipline of mental health inmates, disabled inmates, and inmates with special needs.  The Monitor and DOJ responded with written comments on May 30, 2019.  On November 7, 2019, the Department submitted proposed policy revisions for inmate disciplinary procedures and disciplinary guidelines.  The Monitor and DOJ responded on December 5 and 6, 2019, respectively.  In the Twelfth Report, the County was rated as Non-Compliant with Provision 43 in the Twelfth Reporting Period at CRDF, MCJ, and TTCF as those policies "were never adopted by the Department in the subsequent two-and-a-half years."

Between August 17, 2021, and October 5, 2021, the County produced eight draft policies related to inmate discipline to the Monitor and DOJ.  The DOJ provided comments on November 4, 2021, and the Monitor provided written feedback on November 7, 2021.  In the Thirteenth Self-Assessment, the County reported that it was "working diligently to review any such comments for revision and hopefully adoption in Quarter 1, 2022."  Given this progress, and the Monitor's overall assessments of the County's compliance with this provision, the Monitor found that the Department was in Partial Compliance with Provision 43 for the Thirteenth Reporting Period.  However, the Monitor instructed the County to "prioritize the finalization of these policies before the date of its next self-assessment."

Yet, during the Fourteenth Reporting Period, the County did not finalize these policies.  Moreover, in its Fourteenth Self-Assessment, the County did not provide any explanation for its delay, instead simply repeating that the Department is still "working diligently" to finalize the policies.

The Agreement explicitly requires the County to "develop and implement written policies for formal discipline of prisoners with serious mental illness," "within six months of the [Agreement's] Effective Date."  The polices are today, obviously, sorely overdue.  The Monitor recognizes that Department personnel who are responsible for policy development are working extremely hard and have a difficult task of coordinating and incorporating feedback from various stakeholder entities, including the Monitor and DOJ.  Indeed, the Monitor has often heard from personnel that they are understaffed and under-resourced for the volume of work that has been assigned to them.  That does not excuse the lack of progress on finalizing the policies required by this provision.  The County is again in Non-Compliance with Provision 43.

The County previously achieved Substantial Compliance at NCCF and PDC North for twelve consecutive months and these facilities were not subject to monitoring for compliance with Paragraph 43 during the Fourteenth Reporting Period.

44.     Within six months of the Effective Date, the County and the Sheriff will install protective barriers that do not prevent line-of-sight supervision on the second floor tier of all High Observation Housing areas to prevent prisoners from jumping off of the second floor tier.  Within six months of the Effective Date, the County and the Sheriff will also develop a plan that identifies any other areas in mental health housing where such protective barriers should be installed.

**STATUS:**        **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016)**

The County has maintained Substantial Compliance with Paragraph 44 of the Agreement since January 1, 2016.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 44 in the Fourteenth Reporting Period.

45.     Consistent with existing Sheriff's Department policies, the County and the Sheriff will provide both a Suicide Intervention Kit that contains an emergency cut-down tool and a first-aid kit in the control booth or officer's station of each housing unit.  All custody staff who have contact with prisoners will know the location of the Suicide Intervention Kit and first-aid kit and be trained to use their contents.

**STATUS:**      **SUBSTANTIAL COMPLIANCE (as of October 1, 2015, through September 30, 2016 (verified) at CRDF, NCCF, PDC East, PDC South, and TTCF)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at MCJ and PDC North)**

The County maintained Substantial Compliance with Paragraph 45 for twelve consecutive months at all facilities as of December 31, 2016.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 45 in the Fourteenth Reporting Period.

46.     The County and the Sheriff will immediately interrupt, and if necessary, provide appropriate aid to, any prisoner who threatens or exhibits self-injurious behavior.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of July 1, 2020, through June 30, 2021 (verified))**

The parties agreed on Revised Compliance Measures in 2021.  Substantial Compliance requires the Department to review the documentation from randomly selected incidents involving prisoners who threaten or exhibit self-injurious behavior, and include an assessment of the timeliness and appropriateness of the Department's responses to these incidents in its semi-annual Self-Assessment.

The County's Thirteenth Self-Assessment reported that for the Second Quarter of 2021, 95% of the records reviewed "reflected that appropriate aid and (when necessary) immediate interruption of self-injurious behavior was provided by the Department."[15] The County's Augmented Thirteenth Self-Assessment reports that for the Third Quarter of 2021, 96% of the records reviewed "reflected that appropriate aid and (when necessary) immediate interruption of self-injurious behavior was provided by the Department."  These results have been verified by the Monitor's auditors and the County is no longer subject to monitoring for Substantial Compliance with Paragraph 46.

---

[15] The County notes that the Department expanded the number of cases beginning evaluated in this Provision in Third Quarter 2019 to include items from CIRCs, actual self-directed violence, and BOMHRs to address concerns raised by the Subject Matter Expert about the universe of cases being evaluated.

47.     The County and the Sheriff will ensure there are sufficient custodial, medical, and mental health staff at the Jails to fulfill the terms of this Agreement.  Within six months of the Effective Date, and on a semi-annual basis thereafter, the County and the Sheriff will, in conjunction with the requirements of Paragraph 92 of this Agreement, provide to the Monitor and DOJ a report identifying the steps taken by the County and the Sheriff during the review period to implement the terms of this Agreement and any barriers to implementation, such as insufficient staffing levels at the Jails, if any.  The County and the Sheriff will retain staffing records for two years to ensure that for any critical incident or non-compliance with this Agreement, the Monitor and DOJ can obtain those records to determine whether staffing levels were a factor in that critical incident and/or non-compliance.

**STATUS:        PARTIAL COMPLIANCE**

Under Provision 47 and its associated Compliance Measures, Substantial Compliance requires the County to: a) submit a self-assessment that: i) identifies the steps taken by the County and the Sheriff to implement the terms of the Agreement, and ii) assess whether staffing levels were a factor in any non-compliance with the Agreement, any Critical Incident, or the Department's handling of the Critical Incident. Historically, the Monitor has assessed that the County has provided useful analysis of the role of staffing levels with respect to Critical Incidents (47-4(a)(ii)), but it has not adequately evaluated "whether staffing levels were a factor in any non-compliance with the Agreement" (47-4(a)(ii)).

Regarding critical incidents, again, in the Fourteenth Reporting Period, the County's posted results for Provision 47 reflect the County's assessment of whether staffing levels were a factor in "any critical incident, or the Department's handling of the incident," as Compliance Measures 47-1 and 47-2 require.  The County's posted results report that 63 critical incidents[16] occurred during the Second Half of 2021, and the County's conclusion that staffing was not a factor in any of those incidents.

In the Eleventh Report, the Monitor emphasized the importance of Provision 47, specifically 47-4(a)(ii), to the County's overall compliance efforts

> To help drive progress forward, the Monitor and SMEs must understand, and be able to describe for the Court, any barriers that have impeded compliance to date.  Thankfully, the Agreement includes a specific provision that was designed to aid the Monitor in performing such an analysis.  Paragraph 47 requires the County to 'ensure there are sufficient custodial, medical, and mental health staff at the Jails to fulfill the terms of this Agreement.'  To help effectuate that promise, the County is required to 'provide to the Monitor and DOJ a report identifying the steps taken by the County and the Sheriff during the review period to implement the

---

[16] 25 Inmate Deaths, 23 Serious Suicide Attempts, 11 Inmate Assaults on Staff, and 4 Category 3 Uses of Force.

terms of this Agreement and any barriers to implementation, such as
insufficient staffing levels at the Jails, if any.'

In a number of the Monitor's meetings during the Eleventh Reporting
Period, County and Department personnel have raised staffing deficits as a
key obstacle to Substantial Compliance with various provisions in the
Agreement.  Yet in its Self-Assessments and associated documentation,
the County has not provided the analysis of staffing deficits or other
barriers to implementation that appears to be required by Paragraph 47.
The Monitor views Paragraph 47 as essential to the County's overall
compliance effort.  A detailed, data-driven assessment of 'any barriers to
implementation, such as insufficient staffing levels at the Jails, if any'
would assist the Monitor and Subject Matter Experts in diagnosing any
roadblocks to compliance, and allow the Parties to focus their collective
efforts on addressing any identified gaps on a paragraph-by-paragraph
basis. . . . The County and the Department should prioritize compliance
with Paragraph 47 in the Twelfth Reporting Period.

During the Fourteenth Reporting Period, the County provided staffing plans for
both CHS and LASD, which describe each agency's views of the staffing necessary to
fully effectuate the Agreement.  The CHS staffing analysis attempts to describe the
"staffing needs for CHS to satisfy the provisions of the Settlement Agreement."  It
identifies the number of positions for which CHS is budgeted and the number of positions
filled within different job classifications.  As of March 30, 2022, CHS was budgeted for
292 positions with the most common being psychiatric social workers (117), clinical
psychologists II (37), psychiatrists (37), medical case workers II (33), and MH clinical
supervisors (30).  Of that total number, only 173 positions were filled.  Thus, according
to CHS, "[w]ith the filled positions and the hires in progress CHS has 67.5% of their
positions filled."

It also describes CHS' expectations for the average number of clinical contacts
each of its clinicians could be expected to complete per week.  According to CHS, "[i]t is
reasonable to assume that clinicians can be expected to complete 40 clinical encounters in
a given 40-hour work week."  In arriving at this number, CHS indicated that it was
"relying on its peers within the Mental Health Leadership of the NIC [National Institute
of Corrections]. . .  The ratios CHS developed were developed with the expectation that a
clinician will have a mix of patients who are seen weekly and monthly, so that seeing 40
patients per week would allow the County to comply with the frequency mandates, as
well as the other requirements of the Settlement Agreement. . . . This 40 clinical
encounters per week standard also takes into account the amount of time a clinician or
psychiatrist spends directly addressing patient care, as opposed to time spent on other
duties (i.e., documentation, training, travel between and within facilities)."

Using the 40 clinical contacts per week standard, CHS then did simple arithmetic
involving the number of male and female patients at each MHLOC (P1-P4) and the
number of clinical contacts expected for patients at each MHLOC to determine the

number of clinical positions required to meet that need.  CHS determined that it "would require a minimum of 53 clinicians for the Men's program [] and 11 clinicians for the Female program [] to meet the treatment requirements for individual clinical treatment. Current staffing allocations can address this need."

CHS does a similar analysis for psychiatric contacts and represents that psychiatrists, too, can complete "at least 40 clinical encounters per week."  Using similar math as for the clinicians, CHS determines that "[b]ased on the program needs, as well as additional psychiatry needs listed above, this requires a total of 39 psychiatry positions. Currently, there are 45 psychiatry positions (staff and supervisor) and one chief-physician-psychiatry position.  There is a potential need for one additional position given the current population."

CHS performs a similar analysis for clinical staff within the IRC, CTC, JMET, Training & Policy staff, and Compliance personnel.  In summary, CHS finds that

> there is a minimum need for 136 clinicians and 39 psychiatry providers. Current staffing allocations include 154 clinicians and 38 psychiatry providers.  The challenge does not appear to be the staffing allocation as much as the ability of CHS to recruit and retain clinicians.  Although we regularly hold and offer interviews, there has been a recent decrease in interested applicants for clinical positions.  This is consistent with the fact that there is a national shortage of behavioral health care providers.

This aggregate analysis is useful insofar as it goes.  Yet there are several things it does not address.  First, the relevant Compliance Measure requires the County to disaggregate its staffing data to analyze whether staffing levels were a factor in "any non-compliance with the Agreement."  That is, Provision 47 requires a more particularized evaluation of the role of any staffing deficits on the County's compliance on a paragraph-by-paragraph basis.  To achieve Substantial Compliance, the County will be required to specifically evaluate the role of any staffing deficits on any provisions that are not yet in Substantial Compliance.[17]

Second, the staffing ratios set forth in the CHS plan largely focus on the role of staffing deficits as an obstacle to having the number of mental health visits required under the quantitative thresholds in the Agreement.  They do not sufficiently address the *qualitative improvements* to mental health care that are also required by the Agreement. There are several provisions discussed in this Report, for example, for which the County is meeting the quantitative thresholds in the Agreement, but failing to meet Dr. Johnson's qualitative expectations.  These barriers to compliance must also be explored through the County's analyses under Provision 47.

---

[17] While CHS included a short chart attempting to do this for certain provisions in its staffing plan, this analysis should address all provisions that are not yet in Substantial Compliance.

Third, the County has repeatedly noted that the population of inmates with mental illness has been steadily and consistently rising ("skyrocketing") within the jails.[18]  Based on data reviewed by the Monitor, 2022 has been no exception and the numbers have continued their steady rise, particularly in the P3 and P4 populations.  CHS based its staffing analyses on population data as of October 2021; yet the numbers have already markedly increased since that time.  Realistic evaluation of staffing deficits that are an obstacle to Substantial Compliance would rely upon projections of the rising population, and the staffing necessary to serve that expanding population, rather than static (and stale) population data.

Fourth, Dr. Johnson is concerned about the formulas used by the County to determine that clinicians and psychiatrists can see 40 patients peer week given the unique circumstances in the jails.  In any future staffing analyses provided under Provision 47, the County should more clearly set forth how these ratios account for travel between jail facilities, charting duties, training obligations, the varying amounts of time required for different kinds of clinical visits, any relief factor for sick and leave time, as well as any other variables that the County has considered.

The LASD also provided a staffing analysis that indicates that the "Custody Division needs an additional 806 budgeted positions to support and achieve the requirements of the Agreement, as well as Custody Division's other operations."  However, the methodology by which the Department arrived at this figure is not clear, nor is it apparent if the County endorses this projection.  Pursuant to Compliance Measure 47-4(a)(ii), the County must include in its Self-Assessment *its* view of the role of staffing deficits in any non-compliance with the Agreement.  It should do so regarding LASD staffing in the next Reporting Period.

The Monitor commends the County for beginning to report information necessary for its compliance with Provision 47.  The County should expand on this reporting and begin to incorporate it into its bi-annual Self-Assessments.  These analyses should be dynamic and change as new staff are added.  The County should also describe in each Self-Assessment the specific progress it has made at filling the many vacant positions that it has identified as essential to its compliance with the Agreement.

---

[18] *See, e.g.*, Joint Status Report on Unresolved Disagreements Regarding Implementation Plans, (ECF No. 190) ("In the past 10 years, the number of inmates in the LACJ System who have been diagnosed with a mental illness has skyrocketed from 3,135 to 5,651 as of March 15, 2022, an increase of more than 80%.")

48.     Within three months of the Effective Date, the County and the Sheriff will have written housekeeping, sanitation, and inspection plans to ensure the proper cleaning of, and trash collection and removal in, housing, shower, and medical areas, in accordance with California Code of Regulations ("CCR") Title 15 § 1280: Facility Sanitation, Safety, and Maintenance.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016)**

The County maintained Substantial Compliance with Paragraph 48 of the Agreement at all facilities for twelve consecutive months as of December 31, 2016. Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 48 in the Fourteenth Reporting Period.

49.     Within three months of the Effective Date, the County and the Sheriff will
have a maintenance plan to respond to routine and emergency maintenance needs,
including ensuring that shower, toilet, sink, and lighting units, and heating, ventilation,
and cooling system are adequately maintained and installed.  The plan will also include
steps to treat large mold infestations.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of March 1, 2016,
through February 28, 2017)**

The County maintained Substantial Compliance with Paragraph 49 of the
Agreement at all facilities for twelve consecutive months as of February 28, 2017.
Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject
to monitoring for Substantial Compliance with Paragraph 49 in the Fourteenth Reporting
Period.

50.     Consistent with existing Sheriff's Department policies regarding control of vermin, the County and the Sheriff will provide pest control throughout the housing units, medical units, kitchen, and food storage areas.

> **STATUS:**      **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at all facilities other than PDC South and PDC East)**
>
> **SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 (verified) at PDC South and PDC East)**

The County maintained Substantial Compliance with Paragraph 50 of the Agreement at all facilities for twelve consecutive months as of March 31, 2017.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 50 in the Fourteenth Reporting Period.

51.     Consistent with existing Sheriff's Department policies regarding personal care items and supplies for inmates, the County and the Sheriff will ensure that all prisoners have access to basic hygiene supplies, in accordance with CCR Title 15 § 1265: Issue of Personal Care Items.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) for all facilities other than CRDF)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017 (verified) at CRDF)**

The County maintained Substantial Compliance with Paragraph 51 of the Agreement at all facilities for twelve consecutive months as of June 30, 2017.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 51 in the Fourteenth Reporting Period.

52.     The County and the Sheriff will implement policies governing property restrictions in High Observation Housing that provide:

(a)     Except when transferred directly from FIP, upon initial placement in HOH:

(i)     Suicide-resistant blankets, gowns, and mattresses will be provided until the assessment set forth in section (a)(ii) below is conducted, unless clinically contraindicated as determined and documented by a QMHP.

(ii)    Within 24 hours, a QMHP will make recommendations regarding allowable property based upon an individual clinical assessment.

(b)     Property restrictions in HOH beyond 24 hours will be based on clinical judgment and assessment by a QMHP as necessary to ensure the safety and well-being of the prisoner and documented in the electronic medical record.

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance requires the Department to (1) randomly inspect the cells of prisoners placed in HOH (except from FIP) within the previous 24 hours to confirm that they have been provided with suicide-resistant blankets, gowns and mattresses unless clinically contraindicated, and document the results of the inspection; (2) randomly inspect the cells of prisoners placed in HOH (except from FIP) for more than 24 hours to confirm that they have been provided with allowable property as recommended by a QMHP; and (3) review the electronic medical records of prisoners assigned to HOH on the days of those inspections to verify compliance with the provisions of Paragraph 52. All the Compliance Measures have a 95% threshold for Substantial Compliance.

In its Fourteenth Self-Assessment, the County reports that in the Fourth Quarter of 2021, at CRDF "71%—rather than the required 95%—of the electronic medical records for inmates assigned to HOH reflected a recommendation by a QMHP regarding allowable property pursuant to Compliance Measure 52-5(c)."[19]  Additionally, "50%—rather than the required 95%—of electronic medical records for inmates assigned to HOH reflect that property restrictions were based upon the clinical judgment of a QMHP pursuant to Compliance Measure 52-5(d)."  The County also reported that "100%—more than the required 95%—of inmates analyzed pursuant to Compliance Measure 52-5(e) had allowable property as recommended by a QMHP (unless refused by the inmate)."

---

[19] The County indicated that with respect to 52-5(b), "all inmates temporarily placed in the HOH intake module (Module 1400) receive the same property until they are moved to permanent HOH housing where they receive the door signs and individually assessed property restrictions."  In the County's Augmented Fourteenth Self-Assessment, it noted that in fact, "inmates receive uniform property upon being placed into HOH, rather than 1400 which is a temporary housing module."  The County did not report its compliance percentage for 52-5(b) at CRDF for the Fourth Quarter of 2021.

67

The County also reports that at TTCF in the Fourth Quarter of 2021, "91%—rather than the required 95%—of inmates analyzed pursuant to Compliance Measure 52-5(b) were provided suicide-resistant blankets, gowns and mattresses as required by this Provision." "65%—rather than the required 95%—of the electronic medical records for inmates assigned to HOH reflected a recommendation by a QMHP regarding allowable property pursuant to Compliance Measure 52-5(c)." "81%—rather than the required 95%—of electronic medical records for inmates assigned to HOH reflect that property restrictions were based upon the clinical judgment of a QMHP pursuant to Compliance Measure 52-5(d)." "94%—just short of the required 95%—of inmates analyzed pursuant to Compliance Measure 52-5(e) had allowable property as recommended by a QMHP (unless refused by the inmate)."

The County's Augmented Fourteenth Self-Assessment reports that at CRDF in the First Quarter of 2022, "100%—more than the required 95%—of inmates analyzed pursuant to Compliance Measure 52-5(b) were provided suicide-resistant blankets, gowns and mattresses as required by this Provision." "73%—rather than the required 95%—of the electronic medical records for inmates assigned to HOH reflected a recommendation by a QMHP regarding allowable property pursuant to Compliance Measure 52-5(c)." "54%—rather than the required 95%—of electronic medical records for inmates assigned to HOH reflect that property restrictions were based upon the clinical judgment of a QMHP pursuant to Compliance Measure 52-5(d)." "95%—equal to the required 95%—of inmates analyzed pursuant to Compliance Measure 52-5(e) had allowable property as recommended by a QMHP (unless refused by the inmate)."

The County reports that at TTCF in the First Quarter of 2022, "88%—rather than the required 95%—of inmates analyzed pursuant to Compliance Measure 52-5(b) were provided suicide-resistant blankets, gowns and mattresses as required by this Provision." "64%—rather than the required 95%—of the electronic medical records for inmates assigned to HOH reflected a recommendation by a QMHP regarding allowable property pursuant to Compliance Measure 52-5(c)." "95%—equal to the required 95%—of electronic medical records for inmates assigned to HOH reflect that property restrictions were based upon the clinical judgment of a QMHP pursuant to Compliance Measure 52-5(d)." "96%—more than the required 95%—of inmates analyzed pursuant to Compliance Measure 52-5(e) had allowable property as recommended by a QMHP (unless refused by the inmate)."

53.     If otherwise eligible for an education, work, or similar program, a prisoner's mental health diagnosis or prescription for medication alone will not preclude that prisoner from participating in said programming.

**STATUS:        PARTIAL COMPLIANCE**

Substantial Compliance requires the Department to audit the records of prisoners who were eligible, but rejected or disqualified, for education and work programs to confirm that they were not rejected or disqualified because of a mental health diagnosis or prescription for medication alone.

The County's Fourteenth Self-Assessment reports that 95% of the eligible mentally ill prisoners who were denied education or work in the Fourth Quarter of 2021 and 72% in the First Quarter of 2022 "were not rejected or disqualified from education or work programs solely because of a mental health diagnosis or prescription for medication."

69

54.     Prisoners who are not in Mental Health Housing will not be denied privileges and programming based solely on their mental health status or prescription for psychotropic medication.

**STATUS:        PARTIAL COMPLIANCE**

Substantial Compliance under the revised Compliance Measures for Paragraph 54, effective January 1, 2018, requires the Department to audit the records of a maximum of 100 randomly selected prisoners identified on the Wednesday Pharmacy List as having received psychotropic medication to confirm that no more than 10% were rejected or disqualified because of a mental health diagnosis or prescription for psychotropic medication alone.  Because the Monitor's auditors had verified that the County has maintained Substantial Compliance under the original Compliance Measures, the parties agreed that the County will only be required to maintain Substantial Compliance under the revised Compliance Measures for two additional quarters.

The County's Fourteenth Self-Assessment reports that in the Fourth Quarter of 2021, 10% of inmates "were denied requests improperly for the purposes of this Provision."  It further reports that in the First Quarter of 2022, "50% of inmates were denied requests improperly for purposes of this Provision."  The County does not explain the substantial rise in the percentage of inmates improperly denied requests between the two quarters.  The County should seek to determine the reason for this change so that it can be promptly corrected.  If it persists, the County should explain the reasons why, and the steps it has taken to address it, in its next Self-Assessment.

55.     Relevant custody, medical, and mental health staff in all High Observation Housing units will meet on normal business work days and such staff in all Moderate Observation Housing units will meet at least weekly to ensure coordination and communication regarding the needs of prisoners in mental health housing units as outlined in Custody Services Division Directive(s) regarding coordination of mental health treatment and housing.  When a custody staff member is serving as a member of a treatment team, he or she is subject to the same confidentiality rules and regulations as any other member of the treatment team, and will be trained in those rules and regulations.

**STATUS:**      **SUBSTANTIAL COMPLIANCE (as of October 1, 2016, through September 30, 2017 (verified) at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at PDC North)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 (verified) at MCJ)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2019, through June 30, 2020 (verified) at TTCF)**

The Department maintained Substantial Compliance for twelve consecutive months at all facilities as of June 30, 2020.  These results have now been verified by the Monitor's auditors.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 55 in the Fourteenth Reporting Period.

56.     Consistent with existing DMH and Sheriff's Department policies, the County and the Sheriff will ensure that custody, medical, and mental health staff communicate regarding any change in a prisoner's housing assignment following a suicide threat, gesture, or attempt, or other indication of an obvious and serious change in mental health condition.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified))**

Substantial Compliance requires the Department to review in randomly selected periods the electronic medical records of (1) prisoners admitted to HOH following a suicide threat, gesture, or attempt, or other indication of an obvious and serious change in mental health condition to determine if the medical and/or mental health staff approved the placement of the prisoner in HOH; and (2) prisoners who were the subject of a suicide attempt notification to determine if the prisoners were clinically assessed and that clinical staff approved the post-incident housing.

The County's Substantial Compliance results for the twelve months from January 1, 2016, through December 31, 2016, were verified by the Monitor's auditors. Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 56 in the Fourteenth Reporting Period.

57 (**Revised**).  Within three months of the Effective Date, the County and the Sheriff will revise and implement their policies on safety checks to ensure a range of supervision for prisoners housed in Mental Health Housing.  The County and the Sheriff will ensure that safety checks in Mental Health Housing are completed and documented in accordance with policy and regulatory requirements as set forth below:

(a)     Custody staff will conduct safety checks in a manner that allows staff to view the prisoner to assure his or her well-being and security.  Safety checks involve visual observation and, if necessary to determine the prisoner's well-being, verbal interaction with the prisoner;

(b)     Custody staff will document their checks in a format that does not have pre-printed times;

(c)     Custody staff will stagger checks to minimize prisoners' ability to plan around anticipated checks;

(d)     Video surveillance may not be used to replace rounds and supervision by custodial staff unless new construction is built specifically with constant video surveillance enhancements and could only be used to replace the required safety checks in non-FIP housing, subject to approval by the Monitor;

(e)     A QMHP, in coordination with custody (and medical staff if necessary), will determine mental health housing assignments; and

(f)     Supervision of prisoners in mental health housing will be conducted at the following intervals:

(i)     FIP:  Custody staff will perform safety checks every 15 minutes. DMH staff will perform direct constant observation or one-to-one observation when determined to be clinically appropriate;

(ii)    High Observation Housing:  Every 15 minutes;

(iii)   Moderate Observation Housing:  Every 30 minutes.

**STATUS (57):**     **SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at MCJ)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2021, through March 31, 2022 (verified) at PDC North)**

**PARTIAL COMPLIANCE (at CRDF)**

**NON-COMPLIANCE (at TTCF)**

On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provision 57 ("Revised Paragraph 57") as set forth above.  The Parties also agreed on Revised Compliance Measures.  Substantial Compliance requires the Department to audit the Title 15 Dashboard records (or e-UDAL records if the Title 15 scanner was not working) for all shifts for each module in each mental health housing unit in two randomly selected weeks to determine if the safety checks were staggered and conducted as required by Paragraph 57 of the Agreement, and to audit the housing records for each mental health housing unit for a randomly selected week to determine if QMHPs approved the new mental health housing assignments as required by Paragraph 57(e).

The County's Sixth Self-Assessment reported that it maintained Substantial Compliance with Compliance Measure 57-5(b) in the Fourth Quarter of 2017 and the First Quarter of 2018 in the MOH unit at MCJ (the "Hope Dorm").  It also reported that all of the inmates at MCJ "analyzed pursuant to Compliance Measure 57-5(c) had received QMHP approval for their housing assignments" in both quarters.  The results were verified by the Monitor's auditors and MCJ was not subject to monitoring for compliance with Paragraph 57 in the Fourteenth Reporting Period.

The County's Fourteenth Self-Assessment reports that 63% of the safety checks were in compliance with Compliance Measure 57-5(b) (safety checks in FIP) in the Fourth Quarter of 2021 at TTCF.  It also reports that 49% of the safety checks were in compliance with Compliance Measure 57-5(c) (safety checks in HOH) at TTCF.  The County also reports that 24% of the safety checks complied with Compliance Measure 57-5(d) (safety checks in MOH) at TTCF.  Further, 100% of the new mental health housing assignments at TTCF were approved by a QMHP in the Fourth Quarter of 2021.

The County's Fourteenth Self-Assessment also reports that 67% of the safety checks were in compliance with Compliance Measure 57-5(c) (safety checks in HOH) in the Fourth Quarter of 2021 at CRDF.  The County also reports that 55% of the safety checks complied with Compliance Measure 57-5(d) (safety checks in MOH) at CRDF.  Further, 100% and of the new mental health housing assignments at CRDF, were approved by a QMHP in the Fourth Quarter of 2021.

The County's Augmented Fourteenth Self-Assessment also reports that 56% of the safety checks were in compliance with Compliance Measure 57-5(c) (safety checks in

HOH) in the First Quarter 2022 at CRDF.  The County also reports that 60% of the safety checks complied with Compliance Measure 57-5(d) (safety checks in MOH) at CRDF.  Further, 100% and of the new mental health housing assignments at CRDF were approved by a QMHP in the First Quarter of 2022.

The County's Augmented Fourteenth Self-Assessment also reports that 62% of the safety checks were in compliance with Compliance Measure 57-5(b) (safety checks in FIP) in the First Quarter of 2022 at TTCF.  It also reports that 31% of the safety checks were in compliance with Compliance Measure 57-5(c) (safety checks in HOH) at TTCF.  The County also reports that 16% of the safety checks complied with Compliance Measure 57-5(d) (safety checks in MOH) at TTCF.  98% and of the new mental health housing assignments at TTCF were approved by a QMHP in the Fourth Quarter of 2021.

Regarding TTCF's disappointing results, the County reports

CCSB is actively working with TTCF on corrective actions to improve compliance in this regarding [*sic*].  To date, these measures include (i) WiFi box retrofitting, with approximately 90% of the boxes completed, (ii) CCSB briefings of TTCF Operations regarding the compliance shortcomings in this quarter.  While the CAP is not completed yet, preliminary plans include potentially assigning a supervisor to track operational and non-operational equipment.  CCSB will also be working with LASD CITU to generate a step by step cheater for Custody staff on how to fix non-operational scanners.

These efforts may be promising, and the Monitor hopes that they result in improved performance by TTCF under this provision.  Safety checks, however, are foundational to a jail's safe operation and it is concerning that TTCF's results are so low, particularly this far into the County's compliance with the Agreement.  TTCF is Non-Compliant for the Fourteenth Reporting Period.

The County's Augmented Fourteenth Self-Assessment also reports that 96% of the safety checks at PDC North were in compliance with Compliance Measure 57-5(d) in the Fourth Quarter of 2021 and First Quarter of 2022.[20]  These results have been verified by the Monitor's auditors.

---

[20] The County has indicated that patients assigned to mental health housing at PDC North first have their housing assignments approved by a QMHP at either TTCF or MCJ, which is why results are not separately reported for PDC North for Compliance Measure 57-5(e).  PDC North also does not have HOH housing (57-5(c)) or a FIP (57-5(b)) hence the lack of results for those compliance measures.

58.     Within three months of the Effective Date, the County and the Sheriff will revise and implement their policies on safety checks.  The County and the Sheriff will ensure that safety checks in non-mental health housing units are completed and documented in accordance with policy and regulatory requirements as set forth below:

(a)     At least every 30 minutes in housing areas with cells;

(b)     At least every 30 minutes in dormitory-style housing units where the unit does not provide for unobstructed direct supervision of prisoners from a security control room;

(c)     Where a dormitory-style housing unit does provide for unobstructed direct supervision of prisoners, safety checks must be completed inside the unit at least every 60 minutes;

(d)     At least every 60 minutes in designated minimum security dormitory housing at PDC South, or other similar campus-style unlocked dormitory housing;

(e)     Custody staff will conduct safety checks in a manner that allows staff to view the prisoner to assure his or her well-being and security.  Safety checks involve visual observation and, if necessary to determine the prisoner's well-being, verbal interaction with the prisoner;

(f)     Custody staff will document their checks in a format that does not have pre-printed times;

(g)     Custody staff will stagger checks to minimize prisoners' ability to plan around anticipated checks; and

(h)     Video surveillance may not be used to replace rounds and supervision by custodial staff.

**STATUS (58):**       **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at PDC South, PDC North, and PDC East)**

**SUBSTANTIAL COMPLIANCE ( as of July 1, 2017, through June 30, 2018 (verified) at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at IRC)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2021, through September 30, 2021 (verified), and through March 31, 2022 (unverified) at NCCF)**

**PARTIAL COMPLIANCE (at TTCF and MCJ)**

Substantial Compliance requires the Department to audit the Title 15 Dashboard records (or e-UDAL records) for all shifts for each module in each housing unit to determine if the safety checks were staggered and conducted as required by Paragraph 58. The threshold for achieving Substantial Compliance with each of the Compliance Measures is 90%.

The County maintained Substantial Compliance with Paragraph 58 for twelve consecutive months at PDC South, PDC North, and PDC East as of December 31, 2016, at CRDF as of June 30, 2018, and at IRC as of September 30, 2018. These results have been verified by the Monitor's auditors. Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring at those facilities for Substantial Compliance with Paragraph 58 in the Fourteenth Reporting Period.

The County's Augmented Fourteenth Self-Assessment reports that for the Fourth Quarter of 2021 and the First Quarter of 2022 the following percentages of safety checks were in compliance with Paragraph 58 at TTCF: 73% and 66%, at MCJ: 70% and 46%, and at NCCF: 92% and 90%. These results are subject to verification by the Monitor's auditors.

59.     Consistent with existing Sheriff's Department policies regarding uniform daily activity logs, the County and the Sheriff will ensure that a custodial supervisor conducts unannounced daily rounds on each shift in the prisoner housing units to ensure custodial staff conduct necessary safety checks and document their rounds.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of January 1, 2017, through December 31, 2017 (verified) at PDC East and MCJ)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2018, through December 31, 2018 (verified) at PDC North and PDC South)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 (verified) at TTCF)**

Substantial Compliance requires the Department to audit e-UDAL records for housing units in each facility to determine if supervisors are conducting unannounced daily rounds in accordance with Paragraph 59.  In response to the Monitor's comments, the Department's e-UDAL forms were modified to include a specific notation that the Supervisor verified that the safety checks were conducted.  The threshold for achieving and maintaining Substantial Compliance is that 90% of the supervisor daily rounds were in compliance with the requirements of Paragraph 59.

The County's Substantial Compliance results were verified by the Monitor's auditors.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 59 in the Fourteenth Reporting Period.

60.    Within six months of the Effective Date, the Department of Mental
Health, in cooperation with the Sheriff's Unit described in Paragraph 77 of this
Agreement, will implement a quality improvement program to identify and address
clinical issues that place prisoners at significant risk of suicide or self-injurious behavior.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of April 1, 2019
through March 31, 2020)**

Paragraph 60 requires the County to "implement a quality improvement program
to identify and address clinical issues that place prisoners at significant risk of suicide or
self-injurious behavior."  The Compliance Measures for Paragraph 60 require the County
to "identify and address. . .clinical issues" in the areas identified in Paragraph 61 of the
Agreement" and corrective actions are taken to address "such issues."  See Compliance
Measures 60.1, 60.2(a), and 60.3(b).

The Monitor and the Mental Health Subject Matter previously agreed that the
Department had demonstrated "a sound quality improvement process and the ability to
demonstrate that process through specific quality improvement projects directed by
management," and the Monitor finds that the County had demonstrated that it maintained
Substantial Compliance with Paragraph 60.  Pursuant to Paragraph 111 of the Settlement
Agreement, the Department was not subject to monitoring for Substantial Compliance
with Paragraph 60 in the Fourteenth Reporting Period.[21]

---

[21] The County has acknowledged that its ongoing Quality Improvement efforts will remain subject to
monitoring under other provisions of the Settlement Agreement.

61.     The quality improvement program will review, collect, and aggregate data in the following areas and recommend corrective actions and systemic improvements:

(a)     Suicides and serious suicide attempts:

(i)      Prior suicide attempts or other serious self-injurious behavior
(ii)     Locations
(iii)    Method
(iv)    Lethality
(v)     Demographic information
(vi)    Proximity to court date;

(b)     Use of clinical restraints;

(c)     Psychotropic medications;

(d)     Access to care, timeliness of service, and utilization of the Forensic In-patient Unit; and

(e)     Elements of documentation and use of medical records.

**STATUS:      PARTIAL COMPLIANCE**

Substantial Compliance requires the County's semi-annual reports to (a) review, collect, and aggregate data in the areas set forth in Paragraph 61; (b) recommend corrective actions and systemic improvements in those areas; and (c) assess the effectiveness of actions and improvements in prior reporting periods.

On July 13, 2022, the County posted the Correctional Health Services and Custody Compliance & Sustainability Bureau Combined Semi-Annual Report on Quality Improvement and Suicide Prevention Efforts – Quarter 4 2021 & Quarter 1 2022 ("Combined Suicide Prevention Report"), which relates to Paragraphs 60, 61, 62, and 77. The Combined Suicide Prevention Report sets forth aggregate data for the 30 suicides that occurred between 2015 and the end of the First Quarter of 2022, and 154 critical incidents that occurred between 2016 and the end of the First Quarter of 2022, broken down by the subparts of Paragraph 61(a). The report also includes case-specific discussions of the two suicides that occurred during the Fourth Quarter of 2021 and First Quarter of 2022 at county jail facilities.

The Monitor analyzed the County's Combined Suicide Prevention Report in consultation with Drs. Johnson, Vess, and Eargle. Our view is that the Department has continued to make progress in its Quality Improvement efforts. The Combined Suicide Prevention Report collects much of the data required by this provision and includes some analysis and interpretation of that data.

The Combined Suicide Prevention Report includes various descriptive statistics about suicides in the Department, including aggregate data on methods, inmate demographics, and incident-specific characteristics, such as proximity to court dates, inmate charges, security and mental health levels, and use of psychotropic medications. The report also discuses corrective actions taken as a result of specific suicides, including strategies to reduce inmate overdose.

The report also includes a rich and useful discussion of recent suicides by hanging. The Department has correctly observed that hanging continues to be the most frequent, and most lethal, method of completing suicide in the County jails. In reliance on that data, the Department endeavored to identify the most frequently used ligature points, and then to mitigate them Department-wide. This has included modifying sinks, telephones, and light fixtures, removing bolts inside cells, changing the allowable property provided to inmates in certain mental health housing, and modifying the shirts provided to inmates and the bunks they sleep on to render them less useful for suicide.

This is precisely the kind of project contemplated by Compliance Measure 61-3(b), which requires the Department to "recommend corrective actions and systemic improvements" based upon its analysis of aggregated data about inmate suicide. The Monitor recommends that the County build upon these projects by diving deeper into its data to answer other questions about inmate self-directed violence and suicide. For example, the data reflect that Hispanic males engage in a disproportionate number of acts of self-directed violence. Does the Department have theories about why or what interventions could help to mitigate these risks? Similarly, the increase in the number of SDV events at IRC in 2021 and 2022 is alarming. Between 2016 and 2020, there were an average of 16 SDV incidents in IRC each year. In 2021, there were 77 such incidents, a 381% increase. Has the Department sought to understand why and how this number can be reduced?

This is not an exhaustive list of questions. These are examples of the kinds of inquiries the Department should be engaging in with its data in order to Substantially Comply with this provision. The County reports that it continues to be unable to hire the data analyst required to complete this work. The Monitor continues to believe that filling this position is essential to the County's efforts to comply with this provision.

The DOJ also points to the need for the County to provide baseline data in connection with its analyses under Provisions 61, 62, and 77

> For example, the County presents a chart showing the number of suicides that occurred between 2015 and 2022 in different types of housing, including medical housing, general population, administrative segregation, MOH, and HOH. However, the chart does not control for the proportion of individuals who live or have lived in each of these types of housing. If the County included such data, it would be able to determine if certain housing types were actually associated with higher suicide risk.

The Monitor agrees.  To enhance the utility of the aggregate data presented in the report, the County should include baseline population data, where possible.

62.     The County and the Sheriff's Unit described in Paragraph 77 of this Agreement will develop, implement, and track corrective action plans addressing recommendations of the quality improvement program.

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance requires the County's semi-annual Self-Assessments to set forth (a) the "development of corrective action plans to address the most recent recommendations of the quality improvement program;" and (b) the "implementation and tracking of corrective action plans to address recommendations of the program in prior quarters."

On July 13, 2022, the County posted the Correctional Health Services and Custody Compliance & Sustainability Bureau Combined Semi-Annual Report on Quality Improvement and Suicide Prevention Efforts – Quarter 4 2021 & Quarter 1 2022 ("Combined Suicide Prevention Report"), which relates to Paragraphs 60, 61, 62, and 77. The Combined Suicide Prevention Report sets forth aggregate data for the 30 suicides that occurred between 2015 and the end of the First Quarter of 2022, and 154 critical incidents that occurred between 2016 and the end of the First Quarter of 2022. The report also includes case-specific discussions of the two suicides that occurred during the Fourth Quarter of 2021 and First Quarter of 2022 at county jail facilities.

The County has made significant progress in its development, implementation and, to some extent, tracking of corrective action plans ("CAPS"). As set forth above, the Combined Suicide Prevention Report lays out a series of corrective actions flowing from the County's quality improvement program to mitigate the risks of self-harm in the jails.

Quality improvement programs are dynamic and continuous in nature, and the data generated from the implementation of corrective actions should be fed back into the quality improvement system to be used to shift strategy or try new interventions, as needed, with the goal of continual progress toward program goals. The tracking of corrective action plans, including their impacts, is a key QI element, and allows programs to meaningfully assess the impacts of corrective actions and determine whether or not additional interventions are necessary. Provision 62 requires the County to "develop, implement, and track" its corrective action plans in order to facilitate continual improvement.

While the Combined Suicide Prevention Report lays out various corrective actions taken by the County, it does not yet sufficiently articulate the actual impacts of these CAPS in the jails, what gaps are determined to still exist, nor identify a systematic approach to tracking the CAPS generated during prior years. The County has made significant progress on Provision 62 and with additional attention, should be able to expeditiously achieve Substantial Compliance.

63.     The County and the Sheriff will maintain adequate High Observation Housing and Moderate Observation Housing sufficient to meet the needs of the jail population with mental illness, as assessed by the County and the Sheriff on an ongoing basis.  The County will continue its practice of placing prisoners with mental illness in the least restrictive setting consistent with their clinical needs.

**STATUS:     PARTIAL COMPLIANCE (at TTCF & CRDF)**

The Parties agreed on Revised Compliance Measures in 2021.  The Revised Compliance Measures require that 90% of inmates waited for permanent HOH and MOH housing for no more than 7 days, and that 100% of inmates waited for permanent HOH and MOH housing for no more than 30 days.

The County's Fourteenth Self-Assessment includes results for the Fourth Quarter of 2021 under the Revised Compliance Measures.  It reports that in the relevant weeks, "53% of inmates at TTCF waited fewer than 7 days for permanent mental health housing."  The County further reported that 97% of inmates received permanent mental health housing within 30 days.  At CRDF, "47% of inmates at CRDF waited fewer than 7 days for permanent mental health housing."  Further 100% of inmates received permanent mental health housing within 30 days.

The County's Fourteenth Self-Assessment reports that in the First Quarter of 2022, "42% of inmates at TTCF waited fewer than 7 days for permanent mental health housing."  The County further reported that 94% of inmates received permanent mental health housing within 30 days.  At CRDF, "51% of inmates at CRDF waited fewer than 7 days for permanent mental health housing."  The County further reported that 100% of inmates received permanent mental health housing within 30 days.

Given the percentages reported by the County and the thresholds in the Revised Compliance Measures, the Monitor finds the County to be in Partial Compliance with Provision 63 for the Fourteenth Reporting Period.  However, the number of inmates with prolonged waits for mental health housing is still unacceptably high—and it has substantial human costs.  The County must improve these numbers in the next Reporting Period.

64.     Within six months of the Effective Date, the County and the Sheriff will develop a short-term plan addressing the following 12-month period, and within 12 months of the Effective Date, the County and the Sheriff will develop a long-term plan addressing the following five-year period, to reasonably ensure the availability of licensed inpatient mental health care for prisoners in the Jails.  The County and the Sheriff will begin implementation of each plan within 90 days of plan completion.  These plans will describe the projected capacity required, strategies that will be used to obtain additional capacity if it is needed, and identify the resources necessary for implementation.  Thereafter, the County and the Sheriff will review, and if necessary revise, these plans every 12 months.

**STATUS:      NON-COMPLIANCE**

The parties agreed on Revised Compliance Measures in 2021.  Substantial Compliance requires the Department to develop a long-term plan that will address the availability of licensed inpatient mental health care for prisoners in the following five-year period; and provide an annual report describing the long-term plan and the steps taken to implement it, which must be deemed reasonable by the Monitor.

The County's Augmented Fourteenth Self-Assessment does not describe with specificity efforts by the County to "reasonably ensure the availability of licensed inpatient mental health care for prisoners in the Jails."  The County is therefore again Non-Compliant with Provision 64 for the Fourteenth Reporting Period.

65 (**Revised**).  Consistent with existing Sheriff's Department policies, the County
and the Sheriff will ensure that psychotropic medications are administered in a clinically
appropriate manner to prevent misuse, hoarding, and overdose.  The County will
maintain electronic mental health alerts in prisoners' electronic medical records that
notify medical and mental health staff of a prisoner's risk for hoarding medications.

**STATUS:       PARTIAL COMPLIANCE**

On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement
Agreement that amended the language of Provision 65 ("Revised Paragraph 65") as set
forth above.  They also agreed on Revised Compliance Measures.  Under the Revised
Compliance Measures, (1) the County's Self-Assessments must set forth the (a) results of
weekly medication audits documenting the visual observation of the administration of
medication during the quarter; (b) unauthorized medications found as a result of cell
searches during the reporting period; and (c) incidents involving confirmed prescription
drug overdoses.  Further, "the Monitor must conclude, after consulting with the Subject
Matter Expert, that "psychotropic medications have been administered in a clinically
appropriate manner 85% of the time."  Finally, "85% of the electronic medical records
[must] contain the required alerts."

The County's posted documents for the Fourth Quarter of 2021 again indicate that
it has "temporarily paused reporting for 65-1(a) in order to establish a more consistent
and clinically appropriate process."  These audits have now been paused for multiple
reporting periods.  The County also posted records indicating positive results from a
"mini self-assessment of the weekly results of medication administration audits from
TTCF for the month of March."  The County should build upon these positive results and
begin again reporting on medication administration audits at each of the facilities in the
next Reporting Period.

The County's posted results reflect that the following unannounced searches were
conducted in the Fourth Quarter of 2021: CRDF (86), TTCF (47), MCJ (110), NCCF
(1,135), PDC North (90), and PDC South (170).  During these searches, the following
medications and needles/syringes were found "that did not appear to be appropriately
possessed by inmates": CRDF (40 medications), TTCF (46 medications), MCJ (6
medications), NCCF (20 medications and 4 inhalers), PDC North (50 medications), and
PDC South (no medications).  The County also reported 5 confirmed overdoses and 2
unconfirmed in the Fourth Quarter of 2021.

The County's posted results reflect that the following unannounced searches were
conducted in the First Quarter of 2022: CRDF (147), TTCF (82), MCJ (157), NCCF
(997), PDC North (98), and PDC South (211).  During these searches, the following
medications and needles/syringes were found "that did not appear to be appropriately
possessed by inmates": CRDF (62 medications), TTCF (96 medications), MCJ (116
medications), NCCF (7 medications), PDC North (9 medications), and PDC South (0
medications).  The County also reported 2 confirmed overdoses and 5 unconfirmed in the
First Quarter of 2022.

There are many reasons for conducting unannounced jail searches including but not limited to finding and removing contraband items, deterring future attempts to improperly introduce or possess contraband, seizing potential weapons, reducing drug-seeking behavior, and minimizing underground jail economies that often run on contraband exchange. Thus, the rate at which unauthorized medication is recovered is an imperfect measure of whether unannounced searches have achieved their goals. With that said, the Monitor notes the significant disparity in unauthorized medication recovery rates for various jails that are subject to this Agreement. For example, at TTCF, the facility that houses male inmates with the most serious mental illness, only 47 unannounced searches were conducted in the Fourth Quarter of 2021. Notwithstanding this low number of searches, 46 medications were recovered at TTCF for a recovery rate of nearly 100%. Similarly, in the First Quarter of 2022, there were 82 unannounced searched within TTCF, which resulted in the recovery of 96 medications, a recovery rate of 117%.

In contrast, at NCCF, there were 1,135 unannounced searches conducted in the Fourth Quarter of 2021, which resulted in the seizure of 20 medications and 4 inhalers, for a recovery rate of 2%. Similarly, in the First Quarter of 2022, at NCCF, there were 997 unannounced searches conducted that resulted in the seizure of 7 medications, a recovery rate of 1%. The medication recovery rates for the Fourteenth Reporting Period are represented below:

*Figure 2: Percentage of Unannounced Searches that Resulted in the Seizure of Unauthorized Medications, by Facility*



Given the focus of this provision—preventing the hoarding and misuse of medications—the Monitor recommends that the County evaluate whether it is conducting a sufficient number of unannounced searches at each facility, particularly those facilities, like TTCF, CRDF, MCJ, and PDC North, at which searches usually result in the seizure of unauthorized medications.

Regarding hoarding alerts in electronic medical records, the County's posted documents indicate 76% compliance in the Fourth Quarter of 2021 and 66% in the First Quarter of 2022.[22]

---

[22] During the Fourteenth Reporting Period, the County worked to revise its policies on hoarding alerts with feedback from the DOJ and the Monitor.  These policies should be finalized by the County in the next Reporting Period in order to bring the County closer to Substantial Compliance with Provision 65.

66 (**Revised**).  Consistent with existing Correctional Health Services policies, prisoners with a serious mental illness who reside outside of mental health housing, will remain on an active mental health caseload regardless of whether they refuse medications. The County and the Sheriff will provide prisoners with a serious mental illness who reside outside of mental health housing with therapeutically appropriate individual monthly visits with a QMHP whether or not the prisoners are receiving or refusing psychotropic medications.  The County and the Sheriff will provide medication support services to prisoners who (i) have a mental illness, (ii) reside outside of mental health housing and (iii) are prescribed psychotropic medications.

      **STATUS:**      **PARTIAL COMPLIANCE**

On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provision 66 ("Revised Paragraph 66") as set forth above.  They also agreed on Revised Compliance Measures.  Under the Revised Compliance Measures, Substantial Compliance requires that a) 85% of prisoners with a serious mental illness who resided outside of mental health housing were on an active mental health caseload; b) 85% of prisoners with a serious mental illness who resided outside of mental health housing are offered therapeutically appropriate structured mental health treatment and are seen by a QMHP at least once a month; and c) 85% of prisoners who resided outside of mental health housing and were prescribed psychotropic medications were offered medication support services.

The County's posted results for Compliance Measures 66-5(a) and 66-5(b) indicate that the County only evaluated two patients for the Fourth Quarter of 2021 and three patients for the First Quarter of 2022.  The Monitor reiterates that the County should clarify the methodology it is using to identify this universe of patients in its next Self-Assessment.

The County's Fourteenth Self-Assessment indicates that for Compliance Measure 66-5(a), for the Fourth Quarter of 2021, 100% of patients "with serious mental illness residing outside of mental health housing were on an active mental health caseload," which exceeds the 85% threshold.  For Compliance Measure 66-5(b), 100% of patients "with a serious mental illness who reside outside of mental health housing were offered therapeutically appropriate structured mental health treatment and were seen by a QMHP at least once a month," which also exceeds the 85% threshold.  Regarding Compliance Measure 66-5(c), 38% of patients "residing outside of mental health housing who were prescribed psychotropic medications during the randomly selected week were offered medication support services."  This is lower than the 85% threshold.

The County's Fourteenth Self-Assessment reports that for Compliance Measure 66-5(a), for the First Quarter of 2022, 66% of patients "with serious mental illness residing outside of mental health housing were on an active mental health caseload."  For Compliance Measure 66-5(b), 66% of patients "with a serious mental illness who reside outside of mental health housing were offered therapeutically appropriate structured mental health treatment and were seen by a QMHP at least once a month."  Regarding

Compliance Measure 66-5(c), 26% of patients "residing outside of mental health housing who were prescribed psychotropic medications during the randomly selected week were offered medication support services."

The Monitor's mental health team reviewed the files for a universe of nine patients identified by the County as having serious mental illness but residing outside of mental health housing that were evaluated by the County in connection with Compliance Measures 66-5(a) and 66-5(b) for the Fourth Quarter of 2021 and First Quarter of 2022. The Team noted that "none of the patients had a specific, individualized treatment plan and none were provided treatment that would qualify as structured and 'therapeutically appropriate."

The County continues to report "significant staffing challenges in the area of psychiatry which have required the County to focus on higher acuity patients in mental health housing.  The County is actively exploring solutions to these staffing needs." While the Monitor finds that the County has Partially Complied with Provision 66 for the Fourteenth Reporting Period, its results must improve, or it risks being found Non-Compliant in future Reporting Periods.

67.     Within three months of the Effective Date, the County and the Sheriff will implement policies for prisoners housed in High Observation Housing and Moderate Observation Housing that require:

(a)     documentation of a prisoner's refusal of psychotropic medication in the prisoner's electronic medical record;

(b)     discussion of a prisoner's refusal in treatment team meetings;

(c)     the use of clinically appropriate interventions with such prisoners to encourage medication compliance;

(d)     consideration of the need to transfer non-compliant prisoners to higher levels of mental health housing; and

(e)     individualized consideration of the appropriateness of seeking court orders for involuntary medication pursuant to the provisions of California Welfare and Institutions Code sections 5332-5336 and/or California Penal Code section 2603(a).

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance requires the County to "review the electronic medical records of 25% of the prisoners in HOH and MOH who refused psychotropic medication during the quarter to verify that the records [of 85% of the prisoners] reflect the documentation and consideration of the matters required by the terms of Paragraph 67."

The County's posted results reflect that in the Fourth Quarter of 2021, 80% of the records of prisoners who refused psychotropic medication "reflected the documentation and consideration of the matters required by Paragraph 67."  For the First Quarter of 2022, the County's posted results reflected 69% compliance.[23]

---

[23] In response to a draft of this Report, the DOJ raised several methodological concerns about the County's approach to auditing its records under Provision 67.  The Monitor believes that some of these concerns are valid.  In certain cases, the County has marked as compliant records that are indeterminate on their face about whether or not the clinician considered the matters required by 67(a)-(e).  In other cases, the records appear to reflect no documented consideration by the clinician, but they were marked as compliant anyway.  If the County believes that the matters set forth in Provision 67(a)-(e) need not apply to every patient, depending on their level of care, it should seek to meet with the Monitor and DOJ, rather than adjusting its auditing methodology in a manner that is not consistent with the Provision's plain language.

68.     Within six months of the Effective Date, the County and the Sheriff will develop and implement a procedure for contraband searches on a regular, but staggered basis in all housing units.  High Observation Housing cells will be visually inspected prior to initial housing of inmates with mental health issues.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at MCJ, NCCF, PDC East, PDC South, and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2017, through December 31, 2017 (verified) at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2022, through March 31, 2022 (unverified) at CRDF)**

Substantial Compliance requires that "85% of the housing units are searched for contraband at least once in the previous quarter; and 95% of the HOH units visually inspected prior to housing prisoners in these units."  Self-Assessments are to include a summary of searches conducted and a review of 25 randomly selected Checklist forms for HOH units to confirm that the units were visually inspected prior to initial housing of prisoners in these units.

The County previously maintained Substantial Compliance for twelve consecutive months at TTCF, MCJ, NCCF, PDC East, PDC South, and PDC North.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring at those facilities for Substantial Compliance with Paragraph 68 in the Fourteenth Reporting Period.

The County had previously reported that the Department had ceased certain module searches during the COVID-19 pandemic.  In its posted results for the Fourth Quarter of 2021, the County reports that module searches resumed at CRDF on October 14, 2021.  The County's posted results reflect that in the Fourth Quarter of 2021, 76% of the housing units at CRDF were searched at least once in the quarter, and 96% of the randomly selected HOH cells at CRDF were visually inspected before housing prisoners in these units.  During the First Quarter of 2022, 96% of the housing units at CRDF were searched at least once in the quarter, and 96% of the randomly selected HOH cells at CRDF were visually inspected before housing prisoners in these units.  These results are subject to verification by the Monitor's auditors.

69.     Consistent with existing DMH policies regarding use of clinical restraints, the County and the Sheriff will use clinical restraints only in the Correctional Treatment Center and only with the approval of a licensed psychiatrist who has performed an individualized assessment and an appropriate Forensic Inpatient order.  Use of clinical restraints in CTC will be documented in the prisoner's electronic medical record.  The documentation will include the basis for and duration of the use of clinical restraints and the performance and results of the medical welfare checks on restrained prisoners.  When applying clinical restraints, custody staff will ensure a QMHP is present to document and monitor the condition of the prisoner being placed in clinical restraints.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of July 1, 2018, through June 30, 2019 (verified))**

Substantial Compliance requires the Department to review the electronic medical records of all prisoners placed in clinical restraints to verify that the restraints were used, approved, and documented, and that the results of medical welfare checks on restrained prisoners were also documented.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring at those facilities for Substantial Compliance with Paragraph 69 in the Fourteenth Reporting Period.

70.     Within three months of the Effective Date, the County and the Sheriff will have policies and procedures regarding the use of Security Restraints in HOH and MOH. Such policies will provide that:

(a)     Security Restraints in these areas will not be used as an alternative to mental health treatment and will be used only when necessary to insure safety;

(b)     Security Restraints will not be used to punish prisoners, but will be used only when there is a threat or potential threat of physical harm, destruction of property, or escape;

(c)     Custody staff in HOH and MOH will consider a range of security restraint devices and utilize the least restrictive option, for the least amount of time, necessary to provide safety in these areas; and

(d)     Whenever a prisoner is recalcitrant, as defined by Sheriff's Department policy, and appears to be in a mental health crisis, Custody staff will request a sergeant and immediately refer the prisoner to a QMHP.

**STATUS:       PARTIAL COMPLIANCE**

The Monitor's Eighth Report noted that "[t]he Mental Health Subject Matter Expert and DOJ have expressed concern about the Department's Substantial Compliance with paragraph 70(c) if all inmates in HOH are routinely handcuffed when they are out of their cells 'in a housing pod at the same time.'"[24]

As stated in the Monitor's prior reports, to achieve Substantial Compliance with Paragraph 70, the County must demonstrate that "it is continuing to conduct individual assessments in weekly and daily meetings, expanding the use of Living Modules and FIP step-down pods (or other less restrictive housing arrangements), and articulating policies for these programs."[25]  Also, as previously expressed by DOJ, "the County must show that clinicians routinely make individualized assessments for all HOH inmates about whether [the special housing units] would be appropriate, and that inmates are not being denied access to those housing units due to space or capacity constraints."[26]

The County's Thirteenth Self-Assessment reported that

Significantly, beginning in March 2019, the Department began a pilot program aimed to provide P3/HOH inmates with significant unrestrained out of cell time. The pilot alternates out of cell time between inmates who are in suicide gowns and those who are allowed clothes so that inmates do not have access to property which may allow them to self-harm. Prior

---

[24] See Monitor's Eighth Report, p. 90.
[25] See Monitor's Eighth Report, p. 91; Ninth Report, p. 96.
[26] See Monitor's Ninth Report, p. 96.

to COVID-19, this pilot program was available to inmates in five HOH
pods at TTCF, and three HOH pods at CRDF. This program was
temporarily suspended at TTCF during COVID-19 due to social
distancing requirements, changes to housing modules due to quarantines
and isolation, and staffing changes. CRDF was able to keep its
unrestrained out of cell time pilot operating during COVID-19. TTCF
plans to resume these activities as soon as it is able to safely do so.

As noted in the Monitor's Ninth Report, the Monitor believes, "with additional
CHS staffing, the County could expand the Living and LIFE Modules and the Step-down
units to provide enhanced mental health care treatment to additional HOH inmates who
currently satisfy the criteria for housing in those specialized units."

The County Fourteenth Self-Assessment did not provide any new updates about
the County's efforts to comply with this provision.  Its next Self-Assessment should do
so.

71.     The County and the Sheriff will ensure that any prisoner subjected to
clinical restraints in response to a mental health crisis receives therapeutic services to
remediate any effects from the episode(s) of restraint.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through
June 30, 2017 (verified))**

Substantial Compliance requires the Department to review the electronic medical
records of all prisoners placed in clinical restraints to verify that the prisoners received
therapeutic services as required by Paragraph 71.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject
to monitoring for Substantial Compliance with Paragraph 71 in the Fourteenth Reporting
Period.

72.     The County and the Sheriff will develop and implement policies and procedures that ensure that incidents involving suicide and serious self-injurious behavior are reported and reviewed to determine:  (a) whether staff engaged in any violations of policies, rules, or laws; and (b) whether any improvements to policy, training, operations, treatment programs, or facilities are warranted.  These policies and procedures will define terms clearly and consistently to ensure that incidents are reported and tracked accurately by DMH and the Sheriff's Department.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of January 1, 2017, through December 31, 2017)**

Substantial Compliance requires the Self-Assessments to report on (a) suicide review meetings and (b) CIRC meetings that review incidents of serious self-injurious behavior in the reporting period.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 72 in the Fourteenth Reporting Period.

73.     Depending on the level of severity of an incident involving a prisoner who
threatens or exhibits self-injurious behavior, a custody staff member will prepare a
detailed report (Behavioral Observation and Mental Health Referral Form, Inmate Injury
Report, and/or Incident Report) that includes information from individuals who were
involved in or witnessed the incident as soon as practicable, but no later than the end of
shift.  The report will include a description of the events surrounding the incident and the
steps taken in response to the incident.  The report will also include the date and time that
the report was completed and the names of any witnesses.  The Sheriff's Department will
immediately notify the County Office of Inspector General of all apparent or suspected
suicides occurring at the Jails.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of October 1, 2017,
                through September 30, 2018 (verified))**

Substantial Compliance requires the Department to review quarterly a random
sample of reports of any threats or exhibitions of self-injurious behavior to verify that the
reports have the information required by Paragraph 73; and to provide the Monitor with
the notifications to the Inspector General of all incidents involving an apparent or
suspected suicide during the reporting period.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not
subject to monitoring for Substantial Compliance with Paragraph 73 in the Fourteenth
Reporting Period.

74.     The Sheriff's Department will ensure that there is a timely, thorough, and objective law enforcement investigation of any suicide that occurs in the Jails. Investigations shall include recorded interviews of persons involved in, or who witnessed, the incident, including other prisoners.  Sheriff's Department personnel who are investigating a prisoner suicide or suspected suicide at the Jails will ensure the preservation of all evidence, including physical evidence, relevant witness statements, reports, videos, and photographs.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of September 1, 2016, through December 31, 2017)**

Substantial Compliance requires the Department to provide the Monitor with an Executive Suicide Death Review reflecting the results of the Department's investigation of any suicide in the Jails within six months of the suicide.  The review must reflect steps taken to preserve all of the evidence; and list the interviews of persons involved in, or who witnessed, the incident, and whether the interviews were recorded.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 74 in the Fourteenth Reporting Period.

75.    Within three months of the Effective Date, the County and the Sheriff will review every suicide attempt that occurs in the Jails as follows:

(a)    Within two working days, DMH staff will review the incident, the prisoner's mental health status known at the time of the incident, the need for immediate corrective action if any, and determine the level of suicide attempt pursuant to the Centers for Disease Control and Prevention's Risk Rating Scale;

(b)    Within 30 working days, and only for those incidents determined to be a serious suicide attempt by DMH staff after the review described in subsection (a) above, management and command-level personnel from DMH and the Sheriff's Department (including Custody Division and Medical Services Bureau) will meet to review relevant information known at that time, including the events preceding and following the incident, the prisoner's incarceration, mental health, and health history, the status of any corrective actions taken, and the need for additional corrective action if necessary;

(c)    The County and the Sheriff will document the findings that result from the review of serious suicide attempts described in subsection (b) above; and

(d)    The County and the Sheriff will ensure that information for all suicide attempts is input into a database for tracking and statistical analysis.

**STATUS (75):**     **SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified))**

Substantial Compliance requires (a) DMH to review documentation of randomly selected suicide attempts during the previous quarter to verify that the prisoner's mental health status and need for immediate corrective action were considered timely by the DMH staff and that the staff determined whether the suicide attempt was serious; (b) that the Department and DMH reviewed the relevant information known at that time and the status of any corrective actions taken, and they considered the need for additional corrective action if necessary; and (c) that the information is reflected in the Department's database for tracking and statistical analysis.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 75 in the Fourteenth Reporting Period.

76.     The County and the Sheriff will review every apparent or suspected suicide that occurs in the Jails as follows:

(a)     Within no more than two working days, management and command-level personnel from DMH and the Sheriff's Department (including Custody Division and Medical Services Bureau) will meet to review and discuss the suicide, the prisoner's mental health status known at the time of the suicide, and the need for immediate corrective or preventive action if any;

(b)     Within seven working days, and again within 30 working days, management and command-level personnel from DMH and the Sheriff's Department (including Custody Division and Medical Services Bureau) will meet to review relevant information known at that time, including the events preceding and following the suicide, the prisoner's incarceration, mental health, and health history, the status of any corrective or preventive actions taken, and the need for additional corrective or preventive action if necessary; and

(c)     Within six months of the suicide, the County and the Sheriff will prepare a final written report regarding the suicide.  The report will include:

(i)     time and dated incident reports and any supplemental reports with the same Uniform Reference Number (URN) from custody staff who were directly involved in and/or witnessed the incident;

(ii)     a timeline regarding the discovery of the prisoner and any responsive actions or medical interventions;

(iii)     copies of a representative sample of material video recordings or photographs, to the extent that inclusion of such items does not interfere with any criminal investigation;

(iv)     a reference to, or reports if available, from the Sheriff's Department Homicide Bureau;

(v)     reference to the Internal Affairs Bureau or other personnel investigations, if any, and findings, if any;

(vi)     a Coroner's report, if it is available at the time of the final report, and if it is not available, a summary of efforts made to obtain the report;

(vii)     a summary of relevant information discussed at the prior review meetings, or otherwise known at the time of the final report, including analysis of housing or classification issues if relevant;

(viii)     a clinical mortality review;

(ix)     a Psychological Autopsy utilizing the National Commission on Correctional Health Care's standards; and

(x)     a summary of corrective actions taken and recommendations regarding additional corrective actions if any are needed.

**STATUS (76):**      **SUBSTANTIAL COMPLIANCE (as of September 1, 2016, through December 31, 2017)**

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 76 in the Fourteenth Reporting Period.  Nonetheless, the County continued to conduct the reviews required by Paragraph 76 for the suicides that occurred during this period and invited the Monitor to attend these meetings.

77.     The County and the Sheriff will create a specialized unit to oversee, monitor, and audit the County's jail suicide prevention program in coordination with the Department of Mental Health.  The Unit will be headed by a Captain, or another Sheriff's Department official of appropriate rank, who reports to the Assistant Sheriff for Custody Operations through the chain of command.  The Unit will be responsible for:

(a)     Ensuring the timely and thorough administrative review of suicides and serious suicide attempts in the Jails as described in this Agreement;

(b)     Identifying patterns and trends of suicides and serious suicide attempts in the Jails, keeping centralized records and inputting data into a unit database for statistical analysis, trends, and corrective action, if necessary;

(c)     Ensuring that corrective actions are taken to mitigate suicide risks at both the location of occurrence and throughout the concerned system by providing, or obtaining where appropriate, technical assistance to other administrative units within the Custody Division when such assistance is needed to address suicide-risk issues;

(d)     Analyzing staffing, personnel/disciplinary, prisoner classification, and mental health service delivery issues as they relate to suicides and serious suicide attempts to identify the need for corrective action where appropriate; and recommend remedial measures, including policy revisions, re-training, or staff discipline, to address the deficiencies and ensure implementation; and

(e)     Participating in meetings with DMH to develop, implement, and track corrective action plans addressing recommendations of the quality improvement program.

**STATUS (77):**        **PARTIAL COMPLIANCE**

On July 13, 2022, the County posted the Correctional Health Services and
Custody Compliance & Sustainability Bureau Combined Semi-Annual Report on Quality
Improvement and Suicide Prevention Efforts – Quarter 4 2021 & Quarter 1 2022
("Combined Suicide Prevention Report"), which relates to Paragraphs 60, 61, 62, and 77.
The Combined Suicide Prevention Report sets forth aggregate data for the 30 suicides
that occurred between 2015 and the end of the First Quarter of 2022, and 154 critical
incidents that occurred between 2016 and the end of the First Quarter of 2022.  The
report also includes case-specific discussions of the two suicides that occurred during the
Fourth Quarter of 2021 and First Quarter of 2022 at county jail facilities.

The Monitor analyzed the County's Combined Suicide Prevention Report in
consultation with Drs. Johnson, Vess, and Eargle.  Our view is that the Department has
continued to make progress in its Quality Improvement efforts.  In terms of specific
results, the Combined Suicide Prevention Report reflects that the Department is now
complying with several subparts of Provision 77, including ensuring the timely and
thorough administrative review of suicides and serious suicide attempts in the Jails
(77(a)); analyzing staffing, personnel/disciplinary, prisoner classification, and mental
health service delivery issues as they relate to suicides and serious suicide attempts to
identify the need for corrective action where appropriate (77(d)); and participating in
meetings with DMH to develop, implement, and track corrective action plans addressing
recommendations of the quality improvement program (77(e)).

As set forth above regarding Provision 61, the Monitor believes that the
Department must deepen its evaluation of data to spot trends and patterns in suicides and
serious suicide attempts, as required by Provision 77(b).  The Department must then use
those analyses to take corrective actions "to mitigate suicide risks at both the location of
occurrence and throughout the concerned system by providing, or obtaining where
appropriate, technical assistance to other administrative units within the Custody
Division."  As set forth above regarding Provision 61, the Department still has work to do
to Substantially Comply with this provision.

78.     The County and the Sheriff will maintain a county-level Suicide
Prevention Advisory Committee that will be open to representatives from the Sheriff's
Department Custody Division, Court Services, Custody Support Services, and Medical
Services Bureau; the Department of Mental Health; the Public Defender's Office; County
Counsel's Office; the Office of the Inspector General; and the Department of Mental
Health Patients' Rights Office.  The Suicide Prevention Advisory Committee will meet
twice per year and will serve as an advisory body to address system issues and
recommend coordinated approaches to suicide prevention in the Jails.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of May 11, 2016, through
May 18, 2017)**

Substantial Compliance requires (1) the Committee to meet twice per year and (2)
"recommend coordinated approaches to suicide prevention in the Jails."

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not
subject to monitoring for Substantial Compliance with Paragraph 78 in the Fourteenth
Reporting Period.  Nevertheless, the County has continued to hold Bi-Annual Suicide
Prevention meetings through the last reporting period, which the Monitor endeavors to
attend.

79 (**Revised**).  (a)    Unless clinically contraindicated, the County and the Sheriff will offer prisoners in mental health housing:

        (i)    therapeutically appropriate individual visits with a QMHP;

        (ii)    therapeutically appropriate group programming conducted by a QMHP or other appropriate provider that does not exceed 90 minutes per session;

    (b)    The date, location, topic, attendees, and provider of programming or therapy sessions will be documented.  A clinical supervisor will review documentation of group sessions on a monthly basis.

**STATUS:**    **NON-COMPLIANCE**

On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provision 79 ("Revised Paragraph 79") as set forth above.  They also agreed on Revised Compliance Measures.  Under the Revised Compliance Measures, Substantial Compliance requires the Department to maintain records of therapeutically appropriate individual visits and group programming, and the names of the clinical supervisors who reviewed such records and the conclusions of their reviews.  It also requires that 95% of the prisoners in HOH are offered therapeutically appropriate structured mental health treatment, including at least a weekly QMHP visit and group programming, and that 90% of prisoners in MOH are provided visits by a QMHP at least once a month as well as therapeutically appropriate structured mental health treatment.

The County's Fourteenth Self-Assessment reports that in the Fourth Quarter of 2021, the names and conclusions of all supervisors who reviewed documentation of group sessions were recorded.  The County also reports that "for Measure 79-4(b), which requires that 95% of HOH patients be offered an individual visit by a QMHP and weekly group programming, the County achieved 7% compliance."  "For Measure 79-4(c), which requires that 90% of patients in MOH be offered individual monthly visits by a QMHP and therapeutically appropriate structured treatment, the County achieved 43% compliance."

The County's Fourteenth Self-Assessment reports that "CHS believes its numbers underreport the number of patients that were offered, as opposed to participate in, the relevant group programming."  In addition, according to the County's posted documents, "for the randomized week in October, groups were halted for safety precautions due to a new surge of Covid-19."  Further, "[i]t should be noted that the pandemic has had a substantial negative effect in achieving compliance for Provision 79, as the programs have not been able to provide consistent group programming due to safety concerns."

The County's Augmented Fourteenth Self-Assessment reports that in the First
Quarter of 2022, the names and conclusions of all supervisors who reviewed
documentation of group sessions were recorded.  The County also reports that "for
Measure 79-4(b), which requires that 95% of HOH patients be offered an individual visit
by a QMHP and weekly group programming, the County achieved 33% compliance."
"For Measure 79-4(c), which requires that 90% of patients in MOH be offered individual
monthly visits by a QMHP and therapeutically appropriate structured treatment, the
County achieved 43% compliance."

80.　　(a)　　The County and the Sheriff will continue to make best efforts to provide appropriate out-of-cell time to all prisoners with serious mental illness, absent exceptional circumstances, and unless individually clinically contraindicated and documented in the prisoner's electronic medical record.  To implement this requirement, the County and the Sheriff will follow the schedule below:

　　　　(i)　　By no later than six months after the Effective Date, will offer 25% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week;

　　　　(ii)　　By no later than 12 months after the Effective Date, will offer 50% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week; and

　　　　(iii)　　By no later than 18 months after the Effective Date, will offer 100% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week.

　　　　(b)　　No later than six months after the Effective Date, the County and the Sheriff will record at the end of each day which prisoners in HOH, if any, refused to leave their cells that day.  That data will be presented and discussed with DMH staff at the daily meeting on the following Normal business workday.  The data will also be provided to the specialized unit described in Paragraph 77 and to DMH's quality improvement program to analyze the data for any trends and to implement any corrective action(s) deemed necessary to maximize out-of-cell time opportunities and avoid unnecessary isolation.

**STATUS (80):          NON-COMPLIANCE**

Paragraph 80 requires that, "no later than 18 months after the Effective Date [July 1, 2015]," 100% of the prisoners in HOH receive "ten hours of unstructured out-of-cell recreational time *and* ten hours of structured therapeutic or programmatic time per week."  The parties have agreed that up to five hours of the structured time can consist of education or work programs, but at least five hours of the time must be therapeutic.

The County's Fourteenth Self-Assessment reports that in the Fourth Quarter of 2021, 96% of the HOH prisoners at CRDF and 93% of the HOH prisoners at TTCF were offered "unstructured out-of-cell time by Custody staff."  The County's Fourteenth Self-Assessment also reports that in the First Quarter of 2022, 97% and 93% of HOH prisoners were offered unstructured out-of-cell time at CRDF and TTCF, respectively.[27]

The County also reports data for structured therapeutic or programmatic time for the First Quarter of 2022.  According to the County's Fourteenth Self-Assessment, "14% and 0% for CRDF and TTCF, respectively – rather than the required 100% – of prisoners residing in HOH were offered the required structured out-of-cell time" during the First Quarter of 2022.

The County's posted documents note that during the First Quarter of 2022, TTCF onboarded "(3) new group providers, going from a total of 15 to 18, and the addition of (1) more group on the group schedule, going from a total of three groups a day to four."  At CRDF, the County reported "improved collaboration between custody and mental health [personnel] as well as an increase in group attendance.  With declining COVID rates in the jail the current group size is 12 participants per scheduled group, up from 4-8 participants in prior years. . . . CHS recognizes the long road ahead but with the continued efforts from all relevant stakeholders, it expects to make significant improvements in the number of groups it is able to offer."

---

[27] The Mental Health Subject Matter Expert and the clinicians previously assessed the accuracy of the County's reporting of the out-of-cell time offered to inmates by comparing out-of-cell time records to videos of the HOH units over the same time periods, and they found the County's data to be "highly unreliable."  The Monitor and the Mental Health Subject Matter viewed this as a "very serious problem, . . . both in terms of the accuracy of the Department's records and the conditions in HOH units."

81.     Except as specifically set forth in Paragraphs 18-20 of this Agreement, and except as specifically identified below, the County and the Sheriff will implement the following paragraphs of the Implementation Plan in *Rosas* at all Jails facilities, including the Pitchess Detention Center and the Century Regional Detention Facility, by no later than the dates set forth in the Implementation Plan or as revised by the *Rosas* Monitoring Panel:  Paragraphs 2.2-2.13 (use of force policies and practices); 3.1-3.6 (training and professional development); 4.1-4.10 (use of force on mentally ill prisoners); 5.1-5.3 (data tracking and reporting of force); 6.1-6.20 (prisoner grievances and complaints); 7.1-7.3 (prisoner supervision); 8.1-8.3 (anti-retaliation provisions); 9.1-9.3 (security practices); 10.1-10.2 (management presence in housing units); 11.1 (management review of force); 12.1-12.5 (force investigations, with the training requirement of paragraph 12.1 to be completed by December 31, 2016); 13.1-13.2 (use of force reviews and staff discipline); 14.1-14.2 (criminal referrals and external review); 15.1-15.7 (documentation and recording of force); 16.1-16.3 (health care assessments); 17.1-17.10 (use of restraints); 18.1-18.2 (adequate staffing); 19.1-19.3 (early warning system); 20.1-20.3 (planned uses of force); and 21.1 (organizational culture).

### STATUS:     PARTIAL COMPLIANCE

Because Paragraph 81 of the Settlement Agreement incorporates 100 provisions in the Implementation Plan adopted in the *Rosas* case, the parties agreed in the Compliance Measures adopted in this case that "Substantial Compliance with respect to the substance of the policies required by the *Rosas* Implementation Plan would be determined by the *Rosas* Monitors."  With the exception of the Early Warning System required by Section 19 of the plan, all of the required policies were approved by the *Rosas* Monitors by the Second Reporting Period in this case, and the Early Warning System was approved in the Seventh Reporting Period.

The Compliance Measures in this case then provide that "[o]nce the policies have been approved by the *Rosas* Monitors, the Monitor and Subject Matter Expert will confirm and assess the implementation of these policies in the [DOJ facilities]."  In assessing the Department's compliance with Paragraph 81, the Monitor has grouped the 100 provisions into seven categories and, with input from the Subject Matter Experts, has assessed Department's compliance on a category-by-category basis.  With the exception of the Training category, which is assessed when certain percentages are reached, the Department will no longer be subject to monitoring for the provisions in a particular category once the Monitor has determined that it has achieved and maintained for twelve consecutive months Substantial Compliance with the intent and purpose of the overall category.  The Department will no longer be subject to monitoring for compliance with Paragraph 81 once it has achieved and maintained for twelve consecutive months Substantial Compliance with each of the categories.

### Training (Partial Compliance)

Paragraphs 3.1-3.6, 4.6-4.9, and 12.1 of the *Rosas* Implementation Plan reflect training requirements on use of force, ethics, dealing with mentally ill inmates, and

investigations of force incidents.  The curriculum and lesson plans to implement these
training requirements have been approved by the *Rosas* Monitors.

The County's Augmented Fourteenth Self-Assessment reports that the
Department met the Substantial Compliance thresholds for the following Training
provisions at the DOJ facilities during the Fourth Quarter of 2021: 3.2 (a) and (b), 3.3,
3.5, 4.6, 4.8, 4.9, and 12.1.[28]  The reported results for 3.2, 3.3, 4.6, 4.8, 4.9, and 12.1 have
been verified by the Monitor's auditors.  The County also reported that the Department
did not achieve Substantial Compliance with: 3.1(a) and (b) (achieving 88% not 90%);
3.6 (timely 6 month probationary reviews); 4.7(a) and (b) (DeVRT initial training and
refreshers) (achieving 88% not 90%).[29]

The County's Augmented Fourteenth Self-Assessment reports that the
Department met the Substantial Compliance thresholds for the following Training
provisions at the DOJ facilities during the First Quarter of 2022: 3.3, 3.5, 4.8, 4.9, and
12.1-2.  The reported results for 3.3, 4.8, 4.9, and 12.1-2 have been verified by the
Monitor's auditors.

**Use of Force (Partial Compliance)**

According to data provided by the Department, uses of force decreased at NCCF,
PDC North, and PDC South in the first half of 2022, while increasing slightly at CRDF.
The greatest increase at CRDF was in NCI incidents, or relatively minor uses of force
that involve "no injury or complaint of pain as a result of: Resisted hobble application;
Resisted searching or handcuffing techniques; Resisted firm grip, control holds, come-
along, or control techniques."

The Monitor and Use of Force Expert Susan McCampbell reviewed 25
completed force packages for the DOJ facilities during this Reporting Period.[30]  As a
result of objections by the plaintiffs in the *Rosas* case, the *Rosas* Monitors revised their
approach to assessing the Department's compliance with the use, reporting and
investigation of force provisions of the Implementation Plan.  Under the revised
approach, the *Rosas* Monitors do not determine the percentage of cases in which the
Department's use of force was reasonable overall, but instead assess the Department's
compliance with the specific provision on the use, reporting, and investigation of force
provisions of the Implementation Plan.  To maintain consistency across all of the jail
facilities, the Monitor has adopted the same approach in the DOJ case.

---

[28] Because Paragraph 81 incorporates all 104 provisions of the *Rosas* Implementation Plan in a single
provision, the Monitor agreed to the use of random samples in some cases instead of requiring assessments
of all personnel or incidents, which the Monitor believes would be unduly burdensome for the Department.
[29] The County's Augmented Fourteenth Self-Assessment appears to mistakenly report 4.6 (DeVRT initial
training and refreshers) as not achieving Substantial Compliance as of December 2021.  However, the
posted materials reflect Substantial Compliance (98%).
[30] The Monitor will meet with Department executives to discuss his findings on these force packages during
his upcoming site visits in November 2022.

In the uses of force reviewed during the Fourteenth Monitoring Period, the Monitor determined that the Department was not in compliance with Paragraph 2.2. Regarding Paragraph 2.2(a) (force must be used as a last resort), Department members too readily engaged in uses of force before meaningful attempts were made to de-escalate using time, distance, the presence of a supervisor or mental health professional, and verbal attempts at persuasion.

For example, in one incident, a Deputy was transferring an inmate from pre-discipline housing and therefore instructed him to disrobe in order to allow a visual contraband search to be conducted. According to the Deputy, the inmate cursed, turned around, and then advanced on the Deputy "with both of his fists clenched," in a "common fighting stance." The Deputy punched the inmate in the face and, with assistance, took him to the ground. Review of the video revealed that the Deputy failed to take reasonable steps to de-escalate the situation, such as summoning assistance, or using time and distance to attempt to resolve the incident without force.[31]

### Reporting and Investigation of Force (Partial Compliance)

During the Fourteenth Reporting Period, the Monitor identified several key issues related to the Department's reporting and investigation of force. First, as in the past, the depth and quality of the command reviews of force incidents varied significantly. Sometimes Commanders made note of discrepancies among Deputy use of force reports or between reports and available video, or flagged other issues that may have given rise to the need to use force. Yet, important, sometimes self-evident, issues were not always identified. Often, the de-escalation attempts made by deputies were not specifically described in the relevant reports. Command reviewers should note those issues and require deputies to describe with particularity the attempts they made to de-escalate incidents without force, when applicable.

Similarly, the quality of interviewing varied widely. Some interviewers appeared confused about their role, and unsure what questions to ask or how to elicit relevant information from the inmates who were involved in or witnessed a use of force. The Department should ensure that all supervisors who conduct use of force interviews are properly trained and briefed on how to successfully conduct use of force interviews.

The Department was not in compliance with the requirement that any discrepancies among witnesses and/or evidence should be referred for additional investigation as required by Paragraph 5.3. The Department was also not in compliance with the requirement that force reports be completed by the end of shift as required by Paragraphs 15.1 and 15.2.

---

[31] Moreover, while the command review, which ultimately found the force to be within policy, noted some of the similarities between Deputy reports, including several Deputies using strikingly similar language to describe the inmate's behavior, the Deputies were merely counseled regarding the need to only provide their own independent accounts rather than disciplined for failing to follow Department policy on force reporting.

Regarding the Department's quantitative results on the specific provisions, for the Fourth Quarter of 2021, the County reported Substantial Compliance with the following provisions: 5.1 (timely database entry of force incidents); 8.3 (timely review of retaliation grievances); 11.1 (timely review of force packages by CFRT for potential employee discipline); 13.1 (zero tolerance and related investigations); 13.2 (notifications to OIG required by findings in 13.1); 14.1 (timely unit commander review re: prosecution for inmate assaults on staff); and 14.2 (timely referral of criminal inmate conduct to DA's Office).

For the First Quarter of 2022, the County's Augmented Fourteenth Self-Assessment reports Substantial Compliance with the following provisions: 5.1 (timely database entry of force incidents); 8.3 (timely review of retaliation grievances); 11.1 (timely review of force packages by CFRT for potential employee discipline); 13.1 (zero tolerance and related investigations); 13.2 (notifications to OIG required by findings in 13.1); 14.1 (timely unit commander review re: prosecution for inmate assaults on staff); and 14.2 (timely referral of criminal inmate conduct to DA's Office).

**Grievances (Partial Compliance)**

The County's Augmented Fourteenth Self-Assessment reports that in the Fourth Quarter of 2021, the Department achieved Substantial Compliance with the following grievance provisions at the DOJ facilities: 6.5 (proper handling of harassment and retaliation grievances); 6.7 (appropriate handling of grievances marked "emergency"); 6.8 (inmate notification of downgraded grievances); 6.9 (proper handling of emergency grievances); 6.10 (timely collection of inmate grievances); 6.11 (review of complaints re: inmate grievance process); 6.12 (proper database entry of inmate grievances); 6.13 (proper tracking of handling of inmate grievances); 6.14 (monthly reports of grievance tracking); 6.15 (evaluation of trends in inmate grievance handling); 6.17 (time limit for filing force-related grievances); 6.18 (proper handling of PREA grievances); 6.19 (timely responses to inmate grievances); 6.20 (proper handling of inmate appeals); 7.1 (conflict resolution for inmate grievances); 7.3 (town hall meetings); and 8.1 (reporting of retaliation grievances).  The County reported that the Department did not achieve compliance with 6.4 (proper handling of force-related grievances); 7.2 (timely notification of grievance investigation results).

The County's Augmented Fourteenth Self-Assessment reports that in the First Quarter of 2022, the Department achieved Substantial Compliance with the following grievance provisions at the DOJ facilities: 6.4 (proper handling of force-related grievances); 6.5 (proper handling of harassment and retaliation grievances); 6.7 (appropriate handling of grievances marked "emergency"); 6.8 (inmate notification of downgraded grievances); 6.9 (proper handling of emergency grievances); 6.10 (timely collection of inmate grievances); 6.11 (review of complaints re: inmate grievance process); 6.12 (proper database entry of inmate grievances); 6.13 (proper tracking of handling of inmate grievances); 6.14 (monthly reports of grievance tracking); 6.15 (evaluation of trends in inmate grievance handling); 6.17 (time limit for filing force-

related grievances); 6.18 (proper handling of PREA grievances); 6.19 (timely responses to inmate grievances); 6.20 (proper handling of inmate appeals); 7.1 (conflict resolution for inmate grievances); 7.3 (town hall meetings); and 8.1 (reporting of retaliation grievances).  The Department was not in Substantial Compliance with 7.2 (timely notification of grievance investigation results).

### Management and Administration (Substantial Compliance as of October 1, 2020 through September 30, 2021)

The Department achieved Substantial Compliance with the Management and Administration Provisions at the DOJ facilities as of September 30, 2021, and these provisions were not subject to Monitoring during the Fourteenth Reporting Period.

### Security Restraints (Partial Compliance)

Security Restraints are subject to the provisions in Section 17 of the *Rosas* Plan. It is the Monitor's understanding that the County and the Department do not use "multi-point restraints," which are subject to Paragraphs 17.6 through 17.9 of the plan, at any of the County's jail facilities.  The Monitor reviewed the Safety Chair Logs and Fixed Restraint Logs for both quarters, which reflect that the facilities that produced such logs are complying with the requirements of Paragraphs 17.3 and 17.4 of the *Rosas* Plan.

The Department posted logs of all of the involuntary medications administered in the Fourth Quarter of 2021 and First Quarter of 2022.  The records reflect that all of the medications were administered per court orders to restore the competency of those deemed incompetent to stand trial and none were solely for security purposes in compliance with Paragraph 17.10 of the *Rosas* Plan.

The Monitor and Subject Matter Expert reviewed 25 completed force packages for the DOJ facilities during this Reporting Period.  Several incidents involved the use of the WRAP restraint.  In the majority of these incidents, no specific justification was provided in use of force documentation regarding the reason for the application of the WRAP.  When a justification was provided, it was often extremely general.  To help avoid risks of overuse, supervisors should be trained to describe with particularity what specific threat required the use of the WRAP.

### Early Warning System        (Substantial Compliance as of September 30, 2019 through September 30, 2020)

The Department implemented an Employee Review System that was approved by the *Rosas* Monitors as a pilot program at the Downtown Jail Facilities on July 27, 2018, and expanded it to the DOJ facilities on October 25, 2018.  The Department achieved Substantial Compliance with the Early Warning Provisions at the DOJ facilities as of September 30, 2020, and these provisions were not subject to Monitoring during the Fourteenth Reporting Period.

82.     With respect to paragraph 6.16 of the *Rosas* Implementation Plan, the County and the Sheriff will ensure that Sheriff's Department personnel responsible for collecting prisoners' grievances as set forth in that paragraph are also co-located in the Century Regional Detention Facility.

**STATUS:        SUBSTANTIAL COMPLIANCE (as of July 15, 2016, through December 31, 2017)**

Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring for Substantial Compliance with Paragraph 82 in the Fourteenth Reporting Period.

83.     The County and the Sheriff will install closed circuit security cameras throughout all Jails facilities' common areas where prisoners engage in programming, treatment, recreation, visitation, and intra-facility movement ("Common Areas"), including in the Common Areas at the Pitchess Detention Center and the Century Regional Detention Facility.  The County and the Sheriff will install a sufficient number of cameras in Jails facilities that do not currently have cameras to ensure that all Common Areas of these facilities have security-camera coverage.  The installation of these cameras will be completed no later than June 30, 2018, with TTCF, MCJ, and IRC completed by the Effective Date; CRDF completed by March 1, 2016; and the remaining facilities completed by June 30, 2018.  The County and the Sheriff will also ensure that all video recordings of force incidents are adequately stored and retained for a period of at least one year after the force incident occurs or until all investigations and proceedings related to the use of force are concluded.

**STATUS:**       **SUBSTANTIAL COMPLIANCE (as of July 1, 2015, through June 30, 2016 at MCJ and IRC)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2015, through September 30, 2016 at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 at NCCF and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2018, through June 30, 2019 at PDC South)**

Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring for Substantial Compliance with Paragraph 83 in the Fourteenth Reporting Period.

84.     The Sheriff will continue to maintain and implement policies for the timely and thorough investigation of alleged staff misconduct related to use of force and for timely disciplinary action arising from such investigations.  Specifically:

(a)     Sworn custody staff subject to the provisions of California Government Code section 3304 will be notified of the completion of the investigation and the proposed discipline arising from force incidents in accordance with the requirements of that Code section; and

(b)     All non-sworn Sheriff's Department staff will be notified of the proposed discipline arising from force incidents in time to allow for the imposition of that discipline.

**STATUS:        SUBSTANTIAL COMPLIANCE (as of July 1, 2017, through June 30, 2018 (verified))**

Substantial Compliance under the Compliance Measures requires the Department to demonstrate that 95% of the investigations of force incidents in which sworn custody staff and non-sworn custody staff were found to have violated Department policy or engaged in misconduct were completed and administrative action, which could include discipline, was taken within the time frames provided for in Government Code Section 3304 and relevant Department policies.

Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring for Substantial Compliance with Paragraph 84 in the Fourteenth Reporting Period.

85.     The County and the Sheriff will ensure that Internal Affairs Bureau
management and staff receive adequate specialized training in conducting investigations
of misconduct.

**STATUS:**       **SUBSTANTIAL COMPLIANCE (as of April 1, 2021, through
March 31, 2022 (verified))**

The Parties agreed on Revised Compliance Measures in 2021.  Substantial
Compliance requires the Department to provide the Monitor with (1) the
curriculum/syllabus for the two specialized courses, Internal Affair Investigations and
Interview and Interrogation, given to IAB management, and (2) a list of the sworn
personnel assigned to IAB and proof that such personnel successfully completed the
training.  Substantial Compliance requires the Department to demonstrate that 90% of the
personnel assigned to IAB have successfully completed one course of the required
training within 3 months of their start date, and the second course within 6 months of
their start date.

The County's Fourteenth Self-Assessment reports that 100% of the IAB
investigators completed both of the required courses as of the end of the Fourth Quarter
of 2021 and the First Quarter of 2022.  These results have been verified by the Monitor's
auditors and the County has completed its obligations with respect to Provision 85 and no
longer be subject to monitoring for this provision.

86.     Within three months of the Effective Date, the County and the Sheriff will develop and implement policies and procedures for the effective and accurate maintenance, inventory, and assignment of chemical agents and other security equipment. The County and the Sheriff will develop and maintain an adequate inventory control system for all weapons, including OC spray.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 at MCJ and CRDF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2016, through December 31, 2017 at PDC North)**

**SUBSTANTIAL COMPLIANCE (as of February 1, 2017, through March 31, 2018 at PDC South and PDC East)**

**SUBSTANTIAL COMPLIANCE (as of March 1, 2017, through March 31, 2018 at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 at IRC)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 at TTCF)**

CDM 7-08/080 ACCOUNTABILITY OF SPECIAL WEAPONS, effective October 14, 2016, requires each facility to have unit orders that "establish procedures for the storage, issuance, reissuance, accountability, maintenance, and periodic inventory of all weapons. . . stored at, or issued from, the facility," which includes detailed requirements for the "Inventory, Control, and Accountability of Aerosol Chemical Agents."

In addition to providing written policies and procedures, Substantial Compliance requires the Department to provide up-to-date Unit Orders for each jail requiring the inventory and inspection of special weapons, and armory audit logs documenting the inventory and control of armory-level weapons.  The Department previously maintained Substantial Compliance with Paragraph 86 for twelve consecutive months at all of the facilities, and it was not subject to monitoring with this provision in the Fourteenth Reporting Period.

## APPENDIX A

| NO. | PROVISION | STATUS | SUBSTANTIAL COMPLIANCE DATES |
|-----|-----------|--------|------------------------------|
| 18 | Suicide Prevention Training | Substantial Compliance | **(10/1/17 at MCJ & PDC South)[1] (9/1/17 at NCCF) (12/1/17 at PDC East) (4/1/18 at TTCF, IRC, & PDC North) (8/1/18 at CRDF)** |
| 19 | Crisis Intervention & Conflict Resolution Training | Substantial Compliance | **(4/1/18 at MCJ, NCCF, & IRC) (7/1/18 at TTCF) (12/1/18 at CRDF, PDC East, & PDC North) (3/1/19 at PDC South)** |
| 20 | Training at NCCF, PDC and CRDF | Substantial Compliance | **(8/1/17 at PDC East, PDC North, NCCF, & CRDF) (10/1/17 at PDC South)** |
| 21 | CPR Certification | Substantial Compliance | **(10/1/15 – 9/30/16 at PDC East & PDC South) (1/1/16 – 12/31/16 at NCCF, PDC North, & IRC) (4/1/16 – 3/31/17 at TTCF) (10/1/17 – 9/30/18 at MCJ) (7/1/18 – 6/30/19 at CRDF)** |

---

[1] Substantial Compliance Dates in **bold** reflect that the Department has achieved Substantial Compliance with the training requirements or maintained Substantial Compliance for twelve consecutive months with the other requirements; the results were verified by the Monitor's auditors when required; and the County or designated facilities are no longer subject to monitoring of this provision pursuant to Paragraph 111 of the Settlement Agreement.

## APPENDIX A

| | | | |
|---|---|---|---|
| 22 | Use of Arresting and Booking Documents | Substantial Compliance | **(7/1/16 – 6/30/17)** |
| 23 | Suicide Hazard Mitigation Plans | Substantial Compliance | **(7/12/18)** |
| 24 | Suicide Hazard Inspection | Substantial Compliance | **(10/1/17 – 9/30/18)** |
| 25 | Transportation of Suicidal Inmates (station jails) | Partial Compliance | |
| 26 | Identification and Evaluation of Suicidal Inmates | Substantial Compliance | (7/1/21 – 3/31/22) |
| 27 | Screening for Mental Health Care and Suicide Risk | Substantial Compliance | **(10/1/19 – 3/31/20, 10/1/20 – 3/31/21)** |
| 28 | Expedited Booking of Suicidal Inmates | Substantial Compliance (IRC) Partial Compliance (CRDF) | **(4/1/17 – 3/31/18 at IRC)** |
| 29 | Mental Health Assessments (of non-emergent mental health needs) | Substantial Compliance | **(4/1/17 – 3/31/18)** |
| 30 | Initial Mental Health Assessments & Treatment Plans | Substantial Compliance | **(1/1/19 – 12/31/19)** |
| 31 | Electronic Medical Records Alerts | Partial Compliance (CRDF & TTCF) | |
| 32 | Electronic Medical Records – Suicide Attempts | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 33 | Supervisor Reviews of Electronic Medical Records | Substantial Compliance | **(7/1/16 – 6/30/17)** |
| 34 | Discharge Planning | Non-Compliance | |
| 35 | Referral for Mental Health Care | Substantial Compliance | **(11/1/17 – 12/31/18)** |
| 36 | Assessments After Triggering Events | Non-Compliance | |

## APPENDIX A

| | | | |
|---|---|---|---|
| 37 | Court Services Division Referrals | Non-Compliance | |
| 38 | Weekly Rounds in Restricted Housing Modules | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 39 | Confidential Self-Referral | Substantial Compliance (NCCF & PDC South) Partial Compliance (PDC North, MCJ, & CRDF) Non-Compliance (TTCF) Not Rated (PDC East) | **(7/1/17 – 6/30/18 at NCCF)** (1/1/22 – 3/31/22 at PDC South) |
| 40 | Availability of QMHPs | Partial Compliance | |
| 41 | FIP Step-Down Protocols | Partial Compliance | |
| 42 | HOH Step-Down Protocols | Non-Compliance | |
| 43 | Disciplinary Policies | Substantial Compliance (NCCF & PDC North) Non-Compliance (CRDF, MCJ, & TTCF) | **(10/1/17 – 9/30/18 at NCCF & PDC North)** |
| 44 | Protective Barriers | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 45 | Suicide Intervention and First Aid Kits | Substantial Compliance | **(10/1/15 – 9/30/16 at CRDF, NCCF, TTCF, PDC East, & PDC South) (1/1/16 – 12/31/16 at MCJ & PDC North)** |
| 46 | Interruption of Self-Injurious Behavior | Substantial Compliance | **(7/1/20 – 6/30/21)** |
| 47 | Staffing Requirements | Partial Compliance | |
| 48 | Housekeeping and Sanitation | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 49 | Maintenance Plans | Substantial Compliance | **(3/1/16 – 2/28/17)** |

## APPENDIX A

| 50 | Pest Control | Substantial Compliance | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC North, TTCF, & CRDF) (4/1/16 – 3/31/17 at PDC South & PDC East)** |
|----|--------------|------------------------|---|
| 51 | Personal Care & Supplies | Substantial Compliance | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC East, PDC North, PDC South, & TTCF) (7/1/16 – 6/30/17 at CRDF)** |
| 52 | HOH Property Restrictions | Partial Compliance | |
| 53 | Eligibility for Education, Work and Programs | Partial Compliance | |
| 54 | Privileges and Programs[2] | Partial Compliance | |
| 55 | Staff Meetings | Substantial Compliance | **(10/1/16 – 9/30/17 at CRDF) (4/1/17 – 3/31/18 at PDC North) (4/1/18 – 3/31/19 at MCJ) (7/1/19 – 6/30/20 at TTCF)** |
| 56 | Changes in Housing Assignments | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 57 | Inmate Safety Checks in Mental Housing | Substantial Compliance (MCJ & PDC North) Partial Compliance (CRDF) Non-Compliance (TTCF) | **(4/1/17 – 3/31/18 at MCJ)** (7/1/21 – 3/31/22 at PDC North) |

---

[2] Per agreement of the parties, the County must maintain Substantial Compliance for two additional quarters under the revised Compliance Measures.

## APPENDIX A

| 58 | Inmate Safety Checks in Non-Mental Housing | Substantial Compliance (PDC South, PDC North, PDC East, CRDF, IRC, & NCCF) Partial Compliance (TTCF & MCJ) | **(1/1/16 – 12/31/16 at PDC South, PDC North, & PDC East) (7/1/17 – 6/30/18 at CRDF) (10/1/17 – 9/30/18 at IRC)** (4/1/21 – 3/31/22 at NCCF) |
| --- | --- | --- | --- |
| 59 | Supervisor Rounds | Substantial Compliance | **(1/1/17 – 12/31/17 at PDC East & MCJ) (4/1/17 – 3/31/18 at NCCF) (10/1/17 – 9/30/18 at CRDF) (1/1/18 – 12/31/18 at PDC North & PDC South) (4/1/18 – 3/31/19 at TTCF)** |
| 60 | Implementation of Quality Improvement Program | Substantial Compliance | **(4/1/19 – 3/31/20)** |
| 61 | Requirements of Quality Improvement Program | Partial Compliance | |
| 62 | Tracking of Corrective Action Plans | Partial Compliance | |
| 63 | Sufficient HOH and MOH Housing | Patrial Compliance (CRDF & TTCF) | |
| 64 | Plans for Availability of Inpatient Health Care | Non-Compliance | |
| 65 | Administration of Psychotropic Medication | Partial Compliance | |
| 66 | Active Mental Health Caseloads | Partial Compliance | |
| 67 | Prisoner Refusals of Medication | Partial Compliance | |

## APPENDIX A

| 68 | Contraband Searches | Substantial Compliance (MCJ, NCCF, PDC East, PDC South PDC North, TTCF, & CRDF) | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC East, PDC South, & PDC North) (1/1/17 – 12/31/17 at TTCF)** (1/1/22 – 3/31/22 at CRDF) |
|---|---|---|---|
| 69 | Clinical Restraints in CTC | Substantial Compliance | **(7/1/18 – 6/30/19)** |
| 70 | Security Restraints in HOH and MOH | Partial Compliance | |
| 71 | Therapeutic Services for Inmates in Clinical Restraints | Substantial Compliance | **(7/1/16 – 6/30/17)** |
| 72 | Administrative Reviews | Substantial Compliance | **(1/1/17 – 12/31/17)** |
| 73 | Reporting of Self-Injurious Behavior and Threats | Substantial Compliance | **(10/1/17 – 9/30/18)** |
| 74 | Law Enforcement Investigations of Suicides | Substantial Compliance | **(9/1/16 – 12/31/17)** |
| 75 | Management Reviews of Suicide Attempts | Substantial Compliance | **(10/1/17 – 9/30/18)** |
| 76 | Management Reviews of Suicides | Substantial Compliance | **(9/1/16 – 12/31/17)** |
| 77 | Custody Compliance and Sustainability Bureau | Partial Compliance | |
| 78 | Suicide Prevention Advisory Committee | Substantial Compliance | **(5/11/16 – 5/18/17)** |
| 79 | Therapeutic Services in Mental Health Housing | Non-Compliance | |
| 80 | Out-of-Cell Time in HOH | Non-Compliance | |

## APPENDIX A

| | | | |
|---|---|---|---|
| 81 | Implementation of *Rosas* Recommendations | Partial Compliance | |
| | Training | Partial Compliance | |
| | Use of Force | Partial Compliance | |
| | Reporting and Investigation of Force | Partial Compliance | |
| | Grievances | Partial Compliance | |
| | Management and Administration | Substantial Compliance | **(10/1/20 – 9/30/21)** |
| | Security Restraints | Partial Compliance | |
| | Early Warning System | Substantial Compliance | **(9/30/19 – 9/30/20)** |
| 82 | Grievances at CRDF | Substantial Compliance | **(7/15/16 – 12/31/17)** |
| 83 | Closed Circuit Cameras | Substantial Compliance | **(7/1/15 – 6/30/16 at MCJ & IRC)** **(10/1/15 – 9/30/16 at TTCF)** **(4/1/16 – 3/31/17 at CRDF)** **(4/1/18 – 3/31/19 at NCCF & PDC North)** **(7/1/18 –6/30/19 at PDC South)** |
| 84 | Investigation of Staff Misconduct | Substantial Compliance | **(7/1/17 – 6/30/18)** |
| 85 | Internal Affairs Bureau Training | Substantial Compliance | **(4/1/21 – 3/31/22)** |

**APPENDIX A**

| 86 | Maintenance and Inventory of Security Equipment | Substantial Compliance | **(4/1/16 – 3/31/17 at MCJ & CRDF)** **(10/1/16 – 12/31/17 at PDC North)** **(2/1/17 – 3/31/18 at PDC South & PDC East)** **(3/1/17 – 3/31/18 at NCCF)** **(4/1/17 – 3/31/18 at IRC)** **(4/1/18 – 3/31/19 at TTCF)** |

## APPENDIX B

| | Substantial Compliance (Provisions) | Partial Compliance[1] | Non-Compliance | Suspended (Some Or All Facilities) | Substantial Compliance (Facilities)[2] | No Longer Subject To Monitoring[3] |
|---|---|---|---|---|---|---|
| First[4] | 5 | 16 | | | 10 | |
| Second | 14 | 30 | 13 | | 24 | |
| Third | 22 | 27(1) | 10 | | 29 | 4(2) |
| Fourth | 24 | 26(1) | 10 | | 29 | 10(2) |
| Fifth | 23 | 24(2) | 7 | | 34 | 15(5) |
| Sixth | 32 | 22 | 7 | | 38 | 18(9) |
| Seventh | 30 | 23 | 7 | | 39 | 21(10) |
| Eighth | 35 | 20 | 6 | | 42 | 27(9) |
| Ninth | 36 | 22 | 4 | | 43 | 31(8) |
| Tenth | 39 | 21 | 3 | | 45 | 32(8) |
| Eleventh | 38 | 18 | 5 | 2 | 44 | 34(7) |
| Twelfth | 38 | 18 | 6 | 1 | 44 | 36(6) |
| Thirteenth | 42 | 14(1) | 6 | 1 | 47 | 36(6) |
| Fourteenth | 40 | 17 | 7 | 0 | 45 | 38(6) |

---

[1] The figure in parenthesis under Partial Compliance is the number of additional provisions where some facilities were in Partial Compliance and other facilities were in Non-Compliance.

[2] This represents the number of provisions where the Department is in Substantial Compliance at all or some of the facilities.

[3] The figure in parenthesis under No Longer Subject to Monitoring is the number of additional provisions where some facilities are no longer subject to monitoring.

[4] During the First Reporting Period, 43 provisions were not subject to monitoring.