GRANT A. DAVIS-DENNY (State Bar No. 229335)
grant.davis-denny@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue
Los Angeles, California 90071-1560
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

MARK D. ROSENBAUM (State Bar No. 59940)
mrosenbaum@publiccounsel.org
MALKA S. ZEEFE (State Bar No. 343153)
mzeefe@publiccounsel.org
PUBLIC COUNSEL LAW CENTER
610 S. Ardmore Avenue
Los Angeles, California 90005
Telephone: (213) 385-2977
Facsimile: (213) 385-9089

Attorneys for Plaintiff-Intervenors

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>COUNTY OF LOS ANGELES, et al.,<br><br>Defendants. | Case No. 15-cv-05903-DDP-JEM<br><br>**PLAINTIFF-INTERVENORS' STATUS REPORT**<br><br>Judge: Hon. Dean D. Pregerson<br><br>Date: November 14, 2022<br>Time: 10:00 a.m. |
| TERESA POWERS, DAVID PENN, TIMOTHY POLK, MARK SARNI, DERRICK THOMAS, DARSEL WHITFIELD, ROYAL WILLIAMS, AND LEPRIEST VALENTINE,<br><br>Plaintiff-Intervenors. | |

In advance of the November 14, 2022 status conference, Plaintiff-Intervenors submit this status report to inform the Court of recent developments related to Paragraph 34 of the Settlement Agreement.

Defendants County of Los Angeles and the Sheriff's recent responses to written questions confirm that depositions are needed to evaluate the claims Defendants have made regarding their compliance with Paragraph 34.  (*See* Letter from R. Dugdale to G. Davis-Denny (Oct. 13, 2022), attached hereto as Exhibit A (the "responses" or "Resp.").  As the Court will recall, Defendants agreed in Paragraph 34 to provide certain individuals with significant psychiatric or major neuro-cognitive disorders with comprehensive release planning.  If Defendants fulfilled their duties, these individuals would not be funneled from the jails to Los Angeles streets, but would be connected to community-based organizations that provide housing and other social services and would benefit from those organizations' involvement in planning for their release.

At the August 2022 status conference, the Court authorized Plaintiff-Intervenors to submit twenty written questions to Defendants.  Such discovery to determine compliance with a Court order[1] is warranted where "significant questions regarding noncompliance have been raised."  *Cal. Dept. of Social Services v. Leavitt*, 523 F.3d 1025, 1034 (9th Cir. 2008).  "[T]he kind and amount of evidence

---

[1] The Court's Order approving the Settlement Agreement both "APPROVED" the "Agreement" and "entered [the Agreement] as an Order of the Court."  (Doc. 13 at 3.)  The parties also stipulated in amending Paragraph 34 that "[t]he Court shall retain jurisdiction to enforce the terms set forth in this Stipulation of Dismissal," which included amended Paragraph 34.  (Doc. 144 at 2**.**)  A district court has "ancillary jurisdiction to enforce a settlement agreement" where, as here, "the parties' obligation to comply with the terms of the settlement agreement ha[s] been made part of the order of dismissal—either by separate provision (such as a provision 'retaining jurisdiction' over the settlement agreement) or by incorporating the terms of the settlement agreement in the order." *K.C. ex rel. Erica C. v.*

of noncompliance required to justify discovery is, necessarily, considerably less than that needed to show actual noncompliance." *Id.*

Defendants' October 13, 2022 responses to those written questions raise serious concerns regarding noncompliance and the County's procedures for auditing and assessing compliance:

**First,** those responses reveal that the County has now tasked the same County unit that implements Paragraph 34 with the lead role in auditing and assessing the County's compliance with Paragraph 34. (Resp. to Question 17.) Prior to Q1 2022, the County's Compliance Unit assessed compliance. However, "[s]ince Q1 of 2022, Care Transitions has been responsible for auditing and assessing compliance with Provision 34, in conjunction with the Compliance Unit." (*Id.*) According to the County, the Care Transitions Unit also is the "primary County department responsible for ensuring compliance with Provision 34" and is the unit that "provides release planning for LACJ and linkage to community services upon release." (Resp. to Question 1.) Thus, when Defendants entered into the Paragraph 34 implementation plan in Q1 2022, they also shifted to an auditing and assessment approach that put Care Transitions in charge of analyzing its own compliance with Paragraph 34. Perhaps not coincidentally, Care Transitions' assessment of its compliance has been far rosier than the assessments that the Compliance Unit had performed. This makes it critical that Plaintiff-Intervenors have the opportunity to depose a knowledgeable Care Transitions employee to understand and assess the specifics of how Care Transitions performs its auditing and assessment duties and whether the County's reports of improved compliance with Paragraph 34 reflect real change or simply show the effects of having the same unit both implement and audit compliance with Paragraph 34.

---

*Torlakson*, 762 F.3d 963, 967 (9th Cir. 2014) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994)).

**Second,** the County's responses revealed that the County lacks any training manuals, written instructions, guides, or any other documentation "related to auditing, other than the data and progress reports that are generated each quarter." (Resp. to Question 18.)  Thus, when Care Transitions audits its own performance in implementing Paragraph 34, it does so without any written standards or guidelines. And because of this lack of documentation, Plaintiff-Intervenors cannot assess the specifics of how the County is performing its audits through the written record alone.  This absence of written documentation reinforces the importance of Plaintiff-Intervenors being able to depose a knowledgeable Care Transitions employee regarding the processes that unit uses to audit its own implementation of Paragraph 34.

**Third,** the County's responses strongly suggest that the County has adopted a check-the-box attitude towards Paragraph 34 that is consistent with neither the terms nor the spirit of the settlement.  For example, in response to a request for information on the percentage of prisoners entitled to comprehensive release planning who had a community-based provider participate in the development of the plan, the County states, "The County does not maintain data on how many clients entitled to comprehensive release planning have had a CBO [community-based organization] participate in the development of a comprehensive release plan, and the County is not obligated under the Settlement Agreement to maintain such data." (Resp. to Question 5.)  Similarly, the County acknowledges it "does not maintain data regarding what percentage of prisoners entitled to comprehensive release planning have actually been housed upon their release from prison" but contends it "is not obligated under the Settlement Agreement to maintain such data."  (Resp. to Question 7.)

Paragraph 34, however, provides that "The Comprehensive Release Plan will include … coordinating with community-based providers to identify available services that meet the prisoner's needs … [and] facilitating the transition of care to

community-based providers." (Paragraph 34(b)(ii).) Under that provision, the needs that release planning must account for include "the need of the prisoner for housing." (Paragraph 34(a).) Similarly, the Paragraph 34 compliance measures require the comprehensive release plan to include, among other things, "Connection to available housing or to community-based providers who can assist in meeting housing needs" and "[a]n arrangement for transportation to the community-based provider, residence, or shelter that … is identified in the Comprehensive Release Plan as being the location where the prisoner will be received." (Compliance Measures ¶ 1(d)(3), (8).)

The County's failure to track the involvement of community-based providers in the development of comprehensive release plans or the percentage of prisoners entitled to planning who actually have been housed post-release indicates there are significant issues with whether the County can assess its own compliance with Paragraph 34(b)(ii). It also raises serious questions about whether individuals entitled to connection to housing services and to coordination and facilitation of care through community-based providers are meaningfully receiving the services that the County promised in the Settlement Agreement and the Compliance Measures to provide. Answering those questions also requires and justifies depositions of Care Transitions staff.

**Fourth,** the County's responses state that because the "Provision 34 audit's sample size is small—consisting of 85 randomly selected records of individuals, some of who did not require release planning …. [t]he resulting data … contains a margin of error that makes certain variances statistically insignificant." (Resp. to Question 2.) A sample size of 85 total individuals—and a minimum of 30 individuals who actually required release planning[2]—however, is the sample size

---

[2] "If these randomly selected records do not include at least 30 prisoners for whom comprehensive release plans were developed, additional randomly selected records

the County agreed to in the Compliance Measures.  (Compliance Measures ¶ 1.)  If, as the County apparently now believes, the sample size is so small that it can dismiss unfavorable results as "statistically insignificant," that raises concerns about whether the sample size is sufficiently large to provide a meaningful measurement of the County's compliance with Paragraph 34.  This issue also requires exploration through depositions.

**Fifth,** the County's responses suggest the County lacks any internal accountability practices for its managers' and employees' failures to substantially comply with Paragraph 34 and the Compliance Measures.  In response to a question about how the County ensures accountability for meeting Paragraph 34's requirements and specifically what the consequences are for not meeting those objectives, the County responded that when objectives are not met, Care Transitions analyzes root causes, develops additional efforts to address these causes, and shares these outcomes with staff.  (Resp. to Question 1.)  Those steps, though positive, do not demonstrate an effective system of internal accountability because they do not include adverse consequences for managers and employees if Paragraph 34 substantial compliance is not achieved (or at least the County's response does not reveal any such consequences) or positive rewards if Paragraph 34 substantial compliance is achieved.

In short, the County's responses raise "significant questions regarding noncompliance," *California Dept. of Social Services,* 523 F.3d at 1034, demonstrate the limits of what written interrogatories can achieve, and confirm the necessity of depositions.  *Cf. Shoen v. Shoen*, 5 F.3d 1289, 1297 (9th Cir. 1993) ("[w]ritten interrogatories are rarely, if ever, an adequate substitute for a deposition when the goal is discovery of a witness' recollection of conversations").

---

from the same week will be added to the sample until the threshold of 30 prisoners with comprehensive release plans is met."  (Compliance Measures ¶ 1.)

1    For all of these reasons, Plaintiff-Intervenors have served a 30(b)(6)

2  deposition notice on the County to explore how Care Transitions is implementing

3  Paragraph 34 and assessing and auditing its own compliance with that provision.

4    Finally, Plaintiff-Intervenors understand that the United States will soon

5  move to have the Court adopt the implementation plans that the County agreed to as

6  Court orders.  Plaintiff-Intervenors fully support this relief, which should facilitate

7  the Court holding the County responsible if it fails to abide by its commitments.

8    Plaintiff-Intervenors look forward to discussing these issues with the Court

9  and the Parties at the upcoming status conference.

10

11

12  DATED: November 9, 2022

13                                          MUNGER, TOLLES & OLSON LLP
14                                          GRANT A. DAVIS-DENNY

15

16

17                                  By:   /s/ *Grant Davis-Denny*
18                                          GRANT A. DAVIS-DENNY
19                                  Attorneys for Plaintiff-Intervenors

20

21                                  PUBLIC COUNSEL
22                                          MARK D. ROSENBAUM
23                                          MALKA S. ZEEFE

24

25                                  By:   /s/ *Mark Rosenbaum*
26                                          MARK D. ROSENBAUM
27                                  Attorneys for Plaintiff-Intervenors

28

# EXHIBIT A

 Kendall Brill Kelly

writer's direct:
310.272.7904 telephone
rdugdale@kbkfirm.com

October 13, 2022

**VIA EMAIL AND U.S. MAIL**

Grant A. Davis-Denny
Munger, Tolles & Olson LLP
350 South Grand Ave., Fl. 50
Los Angeles, CA 90071-3426
*grant.davis-denny@mto.com*

Re:     United States v. County of Los Angeles, et al., Case No. 2:15-cv-5903-DDP-JEM

Dear Mr. Davis-Denny:

We write on behalf of the County of Los Angeles ("County") and the Los Angeles
County Sheriff ("Sheriff") (collectively, "Defendants") in response to your letter, dated
September 13, 2022, to answer the questions you set forth pursuant to the Court's August 19,
2022 minute order and ruling from the bench at the Status Conference of the same date.  But as
the Court, in so ruling, expressly declined to order formal discovery at this juncture, *see* ECF No.
216 at 61:2-8, Defendants will not be producing documents in response to the twenty document
requests also included in your letter.  To the extent any questions remain or arise in the future,
we welcome the opportunity to discuss them with you, as we always have in the past.

Defendants will not provide any information protected by the attorney-client privilege,
the attorney work-product doctrine, or any other privilege, protection, or immunity.  Defendants
also will not provide any information that is not relevant to Provision 34 of the Settlement
Agreement, pursuant to which you have intervened in the above-referenced case.

**Question 1:**  How do the County and the Sheriff ensure accountability in meeting the
requirements of Paragraph 34?  At a minimum, the answer to this question should address who is
in the chain of command responsible for ensuring compliance with Paragraph 34, what
objectives are set for their performance with respect to Paragraph 34, and what the consequences
are for employees and managers when these objectives are not met.  Please provide an org chart
showing this chain of command and any documentation evidencing the County or the Sheriff
providing accountability regarding compliance or non-compliance with Paragraph 34.

**Response to Question 1:**  As we have informed you in the past, the Sheriff is not responsible for
release planning at the Los Angeles County Jail ("LACJ").  The primary County department
responsible for ensuring compliance with Provision 34 is the Department of Health Services
("DHS") – Correctional Health Services, and specifically the Care Transitions Unit ("Care

**Kendall Brill & Kelly LLP**

10100 Santa Monica Blvd.   Suite 1725   Los Angeles, CA 90067   310.556.2700 telephone   310.556.2705 facsimile   www.kbkfirm.com

Kendall Brill & Kelly LLP

Grant A. Davis-Denny
October 13, 2022
Page 2

Transitions").  This unit provides release planning for LACJ and linkage to community services upon release.  The Director of Care Transitions is Karen Bernstein.

Care Transitions' objectives with respect to Provision 34 are to achieve substantial compliance with the Provision 34 Compliance Measures.  The Provision 34 Implementation Plan ("Provision 34 Plan") submitted on March 10, 2022 detailed specific actions to be taken toward achieving those objectives, based on analyses of audit data for each individual component of the aggregated measures for the Initial Release Plan ("IRP") and Comprehensive Release Plan ("CRP") measures.  *See* Provision 34 Plan at 2.

To the extent objectives are not met, Care Transitions conducts a further analysis of the most recent audit data and the trajectory of each individual component to assess which elements are deficient, to determine, if possible, any root causes, and to develop additional efforts for addressing them.  Outcomes are shared with staff to ensure the staff is aware of the areas of needed improvement in advance of the next quarter.

**Question 2:**  Why did a lower percentage of inmates receive comprehensive release planning within 30 days and Initial Release Planning in Quarter 1 of 2022 than in Quarter 2 of 2021? Please provide all documentation that contains analysis of why these percentages declined?

**Response to Question 2:**  As a threshold matter, the Provision 34 audit's sample size is small— consisting of 85 randomly selected records of individuals, some of whom did not require release planning due to being sentenced to prison, transferred to state hospital, or other circumstances. The resulting data, therefore, contains a margin of error that makes certain variances statistically insignificant.  The shift in IRPs not completed from 24% in Quarter 2 of 2021 to 26.7% in Quarter 1 of 2022, for a difference of 2.7%, may be within the range of statistical chance.

Regardless, the County believes that any variance between the data from Quarter 2 of 2021 and Quarter 1 of 2022 exists because neither audit reflects the impact from the combination of improved caseload tracking, Community Health Worker work, and supervision changes initiated in February 2022.  As the County has stated, it does not expect these interventions to begin to have an impact until Quarter 2 of 2022.  *See* Provision 34 Plan at 12; Progress Report at 1-2. Irrespective of this, although the percentage of CRPs initiated within 30 days decreased, the percentage of CRPs not completed also decreased.

Finally, this question misses the mark insofar as it fails to account for the fact that, even without having experienced the anticipated benefits of the corrective actions set forth above which took place in February 2022, the County has shown steady improvement under Compliance Measure 34-13(c)(2), which concerns providing inmates with IRPs, and Compliance Measure 34-13(c)(3), which concerns providing inmates with CRPs, during the last four quarters covered by the Monitor's two most-recent Monitoring Reports.

Kendall Brill & Kelly LLP

Grant A. Davis-Denny
October 13, 2022
Page 3

**Provision 34 – Results in the Most Recent Four Quarters Reported By the Monitor**

| Initial Release Plans (Compliance Measure 34-13(c)(2)) | | | |
|---|---|---|---|
| **Q2 2021** | **Q3 2021** | **Q4 2021** | **Q1 2022** |
| 50% | 60% | 63% | 70% |

| Comprehensive Release Plans (Compliance Measure 34-13(c)(3)) | | | |
|---|---|---|---|
| **Q2 2021** | **Q3 2021** | **Q4 2021** | **Q1 2022** |
| 35% | 26% | 33% | 45% |

Indeed, these statistics reflect that the County is on pace, if not ahead of pace, to meet the benchmarks set forth in the Provision 34 Plan agreed to by the parties earlier this year. *See* Provision 34 Plan at 12 (projecting that the County hoped to see an increase in its IRP measure to 70% by Q2 of 2022 and an increase in its CRP measure to 55% by Q2 of 2022).

**Question 3:** What criteria do the County, the Sheriff, and/or release planning staff use to determine when an invitation to a community based organization to participate in release planning has occurred? Does an unanswered phone call from release planning staff count as such an invitation? Does leaving a voicemail qualify? Does sending an email that goes unanswered qualify? Please provide any documentation that is given to release planning staff that provides guidance or training on when they should mark as complete the task of inviting CBOs to participate in release planning or on how to invite CBOs to participate in release planning.

**Response to Question 3:** The County may determine that an invitation to a CBO to participate in release planning has occurred if there was a good faith effort to reach out to the CBO by email or phone and that effort was documented properly in Correctional Health Services' electronic medical record system. An unanswered phone call from release planning staff does not count as such an invitation. A voicemail from release planning staff might qualify, though email is the usual method of communication. An invitation to a CBO to participate in release planning may also be deemed to have occurred based on documentation about the involvement of a CBO in providing such services.

After the Care Transitions staff designates that an invitation was or was not provided, or that release planning was not applicable, an auditor will review the determination during the quarterly audit to ensure it is supported by the case notes before accepting the response.

Kendall Brill & Kelly LLP

Grant A. Davis-Denny
October 13, 2022
Page 4

**Question 4:**  Why did the County and Sheriff fail to meet their hiring goals for Medical Case
Workers ("MCWs")?  Why did two MCWs rescind their acceptances during the onboarding
period?  What is the County and Sheriff's plan for improving retention?  What is the County and
Sheriff's plan for filling vacant MCW positions?  Please provide all documentation evidencing
or discussing these plans or the failure to meet hiring goals.

**Response to Question 4:**  The County did not meet its hiring goals for MCWs for a myriad of
reasons, including because candidates declined or did not respond to requests for an interview or
to the job offer itself.  The challenges described in the Provision 34 Plan and Progress Report
have remained, including candidates' preferences for a non-custody work environment, delays in
receiving the next band of candidates after clearing the current band, and being unable to move
to the next band because there are more than four candidates who have been interviewed and not
selected who would accept the position if offered.  *See* Provision 34 Plan at 3-4; Progress Report
at 3-4.

Two MCWs rescinded their acceptances during the onboarding period because they accepted
different jobs.  One accepted a different position in the same department; the other took another
higher-level job they had applied for prior to applying to the MCW position.  The County
believes that any challenges in hiring and retaining mental health professionals it has
experienced are similar to those being experienced in other organizations at this time.  There is a
critical shortage of mental health professionals across the country, and specifically in California.
Candidates are in high demand and may receive multiple offers.  As the County hires additional
staff and supervisors, it expects improvements in the day-to-day experience of the staff that will
affect retention, such as lower caseloads and more support and training.  The County is actively
recruiting and interviewing candidates to fill vacant MCW positions.

**Question 5:**  In each of the last eight quarters for which data is available, what percentage of
prisoners entitled to comprehensive release planning have had a community-based provider
participate in the development of a comprehensive release plan? Please provide substantiating
documentation.

**Response to Question 5:**  The County does not maintain data on how many clients entitled to
comprehensive release planning have had a CBO participate in the development of a
comprehensive release plan, and the County is not obligated under the Settlement Agreement to
maintain such data.

**Question 6:**  What criteria do the County and the Sheriff use to determine when a connection to
available housing or community-based providers who can assist in meeting housing needs has
occurred?  Does an unanswered phone call from release planning staff meet the criteria?  Does
leaving a voicemail meet the criteria?  Does sending an email that goes unanswered meet the
criteria?  Please provide any documentation that is given to release planning staff that provides
training or guidance on (1) when they should mark as complete the task of making a connection
to available housing or community-based providers who can assist in meeting housing needs;

Kendall Brill & Kelly LLP

Grant A. Davis-Denny
October 13, 2022
Page 5

and (2) how to connect prisoners to community-based providers who can assist in meeting housing needs.

**Response to Question 6:** There is no scenario in which a phone call, voicemail, or email is sufficient to connect a client to interim housing. The County may determine that a connection to interim housing has occurred if a referral has been made, which generally consists of completing and submitting a multi-page referral form, obtaining consent forms, and contacting the applicable CBO by email with follow up emails or calls as necessary. Additionally, for referrals to DHS Housing for Health (the most frequent referrals), obtaining medical records is also required.

The County may additionally determine that a connection to interim housing has occurred if the client is released to a residential treatment provider or if documentation of linkage to a housing case manager exists.

**Question 7:** In each of the last eight quarters for which data is available, what percentage of prisoners entitled to comprehensive release planning have actually been housed upon their release from prison and how do those percentages compare to the percentages before the County began implementing Paragraph 34? Please provide substantiating documentation.

**Response to Question 7:** The County does not maintain data regarding what percentage of prisoners entitled to comprehensive release planning have actually been housed upon their release from prison, and the County is not obligated under the Settlement Agreement to maintain such data.

**Question 8:** For prisoners who have received comprehensive release planning, what data does the County have on their recidivism rates and how do those rates compare to rates for the same population prior to the County beginning to implement Paragraph 34? Please provide substantiating documentation.

**Response to Question 8:** The County does not maintain data on recidivism rates for clients who received comprehensive release planning, and the County is not obligated under the Settlement Agreement to maintain such data.

**Question 9:** How has the County Board of Supervisors' exercise of its budgetary authority and/or "failure to provide minimal and critical resources essential to attaining what is required under the Agreement" impacted the County and Sheriff's compliance with Paragraph 34? *See* Dkt. 202 at 30. The Sheriff has claimed that "the County's Board of Supervisors has increasingly … sought to utilize its budgetary authority over the Sheriff in a very damaging manner consistent with the apparent purpose of impairing the Sheriff's capacity to comply with his independent obligations under the Agreement" and that this has been to "the direct detriment of the Sheriff's ability to comply with his obligations under the Agreement." Dkt. 202 at 8. Please identify each way in which the Board's budgetary authority has impaired, damaged, or

603357555

Kendall Brill & Kelly LLP

Grant A. Davis-Denny
October 13, 2022
Page 6

been to the detriment of the Sheriff's or the County's ability to comply with Paragraph 34 and provide all documentation that discusses this issue.

**Response to Question 9:**  It has not at all.  As we have previously informed you, the Sheriff is not responsible for release planning.

**Question 10:**  What impact(s) has the Board of Supervisor's' cancellation of planned construction of the Consolidated Correctional Treatment Facility had on the County and Sheriff's ability to provide initial release planning and comprehensive release planning or to comply with Paragraph 34?  *See* Dkt. 202 at 9.  Please provide all documentation that discusses any such impacts.

**Response to Question 10:**  None.  *See supra*, Response to Question 9.

**Question 11:**  What impact(s) has the Board of Supervisors' decision to cut 1280 budgeted positions from the Sheriff's Department and/or to implement a hiring freeze had on comprehensive release planning, initial release planning, or the Sheriff's and County's implementation of Paragraph 34?  *See* Dkt. 202 at 9-10 & Dkt. 203-2.  Please provide all documentation that discusses any such impacts.

**Response to Question 11:**  None.  *See supra*, Response to Question 9.

**Question 12:**  Is "the Sheriff's Department understaffed and without any realistic resources to achieve" Paragraph 34 "compliance on a long-term basis," *see* Dkt. 202 at 10?  If so, why and how does this impact Paragraph 34 compliance?  Please provide all documentation that discusses any understaffing or resource shortage that impairs the Sheriff's ability to comply with Paragraph 34.

**Response to Question 12:**  *See supra*, Response to Question 9.

**Question 13:**  How have actions by the Office of County Counsel, the County Chief Executive, or the Board of Supervisors "constrained the ability of the Sheriff to move budgeted and fully appropriated positions within the Department" to cover staffing needs related to Paragraph 34 implementation, comprehensive release planning, or initial release planning?  *See* Dkt. 202 at 10-11.  Please provide all documentation that discusses any such actions or constraints.

**Response to Question 13:**  They have not.  *See supra*, Response to Question 9.

**Question 14:**  Does the Sheriff or the County believe that the closure of Men's Central Jail without either construction of a modern mental health facility or substantial improvement of existing locations will impact the Sheriff's and County's abilities to comply with Paragraph 34, comprehensive release planning, or initial release planning?  *See* Dkt. 202 at 13. If so, how?  Please provide all documentation that discusses any such impacts.

Kendall Brill & Kelly LLP

Grant A. Davis-Denny
October 13, 2022
Page 7

**Response to Question 14:**  No.

**Question 15:**  Does the Sheriff or the County believe that the Paragraph 34 implementation plan is "*insufficient* to meet treatment needs or attain any appreciable measure of long-term compliance with the Agreement"?  *See* Dkt. 202 at 14.  If so, why is the plan insufficient and when did the Sheriff or the County first determine that the plan was insufficient?  Please provide all documentation that discusses the sufficiency of the Paragraph 34 implementation plan to attain compliance with Paragraph 34.

**Response to Question 15:**  No.

**Question 16:**  Does the Sheriff or the County believe that a "lack of valid systematic data," *see* Dkt. 203-8 at 3, impacts the Sheriff's or County's ability to comply with Paragraph 34 or to accurately audit or assess compliance with Paragraph 34?  If so, how does the lack of valid systematic data have such impacts?  Please provide all documentation that discusses the lack of such data or its impacts on Paragraph 34 implementation or compliance assessment.

**Response to Question 16:**  No.

**Question 17:**  Which managers and employees are responsible for auditing or assessing the County's and Sheriff's compliance with Paragraph 34, the Paragraph 34 Compliance Measures, and/or the Paragraph 34 Implementation Plan and for each such manager and employee, what is his or her title and role with respect to such auditing or assessments? Please provide an org chart that includes these managers and employees, as well as their reporting structure, and any documentation in which these managers or employees have raised concerns related to the auditing or assessments, such as about their access to information or the quality of the data they were using for the assessment or audit.

**Response to Question 17:**  Since Q1 of 2022, Care Transitions has been responsible for auditing and assessing compliance with Provision 34, in conjunction with the Compliance Unit. Previously, the Compliance Unit was solely responsible for this.

**Question 18:**  What documentation related to implementation, auditing, or assessment of Paragraph 34 compliance does the Sheriff or County provide to staff who are involved with such implementation, auditing, or assessment?  Please provide such documentation, including all trainings, instructions, guides, manuals, and FAQs.

**Response to Question 18:**  Care Transitions staff documents their release planning efforts in an electronic records system called PowerChart (or JHIS).[1]  There is also a documentation set in the Comprehensive Health Accompaniment and Management Platform ("CHAMP"), another electronic records system, which contains the Exit Checklist set forth in the Provision 34

---

[1]  Care Transitions very recently transitioned to a new system called ORCHID.

Kendall Brill & Kelly LLP

Grant A. Davis-Denny
October 13, 2022
Page 8

Compliance Measures.  There are no documents related to auditing, other than the data and progress reports that are generated each quarter.

**Question 19:**  Does the Board of Supervisors or County believe that any actions or inaction by the Sheriff has impaired the County or Sheriff's ability to comply with Paragraph 34?  If so, what actions or inaction and how have they impaired Paragraph 34 compliance?  Please provide any documents discussing this action or inaction or their impacts on Paragraph 34 compliance.

**Response to Question 19:**  No.

**Question 20:**  Has the Board of Supervisor's' decisions not to provide additional funding to the Office of Diversion and Reentry's Supportive Housing Program or ODR Housing impacted the Sheriff's or County's ability to comply with Paragraph 34?  If so, how?  Please provide any documents discussing these impacts.

**Response to Question 20:**  The County does not believe the decision has impacted its ability to comply with Paragraph 34.  *See supra*, page 3 (setting forth results in the most recent four quarters reported by the Monitor).  Moreover, on October 4, 2022, the Board of Supervisors approved over $25 million in funding to expand the Office of Diversion and Re-Entry Housing Program by an additional 750 beds.

Sincerely,

Robert E. Dugdale

cc:     Dylan Ford;
        Nicholas E. Mitchell;
        Matthew Nickell;
        Margaret Ming Chen;
        Luis E. Saucedo;
        Maggie Filler;
        Maura Klugman;
        Mark D. Rosenbaum