1   KRISTEN CLARKE
    Assistant Attorney General
2   Civil Rights Division
    STEVEN H. ROSENBAUM, Chief
3   MAURA KLUGMAN, Deputy Chief
    LUIS E. SAUCEDO, Trial Attorney
4   MAGGIE FILLER, Trial Attorney
    U.S. Department of Justice
5   Civil Rights Division
    Special Litigation Section
6       150 M. Street NE
        Washington, D.C.  20001
7       Telephone: (202) 305-0053
        Email:  luis.e.saucedo@usdoj.gov | maggie.filler@usdoj.gov
8   E. MARTIN ESTRADA
    United States Attorney
9   DAVID M. HARRIS
    Assistant United States Attorney
10  Chief, Civil Division
    RICHARD M. PARK
11  Assistant United States Attorney
    Chief, Civil Rights Section, Civil Division
12  MATTHEW NICKELL (Cal. Bar No. 304828)
    MARGARET M. CHEN (Cal. Bar No. 288294)
13  Assistant United States Attorneys
        Federal Building, Suite 7516
14      300 North Los Angeles Street
        Los Angeles, California 90012
15      Telephone: (213) 894-8805/3148, Facsimile: (213) 894-7819
        Email: matthew.nickell@usdoj.gov | margaret.chen@usdoj.gov
16  Attorneys for Plaintiff
    UNITED STATES OF AMERICA

17              UNITED STATES DISTRICT COURT

18         FOR THE CENTRAL DISTRICT OF CALIFORNIA

19                   WESTERN DIVISION

20  UNITED STATES OF AMERICA,          Case No. 2:15-cv-5903-DDP-JEM

21          Plaintiff,                 **PLAINTIFF UNITED STATES'
                                        NOTICE OF MOTION AND MOTION
22          v.                         FOR COURT ORDER SETTING
                                        DEADLINES FOR SUBSTANTIAL
23  COUNTY OF LOS ANGELES et al.,      COMPLIANCE; DECLARATION OF
                                        MATTHEW NICKELL; [PROPOSED]
24          Defendants.                ORDER**

25                                      Date: December 19, 2022
                                        Time: 10:00 a.m.
26                                      Courtroom 9C

27                                      Hon. Dean D. Pregerson

28

# **TABLE OF CONTENTS**

DESCRIPTION                                                                                                    PAGE

I.     INTRODUCTION ...................................................................................1

II.    PROCEDURAL HISTORY AND STATEMENT OF FACTS ..............................2

       A.    Defendants' Substantial Compliance Is Overdue and Progress Has
             Stalled. ...............................................................................................2

       B.    Recent Planning Efforts Have Had Limited Success in Charting a
             Path Toward Compliance. .................................................................3

       C.    The Demand for Mental Health Care Continues to Grow. ...........5

III.   ARGUMENT ..........................................................................................6

       A.    Defendants Have Not Achieved Substantial Compliance with
             Settlement Agreement Provisions 63, 64, 80, and Other Provisions. ............7

             1.    There is insufficient capacity to provide specialized mental
                   health housing to incarcerated persons who need it under
                   provision 63 ...........................................................................7

             2.    Incarcerated persons with the most serious needs do not
                   receive appropriate care because there are insufficient inpatient
                   beds as required by provision 64. .......................................8

             3.    Incarcerated persons languish in isolation because they do not
                   receive adequate out-of-cell time as required by provision 80 ...........9

             4.    Defendants' plans to achieve substantial compliance with
                   provisions 63, 64, and 80 are insufficient. ........................10

       B.    The Court Has the Authority to Ensure Compliance by Issuing
             Supplemental Orders. ....................................................................11

       C.    Court-Enforceable Deadlines Are Necessary to Implement the
             Settlement Agreement and Bring Finality to this Case. ..............12

             1.    Defendants must demonstrate quarterly progress toward

i

substantial compliance with respect to provisions 63, 64, and 80.................................................................................13

2.   Defendants must take agreed-upon measures to implement provisions 63, 64, and 80. ...............................................16

3.   Defendants must achieve substantial compliance with outstanding settlement provisions by specific deadlines and with the entire agreement no later than June 30, 2024. ...................20

IV.   CONCLUSION.......................................................................................22

1
2

# TABLE OF AUTHORITIES

<u>DESCRIPTION</u>                                                                                    <u>PAGE</u>

3

## <u>FEDERAL CASES</u>

4

*Armstrong v. Brown*,
5        768 F.3d 975 (9th Cir. 2014) ...................................................................... 11

6   *Bell v. Wolfish*,
         441 U.S. 520 (1979) ..................................................................................... 12
7

8   *Demery v. Arpaio*,
         378 F.3d 1020 (9th Cir. 2004) .................................................................... 13
9

*Disability Rts. Montana, Inc. v. Batista*,
10       930 F.3d 1090 (9th Cir. 2019) .................................................................... 21

11  *Estelle v. Gamble*,
12       429 U.S. 97 (1976) ....................................................................................... 12

13  *Farmer v. Brennan*,
14       511 U.S. 825 (1994) ..................................................................................... 13

15  *Frost v. Agnos*,
16       152 F.3d 1124 (9th Cir. 1998) .................................................................... 12

17  *Gordon v. Cnty. of Orange*,
         888 F.3d 1118 (9th Cir. 2018) .................................................................... 21
18

19  *Helling v. McKinney*,
         509 U.S. 25 (1993) ....................................................................................... 13
20

21  *Mendiola-Martinez v. Arpaio*,
         836 F.3d 1239 (9th Cir. 2016) .................................................................... 12
22

23  *Morales Feliciano v. Rullan*,
         378 F.3d 42 (1st Cir. 2004) ......................................................................... 11
24

25  *Parsons v. Ryan*,
         912 F.3d 486 (9th Cir. 2018) ................................................................. 11, 12
26

27  *Parsons v. Ryan*,
         949 F.3d 443 (9th Cir. 2020) ...................................................................... 11

28

*Vazquez v. Cnty. of Kern*,
  949 F.3d 1153 (9th Cir. 2020) ................................................................. 13, 21

*Whitley v. Albers*,
  475 U.S. 312 (1986) ...................................................................................... 12

## FEDERAL STATUTES

18 U.S.C. § 3626(a) ............................................................................................ 22

## NOTICE OF MOTION AND MOTION FOR COURT ORDER SETTING DEADLINES FOR SUBSTANTIAL COMPLIANCE

PLEASE TAKE NOTICE that, on December 19, 2022, at 10:00 a.m., or as soon thereafter as possible, Plaintiff United States will, and hereby does, move this Court for an order setting deadlines for substantial compliance with the settlement agreement. This order would compel Defendants to make measurable progress each quarter year to implement settlement provisions 63, 64, and 80 by setting intermediate benchmarks tied to increased compliance percentages, and setting a schedule for Defendants to take specific agreed-to actions to improve compliance with these provisions. In addition, the United States seeks an order compelling Defendants to achieve substantial compliance with all outstanding settlement provisions by specific deadlines, and with the entire agreement no later than June 30, 2024.

This motion will be made before the Honorable Dean D. Pregerson, United States District Judge, in Courtroom 9C of the First Street Federal Courthouse located at 350 West 1st Street, Los Angeles, California, 90012.

This motion is made upon this Notice, the attached Memorandum of Points and Authorities, Declaration of Matthew Nickell, and all pleadings, records, and other documents on file with the Court in this action, and upon such oral argument as may be presented at the hearing of this motion.

//
//
//
//
//
//
//
//
//

1 | This motion is made following the conference of counsel pursuant to Local Rule
2 | 7-3 which was held on November 2, 2022 and November 9, 2022.

3

4 | Respectfully submitted,

5 | Dated: November 10, 2022 | FOR THE UNITED STATES:

6 | E. MARTIN ESTRADA | KRISTEN CLARKE
United States Attorney | Assistant Attorney General
7 | Central District of California | Civil Rights Division

8 | DAVID M. HARRIS | STEVEN H. ROSENBAUM
Assistant United States Attorney | Chief, Special Litigation Section
9 | Chief, Civil Division | Civil Rights Division

10 | RICHARD M. PARK | MAURA KLUGMAN
Assistant United States Attorney | Deputy Chief, Special Litigation Section
11 | Chief, Civil Rights Section, Civil Division | Civil Rights Division

12 | /s/ Matthew Nickell | /s/ Luis E. Saucedo
MATTHEW NICKELL | LUIS E. SAUCEDO
13 | Assistant United States Attorney | Trial Attorney, Special Litigation Section
Civil Rights Section, Civil Division | Civil Rights Division

14 | /s/ Margaret M. Chen | /s/ Maggie Filler
15 | MARGARET M. CHEN | MAGGIE FILLER
Assistant United States Attorney | Trial Attorney, Special Litigation Section
16 | Civil Rights Section, Civil Division | Civil Rights Division

17 | *Attorneys for the United States of America*

18

19

20

21

22

23

24

25

26

27

28

i

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Defendants' substantial compliance with their obligation to ensure constitutional conditions of confinement at the Los Angeles Jails is long overdue. The United States' latest efforts to bring about compliance with the settlement agreement—assisting Defendants in developing detailed implementation plans for Defendants to achieve substantial compliance and a timely end to this case—have resulted in limited success. Despite these efforts, there is no clear path to substantial compliance with three of the most fundamental requirements of the settlement agreement (provisions 63, 64, and 80), meant to ensure that incarcerated persons with serious mental illness receive care and treatment in housing appropriate to meet their needs, and adequate out-of-cell time. Meanwhile, greater efforts are needed to keep pace with the growing demand for mental health care at the Jails—incarcerated persons with serious mental illness now make up almost half of the entire incarcerated population, more than double the 22% proportion they made up in 2015. Additional non- and partially compliant requirements of the settlement agreement must also be implemented in a timely manner.

Accordingly, the United States seeks an order with intermediate benchmarks that would require Defendants to make measurable progress each quarter year to implement provisions 63, 64, and 80, and to comply by specific dates with agreed-upon implementation measures including expansion of mental health housing and capacity to provide involuntary medications, expansion of stepdown units that provide an improved care environment for individuals with serious mental illness, and increased use of Medication-Assisted Treatment (MAT). The United States also requests that the Court require Defendants to achieve substantial compliance with outstanding settlement agreement provisions by specific deadlines, and with the entire agreement no later than June 30, 2024.[1]

---

[1] Defendants must also maintain substantial compliance for a period of twelve

## II.    PROCEDURAL HISTORY AND STATEMENT OF FACTS

### A.    Defendants' Substantial Compliance Is Overdue and Progress Has Stalled.

When the parties entered into the settlement agreement in August 2015, they agreed that Defendants would build upon measures already underway to improve conditions and sustain reforms at the Jails. ECF No. 14 at 2–3. As a result, the parties included provision 115 in the settlement agreement in which Defendants committed to implement all provisions of the settlement agreement "within six months" after the effective date of July 1, 2015, "[u]nless otherwise agreed to under a specific provision." *Id.* at 53; *see also id.* at 7 (defining effective date). Defendants made steady progress toward substantial compliance during the first three years of the settlement agreement, according to the Monitor. *See* Monitor's Corrected 12th Rep. ("12th Rep."), ECF No. 174-1, at 3 (noting that "[t]he reports filed by the Monitor between 2015 and 2018 are a testament to the County's earlier accomplishments, with each report assessing new provisions as being Substantially Compliant"). Specifically, from 2015 to 2018, the Monitor found that Defendants had achieved substantial compliance with 32 of 69 substantive provisions. *Id.*

In 2019, Defendants' progress slowed. *See id.* (noting "the County's pace and progress at bringing provisions into Substantial Compliance slowed considerably" in 2019). In 2020 and 2021, the COVID-19 pandemic set back Defendants' compliance

_____

consecutive months in accordance with provision 116. ECF No. 14 at 53. This timeline to achieve and maintain substantial compliance includes provision 34, which requires Defendants to provide release planning services to prisoners with mental illness who require continued supports and services to ensure continuity of care, prevent decompensation, and minimize cycling in and out of the Jails. *See* ECF No. 142 at 5–7 (text of provision 34 as amended). Compliance with this provision—which has been the subject of an intervention motion—is critically important to reducing recidivism among the population with mental illness and to ensuring the public safety. Accordingly, the proposed order holds the County to its promised deadline of December 2022 for reaching substantial compliance with this provision.

2

efforts further. *See* 12th Rep., ECF No. 174-1, at 4 (stating that the "considerable
disruption" the pandemic caused to custody and mental health operations, including by
diverting staff and resources, partially but not wholly explained the County's slowing
progress); *id.* at 14 n.23 (noting that a pilot program to increase out-of-cell time for
individuals in High Observation Housing ("HOH") units was suspended during the
pandemic). In the first quarter of 2021, there were five completed suicides in the Jails,
which was as high as in all of 2018, the year with the highest annual suicide count for the
entire period between 2015 and 2020. *See* 12th Rep., 174-1, at 16. Currently, Defendants
have not achieved substantial compliance with 29 of 69 provisions. 14th Rep., ECF No.
221, at 2.

**B.     Recent Planning Efforts Have Had Limited Success in Charting a Path
Toward Compliance.**

Recognizing Defendants' stalled progress, in January 2021, the United States
demanded that Defendants develop implementation plans to bring all substantive
provisions into substantial compliance and this case to a close in a timely and effective
manner. *See* 12th Rep., ECF No. 174-1, at 3–4, 17; United States' Response to Monitor's
Twelfth Rep. & Request for a Status Conf., ECF No. 166, at 3. The parties, with the
Monitor, engaged in discussions for several months. Despite expressing interest in
finding solutions to compliance barriers, Defendants were unwilling to commit to the
development of meaningful implementation plans. *See* 12th Rep., ECF No. 174-1, at 17.

On September 8, 2021, the Monitor requested a status conference—the first since
2015—to "further[] progress on the development and adoption of such [implementation]
plan[s]," 12th Rep., ECF No. 174-1, at 17; ECF No. 34 (minutes of Oct. 9, 2015 status
conference). The United States supported the status conference request to apprise the
Court of the slowing pace of compliance and to find solutions that would accelerate
progress, including developing plans for coming into substantial compliance with the
settlement agreement. ECF No. 166 at 2.

The Court held its first status conference in this action on November 5, 2021,

placing a renewed focus on overcoming barriers to compliance and adding greater
structure and transparency to the parties' negotiations. The Court then issued an order
requiring, *inter alia*, that implementation plans "be finalized and adopted no later than
May 15, 2022." ECF No. 176. On January 24, 2022, the Court entered a separate order
requiring Defendants to develop and adopt implementation plans for 23 provisions that
had not reached substantial compliance, including provisions 63, 64, and 80. ECF No.
185 at 2–3. The Court ordered that the implementation plans include "short- and long-
term goals with concrete steps to overcome barriers to compliance and achieve
substantial compliance, the allocation of responsibilities to specific staff to ensure
accountability, and timetables to achieve substantial compliance with all outstanding
requirements of the settlement agreement within two years." *Id*. at 2.

The planning process with the Court's assistance over the last several months led
to some success in reaching consensus on steps to bring outstanding provisions into
substantial compliance and finality to the case. *See* 14th Rep., ECF No. 221, at 1 ("Over
the past several months, the County has begun to more purposefully articulate a path
towards Substantial Compliance with this Agreement."); *see also* ECF No. 190, at 42–43
(Monitor crediting the Court's direction and guidance, in part, for the relative success of
the planning process). The parties reached final agreement on most of the plans. For
several others, they reached tentative agreement pending some additional information or
resolution of minor disagreements. ECF No. 190 at 3. The Monitor has opined that the
agreed-upon plans "effectively chart a path for [the County] to achieve substantial
compliance with a majority of the outstanding provisions in the agreement." *Id.* at 42.

However, the planning effort has not produced the same results for provisions 63,
64, and 80, three of the most consequential requirements of the settlement agreement still
outstanding. *See* 14th Rep., ECF No. 221, at 3–4. Although Defendants have developed
initial plans with short-term measures intended to set the groundwork for achieving
substantial compliance, the plans are incomplete, lack consensus support among key
stakeholders, and remain mostly aspirational. *See id*. at 4 (describing the "phased

approach" in Defendants' proposed implementation plans for provisions 63 and 64 as comprising just "a single well-defined phase," and observing that "[a]ny additional phases are speculative, unarticulated, and as yet undefined").

### C.   The Demand for Mental Health Care Continues to Grow.

The influx of incarcerated persons with serious mental illness has increased an already high demand for mental health care during Defendants' stalled progress in reaching substantial compliance with the settlement agreement. *See* ECF No. 14 at 2–3 (recognizing in August 2015 that the Jails "form the largest jail system in the nation and house among the highest populations of prisoners with mental illness."). When the parties entered into the settlement agreement, they expected it would "support the County's and the Sheriff's collaborative efforts to expand comprehensive and effective mental health diversion and re-entry programs that are designed to lead to more positive outcomes in the care and custody of individuals with serious mental illness who are also participants in the criminal justice system." *Id.* at 3. Contrary to these expectations, in the years since the settlement agreement was entered, the population of individuals with mental illness in the Jails has grown enormously in absolute numbers and as a proportion of the total Jails population. In 2015, there were 3,710 individuals in the Jails identified as having mental illness, which constituted 22% of the overall Jails population at that time. 12th Rep., ECF No. 174-1, at 5. In 2021, there were 5,620 individuals with diagnosed mental illnesses in the Jails. *Id.* at 8. And by September 2022, that population had climbed higher still to "just over 7,000," or "about half of the entire jail population." *See* Cnty. of L.A. Board of Supervisors, Meeting Transcript, Sept. 27, 2022 ("BOS 9/27/22 Transcript"), at 211, http://file.lacounty.gov/SDSInter/bos/sop/transcripts/1131103_092722.pdf (testimony of Dr. Timothy Belavich).

At present, the Jails remain both the largest jail system and the largest mental health institution in the nation. *See* Francine Kiefer, *From LA Jail, Two Inmates Pioneer Care for Mentally Ill Peers*, The Christian Science Monitor, May 18, 2021, https://www.csmonitor.com/USA/Justice/2021/0518/From-LA-jail-two-inmates-pioneer-

1   care-for-mentally-ill-peers.

2   **III.    ARGUMENT**

3          Today, more than seven years after the settlement agreement was entered as an

4   order, 29 of 69 provisions have yet to achieve substantial compliance. *See* 14th Rep.,

5   ECF No. 221, at 2. The settlement agreement required Defendants to implement nearly

6   all settlement agreement provisions within six months after the effective date, or by

7   January 1, 2016. ECF No. 14 at 7 (effective date definition), 53 (provision 115). Had

8   Defendants implemented these provisions as required, the settlement agreement would

9   not remain so far from compliance.

10          Defendants also have yet to demonstrate how they will achieve substantial

11   compliance with all overdue requirements. *See* ECF No. 14, at 53. The United States'

12   latest attempts to accelerate compliance through the development of implementation

13   plans have had limited success in addressing Defendants' delay and setting new

14   deadlines to bring this case to a close. While Defendants made important strides

15   developing almost two dozen implementation plans over the last several months, many

16   incarcerated persons with mental illness continue to be denied appropriate mental health

17   care and meaningful opportunities for out-of-cell time because Defendants do not have

18   concrete, long-term plans to ensure substantial and timely compliance with provisions

19   63, 64, and 80. This Court has the authority to issue supplemental orders, including

20   orders setting deadlines, to ensure that Defendants make timely progress to remedy the

21   unconstitutional conditions of confinement that gave rise to this case and that would

22   bring it to a successful conclusion.

23          To hold Defendants accountable and ensure meaningful progress is made, there

24   must be concrete deadlines by which they will comply with the settlement agreement.

25   Defendants should be ordered to (1) meet benchmarks for achieving quarterly progress

26   toward substantial compliance with provisions 63, 64, and 80; (2) comply with agreed-

27   upon implementation measures according to a set schedule; (3) achieve substantial

28   compliance with outstanding settlement provisions by specific deadlines; and (4) reach

substantial compliance with the entire agreement no later than June 30, 2024.

**A.    Defendants Have Not Achieved Substantial Compliance with Settlement Agreement Provisions 63, 64, 80, and Other Provisions.**

According to the Monitor's latest compliance assessment, which was issued over seven years after the Court entered the settlement agreement and nearly six years after the court-imposed deadlines for implementation set forth in provision 115 and other applicable provisions, approximately 40% of the substantive provisions have yet to be implemented at levels to achieve substantial compliance. 14th Rep., ECF No. 221, at 2. This includes provisions 63, 64, and 80.

**1.    There is insufficient capacity to provide specialized mental health housing to incarcerated persons who need it under provision 63.**

Provision 63 requires sufficient mental health housing for individuals with serious mental illness. ECF No. 14, at 31. The provision states:

> 63. The County and the Sheriff will maintain adequate High Observation Housing and Moderate Observation Housing sufficient to meet the needs of the jail population with mental illness, as assessed by the County and the Sheriff on an ongoing basis. The County will continue its practice of placing prisoners with mental illness in the least restrictive setting consistent with their clinical needs.

*Id.* The agreed-upon compliance measures for Provision 63 assess whether Defendants are minimizing wait times in intake HOH areas, where incarcerated persons have almost no opportunities to leave their cells, and ensure such individuals receive permanent HOH placements in a timely manner. But in the first quarter of 2022, the most recent quarter for which data is available, 58% of individuals at the Twin Towers Correctional Facility (TTCF)—the County's principal mental health jail for incarcerated men—and 49% of individuals at the Century Regional Detention Facility (CRDF)—the County's jail for women—waited for seven days or longer in such intake areas for a permanent HOH bed. *See* 14th Rep., ECF No. 221, at 84 (noting that the compliance measures allow only 10%

7

of individuals to wait more than seven days for permanent HOH beds).[2]

### 2. Incarcerated persons with the most serious needs do not receive appropriate care because there are insufficient inpatient beds as required by provision 64.

Provision 64 requires Defendants to create short- and long-term plans to ensure there is sufficient licensed inpatient mental health care in the Jails for incarcerated persons who require it. ECF No. 14, at 31–32. The provision states:

> 64. Within six months of the Effective Date, the County and the Sheriff will develop a short-term plan addressing the following 12-month period, and within 12 months of the Effective Date, the County and the Sheriff will develop a long-term plan addressing the following five-year period, to reasonably ensure the availability of licensed inpatient mental health care for prisoners in the Jails. The County and the Sheriff will begin implementation of each plan within 90 days of plan completion. These plans will describe the projected capacity required, strategies that will be used to obtain additional capacity if it is needed, and identify the resources necessary for implementation. Thereafter, the County and the Sheriff will review, and if necessary revise, these plans every 12 months.

*Id.* Incarcerated individuals receive inpatient mental health care only in the Jails' Correctional Treatment Center – Mental Health Unit (CTC-MHU), a.k.a. the Forensic Inpatient Unit (FIP). *See* ECF No. 190, at 32. But as Defendants themselves have acknowledged, this inpatient unit "does not include sufficient treatment space for the mental health population [Correctional Health Services] serves." *Id.* Currently, there are about 200 individuals in the Jails with a Mental Health Level of Care of P4, indicating

---

[2] As of October 14, 2022, the United States was told that most individuals in TTCF's HOH intake areas wait two to three weeks for a permanent HOH bed. On that date, one individual had been waiting 42 days. Declaration of Matthew Nickell ("Decl.") ¶3.

that they need inpatient care.[3]  But there are just 44 beds in the inpatient unit. ECF No. 190 at 32.

### 3.    Incarcerated persons languish in isolation because they do not receive adequate out-of-cell time as required by provision 80.

Provision 80 requires that individuals with serious mental illness receive sufficient time out of their cells, including for group programming and recreation, to avoid isolation that would be detrimental to their care. ECF No. 14, at 39–40. The provision states that "[t]he County and the Sheriff will continue to make best efforts to provide appropriate out-of-cell time to all prisoners with serious mental illness, absent exceptional circumstances, and unless individually clinically contraindicated and documented in the prisoner's electronic medical record." *Id.* at 39. It required Defendants to implement the out-of-cell requirement according to a fixed schedule, according to which, by January 1, 2017, Defendants should have been offering "100% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week." *Id.*

Defendants have failed to provide almost any of the required structured out-of-cell time for individuals in HOH units, *see* 14th Rep., ECF No. 221 at 110 (at TTCF 0% received the required structured time, while at CRDF only 14% did). Defendants have posted higher results for unstructured out-of-cell time, *see id.* (noting Defendants' self-reported percentages of 96% at CRDF and 93% at TTCF for unstructured time out-of-cell). But the Monitor and his Mental Health Subject Matter Expert Team have called into question Defendants' self-reports. *See* 14th Rep., ECF No. 221, at 110 n.27 (describing a previous assessment finding the accuracy of Defendants' reporting "highly

---

[3] Anyone assigned a P4 level of care requires inpatient care. *See* BOS 9/27/22 Transcript, at 213:4–7 (Dr. Timothy Belavich, head of Correctional Health Services, testifying that "P-4 is the acuity level for an individual who, if we have available an inpatient bed, would be placed in an inpatient bed"); *id.* at 239:23 (estimating there were about 200 such individuals as of September 27, 2022).

unreliable"). The self-reports are also inconsistent with the Monitoring team's in-person observations, in which people in HOH units have been effectively locked down almost all the time. *See* 12th Rep., ECF No. 174-1, at 13–14 (noting that, during multiple visits to HOH units, the people there were "locked down as a matter of course" including when they received limited out-of-cell time, as even then they would be handcuffed to tables in the shared dayroom, preventing them from "engag[ing] in the activities that generally characterize out-of-cell time in jail environments, such as moving around the dayroom, exercising, reading, using the telephone, showering, engaging in group activities, or interacting with other inmates").

### 4. Defendants' plans to achieve substantial compliance with provisions 63, 64, and 80 are insufficient.

In the last three months, Defendants have shared partial plans for provisions 63, 64, and 80, containing measures that are intended to reduce the demand for mental health housing and inpatient care in custody. *See* United States' Statement Relating to L.A. Cnty. Sheriff's Motion for Declaration of Conflict and for an Order Appointing Conflict Counsel, ECF No. 211 at 3; 14th Rep., ECF No. 221, at 4. These steps include: (1) expanding Moderate Observation Housing (MOH) units at Pitchess Detention Center North (PDC North), which if done safely should offset some of the demand for mental health housing systemwide; (2) creating a psychiatric urgent care unit that can administer involuntary psychotropic medications, which should reduce the need for inpatient housing; (3) expanding a stepdown program that provides more out-of-cell time and an improved care environment for HOH individuals; and (4) expanding the MAT program, which should reduce the likelihood of decompensation for individuals with co-occurring mental health and substance use disorders, and thus reduce the pressure on limited mental health housing. *See* ECF No. 211, at 2–3. Defendants should be ordered to carry out these and other commitments safely and consistent with their implementation plans for provisions 63, 64, and 80 by specific deadlines.

However, it is undisputed that Defendants' partial plans will not meet the entire

10

need for mental health housing to bring Defendants into substantial compliance with provisions 63 and 64, and will not stop the needless isolation of individuals with serious mental illness in their cells as provision 80 demands. *See* ECF No. 190, at 36 (Defendants acknowledging that "more long-term solutions" beyond those articulated in implementation plans are needed), 43–45 (Monitor opining that Defendants' plans do not provide sufficient assurance or explanation that substantial compliance will be achieved timely). For that reason, it is critical that Defendants be required to develop and implement lasting solutions to reach substantial compliance with these provisions within an appropriate, court-ordered period.

## B. The Court Has the Authority to Ensure Compliance by Issuing Supplemental Orders.

District courts have authority to issue orders to ensure compliance with consent decrees and vindicate the rights such consent decrees are intended to protect. *See Armstrong v. Brown*, 768 F.3d 975, 986 (9th Cir. 2014); *Parsons v. Ryan* ("*Parsons III*"), 949 F.3d 443, 454 (9th Cir. 2020). A court can issue "specific instructions" to an entity to ensure such compliance: the appropriate "level of intrusiveness" depends "on the history and circumstances of the case," with the failure of "'less intrusive alternatives'" justifying broader ones. *Armstrong*, 768 F.3d at 986 (quoting *Morales Feliciano v. Rullan*, 378 F.3d 42, 55 (1st Cir. 2004)). To issue an order setting forth specific remedies to enforce an existing consent decree, it is not necessary for the Court to engage in further factfinding to determine whether new constitutional violations have occurred. *See Parsons v. Ryan* ("*Parsons II*"), 912 F.3d 486, 501 (9th Cir. 2018) (where parties entered into settlement they agreed was necessary to correct violations of constitutional rights, the court could issue an order to remedy the same underlying violations without making new findings of constitutional violations).

Paragraph 115 of the settlement agreement states that, unless otherwise agreed to under a specific provision of the settlement, "the County and Sheriff will implement all provisions of this Agreement within six months of the Effective Date." ECF No. 14 at

53. Defendants have failed to do this for all provisions not yet in substantial compliance. To bring Defendants into substantial compliance, it is appropriate for this Court to issue orders with specific remedies. *See Parsons II*, 912 F.3d at 501.

### C.   Court-Enforceable Deadlines Are Necessary to Implement the Settlement Agreement and Bring Finality to this Case.

The Court's intervention is necessary to ensure substantial compliance with the settlement agreement and bring a timely end to the case. Defendants should be ordered to come into compliance with the entire settlement no later than June 30, 2024, and maintain that compliance for a period of twelve consecutive months in accordance with provision 116. In particular, the United States requests that the Court issue an Order that: (1) requires Defendants to demonstrate quarterly progress toward substantial compliance with respect to provisions 63, 64, and 80 by setting intermediate benchmarks; (2) requires compliance with agreed-upon implementation measures according to a set schedule; (3) requires Defendants to achieve substantial compliance with outstanding settlement provisions by specific deadlines; and (4) requires Defendants to achieve substantial compliance with the entire agreement no later than June 30, 2024.

At stake are the federal constitutional rights of thousands of individuals. The parties entered into the settlement agreement to protect the constitutional rights of incarcerated persons in Defendants' custody and care. The Eighth Amendment's prohibition of cruel and unusual punishment requires prisons to provide humane conditions for incarcerated individuals convicted of crimes. *Whitley v. Albers*, 475 U.S. 312, 318–20 (1986); *Estelle v. Gamble*, 429 U.S. 97, 102–03 (1976); *Mendiola-Martinez v. Arpaio*, 836 F.3d 1239, 1246 n.5 (9th Cir. 2016). The Fourteenth Amendment protects the rights of incarcerated individuals who have not been tried, and their rights are even more strongly safeguarded than individuals held post-conviction. *See Bell v. Wolfish*, 441 U.S. 520, 545 (1979) ("[P]retrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights . . . enjoyed by convicted prisoners."); *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998) (analyzing rights of pretrial

detainees under the Fourteenth rather than Eighth Amendment); *Vazquez v. Cnty. of Kern*, 949 F.3d 1153, 1163–1164 (9th Cir. 2020) (Fourteenth Amendment "more protective" than Eighth because it "'prohibits all punishment of pretrial detainees, while the Eighth Amendment only prevents the imposition of cruel and unusual punishment of convicted prisoners'" (quoting *Demery v. Arpaio*, 378 F.3d 1020, 1029 (9th Cir. 2004))). Correctional institutions must protect incarcerated individuals from serious risk of harm and take reasonable measures to provide for the health and safety of individuals in their custody. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Helling v. McKinney*, 509 U.S. 25, 33–35 (1993).

### 1.   Defendants must demonstrate quarterly progress toward substantial compliance with respect to provisions 63, 64, and 80.

Court-imposed deadlines are necessary to ensure that Defendants make timely progress toward substantial compliance with respect to critical remedial measures in provisions 63, 64, and 80. In the last three months, Defendants have shared only partial plans for these provisions. These plans contain measures proposed by Defendants and agreed upon by the United States that, if executed properly, are intended to lead to some reduction in the demand for mental health housing and inpatient care in custody, but not to the levels necessary to bring them into substantial compliance, meaning that insufficient numbers of incarcerated persons are receiving mental health care in settings that meet their needs. *See* United States' Statement Relating to L.A. Cnty. Sheriff's Motion for Declaration of Conflict and for an Order Appointing Conflict Counsel, ECF No. 211 at 3; 14th Rep., ECF No. 221, at 4; *see also* ECF No. 190, at 43–45.

Indeed, it is undisputed that Defendants' partial plans will not close the entire gap for mental health housing. ECF No. 190, at 36 (Defendants acknowledging that "more long-term solutions" beyond those articulated in implementation plans are needed). The Monitor has also found that Defendants' current plans, by themselves, do not chart a realistic path to achieving substantial compliance. 14th Rep., ECF No. 221, at 4 (noting that the County has recognized that these initial steps "will not, by themselves, bring the

13

County and the LASD into full compliance") (internal quotations omitted); *id.* at 85 (noting that Defendants had failed to "describe with specificity" efforts to ensure adequate inpatient capacity for individuals with the most serious mental health needs as provision 64 requires). As a result, incarcerated persons will continue to be denied treatment in appropriate housing and will continue to be subjected to needless isolation in violation of provisions 63, 64, and 80.[4]

Therefore, the United States seeks an order that would require Defendants to achieve compliance benchmarks according to the following timetable:

- **Provision 63**
  - By the end of the first quarter of 2023, at least 65% of incarcerated individuals must wait no more than seven days in mental health housing intake areas before transferring to permanent mental health housing,[5] with an average wait no greater than nine days for the quarter.
  - By the end of the second quarter of 2023, 70% of incarcerated individuals must wait no more than seven days in mental health housing intake areas, with an average wait no greater than eight days.
  - By the end of the third quarter of 2023, 75% of incarcerated individuals must wait no more than seven days in mental health housing intake areas, with an average wait no greater than seven days.
  - By the end of the fourth quarter of 2023, 80% of incarcerated individuals must wait no more than seven days in mental health housing intake areas, and the

---

[4] In addition, troubling new developments underscore the need for Defendants to begin implementing solutions immediately to avoid further harm to individuals in their custody and care. These developments include extremely unsafe, overcrowded conditions in the IRC owing largely to the lack of adequate mental health housing. *See Rutherford v. Villanueva*, No. 75-CV-04111-DDP, ECF No. 318-1, at 1–2 (C.D. Cal., Sept. 8, 2022).

[5] "Permanent mental health housing" means "mental health housing," as defined in provision 15(r) of the settlement agreement, ECF No. 14, at 8, where individuals receive care and treatment in conditions that are consistent with the settlement agreement.

14

1   average wait must continue to be below seven days.

2   o By the end of the first quarter of 2024, 85% of incarcerated individuals must

3   wait no more than seven days in mental health housing intake areas, and the

4   average wait must continue to be below seven days.

5   o By the end of the second quarter of 2024, 90% of incarcerated individuals must

6   wait no more than seven days in mental health housing intake areas, and the

7   average wait must continue to be below seven days.

8   • **Provision 64**

9   o By the end of the first quarter of 2023, the difference between the total

10  population of individuals with a mental health level of care (MHLOC) of P4

11  and those receiving inpatient care must be, on average, no greater than 80

12  individuals.

13  o By the end of the second quarter of 2023, the difference must be, on average,

14  no greater than 60 individuals.

15  o By the end of the third quarter of 2023, the difference must be, on average, no

16  greater than 40 individuals.

17  o By the end of the fourth quarter of 2023, the difference must be, on average, no

18  greater than 20 individuals.

19  o By the end of the first quarter of 2024, the difference must be, on average, no

20  greater than 10 individuals.

21  o By the end of the second quarter of 2024, the difference must be, on average,

22  no greater than five individuals, and none of those individuals should wait

23  more than four hours for an inpatient placement.

24  • **Provision 80**

25  o By the end of the first quarter of 2023, 85% of HOH individuals will receive a

26  minimum of ten hours of unstructured out-of-cell time per week, and 75% a

27  minimum of 7.5 hours of structured out-of-cell time per week with at least 3.75

28  such hours consisting of group programming.

15

o By the end of the second quarter of 2023, 90% of HOH individuals will receive a minimum of ten hours of unstructured out-of-cell time per week, and 80% a minimum of eight hours of structured out-of-cell time per week with at least four such hours consisting of group programming.

o By the end of the third quarter of 2023, 95% of HOH individuals will receive a minimum of ten hours of unstructured out-of-cell time per week, and 85% a minimum of 8.5 hours of structured out-of-cell time per week with at least 4.25 such hours consisting of group programming.

o By the end of the fourth quarter of 2023, 100% of HOH individuals will receive a minimum of ten hours of unstructured out-of-cell time per week, and 90% a minimum of nine hours of structured out-of-cell time per week with at least 4.5 such hours consisting of group programming.

o By the end of the first quarter of 2024, 95% of HOH individuals will receive a minimum of 9.5 hours of structured out-of-cell time per week with at least 4.75 such hours consisting of group programming.

o By the end of the second quarter of 2024, 100% of HOH individuals will receive a minimum of ten hours of structured out-of-cell time per week with at least five such hours consisting of group programming.

     **2.**     **Defendants must take agreed-upon measures to implement provisions 63, 64, and 80.**

Although Defendants' partial implementation plans for provisions 63, 64, and 80 are by themselves insufficient to achieve substantial compliance with those provisions, the steps that they outline are critical to remove barriers to compliance. These steps are: (1) expanding MOH units at PDC North; (2) creating a psychiatric urgent care unit; (3) expanding the stepdown program; and (4) expanding the MAT program. To ensure effective steps are taken to comply with the settlement agreement, the Court should impose deadlines for Defendants to carry out these critical steps in accordance with the specific dates outlined in their implementation plans. Therefore, the United States seeks

16

an order that would require the following:

- **Expansion of MOH units at PDC North**. Defendants have committed to expand the number of MOH units at PDC North to offset some of the demand for mental health housing systemwide. *See* ECF No. 190 at 30. Assuming the challenges discussed above can be overcome and Defendants can do this safely,[6] Defendants should be able to add enough MOH capacity to cease using Men's Central Jail (MCJ) for mental health housing. In addition, it should allow Defendants to convert several MOH units in the Twin Towers Correctional Facility to higher-demand HOH units, thus reducing the significant wait times for individuals who need HOH. *See* 14th Rep., ECF No. 221 at 84 (reporting that, in the first quarter of 2022, just 42% of individuals requiring HOH waited fewer than seven days for it); ECF No. 190 at 12–13 (noting that HOH-intake areas where incarcerated individuals await permanent HOH placements lack the staff and facilities to permit almost any out-of-cell time). Consistent with their implementation plans, Defendants must safely complete the conversion of PDC North to an all-MOH facility by July 31, 2023.

- **Creation of Psychiatric Urgent Care**. Defendants have committed to opening a new psychiatric urgent care unit in the Jails. ECF No. 190 at 32. This unit would be licensed to provide involuntary psychotropic medication to individuals who meet criteria for inpatient care, which should reduce the burden on the Jails' overtaxed

---

[6] Defendants recently accelerated efforts to create new MOH units at the Pitchess Detention Center North (PDC North) in response to court orders in another case. *See* ECF No. 190 at 18–19; ECF No. 211 at 3; *Rutherford*, 2:75-cv-04111-DDP, ECF No. 337, at 8–9. Defendants have acknowledged that this acceleration has "come[] at a price," with clinical and custody staff working extra shifts and clinicians' hours at other facilities being cut. *Rutherford*, 2:75-cv-04111-DDP, ECF No. 337, at 9 n.4. The United States has received reports of incarcerated individuals with mental illness at PDC North not receiving their medications or other mental health services since this transition, including individuals the United States spoke with onsite on October 14, 2022. Decl. ¶4. To the extent Defendants continue to rely on the expansion of mental health housing at PDC North to comply with the settlement, it is critical that Defendants provide necessary medication and adequate mental health treatment to individuals housed there.

inpatient unit. *Id*. at 32–33 (Defendants writing that they intend for psychiatric urgent care to "function as an acute stabilization unit that can be used to treat new P3 and P4 inmates within 24 hours of when they are booked into custody and stabilize them before they are sent to the housing required for their level of care"). Defendants have informed the United States that funding was allocated for the psychiatric urgent care on or before October 2022. Decl. ¶5. Defendants must ensure the following:

- o Defendants will obtain licensure and all other necessary approvals from the state no later than March 31, 2023.
- o Defendants will allocate sufficient staff to the psychiatric urgent care such that it can operate 48 beds and can administer involuntary psychotropic medications by March 31, 2023.
- o Defendants will assess the impact of the psychiatric urgent care on the demand for inpatient beds within one month after the psychiatric urgent care becomes operational, or by April 30, 2023.

- **Expansion of Stepdown Program**. The Jails have been operating "Stepdown" HOH units that serve individuals who previously received inpatient care in the Jails and others in the HOH population. ECF No. 190 at 31. These units, unlike standard HOH areas, allow individuals to spend most of the day outside their cells without restraints. *Id.* They also provide improved programming, and a better care environment overall than standard HOH units. *Id*. They are also better at preventing decompensation. Over time, increased use of such Stepdown units should reduce the acuity of mental illness across the system, and thus help to reduce the demand on the Jails' overtaxed inpatient and HOH units, the two most impacted types of mental health housing. *Id*. Defendants must expand the number of operational Stepdown units according to the following schedule, which should be feasible based on their implementation plans:

- o 12 Stepdown pods by March 2023;
- o 20 Stepdown pods by March 2024;

18

o 28 Stepdown pods by March 2025; and

o 30 Stepdown pods by June 2025.

- **Expansion of MAT Program**. Defendants must expand their existing MAT program to reach at least 1,500 incarcerated individuals. Individuals with co-occurring mental health and substance use disorders who receive MAT should be less likely to decompensate, and this should in turn reduce the pressure on limited mental health housing. *See* ECF No. 190 at 34. Defendants must offer proof by March 31, 2023 that at least 1,500 individuals in custody are receiving treatment through the MAT program.

- **Improve access to out-of-cell time**. Defendants must take the following steps to improve access to out-of-cell time under provision 80:

  o Immediately, Defendants will change the process by which custody staff provide individuals with access to group meetings by offering the meetings to upper and lower tiers at the same time, and will develop a form to explain offers and refusals;

  o Immediately, clinicians already working in the Jails will take on group therapy and programming, and the County will develop a schedule of clinician-led groups; and

  o By February 28, 2023, Defendants will provide an analysis of a pilot program to hire outside contractors to provide groups within the jails, and detailed plans for expanding the pilot program throughout HOH housing.

- **Provide data on impact on MOH and HOH**. Defendants must gather data regarding the above steps (MOH expansion at PDC North, creation of psychiatric urgent care, stepdown expansion, MAT expansion, and adequate out-of-cell time in HOH) immediately as those programs are implemented, and analyze that data in order to project the impact those programs will have on HOH and MOH demand. Defendants must provide the data and their analysis no later than January 31, 2023.

- **Analyze expansion of diversion**. Defendants must assess whether the expansion of the Los Angeles County Office of Diversion and Reentry (ODR) will sufficiently reduce the demand for mental health housing in custody to bring provisions 63, 64, and 80 into substantial compliance. Defendants should provide this analysis no later than January 31, 2023.

- **Implement lasting solutions to bring settlement into compliance**. Defendants must develop long-term solutions to reach substantial compliance with provisions 63, 64, and 80. Defendants should be ordered to develop and begin implementing their long-term solutions to ensure all individuals in HOH receive sufficient group programming and out-of-cell time no later than February 17, 2023, subject to review and approval by the United States and Monitor. And Defendants should be ordered to develop and begin implementing long-term solutions to close the remaining gap between mental health housing demand and supply no later than May 17, 2023, subject to review and approval by the United States and Monitor.

3.      **Defendants must achieve substantial compliance with outstanding settlement provisions by specific deadlines and with the entire agreement no later than June 30, 2024.**

The Monitor has found that Defendants have not yet reached substantial compliance with 29 provisions of the settlement agreement. 14th Rep., ECF No. 221, at 2. Of these provisions, Defendants determined—and the United States agreed—that implementation plans were necessary to bring 23 of them into compliance. *See* ECF No. 180 at 3–6; ECF No. 190 at 2, 21. These provisions include 21 provisions focused on mental health care and suicide prevention (provisions 25, 26, 31, 36, 37, 39, 40, 42, 43, 52, 53, 57, 58, 63, 64, 65, 66, 67, 70, 79, and 80); one provision focused on release planning (provision 34); and one provision focused on prevention of excessive force (provision 81). *See* Settlement, ECF No. 14, at 13–41. There is no dispute that Defendants remain far from compliance on a number of these provisions, including 63, 64, and 80. ECF No. 190 at 36. Defendants must bring these provisions into compliance

20

to ensure people with mental illness receive treatment to which they are entitled, and to prevent unnecessary and dangerous use of lockdown in mental health housing areas. *See Disability Rts. Montana, Inc. v. Batista*, 930 F.3d 1090, 1098–1099 (9th Cir. 2019). That many individuals in the Jails are pretrial and have not been convicted of a crime underscores the importance of the rights at stake. *See Vasquez*, 949 F.3d at 1163–1164; *Gordon v. Cnty. of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018).

To ensure accountability and effectuate the settlement agreement, Defendants should be ordered to achieve substantial compliance with all provisions not yet in substantial compliance no later than June 30, 2024. This allows sufficient time for Defendants to take actions necessary to comply with the most intractable remaining provisions, for example by increasing mental health housing capacity within the Jails, or increasing diversion and alternatives to incarceration sufficiently to address the mental health housing gap in custody. Defendants must maintain substantial compliance once achieved for a period of twelve consecutive months in accordance with provision 116. In addition, for certain provisions, Defendants should be ordered to achieve substantial compliance earlier than June 30, 2024, specifically by the deadlines set forth below. Defendants should be able to meet these earlier targets based on commitments they have made in the implementation plans for these provisions.

| Provision No. | Provision Topic | Substantial Compliance Deadline |
|---|---|---|
| 25 | Transportation of suicidal individuals from station jails and observation pending transfer | March 31, 2023 |
| 26 | Identifying prisoners with emergent or urgent MH needs upon arrival at reception centers | Reached June 2021–March 2022; must maintain one additional quarter |
| 34 | Release planning | December 31, 2022 |
| 36 | MH assessments after adverse triggering events | March 31, 2023 |
| 37 | Court Services Division referrals | January 31, 2024 |

| 40 | Availability of Qualified Mental Health Professionals | June 30, 2023 |
| 43 | Disciplinary policies for individuals with mental illness | June 30, 2023 |
| 52 | HOH property restrictions | June 30, 2023 |
| 57 | Safety checks in MH housing | May 16, 2024 |
| 58 | Safety checks in non-MH housing | May 16, 2024 |
| 65 | Administration of psychotropic medications | February 24, 2024 |
| 66 | Active mental health caseloads outside MH housing | March 31, 2023 |
| 67 | Refusals of medications | March 31, 2023 |

## IV.  CONCLUSION

For the reasons stated above, the United States requests that the Court issue an Order that (1) requires Defendants to demonstrate quarterly progress toward substantial compliance with respect to provisions 63, 64, and 80 by setting intermediate benchmarks; (2) requires compliance with agreed-upon implementation measures according to a defined schedule; (3) requires Defendants to achieve substantial compliance with outstanding settlement provisions by specific deadlines; and (4) requires Defendants to achieve substantial compliance with the entire agreement no later than June 30, 2024, and to maintain substantial compliance for a period of twelve consecutive months in accordance with provision 116. Such an Order is necessary to ensure Defendants' compliance with the settlement agreement. Furthermore, it is narrowly drawn, extends no further than necessary to correct ongoing violations of federal rights agreed to by the parties with entry of the settlement agreement, is the least intrusive means necessary to correct these violations, and will not have an adverse impact on public safety or the operation of the criminal justice system. 18 U.S.C. § 3626(a). The United States provides notice of its intention to seek all appropriate remedies, including contempt, if Defendants fail to meet any of these dates.

22

Respectfully submitted,

Dated: November 10, 2022

FOR THE UNITED STATES:

E. MARTIN ESTRADA
United States Attorney
Central District of California

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division

STEVEN H. ROSENBAUM
Chief, Special Litigation Section
Civil Rights Division

RICHARD M. PARK
Assistant United States Attorney
Chief, Civil Rights Section, Civil Division

MAURA KLUGMAN
Deputy Chief, Special Litigation Section
Civil Rights Division

/s/ Matthew Nickell
MATTHEW NICKELL
Assistant United States Attorney
Civil Rights Section, Civil Division

/s/ Luis E. Saucedo
LUIS E. SAUCEDO
Trial Attorney, Special Litigation Section
Civil Rights Division

/s/ Margaret M. Chen
MARGARET M. CHEN
Assistant United States Attorney
Civil Rights Section, Civil Division

/s/ Maggie Filler
MAGGIE FILLER
Trial Attorney, Special Litigation Section
Civil Rights Division

*Attorneys for the United States of America*