OFFICE OF COUNTY COUNSEL
Dawyn Harrison (173855)
Interim County Counsel
 dharrison@counsel.lacounty.gov
Dylan Ford (228699)
Deputy County Counsel
 dford@counsel.lacounty.gov
500 West Temple St., Floor 6
Los Angeles, California 90012
Telephone:  (213) 974-1807/(213) 974-1811
Facsimile:   (213) 687-8822

KENDALL BRILL & KELLY LLP
Robert E. Dugdale (167258)
 rdugdale@kbkfirm.com
Katelyn A. Kuwata (319370)
 kkuwata@kbkfirm.com
10100 Santa Monica Boulevard, Suite 1725
Los Angeles, California 90067-4013
Telephone: (310) 272-7904
Facsimile: (310) 286-0727

Attorneys for Defendants County of Los Angeles and the Los Angeles County Sheriff Alex Villanueva, in his Official Capacity

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF LOS ANGELES, et al.,<br><br>Defendants. | Case No. 2:15-cv-05903-DDP-JEM<br><br>**RESPONSE TO INTERVENORS' STATUS REPORT**<br><br>Date:   November 14, 2022<br>Time:   10:00 a.m.<br>Crtrm.: 9C<br><br>The Hon. Dean D. Pregerson |

Provision 34 of the Settlement Agreement entered in this matter requires, among other things, that the County of Los Angeles (the "County," and together with the Los Angeles County Sheriff, "Defendants"), operating through a branch of the Department of Health Services called the "Care Transitions Unit," provide certain patients facing release from the Los Angeles County Jail system who have serious mental health conditions with Initial Release Plans ("IRPs") or Comprehensive Release Plans ("CRPs"). This is a massive undertaking, and one the County takes seriously.

In an effort to improve the County's delivery of the services required under Provision 34, the Care Transitions Unit conducted an exhaustive review of its processes late last year and into 2022, in an effort to determine what barriers exist to achieving better compliance with Provision 34's requirements and what steps it could take to overcome those barriers. Concurrently, between December 2021 and March 2022, counsel for the Defendants, counsel for the Department of Justice ("DOJ"), and counsel for the Intervenors engaged in numerous discussions that resulted in a detailed plan that memorialized these barriers to compliance, the corrective actions the County would be taking to overcome these barriers and deliver better service in the area of release planning, and benchmarks the County would aim to achieve over time that charted a path to substantial compliance with Provision 34's requirements.

This effort has already borne some fruit. In the latest Semi-Annual Monitoring Report prepared in this matter, which covered Defendants' compliance under the Settlement Agreement in the fourth quarter of 2021 and first quarter of 2022, Defendants' rate of compliance in providing patients with IRPs and CRPs rose when compared to prior quarters; and Defendants achieved this success despite the fact the corrective actions taken pursuant to its implementation plan for Provision 34 are not expected to yield results until later quarters in 2022. Indeed, with the marked improvement in compliance with Provision 34's requirements that

Defendants achieved in the last quarter of 2021 and the first quarter of 2022, Defendants are *ahead* of the compliance benchmarks projected in the implementation plan Defendants entered with the DOJ and Intervenors.

Overlooking these positive developments in their entirety, Intervenors filed a status report on November 9, 2022 ("Status Report") in which they inform the Court that they have unilaterally determined that formal discovery in this matter is necessary and apprise the Court that they have served such discovery on Defendants—a deposition notice seeking testimony from what may be numerous County employees on a wide range of topics.

In doing, however, Intervenors ignore the fact that at the last status conference held in this matter on August 19, 2022, this Court not only advised Intervenors that any formal discovery would require leave of the Court, but also expressly declined to grant leave to conduct formal discovery at that juncture. Dkt. No. 216 at 61:2-8 ("a more formal process of discovery . . . would be something that would have to be taken up, though, through some sort of motion. I'm just not prepared to order that right now").

Moreover, Intervenors *never even attempted* to meet and confer with Defendants before filing the Status Report and issuing their improper deposition notice, despite the fact there is a court order in this case that required them to do so and despite the fact that Defendants offered to meet and confer with Intervenors to discuss any issue related to Provision 34 in the very letter Intervenors attach to their Status Report. *See* Dkt. No. 144 at 13 (Order approving the Joint Stipulation to Dismiss Intervenors' Claims (the "Provision 34 Order") (providing that Intervenors "shall seek to resolve any disputes concerning the implementation of Amended Paragraph 34 with the Parties through a meet-and-confer process"); Dkt. No. 225 at 9 (Status Report, Ex. A).

Furthermore, the formal discovery request Intervenors issued without first obtaining leave from the Court is not even permitted by the Federal Rules of Civil

Procedure, which generally limit the scope of discovery to "any nonprivileged matter that is relevant to any party's **claim or defense** and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1) (emphasis added). Here, there are no existing claims or defenses because this Court dismissed Intervenors' action with prejudice on December 10, 2018. Dkt. No. 144 at 13. Therefore, the formal discovery sought by the Intervenors is neither warranted nor proper.[1]

Finally, the substantive concerns Intervenors raise in their Status Report are baseless, misconstrue important facts while omitting other key facts, and expose a fundamental misunderstanding of how Defendants' release planning process works and how Defendants' obligations under Provision 34 are measured. Defendants could have corrected the Intervenors' errors in this regard had Intervenors given Defendants any opportunity to do so by engaging in the meet and confer process required by this Court and welcomed by Defendants. Because Intervenors failed to do so, Defendants address each of the substantive concerns raised by Intervenors in

---

[1] Intervenors appear to contend that they have authority under *California Department of Social Services v. Leavitt*, 523 F.3d 1025, 1034 (9th Cir. 2008), to take discovery upon their own determination that Defendants may not be complying with the Settlement Agreement. Not so. In *Leavitt*, the intervenor filed a motion to enforce the court's judgment and formally requested the court's permission to take discovery to determine whether the defendants had complied with the judgment. *Id.* at 1029-30. Notably, in that case, there was no court-appointed monitor or other ongoing assessments of compliance agreed to by the parties, as exists here. *See generally id.*; *see also generally Cal. State v. Shalala*, Case No. 2:99-cv-00355 (E.D. Cal.). In largely denying the intervenor's motion to enforce the settlement agreement, the district court declined to address the intervenor's request for discovery. *Id.* at 1031. On appeal, the Ninth Circuit's limited holding on this point was that the district court should have addressed the merits of the request to authorize discovery. *Id.* at 1034 ("we decide only whether the district court should have exercised its discretion by addressing the merits of the request to authorize discovery"). The Ninth Circuit did not hold, as Intervenors incorrectly suggest, that an intervenor's own determination that "significant questions regarding noncompliance" exist somehow gives them license to serve discovery without the approval of the court.

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

4
RESPONSE TO INTERVENORS' STATUS REPORT

turn below:

**1.** *Intervenors' False Claim That There Are "Significant Concerns" Because the Care Transitions Unit Audits Its Compliance With Provision 34:* Intervenors baselessly accuse the County of manipulating the results of the audits required under Provision 34, and present this insulting accusation based solely on the fact the Care Transitions Unit is tasked with both implementing Provision 34's requirements and auditing its compliance with Provision 34. This accusation is unfounded for at least three reasons.

As a threshold matter, and as Intervenors should understand given their years' long participation in this litigation, **all** of the audits that are conducted in this matter, regardless of who performs them, are verified by the Monitor's auditors prior to being accepted and included in the Monitor's Semi-Annual Reports. This is not a process that involves simply rubber-stamping the self-assessments performed by the Care Transitions Unit or anyone else. All of the audit results generated by the Defendants in this case as part of the process to self-assess their performance under the Settlement Agreement, as well as the underlying documentation that supports those audit results, are subject to the scrutiny of the Monitor's auditors and their ultimate verification.² The DOJ attorneys and DOJ Monitor's Subject Matter Expert Team also weigh in on audit results submitted by the County. Thus, even if the Care Transitions team—whose hardworking members dedicate themselves day in and day out to helping the most vulnerable patients within the LA County Jail system—were unethical enough to manipulate the audit data in the completely unspecific manner

---

² This is an exhaustive process. Indeed, just this week alone, the Monitor's auditors spent almost two hours with the Care Transitions Unit analyst who is accessing the Defendants' compliance with Provision 34's requirements to review some of the release planning packages that are being audited from the second quarter of 2022. The Monitor's auditors did so in order to understand exactly how this analyst reached the conclusions she had concerning whether certain release packages were compliant or non-compliant with Provision 34's requirements.

Intervenors suggest, there is significant oversight that would prevent any inaccuracies in that data from being accepted into the Monitor's Semi-Annual Reports. In short, if there was something unreliable about the data relevant to Provision 34 that was reported by the Care Transitions Unit for the first quarter of 2022, as Intervenors baselessly suggest, it is fair to say that data would not have been included in the most recent Semi-Annual Monitoring Report.

Second, Intervenors misrepresent that the results of the audits suddenly became "far rosier" in the first quarter of 2022. In fact, as Defendants explained in response to the Intervenors' written questions, the County has shown steady improvement under Provision 34, including Compliance Measure 34-13(c)(2), which concerns providing patients with IRPs, and Compliance Measure 34-13(c)(3), which concerns providing patients with CRPs, during the last four quarters covered by the Monitor's two most-recent Monitor Reports:

**Provision 34 – Results in the Most Recent Four Quarters Reported By the Monitor**

| Initial Release Plans (Compliance Measure 34-13(c)(2)) | | | |
|---|---|---|---|
| Q2 2021 | Q3 2021 | Q4 2021 | Q1 2022 |
| 50% | 60% | 63% | 70% |

| Comprehensive Release Plans (Compliance Measure 34-13(c)(3)) | | | |
|---|---|---|---|
| Q2 2021 | Q3 2021 | Q4 2021 | Q1 2022 |
| 35% | 26% | 33% | 45% |

*See* Dkt. No. 225 at 11 (Status Report, Ex. A). And, as set forth in both the Provision 34 Implementation Plan, dated March 10, 2022, and the Provision 34 Progress Report, dated July 1, 2022, the County has long anticipated that it would not begin reaping the benefits of the corrective actions initiated in early 2022 until, at the very earliest, the second quarter of 2022.

Third, the Joint Stipulation contained within the Provision 34 Order expressly

recognizes that compliance with Provision 34 is to be measured in this case through *self*-assessments by Defendants—not independent assessments or assessments by any particular County unit.  Dkt. No. 144 at 5.  Indeed, the *entire* system for auditing compliance with *each one* of the Settlement Agreement's provisions is based on self-assessment and reports, which are provided to the Monitor, the DOJ, and, to the "limited" extent they concern Provision 34, the Intervenors.  *See id.*; Dkt. No. 4-1 at 45.  There was no suggestion by Intervenors during the months' long process of negotiating the compliance plan for Provision 34 that these self-assessments are an insufficient or inherently suspect method of determining Defendants' compliance with Provision 34, and, once again, such self-assessments have proven to be a reliable method for determining the Defendants' level of compliance with the Settlement Agreement for *years*.

        2.      *Intervenors' False Assertion That the Defendants' Self-Assessments of Its Performance Under Provision 34 Are Not Guided by Standards and Are Not Supported by Documentation That Can Be Reviewed:*  The Intervenors complain that they cannot "assess the specifics of how the County is performing its audits" because the County "lacks any training manuals, written instructions, guides, or any other documentation" related to Provision 34 auditing.  First of all, Defendants do not understand why Intervenors did not simply ask Defendants for clarity regarding the County's methodologies for conducting its Provision 34 audits, as Defendants explicitly offered, in response to the Intervenors' written questions, to discuss any remaining questions with the Intervenors that they might have on this issue.  Dkt. No. 225 at 9 (Status Report, Ex. A).

      Moreover, whether or not Defendants have training manuals that govern how Provision 34 is being audited is not indicative of whether Defendants are auditing that provision properly or whether they are complying with Provision 34.  Defendants, in fact, have written internal guidance, developed by the Compliance Unit, which addresses methodologies Defendants use for data mining, population

building, exclusionary criteria, and random sampling for each self-assessment of Provision 34.  The Compliance Unit used these methodologies when it audited Defendants' compliance with Provision 34, and these same methodologies are now used by the Care Transitions Unit to audit Defendants' Provision 34 compliance .

Furthermore, there are standards the Care Transitions Unit uses to audit the release plans it reviews for compliance.  There are three separate audits that take place relevant to Provision 34:  audits of Provisions 34-1(a) and 34-1(b-e), which are performed quarterly, and an audit of Provision 34-12, which is conducted semi-annually.  Based on documentation available in CHS electronic medical record systems and LASD databases, for each release plan that is reviewed as part of an audit, Defendants grade each measure that is part of a properly completed release plan with a "Yes," "No," or "N/A."  While not contained in an official document, Defendants have a list of criteria that would satisfy a "Yes" on each measure, that indicate the situations that qualify with a mark of "N/A," and that indicate what circumstances would lead to a "No" result.

Finally, it is not at all true, as Intervenors falsely claim, that there is "no documentation" generated through this process that would allow one to check the Care Transitions Unit analyst's auditing work.  The Care Transitions Unit analyst who conducts audits of IRPs and CRPs to determine if those release plans meet Provision 34's requirements generates documentation in the form of a massive electronic spreadsheet that memorializes her findings as to each release plan she reviews, and she also maintains all of the underlying documentation that supports those findings.  As a result, the Monitor's auditors have full visibility into how Defendants reach the conclusions they do in their Provision 34 self-assessments, and, of course, have the latitude to accept or reject those conclusions before the result of any audit is included in the Semi-Annual Monitoring Reports produced in this case.

**3.      The False Claim That Defendants Have Adopted a "Check the Box" Mentality Concerning Provision 34:**  Intervenors assert that Defendants' written answers to the Intervenors' twenty questions "strongly suggest that the County has adopted a check-the-box attitude towards Paragraph 34 that is consistent with neither the terms nor the spirit of the settlement."  Intervenors make this sweeping (and utterly false) accusation based on just two of Defendants' responses to the twenty questions Intervenors posed to Defendants in September 2022, and by misconstruing the significance of those two responses.

It is true that the County does not (and is not required to) maintain data on a macro level on the two subjects Intervenors inquired about:  (1) how many patients entitled to comprehensive release planning have a community based organization ("CBO") participate in the development of a CRP; and (2) the percentage of patients entitled to a CRP who have actually been housed upon their release from jail.  However, that does not mean there is some flaw in how Provision 34 is audited.

To be crystal clear on this point, the County does document in each individual patient release package whether a patient entitled to a CRP had a CBO that participated in the development of the CRP; as well as whether a patient entitled to a CRP was actually housed upon his or her release from jail.  More importantly, as evidenced by the County's steady improvements across the compliance measures for Provision 34, its patients *are* "meaningfully receiving the services that the County promised."  Defendants do coordinate with community-based providers to identify available services that meet each inmate-client's needs, including housing; connect patients to available housing or community-based providers who can assist in meeting housing needs; and arrange for transportation to the community-based provider, residence, or shelter identified in an inmate-client's CRP.  And when these things occur (or do not occur), that fact is evident from the individual inmate-client release packages **that are actually reviewed to determine compliance under Provision 34**.  Defendants do not currently have a method for capturing this data in

the less granular fashion that neither the Intervenors, the DOJ, nor the Monitor ever requested prior to the questions posed by the Intervenors in September 2022; and, while the Defendants agree that such data would be helpful to have and are currently taking steps to analyze how it can be reliably captured, it is absurd to suggest that the lack of such data on a macro level someone invalidates the Provision 34 audits that have been occurring in this case for years, since those audits review documentation and data on a granular level, rather than the macro level where such data would be relevant to the audits.

In addition, it is significant to note that the Intervenors had every opportunity during the months' long negotiations that took place when the implementation plan for Provision 34 was formulated to raise the idea that the County should maintain the types of data addressed in their Status Report. Indeed, they had every opportunity to inform Defendants over the past three years in which they have been involved in this case that they would like to see these numbers. Intervenors took none of these opportunities, and instead consistently opt to remain silent about their gripes except when before the Court—which is hardly consistent with the terms or spirit of the Settlement Agreement, which requires Intervenors to meet and confer with the Defendants when they disagree with how Provision 34 is being implemented. Once again, Intervenors' refusal to have any dialogue with Defendants about such issues is hindering, rather than advancing, what should be the shared goals in this case.

4. **_Intervenors Misconstrue a Single Response Provided by Defendants to Intervenors' Questions in a Meritless Attempt to Question the Broader Reliability of the Provision 34 Audits:_** Intervenors misrepresent Defendants' written response to Intervenors' second question—stating that Defendants simply "dismiss[ed] unfavorable results as 'statistically insignificant.'" Not so. As set forth in the letter attached to Intervenors' Status Report, Intervenors' second question sought, in part, an explanation for why the number of IRPs completed in

the second quarter of 2021 and the first quarter of 2022 dropped by 2.7%. In its response to this question, Defendants noted that, given the sample size of 85 individuals, "the data contains a margin of error that makes **certain** variances statistically insignificant" and explained that "a difference of 2.7% **may be** within the range of statistical chance." *See* Dkt. No. 225 at 10 (Status Report, Ex. A) (emphasis added). Intervenors' effort to twist this answer as some sort of concession that there is a problem with the sample size used for Provision 34 audits would make the most industrious contortionist envious. There will be a margin of error for any audit, no matter the sample size. Intervenors cannot seriously fault Defendants for pointing this out—particularly given that Defendants then proceeded to substantively answer Intervenors' question. *See id.*

In addition, the parties negotiated the requirements for these audits, with all involved agreeing that a sample size of 85 is both sufficient and workable. That a margin of error exists does not mean, as Intervenors seemingly imply, that the sample size as whole cannot "provide a meaningful measurement" of the County's compliance.

5. ***As the Parties Seemingly Recognized When They Negotiated the Provision 34 Implementation Plan Over the Course of Several Months, There is Appropriate Accountability Built Into That Plan to Account for When Failures Occur and Goals Are Unmet:*** Intervenors conclude that there is "no accountability" for a failure to comply with Provision 34 requirements—seemingly because there are no "adverse consequences for managers and employees if Paragraph 34 substantial compliance is not achieved." To be clear, the Implementation Plan for Provision 34, which was negotiated between the parties over the course of several months before it was finalized, does hold members of the Care Transitions Unit who fail to meet Provision 34's requirements accountable in significant ways for those failures by, among other things, subjecting them to stricter supervision, mentoring, and training to help ensure that shortcomings are not

repeated; and, it is notable that, while the parties negotiated the Provision 34 implementation plan for months and specifically discussed provisions in that plan which address accountability and auditing, Intervenors never once suggested County employees who do not achieve substantial compliance with the Settlement Agreement should face any adverse consequences beyond those noted in the implementation plan agreed to by the parties.  Moreover, although there are disciplinary processes in place in every County department, they are implemented with consultation from Human Resources and when there is objective evidence that an employee/manager is violating a policy/procedure.  The County does not punish employees for unintentionally failing to achieve compliance with a settlement agreement.

Furthermore, as a practical matter, such a suggestion is extremely shortsighted, as the single largest obstacle the County faces in achieving compliance with Provision 34, like many other provisions of the Settlement Agreement, are a lack of resources, including available staff.  The likely result of a practice that unfairly punishes employees for unintended failures that impact compliance with Provision 34 would be the loss of talented, hardworking Care Transitions Unit employees, bringing the County further from compliance—not closer to it.

\* \* \* \*

As noted above, in the last two quarters, the Defendants' compliance with the release planning requirements set forth in Provision 34 has improved, and the Defendants' compliance with generating the release plans required under Provision 34 is trending *ahead* of the benchmarks the parties set in the implementation plan they spent months negotiating earlier this year.  These results did not occur as the result of any slight of hand on the part of the Defendants; these results were verified as accurate by the independent auditors employed by the Monitor in this case, and they were the result of the hard work of the members of the Care Transitions Unit. Defendants recognize that there is still much work to be done to reach sustained

compliance with what Provision 34 requires, and Defendants believe that the implementation plan the parties negotiated establishes a roadmap that will lead to that goal.

What will not assist in this process is requiring the County to engage in time-consuming formal discovery, and litigation concerning such discovery, prompted by Intervenors' failure to follow this Court's orders; their unwillingness to confer about issues that could be addressed in a phone call with counsel, rather than pleadings that consume the Court's time and attention; and arguments, portrayed as "significant concerns," that are nothing of the sort. For those reasons, to the extent Intervenors do not withdraw the deposition notice they improperly propounded on Defendants without this Court's prior approval, Defendants will unfortunately be required to move to quash that notice.

DATED: November 11, 2022        KENDALL BRILL & KELLY LLP

By:      s/ Robert E. Dugdale
         Robert E. Dugdale
         Attorneys for Defendants County of Los Angeles and the Los Angeles County Sheriff Alex Villanueva, in his Official Capacity