OFFICE OF COUNTY COUNSEL
Dawyn Harrison (173855)
Interim County Counsel
*dharrison@counsel.lacounty.gov*
Dylan Ford (228699)
Deputy County Counsel
*dford@counsel.lacounty.gov*
500 West Temple St., Floor 6
Los Angeles, California 90012
Telephone: (213) 974-1807/(213) 974-1811
Facsimile: (213) 687-8822

KENDALL BRILL & KELLY LLP
Robert E. Dugdale (167258)
*rdugdale@kbkfirm.com*
Katelyn A. Kuwata (319370)
*kkuwata@kbkfirm.com*
10100 Santa Monica Boulevard, Suite 1725
Los Angeles, California 90067-4013
Telephone: (310) 272-7904
Facsimile: (310) 286-0727

Attorneys for Defendants County of Los Angeles and the Los Angeles County Sheriff Alex Villanueva, in his Official Capacity

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

UNITED STATES OF AMERICA,

Plaintiff,

v.

COUNTY OF LOS ANGELES, et al.,

Defendants.

Case No. 2:15-cv-5903-DDP-JEM

**RESPONSE TO PLAINTIFF UNITED STATES' MOTION FOR COURT ORDER SETTING DEADLINES FOR SUBSTANTIAL COMPLIANCE**

Date: December 19, 2022
Time: 10:00 a.m.
Crtrm.: 9C

The Hon. Dean D. Pregerson

# TABLE OF CONTENTS

Page

I. INTRODUCTION AND FACTUAL BACKGROUND ..... 1

A. The Challenges Defendants Face as a Result of the Dramatically Increased Number of Inmates in the Los Angeles County Jail System Who Have Serious Mental Health Conditions ..... 1

B. Defendants' Agreement to Take Interim Steps That Will Move Them Closer to Compliance With the Requirements of Provisions 63, 64, and 80, the Government's Agreement to Provide Defendants With Additional Time to Craft Permanent Solutions to the Difficult Issues Posed by These Provisions, and Defendants' Reliance on That Agreement Reached With the Government ..... 2

II. ARGUMENT ..... 7

A. The Government's Request That This Court Impose Dozens of New Benchmarks and Deadlines Upon Defendants Is Ill-Timed for a Number of Reasons and Significantly Alters the Government's Agreement That Defendants Should Employ a Phased Approach to Reaching Compliance with Provisions 63, 64, And 80 ..... 7

III. CONCLUSION ..... 13

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

# I. INTRODUCTION AND FACTUAL BACKGROUND

## A. The Challenges Defendants Face as a Result of the Dramatically Increased Number of Inmates in the Los Angeles County Jail System Who Have Serious Mental Health Conditions

Between the time the government initiated the investigation that led to the settlement agreement in this case in 2015 and today, the challenges the County of Los Angeles (the "County") and the Los Angeles Sheriff's Department (the "LASD") have faced in providing care to those with serious mental health conditions who are housed in the Los Angeles County Jail system (the "LACJ") have changed dramatically. The number of inmates with serious mental health conditions housed in the LACJ between 2012 and 2022 has doubled, from 3,135 such inmates in 2012 to the nearly 6,000 such inmates today; the number of inmates in the LACJ with the most extreme forms of mental health conditions—the "P3" and "P4" inmates, who receive that classification because of the imminent danger they pose to themselves and to others as a result of their mental illnesses—has risen by more than 380% over the past ten years, climbing from 460 inmates in 2012 who would have required High Observation Housing ("HOH") to the roughly 1,750 P3 and P4 inmates in the LACJ today who require such housing; and the percentage of inmates in the LACJ who have a serious mental illness has climbed from roughly 20% of the total LACJ inmate population as of 2012 to roughly 45% of the LACJ's inmate population as of today.

Defendants have taken many significant steps since entering the settlement agreement in this case in an effort to better attend to the needs of those with serious mental health conditions in the LACJ. These include: (1) establishing an entire new department within the LACJ, Correctional Health Services ("CHS"), to address the mental health needs of those incarcerated in the LACJ; (2) standing up two compliance teams, consisting of almost three dozen LASD and CHS employees, who are solely dedicated to bringing Defendants into compliance with the settlement

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

agreement's myriad requirements; (3) establishing a "Care Transitions Unit" dedicated to providing release plans for inmates with serious mental health conditions, which are designed to provide them with a means to successfully transition from the LACJ's custodial environment; and (4) spending several hundred million dollars over the past seven years to address the needs of the mentally ill in the custody of the LASD. These efforts likely would have brought Defendants into full compliance with the settlement agreement's requirements years ago had the number of inmates in the LACJ with severe mental health conditions not exploded in recent years and unleashed a torrent of unexpected problems in this case. However, since the numbers of inmates with serious mental health conditions has overwhelmed the LACJ in the manner described above, these significant efforts by Defendants to address the issues in this case have not led to the success Defendants would have otherwise experienced.

**B. Defendants' Agreement to Take Interim Steps That Will Move Them Closer to Compliance With the Requirements of Provisions 63, 64, and 80, the Government's Agreement to Provide Defendants With Additional Time to Craft Permanent Solutions to the Difficult Issues Posed by These Provisions, and Defendants' Reliance on That Agreement Reached With the Government**

In a shared effort with the government to push this case forward in the face of the overwhelming problems posed by the huge influx of seriously mentally ill inmates into the LACJ over the past several years, the government and Defendants have spent significant time and effort this year crafting roughly two dozen detailed implementation plans setting forth specific corrective actions Defendants have committed to take in an effort to reach substantial compliance with those provisions of the settlement agreement for which Defendants have fallen short to date. While Defendants anticipate that the successful implementation of these plans will help them achieve compliance with the vast majority of provisions of the settlement

agreement where achieving that mark has thus far proven elusive, there are three settlement agreement provisions for which Defendants have had particular difficulty reaching compliance due to the sheer number of inmates with serious mental health conditions who have inundated the LACJ in recent years: (1) Provision 63, which addresses Defendants' need to provide P3 and P4 inmates with permanent HOH, and P2 inmates with permanent Moderate Observational Housing ("MOH"), in a timely manner, upon entering the LACJ; (2) Provision 64, which requires Defendants to craft both short-term and long-term plans to provide P4 inmates in the LACJ with forensic in-patient care; and (3) Provision 80, which requires Defendants to offer HOH inmates with a certain quantity of out-of-cell time, including out-of-cell time for structured group programming, each week.

For these provisions, Defendants agreed to take a number of significant, iterative steps to address the issues posed by these provisions. These corrective actions proposed by Defendants—dubbed its "phase one" plan—admittedly will not place Defendants in compliance with these provisions, but they promise a likelihood that more long-term corrective actions taken in response to these provisions will make the goal of reaching compliance with these provisions achievable. For instance, pursuant to these plans, Defendants promised to take the following steps, among others, at a cost over $100 million:

* Expand the LACJ's Medication Assisted Treatment ("MAT") Program by offering up to 1,500 inmates the injectable drugs that have been proven to curtail opioid addiction (and thus allow Defendants to better treat the sizeable group of inmates who have concurrent mental health and drug addiction conditions, once the drug addiction aspects are resolved);

* Relocate several hundred MOH inmates to the LACJ's PDC-North facility, which is viewed as a far more suitable location to house MOH inmates than other facilities in the Los Angeles basin;

* Open a new 48-bed Psychiatric Urgent Care Unit (the "PUC"),





Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

designed to serve as a location to involuntarily medicate severely medically ill inmates and provide other short-term services designed to stabilize or improve the level of mental health care P4 inmates require, thus reducing the demand on LACJ's overtaxed forensic in-patient treatment program;

* Expand the LACJ's FIP Step-Down Program, a program that places HOH inmates in a dorm-like setting and ensures that they are offered the quantity and type of out-of-cell time Provision 80 requires; and

* Set up a pilot program that involves bringing outside providers into the LACJ who can provide assistance with out-of-cell group programming and help bridge the tremendous gap between the need for such programming and the current ability of LASD and CHS staff to provide such programming.

The government agreed with this phased approach to tackling the difficult issues posed by the requirements of Provisions 63, 64, and 80 and specifically agreed to provide Defendants with additional time to strategize more permanent solutions to bring Defendants into compliance with these provisions as it implemented these interim steps. To this end, as the government informed this Court in August 2022, the government agreed that Defendants should be provided an additional six months (until February 2023) to provide the government with revised plans for Provision 80 and an additional nine months (until May 2023) to provide the government with revised plans for Provisions 63 and 64 that propose permanent solutions to address the gap between where Defendants stand with regard to those provisions after the interim steps it had agreed to take and achieving compliance with what the settlement agreement requires for these provisions. (*See* Dkt. 216 at pp. 18-19 (Tr. of 8/19/22 Status Conference at pp. 18-19)).

Defendants immediately engaged in a number of steps once the government agreed upon this timeline for action. For instance:

* In September 2022, the Los Angeles County Board of Supervisors (the "BOS") formally allocated $100 million in the County's September 2022

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

Supplemental Budget to fund the MAT Program expansion, costs associated with the mass movement of MOH inmates to the LACJ's PDC-North facility, and the newly-conceived PUC[1];

* On October 4, 2022, the BOS approved over $25 million in funding to expand the Office of Diversion and Re-Entry Housing Program by an additional 750 beds, which are expected to be used principally to divert P2, P3, and P4 inmates who require HOH and MOH from the custody of the LACJ;[2]

* In October 2022, the County also kicked off work on a new agreement with the State of California that will provide substantial new state funding which will be used to divert additional LACJ inmates from custody who are designated as "FIST" (Felony Incompetent to Stand Trial);[3]

* CHS is currently finalizing an agreement that it has worked on throughout the Fall with the Chicago School of Professional Psychology (the "Chicago School") through which graduate students pursuing Masters Degrees in

---

1 Defendants separately obtained funding that will allow it to expand the FIP Step-Down Program in the manner described above.

2 This expansion brings the total number of ODR beds funded in the County's Fiscal Year 2022-23 Supplemental Budget from 2,200 beds to 2,950 beds.

3 The law requires those designated FIST to be transported to state mental hospitals for restoration. However, because these state facilities are already at capacity, hundreds of FIST designees, the overwhelming number of whom require HOH housing in the LACJ which is at a severe shortage, currently remain in the LACJ. Indeed, as of mid-November 2022, there were exactly 600 of such inmates (458 male and 142 female) in the LACJ who should, by law, currently be located in a state mental facility operated by the California Department of State Hospitals undergoing restoration. The current funds provided by the state supports 515 beds for FIST inmates, who the state cannot take custody of but who can overwise be diverted out of LACJ custody for restoration. The new agreement being finalized between the County and the State of California will expand that program from 515 beds to 1,344 beds (an increase of 829 beds) over a five year grant term that starts in Fiscal Year 2022-23.

forensic psychiatry will lead out-of-cell group programming sessions for HOH inmates in the LACJ as part of a new practicum program offered by the Chicago School;[4] and

* Perhaps most significantly, on September 27, 2022, the BOS unanimously approved a motion concerning the development of mental health care facilities to help depopulate the LACJ (the "BOS Motion"), recognizing the particular need to divert acutely mentally ill individuals in the P3 and P4 levels of care due to the shortage of HOH in the LACJ. The BOS Motion requires that leaders of a number of County departments—including the Sheriff; the District Attorney; the Public Defender; the Alternate Public Defender; the Acting Director of Mental Health; the Director of Health Services, through its Director of Correctional Health Services and the Office of Diversion and Re-Entry; the Director of Public Health; the Interim County Counsel; and the Executive Officer/Clerk of the Superior Court—collaborate with the Jail Closure Implementation Team and the Alternative to Incarceration Initiative and report back to the BOS within 90 days with recommendations on three key components of the undertaking, including: (1) the composition and number of secured, non-correctional mental health care facility beds needed to safely and appropriately transition the acutely mentally ill from LACJ custody, as well as potential and available revenue sources to fund such beds; (2) the laws and regulations that permit the transition of the P3 and P4 population out of jail custody and into secured mental health care facilities; and (3) a holistic plan to develop secured, non-correctional mental health care facilities needed to serve the P3 and P4 population (collectively, the "Report Back").[5]

---

[4] This program is expected to start, on a trial basis, with 5-10 graduate students who will each provide 20 hours of service leading group programming at the LACJ each week, and, if this program proves successful, it will expand from there.

[5] As this Court knows, in response to the *Rutherford* litigation, this

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

These steps taken by Defendants in an effort to move the County and the LASD closer to compliance with the requirements of Provisions 63, 64, and 80—which, once again, were taken in reliance on the six and nine month deadlines pledged by the government in August 2022—were not trivial. Indeed, the government has recognized as much, previously informing the Court that these measures represented "'real solutions' to the extent that [they] will reduce the demand for, or increase the supply of, mental health housing and resources in the Jails," and promising steps as part of the "first phase" of Defendants' efforts to come into compliance with Provisions 63, 64, and 80. (*See* Dkt. 211 at pp. 2-3 (United States' Statement Relating to Los Angeles County Sheriff's Motion for Declaration of Conflict and for an Order Appointing Conflict Counsel, dated 9/12/22)).

## II. <u>ARGUMENT</u>

### A. <u>The Government's Request That This Court Impose Dozens of New Benchmarks and Deadlines Upon Defendants Is Ill-Timed for a Number of Reasons and Significantly Alters the Government's Agreement That Defendants Should Employ a Phased Approach to Reaching Compliance with Provisions 63, 64, And 80</u>

In a sharp turn from the government's agreement to allow Defendants to craft additional solutions to the issues posed by Provision 63, 64, and 80 by February 2023 (as to Provision 80) and May 2023 (as to Provisions 63 and 64), the government has now filed a motion seeking to impose dozens of rapidly approaching interim "benchmarks" and "timelines" related to these and other provisions. Taking a cue from this Court, Defendants will engage in further efforts to meet and confer with the government in an attempt to reach agreements regarding

Report Back will also include short-term and long-term plans to address the housing needs of MOH inmates as well.



Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

these "benchmarks" and "timelines." However, there are at least four reasons why they are unworkable at this time, including that they cannot be crafted until more current data exists than what the parties presently have available and until after Defendants have the opportunity to form the "second phase" plans under the timeline previously agreed to by the government, and that Defendants require time to craft them in a manner that carefully takes into account the mental health needs of the inmates in the LACJ who will be impacted by the decisions made in order to reach these benchmarks and deadlines, with the input of the newly-elected Sheriff, as well as other reasons.[6]

First, the types of benchmarks and timelines the government wishes to have this Court set should be set based on more current data concerning Defendants' compliance with Provisions 63, 64, and 80 than which currently exists, so benchmarks can be set that are realistically achievable. As the government's motion indicates, the most current verified data the parties have concerning where Defendants stand with regard to complying with the requirements of Provisions 63, 64, and 80 is data from the first quarter of 2022. (*See, e.g.*, Mot. at pp. 7-8 (discussing where Defendants stood with regard to compliance with Provision 63's requirements as of the first quarter of 2022, "the most recent quarter for which data is available"). This is because the Semi-Annual Reports issued by the Monitor—the last of which was issued in September 2022—cannot accurately report the current status of Defendants' compliance with any particular provision and rely instead on

[6] In addition to the benchmarks and deadlines related to Provisions 63, 64, and 80, the government also seeks deadlines for Defendants to come into compliance with a number of other provisions. (*See* Government's Proposed Order at pp. 6-7). While some of those prior deadlines have previously been agreed to by Defendants, some have not. Defendants will attempt to reach resolution on these issues with the government prior to any hearing on this motion per the Court's request.

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

data that is between six and nine months old.[7] By mid-December, Defendants will be providing the Monitor and the government with a "self-assessment" detailing its level of compliance with all of the settlement agreement's outstanding provisions, including Provisions 63, 64, and 80, for the second and third quarters of 2022. While Defendants agree with the government that benchmarks and deadlines in this case could be helpful to encourage sustained progress on the part of Defendants in moving toward compliance with certain provisions of the settlement agreement, it makes little sense to set those benchmarks without the benefit of more current data concerning where Defendants stand with regard to compliance with Provisions 63, 64, and 80; yet that is what the timing of the government's motion asks this Court to do.[8]

Second, many of the deadlines and benchmarks proposed by the government related to Provisions 63, 64, and 80 conflict with the deadlines the government previously agreed to for Defendants to craft "second phase" solutions related to those provisions. For instance, the BOS ordered the Report Back and directed that it be completed in 90 days (by December 26, 2022), well <u>before</u> the May 2023 date the government agreed to provide Defendants to craft and start implementing its "second phase" solutions to address the housing issues posed by Provisions 63 and

---

[7] Thus, the most recent Semi-Annual Monitoring Report issued in September 2022 analyzed data from the fourth quarter of 2021 and first quarter of 2022.

[8] The utility of the benchmarks advocated by the government suffers from a similar issue. The majority of the benchmarks the government favors seek to hold Defendants accountable for achieving certain benchmarks starting at the end of the first quarter of 2023. (*See e.g.* Government's Proposed Order at ¶¶ 1.a.i., 1.b.ii., and 1.c.i.). However, due to the way Defendants' compliance is measured, the parties and the Court will not know if these benchmarks were met until July 2023, at the earliest. For this reason, Defendants have focused more of their energy and efforts on attempting to design solutions to the problems in this case than on benchmarks that will not be measured until well after the fact.

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

64, but after the hearing in which this government is asking this Court to set deadlines and benchmarks relevant to these plans. Asking this Court to order deadlines and benchmarks before the plan to achieve these deadlines and benchmarks has been crafted is inconsistent with the parties' prior agreement. Moreover, unless these deadlines and benchmarks are keyed to the plans the County is formulating under the timeline the government announced to the Court in August 2022, they will not be helpful because they will be untethered to the substantive work Defendants are doing to move toward compliance with provisions like Provisions 63, 64, and 80.[9] Accordingly, at a minimum, the benchmarks and deadlines the government wishes to set with regard to Provisions 63, 64, and 80 should not be set until Defendants have the opportunity the government previously indicated they would be given to craft the "second stage" solutions to the issues posed by those provisions.

Third, while Defendants share the government's desire to reach substantial compliance with all of the outstanding provisions in this case as soon as possible, a rush to reach compliance cannot take priority over safeguarding the health and safety of the very inmates the government wishes to protect in the case. Rushing to meet arbitrary benchmarks in a case where the problems being addressed require carefully considered and executed plans will do just that. The recent movement of

[9] Notably, it is very likely the "second phase" solutions to the issues posed by Provisions 63 and 64 may not correspond at all to the benchmarks the government has proposed for those provisions, which all rest on an end date the government unilaterally selected and certain regimented improvements the government wishes to see each quarter until that end date is reached. To the extent Defendants' plans involve efforts to divert a sizeable number of inmates from the LACJ or to relocate them to existing LACJ facilities renovated to account for the needs of those inmates, significant improvements with compliance with Provision 63's and 64's requirements may not occur for some time, but, when such improvements occur, they may occur in much more sizeable jumps than what the government's benchmarks, as drafted currently, anticipate.

MOH inmates to PDC-North necessitated by overcrowding in the Inmate Reception Center ("IRC") illustrates this point. Before the issues in the IRC necessitated the mass movement of MOH inmates to PDC-North this Fall, Defendants had planned to methodically relocate MOH inmates to that facility over the course of nine months to one year in order to make sure the infrastructure was in place at PDC-North to provide proper mental health treatment for these P2 inmates when their relocation to PDC-North occurred. When the movement of MOH inmates to PDC-North was unexpectedly accelerated this Fall, predictable problems occurred—such as delays in providing certain mental health services to these inmates—because this movement of hundreds of MOH inmates to PDC-North occurred before Defendants could execute their plans to bulk up the mental health staff and make the capital improvements at that facility needed to accommodate a substantially larger mental health staff at that facility. Several of the "deadlines" and "benchmarks" proposed by the government threaten to trigger similar problems. For instance, the government's proposed requirement that Defendants verify by March 2023 that 1,500 inmates have received the injectable anti-opioid medication now provided due to the expansion of the MAT Program[10] is not a deadline the government attempts in any way to link to patient need; it reflects only a desire to meet a number for the sake of meeting a number. Again, while deadlines and benchmarks can serve a useful purpose in this case, the insistence on such deadlines and benchmarks should take a backseat to making sure the solutions to the issues in this case are devised and implemented in a thoughtful, deliberate manner where the mental health needs of the inmates in the LACJ are not sacrificed in the name of expediency.[11]

---

[10] *See* Government's Proposed Order at ¶ 2.d.

[11] Some of the deadlines the government demands are also flawed because they are internally inconsistent. For instance, the government seeks an order that Defendants obtain "licensure and all other necessary approvals from the state" to open the PUC by no later than March 31, 2023 (despite the fact the timing

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

Finally, it is also the wrong time to impose the benchmarks and deadlines advocated by the government because this Court should permit the newly-elected Sheriff with an opportunity to provide his input on how the issues in this case should be addressed before setting benchmarks and deadlines the LASD and the County will be responsible for meeting. While the BOS is unquestionably the entity that will drive the solutions Defendants implemented in this case, the Sheriff is a critical stakeholder whose input in designing and executing the plans that will bring Defendants into compliance with Provisions 63, 64, and 80 is necessary. Accordingly, before the deadlines and benchmarks the government is insisting upon in this case are set, the newly-elected Sheriff should be provided with a brief period of time to provide his input on the corrective actions Defendants will implement to reach deadlines and benchmarks the LASD will have a shared responsibility with the County to meet.

In short, Defendants agree that setting benchmarks and deadlines in this case could be useful in helping to drive this case toward compliance. However, in order for these benchmarks and deadlines to prove helpful, they need to be crafted (1) based on more current data than what the parties presently have available; (2) after Defendants have the opportunity to form the "second phase" plans under the timeline previously agreed to by the government; (3) in a manner that carefully

---

of these occurrences is not within the exclusive control of Defendants), that Defendants fully allocate the staff necessary to service the PUC by that date as well, and that Defendants conduct an assessment of the impact of the PUC on the demand for inpatient beds within the LACJ within one month after that, or by April 30, 2023. (Government's Proposed Order at ¶ 2.b.). However, at the same time, the government advocates that Defendants be held to a particular benchmark related to Provision 64 (a provision that will be directly impacted by the opening of the PUC) by March 31, 2023 (*id.* at ¶ 1.b.i.) and that Defendants provide a data-driven analysis to the government concerning the impact of several programs, including the creation of the PUC, two months before the deadline the government seeks to have the PUC licensed and operational (*id.* at ¶ 2.f.).

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

takes into account the mental health needs of the inmates in the LACJ who will be impacted by the decisions made in order to reach these benchmarks and deadlines; and (4) with the input of the newly-elected Sheriff, who is set to take office in early December. Accordingly, while Defendants will continue to meet and confer with the government in an effort to agree to achievable, meaningful, and helpful benchmarks and deadlines in this case that may better help steer Defendants toward compliance, Defendants believe that many of these benchmarks and deadlines cannot be meaningfully addressed until these prerequisites are met.

## III. CONCLUSION

For each of the foregoing reasons, the government's request to set benchmarks and deadlines related to some of the outstanding settlement agreement provisions should be denied at this time, pending an effort by the parties to reach an agreement concerning these benchmarks and deadlines in January 2023 once the issues raised in this response are addressed.

DATED: November 28, 2022 KENDALL BRILL & KELLY LLP

By: s/ Robert E. Dugdale
Robert E. Dugdale
Attorneys for Defendants County of Los Angeles and the Los Angeles County Sheriff Alex Villanueva, in his Official Capacity