OFFICE OF COUNTY COUNSEL
Dawyn Harrison (173855)
Interim County Counsel
  dharrison@counsel.lacounty.gov
Dylan Ford (228699)
Deputy County Counsel
  dford@counsel.lacounty.gov
500 West Temple St., Floor 6
Los Angeles, California 90012
Telephone:   (213) 974-1807
Facsimile:    (213) 687-8822

KENDALL BRILL & KELLY LLP
Robert E. Dugdale (167258)
  rdugdale@kbkfirm.com
Katelyn A. Kuwata (319370)
  kkuwata@kbkfirm.com
10100 Santa Monica Boulevard, Suite 1725
Los Angeles, California 90067-4013
Telephone: (310) 272-7904
Facsimile: (310) 286-0727

Attorneys for Defendants
County of Los Angeles and Los Angeles
County Sheriff Robert Luna, in his
Official Capacity

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF LOS ANGELES, et al.,<br><br>Defendants. | Case No. 2:15-cv-5903-DDP-JEM<br><br>**DEFENDANTS' PROPOSED ALTERNATIVE TIMELINES TO COME INTO COMPLIANCE WITH PROVISIONS 63, 64, AND 80 OF THE SETTLEMENT AGREEMENT**<br><br>[Proposed Order Filed Under Separate Cover]<br><br>Courtroom 9C<br>Honorable Dean D. Pregerson |

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION ................................................................................ 3

II. ARGUMENT ................................................................................... 7

    A.    DEFENDANTS' PROPOSED INTERIM BENCHMARKS AND TIMELINES FOR PROVISIONS 63, 64, AND 80 AND THE RATIONALE BEHIND THOSE BENCHMARKS AND TIMELINES ................................................................................ 7

        1.    Provision 63 ............................................................... 7

            (a)    The Challenges Posed By Provision 63 and Defendants' Current State of Compliance with Its Requirements ............................................. 7

            (b)    Defendants' Plan to Come Into Compliance With Provision 63 ................................... 10

            (c)    The Benchmarks and Timeline the Government Has Asked This Court to Impose for Defendants to Reach Compliance With Provision 63 Are Not Realistic or Tied to Any Plan to Practically Meet Them ............................................................ 12

        2.    Provision 64 ............................................................... 15

            (a)    The Challenges Posed By Provision 64 and Defendants' Current State of Compliance with Its Requirements ............................................. 15

            (b)    Defendants' Plan to Come Into Compliance With Provision 64 ................................... 15

            (c)    The Benchmarks and Timeline the Government Has Asked This Court to Impose for Defendants to Reach Compliance With Provision 64 Are Not Realistic or Tied to Any Plan to Practically Meet Them ............................................................ 17

        3.    Provision 80 ............................................................... 18

            (a)    The Challenges Posed By Provision 80 and Defendants' Current State of Compliance with Its Requirements ............................................. 18

            (b)    Defendants' Plan to Come Into Compliance With Provision 80 ................................... 20

            (c)    The Benchmarks and Timeline the Government Has Asked This Court to Impose for Defendants to Reach Compliance With Provision 80 Are Not

**Kendall Brill
& Kelly LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

i

Realistic or Tied to Any Plan to Practically Meet Them ............................................................................. 24

    B.    DEFENDANTS PLAN TO OFFER IMPROVED MENTAL HEALTH CARE TO INMATES WITH SERIOUS MENTAL HEALTH CONDITIONS AS THEIR EFFORTS TO DEPOPULATE THE LACJ OF SUCH INMATES TAKE PLACE ...................................................................................... 25

III. CONCLUSION ............................................................................. 27

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

# I.

# INTRODUCTION

Since the Settlement Agreement in this case was entered in September 2015, the County of Los Angeles (the "County") and the Los Angeles County Sheriff's Department (the "LASD") (collectively, the "Defendants") have taken a number of significant steps to better attend to the needs of those with serious mental health conditions housed in the Los Angeles County Jail System (the "LACJ"). These measures have included, among many others:

(1) establishing a Correctional Health Services Department ("CHS") to oversee a staff which currently consists of 376 mental health professionals across a wide variety of disciplines who provide mental health treatment to individuals incarcerated in the LACJ;

(2) standing up two teams, consisting of almost three dozen LASD and CHS employees, who are exclusively dedicated to bringing Defendants into compliance with the Settlement Agreement's myriad requirements;

(3) creating a "Care Transition Unit" dedicated to providing release plans for certain inmates with serious mental health conditions, which are designed to provide them with a means to successfully transition from the LACJ's custodial environment and receive mental health services upon their release from custody;

(4) spending several hundred million dollars over the past seven years to address the needs of LACJ inmates with mental health conditions by, among other things (a) setting up a means to promptly evaluate inmates once they enter the LACJ for existing or emerging mental health conditions; (b) providing medication to inmates to address their mental health needs; and (c) offering special housing and programming for inmates with severe mental health conditions, including special housing designed to mitigate the risk of self-harm those inmates pose; and

(5) establishing several other county entities, which operate independently of CHS and the LASD, and which address issues pertinent to this case by (a)

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

3

overseeing the diversion of inmates with mental health conditions out of the LACJ and into non-carceral settings where they can obtain improved mental health treatment (such as the Office of Diversion and Reentry ("ODR")); (b) creating community-based alternatives to incarceration, including community-based mental health treatment facilities (such as the County's Office of Alternatives to Incarceration ("ATI")); and (c) crafting plans to depopulate the LACJ (such as the County's Jail Closure Implementation Team ("JCIT")).

After achieving substantial compliance with roughly two-thirds of the Settlement Agreement's 69 provisions within six years of executing the agreement, Defendants and the government collaborated extensively over the past 15 months in an effort to put together and execute plans to bring Defendants into compliance with the Settlement Agreement's remaining provisions.  This process led to more commitments from Defendants, including commitments to (a) expand the number of forensic in-patient ("FIP") step-down units within the LACJ, units that are resource-intensive and not suitable for all inmates with severe mental health issues, but which have a proven track record of providing effective mental health treatment to some inmates with severe mental health conditions; (b) fund and create a new Psychiatric Urgent Care Unit, which will be used to conduct involuntary administrations of psychotropic medications to inmates whose severe mental health problems could likely be stabilized, or even improved dramatically, through the administration of such medications; (c) relocate inmates with moderate mental health conditions to improved custodial environments; and (d) create a groundbreaking Medication Treatment Program that is currently being used to treat inmates with severe opioid addictions in order to allow mental health professionals a realistic opportunity to effectively address co-existing mental health conditions such inmates may have.

These steps and others taken by Defendants over the past seven and one-half years almost certainly would have led to Defendants reaching full compliance with all of the Settlement Agreement's requirements long ago had the mental health

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

1  population remained anywhere close to what it was when the Settlement

2  Agreement's provisions were contemplated and agreed to by Defendants in 2015.

3  However, since that time period (and, most acutely, over the past three years), the

4  number of inmates in the LACJ with severe mental health conditions has exploded,

5  unleashing a number of unexpected problems in this case, including (a) a lack of

6  immediately-available specialized housing in the LACJ for P3 and P4 inmates;[1] (b)

7  a deficit in the type of forensic in-patient beds in the LACJ required to treat P4

8  inmates; and (c) an inability to provide 10 hours of "out-of-cell" group

9  programming each week to P3 and P4 inmates, as required under the Settlement

10  Agreement, because the number of P3 and P4 inmates in the LACJ greatly exceeds

11  the capabilities of CHS and LASD staff to safely administer such group

12  programming to the degree the Settlement Agreement contemplates.

13         In the face of these challenges, and despite a long-standing agreement by the

14  government to provide Defendants until May 17, 2023 to arrive at comprehensive

15  solutions to the housing issues that form the principle challenge in this case, the

16  government filed a motion in November 2022 asking this Court to set timelines and

17  interim benchmarks for Defendants to reach full compliance with each of the

18  Settlement Agreement's provisions.  The parties have reached agreed-upon

19  timelines for Defendants to reach compliance with most of the provisions of the

20  Settlement Agreement and to take various substantive steps Defendants have

21  _____

22  [1]  An inmate's "P-level" indicates the severity of that inmate's mental health care

23  needs.  P3 and P4 inmates pose the greatest threat to themselves and others and are
    entitled to Forensic In-Patient ("FIP") or High Observation Housing ("HOH"), in

24  which they are provided with an intensive level of observation and care, and which
    is configured in a manner that accounts for the significant risk of self-harm posed by

25  a P3 or P4 inmate.  P2 inmates pose a more moderate threat to themselves and
    others and make up a large population of inmates with a broad range of mental

26  health diagnoses and functioning.  P2 inmates are entitled to Moderate Observation

27  Housing ("MOH"), which is a less intensive and more open setting than HOH, and

28  includes dorm-style housing, but is more restrictive than general population housing.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

previously agreed to take to improve the mental health care received by inmates in the LACJ.  There are, however, three provisions for which the parties have failed to come to an agreement on a timeline and associated benchmarks:  Provision 63, which obligates Defendants to provide appropriate HOH beds and MOH beds for those inmates with mental health conditions who require such housing; Provision 64, which obligates Defendants to provide FIP beds to all P4 inmates housed in the LACJ; and Provision 80, which obligates Defendants to provide all P3 and P4 inmates housed in the LACJ with 10 hours of out-of-cell unstructured recreational time and 10 hours of out-of-cell structured therapeutic or programmatic time.

As to each of these three provisions, the interim benchmarks and timelines offered by the government are untethered to the current realities in the jails, establish impractical goals which are not conceivably attainable, and sit untethered to any realistic plan that could be devised to reach the benchmarks and timelines the government has offered.  Indeed, as to Provisions 63, 64, and 80, it appears that setting the interim benchmarks and timelines offered by the government involved no more thought than arbitrarily setting a date of June 30, 2024 for Defendants to come into compliance with these provisions (whether that deadline is realistically achievable or not), and working backwards from that point to set, in an entirely linear manner, benchmarks leading to a starting point that is not close to Defendants' current level of compliance.  As an alternative, through this filing, Defendants offer interim benchmarks and timelines which set an achievable starting point (as opposed to initial benchmarks that arrive in a matter of weeks which Defendants have no possible chance of meeting based on their current level of compliance); sensible timelines which include realistic benchmarks that will require Defendants to progressively improve their compliance with Provisions 63, 64, and 80; and deadlines for Defendants to reach compliance with Provisions 63, 64, and 80 that are realistic and tied to aggressive, but achievable, plans.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

## II.

## ARGUMENT

**A.   DEFENDANTS' PROPOSED INTERIM BENCHMARKS AND TIMELINES FOR PROVISIONS 63, 64, AND 80 AND THE RATIONALE BEHIND THOSE BENCHMARKS AND TIMELINES**

### 1.   Provision 63

#### (a)   The Challenges Posed By Provision 63 and Defendants' Current State of Compliance with Its Requirements

Provision 63 of the Settlement Agreement requires Defendants to maintain adequate HOH beds for all P3 and P4 inmates and MOH beds for all P2 inmates. For Defendants to reach compliance with Provision 63: (1) 90% of P2, P3, and P4 inmates entitled to HOH or MOH must receive such permanent mental health housing within seven days; and (2) 100% of P2, P3, and P4 inmates entitled to HOH or MOH must receive such permanent mental health housing within 30 days.

The challenge in complying with Provision 63 is that the number of P3 and P4 inmates entitled to HOH beds has mushroomed since the Settlement Agreement was entered, and that number has far outpaced the number of permanent, specialized HOH beds available in the LACJ.  Indeed, there are currently approximately 1,700 P3 and P4 inmate housed in the LACJ, almost **four times** the number of P3 and P4 inmates who were housed in the LACJ ten years ago.  Moreover, this population contains approximately **330** individuals who have been designated as "Felony Incompetent to Stand Trial" ("FIST").[2]  It is the responsibility of the State of California to take custody of these inmates to restore them to competency promptly after they have been found incompetent to stand trial by a court, but the State of California has long refused to do so on a timely basis, claiming it lacks the bed space and resources to provide the mental health treatment that would bring these

---

[2]   There are currently 660 FIST inmates housed in the LACJ across all P-levels. Approximately half of them are P3 and P4 inmates who occupy HOH beds.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

1  individuals to competency.  This has led to what amounts to a group of hundreds of

2  P3 and P4 inmates who are virtually guaranteed to occupy HOH beds in the LACJ

3  for many months if not years, as they sit in limbo without a trial date and waiting to

4  be restored to competency.[3]

5       As recognized in the Settlement Agreement, maintaining the facilities within

6  the LACJ, the largest jail system in the world, is "an immensely complicated

7  enterprise" (Settlement Agreement ¶ 2), and one aspect of this "immensely

8  complicated enterprise" that has proven most challenging is creating sufficient

9  permanent HOH space.  Of the myriad jails within the LACJ that are used to house

10 inmates, only two – the Twin Towers Correctional Facility ("TTCF") and the

11 Century Regional Detention Facility ("CRDF") are suitable for housing P3 and P4

12 inmates;[4] approximately 75% of all P3 and P4 inmates must be celled alone in

13 double cells because they are not equipped to have a cellmate, a fact which

14 substantially impacts the availability of inmate housing at CRDF and TTCF; HOH

15 areas of the jails require a larger staffing commitment than other areas of the LACJ,

16 both in terms of mental health professionals who work in the jails, and deputies and

17 correctional officers who provide security in the jails; and HOH cells and modules

18 must be equipped with special features, such as "suicide proof" blankets and

19

20  [3]   In 2015, the same year the Settlement Agreement in this case was entered, the

21  American Civil Liberties Union filed a lawsuit against the California Department of
    State Hospitals ("DSH") and Department of Developmental Services ("DDS") on

22  behalf of family members of people who had endured prolonged incarceration in
    California county jails despite having been declared incompetent to stand trial.  *See*

23  *Stiavetti v. Clendenin*, Case No. A157553 (Alameda County Superior Court).
    Despite this lawsuit, and orders issued by the judge in that case requiring the State

24  of California to comply with its obligation to take responsibility for the type of FIST
    inmates who occupy hundreds of HOH beds in the LACJ for large stretches of time,

25  FIST inmates in the LACJ are transferred to state hospitals for restoration on an
    extremely infrequent basis, putting a sizeable strain on Defendants' ability to attend

26  to the mental health needs of the many other inmates otherwise in the LASD's
    custody.

27
    [4]   All male P3 and P4 inmates entitled to HOH are currently housed at TTCF, and

28  all female P3 and P4 inmates entitled to HOH are currently housed at CRDF.

**Kendall Brill & Kelly LLP**
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

mattresses, as well as other safety components, to account for the unique risk of self-harm posed by P3 and P4 inmates.  Because of these factors, the LACJ's inventory of permanent HOH is limited; it has become even more limited during the pandemic because HOH is also the best type of housing available within the LACJ to use to isolate inmates who contract COVID; and, apart from eventually freeing up HOH space currently being used to isolate inmates with COVID once the pandemic wanes, there are limited opportunities within TTCF and CRDF to expand the inventory of permanent HOH.

Due to the surging population of P3 and P4 inmates over the last several years, and the limited amount of HOH space at TTCF and CRDF, new inmates who arrive at the LACJ and who are designated as P3 or P4 inmates entitled to HOH, are initially housed in one of 19 "HOH Intake Pods," where they wait for a permanent HOH bed to become available.[5]  As noted above, for Defendants to reach compliance with Provision 63's requirements, 90% of P3 and P4 inmates housed in these HOH Intake Pods must receive a permanent HOH bed within seven days of their designation as a P3 or P4 inmate, and all such inmates must receive a permanent HOH bed within 30 days of that designation.  As of the end of the third quarter of 2022 -- the most recent period of time for which Defendants have gathered data relevant to this provision -- only 58.6% of inmates at CRDF waited fewer than seven days for permanent mental health housing, and no inmates waited longer than 30 days for permanent mental health housing; and at TTCF, only 45% of the newly-arrived inmates at that facility waited fewer than seven days for permanent mental health housing, and 96% of such inmates waited fewer than 30

---

[5]   HOH Intake Pods are housing units similar to other HOH units in the LACJ, with the significant exception that they lack certain services, such as certain opportunities for structured and unstructured out-of-cell time.  Inmates in HOH Intake Pods receive clinical visits, medical appointments, medication, and safety checks commensurate with their level of care.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

days for permanent mental health housing.[6]  Furthermore, more current figures show that there are approximately 200 inmates now being held in the LACJ's "HOH Intake Pods," and these inmates are currently waiting, on average, approximately 18 days before being placed in permanent HOH beds.

>**(b)** **Defendants' Plan to Come Into Compliance With Provision 63**

Defendants believe that coming into compliance with Provision 63 by eliminating the gap between the number of P3 and P4 inmates eligible for permanent HOH beds and the number of permanent HOH beds Defendants can maintain will require lowering the total population of P3 and P4 inmates in the LACJ to approximately 1,050 inmates from its current level of approximately 1,700 inmates.  To accomplish that degree of depopulation of P3 and P4 inmates, Defendants estimate they will need to bring on-line at least 1,500 beds outside of the jail system, consisting of a mix of acute, sub-acute, and community-based beds overseen by ODR and the Department of Mental Health ("DMH"), to which P3 and P4 inmates can be diverted and receive superior mental health care as compared to the mental health treatment they can receive in a carceral environment.

Defendants estimate that this effort to lower the P3 and P4 inmate population by approximately 650 inmates will take approximately two and one-half years, if performed in a manner that properly takes into account the need to build up an inventory of beds and services which provide suitable mental health treatment to P3 and P4 inmates who are deferred from custody, while at same time accounting for public safety concerns.  Accordingly, the timeline offered by Defendants to reach

---

[6]   In almost all of the cases when a delay of more than seven days occurred in placing an inmate with mental health issues into permanent mental health housing, the delay occurred based on a lack of available permanent HOH space, as opposed to permanent MOH space or permanent housing space needed by an inmate without a mental health issue.

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

compliance with Provision 63 starts by setting a benchmark that approximates where Defendants currently sit with regard to compliance with this provision, and sets benchmarks that anticipate a net drop in the P3 and P4 population by approximately 75 inmates per quarter until the goal of reducing the overall population of P3 and P4 inmates hits approximately 1,050 inmates by the end of the second quarter of 2025.  This timeline provides as follows:

   *      By the end of the second quarter of 2023, at least **50%** of incarcerated individuals must wait no more than seven days in mental health housing intake areas before transferring to permanent mental health housing.

   *      By the end of the third quarter of 2023, at least **55%** of incarcerated individuals must wait no more than seven days in mental health housing intake areas before transferring to permanent mental health housing.

   *      By the end of the fourth quarter of 2023, at least **60%** of incarcerated individuals must wait no more than seven days in mental health housing intake areas before transferring to permanent mental health housing.

   *      By the end of the first quarter of 2024, at least **65%** of incarcerated individuals must wait no more than seven days in mental health housing intake areas before transferring to permanent mental health housing.

   *      By the end of the second quarter of 2024, at least **70%** of incarcerated individuals must wait no more than seven days in mental health housing intake areas before transferring to permanent mental health housing.

   *      By the end of the third quarter of 2024, at least **75%** of incarcerated individuals must wait no more than seven days in mental health housing intake areas before transferring to permanent mental health housing.

   *      By the end of the fourth quarter of 2024, at least **80%** of incarcerated individuals must wait no more than seven days in mental health housing intake areas before transferring to permanent mental health housing.

   *      By the end of the first quarter of 2025, at least **85%** of incarcerated individuals must wait no more than seven days in mental health housing intake areas before transferring to permanent mental health housing.

   *      By the end of the second quarter of 2025, at least **90%** of incarcerated individuals must wait no more than seven days in mental health housing intake areas before transferring to permanent mental health housing.

        This timeline is aggressive.  It will require the County to expand its current inventory of roughly 2,200 beds available to divert inmates from the LACJ to at least 3,700 beds (an increase of almost 70%); to focus its diversion efforts primarily on diverting P3 and P4 inmates with serious mental illnesses; and to include, within

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

11

its inventory of new ODR and DMH beds, beds within types of locked and secure non-carceral facilities that are virtually non-existent at this point.[7]  Moreover, it will take a substantial effort to push in excess of 1,500 inmates over a 30-month span through the state court process required to divert LACJ inmates to the new ODR and DMH beds that incrementally come on-line.  However, while this timeline is aggressive, and will be particularly difficult to meet if external factors the County cannot control arise,[8] it is a plan the County believes it can execute to bring Defendants into sustained compliance with Provision 63, and, more significantly, is a plan that will provide opportunities for better mental health care for both P3 and P4 inmates diverted to non-carceral settings and the lower number of P3 and P4 inmates who remain in the LACJ.

> **(c)     The Benchmarks and Timeline the Government Has Asked This Court to Impose for Defendants to Reach Compliance With Provision 63 Are Not Realistic or Tied to Any Plan to Practically Meet Them**

At the hearing held in this matter on February 13, 2023, the government criticized the alternative timelines offered by Defendants, complaining that the

---

[7]   Because of the federal Medicaid's Institutions for Mental Disease Exclusion, otherwise known as the IMD exclusion, adding 1,500 divertible beds will be particularly challenging, and Defendants will need the additional time laid out in their proposed timeline.  The Medicaid funding needed to fund these beds is unavailable due to the IMD exclusion for any facility with more than 16 beds.  Accordingly, instead of the County focusing on standing up 15 facilities that can house 100 diverted inmates each, the County faces a situation where it must set up no fewer than 94 facilities to house 1,500 inmates diverted from the LACJ.

[8]   Such external factors that could disrupt this plan and its associated timeline include further disruptions caused by the pandemic or an unforeseen surge of new inmates with serious mental health conditions into the LACJ beyond what the LACJ has seen in the past and can reasonably project.  What will not disrupt this plan are factors within the County's control, such as dedicating the funding and setting up the structure to execute the planned diversion of such a sizeable number of inmates.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

government did not have access to or understand the "math" underlying Defendants' proposed timelines.  In reality, it is the government's benchmarks and timeline for Provision 63 which lack any meaningful "math" because they do not account for Defendants' current state of compliance with Provision 63 and are not tied to any plan to depopulate the P3/P4 population or increase HOH capacity that is remotely achievable within the 16 month timeline the government has arbitrarily proposed.

First, the government's proposed timeline for Provision 63 seeks to require that, "[b]y the end of the first quarter of 2023, at least 65% of incarcerated individuals must wait no more than seven days in mental health housing intake areas before transferring to permanent mental health housing, with an average wait of no greater than nine days for the quarter."  (Exhibit 1 at p. 1-2 (Government's "[Proposed] Order Setting Deadlines for Substantial Compliance")).  There are no practical steps Defendants can take in the next six weeks that will possibly allow them to meet this very <u>first</u> benchmark proposed by the government.  As noted above, as of the end of quarter three of 2022 – the last time compliance with Provision 63's requirements was formally measured – 45% of new inmates in the LACJ waited fewer than seven days to be assigned permanent mental health housing at TTCF and only 58.6% of inmates at CRDF met this criteria.  Moreover, inmates eligible for HOH are currently waiting, on average, approximately 17 days, to be assigned permanent HOH beds upon entering the LACJ.  The object of this exercise should not be to set Defendants up for immediate failure, but rather to provide aggressive benchmarks and timelines Defendants have a realistic opportunity to meet if they can execute a plan to bring them into compliance with what the Settlement Agreement requires.

Second, the government has offered no explanation for what realistically achievable plan could be implemented by the County to bring Defendants into compliance with Provision 63's requirements at the rate indicated by the government's proposed benchmarks for this provision or within 16 months, as

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

13

dictated by its timeline.  At the hearing held on February 13, 2023, the government appeared to suggest Defendants could come into compliance with Provision 63 by June 30, 2024 because the County is scheduled to bring on-line 750 new ODR beds to which inmates can be diverted between now and that date.  However, that number of new beds will not drop the overall population of P3 and P4 inmates from its current level of approximately 1,700 inmates to the level needed to ensure immediately available permanent HOH beds to new inmates who arrive in the LACJ – a population of approximately 1,050 P3 and P4 inmates.  Bringing 750 new ODR beds on-line during this time period would only reduce the P3 and P4 population by 650 inmates if all of these new beds are utilized to divert P3 and P4 inmates and the number of new P3 and P4 inmates arriving in the LACJ over the next 16 months only exceeds the number of P3 and P4 inmates who are otherwise released from the LACJ during that time period by 100.  There is nothing in the trends of inmate bookings and releases at the LACJ Defendants have seen in recent years suggesting that is a realistic forecast of what will occur.  It is going to take a substantial additional number of ODR and DMH beds to come on-line, in addition to the 750 new beds that were the subject of the government's comments, in order to net the type of reduced P3/P4 population needed to reach compliance with Provision 63. Building up that inventory of ODR and DMH beds is the quickest and more effective way to remove seriously mentally ill inmates from the LACJ and put them in a more appropriate environment where they can receive better mental health treatment.  However, that build-up cannot be realistically accomplished within 16 months, and even if it could, there is little chance the state court system could divert the number of LACJ inmates who could fill that capacity in that time period.

Accordingly, while the County will aggressively take all steps within its control to drastically slash the number of P3 and P4 inmates in the LACJ, and divert them to non-carceral facilities where they will receive better treatment, it is not realistic to believe that can be accomplished by the government's arbitrary deadline.

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

14

2.     **Provision 64**

    (a)    **The Challenges Posed By Provision 64 and Defendants' Current State of Compliance with Its Requirements**

P4 inmates in the LACJ are those inmates who present the most acute danger to themselves or others or who are gravely disabled due to a mental illness. Provision 64 of the Settlement Agreement obligates Defendants to provide all such inmates with "forensic in-patient" care in the LACJ's "FIP Unit," a mental health unit within the LACJ's Correctional Treatment Center ("CTC") which provides P4 inmates with inpatient mental health care. Due to the skyrocketing number of P4 inmates who have steadily populated the LACJ over the last several years, the number of P4 inmates in the LACJ greatly exceeds the number of FIP beds available in the LACJ. Indeed, there are currently 172 P4 inmates housed in the LACJ, as opposed to a total of 33 licensed inpatient beds which are LPS-designated, and 15 mental health inpatient beds that are non-LPS-designated, for a total of 48 licensed in-patient beds. This leaves a deficit of approximately 124 P4 inmates at this time who require FIP beds for Defendants to reach compliance with Provision 64.[9]

    (b)    **Defendants' Plan to Come Into Compliance With Provision 64**

The County will be taking three primary steps over the next 28 months to reduce the sizeable gap that currently exists between the number of P4 inmates and the number of licensed FIP beds in the LACJ.

---

[9]   These roughly 124 P4 inmates who are not currently receiving FIP care are on a "FIP waitlist" designed to ensure that P4 inmates whose mental health issues are most acute receive FIP care as soon as it becomes available. P4 inmates on this "FIP waitlist" are placed in HOH and evaluated by nursing every day and mental health clinicians three times per week to perform this form of triage. Notably, 52 -- or over 43% -- of the P4 inmates on the "FIP waitlist" have been designated as FIST and the State of California is obligated to house, treat, and restore them to competency, but habitually fails to do so.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

15

First, the efforts to divert P3 and P4 inmates over the next 28 months described above will have the impact of lowering the overall P4 population by some degree to narrow this gap.

Second, the County anticipates it will soon obtain the required state license to open a Psychiatric Urgent Care Unit at TTCF (the "PUC").  The PUC will allow for P4 inmates on the FIP waitlist to receive mental health care that is currently received by P4 inmates in the FIP Unit, including involuntary medication administration that, once received by P4 inmates on the FIP waitlist, stands a high probability of lowering the level of care of many P4 inmates and thus the demand for FIP beds.

Lastly, Defendants also intend to focus on diverting inmates with serious medical issues who are housed in the CTC, so their beds can be converted to inpatient mental health beds.  Currently, there are approximately 135 inmates with medical issues unrelated to their mental health who occupy beds in the CTC.  The County anticipates these individuals can be diverted from custody more easily and on a faster timetable than inmates with severe mental health conditions, and freeing up these in-patient beds, converting them to licensed inpatient mental health beds, and making them available to P4 inmates who require FIP services presents a clear and effective path to expand the number of in-patient beds to a degree to come into compliance with Provision 64 as the two other steps addressed above take effect.

Taking into account Defendants' current state of compliance with what Provision 64 requires, and the time needed to implement the steps set forth above to decrease the demand for FIP beds while simultaneously increasing the number of in-patient mental health beds in the LACJ, Defendants project a 28 month timeline to reach compliance with Provision 64, subject to the following benchmarks:

\*      By the end of quarter two of 2023, the difference between the total number of P4 inmates and those receiving inpatient care must be **120** individuals.

\*      By the end of quarter three of 2023, the difference between the total number of P4 inmates and those receiving inpatient care must be **100** individuals.

\*      By the end of quarter four of 2023, the difference between the total

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

number of P4 inmates and those receiving inpatient care must be **80** individuals.

      *     By the end of quarter one of 2024, the difference between the total number of P4 inmates and those receiving inpatient care must be **70** individuals.

      *     By the end of quarter two of 2024, the difference between the total number of P4 inmates and those receiving inpatient care must be **60** individuals.

      *     By the end of quarter three of 2024, the difference between the total number of P4 inmates and those receiving inpatient care must be **40** individuals.

      *     By the end of quarter four of 2024, the difference between the total number of P4 inmates and those receiving inpatient care must be **20** individuals.

      *     By the end of quarter one of 2025, the difference between the total number of P4 inmates and those receiving inpatient care must be **10** individuals.

      *     By the end of quarter two of 2025, the difference between the total number of P4 inmates and those receiving inpatient care must be no greater than **five** individuals, and none of those individuals should wait longer than 24 hours for inpatient placement.

As with the benchmarks and timeline Defendants have offered for Provision 63, this timeline is aggressive, but realistic, as lowering the population of the most seriously mentally ill in the jails will take both care and time, as will responsibly and safely diverting individuals with serious medical issues from custody to free up new beds in the CTC which can be utilized as licensed mental health beds.  And while there is certainly hope Defendants can reach compliance with Provision 64 at a faster pace by taking the combination of steps set forth above, Defendants cannot project with any suitable degree of certainty that will be the case.

      **(c)**    **The Benchmarks and Timeline the Government Has Asked This Court to Impose for Defendants to Reach Compliance With Provision 64 Are Not Realistic or Tied to Any Plan to Practically Meet Them**

As is the case with the benchmarks and timeline the government has proposed for Provision 63, the benchmarks and timeline the government has proposed for Provision 64 do not reflect the reality of where Defendants currently sit when it comes to their degree of compliance with Provision 64; nor do they coincide with any realistic plan to simultaneously lower the population of the most volatile and gravely ill group of inmates housed in the LACJ, while increasing the inventory of

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

the few licensed FIP beds Defendants have been able to maintain during the seven and one-half years this litigation has progressed.

First, the government's proposed benchmarks for Provision 64 would require Defendants to reduce the gap between the number of P4 inmates and available FIP beds from its current level of 120 to 80 in approximately six weeks. No one could reasonably believe that is possible. And even if Defendants had the legal authority to meet this benchmark by simply releasing 40 individuals from custody who would very likely die or do harm to others if they were not receiving the care they are currently being provided at the LACJ, Defendants would not take that reckless step.

Second, while, once again, Defendants hope to be able to reach compliance with Provision 64's requirements in fewer than 28 months by taking the steps outlined above, that cannot be guaranteed, and the government has offered no alternative plan Defendants could reasonably execute to reach compliance with Provision 64 on the 16-month timeline the government has suggested to this Court.

In short, it was always anticipated that coming into compliance with Provision 64 would be difficult, even at a time when the P4 population in the LACJ was a mere fraction of what it currently is. That is why Provision 64 required Defendants to formulate a five year plan to reach compliance with this provision at a time when it was unlikely anyone could have envisioned that the P4 population in the LACJ would someday regularly stand above or near 200 inmates. Given the complexity of the issues posed to reach compliance with Provision 64, it is not unreasonable to allow Defendants to execute a plan that should bring them to a level of compliance with this provision that is sustainable in only 28 months.

### 3. Provision 80

#### (a) The Challenges Posed By Provision 80 and Defendants' Current State of Compliance with Its Requirements

Provision 80 may be the most difficult provision for Defendants to meet in this case given the demands it places on Defendants to provide 10 hours of weekly

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

18

structured out-of-cell time to a greater number of P3 and P4 inmates than the
Settlement Agreement could have ever anticipated.

Provision 80 requires that Defendants provide 10 hours of unstructured "out-
of-cell" recreational time, as well as 10 hours of structured "out-of-cell"
programming, each week to every P3 and P4 inmate.  For several years, excluding
times when the pandemic severely restricted out-of-cell time for all inmates in the
LACJ, Defendants have come close to providing all P3 and P4 inmates who wished
to take advantage of having 10 hours of unstructured "out-of-cell" recreational time
that amount of time each week out of their cells.[10]  The same cannot be said of
providing P3 and P4 inmates with 10 hours of weekly "structured" out-of-cell time.
In the third quarter of 2022 -- the most recent quarter for which Defendants have
detailed data on the subject -- only 15% of the P3 and P4 inmates at TTCF were
offered 10 hours of weekly structured group programming time out of their cells.

The obstacles Defendants face in reaching compliance with Provision 80 are
formidable:  (1) Defendants only have a limited capacity to provide structured out-
of-cell group programming because there is a scarcity of group programmers in the
labor market and only a limited number of group programmers Defendants can
employ in any event given physical limitations at TTCF, such as limited office space
and even parking space; (2) attrition within the ranks of the LASD in the past few
years has led to staffing shortages in the jails that have not allowed deputies to be
available in sufficient numbers to safely provide needed security during out-of-cell
group programming sessions; (3) safety and security concerns dictate that no more
than eight HOH inmates can participate in out-of-cell group programming at one
time; and (4) most significantly, the number of P3 and P4 inmates currently housed

---

[10]   In the second quarter of 2022, for example, 84.6% of P3 and P4 inmates housed
in the TTCF were offered a minimum of 10 hours of unstructured out-of-cell time;
and that number rose to 86% in the third quarter of 2022.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

inside the LACJ makes it logistically impossible to provide the degree of weekly group programming hours required under the Settlement Agreement.

The "math" referenced by the government at the hearing held on February 13, 2023, illustrates the drastic steps Defendants must take to have any realistic opportunity to reach compliance with Provision 80's onerous requirements. Currently, CHS has staffing approval for 30 group programmers working in the LACJ who provide structured group programming four times each day, five days each week, to groups ideally consisting of eight P3 and P4 inmates.  That equates to a capacity to provide 4,800 hours of structured out-of-cell programming each week. (The "math" in this case is 30 x 4 x 5 x 8 = 4,800.)[11]  However, providing the required 10 hours of weekly structured programming to the 1,700 P3 and P4 inmates currently housed in the LACJ, would require a capacity to deliver 17,000 hours of such programming (10 x 1,700).  Accordingly, there currently exists a tremendous gap between Defendants' ability to deliver out-of-cell group programming and the demand for such group programming given the present size of the P3 and P4 population in the LACJ.

**(b)    Defendants' Plan to Come Into Compliance With Provision 80**

In order for Defendants to come into compliance with Provision 80, Defendants will have to do three things:  (1) decrease the P3 and P4 population to an even lower level through the diversion of the mentally ill out of the LACJ, and other means, than what is required to bring Defendants into compliance with Provision 63; (2) increase Defendants' capacity to provide substantially more structured out-of-cell programming time through additional permanent hires of group programmers by CHS and the use of outside entities, such as graduate school programs and

---

[11]  Defendants also contract with organizations to provide group programming activities, such as music, art, and pet therapy, but those hours are not plentiful.

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

20

contractors, who can supplement this capacity; and (3) address staffing shortages of LASD deputies and correctional officers in the LACJ that have made it difficult to safely allow groups of P3 and P4 inmates out of their cells for structured out-of-cell time when CHS group programming resources are available.

Defendants estimate that they will need to reduce the P3 and P4 inmate population in the LACJ to no more than 750 inmates, and simultaneously increase CHS' capacity to provide group programming to 7,500 hours each week, in order to reach a point where Defendants can achieve sustained compliance with Provision 80's stringent requirements.  Defendants further estimate that it will take as long as 40 months to achieve these goals, as they also address LASD's staffing issues in the jails that have hampered Defendants' ability to safely provide structured out-of-cell time to groups of P3 and P4 inmates.  To that end, Defendants offer the following benchmarks and timeline for Provision 80, along with some explanatory notes to illustrate how these benchmarks and this timeline fit within a plan to reduce the P3 and P4 population in the LACJ while simultaneously increasing Defendants' capacity to provide structured group programming beyond its current level:

     *    By the end of the second quarter of 2023, 80% of HOH individuals will be offered a minimum of 10 hours of unstructured out-of-cell time per week, and 40% a minimum of 4 hours of structured out-of-cell time per week, with at least 2 such hours consisting of group programing.  (This benchmark assumes an HOH population of 1650, and meeting this benchmark would require approximately **2,640** programming hours for the 40% of patients subject to the benchmark alone.  (1650 x 40% x 4 = 2,640)),[12]

---

[12]   While this 2,640 programming hours is less than the 4,800 programming hours CHS currently has the capacity to deliver, one must keep in mind that, under this benchmark, these 2,640 programming hours would only be provided to 40% of the HOH population, leaving 2,160 programming hours for the remaining 60% of the HOH population for whom a four hour benchmark would not be met, but who still would be offered some amount of group programming hours each week.  The fact that there is some other percentage of HOH inmates who would be offered group programming hours on top of that percentage of HOH inmates covered by each of these benchmarks is true all the way up to the point where 100% of the HOH population is offered  a full 10 hours of structured out-of-cell programmatic time.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

* By the end of the third quarter of 2023, 85% of HOH individuals will be offered a minimum of ten hours of unstructured out-of-cell time per week, and 45% a minimum of 4.5 hours of structured out-of-cell time per week with at least 2.25 hours consisting of group programming. (This benchmark assumes an HOH population of 1575, and meeting this benchmark would require approximately **3,189** programming hours for the 45% of patients subject to the benchmark alone).

* By the end of the fourth quarter of 2023, 90% of HOH inmates will be offered a minimum of ten hours of unstructured out-of-cell time per week, and 50% a minimum of 5 hours of structured out-of-cell time per week with at least 2.5 such hours consisting of group programming. (This benchmark assumes an HOH population of 1500, and meeting this benchmark would require approximately **3,750** programming hours for the 50% of patients subject to the benchmark alone.)

* By the end of the first quarter of 2024, 95% of HOH individuals will be offered a minimum of ten hours of unstructured out-of-cell time per week, and 55% a minimum of 5.5 hours of structured out-of-cell time per week with at least 2.75 such hours consisting of group programming. (This benchmark assumes an HOH population of 1425, and meeting this benchmark would require approximately **4,310** programming hours for the 55% of patients subject to the benchmark alone.)

* By the end of the second quarter of 2024, 100% of HOH individuals will be offered a minimum of ten hours of unstructured out-of-cell time per week, and 60% a minimum of 6 hours of structured out-of-cell time per week with at least 3 such hours consisting of group programming. (This benchmark assumes an HOH population of 1350, and meeting this benchmark would require approximately **4,860** programming hours for the 60% of patients subject to the benchmark alone.)

* By the end of the third quarter of 2024, 100% of HOH individuals will be offered a minimum of ten hours of unstructured out-of-cell time per week, and 65% a minimum of 6.5 hours of structured out-of-cell time per week with at least 3.25 such hours consisting of group programming. (This benchmark assumes an HOH population of 1275, and meeting this benchmark would require approximately **5,387** programming hours for the 65% of patients subject to the benchmark alone.)

* By the end of the fourth quarter of 2024, 100% of HOH individuals will be offered a minimum of ten hours of unstructured out-of-cell time per week, and 70% a minimum of 7 hours of structured out-of-cell time per week with at least 3.5 such hours consisting of group programming. (This benchmark assumes an HOH population of 1200, and meeting this benchmark would require approximately **5,880** programming hours for the 70% of patients subject to the benchmark alone.)

* By the end of the first quarter of 2025, 100% of HOH individuals will be offered a minimum of ten hours of unstructured out-of-cell time per week, and 75% a minimum of 7.5 hours of structured out-of-cell time per week with at least 3.75 such hours consisting of group programming. (This benchmark assumes an HOH population of 1125, and meeting this benchmark would require approximately **6,328** programming hours for the 75% of patients subject to the benchmark alone.)

* By the end of the second quarter of 2025, 100% of HOH individuals will be offered a minimum of ten hours of unstructured out-of-cell time per week, and 80% a minimum of 8 hours of structured out-of-cell time per week with at least 4 such hours consisting of group programming. (This benchmark assumes an HOH population of 1050, and meeting this benchmark would require approximately **6,720** programming hours for the 80% of patients subject to the benchmark alone.)

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

22

\*      By the end of the third quarter of 2025, 100% of HOH individuals will be offered a minimum of ten hours of unstructured out-of-cell time per week, and 85% a minimum of 8.5 hours of structured out-of-cell time per week with at least 4.25 such hours consisting of group programming.  (This benchmark assumes an HOH population of 975, and meeting this benchmark would require approximately **7,044** programming hours for the 85% of patients subject to the benchmark alone.)

\*      By the end of the fourth quarter of 2025, 100% of HOH individuals will be offered a minimum of ten hours of unstructured out-of-cell time per week, and 90% a minimum of 9 hours of structured out-of-cell time per week with at least 4.5 such hours consisting of group programming.  (This benchmark assumes an HOH population of 900, and meeting this benchmark would require approximately **7,290** programming hours for the 90% of patients subject to the benchmark alone.)

\*      By the end of the first quarter of 2026, 100% of HOH individuals will be offered a minimum of ten hours of unstructured out-of-cell time per week, and 95% a minimum of 9.5 of structured out-of-cell time per week with at least 4.75 such hours consisting of group programming.  (This benchmark assumes an HOH population of 825, and meeting this benchmark would require approximately **7,445** programming hours for the 95% of patients subject to the benchmark alone.)

\*      By the end of the second quarter of 2026, 100% of HOH individuals will be offered a minimum of ten hours of unstructured out-of-cell time per week, and 100% a minimum of 10 hours of structured out-of-cell per week with at least 5 such hours consisting of group programming.  (This benchmark assumes an HOH population of 750, and meeting this benchmark would require **7,500** programming hours for the 100% of patients subject to the benchmark alone.)

While these benchmarks and timeline would place Defendants in compliance with Provision 80's requirements two years after the unrealistic timeline advocated by the government, there is little chance Defendants will ever reach compliance with this provision unless it slashes the P3 and P4 population in the jails as severely as described above.  Doing so in a manner that takes into account the need to protect the public and the individual health needs of those with severe mental health conditions being diverted from custody will take time.  And increasing Defendants' capacity to provide out-of-cell group programming hours by over 50% will also not be an easy feat given the severe shortage of mental health professionals available to provide such a service not just in Los Angeles County but nationwide.

Moreover, as long as this timeline may appear, it provides for gradual and sustained improvements that will ensure P3 and P4 inmates are provided with substantially greater structured out-of-cell time than they receive today as the time

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

period covered by this timeline moves forward (i.e., by the time Defendants anticipate they will reach compliance with Provisions 63 and 64 per the timelines detailed above, at least 80% of all HOH inmates will be offered at least 8 hours of structured out-of-cell time).  Accordingly, given the complexities surrounding compliance with this particular provision, these benchmarks and timelines offered by Defendants present a reasonable roadmap to achieving sustained compliance with Provision 80 and providing markedly better mental health care to the substantial numbers of P3 and P4 inmates diverted from custody over the course of this timeline, as well as those who remain in custody and who will receive progressively more and more structured programmatic treatment.

**(c)**   **The Benchmarks and Timeline the Government Has Asked This Court to Impose for Defendants to Reach Compliance With Provision 80 Are Not Realistic or Tied to Any Plan to Practically Meet Them**

The benchmarks and timeline for Provision 80 proposed by the government, like its other proposed benchmarks and timelines, are not grounded in reality, do not account for any of the barriers to achieving compliance with Provision 80 addressed above, and are not based on any realistically achievable plan to meet these proposed benchmarks or timeline the government has offered.  Instead, like its other proposed benchmarks and timelines, what the government is advocating would set Defendants up for almost immediate failure, as the very first benchmark proposed by the government would require Defendants to have the capacity to deliver almost twice as much group programming time than what CHS can currently deliver **within six weeks**, without leaving a single minute of group programming time to the approximately 425 P3 and P4 inmates not covered by that benchmark.  (Exhibit 1 at p. 3 (where the government advocates that "by the end of the first quarter of 2023," the Defendants provide 75% of the approximately 1,700 P3 and P4 inmates in the LACJ with 7.5 hours of unstructured out-of-cell time (or the equivalent of 9,562.5 programming hours of out-of-cell time)).  As the government provides no

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

24

explanation for how Defendants could realistically meet this or any of the other
benchmarks for Provision 80 it proposes, it would not be reasonable to hold
Defendants to these benchmarks and timeline.

**B.**    <u>**DEFENDANTS PLAN TO OFFER IMPROVED MENTAL HEALTH
CARE TO INMATES WITH SERIOUS MENTAL HEALTH
CONDITIONS AS THEIR EFFORTS TO DEPOPULATE THE LACJ
OF SUCH INMATES TAKE PLACE**</u>

While the government has conceded that Defendants are not yet obligated to
provide their overall plan to reach compliance with the housing provisions of the
Settlement Agreement that are the key to reaching compliance with Provisions 63,
64, and 80,[13] Defendants will share with the Court several key components of the
holistic plan it has developed to divert those with severe mental health diagnoses
from the jails and improve conditions within the jail for those with mental health
conditions as that process unfolds pursuant to the timelines set forth above.

First, the County is actively engaged in selecting a County lead who will be in
charge of, and accountable for, Settlement Agreement compliance in this case, and it
expects to announce that person no later than February 22, 2023.  Appointing a
"czar" in this case who has access to allocated funding, has been granted key
decision-making authority, and can coordinate the steps that must be taken by
numerous different County Departments (and even different branches of County
government) is essential at this stage to bring Defendants into compliance with the
Settlement Agreement's most difficult provisions.

Second, the County is committed to taking steps to provide better care for
individuals in the LACJ with mental health conditions as it takes the time needed to
build up the capacity to divert those inmates in large numbers out of the LACJ and
into non-carceral environments where they can receive better treatment.  These steps
include (1) addressing CHS' staffing deficiencies, which are certainly due to the

---

[13]   The deadline to provide the government with such a plan is May 17, 2023.

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

acute nationwide shortage of mental health professionals,[14] but are also likely due to the unacceptable amount of time it takes to onboard the precious few qualified mental health professionals willing to work in the LACJ; (2) providing the new Sheriff with greater resources in the LACJ, including more personnel; (3) continuing to expand CHS' treatment capacities at PDC-North, which will become a facility almost exclusively comprised of MOH inmates by mid-2023; (4) expanding the FIP-stepdown program; and (5) exploring whether PDC-East can be used as a more humane location to house inmates with mental health issues, as the County's efforts to divert those inmates to non-carceral settings unfold.

And finally, the County is committed to taking those measures necessary to halt the unsustainable flow of individuals into the LACJ, as all of the plans the County formulates to divert individuals with mental health conditions out of the LACJ will not succeed if the LACJ continues to be overwhelmed with even greater numbers of incoming inmates with severe mental health conditions.  To this end, the County has made, and will continue to make, sizeable investments in community-based mental health treatment programs designed to address individuals' mental

---

[14]   The DOJ should be familiar with this issue because this nationwide shortage of mental health professionals has impacted staffing levels in federal prisons and jails as well.  "Addressing Shortages of Mental Health Professionals in U.S. Jails and Prisons," Journal of Correctional Health Care (Aug. 4, 2022) (recognizing that "[m]any jails and prisons in the United States do not have enough mental health professionals to meet the mental health needs of the people incarcerated in these facilities," and noting that solutions like compensation incentives and flexible work schedules will not be enough to remedy these shortages) https://www.liebertpub.com/doi/full/10.1089/jchc.21.08.0072); "Treatment Denied: The Mental Health Crisis in Federal Prisons," The Marshall Project (Nov. 21, 2018) (addressing acute staffing shortages in the federal prison system and evaluating how the Bureau of Prisons responded to the demand for mental health services by simply dropping thousands who required mental health needs from its caseload) (https://www.themarshallproject.org/2018/11/21/treatment-denied-the-mental-health-crisis-in-federal-prisons).

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

health conditions before they manifest themselves in a way that entangles them in the criminal justice system; the County endorses the permanent implementation of the emergency bail schedule that was in place at the height of the pandemic and kept the LACJ population at a more manageable level; and the County will continue to explore and take advantage of additional programs which provide increased opportunities for individuals to avoid unnecessary incarceration in the LACJ through the utilization of cite-and-release practices, enhanced opportunities for pre-trial release, and increased opportunities for earlier post-sentence release dates.

### III.

### CONCLUSION

Defendants agree that setting benchmarks and deadlines in this case could be useful in helping to drive Defendants toward compliance with the Settlement Agreement's most difficult provisions.  However, in order for these benchmarks and deadlines to prove helpful and meaningful, they need to be grounded in the present realities Defendants confront in the LACJ due to the skyrocketing numbers of inmates with severe mental health conditions who have inundated the LACJ in recent years; tied to realistic plans Defendants can execute to overcome challenges the parties could not have reasonably foreseen when the Settlement Agreement was entered in 2015; and crafted in a manner that carefully takes into account the mental health needs of the inmates in the LACJ who will be impacted by the decisions made in order to reach these benchmarks and deadlines.  For each of these reasons, Defendants request that the Court set the alternative benchmarks and timelines proposed by Defendants and described above.

DATED:  February 17, 2023            KENDALL BRILL & KELLY LLP

By:   /s/ Robert E. Dugdale
Robert E. Dugdale
Attorneys for Defendants

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

27