KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division
STEVEN H. ROSENBAUM, Chief
MAURA KLUGMAN, Deputy Chief
LUIS E. SAUCEDO, Trial Attorney
MAGGIE FILLER, Trial Attorney
U.S. Department of Justice
Civil Rights Division
Special Litigation Section
    150 M. Street NE
    Washington, D.C.  20001
    Telephone: (202) 305-0053
    Email:  luis.e.saucedo@usdoj.gov | maggie.filler@usdoj.gov
JOSEPH T. MCNALLY
First Assistant United States Attorney
Attorney for the United States, Acting
Under Authority Conferred by 28 U.S.C. § 515
DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division
RICHARD M. PARK
Assistant United States Attorney
Chief, Civil Rights Section, Civil Division
MATTHEW NICKELL (Cal. Bar No. 304828)
MARGARET M. CHEN (Cal. Bar No. 288294)
Assistant United States Attorneys
    Federal Building, Suite 7516
    300 North Los Angeles Street
    Los Angeles, California 90012
    Telephone: (213) 894-8805/3148, Facsimile: (213) 894-7819
    Email: matthew.nickell@usdoj.gov | margaret.chen@usdoj.gov
Attorneys for Plaintiff
UNITED STATES OF AMERICA

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>COUNTY OF LOS ANGELES et al.,<br><br>Defendants. | Case No. 2:15-cv-5903-DDP-JEM<br><br>**PLAINTIFF UNITED STATES' RESPONSE TO DEFENDANTS' PROPOSED ALTERNATIVE TIMELINES TO COME INTO COMPLIANCE WITH PROVISIONS 63, 64, AND 80 OF THE SETTLEMENT AGREEMENT**<br><br>[Proposed Order]<br><br>Hon. Dean D. Pregerson |

Despite the Court's admonition at the February 13, 2023, hearing to "be aggressive" in breaking through barriers to meet the mental health needs of individuals in their care, Defendants have made no attempt to reduce their delay in bringing provisions 63, 64, and 80 of the settlement agreement into substantial compliance in their submission of alternative deadlines. *See* ECF 237. Instead, having previously asserted that they are "starting from zero," Defendants submit the same deadlines offered to the United States on February 9, 2023. In doing so, Defendants insist that they be granted three more years to ensure that incarcerated individuals receive timely access to adequate mental health housing and out-of-cell time. But Defendants are not starting from zero: Defendants entered the settlement agreement in 2015 and have talked about reducing the mental health population at the Jails since at least November 2021. *See* Joint Status Rep. on Unresolved Disagreements Regarding Implementation Plans, ECF No. 190, at 6. Although Defendants have developed short-term plans and have started to take some initial steps to implement them, it is time for Defendants to execute and ensure that incarcerated individuals receive proper mental health care.

That there is a mental health crisis in the Jails is undisputed: Suicides are spiking, hundreds of individuals wait weeks for mental health housing, and only a fraction of the nearly 200 individuals who require psychiatric inpatient care at any given time can access it. Those who require high-observation mental health housing (HOH) wait weeks in near-total isolation to move to such specialized housing. Should they eventually arrive at HOH, these individuals receive virtually no out-of-cell time, either for recreation or treatment. Under these conditions, individuals decompensate, strip naked, smear feces, and physically hurt themselves.

Defendants' proposed deadlines—which are one to two years *beyond* the deadlines requested by the United States—must be rejected. To ensure that Defendants move swiftly to address the mental health care crisis in the Jails, this Court should grant the United States' motion and enter the earlier deadlines and interim benchmarks in its proposed order. These deadlines provide a realistic proposal for jumpstarting

Defendants' efforts to bring provisions 63, 64, and 80 into substantial compliance within the next sixteen months.

**I.    Defendants Should Be Ordered to Bring Provisions 63, 64, and 80 into Substantial Compliance by June 30, 2024.**

Because Defendants have made no attempt to tighten their alternative deadlines on their own following the February 13th hearing, the Court should order Defendants to accelerate their compliance efforts. The well-being of thousands of individuals with mental illness now in the Jails and thousands more who will cycle through them in the coming years depends on Defendants' substantial compliance with the settlement agreement.

At any given time, well over 100 of the most gravely ill individuals with a P4 designation wait for one of the Jails' 48 inpatient beds. The next most in-need individuals, those with a P3 level of care, typically wait weeks in jail intake areas—currently an average of 17 days according to Defendants, *see* ECF No. 237 at 13—before they secure an HOH bed. And even when P3 individuals receive a permanent mental health bed, they still languish in isolation most of the time because the Jails fail to provide adequate out-of-cell time. *See* Monitor's Corrected 12th Rep., ECF No. 174-1, at 13–14 (noting that, when individuals in HOH do leave their cells, they are handcuffed to tables and rarely participate in structured programming).

No good reason exists for Defendants' refusal to bring provisions 63, 64, and 80 into substantial compliance by June 30, 2024. Defendants claim they cannot reach substantial compliance unless they use diversion to reduce the population of P3 and P4 individuals by 650, and that this will take two-and-a-half years. But nowhere do they break down why they need this much time, especially given that short-term measures to improve compliance with these provisions are already underway. In fact, since at least August 2022, Defendants were supposed to have begun implementing short-term measures to improve compliance for provisions 63, 64, and 80, which were agreed to by Defendants as part of their first-phase plans for these provisions. *See* ECF No. 234 at 2–

2

4; ECF No. 237 at 3–4.

By confronting bureaucratic barriers, centralizing decision-making, and following through with short-term solutions, Defendants should be able to achieve substantial compliance within 16 months. For instance, the pace at which diversion beds are added in the community is within Defendants' control. Similarly, Defendants control County hiring practices and can provide competitive compensation to hire, retain, and promote qualified mental health staff, engage more health care contractors in lieu of full-time County employees, and shortcut the County's extremely slow hiring processes specifically for mental health hires to provide sufficient group programming under provision 80. Defendants should also be able to bring the number of P4 individuals awaiting an inpatient bed down from 120 to 80 by the end of March 2023, particularly after the new psychiatric urgent care unit becomes operational.[1]

In contrast to the United States' proposal, which recognizes the urgency of the mental health care crisis in the Jails, significant mental health needs will go unmet for years under Defendants' proposed timeline:

Provision 63: Under Defendants' alternative benchmark scheme, by the end of 2023, 40% of all P3 individuals would still be waiting for mental health beds after seven days, and nearly a third would still be waiting for such beds by June 2024. ECF No. 237 at 11. Meanwhile, these individuals would continue to languish in isolation in intake areas where they receive virtually no out-of-cell time or group programming and are at greater risk of self-harm.

Provision 64: Defendants' alternative scheme would allow the number of individuals waiting for inpatient care to remain roughly where it is now—between 100

---

[1] Defendants have stated that the psychiatric urgent care will be able to provide emergency involuntary medications for those who need them. Provided that Defendants can do so with appropriate due process protections, in compliance with applicable laws, and in a manner that prevents escalating crises, this unit should reduce some of the demand for inpatient beds.

and 120 individuals at any time—until the end of September 2023, not reaching 80 until the end of 2023. *Id.* at 16–17. Even by the middle of 2024, nearly a year and a half from now, that number would remain at 60 individuals, meaning the number of inpatient beds would still be under half what is necessary. *Id.* at 17. These are individuals who present the most acute danger to themselves or others and who have the most severe mental health disabilities. Without an inpatient bed, many of these individuals cannot receive the emergency involuntary medications that are often critical to ending their mental health crises.

Provision 80: Defendants' timeline and benchmarks for this provision are so elongated that individuals with mental illness would not receive adequate structured out-of-cell time for *years*. For example, under Defendants' proposal, by the end of 2023, only 50% of P3 individuals would receive five hours of structured out-of-cell time including treatment. And by the end of 2024, almost two years from now, only 70% of P3 individuals would receive seven hours of structured time. *Id.* at 22. This is too long for so many high-need individuals to wait for a fraction of the structured treatment they require.[2]

Given the time that has passed since Defendants agreed to remedy the lack of specialized mental health housing and out-of-cell time at the Jails, Defendants must act with urgency to accelerate reforms. Sixteen months is more than enough time for Defendants to identify and implement solutions to bring the settlement into compliance and provide adequate care for individuals with mental health needs in their custody and care. To allow the deadlines to slip back another year or even two years is unacceptable.

**II.    The United States' Proposed Interim Benchmarks for Provisions 63, 64, and 80 Should Be Entered as an Order.**

Contrary to Defendants' assertions, the benchmarks that the United States seeks

---

[2] In addition, Defendants' math overstates the challenge, incorrectly assuming that all structured out-of-cell hours must be for mental health groups even though the parties previously agreed that only half those hours must be for that purpose.

4

are achievable, even if the first ones are just six weeks away.[3] For provision 64, Defendants should be able to bring the number of P4 individuals awaiting an inpatient bed down from 120 to 80 by the end of March 2023, particularly after the new psychiatric urgent care unit becomes operational.[4] For provision 63, Defendants' posted results in the third quarter of 2022 for Century Regional Detention Facility (CRDF), the women's jail (57% cleared through intake areas in seven days or less), were just a few percentage points from those that the United States' first benchmark requires (65% compliance) by March 31, 2023. And while the posted results for Twin Towers Correctional Facility (TTCF) in that quarter were lower, Defendants had posted a 57% compliance rating for TTCF in the second quarter of 2022, demonstrating that 65% compliance by March 31, 2023 is within striking reach.[5] For provision 80, Defendants should be able to obtain the staff needed to meet the first modest benchmark the United States proposed: 75% of individuals in HOH receiving 7.5 hours of structured time by March 31, 2023, with at least 3.75 hours for group programs.[6] And once they have reached these initial benchmarks, Defendants should be able to meet the modest quarterly compliance improvements that subsequent benchmarks require. Indeed,

---

[3] Defendants repeatedly point to the proximity of this initial deadline in its February 17th filing. *See* ECF No. 237 at 13, 18, 24. But Defendants have been aware of it at least since November 10, 2022, when the United States filed its motion with the proposed benchmarks.

[4] Defendants are required to take all steps necessary to obtain licensure to begin operating 20 beds in the psychiatric urgent care no later than February 28, 2023. ECF No. 234 at 2.

[5] The first benchmark is more forgiving than the compliance measure, as it sets nine days rather than seven as the outer limit. Defendants omit this fact, which should make the benchmark easier to reach.

[6] Defendants have posted results that reach or are close to reaching required thresholds for unstructured time. Putting aside the United States' concerns about the accuracy of such data, the parties both acknowledge that structured time, including for group treatment, is the harder requirement from provision 80 to satisfy.

Defendants adopt the United States' proposed rate of incremental improvement each quarter in their alternative deadlines. *See* ECF No. 237 at 11, 16–17, 21–23.

**III.   Conclusion**

After years of opportunity to develop plans to come into compliance with provisions 63, 64, and 80, Defendants cannot be allowed to evade their constitutional obligations to individuals with mental illness any further. The lives and well-being of thousands are at stake. Accordingly, the United States asks this Court to enter an order (1) requiring Defendants to bring provisions 63, 64, and 80 into substantial compliance by June 30, 2024, and (2) requiring Defendants to satisfy the benchmarks for those provisions set forth in the United States' November 10, 2022 motion.

Respectfully submitted,

Dated: February 27, 2022

FOR THE UNITED STATES:

JOSEPH T. MCNALLY
First Assistant United States Attorney
Attorney for the United States, Acting
Under Authority Conferred by 28 U.S.C.
§ 515

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

DAVID M. HARRIS
Assistant United States Attorney
Chief, Civil Division

STEVEN H. ROSENBAUM
Chief, Special Litigation Section
Civil Rights Division

RICHARD M. PARK
Assistant United States Attorney
Chief, Civil Rights Section, Civil Division

MAURA KLUGMAN
Deputy Chief, Special Litigation Section
Civil Rights Division

/s/ Matthew Nickell
MATTHEW NICKELL
Assistant United States Attorney
Civil Rights Section, Civil Division

/s/ Luis E. Saucedo
LUIS E. SAUCEDO
Trial Attorney, Special Litigation Section
Civil Rights Division

/s/ Margaret M. Chen
MARGARET M. CHEN
Assistant United States Attorney
Civil Rights Section, Civil Division

MAGGIE FILLER
Trial Attorney, Special Litigation Section
Civil Rights Division

*Attorneys for the United States of America*

6