OFFICE OF COUNTY COUNSEL
Dawyn Harrison (173855)
Interim County Counsel
  dharrison@counsel.lacounty.gov
Dylan Ford (228699)
Deputy County Counsel
  dford@counsel.lacounty.gov
500 West Temple St., Floor 6
Los Angeles, California 90012
Telephone:   (213) 974-1807
Facsimile:    (213) 687-8822

KENDALL BRILL & KELLY LLP
Robert E. Dugdale (167258)
  rdugdale@kbkfirm.com
Katelyn A. Kuwata (319370)
  kkuwata@kbkfirm.com
10100 Santa Monica Boulevard, Suite 1725
Los Angeles, California 90067-4013
Telephone: (310) 272-7904
Facsimile: (310) 286-0727

Attorneys for Defendants
County of Los Angeles and Los Angeles
County Sheriff Robert Luna, in his
Official Capacity

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> COUNTY OF LOS ANGELES, et al., <br><br> Defendants. | Case No. 2:15-cv-5903-DDP-JEM <br><br> **DEFENDANTS' REPLY TO THE GOVERNMENT'S RESPONSE TO DEFENDANTS' ALTERNATIVE TIMELINES TO COME INTO COMPLIANCE WITH PROVISIONS 63, 64, AND 80 OF THE SETTLEMENT AGREEMENT** <br><br> Courtroom 9C <br> Honorable Dean D. Pregerson <br> No Hearing Date Set |

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

# **TABLE OF CONTENTS**

Page

I. INTRODUCTION ........................................................................................... 1

II. ARGUMENT ................................................................................................. 4

    A.    DEFENDANTS' ALTERNATIVE COMPLIANCE TIMELINES PRESENT AN AGGRESSIVE, BUT REALISTIC PROJECTION OF THE AMOUNT OF TIME IT WILL TAKE FOR DEFENDANTS TO REACH COMPLIANCE WITH PROVISIONS 63, 64, AND 80, WHILE THE GOVERNMENT'S PROPOSED TIMELINES DO NOT ..................... 4

    B.    ALLOWING DEFENDANTS TO EXECUTE THEIR PLAN TO DEPOPULATE THE LACJ OF INDIVIDUALS WITH SEVERE MENTAL HEALTH CONDITIONS UNDER ITS PROPOSED TIMELINES PROVIDES THE BEST CHANCE FOR GOOD OUTCOMES IN THIS CASE .......................................... 11

III. CONCLUSION ............................................................................................ 13

Kendall Brill
& Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

i

# I.

# **INTRODUCTION**

Contrary to what the government asserts, the County of Los Angeles (the "County") and the Los Angeles County Sheriff's Department (the "LASD") (collectively, "Defendants") fully recognize the need to urgently confront the current mental health crisis in the Los Angeles County Jails (the "LACJ")—a crisis spurred by decades of relative indifference from a wide cast of characters, including the federal government, regarding the plight of individuals with severe mental health conditions that has turned the LACJ into the world's largest mental health institution by default. To address this crisis, Defendants have begun executing a plan to depopulate the LACJ from the current staggering level of individuals with serious mental health conditions to levels that have not been seen in many years in order to allow for the treatment of those who remain in custody consistent with what Provisions 63, 64, and 80 of the settlement agreement require. Executing this plan in a manner that properly accounts for the well-being of the inmates who are subject to this plan, and that does not compromise public safety, will take time. The alternative compliance benchmarks and timelines Defendants propose recognize that fact and represent an aggressive, but realistic, path for Defendants to come into compliance with the settlement agreement's provisions as Defendants maneuver the complexities of building up a vast inventory of non-carceral settings where inmates with a wide range of severe mental health conditions can receive treatment and the process that will need to be navigated in many hundreds of individual court cases to remove individuals from custody into such settings.

In contrast to Defendants' proposed benchmarks and timelines and how they are tied to a specific plan to gradually and safely depopulate the LACJ of those with severe mental health conditions, the government's proposed benchmarks and timelines are not tied to any plan Defendants could realistically execute to meet those benchmarks and timelines or, for that matter, even the suggestion of a plan

that Defendants could execute to reach the government's proposed deadlines. Furthermore, the government's advocacy in favor of its proposed benchmarks and timelines vacillates between overstating and understating where Defendants stand in reaching compliance with the various settlement agreement provisions at issue;[1] incorrectly claims that reaching compliance in this case is a matter purely within Defendants' control, when, in fact, numerous outside factors over which Defendants do not have full control have led to the current crisis in the jails and must be overcome;[2] and drastically misunderstands the complexity of executing a plan to

---

[1] For instance, at one point in its brief, the government falsely claims that P3 and P4 inmates in High Observation Housing ("HOH") receive "virtually no out-of-cell time, either for recreation or treatment" (Gov't Br. at p. 1), but four pages later, the government conversely claims that Defendants should be able to reach its proposed Provision 80 benchmarks because Defendants "have posted results that reach or are close to reaching required thresholds for unstructured [recreational] time" (while ignoring that Defendants are currently far from reaching the very first benchmark the government unrealistically proposed for March 31, 2023 for structured out-of-cell time).  (*Id.* at p. 5).

[2] In fact, the difficulty Defendants face in finding lasting solutions to the crisis at issue is substantially compounded by factors Defendants have very limited power to control.  Indeed, the thrust of the problem Defendants confront in this case—the inundation of unprecedented numbers of individuals with mental health conditions into the LACJ—is the consequence of decisions made by a host of individuals and entities other than Defendants, from the individuals who engage in criminal behavior that lands them in custody; to officers from the many different law enforcement agencies apart from the LASD who rely on the LACJ to hold those who they arrest in custody; to prosecutors who are now charging individuals with mental health conditions with crimes in greater numbers than ever; to state court judges who have been remanding indigent individuals with mental health conditions as a matter of course since the COVID-inspired emergency bail schedule was vacated on July 1, 2022; to the state Department of Mental Health, which for years has failed to fulfill its legal obligation to take individuals declared incompetent to stand trial into its custody so they can be restored to competency, illegally leaving hundreds of some of the sickest inmates the LACJ must treat in Defendants' care for prolonged periods of time as their court cases sit in limbo.  While Defendants are attempting to utilize the levers at their disposal to influence these decisionmakers in

divert many hundreds of individuals with serious mental health conditions out of the LACJ. In short, the government's proposed benchmarks and timelines do nothing more than set Defendants up for failure, and they will not accomplish faster compliance by Defendants, even if ordered, because there is no realistic way for Defendants to meet the benchmarks and timelines proposed by the government in a manner that safeguards the well-being of the very people the government wants to protect and that does not pose an unacceptable risk to public safety.

Furthermore, consistent with the government's and the Court's wishes for Defendants to take those steps necessary to reach compliance in this case as quickly as possible, Defendants' plan to depopulate the LACJ and place many hundreds of individuals with severe mental illnesses in non-carceral facilities represents the fastest path Defendants can take to comply with Provision 63, 64, and 80 under the timelines Defendants have offered. Addressing the current mental health crisis besetting the LACJ by constructing a new jail facility, for example, would add years onto this timeline, and would only provide a solution until that new facility is similarly stuffed with inmates with severe mental health conditions. Moreover, Defendants' plan also presents a better path than other alternatives that could be pursued, as this plan, once executed, will create a network of community-based mental health treatment facilities that see low rates of recidivism among their participants and that provide better mental health treatment, in a more therapeutic setting and at a lower cost, than the treatment that can be provided to people with severe mental health conditions housed in any LACJ facility. Accordingly, while the timeline to reach compliance with Provisions 63, 64, and 80 advocated by Defendants may stretch longer than the timeline offered by the government, the illusory and fleeting satisfaction of having short, but wholly unrealistic, timelines in

---

ways to abate the current crisis in the LACJ, it is an undeniable truth that the sources of the principal problems in this case are outside Defendants' control.

3

place in this case is the only benefit the government's proposed timelines will bring, as opposed to the real benefits Defendants can deliver if provided with the time necessary to implement their plan and provide long-term solutions to the problems in this case, which themselves, have been many years, if not decades, in the making.

## II.

## ARGUMENT

### A. DEFENDANTS' ALTERNATIVE COMPLIANCE TIMELINES PRESENT AN AGGRESSIVE, BUT REALISTIC PROJECTION OF THE AMOUNT OF TIME IT WILL TAKE FOR DEFENDANTS TO REACH COMPLIANCE WITH PROVISIONS 63, 64, AND 80, WHILE THE GOVERNMENT'S PROPOSED TIMELINES DO NOT

As Monitor Nicholas Mitchell has correctly noted, the fundamental problem confronting Defendants in this case is one of supply and demand: over the past several years the demand for mental health housing and services for inmates in the LACJ with acute mental health conditions has far exceeded the availability of such housing and services in the LACJ. This imbalance has tilted to particularly unsustainable levels in the past year. Indeed, between January 2022 and January 2023 alone, the number of inmates in the LACJ requiring HOH services skyrocketed from approximately 1,200 to approximately 1,750, outpacing, in many cases, the effectiveness of the corrective actions Defendants have been taking during this time period to deliver better mental health care to HOH inmates in the LACJ.

Unless the population of P3 and P4 inmates in the LACJ who require HOH services drastically shrinks to correct the imbalance Monitor Mitchell has identified, Defendants cannot reach compliance with Provision 63, 64, or 80, as (1) there is not enough permanent HOH housing that exists in the LACJ to reasonably accommodate more than approximately 1,050 P3 and P4 inmates;[3] (2) in the past few years there have often been more than four to five times the number of P4

---

[3] This results in non-compliance with Provision 63.

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

4

inmates in custody than the number of licensed forensic in-patient beds required to treat them;[4] and (3) given the number of P3 and P4 inmates in custody at the LACJ, Defendants' current capacity to provide group programming for HOH inmates is less than 1/3 what is required under the settlement agreement.[5]

As discussed in its February 17th filing, Defendants intend to bridge the gap in the demand for housing and services required under Provisions 63, 64, and 80 and what Defendants can reasonably provide in terms of such housing and services, by aggressively diverting P3 and P4 inmates from custody at a rate that will bring the HOH population in the LACJ down from 1,750 to approximately 1,050 by June 30, 2025 (to move toward and ultimately reach compliance with Provisions 63 and 64), and down to no more than 750 P3 and P4 inmates by June 30, 2026.  To achieve this plan, the County plans to add the following types of beds that the County Department of Health Services ("DHS") (operating through its Office of Diversion and Reentry ("ODR"))  and Department of Mental Health ("DMH") will primarily use to divert P3 and P4 inmates over the next five years:

---

[4]   This causes non-compliance with Provision 64.

[5]   This causes non-compliance with Provision 80.

**New Beds Added by Year: Department of Health Services/Office of Diversion & Reentry**

| P3/P4 Population | Bed Type | New Beds Added Year 1 | New Beds Added Year 2 | New Beds Added Year 3 | New Beds Added Year 4 | New Beds Added Year 5 |
|---|---|---|---|---|---|---|
| P3/P4 Inmates Who Are Divertible | Acute | 20 | 0 | 0 | 0 | 0 |
| | Subacute | 50 | 0 | 0 | 0 | 0 |
| | Specialty Interim Housing | 233 | 0 | 0 | 0 | 0 |
| | Permanent Supportive Housing ("PSH") | 0 | 140 | 140 | 105 | 79 |
| P3/P4 Inmates Who Are FIST | Acute | 10 | 15 | 5 | 0 | TBD |
| | Subacute | 50 | 50 | 0 | 0 | TBD |
| | Specialty Interim Housing | 210 | 150 | 164 | 105 | TBD |

**New Beds Added by Year: Department of Mental Health**

| P3/P4 Population | Bed Type | New Beds Added Year 1 | New Beds Added Year 2 | New Beds Added Year 3 | New Beds Added Year 4 | New Beds Added Year 5 |
|---|---|---|---|---|---|---|
| P3/P4 Inmates Who Are Conserved/ Conservable | Acute | 15 | 20 | 15 | 0 | 0 |
| | Subacute | 32 | 16 | 16 | 128 | 16 |
| | Enriched Residential Services | 15 | 30 | 35 | 35 | 35 |
| | Skilled Nursing Facility | 10 | 0 | 0 | 0 | 0 |

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

| P3/P4 Inmates Who Are Non-divertible / non-FIST / non-LPS conserved/ conservable | Acute | 0 | 0 | 0 | 0 | 0 |
| --- | --- | --- | --- | --- | --- | --- |
| | Subacute | 0 | 16 | 16 | 0 | 16 |
| | Skilled Nursing Facility | 0 | 10 | 10 | 10 | 4 |

In its brief, the government fairly asks why it will take as long as Defendants' alternative compliance timelines provide to come into compliance with Provisions 63, 64, and 80 through Defendants' depopulation efforts. (Gov't Br. at p. 3). The answer is that creating the new infrastructure of non-carceral beds identified in the tables above and filling those new beds with P3 and P4 inmates who are diverted from the LACJ are both time-consuming processes and, contrary to what the government appears to believe, the pace at which Defendants can safely divert various kinds of P3 and P4 inmates from custody and into the various types of beds noted above is not completely "within Defendants' control," but rather subject to the decisions and actions of third parties, such as the outside providers who contract to provide housing and services to ODR clients and the courts who decide if and when an inmate is an appropriate candidate for diversion. (*Id.*).

For instance, the process of identifying and contracting with the operators of new non-carceral sites that can provide housing and mental health services to P3 and P4 inmates Defendants are seeking to divert—the "specialty interim housing" noted in the tables above—is a process that can take anywhere from **12 to 20 weeks**. The numerous and necessary steps involved in this process to ensure these contracted facilities can properly attend to the mental health needs of inmates with acuity issues as severe as those P3 and P4 inmates present involves, among other things: (1) ODR drafting a solicitation with DHS seeking outside providers capable and willing to provide the requested housing and services; (2) County Counsel reviewing and approving the solicitation; (3) the County releasing the solicitation so provider organizations can apply to provide the requested housing and services;

(4) ODR evaluating those organizations which respond to the solicitation to ensure they can capably and safely provide the requested housing and services; (5) executing a work order between the County and the provider memorializing the provision of the necessary housing and services once the provider is selected; (6) identifying the site where the provider will provide the contracted housing and services; (7) making necessary tenant improvements at the site where the contracted housing services will take place; (8) negotiating a budget between ODR and the provider, including a staffing plan that is appropriate to the needs of the individuals being diverted to the provider from custody; (9) having the provider identify and hire the staff needed to serve its facility; and (10) opening the site once it is ready to receive clients.[6]

The process of diverting an individual from the LACJ and into these outside service providers as they become operational is also time-consuming, but necessarily so in order to make sure it is safe to place these individuals in a non-carceral setting. Specifically, diverting an individual who is in custody into an ODR program involves at least the following steps, which typically take between **4 and 12 weeks** to complete: (1) the individual's attorney submits a referral for ODR services via an electronic portal (except in cases involving FIST and MIST inmates, where the referral is generated by ODR itself); (2) ODR performs a clinical-legal

---

[6] As the tables included above indicate, Defendants' plan calls for DMH and DHS to establish a broad continuum of beds to which P3 and P4 inmates of all types can be safely diverted. These will include beds in secured (i.e. locked) and non-secured (i.e. unlocked) facilities. The timeline set forth above to set up beds in an ODR-contracted facility is the timeline involved when setting up non-secured, community-based facilities to which P3 and P4 inmates can be diverted. Secured beds which provide acute and subacute care are currently in extremely short supply in the County. Indeed, there currently are only approximately 50 such beds, located at a single facility in the County, to which inmates with acute mental health conditions can be diverted from custody. Building out such beds will take a considerably longer period of time than the 12 to 20 week timeline set forth above.

assessment of that referral to ensure the individual meets ODR's targeted population for the services it provides (i.e., the person is unhoused and has a serious mental disorder); (3) if ODR determines the individual is a suitable candidate for diversion, it submits a conditional release request affidavit to the court advocating for the individual's diversion from custody and into ODR-contracted housing; (4) if the court accepts ODR's conditional release request affidavit, it sets a suitability hearing, typically within two to eight weeks, to determine if the individual should be diverted; (5) ODR conducts further assessments to prepare for the suitability hearing, including assessing whether the individual requires transitional ODR psychiatric care for purposes of getting the individual through the hearing and stabilizing the individual so he or she can successfully transition to a non-carceral setting; (6) the suitability hearing takes place and the court determines whether the individual should be diverted from custody; (7) if the individual is found suitable for diversion by a judge, the conditional release process begins; (8) additional psychiatric and nursing care is provided to the individual while he or she is still in custody, as needed, to improve the probability of a successful transition to the ODR program; (9) ODR coordinates the medications the individual will need upon release, assists in scheduling and helping the individual meet appointments he or she might have, and handles any other clinical hand-off issues relevant to the individual's circumstances; and (10) the individual's release is scheduled with the LASD and the contracted ODR provider picks up the individual at the LACJ and brings the individual to his or her new home.[7]

---

[7] Defendants are looking for ways to shorten this 4 to 12 week timeline by, among other things, establishing a process in which ODR targets those inmates for whom it wishes to advocate for diversion, rather than vetting candidates for diversion proposed by others. Still, since the timeline to divert an inmate from custody is largely court-driven, how quickly individuals can be diverted into an ODR-contracted facility is largely subject to court calendars and other factors outside Defendants' control.

These processes take time, but they are in place to ensure the welfare of the individuals being diverted from custody and, to the greatest extent possible, that individuals who are diverted do not pose a threat to the community. And while the fastest way for Defendants to responsibly come into compliance with the settlement agreement's most demanding provisions is for them to engage in the unprecedented efforts they are taking to divert individuals with serious mental health conditions out of the LACJ and into non-carceral settings where they can obtain materially better treatment, executing this plan will not be as simple as what the government imagines nor, as shown above, a process that is within Defendants' sole control. Among other things, the execution of this plan will involve (1) standing up many hundreds of new beds outside of the LACJ each year, including certain types of beds which are currently in very rare supply (i.e., beds in locked facilities which provide acute and subacute mental health treatment); (2) contracting with dozens of different third party providers who can render the particular types of services acutely mentally ill individuals require; (3) convincing judges in many hundreds of cases calendared each year to permit the diversion of individuals from custody into settings where the threat they may pose to the public can be mitigated but not eliminated; and (4) overcoming legal barriers—such as the federal IMD exclusion—which will make the wide-scale diversion of sizeable numbers of individuals with mental health conditions planned by the County even more challenging. While Defendants will aggressively take all steps within its control to drastically slash the number of P3 and P4 inmates in the LACJ as fast as it can responsibly do so, it is unrealistic to believe Defendants can accomplish the diversion of more than 1,500 P3 and P4 inmates—the minimum number that will need to be diverted before Defendants can reach compliance with Provision 63, 64, and 80—on the arbitrary timelines imagined by the government; and ordering the timelines and benchmarks requested by the government will accomplish nothing but setting Defendants up for

certain and near immediate failure.[8]

## B. ALLOWING DEFENDANTS TO EXECUTE THEIR PLAN TO DEPOPULATE THE LACJ OF INDIVIDUALS WITH SEVERE MENTAL HEALTH CONDITIONS UNDER ITS PROPOSED TIMELINES PROVIDES THE BEST CHANCE FOR GOOD OUTCOMES IN THIS CASE

Providing Defendants with the time necessary to safely divert such a sizeable number of P3 and P4 inmates from the LACJ that Defendants can reach compliance with Provision 63, 64, and 80 also has the virtue of providing the fastest way for Defendants to reach compliance with all of the settlement agreement's provisions and promises the best outcomes that can be achieved in this case.

First, while it is Defendants' burden, and not the government's burden, to navigate a path to reach compliance in this case, the government has offered no evidence how Defendants could achieve compliance with Provisions 63, 64, and 80 more quickly than under the timelines Defendants have proposed. Indeed, even alternative plans Defendants have considered in the past to reach compliance with the settlement agreement's provisions—such as building a new jail better equipped

---

[8] For instance, by means of example only, the government's insistence that the Court order Defendants to close the gap between the number of P4 inmates and the number of licensed FIP beds from its current level of roughly 120 P4 inmates to 80 P4 inmates within the next 25 days is not based on any lawful or reasonable actions Defendants could take to meet that benchmark. And while the opening of the Psychiatric Urgent Care Unit (the "PUC") planned by Defendants is anticipated to have a positive impact on reducing the number of P4 inmates waiting for licensed FIP beds, as the government well knows, Defendants are currently waiting for the state Department of Mental Health to grant a license for Defendants to operate that facility after Defendants completed all of the steps within its control to receive that license at the end of last month. Defendants now expect that whenever the PUC is initially licensed, which is in the hands of state officials, it will be for 18 beds. Accordingly, the government's speculation that the opening of the PUC should allow Defendants to magically shed 40 of the LACJ's sickest inmates from the FIP waitlist within a matter of weeks is not based on the current realities in this case.

to serve inmates with mental health conditions—would take longer at this point to implement than the efforts to reach compliance with the settlement agreement by depopulating the LACJ of P3 and P4 inmates in the manner described above.

Second, the plan Defendants have formulated to slice the population of P3 and P4 inmates in the LACJ by almost 60% over roughly the next three years will provide the best outcomes for the very inmates this plan is designed to help. Those P3 and P4 inmates who are diverted from custody will be placed in more appropriate settings where they can receive better and more focused mental health treatment; and even those P3 and P4 inmates who remain in custody because they cannot be safely diverted from the LACJ will benefit from the diversion of massive numbers of other P3 and P4 inmates because that will avail them of the better treatment that can be provided to a smaller cadre of inmates at the LACJ with serious mental health conditions.

Finally, Defendants' plan to depopulate the LACJ promises better outcomes for society as well, as the ODR programs the County will largely depend upon to divert P3 and P4 inmates from custody have a proven track record of drastically decreasing recidivism rates amongst the clients they serve. Indeed, according a recent RAND study of inmates with serious mental health conditions diverted to ODR housing programs, only 14% of the inmates who were subject to the study returned to custody within one year of participating in the ODR program. *See* https://www.rand.org/pubs/research_reports/RR3232.html.

Accordingly, while Defendants' plan to depopulate the LACJ to bring Defendants into compliance with Provisions 63, 64, and 80 may take as long as provided in Defendants' proposed alternative timelines, for the reasons set forth above, the creation of an extensive network of non-carceral beds of various types that can serve as an alternative to cells in the LACJ will deliver the fastest path to compliance available to Defendants as well as a solution to the issues in this case

that yields the best outcomes.[9]

## III.

## **CONCLUSION**

For each of the foregoing reasons, Defendants request that the Court set the alternative benchmarks and timelines offered by Defendants to reach compliance with Provisions 63, 64, and 80.

DATED: March 6, 2023                    KENDALL BRILL & KELLY LLP

By:  /s/ Robert E. Dugdale
     Robert E. Dugdale
     Attorneys for Defendants

---

[9] Moreover, as noted in Defendants' initial brief to the Court concerning its proposed alternative timelines, Defendants will address the length of time required to depopulate the LACJ, as described above, by taking a number of concrete steps aimed at improving the mental health care provided to inmates with serious mental health conditions as Defendants' depopulation strategies unfold. (*See* Defs.' Br., dated 2/17/23, at pp. 25-27).  In addition, while the diversion of inmates from the LACJ is the principle means Defendants intend to use to obtain compliance with Provisions 63, 64, and 80 of the settlement agreement, Defendants will also use whatever other tools, programs, and influence with others Defendants have to accelerate the pace at which Defendants can meet the Constitutional obligations owed to those in their custody and to stop the unsustainable flow of mentally ill inmates entering the LACJ.  (*Id.*)

Kendall Brill & Kelly LLP
10100 Santa Monica Blvd.
Suite 1725
Los Angeles, CA 90067

13