Nicholas E. Mitchell
nmitchell@independentmonitor.com

**Monitor**

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CV No. 15-05903 DDP (JEMX) |
| v. | **MONITOR'S FIFTEENTH REPORT** |
| COUNTY OF LOS ANGELES et al., | |

1    Pursuant to Paragraph 109 of the Joint Settlement Agreement Regarding Los
2 Angeles County Jails, the Monitor appointed by this Court hereby submits the
3 attached Report "describing the steps taken" by the County of Los Angeles and the
4 Los Angeles County Sheriff Department ("Department") during the six-month
5 period from July 1, 2022, through December 31, 2022, "to implement the
6 Agreement and evaluating the extent to which they have complied with this
7 Agreement."  This Report takes into consideration the advice and assistance I have
8 received from the Subject Matter Experts appointed by this Court and the comments
9 from the Parties in accordance with Paragraph 110 of the Agreement.  I am available
10 to answer any questions the Court may have regarding my Report at such times as
11 are convenient for the Court and the parties.

12

13 DATED:  July 17, 2023                Respectfully submitted,

14

15

16                                By:  */s/ Nicholas E. Mitchell*
17                                    Nicholas E. Mitchell
18                                    Monitor

19

20

21

22

23

24

25

26

27

28

## MONITOR'S FIFTEENTH REPORT

This Fifteenth Report sets forth the Monitor's assessments of the implementation of the Settlement Agreement (the "Agreement" or "DOJ Agreement") between the County of Los Angeles (the "County") and the United States Department of Justice ("DOJ") for the treatment of inmates with mental illness in the County's jail facilities by the Los Angeles Sheriff's Department (the "Department" or "LASD") and the County's Correctional Health Services ("CHS").  It also reports on the Department's compliance with the provisions of the Implementation Plan in the settlement of *Alex Rosas, et al., v. Leroy Baca,* No. CV 12-00428 DDP, that were extended under the terms of the DOJ Agreement to the facilities not covered by the *Rosas* case.[1]  This Report covers the County's reported results for the period from July 1, 2022, through December 31, 2022 (the "Fifteenth Reporting Period").

This Fifteenth Report is based upon the Monitor's review of the policies, procedures, and directives proposed and/or implemented by the Department and CHS in the Fifteenth Reporting Period, and assessments and observations of the Mental Health and Use of Force Subject Matter Experts, and mental health clinicians and auditors retained by the Monitor.  It takes into consideration the County's Self-Assessment Status Report ("Fifteenth Self-Assessment"); Correctional Health Services and Custody Compliance and Sustainability Bureau ("CCSB") Combined Semi-Annual Report on Quality Improvement and Suicide Prevention Efforts – Quarter 2 & Quarter 3 2022; the County's Augmented Self-Assessment Status Report ("Augmented Fifteenth Self-Assessment"); and results reported by the County through December 31, 2022.

In November 2022, the Monitor conducted site visits within the jails with Mental Health Subject Matter Expert Dr. Nicole Johnson and clinician Dr. Amy Eargle.  During the visits, the Monitoring Team spoke with inmates, custody staff and supervisors, and mental health staff and supervisors, and inspected mental health housing at all patient acuity levels.  This includes the recently expanded housing for MOH inmates at Pitchess Detention Center North ("PDC North") and Men's Central Jail ("MCJ").  The County and the Department cooperated fully with the Monitoring Team during these visits and throughout the Fifteenth Monitoring Period.  The Monitor thanks County personnel for their unfailing responsiveness, professionalism, and collegiality.

There are 69 provisions in the Agreement that are subject to monitoring by the Monitor and Subject Matter Experts.  As of the date of this Report, the County and the Department are in Substantial Compliance with 42 provisions, in Partial Compliance with 13 provisions, and in Non-Compliance with nine provisions.  In addition, there are five provisions where the County is in different compliance ratings at different facilities.  This

---

[1] The *Rosas* case involved allegations of excessive force in Men's Central Jail (MCJ), the Twin Towers Correctional Facility (TTCF), and the Inmate Reception Center (IRC) (collectively the "Downtown Jail Complex").  The DOJ Agreement extends provisions of the Implementation Plan to the Century Regional Detention Facility (CRDF), the North County Correctional Facility (NCCF), and the Pitchess Detention Center (PDC).

is similar to the County's averaged results for the previous five Reporting Periods.

*Figure 1:  The County's Cumulative Substantial Compliance with All Provisions by Reporting Period*



As the Monitor has highlighted in each of the last several reports, the County's progress at bringing additional Provisions into Substantial Compliance has been hampered by the growing imbalance between the *demand* for mental health treatment beds and the *supply* of such beds maintained by the County.[2]  In addition, the shortage of CHS mental health workers in the jails has also been a persistent obstacle to the County's further progress in complying with the Agreement.  Because these are threshold issues that impact many other aspects of the County's compliance, in this introduction to the Fifteenth Report, the Monitor provides updates on both.  Additionally, the Monitor shares disappointing—but preliminary—results of the County's recent efforts to execute 23 implementation plans in the jails that are intended to improve its compliance with the Agreement.

<u>Availability of HOH Housing in the LA Jails</u>

Provision 63 requires the County to maintain adequate mental health treatment

---

[2] The Monitor is using "mental health treatment beds" here to denote beds in dedicated mental health units and to distinguish them from beds in the Inmate Reception Center ("IRC") Unit 231 or other temporary housing areas.  The Monitor has elsewhere raised concerns about current conditions within those mental health units, including later in this Report.

beds for the population of High Observation Housing ("HOH") and Moderate Observation Housing ("MOH") inmates in its custody.  Since the Agreement was executed, the County has been unable to achieve compliance with Provision 63, and the Fifteenth Reporting Period is no exception.  While the County is generally able to expeditiously house MOH inmates, it has an insufficient number of HOH beds to timely house HOH patients, particularly male inmates at TTCF.  Data suggest that these delays have contributed to a troubling rise in the number of self-directed violence ("SDV") incidents among HOH inmates who are awaiting treatment beds.

By way of background, when male HOH inmates are brought into LASD custody, they are processed at the Inmate Reception Center ("IRC") where they are screened for medical and mental health issues.[3]  The screening process results in the assignment of a Mental Health Level of Care ("MHLOC") from P0 to P4 (with P4 representing patients with the most acute mental illness).  The Department maintains housing that it considers appropriate for inmates at each MHLOC, and it attempts to house patients in corresponding treatment beds.  If no such beds are available, male patients generally wait in a housing area known as "Unit 231" until appropriate beds open up.

According to County data, in 2022, the County jails housed an average of 13,807 total inmates per day.[4]  This was a slight reduction from the prior year, and a long-term drop from the population highs of the last decade, which often brought the Department's daily inmate count above seventeen thousand.  Of the total 2022 population, an average of 174 inmates were assigned MHLOCs of P4 (requiring inpatient care in a hospital setting), 1,305 were assigned P3 (high observation), and 3,278 were assigned P2 (moderate observation).  This continued multi-year trends of increasing numbers of patients with serious mental illness in the Department's custody.

The County has been unable to provide the Monitor with the number of beds it maintained for each MHLOC in 2022.  However, according to the observations of the Monitor and Subject Matter Experts, as well as anecdotal reports and other data produced by the County, the number of beds has not grown commensurate with the steadily increasing number of patients with mental illness in the Department's custody, particularly at the P3 (or "HOH") MHLOC.

This gap between the rising demand for treatment beds and the more static supply of such beds substantially delayed the housing of acutely ill patients in 2022.  For example, the County housed 58% and 42% of male HOH/MOH inmates in mental health treatment beds within 7 days in the Second and Third Quarters of 2022, respectively.  The delays were more pronounced for male HOH inmates, particularly those requiring single person housing.  According to analyses conducted by the Monitor's auditors, in the Second Quarter of 2022, the County housed only 22% of HOH inmates at TTCF who needed single-person cells in treatment beds within seven days.  That number was 19% in the Third Quarter of 2022.  That is, a full 78% and 81% of male HOH inmates who needed single-person cells waited more than seven days for treatment beds in the Second

---

[3] Female inmates are processed and screened at the Century Regional Detention Facility ("CRDF").
[4] *See* Custody Division Population Year End Review 2022 (on file with author).

and Third Quarters of 2022, respectively.  HOH inmates often waited in Unit 231.

The Monitor and Subject Matter Experts have spent time in Unit 231 on various monitoring visits and spoken with inmates, clinicians, and custody staff within it.  Based on these visits, we report that conditions in Unit 231 are poor.  HOH patients detained in Unit 231 are locked in individual cells for most of the day without regular out-of-cell time.  They do not have regular access to a recreation yard, nor phone calls, exercise, or the ability to socialize with others in a common day room.  While they may have sporadic mental health visits for triage or emergency, they do not have an assigned mental health clinician for treatment like patients in permanent mental health housing.  They receive no group programming of any kind, including none of the therapeutic group programming that is required under the Agreement.

Recent data suggest that the prolonged waits in Unit 231 have contributed to a rising number of self-directed violence ("SDV") incidents among HOH inmates.  Jail SDV can take many forms, including cutting, hanging, overdose, and jumping from dangerous areas, among others.  Between 2016 and 2020, there were an average of 16 SDV incidents in the IRC (including Unit 231) each year.  However, in 2021, during these elongated wait times, there were 77 incidents of SDV in the IRC, a 381% increase.  The vast majority of these incidents occurred in Unit 231 among HOH patients who were awaiting permanent mental health treatment beds.



Of the 77 incidents, there were multiple occurrences each of HOH inmates in Unit 231 engaging in strangulation, head banging, hanging, asphyxiation, cutting, and dangerous foreign body ingestion.

The risks of self-harm for HOH inmates are well-known.  Pursuant to CHS policy, such inmates demonstrate "significant impairment," with "persistent danger of hurting self in less acute care setting."[5]  According to Court-appointed Mental Health Subject Matter Expert, Dr. Johnson, prolonged isolation and treatment delays for HOH patients can enhance the likelihood of decompensation and the risks that they will engage in self-harm.  Moreover, the longer they remain untreated, the more difficult it may become to eventually address their mental illness.

The delays in getting HOH inmates into treatment beds represent an ongoing emergency for the County.  CHS has indicated that it has assigned additional mental health workers to Unit 231 to provide greater clinical attention while HOH patients await housing, which is commendable.  However, the County must not further delay remedying the imbalance between the demand for and supply of mental health beds, which is seriously impacting the safety of vulnerable patients in its custody.

In response to a draft of this Report, the County noted its significant recent efforts to address the "mismatch between the current population in the LACJ and the availability of MOH and HOH housing."  This includes reducing the number of people awaiting transfer to state prison, transferring an increasing number of FIST patients to the Department of State Hospitals for restoration, opening a new Jail Inpatient Unit in TTCF, opening HOH dorms in TTCF, and beginning to ramp-up the creation of community mental health treatment beds and an increase in ODR services.[6]  These are noteworthy steps but not yet sufficient to address the continuing mismatch between the existing population and the beds available to treat them that is discussed throughout this report.

Update on CHS Staffing of Mental Health Worker Positions

Many of the Agreement's provisions require the County to improve the depth and quality of the mental health treatment being provided to the patient population in the jails.  For example, the Agreement requires clinicians to, among other things, provide initial treatment planning for inmates with mental illness (Provision 30), conduct timely mental health assessments after triggering events (Provision 36), provide clinically appropriate mental health treatment (Provision 66), offer therapeutically appropriate care to prisoners in mental health housing (Provision 79), and provide documented amounts of structured therapeutic time to each patient per week (Provision 80).  Obviously, the County must have enough mental health workers on staff in order to achieve these goals.  Without the necessary staffing, the County's efforts to comply with the Agreement will not be successful.

In a staffing plan produced to the Monitor during the Fourteenth Reporting Period and discussed in the Monitor's Fourteenth Report, the County estimated the number of CHS mental health staff that it would need to achieve Compliance with the Agreement. *See* Monitor's Fourteenth Report at 60-62.  At that time, CHS had 292 authorized mental

---

[5] *See* CHS policy #175.05, Mental Health Levels of Care (on file with author).
[6] *See* letter from Dylan Ford to Nicholas E. Mitchell dated June 21, 2023 (on file with author).

health worker positions, 173 of which were actually filled (and hires in progress), representing 67.5% of the authorized total.

As of February 2023, CHS had 310 total authorized mental health worker positions with 179 filled, or just 58% of the total (34 positions had candidates who had accepted offers and were in the process of onboarding). More specifically, of 39 budgeted Clinical Psychologist II positions, only 19 were filled, just less than half. Of 43 budgeted Psychiatrist positions, only 17 were filled, or 40%. Of 127 Psych Social Worker positions, only 75 were filled, or 59%. Give the centrality of Clinical Psychologists, Psychiatrists, and Social Workers to the County's compliance with various provisions of the Agreement, it is troubling that such significant staffing gaps have persisted over eight years into the County's compliance efforts.

The County has often explained that it has struggled to recruit mental health workers to its jails and repeatedly pointed to a national shortage of such workers. *See, e.g. Joint Status Report on Unresolved Disagreements*, Dkt. 190 at 27. The Monitor believes that this is accurate insofar as it goes; qualified mental health workers are in short supply throughout the United States and many public health systems are struggling to fill open positions. Yet, the national shortage does not account for at least two factors that are within the County's control.

First, according to comparative salary data provided by CHS, certain types of mental health workers have been underpaid by the County relative to their colleagues in other regional correctional institutions. For example, the starting salary for workers in the Clinical Psychologist 1 classification in LA's jails is $81,481. According to CHS, those same candidates are offered $104,484, or 28% more, to take equivalent jobs at the California Department of Corrections and Rehabilitation ("CDCR"). Similarly, Psychiatrists are offered $230,995 to start in LA's jails but $285,948, or 24% more, at CDCR. Mental Health Clinical Supervisors start at $86,441 in LA's jails but $102,888, or 19% more, at CDCR. Perhaps unsurprisingly, CHS personnel report that their attempts to hire into open positions often fail due to these comparatively low salaries, particularly given the tight labor market for these specialized workers.

Second, according to the County, its byzantine hiring process creates delays that cause many willing applicants to withdraw even months after they have accepted job offers. For example, once a prospective jail mental health worker has accepted a County job offer, they must go through an onboarding process that apparently involves no less than six steps, each of which can take days or weeks: 1) live scan, 2) LASD clearance, 3) health physical, 4) credentialing, 5) attestation forms, and 6) intake. According to CHS personnel, it takes an average of 4-8 months for County administrative personnel to complete these processes, and many willing candidates initially accept job offers but then withdraw during the subsequent indeterminate, unpaid waiting period.[7]

---

[7] In response to a draft of this Report, the County noted its "renewed focus" on filling critical CHS vacancies, which reportedly included cutting onboarding times for new staff and making a substantial number of new hires. More data will be obtained and shared about these efforts in future Monitoring Reports.

Under Provision 47, the County is required to "ensure there are sufficient custodial, medical, and mental health staff at the Jails to fulfill the terms of this Agreement." To help effectuate that promise, the County is required to periodically provide to the Monitor and DOJ a report identifying "any barriers to implementation, such as insufficient staffing levels at the Jails, if any." The County is out of compliance with both of these parts of Provision 47. It must make immediate and purposeful efforts to identify and address the conditions that have prevented its hiring of the mental health workers that are necessary for its compliance with the Agreement, including but not limited to the two discussed above.[8]

<u>Preliminary Impacts of Implementation Plans on Compliance Results</u>

Following the Monitor's Twelfth Report, which documented the County's slowing pace of compliance with the Agreement in the years 2019 through 2021, the Court held a series of status conferences and issued an order that required the County to create detailed implementation plans for the provisions that were not yet in Substantial Compliance.[9] The Parties worked with the Monitor to develop 23 such implementation plans that the County has now begun to execute within the jails. The County also developed a spreadsheet to track its progress in executing those plans ("Tracker" or "Implementation Plan Tracker").

The Tracker lists steps (also referred to as "actions" and "sub-action items") drawn from the 23 implementation plans, and includes fields for other relevant information, such as responsible person(s), status, and completion dates. The Tracker identifies 300 total implementation steps covering activities that range from retraining staff, adjusting policies and practices, mobilizing new resources, enhancing supervision, and the like. The responsibility for executing these steps is allocated among LASD and CHS personnel.

According to the Tracker, as of April 27, 2023, the County has completed 143 of 300 steps, or approximately 48% of the total. For some provisions, the County included reasonably detailed notes about the specific actions taken, on which dates, and the reasons for any delays. The quality of the information in the Tracker varies by provision, however, and other provisions include no notes or dates. For example, of the 143 completed steps, no completion date is provided for 71 steps. The County should enrich and standardize the information contained in the Tracker in the Sixteenth Reporting

---

[8] On April 14, 2023, the County reported in a related matter that "to attract even more professionals to fill CHS' remaining vacancies, and to retain CHS' current workforce, the County has instituted 20% pay increases to mental health staff and key support staff." Moreover, it reported that it plans to onboard 83 new CHS employees by May 8, 2023. These are useful preliminary steps, though the 20% may be more accurately described as a temporary pay adjustment rather than a permanent pay increase. The County will be required to report on the specific impacts of these changes in its future self-reporting under Provision 47 and any additional steps it is taking to attract and retain the mental health workers necessary for its compliance with the Agreement. *See Rutherford v Luna*, 2-75-cv-04111, Defendants' Pre-Hearing Status Report, filed Apr. 14, 2023 (Dkt. 384) at 2.

[9] *See* Order Regarding Settlement Provisions that Will Imminently Reach Substantial Compliance and Implementation Plans, dated January 24, 2022 (Dkt. 185).

Period.

Regarding the preliminary impacts of the implementation plans, of the 23 Provisions with such plans, compliance results for the Fifteenth Reporting Period improved for six provisions, stayed the same for nine provisions, and declined for eight provisions.

*Table 1:  Changes in Results for Provisions with Implementation Plans*

| Provision(s) | Steps Completed | Total Steps | % of Steps Completed | Change in Results for the Fifteenth Reporting Period |
|---|---|---|---|---|
| 25 | 10 | 15 | 67% | No Change |
| 26 | - | 3 | 0% | Decrease |
| 31 | 2 | 3 | 67% | No Change |
| 34 | 21 | 24 | 88% | No Change |
| 36 | 13 | 22 | 59% | Increase |
| 40 | | | | No Change |
| 37 | 3 | 4 | 75% | Increase |
| 39 | 5 | 11 | 45% | Decrease |
| 42 | 2 | 7 | 29% | Increase |
| 43 | 10 | 17 | 59% | Decrease |
| 52 | 8 | 15 | 53% | Decrease |
| 53 | 4 | 7 | 57% | Decrease |
| 57 | 9 | 31 | 29% | Decrease |
| 58 | | | | Decrease |
| 63 | 2 | 9 | 22% | Increase |
| 64 | - | 4 | 0% | No Change |
| 65 | 18 | 32 | 56% | Decrease |
| 66 | 7 | 20 | 35% | Increase |
| 67 | 4 | 10 | 40% | Increase |
| 70 | 15 | 20 | 75% | No Change |
| 79 | 6 | 7 | 86% | No Change |
| 80 | 4 | 12 | 33% | No Change |
| 81 | - | 27 | 0% | No Change |
| **Total** | **143** | **300** | **48%** | |

These mixed results are disappointing but preliminary.  While the implementation plans are not yet consistently improving the County's compliance results on the specific provisions, their impacts may take time to materialize.  Further, many of the steps were completed early in the Reporting Period, thus their impacts would not yet have shown up in the County's reported data.  The Monitor will provide further updates on the effectiveness of the implementation plans in future Monitoring Reports.

Nicholas E. Mitchell, Monitor
July 17, 2023

## EXECUTIVE SUMMARY

There are 69 provisions in the Settlement Agreement that are subject to monitoring by the Monitor and Subject Matter Experts.  As of the date of this Report, the County and the Department are in Substantial Compliance with 42 provisions, in Partial Compliance with 13 provisions, and in Non-Compliance with nine provisions.  There is one provision (Paragraph 39) for which the Department is in Substantial Compliance at certain facilities, Partial Compliance at other facilities, and Not Rated at other facilities. There is one provision (Paragraph 57) for which the Department is in Substantial Compliance at certain facilities and Non-Compliance at other facilities.  There are two provisions (Paragraphs 43 and 58) for which the Department is in Substantial Compliance at certain facilities, Partial Compliance at other facilities, and Non-Compliance at other facilities.  There is one provision (Paragraph 25) for which the Department is in Partial Compliance at certain facilities and in Non-Compliance at other facilities.  There are 46 provisions for which the County and the Department are in Substantial Compliance at some or all facilities.[10]

The Monitor's determination of the County's compliance is based upon the quantitative thresholds in the Compliance Measures (and any other applicable requirements in the Compliance Measures) for achieving Substantial Compliance, unless the quality of the County's performance as determined by the qualitative assessment is plainly inadequate or the results reported by the Monitor's mental health team vary significantly from the results reported by the Department.[11]  As used herein, "Substantial Compliance" means that the County has "achieved compliance with the material components of the relevant provisions of this Agreement in accordance with the [agreed-upon Compliance Measures for assessing Substantial Compliance]," which it must maintain for twelve-consecutive months; "Partial Compliance" means that the County has achieved "compliance on some, but not all, of the material components of the relevant provision of this Agreement;" and "Non-Compliance" means that the County has not met "most or all of the material components of the relevant provisions of this Agreement."

Appendix A to this Fifteenth Report shows the status of each of the 69 provisions of the Agreement that are subject to monitoring and the twelve-month triggering dates

---

[10] Under Paragraph 111 of the Agreement, the twelve-month period for which the County is required to maintain Substantial Compliance can be determined on a facility-by-facility basis.

[11] As in prior reports, this Fifteenth Report also reflects the results of audits by the Monitor's auditors to verify results reported by the County.  The Monitor has deemed the County to be in Substantial Compliance "as of" the beginning of the quarter reported by the County if the auditors have verified that the County has met the thresholds in the Compliance Measures.  If the auditors were not able to verify the results reported by the County, the twelve-month period for maintaining Substantial Compliance will commence in a future period when the County's reported results are verified by the auditors.  If the County maintains Substantial Compliance with a provision for twelve consecutive months, pursuant to Paragraph 111 of the Agreement, the Monitor and Subject Matter Expert will "no longer. . .assess or report on that provision" in future reporting periods.  Some of the Substantial Compliance results reported by the County in the Fourteenth Reporting Period have not been audited by the Monitor's auditors and cannot be considered final until verified by the auditors.  The County will not be deemed to be in Substantial Compliance as of the County's reported date for purposes of determining the twelve-month compliance period if the results are not verified by the auditors.

where the County is deemed to be in Substantial Compliance.  Appendix B shows the
County's progress from the Initial Reporting Period through the Fifteenth Reporting
Period in achieving Substantial Compliance and in maintaining Substantial Compliance
for twelve consecutive months on provisions that are no longer subject to monitoring.

There are 38 provisions that are no longer subject to monitoring because the
County and Department maintained Substantial Compliance for twelve consecutive
months as required by Paragraph 111 of the Settlement Agreement and verified by the
Monitor's auditors as required.[12]  There are another six provisions for which some
facilities are no longer subject to monitoring because those facilities maintained
Substantial Compliance for the required twelve consecutive months.[13]

As of the date of this Report, and subject to verification by the Monitor's auditors
and qualitative assessments in some cases, the County and the Department are in
Substantial Compliance at some or all of the facilities with the following provisions of
the Settlement Agreement:

The County has achieved Substantial Compliance with Paragraph 18, which
requires the (initial) training of Deputy Sheriffs and Custody Assistants on suicide
prevention as follows: at Men's Central Jail ("MCJ") and Pitchess Detention Center
("PDC") South as of October 1, 2017; at North County Correctional Facility ("NCCF")
as of September 1, 2017; at PDC East as of December 1, 2017; at Twin Towers
Correctional Facility ("TTCF"), the Inmate Reception Center ("IRC"), and PDC North as
of April 1, 2018; and at Century Regional Detention Facility ("CRDF") as of August 1,
2018.  The County has maintained compliance with the refresher training requirements
under Provision 81 Rosas 4.6(b) as of December 2021.  The County was unable to
maintain compliance under Provision 81 Rosas 4.7(b) as of December 2021.

The County has achieved Substantial Compliance at NCCF, MCJ, and IRC as of
April 1, 2018; at TTCF as of July 1, 2018; at CRDF, PDC East, and PDC North as of
December 1, 2018; and at PDC South as of March 1, 2019, with Paragraph 19, which
requires the (initial) training of Deputy Sheriffs on Crisis Intervention and Conflict
Resolution and the training of Deputy Sheriffs and Custody Assistants in working with
mentally ill prisoners.  The Department has achieved Substantial Compliance at CRDF,
IRC, NCCF, MCJ, PDC East, PDC North, PDC South, and TTCF as of December 2019
with the refresher training requirements of Paragraph 19.  The County has maintained
compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) as
of December 2021.  The County was unable to maintain compliance under Provision 81
Rosas 4.7(b) as of December 2021.

The County has achieved Substantial Compliance at PDC East, PDC North,

---

[12] This includes the initial training required by Paragraphs 18, 19, and 20, which have been completed and
are no longer subject to monitoring.  The refresher training requirements for each of these provisions are,
however, still subject to monitoring under Provision 81 Rosas 4.6(b) and 4.7(b).
[13] The provisions that are no longer subject to monitoring at some or all of the facilities are highlighted in
bold in Appendix A.

NCCF, and CRDF as of August 1, 2017 and at PDC South as of October 1, 2017, with Paragraph 20, which requires the (initial) training of additional Deputy Sheriffs on Crisis Intervention and Conflict Resolution and on working with mentally ill prisoners.  The County has maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) as of December 2021.  The County was unable to maintain compliance under Provision 81 Rosas 4.7(b) as of December 2021.

The County has maintained Substantial Compliance for twelve consecutive months at PDC East, PDC South, PDC North, NCCF, IRC, TTCF, CRDF, and MCJ with Paragraph 21, which requires Custody personnel to maintain CPR certifications.

The County has maintained Substantial Compliance for twelve consecutive months with Paragraph 22, which requires the County and the Sheriff to provide instructional material on the use of arresting and booking documents to ensure the sharing of known relevant and available information on prisoners' mental health status and suicide risk.

The County has maintained Substantial Compliance for twelve consecutive months as of July 12, 2018, with Paragraph 23, which requires that the Department conduct a systematic review of prisoner housing to reduce the risk of self-harm and to identify and address suicide hazards, and to develop plans to reasonably mitigate suicide hazards identified in the review.

The County has maintained Substantial Compliance for twelve consecutive months as of September 30, 2018, with Paragraph 24, which requires the Department to conduct annual reviews and inspections of prisoner housing to identify suicide hazards.

The County has maintained Substantial Compliance for twelve months as of March 31, 2021, with Paragraph 27, which requires that all prisoners are individually and privately screened within 12 hours of their arrival at the jails.

The County has maintained Substantial Compliance for twelve consecutive months at IRC as of March 31, 2018, with Paragraph 28, which requires the Department to expedite inmates having urgent or emergent mental health needs through the booking process.  The County has provided documentation reflecting that it achieved Substantial Compliance as of April 1, 2022, through September 30, 2022, at CRDF.  These results have been verified by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2018, with Paragraph 29, which requires mental health assessments of prisoners with non-emergent mental health needs within 24 hours of the intake nursing assessment.

The County has maintained Substantial Compliance as of January 1, 2019, through December 31, 2019, with Paragraph 30, which requires the County to provide an initial mental health assessment that includes a brief initial treatment plan that addresses

"housing recommendations and preliminary discharge information."

The County has maintained Substantial Compliance for twelve consecutive
months as of December 31, 2016, with Paragraph 32, which requires that a serious
suicide attempt be entered in the prisoner's electronic medical record in a timely manner.

The County has maintained Substantial Compliance for twelve consecutive
months as of June 30, 2017, with Paragraph 33, which requires mental health supervisors
to review electronic medical records on a quarterly basis to assess their accuracy.

The County has maintained Substantial Compliance for twelve consecutive
months as of December 31, 2018, with Paragraph 35, which requires the Department to
ensure that custody staff refer prisoners who are demonstrating a potential need for
routine mental health care to a QMHP or a Jail Mental Evaluation Team.

The County has maintained Substantial Compliance for twelve consecutive
months as of December 31, 2016, with Paragraph 38, which requires mental health staff
or JMET teams to make weekly cell-by-cell rounds in restricted non-mental health
housing modules to identify prisoners with mental illnesses and grant prisoner's requests
for out-of-cell interviews.

The County has maintained Substantial Compliance at NCCF for twelve
consecutive months as of June 30, 2018, with Paragraph 39, which requires the County to
use a confidential self-referral system for prisoners to request mental health care.

The County has achieved Substantial Compliance as of July 1, 2022, through
September 30, 2022, with Paragraph 41, which requires CHS to review the medical
records of all prisoners on suicide watch in FIP for one randomly selected month each
quarter, and submit a report regarding the implementation of the step-down protocols and
the results of its review of the medical records.

The County has maintained Substantial Compliance at NCCF and PDC North for
twelve consecutive months, as of September 30, 2018, with Paragraph 43, which requires
the Department to develop and implement policies for the discipline of prisoners with
serious mental illnesses.

The County has maintained Substantial Compliance for twelve consecutive
months as of December 31, 2016, with Paragraph 44, which requires the Department to
install protective barriers in High Observation Housing and other mental health housing.

The County has maintained Substantial Compliance for twelve consecutive
months as of December 31, 2016, with Paragraph 45, which requires Suicide Prevention
Kits and first-aid kits in control booths in all facilities.

The County has maintained Substantial Compliance for twelve consecutive
months as of June 30, 2021, with Paragraph 46, which requires the Department to

interrupt, and if necessary, provide appropriate aid to any prisoner who threatens or exhibits self-injurious behavior.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 48, which requires the Department to have written housekeeping, sanitation, and inspection plans to ensure proper cleaning.

The County has maintained Substantial Compliance for twelve consecutive months as of February 28, 2017, with Paragraph 49, which requires the Department to have maintenance plans to respond to routine and emergency maintenance needs.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2017, with Paragraph 50, which requires pest control in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2017, with Paragraph 51, which requires the Department to ensure that all prisoners have access to basic hygiene supplies in accordance with state regulations.

The County has maintained Substantial Compliance for twelve consecutive months at CRDF, PDC North, MCJ, and TTCF with Paragraph 55, which requires custody, medical, and mental health staff to meet daily in High Observation Housing and weekly in Moderate Observation Housing.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 56, which requires custody, medical, and mental health staff to communicate regarding any change in a housing assignment following a suicide attempt or serious change in mental health condition.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2018, at MCJ with Paragraph 57, which requires safety checks in mental health housing.  The County has also maintained Substantial Compliance for twelve consecutive months at PDC North as of June 30, 2022

The County has maintained Substantial Compliance for twelve consecutive months at PDC South, PDC North, and PDC East as of December 31, 2016, at CRDF as of June 30, 2018, and at IRC as of September 30, 2018, with Paragraph 58, which requires safety checks in non-mental health housing.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2019, with Paragraph 59, which requires unannounced daily supervisory rounds to verify safety checks.

The County has achieved Substantial Compliance with Paragraph 60, as of April 1, 2019, through March 31, 2020, which requires the implementation of a quality improvement plan.

The County has maintained Substantial Compliance for twelve consecutive months at MCJ, NCCF, PDC East, PDC North, PDC South, and TTCF with Paragraph 68, which requires staggered contraband searches in housing units.  The County has provided documentation reflecting that it has achieved Substantial Compliance at CRDF as of January 1, 2022, through September 30, 2022.  These results have been verified by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2019, with Paragraph 69, which requires the County and the Sheriff to use clinical restraints only in the Correctional Treatment Center with the approval of a licensed psychiatrist who performed an individualized assessment.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2017, with Paragraph 71, which requires the County and the Sheriff to ensure that any prisoner subjected to clinical restraints in response to a mental health crisis receives therapeutic services to remediate any effects from the restraints.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 72, which requires the Department and the County to report on meetings to review suicides and incidents of serious self-injurious behavior.

The County has maintained Substantial Compliance for twelve consecutive months as of September 30, 2018, with Paragraph 73, which requires the Department to prepare detailed reports of prisoners who threaten or exhibit self-injurious behavior.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 74, which requires the Department to have an objective law enforcement investigation of every suicide that occurs in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of September 30, 2018, with Paragraph 75, which requires the Department and the County to review every serious suicide attempt that occurs in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 76, which requires the Department to follow certain procedures whenever there is an apparent or suspected suicide.

The County has achieved Substantial Compliance as of September 30, 2022, with Paragraph 77, which requires, among other things, identifying patterns and trends of suicides and suicide attempts and ensuring corrective actions are taken to mitigate suicide risks.

The County has maintained Substantial Compliance for twelve consecutive months as of May 18, 2017, with Paragraph 78, which requires the Suicide Prevention

Advisory Committee to meet twice a year.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 82, which requires the Department to co-locate personnel responsible for collecting prisoners' grievances at CRDF.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2019, with Paragraph 83, which requires it to install closed circuit security cameras throughout all of the common areas in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2018, with Paragraph 84, which requires investigations of force incidents and administrative actions to be completed timely.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2022, with Paragraph 85, which requires Internal Affairs Bureau personnel to receive adequate specialized training in conducting investigations of misconduct.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2019, with Paragraph 86, which requires inventory and control of weapons.

**FIFTEENTH REPORT**

18.     Within three months of the Effective Date, the County and the Sheriff will
develop, and within six months of the Effective Date will commence providing:  (1) a
four-hour custody-specific, scenario-based, skill development training on suicide
prevention, which can be part of the eight-hour training described in paragraph 4.8 of the
Implementation Plan in *Rosas* to all new Deputies as part of the Jail Operations
Continuum and to all new Custody Assistants at the Custody Assistants academy; and (2)
a two-hour custody-specific, scenario-based, skill development training on suicide
prevention to all existing Deputies and Custody Assistants at their respective facilities,
which can be part of the eight-hour training described in paragraph 4.7 of the
Implementation Plan in *Rosas*, through in-service Intensified Formatted Training, which
training will be completed by December 31, 2016.

These trainings will include the following topics:

(a)     suicide prevention policies and procedures, including observation and
supervision of prisoners at risk for suicide or self-injurious behavior;

(b)     discussion of facility environments and staff interactions and why they
may contribute to suicidal behavior;

(c)     potential predisposing factors to suicide;

(d)     high-risk suicide periods and settings;

(e)     warning signs and symptoms of suicidal behavior;

(f)     case studies of recent suicides and serious suicide attempts;

(g)     emergency notification procedures;

(h)     mock demonstrations regarding the proper response to a suicide attempt,
including a hands-on simulation experience that incorporates the
challenges that often accompany a jail suicide, such as cell doors being
blocked by a hanging body and delays in securing back-up assistance;

(i)     differentiating between suicidal and self-injurious behavior; and

(j)     the proper use of emergency equipment.

**STATUS (18):**          **SUBSTANTIAL COMPLIANCE (as of October 1, 2017 (verified) at MCJ and PDC South)**

**SUBSTANTIAL COMPLIANCE (as of September 1, 2017 (verified) at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of December 1, 2017 (verified) at PDC East)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018 (verified) at TTCF, IRC, and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of August 1, 2018 (verified) at CRDF)**

The Department was not subject to monitoring during the Fifteenth Reporting Period for the initial training of existing Deputy Sheriffs or Custody Assistants or of new Deputies in the Jail Operations Continuum and new Custody Assistants in the Custody Assistant Academy as required by Paragraph 18.  Virtually all of the Deputy Sheriffs and Custody Assistants in the custody facilities received the initial training because they were assigned to the jails as of the Existing Date of the Settlement Agreement or they received the training as new Deputies or new Custody Assistants.

The Department is still subject to monitoring in future periods for Substantial Compliance with the refresher course requirements under Provision 81 Rosas 4.6(b) and 4.7(b).  The County has maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) as of December 2021.  The County has posted results reflecting that it was unable to maintain compliance with the refresher training requirements under Provision 81 Rosas 4.7(b) as of December 2021.

19.     Commencing July 1, 2015, the County and the Sheriff will provide:

(a)     Custody-specific, scenario-based, skill development training to new Deputies during their Jail Operations training, and to existing Deputies assigned to Twin Towers Correctional Facility, Inmate Reception Center, Men's Central Jail, the Mental Health Housing Units at Century Regional Detention Facility, and the Jail Mental Evaluation Teams ("JMET") at North County Correctional Facility as follows:

      (i)     32 hours of Crisis Intervention and Conflict Resolution as described in paragraphs 4.6 and 4.9 of the Implementation Plan in *Rosas* to be completed within the time frames established in that case (currently December 31, 2016). Deputies at these facilities will receive an eight-hour refresher course consistent with paragraph 4.6 of the Implementation Plan in *Rosas* every other year until termination of court jurisdiction in that case and then a four-hour refresher course every other year thereafter.

      (ii)    Eight hours identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas* to be completed by December 31, 2016. This training requirement may be a part of the 32-hour training described in the previous subsection. Deputies at these facilities will receive a four-hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

(b)     Commencing July 1, 2015, the County and the Sheriff will ensure that new Custody Assistants receive eight hours of training in the Custody Assistant academy, and that all existing Custody Assistants receive eight hours of training related to identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas*. This training will be completed by December 31, 2016. Custody Assistants will receive a four-hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

STATUS (19):    **SUBSTANTIAL COMPLIANCE (as of April 1, 2018, (verified) at NCCF, MCJ, and IRC)**

                        **SUBSTANTIAL COMPLIANCE (as of July 1, 2018, (verified) at TTCF)**

                        **SUBSTANTIAL COMPLIANCE (as of December 1, 2018 (verified) at CRDF, PDC East, and PDC North)**

                        **SUBSTANTIAL COMPLIANCE (as of March 1, 2019 (verified) at PDC South)**

The Department was not subject to monitoring during the Fifteenth Reporting Period for the training of existing and new Deputy Sheriffs and Custody Assistants required by Paragraph 19.

The Department is still subject to monitoring in future periods for Substantial Compliance with the refresher course requirements under Provision 81 Rosas 4.6(b) and 4.7(b).  The County has maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) as of December 2021.  The County has posted results reflecting that it was unable to maintain compliance with the refresher training requirements under Provision 81 Rosas 4.7(b) as of December 2021.

20.     Commencing no later than July 1, 2017, the County and the Sheriff will
         provide:

(a)     Custody-specific, scenario-based, skill development training to existing
         Deputies assigned to North County Correctional Facility, Pitchess
         Detention Center, and the non-Mental Health Housing Units in Century
         Regional Detention Facility as follows:

         (i)     32 hours of Crisis Intervention and Conflict Resolution as
                 described in paragraphs 4.6 and 4.9 of the Implementation Plan in
                 *Rosas* to be completed by December 31, 2019.  Deputies at these
                 facilities will receive an eight-hour refresher course consistent with
                 paragraph 4.6 of the Implementation Plan in *Rosas* every other
                 year until termination of court jurisdiction in that case and then a
                 four-hour refresher course every other year thereafter.

         (ii)    Eight hours identifying and working with mentally ill prisoners as
                 described in paragraph 4.7 of the Implementation Plan in *Rosas* to
                 be completed by December 31, 2019.  This training requirement
                 may be a part of the 32-hour training described in the previous
                 subsection.  Deputies at these facilities will receive a four-hour
                 refresher course consistent with paragraph 4.7 of the
                 Implementation Plan in *Rosas* every other year thereafter.

|  |  |
|---|---|
| **STATUS (20):** | **SUBSTANTIAL COMPLIANCE (as of August 1, 2017 (verified) at CRDF, PDC East, PDC North, and NCCF)** |
|  | **SUBSTANTIAL COMPLIANCE (as of October 1, 2017 (verified) at PDC South)** |

The Department was not subject to monitoring for the initial training for existing Deputies as required by Paragraph 20 during the Fifteenth Reporting Period.

The Department is still subject to monitoring in future periods for Substantial Compliance with the refresher course requirements under Provision 81 Rosas 4.6(b) and 4.7(b).  The County has posted results for maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) as of December 2021.  The County has posted results reflecting that it was unable to maintain compliance with the refresher training requirements under Provision 81 Rosas 4.7(b) as of December 2021.

21.     Consistent with existing Sheriff's Department policies regarding training requirements for sworn personnel, the County and the Sheriff will ensure that existing custody staff that have contact with prisoners maintain active certification in cardiopulmonary resuscitation and first aid.

**STATUS:**      **SUBSTANTIAL COMPLIANCE (as of October 1, 2015, through September 30, 2016 (verified) at PDC East and South)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at NCCF, PDC North, and IRC)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 (verified) at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at MCJ)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2018, through June 30, 2019 (verified) at CRDF)**

The Compliance Measures provide that the Department will demonstrate Substantial Compliance when 95% of the designated custody staff have the required CPR and first aid certifications for twelve consecutive months.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 21 in the Fifteenth Reporting Period.

23

22.     Within six months of the Effective Date and at least annually thereafter, the County and the Sheriff will provide instructional material to all Sheriff station personnel, Sheriff court personnel, custody booking personnel, and outside law enforcement agencies on the use of arresting and booking documents, including the Arrestee Medical Screening Form, to ensure the sharing of known relevant and available information on prisoners' mental health status and suicide risk.  Such instructional material will be in addition to the training provided to all custody booking personnel regarding intake.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017)**

The Justice Data Interface Controller ("JDIC") message the Department has been using since June 29, 2016, is sufficient to establish Substantial Compliance with Paragraph 22, and the County maintained Substantial Compliance for twelve consecutive months through June 30, 2017.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 22 in the Fifteenth Reporting Period.

23.     Within three months of the Effective Date, the County and the Sheriff will commence a systematic review of all prisoner housing, beginning with the Mental Health Unit of the Correctional Treatment Center, all High Observation Housing areas, all Moderate Observation Housing areas, single-person discipline, and areas in which safety precautions are implemented, to reduce the risk of self-harm and to identify and address suicide hazards.  The County and the Sheriff will utilize a nationally-recognized audit tool for the review.  From this tool, the County and the Sheriff will:

(a)     develop short and long term plans to reasonably mitigate suicide hazards identified by this review; and

(b)     prioritize planning and mitigation in areas where suicide precautions are implemented and seek reasonable mitigation efforts in those areas.

**STATUS:     SUBSTANTIAL COMPLIANCE**

The Monitor has verified, with the advice of the Subject Matter Expert, that the Department's Suicide Hazard Inspection Check List tool is a nationally recognized audit tool for this review.  The Department provided the Monitor with completed checklists documenting inspections of all housing units by January 14, 2016.

The Department submitted updated Suicide Hazard Mitigation plans to the Monitor on January 18, 2018 and July 12, 2018.  After consultations with the Mental Health Subject Matter Expert, the Monitor concluded that the plans satisfied the requirements of Paragraph 23 and that the Department had achieved and maintained Substantial Compliance with the provision.  Accordingly, pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 23 in the Fifteenth Reporting Period.

24.     The County and the Sheriff will review and inspect housing areas on at least an annual basis to identify suicide hazards.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018)**

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 24 in the Fifteenth Reporting Period.  As the Monitor has noted, however, implementation and tracking of corrective actions must be addressed by the Custody Compliance and Sustainability Bureau ("CCSB") under Paragraph 77(c), which requires CCSB to "ensur[e] that corrective actions are taken to mitigate suicide risk. . .obtaining where appropriate, technical assistance. . .when such assistance is needed to address suicide-risk issues."

25.     The County and the Sheriff will ensure that any prisoner in a Sheriff's Department station jail who verbalizes or who exhibits a clear and obvious indication of current suicidal intent will be transported to IRC, CRDF, or a medical facility as soon as practicable.  Pending transport, such prisoners will be under unobstructed visual observation, or in a suicide resistant location with safety checks every 15 minutes.

**STATUS:      PARTIAL COMPLIANCE (at East and North Patrol Divisions)**

**NON-COMPLIANCE (at Central and South Patrol Divisions)**

A provision of the Station Jail Manual adopted in March 2018 requires that any arrestee who "displays obvious suicidal ideation or exhibits unusual behavior that clearly manifest[s] self-injurious behavior or other clear indication of mental health crisis shall be transported to the Inmate Reception Center (IRC), Century Regional Detention Facility (CRDF), or a medical facility as soon as practicable.  Pending transport, such inmates. . .shall be under unobstructed visual observation or in a suicidal restraint location with safety checks every 15 minutes."

Under the revised Compliance Measures, which were updated in 2021, the Department must randomly select and analyze Arrestee Medical Screening Forms from station jails identifying prisoners who verbalize or exhibit a clear and obvious indication of current suicidal intent to determine compliance with Paragraph 25.  Substantial Compliance requires that 90% of the selected records from each Patrol Division meet the requirements of Paragraph 25.  Each Patrol Division can achieve sustained compliance after twelve consecutive months of Substantial Compliance independent of the other divisions.

For the last several Reporting Periods, the Monitor has noted the high levels of variance in the results for the individual station jails and Patrol Divisions.  In the Fourteenth Report, the Monitor noted that "if the County's results do not markedly improve, certain Patrol Divisions may be found Non-Compliant with Provision 25 in the next Reporting Period."

The County's results for the Fifteenth Reporting Period were mixed.  For the Second Quarter of 2022, the County reports 50% compliance for the Central Patrol Division, 50% for the East Patrol Division, 55% for the North Patrol Division, and 50% for the South Patrol Division.  For the Third Quarter of 2022, however, the results varied significantly (83% for the East Patrol Division and 70% for the North Patrol Division, 33% for the Central Patrol Division and 25% for the South Patrol Division).

Given these results, the County reports

In September 2022, CCSB issued ten corrective action plans to stations that were non-compliant with Provision 25 in the Second Quarter of 2022. Although there has been a slight improvement from the second to the third

27

quarter of the reporting period, the required compliance measure of 95%
has not been met.

Moreover

CCSB will be sending follow-up memos to the Unit Commanders of the
stations who have struggled with compliance.  Gradual improvement is
anticipated.

According to the County's implementation plan tracker, the County has
completed 10 out of 15 of corrective action steps regarding Provision 25.  These steps
include: briefing the lieutenant division aides (completed January 2022); having the
lieutenant division aides brief the lieutenant liaisons (completed January 2022); providing
training to lieutenants and lieutenant division aides (completed June 2022); meeting with
the lieutenants and lieutenant division aides to set compliance benchmarks (completed
June 2022); identifying policies and procedures regarding Provision 25 for re-briefing to
all patrol personnel (completed February 2022); meetings between CCSB and lieutenant
division aides and patrol lieutenants to designate a benchmark for corrective action plan
compliance (completed June 2022); and posting laminated signage regarding the
requirements of Provision 25 (completed June 2022).

These corrective actions do not appear to be working, at least not yet.  For the
Fifteenth Reporting Period, the County is Partially Compliant with Provision 25 for the
East and North Patrol Divisions, and Non-Compliant for the Central and South Patrol
Divisions.

26.     Consistent with existing Sheriff's Department policies, the County and the Sheriff will follow established screening procedures to identify prisoners with emergent or urgent mental health needs based upon information contained in the Arrestee Medical Screening Form (SH-R-422) or its equivalent and the Medical/Mental Health Screening Questionnaire and to expedite such prisoners for mental health evaluation upon arrival at the Jail Reception Centers and prior to routine screening.  Prisoners who are identified as having emergent or urgent mental health needs, including the need for emergent psychotropic medication, will be evaluated by a QMHP as soon as possible but no later than four hours from the time of identification.

**STATUS:     PARTIAL COMPLIANCE**

The Compliance Measures require the Department to "review Arrestee Medical Screening Forms (SH-R-422) (or its equivalent) and the Medical/Mental Health Screening Questionnaires of 100 randomly selected prisoners during one randomly selected week per quarter at CRDF and at IRC."  Substantial Compliance requires that (1) 95% of the forms "include the required mental health information" and (2) 90% of the prisoners having urgent or emergent needs were "seen by a QMHP within four hours."

The County's Fifteenth Self-Assessment reports that for the one randomly selected week in the Second Quarter of 2022, 95% of the screening forms reviewed had the required mental health information, which equals the threshold for Substantial Compliance.  92% of the prisoners with urgent or emergent mental health needs were seen by a QMHP within four hours, which exceeds the relevant threshold.  The County's Fifteenth Self-Assessment also reports that for the one randomly selected week in the Third Quarter of 2022, 98% of the screening forms reviewed had the required mental health information, which exceeds the relevant threshold.  However, only 56% of the prisoners with urgent or emergent mental health needs were seen by a QMHP within four hours, which did not meet the relevant threshold, and was a significant decline from the County's recent results under Provision 26.

The County did not explain the decline in its performance under Compliance Measure 26-4(b) during the Third Quarter of 2022 in its Augmented Fifteenth Self-Assessment in this case.  However, in a related matter that is also pending in this Court, *Rutherford v. Luna*, the County recently provided context regarding the IRC that appears to be relevant:

> In the summer of 2022, the LACJ experienced a crisis in the IRC, as surges of inmates, including a high percentage of new inmates with serious mental health conditions, cycled into the IRC once the Emergency Bail Schedule (the "EBS") put in place during the pandemic lapsed on July 1, 2022. With the EBS no longer in place to control the stream of new inmates into the LACJ, it was common to see days when dozens, if not hundreds, of inmates waited in the IRC for more than 24 hours, because Defendants were not equipped to process and immediately house the large

number of inmates suddenly entering the IRC.[14]

The Monitor's Mental Health Team also continues to note issues during its qualitative reviews of Provision 26.  In December 2022, Drs. Johnson, Vess, and Eargle conducted a qualitative review of the County's compliance with Provision 26.  They assessed the completeness of intake documentation and sought to "determine whether patients with emergent or urgent needs were missed at intake" by examining the intake records and other associated documents.  They found that in 100% of cases, the intake documentation was complete and available.  They also found that in 55% of the cases sampled it was "highly likely that the condition leading to subsequent HOH or FIP placement was present at the time of the intake screening."  In 19% of cases, "an urgent or emergent condition was likely present at the time of the intake screening that should have been detected during a standard intake process" but it was not detected.  These results were generally consistent with prior qualitative findings.

In October 2022, the Monitor and Drs. Johnson, Vess, and Eargle, met with CHS personnel to discuss these qualitative findings, and share case examples in which an urgent or emergent condition was likely present at intake that should have been detected through screening but went undetected, and ask the County for a plan to better identify such cases in the future.  The County has not yet provided that plan.[15]

According to the County's implementation plan tracker, the County is in the process but has not yet completed any corrective action steps regarding Provision 26.

---

[14] *See* Rutherford v. Luna, 2:75-cv-04111-DDP, Dkt. 379.

[15] In the Fourteenth Report, the Monitor also noted that the County committed to briefing intake nurses on a quarterly basis as to cases involving emergent or urgent mental health needs that were missed by that nurse at intake to enhance the accuracy of the screening process.  The Monitor encouraged the County to include a discussion of its briefings with intake nurses in its next self-assessment, but no such discussion was included in the Fifteenth Self-Assessment or Augmented Fifteenth Self-Assessment.

27.     Consistent with existing Sheriff's Department policies, the County and the Sheriff will ensure that all prisoners are individually and privately screened by Qualified Medical Staff or trained custody personnel as soon as possible upon arrival to the Jails, but no later than 12 hours, barring an extraordinary circumstance, to identify a prisoner's need for mental health care and risk for suicide or self-injurious behavior.  The County and the Sheriff will ensure that the Medical/Mental Health Screening Questionnaire, the Arrestee Medical Screening Form (SH-R-422), or its equivalent, and/or the Confidential Medical Mental Health Transfer Form are in the prisoner's electronic medical record or otherwise available at the time the prisoner is initially assessed by a QMHP.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of October 1, 2019, through March 31, 2020, and October 1, 2020, through March 31, 2021 (verified))**

The Compliance Measures require the Department to review the records of "randomly selected prisoners who were processed for intake during one randomly selected week at CRDF and at IRC" to determine compliance with this provision. Substantial Compliance requires that 90% of the records reviewed reflected that the prisoners were screened for mental health needs within 12 hours and that the required documentation was available to the QMHP for 90% of the mental health assessments conducted by the QMHP.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 27 in the Fifteenth Reporting Period.

28.     The County and the Sheriff will ensure that any prisoner who has been identified during the intake process as having emergent or urgent mental health needs as described in Paragraph 26 of this Agreement will be expedited through the booking process.  While the prisoner awaits evaluation, the County and the Sheriff will maintain unobstructed visual observation of the prisoner when necessary to protect his or her safety, and will conduct 15-minute safety checks if the prisoner is in a cell.

**STATUS:**      **SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at IRC)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2022, through September 30, 2022 (verified) at CRDF)**

The Compliance Measures require the Department to review the records of randomly selected prisoners at CRDF and IRC who have urgent or emergent mental health needs to determine whether they were expedited through the booking process and under visual observation or checked every 15 minutes.

The County's Fifteenth Self-Assessment reflects that in the Second Quarter of 2022, 100% of the inmates with urgent or emergent mental health needs were expedited through the booking process at CRDF in the randomly selected week, as required by the applicable Compliance Measures, and 100% of the inmates were observed or checked as is required.  The County's Fifteenth Self-Assessment also reported that in the Third Quarter of 2022, 100% of the inmates with urgent or emergent mental health needs were expedited through the booking process at CRDF in the randomly selected week, and 100% of the inmates were observed or checked, as is required.

The County previously maintained Substantial Compliance with Paragraph 28 at IRC for twelve consecutive months, and IRC was not subject to monitoring for Substantial Compliance with Paragraph 28 in the Fifteenth Reporting Period.

32

29.     The County and the Sheriff will ensure that a QMHP conducts a mental
health assessment of prisoners who have non-emergent mental health needs within 24
hours (or within 72 hours on weekends and legal holidays) of a registered nurse
conducting an intake nursing assessment at IRC or CRDF.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through
                March 31, 2018 (verified))**

The Compliance Measures require the Department to review randomly selected
records of the prisoners identified in the intake nursing assessment as having non-
emergent mental health needs to determine if the Department completed mental health
assessments for 85% of the prisoners within the required time periods.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not
subject to monitoring for Substantial Compliance with Paragraph 29 in the Fifteenth
Reporting Period.

30.     Consistent with existing DMH policies, the initial mental health assessment will include a brief initial treatment plan.  The initial treatment plan will address housing recommendations and preliminary discharge information.  During the initial assessment, a referral will be made for a more comprehensive mental health assessment if clinically indicated.  The initial assessment will identify any immediate issues and determine whether a more comprehensive mental health evaluation is indicated.  The Monitor and SMEs will monitor whether the housing recommendations in the initial treatment plan have been followed.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of January 1, 2019, through December 31, 2019 (verified))**

The Compliance Measures require the Department to review randomly selected initial mental health assessments and report on (1) the percentage of assessments that have (i) included an initial treatment plan that addresses housing recommendations and preliminary discharge information and (ii) identified any immediate issues and whether a more comprehensive evaluation was indicated; and (2) whether the housing recommendations were followed.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 30 in the Fifteenth Reporting Period.

31 (**Revised**).  Consistent with existing Correctional Health Services and Sheriff's Department policies, the County and the Sheriff will maintain electronic mental health alerts in prisoners' electronic medical records that notify medical and mental health staff of a prisoner's risk for suicide or self-injurious behavior.  The alerts will be for the following risk factors:

(a)     current suicide risk; and

(b)     prior suicide attempts.

**STATUS:        PARTIAL COMPLIANCE (at TTCF and CRDF)**

On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provision 31 ("Revised Paragraph 31") as set forth above.  They also agreed on Revised Compliance Measures.  The Revised Compliance Measures require the Department to review randomly selected electronic medical records for prisoners in certain at-risk groups to determine if the required mental health alerts are in 85% of the records reviewed, which is the threshold for Substantial Compliance, for prisoners who report suicidal thoughts (at suicide risk) during the intake process; or were removed from risk precautions in the prior quarter.

The County's Augmented Fifteenth Self-Assessment reports that for the Second Quarter of 2022, at CRDF, 96% of the records reviewed contained the mental health alerts required by 31-1(a).  For Compliance Measure 31-1(b), the County reports that there were four responsive patients and 100% were compliant.  At TTCF, 100% of the records reviewed contained the mental health alerts required by 31-1(a).  For Compliance Measure 31-1(b), there were 25 responsive patients, 20 of which did not contain the required alerts, "resulting in a compliance level of 20%."

The County's Augmented Fifteenth Self-Assessment reports that for the Third Quarter of 2022, at CRDF, 100% of the records reviewed contained the mental health alerts required by 31-1(a).[16]  Regarding 31-1(b), 80% of the relevant records contained the required alerts.  At TTCF, 100% of the records reviewed contained the mental health

---

[16] In the Fourteenth Report, the Monitor stated that the County should explain the reasons for any exclusion of patients for all Compliance Measures under Provision 31.  Notwithstanding a large number of patient exclusions under Compliance Measure 31-1(a) for the Fifteenth Reporting Period (36 and 15 exclusions at CRDF and TTCF, respectively in the Second Quarter of 2022, and 55 and 10 exclusions at CRDF and TTCF, respectively, in the Third Quarter of 2022), the County did not provide explanations.  In response to a draft of this Report, the County generally explained that the large number of exclusions result from "the County's new Medical and Mental Health (MMH) screening tool captur[ing] a broader sample in the first instance, and the audit later excludes only those patients who both did not express suicidal thoughts during the intake process and who also were not found to be at a high or imminent risk of suicide after being expedited for a mental health evaluation for some other reason."  Additionally, "CHS found that the majority of the patients expedited to mental health without endorsement of suicidality did not meet criteria of being suicidal at intake.  Thus, these patients were properly excluded."  While this explanation is useful as a general matter, in the next Reporting Period, the County should provide a brief reason for each record that is excluded from the assessment.

alerts required by 31-1(a).  Regarding 31-1(b), 16% of the relevant records contained the required alerts.

> The Fourteenth Report noted that

> the methodology utilized by the County in its posted results differs from what is required by Compliance Measure 31-1(b).  The County is required to sample from a universe of inmates whose risk levels were lowered in the prior quarter. Yet, the County inadvertently sampled from a universe of inmates who were assigned a High or Imminent risk level during the prior quarter, which was then lowered in either the prior or current quarter.

> In a posted response, the County reports

> The County implemented a revised methodology for establishing the Q2 universe based on this feedback, however, we encountered technical difficulties in trying to capture this universe. It was discovered that the JHIS report used to capture the correct bookings did not in fact capture the exclusive list of relevant bookings (on beta testing for validation purposes), and there is unfortunately no data solution to capture these missing inmates for Q2 & Q3. Ultimately this technical issue will remain unresolved due to CHS not allotting any further resources to fix IT issues with JHIS (the previous medical record) or its reports. However, going forward, we are confident that beginning in the 4th quarter, the new report, which will be exported from the new medical record, will capture the target population for all self-assessments going forward.

The Monitor finds the County in Partial Compliance with Provision 31.  In the Sixteenth Reporting Period, the County's assessment of Compliance Measure 31-1(b) should be based on a universe of inmates whose risk levels were lowered during the prior quarter, regardless of when the High or Imminent risk levels were initially assigned, or the County will be found in Non-Compliance.

According to the County's implementation plan tracker, the County has completed 2 out of 3 corrective action steps regarding Provision 31.  These steps include: training staff on suicide risk alerts (completion date unclear); and providing a self-assessment with a new universe and methodology (completion date unclear).

32.     Information regarding a serious suicide attempt will be entered in the prisoner's electronic medical record in a timely manner.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified))**

The Compliance Measures require that 95% of the electronic medical records of prisoners who had a serious suicide attempt reflect information regarding the attempt, and 85% of the records reflect that the information was entered into the record within one day of the attempt.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 32 in the Fifteenth Reporting Period.

33.     The County will require mental health supervisors in the Jails to review electronic medical records on a quarterly basis to assess their accuracy as follows:

(a)     Supervisors will randomly select two prisoners from each clinician's caseload in the prior quarter;

(b)     Supervisors will compare records for those prisoners to corroborate clinician attendance, units of service, and any unusual trends, including appropriate time spent with prisoners, recording more units of service than hours worked, and to determine whether contacts with those prisoners are inconsistent with their clinical needs;

(c)     Where supervisors identify discrepancies through these reviews, they will conduct a more thorough review using a DMH-developed standardized tool and will consider detailed information contained in the electronic medical record and progress notes; and

(d)     Serious concerns remaining after the secondary review will be elevated for administrative action in consultation with DMH's centralized Human Resources.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017 (verified))**

The Compliance Measures require the County to provide the Monitor and the Subject Matter Experts with the DMH-developed standardized tool required by Paragraph 33(c), and to report the results of its analysis of the electronic medical records of two randomly selected prisoners from each clinician's caseload.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 33 in the Fifteenth Reporting Period.

34 **(Revised).**  Consistent with existing Correctional Health Services policy, the County and the Sheriff will conduct clinically appropriate release planning for all prisoners who are being released to the community and who have been identified by a QMHP as having a mental illness and needing mental health treatment, or as having a DSM-5 major neuro-cognitive disorder that caused them to be housed in the Correctional Treatment Center at any time during their current incarceration.  For prisoners with mental illness and needing mental health treatment, the release planning services will be guided by the prisoner's level of care.  Specifically, prisoners who at any time during their incarceration meet mental health level of P3 or P4 will be presumptively referred for release planning services, and prisoners who meet mental health level of care P2 will receive release planning services upon referral by a clinician or upon their request.  Prisoners who have a DSM-5 major neuro-cognitive disorder that caused them to be housed in the Correctional Treatment Center will also be referred for release planning services consistent with the Correctional Health Services policy applying to prisoners with mental illness.

(a) Release planning will consider the need of the prisoner for housing; transportation to the prisoner's community-based provider, residence, or shelter within the County; bridge psychotropic medications; medical/mental health/substance abuse services; income/benefits establishment; and family/community/social supports ("Release Planning Areas").

(b) Release planning will be based on an individualized assessment of the prisoner's needs and, unless the prisoner is unable or unwilling to participate, will be undertaken in collaboration with the prisoner.  For prisoners referred for release planning services, those services will include:

(i) An Initial Release Plan that will be created at intake or no later than ten days after the referral for release planning, which referral shall normally occur at the time of intake.  The Initial Release Plan will include preliminary identification of needs in each of the Release Planning Areas and preliminary recommendations for services to address those needs, and a referral for assistance in obtaining California identification when needed and when the prisoner is eligible; and/or

(ii) A Comprehensive Release Plan that will be initiated no later than thirty days after the referral for release planning.  The Comprehensive Release Plan will include (A) collecting information regarding the prisoner's needs; (B) coordinating with community-based providers to identify available services that meet the prisoner's needs; (C) facilitating the transition of care to community-based providers, and (D) assisting in obtaining identification and/or benefits when needed, when the prisoner is eligible, and as offered by the Sheriff's Community Transition Unit.

(c) The County will maintain a re-entry resource center with staff supervised by a QMHP.  The re-entry resource center will:

(i) Provide information appropriate to the released prisoner about available housing, transportation, medical/mental health/substance abuse services, income/benefits establishment, community/social supports, and other community resources; and

(ii) Provide released prisoners with copies of their release plans, as available.

(d) All prisoners who are receiving and continue to require psychotropic medications will be offered a clinically appropriate supply of those medications upon their release from incarceration.  Unless contraindicated, this will be presumed to be a 14-day supply or a supply with a prescription sufficient so that the prisoner has the psychotropic medication available during the period of time reasonably necessary to permit the prisoner to consult with a doctor and obtain a new supply.

(e) Nothing in Paragraph 34 will require prisoners to accept or participate in any of the services provided under this Paragraph.

(f) Neither the County nor the Sheriff shall be in violation of this paragraph if after reasonable efforts as set forth in Correctional Health Services Policy M380.01, Release Planners are unable to identify available post-release services.

STATUS (34):          NON-COMPLIANCE

During the Seventh Reporting Period, the parties and the Intervenors reached an
agreement on the provisions of revised Paragraph 34 ("Revised Paragraph 34") set forth
above.  They also agreed on revised Compliance Measures and a revised policy to
implement Revised Paragraph 34.  On December 10, 2018, the Court issued an order
pursuant to the parties' joint stipulation revising Paragraph 34.

In the Fourteenth Reporting Period, the Monitor instructed his auditors to initiate
a comprehensive audit of the County's self-reporting under Provision 34 to address
various concerns that have been raised about the County's self-reporting methodologies.
That audit of data for the Second Quarter of 2022 was completed in the Fifteenth
Reporting Period and shared with the parties on December 30, 2022.[17]  It revealed several
notable deficiencies in the accuracy of the County's self-reporting under Provision 34,
which must be corrected in the County's future Self-Assessments.

In summary, Provision 34 requires the County to engage in release planning for
inmates with mental illness who need mental health treatment.  Release planning must
consider the need for housing, transportation, bridge psychotropic medications, mental
health and substance abuse services, income and benefits establishment, and family and
community supports.  Release planning must be based upon an individualized assessment
of the inmate's needs and conducted in collaboration with the inmate, to the extent that
they are able and willing to participate.

Release planning is bifurcated into initial release planning, to be conducted no
later than ten days after the referral for release planning, and comprehensive release
planning, to be initiated no later than thirty days after the referral and completed prior to
an inmate's release.  The goal is, among other things, for inmates with mental illness to
be released from custody with a comprehensive written plan, and linkages to the
necessary supports to enable them to successfully transition out of jail.

In the years since the Agreement was executed, the County has made important
progress in building a release planning apparatus within the jails.  This includes hiring a
significant complement of medical case workers, psychiatric social workers, and
community health workers to engage in release planning services.  The County has met
or exceeded the quantitative thresholds for Substantial Compliance on several of the
Compliance Measures for years, while on other Compliance Measures, progress has been
slower.  In particular, the Monitor has long identified compliance with Compliance
Measures 34-13(c)(2) and 34-13(c)(3) as particularly challenging for the County.  These
measures require the County to create initial and comprehensive release plans that
address the various topics enumerated in the Compliance Measures for a sufficient
number of inmates.

There are several deficiencies in the County's self-reporting that call its recent

---

[17] *See Assessment of Posted Results for Provision 34 (Second Quarter of 2022) Compliance Measures 34-
13(c)(1) through (c)(4)*, dated December 30, 2022 (on file with author).

results under 34-13(c)(2) and 34-13(c)(3) into question.  For example, Provision 34 and the associated Compliance Measures require the County to provide inmates with "Comprehensive Release Plans" that include the enumerated information set forth in the Compliance Measures.  Notwithstanding this explicit requirement, in some cases, the County has been reporting itself compliant with Compliance Measure 34-13(c)(3) in reliance on other documentation when no Comprehensive Release Plan exists.  The County has relied upon Care Transitions Notes, Clinical Notes, Initial Mental Health Evaluations, and Initial Release Plans.  The County has also relied upon alternative documentation instead of the Exit Checklist that is required by the Compliance Measures.  The County's methods for calculating its compliance percentages with Compliance Measure 34-13(c)(2) and (c)(3) are also flawed.[18]

There have also been problems with the preliminary release information recorded by County release planners, which is sometimes "incomplete, insufficiently specific, and inconsistent within and between inmates' Initial Mental Health Evaluations."[19]  The information recorded by the County in the Initial Release Plan Handout, Initial Release Plan Note, Comprehensive Release Plan Handout, and Comprehensive Release Plan Note, are also sometimes incomplete or insufficiently specific.

Pursuant to Compliance Measure 34-1(e)(1), a copy of the Comprehensive Release Plan or Initial Release Plan must be "provided to the prisoner in a language the prisoner understands, to the extent legally required" yet these documents have thus far only been available in English.  Further, in the County's self-reporting, it has sometimes been determined that inmates did not require Comprehensive Release Plans when, in fact, they appear to have required Comprehensive Release Plans based upon information in the patient files.  In addition, the County has not been routinely including its results under Compliance Measure 34-1(a) in its self-reporting under Compliance Measures 34-13(c)(2) and 34-13(c)(3), though the Compliance Measures require it.

Regarding the Fifteenth Reporting Period, the County's Fifteenth Self-Assessment reports that, as required by Compliance Measure 34-10, the Department's Compliance Team made six visits in the Second and Third Quarters of 2022 to CRRC to confirm the presence of staff representing the Health Agency, Probation, and Sheriff's Departments.  The County concluded that it achieved 100% compliance with all departments being present at each visit.

Compliance Measures 34-1 and 2 require the County to review on a quarterly basis "randomly selected records of 85 prisoners released in a randomly selected week" who had been identified as having a need for mental health care to determine if the requirements of the County's Release Planning Policy were satisfied and state for each prisoner who did not receive a Comprehensive Release Plan why a plan was not completed, whether repeated efforts were made to offer the prisoner comprehensive release planning, and whether an Initial Release Plan was completed.  Compliance Measure 34-13(c) sets forth the relevant thresholds for Compliance Measure 34-1.

---

[18] *Id.* at pages 19 – 21.
[19] *Id.*

For the Second Quarter of 2022, the County's Fifteenth Self-Assessment reports
that regarding Compliance Measure 13(c)(1), 92% of inmates received a referral for
release planning, above the required 85%.  Regarding Compliance Measure 34-13(c)(2),
"90% of inmates receiv[ed] the required services and documentation, more than the
required 85%." For Compliance Measure 34-13(c)(3), "75% of inmates receiv[ed] the
required services and documentation, rather than the required 85%." For Compliance
Measure 34-13(c)(4), which requires certain services and documentation relating to
inmates requiring psychotropic medications, "the County achieved 100% compliance."
The County was unable to post results for the Third Quarter of 2022 in time for inclusion
in this Report.

According to the County's implementation plan tracker, the County completed 21
out of 24 corrective action steps regarding Provision 34 during the First Quarter of 2022.
These steps include: making contingent offers to candidates for 5 PSW vacancies
(completed January 2022); implementing a standardized Excel case tracker for TTCF
staff (completed January and February 2022); having a dedicated release planner for
high-bail and serious charges (completed January 2022); taking steps to provide
compliant Initial Release Plans (completed First Quarter 2022); meetings between
supervisors and supervisees at least twice per month (completed First Quarter 2022); and
providing a list of Community Based Organizations ("CBOs") used for Paragraph 34
referrals (completion date unclear).

Notwithstanding these steps, given the issues discussed above, the County is rated
as Non-Compliant with Provision 34 for the Fifteenth Reporting Period.  The Monitor has
had very productive discussions with County personnel and his auditors regarding these
issues, and the County has agreed to make several changes in response to the Monitor's
feedback, including translating the Comprehensive Release Plan handouts into Spanish.
The Parties should meet in the next Reporting Period to consider potential changes being
considered by the County to its audit methodologies and/or the Compliance Measures.
The County must also improve the accuracy of its self-reporting under Provision 34 in the
next Reporting Period.

35.     Consistent with existing DMH and Sheriff's Department policies, the County and the Sheriff will ensure that custody staff, before the end of shift, refer prisoners in general or special populations who are demonstrating a potential need for routine mental health care to a QMHP or a Jail Mental Evaluation Team ("JMET") member for evaluation, and document such referrals.  Custody staff will utilize the Behavior Observation and Referral Form.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of November 1, 2017, through December 31, 2018 (verified))**

The Compliance Measures require the Department to review, for a randomly selected month each quarter, the Behavior Observation and Mental Health Referral ("BOMHR") records for prisoners referred by custody staff to a QMHP or JMET member for "routine" mental health care to determine the timeliness of the referrals, and that 85% of the referrals "occurred before the end of the shift in which the potential need for mental health care is identified."

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 35 in the Fifteenth Reporting Period.

36.     Consistent with existing DMH policies, the County and the Sheriff will ensure that a QMHP performs a mental health assessment after any adverse triggering event, such as a suicide attempt, suicide threat, self-injurious behavior, or any clear de-compensation of mental health status.  For those prisoners who repeatedly engage in such self-injurious behavior, the County will perform such a mental health assessment only when clinically indicated, and will, when clinically indicated, develop an individualized treatment plan to reduce, and minimize reinforcement of, such behavior.  The County and the Sheriff will maintain an on-call system to ensure that mental health assessments are conducted within four hours following the notification of the adverse triggering event or upon notification that the prisoner has returned from a medical assessment related to the adverse triggering event.  The prisoner will remain under unobstructed visual observation by custody staff until a QMHP has completed his or her evaluation.

**STATUS:     NON-COMPLIANCE**

The Compliance Measures require the Department to develop a staffing schedule to provide on-call services, and the County's Fifteenth Self-Assessment reported that it has complied with this requirement for the Second Quarter of 2022.  The Compliance Measures also require the Department to review randomly selected records of prisoners newly admitted to mental health housing from a lower level of care due to an adverse triggering event during two randomly selected weeks per quarter.  The County's Fifteenth Self-Assessment reports that during the Second Quarter of 2022, (a) "79% -- rather than the required 95% -- of inmates" identified in the two randomly selected weeks received an assessment by a QMHP within four hours, as required by Compliance Measure 36-4(a).  The County further reports that (b) 100% of the selected prisoners at TTCF and 100% at CRDF were seen on videos "under unobstructed visual observation pending assessment," as required by Compliance Measure 36-4(b).

The County's Augmented Fifteenth Self-Assessment reports that for the Third Quarter of 2022, the Department complied with the staffing schedule requirement.  The County further reports that during the Third Quarter of 2022 "83% -- rather than the required 95% -- of inmates" identified in the two randomly selected weeks received an assessment by a QMHP within four hours, as required by Compliance Measure 36-4(a).  The County further reports that 100% of the selected prisoners at TTCF and CRDF were "under unobstructed visual observation pending assessment," as is required by Compliance Measure 36-4(b).

In December 2022, Drs. Johnson, Vess, and Eargle, conducted a follow-up qualitative assessment of the County's compliance with Paragraph 36.  In it, they sought to assess, among other things, "the County's methodology, specifically whether it sufficiently detects adverse triggering events and acts of repeated self-harm" in order to assure prompt assessment by a QMHP and a clinically-adequate treatment plan.  They also sought to determine whether any assessment conducted "sufficiently addressed the adverse triggering event(s), including discussing relevant risk factors, and whether there was a clinically-adequate crisis response or safety plan put in place."

They found that of 38 qualifying cases with a single adverse triggering event (12 were indeterminate), 88% of the patients were seen within four hours by a QMHP.  The Team noted, however, that a substantial number of cases were indeterminate during this review "due to lack of clear documentation of time stamps for various steps in the process.  Better documentation of the timeline in clinical notes is needed."

In 47% of the cases with a single adverse triggering event (seven were indeterminate and one was not applicable), a QMHP adequately evaluated the apparent risk factors.  This is a decrease from the 65% found during the Fourteenth Reporting Period.  In only 45% of the cases was any safety plan or crisis response plan in place to address the identified risk factors.[20]  This deficit continues to represent a significant risk to inmate safety concerning Provision 36 that must receive prompt attention from the County.  The first mental health contact with patients in these circumstances "should result in a simple and clear safety plan for the period prior to transfer to a higher level of care followed by more detailed treatment planning by an assigned clinician."[21]

Regarding cases of repeated self-harm, the Team assessed 21 patients who were being followed by the Complex Case Committee.  Of those cases, nine were found to have engaged in repeated instances of self-injurious behavior.  Of these nine patients, there was a treatment plan to address the behavior in only one case, or 13% (one was indeterminate).  Of the remaining cases in the sample, "there was no indication that clinicians determined that a treatment plan was not clinically indicated or that a behavior management plan was put in place instead."  The lack of treatment planning for inmates who engage in repeated self-harming behavior also continues to be an urgent safety risk that must receive prompt attention from the County.

According to the County's implementation plan tracker, the County has completed 1 out of 1 corrective action steps regarding Provision 36 and 12 out of 21 corrective action steps regarding Provisions 36 and 40.  These steps include: CCSB collaborating with TTCF training to ensure dissemination and re-briefing of "Handling Suicidal Inmate in Discipline Modules Procedure" (completed January 2022); ensuring that at least one QMHP in the IRC is available to meet with quarantined individuals in MCJ and TTCF during evening and overnight shifts (completion date unclear); submitting on-call staff schedules each quarter (completion date unclear); steps related to improving documentation practices (completion date unclear); and improving treatment planning (completion date unclear).

Based on the discussion above, the County is again Non-Compliant with Provision 36 for the Fifteenth Reporting Period.

---

[20] County personnel have noted that inmates are sometimes resistant, unwilling, or unable to participate in the safety planning process.  In these circumstances, the efforts to engage in safety planning should be documented and the inmate's responses noted in the safety plan and elsewhere in the patient chart, if necessary.

[21] The Team noted that of the cases that included safety plans, some of them were "boilerplate bullet point lists" rather than individualized plans for each inmate.  The County must ensure that its plans are individualized to the presentation and symptoms of each inmate.

37.     Sheriff's Court Services Division staff will complete a Behavioral Observation and Mental Health Referral ("BOMHR") Form and forward it to the Jail's mental health and/or medical staff when the Court Services Division staff obtains information that indicates a prisoner has displayed obvious suicidal ideation or when the prisoner exhibits unusual behavior that clearly manifests self-injurious behavior, or other clear indication of mental health crisis.  Pending transport, such prisoner will be under unobstructed visual observation or subject to 15-minute safety checks.

**STATUS:     NON-COMPLIANCE**

The Compliance Measures require the Department to randomly select six courts from among the three Court Divisions each quarter, review written communications and orders that refer to a suicide risk or serious mental health crisis for a prisoner and incident reports for self-injurious behavior by prisoners appearing in the selected courts, and determine if these incidents are reflected in BOMHR forms completed by the Court Services Division staff in the selected courts.

In the County's Fifteenth Self-Assessment, it reported that for the Second Quarter of 2022, "42% – rather than the required 90% – of the incidents involving suicidal behavior, self-injurious behavior, or clear indications of mental health crises were identified in court communications or incident reports reflected on BOHMRs…."  In the Third Quarter of 2022, the County reported 40% compliance.

The County's previously reported on its corrective actions regarding Provision 37. Specifically:

> the Department has engaged in several efforts to improve compliance for this Provision consistent with its implementation plans.  The Department, with CCSB serving as a subject matter expert, briefed Court Services Division training on court services-specific issues affecting compliance. CCSB also created and provided a PowerPoint training on Provision 37 and common compliance issues as a training tool for use by Court Services Division Training.  CCSB and Court Services Training hosted a train the trainer presentation on multiple days in January 2022.  CCSB also specifically briefed the Court Services Division Commander and Captains regarding Provision 37, its obligations, and compliance issues. Further, CCSB issued Corrective Action Plan requests regarding non-compliant courts in Quarter 1 2022, specifically for Court Services East Division and West Division.

According to the County's implementation plan tracker, the County has completed 3 out of 4 corrective action steps regarding Provision 37.  These steps include: Court Services Training Bureau briefing operations staff at each of the three court services bureaus (completed January 2022); Court Services operations staff conducting mass briefings and training to Court Services lockup staff about expectations (completed February 2022); and Court Services commencing quarterly training on provision

requirements and documentation (completed February 2022 and ongoing).

While these efforts largely occurred in the First Quarter of 2022, they did not result in marked improvements to the County's performance under this provision in the next two quarters.  The County is rated Non-Compliant with Provision 37 for the Fifteenth Reporting Period.

38.     Consistent with existing DMH policies and National Commission on Correctional Health Care standards for jails, the County and the Sheriff will ensure that mental health staff or JMET teams make weekly cell-by-cell rounds in restricted non-mental health housing modules (e.g., administrative segregation, disciplinary segregation) at the Jails to identify prisoners with mental illness who may have been missed during screening or who have decompensated while in the Jails.  In conducting the rounds, either the clinician, the JMET Deputy, or the prisoner may request an out-of-cell interview. This request will be granted unless there is a clear and documented security concern that would prohibit such an interview or the prisoner has a documented history of repeated, unjustified requests for such out-of-cell interviews.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified))**

The Compliance Measures require the Department to review the documentation of the weekly cell-by-cell rounds and the JMET Logs for a randomly selected week each quarter to confirm that the required cell-by-cell checks were conducted and out-of-cell interviews were handled in accordance with this provision.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 38 in the Fifteenth Reporting Period.

39.     The County and the Sheriff will continue to use a confidential self-referral system by which all prisoners can request mental health care without revealing the substance of their requests to custody staff or other prisoners.

> STATUS        **SUBSTANTIAL COMPLIANCE (as of July 1, 2017, through June 30, 2018 (verified) at NCCF)**
>
> **PARTIAL COMPLIANCE (at PDC South, CRDF, MCJ, TTCF, and PDC North)**
>
> **NOT RATED (at PDC East)**

Substantial Compliance requires the Department to (a) verify that housing areas have the required forms and (b) review randomly selected self-referrals for mental health care from prisoners to confirm that (i) the referrals "were forwarded to DMH" by the Department, and (ii) that "DMH documented the timeliness and nature of DMH's response to the self-referrals[.]"  The thresholds for Substantial Compliance are that 85% of the housing areas have the required forms and 90% of the self-referrals must be forwarded by the Department to the Department of Health Services – Custody Health Services (DHS-CHS) and 90% must contain the required documentation of DHS-CHS's response.

The County's Fifteenth Self-Assessment reports that it achieved Substantial Compliance with Compliance Measure 39-4(a) in the Second and Third Quarters of 2022 "at all applicable" facilities.

Regarding Compliance Measures 39-4(b) and 4(c), the County's Fifteenth Self-Assessment reports that 100% of the self-referrals from PDC South, PDC North, TTCF, MCJ, and CRDF were forwarded by the Department to CHS in the Second Quarter of 2022.[22]  It further reported that CHS documented the timeliness and nature of its response in 100% of the PDC South referrals, 64% of the PDC North referrals, 52% of the CRDF referrals, 60% of the TTCF referrals, and 64% of the MCJ referrals.

The County's Augmented Fifteenth Self-Assessment also reports that 100% of the self-referrals from PDC South, PDC North, CRDF, TTCF, and MCJ, were forwarded by the Department to CHS in the Third Quarter of 2022.  The County further reports that CHS documented the timeliness and nature of its response in 0% of the PDC South referrals,[23] 80% of the PDC North referrals, 56% of the CRDF referrals, 60% of the

---

[22] According to the County's Augmented Fifteenth Self-Assessment, "there were no relevant referrals from PDC East, the Department's Fire Camp operation," during the Second or Third Quarters of 2022.

[23] The County's posted results reflect that there was only one such referral from PDC South during the period, and it was non-compliant, hence the 0% compliance percentage.

TTCF referrals,[24] and 52% of the MCJ referrals.[25]

The County previously reported Substantial Compliance at NCCF for twelve consecutive months from July 1, 2017, through June 30, 2018.  These results have been verified by the Monitor's auditors and NCCF is no longer subject to monitoring for compliance with Paragraph 39.

According to the County's implementation plan tracker, the County has completed 5 out of 11 corrective action steps regarding Provision 39.  These steps include: informal refresher courses (completion date unclear); workshop meetings at each facility regarding delays (completed May 2022); conducting hiring fairs (completed March 2022 and ongoing); providing periodic hiring reports (completion date unclear and ongoing); and having relief physicians trained for patient needs (completion date unclear).

---

[24] The County's posted records note an actual compliance percentage of 54% at TTCF in the Third Quarter of 2022.

[25] The County must ensure that it is not inappropriately marking non-compliant records as compliant.  For example, in record 8 in the posted results for PDC North, the patient indicated a need to see a psychiatrist for symptoms of bi-polar disorder.  The CHS response noted that the patient had a psychiatry appointment in eight weeks and thus no other follow up was necessary.  But an eight-week delay for addressing a patient's need for psychiatric consultation is not clinically appropriate and the record should not have been considered compliant.

40.    The County and the Sheriff will ensure a QMHP will be available on-site, by transportation of the prisoner, or through tele-psych 24 hours per day, seven days per week (24/7) to provide clinically appropriate mental health crisis intervention services.

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance requires the County (1) to provide the Monitor with on-call schedules for two randomly selected weeks reflecting that a QMHP was assigned 24 hours a day, seven days per week, and (2) to randomly select referrals for mental health crisis intervention received by a QMHP per quarter to verify (i) that a QMHP responded to all referrals, and (ii) responses to 90% of the referrals were within four hours.

The County's Fifteenth Self-Assessment reports that in the Second Quarter of 2022, a QMHP responded to 99% of the referrals for mental health crisis intervention services, which is just below the 100% threshold for Substantial Compliance, and that 98% of the responses were within four hours, which is above the 90% threshold for Substantial Compliance.

The County's Augmented Fifteenth Self-Assessment reports that in the Third Quarter of 2022, a QMHP responded to 99% of the referrals for mental health crisis intervention services, which is just below the 100% threshold for Substantial Compliance, and that 93% of the responses were within four hours, which exceeds the 90% threshold.

In the County's posted documents, it reports on its efforts to perform qualitative assessments of clinicians' crisis response notes:

Crisis Documentation Template: The standardized crisis response template has been in effect since November 9, 2020, and CHS Compliance continues to evaluate its use. All of the notes from the current audit were evaluated to determine if the QMHPs used the crisis response template, and it was determined 96% of the notes were completed using the template. Upon further examination, it was determined that 97% of QMHPs who appeared in the current audit did use the template at least once during the quarter. There was only one QMHP who did not use the template during the quarter. This information will be provided to the programs for follow up to ensure all QMHPs are provided with the template and the template use primer, and they understand the expectations for its use.

Provision 36 & 40 Implementation Plan: As previously reported by the County in the CHS Semi-Annual Report on Quality Improvement (submitted 1Q21), the use of the new crisis response template correlated with higher qualitative scores. This quarter, CHS Compliance continued to collect qualitative data from the crisis response notes. In accordance with the new Provision 36 & 40 Implementation Plan, a sample of 30 clinical

crisis response notes (taken from the current audit, with 10 notes from
each month) were scored according to the qualitative scoring tool that was
developed by CHS Compliance. The audit found the qualitative scores for
2Q22 were similar to those found during prior quarters, which indicates
clinicians have largely adapted to using the new template. It is expected
the data from these internal audits will assist the mental health program
managers and supervisors in their efforts in working with individual
QMHPs to improve clinical documentation quality.

It is positive and commendable for CHS Compliance to be performing qualitative
evaluations of clinicians' crisis response notes.  However, the Monitor's Mental Health
Team notes that "the language in the posted documents focuses primarily on clinicians'
use of the crisis response template but says nothing about whether the notes were found
to be clinically adequate.  The use of a template may be necessary but is not sufficient for
compliance.  Our reviews reflect continuing concerns about the clinical adequacy of the
crisis response notes.  More information from the County about the results of its
qualitative evaluations of the crisis response notes, and any fixes being implemented to
improve their quality, would be useful in the next Reporting Period."

In December 2022, Drs. Johnson, Vess, and Eargle, performed a qualitative
review of the County's compliance with Paragraph 40.  They reviewed 51 qualifying
cases from TTCF, CRDF, NCCF, and PDC North.  The responses were deemed to be
clinically adequate in just 43% of cases.  As with Provision 36, in some cases, the
interventions "were rote and non-specific, and appeared to include boilerplate lists that
could have been cut and pasted."  Such cases were not counted as compliant, and
individualized detail may have rendered more of the clinicians' notes adequate to be
found in compliance.  "A concise summary of the specific interventions attempted, and
the inmate's response would be sufficient.  Moreover, greater attention to the specific
content of clinical documentation could potentially result in rapid progress towards
compliance, assuming that such documentation accurately reflected an adequate level of
clinical assessment and intervention, as needed."

"Finally, it would be useful to clarify the specific protocols and procedures
associated with the management of inmates after urgent/emergent referrals.  If, for
example, the protocol for management of patients referred to a higher level of care
includes continuous line of sight supervision, no access to sharps, etc, between the point
of the initial mental health crisis contact and the implementation of adequate safety
precautions following transfer to a higher level of care, this needs to be clearly
understood and adequately referenced in the clinical documentation."

According to the County's implementation plan tracker, the County has already
completed 13 out of 21 corrective action steps regarding Provisions 36 and 40.  These
include: ensuring that at least one QMHP in the IRC is available to meet with quarantined
individuals in MCJ and TTCF during evening and overnight shifts (completion date
unclear); submitting on-call staff schedules each quarter (completion date unclear); steps
related to improving documentation practices (completion date unclear); and improving

treatment planning (completion date unclear).

41.     Consistent with existing DMH policies, the County and the Sheriff will implement step-down protocols that provide clinically appropriate transition when prisoners are discharged from FIP after being the subject of suicide watch.  The protocols will provide:

(a)     intermediate steps between highly restrictive suicide measures (e.g., clinical restraints and direct constant observation) and the discontinuation of suicide watch;

(b)     an evaluation by a QMHP before a prisoner is removed from suicide watch;

(c)     every prisoner discharged from FIP following a period of suicide watch will be housed upon release in the least restrictive setting deemed clinically appropriate unless exceptional circumstances affecting the facility exist; and

(d)     all FIP discharges following a period of suicide watch will be seen by a QMHP within 72 hours of FIP release, or sooner if indicated, unless exceptional circumstances affecting the facility exist.

**STATUS:        SUBSTANTIAL COMPLIANCE (as of July 1, 2022, through September 30, 2022 (unverified)**

Substantial Compliance requires CHS to review the medical records of all prisoners on suicide watch in FIP for one randomly selected month each quarter, and submit a report regarding the implementation of the step-down protocols and the results of its review of the medical records.  During the Fifth Reporting Period, the parties agreed to revise the Compliance Measures to increase the number of inmates subject to the step-down protocols of Paragraph 41 and ensure that the implementation of step-down protocols for FIP patients on suicide watch "ameliorate the impact of the restrictions" and have the necessary "level of precautions based upon individual assessment[s]" of the patients.

The County's Fifteenth Self-Assessment reports that it achieved Substantial Compliance in the Second and Third Quarters of 2022 as it met the requirements in Compliance Measure 41-4 for 100% of the prisoners discharged from FIP during the Reporting Period after having been on suicide watch.  However, in the judgment of the Monitor and Mental Health Subject Matter Expert, one patient record was incorrectly marked as compliant in the Second Quarter of 2022, and the County's compliance percentage for the Second Quarter of 2022 was instead 90%.[26]  The County is therefore

---

[26] In that record, the patient had been admitted to FIP due to head banging and other self-harming behaviors.  On the morning that the patient was discharged from FIP, a clinician noted that "smeared blood was observed on the door glass caused by head banging that [they] engaged in."  The patient was discharged, had their MHLOC reduced, and they were taken off suicide precautions notwithstanding the continued evidence of ongoing self-harming behaviors.

in Substantial Compliance as of the Third Quarter of 2022.

42.     Consistent with existing DMH policies, the County and the Sheriff will implement step-down protocols to ensure that prisoners admitted to HOH and placed on risk precautions are assessed by a QMHP.  As part of the assessment, the QMHP will determine on an individualized basis whether to implement "step-down" procedures for that prisoner as follows:

(a)     the prisoner will be assessed by a QMHP within three Normal business work days, but not to exceed four days, following discontinuance of risk precautions;

(b)     the prisoner is counseled to ameliorate the negative psychological impact that any restrictions may have had and in ways of dealing with this impact;

(c)     the prisoner will remain in HOH or be transferred to MOH, as determined on a case-by-case basis, until such assessment and counseling is completed, unless exceptional circumstances affecting the facility exist; and

(d)     the prisoner is subsequently placed in a level of care/housing as determined by a QMHP.

**STATUS:     NON-COMPLIANCE**

The County's Fifteenth Self-Assessment assesses the County's compliance using the revised methodology discussed in the Monitor's Fourteenth Report.  It reports that in the Second Quarter of 2022 at TTCF, "100% of the 25 inmates with High or Imminent Risk Level on their RAS [Risk Assessment for Suicide] were assessed by a QMHP pursuant to Measure 42-4(a)."  "None of the relevant inmates received documentation reflecting that a QMHP determined on an individualized basis whether to implement step-down procedures."  "TTCF had no records to assess for Measure 42-2(c)"

In the Third Quarter of 2022 at TTCF "100% of the 25 inmates with High or Imminent Risk Level on their RAS [Risk Assessment for Suicide] were assessed by a QMHP pursuant to Measure 42-4(a)."  "32% of these patients received documentation reflecting that a QMHP determined on an individualized basis whether to implement step-down procedures."  There were no records to assess for Measure 42-4(c).

At CRDF, there were only six responsive patient files in the Second Quarter of 2022.  Of those files, "100% of inmates with High or Imminent Risk Level on their RAS [Risk Assessment for Suicide] were assessed by a QMHP pursuant to Measure 42-4(a)." "None of the relevant inmates received documentation reflecting that a QMHP determined on an individualized basis whether to implement step-down procedures." "CRDF had no records to assess for Measure 42-2(c)."

For the Third Quarter of 2022 at CRDF, there was only one responsive patient who was assessed by a QMHP pursuant to Measure 42-4(a).  This patient "did not receive

documentation reflecting that a QMHP determined on an individualized basis whether to implement step-down procedures."  "CRDF had no records to assess for Measure 42-2(c)."

The County reports that given its inability to have QMHPs determine whether to implement stepdown procedures for these patients on an individualized basis, CHS "is working to train all staff on the new procedures and expectations and anticipates improved performance as that training is rolled out.  CHS staff trainings for Suicide Risk Assessment were scheduled to begin in the Second Quarter of 2022 but were delayed due to critical staffing issues and an increased need for available staff to provide direct patient care."

According to the County's implementation plan tracker, the County has completed 2 out of 7 corrective action steps regarding Provision 42.  These steps include: writing a new program and providing training and access to the program for staff in order to streamline access to suicide risk information (completed September 2022); and training the training team (completed January and February 2022).

43.     Within six months of the Effective Date, the County and the Sheriff will develop
and implement written policies for formal discipline of prisoners with serious mental
illness incorporating the following:

(a)     Prior to transfer, custody staff will consult with a QMHP to determine
whether assignment of a prisoner in mental health housing to disciplinary
housing is clinically contraindicated and whether placement in a higher
level of mental health housing is clinically indicated, and will thereafter
follow the QMHP's recommendation;

(b)     If a prisoner is receiving psychotropic medication and is placed in
disciplinary housing from an area other than mental health housing, a
QMHP will meet with that prisoner within 24 hours of such placement to
determine whether maintenance of the prisoner in such placement is
clinically contraindicated and whether transfer of the prisoner to mental
health housing is clinically appropriate, and custody staff will thereafter
follow the QMHP's recommendation;

(c)     A QMHP will participate in weekly walks, as specified in paragraph 38, in
disciplinary housing areas to observe prisoners in those areas and to
identify those prisoners with mental health needs; and

(d)     Prior to a prisoner in mental health housing losing behavioral credits for
disciplinary reasons, the disciplinary decision-maker will receive and take
into consideration information from a QMHP regarding the prisoner's
underlying mental illness, the potential effects of the discipline being
considered, and whether transfer of the prisoner to a higher level of mental
health housing is clinically indicated.

**STATUS (43):**          **SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at NCCF and PDC North)**

**PARTIAL COMPLIANCE (at TTCF and MCJ)**

**NON-COMPLIANCE (at CRDF)**

In the Fourteenth Report, the Monitor found the County in Non-Compliance with Provision 43 due to its failures to finalize the discipline policies required under the Provision.  During the Fifteenth Reporting Period, the County made efforts to finalize those polices, including meetings with the Monitor and DOJ, correspondence regarding the content of the policies, and promulgating new versions that reflect some of the feedback received.  The County must finalize all of the discipline policies in the next Reporting Period.

Regarding Compliance Measure 43-6 and 43-9(e), the Department posted a memo indicating that no inmates with mental illness lost behavioral credits for disciplinary reasons during the Second Quarter of 2022.  The County's Fifteenth Self-Assessment reports that in the Second Quarter of 2022, 89% of the required consultations at CRDF "occurred prior to transfers from mental health housing."  The County further reports that "90% – level with the required 90% – of the meetings required pursuant to Compliance Measure 43-9(c) occurred when transferring inmates to disciplinary housing from areas other than mental health housing."  The County also reports that 100% of the weekly row walks through disciplinary units occurred at CRDF.  The results for MCJ were 86%, 54%, and 60%, respectively.

At TTCF, 72% of the required consultations "occurred prior to transfers from mental health housing," and "there were no patients to assess for Measure 43-9(c) during this quarter," since "[i]nstead of being used for discipline, these modules in TTCF were used for Covid-related quarantines during the reporting period."  Similarly, the County reports that regarding Compliance Measure 43-9(d), "there were no discipline row walks required during the random weeks as no inmates or patients were housed in TTCF discipline modules during the relevant weeks due to changes required to reduce the risk of spreading COVID-19."

The County's Augmented Fifteenth Self-Assessment reports that "no inmates with mental illness lost behavioral credits for disciplinary reasons during the Third Quarter of 2022."  However, just 35% of the required consultations at CRDF "occurred prior to transfers from mental health housing."  This is a substantial decline from the previous quarter.  58% of the required consultations at CRDF "occurred when transferring inmates from areas other than mental health housing."  The County also reports that 100% of the weekly row walks through disciplinary units occurred at CRDF.  The results for TTCF were 73% (consultations before transfer), but there were no results to report for Compliance Measures 43-9(c) or 43-9(d) due to COVID-19 related population changes.  For MCJ, the results were 56%, 57%, and 80% in the Third Quarter

of 2022.

The County previously achieved Substantial Compliance at NCCF and PDC
North for twelve consecutive months and these facilities were not subject to monitoring
for compliance with Paragraph 43 during the Fifteenth Reporting Period.

According to the County's implementation plan tracker, the County has
completed 10 out of 17 corrective action steps regarding Provision 43.  These steps
include: providing the DOJ and Monitor with updated, revised discipline policies and
responses to DOJ comments on the policies (completed March 2023); improving
communication issues at TTCF by commencing in-person briefings of line staff and
supervisors to reiterate the importance of following proper discipline procedures
(completed December 2021); training line staff and supervisors on proper documentation
practices (completed March 2022); establishing consistent discipline processes and
custody point of contact at CRDF (completed March 2022); preparing a directive for staff
requiring them to clarify with custody during crisis calls whether an IRTS is being
produced (completed March 2022); and CHS training relevant CRDF staff on
requirements related to staff conduct evaluations (completed March 2022).

44.     Within six months of the Effective Date, the County and the Sheriff will install protective barriers that do not prevent line-of-sight supervision on the second floor tier of all High Observation Housing areas to prevent prisoners from jumping off of the second floor tier.  Within six months of the Effective Date, the County and the Sheriff will also develop a plan that identifies any other areas in mental health housing where such protective barriers should be installed.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016)**

The County has maintained Substantial Compliance with Paragraph 44 of the Agreement since January 1, 2016.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 44 in the Fifteenth Reporting Period.

45.     Consistent with existing Sheriff's Department policies, the County and the
Sheriff will provide both a Suicide Intervention Kit that contains an emergency cut-down
tool and a first-aid kit in the control booth or officer's station of each housing unit.  All
custody staff who have contact with prisoners will know the location of the Suicide
Intervention Kit and first-aid kit and be trained to use their contents.

> **STATUS:** **SUBSTANTIAL COMPLIANCE (as of October 1, 2015,
> through September 30, 2016 (verified) at CRDF, NCCF, PDC
> East, PDC South, and TTCF)**
>
> **SUBSTANTIAL COMPLIANCE (as of January 1, 2016,
> through December 31, 2016 (verified) at MCJ and PDC North)**

The County maintained Substantial Compliance with Paragraph 45 for twelve
consecutive months at all facilities as of December 31, 2016.  Pursuant to Paragraph 111
of the Settlement Agreement, the Department was not subject to monitoring for
Substantial Compliance with Paragraph 45 in the Fifteenth Reporting Period.

46.     The County and the Sheriff will immediately interrupt, and if necessary, provide appropriate aid to, any prisoner who threatens or exhibits self-injurious behavior.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of July 1, 2020, through June 30, 2021 (verified))**

The parties agreed on Revised Compliance Measures in 2021.  Substantial Compliance requires the Department to review the documentation from randomly selected incidents involving prisoners who threaten or exhibit self-injurious behavior, and include an assessment of the timeliness and appropriateness of the Department's responses to these incidents in its semi-annual Self-Assessment.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 46 in the Fifteenth Reporting Period.

47.     The County and the Sheriff will ensure there are sufficient custodial, medical, and mental health staff at the Jails to fulfill the terms of this Agreement.  Within six months of the Effective Date, and on a semi-annual basis thereafter, the County and the Sheriff will, in conjunction with the requirements of Paragraph 92 of this Agreement, provide to the Monitor and DOJ a report identifying the steps taken by the County and the Sheriff during the review period to implement the terms of this Agreement and any barriers to implementation, such as insufficient staffing levels at the Jails, if any.  The County and the Sheriff will retain staffing records for two years to ensure that for any critical incident or non-compliance with this Agreement, the Monitor and DOJ can obtain those records to determine whether staffing levels were a factor in that critical incident and/or non-compliance.

**STATUS:     PARTIAL COMPLIANCE**

Under Provision 47 and its associated Compliance Measures, Substantial Compliance requires the County to: a) submit a self-assessment that: i) identifies the steps taken by the County and the Sheriff to implement the terms of the Agreement, and ii) assess whether staffing levels were a factor in any non-compliance with the Agreement, any Critical Incident, or the Department's handling of the Critical Incident. Historically, the Monitor has assessed that the County has provided useful analysis of the role of staffing levels with respect to Critical Incidents (47-4(a)(ii)), but it has not adequately evaluated "whether staffing levels were a factor in any non-compliance with the Agreement" (47-4(a)(ii)).

Regarding critical incidents, in the Fifteenth Reporting Period, the County's posted results for Provision 47 reflect the County's assessment of whether staffing levels were a factor in "any critical incident, or the Department's handling of the incident," as Compliance Measures 47-1 and 47-2 require.  The County's posted results report that 33 critical incidents[27] occurred during the First Half of 2022, and the County's conclusion that staffing was not a factor in any of those incidents.

In the Fifteenth Reporting Period, the Department again did not evaluate in its Self-Assessment "whether staffing levels were a factor in any non-compliance with the Agreement" (47-4(a)(ii)).  Providing such analysis is essential to the County's compliance with Provision 47.

As set forth in the introduction to this Report, the County has repeatedly noted that there is a shortage of available mental health workers who are interested in working in its jails.  *See, e.g. Joint Status Report on Unresolved Disagreements*, Dkt. 190 at 27. The Monitor believes that this is accurate; the data indeed reflect that the County has been unable to hire the mental health workers necessary for its compliance with the Agreement.

---

[27] 23 Inmate Deaths, 4 Serious Suicide Attempts, 2 Inmate Assaults on Staff, and 4 Category 3 Uses of Force.

For example, according to data provided by the County, as of February 2023, CHS had 310 total authorized mental health worker positions and 179 were filled, or just 54% of the total (34 positions had candidates who had accepted offers and were in the process of onboarding). More specifically, of 39 budgeted Clinical Psychologist II positions, only 19 were filled, less than half. Of 43 budgeted Psychiatrist positions, only 17 were filled, or 39%. Of 127 Psych Social Worker positions, only 75 were filled, or 59%. Given the centrality of Clinical Psychologists, Psychiatrists, and Social Workers to the County's compliance efforts, it is unsurprising that these large, persistent staffing gaps have caused the County to struggle to comply with various provisions of the Agreement.

The County agrees that filling CHS' budgeted positions is necessary for its compliance with the Agreement. Yet, in the years since the Agreement was executed, the County has not detailed in any of its Self-Assessments why these positions have gone unfilled. It must do so now. It must explain why it cannot fill these essential positions, what impact these vacancies have on its lack of compliance with the Agreement, and any steps it is taking to address its inability to hire these essential mental health workers. Failure to do so will result in a Non-Compliance rating in the next Reporting Period.

48.     Within three months of the Effective Date, the County and the Sheriff will
have written housekeeping, sanitation, and inspection plans to ensure the proper cleaning
of, and trash collection and removal in, housing, shower, and medical areas, in
accordance with California Code of Regulations ("CCR") Title 15 § 1280: Facility
Sanitation, Safety, and Maintenance.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of January 1, 2016,
              through December 31, 2016)**

The County maintained Substantial Compliance with Paragraph 48 of the
Agreement at all facilities for twelve consecutive months as of December 31, 2016.
Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject
to monitoring for Substantial Compliance with Paragraph 48 in the Fifteenth Reporting
Period.

49.     Within three months of the Effective Date, the County and the Sheriff will
have a maintenance plan to respond to routine and emergency maintenance needs,
including ensuring that shower, toilet, sink, and lighting units, and heating, ventilation,
and cooling system are adequately maintained and installed.  The plan will also include
steps to treat large mold infestations.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of March 1, 2016,
               through February 28, 2017)**

The County maintained Substantial Compliance with Paragraph 49 of the
Agreement at all facilities for twelve consecutive months as of February 28, 2017.
Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject
to monitoring for Substantial Compliance with Paragraph 49 in the Fifteenth Reporting
Period.

50.     Consistent with existing Sheriff's Department policies regarding control of
vermin, the County and the Sheriff will provide pest control throughout the housing units,
medical units, kitchen, and food storage areas.

> **STATUS:**      **SUBSTANTIAL COMPLIANCE (as of January 1, 2016,
> through December 31, 2016 (verified) at all facilities other than
> PDC South and PDC East)**
>
> **SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through
> March 31, 2017 (verified) at PDC South and PDC East)**

The County maintained Substantial Compliance with Paragraph 50 of the
Agreement at all facilities for twelve consecutive months as of March 31, 2017.  Pursuant
to Paragraph 111 of the Settlement Agreement, the Department was not subject to
monitoring for Substantial Compliance with Paragraph 50 in the Fifteenth Reporting
Period.

51.     Consistent with existing Sheriff's Department policies regarding personal care items and supplies for inmates, the County and the Sheriff will ensure that all prisoners have access to basic hygiene supplies, in accordance with CCR Title 15 § 1265: Issue of Personal Care Items.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) for all facilities other than CRDF)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017 (verified) at CRDF)**

The County maintained Substantial Compliance with Paragraph 51 of the Agreement at all facilities for twelve consecutive months as of June 30, 2017.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 51 in the Fifteenth Reporting Period.

52.     The County and the Sheriff will implement policies governing property restrictions in High Observation Housing that provide:

(a)     Except when transferred directly from FIP, upon initial placement in HOH:

(i)     Suicide-resistant blankets, gowns, and mattresses will be provided until the assessment set forth in section (a)(ii) below is conducted, unless clinically contraindicated as determined and documented by a QMHP.

(ii)     Within 24 hours, a QMHP will make recommendations regarding allowable property based upon an individual clinical assessment.

(b)     Property restrictions in HOH beyond 24 hours will be based on clinical judgment and assessment by a QMHP as necessary to ensure the safety and well-being of the prisoner and documented in the electronic medical record.

**STATUS:       PARTIAL COMPLIANCE**

Substantial Compliance requires the Department to (1) randomly inspect the cells of prisoners placed in HOH (except from FIP) within the previous 24 hours to confirm that they have been provided with suicide-resistant blankets, gowns and mattresses unless clinically contraindicated, and document the results of the inspection; (2) randomly inspect the cells of prisoners placed in HOH (except from FIP) for more than 24 hours to confirm that they have been provided with allowable property as recommended by a QMHP; and (3) review the electronic medical records of prisoners assigned to HOH on the days of those inspections to verify compliance with the provisions of Paragraph 52. All the Compliance Measures have a 95% threshold for Substantial Compliance.

In its Fifteenth Self-Assessment, the County reports that in the Second Quarter of 2022, at CRDF there was "100%" compliance with Compliance Measure 52-5(b). Regarding Compliance Measure 52-5(c), "76%—rather than the required 95%—of the electronic medical records for inmates assigned to HOH reflected a recommendation by a QMHP regarding allowable property ." Additionally, "45%—rather than the required 95%—of electronic medical records for inmates assigned to HOH reflect that property restrictions were based upon the clinical judgment of a QMHP pursuant to Compliance Measure 52-5(d)." The County also reported that "92%—less than the required 95%—of inmates analyzed pursuant to Compliance Measure 52-5(e) had allowable property as recommended by a QMHP (unless refused by the inmate)."

The County also reports that at TTCF in the Second Quarter of 2022, "82%—rather than the required 95%—of inmates analyzed pursuant to Compliance Measure 52-5(b) were provided suicide-resistant blankets, gowns and mattresses as required by this Provision." "47%—rather than the required 95%—of the electronic medical records for

inmates assigned to HOH reflected a recommendation by a QMHP regarding allowable property pursuant to Compliance Measure 52-5(c)."  "78%—rather than the required 95%—of electronic medical records for inmates assigned to HOH reflect that property restrictions were based upon the clinical judgment of a QMHP pursuant to Compliance Measure 52-5(d)."  "95%—equal to the required 95%—of inmates analyzed pursuant to Compliance Measure 52-5(e) had allowable property as recommended by a QMHP (unless refused by the inmate)."

The County's Augmented Fifteenth Self-Assessment reports that at CRDF in the Third Quarter of 2022, 100% compliance with Compliance Measure 52-5(b)." Further, "68%—rather than the required 95%—of the electronic medical records for inmates assigned to HOH reflected a recommendation by a QMHP regarding allowable property pursuant to Compliance Measure 52-5(c)."  "27%—rather than the required 95%—of electronic medical records for inmates assigned to HOH reflect that property restrictions were based upon the clinical judgment of a QMHP pursuant to Compliance Measure 52-5(d)."  "98%—more than the required 95%—of inmates analyzed pursuant to Compliance Measure 52-5(e) had allowable property as recommended by a QMHP (unless refused by the inmate)."

The County reports that at TTCF in the Third Quarter of 2022, "92%—rather than the required 95%—of inmates analyzed pursuant to Compliance Measure 52-5(b) were provided suicide-resistant blankets, gowns and mattresses as required by this Provision." "48%—rather than the required 95%—of the electronic medical records for inmates assigned to HOH reflected a recommendation by a QMHP regarding allowable property pursuant to Compliance Measure 52-5(c)."  79% "rather than the required 95%—of electronic medical records for inmates assigned to HOH reflect that property restrictions were based upon the clinical judgment of a QMHP pursuant to Compliance Measure 52-5(d)."[28]  "94%—less than the required 95%—of inmates analyzed pursuant to Compliance Measure 52-5(e) had allowable property as recommended by a QMHP (unless refused by the inmate)."

According to the County's implementation plan tracker, the County has completed 8 out of 15 corrective action steps regarding Provision 52.  These steps include: allocation of designated staff to complete all HOH intakes at CRDF (completed October 2022); CHS posting information outlining the requirements of Provision 52 in areas frequented by staff (completion date unclear); program-wide training of provision guidelines to clarify for clinical staff what documentation reflects adequate justification of restrictions (completed February 2022); CCSB working with CCS to ensure dissemination of an information bulletin advising custody personnel of proper procedures for usage of "Inmate Property Door Signs" for inmates in HOH (completed March 2022); revised duty statements for Deputies and Custody Assistants to reflect responsibility for updating allowable property restriction door signs (completed January 2022); and weekly module spot checks for at least 10 cells (completion date unclear).

---

[28] The County's Fifteenth Self-Assessment reported that this number was 81%.  However, the relevant records make clear that 79% is the correct figure.

53.     If otherwise eligible for an education, work, or similar program, a prisoner's mental health diagnosis or prescription for medication alone will not preclude that prisoner from participating in said programming.

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance requires the Department to audit the records of prisoners who were eligible, but rejected or disqualified, for education and work programs to confirm that they were not rejected or disqualified because of a mental health diagnosis or prescription for medication alone.

The County's Fifteenth Self-Assessment reports that 47% of the eligible mentally ill prisoners who were denied education or work in the Second Quarter of 2022 and 55% in the Third Quarter of 2022 were denied "for reasons other than a mental health diagnosis or medication prescription."  The County further reported that "in the interest of completeness and transparency, the Department determined that in every case where a person's request for programming was not handled in a timely manner, it should be treated as a denial of programming within the Meaning of Provision 53—that is, a denial based on a mental health diagnosis or medication prescription."

According to the County's implementation plan tracker, the County has already completed 4 out of 7 corrective action steps regarding Provision 53.  These include: hiring a new staff member at CRDF to process requests from incarcerated individuals (completed February 2022); on a weekly basis, CRDF and MCJ staff identify requests pending for more than 15 days, reviewing denials under the provision, and determining whether training or other measures are appropriate (completion date unclear); using a new housing matrix at MCJ that identifies every mental health housing location with inmate information to facilitate decision making (completed February 2022); and CCSB meeting with PMB and PPO staff to provide guidance on the compliance requirements of Provision 53 (completed January 2022).

54.     Prisoners who are not in Mental Health Housing will not be denied privileges and programming based solely on their mental health status or prescription for psychotropic medication.

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance under the revised Compliance Measures for Paragraph 54, effective January 1, 2018, requires the Department to audit the records of a maximum of 100 randomly selected prisoners identified on the Wednesday Pharmacy List as having received psychotropic medication to confirm that no more than 10% were rejected or disqualified because of a mental health diagnosis or prescription for psychotropic medication alone.  Because the Monitor's auditors had verified that the County has maintained Substantial Compliance under the original Compliance Measures, the parties agreed that the County will only be required to maintain Substantial Compliance under the revised Compliance Measures for two additional quarters.

The County's Fifteenth Self-Assessment reports that in the Second Quarter of 2022, 23% of inmates "were denied requests improperly for the purposes of this Provision."  It further reports that in the Third Quarter of 2022, "32% of inmates were denied requests improperly for purposes of this Provision."  The County notes that "the assessment for this Provision counts as denials requests that were denied, or simply not answered, in a timely manner because those denials are inconsistent with Department policy, even though the denials were unrelated to the inmate's mental health status."

55.     Relevant custody, medical, and mental health staff in all High Observation
Housing units will meet on normal business work days and such staff in all Moderate
Observation Housing units will meet at least weekly to ensure coordination and
communication regarding the needs of prisoners in mental health housing units as
outlined in Custody Services Division Directive(s) regarding coordination of mental
health treatment and housing.  When a custody staff member is serving as a member of a
treatment team, he or she is subject to the same confidentiality rules and regulations as
any other member of the treatment team, and will be trained in those rules and
regulations.

> **STATUS:**      **SUBSTANTIAL COMPLIANCE (as of October 1, 2016,
> through September 30, 2017 (verified) at CRDF)**
>
> **SUBSTANTIAL COMPLIANCE (as of April 1, 2017,
> through March 31, 2018 (verified) at PDC North)**
>
> **SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through
> March 31, 2019 (verified) at MCJ)**
>
> **SUBSTANTIAL COMPLIANCE (as of July 1, 2019, through
> June 30, 2020 (verified) at TTCF)**

The Department maintained Substantial Compliance for twelve consecutive
months at all facilities as of June 30, 2020.  These results have now been verified by the
Monitor's auditors.  Pursuant to Paragraph 111 of the Settlement Agreement, the
Department was not subject to monitoring for Substantial Compliance with Paragraph 55
in the Fifteenth Reporting Period.

56.     Consistent with existing DMH and Sheriff's Department policies, the County and the Sheriff will ensure that custody, medical, and mental health staff communicate regarding any change in a prisoner's housing assignment following a suicide threat, gesture, or attempt, or other indication of an obvious and serious change in mental health condition.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified))**

Substantial Compliance requires the Department to review in randomly selected periods the electronic medical records of (1) prisoners admitted to HOH following a suicide threat, gesture, or attempt, or other indication of an obvious and serious change in mental health condition to determine if the medical and/or mental health staff approved the placement of the prisoner in HOH; and (2) prisoners who were the subject of a suicide attempt notification to determine if the prisoners were clinically assessed and that clinical staff approved the post-incident housing.

The County's Substantial Compliance results for the twelve months from January 1, 2016, through December 31, 2016, were verified by the Monitor's auditors.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 56 in the Fifteenth Reporting Period.

57 (**Revised**).  Within three months of the Effective Date, the County and the Sheriff will revise and implement their policies on safety checks to ensure a range of supervision for prisoners housed in Mental Health Housing.  The County and the Sheriff will ensure that safety checks in Mental Health Housing are completed and documented in accordance with policy and regulatory requirements as set forth below:

(a)     Custody staff will conduct safety checks in a manner that allows staff to view the prisoner to assure his or her well-being and security.  Safety checks involve visual observation and, if necessary to determine the prisoner's well-being, verbal interaction with the prisoner;

(b)     Custody staff will document their checks in a format that does not have pre-printed times;

(c)     Custody staff will stagger checks to minimize prisoners' ability to plan around anticipated checks;

(d)     Video surveillance may not be used to replace rounds and supervision by custodial staff unless new construction is built specifically with constant video surveillance enhancements and could only be used to replace the required safety checks in non-FIP housing, subject to approval by the Monitor;

(e)     A QMHP, in coordination with custody (and medical staff if necessary), will determine mental health housing assignments; and

(f)     Supervision of prisoners in mental health housing will be conducted at the following intervals:

(i)     FIP:  Custody staff will perform safety checks every 15 minutes. DMH staff will perform direct constant observation or one-to-one observation when determined to be clinically appropriate;

(ii)     High Observation Housing:  Every 15 minutes;

(iii)     Moderate Observation Housing:  Every 30 minutes.

**STATUS (57):**       **SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at MCJ)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2021, through June 30, 2022 (verified) at PDC North)**

**NON-COMPLIANCE (at TTCF and CRDF)**

On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provision 57 ("Revised Paragraph 57") as set forth above.  The Parties also agreed on Revised Compliance Measures.  Substantial Compliance requires the Department to audit the Title 15 Dashboard records (or e-UDAL records if the Title 15 scanner was not working) for all shifts for each module in each mental health housing unit in two randomly selected weeks to determine if the safety checks were staggered and conducted as required by Paragraph 57 of the Agreement, and to audit the housing records for each mental health housing unit for a randomly selected week to determine if QMHPs approved the new mental health housing assignments as required by Paragraph 57(e).

The County's Sixth Self-Assessment reported that it maintained Substantial Compliance with Compliance Measure 57-5(b) in the Fourth Quarter of 2017 and the First Quarter of 2018 in the MOH unit at MCJ (the "Hope Dorm").  It also reported that all of the inmates at MCJ "analyzed pursuant to Compliance Measure 57-5(c) had received QMHP approval for their housing assignments" in both quarters.  The results were verified by the Monitor's auditors and MCJ was not subject to monitoring for compliance with Paragraph 57 in the Fifteenth Reporting Period.

The County's Fifteenth Self-Assessment reports that 52% of the safety checks were in compliance with Compliance Measure 57-5(b) (safety checks in FIP) in the Second Quarter of 2022 at TTCF.  It also reports that 29% of the safety checks were in compliance with Compliance Measure 57-5(c) (safety checks in HOH) at TTCF.  The County also reports that 10% of the safety checks complied with Compliance Measure 57-5(d) (safety checks in MOH) at TTCF.  100% of the new mental health housing assignments at TTCF were approved by a QMHP in the Second Quarter of 2022.

The County's Fifteenth Self-Assessment also reports that 45.5% of the safety checks were in compliance with Compliance Measure 57-5(c) (safety checks in HOH) in the Second Quarter 2022 at CRDF.  The County also reports that 37.5% of the safety checks complied with Compliance Measure 57-5(d) (safety checks in MOH) at CRDF.  100% and of the new mental health housing assignments at CRDF were approved by a QMHP in the Second Quarter of 2022.

The County's Augmented Fifteenth Self-Assessment reports that 11% of the safety checks were in compliance with Compliance Measure 57-5(c) (safety checks in HOH) in the Third Quarter of 2022 at CRDF.  The County also reports that 9.1% of the safety checks complied with Compliance Measure 57-5(d) (safety checks in MOH) at

CRDF.  100% and of the new mental health housing assignments at CRDF were approved by a QMHP in the First Quarter of 2022.

The County's Augmented Fifteenth Self-Assessment also reports that 41.1% of the safety checks were in compliance with Compliance Measure 57-5(b) (safety checks in FIP) in the Third Quarter of 2022 at TTCF.  It also reports that 9.2% of the safety checks were in compliance with Compliance Measure 57-5(c) (safety checks in HOH) at TTCF.  The County also reports that 0.07% of the safety checks complied with Compliance Measure 57-5(d) (safety checks in MOH) at TTCF.  100% and of the new mental health housing assignments at TTCF were approved by a QMHP in the Fourth Quarter of 2021.

Regarding its disappointing results, the County reports

The Department continues to experience, and work to improve, Wi-Fi and server issues to improve the accuracy of safety check scanning. However, these technological challenges remained insuperable during the reporting period. The Department has not yet found a means to ensure that its WiFi-based systems function as designed in the jail facilities. As in the past, the Department provides e-UDAL logs reflecting the identification of these issues as they arose during the reporting period.

The Monitor walked the jails with representatives from the County department responsible for managing these technology issues in March 2023.  They explained the significant efforts that have been made to diagnose the problems with existing technologies and make improvements, such as adding Wi-Fi access points throughout the County jails.  While commendable, these efforts have not yet improved the County's results, and the County is Non-Compliant for the Fifteenth Reporting Period at TTCF and CRDF.

The County's Augmented Fifteenth Self-Assessment also reports that 97.7% of the safety checks at PDC North were in compliance with Compliance Measure 57-5(d) in the Second Quarter of 2022.[29]  These results have been verified by the Monitor's auditors and PDC North is no longer subject to monitoring for Provision 57.

According to the County's implementation plan tracker, the County has completed 9 out of 31 corrective action steps regarding Provisions 57 and 58.  These steps include: having safety check teams solely focus on performing timely and quality safety checks (completion date unclear); facilities re-briefing staff on properly recording safety checks when the scanners or network are down (completed March 2023); shifting audits to be documented in a new Custody Watch Commander Log (completion date unclear); providing rosters or SMS acknowledgements of which staff received training (completion date unclear); facilities determining and using scanners that work properly

---

[29] The County has indicated that patients assigned to mental health housing at PDC North first have their housing assignments approved by a QMHP at either TTCF or MCJ, which is why results are not separately reported for PDC North for Compliance Measure 57-5(e).  PDC North also does not have HOH housing (57-5(c)) or a FIP (57-5(b)) hence the lack of results for those compliance measures.

(completed March 2023); sending problematic iPods and scanners to CITU and CAU to
be examined and reprogrammed (completed March 2023); TTCF modifications to
improve Wi-Fi coverage (completed January 2022); obtaining the number of additional
access points needed at PDC, MCJ, and CRDF (completion date unclear); and identifying
which locations in each facility have worst coverage and resolving those issues first by
collaborating with DSB and CITU (completion date unclear).

58.     Within three months of the Effective Date, the County and the Sheriff will revise and implement their policies on safety checks.  The County and the Sheriff will ensure that safety checks in non-mental health housing units are completed and documented in accordance with policy and regulatory requirements as set forth below:

(a)     At least every 30 minutes in housing areas with cells;

(b)     At least every 30 minutes in dormitory-style housing units where the unit does not provide for unobstructed direct supervision of prisoners from a security control room;

(c)     Where a dormitory-style housing unit does provide for unobstructed direct supervision of prisoners, safety checks must be completed inside the unit at least every 60 minutes;

(d)     At least every 60 minutes in designated minimum security dormitory housing at PDC South, or other similar campus-style unlocked dormitory housing;

(e)     Custody staff will conduct safety checks in a manner that allows staff to view the prisoner to assure his or her well-being and security.  Safety checks involve visual observation and, if necessary to determine the prisoner's well-being, verbal interaction with the prisoner;

(f)     Custody staff will document their checks in a format that does not have pre-printed times;

(g)     Custody staff will stagger checks to minimize prisoners' ability to plan around anticipated checks; and

(h)     Video surveillance may not be used to replace rounds and supervision by custodial staff.

STATUS (58):        **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at PDC South, PDC North, and PDC East)**

        **SUBSTANTIAL COMPLIANCE ( as of July 1, 2017, through June 30, 2018 (verified) at CRDF)**

        **SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at IRC)**

        **PARTIAL COMPLIANCE (at NCCF)**

        **NON-COMPLIANCE (at TTCF and MCJ)**

Substantial Compliance requires the Department to audit the Title 15 Dashboard records (or e-UDAL records) for all shifts for each module in each housing unit to determine if the safety checks were staggered and conducted as required by Paragraph 58. The threshold for achieving Substantial Compliance with each of the Compliance Measures is 90%.

The County maintained Substantial Compliance with Paragraph 58 for twelve consecutive months at PDC South, PDC North, and PDC East as of December 31, 2016, at CRDF as of June 30, 2018, and at IRC as of September 30, 2018. These results have been verified by the Monitor's auditors. Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring at those facilities for Substantial Compliance with Paragraph 58 in the Fifteenth Reporting Period.

The County's Augmented Fifteenth Self-Assessment reports that for the Second and Third Quarters of 2022, the following percentages of safety checks were in compliance with Paragraph 58: at TTCF (52% and 0%), at MCJ (53% and 35%), and at NCCF (93% and 78%).[30]

According to the County's implementation plan tracker, the County has completed 9 out of 31 corrective action steps regarding Provisions 57 and 58. These steps include: having safety check teams solely focus on performing timely and quality safety checks (completion date unclear); facilities re-briefing staff on properly recording safety checks when the scanners or network are down (completed March 2023); shifting audits to be documented in a new Custody Watch Commander Log (completion date unclear); providing rosters or SMS acknowledgements of which staff received training (completion date unclear); facilities determining and using scanners that work properly (completed March 2023); sending problematic iPods and scanners to CITU and CAU to

---

[30] The Fourteenth Report reflected that the Substantial Compliance rating at NCCF for October 1, 2021, through March 31, 2022 was pending verification by the Monitor's auditors. The auditors verified the reported results for the Fourth Quarter of 2021 and could not verify the results for the First Quarter of 2022. Therefore, the posted results for the Second Quarter of 2022 were audited and verified. However, the posted results for the Third Quarter of 2022 reflect Partial Compliance.

be examined and reprogrammed (completed March 2023); TTCF modifications to
improve Wi-Fi coverage (completed January 2022); obtaining the number of additional
access points needed at PDC, MCJ, and CRDF (completion date unclear); and identifying
which locations in each facility have worst coverage and resolving those issues first by
collaborating with DSB and CITU (completion date unclear).

The Monitor walked the jails with representatives from the County department
responsible for managing these technology issues in March 2023.  They explained the
significant efforts that have been made to diagnose the problems with existing
technologies and make improvements, such as adding Wi-Fi access points throughout the
County jails.  While commendable, these efforts have not yet improved the County's
results, and the County is Non-Compliant for the Fifteenth Reporting Period at TTCF and
MCJ.

59.     Consistent with existing Sheriff's Department policies regarding uniform daily activity logs, the County and the Sheriff will ensure that a custodial supervisor conducts unannounced daily rounds on each shift in the prisoner housing units to ensure custodial staff conduct necessary safety checks and document their rounds.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of January 1, 2017, through December 31, 2017 (verified) at PDC East and MCJ)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2018, through December 31, 2018 (verified) at PDC North and PDC South)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 (verified) at TTCF)**

Substantial Compliance requires the Department to audit e-UDAL records for housing units in each facility to determine if supervisors are conducting unannounced daily rounds in accordance with Paragraph 59.  In response to the Monitor's comments, the Department's e-UDAL forms were modified to include a specific notation that the Supervisor verified that the safety checks were conducted.  The threshold for achieving and maintaining Substantial Compliance is that 90% of the supervisor daily rounds were in compliance with the requirements of Paragraph 59.

The County's Substantial Compliance results were verified by the Monitor's auditors.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 59 in the Fifteenth Reporting Period.

60.     Within six months of the Effective Date, the Department of Mental
Health, in cooperation with the Sheriff's Unit described in Paragraph 77 of this
Agreement, will implement a quality improvement program to identify and address
clinical issues that place prisoners at significant risk of suicide or self-injurious behavior.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of April 1, 2019
                through March 31, 2020)**

Paragraph 60 requires the County to "implement a quality improvement program
to identify and address clinical issues that place prisoners at significant risk of suicide or
self-injurious behavior."  The Compliance Measures for Paragraph 60 require the County
to "identify and address. . .clinical issues" in the areas identified in Paragraph 61 of the
Agreement" and corrective actions are taken to address "such issues."  See Compliance
Measures 60.1, 60.2(a), and 60.3(b).

The Monitor and the Mental Health Subject Matter previously agreed that the
Department had demonstrated "a sound quality improvement process and the ability to
demonstrate that process through specific quality improvement projects directed by
management," and the Monitor finds that the County had demonstrated that it maintained
Substantial Compliance with Paragraph 60.  Pursuant to Paragraph 111 of the Settlement
Agreement, the Department was not subject to monitoring for Substantial Compliance
with Paragraph 60 in the Fifteenth Reporting Period.[31]

---

[31] The County has acknowledged that its ongoing Quality Improvement efforts will remain subject to
monitoring under other provisions of the Settlement Agreement.

61.     The quality improvement program will review, collect, and aggregate data in the following areas and recommend corrective actions and systemic improvements:

(a)     Suicides and serious suicide attempts:

        (i)     Prior suicide attempts or other serious self-injurious behavior
        (ii)    Locations
        (iii)   Method
        (iv)    Lethality
        (v)     Demographic information
        (vi)    Proximity to court date;

(b)     Use of clinical restraints;

(c)     Psychotropic medications;

(d)     Access to care, timeliness of service, and utilization of the Forensic In-patient Unit; and

(e)     Elements of documentation and use of medical records.

**STATUS:        PARTIAL COMPLIANCE**

Substantial Compliance requires the County's semi-annual reports to (a) review, collect, and aggregate data in the areas set forth in Paragraph 61; (b) recommend corrective actions and systemic improvements in those areas; and (c) assess the effectiveness of actions and improvements in prior reporting periods.

On January 11, 2023, the County posted the Correctional Health Services and Custody Compliance & Sustainability Bureau Combined Semi-Annual Report on Quality Improvement and Suicide Prevention Efforts – Quarter 2 & Quarter 3 2022 ("Combined Suicide Prevention Report"), which relates to Paragraphs 60, 61, 62, and 77. The Combined Suicide Prevention Report sets forth aggregate data for the 30 suicides that occurred between 2015 and the end of the Third Quarter of 2022, and 157 critical incidents that occurred between 2016 and the end of the First Quarter of 2022, broken down by the subparts of Paragraph 61(a).

The Monitor analyzed the County's Combined Suicide Prevention Report in consultation with Drs. Johnson, Vess, and Eargle. Our view is that this report, and the QI work it summarizes, represent substantial improvement in the Department's ability to apply core QI concepts and utilize them in reducing acts of self-harm in the jails.

The Combined Suicide Prevention Report, for example, reflects a number of analytical projects undertaken to understand correlates or causes of suicide. That is, the Department has improved its ability to not merely aggregate data about trends in self-harm, but to analyze that data to mitigate suicide risks in the jails. It also includes an

analysis of self-directed violence in the IRC and cutting incidents, which builds upon the
Department's other recent projects evaluating hanging and the recent "Covid Cohort" of
suicides.

Moreover, the Department has begun to use and reference baseline population
data to better identify concerning trends. This includes rates of suicide against baselines
for gender, ethnicity, and age, and rates of cutting by facility against average daily
population of each facility. We were pleased to see this baseline data, which is
analytically useful, and encourage the Department to include additional baseline data in
its subsequent reports. As will be discussed more fully in connection with Provision 62,
the Department has also now created a Corrective Action Plan ("CAP") tracker, which
will allow the Department to better assess the impacts of its CAPs over time.

We also note several outstanding needs for compliance with Provision 61. First,
in its Self-Assessments, the County has attributed some of its challenges with the QI
provisions to CCSB's long-vacant analyst position, which has been noted in four years of
Monitoring Reports.[32] Puzzlingly, the County continues to be unable to fill this position
despite its continued recognition that such an analyst is necessary for its compliance. The
Combined Suicide Prevention Report states:

> the statistical analyst who assisted CCSB with much of the aggregate data
> gathering, analysis, and presentation was promoted (July 2019). Despite
> significant efforts to secure a replacement, the position continues to be
> vacant due to a County-wide hiring freeze. CCSB reports all professional
> staff positions have been frozen and they cannot backfill on lost civilian
> positions. The lack of a statistician continues to impact the County's
> ability to evaluate data at the level of detail that it would like and to
> address the feedback received in previous Monitor's reports regarding the
> quality improvement provisions.

Although the Combined Suicide Prevention Report holds responsible the
County's own rules for preventing the hiring of the necessary analyst, it does not indicate
what efforts the County, which is bound by the Agreement, has taken to relax those rules
in order to allow a new analyst to be hired. It should include such information in the next
Self-Assessment or a specific explanation of why the County cannot do so.

Second, the data continue to reveal troubling trends in suicide attempt and SDV
that are not yet being analyzed to drive corrective actions in the Department. For
example, the data reflect that before 2018, the majority of suicides occurred at TTCF, but
after 2018, the majority now occur at MCJ. While this pattern is noted in the Combined
Suicide Prevention Report, it goes largely unanalyzed, which prevents the Department

---

[32] *See, e.g.*, Monitor's Ninth Report, *et. seq* ("Unfortunately, '[t]he capacity to build upon the data analysis
which began during the previous reporting period remains limited due to staff availability and the continued
challenge of having to extract data manually.' The County has 'yet to find a replacement' for the recently
promoted statistical analyst who previously 'provided much of the data support for JQIC presentations'
through the 'first part of 2019'")

from identifying corrective actions to address it.  Similarly, it notes the outsize number of cutting incidents among the total number of inmate SDV episodes.  In fact, cutting incidents represent a substantial percentage of all SDV incidents that occurred in the jails between 2016 and the Third Quarter of 2022.



The Combined Suicide Prevention Report further notes the pervasive use of razor blades for cutting; indeed "46% of the total cutting incidents" involved inmates using razor blades, and 95.7% of the SDV incidents involving the use of hygiene items involved razor blades used for self-harm.



While these data tell a compelling story that razor blades are a key implement being used for inmate SDV, the Combined Suicide Prevention Report does not take the next necessary step of "recommend[ing] corrective actions and systemic improvements" to address this problem as the Compliance Measures require.  Instead, it simply notes

the data validates that razors are the number one item being utilized
….this information was presented to Custody with a recommendation to

review current policies related to allowable property and to further evaluate what CAPS may be reasonable and feasible to implement.  For any CAPs that are developed by Custody they can then, once implemented, be tracked and monitored for effectiveness.

A more useful analytic step would have been to look at current blade control policies and practices in the LASD jails, which were raised as a concern in a previous Monitoring Report.[33]  The Department could have also reported on blade control policies in other jail and prison systems, and made recommendations for any necessary changes to policies and practices to prevent uncontrolled inmate access to dangerous razor blades.

Similarly, the data clearly show that proximity to court is correlated with higher risks of suicide attempts, particularly in criminal cases related to felony crimes against persons.  While this trend is noted in the report, no steps to address it are discussed.  As the Monitor's Mental Health Team notes

> while it may be infeasible for mental health staff to screen all inmates returning from court given the large number of daily appearances, that does not preclude other steps to mitigate the heightened suicide risks engendered by court.  This could include screening a smaller pool of inmates in the highest risk categories, enhanced training for custody staff transporting inmates from court to better identify signs of suicidality, or providing patient education materials to court returnees with techniques for coping with the stress of court, and reminders about reaching out to mental health staff if needed.

These are just a few ideas and not a proscriptive list, but they are the kinds of "corrective actions and systemic improvements" that the Provision requires.

In addition, the Combined Suicide Prevention Report must more clearly tie corrective actions to the data gathered and analyzed.  For example, it notes 152 suicide corrective action plans between 2016 and 2021, and a series of programs implemented to help with suicide prevention.  This includes changing notification procedures and observation requirements when suicidal behavior is detected, providing mental health and substance abuse training, the launch or expansion of the START and MAT programs to combat substance use disorder and addiction to opiates, and pet therapy programming, as well as additional steps taken by Custody over the years, like specialized training, and amendments to the custody division and station jail manuals.  However, as has been noted in previous Monitoring Reports, the Combined Suicide Prevention Report does not explain what specific data or trends drove the creation of these programs as it should.

---

[33] *See* Monitor's Twelfth Report at 15 (noting that during a site visit "the Monitor observed a large pile of used safety razor blades lying on the floor of a hallway.  Thankfully, it was a locked hallway and not generally accessible to inmates.  But blade control is fundamental in a jail environment where uncontrolled sharps present severe safety and infectious disease risks to both staff and inmates, and unaccounted for razor blades are extremely dangerous."  The County committed at that time to "revising relevant policies on blade control" because of these observations but has not yet reported on whether or not it has done so).

The Department has demonstrated noteworthy and commendable progress in its QI efforts during the Fifteenth Reporting Period.  Continuing to enhance the quality and depth of the analysis performed by the QI program, as set forth above, will enable the Department to expeditiously achieve substantial compliance with Provision 61.

62.      The County and the Sheriff's Unit described in Paragraph 77 of this
Agreement will develop, implement, and track corrective action plans addressing
recommendations of the quality improvement program.

**STATUS:      PARTIAL COMPLIANCE**

Substantial Compliance requires the County's semi-annual Self-Assessments to
set forth (a) the "development of corrective action plans to address the most recent
recommendations of the quality improvement program;" and (b) the "implementation and
tracking of corrective action plans to address recommendations of the program in prior
quarters."

On January 11, 2023, the County posted the Correctional Health Services and
Custody Compliance & Sustainability Bureau Combined Semi-Annual Report on Quality
Improvement and Suicide Prevention Efforts – Quarter 2 & Quarter 3 2022 ("Combined
Suicide Prevention Report"), which relates to Paragraphs 60, 61, 62, and 77.  The
Combined Suicide Prevention Report sets forth aggregate data for the 30 suicides that
occurred between 2015 and the end of the Third Quarter of 2022, and 157 critical
incidents that occurred between 2016 and the end of the First Quarter of 2022.

The Monitor analyzed the County's Combined Suicide Prevention Report in
consultation with Drs. Johnson, Vess, and Eargle.  Our view is that the County made
notable progress in its tracking of CAPS in the Fifteenth Reporting Period.  As the
Fourteenth Monitoring Report stated

> Quality improvement programs are dynamic and continuous in nature, and
> the data generated from the implementation of corrective actions should be
> fed back into the quality improvement system to be used to shift strategy
> or try new interventions, as needed, with the goal of continual progress
> toward program goals.  The tracking of corrective action plans, including
> their impacts, is a key QI element, and allows programs to meaningfully
> assess the impacts of corrective actions and determine whether or not
> additional interventions are necessary.  Provision 62 requires the County
> to "develop, implement, and track" its corrective action plans in order to
> facilitate continual improvement.

The Department now reports that it has taken the important step of building a
CAP tracker in an Excel database, and that it went into use on January 1, 2023.  The
tracker is summarized as follows

> The CAP tracker was developed to further increase communication,
> increase efficiency of information gathering, track the progress of systems
> improvements, and have historical data for each project.  Historically,
> there was no one location where information was stored and no standard
> for what information was provided so compiling historical data (start
> dates, end dates, what happened in the project, etc) was an arduous

91

process of gathering disparate information from multiple sources and reconstructing events.  This method often yielded gaps in the information and was far too time consuming for the final level of project detail.  For these reasons, along with feedback from the DOJ, the County built a unified tracking system to eliminate these issues.

The CAP tracker includes a dashboard, which provides overall statistics and an "overview of the projects at a glance.  It compiles how many CAPs there are, their status (Not Started, In Progress, On Hold) and other information."  The Department describes the process of entering a CAP, the available data fields, and the relevant search functions.  The Monitor and Mental Health Team met with CHS representatives in January 2023 to go over the CAP tracker, and we were favorably impressed by its usability and functionality.  We recommended then, and reiterate here, that the CAP tracker should be used for all CAPs generated as a result of the Department's QI processes, including CAPs generated through the systemic reviews conducted by the Department's JQIC committee, and not limited to CAPs arising from the review of critical incidents.

Now that the Department has a CAP tracking tool, it will be better able to study the impacts of its CAPs, including CAPs from prior quarters, and provide such analyses in future Combined Suicide Prevention Reports.

63.     The County and the Sheriff will maintain adequate High Observation Housing and Moderate Observation Housing sufficient to meet the needs of the jail population with mental illness, as assessed by the County and the Sheriff on an ongoing basis.  The County will continue its practice of placing prisoners with mental illness in the least restrictive setting consistent with their clinical needs.

**STATUS:     PARTIAL COMPLIANCE (at TTCF & CRDF)**

The Parties agreed on Revised Compliance Measures in 2021.  The Revised Compliance Measures require that 90% of inmates waited for permanent HOH and MOH housing for no more than 7 days, and that 100% of inmates waited for permanent HOH and MOH housing for no more than 30 days.

The County's Fifteenth Self-Assessment includes results for the Second Quarter of 2022 under the Revised Compliance Measures.  It reports that in the relevant weeks, "58% of inmates at TTCF waited fewer than 7 days for permanent mental health housing."  The County further reported that 100% of inmates received permanent mental health housing within 30 days.  At CRDF, "98% of inmates at CRDF waited fewer than 7 days for permanent mental health housing."  Further 100% of inmates received permanent mental health housing within 30 days.

The County's Fifteenth Self-Assessment also reports that in the Third Quarter of 2022, "45% of inmates at TTCF waited fewer than 7 days for permanent mental health housing."  The County further reported that 96% of inmates received permanent mental health housing within 30 days.  At CRDF, "58.5% of inmates at CRDF waited fewer than 7 days for permanent mental health housing."  The County further reported that 100% of inmates received permanent mental health housing within 30 days.

According to the County's implementation plan tracker, the County has completed 2 out of 9 corrective action steps regarding Provision 63.  These steps include: expanding the MAT program such that it can administer long-acting injectables, including Sublocade and Suboxone (completion date unclear); and securing funding to create a new psychiatric urgent care/jail inpatient unit with 48 beds (completion date unclear).

Given the percentages reported by the County and the thresholds in the Revised Compliance Measures, the Monitor finds the County to be in Partial Compliance with Provision 63 for the Fifteenth Reporting Period.  However, the number of inmates with prolonged waits for mental health housing is still unacceptably high.

64.     Within six months of the Effective Date, the County and the Sheriff will develop a short-term plan addressing the following 12-month period, and within 12 months of the Effective Date, the County and the Sheriff will develop a long-term plan addressing the following five-year period, to reasonably ensure the availability of licensed inpatient mental health care for prisoners in the Jails.  The County and the Sheriff will begin implementation of each plan within 90 days of plan completion.  These plans will describe the projected capacity required, strategies that will be used to obtain additional capacity if it is needed, and identify the resources necessary for implementation.  Thereafter, the County and the Sheriff will review, and if necessary revise, these plans every 12 months.

**STATUS:     NON-COMPLIANCE**

The parties agreed on Revised Compliance Measures in 2021.  Substantial Compliance requires the Department to develop a long-term plan that will address the availability of licensed inpatient mental health care for prisoners in the following five-year period; and provide an annual report describing the long-term plan and the steps taken to implement it, which must be deemed reasonable by the Monitor.

The County's Augmented Fifteenth Self-Assessment includes only a short discussion of the County's efforts to comply with Provision 64.  It states

> The principal effort underway to improve compliance with Provision 64 is the creation of a Psychiatric Urgent Care Unit within TTCF.  The site has been designated, and state authorities have conducted initial inspections.  Based on these initial inspections, certain physical improvements to the module have begun.  Once the state completes a final inspection, the County can move on to finalizing the licensing process.  It is anticipated that the unit can begin to treat patients—with the use of 20 beds at the outset—by the summer of 2023.

> The unit will be used to medicate those at the highest acuity levels, with people staying in the beds for only a short time so that the unit can treat more people.  It is hoped that this unit and its treatment will reduce the number of people waiting for FIP beds.

The Monitor views the creation of a Psychiatric Urgent Care ("PUC") Unit as a useful step towards compliance with Provision 64.  However, the County has not presented data reflecting that it will be sufficient, on its own, to achieve full compliance, and nor does the relatively modest projected capacity of 20 beds suggest that it will be enough to meet the significant demand for inpatient care in the jails.  To comply with this provision, the County must produce a specific plan to meet the existing demand, which it has not yet done.  The County's implementation plan tracker does not reflect that it has completed any of the four corrective action steps related to Provision 64.  The County is therefore again Non-Compliant with Provision 64 for the Fifteenth Reporting Period.

65 (**Revised**).  Consistent with existing Sheriff's Department policies, the County
and the Sheriff will ensure that psychotropic medications are administered in a clinically
appropriate manner to prevent misuse, hoarding, and overdose.  The County will
maintain electronic mental health alerts in prisoners' electronic medical records that
notify medical and mental health staff of a prisoner's risk for hoarding medications.

**STATUS:        PARTIAL COMPLIANCE**

On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement
Agreement that amended the language of Provision 65 ("Revised Paragraph 65") as set
forth above.  They also agreed on Revised Compliance Measures.  Under the Revised
Compliance Measures, (1) the County's Self-Assessments must set forth the (a) results of
weekly medication audits documenting the visual observation of the administration of
medication during the quarter; (b) unauthorized medications found as a result of cell
searches during the reporting period; and (c) incidents involving confirmed prescription
drug overdoses.  Further, "the Monitor must conclude, after consulting with the Subject
Matter Expert, that "psychotropic medications have been administered in a clinically
appropriate manner 85% of the time."  Finally, "85% of the electronic medical records
[must] contain the required alerts."

The Fourteenth Report noted:

There are many reasons for conducting unannounced jail searches
including but not limited to finding and removing contraband items,
deterring future attempts to improperly introduce or possess contraband,
seizing potential weapons, reducing drug-seeking behavior, and
minimizing underground jail economies that often run on contraband
exchange.  Thus, the rate at which unauthorized medication is recovered is
an imperfect measure of whether unannounced searches have achieved
their goals.  With that said, the Monitor notes the significant disparity in
unauthorized medication recovery rates for various jails that are subject to
this Agreement.  For example, at TTCF, the facility that houses male
inmates with the most serious mental illness, only 47 unannounced
searches were conducted in the Fourth Quarter of 2021.  Notwithstanding
this low number of searches, 46 medications were recovered at TTCF for a
recovery rate of nearly 100%.  Similarly, in the First Quarter of 2022,
there were 82 unannounced searched within TTCF, which resulted in the
recovery of 96 medications, a recovery rate of 117%.

In contrast, at NCCF, there were 1,135 unannounced searches conducted in the
Fourth Quarter of 2021, which resulted in the seizure of 20 medications and 4
inhalers, for a recovery rate of 2%.  Similarly, in the First Quarter of 2022, at
NCCF, there were 997 unannounced searches conducted that resulted in the
seizure of 7 medications, a recovery rate of 1%.

Given the focus of this provision—preventing the hoarding and misuse of

medications—the Monitor recommends that the County evaluate whether it is conducting a sufficient number of unannounced searches at each facility, particularly those facilities, like TTCF, CRDF, MCJ, and PDC North, at which searches usually result in the seizure of unauthorized medications.

In the Fifteenth Self-Assessment, the County does not indicate whether or not it performed such an evaluation.  However, medications continue to be recovered in the significant majority of the relatively small number of unannounced searches conducted at TTCF and MCJ.  In the Second Quarter of 2022, the County's posted results reflect that 97 unannounced searches were conducted at TTCF and 153 at MCJ.  These searches yielded a significant number of unauthorized medications (97 unauthorized medications at TTCF and 90 unauthorized medications at MCJ).  Contrast this with several of the other facilities at which a relatively high number of searches resulted in the recovery of a smaller relative number of unauthorized medications: CRDF (175 searches resulting in the seizure of 6 medications), NCCF (933 searches resulting in the seizure of 0 medications), PDC North (83 searches resulting in the seizure of 10 medications), and PDC South (267 searches resulting in the seizure of no medications).

The County's posted results for the Third Quarter of 2022 reflect similar trends.  There were 37 unannounced searches at TTCF and 91 at MCJ, which resulted in the seizure of 16 and 88 unauthorized medications, respectively.  These are very high recovery rates, which contrast with those at the other facilities: CRDF (178 searches resulting in 25 medications), NCCF (895 searches resulting in no medications), PDC North (83 searches resulting in no medications), and PDC South (216 searches resulting in 2 medications and 2 empty inhalers).

Given the large populations at TTCF and MCJ, the significant quantity of psychoactive and somatic medication prescribed at each, and the frequency with which unauthorized medications are recovered at those facilities during only a relatively small number of unannounced searches, the Monitor believes that TTCF and MCJ are likely not being searched frequently enough to accomplish a key purpose of Provision 65: preventing "misuse, hoarding, and overdose."  The County should report on its efforts to enhance the frequency of unannounced searches at these facilities in its next Self-Assessment.

The County also reported 4 confirmed overdoses and 2 unconfirmed in the Second Quarter of 2022.[34]  The County reported 1 confirmed overdose and 3 unconfirmed in the Third Quarter of 2022.

Regarding hoarding alerts in electronic medical records, the County's posted documents indicate 80% compliance in the Second Quarter of 2022 and 79% in the Third Quarter of 2022.

---

[34] The County's posted documents for the Second and Third Quarters of 2022 indicate that the County has resumed its weekly medication administration audits, which had been paused for several Reporting Periods.

According to the County's implementation plan tracker, the County has completed 18 out of 32 corrective action steps regarding Provision 65.  These steps include: providing the Medication Administration Audit and Quality Check of Medication Administration Audit to the Monitor (completed September 2022); training relevant Nurse Managers and Nurse Supervisors at TTCF, MCJ, CRDF, NCCF, and PDC North (completion date unclear); beginning Medication Administration Audits at TTCF (completion date unclear), MCJ, CRDF, NCCF, and PDC North (completion date unclear); beginning Quality Checks of Medication Administration Audits (completion date unclear); developing new compliance audit criteria and tool, for 65-5(c) to be approved by the Compliance Team Program Manager and County Counsel (completion date unclear); conducting informal mini self-assessments for 65-5(c) to include at least ten samples from TTCF (completion date unclear) and at least twenty samples comprised of patients from all facilities (completion date unclear); holding a workgroup meeting with Responsible Parties from Nursing, Custody, Compliance Team, and County Counsel (completion date unclear); reporting compliance data for 65-1(a) and 65-5(c) for TTCF (completion date unclear), MCJ, CRDF, NCCF, and PDC North in self-assessments (completion date unclear); revising Policy M355.01 Mental Health Alerts, submitted to Monitor (65-4) (completion date unclear); and submitting summary of methodology to Monitor (completion date unclear) and receiving approval (or feedback) (65-4) (completion date unclear).

66 (**Revised**).  Consistent with existing Correctional Health Services policies, prisoners with a serious mental illness who reside outside of mental health housing, will remain on an active mental health caseload regardless of whether they refuse medications. The County and the Sheriff will provide prisoners with a serious mental illness who reside outside of mental health housing with therapeutically appropriate individual monthly visits with a QMHP whether or not the prisoners are receiving or refusing psychotropic medications.  The County and the Sheriff will provide medication support services to prisoners who (i) have a mental illness, (ii) reside outside of mental health housing and (iii) are prescribed psychotropic medications.

STATUS:        NON-COMPLIANCE

On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provision 66 ("Revised Paragraph 66") as set forth above.  They also agreed on Revised Compliance Measures.  Under the Revised Compliance Measures, Substantial Compliance requires that a) 85% of prisoners with a serious mental illness who resided outside of mental health housing were on an active mental health caseload; b) 85% of prisoners with a serious mental illness who resided outside of mental health housing are offered therapeutically appropriate structured mental health treatment and are seen by a QMHP at least once a month; and c) 85% of prisoners who resided outside of mental health housing and were prescribed psychotropic medications were offered medication support services.

The County's posted results for Compliance Measures 66-5(a) and 66-5(b) indicate that there were no patients who "met the criteria for severe mental illness housed in general population areas" in the Second or Third Quarters of 2022.  In its posted documents, the County clarifies that

The County has typically reported a very small number of SMI patients (those with severe mental illness) in GP. For this quarter, there were no records to assess for 66-2, as there were no patients who met criteria for SMI in the GP areas….The County believes that those who meet the definition of SMI are best served in mental health housing. However there have been times in the past when inmates with specific medical issues or special classifications, could not be housed in mental health. After confirming the definition and examining procedures and programs, JMET and CRDF program leadership have committed to moving any patients who meet the SMI definition into mental health housing areas. CRDF has been able to accommodate all SMI patients in mental health housing. Patients residing in the MOSH area of MCJ have been moved to HOH successfully. In the cases where HOH housing could not meet the medical need, they were transferred to CTC. The new procedures allow JMET to continue careful screening of SMI patients and move them to appropriate mental health housing. In the event an inmate becomes designated as SMI and doesn't immediately move from GP, JMET staff will track these patients and initiate the required treatment until they are moved to Mental

Health housing. During this quarter, no patients meeting SMI criteria were housed in GP areas.

Given the County's commitment to moving prisoners with serious mental illness out of general population and into mental health housing, the results being evaluated for this provision are narrowed and largely focus on medication support services for prisoners receiving psychotropic medication and living outside of mental health housing under Compliance Measures 66-3, and 66-5(c).

Regarding those compliance measures, the County's posted results indicates that for the Second and Third Quarters of 2022, 31% and 57%, respectively, of patients residing outside of mental health housing who were prescribed psychotropic medications during the randomly selected week were offered medication support services.  This is lower than the 85% threshold.

According to the County's implementation plan tracker, the County has completed 7 out of 20 corrective action steps regarding Provision 66.  These steps include: CHS formulating a uniform process by which SMI patients in general population will be tracked (completion date unclear); resolving psychiatry staffing shortages by expanding telehealth (completion date unclear); training Nurse Practitioners, Psychiatric Technicians, and other staff versed in psychiatric care to see P1 and P2 level patients in General Population (completion date unclear); creating a relief physician position for psychiatrists to have access to in overtime (completion date unclear); assessing potential inefficiencies that may allow the County to better utilize the staff it has as staff grows during the hiring process that is underway (completion date unclear); and adding one additional Nurse Practitioner for JMET and five additional Nurse Practitioners to the Phase II budget (completion date unclear).

67.     Within three months of the Effective Date, the County and the Sheriff will implement policies for prisoners housed in High Observation Housing and Moderate Observation Housing that require:

(a)     documentation of a prisoner's refusal of psychotropic medication in the prisoner's electronic medical record;

(b)     discussion of a prisoner's refusal in treatment team meetings;

(c)     the use of clinically appropriate interventions with such prisoners to encourage medication compliance;

(d)     consideration of the need to transfer non-compliant prisoners to higher levels of mental health housing; and

(e)     individualized consideration of the appropriateness of seeking court orders for involuntary medication pursuant to the provisions of California Welfare and Institutions Code sections 5332-5336 and/or California Penal Code section 2603(a).

**STATUS:     NON-COMPLIANCE**

Substantial Compliance requires the County to "review the electronic medical records of 25% of the prisoners in HOH and MOH who refused psychotropic medication during the quarter to verify that the records [of 85% of the prisoners] reflect the documentation and consideration of the matters required by the terms of Paragraph 67."

The Fourteenth Report said

In response to a draft of this Report, the DOJ raised several methodological concerns about the County's approach to auditing its records under Provision 67.  The Monitor believes that some of these concerns are valid.  In certain cases, the County has marked as compliant records that are indeterminate on their face about whether or not the clinician considered the matters required by 67(a)-(c). In other cases, the records appear to reflect no documented consideration by the clinician, but they were marked as compliant anyway.  If the County believes that the matters set forth in Provision 67(a)-(c) need not apply to every patient, depending on their level of care, it should seek to meet with the Monitor and DOJ, rather than adjusting its auditing methodology in a manner that is not consistent with the Provision's plain language.

No such meeting occurred in the Fifteenth Reporting Period.[35]  Instead, the County's posted materials reflect that it is continuing to use an audit approach that involves counting certain records as compliant even when they do not satisfy all parts of Provision 67.  Indeed, the County's posted documents indicate that the County believes that "not all of the above referenced five areas [of Provision 67] apply to all medication refusers."  While there may be clinical reasons this is true for certain patients, as currently drafted, Provision 67 applies to all inmates in MOH and HOH housing.  If the County believes that it is clinically appropriate to exempt certain prisoners in MOH or HOH housing from certain of the requirements of Provision 67, it should seek to amend Provision 67 in consultation with the DOJ and the Monitor.  The County is Non-Compliant with Provision 67 for the Fifteenth Reporting Period.

According to the County's implementation plan tracker, the County has completed 4 out of 10 corrective action steps regarding Provision 67.  These steps include: training five new Nurse Practitioners (completed April 2023); relief physicians being identified and trained, and are assessing patients (completion date unclear); implementing a weekly employee hiring tracker (completed April 2022 and ongoing); and conducting hiring fairs (completed March 2022 and ongoing).

---

[35] The County notes that it met with Dr. Bruce Gage, the former Mental Health Subject Matter Expert, at various points in the past to discuss its approach to auditing Provision 67.

68.     Within six months of the Effective Date, the County and the Sheriff will develop and implement a procedure for contraband searches on a regular, but staggered basis in all housing units.  High Observation Housing cells will be visually inspected prior to initial housing of inmates with mental health issues.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at MCJ, NCCF, PDC East, PDC South, and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2017, through December 31, 2017 (verified) at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2022, through September 30, 2022 (verified) at CRDF)**

Substantial Compliance requires that "85% of the housing units are searched for contraband at least once in the previous quarter; and 95% of the HOH units visually inspected prior to housing prisoners in these units."  Self-Assessments are to include a summary of searches conducted and a review of 25 randomly selected Checklist forms for HOH units to confirm that the units were visually inspected prior to initial housing of prisoners in these units.

The County previously maintained Substantial Compliance for twelve consecutive months at TTCF, MCJ, NCCF, PDC East, PDC South, and PDC North.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring at those facilities for Substantial Compliance with Paragraph 68 in the Fifteenth Reporting Period.

The County's posted results reflect that in the Second Quarter of 2022, 94% of the housing units at CRDF were searched at least once in the quarter, and 96% of the randomly selected HOH cells at CRDF were visually inspected before housing prisoners in these units.  During the Third Quarter of 2022, 98% of the housing units at CRDF were searched at least once in the quarter, and 100% of the randomly selected HOH cells at CRDF were visually inspected before housing prisoners in these units.  These results have been verified by the Monitor's auditors.

69.     Consistent with existing DMH policies regarding use of clinical restraints, the County and the Sheriff will use clinical restraints only in the Correctional Treatment Center and only with the approval of a licensed psychiatrist who has performed an individualized assessment and an appropriate Forensic Inpatient order.  Use of clinical restraints in CTC will be documented in the prisoner's electronic medical record.  The documentation will include the basis for and duration of the use of clinical restraints and the performance and results of the medical welfare checks on restrained prisoners.  When applying clinical restraints, custody staff will ensure a QMHP is present to document and monitor the condition of the prisoner being placed in clinical restraints.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of July 1, 2018, through June 30, 2019 (verified))**

Substantial Compliance requires the Department to review the electronic medical records of all prisoners placed in clinical restraints to verify that the restraints were used, approved, and documented, and that the results of medical welfare checks on restrained prisoners were also documented.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring at those facilities for Substantial Compliance with Paragraph 69 in the Fifteenth Reporting Period.

70.     Within three months of the Effective Date, the County and the Sheriff will have policies and procedures regarding the use of Security Restraints in HOH and MOH. Such policies will provide that:

(a)     Security Restraints in these areas will not be used as an alternative to mental health treatment and will be used only when necessary to insure safety;

(b)     Security Restraints will not be used to punish prisoners, but will be used only when there is a threat or potential threat of physical harm, destruction of property, or escape;

(c)     Custody staff in HOH and MOH will consider a range of security restraint devices and utilize the least restrictive option, for the least amount of time, necessary to provide safety in these areas; and

(d)     Whenever a prisoner is recalcitrant, as defined by Sheriff's Department policy, and appears to be in a mental health crisis, Custody staff will request a sergeant and immediately refer the prisoner to a QMHP.

**STATUS:      PARTIAL COMPLIANCE**

The County has articulated its belief that it has fully satisfied Provision 70 and should therefore no longer be subject to monitoring for this provision.[36]  The Monitor and Mental Health Subject Matter Expert, Dr. Johnson, disagree for the following reasons.

Provision 70 requires the Department to have policies and procedures regarding the use of security restraints in HOH and MOH, and articulates four specific areas that those policies must address.  For this discussion, we will focus on two subsections of Provision 70: (a) and (c).  Pursuant to 70(a) and (c), the Department's policies must ensure that a) security restraints in HOH and MOH are used "only when necessary" to ensure safety, and c) custody staff in HOH and MOH will use only the least restrictive security restraint necessary, and only for the least amount of time needed to provide safety.  Implicit in these requirements is that the determination of what restraint to use must be individualized to each HOH or MOH inmate and circumstance.[37]  Blanket rules, customs, or practices that require the application of the same type of restraint to all inmates based upon their diagnosis or MHLOC do not comply with Provision 70.

The Department has adopted written policies that comply with the enumerated areas of Provision 70.  Yet, as the Monitor and Court-appointed Mental Health Subject

---

[36] *See, e.g.*, County's Augmented Fifteenth Self-Assessment at 87-88.
[37] Many factors could contribute to that individualized determination, including any history of institutional violence, present behavior, and current symptomatology, among others.

Matter Expert have long made clear, the practice inside certain HOH housing areas in the
jails is not compliant.  For example, the Twelfth Report explained that

> During recent site visits, the Monitor observed that HOH inmates are
> cuffed to metal "spider tables" during their recreational out-of-cell time as
> a matter of course.  That is, security restraints continue to be routinely
> applied based upon prisoners' mental health classifications and housing
> assignments, rather than individual assessments of particular risks that
> they might pose.  The Monitor reiterates the guidance that has been given
> previously.  To attain Substantial Compliance, the County will need to
> demonstrate that it is using security restraints based upon individualized
> assessments, "only when necessary to ensure safety," rather than based
> upon housing assignments or mental health classifications alone.

Subsequent visits by the Monitor and Dr. Johnson have confirmed that this
phenomenon persists—HOH inmates in certain housing areas are all locked down to
metal spider tables during their "out time" as a matter of course, and not due to any
individualized determination that the use of these restraints is "necessary to ensure
safety," as Provision 70 requires.  The Department will not comply with Provision 70 by
adopting written policies that adhere to its dictates, and informal rules, practices, or unit
orders that implicitly amend those policies in violation of the Provision's language and
intent.

The County has recently embarked upon an ambitious plan to expand the number
of FIP stepdown units in TTCF and CRDF.  In those units, HOH inmates are permitted to
program out of their cells without being locked down to fixed metal tables for their
recreation time as a matter of course.  The Monitor and Dr. Johnson believe that this plan
is a promising and commendable step by the County that can lead to Substantial
Compliance with Provision 70 in the future.  For the Fifteenth Reporting Period,
however, the County remains in Partial Compliance with Provision 70, which will remain
subject to continued monitoring in the next Reporting Period.

According to the County's implementation plan tracker, the County has
completed 15 out of 20 corrective action steps regarding Provision 70.  These include:
beginning renovations of CRDF Module 1300, which will serve as a FIP Stepdown Unit
(completed December 2022); finishing renovations and adding plastic molding furniture
to allow unrestrained out-of-cell time (completed January 2023); relocating FIP stepdown
and specialized program individuals to CRDF Module 1300 (completed September
2022); updating CRDF policies regarding out-of-cell modules (completed August 2022);
CCSB creating a training guide for Sergeants regarding out-of-cell time and how to
document it (completion date unclear); developing an additional tab within the Custody
Watch Commander Log for tracking out-of-cell time in HOH modules (completed March
2022); begin using TTCF Module 161B and 162B as living modules (completion date
unclear); having unrestrained out-of-cell time in TTCF Module 162F and fully convert
the unit into a Living Module (completed April 2023); fully occupying Module 141 Pods
A through F as FIP Stepdown Units (completed March 2023); and reinstating the HOH

unrestrained out-of-cell time pilot program in Module 161 Pods A through E (completed
September 2022).

71.     The County and the Sheriff will ensure that any prisoner subjected to clinical restraints in response to a mental health crisis receives therapeutic services to remediate any effects from the episode(s) of restraint.

**STATUS:        SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017 (verified))**

Substantial Compliance requires the Department to review the electronic medical records of all prisoners placed in clinical restraints to verify that the prisoners received therapeutic services as required by Paragraph 71.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 71 in the Fifteenth Reporting Period.

72.     The County and the Sheriff will develop and implement policies and procedures that ensure that incidents involving suicide and serious self-injurious behavior are reported and reviewed to determine:  (a) whether staff engaged in any violations of policies, rules, or laws; and (b) whether any improvements to policy, training, operations, treatment programs, or facilities are warranted.  These policies and procedures will define terms clearly and consistently to ensure that incidents are reported and tracked accurately by DMH and the Sheriff's Department.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of January 1, 2017, through December 31, 2017)**

Substantial Compliance requires the Self-Assessments to report on (a) suicide review meetings and (b) CIRC meetings that review incidents of serious self-injurious behavior in the reporting period.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 72 in the Fifteenth Reporting Period.

73.     Depending on the level of severity of an incident involving a prisoner who threatens or exhibits self-injurious behavior, a custody staff member will prepare a detailed report (Behavioral Observation and Mental Health Referral Form, Inmate Injury Report, and/or Incident Report) that includes information from individuals who were involved in or witnessed the incident as soon as practicable, but no later than the end of shift.  The report will include a description of the events surrounding the incident and the steps taken in response to the incident.  The report will also include the date and time that the report was completed and the names of any witnesses.  The Sheriff's Department will immediately notify the County Office of Inspector General of all apparent or suspected suicides occurring at the Jails.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified))**

Substantial Compliance requires the Department to review quarterly a random sample of reports of any threats or exhibitions of self-injurious behavior to verify that the reports have the information required by Paragraph 73; and to provide the Monitor with the notifications to the Inspector General of all incidents involving an apparent or suspected suicide during the reporting period.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 73 in the Fifteenth Reporting Period.

74.    The Sheriff's Department will ensure that there is a timely, thorough, and objective law enforcement investigation of any suicide that occurs in the Jails. Investigations shall include recorded interviews of persons involved in, or who witnessed, the incident, including other prisoners.  Sheriff's Department personnel who are investigating a prisoner suicide or suspected suicide at the Jails will ensure the preservation of all evidence, including physical evidence, relevant witness statements, reports, videos, and photographs.

**STATUS:        SUBSTANTIAL COMPLIANCE (as of September 1, 2016, through December 31, 2017)**

Substantial Compliance requires the Department to provide the Monitor with an Executive Suicide Death Review reflecting the results of the Department's investigation of any suicide in the Jails within six months of the suicide.  The review must reflect steps taken to preserve all of the evidence; and list the interviews of persons involved in, or who witnessed, the incident, and whether the interviews were recorded.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 74 in the Fifteenth Reporting Period.

75.     Within three months of the Effective Date, the County and the Sheriff will review every suicide attempt that occurs in the Jails as follows:

(a)     Within two working days, DMH staff will review the incident, the prisoner's mental health status known at the time of the incident, the need for immediate corrective action if any, and determine the level of suicide attempt pursuant to the Centers for Disease Control and Prevention's Risk Rating Scale;

(b)     Within 30 working days, and only for those incidents determined to be a serious suicide attempt by DMH staff after the review described in subsection (a) above, management and command-level personnel from DMH and the Sheriff's Department (including Custody Division and Medical Services Bureau) will meet to review relevant information known at that time, including the events preceding and following the incident, the prisoner's incarceration, mental health, and health history, the status of any corrective actions taken, and the need for additional corrective action if necessary;

(c)     The County and the Sheriff will document the findings that result from the review of serious suicide attempts described in subsection (b) above; and

(d)     The County and the Sheriff will ensure that information for all suicide attempts is input into a database for tracking and statistical analysis.

**STATUS (75):          SUBSTANTIAL COMPLIANCE (as of October 1,
2017, through September 30, 2018 (verified))**

Substantial Compliance requires (a) DMH to review documentation of randomly
selected suicide attempts during the previous quarter to verify that the prisoner's mental
health status and need for immediate corrective action were considered timely by the
DMH staff and that the staff determined whether the suicide attempt was serious; (b) that
the Department and DMH reviewed the relevant information known at that time and the
status of any corrective actions taken, and they considered the need for additional
corrective action if necessary; and (c) that the information is reflected in the
Department's database for tracking and statistical analysis.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not
subject to monitoring for Substantial Compliance with Paragraph 75 in the Fifteenth
Reporting Period.

76. The County and the Sheriff will review every apparent or suspected suicide that occurs in the Jails as follows:

(a) Within no more than two working days, management and command-level personnel from DMH and the Sheriff's Department (including Custody Division and Medical Services Bureau) will meet to review and discuss the suicide, the prisoner's mental health status known at the time of the suicide, and the need for immediate corrective or preventive action if any;

(b) Within seven working days, and again within 30 working days, management and command-level personnel from DMH and the Sheriff's Department (including Custody Division and Medical Services Bureau) will meet to review relevant information known at that time, including the events preceding and following the suicide, the prisoner's incarceration, mental health, and health history, the status of any corrective or preventive actions taken, and the need for additional corrective or preventive action if necessary; and

(c) Within six months of the suicide, the County and the Sheriff will prepare a final written report regarding the suicide. The report will include:

(i) time and dated incident reports and any supplemental reports with the same Uniform Reference Number (URN) from custody staff who were directly involved in and/or witnessed the incident;

(ii) a timeline regarding the discovery of the prisoner and any responsive actions or medical interventions;

(iii) copies of a representative sample of material video recordings or photographs, to the extent that inclusion of such items does not interfere with any criminal investigation;

(iv) a reference to, or reports if available, from the Sheriff's Department Homicide Bureau;

(v) reference to the Internal Affairs Bureau or other personnel investigations, if any, and findings, if any;

(vi) a Coroner's report, if it is available at the time of the final report, and if it is not available, a summary of efforts made to obtain the report;

(vii) a summary of relevant information discussed at the prior review meetings, or otherwise known at the time of the final report, including analysis of housing or classification issues if relevant;

(viii) a clinical mortality review;

(ix) a Psychological Autopsy utilizing the National Commission on Correctional Health Care's standards; and

(x) a summary of corrective actions taken and recommendations regarding additional corrective actions if any are needed.

**STATUS (76):**   **SUBSTANTIAL COMPLIANCE (as of
September 1, 2016, through December 31, 2017)**

      Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 76 in the Fifteenth Reporting Period.  Nonetheless, the County continued to conduct the reviews required by Paragraph 76 for the suicides that occurred during this period and invited the Monitor to attend these meetings.

77.    The County and the Sheriff will create a specialized unit to oversee, monitor, and audit the County's jail suicide prevention program in coordination with the Department of Mental Health.  The Unit will be headed by a Captain, or another Sheriff's Department official of appropriate rank, who reports to the Assistant Sheriff for Custody Operations through the chain of command.  The Unit will be responsible for:

(a)    Ensuring the timely and thorough administrative review of suicides and serious suicide attempts in the Jails as described in this Agreement;

(b)    Identifying patterns and trends of suicides and serious suicide attempts in the Jails, keeping centralized records and inputting data into a unit database for statistical analysis, trends, and corrective action, if necessary;

(c)    Ensuring that corrective actions are taken to mitigate suicide risks at both the location of occurrence and throughout the concerned system by providing, or obtaining where appropriate, technical assistance to other administrative units within the Custody Division when such assistance is needed to address suicide-risk issues;

(d)    Analyzing staffing, personnel/disciplinary, prisoner classification, and mental health service delivery issues as they relate to suicides and serious suicide attempts to identify the need for corrective action where appropriate; and recommend remedial measures, including policy revisions, re-training, or staff discipline, to address the deficiencies and ensure implementation; and

(e)    Participating in meetings with DMH to develop, implement, and track corrective action plans addressing recommendations of the quality improvement program.

**STATUS (77):          SUBSTANTIAL COMPLIANCE (as of April 1, 2022)**

On January 11, 2023, the County posted the Correctional Health Services and
Custody Compliance & Sustainability Bureau Combined Semi-Annual Report on Quality
Improvement and Suicide Prevention Efforts – Quarter 2 & Quarter 3 2022 ("Combined
Suicide Prevention Report"), which relates to Paragraphs 60, 61, 62, and 77.  The
Combined Suicide Prevention Report sets forth aggregate data for the 30 suicides that
occurred between 2015 and the end of the Third Quarter of 2022, and 157 critical
incidents that occurred between 2016 and the end of the First Quarter of 2022.

The Monitor analyzed the County's Combined Suicide Prevention Report in
consultation with Drs. Johnson, Vess, and Eargle.  Our view is that the Combined Suicide
Prevention Report, and the QI work it encapsulates, represent substantial improvement in
the Department's ability to apply core QI concepts and utilize them in reducing acts of
self-harm in the jails.

The Department has long complied with many of the subparts of Provision 77 and
in prior Reports, the Monitor has directed the Department to focus its efforts on subparts
77(b) (identifying patterns of suicides and serious suicide attempts and inputting data into
a database for statistical analysis), and 77(c) (taking corrective actions to mitigate suicide
risks throughout the system by providing technical assistance to address suicide-risk
issues).  The Monitor believes that the Department is now in Substantial Compliance with
those subparts.

Regarding 77(b), the Combined Suicide Prevention Report reflects a number of
analytical projects undertaken to understand correlates or causes of suicide.  That is, the
Department has improved its ability to not merely aggregate data about trends in self-
harm, but to analyze that data to mitigate suicide risks in the jails.  It includes an analysis
of self-directed violence in the IRC and cutting incidents, which builds upon the
Department's other recent projects evaluating hanging and the recent "Covid Cohort" of
suicides.

Moreover, the Department has begun to use and reference baseline population
data to better identify concerning trends.  This includes rates of suicide against baselines
for gender, ethnicity, and age, and rates of cutting by facility against average daily
population of each facility.  We were pleased to see this baseline data, which is
analytically useful, and encourage the Department to include additional baseline data in
its subsequent Combined Suicide Prevention Reports.  As discussed more fully in
connection with Provision 62, the Department has also now created a Corrective Action
Plan tracker, which will allow the Department to better assess the impacts of its CAPs
over time.

Regarding the necessary database, the Department is inputting data about patient
self-harm into its Safety Intelligence ("SI") System, which "is designed to improve

116

patient safety and the quality of patient care by providing front line staff with a non-punitive mechanism to report a variety of events some of which may include mistakes or 'near misses.'  The goal of this system is to alert leadership to an event which then triggers appropriate inquiries and problem solving in a standard and structured manner. The system also allows aggregation of data so that trends and patterns can be more easily noticed and remedied.  The system is robust enough to allow the Department to identify trends and patterns in suicides and serious suicide attempts, and the results are now showing up in the Department's reporting.

Regarding 77(c), the Department is reporting on corrective actions that it is taking Department-wide to address the risks of suicide.  This includes changing notification procedures and observation requirements when suicidal behavior is detected, providing mental health and substance abuse training, the launch or expansion of the START and MAT programs to combat substance use disorder and addiction to opiates, and pet therapy programming, as well as additional steps taken by Custody over the years, like specialized training, and amendments to the custody division and station jail manuals. The Department has previously reported on other noteworthy projects it has undertaken Department-wide, such identifying and mitigating the most frequently used ligature points Department-wide.  This has included modifying sinks, telephones, and light fixtures, removing bolts inside cells, changing the allowable property provided to inmates in certain mental health housing, and modifying the shirts provided to inmates and the bunks they sleep on to render them less useful for suicide.

The Department has demonstrated sufficient progress that it is now in Substantial Compliance with Provision 77 for the Fifteenth Reporting Period.

78.     The County and the Sheriff will maintain a county-level Suicide
Prevention Advisory Committee that will be open to representatives from the Sheriff's
Department Custody Division, Court Services, Custody Support Services, and Medical
Services Bureau; the Department of Mental Health; the Public Defender's Office; County
Counsel's Office; the Office of the Inspector General; and the Department of Mental
Health Patients' Rights Office.  The Suicide Prevention Advisory Committee will meet
twice per year and will serve as an advisory body to address system issues and
recommend coordinated approaches to suicide prevention in the Jails.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of May 11, 2016, through
May 18, 2017)**

Substantial Compliance requires (1) the Committee to meet twice per year and (2)
"recommend coordinated approaches to suicide prevention in the Jails."

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not
subject to monitoring for Substantial Compliance with Paragraph 78 in the Fifteenth
Reporting Period.  Nevertheless, the County has continued to hold Bi-Annual Suicide
Prevention meetings through the last reporting period, which the Monitor endeavors to
attend.

79 (**Revised**).  (a)    Unless clinically contraindicated, the County and the Sheriff will offer prisoners in mental health housing:

    (i)    therapeutically appropriate individual visits with a QMHP;

    (ii)   therapeutically appropriate group programming conducted by a QMHP or other appropriate provider that does not exceed 90 minutes per session;

    (b)    The date, location, topic, attendees, and provider of programming or therapy sessions will be documented.  A clinical supervisor will review documentation of group sessions on a monthly basis.

**STATUS:**    **NON-COMPLIANCE**

On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provision 79 ("Revised Paragraph 79") as set forth above.  They also agreed on Revised Compliance Measures.  Under the Revised Compliance Measures, Substantial Compliance requires the Department to maintain records of therapeutically appropriate individual visits and group programming, and the names of the clinical supervisors who reviewed such records and the conclusions of their reviews.  It also requires that 95% of the prisoners in HOH are offered therapeutically appropriate structured mental health treatment, including at least a weekly QMHP visit and group programming, and that 90% of prisoners in MOH are provided visits by a QMHP at least once a month as well as therapeutically appropriate structured mental health treatment.

The County's Fifteenth Self-Assessment reports that in the Second Quarter of 2022, the names and conclusions of the supervisor who reviewed documentation of group sessions were recorded.  The County also reports that "for Measure 79-4(b), which requires that 95% of HOH patients be offered an individual visit by a QMHP and weekly group programming, the County achieved 38% compliance."  "For Measure 79-4(c), which requires that 90% of patients in MOH be offered individual monthly visits by a QMHP and therapeutically appropriate structured treatment, the County achieved 58% compliance."

The County's Augmented Fifteenth Self-Assessment reports that in the Third Quarter of 2022, the names and conclusions of supervisor who reviewed documentation of group sessions was recorded.  The County also reports that "for Measure 79-4(b), which requires that 95% of HOH patients be offered an individual visit by a QMHP and weekly group programming, the County achieved 23% compliance."  "For Measure 79-4(c), which requires that 90% of patients in MOH be offered individual monthly visits by a QMHP and therapeutically appropriate structured treatment, the County achieved 50%

compliance."

       According to the County's implementation plan tracker, the County has completed six out of seven corrective action steps regarding Provision 79.  These steps include: reaching out to potential PSW candidates (completion date unclear); conducting a pay analysis relating to County mental health personnel (completion date unclear); performing quarterly staffing analyses (completion date unclear and ongoing); reorganizing the delivery of its services to allow clinicians to be assigned by location for MOH (P2) patients in addition to HOH (P3 and P4) patients (completion date unclear); adopting a uniform treatment plan that allows for accommodations to a patient's level of need and engagement (completed September 2022); and providing training on treatment plans specific to each patient's needs (completion date unclear ).

80.  (a)  The County and the Sheriff will continue to make best efforts to provide appropriate out-of-cell time to all prisoners with serious mental illness, absent exceptional circumstances, and unless individually clinically contraindicated and documented in the prisoner's electronic medical record.  To implement this requirement, the County and the Sheriff will follow the schedule below:

(i)  By no later than six months after the Effective Date, will offer 25% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week;

(ii)  By no later than 12 months after the Effective Date, will offer 50% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week; and

(iii)  By no later than 18 months after the Effective Date, will offer 100% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week.

(b)  No later than six months after the Effective Date, the County and the Sheriff will record at the end of each day which prisoners in HOH, if any, refused to leave their cells that day.  That data will be presented and discussed with DMH staff at the daily meeting on the following Normal business workday.  The data will also be provided to the specialized unit described in Paragraph 77 and to DMH's quality improvement program to analyze the data for any trends and to implement any corrective action(s) deemed necessary to maximize out-of-cell time opportunities and avoid unnecessary isolation.

**STATUS (80):**          **NON-COMPLIANCE**

Paragraph 80 requires that, "no later than 18 months after the Effective Date [July 1, 2015]," 100% of the prisoners in HOH receive "ten hours of unstructured out-of-cell recreational time *and* ten hours of structured therapeutic or programmatic time per week." The parties have agreed that up to five hours of the structured time can consist of education or work programs, but at least five hours of the time must be therapeutic.

The County's Fifteenth Self-Assessment reports that in the Second Quarter of 2022, 96.6% of the HOH prisoners at CRDF and 84.6% of the HOH prisoners at TTCF were offered "unstructured out-of-cell time by Custody staff." The County's Fifteenth Self-Assessment also reports that in the Third Quarter of 2022, 51% and 86% of HOH prisoners were offered unstructured out-of-cell time at CRDF and TTCF, respectively.[38]

The County also reports data for structured therapeutic or programmatic time for the Second Quarter of 2022. According to the County's Fifteenth Self-Assessment, 0% and 13% for CRDF and TTCF, respectively, rather than the required 100%, of prisoners residing in HOH were offered the required structured out-of-cell time during the Second Quarter of 2022. For the Third Quarter of 2022, the County reports that 0% and 15% for CRDF and TTCF, respectively, rather than the required 100% of prisoners residing in HOH were offered the required structured out-of-cell time.

According to the County's implementation plan tracker, the County has completed 4 out of 12 corrective action steps regarding Provision 80. These steps include: implementing a rotating schedule at TTCF that pulls Sergeants assigned to the Emergency Response Team and task them with removing from HOH individuals that no longer require HOH care (completed April 2022); incentivizing more out-of-cell time in HOH, including through purchasing supplies and adding activity programming (completed April 2022); improving documentation of out-of-cell time by finishing transition to Orchid (completion date unclear); and submitting supplemental implementation plan for Provision 80 (completed February 2023).

---

[38] The Mental Health Subject Matter Expert and the clinicians previously assessed the accuracy of the County's reporting of the out-of-cell time offered to inmates by comparing out-of-cell time records to videos of the HOH units over the same time periods, and they found the County's data to be "highly unreliable." The Monitor and the Mental Health Subject Matter viewed this as a "very serious problem, . . . both in terms of the accuracy of the Department's records and the conditions in HOH units."

81.     Except as specifically set forth in Paragraphs 18-20 of this Agreement, and except as specifically identified below, the County and the Sheriff will implement the following paragraphs of the Implementation Plan in *Rosas* at all Jails facilities, including the Pitchess Detention Center and the Century Regional Detention Facility, by no later than the dates set forth in the Implementation Plan or as revised by the *Rosas* Monitoring Panel:  Paragraphs 2.2-2.13 (use of force policies and practices); 3.1-3.6 (training and professional development); 4.1-4.10 (use of force on mentally ill prisoners); 5.1-5.3 (data tracking and reporting of force); 6.1-6.20 (prisoner grievances and complaints); 7.1-7.3 (prisoner supervision); 8.1-8.3 (anti-retaliation provisions); 9.1-9.3 (security practices); 10.1-10.2 (management presence in housing units); 11.1 (management review of force); 12.1-12.5 (force investigations, with the training requirement of paragraph 12.1 to be completed by December 31, 2016); 13.1-13.2 (use of force reviews and staff discipline); 14.1-14.2 (criminal referrals and external review); 15.1-15.7 (documentation and recording of force); 16.1-16.3 (health care assessments); 17.1-17.10 (use of restraints); 18.1-18.2 (adequate staffing); 19.1-19.3 (early warning system); 20.1-20.3 (planned uses of force); and 21.1 (organizational culture).

## STATUS:     PARTIAL COMPLIANCE

Because Paragraph 81 of the Settlement Agreement incorporates 100 provisions in the Implementation Plan adopted in the *Rosas* case, the parties agreed in the Compliance Measures adopted in this case that "Substantial Compliance with respect to the substance of the policies required by the *Rosas* Implementation Plan would be determined by the *Rosas* Monitors."  With the exception of the Early Warning System required by Section 19 of the plan, all of the required policies were approved by the *Rosas* Monitors by the Second Reporting Period in this case, and the Early Warning System was approved in the Seventh Reporting Period.

The Compliance Measures in this case then provide that "[o]nce the policies have been approved by the *Rosas* Monitors, the Monitor and Subject Matter Expert will confirm and assess the implementation of these policies in the [DOJ facilities]."  In assessing the Department's compliance with Paragraph 81, the Monitor has grouped the 100 provisions into seven categories and, with input from the Subject Matter Experts, has assessed Department's compliance on a category-by-category basis.  With the exception of the Training category, which is assessed when certain percentages are reached, the Department will no longer be subject to monitoring for the provisions in a particular category once the Monitor has determined that it has achieved and maintained for twelve consecutive months Substantial Compliance with the intent and purpose of the overall category.  The Department will no longer be subject to monitoring for compliance with Paragraph 81 once it has achieved and maintained for twelve consecutive months Substantial Compliance with each of the categories.  The County's implementation plan tracker does not reflect that it has completed any corrective action steps related to Provision 81.

### Training (Partial Compliance)

Paragraphs 3.1-3.6, 4.6-4.9, and 12.1 of the *Rosas* Implementation Plan reflect training requirements on use of force, ethics, dealing with inmates with mental illness, and investigations of force incidents.  The curriculum and lesson plans to implement these training requirements have been approved by the *Rosas* Monitors.

The Monitor's Fourteenth Report reflected that the annual refresher training results for 2021 related to 3.2, 4.6, and 12.1-1 were verified by the Monitor's auditors.  It also reflected that the County's posted results reflected Partial Compliance for the annual refresher training results for 2021 related to 3.1 and 4.7.

The County's Augmented Fifteenth Self-Assessment reports that the Department met the Substantial Compliance thresholds for the following Training provisions at the DOJ facilities during the Second Quarter of 2022: 3.3, 3.5,[39] 4.8, 4.9, and 12.1-2.[40]  The reported results for 3.3, 4.8, 4.9, and 12.1-2 have been verified by the Monitor's auditors.  The County also reported that the Department did not achieve Substantial Compliance with 3.6 (timely 6-month probationary reviews), though its results improved.

The County's Augmented Fifteenth Self-Assessment reports that the Department met the Substantial Compliance thresholds for the following Training provisions at the DOJ facilities during the Third Quarter of 2022: 3.3, 3.5,[41] 4.8, 4.9, and 12.1-2.  The reported results for 3.3, 4.8, 4.9, and 12.1-2 have been verified by the Monitor's auditors.

**Use of Force (Partial Compliance)**

According to data provided by the Department, uses of force increased slightly at the DOJ facilities in the second half of 2022, though all of the increase was in NCI incidents, or relatively minor uses of force that involve "no injury or complaint of pain as a result of: Resisted hobble application; Resisted searching or handcuffing techniques; Resisted firm grip, control holds, come-along, or control techniques."  More serious Category 1 and Category 2 incidents declined at the DOJ facilities in the second half of 2022, and there were no Category 3 incidents recorded for the second half of 2022.

Among the most significant and persistent issues identified by the Monitoring Panel in the Rosas case has been the overuse of head strikes in the downtown Basin facilities in violation of the Rosas provisions.[42]  The use of head strikes is far less frequent in the DOJ facilities.  There were 10 documented head strikes in the DOJ facilities for 2022,[43] which represented a noteworthy decrease from the prior year.

---

[39] The posted results for 3.5 indicate that "[t]here were no inmate grievances against staff investigations involving force with a finding of "Appears the Employee Conduct Could Have Been Better."

[40] Because Paragraph 81 incorporates all 104 provisions of the *Rosas* Implementation Plan in a single provision, the Monitor agreed to the use of random samples in some cases instead of requiring assessments of all personnel or incidents, which the Monitor believes would be unduly burdensome for the Department.

[41] The posted results for 3.5 indicate that "[t]here were no inmate grievances against staff investigations involving force with a finding of "Appears the Employee Conduct Could Have Been Better."

[42] *See, e.g.*, *Rosas, et al., v. Leroy Baca*, No. CV 12-00428 DDP, Panel's Eleventh Monitoring Report, filed Mar. 8, 2023.

[43] All data as of November 30, 2022.

The Monitor and Use of Force Expert Susan McCampbell reviewed 25 completed force packages for the DOJ facilities during this Reporting Period.  As a result of objections by the plaintiffs in the *Rosas* case, the *Rosas* Monitors revised their approach to assessing the Department's compliance with the use, reporting and investigation of force provisions of the Implementation Plan.  Under the revised approach, the *Rosas* Monitors do not determine the percentage of cases in which the Department's use of force was reasonable overall, but instead assess the Department's compliance with the specific provision on the use, reporting, and investigation of force provisions of the Implementation Plan.  To maintain consistency across all of the jail facilities, the Monitor has adopted the same approach in the DOJ case.

In the uses of force reviewed during the Fifteenth Monitoring Period, the Monitor determined that the Department was not in compliance with Paragraph 2.2.  Regarding Paragraph 2.2(a) (force must be used as a last resort), Department members too readily engaged in uses of force before meaningful attempts were made to de-escalate using time, distance, the presence of a supervisor or mental health professional, and verbal attempts at persuasion.  These cases often arise when Department members are handling inmates who would be deemed "recalcitrant" under the Department's *Handling Insubordinate, Recalcitrant, Hostile, or Aggressive Inmates* Policy ("Recalcitrant Inmate Policy").[44] Under the Recalcitrant Inmate Policy, when an inmate is verbally defiant, uncooperative to commands, aggressive, or passively resistant, deputies shall request backup (in non-emergency situations) and a supervisor to assist with developing a "planned tactical approach to the situation that will reduce the possibility of physical confrontation or injuries."  Deputies too often engage without following these steps and uses of force ensue.  The Department was also not in compliance with Paragraph 9.2 (requiring that deputies who were involved in a use of force shall not escort involved inmates to medical, holding, or segregation).

**Reporting and Investigation of Force (Partial Compliance)**

The quality of the command reviews was improved in the force packages reviewed during the Fifteenth Monitoring Period.  The Monitor and SME noted that command reviewers were more frequently identifying inconsistencies in deputy reports and sending the reports back for clarification.  Moreover, command reviewers more frequently provided their own analyses of the incidents rather than pro forma approval of the findings of the investigating sergeants.  That is, they often included independent evaluation of relevant pieces of video evidence and interviews and how they related to Department policy.  This greater engagement with the evidence was encouraging.

However, there is work still to be done.  First, command reviewers are not consistently identifying errors or root causes that may have precipitated the need to use force and without which no force would have been necessary.  This sometimes included potential violations of the Recalcitrant Inmate policy, including decisions to rush headlong into potential force encounters rather than slowing down, summoning a

---

[44] *See* LASD Custody Division Manual 7-02/020.00.

supervisor and/or a mental health professional, activating a handheld video camera, and mobilizing other resources to help resolve the encounter without force.

Second, when command reviewers did identify potential errors or problematic uses of force, in almost all instances, they concluded that they should be resolved with training.  There was no analysis of whether or not discipline was appropriate and, if not, why not, even though Department policy explicitly requires such an analysis.  For example, under the Department's Guidelines for Discipline and Education-Based Alternatives:

> The judgment of whether discipline is appropriate should be based upon several factors:
>
> 1. Seriousness of the offense; the impact, actual or potential, upon the department and/or the community.
> 2. The length of service and overall performance of the employee.
> 3. The attitude and culpability of the employee.
> 4. Previous discipline and the length of time since imposed.[45]

We have yet to review a force package that includes an evaluation of these factors; instead a conclusion is invariably reached to provide training rather than discipline without a substantive explanation of why.  To enhance the credibility of its force reviews, the Department must remedy this.  Moreover, two force packages were reviewed during the period that were resolved with memos from the Executive Force Review Committee, rather than a Commander's Review, and they included no discussion of why the force was found to be consistent with Department policy.[46]  To address these gaps, in the Fifteenth Reporting Period, the Monitor had productive meetings with Department command personnel to discuss expectations for the kinds of analysis that must be included in Commander Reviews in the future.

A majority of the force packages reviewed during the Fifteenth Reporting Period also did not include any detail about compliance with Paragraph 15.6 (requiring separation of custody personnel until they have completed their use of force reports).

Regarding the Department's quantitative results on the specific provisions, for the Second Quarter of 2022, the County reported Substantial Compliance with the following provisions: 5.1 (timely database entry of force incidents); 8.3 (timely review of retaliation grievances); 11.1 (timely review of force packages by CFRT for potential employee discipline); 13.1 (zero tolerance and related investigations); 13.2 (notifications to OIG required by findings in 13.1); 14.1 (timely unit commander review re: prosecution for

---

[45] See LASD Guidelines for Discipline and Education-Based Alternatives, dated Aug. 1, 2020.

[46] In one case, an inmate who was following orders to walk away and return to his bunk was instead taken to the ground.  Although no credible reason was provided for the takedown, the Executive Force Review Committee found that the "tactics and force used by all Department personnel in this incident were within Department policy."  This summary conclusion was not accompanied by any substantive review of the takedown nor the requirements to de-escalate, when possible, pursuant to Department policy or the Rosas provisions.

inmate assaults on staff); and 14.2 (timely referral of criminal inmate conduct to DA's Office).

For the Third Quarter of 2022, the County's Augmented Fifteenth Self-Assessment reports Substantial Compliance with the following provisions: 5.1 (timely database entry of force incidents); 8.3 (timely review of retaliation grievances); 11.1 (timely review of force packages by CFRT for potential employee discipline); 13.1 (zero tolerance and related investigations); 13.2 (notifications to OIG required by findings in 13.1); 14.1 (timely unit commander review re: prosecution for inmate assaults on staff); and 14.2 (timely referral of criminal inmate conduct to DA's Office).

### Grievances (Partial Compliance)

The County's Augmented Fifteenth Self-Assessment reports that in the Second Quarter of 2022, the Department achieved Substantial Compliance with the following grievance provisions at the DOJ facilities: 6.4 (proper handling of force-related grievances), 6.5 (proper handling of harassment and retaliation grievances); 6.7 (appropriate handling of grievances marked emergency"), 6.8 (inmate notification of downgraded grievances); 6.9 (proper handling of emergency grievances), 6.10 (timely collection of inmate grievances); 6.11 (review of complaints re: inmate grievance process); 6.12 (proper database entry of inmate grievances); 6.13 (proper tracking of handling of inmate grievances); 6.14 (monthly reports of grievance tracking); 6.15 (evaluation of trends in inmate grievance handling); 6.17 (time limit for filing force-related grievances); 6.18 (proper handling of PREA grievances); 6.19 (timely responses to inmate grievances); 6.20 (proper handling of inmate appeals); 7.1 (conflict resolution for inmate grievances); 7.3 (town hall meetings); and 8.1 (reporting of retaliation grievances).  The County reported that the Department did not achieve compliance with 7.2 (timely notification of grievance investigation results).

The County's Augmented Fifteenth Self-Assessment reports that in the Third Quarter of 2022, the Department achieved Substantial Compliance with the following grievance provisions at the DOJ facilities: 6.4 (proper handling of force-related grievances); 6.5 (proper handling of harassment and retaliation grievances); 6.8 (inmate notification of downgraded grievances); 6.10 (timely collection of inmate grievances) 6.7 (appropriate handling of grievances marked "emergency"); 6.9 (proper handling of emergency grievances); 6.11 (review of complaints re: inmate grievance process); 6.12 (proper database entry of inmate grievances); 6.13 (proper tracking of handling of inmate grievances); 6.14 (monthly reports of grievance tracking); 6.15 (evaluation of trends in inmate grievance handling); 6.19 (timely responses to inmate grievances); 6.20 (proper handling of inmate appeals); 7.1 (conflict resolution for inmate grievances); 7.3 (town hall meetings); and 8.1 (reporting of retaliation grievances).  The Department was not in Substantial Compliance with 6.17 (time limit for filing force-related grievances); and 6.18 (proper handling of PREA grievances).

### Management and Administration (Substantial Compliance as of October 1,

2020 through September 30, 2021)

The Department achieved Substantial Compliance with the Management and Administration Provisions at the DOJ facilities as of September 30, 2021, and these provisions were not subject to Monitoring during the Fifteenth Reporting Period.

**Security Restraints (Partial Compliance)**

Security Restraints are subject to the provisions in Section 17 of the *Rosas* Plan. It is the Monitor's understanding that the County and the Department do not use "multi-point restraints," which are subject to Paragraphs 17.6 through 17.9 of the plan, at any of the County's jail facilities.  The Monitor reviewed the Safety Chair Logs and Fixed Restraint Logs for both quarters, which reflect that the facilities that produced such logs are complying with the requirements of Paragraphs 17.3 and 17.4 of the *Rosas* Plan.

The Department posted logs of all of the involuntary medications administered in the Second and Third Quarters of 2022.  The records reflect that all of the medications were administered per court orders to restore the competency of those deemed incompetent to stand trial and none were solely for security purposes in compliance with Paragraph 17.10 of the *Rosas* Plan.

Regarding Paragraph 17.3, there is no indication that medical professionals are performing vitals on inmates who are in safety chairs for prolonged periods, including during transports to court.  The Monitor and Subject Matter Expert reviewed multiple incidents involving the use of the WRAP restraint during the Fifteenth Reporting Period. In the majority of these incidents, no specific justification was provided in use of force documentation regarding the reason for the application of the WRAP.  When a justification was provided, it was often extremely general.  Supervisors must be trained to describe with particularity what specific threat required the use of the WRAP.

According to data provided by the Department, in 2022, uses of the WRAP restraint decreased substantially at CRDF and increased at NCCF.  The total number of applications of the WRAP restraint trended downwards at the DOJ facilities in 2022.[47]

**Early Warning System**       **(Substantial Compliance as of September 30, 2019 through September 30, 2020)**

The Department implemented an Employee Review System that was approved by the *Rosas* Monitors as a pilot program at the Downtown Jail Facilities on July 27, 2018, and expanded it to the DOJ facilities on October 25, 2018.  The Department achieved Substantial Compliance with the Early Warning Provisions at the DOJ facilities as of September 30, 2020, and these provisions were not subject to Monitoring during the Fifteenth Reporting Period.

---

[47] As of November 30, 2022, there were 71 documented uses of the WRAP restraint at the DOJ facilities as opposed to 99 for the year 2021.

82.     With respect to paragraph 6.16 of the *Rosas* Implementation Plan, the
County and the Sheriff will ensure that Sheriff's Department personnel responsible for
collecting prisoners' grievances as set forth in that paragraph are also co-located in the
Century Regional Detention Facility.

**STATUS:        SUBSTANTIAL COMPLIANCE (as of July 15, 2016, through
December 31, 2017)**

Pursuant to Paragraph 111 of the Settlement Agreement, the County was not
subject to monitoring for Substantial Compliance with Paragraph 82 in the Fifteenth
Reporting Period.

83.     The County and the Sheriff will install closed circuit security cameras throughout all Jails facilities' common areas where prisoners engage in programming, treatment, recreation, visitation, and intra-facility movement ("Common Areas"), including in the Common Areas at the Pitchess Detention Center and the Century Regional Detention Facility.  The County and the Sheriff will install a sufficient number of cameras in Jails facilities that do not currently have cameras to ensure that all Common Areas of these facilities have security-camera coverage.  The installation of these cameras will be completed no later than June 30, 2018, with TTCF, MCJ, and IRC completed by the Effective Date; CRDF completed by March 1, 2016; and the remaining facilities completed by June 30, 2018.  The County and the Sheriff will also ensure that all video recordings of force incidents are adequately stored and retained for a period of at least one year after the force incident occurs or until all investigations and proceedings related to the use of force are concluded.

**STATUS:**      **SUBSTANTIAL COMPLIANCE (as of July 1, 2015, through June 30, 2016 at MCJ and IRC)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2015, through September 30, 2016 at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 at NCCF and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2018, through June 30, 2019 at PDC South)**

Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring for Substantial Compliance with Paragraph 83 in the Fifteenth Reporting Period.

84.     The Sheriff will continue to maintain and implement policies for the timely and thorough investigation of alleged staff misconduct related to use of force and for timely disciplinary action arising from such investigations.  Specifically:

(a)     Sworn custody staff subject to the provisions of California Government Code section 3304 will be notified of the completion of the investigation and the proposed discipline arising from force incidents in accordance with the requirements of that Code section; and

(b)     All non-sworn Sheriff's Department staff will be notified of the proposed discipline arising from force incidents in time to allow for the imposition of that discipline.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of July 1, 2017, through June 30, 2018 (verified))**

Substantial Compliance under the Compliance Measures requires the Department to demonstrate that 95% of the investigations of force incidents in which sworn custody staff and non-sworn custody staff were found to have violated Department policy or engaged in misconduct were completed and administrative action, which could include discipline, was taken within the time frames provided for in Government Code Section 3304 and relevant Department policies.

Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring for Substantial Compliance with Paragraph 84 in the Fifteenth Reporting Period.

131

85.     The County and the Sheriff will ensure that Internal Affairs Bureau management and staff receive adequate specialized training in conducting investigations of misconduct.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of April 1, 2021, through March 31, 2022 (verified))**

The Parties agreed on Revised Compliance Measures in 2021.  Substantial Compliance requires the Department to provide the Monitor with (1) the curriculum/syllabus for the two specialized courses, Internal Affair Investigations and Interview and Interrogation, given to IAB management, and (2) a list of the sworn personnel assigned to IAB and proof that such personnel successfully completed the training.  Substantial Compliance requires the Department to demonstrate that 90% of the personnel assigned to IAB have successfully completed one course of the required training within 3 months of their start date, and the second course within 6 months of their start date.

Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring for Substantial Compliance with Paragraph 85 in the Fifteenth Reporting Period.

86.     Within three months of the Effective Date, the County and the Sheriff will develop and implement policies and procedures for the effective and accurate maintenance, inventory, and assignment of chemical agents and other security equipment. The County and the Sheriff will develop and maintain an adequate inventory control system for all weapons, including OC spray.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 at MCJ and CRDF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2016, through December 31, 2017 at PDC North)**

**SUBSTANTIAL COMPLIANCE (as of February 1, 2017, through March 31, 2018 at PDC South and PDC East)**

**SUBSTANTIAL COMPLIANCE (as of March 1, 2017, through March 31, 2018 at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 at IRC)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 at TTCF)**

CDM 7-08/080 ACCOUNTABILITY OF SPECIAL WEAPONS, effective October 14, 2016, requires each facility to have unit orders that "establish procedures for the storage, issuance, reissuance, accountability, maintenance, and periodic inventory of all weapons. . . stored at, or issued from, the facility," which includes detailed requirements for the "Inventory, Control, and Accountability of Aerosol Chemical Agents."

In addition to providing written policies and procedures, Substantial Compliance requires the Department to provide up-to-date Unit Orders for each jail requiring the inventory and inspection of special weapons, and armory audit logs documenting the inventory and control of armory-level weapons.  The Department previously maintained Substantial Compliance with Paragraph 86 for twelve consecutive months at all of the facilities, and it was not subject to monitoring with this provision in the Fifteenth Reporting Period.

133

## APPENDIX A

| NO. | PROVISION | STATUS | SUBSTANTIAL COMPLIANCE DATES |
|---|---|---|---|
| 18 | Suicide Prevention Training | Substantial Compliance | **(10/1/17 at MCJ & PDC South)[1] (9/1/17 at NCCF) (12/1/17 at PDC East) (4/1/18 at TTCF, IRC, & PDC North) (8/1/18 at CRDF)** |
| 19 | Crisis Intervention & Conflict Resolution Training | Substantial Compliance | **(4/1/18 at MCJ, NCCF, & IRC) (7/1/18 at TTCF) (12/1/18 at CRDF, PDC East, & PDC North) (3/1/19 at PDC South)** |
| 20 | Training at NCCF, PDC and CRDF | Substantial Compliance | **(8/1/17 at PDC East, PDC North, NCCF, & CRDF) (10/1/17 at PDC South)** |
| 21 | CPR Certification | Substantial Compliance | **(10/1/15 – 9/30/16 at PDC East & PDC South) (1/1/16 – 12/31/16 at NCCF, PDC North, & IRC) (4/1/16 – 3/31/17 at TTCF) (10/1/17 – 9/30/18 at MCJ) (7/1/18 – 6/30/19 at CRDF)** |

---

[1] Substantial Compliance Dates in **bold** reflect that the Department has achieved Substantial Compliance with the training requirements or maintained Substantial Compliance for twelve consecutive months with the other requirements; the results were verified by the Monitor's auditors when required; and the County or designated facilities are no longer subject to monitoring of this provision pursuant to Paragraph 111 of the Settlement Agreement.

## APPENDIX A

| | | | |
|---|---|---|---|
| 22 | Use of Arresting and Booking Documents | Substantial Compliance | **(7/1/16 – 6/30/17)** |
| 23 | Suicide Hazard Mitigation Plans | Substantial Compliance | **(7/12/18)** |
| 24 | Suicide Hazard Inspection | Substantial Compliance | **(10/1/17 – 9/30/18)** |
| 25 | Transportation of Suicidal Inmates (station jails) | Partial Compliance (East & North Patrol Divisions) Non-Compliance (Central & South Patrol Divisions) | |
| 26 | Identification and Evaluation of Suicidal Inmates | Partial Compliance | |
| 27 | Screening for Mental Health Care and Suicide Risk | Substantial Compliance | **(10/1/19 – 3/31/20, 10/1/20 – 3/31/21)** |
| 28 | Expedited Booking of Suicidal Inmates | Substantial Compliance (IRC & CRDF) | **(4/1/17 – 3/31/18 at IRC)** (4/1/22 – 9/30/22 at CRDF) |
| 29 | Mental Health Assessments (of non-emergent mental health needs) | Substantial Compliance | **(4/1/17 – 3/31/18)** |
| 30 | Initial Mental Health Assessments & Treatment Plans | Substantial Compliance | **(1/1/19 – 12/31/19)** |
| 31 | Electronic Medical Records Alerts | Partial Compliance (CRDF & TTCF) | |
| 32 | Electronic Medical Records – Suicide Attempts | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 33 | Supervisor Reviews of Electronic Medical Records | Substantial Compliance | **(7/1/16 – 6/30/17)** |
| 34 | Discharge Planning | Non-Compliance | |
| 35 | Referral for Mental Health Care | Substantial Compliance | **(11/1/17 – 12/31/18)** |

## APPENDIX A

| | | | |
|---|---|---|---|
| 36 | Assessments After Triggering Events | Non-Compliance | |
| 37 | Court Services Division Referrals | Non-Compliance | |
| 38 | Weekly Rounds in Restricted Housing Modules | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 39 | Confidential Self-Referral | Substantial Compliance (NCCF) Partial Compliance (PDC South, TTCF, PDC North, MCJ, & CRDF) Not Rated (PDC East) | **(7/1/17 – 6/30/18 at NCCF)** |
| 40 | Availability of QMHPs | Partial Compliance | |
| 41 | FIP Step-Down Protocols | Substantial Compliance | (7/1/22 – 9/30/22) |
| 42 | HOH Step-Down Protocols | Non-Compliance | |
| 43 | Disciplinary Policies | Substantial Compliance (NCCF & PDC North) Partial Compliance (TTCF & MCJ) Non-Compliance (CRDF) | **(10/1/17 – 9/30/18 at NCCF & PDC North)** |
| 44 | Protective Barriers | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 45 | Suicide Intervention and First Aid Kits | Substantial Compliance | **(10/1/15 – 9/30/16 at CRDF, NCCF, TTCF, PDC East, & PDC South) (1/1/16 – 12/31/16 at MCJ & PDC North)** |
| 46 | Interruption of Self-Injurious Behavior | Substantial Compliance | **(7/1/20 – 6/30/21)** |
| 47 | Staffing Requirements | Partial Compliance | |
| 48 | Housekeeping and Sanitation | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 49 | Maintenance Plans | Substantial Compliance | **(3/1/16 – 2/28/17)** |

## APPENDIX A

| 50 | Pest Control | Substantial Compliance | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC North, TTCF, & CRDF)** **(4/1/16 – 3/31/17 at PDC South & PDC East)** |
|---|---|---|---|
| 51 | Personal Care & Supplies | Substantial Compliance | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC East, PDC North, PDC South, & TTCF)** **(7/1/16 – 6/30/17 at CRDF)** |
| 52 | HOH Property Restrictions | Partial Compliance | |
| 53 | Eligibility for Education, Work and Programs | Partial Compliance | |
| 54 | Privileges and Programs[2] | Partial Compliance | |
| 55 | Staff Meetings | Substantial Compliance | **(10/1/16 – 9/30/17 at CRDF)** **(4/1/17 – 3/31/18 at PDC North)** **(4/1/18 – 3/31/19 at MCJ)** **(7/1/19 – 6/30/20 at TTCF)** |
| 56 | Changes in Housing Assignments | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 57 | Inmate Safety Checks in Mental Housing | Substantial Compliance (MCJ & PDC North) Non-Compliance (TTCF & CRDF) | **(4/1/17 – 3/31/18 at MCJ)** **(7/1/21 – 6/30/22 at PDC North)** |

---

[2] Per agreement of the parties, the County must maintain Substantial Compliance for two additional quarters under the revised Compliance Measures.

## APPENDIX A

| 58 | Inmate Safety Checks in Non-Mental Housing | Substantial Compliance (PDC South, PDC North, PDC East, CRDF & IRC)<br>Partial Compliance (NCCF)<br>Non-Compliance (TTCF & MCJ) | **(1/1/16 – 12/31/16 at PDC South, PDC North, & PDC East)**<br>**(7/1/17 – 6/30/18 at CRDF)**<br>**(10/1/17 – 9/30/18 at IRC)** |
|---|---|---|---|
| 59 | Supervisor Rounds | Substantial Compliance | **(1/1/17 – 12/31/17 at PDC East & MCJ)**<br>**(4/1/17 – 3/31/18 at NCCF)**<br>**(10/1/17 – 9/30/18 at CRDF)**<br>**(1/1/18 – 12/31/18 at PDC North & PDC South)**<br>**(4/1/18 – 3/31/19 at TTCF)** |
| 60 | Implementation of Quality Improvement Program | Substantial Compliance | **(4/1/19 – 3/31/20)** |
| 61 | Requirements of Quality Improvement Program | Partial Compliance | |
| 62 | Tracking of Corrective Action Plans | Partial Compliance | |
| 63 | Sufficient HOH and MOH Housing | Partial Compliance (CRDF & TTCF) | |
| 64 | Plans for Availability of Inpatient Health Care | Non-Compliance | |
| 65 | Administration of Psychotropic Medication | Partial Compliance | |
| 66 | Active Mental Health Caseloads | Non-Compliance | |
| 67 | Prisoner Refusals of Medication | Non-Compliance | |

## APPENDIX A

| | | | |
|---|---|---|---|
| 68 | Contraband Searches | Substantial Compliance (MCJ, NCCF, PDC East, PDC South PDC North, TTCF, & CRDF) | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC East, PDC South, & PDC North) (1/1/17 – 12/31/17 at TTCF)** (1/1/22 – 9/30/22 at CRDF) |
| 69 | Clinical Restraints in CTC | Substantial Compliance | **(7/1/18 – 6/30/19)** |
| 70 | Security Restraints in HOH and MOH | Partial Compliance | |
| 71 | Therapeutic Services for Inmates in Clinical Restraints | Substantial Compliance | **(7/1/16 – 6/30/17)** |
| 72 | Administrative Reviews | Substantial Compliance | **(1/1/17 – 12/31/17)** |
| 73 | Reporting of Self-Injurious Behavior and Threats | Substantial Compliance | **(10/1/17 – 9/30/18)** |
| 74 | Law Enforcement Investigations of Suicides | Substantial Compliance | **(9/1/16 – 12/31/17)** |
| 75 | Management Reviews of Suicide Attempts | Substantial Compliance | **(10/1/17 – 9/30/18)** |
| 76 | Management Reviews of Suicides | Substantial Compliance | **(9/1/16 – 12/31/17)** |
| 77 | Custody Compliance and Sustainability Bureau | Substantial Compliance | (4/1/22) |
| 78 | Suicide Prevention Advisory Committee | Substantial Compliance | **(5/11/16 – 5/18/17)** |
| 79 | Therapeutic Services in Mental Health Housing | Non-Compliance | |
| 80 | Out-of-Cell Time in HOH | Non-Compliance | |

<u>**APPENDIX A**</u>

| 81 | Implementation of *Rosas* Recommendations | Partial Compliance | |
|----|----|----|----|
| | Training | Partial Compliance | |
| | Use of Force | Partial Compliance | |
| | Reporting and Investigation of Force | Partial Compliance | |
| | Grievances | Partial Compliance | |
| | Management and Administration | Substantial Compliance | **(10/1/20 – 9/30/21)** |
| | Security Restraints | Partial Compliance | |
| | Early Warning System | Substantial Compliance | **(9/30/19 – 9/30/20)** |
| 82 | Grievances at CRDF | Substantial Compliance | **(7/15/16 – 12/31/17)** |
| 83 | Closed Circuit Cameras | Substantial Compliance | **(7/1/15 – 6/30/16 at MCJ & IRC)** **(10/1/15 – 9/30/16 at TTCF)** **(4/1/16 – 3/31/17 at CRDF)** **(4/1/18 – 3/31/19 at NCCF & PDC North)** **(7/1/18 –6/30/19 at PDC South)** |
| 84 | Investigation of Staff Misconduct | Substantial Compliance | **(7/1/17 – 6/30/18)** |
| 85 | Internal Affairs Bureau Training | Substantial Compliance | **(4/1/21 – 3/31/22)** |

**APPENDIX A**

| | | | |
|---|---|---|---|
| 86 | Maintenance and Inventory of Security Equipment | Substantial Compliance | **(4/1/16 – 3/31/17 at MCJ & CRDF) (10/1/16 – 12/31/17 at PDC North) (2/1/17 – 3/31/18 at PDC South & PDC East) (3/1/17 – 3/31/18 at NCCF) (4/1/17 – 3/31/18 at IRC) (4/1/18 – 3/31/19 at TTCF)** |

## APPENDIX B

| | Substantial Compliance (Provisions) | Partial Compliance[1] | Non-Compliance | Suspended (Some Or All Facilities) | Substantial Compliance (Facilities)[2] | No Longer Subject To Monitoring[3] |
|---|---|---|---|---|---|---|
| First[4] | 5 | 16 | | | 10 | |
| Second | 14 | 30 | 13 | | 24 | |
| Third | 22 | 27(1) | 10 | | 29 | 4(2) |
| Fourth | 24 | 26(1) | 10 | | 29 | 10(2) |
| Fifth | 23 | 24(2) | 7 | | 34 | 15(5) |
| Sixth | 32 | 22 | 7 | | 38 | 18(9) |
| Seventh | 30 | 23 | 7 | | 39 | 21(10) |
| Eighth | 35 | 20 | 6 | | 42 | 27(9) |
| Ninth | 36 | 22 | 4 | | 43 | 31(8) |
| Tenth | 39 | 21 | 3 | | 45 | 32(8) |
| Eleventh | 38 | 18 | 5 | 2 | 44 | 34(7) |
| Twelfth | 38 | 18 | 6 | 1 | 44 | 36(6) |
| Thirteenth | 42 | 14(1) | 6 | 1 | 47 | 36(6) |
| Fourteenth | 40 | 17 | 7 | 0 | 45 | 38(6) |
| Fifteenth | 42 | 13(1) | 9 | 0 | 46 | 38(6) |

---

[1] The figure in parenthesis under Partial Compliance is the number of additional provisions where some facilities were in Partial Compliance and other facilities were in Non-Compliance.

[2] This represents the number of provisions where the Department is in Substantial Compliance at all or some of the facilities.

[3] The figure in parenthesis under No Longer Subject to Monitoring is the number of additional provisions where some facilities are no longer subject to monitoring.

[4] During the First Reporting Period, 43 provisions were not subject to monitoring.