Nicholas E. Mitchell
nmitchell@independentmonitor.com

**Monitor**

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> v. <br><br> COUNTY OF LOS ANGELES et al., | CV No. 15-05903 DDP (JEMX) <br><br> **MONITOR'S SIXTEENTH REPORT** |

1       Pursuant to Paragraph 109 of the Joint Settlement Agreement Regarding Los

2 Angeles County Jails, the Monitor appointed by this Court hereby submits the

3 attached Report "describing the steps taken" by the County of Los Angeles and the

4 Los Angeles County Sheriff Department ("Department") during the six-month

5 period from January 1, 2023, through June 30, 2023, "to implement the Agreement

6 and evaluating the extent to which they have complied with this Agreement."  This

7 Report takes into consideration the advice and assistance I have received from the

8 Subject Matter Experts appointed by this Court and the comments from the Parties

9 in accordance with Paragraph 110 of the Agreement.  I am available to answer any

10 questions the Court may have regarding my Report at such times as are convenient

11 for the Court and the parties.

12

13 DATED:  October 30, 2023       Respectfully submitted,

14

15

16           By:  */s/ Nicholas E. Mitchell*

17               Nicholas E. Mitchell

18               Monitor

19

20

21

22

23

24

25

26

27

28

# MONITOR'S SIXTEENTH REPORT

This Sixteenth Report sets forth the Monitor's assessments of the implementation of the Settlement Agreement (the "Agreement" or "DOJ Agreement") between the County of Los Angeles (the "County") and the United States Department of Justice ("DOJ") for the treatment of inmates with mental illness in the County's jail facilities by the Los Angeles Sheriff's Department (the "Department" or "LASD") and the County's Correctional Health Services ("CHS"). It also reports on the Department's compliance with the provisions of the Implementation Plan in the settlement of *Alex Rosas, et al., v. Leroy Baca,* No. CV 12-00428 DDP, that were extended under the terms of the DOJ Agreement to the facilities not covered by the *Rosas* case.[1] This Report covers the County's reported results for the period from January 1, 2023, through June 30, 2023 (the "Sixteenth Reporting Period").

This Sixteenth Report is based upon the Monitor's review of the policies, procedures, and directives proposed and/or implemented by the Department and CHS in the Sixteenth Reporting Period, and assessments and observations of the Mental Health and Use of Force Subject Matter Experts, and mental health clinicians and auditors retained by the Monitor. It takes into consideration the County's Self-Assessment Status Report ("Sixteenth Self-Assessment"); Correctional Health Services and Custody Compliance and Sustainability Bureau ("CCSB") Combined Semi-Annual Report on Quality Improvement and Suicide Prevention Efforts – Quarter 4 2022 & Quarter 1 2023; the County's Augmented Self-Assessment Status Report ("Augmented Sixteenth Self-Assessment"); and results reported by the County through June 30, 2023.

In May 2023, the Monitor visited the jails during United States District Judge Dean D. Pregerson's site visits therein. In June 2023, the Monitor conducted site visits in the jails with Use of Force Subject Matter Expert Susan McCampbell, and in July 2023, the Monitor conducted additional site visits with Mental Health Subject Matter expert Dr. Nicole Johnson and clinician Dr. Jim Vess. During the visits, the Monitoring Team spoke with inmates, custody staff and supervisors, and mental health staff and supervisors, and inspected mental health housing at all patient acuity levels. The County and the Department cooperated fully with the Monitoring Team during these visits and throughout the Sixteenth Reporting Period. The Monitor thanks County personnel for their unfailing responsiveness, professionalism, and collegiality.

There are 69 provisions in the Agreement that are subject to monitoring by the Monitor and Subject Matter Experts. As of the date of this Report, the County and the Department are in Substantial Compliance with 43 provisions, in Partial Compliance with 12 provisions, in Non-Compliance with four provisions, and Not Rated with two

---

[1] The *Rosas* case involved allegations of excessive force in Men's Central Jail (MCJ), the Twin Towers Correctional Facility (TTCF), and the Inmate Reception Center (IRC) (collectively the "Downtown Jail Complex"). The DOJ Agreement extends provisions of the Implementation Plan to the Century Regional Detention Facility (CRDF), the North County Correctional Facility (NCCF), and the Pitchess Detention Center (PDC).

provisions.  In addition, there are eight provisions where the County is in different compliance ratings at different facilities.  This is similar to the County's averaged results for the previous three Reporting Periods.

*Figure 1:  The County's Cumulative Substantial Compliance with All Provisions by Reporting Period*



This Sixteenth Report reflects noteworthy progress by the County and, given its current trajectory, also some cause for concern about its ability to meet the compliance deadlines set by this Court.  In the last year, the County has made notable progress in several areas related to its compliance with the Agreement.  For example:

- The County reduced the population of inmates requiring High Observation Housing ("HOH") in various ways, including by transferring a large number of such patients to state prisons to serve state prison terms or to state hospitals to be restored to competency.  Indeed, between November 2022 and August 2023, the number of P3/HOH patients in the LASD jails decreased from 1,699 to 1,388.  These reductions are likely to improve the Department's ability to comply with several provisions of the Agreement.[2]

---

[2] In addition, a preliminary injunction order was issued in *Urquidi v. City of Los Angeles*, which required the County and the City of Los Angeles to enforce the Emergency Bail Schedule that was in effect during the COVID-19 emergency.

- Prior Monitoring reports have cited the comparatively low salaries offered to CHS mental health workers as a significant obstacle to the County being fully staffed in order to comply with the Agreement.  The County recently authorized significant "jail-based assignment bonuses" to improve recruiting and retention of such workers.  While the gains in the total number of mental health personnel in the jails to date are extremely modest,[3] the County expects that its recruiting will continue to improve.

- The County opened the Acute Intervention Module ("AIM") to treat P3 and P4 patients and attempt to reduce their Mental Health Levels of Care ("MHLOC").  According to County data, the AIM has treated 329 patients, and the population of P4 inmates, or those who require inpatient care, has been reduced from 160 patients in September 2022 to 73 such patients in September 2023.  This was an important step towards remedying the long-standing imbalance between the number of P4 patients and the small number of licensed inpatient beds available to treat them.

- The County created a new housing model for some HOH inmates—HOH dorms—which allow HOH patients to program out of their cells in a common dayroom instead of being routinely locked down to metal "spider tables" during their out-of-cell time.  In so doing, the County overcame its long-standing resistance to permitting HOH patients to program without restraints, and dramatically improved conditions for the group of HOH patients who are now detained in these dorm units.

Notwithstanding these improvements and others discussed elsewhere in this Report, there are reasons for concern.  This includes:

- More than two years after the Los Angeles County Board of Supervisors voted to close MCJ, during the Sixteenth Reporting Period, there were an average of 925 MOH inmates with serious mental illness detained therein, and no concrete plan or timeline has been presented to move them to appropriate facilities.  To be clear, the MOH units in MCJ are overcrowded, decrepit, and decaying, and they have inadequate treatment space for contact between patients and mental health clinicians.  To put it plainly, they are entirely unfit for the housing or treatment of inmates with serious mental illness, and the County will struggle to demonstrate that it can provide "therapeutically appropriate" mental health treatment to these patients, as the Agreement requires, while they remain in MCJ.

- As set forth below, the treatment planning for patients detained in the LACJ

---

[3] *See infra* analysis of Provision 47 at pp. 67-69.

remains suboptimal, which necessarily compromises the quality of the mental health treatment they receive.  Much of the treatment now being provided constitutes what Court-appointed Mental Health Subject Matter Expert Dr. Nicole Johnson characterizes as "wellness checks" or "cell-side check-ins" rather than "structured mental health treatment" with defined goals and incremental steps toward achieving those goals.[4]  Moreover, the County's positive assessments of its own treatment planning diverge—sharply—from the assessments of the Monitoring Team and appear to reflect persistent misunderstandings about treatment planning among County personnel.[5]

- In the first three quarters of 2022, there were no inmate suicides in the jails, but there were five inmate suicides during the Sixteenth Reporting Period, a troubling increase.  There is no conclusive evidence that these higher suicide numbers were specifically caused by the issues discussed in this Report, and we are heartened that County and Department executives are taking them very seriously and attempting to ascertain their cause(s).  However, the suicides remain a pressing reminder of the need for the County to dramatically and quickly address the issues discussed in this Report.

- Given the importance of ongoing training of CHS mental health staff to the County's compliance with the Agreement, the Monitoring Team previously identified the launch of LASD's Mental Health Training Department as a "proactive and commendable initiative by the County to address some of the deficiencies discussed" in the Monitoring Reports.[6]  Yet, in recent site visits, we learned that rather than being adequately staffed and resourced, the Mental Health Training Department has been reduced to a single employee who is primarily focused on onboarding and providing routine training to clinical staff, rather than attempting to utilize the feedback and technical advice provided by the Monitoring Team and integrating it into training for clinical staff to enhance their ability to comply with the Agreement.[7]

---

[4] In response to a draft of this Report, the County asserts that given the "highly transitory" nature of the jail population, the Monitoring Team's expectations for treatment planning are "unrealistic."  Yet, the County simultaneously notes that the average length of stay of P3/P4 inmates in the LACJ is actually 121 days.  *See* County Response to Draft Report dated September 29, 2023 (on file with author).  Further, the Monitor and Dr. Johnson note that treatment planning is an expected facet of competent mental health care in jails as well as prisons.  *See, e.g.*, J. Metzner and K. Applebaum, *Levels of Care*, Oxford Textbook of Correctional Psychiatry, 2015, at 113 ("Every inmate who receives mental health care needs a written treatment plan.  Such a plan is individualized and often multidisciplinary statement of short- and long-term goals the methods to achieve them.").

[5] *See infra* analysis of Provision 79 at pp. 129-132.

[6] *See* Monitor's Thirteenth Report at pp. 2.

[7] The County has indicated that it recently assigned an additional Supervising Psychologist to work with the Training Department to review compliance audits from this case and provide related training.

- There were performance reductions at CRDF on a number of key provisions in the Sixteenth Reporting Period.  This includes Provisions 28, 36, 43, 57, 63, and 80.   Figure 2 below reflects the changes in reported compliance at CRDF for these provisions.

*Figure 2:  Performance Reductions at CRDF in the Sixteenth Reporting Period*

| | Fifteenth | | Sixteenth | |
|---|---|---|---|---|
| | **2Q2022** | **3Q2022** | **4Q2022** | **1Q2023** |
| **Provision 28:** | | | | |
| 28-5(a) - Expedited Booking | 100% | 100% | 48% | 64% |
| 25-5(b) - Observation | 100% | 100% | 60% | 60% |
| **Provision 36:** | | | | |
| 36-4(b) - Observation | 100% | 100% | 100% | 40% |
| **Provision 43:** | | | | |
| 43-9(b) - Consultations | 89% | 35% | 40% | 33% |
| 43-9(c) - QMHP Meetings | 90% | 58% | 100% | 16% |
| **Provision 57:** | | | | |
| 57-5(c) - HOH Safety Checks | 46% | 11% | 0% | 3% |
| 57-5(d) - MOH Safety Checks | 38% | 9% | 0% | 5% |
| **Provision 63:** | | | | |
| Perm. HOH/MOH Housing - ≤ 7 days | 98% | 59% | 58% | 67% |
| **Provision 80:** | | | | |
| Unstructured Out-of-Cell Time | 97% | 51% | 77% | 55% |
| Structured Out-of-Cell Time | 0% | 0% | 0% | 0% |

While the County reported individual explanations for some of these reductions in its Augmented Sixteenth Self-Assessment, it has not provided a more comprehensive explanation for the compliance challenges it is currently experiencing at this facility.  Moreover, the number of uses of force per 100 inmates at CRDF in the Sixteenth Reporting Period was nearly double the number at NCCF, and almost 6 times higher than at PDC South or PDC North.[8]   The County must expeditiously investigate the causes of these issues and address them.

- Finally, but importantly, in December 2022 and again on April 2023, the Court

---

[8] In the Monitoring Team's most recent site visits at CRDF, it also observed very concerning conditions for female inmates with mental illness in the mental health intake unit at that facility, which the Monitor reported to County personnel.

issued Orders Setting Deadlines for Substantial Compliance, ECF No. 234 and 248, respectively, which established specific deadlines for the County to come into Substantial Compliance with the Agreement.  As set forth below, for the Sixteenth Reporting Period, a number of provisions remain far away from Substantial Compliance.[9]  This includes Provisions 28, 31, 37, 39, 42, 43, 52, 57, 58, 63, 65, 66, 79, and 80.  Other Provisions have not sufficiently improved given the Monitor's assessments and those of the Court Appointed Subject Matter Experts.  This includes Provisions 26, 36, 40, 47, 61, 62, 64, 70, and 81.[10]  Given the fast-approaching deadlines in the Court's orders—and the need to dramatically improve patient care—the County must act with intensity and focus to expeditiously overcome the remaining obstacles to its full compliance with the Court orders and the Agreement.

Nicholas E. Mitchell, Monitor
October 30, 2023

---

[9] Provisions 34, 52 (at CRDF), and 67, are Not Rated in this Report, and therefore the Monitor cannot currently assess how far they are from Substantial Compliance.
[10] There are some provisions for which the County has not been able to demonstrate compliance with the Court orders, including Provisions 34 and 66.

# EXECUTIVE SUMMARY

There are 69 provisions in the Settlement Agreement that are subject to monitoring by the Monitor and Subject Matter Experts.  As of the date of this Report, the County and the Department are in Substantial Compliance with 43 provisions, in Partial Compliance with 12 provisions, and in Non-Compliance with four provisions.  There are two provisions (Paragraphs 28 and 31) for which the Department is in Substantial Compliance at certain facilities and Partial Compliance at other facilities.  There is one provision (Paragraph 39) for which the Department is in Substantial Compliance at certain facilities, Partial Compliance at other facilities, and Not Rated at other facilities.  There is one provision (Paragraph 57) for which the Department is in Substantial Compliance at certain facilities and Non-Compliance at other facilities.  There are two provisions (Paragraphs 43 and 58) for which the Department is in Substantial Compliance at certain facilities, Partial Compliance at other facilities, and Non-Compliance at other facilities.  There are two provisions (Paragraphs 36 and 63) for which the Department is in Partial Compliance at certain facilities and in Non-Compliance at other facilities.  There are two provisions (Paragraphs 34 and 67) for which the County is Not Rated.  There are 49 provisions for which the County and the Department are in Substantial Compliance at some or all facilities.[11]

The Monitor's determination of the County's compliance is based upon the quantitative thresholds in the Compliance Measures (and any other applicable requirements in the Compliance Measures) for achieving Substantial Compliance, unless the quality of the County's performance as determined by the qualitative assessment is plainly inadequate or the results reported by the Monitor's mental health team vary significantly from the results reported by the Department.[12]  As used herein, "Substantial Compliance" means that the County has "achieved compliance with the material components of the relevant provisions of this Agreement in accordance with the [agreed-upon Compliance Measures for assessing Substantial Compliance]," which it must maintain for twelve-consecutive months; "Partial Compliance" means that the County has achieved "compliance on some, but not all, of the material components of the relevant provision of this Agreement;" and "Non-Compliance" means that the County has not met "most or all of the material components of the relevant provisions of this Agreement."

---

[11] Under Paragraph 111 of the Agreement, the twelve-month period for which the County is required to maintain Substantial Compliance can be determined on a facility-by-facility basis.

[12] As in prior reports, this Sixteenth Report also reflects the results of audits by the Monitor's auditors to verify results reported by the County.  The Monitor has deemed the County to be in Substantial Compliance "as of" the beginning of the quarter reported by the County if the auditors have verified that the County has met the thresholds in the Compliance Measures.  If the auditors were not able to verify the results reported by the County, the twelve-month period for maintaining Substantial Compliance will commence in a future period when the County's reported results are verified by the auditors.  If the County maintains Substantial Compliance with a provision for twelve consecutive months, pursuant to Paragraph 111 of the Agreement, the Monitor and Subject Matter Expert will "no longer. . .assess or report on that provision" in future reporting periods.  Some of the Substantial Compliance results reported by the County in the Sixteenth Reporting Period have not been audited by the Monitor's auditors and cannot be considered final until verified by the auditors.  The County will not be deemed to be in Substantial Compliance as of the County's reported date for purposes of determining the twelve-month compliance period if the results are not verified by the auditors.

Appendix A to this Sixteenth Report shows the status of each of the 69 provisions of the Agreement that are subject to monitoring and the twelve-month triggering dates where the County is deemed to be in Substantial Compliance.  Appendix B shows the County's progress from the Initial Reporting Period through the Sixteenth Reporting Period in achieving Substantial Compliance and in maintaining Substantial Compliance for twelve consecutive months on provisions that are no longer subject to monitoring.

There are 39 provisions that are no longer subject to monitoring because the County and Department maintained Substantial Compliance for twelve consecutive months as required by Paragraph 111 of the Settlement Agreement and verified by the Monitor's auditors as required.[13]  There are another five provisions for which some facilities are no longer subject to monitoring because those facilities maintained Substantial Compliance for the required twelve consecutive months.[14]

As of the date of this Report, and subject to verification by the Monitor's auditors and qualitative assessments in some cases, the County and the Department are in Substantial Compliance at some or all of the facilities with the following provisions of the Settlement Agreement:

The County has achieved Substantial Compliance with Paragraph 18, which requires the (initial) training of Deputy Sheriffs and Custody Assistants on suicide prevention as follows: at Men's Central Jail ("MCJ") and Pitchess Detention Center ("PDC") South as of October 1, 2017; at North County Correctional Facility ("NCCF") as of September 1, 2017; at PDC East as of December 1, 2017; at Twin Towers Correctional Facility ("TTCF"), the Inmate Reception Center ("IRC"), and PDC North as of April 1, 2018; and at Century Regional Detention Facility ("CRDF") as of August 1, 2018.  The County has maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) as of December 2022.  The County regained compliance under Provision 81 Rosas 4.7(b) as of December 2022.

The County has achieved Substantial Compliance at NCCF, MCJ, and IRC as of April 1, 2018; at TTCF as of July 1, 2018; at CRDF, PDC East, and PDC North as of December 1, 2018; and at PDC South as of March 1, 2019, with Paragraph 19, which requires the (initial) training of Deputy Sheriffs on Crisis Intervention and Conflict Resolution and the training of Deputy Sheriffs and Custody Assistants in working with mentally ill prisoners.  The Department has achieved Substantial Compliance at CRDF, IRC, NCCF, MCJ, PDC East, PDC North, PDC South, and TTCF as of December 2019 with the refresher training requirements of Paragraph 19.  The County has maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) as of December 2022.  The County regained compliance under Provision 81 Rosas 4.7(b) as

---

[13] This includes the initial training required by Paragraphs 18, 19, and 20, which have been completed and are no longer subject to monitoring.  The refresher training requirements for each of these provisions are, however, still subject to monitoring under Provision 81 Rosas 4.6(b) and 4.7(b).

[14] The provisions that are no longer subject to monitoring at some or all of the facilities are highlighted in bold in Appendix A.

of December 2022.

The County has achieved Substantial Compliance at PDC East, PDC North, NCCF, and CRDF as of August 1, 2017 and at PDC South as of October 1, 2017, with Paragraph 20, which requires the (initial) training of additional Deputy Sheriffs on Crisis Intervention and Conflict Resolution and on working with mentally ill prisoners. The County has maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) as of December 2022. The County regained compliance under Provision 81 Rosas 4.7(b) as of December 2022.

The County has maintained Substantial Compliance for twelve consecutive months at PDC East, PDC South, PDC North, NCCF, IRC, TTCF, CRDF, and MCJ with Paragraph 21, which requires Custody personnel to maintain CPR certifications.

The County has maintained Substantial Compliance for twelve consecutive months with Paragraph 22, which requires the County and the Sheriff to provide instructional material on the use of arresting and booking documents to ensure the sharing of known relevant and available information on prisoners' mental health status and suicide risk.

The County has maintained Substantial Compliance for twelve consecutive months as of July 12, 2018, with Paragraph 23, which requires that the Department conduct a systematic review of prisoner housing to reduce the risk of self-harm and to identify and address suicide hazards, and to develop plans to reasonably mitigate suicide hazards identified in the review.

The County has maintained Substantial Compliance for twelve consecutive months as of September 30, 2018, with Paragraph 24, which requires the Department to conduct annual reviews and inspections of prisoner housing to identify suicide hazards.

The County has maintained Substantial Compliance for twelve months as of March 31, 2021, with Paragraph 27, which requires that all prisoners are individually and privately screened within 12 hours of their arrival at the jails.

The County has maintained Substantial Compliance for twelve consecutive months at IRC as of March 31, 2018, with Paragraph 28, which requires the Department to expedite inmates having urgent or emergent mental health needs through the booking process.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2018, with Paragraph 29, which requires mental health assessments of prisoners with non-emergent mental health needs within 24 hours of the intake nursing assessment.

The County has maintained Substantial Compliance as of January 1, 2019, through December 31, 2019, with Paragraph 30, which requires the County to provide an

initial mental health assessment that includes a brief initial treatment plan that addresses "housing recommendations and preliminary discharge information."

The County has provided documentation reflecting that it has achieved Substantial Compliance as of January 1, 2023, through March 31, 2023, at CRDF, with Paragraph 31, which requires the County to maintain electronic mental health alerts for inmates who report suicidal thoughts during the intake process, or who were removed from risk precautions in the prior quarter. The reported results have been verified by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 32, which requires that a serious suicide attempt be entered in the prisoner's electronic medical record in a timely manner.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2017, with Paragraph 33, which requires mental health supervisors to review electronic medical records on a quarterly basis to assess their accuracy.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2018, with Paragraph 35, which requires the Department to ensure that custody staff refer prisoners who are demonstrating a potential need for routine mental health care to a QMHP or a Jail Mental Evaluation Team.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 38, which requires mental health staff or JMET teams to make weekly cell-by-cell rounds in restricted non-mental health housing modules to identify prisoners with mental illnesses and grant prisoner's requests for out-of-cell interviews.

The County has maintained Substantial Compliance at NCCF for twelve consecutive months as of June 30, 2018, with Paragraph 39, which requires the County to use a confidential self-referral system for prisoners to request mental health care.

The County has achieved Substantial Compliance as of July 1, 2022, through September 30, 2022, with Paragraph 41, which requires CHS to review the medical records of all prisoners on suicide watch in FIP for one randomly selected month each quarter, and submit a report regarding the implementation of the step-down protocols and the results of its review of the medical records. The County has also provided documentation reflecting that it maintained Substantial Compliance as of October 1, 2022, through March 31, 2023. These results are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance at NCCF and PDC North for twelve consecutive months, as of September 30, 2018, with Paragraph 43, which requires the Department to develop and implement policies for the discipline of prisoners with serious mental illnesses.

10

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 44, which requires the Department to install protective barriers in High Observation Housing and other mental health housing.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 45, which requires Suicide Prevention Kits and first-aid kits in control booths in all facilities.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2021, with Paragraph 46, which requires the Department to interrupt, and if necessary, provide appropriate aid to any prisoner who threatens or exhibits self-injurious behavior.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 48, which requires the Department to have written housekeeping, sanitation, and inspection plans to ensure proper cleaning.

The County has maintained Substantial Compliance for twelve consecutive months as of February 28, 2017, with Paragraph 49, which requires the Department to have maintenance plans to respond to routine and emergency maintenance needs.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2017, with Paragraph 50, which requires pest control in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2017, with Paragraph 51, which requires the Department to ensure that all prisoners have access to basic hygiene supplies in accordance with state regulations.

The County has provided documentation reflecting that it achieved Substantial Compliance as of January 1, 2023, through March 31, 2023, with Paragraph 53, which requires the Department to ensure that an inmate's mental health diagnosis or prescription for medication alone does not preclude the inmate from participating in education, work, or similar programs.  The reported results are subject to verification by the Monitor's auditors.

The County has provided documentation showing that it has achieved Substantial Compliance as of January 1, 2023, through March 31, 2023, with Paragraph 54, which requires the County to ensure that prisoners not in mental health housing are "not denied privileges and programming based solely on their mental health status or prescription for psychotropic medication."  The reported results are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive months at CRDF, PDC North, MCJ, and TTCF with Paragraph 55, which requires

custody, medical, and mental health staff to meet daily in High Observation Housing and weekly in Moderate Observation Housing.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 56, which requires custody, medical, and mental health staff to communicate regarding any change in a housing assignment following a suicide attempt or serious change in mental health condition.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2018, at MCJ with Paragraph 57, which requires safety checks in mental health housing.  The County has also maintained Substantial Compliance for twelve consecutive months at PDC North as of June 30, 2022

The County has maintained Substantial Compliance for twelve consecutive months at PDC South, PDC North, and PDC East as of December 31, 2016, at CRDF as of June 30, 2018, and at IRC as of September 30, 2018, with Paragraph 58, which requires safety checks in non-mental health housing.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2019, with Paragraph 59, which requires unannounced daily supervisory rounds to verify safety checks.

The County has achieved Substantial Compliance with Paragraph 60, as of April 1, 2019, through March 31, 2020, which requires the implementation of a quality improvement plan.

The County has maintained Substantial Compliance for twelve consecutive months at MCJ, NCCF, PDC East, PDC North, and PDC South as of December 31, 2016, and at TTCF as of December 31, 2017, with Paragraph 68, which requires staggered contraband searches in housing units.  The County maintained Substantial Compliance for twelve consecutive months at CRDF as of January 1, 2022, through December 31, 2022.  These results are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2019, with Paragraph 69, which requires the County and the Sheriff to use clinical restraints only in the Correctional Treatment Center with the approval of a licensed psychiatrist who performed an individualized assessment.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2017, with Paragraph 71, which requires the County and the Sheriff to ensure that any prisoner subjected to clinical restraints in response to a mental health crisis receives therapeutic services to remediate any effects from the restraints.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 72, which requires the Department and the County to report on meetings to review suicides and incidents of serious self-injurious

behavior.

The County has maintained Substantial Compliance for twelve consecutive months as of September 30, 2018, with Paragraph 73, which requires the Department to prepare detailed reports of prisoners who threaten or exhibit self-injurious behavior.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 74, which requires the Department to have an objective law enforcement investigation of every suicide that occurs in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of September 30, 2018, with Paragraph 75, which requires the Department and the County to review every serious suicide attempt that occurs in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 76, which requires the Department to follow certain procedures whenever there is an apparent or suspected suicide.

The County has achieved Substantial Compliance as of September 30, 2022, with Paragraph 77, which requires, among other things, identifying patterns and trends of suicides and suicide attempts and ensuring corrective actions are taken to mitigate suicide risks.

The County has maintained Substantial Compliance for twelve consecutive months as of May 18, 2017, with Paragraph 78, which requires the Suicide Prevention Advisory Committee to meet twice a year.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 82, which requires the Department to co-locate personnel responsible for collecting prisoners' grievances at CRDF.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2019, with Paragraph 83, which requires it to install closed circuit security cameras throughout all of the common areas in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2018, with Paragraph 84, which requires investigations of force incidents and administrative actions to be completed timely.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2022, with Paragraph 85, which requires Internal Affairs Bureau personnel to receive adequate specialized training in conducting investigations of misconduct.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2019, with Paragraph 86, which requires inventory and control of

weapons.

## SIXTEENTH REPORT

18.     Within three months of the Effective Date, the County and the Sheriff will
develop, and within six months of the Effective Date will commence providing:  (1) a
four-hour custody-specific, scenario-based, skill development training on suicide
prevention, which can be part of the eight-hour training described in paragraph 4.8 of the
Implementation Plan in *Rosas* to all new Deputies as part of the Jail Operations
Continuum and to all new Custody Assistants at the Custody Assistants academy; and (2)
a two-hour custody-specific, scenario-based, skill development training on suicide
prevention to all existing Deputies and Custody Assistants at their respective facilities,
which can be part of the eight-hour training described in paragraph 4.7 of the
Implementation Plan in *Rosas*, through in-service Intensified Formatted Training, which
training will be completed by December 31, 2016.

These trainings will include the following topics:

(a)     suicide prevention policies and procedures, including observation and
supervision of prisoners at risk for suicide or self-injurious behavior;

(b)     discussion of facility environments and staff interactions and why they
may contribute to suicidal behavior;

(c)     potential predisposing factors to suicide;

(d)     high-risk suicide periods and settings;

(e)     warning signs and symptoms of suicidal behavior;

(f)     case studies of recent suicides and serious suicide attempts;

(g)     emergency notification procedures;

(h)     mock demonstrations regarding the proper response to a suicide attempt,
including a hands-on simulation experience that incorporates the
challenges that often accompany a jail suicide, such as cell doors being
blocked by a hanging body and delays in securing back-up assistance;

(i)     differentiating between suicidal and self-injurious behavior; and

(j)     the proper use of emergency equipment.

**STATUS (18):**　　　**SUBSTANTIAL COMPLIANCE (as of October 1, 2017 (verified) at MCJ and PDC South)**

　　　　　　　**SUBSTANTIAL COMPLIANCE (as of September 1, 2017 (verified) at NCCF)**

　　　　　　　**SUBSTANTIAL COMPLIANCE (as of December 1, 2017 (verified) at PDC East)**

　　　　　　　**SUBSTANTIAL COMPLIANCE (as of April 1, 2018 (verified) at TTCF, IRC, and PDC North)**

　　　　　　　**SUBSTANTIAL COMPLIANCE (as of August 1, 2018 (verified) at CRDF)**

The Department was not subject to monitoring during the Sixteenth Reporting Period for the initial training of existing Deputy Sheriffs or Custody Assistants or of new Deputies in the Jail Operations Continuum and new Custody Assistants in the Custody Assistant Academy as required by Paragraph 18.  Virtually all of the Deputy Sheriffs and Custody Assistants in the custody facilities received the initial training because they were assigned to the jails as of the Existing Date of the Settlement Agreement or they received the training as new Deputies or new Custody Assistants.

The Department is still subject to monitoring in future periods for Substantial Compliance with the refresher course requirements under Provision 81 Rosas 4.6(b) and 4.7(b).  The County has maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) as of December 2022.  The County has regained compliance with the refresher training requirements under Provision 81 Rosas 4.7(b) as of December 2022.

19.     Commencing July 1, 2015, the County and the Sheriff will provide:

(a)     Custody-specific, scenario-based, skill development training to new Deputies during their Jail Operations training, and to existing Deputies assigned to Twin Towers Correctional Facility, Inmate Reception Center, Men's Central Jail, the Mental Health Housing Units at Century Regional Detention Facility, and the Jail Mental Evaluation Teams ("JMET") at North County Correctional Facility as follows:

(i)     32 hours of Crisis Intervention and Conflict Resolution as described in paragraphs 4.6 and 4.9 of the Implementation Plan in *Rosas* to be completed within the time frames established in that case (currently December 31, 2016). Deputies at these facilities will receive an eight-hour refresher course consistent with paragraph 4.6 of the Implementation Plan in *Rosas* every other year until termination of court jurisdiction in that case and then a four-hour refresher course every other year thereafter.

(ii)    Eight hours identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas* to be completed by December 31, 2016. This training requirement may be a part of the 32-hour training described in the previous subsection. Deputies at these facilities will receive a four-hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

(b)     Commencing July 1, 2015, the County and the Sheriff will ensure that new Custody Assistants receive eight hours of training in the Custody Assistant academy, and that all existing Custody Assistants receive eight hours of training related to identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas*. This training will be completed by December 31, 2016. Custody Assistants will receive a four-hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

**STATUS (19):**     **SUBSTANTIAL COMPLIANCE (as of April 1, 2018, (verified) at NCCF, MCJ, and IRC)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2018, (verified) at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of December 1, 2018 (verified) at CRDF, PDC East, and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of March 1, 2019 (verified) at PDC South)**

The Department was not subject to monitoring during the Sixteenth Reporting Period for the training of existing and new Deputy Sheriffs and Custody Assistants required by Paragraph 19.

The Department is still subject to monitoring in future periods for Substantial Compliance with the refresher course requirements under Provision 81 Rosas 4.6(b) and 4.7(b). The County has maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) as of December 2022. The County has regained compliance with the refresher training requirements under Provision 81 Rosas 4.7(b) as of December 2022.

20.    Commencing no later than July 1, 2017, the County and the Sheriff will provide:

(a)    Custody-specific, scenario-based, skill development training to existing Deputies assigned to North County Correctional Facility, Pitchess Detention Center, and the non-Mental Health Housing Units in Century Regional Detention Facility as follows:

(i)    32 hours of Crisis Intervention and Conflict Resolution as described in paragraphs 4.6 and 4.9 of the Implementation Plan in *Rosas* to be completed by December 31, 2019.  Deputies at these facilities will receive an eight-hour refresher course consistent with paragraph 4.6 of the Implementation Plan in *Rosas* every other year until termination of court jurisdiction in that case and then a four-hour refresher course every other year thereafter.

(ii)    Eight hours identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas* to be completed by December 31, 2019.  This training requirement may be a part of the 32-hour training described in the previous subsection.  Deputies at these facilities will receive a four-hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

**STATUS (20):**          **SUBSTANTIAL COMPLIANCE (as of August 1, 2017 (verified) at CRDF, PDC East, PDC North, and NCCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017 (verified) at PDC South)**

The Department was not subject to monitoring for the initial training for existing Deputies as required by Paragraph 20 during the Sixteenth Reporting Period.

The Department is still subject to monitoring in future periods for Substantial Compliance with the refresher course requirements under Provision 81 Rosas 4.6(b) and 4.7(b). The County has posted results for maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) as of December 2022. The County has regained compliance with the refresher training requirements under Provision 81 Rosas 4.7(b) as of December 2022.

21.     Consistent with existing Sheriff's Department policies regarding training requirements for sworn personnel, the County and the Sheriff will ensure that existing custody staff that have contact with prisoners maintain active certification in cardiopulmonary resuscitation and first aid.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of October 1, 2015, through September 30, 2016 (verified) at PDC East and South)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at NCCF, PDC North, and IRC)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 (verified) at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at MCJ)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2018, through June 30, 2019 (verified) at CRDF)**

The Compliance Measures provide that the Department will demonstrate Substantial Compliance when 95% of the designated custody staff have the required CPR and first aid certifications for twelve consecutive months.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 21 in the Sixteenth Reporting Period.

22.     Within six months of the Effective Date and at least annually thereafter, the County and the Sheriff will provide instructional material to all Sheriff station personnel, Sheriff court personnel, custody booking personnel, and outside law enforcement agencies on the use of arresting and booking documents, including the Arrestee Medical Screening Form, to ensure the sharing of known relevant and available information on prisoners' mental health status and suicide risk.  Such instructional material will be in addition to the training provided to all custody booking personnel regarding intake.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017)**

The Justice Data Interface Controller ("JDIC") message the Department has been using since June 29, 2016, is sufficient to establish Substantial Compliance with Paragraph 22, and the County maintained Substantial Compliance for twelve consecutive months through June 30, 2017.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 22 in the Sixteenth Reporting Period.

23.     Within three months of the Effective Date, the County and the Sheriff will commence a systematic review of all prisoner housing, beginning with the Mental Health Unit of the Correctional Treatment Center, all High Observation Housing areas, all Moderate Observation Housing areas, single-person discipline, and areas in which safety precautions are implemented, to reduce the risk of self-harm and to identify and address suicide hazards.  The County and the Sheriff will utilize a nationally-recognized audit tool for the review.  From this tool, the County and the Sheriff will:

(a)     develop short and long term plans to reasonably mitigate suicide hazards identified by this review; and

(b)     prioritize planning and mitigation in areas where suicide precautions are implemented and seek reasonable mitigation efforts in those areas.

**STATUS:        SUBSTANTIAL COMPLIANCE**

The Monitor has verified, with the advice of the Subject Matter Expert, that the Department's Suicide Hazard Inspection Check List tool is a nationally recognized audit tool for this review.  The Department provided the Monitor with completed checklists documenting inspections of all housing units by January 14, 2016.

The Department submitted updated Suicide Hazard Mitigation plans to the Monitor on January 18, 2018 and July 12, 2018.  After consultations with the Mental Health Subject Matter Expert, the Monitor concluded that the plans satisfied the requirements of Paragraph 23 and that the Department had achieved and maintained Substantial Compliance with the provision.  Accordingly, pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 23 in the Sixteenth Reporting Period.

24.     The County and the Sheriff will review and inspect housing areas on at least an annual basis to identify suicide hazards.

**STATUS:        SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018)**

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 24 in the Sixteenth Reporting Period.  As the Monitor has noted, however, implementation and tracking of corrective actions must be addressed by the Custody Compliance and Sustainability Bureau ("CCSB") under Paragraph 77(c), which requires CCSB to "ensur[e] that corrective actions are taken to mitigate suicide risk. . .obtaining where appropriate, technical assistance. . .when such assistance is needed to address suicide-risk issues."

25.     The County and the Sheriff will ensure that any prisoner in a Sheriff's Department station jail who verbalizes or who exhibits a clear and obvious indication of current suicidal intent will be transported to IRC, CRDF, or a medical facility as soon as practicable.  Pending transport, such prisoners will be under unobstructed visual observation, or in a suicide resistant location with safety checks every 15 minutes.

**STATUS:        PARTIAL COMPLIANCE (at all Patrol Divisions)**

A provision of the Station Jail Manual adopted in March 2018 requires that any arrestee who "displays obvious suicidal ideation or exhibits unusual behavior that clearly manifest[s] self-injurious behavior or other clear indication of mental health crisis shall be transported to the Inmate Reception Center (IRC), Century Regional Detention Facility (CRDF), or a medical facility as soon as practicable.  Pending transport, such inmates. . .shall be under unobstructed visual observation or in a suicidal restraint location with safety checks every 15 minutes."

Under the revised Compliance Measures, which were updated in 2021, the Department must randomly select and analyze Arrestee Medical Screening Forms from station jails identifying prisoners who verbalize or exhibit a clear and obvious indication of current suicidal intent to determine compliance with Paragraph 25.  Substantial Compliance requires that 90% of the selected records from each Patrol Division meet the requirements of Paragraph 25.  Each Patrol Division can achieve sustained compliance after twelve consecutive months of Substantial Compliance independent of the other divisions.

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required the County to achieve Substantial Compliance with Provision 25 by June 30, 2023, which does not fall within the Sixteenth Reporting Period covered by this Report.  The County's results for the Sixteenth Reporting Period were mixed.  For the Fourth Quarter of 2022, the County reports 71% compliance for the Central Patrol Division, 100% for the East Patrol Division, 70% for the North Patrol Division, and 50% for the South Patrol Division.  For the First Quarter of 2023, however, the results markedly improved at the North and South Patrol Divisions (88% for the North Patrol Division, and 88% for the South Patrol Division), improved moderately for the Central Patrol Division (80%) and declined for the East Patrol Division (87.5%).  While these results fall short of Substantial Compliance, they are close to Substantial Compliance at all four patrol divisions.

The County reports

CCSB in September 2022 issued ten corrective action plans to patrol stations that had been non-compliant with Provision 25 in the Second Quarter of 2022. (15th Rep., at pp. 27-28.) Furthermore, on September 29, 2022, CCSB sent follow-up memoranda to the Unit Commanders of the stations with poor compliance results. In addition, CCSB has been in regular communication with the Division Lieutenants. The corrective

25

action plans and regular communication are credited with the improved compliance levels commencing during Quarter 4, 2022.

Further

As part of the effort to execute the Implementation Plan and achieve Substantial Compliance at all stations, CCSB met with patrol stations on July 13, 2023, to review Provision 25 requirements and plans to schedule monthly meetings with Lieutenant Division Aides to discuss Provision 25 supervision requirements, including patrol division audit obligations.

According to the County's implementation plan tracker, the County has completed 12 out of 15 of corrective action steps regarding Provision 25.[15] These steps include: briefing the lieutenant division aides (completed January 2022); having the lieutenant division aides brief the lieutenant liaisons (completed January 2022); providing training to lieutenants and lieutenant division aides (completed June 2022); lieutenant division aides and patrol lieutenants reporting back to CCSB to ensure self-assessments are completed properly (completed June 2022); meeting with the lieutenants and lieutenant division aides to set compliance benchmarks (completed June 2022 and January 2023); LASD compliance team telling station jailers to alert station watch commanders when arrestee expresses suicidal intent (completed May 2022); CCSB providing methodology to and review of lieutenant self-assessments (completed May 2022); identifying policies and procedures regarding Provision 25 for re-briefing to all patrol personnel (completed February 2022); lieutenant division aides and patrol lieutenants re-brief and track in-service briefings at station jails (completed June 2022); meetings between CCSB and lieutenant division aides and patrol lieutenants to designate a benchmark for corrective action plan compliance (completed June 2022); personnel who do not work in station jails being re-briefed about requirements at the beginning of shift (completed June 2022); and posting laminated signage regarding the requirements of Provision 25 (completed June 2022).

---

[15] Throughout this Report, the Monitor discusses the corrective action steps that the County has self-reported as complete in its implementation plan tracker.  The Monitor has not verified the completion of these steps but has alerted the County that he will attempt to do so for some provisions in the coming months.

26.     Consistent with existing Sheriff's Department policies, the County and the Sheriff will follow established screening procedures to identify prisoners with emergent or urgent mental health needs based upon information contained in the Arrestee Medical Screening Form (SH-R-422) or its equivalent and the Medical/Mental Health Screening Questionnaire and to expedite such prisoners for mental health evaluation upon arrival at the Jail Reception Centers and prior to routine screening.  Prisoners who are identified as having emergent or urgent mental health needs, including the need for emergent psychotropic medication, will be evaluated by a QMHP as soon as possible but no later than four hours from the time of identification.

**STATUS:     PARTIAL COMPLIANCE**

The Compliance Measures require the Department to "review Arrestee Medical Screening Forms (SH-R-422) (or its equivalent) and the Medical/Mental Health Screening Questionnaires of 100 randomly selected prisoners during one randomly selected week per quarter at CRDF and at IRC."  Substantial Compliance requires that (1) 95% of the forms "include the required mental health information" and (2) 90% of the prisoners having urgent or emergent needs were "seen by a QMHP within four hours."

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234.  Pursuant to that Order, "Defendants will achieve substantial compliance with the following individual provisions of the settlement agreement in accordance with the following schedule," and regarding Provision 26, the Court ordered "Reached June 2021-March 2022; must maintain one additional quarter." As noted in the Monitor's Fifteenth Report, however, in the Third Quarter of 2022, the County fell out of Substantial Compliance with Provision 26 as "only 56% of the prisoners with urgent or emergent mental health needs were seen by a QMHP within four hours, which did not meet the relevant threshold, and was a significant decline from the County's recent results under Provision 26."[16]

For the Sixteenth Reporting Period, the County's Sixteenth Self-Assessment reports that for the one randomly selected week in the Fourth Quarter of 2022, 98% of the screening forms reviewed had the required mental health information, and 95% of the prisoners with urgent or emergent mental health needs were seen by a QMHP within four hours.  The County's Sixteenth Self-Assessment also reports that for the one randomly selected week in the First Quarter of 2023, 100% of the screening forms reviewed had the required mental health information, which exceeds the relevant threshold.  However, only 89% of the prisoners with urgent or emergent mental health needs were seen by a QMHP within four hours, which did not meet the relevant threshold.  The County's Augmented Sixteenth Self-Assessment further reports that

> since May 7, 2023, when the LASD launched a new data system in the IRC that allows for accurate real-time tracking of wait times in the IRC, including to ensure rapid evaluation of new arrestees with suspected highest acuity mental health conditions, there has not been a single such

---

[16] Given this, the Parties may need to discuss a new compliance deadline for Provision 26.

severely acute patient who has waited longer than four hours for a mental health evaluation. Indeed, of the handful of possible violations of the so-called four-hour "Front Bench" clock at the IRC, none appeared to be due to delays in mental health evaluation. (One wait for four hours and three minutes was due to bed availability, three were due to delays with in-custody releases, and one was due to a computer input error that erroneously indicated that the individual waited for more than four hours total.)

In recent reports, the Monitoring Team has shared the results of its qualitative reviews of the County's performance under Provision 26.  *See* Monitor's Eleventh, Twelfth, Thirteenth, Fourteenth, and Fifteenth Reports.  These reviews have sought to "determine whether patients with emergent or urgent needs were missed at intake" by examining patient intake records and other associated documents.  In particular, the Team reviewed a sample of records of patients assigned to general population housing after their intake screening and, shortly thereafter, were transferred into mental health housing. The Team then reviewed the intake materials to determine whether the mental illness should have been detected through a "clinically competent intake screening process."  In these reviews, the Team generally found that for approximately 19% of patients, "an urgent or emergent condition was likely present at the time of the intake screening that should have been detected during a standard intake process," but was not.

According to Mental Health Subject Matter Expert Dr. Johnson, "implicit in this qualitative review process is the understanding that patients do not generally decompensate from asymptomatic to floridly psychotic within a matter of days even in a jail environment.  A clinically competent intake screening process, in which screeners have adequate training to elicit patient history and detect latent or hidden symptoms, the necessary time to spend with each patient, a private location that allows for frank communication, and supervision that encourages them to go beyond mere rote administration of the screening instrument in order to observe patient presentation and mannerism and ask follow up questions, will allow intake screeners to consistently detect patients who require a follow-up screening by trained mental health personnel."[17]

In response to the Monitoring Team's feedback, the County's Augmented Sixteenth Self-Assessment provides context about the large number of inmates who process through intake (noting, for example, that in the Second Quarter of 2022, of the "15,829 new arrivals screened at the jail; of this total, only 52 people initially assigned to general population were redirected to mental health housing within six days of admission").  The County also notes that "it cannot be said that screening nurses are generally failing to flag patients for potential mental health issues and referring them for a mental health assessment. Indeed, in the Second Quarter of 2022, screening nurses at intake referred 49% of all new arrivals for mental health assessments. This is a ten percent increase from the Second Quarter of 2021, when 39% of all new arrivals were referred for a mental health assessment."  Further, the County opines that "it is unlikely

---

[17] The County rightly notes that it is required to expeditiously move inmates through the screening process pursuant to its obligations in the *Rutherford* case.  *See Rutherford v Luna*, 2-75-cv-04111.

that any screening tool would have a 100% success rate at identifying new patients with urgent or emergent conditions."

The County also notes its commitment to "doing everything in its power to perfect its screening process to identify those patients with serious, urgent, or emergent conditions" and it specifically solicits "recommendations on how to improve its processes, along with any technical assistance the Monitor and Mental Health Team suggest that helps screening personnel to detect serious conditions that are not evident on the face of the current screening tools." In response, the Monitoring Team provides the following feedback.

It is well-settled that in jail mental health intake screening (sometimes called "receiving screening"), "the consequences of a false-positive screen are relatively low; the person will receive a brief assessment by a mental health professional. On the other hand, false-negative findings could potentially result in an unnecessary and severe exacerbation of mental illness or even in a preventable suicide." Thus, screeners must "err on the side of caution," particularly for inmates at risk of suicide or self-harm so that they may be kept safe pending a more complete mental health evaluation.[18] Thus, the Monitoring Team commends the County for being interested in continuous improvement of its screening process, and provides the following specific suggestions.

First, the Team has observed the Department's intake screening on various occasions, and notes that it occurs in a public area of the IRC with the inmate separated from the screener who sits behind a cage. When the IRC is crowded, other inmates are seated on benches nearby. The physical environment, which is not private, is not conducive to the frank exchange of confidential (and sometimes potentially embarrassing) mental health and suicidality information, and having a metal cage obscuring the patient being screened obstructs the ability of the screener to accurately observe a patient's clinical presentation. The County should consider identifying a more private location for these screenings that would better facilitate productive dialogue between the screener and the patient being screened.

Second, the screening generally relies upon patients to self-report their mental health information in response to a pre-populated list of questions on the screening instrument. However, relying exclusively or primarily on patient self-reporting can result in false negatives.[19] Indeed, there is a well-recognized "need to augment jail screens by using additional observational data (e.g., bizarre or atypical behavior)" and follow-up

---

[18] See M. Maloney, et. al., Mental Health Screening and Brief Assessments, Oxford Textbook of Correctional Psychiatry, 2015, at 57-61.

[19] According to one study of screening in the LASD of approximately 16,000 bookings screens, when patients were asked to self-report whether they were currently thinking about hurting themselves only 0.65% of patients responded "yes." However, when a sample of 1,000 of those same patients were personally interviewed in a more detailed and rigorous screening process, 5.03% of the men and 7.50% of the women acknowledged that they were, in fact, currently suicidal. This highlights the danger of relying exclusively on patient self-reporting from rote administration of a screening instrument without follow up questioning. Id. at 59 (citing M. Maloney, et. al., Prevalence of Risk Factors for Mental Illness in a Large County Jail, Unpublished Manuscript).

questions prompted by patient responses.  The County should ensure that the screeners (who are generally nursing staff rather than clinicians) receive the necessary training to do more than just ask the questions on the screening instrument and record the patient's answers.  They should be trained to make observations of a patient's clinical presentation and behavior, and in interviewing techniques that allow them to elicit information from reluctant patients and ask further questions, as necessary.

Third, "there is a need for ongoing quality improvement studies" of the patient screening process to ensure that it is minimizing false negatives and ensuring that changes in population characteristics are being incorporated into current screening methods.[20]  In the Fourteenth Report, the Monitor noted that the County committed to briefing intake nurses on a quarterly basis as to cases involving emergent or urgent mental health needs that were missed at intake to enhance the accuracy of the screening process.  The Monitor encouraged the County to include a discussion of its briefings with intake nurses in its next self-assessment, but no such discussion was included in either the Fifteenth or Sixteenth Self-Assessments.  The Team again reiterates the importance of using cases missed at intake for continuous training of the nursing screeners, and would be pleased to again meet with the County to discuss such cases as it did in October 2022.

In response to a draft of this Report, the County noted that it intends to "renovate the Bath Rear" portion of the IRC to add clinical space for enhanced mental health screening, and it will provide additional training to nurses who conduct these screenings consistent with the feedback in this Report.[21]

According to the County's implementation plan tracker, the County has completed 2 out of 3 corrective action steps regarding Provision 26.  These steps include: adding 8 new TTCF staff to address challenges in meeting the four hour time frame (completion date unclear); and adding 5 new CRDF staff to address challenges in meeting the four hour time frame (completion date unclear).

---

[20] *Id.*
[21] *See* County Response to Draft Report dated September 29, 2023 (on file with author).

27.     Consistent with existing Sheriff's Department policies, the County and the Sheriff will ensure that all prisoners are individually and privately screened by Qualified Medical Staff or trained custody personnel as soon as possible upon arrival to the Jails, but no later than 12 hours, barring an extraordinary circumstance, to identify a prisoner's need for mental health care and risk for suicide or self-injurious behavior.  The County and the Sheriff will ensure that the Medical/Mental Health Screening Questionnaire, the Arrestee Medical Screening Form (SH-R-422), or its equivalent, and/or the Confidential Medical Mental Health Transfer Form are in the prisoner's electronic medical record or otherwise available at the time the prisoner is initially assessed by a QMHP.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of October 1, 2019, through March 31, 2020, and October 1, 2020, through March 31, 2021 (verified))**

The Compliance Measures require the Department to review the records of "randomly selected prisoners who were processed for intake during one randomly selected week at CRDF and at IRC" to determine compliance with this provision. Substantial Compliance requires that 90% of the records reviewed reflected that the prisoners were screened for mental health needs within 12 hours and that the required documentation was available to the QMHP for 90% of the mental health assessments conducted by the QMHP.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 27 in the Sixteenth Reporting Period.

28.     The County and the Sheriff will ensure that any prisoner who has been identified during the intake process as having emergent or urgent mental health needs as described in Paragraph 26 of this Agreement will be expedited through the booking process.  While the prisoner awaits evaluation, the County and the Sheriff will maintain unobstructed visual observation of the prisoner when necessary to protect his or her safety, and will conduct 15-minute safety checks if the prisoner is in a cell.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at IRC)**

**PARTIAL COMPLIANCE (at CRDF)**

The Compliance Measures require the Department to review the records of randomly selected prisoners at CRDF and IRC who have urgent or emergent mental health needs to determine whether they were expedited through the booking process and under visual observation or checked every 15 minutes.

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires the County to achieve Substantial Compliance with Provision 28 by June 30, 2024.  The County's Sixteenth Self-Assessment reflects that in the Fourth Quarter of 2022, 48% of the inmates with urgent or emergent mental health needs were expedited through the booking process at CRDF in the randomly selected week, as required by the applicable Compliance Measures, and 60% of the inmates were observed or checked as required.  The County's Sixteenth Self-Assessment also reported that in the First Quarter of 2023, 64% of the inmates with urgent or emergent mental health needs were expedited through the booking process at CRDF in the randomly selected week, and 60% of the inmates were observed or checked, as is required.  These were dramatic performance reductions at CRDF, which had been in Substantial Compliance during the previous Reporting Period.

The County's Augmented Sixteenth Self-Assessment reports that the performance reductions at CRDF during the Sixteenth Reporting Period relate to various changes in its compliance assessment methodology.  The first was adding additional random weeks until the requisite 25 records could be reviewed.  The second was that

CCSB changed its methodology to deem a record compliant only if the CREX was reflected in the DIMMS system, even if CHS medical records contained that information. Following this methodology change, compliance results immediately fell during the Fourth Quarter of 2022, reflecting that for some inmates, expedited booking was reflected only in CHS medical records, not with the CREX code. Although results improved during the First Quarter of 2023, they were still below the results from the prior reporting period.

CCSB has identified this as a training issue and a corrective action plan will be issued to the facility. The County anticipates the corrective action

plan will be reflected improved compliance results by the Fourth Quarter
2023.[22]

Regarding Compliance Measure 28-5(b), the County notes that its "video audits
have identified that Title 15 safety checks are not completed within the required
timeframes for Provision 28 at CRDF. Based on this recent analysis, the County will be
developing a corrective action plan to improve compliance results by the Fourth Quarter
2023."

The County previously maintained Substantial Compliance with Paragraph 28 at
IRC for twelve consecutive months, and IRC was not subject to monitoring for
Substantial Compliance with Paragraph 28 in the Sixteenth Reporting Period.

---

[22] The Augmented Sixteenth Self-Assessment also notes that the "County would also like to explore with
the Monitor and the DOJ other potential auditing mechanisms to account for circumstances where
expedited booking occurred but is reflected elsewhere than with the CREX code. One such mechanism
could include review and inclusion of CCTV recording reviews, to verify whether the expedited booking
occurred."

29.     The County and the Sheriff will ensure that a QMHP conducts a mental health assessment of prisoners who have non-emergent mental health needs within 24 hours (or within 72 hours on weekends and legal holidays) of a registered nurse conducting an intake nursing assessment at IRC or CRDF.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified))**

The Compliance Measures require the Department to review randomly selected records of the prisoners identified in the intake nursing assessment as having non-emergent mental health needs to determine if the Department completed mental health assessments for 85% of the prisoners within the required time periods.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 29 in the Sixteenth Reporting Period.

30.     Consistent with existing DMH policies, the initial mental health assessment will include a brief initial treatment plan.  The initial treatment plan will address housing recommendations and preliminary discharge information.  During the initial assessment, a referral will be made for a more comprehensive mental health assessment if clinically indicated.  The initial assessment will identify any immediate issues and determine whether a more comprehensive mental health evaluation is indicated.  The Monitor and SMEs will monitor whether the housing recommendations in the initial treatment plan have been followed.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of January 1, 2019, through December 31, 2019 (verified))**

The Compliance Measures require the Department to review randomly selected initial mental health assessments and report on (1) the percentage of assessments that have (i) included an initial treatment plan that addresses housing recommendations and preliminary discharge information and (ii) identified any immediate issues and whether a more comprehensive evaluation was indicated; and (2) whether the housing recommendations were followed.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 30 in the Sixteenth Reporting Period.

31 (**Revised**).  Consistent with existing Correctional Health Services and Sheriff's Department policies, the County and the Sheriff will maintain electronic mental health alerts in prisoners' electronic medical records that notify medical and mental health staff of a prisoner's risk for suicide or self-injurious behavior.  The alerts will be for the following risk factors:

      (a)     current suicide risk; and

      (b)     prior suicide attempts.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of January 1, 2023, through March 31, 2023 (verified) at CRDF)**

**PARTIAL COMPLIANCE (at TTCF)**

On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provision 31 ("Revised Paragraph 31") as set forth above.  They also agreed on Revised Compliance Measures.  The Revised Compliance Measures require the Department to review randomly selected electronic medical records for prisoners in certain at-risk groups to determine if the required mental health alerts are in 85% of the records reviewed, which is the threshold for Substantial Compliance, for prisoners who report suicidal thoughts (at suicide risk) during the intake process; or were removed from risk precautions in the prior quarter.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires the County to achieve Substantial Compliance with Provision 31 by June 30, 2024.

The County's Augmented Sixteenth Self-Assessment reports that for the Fourth Quarter of 2022, at CRDF, 95% of the records reviewed contained the mental health alerts required by 31-1(a).  For Compliance Measure 31-1(b), the County reports that there were four responsive patients, and 3 out of 4, or 75%, were compliant.  At TTCF, 92% of the records reviewed contained the mental health alerts required by 31-1(a).  For Compliance Measure 31-1(b), there were 25 responsive patients, 18 of which did not contain the required alerts, "resulting in a compliance level of 28%."

The County's Augmented Sixteenth Self-Assessment also reports that for the First Quarter of 2023, at CRDF, 100% of the records reviewed contained the mental health

alerts required by 31-1(a).[23]  Regarding 31-1(b), 100% of the four relevant records contained the required alerts.  At TTCF, 96% of the records reviewed contained the mental health alerts required by 31-1(a).  Regarding 31-1(b), 32% of the relevant records contained the required alerts.

According to the County's implementation plan tracker, the County has completed all 3 corrective action steps regarding Provision 31.  These steps include: training staff on suicide risk alerts (completion date unclear); auditing to determine the effectiveness of training and for supervisors to audit three patients per clinician per week (completed May 2023; and providing a self-assessment with a new universe and methodology (completion date unclear).

---

[23] In the Fourteenth Report, the Monitor stated that the County should explain the reasons for any exclusion of patients for all Compliance Measures under Provision 31.  Although the County did not provide such explanations in the posted results for the Sixteenth Reporting Period, the County's Sixteenth Augmented Self-Assessment states that "[i]n response to this directive, CHS has instituted a system, inaugurated in the Second Quarter of 2023, where the reason for each exclusion from the audit is specified in the record."  The Monitor will expect to see these explanations in the Seventeenth Reporting Period.  In addition, the County's Sixteenth Augmented Self-Assessment states that "the County's self-assessments for the 16th Reporting Period are based on the precise universe the Monitor described in the Fifteenth Report. The current self-assessments fulfill the Monitor's directive."  Based on a review of the posted documents, the Monitor agrees that the County is now using the correct universe of patients.

32.     Information regarding a serious suicide attempt will be entered in the prisoner's electronic medical record in a timely manner.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified))**

The Compliance Measures require that 95% of the electronic medical records of prisoners who had a serious suicide attempt reflect information regarding the attempt, and 85% of the records reflect that the information was entered into the record within one day of the attempt.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 32 in the Sixteenth Reporting Period.

33.     The County will require mental health supervisors in the Jails to review electronic medical records on a quarterly basis to assess their accuracy as follows:

(a)     Supervisors will randomly select two prisoners from each clinician's caseload in the prior quarter;

(b)     Supervisors will compare records for those prisoners to corroborate clinician attendance, units of service, and any unusual trends, including appropriate time spent with prisoners, recording more units of service than hours worked, and to determine whether contacts with those prisoners are inconsistent with their clinical needs;

(c)     Where supervisors identify discrepancies through these reviews, they will conduct a more thorough review using a DMH-developed standardized tool and will consider detailed information contained in the electronic medical record and progress notes; and

(d)     Serious concerns remaining after the secondary review will be elevated for administrative action in consultation with DMH's centralized Human Resources.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017 (verified))**

The Compliance Measures require the County to provide the Monitor and the Subject Matter Experts with the DMH-developed standardized tool required by Paragraph 33(c), and to report the results of its analysis of the electronic medical records of two randomly selected prisoners from each clinician's caseload.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 33 in the Sixteenth Reporting Period.

34 **(Revised).**  Consistent with existing Correctional Health Services policy, the County and the Sheriff will conduct clinically appropriate release planning for all prisoners who are being released to the community and who have been identified by a QMHP as having a mental illness and needing mental health treatment, or as having a DSM-5 major neuro-cognitive disorder that caused them to be housed in the Correctional Treatment Center at any time during their current incarceration.  For prisoners with mental illness and needing mental health treatment, the release planning services will be guided by the prisoner's level of care.  Specifically, prisoners who at any time during their incarceration meet mental health level of P3 or P4 will be presumptively referred for release planning services, and prisoners who meet mental health level of care P2 will receive release planning services upon referral by a clinician or upon their request. Prisoners who have a DSM-5 major neuro-cognitive disorder that caused them to be housed in the Correctional Treatment Center will also be referred for release planning services consistent with the Correctional Health Services policy applying to prisoners with mental illness.

(a) Release planning will consider the need of the prisoner for housing; transportation to the prisoner's community-based provider, residence, or shelter within the County; bridge psychotropic medications; medical/mental health/substance abuse services; income/benefits establishment; and family/community/social supports ("Release Planning Areas").

(b) Release planning will be based on an individualized assessment of the prisoner's needs and, unless the prisoner is unable or unwilling to participate, will be undertaken in collaboration with the prisoner.  For prisoners referred for release planning services, those services will include:

(i) An Initial Release Plan that will be created at intake or no later than ten days after the referral for release planning, which referral shall normally occur at the time of intake.  The Initial Release Plan will include preliminary identification of needs in each of the Release Planning Areas and preliminary recommendations for services to address those needs, and a referral for assistance in obtaining California identification when needed and when the prisoner is eligible; and/or

(ii) A Comprehensive Release Plan that will be initiated no later than thirty days after the referral for release planning.  The Comprehensive Release Plan will include (A) collecting information regarding the prisoner's needs; (B) coordinating with community-based providers to identify available services that meet the prisoner's needs; (C) facilitating the transition of care to community-based providers, and (D) assisting in obtaining identification and/or benefits when needed, when the prisoner is eligible, and as offered by the Sheriff's Community Transition Unit.

(c) The County will maintain a re-entry resource center with staff supervised by a QMHP.  The re-entry resource center will:

(i) Provide information appropriate to the released prisoner about available
housing, transportation, medical/mental health/substance abuse services,
income/benefits establishment, community/social supports, and other
community resources; and

(ii) Provide released prisoners with copies of their release plans, as
available.

(d) All prisoners who are receiving and continue to require psychotropic
medications will be offered a clinically appropriate supply of those medications
upon their release from incarceration.  Unless contraindicated, this will be
presumed to be a 14-day supply or a supply with a prescription sufficient so that
the prisoner has the psychotropic medication available during the period of time
reasonably necessary to permit the prisoner to consult with a doctor and obtain a
new supply.

(e) Nothing in Paragraph 34 will require prisoners to accept or participate in any
of the services provided under this Paragraph.

(f) Neither the County nor the Sheriff shall be in violation of this paragraph if
after reasonable efforts as set forth in Correctional Health Services Policy
M380.01, Release Planners are unable to identify available post-release services.

**STATUS (34):**          **NOT RATED**

During the Seventh Reporting Period, the parties and the Intervenors reached an agreement on the provisions of revised Paragraph 34 ("Revised Paragraph 34") set forth above.  They also agreed on revised Compliance Measures and a revised policy to implement Revised Paragraph 34.  On December 10, 2018, the Court issued an order pursuant to the parties' joint stipulation revising Paragraph 34.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234.  That Order required Defendants to achieve Substantial Compliance with Provision 34 by December 31, 2022.

The Fifteenth Report reflected the results of an audit of the County's self-reporting under Provision 34 by the Monitor's auditors that revealed several notable deficiencies.  On June 1, 2023, the County provided the Monitor, the DOJ, and the Intervenors with a copy of its Care Transitions Audit Guide and feedback was provided thereafter by the Monitor and the DOJ.  On August 14, 2023, the County proposed a series of modifications to the Compliance Measures for Provision 34.  Given the potential changes in the Compliance Measures, the County did not report results for Provision 34 for the Sixteenth Reporting Period.  Instead, it indicated

> The County looks forward to discussing these common-sense [proposed] modifications with the parties, as well as with the Monitor and his auditors. Once we reach agreement on the amendments, the County will pick up with the Q1 and Q4 audits that have been on hold.
>
> In the meantime, the County continues to make progress in implementing the features of its Provision 34 implementation plans. In this regard, CHS previously created a custom tracker for high bail/serious charge caseloads, and all staff have been trained and currently use the tracker. CHS reviews all IRP assignments for equitable distribution and to ensure productivity and accurate tracker updates. In addition, supervisors meet twice monthly to review cases and interact daily with supervisees to provide support and training. CHS staff also created a shared resource folder on the DHS IT platform containing Spanish translations of CHS documents. Our expectation is that when auditing resumes under the more carefully tailored parameters proposed by the County or some approximate version of that proposal, the County's overall compliance with this provision will increase substantially.

Given the above, the Monitor is not able at this time to rate Provision 34 for the Sixteenth Reporting Period, nor ascertain whether or not the County complied with the Court's December 27, 2022, Order requiring Substantial Compliance with Provision 34 by December 31, 2022.  The County will be rated in Non-Compliance with Provision 34 if no self-assessment is provided for the Seventeenth Reporting Period.

According to the County's implementation plan tracker, the County completed 23

out of 24 corrective action steps regarding Provision 34 during the First Quarter of 2022. These steps include: making contingent offers to candidates for 5 PSW vacancies (completed January 2022); making contingent offers for 10 MCW vacancies (completion date unclear); implementing a standardized Excel case tracker for TTCF staff (completed January and February 2022); having a dedicated release planner for high-bail and serious charges (completed January 2022); taking steps to provide compliant Initial Release Plans (completed First Quarter 2022); meetings between supervisors and supervisees at least twice per month (completed First Quarter 2022); and providing a list of Community Based Organizations ("CBOs") used for Paragraph 34 referrals (completed December 2022).

35.      Consistent with existing DMH and Sheriff's Department policies, the County and the Sheriff will ensure that custody staff, before the end of shift, refer prisoners in general or special populations who are demonstrating a potential need for routine mental health care to a QMHP or a Jail Mental Evaluation Team ("JMET") member for evaluation, and document such referrals.  Custody staff will utilize the Behavior Observation and Referral Form.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of November 1, 2017,
               through December 31, 2018 (verified))**

The Compliance Measures require the Department to review, for a randomly selected month each quarter, the Behavior Observation and Mental Health Referral ("BOMHR") records for prisoners referred by custody staff to a QMHP or JMET member for "routine" mental health care to determine the timeliness of the referrals, and that 85% of the referrals "occurred before the end of the shift in which the potential need for mental health care is identified."

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 35 in the Sixteenth Reporting Period.

36.     Consistent with existing DMH policies, the County and the Sheriff will ensure that a QMHP performs a mental health assessment after any adverse triggering event, such as a suicide attempt, suicide threat, self-injurious behavior, or any clear de-compensation of mental health status.  For those prisoners who repeatedly engage in such self-injurious behavior, the County will perform such a mental health assessment only when clinically indicated, and will, when clinically indicated, develop an individualized treatment plan to reduce, and minimize reinforcement of, such behavior.  The County and the Sheriff will maintain an on-call system to ensure that mental health assessments are conducted within four hours following the notification of the adverse triggering event or upon notification that the prisoner has returned from a medical assessment related to the adverse triggering event.  The prisoner will remain under unobstructed visual observation by custody staff until a QMHP has completed his or her evaluation.

**STATUS:      PARTIAL COMPLIANCE (at TTCF)**

**NON-COMPLIANCE (at CRDF)**

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 36 by September 30, 2023, which is after the Sixteenth Reporting Period covered by this Report.

The Compliance Measures require the Department to develop a staffing schedule to provide on-call services, and the County's Sixteenth Self-Assessment reported that it complied with this requirement for the Fourth Quarter of 2022.  The Compliance Measures also require the Department to review randomly selected records of prisoners newly admitted to mental health housing from a lower level of care due to an adverse triggering event during two randomly selected weeks per quarter.  The County's Sixteenth Self-Assessment reports that during the Fourth Quarter of 2022, "64% -- rather than the required 95% -- of inmates" identified in the two randomly selected weeks received an assessment by a QMHP within four hours, as required by Compliance Measure 36-4(a).  The County further reports that 100% of the selected prisoners at TTCF and 100% at CRDF were seen on videos "under unobstructed visual observation pending assessment," as required by Compliance Measure 36-4(b).

The County's Augmented Sixteenth Self-Assessment reports that for the First Quarter of 2023, the Department complied with the staffing schedule requirement.  The County further reports that during the First Quarter of 2023 "74% -- rather than the required 95% -- of inmates" identified in the two randomly selected weeks received an assessment by a QMHP within four hours, as required by Compliance Measure 36-4(a). The County further reports that 40% of the selected prisoners at CRDF and 100% at TTCF were "under unobstructed visual observation pending assessment," as is required by Compliance Measure 36-4(b).

The Monitoring Team has conducted multiple qualitative reviews of the County's compliance with Provision 36 in several recent Reporting Periods and has repeatedly

identified compliance as a priority that requires urgent attention.[24]  A common goal of these qualitative reviews has been to determine whether the County "sufficiently detects adverse triggering events and acts of repeated self-harm" in order to assure prompt assessment by a QMHP and a clinically-adequate treatment plan.  Further, whether any assessment conducted "sufficiently addressed the adverse triggering event(s), including discussing relevant risk factors, and whether there was a clinically-adequate crisis response or safety plan put in place."

Those qualitative reviews generally found that a substantial percentage of patients were timely seen by QMHPs after triggering events.  However, there were deficits in the frequency with which QMHPs adequately evaluated the apparent risk factors and provided safety or crisis response plans to address them.  The Team also noted that the first mental health contact with patients in these circumstances "should result in a simple and clear safety plan for the period prior to transfer to a higher level of care followed by more detailed treatment planning by an assigned clinician."[25]  Regarding cases of repeated self-harm, the Team found that there were treatment plans to address the behavior in only a fraction of the relevant cases, nor were there indications that clinicians determined that a treatment plan was not clinically indicated.  The Fifteenth Report noted that the lack of treatment planning for inmates who engage in repeated self-harming behavior was an "urgent safety risk that must receive prompt attention from the County."

In the Augmented Sixteenth Self-Assessment, the County reports that it has both been conducting "qualitative evaluations of crisis response notes" and also monitoring to ensure that clinicians are "using the crisis template."  Regarding the qualitative evaluations of crisis response notes, the County reportedly evaluates "1) proper identification of the patient's problem; 2) risk assessment; 3) intervention information; and 4) the presence in the notes of a plan for the patient's care and safety."  The resulting scoring reportedly "not only assesses the crisis notes in particular cases, but also evaluates the overall quality of documentation at each facility, allowing managers to detect trends or issues at individual programs."[26]  Regarding the monitoring of use of the crisis template, the County evaluates whether the crisis template was used "in 100 cases broken down by facility."

This is useful context.  However, while the County provides data about the results of its monitoring of use of the crisis response template,[27] it does not provide specific

---

[24] *See* Monitor's Eleventh, Twelfth, Thirteenth, Fourteenth, and Fifteenth Reports.

[25] The Team noted that of the cases that included safety plans, some of them were "boilerplate bullet point lists" rather than individualized plans for each inmate.

[26] The County further reports that "CHS Compliance will evaluate the records of one patient who engaged in multiple self-directed violence incidents in the previous month to evaluate the quality of treatment planning and supporting documentation."  Further, "the results of this evaluation will be shared with the Director of Mental Health and relevant program manager[s] for consideration of corrective actions and further training. The results from these evaluations have been shared with the mental health director and program managers through the Provision 40 scorecard since the Fourth Quarter of 2022."  Information about the results of these evaluations should also be shared in the County's next Self-Assessment.

[27] It reports that a First Quarter 2023 audit "determined that 90% of the notes were completed using the template.  Upon further examination, it was determined that 100% of QMHPs who appeared in the current audit did use the template at least once during the quarter."

information about the qualitative evaluations it conducts of crisis response notes.  It does not detail whether its evaluations have found that "the patient's problem" is being properly identified, a risk assessment adequately completed, tailored interventions determined, or the presence of a plan for the patient's care and safety implemented.

The Fifteenth Report previously observed regarding Provision 40

the Monitor's Mental Health Team notes that 'the language in the posted documents focuses primarily on clinicians' use of the crisis response template but says nothing about whether the notes were found to be clinically adequate. The use of a template may be necessary but is not sufficient for compliance. Our reviews reflect continuing concerns about the clinical adequacy of the crisis response notes. More information from the County about the results of its qualitative evaluations of the crisis response notes, and any fixes being implemented to improve their quality, would be useful in the next Reporting Period.'

The County should provide the requested information in the next Reporting Period.

According to the County's implementation plan tracker, the County has completed 1 out of 1 corrective action steps regarding Provision 36 and 17 out of 21 corrective action steps regarding Provisions 36 and 40.  These steps include: CCSB collaborating with TTCF training to ensure dissemination and re-briefing of "Handling Suicidal Inmate in Discipline Modules Procedure" (completed January 2022); ensuring that at least one QMHP in the IRC is available to meet with quarantined individuals in MCJ and TTCF during evening and overnight shifts (completion date unclear); submitting on-call staff schedules each quarter (completion date unclear); steps related to improving documentation practices (completion date unclear); improving treatment planning (completion date unclear); compliance team working with the program to develop interim internal audit to assess the impact of the training program (completed May 2023); beginning internal audits on a monthly basis (completed May 2023); and monthly identification of 20 notes from each facility to see if the standardized crisis/on-call response template was used (completion date unclear).

The County also reports that it has relied on the CHS training department and weekly clinical team meetings and individual supervision to enhance compliance with Provision 36.  In addition, a checklist was provided to clinicians to guide them on the necessary elements of on-call assessments and interventions, and a treatment binder was provided to all new CHS employees who enter the Mental Health Program, "emphasizing expectations for interventions and documentation."

Based on the discussion above, the County is in Partial Compliance at TTCF and Non-Compliance at CRDF with Provision 36 for the Sixteenth Reporting Period.  Given the drop in CRDF's performance under Compliance Measure 36-4(b) in the First Quarter of 2023, the County should identify more specific steps it will take to enhance

compliance at CRDF in the future.

37.     Sheriff's Court Services Division staff will complete a Behavioral Observation and Mental Health Referral ("BOMHR") Form and forward it to the Jail's mental health and/or medical staff when the Court Services Division staff obtains information that indicates a prisoner has displayed obvious suicidal ideation or when the prisoner exhibits unusual behavior that clearly manifests self-injurious behavior, or other clear indication of mental health crisis.  Pending transport, such prisoner will be under unobstructed visual observation or subject to 15-minute safety checks.

**STATUS:     NON-COMPLIANCE**

The Compliance Measures require the Department to randomly select six courts from among the three Court Divisions each quarter, review written communications and orders that refer to a suicide risk or serious mental health crisis for a prisoner and incident reports for self-injurious behavior by prisoners appearing in the selected courts, and determine if these incidents are reflected in BOMHR forms completed by the Court Services Division staff in the selected courts.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 37 by March 31, 2024.

In the County's Augmented Sixteenth Self-Assessment, it reported that for the Fourth Quarter of 2022, "58% – rather than the required 90% – of the 17 incidents involving suicidal behavior, self-injurious behavior, or clear indications of mental health crises were identified in court communications or incident reports reflected on BOHMRs…."  In the First Quarter of 2023, the County reported 33% compliance.  The County notes that the "primary driver" of the compliance challenges is the "lack of documentation for the 15-minute safety check logs and their timeliness."  To address this, the County reports

> For Court Services Division personnel, encountering and responding to someone who is decompensating from a mental health crisis is relatively rare and requires training and re-briefing. To improve compliance, CCSB will complete re-trainings on Provision 37 by the end of the Third Quarter of 2023. CCSB also is committed to conducting monthly audits of Court Services Division results.
>
> Finally, in the month of August 2023, CCSB will be distributing newly designed signage that clearly states Provision 37's requirements, including the necessity of conducting and documenting 15-minute checks. These signs will be posted in all County court lock-ups. The County believes that supplementing training with signage will improve compliance by constantly reinforcing information about Provision 37 requirements provided during the training.

According to the County's implementation plan tracker, the County has completed 3 out of 4 corrective action steps regarding Provision 37.  These steps include: Court Services Training Bureau briefing operations staff at each of the three court

services bureaus (completed January 2022); Court Services operations staff conducting mass briefings and training to Court Services lockup staff about expectations (completed February 2022); and Court Services commencing quarterly training on provision requirements and documentation (completed February 2022 and ongoing).

38.     Consistent with existing DMH policies and National Commission on Correctional Health Care standards for jails, the County and the Sheriff will ensure that mental health staff or JMET teams make weekly cell-by-cell rounds in restricted non-mental health housing modules (e.g., administrative segregation, disciplinary segregation) at the Jails to identify prisoners with mental illness who may have been missed during screening or who have decompensated while in the Jails.  In conducting the rounds, either the clinician, the JMET Deputy, or the prisoner may request an out-of-cell interview. This request will be granted unless there is a clear and documented security concern that would prohibit such an interview or the prisoner has a documented history of repeated, unjustified requests for such out-of-cell interviews.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified))**

The Compliance Measures require the Department to review the documentation of the weekly cell-by-cell rounds and the JMET Logs for a randomly selected week each quarter to confirm that the required cell-by-cell checks were conducted and out-of-cell interviews were handled in accordance with this provision.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 38 in the Sixteenth Reporting Period.

39.     The County and the Sheriff will continue to use a confidential self-referral system by which all prisoners can request mental health care without revealing the substance of their requests to custody staff or other prisoners.

STATUS          **SUBSTANTIAL COMPLIANCE (as of July 1, 2017, through June 30, 2018 (verified) at NCCF)**

**PARTIAL COMPLIANCE (at PDC South, CRDF, MCJ, TTCF, and PDC North)**

**NOT RATED (at PDC East)**

Substantial Compliance requires the Department to (a) verify that housing areas have the required forms and (b) review randomly selected self-referrals for mental health care from prisoners to confirm that (i) the referrals "were forwarded to DMH" by the Department, and (ii) that "DMH documented the timeliness and nature of DMH's response to the self-referrals[.]"  The thresholds for Substantial Compliance are that (i) 85% of the housing areas have the required forms; (ii) 90% of the self-referrals must be forwarded by the Department to the Department of Health Services – Custody Health Services (DHS-CHS); and (iii) 90% must contain the required documentation of DHS-CHS's response.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 39 by June 30, 2024.

The County's Augmented Sixteenth Self-Assessment reports that it achieved Substantial Compliance with Compliance Measure 39-4(a) in the Fourth Quarter of 2022 "at all applicable" facilities.  The reported results were 89% at MCJ, 90% at CRDF, 88% at TTCF, 100% at PDC North, 100% at PDC South, and 100% at PDC East.  Regarding Compliance Measures 39-4(b) and 4(c), the County's Augmented Sixteenth Self-Assessment reports that

no official assessment for the Fourth Quarter of 2022 was submitted, however, for the remaining components of Provision 39 subject to monitoring, due to a data gap produced by the transition to the ORCHID system in September 2022. The problem is that people can submit two different Health Service Request ("HSR") forms: one specifically and exclusively for mental health concerns, and another that allows people to ask for help for both mental health and medical concerns, and the second form is currently not reliably captured in the new ORCHID system reporting.

The County reports that "CHS's Compliance Analyst worked extensively with the ORCHID transition team in 2022 to help build a report that would capture both types of HSRs in its universe. . . To date, a fix has yet to be identified but the request is high on ORCHID's list of priority items for resolution."  The County will need to rectify this issue or it may be found in Non-Compliance in the Seventeenth Reporting Period.

52

For the First Quarter of 2023, the County reports that it achieved Substantial Compliance with Compliance Measure 39-4(a) "at all applicable" facilities.  The reported results were 91% at MCJ, 85% at CRDF, 92% at TTCF, 90% at PDC North, 100% at PDC South, and 100% at PDC East.

Regarding Compliance Measures 39-4(b) and 4(c), the County's Augmented Sixteenth Self-Assessment reports that

> For the First Quarter of 2023, CHS leadership recently decided to submit audits for the data that can currently be captured in ORCHID reporting, even though the complete universe of mental health HSRs cannot be captured at this time.[28]

100% of the self-referrals from PDC North, CRDF, TTCF, and MCJ, were forwarded by the Department to CHS in the First Quarter of 2023, and there were no relevant referrals from PDC South.  The County further reports that CHS documented the timeliness and nature of its response in 0% of the PDC North referrals, 50% of the CRDF referrals, 58% of the TTCF referrals, and 48% of the MCJ referrals.

The County previously reported Substantial Compliance at NCCF for twelve consecutive months from July 1, 2017, through June 30, 2018.  These results have been verified by the Monitor's auditors and NCCF is no longer subject to monitoring for compliance with Paragraph 39.

According to the County's implementation plan tracker, the County has completed all 11 corrective action steps regarding Provision 39.  These steps include: informal refresher courses (completed January 2023); review of self-assessments for 4Q2021 and 2022 quarters by the Compliance Team for (i) failures to scan forms into the HER (completion date unclear) and (ii) delayed MPTL entries (completion date unclear), including reviewing staffing during periods of non-compliance and make revisions (completed 3Q2022); updated staffing plan for triage of mental health referrals (completed July 2023); workshop meetings at each facility regarding delays (completed May 2022); conducting hiring fairs (completed March 2022 and ongoing); providing periodic hiring reports (completed March 2022and ongoing); using nurse practitioners to support psychiatrists (completion date unclear); complete negotiations with unions to address loan repayment concerns for psychiatrists and other mental health staff (completed April 2023); and having relief physicians trained for patient needs (completion date unclear).

---

[28] The County will be required to fix the issues with the universe of records sampled for Provision 39 in order to achieve Substantial Compliance with the provision.

40.     The County and the Sheriff will ensure a QMHP will be available on-site, by transportation of the prisoner, or through tele-psych 24 hours per day, seven days per week (24/7) to provide clinically appropriate mental health crisis intervention services.

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance requires the County (1) to provide the Monitor with on-call schedules for two randomly selected weeks reflecting that a QMHP was assigned 24 hours a day, seven days per week, and (2) to randomly select referrals for mental health crisis intervention received by a QMHP per quarter to verify (i) that a QMHP responded to all referrals, and (ii) responses to 90% of the referrals were within four hours.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234.  That Order required Defendants to achieve Substantial Compliance with Provision 40 by September 30, 2023, a date that falls outside the Sixteenth Reporting Period discussed in this Report.

The County's Sixteenth Self-Assessment reports that in the Fourth Quarter of 2022, a QMHP responded to 100% of the referrals for mental health crisis intervention services, which equals the 100% threshold for Substantial Compliance, and that 89% of the responses were within four hours, which is just below the 90% threshold for Substantial Compliance.

The County's Augmented Sixteenth Self-Assessment reports that in the First Quarter of 2023, a QMHP responded to 100% of the referrals for mental health crisis intervention services, which equals the 100% threshold for Substantial Compliance, and that 88% of the responses were within four hours, which is just below the 90% threshold.

As set forth above regarding Provision 36, the Monitoring Team has conducted multiple qualitative reviews of the County's compliance with Provision 40 in several recent Reporting Periods and has repeatedly identified compliance as a priority that requires urgent attention.[29]  A common goal of these qualitative reviews has been to determine whether the County's crisis responses were clinically appropriate.  These reviews generally found that a substantial percentage of patients were timely seen by QMHPs after triggering events.  However, there were deficits in the percentage of cases in which the crisis response was deemed to be clinically appropriate.  The Team has noted that "what is typically missing is an indication that sound crisis interventions were attempted at the time of the initial clinical contact. More explicit documentation is needed of attempts at de-escalation when needed, consideration of alternative behaviors, explicit attention to and instruction in specific coping strategies, communication and collaboration with custody, or other short-term interventions intended to ensure the safety of the patient until changes in housing and more explicit treatment planning can be enacted."

In the Augmented Sixteenth Self-Assessment, the County reports that it has both been evaluating the use of crisis response template by clinicians, and also "collect[ing]

---

[29] *See* Monitor's Eleventh, Twelfth, Thirteenth, Fourteenth, and Fifteenth Reports.

qualitative data from these crisis response notes."  Regarding the qualitative evaluations of crisis response notes, the County evaluates "1) proper identification of the patient's problem; 2) risk assessment; 3) intervention information; and 4) the presence in the notes of a plan for the patient's care and safety."  The resulting scoring reportedly "not only assesses the crisis notes in particular cases, but also evaluates the overall quality of documentation at each facility, allowing managers to detect trends or issues at individual programs."[30]  Regarding the monitoring of use of the crisis template, the County evaluates whether the crisis template was used "in 100 cases broken down by facility," and also whether "patients who have engaged in repeated self-directed violence ("SDV") have a treatment plan."

This is useful context.  However, while the County provides data about the results of its monitoring of use of the crisis response template, it does not provide specific information about the qualitative evaluations it conducts of crisis response notes.[31]  It does not detail whether its evaluations have found that "the patient's problem" is being properly identified, a risk assessment adequately completed, tailored interventions determined, or the presence of a plan for the patient's care and safety.

The Fifteenth Report previously observed

the Monitor's Mental Health Team notes that 'the language in the posted documents focuses primarily on clinicians' use of the crisis response template but says nothing about whether the notes were found to be clinically adequate. The use of a template may be necessary but is not sufficient for compliance. Our reviews reflect continuing concerns about the clinical adequacy of the crisis response notes. More information from the County about the results of its qualitative evaluations of the crisis response notes, and any fixes being implemented to improve their quality, would be useful in the next Reporting Period.'

The County should provide the requested information in the next Reporting Period.

According to the County's implementation plan tracker, the County has completed 17 out of 21 corrective action steps regarding Provisions 36 and 40.  These steps include: CCSB collaborating with TTCF training to ensure dissemination and re-briefing of "Handling Suicidal Inmate in Discipline Modules Procedure" (completed

---

[30] The County further reports that "CHS Compliance will evaluate the records of one patient who engaged in multiple self-directed violence incidents in the previous month to evaluate the quality of treatment planning and supporting documentation."  Further, "the results of this evaluation will be shared with the Director of Mental Health and relevant program manager[s] for consideration of corrective actions and further training. The results from these evaluations have been shared with the mental health director and program managers through the Provision 40 scorecard since the Fourth Quarter of 2022."  Information about the results of these evaluations should also be shared in the County's next Self-Assessment.

[31] It reports that a First Quarter 2023 audit "determined that 98% of the notes were completed using the template.  Upon further examination, it was determined that 100% of QMHPs who appeared in the current audit did use the template at least once during the quarter."

January 2022); ensuring that at least one QMHP in the IRC is available to meet with quarantined individuals in MCJ and TTCF during evening and overnight shifts (completion date unclear); submitting on-call staff schedules each quarter (completion date unclear); steps related to improving documentation practices (completion date unclear); improving treatment planning (completion date unclear); compliance team working with the program to develop interim internal audit to assess the impact of the training program (completed May 2023); beginning internal audits on a monthly basis (completed May 2023); and monthly identification of 20 notes from each facility to see if the standardized crisis/on-call response template was used (completion date unclear).

The County also reports that it has relied on the CHS training department and weekly clinical team meetings and individual supervision to enhance compliance with Provision 36.  In addition, a checklist was provided to clinicians to guide them on the necessary elements of on-call assessments and interventions, and a treatment binder was provided to all new CHS employees who enter the Mental Health Program, "emphasizing expectations for interventions and documentation."

41.     Consistent with existing DMH policies, the County and the Sheriff will implement step-down protocols that provide clinically appropriate transition when prisoners are discharged from FIP after being the subject of suicide watch.  The protocols will provide:

(a)     intermediate steps between highly restrictive suicide measures (e.g., clinical restraints and direct constant observation) and the discontinuation of suicide watch;

(b)     an evaluation by a QMHP before a prisoner is removed from suicide watch;

(c)     every prisoner discharged from FIP following a period of suicide watch will be housed upon release in the least restrictive setting deemed clinically appropriate unless exceptional circumstances affecting the facility exist; and

(d)     all FIP discharges following a period of suicide watch will be seen by a QMHP within 72 hours of FIP release, or sooner if indicated, unless exceptional circumstances affecting the facility exist.

**STATUS:        SUBSTANTIAL COMPLIANCE (as of July 1, 2022, through March 31, 2023 (verified)[32]**

Substantial Compliance requires CHS to review the medical records of all prisoners on suicide watch in FIP for one randomly selected month each quarter, and submit a report regarding the implementation of the step-down protocols and the results of its review of the medical records.  During the Fifth Reporting Period, the parties agreed to revise the Compliance Measures to increase the number of inmates subject to the step-down protocols of Paragraph 41 and ensure that the implementation of step-down protocols for FIP patients on suicide watch "ameliorate the impact of the restrictions" and have the necessary "level of precautions based upon individual assessment[s]" of the patients.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 41 by June 30, 2024.

The County's Sixteenth Self-Assessment reports that it achieved Substantial

---

[32] In the County's Sixteenth Augmented Self-Assessment, the County incorrectly reports that it was found to be in Partial Compliance for the Fifteenth Reporting Period.  *See* County's Augmented Sixteenth Self-Assessment at pp. 52-53.  In fact, the Monitor found the County to be in Substantial Compliance with Provision 41 for the Fifteenth Reporting Period.  *See* Monitor's Fifteenth Report at pp. 55.  The County also erroneously notes its belief that it has been in "Substantial Compliance with Provision 41 since July 1, 2022.  Accordingly, the County submits that it is no longer subject to monitoring for Provision 41."  However, pursuant to Paragraph 111 of the Agreement, the County must be in Substantial Compliance with a provision for no less than 12 consecutive months to be relieved of its obligations with respect to that provision.  Given that the Sixteenth Reporting Period ended on March 31, 2023, the County has not yet been in Substantially Compliance with Provision 41 for the requisite 12-month period.

Compliance in the Fourth Quarter of 2022 and First Quarter of 2023 as it met the requirements in Compliance Measure 41-4 for 100% of the prisoners discharged from FIP during the Reporting Period after having been on suicide watch.  The reported results have been verified by the Monitor's auditors.

In August 2023, the Monitoring Team conducted a qualitative review of Provision 41.  They assessed nine female and 34 male cases FIP inmates who were on any level of safety precaution because of a determination by mental health staff that the patient was at substantial risk of seriously harming him or herself.  They evaluated several key questions related to the patient sample.  This included determining whether the patient was evaluated by a QMHP prior to discharge and in 95% of cases, the answer was yes, such an evaluation had been completed.[33]

The Team also found that in 100% of cases, the QMHP discharge evaluation specified the least restrictive housing deemed clinically appropriate.  In 94% of cases, the housing determinations appeared to be clinically reasonable (six were N/A and one was indeterminate).  The Team also found that in 100% of cases, the patients were seen by a QMHP within 72 hours of discharge (11 cases were N/A and one was indeterminate).  In summary, the qualitative review validated that the County satisfactorily met the obligations of Provision 41 in the Sixteenth Reporting Period.

---

[33] In the two cases that were noncompliant, both patients had been evaluated and discharged by the psychiatrist but were not transferred from the FIP within 72 hours, and no further clinical evaluations were completed prior to transfer.

42.     Consistent with existing DMH policies, the County and the Sheriff will implement step-down protocols to ensure that prisoners admitted to HOH and placed on risk precautions are assessed by a QMHP.  As part of the assessment, the QMHP will determine on an individualized basis whether to implement "step-down" procedures for that prisoner as follows:

(a)     the prisoner will be assessed by a QMHP within three Normal business work days, but not to exceed four days, following discontinuance of risk precautions;

(b)     the prisoner is counseled to ameliorate the negative psychological impact that any restrictions may have had and in ways of dealing with this impact;

(c)     the prisoner will remain in HOH or be transferred to MOH, as determined on a case-by-case basis, until such assessment and counseling is completed, unless exceptional circumstances affecting the facility exist; and

(d)     the prisoner is subsequently placed in a level of care/housing as determined by a QMHP.

**STATUS:     NON-COMPLIANCE**

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 42 by June 30, 2024.  The County's Sixteenth Self-Assessment assesses the County's compliance using the revised methodology discussed in the Monitor's Fourteenth Report.  It reports that in the Fourth Quarter of 2022 at TTCF "100% of the 25 inmates with High or Imminent Risk Level on their RAS [Risk Assessment for Suicide] were assessed by a QMHP pursuant to Measure 42-4(a)."  "24% of these patients received documentation reflecting that a QMHP determined on an individualized basis whether to implement step-down procedures."  There were no records to assess for Measure 42-4(c).

In the First Quarter of 2023 at TTCF, "100% of the 25 inmates with High or Imminent Risk Level on their RAS [Risk Assessment for Suicide] were assessed by a QMHP pursuant to Measure 42-4(a)."  "28% of these patients received documentation reflecting that a QMHP determined on an individualized basis whether to implement step-down procedures."  With respect to Measures 42-4(c), "the County determined that it had implemented step-down procedures for one of the two patients whose assessments provided for such procedures."

At CRDF, there were no responsive patient files in the Fourth Quarter of 2022.[34] In the First Quarter of 2023 at CRDF, the County reported that 17% of responsive

---

[34] If the County again has an insufficient number of responsive patient files at CRDF in the Seventeenth Reporting Period, it should add an additional month(s) until a larger sample is achieved.

patients "received documentation reflecting that a QMHP determined on an
individualized basis whether to implement step-down procedures." Of the one patient
whose assessment provided for step-down procedures, "these procedures were not
implemented as required under Measure 42-4(c)."

In August 2023, the Monitoring Team performed a qualitative review of Provision
42. They sought to review a sample of 30 male and 30 female inmates but ended up with
a sample of 26 patients.[35] The Team determined that in 25% of cases, "the patients were
seen by a QMHP within three business days of their risk rating being lowered to medium
or low risk." In 0% of cases, "the clinical documentation indicated that the prisoner was
counseled to ameliorate the negative psychological impact of any restrictions, or was it
clear that such counseling was not necessary." In 27% of cases, "the clinical
documentation addressed the level of care required following release from risk
precautions." In 75% of cases, "if the QMHP addressed the level of care required, the
specified level of care was deemed to be clinically reasonable."

The County's Augmented Sixteenth Self-Assessment reports that since the
Fifteenth Report, it has implemented "training geared to achieving Substantial
Compliance with Provision 42…on an aggressive schedule." In particular, it reports
conducting 10 trainings on step-down protocols between December 2022 and July 2023
for a diverse range of trainees. Furthermore

the first round of training has been completed for the new suicide risk
assessment for each mental health program; there is an electronic version
of the training; and the Mental Health Training Department provides
quarterly refresher training. Finally, Mental Health supervisors are
conducting audits of clinicians' cases to ensure compliance with CHS
step-down protocols. With these efforts, both completed and ongoing, the
County expects improved compliance with Provision 42 in the near term.

According to the County's implementation plan tracker, the County has
completed 6 out of 7 corrective action steps regarding Provision 42. These steps include:
writing a new program and providing training and access to the program for staff in order
to streamline access to suicide risk information (completed September 2022); developing
a calendar designating responsible staff for producing and disseminating reports
(completed September 2022); monthly reports from program managers on days that
reports are unavailable (completed September 2022); training the training team
(completed January and February 2022); training for each mental health program

---

[35] County personnel indicated that CRDF is currently the only facility that is using new risk assessment
forms, and that the existing report procedures have not yet been updated to capture data using the new
forms. Therefore, a female sample was not available for this review.

(completed July 2023); and review for clinicians non-compliant in their audits (completion date unclear).[36]

---

[36] In response to a draft of this Report, the County also indicated that it made administrative or technological changes that include submitting an "ORCHID Enhancement Request" to automate the Stepdown protocol within ORCHID in order to "aid programs in managing and assigning Stepdown Assessments and ensure completion within three days."  *See* County Response to Draft Report dated Oct. 6, 2023 (on file with author).

43.     Within six months of the Effective Date, the County and the Sheriff will develop and implement written policies for formal discipline of prisoners with serious mental illness incorporating the following:

(a)     Prior to transfer, custody staff will consult with a QMHP to determine whether assignment of a prisoner in mental health housing to disciplinary housing is clinically contraindicated and whether placement in a higher level of mental health housing is clinically indicated, and will thereafter follow the QMHP's recommendation;

(b)     If a prisoner is receiving psychotropic medication and is placed in disciplinary housing from an area other than mental health housing, a QMHP will meet with that prisoner within 24 hours of such placement to determine whether maintenance of the prisoner in such placement is clinically contraindicated and whether transfer of the prisoner to mental health housing is clinically appropriate, and custody staff will thereafter follow the QMHP's recommendation;

(c)     A QMHP will participate in weekly walks, as specified in paragraph 38, in disciplinary housing areas to observe prisoners in those areas and to identify those prisoners with mental health needs; and

(d)     Prior to a prisoner in mental health housing losing behavioral credits for disciplinary reasons, the disciplinary decision-maker will receive and take into consideration information from a QMHP regarding the prisoner's underlying mental illness, the potential effects of the discipline being considered, and whether transfer of the prisoner to a higher level of mental health housing is clinically indicated.

**STATUS (43):**      **SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at NCCF and PDC North)**

**PARTIAL COMPLIANCE (at TTCF and MCJ)**

**NON-COMPLIANCE (at CRDF)**

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 43 by March 31, 2024.  According to the County, it has "completed the majority of action items in its Implementation Plan for Provision 43."  But while the County achieved some intermittent improvement in its results on this Provision, particularly in the Fourth Quarter of 2022, they were not consistent across the relevant compliance measures and, in fact, there were some declines in the First Quarter of 2023.

Regarding Compliance Measures 43-6 and 43-9(e), the Department posted a memo indicating that no inmates with mental illness lost behavioral credits for disciplinary reasons during the Fourth Quarter of 2022.  The County's Sixteenth Self-Assessment reports that in the Fourth Quarter of 2022, 40% of the required consultations at CRDF "occurred prior to transfers from mental health housing."  The County further reports that "100% – more than the required 90% – of the meetings required pursuant to Compliance Measure 43-9(c) occurred when transferring inmates to disciplinary housing from areas other than mental health housing."  The County also reports that 100% of the weekly row walks through disciplinary units pursuant to Compliance Measure 43-9(d) occurred at CRDF.  The results for MCJ were 48%, 100%, and 80%, respectively.

At TTCF, 84% of the required consultations "occurred prior to transfers from mental health housing," and "there were no patients to assess for Measure 43-9(c) during this quarter," since "[i]nstead of being used for discipline, these modules in TTCF were used for Covid-related quarantines during the reporting period."  Similarly, the County reports that regarding Compliance Measure 43-9(d), "there were no discipline row walks required during the random weeks as no inmates or patients were housed in TTCF discipline modules during the relevant weeks due to changes required to reduce the risk of spreading COVID-19."

The County's Augmented Sixteenth Self-Assessment reports that "no inmates with mental illness lost behavioral credits for disciplinary reasons during the First Quarter of 2023."  However, just 33% of the required consultations at CRDF "occurred prior to transfers from mental health housing."  16% of the required consultations at CRDF "occurred when transferring inmates from areas other than mental health housing."  The County also reports that 100% of the weekly row walks through disciplinary units occurred at CRDF.

The results for TTCF were 72% (consultations before transfer), but there were no

results to report for Compliance Measures 43-9(c) or 43-9(d) due to COVID-19 related population changes.  For MCJ, the results were 41%, 57%, and 100% in the First Quarter of 2023.

Given these results, the County reports that "each facility has efforts underway to improve compliance results in future reporting periods."  These include, in summary, efforts to more timely notify the mental health team prior to moving patients to discipline, actively recruiting to fill CHS staffing vacancies, developing an "assessment template" for use at CRDF, and more frequently providing the discipline housing list to CHS.  Regarding the necessary disciplinary policies, they are nearly finalized save for one outstanding issue that the Parties are working to expeditiously resolve.   The County also reports that it is meeting to "discuss the creation of a disciplinary housing report" to provide real time information about inmates who have been moved into disciplinary housing areas, and it has created "an email notification system" for that report.

According to the County's implementation plan tracker, the County has completed 13 out of 17 corrective action steps regarding Provision 43.  These steps include: providing the DOJ and Monitor with updated, revised discipline policies and responses to DOJ comments on the policies (completed March 2023); improving communication issues at TTCF by commencing in-person briefings of line staff and supervisors to reiterate the importance of following proper discipline procedures (completed December 2021); training line staff and supervisors on proper documentation practices (completed March 2022); establishing consistent discipline processes and custody point of contact at CRDF (completed March 2022); CHS evaluating one DRB evaluation by each new clinician per week (completed September 2022 and ongoing); staffing coverage for discipline reviews at TTCF to be complete (completion date unclear); training for new staff at TTCF after orientation (completion date unclear); preparing a directive for staff requiring them to clarify with custody during crisis calls whether an IRTS is being produced (completed March 2022); and CHS training relevant CRDF staff on requirements related to staff conduct evaluations (completed March 2022).

The County previously achieved Substantial Compliance at NCCF and PDC North for twelve consecutive months and these facilities were not subject to monitoring for compliance with Paragraph 43 during the Sixteenth Reporting Period.

44.     Within six months of the Effective Date, the County and the Sheriff will install protective barriers that do not prevent line-of-sight supervision on the second floor tier of all High Observation Housing areas to prevent prisoners from jumping off of the second floor tier.  Within six months of the Effective Date, the County and the Sheriff will also develop a plan that identifies any other areas in mental health housing where such protective barriers should be installed.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016)**

The County has maintained Substantial Compliance with Paragraph 44 of the Agreement since January 1, 2016.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 44 in the Sixteenth Reporting Period.

45.     Consistent with existing Sheriff's Department policies, the County and the Sheriff will provide both a Suicide Intervention Kit that contains an emergency cut-down tool and a first-aid kit in the control booth or officer's station of each housing unit.  All custody staff who have contact with prisoners will know the location of the Suicide Intervention Kit and first-aid kit and be trained to use their contents.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of October 1, 2015, through September 30, 2016 (verified) at CRDF, NCCF, PDC East, PDC South, and TTCF)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at MCJ and PDC North)**

The County maintained Substantial Compliance with Paragraph 45 for twelve consecutive months at all facilities as of December 31, 2016.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 45 in the Sixteenth Reporting Period.

46.     The County and the Sheriff will immediately interrupt, and if necessary, provide appropriate aid to, any prisoner who threatens or exhibits self-injurious behavior.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of July 1, 2020, through June 30, 2021 (verified))**

The parties agreed on Revised Compliance Measures in 2021.  Substantial Compliance requires the Department to review the documentation from randomly selected incidents involving prisoners who threaten or exhibit self-injurious behavior, and include an assessment of the timeliness and appropriateness of the Department's responses to these incidents in its semi-annual Self-Assessment.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 46 in the Sixteenth Reporting Period.

47.     The County and the Sheriff will ensure there are sufficient custodial, medical, and mental health staff at the Jails to fulfill the terms of this Agreement.  Within six months of the Effective Date, and on a semi-annual basis thereafter, the County and the Sheriff will, in conjunction with the requirements of Paragraph 92 of this Agreement, provide to the Monitor and DOJ a report identifying the steps taken by the County and the Sheriff during the review period to implement the terms of this Agreement and any barriers to implementation, such as insufficient staffing levels at the Jails, if any.  The County and the Sheriff will retain staffing records for two years to ensure that for any critical incident or non-compliance with this Agreement, the Monitor and DOJ can obtain those records to determine whether staffing levels were a factor in that critical incident and/or non-compliance.

**STATUS:       PARTIAL COMPLIANCE**

Under Provision 47 and its associated Compliance Measures, Substantial Compliance requires the County to: a) submit a self-assessment that: i) identifies the steps taken by the County and the Sheriff to implement the terms of the Agreement, and ii) assess whether staffing levels were a factor in any non-compliance with the Agreement, any Critical Incident, or the Department's handling of the Critical Incident. Historically, the Monitor has assessed that the County has provided useful analysis of the role of staffing levels with respect to Critical Incidents (47-4(a)(ii)), but it has not adequately evaluated "whether staffing levels were a factor in any non-compliance with the Agreement" (47-4(a)(ii)).  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 47 by June 30, 2024.

Regarding critical incidents, in the Sixteenth Reporting Period, the County's posted results for Provision 47 reflect the County's assessment of whether staffing levels were a factor in "any critical incident, or the Department's handling of the incident," as Compliance Measures 47-1 and 47-2 require.  The County's posted results report that 30 critical incidents[37] occurred during the Second Half of 2022, and the County concluded that staffing was not a factor in any of those incidents.

In the Sixteenth Reporting Period, the Department again did not do a comprehensive evaluation in its Self-Assessment of "whether staffing levels were a factor in any non-compliance with the Agreement" (47-4(a)(ii)).[38]  However, the County did begin to more specifically address the role of staffing deficits in its discussion of certain provisions.  For example, in its discussion of Provision 64, the County noted the role a lack of nursing and psychiatric staff has had on its ability to achieve compliance with the

---

[37] 20 Inmate Deaths, 1 Serious Suicide Attempts, 3 Inmate Assaults on Staff, and 6 Category 3 Uses of Force.

[38] In response to a draft of this Report, the County asserted that "it is not the case that the County has failed to identify and evaluate when staffing levels have hindered compliance with Provisions in the Settlement Agreement" given that its Implementation Plans often address that very issue.  *See* County Response to Draft Report dated Oct. 6, 2023 (on file with author).  The Monitor reminds the County that Provision 47 requires the County to perform this analysis "on a semi-annual basis," which it has not yet consistently done.

Provision, and also on its efforts to remedy those deficiencies.  These are useful discussions and should be deepened and expanded for all remaining provisions that are not yet in Substantial Compliance in the Seventeenth Reporting Period.

Regarding persistent vacancies in the CHS mental health ranks, the County's Augmented Sixteenth Self-Assessment reports

> CHS has seen critically-needed improvements in its process for hiring new staff, including expediting onboarding for new staff, additional resources dedicated by the Department of Health Services (DHS) to support CHS, and oversight and advocacy from DOJ Compliance. To incentivize recruitment and retention of critical CHS staff, and to encourage overtime work by CHS staff when needed at the LACJ, the DOJ Compliance Office announced on April 7, 2023 and the County has now implemented jail-based assignment bonuses of up to 20 percent for roughly 1,900 employees spanning roughly 50 classifications in the jails for various nursing, mental health, case management, technical, and administrative support staff. The County has also increased focus on the CHS onboarding process, increasing hiring fairs for key classifications, troubleshooting and streamlining delays in the onboarding process, updating recruiting materials, and simultaneously supplementing the hiring process with additional effort to recruit supplemental registry staff.

> These actions have already yielded positive results, as CHS hired an additional 241 total staff between March 2023 and August 3, 2023, inclusive of new hires, promotions, and transfers, with an additional 88 in the process to be hired.

While these reported data are promising, they do not disaggregate mental health workers from other CHS workers.  Thus, the Monitor requested and obtained data specific to the County's recruitment efforts for mental health workers, which reflect much more modest gains.  As of September 2023, CHS had 334 total authorized mental health worker positions, and 198 were filled, or just 59% of the total (29 positions had candidates who had accepted offers and were in the process of onboarding).  This reflects minimal improvement over the same data included in the Fifteenth Monitoring Report, which noted that as of February 2023, CHS had 310 authorized mental health worker positions with 179 filled.  Thus, accounting for attrition, the County added fewer than 20 total mental health workers between February and August 2023.  Given the fast-approaching Court-ordered compliance deadlines, the Monitor is concerned that this pace will not be sufficient.

The County should explain in its next Self-Assessment, if not before, what additional steps it is taking to improve its hiring of the mental health staff necessary for its compliance with the Agreement.

48.     Within three months of the Effective Date, the County and the Sheriff will
have written housekeeping, sanitation, and inspection plans to ensure the proper cleaning
of, and trash collection and removal in, housing, shower, and medical areas, in
accordance with California Code of Regulations ("CCR") Title 15 § 1280: Facility
Sanitation, Safety, and Maintenance.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of January 1, 2016,
                through December 31, 2016)**

The County maintained Substantial Compliance with Paragraph 48 of the
Agreement at all facilities for twelve consecutive months as of December 31, 2016.
Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject
to monitoring for Substantial Compliance with Paragraph 48 in the Sixteenth Reporting
Period.

49.     Within three months of the Effective Date, the County and the Sheriff will
have a maintenance plan to respond to routine and emergency maintenance needs,
including ensuring that shower, toilet, sink, and lighting units, and heating, ventilation,
and cooling system are adequately maintained and installed.  The plan will also include
steps to treat large mold infestations.

**STATUS:        SUBSTANTIAL COMPLIANCE (as of March 1, 2016,
                 through February 28, 2017)**

The County maintained Substantial Compliance with Paragraph 49 of the
Agreement at all facilities for twelve consecutive months as of February 28, 2017.
Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject
to monitoring for Substantial Compliance with Paragraph 49 in the Sixteenth Reporting
Period.

50.    Consistent with existing Sheriff's Department policies regarding control of vermin, the County and the Sheriff will provide pest control throughout the housing units, medical units, kitchen, and food storage areas.

> **STATUS:**    **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at all facilities other than PDC South and PDC East)**
>
> **SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 (verified) at PDC South and PDC East)**

The County maintained Substantial Compliance with Paragraph 50 of the Agreement at all facilities for twelve consecutive months as of March 31, 2017.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 50 in the Sixteenth Reporting Period.

51.     Consistent with existing Sheriff's Department policies regarding personal care items and supplies for inmates, the County and the Sheriff will ensure that all prisoners have access to basic hygiene supplies, in accordance with CCR Title 15 § 1265: Issue of Personal Care Items.

**STATUS:**      **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) for all facilities other than CRDF)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017 (verified) at CRDF)**

The County maintained Substantial Compliance with Paragraph 51 of the Agreement at all facilities for twelve consecutive months as of June 30, 2017.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 51 in the Sixteenth Reporting Period.

52.     The County and the Sheriff will implement policies governing property
restrictions in High Observation Housing that provide:

(a)     Except when transferred directly from FIP, upon initial placement in
        HOH:

        (i)     Suicide-resistant blankets, gowns, and mattresses will be provided
                until the assessment set forth in section (a)(ii) below is conducted,
                unless clinically contraindicated as determined and documented by
                a QMHP.

        (ii)    Within 24 hours, a QMHP will make recommendations regarding
                allowable property based upon an individual clinical assessment.

(b)     Property restrictions in HOH beyond 24 hours will be based on clinical
        judgment and assessment by a QMHP as necessary to ensure the safety
        and well-being of the prisoner and documented in the electronic medical
        record.

**STATUS:     PARTIAL COMPLIANCE (at CRDF and TTCF)**

Substantial Compliance requires the Department to (1) randomly inspect the cells
of prisoners placed in HOH (except from FIP) within the previous 24 hours to confirm
that they have been provided with suicide-resistant blankets, gowns and mattresses unless
clinically contraindicated, and document the results of the inspection; (2) randomly
inspect the cells of prisoners placed in HOH (except from FIP) for more than 24 hours to
confirm that they have been provided with allowable property as recommended by a
QMHP; and (3) review the electronic medical records of prisoners assigned to HOH on
the days of those inspections to verify compliance with the provisions of Paragraph 52.
All the Compliance Measures have a 95% threshold for Substantial Compliance.  On
December 27, 2022, the Court issued an Order Setting Deadlines for Substantial
Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance
with Provision 52 by December 31, 2023.

In its Sixteenth Self-Assessment, the County reports that in the Fourth Quarter of
2022, at CRDF there was "100%" compliance with Compliance Measure 52-5(b).
Regarding Compliance Measure 52-5(c), "57%—rather than the required 95%—of the
electronic medical records for inmates assigned to HOH reflected a recommendation by a
QMHP regarding allowable property."  Additionally, "13%—rather than the required
95%—of electronic medical records for inmates assigned to HOH reflect that property
restrictions were based upon the clinical judgment of a QMHP pursuant to Compliance
Measure 52-5(d)."  The County also reported that "92%—less than the required 95%—of
inmates analyzed pursuant to Compliance Measure 52-5(e) had allowable property as
recommended by a QMHP (unless refused by the inmate)."

The County also reports that at TTCF in the Fourth Quarter of 2022, "89%—

rather than the required 95%—of inmates analyzed pursuant to Compliance Measure 52-5(b) were provided suicide-resistant blankets, gowns and mattresses as required by this Provision." "46%—rather than the required 95%—of the electronic medical records for inmates assigned to HOH reflected a recommendation by a QMHP regarding allowable property pursuant to Compliance Measure 52-5(c)."  "89%—rather than the required 95%—of electronic medical records for inmates assigned to HOH reflect that property restrictions were based upon the clinical judgment of a QMHP pursuant to Compliance Measure 52-5(d)."  "94%—rather than the required 95%—of inmates analyzed pursuant to Compliance Measure 52-5(e) had allowable property as recommended by a QMHP (unless refused by the inmate)."

The County reports that at TTCF in the First Quarter of 2023, "90%—rather than the required 95%—of inmates analyzed pursuant to Compliance Measure 52-5(b) were provided suicide-resistant blankets, gowns and mattresses as required by this Provision." "37%—rather than the required 95%—of the electronic medical records for inmates assigned to HOH reflected a recommendation by a QMHP regarding allowable property pursuant to Compliance Measure 52-5(c)."  73% "rather than the required 95%—of electronic medical records for inmates assigned to HOH reflect that property restrictions were based upon the clinical judgment of a QMHP pursuant to Compliance Measure 52-5(d)."  "96%—more than the required 95%—of inmates analyzed pursuant to Compliance Measure 52-5(e) had allowable property as recommended by a QMHP (unless refused by the inmate)."

The County also reports 100% compliance with Compliance Measure 52-5(b) at CRDF in the First Quarter of 2023.  Further, "65%—rather than the required 95%—of the electronic medical records for inmates assigned to HOH reflected a recommendation by a QMHP regarding allowable property pursuant to Compliance Measure 52-5(c)." "77%—rather than the required 95%—of electronic medical records for inmates assigned to HOH reflect that property restrictions were based upon the clinical judgment of a QMHP pursuant to Compliance Measure 52-5(d)."  "90%—less than the required 95%— of inmates analyzed pursuant to Compliance Measure 52-5(e) had allowable property as recommended by a QMHP (unless refused by the inmate)."

Regarding these results, the County notes that it "changed its process for auditing compliance at CRDF in the First Quarter of 2023."  Specifically

In the Third Quarter of 2022, CRDF Mental Health staff and CHS Compliance began a series of discussions to address the ways in which CRDF functions differently from TTCF and how these differences were affecting CRDF's compliance with Provision 52. Many of the expectations underlying the provision presume that CRDF operates similarly to TTCF and follows the traditional processes of the men's program. For example, CRDF does not operate a SAT program, thus patients are not coming into HOH housing from a setting that uniformly imposes property restrictions. Indeed, past audits have established that it is comparatively rare for CRDF patients to enter HOH with property restrictions. Despite the rarity of such

restrictions, under the dictates of Provision 52, CRDF's policy was to attempt to follow up with all HOH patients within 24 hours to assess property restrictions even though only a small subset of these patients actually had such restrictions to begin with. This elevation of form over substance led to strains on the system without benefit to patients. Therefore, in December 2022, in an effort to maintain the effect of the provision while also meeting the clinical needs of patients, CRDF prioritized those patients who actually had property restrictions for these Provision 52 assessments. The CRDF audit for the First Quarter of 2023 reflects this prioritization and constitutes a new assessment methodology.

In a meeting with the Monitor on October 17, 2023, the County clarified that the process at CRDF differs from the process at TTCF in that the QMHP assessment and "recommendations regarding allowable property" discussed in Provision 52(a)(ii) actually occurs in CRDF intake before patients are assigned to HOH housing.

According to the County's implementation plan tracker, the County has completed all 15 corrective action steps regarding Provision 52. These steps include: onboarding staff to fill vacant positions (completion date unclear and ongoing); allocation of designated staff to complete all HOH intakes at CRDF (completed October 2022); allocation of staff on weekends to identify and assign incoming HOH patients to be seen for follow up (completed October 2022); weekly reports by supervisors on their progress training each staff on the expectations for Provision 52 (completed May 2023); CHS posting information outlining the requirements of Provision 52 in areas frequented by staff (completed January 2023); staff members signing acknowledgement that they understand the requirements of Provision 52 (completed May 2023); program-wide training of provision guidelines to clarify for clinical staff what documentation reflects adequate justification of restrictions (completed February 2022); additional guidance to clinicians identified via audits who are struggling with documentation (Completed May 2023 and ongoing); CCSB working with CCS to ensure dissemination of an information bulletin advising custody personnel of proper procedures for usage of "Inmate Property Door Signs" for inmates in HOH (completed March 2022); revised duty statements for Deputies and Custody Assistants to reflect responsibility for updating allowable property restriction door signs (completed January 2022); and weekly module spot checks for at least 10 cells (completion date unclear).

These steps did not consistently show up in the County's results for the Sixteenth Reporting Period. Yet, the County sounds an optimistic note in its Augmented Sixteenth Self-Assessment.

the County has made significant progress with Provision 52 compliance in recent months, which it believes will be reflected in improvements in compliance audits for future quarters. As of May 2023, for instance, the County completed additional training regarding the expectations for compliance with this provision. That training will be provided to all staff, both when they first start and on an ongoing basis as needs are identified.

Additionally, staff members are now required to sign an acknowledgement
that they understand Provision 52's requirements before accepting new
HOH patients. To help reinforce this training, the County has also
disseminated an information bulletin advising custody personnel of proper
procedures for the usage of "Inmate Property Door Signs."

The County has also recognized the need for targeted improvement with
documentation with respect to this provision. This is particularly true
because the County applies such an exacting standard in assessing this
provision. Accordingly, in May 2023, the County began to perform chart
audits to identify clinicians who are struggling with documentation to
provide further targeted training. To the extent any clinician is repeatedly
identified in these audits, the County will also consider sending that
clinician a letter of warning and consider other interventions. Finally, the
Access to Care Team has begun performing spot checks of cells, and if a
cell is deemed to be out of compliance, corrective actions are being taken
immediately, including subsequent heightened oversight of that cell and a
corrective action plan concerning that cell.

The County believes that these numerous recent actions will significantly
improve future compliance with Provision 52.

53.     If otherwise eligible for an education, work, or similar program, a prisoner's mental health diagnosis or prescription for medication alone will not preclude that prisoner from participating in said programming.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of January 1, 2023, through March 31, 2023 (unverified))**

Substantial Compliance requires the Department to audit the records of prisoners who were eligible, but rejected or disqualified, for education and work programs to confirm that they were not rejected or disqualified because of a mental health diagnosis or prescription for medication alone.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 53 by June 30, 2024.

The County's Sixteenth Self-Assessment reports that 72% of the eligible mentally ill prisoners who were denied education or work in the Fourth Quarter of 2022 and 93% in the First Quarter of 2023 were denied "for reasons other than a mental health diagnosis or medication prescription."  The County further reported that "in the interest of completeness and transparency, the Department determined that in every case where a person's request for programming was not handled in a timely manner, it should be treated as a denial of programming within the Meaning of Provision 53—that is, a denial based on a mental health diagnosis or medication prescription."  The reported results for the First Quarter of 2023 are subject to verification by the Monitor's auditors.

According to the County's implementation plan tracker, the County has already completed all seven corrective action steps regarding Provision 53.  These include: hiring a new staff member at CRDF to process requests from incarcerated individuals (completed February 2022); on a weekly basis, CRDF and MCJ staff identify requests pending for more than 15 days, reviewing denials under the provision, and determining whether training or other measures are appropriate (completion date unclear); using a new housing matrix at MCJ that identifies every mental health housing location with inmate information to facilitate decision making (completed February 2022); CCSB evaluating 10 random requests on a monthly basis (completion date unclear and ongoing); weekly meetings between facility grievance teams and PPO team regarding responses to requests (completed First Quarter of 2023); rebuild CARTS system to allow staff to identify pending requests (completed June 2023); and CCSB meeting with PMB and PPO staff to provide guidance on the compliance requirements of Provision 53 (completed January 2022).

The County's Augmented Sixteenth Self-Assessment also reports

the County has also completed a rebuild of CARTS (Custody Automated Reporting and Tracking System) which went live on June 1, 2023, and provides warnings at the 5, 10, and 15 day mark for responses to grievances. Grievance teams [are] in place in each of the facilities and actively review denials.

54.     Prisoners who are not in Mental Health Housing will not be denied privileges and programming based solely on their mental health status or prescription for psychotropic medication.

> **STATUS:     SUBSTANTIAL COMPLIANCE (as of January 1, 2023, through March 31, 2023 (unverified))**

Substantial Compliance under the revised Compliance Measures for Paragraph 54, effective January 1, 2018, requires the Department to audit the records of a maximum of 100 randomly selected prisoners identified on the Wednesday Pharmacy List as having received psychotropic medication to confirm that no more than 10% were rejected or disqualified because of a mental health diagnosis or prescription for psychotropic medication alone.  Because the Monitor's auditors had verified that the County had maintained Substantial Compliance under the original Compliance Measures, the parties agreed that the County will only be required to maintain Substantial Compliance under the revised Compliance Measures for two additional quarters.

The County's Sixteenth Self-Assessment reports that in the Fourth Quarter of 2022, 45% of inmates "were denied requests improperly for the purposes of this Provision."  It further reports that in the First Quarter of 2023, none of the denials "were based on the person's mental health status or prescription for psychotropic medication. Furthermore, CCSB reported that in the sample there were no inmates who had visits canceled solely due to their mental health status or prescription for psychotropic medication."  The results for the First Quarter of 2023 are subject to verification by the Monitor's auditors.[39]

---

[39] In the Augmented Sixteenth Self-Assessment, the County reports several issues with the gathering of the necessary data for auditing Provision 54 for the First Quarter of 2023.  The Monitor believes that the approach being taken by the County is reasonable but agrees that in future self-assessments, "the County will report on efforts to ensure that it is using a comprehensive data set for analysis under this provision, and will also detail the steps it has taken to assure timely responses to inmate requests."

55.     Relevant custody, medical, and mental health staff in all High Observation Housing units will meet on normal business work days and such staff in all Moderate Observation Housing units will meet at least weekly to ensure coordination and communication regarding the needs of prisoners in mental health housing units as outlined in Custody Services Division Directive(s) regarding coordination of mental health treatment and housing.  When a custody staff member is serving as a member of a treatment team, he or she is subject to the same confidentiality rules and regulations as any other member of the treatment team, and will be trained in those rules and regulations.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of October 1, 2016, through September 30, 2017 (verified) at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at PDC North)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 (verified) at MCJ)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2019, through June 30, 2020 (verified) at TTCF)**

The Department maintained Substantial Compliance for twelve consecutive months at all facilities as of June 30, 2020.  These results have now been verified by the Monitor's auditors.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 55 in the Sixteenth Reporting Period.

56.     Consistent with existing DMH and Sheriff's Department policies, the County and the Sheriff will ensure that custody, medical, and mental health staff communicate regarding any change in a prisoner's housing assignment following a suicide threat, gesture, or attempt, or other indication of an obvious and serious change in mental health condition.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of January 1, 2016,
through December 31, 2016 (verified))**

Substantial Compliance requires the Department to review in randomly selected periods the electronic medical records of (1) prisoners admitted to HOH following a suicide threat, gesture, or attempt, or other indication of an obvious and serious change in mental health condition to determine if the medical and/or mental health staff approved the placement of the prisoner in HOH; and (2) prisoners who were the subject of a suicide attempt notification to determine if the prisoners were clinically assessed and that clinical staff approved the post-incident housing.

The County's Substantial Compliance results for the twelve months from January 1, 2016, through December 31, 2016, were verified by the Monitor's auditors. Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 56 in the Sixteenth Reporting Period.

57 (**Revised**).  Within three months of the Effective Date, the County and the Sheriff will revise and implement their policies on safety checks to ensure a range of supervision for prisoners housed in Mental Health Housing.  The County and the Sheriff will ensure that safety checks in Mental Health Housing are completed and documented in accordance with policy and regulatory requirements as set forth below:

    (a)    Custody staff will conduct safety checks in a manner that allows staff to view the prisoner to assure his or her well-being and security.  Safety checks involve visual observation and, if necessary to determine the prisoner's well-being, verbal interaction with the prisoner;

    (b)    Custody staff will document their checks in a format that does not have pre-printed times;

    (c)    Custody staff will stagger checks to minimize prisoners' ability to plan around anticipated checks;

    (d)    Video surveillance may not be used to replace rounds and supervision by custodial staff unless new construction is built specifically with constant video surveillance enhancements and could only be used to replace the required safety checks in non-FIP housing, subject to approval by the Monitor;

    (e)    A QMHP, in coordination with custody (and medical staff if necessary), will determine mental health housing assignments; and

    (f)    Supervision of prisoners in mental health housing will be conducted at the following intervals:

        (i)    FIP:  Custody staff will perform safety checks every 15 minutes.  DMH staff will perform direct constant observation or one-to-one observation when determined to be clinically appropriate;

        (ii)    High Observation Housing:  Every 15 minutes;

        (iii)    Moderate Observation Housing:  Every 30 minutes.

**STATUS (57):**       **SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at MCJ)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2021, through June 30, 2022 (verified) at PDC North)**

**NON-COMPLIANCE (at TTCF and CRDF)**

On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provision 57 ("Revised Paragraph 57") as set forth above.  The Parties also agreed on Revised Compliance Measures.  Substantial Compliance requires the Department to audit the Title 15 Dashboard records (or e-UDAL records if the Title 15 scanner was not working) for all shifts for each module in each mental health housing unit in two randomly selected weeks to determine if the safety checks were staggered and conducted as required by Paragraph 57 of the Agreement, and to audit the housing records for each mental health housing unit for a randomly selected week to determine if QMHPs approved the new mental health housing assignments as required by Paragraph 57(e).  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 57 by June 30, 2024.

The County's Sixth Self-Assessment reported that it maintained Substantial Compliance with Compliance Measure 57-5(b) in the Fourth Quarter of 2017 and the First Quarter of 2018 in the MOH unit at MCJ (the "Hope Dorm").  It also reported that all of the inmates at MCJ "analyzed pursuant to Compliance Measure 57-5(c) had received QMHP approval for their housing assignments" in both quarters.  The results were verified by the Monitor's auditors and MCJ was not subject to monitoring for compliance with Paragraph 57 in the Fifteenth Reporting Period.

The County's Sixteenth Self-Assessment reports that 28.8% of the safety checks were in compliance with Compliance Measure 57-5(b) (safety checks in FIP) in the Fourth Quarter of 2022 at TTCF.  It also reports that 15.3% of the safety checks were in compliance with Compliance Measure 57-5(c) (safety checks in HOH) at TTCF.  The County also reports that .01% of the safety checks complied with Compliance Measure 57-5(d) (safety checks in MOH) at TTCF.  97% of the new mental health housing assignments at TTCF were approved by a QMHP in the Fourth Quarter of 2022.

The County's Sixteenth Self-Assessment also reports that .08% of the safety checks were in compliance with Compliance Measure 57-5(c) (safety checks in HOH) in the Fourth Quarter of 2022 at CRDF.  The County also reports that .09% of the safety checks complied with Compliance Measure 57-5(d) (safety checks in MOH) at CRDF. 100% of the new mental health housing assignments at CRDF were approved by a QMHP in the Fourth Quarter of 2022.

The County's Augmented Sixteenth Self-Assessment reports that 3.3% of the safety checks were in compliance with Compliance Measure 57-5(c) (safety checks in

HOH) in the First Quarter of 2023 at CRDF.  The County also reports that 5.3% of the safety checks complied with Compliance Measure 57-5(d) (safety checks in MOH) at CRDF.  100% of the new mental health housing assignments at CRDF were approved by a QMHP in the First Quarter of 2023.

The County's Augmented Sixteenth Self-Assessment also reports that 40.6% of the safety checks were in compliance with Compliance Measure 57-5(b) (safety checks in FIP) in the First Quarter of 2023 at TTCF.  It also reports that 8.9% of the safety checks were in compliance with Compliance Measure 57-5(c) (safety checks in HOH) at TTCF.  The County also reports that 0% of the safety checks complied with Compliance Measure 57-5(d) (safety checks in MOH) at TTCF.  100% of the new mental health housing assignments at TTCF were approved by a QMHP in the First Quarter of 2023.[40]

Regarding these results, the County reports that there are various technological problems with its scanning system, some of which have been reported before.  This includes "numerous Wi-Fi, server, docking station, and scanner device issues that impact the County's results."  The County also reports

> that there are likely other alarming data upload and reporting problems that [*sic*] beyond the hardware problems identified and addressed in March 2023. Indeed, the percentages of compliance reported by the BREAVA system are so low that the County suspected that the BREAVA reporting system cannot or does not accurately capture those safety checks that may comply, and thus the results from the BREAVA system understate compliance and do not effectively isolate obstacles to compliance for troubleshooting.

The County engaged in a manual review of video to determine the nature and extent of these issues, which revealed that many safety checks that were actually being conducted were not being recorded within the BREAVA system.[41]  The County reports that it is now attempting to "troubleshoot to identify the underlying source(s) that have hampered our ability to accurately report the Title 15 safety checks."  CCSB is also "developing a memorandum to not only inform the involved parties of the latest assessment results, but also to request a Corrective Action Plan (CAP) to re-brief personnel on how to properly conduct and document Title 15 safety checks."  Further, "the County continues to explore new modern systems," including recent meetings with three companies that could provide "alternative Title 15 compliance systems."

---

[40] Given its sustained history of compliance with Provision 57-5(e), the County has requested that the Monitor find the County no longer subject to monitoring for that portion of Provision 57.  Given that the County must comply with the entire provision to be relieved of its obligations with respect to that provision, the Monitor declines this request.

[41] The County noted "to take one extreme example, for the two randomly selected weeks audited in the First Quarter of 2023, the County reported that of 2,016 required safety checks in Twin Towers MOH modules, the BREAVA reporting system indicated that zero were performed in [a] compliant fashion. Even if one were deliberately seeking to perform untimely checks across more than 2,000 intervals in the audited period, it would be mathematically challenging to avoid a compliant check at some point unless checks were not conducted at all."

The County has reported various technological problems with the BREAVA system since the Fourteenth Reporting Period.  The Monitor believes that in the Sixteenth Reporting Period, the County engaged in a good-faith, useful effort to determine the accuracy of that system, which appeared to be conclusive: the system as currently operating does not work and cannot reliably capture information about whether safety checks are being conducted in conformity with Provision 57.

The County's Court-ordered Substantial Compliance deadline of June 30, 2024, for Provision 57 is fast approaching.  Given the inevitable delays in planning for, researching, acquiring, and implementing new data systems, the Monitor recommends that the County move aggressively to determine whether the existing system can be fixed, and if not, to make expeditious plans to acquire a new system.  In the Seventeenth Self-Assessment—if not before—the County should share additional information about how it has answered these questions and any revised implementation plan for Provision 57 that may be necessary.

According to the County's implementation plan tracker, the County has completed 23 out of 31 corrective action steps regarding Provisions 57 and 58.  These steps include: having safety check teams solely focus on performing timely and quality safety checks (completed January 2014); facilities re-briefing staff on properly recording safety checks when the scanners or network are down (completed March 2023); shifting audits to be documented in a new Custody Watch Commander Log (completed July 2021); providing rosters or SMS acknowledgements of which staff received training (completed March 2022); rebriefing staff regarding key areas of improvement every six months (completed January 2023 and ongoing); facilities determining and using scanners that work properly (completed March 2023); sending problematic iPods and scanners to CITU and CAU to be examined and reprogrammed (completed March 2023); TTCF modifications to improve Wi-Fi coverage (completed January 2022); and obtaining the number of additional access points needed at PDC, MCJ, and CRDF (completion date unclear).

The County's implementation plan tracker reflects that the remaining eight uncompleted corrective action steps for Provisions 57 and 58 include:  facility operations being responsible for monitoring safety checks on a weekly basis and updating CCSB on their findings; CCSB conducting a weekly audit of the logs and informing the respective Operations Staff if there are any issues; CCSB, in collaboration with CSB and CITU, conducting a new pilot program with a scanning device suitable for all facilities, with the new device being chosen by July 2022; CCSB conducting video audits of no data is recorded on the BREAVA during an official assessment; Operations Staff identifying which locations in their facility have the worst coverage and resolving those issues, including by submitting maintenance requests; CCSB verifying with audits if WiFi coverage has improved; identification of staff members who have been assessed to have had multiple non-compliant safety check rounds so they can be counseled; and identification of modules or floors with lowest compliance rates so the safety teams can be restructured in those targeted areas.

The County maintained Substantial Compliance with Paragraph 57 for twelve consecutive months at PDC North as of June 30, 2022.  These results have been verified by the Monitor's auditors.  Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring at PDC North for Substantial Compliance with Paragraph 57 in the Sixteenth Reporting Period.

58.     Within three months of the Effective Date, the County and the Sheriff will revise and implement their policies on safety checks.  The County and the Sheriff will ensure that safety checks in non-mental health housing units are completed and documented in accordance with policy and regulatory requirements as set forth below:

(a)     At least every 30 minutes in housing areas with cells;

(b)     At least every 30 minutes in dormitory-style housing units where the unit does not provide for unobstructed direct supervision of prisoners from a security control room;

(c)     Where a dormitory-style housing unit does provide for unobstructed direct supervision of prisoners, safety checks must be completed inside the unit at least every 60 minutes;

(d)     At least every 60 minutes in designated minimum security dormitory housing at PDC South, or other similar campus-style unlocked dormitory housing;

(e)     Custody staff will conduct safety checks in a manner that allows staff to view the prisoner to assure his or her well-being and security.  Safety checks involve visual observation and, if necessary to determine the prisoner's well-being, verbal interaction with the prisoner;

(f)     Custody staff will document their checks in a format that does not have pre-printed times;

(g)     Custody staff will stagger checks to minimize prisoners' ability to plan around anticipated checks; and

(h)     Video surveillance may not be used to replace rounds and supervision by custodial staff.

**STATUS (58):**          **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at PDC South, PDC North, and PDC East)**

**SUBSTANTIAL COMPLIANCE ( as of July 1, 2017, through June 30, 2018 (verified) at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at IRC)**

**PARTIAL COMPLIANCE (at NCCF and MCJ)**

**NON-COMPLIANCE (at TTCF)**

Substantial Compliance requires the Department to audit the Title 15 Dashboard records (or e-UDAL records) for all shifts for each module in each housing unit to determine if the safety checks were staggered and conducted as required by Paragraph 58. The threshold for achieving Substantial Compliance with each of the Compliance Measures is 90%. On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 58 by June 30, 2024.

The County maintained Substantial Compliance with Paragraph 58 for twelve consecutive months at PDC South, PDC North, and PDC East as of December 31, 2016, at CRDF as of June 30, 2018, and at IRC as of September 30, 2018. These results have been verified by the Monitor's auditors. Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring at those facilities for Substantial Compliance with Paragraph 58 in the Sixteenth Reporting Period.

The County's Augmented Sixteenth Self-Assessment reports that for the Fourth Quarter of 2022 and First Quarter of 2023, the following percentages of safety checks were in compliance with Paragraph 58: at TTCF (54.7% and 14.2%), at MCJ (20.7% and 62.3%), and at NCCF (90% and 86.5%). As with Provision 57, the County reports that its results are hampered by "technological issues centering on the scanning system hardware, the electronic reporting system, known as BREAVA, and the practical implementation of physically scanning each location during the safety check walk." The County contends that its "audit results therefore do not reflect the true percentage of the visual safety checks actually performed. If and when the scanning technology is working, a more accurate percentage of timely checks would be returned from the Title 15 Dashboard."

To address these issues, the County reports that it is "taking action" on a facility-by-facility basis, including by enhancing "supervision and monitoring," purchasing new scanners and batteries, doing an IT walkthrough to correct "Wi-Fi, server, docking station, and scanner device issues," requesting a corrective action plan, and at NCCF, adding a sergeant and senior deputy to monitor safety checks. It also "continues to

explore new modern systems," including recent meetings with three companies that could provide "alternative Title 15 compliance systems."

As noted regarding Provision 57, the County has been reporting various technological problems with the BREAVA system since the Fourteenth Reporting Period. The County's Court-ordered Substantial Compliance deadline of June 30, 2024, for Provision 58 is fast approaching.  Given the inevitable delays in planning for, researching, acquiring, and implementing new data systems, the Monitor recommends that the County move aggressively to determine whether the existing system can be fixed, and if not, to make expeditious plans to acquire a new system.  In the Seventeenth Self-Assessment—if not before—the County should share additional information about how it has answered these questions and any revised implementation plan for Provision 58 that may be necessary.

According to the County's implementation plan tracker, the County has completed 23 out of 31 corrective action steps regarding Provisions 57 and 58.  These steps include: having safety check teams solely focus on performing timely and quality safety checks (completed January 2014); facilities re-briefing staff on properly recording safety checks when the scanners or network are down (completed March 2023); shifting audits to be documented in a new Custody Watch Commander Log (completed July 2021); providing rosters or SMS acknowledgments of which staff received training (completed March 2022); rebriefing staff regarding key areas of improvement every six months (completed January 2023 and ongoing); facilities determining and using scanners that work properly (completed March 2023); sending problematic iPods and scanners to CITU and CAU to be examined and reprogrammed (completed March 2023); TTCF modifications to improve Wi-Fi coverage (completed January 2022); and obtaining the number of additional access points needed at PDC, MCJ, and CRDF (completion date unclear).

The County's implementation plan tracker reflects that the remaining eight uncompleted corrective action steps for Provisions 57 and 58 include:  facility operations being responsible for monitoring safety checks on a weekly basis and updating CCSB on their findings; CCSB conducting a weekly audit of the logs and informing the respective Operations Staff if there are any issues; CCSB, in collaboration with CSB and CITU, conducting a new pilot program with a scanning device suitable for all facilities, with the new device being chosen by July 2022; CCSB conducting video audits of no data is recorded on the BREAVA during an official assessment; Operations Staff identifying which locations in their facility have the worst coverage and resolving those issues, including by submitting maintenance requests; CCSB verifying with audits if WiFi coverage has improved; identification of staff members who have been assessed to have had multiple non-compliant safety check rounds so they can be counseled; and identification of modules or floors with lowest compliance rates so the safety teams can be restructured in those targeted areas.

59.     Consistent with existing Sheriff's Department policies regarding uniform daily activity logs, the County and the Sheriff will ensure that a custodial supervisor conducts unannounced daily rounds on each shift in the prisoner housing units to ensure custodial staff conduct necessary safety checks and document their rounds.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of January 1, 2017, through December 31, 2017 (verified) at PDC East and MCJ)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2018, through December 31, 2018 (verified) at PDC North and PDC South)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 (verified) at TTCF)**

Substantial Compliance requires the Department to audit e-UDAL records for housing units in each facility to determine if supervisors are conducting unannounced daily rounds in accordance with Paragraph 59.  In response to the Monitor's comments, the Department's e-UDAL forms were modified to include a specific notation that the Supervisor verified that the safety checks were conducted.  The threshold for achieving and maintaining Substantial Compliance is that 90% of the supervisor daily rounds were in compliance with the requirements of Paragraph 59.

The County's Substantial Compliance results were verified by the Monitor's auditors.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 59 in the Sixteenth Reporting Period.

60.      Within six months of the Effective Date, the Department of Mental Health, in cooperation with the Sheriff's Unit described in Paragraph 77 of this Agreement, will implement a quality improvement program to identify and address clinical issues that place prisoners at significant risk of suicide or self-injurious behavior.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of April 1, 2019 through March 31, 2020)**

Paragraph 60 requires the County to "implement a quality improvement program to identify and address clinical issues that place prisoners at significant risk of suicide or self-injurious behavior."  The Compliance Measures for Paragraph 60 require the County to "identify and address. . .clinical issues" in the areas identified in Paragraph 61 of the Agreement" and corrective actions are taken to address "such issues."  See Compliance Measures 60.1, 60.2(a), and 60.3(b).

The Monitor and the Mental Health Subject Matter previously agreed that the Department had demonstrated "a sound quality improvement process and the ability to demonstrate that process through specific quality improvement projects directed by management," and the Monitor finds that the County had demonstrated that it maintained Substantial Compliance with Paragraph 60.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 60 in the Sixteenth Reporting Period.[42]

---

[42] The County has acknowledged that its ongoing Quality Improvement efforts will remain subject to monitoring under other provisions of the Settlement Agreement.

61.     The quality improvement program will review, collect, and aggregate data
in the following areas and recommend corrective actions and systemic improvements:

(a)     Suicides and serious suicide attempts:

        (i)     Prior suicide attempts or other serious self-injurious behavior
        (ii)    Locations
        (iii)   Method
        (iv)    Lethality
        (v)     Demographic information
        (vi)    Proximity to court date;

(b)     Use of clinical restraints;

(c)     Psychotropic medications;

(d)     Access to care, timeliness of service, and utilization of the Forensic In-
        patient Unit; and

(e)     Elements of documentation and use of medical records.

**STATUS:        PARTIAL COMPLIANCE**

Substantial Compliance requires the County's semi-annual reports to (a) review,
collect, and aggregate data in the areas set forth in Paragraph 61; (b) recommend
corrective actions and systemic improvements in those areas; and (c) assess the
effectiveness of actions and improvements in prior reporting periods. On December 27,
2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No.
234, which requires Defendants to achieve Substantial Compliance with Provision 61 by
June 30, 2024.

On July 13, 2023, the County posted the Correctional Health Services and
Custody Compliance & Sustainability Bureau Combined Semi-Annual Report on Quality
Improvement and Suicide Prevention Efforts – Quarter 4 2022 & Quarter 1 2023
("Combined Suicide Prevention Report"), which relates to Paragraphs 60, 61, 62, and 77.
The Combined Suicide Prevention Report sets forth aggregate data for the 35 suicides
that occurred between 2015 and the end of the First Quarter of 2023, and 162 critical
incidents that occurred between 2016 and the end of the First Quarter of 2023, broken
down by the subparts of Paragraph 61(a).

The Fifteenth Report noted progress made by the County with respect to
Provision 61 in several areas. First, it noted that the Department had undertaken a
"number of analytical projects undertaken to understand correlates or causes of suicide.
That is, the Department has improved its ability to not merely aggregate data about trends
in self-harm, but to analyze that data to mitigate suicide risks in the jails. It also includes
an analysis of self-directed violence in the IRC and cutting incidents, which builds upon

the Department's other recent projects evaluating hanging and the recent "Covid Cohort" of suicides."

It also praised the Department for beginning to "use and reference baseline population data to better identify concerning trends." This included rates of suicide against baselines for gender, ethnicity, and age, and rates of cutting by facility against the average daily population of each facility. "We were pleased to see this baseline data, which is analytically useful, and encourage the Department to include additional baseline data in its subsequent reports." The Combined Suicide Prevention Report again included some baseline population data, particularly related to race, ethnicity, age, gender, and location. However, many other data points included in the report would also benefit from baseline data to determine their significance related to risks of inmate suicide or other self-directed violence.[43]

The Fifteenth Report also noted "several outstanding needs for compliance with Provision 61. First, in its Self-Assessments, the County has attributed some of its challenges with the QI provisions to CCSB's long-vacant analyst position, which has been noted in four years of Monitoring Reports. Puzzlingly, the County continues to be unable to fill this position despite its continued recognition that such an analyst is necessary for its compliance. . . . Although the Combined Suicide Prevention Report holds responsible the County's own rules for preventing the hiring of the necessary analyst, it does not indicate what efforts the County, which is bound by the Agreement, has taken to relax those rules in order to allow a new analyst to be hired. It should include such information in the next Self-Assessment or a specific explanation of why the County cannot do so." In the Augmented Sixteenth Self-Assessment, the County reports that

> Custody Division executives directed CCSB to draft a memorandum requesting that the statistical analyst item be filled as soon as is practicable. CCSB's captain completed and submitted this memorandum the week of August 7, 2023. Once this this [*sic*] request is approved by Custody Division executives, the process of hiring an analyst to re-assume this role will be a priority for the Department.

The County has subsequently indicated that the position has been approved, interviews conducted, and a candidate selected to fill the position. The Monitor appreciates that the County has taken steps towards filling this long-vacant position. The County's compliance with Provision 61 will depend, in part, upon having sufficient

---

[43] This includes, for example, Figures: 2.5 (Suicide by Type of Housing), 2.12 (Suicides Within One Week Before/After Court Date), 2.13 (Suicide: Client Charges), 2.15 (Type of Security Level), 2.17 (Client P-Level), 2.18 (Clients Receiving Psychotropic Medication), 2.20 (Suicide: Outside Facility by Age), 2.21 (Suicide: Outside Facility by Ethnicity), 2.22 (Suicide: Outside Facility Charge Descriptions), 3.4 (Critical Incidents Prior Documented Attempts), 3.5 (Critical Incidents Proximity to Court Date), 3.6 (Critical Incidents by Age), 3.7 (Critical Incidents by Ethnicity), 3.8 (Critical Incidents by Ethnicity), 3.9 (Critical Incidents by Gender), 3.10 (Self-Directed Violence by Year), 3.11 (SDV Incidents by Location), 3.14 (Self-Directed Violence by Age), 3.15 (Self-Directed Violence by Ethnicity), and 3.16 (Self-Directed Violence by Gender).

qualified staff to perform the necessary analysis for compliance.  In the Seventeenth Self-Assessment, the County should include an evaluation of the number and type of analytical staff members necessary for compliance, and a specific description of the steps taken to onboard such staff during the Reporting Period.

The Fifteenth Report also noted that "the data continue to reveal troubling trends in suicide attempt and SDV that are not yet being analyzed to drive corrective actions in the Department."  This included the large proportional increase in the number of suicides at MCJ, and the outsize number of cutting incidents among the total number of inmate SDV episodes. While the Department noted these trends, "the Combined Suicide Prevention Report does not take the next necessary step of 'recommend[ing] corrective actions and systemic improvements' to address this problem as the Compliance Measures require."  Similarly, the data clearly show that proximity to court is correlated with higher risks of suicide attempts, particularly in criminal cases related to felony crimes against persons.  While the report noted this trend, no steps to address it were discussed.

In response to this feedback, the County reports that Dr. Sean Henderson, CHS's Medical Director, "recently assumed leadership of JQIC initiatives."  In order to enhance the Department's ability to perform the requisite analysis, "Dr. Henderson and his team developed a project template that identifies: (1) a title for a project that is simple, focused, relevant to patient care and doable within 4-6 weeks; (2) team members who will be responsible for completing the project; (3) a problem statement that describes what the issue is, how it was discovered, and why it is important to solve, all premised on current baseline data; and (4) a results section that assess whether an initiative has been accomplished, what the outcome of the initiative has been, and 'balance measures'—that is, whether the resources devoted to the project have degraded performance in other areas."

The Monitor believes that centralizing responsibility for QI/QA initiatives may be a useful change.  The Monitor reiterates that while the Combined Suicide Prevention Report often notes trends in inmate suicide and self-harm, it often does not identify corresponding corrective actions and systemic improvements.  In the Combined Suicide Prevention Report for the Sixteenth Reporting Period, for example, the Department notes in passing that "an additional factor that has been associated with increased inmate risk is a recent substance abuse history" but it provides no further, substantive analysis of the data leading to this conclusion, nor any steps to mitigate it.[44]

Similarly, it notes that for completed suicides, "although most of these inmates were not in Mental Health housing or on psychotropic medication, the majority had been seen by a mental health clinician."  The finding, again mentioned briefly, should prompt additional inquiry about this cohort, and whether a subsequent review of their treatment record, mental health levels of care, and housing assignments revealed other opportunities for earlier identification of suicidality.  Some of this analysis is accomplished in the individual death reviews of each suicide, but examining the cohort in the aggregate may lead to useful insights and interventions to reduce suicide risk.

---

[44] *See* Combined Suicide Prevention Report at 13.

Similarly, the DOJ rightly notes that inmates over the age of 40 are at a proportionally greater risk of suicide, which is noted by the County but not analyzed.

In contrast, the Combined Suicide Prevention Report is much more effective at identifying risks and corresponding Corrective Actions that flow obviously from individual suicides (as opposed to the aggregate self-harm data). For example, it effectively documents the multiple suicides that occurred in the CTC by hanging, and commendably notes a series of physical plant changes that the Department has already undertaken to reduce those risks, including modifying shower heads and removing shower doors that obscured site lines for Title 15 safety checks.[45]  The Department should employ this same approach to its analysis of aggregate data generated through the QA/QI program.

The Department continued to demonstrate progress in its QI efforts during the Sixteenth Reporting Period.  Continuing to enhance the quality and depth of the analysis performed by the QI program, as set forth above, should enable the Department to expeditiously achieve substantial compliance with Provision 61.

---

[45] The Monitor notes that Title 15 safety checks are inextricably linked to the Department's suicide prevention efforts and, as set forth in the discussion of Provisions 57 and 58 in this Report, the County cannot at this time demonstrate that it is adequately conducting those checks.  The Monitor encourages the County to resolve the compliance issues with Provisions 57 and 58 expeditiously to ensure that its suicide prevention programs are as effective as possible.

62.     The County and the Sheriff's Unit described in Paragraph 77 of this Agreement will develop, implement, and track corrective action plans addressing recommendations of the quality improvement program.

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance requires the County's semi-annual Self-Assessments to set forth (a) the "development of corrective action plans to address the most recent recommendations of the quality improvement program;" and (b) the "implementation and tracking of corrective action plans to address recommendations of the program in prior quarters."  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 62 by June 30, 2024.

On July 13, 2023, the County posted the Correctional Health Services and Custody Compliance & Sustainability Bureau Combined Semi-Annual Report on Quality Improvement and Suicide Prevention Efforts – Quarter 4 2022 & Quarter 1 2023 ("Combined Suicide Prevention Report"), which relates to Paragraphs 60, 61, 62, and 77. The Combined Suicide Prevention Report sets forth aggregate data for the 35 suicides that occurred between 2015 and the end of the First Quarter of 2023, and 162 critical incidents that occurred between 2016 and the end of the First Quarter of 2023, broken down by the subparts of Paragraph 61(a).

In the Fifteenth Report, the Monitor noted that the County had built a tool for tracking CAPs in an Excel database, which went into use on January 1, 2023.  It was summarized, including a dashboard, which provides overall statistics and an "overview of the projects at a glance.  It compiles how many CAPs there are, their status (Not Started, In Progress, On Hold), and other information."  The Department describes the process of entering a CAP, the available data fields, and the relevant search functions.  The Monitor and Mental Health Team met with CHS representatives in January 2023 to review the CAP tracker, and we were favorably impressed by its usability and functionality.  We recommended then, and reiterate here, that the CAP tracker should be used for all CAPs generated as a result of the Department's QI processes, including CAPs generated through the systemic reviews conducted by the Department's JQIC committee, and not limited to CAPs arising from the review of critical incidents.

The Augmented Sixteenth Self-Assessment did not provide further information about this CAP tracker, which the County should do in its next Self-Assessment.[46]

---

[46] The Monitor has also requested a meeting with County personnel to inspect and review the CAP tracker, which has not yet been scheduled.

63.     The County and the Sheriff will maintain adequate High Observation Housing and Moderate Observation Housing sufficient to meet the needs of the jail population with mental illness, as assessed by the County and the Sheriff on an ongoing basis.  The County will continue its practice of placing prisoners with mental illness in the least restrictive setting consistent with their clinical needs.

**STATUS:**     **PARTIAL COMPLIANCE (at CRDF)**

**NON-COMPLIANCE (at TTCF)**

The Parties agreed on Revised Compliance Measures in 2021.  The Revised Compliance Measures require that 90% of inmates waited for permanent HOH and MOH housing for no more than 7 days, and that 100% of inmates waited for permanent HOH and MOH housing for no more than 30 days.

On December 27, 2022, and on April 20, 2023, the Court issued Orders Setting Deadlines for Substantial Compliance, ECF No. 234 and 248, respectively, which established specific deadlines for Defendants to "improve compliance with provisions 63, 64, and 80."  With respect to Provision 63, the December 2022 Order established deadlines for Defendants to take a series of "agreed-upon actions to improve compliance,"[47] while the April 2023 Order established incremental targets for the Defendants' overall compliance with Provision 63 by the end of each quarter.

*Figure 3:  Quarterly Court-Ordered Targets for Provision 63 Compliance*

| | % of Inmates Waiting ≤ 7 Days in MH Housing Intake Areas Before Transfer to Permanent MH Housing | Average Wait Time |
|---|---|---|
| **2Q2023** | 60% | 10 days |
| **3Q2023** | 65% | 9 days |
| **4Q2023** | 70% | 8 days |
| **1Q2024** | 75% | 7 days |
| **2Q2024** | 80% | 7 days |
| **3Q2024** | 85% | 7 days |
| **4Q2024** | 90% | 7 days |

---

[47] For example, it required Defendants to complete the conversion of PDC North to an all-MOH facility by July 31, 2023, to obtain the licensure by February 28, 2023 for, and thereafter begin operating a psychiatric urgent care unit with at least 20 beds, to expand the number of FIP Stepdown units incrementally until 30 Stepdown pods are operating in June 2025, to provide proof that at least 750 individuals are receiving treatment through the Medication Assisted Treatment program by June 30, 2023 and 1,500 by June 30, 2024, and to take various steps to expand the amount of out-of-cell time provided to HOH patients.

The County's Sixteenth Self-Assessment includes results for the Fourth Quarter of 2022 under the Revised Compliance Measures.  It reports that in the relevant weeks, "38.06% of inmates at TTCF waited fewer than 7 days for permanent mental health housing."  The County further reported that 92.26% of inmates received permanent mental health housing within 30 days.  At CRDF, "57.95% of inmates at CRDF waited fewer than 7 days for permanent mental health housing."  Further 100% of inmates received permanent mental health housing within 30 days.

The County's Augmented Sixteenth Self-Assessment also reports that in the First Quarter of 2023, "67.07% of inmates at CRDF waited fewer than 7 days for permanent mental health housing."  100% of inmates received permanent mental health housing within 30 days.  Regarding TTCF, the County does not report compliance data for the First Quarter of 2023.  Instead, it reports

> Reliable data does not exist to provide an accurate self-assessment of the Department's performance in satisfying Provision 63's requirements for Q1 of 2023. As explained below, the Department's current deficiencies in accurately tracking its compliance with Provision 63's requirements are being addressed through the creation and implementation of the Department's Mental Health Intake Tracker ("MHIT") application, which is scheduled to be operational in the coming weeks.

Given the Department's reported results, the County is Partially Compliant at CRDF and Non-Compliant at TTCF with Provision 63 for the Sixteenth Reporting Period.

The County has struggled to comply with Provision 63 for years and has been either Non-Compliant or Partially Compliant with the provision since the execution of the Agreement in 2015.  The explanations for the County's struggles to comply have often turned on the dramatic expansion in the number of inmates with serious mental illness in the County's custody during those years.[48]  The Monitor agrees that these population-level changes have undoubtedly been a factor.  However, the Monitor made several concerning findings during a recent site visit that also appear to have played a role in the County's struggles under Provision 63.

In a monitoring visit conducted in June 2023, the Monitor and Subject Matter Expert Susan McCampbell met with representatives of the LASD Population Management Bureau ("PMB") and Central Housing Unit ("CHU"), and sworn staff from HOH pods, to investigate the causes of the persistent delays in moving HOH patients from intake housing into permanent mental health housing.  Several important facts became apparent.  First, the responsibility for situating HOH inmates into mental health treatment beds is decentralized in the LASD.  That is, the PMB and CHU, which are generally responsible for assigning inmates to beds, are not responsible for finding beds for HOH inmates.  Instead, historically, a "SAT List" composed of all HOH patients

---

[48] *See, e.g.*, Defendants' Reply to the Government's Response to Defendants' Alternative Timelines to Come into Compliance With Provision 63, 64, and 80 of the Settlement Agreement, Dkt. 243.

awaiting treatment beds has been circulated multiple times a week to Deputies in the HOH housing pods, who are then responsible for selecting HOH patients from that list for any available beds in their pods.

Second, the Department has no centralized system for tracking bed availability in HOH pods. While the PMB and CHU maintain records of bed availability in other types of housing through an Excel spreadsheet and a related database, there is no equivalent system for tracking bed availability in HOH pods. As such, when an HOH patient must be moved into a mental health treatment bed, custody staff are required to place phone calls to Deputies in HOH pods to ascertain whether or not they have any appropriate beds available.

The Monitor makes several observations about these facts. First, in corrections, housing should be a centralized rather than a decentralized function; departments must have a validated classification system and a transparent housing plan that identifies how bedspace is to be designated to maximize inmate and staff safety. Further, a central administrative unit should be responsible for ensuring that inmates are assigned to beds in accordance with the housing plan and their security classification, and medical or mental health status. The LASD has such units in the PMB and CHU, but it has not historically used them for assigning HOH patients to treatment beds. This was a missed opportunity for greater timeliness and administrative control in the process of housing HOH patients in treatment beds.

Second, the Department has not historically made a single custody official responsible for ensuring that HOH patients awaiting housing on the SAT List were being timely assigned to available beds (or even to identify if beds were available). While TTCF had a Sergeant assigned to mental health who sometimes, by his own description, attempted to coordinate the movement of inmates from the SAT List, interviews revealed that the Sergeant did not have clear authority or a mandate to execute that function consistently and effectively. Instead, individual Deputies were responsible for selecting patients from the SAT list for housing. This system of diffuse responsibility for housing HOH patients, in which no one was truly individually responsible, was an obstruction to the timely housing of HOH patients. The system may have also created distorted incentives in which patients with the greatest behavioral issues (and likely the most severe mental illness) were least likely to be quickly selected for permanent mental health housing. Clinically, these are the very patients who need treatment most quickly to prevent further decompensation.

Finally, it is concerning that it took an inquiry by the Monitor and Subject Matter Expert to uncover these issues, which the County has had years to discover and address, including through the lengthy process of developing iterative implementation plans for Provision 63. However, in a series of meetings in June 2023, the Monitor shared these findings with the County, which has commendably responded by initiating several necessary reforms. Specifically, the County reports

Effective July 14, 2023, the dedicated mental health sergeant assigned to

TTCF's SAT unit has been granted enhanced authority to transfer inmates housed in SAT to permanent HOH. Inmates with longer wait times in SAT (e.g., more than 5 days) are prioritized to be transferred to permanent HOH when suitable HOH for that inmate becomes available. This process includes safeguards to ensure inmate safety, such as iMatch compatibility for inmates who will be celled together in permanent HOH. In addition, the TTCF Commander has begun random weekly audits to ensure the timely movement of inmates out of temporary housing in SAT and into permanent HOH. A Unit Order reflecting these improvements is currently being drafted.

These efforts have resulted in significant improvement in the last few weeks. As recently as early June 2023, there were several inmates in SAT housing at TTCF with outlier wait times who had been waiting to be assigned permanent housing for longer than 30 days. By July 28, 2023, however, there was not a single inmate in SAT housing who had been waiting for permanent housing for longer than 11 days; and currently the mean and median lengths of stays in SAT for inmates in the TTCF are both less than five days.

Moreover, the Department's ability to process inmates through SAT has been so successful in recent weeks that the Department was able to cut the number of SAT pods at TTCF in half by the end of June 2023 and convert those SAT pods into permanent HOH, a move which has had the duel impact of drastically lowering the number of inmates waiting in temporary housing for permanent specialty mental health housing and increasing the availability of permanent HOH at TTCF that was being utilized as SAT housing.

Moreover, the County reports that its "MHIT Application," which was under development before the Monitor's inquiry in June 2023, is "an automated system with a user-friendly 'dashboard' available to Department and CHS personnel that will track exactly how long each inmate receiving temporary housing has been waiting for permanent specialty mental health housing and provide an alert for each inmate who is approaching seven days in temporary housing."  The system "is currently being used at CRDF" and "is in the beta testing phase at TTCF."  The County anticipates that "the alerts provided by the MHIT application, and the awareness this new system will raise as to Provision 63's requirements, will improve the Department's compliance with Provision 63 by allowing the Department to better prioritize the movement of inmates into specialty mental health housing before their time in temporary housing exceeds one week."

The Monitor views these changes as promising and expects that they will indeed continue to improve the County's performance under Provision 63.  The Monitor does not believe, however, that the MHIT application, as currently envisioned, will track bed availability in HOH pods, nor will it centralize the housing of HOH patients under a

single unit or official.  The Monitor encourages the County to further examine and improve the processes necessary to address these remaining issues, as well as to develop and implement relevant policies and procedures, and staff training so that full compliance with Provision 63 may finally be achievable.

According to the County's implementation plan tracker, the County has completed 3 out of 6 corrective action steps regarding Provision 63.  These steps include: expanding the MAT program such that it can administer long-acting injectables, including Sublocade and Suboxone (completion date unclear); gathering and providing data about implemented measures, including projected impact of program on HOH and MOH demand (completed May 2023); and securing funding to create a new psychiatric urgent care/jail inpatient unit with 48 beds (completion date unclear).

64.     Within six months of the Effective Date, the County and the Sheriff will develop a short-term plan addressing the following 12-month period, and within 12 months of the Effective Date, the County and the Sheriff will develop a long-term plan addressing the following five-year period, to reasonably ensure the availability of licensed inpatient mental health care for prisoners in the Jails.  The County and the Sheriff will begin implementation of each plan within 90 days of plan completion.  These plans will describe the projected capacity required, strategies that will be used to obtain additional capacity if it is needed, and identify the resources necessary for implementation.  Thereafter, the County and the Sheriff will review, and if necessary revise, these plans every 12 months.

**STATUS:     PARTIAL COMPLIANCE**

The parties agreed on Revised Compliance Measures in 2021.  Substantial Compliance requires the Department to develop a long-term plan that will address the availability of licensed inpatient mental health care for prisoners in the following five-year period; and provide an annual report describing the long-term plan and the steps taken to implement it, which must be deemed reasonable by the Monitor.

On December 27, 2022, and on April 20, 2023, the Court issued Orders Setting Deadlines for Substantial Compliance, ECF No. 234 and 248, respectively, which established specific deadlines for Defendants to "improve compliance with provisions 63, 64, and 80."  With respect to Provision 64, the December 2022 Order established deadlines for Defendants to take a series of "agreed-upon actions to improve compliance,"[49] while the April 2023 Order established incremental targets for the Defendants' overall compliance with the provision by specific quarters.  The incremental targets are visualized in the figure below.

*Figure 4:  Quarterly Court-Ordered Targets for Provision 64 Compliance*

| | Difference Between # of P4s and # of Patients Receiving Inpatient Care |
|---|---|
| **2Q2023** | ≤80 |
| **3Q2023** | ≤60 |
| **4Q2023** | ≤40 |
| **1Q2024** | ≤20 |
| **2Q2024** | ≤10 |
| **3Q2024** | ≤5 (and must wait no more than 8 hours for placement) |

---

[49] For example, it required Defendants to complete the conversion of PDC North to an all-MOH facility by July 31, 2023, to obtain the licensure by February 28, 2023 for, and thereafter begin operating, a psychiatric urgent care unit with at least 20 beds, to expand the number of FIP Stepdown units incrementally until 30 Stepdown pods are operating in June 2025, to provide proof that at least 750 individuals are receiving treatment through the Medication Assisted Treatment program by June 30, 2023 and 1,500 by June 30, 2024, and to take various steps to expand the amount of out-of-cell time provided to HOH patients.

In the Sixteenth Reporting Period, or shortly thereafter, the County achieved several encouraging successes in its efforts to comply with Provision 64.  This included opening the Jail Inpatient Unit/Acute Intervention Module ("JIU/AIM") on June 1, 2023, and beginning to treat P4 patients therein to stabilize them and potentially move them to a lower level of care. While the operating capacity of the AIM is far below what was contemplated in the County's Implementation Plan for Provision 64, it appears to be having a notable impact on the overall P4 population and the number of patients waiting for inpatient care on the FIP waitlist.  The County reports

> Although the JIU is presently staffed for [ten] beds—far fewer than the 48-bed capacity the County had intended and below the 16-bed license — the JIU/AIM is nevertheless proving extremely effective. Indeed, the JIU/AIM has treated and stabilized 212 patients within the past two months, and it appears unlikely, based upon what has been learned over the time period the JIU/AIM has been operational, that CHS will ever have a need for a JIU/AIM unit at the LACJ of the size initially contemplated in order to serve the needs of the now-dwindling P4 population in the LACJ.
>
> As of August 7, 2023, the total P4 population is down to 93 patients, and the FIP waitlist – which measures the gap between the number of P4 patients requiring FIP services and the LACJ's current capacity to provide those services – is down to less than 25 patients. These numbers can fluctuate day-to-day as new P4 patients present at the LACJ, but these numbers nevertheless represent a significant reduction in the P4 population that puts the County on track, not only to meet the court-ordered interim compliance benchmarks set in future quarters, but also to come into substantial compliance with Provision 64 within the timeframe set by the Court's order issued on April 20, 2023.

Indeed, the reduction in the number of P4 patients in the Second and Third Quarters of 2023 has been noteworthy.

*Figure 5:  Number of P4 Inmates in LASD Custody (Aug. 2022 – Aug. 2023)*



The County also reports on its continuing efforts to transfer P4 patients into State custody when they become eligible.  The County reports that it made

> significant headway in this regard after the close of the 16th Reporting Period by expediting the movement of inmates who require state hospitalization to restore them to competency out of the LACJ and expediting the movement of inmates who have been sentenced to state prison out of the LACJ. Indeed, between March 20, 2023, and August 8, 2023, the County had transferred 676 FIST inmates to state hospitals and reduced the pending state hospital transfer population from 506 to 426. Moreover, since March 6, 2024, 4,063 people have transferred to state prisons, reducing the current population pending state prison transfer from 1,639 to 499.

The County is somewhat less precise about its efforts to divert P3 and P4 patients into community mental health treatment settings.  It notes that "the Board of Supervisors has allocated funding for the County portion of the year one ramp up of expanded community treatment placements for this population through the County's Office of Diversion and Reentry (ODR) and Department of Mental Health (DMH). The County has also entered into a $629 million contract with the Department of State Hospitals to increase capacity for community-based restoration services for FIST individuals who would otherwise wait in the LACJ for transfer to state hospital."  The County should provide more specific details about these efforts in its next Self-Assessment.

According to the County's implementation plan tracker, the County has completed 3 out of 6 corrective action steps regarding Provision 64.  These steps include:

funding becoming available for a new AIM/jail inpatient unit that can administer involuntary psychotropic medications (completion date unclear); obtaining licensure and approvals from the state for the new AIM/jail inpatient unit (completed June 2023); and County reviewing and supplementing its implementation plan with additional steps (completed May 2023).

65 (**Revised**).  Consistent with existing Sheriff's Department policies, the County and the Sheriff will ensure that psychotropic medications are administered in a clinically appropriate manner to prevent misuse, hoarding, and overdose.  The County will maintain electronic mental health alerts in prisoners' electronic medical records that notify medical and mental health staff of a prisoner's risk for hoarding medications.

STATUS:   **PARTIAL COMPLIANCE**

On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provision 65 ("Revised Paragraph 65") as set forth above.  They also agreed on Revised Compliance Measures.  Under the Revised Compliance Measures, (1) the County's Self-Assessments must set forth the (a) results of weekly medication audits documenting the visual observation of the administration of medication during the quarter; (b) unauthorized medications found as a result of cell searches during the reporting period; and (c) incidents involving confirmed prescription drug overdoses.  Further, "the Monitor must conclude, after consulting with the Subject Matter Expert, that "psychotropic medications have been administered in a clinically appropriate manner 85% of the time."  Finally, "85% of the electronic medical records [must] contain the required alerts."  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 65 by March 31, 2024.

The County's Sixteenth Augmented Self-Assessment reports that for the Fourth Quarter of 2022, "44%—less than the required 85%—of the reviewed electronic medical records contained the alerts required for those suspected of hoarding medication" pursuant to Compliance Measure 65-5(d).

The County's Sixteenth Augmented Self-Assessment also reports "the County determined that nurses were compliant with pill call procedures in 92% of 1,415 instances of observed administration — above the 85% threshold required."  These are promising results.  However, Subject Matter Expert Dr. Nicole Johnson notes that during a site visit in July 2023, she observed irregularities in the pill pass process.  This included "a nurse checking patient mouths to confirm that the administered medication had been swallowed, but when there was a refusal or the patient walked away without complying, there was no follow up.  In one case, the patient refused to comply with the instructed mouth check and walked to the trash can and appeared to spit the pill out.  Another patient took the pills in his hands and walked over to the trash can and appeared to throw them away.  At another point during pill pass, the assigned Deputy had to do something else and asked the nurse to pause.  She did not and continued to give medications while the Deputy was unable to assist to ensure medication compliance."  Dr. Johnson also noted that she observed nursing personnel consistently checking patient wristbands, which was an improvement from prior site visits.

The Fifteenth Report noted:

There are many reasons for conducting unannounced jail searches

106

including but not limited to finding and removing contraband items, deterring future attempts to improperly introduce or possess contraband, seizing potential weapons, reducing drug-seeking behavior, and minimizing underground jail economies that often run on contraband exchange.  Thus, the rate at which unauthorized medication is recovered is an imperfect measure of whether unannounced searches have achieved their goals.  With that said, the Monitor notes the significant disparity in unauthorized medication recovery rates for various jails that are subject to this Agreement.  For example, at TTCF, the facility that houses male inmates with the most serious mental illness, only 47 unannounced searches were conducted in the Fourth Quarter of 2021.  Notwithstanding this low number of searches, 46 medications were recovered at TTCF for a recovery rate of nearly 100%.  Similarly, in the First Quarter of 2022, there were 82 unannounced searched within TTCF, which resulted in the recovery of 96 medications, a recovery rate of 117%.

In contrast, at NCCF, there were 1,135 unannounced searches conducted in the Fourth Quarter of 2021, which resulted in the seizure of 20 medications and 4 inhalers, for a recovery rate of 2%.  Similarly, in the First Quarter of 2022, at NCCF, there were 997 unannounced searches conducted that resulted in the seizure of 7 medications, a recovery rate of 1%.

It further noted that

Given the large populations at TTCF and MCJ, the significant quantity of psychoactive and somatic medication prescribed at each, and the frequency with which unauthorized medications are recovered at those facilities during only a relatively small number of unannounced searches, the Monitor believes that TTCF and MCJ are likely not being searched frequently enough to accomplish a key purpose of Provision 65: preventing "misuse, hoarding, and overdose." The County should report on its efforts to enhance the frequency of unannounced searches at these facilities in its next Self-Assessment.

In the Augmented Sixteenth Self-Assessment, the County reported that "[o]n August 11, 2023, CCSB issued memoranda to TTCF and MCJ that outlined their respective results under Provision 65 and the Fifteenth Report's call for more frequent unannounced searches at the two facilities to prevent medication misuse, hoarding, and overdose. CCSB directed the facilities to submit corrective action plans to increase the number of searches in conformance with the direction of the Fifteenth Report. The facilities must submit their plans to increase search frequency to CCSB by August 25, 2023."

The Monitor will look forward to reviewing the results of these efforts.  In the Sixteenth Reporting Period, medications continued to be recovered in a relatively high

percentage of the unannounced searches conducted at TTCF and MCJ.  In the Fourth Quarter of 2022, the County's posted results reflect that 66 unannounced searches were conducted at TTCF and 110 at MCJ.  These searches yielded 19 unauthorized medications at TTCF and 95 unauthorized medications at MCJ.  The numbers at the other facilities were CRDF (162 searches resulting in the seizure of 50 medications), NCCF (1068 searches resulting in the seizure of 1 medication), PDC North (63 searches resulting in the seizure of no medications), and PDC South (216 searches resulting in the seizure of no medications).

The County's posted results for the first Quarter of 2023 reflect similar trends.  There were 43 unannounced searches at TTCF and 116 at MCJ, which resulted in the seizure of 24 and 60 unauthorized medications, respectively.  The numbers at the other facilities were CRDF (162 searches resulting in 37 medications), NCCF (912 searches resulting in 5 medications), PDC North (79 searches resulting in no medications), and PDC South (193 searches resulting in no medications).

The County also reported 3 confirmed overdoses and 5 unconfirmed in the Fourth Quarter of 2022.  The County reported 5 confirmed overdoses and 2 unconfirmed in the First Quarter of 2023.

According to the County's implementation plan tracker, the County has completed 16 out of 32 corrective action steps regarding Provision 65.[50]  These steps include: providing the Medication Administration Audit and Quality Check of Medication Administration Audit to the Monitor (completed September 2022); training relevant Nurse Managers and Nurse Supervisors at TTCF, MCJ, CRDF, NCCF, and PDC North (completed March 2022 and May 2022); beginning Medication Administration Audits at TTCF (completed April 2022), MCJ, CRDF, NCCF, and PDC North (completed May 2022); beginning Quality Checks of Medication Administration Audits (completed June 2022); developing new compliance audit criteria and tool, for 65-5(c) to be approved by the Compliance Team Program Manager and County Counsel (completed May 2022); conducting informal mini self-assessments for 65-5(c) to include at least ten samples from TTCF (completed May 2022) and at least twenty samples comprised of patients from all facilities (completed September 2022); holding a workgroup meeting with Responsible Parties from Nursing, Custody, Compliance Team, and County Counsel (completed May 2022); and reporting compliance data for 65-1(a) and 65-5(c) for TTCF (completed September 2022), MCJ, CRDF, NCCF, and PDC North in self-assessments (completed January 2023).

---

[50] The County indicates that the remaining 16 corrective action plan steps are no longer applicable as "executive management considered revisions and, as of September 2022, declined to implement any revisions to this policy."

66 (**Revised**).  Consistent with existing Correctional Health Services policies, prisoners with a serious mental illness who reside outside of mental health housing, will remain on an active mental health caseload regardless of whether they refuse medications. The County and the Sheriff will provide prisoners with a serious mental illness who reside outside of mental health housing with therapeutically appropriate individual monthly visits with a QMHP whether or not the prisoners are receiving or refusing psychotropic medications.  The County and the Sheriff will provide medication support services to prisoners who (i) have a mental illness, (ii) reside outside of mental health housing and (iii) are prescribed psychotropic medications.

STATUS:        PARTIAL COMPLIANCE

On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provision 66 ("Revised Paragraph 66") as set forth above.  They also agreed on Revised Compliance Measures.  Under the Revised Compliance Measures, Substantial Compliance requires that a) 85% of prisoners with a serious mental illness who resided outside of mental health housing were on an active mental health caseload; b) 85% of prisoners with a serious mental illness who resided outside of mental health housing are offered therapeutically appropriate structured mental health treatment and are seen by a QMHP at least once a month; and c) 85% of prisoners who resided outside of mental health housing and were prescribed psychotropic medications were offered medication support services.

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required Defendants to achieve Substantial Compliance with Provision 66 by March 31, 2023, which falls within the Sixteenth Reporting Period covered by this Report.

The County's Augmented Sixteenth Self-Assessment again reports that "there were no records to assess for Compliance Measures 66-5(a) and 66-5(b) because there were no patients who met the criteria for severe mental illness ('SMI') housed in general population areas" in the Fourth Quarter of 2022 or the First Quarter of 2023.  Given the County's commitment to moving prisoners with serious mental illness out of general population and into mental health housing, the results being evaluated for this provision are narrowed and largely focus on medication support services for prisoners receiving psychotropic medication and living outside of mental health housing under Compliance Measures 66-3 and 66-5(c).

Regarding those compliance measures, the County's posted results indicate that for the Fourth Quarter of 2022 and the First Quarter of 2023, 52% and 64%, respectively, of patients residing outside of mental health housing who were prescribed psychotropic medications during the randomly selected week were offered medication support services.  This is lower than the 85% threshold.

Regarding these results, the County reports

109

The County has struggled to comply with requirements for medication support services for inmates who reside outside of mental health as a result of staff shortages. With limited psychiatry staff, the priority has been to address the highest acuity patients in mental health housing. Over a several-year timespan, CHS has lost psychiatry staff, while the number of HOH patients has held steady or increased. Staff have been diverted from general population (GP) areas to mental health housing areas to provide coverage for HOH patients. Although CRDF had been 100% compliant in the past, this program has faced psychiatry staff shortages as well.

To improve compliance, the County has stepped up the pace of onboarding psychiatric Nurse Practitioners to manage medication for more stable populations (GP Taking Medication, MOH) who need psychiatric medication. Since March 2023, 44 RNs have been hired or promoted, along with 1 NP. In addition, through efforts by the Office of Nursing Affairs (ONA) within DHS to target nursing registries for 13- and 20-week assignments in the jails, 52 registry nurse profiles had been received as of August 11, 2023, and 14 nurses had already accepted assignments.

In addition, CHS has also redoubled efforts to hire psychiatric staff system-wide. Since March 2023, CHS has hired or promoted a total of 49 staff, including: 6 Clinical Psychologists; 5 Mental Health Clinical Supervisors; 1 Mental Health Psychiatrist; 27 Psychiatric Social Workers; 3 Psychiatric Techs; 1 Relief Mental Health Psychiatrist; 2 Supervising Psychologists; and 4 Supervising Mental Health Psychiatrists.

The County has also made concerted efforts to expand telehealth to increase access to medication support services for psychiatric patients. In June of this year, 8 certified medical assistants along with equipment upgrades were approved in CHS's fiscal year 2023-2024 budget to facilitate telehealth across jail facilities.

The County is hopeful that as continued efforts are made to both increase staffing and address inefficiencies in service delivery, compliance with Provision 66 will improve in future quarters.

According to the County's implementation plan tracker, the County has completed 8 out of 20 corrective action steps regarding Provision 66.[51]  These steps include: CHS formulating a uniform process by which SMI patients in general population will be tracked (completion date unclear); defining and documenting car expectations for SMI inmates outside of mental health housing (completion date unclear); clarifying the process by which patients are identified as belonging to the universe of SMI patients outside of mental health housing (completion date unclear); share with DOJ and Monitor

---

[51] The County indicates that the remaining 12 corrective action steps are completed.  However, it appears that these 12 steps are not applicable or unable to be completed as per the implementation plan tracker, "there is currently no SMI universe in gen pop to evaluate."

how the County intends to identify and clarify the universe of patients subject to
Provision 66 and the care expectation for this universe of patients (completion date
unclear), including a 30 day period for DOJ and Monitor to comment on County's
proposals and follow-up meeting to discuss (completion date unclear); CHS to evaluate
and consider alternative ways to provide therapeutically appropriate structured treatment
and QMHP visits to this population (completion date unclear); and negotiations with
unions to address loan repayment for psychiatrists and other mental health staff
(completed April 2023).

67.     Within three months of the Effective Date, the County and the Sheriff will implement policies for prisoners housed in High Observation Housing and Moderate Observation Housing that require:

(a)     documentation of a prisoner's refusal of psychotropic medication in the prisoner's electronic medical record;

(b)     discussion of a prisoner's refusal in treatment team meetings;

(c)     the use of clinically appropriate interventions with such prisoners to encourage medication compliance;

(d)     consideration of the need to transfer non-compliant prisoners to higher levels of mental health housing; and

(e)     individualized consideration of the appropriateness of seeking court orders for involuntary medication pursuant to the provisions of California Welfare and Institutions Code sections 5332-5336 and/or California Penal Code section 2603(a).

**STATUS:     NOT RATED**

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 67 by June 30, 2023, which falls outside the Sixteenth Reporting Period covered by this Report.  Substantial Compliance requires the County to "review the electronic medical records of 25% of the prisoners in HOH and MOH who refused psychotropic medication during the quarter to verify that the records [of 85% of the prisoners] reflect the documentation and consideration of the matters required by the terms of Paragraph 67."

By its very terms, Provision 67 is somewhat inflexible in several ways.  First, it applies to all prisoners "housed in High Observation Housing and Moderate Observation Housing," regardless of the severity of their symptoms, their history of medication compliance, and the reason(s) for their refusal.  Second, it requires that all five sub-parts of the provision (a) – (e) apply to all medication refusers on the mental health caseload, regardless of whether they would be clinically appropriate for all such patients.  Prior Monitoring Reports have recognized this, and the County therefore adopted a "tiered approach" to its self-auditing of Provision 67.  According to the County, its tiered methodology involves

The EMRs of patients with a Mental Health Level of Care (MHLOC) of P2 would minimally include documentation of the patient's refusal of

psychotropic medication and the use of clinically appropriate interventions to encourage medication compliance. For patients who are higher functioning and able to make informed decisions, as in the community, appropriate interventions may include discontinuation of the medication if the patient no longer wants to take it or has valid concerns about the medication. Additionally, the need to transfer non-compliant patients to higher levels of care would be considered only when there is indication of decompensation; discussion of refusals in treatment team meetings (67, subd. (b)) and consideration of involuntary medication orders (67, subd. (e)) would not routinely be required for this P2 population. For P2 patients, the audit would not consider factors beyond increased level of care. If a P2 patient's level of care increased to P3, the audit will end at consideration for higher level of care. If a P2 patient's level of care increased to P4, then all factors in the audit would need to be considered and would be clinically appropriate.

Interventions are based on what is clinically appropriate for patients of all P-levels. Patients who become medication-compliant with clinical intervention may not require any additional interventions, and this was considered in the auditing process. Generally, the County rated as compliant those cases where the EMR for each medication refuser in the sample appropriately reflected the necessary documentation and consideration of the matters in Paragraph 67 based on the above-described approach.

This audit is nuanced and requires a clinical approach that evaluates the unique issues for each individual. Thus, to provide clearer communication and an explanation regarding what was considered in reviewing each case assessed, the audit includes a justification for those cases where the reasoning for the compliant rating may be unclear according to the literal terms of the provision.

The County has pointed out that it consulted with prior Subject Matter Expert, Dr. Bruce Gage, in formulating that methodology, which was favorably commented upon in prior monitoring reports.[52]  Prior monitoring reports, however, have also raised concerns about the possible divergence between the County's revised methodology and the specific language of the provision, or explicitly called upon the County to seek an amendment of Provision 67, which has not yet happened.[53]

---

[52] *See, e.g.*, Monitor's Tenth Report at 89.

[53] *See* Monitor's Fourteenth Report, ECF No, 221, at 91 (noting concerns about the auditing methodology not being "consistent with the Provision's plain language"); Fifteenth Report, ECF No. 257, at pp. 101 ("if the County believes that it is clinically appropriate to exempt certain prisoners in MOH or HOH housing from certain of the requirements of Provision 67, it should seek to amend Provision 67").

Which brings us to the Sixteenth Reporting Period and the County's reported results.  The County's Augmented Sixteenth Self-Assessment reports that for the Fourth Quarter of 2022, "78% of inmates who refused psychotropic medications receiving the appropriate consideration and documentation. The measure requires 85% for substantial compliance."  For the First Quarter of 2023, the County reports "79% of inmates who refused psychotropic medications receiving the appropriate consideration and documentation."  The County has requested a rating of Partial Compliance on the basis of these results which, again, were generated using an audit methodology that appears to conflict with the plain language of the provision.  The Monitor instead will not rate Provision 67 for the Sixteenth Reporting Period pending an attempt by the County to change the language of Provision 67 in light of the discussion above, which the Monitor encourages the County to pursue expeditiously.

Regarding its overall compliance efforts, the County reports commendable progress in several areas, including

Develop[ing] an alert system designed to quickly inform a treating psychiatrist or psychiatric nurse practitioner of a patient's refusal or sequence of refusals. CHS has worked with the Monitor's Mental Health SME to develop a list of medications that will trigger an alert in the electronic medical record ("EMR") if the medication is prescribed for but refused by the patient. To avoid instances where a refusal or series of refusals is not elevated immediately for non-critical medication refusals to the treating prescriber, the County has invested in an Artificial Intelligence (colloquially referred to as a "bot") that will "crawl" through medical records of incarcerated patients, identify significant medication refusals, and issue an alert to the prescribing physician. This bot was deployed for beta testing the first week of August 2023, and the testing results are undergoing analysis to confirm the technology's efficacy.

The County also has "stepped up the pace of onboarding psychiatric and clinical staff to meet the mental health needs of patients. Additionally, there have been concerted efforts to expand telehealth, and an adjustment was just approved for CHS' fiscal year 23-24 budget to fund 8 certified medical assistants and equipment upgrades to support telehealth throughout the jails to increase access to medication support services for psychiatric patients."

According to the County's implementation plan tracker, the County has completed 6 out of 10 corrective action steps regarding Provision 67.  These steps include: training five new Nurse Practitioners (completed April 2023); complete negotiations with unions to address loan repayment concerns for psychiatrists and other mental health staff (completed September 2022); relief physicians being identified and trained, and are assessing patients (completion date unclear); implementing a weekly employee hiring tracker (completed April 2022 and ongoing); conducting hiring fairs (completed March 2022, January 2023, April 2023, and ongoing); and beginning the planning phase for a new LPS-designated pod in 172 by working with the Department of

State Hospitals and developing a team (completion date unclear).

68.     Within six months of the Effective Date, the County and the Sheriff will develop and implement a procedure for contraband searches on a regular, but staggered basis in all housing units.  High Observation Housing cells will be visually inspected prior to initial housing of inmates with mental health issues.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at MCJ, NCCF, PDC East, PDC South, and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2017, through December 31, 2017 (verified) at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2022, through December 31, 2022 (unverified) at CRDF)**

Substantial Compliance requires that "85% of the housing units are searched for contraband at least once in the previous quarter; and 95% of the HOH units visually inspected prior to housing prisoners in these units."  Self-Assessments are to include a summary of searches conducted and a review of 25 randomly selected Checklist forms for HOH units to confirm that the units were visually inspected prior to initial housing of prisoners in these units.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 68 by June 30, 2024.

The County previously maintained Substantial Compliance for twelve consecutive months at TTCF, MCJ, NCCF, PDC East, PDC South, and PDC North.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring at those facilities for Substantial Compliance with Paragraph 68 in the Sixteenth Reporting Period.

The County's posted results reflect that in the Fourth Quarter of 2022, 100% of the housing units at CRDF were searched at least once in the quarter, and 96% of the randomly selected HOH cells at CRDF were visually inspected before housing prisoners in these units.  These results are subject to verification by the Monitor's auditors.

69.     Consistent with existing DMH policies regarding use of clinical restraints, the County and the Sheriff will use clinical restraints only in the Correctional Treatment Center and only with the approval of a licensed psychiatrist who has performed an individualized assessment and an appropriate Forensic Inpatient order.  Use of clinical restraints in CTC will be documented in the prisoner's electronic medical record.  The documentation will include the basis for and duration of the use of clinical restraints and the performance and results of the medical welfare checks on restrained prisoners.  When applying clinical restraints, custody staff will ensure a QMHP is present to document and monitor the condition of the prisoner being placed in clinical restraints.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of July 1, 2018, through June 30, 2019 (verified))**

Substantial Compliance requires the Department to review the electronic medical records of all prisoners placed in clinical restraints to verify that the restraints were used, approved, and documented, and that the results of medical welfare checks on restrained prisoners were also documented.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring at those facilities for Substantial Compliance with Paragraph 69 in the Sixteenth Reporting Period.

70.     Within three months of the Effective Date, the County and the Sheriff will have policies and procedures regarding the use of Security Restraints in HOH and MOH. Such policies will provide that:

(a)     Security Restraints in these areas will not be used as an alternative to mental health treatment and will be used only when necessary to insure safety;

(b)     Security Restraints will not be used to punish prisoners, but will be used only when there is a threat or potential threat of physical harm, destruction of property, or escape;

(c)     Custody staff in HOH and MOH will consider a range of security restraint devices and utilize the least restrictive option, for the least amount of time, necessary to provide safety in these areas; and

(d)     Whenever a prisoner is recalcitrant, as defined by Sheriff's Department policy, and appears to be in a mental health crisis, Custody staff will request a sergeant and immediately refer the prisoner to a QMHP.

**STATUS:     PARTIAL COMPLIANCE**

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 70 by June 30, 2024.  The County has articulated its belief that it has fully satisfied Provision 70 and should therefore no longer be subject to monitoring for this provision.  As the Fifteenth Report explained, the Monitor and Mental Health Subject Matter Expert, Dr. Johnson, disagree for the following reasons:

Provision 70 requires the Department to have policies and procedures regarding the use of security restraints in HOH and MOH, and articulates four specific areas that those policies must address.  For this discussion, we will focus on two subsections of Provision 70: (a) and (c).  Pursuant to 70(a) and (c), the Department's policies must ensure that a) security restraints in HOH and MOH are used "only when necessary" to ensure safety, and c) custody staff in HOH and MOH will use only the least restrictive security restraint necessary, and only for the least amount of time needed to provide safety.  Implicit in these requirements is that the determination of what restraint to use must be individualized to each HOH or MOH inmate and circumstance.[54]  Blanket rules, customs, or practices that require the application of the same type of restraint to all inmates

---

[54] Many factors could contribute to that individualized determination, including any history of institutional violence, present behavior, and current symptomatology, among others.

based upon their diagnosis or MHLOC do not comply with Provision 70.

The Department has adopted written policies that comply with the enumerated areas of Provision 70. Yet, as the Monitor and Court-appointed Mental Health Subject Matter Expert have long made clear, the practice inside certain HOH housing areas in the jails is not compliant. For example, the Twelfth Report explained that

During recent site visits, the Monitor observed that HOH inmates are cuffed to metal "spider tables" during their recreational out-of-cell time as a matter of course. That is, security restraints continue to be routinely applied based upon prisoners' mental health classifications and housing assignments, rather than individual assessments of particular risks that they might pose. The Monitor reiterates the guidance that has been given previously. To attain Substantial Compliance, the County will need to demonstrate that it is using security restraints based upon individualized assessments, "only when necessary to ensure safety," rather than based upon housing assignments or mental health classifications alone.

Subsequent visits by the Monitor and Dr. Johnson have confirmed that this phenomenon persists—HOH inmates in certain housing areas are all locked down to metal spider tables during their "out time" as a matter of course, and not due to any individualized determination that the use of these restraints is "necessary to ensure safety," as Provision 70 requires. The Department will not comply with Provision 70 by adopting written policies that adhere to its dictates, and informal rules, practices, or unit orders that implicitly amend those policies in violation of the Provision's language and intent.

In the Augmented Sixteenth Self-Assessment, the County rightly noted that it is engaged in a dramatic expansion of the number of FIP Stepdown Units and HOH dorms that will allow a greater number of HOH patients to program without restraints when it is safe and appropriate for them to do so. Specifically, "there are 15 total therapeutic housing units at the LACJ: 6 FIP Stepdown Pods at TTCF, 5 HOH Dorm Pods at TTCF, and 4 FIP Stepdown Pods at CRDF. The County currently plans to open another 7 pods at TTCF and one more pod at CRDF this quarter for a total of 23 pods, more pod faster [*sic*] than the 20 pods required by the December 2022 order." The Monitor believes that this is a commendable and important effort by the County to address the requirements of Provision 70.

The County also rightly notes the importance of screening HOH patients for admission to the FIP Stepdown pods and HOH dorms to ensure that doing so is safe for them, staff, and other inmates. "Although not formalized in policy, the process of selection for placement in FIP stepdown and HOH dormitories constitutes an individualized' assessment that the Fifteenth Report refers to as an 'implicit' requirement in the Fifteenth Report. (15th Rep., p. 104). This is appropriate and consistent with

Provision 70."  Further

> Ultimately, the County's response to the Fifteenth Report's concerns
> raises the question whether the appropriate starting point is full freedom of
> movement at the outset or whether the history of assaults among the most
> acute patient population justifies the use of security restraints until CHS
> and LASD can truly assess and know a patient's condition and stability.
> While the evaluation necessary to the latter approach takes some amount
> of time, its purpose is not to punish or substitute for treatment, but only to
> avoid instances of violence and uses of force. Evaluation time allows
> custody staff not only to observe and know a patient, but also to receive
> the evaluations of mental health professionals. With this information
> developed and communicated, HOH patients can be accurately placed in
> the least-restrictive settings available.

The Monitor agrees entirely.  To comply with Provision 70, the County need not
presume that all HOH patients can program unrestrained with "full freedom of
movement" before an assessment can be conducted.  However, the County must endeavor
to perform these evaluations in a timely fashion under set timeframes, clearly articulate
screening criteria for admission to the FIP Stepdown pods and HOH dorms, and enshrine
these requirements in policy.  When the County can do so, and can show that it is timely
performing the "individualized assessments" that Provision 70 requires such that a)
security restraints in HOH and MOH are being used "only when necessary to insure
safety," and b) only the least restrictive security restraint necessary is being used, it will
be able to demonstrate compliance with Provision 70.

According to the County's implementation plan tracker, the County has
completed 17 out of 20 corrective action steps regarding Provision 70.  These include:
Custody personnel working in HOH modules contacting the on-duty Watch Commander
to advise if HOH is offered out-of-cell time, and if it is not offered, an explanation in the
Watch Commander log (completed March 2022); beginning renovations of CRDF
Module 1300, which will serve as a FIP Stepdown Unit (completed December 2022);
finishing renovations and adding plastic molding furniture to allow unrestrained out-of-
cell time (completed January 2023); relocating FIP stepdown and specialized program
individuals to CRDF Module 1300 (completed September 2022); updating CRDF
policies regarding out-of-cell modules (completed August 2022); CCSB creating a
training guide for Sergeants regarding out-of-cell time and how to document it
(completion date unclear); developing an additional tab within the Custody Watch
Commander Log for tracking out-of-cell time in HOH modules (completed March 2022);
assigning a Deputy to TTCF Module 141B (completed June 2023); begin using TTCF
Module 161B and 162B as living modules (completed April 2023); having unrestrained
out-of-cell time in TTCF Module 162F and fully convert the unit into a Living Module
(completed April 2023); fully occupying Module 141 Pods A through F as FIP Stepdown
Units (completed March 2023); and reinstating the HOH unrestrained out-of-cell time
pilot program in Module 161 Pods A through E (completed September 2022).

71.    The County and the Sheriff will ensure that any prisoner subjected to clinical restraints in response to a mental health crisis receives therapeutic services to remediate any effects from the episode(s) of restraint.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017 (verified))**

Substantial Compliance requires the Department to review the electronic medical records of all prisoners placed in clinical restraints to verify that the prisoners received therapeutic services as required by Paragraph 71.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 71 in the Sixteenth Reporting Period.

72.     The County and the Sheriff will develop and implement policies and
procedures that ensure that incidents involving suicide and serious self-injurious behavior
are reported and reviewed to determine:  (a) whether staff engaged in any violations of
policies, rules, or laws; and (b) whether any improvements to policy, training, operations,
treatment programs, or facilities are warranted.  These policies and procedures will define
terms clearly and consistently to ensure that incidents are reported and tracked accurately
by DMH and the Sheriff's Department.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of January 1,
2017, through December 31, 2017)**

Substantial Compliance requires the Self-Assessments to report on (a) suicide
review meetings and (b) CIRC meetings that review incidents of serious self-injurious
behavior in the reporting period.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not
subject to monitoring for Substantial Compliance with Paragraph 72 in the Sixteenth
Reporting Period.

73.     Depending on the level of severity of an incident involving a prisoner who threatens or exhibits self-injurious behavior, a custody staff member will prepare a detailed report (Behavioral Observation and Mental Health Referral Form, Inmate Injury Report, and/or Incident Report) that includes information from individuals who were involved in or witnessed the incident as soon as practicable, but no later than the end of shift.  The report will include a description of the events surrounding the incident and the steps taken in response to the incident.  The report will also include the date and time that the report was completed and the names of any witnesses.  The Sheriff's Department will immediately notify the County Office of Inspector General of all apparent or suspected suicides occurring at the Jails.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified))**

Substantial Compliance requires the Department to review quarterly a random sample of reports of any threats or exhibitions of self-injurious behavior to verify that the reports have the information required by Paragraph 73; and to provide the Monitor with the notifications to the Inspector General of all incidents involving an apparent or suspected suicide during the reporting period.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 73 in the Sixteenth Reporting Period.

74.     The Sheriff's Department will ensure that there is a timely, thorough, and objective law enforcement investigation of any suicide that occurs in the Jails. Investigations shall include recorded interviews of persons involved in, or who witnessed, the incident, including other prisoners.  Sheriff's Department personnel who are investigating a prisoner suicide or suspected suicide at the Jails will ensure the preservation of all evidence, including physical evidence, relevant witness statements, reports, videos, and photographs.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of September 1, 2016, through December 31, 2017)**

Substantial Compliance requires the Department to provide the Monitor with an Executive Suicide Death Review reflecting the results of the Department's investigation of any suicide in the Jails within six months of the suicide.  The review must reflect steps taken to preserve all of the evidence; and list the interviews of persons involved in, or who witnessed, the incident, and whether the interviews were recorded.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 74 in the Sixteenth Reporting Period.

75.      Within three months of the Effective Date, the County and the Sheriff will
review every suicide attempt that occurs in the Jails as follows:

(a)      Within two working days, DMH staff will review the incident, the
prisoner's mental health status known at the time of the incident, the need
for immediate corrective action if any, and determine the level of suicide
attempt pursuant to the Centers for Disease Control and Prevention's Risk
Rating Scale;

(b)      Within 30 working days, and only for those incidents determined to be a
serious suicide attempt by DMH staff after the review described in
subsection (a) above, management and command-level personnel from
DMH and the Sheriff's Department (including Custody Division and
Medical Services Bureau) will meet to review relevant information known
at that time, including the events preceding and following the incident, the
prisoner's incarceration, mental health, and health history, the status of
any corrective actions taken, and the need for additional corrective action
if necessary;

(c)      The County and the Sheriff will document the findings that result from the
review of serious suicide attempts described in subsection (b) above; and

(d)      The County and the Sheriff will ensure that information for all suicide
attempts is input into a database for tracking and statistical analysis.

**STATUS (75):**     **SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified))**

Substantial Compliance requires (a) DMH to review documentation of randomly selected suicide attempts during the previous quarter to verify that the prisoner's mental health status and need for immediate corrective action were considered timely by the DMH staff and that the staff determined whether the suicide attempt was serious; (b) that the Department and DMH reviewed the relevant information known at that time and the status of any corrective actions taken, and they considered the need for additional corrective action if necessary; and (c) that the information is reflected in the Department's database for tracking and statistical analysis.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 75 in the Sixteenth Reporting Period.

76.     The County and the Sheriff will review every apparent or suspected suicide that occurs in the Jails as follows:

(a)     Within no more than two working days, management and command-level personnel from DMH and the Sheriff's Department (including Custody Division and Medical Services Bureau) will meet to review and discuss the suicide, the prisoner's mental health status known at the time of the suicide, and the need for immediate corrective or preventive action if any;

(b)     Within seven working days, and again within 30 working days, management and command-level personnel from DMH and the Sheriff's Department (including Custody Division and Medical Services Bureau) will meet to review relevant information known at that time, including the events preceding and following the suicide, the prisoner's incarceration, mental health, and health history, the status of any corrective or preventive actions taken, and the need for additional corrective or preventive action if necessary; and

(c)     Within six months of the suicide, the County and the Sheriff will prepare a final written report regarding the suicide.  The report will include:

    (i)     time and dated incident reports and any supplemental reports with the same Uniform Reference Number (URN) from custody staff who were directly involved in and/or witnessed the incident;

    (ii)    a timeline regarding the discovery of the prisoner and any responsive actions or medical interventions;

    (iii)   copies of a representative sample of material video recordings or photographs, to the extent that inclusion of such items does not interfere with any criminal investigation;

    (iv)    a reference to, or reports if available, from the Sheriff's Department Homicide Bureau;

    (v)     reference to the Internal Affairs Bureau or other personnel investigations, if any, and findings, if any;

    (vi)    a Coroner's report, if it is available at the time of the final report, and if it is not available, a summary of efforts made to obtain the report;

    (vii)   a summary of relevant information discussed at the prior review meetings, or otherwise known at the time of the final report, including analysis of housing or classification issues if relevant;

    (viii)  a clinical mortality review;

    (ix)    a Psychological Autopsy utilizing the National Commission on Correctional Health Care's standards; and

    (x)     a summary of corrective actions taken and recommendations regarding additional corrective actions if any are needed.

**STATUS (76):**       **SUBSTANTIAL COMPLIANCE (as of September 1, 2016, through December 31, 2017)**

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 76 in the Sixteenth Reporting Period.  Nonetheless, the County continued to conduct the reviews required by Paragraph 76 for the suicides that occurred during this period and invited the Monitor to attend these meetings.

77.     The County and the Sheriff will create a specialized unit to oversee, monitor, and audit the County's jail suicide prevention program in coordination with the Department of Mental Health.  The Unit will be headed by a Captain, or another Sheriff's Department official of appropriate rank, who reports to the Assistant Sheriff for Custody Operations through the chain of command.  The Unit will be responsible for:

(a)     Ensuring the timely and thorough administrative review of suicides and serious suicide attempts in the Jails as described in this Agreement;

(b)     Identifying patterns and trends of suicides and serious suicide attempts in the Jails, keeping centralized records and inputting data into a unit database for statistical analysis, trends, and corrective action, if necessary;

(c)     Ensuring that corrective actions are taken to mitigate suicide risks at both the location of occurrence and throughout the concerned system by providing, or obtaining where appropriate, technical assistance to other administrative units within the Custody Division when such assistance is needed to address suicide-risk issues;

(d)     Analyzing staffing, personnel/disciplinary, prisoner classification, and mental health service delivery issues as they relate to suicides and serious suicide attempts to identify the need for corrective action where appropriate; and recommend remedial measures, including policy revisions, re-training, or staff discipline, to address the deficiencies and ensure implementation; and

(e)     Participating in meetings with DMH to develop, implement, and track corrective action plans addressing recommendations of the quality improvement program.

**STATUS (77):**      **SUBSTANTIAL COMPLIANCE (as of April 1, 2022, through March 31, 2023)**

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 77 by June 30, 2024.  On July 13, 2023, the County posted the Correctional Health Services and Custody Compliance & Sustainability Bureau Combined Semi-Annual Report on Quality Improvement and Suicide Prevention Efforts – Quarter 4 2022 & Quarter 1 2023 ("Combined Suicide Prevention Report"), which relates to Paragraphs 60, 61, 62, and 77.  The Combined Suicide Prevention Report sets forth aggregate data for the 35 suicides that occurred between 2015 and the end of the First Quarter of 2023, and 162 critical incidents that occurred between 2016 and the end of the First Quarter of 2023.

There are three quality improvement provisions in the Agreement that remain subject to monitoring by the Monitor and Subject Matter Experts.  All touch on efforts to prevent suicide and other serious self-harm and, given that they overlap in certain ways, the Monitor will summarize them, and the key differences, here for clarity.  In brief summary, Provision 62 is focused on the tracking and implementation of corrective action plans generated by the quality improvement program.  As set forth above, the Department is working towards, but has not yet sufficiently established, a robust system that satisfies Provision 62 and it remains in Partial Compliance with Provision 62 for the Sixteenth Reporting Period.  Provisions 61 and 77 both relate to the functioning of the quality improvement program, and require it to sufficiently collect, aggregate, and analyze information about inmate suicide and self-harm, and recommend corrective actions to mitigate those risks.  Provision 77 is specifically focused on the creation of "a specialized unit" to accomplish these tasks.  Specifically, Provision 77 requires the County and Sheriff to

> create a specialized unit to oversee, Monitor, and audit the County's jail suicide prevention program in coordination with the Department of Mental Health. The Unit will be headed by a Captain, or another Sheriff's Department official of appropriate rank, who reports to the Assistant Sheriff for Custody Operations through the chain of command.

The County has long had such a unit.  However, Provision 77 also requires the Unit to be responsible for a broad array of functions related to suicide prevention, including (in summary): a) ensuring the timely and thorough administrative review of suicides and serious suicide attempts; b) identifying patterns and trends in suicides and serious suicide attempts and "inputting data into a unit database" for analysis; c) ensuring that corrective actions are taken to mitigate suicide risks "at the location of occurrence and throughout the concerned system;" d) analyzing data related to suicide and serious suicide attempts to identify the need for corrective actions; and e) participating in meetings to develop, implement, and track corrective actions.

Provision 61 is somewhat narrower in scope in that it focuses on collecting and analyzing data related to suicides and serious suicide attempts, and other features of patient care, including the use of clinical restraints, psychotropic medications, access to care, and patient medical records.  That is, while Provision 77 concentrates on establishing a unit to coordinate the review of suicides, Provision 61 is explicitly focused on aggregate data analysis to mitigate suicide risk and improve patient care.

The Monitor and Mental Health Expert Dr. Johnson believe that the County has demonstrated sufficient progress regarding Provision 77 that it will again be found in Substantial Compliance for the Sixteenth Reporting Period.  The Department is now timely reviewing suicides and serious suicide attempts, identifying patterns in suicides and serious suicide attempts, ensuring that corrective actions are taken to mitigate suicide risk in response to suicide and serious suicide attempts, and participating in meetings regarding corrective action plans.  The Department has maintained Substantial Compliance for twelve consecutive months and pursuant to Paragraph 111 of the Settlement Agreement, the Department is no longer subject to monitoring for compliance with Paragraph 77.  While the Department continues to struggle with its analysis of aggregate data to identify necessary corrective actions, the County understands that its quality improvement efforts in that regard will remain subject to monitoring under Provision 61, where it should focus with intensity in the next Reporting Period.

78.     The County and the Sheriff will maintain a county-level Suicide Prevention Advisory Committee that will be open to representatives from the Sheriff's Department Custody Division, Court Services, Custody Support Services, and Medical Services Bureau; the Department of Mental Health; the Public Defender's Office; County Counsel's Office; the Office of the Inspector General; and the Department of Mental Health Patients' Rights Office.  The Suicide Prevention Advisory Committee will meet twice per year and will serve as an advisory body to address system issues and recommend coordinated approaches to suicide prevention in the Jails.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of May 11, 2016, through May 18, 2017)**

Substantial Compliance requires (1) the Committee to meet twice per year and (2) "recommend coordinated approaches to suicide prevention in the Jails."

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 78 in the Sixteenth Reporting Period.  Nevertheless, the County has continued to hold Bi-Annual Suicide Prevention meetings through the last reporting period, which the Monitor endeavors to attend.

79 (**Revised**).  (a)      Unless clinically contraindicated, the County and the Sheriff will offer prisoners in mental health housing:

(i)      therapeutically appropriate individual visits with a QMHP;

(ii)      therapeutically appropriate group programming conducted by a QMHP or other appropriate provider that does not exceed 90 minutes per session;

(b)      The date, location, topic, attendees, and provider of programming or therapy sessions will be documented.  A clinical supervisor will review documentation of group sessions on a monthly basis.

**STATUS:      NON-COMPLIANCE**

On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provision 79 ("Revised Paragraph 79") as set forth above.  They also agreed on Revised Compliance Measures.  Under the Revised Compliance Measures, Substantial Compliance requires the Department to maintain records of therapeutically appropriate individual visits and group programming, and the names of the clinical supervisors who reviewed such records and the conclusions of their reviews.  It also requires that 95% of the prisoners in HOH are offered therapeutically appropriate structured mental health treatment, including at least a weekly QMHP visit and group programming, and that 90% of prisoners in MOH are provided visits by a QMHP at least once a month as well as therapeutically appropriate structured mental health treatment.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 79 by June 30, 2024.

The County's Sixteenth Self-Assessment reports that in the Fourth Quarter of 2022, the names and conclusions of the supervisor who reviewed documentation of group sessions were recorded.  The County also reports that "for Measure 79-4(b), which requires that 95% of HOH patients be offered an individual visit by a QMHP and weekly group programming, the County achieved 37% compliance."  "For Measure 79-4(c), which requires that 90% of patients in MOH be offered individual monthly visits by a QMHP and therapeutically appropriate structured treatment, the County achieved 46% compliance."

The County's Augmented Sixteenth Self-Assessment reports that in the First Quarter of 2023, the names and conclusions of supervisors who reviewed documentation of group sessions were recorded.  The County also reports that "for Measure 79-4(b), which requires that 95% of HOH patients be offered an individual visit by a QMHP and weekly group programming, the County achieved 7% compliance."  "For Measure 79-

133

4(c), which requires that 90% of patients in MOH be offered individual monthly visits by a QMHP and therapeutically appropriate structured treatment, the County achieved 39% compliance."

Regarding these results, the County reports

The County believes that the way that group programming is currently tracked understates the groups that are actually being offered to patients subject to Provision 79. Currently, there is not adequate clinical documentation in the electronic medical record to reflect when group programming is offered rather than actually attended. The County therefore currently uses a manual tracking system to capture data pertaining to the offers of group programming. These trackers will be included in the support documentation. Because this is a manual process, however, the County submits that it does not fully capture all of the programming that is actually being offered. The County is continuing to explore ways to electronically capture offers of group programming, and also additional training for providers to ensure that they are fully capturing all group programming offered and attended.

Compliance with Provision 79 has been also been [*sic*] challenging as a result of the shortage of mental health staff, including staff and contractors to provide comprehensive group programming. Staff shortages also impact the timeliness of individual follow-up.

The County is currently focusing significant effort on both addressing CHS staffing shortages generally and also on approaches to build the County's capacity to offer more group programming hours. These efforts are described in more detail in the augmented self-assessments for Provisions 66 and 80, as well as in the concurrently provided tracker. The County anticipates that as staffing shortages are addressed and capacity for group programming is expanded, there will be overall improvement in compliance with this provision in future quarters.

Indeed, the issues reported by the County manifested in the chart reviews performed by the Monitoring Team in the Sixteenth Reporting Period. In August 2023, the Team performed a qualitative review of Provision 79. They assessed "30 cases from MOH and 30 cased from HOH, with 15 males and 15 females from each level of care. Male cases were from TTCF for the HOH sample, and a mixture of TTCF, PDC-N, and MCJ for the MOH sample. The rates at which males and females in MOH were offered individual treatment differed, with 11/14 = 79% of males (one case was indeterminate) offered individual treatment vs. 8/15 = 53% of females. In HOH, 15/15 = 100% of males were offered individual treatment vs. 12/14 = 86% of females (one case was N/A due to being primarily at an inpatient level of care for the period under review). Overall, 46/58 = 79% of cases were offered individual treatment." Significantly

In 0 of 47, that is, 0% of cases, was the treatment specified in a treatment plan (thirteen cases were N/A or indeterminate).  This is in spite of recent changes in documentation patterns which sometimes now includes separate entries labeled 'Treatment Plan' and usually includes sections of the progress notes labeled 'plan' and 'interventions.'  Where present, these were not considered to be sufficiently specific or individualized to qualify as a treatment plan.  Specifically, the 'goal' at the top of most progress notes typically appears to reflect goals for the session (e.g., to assess the patient) rather than treatment goals.  When interventions were specifically listed, these were typically in boilerplate language that appears to have been populated from a drop-down list or cut and pasted into the note; they were not sufficiently specific or individualized and many were focused on assessment rather than treatment.  Chart entries labeled 'Treatment Plan' were uniformly skeletal in the information they contained; they appeared to be selected from a menu of possible entries, were not sufficiently individualized or tied to specific mental health needs assessed for the patient, and were not considered sufficient to effectively guide treatment for the patient.

For the total sample, in 1/46 = 2% of cases the treatment could be said to be evidence-based. Some made reference to a recognized modality or treatment approach (e.g. CBT, or Cognitive Behavioral Therapy), but were not further specified and so did not provide particularly useful information about how a patient was actually being treated.

Regarding group therapy, the team found that there was a "significant difference between MOH and HOH, where 3/29 = 10% of MOH patients vs. 24/29 = 83% of HOH patients were offered group therapy.  This suggests the emphasis may be on ensuring that HOH patients receive group therapy and that staffing is still a limitation to group treatment in MOH.  However, in none of the cases was the group therapy delivered according to a treatment plan. Moreover, none of the group therapy was considered evidence-based or guided by individualized treatment planning."

These findings echo the concerns expressed above in the discussions of Provisions 36 and 40 regarding the County's own positive self-audits of its own treatment planning, which sharply contrast with the findings of the Monitoring Team that clinically adequate treatment planning is not being conducted for majority of patients with serious mental illness in the Los Angeles County jails.  The Monitoring Team remains available for additional meetings with County staff to further clarify expectations on this issue.

According to the County's implementation plan tracker, the County has completed all seven corrective action steps regarding Provision 79.  These steps include: monitoring treatment plans generating by each staff member (completed May 2023 and ongoing); reaching out to potential PSW candidates (completed April 2023 and ongoing); conducting a pay analysis relating to County mental health personnel (completed March 2023); performing quarterly staffing analyses (completed August 2023 and ongoing);

reorganizing the delivery of its services to allow clinicians to be assigned by location for
MOH (P2) patients in addition to HOH (P3 and P4) patients (completion date unclear);
adopting a uniform treatment plan that allows for accommodations to a patient's level of
need and engagement (completed September 2022); and providing training on treatment
plans specific to each patient's needs (completion date unclear).

80.     (a)     The County and the Sheriff will continue to make best efforts to provide appropriate out-of-cell time to all prisoners with serious mental illness, absent exceptional circumstances, and unless individually clinically contraindicated and documented in the prisoner's electronic medical record.  To implement this requirement, the County and the Sheriff will follow the schedule below:

(i)     By no later than six months after the Effective Date, will offer 25% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week;

(ii)     By no later than 12 months after the Effective Date, will offer 50% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week; and

(iii)     By no later than 18 months after the Effective Date, will offer 100% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week.

(b)     No later than six months after the Effective Date, the County and the Sheriff will record at the end of each day which prisoners in HOH, if any, refused to leave their cells that day.  That data will be presented and discussed with DMH staff at the daily meeting on the following Normal business workday.  The data will also be provided to the specialized unit described in Paragraph 77 and to DMH's quality improvement program to analyze the data for any trends and to implement any corrective action(s) deemed necessary to maximize out-of-cell time opportunities and avoid unnecessary isolation.

STATUS (80):           NON-COMPLIANCE

Paragraph 80 requires that, "no later than 18 months after the Effective Date [July 1, 2015]," 100% of the prisoners in HOH receive "ten hours of unstructured out-of-cell recreational time *and* ten hours of structured therapeutic or programmatic time per week."  The parties have agreed that up to five hours of the structured time can consist of education or work programs, but at least five hours of the time must be therapeutic.

On December 27, 2022, and on April 20, 2023, the Court issued Orders Setting Deadlines for Substantial Compliance, ECF No. 234 and 248, respectively, which established specific deadlines for Defendants to "improve compliance with provisions 63, 64, and 80."  With respect to Provision 80, the December 2022 Order established deadlines for Defendants to take a series of "agreed-upon actions to improve compliance,"[55] while the April 2023 Order established incremental targets for the Defendants' overall compliance with the provision by the end of upcoming quarters.

*Figure 6:  Quarterly Court-Ordered Targets for Provision 80 Compliance*

| Targets by Quarter | % of HOH Inmates Receiving 10 Hours Unstructured Out-of-Cell Time | % of HOH Inmates Receiving Structured Out-of-Cell Time | Total Hours of Structured Out-of-Cell Time | # of Group Hours (of total Structured Out-of-Cell Time) |
|---|---|---|---|---|
| 2Q2023 | 85% | 50% | 5 | 2.5 (of 5) |
| 3Q2023 | 90% | 60% | 6 | 3 (of 6) |
| 4Q2023 | 95% | 70% | 7 | 3.5 (of 7) |
| 1Q2024 | 100% | 75% | 7.5 | 3.75 (of 7.5) |
| 2Q2024 | | 80% | 8 | 4 (of 8) |
| 3Q2024 | | 85% | 8.5 | 4.25 (of 8.5) |
| 4Q2024 | | 90% | 9 | 4.5 (of 9) |
| 1Q2025 | | 95% | 9.5 | 4.75 (of 9.5) |
| 2Q2025 | | 100% | 10 | 5 (of 10) |

The County's Sixteenth Self-Assessment reports that in the Fourth Quarter of 2022, 76.9% of the HOH prisoners at CRDF and 73.8% of the HOH prisoners at TTCF

---

[55] For example, it required Defendants to complete the conversion of PDC North to an all-MOH facility by July 31, 2023, to obtain the licensure by February 28, 2023 for, and thereafter begin operating, a psychiatric urgent care unit with at least 20 beds, to expand the number of FIP Stepdown units incrementally until 30 Stepdown pods are operating in June 2025, to provide proof that at least 750 individuals are receiving treatment through the Medication Assisted Treatment program by June 30, 2023 and 1,500 by June 30, 2024, and to take various steps to expand the amount of out-of-cell time provided to HOH patients.

were offered "unstructured out-of-cell time by Custody staff."  The County's Sixteenth Self-Assessment also reports that in the First Quarter of 2023, 55% and 83% of HOH prisoners were offered unstructured out-of-cell time at CRDF and TTCF, respectively.[56]

The County also reports data for structured therapeutic or programmatic time. According to the County's Sixteenth Self-Assessment, 0% for CRDF and TTCF, rather than the required 100%, of prisoners residing in HOH were offered the required structured out-of-cell time during the Fourth Quarter of 2022.  For the First Quarter of 2023, the County's Augmented Sixteenth Self-Assessment reports that 2% for TTCF, rather than the required 100% of prisoners residing in HOH, were offered the required structured out-of-cell time.  At CRDF, "no HOH inmates were offered ten hours of structured out-of-cell time."[57]

The County acknowledges that these results fall "far short of what is required to obtain substantial compliance with Provision 80 and reflect the County's ongoing challenges in building capacity to provide structured and group programming to the sizable P3/P4 population residing in the LACJ."  The County reports some incremental progress at getting inmates at TTCF at least a small number of hours of structured programming, and a continuing shortage of group providers at CRDF.  Moreover, the County reports that it has made other recent progress that is not yet reflected in its compliance results

> CHS has been working on three different fronts to increase its capacity to provide structured group programming. First, it is piloting using psychology interns (graduate students) to run structured therapeutic groups through a new contract with Chicago School of Professional Psychology ("CSPP"). Pursuant to this contract, ten graduate students at the CSPP will be participating in a clinical program at the school in which each student will provide at least 16 to 24 hours of group programming targeting HOH inmates on a weekly basis during the school's academic year. The Department and the CSPP are currently working to clear and onboard these 10 students so this pilot program can commence. At this juncture, one student has been cleared to work in the LACJ and others should be following shortly, after which they will go through an orientation process and begin to provide group services. Second, the County has increased efforts to retain contractors to provide group programming. Specifically, in June 2023, the County released a new solicitation for contract providers. It received a total of five responses to this solicitation, which are now under review to make sure that the providers meet minimum qualification requirements. The solicitation will stay open until the needs

---

[56] The Monitor notes that moving a greater number of HOH patients into FIP stepdown units or HOH dorms would remedy many of the County's challenges with providing a sufficient number of unstructured out-of-cell hours.

[57] The DOJ has rightly noted the high degree of variance across modules at CRDF for both structured and unstructured time.  The County should investigate the causes of these discrepancies so that they can be promptly addressed.

of CHS are met for providing structured group programming. The objective is to have new contract providers starting in the Fall of 2023. Third, CHS is offering overtime to CHS staff to provide group programming at the higher compensation rates resulting from recently implemented jail-based assignment bonuses of up to 20 percent to incentivize its current staff to fill in deficits in group programming hours CHS is required to provide.

In addition, the County reports that it has conducted several trainings with recently onboarded group programmers at TTCF and CRDF. The County also provides several updates on its efforts to reduce the population of P3 and P4 inmates in custody (as discussed elsewhere in this Report), which will reduce demand for structured programming. It also reports on its efforts to "improve documentation of offers to participate in both structured and unstructured out-of-cell time." This includes "working to improve documentation in ORCHID, and also to train providers to consistently and regularly document offers of such programming. The Department is also working on documentation improvements, and the Correctional Innovative Technologies Unit ("CITU") has recently adjusted the e-UDAL algorithm so that specific pods may be selected when a report is generated to ensure an accurate calculation of when out-of-cell time is offered, when it is accepted, and when and why it is refused."

According to the County's implementation plan tracker, the County has completed 9 out of 12 corrective action steps regarding Provision 80. These steps include: implementing a rotating schedule at TTCF that pulls Sergeants assigned to the Emergency Response Team and task them with removing from HOH individuals that no longer require HOH care (completed April 2022); incentivizing more out-of-cell time in HOH, including through purchasing supplies and adding activity programming (completed April 2022); improving documentation of out-of-cell time by finishing transition to Orchid (completion date unclear); gathering and providing data about implemented measures, and making projections about the impact of measures on out-of-cell time (completion date unclear); submitting supplemental implementation plan for Provision 80 (completed February 2023); addressing staffing shortages of LASD staff that have made it difficult to move P3 and P4 inmates for structured out-of-cell time (completion date unclear, incremental targets); increasing CHS capacity to provide 7,500 hours of group programming per week (completion date unclear, incremental targets); and reduce P3/P4 population to no more than 750 inmates (completion date unclear, incremental targets).

81.     Except as specifically set forth in Paragraphs 18-20 of this Agreement, and except as specifically identified below, the County and the Sheriff will implement the following paragraphs of the Implementation Plan in *Rosas* at all Jails facilities, including the Pitchess Detention Center and the Century Regional Detention Facility, by no later than the dates set forth in the Implementation Plan or as revised by the *Rosas* Monitoring Panel:  Paragraphs 2.2-2.13 (use of force policies and practices); 3.1-3.6 (training and professional development); 4.1-4.10 (use of force on mentally ill prisoners); 5.1-5.3 (data tracking and reporting of force); 6.1-6.20 (prisoner grievances and complaints); 7.1-7.3 (prisoner supervision); 8.1-8.3 (anti-retaliation provisions); 9.1-9.3 (security practices); 10.1-10.2 (management presence in housing units); 11.1 (management review of force); 12.1-12.5 (force investigations, with the training requirement of paragraph 12.1 to be completed by December 31, 2016); 13.1-13.2 (use of force reviews and staff discipline); 14.1-14.2 (criminal referrals and external review); 15.1-15.7 (documentation and recording of force); 16.1-16.3 (health care assessments); 17.1-17.10 (use of restraints); 18.1-18.2 (adequate staffing); 19.1-19.3 (early warning system); 20.1-20.3 (planned uses of force); and 21.1 (organizational culture).

### STATUS:       PARTIAL COMPLIANCE

Because Paragraph 81 of the Settlement Agreement incorporates 100 provisions in the Implementation Plan adopted in the *Rosas* case, the parties agreed in the Compliance Measures adopted in this case that "Substantial Compliance with respect to the substance of the policies required by the *Rosas* Implementation Plan would be determined by the *Rosas* Monitors."  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 81 by June 30, 2024.

The Compliance Measures in this case provide that "[o]nce the policies have been approved by the *Rosas* Monitors, the Monitor and Subject Matter Expert will confirm and assess the implementation of these policies in the [DOJ facilities]."  In assessing the Department's compliance with Paragraph 81, the Monitor has grouped the 100 provisions into seven categories and, with input from the Subject Matter Experts, has assessed the Department's compliance on a category-by-category basis.  With the exception of the Training category, which is assessed when certain percentages are reached, the Department will no longer be subject to monitoring for the provisions in a particular category once the Monitor has determined that it has achieved and maintained for twelve consecutive months Substantial Compliance with the intent and purpose of the overall category.  The Department will no longer be subject to monitoring for compliance with Paragraph 81 once it has achieved and maintained for twelve consecutive months Substantial Compliance with each of the categories.

According to the County's implementation plan tracker, the County has completed 18 out of 27 corrective action steps regarding Provision 81.  These steps include: providing updated versions of implementation plans (process is begun and is ongoing); requesting new staffing model at CRDF to increase grievance staffing (completed April 2022); developing training and workflow to improve grievance

timeliness (completed April 2022); meeting with CCSB to review probationary employee training tracker (process is begun and is ongoing); meeting with DOJ Settlement Agreement Commander, Commander and Chief overseeing CRDF regarding probationary employee training tracker (completed September 2021 and June 2022); providing plan for monthly self-assessments regarding probationary employee training (June 2022); monitoring progress based on monthly probationary employee training self-assessments (process is begun and is ongoing); conducting monthly self-assessments, developing data-based corrective actions, and setting benchmarks (completed September 2021 and June 2022); briefing custody facilities on dangers of striking individuals in the head (completed May 2022); training on new directives (completed in 2023); finalizing data-driven review process to track the effectiveness of new directives for the WRAP and head strikes (completed in 2022); developing process for a force-related performance review process (completed September 2020); creating a report on the process for review (completed in 2022); implementing the force-related performance review process (completed in 2022); forming a work group to explore the possibility of creating a new force reporting memo (completed July 2023); creating a force report guide for deputies (completed August 2022); reporting on the workgroups progress (completed July 2023); and distributing the approved force report guides (completed August 2022).

**Training (Partial Compliance)**

Paragraphs 3.1-3.6, 4.6-4.9, and 12.1 of the *Rosas* Implementation Plan reflect training requirements on use of force, ethics, dealing with inmates with mental illness, and investigations of force incidents. The curriculum and lesson plans to implement these training requirements have been approved by the *Rosas* Monitors.

The Monitor's Fourteenth Report reflected that the annual refresher training results for 2021 related to 3.2, 4.6, and 12.1-1 were verified by the Monitor's auditors. It also reflected that the County's posted results reflected Partial Compliance for the annual refresher training results for 2021 related to 3.1 and 4.7.

The County's Augmented Sixteenth Self-Assessment reports that the Department met the Substantial Compliance thresholds for the following Training provisions at the DOJ facilities during the Fourth Quarter of 2022: 3.3, 3.5,[58] 4.8, 4.9, and 12.1-2.[59] The reported results for 3.3, 4.8, 4.9, and 12.1-2 have been verified by the Monitor's auditors. The County also reported that the Department did not achieve Substantial Compliance with 3.6 (timely 6-month probationary reviews), though its results improved. The County also reports that the Department met the Substantial Compliance thresholds for the following refresher training requirements for 2022: 3.1, 3.2, 4.6, 4.7, and 12.1-1. The reported results for 3.2, 4.6, and 12.1-1 have been verified by the Monitor's auditors. The reported results for 4.7 are subject to verification by the Monitor's auditors. The

---

[58] The posted results for 3.5 indicate that "[t]here were no inmate grievances against staff investigations involving force with a finding of "Appears the Employee Conduct Could Have Been Better."

[59] Because Paragraph 81 incorporates all 104 provisions of the *Rosas* Implementation Plan in a single provision, the Monitor agreed to the use of random samples in some cases instead of requiring assessments of all personnel or incidents, which the Monitor believes would be unduly burdensome for the Department.

reported results for 3.1 were not verified by the Monitor's auditors.

The County's Augmented Sixteenth Self-Assessment also reports that the Department met the Substantial Compliance thresholds for the following Training provisions at the DOJ facilities during the First Quarter of 2022: 3.3, 3.5,[60] 4.8, 4.9, and 12.1-2.  The reported results for 3.3, 4.8, 4.9, and 12.1-2 have been verified by the Monitor's auditors.

**Use of Force (Partial Compliance)**

The Department achieved noteworthy reductions in the total number of uses of force in the DOJ facilities in the Sixteenth Reporting Period.  According to Department data, the total number of force incidents in the First Quarter of 2023 decreased by 22% compared to the Fourth Quarter of 2022 and by 16% compared to the First Quarter of 2022.

*Figure 7:  Total Use of Force by Quarter*



These declines appear independent of fluctuations in the facilities' average daily populations.  Figure 8 presents the total use of force incidents per 100 inmates, based on average daily population, between the First Quarter of 2020 and the First Quarter 2023.  The 1.42 uses of force per 100 inmates in the First Quarter of 2023 was approximately 20% less than the average for that time period.

---

[60] The posted results for 3.5 indicate that "[t]here were no inmate grievances against staff investigations involving force with a finding of "Appears the Employee Conduct Could Have Been Better."

*Figure 8:  Uses of Force Per 100 Inmates by Quarter*



When examined by facility, a key difference in the number of uses of force per inmate becomes apparent.  Figure 9 presents the number of use of force incidents per 100 inmates in the Fourth Quarter of 2022 and the First Quarter of 2023 by facility.  CRDF averaged the highest number of force incidents at 6.40 uses of force per 100 inmates.  NCCF averaged approximately half that number at 3.22.  PDC South and North were substantially lower, with 1.06 and 0.88 averages, respectively.  The County should expeditiously investigate the causes of this proportionally higher number of uses of force at CRDF and take appropriate corrective action.[61]

*Figure 9:  Uses of Force Per 100 Inmates by Facility, Q4-2022 and Q1-2023*

---

[61] The County notes various distinctions between CRDF and its comparator facilities, including the fact that CRDF "houses people at all stages of incarceration and at all levels of mental health care" and also houses people who have recently been arrested, are detoxing, and also subjects inmates to various screenings "that can become flashpoints" for conflict.  While this is useful context, the County is encouraged to investigate other potential causes of the discrepancies in use of force rates.

Figure 10 presents the total uses of force by quarter and category. Category 1 Force was the most common, though the number of Category 1 Force incidents in the First Quarter of 2023 decreased by 31% compared to the Fourth Quarter of 2022 and 46% compared to the Second Quarter of 2022. Category 2 Force incidents also declined, though not at the same rate as Category 1 Force incidents.

*Figure 10:  Total Use of Force by Category and Quarter*



Figures 11 through 14 break out these data by facility. In the First Quarter of 2023, Category 1 Force incidents at NCCF decreased by 22% compared to the Fourth Quarter of 2022 and 52% compared to the Second Quarter of 2022. Similarly, Category 1 Force incidents at CRDF decreased by 35% compared to the Fourth Quarter of 2022 and 37% compared to the Second Quarter of 2022. Incidents at PDC North and South facilities, where force is used substantially less often, did not vary significantly in recent quarters.

*Figure 11: Total Use of Force by Category, Quarter, and Facility*

 




Among the most significant and persistent issues identified by the Monitoring Panel in the *Rosas* case has been the overuse of head strikes in the downtown Basin facilities in violation of the *Rosas* provisions.[62] LASD provided information about the number of use of force incidents that involved head strikes from the First Quarter of 2021 through the First Quarter of 2023. Across this time period, the DOJ facilities averaged a combined 4.1 force incidents with head strikes per quarter. Recent quarters were consistent with this average, but lower than the peaks in the Second and Fourth Quarters of 2021.

*Figure 12: Uses of Force with Head Strikes by Quarter*



Figure 13 presents the total number of force incidents involving head strikes in the Fourth Quarter of 2022 and First Quarter of 2023 by facility. There were 4 such incidents at NCCF. Head strikes were less common at CRDF and PDC North, and there were no head strike incidents at PDC South.

---

[62] *See, e.g.*, *Rosas, et al., v. Leroy Baca*, No. CV 12-00428 DDP, Panel's Eleventh Monitoring Report, filed Mar. 8, 2023.

*Figure 13:  Uses of Force with Head Strikes by Facility, Q4-2022 and Q1-2023*



The Monitor and Court-Appointed Use of Force Expert Susan McCampbell reviewed 25 completed force packages for the DOJ facilities during the Sixteenth Reporting Period.  As a result of objections by the plaintiffs in the *Rosas* case, the *Rosas* Monitors revised their approach to assessing the Department's compliance with the use, reporting and investigation of force provisions of the Implementation Plan.  Under the revised approach, the *Rosas* Monitors do not determine the percentage of cases in which the Department's use of force was reasonable overall, but instead assess the Department's compliance with the specific provision on the use, reporting, and investigation of force provisions of the Implementation Plan.  To maintain consistency across all of the jail facilities, the Monitor has adopted the same approach in the DOJ case.

The County's Sixteenth Self-Assessment indicates a request for "a more collaborative review process" in which the "Monitoring Panel meets with representatives of LASD's Custody Division to review and analyze the particular force packages about which the Panel has raised concerns."  The Monitor reminds the County that the Monitor and Use of Force Subject Matter Expert McCampbell met with Custody Division leadership on June 5, 2023, to watch video of force incidents, review deputy reports and command memos, and discuss the Monitoring Team's concerns about particular use of force packages—and the force review process—with Department executives.  During that same visit, the Team met with the Assistant Sheriff of the Custody Division to discuss similar issues.  Counsel for the County is invited to attend the force review meetings, which occur during jail site visits.  In the meeting with Department executives, the Team focused, among other things, on compliance with Provision 2.2 as a threshold issue for the Department in its efforts to comply with Provision 81.[63]

---

[63] The County has also requested a spreadsheet, or "Matrix," of the Monitoring Team's scoring of use of force packages to enable it to "ensure that the provisions are being assessed correctly, and to develop corrective actions with a full understanding of any identified deficiencies."  Subject to further discussion with County personnel to ensure that the Matrix will be used to address the substantive issues with the force packages, rather than to engage in unproductive debate about ratings, the Monitoring Team is amenable to providing such a Matrix in the next Reporting Period.

Provision 2.2 requires that the force used by Department members (a) must be used as a last resort; (b) must be the minimal amount that is necessary and objectively reasonable to overcome the resistance; (c) must be terminated as soon as possible consistent with maintaining control of the situation; and (d) must be deescalated if resistance decreases. To be clear, force is sometimes unavoidable in correctional environments, and custody personnel have a right to defend themselves or others from attack. However, Department personnel often enjoy significant advantages that allow them to utilize non-force options. This includes the speed with which backup generally arrives in response to radio calls for assistance, use of time and distance, access to mental health staff and chaplains to attempt to de-escalate, the ability to use the physical environment, and closing cell doors on aggressive or hostile inmates. Notwithstanding these advantages, too often in the packages reviewed during the Sixteenth Reporting period, the Team found Department members to have violated Provision 2.2. For example

- Inmates were fighting in a dorm at NCCF. When deputies were about to make entry, one inmate lay facedown on the floor. When they arrived, the inmate flipped over and punched a deputy, which prompted multiple deputies to punch him while he was on the ground. Rather than using their superior numbers to restrain his arms, one deputy threw 15 punches, another 6, and another 5. The inmate sustained a fractured orbital bone. Almost a year later, the Executive Force Review Committee met and issued a memo concluding that the "tactics and force were within Department policy."[64]  921-02247-5640-058

- Deputies were searching a dorm at NCCF and one inmate appeared to be agitated, pacing around, and did not follow commands to go onto his bunk. Pursuant to the Department's Recalcitrant Inmate Policy, in this circumstance, deputies are required to request a sergeant (and/or a mental health professional) to develop "a planned tactical approach to the situation that will reduce the possibility of physical confrontation or injuries." Deputies instead approached the inmate, tased him, and took him to the ground. When the inmate tried to stand up again, a deputy ran a second taser cycle, again incapacitating him. Some of the reports filed by Deputies made questionable claims about the inmate's behavior, including that he had been about to assault a deputy who he "charged" or "lunged" at, which was belied by video of the incident.  922-00486-5640-145

- Deputies were removing old food from inmate property in a dorm at PDC North. Inmates were at a table eating and one of them stood up and appeared agitated. With no attempts to de-escalate, one of the deputies came around his side and deployed his Taser, which struck and incapacitated the inmate. Reviewers noted that the deputies should have given more verbal commands to the inmate, and that

---

[64] However, a sergeant was found to have improperly supervised during the incident, resulting in the loss of one day's pay and being sent to retraining on proper supervision of uses of force.

the deputy who used force "let his emotions get the better of him."  922-00253-5630-505

- An inmate punched a deputy in the face during morning count.  The deputy defended himself by punching the inmate several times in the head and torso.  Other deputies quickly arrived and the inmate was taken to the ground.  While on the ground, the inmate, who was of small stature (5'4" and 130 lbs.), continued to struggle and he was punched again notwithstanding the fact that he was on the ground and 6 deputies were by then involved and could have restrained him.  921-00038-5640-145

The Monitor and Use of Force Expert reiterate that 2.2 is a threshold issue related to the Department's compliance with Provision 81, and the County should focus on ensuring consistent compliance with its mandates in the future.

### Reporting and Investigation of Force (Partial Compliance)

The timely investigation of force incidents is essential to ensuring the thoroughness of those investigations and accountability in the Department.  Department data reflect that there continue to be serious delays in the process of investigating use of force incidents at the DOJ facilities.  As part of its self-assessment, LASD provided information about the status of force investigations into incidents in the First Quarter of 2022 through the First Quarter of 2023.  Figure 14 presents the percentage of these investigations that were still in progress at the time the data were provided.  Among the investigations into force incidents that occurred in the First Quarter of 2022, 57% were still in progress as of July 5, 2023—more than a year later.  Among those still in progress, the average age of investigations into force incidents from the First Quarter of 2022 through the First Quarter of 2023 was 319 days.

*Figure 14:  Percentage of Force Investigations In Progress as of July 5, 2023, Q1-2022 through Q1-2023*



Figure 15 presents the overall percentage of investigations into incidents occurring in the First Quarter of 2022 through the First Quarter of 2023 that were still in progress by facility.  Of the 188 investigations into uses of force at CRDF during this time period, 91% were still in progress as of July 5, 2023.  NCCF had a total of 328 investigations, and 81% were still in progress.  A substantially smaller percentage of force investigations were in progress at the North and South facilities, though they also had far fewer investigations to complete during this time period (16 each).

*Figure 15:  Percentage of Force Investigations In Progress as of July 5, 2023, by Facility, Q1-2022 through Q1-2023*

Figure 16 provides a similar comparison, but for the category of force used during the incidents occurring in the First Quarter of 2022 through the First Quarter of 2023.  Of the 459 Category 1 Force incidents under investigation during this time period, 85% were still in progress as of July 5, 2023.  A smaller percentage of the 87 investigations into Category 2 Force incidents were still in progress (69%).  During this time period, there were only 2 investigations into Category 3 Force incidents, and both were still in progress.

150

*Figure 16:  Percentage of Force Investigations In Progress as of
July 5, 2023, by Category, Q1-2022 through Q1-2023*



Figure 17 presents the overall percentage of investigations into incidents occurring in the First Quarter of 2022 through the First Quarter of 2023 that were still in progress by whether the incident occurred in a mental health housing unit.  Of the 141 force incidents in mental health housing units under investigation during this time period, 87% were still in progress as of July 5, 2023.  There were 407 force incidents that occurred in other housing units under investigation during this time period, and 80% of these were still in progress.

*Figure 17:  Percentage of Force Investigations In Progress as of
July 5, 2023, by Mental Health Housing, Q1-2022 through Q1-2023*



The Department reports that it issued corrective action plans to NCCF and PDC South related to overdue investigations into force packages.  The Monitor reiterates that the timeliness of the force investigation process is a pressing issue that requires the County's urgent attention.  The County should include detailed information about its

plans to address this issue, including specifics about the new Force Investigation Unit, in its next Self-Assessment if not before.

Regarding the quality of the command reviews in the packages examined during the Sixteenth Reporting Period, Court-appointed Use of Force Subject Matter Expert McCampbell noted

> Often the reviews conducted by command personnel are shallow examinations of the specific moments in which force is being rather than of the circumstances that led to the need to use force, or patterns that can and should be corrected.  In only a small minority of the packages examined did the investigator or command reviewer identify contributors to the need to use force at all, including staff inattentiveness, poor operational or escort practices, or problems associated with the management of the inmate housing unit.  Moreover, the source of the delay in processing force packages is also unclear as little (if any) investigation is conducted after the initial reports, interviews, and video are collected close in time to the incident.  Thus, delays of a year or more are not explained by ongoing investigative work or follow-up interviews, which are rarely conducted.

During the Sixteenth Reporting Period, the Department was also not in compliance with Paragraph 15.6 (separation of custody personnel until they have completed their use of force reports), 12.2 (inmate witnesses should be asked to be interviewed, and interviewed, away from other inmates), and 16.2 (photographs of Department member injuries).

Regarding the Department's quantitative results on the specific provisions, for the Fourth Quarter of 2022, the County reported Substantial Compliance with the following provisions: 5.1 (timely database entry of force incidents); 8.3 (timely review of retaliation grievances); 11.1 (timely review of force packages by CFRT for potential employee discipline); 13.1 (zero tolerance and related investigations); 13.2 (notifications to OIG required by findings in 13.1); 14.1 (timely unit commander review re: prosecution for inmate assaults on staff); and 14.2 (timely referral of criminal inmate conduct to DA's Office).[65]

For the First Quarter of 2023, the County's Augmented Sixteenth Self-Assessment reports Substantial Compliance with the following provisions: 5.1 (timely database entry of force incidents); 8.3 (timely review of retaliation grievances); 11.1 (timely review of force packages by CFRT for potential employee discipline); 13.1 (zero tolerance and related investigations); 13.2 (notifications to OIG required by findings in

---

[65] The County has requested that 5.1-4(a) be assessed separately from sections (b) and (c) "given that this is the first time the Department has been asked to provide a self-assessment for sections (b) and (c)."  The Monitor will grant that request for the Sixteenth Reporting Period but in future Reporting Periods, in order to be found compliant with 5.1, the Department must meet the applicable thresholds for 5.1-4(a), (b), and (c).

13.1); 14.1 (timely unit commander review re: prosecution for inmate assaults on staff); and 14.2 (timely referral of criminal inmate conduct to DA's Office).

### Grievances (Partial Compliance)

The County's Augmented Sixteenth Self-Assessment reports that in the Fourth Quarter of 2022, the Department achieved Substantial Compliance with the following grievance provisions at the DOJ facilities: 6.5 (proper handling of harassment and retaliation grievances); 6.7 (appropriate handling of grievances marked emergency"); 6.8 (inmate notification of downgraded grievances); 6.9 (proper handling of emergency grievances); 6.10 (timely collection of inmate grievances); 6.11 (review of complaints re: inmate grievance process); 6.12 (proper database entry of inmate grievances); 6.13 (proper tracking of handling of inmate grievances); 6.14 (monthly reports of grievance tracking); 6.15 (evaluation of trends in inmate grievance handling); 6.18 (proper handling of PREA grievances); 6.20 (proper handling of inmate appeals); 7.1 (conflict resolution for inmate grievances); 7.2 (timely notification of grievance investigation results); 7.3 (town hall meetings); and 8.1 (reporting of retaliation grievances). The County reported that the Department did not achieve compliance with 6.4 (proper handling of force-related grievances); 6.17 (time limit for filing force-related grievances); and 6.19 (timely responses to inmate grievances).

The County's Augmented Sixteenth Self-Assessment reports that in the First Quarter of 2023, the Department achieved Substantial Compliance with the following grievance provisions at the DOJ facilities: 6.4 (proper handling of force-related grievances); 6.5 (proper handling of harassment and retaliation grievances); 6.7 (appropriate handling of grievances marked "emergency"); 6.8 (inmate notification of downgraded grievances); 6.9 (proper handling of emergency grievances); 6.10 (timely collection of inmate grievances) 6.11 (review of complaints re: inmate grievance process); 6.12 (proper database entry of inmate grievances); 6.13 (proper tracking of handling of inmate grievances); 6.14 (monthly reports of grievance tracking); 6.15 (evaluation of trends in inmate grievance handling); 6.17 (time limit for filing force-related grievances); 6.18 (proper handling of PREA grievances); 6.19 (timely responses to inmate grievances); 6.20 (proper handling of inmate appeals); 7.1 (conflict resolution for inmate grievances); 7.2 (timely notification of grievance investigation results); 7.3 (town hall meetings); and 8.1 (reporting of retaliation grievances).

### Management and Administration (Substantial Compliance as of October 1, 2020 through September 30, 2021)

The Department achieved Substantial Compliance with the Management and Administration Provisions at the DOJ facilities as of September 30, 2021, and these provisions were not subject to Monitoring during the Sixteenth Reporting Period.

### Security Restraints (Partial Compliance)

Security Restraints are subject to the provisions in Section 17 of the *Rosas* Plan.

It is the Monitor's understanding that the County and the Department do not use "multi-point restraints," which are subject to Paragraphs 17.6 through 17.9 of the plan, at any of the County's jail facilities.  The Monitor reviewed the Safety Chair Logs and Fixed Restraint Logs for both quarters, which reflect that the facilities that produced such logs are complying with the requirements of Paragraphs 17.3 and 17.4 of the *Rosas* Plan.

The Department posted logs of all involuntary medications administered in the Fourth Quarter of 2022 and First Quarter of 2023.  The records reflect that all of the medications were administered per court orders to restore the competency of those deemed incompetent to stand trial and none were solely for security purposes in compliance with Paragraph 17.10 of the *Rosas* Plan.

The Monitor and Subject Matter Expert reviewed multiple incidents involving the use of the WRAP restraint during the Sixteenth Reporting Period.  In the majority of these incidents, no specific justification was provided in use of force documentation regarding the reason for the application of the WRAP.  When a justification was provided, it was often extremely general.  Supervisors must be trained to describe with particularity what specific threat required the use of the WRAP.

According to data provided by the Department, in 2022, the total number of applications of the WRAP restraint trended downwards at the DOJ facilities in 2022.[66]

**Early Warning System**          **(Substantial Compliance as of September 30, 2019 through September 30, 2020)**

The Department implemented an Employee Review System that was approved by the *Rosas* Monitors as a pilot program at the Downtown Jail Facilities on July 27, 2018, and expanded it to the DOJ facilities on October 25, 2018.  The Department achieved Substantial Compliance with the Early Warning Provisions at the DOJ facilities as of September 30, 2020, and these provisions were not subject to Monitoring during the Fifteenth Reporting Period.

---

[66] As of November 30, 2022, there were 71 documented uses of the WRAP restraint at the DOJ facilities as opposed to 99 for the year 2021.  The County has indicated that due to technological issues, it is unable to provide a precise count of WRAP applications at the DOJ facilities for 2023.

82.     With respect to paragraph 6.16 of the *Rosas* Implementation Plan, the County and the Sheriff will ensure that Sheriff's Department personnel responsible for collecting prisoners' grievances as set forth in that paragraph are also co-located in the Century Regional Detention Facility.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of July 15, 2016, through December 31, 2017)**

Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring for Substantial Compliance with Paragraph 82 in the Sixteenth Reporting Period.

83.     The County and the Sheriff will install closed circuit security cameras throughout all Jails facilities' common areas where prisoners engage in programming, treatment, recreation, visitation, and intra-facility movement ("Common Areas"), including in the Common Areas at the Pitchess Detention Center and the Century Regional Detention Facility.  The County and the Sheriff will install a sufficient number of cameras in Jails facilities that do not currently have cameras to ensure that all Common Areas of these facilities have security-camera coverage.  The installation of these cameras will be completed no later than June 30, 2018, with TTCF, MCJ, and IRC completed by the Effective Date; CRDF completed by March 1, 2016; and the remaining facilities completed by June 30, 2018.  The County and the Sheriff will also ensure that all video recordings of force incidents are adequately stored and retained for a period of at least one year after the force incident occurs or until all investigations and proceedings related to the use of force are concluded.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of July 1, 2015, through June 30, 2016 at MCJ and IRC)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2015, through September 30, 2016 at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 at NCCF and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2018, through June 30, 2019 at PDC South)**

Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring for Substantial Compliance with Paragraph 83 in the Sixteenth Reporting Period.

84.     The Sheriff will continue to maintain and implement policies for the timely and thorough investigation of alleged staff misconduct related to use of force and for timely disciplinary action arising from such investigations.  Specifically:

(a)     Sworn custody staff subject to the provisions of California Government Code section 3304 will be notified of the completion of the investigation and the proposed discipline arising from force incidents in accordance with the requirements of that Code section; and

(b)     All non-sworn Sheriff's Department staff will be notified of the proposed discipline arising from force incidents in time to allow for the imposition of that discipline.

**STATUS:        SUBSTANTIAL COMPLIANCE (as of July 1, 2017, through June 30, 2018 (verified))**

Substantial Compliance under the Compliance Measures requires the Department to demonstrate that 95% of the investigations of force incidents in which sworn custody staff and non-sworn custody staff were found to have violated Department policy or engaged in misconduct were completed and administrative action, which could include discipline, was taken within the time frames provided for in Government Code Section 3304 and relevant Department policies.

Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring for Substantial Compliance with Paragraph 84 in the Sixteenth Reporting Period.

85.     The County and the Sheriff will ensure that Internal Affairs Bureau management and staff receive adequate specialized training in conducting investigations of misconduct.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of April 1, 2021, through March 31, 2022 (verified))**

The Parties agreed on Revised Compliance Measures in 2021.  Substantial Compliance requires the Department to provide the Monitor with (1) the curriculum/syllabus for the two specialized courses, Internal Affair Investigations and Interview and Interrogation, given to IAB management, and (2) a list of the sworn personnel assigned to IAB and proof that such personnel successfully completed the training.  Substantial Compliance requires the Department to demonstrate that 90% of the personnel assigned to IAB have successfully completed one course of the required training within 3 months of their start date, and the second course within 6 months of their start date.

Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring for Substantial Compliance with Paragraph 85 in the Sixteenth Reporting Period.

86.     Within three months of the Effective Date, the County and the Sheriff will develop and implement policies and procedures for the effective and accurate maintenance, inventory, and assignment of chemical agents and other security equipment. The County and the Sheriff will develop and maintain an adequate inventory control system for all weapons, including OC spray.

**STATUS:**       **SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 at MCJ and CRDF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2016, through December 31, 2017 at PDC North)**

**SUBSTANTIAL COMPLIANCE (as of February 1, 2017, through March 31, 2018 at PDC South and PDC East)**

**SUBSTANTIAL COMPLIANCE (as of March 1, 2017, through March 31, 2018 at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 at IRC)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 at TTCF)**

CDM 7-08/080 ACCOUNTABILITY OF SPECIAL WEAPONS, effective October 14, 2016, requires each facility to have unit orders that "establish procedures for the storage, issuance, reissuance, accountability, maintenance, and periodic inventory of all weapons. . . stored at, or issued from, the facility," which includes detailed requirements for the "Inventory, Control, and Accountability of Aerosol Chemical Agents."

In addition to providing written policies and procedures, Substantial Compliance requires the Department to provide up-to-date Unit Orders for each jail requiring the inventory and inspection of special weapons, and armory audit logs documenting the inventory and control of armory-level weapons.  The Department previously maintained Substantial Compliance with Paragraph 86 for twelve consecutive months at all of the facilities, and it was not subject to monitoring with this provision in the Sixteenth Reporting Period.

## APPENDIX A

| NO. | PROVISION | STATUS | SUBSTANTIAL COMPLIANCE DATES |
|---|---|---|---|
| 18 | Suicide Prevention Training | Substantial Compliance | **(10/1/17 at MCJ & PDC South)[1] (9/1/17 at NCCF) (12/1/17 at PDC East) (4/1/18 at TTCF, IRC, & PDC North) (8/1/18 at CRDF)** |
| 19 | Crisis Intervention & Conflict Resolution Training | Substantial Compliance | **(4/1/18 at MCJ, NCCF, & IRC) (7/1/18 at TTCF) (12/1/18 at CRDF, PDC East, & PDC North) (3/1/19 at PDC South)** |
| 20 | Training at NCCF, PDC and CRDF | Substantial Compliance | **(8/1/17 at PDC East, PDC North, NCCF, & CRDF) (10/1/17 at PDC South)** |
| 21 | CPR Certification | Substantial Compliance | **(10/1/15 – 9/30/16 at PDC East & PDC South) (1/1/16 – 12/31/16 at NCCF, PDC North, & IRC) (4/1/16 – 3/31/17 at TTCF) (10/1/17 – 9/30/18 at MCJ) (7/1/18 – 6/30/19 at CRDF)** |

---

[1] Substantial Compliance Dates in **bold** reflect that the Department has achieved Substantial Compliance with the training requirements or maintained Substantial Compliance for twelve consecutive months with the other requirements; the results were verified by the Monitor's auditors when required; and the County or designated facilities are no longer subject to monitoring of this provision pursuant to Paragraph 111 of the Settlement Agreement.

### APPENDIX A

| | | | |
|---|---|---|---|
| 22 | Use of Arresting and Booking Documents | Substantial Compliance | **(7/1/16 – 6/30/17)** |
| 23 | Suicide Hazard Mitigation Plans | Substantial Compliance | **(7/12/18)** |
| 24 | Suicide Hazard Inspection | Substantial Compliance | **(10/1/17 – 9/30/18)** |
| 25 | Transportation of Suicidal Inmates (station jails) | Partial Compliance (East, North, Central, & South Patrol Divisions) | |
| 26 | Identification and Evaluation of Suicidal Inmates | Partial Compliance | |
| 27 | Screening for Mental Health Care and Suicide Risk | Substantial Compliance | **(10/1/19 – 3/31/20, 10/1/20 – 3/31/21)** |
| 28 | Expedited Booking of Suicidal Inmates | Substantial Compliance (IRC) Partial Compliance (CRDF) | **(4/1/17 – 3/31/18 at IRC)** |
| 29 | Mental Health Assessments (of non-emergent mental health needs) | Substantial Compliance | **(4/1/17 – 3/31/18)** |
| 30 | Initial Mental Health Assessments & Treatment Plans | Substantial Compliance | **(1/1/19 – 12/31/19)** |
| 31 | Electronic Medical Records Alerts | Substantial Compliance (CRDF) Partial Compliance (TTCF) | (1/1/23 – 3/31/23) |
| 32 | Electronic Medical Records – Suicide Attempts | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 33 | Supervisor Reviews of Electronic Medical Records | Substantial Compliance | **(7/1/16 – 6/30/17)** |
| 34 | Discharge Planning | Not Yet Rated | |
| 35 | Referral for Mental Health Care | Substantial Compliance | **(11/1/17 – 12/31/18)** |
| 36 | Assessments After Triggering Events | Partial Compliance (TTCF) Non-Compliance (CRDF) | |

## APPENDIX A

| | | | |
|---|---|---|---|
| 37 | Court Services Division Referrals | Non-Compliance | |
| 38 | Weekly Rounds in Restricted Housing Modules | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 39 | Confidential Self-Referral | Substantial Compliance (NCCF) Partial Compliance (PDC South, TTCF, PDC North, MCJ, & CRDF) Not Rated (PDC East) | **(7/1/17 – 6/30/18 at NCCF)** |
| 40 | Availability of QMHPs | Partial Compliance | |
| 41 | FIP Step-Down Protocols | Substantial Compliance | (7/1/22 – 3/31/23) |
| 42 | HOH Step-Down Protocols | Non-Compliance | |
| 43 | Disciplinary Policies | Substantial Compliance (NCCF & PDC North) Partial Compliance (TTCF & MCJ) Non-Compliance (CRDF) | **(10/1/17 – 9/30/18 at NCCF & PDC North)** |
| 44 | Protective Barriers | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 45 | Suicide Intervention and First Aid Kits | Substantial Compliance | **(10/1/15 – 9/30/16 at CRDF, NCCF, TTCF, PDC East, & PDC South) (1/1/16 – 12/31/16 at MCJ & PDC North)** |
| 46 | Interruption of Self-Injurious Behavior | Substantial Compliance | **(7/1/20 – 6/30/21)** |
| 47 | Staffing Requirements | Partial Compliance | |
| 48 | Housekeeping and Sanitation | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 49 | Maintenance Plans | Substantial Compliance | **(3/1/16 – 2/28/17)** |
| 50 | Pest Control | Substantial Compliance | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC** |

## APPENDIX A

| | | | |
|---|---|---|---|
| | | | **North, TTCF, & CRDF) (4/1/16 – 3/31/17 at PDC South & PDC East)** |
| 51 | Personal Care & Supplies | Substantial Compliance | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC East, PDC North, PDC South, & TTCF) (7/1/16 – 6/30/17 at CRDF)** |
| 52 | HOH Property Restrictions | Partial Compliance (CRDF & TTCF) | |
| 53 | Eligibility for Education, Work and Programs | Substantial Compliance | (1/1/23 – 3/31/23) |
| 54 | Privileges and Programs[2] | Substantial Compliance | (1/1/23 – 3/31/23) |
| 55 | Staff Meetings | Substantial Compliance | **(10/1/16 – 9/30/17 at CRDF) (4/1/17 – 3/31/18 at PDC North) (4/1/18 – 3/31/19 at MCJ) (7/1/19 – 6/30/20 at TTCF)** |
| 56 | Changes in Housing Assignments | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 57 | Inmate Safety Checks in Mental Housing | Substantial Compliance (MCJ & PDC North) Non-Compliance (TTCF & CRDF) | **(4/1/17 – 3/31/18 at MCJ) (7/1/21 – 6/30/22 at PDC North)** |

---

[2] Per agreement of the parties, the County must maintain Substantial Compliance for two additional quarters under the revised Compliance Measures.

### APPENDIX A

| 58 | Inmate Safety Checks in Non-Mental Housing | Substantial Compliance (PDC South, PDC North, PDC East, CRDF & IRC)<br>Partial Compliance (NCCF & MCJ)<br>Non-Compliance (TTCF) | **(1/1/16 – 12/31/16 at PDC South, PDC North, & PDC East)**<br>**(7/1/17 – 6/30/18 at CRDF)**<br>**(10/1/17 – 9/30/18 at IRC)** |
|---|---|---|---|
| 59 | Supervisor Rounds | Substantial Compliance | **(1/1/17 – 12/31/17 at PDC East & MCJ)**<br>**(4/1/17 – 3/31/18 at NCCF)**<br>**(10/1/17 – 9/30/18 at CRDF)**<br>**(1/1/18 – 12/31/18 at PDC North & PDC South)**<br>**(4/1/18 – 3/31/19 at TTCF)** |
| 60 | Implementation of Quality Improvement Program | Substantial Compliance | **(4/1/19 – 3/31/20)** |
| 61 | Requirements of Quality Improvement Program | Partial Compliance | |
| 62 | Tracking of Corrective Action Plans | Partial Compliance | |
| 63 | Sufficient HOH and MOH Housing | Partial Compliance (CRDF)<br>Non-Compliance (TTCF) | |
| 64 | Plans for Availability of Inpatient Health Care | Partial Compliance | |
| 65 | Administration of Psychotropic Medication | Partial Compliance | |
| 66 | Active Mental Health Caseloads | Partial Compliance | |
| 67 | Prisoner Refusals of Medication | Not Rated | |

## APPENDIX A

| | | | |
|---|---|---|---|
| 68 | Contraband Searches | Substantial Compliance (MCJ, NCCF, PDC East, PDC South PDC North, TTCF, & CRDF) | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC East, PDC South, & PDC North)** **(1/1/17 – 12/31/17 at TTCF)** (1/1/22 – 12/31/22 at CRDF) |
| 69 | Clinical Restraints in CTC | Substantial Compliance | **(7/1/18 – 6/30/19)** |
| 70 | Security Restraints in HOH and MOH | Partial Compliance | |
| 71 | Therapeutic Services for Inmates in Clinical Restraints | Substantial Compliance | **(7/1/16 – 6/30/17)** |
| 72 | Administrative Reviews | Substantial Compliance | **(1/1/17 – 12/31/17)** |
| 73 | Reporting of Self-Injurious Behavior and Threats | Substantial Compliance | **(10/1/17 – 9/30/18)** |
| 74 | Law Enforcement Investigations of Suicides | Substantial Compliance | **(9/1/16 – 12/31/17)** |
| 75 | Management Reviews of Suicide Attempts | Substantial Compliance | **(10/1/17 – 9/30/18)** |
| 76 | Management Reviews of Suicides | Substantial Compliance | **(9/1/16 – 12/31/17)** |
| 77 | Custody Compliance and Sustainability Bureau | Substantial Compliance | **(4/1/22 – 3/31/23)** |
| 78 | Suicide Prevention Advisory Committee | Substantial Compliance | **(5/11/16 – 5/18/17)** |
| 79 | Therapeutic Services in Mental Health Housing | Non-Compliance | |
| 80 | Out-of-Cell Time in HOH | Non-Compliance | |

<u>**APPENDIX A**</u>

| | | | |
|---|---|---|---|
| 81 | Implementation of *Rosas* Recommendations | Partial Compliance | |
| | Training | Partial Compliance | |
| | Use of Force | Partial Compliance | |
| | Reporting and Investigation of Force | Partial Compliance | |
| | Grievances | Partial Compliance | |
| | Management and Administration | Substantial Compliance | **(10/1/20 – 9/30/21)** |
| | Security Restraints | Partial Compliance | |
| | Early Warning System | Substantial Compliance | **(9/30/19 – 9/30/20)** |
| 82 | Grievances at CRDF | Substantial Compliance | **(7/15/16 – 12/31/17)** |
| 83 | Closed Circuit Cameras | Substantial Compliance | **(7/1/15 – 6/30/16 at MCJ & IRC)** **(10/1/15 – 9/30/16 at TTCF)** **(4/1/16 – 3/31/17 at CRDF)** **(4/1/18 – 3/31/19 at NCCF & PDC North)** **(7/1/18 –6/30/19 at PDC South)** |
| 84 | Investigation of Staff Misconduct | Substantial Compliance | **(7/1/17 – 6/30/18)** |
| 85 | Internal Affairs Bureau Training | Substantial Compliance | **(4/1/21 – 3/31/22)** |

**APPENDIX A**

| 86 | Maintenance and Inventory of Security Equipment | Substantial Compliance | **(4/1/16 – 3/31/17 at MCJ & CRDF) (10/1/16 – 12/31/17 at PDC North) (2/1/17 – 3/31/18 at PDC South & PDC East) (3/1/17 – 3/31/18 at NCCF) (4/1/17 – 3/31/18 at IRC) (4/1/18 – 3/31/19 at TTCF)** |

**APPENDIX B**

| | Substantial Compliance (Provisions) | Partial Compliance[1] | Non-Compliance | Suspended (Some Or All Facilities) | Substantial Compliance (Facilities)[2] | No Longer Subject To Monitoring[3] |
|---|---|---|---|---|---|---|
| First[4] | 5 | 16 | | | 10 | |
| Second | 14 | 30 | 13 | | 24 | |
| Third | 22 | 27(1) | 10 | | 29 | 4(2) |
| Fourth | 24 | 26(1) | 10 | | 29 | 10(2) |
| Fifth | 23 | 24(2) | 7 | | 34 | 15(5) |
| Sixth | 32 | 22 | 7 | | 38 | 18(9) |
| Seventh | 30 | 23 | 7 | | 39 | 21(10) |
| Eighth | 35 | 20 | 6 | | 42 | 27(9) |
| Ninth | 36 | 22 | 4 | | 43 | 31(8) |
| Tenth | 39 | 21 | 3 | | 45 | 32(8) |
| Eleventh | 38 | 18 | 5 | 2 | 44 | 34(7) |
| Twelfth | 38 | 18 | 6 | 1 | 44 | 36(6) |
| Thirteenth | 42 | 14(1) | 6 | 1 | 47 | 36(6) |
| Fourteenth | 40 | 17 | 7 | 0 | 45 | 38(6) |
| Fifteenth | 42 | 13(1) | 9 | 0 | 46 | 38(6) |
| Sixteenth | 43 | 12(2) | 4 | 0 | 49 | 39(5) |

---

[1] The figure in parenthesis under Partial Compliance is the number of additional provisions where some facilities were in Partial Compliance and other facilities were in Non-Compliance.

[2] This represents the number of provisions where the Department is in Substantial Compliance at all or some of the facilities.

[3] The figure in parenthesis under No Longer Subject to Monitoring is the number of additional provisions where some facilities are no longer subject to monitoring.

[4] During the First Reporting Period, 43 provisions were not subject to monitoring.