1  Nicholas E. Mitchell
2  nmitchell@independentmonitor.com

3  **Monitor**

4

5  **UNITED STATES DISTRICT COURT**

6  **CENTRAL DISTRICT OF CALIFORNIA**

7  **WESTERN DIVISION**

8

9  | | CV No. 15-05903 DDP (JEMX) |
10 | UNITED STATES OF AMERICA, | |
   | | **MONITOR'S SEVENTEENTH** |
11 | v. | **REPORT** |
   | COUNTY OF LOS ANGELES et al., | |
12 | | |
13 | | |

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    Pursuant to Paragraph 109 of the Joint Settlement Agreement Regarding Los

2   Angeles County Jails, the Monitor appointed by this Court hereby submits the

3   attached Report "describing the steps taken" by the County of Los Angeles and the

4   Los Angeles County Sheriff Department ("Department") during the six-month

5   period from July 1, 2023, through December 31, 2023, "to implement the

6   Agreement and evaluating the extent to which they have complied with this

7   Agreement."  This Report takes into consideration the advice and assistance I have

8   received from the Subject Matter Experts appointed by this Court and the comments

9   from the Parties in accordance with Paragraph 110 of the Agreement.  I am available

10   to answer any questions the Court may have regarding my Report at such times as

11   are convenient for the Court and the parties.

12

13   DATED:  April 23, 2024            Respectfully submitted,

14

15

16                                     By:  */s/ Nicholas E. Mitchell*

17                                          Nicholas E. Mitchell
                                            Monitor
18

19

20

21

22

23

24

25

26

27

28

## MONITOR'S SEVENTEENTH REPORT

This Seventeenth Report sets forth the Monitor's assessments of the implementation of the Settlement Agreement (the "Agreement" or "DOJ Agreement") between the County of Los Angeles (the "County") and the United States Department of Justice ("DOJ") for the treatment of inmates with mental illness in the County's jail facilities by the Los Angeles Sheriff's Department (the "Department" or "LASD") and the County's Correctional Health Services ("CHS"). It also reports on the Department's compliance with the provisions of the Implementation Plan in the settlement of *Alex Rosas, et al., v. Leroy Baca,* No. CV 12-00428 DDP, that were extended under the terms of the DOJ Agreement to the facilities not covered by the *Rosas* case.[1] This Report includes results reported by the County from July 1, 2023, through December 31, 2023 for the Second and Third Quarters of 2023 (the "Seventeenth Reporting Period").

This Seventeenth Report is based upon the Monitor's review of the policies, procedures, and directives proposed and/or implemented by the Department and CHS in the Seventeenth Reporting Period, and assessments and observations of the Mental Health and Use of Force Subject Matter Experts, and mental health clinicians and auditors retained by the Monitor. It takes into consideration the County's Self-Assessment Status Report ("Seventeenth Self-Assessment"); Correctional Health Services and Custody Compliance and Sustainability Bureau ("CCSB") Combined Semi-Annual Report on Quality Improvement and Suicide Prevention Efforts – Quarter 2 2023 & Quarter 3 2023; and the County's Augmented Self-Assessment Status Report ("Augmented Seventeenth Self-Assessment").

In July 2023, the Monitor conducted site visits within the jails with Court-appointed Mental Health Expert Dr. Nicole Johnson and Dr. Jim Vess. In December 2023, the Monitor conducted site visits with Drs. Jim Vess and Robert Canning. During the visits, the Monitoring Team spoke with inmates, custody staff and supervisors, and mental health staff and supervisors, and inspected mental health housing at all patient acuity levels. The County and the Department cooperated fully with the Monitoring Team during these visits and throughout the Seventeenth Reporting Period. The Monitor thanks County personnel for their responsiveness, professionalism, and collegiality.

There are 69 provisions in the Agreement that are subject to monitoring by the Monitor and Subject Matter Experts. As of the date of this Report, the County and the Department are in Substantial Compliance with 43 provisions, in Partial Compliance with 16 provisions, and in Non-Compliance with three provisions. In addition, there are seven provisions where the County is in different compliance ratings at different facilities. This is similar to, and reflects minimal change from, the County's averaged results for the previous four Reporting Periods.

---

[1] The *Rosas* case involved allegations of excessive force in Men's Central Jail (MCJ), the Twin Towers Correctional Facility (TTCF), and the Inmate Reception Center (IRC) (collectively the "Downtown Jail Complex"). The DOJ Agreement extends provisions of the Implementation Plan to the Century Regional Detention Facility (CRDF), the North County Correctional Facility (NCCF), and the Pitchess Detention Center (PDC).

*Figure 1:  The County's Cumulative Substantial Compliance with All Provisions by Reporting Period*



As in the Sixteenth Report, this Report reflects progress by the County on some provisions and also cause for concern about its ability to meet upcoming compliance deadlines set by this Court.  In some cases, the County's results have improved on certain provisions at some or all facilities, which is encouraging, but not yet enough to achieve Substantial Compliance with those Provisions.[2]  Signs of progress include:

- The County has continued to increase the number of High Observation Housing ("HOH") inmates who are allowed out of their cells unrestrained for recreation and socialization during the day.  This partially reverses a years-long policy, discussed at length in prior monitoring reports, of reflexively handcuffing all such inmates to metal "spider tables" during their limited out-of-cell time based only on their mental health status rather than any individualized assessment of the security risks they pose.  The County has created, and is now operating, 23 combined FIP Stepdown pods and HOH dorms in which HOH inmates can move freely without restraints.  This is a significant step forward in conforming to modern practices in corrections in these dorms and improving the County's compliance with Provision 70 of this Agreement.[3]

---

[2] *See, e.g.,* Provisions 25, 31, 37, 43, 52, 64, and 67.
[3] For a discussion of the differences between FIP Stepdown pods and HOH dorms, see pages 99 – 100 of this Report.

- Structured group programming is essential to the treatment of mental illness in jail, and the County has begun to build capacity to provide it through a cadre of staff, interns, and contractors.[4]  Although the County's results under Provision 80 remain largely disappointing, as the County mobilizes additional resources to provide structured group programming, its results under Provision 80 should improve.

- Pursuant to feedback in prior monitoring reports, the County has revamped its Quality Improvement ("QI") process, which aims to improve the quality of treatment being provided to patients with mental illness and to reduce the risks of suicide and self-harm.  Although the revamped process is in its early stages, the Monitoring Team has been favorably impressed by its first meetings and the involvement of staff from all jail disciplines in identifying and addressing obstacles to competent patient care.

Notwithstanding these improvements and others discussed elsewhere in this Report, there are reasons for concern:

- The County's efforts to hire mental health workers into the jails have significantly lagged expectations.  Prior monitoring reports have cited the County's renewed attempts to recruit such workers, including through the payment of financial bonuses.  *See* Sixteenth Monitoring Report at pp. 68-69.  But the County's optimistic projections about those efforts have not yet materialized at all jail facilities.  County data reflect that in the Seventeenth Reporting Period, CHS had 354 total authorized mental health worker positions, of which only 212 were filled, or 60% of the total.  This again reflects minimal improvement over the same data from the Fifteenth and Sixteenth Reporting Periods.[5]

> *Figure 2:  The Percentage of Filled and Vacant Mental Health Worker Positions by Reporting Period*

---

[4] These efforts are discussed in greater depth at pages 139-141 of this Report.

[5] In response to a draft of this Report, the County has suggested that the staffing data included do not tell the whole story, as the County has supplemented its hiring process with the use of registry workers and overtime.  Thus, the County suggests, its "functional vacancy rate" for mental health workers is actually only 26.1%.  The Agreement requires the County to make significant, lasting changes to practices and expectations for the treatment of patients with mental illness.  As some of the County's implementation plans make clear, these changes are to be inculcated through repeated, iterative training, mentorship, and modeling.  The Monitor and Mental Health Subject Matter Expert view the use of registry and overtime workers as useful adaptations to the staffing gaps in full time mental health workers.  However, short term workers do not replace a full time staff that will be responsible for effectuating the Agreement.



Achieving Substantial Compliance with the Agreement's remaining provisions will require a significantly expanded mental health staff, and the County's inability to substantially accelerate its hiring of these workers increases the risk that it will fail to meet deadlines imposed by this Court.

- The County has articulated a five-year plan to close Men's Central Jail ("MCJ") that depends on the County's accomplishment a list of ambitious criminal justice goals to reduce and stabilize jail populations.[6]  According to the County's own modeling, these goals will work in synergy, and the failure to achieve any may compromise the entire plan.  They are: 1) building 1,200 community beds per year for jail depopulation, 2) achieving a turn-over rate in community beds of once per year, after which persons progress to beds that are not dedicated to jail alternatives, 3) judges finding an additional 7,000 people per year safe for release into the community, 3) reducing the recidivism rate of persons placed in non-jail beds by 30%, 4) accelerating jail releases by 50% through quicker pre-trial release and faster case processing, 5) LA County experiencing no other major increases in crime, bookings to the jail, or legislative changes that create lengthier punishments for crimes, 6) relocating all remaining specialized populations within MCJ to other jail facilities, and 7) finding custody space adjacent to the Inmate Reception Center.

Several of these goals are extremely ambitious and, on their own, would require

---

[6] *See* Jail Closure Opportunities Division, Jail Closure Update, slide 13 (dated January 30, 2024), available at https://file.lacounty.gov/SDSInter/bos/supdocs/188244.pdf

significant investments of time, expertise, knowledge, staffing, and money—if they are even achievable at all. Accomplishing all simultaneously without room for error or failure strains credulity. It is therefore imperative that the County present in this case concrete plans to: 1) relocate the hundreds of patients with serious mental illness who are now detained in MCJ, in deplorable conditions and with limited access to therapeutic services, into treatment beds while the plan to close MCJ is attempted; and 2) improve conditions and provide clinically appropriate care for these patients for as long as they remain in MCJ.[7] Although the County has described several options it is considering for relocating these patients, no concrete plan has yet been identified.

- The Sixteenth Report noted performance reductions at CRDF on a number of key provisions, including 28, 36, 43, 57, 63, and 80. While CRDF saw some improvements on certain provisions in the Seventeenth Reporting Period,[8] it also experienced notable decreases. Figure 3 below reflects compliance measures with reductions in reported compliance at CRDF during the Seventeenth Reporting Period.

*Figure 3: Performance Reductions at CRDF in the Seventeenth Reporting Period*

|  | Sixteenth | | Seventeenth | |
|---|---|---|---|---|
|  | 4Q2022 | 1Q2023 | 2Q2023 | 3Q2023 |
| **Provision 28:** | | | | |
| 25-5(b) - Observation | 60% | 60% | 80% | 40% |
| **Provision 39:** | | | | |
| 39-4(c) - Referral Response | NR | 50% | 42% | 26% |
| **Provision 43:** | | | | |
| 43-9(b) - Consultations | 40% | 33% | 11% | 14% |
| 43-9(c) - QMHP Meetings | 100% | 16% | 40% | 14% |
| **Provision 52:** | | | | |
| 52-5(e) - Allowable Property per QMHP | 92% | 90% | 83% | 88% |
| **Provision 57:** | | | | |
| 57-5(c) - HOH Safety Checks | 0% | 3% | 0% | 0% |
| **Provision 79:** | | | | |
| 79-1(d) - Supervisor Reviews | 100% | 100% | 0% | 0% |

---

[7] The County indicates that as of February 6, 2024, there were 596 MOH patients at MCJ. However, some of these patients "are not eligible for relocation" because they have special medical needs or security designations. Removing these patients from the overall count, the County reports that there were 294 MOH patients at MCJ as of February 6, 2024, who were eligible for mental health treatment beds but not occupying such beds.

[8] *See, e.g.,* Provisions 31 and 63.

While the County has acknowledged compliance challenges at CRDF, it has yet to describe a more comprehensive strategy for bringing this facility into full compliance with the Agreement given its inconsistent results.

### Court-Ordered Compliance Deadlines

Finally, in December 2022 and again on April 2023, the Court issued Orders Setting Deadlines for Substantial Compliance, ECF No. 234 and 248, respectively, which established specific deadlines for the County to come into Substantial Compliance with the Agreement. On March 11, 2024, the Court issued an order Modifying Deadlines for Substantial Compliance, ECF 266. The table below represents deadlines—past and upcoming—reflected in these orders, by provision, and whether the County was in Substantial, Partial, or Non-Compliance in the Third Quarter of 2023, which is covered by this Report.

*Figure 4: Past and Upcoming Court-Ordered Compliance Deadlines, by Provision*



A majority of the deadlines in this case fall in June 2024—in just a few short months—and many provisions are not yet in Substantial Compliance. Given the speed with which the deadlines are approaching, the County must redouble its efforts now to comply with the full Agreement within the timeframes set by this Court.

Nicholas E. Mitchell, Monitor
April 23, 2024

# EXECUTIVE SUMMARY

There are 69 provisions in the Settlement Agreement that are subject to monitoring by the Monitor and Subject Matter Experts.  As of the date of this Report, the County and the Department are in Substantial Compliance with 43 provisions, in Partial Compliance with 16 provisions, and in Non-Compliance with three provisions.  There are three provisions (Paragraphs 25, 28, and 31) for which the Department is in Substantial Compliance at certain facilities and Partial Compliance at other facilities.  There is one provision (Paragraph 39) for which the Department is in Substantial Compliance at certain facilities, Partial Compliance at other facilities, and Not Rated at other facilities.  There is one provision (Paragraph 57) for which the Department is in Substantial Compliance at certain facilities and Non-Compliance at other facilities.  There are two provisions (Paragraphs 43 and 58) for which the Department is in Substantial Compliance at certain facilities, Partial Compliance at other facilities, and Non-Compliance at other facilities.  There are 50 provisions for which the County and the Department are in Substantial Compliance at some or all facilities.[9]

The Monitor's determination of the County's compliance is based upon the quantitative thresholds in the Compliance Measures (and any other applicable requirements in the Compliance Measures) for achieving Substantial Compliance, unless the quality of the County's performance as determined by the qualitative assessment is plainly inadequate or the results reported by the Monitor's mental health team vary significantly from the results reported by the Department.[10]  As used herein, "Substantial Compliance" means that the County has "achieved compliance with the material components of the relevant provisions of this Agreement in accordance with the [agreed-upon Compliance Measures for assessing Substantial Compliance]," which it must maintain for twelve-consecutive months; "Partial Compliance" means that the County has achieved "compliance on some, but not all, of the material components of the relevant provision of this Agreement;" and "Non-Compliance" means that the County has not met "most or all of the material components of the relevant provisions of this Agreement."

Appendix A to this Sixteenth Report shows the status of each of the 69 provisions of the Agreement that are subject to monitoring and the twelve-month triggering dates

---

[9] Under Paragraph 111 of the Agreement, the twelve-month period for which the County is required to maintain Substantial Compliance can be determined on a facility-by-facility basis.

[10] As in prior reports, this Seventeenth Report also reflects the results of audits by the Monitor's auditors to verify results reported by the County.  The Monitor has deemed the County to be in Substantial Compliance "as of" the beginning of the quarter reported by the County if the auditors have verified that the County has met the thresholds in the Compliance Measures.  If the auditors were not able to verify the results reported by the County, the twelve-month period for maintaining Substantial Compliance will commence in a future period when the County's reported results are verified by the auditors.  If the County maintains Substantial Compliance with a provision for twelve consecutive months, pursuant to Paragraph 111 of the Agreement, the Monitor and Subject Matter Expert will "no longer. . .assess or report on that provision" in future reporting periods.  Some of the Substantial Compliance results reported by the County in the Seventeenth Reporting Period have not been audited by the Monitor's auditors and cannot be considered final until verified by the auditors.  The County will not be deemed to be in Substantial Compliance as of the County's reported date for purposes of determining the twelve-month compliance period if the results are not verified by the auditors.

where the County is deemed to be in Substantial Compliance.  Appendix B shows the County's progress from the Initial Reporting Period through the Sixteenth Reporting Period in achieving Substantial Compliance and in maintaining Substantial Compliance for twelve consecutive months on provisions that are no longer subject to monitoring.

There are 40 provisions that are no longer subject to monitoring because the County and Department maintained Substantial Compliance for twelve consecutive months as required by Paragraph 111 of the Settlement Agreement and verified by the Monitor's auditors as required.[11]  There are another five provisions for which some facilities are no longer subject to monitoring because those facilities maintained Substantial Compliance for the required twelve consecutive months.[12]

As of the date of this Report, and subject to verification by the Monitor's auditors and qualitative assessments in some cases, the County and the Department are in Substantial Compliance at some or all of the facilities with the following provisions of the Settlement Agreement:

The County has achieved Substantial Compliance with Paragraph 18, which requires the (initial) training of Deputy Sheriffs and Custody Assistants on suicide prevention as follows: at Men's Central Jail ("MCJ") and Pitchess Detention Center ("PDC") South as of October 1, 2017; at North County Correctional Facility ("NCCF") as of September 1, 2017; at PDC East as of December 1, 2017; at Twin Towers Correctional Facility ("TTCF"), the Inmate Reception Center ("IRC"), and PDC North as of April 1, 2018; and at Century Regional Detention Facility ("CRDF") as of August 1, 2018.  The County has maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) as of December 2022.  The County regained compliance under Provision 81 Rosas 4.7(b) as of December 2022.

The County has achieved Substantial Compliance at NCCF, MCJ, and IRC as of April 1, 2018; at TTCF as of July 1, 2018; at CRDF, PDC East, and PDC North as of December 1, 2018; and at PDC South as of March 1, 2019, with Paragraph 19, which requires the (initial) training of Deputy Sheriffs on Crisis Intervention and Conflict Resolution and the training of Deputy Sheriffs and Custody Assistants in working with mentally ill prisoners.  The Department has achieved Substantial Compliance at CRDF, IRC, NCCF, MCJ, PDC East, PDC North, PDC South, and TTCF as of December 2019 with the refresher training requirements of Paragraph 19.  The County has maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) as of December 2022.  The County regained compliance under Provision 81 Rosas 4.7(b) as of December 2022.

The County has achieved Substantial Compliance at PDC East, PDC North,

---

[11] This includes the initial training required by Paragraphs 18, 19, and 20, which have been completed and are no longer subject to monitoring.  The refresher training requirements for each of these provisions are, however, still subject to monitoring under Provision 81 Rosas 4.6(b) and 4.7(b).
[12] The provisions that are no longer subject to monitoring at some or all of the facilities are highlighted in bold in Appendix A.

NCCF, and CRDF as of August 1, 2017 and at PDC South as of October 1, 2017, with Paragraph 20, which requires the (initial) training of additional Deputy Sheriffs on Crisis Intervention and Conflict Resolution and on working with mentally ill prisoners.  The County has maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) as of December 2022.  The County regained compliance under Provision 81 Rosas 4.7(b) as of December 2022.

The County has maintained Substantial Compliance for twelve consecutive months at PDC East, PDC South, PDC North, NCCF, IRC, TTCF, CRDF, and MCJ with Paragraph 21, which requires Custody personnel to maintain CPR certifications.

The County has maintained Substantial Compliance for twelve consecutive months with Paragraph 22, which requires the County and the Sheriff to provide instructional material on the use of arresting and booking documents to ensure the sharing of known relevant and available information on prisoners' mental health status and suicide risk.

The County has maintained Substantial Compliance for twelve consecutive months as of July 12, 2018, with Paragraph 23, which requires that the Department conduct a systematic review of prisoner housing to reduce the risk of self-harm and to identify and address suicide hazards, and to develop plans to reasonably mitigate suicide hazards identified in the review.

The County has maintained Substantial Compliance for twelve consecutive months as of September 30, 2018, with Paragraph 24, which requires the Department to conduct annual reviews and inspections of prisoner housing to identify suicide hazards.

The County has achieved Substantial Compliance at CRDF as of July 1, 2023, through September 30, 2023, with Paragraph 25, which requires that any arrestee in a station jail who verbalizes or exhibits suicidal intent will be under unobstructed visual observation, or in a suicide resistant location with safety checks every 15 minutes until they are transported to IRC, CRDF, or a medical facility as soon as practicable.

The County has provided documentation reflecting that it has achieved Substantial Compliance as of April 1, 2023, through September 30, 2023, with Paragraph 26, which requires the Department to identify inmates with emergent or urgent mental health needs based on intake screenings and to expedite such inmates for a mental health screening by a QMHP within four hours.  These results are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve months as of March 31, 2021, with Paragraph 27, which requires that all prisoners are individually and privately screened within 12 hours of their arrival at the jails.

The County has maintained Substantial Compliance for twelve consecutive months at IRC as of March 31, 2018, with Paragraph 28, which requires the Department

to expedite inmates having urgent or emergent mental health needs through the booking process.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2018, with Paragraph 29, which requires mental health assessments of prisoners with non-emergent mental health needs within 24 hours of the intake nursing assessment.

The County has maintained Substantial Compliance as of January 1, 2019, through December 31, 2019, with Paragraph 30, which requires the County to provide an initial mental health assessment that includes a brief initial treatment plan that addresses "housing recommendations and preliminary discharge information."

The County has achieved Substantial Compliance as of January 1, 2023, through March 31, 2023, at CRDF, with Paragraph 31, which requires the County to maintain electronic mental health alerts for inmates who report suicidal thoughts during the intake process, or who were removed from risk precautions in the prior quarter. The County has also provided documentation that it maintained Substantial Compliance at CRDF as of April 1, 2023, through September 30, 2023. The reported results from April 1, 2023, through September 30, 2023 are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 32, which requires that a serious suicide attempt be entered in the prisoner's electronic medical record in a timely manner.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2017, with Paragraph 33, which requires mental health supervisors to review electronic medical records on a quarterly basis to assess their accuracy.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2018, with Paragraph 35, which requires the Department to ensure that custody staff refer prisoners who are demonstrating a potential need for routine mental health care to a QMHP or a Jail Mental Evaluation Team.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 38, which requires mental health staff or JMET teams to make weekly cell-by-cell rounds in restricted non-mental health housing modules to identify prisoners with mental illnesses and grant prisoner's requests for out-of-cell interviews.

The County has maintained Substantial Compliance at NCCF for twelve consecutive months as of June 30, 2018, with Paragraph 39, which requires the County to use a confidential self-referral system for prisoners to request mental health care.

The County has achieved Substantial Compliance as of July 1, 2022, through March 31, 2023, with Paragraph 41, which requires CHS to review the medical records of

all prisoners on suicide watch in FIP for one randomly selected month each quarter, and submit a report regarding the implementation of the step-down protocols and the results of its review of the medical records.  The County has also provided documentation reflecting that it maintained Substantial Compliance as of April 1, 2023, through June 30, 2023.  The reported results as of April 1, 2023, through June 30, 2023 are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance at NCCF and PDC North for twelve consecutive months, as of September 30, 2018, with Paragraph 43, which requires the Department to develop and implement policies for the discipline of prisoners with serious mental illnesses.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 44, which requires the Department to install protective barriers in High Observation Housing and other mental health housing.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 45, which requires Suicide Prevention Kits and first-aid kits in control booths in all facilities.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2021, with Paragraph 46, which requires the Department to interrupt, and if necessary, provide appropriate aid to any prisoner who threatens or exhibits self-injurious behavior.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 48, which requires the Department to have written housekeeping, sanitation, and inspection plans to ensure proper cleaning.

The County has maintained Substantial Compliance for twelve consecutive months as of February 28, 2017, with Paragraph 49, which requires the Department to have maintenance plans to respond to routine and emergency maintenance needs.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2017, with Paragraph 50, which requires pest control in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2017, with Paragraph 51, which requires the Department to ensure that all prisoners have access to basic hygiene supplies in accordance with state regulations.

The County has provided documentation showing that it has achieved Substantial Compliance as of January 1, 2023, through June 30, 2023, with Paragraph 54, which requires the County to ensure that prisoners not in mental health housing are "not denied privileges and programming based solely on their mental health status or prescription for psychotropic medication."  The reported results are subject to verification by the

Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive months at CRDF, PDC North, MCJ, and TTCF with Paragraph 55, which requires custody, medical, and mental health staff to meet daily in High Observation Housing and weekly in Moderate Observation Housing.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 56, which requires custody, medical, and mental health staff to communicate regarding any change in a housing assignment following a suicide attempt or serious change in mental health condition.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2018, at MCJ with Paragraph 57, which requires safety checks in mental health housing. The County has also maintained Substantial Compliance for twelve consecutive months at PDC North as of June 30, 2022

The County has maintained Substantial Compliance for twelve consecutive months at PDC South, PDC North, and PDC East as of December 31, 2016, at CRDF as of June 30, 2018, and at IRC as of September 30, 2018, with Paragraph 58, which requires safety checks in non-mental health housing.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2019, with Paragraph 59, which requires unannounced daily supervisory rounds to verify safety checks.

The County has achieved Substantial Compliance with Paragraph 60, as of April 1, 2019, through March 31, 2020, which requires the implementation of a quality improvement plan.

The County has maintained Substantial Compliance for twelve consecutive months at MCJ, NCCF, PDC East, PDC North, and PDC South as of December 31, 2016, and at TTCF as of December 31, 2017, with Paragraph 68, which requires staggered contraband searches in housing units. The County has also maintained Substantial Compliance for twelve consecutive months at CRDF as of January 1, 2022, through December 31, 2022.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2019, with Paragraph 69, which requires the County and the Sheriff to use clinical restraints only in the Correctional Treatment Center with the approval of a licensed psychiatrist who performed an individualized assessment.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2017, with Paragraph 71, which requires the County and the Sheriff to ensure that any prisoner subjected to clinical restraints in response to a mental health crisis receives therapeutic services to remediate any effects from the restraints.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 72, which requires the Department and the County to report on meetings to review suicides and incidents of serious self-injurious behavior.

The County has maintained Substantial Compliance for twelve consecutive months as of September 30, 2018, with Paragraph 73, which requires the Department to prepare detailed reports of prisoners who threaten or exhibit self-injurious behavior.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 74, which requires the Department to have an objective law enforcement investigation of every suicide that occurs in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of September 30, 2018, with Paragraph 75, which requires the Department and the County to review every serious suicide attempt that occurs in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 76, which requires the Department to follow certain procedures whenever there is an apparent or suspected suicide.

The County has achieved Substantial Compliance as of September 30, 2022, with Paragraph 77, which requires, among other things, identifying patterns and trends of suicides and suicide attempts and ensuring corrective actions are taken to mitigate suicide risks.

The County has maintained Substantial Compliance for twelve consecutive months as of May 18, 2017, with Paragraph 78, which requires the Suicide Prevention Advisory Committee to meet twice a year.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 82, which requires the Department to co-locate personnel responsible for collecting prisoners' grievances at CRDF.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2019, with Paragraph 83, which requires it to install closed circuit security cameras throughout all of the common areas in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2018, with Paragraph 84, which requires investigations of force incidents and administrative actions to be completed timely.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2022, with Paragraph 85, which requires Internal Affairs Bureau personnel to receive adequate specialized training in conducting investigations of

misconduct.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2019, with Paragraph 86, which requires inventory and control of weapons.

## SEVENTEENTH REPORT

18.    Within three months of the Effective Date, the County and the Sheriff will develop, and within six months of the Effective Date will commence providing:  (1) a four-hour custody-specific, scenario-based, skill development training on suicide prevention, which can be part of the eight-hour training described in paragraph 4.8 of the Implementation Plan in *Rosas* to all new Deputies as part of the Jail Operations Continuum and to all new Custody Assistants at the Custody Assistants academy; and (2) a two-hour custody-specific, scenario-based, skill development training on suicide prevention to all existing Deputies and Custody Assistants at their respective facilities, which can be part of the eight-hour training described in paragraph 4.7 of the Implementation Plan in *Rosas*, through in-service Intensified Formatted Training, which training will be completed by December 31, 2016.

These trainings will include the following topics:

(a)    suicide prevention policies and procedures, including observation and supervision of prisoners at risk for suicide or self-injurious behavior;

(b)    discussion of facility environments and staff interactions and why they may contribute to suicidal behavior;

(c)    potential predisposing factors to suicide;

(d)    high-risk suicide periods and settings;

(e)    warning signs and symptoms of suicidal behavior;

(f)    case studies of recent suicides and serious suicide attempts;

(g)    emergency notification procedures;

(h)    mock demonstrations regarding the proper response to a suicide attempt, including a hands-on simulation experience that incorporates the challenges that often accompany a jail suicide, such as cell doors being blocked by a hanging body and delays in securing back-up assistance;

(i)    differentiating between suicidal and self-injurious behavior; and

(j)    the proper use of emergency equipment.

**STATUS (18):**      **SUBSTANTIAL COMPLIANCE (as of October 1, 2017 (verified) at MCJ and PDC South)**

**SUBSTANTIAL COMPLIANCE (as of September 1, 2017 (verified) at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of December 1, 2017 (verified) at PDC East)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018 (verified) at TTCF, IRC, and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of August 1, 2018 (verified) at CRDF)**

The Department was not subject to monitoring during the Seventeenth Reporting Period for the initial training of existing Deputy Sheriffs or Custody Assistants or of new Deputies in the Jail Operations Continuum and new Custody Assistants in the Custody Assistant Academy as required by Paragraph 18. Virtually all of the Deputy Sheriffs and Custody Assistants in the custody facilities received the initial training because they were assigned to the jails as of the Existing Date of the Settlement Agreement or they received the training as new Deputies or new Custody Assistants.

The Department is still subject to monitoring in future periods for Substantial Compliance with the refresher course requirements under Provision 81 Rosas 4.6(b) and 4.7(b). The County has maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) as of December 2022. The County has regained compliance with the refresher training requirements under Provision 81 Rosas 4.7(b) as of December 2022. The County's Augmented Seventeenth Self-Assessment reports that refresher training results for 2023 will be submitted as part of its Eighteenth Self-Assessment.

19.    Commencing July 1, 2015, the County and the Sheriff will provide:

(a)    Custody-specific, scenario-based, skill development training to new Deputies during their Jail Operations training, and to existing Deputies assigned to Twin Towers Correctional Facility, Inmate Reception Center, Men's Central Jail, the Mental Health Housing Units at Century Regional Detention Facility, and the Jail Mental Evaluation Teams ("JMET") at North County Correctional Facility as follows:

(i)    32 hours of Crisis Intervention and Conflict Resolution as described in paragraphs 4.6 and 4.9 of the Implementation Plan in *Rosas* to be completed within the time frames established in that case (currently December 31, 2016). Deputies at these facilities will receive an eight-hour refresher course consistent with paragraph 4.6 of the Implementation Plan in *Rosas* every other year until termination of court jurisdiction in that case and then a four-hour refresher course every other year thereafter.

(ii)    Eight hours identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas* to be completed by December 31, 2016. This training requirement may be a part of the 32-hour training described in the previous subsection. Deputies at these facilities will receive a four-hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

(b)    Commencing July 1, 2015, the County and the Sheriff will ensure that new Custody Assistants receive eight hours of training in the Custody Assistant academy, and that all existing Custody Assistants receive eight hours of training related to identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas*. This training will be completed by December 31, 2016. Custody Assistants will receive a four-hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

**STATUS (19):**  **SUBSTANTIAL COMPLIANCE (as of April 1, 2018, (verified) at NCCF, MCJ, and IRC)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2018, (verified) at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of December 1, 2018 (verified) at CRDF, PDC East, and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of March 1, 2019 (verified) at PDC South)**

The Department was not subject to monitoring during the Seventeenth Reporting Period for the training of existing and new Deputy Sheriffs and Custody Assistants required by Paragraph 19.

The Department is still subject to monitoring in future periods for Substantial Compliance with the refresher course requirements under Provision 81 Rosas 4.6(b) and 4.7(b). The County has maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) as of December 2022. The County has regained compliance with the refresher training requirements under Provision 81 Rosas 4.7(b) as of December 2022. The County's Augmented Seventeenth Self-Assessment reports that refresher training results for 2023 will be submitted as part of its Eighteenth Self-Assessment.

20.     Commencing no later than July 1, 2017, the County and the Sheriff will provide:

(a)     Custody-specific, scenario-based, skill development training to existing Deputies assigned to North County Correctional Facility, Pitchess Detention Center, and the non-Mental Health Housing Units in Century Regional Detention Facility as follows:

(i)     32 hours of Crisis Intervention and Conflict Resolution as described in paragraphs 4.6 and 4.9 of the Implementation Plan in *Rosas* to be completed by December 31, 2019. Deputies at these facilities will receive an eight-hour refresher course consistent with paragraph 4.6 of the Implementation Plan in *Rosas* every other year until termination of court jurisdiction in that case and then a four-hour refresher course every other year thereafter.

(ii)    Eight hours identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas* to be completed by December 31, 2019. This training requirement may be a part of the 32-hour training described in the previous subsection. Deputies at these facilities will receive a four-hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

**STATUS (20):**        **SUBSTANTIAL COMPLIANCE (as of August 1, 2017 (verified) at CRDF, PDC East, PDC North, and NCCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017 (verified) at PDC South)**

The Department was not subject to monitoring for the initial training for existing Deputies as required by Paragraph 20 during the Seventeenth Reporting Period.

The Department is still subject to monitoring in future periods for Substantial Compliance with the refresher course requirements under Provision 81 Rosas 4.6(b) and 4.7(b).  The County has posted results for maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) as of December 2022.  The County has regained compliance with the refresher training requirements under Provision 81 Rosas 4.7(b) as of December 2022.  The County's Augmented Seventeenth Self-Assessment reports that refresher training results for 2023 will be submitted as part of its Eighteenth Self-Assessment.

21.     Consistent with existing Sheriff's Department policies regarding training requirements for sworn personnel, the County and the Sheriff will ensure that existing custody staff that have contact with prisoners maintain active certification in cardiopulmonary resuscitation and first aid.

**STATUS:**      **SUBSTANTIAL COMPLIANCE (as of October 1, 2015, through September 30, 2016 (verified) at PDC East and South)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at NCCF, PDC North, and IRC)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 (verified) at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at MCJ)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2018, through June 30, 2019 (verified) at CRDF)**

The Compliance Measures provide that the Department will demonstrate Substantial Compliance when 95% of the designated custody staff have the required CPR and first aid certifications for twelve consecutive months.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 21 in the Seventeenth Reporting Period.

22.    Within six months of the Effective Date and at least annually thereafter, the County and the Sheriff will provide instructional material to all Sheriff station personnel, Sheriff court personnel, custody booking personnel, and outside law enforcement agencies on the use of arresting and booking documents, including the Arrestee Medical Screening Form, to ensure the sharing of known relevant and available information on prisoners' mental health status and suicide risk.  Such instructional material will be in addition to the training provided to all custody booking personnel regarding intake.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017)**

The Justice Data Interface Controller ("JDIC") message the Department has been using since June 29, 2016, is sufficient to establish Substantial Compliance with Paragraph 22, and the County maintained Substantial Compliance for twelve consecutive months through June 30, 2017.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 22 in the Seventeenth Reporting Period.

23.    Within three months of the Effective Date, the County and the Sheriff will commence a systematic review of all prisoner housing, beginning with the Mental Health Unit of the Correctional Treatment Center, all High Observation Housing areas, all Moderate Observation Housing areas, single-person discipline, and areas in which safety precautions are implemented, to reduce the risk of self-harm and to identify and address suicide hazards.  The County and the Sheriff will utilize a nationally-recognized audit tool for the review.  From this tool, the County and the Sheriff will:

(a)    develop short and long term plans to reasonably mitigate suicide hazards identified by this review; and

(b)    prioritize planning and mitigation in areas where suicide precautions are implemented and seek reasonable mitigation efforts in those areas.

**STATUS:    SUBSTANTIAL COMPLIANCE**

The Monitor has verified, with the advice of the Subject Matter Expert, that the Department's Suicide Hazard Inspection Check List tool is a nationally recognized audit tool for this review.  The Department provided the Monitor with completed checklists documenting inspections of all housing units by January 14, 2016.

The Department submitted updated Suicide Hazard Mitigation plans to the Monitor on January 18, 2018 and July 12, 2018.  After consultations with the Mental Health Subject Matter Expert, the Monitor concluded that the plans satisfied the requirements of Paragraph 23 and that the Department had achieved and maintained Substantial Compliance with the provision.  Accordingly, pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 23 in the Seventeenth Reporting Period.

24.    The County and the Sheriff will review and inspect housing areas on at least an annual basis to identify suicide hazards.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018)**

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 24 in the Seventeenth Reporting Period.  As the Monitor has noted, however, implementation and tracking of corrective actions must be addressed by the Custody Compliance and Sustainability Bureau ("CCSB") under Paragraph 77(c), which requires CCSB to "ensur[e] that corrective actions are taken to mitigate suicide risk. . .obtaining where appropriate, technical assistance. . .when such assistance is needed to address suicide-risk issues."

25.    The County and the Sheriff will ensure that any prisoner in a Sheriff's Department station jail who verbalizes or who exhibits a clear and obvious indication of current suicidal intent will be transported to IRC, CRDF, or a medical facility as soon as practicable.  Pending transport, such prisoners will be under unobstructed visual observation, or in a suicide resistant location with safety checks every 15 minutes.

**STATUS:**    **SUBSTANTIAL COMPLIANCE (as of July 1, 2023, through September 30, 2023 (verified) at the Central Patrol Division)**

**PARTIAL COMPLIANCE (at the East, North, and South Patrol Divisions)**

A provision of the Station Jail Manual adopted in March 2018 requires that any arrestee who "displays obvious suicidal ideation or exhibits unusual behavior that clearly manifest[s] self-injurious behavior or other clear indication of mental health crisis shall be transported to the Inmate Reception Center (IRC), Century Regional Detention Facility (CRDF), or a medical facility as soon as practicable.  Pending transport, such inmates. . .shall be under unobstructed visual observation or in a suicidal restraint location with safety checks every 15 minutes."

Under the revised Compliance Measures, which were updated in 2021, the Department must randomly select and analyze Arrestee Medical Screening Forms from station jails identifying prisoners who verbalize or exhibit a clear and obvious indication of current suicidal intent to determine compliance with Paragraph 25.  Substantial Compliance requires that 90% of the selected records from each Patrol Division meet the requirements of Paragraph 25.  Each Patrol Division can achieve sustained compliance after twelve consecutive months of Substantial Compliance independent of the other divisions.

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required the County to achieve Substantial Compliance with Provision 25 by June 30, 2023, or the end of the Second Quarter of 2023.  On March 11, 2024, the Court issued an Order Modifying Deadlines for Substantial Compliance, which extended the deadline for Substantial Compliance to March 31, 2024.

For the Second Quarter of 2023, the County reports 100% compliance for the Central Patrol Division, 100% for the East Patrol Division, 90% for the North Patrol Division, and 83% for the South Patrol Division.  For the Third Quarter of 2023, the County reports 100% compliance at the South and Central Patrol Divisions and 80% for

the East and North Patrol Divisions.[13]

Based on an audit of the reported results for the Central Patrol Division by the Monitor's auditors, there appear to be differences between the requirements in the compliance measures and the County's audit methodology.  The compliance measures require that 90% of selected inmate records reflect that the inmate is "under unobstructed visual observation, or in a suicide resistant location with safety checks every 15 minutes."  The County's audit methodology determines that an individual record is compliant if safety checks are performed within 15 minutes 85% of the time, based on the

---

[13] In its Augmented Seventeenth Self-Assessment, the County requested that "given the small sample sizes at issue when auditing this provision and the anomalous results that can occur from just one noncompliant case, the County and LASD should be deemed to have achieved Substantial Compliance if either 90 percent of records are compliant *or* if a division has no more than one noncompliant record in the audit sample for the quarter."  The County made similar requests for Provisions 31 and 37.  To provide clarity about how such requests will be evaluated, all will be addressed here.

The Monitor may choose to exercise his discretion to consider such requests where the County has a demonstrated track record of successfully meeting the quantitative targets in the compliance measures for a provision and the failure to meet them is truly an anomaly.  Where, as here, the County was in Partial Compliance or Non-Compliance in the prior monitoring period, such requests will generally be denied.  Where the County has sampled a small number of records from a larger universe, the County may choose to submit a second randomly selected sample (clearly identified as such and provided to supplement its first random sample) to support its position that the results are anomalous, which the Monitor may, in his discretion, consider.

The County has requested that to address the challenges of achieving "perfect" compliance with Provision 25, in particular, a third scenario should be considered for discretionary variances: when there are four consecutive quarters in which the County misses Substantial Compliance by only one case.  The Monitor may or may not consider this on a case-by-case basis.  However, as to Provision 25, the Monitor reiterates that the one of the County's principal obstacles to compliance is the fact that suicidal inmates remain in the station jails for too long, which increases the risks of suicide attempt and compliance failures.  *See* Monitor Comments on Draft Implementation Plan for Provision 25, dated Feb. 9, 2022 ("The station jails are not designed for close monitoring of high-risk patients by custody staff, and also do not have mental health experts on staff to implement tailored interventions to keep such patients safe. In addition, each hour that an actively suicidal prisoner is at a station jail magnifies the risk of staff error that would enable such patients to engage in an act of self-harm. Moving these patients to IRC or CRDF as quickly as possible minimizes these risks").  The prolonged delays at the station jails continue to be a problem that has not yet been fully addressed.

Applying this framework, the County's request is granted as to Provision 31 but denied as to Provisions 25 and 37.

requirements of Provision 57.[14]  The County should amend its audit methodology going forward to not rely on requirements of Provision 57 as a basis for its methodology regarding Provision 25.  Based on these directions, at least two of seven records in the Second Quarter of 2023 and none of five records in the Third Quarter of 2023 for the Century Patrol Division were non-compliant, resulting in compliance percentages of 71% and 100%, respectively.  Therefore, the County is in Partial Compliance for the Central Patrol Division for the Second Quarter of 2023 and has achieved Substantial Compliance for the Third Quarter of 2023.

According to the County's implementation plan tracker, the County has completed 14 out of 15 corrective action steps regarding Provision 25.  These steps include: briefing the lieutenant division aides (completed January 2022); having the lieutenant division aides brief the lieutenant liaisons (completed January 2022); providing training to lieutenants and lieutenant division aides (completed June 2022); lieutenant division aides and patrol lieutenants reporting back to CCSB to ensure self-assessments are completed properly (completed June 2022); meeting with the lieutenants and lieutenant division aides to set compliance benchmarks (completed June 2022 and January 2023); LASD compliance team telling station jailers to alert station watch commanders when arrestee expresses suicidal intent (completed May 2022); CCSB providing methodology to and review of lieutenant self-assessments (completed May 2022); identifying policies and procedures regarding Provision 25 for re-briefing to all patrol personnel (completed February 2022); lieutenant division aides and patrol lieutenants re-brief and track in-service briefings at station jails (completed June 2022); meetings between CCSB and lieutenant division aides and patrol lieutenants to designate a benchmark for corrective action plan compliance (completed June 2022); personnel who do not work in station jails being re-briefed about requirements at the beginning of shift (completed June 2022); posting laminated signage regarding the requirements of Provision 25 (completed June 2022); tasking lieutenants at each station to oversee suicidal inmate packet audits (completion date unclear); and providing a report with staffing needs (completion date unclear).

---

[14] For example, in the posted results for Century Station for the Third Quarter of 2023, both selected records include notes reflecting this methodology.  The note for one inmate states, "[t]wo safety checks were late for arrestee [] resulting [in] 85% compliance pursuant to DOJ Provision #57."  A similar note is also present for an inmate within the posted results for Marina Del Rey Station for the Second Quarter of 2023.  Given the dynamic environment in which these safety checks occur, the Monitor may consider checks that occur after the specified 15-minute requirement to be compliant if there are a small number of safety checks exceeding the 15-minute requirement by five minutes or less.  However, the 85% threshold the County imports from Provision 57 is not appropriate for Provision 25 as Provision 57 pertains to routine safety checks performed by Deputies, whereas Provision 25 applies to inmates who have already expressed suicidal intent.  The Department must conduct 100% of the required safety checks for the vulnerable inmates subject to Provision 25 to be found in compliance with the Provision.  The Monitor's auditors have conducted their audit consistent with the directions in this footnote.

26.     Consistent with existing Sheriff's Department policies, the County and the Sheriff will follow established screening procedures to identify prisoners with emergent or urgent mental health needs based upon information contained in the Arrestee Medical Screening Form (SH-R-422) or its equivalent and the Medical/Mental Health Screening Questionnaire and to expedite such prisoners for mental health evaluation upon arrival at the Jail Reception Centers and prior to routine screening.  Prisoners who are identified as having emergent or urgent mental health needs, including the need for emergent psychotropic medication, will be evaluated by a QMHP as soon as possible but no later than four hours from the time of identification.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of April 1, 2023, through September 30, 2023 (unverified))**

The Compliance Measures require the Department to "review Arrestee Medical Screening Forms (SH-R-422) (or its equivalent) and the Medical/Mental Health Screening Questionnaires of 100 randomly selected prisoners during one randomly selected week per quarter at CRDF and at IRC."  Substantial Compliance requires that (1) 95% of the forms "include the required mental health information" and (2) 90% of the prisoners having urgent or emergent needs were "seen by a QMHP within four hours."

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234.  Pursuant to that Order, "Defendants will achieve substantial compliance with the following individual provisions of the settlement agreement in accordance with the following schedule," and regarding Provision 26, the Court ordered "Reached June 2021-March 2022; must maintain one additional quarter." As noted in the Monitor's Fifteenth Report, however, in the Third Quarter of 2022, the County fell out of Substantial Compliance with Provision 26 as "only 56% of the prisoners with urgent or emergent mental health needs were seen by a QMHP within four hours, which did not meet the relevant threshold, and was a significant decline from the County's recent results under Provision 26." On March 11, 2024, the Court issued an Order Modifying Deadlines for Substantial Compliance, which extended the deadline for Substantial Compliance to June 30, 2024.

For the Seventeenth Reporting Period, the County's Augmented Seventeenth Self-Assessment reports that for the one randomly selected week in the Second Quarter of 2023, 97% of the screening forms reviewed had the required mental health information, and 96% of the prisoners with urgent or emergent mental health needs were seen by a QMHP within four hours.  The County's Augmented Seventeenth Self-Assessment also reports that for the one randomly selected week in the Third Quarter of 2023, 95% of the screening forms reviewed had the required mental health information, and 91% of the prisoners with urgent or emergent mental health needs were seen by a QMHP within four hours, which met the relevant thresholds.  These results are subject to verification by the Monitor's auditors.

The Sixteenth Monitoring Report noted

The Monitoring Team has, in several reports, shared the results of its qualitative reviews of the County's performance under Provision 26. *See* Monitor's Eleventh, Twelfth, Thirteenth, Fourteenth, and Fifteenth Reports. These reviews have sought to "determine whether patients with emergent or urgent needs were missed at intake" by examining patient intake records and other associated documents. In particular, the Team reviewed a sample of records of patients assigned to general population housing after their intake screening and, shortly thereafter, were transferred into mental health housing. The Team then reviewed the intake materials to determine whether the mental illness should have been detected through a "clinically competent intake screening process." In these reviews, the Team generally found that for approximately 19% of patients, "an urgent or emergent condition was likely present at the time of the intake screening that should have been detected during a standard intake process," but was not.

According to Mental Health Subject Matter Expert Dr. Johnson, "implicit in this qualitative review process is the understanding that patients do not generally decompensate from asymptomatic to floridly psychotic within a matter of days even in a jail environment. A clinically competent intake screening process, in which screeners have adequate training to elicit patient history and detect latent or hidden symptoms, the necessary time to spend with each patient, a private location that allows for frank communication, and supervision that encourages them to go beyond mere rote administration of the screening instrument in order to observe patient presentation and mannerism and ask follow up questions, will allow intake screeners to consistently detect patients who require a follow-up screening by trained mental health personnel."

While the County does not appear to dispute this as a general matter, in its Augmented Seventeenth Self-Assessment, the County again contextualizes the Monitoring Team's findings in light of the total number of patients screened pursuant to Provision 26

During the Second Quarter of 2023, there were 16,249 new arrivals screened at the jail; of this total, only 54 people initially assigned to general population were re-directed to mental-health housing within five days of admission. The 54 patients meeting these criteria in the Second Quarter of 2023 represented less than one percent of the total number of people who went through the intake process at the jail. The 54 people also constituted less than one percent of the 7,436 people sent to general population housing without a referral for mental health evaluation after initial nursing screening.

During the Third Quarter of 2023, there were 14,956 new arrivals screened at the jail; of this total, only 72 people initially assigned to

general population were re-directed to mental-health housing within five days of admission. The 72 patients meeting these criteria in the Third Quarter of 2023 represented less than one percent of the total number of people who went through the intake process at the jail. The 72 people also constituted less than one percent of the 6,786 people sent to general population housing without a referral for mental health evaluation after initial nursing screening.

Furthermore, screening nurses are referring new arrivals for a mental health assessment at a substantial and increasing rate. Indeed, in the Second and Third Quarters of 2023, screening nurses at intake referred 54% of all new arrivals for mental health assessments. This is a five percent increase from the Second Quarter of 2022, when 49% of all new arrivals were referred for a mental health assessment, and a 15% increase from the Second Quarter of 2021, when the rate of referral stood at 39%.

The Monitoring Reports have long made clear that the Monitor's determination of the County's compliance is based upon the quantitative thresholds in the Compliance Measures "unless the quality of the County's performance as determined by the qualitative assessment is plainly inadequate or the results reported by the Monitor's mental health team vary significantly from the results reported by the Department."

There have been substantial improvements in the accuracy of the County's screening process as measured by Provision 26.  The Monitor and Mental Health Subject Matter Expert have met with intake screeners, observed the administration of the screening instrument, and evaluated the overall data about the number of missed cases given the total number of patients screened.  Given that context, we conclude that the number of missed cases is sufficiently small as to not preclude a finding of Substantial Compliance.  Furthermore, the County has committed to evaluating missed cases through its Quality Improvement process, providing comfort that any weaknesses in the screening process can be identified and corrected.  The County is therefore in Substantial Compliance with Provision 26 for the Seventeenth Reporting Period.

According to the County's implementation plan tracker, the County has completed all 3 corrective action steps regarding Provision 26.  These steps include: adding 8 new TTCF staff to address challenges in meeting the four hour time frame (completion date unclear); adding 5 new CRDF staff to address challenges in meeting the four hour time frame (completion date unclear); briefing intake nurses about emergent or urgent mental health needs that were missed at intake (completion date unclear).

27.    Consistent with existing Sheriff's Department policies, the County and the Sheriff will ensure that all prisoners are individually and privately screened by Qualified Medical Staff or trained custody personnel as soon as possible upon arrival to the Jails, but no later than 12 hours, barring an extraordinary circumstance, to identify a prisoner's need for mental health care and risk for suicide or self-injurious behavior.  The County and the Sheriff will ensure that the Medical/Mental Health Screening Questionnaire, the Arrestee Medical Screening Form (SH-R-422), or its equivalent, and/or the Confidential Medical Mental Health Transfer Form are in the prisoner's electronic medical record or otherwise available at the time the prisoner is initially assessed by a QMHP.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of October 1, 2019, through March 31, 2020, and October 1, 2020, through March 31, 2021 (verified))**

The Compliance Measures require the Department to review the records of "randomly selected prisoners who were processed for intake during one randomly selected week at CRDF and at IRC" to determine compliance with this provision. Substantial Compliance requires that 90% of the records reviewed reflected that the prisoners were screened for mental health needs within 12 hours and that the required documentation was available to the QMHP for 90% of the mental health assessments conducted by the QMHP.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 27 in the Seventeenth Reporting Period.

28.     The County and the Sheriff will ensure that any prisoner who has been identified during the intake process as having emergent or urgent mental health needs as described in Paragraph 26 of this Agreement will be expedited through the booking process.  While the prisoner awaits evaluation, the County and the Sheriff will maintain unobstructed visual observation of the prisoner when necessary to protect his or her safety, and will conduct 15-minute safety checks if the prisoner is in a cell.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at IRC)**

**PARTIAL COMPLIANCE (at CRDF)**

The Compliance Measures require the Department to review the records of randomly selected prisoners at CRDF and IRC who have urgent or emergent mental health needs to determine whether they were expedited through the booking process and under visual observation or checked every 15 minutes.

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires the County to achieve Substantial Compliance with Provision 28 by June 30, 2024.  The County's Seventeenth Self-Assessment reflects that in the Second Quarter of 2023, 56% of the inmates with urgent or emergent mental health needs were expedited through the booking process at CRDF in the randomly selected week, as required by the applicable Compliance Measures, and 80% of the inmates were observed or checked as required.  The County's Augmented Seventeenth Self-Assessment also reported that in the Third Quarter of 2023, 84% of the inmates with urgent or emergent mental health needs were expedited through the booking process at CRDF in the randomly selected week, and 40% of the inmates were observed or checked, as is required.

Regarding these results, the County reports

On September 28, 2023, CCSB representatives met with CRDF personnel to review Provision 28 requirements and discuss proper documentation of those patients expedited through the booking process. The briefing included a meeting with the sergeant at CRDF Reception to discuss the need to use a CREX code scan to document to reflect that a patient was expedited. During that meeting, CCSB learned that the scanners used by CRDF Reception required upgrades and repair. The CRDF Reception sergeant informed CCSB that in the event a scanner was not operable, or if all the scanners were in use, the default record was a handwritten log, called the "Red Book," in which all relevant inmate movement was entered.

One of the reasons for the increased success against Compliance Measure 28-5(a) in the third quarter is CRDF's production of Red Book entries documenting people expedited through booking for psychological

evaluation. These handwritten entries, used on occasions when a patient was expedited but a CREX barcode could not be scanned, were provided along with the other supporting documents submitted to the Monitor for Provision 28. CRDF personnel were all aware of the unit order requiring a scan of the CREX code for expedites, and the barcode itself was located next to the station holding the scanners, but technical issues with the scanners required manual entries to be the primary source of documentation.

Specific to the Department's declining results under Compliance Measure 28-5(b), the County reports

CRDF believes that performance against Compliance Measure 28-5(b) suffered during the reporting period in cases when patients were moved from intake areas where they were under continuous visual observation and thereafter were in pods where safety checks were late, did not occur, or there was no documentation of a timely safety check.

On January 30, 2024, a captain-to-captain email was sent from CCSB to CRDF regarding the facility's results for the third quarter. CCSB informed CRDF that if it fails to reach compliance in the fourth quarter, an additional CAP request will be issued.

Finally, CCSB briefed the new training sergeant at CRDF on February 1, 2024, regarding the requirements of Provision 28, focusing on the requirement of continuous visual observation or timely 15-minute safety checks for those patients with urgent mental health issues while they wait for a mental health evaluation.

According to the County's implementation plan tracker, the County has completed all 3 corrective action steps regarding Provision 28. These steps include: for one randomly selected week each quarter, reviewing 25 randomly selected records for CRDF prisoners who have been identified as having urgent or emergent mental health needs to determine whether they were expedited through the booking process. (completion date unclear); quarterly unannounced visits to observe the housing location of inmates with urgent or emergent mental health needs pending a QMHP evaluation (completion date unclear); quarterly unannounced visits to observe the required safety checks for inmates pending a QMHP evaluation (completion date unclear).

The County previously maintained Substantial Compliance with Paragraph 28 at IRC for twelve consecutive months, and IRC was not subject to monitoring for Substantial Compliance with Paragraph 28 in the Seventeenth Reporting Period.

29.    The County and the Sheriff will ensure that a QMHP conducts a mental health assessment of prisoners who have non-emergent mental health needs within 24 hours (or within 72 hours on weekends and legal holidays) of a registered nurse conducting an intake nursing assessment at IRC or CRDF.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified))**

The Compliance Measures require the Department to review randomly selected records of the prisoners identified in the intake nursing assessment as having non-emergent mental health needs to determine if the Department completed mental health assessments for 85% of the prisoners within the required time periods.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 29 in the Seventeenth Reporting Period.

30.     Consistent with existing DMH policies, the initial mental health assessment will include a brief initial treatment plan.  The initial treatment plan will address housing recommendations and preliminary discharge information.  During the initial assessment, a referral will be made for a more comprehensive mental health assessment if clinically indicated.  The initial assessment will identify any immediate issues and determine whether a more comprehensive mental health evaluation is indicated.  The Monitor and SMEs will monitor whether the housing recommendations in the initial treatment plan have been followed.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of January 1, 2019, through December 31, 2019 (verified))**

The Compliance Measures require the Department to review randomly selected initial mental health assessments and report on (1) the percentage of assessments that have (i) included an initial treatment plan that addresses housing recommendations and preliminary discharge information and (ii) identified any immediate issues and whether a more comprehensive evaluation was indicated; and (2) whether the housing recommendations were followed.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 30 in the Seventeenth Reporting Period.

31 (**Revised**).  Consistent with existing Correctional Health Services and Sheriff's Department policies, the County and the Sheriff will maintain electronic mental health alerts in prisoners' electronic medical records that notify medical and mental health staff of a prisoner's risk for suicide or self-injurious behavior.  The alerts will be for the following risk factors:

(a)    current suicide risk; and

(b)    prior suicide attempts.

**STATUS:**    **SUBSTANTIAL COMPLIANCE (as of January 1, 2023, through March 31, 2023 (verified) and April 1, 2023, through September 30, 2023 (unverified) at CRDF)**

**PARTIAL COMPLIANCE (at TTCF)**

On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provision 31 ("Revised Paragraph 31") as set forth above.  They also agreed on Revised Compliance Measures.  The Revised Compliance Measures require the Department to review randomly selected electronic medical records for prisoners in certain at-risk groups to determine if the required mental health alerts are in 85% of the records reviewed, which is the threshold for Substantial Compliance, for prisoners who report suicidal thoughts (at suicide risk) during the intake process; or were removed from risk precautions in the prior quarter.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires the County to achieve Substantial Compliance with Provision 31 by June 30, 2024.

The County's Augmented Seventeenth Self-Assessment reports that for the Second Quarter of 2023, at CRDF, 96% of the records reviewed contained the mental health alerts required by 31-1(a).  For Compliance Measure 31-1(b), the County reports that there were three responsive patients, and 2 out of 3, or 67%, were compliant.[15]  At TTCF, 92% of the records reviewed contained the mental health alerts required by 31-1(a).  For Compliance Measure 31-1(b), there were 25 responsive patients, 18 of which did not contain the required alerts, "resulting in a compliance level of 28%."

The County's Augmented Seventeenth Self-Assessment also reports that for the Third Quarter of 2023, at CRDF, 96% of the records reviewed contained the mental health alerts required by 31-1(a).  Regarding 31-1(b), 100% of the 11 relevant records contained the required alerts.  At TTCF, 96% of the records reviewed contained the mental health alerts required by 31-1(a).  Regarding 31-1(b), 32% of the relevant records contained the required alerts.

According to the County's implementation plan tracker, the County has

---

[15] As explained above, the County's request for a variance due to a single non-compliant case is granted as to these reported results.

completed all 3 corrective action steps regarding Provision 31.  These steps include: training staff on suicide risk alerts (completed April 2022); auditing to determine the effectiveness of training and for supervisors to audit three patients per clinician per week (completed May 2023); and providing a self-assessment with a new universe and methodology (completed 2Q2022).

32.    Information regarding a serious suicide attempt will be entered in the prisoner's electronic medical record in a timely manner.

**STATUS:        SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified))**

The Compliance Measures require that 95% of the electronic medical records of prisoners who had a serious suicide attempt reflect information regarding the attempt, and 85% of the records reflect that the information was entered into the record within one day of the attempt.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 32 in the Seventeenth Reporting Period.

33.    The County will require mental health supervisors in the Jails to review electronic medical records on a quarterly basis to assess their accuracy as follows:

(a)    Supervisors will randomly select two prisoners from each clinician's caseload in the prior quarter;

(b)    Supervisors will compare records for those prisoners to corroborate clinician attendance, units of service, and any unusual trends, including appropriate time spent with prisoners, recording more units of service than hours worked, and to determine whether contacts with those prisoners are inconsistent with their clinical needs;

(c)    Where supervisors identify discrepancies through these reviews, they will conduct a more thorough review using a DMH-developed standardized tool and will consider detailed information contained in the electronic medical record and progress notes; and

(d)    Serious concerns remaining after the secondary review will be elevated for administrative action in consultation with DMH's centralized Human Resources.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017 (verified))**

The Compliance Measures require the County to provide the Monitor and the Subject Matter Experts with the DMH-developed standardized tool required by Paragraph 33(c), and to report the results of its analysis of the electronic medical records of two randomly selected prisoners from each clinician's caseload.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 33 in the Seventeenth Reporting Period.

34 **(Revised).**  Consistent with existing Correctional Health Services policy, the County and the Sheriff will conduct clinically appropriate release planning for all prisoners who are being released to the community and who have been identified by a QMHP as having a mental illness and needing mental health treatment, or as having a DSM-5 major neuro-cognitive disorder that caused them to be housed in the Correctional Treatment Center at any time during their current incarceration.  For prisoners with mental illness and needing mental health treatment, the release planning services will be guided by the prisoner's level of care.  Specifically, prisoners who at any time during their incarceration meet mental health level of P3 or P4 will be presumptively referred for release planning services, and prisoners who meet mental health level of care P2 will receive release planning services upon referral by a clinician or upon their request.  Prisoners who have a DSM-5 major neuro-cognitive disorder that caused them to be housed in the Correctional Treatment Center will also be referred for release planning services consistent with the Correctional Health Services policy applying to prisoners with mental illness.

> (a) Release planning will consider the need of the prisoner for housing; transportation to the prisoner's community-based provider, residence, or shelter within the County; bridge psychotropic medications; medical/mental health/substance abuse services; income/benefits establishment; and family/community/social supports ("Release Planning Areas").

> (b) Release planning will be based on an individualized assessment of the prisoner's needs and, unless the prisoner is unable or unwilling to participate, will be undertaken in collaboration with the prisoner.  For prisoners referred for release planning services, those services will include:

>> (i) An Initial Release Plan that will be created at intake or no later than ten days after the referral for release planning, which referral shall normally occur at the time of intake.  The Initial Release Plan will include preliminary identification of needs in each of the Release Planning Areas and preliminary recommendations for services to address those needs, and a referral for assistance in obtaining California identification when needed and when the prisoner is eligible; and/or

>> (ii) A Comprehensive Release Plan that will be initiated no later than thirty days after the referral for release planning.  The Comprehensive Release Plan will include (A) collecting information regarding the prisoner's needs; (B) coordinating with community-based providers to identify available services that meet the prisoner's needs; (C) facilitating the transition of care to community-based providers, and (D) assisting in obtaining identification and/or benefits when needed, when the prisoner is eligible, and as offered by the Sheriff's Community Transition Unit.

> (c) The County will maintain a re-entry resource center with staff supervised by a QMHP.  The re-entry resource center will:

(i) Provide information appropriate to the released prisoner about available housing, transportation, medical/mental health/substance abuse services, income/benefits establishment, community/social supports, and other community resources; and

(ii) Provide released prisoners with copies of their release plans, as available.

(d) All prisoners who are receiving and continue to require psychotropic medications will be offered a clinically appropriate supply of those medications upon their release from incarceration.  Unless contraindicated, this will be presumed to be a 14-day supply or a supply with a prescription sufficient so that the prisoner has the psychotropic medication available during the period of time reasonably necessary to permit the prisoner to consult with a doctor and obtain a new supply.

(e) Nothing in Paragraph 34 will require prisoners to accept or participate in any of the services provided under this Paragraph.

(f) Neither the County nor the Sheriff shall be in violation of this paragraph if after reasonable efforts as set forth in Correctional Health Services Policy M380.01, Release Planners are unable to identify available post-release services.

STATUS (34):           PARTIAL COMPLIANCE

During the Seventh Reporting Period, the parties and the Intervenors reached an agreement on the provisions of revised Paragraph 34 ("Revised Paragraph 34") set forth above.  They also agreed on revised Compliance Measures and a revised policy to implement Revised Paragraph 34.  On December 10, 2018, the Court issued an order pursuant to the parties' joint stipulation revising Paragraph 34.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234.  That Order required Defendants to achieve Substantial Compliance with Provision 34 by December 31, 2022, which fell within the Fifteenth Reporting Period.

The Fifteenth Report reflected the results of an audit of the County's self-reporting under Provision 34 by the Monitor's auditors, revealing several notable deficiencies.  In the Sixteenth Reporting Period, the County did not report results for Provision 34, and the Parties instead focused on revising the Compliance Measures and self-audit methodology.[16]  Those efforts continued during the Seventeenth Reporting Period, and a provisional agreement was reached that the County should report results for the Third Quarter of 2023 under a draft of revised Compliance Measures.

The County's Augmented Seventeenth Self-Assessment reports that regarding Compliance Measure 34-13(c)(1), 100% of inmates in the Third Quarter of 2023 received a referral for release planning, greater than the required 85%.  For Compliance Measure 34-13(c)(2), which concerns Initial Release Plans, the County reports that the records of 62% of inmates who should have received an Initial Release Plan were compliant, less than the required 85%.  Similarly, for Compliance Measure 34-13(c)(3), which requires certain services and documentation relating to inmates receiving comprehensive release planning, the County reports that the records of 63% of inmates were compliant, less than the required 85%.[17]

For Compliance Measure 34-13(c)(4), which pertains generally to the release planning process, the County reports that the records of 50% of inmates were compliant, less than the required 85%.  Finally, the County reports 100% compliance with Compliance Measure 34-13(c)(5), which requires documentation relating to inmates requiring psychotropic medications, exceeding the 90% requirement.

With respect to the County's posted results, the Monitor's auditors observed that initial release plans were not completed for a substantial number of inmates and, therefore, adversely impacted the results for both the initial release plan and release process.  In addition, the Monitor's auditors noted that inmates without completed

---

[16] For example, on June 1, 2023, the County provided the Monitor, the DOJ, and the Intervenors with a copy of its Care Transitions Audit Guide and feedback was provided thereafter by the Monitor and the DOJ.  On August 14, 2023, the County proposed a series of modifications to the Compliance Measures for Provision 34.  The Parties met with the Monitor on November 17, November 30, and December 14, 2023, to discuss the proposal.

[17] On January 29, 2024, the Monitor shared with the Parties a memorandum prepared by the Monitor's auditors reflecting concerns about the manner in which the County was auditing its results.  The parties met with the Monitor on March 14, 2024, to discuss these issues.

comprehensive release plans and who were released within 30 days of referral were included in the assessment of the comprehensive release planning process. As comprehensive release plans were neither completed nor required, these inmates should be excluded from the calculation of compliance.

According to the County's implementation plan tracker, the County completed 23 out of 24 corrective action steps regarding Provision 34 during the First Quarter of 2022. These steps include: making contingent offers to candidates for 5 PSW vacancies (completed January 2022); making contingent offers for 10 MCW vacancies (completion date unclear); implementing a standardized Excel case tracker for TTCF staff (completed January and February 2022); having a dedicated release planner for high-bail and serious charges (completed January 2022); taking steps to provide compliant Initial Release Plans (completed First Quarter 2022); meetings between supervisors and supervisees at least twice per month (completed First Quarter 2022); and providing a list of Community Based Organizations ("CBOs") used for Paragraph 34 referrals (completed December 2022).

35.     Consistent with existing DMH and Sheriff's Department policies, the County and the Sheriff will ensure that custody staff, before the end of shift, refer prisoners in general or special populations who are demonstrating a potential need for routine mental health care to a QMHP or a Jail Mental Evaluation Team ("JMET") member for evaluation, and document such referrals.  Custody staff will utilize the Behavior Observation and Referral Form.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of November 1, 2017, through December 31, 2018 (verified))**

The Compliance Measures require the Department to review, for a randomly selected month each quarter, the Behavior Observation and Mental Health Referral ("BOMHR") records for prisoners referred by custody staff to a QMHP or JMET member for "routine" mental health care to determine the timeliness of the referrals, and that 85% of the referrals "occurred before the end of the shift in which the potential need for mental health care is identified."

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 35 in the Seventeenth Reporting Period.

36.     Consistent with existing DMH policies, the County and the Sheriff will ensure that a QMHP performs a mental health assessment after any adverse triggering event, such as a suicide attempt, suicide threat, self-injurious behavior, or any clear de-compensation of mental health status.  For those prisoners who repeatedly engage in such self-injurious behavior, the County will perform such a mental health assessment only when clinically indicated, and will, when clinically indicated, develop an individualized treatment plan to reduce, and minimize reinforcement of, such behavior.  The County and the Sheriff will maintain an on-call system to ensure that mental health assessments are conducted within four hours following the notification of the adverse triggering event or upon notification that the prisoner has returned from a medical assessment related to the adverse triggering event.  The prisoner will remain under unobstructed visual observation by custody staff until a QMHP has completed his or her evaluation.

**STATUS:     PARTIAL COMPLIANCE (at TTCF and CRDF)**

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 36 by September 30, 2023, which falls within the Seventeenth Reporting Period covered by this Report.

The Compliance Measures require the Department to develop a staffing schedule to provide on-call services, and the County's Seventeenth Self-Assessment reported that it complied with this requirement for the Second Quarter of 2023.  The Compliance Measures also require the Department to review randomly selected records of prisoners newly admitted to mental health housing from a lower level of care due to an adverse triggering event during two randomly selected weeks per quarter.  The County's Seventeenth Self-Assessment reports that during the Second Quarter of 2023, "84% -- rather than the required 95% -- of inmates" identified in the two randomly selected weeks received an assessment by a QMHP within four hours, as required by Compliance Measure 36-4(a).  The County further reports that 100% of the selected prisoners at TTCF and 66% at CRDF were seen on videos "under unobstructed visual observation pending assessment," as required by Compliance Measure 36-4(b).

The County's Augmented Seventeenth Self-Assessment reports that for the Third Quarter of 2023, the Department complied with the staffing schedule requirement.  The County further reports that during the Third Quarter of 2023, "73% -- rather than the required 95% -- of inmates" identified in the two randomly selected weeks received an assessment by a QMHP within four hours, as required by Compliance Measure 36-4(a).[18] The County further reports that 60% of the selected prisoners at CRDF and 100% at TTCF were "under unobstructed visual observation pending assessment," as is required by Compliance Measure 36-4(b).

The County has missed the applicable deadline for bringing Provision 36 into

---

[18] The DOJ rightly notes that this issue arises most often at NCCF.  In its next Self-Assessment, the County should address this, and report on its efforts to fix the problem, through corrective action plans or otherwise, at NCCF.

Substantial Compliance in the Court's December 27, 2022, Order, ECF No. 234. The County reports that it has undertaken a number of remedial steps to fix this

> On September 28, 2023, CCSB visited CRDF and briefed the facility's Operations and Access to Care ("ACB") lieutenants, as well as the CRDF Training unit, on the requirements of Provision 36 and the imperative of unobstructed visual observation of those patients in the aftermath of an adverse triggering event. CCSB took CRDF staff through exemplars of non-compliant incidents and discussed training strategies to ensure compliance. One issue that was addressed involved a situation at CRDF in which custody staff was using a shower area at CRDF in a way that did not meet the requirements of Provision 36-4(b) for unobstructed visual observation. Specifically, CRDF has been retrained on requirements for unobstructed visual observation. Individuals currently under direct observation are seated at tables in Module 1400 and other pod settings at CRDF that provide for unobstructed visual observation.[19]

> CCSB issued a formal corrective action request to CRDF. In response to CCSB's visit, the CRDF Training unit on October 2, 2023, briefed 96 line staff members at the facility on Custody policies encompassing Provision 36's requirements and the CRDF unit order that directs proper procedure in the event a person in custody experiences a triggering event. Furthermore, CRDF disseminated a virtual briefing on Provision 36 to all staff that required acknowledgement of receipt and review. CCSB's visit to the facility took place late in the third quarter and the staff briefings took place early in the fourth. But based on the trainings conducted, the urgency CCSB communicated, and the comprehensiveness of CRDF's response, the County expects performance under 36-4(b) to improve across the Eighteenth Reporting Period.

The Monitoring Team has conducted multiple qualitative reviews of the County's compliance with Provision 36 in several recent Reporting Periods and has found deficits in the frequency with which QMHPs adequately evaluated the apparent risk factors and provided safety or crisis response plans to address them. Regarding cases of repeated self-harm, the Team found that there were treatment plans to address the behavior in only a fraction of the relevant cases, nor were there indications that clinicians determined that a treatment plan was not clinically indicated. The Fifteenth Report noted that the lack of treatment planning for inmates who engage in repeated self-harming behavior was an "urgent safety risk that must receive prompt attention from the County." Regarding this feedback, the County reports

> As noted in prior self-assessments, not only are clinicians utilizing the

---

[19] Regarding unobstructed visual observation in 1400, on the Monitoring Team's most recent site visit to CRDF, three tall laundry carts were lined up between the deputy workstation and one of the 1400 dayrooms, obstructing site lines therein. Care should be taken to avoid creating similar obstructions in the future.

crisis response template that directs analysis and documentation of these elements, but Mental Health Program supervisors are required to audit the clinical crisis response notes for two patients of each clinician every week. Furthermore, each supervisor then meets with the clinician on a weekly basis to discuss whether their crisis assessments adequately address the areas the Sixteenth Report prioritizes. These meetings are designed to be case-specific trainings that supplement the general training the Program provides on identifying a patient's problem, providing tools patients can use to cope with and overcome the problem, and to map out a broader plan for the patient's care and safety.[20]

The County also reports on several recent trainings on compliance with the provisions of this Agreement for all clinical supervisors, including on the requirements of Provision 36.

According to the County's implementation plan tracker, the County has completed all 22 corrective action steps regarding Provisions 36 and 40.  These steps include: CCSB collaborating with TTCF training to ensure dissemination and re-briefing of "Handling Suicidal Inmate in Discipline Modules Procedure" (completed January 2022); determining the tele-psych resources required to offer 24/7 services at Wayside facilities (completion date unclear); developing a timeline and plan for expanding psychline at Wayside facilities (completion date unclear); ensuring that at least one QMHP in the IRC is available to meet with quarantined individuals in MCJ and TTCF during evening and overnight shifts (completion date unclear); submitting on-call staff schedules each quarter (completion date unclear); steps related to improving documentation practices (completion date unclear); improving treatment planning (completion date unclear); adding staff to provide evening and weekend crisis evaluation coverage (completed December 2016[21]); developing a training platform for CHS Wayside (completed 3Q2023) compliance team working with the program to develop interim internal audit to assess the impact of the training program (completed May 2023); beginning internal audits on a monthly basis (completed May 2023); and monthly identification of 20 notes from each facility to see if the standardized crisis/on-call response template was used (completed July 2022).

---

[20] The Monitoring Team has asked whether there is documentation prepared as a result of these supervisory meetings or any summary of the supervisor's findings and feedback to the clinicians.  If so, samples should be provided to the Team for review.

[21] The date listed in the tracker is erroneous.  The County may provide the Monitor with the correct date before the final report is issued.

37.    Sheriff's Court Services Division staff will complete a Behavioral Observation and Mental Health Referral ("BOMHR") Form and forward it to the Jail's mental health and/or medical staff when the Court Services Division staff obtains information that indicates a prisoner has displayed obvious suicidal ideation or when the prisoner exhibits unusual behavior that clearly manifests self-injurious behavior, or other clear indication of mental health crisis. Pending transport, such prisoner will be under unobstructed visual observation or subject to 15-minute safety checks.

**STATUS:    PARTIAL COMPLIANCE**

The Compliance Measures require the Department to randomly select six courts from among the three Court Divisions each quarter, review written communications and orders that refer to a suicide risk or serious mental health crisis for a prisoner and incident reports for self-injurious behavior by prisoners appearing in the selected courts, and determine if these incidents are reflected in BOMHR forms completed by the Court Services Division staff in the selected courts. On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 37 by March 31, 2024.

In the County's Augmented Seventeenth Self-Assessment, it reported that for the Second Quarter of 2023, in all of the three qualifying incidents, "Court Division staff completed BOHMRs for the patient and forwarded them to CHS." However, in one of the cases, timely safety checks were not completed, resulting in a compliance percentage of 66%. In the Third Quarter of 2023, the County reported that for all five qualifying incidents, Court Division staff completed BOHMRs and forwarded them to CHS. However, in one case, staff failed to document the safety checks, resulting in 80% compliance.[22]

To improve compliance with the safety check requirements of Provision 37, the County reports that it has taken several corrective actions

CCSB completed re-trainings on Provision 37 requirements in the Third Quarter of 2023. CCSB conducted audits of Court Services Division results, analyzing particular cases potentially subject to the provision in July and August of 2023.

Furthermore, Court Services Division's training unit has been sending to all courthouse staff Provision 37 training materials, covering when and how to fill out BOMHRs and the observation and safety-check requirements, on a quarterly basis. Automated Personnel In-Service ("APIS") rosters affirming staff members' review of the materials are required.

Finally, in August 2023, CCSB provided Court Services Division's

---

[22] As explained above, the County's request for a variance from the Compliance Measures as to these results is denied.

training unit newly designed signage that clearly states Provision 37's requirements, including the necessity of conducting and documenting 15-minute checks. The training unit posted these signs in all County court lock-ups in September 2023.

According to the County's implementation plan tracker, the County has completed all 4 corrective action steps regarding Provision 37.  These steps include: Court Services Training Bureau briefing operations staff at each of the three court services bureaus (completed January 2022); Court Services operations staff conducting mass briefings and training to Court Services lockup staff about expectations (completed February 2022); and Court Services commencing quarterly training on provision requirements and documentation (completed February 2022 and ongoing); assessing one incident per month at each of the three court services bureaus and sharing the results with Court Services Training Bureau (completed March 2022 and ongoing).

38.      Consistent with existing DMH policies and National Commission on Correctional Health Care standards for jails, the County and the Sheriff will ensure that mental health staff or JMET teams make weekly cell-by-cell rounds in restricted non-mental health housing modules (e.g., administrative segregation, disciplinary segregation) at the Jails to identify prisoners with mental illness who may have been missed during screening or who have decompensated while in the Jails.  In conducting the rounds, either the clinician, the JMET Deputy, or the prisoner may request an out-of-cell interview. This request will be granted unless there is a clear and documented security concern that would prohibit such an interview or the prisoner has a documented history of repeated, unjustified requests for such out-of-cell interviews.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified))**

The Compliance Measures require the Department to review the documentation of the weekly cell-by-cell rounds and the JMET Logs for a randomly selected week each quarter to confirm that the required cell-by-cell checks were conducted and out-of-cell interviews were handled in accordance with this provision.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 38 in the Seventeenth Reporting Period.

39.    The County and the Sheriff will continue to use a confidential self-referral system by which all prisoners can request mental health care without revealing the substance of their requests to custody staff or other prisoners.

**STATUS        SUBSTANTIAL COMPLIANCE (as of July 1, 2017, through June 30, 2018 (verified) at NCCF)**

**PARTIAL COMPLIANCE (at PDC South, CRDF, MCJ, TTCF, and PDC North)**

**NOT RATED (at PDC East)**

Substantial Compliance requires the Department to (a) verify that housing areas have the required forms and (b) review randomly selected self-referrals for mental health care from prisoners to confirm that (i) the referrals "were forwarded to DMH" by the Department, and (ii) that "DMH documented the timeliness and nature of DMH's response to the self-referrals[.]"  The thresholds for Substantial Compliance are that (i) 85% of the housing areas have the required forms; (ii) 90% of the self-referrals must be forwarded by the Department to the Department of Health Services – Custody Health Services (DHS-CHS); and (iii) 90% must contain the required documentation of DHS-CHS's response.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 39 by June 30, 2024.  Unless the County's performance improves substantially, it is at risk of missing this deadline.

The County's Augmented Seventeenth Self-Assessment reports that it achieved Substantial Compliance with Compliance Measure 39-4(a) in the Second Quarter of 2023 at all monitored facilities.  The reported results were 93% at MCJ, 90% at CRDF, 88% at TTCF, 85% at PDC North, 100% at PDC South, and 100% at PDC East.

Regarding Compliance Measures 39-4(b) and 4(c), the County's Augmented Seventeenth Self-Assessment reports that 100% of the self-referrals from PDC North, PDC South, CRDF, TTCF, and MCJ were forwarded by the Department to CHS in the Second Quarter of 2023.  The County further reports that CHS documented the timeliness and nature of its response in 0% of the PDC North referrals, 0% of the PDC South referrals, 42% of the CRDF referrals, 34% of the TTCF referrals, and 43% of the MCJ referrals.  The County reports there were no relevant referrals from PDC East during the Second Quarter of 2023.

For the Third Quarter of 2023, the County reports that it achieved Substantial Compliance with Compliance Measure 39-4(a) at all applicable facilities.  The reported results were 91% at MCJ, 95% at CRDF, 92% at TTCF, 90% at PDC North, 89% at PDC South, and 100% at PDC East.

Regarding Compliance Measures 39-4(b) and 4(c), the County's Augmented Seventeenth Self-Assessment reports that 100% of the self-referrals from PDC North,

CRDF, TTCF, and MCJ were forwarded by the Department to CHS in the Third Quarter of 2023, and there were no relevant referrals from PDC South and PDC East.  The County further reports that CHS documented the timeliness and nature of its response in 33% of the PDC North referrals, 26% of the CRDF referrals, 46% of the TTCF referrals, and 41% of the MCJ referrals.

The County reports its conclusion that the "lone remaining barrier" to its substantial compliance with Provision 39 is ensuring that Health Service Requests ("HSRs") are "addressed in a timely fashion, and that the response is documented."  To achieve that end, the County reports that it has worked to 1) train staff in daily triage of HSRs; 2) train clinicians in how to easily ascertain from a patient's EMR whether the patient has a pending HSR; 3) hire additional staff to increase capacity; and 4) establish a system to track submitted HSRs and assure timely, documented responses.

The County previously reported Substantial Compliance at NCCF for twelve consecutive months from July 1, 2017, through June 30, 2018.  These results have been verified by the Monitor's auditors and NCCF is no longer subject to monitoring for compliance with Paragraph 39.

According to the County's implementation plan tracker, the County has completed all 11 corrective action steps regarding Provision 39.  These steps include: informal refresher courses (completed January 2023); review of self-assessments for 4Q2021 and 2022 quarters by the Compliance Team for (i) failures to scan forms into the HER (completed August 2023 and ongoing) and (ii) delayed MPTL entries (completed August 2023 and ongoing), including reviewing staffing during periods of non-compliance and make revisions (completed 3Q2022); updated staffing plan for triage of mental health referrals (completed July 2023); workshop meetings at each facility regarding delays (completed May 2022); conducting hiring fairs (completed March 2022 and ongoing); providing periodic hiring reports (completed March 2022and ongoing); using nurse practitioners to support psychiatrists (completion date unclear); complete negotiations with unions to address loan repayment concerns for psychiatrists and other mental health staff (completed April 2023); and having relief physicians trained for patient needs (completed September 2023).

40.    The County and the Sheriff will ensure a QMHP will be available on-site, by transportation of the prisoner, or through tele-psych 24 hours per day, seven days per week (24/7) to provide clinically appropriate mental health crisis intervention services.

STATUS:    **PARTIAL COMPLIANCE**

Substantial Compliance requires the County (1) to provide the Monitor with on-call schedules for two randomly selected weeks reflecting that a QMHP was assigned 24 hours a day, seven days per week, and (2) to randomly select referrals for mental health crisis intervention received by a QMHP per quarter to verify (i) that a QMHP responded to all referrals, and (ii) responses to 90% of the referrals were within four hours.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234.  That Order required Defendants to achieve Substantial Compliance with Provision 40 by September 30, 2023, which falls within the Seventeenth Reporting Period discussed in this Report.

The County's Seventeenth Self-Assessment reports that in the Second Quarter of 2023, a QMHP responded to 100% of the referrals for mental health crisis intervention services, which equals the 100% threshold for Substantial Compliance, and that 89% of the responses were within four hours, which is just below the 90% threshold for Substantial Compliance.  The County's Augmented Seventeenth Self-Assessment reports that in the Third Quarter of 2023, a QMHP responded to 100% of the referrals for mental health crisis intervention services, which equals the 100% threshold for Substantial Compliance, and that 97% of the responses were within four hours, which is above the 90% threshold.

The County has long struggled to comply with Provision 40 and prior Monitoring Reports have shared significant critiques and advice to the County about its compliance.  The County is now reporting that it has achieved Substantial Compliance in the Third Quarter of 2023 given that it is now meeting the expectation of having a QMHP respond to all referrals for urgent or emergent mental health crises within four hours.  However, Provision 40, by its very terms, also requires that those responses include "clinically appropriate mental health crisis intervention services."  As set forth below, the Monitor and the Court-Appointed Mental Health Subject Matter Expert, Dr. Johnson, conclude that the County's crisis responses continue to not be "clinically appropriate" in a sufficient number of cases.  The County is, therefore, in Partial Compliance with Provision 40 for the Seventeenth Reporting Period.

The Monitoring Team has conducted multiple qualitative reviews of the County's compliance with Provision 40 in several recent Reporting Periods and has repeatedly identified compliance as a priority that requires urgent attention.[23]  These reviews generally found that a substantial percentage of patients were seen by QMHPs in a timely manner after triggering events.  However, there were deficits in the percentage of cases in which the crisis response was deemed to be clinically appropriate.  The Team has noted that "what is typically missing is an indication that sound crisis interventions were

---

[23] *See* Monitor's Eleventh, Twelfth, Thirteenth, Fourteenth, and Fifteenth Reports.

attempted at the time of the initial clinical contact. More explicit documentation is needed of attempts at de-escalation when needed, consideration of alternative behaviors, explicit attention to and instruction in specific coping strategies, communication and collaboration with custody, or other short-term interventions intended to ensure the safety of the patient until changes in housing and more explicit treatment planning can be enacted."

The Team again reviewed Provision 40 in the Seventeenth Reporting Period. It reviewed "60 qualifying cases from IRC, TTCF, CRDF, NCCF, and MCJ. A QMHP responded to the crisis in 60/60 = 100% of cases." The response was found to be "within four hours in 50/59 = 85% of cases (one was indeterminate). However,

> a clinically appropriate crisis response was documented in just 16/58, or 28% of cases (two were indeterminate). This is a substantial decrease from most recent prior reviews. Differences were noted across facilities, with 40% at CRDF, 32% at TTCF, and 11% at other facilities. As noted in earlier reviews, the majority of crisis responses continued to consist of change of P level and housing placement, and/or implementation of property restrictions.

These findings echo the Team's findings regarding Provision 40 in multiple prior monitoring reports. The County reports that it has relied on the CHS training department and weekly clinical team meetings and individual supervision to enhance compliance. In addition, a checklist was provided to clinicians to guide them on the necessary elements of on-call assessments and interventions, and a treatment binder was provided to all new CHS employees who enter the Mental Health Program, "emphasizing expectations for interventions and documentation."[24] The County remains in Partial Compliance with Provision 40 for the Seventeenth Reporting Period.

According to the County's implementation plan tracker, the County has completed all 22 corrective action steps regarding Provisions 36 and 40. These steps include: CCSB collaborating with TTCF training to ensure dissemination and re-briefing of "Handling Suicidal Inmate in Discipline Modules Procedure" (completed January 2022); determining the tele-psych resources required to offer 24/7 services at Wayside facilities (completion date unclear); developing a timeline and plan for expanding psychline at Wayside facilities (completion date unclear); ensuring that at least one QMHP in the IRC is available to meet with quarantined individuals in MCJ and TTCF during evening and overnight shifts (completion date unclear); submitting on-call staff schedules each quarter (completion date unclear); steps related to improving documentation practices (completion date unclear); improving treatment planning (completion date unclear); adding staff to provide evening and weekend crisis evaluation coverage (completed December 2016); and developing a training platform for CHS Wayside (completed 3Q2023); compliance team working with the program to develop interim internal audit to assess the impact of the training program (completed May 2023); beginning internal audits on a monthly basis (completed May 2023); and monthly

---

[24] The Monitor requests that copies of these materials be provided to the Monitor and Dr. Johnson.

identification of 20 notes from each facility to see if the standardized crisis/on-call response template was used (completed July 2022

41.    Consistent with existing DMH policies, the County and the Sheriff will implement step-down protocols that provide clinically appropriate transition when prisoners are discharged from FIP after being the subject of suicide watch.  The protocols will provide:

(a)    intermediate steps between highly restrictive suicide measures (e.g., clinical restraints and direct constant observation) and the discontinuation of suicide watch;

(b)    an evaluation by a QMHP before a prisoner is removed from suicide watch;

(c)    every prisoner discharged from FIP following a period of suicide watch will be housed upon release in the least restrictive setting deemed clinically appropriate unless exceptional circumstances affecting the facility exist; and

(d)    all FIP discharges following a period of suicide watch will be seen by a QMHP within 72 hours of FIP release, or sooner if indicated, unless exceptional circumstances affecting the facility exist.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of July 1, 2022, through March 31, 2023 (verified) and April 1, 2023, through June 30, 2023 (unverified))**

Substantial Compliance requires CHS to review the medical records of all prisoners on suicide watch in FIP for one randomly selected month each quarter, and submit a report regarding the implementation of the step-down protocols and the results of its review of the medical records.  During the Fifth Reporting Period, the parties agreed to revise the Compliance Measures to increase the number of inmates subject to the step-down protocols of Paragraph 41 and ensure that the implementation of step-down protocols for FIP patients on suicide watch "ameliorate the impact of the restrictions" and have the necessary "level of precautions based upon individual assessment[s]" of the patients.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 41 by June 30, 2024.

The County's Augmented Seventeenth Self-Assessment reports that it achieved Substantial Compliance in the Second Quarter of 2023 as it met the requirements in Compliance Measure 41-4 for 100% of the prisoners discharged from FIP during the Reporting Period after having been on suicide watch.  These results are subject to verification by the Monitor's auditors.

The Monitoring Team conducted a qualitative review of Provision 41 during the Seventeenth Reporting Period.  It randomly selected 30 male and 30 female FIP inmates who were on any level of safety precaution because of a determination by mental health

staff that the patient was at substantial risk of seriously harming him or herself.  Based on these criteria, nine female and 34 male cases were identified reflecting FIP discharges occurring between March and June 2023.

The Team determined that in 40/42, or 95% of cases (one was indeterminate), the FIP psychiatrist completed a discharge evaluation within 72 hours of FIP discharge.[25]  It also determined that in 36/36 cases, or 100% (one case was indeterminate and six cases were N/A, typically because the patient was released directly from FIP, usually to an outside treatment facility), the QMHP discharge evaluation specified the least restrictive housing that was deemed clinically appropriate. In 33/35 cases, or 94%, the housing determinations appeared clinically reasonable (six were N/A and one was indeterminate). Further, 31/31 cases, or 100%, were seen within 72 hours of discharge (11 cases were N/A and one was indeterminate).

The Team noted weaknesses in the number of cases in which the patient was counseled regarding potential adverse effects of the restrictions imposed by suicide prevention measures, finding documentation of such counseling in only 1/31, or 3% of cases.  However, "the chart notes from these encounters were frequently well-written and otherwise adequate.  In fact, many were better and more comprehensive than much of the clinical documentation the Team has seen in its evaluations of other Provisions."

Finally, the Team noted weaknesses in the frequency with which the step-down procedures specified by the QMHP were actually implemented following discharge from FIP.  A review of records showed that in just 4/33, or 11% of cases, this was obviously true from the clinical notes.  However, the Team noted that this item was more difficult to score than the others, "primarily due to uncertainty about how to define what constituted specific step-down procedures that should have been documented in the discharge summary.  The most common entry in the plan section of the discharge summary was "FU per LOC protocol" or something similar."

On balance, while the qualitative review revealed areas for improvement in the County's performance, it should not—and does not—prevent a finding that the County is in Substantial Compliance with Provision 41 for the Seventeenth Reporting Period.

---

[25] In the two cases that were noncompliant, both patients had been evaluated and discharged by the psychiatrist, but the patient was not transferred from the FIP within 72 hours, and no further clinical evaluations were completed prior to transfer.

42.    Consistent with existing DMH policies, the County and the Sheriff will implement step-down protocols to ensure that prisoners admitted to HOH and placed on risk precautions are assessed by a QMHP.  As part of the assessment, the QMHP will determine on an individualized basis whether to implement "step-down" procedures for that prisoner as follows:

(a)    the prisoner will be assessed by a QMHP within three Normal business work days, but not to exceed four days, following discontinuance of risk precautions;

(b)    the prisoner is counseled to ameliorate the negative psychological impact that any restrictions may have had and in ways of dealing with this impact;

(c)    the prisoner will remain in HOH or be transferred to MOH, as determined on a case-by-case basis, until such assessment and counseling is completed, unless exceptional circumstances affecting the facility exist; and

(d)    the prisoner is subsequently placed in a level of care/housing as determined by a QMHP.

**STATUS:    NON-COMPLIANCE**

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 42 by June 30, 2024.  The County's Augmented Seventeenth Self-Assessment assesses the County's compliance using the revised methodology discussed in the Monitor's Fourteenth Report.  It reports that in the Second Quarter of 2023 at TTCF, "100% of the 25 inmates with High or Imminent Risk Level on their RAS [Risk Assessment for Suicide] were assessed by a QMHP pursuant to Measure 42-4(a)." "[N]one of these patients, or 0%, had records documenting that a QMHP determined on an individualized basis whether to implement step-down procedures."  There were no records to assess for Measure 42-4(c).

In the Third Quarter of 2023 at TTCF, "100% of the 25 inmates with High or Imminent Risk Level on their RAS [Risk Assessment for Suicide] were assessed by a QMHP pursuant to Measure 42-4(a)."  "[O]ne of these patients, or 4%, had records documenting that a QMHP determined on an individualized basis whether to implement step-down procedures."  There were no records to assess for Measure 42-4(c).

In the Second Quarter of 2023 at CRDF, the County reported that "100% of the six inmates with High or Imminent Risk Level on their RAS [Risk Assessment for Suicide] were assessed by a QMHP pursuant to Measure 42-4(a)."  "[N]one of these patients, or 0%, had records documenting that a QMHP determined on an individualized basis whether to implement step-down procedures."  There were no records to assess for Measure 42-4(c).

58

In the Third Quarter of 2023 at CRDF, "100% of the nine inmates with High or Imminent Risk Level on their RAS [Risk Assessment for Suicide] were assessed by a QMHP pursuant to Measure 42-4(a)."  The County reported that 56% of responsive patients "had records documenting that a QMHP determined on an individualized basis whether to implement step-down procedures."  Of the three patients whose assessment provided for step-down procedures, documentation failed to reflect implementation as required under Measure 42-4(c).

The Sixteenth Monitoring Report listed a number of trainings being provided to County personnel to improve the County's performance under Provision 42.  *See* Sixteenth Report at p. 60.  In its Augmented Seventeenth Self-Assessment, the County notes that the bulk of these trainings occurred during the Second and Third Quarters of 2023.  Thus, their impacts will necessarily not be reflected in the County's results in this Report.  The Monitor will look for improved performance in the Eighteenth Reporting Period.

The County also reports

CHS has more recently submitted an ORCHID optimization request to enhance compliance with Provision 42 by introducing automation to streamline the step-down protocols process. This optimization would address several critical compliance challenges, including eliminating reliance on error-prone spreadsheet logs by automating the step-down protocols, thereby reducing the need for constant manual updates. The requested ORCHID automation will prompt clinicians to assess whether step-down protocols are required whenever a clinician lowers suicide risk levels. Additionally, it would assist programs in efficiently managing and assigning step-down assessments by creating multi-patient task lists of patients who required assessment for step-down protocols. Furthermore, the ORCHID optimization would require clinicians to respond to specific protocol questions based on the requirements of Provision 42, ensuring a more systematic and accurate compliance process. The optimization request has already been made by CHS, completed internal vetting within DHS, and was sent to the ORCHID administrator, Cerner, on January 23, 2024, for testing and implementation. CHS will begin testing the optimization as early as February 21, 2024.

On April 18, 2024, the County reported

The ORCHID optimization for Provision 42 has undergone multiple rounds of testing and adjustments since February to ensure all elements work as intended.  A final adjustment is being made the week of 4/15/24 and the full enhancement should be live by 4/19/24, barring any unexpected complications.  The relevant staff who will utilize the enhancement has already been trained on its use and will receive an email

notice when it goes live that includes reminder instructions.  Furthermore, staff was trained at the beginning of April on the general importance of the step-down protocol and a refresher on how to complete all tasks and appropriate documentation in ORCHID without the benefit of the enhancement, until it is live.  This training was recorded and is available to all relevant staff.

According to the County's implementation plan tracker, the County has completed 6 out of 7 corrective action steps regarding Provision 42.  These steps include: writing a new program and providing training and access to the program for staff in order to streamline access to suicide risk information (completed September 2022); developing a calendar designating responsible staff for producing and disseminating reports (completed September 2022); monthly reports from program managers on days that reports are unavailable (completed September 2022); training the training team (completed January and February 2022); training for each mental health program (completed July 2023); and review for clinicians non-compliant in their audits (completion date unclear and ongoing).

43.    Within six months of the Effective Date, the County and the Sheriff will develop and implement written policies for formal discipline of prisoners with serious mental illness incorporating the following:

(a)    Prior to transfer, custody staff will consult with a QMHP to determine whether assignment of a prisoner in mental health housing to disciplinary housing is clinically contraindicated and whether placement in a higher level of mental health housing is clinically indicated, and will thereafter follow the QMHP's recommendation;

(b)    If a prisoner is receiving psychotropic medication and is placed in disciplinary housing from an area other than mental health housing, a QMHP will meet with that prisoner within 24 hours of such placement to determine whether maintenance of the prisoner in such placement is clinically contraindicated and whether transfer of the prisoner to mental health housing is clinically appropriate, and custody staff will thereafter follow the QMHP's recommendation;

(c)    A QMHP will participate in weekly walks, as specified in paragraph 38, in disciplinary housing areas to observe prisoners in those areas and to identify those prisoners with mental health needs; and

(d)    Prior to a prisoner in mental health housing losing behavioral credits for disciplinary reasons, the disciplinary decision-maker will receive and take into consideration information from a QMHP regarding the prisoner's underlying mental illness, the potential effects of the discipline being considered, and whether transfer of the prisoner to a higher level of mental health housing is clinically indicated.

**STATUS (43):**       **SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at NCCF and PDC North)**

**PARTIAL COMPLIANCE (at TTCF and MCJ)**

**NON-COMPLIANCE (at CRDF)**

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 43 by March 31, 2024.

Regarding Compliance Measures 43-6 and 43-9(e), the Department submitted a memorandum indicating that no individuals with mental illness lost behavioral credits for disciplinary reasons during the Second Quarter of 2023.  The County's Augmented Seventeenth Self-Assessment reports that in the Second Quarter of 2023, 11% of the required consultations at CRDF "occurred prior to transfers from mental health housing to discipline housing."  The County further reports that "40% – less than the required 90% – of the meetings required pursuant to Compliance Measure 43-9(c) occurred when transferring individuals to disciplinary housing from areas other than mental health housing."  The County also reports that 100% of the weekly row walks through disciplinary units pursuant to Compliance Measure 43-9(d) occurred at CRDF.  The results for MCJ were 20%, 75%, and 100%, respectively.

At TTCF, 66% of the required consultations "occurred prior to transfers from mental health housing," and "there were no patients to assess for Measure 43-9(c) during this quarter," since "instead of being used for discipline, these modules in TTCF were used for Covid-related quarantines during the reporting period."  Similarly, the County reports that regarding Compliance Measure 43-9(d), "there were no discipline row walks required during the random weeks as no individuals were housed in TTCF discipline modules during the relevant weeks due to changes required to reduce the risk of spreading COVID-19."

Regarding Compliance Measures 43-6 and 43-9(e), the Department submitted a memorandum indicating that "no individuals with mental illness lost behavioral credits for disciplinary reasons during the Third Quarter of 2023."  However, just 14% of the required consultations at CRDF "occurred prior to transfers from mental health housing." 14% of the required consultations at CRDF "occurred when transferring inmates from areas other than mental health housing."  The County also reports that 100% of the weekly row walks through disciplinary units occurred at CRDF.

The results for TTCF were 84% (consultations before transfer), but there were no results to report for Compliance Measures 43-9(c) or 43-9(d) due to COVID-19-related population changes.  For MCJ, the results were 77%, 73%, and 100% in the Third Quarter of 2023.

Given the poor results at CRDF, the County reports

The reason for the poor performance at CRDF during the period under Compliance Measures 43-9(b) and 43-9(c) was again insufficient CHS staffing at the facility. But the news there is hopeful: CHS mental health staff at CRDF grew steadily in the fall and winter, and as of February 14, 2024, CRDF had only two clinical vacancies. All other clinical positions are filled with staff currently in place working at the facility or in the onboarding process. At CRDF, all clinical staff are trained to provide clinical evaluations for those transferred to discipline housing or in pre-discipline status, including in the use of the assessment template that CHS has implemented, so as CRDF nears full staffing levels, the County expects CRDF's results to improve steadily in the next reporting period.

The County also reports, and the Monitor confirms, that the relevant disciplinary policies that fall under Provision 43 were finalized and formally published by the County in January 2024.

The Monitoring Team conducted a qualitative review of Provision 43 during the Seventeenth Reporting Period.  It reviewed the medical records of the 39 inmates in HOH and MOH from CRDF and TTCF who were subject to discipline.  In 9/22, or 41% of cases (17 were indeterminate), a QMHP evaluated the patient prior to discipline being imposed.  This was a substantial decline from prior reviews.  In 24/37, or 65% of cases (two were indeterminate), the QMHP considered whether a higher level of housing was indicated.  This was also a substantial decline from prior reviews.

In 28/29, or 97% of cases (10 were not applicable due to there being no DRB evaluation), the clinician addressed whether discipline was contraindicated.  In 27/29, or 93% of cases (10 were N/A due to no evaluation documentation), the clinical documentation demonstrated evidence of the recommendations being based on the clinical condition of the patient.  For inmates in GP on psychotropic medication, the Team found that 23/37, or 62% of cases, were evaluated by a QMHP, and 18/34, or 53% (3 were indeterminate), were evaluated within 24 hours, as required.  This is a substantial decline from prior findings.  In 23/23, or 100% of GP cases, the QMHP both "considered a higher level of mental health housing, and provided recommendations regarding whether restrictive housing was clinically contraindicated. (14 cases were considered N/A because no QMHP evaluation was found in the healthcare record).

As noted in prior reviews, "the clinical documentation should be more specific regarding the nexus between the clinical factors assessed and any recommendations or counterindications to the proposed discipline. The discipline being proposed must be known to the clinician at the time of the assessment if the clinical input is to be meaningful.  Recommendations to modify the proposed discipline should explain why based on clinical concerns. In most cases, there is still little or no discussion of the nature of discipline proposed and how this might affect the mental health of the patient."

According to the County's implementation plan tracker, the County has completed 15 out of 17 corrective action steps regarding Provision 43.  These steps include: providing the DOJ and Monitor with updated, revised discipline policies and responses to DOJ comments on the policies (completed March 2023); finalizing policies about disciplining individuals with severe mental illness (completed January 2024); improving communication issues at TTCF by commencing in-person briefings of line staff and supervisors to reiterate the importance of following proper discipline procedures (completed December 2021); training line staff and supervisors on proper documentation practices (completed March 2022); establishing consistent discipline processes and custody point of contact at CRDF (completed March 2022); CHS evaluating one DRB evaluation by each new clinician per week (completed September 2022 and ongoing); staffing coverage for discipline reviews at TTCF to be complete (completion date unclear); training for new staff at TTCF after orientation (completion date unclear and ongoing); preparing a directive for staff requiring them to clarify with custody during crisis calls whether an IRTS is being produced (completed March 2022); CHS training relevant CRDF staff on requirements related to staff conduct evaluations (completed March 2022); and supervisor evaluations to determine if CHS was notified of proposed discipline and the patient was evaluated accordingly (completed May 2023).

The County previously achieved Substantial Compliance at NCCF and PDC North for twelve consecutive months and these facilities were not subject to monitoring for compliance with Paragraph 43 during the Sixteenth Reporting Period.

44.    Within six months of the Effective Date, the County and the Sheriff will install protective barriers that do not prevent line-of-sight supervision on the second floor tier of all High Observation Housing areas to prevent prisoners from jumping off of the second floor tier.  Within six months of the Effective Date, the County and the Sheriff will also develop a plan that identifies any other areas in mental health housing where such protective barriers should be installed.

**STATUS:**      **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016)**

The County has maintained Substantial Compliance with Paragraph 44 of the Agreement since January 1, 2016.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 44 in the Seventeenth Reporting Period.

45.    Consistent with existing Sheriff's Department policies, the County and the Sheriff will provide both a Suicide Intervention Kit that contains an emergency cut-down tool and a first-aid kit in the control booth or officer's station of each housing unit.  All custody staff who have contact with prisoners will know the location of the Suicide Intervention Kit and first-aid kit and be trained to use their contents.

> **STATUS:**    **SUBSTANTIAL COMPLIANCE (as of October 1, 2015, through September 30, 2016 (verified) at CRDF, NCCF, PDC East, PDC South, and TTCF)**
>
> **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at MCJ and PDC North)**

The County maintained Substantial Compliance with Paragraph 45 for twelve consecutive months at all facilities as of December 31, 2016.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 45 in the Seventeenth Reporting Period.

46.     The County and the Sheriff will immediately interrupt, and if necessary, provide appropriate aid to, any prisoner who threatens or exhibits self-injurious behavior.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of July 1, 2020, through June 30, 2021 (verified))**

The parties agreed on Revised Compliance Measures in 2021.  Substantial Compliance requires the Department to review the documentation from randomly selected incidents involving prisoners who threaten or exhibit self-injurious behavior, and include an assessment of the timeliness and appropriateness of the Department's responses to these incidents in its semi-annual Self-Assessment.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 46 in the Seventeenth Reporting Period.

47.     The County and the Sheriff will ensure there are sufficient custodial, medical, and mental health staff at the Jails to fulfill the terms of this Agreement.  Within six months of the Effective Date, and on a semi-annual basis thereafter, the County and the Sheriff will, in conjunction with the requirements of Paragraph 92 of this Agreement, provide to the Monitor and DOJ a report identifying the steps taken by the County and the Sheriff during the review period to implement the terms of this Agreement and any barriers to implementation, such as insufficient staffing levels at the Jails, if any.  The County and the Sheriff will retain staffing records for two years to ensure that for any critical incident or non-compliance with this Agreement, the Monitor and DOJ can obtain those records to determine whether staffing levels were a factor in that critical incident and/or non-compliance.

**STATUS:      PARTIAL COMPLIANCE**

Under Provision 47 and its associated Compliance Measures, Substantial Compliance requires the County to: a) submit a self-assessment that: i) identifies the steps taken by the County and the Sheriff to implement the terms of the Agreement, and ii) assesses whether staffing levels were a factor in any non-compliance with the Agreement, any Critical Incident, or the Department's handling of the Critical Incident. Historically, the Monitor has assessed that the County has provided useful analysis of the role of staffing levels with respect to Critical Incidents (47-4(a)(ii)), but it has not adequately evaluated "whether staffing levels were a factor in any non-compliance with the Agreement" (47-4(a)(ii)).  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 47 by June 30, 2024.

Regarding critical incidents, in the Sixteenth Reporting Period, the County's posted results for Provision 47 reflect the County's assessment of whether staffing levels were a factor in "any critical incident, or the Department's handling of the incident," as Compliance Measures 47-1 and 47-2 require.  The County's posted results report that 41 critical incidents[26] occurred during the First Half of 2023, and the County concluded that staffing was not a factor in any of those incidents.  The County also reports its conclusion that

> it was in partial compliance with Provision 47. As is evident from the current augmented self-assessment, this rating results from the County's acknowledgement that insufficient staffing has been a factor in its failure to reach substantial compliance with several of the provisions that remain subject to monitoring.

Accompanying its Augmented Self-Assessment, the County also provided two documents (captioned "staff analysis" and "staffing analysis") that are compilations of data about CHS' budgeted and vacant positions as of January 2024.  They reflect that CHS had 354 total authorized mental health worker positions, and 212 were filled, or just

---

[26] 25 Deaths of People in Custody, 4 Serious Suicide Attempts, 8 Inmate Assaults on Staff, and 4 Category 3 Uses of Force.

60% of the total (16 positions had candidates who had accepted offers and were in the process of onboarding).  This again reflects minimal improvement over the same data included in the Fifteenth and Sixteenth Monitoring Reports.

*Figure 5:  The Percentage of Filled and Vacant Mental Health Worker Positions by Reporting Period*



Given the fast-approaching Court-ordered compliance deadlines, this pace of recruitment and onboarding will not be sufficient.  The Monitor strongly encourages the County to immediately prioritize the implementation of new measures to increase its pace of recruitment of mental health workers for the jails.

Regarding the Monitoring Reports' often-repeated guidance that the County must also evaluate the role of staffing deficits in any non-compliance with the Agreement itself, the County appears to confuse "data" with "analysis."  The Seventeenth Augmented Self-Assessment notes, for example, that it is "certainly not the case that the County fails to report extensive information on both CHS and LASD staffing levels.  Indeed, as was the case in preparation for the Sixteenth Report, the County is submitting contemporaneously with this augmented self-assessment CHS staffing analyses, both for the agency as a whole and for mental health staff in particular."

The County has, indeed, provided staffing *data* in two spreadsheets produced contemporaneously with the Seventeenth Augmented Self-Assessment.  They reflect the number of authorized and vacant positions and other routine HR information (positions onboarding, etc.) across CHS' operations.  But they include no analysis nor any

69

discussion of the role of staffing deficits in the County's non-compliance with any of the provisions of the Agreement.  Captioning them "analyses" does not make it so.

As the Sixteenth Monitoring Report noted, the County has begun to provide some relevant analyses in its discussion of some of the provisions not yet in Substantial Compliance:

the County did begin to more specifically address the role of staffing deficits in its discussion of certain provisions. For example, in its discussion of Provision 64, the County noted the role a lack of nursing and psychiatric staff has had on its ability to achieve compliance with the Provision, and also on its efforts to remedy those deficiencies. These are useful discussions and should be deepened and expanded for all remaining provisions that are not yet in Substantial Compliance in the Seventeenth Reporting Period.

In the Augmented Seventeenth Self-Assessment, the County heeded that advice for some provisions but not others.  For the Eighteenth Reporting Period, for all provisions not in Substantial Compliance, the County should particularize the staffing necessary to achieve Substantial Compliance, support (such as workload measures) for those calculations, the number of staff positions authorized, filled, and vacant, and a specific description (some of which may apply generally to many provisions) of the obstacles to achieving the necessary staffing levels and the steps taken to overcome them.

48.     Within three months of the Effective Date, the County and the Sheriff will have written housekeeping, sanitation, and inspection plans to ensure the proper cleaning of, and trash collection and removal in, housing, shower, and medical areas, in accordance with California Code of Regulations ("CCR") Title 15 § 1280: Facility Sanitation, Safety, and Maintenance.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016)**

The County maintained Substantial Compliance with Paragraph 48 of the Agreement at all facilities for twelve consecutive months as of December 31, 2016. Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 48 in the Seventeenth Reporting Period.

49.    Within three months of the Effective Date, the County and the Sheriff will have a maintenance plan to respond to routine and emergency maintenance needs, including ensuring that shower, toilet, sink, and lighting units, and heating, ventilation, and cooling system are adequately maintained and installed.  The plan will also include steps to treat large mold infestations.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of March 1, 2016, through February 28, 2017)**

The County maintained Substantial Compliance with Paragraph 49 of the Agreement at all facilities for twelve consecutive months as of February 28, 2017. Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 49 in the Seventeenth Reporting Period.

50.    Consistent with existing Sheriff's Department policies regarding control of vermin, the County and the Sheriff will provide pest control throughout the housing units, medical units, kitchen, and food storage areas.

**STATUS:**    **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at all facilities other than PDC South and PDC East)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 (verified) at PDC South and PDC East)**

The County maintained Substantial Compliance with Paragraph 50 of the Agreement at all facilities for twelve consecutive months as of March 31, 2017.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 50 in the Seventeenth Reporting Period.

51.     Consistent with existing Sheriff's Department policies regarding personal care items and supplies for inmates, the County and the Sheriff will ensure that all prisoners have access to basic hygiene supplies, in accordance with CCR Title 15 § 1265: Issue of Personal Care Items.

**STATUS:**        **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) for all facilities other than CRDF)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017 (verified) at CRDF)**

The County maintained Substantial Compliance with Paragraph 51 of the Agreement at all facilities for twelve consecutive months as of June 30, 2017. Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 51 in the Seventeenth Reporting Period.

52.     The County and the Sheriff will implement policies governing property restrictions in High Observation Housing that provide:

(a)     Except when transferred directly from FIP, upon initial placement in HOH:

(i)     Suicide-resistant blankets, gowns, and mattresses will be provided until the assessment set forth in section (a)(ii) below is conducted, unless clinically contraindicated as determined and documented by a QMHP.

(ii)    Within 24 hours, a QMHP will make recommendations regarding allowable property based upon an individual clinical assessment.

(b)     Property restrictions in HOH beyond 24 hours will be based on clinical judgment and assessment by a QMHP as necessary to ensure the safety and well-being of the prisoner and documented in the electronic medical record.

**STATUS:     PARTIAL COMPLIANCE (at CRDF and TTCF)**

Substantial Compliance requires the Department to (1) randomly inspect the cells of prisoners placed in HOH (except from FIP) within the previous 24 hours to confirm that they have been provided with suicide-resistant blankets, gowns and mattresses unless clinically contraindicated, and document the results of the inspection; (2) randomly inspect the cells of prisoners placed in HOH (except from FIP) for more than 24 hours to confirm that they have been provided with allowable property as recommended by a QMHP; and (3) review the electronic medical records of prisoners assigned to HOH on the days of those inspections to verify compliance with the provisions of Paragraph 52. All the Compliance Measures have a 95% threshold for Substantial Compliance.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 52 by December 31, 2023.

In its Seventeenth Augmented Self-Assessment, the County reports that in the Second Quarter of 2023, at CRDF there was "100%" compliance with Compliance Measure 52-5(b).  Regarding Compliance Measure 52-5(c), "64%—rather than the required 95%—of the electronic medical records for inmates assigned to HOH reflected a recommendation by a QMHP regarding allowable property."  Additionally, "70%—rather than the required 95%—of electronic medical records for inmates assigned to HOH reflect that property restrictions were based upon the clinical judgment of a QMHP pursuant to Compliance Measure 52-5(d)."  The County also reported that "83%—less than the required 95%—of inmates analyzed pursuant to Compliance Measure 52-5(e) had allowable property as recommended by a QMHP (unless refused by the inmate)."

The County also reports that at TTCF in the Second Quarter of 2023, "94%—just

75

shy of the required 95%—of inmates analyzed pursuant to Compliance Measure 52-5(b) were provided suicide-resistant blankets, gowns and mattresses as required by this Provision." "42%—less than the required 95%—of the electronic medical records for inmates assigned to HOH reflected a recommendation by a QMHP regarding allowable property pursuant to Compliance Measure 52-5(c)." "91%—less than the required 95%—of electronic medical records for inmates assigned to HOH reflect that property restrictions were based upon the clinical judgment of a QMHP pursuant to Compliance Measure 52-5(d)." "95%—meeting the threshold for substantial compliance—of patients analyzed pursuant to Compliance Measure 52-5(e) had allowable property as recommended by a QMHP (unless refused by the patient)."

The County reports that at TTCF in the Third Quarter of 2023, "85%—rather than the required 95%—of patients analyzed pursuant to Compliance Measure 52-5(b) were provided suicide-resistant blankets, gowns and mattresses as required by this Provision." "51%—rather than the required 95%—of the electronic medical records for patients assigned to HOH reflected a recommendation by a QMHP regarding allowable property pursuant to Compliance Measure 52-5(c)." "88%—rather than the required 95%—of electronic medical records for patients assigned to HOH reflect that property restrictions were based upon the clinical judgment of a QMHP pursuant to Compliance Measure 52-5(d)." "94%—just short of the required 95%—of inmates analyzed pursuant to Compliance Measure 52-5(e) had allowable property as recommended by a QMHP (unless refused by the patient)."

The County also reports 100% compliance with Compliance Measure 52-5(b) at CRDF in the Third Quarter of 2023. Further, "78%—less than the required 95%—of the electronic medical records for patients assigned to HOH reflected a recommendation by a QMHP regarding allowable property pursuant to Compliance Measure 52-5(c)." "71%—less than the required 95%—of electronic medical records for patients assigned to HOH reflect that property restrictions were based upon the clinical judgment of a QMHP pursuant to Compliance Measure 52-5(d)." "88%—less than the required 95%—of inmates analyzed pursuant to Compliance Measure 52-5(e) had allowable property as recommended by a QMHP (unless refused by the patient)." Regarding these results, the County reports

> Remaining non-compliance appears to have mostly stemmed from issues that can be addressed by additional training. For example, in the third quarter, all seven non-compliant records under 52-5(c) involved missing Allowable Property Forms. For 52-5(d), seven of the nine cases deemed non-compliant also involved missing Allowable Property Forms; the remaining two cases were non-compliant because case documentation lacked justification for restrictions. These issues are all correctible with training, and CRDF supervisors have addressed these documentation issues with the staff members who provided non-compliant records. Furthermore, Dr. Gonzalez personally conducted training with all CRDF clinical staff in January 2024 to ensure staff understanding of the requirement of Provision 52 and the importance of complete case

documentation, including all necessary forms.

According to the County's implementation plan tracker, the County has completed 15 out of 16 corrective action steps regarding Provision 52.  These steps include: onboarding staff to fill vacant positions (completion date unclear and ongoing); allocation of designated staff to complete all HOH intakes at CRDF (completed October 2022); allocation of staff on weekends to identify and assign incoming HOH patients to be seen for follow up (completed October 2022); weekly reports by supervisors on their progress training each staff on the expectations for Provision 52 (completed May 2023); CHS posting information outlining the requirements of Provision 52 in areas frequented by staff (completed January 2023); staff members signing acknowledgement that they understand the requirements of Provision 52 (completed May 2023); program-wide training of provision guidelines to clarify for clinical staff what documentation reflects adequate justification of restrictions (completed February 2022); additional guidance to clinicians identified via audits who are struggling with documentation (completed May 2023 and ongoing); CCSB working with CCS to ensure dissemination of an information bulletin advising custody personnel of proper procedures for usage of "Inmate Property Door Signs" for inmates in HOH (completed March 2022); revised duty statements for Deputies and Custody Assistants to reflect responsibility for updating allowable property restriction door signs (completed January 2022); and weekly module spot checks for at least 10 cells (completion date unclear and ongoing).

53.    If otherwise eligible for an education, work, or similar program, a prisoner's mental health diagnosis or prescription for medication alone will not preclude that prisoner from participating in said programming.

**STATUS:    PARTIAL COMPLIANCE**

Substantial Compliance requires the Department to audit the records of prisoners who were eligible, but rejected or disqualified, for education and work programs to confirm that they were not rejected or disqualified because of a mental health diagnosis or prescription for medication alone. On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 53 by June 30, 2024.

The County's Augmented Seventeenth Self-Assessment reports that 96% of the eligible mentally ill prisoners who were denied education or work in the Second Quarter of 2023 and 64% in the Third Quarter of 2023 were denied "for reasons other than a mental health diagnosis or medication prescription." The County further reported that "in the interest of completeness and transparency, the Department treated every case in which a person's request for programming was not handled in a timely manner, or where the request went unanswered and had not disposition, as a denial of programming within the Meaning of Provision 53." The County's Augmented Seventeenth Self-Assessment also reports

> Although the County has had very good compliance with Provision 53, in the third quarter of 2023 it appears that there were slips in compliance at CRDF and MCJ. The County is investigating why alert systems failed in these instances and why notes at CRDF indicated that in two cases inmates were disqualified because of their HOH housing status. The County notes that changes to the alert system were implemented at the end of the second quarter and will investigate whether unfamiliarity with the new system led to untimeliness.

According to the County's implementation plan tracker, the County has already completed all seven corrective action steps regarding Provision 53. These include: hiring a new staff member at CRDF to process requests from incarcerated individuals (completed February 2022); on a weekly basis, CRDF and MCJ staff identify requests pending for more than 15 days, reviewing denials under the provision, and determining whether training or other measures are appropriate (completion date unclear); using a new housing matrix at MCJ that identifies every mental health housing location with inmate information to facilitate decision making (completed February 2022); CCSB evaluating 10 random requests on a monthly basis (completion date unclear and ongoing); weekly meetings between facility grievance teams and PPO team regarding responses to requests (completed First Quarter of 2023); rebuild CARTS system to allow staff to identify pending requests (completed June 2023); and CCSB meeting with PMB and PPO staff to provide guidance on the compliance requirements of Provision 53 (completed January 2022).

54.      Prisoners who are not in Mental Health Housing will not be denied privileges and programming based solely on their mental health status or prescription for psychotropic medication.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of January 1, 2023, through June 30, 2023 (unverified)[27]**

Substantial Compliance under the revised Compliance Measures for Paragraph 54, effective January 1, 2018, requires the Department to audit the records of a maximum of 100 randomly selected prisoners identified on the Wednesday Pharmacy List as having received psychotropic medication to confirm that no more than 10% were rejected or disqualified because of a mental health diagnosis or prescription for psychotropic medication alone.  Because the Monitor's auditors had verified that the County had maintained Substantial Compliance under the original Compliance Measures, the parties agreed that the County will only be required to maintain Substantial Compliance under the revised Compliance Measures for two additional quarters.

The County's Augmented Seventeenth Self-Assessment reports that in the Second Quarter of 2023, no individuals were denied requests or had visits canceled solely due to their mental health status or their prescription for psychotropic medication.  It further reports that in the Third Quarter of 2023, "of the 29 general population inmates on the pharmacy list who made requests for privileges or programming, there were 13 people whose requests were denied."  Also, none of the denials "were based on the person's mental health status or prescription for psychotropic medication.  But 11 of the 13 denials were deemed non-compliant based on the untimeliness of the response."  Furthermore, "CCSB reported that in the sample for the quarter there was no one who had visits canceled solely due to their mental health status or prescription for psychotropic medication."  The County reports

In its augmented self-assessment for the Sixteenth Reporting Period, the County promised to outline its methodology for obtaining the universe of patients comprising the sample for Provision 54. The Department reports that it previously utilized the "Wednesday Pharmacy List" as the universe for this provision. However, effective June 1, 2023, the Custody Support Services Bureau ("CSSB") Grievance Team transitioned from the Custody Automated Reporting System ("CARTS") to the Custody Inmate Grievance Application ("CIGA"). The CIGA application allows for CCSB to obtain a dataset that identifies inmates with a special handling code "P" (for those prescribed psychotropic medication) who made requests for the

---

[27] The County reported Partial Compliance for the Third Quarter of 2023 and did not request to be relieved of its obligations under Provision 54.  However, the Monitor notes that the County was required to achieve only two additional quarters of Substantial Compliance and its reported results for the First and Second Quarters of 2023 reflected Substantial Compliance.  Therefore, if the Monitor's auditors can verify the County's results for First and Second Quarters of 2023 (and if 11 of the 13 denials in the Third Quarter "were deemed non-compliant based on the untimeliness of the response, not on a requester's mental health diagnosis or prescription for medication" as reported), the Monitor will find that the County has fulfilled its obligations under Provision 54 and it will be relieved of its obligations under that provision.

week randomly selected by the Monitor. This eliminated the need to utilize the "Wednesday Pharmacy List" to obtain the universe studied in the self-assessment.

Patient requests generated during the randomly selected week were obtained using CIGA reporting. The list generated for the week of July 2 through July 8, 2023, included 55 patient requests under the categories considered privileges or programming. Patients in mental health housing were removed through identification of the special handling code "M" (for those in mental health housing). For the third quarter, that left a total universe of 29 general population who were prescribed psychotropic medication and who made qualifying requests. Of the 29 requests, 13 were denied, but none of the denials were based on the person's mental health status or prescribed medications. Again, all non-compliant denials were non-compliant based on untimeliness.

Here, too, the County will investigate why otherwise strong performance dipped in quarter three based on untimeliness. The County notes that changes to the alert system were implemented at the end of the second quarter and will investigate whether unfamiliarity with the new system led to untimeliness.

55.    Relevant custody, medical, and mental health staff in all High Observation Housing units will meet on normal business work days and such staff in all Moderate Observation Housing units will meet at least weekly to ensure coordination and communication regarding the needs of prisoners in mental health housing units as outlined in Custody Services Division Directive(s) regarding coordination of mental health treatment and housing.  When a custody staff member is serving as a member of a treatment team, he or she is subject to the same confidentiality rules and regulations as any other member of the treatment team, and will be trained in those rules and regulations.

> **STATUS:**    **SUBSTANTIAL COMPLIANCE (as of October 1, 2016, through September 30, 2017 (verified) at CRDF)**
>
> **SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at PDC North)**
>
> **SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 (verified) at MCJ)**
>
> **SUBSTANTIAL COMPLIANCE (as of July 1, 2019, through June 30, 2020 (verified) at TTCF)**

The Department maintained Substantial Compliance for twelve consecutive months at all facilities as of June 30, 2020.  These results have now been verified by the Monitor's auditors.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 55 in the Seventeenth Reporting Period.

56.     Consistent with existing DMH and Sheriff's Department policies, the County and the Sheriff will ensure that custody, medical, and mental health staff communicate regarding any change in a prisoner's housing assignment following a suicide threat, gesture, or attempt, or other indication of an obvious and serious change in mental health condition.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified))**

Substantial Compliance requires the Department to review in randomly selected periods the electronic medical records of (1) prisoners admitted to HOH following a suicide threat, gesture, or attempt, or other indication of an obvious and serious change in mental health condition to determine if the medical and/or mental health staff approved the placement of the prisoner in HOH; and (2) prisoners who were the subject of a suicide attempt notification to determine if the prisoners were clinically assessed and that clinical staff approved the post-incident housing.

The County's Substantial Compliance results for the twelve months from January 1, 2016, through December 31, 2016, were verified by the Monitor's auditors.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 56 in the Seventeenth Reporting Period.

57 (**Revised**).  Within three months of the Effective Date, the County and the Sheriff will revise and implement their policies on safety checks to ensure a range of supervision for prisoners housed in Mental Health Housing.  The County and the Sheriff will ensure that safety checks in Mental Health Housing are completed and documented in accordance with policy and regulatory requirements as set forth below:

(a)    Custody staff will conduct safety checks in a manner that allows staff to view the prisoner to assure his or her well-being and security.  Safety checks involve visual observation and, if necessary to determine the prisoner's well-being, verbal interaction with the prisoner;

(b)    Custody staff will document their checks in a format that does not have pre-printed times;

(c)    Custody staff will stagger checks to minimize prisoners' ability to plan around anticipated checks;

(d)    Video surveillance may not be used to replace rounds and supervision by custodial staff unless new construction is built specifically with constant video surveillance enhancements and could only be used to replace the required safety checks in non-FIP housing, subject to approval by the Monitor;

(e)    A QMHP, in coordination with custody (and medical staff if necessary), will determine mental health housing assignments; and

(f)    Supervision of prisoners in mental health housing will be conducted at the following intervals:

(i)    FIP:  Custody staff will perform safety checks every 15 minutes.  DMH staff will perform direct constant observation or one-to-one observation when determined to be clinically appropriate;

(ii)    High Observation Housing:  Every 15 minutes;

(iii)    Moderate Observation Housing:  Every 30 minutes.

STATUS (57):      **SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at MCJ)**

                                    **SUBSTANTIAL COMPLIANCE (as of July 1, 2021, through June 30, 2022 (verified) at PDC North)**

                                    **NON-COMPLIANCE (at TTCF and CRDF)**

On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provision 57 ("Revised Paragraph 57") as set forth above. The Parties also agreed on Revised Compliance Measures. Substantial Compliance requires the Department to audit the Title 15 Dashboard records (or e-UDAL records if the Title 15 scanner was not working) for all shifts for each module in each mental health housing unit in two randomly selected weeks to determine if the safety checks were staggered and conducted as required by Paragraph 57 of the Agreement, and to audit the housing records for each mental health housing unit for a randomly selected week to determine if QMHPs approved the new mental health housing assignments as required by Paragraph 57(e). On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 57 by June 30, 2024.

The County's Sixth Self-Assessment reported that it maintained Substantial Compliance with Compliance Measure 57-5(b) in the Fourth Quarter of 2017 and the First Quarter of 2018 in the MOH unit at MCJ (the "Hope Dorm"). It also reported that all of the inmates at MCJ "analyzed pursuant to Compliance Measure 57-5(c) had received QMHP approval for their housing assignments" in both quarters. The results were verified by the Monitor's auditors and MCJ was not subject to monitoring for compliance with Paragraph 57 in the Seventeenth Reporting Period.

The County's Augmented Seventeenth Self-Assessment reports that 36.5% of the safety checks were in compliance with Compliance Measure 57-5(b) (safety checks in FIP) in the Second Quarter of 2023 at TTCF. It also reports that 4.6% of the safety checks were in compliance with Compliance Measure 57-5(c) (safety checks in HOH) at TTCF. The County also reports that 0 % of the safety checks complied with Compliance Measure 57-5(d) (safety checks in MOH) at TTCF. 98% of the new mental health housing assignments at TTCF were approved by a QMHP in the Second Quarter of 2023.

The County's Seventeenth Self-Assessment also reports that 0% of the safety checks were in compliance with Compliance Measure 57-5(c) (safety checks in HOH) in the Second Quarter of 2023 at CRDF. The County also reports that 6% of the safety checks complied with Compliance Measure 57-5(d) (safety checks in MOH) at CRDF. 100% of the new mental health housing assignments at CRDF were approved by a QMHP in the Second Quarter of 2023.

The County's Augmented Seventeenth Self-Assessment reports that 0% of the safety checks were in compliance with Compliance Measure 57-5(c) (safety checks in

HOH) in the Third Quarter of 2023 at CRDF.  The County also reports that 1.9% of the safety checks complied with Compliance Measure 57-5(d) (safety checks in MOH) at CRDF.  100% of the new mental health housing assignments at CRDF were approved by a QMHP in the First Quarter of 2023.

The County's Augmented Seventeenth Self-Assessment also reports that 21.5% of the safety checks were in compliance with Compliance Measure 57-5(b) (safety checks in FIP) in the Third Quarter of 2023 at TTCF.  It also reports that 7% of the safety checks were in compliance with Compliance Measure 57-5(c) (safety checks in HOH) at TTCF.  The County also reports that 0% of the safety checks complied with Compliance Measure 57-5(d) (safety checks in MOH) at TTCF.  100% of the new mental health housing assignments at TTCF were approved by a QMHP in the First Quarter of 2023.

Regarding the County's consistently disappointing results on Provision 57, the Sixteenth Monitoring Report noted

> The County has reported various technological problems with the BREAVA system since the Fourteenth Reporting Period.  The Monitor believes that in the Sixteenth Reporting Period, the County engaged in a good-faith, useful effort to determine the accuracy of that system, which appeared to be conclusive: the system as currently operating does not work and cannot reliably capture information about whether safety checks are being conducted in conformity with Provision 57.

> The County's Court-ordered Substantial Compliance deadline of June 30, 2024, for Provision 57 is fast approaching.  Given the inevitable delays in planning for, researching, acquiring, and implementing new data systems, the Monitor recommends that the County move aggressively to determine whether the existing system can be fixed, and if not, to make expeditious plans to acquire a new system.  In the Seventeenth Self-Assessment—if not before—the County should share additional information about how it has answered these questions and any revised implementation plan for Provision 57 that may be necessary.

In response, the County reports that it is engaging in a "facility-by-facility" approach to improving compliance.  At TTCF, that involves efforts to "fix scanners, double-check Wi-Fi access points, and purchase additional refurbished scanners for the facility to swap in." Moreover, four sergeants have reportedly been assigned to "spot audit safety checks."  In addition

> TTCF has piloted a project to reduce scan points in certain modules where it appears that the sheer volume of scan points has created likelihood of accuracy errors in data recorded by the BREAVA device, or likelihood of increased user error in operating the devices. In addition, command staff hypothesized that in some instance the volume of scan points was also creating an undue focus on scanning the scan points instead of actually

observing inmates in their cells to perform quality safety checks. This pilot program began in Module 242, where scan points were reduced from 16 to 6, timely scans were measured, and video spot audits were performed to ensure that deputies were performing quality checks. After several weeks of piloting this approach in November, December, and January, TTCF believes that compliance is improving with better quality checks. TTCF intends to further experiment with this approach in Tower 1 modules.

The Monitor is open to this approach, though notes the possibility that reducing scan points could inadvertently degrade the quality of safety checks.  The County should closely review CCTV video to ascertain what impacts the smaller number of scan points is having on the quality of safety checks performed in these units.

At CRDF, the County reports that "despite a very dedicated attempt to troubleshoot BREAVA performance at CRDF, CRDF still cannot get reliable results from its scanners. Accordingly, it is relying on a backup method contemplated within the Settlement Agreement – documentation in eUDAL. CRDF is also verifying with spot audits (sergeants do 5 per shift)."  CRDF is also continuing to attempt interim technological fixes that include increasing the "antenna signal" for Wi-Fi access and replacing Wi-Fi access points (February 2024).

The County reports that its results have substantially improved at both facilities as a result of these fixes.  Regarding the need for a new system that can more reliably capture safety check information, the County reports

LASD also posted a Request for Information (RFI) to identify scanner systems in the market that would hopefully more fully resolve the current issues with the outdated BREAVA system. This RFI was posted in the fall and has now closed with multiple vendors scheduled to demonstrate their systems. Notably, however, any "off-the-shelf" scanner system will lack some of the customization of the current BREAVA system.

During their work with the facilities, CITU noted the increasing demands from custody operations and Correctional Health systems is straining the bandwidth of the network on which the BREAVA system operates (along with other critical Custody and CHS systems). This was identified as a potential underlying cause for BREAVA errors.

A solution to this is also in progress. LASD has recently developed, in connection with the County Chief Information Office and the County's DOJ Compliance Office, a Custody Network Infrastructure Upgrade ("CNIU") proposal to replace the existing legacy equipment and computers, add bandwidth capacity, and provide the technology backbone needed to support the deployment of new platforms, including custody body worn cameras ("BWC"), upgraded closed circuit television ("CCTV") cameras, and an advanced jail management system (a proposal

86

is in development). On January 23, 2024, the Board of Supervisors approved $22.9 million to implement the five-year CNIU implementation plan. Based on the high concentration of mental health housing units and the corresponding volume of 15- and 30-minute safety checks compared to other facilities, TTCF will be the first facility to be upgraded with network, BWC, and CCTVs with target completion within the first half of 2024. Upgrades will then subsequently begin at CRDF, MCJ, and the PDC facilities over the next several years. In addition, the CNIU will allow the County to expand the number of options being considered to replace the existing antiquated Title 15 scanning system.

According to the County's implementation plan tracker, the County has completed 24 out of 31 corrective action steps regarding Provisions 57 and 58. These steps include: having safety check teams solely focus on performing timely and quality safety checks (completed January 2014); facilities re-briefing staff on properly recording safety checks when the scanners or network are down (completed March 2023); shifting audits to be documented in a new Custody Watch Commander Log (completed July 2021); providing rosters or SMS acknowledgements of which staff received training (completed March 2022); rebriefing staff regarding key areas of improvement every six months (completed January 2023 and ongoing); facility operations being responsible for monitoring safety checks on a weekly basis and updating CCSB on their findings (completion date unclear); facilities determining and using scanners that work properly (completed March 2023); sending problematic iPods and scanners to CITU and CAU to be examined and reprogrammed (completed March 2023); TTCF modifications to improve Wi-Fi coverage (completed January 2022); obtaining the number of additional access points needed at PDC, MCJ, and CRDF (completion date unclear).

The County's implementation plan tracker reflects that the remaining seven uncompleted corrective action steps for Provisions 57 and 58 include: CCSB conducting a weekly audit of the logs and informing the respective Operations Staff if there are any issues; CCSB, in collaboration with CSB and CITU, conducting a new pilot program with a scanning device suitable for all facilities, with the new device being chosen by July 2022; CCSB conducting video audits of no data is recorded on the BREAVA during an official assessment; Operations Staff identifying which locations in their facility have the worst coverage and resolving those issues, including by submitting maintenance requests; CCSB verifying with audits if WiFi coverage has improved; identification of staff members who have been assessed to have had multiple non-compliant safety check rounds so they can be counseled; and identification of modules or floors with lowest compliance rates so the safety teams can be restructured in those targeted areas.

The County maintained Substantial Compliance with Paragraph 57 for twelve consecutive months at PDC North as of June 30, 2022. These results have been verified by the Monitor's auditors. Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring at PDC North for Substantial Compliance with Paragraph 57 in the Seventeenth Reporting Period.

58.    Within three months of the Effective Date, the County and the Sheriff will revise and implement their policies on safety checks.  The County and the Sheriff will ensure that safety checks in non-mental health housing units are completed and documented in accordance with policy and regulatory requirements as set forth below:

(a)    At least every 30 minutes in housing areas with cells;

(b)    At least every 30 minutes in dormitory-style housing units where the unit does not provide for unobstructed direct supervision of prisoners from a security control room;

(c)    Where a dormitory-style housing unit does provide for unobstructed direct supervision of prisoners, safety checks must be completed inside the unit at least every 60 minutes;

(d)    At least every 60 minutes in designated minimum security dormitory housing at PDC South, or other similar campus-style unlocked dormitory housing;

(e)    Custody staff will conduct safety checks in a manner that allows staff to view the prisoner to assure his or her well-being and security.  Safety checks involve visual observation and, if necessary to determine the prisoner's well-being, verbal interaction with the prisoner;

(f)    Custody staff will document their checks in a format that does not have pre-printed times;

(g)    Custody staff will stagger checks to minimize prisoners' ability to plan around anticipated checks; and

(h)    Video surveillance may not be used to replace rounds and supervision by custodial staff.

**STATUS (58):**     **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at PDC South, PDC North, and PDC East)**

**SUBSTANTIAL COMPLIANCE ( as of July 1, 2017, through June 30, 2018 (verified) at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at IRC)**

**PARTIAL COMPLIANCE (at NCCF and MCJ)**

**NON-COMPLIANCE (at TTCF)**

Substantial Compliance requires the Department to audit the Title 15 Dashboard records (or e-UDAL records) for all shifts for each module in each housing unit to determine if the safety checks were staggered and conducted as required by Paragraph 58. The threshold for achieving Substantial Compliance with each of the Compliance Measures is 90%. On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 58 by June 30, 2024.

The County maintained Substantial Compliance with Paragraph 58 for twelve consecutive months at PDC South, PDC North, and PDC East as of December 31, 2016, at CRDF as of June 30, 2018, and at IRC as of September 30, 2018. These results have been verified by the Monitor's auditors. Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring at those facilities for Substantial Compliance with Paragraph 58 in the Seventeenth Reporting Period.

The County's Augmented Seventeenth Self-Assessment reports that for the Second Quarter of 2023 and Third Quarter of 2023, the following percentages of safety checks were in compliance with Paragraph 58: at TTCF (50.5% and 0%), at MCJ (74.7% and 67.2%), and at NCCF (84.6% and 74.8%).

The County reports that "as described above in the augmented self-assessment for Provision 57, most of these challenges relate to the aging BREAVA scanner system . . . Notably, the last two Reporting Period[s] show wild swings in the performance data from TTCF that bear little resemblance to how that facility is actually conducting safety checks. Indeed, in the third quarter of 2023, the scanners reported no valid safety checks at all at TTCF in the audit sample, although at least some compliant checks were in fact taking place."

The County incorporates its Provision 57 discussion of improvements into its discussion of Provision 58 by reference. Regarding the individual facilities, it most notably reports that at MCJ, the County ordered "20 refurbished scanners in December. MCJ has also added lead walkers for each floor within the safety check team, who have

89

taken ownership of compliance results within the team and on each floor. The teams review results from the previous day every day, and any results below 90% are flagged for review by floor sergeants to determine the reason for any drop. MCJ is also conducting extra safety checks and has a walk schedule that builds in two extra walks per shift."

According to the County's implementation plan tracker, the County has completed 24 out of 31 corrective action steps regarding Provisions 57 and 58.  These steps include: having safety check teams solely focus on performing timely and quality safety checks (completed January 2014); facilities re-briefing staff on properly recording safety checks when the scanners or network are down (completed March 2023); shifting audits to be documented in a new Custody Watch Commander Log (completed July 2021); providing rosters or SMS acknowledgments of which staff received training (completed March 2022); rebriefing staff regarding key areas of improvement every six months (completed January 2023 and ongoing); facility operations being responsible for monitoring safety checks on a weekly basis and updating CCSB on their findings (completion date unclear); facilities determining and using scanners that work properly (completed March 2023); sending problematic iPods and scanners to CITU and CAU to be examined and reprogrammed (completed March 2023); TTCF modifications to improve Wi-Fi coverage (completed January 2022); and obtaining the number of additional access points needed at PDC, MCJ, and CRDF (completion date unclear).

The County's implementation plan tracker reflects that the remaining seven uncompleted corrective action steps for Provisions 57 and 58 include:  CCSB conducting a weekly audit of the logs and informing the respective Operations Staff if there are any issues; CCSB, in collaboration with CSB and CITU, conducting a new pilot program with a scanning device suitable for all facilities, with the new device being chosen by July 2022; CCSB conducting video audits of no data is recorded on the BREAVA during an official assessment; Operations Staff identifying which locations in their facility have the worst coverage and resolving those issues, including by submitting maintenance requests; CCSB verifying with audits if WiFi coverage has improved; identification of staff members who have been assessed to have had multiple non-compliant safety check rounds so they can be counseled; and identification of modules or floors with lowest compliance rates so the safety teams can be restructured in those targeted areas.

59.     Consistent with existing Sheriff's Department policies regarding uniform daily activity logs, the County and the Sheriff will ensure that a custodial supervisor conducts unannounced daily rounds on each shift in the prisoner housing units to ensure custodial staff conduct necessary safety checks and document their rounds.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of January 1, 2017, through December 31, 2017 (verified) at PDC East and MCJ)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2018, through December 31, 2018 (verified) at PDC North and PDC South)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 (verified) at TTCF)**

Substantial Compliance requires the Department to audit e-UDAL records for housing units in each facility to determine if supervisors are conducting unannounced daily rounds in accordance with Paragraph 59. In response to the Monitor's comments, the Department's e-UDAL forms were modified to include a specific notation that the Supervisor verified that the safety checks were conducted. The threshold for achieving and maintaining Substantial Compliance is that 90% of the supervisor daily rounds were in compliance with the requirements of Paragraph 59.

The County's Substantial Compliance results were verified by the Monitor's auditors. Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 59 in the Seventeenth Reporting Period.

60.    Within six months of the Effective Date, the Department of Mental Health, in cooperation with the Sheriff's Unit described in Paragraph 77 of this Agreement, will implement a quality improvement program to identify and address clinical issues that place prisoners at significant risk of suicide or self-injurious behavior.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of April 1, 2019 through March 31, 2020)**

Paragraph 60 requires the County to "implement a quality improvement program to identify and address clinical issues that place prisoners at significant risk of suicide or self-injurious behavior."  The Compliance Measures for Paragraph 60 require the County to "identify and address. . .clinical issues" in the areas identified in Paragraph 61 of the Agreement" and corrective actions are taken to address "such issues."  See Compliance Measures 60.1, 60.2(a), and 60.3(b).

The Monitor and the Mental Health Subject Matter previously agreed that the Department had demonstrated "a sound quality improvement process and the ability to demonstrate that process through specific quality improvement projects directed by management," and the Monitor finds that the County had demonstrated that it maintained Substantial Compliance with Paragraph 60.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 60 in the Seventeenth Reporting Period.[28]

---

[28] The County has acknowledged that its ongoing Quality Improvement efforts will remain subject to monitoring under other provisions of the Settlement Agreement.

61.    The quality improvement program will review, collect, and aggregate data in the following areas and recommend corrective actions and systemic improvements:

(a)    Suicides and serious suicide attempts:

  (i)     Prior suicide attempts or other serious self-injurious behavior
  (ii)    Locations
  (iii)   Method
  (iv)    Lethality
  (v)     Demographic information
  (vi)    Proximity to court date;

(b)    Use of clinical restraints;

(c)    Psychotropic medications;

(d)    Access to care, timeliness of service, and utilization of the Forensic Inpatient Unit; and

(e)    Elements of documentation and use of medical records.

**STATUS:    PARTIAL COMPLIANCE**

Substantial Compliance requires the County's semi-annual reports to (a) review, collect, and aggregate data in the areas set forth in Paragraph 61; (b) recommend corrective actions and systemic improvements in those areas; and (c) assess the effectiveness of actions and improvements in prior reporting periods.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 61 by June 30, 2024.

On February 15, 2024, the County submitted its Semi-Annual Report on Quality Improvement and Suicide Prevention Efforts (the "QI Report"), which relates to Paragraphs 60, 61, 62, and 77.  The QI Report sets forth aggregate data for the 37 suicides and 164 critical incidents that occurred between 2016 and the end of the Third Quarter of 2023, broken down by the subparts of Paragraph 61(a).

To comply with Provision 61, the County must both build an infrastructure for its QI program and then successfully implement it.  Beginning in the Seventeenth Reporting Period—and accelerating in the months immediately after—the County began to build an infrastructure and the tools necessary for its QI program.  For example, it filled the long-vacant data analyst position that had been discussed in several Monitoring Reports, placed the program under a seasoned Supervising Psychologist, developed new forms and tracking tools, created a framework for prioritizing quality improvement projects and scheduling them in advance, and—significantly—sought to engage leaders from multiple jail disciplines, including Mental Health, Psychiatry, Nursing, and Medicine, in

meaningful discussions at the monthly JQIC meetings.  The County summarizes its efforts as follows

> CHS added Dr. Inez Gonzales, a Supervising Psychologist with 12 years of experience working in the LA County Jail system as a consultant to the CHS Compliance Team. She brings extensive experience in auditing, regulatory compliance, overseeing large-scale projects, and a deep understanding of the LA County Jail programs. Dr. Gonzales now leads the CHS Compliance team and is helping to further refine and enhance the QI/QA process to improve patient safety in the jails.
>
> The County met with the Monitor and his SMEs on December 12, 2023 to discuss further enhancements to the QI efforts. The guidance from the Monitor and team was clear that there should be a defined process to identify the most important QI projects in a given period and an articulated rationale behind the particular projects on which the County focused. After the meeting, the County refined a four-step process flow for QI that starts with (1) Observations, specifically including any made by the Monitor, with reference back to the areas listed in Provision 61 (a) – (e); (2) Prioritization that includes a standard evaluation system to prioritize focus areas and agenda-setting JQIC meetings to analyze and determine priority projects in a given 6-month period; (3) Analysis to closely analyze the data for the prioritized projects; and (4) Improvement, attained by detailing an action plan to address the issue and improve processes. Dr. Gonzales developed an evaluation system to determine the priority of an observation that examines patient risk level (from low to high), chronicity (how long an issue has existed), and compliance level (the percentage level of compliance per audit results). All observations are analyzed and rated in each category by the SMEs in the JQIC meetings and a priority score is determined.  The observations with the highest priorities are then selected for analysis and improvement plans over the subsequent six-month period.
>
> On January 18, 2024, Dr. Gonzales, Dr. Henderson, Joan Hubbell, and the CEO DOJ Compliance team met with the Monitor team and reviewed the revised process and evaluation protocol, and both were received favorably. The first agenda-setting meeting for the revised JQIC process occurred on January 25, 2024, and two projects were determined for the QI period from January to June 2024: (1) Mental Health Evaluations for Discipline, and (2) Mental Health Crisis On-call Response Notes. These subjects will be analyzed over that period and discussed at upcoming JQIC meetings to develop improvement plans. The next JQIC meeting will be on February 29, 2024. The Monitor and his SMEs participated in the agenda-setting meeting and are invited to attend and participate in all JQIC meetings. The County intends to continue the JQIC process even after substantial

compliance is obtained to continually make improvements related to patient safety.

These are promising developments, and the Monitoring Team has been favorably impressed by the early JQIC meetings that reflect the results of these efforts. The Monitor incorporates prior guidance given about the QI program here by reference. With this new infrastructure in place, the Monitoring Team will evaluate the various QI projects now underway, and the effectiveness of the QI program, in future Monitoring Reports.

62.    The County and the Sheriff's Unit described in Paragraph 77 of this Agreement will develop, implement, and track corrective action plans addressing recommendations of the quality improvement program.

**STATUS:    PARTIAL COMPLIANCE**

Substantial Compliance requires the County's semi-annual Self-Assessments to set forth (a) the "development of corrective action plans to address the most recent recommendations of the quality improvement program;" and (b) the "implementation and tracking of corrective action plans to address recommendations of the program in prior quarters." On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 62 by June 30, 2024.

On February 15, 2024, the County submitted its Semi-Annual Report on Quality Improvement and Suicide Prevention Efforts (the "QI Report"), which relates to Paragraphs 60, 61, 62, and 77. The Combined Suicide Prevention Report sets forth aggregate data for the 35 suicides that occurred between 2015 and the end of the Third Quarter of 2023, and 162 critical incidents that occurred between 2016 and the end of the Third Quarter of 2023.

In the Fifteenth Report, the Monitor noted that the County had built a tool for tracking CAPs in an Excel database, which went into use on January 1, 2023. It was summarized, including a dashboard that provides overall statistics and an "overview of the projects at a glance. It compiles how many CAPs there are, their status (Not Started, In Progress, On Hold), and other information." The Department describes the process of entering a CAP, the available data fields, and the relevant search functions. The Monitor and Mental Health Team met with CHS representatives in January 2023 to review the CAP tracker, and we were favorably impressed by its usability and functionality. We recommended then, and reiterate here, that the CAP tracker should be used for all CAPs generated as a result of the Department's QI processes, including CAPs generated through the systemic reviews conducted by the Department's JQIC committee, and not limited to CAPs arising from the review of critical incidents.

The Augmented Seventeenth Self-Assessment did not provide further information about this CAP tracker, which the County should do in its next Self-Assessment.[29]

---

[29] The Monitor has also requested access to the CAP tracker, which has not yet been provided.

63.    The County and the Sheriff will maintain adequate High Observation Housing and Moderate Observation Housing sufficient to meet the needs of the jail population with mental illness, as assessed by the County and the Sheriff on an ongoing basis.  The County will continue its practice of placing prisoners with mental illness in the least restrictive setting consistent with their clinical needs.

**STATUS:    PARTIAL COMPLIANCE (at CRDF and TTCF)**

The Parties agreed on Revised Compliance Measures in 2021.[30]  The Revised Compliance Measures require that 90% of inmates waited for permanent HOH and MOH housing for no more than 7 days, and that 100% of inmates waited for permanent HOH and MOH housing for no more than 30 days.

On December 27, 2022, and on April 20, 2023, the Court issued Orders Setting Deadlines for Substantial Compliance, ECF No. 234 and 248, respectively, which established specific deadlines for Defendants to "improve compliance with provisions 63, 64, and 80."  With respect to Provision 63, the December 2022 Order established deadlines for Defendants to take a series of "agreed-upon actions to improve compliance," while the April 2023 Order established incremental targets for the Defendants' overall compliance with Provision 63 by the end of each quarter.

*Figure 6:  Quarterly Court-Ordered Targets for Provision 63 Compliance*

| | % of Inmates Waiting ≤ 7 Days in MH Housing Intake Areas Before Transfer to Permanent MH Housing | Average Wait Time |
|---|---|---|
| **2Q2023** | 60% | 10 days |
| **3Q2023** | 65% | 9 days |
| **4Q2023** | 70% | 8 days |
| **1Q2024** | 75% | 7 days |
| **2Q2024** | 80% | 7 days |
| **3Q2024** | 85% | 7 days |
| **4Q2024** | 90% | 7 days |

Regarding CRDF, the County's Augmented Seventeenth Self-Assessment includes results for the Second Quarter of 2023 under the Revised Compliance Measures. It reports that in the random weeks of the Second Quarter of 2023, "62.34% of individuals at CRDF waited fewer than seven days for permanent mental health housing,

---

[30] The County's Seventeenth Augmented Self-Assessment suggests that "the availability of permanent HOH space is a fluid situation and varies from week to week. . . .this raises the issue of whether auditing random weeks – as has been done to determine compliance during the reporting period – presents the most accurate way to determine whether the LASD is promptly locating permanent housing."  The Monitor is available for discussion with the Parties, on the County's initiative, about this issue.

and 100% waited fewer than 30 days." The average wait time was 6.2 days.[31] This met the incremental targets in the Court's April 2023 Order. It also reports that in the randomly selected weeks in the Third Quarter of 2023, "78.98% of individuals [at] CRDF waited fewer than seven days for permanent mental health housing, and 100% waited fewer than 30 days." The average wait time was 1.52 days.[32] This also met the incremental targets in the Court's April 2023 Order.

Regarding TTCF, the County reports that in the final week of the Second Quarter of 2023, "44.97% of individuals waited fewer than seven days for permanent mental health housing, and 84.59% waited fewer than 30 days."[33] The average wait time was 14.69 days. This did not meet the incremental targets in the Court's April 2023 Order. In the final week of the Third Quarter of 2023, at TTCF, "45.68% of individuals waited fewer than seven days for permanent mental health housing, and 100% waited fewer than 30 days." The average wait time was 8.13 days. This also did not meet the incremental targets in the Court's April 2023 Order.

Given the Department's reported results, the County is in Partial Compliance at CRDF and TTCF with Provision 63 for the Seventeenth Reporting Period.

Regarding these results, the County reports

One of the barriers that has stifled the Department's ability to comply with Provision 63 in the past, including during the reporting period, is that the Department has a seriously outdated jail management system to track the movement of inmates inside the LACJ. This outdated system has not provided the Department with the ability it needs to track easily, and in real time, how long those receiving temporary housing services have been waiting for permanent specialty mental health housing nor alert LASD personnel when any patient's wait for permanent housing is approaching seven days.

The MHIT application -- which the Department developed on an expedited basis during the reporting period and deployed at both TTCF and CRDF during the fourth quarter of 2023 -- has addressed this issue and, particularly at CRDF, has greatly enhanced the LASD's ability to track, monitor, and accurately report on individuals who are waiting for permanent HOH or MOH. The MHIT is an automated system with a user-

---

[31] While not explicitly stated, the average wait time of 6.2 days reported at CRDF for the Second Quarter of 2023 appears to be for the final week of the quarter rather than the randomly selected weeks. The average wait time for the two randomly selected weeks was 6.7 days. The Eighteenth Reporting Period should report results for the weeks randomly selected by the Monitor.

[32] The average wait time of 1.52 days reported at CRDF for the Third Quarter of 2023 is for the final week of the quarter rather than the randomly selected weeks. The average wait time for the two randomly selected weeks was 3.91 days. The Eighteenth Reporting Period should report results for the weeks randomly selected by the Monitor.

[33] The County reported results for TTCF for the final week of the Second and Third Quarters of 2023. In the Eighteenth Reporting Period, it should report results for the weeks randomly selected by the Monitor.

friendly "dashboard" available to Department and CHS personnel that tracks exactly how long each person receiving temporary housing has been waiting for permanent specialty mental health housing and provides an alert for each person who is approaching seven days in temporary housing.

The County also reports on its continuing efforts to reduce the number of P3 inmates who need HOH housing and notes the importance of those efforts to its overall plan to comply with Provision 63 ("the County will likely need to continue to work to reduce jail population in 2024 to achieve substantial compliance with Provision 63 within the timetable set by the Court"). The County also reports on its development of "module neighborhoods" for HOH inmates. Module neighborhoods will be

comprised of a mix of FIP Stepdown Units and HOH Dorm pods, along with additional hybrid pods with a mix of therapeutic furniture and spider tables where HOH patients, including those in suicide-resistant gowns, can program restrained or unrestrained based how they are presenting at any particular time.

Creating modules with a mix of HOH pod types will allow individuals to be more nimbly moved out of SAT and within HOH, including to less restrictive FIP Stepdown Units or HOH Dorms in a module neighborhood. This neighborhood model is clinically advantageous because it takes into consideration the fluidity of a patient's mental condition, which may change several times during their jail stay, and allow them to be moved to the most clinically appropriate pod within the same module without changing their treatment and custody team. In addition, this reconfiguration of HOH units may provide greater opportunities for more HOH patients to program unrestrained for more of the day, including those in suicide gowns. For purposes of improving compliance with Provision 63, these mixed modules should also improve the speed and agility with which individuals can be moved from temporary mental health intake space into permanent housing because the Mental Health Sergeant and TTCF command staff will have improved visibility into housing availability within all of the different HOH housing models.

<u>Preliminary Assessment of the Mix of Therapeutic Features in FIP Stepdown Units and HOH Dorms</u>

On March 11, 2024, the Court issued an Order Modifying Deadlines for Substantial Compliance, ECF 266, which extended several deadlines pending in this case. As part of that Order, the Court also instructed that "the Monitor and the Mental Health Subject Matter Expert will assess as part of the Monitor's semi-annual reports the mix of therapeutic features in the Stepdown units and HOH dorms." The Monitor and Mental Health Subject Matter Expert therefore share the following preliminary assessment of the mix of therapeutic features in the Stepdown units and HOH dorms.

Therapeutic features of the FIP Stepdown units include enhancements to the physical environment, greater freedom of movement, the presence of Inmate Mental Health Assistants ("MHAs"), and the support of the custody sergeant and deputies assigned to these units. The physical environment is distinguished by soft furniture and traditional tables rather than the metal spider tables in other units. There are murals, artwork, and plants to create a more comfortable and less austere living space. Other amenities, such as books and a coffee machine, contribute to the livability of the environment. Inmates are not cuffed when out of their cells.

Inmate MHAs in the TTCF FIP Stepdown units have received intensive training for their therapeutic role, reside in the units, and provide a consistent supportive presence in addition to the regular structured programming they deliver. They are involved in an incentive-based program to reinforce positive behavior and daily self-care habits. This includes providing access to amenities, such as hot coffee, as a reward for meaningful engagement in group programming and maintaining cells and the common dayroom in a clean and orderly condition. They also serve as mediators to prevent and de-escalate conflict in the unit. In interviews with inmates in these units, the presence of inmate MHAs has been described as essential for preventing the gang politics of threat, coercion, and intimidation that are pervasive in other dorm-style housing areas, which supports the ability of patients to engage in mental health programming without fear or distraction. The custody staff are also a consistent and supportive presence. They do not rotate and thus build positive, empathetic relationships with the patients residing in the FIP Stepdown units.

HOH dorms also allow enhanced freedom of movement (compared to traditional HOH housing pods), in that inmates are not cuffed to tables during out-of-cell time. A distinction between FIP Stepdown and HOH dorm units involved the referral process. According to information provided by the County, referrals to FIP Stepdown are initiated by clinicians based on the health history, need, and clinical presentation of the patient. Referrals to HOH dorms are initiated by custody based on observations of the patient's behavior and ability to program unrestrained. HOH dorms do not appear to include other distinguishing therapeutic features as described for the TTCF FIP Stepdown units.

Differences were noted in the FIP Stepdown units at CRDF and those at TTCF. Interviews revealed that the female MHAs were not providing the same regularity or depth of group programming as the male MHAs at TTCF. Their training consisted primarily of self-study from various texts, with testing to demonstrate understanding, but without the hands-on modeling and mentoring that appears to take place with male MHAs. The female MHAs are responsible for documenting the inmates' daily compliance in areas like taking medications, showering, brushing teeth, and cleaning activities, as part of a token economy with food reinforcers referred to as the "Five Star Program." Beyond this, it appeared that programming was limited to one hour in the morning and one hour in the afternoon, when the patients were out of their cells uncuffed. Overall, the women's program seemed less richly resourced than the men's program, with less programming and supportive services and less out-of-cell time. At this time, the physical environment was also less distinctive (in the ways described above) from other

HOH housing units than appears to be the case with the men's FIP Stepdown units.

According to the County's implementation plan tracker, the County has completed 5 out of 6 corrective action steps regarding Provision 63. These steps include: expanding the MAT program such that it can administer long-acting injectables, including Sublocade and Suboxone (completed June 2023); creating a new jail inpatient unit with 48 beds that can administer involuntary psychotropic medication (completion date unclear); relocating MOH individuals from MCJ to PDC North (completed January 2024); gathering and providing data about implemented measures, including projected impact of program on HOH and MOH demand (completed May 2023); and the County supplementing the implementation plan with additional steps to close the gap between HOH/MOH need and supply (completed May 2023).

64.    Within six months of the Effective Date, the County and the Sheriff will develop a short-term plan addressing the following 12-month period, and within 12 months of the Effective Date, the County and the Sheriff will develop a long-term plan addressing the following five-year period, to reasonably ensure the availability of licensed inpatient mental health care for prisoners in the Jails.  The County and the Sheriff will begin implementation of each plan within 90 days of plan completion.  These plans will describe the projected capacity required, strategies that will be used to obtain additional capacity if it is needed, and identify the resources necessary for implementation.  Thereafter, the County and the Sheriff will review, and if necessary revise, these plans every 12 months.

**STATUS:**    **PARTIAL COMPLIANCE**

The parties agreed on Revised Compliance Measures in 2021.  Substantial Compliance requires the Department to develop a long-term plan that will address the availability of licensed inpatient mental health care for prisoners in the following five-year period; and provide an annual report describing the long-term plan and the steps taken to implement it, which must be deemed reasonable by the Monitor.

On December 27, 2022, and on April 20, 2023, the Court issued Orders Setting Deadlines for Substantial Compliance, ECF No. 234 and 248, respectively, which established specific deadlines for Defendants to "improve compliance with provisions 63, 64, and 80."  With respect to Provision 64, the December 2022 Order established deadlines for Defendants to take a series of "agreed-upon actions to improve compliance," while the April 2023 Order established incremental targets for the Defendants' overall compliance with the provision by specific quarters.  The incremental targets are visualized in the figure below.

*Figure 7:  Quarterly Court-Ordered Targets for Provision 64 Compliance*

|        | Difference Between # of P4s and # of Patients Receiving Inpatient Care |
|--------|----------------------------------------------------------------------|
| **2Q2023** | ≤80 |
| **3Q2023** | ≤60 |
| **4Q2023** | ≤40 |
| **1Q2024** | ≤20 |
| **2Q2024** | ≤10 |
| **3Q2024** | ≤5 (and must wait no more than 8 hours for placement) |

Beginning in the Sixteenth Reporting Period, and extending into the Seventeenth Reporting Period, the County achieved several encouraging successes in its efforts to comply with Provision 64.  This included opening the Jail Inpatient Unit/Acute Intervention Module ("JIU/AIM") on June 1, 2023, and beginning to treat P4 patients therein to stabilize them and potentially move them to a lower level of care. While the

operating capacity of the AIM is far below what was contemplated in the County's Implementation Plan for Provision 64, it continues to have a notable impact on the overall P4 population and the number of patients waiting for inpatient care on the FIP waitlist.[34]   The County reports

> While the number of FIP licensed beds at the LACJ did not substantially increase during the last nine months of 2023, the number of P4 patients in the LACJ requiring FIP services did dramatically shrink during this time period. Indeed, between the beginning of the second quarter of 2023 and the end of the fourth quarter of 2023, the P4 population declined as follows:

| Date | Number of P4 Patients | Percentage Decrease Since the Start of the 2nd Quarter of 2023 |
|---|---|---|
| April 3, 2023 (the start of Q2 2023) | 173 | |
| July 3, 2023 (the end of Q2 2023) | 107 | ↓ 38% |
| October 2, 2023 (the end of Q3 2023) | 74 | ↓ 57% |
| January 2, 2024 (the end of Q4 2023) | 68 | ↓ 61% |

> As a result of this dramatic decline in the number of P4 patients housed in the LACJ during the last three quarters of 2023, the County met each of the Court-ordered benchmarks for Provision 64 covering this time period, as (1) the difference between the number of P4 inmates receiving FIP services at the end of Q2 of 2023 and the number of P4 inmates requiring such services was 54 (below the Court-ordered benchmark of 80); (2) that difference was 16 at the end of Q3 of 2023 (below the Court-ordered benchmark of 60); and (3) that difference was 10 at the end of Q4 of 2023 (below the Court-ordered benchmark of 40).

> Between the time the JIU/AIM began treating P4 patients on June 1, 2023 and early December 2023, it: (1) treated 614 unique patients; (2) helped lower the level of care for 216 patients; and (3) was responsible for removing 228 patients from the FIP wait list. This data strongly supports the County's belief that there has been a direct correlation between the opening of the JIU/AIM and the significant decline in the P4 population since the JIU/AIM was opened, as the P4 population has fallen from 164 P4 patients as of May 29, 2023 (three days before the JIU/AIM started treating patients) to 68 P4 patients at the end of 2023 (seven months after the JIU/AIM started treating patients). Moreover, while the P4 population has plateaued over the most recent quarter as the focus of the JIU/AIM has

---

[34] The County reports that there are currently 58 total usable, licensed beds for treating P4 inmates (33 usable, licensed beds in the FIP itself, ten licensed beds in the AIM Unit, and 15 licensed beds in the MHTU on the second floor of the CTC).  It also reports that it is licensed to open an additional six beds in the AIM, if necessary.

turned to providing slightly longer term treatment to P4 patients who require its services, and the P4 population tends to fluctuate from week to week, the P4 population has shrunk to such a degree that the County believes the gap between the number of P4 inmates at the LACJ and the number of P4 patients at the LACJ receiving FIP services can be closed to zero, or close to zero, based on other steps discussed below that the County is taking to lower the P4 population.[35]

The County also reports on its efforts to embed a psychiatric staff in IRC in order to ensure that inmates with mental illness who are newly booked into the jails "do not decompensate to a P4 status." The unit consists of "2.75 psychiatrists and 8.25 psychiatric nurse practitioners" and currently "provides 24/7 psychiatric coverage in the IRC from Tuesday through Friday, 10-17 hours of coverage on Saturdays, 14 hours on Sundays, and 21 hours on Mondays."

The County also reports that it has continued to expedite the transfer of inmates found incompetent to stand trial to state hospitals, reducing "the number of pending FIST state hospital transfers from 506 to 179, a 65% reduction" between March 30, 2023 and November 6, 2023. Similarly, it has continued to transfer inmates to state prison, thereby reducing the "daily average of inmates awaiting transfer to a state prison to serve their sentences . . .from approximately 1,500 to approximately 700 inmates, a 53% reduction." Finally, the County reports on various initiatives to build community-based bed capacity through the Office of Diversion and Reentry and the Department of State Hospitals.

According to the County's implementation plan tracker, the County has completed all 6 corrective action steps regarding Provision 64. These steps include: funding becoming available for a new AIM/jail inpatient unit that can administer involuntary psychotropic medications (completed May 2022); obtaining licensure and approvals from the state for the new AIM/jail inpatient unit (completed June 2023); onboard additional staff to operate the new AIM/jail inpatient unit (completed August 2023); County assessing impact of PUC on demand for FOP/inpatient needs (completion date unclear); gathering data about implemented measures from first-phase plan, and making projections about impact of program on FIP/inpatient housing (completion date unclear); and County reviewing and supplementing its implementation plan with additional steps (completed May 2023).

---

[35] During the Seventeenth Reporting Period, the Monitor's Mental Health team reviewed 23 cases treated in the AIM unit whose level of care was reduced from P4 to P3, including eight cases that were returned to P4 within 30 days. These reviews observed some apparent lack of clarity and potential inconsistency regarding the assigned P levels, with different P levels sometimes assigned by different clinicians within the same day, and sometimes within the same progress note. Assuring that there is sufficient availability of licensed inpatient mental health care will depend upon accurate and consistent clinical determination of inmates' P levels over time and across clinicians.

65 (**Revised**).  Consistent with existing Sheriff's Department policies, the County and the Sheriff will ensure that psychotropic medications are administered in a clinically appropriate manner to prevent misuse, hoarding, and overdose.  The County will maintain electronic mental health alerts in prisoners' electronic medical records that notify medical and mental health staff of a prisoner's risk for hoarding medications.

**STATUS:**        **PARTIAL COMPLIANCE**

On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provision 65 ("Revised Paragraph 65") as set forth above.  They also agreed on Revised Compliance Measures.  Under the Revised Compliance Measures, (1) the County's Self-Assessments must set forth the (a) results of weekly medication audits documenting the visual observation of the administration of medication during the quarter; (b) unauthorized medications found as a result of cell searches during the reporting period; and (c) incidents involving confirmed prescription drug overdoses.  Further, "the Monitor must conclude, after consulting with the Subject Matter Expert, that "psychotropic medications have been administered in a clinically appropriate manner 85% of the time."  Finally, "85% of the electronic medical records [must] contain the required alerts."  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 65 by March 31, 2024.

The County's Augmented Seventeenth Self-Assessment reports that for the Second Quarter of 2023, "65%—less than the required 85%—of the 60 electronic medical records of patients identified as being at risk of hoarding medicine contained the required mental health alerts" pursuant to Compliance Measure 65-5(d).  For the Third Quarter of 2023, the County reports "56%—less than the required 85%—of the 60 electronic medical records of patients identified as being at risk of hoarding medicine contained the required mental health alerts"

Regarding Compliance Measure 65-5(c), the County's Seventeenth Self-Assessment reports that in the Second Quarter of 2023, the County determined that "nurses were compliant with pill call procedures in 92% of 912 instances of observed administration—exceeding the 85% threshold set by Compliance Measure 65-5(c)."  For the Third Quarter of 2023, the County reports that "nurses were compliant with pill call procedures in 99.81% of 1,080 instances of observed administration—far exceeding the 85% threshold set by Compliance Measure 65-5(c).  Moreover, this rate improved by 8.5% from the second quarter and improved by 37% since the first quarter."

Notwithstanding these promising reported results, the Monitoring Team has observed medication administration for several Reporting Periods that is neither consistent with County policy nor "clinically appropriate," as is required by Provision 65 or Compliance Measure 65-5(c).  *See* Sixteenth Monitoring Report at p.106.  On the Team's most recent site visits to the LACJ, in February 2024, the Team again observed inadequate medication administration in several facilities conducted by multiple combinations of deputies and nurses.  Subject Matter Expert Dr. Nicole Johnson, and

clinicians Drs. James Vess and Robert Canning, share the following observations

There were various inconsistencies observed in the numerous pill passes watched by the mental health team during the site visit from February 20-22, 2024. At MCJ, pill pass was performed through an opening in a closed door and the nurse handed flat envelopes containing medications to the patients who simply returned into the dorm with the envelopes in hand. Patients were not required to get water prior to coming to the door, nor was any water provided to them at the door, to ensure ingestion of the prescribed medication while under observation. There were no consistent efforts to check patient mouths and, indeed, mouth checks would have been impossible since the patients were not ingesting the medication in view of staff. Some patients came to the door with their wristbands in their hands, rather than securely fastened to their wrists, and received medication without a second verification to confirm that the medication was being dispensed to the correct patient.

At PDC North, one nurse attempted to have inmates secure water prior to coming to the window for medication but those who were late to the window were not required to get water and many walked away with pills in hand. If the patient voluntarily showed their mouth, a mouth check was performed. If the patient walked away without showing their mouth, there was no attempt by the nurse or deputy to perform a mouth check.

The team also noted that assigned deputies were often distracted by persons coming and going from the pod or other deputies providing information compromising their ability to focus on pill pass. There was no psychoeducation given by the nurses to the patients who refused medications in an attempt to secure informed consent. The refusals were merely documented on the flat envelope to be recorded in the EMR later. Some nurses gave the flat envelope to the patients while others poured the pills into the patients' hands and kept the flat envelope. At one pill pass, there was an excessive amount of wind coming through the window which resulted in a pill falling to the ground. The pill was not recovered at any time during the medication administration.

The Monitor is concerned by the significant discrepancy between the County's own audit results and the Monitoring Team's observations of medication administration across several Reporting Periods. The County's self-audit process contains multiple steps, including real-time observation by nursing supervisors and quality checks by nurse managers utilizing Closed Circuit Television (CCTV) footage.[36] To evaluate the accuracy and reliability of the County's self-audit process, the Monitoring Team has requested, and will review, CCTV video from a sample of medication administrations that are included within the County's reported results for the Eighteenth Reporting Period.

---

[36] *See* CHS Medication Administration Audit Review Guide (dated Apr. 11, 2022) (on file with author).

In response to feedback in prior monitoring reports, the County also reports on its efforts to increase the frequency of unannounced searches at both TTCF and MCJ to recover contraband medication

TTCF submitted its corrective action plan on August 24, 2023. TTCF revised its module search schedule and distributed the schedule to all TTCF sergeants. At the time of distribution, TTCF executives emphasized the importance of conducting housing-location searches, and the topic was a focus of sergeant orientation on August 28, 2023. TTCF command informed all TTCF sergeants through an email dated August 24, 2023, that increased searches were expected, and that on a quarterly basis, TTCF Operations would conduct an audit of the CARTS application to determine the number of unannounced searches that had been conducted in the period. Additionally, on August 23, 2023, TTCF personnel were briefed via email regarding Custody Division policy requiring that all medication found during a search should be returned to medical staff along with the name and booking number of the person in possession of excess medication. Finally, the same email briefing addressed the use of the CARTS application and reiterated the importance of documenting instances when excess medication is discovered during a search and how such documentation is properly completed.

MCJ submitted its corrective action plan to CCSB on August 23, 2023. MCJ vowed to increase the number of searches it conducted on a quarterly basis, noting that housing-location searches at the facility had increased to 132 in the Second Quarter of 2023 from 116 in the previous quarter. Furthermore, on August 15, 2023, MCJ Operations emailed all MCJ staff with the Custody Division policy governing searches. MCJ watch commanders and sergeants then conducted shift briefings reminding staff to ensure that all medications recovered during searches are provided to medical staff, along with the name and booking number of the inmate who appeared to have possessed the excess medication. MCJ watch commanders also reminded sergeants to thoroughly review search reports to ensure the search policy was being followed. Finally, MCJ Operations sent an email on August 22, 2023, to all MCJ staff reiterating that all searches must be properly documented in CARTS.

The Monitor will look forward to reviewing the results of these efforts.  In the Seventeenth Reporting Period, medications continued to be recovered in a relatively high percentage of the unannounced searches conducted at TTCF and MCJ.  In the Second Quarter of 2023, the County's posted results reflect that 47 unannounced searches were conducted at TTCF and 132 at MCJ.  These searches yielded 110 unauthorized medications at TTCF and 75 unauthorized medications at MCJ.  The numbers at the other facilities were CRDF (162 searches resulting in the seizure of 60 medications), NCCF (418 searches resulting in the seizure of 1 medication), PDC North (83 searches resulting

in the seizure of 1 medication), and PDC South (198 searches resulting in the seizure of 5 medications).

The County's posted results for the Third Quarter of 2023 reflect similar trends. There were 41 unannounced searches at TTCF and 197 at MCJ, which resulted in the seizure of 78 and 52 unauthorized medications, respectively. The numbers at the other facilities were CRDF (146 searches resulting in 30 medications), NCCF (208 searches resulting in 30 medications), PDC North (108 searches resulting in 4 medications), and PDC South (229 searches resulting in 2 medications).

The County also reported 1 confirmed overdose and 5 unconfirmed in the Second Quarter of 2023. The County reported 2 confirmed overdoses and 4 unconfirmed in the Third Quarter of 2023.

According to the County's implementation plan tracker, the County has completed 16 out of 32 corrective action steps regarding Provision 65.[37] These steps include: providing the Medication Administration Audit and Quality Check of Medication Administration Audit to the Monitor (completed September 2022); training relevant Nurse Managers and Nurse Supervisors at TTCF, MCJ, CRDF, NCCF, and PDC North (completed March 2022 and May 2022); beginning Medication Administration Audits at TTCF (completed April 2022), MCJ, CRDF, NCCF, and PDC North (completed May 2022); beginning Quality Checks of Medication Administration Audits (completed June 2022); developing new compliance audit criteria and tool, for 65-5(c) to be approved by the Compliance Team Program Manager and County Counsel (completed May 2022); conducting informal mini self-assessments for 65-5(c) to include at least ten samples from TTCF (completed May 2022) and at least twenty samples comprised of patients from all facilities (completed September 2022); holding a workgroup meeting with Responsible Parties from Nursing, Custody, Compliance Team, and County Counsel (completed May 2022); and reporting compliance data for 65-1(a) and 65-5(c) for TTCF (completed September 2022), MCJ, CRDF, NCCF, and PDC North in self-assessments (completed January 2023).

---

[37] The County indicates that the remaining 16 corrective action plan steps are no longer applicable as "executive management considered revisions and, as of September 2022, declined to implement any revisions to this policy."

66 (**Revised**).  Consistent with existing Correctional Health Services policies, prisoners with a serious mental illness who reside outside of mental health housing, will remain on an active mental health caseload regardless of whether they refuse medications. The County and the Sheriff will provide prisoners with a serious mental illness who reside outside of mental health housing with therapeutically appropriate individual monthly visits with a QMHP whether or not the prisoners are receiving or refusing psychotropic medications.  The County and the Sheriff will provide medication support services to prisoners who (i) have a mental illness, (ii) reside outside of mental health housing and (iii) are prescribed psychotropic medications.

STATUS:        PARTIAL COMPLIANCE

On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provision 66 ("Revised Paragraph 66") as set forth above.  They also agreed on Revised Compliance Measures.  Under the Revised Compliance Measures, Substantial Compliance requires that a) 85% of prisoners with a serious mental illness who resided outside of mental health housing were on an active mental health caseload; b) 85% of prisoners with a serious mental illness who resided outside of mental health housing are offered therapeutically appropriate structured mental health treatment and are seen by a QMHP at least once a month; and c) 85% of prisoners who resided outside of mental health housing and were prescribed psychotropic medications were offered medication support services.

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required Defendants to achieve Substantial Compliance with Provision 66 by March 31, 2023.  On March 11, 2024, the Court issued an Order Modifying Deadlines for Substantial Compliance, which extended the deadline for Substantial Compliance to June 30, 2024.

The County's Augmented Seventeenth Self-Assessment again reports that "there were no records to assess for Compliance Measures 66-5(a) and 66-5(b) because there were no patients who met the criteria for severe mental illness housed in general population areas" in the Second Quarter of 2023 or the Third Quarter of 2023.  Given the County's commitment to moving prisoners with serious mental illness out of general population and into mental health housing, the results being evaluated for this provision are narrowed and largely focus on medication support services for prisoners receiving psychotropic medication and living outside of mental health housing under Compliance Measures 66-3 and 66-5(c).

Regarding those compliance measures, the County's posted results indicate that for the Second Quarter of 2023 and the Third Quarter of 2023, 60% and 62%, respectively, of patients residing outside of mental health housing who were prescribed psychotropic medications during the randomly selected week were offered medication support services.  This is lower than the 85% threshold.

Regarding these results, the County reports that it has identified various issues

with the way that patients are scheduled for medication support services.  To address these issues

> CHS recently tasked supervising psychiatrists to more intensively manage their staffs' schedules to ensure that they are filled with current, non-duplicative orders. This has involved scrubbing duplicative referrals that can clog schedules such that other patients are not scheduled for medication support services. Supervisors have also directed clinicians to backfill their schedule openings (including those caused by eliminating duplicative referrals) to visit inmates who need to be seen for medication management support.

> CHS is also seeking technology fixes to make schedules more efficient and better ensure that all patients who need medication support services receive them timely. Dr. Gayani DeSilva and Dr. Inez Gonzalez worked with CHS and DHS technology staff to submit an ORCHID ticket in January 2024 to prevent duplicate psychiatry orders and to automate psychiatry orders for patients on psychotropic medication. In the interim, CSU will regularly run reports from the scheduling system to purge duplicates from the scheduling system, and users will receive training on using "Start Date" and notation fields for better communication so that it is clear whether the referral is new or is a repeat referral made for some other reason.

> CHS Compliance also will provide comprehensive scheduling training for psychiatrists and nurse practitioners on Provision 66's requirements. In the meantime, all CHS staff will be instructed by email how to view scheduled psychiatry appointments in ORCHID.

According to the County's implementation plan tracker, the County has completed 9 out of 23 corrective action steps regarding Provision 66.[38]  These steps include: CHS formulating a uniform process by which SMI patients in general population will be tracked (completed April 2022); defining and documenting car expectations for SMI inmates outside of mental health housing (completion date unclear); clarifying the process by which patients are identified as belonging to the universe of SMI patients outside of mental health housing (completion date unclear); share with DOJ and Monitor how the County intends to identify and clarify the universe of patients subject to Provision 66 and the care expectation for this universe of patients (completion date unclear), including a 30 day period for DOJ and Monitor to comment on County's proposals and follow-up meeting to discuss (completion date unclear); CHS to evaluate and consider alternative ways to provide therapeutically appropriate structured treatment and QMHP visits to this population (completion date unclear); negotiations with unions to address loan repayment for psychiatrists and other mental health staff (completed April 2023); and working with the Central Scheduling Unit to determine how it can help

---

[38] The County indicates that the remaining 12 corrective action steps are completed.  However, it appears that these 12 steps are not applicable or unable to be completed as per the implementation plan tracker, "there is currently no SMI universe in gen pop to evaluate."

eliminate and prevent duplicate referrals and adjust prioritization such that general population inmates are seen by psychiatry and receive timely follow-up appointments (completed January 2024 and ongoing).

67.    Within three months of the Effective Date, the County and the Sheriff will implement policies for prisoners housed in High Observation Housing and Moderate Observation Housing that require:

(a)    documentation of a prisoner's refusal of psychotropic medication in the prisoner's electronic medical record;

(b)    discussion of a prisoner's refusal in treatment team meetings;

(c)    the use of clinically appropriate interventions with such prisoners to encourage medication compliance;

(d)    consideration of the need to transfer non-compliant prisoners to higher levels of mental health housing; and

(e)    individualized consideration of the appropriateness of seeking court orders for involuntary medication pursuant to the provisions of California Welfare and Institutions Code sections 5332-5336 and/or California Penal Code section 2603(a).

**STATUS:    PARTIAL COMPLIANCE**

On December 27, 2022, the Court issued an Order Setting Deadlines for Compliance with Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 67 by June 30, 2023.  On March 11, 2024, the Court issued an Order Modifying Deadlines for Substantial Compliance, which extended the deadline for Substantial Compliance to March 31, 2024.

Substantial Compliance requires the County to "review the electronic medical records of 25% of the prisoners in HOH and MOH who refused psychotropic medication during the quarter to verify that the records [of 85% of the prisoners] reflect the documentation and consideration of the matters required by the terms of Paragraph 67." The Sixteenth Report noted

By its very terms, Provision 67 is somewhat inflexible in several ways. First, it applies to all prisoners "housed in High Observation Housing and Moderate Observation Housing," regardless of the severity of their symptoms, their history of medication compliance, and the reason(s) for their refusal.  Second, it requires that all five sub-parts of the provision (a) – (e) apply to all medication refusers on the mental health caseload, regardless of whether they would be clinically appropriate for all such patients.  Prior Monitoring Reports have recognized this, and the County therefore adopted a "tiered approach" to its self-auditing of Provision 67.

According to the County, its tiered methodology involves

The EMRs of patients with a Mental Health Level of Care (MHLOC) of P2 would minimally include documentation of the patient's refusal of psychotropic medication and the use of clinically appropriate interventions to encourage medication compliance. For patients who are higher functioning and able to make informed decisions, as in the community, appropriate interventions may include discontinuation of the medication if the patient no longer wants to take it or has valid concerns about the medication. Additionally, the need to transfer non-compliant patients to higher levels of care would be considered only when there is indication of decompensation; discussion of refusals in treatment team meetings (67, subd. (b)) and consideration of involuntary medication orders (67, subd. (e)) would not routinely be required for this P2 population. For P2 patients, the audit would not consider factors beyond increased level of care. If a P2 patient's level of care increased to P3, the audit will end at consideration for higher level of care. If a P2 patient's level of care increased to P4, then all factors in the audit would need to be considered and would be clinically appropriate.

Interventions are based on what is clinically appropriate for patients of all P-levels. Patients who become medication-compliant with clinical intervention may not require any additional interventions, and this was considered in the auditing process. Generally, the County rated as compliant those cases where the EMR for each medication refuser in the sample appropriately reflected the necessary documentation and consideration of the matters in Paragraph 67 based on the above-described approach.

This audit is nuanced and requires a clinical approach that evaluates the unique issues for each individual. Thus, to provide clearer communication and an explanation regarding what was considered in reviewing each case assessed, the audit includes a justification for those cases where the reasoning for the compliant rating may be unclear according to the literal terms of the provision.

The County has pointed out that it consulted with prior Subject Matter Expert, Dr. Bruce Gage, in formulating that methodology, which was favorably commented upon in prior monitoring reports.[39]  Prior monitoring reports, however, have also raised concerns about the possible divergence between the County's revised methodology and the specific

---

[39] *See, e.g.*, Monitor's Tenth Report at 89.

language of the provision, or explicitly called upon the County to seek an amendment of Provision 67, which has not yet happened.[40]

Since the Sixteenth Monitoring Report was issued, the County has engaged in a series of discussions with the DOJ and the Monitor to come to a shared understanding of what Provision 67 requires. This has included sharing a copy of its Provision 67 audit guide, and meeting on several occasions with the Monitor, Mental Health Subject Matter Expert, and the DOJ. The Parties also met on March 14, 2024, to discuss a possible request to amend the language of the Provision to conform the clinical realities of how it is operationalized in the jails. The County has also engaged in other efforts to enhance its compliance with Provision 67, which it summarizes as follows

- CHS's increased pace in onboarding psychiatric and clinical staff;
- Concerted efforts to expand telehealth to increase access to medication support services for psychiatric patients;
- The use of the "bots," introduced to ORCHID in August 2023 to identify refusers for clinical staff;
- Increases in admissions to the Forensic In-Patient ("FIP") unit and transfers to Metropolitan State Hospital, which rose by seven percent from the first to the second quarter of 2023;
- A two-percent increase in patients whose records reflected Involuntary Medication Orders ("IMOs") or Long Acting Injectables ("LAIs") from the first to the second quarter of 2023; and
- The inauguration of operations of the Acute Intervention Module ("AIM") in the second quarter.

Regarding the County's reported results for the Seventeenth Reporting Period, the County's Augmented Seventeenth Self-Assessment reports that for the Second Quarter of 2023, "89% of inmates who refused psychotropic medications receiving the appropriate consideration and documentation." For the Third Quarter of 2023, the County reports "85% of inmates who refused psychotropic medications receiving the appropriate consideration and documentation."

According to the County's implementation plan tracker, the County has completed all 10 corrective action steps regarding Provision 67. These steps include: using the revised audit tool in self-assessments (completed September 2023); recruiting and hiring new recruits, leaving only "routine hiring" afterwards (completion date unclear); training five new Nurse Practitioners (completed April 2023); complete negotiations with unions to address loan repayment concerns for psychiatrists and other mental health staff (completed September 2022); relief physicians being identified and trained, and are assessing patients (completion date unclear); implementing a weekly employee hiring tracker (completed April 2022 and ongoing); conducting hiring fairs

---

[40] *See* Monitor's Fourteenth Report, ECF No, 221, at 91 (noting concerns about the auditing methodology not being "consistent with the Provision's plain language"); Fifteenth Report, ECF No. 257, at pp. 101 ("if the County believes that it is clinically appropriate to exempt certain prisoners in MOH or HOH housing from certain of the requirements of Provision 67, it should seek to amend Provision 67").

(completed March 2022, January 2023, April 2023, and ongoing); training clinicians on provision expectations (completion date unclear); auditing two clinicians' records per week (completed May 2023 and ongoing); and beginning the planning phase for a new LPS-designated pod in 172 by working with the Department of State Hospitals and developing a team (completion date unclear).

68.     Within six months of the Effective Date, the County and the Sheriff will develop and implement a procedure for contraband searches on a regular, but staggered basis in all housing units.  High Observation Housing cells will be visually inspected prior to initial housing of inmates with mental health issues.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at MCJ, NCCF, PDC East, PDC South, and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2017, through December 31, 2017 (verified) at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2022, through December 31, 2022 (verified) at CRDF)**

Substantial Compliance requires that "85% of the housing units are searched for contraband at least once in the previous quarter; and 95% of the HOH units visually inspected prior to housing prisoners in these units."  Self-Assessments are to include a summary of searches conducted and a review of 25 randomly selected Checklist forms for HOH units to confirm that the units were visually inspected prior to initial housing of prisoners in these units.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 68 by June 30, 2024.

The County previously maintained Substantial Compliance for twelve consecutive months at TTCF, MCJ, NCCF, PDC East, PDC South, and PDC North.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring at those facilities for Substantial Compliance with Paragraph 68 in the Seventeenth Reporting Period.

The County's posted results reflect that in the Fourth Quarter of 2022, 100% of the housing units at CRDF were searched at least once in the quarter, and 96% of the randomly selected HOH cells at CRDF were visually inspected before housing prisoners in these units.  These results have been verified by the Monitor's auditors.[41]  The Department has maintained Substantial Compliance for twelve consecutive months and pursuant to Paragraph 111 of the Settlement Agreement, the Department is no longer subject to monitoring for compliance with Paragraph 68.

---

[41] The Monitor's auditors requested additional CCTV footage from the County on November 17, 2023, which was reduced to a smaller number of records at the County's request on November 30, 2023.  The County provided the additional records on March 11, 2024.  Additional necessary information about these records to complete this audit was requested by the Monitor's auditors on March 13, 2024, and provided by the County on March 14, 2024.

69.    Consistent with existing DMH policies regarding use of clinical restraints, the County and the Sheriff will use clinical restraints only in the Correctional Treatment Center and only with the approval of a licensed psychiatrist who has performed an individualized assessment and an appropriate Forensic Inpatient order.  Use of clinical restraints in CTC will be documented in the prisoner's electronic medical record.  The documentation will include the basis for and duration of the use of clinical restraints and the performance and results of the medical welfare checks on restrained prisoners.  When applying clinical restraints, custody staff will ensure a QMHP is present to document and monitor the condition of the prisoner being placed in clinical restraints.

**STATUS:**    **SUBSTANTIAL COMPLIANCE (as of July 1, 2018, through June 30, 2019 (verified))**

Substantial Compliance requires the Department to review the electronic medical records of all prisoners placed in clinical restraints to verify that the restraints were used, approved, and documented, and that the results of medical welfare checks on restrained prisoners were also documented.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring at those facilities for Substantial Compliance with Paragraph 69 in the Seventeenth Reporting Period.

70.     Within three months of the Effective Date, the County and the Sheriff will have policies and procedures regarding the use of Security Restraints in HOH and MOH. Such policies will provide that:

(a)     Security Restraints in these areas will not be used as an alternative to mental health treatment and will be used only when necessary to insure safety;

(b)     Security Restraints will not be used to punish prisoners, but will be used only when there is a threat or potential threat of physical harm, destruction of property, or escape;

(c)     Custody staff in HOH and MOH will consider a range of security restraint devices and utilize the least restrictive option, for the least amount of time, necessary to provide safety in these areas; and

(d)     Whenever a prisoner is recalcitrant, as defined by Sheriff's Department policy, and appears to be in a mental health crisis, Custody staff will request a sergeant and immediately refer the prisoner to a QMHP.

**STATUS:     PARTIAL COMPLIANCE**

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 70 by June 30, 2024.  The County has articulated its belief that it has fully satisfied Provision 70 and should therefore no longer be subject to monitoring for this provision.  However, as both the Fifteenth and Sixteenth Reports have explained, the Monitor and Mental Health Subject Matter Expert, Dr. Johnson, disagree for the following reasons:

Provision 70 requires the Department to have policies and procedures regarding the use of security restraints in HOH and MOH, and articulates four specific areas that those policies must address.  For this discussion, we will focus on two subsections of Provision 70: (a) and (c).  Pursuant to 70(a) and (c), the Department's policies must ensure that a) security restraints in HOH and MOH are used "only when necessary" to ensure safety, and c) custody staff in HOH and MOH will use only the least restrictive security restraint necessary, and only for the least amount of time needed to provide safety.  Implicit in these requirements is that the determination of what restraint to use must be individualized to each HOH or MOH inmate and circumstance.[42]  Blanket rules, customs, or practices

---

[42] Many factors could contribute to that individualized determination, including any history of institutional violence, present behavior, and current symptomatology, among others.

that require the application of the same type of restraint to all inmates based upon their diagnosis or MHLOC do not comply with Provision 70.

The Department has adopted written policies that comply with the enumerated areas of Provision 70. Yet, as the Monitor and Court-appointed Mental Health Subject Matter Expert have long made clear, the practice inside certain HOH housing areas in the jails is not compliant. For example, the Twelfth Report explained that

During recent site visits, the Monitor observed that HOH inmates are cuffed to metal "spider tables" during their recreational out-of-cell time as a matter of course. That is, security restraints continue to be routinely applied based upon prisoners' mental health classifications and housing assignments, rather than individual assessments of particular risks that they might pose. The Monitor reiterates the guidance that has been given previously. To attain Substantial Compliance, the County will need to demonstrate that it is using security restraints based upon individualized assessments, "only when necessary to ensure safety," rather than based upon housing assignments or mental health classifications alone.

Subsequent visits by the Monitor and Dr. Johnson have confirmed that this phenomenon persists—HOH inmates in certain housing areas are all locked down to metal spider tables during their "out time" as a matter of course, and not due to any individualized determination that the use of these restraints is "necessary to ensure safety," as Provision 70 requires. The Department will not comply with Provision 70 by adopting written policies that adhere to its dictates, and informal rules, practices, or unit orders that implicitly amend those policies in violation of the Provision's language and intent.

In the Augmented Seventeenth Self-Assessment, the County rightly noted that it is engaged in a dramatic expansion of the number of FIP Stepdown Units and HOH dorms that will allow a greater number of HOH patients to program without restraints when it is safe and appropriate for them to do so. Specifically, "at the beginning of the reporting period (April 1, 2023), there were 10 FIP Stepdown pods operating between TTCF and CRDF. Today, the County and the Department are successfully programming a total of 23 pods as FIP Stepdown and HOH Dorm pods, between TTCF and CRDF, and there is currently a total of 19 trained Mental Health Assistant ("MHA") inmates between TTCF and CRDF assisting CHS and LASD personnel in this programming. The Monitor reiterates that this is a commendable and important effort by the County to address the requirements of Provision 70.[43]

---

[43] On March 11, 2024, the Court issued an Order Modifying Dates for Substantial Compliance, ECF 266, which requires the County to: expand the number of Stepdown units and HOH dorms according to the following schedule: (i) 12 Stepdown pods and/or HOH dorms by March 2023; (ii) 20 Stepdown pods and/or HOH dorms by March 2024; (iii) 28 Stepdown pods and/or HOH dorms by March 2025; and (iv) 30 Stepdown pods and/or HOH dorms by June 2025, consisting of at least 18 Stepdown pods.

The County again contends that it is in Substantial Compliance with Provision 70 because it asserts that it is conducting the individualized assessments necessary to ensure that "security restraints are applied only when necessary to ensure safety. However, as the Sixteenth Monitoring Report made clear

> To comply with Provision 70, the County need not presume that all HOH patients can program unrestrained with 'full freedom of movement' before an assessment can be conducted. However, the County must endeavor to perform these evaluations in a timely fashion under set timeframes, clearly articulate screening criteria for admission to the FIP Stepdown pods and HOH dorms, and enshrine these requirements in policy. When the County can do so, and can show that it is timely performing the "individualized assessments" that Provision 70 requires such that a) security restraints in HOH and MOH are being used "only when necessary to insure safety," and b) only the least restrictive security restraint necessary is being used, it will be able to demonstrate compliance with Provision 70.

The County has not provided data in response to this guidance and summary conclusions will not suffice. In its next Self-Assessment, the County should provide the following data: 1) the percentage of HOH patients who have been assessed for FIP Stepdown and HOH dorms; 2) the percentage of HOH patients who are actually assigned to FIP Stepdown Pods and HOH dorms; 3) the average number of days between the assignment of a P3 MHLOC and the assessment of HOH patients for FIP Stepdown Pods or HOH dorms; 4) the average number of days between the assessment of patients for FIP Stepdown Pods or HOH dorms and their actual transfer to FIP Stepdown Pods or HOH dorms; and 5) any policies or unit orders now in force that reflect the timeframes and screening criteria for admission to FIP Stepdown Pods and HOH dorms.

According to the County's implementation plan tracker, the County has completed 19 out of 20 corrective action steps regarding Provision 70. These include: increasing staffing at CRDF (completed January 2024); custody personnel working in HOH modules contacting the on-duty Watch Commander to advise if HOH is offered out-of-cell time, and if it is not offered, an explanation in the Watch Commander log (completed March 2022); beginning renovations of CRDF Module 1300, which will serve as a FIP Stepdown Unit (completed December 2022); finishing renovations and adding plastic molding furniture to allow unrestrained out-of-cell time (completed January 2023); relocating FIP stepdown and specialized program individuals to CRDF Module 1300 (completed September 2022); updating CRDF policies regarding out-of-cell modules (completed August 2022); CCSB creating a training guide for Sergeants regarding out-of-cell time and how to document it (completion date unclear); developing an additional tab within the Custody Watch Commander Log for tracking out-of-cell time in HOH modules (completed March 2022); assigning a Deputy to TTCF Module 141B (completed June 2023); begin using TTCF Module 161B and 162B as living modules (completed April 2023); having unrestrained out-of-cell time in TTCF Module 162F and fully convert the unit into a Living Module (completed April 2023); fully occupying

Module 141 Pods A through F as FIP Stepdown Units (completed March 2023); reinstating the HOH unrestrained out-of-cell time pilot program in Module 161 Pods A through E (completed September 2022); and expanding the pilot program to further modules (completion date unclear).

71.     The County and the Sheriff will ensure that any prisoner subjected to clinical restraints in response to a mental health crisis receives therapeutic services to remediate any effects from the episode(s) of restraint.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017 (verified))**

Substantial Compliance requires the Department to review the electronic medical records of all prisoners placed in clinical restraints to verify that the prisoners received therapeutic services as required by Paragraph 71.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 71 in the Seventeenth Reporting Period.

72.     The County and the Sheriff will develop and implement policies and procedures that ensure that incidents involving suicide and serious self-injurious behavior are reported and reviewed to determine:  (a) whether staff engaged in any violations of policies, rules, or laws; and (b) whether any improvements to policy, training, operations, treatment programs, or facilities are warranted.  These policies and procedures will define terms clearly and consistently to ensure that incidents are reported and tracked accurately by DMH and the Sheriff's Department.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of January 1, 2017, through December 31, 2017)**

Substantial Compliance requires the Self-Assessments to report on (a) suicide review meetings and (b) CIRC meetings that review incidents of serious self-injurious behavior in the reporting period.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 72 in the Seventeenth Reporting Period.

73.     Depending on the level of severity of an incident involving a prisoner who threatens or exhibits self-injurious behavior, a custody staff member will prepare a detailed report (Behavioral Observation and Mental Health Referral Form, Inmate Injury Report, and/or Incident Report) that includes information from individuals who were involved in or witnessed the incident as soon as practicable, but no later than the end of shift.  The report will include a description of the events surrounding the incident and the steps taken in response to the incident.  The report will also include the date and time that the report was completed and the names of any witnesses.  The Sheriff's Department will immediately notify the County Office of Inspector General of all apparent or suspected suicides occurring at the Jails.

**STATUS:        SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified))**

Substantial Compliance requires the Department to review quarterly a random sample of reports of any threats or exhibitions of self-injurious behavior to verify that the reports have the information required by Paragraph 73; and to provide the Monitor with the notifications to the Inspector General of all incidents involving an apparent or suspected suicide during the reporting period.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 73 in the Seventeenth Reporting Period.

74.     The Sheriff's Department will ensure that there is a timely, thorough, and objective law enforcement investigation of any suicide that occurs in the Jails. Investigations shall include recorded interviews of persons involved in, or who witnessed, the incident, including other prisoners.  Sheriff's Department personnel who are investigating a prisoner suicide or suspected suicide at the Jails will ensure the preservation of all evidence, including physical evidence, relevant witness statements, reports, videos, and photographs.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of September 1, 2016, through December 31, 2017)**

Substantial Compliance requires the Department to provide the Monitor with an Executive Suicide Death Review reflecting the results of the Department's investigation of any suicide in the Jails within six months of the suicide.  The review must reflect steps taken to preserve all of the evidence; and list the interviews of persons involved in, or who witnessed, the incident, and whether the interviews were recorded.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 74 in the Seventeenth Reporting Period.

75.    Within three months of the Effective Date, the County and the Sheriff will review every suicide attempt that occurs in the Jails as follows:

(a)    Within two working days, DMH staff will review the incident, the prisoner's mental health status known at the time of the incident, the need for immediate corrective action if any, and determine the level of suicide attempt pursuant to the Centers for Disease Control and Prevention's Risk Rating Scale;

(b)    Within 30 working days, and only for those incidents determined to be a serious suicide attempt by DMH staff after the review described in subsection (a) above, management and command-level personnel from DMH and the Sheriff's Department (including Custody Division and Medical Services Bureau) will meet to review relevant information known at that time, including the events preceding and following the incident, the prisoner's incarceration, mental health, and health history, the status of any corrective actions taken, and the need for additional corrective action if necessary;

(c)    The County and the Sheriff will document the findings that result from the review of serious suicide attempts described in subsection (b) above; and

(d)    The County and the Sheriff will ensure that information for all suicide attempts is input into a database for tracking and statistical analysis.

**STATUS (75):**        **SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified))**

Substantial Compliance requires (a) DMH to review documentation of randomly selected suicide attempts during the previous quarter to verify that the prisoner's mental health status and need for immediate corrective action were considered timely by the DMH staff and that the staff determined whether the suicide attempt was serious; (b) that the Department and DMH reviewed the relevant information known at that time and the status of any corrective actions taken, and they considered the need for additional corrective action if necessary; and (c) that the information is reflected in the Department's database for tracking and statistical analysis.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 75 in the Seventeenth Reporting Period.

76.     The County and the Sheriff will review every apparent or suspected suicide that occurs in the Jails as follows:

(a)     Within no more than two working days, management and command-level personnel from DMH and the Sheriff's Department (including Custody Division and Medical Services Bureau) will meet to review and discuss the suicide, the prisoner's mental health status known at the time of the suicide, and the need for immediate corrective or preventive action if any;

(b)     Within seven working days, and again within 30 working days, management and command-level personnel from DMH and the Sheriff's Department (including Custody Division and Medical Services Bureau) will meet to review relevant information known at that time, including the events preceding and following the suicide, the prisoner's incarceration, mental health, and health history, the status of any corrective or preventive actions taken, and the need for additional corrective or preventive action if necessary; and

(c)     Within six months of the suicide, the County and the Sheriff will prepare a final written report regarding the suicide.  The report will include:

(i)      time and dated incident reports and any supplemental reports with the same Uniform Reference Number (URN) from custody staff who were directly involved in and/or witnessed the incident;

(ii)     a timeline regarding the discovery of the prisoner and any responsive actions or medical interventions;

(iii)    copies of a representative sample of material video recordings or photographs, to the extent that inclusion of such items does not interfere with any criminal investigation;

(iv)    a reference to, or reports if available, from the Sheriff's Department Homicide Bureau;

(v)     reference to the Internal Affairs Bureau or other personnel investigations, if any, and findings, if any;

(vi)    a Coroner's report, if it is available at the time of the final report, and if it is not available, a summary of efforts made to obtain the report;

(vii)   a summary of relevant information discussed at the prior review meetings, or otherwise known at the time of the final report, including analysis of housing or classification issues if relevant;

(viii)  a clinical mortality review;

(ix)    a Psychological Autopsy utilizing the National Commission on Correctional Health Care's standards; and

(x)     a summary of corrective actions taken and recommendations regarding additional corrective actions if any are needed.

128

**STATUS (76):**          **SUBSTANTIAL COMPLIANCE (as of September 1, 2016, through December 31, 2017)**

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 76 in the Seventeenth Reporting Period.  Nonetheless, the County continued to conduct the reviews required by Paragraph 76 for the suicides that occurred during this period and invited the Monitor to attend these meetings.

77.    The County and the Sheriff will create a specialized unit to oversee, monitor, and audit the County's jail suicide prevention program in coordination with the Department of Mental Health.  The Unit will be headed by a Captain, or another Sheriff's Department official of appropriate rank, who reports to the Assistant Sheriff for Custody Operations through the chain of command.  The Unit will be responsible for:

(a)    Ensuring the timely and thorough administrative review of suicides and serious suicide attempts in the Jails as described in this Agreement;

(b)    Identifying patterns and trends of suicides and serious suicide attempts in the Jails, keeping centralized records and inputting data into a unit database for statistical analysis, trends, and corrective action, if necessary;

(c)    Ensuring that corrective actions are taken to mitigate suicide risks at both the location of occurrence and throughout the concerned system by providing, or obtaining where appropriate, technical assistance to other administrative units within the Custody Division when such assistance is needed to address suicide-risk issues;

(d)    Analyzing staffing, personnel/disciplinary, prisoner classification, and mental health service delivery issues as they relate to suicides and serious suicide attempts to identify the need for corrective action where appropriate; and recommend remedial measures, including policy revisions, re-training, or staff discipline, to address the deficiencies and ensure implementation; and

(e)    Participating in meetings with DMH to develop, implement, and track corrective action plans addressing recommendations of the quality improvement program.

**STATUS (77):**     **SUBSTANTIAL COMPLIANCE (as of April 1, 2022, through March 31, 2023)**

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 77 in the Seventeenth Reporting Period. [44]

---

[44] The County has acknowledged that its ongoing Quality Improvement efforts will remain subject to monitoring under other provisions of the Settlement Agreement.

78.    The County and the Sheriff will maintain a county-level Suicide Prevention Advisory Committee that will be open to representatives from the Sheriff's Department Custody Division, Court Services, Custody Support Services, and Medical Services Bureau; the Department of Mental Health; the Public Defender's Office; County Counsel's Office; the Office of the Inspector General; and the Department of Mental Health Patients' Rights Office.  The Suicide Prevention Advisory Committee will meet twice per year and will serve as an advisory body to address system issues and recommend coordinated approaches to suicide prevention in the Jails.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of May 11, 2016, through May 18, 2017)**

Substantial Compliance requires (1) the Committee to meet twice per year and (2) "recommend coordinated approaches to suicide prevention in the Jails."

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 78 in the Seventeenth Reporting Period.  Nevertheless, the County has continued to hold Bi-Annual Suicide Prevention meetings through the last reporting period, which the Monitor endeavors to attend.

79 (**Revised**).  (a)  Unless clinically contraindicated, the County and the Sheriff will offer prisoners in mental health housing:

    (i)  therapeutically appropriate individual visits with a QMHP;

    (ii)  therapeutically appropriate group programming conducted by a QMHP or other appropriate provider that does not exceed 90 minutes per session;

    (b)  The date, location, topic, attendees, and provider of programming or therapy sessions will be documented.  A clinical supervisor will review documentation of group sessions on a monthly basis.

**STATUS:**     **NON-COMPLIANCE**

On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provision 79 ("Revised Paragraph 79") as set forth above.  They also agreed on Revised Compliance Measures.  Under the Revised Compliance Measures, Substantial Compliance requires the Department to maintain records of therapeutically appropriate individual visits and group programming, and the names of the clinical supervisors who reviewed such records and the conclusions of their reviews.  It also requires that 95% of the prisoners in HOH are offered therapeutically appropriate structured mental health treatment, including at least a weekly QMHP visit and group programming, and that 90% of prisoners in MOH are provided visits by a QMHP at least once a month as well as therapeutically appropriate structured mental health treatment.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 79 by June 30, 2024.

The County's Augmented Seventeenth Self-Assessment reports that in the Second Quarter of 2023, the "supervisor responsible for reviewing relevant documentation on a monthly basis did so at TTCF, for 100% compliance, but not at CRDF."  "For Measure 79-4(b), which requires that 95% of HOH patients be offered an individual visit by a QMHP and weekly group programming, the County reported 31% compliance."  "For Measure 79-4(c), which requires that 90% of patients in MOH be offered individual monthly visits by a QMHP and therapeutically appropriate structured treatment, the County reported 47% compliance."

The County's Augmented Seventeenth Self-Assessment reports that in the Third Quarter of 2023, the "supervisor responsible for reviewing relevant documentation on a monthly basis did so at TTCF, fulfilling compliance, but at CRDF there was no supervisor to review documentation, which resulted in non-compliance."  "For Measure 79-4(b), which requires that 95% of HOH patients be offered an individual visit by a QMHP and weekly group programming, the County reported 16% compliance."  "For Measure 79-4(c),

which requires that 90% of patients in MOH be offered individual monthly visits by a QMHP and therapeutically appropriate structured treatment, the County reported 48% compliance." Regarding these results, the County reports on various efforts underway to increase the recruitment of the mental health personnel necessary for compliance. As a result, the County reports

> Although clinical hiring is a persistent problem, these focused efforts are paying off. Just a few months ago, CRDF had nine clinical vacancies consisting of two CPs and seven PSWs. As of February 8, 2024, just one PSWs and one CP vacancy remain. The CP began their assignment at CRDF February 1, 2024, and three PSWs started on January 16, 2024, while the remaining five PSWs are in various stages of onboarding. The County is hopeful that the current efforts will next extend to the Men's Program, which currently has approximately nine CP vacancies and 16 PSW vacancies.

The Sixteenth Report discussed the Monitoring Team's findings and critiques related to the County's use of treatment plans. *See* Sixteenth Report at pp. 134-135. The County reports that it has "taken seriously" those concerns and thus taken the following actions in response

> CHS conducted treatment-plan training for staff from August 28, 2023, through November 7, 2023. Additionally, CHS is now utilizing a treatment-plan template that was not in use in 2022. The County understands that most of the records that the Monitoring Team reviewed for its qualitative assessment were cases from 2022, so the template's impact could not be observed.
>
> CHS recently has invested significant resources in training mental health staff in Dialectical Behavioral Therapy ("DBT") and expanding its application in the care for its patients. In its general description, DBT "is a comprehensive and multifaceted therapy designed to help patients cope with extreme emotional suffering and, often, self-injurious behavior. It is a structured program of psychotherapy with a strong educational component designed to provide skills for managing intense emotions and negotiating social relationships." Beginning on November 15, 2023, CHS contracted outside experts to provide a three-day training on DBT for its clinicians. Each member of the mental health staff has received or will receive nine hours of online training and 18 hours of in-patient DBT training. This training is mandatory for all clinicians, supervisors, and managers. Additionally, CHS adopted a DBT implementation plan that requires:

> • Supervisors to discuss DBT in every team meeting for a minimum of three months, with a focus on cases where DBT was utilized, how the treatment was documented, and any challenges to successful use of the modality;

- Program heads to discuss DBT in monthly meetings and to review DBT implementation in every supervisors meeting for the first three months of the plan, moving to twice a month if success is demonstrated;

- The Clinical Director to assess implementation of DBT at all programs over the next six to 12 months, including assessing the percentage of cases where DBT was incorporated in case audits and determining what support clinicians need to broaden the treatment's use in the jail.

  Furthermore, CHS's plan requires supervisors to provide reports on clinicians' DBT implementation, including whether the clinician under review used DBT in specific cases, whether an opportunity to utilize the treatment was missed, whether the treatment was used constructively, and whether its use was documented properly.

     These are potentially useful initiatives.  However, the Monitoring Team notes that in our discussions with clinical staff, one of the most-frequently articulated impediments to their greater use of and reliance on treatment plans relates to their accessibility within the patient Electronic Medical Record ("EMR").  While CHS has a Powerforms template available for use in treatment planning that is searchable through the Forms Browser in Orchid, clinicians have informed us that they generally attempt to search for treatment plans within the clinical notes, which is cumbersome and unreliable.  Moreover, clinicians report that information from prior treatment plans is not pulled forward into any new treatment plan, which requires them to start from scratch each time.  These are reported disincentives for creating and relying on treatment plans given the time pressures associated with heavy patient loads. We encourage the County to further investigate how to improve the accessibility and usability of treatment plans within the EMR and/or to provide training to clinical staff on how to best access and use them.

     According to the County's implementation plan tracker, the County has completed all seven corrective action steps regarding Provision 79.  These steps include: monitoring treatment plans generating by each staff member (completed May 2023 and ongoing); reaching out to potential PSW candidates (completed April 2023 and ongoing); conducting a pay analysis relating to County mental health personnel (completed March 2023); performing quarterly staffing analyses (completed August 2023 and ongoing); reorganizing the delivery of its services to allow clinicians to be assigned by location for MOH (P2) patients in addition to HOH (P3 and P4) patients (completed October 2022); adopting a uniform treatment plan that allows for accommodations to a patient's level of need and engagement (completed September 2022); and providing training on treatment plans specific to each patient's needs (completed November 2022).

80.    (a)    The County and the Sheriff will continue to make best efforts to provide appropriate out-of-cell time to all prisoners with serious mental illness, absent exceptional circumstances, and unless individually clinically contraindicated and documented in the prisoner's electronic medical record.  To implement this requirement, the County and the Sheriff will follow the schedule below:

(i)    By no later than six months after the Effective Date, will offer 25% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week;

(ii)    By no later than 12 months after the Effective Date, will offer 50% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week; and

(iii)    By no later than 18 months after the Effective Date, will offer 100% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week.

(b)    No later than six months after the Effective Date, the County and the Sheriff will record at the end of each day which prisoners in HOH, if any, refused to leave their cells that day.  That data will be presented and discussed with DMH staff at the daily meeting on the following Normal business workday.  The data will also be provided to the specialized unit described in Paragraph 77 and to DMH's quality improvement program to analyze the data for any trends and to implement any corrective action(s) deemed necessary to maximize out-of-cell time opportunities and avoid unnecessary isolation.

**STATUS (80):**          **NON-COMPLIANCE**

Paragraph 80 requires that, "no later than 18 months after the Effective Date [July 1, 2015]," 100% of the prisoners in HOH receive "ten hours of unstructured out-of-cell recreational time *and* ten hours of structured therapeutic or programmatic time per week." The parties have agreed that up to five hours of the structured time can consist of education or work programs, but at least five hours of the time must be therapeutic.

On December 27, 2022, and on April 20, 2023, the Court issued Orders Setting Deadlines for Substantial Compliance, ECF No. 234 and 248, respectively, which established specific deadlines for Defendants to "improve compliance with provisions 63, 64, and 80." With respect to Provision 80, the December 2022 Order established deadlines for Defendants to take a series of "agreed-upon actions to improve compliance," while the April 2023 Order established incremental targets for the Defendants' overall compliance with the provision by the end of then-upcoming quarters.

*Figure 8:  Quarterly Court-Ordered Targets for Provision 80 Compliance*

| Targets by Quarter | % of HOH Inmates Receiving 10 Hours <u>Unstructured</u> Out-of-Cell Time | % of HOH Inmates Receiving <u>Structured</u> Out-of-Cell Time | Total Hours of <u>Structured</u> Out-of-Cell Time | # of Group Hours (of total <u>Structured</u> Out-of-Cell Time) |
|---|---|---|---|---|
| 2Q2023 | 85% | 50% | 5 | 2.5 (of 5) |
| 3Q2023 | 90% | 60% | 6 | 3 (of 6) |
| 4Q2023 | 95% | 70% | 7 | 3.5 (of 7) |
| 1Q2024 | 100% | 75% | 7.5 | 3.75 (of 7.5) |
| 2Q2024 | | 80% | 8 | 4 (of 8) |
| 3Q2024 | | 85% | 8.5 | 4.25 (of 8.5) |
| 4Q2024 | | 90% | 9 | 4.5 (of 9) |
| 1Q2025 | | 95% | 9.5 | 4.75 (of 9.5) |
| 2Q2025 | | 100% | 10 | 5 (of 10) |

<u>Unstructured out-of-cell Time</u>

The County's Augmented Seventeenth Self-Assessment reports that in the Second Quarter of 2023, 64% of the HOH prisoners at CRDF and 66.8% of the HOH prisoners at TTCF were offered "10 hours of required unstructured out-of-cell time by Custody staff." This failed to meet the 85% target in the Court order. The County's Augmented Seventeenth Self-Assessment also reports that in the Third Quarter of 2023, 94% and 63.2% of HOH prisoners were offered unstructured out-of-cell time at CRDF and TTCF, respectively. This met the 90% target in the Court's April 2023 Order at CRDF but not at

TTCF.  Regarding these results, the County reports

> As addressed in the County's 16th Augmented Self-Assessment, the County and the LASD have long believed that one of the chief compliance failures they have long experienced with respect to Provision 80 is accurately recording and tracking offers of out-of-cell time, especially when patients decline offers. To address this issue, LASD adjusted the e-UDAL algorithm during the third quarter of 2023 so that specific pods may be selected when a report of out-of-cell time is generated to ensure an accurate calculation of when out-of-cell time is offered, whether it is accepted, and or why it is refused. LASD also conducted additional training on use of the e-UDAL system to document out-of-cell time offers and refusals during the fourth quarter of 2023.

> It is anticipated that these efforts will produce more accurate documentation of out-of-cell offers and improve the County's compliance with Provision 80 in future quarters. Indeed, there is well-founded basis to believe that will occur, as a recent review of out-of-cell time data at TTCF confirmed that between February 5, 2024 and February 10, 2024, 82.5% of the HOH inmates at that facility received offers for at least 10 hours of unstructured out-of-cell time that week, a notable improvement from the figures reported for the second and third quarters of 2023. The County also anticipates improved opportunities to troubleshoot any compliance challenges that come to light with use of the new algorithm and better assess how to minimize refusals of offers for out-of-cell time.[45]

Structured out-of-cell Time

The County also reports data for structured therapeutic or programmatic time. According to the County's Augmented Seventeenth Self-Assessment, 0% for CRDF and 24% for TTCF, of people residing in HOH were offered the required 10 hours of structured out-of-cell time during the Second Quarter of 2023.  For the Third Quarter of 2023, the County's Augmented Seventeenth Self-Assessment reports that 42% for TTCF of prisoners residing in HOH were offered the required amount of structured out-of-cell time.  At CRDF, the County reported 0% compliance."  The County's posted results reflect that in the Third Quarter of 2023, 70% of TTCF prisoners residing in HOH were offered at least 6.5 hours of structured out-of-cell time.  At CRDF, 1% of prisoners were offered the same amount of time.  The numbers at TTCF met the 60% target in the April 2023 Court order, but those at CRDF did not.

The County acknowledges that these results fall "short of what is required to obtain substantial compliance with Provision 80 and reflect the County's ongoing

---

[45] The County also suggests that its methodology for auditing the provision may need to be adjusted given that it may be counting individuals who are not truly available for out-of-cell time because they are in court, receiving visitors (including attorney visits), or receiving medical treatment.  The Parties have had preliminary discussions with the Monitor about this issue, which should continue and be resolved before the County adjusts its methodology.

challenges in building capacity to provide structured and group programming to the sizable P3/P4 population residing in the LACJ." Further

> One of the principal barriers the County faces in reaching compliance with Provision 80 is having sufficient staff to conduct out-of-cell structured group programming for the HOH population housed in the LACJ, as the County currently employs only 25 full-time group providers (8 at CRDF and 17 at TTCF), far fewer than can provide the required number of group programming hours for the roughly 1,400 HOH inmates currently housed at TTCF and CRDF. CHS has been working on three different fronts to increase its capacity to provide the required structured group programming.

> First, near the conclusion of the reporting period, CHS was able to launch a pilot program involving ten psychology interns (graduate students) from the Chicago School of Professional Psychology ("CSPP") who are currently running structured therapeutic group programming on a weekly basis at the LACJ for HOH inmates as part of a clinical program run by CSPP. The 10 students from CSPP who participate in this pilot program take classes on certain days at the school and spend two days each week at the LACJ providing group programming services to HOH inmates for eight hours on each of those two days. Each of these students are assigned a floor of HOH inmates, just like CHS' group programming personnel, and they conduct groups featuring topics that include anger management, substance abuse, life skills, mediation, yoga (stretching and mindfulness), and decision-making processes (starting with a prompt and discussing life's obstacles as a group). Although the initial goal was for the students participating in this pilot program to add 60 hours to CHS' group programming capacity each week, due to various circumstances— including that CSPP was unable to provide clinical supervision offsite, so CHS had to provide supervision to the students onsite at the LACJ, cutting into the time that the students could provide groups the actual amount of group programming hours provided by this student group has fluctuated between 36 and 60 hours each week. Nevertheless, this pilot program has materially helped supplement the resources CHS has at its disposable to dedicate to group programming for HOH inmates, and CHS has initiated talks with other universities to replicate the CSPP clinical program and is brainstorming options to ensure that students receive clinical supervision in an efficient way.

> Second, at the end of October 2023, shortly after the reporting period ended, the County completed a months' long solicitation process and finalized contracts with two companies to provide a number of group programmers that would significantly expand CHS' group programming capacity. Specifically, the County executed agreements with McKinley to provide group programming services for HOH inmates housed at TTCF

and with Sistah Friends to provide group programming services for inmates at CRDF. Per these contracts, McKinley has agreed to provide personnel to lead 600 groups per week for male HOH inmates at TTCF, and Sistah Friends has agreed to provide personnel to lead 80 groups per week for female HOH inmates at CRDF. These contracted services would add 5,440 inmate programming hours per week (assuming the groups led involve an average of eight inmates) to CHS' group programming capacity, provided that McKinley and Sistah Friends can deliver the services required under their respective contracts with the County. Whether that will occur or not is currently unknown. Since the start of 2024, McKinley has 8 group programmers onboarding and Sistah Friends has 1 group provider who has started providing services and two onboarding. This slow ramp up unfortunately indicates that these two organizations are suffering from the same difficulty in recruiting and employing mental health group programmers, who are in rare supply, that the County has faced for years.[46]

According to the County's implementation plan tracker, the County has completed 11 out of 12 corrective action steps regarding Provision 80. These steps include: implementing a rotating schedule at TTCF that pulls Sergeants assigned to the Emergency Response Team and task them with removing from HOH individuals that no longer require HOH care (completed April 2022); creating a MHIT system with one sergeant and two custody assistants at CRDF, who will identify individuals with highest number of days in intake module 1400 and expedite their movement elsewhere (completed August 2023); incentivizing more out-of-cell time in HOH, including through purchasing supplies and adding activity programming (completed April 2022); improving documentation of out-of-cell time by finishing transition to Orchid (completion date unclear); hiring outside providers to run groups (completion date unclear); gathering and providing data about implemented measures, and making projections about the impact of measures on out-of-cell time (completion date unclear); submitting supplemental implementation plan for Provision 80 (completed February 2023); addressing staffing shortages of LASD staff that have made it difficult to move P3 and P4 inmates for structured out-of-cell time (completion date unclear, incremental targets); increasing CHS capacity to provide 7,500 hours of group programming per week (completion date unclear, incremental targets); and reduce P3/P4 population to no more than 750 inmates (completion date unclear, incremental targets).

---

[46] The Monitoring Team notes that "as CHS increases its capacity by adding groups facilitator from the community who are unfamiliar with the individual patients, it is imperative that treatment plans be completed and easily accessible so all clinical service providers—including group providers—are working from the same framework to promote recovery in these patients. Easily accessible treatment plans with identified goals, objectives and interventions will help solidify the subject matter for group programming and provide a more targeted and comprehensive recovery for each inmate participating in group programming."

81.     Except as specifically set forth in Paragraphs 18-20 of this Agreement, and except as specifically identified below, the County and the Sheriff will implement the following paragraphs of the Implementation Plan in *Rosas* at all Jails facilities, including the Pitchess Detention Center and the Century Regional Detention Facility, by no later than the dates set forth in the Implementation Plan or as revised by the *Rosas* Monitoring Panel:  Paragraphs 2.2-2.13 (use of force policies and practices); 3.1-3.6 (training and professional development); 4.1-4.10 (use of force on mentally ill prisoners); 5.1-5.3 (data tracking and reporting of force); 6.1-6.20 (prisoner grievances and complaints); 7.1-7.3 (prisoner supervision); 8.1-8.3 (anti-retaliation provisions); 9.1-9.3 (security practices); 10.1-10.2 (management presence in housing units); 11.1 (management review of force); 12.1-12.5 (force investigations, with the training requirement of paragraph 12.1 to be completed by December 31, 2016); 13.1-13.2 (use of force reviews and staff discipline); 14.1-14.2 (criminal referrals and external review); 15.1-15.7 (documentation and recording of force); 16.1-16.3 (health care assessments); 17.1-17.10 (use of restraints); 18.1-18.2 (adequate staffing); 19.1-19.3 (early warning system); 20.1-20.3 (planned uses of force); and 21.1 (organizational culture).

### STATUS:     PARTIAL COMPLIANCE

Because Paragraph 81 of the Settlement Agreement incorporates 100 provisions in the Implementation Plan adopted in the *Rosas* case, the parties agreed in the Compliance Measures adopted in this case that "Substantial Compliance with respect to the substance of the policies required by the *Rosas* Implementation Plan would be determined by the *Rosas* Monitors."  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 81 by June 30, 2024.

The Compliance Measures in this case provide that "[o]nce the policies have been approved by the *Rosas* Monitors, the Monitor and Subject Matter Expert will confirm and assess the implementation of these policies in the [DOJ facilities]."  In assessing the Department's compliance with Paragraph 81, the Monitor has grouped the 100 provisions into seven categories and, with input from the Subject Matter Experts, has assessed the Department's compliance on a category-by-category basis.  With the exception of the Training category, which is assessed when certain percentages are reached, the Department will no longer be subject to monitoring for the provisions in a particular category once the Monitor has determined that it has achieved and maintained for twelve consecutive months Substantial Compliance with the intent and purpose of the overall category.  The Department will no longer be subject to monitoring for compliance with Paragraph 81 once it has achieved and maintained for twelve consecutive months Substantial Compliance with each of the categories.

According to the County's implementation plan tracker, the County has completed 22 out of 27 corrective action steps regarding Provision 81.  These steps include: providing updated versions of implementation plans (process is begun and is ongoing); requesting new staffing model at CRDF to increase grievance staffing (completed April 2022); developing method of monthly self-assessments in conjunction

with Inmate Grievance Coordinator (completed September 2023); DOJ Settlement Agreement Commander & Captain, Commander and Chief overseeing CRDF to monitor progress based on monthly reports (completed September 2023); monthly self-assessments, data-based corrective actions, and benchmarks set (completed September 2023); developing training and workflow to improve grievance timeliness (completed April 2022); meeting with CCSB to review probationary employee training tracker (process is begun and is ongoing); meeting with DOJ Settlement Agreement Commander, Commander and Chief overseeing CRDF regarding probationary employee training tracker (completed September 2021 and June 2022); providing plan for monthly self-assessments regarding probationary employee training (June 2022); monitoring progress based on monthly probationary employee training self-assessments (process is begun and is ongoing); conducting monthly self-assessments, developing data-based corrective actions, and setting benchmarks (completed September 2021 and June 2022); finalizing policies regarding head strikes (Prohibited Force) and WRAP (completion date unclear); briefing custody facilities on dangers of striking individuals in the head (completed May 2022); training on new directives (completed in 2023); finalizing data-driven review process to track the effectiveness of new directives for the WRAP and head strikes (completed in 2022); developing process for a force-related performance review process (completed September 2020); creating a report on the process for review (completed in 2022); implementing the force-related performance review process (completed in 2022); forming a work group to explore the possibility of creating a new force reporting memo (completed July 2023); creating a force report guide for deputies (completed August 2022); reporting on the workgroups progress (completed July 2023); and distributing the approved force report guides (completed August 2022).

### Training (Partial Compliance)

Paragraphs 3.1-3.6, 4.6-4.9, and 12.1 of the *Rosas* Implementation Plan reflect training requirements on use of force, ethics, dealing with inmates with mental illness, and investigations of force incidents. The curriculum and lesson plans to implement these training requirements have been approved by the *Rosas* Monitors.

In the Sixteenth Reporting Period, the County achieved Substantial Compliance with the refresher training requirements of 4.7 for 2022 after falling out of compliance in the Fourteenth Reporting Period. The County maintained Substantial Compliance with the following Training provisions: 3.2, 3.3, 3.5,[47] 4.8, 4.9, and 12.1. The reported substantial results for 3.1 were not verified by the Monitor's auditors.

The County's Augmented Seventeenth Self-Assessment reports that it maintained Substantial Compliance with the following Training provisions during the Seventeenth Reporting Period: 3.3, 3.5, 3.6,[48] 4.8, 4.9, and 12.1-2. The results for 3.3, 3.6, 4.8, 4.9,

---

[47] The posted results for 3.5 indicate that "[t]here were no inmate grievances against staff investigations involving force with a finding of "Appears the Employee Conduct Could Have Been Better."

[48] The County reported Substantial Compliance with 3.6 for the First Semester of 2023. The Augmented Seventeenth Self-Assessment reports that it will submit its 2023 Second Semester assessment in the Eighteenth Reporting Period.

and 12.1-2 have been verified by the Monitor's auditors.  The County also reports that it expects to submit its 2023 annual refresher training assessment as part of its Eighteenth Self-Assessment.

### Use of Force (Partial Compliance)

In February 2024, Court-Appointed Use of Force Subject Matter Expert, Susan McCampbell, toured the jails with the Monitor and met with Custody executives, force and internal affairs investigators, population management staff, and line sergeants who oversee and manage force.  She provides the following feedback regarding the force data now available in the Department and the approach necessary to properly analyze force issues

> The County's initiatives to manage uses of force must rely on discrete, credible data that defines of the problem (root cause), explores and assigns quantifiable countermeasures (corrective actions), tracks progress, and allows for conclusions as to the effectiveness of the responses.  At the end of the day, the County must be able to discern the real causes and effective solutions – that is focusing on the core issue, rather than symptoms.  Basic data necessary for reliable assessment, identification and evaluation of corrective actions include, for example:  assessment by facility (not aggregate data), the security custody level (classification) of involved inmate(s), whether the involved inmate(s) were classified and housed based on established policies and procedures, the involved inmate's status on the mental health caseload (level) before and after the incident, gender, inmate's history of sentinel events (e.g. assaults, uses of force, self-harm) during this and past incarcerations, the time of day, day of week, and location of the incidents (e.g. mapping), as well as cause (if determined) resulting in the use of force.

> Documenting the training of involved staff (preventive and post-incident remediation) is also important to assessing the force options available and used.  If there are initiatives underway by the County to address uses of force, reporting should identify the data that defined the problem, the specific tasks involved, resources allocated, and how "success" is/will be measured.  There are other factors that can be considered once the basics are addressed, such as the trend data of the use of force in the housing unit, by facility, number/location/time of day day/day of week of inmate/inmate altercations not requiring force, and assaults on staff data, grievance histories, and complaints against deputies.  Trained staff subject matter experts, using statistically valid and defensible analysis, are also necessary for credible progress to be demonstrated.  Understanding that the data systems within the jails are problematic in terms of their age, data entry capabilities, and reporting formats, valid sampling may be an alternative technique.

Regarding uses of force at the DOJ facilities, the Department has been engaged in an effort to reduce the total number of uses of force and achieved some success in the Seventeenth Reporting Period.  Given the data available to the Monitoring Team, the total number of force incidents in the Third Quarter of 2023 decreased by 11% compared to the Second Quarter of 2023 and by 35% compared to the Third Quarter of 2022.

*Figure 9:  Total Use of Force by Quarter*



These declines appear independent of fluctuations in the facilities' average daily populations.  Figure 10 presents the total use of force incidents per 100 inmates, based on average daily population, between the First Quarter of 2020 and the Third Quarter of 2023.  The 1.49 uses of force per 100 inmates in the Third Quarter of 2023 was approximately 15% less than the average for that time period.

*Figure 10:  Uses of Force Per 100 Inmates by Quarter*

Regarding the total uses of force at the individual facilities, the Sixteenth Monitoring Report noted

> When examined by facility, a key difference in the number of uses of force per inmate becomes apparent. Figure 9 presents the number of uses of force incidents per 100 inmates in the Fourth Quarter of 2022 and the First Quarter of 2023 by facility. CRDF averaged the highest number of force incidents at 6.40 uses of force per 100 inmates.  NCCF averaged approximately half that number at 3.22. PDC South and North were substantially lower, with 1.06 and 0.88 averages, respectively. The County should expeditiously investigate the causes of this proportionally higher number of uses of force.

These differences became starker in the Seventeenth Reporting Period.  Figure 11 presents the number of use of force incidents per 100 inmates in the Second and Third Quarters of 2023 by facility.  CRDF averaged the highest number of force incidents at 8.19 uses of force per 100 inmates.  NCCF averaged approximately a quarter of that number at 2.20.  PDC North and South were substantially lower, with 1.38 and 0.53 averages, respectively.

*Figure 11:  Uses of Force Per 100 Inmates by Facility, Q2-2023 and Q3-2023*



The Sixteenth Monitoring Report called on the County to "expeditiously investigate the causes of this proportionally higher number of uses of force at CRDF and take appropriate corrective action."  In response, the County reports

> The Department takes seriously the concerns expressed in the Sixteenth Report and undertook a close analysis of CRDF's force statistics during the period. The investigation determined that the uses of force during the period at the facility largely were driven by a combination of a higher number of court-ordered extractions; force used by staff to quell fights

among people housed in general population housing locations; and instances where personnel had to use force to prevent harm from occurring to medical staff, Department staff, or others.

CRDF took several corrective actions to decrease force incidents at the facility. At the beginning of each week, the Facility's Commander and Unit Commander meet to review all force incidents that occurred the week prior. All recommendations and concerns discussed in the meeting are relayed to the handling Watch Commander and Sergeant to address in the force investigation package and take any corrective action that may be needed. In addition, monthly emails and regular briefings are conducted with the supervisors and line staff to outline or discuss the importance of documentation, identified trends, force prevention efforts tactics, and other post-force considerations. As part of the force review process at CRDF, trends, force prevention techniques, tactics and other post-force considerations are identified. If any of these areas were handled exceptionally well in a particular case, these areas are discussed among the lieutenants and sergeants then briefed to personnel to train on optimal tactics and the use of time and distance as a force-avoidance strategy. Certain factors, such as the number of court orders to extract a person from her cell, are beyond the facility's control. CRDF is committed to employing techniques where such extractions can be accomplished without force, or with minimal force, but the fact of an ordered extraction presents a circumstance where some level of force may become necessary to fulfill a court's order.

In December 2023, CRDF added two personnel to the Training Team who are Department Force Instructors. Common dynamic scenarios are being developed and anticipated to be implemented by the end of the First Quarter of 2024.

Newly promoted supervisors are provided with a three-day orientation. A mentoring program has also been developed to build newly promoted supervisors' skills. Each supervisor is assigned a mentor and provided with a mentorship packet. The packet is used as a checkpoint and guide for the mentor to operate with a newly appointed supervisor to ensure competency and lower variances on the learning curve. The Training Team also incorporated a more interactive approach to training on the use of security restraints, cell placements, and extractions. During this block of instruction, not only are videos and instruction occurring, but the supervisors are actively directing and participating in the exercise.

Lastly, meetings are conducted with deputies who are found to have engaged in a proportionally higher number of uses of force, and every attempt is made to reassign the deputy to a position where he or she is less likely to be involved in force incidents, including planned use of force.

The County should continue to report on these efforts and provide additional details about them and their impacts in the Eighteenth Self-Assessment.

Figure 12 presents the total uses of force by quarter and category. Category 1 Force was the most common, though the number of Category 1 Force incidents in the Third Quarter of 2023 decreased by 18% compared to the Second Quarter of 2023 and 30% compared to the Fourth Quarter of 2022. Category 2 Force incidents stayed relatively consistent in recent quarters.

*Figure 12: Total Use of Force by Category and Quarter*



Figures 13 through 16 break out these data by facility. Despite a sharp increase in Category 1 Force incidents at CRDF in the Second Quarter of 2023, Category 1 Force incidents in the Third Quarter of 2023 decreased by 21% compared to the Second Quarter of 2023 and 8% compared to the Fourth Quarter of 2022. Category 1 Force incidents at NCCF decreased by 37% compared to the Second Quarter of 2023 and 61% compared to the Fourth Quarter of 2022. In the Third Quarter of 2023, Category 1 Force incidents more than doubled at PDC North compared to prior quarters, though force is used substantially less often there, and there were only four more incidents than the average over the last four quarters.

147

*Figures 13-16: Total Use of Force by Category, Quarter, and Facility*









Among the most significant and persistent issues identified by the Monitoring Panel in the *Rosas* case has been the overuse of head strikes in the downtown Basin facilities in violation of the *Rosas* provisions.[49]  LASD provided information about the number of use of force incidents that involved head strikes at the DOJ facilities from the First Quarter of 2021 through the Third Quarter of 2023.  Across this time period, the DOJ facilities averaged a combined 3.7 force incidents with head strikes per quarter.  Recent quarters were consistent with this average, but lower than the peaks in the Second and Fourth Quarters of 2021.

---

[49] *See, e.g.*, *Rosas, et al., v. Leroy Baca*, No. CV 12-00428 DDP, Panel's Eleventh Monitoring Report, filed Mar. 8, 2023.

*Figure 17:  Uses of Force with Head Strikes by Quarter*



Figure 18 presents the total number of force incidents involving head strikes in the Second and Third Quarters of 2023 by facility.  There were three such incidents at NCCF.  Head strikes were less common at PDC North, and there were no head strike incidents at CRDF or PDC South.

*Figure 18:  Uses of Force with Head Strikes by Facility, Q2-2023 and Q3-2023*



The Monitor and Court-Appointed Use of Force Expert Susan McCampbell reviewed 25 completed force packages for the DOJ facilities during the Seventeenth Reporting Period.  As a result of objections by the plaintiffs in the *Rosas* case, the *Rosas* Monitors revised their approach to assessing the Department's compliance with the use, reporting and investigation of force provisions of the Implementation Plan.  Under the revised approach, the *Rosas* Monitors do not determine the percentage of cases in which the Department's use of force was reasonable overall, but instead assess the Department's compliance with the specific provision on the use, reporting, and investigation of force

provisions of the Implementation Plan.  To maintain consistency across all jail facilities, the Monitor has adopted the same approach in the DOJ case.

On January 16, 2024, the Monitor provided the County with a use of force matrix reflecting the ratings for the 25 force packages reviewed.  On February 8, 2024, the Monitor met with Department executives to discuss the ratings assigned, watch video of force incidents, review deputy reports and command memos, and discuss the Monitoring Team's concerns about particular use of force packages—and the force review process—with Department executives, and to listen to their feedback and respond to their questions.  The cases reviewed during the meeting reflect that the Department has considerable work to do in ensuring that incidents are de-escalated (Rosas 2.2), supervisors are timely summoned to the scene (Rosas 2.7), staff involved in uses of force did not escort inmates from the scene (Rosas 9.2), and staff did not place weight on an inmate's back or shoulders in a way that impaired his/her breathing and put him/her into the recovery position as soon as practical (Rosas 17.5).

### Reporting and Investigation of Force (Partial Compliance)

The timely investigation of force incidents is essential to ensuring the thoroughness of those investigations and accountability in the Department.  Department data reflect that there continue to be serious delays in the process of investigating use of force incidents at the DOJ facilities.  As part of its self-assessment, LASD provided information about the status of force investigations into incidents in the First Quarter of 2022 through the Third Quarter of 2023.  Figure 19 presents the percentage of these investigations that were still in progress at the time the data were provided.  Among the investigations into force incidents that occurred in the First Quarter of 2022, 49% were still in progress as of January 4, 2024—nearly two years later.  Among those still in progress, the average age of investigations into force incidents from the First Quarter of 2022 through the Third Quarter of 2023 was 397 days.

*Figure 19:  Percentage of Force Investigations In Progress as of July 5, 2023, Q1-2022 through Q3-2023*



Figure 20 presents the overall percentage of investigations into incidents occurring in the First Quarter of 2022 through the Third Quarter of 2023 that were still in progress by facility.  Of the 280 investigations into uses of force at CRDF during this time period, 88% were still in progress as of January 4, 2024.  PDC North had far fewer investigations to complete, only 31, and 65% were still in progress.  NCCF had a total of 389 investigations, and 48% were still in progress.

*Figure 20:  Percentage of Force Investigations In Progress as of July 5, 2023, by Facility, Q1-2022 through Q1-2023*



These delays are not acceptable.  The failure to timely investigate and review force incidents compromises the ability of command personnel to hold staff accountable, provide timely retraining, and quickly respond to trends and patterns in force that should be corrected.

Figure 21 provides a similar comparison, but for the category of force used during the incidents occurring in the First Quarter of 2022 through the Third Quarter of 2023.  Of the 606 Category 1 Force incidents under investigation during this time period, 66% were still in progress as of July 5, 2023.  A smaller percentage of the 113 investigations into Category 2 Force incidents were still in progress (49%).  During this time period, there was only one investigation into Category 3 Force incidents, and it was completed.

*Figure 21:  Percentage of Force Investigations In Progress as of*
*July 5, 2023, by Category, Q1-2022 through Q3-2023*



Figure 21 presents the overall percentage of investigations into incidents
occurring in the First Quarter of 2022 through the Third Quarter of 2023 that were still in
progress by whether the incident occurred in a mental health housing unit.  Of the 221
force incidents in mental health housing units under investigation during this time period,
84% were still in progress as of January 4, 2024.  There were 498 force incidents that
occurred in other housing units under investigation during this time period, and 54% of
these were still in progress.

*Figure 22:  Percentage of Force Investigations In Progress as of*
*July 5, 2023, by Mental Health Housing, Q1-2022 through Q3-2023*



The Department reports that it issued a corrective action plan to NCCF related to
overdue investigations into force packages.  The Monitor reiterates that the timeliness of
the force investigation process is a pressing issue that requires the County's urgent

attention.  The County notes that it has recently implemented a Custody Force Investigation Team that has "significantly improved the timeliness of many use of force investigations" to date

> In August 2023, an initial four Sergeants were selected for the creation of CFIT. The second set of four Sergeants came on board in January 2024. The full complement of 12 CFIT sergeants will be in place in July 2024. Currently, CFIT is comprised of eight sergeants who have been designated to complete custody use of force investigations that meet the following criteria:
> - Any head strikes
> - Any use of personal weapons
> - Taser applications
> - Major and minor inmate disturbances
> - Inmates struck by special weapons (i.e. Pepperball, FN-303, Arwen)
> - Significant injury to an inmate as a result of the force used
> - Any use of OC Spray on restrained inmates
> - Significant injury to staff (regardless of category)
> - Force on a pregnant inmate (regardless of category)
>
> The centerpiece of CFIT is its ability to investigate all custody Category 2 use of force incidents impartially while identifying policies, training, and enforcement issues to improve the overall safety of the LACJ. CFIT is currently developing a comprehensive system that will allow the team to collect data that can offer insight into the initiating events and/or triggering factors that ultimately evolve into use of force incidents. Knowing which types of incidents are likely to result in force provides an opportunity for LASD to better train and prepare for prevention, de-escalation, and coordinated responses.
>
> Additionally, the goal of CFIT is to effectively monitor, train, enforce, and track all custody use of force incidents that meet CFIT criteria. Monitoring will provide a more thorough view into the particulars of use of force incidents, which will, in turn, improve LASD training and identify policy deficiencies. Training will decisively prepare LASD members for dangerous custody situations while providing them with a better understanding of LASD's use of force policy. Enforcement will assist in identifying inappropriate force techniques so that individual accountability is correctly understood and implemented in a fundamental manner. Tracking will increase our ability to show LASD's improvements in how custody use of force incidents are monitored and taught.

Regarding force investigations, on January 16, 2024, the Monitor provided the County with a use of force matrix reflecting the ratings for 25 force packages reviewed by the Monitor and Use of Force Subject Matter Expert in the Seventeenth Reporting

Period.  On February 8, 2024, the Monitor met with Department executives to discuss the ratings assigned, watch video of force incidents, review deputy reports and command memos, and discuss the Monitoring Team's concerns about particular use of force packages—and the force review process—with Department executives, and to listen to their feedback, and respond to their questions.  The cases reviewed during the meeting reflect that the Department has considerable work to do in ensuring that reported staff injuries were photographed (Rosas 16.2), unexplained tactical decisions or discrepancies among witnesses were referred for additional investigation (Rosas 5.3), inmate witnesses were asked in private if they were willing to be interviewed (Rosas 12.2), involved staff wrote separate and independent reports (Rosas 15.1 and 15.2), staff reported the force used by others (Rosas 15.3), staff reports included descriptions of all visible injuries (Rosas 15.4), and staff were separated until all reports were completed (Rosas 15.6).  The Monitor incorporates other feedback provided about force reviews in prior Monitoring Reports here by reference.

Regarding the Department's quantitative results on the specific provisions, for the Second Quarter of 2023, the County reported Substantial Compliance with the following provisions: 8.3 (timely review of retaliation grievances); 11.1 (timely review of force packages by CFRT for potential employee discipline); 13.1 (zero tolerance and related investigations); 13.2 (notifications to OIG required by findings in 13.1); 14.1 (timely unit commander review re: prosecution for inmate assaults on staff); and 14.2 (timely referral of criminal inmate conduct to DA's Office).

For the Third Quarter of 2023, the County's Augmented Seventeenth Self-Assessment reports Substantial Compliance with the following provisions: 5.1(a) (timely database entry of force incidents); 8.3 (timely review of retaliation grievances); 11.1 (timely review of force packages by CFRT for potential employee discipline); 13.1 (zero tolerance and related investigations); 13.2 (notifications to OIG required by findings in 13.1); 14.1 (timely unit commander review re: prosecution for inmate assaults on staff); and 14.2 (timely referral of criminal inmate conduct to DA's Office).

**Grievances (Partial Compliance)**

The County's Augmented Seventeenth Self-Assessment reports that in the Second Quarter of 2023, the Department achieved Substantial Compliance with the following grievance provisions at the DOJ facilities: 6.4 (proper handling of force-related grievances); 6.7 (appropriate handling of grievances marked "emergency"); 6.8 (inmate notification of downgraded grievances); 6.9 (proper handling of emergency grievances); 6.10 (timely collection of inmate grievances); 6.10 (timely collection of inmate grievances); 6.11 (review of complaints re: inmate grievance process); 6.12 (proper database entry of inmate grievances); 6.13 (proper tracking of handling of inmate grievances); 6.14 (monthly reports of grievance tracking); 6.15 (evaluation of trends in inmate grievance handling); 6.17 (time limit for filing force-related grievances); 6.18 (proper handling of PREA grievances); 6.19 (timely responses to inmate grievances); 6.20 (proper handling of inmate appeals); 7.1 (conflict resolution for inmate grievances); 7.2 (timely notification of grievance investigation results); 7.3 (town hall meetings); and

8.1 (reporting of retaliation grievances).  The County reported that the Department achieved partial compliance with 6.5 (proper handling of harassment and retaliation grievances).

The County's Augmented Seventeenth Self-Assessment reports that in the Third Quarter of 2023, the Department achieved Substantial Compliance with the following grievance provisions at the DOJ facilities: 6.4 (proper handling of force-related grievances); 6.7 (appropriate handling of grievances marked "emergency"); 6.8 (inmate notification of downgraded grievances); 6.9 (proper handling of emergency grievances); 6.10 (timely collection of inmate grievances) 6.11 (review of complaints re: inmate grievance process); 6.12 (proper database entry of inmate grievances); 6.13 (proper tracking of handling of inmate grievances); 6.14 (monthly reports of grievance tracking); 6.15 (evaluation of trends in inmate grievance handling); 6.17 (time limit for filing force-related grievances); 6.18 (proper handling of PREA grievances); 6.19 (timely responses to inmate grievances); 6.20 (proper handling of inmate appeals); 7.1 (conflict resolution for inmate grievances); 7.2 (timely notification of grievance investigation results); 7.3 (town hall meetings); and 8.1 (reporting of retaliation grievances).  The County reported that the Department achieved partial compliance with 6.5 (proper handling of harassment and retaliation grievances).

### Management and Administration (Substantial Compliance as of October 1, 2020 through September 30, 2021)

The Department achieved Substantial Compliance with the Management and Administration Provisions at the DOJ facilities as of September 30, 2021, and these provisions were not subject to Monitoring during the Seventeenth Reporting Period.

### Security Restraints (Partial Compliance)

Security Restraints are subject to the provisions in Section 17 of the *Rosas* Plan. It is the Monitor's understanding that the County and the Department do not use "multi-point restraints," which are subject to Paragraphs 17.6 through 17.9 of the *Rosas* Plan, at any of the County's jail facilities.  The Monitor's auditors are reviewing the Safety Chair Logs and Fixed Restraint Logs for both quarters, which reflect the County's compliance with Paragraphs 17.3 and 17.4 of the *Rosas* Plan.

The Department posted logs of all involuntary medications administered in the Second and Third Quarters of 2023.  The records reflect that all of the medications were administered per court orders to restore the competency of those deemed incompetent to stand trial and none were solely for security purposes in compliance with Paragraph 17.10 of the *Rosas* Plan.

The Monitor and Subject Matter Expert reviewed multiple incidents involving the use of the WRAP restraint during the Seventeenth Reporting Period.  In the majority of these incidents, no specific justification was provided in use of force documentation regarding the reason for the application of the WRAP.  When a justification was

provided, it was often extremely general. Supervisors must be trained to describe with particularity what specific threat required the use of the WRAP.

According to data provided by the Department, in 2022, the total number of applications of the WRAP restraint trended downwards at the DOJ facilities in 2022.

**Early Warning System**          **(Substantial Compliance as of September 30, 2019 through September 30, 2020)**

The Department implemented an Employee Review System that was approved by the *Rosas* Monitors as a pilot program at the Downtown Jail Facilities on July 27, 2018, and expanded it to the DOJ facilities on October 25, 2018. The Department achieved Substantial Compliance with the Early Warning Provisions at the DOJ facilities as of September 30, 2020, and these provisions were not subject to Monitoring during the Seventeenth Reporting Period.

82.    With respect to paragraph 6.16 of the *Rosas* Implementation Plan, the County and the Sheriff will ensure that Sheriff's Department personnel responsible for collecting prisoners' grievances as set forth in that paragraph are also co-located in the Century Regional Detention Facility.

**STATUS:        SUBSTANTIAL COMPLIANCE (as of July 15, 2016, through December 31, 2017)**

Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring for Substantial Compliance with Paragraph 82 in the Seventeenth Reporting Period.

83.    The County and the Sheriff will install closed circuit security cameras throughout all Jails facilities' common areas where prisoners engage in programming, treatment, recreation, visitation, and intra-facility movement ("Common Areas"), including in the Common Areas at the Pitchess Detention Center and the Century Regional Detention Facility.  The County and the Sheriff will install a sufficient number of cameras in Jails facilities that do not currently have cameras to ensure that all Common Areas of these facilities have security-camera coverage.  The installation of these cameras will be completed no later than June 30, 2018, with TTCF, MCJ, and IRC completed by the Effective Date; CRDF completed by March 1, 2016; and the remaining facilities completed by June 30, 2018.  The County and the Sheriff will also ensure that all video recordings of force incidents are adequately stored and retained for a period of at least one year after the force incident occurs or until all investigations and proceedings related to the use of force are concluded.

**STATUS:**    **SUBSTANTIAL COMPLIANCE (as of July 1, 2015, through June 30, 2016 at MCJ and IRC)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2015, through September 30, 2016 at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 at NCCF and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2018, through June 30, 2019 at PDC South)**

Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring for Substantial Compliance with Paragraph 83 in the Seventeenth Reporting Period.

84.     The Sheriff will continue to maintain and implement policies for the
timely and thorough investigation of alleged staff misconduct related to use of force and
for timely disciplinary action arising from such investigations.  Specifically:

    (a)     Sworn custody staff subject to the provisions of California Government
Code section 3304 will be notified of the completion of the investigation
and the proposed discipline arising from force incidents in accordance
with the requirements of that Code section; and

    (b)     All non-sworn Sheriff's Department staff will be notified of the proposed
discipline arising from force incidents in time to allow for the imposition
of that discipline.

**STATUS:        SUBSTANTIAL COMPLIANCE (as of July 1, 2017, through
June 30, 2018 (verified))**

Substantial Compliance under the Compliance Measures requires the Department
to demonstrate that 95% of the investigations of force incidents in which sworn custody
staff and non-sworn custody staff were found to have violated Department policy or
engaged in misconduct were completed and administrative action, which could include
discipline, was taken within the time frames provided for in Government Code Section
3304 and relevant Department policies.

Pursuant to Paragraph 111 of the Settlement Agreement, the County was not
subject to monitoring for Substantial Compliance with Paragraph 84 in the Seventeenth
Reporting Period.

85.    The County and the Sheriff will ensure that Internal Affairs Bureau management and staff receive adequate specialized training in conducting investigations of misconduct.

**STATUS:        SUBSTANTIAL COMPLIANCE (as of April 1, 2021, through March 31, 2022 (verified))**

The Parties agreed on Revised Compliance Measures in 2021.  Substantial Compliance requires the Department to provide the Monitor with (1) the curriculum/syllabus for the two specialized courses, Internal Affair Investigations and Interview and Interrogation, given to IAB management, and (2) a list of the sworn personnel assigned to IAB and proof that such personnel successfully completed the training.  Substantial Compliance requires the Department to demonstrate that 90% of the personnel assigned to IAB have successfully completed one course of the required training within 3 months of their start date, and the second course within 6 months of their start date.

Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring for Substantial Compliance with Paragraph 85 in the Seventeenth Reporting Period.

86.      Within three months of the Effective Date, the County and the Sheriff will develop and implement policies and procedures for the effective and accurate maintenance, inventory, and assignment of chemical agents and other security equipment. The County and the Sheriff will develop and maintain an adequate inventory control system for all weapons, including OC spray.

**STATUS:**      **SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 at MCJ and CRDF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2016, through December 31, 2017 at PDC North)**

**SUBSTANTIAL COMPLIANCE (as of February 1, 2017, through March 31, 2018 at PDC South and PDC East)**

**SUBSTANTIAL COMPLIANCE (as of March 1, 2017, through March 31, 2018 at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 at IRC)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 at TTCF)**

CDM 7-08/080 ACCOUNTABILITY OF SPECIAL WEAPONS, effective October 14, 2016, requires each facility to have unit orders that "establish procedures for the storage, issuance, reissuance, accountability, maintenance, and periodic inventory of all weapons. . . stored at, or issued from, the facility," which includes detailed requirements for the "Inventory, Control, and Accountability of Aerosol Chemical Agents."

In addition to providing written policies and procedures, Substantial Compliance requires the Department to provide up-to-date Unit Orders for each jail requiring the inventory and inspection of special weapons, and armory audit logs documenting the inventory and control of armory-level weapons.  The Department previously maintained Substantial Compliance with Paragraph 86 for twelve consecutive months at all of the facilities, and it was not subject to monitoring with this provision in the Seventeenth Reporting Period.

## APPENDIX A

| NO. | PROVISION | STATUS | SUBSTANTIAL COMPLIANCE DATES |
|-----|-----------|--------|------------------------------|
| 18 | Suicide Prevention Training | Substantial Compliance | **(10/1/17 at MCJ & PDC South)[1] (9/1/17 at NCCF) (12/1/17 at PDC East) (4/1/18 at TTCF, IRC, & PDC North) (8/1/18 at CRDF)** |
| 19 | Crisis Intervention & Conflict Resolution Training | Substantial Compliance | **(4/1/18 at MCJ, NCCF, & IRC) (7/1/18 at TTCF) (12/1/18 at CRDF, PDC East, & PDC North) (3/1/19 at PDC South)** |
| 20 | Training at NCCF, PDC and CRDF | Substantial Compliance | **(8/1/17 at PDC East, PDC North, NCCF, & CRDF) (10/1/17 at PDC South)** |
| 21 | CPR Certification | Substantial Compliance | **(10/1/15 – 9/30/16 at PDC East & PDC South) (1/1/16 – 12/31/16 at NCCF, PDC North, & IRC) (4/1/16 – 3/31/17 at TTCF) (10/1/17 – 9/30/18 at MCJ) (7/1/18 – 6/30/19 at CRDF)** |

---

[1] Substantial Compliance Dates in **bold** reflect that the Department has achieved Substantial Compliance with the training requirements or maintained Substantial Compliance for twelve consecutive months with the other requirements; the results were verified by the Monitor's auditors when required; and the County or designated facilities are no longer subject to monitoring of this provision pursuant to Paragraph 111 of the Settlement Agreement.

## APPENDIX A

| 22 | Use of Arresting and Booking Documents | Substantial Compliance | **(7/1/16 – 6/30/17)** |
|----|----|----|----|
| 23 | Suicide Hazard Mitigation Plans | Substantial Compliance | **(7/12/18)** |
| 24 | Suicide Hazard Inspection | Substantial Compliance | **(10/1/17 – 9/30/18)** |
| 25 | Transportation of Suicidal Inmates (station jails) | Substantial Compliance (Central Patrol Division) Partial Compliance (East, North, & South Patrol Divisions) | (7/1/23 – 9/30/23 at Central) |
| 26 | Identification and Evaluation of Suicidal Inmates | Substantial Compliance | (4/1/23 – 9/30/23) |
| 27 | Screening for Mental Health Care and Suicide Risk | Substantial Compliance | **(10/1/19 – 3/31/20, 10/1/20 – 3/31/21)** |
| 28 | Expedited Booking of Suicidal Inmates | Substantial Compliance (IRC) Partial Compliance (CRDF) | **(4/1/17 – 3/31/18 at IRC)** |
| 29 | Mental Health Assessments (of non-emergent mental health needs) | Substantial Compliance | **(4/1/17 – 3/31/18)** |
| 30 | Initial Mental Health Assessments & Treatment Plans | Substantial Compliance | **(1/1/19 – 12/31/19)** |
| 31 | Electronic Medical Records Alerts | Substantial Compliance (CRDF) Partial Compliance (TTCF) | (1/1/23 – 9/30/23 at CRDF) |
| 32 | Electronic Medical Records – Suicide Attempts | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 33 | Supervisor Reviews of Electronic Medical Records | Substantial Compliance | **(7/1/16 – 6/30/17)** |
| 34 | Discharge Planning | Partial Compliance | |
| 35 | Referral for Mental Health Care | Substantial Compliance | **(11/1/17 – 12/31/18)** |
| 36 | Assessments After Triggering Events | Partial Compliance (TTCF & CRDF) | |

## APPENDIX A

| 37 | Court Services Division Referrals | Partial Compliance | |
|----|----|----|----|
| 38 | Weekly Rounds in Restricted Housing Modules | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 39 | Confidential Self-Referral | Substantial Compliance (NCCF) Partial Compliance (PDC South, TTCF, PDC North, MCJ, & CRDF) Not Rated (PDC East) | **(7/1/17 – 6/30/18 at NCCF)** |
| 40 | Availability of QMHPs | Partial Compliance | |
| 41 | FIP Step-Down Protocols | Substantial Compliance | (7/1/22 – 6/30/23) |
| 42 | HOH Step-Down Protocols | Non-Compliance | |
| 43 | Disciplinary Policies | Substantial Compliance (NCCF & PDC North) Partial Compliance (TTCF & MCJ) Non-Compliance (CRDF) | **(10/1/17 – 9/30/18 at NCCF & PDC North)** |
| 44 | Protective Barriers | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 45 | Suicide Intervention and First Aid Kits | Substantial Compliance | **(10/1/15 – 9/30/16 at CRDF, NCCF, TTCF, PDC East, & PDC South) (1/1/16 – 12/31/16 at MCJ & PDC North)** |
| 46 | Interruption of Self-Injurious Behavior | Substantial Compliance | **(7/1/20 – 6/30/21)** |
| 47 | Staffing Requirements | Partial Compliance | |
| 48 | Housekeeping and Sanitation | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 49 | Maintenance Plans | Substantial Compliance | **(3/1/16 – 2/28/17)** |

## APPENDIX A

| 50 | Pest Control | Substantial Compliance | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC North, TTCF, & CRDF)** **(4/1/16 – 3/31/17 at PDC South & PDC East)** |
|---|---|---|---|
| 51 | Personal Care & Supplies | Substantial Compliance | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC East, PDC North, PDC South, & TTCF)** **(7/1/16 – 6/30/17 at CRDF)** |
| 52 | HOH Property Restrictions | Partial Compliance (CRDF & TTCF) | |
| 53 | Eligibility for Education, Work and Programs | Partial Compliance | |
| 54 | Privileges and Programs | Substantial Compliance[2] | (1/1/23 – 6/30/23) |
| 55 | Staff Meetings | Substantial Compliance | **(10/1/16 – 9/30/17 at CRDF)** **(4/1/17 – 3/31/18 at PDC North)** **(4/1/18 – 3/31/19 at MCJ)** **(7/1/19 – 6/30/20 at TTCF)** |
| 56 | Changes in Housing Assignments | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 57 | Inmate Safety Checks in Mental Housing | Substantial Compliance (MCJ & PDC North) Non-Compliance (TTCF & CRDF) | **(4/1/17 – 3/31/18 at MCJ)** **(7/1/21 – 6/30/22 at PDC North)** |

---

[2] The County earned a Partial Compliance rating in the Third Quarter of 2023. However, the County is required to achieve two additional quarters of Substantial Compliance and its reported results for the First Quarter of 2023 and Second Quarter of 2023 reflect Substantial Compliance. If the Monitor's auditors are able to verify the County's results, the County will have fulfilled its obligations under Provision 54.

## APPENDIX A

| 58 | Inmate Safety Checks in Non-Mental Housing | Substantial Compliance (PDC South, PDC North, PDC East, CRDF & IRC) Partial Compliance (NCCF & MCJ) Non-Compliance (TTCF) | **(1/1/16 – 12/31/16 at PDC South, PDC North, & PDC East) (7/1/17 – 6/30/18 at CRDF) (10/1/17 – 9/30/18 at IRC)** |
|---|---|---|---|
| 59 | Supervisor Rounds | Substantial Compliance | **(1/1/17 – 12/31/17 at PDC East & MCJ) (4/1/17 – 3/31/18 at NCCF) (10/1/17 – 9/30/18 at CRDF) (1/1/18 – 12/31/18 at PDC North & PDC South) (4/1/18 – 3/31/19 at TTCF)** |
| 60 | Implementation of Quality Improvement Program | Substantial Compliance | **(4/1/19 – 3/31/20)** |
| 61 | Requirements of Quality Improvement Program | Partial Compliance | |
| 62 | Tracking of Corrective Action Plans | Partial Compliance | |
| 63 | Sufficient HOH and MOH Housing | Partial Compliance (CRDF & TTCF) | |
| 64 | Plans for Availability of Inpatient Health Care | Partial Compliance | |
| 65 | Administration of Psychotropic Medication | Partial Compliance | |
| 66 | Active Mental Health Caseloads | Partial Compliance | |
| 67 | Prisoner Refusals of Medication | Partial Compliance | |

## APPENDIX A

| | | | |
|---|---|---|---|
| 68 | Contraband Searches | Substantial Compliance (MCJ, NCCF, PDC East, PDC South, PDC North, TTCF, & CRDF) | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC East, PDC South, & PDC North) (1/1/17 – 12/31/17 at TTCF) (1/1/22 – 12/31/22 at CRDF)** |
| 69 | Clinical Restraints in CTC | Substantial Compliance | **(7/1/18 – 6/30/19)** |
| 70 | Security Restraints in HOH and MOH | Partial Compliance | |
| 71 | Therapeutic Services for Inmates in Clinical Restraints | Substantial Compliance | **(7/1/16 – 6/30/17)** |
| 72 | Administrative Reviews | Substantial Compliance | **(1/1/17 – 12/31/17)** |
| 73 | Reporting of Self-Injurious Behavior and Threats | Substantial Compliance | **(10/1/17 – 9/30/18)** |
| 74 | Law Enforcement Investigations of Suicides | Substantial Compliance | **(9/1/16 – 12/31/17)** |
| 75 | Management Reviews of Suicide Attempts | Substantial Compliance | **(10/1/17 – 9/30/18)** |
| 76 | Management Reviews of Suicides | Substantial Compliance | **(9/1/16 – 12/31/17)** |
| 77 | Custody Compliance and Sustainability Bureau | Substantial Compliance | **(4/1/22 – 3/31/23)** |
| 78 | Suicide Prevention Advisory Committee | Substantial Compliance | **(5/11/16 – 5/18/17)** |
| 79 | Therapeutic Services in Mental Health Housing | Non-Compliance | |
| 80 | Out-of-Cell Time in HOH | Non-Compliance | |

## APPENDIX A

| 81 | Implementation of *Rosas* Recommendations | Partial Compliance | |
|---|---|---|---|
| | Training | Partial Compliance | |
| | Use of Force | Partial Compliance | |
| | Reporting and Investigation of Force | Partial Compliance | |
| | Grievances | Partial Compliance | |
| | Management and Administration | Substantial Compliance | **(10/1/20 – 9/30/21)** |
| | Security Restraints | Partial Compliance | |
| | Early Warning System | Substantial Compliance | **(9/30/19 – 9/30/20)** |
| 82 | Grievances at CRDF | Substantial Compliance | **(7/15/16 – 12/31/17)** |
| 83 | Closed Circuit Cameras | Substantial Compliance | **(7/1/15 – 6/30/16 at MCJ & IRC)** **(10/1/15 – 9/30/16 at TTCF)** **(4/1/16 – 3/31/17 at CRDF)** **(4/1/18 – 3/31/19 at NCCF & PDC North)** **(7/1/18 –6/30/19 at PDC South)** |
| 84 | Investigation of Staff Misconduct | Substantial Compliance | **(7/1/17 – 6/30/18)** |
| 85 | Internal Affairs Bureau Training | Substantial Compliance | **(4/1/21 – 3/31/22)** |

**APPENDIX A**

| 86 | Maintenance and Inventory of Security Equipment | Substantial Compliance | **(4/1/16 – 3/31/17 at MCJ & CRDF)** **(10/1/16 – 12/31/17 at PDC North)** **(2/1/17 – 3/31/18 at PDC South & PDC East)** **(3/1/17 – 3/31/18 at NCCF)** **(4/1/17 – 3/31/18 at IRC)** **(4/1/18 – 3/31/19 at TTCF)** |

## APPENDIX B

| | Substantial Compliance (Provisions) | Partial Compliance[1] | Non-Compliance | Suspended (Some Or All Facilities) | Substantial Compliance (Facilities)[2] | No Longer Subject To Monitoring[3] |
|---|---|---|---|---|---|---|
| First[4] | 5 | 16 | | | 10 | |
| Second | 14 | 30 | 13 | | 24 | |
| Third | 22 | 27(1) | 10 | | 29 | 4(2) |
| Fourth | 24 | 26(1) | 10 | | 29 | 10(2) |
| Fifth | 23 | 24(2) | 7 | | 34 | 15(5) |
| Sixth | 32 | 22 | 7 | | 38 | 18(9) |
| Seventh | 30 | 23 | 7 | | 39 | 21(10) |
| Eighth | 35 | 20 | 6 | | 42 | 27(9) |
| Ninth | 36 | 22 | 4 | | 43 | 31(8) |
| Tenth | 39 | 21 | 3 | | 45 | 32(8) |
| Eleventh | 38 | 18 | 5 | 2 | 44 | 34(7) |
| Twelfth | 38 | 18 | 6 | 1 | 44 | 36(6) |
| Thirteenth | 42 | 14(1) | 6 | 1 | 47 | 36(6) |
| Fourteenth | 40 | 17 | 7 | 0 | 45 | 38(6) |
| Fifteenth | 42 | 13(1) | 9 | 0 | 46 | 38(6) |
| Sixteenth | 43 | 12(2) | 4 | 0 | 49 | 39(5) |
| Seventeenth | 43 | 16 | 3 | 0 | 50 | 40(5) |

[1] The figure in parenthesis under Partial Compliance is the number of additional provisions where some facilities were in Partial Compliance and other facilities were in Non-Compliance.

[2] This represents the number of provisions where the Department is in Substantial Compliance at all or some of the facilities.

[3] The figure in parenthesis under No Longer Subject to Monitoring is the number of additional provisions where some facilities are no longer subject to monitoring.

[4] During the First Reporting Period, 43 provisions were not subject to monitoring.