1  Nicholas E. Mitchell
2  nmitchell@independentmonitor.com

3  **Monitor**

4

5              **UNITED STATES DISTRICT COURT**

6             **CENTRAL DISTRICT OF CALIFORNIA**

7                  **WESTERN DIVISION**

8

9                                              CV No. 15-05903 DDP (JEMX)

   UNITED STATES OF AMERICA,
10
                  v.                           **MONITOR'S EIGHTEENTH**
11                                             **REPORT**
   COUNTY OF LOS ANGELES et al.,
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1    Pursuant to Paragraph 109 of the Joint Settlement Agreement Regarding Los
2    Angeles County Jails, the Monitor appointed by this Court hereby submits the
3    attached Report "describing the steps taken" by the County of Los Angeles and the
4    Los Angeles County Sheriff Department ("Department") during the six-month
5    period from January 1, 2024, through June 30, 2024, "to implement the Agreement
6    and evaluating the extent to which they have complied with this Agreement."  This
7    Report takes into consideration the advice and assistance I have received from the
8    Subject Matter Experts appointed by this Court and the comments from the Parties
9    in accordance with Paragraph 110 of the Agreement.  I am available to answer any
10   questions the Court may have regarding my Report at such times as are convenient
11   for the Court and the parties.

12

13   DATED:  October 16, 2024          Respectfully submitted,

14

15

16                                     By:  /s/ Nicholas E. Mitchell
17                                          Nicholas E. Mitchell
18                                          Monitor

19

20

21

22

23

24

25

26

27

28

# MONITOR'S EIGHTEENTH REPORT

This Eighteenth Report sets forth the Monitor's assessments of the implementation of the Settlement Agreement (the "Agreement" or "DOJ Agreement") between the County of Los Angeles (the "County") and the United States Department of Justice ("DOJ") for the treatment of inmates with mental illness in the County's jail facilities by the Los Angeles Sheriff's Department (the "Department" or "LASD") and the County's Correctional Health Services ("CHS"). It also reports on the Department's compliance with the provisions of the Implementation Plan in the settlement of *Alex Rosas, et al., v. Leroy Baca,* No. CV 12-00428 DDP, that were extended under the terms of the DOJ Agreement to the facilities not covered by the *Rosas* case.[1] This Report includes results reported by the County from January 1, 2024, through June 30, 2024 for the Fourth Quarter of 2023 and First Quarter of 2024 (the "Eighteenth Reporting Period").

This Eighteenth Report is based upon the Monitor's review of the policies, procedures, and directives proposed and/or implemented by the Department and CHS in the Eighteenth Reporting Period, and assessments and observations of the Mental Health and Use of Force Subject Matter Experts, and mental health clinicians and auditors retained by the Monitor. It takes into consideration the County's Self-Assessment Status Report ("Eighteenth Self-Assessment"); Correctional Health Services and Custody Compliance and Sustainability Bureau ("CCSB") Combined Semi-Annual Report on Quality Improvement and Suicide Prevention Efforts – Quarter 4 2023 & Quarter 1 2024; and the County's Augmented Self-Assessment Status Report ("Augmented Eighteenth Self-Assessment").

In February 2024, and again in August 2024, the Monitor conducted site visits within the jails with members of the Monitoring Team. During the visits, the Monitoring Team spoke with inmates, custody staff and supervisors, and mental health staff and supervisors, and inspected mental health housing at all patient acuity levels. The County and the Department cooperated fully with the Monitoring Team during these visits and throughout the Reporting Period. The Monitor thanks County personnel for their responsiveness, professionalism, and collegiality.

There are 69 provisions in the Agreement that are subject to monitoring by the Monitor and Subject Matter Experts. As of the date of this Report, the County and the Department are in Substantial Compliance with 45 provisions, in Partial Compliance with 15 provisions, and in Non-Compliance with three provisions. In addition, there are six provisions where the County is in different compliance ratings at different facilities. This is similar to, but reflects a small improvement from, the County's averaged results for the previous five Reporting Periods.

---

[1] The *Rosas* case involved allegations of excessive force in Men's Central Jail (MCJ), the Twin Towers Correctional Facility (TTCF), and the Inmate Reception Center (IRC) (collectively the "Downtown Jail Complex"). The DOJ Agreement extends provisions of the Implementation Plan to the Century Regional Detention Facility (CRDF), the North County Correctional Facility (NCCF), and the Pitchess Detention Center (PDC).

*Figure 1:  The County's Cumulative Substantial Compliance with All Provisions by Reporting Period*



In the Twelfth Monitoring Report, the Monitor expressed concern about the pace at which the County was bringing the Agreement into Substantial Compliance.  The Court thereafter held a series of status conferences and issued several orders establishing clear deadlines for the County.  As set forth in previous Monitoring Reports, the County subsequently dedicated substantial additional resources to its compliance efforts.  In the Eighteenth Reporting Period, those efforts are now beginning to materialize in the County's compliance results, and in the jails themselves:

- The preliminary successes of the County's creation of unrestrained, dorm-style housing for HOH patients are now self-evident.  Today, more than 50% of HOH patients detained in the LACJ are housed in FIP Stepdown Pods or HOH Dorms, in which they are allowed out of their cells unrestrained for recreation and socialization during the day.  The results have been almost entirely positive.  These pods are cleaner, brighter, and more therapeutic, and inmates avoid the persistent, crushing isolation of traditional HOH housing that is so deleterious to patient mental health.  Moreover, LASD personnel have reported that the increase in the number of these unrestrained pods has not resulted in a materially greater number of fights or assaults on staff.  This change in approach to housing for some patients with serious mental illness may be among the most significant,

2

lasting impacts of this litigation.

- The County made little observable progress for years on Provision 63, which requires patients to be given permanent mental health housing assignments within seven days.  But in recent months, through a combination of technological and operational changes, the County has drastically improved compliance at both CRDF and TTCF, with CRDF near 100% reported compliance in the Eighteenth Reporting Period, and TTCF reporting significant improvements in compliance in the months thereafter.  This reduction in patient waiting times to begin mental health treatment is likely to reduce the frequency with which patients decompensate while in custody.

- The County's retention of contractors to provide group programming to patients in mental health housing is now observable in the jails.  During recent site visits, more group programming was in evidence than the Monitoring Team had ever seen before.  Moreover, our interviews with patients reflect that the group programming is helping them adjust to the jail environment, feel a sense of connection and purpose, and work on life goals and mental health symptom reduction.  While the County is not yet close to achieving the quantitative targets for group programming required by the Court's orders, its progress is encouraging.

- The County has improved its hiring and retention of jail mental health staff such that a greater number of positions are now filled than in prior Reporting Periods.  These mental health staff are essential to providing clinically adequate patient care and will be instrumental in the County's efforts to further comply with the Agreement.[2]

- Compliance for a number of provisions has now improved, in some cases dramatically, after showing limited progress for years.  This includes Provision 25 (safety measures for suicidal prisoners at station jails), 57 and 58 (timely safety checks in mental health and general population housing), 63 (timely housing of HOH patients in treatment beds), and 70 (use of security restraints in HOH and MOH).  The County's focused efforts are now having a significant positive impact on its compliance results on a number of challenging provisions.

---

[2] As set forth below, by including Registry workers, overtime, and contracted group providers in its calculated rate of filled mental health worker positions, the County calculates an "effective vacancy" rate of just 22 such positions.  As explained in the discussion of Provision 47, the Monitor believes that while it is appropriate to include Registry workers, it is not appropriate to include staff overtime or contracted group providers, and therefore calculates a real effective vacancy rate of 26% (or 269 of 365 positions filled).  *See infra* pp. 66-67.  Regardless of which calculation method is used, the County made significant headway at filling vacancies in its mental health ranks in the Eighteenth Reporting Period.

- The Sixteenth and Seventeenth Reports noted performance reductions at CRDF on a number of key provisions, including 28, 36, 39, 43, 52, 57, 63, 79, and 80. The County's reported compliance with certain of those provisions has improved substantially. The following table provides an update on the County's compliance with these provisions at CRDF.

| | Sixteenth | | Seventeenth | | Eighteenth | |
|---|---|---|---|---|---|---|
| | 4Q2022 | 1Q2023 | 2Q2023 | 3Q2023 | 4Q2023 | 1Q2024 |
| **Provision 28:** | | | | | | |
| 28-5(a) - Expedited Booking | 48% | 64% | 56% | 84% | 92% | 100% |
| 28-5(b) - Observation | 60% | 60% | 80% | 40% | 20% | 80% |
| **Provision 36:** | | | | | | |
| 36-4(b) - Observation | 100% | 40% | 66% | 60% | 80% | 40% |
| **Provision 39:** | | | | | | |
| 39-4(c) - Referral Response | UTA | 50% | 42% | 26% | 46% | 41% |
| **Provision 43:** | | | | | | |
| 43-9(b) - Consultations | 40% | 33% | 11% | 14% | 33% | No Records |
| 43-9(c) - QMHP Meetings | 100% | 16% | 40% | 14% | 20% | 0% |
| **Provision 52:** | | | | | | |
| 52-5(e) - Allowable Property | 92% | 90% | 83% | 88% | 84% | 85% |
| **Provision 57:** | | | | | | |
| 57-5(c) - HOH Safety Checks | 0% | 3% | 0% | 0% | UTA | 66% |
| 57-5(d) - MOH Safety Checks | 0% | 5% | 6% | 2% | UTA | 59% |
| **Provision 63:** | | | | | | |
| Perm. HOH/MOH Housing ≤ 7 days | 58% | 67% | 62% | 79% | 100% | 99% |
| **Provision 79:** | | | | | | |
| 79-1(d) - Supervisor Reviews | 100% | 100% | 0% | 0% | 100% | 0% |
| **Provision 80:** | | | | | | |
| Unstructured Out-of-Cell Time | 77% | 55% | 64% | 94% | 100% | 95% |
| Structured Out-of-Cell Time | 0% | 0% | 0% | 0% | 0% | 0% |

Notwithstanding these improvements and others discussed elsewhere in this Report, there are reasons for continuing concern:

- There continue to be 365 MOH patients detained in MCJ.[3] As discussed in prior Monitoring Reports, these patients are housed in deplorable conditions, in cramped, darkened, filthy dorms that are often filled with smoke, with minimal common space to congregate, sit together, or recreate. There are no private areas within which they can meet with clinicians regarding their mental health symptoms, nor common spaces for them to receive group mental health programming. Lines of sight from deputy workstations are poor, creating dangerous conditions for staff and inmates.

---

[3] This number has been reduced by the County. As recently as the Sixteenth Monitoring Report, filed in October 2023, the number of MOH patients detained in MCJ was reported by the County to be 925. *See* Sixteenth Monitoring Report at pp. 3-4.

While some of these patients appear to be mostly functional, others demonstrate symptoms of profound mental illness that cannot reasonably be treated in MCJ. This includes overt signs of psychosis such as disorganized and delusional thinking; depression and signs of serious mood disorders; anxiety; and deficits in hygiene and grooming likely related to serious mental illness. The County has yet to identify any solution to move these patients out of MCJ, where adequate mental health treatment is simply impossible.[4]

- Notwithstanding the County's positive self-reports of its compliance with the medication administration requirements of Provision 65, medication administration has continued to show deficiencies in the jails. Although these issues were repeatedly raised by the Monitoring Team in prior reports, they were not adequately addressed by the County. The Court's Orders require the County to be in Substantial Compliance with Provision 65 by March 31, 2024, which falls within the period covered by this Report. Yet, the County must now recalibrate its approach to Provision 65 by implementing new policies, Unit Orders, and training to address the continuing deficiencies with medication administration. As set forth below, the County has begun taking steps to do that.

- As of July 15, 2024, 652 patients remained assigned to traditional HOH Lockdown pods. Conditions are much worse, and far less therapeutic, in the HOH Lockdown Pods than in the Unrestrained Pods (FIP Stepdown and HOH Dorms). The cells are dark, often with some accumulation of trash, and there is nothing for these patients to do but sleep. While they, too, get time out of cell, they are generally kept cuffed to metal spider tables in common day rooms during their "out time." They are unable to engage in the activities that generally characterize out-of-cell time in jail environments, such as moving around the dayroom, exercising, using the telephone, showering, engaging in group activities, or interacting freely with other inmates. Their detention is characterized by pervasive isolation, which is damaging to their mental health.

Provision 70 requires that security restraints "will not be used as an alternative to mental health treatment and will be used only when necessary to insure safety." The County has been unable to provide evidence that these 652 patients has been evaluated, and a security determination made that they must remain in restraints

---

[4] The structural integrity of the jails plays no role in the Settlement Agreement. However, the Monitor would be remiss to not mention recent public reporting indicating that an engineering report found MCJ to suffer from "weak walls, inadequate reinforcements and concrete so brittle that it could crack or shatter," causing "catastrophic failure" in the event of an earthquake, as an independent—and urgent—reason to transfer these patients from MCJ without delay. *See* Keri Blakinger & Rong-Gong Lin II, *Men's Central Jail Faces 'Severe Structural Damage' in Event of Earthquake*, L.A. Times (Aug. 27, 2024), https://www.latimes.com/california/story/2024-08-27/mens-central-jail-faces-severe-structural-damage-in-earthquake-report-says.

during their out-of-cell time.  Until it can do so, the County will struggle to demonstrate compliance with Provision 70.

- A qualitative review by the Monitoring Team reflects that recent training provided by the County to mental health staff, along with increases to clinical staffing, are having positive effects on treatment planning for patients in the LACJ.  Indeed, while the overall percentage of cases found compliant by the Monitoring Team remains relatively low (41% of the cases reviewed reflected treatment being provided according to a treatment plan), it has substantially improved from prior reviews (often 0% compliance, or close to it).  Until the County develops a reliable supervisory, internal audit function to detect these continuing treatment planning deficits on its own, it may struggle to demonstrate that it is providing "therapeutically appropriate" mental health treatment, as required by Provision 79.

- Finally, the County has been unable to comply with Court-ordered deadlines for a number of Provisions, and other Provisions remain far from compliance with deadlines fast approaching.  The table below represents deadlines—past and upcoming—required by the Court's orders, by provision, and whether the County was in Substantial, Partial, or Non-Compliance in the First Quarter of 2024, which is covered by this Report.

*Figure 4: Past and Upcoming Court-Ordered Compliance Deadlines, by Provision*



In May 2024, the DOJ initiated the meet and confer process under Provision 117 of the Agreement related to Provisions 34, 36, 40, 63, and 80.  From May through October 2024, the DOJ, County, and the Intervenors (as to Provision 34) participated in meetings with the Monitor regarding these provisions, among others, and to discuss potential cure plans to address any non-compliance.  These discussions have been

collaborative and productive, and resulted in agreement on corrective actions to be taken by the County, some adjustments to the manner in which compliance is to be measured, and extensions of certain compliance deadlines.  Several issues remain outstanding, and the Parties will continue meeting with the Monitor until they are resolved.  It is the Monitor's understanding that the Parties intend to file a proposed order memorializing the agreements reached promptly once the meet and confer process concludes.

Nicholas E. Mitchell, Monitor
October 16, 2024

# EXECUTIVE SUMMARY

There are 69 provisions in the Settlement Agreement that are subject to monitoring by the Monitor and Subject Matter Experts.  As of the date of this Report, the County and the Department are in Substantial Compliance with 45 provisions, in Partial Compliance with 15 provisions, and in Non-Compliance with three provisions.  There are five provisions (Paragraphs 25, 28, 43, 57, and 63) for which the Department is in Substantial Compliance at certain facilities and Partial Compliance at other facilities.  There is one provision (Paragraph 39) for which the Department is in Substantial Compliance at certain facilities, Partial Compliance at other facilities, and Not Rated at other facilities.  There are 51 provisions for which the County and the Department are in Substantial Compliance at some or all facilities.[5]

The Monitor's determination of the County's compliance is based upon the quantitative thresholds in the Compliance Measures (and any other applicable requirements in the Compliance Measures) for achieving Substantial Compliance, unless the quality of the County's performance as determined by the qualitative assessment is plainly inadequate or the results reported by the Monitor's mental health team vary significantly from the results reported by the Department.[6]  As used herein, "Substantial Compliance" means that the County has "achieved compliance with the material components of the relevant provisions of this Agreement in accordance with the [agreed-upon Compliance Measures for assessing Substantial Compliance]," which it must maintain for twelve-consecutive months; "Partial Compliance" means that the County has achieved "compliance on some, but not all, of the material components of the relevant provision of this Agreement;" and "Non-Compliance" means that the County has not met "most or all of the material components of the relevant provisions of this Agreement."

Appendix A to this Eighteenth Report shows the status of each of the 69 provisions of the Agreement that are subject to monitoring and the twelve-month triggering dates where the County is deemed to be in Substantial Compliance.  Appendix B shows the County's progress from the Initial Reporting Period through the Eighteenth Reporting Period in achieving Substantial Compliance and in maintaining Substantial Compliance for twelve consecutive months on provisions that are no longer subject to

---

[5] Under Paragraph 111 of the Agreement, the twelve-month period for which the County is required to maintain Substantial Compliance can be determined on a facility-by-facility basis.

[6] As in prior reports, this Eighteenth Report also reflects the results of audits by the Monitor's auditors to verify results reported by the County.  The Monitor has deemed the County to be in Substantial Compliance "as of" the beginning of the quarter reported by the County if the auditors have verified that the County has met the thresholds in the Compliance Measures.  If the auditors were not able to verify the results reported by the County, the twelve-month period for maintaining Substantial Compliance will commence in a future period when the County's reported results are verified by the auditors.  If the County maintains Substantial Compliance with a provision for twelve consecutive months, pursuant to Paragraph 111 of the Agreement, the Monitor and Subject Matter Expert will "no longer. . .assess or report on that provision" in future reporting periods.  Some of the Substantial Compliance results reported by the County in the Eighteenth Reporting Period have not been audited by the Monitor's auditors and cannot be considered final until verified by the auditors.  The County will not be deemed to be in Substantial Compliance as of the County's reported date for purposes of determining the twelve-month compliance period if the results are not verified by the auditors.

monitoring.

There are 42 provisions that are no longer subject to monitoring because the County and Department maintained Substantial Compliance for twelve consecutive months as required by Paragraph 111 of the Settlement Agreement and verified by the Monitor's auditors as required.[7] There are another five provisions for which some facilities are no longer subject to monitoring because those facilities maintained Substantial Compliance for the required twelve consecutive months.[8]

As of the date of this Report, and subject to verification by the Monitor's auditors and qualitative assessments in some cases, the County and the Department are in Substantial Compliance at some or all of the facilities with the following provisions of the Settlement Agreement:

The County has achieved Substantial Compliance with Paragraph 18, which requires the (initial) training of Deputy Sheriffs and Custody Assistants on suicide prevention as follows: at Men's Central Jail ("MCJ") and Pitchess Detention Center ("PDC") South as of October 1, 2017; at North County Correctional Facility ("NCCF") as of September 1, 2017; at PDC East as of December 1, 2017; at Twin Towers Correctional Facility ("TTCF"), the Inmate Reception Center ("IRC"), and PDC North as of April 1, 2018; and at Century Regional Detention Facility ("CRDF") as of August 1, 2018. The County's posted results reflect that it maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) and 4.7(b) as of December 2023. These results are subject to verification by the Monitor's auditors.

The County has achieved Substantial Compliance at NCCF, MCJ, and IRC as of April 1, 2018; at TTCF as of July 1, 2018; at CRDF, PDC East, and PDC North as of December 1, 2018; and at PDC South as of March 1, 2019, with Paragraph 19, which requires the (initial) training of Deputy Sheriffs on Crisis Intervention and Conflict Resolution and the training of Deputy Sheriffs and Custody Assistants in working with mentally ill prisoners. The Department has achieved Substantial Compliance at CRDF, IRC, NCCF, MCJ, PDC East, PDC North, PDC South, and TTCF as of December 2019 with the refresher training requirements of Paragraph 19. The County's posted results reflect that it maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) and 4.7(b) as of December 2023. These results are subject to verification by the Monitor's auditors.

The County has achieved Substantial Compliance at PDC East, PDC North, NCCF, and CRDF as of August 1, 2017 and at PDC South as of October 1, 2017, with Paragraph 20, which requires the (initial) training of additional Deputy Sheriffs on Crisis Intervention and Conflict Resolution and on working with mentally ill prisoners. The

---

[7] This includes the initial training required by Paragraphs 18, 19, and 20, which have been completed and are no longer subject to monitoring. The refresher training requirements for each of these provisions are, however, still subject to monitoring under Provision 81 Rosas 4.6(b) and 4.7(b).

[8] The provisions that are no longer subject to monitoring at some or all of the facilities are highlighted in bold in Appendix A.

County's posted results reflect that it maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) and 4.7(b) as of December 2023. These results are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive months at PDC East, PDC South, PDC North, NCCF, IRC, TTCF, CRDF, and MCJ with Paragraph 21, which requires Custody personnel to maintain CPR certifications.

The County has maintained Substantial Compliance for twelve consecutive months with Paragraph 22, which requires the County and the Sheriff to provide instructional material on the use of arresting and booking documents to ensure the sharing of known relevant and available information on prisoners' mental health status and suicide risk.

The County has maintained Substantial Compliance for twelve consecutive months as of July 12, 2018, with Paragraph 23, which requires that the Department conduct a systematic review of prisoner housing to reduce the risk of self-harm and to identify and address suicide hazards, and to develop plans to reasonably mitigate suicide hazards identified in the review.

The County has maintained Substantial Compliance for twelve consecutive months as of September 30, 2018, with Paragraph 24, which requires the Department to conduct annual reviews and inspections of prisoner housing to identify suicide hazards.

The County has achieved Substantial Compliance at the North and South Patrol Divisions as of January 1, 2024, through March 31, 2024, with Paragraph 25, which requires that any arrestee in a station jail who verbalizes or exhibits suicidal intent will be under unobstructed visual observation, or in a suicide resistant location with safety checks every 15 minutes until they are transported to IRC, CRDF, or a medical facility as soon as practicable.

The County has achieved Substantial Compliance as of April 1, 2023, through December 31, 2023, with Paragraph 26, which requires the Department to identify inmates with emergent or urgent mental health needs based on intake screenings and to expedite such inmates for a mental health screening by a QMHP within four hours. The County has also provided documentation reflecting that it maintained Substantial Compliance as of January 1, 2024, through March 31, 2024. These results are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve months as of March 31, 2021, with Paragraph 27, which requires that all prisoners are individually and privately screened within 12 hours of their arrival at the jails.

The County has maintained Substantial Compliance for twelve consecutive months at IRC as of March 31, 2018, with Paragraph 28, which requires the Department to expedite inmates having urgent or emergent mental health needs through the booking

process.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2018, with Paragraph 29, which requires mental health assessments of prisoners with non-emergent mental health needs within 24 hours of the intake nursing assessment.

The County has maintained Substantial Compliance as of January 1, 2019, through December 31, 2019, with Paragraph 30, which requires the County to provide an initial mental health assessment that includes a brief initial treatment plan that addresses "housing recommendations and preliminary discharge information."

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 32, which requires that a serious suicide attempt be entered in the prisoner's electronic medical record in a timely manner.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2017, with Paragraph 33, which requires mental health supervisors to review electronic medical records on a quarterly basis to assess their accuracy.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2018, with Paragraph 35, which requires the Department to ensure that custody staff refer prisoners who are demonstrating a potential need for routine mental health care to a QMHP or a Jail Mental Evaluation Team.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 38, which requires mental health staff or JMET teams to make weekly cell-by-cell rounds in restricted non-mental health housing modules to identify prisoners with mental illnesses and grant prisoner's requests for out-of-cell interviews.

The County has maintained Substantial Compliance at NCCF for twelve consecutive months as of June 30, 2018, with Paragraph 39, which requires the County to use a confidential self-referral system for prisoners to request mental health care.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2023, with Paragraph 41, which requires CHS to review the medical records of all prisoners on suicide watch in FIP for one randomly selected month each quarter, and submit a report regarding the implementation of the step-down protocols and the results of its review of the medical records.

The County has maintained Substantial Compliance at NCCF and PDC North for twelve consecutive months, as of September 30, 2018, with Paragraph 43, which requires the Department to develop and implement policies for the discipline of prisoners with serious mental illnesses.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 44, which requires the Department to install protective barriers in High Observation Housing and other mental health housing.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 45, which requires Suicide Prevention Kits and first-aid kits in control booths in all facilities.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2021, with Paragraph 46, which requires the Department to interrupt, and if necessary, provide appropriate aid to any prisoner who threatens or exhibits self-injurious behavior.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 48, which requires the Department to have written housekeeping, sanitation, and inspection plans to ensure proper cleaning.

The County has maintained Substantial Compliance for twelve consecutive months as of February 28, 2017, with Paragraph 49, which requires the Department to have maintenance plans to respond to routine and emergency maintenance needs.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2017, with Paragraph 50, which requires pest control in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2017, with Paragraph 51, which requires the Department to ensure that all prisoners have access to basic hygiene supplies in accordance with state regulations.

The County has achieved Substantial Compliance as of January 1, 2023, through June 30, 2023, with Paragraph 54, which requires the County to ensure that prisoners not in mental health housing are "not denied privileges and programming based solely on their mental health status or prescription for psychotropic medication."

The County has maintained Substantial Compliance for twelve consecutive months at CRDF, PDC North, MCJ, and TTCF with Paragraph 55, which requires custody, medical, and mental health staff to meet daily in High Observation Housing and weekly in Moderate Observation Housing.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 56, which requires custody, medical, and mental health staff to communicate regarding any change in a housing assignment following a suicide attempt or serious change in mental health condition.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2018, at MCJ with Paragraph 57, which requires safety checks in

mental health housing. The County has also maintained Substantial Compliance for twelve consecutive months at PDC North as of June 30, 2022

The County has maintained Substantial Compliance for twelve consecutive months at PDC South, PDC North, and PDC East as of December 31, 2016, at CRDF as of June 30, 2018, and at IRC as of September 30, 2018, with Paragraph 58, which requires safety checks in non-mental health housing. The County has also provided documentation reflecting that it has achieved Substantial Compliance as of October 1, 2023, through March 31, 2024, at TTCF and as of January 1, 2024, through March 31, 2024, at NCCF and MCJ. These results are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2019, with Paragraph 59, which requires unannounced daily supervisory rounds to verify safety checks.

The County has achieved Substantial Compliance with Paragraph 60, as of April 1, 2019, through March 31, 2020, which requires the implementation of a quality improvement plan.

The County has provided documentation reflecting that it has achieved Substantial Compliance as of October 1, 2023, through March 31, 2024, at CRDF, with Paragraph 63, which requires adequate space in High and Moderate Observation Housing for inmates with mental illness. These results are subject to verification by the Monitor's auditors.

The County has provided documentation reflecting that it has achieved Substantial Compliance as of October 1, 2023, through March 31, 2024, with Paragraph 67, which requires certain documentation and clinically appropriate actions for inmates refusing medication in High and Moderate Observation Housing. These results are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive months at MCJ, NCCF, PDC East, PDC North, and PDC South as of December 31, 2016, and at TTCF as of December 31, 2017, with Paragraph 68, which requires staggered contraband searches in housing units. The County has also maintained Substantial Compliance for twelve consecutive months at CRDF as of January 1, 2022, through December 31, 2022.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2019, with Paragraph 69, which requires the County and the Sheriff to use clinical restraints only in the Correctional Treatment Center with the approval of a licensed psychiatrist who performed an individualized assessment.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2017, with Paragraph 71, which requires the County and the

Sheriff to ensure that any prisoner subjected to clinical restraints in response to a mental health crisis receives therapeutic services to remediate any effects from the restraints.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 72, which requires the Department and the County to report on meetings to review suicides and incidents of serious self-injurious behavior.

The County has maintained Substantial Compliance for twelve consecutive months as of September 30, 2018, with Paragraph 73, which requires the Department to prepare detailed reports of prisoners who threaten or exhibit self-injurious behavior.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 74, which requires the Department to have an objective law enforcement investigation of every suicide that occurs in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of September 30, 2018, with Paragraph 75, which requires the Department and the County to review every serious suicide attempt that occurs in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 76, which requires the Department to follow certain procedures whenever there is an apparent or suspected suicide.

The County has achieved Substantial Compliance as of September 30, 2022, with Paragraph 77, which requires, among other things, identifying patterns and trends of suicides and suicide attempts and ensuring corrective actions are taken to mitigate suicide risks.

The County has maintained Substantial Compliance for twelve consecutive months as of May 18, 2017, with Paragraph 78, which requires the Suicide Prevention Advisory Committee to meet twice a year.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 82, which requires the Department to co-locate personnel responsible for collecting prisoners' grievances at CRDF.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2019, with Paragraph 83, which requires it to install closed circuit security cameras throughout all of the common areas in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2018, with Paragraph 84, which requires investigations of force incidents and administrative actions to be completed timely.

The County has maintained Substantial Compliance for twelve consecutive

months as of March 31, 2022, with Paragraph 85, which requires Internal Affairs Bureau personnel to receive adequate specialized training in conducting investigations of misconduct.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2019, with Paragraph 86, which requires inventory and control of weapons.

## EIGHTEENTH REPORT

18.     Within three months of the Effective Date, the County and the Sheriff will develop, and within six months of the Effective Date will commence providing:  (1) a four-hour custody-specific, scenario-based, skill development training on suicide prevention, which can be part of the eight-hour training described in paragraph 4.8 of the Implementation Plan in *Rosas* to all new Deputies as part of the Jail Operations Continuum and to all new Custody Assistants at the Custody Assistants academy; and (2) a two-hour custody-specific, scenario-based, skill development training on suicide prevention to all existing Deputies and Custody Assistants at their respective facilities, which can be part of the eight-hour training described in paragraph 4.7 of the Implementation Plan in *Rosas*, through in-service Intensified Formatted Training, which training will be completed by December 31, 2016.

These trainings will include the following topics:

(a)     suicide prevention policies and procedures, including observation and supervision of prisoners at risk for suicide or self-injurious behavior;

(b)     discussion of facility environments and staff interactions and why they may contribute to suicidal behavior;

(c)     potential predisposing factors to suicide;

(d)     high-risk suicide periods and settings;

(e)     warning signs and symptoms of suicidal behavior;

(f)     case studies of recent suicides and serious suicide attempts;

(g)     emergency notification procedures;

(h)     mock demonstrations regarding the proper response to a suicide attempt, including a hands-on simulation experience that incorporates the challenges that often accompany a jail suicide, such as cell doors being blocked by a hanging body and delays in securing back-up assistance;

(i)     differentiating between suicidal and self-injurious behavior; and

(j)     the proper use of emergency equipment.

**STATUS (18):**     **SUBSTANTIAL COMPLIANCE (as of October 1, 2017 (verified) at MCJ and PDC South)**

**SUBSTANTIAL COMPLIANCE (as of September 1, 2017 (verified) at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of December 1, 2017 (verified) at PDC East)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018 (verified) at TTCF, IRC, and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of August 1, 2018 (verified) at CRDF)**

The Department was not subject to monitoring during the Eighteenth Reporting Period for the initial training of existing Deputy Sheriffs or Custody Assistants or of new Deputies in the Jail Operations Continuum and new Custody Assistants in the Custody Assistant Academy as required by Paragraph 18.  Virtually all of the Deputy Sheriffs and Custody Assistants in the custody facilities received the initial training because they were assigned to the jails as of the Existing Date of the Settlement Agreement or they received the training as new Deputies or new Custody Assistants.

The Department is still subject to monitoring in future periods for Substantial Compliance with the refresher course requirements under Provision 81 Rosas 4.6(b) and 4.7(b).  The County previously reported compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) and Rosas 4.7(b) as of December 2022.  The Monitor's auditors verified the previously reported results.  The County has posted results reflecting that it maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) and Rosas 4.7(b) as of December 2023.  These results are subject to verification by the Monitor's auditors.

19.     Commencing July 1, 2015, the County and the Sheriff will provide:

(a)     Custody-specific, scenario-based, skill development training to new Deputies during their Jail Operations training, and to existing Deputies assigned to Twin Towers Correctional Facility, Inmate Reception Center, Men's Central Jail, the Mental Health Housing Units at Century Regional Detention Facility, and the Jail Mental Evaluation Teams ("JMET") at North County Correctional Facility as follows:

    (i)     32 hours of Crisis Intervention and Conflict Resolution as described in paragraphs 4.6 and 4.9 of the Implementation Plan in *Rosas* to be completed within the time frames established in that case (currently December 31, 2016). Deputies at these facilities will receive an eight-hour refresher course consistent with paragraph 4.6 of the Implementation Plan in *Rosas* every other year until termination of court jurisdiction in that case and then a four-hour refresher course every other year thereafter.

    (ii)     Eight hours identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas* to be completed by December 31, 2016. This training requirement may be a part of the 32-hour training described in the previous subsection. Deputies at these facilities will receive a four-hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

(b)     Commencing July 1, 2015, the County and the Sheriff will ensure that new Custody Assistants receive eight hours of training in the Custody Assistant academy, and that all existing Custody Assistants receive eight hours of training related to identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas*. This training will be completed by December 31, 2016. Custody Assistants will receive a four-hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

**STATUS (19):**          **SUBSTANTIAL COMPLIANCE (as of April 1, 2018, (verified) at NCCF, MCJ, and IRC)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2018, (verified) at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of December 1, 2018 (verified) at CRDF, PDC East, and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of March 1, 2019 (verified) at PDC South)**

The Department was not subject to monitoring during the Eighteenth Reporting Period for the training of existing and new Deputy Sheriffs and Custody Assistants required by Paragraph 19.

The Department is still subject to monitoring in future periods for Substantial Compliance with the refresher course requirements under Provision 81 Rosas 4.6(b) and 4.7(b). The County previously reported compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) and Rosas 4.7(b) as of December 2022. The Monitor's auditors verified the previously reported results. The County has posted results reflecting that it maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) and Rosas 4.7(b) as of December 2023. These results are subject to verification by the Monitor's auditors.

20.    Commencing no later than July 1, 2017, the County and the Sheriff will provide:

(a)    Custody-specific, scenario-based, skill development training to existing Deputies assigned to North County Correctional Facility, Pitchess Detention Center, and the non-Mental Health Housing Units in Century Regional Detention Facility as follows:

(i)    32 hours of Crisis Intervention and Conflict Resolution as described in paragraphs 4.6 and 4.9 of the Implementation Plan in *Rosas* to be completed by December 31, 2019.  Deputies at these facilities will receive an eight-hour refresher course consistent with paragraph 4.6 of the Implementation Plan in *Rosas* every other year until termination of court jurisdiction in that case and then a four-hour refresher course every other year thereafter.

(ii)    Eight hours identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas* to be completed by December 31, 2019.  This training requirement may be a part of the 32-hour training described in the previous subsection.  Deputies at these facilities will receive a four-hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

**STATUS (20):**    **SUBSTANTIAL COMPLIANCE (as of August 1, 2017 (verified) at CRDF, PDC East, PDC North, and NCCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017 (verified) at PDC South)**

The Department was not subject to monitoring for the initial training for existing Deputies as required by Paragraph 20 during the Eighteenth Reporting Period.

The Department is still subject to monitoring in future periods for Substantial Compliance with the refresher course requirements under Provision 81 Rosas 4.6(b) and 4.7(b). The County previously reported compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) and Rosas 4.7(b) as of December 2022. The Monitor's auditors verified the previously reported results. The County has posted results reflecting that it maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) and Rosas 4.7(b) as of December 2023. These results are subject to verification by the Monitor's auditors.

21.    Consistent with existing Sheriff's Department policies regarding training requirements for sworn personnel, the County and the Sheriff will ensure that existing custody staff that have contact with prisoners maintain active certification in cardiopulmonary resuscitation and first aid.

**STATUS:**    **SUBSTANTIAL COMPLIANCE (as of October 1, 2015, through September 30, 2016 (verified) at PDC East and South)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at NCCF, PDC North, and IRC)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 (verified) at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at MCJ)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2018, through June 30, 2019 (verified) at CRDF)**

The Compliance Measures provide that the Department will demonstrate Substantial Compliance when 95% of the designated custody staff have the required CPR and first aid certifications for twelve consecutive months.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 21 in the Eighteenth Reporting Period.

22.    Within six months of the Effective Date and at least annually thereafter, the County and the Sheriff will provide instructional material to all Sheriff station personnel, Sheriff court personnel, custody booking personnel, and outside law enforcement agencies on the use of arresting and booking documents, including the Arrestee Medical Screening Form, to ensure the sharing of known relevant and available information on prisoners' mental health status and suicide risk.  Such instructional material will be in addition to the training provided to all custody booking personnel regarding intake.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017)**

The Justice Data Interface Controller ("JDIC") message the Department has been using since June 29, 2016, is sufficient to establish Substantial Compliance with Paragraph 22, and the County maintained Substantial Compliance for twelve consecutive months through June 30, 2017.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 22 in the Eighteenth Reporting Period.

23.     Within three months of the Effective Date, the County and the Sheriff will commence a systematic review of all prisoner housing, beginning with the Mental Health Unit of the Correctional Treatment Center, all High Observation Housing areas, all Moderate Observation Housing areas, single-person discipline, and areas in which safety precautions are implemented, to reduce the risk of self-harm and to identify and address suicide hazards.  The County and the Sheriff will utilize a nationally-recognized audit tool for the review.  From this tool, the County and the Sheriff will:

(a)     develop short and long term plans to reasonably mitigate suicide hazards identified by this review; and

(b)     prioritize planning and mitigation in areas where suicide precautions are implemented and seek reasonable mitigation efforts in those areas.

**STATUS:        SUBSTANTIAL COMPLIANCE**

The Monitor has verified, with the advice of the Subject Matter Expert, that the Department's Suicide Hazard Inspection Check List tool is a nationally recognized audit tool for this review.  The Department provided the Monitor with completed checklists documenting inspections of all housing units by January 14, 2016.

The Department submitted updated Suicide Hazard Mitigation plans to the Monitor on January 18, 2018 and July 12, 2018.  After consultations with the Mental Health Subject Matter Expert, the Monitor concluded that the plans satisfied the requirements of Paragraph 23 and that the Department had achieved and maintained Substantial Compliance with the provision.  Accordingly, pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Paragraph 23 in the Eighteenth Reporting Period.

24.    The County and the Sheriff will review and inspect housing areas on at least an annual basis to identify suicide hazards.

**STATUS:**    **SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018)**

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 24 in the Eighteenth Reporting Period.  As the Monitor has noted, however, implementation and tracking of corrective actions must be addressed by the Custody Compliance and Sustainability Bureau ("CCSB") under Paragraph 77(c), which requires CCSB to "ensur[e] that corrective actions are taken to mitigate suicide risk. . .obtaining where appropriate, technical assistance. . .when such assistance is needed to address suicide-risk issues."

25.     The County and the Sheriff will ensure that any prisoner in a Sheriff's Department station jail who verbalizes or who exhibits a clear and obvious indication of current suicidal intent will be transported to IRC, CRDF, or a medical facility as soon as practicable.  Pending transport, such prisoners will be under unobstructed visual observation, or in a suicide resistant location with safety checks every 15 minutes.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of January 1, 2024, through March 31, 2024 (verified) at the North and South Patrol Divisions)**

**PARTIAL COMPLIANCE (at the East and Central Patrol Divisions)**

A provision of the Station Jail Manual adopted in March 2018 requires that any arrestee who "displays obvious suicidal ideation or exhibits unusual behavior that clearly manifest[s] self-injurious behavior or other clear indication of mental health crisis shall be transported to the Inmate Reception Center (IRC), Century Regional Detention Facility (CRDF), or a medical facility as soon as practicable.  Pending transport, such inmates. . .shall be under unobstructed visual observation or in a suicidal restraint location with safety checks every 15 minutes."  Under the revised Compliance Measures, which were updated in 2021, the Department must randomly select and analyze Arrestee Medical Screening Forms from station jails identifying prisoners who verbalize or exhibit a clear and obvious indication of current suicidal intent to determine compliance with Paragraph 25.[9]  Substantial Compliance requires that 90% of the selected records from each Patrol Division meet the requirements of Paragraph 25.  Each Patrol Division can achieve sustained compliance after twelve consecutive months of Substantial Compliance independent of the other divisions.

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required the County to achieve Substantial Compliance with Provision 25 by June 30, 2023, or the end of the Second Quarter of 2023.  On March 11, 2024, the Court issued an Order Modifying Deadlines for Substantial Compliance, which extended the deadline for Substantial Compliance to March 31, 2024, which falls within the Eighteenth Reporting Period covered by this Report.

For the Fourth Quarter of 2023, the County reports 100% compliance for the Central Patrol Division, 100% for the East Patrol Division, 80% for the North Patrol

---

[9] The County has requested a revised method of measuring compliance, which is under discussion between the Parties and the Monitor. Pending resolution, compliance continues to be measured as set forth in this Report.

Division, and 80% for the South Patrol Division.[10]

For the First Quarter of 2024, the County posted amended results reflecting 60% compliance for the Central Patrol Division, 80% compliance for the East Patrol Division, 90% for the North Patrol Division, and 100% compliance for the South Patrol Division. The reported results at North and South Patrol Divisions have been verified by the Monitor's auditors.  Regarding these results, the County reports

> Custody Compliance and Sustainability Bureau (CCSB) continues to have semiannual meetings with the patrol divisions. CCSB set the next meeting for the end of July 2024. Meanwhile, Patrol Division Lieutenant Aides are conducting monthly spot checks for Provision 25 compliance, sending the results of these spot checks to CCSB and receiving real-time input from CCSB to troubleshoot any compliance issues. These meetings and communications reiterate the importance of the station lieutenant audits and the need to review Provision 25 requirements during shift briefings.

Regarding the comments in the Seventeenth Monitoring Report concerning wait times in the station jails, the County reports

> Patrol Division Aides are convening a meeting on July 16, 2024, that includes supervisors from all station jails, and representatives from Field Operation Support Services ("FOSS"), CCSB, and MET to discuss wait times at station jails; transport to IRC, CRDF, and medical facilities; and the importance of timely safety checks and their documentation.

> The County has completed the action items in the implementation plan. On February 7, 2024, CCSB met with each Patrol Division's Lieutenant Aide and reviewed in detail issues seen in BOMHRs and 15-minute safety-check logs. CCSB also emphasized the need for near perfect

---

[10] The County has requested that "given the small sample sizes at issue when auditing this provision and the anomalous results that can occur from just one noncompliant case, the County and LASD should be deemed to have achieved Substantial Compliance at South Patrol Station in the Fourth Quarter of 2023 because only one record in the quarter was noncompliant."  The Seventeenth Monitoring Report articulated the standard that would be used to evaluate such requests. *See* Seventeenth Monitoring Report at fn. 13 ("The Monitor may choose to exercise his discretion to consider such requests where the County has a demonstrated track record of successfully meeting the quantitative targets in the compliance measures for a provision and the failure to meet them is truly an anomaly.  Where, as here, the County was in Partial Compliance or Non-Compliance in the prior monitoring period, such requests will generally be denied").

In the Seventeenth Reporting Period, the South Patrol Division did not meet the quantitative targets for the Second Quarter of 2023 (83% compliant) but did meet them for the Third Quarter of 2023 (100% compliant).  In the Sixteenth Reporting Period, the South Patrol Division did not meet the quantitative targets for the Fourth Quarter of 2022 (50% compliant) or the First Quarter of 2023 (88% compliant).  The Monitor does not find that the South Patrol Division has established a track record of meeting the quantitative targets in Provision 25 such that its non-compliant results for the Fourth Quarter of 2023 are an "anomaly."  The County's request is denied.

compliance at each station jail to achieve substantial compliance as it is currently being assessed for Provision 25. CCSB also reiterated the importance of timely safety checks and expedited transport of arrestees to IRC/CRDF.

26.    Consistent with existing Sheriff's Department policies, the County and the Sheriff will follow established screening procedures to identify prisoners with emergent or urgent mental health needs based upon information contained in the Arrestee Medical Screening Form (SH-R-422) or its equivalent and the Medical/Mental Health Screening Questionnaire and to expedite such prisoners for mental health evaluation upon arrival at the Jail Reception Centers and prior to routine screening.  Prisoners who are identified as having emergent or urgent mental health needs, including the need for emergent psychotropic medication, will be evaluated by a QMHP as soon as possible but no later than four hours from the time of identification.

**STATUS:**    **SUBSTANTIAL COMPLIANCE (as of April 1, 2023, through December 31, 2023 (verified), and through March 31, 2024 (unverified))**

The Compliance Measures require the Department to "review Arrestee Medical Screening Forms (SH-R-422) (or its equivalent) and the Medical/Mental Health Screening Questionnaires of 100 randomly selected prisoners during one randomly selected week per quarter at CRDF and at IRC."  Substantial Compliance requires that (1) 95% of the forms "include the required mental health information" and (2) 90% of the prisoners having urgent or emergent needs were "seen by a QMHP within four hours."

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234.  Pursuant to that Order, "Defendants will achieve substantial compliance with the following individual provisions of the settlement agreement in accordance with the following schedule," and regarding Provision 26, the Court ordered "Reached June 2021-March 2022; must maintain one additional quarter." As noted in the Monitor's Fifteenth Report, however, in the Third Quarter of 2022, the County fell out of Substantial Compliance with Provision 26 as "only 56% of the prisoners with urgent or emergent mental health needs were seen by a QMHP within four hours, which did not meet the relevant threshold, and was a significant decline from the County's recent results under Provision 26." On March 11, 2024, the Court issued an Order Modifying Deadlines for Substantial Compliance, which extended the deadline for Substantial Compliance to June 30, 2024, which does not fall within the period covered by this Report.

For the Eighteenth Reporting Period, the County's amended posted results reflect that for the one randomly selected week in the Fourth Quarter of 2023, 97% of the screening forms reviewed had the required mental health information, and 96% of the prisoners with urgent or emergent mental health needs were seen by a QMHP within four hours.  The reported results through the Fourth Quarter of 2023 have been verified by the Monitor's auditors.  The County's Augmented Eighteenth Self-Assessment also reports that for the one randomly selected week in the First Quarter of 2024, 97% of the screening forms reviewed had the required mental health information, and 98% of the prisoners with urgent or emergent mental health needs were seen by a QMHP within four hours, which met the relevant thresholds.  The results for the First Quarter of 2024 are subject to verification by the Monitor's auditors.  If verified, the County will have

satisfied its obligations as to Provision 26 and will no longer be subject to monitoring for the provision.

27.    Consistent with existing Sheriff's Department policies, the County and the Sheriff will ensure that all prisoners are individually and privately screened by Qualified Medical Staff or trained custody personnel as soon as possible upon arrival to the Jails, but no later than 12 hours, barring an extraordinary circumstance, to identify a prisoner's need for mental health care and risk for suicide or self-injurious behavior.  The County and the Sheriff will ensure that the Medical/Mental Health Screening Questionnaire, the Arrestee Medical Screening Form (SH-R-422), or its equivalent, and/or the Confidential Medical Mental Health Transfer Form are in the prisoner's electronic medical record or otherwise available at the time the prisoner is initially assessed by a QMHP.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of October 1, 2019, through March 31, 2020, and October 1, 2020, through March 31, 2021 (verified))**

The Compliance Measures require the Department to review the records of "randomly selected prisoners who were processed for intake during one randomly selected week at CRDF and at IRC" to determine compliance with this provision. Substantial Compliance requires that 90% of the records reviewed reflected that the prisoners were screened for mental health needs within 12 hours and that the required documentation was available to the QMHP for 90% of the mental health assessments conducted by the QMHP.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 27 in the Eighteenth Reporting Period.

28.     The County and the Sheriff will ensure that any prisoner who has been identified during the intake process as having emergent or urgent mental health needs as described in Paragraph 26 of this Agreement will be expedited through the booking process. While the prisoner awaits evaluation, the County and the Sheriff will maintain unobstructed visual observation of the prisoner when necessary to protect his or her safety, and will conduct 15-minute safety checks if the prisoner is in a cell.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at IRC)**

**PARTIAL COMPLIANCE (at CRDF)**

The Compliance Measures require the Department to review the records of randomly selected prisoners at CRDF and IRC who have urgent or emergent mental health needs to determine whether they were expedited through the booking process and under visual observation or checked every 15 minutes.

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires the County to achieve Substantial Compliance with Provision 28 by June 30, 2024, which does not fall within the period covered by this Report.

The County's Augmented Eighteenth Self-Assessment reflects that in the Fourth Quarter of 2023, 92% of the inmates with urgent or emergent mental health needs were expedited through the booking process at CRDF in the randomly selected week, as required by the applicable Compliance Measures, and 20%[11] of the inmates were observed or checked as required.[12]  The County's Augmented Eighteenth Self-Assessment also reported that in the First Quarter of 2024, 100% of the inmates with urgent or emergent mental health needs were expedited through the booking process at CRDF in the randomly selected week, and 80% of the inmates were observed or checked, as is required.

Regarding Compliance Measure 28-5(b), which requires that patients be under visual observation or checked every 15 minutes, the County notes "the Department's corrective measures in the First Quarter of 2024 led to a significant jump in performance, and the County missed substantial compliance by a single case in the period."  Moreover

the Department on January 8, 2024, revamped its staffing of Module 1400

---

[11] The County's Augmented Eighteenth Self-Assessment reflects 0%.  However, the County has posted amended results reflecting 20%.

[12] The County reports that the Department continues to rely on several sources of information for Compliance Measure 28-5(a), including "DIMMS and in two backup sources."  *See* Augmented Eighteenth Self-Assessment at pp. 24.  This includes "a handwritten back-up log, known as the 'red book.'"  In response to a draft of this Report, the DOJ requested that the County "define in its self-assessments the labels it uses in Red Book entries to flag individuals eligible for expedited booking and apply those labels consistently."  The Monitor agrees that this would be useful and asks the County to do so in future self-assessments provided in this matter.

by assigning a designated team of experienced deputies, custody assistants, and sergeants to each shift, including early mornings. Each staff member is trained extensively on DOJ provisions governing intake, and each has a specific role, including bonus deputies to monitor operations and dedicated safety check deputies and sergeants. The CRDF Captain has directed Module 1400 to be fully staffed at all times on all shifts; therefore, Module 1400 staffers are not pulled away from the unit to address extraordinary circumstances. Instead, if additional Custody staff is needed for a particular task, deputies and custody assistants are pulled from other areas of the facility.

This new staffing model supplemented other corrective actions taken by the Department, including performance log entries for personnel who failed to conduct timely safety checks of good quality, and the Provision 28 briefing CCSB provided to CRDF's new training sergeant on February 1, 2024.

As discussed in more detail in the Augmented Self-Assessments for Provisions 57 and 58, the Department has also been engaged in a facility-focused effort to rebuild a successful approach to conducting quality Title 15 safety checks in timely fashion. At CRDF, this effort involved significant technology upgrades, intensive training, and shift-by-shift auditing. These efforts at CRDF, still transitional in the Fourth Quarter of 2023, had more time to take hold in the first quarter, and the Department believes that the improved compliance during the First Quarter of 2024 were partly attributable to these efforts.

The County previously maintained Substantial Compliance with Paragraph 28 at IRC for twelve consecutive months, and IRC was not subject to monitoring for Substantial Compliance with Paragraph 28 in the Eighteenth Reporting Period.

29.    The County and the Sheriff will ensure that a QMHP conducts a mental health assessment of prisoners who have non-emergent mental health needs within 24 hours (or within 72 hours on weekends and legal holidays) of a registered nurse conducting an intake nursing assessment at IRC or CRDF.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified))**

The Compliance Measures require the Department to review randomly selected records of the prisoners identified in the intake nursing assessment as having non-emergent mental health needs to determine if the Department completed mental health assessments for 85% of the prisoners within the required time periods.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 29 in the Eighteenth Reporting Period.

30.     Consistent with existing DMH policies, the initial mental health assessment will include a brief initial treatment plan.  The initial treatment plan will address housing recommendations and preliminary discharge information.  During the initial assessment, a referral will be made for a more comprehensive mental health assessment if clinically indicated.  The initial assessment will identify any immediate issues and determine whether a more comprehensive mental health evaluation is indicated.  The Monitor and SMEs will monitor whether the housing recommendations in the initial treatment plan have been followed.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of January 1, 2019, through December 31, 2019 (verified))**

The Compliance Measures require the Department to review randomly selected initial mental health assessments and report on (1) the percentage of assessments that have (i) included an initial treatment plan that addresses housing recommendations and preliminary discharge information and (ii) identified any immediate issues and whether a more comprehensive evaluation was indicated; and (2) whether the housing recommendations were followed.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 30 in the Eighteenth Reporting Period.

31 (**Revised**).  Consistent with existing Correctional Health Services and Sheriff's Department policies, the County and the Sheriff will maintain electronic mental health alerts in prisoners' electronic medical records that notify medical and mental health staff of a prisoner's risk for suicide or self-injurious behavior.  The alerts will be for the following risk factors:

      (a)    current suicide risk; and

      (b)    prior suicide attempts.

**STATUS:**      **PARTIAL COMPLIANCE (at CRDF and TTCF)**

On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provision 31 ("Revised Paragraph 31") as set forth above.  They also agreed on Revised Compliance Measures.  The Revised Compliance Measures require the Department to review randomly selected electronic medical records for prisoners in certain at-risk groups to determine if the required mental health alerts are in 85% of the records reviewed, which is the threshold for Substantial Compliance, for prisoners who report suicidal thoughts during the intake process; or were removed from risk precautions in the prior quarter.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires the County to achieve Substantial Compliance with Provision 31 by June 30, 2024, which does not fall in the period covered by this Report.

The County's Augmented Eighteenth Self-Assessment reports that for the Fourth Quarter of 2023, at CRDF, 100% of the records reviewed contained the mental health alerts required by 31-1(a).  For Compliance Measure 31-1(b), the County reports that there were 10 responsive patients, and 6 out of 10, or 60%, were compliant.  At TTCF, 92% of the records reviewed contained the mental health alerts required by 31-1(a).  For Compliance Measure 31-1(b), there were 25 responsive patients, 5 of which contained the required alerts, "resulting in a compliance level of 20%."

The County's Augmented Eighteenth Self-Assessment also reports that for the First Quarter of 2024, at CRDF, 92% of the records reviewed contained the mental health alerts required by 31-1(a).  Regarding 31-1(b), 75% (12) of the 16 relevant records contained the required alerts.  At TTCF, 88% of the records reviewed contained the mental health alerts required by 31-1(a).  Regarding 31-1(b), 32% (8) of the 25 responsive records contained the required alerts.

The County was in Substantial Compliance at CRDF in the Seventeenth Reporting Period, and its results at CRDF and TTCF for the Eighteenth Reporting Period are concerning, particularly related to Compliance Measure 31-1(b).[13]  Regarding these results, it reports that "CHS established [a] Suicide Risk Tracker that tracks all patients assessed as high or imminent risk. Starting on March 20, 2024, CRDF mental health

---

[13] According to the County's posted documents, the results for Compliance Measure 31-1(b) improved in the Second Quarter of 2024, with 88% reported compliance at CRDF and 68% at TTCF.

supervisors began checking the Suicide Risk Tracker daily to ensure the appropriate alerts are being added for high or imminent risk patients."  Further, it indicates that it has implemented an enhancement to ORCHID that will

> ensure that appropriate mental health alerts are put in place for high and imminent risk patients. This fix automatically incorporates the alerts for Risk Assessment for Suicide (RAS) forms, including both baseline and follow-up risk assessments. Whenever a Qualified Mental Health Professional (QMHP) indicates high or imminent risk for a patient in the relevant form, the appropriate alert will automatically generate for that patient's chart. The ORCHID enhancement went live on May 10, 2024. This was after the 18th Reporting Period, but the County expects that it will lead to greatly improved results in the Second Quarter of 2024 and particularly in the Third Quarter of 2024. A mini-audit that analyzed all electronic medical records for patients elevated to high or imminent risk between May 10 and June 30, 2024, which is after the ORCHID fix went live, found that, in 25 records, 100% contained the required alerts.

32.     Information regarding a serious suicide attempt will be entered in the prisoner's electronic medical record in a timely manner.

**STATUS:**          **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified))**

The Compliance Measures require that 95% of the electronic medical records of prisoners who had a serious suicide attempt reflect information regarding the attempt, and 85% of the records reflect that the information was entered into the record within one day of the attempt.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 32 in the Eighteenth Reporting Period.

33.     The County will require mental health supervisors in the Jails to review electronic medical records on a quarterly basis to assess their accuracy as follows:

(a)     Supervisors will randomly select two prisoners from each clinician's caseload in the prior quarter;

(b)     Supervisors will compare records for those prisoners to corroborate clinician attendance, units of service, and any unusual trends, including appropriate time spent with prisoners, recording more units of service than hours worked, and to determine whether contacts with those prisoners are inconsistent with their clinical needs;

(c)     Where supervisors identify discrepancies through these reviews, they will conduct a more thorough review using a DMH-developed standardized tool and will consider detailed information contained in the electronic medical record and progress notes; and

(d)     Serious concerns remaining after the secondary review will be elevated for administrative action in consultation with DMH's centralized Human Resources.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017 (verified))**

The Compliance Measures require the County to provide the Monitor and the Subject Matter Experts with the DMH-developed standardized tool required by Paragraph 33(c), and to report the results of its analysis of the electronic medical records of two randomly selected prisoners from each clinician's caseload.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 33 in the Eighteenth Reporting Period.

34 **(Revised).**  Consistent with existing Correctional Health Services policy, the County and the Sheriff will conduct clinically appropriate release planning for all prisoners who are being released to the community and who have been identified by a QMHP as having a mental illness and needing mental health treatment, or as having a DSM-5 major neuro-cognitive disorder that caused them to be housed in the Correctional Treatment Center at any time during their current incarceration.  For prisoners with mental illness and needing mental health treatment, the release planning services will be guided by the prisoner's level of care.  Specifically, prisoners who at any time during their incarceration meet mental health level of P3 or P4 will be presumptively referred for release planning services, and prisoners who meet mental health level of care P2 will receive release planning services upon referral by a clinician or upon their request. Prisoners who have a DSM-5 major neuro-cognitive disorder that caused them to be housed in the Correctional Treatment Center will also be referred for release planning services consistent with the Correctional Health Services policy applying to prisoners with mental illness.

(a) Release planning will consider the need of the prisoner for housing; transportation to the prisoner's community-based provider, residence, or shelter within the County; bridge psychotropic medications; medical/mental health/substance abuse services; income/benefits establishment; and family/community/social supports ("Release Planning Areas").

(b) Release planning will be based on an individualized assessment of the prisoner's needs and, unless the prisoner is unable or unwilling to participate, will be undertaken in collaboration with the prisoner.  For prisoners referred for release planning services, those services will include:

(i) An Initial Release Plan that will be created at intake or no later than ten days after the referral for release planning, which referral shall normally occur at the time of intake.  The Initial Release Plan will include preliminary identification of needs in each of the Release Planning Areas and preliminary recommendations for services to address those needs, and a referral for assistance in obtaining California identification when needed and when the prisoner is eligible; and/or

(ii) A Comprehensive Release Plan that will be initiated no later than thirty days after the referral for release planning.  The Comprehensive Release Plan will include (A) collecting information regarding the prisoner's needs; (B) coordinating with community-based providers to identify available services that meet the prisoner's needs; (C) facilitating the transition of care to community-based providers, and (D) assisting in obtaining identification and/or benefits when needed, when the prisoner is eligible, and as offered by the Sheriff's Community Transition Unit.

(c) The County will maintain a re-entry resource center with staff supervised by a QMHP.  The re-entry resource center will:

(i) Provide information appropriate to the released prisoner about available housing, transportation, medical/mental health/substance abuse services, income/benefits establishment, community/social supports, and other community resources; and

(ii) Provide released prisoners with copies of their release plans, as available.

(d) All prisoners who are receiving and continue to require psychotropic medications will be offered a clinically appropriate supply of those medications upon their release from incarceration.  Unless contraindicated, this will be presumed to be a 14-day supply or a supply with a prescription sufficient so that the prisoner has the psychotropic medication available during the period of time reasonably necessary to permit the prisoner to consult with a doctor and obtain a new supply.

(e) Nothing in Paragraph 34 will require prisoners to accept or participate in any of the services provided under this Paragraph.

(f) Neither the County nor the Sheriff shall be in violation of this paragraph if after reasonable efforts as set forth in Correctional Health Services Policy M380.01, Release Planners are unable to identify available post-release services.

**STATUS (34):**        **PARTIAL COMPLIANCE**

During the Seventh Reporting Period, the parties and the Intervenors reached an agreement on the provisions of revised Paragraph 34 ("Revised Paragraph 34") set forth above.  They also agreed on revised Compliance Measures and a revised policy to implement Revised Paragraph 34.  On December 10, 2018, the Court issued an order pursuant to the parties' joint stipulation revising Paragraph 34.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234. That Order required Defendants to achieve Substantial Compliance with Provision 34 by December 31, 2022, which was missed during the Fifteenth Reporting Period.

In the Eighteenth Reporting Period, the Parties continued their efforts to revise the Compliance Measures and agree upon corrective actions to be taken by the County to cure its deficient results under Provision 34.  On various occasions, the Monitor met with each of the Parties individually, and with the Parties as a group. In August 2024, the Parties arrived at a provisional agreement as to a number of the outstanding issues, including the steps to be taken by the County as part of a cure plan.  Regarding that cure plan, the County reports

> CHS redirected three additional Community Health Workers ("CHWs") in June 2024 to focus on the initiation and timely completion of IRPs. Although the County believes it is unwise to reflect upon only one month of results, the early data is promising. Across the Fourth Quarter of 2023 and First Quarter of 2024, Care Transitions' staff timely completed IRPs only 33% and 32% of the time, respectively. With the additional focus on timely IRP completion in June 2024 (along with the focused efforts of the three CHWs), that number rose to 56%. Moreover, of the 463 individuals who received an IRP, 411 had a completed IRP by day 10. It is still too early to determine the positive impact on other compliance measures later in the release planning process, but the County views these initial results as encouraging signs.

> Another component that was initiated during this period was the creation of two working groups of release planners—a six-person team at TTCF and a four-person team at CRDF, comprised of PSWs, MCWs, CHWs, and a SUD Counselor (and a nurse and typist clerk at TTCF)— to generally address and troubleshoot issues that arise in specific cases; identify, study, and elevate issues to leadership relevant to barriers to effective release planning in general; monitor performance and gauge the need for improvements on a real-time basis, and ensure that deadlines are not missed, all as a team. Weekly meetings with a supervisor allow these two teams to present their findings and work directly with leadership to conceive and implement corrective actions. These smaller working groups not only present the opportunity to test new strategies but also to test developing technology, such as the improved case tracking system to alert supervisors and case planners when significant benchmarks are in danger

of not being met. Currently, a pilot of this tracker system is being utilized by the CRDF working group to focus on completing IRPs within the 10-day deadline. A supervisor is alerted when an IRP has not been uploaded by day 5 and again on day 8. If this system, which was first piloted in the third week of June, is successful in improving this one critical IRP metric, it intends to expand this system to the TTCF working group and then the remaining release planning staff by sometime around August 15.

The County also reports that it has ordered Surface Pro tablets for all of its release planners to "remove the unnecessary and inefficient steps of planners having to return to their workstations between visiting clients and will eliminate the need to later manually upload all IRP paperwork."

Under this new computer tablet-based system, planners will complete IRPs at inmates' housing units and then submit them electronically in real time. The submissions from planners' tablets will instantly populate release planning data into HIM and ORCHID and also send the IRP for printing at the inmate property location so every inmate's IRP accompanies that inmate when he or she is released from custody.

Through the Justice, Care and Opportunities Department, the County is in the early stages of developing a voluntary, post-release Warm Landing Place ("WLP") program operating outside of Provision 34 that will provide additional opportunities for community linkages. On June 10, 2024, Phase I of this program launched with the establishment of a welcome table at the public lobby of the Inmate Reception Center that is fully staffed during the jail's release window. The contracted release planning specialists at this table offer information to individuals exiting the jail, as well as the friends and family set to pick up inmates in the waiting area, and direct connections to services in the community. WLP plans to provide beds at a larger, semi-permanent location about 1.5 miles away from the IRC as part of Phase II by the end of this year. Finally, Phase III will feature a permanent office location across the street from the IRC. The County has already allocated $1.8 million toward the purchase of this permanent location, which will also feature a small number of interim housing beds and facilities for bathing.

Regarding the County's specific results, the County's Augmented Eighteenth Self-Assessment reports that for Compliance Measure 34-13(c)(1), which relates to referrals for release planning, 96.5% of inmates in the Fourth Quarter of 2023 and 97.8% of inmates in the First Quarter of 2024 received a referral for release planning, greater than the required 85%.

For Compliance Measure 34-13(c)(2), which concerns Initial Release Plans ("IRPs"), the County reports that the records of 55.2% of inmates in the Fourth Quarter of 2023 and 64.3% of inmates in the First Quarter of 2024 who should have received an

Initial Release Plan were compliant, less than the required 85%.  Similarly, for Compliance Measure 34-13(c)(3), which requires certain services and documentation relating to inmates receiving comprehensive release planning, the County reports that the records of 28.8% of inmates in the Fourth Quarter of 2023 and 39.4% in the First Quarter of 2024 were compliant, less than the required 85%.

For Compliance Measure 34-13(c)(4), which pertains generally to the release planning process, the County reports that the records of 44.7% of inmates in the Fourth Quarter of 2023 and 50.6% of inmates in the First Quarter of 2024 were compliant, less than the required 85%.  Finally, for both the Fourth Quarter of 2023 and the First Quarter of 2024, the County reports 94% compliance with Compliance Measure 34-13(c)(5), which requires documentation relating to inmates requiring psychotropic medications, exceeding the 90% requirement.

With respect to the County's posted results for the First Quarter of 2024, the Monitor's auditors observed that missing and untimely IRPs continue to adversely affect the County's compliance.  As noted in the Monitor's Seventeenth Report, the Monitor's auditors also note that inmates without completed comprehensive release plans ("CRPs") who were released within 30 days of referral were included in the assessment of the comprehensive release planning process.  These inmates should be excluded from the calculation of compliance since comprehensive release plans were neither completed nor required.  Other issues previously noted by the Monitor's auditors have also continued.[14]

---

[14] For example, despite no CRP being initiated or completed for an inmate (Count 6, BKG #6769809) pursuant to Compliance Measure 34-13(c)(3), the County appears to rely on the IRP to determine that this record was compliant with the comprehensive release planning criteria of a bridge psychotropic medication plan.  In addition, the care transitions note provided, dated February 29, 2024, implies that the IRP handout was completed based on the preliminary discharge information collected during intake and assessed under Compliance Measure 34-13(c)(1), rather than a discussion between the release planner and inmate.

The posted results also reflect that the records for an inmate (Count 9, BKG #6723993) were non-compliant with the IRP criteria and compliant with the comprehensive release planning criteria.  The source documentation provided does not include an IRP or CRP.  However, the County determined that this record was compliant with the comprehensive release planning criteria due to all criteria being not applicable, except for one: a plan for bridge psychotropic medication.  To satisfy this criterion, the County appears to rely on documentation reflecting that release medications were provided to the inmate.  However, documentation reflecting that an inmate received release medications differs from a plan for bridge psychotropic medications.  As this inmate was released less than 30 days after the referral for release planning, this record should be marked as not applicable with respect to the comprehensive release planning process.

35.    Consistent with existing DMH and Sheriff's Department policies, the County and the Sheriff will ensure that custody staff, before the end of shift, refer prisoners in general or special populations who are demonstrating a potential need for routine mental health care to a QMHP or a Jail Mental Evaluation Team ("JMET") member for evaluation, and document such referrals.  Custody staff will utilize the Behavior Observation and Referral Form.

**STATUS:**        **SUBSTANTIAL COMPLIANCE (as of November 1, 2017, through December 31, 2018 (verified))**

The Compliance Measures require the Department to review, for a randomly selected month each quarter, the Behavior Observation and Mental Health Referral ("BOMHR") records for prisoners referred by custody staff to a QMHP or JMET member for "routine" mental health care to determine the timeliness of the referrals, and that 85% of the referrals "occurred before the end of the shift in which the potential need for mental health care is identified."

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 35 in the Eighteenth Reporting Period.

36.    Consistent with existing DMH policies, the County and the Sheriff will
ensure that a QMHP performs a mental health assessment after any adverse triggering
event, such as a suicide attempt, suicide threat, self-injurious behavior, or any clear de-
compensation of mental health status.  For those prisoners who repeatedly engage in such
self-injurious behavior, the County will perform such a mental health assessment only
when clinically indicated, and will, when clinically indicated, develop an individualized
treatment plan to reduce, and minimize reinforcement of, such behavior.  The County and
the Sheriff will maintain an on-call system to ensure that mental health assessments are
conducted within four hours following the notification of the adverse triggering event or
upon notification that the prisoner has returned from a medical assessment related to the
adverse triggering event.  The prisoner will remain under unobstructed visual observation
by custody staff until a QMHP has completed his or her evaluation.

**STATUS:**    **PARTIAL COMPLIANCE (at TTCF and CRDF)**

On December 27, 2022, the Court issued an Order Setting Deadlines for
Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial
Compliance with Provision 36 by September 30, 2023, which was missed during the
Seventeenth Reporting Period.

The Compliance Measures require the Department to develop a staffing schedule
to provide on-call services, and the County's Augmented Eighteenth Self-Assessment
reported that it complied with this requirement for the Fourth Quarter of 2023.  The
Compliance Measures also require the Department to review randomly selected records
of prisoners newly admitted to mental health housing from a lower level of care due to an
adverse triggering event during two randomly selected weeks per quarter.  The County's
posted results reflect that during the Fourth Quarter of 2023, 73% of inmates identified in
the two randomly selected weeks received an assessment by a QMHP within four hours,
rather than the 95% required by Compliance Measure 36-4(a).[15]  The County further
reports that 80% of the selected prisoners at TTCF and at CRDF were seen on videos
under unobstructed visual observation pending assessment, less than the 95% required by
Compliance Measure 36-4(b).

The County's Augmented Eighteenth Self-Assessment reports that for the First
Quarter of 2024, the Department complied with the staffing schedule requirement.  The
County further reports that during the First Quarter of 2024, 75% of inmates identified in
the two randomly selected weeks received an assessment by a QMHP within four hours,
as required by Compliance Measure 36-4(a).  The County further reports that 40% of the
selected prisoners at CRDF and 100% at TTCF were under unobstructed visual
observation pending assessment, as is required by Compliance Measure 36-4(b).

As noted in the Seventeenth Report, the County missed the applicable deadline
for bringing Provision 36 into Substantial Compliance in the Court's December 27, 2022,
Order, ECF No. 234.  The County reports that it has undertaken a number of remedial

---

[15] The Eighteenth Augmented Self-Assessment indicates 74% compliance, however the posted records
reflect 73.49% compliance, which equals 73%.

steps to fix this, including increases to staffing

Hiring efforts have reduced vacancies at CRDF from nine vacant Psychiatric Social Worker positions in November 2023 to just one vacant position as of February 8, 2024, and from two Clinical Psychologist vacancies down to one (including those who are onboarding). Since March 2024, CHS has hired additional Psychiatric Social Workers and Clinical Psychologists.

Staffing on some early morning and weekend shifts remains light, however, at the North County facilities, which significantly contributed to the lack of significant improvement from the compliance percentages in 17th Reporting period. Out of 21 non-compliant records in the fourth quarter of 2023, 18 came from North County facilities (17 from NCCF and 1 from PDC North). Out of 15 non-compliant records in the First Quarter of 2024, 9 came from NCCF. This occurred even though the North County facilities hired and onboarded 6 new clinicians and 1 overnight clinician in 2023. During a period during the 18th Reporting period, when overnight clinicians were on leave or not working, custody staffing at the NCCF were delayed by their own staffing shortages in transporting individuals to the IRC, or they otherwise waited until the next morning to alert clinical staff. This resulted in some inmates not being assessed by a QMHP within the required four-hour timeframe.

The County implemented detailed workflow and protocols for staff at the North County facilities to invoke when clinicians at North County cannot promptly evaluate a patient subject to Measure 36-4(a) that will allow for that patient to be evaluated via a telepsych evaluation by clinicians working 24-7 in the IRC. In April 2024, staff in mental health at NCCF were provided with training documentation instructing them how to use telehealth capabilities to contact clinicians in the IRC for a telepsych assessment. Through the BOMHR telehealth video program, if there is no on-call QMHP on duty at the North County facilities, staff can telephone the IRC lead deputy station to notify them of the BOMHR, and IRC mental health staff can assess the inmate through the Inmate Video Visitation Services teleconferencing service.[16]

Regarding the requirement to keep patients under unobstructed visual observation until the QMHP evaluation is completed, the County reports on its efforts to address the declining results at CRDF

---

[16] The Monitoring Team notes that while telepsych may be useful for crisis evaluations in limited circumstances, in-person observations are a more reliable method of building rapport, and assessing a patient's mental status, behavior, presentation, appearance, eye contact, body language, facial expressions, psychomotor activity, affect, mood, and speech, and telepsych should not become the primary method by which crisis evaluations are performed at the North County facilities.

On September 28, 2023, CCSB visited CRDF and briefed the facility's Operations and Access to Care ("ACB") lieutenants, as well as the CRDF Training unit, on the requirements of Provision 36 and the imperative of unobstructed visual observation of those patients in the aftermath of an adverse triggering event. CCSB took CRDF staff through exemplars of non-compliant incidents and discussed training strategies to ensure compliance. CRDF staff have also been retrained on the requirements for unobstructed visual observation.  More significantly, as discussed above in the self-assessment concerning Provision 28, CRDF has recently put in place a new staffing model for 1400, which includes, as a component, a "front bench" area where those individuals required to remain under unobstructed visual observation will be located in an area of 1400 that provides deputies with an opportunity to have an unobstructed view of such individuals.

The Monitoring Team has conducted multiple qualitative reviews of the County's compliance with Provision 36 in several recent Reporting Periods and has found deficits in the frequency with which QMHPs adequately evaluated the apparent risk factors and provided safety or crisis response plans to address them.  The Team again reviewed Provision 36 cases in the Eighteenth Reporting Period, and found similar deficits in the cases reviewed.[17]  The County has expressed a desire for an agreed-upon set of minimum standards to use for crisis responses to ensure uniformity and consistency in the standards to be used in reviewing them.  To that end, on June 20, 2024, the Monitoring Team shared draft crisis response minimum standards with the County, and, on August 1, 2024, the County responded with its suggested revisions.  On August 28, 2024, the Monitoring Team provided revisions to the County, with which the County agreed on September 26, 2024.  These minimum standards will be utilized during subsequent qualitative reviews by the Monitoring Team.

---

[17] The Monitoring Team met with County personnel remotely on August 1, 2024, and again during a site visit on August 19, 2024, and was informed that certain safety precautions, which are not documented within the crisis notes, are taken in the wake of crisis responses to protect patient safety until patients can be moved and/or property restrictions imposed.  This was a very useful discussion.  The Team has requested that these precautions be documented in writing and formalized in Unit Orders and a post-crisis call log sheet to track patient movement and continuous observation.  The County has indicated that that responsive Unit Orders are being drafted, but they have not yet been shared with the Monitoring Team.  To the extent that the County can promptly complete and formalize these procedures, they will be considered in future qualitative reviews of this provision.

37.     Sheriff's Court Services Division staff will complete a Behavioral Observation and Mental Health Referral ("BOMHR") Form and forward it to the Jail's mental health and/or medical staff when the Court Services Division staff obtains information that indicates a prisoner has displayed obvious suicidal ideation or when the prisoner exhibits unusual behavior that clearly manifests self-injurious behavior, or other clear indication of mental health crisis.  Pending transport, such prisoner will be under unobstructed visual observation or subject to 15-minute safety checks.

**STATUS:     NON-COMPLIANCE**

The Compliance Measures require the Department to randomly select nine courts from among the three Court Divisions each quarter, review written communications and orders that refer to a suicide risk or serious mental health crisis for a prisoner and incident reports for self-injurious behavior by prisoners appearing in the selected courts, and determine if these incidents are reflected in BOMHR forms completed by the Court Services Division staff in the selected courts.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required Defendants to achieve Substantial Compliance with Provision 37 by March 31, 2024, which falls within the period covered by this Report.

In the County's Augmented Eighteenth Self-Assessment, it reported that for the Fourth Quarter of 2023, in all of the 13 qualifying incidents, Court Division staff completed BOHMRs for the patient and forwarded them to CHS.  However, in five of the cases, staff failed to document and perform timely safety checks, resulting in a compliance percentage of 62%.  In the First Quarter of 2024, the County reported that for all four qualifying incidents, Court Division staff completed BOHMRs and forwarded them to CHS.  However, staff failed to document the safety checks in one case and the checks were not done in a timely manner in two cases, resulting in 25% compliance.

To improve compliance with the safety check requirements of Provision 37, the County reports that it has taken several corrective actions

Court Services Division ("CSD") staff has continued substantial compliance with Measure 37-4(a) in writing BOMHRs and forwarding those reports to CHS. To improve compliance with Measure 37-4(b), Court Services Training sends out a quarterly email regarding Provision 37 with instructions on the proper procedure to follow once a BOHMR is completed. These instructions include directions to scan records of safety checks or unobstructed visual observation into a shared drive accessible by CCSB. Furthermore, review of the Provision 37 guide prepared by CCSB is mandatory for all CSD staff, and such reviews are required to be documented in APIS rosters each quarter, with completed rosters—ensuring that all staff have complied—forwarded to CSD administration. On July 5, 2024, CSD sent an email to all branch supervisors addressing missing safety check and observation documentation. The email directed supervisors to address BOMHR documentation in weekly briefings, and to

inform all personnel to scan all attendant documents, including safety-check logs. Supervisors were directed to instruct all staff to complete scanning, email all forms to "appropriate expedite recipients," and then save the documents in the CCSB shared folder.

CCSB also continues to take a hands-on approach to assist. To obtain a better understanding of each court lock-up's physical layout and their respective issues, CCSB visited East Los Angeles Courthouse on February 9, 2024, and CSFCJC on April 30, 2024. At these visits, CCSB emphasized the importance of both proper completion of the BOMHR and submission of the Title 15 safety check logs.

38.     Consistent with existing DMH policies and National Commission on Correctional Health Care standards for jails, the County and the Sheriff will ensure that mental health staff or JMET teams make weekly cell-by-cell rounds in restricted non-mental health housing modules (e.g., administrative segregation, disciplinary segregation) at the Jails to identify prisoners with mental illness who may have been missed during screening or who have decompensated while in the Jails.  In conducting the rounds, either the clinician, the JMET Deputy, or the prisoner may request an out-of-cell interview. This request will be granted unless there is a clear and documented security concern that would prohibit such an interview or the prisoner has a documented history of repeated, unjustified requests for such out-of-cell interviews.

**STATUS:        SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified))**

The Compliance Measures require the Department to review the documentation of the weekly cell-by-cell rounds and the JMET Logs for a randomly selected week each quarter to confirm that the required cell-by-cell checks were conducted and out-of-cell interviews were handled in accordance with this provision.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 38 in the Eighteenth Reporting Period.

39.     The County and the Sheriff will continue to use a confidential self-referral system by which all prisoners can request mental health care without revealing the substance of their requests to custody staff or other prisoners.

STATUS     **SUBSTANTIAL COMPLIANCE (as of July 1, 2017, through June 30, 2018 (verified) at NCCF)**

**PARTIAL COMPLIANCE (at CRDF, MCJ, TTCF, and PDC North)**

**NOT RATED (at PDC East and PDC South)**

Substantial Compliance requires the Department to (a) verify that housing areas have the required forms and (b) review randomly selected self-referrals for mental health care from prisoners to confirm that (i) the referrals "were forwarded to DMH" by the Department, and (ii) that "DMH documented the timeliness and nature of DMH's response to the self-referrals[.]"  The thresholds for Substantial Compliance are that (i) 85% of the housing areas have the required forms; (ii) 90% of the self-referrals must be forwarded by the Department to the Department of Health Services – Custody Health Services (DHS-CHS); and (iii) 90% must contain the required documentation of DHS-CHS's response.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 39 by June 30, 2024, which does not fall within the period covered by this Report.

The County's Augmented Eighteenth Self-Assessment reports that it achieved Substantial Compliance with Compliance Measure 39-4(a) in the Fourth Quarter of 2023 at all monitored facilities.  The reported results were 89% at MCJ, 95% at CRDF, 92% at TTCF, 100% at PDC North, 100% at PDC South, and 100% at PDC East.

Regarding Compliance Measures 39-4(b) and 4(c), the County's Augmented Eighteenth Self-Assessment reports that 100% of the self-referrals from PDC North, PDC South, CRDF, TTCF, and MCJ were forwarded by the Department to CHS in the Fourth Quarter of 2023.  The County further reports that CHS documented the timeliness and nature of its response in 15% of the PDC North referrals, 50% of the PDC South referrals, 46% of the CRDF referrals, 42% of the TTCF referrals, and 47% of the MCJ referrals.  The County reports there were no relevant referrals from PDC East during the Fourth Quarter of 2023.

For the First Quarter of 2024, the County reports that it achieved Substantial Compliance with Compliance Measure 39-4(a) at all applicable facilities.  The reported results were 91% at MCJ, 90% at CRDF, 92% at TTCF, 89% at PDC North, 100% at PDC South, and 100% at PDC East.

Regarding Compliance Measures 39-4(b) and 4(c), the County's Augmented Eighteenth Self-Assessment reports that 100% of the self-referrals from PDC North,

CRDF, TTCF, and MCJ were forwarded by the Department to CHS in the First Quarter of 2024, and there were no relevant referrals from PDC South and PDC East.  The County further reports that CHS documented the timeliness and nature of its response in 44% of the PDC North referrals, 41% of the CRDF referrals, 35% of the TTCF referrals, and 75% of the MCJ referrals.

The County reports that in early 2024, it retained additional clinical staff and CHS Health Information Management ("HIM") staff to assist with Provision 39, but they were hired toward the end of the Eighteenth Reporting Period, thus "they produced little improvement in compliance results for that period but should lead to increase compliance in future quarters."  Further, "[n]ew staff for both the clinical and HIM teams have been trained on the HSR documenting and response protocol. In addition, existing staff receives recurring training to bolster awareness and understanding of the required procedures for Provision 39. The most recent training was provided on March 12, 2024 to the staff that triages HSRs at CRDF."  Also

> the County planned to expand the model used by JMET to document HSR response times and create alerts when patient requests approach the seven-day mark. This HSR Tracker was in use at TTCF and MCJ during the Seventeenth Reporting Period and has now been implemented at CRDF at the end of the First Quarter of 2024, and at North Facility in April of 2024. This system allows tracking of submitted HSRs, including more real time information on those patients who have an approaching deadline.

The County projects that "the increased staffing, continued training, and better tracking that has been implemented in recent months will have a significant impact on future performance, and the County expects compliance to improve significantly in the 19th Reporting Period."  The County previously reported Substantial Compliance at NCCF for twelve consecutive months from July 1, 2017, through June 30, 2018.  These results have been verified by the Monitor's auditors and NCCF is no longer subject to monitoring for compliance with Paragraph 39.

40.     The County and the Sheriff will ensure a QMHP will be available on-site, by transportation of the prisoner, or through tele-psych 24 hours per day, seven days per week (24/7) to provide clinically appropriate mental health crisis intervention services.

**STATUS:        PARTIAL COMPLIANCE**

Substantial Compliance requires the County (1) to provide the Monitor with on-call schedules for two randomly selected weeks reflecting that a QMHP was assigned 24 hours a day, seven days per week, and (2) to randomly select referrals for mental health crisis intervention received by a QMHP per quarter to verify (i) that a QMHP responded to all referrals, and (ii) responses to 90% of the referrals were within four hours.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234.  That Order required Defendants to achieve Substantial Compliance with Provision 40 by September 30, 2023, which fell within the period covered by the Seventeenth Report.

The County's Augmented Eighteenth Self-Assessment reports that in the Fourth Quarter of 2023, a QMHP responded to 100% of the referrals for mental health crisis intervention services, which equals the 100% threshold for Substantial Compliance, and that 97% of the responses were within four hours, exceeding the 90% threshold for Substantial Compliance.  The County's Augmented Eighteenth Self-Assessment reports that in the First Quarter of 2024, a QMHP responded to 100% of the referrals for mental health crisis intervention services, which equals the 100% threshold for Substantial Compliance, and that 98% of the responses were within four hours, which is above the 90% threshold.

The Monitoring Team has conducted multiple qualitative reviews of the County's compliance with Provision 40 in several recent Reporting Periods and these reviews generally found that a substantial percentage of patients were seen by QMHPs in a timely manner after triggering events.  However, there were deficits in the percentage of cases in which the crisis response was deemed to be clinically appropriate.  The Team has noted in prior monitoring reports that "what is typically missing is an indication that sound crisis interventions were attempted at the time of the initial clinical contact. More explicit documentation is needed of attempts at de-escalation when needed, consideration of alternative behaviors, explicit attention to and instruction in specific coping strategies, communication and collaboration with custody, or other short-term interventions intended to ensure the safety of the patient until changes in housing and more explicit treatment planning can be enacted."

The Team again reviewed Provision 40 in the Eighteenth Reporting Period, and

54

found similar deficits in the cases reviewed.[18]  Two groups of internal County personnel (Compliance staff and CHS clinical staff) also conducted their own reviews of cases from a prior Reporting Period and also found a high number of the cases reviewed failed with respect to whether "the QMPH's response include[d] clinically appropriate crisis intervention services"  Compliance Team staff found 19 of 58 cases reviewed, or 33%, compliant with that question, while CHS clinical found 25 of 46 cases reviewed, or 54%, compliant with that question).[19]

Given these findings, and the fact that the County has helpfully suggested the need for an agreed-upon set of minimum standards to use for crisis responses to ensure uniformity in the approach to be used in reviewing them, on June 20, 2024, the Monitoring Team shared draft crisis response minimum standards with the County, and, on August 1, 2024, the County responded with its suggested revisions.  On August 28, 2024, the Monitoring Team provided revisions to the County with which the County agreed on September 26, 2024.  These minimum standards will be utilized during subsequent qualitative reviews by the Monitoring Team.  The County remains in Partial Compliance with Provision 40 for the Eighteenth Reporting Period.

---

[18] The Monitoring Team met with County personnel remotely on August 1, 2024, and again during a site visit on August 19, 2024, and was informed that certain safety precautions, which are not documented within the crisis notes, are taken in the wake of crisis responses to protect patient safety until patients can be moved and/or property restrictions imposed.  This was a very useful discussion.  The Team has requested that these precautions be reduced to writing and formalized in Unit Orders and a post-crisis call log sheet to track patient movement and continuous observation.  The County has indicated that that responsive Unit Orders are being drafted, but they have not yet been shared with the Monitoring Team.  To the extent that the County can promptly complete and formalize these procedures, they will be considered in future qualitative reviews of this provision.

[19] *See* email to Nicholas E. Mitchell, dated May 23, 2024 ("The DOJ REVIEW Column represents the Monitoring Team's assessment of the qualitative question, 'Did the QMPH's response include clinically appropriate crisis intervention services?  The CHS REVIEW Column represents the CHS Supervisor's assessment, and the COMP REVIEW Column represents CHS Compliance's assessment'").

41.    Consistent with existing DMH policies, the County and the Sheriff will implement step-down protocols that provide clinically appropriate transition when prisoners are discharged from FIP after being the subject of suicide watch.  The protocols will provide:

(a)    intermediate steps between highly restrictive suicide measures (e.g., clinical restraints and direct constant observation) and the discontinuation of suicide watch;

(b)    an evaluation by a QMHP before a prisoner is removed from suicide watch;

(c)    every prisoner discharged from FIP following a period of suicide watch will be housed upon release in the least restrictive setting deemed clinically appropriate unless exceptional circumstances affecting the facility exist; and

(d)    all FIP discharges following a period of suicide watch will be seen by a QMHP within 72 hours of FIP release, or sooner if indicated, unless exceptional circumstances affecting the facility exist.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of July 1, 2022, through June 30, 2023 (verified))**

Substantial Compliance requires CHS to review the medical records of all prisoners on suicide watch in FIP for one randomly selected month each quarter, and submit a report regarding the implementation of the step-down protocols and the results of its review of the medical records.  During the Fifth Reporting Period, the parties agreed to revise the Compliance Measures to increase the number of inmates subject to the step-down protocols of Paragraph 41 and ensure that the implementation of step-down protocols for FIP patients on suicide watch "ameliorate the impact of the restrictions" and have the necessary "level of precautions based upon individual assessment[s]" of the patients.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 41 by June 30, 2024.  The reported results have been verified by the Monitor's auditors and pursuant to Paragraph 111 of the Settlement Agreement, the Department is no longer subject to monitoring for Substantial Compliance with Paragraph 41.

42.     Consistent with existing DMH policies, the County and the Sheriff will implement step-down protocols to ensure that prisoners admitted to HOH and placed on risk precautions are assessed by a QMHP.  As part of the assessment, the QMHP will determine on an individualized basis whether to implement "step-down" procedures for that prisoner as follows:

(a)     the prisoner will be assessed by a QMHP within three Normal business work days, but not to exceed four days, following discontinuance of risk precautions;

(b)     the prisoner is counseled to ameliorate the negative psychological impact that any restrictions may have had and in ways of dealing with this impact;

(c)     the prisoner will remain in HOH or be transferred to MOH, as determined on a case-by-case basis, until such assessment and counseling is completed, unless exceptional circumstances affecting the facility exist; and

(d)     the prisoner is subsequently placed in a level of care/housing as determined by a QMHP.

**STATUS:     PARTIAL COMPLIANCE (at CRDF and TTCF)**

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 42 by June 30, 2024, which does not fall within the period covered by this Report.  The thresholds for Substantial Compliance are that 95% of prisoners in HOH and placed on risk precautions are assessed by a QMHP; 90% of the assessments reflect that a QMHP determined on an individualized basis whether to implement step-down procedures; and 85% of the QMHP assessments that provide for step-down procedures are implemented by the Department.

The County's Augmented Eighteenth Self-Assessment assesses the County's compliance using the revised methodology discussed in the Monitor's Fourteenth Report. It reports that in the Fourth Quarter of 2023 at TTCF, "100% of the 25 patients with High or Imminent Risk Level on their RAS [Risk Assessment for Suicide] were assessed by a QMHP pursuant to Measure 42-4(a)."  "[T]wo of these patients, or 8%, had records documenting that a QMHP determined on an individualized basis whether to implement step-down procedures."  There were no records to assess for Measure 42-4(c).

In the First Quarter of 2024 at TTCF, "100% of the 25 patients with High or Imminent Risk Level on their RAS [Risk Assessment for Suicide] were assessed by a QMHP pursuant to Measure 42-4(a)," and "19 of these patients, or 76%, had records documenting that a QMHP determined on an individualized basis whether to implement step-down procedures."  "[A]mong the fourteen cases where assessments called for step-down procedures, documentation reflected implementation per Provision 42 for eleven

patients," a compliance percentage of 79% for Measure 42-4(c).

In the Fourth Quarter of 2023 at CRDF, the County reported that "100% of the eight patients with High or Imminent Risk Level on their RAS [Risk Assessment for Suicide] were assessed by a QMHP pursuant to Measure 42-4(a)." "[F]our of these patients, or 50%, had records documenting that a QMHP determined on an individualized basis whether to implement step-down procedures." There were no records to assess for Measure 42-4(c).

In the First Quarter of 2024 at CRDF, "100% of the 13 patients with High or Imminent Risk Level on their RAS [Risk Assessment for Suicide] were assessed by a QMHP pursuant to Measure 42-4(a)." The County reported that 62% of responsive patients "had records documenting that a QMHP determined on an individualized basis whether to implement step-down procedures." Of the four patients whose assessment provided for step-down procedures, documentation reflected implementation as required under Measure 42-4(c) for two patients. Regarding its corrective actions, the County reports

> By the end of the Fourth Quarter of 2023, TTCF initiated a new procedure to alert clinicians to high-risk patients, including those pending step-down, on a daily basis. Both documentation and training were provided on this new process in December of 2023. Training was also provided to CRDF clinicians in December of 2023 to both new and existing clinicians on the protocol of incorporating step-down considerations into their evaluations. These efforts led to improvements in the First Quarter of 2024 over the [Fourth] Quarter of 2023 at both facilities, with CRDF's numbers rising from 50% to 62% on Compliance Measure 42-4(b), and with step-down procedures being implemented fully in half of the instances in which they were recommended. TTCF's improvement was even greater, rising from 8% to 76% on Compliance Measure 42-4(b), with step-down procedures being implemented fully in 79% of the instances in which they were recommended.

> CHS expects continued improvement in compliance numbers in future quarters, based largely on additional trainings and technological enhancements that have occurred during the Second Quarter of 2024. On May 10, 2024, an ORCHID enhancement for Provision 42 went live to further automate the step-down protocol process. This enhancement prompts QMHPs to make a step-down procedure determination when they lower a patient's suicide risk from imminent/high to medium/low. If the step-down procedure is recommended, the system automatically places the patient on a Step-down Multi-Patient Task List (MPTL), which supervisors then monitor to ensure assessments are completed within three days. The automatically-generated MPTL improves upon the manual spreadsheets that CHS was using to implement the new procedures before the ORCHID fix went live. Although the manual spreadsheets and the new

58

procedures helped lead to the gains in the 18th Reporting Period, the ORCHID fix should further improve both the efficiency of the new process and accuracy of information regarding pending step-down assessments.

An additional technological improvement was made to the Mental Health Follow-up Note, which had been used to document QMHP step-down evaluations in the past. A new Step-down Powerform prompts QMHPs to assess and address each protocol requirement within the step-down assessment, facilitating more comprehensive assessments on a more consistent basis.

CHS has more recently submitted an ORCHID optimization request to enhance compliance with Provision 42 by introducing automation to streamline the step-down protocols process. This optimization would address several critical compliance challenges, including eliminating reliance on error-prone spreadsheet logs by automating the step-down protocols, thereby reducing the need for constant manual updates. The requested ORCHID automation will prompt clinicians to assess whether step-down protocols are required whenever a clinician lowers suicide risk levels. Additionally, it would assist programs in efficiently managing and assigning step-down assessments by creating multi-patient task lists of patients who required assessment for step-down protocols. Furthermore, the ORCHID optimization would require clinicians to respond to specific protocol questions based on the requirements of Provision 42, ensuring a more systematic and accurate compliance process. The optimization request has already been made by CHS, completed internal vetting within DHS, and was sent to the ORCHID administrator, Cerner, on January 23, 2024, for testing and implementation.

43.     Within six months of the Effective Date, the County and the Sheriff will develop and implement written policies for formal discipline of prisoners with serious mental illness incorporating the following:

(a)     Prior to transfer, custody staff will consult with a QMHP to determine whether assignment of a prisoner in mental health housing to disciplinary housing is clinically contraindicated and whether placement in a higher level of mental health housing is clinically indicated, and will thereafter follow the QMHP's recommendation;

(b)     If a prisoner is receiving psychotropic medication and is placed in disciplinary housing from an area other than mental health housing, a QMHP will meet with that prisoner within 24 hours of such placement to determine whether maintenance of the prisoner in such placement is clinically contraindicated and whether transfer of the prisoner to mental health housing is clinically appropriate, and custody staff will thereafter follow the QMHP's recommendation;

(c)     A QMHP will participate in weekly walks, as specified in paragraph 38, in disciplinary housing areas to observe prisoners in those areas and to identify those prisoners with mental health needs; and

(d)     Prior to a prisoner in mental health housing losing behavioral credits for disciplinary reasons, the disciplinary decision-maker will receive and take into consideration information from a QMHP regarding the prisoner's underlying mental illness, the potential effects of the discipline being considered, and whether transfer of the prisoner to a higher level of mental health housing is clinically indicated.

STATUS (43):        **SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at NCCF and PDC North)**

**PARTIAL COMPLIANCE (at CRDF, TTCF, and MCJ)**

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 43 by March 31, 2024, which falls within the period covered by this Report.

Regarding Compliance Measures 43-6 and 43-9(e), the Department submitted a memorandum indicating that no individuals with mental illness lost behavioral credits for disciplinary reasons during the Fourth Quarter of 2023. The County's Augmented Eighteenth Self-Assessment reports that in the Fourth Quarter of 2023, 33% of the required consultations at CRDF occurred prior to transfers from mental health housing to discipline housing. The County further reports that 20%, less than the required 90%, of the meetings required pursuant to Compliance Measure 43-9(c) occurred when transferring individuals to disciplinary housing from areas other than mental health housing. The County also reports that 100% of the weekly row walks through disciplinary units pursuant to Compliance Measure 43-9(d) occurred at CRDF. The results for MCJ were 50%, 66%, and 100%, respectively.

At TTCF, 84% of the required consultations occurred prior to transfers from mental health housing, and there were no patients to assess for Measure 43-9(c) during this quarter, since "TTCF does not have non-mental health housing nor disciplinary housing units." Similarly, the County reports that regarding Compliance Measure 43-9(d), "no patients received any disciplinary action."

Regarding Compliance Measures 43-6 and 43-9(e), the Department submitted a memorandum indicating that no individuals with mental illness lost behavioral credits for disciplinary reasons during the First Quarter of 2024. The County's Augmented Eighteenth Self-Assessment reports that no patients required consultations at CRDF prior to transfers from mental health housing. 0% of the required consultations at CRDF occurred when transferring inmates from areas other than mental health housing.[20] The County also reports that 100% of the weekly row walks through disciplinary units occurred at CRDF.

The results for TTCF were 84% (consultations before transfer), but there were no results to report for Compliance Measures 43-9(c) or 43-9(d) due to TTCF not having non-mental health housing, disciplinary housing units, or any patients that received disciplinary action. For MCJ, the results were 71%, 90%, and 100% in the First Quarter of 2024. Regarding its corrective actions, the County reports

---

[20] The County's Augmented Eighteenth Self-Assessment reported 100% compliance at CRDF in the First Quarter of 2024. The County posted amended results reflecting a corrected compliance percentage of 0%.

To improve compliance with Measure 43-9(b), in March/April 2024, LASD issued mental health discipline guidelines that reiterated the requirements of the measure and that identified those violations subject to immediate movement due to the safety risk to self or others, including: i) use of force, ii) fighting, iii) possession of a weapon, iv) recalcitrant behavior, and v) possession of narcotics. In addition, the guidelines require custody staff to describe the safety concern necessitating immediate movement.

On May 2, 2024, the CHS audit team met with command staff from CRDF, TTCF, MCJ, and CCSB to specifically address concerns on documentation and visibility for CHS into who was in discipline housing (to aid with compliance with Measure 43-9(c)). Custody leadership committed that staff would provide more robust details in their narrative explaining the safety risk to self or others that necessitates immediate movement.

To respond to the visibility concern, custody has provided CHS clinicians with i) automated e-mail alerts for new Inmate Discipline Reports, ii) the Discipline Housing Report which identifies when patients are moved into discipline housing in all facilities, and iii) direct system access to identify who is assigned to discipline housing in all facilities. All of these resources facilitate CHS' ability to timely meet with individuals who have been moved. CHS mental health supervisors have also increased both daily informal communication with custody staff regarding patients and clinical resources available to custody to consult prior to or shortly after an inmate's movement.

Since LASD and CHS began to implement these changes, the CHS audit team noted that documentation has improved, and clinicians are being consulted more often prior to movement. The County anticipates these changes will be reflected in the compliance audits for future quarters.

As mentioned in the CRDF section, clinical staffing has been a challenge for Provision 43 compliance. By the end of the First Quarter of 2024, CHS redeployed staff, including compliance clinicians, to assist with and focus on DRB evaluations. These staff have been able to work more efficiently due to the creation of a Discipline Housing Report to help identify when new patients are being moved into discipline housing at all facilities. Weekly supervisor audits also allow more targeted triaging of any areas of issue.

The County previously achieved Substantial Compliance at NCCF and PDC North for twelve consecutive months and these facilities were not subject to monitoring for compliance with Paragraph 43 during the Eighteenth Reporting Period.

44.    Within six months of the Effective Date, the County and the Sheriff will install protective barriers that do not prevent line-of-sight supervision on the second floor tier of all High Observation Housing areas to prevent prisoners from jumping off of the second floor tier.  Within six months of the Effective Date, the County and the Sheriff will also develop a plan that identifies any other areas in mental health housing where such protective barriers should be installed.

**STATUS:**    **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016)**

The County has maintained Substantial Compliance with Paragraph 44 of the Agreement since January 1, 2016.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 44 in the Eighteenth Reporting Period.

45.     Consistent with existing Sheriff's Department policies, the County and the Sheriff will provide both a Suicide Intervention Kit that contains an emergency cut-down tool and a first-aid kit in the control booth or officer's station of each housing unit.  All custody staff who have contact with prisoners will know the location of the Suicide Intervention Kit and first-aid kit and be trained to use their contents.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of October 1, 2015, through September 30, 2016 (verified) at CRDF, NCCF, PDC East, PDC South, and TTCF)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at MCJ and PDC North)**

The County maintained Substantial Compliance with Paragraph 45 for twelve consecutive months at all facilities as of December 31, 2016.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 45 in the Eighteenth Reporting Period.

46.     The County and the Sheriff will immediately interrupt, and if necessary, provide appropriate aid to, any prisoner who threatens or exhibits self-injurious behavior.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of July 1, 2020, through June 30, 2021 (verified))**

The parties agreed on Revised Compliance Measures in 2021.  Substantial Compliance requires the Department to review the documentation from randomly selected incidents involving prisoners who threaten or exhibit self-injurious behavior, and include an assessment of the timeliness and appropriateness of the Department's responses to these incidents in its semi-annual Self-Assessment.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 46 in the Eighteenth Reporting Period.

47.    The County and the Sheriff will ensure there are sufficient custodial, medical, and mental health staff at the Jails to fulfill the terms of this Agreement.  Within six months of the Effective Date, and on a semi-annual basis thereafter, the County and the Sheriff will, in conjunction with the requirements of Paragraph 92 of this Agreement, provide to the Monitor and DOJ a report identifying the steps taken by the County and the Sheriff during the review period to implement the terms of this Agreement and any barriers to implementation, such as insufficient staffing levels at the Jails, if any.  The County and the Sheriff will retain staffing records for two years to ensure that for any critical incident or non-compliance with this Agreement, the Monitor and DOJ can obtain those records to determine whether staffing levels were a factor in that critical incident and/or non-compliance.

**STATUS:    PARTIAL COMPLIANCE**

Under Provision 47 and its associated Compliance Measures, Substantial Compliance requires the County to: a) submit a self-assessment that: i) identifies the steps taken by the County and the Sheriff to implement the terms of the Agreement, and ii) assesses whether staffing levels were a factor in any non-compliance with the Agreement, any Critical Incident, or the Department's handling of the Critical Incident. Historically, the Monitor has assessed that the County has provided useful analysis of the role of staffing levels with respect to Critical Incidents (47-4(a)(ii)), but it has not adequately evaluated "whether staffing levels were a factor in any non-compliance with the Agreement" (47-4(a)(ii)).  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 47 by June 30, 2024, which does not fall within the period covered by this Report.

Regarding critical incidents, the County's posted results for Provision 47 reflect the County's assessment of whether staffing levels were a factor in "any Critical Incident, or the Department's handling of the Critical Incident," as Compliance Measures 47-1 and 47-2 require.  The County's posted results report that 30 critical incidents[21] occurred during the Second Half of 2023, and the County concluded that staffing was not a factor in any of those incidents.

Accompanying its Augmented Eighteenth Self-Assessment, the County also provided two documents (captioned "CHS HR Staffing Analysis" and "CHS Mental Health Staffing Analysis") that are compilations of data about CHS' budgeted and vacant positions as of June 30, 2024.  They reflect that CHS had 365 total authorized mental health worker positions, and 221 were filled, or 61% of the total (30 positions had candidates who had accepted offers and were in the process of onboarding).

The County notes, however, that it is filling some of its vacancies with the use of Registry workers, overtime, and contracted group providers.  The Eighteenth Augmented Self-Assessment therefore calculates "effective vacancies," including Registry workers,

---

[21] 20 Deaths of People in Custody, 3 Serious Suicide Attempts, 4 Inmate Assaults on Staff, and 3 Category 3 Uses of Force.

overtime, and contracted group providers, of only 22 mental health worker positions currently vacant.

The County's use of Registry personnel, contracted group providers, and staff overtime are useful adaptations to the tight labor market for mental health workers. However, while Registry workers may reasonably be construed as fill-ins for full-time staff, staff overtime is not. Many organizations rely on staff overtime, and it does not change the number of full-time positions authorized, eligible to be filled, or vacant. Moreover, pursuant to the County's implementation plan for Provision 80, the County has added contracted group providers to *supplement* the group programming being offered by full time CHS personnel, not to supplant it. The use of contracted group providers does not obviate the need for the County to fill its vacant CHS staff positions if they are necessary to achieve compliance.[22] The Monitor therefore calculates the true rate of filled mental health worker positions, including Registry workers but excluding staff overtime or contracted group providers, as 269 of 365, or 74% (excluding the 30 onboarding). Thus, a real effective vacancy rate of 26%.

The Monitor has repeatedly encouraged the County to explore ways to speed up the onboarding process for CHS staff to address the persistent hiring delays that have been an obstacle to hiring. The County reports

> the Civil Service Rules also include a provision that allows for special hiring authority in the case of an emergency to expedite hiring to help mitigate that emergency. The Board of Supervisors determined in 2023 that this authority applies to efforts to comply with the DOJ settlement agreement.

> The special hiring authority allows for appointments to be made without initial completion of an examination if the position being filled has a nexus to DOJ Compliance and the candidate meets the minimum requirements for the job. An exam must be administered for any appointed employee within 90 days of appointment, but moving the exam to a later time allows for quicker hiring up front for qualified positions under certain circumstances, such as when no eligible hire list exists to fill the targeted position(s).

---

[22] In response to a draft of this Report, the County indicates that it disagrees "with the Monitoring Team's refusal to factor in how the County has utilized contractors and has incentivized CHS personnel to take voluntary overtime to address staffing needs to meet compliance with certain Settlement provisions in this case. There is nothing in Provision 47 that requires the County to lower CHS' vacancy rate to zero or near zero to reach substantial compliance with this provision." The Monitor notes that the Agreement requires the County to have "sufficient . . . mental health staff at the Jails to fulfill the terms of this Agreement." The Monitoring Team has not conducted an independent staffing analysis to determine the number of mental health staff that are necessary to comply with the Agreement. However, County personnel have previously indicated that CHS' budgeted mental health positions are necessary for compliance. If the County believes that this is no longer true and that Substantial Compliance can be achieved without filling all budgeted FTE positions, it should so state and explain the basis for that conclusion. Providing such an analysis could obviate any need for argument about whether the use of staff overtime and contractors should be construed as effectively filling FTE positions that remain vacant.

Most positions at Correctional Health Services qualify for this authority since they all relate to addressing mental health conditions at County jail facilities. CHS has been granted this special authority for the majority of its positions, which allows for great flexibility in using a more rapid hiring process to meet DOJ Compliance deadlines.

Anecdotal reports from recent jail site visits reflect that staff perceive the hiring process to move more quickly now and that the chronic, persistent delays of the past are no longer as significant of an obstacle to the recruitment of mental health workers.

Regarding the Monitoring Reports' often-repeated guidance that the County must also evaluate the role of staffing deficits in any non-compliance with the Agreement itself, the County has now begun to do a better job of providing such analysis. For example, the Eighteenth Augmented Self-Assessment provides useful analysis of staffing gaps or staffing approaches relating to compliance with Provisions 28, 34, 36, 39, 43, 57/58, 79/80, and 81. These are very useful discussions that should be continued and expanded, to the extent necessary, in future County self-assessments.

48.    Within three months of the Effective Date, the County and the Sheriff will have written housekeeping, sanitation, and inspection plans to ensure the proper cleaning of, and trash collection and removal in, housing, shower, and medical areas, in accordance with California Code of Regulations ("CCR") Title 15 § 1280: Facility Sanitation, Safety, and Maintenance.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016)**

The County maintained Substantial Compliance with Paragraph 48 of the Agreement at all facilities for twelve consecutive months as of December 31, 2016. Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 48 in the Eighteenth Reporting Period.

49.    Within three months of the Effective Date, the County and the Sheriff will have a maintenance plan to respond to routine and emergency maintenance needs, including ensuring that shower, toilet, sink, and lighting units, and heating, ventilation, and cooling system are adequately maintained and installed.  The plan will also include steps to treat large mold infestations.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of March 1, 2016, through February 28, 2017)**

The County maintained Substantial Compliance with Paragraph 49 of the Agreement at all facilities for twelve consecutive months as of February 28, 2017. Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 49 in the Eighteenth Reporting Period.

50.    Consistent with existing Sheriff's Department policies regarding control of vermin, the County and the Sheriff will provide pest control throughout the housing units, medical units, kitchen, and food storage areas.

**STATUS:**    **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at all facilities other than PDC South and PDC East)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 (verified) at PDC South and PDC East)**

The County maintained Substantial Compliance with Paragraph 50 of the Agreement at all facilities for twelve consecutive months as of March 31, 2017.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 50 in the Eighteenth Reporting Period.

51.     Consistent with existing Sheriff's Department policies regarding personal care items and supplies for inmates, the County and the Sheriff will ensure that all prisoners have access to basic hygiene supplies, in accordance with CCR Title 15 § 1265: Issue of Personal Care Items.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) for all facilities other than CRDF)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017 (verified) at CRDF)**

The County maintained Substantial Compliance with Paragraph 51 of the Agreement at all facilities for twelve consecutive months as of June 30, 2017. Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 51 in the Eighteenth Reporting Period.

52.     The County and the Sheriff will implement policies governing property restrictions in High Observation Housing that provide:

(a)     Except when transferred directly from FIP, upon initial placement in HOH:

    (i)     Suicide-resistant blankets, gowns, and mattresses will be provided until the assessment set forth in section (a)(ii) below is conducted, unless clinically contraindicated as determined and documented by a QMHP.

    (ii)     Within 24 hours, a QMHP will make recommendations regarding allowable property based upon an individual clinical assessment.

(b)     Property restrictions in HOH beyond 24 hours will be based on clinical judgment and assessment by a QMHP as necessary to ensure the safety and well-being of the prisoner and documented in the electronic medical record.

**STATUS:     PARTIAL COMPLIANCE (at CRDF and TTCF)**

Substantial Compliance requires the Department to (1) randomly inspect the cells of prisoners placed in HOH (except from FIP) within the previous 24 hours to confirm that they have been provided with suicide-resistant blankets, gowns and mattresses unless clinically contraindicated, and document the results of the inspection; (2) randomly inspect the cells of prisoners placed in HOH (except from FIP) for more than 24 hours to confirm that they have been provided with allowable property as recommended by a QMHP; and (3) review the electronic medical records of prisoners assigned to HOH on the days of those inspections to verify compliance with the provisions of Paragraph 52. All the Compliance Measures have a 95% threshold for Substantial Compliance.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 52 by December 31, 2023, which falls within the period covered by this Report.

In its Augmented Eighteenth Self-Assessment, the County reports that in the Fourth Quarter of 2023, at CRDF, there was 100% compliance with Compliance Measure 52-5(b).  Regarding Compliance Measure 52-5(c), "75%—rather than the required 95%—of the electronic medical records for patients assigned to HOH reflected a recommendation by a QMHP regarding allowable property."  Additionally, "87%—rather than the required 95%—of electronic medical records for patients assigned to HOH reflect that property restrictions were based upon the clinical judgment of a QMHP pursuant to Compliance Measure 52-5(d)."  The County also reported that "84%—less than the required 95%—of patients analyzed pursuant to Compliance Measure 52-5(e) had allowable property as recommended by a QMHP (unless refused by the patient)."

The County also reports that at TTCF in the Fourth Quarter of 2023, "90%—rather than the required 95%—of inmates analyzed pursuant to Compliance Measure 52-5(b) were provided suicide-resistant blankets, gowns and mattresses as required by this Provision." "70%—less than the required 95%—of the electronic medical records for patients assigned to HOH reflected a recommendation by a QMHP regarding allowable property pursuant to Compliance Measure 52-5(c)." "93%—less than the required 95%—of electronic medical records for patients assigned to HOH reflect that property restrictions were based upon the clinical judgment of a QMHP pursuant to Compliance Measure 52-5(d)." "95%—meeting the threshold for substantial compliance—of patients analyzed pursuant to Compliance Measure 52-5(e) had allowable property as recommended by a QMHP (unless refused by the patient)."

The County reports that at TTCF in the First Quarter of 2024, "97%—exceeding the required 95%—of patients analyzed pursuant to Compliance Measure 52-5(b) were provided suicide-resistant blankets, gowns and mattresses as required by this Provision." "72%—rather than the required 95%—of the electronic medical records for patients assigned to HOH reflected a recommendation by a QMHP regarding allowable property pursuant to Compliance Measure 52-5(c)." "96%—exceeding the required 95%—of electronic medical records for patients assigned to HOH reflect that property restrictions were based upon the clinical judgment of a QMHP pursuant to Compliance Measure 52-5(d)." "95%—equal to the required 95%—of inmates analyzed pursuant to Compliance Measure 52-5(e) had allowable property as recommended by a QMHP (unless refused by the patient)."

The County also reports 100% compliance with Compliance Measure 52-5(b) at CRDF in the First Quarter of 2024. Further, "77%—less than the required 95%—of the electronic medical records for patients assigned to HOH reflected a recommendation by a QMHP regarding allowable property pursuant to Compliance Measure 52-5(c)." "76%—less than the required 95%—of electronic medical records for patients assigned to HOH reflect that property restrictions were based upon the clinical judgment of a QMHP pursuant to Compliance Measure 52-5(d)." "85%—less than the required 95%—of inmates analyzed pursuant to Compliance Measure 52-5(e) had allowable property as recommended by a QMHP (unless refused by the patient)."

53.    If otherwise eligible for an education, work, or similar program, a prisoner's mental health diagnosis or prescription for medication alone will not preclude that prisoner from participating in said programming.

**STATUS:       PARTIAL COMPLIANCE**

Substantial Compliance requires the Department to audit the records of prisoners who were eligible, but rejected or disqualified, for education and work programs to confirm that they were not rejected or disqualified because of a mental health diagnosis or prescription for medication alone. On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 53 by June 30, 2024, which does not fall within the period covered by this Report.

The County's Augmented Eighteenth Self-Assessment reports that 58% of the eligible mentally ill prisoners who were denied education or work in the Fourth Quarter of 2023 and 45% in the First Quarter of 2024 were denied "for reasons other than a mental health diagnosis or a medication prescription." The County further reported that "in the interest of completeness and transparency, the Department treats every case in which a person's request for programming was not handled in a timely manner, or where the request went unanswered and had not disposition, as a denial of programming within the meaning of Provision 53."

Regarding these results, the County's Augmented Eighteenth Self-Assessment notes that it recently transitioned to a new system for tracking inmate requests (the Custody Inmate Grievance Application or "CIGA") and that the decline in performance continues to be a problem of "timeliness of replies," "not because of any increase in discriminatory denials based on a person's mental health status or prescription for psychotropic medication. Such denials remain extremely rare—indeed, there were only two such discriminatory denials across the six months of the 18th Reporting Period." To enhance staff capacity to use the new CIGA system, the County reports that it is

> rolling out additional CIGA trainings (both in-person and recorded) for grievance teams, subunits, and their respective supervisors. CSSB and CITU have also been honing CIGA alerts so that they are distributed to comprehensive group lists to ensure that everyone in the chain of responsibility will see requests whose responses are nearing their due date. Facility grievance teams are also now checking CIGA weekly and notifying subunits if there are near-due or overdue requests pending in the subunit's queue. Finally, the County has set up an email distribution list to whom CSSB and facility grievance teams will report weekly on all work and education requests that are past the 15-day threshold. This list will include not only grievance teams and subunits, but also CSSB, CITU, CCSB, and facility executives.

54.    Prisoners who are not in Mental Health Housing will not be denied privileges and programming based solely on their mental health status or prescription for psychotropic medication.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of January 1, 2023, through June 30, 2023 (verified))**

Substantial Compliance under the revised Compliance Measures for Paragraph 54, effective January 1, 2018, requires the Department to audit the records of a maximum of 100 randomly selected prisoners identified on the Wednesday Pharmacy List as having received psychotropic medication to confirm that no more than 10% were rejected or disqualified because of a mental health diagnosis or prescription for psychotropic medication alone.  Because the Monitor's auditors had verified that the County had maintained Substantial Compliance under the original Compliance Measures, the parties agreed that the County will only be required to maintain Substantial Compliance under the revised Compliance Measures for two additional quarters.

The Monitor's auditors have verified the reported results for the First and Second Quarters of 2023[23] and pursuant to Paragraph 111 of the Settlement Agreement, the Department is no longer subject to monitoring.

---

[23] The Seventeenth Monitoring Report noted "The County reported Partial Compliance for the Third Quarter of 2023 and did not request to be relieved of its obligations under Provision 54. However, the Monitor notes that the County was required to achieve only two additional quarters of Substantial Compliance and its reported results for the First and Second Quarters of 2023 reflected Substantial Compliance. Therefore, if the Monitor's auditors can verify the County's results for [the] First and Second Quarters of 2023 (and if 11 of the 13 denials in the Third Quarter "were deemed non-compliant based on the untimeliness of the response, not on a requester's mental health diagnosis or prescription for medication" as reported), the Monitor will find that the County has fulfilled its obligations under Provision 54 and it will be relieved of its obligations under that provision."  The results have now been verified.

55.    Relevant custody, medical, and mental health staff in all High Observation Housing units will meet on normal business work days and such staff in all Moderate Observation Housing units will meet at least weekly to ensure coordination and communication regarding the needs of prisoners in mental health housing units as outlined in Custody Services Division Directive(s) regarding coordination of mental health treatment and housing.  When a custody staff member is serving as a member of a treatment team, he or she is subject to the same confidentiality rules and regulations as any other member of the treatment team, and will be trained in those rules and regulations.

STATUS:    **SUBSTANTIAL COMPLIANCE (as of October 1, 2016, through September 30, 2017 (verified) at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at PDC North)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 (verified) at MCJ)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2019, through June 30, 2020 (verified) at TTCF)**

The Department maintained Substantial Compliance for twelve consecutive months at all facilities as of June 30, 2020.  These results have now been verified by the Monitor's auditors.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 55 in the Eighteenth Reporting Period.

56.    Consistent with existing DMH and Sheriff's Department policies, the County and the Sheriff will ensure that custody, medical, and mental health staff communicate regarding any change in a prisoner's housing assignment following a suicide threat, gesture, or attempt, or other indication of an obvious and serious change in mental health condition.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified))**

Substantial Compliance requires the Department to review in randomly selected periods the electronic medical records of (1) prisoners admitted to HOH following a suicide threat, gesture, or attempt, or other indication of an obvious and serious change in mental health condition to determine if the medical and/or mental health staff approved the placement of the prisoner in HOH; and (2) prisoners who were the subject of a suicide attempt notification to determine if the prisoners were clinically assessed and that clinical staff approved the post-incident housing.

The County's Substantial Compliance results for the twelve months from January 1, 2016, through December 31, 2016, were verified by the Monitor's auditors. Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 56 in the Eighteenth Reporting Period.

57 (**Revised**).  Within three months of the Effective Date, the County and the Sheriff will revise and implement their policies on safety checks to ensure a range of supervision for prisoners housed in Mental Health Housing.  The County and the Sheriff will ensure that safety checks in Mental Health Housing are completed and documented in accordance with policy and regulatory requirements as set forth below:

    (a)    Custody staff will conduct safety checks in a manner that allows staff to view the prisoner to assure his or her well-being and security.  Safety checks involve visual observation and, if necessary to determine the prisoner's well-being, verbal interaction with the prisoner;

    (b)    Custody staff will document their checks in a format that does not have pre-printed times;

    (c)    Custody staff will stagger checks to minimize prisoners' ability to plan around anticipated checks;

    (d)    Video surveillance may not be used to replace rounds and supervision by custodial staff unless new construction is built specifically with constant video surveillance enhancements and could only be used to replace the required safety checks in non-FIP housing, subject to approval by the Monitor;

    (e)    A QMHP, in coordination with custody (and medical staff if necessary), will determine mental health housing assignments; and

    (f)    Supervision of prisoners in mental health housing will be conducted at the following intervals:

        (i)    FIP:  Custody staff will perform safety checks every 15 minutes.  DMH staff will perform direct constant observation or one-to-one observation when determined to be clinically appropriate;

        (ii)    High Observation Housing:  Every 15 minutes;

        (iii)    Moderate Observation Housing:  Every 30 minutes.

STATUS (57):        **SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at MCJ)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2021, through June 30, 2022 (verified) at PDC North)**

**PARTIAL COMPLIANCE (at TTCF and CRDF)**

On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provision 57 ("Revised Paragraph 57") as set forth above. The Parties also agreed on Revised Compliance Measures. Substantial Compliance requires the Department to audit the Title 15 Dashboard records (or e-UDAL records if the Title 15 scanner was not working) for all shifts for each module in each mental health housing unit in two randomly selected weeks to determine if the safety checks were staggered and conducted as required by Paragraph 57 of the Agreement, and to audit the housing records for each mental health housing unit for a randomly selected week to determine if QMHPs approved the new mental health housing assignments as required by Paragraph 57(e). On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 57 by June 30, 2024, which does not fall within the period covered by this Report.

The County's Sixth Self-Assessment reported that it maintained Substantial Compliance with Compliance Measure 57-5(b) in the Fourth Quarter of 2017 and the First Quarter of 2018 in the MOH unit at MCJ (the "Hope Dorm"). It also reported that all of the inmates at MCJ "analyzed pursuant to Compliance Measure 57-5(c) had received QMHP approval for their housing assignments" in both quarters. The results were verified by the Monitor's auditors and MCJ was not subject to monitoring for compliance with Paragraph 57 in the Eighteenth Reporting Period.

The County's Augmented Eighteenth Self-Assessment reports that 84.2% of the safety checks were in compliance with Compliance Measure 57-5(b) (safety checks in FIP) in the Fourth Quarter of 2023 at TTCF. It also reports that 81.1% of the safety checks were in compliance with Compliance Measure 57-5(c) (safety checks in HOH) at TTCF. The County also reports that 91.3% of the safety checks complied with Compliance Measure 57-5(d) (safety checks in MOH) at TTCF. 100% of the new mental health housing assignments at TTCF were approved by a QMHP in the Fourth Quarter of 2023.

The County's Augmented Eighteenth Self-Assessment also reports that due to technical issues with the BREAVA system at CRDF, the County relied on the e-UDAL system for capturing results for CRDF in the Fourth Quarter of 2023. It, therefore, did not generally report such results, save for Compliance Measure 57-5(e), for which the County reported that 100% of the new mental health housing assignments at CRDF were approved by a QMHP in the Fourth Quarter of 2023.

The County's Augmented Eighteenth Self-Assessment reports that 65.5% of the safety checks were in compliance with Compliance Measure 57-5(c) (safety checks in HOH) in the First Quarter of 2024 at CRDF.  The County also reports that 58.6% of the safety checks complied with Compliance Measure 57-5(d) (safety checks in MOH) at CRDF.  A QMHP approved 100% of the new mental health housing assignments at CRDF in the First Quarter of 2024.

The County's Augmented Eighteenth Self-Assessment also reports that 87.9% of the safety checks were in compliance with Compliance Measure 57-5(b) (safety checks in FIP) in the First Quarter of 2024 at TTCF.  It also reports that 96.1% of the safety checks were in compliance with Compliance Measure 57-5(c) (safety checks in HOH) at TTCF.  The County also reports that 90.7% of the safety checks complied with Compliance Measure 57-5(d) (safety checks in MOH) at TTCF.  100% of the new mental health housing assignments at TTCF were approved by a QMHP in the First Quarter of 2024.

The County's reported results within its Augmented Eighteenth Self-Assessment are based on a "CCSB Proposed Calculation," which is an alternative calculation reflected within the posted results.  The following table compares CCSB's "Original" and "Proposed" calculated compliance percentages for Provision 57:

| | "Original" Calculation | "Proposed" Calculation | Increase |
|---|---|---|---|
| **4Q2023** | | | |
| *TTCF:* | | | |
| FIP | 82.7% | 84.2% | 1.5% |
| HOH | 80.2% | 81.1% | 0.9% |
| MOH | 87.7% | 91.3% | 3.6% |
| *CRDF:* | | | |
| | *Not Rated* | | |
| **1Q2024** | | | |
| *TTCF:* | | | |
| FIP | 86.6% | 87.9% | 1.3% |
| HOH | 93.4% | 96.1% | 2.7% |
| MOH | 89.2% | 90.7% | 1.5% |
| Mixed | 90.7% | 93.0% | 2.3% |
| *CRDF:* | | | |
| MOH | 58.6% | 58.6% | 0.0% |
| HOH | 65.5% | 65.5% | 0.0% |

Regarding the proposed methodology, the County's Augmented Eighteenth Self-Assessment states

the County submits that these compliance measures for Provision 57 and 58

should be assessed as percentages of compliant rounds to required rounds not rounds attempted, especially because one of the ways that some facilities are achieving compliance is by doing more safety checks than are required by the Compliance Measures. Note that this can result in compliance percentages above 100%, as is true for some compliance measures for Provision 58 below.

The Monitor, in consultation with his auditors, does not accept the County's proposed methodology for calculating compliance. The Monitor's auditors explain that

the County proposes calculating compliance by dividing the number of safety checks occurring within a week by the number of "required rounds," which is calculated by dividing the number of hours or minutes in a week by the required safety check interval. For example, if safety checks are required every 30 minutes, the number of "required rounds" is calculated as follows: (24 hours/day * 60 minutes/hour * 7 days) / 30 minutes = 336 "required rounds." Therefore, if 300 safety checks occurred over the course of the week, the County proposes a compliance calculation resulting in 89.3% (300 / 336).

This proposed compliance calculation presents two issues. First, it detaches the compliance calculation from the requirements of Provisions 57 and 58. The Provisions require that safety checks occur at specific time intervals, not that a total number of safety checks occur within a period of time. In other words, summing the total number of checks that occurred within a week is not the same as determining the number of checks that occurred every 15, 30, or 60 minutes, which is what the Compliance Measures require. Using a 24-hour period as an example with 60-minute safety checks, suppose that for the first 12 hours of the day, no safety checks were performed. However, for the remaining 12 hours, a safety check was performed every 30 minutes, resulting in 24 total safety checks performed. The resulting compliance percentage based on the County's proposed methodology would be 100% (24 checks / 24 required checks) when in actuality, the percentage would be much lower due to no safety checks occurring for the first half of the day.

Second, the calculation of "required rounds" assumes that safety checks occur exactly at the required intervals. This is rare, as safety checks generally occur with a several-minute buffer until the required interval. This, in combination with Compliance Measures 57(c) and 58(g), which require Custody to stagger checks to minimize inmates' ability to plan around anticipated checks, means that in order for the County to achieve Substantial Compliance, safety checks must generally occur at intervals less than the requirements. Therefore, the number of "required rounds" as defined by the County is understated and results in an overstated compliance percentage.

While increasing the number of safety checks can increase compliance, as stated by the County in its Augmented Eighteenth Self-Assessment, the increased number of rounds must be reflected in not only the numerator, as it suggests, but

also the denominator of the calculation.  In order to determine the percentage of compliant safety checks, the County should adhere to its original calculation method based on the number of safety checks that occurred within the required intervals divided by the number of safety checks actually occurring or that should have occurred.[24]

Notwithstanding the methodological issues, in the Eighteenth Reporting Period, the County saw dramatic improvements in its compliance with Provision 57 at both TTCF and CRDF, which it attributes to various developments.  At TTCF, the County notes that it has generally attempted to avoid having "mixed modules" of inmates whose housing require differing safety check intervals, which can erroneously cause the BREAVA system to record scans "as noncompliant for an entire module or entire walk." It also includes reducing "scan points from 16 to six in certain pods where it appears that the sheer volume of scan points has created a likelihood of accuracy errors in data recorded by the BREAVA system."  The County reports that this reduction in the number of scan points has not resulted in any decline in the quality of the safety checks conducted "based on supervisor spot checks of video footage that are taking place during each shift." Finally, due to the often-reported WiFi issues that have long plagued the TTCF results under Provision 57, "CITU [] conducted a Custody Division-wide replacement of routers and WiFi access points. TTCF completed the equipment installation on April 27, 2024."

At CRDF, the County reports

The Department has been using the CN70 as its Title 15 handheld scanning device. These devices were first introduced into the market in 2011, so they are outdated and provide very limited functionality. CITU conducted a needs assessment with the facility and determined 58 scanners are needed to provide adequate coverage at CRDF and provide for replacements when devices are sent out for repair. CITU has also identified a more recent CN75 scanner model that is compatible with the BREAVA system and more reliable, and has procured a limited supply of available CN75s for immediate deployment at CRDF and MCJ, and will be procuring more CN75s to be deployed to all facilities as soon as they arrive and are configured. CRDF was the test facility to pilot the CN75, which produced significantly better results, especially with respect to quicker and more reliable uploads to BREAVA. Since May 2024, CRDF has received 19 CN75 devices, including five CITU "loaners." Another 44 devices for CRDF are part of a current bid solicitation.

Further, the County reports that staff received additional training on proper use of

---

[24] In response to a draft of this Report, the County proposed "a new formula that the County believes both addresses the Draft Report's concerns and achieves the greatest possible accuracy in calculating the County's compliance."  The County's new formula is under review and the Monitoring Team may have additional questions for the County.  However, the Team's preliminary impressions are positive, and on first impression, the new formula appears to adequately address the concerns raised in the Draft Report.

the scanning devices, and that "CITU then conducted a Custody Division-wide replacement of routers and WiFi access points. CRDF was the first facility for equipment installation, which was completed on March 24, 2024." The County also describes extensive process improvement efforts that include the formation of a Title 15 Workgroup that meets regularly and the assignment of three sergeants as "dedicated Title 15 supervisors who monitor safety check walk compliance, supervise, consult, and motivate staff, and conduct two video audits per shift to confirm the quality of those rounds." The County also reports that it has provided "training and regular briefings to maintain standards and performance consistency in timeliness and quality," adjusted the number of scan points "to improve the efficiency of safety walks and scans. The adjustments either increase or decrease the number of scan points, depending on the physical layout of the module."

Regarding the attempt to replace the BREAVA system (*see* Seventeenth Monitoring Report at pp. 86), the County reports that vendors "'off-the-shelf' solutions lacked the capabilities needed to meet the requirements of Provision 57, DSB currently plans to develop an in-house custom solution. This approach has advantages and disadvantages, but on balance DSB currently believes that it can design and build a system that is sufficiently flexible that it will not quickly become outdated and flawed (like BREAVA), and that the level of customization and subsequent technical support that would be needed to customize a vendor's off-the-shelf solution would ultimately be more expensive and less flexible. Accordingly, DSB is now pursuing this avenue, which will take time to conceive fully, develop, and implement."

The County maintained Substantial Compliance with Paragraph 57 for twelve consecutive months at PDC North as of June 30, 2022. These results have been verified by the Monitor's auditors. Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring at PDC North for Substantial Compliance with Paragraph 57 in the Eighteenth Reporting Period.

58.    Within three months of the Effective Date, the County and the Sheriff will revise and implement their policies on safety checks.  The County and the Sheriff will ensure that safety checks in non-mental health housing units are completed and documented in accordance with policy and regulatory requirements as set forth below:

(a)    At least every 30 minutes in housing areas with cells;

(b)    At least every 30 minutes in dormitory-style housing units where the unit does not provide for unobstructed direct supervision of prisoners from a security control room;

(c)    Where a dormitory-style housing unit does provide for unobstructed direct supervision of prisoners, safety checks must be completed inside the unit at least every 60 minutes;

(d)    At least every 60 minutes in designated minimum security dormitory housing at PDC South, or other similar campus-style unlocked dormitory housing;

(e)    Custody staff will conduct safety checks in a manner that allows staff to view the prisoner to assure his or her well-being and security.  Safety checks involve visual observation and, if necessary to determine the prisoner's well-being, verbal interaction with the prisoner;

(f)    Custody staff will document their checks in a format that does not have pre-printed times;

(g)    Custody staff will stagger checks to minimize prisoners' ability to plan around anticipated checks; and

(h)    Video surveillance may not be used to replace rounds and supervision by custodial staff.

| STATUS (58): | **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at PDC South, PDC North, and PDC East)** |
|---|---|
| | **SUBSTANTIAL COMPLIANCE ( as of July 1, 2017, through June 30, 2018 (verified) at CRDF)** |
| | **SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at IRC)** |
| | **SUBSTANTIAL COMPLIANCE (as of October 1, 2023, through March 31, 2024 (unverified) at TTCF)** |
| | **SUBSTANTIAL COMPLIANCE (as of January 1, 2024, through March 31, 2024 (unverified) at NCCF and MCJ)** |

Substantial Compliance requires the Department to audit the Title 15 Dashboard records (or e-UDAL records) for all shifts for each module in each housing unit to determine if the safety checks were staggered and conducted as required by Paragraph 58. The threshold for achieving Substantial Compliance with each of the Compliance Measures is 90%. On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 58 by June 30, 2024, which does not fall within the period covered by this Report.

The County maintained Substantial Compliance with Paragraph 58 for twelve consecutive months at PDC South, PDC North, and PDC East as of December 31, 2016, at CRDF as of June 30, 2018, and at IRC as of September 30, 2018. These results have been verified by the Monitor's auditors. Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring at those facilities for Substantial Compliance with Paragraph 58 in the Eighteenth Reporting Period.

The County's Augmented Eighteenth Self-Assessment reports that for the Fourth Quarter of 2023 and First Quarter of 2024, the following percentages of safety checks were in compliance with Paragraph 58: at TTCF (109.5% and 97.0%), at MCJ (91.4% and 108.0%), and at NCCF (95.42% and 113.4%).[25]

As discussed in detail above in Provision 57, the Monitor, in consultation with his auditors, does not accept the County's proposed methodology for calculating compliance.

---

[25] In response to a draft of this Report, the DOJ commented that it is "concerned that the rounds recorded by BREAVA are, in many cases, quite quick." The Monitor notes that he plans to assess the quality of a sample of the safety checks occurring and that the Monitor's auditors requested CCTV footage for certain checks at TTCF for the Fourth Quarter of 2023 on July 25, 2024. CCTV footage for CRDF, IRC, TTCF, and NCCF for the First Quarter of 2024 was requested on September 13, 2024.

The following table compares CCSB's "Original" and "Proposed" calculated compliance percentages:

|  | "Original" Calculation | "Proposed" Calculation | Increase |
|---|---|---|---|
| **4Q2023** | | | |
| TTCF | 97.6% | 109.5% | 11.9% |
| MCJ | 83.2% | 91.4% | 8.2% |
| NCCF | 87.9% | 95.4% | 7.5% |
| **1Q2024** | | | |
| TTCF | 92.9% | 97.0% | 4.1% |
| MCJ | 94.6% | 108.0% | 13.4% |
| NCCF | 95.4% | 113.4% | 18.0% |

The County reports that many of its corrective actions regarding Provision 57, discussed above, also apply to Provision 58. Regarding the individual facilities, it most notably reports that at MCJ and NCCF, there is an enhanced role for sergeants in monitoring safety check walk compliance; briefing staff, and "performing supplemental video audits in each shift to confirm the quality of the safety check rounds." Further, "[t]here has been a reduction in the number of scan points in some modules to improve safety walk efficiency. The quality of the safety check rounds has been maintained, as confirmed by video spot audits."

Regarding the scanner devices themselves, MCJ has already replaced ten of the older CN70 handheld scanner devices with the newer CN75 model. The remaining 50 devices at MCJ, and 40 at NCCF, "are included in the Department's current solicitation to replace all of the Custody Division's CN70s scanner devices with the newer CN75 model."

59.     Consistent with existing Sheriff's Department policies regarding uniform daily activity logs, the County and the Sheriff will ensure that a custodial supervisor conducts unannounced daily rounds on each shift in the prisoner housing units to ensure custodial staff conduct necessary safety checks and document their rounds.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of January 1, 2017, through December 31, 2017 (verified) at PDC East and MCJ)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2018, through December 31, 2018 (verified) at PDC North and PDC South)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 (verified) at TTCF)**

Substantial Compliance requires the Department to audit e-UDAL records for housing units in each facility to determine if supervisors are conducting unannounced daily rounds in accordance with Paragraph 59.  In response to the Monitor's comments, the Department's e-UDAL forms were modified to include a specific notation that the Supervisor verified that the safety checks were conducted.  The threshold for achieving and maintaining Substantial Compliance is that 90% of the supervisor daily rounds were in compliance with the requirements of Paragraph 59.

The County's Substantial Compliance results were verified by the Monitor's auditors.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 59 in the Eighteenth Reporting Period.

60.    Within six months of the Effective Date, the Department of Mental Health, in cooperation with the Sheriff's Unit described in Paragraph 77 of this Agreement, will implement a quality improvement program to identify and address clinical issues that place prisoners at significant risk of suicide or self-injurious behavior.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of April 1, 2019 through March 31, 2020)**

Paragraph 60 requires the County to "implement a quality improvement program to identify and address clinical issues that place prisoners at significant risk of suicide or self-injurious behavior."  The Compliance Measures for Paragraph 60 require the County to "identify and address clinical issues. . .in the areas identified in Paragraph 61 of the Agreement" and corrective actions are taken to address "such issues."  See Compliance Measures 60.1, 60.2(a), and 60.3(b).

The Monitor and the Mental Health Subject Matter previously agreed that the Department had demonstrated "a sound quality improvement process and the ability to demonstrate that process through specific quality improvement projects directed by management," and the Monitor finds that the County had demonstrated that it maintained Substantial Compliance with Paragraph 60.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 60 in the Eighteenth Reporting Period.[26]

---

[26] The County has acknowledged that its ongoing Quality Improvement efforts will remain subject to monitoring under other provisions of the Settlement Agreement.

61.     The quality improvement program will review, collect, and aggregate data in the following areas and recommend corrective actions and systemic improvements:

(a)     Suicides and serious suicide attempts:

        (i)      Prior suicide attempts or other serious self-injurious behavior
        (ii)     Locations
        (iii)    Method
        (iv)     Lethality
        (v)      Demographic information
        (vi)     Proximity to court date;

(b)     Use of clinical restraints;

(c)     Psychotropic medications;

(d)     Access to care, timeliness of service, and utilization of the Forensic Inpatient Unit; and

(e)     Elements of documentation and use of medical records.

**STATUS:      PARTIAL COMPLIANCE**

Substantial Compliance requires the County's semi-annual reports to (a) review, collect, and aggregate data in the areas set forth in Paragraph 61; (b) recommend corrective actions and systemic improvements in those areas; and (c) assess the effectiveness of actions and improvements in prior reporting periods.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 61 by June 30, 2024, which does not fall within the period covered by this Report.

On August 6, 2024, the County submitted its Semi-Annual Report on Quality Improvement and Suicide Prevention Efforts (the "QI Report"), which relates to Paragraphs 61 and 62.  The QI Report sets forth aggregate data for the 19 suicides and 26 critical incidents that occurred between 2021 and the end of the First Quarter of 2024, broken down by the subparts of Paragraph 61(a).

To comply with Provision 61, the County must both build an infrastructure for its QI program and then successfully implement it.  Beginning in the Seventeenth Reporting Period—and accelerating in the months immediately after—the County began to build an infrastructure and the tools necessary for its QI program.  For example, it filled the long-vacant data analyst position that had been discussed in several Monitoring Reports, placed the program under a seasoned Supervising Psychologist, developed new forms and tracking tools, created a framework for prioritizing quality improvement projects and scheduling them in advance, and—significantly—sought to engage leaders from multiple

jail disciplines, including Mental Health, Psychiatry, Nursing, and Medicine, in meaningful discussions at the monthly JQIC meetings. These are useful developments.

However, the Monitoring Team has long pointed to the fact that the QI program does not adequately identify "corrective actions and systemic improvements" based upon the data collected. *See, e.g.*, Fifteenth Monitoring Report ("the data continue to reveal troubling trends in suicide attempt and self-directed violence ('SDV') that are not yet being analyzed to drive corrective actions in the Department"); Sixteenth Monitoring Report ("while the Combined Suicide Prevention Report often notes trends in inmate suicide and self-harm, it often does not identify corresponding corrective actions and systemic improvements"). The QI Report for the Eighteenth Reporting Period continues this trend. According to the Monitoring Team, it provides "useful descriptive data, and also identifies a need for 'targeted strategies and interventions' that it never actually discusses." For example

- "The higher number of suicides in HOH, despite its purpose of providing heightened observation and care, underscores the necessity for continuous evaluation and enhancement of mental health protocols. Given that HOH houses the largest number of inmates with acute mental health issues, these findings emphasize the need for targeted interventions and specialized care strategies." *See* QI Report at pp. 19-20.

- "The analysis of in-house suicide methods from 2021 to Q1 2024 . . . uncovers key trends and highlights areas requiring focused intervention[s]." *Id.* at pp. 20-21.

- "This consistent prevalence underscores the critical need for targeted prevention measures, such as enhanced monitoring and environmental modifications, to mitigate the risk of hanging within the jail settings." *Id.* at pp. 21.

- "This data reveals a predominance of Hispanic and African American individuals among those who engage in self-directed violence, indicating a need for targeted mental health interventions and support tailored to these ethnic communities." *Id.* at pp. 36

- "The most pronounced finding is the high suicide rate among inmates aged 45 and older. This age group accounts for 33% of all suicides, despite comprising only 20% of the total inmate population. . . Addressing this trend may involve implementing

targeted interventions and support systems designed to address the unique needs of older inmates." *Id.* at pp. 22.

- "The fact that a quarter of the suicides involved individuals with a known history of suicide attempts underscores the importance of closely monitoring and providing targeted support to inmates with such histories.  Previous suicide attempts are a known risk factor for future suicidal behavior, suggesting that enhanced intervention strategies could be beneficial for this subgroup." *Id.* at pp. 23.

Notwithstanding this call for targeted interventions in these areas, no responsive interventions are discussed or referenced regarding these data.  Nor do the meeting agendas for the JQIC suggest that these observations in the QI Report are feeding into analytical projects undertaken by the QI program.  Indeed, many QI projects appear to relate to compliance with the DOJ Agreement, rather than specific trends in suicide, SDV, or patient care.[27]

The Monitoring Team reiterates that the principal weaknesses in the QI Program, relevant to Provision 61, remains the need to identify corrective actions and systemic improvements related to the data collected by the Department.[28]

---

[27] In response to a draft of this Report, the County emphasized that the Monitoring Team was consulted when the County developed its process for prioritizing QI projects, and that the County now seeks to avoid focusing only on self-harm and suicide prevention matters in its JQIC meetings.  The Monitoring Team appreciates the County's project prioritization process, but notes that addressing longer-term analytical projects and responding contemporaneously to changes in key indicators, including those related to patient self-harm, need not be mutually exclusive.  Indeed, some QI programs create time in their regular QI meetings to report on key indicators, such as SDV incidents, time to house patients, and group hours, among others, to allow leaders to promptly respond to the kinds of observations made in the QI Report with targeted interventions.

[28] The Department also includes certain data in the QI Report with no corresponding analysis.  In these cases, it is unclear what role this data plays in the QI program or what relationship it has to any analytical projects or attempts to improve patient care.  *See, e.g.*, QI Report at pp. 45 – 53 (including a series of descriptive data tables and charts for the MAT program, but no analysis, and no apparent program evaluation).  In contrast, certain QI projects have clear project goals, descriptions of baseline data, goals, process measures, and mobilization of data that is actually relevant to the goals and the program being evaluated.  *See, e.g.*, QI Report at pp. 127-130 (regarding a project undertaken by Dr. DeSilva, et al., to improve the timeliness of initial psychiatric assessments after patient intake).

62.    The County and the Sheriff's Unit described in Paragraph 77 of this Agreement will develop, implement, and track corrective action plans addressing recommendations of the quality improvement program.

**STATUS:    PARTIAL COMPLIANCE**

Substantial Compliance requires the County's semi-annual Self-Assessments to set forth (a) the "development of corrective action plans to address the most recent recommendations of the quality improvement program;" and (b) the "implementation and tracking of corrective action plans to address recommendations of the program in prior quarters." On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 62 by June 30, 2024, which does not fall within the period covered by this Report.

On August 6, 2024, the County submitted its Semi-Annual Report on Quality Improvement and Suicide Prevention Efforts (the "QI Report"), which relates to Paragraphs 61 and 62. The QI Report sets forth aggregate data for the 19 suicides and 26 critical incidents that occurred between 2021 and the end of the First Quarter of 2024. Regarding Provision 62, the County's Augmented Eighteenth Self-Assessment reports

Since the original CAP tracker was developed, there have been several enhancements made to the QI program, most notably to the JQIC process in response to feedback from the Monitoring team. A new CAP tracker tool was therefore developed in the spring of 2024 that allowed for better access and easier use. That version of the tracker is accessible by both LASD and CHS staff, and records and tracks progress on CAPs from multiple sources, including from the CIRC, and from the Suicide Review team.

As described in the Self-Assessment for Provision 61, above, JQIC has a robust shared site that serves as a central hub, repository, and tracker of issues, analysis, and interventions developed and implemented through the JQIC process. This helps centralize everything JQIC related and facilitates collaboration between the JQIC team members. Additionally, JQIC interventions are added as CAPs to the CAP Tracker to combine and centralize tracking efforts across all QI efforts.

All CAPs and other QI efforts are being tracked and recorded and are accessible by the appropriate stakeholders using these two tools in combination, allowing for analysis across trends and patterns that may emerge.

The Monitoring Team reviewed the shared site described by the County ("QI Shared Site"), and the CAP Tracker, and provides the following assessment.

The QI Shared Site has a landing page, which includes general information, such as links to relevant contacts, several articles about quality improvement, the date of the next JQIC meeting, a form for award nominations by the JQIC Committee, and a link to a repository of JQIC meetings documents, such as agendas.  It also includes tabs labeled "Conversations," and "Calendar," which were inaccessible to the Team, and a "Shared with us" folder, which was empty.  The two tabs that most closely resemble the County's description of a "central hub, repository, and tracker of issues, analysis, and interventions developed and implemented through the JQIC process" were the "Project Tracker List" and "Issue Tracker List" tabs, which were accessible to the Monitoring Team.

The Project Tracker List tab links to a document formatted in a grid-style with a list of "Interventions."  Each intervention is grouped by project and includes a field for the name of the project, the name of the intervention, a brief description of the intervention, a progress field (such as "in progress," "completed," or "not started"), start and end dates, and the name of the person assigned to completion.  It also includes a notes field, which is rarely used.

The information contained in the description field is sparse and does not set forth what steps were taken, in what jails or with what personnel, to what effect, or how the intervention would be monitored in the future.  Nor does it provide any specificity about the intervention.  For example, under the "Stepdown Protocol Procedures" project is an intervention labeled "Provision 42 training."  It is listed as "completed" with start and end dates both of April 3rd.  The description states "Clinician Training, Provide training to all CHS clinicians to review provision requirements."  No further information is provided about what training was provided, by whom, to what personnel, or how the effectiveness of the training would be monitored in the future.  Are there specific quantitative improvements envisioned by implementing this intervention and a date when the success or failure of the intervention will be measured?  It doesn't say.  Other entries on the list are similarly vague.

It is unclear to the Monitoring Team who the target audience is for this interventions list, whether it is being used by staff involved in the County's QI efforts, or how it could be used to improve patient care given the sparsity of the information reflected therein.  The Issue Tracker List is similarly formatted and includes the same kinds of information.  It is also sparsely populated and its potential use in the Department's QI efforts also remains unclear.

The CAP Tracker document shared with the Monitoring Team is a nine-page document that lists a series of corrective actions that appear to flow from Critical Incident Review Committee ("CIRC") cases and death reviews.  Each entry has incident and booking numbers, the name of the involved inmate, the date of the incident, a description of the necessary CAP, to whom the CAP is assigned, and a comments field, which sometimes includes substantial information about the progress at implementing the CAP.  It is a very useful document that appears to effectively track CAPs related to CIRCs and inmate deaths but not apparently from the County's QI programs.

63.    The County and the Sheriff will maintain adequate High Observation Housing and Moderate Observation Housing sufficient to meet the needs of the jail population with mental illness, as assessed by the County and the Sheriff on an ongoing basis.  The County will continue its practice of placing prisoners with mental illness in the least restrictive setting consistent with their clinical needs.

STATUS:    **SUBSTANTIAL COMPLIANCE (as of October 1, 2023, through March 31, 2024 (unverified) at CRDF)**

**PARTIAL COMPLIANCE (at TTCF)**

The Parties agreed on Revised Compliance Measures in 2021.  The Revised Compliance Measures require that 90% of inmates waited for permanent HOH and MOH housing for no more than 7 days, and that 100% of inmates waited for permanent HOH and MOH housing for no more than 30 days.

On December 27, 2022, and on April 20, 2023, the Court issued Orders Setting Deadlines for Substantial Compliance, ECF No. 234 and 248, respectively, which established specific deadlines for Defendants to "improve compliance with provisions 63, 64, and 80."  With respect to Provision 63, the December 2022 Order established deadlines for Defendants to take a series of "agreed-upon actions to improve compliance," while the April 2023 Order established incremental targets for the Defendants' overall compliance with Provision 63 by the end of each quarter.

*Figure 6:  Quarterly Court-Ordered Targets for Provision 63 Compliance*

|  | **% of Inmates Waiting ≤ 7 Days in MH Housing Intake Areas Before Transfer to Permanent MH Housing** | **Average Wait Time** |
|---|---|---|
| **2Q2023** | 60% | 10 days |
| **3Q2023** | 65% | 9 days |
| **4Q2023** | 70% | 8 days |
| **1Q2024** | 75% | 7 days |
| **2Q2024** | 80% | 7 days |
| **3Q2024** | 85% | 7 days |
| **4Q2024** | 90% | 7 days |

Regarding CRDF, the County's Augmented Eighteenth Self-Assessment includes results for the Fourth Quarter of 2023 under the Revised Compliance Measures.  It reports that in the random weeks of the Fourth Quarter of 2023, "100% of the inmates at CRDF waited no more than seven days in mental health housing intake areas before being transferred to permanent mental health housing, and there were no inmates who

waited longer than 30 days." The average wait time was 1.2 days.[29] This met the incremental targets in the Court's April 2023 Order. It also reports that in the randomly selected weeks in the First Quarter of 2024, "99.4% of the inmates at CRDF waited no more than seven days in mental health housing intake areas before being transferred to permanent mental health housing, and 100% waited fewer than 30 days." The average wait time was 1.3 days.[30] This also met the incremental targets in the Court's April 2023 Order.

Regarding TTCF, the County reports that in the random weeks of the Fourth Quarter of 2023, "56% of the inmates at that facility waited no more than seven days in metal health housing intake areas before being transferred to permanent mental health housing, and 100% waited no longer than 30 days." The average wait time was 9.6 days.[31] This did not meet the incremental targets in the Court's April 2023 Order. In the random weeks of the First Quarter of 2024, at TTCF, "42.3% of the inmates at that facility waited no more than seven days in mental health housing intake areas before being transferred to permanent mental health housing, and 99.7% waited no longer than 30 days." The average wait time was 10.4 days.[32] This also did not meet the incremental targets in the Court's April 2023 Order.

Given the Department's reported results, the County is in Substantial Compliance at CRDF and Partial Compliance at TTCF with Provision 63 for the Eighteenth Reporting Period.[33] These results are subject to verification by the Monitor's auditors.

The Monitor has consistently highlighted the gap between the demand for HOH beds and the supply of such beds available to meet that demand as a key contributor to the County's compliance challenges with Provision 63. *See, e.g.*, Fifteenth Monitoring Report at pp. 2-5. The County notes the impact of that gap in the difference in its results at CRDF and TTCF in the Eighteenth Reporting Period.

The County attributes the excellent results at CRDF to two primary

---

[29] While not explicitly stated, the average wait time of 1.23 days reported at CRDF for the Fourth Quarter of 2023 appears to be for the final week of the quarter rather than the randomly selected weeks. The average wait time for the two randomly selected weeks was 1.07 days. The Monitor's Seventeenth Report noted this discrepancy and requested that the results for the Eighteenth Reporting Period reflect the weeks randomly selected by the Monitor.

[30] The average wait time of 1.31 days reported at CRDF for the First Quarter of 2024 is for the final week of the quarter rather than the randomly selected weeks. The average wait time for the two randomly selected weeks was 1.72 days.

[31] While not explicitly stated, the average wait time of 9.55 days reported at TTCF for the Fourth Quarter of 2023 appears to be for the final week of the quarter rather than the randomly selected weeks. The average wait time for the two randomly selected weeks was 7.35 days.

[32] While not explicitly stated, the average wait time of 40.42 days reported at TTCF for the First Quarter of 2024 appears to be for the final week of the quarter rather than the randomly selected weeks. The average wait time for the two randomly selected weeks was 9.11 days.

[33] In response to a draft of this Report, the County indicates that "since July 8, 2024: (a) CRDF has continuously reported 100% compliance in placing new inmates in permanent mental health housing within seven days; and (b) at TTCF, MHIT data has recorded that inmates were placed in permanent mental health housing within seven days over 90% of time during 11 of the past 12 weeks." All such data are subject to verification by the Monitor's auditors.

factors: First, the implementation of the Mental Health Tracker ("MHIT") system at CRDF in November 2023 has provided CRDF's custody and intake staff with real-time situational awareness as to how long inmates at that facility have been waiting to be assigned permanent mental health housing, and that tool has provided insight on a real-time basis that prompts personnel to act to locate permanent housing when new arrivals appear at that facility. Second, CRDF has managed to maintain a facility occupancy rate of under 60% of that facility's capacity during the current reporting period. Accordingly, when new arrivals at CRDF require permanent mental health housing, such housing is currently readily available. Through a combination of these factors, coupled with a staff that has increased its focus on meeting Provision 63's requirements, CRDF has experienced a dramatic turnaround when compared to previous reporting periods and has achieved substantial compliance with Provision 63's requirements.

In contrast

Unlike CRDF, the space needed to provide permanent housing for the roughly 1,320 HOH men at TTCF is extremely scarce. Therefore, a much greater degree of operational intensity is required at TTCF to find permanent housing matches on a timely basis for the inmates who reside in SAT. This is particularly true because SAT housing numbers can fluctuate between approximately 150 and 200 inmates (or more) on any given day and SAT consists of many inmates with unique circumstances that make their placement in permanent housing especially challenging (i.e., inmates with severe mental health issues who may also require "keep away" status from other inmates due to the nature of their offense or the threat they pose to others).

Regarding its efforts to reduce the population of P3 and P4 patients, and thus the demand for HOH beds, the County reports

While the size of the HOH population in the LACJ involves numerous factors that are well outside its control, the County continues to execute on its plans to reduce the total population who require HOH, and has focused its efforts to depopulate the jail on removing P3 and P4 inmates from the LACJ whenever appropriate to do so by (a) expediting the transfer of FIST inmates to state hospitals for restorative services; (b) promptly transporting County inmates to state prison when the opportunity presents itself; and (c) building out community treatment bed capacity for those P3 and P4 inmates who qualify for mental health diversion and other such programs.

Regarding the third item on that list, building out community treatment bed capacity, the County reports

The County is also reducing the demand for HOH housing and FIP services by safely diverting P3 and P4 inmates into community-based mental health treatment settings. In this regard, the Board of Supervisors has allocated funding for the County portion of the year one ramp up of expanded community treatment placements for this population through the County's Office of Diversion and Reentry ("ODR") and Department of Mental Health ("DMH"), and the County also entered into a $629 million dollar contract with the Department of State Hospitals to increase capacity for community-based restoration services for FIST individuals who would otherwise wait in the LACJ for transfer to state hospital. ODR has also changed its intake focus to center on P3s and FIST inmates. As a result of these pushes to create alternatives for incarceration for individuals with serious mental health conditions who could find more appropriate treatment outside of a jail environment, as of July 2, 2024 there were 3,026 slots for ODR diversion placements (the ODR Housing program), 722 slots for community-based FIST restoration services and diversion, and 203 slots for community-based placements for MIST inmates (misdemeanor incompetent to stand trial).

Notwithstanding these releases, in its Augmented Eighteenth Self-Assessment, the County reports that not only did the population of inmates who require HOH housing not decline during the same period, instead it grew. *See* County's Augmented Eighteenth Self-Assessment at Fn. 17 ("According to LASD population data, 1,319 men were housed in HOH housing as of July 9, 2024. That is up from a recent low of just over 1,200"). The County has shared significantly improved results at TTCF for Provision 63 for the months after the end of the Eighteenth Reporting Period. If those results do not hold, in its Nineteenth Self-Assessment, the County should provide additional detail about how it intends to close the gap between the demand for HOH beds, and the available supply, to enable it to achieve Substantial Compliance with Provision 63 at TTCF consistent with the Court's orders.

<u>Assessment of the Mix of Therapeutic Features in FIP Stepdown Units and HOH Dorms</u>

On March 11, 2024, the Court issued an Order Modifying Deadlines for Substantial Compliance, ECF 266, which extended several deadlines pending in this case. As part of that Order, the Court also instructed that "the Monitor and the Mental Health Subject Matter Expert will assess as part of the Monitor's semi-annual reports the mix of therapeutic features in the Stepdown units and HOH dorms." The Monitor and Mental Health Subject Matter Expert therefore share the following assessment of the mix of therapeutic features in the Stepdown units and HOH dorms.

Therapeutic features of the FIP Stepdown units include enhancements to the physical environment, greater freedom of movement, the presence of Inmate Mental Health Assistants ("MHAs"), and the support of the custody sergeant and deputies

assigned to these units.  The physical environment is distinguished by soft furniture and
traditional tables rather than the metal spider tables in other units.  There are murals,
artwork, and plants to create a more comfortable and less austere living space.  Other
amenities, such as books and a coffee machine, contribute to the livability of the
environment.  Inmates are not cuffed when out of their cells.

Inmate MHAs in the TTCF FIP Stepdown units have received intensive training
for their therapeutic role, reside in the units, and provide a consistent supportive presence
in addition to the regular structured programming they deliver.  They are involved in an
incentive-based program to reinforce positive behavior and daily self-care habits.  This
includes providing access to amenities, such as hot coffee, as a reward for meaningful
engagement in group programming and maintaining cells and the common dayroom in a
clean and orderly condition.  They also serve as mediators to prevent and de-escalate
conflict in the unit.  In interviews with inmates in these units, the presence of inmate
MHAs has been described as essential for preventing the gang politics of threat, coercion,
and intimidation that are pervasive in other dorm-style housing areas, which supports the
ability of patients to engage in mental health programming without fear or distraction.
The custody staff are also a consistent and supportive presence.  They do not rotate and
thus build positive, empathetic relationships with the patients residing in the FIP
Stepdown units.

HOH dorms also allow enhanced freedom of movement (compared to traditional
HOH housing pods), in that inmates are not cuffed to tables during out-of-cell time.  A
distinction between FIP Stepdown and HOH dorm units involved the referral process.
According to information provided by the County, referrals to FIP Stepdown are initiated
by clinicians based on the health history, need, and clinical presentation of the patient.
Referrals to HOH dorms are initiated by custody based on observations of the patient's
behavior and ability to program unrestrained.  HOH dorms do not appear to include other
distinguishing therapeutic features as described for the TTCF FIP Stepdown units.

Differences were noted in the FIP Stepdown units at CRDF and those at TTCF.
Interviews revealed that the female MHAs were not providing the same regularity or
depth of group programming as the male MHAs at TTCF.  Their training consisted
primarily of self-study from various texts, with testing to demonstrate understanding, but
without the hands-on modeling and mentoring that appears to take place with male
MHAs.  The female MHAs are responsible for documenting the inmates' daily
compliance in areas like taking medications, showering, brushing teeth, and cleaning
activities, as part of a token economy with food reinforcers referred to as the "Five Star
Program."  Beyond this, it appeared that programming was limited to one hour in the
morning and one hour in the afternoon, when the patients were out of their cells uncuffed.
Overall, the women's program seemed less richly resourced than the men's program,
with less programming and supportive services and less out-of-cell time.  At this time, the
physical environment was also less distinctive (in the ways described above) from other

HOH housing units than appears to be the case with the men's FIP Stepdown units.[34]

---

[34] In response to a draft of this Report, the DOJ noted that pursuant to orders of the Court, FIP Stepdown units must all have the following "essential features:" "(i) enhanced, unrestrained out-of-cell time with access to out-of-pod recreation areas; (ii) a therapeutic physical space with games, soft furniture, decorative art or plants, and other pro-social environmental features similar to those in TTCF's existing Stepdown units; (iii) consistent and specially trained staff; and (iv) tailored treatment plans and programming." *See United States, v. County of Los Angeles*, No. 2:15 CV 05903 DDP, Order Modifying Deadlines for Substantial Compliance, Dkt. 266. Given the findings shared by the Monitoring Team, the County should, in its next Self-Assessment, provide information about its efforts to address the observable differences between the FIP Stepdown units at TTCF and CRDF and any obstacles to ensuring that all FIP Stepdown units have the required "essential features."

64.     Within six months of the Effective Date, the County and the Sheriff will develop a short-term plan addressing the following 12-month period, and within 12 months of the Effective Date, the County and the Sheriff will develop a long-term plan addressing the following five-year period, to reasonably ensure the availability of licensed inpatient mental health care for prisoners in the Jails.  The County and the Sheriff will begin implementation of each plan within 90 days of plan completion.  These plans will describe the projected capacity required, strategies that will be used to obtain additional capacity if it is needed, and identify the resources necessary for implementation.  Thereafter, the County and the Sheriff will review, and if necessary revise, these plans every 12 months.

**STATUS:       PARTIAL COMPLIANCE**

The parties agreed on Revised Compliance Measures in 2021.  Substantial Compliance requires the Department to develop a long-term plan that will address the availability of licensed inpatient mental health care for prisoners in the following five-year period; and provide an annual report describing the long-term plan and the steps taken to implement it, which must be deemed reasonable by the Monitor.

On December 27, 2022, and on April 20, 2023, the Court issued Orders Setting Deadlines for Substantial Compliance, ECF No. 234 and 248, respectively, which established specific deadlines for Defendants to "improve compliance with provisions 63, 64, and 80."  With respect to Provision 64, the December 2022 Order established deadlines for Defendants to take a series of "agreed-upon actions to improve compliance," while the April 2023 Order established incremental targets for the Defendants' overall compliance with the provision by specific quarters.  The incremental targets are visualized in the figure below.

*Figure 7:  Quarterly Court-Ordered Targets for Provision 64 Compliance*

|  | Difference Between # of P4s and # of Patients Receiving Inpatient Care |
|---|---|
| **2Q2023** | ≤80 |
| **3Q2023** | ≤60 |
| **4Q2023** | ≤40 |
| **1Q2024** | ≤20 |
| **2Q2024** | ≤10 |
| **3Q2024** | ≤5 (and must wait no more than 8 hours for placement) |

Beginning in the Sixteenth Reporting Period, and extending into the Eighteenth Reporting Period, the County achieved several encouraging successes in its efforts to comply with Provision 64.  This included opening the Jail Inpatient Unit/Acute Intervention Module ("JIU/AIM") on June 1, 2023, and beginning to treat P4 patients therein to stabilize them and potentially move them to a lower level of care, which

continues to have a notable impact on the overall P4 population and the number of patients waiting for inpatient care on the FIP waitlist.[35]  The County reports that at the end of the First Quarter of 2024, there were 69 P4 patients in the LACJ, which is a significant decline from the number just months earlier.  In addition

> As a result of this dramatic decline in the number of P4 inmates housed in the LACJ over the last 20 months, combined with the slight increase in the number of inpatient beds now in use at the LACJ, the County met each of the Court-ordered benchmarks for Provision 64 for the four quarters during the 17th and 18th Reporting Periods, and is currently in compliance with the very aggressive benchmark for the Second Quarter of 2024, as (1) the difference between the number of P4 inmates receiving FIP services at the end of the Second Quarter of 2023 and the number of P4 inmates requiring such services was 54 (below the Court-ordered benchmark of 80); (2) that difference was 16 at the end of the Third Quarter of 2023 (below the Court-ordered benchmark of 60); (3) that difference was 10 at the end of the Fourth Quarter of 2023 (below the Court-ordered benchmark of 40); (4) that difference was 11 at the end of the First Quarter of 2024 (below the Court-ordered benchmark of 20).

The County also reports on its efforts to embed a psychiatric staff in IRC in order to ensure that inmates with mental illness who are newly booked into the jails do not decompensate to a P4 status.  The unit consists of "2.75 psychiatrists, and 8.25 psychiatric nurse practitioners" and currently "provide[s] 24/7 psychiatric coverage in the IRC from Tuesday through Friday, 10-17 hours of coverage on Saturdays, 14 hours on Sundays, and 21 hours on Monday."  The County further reports that

> the psychiatric team embedded in the IRC continued to see the vast majority of the patients referred for a psychiatric medication evaluation face-to-face before those patients were assigned to permanent housing and left the IRC. The County provides the balance of those individuals who are not seen by the IRC psychiatric team with treatment in line with CHS' Bridge Medication Policy; and, for those individuals who meet that policy's criteria, 100% receive orders for the continuation of their medications. The ultimate goal of this enhanced psychiatric staff embedded in the IRC is to ensure, to the greatest extent possible, that individuals entering the LACJ receive a psychiatric assessment for medication before transferring to permanent housing.

The County also reports that it has continued to expedite the transfer of inmates facing felony charges found incompetent to stand trial to state hospitals, noting that "between March 30, 2023 and July 11, 2024, the County has

---

[35] The County reports that there are currently 58 total usable, licensed beds for treating P4 inmates (33 usable, licensed beds in the FIP itself, ten licensed beds in the AIM Unit, and 15 licensed beds in the MHTU on the second floor of the CTC).

transferred 1,992 FIST inmates to state hospitals for restoration services and, in the process, reduced the number of pending FIST state hospital transfers from 506 to 147."

Similarly, it has continued to transfer inmates to state prison, noting that "between March 6, 2023 and July 11, 2023, the LASD has transferred over 9,600 LACJ inmates to state prison, and the daily average of inmates awaiting transfer to a state prison to serve their sentences has fallen from approximately 1,500 inmates to approximately 526 inmates, a roughly 65% reduction, and well below pre-COVID levels around 700 inmates." The County also reports on various initiatives to build community-based bed capacity through the Office of Diversion and Reentry and the Department of State Hospitals.

Finally, the County reports on its efforts to increase the number of inpatient beds in the CTC

CHS plans to reallocate some of the licenses currently attached to four-person cells in FIP to single person cells in the CTC. CHS requires state approval to do this, and it is seeking to obtain that approval from the relevant state licensing agencies in phases, beginning with the reallocation of eight LPS licenses from two four-person cells in the FIP that cannot practically be used to house multiple P4 inmates. CHS seeks to relocate those licenses to eight single man cells in the CTC to increase the total number of functional licensed inpatient beds. This will expand the number of functional licensed beds that can be used to reduce the delta between the total P4 population has and the total number of inpatient mental health treatment beds within TTCF from 58 beds to 66 beds.

65 (**Revised**).  Consistent with existing Sheriff's Department policies, the County and the Sheriff will ensure that psychotropic medications are administered in a clinically appropriate manner to prevent misuse, hoarding, and overdose.  The County will maintain electronic mental health alerts in prisoners' electronic medical records that notify medical and mental health staff of a prisoner's risk for hoarding medications.

**STATUS:**        **PARTIAL COMPLIANCE**

On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provision 65 ("Revised Paragraph 65") as set forth above.  They also agreed on Revised Compliance Measures.  Under the Revised Compliance Measures, (1) the County's Self-Assessments must set forth the (a) results of weekly medication audits documenting the visual observation of the administration of medication during the quarter; (b) unauthorized medications found as a result of cell searches during the reporting period; and (c) incidents involving confirmed prescription drug overdoses.  Further, the Monitor must conclude, after consulting with the Subject Matter Expert, that "psychotropic medications are administered in a clinically appropriate manner 85% of the time."  Finally, "85% of the electronic medical records [must] contain the required alerts."  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 65 by March 31, 2024, which falls within the period covered by this Report.

The Settlement Agreement requires the County to administer medication to patients in a clinically appropriate manner.  This means, among other things, ensuring that when medication is administered, it is taken by the patient while under observation by the nurse and assigned deputy, to ensure that the medication is not hoarded, later traded as jail currency, or used to for self-harm or overdose.  LACJ nurses dispense thousands of medication doses each day, ranging from harmless supplements, like melatonin, to medicines that can be dangerous, or deadly, when improperly consumed.  Anecdotal reports and self-harm data reflect that hoarded medication continues to be a problem in the Los Angeles County jails.  Indeed, during the Eighteenth Reporting Period, the County reports that there were eighteen instances of self-directed violence by patients involving the ingestion of medication (five in the Fourth Quarter of 2023, and 13 in the First Quarter of 2024).

Beginning in the Sixteenth Reporting Period, the County began to report data from a self-audit process it developed to assess whether medication was being administered appropriately.  In the last three Reporting Periods, the results of this process have been included in the County's self-assessments and have reflected extremely high rates of reported compliance, outstripping the 85% compliance threshold.

| Quarter | Instances of Psychotropic Medication Administration Observed | Percentage Reported Compliant with Pill Call Procedures |
|---------|---------|---------|
| 4Q2022 | 1,415 | 92% |
| 1Q2023 | 1,005 | 99% |
| 2Q2023 | 912 | 92% |
| 3Q2023 | 1,080 | 99.81% |
| 4Q2023 | 1,644 | 97% |
| 1Q2024 | 1,493 | 97% |

However, also beginning in the Sixteenth Reporting Period, the Monitoring Team began alerting the County that these results differed from the Monitoring Team's observations of actual medication administration in the jails.  For example, the Sixteenth Report noted that in a site visit in July 2023, Court-appointed Mental Health Subject Matter Expert Dr. Johnson observed

irregularities in the pill pass process. This included a nurse checking patient mouths to confirm that the administered medication had been swallowed, but when there was a refusal or the patient walked away without complying, there was no follow up.  In one case, the patient refused to comply with the instructed mouth check and walked to the trash can and appeared to spit the pill out.  Another patient took the pills in his hands and walked over to the trash can and appeared to throw them away. At another point during pill pass, the assigned Deputy had to do something else and asked the nurse to pause.  She did not and continued to give medications while the Deputy was unable to assist to ensure medication compliance.

The Seventeenth Report shared similar observations

There were various inconsistencies observed in the numerous pill passes watched by the mental health team during the site visit from February 20-22, 2024.  At MCJ, pill pass was performed through an opening in a closed door and the nurse handed flat envelopes containing medications to the patients who simply returned into the dorm with the envelopes in hand. Patients were not required to get water prior to coming to the door, nor was any water provided to them at the door, to ensure ingestion of the prescribed medication while under observation.  There were no consistent efforts to check patient mouths and, indeed, mouth checks would have been impossible since the patients were not ingesting the medication in view of staff.  Some patients came to the door with their wristbands in their hands, rather than securely fastened to their wrists, and received medication without a second verification to confirm that the medication was being dispensed to the correct patient.

105

At PDC North, one nurse attempted to have inmates secure water prior to coming to the window for medication but those who were late to the window were not required to get water and many walked away with pills in hand.  If the patient voluntarily showed their mouth, a mouth check was performed.  If the patient walked away without showing their mouth, there was no attempt by the nurse or deputy to perform a mouth check.

The team also noted that assigned deputies were often distracted by persons coming and going from the pod or other deputies providing information compromising their ability to focus on pill pass.  There was no psychoeducation given by the nurses to the patients who refused medications in an attempt to secure informed consent.  The refusals were merely documented on the flat envelope to be recorded in the EMR later. Some nurses gave the flat envelope to the patients while others poured the pills into the patients' hands and kept the flat envelope.  At one pill pass, there was an excessive amount of wind coming through the window which resulted in a pill falling to the ground. The pill was not recovered at any time during the medication administration.

The Monitor is concerned by the significant discrepancy between the County's own audit results and the Monitoring Team's observations of medication administration across several Reporting Periods

The County has indicated that when sufficient information was shared by the Monitoring Team, these incidents were individually investigated.  It has not, however, shared information about any investigation conducted into the Monitoring Team's broader concerns about medication administration.  The Monitoring Team took steps to explore these concerns, including through a meeting in May 2024 with the CHS Chief Nursing Officer, requesting a random sample of videos of medication administrations to assess pill call and the self-audit process, close review of self-audit documents, and interviews with a group of CHS Nursing Managers and Supervisors.  Based on that review, we conclude that the County is not consistently administering medication in a clinically appropriate manner, and that the County's self-audit process does not reliably measure its compliance with Provision 65.

Regarding medication administration, pill call should be a collaboration between Custody and Nursing, with attentive deputies and nurses each acting as engaged participants in making sure that patients are actually ingesting their medications while under observation.  However, our in-person observations, video review, and interviews with staff, reflect that too often, deputies are distracted by other duties and are not paying attention to pill call.  They are managing pod operations, facilitating inmate movement, or simply ignoring their responsibilities to collaborate with nursing.  Pill pass appears to be low on their priority list.  At MCJ, prior jail leaders reportedly refused to provide clean, full water containers for the pill call process.  Needless to say, if no water is available at the location of the pill pass, inmates will be unable to take their medications

in view of staff and will instead return into the pod where they may ingest the medication—or not.  The failure of Custody staff to actively participate in pill call, which is a reported problem at multiple jails, creates opportunities for hoarding and overdose, and undermines the goals set forth in Provision 65.

Flaws in the County's self-audit process[36] have prevented the systemic nature of this problem from coming to light, and the County's reported results for medication administration are not reliable measures of its real compliance for several reasons.  First, the County's nurse managers freely acknowledge it.  They agree that their managerial duties and their quality checks of pill call have demonstrated recurring non-compliance over time that validates the observations shared by the Monitoring Team in recent reports.  CHS nursing leaders assert that pill call is meticulous and careful in the Forensic Inpatient Unit, and in the Medication Assisted Treatment Program, but that in other jail units and programs, there are persistent problems with the quality of medication administration that have not been resolved.

Second, in several facilities, nursing supervisors audit medication administration by standing alongside, or just behind, the nurse whose work is under audit.  They are not hidden, and the nurse is aware that they are being audited.  CHS' self-audit procedure requires that the nursing supervisor performing an audit should be unobtrusive and unobserved, but this is impossible in many jail locations.  In several of the randomly selected videos reviewed by the Monitoring Team, the nursing supervisor stood very near to the nurse who was administering medication.  Nursing leaders openly shared their concern that this renders the self-audits inherently unreliable, as nurses may provide medications appropriately when they are under audit, but in a less attentive fashion when they are not.  The Monitoring Team shares this concern.

Third, for numerous jail locations, performing quality checks of medication administration using CCTV video, as required in the second phase of the self-audit process, is simply not possible.  The CCTV cameras don't point to the locations of pill call, or their resolution is insufficiently sharp to be able to make determinations about the clinical adequacy of medication administration.  Nurse managers described this phenomenon to the Monitoring Team, and it was borne out by our own review of the videos produced by the County.  Of that sample, video was unavailable for two of the randomly selected dates and times.  In several of the videos that were available, the video was useless due to freezing or pixelated images, or because the CCTV camera angle showed parts of a pod or hallway, or the nurse but not the inmate, rather than the interaction happening between both during pill pass.  Finally, the self-audit records themselves indicate problems with the self-audit process.  For example, certain nursing supervisors use identical boilerplate to describe their audit results for numerous

---

[36] The self-audit process is supposed to involve two steps.  The first step is performed in real time by a supervising staff nurse who is supposed to observe and listen to pill call without being seen, and to document for ten patients whether medications were administered in a clinically appropriate manner.  The second step is a post-hoc quality check by a nursing manager reviewing CCTV video of randomly selected pill calls that were part of the original self-audit.

medication administrations.[37]

In response to a draft of this Report, the County indicates that it has now "developed a plan to both ensure improved communication and collaboration between Nursing and Custody and to eliminate any gray areas of accountability that arise from a joint responsibility." The elements of that plan are:

- The County will extend the joint Nursing-Custody pill call trainings at MCJ to all LACJ facilities;

- CHS will modify its pill-call policy, and Custody will modify its relevant facility unit orders, to incorporate a reciprocal escalation policy in cases where either a nurse or a Custody employee is failing to follow the requirements of clinically appropriate psychotropic medication administration; these modifications will clearly mandate communication to an employee's supervisor in their respective chain of command if their partner is not participating in pill call or following protocol; and, in turn, supervisors will be required to timely communicate with their cross-agency counterparts to address issues immediately;

- Custody facility unit orders will clearly specify that Custody is responsible for providing water jugs to fill and replenish the Nursing pill call carts (understanding that these water containers should not be on or near the medication carts so as to prevent contamination of the medication);

- CHS and Custody will jointly develop a specific post-administration protocol for addressing patients who refuse to show proof of ingestion and who ignore Custody employees' reasonable attempts to gain compliance with this requirement during the pill call itself; and

- LASD will incorporate medication administration training into the Jail Ops curriculum so that all Custody employees have a core understanding not only of proper psychotropic pill call protocols at the time they arrive to work at a jail facility, but also the necessity of communication and collaboration with their

---

[37] *See, e.g.*, TTCF records #5, 6, 7, 8, 9, 10, and 11 for January 2024; TTCF records #1, 2, 3, 4, 5, 6, 12, and 13 for February 2024; and TTCF records #8 and 9 for March 2024, (all using identical boilerplate language for comments/corrective actions on multiple dates involving medication administration by various nurses: "The nurse has a laptop but no documentation of the actual time during pill call. The nurse checked the wristbands. The nurse verified the ingestion of medication during the pill call. Reminded the nurse needs to verify all medication ingestion. The custody consistently stays with the nurse during the pill call audit. No patient refusal during pill call audit. The nurse was reminded to continue following the provision 65 pill call procedure.")

Nursing colleagues.

The elements of this plan appear to be useful and promising.  The County plan should also address the deficiencies identified in the self-audit process, which it does not appear to yet do.

Regarding other Provision 65 Compliance Measures, the County's Augmented Eighteenth Self-Assessment reports that for the Fourth Quarter of 2023, 60%—less than the required 85%—of the 60 electronic medical records of patients identified as being at risk of hoarding medicine contained the required mental health alerts pursuant to Compliance Measure 65-5(d).  For the First Quarter of 2024, the County reports 58%— less than the required 85%—of the 60 electronic medical records of patients identified as being at risk of hoarding medicine contained the required mental health alerts.

The County's Augmented Eighteenth Self-Assessment also reports that in the Fourth Quarter of 2023, 32 unannounced searches were conducted at TTCF.  Staff identified unauthorized medications in 10 of these searches.[38]  The numbers at the other facilities were CRDF (8 of 148 searches resulting in the seizure of medication), MCJ (2 of 110 searches resulting in the seizure of medication), NCCF (0 of 269 searches resulting in the seizure of medication), PDC North (0 of 137 searches resulting in the seizure of  medication), and PDC South (0 of 168 searches resulting in the seizure of medication).

The County's posted results for the First Quarter of 2024 reflect similar trends. There were 57 unannounced searches at TTCF, and 6 resulted in the seizure of unauthorized medications.  The numbers at the other facilities were CRDF (3 of 140 searches resulting in the seizure of medication), MCJ (3 of 195 searches resulting in the seizure of medication), NCCF (1 of 259 searches resulting in the seizure of medication), PDC North (1 of 122 searches resulting in the seizure of medication), and PDC South (0 of 179 searches resulting in the seizure of medications).

The County also reported 2 confirmed overdose and 3 unconfirmed in the Fourth Quarter of 2023.  The County reported 0 confirmed overdoses and 13 unconfirmed in the First Quarter of 2024.

---

[38] The County clarifies that this number "only reflects the number of searches that resulted in medications being found. It does not reflect the number of people found with medications. For example, a search will be counted a "one" even though multiple people were found with medications."

66 (**Revised**).  Consistent with existing Correctional Health Services policies, prisoners with a serious mental illness who reside outside of mental health housing, will remain on an active mental health caseload regardless of whether they refuse medications. The County and the Sheriff will provide prisoners with a serious mental illness who reside outside of mental health housing with therapeutically appropriate individual monthly visits with a QMHP whether or not the prisoners are receiving or refusing psychotropic medications.  The County and the Sheriff will provide medication support services to prisoners who (i) have a mental illness, (ii) reside outside of mental health housing and (iii) are prescribed psychotropic medications.

> **STATUS:**        **PARTIAL COMPLIANCE**

On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provision 66 ("Revised Paragraph 66") as set forth above.  They also agreed on Revised Compliance Measures.  Under the Revised Compliance Measures, Substantial Compliance requires that a) 85% of prisoners with a serious mental illness who resided outside of mental health housing were on an active mental health caseload; b) 85% of prisoners with a serious mental illness who resided outside of mental health housing are offered therapeutically appropriate structured mental health treatment and are seen by a QMHP at least once a month; and c) 85% of prisoners who resided outside of mental health housing and were prescribed psychotropic medications were offered medication support services.

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required Defendants to achieve Substantial Compliance with Provision 66 by March 31, 2023.  On March 11, 2024, the Court issued an Order Modifying Deadlines for Substantial Compliance, which extended the deadline for Substantial Compliance to June 30, 2024, which does not fall within the period covered by this Report.

The County's Augmented Eighteenth Self-Assessment again reports that "there were no records to assess for Compliance Measures 66-5(a) and 66-5(b) because there were no patients who met the criteria for severe mental illness housed in general population areas" in the Fourth Quarter of 2023 or the First Quarter of 2024.  Given the County's commitment to moving prisoners with serious mental illness out of general population and into mental health housing, the results being evaluated for this provision are narrowed and largely focus on medication support services for prisoners receiving psychotropic medication and living outside of mental health housing under Compliance Measures 66-3 and 66-5(c).

Regarding those compliance measures, the County's posted results indicate that for both the Fourth Quarter of 2023 and the First Quarter of 2024, 59% of patients residing outside of mental health housing who were prescribed psychotropic medications during the randomly selected week were offered medication support services.  This is lower than the 85% threshold.

Regarding these results, the County indicates that the fix to the ORCHID software (discussed in the Seventeenth Monitoring Report at pp. 110):

> was initially slated for deployment by May 20, 2024, however, the implementation has been delayed due to the complicated nature of the testing process. The County has continuously worked with Cerner programmers throughout the testing process, which has been quite complex due to the need to evaluate multiple rule scenarios that involve specific criteria related to Behavioral Health medication orders, Psychiatry Referral Orders, Psychiatry Appointments, P-levels, and Psychiatry Documentation Notes in ORCHID. The County will continue to work with the Cerner programmers to complete the testing process and overcome these challenges and anticipates that it will be able to finalize the ORCHID implementation by the end of the summer.

In the Seventeenth Self-Assessment, the County reported that "CHS Compliance also will provide comprehensive scheduling training for psychiatrists and nurse practitioners on Provision 66's requirements." The County should provide specific information about whether or not that has been accomplished for all relevant staff (including registry workers). In the Seventeenth Self-Assessment, the County also reported that it "recently tasked supervising psychiatrists to more intensively manage their staffs' schedules to ensure that they are filled with current, non-duplicative orders. This has involved scrubbing duplicative referrals that can clog schedules such that other patients are not scheduled for medication support services. Supervisors have also directed clinicians to backfill their schedule openings (including those caused by eliminating duplicative referrals) to visit inmates who need to be seen for medication management support." The County should provide detailed information about whether or not this has been accomplished and if so, how.

67 (**Revised**).  The County and the Sheriff will implement policies for patients housed in High Observation Housing and Moderate Observation Housing that require:

(a)     For patients with a Mental Health Level of Care ("MHLOC") of P2:

     (i)  documentation of a patient's refusal of psychotropic medication in the patient's electronic medical record;

     (ii)  the use of clinically appropriate interventions with such patients to encourage medication adherence; and

     (iii) consideration of the need to transfer non-adherent patients to higher levels of mental health housing.

(b)     For patients with an MHLOC of P3 or P4:

     (i) documentation of a patient's refusal of psychotropic medication in the patient's electronic medical record;

     (ii) the use of clinically appropriate interventions with such patients to encourage medication adherence;

     (iii) consideration of the need to transfer non-adherent patients to higher levels of care;

     (iv) discussion in treatment team meetings of non-adherent patients who are under consideration for admission to the forensic in-patient unit (i.e., individuals with an MHLOC of P4 as well as individuals referred for consideration of an increase to P4); and

     (v) individualized consideration of the appropriateness of seeking orders for involuntary medication pursuant to the provisions of California Welfare and Institutions Code sections 5332-5336 and/or California Penal Code section 2603(a).

**STATUS:      SUBSTANTIAL COMPLIANCE (as of October 1, 2023 through March 31, 2024 (unverified))**

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 67 by June 30, 2023. On March 11, 2024, the Court issued an Order Modifying Deadlines for Substantial Compliance, which extended the deadline for Substantial Compliance to March 31, 2024, which falls within the period covered by this Report. On April 22, 2024, the Parties filed a Joint Stipulation to Modify Provision 67 of the Settlement Agreement, ECF. No. 267, as set forth above.

Substantial Compliance requires the County to "review the electronic medical records of 25% of the prisoners in HOH and MOH who refused psychotropic medication during the quarter to verify that the records [of 85% of the prisoners] reflect the documentation and consideration of the matters required by the terms of Paragraph 67."

The County's Augmented Eighteenth Self-Assessment reports that for the Fourth Quarter of 2023, "98% of inmates who refused psychotropic medications receiving the appropriate consideration and documentation." For the First Quarter of 2024, the County reports "100% of inmates who refused psychotropic medications receiving the appropriate consideration and documentation."[39] These exceed the 85% threshold for Substantial Compliance. These results are subject to verification by the Monitor's auditors.[40]

The County has also requested that the Monitor retroactively find the County in Substantial Compliance for the Second and Third Quarters of 2023, which were discussed in the Seventeenth Monitoring Report, as "during the [Seventeenth] reporting period the parties and the Monitor were engaged in discussions regarding revision of the provisional language to better reflect standard clinical practice. The parties jointly stipulated to a revision of Provision 67 in April 2024 that aligned the provisional requirements with the County's interventions with patients who refuse psychotropic

---

[39] In response to a draft of this Report, the DOJ notes that the supporting documentation "often lack[s] any indication that a clinician has asked the patient why they are refusing medication or otherwise attempted to discern the reason for the refusal." The DOJ also notes that some records may have been marked as compliant that should not have been, including records where the clinician was unable to meet with the inmate. The Monitor's auditors have made similar observations. However, due to the ongoing nature of their audit, the impact of these observations on reported compliance is yet to be determined.

[40] The County's posted results for the First Quarter of 2024 reflect that 31 records selected were excluded, with various reasons provided for the exclusions. Out of the 31 exclusions, 18 included a reason related to the inmate's "short stay." Based on the information provided, the duration of admission to HOH or MOH for these 18 inmates ranged from three to 16 days, with the average duration being 8 days. Additional information is required from the County explaining the threshold used by the County to determine exclusions based on length of stay. Additionally, the posted results for the Fourth Quarter of 2023 reflect 23 exclusions with explanations containing fewer details than those provided for the subsequent quarter. Specifically, 22 out of 23 exclusions provide the reason for exclusion being "RELEASED." The Monitor's auditors will request additional information from the County regarding the specific release dates to assess the reasonableness of the exclusions. The County should discuss with the Monitoring Team the reasons and parameters for these exclusions to ensure that appropriate records are assessed under Provision 67.

medication. Accordingly, the County submits that the Monitor should now determine that the County was in substantial compliance during the Seventeenth Reporting Period, and therefore should no longer be subject to monitoring."

However, nothing in the Joint Stipulation suggests that the Parties intended it to be retroactive, and in fact, the language of the Joint Stipulation is generally forward looking. *See, e.g.*, ECF No. 267 at 2 ("The County believes revising Provision 67 will allow it to better direct compliance efforts to goals advanced in the Settlement Agreement, and assist the County and the Sheriff in more accurately and efficiently directing compliance efforts and documentation"). Moreover, the language of the Agreement itself notes that it may be modified by joint stipulation, which will only be effective 30 days after filing with the Court. *See* Agreement at 119 ("The Parties may jointly stipulate to make changes, modifications, and amendments to this Agreement, which will be effective absent further action from the Court, 30 days after a stipulation signed by all of the Parties has been filed with the Court"). As such, the Monitor declines to apply revised Provision 67 retroactively to the Second and Third Quarters of 2023, and the County remains subject to Provision 67 for the Nineteenth Reporting Period.

68.     Within six months of the Effective Date, the County and the Sheriff will develop and implement a procedure for contraband searches on a regular, but staggered basis in all housing units.  High Observation Housing cells will be visually inspected prior to initial housing of inmates with mental health issues.

**STATUS:**        **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at MCJ, NCCF, PDC East, PDC South, and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2017, through December 31, 2017 (verified) at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2022, through December 31, 2022 (verified) at CRDF)**

Substantial Compliance requires that "85% of the housing units are searched for contraband at least once in the previous quarter; and 95% of the HOH units visually inspected prior to housing prisoners in these units."  Self-Assessments are to include a summary of searches conducted and a review of 25 randomly selected Checklist forms for HOH units to confirm that the units were visually inspected prior to initial housing of prisoners in these units.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 68 by June 30, 2024.

The County previously maintained Substantial Compliance for twelve consecutive months at TTCF, MCJ, NCCF, PDC East, PDC South, CRDF, and PDC North.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring at those facilities for Substantial Compliance with Paragraph 68 in the Eighteenth Reporting Period.

69.     Consistent with existing DMH policies regarding use of clinical restraints, the County and the Sheriff will use clinical restraints only in the Correctional Treatment Center and only with the approval of a licensed psychiatrist who has performed an individualized assessment and an appropriate Forensic Inpatient order.  Use of clinical restraints in CTC will be documented in the prisoner's electronic medical record.  The documentation will include the basis for and duration of the use of clinical restraints and the performance and results of the medical welfare checks on restrained prisoners.  When applying clinical restraints, custody staff will ensure a QMHP is present to document and monitor the condition of the prisoner being placed in clinical restraints.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of July 1, 2018, through June 30, 2019 (verified))**

Substantial Compliance requires the Department to review the electronic medical records of all prisoners placed in clinical restraints to verify that the restraints were used, approved, and documented, and that the results of medical welfare checks on restrained prisoners were also documented.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring at those facilities for Substantial Compliance with Paragraph 69 in the Eighteenth Reporting Period.

70.      Within three months of the Effective Date, the County and the Sheriff will have policies and procedures regarding the use of Security Restraints in HOH and MOH. Such policies will provide that:

(a)      Security Restraints in these areas will not be used as an alternative to mental health treatment and will be used only when necessary to insure safety;

(b)      Security Restraints will not be used to punish prisoners, but will be used only when there is a threat or potential threat of physical harm, destruction of property, or escape;

(c)      Custody staff in HOH and MOH will consider a range of security restraint devices and utilize the least restrictive option, for the least amount of time, necessary to provide safety in these areas; and

(d)      Whenever a prisoner is recalcitrant, as defined by Sheriff's Department policy, and appears to be in a mental health crisis, Custody staff will request a sergeant and immediately refer the prisoner to a QMHP.

**STATUS:      PARTIAL COMPLIANCE**

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 70 by June 30, 2024, which does not fall within the period covered by this Report.

In the last several Reporting Periods, the County has taken significant steps forward in its compliance with Provision 70.  Most notably, it has significantly expanded the number of FIP Stepdown pods and HOH Dorms in which HOH patients program together without restraints.  The County reports that at the end of the Eighteenth Reporting Period, there were 20 FIP Stepdown pods and 15 HOH Dorms (which the County has referred to together as "Unrestrained Pods").  738 total patients were assigned to these Unrestrained Pods, which is greater than 50% of HOH patients in LASD custody.

This expansion of Unrestrained Pods has lessened the pervasive isolation and reflexive use of restraints experienced by patients assigned to HOH housing and dramatically improved the conditions of their detention.  As discussed in prior Monitoring Reports, the LASD had a history of objecting to this type of housing for a majority of HOH patients.  Yet, during recent site visits to the jails, LASD leaders expressed pride about the number of patients experiencing serious mental illness who program together safely unrestrained.  This sea change in attitude and approach suggests that these improvements can be sustained after the conclusion of this litigation, which is

very encouraging.

However, as of July 15, 2024, 652 patients remained assigned to traditional HOH pods (hereafter "HOH Lockdown Pods"). Conditions are much worse, and far less therapeutic, in the HOH Lockdown Pods than in the Unrestrained Pods. The cells are dark, often have some accumulation of trash, and there is nothing for these patients to do but sleep. While they, too, get time out of cell, they are generally kept cuffed to metal spider tables in a common day room during their out time. They are unable to engage in the activities that generally characterize out-of-cell time in jail environments, such as moving around the dayroom, exercising, reading, using the telephone, showering, engaging in group activities, or interacting with other inmates. Their detention is characterized by pervasive isolation, which is damaging to mental health in correctional environments.

Provision 70 requires that security restraints "will not be used as an alternative to mental health treatment and will be used only when necessary to insure safety." As such, the Monitor has instructed the County that to achieve Substantial Compliance, it must be able to demonstrate that it is conducting timely individualized assessments of all HOH patients and making determinations about whether or not they can safely program without restraints. *See* Seventeenth Monitoring Report at pp. 120.

In response, the County has asserted that 100% of inmates in HOH housing are screened for admission to the Unrestrained Pods in a process that is "frequent and ongoing." Regarding the TTCF HOH Dorms, "tank sheets in traditional HOH housing will be reviewed every shift to find individuals appropriate to move into unrestrained housing in the HOH Dorms."[41] Regarding evaluation for FIP Stepdown Pods

> The same patients who are routinely reviewed by LASD for possible movement into HOH dorm settings are also continually monitored by CHS clinicians as part of their complete clinical evaluation, treatment, and monitoring of patients. CHS clinicians interact with patients on a regular basis and seek to identify those who are appropriate for FIP Stepdown pods, with special focus on patients with multiple FIP admissions, those who are on the FIP waitlist or recently discharged from FIP, patients who move frequently between levels of care, are taking Clozaril, or are especially fragile or vulnerable.

The process articulated by the County is good insofar as it goes. However, the Monitor has requested that the County provide evidence that these assessments have actually been conducted for the 652 patients who remain in HOH Lockdown pods, establishing that they must remain in restraints during out-of-cell time to ensure safety, as Provision 70 requires. In response, the County contends that the "striking surge in the number of HOH patients living in unrestrained environments . . . is and should be

---

[41] While the TTCF unit order includes detail about the timing of these evaluations, noting that they are conducted at the beginning of every shift, the CRDF unit order does not include a similar time element. It should.

sufficient proof of practice for compliance with Provision 70.  Indeed, the focus of Provision 70 is on LASD's policies regarding restraints in HOH housing.  Those policies have been compliant for some time."

The Monitor disagrees that this is sufficient.  The determination of whether or not restraints are required is necessarily an individualized one to be based upon multiple factors, including the patient's behavioral history, current presentation, and any record of dangerous or assaultive conduct.  The fact that the County has increased the number of HOH patients programming without restraints is evidence that the County is doing some screening for those pods, but it does not establish that it has made individualized determinations that restraints are required for each one of the 652 patients remaining in HOH Lockdown pods in order to "ensure safety."[42]

The Compliance Measures for Provision 70 require that the Department adopt policies "that reflect the terms of paragraph 70 of the Agreement," which the Department has satisfactorily completed.  They also require "documentation of the Department's implementation of such policies," and "confirmation that the policies and procedures have been implemented," which has not yet been fully accomplished.  The County therefore remains in Partial Compliance with Provision 70 for the Eighteenth Reporting Period.

---

[42] In response to a draft of this Report, the County stated it "strongly disagrees" with the conclusion that it must provide evidence that it has conducted individual assessments of the patients who remain in restraints during out-of-cell time in HOH Lockdown Pods, as "Provision 70 requires that the County and Sheriff create and implement policies and procedures regarding the use of security restraints in HOH and MOH. They have done so, and have created an effective screening tool."  However, it provides neither argument nor evidence for why the screenings that are conducted cannot be memorialized in a summary document that reflects individualized reasons why these patients must remain in restraints to "ensure safety," as Provision 70 requires.  Nor is the County's position that the Monitoring Team should take on faith that these screenings have been conducted consistent with the language of the Agreement, which charges the Monitor with "independently verifying representations from the County or the Sheriff regarding progress toward compliance, and examining supporting documentation," or the practice for many other provisions in this litigation, which the County has accepted without objection, where the County provides supporting documents for review by the Monitoring Team in order to ensure that compliance may be verified.  *See* Agreement at § 109.  The Monitor recommends that the County develop a process for memorializing its screenings in writing, and offers the assistance of the Monitoring Team in developing that process and the standards to be used therein

71.    The County and the Sheriff will ensure that any prisoner subjected to clinical restraints in response to a mental health crisis receives therapeutic services to remediate any effects from the episode(s) of restraint.

**STATUS:        SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017 (verified))**

Substantial Compliance requires the Department to review the electronic medical records of all prisoners placed in clinical restraints to verify that the prisoners received therapeutic services as required by Paragraph 71.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 71 in the Eighteenth Reporting Period.

72.     The County and the Sheriff will develop and implement policies and procedures that ensure that incidents involving suicide and serious self-injurious behavior are reported and reviewed to determine:  (a) whether staff engaged in any violations of policies, rules, or laws; and (b) whether any improvements to policy, training, operations, treatment programs, or facilities are warranted.  These policies and procedures will define terms clearly and consistently to ensure that incidents are reported and tracked accurately by DMH and the Sheriff's Department.

**STATUS:        SUBSTANTIAL COMPLIANCE (as of January 1, 2017, through December 31, 2017)**

Substantial Compliance requires the Self-Assessments to report on (a) suicide review meetings and (b) CIRC meetings that review incidents of serious self-injurious behavior in the reporting period.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 72 in the Eighteenth Reporting Period.

73.     Depending on the level of severity of an incident involving a prisoner who threatens or exhibits self-injurious behavior, a custody staff member will prepare a detailed report (Behavioral Observation and Mental Health Referral Form, Inmate Injury Report, and/or Incident Report) that includes information from individuals who were involved in or witnessed the incident as soon as practicable, but no later than the end of shift.  The report will include a description of the events surrounding the incident and the steps taken in response to the incident.  The report will also include the date and time that the report was completed and the names of any witnesses.  The Sheriff's Department will immediately notify the County Office of Inspector General of all apparent or suspected suicides occurring at the Jails.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified))**

Substantial Compliance requires the Department to review quarterly a random sample of reports of any threats or exhibitions of self-injurious behavior to verify that the reports have the information required by Paragraph 73; and to provide the Monitor with the notifications to the Inspector General of all incidents involving an apparent or suspected suicide during the reporting period.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 73 in the Eighteenth Reporting Period.

74.     The Sheriff's Department will ensure that there is a timely, thorough, and objective law enforcement investigation of any suicide that occurs in the Jails. Investigations shall include recorded interviews of persons involved in, or who witnessed, the incident, including other prisoners.  Sheriff's Department personnel who are investigating a prisoner suicide or suspected suicide at the Jails will ensure the preservation of all evidence, including physical evidence, relevant witness statements, reports, videos, and photographs.

**STATUS:        SUBSTANTIAL COMPLIANCE (as of September 1, 2016, through December 31, 2017)**

Substantial Compliance requires the Department to provide the Monitor with an Executive Suicide Death Review reflecting the results of the Department's investigation of any suicide in the Jails within six months of the suicide.  The review must reflect steps taken to preserve all of the evidence; and list the interviews of persons involved in, or who witnessed, the incident, and whether the interviews were recorded.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 74 in the Eighteenth Reporting Period.

75.     Within three months of the Effective Date, the County and the Sheriff will review every suicide attempt that occurs in the Jails as follows:

(a)     Within two working days, DMH staff will review the incident, the prisoner's mental health status known at the time of the incident, the need for immediate corrective action if any, and determine the level of suicide attempt pursuant to the Centers for Disease Control and Prevention's Risk Rating Scale;

(b)     Within 30 working days, and only for those incidents determined to be a serious suicide attempt by DMH staff after the review described in subsection (a) above, management and command-level personnel from DMH and the Sheriff's Department (including Custody Division and Medical Services Bureau) will meet to review relevant information known at that time, including the events preceding and following the incident, the prisoner's incarceration, mental health, and health history, the status of any corrective actions taken, and the need for additional corrective action if necessary;

(c)     The County and the Sheriff will document the findings that result from the review of serious suicide attempts described in subsection (b) above; and

(d)     The County and the Sheriff will ensure that information for all suicide attempts is input into a database for tracking and statistical analysis.

**STATUS (75):**          **SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified))**

Substantial Compliance requires (a) DMH to review documentation of randomly selected suicide attempts during the previous quarter to verify that the prisoner's mental health status and need for immediate corrective action were considered timely by the DMH staff and that the staff determined whether the suicide attempt was serious; (b) that the Department and DMH reviewed the relevant information known at that time and the status of any corrective actions taken, and they considered the need for additional corrective action if necessary; and (c) that the information is reflected in the Department's database for tracking and statistical analysis.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 75 in the Eighteenth Reporting Period.

76.    The County and the Sheriff will review every apparent or suspected suicide that occurs in the Jails as follows:

(a)    Within no more than two working days, management and command-level personnel from DMH and the Sheriff's Department (including Custody Division and Medical Services Bureau) will meet to review and discuss the suicide, the prisoner's mental health status known at the time of the suicide, and the need for immediate corrective or preventive action if any;

(b)    Within seven working days, and again within 30 working days, management and command-level personnel from DMH and the Sheriff's Department (including Custody Division and Medical Services Bureau) will meet to review relevant information known at that time, including the events preceding and following the suicide, the prisoner's incarceration, mental health, and health history, the status of any corrective or preventive actions taken, and the need for additional corrective or preventive action if necessary; and

(c)    Within six months of the suicide, the County and the Sheriff will prepare a final written report regarding the suicide.  The report will include:

(i)    time and dated incident reports and any supplemental reports with the same Uniform Reference Number (URN) from custody staff who were directly involved in and/or witnessed the incident;

(ii)    a timeline regarding the discovery of the prisoner and any responsive actions or medical interventions;

(iii)    copies of a representative sample of material video recordings or photographs, to the extent that inclusion of such items does not interfere with any criminal investigation;

(iv)    a reference to, or reports if available, from the Sheriff's Department Homicide Bureau;

(v)    reference to the Internal Affairs Bureau or other personnel investigations, if any, and findings, if any;

(vi)    a Coroner's report, if it is available at the time of the final report, and if it is not available, a summary of efforts made to obtain the report;

(vii)    a summary of relevant information discussed at the prior review meetings, or otherwise known at the time of the final report, including analysis of housing or classification issues if relevant;

(viii)    a clinical mortality review;

(ix)    a Psychological Autopsy utilizing the National Commission on Correctional Health Care's standards; and

(x)    a summary of corrective actions taken and recommendations regarding additional corrective actions if any are needed.

**STATUS (76):**   **SUBSTANTIAL COMPLIANCE (as of September 1, 2016, through December 31, 2017)**

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 76 in the Eighteenth Reporting Period.  Nonetheless, the County continued to conduct the reviews required by Paragraph 76 for the suicides that occurred during this period and invited the Monitor to attend these meetings.

77.    The County and the Sheriff will create a specialized unit to oversee, monitor, and audit the County's jail suicide prevention program in coordination with the Department of Mental Health.  The Unit will be headed by a Captain, or another Sheriff's Department official of appropriate rank, who reports to the Assistant Sheriff for Custody Operations through the chain of command.  The Unit will be responsible for:

(a)    Ensuring the timely and thorough administrative review of suicides and serious suicide attempts in the Jails as described in this Agreement;

(b)    Identifying patterns and trends of suicides and serious suicide attempts in the Jails, keeping centralized records and inputting data into a unit database for statistical analysis, trends, and corrective action, if necessary;

(c)    Ensuring that corrective actions are taken to mitigate suicide risks at both the location of occurrence and throughout the concerned system by providing, or obtaining where appropriate, technical assistance to other administrative units within the Custody Division when such assistance is needed to address suicide-risk issues;

(d)    Analyzing staffing, personnel/disciplinary, prisoner classification, and mental health service delivery issues as they relate to suicides and serious suicide attempts to identify the need for corrective action where appropriate; and recommend remedial measures, including policy revisions, re-training, or staff discipline, to address the deficiencies and ensure implementation; and

(e)    Participating in meetings with DMH to develop, implement, and track corrective action plans addressing recommendations of the quality improvement program.

**STATUS (77):**      **SUBSTANTIAL COMPLIANCE (as of April 1, 2022, through March 31, 2023)**

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 77 in the Eighteenth Reporting Period.[43]

---

[43] The County has acknowledged that its ongoing Quality Improvement efforts will remain subject to monitoring under other provisions of the Settlement Agreement.

78.     The County and the Sheriff will maintain a county-level Suicide Prevention Advisory Committee that will be open to representatives from the Sheriff's Department Custody Division, Court Services, Custody Support Services, and Medical Services Bureau; the Department of Mental Health; the Public Defender's Office; County Counsel's Office; the Office of the Inspector General; and the Department of Mental Health Patients' Rights Office.  The Suicide Prevention Advisory Committee will meet twice per year and will serve as an advisory body to address system issues and recommend coordinated approaches to suicide prevention in the Jails.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of May 11, 2016, through May 18, 2017)**

Substantial Compliance requires (1) the Committee to meet twice per year and (2) "recommend coordinated approaches to suicide prevention in the Jails."

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 78 in the Eighteenth Reporting Period.  Nevertheless, the County has continued to hold Bi-Annual Suicide Prevention meetings through the last reporting period, which the Monitor endeavors to attend.

79 (**Revised**).  (a)     Unless clinically contraindicated, the County and the Sheriff will offer prisoners in mental health housing:

        (i)      therapeutically appropriate individual visits with a QMHP; and

        (ii)     therapeutically appropriate group programming conducted by a QMHP or other appropriate provider that does not exceed 90 minutes per session.

    (b)     The date, location, topic, attendees, and provider of programming or therapy sessions will be documented.  A clinical supervisor will review documentation of group sessions on a monthly basis.

**STATUS:     NON-COMPLIANCE**

On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provision 79 ("Revised Paragraph 79") as set forth above.  They also agreed on Revised Compliance Measures.  Under the Revised Compliance Measures, Substantial Compliance requires the Department to maintain records of therapeutically appropriate individual visits and group programming, and the names of the clinical supervisors who reviewed such records and the conclusions of their reviews.  It also requires that 95% of the prisoners in HOH are offered therapeutically appropriate structured mental health treatment, including at least a weekly QMHP visit and group programming, and that 90% of prisoners in MOH are provided visits by a QMHP at least once a month as well as therapeutically appropriate structured mental health treatment.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 79 by June 30, 2024, which does not fall within the period covered by this Report.

The County's Augmented Eighteenth Self-Assessment reports that in the Fourth Quarter of 2023, the "supervisor responsible for reviewing relevant documentation on a monthly basis did so at TTCF and CRDF, resulting in 100% compliance at both facilities."  "For Measure 79-4(b), which requires that 95% of HOH patients be offered an individual visit by a QMHP and weekly group programming, the County reported 39% compliance.  For Measure 79-4(c), which requires that 90% of patients in MOH are offered individual monthly visits by a QMHP and therapeutically appropriate structured treatment, the County reported 47% compliance."

The County's Augmented Eighteenth Self-Assessment reports that in the First Quarter of 2024, the "supervisor responsible for reviewing relevant documentation monthly did so at TTCF, but at CRDF the supervisors with this responsibility did not conduct their reviews and note their conclusions on a monthly basis.  That situation has since been remedied."  "For Measure 79-4(b), which requires that 95% of HOH patients be offered

an individual visit by a QMHP and weekly group programming, the County reported 15% compliance." "For Measure 79-4(c), which requires that 90% of patients in MOH are offered individual monthly visits by a QMHP and therapeutically appropriate structured treatment, the County reported 57% compliance." Regarding these results, the County reports on various efforts underway to increase the recruitment of the mental health personnel necessary for compliance.

> Although staffing and capacity have significantly improved over the course of 2024, staffing levels continued to hinder compliance with Provision 79 during the current reporting period. The County has now reversed the dramatic staffing shortages that formerly plagued CRDF, including retaining a supervisor in January 2024, but compliance with Provision 79 lagged as new staff were onboarding and training up during the Third Quarter of 2023 and First Quarter of 2024.

The Sixteenth and Seventeenth Reports discussed the Monitoring Team's findings and critiques related to the County's use of treatment plans necessary to provide "therapeutically appropriate" mental health treatment. *See* Sixteenth Report at pp. 134-135, Seventeenth Report at pp. 133-135. The County reports that it has "taken seriously" those concerns and, in response, provided treatment planning training to staff. *See* Seventeenth Report at pp. 134. The Monitoring Team reviewed the slides used in this training and found that they "appeared to adequately address the importance of treatment plan documentation and teach some of the fundamentals of treatment planning in the jail context." The treatment planning training was delivered to staff between August 28, 2023, and November 7, 2023, thus the Monitor would expect to see improvements in treatment planning in the Fourth Quarter of 2023 and First Quarter of 2024, which are covered by this Report.

To ascertain whether or not this was the case, the Monitoring Team reviewed 30 cases from MOH and 30 cases from HOH, with 15 males and 15 females from each level of care.[44] Overall, 56/58, or 97% of cases were offered individual treatment (two cases were N/A). This is an improvement from the 79% reported in August 2023. There were no apparent differences between males or females or between MOH and HOH patients.

Significantly, in 23/56, or 41% of the cases, the treatment was specified in a

---

[44] In response to a draft of this Report, the County indicated that "if the County's compliance with this provision is to be judged by qualitative metrics, the County is entitled to a clear understanding of what those metrics are . . . it appears from the discussion in the Draft Report that a number of qualitative judgments are being set up as new (but undefined) quantitative requirements that go beyond the Settlement Agreement." The Monitoring Team has several points here. First, the Monitoring Team began reporting on its qualitative reviews of Provision 79 in the Monitor's Sixteenth Report, which covered the Fourth Quarter of 2022 and First Quarter of 2023, without objection, and these reviews are not "new." *See* Monitor's Sixteenth Report at pp. 134-136. Second, the Monitoring Team disagrees that its qualitative reviews "go beyond the Settlement Agreement," and, indeed, the Team's qualitative reviews have been incorporated into the Monitor's Reports for years. With that said, the Monitoring Team is entirely amenable to sharing information with the Parties about the standards it is using to perform these reviews, as it has recently done regarding Provisions 36 and 40.

treatment plan (four cases were N/A).  This is a substantial improvement from the 0% reported in August 2023.  Earlier qualitative reviews of this measure typically found no treatment plans in the healthcare records.  For the total sample, 15/56, or 27% of cases, the treatment could be considered "evidence-based" (four were N/A).  This is substantial improvement from the 2% reported in August 2023.  "More cases in the current review had specific documentation of recognized intervention techniques in contrast to prior reviews in which there were oblique references to a recognized modality or treatment approach (e.g. Cognitive Behavioral Therapy), but were not further specified and did not provide useful information about how a patient was actually being treated."  Regarding these results

Changes in treatment plan documentation were noted in the current review, leading to more cases being found to have an adequate treatment plan.  A separate treatment plan form was more frequently found in the healthcare record, although these were sometimes inadequate due to a lack of specific treatment interventions aligned with identified goals that were in turn based on assessed individual needs.  A number of the treatment plan forms listed interventions that were in fact evaluations rather than treatment.  Improvements in the documentation contained in the treatment plan forms would lead to a higher rate of compliance, if the goals and interventions listed were in fact clearly followed (or modified) in the progress notes for subsequent contacts with the patient.  Few treatment plans had more than one identified problem and few were behaviorally specific to the case at hand.

The other source of treatment planning documentation is found in the progress notes.  More of the progress notes in this review contained information regarding goals and treatment interventions, which appeared to sometimes serve in lieu of a treatment plan if consistently followed (or modified) in subsequent clinical contacts.  However, in many of the progress notes, there was still a lack of clear, specific information regarding assessed needs, treatment goals, and targeted interventions.  It was unclear from either the Treatment Plan forms or the follow-up progress notes what timeframes apply to treatment planning. Individualized treatment planning ought to be specific enough to include some rough timeframes and the need for review and possible revision based on patient progress on problems.

The Monitoring Team found that in 16/56, or 29% of cases, the treatment was "therapeutically appropriate."  This is a substantial improvement from the 9% reported in August 2023.  This reflects the Team's observations that more cases had documentation with specific interventions appropriate to the patient's clinical presentation.  However, many treatment plans and progress notes still did not contain specific interventions that were clearly aligned with goals derived from assessed individual needs, and entries labelled as interventions were still frequently various assessment techniques (e.g., "employed empathic listening") or information gathering (e.g., "used open-ended

question to explore coping") rather than treatment.  The progress notes also frequently failed to follow prior planned interventions specified in prior treatment plans or the contents of prior progress notes, nor did they explain why the focus or interventions had changed, especially if a different clinician was seeing the patient.

Group therapy was offered in 22/59, or 37% of cases, for the entire sample.  This is a decline from the 47% of cases in August 2023.  Once again, there was a substantial difference between MOH and HOH, where 60% of HOH patient were offered group treatment vs. 14% of MOH patients.  This compares to 83% of HOH patients and 10% of MOH patient in August 2023.  It appears the emphasis continues to be on ensuring that HOH patients receive group therapy opportunities.  It may be that staffing is still a limitation to group treatment in both HOH and MOH.

In 2/22, or 9% of cases, the group therapy was delivered according to a treatment plan, although these two cases provided minimal information regarding the alignment of the group content to assessed needs of the patient. Prior reviews have found no group therapy delivered according to a treatment plan.  None of the group therapy was considered evidence-based, consistent with prior reviews.  In 2/22, or 9% of cases, the group therapy was considered "therapeutically appropriate," whereas prior reviews have found no such cases.  The pattern of practice noted in earlier qualitative reviews continues, in which patients are not assigned or selected for group participation according to assessed need and individualized treatment planning.  Some group offerings may be relevant to an individual's needs, but this is not guided by a treatment plan.  As noted in prior reviews, groups are haphazard but are likely to provide some degree of support, socialization, and out-of-cell time for the minority of patients who participate.

The results of the Monitoring Team's review reflect that the County made noteworthy progress at providing "therapeutically appropriate" treatment between the Seventeenth and Eighteenth Reporting Periods.  The treatment planning training provided by the County and, perhaps, the staffing changes discussed elsewhere in this Report, appear to have been significant drivers of this progress.  These are encouraging developments.

However, the County appears to lack a reliable supervisory, internal audit function that would detect the continuing treatment planning deficits that have been revealed by the Team's qualitative reviews.  The Monitoring Team notes

Documentation should be routinely reviewed by supervisors and feedback given to achieve compliance with expected standards and training, including the need for specific, quantifiable goals based on the assessed needs of the individual patient, an identification of specific, clinical interventions to be used (e.g., not generic statements about developing coping skills),  continuity of treatment interventions and progress, or lack thereof, in clinical contact notes, and any changes in the treatment approach and the reasons given for these changes (e.g., resolution of identified problems, the emergence of other treatment needs, and/or other

changes in the clinical status of the inmate).  Effort is also needed to link group treatments to the assessed needs of individual patients, which should be reflected in the treatment planning documentation.

Until the County develops an ability to identify and correct the deficits discussed above on its own, it may struggle to attain Substantial Compliance with Provision 79.

80.    (a)    The County and the Sheriff will continue to make best efforts to provide appropriate out-of-cell time to all prisoners with serious mental illness, absent exceptional circumstances, and unless individually clinically contraindicated and documented in the prisoner's electronic medical record.  To implement this requirement, the County and the Sheriff will follow the schedule below:

(i)     By no later than six months after the Effective Date, will offer 25% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week;

(ii)    By no later than 12 months after the Effective Date, will offer 50% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week; and

(iii)   By no later than 18 months after the Effective Date, will offer 100% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week.

(b)    No later than six months after the Effective Date, the County and the Sheriff will record at the end of each day which prisoners in HOH, if any, refused to leave their cells that day.  That data will be presented and discussed with DMH staff at the daily meeting on the following Normal business workday.  The data will also be provided to the specialized unit described in Paragraph 77 and to DMH's quality improvement program to analyze the data for any trends and to implement any corrective action(s) deemed necessary to maximize out-of-cell time opportunities and avoid unnecessary isolation.

STATUS (80):        NON-COMPLIANCE

Paragraph 80 requires that, "no later than 18 months after the Effective Date [July 1, 2015]," 100% of the prisoners in HOH receive "ten hours of unstructured out-of-cell recreational time *and* ten hours of structured therapeutic or programmatic time per week" (emphasis added). The parties have agreed that up to five hours of the structured time can consist of education or work programs, but at least five hours of the time must be therapeutic. In July 2024, the Parties amended the Compliance Measures to permit the County to exclude from the sampled records inmates who were not assigned to HOH for every day of the sampled week. However, the County "shall not cease providing offers to participate in meaningful opportunities for out-of-cell time to individuals based on their length of stay in HOH."

On December 27, 2022, and on April 20, 2023, the Court issued Orders Setting Deadlines for Substantial Compliance, ECF No. 234 and 248, respectively, which established specific deadlines for Defendants to "improve compliance with provisions 63, 64, and 80." With respect to Provision 80, the December 2022 Order established deadlines for Defendants to take a series of "agreed-upon actions to improve compliance," while the April 2023 Order established incremental targets for the Defendants' overall compliance with the provision by the end of then-upcoming quarters.

*Figure 8:  Quarterly Court-Ordered Targets for Provision 80 Compliance*

| Targets by Quarter | % of HOH Inmates Receiving 10 Hours Unstructured Out-of-Cell Time | % of HOH Inmates Receiving Structured Out-of-Cell Time | Minimum Hours of Structured Out-of-Cell Time | # of Group Hours (of total Structured Out-of-Cell Time) |
|---|---|---|---|---|
| 2Q2023 | 85% | 50% | 5 | 2.5 (of 5) |
| 3Q2023 | 90% | 60% | 6 | 3 (of 6) |
| 4Q2023 | 95% | 70% | 7 | 3.5 (of 7) |
| 1Q2024 | 100% | 75% | 7.5 | 3.75 (of 7.5) |
| 2Q2024 | | 80% | 8 | 4 (of 8) |
| 3Q2024 | | 85% | 8.5 | 4.25 (of 8.5) |
| 4Q2024 | | 90% | 9 | 4.5 (of 9) |
| 1Q2025 | | 95% | 9.5 | 4.75 (of 9.5) |
| 2Q2025 | | 100% | 10 | 5 (of 10) |

Unstructured Out-of-Cell Time
The County's Augmented Eighteenth Self-Assessment reports that in the Fourth Quarter of 2023, 100% of the HOH inmates at CRDF and 76% at TTCF were offered

"ten or more hours of unstructured out-of-cell time by Custody staff." This failed to meet the 95% target in the Court order. It also reports that in the First Quarter of 2024, 95% of HOH inmates were offered unstructured out-of-cell time at both CRDF and TTCF. This failed to meet the 100% target in the Court's April 2023 Order at both CRDF and TTCF.

Structured Out-of-Cell Time

The County also reports data for structured therapeutic or programmatic time. According to the County's Augmented Eighteenth Self-Assessment, 0% for CRDF and 5% for TTCF, of people residing in HOH were offered the required 10 hours of structured out-of-cell time during the Fourth Quarter of 2023. For the First Quarter of 2024, the County's Augmented Eighteenth Self-Assessment reports that 13% for TTCF of inmates residing in HOH were offered the required amount of structured out-of-cell time. At CRDF, the County reported 0% compliance. Neither facility met the relevant target in the April 2023 Court order in either quarter.

Regarding the number of hours offered, the County's posted results reflect that in the First Quarter of 2024, 26% of TTCF inmates residing in HOH were offered 6.5 hours or more of structured out-of-cell time. At CRDF, 3% of inmates were offered 6.5 hours or more. This also failed to meet the targets in the April 2023 Court Order. The County identifies several corrective actions "that have been taken, and that are being taken" to improve compliance. This includes auditing results for structured out-of-cell time using the new methodology agreed on by the Parties in the future, and "offering overtime to CHS staff to provide group programming at the higher compensation rates" than were available in the past. In addition, the County is "working to better capture the other structured programming that is, in fact, being offered to HOH inmates by non-CHS and non-CHS-contracted providers." This includes "structured life skills programming provided by MHAs, yoga therapy, therapy animal sessions, anger management, religious services, and parenting classes" offered in HOH Dorm and FIP Stepdown modules. Most notably

> Perhaps the greatest barrier the County has faced in reaching compliance with Provision 80 is having sufficient staff to conduct out-of-cell structured group programming for the HOH population housed in the LACJ, as the County currently employs only 25 full-time group programmers (8 at CRDF and 17 at TTCF), which is far fewer than can provide the required number of group programming hours for the roughly 1,600 HOH inmates currently housed at TTCF and CRDF.

> As such, "CHS launched a pilot program involving ten psychology interns (graduate students) from the Chicago School of Professional Psychology ("CSPP"), who ran structured therapeutic group programming on a weekly basis at the LACJ for HOH inmates as part of a clinical program run by CSPP." Further

> In October 2023, at the end of the last reporting period, the County completed a months' long solicitation process and finalized contracts with two companies to provide a number of group

programmers and significantly expand CHS' group programming capacity. Specifically, the County executed agreements with McKinley to provide group programming services for HOH inmates housed at TTCF and with Sistahfriends to provide group programming services for HOH inmates housed at CRDF.

Pursuant to their agreements with the County, McKinley agreed to provide personnel to lead 600 groups per week for male HOH inmates at TTCF, and Sistahfriends agreed to provide personnel to lead 80 groups per week for female HOH inmates at CRDF. Since executing these agreements and making these commitments, 20 new group programming personnel hired by McKinley have started providing group programming services at TTCF—a workforce consisting of 16 clinicians, three supervisors, and one manager; and three new group programming personnel hired by Sistahfriends, including a manager/supervisor and two clinicians, have started providing group programming hours at CRDF.

This group of contractors has essentially doubled CHS' capacity to provide group programming hours at TTCF and CRDF from what it was at the start of the Reporting Period. However, since most of these new group programmers did not start working in the LACJ until after the end of the Reporting Period, the County does not expect that their impact will be felt in improving compliance with Provision 80's requirements until the Second and Third Quarters of 2024. At that time, however, the use of this newly deployed resource should translate to a sizeable leap in the Provision 80 compliance numbers.

The County also reports on its efforts to coordinate

the schedules of CHS or CHS-contracted personnel who provide group programming with the schedules of custody personnel who are needed to provide security during out-of-cell activities. To address this issue at TTCF, as of May 2024, custody staff have been added to support group programmers at TTCF during three specific 2.5 hour to 3 hour blocks of time seven days each week. In addition, since May 2024, all HOH floors at TTCF have been assigned a "programming deputy" to assist group programmers by accompanying them cell-to-cell when offers are made for inmates to come out of their cells for group programming. A unit order has been issued that outlines these processes, and "programming deputies" have been trained on that unit order. In addition, clinical personnel who offer group programming at TTCF—including McKinley contractors, psychiatric interns, and CHS group programming staff—have received an orientation from the LASD

on jail processes and how to arrange for inmates to come out of their cells for group programming.

At CRDF, beginning in November 2023, that facility instituted the use of an "Out of Cell Team" that is designed to proactively monitor out-of-cell time for the inmates at that facility and ensure inmates are offered opportunities to program unrestrained out of their cells. While this group, to date, has focused, with great success, in ensuring HOH inmates at CRDF receive at least 10 hours of recreational time outside of their cells each week, it is in the process of attempting to translate that success to obtaining the requisite amount of structured out-of-cell time for those inmates as well.[45]

---

[45] The Monitoring Team reiterates that "as CHS increases its capacity by adding group facilitators from the community who are unfamiliar with the individual patients, it is imperative that treatment plans be completed and easily accessible so all clinical service providers—including group providers—are working from the same framework to promote recovery in these patients. Easily accessible treatment plans with identified goals, objectives and interventions will help solidify the subject matter for group programming and provide a more targeted and comprehensive recovery for each inmate participating in group programming."

81.     Except as specifically set forth in Paragraphs 18-20 of this Agreement, and except as specifically identified below, the County and the Sheriff will implement the following paragraphs of the Implementation Plan in *Rosas* at all Jails facilities, including the Pitchess Detention Center and the Century Regional Detention Facility, by no later than the dates set forth in the Implementation Plan or as revised by the *Rosas* Monitoring Panel:  Paragraphs 2.2-2.13 (use of force policies and practices); 3.1-3.6 (training and professional development); 4.1-4.10 (use of force on mentally ill prisoners); 5.1-5.3 (data tracking and reporting of force); 6.1-6.20 (prisoner grievances and complaints); 7.1-7.3 (prisoner supervision); 8.1-8.3 (anti-retaliation provisions); 9.1-9.3 (security practices); 10.1-10.2 (management presence in housing units); 11.1 (management review of force); 12.1-12.5 (force investigations, with the training requirement of paragraph 12.1 to be completed by December 31, 2016); 13.1-13.2 (use of force reviews and staff discipline); 14.1-14.2 (criminal referrals and external review); 15.1-15.7 (documentation and recording of force); 16.1-16.3 (health care assessments); 17.1-17.10 (use of restraints); 18.1-18.2 (adequate staffing); 19.1-19.3 (early warning system); 20.1-20.3 (planned uses of force); and 21.1 (organizational culture).

### STATUS:      PARTIAL COMPLIANCE

Because Paragraph 81 of the Settlement Agreement incorporates 100 provisions in the Implementation Plan adopted in the *Rosas* case, the parties agreed in the Compliance Measures adopted in this case that "Substantial Compliance with respect to the substance of the policies required by the *Rosas* Implementation Plan will be determined by the *Rosas* Monitors."  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 81 by June 30, 2024, which does not fall within the period covered by this Report.

The Compliance Measures in this case provide that "[o]nce the policies have been approved by the *Rosas* Monitors, the Monitor and Subject Matter Experts will confirm and assess the implementation of these policies in the [DOJ facilities]."  In assessing the Department's compliance with Paragraph 81, the Monitor has grouped the 100 provisions into seven categories and, with input from the Subject Matter Experts, has assessed the Department's compliance on a category-by-category basis.  With the exception of the Training category, which is assessed when certain percentages are reached, the Department will no longer be subject to monitoring for the provisions in a particular category once the Monitor has determined that it has achieved and maintained for twelve consecutive months Substantial Compliance with the intent and purpose of the overall category.  The Department will no longer be subject to monitoring for compliance with Paragraph 81 once it has achieved and maintained for twelve consecutive months Substantial Compliance with each of the categories.

### Training (Substantial Compliance)

Paragraphs 3.1-3.6, 4.6-4.9, and 12.1 of the *Rosas* Implementation Plan reflect training requirements on use of force, ethics, dealing with inmates with mental illness,

and investigations of force incidents.  The curriculum and lesson plans to implement these training requirements have been approved by the *Rosas* Monitors.

In the Sixteenth Reporting Period, the County was in Substantial Compliance with the refresher training requirements of 3.2, 4.6, 4.7, and 12.1-1 as of December 2022.  The reported substantial results for 3.1 were not verified by the Monitor's auditors.  In the Seventeenth Reporting Period, the County maintained Substantial Compliance with the following Training provisions: 3.3, 3.5,[46] 3.6, 4.8, 4.9, and 12.1-2.  The results for 3.3, 3.6, 4.8, 4.9, and 12.1-2 were verified by the Monitor's auditors.

The County's Augmented Eighteenth Self-Assessment reports that it maintained Substantial Compliance with the following Training provisions during the Eighteenth Reporting Period: 3.2, 3.3, 3.5, 3.6,[47] 4.6, 4.7, 4.8, 4.9, and 12.1-2.  The County also reports that it regained Substantial Compliance with 3.1.  The results for 3.3, 4.8, 4.9, and 12.1-2 have been verified by the Monitor's auditors.  The reported results for 3.1, 3.2, 3.6, 4.6, 4.7, and 12.1-1 are subject to verification by the Monitor's auditors.  The chart below summarizes the County's reported compliance from the Sixteenth through the Eighteenth Reporting Periods.

| | 16th Report | | 17th Report | | 18th Report | |
|---|---|---|---|---|---|---|
| **Training Provision** | **Reported Results** | **Monitor's Auditors** | **Reported Results** | **Monitor's Auditors** | **Reported Results** | **Monitor's Auditors** |
| 3.1 - UoF Refresher | SC | X | N/A | N/A | SC | *Pending* |
| 3.2 - Ethics Refresher | SC | ✓ | N/A | N/A | SC | *Pending* |
| 3.3 - UoF & Ethics New Hires | SC | ✓ | SC | ✓ | SC | ✓ |
| 3.5 - Addt'l UoF | No Records | | No Records | | No Records | |
| 3.6 - Probationary Review | PC | N/A | SC | ✓ | PC | *Pending* |
| 4.6 - DeVRT Refresher | SC | ✓ | N/A | N/A | SC | *Pending* |
| 4.7 - DeVRT Refresher | SC | ✓ | N/A | N/A | SC | *Pending* |
| 4.8 & 4.9 - DeVRT New Hires | SC | ✓ | SC | ✓ | SC | ✓ |
| 12.1-1 - Sgt. Refresher | SC | ✓ | N/A | N/A | SC | *Pending* |
| 12.1-2 - New Sgts. | SC | ✓ | SC | ✓ | SC | ✓ |

## Use of Force (Partial Compliance)

In February 2024, Court-Appointed Use of Force Subject Matter Expert, Susan McCampbell, toured the jails with the Monitor and met with Custody executives, force and internal affairs investigators, population management staff, and line sergeants who oversee and manage force.  The Seventeenth Monitoring Report included the following feedback to the Department.

---

[46] The posted results for 3.5 indicate that "[t]here were no inmate grievances against staff investigations involving force with a finding of "Appears the Employee Conduct Could Have Been Better."
[47] The County reported Substantial Compliance with 3.6 for the Second Semester of 2023.

The County's initiatives to manage uses of force must rely on discrete, credible data that defines of the problem (root cause), explores and assigns quantifiable countermeasures (corrective actions), tracks progress, and allows for conclusions as to the effectiveness of the responses. At the end of the day, the County must be able to discern the real causes and effective solutions – that is focusing on the core issue, rather than symptoms. Basic data necessary for reliable assessment, identification and evaluation of corrective actions include, for example: assessment by facility (not aggregate data), the security custody level (classification) of involved inmate(s), whether the involved inmate(s) were classified and housed based on established policies and procedures, the involved inmate's status on the mental health caseload (level) before and after the incident, gender, inmate's history of sentinel events (e.g. assaults, uses of force, self-harm) during this and past incarcerations, the time of day, day of week, and location of the incidents (e.g. mapping), as well as cause (if determined) resulting in the use of force.

Documenting the training of involved staff (preventive and post-incident remediation) is also important to assessing the force options available and used. If there are initiatives underway by the County to address uses of force, reporting should identify the data that defined the problem, the specific tasks involved, resources allocated, and how "success" is/will be measured. There are other factors that can be considered once the basics are addressed, such as the trend data of the use of force in the housing unit, by facility, number/location/time of day day/day of week of inmate/inmate altercations not requiring force, and assaults on staff data, grievance histories, and complaints against deputies. Trained staff subject matter experts, using statistically valid and defensible analysis, are also necessary for credible progress to be demonstrated. Understanding that the data systems within the jails are problematic in terms of their age, data entry capabilities, and reporting formats, valid sampling may be an alternative technique.

The County did not respond to this feedback in the Eighteenth Augmented Self-Assessment. On July 10, 2024, the Monitor and Use of Force Subject Matter Expert did receive a presentation on the Department's new force tracking database, E-Force, that is under development, and had a subsequent meeting with the newly appointed Assistant Sheriff of Custody Operations, Paula L. Tokar, to discuss the same issues.

The Monitor reviewed 25 completed force packages for the DOJ facilities during the Eighteenth Reporting Period, some of which were also evaluated by Court-Appointed Use of Force Expert Susan McCampbell. Force packages were not selected randomly or in proportion to the frequency with which various categories of force occur. Rather, they were selected based upon severity of the force used and other criteria. On July 31, 2024, the Monitor provided the County with a use of force matrix reflecting the ratings for the 25 force packages reviewed. On August 20, 2024, the Monitor met with Department

executives to discuss the ratings assigned, watch video of force incidents, review deputy reports and command memos, and discuss the Monitoring Team's concerns about particular use of force packages—and the force review process—with Department executives, and to listen to their feedback and respond to their questions.

Of the 25 cases reviewed, 8 included some violation of the force prevention principles of Section 2.2 of the Action Plan, which requires that force be used "as a last resort," only the "minimal amount . . . necessary and objectively reasonable," "terminated as soon as possible," and "de-escalated if resistance decreases."  These results recapitulate previous findings in earlier Monitoring Reports that compliance with the force prevention principles of Section 2.2 of the Action Plan is a "threshold issue" at the DOJ facilities, and that "the County should focus on ensuring consistent compliance with its mandates in the future."[48]

Also related to force prevention, 6 of 25 packages reviewed involved a violation of Section 2.7 of the Action Plan, requiring the summoning of a supervisor to the scene as soon as time and circumstances permit.  7 of 25 cases reviewed involved violations of Section 17.5 of the Action Plan, requiring avoiding placing weight on an inmate's back in a way that impairs their breathing, or failing to place them in the recovery position once they are controlled.

While impermissible head strikes continue to be found in a high percentage of cases reviewed by the *Rosas* Panel in the Downtown Basin Facilities, a smaller number, or 4 of 25 cases reviewed from the DOJ Facilities, involved violations of Section 2.6 of the Action Plan, which includes prohibitions on the use of head strikes.[49]  Regarding the total number of head strikes in the DOJ facilities during the Eighteenth Reporting Period, there were three head strikes in the Fourth Quarter of 2023, and 3 in the First Quarter of 2024.  This was consistent with the average of 3.6 uses of force involving head strikes by staff in the DOJ facilities between the First Quarter of 2021 and the First Quarter of 2024.

*Figure 17:  Uses of Force with Head Strikes by Quarter*



---

[48] *See* Sixteenth Monitoring Report at pp. 149.
[49] *See, e.g.*, *Rosas, et al., v. Leroy Baca*, No. CV 12-00428 DDP, Panel's Thirteenth Monitoring Report at pp. 16-17, filed May 21, 2024.

Figure 18 disaggregates these head strike data by facility. There were three such incidents at CRDF. Reported head strikes were less common at NCCF and PDC North, and there were no head strike incidents at PDC South.

*Figure 18: Uses of Force with Head Strikes by Facility, Q4-2023 and Q1-2024*



Regarding total uses of force at the DOJ facilities, total uses of force fell in the Fourth Quarter of 2023 and rose slightly in the First Quarter of 2024.

*Figure 9: Total Use of Force by Quarter*



These fluctuations do not appear to be driven by changes in the facilities' average daily populations. Figure 10 presents the total use of force incidents per 100 inmates, based on average daily population, between the First Quarter of 2020 and the First Quarter of 2024. The 1.53 uses of force per 100 inmates in the First Quarter of 2024 was consistent with recent quarters and those prior to peaks in 2021 and 2022.

*Figure 10:  Uses of Force Per 100 Inmates by Quarter*



As in prior Monitoring Periods, CRDF continued to have a significantly higher frequency of force incidents per inmate during the Eighteenth Reporting Period.  Figure 11 presents the number of use of force incidents per 100 inmates in the Fourth Quarter of 2023 and First Quarter of 2024 by facility.  CRDF averaged the highest number of force incidents at 6.28 uses of force per 100 inmates.  NCCF averaged approximately a third of that number at 2.34.  PDC South and North were substantially lower, with 1.30 and 1.22 averages, respectively.

*Figure 11:  Uses of Force Per 100 Inmates by Facility, Q4-2023 and Q1-2024*

The Sixteenth Monitoring Report called on the County to "expeditiously investigate the causes of this proportionally higher number of uses of force at CRDF and take appropriate corrective action."  The County has previously reported that it "undertook a close analysis of CRDF's force statistics during the period.  The

investigation determined that the uses of force during the period at the facility largely were driven by a combination of a higher number of court-ordered extractions; force used by staff to quell fights among people housed in general population housing locations; and instances where personnel had to use force to prevent harm from occurring to medical staff, Department staff, or others."  The County provides no further update about additional investigation into these outsize rates of use of force at CRDF, but the Eighteenth Augmented Self-Assessment does indicate that certain additional corrective actions have been taken

> CRDF continues to distribute monthly emails and supervisors have regular briefings with staff to discuss the importance of documentation, identifying trends, force prevention efforts tactics, and other post-force considerations. As part of the force review process at CRDF, the Facility's Commander and Unit Commander meet to review the prior week's force incidents and have their recommendations relayed to the handling Watch Commander and Sergeant to address in the force investigation package and take any corrective action that may be needed. For deputies who are found to have engaged in a proportionally higher number of uses of force, every attempt is made to reassign the deputy to a position where he or she is less likely to be involved in force incidents, including planned use of force.

> Certain factors will always be beyond the facility's control, such as court orders to extract a person from her cell. CRDF is committed to employing techniques where such extractions can be accomplished without force, or with minimal force, but the very nature of an extraction presents circumstance where some level of force may become necessary to fulfill a court's order.

Figure 12 presents the total uses of force by quarter and category.  As usual, Category 1 Force was the most common force type.

*Figure 12: Total Use of Force by Category and Quarter*



Figures 13 through 16 break out these data by facility. Category 1 Force incidents at CRDF in the First Quarter of 2024 decreased by 28% compared to the Second Quarter of 2023. Category 1 Force incidents at NCCF, PDC North, and PDC South were relatively consistent over the last four quarters.

*Figures 13-16: Total Use of Force by Category, Quarter, and Facility*







**Reporting and Investigation of Force (Partial Compliance)**

The timely investigation of force incidents is essential to ensuring the thoroughness of those investigations and accountability in the Department.  Department data reflect that there continue to be serious delays in the process of investigating use of force incidents at the DOJ facilities.  LASD provided information about the status of force investigations into incidents in the First Quarter of 2023 through the First Quarter of 2024.  Figure 19 presents the percentage of these investigations that were still in progress at the time the data were provided.  Among the investigations into force incidents that occurred in the First Quarter of 2023, 48% were still in progress as of July 3, 2024—more than a year later.  Among those still in progress, the average age of investigations into force incidents from the First Quarter of 2023 through the First Quarter of 2024 was 315 days.

*Figure 19:  Percentage of Force Investigations In Progress as of July 3, 2024, Q1-2023 through Q1-2024*



Figure 20 presents the overall percentage of investigations into incidents occurring in the First Quarter of 2023 through the First Quarter of 2024 that were still in progress by facility. Of the 180 investigations into uses of force at CRDF during this time period, 93% were still in progress as of July 3, 2024. PDC North had far fewer investigations to complete, only 29, and 62% were still in progress. NCCF had a total of 153 investigations, and 48% were still in progress.

*Figure 20: Percentage of Force Investigations In Progress as of July 3, 2024, by Facility, Q1-2023 through Q1-2024*



As the Monitoring Reports have expressed in the past, these delays are not acceptable. The failure to timely investigate and review force incidents compromises the ability of command personnel to hold staff accountable, provide timely retraining, and quickly respond to trends and patterns in force that should be corrected.

Figure 21 provides a similar comparison, but for the category of force used during the incidents occurring in the First Quarter of 2023 through the First Quarter of 2024. Of the 316 Category 1 Force incidents under investigation during this time period, 72% were still in progress as of July 3, 2024. A smaller percentage of the 59 investigations into Category 2 Force incidents were still in progress (56%).

*Figure 21:  Percentage of Force Investigations In Progress as of July 3, 2024, by Category, Q1-2023 through Q1-2024*



Figure 22 presents the overall percentage of investigations into incidents occurring in the First Quarter of 2023 through the First Quarter of 2024 that were still in progress by whether the incident occurred in a mental health housing unit.  Of the 151 force incidents in mental health housing units under investigation during this time period, 88% were still in progress as of July 3, 2024.  There were 222 force incidents that occurred in other housing units under investigation during this time period, and 57% of these were still in progress.

*Figure 22:  Percentage of Force Investigations In Progress as of July 3, 2024, by Mental Health Housing, Q1-2023 through Q1-2024*



Regarding these issues, Court-appointed Use of Force Subject Matter Expert McCampbell notes

Timely, objective and complete review/investigations of uses of force are
critical to detainee and staff safety.  These reviews are more than just
"checking boxes" and filling out forms.  The purpose of these
investigations is to prevent current and future harm, learn from findings,
improve training, increase supervision as appropriate, and enhance
operational practices.  The current process at LASD strains to meet these
goals; or there has been a lack of articulation of the outcomes in terms of
compliance.

Timely – the review of uses of force now often takes months/years to
complete through the chain-of-command.  Whatever information is critical
to detainee and staff safety is lost and opportunities for prevention missed.
LASD CFIT is an approach to improve the process; which will be
enhanced by policies, procedures, measurable outcomes, as well as a
description of how CFIT works with other organizational entities such as,
for example, Internal Affairs.

Objective – the years of reviewing use of force packages have often
revealed findings and chain-of-command concurrences with faulty
conclusions, and ignoring inconsistencies and missing information.  For
example, in the last year, looking at 25 uses of force packages, only one
upper command review challenged inadequate findings and conclusions –
and then it is impossible to know if that challenge even filtered down to
those who were the authors, or resulted in any change.

Complete – often critical information is missing – for example the
detainee's custody classification, whether the detainee was on the mental
health caseload, whether staff involved had previously been involved with
a use of force (outside their role in a specialized unit), and whether
operational practices triggered or contributed to the incident.  If a detainee
has been disciplined previously for involvement for use of force, did the
sanctions improve the inmate's future behavior.  The reviews are often
superficial in terms of operational practices, and lessons learned
unidentified – such as a need to improve training, and/or need to improve
operational practices, etc.

For completeness, reviews tend to be siloed – looking only at the force
event and not broadening the review, at any command level, in terms of
what else needs fixing.  Without this broader view – it will be challenging
for the agency to improve detainee and staff safety.  For example, several
recent reviews pointed to incidents where deputies conducting their safety
checks found violations of policy (for example, detainees' hanging towels,
etc. on bunk) triggering incidents, yet no one asks why that condition was
allowed to happen– what are the deputies assigned to those unit's
supervision supposed to be doing?  Often incidents may be avoided if
deputies assigned to housing units are paying attention to the verbal and

152

non-verbal cues of the detainees and assessing the level of tension rising
and falling in the unit.  No one asks if the detainees involved were
accurately classified; nor if they were on the mental health caseload [other
than a check box which provides no insight]– before or after the incident.

The training provided to responding staff is not questioned – what was in
their training record; and very importantly, was the training recommended
by those in the chain-of-command review ever completed (and/or whether
the training had any future effect on performance).  Few reviewers look at
the history of the housing unit in terms of uses of force and/or other
violence for that unit; what activities are available to the detainees;
whether there were grievances from the unit, etc.  There are many more
questions, and the question must be: what did LASD learn from the use of
force reviews and how were these lessons applied to improve detainee and
staff safety?

The Process – LASD has a process for reporting which appears to not
facilitate timely, objective and/or complete review of uses of force as
measured by the time to complete reviews and the quality.  Yet, the
process is not adapted to meet the needs of the agency or the various
consent agreements.   CFIT may change this; but timeliness, while
welcome, is only part of the picture to improve investigations.

As set forth above, on July 31, 2024, the Monitor provided the County with a use
of force matrix reflecting the ratings for the 25 force packages reviewed by the Monitor
and Use of Force Subject Matter Expert McCampbell.  On August 20, 2024, the Monitor
met with Department executives to discuss the ratings assigned.  Of the 25 cases
reviewed, 7 included some violation of Section 12.2 of the Action Plan, which requires
that inmate witnesses be asked to be interviewed, and interviewed, away from other
inmates.  8 of 25 included some violation of Section 15.1 of the Action Plan, which
requires Department members to complete a separate and independent report before
going off duty.  10 of 25 included some violation of Section 15.3 of the Action Plan,
which requires Department members to describe in their written reports the force used by
others.  23 of 25 included some violation of Section 15.6 of the Action Plan, which
requires Department members to be separated until they have completed their use of
force reports.   4 of 25 included some violation of Section 5.3 of the Action Plan, which
requires reviewing commanders to return any cases involving unexplained tactical
decisions or discrepancies among witnesses and/or evidence for additional investigation.

Regarding the Department's quantitative results on the specific provisions, for the
Fourth Quarter of 2023, the County reported Substantial Compliance with the following
provisions: 5.1(a) (timely database entry of force incidents); 8.3 (timely review of
retaliation grievances); 11.1 (timely review of force packages by CFRT for potential
employee discipline); 13.1 (zero tolerance and related investigations); 13.2 (notifications
to OIG required by findings in 13.1); 14.1 (timely unit commander review re: prosecution
for inmate assaults on staff); and 14.2 (timely referral of criminal conduct by a

Department member to DA's Office).

For the First Quarter of 2024, the County's Augmented Eighteenth Self-Assessment reports Substantial Compliance with the following provisions: 5.1(a) (timely database entry of force incidents); 8.3 (timely review of retaliation grievances); 11.1 (timely review of force packages by CFRT for potential employee discipline); 13.1 (zero tolerance and related investigations); 13.2 (notifications to OIG required by findings in 13.1); 14.1 (timely unit commander review re: prosecution for inmate assaults on staff); and 14.2 (timely referral of criminal conduct by a Department member to DA's Office).

### Grievances (Partial Compliance)

The County's Augmented Eighteenth Self-Assessment reports that in the Fourth Quarter of 2023, the Department achieved Substantial Compliance with the following grievance provisions at the DOJ facilities: 6.4 (proper handling of force-related grievances); 6.5 proper handling of harassment and retaliation grievances); 6.7 (appropriate handling of grievances marked "emergency"); 6.8 (inmate notification of downgraded grievances); 6.9 (proper handling of emergency grievances); 6.10 (timely collection of inmate grievances); 6.11 (review of complaints re: inmate grievance process); 6.12 (proper database entry of inmate grievances); 6.13 (proper tracking of handling of inmate grievances); 6.14 (monthly reports of grievance tracking); 6.15 (monthly evaluation of trends in inmate grievance handling); 6.17 (time limit for filing force-related grievances); 6.18 (proper handling of PREA grievances); 6.19 (timely responses to inmate grievances); 6.20 (proper handling of inmate appeals); 7.1 (conflict resolution for inmate grievances); 7.2 (timely notification of grievance investigation results); 7.3 (town hall meetings); and 8.1 (reporting of retaliation grievances).

The County's Augmented Eighteenth Self-Assessment reports that in the First Quarter of 2024, the Department achieved Substantial Compliance with the following grievance provisions at the DOJ facilities: 6.4 (proper handling of force-related grievances); 6.5 (proper handling of harassment and retaliation grievances); 6.7 (appropriate handling of grievances marked "emergency"); 6.8 (inmate notification of downgraded grievances); 6.9 (proper handling of emergency grievances); 6.10 (timely collection of inmate grievances); 6.11 (review of complaints re: inmate grievance process); 6.12 (proper database entry of inmate grievances); 6.13 (proper tracking of handling of inmate grievances); 6.14 (monthly reports of grievance tracking); 6.15 (monthly evaluation of trends in inmate grievance handling); 6.17 (time limit for filing force-related grievances); 6.18 (proper handling of PREA grievances); 6.19 (timely responses to inmate grievances); 6.20 (proper handling of inmate appeals); 7.1 (conflict resolution for inmate grievances); 7.3 (town hall meetings); and 8.1 (reporting of retaliation grievances).  The County reported that the Department achieved Partial Compliance with 7.2 (timely notification of grievance investigation results).

### Management and Administration (Substantial Compliance as of October 1, 2020, through September 30, 2021)

The Department achieved Substantial Compliance with the Management and Administration Provisions at the DOJ facilities as of September 30, 2021, and these provisions were not subject to Monitoring during the Eighteenth Reporting Period.

### Security Restraints (Partial Compliance)

Security Restraints are subject to the provisions in Section 17 of the *Rosas* Plan. It is the Monitor's understanding that the County and the Department do not use "multi-point restraints," which are subject to Paragraphs 17.6 through 17.9 of the *Rosas* Plan, at any of the County's jail facilities. The Monitor's auditors are reviewing the Safety Chair Logs and Fixed Restraint Logs for both quarters, which includes 35 uses of the safety chair and six uses of fixed restraints in the Fourth Quarter of 2023 and 29 and five in the First Quarter of 2024. The Monitor's auditors note that the Safety Chair Logs reflect three uses of force to place the inmate in the safety chair in the Fourth Quarter of 2023 and one use of force in the First Quarter of 2024. A medical evaluation was indicated in each case.[50]

While safety checks generally occur within the 20-minute requirement of Section 17.4,[51] compliance with this requirement remains a barrier to achieving Substantial Compliance. For example, one cause is incomplete documentation of safety checks. While a safety check may have occurred, the corresponding time may be blank or incomplete.[52] Therefore, it is impossible to assess the timeliness of the safety check, which causes the subsequent check to be non-compliant.

The Monitor's auditors note that vitals checks are not occurring as required by Section 17.3 and Fixed Restraint Logs do not explicitly document whether the inmate was in undue pain or that the restraints were not causing injury, as required by Section 17.4. Therefore, the County is in Partial Compliance with Paragraphs 17.3 and 17.4 of the *Rosas* Plan.

The Department posted logs of all involuntary medications administered in the Fourth Quarter of 2023 and First Quarter of 2024. The records reflect that all of the medications were administered per court orders to restore the competency of those deemed incompetent to stand trial and none were solely for security purposes in compliance with Paragraph 17.10 of the *Rosas* Plan.

---

[50] For CRDF Safety Chair Count 35 in the Fourth Quarter of 2023, the safety checks indicate that the inmate was being monitored by medical staff. However, the log indicates this occurred approximately two hours and twenty minutes after the inmate was initially placed in the safety chair.

[51] Safety checks are not required for the use of safety chairs for inmate movement (e.g., to/from court).

[52] For example, see CRDF Fixed Restraint Counts 1 and 2 in the Fourth Quarter of 2023, where the hours for the safety check times appear to be pre-filled by Custody personnel.

**Early Warning System        (Substantial Compliance as of September 30, 2019, through September 30, 2020)**

The Department implemented an Employee Review System that was approved by the *Rosas* Monitors as a pilot program at the Downtown Jail Facilities on July 27, 2018, and expanded it to the DOJ facilities on October 25, 2018.  The Department achieved Substantial Compliance with the Early Warning Provisions at the DOJ facilities as of September 30, 2020, and these provisions were not subject to Monitoring during the Eighteenth Reporting Period.

82.     With respect to paragraph 6.16 of the *Rosas* Implementation Plan, the County and the Sheriff will ensure that Sheriff's Department personnel responsible for collecting prisoners' grievances as set forth in that paragraph are also co-located in the Century Regional Detention Facility.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of July 15, 2016, through December 31, 2017)**

Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring for Substantial Compliance with Paragraph 82 in the Eighteenth Reporting Period.

83.    The County and the Sheriff will install closed circuit security cameras throughout all Jails facilities' common areas where prisoners engage in programming, treatment, recreation, visitation, and intra-facility movement ("Common Areas"), including in the Common Areas at the Pitchess Detention Center and the Century Regional Detention Facility.  The County and the Sheriff will install a sufficient number of cameras in Jails facilities that do not currently have cameras to ensure that all Common Areas of these facilities have security-camera coverage.  The installation of these cameras will be completed no later than June 30, 2018, with TTCF, MCJ, and IRC completed by the Effective Date; CRDF completed by March 1, 2016; and the remaining facilities completed by June 30, 2018.  The County and the Sheriff will also ensure that all video recordings of force incidents are adequately stored and retained for a period of at least one year after the force incident occurs or until all investigations and proceedings related to the use of force are concluded.

**STATUS:**    **SUBSTANTIAL COMPLIANCE (as of July 1, 2015, through June 30, 2016 at MCJ and IRC)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2015, through September 30, 2016 at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 at NCCF and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2018, through June 30, 2019 at PDC South)**

Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring for Substantial Compliance with Paragraph 83 in the Eighteenth Reporting Period.

84.     The Sheriff will continue to maintain and implement policies for the timely and thorough investigation of alleged staff misconduct related to use of force and for timely disciplinary action arising from such investigations.  Specifically:

(a)     Sworn custody staff subject to the provisions of California Government Code section 3304 will be notified of the completion of the investigation and the proposed discipline arising from force incidents in accordance with the requirements of that Code section; and

(b)     All non-sworn Sheriff's Department staff will be notified of the proposed discipline arising from force incidents in time to allow for the imposition of that discipline.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of July 1, 2017, through June 30, 2018 (verified))**

Substantial Compliance under the Compliance Measures requires the Department to demonstrate that 95% of the investigations of force incidents in which sworn custody staff and non-sworn custody staff were found to have violated Department policy or engaged in misconduct were completed and administrative action, which could include discipline, was taken within the time frames provided for in Government Code Section 3304 and relevant Department policies.

Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring for Substantial Compliance with Paragraph 84 in the Eighteenth Reporting Period.

85.    The County and the Sheriff will ensure that Internal Affairs Bureau management and staff receive adequate specialized training in conducting investigations of misconduct.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of April 1, 2021, through March 31, 2022 (verified))**

The Parties agreed on Revised Compliance Measures in 2021.  Substantial Compliance requires the Department to provide the Monitor with (1) the curriculum/syllabus for the two specialized courses, Internal Affair Investigations and Interview and Interrogation, given to IAB management, and (2) a list of the sworn personnel assigned to IAB and proof that such personnel successfully completed the training.  Substantial Compliance requires the Department to demonstrate that 90% of the personnel assigned to IAB have successfully completed one course of the required training within 3 months of their start date, and the second course within 6 months of their start date.

Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring for Substantial Compliance with Paragraph 85 in the Eighteenth Reporting Period.

86.    Within three months of the Effective Date, the County and the Sheriff will develop and implement policies and procedures for the effective and accurate maintenance, inventory, and assignment of chemical agents and other security equipment. The County and the Sheriff will develop and maintain an adequate inventory control system for all weapons, including OC spray.

**STATUS:**    **SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 at MCJ and CRDF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2016, through December 31, 2017 at PDC North)**

**SUBSTANTIAL COMPLIANCE (as of February 1, 2017, through March 31, 2018 at PDC South and PDC East)**

**SUBSTANTIAL COMPLIANCE (as of March 1, 2017, through March 31, 2018 at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 at IRC)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 at TTCF)**

CDM 7-08/080 ACCOUNTABILITY OF SPECIAL WEAPONS, effective October 14, 2016, requires each facility to have unit orders that "establish procedures for the storage, issuance, reissuance, accountability, maintenance, and periodic inventory of all weapons. . . stored at, or issued from, the facility," which includes detailed requirements for the "Inventory, Control, and Accountability of Aerosol Chemical Agents."

In addition to providing written policies and procedures, Substantial Compliance requires the Department to provide up-to-date Unit Orders for each jail requiring the inventory and inspection of special weapons, and armory audit logs documenting the inventory and control of armory-level weapons.  The Department previously maintained Substantial Compliance with Paragraph 86 for twelve consecutive months at all of the facilities, and it was not subject to monitoring with this provision in the Eighteenth Reporting Period.

## APPENDIX A

| NO. | PROVISION | STATUS | SUBSTANTIAL COMPLIANCE DATES |
|---|---|---|---|
| 18 | Suicide Prevention Training | Substantial Compliance | **(10/1/17 at MCJ & PDC South)[1] (9/1/17 at NCCF) (12/1/17 at PDC East) (4/1/18 at TTCF, IRC, & PDC North) (8/1/18 at CRDF)** |
| 19 | Crisis Intervention & Conflict Resolution Training | Substantial Compliance | **(4/1/18 at MCJ, NCCF, & IRC) (7/1/18 at TTCF) (12/1/18 at CRDF, PDC East, & PDC North) (3/1/19 at PDC South)** |
| 20 | Training at NCCF, PDC and CRDF | Substantial Compliance | **(8/1/17 at PDC East, PDC North, NCCF, & CRDF) (10/1/17 at PDC South)** |
| 21 | CPR Certification | Substantial Compliance | **(10/1/15 – 9/30/16 at PDC East & PDC South) (1/1/16 – 12/31/16 at NCCF, PDC North, & IRC) (4/1/16 – 3/31/17 at TTCF) (10/1/17 – 9/30/18 at MCJ) (7/1/18 – 6/30/19 at CRDF)** |

---

[1] Substantial Compliance Dates in **bold** reflect that the Department has achieved Substantial Compliance with the training requirements or maintained Substantial Compliance for twelve consecutive months with the other requirements; the results were verified by the Monitor's auditors when required; and the County or designated facilities are no longer subject to monitoring of this provision pursuant to Paragraph 111 of the Settlement Agreement.

## APPENDIX A

| | | | |
|---|---|---|---|
| 22 | Use of Arresting and Booking Documents | Substantial Compliance | **(7/1/16 – 6/30/17)** |
| 23 | Suicide Hazard Mitigation Plans | Substantial Compliance | **(7/12/18)** |
| 24 | Suicide Hazard Inspection | Substantial Compliance | **(10/1/17 – 9/30/18)** |
| 25 | Transportation of Suicidal Inmates (station jails) | Substantial Compliance (North & South Patrol Divisions) Partial Compliance (East & Central Patrol Divisions) | (1/1/24 – 3/31/24 at North & South Patrol Divisions) |
| 26 | Identification and Evaluation of Suicidal Inmates | Substantial Compliance | (4/1/23 – 3/31/24) |
| 27 | Screening for Mental Health Care and Suicide Risk | Substantial Compliance | **(10/1/19 – 3/31/20, 10/1/20 – 3/31/21)** |
| 28 | Expedited Booking of Suicidal Inmates | Substantial Compliance (IRC) Partial Compliance (CRDF) | **(4/1/17 – 3/31/18 at IRC)** |
| 29 | Mental Health Assessments (of non-emergent mental health needs) | Substantial Compliance | **(4/1/17 – 3/31/18)** |
| 30 | Initial Mental Health Assessments & Treatment Plans | Substantial Compliance | **(1/1/19 – 12/31/19)** |
| 31 | Electronic Medical Records Alerts | Partial Compliance (CRDF & TTCF) | |
| 32 | Electronic Medical Records – Suicide Attempts | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 33 | Supervisor Reviews of Electronic Medical Records | Substantial Compliance | **(7/1/16 – 6/30/17)** |
| 34 | Discharge Planning | Partial Compliance | |
| 35 | Referral for Mental Health Care | Substantial Compliance | **(11/1/17 – 12/31/18)** |
| 36 | Assessments After Triggering Events | Partial Compliance (TTCF & CRDF) | |

## APPENDIX A

| 37 | Court Services Division Referrals | Non-Compliance | |
| 38 | Weekly Rounds in Restricted Housing Modules | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 39 | Confidential Self-Referral | Substantial Compliance (NCCF) Partial Compliance (TTCF, PDC North, MCJ, & CRDF) Not Rated (PDC East & PDC South) | **(7/1/17 – 6/30/18 at NCCF)** |
| 40 | Availability of QMHPs | Partial Compliance | |
| 41 | FIP Step-Down Protocols | Substantial Compliance | **(7/1/22 – 6/30/23)** |
| 42 | HOH Step-Down Protocols | Partial Compliance (CRDF & TTCF) | |
| 43 | Disciplinary Policies | Substantial Compliance (NCCF and PDC North) Partial Compliance (CRDF, TTCF, and MCJ) | **(10/1/17 – 9/30/18 at NCCF & PDC North)** |
| 44 | Protective Barriers | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 45 | Suicide Intervention and First Aid Kits | Substantial Compliance | **(10/1/15 – 9/30/16 at CRDF, NCCF, TTCF, PDC East, & PDC South) (1/1/16 – 12/31/16 at MCJ & PDC North)** |
| 46 | Interruption of Self-Injurious Behavior | Substantial Compliance | **(7/1/20 – 6/30/21)** |
| 47 | Staffing Requirements | Partial Compliance | |
| 48 | Housekeeping and Sanitation | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 49 | Maintenance Plans | Substantial Compliance | **(3/1/16 – 2/28/17)** |

## APPENDIX A

| 50 | Pest Control | Substantial Compliance | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC North, TTCF, & CRDF)**<br>**(4/1/16 – 3/31/17 at PDC South & PDC East)** |
| 51 | Personal Care & Supplies | Substantial Compliance | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC East, PDC North, PDC South, & TTCF)**<br>**(7/1/16 – 6/30/17 at CRDF)** |
| 52 | HOH Property Restrictions | Partial Compliance (CRDF & TTCF) | |
| 53 | Eligibility for Education, Work and Programs | Partial Compliance | |
| 54 | Privileges and Programs | Substantial Compliance | **(1/1/23 – 6/30/23)** |
| 55 | Staff Meetings | Substantial Compliance | **(10/1/16 – 9/30/17 at CRDF)**<br>**(4/1/17 – 3/31/18 at PDC North)**<br>**(4/1/18 – 3/31/19 at MCJ)**<br>**(7/1/19 – 6/30/20 at TTCF)** |
| 56 | Changes in Housing Assignments | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 57 | Inmate Safety Checks in Mental Housing | Substantial Compliance (MCJ & PDC North)<br>Partial Compliance (TTCF & CRDF) | **(4/1/17 – 3/31/18 at MCJ)**<br>**(7/1/21 – 6/30/22 at PDC North)** |

**APPENDIX A**

| 58 | Inmate Safety Checks in Non-Mental Housing | Substantial Compliance | **(1/1/16 – 12/31/16 at PDC South, PDC North, & PDC East)** **(7/1/17 – 6/30/18 at CRDF)** **(10/1/17 – 9/30/18 at IRC)** (10/1/23 – 3/31/24 at TTCF) (1/1/24 – 3/31/24 at NCCF & MCJ) |
|---|---|---|---|
| 59 | Supervisor Rounds | Substantial Compliance | **(1/1/17 – 12/31/17 at PDC East & MCJ)** **(4/1/17 – 3/31/18 at NCCF)** **(10/1/17 – 9/30/18 at CRDF)** **(1/1/18 – 12/31/18 at PDC North & PDC South)** **(4/1/18 – 3/31/19 at TTCF)** |
| 60 | Implementation of Quality Improvement Program | Substantial Compliance | **(4/1/19 – 3/31/20)** |
| 61 | Requirements of Quality Improvement Program | Partial Compliance | |
| 62 | Tracking of Corrective Action Plans | Partial Compliance | |
| 63 | Sufficient HOH and MOH Housing | Substantial Compliance (CRDF) Partial Compliance (TTCF) | (10/1/23 – 3/31/24 at CRDF) |
| 64 | Plans for Availability of Inpatient Health Care | Partial Compliance | |
| 65 | Administration of Psychotropic Medication | Partial Compliance | |
| 66 | Active Mental Health Caseloads | Partial Compliance | |

### APPENDIX A

| 67 | Prisoner Refusals of Medication | Substantial Compliance | (10/1/23 – 3/31/24) |
|---|---|---|---|
| 68 | Contraband Searches | Substantial Compliance | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC East, PDC South, & PDC North)<br>(1/1/17 – 12/31/17 at TTCF)<br>(1/1/22 – 12/31/22 at CRDF)** |
| 69 | Clinical Restraints in CTC | Substantial Compliance | **(7/1/18 – 6/30/19)** |
| 70 | Security Restraints in HOH and MOH | Partial Compliance | |
| 71 | Therapeutic Services for Inmates in Clinical Restraints | Substantial Compliance | **(7/1/16 – 6/30/17)** |
| 72 | Administrative Reviews | Substantial Compliance | **(1/1/17 – 12/31/17)** |
| 73 | Reporting of Self-Injurious Behavior and Threats | Substantial Compliance | **(10/1/17 – 9/30/18)** |
| 74 | Law Enforcement Investigations of Suicides | Substantial Compliance | **(9/1/16 – 12/31/17)** |
| 75 | Management Reviews of Suicide Attempts | Substantial Compliance | **(10/1/17 – 9/30/18)** |
| 76 | Management Reviews of Suicides | Substantial Compliance | **(9/1/16 – 12/31/17)** |
| 77 | Custody Compliance and Sustainability Bureau | Substantial Compliance | **(4/1/22 – 3/31/23)** |
| 78 | Suicide Prevention Advisory Committee | Substantial Compliance | **(5/11/16 – 5/18/17)** |
| 79 | Therapeutic Services in Mental Health Housing | Non-Compliance | |
| 80 | Out-of-Cell Time in HOH | Non-Compliance | |

**APPENDIX A**

| | | | |
|---|---|---|---|
| 81 | Implementation of *Rosas* Recommendations | Partial Compliance | |
| | Training | Substantial Compliance | |
| | Use of Force | Partial Compliance | |
| | Reporting and Investigation of Force | Partial Compliance | |
| | Grievances | Partial Compliance | |
| | Management and Administration | Substantial Compliance | **(10/1/20 – 9/30/21)** |
| | Security Restraints | Partial Compliance | |
| | Early Warning System | Substantial Compliance | **(9/30/19 – 9/30/20)** |
| 82 | Grievances at CRDF | Substantial Compliance | **(7/15/16 – 12/31/17)** |
| 83 | Closed Circuit Cameras | Substantial Compliance | **(7/1/15 – 6/30/16 at MCJ & IRC)** **(10/1/15 – 9/30/16 at TTCF)** **(4/1/16 – 3/31/17 at CRDF)** **(4/1/18 – 3/31/19 at NCCF & PDC North)** **(7/1/18 –6/30/19 at PDC South)** |
| 84 | Investigation of Staff Misconduct | Substantial Compliance | **(7/1/17 – 6/30/18)** |
| 85 | Internal Affairs Bureau Training | Substantial Compliance | **(4/1/21 – 3/31/22)** |

**APPENDIX A**

| 86 | Maintenance and Inventory of Security Equipment | Substantial Compliance | **(4/1/16 – 3/31/17 at MCJ & CRDF)**<br>**(10/1/16 – 12/31/17 at PDC North)**<br>**(2/1/17 – 3/31/18 at PDC South & PDC East)**<br>**(3/1/17 – 3/31/18 at NCCF)**<br>**(4/1/17 – 3/31/18 at IRC)**<br>**(4/1/18 – 3/31/19 at TTCF)** |

## APPENDIX B

| | Substantial Compliance (Provisions) | Partial Compliance[1] | Non-Compliance | Suspended (Some Or All Facilities) | Substantial Compliance (Facilities)[2] | No Longer Subject To Monitoring[3] |
|---|---|---|---|---|---|---|
| **First[4]** | 5 | 16 | | | 10 | |
| **Second** | 14 | 30 | 13 | | 24 | |
| **Third** | 22 | 27(1) | 10 | | 29 | 4(2) |
| **Fourth** | 24 | 26(1) | 10 | | 29 | 10(2) |
| **Fifth** | 23 | 24(2) | 7 | | 34 | 15(5) |
| **Sixth** | 32 | 22 | 7 | | 38 | 18(9) |
| **Seventh** | 30 | 23 | 7 | | 39 | 21(10) |
| **Eighth** | 35 | 20 | 6 | | 42 | 27(9) |
| **Ninth** | 36 | 22 | 4 | | 43 | 31(8) |
| **Tenth** | 39 | 21 | 3 | | 45 | 32(8) |
| **Eleventh** | 38 | 18 | 5 | 2 | 44 | 34(7) |
| **Twelfth** | 38 | 18 | 6 | 1 | 44 | 36(6) |
| **Thirteenth** | 42 | 14(1) | 6 | 1 | 47 | 36(6) |
| **Fourteenth** | 40 | 17 | 7 | 0 | 45 | 38(6) |
| **Fifteenth** | 42 | 13(1) | 9 | 0 | 46 | 38(6) |
| **Sixteenth** | 43 | 12(2) | 4 | 0 | 49 | 39(5) |
| **Seventeenth** | 43 | 16 | 3 | 0 | 50 | 40(5) |
| **Eighteenth** | 45 | 15 | 3 | 0 | 51 | 42(5) |

[1] The figure in parenthesis under Partial Compliance is the number of additional provisions where some facilities were in Partial Compliance and other facilities were in Non-Compliance.

[2] This represents the number of provisions where the Department is in Substantial Compliance at all or some of the facilities.

[3] The figure in parenthesis under No Longer Subject to Monitoring is the number of additional provisions where some facilities are no longer subject to monitoring.

[4] During the First Reporting Period, 43 provisions were not subject to monitoring.