Nicholas E. Mitchell
nmitchell@independentmonitor.com

**Monitor**

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> v. <br><br> COUNTY OF LOS ANGELES et al., | CV No. 15-05903 DDP (JEMX) <br><br> **MONITOR'S NINETEENTH REPORT** |

1    Pursuant to Paragraph 109 of the Joint Settlement Agreement Regarding Los
2    Angeles County Jails, the Monitor appointed by this Court hereby submits the
3    attached Report "describing the steps taken" by the County of Los Angeles and the
4    Los Angeles County Sheriff Department ("Department") during the six-month
5    period from July 1, 2024, through December 31, 2024, "to implement the
6    Agreement and evaluating the extent to which they have complied with this
7    Agreement."  This Report takes into consideration the advice and assistance I have
8    received from the Subject Matter Experts appointed by this Court and the comments
9    from the Parties in accordance with Paragraph 110 of the Agreement.  I am available
10   to answer any questions the Court may have regarding my Report at such times as
11   are convenient for the Court and the parties.

12

13   DATED:  May 15, 2025              Respectfully submitted,

14

15

16                                    By:  /s/ Nicholas E. Mitchell
17                                         Nicholas E. Mitchell
18                                         Monitor

19

20

21

22

23

24

25

26

27

28

## MONITOR'S NINETEENTH REPORT

This Nineteenth Report sets forth the Monitor's assessments of the implementation of the Settlement Agreement (the "Agreement" or "DOJ Agreement") between the County of Los Angeles (the "County") and the United States Department of Justice ("DOJ") for the treatment of inmates with mental illness in the County's jail facilities by the Los Angeles Sheriff's Department (the "Department" or "LASD") and the County's Correctional Health Services ("CHS").  It also reports on the Department's compliance with the provisions of the Implementation Plan in the settlement of *Alex Rosas, et al., v. Leroy Baca,* No. CV 12-00428 DDP, that were extended under the terms of the DOJ Agreement to the facilities not covered by the *Rosas* case.[1]  This Report includes results reported by the County from July 1, 2024, through December 31, 2024, for the Second and Third Quarters of 2024 (the "Nineteenth Reporting Period").

This Nineteenth Report is based upon the Monitor's review of the policies, procedures, and directives proposed and/or implemented by the Department and CHS in the Nineteenth Reporting Period, and assessments and observations of the Mental Health and Use of Force Subject Matter Experts, and mental health clinicians and auditors retained by the Monitor.  It takes into consideration the County's Self-Assessment Status Report ("Nineteenth Self-Assessment"); Correctional Health Services and Custody Compliance and Sustainability Bureau ("CCSB") Combined Semi-Annual Report on Quality Improvement and Suicide Prevention Efforts – Quarter 2 2024 & Quarter 3 2024; the County's Augmented Self-Assessment Status Report ("Augmented Nineteenth Self-Assessment"), and its Supplemental Self-Assessment.  It also incorporates observations of the Monitoring Team during jail site visits in November and December 2024, and in January and February 2025.

During the Nineteenth Reporting Period or in the months immediately after, several significant exogenous events impacted the County of Los Angeles and its residents.  This includes the outbreak of a series of devastating wildfires in Los Angeles County and the passage of California Proposition 36, which has already resulted in increases to the Los Angeles County jail population.  A comprehensive discussion of the Department's improved and improving results under the Agreement during the Nineteenth Reporting Period—which are noteworthy— must begin with a discussion of these recent events, which may continue to present compliance challenges in the next Reporting Period.

### January 2025 Los Angeles County Wildfires

From January 7 to 31, 2025, a series of seven destructive wildfires erupted in Los Angeles County.  The fires were magnified by drought conditions and fierce winds, which reached an estimated 100 miles per hour.  At least 29 people were killed, more

---

[1] The *Rosas* case involved allegations of excessive force in Men's Central Jail (MCJ), the Twin Towers Correctional Facility (TTCF), and the Inmate Reception Center (IRC) (collectively the "Downtown Jail Complex").  The DOJ Agreement extends provisions of the Implementation Plan to the Century Regional Detention Facility (CRDF), the North County Correctional Facility (NCCF), and the Pitchess Detention Center (PDC).

than 200,000 residents were forced to evacuate, and more than 18,000 homes and
structures were destroyed.  The fires burned a grievous line through the lives of many Los
Angeles residents who have struggled to adapt and, in some cases, rebuild their lives in
the wake of this incalculable human tragedy.

The Sheriff Department's Custody Operations were not left unscathed.  In
addition to the heartbreaking personal costs borne by many County and Sheriff
Department employees, the Department itself was challenged by the Hughes Fire, which
grew to 10,000 acres, including terrain proximate to the Pitchess Detention Center,
causing the evacuation of one of its jails.  Thankfully, the fires were stopped before they
reached the detention complex, and no lives were lost in the jails.  However, the
Department was forced to grapple with significant operational disruptions both during the
fires and in their aftermath.

**California Proposition 36 and its Early Impacts on the LA Jail Population**

On December 18, 2024, California Proposition 36, which was passed by voters in
the November 2024 general election, went into effect.  Proposition 36 increased penalties
for certain theft and drug crimes.  For example, prior to its passage, petty theft and
shoplifting were generally misdemeanors.  Under Proposition 36, they may now be
felonies if the individual has two or more past convictions for certain theft-related crimes,
and the sentence could be up to three years in a county jail or state prison.  Similarly,
possession of certain drugs, such as fentanyl and methamphetamine, may now be treated
as felonies if the individual has two or more drug-related convictions.

The specific effects that Proposition 36 will have on California's jail populations
remain uncertain.  To be sure, some who would have been detained in county jails will
now instead be sentenced to state prison, while others who would otherwise have been
released will now be detained in county jails.  Projections about the likely effects of
Proposition 36 on statewide jail populations have varied from an increase of a few
thousand people to as many as 130,000.[2]

It is too early to know the impacts that Proposition 36 will have on LASD jail
populations, but preliminary data are concerning.  According to an initial analysis
provided by the LASD, in December 2024, the LASD had 12 individuals in custody on
two charges addressed by Proposition 36.[3]  By January 21, 2025, less than a month later,
LASD had 155 such persons in custody, a nearly 13-fold increase.  The demand for
mental health beds, which are perennially in short supply, also increased as a result, as 65
of the 155 individuals required mental health housing in either moderate- or high-
observation housing units.

If these trends continue, they may strain the County's efforts to comply with
several provisions in this case, as a rising jail population would require more custody and
clinical staff time, and further deplete existing bed capacity in the LASD's mental health

---

[2] Nigel Duara, *California's Jail Population will Rise Thanks to Prop. 36*, Associated Press, Dec. 17, 2024.
[3] Cal. Penal Code § 666.1(A)1PC and Cal. Health and Safety Code § 11395HS.

units.[4]  The County must proactively assess these population-level changes and, if they continue, take action to ameliorate their impacts.  The Monitor will track these data, and the County's responses, and apprise the Court of any material impacts on the County's compliance with the Agreement.

### Progress in the Nineteenth Reporting Period

Against this challenging backdrop, the County made significant progress in its compliance with the Agreement during the Nineteenth Reporting Period.  This Report includes a discussion of a number of Provisions that the County has brought into Substantial Compliance since the Eighteenth Report was filed.  This includes Provision 28 (expedited booking of suicidal inmates at CRDF), Provision 40 (availability of QMHPs to provide crisis intervention services), Provision 42 (HOH step-down protocols), Provision 53 (eligibility for education and programs), and Provision 62 (developing, implementing, and tracking corrective actions in the quality improvement program).

Moreover, though not yet in Substantial Compliance at all facilities, the County's results under various other Provisions, such as Provisions 31 (mental health alerts of suicide risk), 36 (mental health assessments after triggering events), 37 (referral by court personnel of prisoner suicidal ideation), 39 (confidential self-referral system for requesting mental health care), 43 (disciplinary process for inmates with serious mental illness), and 79 (therapeutically appropriate treatment for inmates in mental health housing) improved *significantly* in the Nineteenth Reporting Period.  The County has also continued its trajectory of successfully implementing Provision 63, one of the Agreement's most complicated requirements given the scarcity of mental health beds, and it is now in Substantial Compliance at both TTCF and CRDF.[5]  These are commendable achievements.

In total, there are 69 provisions in the Agreement that are subject to monitoring by the Monitor and Subject Matter Experts.  As of the date of this Report, the County and the Department are in Substantial Compliance with 50 provisions, in Partial Compliance with 15 provisions, and in Non-Compliance with one provision.  In addition, there are three provisions where the County is in different compliance ratings at different facilities.  This is a marked improvement from the County's results for recent Reporting Periods.

---

[4] The provisions most obviously vulnerable to these impacts are Provision 34 (release planning for patients with mental illness), Provision 63 (timely housing in mental health beds), Provision 79 (provision of therapeutically appropriate mental health treatment), and Provision 80 (structured and unstructured out-of-cell time for patients with serious mental illness).
[5] All reported results are subject to review and verification by the Monitor's auditors.

*Figure 1: The County's Cumulative Substantial Compliance with All Provisions by Reporting Period*



Notwithstanding these improvements and others discussed elsewhere in this Report, there are several obstacles that the County must still overcome.

- As discussed in previous Monitoring Reports, there continue to be hundreds of MOH patients detained in MCJ in deplorable conditions. There are no private areas within which they can meet with clinicians regarding their mental health symptoms, nor common spaces for them to receive group mental health programming.[6] Lines of sight from Deputy workstations are poor, creating dangerous conditions for staff and inmates. The County must determine how it will get these inmate patients, some of whom are quite symptomatic, into housing that is safer and more clinically appropriate. It has not yet described a plan to achieve this goal, and it should do so without delay.

- The County is continuing to struggle to provide the requisite amount of structured out-of-cell group programming necessitated by Provision 80. While the County saw some gains in compliance at TTCF in the Nineteenth Reporting Period, CRDF did not keep pace, and both facilities remain far from the Substantial

---

[6] The Augmented Nineteenth Self-Assessment includes a notation that "CHS and LASD are currently exploring options for improved space for clinical assessments on the 5000 floor of MCJ." *See* Augmented Nineteenth Self-Assessment at pp. 153. This would be useful and should be implemented promptly.

Compliance thresholds.  The County has acknowledged that its creation of unrestrained housing pods for HOH inmates has facilitated its compliance with the structured out-of-cell requirements of Provision 80,[7] but it has not described a plan to further expand the number of such pods, or to increase the number of staff members providing structured out-of-cell programming.  It is thus difficult to discern how the County will close the significant gap between its current results and the Substantial Compliance thresholds to meet the compliance deadline set by this Court.

- As explained in previous Monitoring Reports, the County's self-audit process for assessing its compliance with Provision 65 remains unreliable, and the County has yet to describe efforts to reconcile its near-perfect results with the observable realities of pill call in the jails.  The Monitoring Team increased the number of its site visits in the Nineteenth Reporting Period (and thereafter) to make in-person observations of pill calls, which resulted in useful insight into both ongoing deficiencies in the pill call process, and improvements in the Nineteenth Reporting Period.  Yet, the test for Substantial Compliance with Provision 65 requires the County to calculate a compliance percentage through a self-audit process that neither the Monitor nor the Court can now credit.  To achieve compliance with the Agreement and the Court's Orders, the County will need to address the continuing deficiencies in its Provision 65 self-audit process that have been repeatedly raised in recent Monitoring Reports.

**Conclusion of the Meet-and-Confer Process & Extension of Certain Compliance Deadlines**

As set forth in the Eighteenth Monitoring Report, in May 2024, the DOJ initiated the meet and confer process under Provision 117 of the Agreement related to Provisions 34, 36, 40, 63, and 80.  From May 2024 through January 2025, the DOJ, County, and the Intervenors (as to Provision 34) participated in meetings with the Monitor regarding these provisions, among others, to discuss potential cure plans to address any non-compliance. These discussions were collaborative and productive, and resulted in agreement on corrective actions to be taken by the County, some adjustments to the manner in which compliance is to be measured, and extensions of certain compliance deadlines.

---

[7] *See* Supplemental Nineteenth Self-Assessment at pp. 38  ("A major part of the effort to maximize delivery of both unstructured and structured out-of-cell time is the expansion of unrestrained therapeutic housing units (FIP Stepdown and HOH Dorms), where patients are out of their cells most of the day and in which it is much easier to deliver larger, more frequent, and more varied group programming. . . . For Provision 80 compliance, these units are helpful because often group providers can hold much bigger groups and can make offers for out-of-cell time much more efficiently to an entire pod of patients. There is rarely a need to go cell-to-cell to make offers because group programming is provided on a daily schedule that helps inmates structure their day and is part of the therapeutic model of the program. Groups can be generally announced, and individuals are incentivized to participate, and participation is not constrained by the number of seats that have safety restraints or safety separation from other patients").

In March 2025, the Parties reached final agreement on two stipulations and associated proposed orders. *See* Joint Stipulation to Modify Court Orders Setting Deadlines for Substantial Compliance ("Joint Stipulation to Modify Deadlines") and Joint Stipulation to Modify December 27, 2022 Court Order Setting Deadline for Substantial Compliance ("Joint Stipulation to Modify Provision 34 Compliance Deadlines").[8]  The Court issued corresponding orders on March 10, 2025, and the Monitor has therefore applied the new deadlines and Compliance Measures included in these stipulations and Orders throughout this Report.[9]

*Figure 2: Past and Upcoming Court-Ordered Compliance Deadlines, by Provision*



The recent progress reflected in this Report results from the hard work of many people, including scores of County personnel, as well as the substantial financial and human resources devoted by the County to its compliance efforts.  The Monitor recognizes the County's demonstrated commitment to compliance with the Agreement, and appreciates its unfailing professionalism and collaboration with the Monitoring Team in the Nineteenth Reporting Period.

The diligence and attention of Plaintiff's counsel to this case has also been instrumental.  Counsel for Plaintiff and Defendants meet with the Monitor bi-weekly to discuss the County's results under the Agreement's provisions, prioritize projects, problem-solve obstacles to compliance, and agree upon deadlines.  Plaintiff's counsel regularly attends patient death reviews and quality improvement meetings, and shares feedback, expertise, and suggestions about the steps necessary to improve these processes, which are essential to compliance with the Agreement.  Plaintiff's counsel has frequently shared letters, emails, and analysis of draft Monitoring Reports, County implementation plans, and other documents that have resulted in the material enhancement of those documents. Stated plainly, the active, recurring engagement of Plaintiff's counsel has played a critical role in the strides the County has made towards compliance with the Agreement.  Given the significant, recent departures from the team

---

[8] Dkts. 273 and 272, respectively.
[9] Dkts. 275 and 274, respectively.

representing the United States, the Monitor wanted to also recognize the essential role that Plaintiff's counsel has played in the County's progress to date, and to share the hope that this level of sustained engagement by Plaintiff's counsel continues in the future.[10]

> Nicholas E. Mitchell, Monitor
> May 15, 2025

---

[10] *See* Dkts. 276, 279, 280, 281, 282, dated Mar. 13, 2025 – May 5, 2025 (notices of withdrawal of Luis E. Saucedo, Maggie Filler, Maura Klugman, Matthew Nickell, and Helen Vera as counsel for the United States).

## EXECUTIVE SUMMARY

There are 69 provisions in the Settlement Agreement that are subject to monitoring by the Monitor and Subject Matter Experts.  As of the date of this Report, the County and the Department are in Substantial Compliance with 50 provisions, in Partial Compliance with 15 provisions, and in Non-Compliance with one provision.  There are two provisions (Paragraphs 43 and 57) for which the Department is in Substantial Compliance at certain facilities and Partial Compliance at other facilities.  There is one provision (Paragraph 39) for which the Department is in Substantial Compliance at certain facilities, Partial Compliance at other facilities, and Not Rated at other facilities. There are 53 provisions for which the County and the Department are in Substantial Compliance at some or all facilities.[11]

The Monitor's determination of the County's compliance is based upon the quantitative thresholds in the Compliance Measures (and any other applicable requirements in the Compliance Measures) for achieving Substantial Compliance, unless the quality of the County's performance as determined by the qualitative assessment is plainly inadequate or the results reported by the Monitor's Mental Health Team vary significantly from the results reported by the Department.[12]  As used herein, "Substantial Compliance" means that the County has "achieved compliance with the material components of the relevant provisions of this Agreement in accordance with the [agreed-upon Compliance Measures for assessing Substantial Compliance]," which it must maintain for twelve-consecutive months; "Partial Compliance" means that the County has achieved "compliance on some, but not all, of the material components of the relevant provision of this Agreement;" and "Non-Compliance" means that the County has not met "most or all of the material components of the relevant provisions of this Agreement."

Appendix A to this Nineteenth Report shows the status of each of the 69 provisions of the Agreement that are subject to monitoring and the twelve-month triggering dates where the County is deemed to be in Substantial Compliance.  Appendix B shows the County's progress from the Initial Reporting Period through the Nineteenth Reporting Period in achieving Substantial Compliance and in maintaining Substantial Compliance for twelve consecutive months on provisions that are no longer subject to

---

[11] Under Paragraph 111 of the Agreement, the twelve-month period for which the County is required to maintain Substantial Compliance can be determined on a facility-by-facility basis.

[12] As in prior reports, this Nineteenth Report also reflects the results of audits by the Monitor's auditors to verify results reported by the County.  The Monitor has deemed the County to be in Substantial Compliance "as of" the beginning of the quarter reported by the County if the auditors have verified that the County has met the thresholds in the Compliance Measures.  If the auditors were not able to verify the results reported by the County, the twelve-month period for maintaining Substantial Compliance will commence in a future period when the County's reported results are verified by the auditors.  If the County maintains Substantial Compliance with a provision for twelve consecutive months, pursuant to Paragraph 111 of the Agreement, the Monitor and Subject Matter Expert will "no longer. . .assess or report on that provision" in future reporting periods.  Some of the Substantial Compliance results reported by the County in the Nineteenth Reporting Period have not been audited by the Monitor's auditors and cannot be considered final until verified by the auditors.  The County will not be deemed to be in Substantial Compliance as of the County's reported date for purposes of determining the twelve-month compliance period if the results are not verified by the auditors.

monitoring.

There are 43 provisions that are no longer subject to monitoring because the County and Department maintained Substantial Compliance for twelve consecutive months as required by Paragraph 111 of the Settlement Agreement and verified by the Monitor's auditors as required.[13]  There are another five provisions for which some facilities are no longer subject to monitoring because those facilities maintained Substantial Compliance for the required twelve consecutive months.[14]

As of the date of this Report, and subject to verification by the Monitor's auditors and qualitative assessments in some cases, the County and the Department are in Substantial Compliance at some or all of the facilities with the following provisions of the Settlement Agreement:

The County has achieved Substantial Compliance with Paragraph 18, which requires the (initial) training of Deputy Sheriffs and Custody Assistants on suicide prevention as follows: at Men's Central Jail ("MCJ") and Pitchess Detention Center ("PDC") South as of October 1, 2017; at North County Correctional Facility ("NCCF") as of September 1, 2017; at PDC East as of December 1, 2017; at Twin Towers Correctional Facility ("TTCF"), the Inmate Reception Center ("IRC"), and PDC North as of April 1, 2018; and at Century Regional Detention Facility ("CRDF") as of August 1, 2018.  The County maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) and 4.7(b) as of December 2023.

The County has achieved Substantial Compliance at NCCF, MCJ, and IRC as of April 1, 2018; at TTCF as of July 1, 2018; at CRDF, PDC East, and PDC North as of December 1, 2018; and at PDC South as of March 1, 2019, with Paragraph 19, which requires the (initial) training of Deputy Sheriffs on Crisis Intervention and Conflict Resolution and the training of Deputy Sheriffs and Custody Assistants in working with mentally ill prisoners.  The Department has achieved Substantial Compliance at CRDF, IRC, NCCF, MCJ, PDC East, PDC North, PDC South, and TTCF as of December 2019 with the refresher training requirements of Paragraph 19.  The County maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) and 4.7(b) as of December 2023.

The County has achieved Substantial Compliance at PDC East, PDC North, NCCF, and CRDF as of August 1, 2017, and at PDC South as of October 1, 2017, with Paragraph 20, which requires the (initial) training of additional Deputy Sheriffs on Crisis Intervention and Conflict Resolution and on working with mentally ill prisoners.  The County maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) and 4.7(b) as of December 2023.

---

[13] This includes the initial training required by Paragraphs 18, 19, and 20, which have been completed and are no longer subject to monitoring.  The refresher training requirements for each of these provisions are, however, still subject to monitoring under Provision 81 Rosas 4.6(b) and 4.7(b).

[14] The provisions that are no longer subject to monitoring at some or all of the facilities are highlighted in bold in Appendix A.

The County has maintained Substantial Compliance for twelve consecutive months at PDC East, PDC South, PDC North, NCCF, IRC, TTCF, CRDF, and MCJ with Paragraph 21, which requires Custody personnel to maintain CPR certifications.

The County has maintained Substantial Compliance for twelve consecutive months with Paragraph 22, which requires the County and the Sheriff to provide instructional material on the use of arresting and booking documents to ensure the sharing of known relevant and available information on prisoners' mental health status and suicide risk.

The County has maintained Substantial Compliance for twelve consecutive months as of July 12, 2018, with Paragraph 23, which requires that the Department conduct a systematic review of prisoner housing to reduce the risk of self-harm and to identify and address suicide hazards, and to develop plans to reasonably mitigate suicide hazards identified in the review.

The County has maintained Substantial Compliance for twelve consecutive months as of September 30, 2018, with Paragraph 24, which requires the Department to conduct annual reviews and inspections of prisoner housing to identify suicide hazards.

The County has maintained Substantial Compliance for twelve consecutive months as of April 1, 2023, through March 31, 2024, with Paragraph 26, which requires the Department to identify inmates with emergent or urgent mental health needs based on intake screenings and to expedite such inmates for a mental health screening by a QMHP within four hours.

The County has maintained Substantial Compliance for twelve months as of March 31, 2021, with Paragraph 27, which requires that all prisoners are individually and privately screened within 12 hours of their arrival at the jails.

The County has maintained Substantial Compliance for twelve consecutive months at IRC as of March 31, 2018, with Paragraph 28, which requires the Department to expedite inmates having urgent or emergent mental health needs through the booking process.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2018, with Paragraph 29, which requires mental health assessments of prisoners with non-emergent mental health needs within 24 hours of the intake nursing assessment.

The County has maintained Substantial Compliance as of January 1, 2019, through December 31, 2019, with Paragraph 30, which requires the County to provide an initial mental health assessment that includes a brief initial treatment plan that addresses "housing recommendations and preliminary discharge information."

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 32, which requires that a serious suicide attempt be entered in the prisoner's electronic medical record in a timely manner.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2017, with Paragraph 33, which requires mental health supervisors to review electronic medical records on a quarterly basis to assess their accuracy.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2018, with Paragraph 35, which requires the Department to ensure that custody staff refer prisoners who are demonstrating a potential need for routine mental health care to a QMHP or a Jail Mental Evaluation Team.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 38, which requires mental health staff or JMET to make weekly cell-by-cell rounds in restricted non-mental health housing modules to identify prisoners with mental illnesses and grant prisoner's requests for out-of-cell interviews.

The County has maintained Substantial Compliance at NCCF for twelve consecutive months as of June 30, 2018, with Paragraph 39, which requires the County to use a confidential self-referral system for prisoners to request mental health care. The County has also provided documentation showing that it has achieved Substantial Compliance at CRDF as of July 1, 2024, through September 30, 2024. The reported results are subject to verification by the Monitor's auditors.

The County has achieved Substantial Compliance as of April 1, 2024, through September 30, 2024, with Paragraph 40, which requires the County to ensure a QMHP will be available seven days per week to provide clinically appropriate mental health crisis intervention services.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2023, with Paragraph 41, which requires CHS to review the medical records of all prisoners on suicide watch in FIP for one randomly selected month each quarter, and submit a report regarding the implementation of the step-down protocols and the results of its review of the medical records.

The County has provided documentation showing it has achieved Substantial Compliance as of July 1, 2024, through September 30, 2024, at CRDF and TTCF, with Paragraph 42, which requires the County to perform QMHP assessments of inmates placed on risk precautions in HOH and for step-down procedures to be determined on an individualized basis by the QMHP and implemented by the Department. The reported results are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance at NCCF and PDC North for twelve consecutive months as of September 30, 2018, with Paragraph 43, which requires

the Department to develop and implement policies for the discipline of prisoners with serious mental illnesses.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 44, which requires the Department to install protective barriers in High Observation Housing and other mental health housing.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 45, which requires Suicide Prevention Kits and first-aid kits in control booths in all facilities.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2021, with Paragraph 46, which requires the Department to interrupt and, if necessary, provide appropriate aid to any prisoner who threatens or exhibits self-injurious behavior.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 48, which requires the Department to have written housekeeping, sanitation, and inspection plans to ensure proper cleaning.

The County has maintained Substantial Compliance for twelve consecutive months as of February 28, 2017, with Paragraph 49, which requires the Department to have maintenance plans to respond to routine and emergency maintenance needs.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2017, with Paragraph 50, which requires pest control in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2017, with Paragraph 51, which requires the Department to ensure that all prisoners have access to basic hygiene supplies in accordance with state regulations.

The County has provided documentation showing it has achieved Substantial Compliance as of April 1, 2024, through September 30, 2024, with Paragraph 53, which requires the Department to ensure that an inmate's mental health diagnosis or prescription for medication alone does not preclude an inmate from participating in education, work, or similar programs.  The reported results are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance as of January 1, 2023, through June 30, 2023, with Paragraph 54, which requires the County to ensure that prisoners not in mental health housing are "not denied privileges and programming based solely on their mental health status or prescription for psychotropic medication."

The County has maintained Substantial Compliance at CRDF, PDC North, MCJ, and TTCF for twelve consecutive months as of June 30, 2020, with Paragraph 55, which

requires custody, medical, and mental health staff to meet daily in High Observation Housing and weekly in Moderate Observation Housing.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 56, which requires custody, medical, and mental health staff to communicate regarding any change in a housing assignment following a suicide attempt or serious change in mental health condition.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2018, at MCJ with Paragraph 57, which requires safety checks in mental health housing. The County has also maintained Substantial Compliance for twelve consecutive months at PDC North as of June 30, 2022.

The County has maintained Substantial Compliance for twelve consecutive months at PDC South, PDC North, and PDC East as of December 31, 2016, at CRDF as of June 30, 2018, and at IRC as of September 30, 2018, with Paragraph 58, which requires safety checks in non-mental health housing. The County has also provided documentation reflecting that it has achieved Substantial Compliance as of October 1, 2023, through September 30, 2024, at TTCF, and as of January 1, 2024, through September 30, 2024, at NCCF and MCJ. These results are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2019, with Paragraph 59, which requires unannounced daily supervisory rounds to verify safety checks.

The County has achieved Substantial Compliance with Paragraph 60 as of April 1, 2019, through March 31, 2020, which requires the implementation of a quality improvement plan.

The County has achieved Substantial Compliance as of April 1, 2024, through September 30, 2024, with Paragraph 62, which requires the County to develop, implement, and track corrective action plans addressing recommendations of the quality improvement program.

The County has achieved Substantial Compliance as of October 1, 2023, through June 30, 2024, at CRDF, with Paragraph 63, which requires adequate space in High and Moderate Observation Housing for inmates with mental illness. The County has also provided documentation reflecting that it maintained Substantial Compliance at CRDF through September 30, 2024, and that it achieved Substantial Compliance at TTCF as of July 1, 2024, through September 30, 2024. These results are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive months at MCJ, NCCF, PDC East, PDC North, and PDC South as of December 31, 2016, and at TTCF as of December 31, 2017, with Paragraph 68, which requires staggered

contraband searches in housing units.  The County has also maintained Substantial Compliance for twelve consecutive months at CRDF as of January 1, 2022, through December 31, 2022.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2019, with Paragraph 69, which requires the County and the Sheriff to use clinical restraints only in the Correctional Treatment Center with the approval of a licensed psychiatrist who performed an individualized assessment.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2017, with Paragraph 71, which requires the County and the Sheriff to ensure that any prisoner subjected to clinical restraints in response to a mental health crisis receives therapeutic services to remediate any effects from the restraints.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 72, which requires the Department and the County to report on meetings to review suicides and incidents of serious self-injurious behavior.

The County has maintained Substantial Compliance for twelve consecutive months as of September 30, 2018, with Paragraph 73, which requires the Department to prepare detailed reports of prisoners who threaten or exhibit self-injurious behavior.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 74, which requires the Department to have an objective law enforcement investigation of every suicide that occurs in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of September 30, 2018, with Paragraph 75, which requires the Department and the County to review every serious suicide attempt that occurs in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 76, which requires the Department to follow certain procedures whenever there is an apparent or suspected suicide.

The County has maintained Substantial Compliance as of March 31, 2023, with Paragraph 77, which requires, among other things, identifying patterns and trends of suicides and suicide attempts and ensuring corrective actions are taken to mitigate suicide risks.

The County has maintained Substantial Compliance for twelve consecutive months as of May 18, 2017, with Paragraph 78, which requires the Suicide Prevention Advisory Committee to meet twice a year.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 82, which requires the Department to

co-locate personnel responsible for collecting prisoners' grievances at CRDF.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2019, with Paragraph 83, which requires it to install closed circuit security cameras throughout all of the common areas in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2018, with Paragraph 84, which requires investigations of force incidents and administrative actions to be completed timely.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2022, with Paragraph 85, which requires Internal Affairs Bureau personnel to receive adequate specialized training in conducting investigations of misconduct.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2019, with Paragraph 86, which requires inventory and control of weapons.

## NINETEENTH REPORT

18.    Within three months of the Effective Date, the County and the Sheriff will develop, and within six months of the Effective Date will commence providing:  (1) a four-hour custody-specific, scenario-based, skill development training on suicide prevention, which can be part of the eight-hour training described in paragraph 4.8 of the Implementation Plan in *Rosas* to all new Deputies as part of the Jail Operations Continuum and to all new Custody Assistants at the Custody Assistants academy; and (2) a two-hour custody-specific, scenario-based, skill development training on suicide prevention to all existing Deputies and Custody Assistants at their respective facilities, which can be part of the eight-hour training described in paragraph 4.7 of the Implementation Plan in *Rosas*, through in-service Intensified Formatted Training, which training will be completed by December 31, 2016.

These trainings will include the following topics:

(a)    suicide prevention policies and procedures, including observation and supervision of prisoners at risk for suicide or self-injurious behavior;

(b)    discussion of facility environments and staff interactions and why they may contribute to suicidal behavior;

(c)    potential predisposing factors to suicide;

(d)    high-risk suicide periods and settings;

(e)    warning signs and symptoms of suicidal behavior;

(f)    case studies of recent suicides and serious suicide attempts;

(g)    emergency notification procedures;

(h)    mock demonstrations regarding the proper response to a suicide attempt, including a hands-on simulation experience that incorporates the challenges that often accompany a jail suicide, such as cell doors being blocked by a hanging body and delays in securing back-up assistance;

(i)    differentiating between suicidal and self-injurious behavior; and

(j)    the proper use of emergency equipment.

**STATUS (18):**          **SUBSTANTIAL COMPLIANCE (as of October 1, 2017 (verified) at MCJ and PDC South)**

**SUBSTANTIAL COMPLIANCE (as of September 1, 2017 (verified) at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of December 1, 2017 (verified) at PDC East)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018 (verified) at TTCF, IRC, and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of August 1, 2018 (verified) at CRDF)**

The Department was not subject to monitoring during the Nineteenth Reporting Period for the initial training of existing Deputy Sheriffs or Custody Assistants or of new Deputies in the Jail Operations Continuum and new Custody Assistants in the Custody Assistant Academy as required by Paragraph 18.  Virtually all of the Deputy Sheriffs and Custody Assistants in the custody facilities received the initial training because they were assigned to the jails as of the Existing Date of the Settlement Agreement or they received the training as new Deputies or new Custody Assistants.

The Department is still subject to monitoring in future periods for Substantial Compliance with the refresher course requirements under Provision 81 Rosas 4.6(b) and 4.7(b).  The County previously reported compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) and Rosas 4.7(b) as of December 2022.  The Monitor's auditors verified the previously reported results.  The County has posted results reflecting that it maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) and Rosas 4.7(b) as of December 2023.  These results were verified by the Monitor's auditors.

19.    Commencing July 1, 2015, the County and the Sheriff will provide:

(a)    Custody-specific, scenario-based, skill development training to new Deputies during their Jail Operations training, and to existing Deputies assigned to Twin Towers Correctional Facility, Inmate Reception Center, Men's Central Jail, the Mental Health Housing Units at Century Regional Detention Facility, and the Jail Mental Evaluation Teams ("JMET") at North County Correctional Facility as follows:

(i)    32 hours of Crisis Intervention and Conflict Resolution as described in paragraphs 4.6 and 4.9 of the Implementation Plan in *Rosas* to be completed within the time frames established in that case (currently December 31, 2016). Deputies at these facilities will receive an eight-hour refresher course consistent with paragraph 4.6 of the Implementation Plan in *Rosas* every other year until termination of court jurisdiction in that case and then a four-hour refresher course every other year thereafter.

(ii)    Eight hours identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas* to be completed by December 31, 2016. This training requirement may be a part of the 32-hour training described in the previous subsection. Deputies at these facilities will receive a four-hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

(b)    Commencing July 1, 2015, the County and the Sheriff will ensure that new Custody Assistants receive eight hours of training in the Custody Assistant academy, and that all existing Custody Assistants receive eight hours of training related to identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas*. This training will be completed by December 31, 2016. Custody Assistants will receive a four-hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

**STATUS (19):**          **SUBSTANTIAL COMPLIANCE (as of April 1, 2018, (verified) at NCCF, MCJ, and IRC)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2018, (verified) at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of December 1, 2018 (verified) at CRDF, PDC East, and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of March 1, 2019 (verified) at PDC South)**

The Department was not subject to monitoring during the Nineteenth Reporting Period for the training of existing and new Deputy Sheriffs and Custody Assistants required by Paragraph 19.

The Department is still subject to monitoring in future periods for Substantial Compliance with the refresher course requirements under Provision 81 Rosas 4.6(b) and 4.7(b). The County previously reported compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) and Rosas 4.7(b) as of December 2022. The Monitor's auditors verified the previously reported results. The County has posted results reflecting that it maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) and Rosas 4.7(b) as of December 2023. These results were verified by the Monitor's auditors.

20.     Commencing no later than July 1, 2017, the County and the Sheriff will provide:

(a)     Custody-specific, scenario-based, skill development training to existing Deputies assigned to North County Correctional Facility, Pitchess Detention Center, and the non-Mental Health Housing Units in Century Regional Detention Facility as follows:

    (i)     32 hours of Crisis Intervention and Conflict Resolution as described in paragraphs 4.6 and 4.9 of the Implementation Plan in *Rosas* to be completed by December 31, 2019.  Deputies at these facilities will receive an eight-hour refresher course consistent with paragraph 4.6 of the Implementation Plan in *Rosas* every other year until termination of court jurisdiction in that case and then a four-hour refresher course every other year thereafter.

    (ii)    Eight hours identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas* to be completed by December 31, 2019.  This training requirement may be a part of the 32-hour training described in the previous subsection.  Deputies at these facilities will receive a four-hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

**STATUS (20):**      **SUBSTANTIAL COMPLIANCE (as of August 1, 2017 (verified) at CRDF, PDC East, PDC North, and NCCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017 (verified) at PDC South)**

The Department was not subject to monitoring for the initial training for existing Deputies as required by Paragraph 20 during the Nineteenth Reporting Period.

The Department is still subject to monitoring in future periods for Substantial Compliance with the refresher course requirements under Provision 81 Rosas 4.6(b) and 4.7(b). The County previously reported compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) and Rosas 4.7(b) as of December 2022. The Monitor's auditors verified the previously reported results. The County has posted results reflecting that it maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) and Rosas 4.7(b) as of December 2023. These results were verified by the Monitor's auditors.

21.    Consistent with existing Sheriff's Department policies regarding training requirements for sworn personnel, the County and the Sheriff will ensure that existing custody staff that have contact with prisoners maintain active certification in cardiopulmonary resuscitation and first aid.

**STATUS:**    **SUBSTANTIAL COMPLIANCE (as of October 1, 2015, through September 30, 2016 (verified) at PDC East and South)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at NCCF, PDC North, and IRC)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 (verified) at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at MCJ)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2018, through June 30, 2019 (verified) at CRDF)**

The Compliance Measures provide that the Department will demonstrate Substantial Compliance when 95% of the designated custody staff have the required CPR and first aid certifications for twelve consecutive months.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 21 in the Nineteenth Reporting Period.

22.     Within six months of the Effective Date and at least annually thereafter, the County and the Sheriff will provide instructional material to all Sheriff station personnel, Sheriff court personnel, custody booking personnel, and outside law enforcement agencies on the use of arresting and booking documents, including the Arrestee Medical Screening Form, to ensure the sharing of known relevant and available information on prisoners' mental health status and suicide risk.  Such instructional material will be in addition to the training provided to all custody booking personnel regarding intake.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017)**

The Justice Data Interface Controller ("JDIC") message the Department has been using since June 29, 2016, is sufficient to establish Substantial Compliance with Paragraph 22, and the County maintained Substantial Compliance for twelve consecutive months through June 30, 2017.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 22 in the Nineteenth Reporting Period.

23.    Within three months of the Effective Date, the County and the Sheriff will commence a systematic review of all prisoner housing, beginning with the Mental Health Unit of the Correctional Treatment Center, all High Observation Housing areas, all Moderate Observation Housing areas, single-person discipline, and areas in which safety precautions are implemented, to reduce the risk of self-harm and to identify and address suicide hazards.  The County and the Sheriff will utilize a nationally-recognized audit tool for the review.  From this tool, the County and the Sheriff will:

(a)    develop short and long term plans to reasonably mitigate suicide hazards identified by this review; and

(b)    prioritize planning and mitigation in areas where suicide precautions are implemented and seek reasonable mitigation efforts in those areas.

**STATUS:        SUBSTANTIAL COMPLIANCE**

The Monitor has verified, with the advice of the Subject Matter Expert, that the Department's Suicide Hazard Inspection Check List tool is a nationally recognized audit tool for this review.  The Department provided the Monitor with completed checklists documenting inspections of all housing units by January 14, 2016.

The Department submitted updated Suicide Hazard Mitigation plans to the Monitor on January 18, 2018 and July 12, 2018.  After consultations with the Mental Health Subject Matter Expert, the Monitor concluded that the plans satisfied the requirements of Paragraph 23 and that the Department had achieved and maintained Substantial Compliance with the provision.  Accordingly, pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Paragraph 23 in the Nineteenth Reporting Period.

24.    The County and the Sheriff will review and inspect housing areas on at least an annual basis to identify suicide hazards.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018)**

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 24 in the Nineteenth Reporting Period.  As the Monitor has noted, however, implementation and tracking of corrective actions must be addressed by the Custody Compliance and Sustainability Bureau ("CCSB") under Paragraph 77(c), which requires CCSB to "ensur[e] that corrective actions are taken to mitigate suicide risk. . .obtaining where appropriate, technical assistance. . .when such assistance is needed to address suicide-risk issues."

25.    The County and the Sheriff will ensure that any prisoner in a Sheriff's Department station jail who verbalizes or who exhibits a clear and obvious indication of current suicidal intent will be transported to IRC, CRDF, or a medical facility as soon as practicable.  Pending transport, such prisoners will be under unobstructed visual observation, or in a suicide resistant location with safety checks every 15 minutes.

**STATUS:        PARTIAL COMPLIANCE (at all Patrol Divisions)**

A provision of the Station Jail Manual adopted in March 2018 requires that any arrestee who "displays obvious suicidal ideation or exhibits unusual behavior that clearly manifest[s] self-injurious behavior or other clear indication of mental health crisis shall be transported to the Inmate Reception Center (IRC), Century Regional Detention Facility (CRDF), or a medical facility as soon as practicable.  Pending transport, such inmates. . .shall be under unobstructed visual observation or in a suicidal restraint location with safety checks every 15 minutes."  Under the revised Compliance Measures, which were updated in 2021, the Department must randomly select and analyze Arrestee Medical Screening Forms from station jails identifying prisoners who verbalize or exhibit a clear and obvious indication of current suicidal intent to determine compliance with Paragraph 25.  Pursuant to the Joint Stipulation to Modify Deadlines, beginning in the Third Quarter of 2024, compliance is to be measured by combining the results across all Patrol Divisions.  Substantial Compliance requires that 90% of the selected records meet the requirements of Paragraph 25.

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required the County to achieve Substantial Compliance with Provision 25 by June 30, 2023, or the end of the Second Quarter of 2023.  On March 11, 2024, the Court issued an Order Modifying Deadlines for Substantial Compliance, which extended the deadline for Substantial Compliance to March 31, 2024.  Pursuant to the Joint Stipulation to Modify Deadlines, the County's compliance date for this Provision was extended to March 31, 2025, which does not fall within the period covered by this Report.

For the Second Quarter of 2024, the County reports 100% compliance for the Central Patrol Division, 83% for the East Patrol Division, 88% for the North Patrol Division, and 50% for the South Patrol Division.

For the Third Quarter of 2024, the County posted results reflecting 33% compliance for the Central Patrol Division, 89% compliance for the East Patrol Division, 100% for the North Patrol Division, and 100% compliance for the South Patrol Division.  The aggregate reported compliance percentage was 88%.[15]  The County reports that

---

[15] Included as compliant records, as noted in the County's Augmented Nineteenth Self-Assessment and posted results, were three records (one at Industry Station, one at Walnut Station, and one at Carson Station) where a limited number of safety checks exceeded the 15-minute threshold contemplated by Provision 25 by one to three minutes and additional context was provided as to the circumstances resulting in the late checks.  The Monitor, using his discretion, agrees with the County that these three records should be considered compliant.

CCSB continues to have semiannual meetings with the patrol divisions, and liaisons at each patrol division continue to act as a bridge to the station representatives in charge of Provision 25 compliance issues. The focus of these meetings is to remind them of Provision 25 requirements, prioritize documentation via safety logs, and work through any barriers facing the station jails. Between meetings, CCSB sends follow-up memoranda to any stations with poor compliance results.

Meanwhile, in collaboration with Patrol Division Lieutenant Aides, Station Custody Assistants are now conducting enhanced weekly spot checks for Provision 25 compliance to receive even more real-time input to troubleshoot any compliance issues as soon as they happen and to emphasize the importance of timely safety checks. Station Custody Assistants and others responsible for station compliance were trained on the new protocols in December 2024. In addition to these weekly spot checks, stations continue to send monthly self-assessment audits to CCSB to track documentation.

These operational improvements and consistent communication with division liaisons and patrol stations have not only led to much improved compliance results with this provision; they also provide a level of assurance that the improved compliance with Provision 25's requirements is sustainable and will allow the County to come into substantial compliance in the next reporting period, despite the difficult threshold.

26.     Consistent with existing Sheriff's Department policies, the County and the Sheriff will follow established screening procedures to identify prisoners with emergent or urgent mental health needs based upon information contained in the Arrestee Medical Screening Form (SH-R-422) or its equivalent and the Medical/Mental Health Screening Questionnaire and to expedite such prisoners for mental health evaluation upon arrival at the Jail Reception Centers and prior to routine screening.  Prisoners who are identified as having emergent or urgent mental health needs, including the need for emergent psychotropic medication, will be evaluated by a QMHP as soon as possible but no later than four hours from the time of identification.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of April 1, 2023, through March 31, 2024 (verified))**

The Compliance Measures require the Department to "review Arrestee Medical Screening Forms (SH-R-422) (or its equivalent) and the Medical/Mental Health Screening Questionnaires of 100 randomly selected prisoners during one randomly selected week per quarter at CRDF and at IRC."  Substantial Compliance requires that (1) 95% of the forms "include the required mental health information" and (2) 90% of the prisoners having urgent or emergent needs were "seen by a QMHP within four hours."

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 26 in the Nineteenth Reporting Period.

27.    Consistent with existing Sheriff's Department policies, the County and the Sheriff will ensure that all prisoners are individually and privately screened by Qualified Medical Staff or trained custody personnel as soon as possible upon arrival to the Jails, but no later than 12 hours, barring an extraordinary circumstance, to identify a prisoner's need for mental health care and risk for suicide or self-injurious behavior.  The County and the Sheriff will ensure that the Medical/Mental Health Screening Questionnaire, the Arrestee Medical Screening Form (SH-R-422), or its equivalent, and/or the Confidential Medical Mental Health Transfer Form are in the prisoner's electronic medical record or otherwise available at the time the prisoner is initially assessed by a QMHP.

**STATUS:        SUBSTANTIAL COMPLIANCE (as of October 1, 2019, through March 31, 2020, and October 1, 2020, through March 31, 2021 (verified))**

The Compliance Measures require the Department to review the records of "randomly selected prisoners who were processed for intake during one randomly selected week at CRDF and at IRC" to determine compliance with this provision. Substantial Compliance requires that 90% of the records reviewed reflected that the prisoners were screened for mental health needs within 12 hours and that the required documentation was available to the QMHP for 90% of the mental health assessments conducted by the QMHP.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 27 in the Nineteenth Reporting Period.

28.      The County and the Sheriff will ensure that any prisoner who has been identified during the intake process as having emergent or urgent mental health needs as described in Paragraph 26 of this Agreement will be expedited through the booking process.  While the prisoner awaits evaluation, the County and the Sheriff will maintain unobstructed visual observation of the prisoner when necessary to protect his or her safety, and will conduct 15-minute safety checks if the prisoner is in a cell.

**STATUS:**      **SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at IRC)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2024, through September 30, 2024 (unverified) at CRDF)**

The Compliance Measures require the Department to review the records of randomly selected prisoners at CRDF and IRC who have urgent or emergent mental health needs to determine whether they were expedited through the booking process and under visual observation or checked every 15 minutes.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required the County to achieve Substantial Compliance with Provision 28 by June 30, 2024.  Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed to extend the compliance deadline for Provision 28 to March 31, 2025, which does not fall within the period covered by this Report.

The County's Augmented Nineteenth Self-Assessment reflects that in the Second Quarter of 2024, 92% of the inmates with urgent or emergent mental health needs were expedited through the booking process at CRDF in the randomly selected week, as required by the applicable Compliance Measures, and 100% of the inmates were observed or checked as required.  The County's Augmented Nineteenth Self-Assessment also reported that in the Third Quarter of 2024, 100% of the inmates with urgent or emergent mental health needs were expedited through the booking process at CRDF in the randomly selected week, and 100% of the inmates were observed or checked, as is required.  These results are subject to verification by the Monitor's Auditors.

The County previously maintained Substantial Compliance with Paragraph 28 at IRC for twelve consecutive months, and IRC was not subject to monitoring for Substantial Compliance with Paragraph 28 in the Nineteenth Reporting Period.

29.    The County and the Sheriff will ensure that a QMHP conducts a mental health assessment of prisoners who have non-emergent mental health needs within 24 hours (or within 72 hours on weekends and legal holidays) of a registered nurse conducting an intake nursing assessment at IRC or CRDF.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified))**

The Compliance Measures require the Department to review randomly selected records of the prisoners identified in the intake nursing assessment as having non-emergent mental health needs to determine if the Department completed mental health assessments for 85% of the prisoners within the required time periods.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 29 in the Nineteenth Reporting Period.

30.     Consistent with existing DMH policies, the initial mental health assessment will include a brief initial treatment plan.  The initial treatment plan will address housing recommendations and preliminary discharge information.  During the initial assessment, a referral will be made for a more comprehensive mental health assessment if clinically indicated.  The initial assessment will identify any immediate issues and determine whether a more comprehensive mental health evaluation is indicated.  The Monitor and SMEs will monitor whether the housing recommendations in the initial treatment plan have been followed.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of January 1, 2019, through December 31, 2019 (verified))**

The Compliance Measures require the Department to review randomly selected initial mental health assessments and report on (1) the percentage of assessments that have (i) included an initial treatment plan that addresses housing recommendations and preliminary discharge information and (ii) identified any immediate issues and whether a more comprehensive evaluation was indicated; and (2) whether the housing recommendations were followed.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 30 in the Nineteenth Reporting Period.

31 (**Revised**).  Consistent with existing Correctional Health Services and Sheriff's Department policies, the County and the Sheriff will maintain electronic mental health alerts in prisoners' electronic medical records that notify medical and mental health staff of a prisoner's risk for suicide or self-injurious behavior.  The alerts will be for the following risk factors:

(a)    current suicide risk; and

(b)    prior suicide attempts.

**STATUS:        PARTIAL COMPLIANCE (at CRDF and TTCF)[16]**

On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provision 31 ("Revised Paragraph 31") as set forth above.  They also agreed on Revised Compliance Measures.  The Revised Compliance Measures require the Department to review randomly selected electronic medical records for prisoners in certain at-risk groups to determine if the required mental health alerts are in 85% of the records reviewed, which is the threshold for Substantial Compliance, for prisoners who report suicidal thoughts during the intake process; or were removed from risk precautions in the prior quarter.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required the County to achieve Substantial Compliance with Provision 31 by June 30, 2024.  Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed to extend the compliance deadline for Provision 31 to June 30, 2025, which does not fall within the period covered by this Report.

The County's amended posted results for the Second Quarter of 2024, at CRDF, reflect that 96% of the records reviewed contained the mental health alerts required by 31-1(a).  For Compliance Measure 31-1(b), the County reports 19 responsive patients, and 16 out of the 19, or 84%, were compliant.  At TTCF, 92% of the records reviewed contained the mental health alerts required by 31-1(a).  For Compliance Measure 31-1(b), there were 25 responsive patients, 17 of which contained the required alerts, "resulting in a compliance level of 68%."

The County's amended posted results for the Third Quarter of 2024, at CRDF, reflect that 80% of the records reviewed contained the mental health alerts required by 31-1(a).  Regarding 31-1(b), 100% of the 9 relevant records contained the required alerts.  At TTCF, 96% of the records reviewed contained the mental health alerts required by 31-1(a).  Regarding 31-1(b), 60% (15) of the 25 responsive records contained the required alerts.  Regarding these results, the County reports

As detailed in the 18th Augmented Self-Assessment, an enhancement to

---

[16] The County initially self-reported results reflecting that CRDF was in Substantial Compliance in the Second and Third Quarters of 2024.  After inquiries by the Monitor's Auditors, the County posted amended results on April 7, 2025, and May 6, 2025, reflecting that CRDF was, in fact, in Partial Compliance during those quarters.

ORCHID was implemented in May 2024 that automatically creates the required mental health alerts whenever patients are assessed as high risk. Testing has proved this enhancement to be extremely effective, with rates at or near 100% found during spot audits after the enhancement went live. This effectiveness is not fully reflected in the current reporting period, particularly because the self-assessment method for a given reporting quarter looks at records that reflect high-risk in the previous quarter. Therefore, the self-assessment results reported above for the Second Quarter do not cover any of the period after the enhancement went live, and the results for the Third Quarter only partially include a period when the enhancement was live. The improvements realized in this reporting period are due to the continued trainings covering this provision, as well as the practice at CRDF of checking records against the Suicide Risk Tracker, two corrective actions undertaken by the County and described in the 18th Augmented Self-Assessment.

The next reporting period, however, will exclusively cover periods after the enhancement went live, and the County is confident that substantial compliance will be attained at TTCF once this data is fully factored into the County's compliance results. Indeed, spot audits performed since the ORCHID enhancement was fully implemented indicate substantial compliance with 31-1(b) is likely because the alerts are now fully automated due to the ORCHID fix.

32.    Information regarding a serious suicide attempt will be entered in the prisoner's electronic medical record in a timely manner.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified))**

The Compliance Measures require that 95% of the electronic medical records of prisoners who had a serious suicide attempt reflect information regarding the attempt, and 85% of the records reflect that the information was entered into the record within one day of the attempt.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 32 in the Nineteenth Reporting Period.

33.    The County will require mental health supervisors in the Jails to review electronic medical records on a quarterly basis to assess their accuracy as follows:

(a)    Supervisors will randomly select two prisoners from each clinician's caseload in the prior quarter;

(b)    Supervisors will compare records for those prisoners to corroborate clinician attendance, units of service, and any unusual trends, including appropriate time spent with prisoners, recording more units of service than hours worked, and to determine whether contacts with those prisoners are inconsistent with their clinical needs;

(c)    Where supervisors identify discrepancies through these reviews, they will conduct a more thorough review using a DMH-developed standardized tool and will consider detailed information contained in the electronic medical record and progress notes; and

(d)    Serious concerns remaining after the secondary review will be elevated for administrative action in consultation with DMH's centralized Human Resources.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017 (verified))**

The Compliance Measures require the County to provide the Monitor and the Subject Matter Experts with the DMH-developed standardized tool required by Paragraph 33(c), and to report the results of its analysis of the electronic medical records of two randomly selected prisoners from each clinician's caseload.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 33 in the Nineteenth Reporting Period.

34 **(Revised).**  Consistent with existing Correctional Health Services policy, the County and the Sheriff will conduct clinically appropriate release planning for all prisoners who are being released to the community and who have been identified by a QMHP as having a mental illness and needing mental health treatment, or as having a DSM-5 major neuro-cognitive disorder that caused them to be housed in the Correctional Treatment Center at any time during their current incarceration.  For prisoners with mental illness and needing mental health treatment, the release planning services will be guided by the prisoner's level of care.  Specifically, prisoners who at any time during their incarceration meet mental health level of P3 or P4 will be presumptively referred for release planning services, and prisoners who meet mental health level of care P2 will receive release planning services upon referral by a clinician or upon their request.  Prisoners who have a DSM-5 major neuro-cognitive disorder that caused them to be housed in the Correctional Treatment Center will also be referred for release planning services consistent with the Correctional Health Services policy applying to prisoners with mental illness.

> (a) Release planning will consider the need of the prisoner for housing; transportation to the prisoner's community-based provider, residence, or shelter within the County; bridge psychotropic medications; medical/mental health/substance abuse services; income/benefits establishment; and family/community/social supports ("Release Planning Areas").

> (b) Release planning will be based on an individualized assessment of the prisoner's needs and, unless the prisoner is unable or unwilling to participate, will be undertaken in collaboration with the prisoner.  For prisoners referred for release planning services, those services will include:

>> (i) An Initial Release Plan that will be created at intake or no later than ten days after the referral for release planning, which referral shall normally occur at the time of intake.  The Initial Release Plan will include preliminary identification of needs in each of the Release Planning Areas and preliminary recommendations for services to address those needs, and a referral for assistance in obtaining California identification when needed and when the prisoner is eligible; and/or

>> (ii) A Comprehensive Release Plan that will be initiated no later than thirty days after the referral for release planning.  The Comprehensive Release Plan will include (A) collecting information regarding the prisoner's needs; (B) coordinating with community-based providers to identify available services that meet the prisoner's needs; (C) facilitating the transition of care to community-based providers, and (D) assisting in obtaining identification and/or benefits when needed, when the prisoner is eligible, and as offered by the Sheriff's Community Transition Unit.

> (c) The County will maintain a re-entry resource center with staff supervised by a QMHP.  The re-entry resource center will:

(i) Provide information appropriate to the released prisoner about available housing, transportation, medical/mental health/substance abuse services, income/benefits establishment, community/social supports, and other community resources; and

(ii) Provide released prisoners with copies of their release plans, as available.

(d) All prisoners who are receiving and continue to require psychotropic medications will be offered a clinically appropriate supply of those medications upon their release from incarceration.  Unless contraindicated, this will be presumed to be a 14-day supply or a supply with a prescription sufficient so that the prisoner has the psychotropic medication available during the period of time reasonably necessary to permit the prisoner to consult with a doctor and obtain a new supply.

(e) Nothing in Paragraph 34 will require prisoners to accept or participate in any of the services provided under this Paragraph.

(f) Neither the County nor the Sheriff shall be in violation of this paragraph if after reasonable efforts as set forth in Correctional Health Services Policy M380.01, Release Planners are unable to identify available post-release services.

**STATUS (34):          PARTIAL COMPLIANCE**

During the Seventh Reporting Period, the parties and the Intervenors reached an agreement on the provisions of revised Paragraph 34 ("Revised Paragraph 34") set forth above.  They also agreed on revised Compliance Measures and a revised policy to implement Revised Paragraph 34.  On December 10, 2018, the Court issued an order pursuant to the parties' joint stipulation revising Paragraph 34.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234.  That Order required Defendants to achieve Substantial Compliance with Provision 34 by December 31, 2022, which was missed during the Fifteenth Reporting Period.

In the Nineteenth Reporting Period, the Parties continued meeting with the Monitor to revise the Compliance Measures and agree upon corrective actions.  In November 2024, the Parties convened a productive meeting of Community-Based Organizations ("CBOs") to discuss obstacles to providing release planning services, particularly for those with severe mental illness without predicted release dates ("PRDs").  The Parties thereafter agreed upon a Joint Stipulation to Modify the December 27, 2022 Court Order Setting Deadline for Substantial Compliance ("Joint Stipulation to Modify Provision 34 Compliance Deadlines").  As set forth more fully below, pursuant to that Joint Stipulation, the Parties agreed upon a series of cure measures and revisions to the existing Compliance Measures.[17]  Further, the Parties agreed to extend the County's compliance deadline to June 30, 2025, which does not fall within the period covered by this Report.

For the Nineteenth Reporting Period, the County's Augmented Nineteenth Self-Assessment reports that for Compliance Measure 34-13(c)(1), which relates to referrals for release planning, 100% of inmates in the Second Quarter of 2024 and 96.9% of inmates in the Third Quarter of 2024 received a referral for release planning, greater than the required 85%.

For Compliance Measure 34-13(c)(2), which concerns Initial Release Plans ("IRPs"), the County reports that 72.8% of inmates in the Second Quarter of 2024 who should have received an Initial Release Plan were compliant, less than the required 85%.  In the Third Quarter of 2024, 86.2% of inmates who should have received an Initial Release Plan were compliant, greater than the required 85%.

For Compliance Measure 34-13(c)(3), which requires certain services and documentation relating to inmates receiving comprehensive release planning, the County reports that 35.1% of inmates in the Second Quarter of 2024 and 59% in the Third

---

[17] These revisions bifurcate the measurement of release planning services for those with and without PRDs.  For those without PRDs, the County will pilot for an initial six-month period a program to offer such inmates an opt-in to a meeting with a CHS release planner prior to their release (to the extent that it does not violate the County's obligations under state law, a court order, or deadlines established under Rutherford v. County of Los Angeles, Case No. 2:75-cv-04111-DDP).  The County has also agreed to provide quarterly reporting regarding the utilization of this option during the pilot period, and the Parties have agreed to reconvene to discuss these data and collectively evaluate whether the pilot should continue after the six-month pilot period.

Quarter of 2024 were compliant, less than the required 85%, though improving.

For Compliance Measure 34-13(c)(4), which pertains generally to the release planning process, the County reports that the records of 56.5% of inmates in the Second Quarter of 2024 and 71.3% of inmates in the Third Quarter of 2024 were compliant, less than the required 85%. Finally, the County reports 75% compliance for the Second Quarter of 2024 and 85.7% compliance for the Third Quarter of 2024 with Compliance Measure 34-13(c)(5), which requires documentation relating to inmates requiring psychotropic medications, less than the 90% requirement. These results are improving but remain below the Substantial Compliance thresholds in certain key areas. The County reports that

> CHS redirected three additional Community Health Workers in June 2024 to concentrate on initiating and finishing IRPs, and saw an immediate improvement of over 20 percentage points from the previous two quarters (33% and 32% to 56% in June 2024) following this staffing re-allocation. By September 2024, the timely initiation of IRPs had improved to 90%, above the substantial compliance threshold, and an October 2024 snapshot revealed these gains had been maintained at 90%.

These efforts are amplified by commitments made by the County in the Joint Stipulation to Modify Provision 34 Compliance Deadlines, which requires the County to pilot new measures allowing incarcerated persons without a PRD to voluntarily opt-in to a release planning meeting prior to the point of exit and to provide release planning services at an exit window. The County reports

> the County has explored new avenues for providing a "warm hand-off" to those without a PRD, who have traditionally been more difficult to complete release planning for due to the nature of their unexpected, unanticipated releases. Beginning in November 2024, PRCM began to pilot an exit window program for individuals covered by Provision 34 in the Inmate Reception Center ("IRC") atrium just beyond the point of exit from the Los Angeles County Jail. Prior to release, Provision 34-eligible inmates are notified of the opportunity to voluntarily stop at the exit window in the lobby and receive available release planning services. PRCM staff stationed at the window are prepared to direct the recently released to resources, make phone calls as necessary to establish direct connections with providers, and review the extensive release planning materials provided by LASD to inmates with their property at the time of release. Most importantly, this staff has access to all mental health records for any inmate who chooses to take advantage of this resource. A second new pilot program which is currently being developed is a voluntarily, opt-in meeting with a PRCM release planner which would occur on the day of, but prior to, an inmate's release. As envisioned, Provision 34-eligible inmates would be notified of this opportunity in advance and staff would describe the benefits of opting-in to this meeting.

The parties have met and conferred about both programs and developed the amended compliance measures informed by the planned implementation of this program.[18]

The Joint Stipulation to Modify Provision 34 Compliance Deadlines also requires the County to provide quarterly reporting, beginning in the First Quarter of 2025, about the phased implementation of the Warm Landings Place ("WLP") program operated by the Justice Care and Opportunities Department. The County reports

> the County continues to implement the voluntary, post-release Warm Landings Place ("WLP") program operated by the Justice Care and Opportunities Department that will provide additional opportunities for community linkages. As previously reported, on June 15, 2024, Phase I of this program launched with the establishment of a welcome table at the public lobby of the IRC that is fully staffed during the jail's release window. The contracted release planning specialists at this table offer information to individuals exiting the jail, as well as the friends and family set to pick up inmates in the waiting area, and direct connections to services in the community. The County continues to work toward preparing a larger interim site near the jail as part of Phase II, with the longer-term goal of securing a permanent location with limited temporary housing and expanded programming in Phase III.

The Joint Stipulation to Modify Provision 34 Compliance Deadlines also requires the County to convene, beginning in the First Quarter of 2025, a regular working group focused on improving the County's release planning processes, composed of release planning staff, and representatives from the Department, the Los Angeles County Public Defender's Office, and CBOs that provide release planning services.

---

[18] The Monitor has visited this exit window accompanied by the Parties and has provided feedback about how its visibility and utilization can be enhanced.

35.    Consistent with existing DMH and Sheriff's Department policies, the County and the Sheriff will ensure that custody staff, before the end of shift, refer prisoners in general or special populations who are demonstrating a potential need for routine mental health care to a QMHP or a Jail Mental Evaluation Team ("JMET") member for evaluation, and document such referrals.  Custody staff will utilize the Behavior Observation and Referral Form.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of November 1, 2017, through December 31, 2018 (verified))**

The Compliance Measures require the Department to review, for a randomly selected month each quarter, the Behavior Observation and Mental Health Referral ("BOMHR") records for prisoners referred by custody staff to a QMHP or JMET member for "routine" mental health care to determine the timeliness of the referrals, and that 85% of the referrals "occurred before the end of the shift in which the potential need for mental health care is identified."

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 35 in the Nineteenth Reporting Period.

36.    Consistent with existing DMH policies, the County and the Sheriff will ensure that a QMHP performs a mental health assessment after any adverse triggering event, such as a suicide attempt, suicide threat, self-injurious behavior, or any clear de-compensation of mental health status.  For those prisoners who repeatedly engage in such self-injurious behavior, the County will perform such a mental health assessment only when clinically indicated, and will, when clinically indicated, develop an individualized treatment plan to reduce, and minimize reinforcement of, such behavior.  The County and the Sheriff will maintain an on-call system to ensure that mental health assessments are conducted within four hours following the notification of the adverse triggering event or upon notification that the prisoner has returned from a medical assessment related to the adverse triggering event.  The prisoner will remain under unobstructed visual observation by custody staff until a QMHP has completed his or her evaluation.

**STATUS:    PARTIAL COMPLIANCE (at TTCF and CRDF)**

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required Defendants to achieve Substantial Compliance with Provision 36 by September 30, 2023, which was missed during the Seventeenth Reporting Period.  Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed that the County's revised compliance deadline for Provision 36 would be June 30, 2025, which does not fall within the period covered by this Report.

The Compliance Measures require the Department to develop a staffing schedule to provide on-call services, and the County's Augmented Nineteenth Self-Assessment reported that it complied with this requirement for the Second Quarter of 2024.  The Compliance Measures also require the Department to review randomly selected records of prisoners newly admitted to mental health housing from a lower level of care due to an adverse triggering event during two randomly selected weeks per quarter.  The County's results reflect that during the Second Quarter of 2024, 86% of inmates identified in the two randomly selected weeks received an assessment by a QMHP within four hours, rather than the 95% required by Compliance Measure 36-4(a).  The County further reports that 100% of the selected prisoners at TTCF and CRDF were seen on videos under unobstructed visual observation pending assessment, exceeding the 95% required by Compliance Measure 36-4(b).

The County's Augmented Nineteenth Self-Assessment reports that for the Third Quarter of 2024, the Department complied with the staffing schedule requirement.  The County further reports that during the Third Quarter of 2024, 93% of inmates identified in the two randomly selected weeks received an assessment by a QMHP within four hours, as required by Compliance Measure 36-4(a).  The County further reports that 80% of the selected prisoners at CRDF and TTCF were under unobstructed visual observation pending assessment, less than the 95% required by Compliance Measure 36-4(b).

The County rightly notes that its results have been steadily improving under Provision 36, and attributes its remaining challenges under Compliance Measure 36-4(a) to the "imperfect use of telepsych services in the North County facilities. Of the

noncompliant cases in the Second Quarter of 2024, most were crisis referrals from NCCF in which telepsych was not used."  The County reports

> Recently, the County adjusted its approach to overnight coverage at NCCF due to the very low volume of crisis calls received at night. On average, less than one call was received by onsite staff per night, which is not an efficient use of a valuable clinical staffing item when telepsych is available 24/7. Calls received after 7:00 p.m. are now routed to IRC via telehealth during the early morning shift. With this staffing change, it is all the more important that NCCF and PDC North reliably use telepsych for crisis calls during this time frame to avoid delays that may result if patients must be physically transported to IRC for evaluation.[19]

The County also reports that "[i]n November 2024, the County adapted these processes and workflows to create a telepsych option for patients at CRDF. Custody can now refer crisis patients to IRC for a telepsych crisis evaluation if there is any gap in QMHP staffing at CRDF."

As set forth in the Eighteenth Monitoring Report, the County "expressed a desire for an agreed-upon set of minimum standards to use for crisis responses to ensure uniformity and consistency in the standards to be used in reviewing them.  To that end, on June 20, 2024, the Monitoring Team shared draft crisis response minimum standards with the County, and, on August 1, 2024, the County responded with its suggested revisions.  On August 28, 2024, the Monitoring Team provided revisions to the County, with which the County agreed on September 26, 2024."  With these minimum standards as a touchstone, the County "made significant progress in the 19th Reporting Period to respond to qualitative concerns raised by the Monitoring Team with the safety or crisis response plans resulting from QMHP evaluations for Provisions 36 and 40."

The Monitoring Team utilized these minimum standards in performing a qualitative review of Provision 36 for the Nineteenth Reporting Period, and the County's hard work was evident in the records reviewed.  The Monitoring Team sought to assess, among other things, "the County's methodology, specifically whether it sufficiently detects adverse triggering events and acts of repeated self-harm" in order to ensure prompt assessment by a QMHP and a clinically-adequate treatment plan.  They also sought to determine whether any assessment conducted "sufficiently addressed the adverse triggering event(s), including discussing relevant risk factors, and whether there was a clinically-adequate crisis response or safety plan put in place."

---

[19] The County indicates that the preliminary results from the Fourth Quarter of 2024, which is not covered by this Report, reflect Substantial Compliance under Compliance Measure 36-4(a), which is encouraging. The County also reports that "CHS Compliance has conducted weekly mini audits, communicated the results to CHS and LASD supervisors, and provided education to clinical staff and custody staff as needed. Additionally, a CHS supervisor conducts a weekly spot check of telepsych usage for crisis calls.  The IRC supervisor continues to work with facilities to improve the use of telehealth, including providing instruction on contacting the IRC desk if deputies experience any delays in obtaining a telehealth evaluation."  If the imperfect use of telepsych services persists in the North County facilities, the County should further indicate what steps it is taking to remedy the issue.

The Team found that of 49 qualifying cases with a single adverse triggering event, 86% of the patients were seen within four hours by a QMHP (five were indeterminate). In 70% of the cases with a single adverse triggering event (three were not applicable), a QMHP adequately evaluated the apparent risk factors. This is a substantial increase from the results of prior qualitative reviews.

In 94% of the cases, a safety plan was implemented to address the risk. This was also a substantial increase from prior qualitative reviews. The Team noted "there was much greater consistency in the extent to which the clinical documentation described specific attempts at de-escalation and the use of identifiable coping strategies."[20] Of the three cases rated as having an inadequate safety plan, two were found deficient in the documentation of coping strategies and clinical interventions, and one was found deficient in the documented risk assessment component of the standards.

Regarding cases of repeated self-harm, the County provided a list of 40 incidents of repeated self-injurious or suicidal behavior across eight unique inmates. There was a treatment plan to address this behavior in 5/8, or 63% of these cases. This was also a substantial improvement from the results of previous qualitative reviews. However, "the treatment plans, when present, for all cases in our prior reviews have been marginal in their specific focus on managing the patient's SIB, and in no cases have the treatment plans been based on an individualized case formulation to reduce and minimize self-harm behavior. This was again observed in the current review; there were no cases where the clinical documentation provided a treatment plan based on an individualized case formulation to reduce and minimize reinforcement of self-harm behaviors, with alternative desired behaviors to supplant self-harm."[21] The County should focus on improving this in subsequent reporting periods.[22]

---

[20] It should be noted, however, that the frequent reference to Dialectical Behavior Therapy ("DBT") interventions were not always consistent with the clinical presentation described in the notes. Clinicians interviewed during recent site visits described an expectation that they will specifically document attempted DBT interventions for every encounter. While it may not be management's intent to insist exclusively on DBT interventions, that appears to be the understanding of clinical staff at multiple facilities. A range of interventions should be utilized, as clinically appropriate, recognizing that not all patients will be receptive or responsive to each type of intervention, especially during a crisis episode, which should be noted in the documentation, when necessary.

[21] As reported for previous qualitative reviews of this provision, in cases without a treatment plan, there was no evidence that the mental health providers determined that a treatment plan was not necessary, or that a behavior management plan was instead put in place.

[22] As set forth in the Eighteenth Monitoring Report, the Monitoring Team met with County personnel remotely on August 1, 2024, and again during a site visit on August 19, 2024, and was informed that certain safety precautions, which are not documented within the crisis notes, are taken in the wake of crisis responses to protect patient safety until patients can be moved and/or property restrictions imposed. The Team has requested that these precautions be documented in writing and formalized in Unit Orders and a post-crisis call log sheet to track patient movement and continuous observation. The County has indicated that responsive Unit Orders are being drafted, but they have not yet been shared with the Monitoring Team. It should finalize and provide these documents promptly.

37.     Sheriff's Court Services Division staff will complete a Behavioral Observation and Mental Health Referral ("BOMHR") Form and forward it to the Jail's mental health and/or medical staff when the Court Services Division staff obtains information that indicates a prisoner has displayed obvious suicidal ideation or when the prisoner exhibits unusual behavior that clearly manifests self-injurious behavior, or other clear indication of mental health crisis.  Pending transport, such prisoner will be under unobstructed visual observation or subject to 15-minute safety checks.

**STATUS:        PARTIAL COMPLIANCE**

The Compliance Measures require the Department to randomly select nine courts from among the three Court Divisions each quarter, review written communications and orders that refer to a suicide risk or serious mental health crisis for a prisoner and incident reports for self-injurious behavior by prisoners appearing in the selected courts, and determine if these incidents are reflected in BOMHR forms completed by the Court Services Division staff in the selected courts.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required Defendants to achieve Substantial Compliance with Provision 37 by March 31, 2024.  Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed that the County's revised compliance deadline for Provision 37 would be March 31, 2025, which does not fall within the period covered by this Report.  The Parties also agreed that the County's compliance would be measured by increasing the number of courthouses audited by the County from six to 12 each quarter.

In the County's Augmented Nineteenth Self-Assessment, it reported that for the Second Quarter of 2024, in all of the two qualifying incidents, Court Division staff completed BOHMRs for the patient and forwarded them to CHS.  However, in both cases, staff documented the safety checks but failed to perform them in a timely manner, resulting in a compliance percentage of 0% under Compliance Measure 37-4(b).  In the Third Quarter of 2024, the County reported that for all 12 qualifying incidents, Court Division staff completed BOHMRs and forwarded them to CHS.  However, staff failed to document the safety checks in two cases, resulting in 83% compliance, and the checks were not done in a timely manner in two cases, resulting in 83% compliance.[23]

These results are encouraging, and assuming consistent effort, Substantial Compliance should be within the County's reach.  To that end, the County reports that it has taken several corrective actions

Court Services Training continues to send out a quarterly email regarding Provision 37 with instructions on the proper procedure to follow once a BOMHR is completed to ensure that: (1) safety checks are completed in a

---

[23] The Augmented Nineteenth Self-Assessment reports 75% compliance as to Compliance Measure 37-4(b) for the Third Quarter of 2024.  However, the Monitor has reviewed the relevant records and finds that the lateness of the safety check as to booking number 6847969 at West Covina court was minimal, not repeated in multiple records, and the Monitor has therefore exercised his discretion to find that record compliant, resulting in a revised compliance percentage of 83%.

timely manner; and (2) the checks are logged and a copy of the log is retained. The email includes a reminder to scan records of safety checks or unobstructed visual observation into a shared drive accessible by CCSB. For those instances when safety check logs were missing, courthouse-specific CAPs were issued, and staff were reminded of the proper process for retaining safety check logs. There were no instances when safety check logs were not completed at all at any courthouse, which shows that staff at each courthouse are conducting and documenting safety checks.

CAPs were also issued for the cases with untimely safety checks, and CSD continues to send out reminders about the importance of timely safety checks. While two cases with untimely safety checks were recorded in Long Beach in the Second Quarter of 2024, only one case out of the 12 records in the Third Quarter of 2024 was confirmed to have an untimely safety check, and that was a single check that was only three minutes late. This is a dramatic improvement when compared to prior reporting periods and demonstrates that, even in the one case where a safety check was untimely, this was not a situation where safety checks were consistently missed or consistently late.

As an additional effort to ensure future compliance with Provision 37, starting in December 2024, each courthouse is now doing a weekly spot check to ensure that safety checks are completed in a timely manner. If there is a missed or late safety check, or if records are unavailable, staff can receive near-real-time training. As part of the launch of this weekly spot check process, courthouse staff were also retrained on Provision 37 and its key components.

38.    Consistent with existing DMH policies and National Commission on Correctional Health Care standards for jails, the County and the Sheriff will ensure that mental health staff or JMET teams make weekly cell-by-cell rounds in restricted non-mental health housing modules (e.g., administrative segregation, disciplinary segregation) at the Jails to identify prisoners with mental illness who may have been missed during screening or who have decompensated while in the Jails.  In conducting the rounds, either the clinician, the JMET Deputy, or the prisoner may request an out-of-cell interview. This request will be granted unless there is a clear and documented security concern that would prohibit such an interview or the prisoner has a documented history of repeated, unjustified requests for such out-of-cell interviews.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified))**

The Compliance Measures require the Department to review the documentation of the weekly cell-by-cell rounds and the JMET Logs for a randomly selected week each quarter to confirm that the required cell-by-cell checks were conducted and out-of-cell interviews were handled in accordance with this provision.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 38 in the Nineteenth Reporting Period.

39.    The County and the Sheriff will continue to use a confidential self-referral system by which all prisoners can request mental health care without revealing the substance of their requests to custody staff or other prisoners.

STATUS        **SUBSTANTIAL COMPLIANCE (as of July 1, 2017, through June 30, 2018 (verified) at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2024, through September 30, 2024 (unverified) at CRDF)**

**PARTIAL COMPLIANCE (at MCJ, TTCF, and PDC North)**

**NOT RATED (at PDC East and PDC South)**

Substantial Compliance requires the Department to (a) verify that housing areas have the required forms and (b) review randomly selected self-referrals for mental health care from prisoners to confirm that (i) the referrals "were forwarded to DMH" by the Department, and (ii) that "DMH documented the timeliness and nature of DMH's response to the self-referrals[.]" The thresholds for Substantial Compliance are that (i) 85% of the housing areas have the required forms; (ii) 90% of the self-referrals must be forwarded by the Department to the Department of Health Services – Custody Health Services (DHS-CHS); and (iii) 90% must contain the required documentation of DHS-CHS's response. On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required Defendants to achieve Substantial Compliance with Provision 39 by June 30, 2024. Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed to extend the compliance deadline for Provision 39 to June 30, 2025, which does not fall within the period covered by this Report.

The County's Augmented Nineteenth Self-Assessment reports that it achieved Substantial Compliance with Compliance Measure 39-4(a) in the Second Quarter of 2024 at all monitored facilities. The reported results were 98% at MCJ, 95% at CRDF, 100% at TTCF, 100% at PDC North, 100% at PDC South, and 100% at PDC East.

Regarding Compliance Measures 39-4(b) and 4(c), the County's Augmented Nineteenth Self-Assessment reports that 100% of the self-referrals from PDC North, CRDF, TTCF, and MCJ were forwarded by the Department to CHS in the Second Quarter of 2024. The County further reports that CHS documented the timeliness and nature of its response in 75% of the PDC North referrals, 64% of the CRDF referrals, 66% of the TTCF referrals, and 46% of the MCJ referrals. The County reports no relevant referrals from PDC South and PDC East during the Second Quarter of 2024.

For the Third Quarter of 2024, the County reports that it achieved Substantial Compliance with Compliance Measure 39-4(a) at all applicable facilities. The reported results were 100% at MCJ, CRDF, TTCF, PDC North, PDC South, and PDC East. Regarding Compliance Measures 39-4(b) and 4(c), the County's Augmented Nineteenth

Self-Assessment reports that 100% of the self-referrals from PDC North, CRDF, TTCF, and MCJ were forwarded by the Department to CHS in the Third Quarter of 2024, and there were no relevant referrals from PDC South and PDC East.  The County further reports that CHS documented the timeliness and nature of its response in 60% of the PDC North referrals, 92% of the CRDF referrals, 62% of the TTCF referrals, and 75% of the MCJ referrals.  The reported Substantial Compliance results at CRDF for the Third Quarter of 2024 are subject to verification by the Monitor's auditors.

As set forth in the Eighteenth Monitoring Report, the County reported in its Augmented Eighteenth Self-Assessment that in early 2024, "it retained additional clinical staff and CHS Health Information Management ("HIM") staff to assist with Provision 39,"  Further, "[n]ew staff for both the clinical and HIM teams have been trained on the HSR documenting and response protocol."  In the Augmented Nineteenth Self-Assessment, the County reports that

The CHS Compliance mini audits that began in the second quarter of 2024 continue to aid in identifying issues, including technical lags in the processing of scanned documents. The mini audits also provide a basis for ongoing discussions between Custody and CHS on both the staff and command levels, enabling a more complete analysis of any bottleneck points or areas with room for improvement. One potential bottleneck identified by the mini audits is scanning capacity in the North County facilities. The different facilities at Pitchess Detention Center in the North are considerably spread out, and traversing between buildings and jails is cumbersome, which makes it more challenging to collect physical HSR forms from multiple locations and scan them from the central location where the specialized scanner resides. This has caused delays in how quickly HSR forms are scanned into ORCHID and thus delays in how quickly QMHPs can respond to them.

The HIM team is addressing these challenges by using a new process that will allow for remote uploads of the HSR forms at any building or facility to a central share drive, which can be accessed by HIM staff anywhere, 24/7, so that the forms can be added to ORCHID for attention by QMHPs. Slight staffing reallocations will also ensure there is sufficient HIM staff available every day of the week at the North County facilities to capture HSR forms as quickly as possible.

Both HIM staff and clinical teams continue to be trained on HSR form documentation and response. The most recent training was on September 25, 2024.

The County previously reported Substantial Compliance at NCCF for twelve consecutive months from July 1, 2017, through June 30, 2018.  These results have been verified by the Monitor's auditors and NCCF is no longer subject to monitoring for compliance with Paragraph 39.

40.     The County and the Sheriff will ensure a QMHP will be available on-site, by transportation of the prisoner, or through tele-psych 24 hours per day, seven days per week (24/7) to provide clinically appropriate mental health crisis intervention services.

**STATUS:        SUBSTANTIAL COMPLIANCE (as of April 1, 2024, through September 30, 2024 (verified)**

Substantial Compliance requires the County (1) to provide the Monitor with on-call schedules for two randomly selected weeks reflecting that a QMHP was assigned 24 hours a day, seven days per week, and (2) to randomly select referrals for mental health crisis intervention received by a QMHP per quarter to verify (i) that a QMHP responded to all referrals, and (ii) responses to 90% of the referrals were within four hours.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234.  That Order required Defendants to achieve Substantial Compliance with Provision 40 by September 30, 2023.  Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed to extend the County's compliance deadline to June 30, 2025, which does not fall within the period covered by this Report.

The County's Augmented Nineteenth Self-Assessment reports that in the Second Quarter of 2024, a QMHP responded to 100% of the referrals for mental health crisis intervention services, which equals the 100% threshold for Substantial Compliance, and that 99% of the responses were within four hours, exceeding the 90% threshold for Substantial Compliance.  The County's Augmented Nineteenth Self-Assessment reports that in the Third Quarter of 2024, a QMHP responded to 100% of the referrals for mental health crisis intervention services, which equals the 100% threshold for Substantial Compliance, and that 99% of the responses were within four hours, which is above the 90% threshold.

The Monitor has previously explained the role that the Monitoring Team's qualitative reviews would play in the Monitor's compliance determinations.  *See* Eighteenth Monitoring Report at pp. 8 (the "Monitor's determination of the County's compliance is based upon the quantitative thresholds in the Compliance Measures (and any other applicable requirements in the Compliance Measures) for achieving Substantial Compliance, unless the quality of the County's performance as determined by the qualitative assessment is plainly inadequate or the results reported by the Monitor's Mental Health Team vary significantly from the results reported by the Department").  Given the significant gap between the County's previously reported results under Provision 40 and the results of the Monitoring Team's earlier qualitative reviews, the County was not in Substantial Compliance with Provision 40 in prior Reporting Periods.  Thankfully, the quality of the County's crisis responses substantially improved during the Nineteenth Reporting Period, and the qualitative reviews conducted by the Monitoring Team confirmed, rather than undermined, the County's assertion that it is in Substantial Compliance with Provision 40.

As explained in the Eighteenth Monitoring Report, the Monitor and the County agreed upon a set of minimum standards for crisis responses.  In the Augmented

Nineteenth Self-Assessment, the County reports that with these minimum standards as a touchstone, it "made significant progress in the 19th Reporting Period to respond to qualitative concerns raised by the Monitoring Team with the safety or crisis response plans resulting from QMHP evaluations for Provisions 36 and 40."

The Monitoring Team utilized these minimum standards in performing a qualitative review of Provision 40 for the Nineteenth Reporting Period, reviewing 60 cases from IRC, TTCF, CRDF, NCCF, MCJ, and PDC North. A QMHP responded to the crisis in 55/55 = 100% of cases (this could not be assessed in five cases), which was consistent with previous findings on this metric. A clinically appropriate crisis response was documented in 47/59, or 80%, of cases (one case could not be adequately assessed). This is a substantial improvement from previous reviews. A similar pattern was again noted across facilities, with CRDF showing a clinically appropriate response in 19/20, or 95%, TTCF showing 17/20, or 85%, and other facilities showing 11/19, or 58%.[24]

The records examined during the current review "more frequently included adequate documentation in light of the clinical presentation of the inmate" than records examined in prior reviews. "The notes were more specific about the interventions attempted, the inmate's responses to those interventions, when the inmate was not responsive, and when the inmate was not actually in crisis at the time of the evaluation." While the Monitoring Team noted areas for continued improvement,[25] these results generally support the County's claims that it is in Substantial Compliance with Provision 40 in the Nineteenth Reporting Period. And so it is rated.

---

[24] The County has been rated in Substantial Compliance with Provision 40 for the Nineteenth Reporting Period, but this provision will again be qualitatively reviewed in the Twentieth Reporting Period. The compliance percentage generated from the qualitative reviews at other facilities should increase for the County to retain its Substantial Compliance rating.

[25] For the 12 cases that did not have a clinically appropriate crisis response, the following deficits were noted, with some cases showing more than one deficit: a lack of a clear clinical rationale for the changes to housing and allowable property to ensure a safe environment was noted in five cases; interventions were noted as missing or not appropriate for the clinical presentation in four cases; there was an inadequate risk assessment in four cases; the presenting crisis was not described in three cases; and the triggers for the current crisis were not described in two cases.

41.    Consistent with existing DMH policies, the County and the Sheriff will implement step-down protocols that provide clinically appropriate transition when prisoners are discharged from FIP after being the subject of suicide watch.  The protocols will provide:

(a)    intermediate steps between highly restrictive suicide measures (e.g., clinical restraints and direct constant observation) and the discontinuation of suicide watch;

(b)    an evaluation by a QMHP before a prisoner is removed from suicide watch;

(c)    every prisoner discharged from FIP following a period of suicide watch will be housed upon release in the least restrictive setting deemed clinically appropriate unless exceptional circumstances affecting the facility exist; and

(d)    all FIP discharges following a period of suicide watch will be seen by a QMHP within 72 hours of FIP release, or sooner if indicated, unless exceptional circumstances affecting the facility exist.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of July 1, 2022, through June 30, 2023 (verified))**

Substantial Compliance requires CHS to review the medical records of all prisoners on suicide watch in FIP for one randomly selected month each quarter, and submit a report regarding the implementation of the step-down protocols and the results of its review of the medical records.  During the Fifth Reporting Period, the parties agreed to revise the Compliance Measures to increase the number of inmates subject to the step-down protocols of Paragraph 41 and ensure that the implementation of step-down protocols for FIP patients on suicide watch "ameliorate the impact of the restrictions" and have the necessary "level of precautions based upon individual assessment[s]" of the patients.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 41 by June 30, 2024.  The reported results have been verified by the Monitor's auditors and pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 41 in the Nineteenth Reporting Period.

42.    Consistent with existing DMH policies, the County and the Sheriff will implement step-down protocols to ensure that prisoners admitted to HOH and placed on risk precautions are assessed by a QMHP.  As part of the assessment, the QMHP will determine on an individualized basis whether to implement "step-down" procedures for that prisoner as follows:

(a)    the prisoner will be assessed by a QMHP within three Normal business work days, but not to exceed four days, following discontinuance of risk precautions;

(b)    the prisoner is counseled to ameliorate the negative psychological impact that any restrictions may have had and in ways of dealing with this impact;

(c)    the prisoner will remain in HOH or be transferred to MOH, as determined on a case-by-case basis, until such assessment and counseling is completed, unless exceptional circumstances affecting the facility exist; and

(d)    the prisoner is subsequently placed in a level of care/housing as determined by a QMHP.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of July 1, 2024, through September 30, 2024 (unverified) at CRDF and TTCF)[26]**

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required Defendants to achieve Substantial Compliance with Provision 42 by June 30, 2024.  Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed to extend the compliance deadline for Provision 42 to June 30, 2025, which does not fall within the period covered by this Report.   The thresholds for Substantial Compliance are that 95% of prisoners in HOH and placed on risk precautions are assessed by a QMHP; 90% of the assessments reflect that a QMHP determined on an individualized basis whether to implement step-down procedures; and 85% of the QMHP assessments that provide for step-down procedures are implemented by the Department.

The County's Augmented Nineteenth Self-Assessment assesses the County's compliance using the revised methodology discussed in the Monitor's Fourteenth Report. It reports that in the Second Quarter of 2024 at TTCF, "100% of the 30 patients with High or Imminent Risk Level on their Risk Assessment for Suicide (RAS) were assessed by a QMHP pursuant to Measure 42-4(a)" and "23 of these patients, or 76%, had records documenting that a QMHP determined on an individualized basis whether to implement step-down procedures, as required by Measure 42-4(b)."  For Measure 42-4(c), 10 of the 19 cases where assessments called for step-down procedures, or 53%, had documentation

---

[26] The DOJ has suggested that Partial Compliance is the appropriate rating for this provision and pointed to concerns about the accuracy of the County's audit tool.  The Monitor notes that the County's reported results are currently being audited by the Monitor's auditors.

reflecting implementation.

In the Third Quarter of 2024 at TTCF, "100% of the 19 patients with High or Imminent Risk Level on their RAS [Risk Assessment for Suicide] were assessed by a QMHP pursuant to Measure 42-4(a)," and "18 of these patients, or 94%, had records documenting that a QMHP determined on an individualized basis whether to implement step-down procedures."  "[O]f the 18 cases where assessments called for step-down procedures, documentation reflected implementation per Provision 42 for all 18 patients," a compliance percentage of 100% for Measure 42-4(c).  These results are subject to verification by the Monitor's auditors.

In the Second Quarter of 2024 at CRDF, the County reported that "100% of the 30 patients with High or Imminent Risk Level on their RAS [Risk Assessment for Suicide] were assessed by a QMHP pursuant to Measure 42-4(a)" and "100% of patients had records documenting that a QMHP determined on an individualized basis whether to implement step-down procedures, as required by Measure 42-4(b)."  For Measure 42-4(c), 2 of the 5 cases where assessments called for step-down procedures, or 40%, had documentation reflecting implementation.

In the Third Quarter of 2024 at CRDF, "100% of the 11 patients with High or Imminent Risk Level on their RAS [Risk Assessment for Suicide] were assessed by a QMHP pursuant to Measure 42-4(a)."  The County reported that 100% of responsive patients "had records documenting that a QMHP determined on an individualized basis whether to implement step-down procedures, as required by Measure 42-4(b)."  All 11 patients whose assessment provided for step-down procedures, or 100%, had documentation reflecting implementation as required under Measure 42-4(c).  These results are subject to verification by the Monitor's auditors.

43.     Within six months of the Effective Date, the County and the Sheriff will develop and implement written policies for formal discipline of prisoners with serious mental illness incorporating the following:

(a)     Prior to transfer, custody staff will consult with a QMHP to determine whether assignment of a prisoner in mental health housing to disciplinary housing is clinically contraindicated and whether placement in a higher level of mental health housing is clinically indicated, and will thereafter follow the QMHP's recommendation;

(b)     If a prisoner is receiving psychotropic medication and is placed in disciplinary housing from an area other than mental health housing, a QMHP will meet with that prisoner within 24 hours of such placement to determine whether maintenance of the prisoner in such placement is clinically contraindicated and whether transfer of the prisoner to mental health housing is clinically appropriate, and custody staff will thereafter follow the QMHP's recommendation;

(c)     A QMHP will participate in weekly walks, as specified in paragraph 38, in disciplinary housing areas to observe prisoners in those areas and to identify those prisoners with mental health needs; and

(d)     Prior to a prisoner in mental health housing losing behavioral credits for disciplinary reasons, the disciplinary decision-maker will receive and take into consideration information from a QMHP regarding the prisoner's underlying mental illness, the potential effects of the discipline being considered, and whether transfer of the prisoner to a higher level of mental health housing is clinically indicated.

**STATUS (43):**     **SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at NCCF and PDC North)**

**PARTIAL COMPLIANCE**

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required Defendants to achieve Substantial Compliance with Provision 43 by March 31, 2024.  Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed to modify the applicable compliance deadline to March 31, 2025, which does not fall within the period covered by this Report, and to assess all facilities together, assuming that no facility reports less than 50% compliance.

For the Second Quarter of 2024, regarding Compliance Measures 43-6 and 43-9(e), the Department submitted a memorandum indicating that no individuals with mental illness lost behavioral credits for disciplinary reasons.  The County's Supplemental Self-Assessment for the Nineteenth Reporting Period reports that in the Second Quarter of 2024, no patients required consultations at CRDF prior to transfers from mental health housing.[27]  The County further reports that 100%, more than the required 90%, of the meetings required pursuant to Compliance Measure 43-9(c) occurred when transferring individuals to disciplinary housing from areas other than mental health housing.  The County also reports that 100% of the weekly row walks through disciplinary units pursuant to Compliance Measure 43-9(d) occurred at CRDF.  The results for MCJ were 100%, 88%, and 100%, respectively.

At TTCF, 94% of the required consultations pursuant to Compliance Measure 43-9(b) occurred prior to transfers from mental health housing, and there were no patients to assess for Measure 43-9(c) during the Second Quarter of 2024, since "TTCF does not have non-mental health housing nor disciplinary housing units."  Similarly, the County reports that regarding Compliance Measure 43-9(d), "no patients received any disciplinary action."  Combining these facility-level metrics, the County's consolidated compliance percentages for the Second Quarter of 2024 were 95% (43-9(b)), 92% (43-9(c)), and 100% (43-9(d)), which exceeded the Substantial Compliance thresholds.

For the Third Quarter of 2024, regarding Compliance Measures 43-6 and 43-9(e), the Department submitted a memorandum indicating that no individuals with mental illness lost behavioral credits for disciplinary reasons.  The County's Augmented Nineteenth Self-Assessment reports that 100% of the required consultations at CRDF occurred prior to transfers from mental health housing. 75% of the required consultations at CRDF occurred when transferring inmates from areas other than mental health housing.  The County also reports that 100% of the weekly row walks through disciplinary units occurred at CRDF.

---

[27] On March 4, 2025, the County provided a Supplemental Self-Assessment Status Report for the Nineteenth Reporting Period, covering Provisions 43, 47, 61, 62, and 81, which will be referred to herein as the "Supplemental Self-Assessment."

The results for TTCF were 98% (consultations before transfer), but there were no results to report for Compliance Measures 43-9(c) or 43-9(d) due to TTCF not having non-mental health housing, disciplinary housing units, or any patients that received disciplinary action.  For MCJ, the results were 84%, 80%, and 100% in the Third Quarter of 2024.  Combining these facility-level metrics, the County's consolidated compliance percentages for the Third Quarter of 2024 were 96% (43-9(b)), 79% (43-9(c)), and 100% (43-9(d)), which fell short of the Substantial Compliance threshold as to Compliance Measure 43-9(c).

The Monitoring Team conducted a qualitative review of Provision 43 during the Nineteenth Reporting Period.  It reviewed the medical records of the 56 inmates in HOH and MOH from CRDF and TTCF who were subject to discipline.  In 47/47, or 100%, of cases (nine were indeterminate), a QMHP evaluated the patient prior to discipline being imposed.  This was a substantial improvement from the previous review.  In 55/56, or 98% of cases (one was indeterminate), the QMHP considered whether a higher level of housing was indicated.  This was also a substantial improvement from prior reviews.  The Team noted that "in this review, the clinical documentation consistently provided a recommended level of care.  Cases were rated as compliant when the clinical note clearly displayed the current and recommended housing, and the housing determination was consistent with the clinical presentation described in the notes."

In 56/56, or 100% of cases, the clinician addressed whether discipline was contraindicated.  In 56/56, or 100% of cases, the clinical documentation demonstrated evidence of the recommendations being based on the patient's clinical condition.  This is also an improvement from the last qualitative review.  For inmates in general population on psychotropic medication, the Team found that 35/37, or 95% of cases (three cases were indeterminate), were evaluated by a QMHP, and 35/37, or 95% (three were indeterminate), were evaluated within 24 hours, as required.  This is a substantial improvement from prior findings.  In 29/38, or 76% of cases, the QMHP considered a higher level of mental health housing.  In 33/38, or 87% of general population cases with a QMHP evaluation, the QMHP provided recommendations regarding whether restrictive housing was clinically contraindicated.  Finally, in 35/38, or 92% of the cases with a QMHP evaluation, the QMHP assessment was based on the inmate's clinical condition.

These positive results, coupled with the County's generally improving results under the Compliance Measures, are encouraging.  The Monitor notes that during recent site visits at CRDF, custody staff indicated that mental health staff are rarely available to conduct mental health evaluations for discipline cases, which results in no discipline for rule infractions by inmates on the mental health caseload.  Custody staff further reported that inmates know there would be no consequences for rule infractions, which undermines incentives for inmates to conform to jail rules.  The extremely small sample sizes of responsive cases for CRDF in the Second and Third Quarters of 2024 appear to support these concerns.  The Monitor encourages the County to explore staffing gaps, if any, at CRDF to address these issues.

The County previously achieved Substantial Compliance at NCCF and PDC

North for twelve consecutive months and these facilities were not subject to monitoring for compliance with Paragraph 43 during the Nineteenth Reporting Period.

44.     Within six months of the Effective Date, the County and the Sheriff will install protective barriers that do not prevent line-of-sight supervision on the second floor tier of all High Observation Housing areas to prevent prisoners from jumping off of the second floor tier.  Within six months of the Effective Date, the County and the Sheriff will also develop a plan that identifies any other areas in mental health housing where such protective barriers should be installed.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016)**

The County has maintained Substantial Compliance with Paragraph 44 of the Agreement since January 1, 2016.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 44 in the Nineteenth Reporting Period.

45.     Consistent with existing Sheriff's Department policies, the County and the Sheriff will provide both a Suicide Intervention Kit that contains an emergency cut-down tool and a first-aid kit in the control booth or officer's station of each housing unit.  All custody staff who have contact with prisoners will know the location of the Suicide Intervention Kit and first-aid kit and be trained to use their contents.

**STATUS:**          **SUBSTANTIAL COMPLIANCE (as of October 1, 2015, through September 30, 2016 (verified) at CRDF, NCCF, PDC East, PDC South, and TTCF)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at MCJ and PDC North)**

The County maintained Substantial Compliance with Paragraph 45 for twelve consecutive months at all facilities as of December 31, 2016.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 45 in the Nineteenth Reporting Period.

46.    The County and the Sheriff will immediately interrupt, and if necessary, provide appropriate aid to, any prisoner who threatens or exhibits self-injurious behavior.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of July 1, 2020, through June 30, 2021 (verified))**

The parties agreed on Revised Compliance Measures in 2021.  Substantial Compliance requires the Department to review the documentation from randomly selected incidents involving prisoners who threaten or exhibit self-injurious behavior, and include an assessment of the timeliness and appropriateness of the Department's responses to these incidents in its semi-annual Self-Assessment.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 46 in the Nineteenth Reporting Period.

47.     The County and the Sheriff will ensure there are sufficient custodial, medical, and mental health staff at the Jails to fulfill the terms of this Agreement.  Within six months of the Effective Date, and on a semi-annual basis thereafter, the County and the Sheriff will, in conjunction with the requirements of Paragraph 92 of this Agreement, provide to the Monitor and DOJ a report identifying the steps taken by the County and the Sheriff during the review period to implement the terms of this Agreement and any barriers to implementation, such as insufficient staffing levels at the Jails, if any.  The County and the Sheriff will retain staffing records for two years to ensure that for any critical incident or non-compliance with this Agreement, the Monitor and DOJ can obtain those records to determine whether staffing levels were a factor in that critical incident and/or non-compliance.

**STATUS:     PARTIAL COMPLIANCE**

Under Provision 47 and its associated Compliance Measures, Substantial Compliance requires the County to: a) submit a self-assessment that: i) identifies the steps taken by the County and the Sheriff to implement the terms of the Agreement, and ii) assesses whether staffing levels were a factor in any non-compliance with the Agreement, any Critical Incident, or the Department's handling of the Critical Incident. On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required Defendants to achieve Substantial Compliance with Provision 47 by June 30, 2024.  Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed to extend the compliance deadline for Provision 47 to June 30, 2025, which does not fall within the period covered by this Report.

Regarding critical incidents, the County's posted results for Provision 47 reflect the County's assessment of whether staffing levels were a factor in "any Critical Incident, or the Department's handling of the Critical Incident," as Compliance Measures 47-1 and 47-2 require.  The County's posted results report that 23 critical incidents[28] occurred during the First Semester of 2024, and the County concluded that staffing was not a factor in any of those incidents.

Regarding "whether staffing levels were a factor in any non-compliance with the Agreement" pursuant to Compliance Measure 47-4(a)(ii), the County contends in its Supplemental Self-Assessment that "CHS currently believes that it has sufficient mental health staffing capacity to comply with the Settlement Agreement as required by Provision 47."  Moreover, it reports that "staffing is no longer a critical barrier to compliance with the remaining provisions of the Settlement Agreement."  In support of these assertions, the County provided two documents (titled "Mental Health Staff Analysis for 19th Augmented Self Assessment" and "CHS Staffing Analysis December 2024") that are compilations of data about CHS' budgeted and vacant positions as of December 31, 2024.  They reflect that CHS had 371 total budgeted mental health worker

---

[28] 15 deaths of people in custody, 2 serious suicide attempts, 2 qualifying inmate assaults on staff, and 4 Category 3 Uses of Force.

positions,[29] and 234 were filled, or 63% of the total (20 positions had candidates who had accepted offers and were in the process of onboarding).  These are slight increases from the number of budgeted and filled positions from the Eighteenth Reporting Period.  The County has also produced useful staffing analyses related to several provisions, including Provisions 36, 39, 43, 52, and 64 in its self-assessments.  It further reports

> Although CHS has begun to decrease its focus on filling effective vacancies with overtime and registry hires, the significant gains in staffing made in the six months leading up to submission of the 18th Augmented Self-Assessment have been largely retained and, in general, are sufficient to provide the capacity needed to comply with nearly every provision of the Settlement Agreement. There are a few outliers, described below and in more detail in other sections of this report, where staffing challenges continue to remain a factor in reaching substantial compliance; however, because of the robust efforts to attract, hire, and retain employees, and process enhancements and other improvements that more efficiently deploy existing staff, the level of mental health staff at the jails is broadly sufficient to fulfill the terms of the Settlement Agreement.

This is encouraging.  As set forth throughout this Report, these approaches have resulted in meaningful improvements in the County's performance under several of the Agreement's provisions.[30]  Yet, Provision 80 remains far from Substantial Compliance related to structured out-of-cell time, and the County's still-deficient performance appears to largely result from the numerosity of the patient population relative to the number of staff who are treating them.  While the County indicates that "CHS is optimistic that staffing levels are no longer the critical issue to compliance" with Provision 80, it has not sufficiently articulated how its cadre of group providers will be able to dramatically increase the number of patients receiving structured treatment without an increase to the number of staff providing such treatment.

---

[29] Broken down into 72 psychiatry positions and 299 positions associated with mental health treatment teams.

[30] These increases were achieved amidst dramatic pressures on the Los Angeles County budget, including the potential for a "hard hiring freeze, excluding critical health and safety positions" in 2025.  *See* letters from Los Angeles County CEO Fesia A. Davenport to the Los Angeles County Board of Supervisors dated Feb. 10, 2025 and Mar. 4, 2025 (available at: https://file.lacounty.gov/SDSInter/bos/bc/1177546_BM_FY2025_26BudgetaryOutlookandPressures_EconomicandLaborImpacts_021025.pdf, and https://file.lacounty.gov/SDSInter/bos/supdocs/200926.pdf). The County has not described the impacts of these budgetary pressures on its staffing needs in this case.  But County personnel have assured the Monitor that they continue to be able to hire into vacant mental health worker positions, and the number of mental health workers who are currently "onboarding" supports these assertions.

48.      Within three months of the Effective Date, the County and the Sheriff will have written housekeeping, sanitation, and inspection plans to ensure the proper cleaning of, and trash collection and removal in, housing, shower, and medical areas, in accordance with California Code of Regulations ("CCR") Title 15 § 1280: Facility Sanitation, Safety, and Maintenance.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016)**

The County maintained Substantial Compliance with Paragraph 48 of the Agreement at all facilities for twelve consecutive months as of December 31, 2016. Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 48 in the Nineteenth Reporting Period.

49.    Within three months of the Effective Date, the County and the Sheriff will have a maintenance plan to respond to routine and emergency maintenance needs, including ensuring that shower, toilet, sink, and lighting units, and heating, ventilation, and cooling system are adequately maintained and installed.  The plan will also include steps to treat large mold infestations.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of March 1, 2016, through February 28, 2017)**

The County maintained Substantial Compliance with Paragraph 49 of the Agreement at all facilities for twelve consecutive months as of February 28, 2017. Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 49 in the Nineteenth Reporting Period.

50.     Consistent with existing Sheriff's Department policies regarding control of vermin, the County and the Sheriff will provide pest control throughout the housing units, medical units, kitchen, and food storage areas.

**STATUS:**    **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at all facilities other than PDC South and PDC East)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 (verified) at PDC South and PDC East)**

The County maintained Substantial Compliance with Paragraph 50 of the Agreement at all facilities for twelve consecutive months as of March 31, 2017.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 50 in the Nineteenth Reporting Period.

51.     Consistent with existing Sheriff's Department policies regarding personal care items and supplies for inmates, the County and the Sheriff will ensure that all prisoners have access to basic hygiene supplies, in accordance with CCR Title 15 § 1265: Issue of Personal Care Items.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) for all facilities other than CRDF)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017 (verified) at CRDF)**

The County maintained Substantial Compliance with Paragraph 51 of the Agreement at all facilities for twelve consecutive months as of June 30, 2017.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 51 in the Nineteenth Reporting Period.

52.     The County and the Sheriff will implement policies governing property restrictions in High Observation Housing that provide:

(a)     Except when transferred directly from FIP, upon initial placement in HOH:

(i)     Suicide-resistant blankets, gowns, and mattresses will be provided until the assessment set forth in section (a)(ii) below is conducted, unless clinically contraindicated as determined and documented by a QMHP.

(ii)    Within 24 hours, a QMHP will make recommendations regarding allowable property based upon an individual clinical assessment.

(b)     Property restrictions in HOH beyond 24 hours will be based on clinical judgment and assessment by a QMHP as necessary to ensure the safety and well-being of the prisoner and documented in the electronic medical record.

**STATUS:     PARTIAL COMPLIANCE (at CRDF and TTCF)**

Substantial Compliance requires the Department to (1) randomly inspect the cells of prisoners placed in HOH (except from FIP) within the previous 24 hours to confirm that they have been provided with suicide-resistant blankets, gowns, and mattresses unless clinically contraindicated, and document the results of the inspection; (2) randomly inspect the cells of prisoners placed in HOH (except from FIP) for more than 24 hours to confirm that they have been provided with allowable property as recommended by a QMHP; and (3) review the electronic medical records of prisoners assigned to HOH on the days of those inspections to verify compliance with the provisions of Paragraph 52. All the Compliance Measures have a 95% threshold for Substantial Compliance. On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required Defendants to achieve Substantial Compliance with Provision 52 by December 31, 2023. Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed that the applicable compliance deadline would be extended to March 31, 2025, which does not fall within the period covered by this Report.

In its Augmented Nineteenth Self-Assessment, the County reports that at CRDF in the Second Quarter of 2024, there was 100% compliance with Compliance Measure 52-5(b). Regarding Compliance Measure 52-5(c), 90%—rather than the required 95%—of the electronic medical records for patients assigned to HOH reflected a recommendation by a QMHP regarding allowable property. Additionally, 80%—rather than the required 95%—of electronic medical records for patients assigned to HOH reflect that property restrictions were based upon the clinical judgment of a QMHP pursuant to Compliance Measure 52-5(d). The County also reported that 90%—less than the required 95%—of patients analyzed pursuant to Compliance Measure 52-5(e) had

69

allowable property as recommended by a QMHP (unless refused by the patient).

The County also reports that at TTCF in the Second Quarter of 2024, 91%—rather than the required 95%—of inmates analyzed pursuant to Compliance Measure 52-5(b) were provided suicide-resistant blankets, gowns, and mattresses as required by this Provision. Regarding Compliance Measure 52-5(c), 56%—less than the required 95%—of the electronic medical records for patients assigned to HOH reflected a recommendation by a QMHP regarding allowable property pursuant to Compliance Measure 52-5(c). The County reports that 83%—less than the required 95%—of electronic medical records for patients assigned to HOH reflect that property restrictions were based upon the clinical judgment of a QMHP pursuant to Compliance Measure 52-5(d). Additionally, 97%—exceeding the threshold for substantial compliance—of patients analyzed pursuant to Compliance Measure 52-5(e) had allowable property as recommended by a QMHP (unless refused by the patient).

The County also reports 100% compliance with Compliance Measure 52-5(b) at CRDF in the Third Quarter of 2024. Regarding Compliance Measure 52-5(c), 90%—rather than the required 95%—of the electronic medical records for patients assigned to HOH reflected a recommendation by a QMHP regarding allowable property. Additionally, 85%—rather than the required 95%—of electronic medical records for patients assigned to HOH reflect that property restrictions were based upon the clinical judgment of a QMHP pursuant to Compliance Measure 52-5(d). The County also reports that 99%—exceeding the required 95%—of inmates analyzed pursuant to Compliance Measure 52-5(e) had allowable property as recommended by a QMHP (unless refused by the patient).

The County reports that at TTCF in the Third Quarter of 2024, 100%—exceeding the required 95%—of patients analyzed pursuant to Compliance Measure 52-5(b) were provided suicide-resistant blankets, gowns, and mattresses. Further, 65%—less than the required 95%—of the electronic medical records for patients assigned to HOH reflected a recommendation by a QMHP regarding allowable property pursuant to Compliance Measure 52-5(c). The County also reports that 96%—exceeding the required 95%—of electronic medical records for patients assigned to HOH reflect that property restrictions were based upon the clinical judgment of a QMHP pursuant to Compliance Measure 52-5(d). Regarding Compliance Measure 52-5(e), 92%—less than the required 95%—of inmates analyzed had allowable property as recommended by a QMHP (unless refused by the patient).

53.    If otherwise eligible for an education, work, or similar program, a prisoner's mental health diagnosis or prescription for medication alone will not preclude that prisoner from participating in said programming.

**STATUS:        SUBSTANTIAL COMPLIANCE (as of April 1, 2024, through September 30, 2024 (unverified))**

Substantial Compliance requires the Department to audit the records of prisoners who were eligible, but rejected or disqualified, for education and work programs to confirm that they were not rejected or disqualified because of a mental health diagnosis or prescription for medication alone.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required Defendants to achieve Substantial Compliance with Provision 53 by June 30, 2024.  Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed to extend the compliance deadline for Provision 53 to March 31, 2025, which does not fall within the Period covered by this Report.

The County's Augmented Nineteenth Self-Assessment reports that 98% of the eligible mentally ill prisoners who were denied education or work in the Second Quarter of 2024 and 96% in the Third Quarter of 2024 were denied "for reasons other than a mental health diagnosis or a medication prescription."[31]  The County further reported that in the interest of completeness and transparency, the "Department treats every case in which a person's request for programming was not handled in a timely manner, or where the request went unanswered and had not disposition, as a denial of programming within the meaning of Provision 53."  These results are subject to verification by the Monitor's auditors.

---

[31] The random week initially sampled for the Second Quarter of 2024 reflected 48% compliance.  The Monitor granted the County's request for a second additional random week that occurred after the County's corrective actions (described in the Eighteenth Monitoring Report at pp. 75 and the Augmented Nineteenth Self-Assessment pp. 87-88) had been implemented, which yielded the 98% compliance rating reflected in this Report.

54.    Prisoners who are not in Mental Health Housing will not be denied privileges and programming based solely on their mental health status or prescription for psychotropic medication.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of January 1, 2023, through June 30, 2023 (verified))**

Substantial Compliance under the revised Compliance Measures for Paragraph 54, effective January 1, 2018, requires the Department to audit the records of a maximum of 100 randomly selected prisoners identified on the Wednesday Pharmacy List as having received psychotropic medication to confirm that no more than 10% were rejected or disqualified because of a mental health diagnosis or prescription for psychotropic medication alone.  Because the Monitor's auditors had verified that the County had maintained Substantial Compliance under the original Compliance Measures, the parties agreed that the County will only be required to maintain Substantial Compliance under the revised Compliance Measures for two additional quarters.

The Monitor's auditors verified the reported results for the First and Second Quarters of 2023 and pursuant to Paragraph 111 of the Settlement Agreement, and the Department was not subject to monitoring for Substantial Compliance with Paragraph 54 in the Nineteenth Reporting Period.

55.    Relevant custody, medical, and mental health staff in all High Observation Housing units will meet on normal business work days and such staff in all Moderate Observation Housing units will meet at least weekly to ensure coordination and communication regarding the needs of prisoners in mental health housing units as outlined in Custody Services Division Directive(s) regarding coordination of mental health treatment and housing.  When a custody staff member is serving as a member of a treatment team, he or she is subject to the same confidentiality rules and regulations as any other member of the treatment team, and will be trained in those rules and regulations.

**STATUS:**    **SUBSTANTIAL COMPLIANCE (as of October 1, 2016, through September 30, 2017 (verified) at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at PDC North)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 (verified) at MCJ)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2019, through June 30, 2020 (verified) at TTCF)**

The Department maintained Substantial Compliance for twelve consecutive months at all facilities as of June 30, 2020.  These results have now been verified by the Monitor's auditors.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 55 in the Nineteenth Reporting Period.

56.    Consistent with existing DMH and Sheriff's Department policies, the County and the Sheriff will ensure that custody, medical, and mental health staff communicate regarding any change in a prisoner's housing assignment following a suicide threat, gesture, or attempt, or other indication of an obvious and serious change in mental health condition.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified))**

Substantial Compliance requires the Department to review in randomly selected periods the electronic medical records of (1) prisoners admitted to HOH following a suicide threat, gesture, or attempt, or other indication of an obvious and serious change in mental health condition to determine if the medical and/or mental health staff approved the placement of the prisoner in HOH; and (2) prisoners who were the subject of a suicide attempt notification to determine if the prisoners were clinically assessed and that clinical staff approved the post-incident housing.

The County's Substantial Compliance results for the twelve months from January 1, 2016, through December 31, 2016, were verified by the Monitor's auditors.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 56 in the Nineteenth Reporting Period.

57 (**Revised**).  Within three months of the Effective Date, the County and the Sheriff will revise and implement their policies on safety checks to ensure a range of supervision for prisoners housed in Mental Health Housing.  The County and the Sheriff will ensure that safety checks in Mental Health Housing are completed and documented in accordance with policy and regulatory requirements as set forth below:

(a)     Custody staff will conduct safety checks in a manner that allows staff to view the prisoner to assure his or her well-being and security.  Safety checks involve visual observation and, if necessary to determine the prisoner's well-being, verbal interaction with the prisoner;

(b)     Custody staff will document their checks in a format that does not have pre-printed times;

(c)     Custody staff will stagger checks to minimize prisoners' ability to plan around anticipated checks;

(d)     Video surveillance may not be used to replace rounds and supervision by custodial staff unless new construction is built specifically with constant video surveillance enhancements and could only be used to replace the required safety checks in non-FIP housing, subject to approval by the Monitor;

(e)     A QMHP, in coordination with custody (and medical staff if necessary), will determine mental health housing assignments; and

(f)     Supervision of prisoners in mental health housing will be conducted at the following intervals:

(i)     FIP:  Custody staff will perform safety checks every 15 minutes. DMH staff will perform direct constant observation or one-to-one observation when determined to be clinically appropriate;

(ii)    High Observation Housing:  Every 15 minutes; and

(iii)   Moderate Observation Housing:  Every 30 minutes.

STATUS (57):       **SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at MCJ)**

                                  **SUBSTANTIAL COMPLIANCE (as of July 1, 2021, through June 30, 2022 (verified) at PDC North)**

                                  **PARTIAL COMPLIANCE (at TTCF and CRDF)**

On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provision 57 ("Revised Paragraph 57") as set forth above. The Parties also agreed on Revised Compliance Measures. Substantial Compliance requires the Department to audit the Title 15 Dashboard records (or e-UDAL records if the Title 15 scanner was not working) for all shifts for each module in each mental health housing unit in two randomly selected weeks to determine if the safety checks were staggered and conducted as required by Paragraph 57 of the Agreement, and to audit the housing records for each mental health housing unit for a randomly selected week to determine if QMHPs approved the new mental health housing assignments as required by Paragraph 57(e). On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required Defendants to achieve Substantial Compliance with Provision 57 by June 30, 2024. Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed to extend the compliance deadline for Provision 57 to June 30, 2025, which does not fall within the period covered by this Report.

The County's Augmented Nineteenth Self-Assessment reports that 72.1% of the safety checks were in compliance with Compliance Measure 57-5(b) (safety checks in FIP) in the Second Quarter of 2024 at TTCF. It also reports that 90.6% of the safety checks were in compliance with Compliance Measure 57-5(c) (safety checks in HOH) at TTCF. The County also reports that 90.1% of the safety checks complied with Compliance Measure 57-5(d) (safety checks in MOH) at TTCF. The County also reports 87.7% compliance for mixed pods that include both HOH and MOH inmates. 100% of the new mental health housing assignments at TTCF were approved by a QMHP in the Second Quarter of 2024.

The County's Augmented Nineteenth Self-Assessment does not include a compliance percentage for Compliance Measure 57-5(b) for CRDF because it does not have FIP housing. It reports that 72.8% of the safety checks were in compliance with Compliance Measure 57-5(c) (safety checks in HOH) in the Second Quarter of 2024 at CRDF. The County also reports that 67.1% of the safety checks complied with Compliance Measure 57-5(d) (safety checks in MOH) at CRDF. Regarding Compliance Measure 57-5(e), 100% of the new mental health housing assignments at CRDF were approved by a QMHP in the Second Quarter of 2024.

The County began using a revised methodology for calculating compliance for the

Third Quarter of 2024 with the approval of the Monitor.[32]  The County's Augmented Nineteenth Self-Assessment reports that 88.9% of the safety checks were in compliance with Compliance Measure 57-5(c) (safety checks in HOH) in the Third Quarter of 2024 at CRDF.[33]  The County also reports 81.7% of the safety checks complied with Compliance Measure 57-5(d) (safety checks in MOH) at CRDF.  A QMHP approved 100% of the new mental health housing assignments at CRDF in the Third Quarter of 2024.

The County's Augmented Nineteenth Self-Assessment also reports that 93% of the safety checks were in compliance with Compliance Measure 57-5(b) (safety checks in FIP) in the Third Quarter of 2024 at TTCF.  It also reports that 94.8% of the safety checks were in compliance with Compliance Measure 57-5(c) (safety checks in HOH) at TTCF.  The County also reports that 95.4% of the safety checks complied with Compliance Measure 57-5(d) (safety checks in MOH) at TTCF.  The County also reports 90.9% compliance for mixed pods that include both HOH and MOH inmates.  A QMHP approved 100% of the new mental health housing assignments at TTCF in the Third Quarter of 2024.

These results reflect significant improvement by the County at both TTCF and CRDF. The County reports that its new BREAVA 2.0 system provides several advantages, including greater accuracy, the ability for Deputies and supervisors to write notes, and real-time monitoring of compliance percentages.  Using these features, "both CRDF and TTCF are producing spot check reports for facility commanders and CCSB at least weekly, with Title 15 Safety Check Sergeants then providing an immediate feedback loop to safety check teams as needed. Additionally, the Title 15 Workgroup, consisting of representatives from each facility, CCSB, the County's DOJ Compliance Office, CITU, and the Department's Data Systems Bureau ("DSB"), continues to meet regularly to share data, best practices, and work through any ongoing needs involving Title 15 safety checks."

The County's Sixth Self-Assessment reported that it maintained Substantial Compliance with Compliance Measure 57-5(b) in the Fourth Quarter of 2017 and the First Quarter of 2018 in the MOH unit at MCJ (the "Hope Dorm").  It also reported that all of the inmates at MCJ "analyzed pursuant to Compliance Measure 57-5(c) had received QMHP approval for their housing assignments" in both quarters.  The results were verified by the Monitor's auditors and MCJ was not subject to monitoring for compliance with Paragraph 57 in the Nineteenth Reporting Period.  The County maintained Substantial Compliance with Paragraph 57 for twelve consecutive months at PDC North as of June 30, 2022.  These results have been verified by the Monitor's auditors.  Pursuant to Paragraph 111 of the Settlement Agreement, the County was not

---

[32] *See* Letter from R. Dugdale to N. Mitchell dated Sept. 27, 2024, Exhibit A (describing revised methodology) (on file with author).

[33] The County indicates that the "LASD can be compliant with Provision 57's timeliness requirement in HOH if 85% of the checks are within a 15-minute range and 90% are within a 17-minute range. This is relevant for the CRDF results for the Third Quarter of 2024, when 88.9% of the checks in HOH were within the 15-minute range and 95.3% were within the 17-minute range."

subject to monitoring at PDC North for Substantial Compliance with Paragraph 57 in the
Nineteenth Reporting Period.

58.     Within three months of the Effective Date, the County and the Sheriff will revise and implement their policies on safety checks.  The County and the Sheriff will ensure that safety checks in non-mental health housing units are completed and documented in accordance with policy and regulatory requirements as set forth below:

(a)     At least every 30 minutes in housing areas with cells;

(b)     At least every 30 minutes in dormitory-style housing units where the unit does not provide for unobstructed direct supervision of prisoners from a security control room;

(c)     Where a dormitory-style housing unit does provide for unobstructed direct supervision of prisoners, safety checks must be completed inside the unit at least every 60 minutes;

(d)     At least every 60 minutes in designated minimum security dormitory housing at PDC South, or other similar campus-style unlocked dormitory housing;

(e)     Custody staff will conduct safety checks in a manner that allows staff to view the prisoner to assure his or her well-being and security.  Safety checks involve visual observation and, if necessary to determine the prisoner's well-being, verbal interaction with the prisoner;

(f)     Custody staff will document their checks in a format that does not have pre-printed times;

(g)     Custody staff will stagger checks to minimize prisoners' ability to plan around anticipated checks; and

(h)     Video surveillance may not be used to replace rounds and supervision by custodial staff.

STATUS (58):      **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at PDC South, PDC North, and PDC East)**

                          **SUBSTANTIAL COMPLIANCE ( as of July 1, 2017, through June 30, 2018 (verified) at CRDF)**

                          **SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at IRC)**

                          **SUBSTANTIAL COMPLIANCE (as of October 1, 2023, through September 30, 2024 (unverified) at TTCF)**

                          **SUBSTANTIAL COMPLIANCE (as of January 1, 2024, through September 30, 2024 (unverified) at NCCF and MCJ)**

Substantial Compliance requires the Department to audit the Title 15 Dashboard records (or e-UDAL records) for all shifts for each module in each housing unit to determine if the safety checks were staggered and conducted as required by Paragraph 58. The threshold for achieving Substantial Compliance with each of the Compliance Measures is 90%. On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 58 by June 30, 2024, which falls within the Nineteenth Reporting Period covered by this Report.

The County's Augmented Nineteenth Self-Assessment reports that for the Second and Third Quarters of 2024, the following percentages of safety checks were in compliance with Paragraph 58: at TTCF (95.6% and 97.3%), at MCJ (96.1% and 92.3%), and at NCCF (94.6% and 99.6%).[34]

As set forth in the Eighteenth Monitoring Report, the DOJ has raised concerns that the "rounds recorded by BREAVA are, in many cases, quite quick." *See* Eighteenth Monitoring Report at pp. 86. The Monitor noted that he planned to assess the quality of a sample of those safety checks during the Nineteenth Reporting Period. *Id.* The Monitor, therefore, requested CCTV footage for a sample of safety checks from multiple modules across three jails for the Fourth Quarter of 2023 through the Second Quarter of 2024, as shown below.

---

[34] For the reported results for the Third Quarter of 2024, the County began using a revised methodology for calculating compliance with the approval of the Monitor. *See* Letter from R. Dugdale to N. Mitchell dated Sept.27, 2024, Exhibit A (describing revised methodology) (on file with author).

*Figure 3: Summary of Requested CCTV Footage for Qualitative Review*

|  | 4Q2023 | | 1Q2024 | | 2Q2024 | | 3Q2024 | |
|---|---|---|---|---|---|---|---|---|
|  | No. of Modules | No. of Safety Checks | No. of Modules | No. of Safety Checks | No. of Modules | No. of Safety Checks | No. of Modules | No. of Safety Checks |
| TTCF | 1 | 20 | 1 | 10 | 1 | 10 | 1 | 9 |
| MCJ | N/A | N/A | 3 | 18 | 3 | 18 | 3 | 27 |
| NCCF | N/A | N/A | 4 | 12 | 4 | 24 | 4 | 36 |

The County produced the requested footage, which was reviewed by the Monitoring Team for conformity with the requirements of Provision 58, including 58(e) ("Custody staff will conduct safety checks in a manner that allows staff to view the prisoner to assure his or her well-being and security. Safety checks involve visual observation and, if necessary to determine the prisoner's well-being, verbal interaction with the prisoner"). The footage was often composed of multiple videos based on different pods, angles, and/or hallways. Some videos were clear, while others were grainy or involved technical issues, such as frozen video frames. The Team's assessment considered the following factors:

- The speed at which Custody staff walked through inmate housing areas during their safety check rounds;
- Whether Custody personnel appeared to be looking into the cells or not; and
- The time of day and level of inmate activity at the time of the safety checks.

The quality of the safety checks, as determinable from the produced videos, varied significantly. On some dates in some modules, Custody staff were obviously looking into the cells while they performed their safety checks. In others, Custody staff walked through housing areas quickly without appearing to look directly into the cells at all. The Team initially assessed each video as "Good," "Adequate," "Not Satisfactory," "Unable to Assess (UTA)" due to video quality issues, or "Not Applicable (N/A)" due to the camera angle being of non-housing areas. On February 21, 2025, the Monitor provided a list of safety checks identified as Not Satisfactory to the County, which has indicated that it has relevant context for why apparent deficiencies in safety check quality in some videos may not actually indicate non-compliance.[35] On March 20, 2025, the Monitoring Team met with County personnel to discuss these issues, which will need to be addressed before the County's reported Substantial Compliance can be verified.[36]

The County maintained Substantial Compliance with Paragraph 58 for twelve consecutive months at PDC South, PDC North, and PDC East as of December 31, 2016, at CRDF as of June 30, 2018, and at IRC as of September 30, 2018. These results have been verified by the Monitor's auditors. Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring at those facilities for Substantial

---

[35] For example, the County has indicated that some of the cells may not have been occupied at the times of the safety checks that appear on video to have been improperly conducted.

[36] Moreover, as noted by the DOJ and confirmed by the Monitor, various recent death reviews in the relevant facilities have revealed significant concerns about the quality and adequacy of the safety checks performed before the inmate deaths, in some cases resulting in the initiation of staff conduct investigations.

Compliance with Paragraph 58 in the Nineteenth Reporting Period.

59.    Consistent with existing Sheriff's Department policies regarding uniform daily activity logs, the County and the Sheriff will ensure that a custodial supervisor conducts unannounced daily rounds on each shift in the prisoner housing units to ensure custodial staff conduct necessary safety checks and document their rounds.

**STATUS:**    **SUBSTANTIAL COMPLIANCE (as of January 1, 2017, through December 31, 2017 (verified) at PDC East and MCJ)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2018, through December 31, 2018 (verified) at PDC North and PDC South)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 (verified) at TTCF)**

Substantial Compliance requires the Department to audit e-UDAL records for housing units in each facility to determine if supervisors are conducting unannounced daily rounds in accordance with Paragraph 59.  In response to the Monitor's comments, the Department's e-UDAL forms were modified to include a specific notation that the Supervisor verified that the safety checks were conducted.  The threshold for achieving and maintaining Substantial Compliance is that 90% of the supervisor daily rounds were in compliance with the requirements of Paragraph 59.

The County's Substantial Compliance results were verified by the Monitor's auditors.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 59 in the Nineteenth Reporting Period.

60.    Within six months of the Effective Date, the Department of Mental Health, in cooperation with the Sheriff's Unit described in Paragraph 77 of this Agreement, will implement a quality improvement program to identify and address clinical issues that place prisoners at significant risk of suicide or self-injurious behavior.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of April 1, 2019 through March 31, 2020)**

Paragraph 60 requires the County to "implement a quality improvement program to identify and address clinical issues that place prisoners at significant risk of suicide or self-injurious behavior."  The Compliance Measures for Paragraph 60 require the County to "identify and address clinical issues. . .in the areas identified in [P]aragraph 61 of the Agreement" and corrective actions are taken to address "such issues."  See Compliance Measures 60.1, 60.2(a), and 60.3(b).

The Monitor and the Mental Health Subject Matter previously agreed that the Department had demonstrated "a sound quality improvement process and the ability to demonstrate that process through specific quality improvement projects directed by management," and the Monitor finds that the County had demonstrated that it maintained Substantial Compliance with Paragraph 60.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 60 in the Nineteenth Reporting Period.[37]

---

[37] The County has acknowledged that its ongoing Quality Improvement efforts will remain subject to monitoring under other provisions of the Settlement Agreement.

61.     The quality improvement program will review, collect, and aggregate data in the following areas and recommend corrective actions and systemic improvements:

(a)     Suicides and serious suicide attempts:

> (i)      Prior suicide attempts or other serious self-injurious behavior
> (ii)     Locations
> (iii)    Method
> (iv)     Lethality
> (v)      Demographic information
> (vi)     Proximity to court date;

(b)     Use of clinical restraints;

(c)     Psychotropic medications;

(d)     Access to care, timeliness of service, and utilization of the Forensic In-patient Unit; and

(e)     Elements of documentation and use of medical records.

**STATUS:     PARTIAL COMPLIANCE**

Substantial Compliance requires the County's semi-annual reports to (a) review, collect, and aggregate data in the areas set forth in Paragraph 61; (b) recommend corrective actions and systemic improvements in those areas; and (c) assess the effectiveness of actions and improvements in prior reporting periods.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required Defendants to achieve Substantial Compliance with Provision 61 by June 30, 2024.  Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed to extend the compliance deadline for Provision 61 to June 30, 2025.

On February 28, 2025, the County submitted its Semi-Annual Report on Quality Improvement and Suicide Prevention Efforts (the "QI Report"), which relates to Paragraphs 61 and 62.  The QI Report sets forth aggregate data for the 20 suicides and 27 critical incidents that occurred between 2021 and the end of the Third Quarter of 2024, broken down by the subparts of Paragraph 61(a).

The County has made significant progress in its QI efforts.  The Monitoring Team has observed that the individual projects pursued in the JQIC (and documented in the QI report and the JQIC SharePoint site) are useful efforts to address issues related to patient care.  As set forth more in the discussion of Provision 62, more of these projects should go beyond attempts to improve compliance with the Agreement and should instead address the root causes of problematic patient care that arise from the observations of

staff, patient complaints and concerns, clinician reports, supervisor reviews, and data trends.[38]

Regarding the review of suicide and serious suicide attempts and taking related corrective actions, as Provision 61(a) requires, the Monitoring Team has broken down these efforts in prior Monitoring Reports, which are incorporated by reference herein. The issue to be solved to achieve Substantial Compliance with Provision 61 is not only building an infrastructure for quality improvement, which the County has done, but also, as explained in the Eighteenth Monitoring Report

the Monitoring Team has long pointed to the fact that the QI program does not adequately identify "corrective actions and systemic improvements" based upon the data collected. *See, e.g.*, Fifteenth Monitoring Report ("the data continue to reveal troubling trends in suicide attempt and self-directed violence ('SDV') that are not yet being analyzed to drive corrective actions in the Department"); Sixteenth Monitoring Report ("while the Combined Suicide Prevention Report often notes trends in inmate suicide and self-harm, it often does not identify corresponding corrective actions and systemic improvements"). The QI Report for the Eighteenth Reporting Period continues this trend. According to the Monitoring Team, it provides "useful descriptive data, and also identifies a need for 'targeted strategies and interventions' that it never actually discusses." For example

- "The higher number of suicides in HOH, despite its purpose of providing heightened observation and care, underscores the necessity for continuous evaluation and enhancement of mental health protocols. Given that HOH houses the largest number of inmates with acute mental health issues, these findings emphasize the need for targeted interventions and specialized care strategies." *See* QI Report at pp. 19-20.

- "The analysis of in-house suicide methods from 2021 to Q1 2024 . . . uncovers key trends and highlights areas requiring focused intervention[s]." *Id.* at pp. 20-21.

- "This consistent prevalence underscores the critical need for targeted prevention measures, such as enhanced monitoring and environmental modifications, to mitigate the risk of hanging within the jail settings." *Id.* at pp. 21.

---

[38] That a majority of the projects undertaken by JQIC relate to compliance with the Agreement rather than the observations of staff, patient complaints and concerns, clinician reports, supervisor reviews, and data trends is not a basis for the Partial Compliance rating on Provision 61, nor even a criticism of the County. In fact, it is a recognition of the County's progress under Provision 61. At earlier phases, such feedback would not have been warranted given that the capacity to undertake effective QI projects was being built. The County has now developed sufficient capacity within its QI program to tackle a greater number of projects that are responsive to deficits in patient care that go beyond the four corners of the Agreement, thereby building an effective QI program that far outlasts the Agreement.

- "This data reveals a predominance of Hispanic and African American individuals among those who engage in self-directed violence, indicating a need for targeted mental health interventions and support tailored to these ethnic communities." *Id.* at pp. 36

- "The most pronounced finding is the high suicide rate among inmates aged 45 and older. This age group accounts for 33% of all suicides, despite comprising only 20% of the total inmate population. . . Addressing this trend may involve implementing targeted interventions and support systems designed to address the unique needs of older inmates." *Id.* at pp. 22.

- "The fact that a quarter of the suicides involved individuals with a known history of suicide attempts underscores the importance of closely monitoring and providing targeted support to inmates with such histories. Previous suicide attempts are a known risk factor for future suicidal behavior, suggesting that enhanced intervention strategies could be beneficial for this subgroup." *Id.* at pp. 23.

Notwithstanding this call for targeted interventions in these areas, no responsive interventions are discussed or referenced regarding these data. Nor do the meeting agendas for the JQIC suggest that these observations in the QI Report are feeding into analytical projects undertaken by the QI program. Indeed, many QI projects appear to relate to compliance with the DOJ Agreement, rather than specific trends in suicide, SDV, or patient care.

The QI Report for the Nineteenth Reporting Period is somewhat more responsive to this critique than past QI Reports. It notes, for example, that

[t]he analysis of suicide methods from 2021 to Q3 2024, as illustrated in Figure 2.7, highlights key trends in suicide methods. Hanging remains the most frequently used method, accounting for 8 of the 17 recorded incidents. Statistical analysis confirms that hanging occurs at a significantly higher rate than expected, emphasizing the need for enhanced supervision and environmental modifications to mitigate the risk of hanging within jail settings.

In response to hanging incidents, the County has implemented targeted infrastructure improvements to reduce ligature risks and enhance inmate supervision. LASD has removed doors from shower areas, installed new ligature-resistant showerheads, and added covers to shower grab bars to eliminate potential tie-off points. Additionally, cell doors in MOSH housing were retrofitted with larger windows to allow for improved visibility and enhanced supervision of inmates at heightened risk. These

87

proactive measures reflect the County's commitment to addressing suicide risks.

The QI Report also discusses the ethnicities and ages of those who completed suicide in the County jails, while, for the first time, indicating that the County does not possess baseline population data to determine whether certain populations were overrepresented in the suicide data.

> While Hispanic inmates accounted for the highest number of suicides (8 out of 17 cases), followed by Caucasian (4), Other (3), and African American (2) inmates, the absence of historical population size data for each ethnic group prevents a conclusive determination of whether suicides are disproportionately concentrated in any specific ethnicity.

> While these numbers reflect variations in suicide counts among age groups, the absence of reliable historical population data for each age group from 2021 to Q3 2024 prevents an accurate assessment of suicide risk. A higher number of suicides in a particular age group does not necessarily indicate an elevated risk, as it may simply correspond to a larger proportion of that age group within the overall inmate population. Without a clear baseline of the average inmate population by age, it is not possible to determine whether any age group is overrepresented in suicide incidents.

The Monitoring Team does not understand why baseline data for ethnicity and age from 2021 to the present is not available for use in the County's Quality Improvement efforts.[39] These data should be available in arrest and booking paperwork and accessible to the administrators of the QI program. A more specific plan from the County as to how these data will be made available for use in the County's QI efforts is necessary.[40]

Regarding self-harm data, the QI report helpfully notes useful and important efforts to standardize and improve the collection of data about inmate self-harm.

---

[39] Moreover, when discussing self-directed violence incidents, the QI Report *does* draw conclusions about youth as a correlate of risk for self-directed violence. *See* QI Report at pp. 45 ("Statistical analysis confirms a significant association between age group and SDV likelihood, indicating that certain age groups experience more or fewer SDV incidents than expected based on their inmate population size. Specifically, the SDV rate was the highest among inmates aged 18-29, followed by the 30-39 age group. The SDV rate decreases significantly in the older age groups, 40-49 years, 50-59 years, and 60+ years. This trend suggests that younger individuals are more vulnerable to self-harm behaviors while in custody, whereas older inmates may have different coping mechanisms, lower impulsivity, or benefit more from existing intervention strategies").

[40] The QI Report notes generally that "[t]o strengthen future analyses, CHS is working to implement a more systematic, accurate, and uniform approach to tracking population data across demographic groups. This enhanced data collection will allow for the identification of significant patterns and relationships that can inform targeted suicide prevention strategies. Ensuring reliable demographic data will further support the County's ability to develop culturally responsive mental health interventions and suicide prevention programs that effectively address the needs of diverse inmate populations."

[T]he CHS Compliance Team conducted a comprehensive review of all self-directed violence records. During this review, the Compliance Team identified several inconsistencies and gaps in the data that affected the consistency of reporting and the ability to appropriately analyze self-harm incidents. The findings included:

- Similar incidents classified under different categories.
- Missing details on specific self-harm items used by inmates.
- Common self-harm methods unlisted and classified as "Other".
- Frequently used drugs classified as "Other" due to a lack of specific options.

To correct these issues and standardize reporting, the self-harm incident tracker was updated to include new self-harm methods, commonly used drugs, and specific self-harm items. The CHS Compliance Team also researched past incidents to fill in missing information, updated records to ensure proper classification, and retrained staff to maintain uniform reporting practices. These improvements enhance data reliability and consistency, allowing for more precise trend analysis and better-informed suicide prevention strategies. The CHS Compliance Team will continue to advance improvements in data collection processes and conduct routine quality assurance checks to ensure that reporting remains consistent, comprehensive, reliable, and accurate, reinforcing the integrity of self-harm data and strengthening prevention efforts.

Regarding self-harm incidents, the County reports noteworthy declines at most facilities from 2021 to the present, save at the CTC.

CTC was the only location to experience an increase, rising from 8 incidents in 2021 to 25 through Q3 2024. This upward trend is likely attributable to enhanced identification and more accurate reporting of SDV incidents within CTC, particularly following improvements implemented in 2023. For example, that year a CAP was identified from a CIRC case regarding Notifications of Self-Harm, leading CTC to develop a structured workflow to ensure consistent documentation and communication of self-harm incidents, thereby improving the accuracy and reliability of reporting processes. Rather than reflecting a rise in self-harm behaviors, this increase is likely due to a more proactive approach to documentation, monitoring, and intervention within the facility.

Regarding methods of self-harm, the most frequently used methods continue to be cutting and head banging

from 2021 to Q3 2024. The data shows that cutting (521 incidents) and head banging (396 incidents) have consistently been the most prevalent

89

methods of self-harm, indicating that these methods may be preferred or more accessible methods of self-harm among inmates, with cutting being the most statistically significant. Other commonly used methods include foreign body (FB) ingestion (180 incidents), asphyxiation (167 incidents), and hanging (105 incidents). Methods such as hitting (84), overdose (84), and ingestion (52) were reported less frequently, while jumping (10) and stabbing (2) remained minimal throughout the period. Over time, cutting and head banging have remained the leading methods of self-harm, while other methods have fluctuated in frequency without significant long-term trends.

Moreover, as has long been apparent, the County's lax practices with respect to razor blade control create organizational risk that loose razor blades will be used to engage in self-harm, harm to other inmates, or staff.  The County reports

The high occurrence of cutting incidents prompted further analysis, as seen in Figure 3.4, which categorizes cutting incidents by item type. This breakdown reveals that hygiene items were the most frequently used category, accounting for 228 incidents. Found objects (44 incidents), identification items (51 incidents), and unknown items (77 incidents) also played a role, while utensils (27 incidents) and medical supplies (12 incidents) were used less frequently.

Figure 3.5 provides further insight into the specific hygiene items used in cutting incidents from 2021 through Q3 2024.  The data reveals that razors were overwhelmingly the most frequently used item, accounting for 219 incidents. In comparison, hairbrushes/combs were used in 6 incidents, while other hygiene items were involved in 3 cases. While hygiene items as a broader category were frequently used in self-harm incidents, the data indicates that razors, rather than hygiene items in general, represent the most concerning risk factor, likely due to their accessibility and effectiveness. These findings highlight the need for stricter control measures regarding the distribution, monitoring, and disposal of razors within the facility to mitigate the risk of self-harm associated with razors. In response to a recent Suicide Review, an inquiry was made to LASD regarding razor monitoring within the jail. The CHS Compliance Team will oversee the progress of this inquiry, assess whether it results in a Corrective Action Plan (CAP), and ensure any necessary measures are effectively implemented and monitored.

While it is positive that a CAP is now being generated to address this risk, the lack of razor control policies to require blades to be checked in and out has long been

raised as a problem in the Monitoring Reports.[41]  A CAP with specific corrective actions and systemic improvements should be generated without delay.

The QI Report notes that female gender is also associated with enhanced risk of self-directed violence.

While the overall trend shows a reduction in SDV incidents across both genders, further analysis of individuals engaging in SDVs from Q1 to Q3 2024 reveals additional insights as illustrated in Figure 3.10. The 224 SDV incidents among males were committed by 162 individuals, while the 55 SDV incidents among females were committed by 36 individuals. When adjusted for population size, females had a higher SDV rate (26 per 1,000 inmates) compared to males (15 per 1,000 inmates). This means that while males account for a higher absolute number of SDV incidents, females are actually 1.82 times more likely to engage in SDVs when adjusting for population size.

the elevated risk of SDVs among female inmates remains a critical concern. This finding aligns with broader research indicating that female inmates experience higher rates of trauma, emotional distress, and mental health conditions, which contribute to their heightened vulnerability to self-harm behaviors. These insights will be integrated into future suicide prevention trainings to ensure that mental health professionals and correctional staff are equipped to recognize and respond effectively to self-harm risks among female inmates. Trainings should emphasize the importance of early identification of psychological distress, increased screening for trauma-related disorders, and proactive crisis intervention strategies to prevent the escalation into self-harm behaviors.

These steps are good insofar as they go.  However, what continues to be lacking are specific corrective actions and targeted interventions to address the risks discussed in the QI Report.

___

[41] *See* Fifteenth Monitoring Report at pp. 88-89 ("While these data tell a compelling story that razor blades are a key implement being used for inmate SDV, the Combined Suicide Prevention Report does not take the next necessary step of 'recommend[ing] corrective actions and systemic improvements' to address this problem as the Compliance Measures require. Instead, it simply notes

the data validates that razors are the number one item being utilized ….this information was presented to Custody with a recommendation to review current policies related to allowable property and to further evaluate what CAPS may be reasonable and feasible to implement. For any CAPs that are developed by Custody they can then, once implemented, be tracked and monitored for effectiveness.

A more useful analytic step would have been to look at current blade control policies and practices in the LASD jails, which were raised as a concern in a previous Monitoring Report. The Department could have also reported on blade control policies in other jail and prison systems, and made recommendations for any necessary changes to policies and practices to prevent uncontrolled inmate access to dangerous razor blades") (citing Twelfth Monitoring Report).

The County's hard work in the QI program is noted, particularly related to its ongoing QI projects pursued through the JQIC.  In addition to those efforts, the County should, again, focus on better use of its existing data about suicide and self-directed violence to implement specific, targeted intervention strategies in order to achieve Substantial Compliance with Provision 61.

62.    The County and the Sheriff's Unit described in Paragraph 77 of this Agreement will develop, implement, and track corrective action plans addressing recommendations of the quality improvement program.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of April 1, 2024, through September 30, 2024)**

Substantial Compliance requires the County's semi-annual Self-Assessments to set forth (a) the "development of corrective action plans to address the most recent recommendations of the quality improvement program;" and (b) the "implementation and tracking of corrective action plans to address recommendations of the program in prior quarters." On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required Defendants to achieve Substantial Compliance with Provision 62 by June 30, 2024. Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed to extend the compliance deadline for Provision 62 to June 30, 2025.

On February 28, 2025, the County submitted its Semi-Annual Report on Quality Improvement and Suicide Prevention Efforts (the "QI Report"), which relates to Paragraphs 61 and 62. The QI Report sets forth aggregate data for the 20 suicides and 27 critical incidents that occurred between 2021 and the end of the Third Quarter of 2024, broken down by the subparts of Paragraph 61(a). Regarding Provision 62, the County's Supplemental Self-Assessment describes a bi-furcated system for tracking CAPs, in which CAPs that flow from critical incidents and death reviews are captured in a "CAP Tracker" and CAPs that result from the QI process are tracked in an online SharePoint site:

Provision 62 focuses on ensuring that Corrective Action Plans (CAPs) are developed, tracked, and implemented in response to critical incidents and other identified issues and incidents that impact suicide prevention and the other areas of concern set forth in Provision 61. As detailed below, the County has instituted a "CAP Tracker" that records CAPs and tracks their implementation status. The County uses this tracker for CAPs put in place in response to critical incidents, including suicides. In this sense, these CAPs in the CAP Tracker are a specific subset of the interventions and improvements that are identified and implemented through the broader quality improvement and quality assurance efforts described in the Provision 61 discussion, above.

Other interventions and improvements are recorded and tracked on the JQIC SharePoint site, which has trackers for both issues and interventions; however, these improvement projects are not called CAPs in the parlance of the County's QI Program. Between the CAP Tracker and the JQIC site trackers, all improvements and projects that come out of the broad quality improvement efforts are captured and tracked. Both are used in conjunction with the relevant efforts, such as using the CAP Tracker to

identify any trends relating to critical incidents that should be addressed by a JQIC project.

## The "CAP Tracker" Document

The CAP Tracker document shared with the Monitoring Team is a multi-page document that lists a series of corrective actions that appear to flow from Critical Incident Review Committee ("CIRC") cases and death reviews. Each entry has incident and booking numbers, the name of the involved inmate, the date of the incident, a description of the necessary CAP, to whom the CAP is assigned, and a comments field, which sometimes includes substantial information about the progress made toward implementing the CAP. It is a very useful document that appears to effectively track CAPs related to CIRCs and inmate deaths but not CAPs generated through the County's QI programs. As explained by the County, CAPs from the County's QI programs are tracked on the JQIC SharePoint site.

## The JQIC SharePoint Site

The County reports that it maintains "Intervention" and "Issue Trackers" on its JQIC site to "record and manage implementation of interventions and improvements developed in response to identified trends, deficiencies, and challenges in the areas delineated in Provision 61, including administration of psychotropic medications, access to care, and use of clinical restraints. The Intervention and Issue Trackers on the JQIC site list interventions and identify who is assigned to tasks and provide the status of implementation. The site is used by QI program leads to ensure that all interventions and improvements are completed."

The Monitoring Team reviewed the relevant pages on the JQIC SharePoint site and finds that the JQIC Site has a landing page, which includes general information, such as links to relevant contacts, several articles about quality improvement, the date of the next JQIC meeting, a form for award nominations by the JQIC Committee, and a link to a repository of documents from JQIC meetings, such as agendas. It also includes tabs labeled "Conversations," "Shared With Us," and "Notebook," which did not have content viewable by the Monitoring Team. A "Documents" tab included links to agendas and presentations from the JQIC meetings. The heart of the site, as related to Provision 62, thus appeared to be tabs labeled "Issue Tracker List" and "Project Tracker List."

The "Issue Tracker List" is a 14-line document that includes a handful of issues (mostly relating to compliance with the Agreement), brief descriptions, and personnel assigned to fix them. Although it was accessed in March 2025, the last recorded issue was from July 2024. It is sparsely populated and not particularly useful at demonstrating an effective QI program, nor does it appear particularly responsive to Provision 62.

The "Project Tracker List" tab, also accessed in March 2025, linked to a more robust document formatted in a grid-style with a list of "Interventions." Each intervention was grouped by project and included a field for the name of the project, the name of the intervention, a brief description of the intervention, a progress field (such as

"in progress," "completed," or "not started"), start and end dates, and the name of the person assigned to completion.  It also included a notes field, which now includes more content than when it was last reviewed during the preparation of the Eighteenth Monitoring Report.  The interventions ranged by date from February 15, 2024, through January 6, 2025.

The Project Tracker List appears to track a listing of CAPs from the QI program, without information about how the CAPs would be implemented, what steps will be required for their implementation, in what jails or with what personnel, to what effect, or how the interventions would be monitored in the future.  Thus, while it does track CAPs, as Provision 62 requires, its actual utility for Custody and CHS personnel appears limited.  To address this, the Monitoring Team recommends that it be amended by adding two relevant data fields, and makes one additional suggestion:

First, the Project Tracker List should include a "Root Cause" field to explicate the causes of the problem that necessitated the CAP.  Including a Root Cause field will allow personnel to revisit the CAP in the future to determine whether those root causes have been fixed or not.  Second, it should also include a date on which the CAP will be revisited in the QI program to determine whether the CAP has been successfully implemented, and the root causes addressed, or if additional action is necessary.[42]  Needless to say, those follow up dates should flow into the JQIC meetings such that follow up is being tracked and monitored by the LASD/CHS QI community.

Finally, and perhaps most importantly, many (but not all) of the existing CAPs relate to compliance with the Provisions of this Agreement.  A primary goal of the QI program should be to enable the County to continually improve the quality of patient care far beyond the tenure of this Consent Decree.  At this stage, the County should be expanding its QI efforts by aggressively addressing the root causes of problematic patient care, and risks of self-harm, identified through staff observations, patient complaints and concerns, clinician reports, supervisor reviews, and data trends, such that its QI program is successful long after the Agreement ends.  While it endures, the Monitoring Team will be observing to ensure that this transition to QI efforts that are not specifically linked to the Agreement is occurring.

Subject to the above, the Project Tracker List appears to adequately satisfy the requirements of Provision 62.  The County is rated in Substantial Compliance with Provision 62 for the Nineteenth Reporting Period, but will be continually evaluated for its compliance in the next Reporting Period.

---

[42] *See* Compliance Measure 62-1(b) (requiring the department to report on its "implementation and tracking of corrective action plans to address recommendations of the program in prior quarters") (emphasis added).

63.    The County and the Sheriff will maintain adequate High Observation Housing and Moderate Observation Housing sufficient to meet the needs of the jail population with mental illness, as assessed by the County and the Sheriff on an ongoing basis.  The County will continue its practice of placing prisoners with mental illness in the least restrictive setting consistent with their clinical needs.

STATUS:    **SUBSTANTIAL COMPLIANCE (as of October 1, 2023, through June 30, 2024 (verified) and through September 30, 2024 (unverified) at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2024, through September 30, 2024 (unverified) at TTCF)**

The Parties agreed on Revised Compliance Measures in 2021.  The Revised Compliance Measures require that 90% of inmates wait for permanent HOH and MOH housing for no more than seven days, and that 100% of inmates wait for permanent HOH and MOH housing for no more than 30 days.

On December 27, 2022, and on April 20, 2023, the Court issued Orders Setting Deadlines for Substantial Compliance, ECF No. 234 and 248, respectively, which established specific deadlines for Defendants to "improve compliance with provisions 63, 64, and 80."  With respect to Provision 63, the December 2022 Order established deadlines for Defendants to take a series of "agreed-upon actions to improve compliance," while the April 2023 Order established incremental targets for the Defendants' overall compliance with Provision 63 by the end of each quarter.  Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed to extend the County's Substantial Compliance deadline to March 31, 2025, which does not fall within the period covered by this Report, and to modify the interim compliance targets as follows.

*Figure 4:  Quarterly Court-Ordered Targets for Provision 63 Compliance*

|  | **% of Inmates Waiting ≤ 7 Days in MH Housing Intake Areas Before Transfer to Permanent MH Housing** | **Average Wait Time** |
|---|---|---|
| **2Q2024** | 80% | 7 days |
| **3Q2024** | 80% | 7 days |
| **4Q2024** | 85% | 7 days |
| **1Q2025** | 90% | 7 days |

Given the bed space constraints described in previous monitoring reports, the results of the County's concerted efforts to meet these benchmarks are impressive. Regarding CRDF, the County's Augmented Nineteenth Self-Assessment includes results for the Second Quarter of 2024.  It reports that in the random weeks of the Second Quarter of 2024, "100% of the inmates at CRDF waited no more than seven days in

96

mental health housing intake areas before being transferred to permanent mental health housing, and there were no inmates who waited longer than 30 days." The County's posted results reflect that the average wait time was 1.59 days for the two random weeks.[43] This met the incremental targets in the Court's April 2023 Order, as modified by the Joint Stipulation to Modify Deadlines. The reported results at CRDF for the Second Quarter of 2024 have been verified by the Monitor's auditors. The County also reports that in the randomly selected weeks in the Third Quarter of 2024, "100% of the inmates at CRDF waited no more than seven days in mental health housing intake areas before being transferred to permanent mental health housing, and 100% waited fewer than 30 days." The County's posted results reflect the average wait time was 1.33 days for the two random weeks. This also met the incremental targets in the Court's April 2023 Order, as modified. These results are subject to verification by the Monitor's Auditors.

Regarding TTCF, the County reports that in the random weeks of the Second Quarter of 2024, "64.13% of the inmates at that facility waited no more than seven days in mental health housing intake areas before being transferred to permanent mental health housing, and 100% waited no longer than 30 days." The County's posted results reflect that the average wait time was 7.85 days for the two random weeks. This did not meet the incremental targets in the Court's April 2023 Order, as modified. In the random weeks of the Third Quarter of 2024, at TTCF, "95.25% of the inmates at that facility waited no more than seven days in mental health housing intake areas before being transferred to permanent mental health housing, and 100% waited no longer than 30 days." The average wait time was 4.91 days. This met the incremental targets in the Court's April 2023 Order, as modified. The reported results at TTCF for the Third Quarter of 2024 are subject to verification by the Monitor's auditors.

Given the Department's reported results, the County is in Substantial Compliance at CRDF for the full Nineteenth Reporting Period and at TTCF for the Third Quarter of 2024. These results are subject to verification by the Monitor's auditors, as indicated above.

<u>Assessment of the Mix of Therapeutic Features in FIP Stepdown Units and HOH Dorms[44]</u>

On March 11, 2024, the Court issued an Order Modifying Deadlines for Substantial Compliance, ECF 266, which extended several deadlines pending in this case. As part of that Order, the Court also instructed that "the Monitor and the Mental Health Subject Matter Expert will assess as part of the Monitor's semi-annual reports the mix of therapeutic features in the Stepdown units and HOH dorms." The Monitor and Mental

---

[43] The County's Augmented Nineteenth Self-Assessment reflects an average wait time of 1.53 days, which, as in the Seventeenth and Eighteenth Reports, appears to be drawn from the final week of the quarter, rather than the weeks randomly identified by the Monitor. Again, the Monitor reiterates that for all wait time calculations under Provision 63, the County should utilize the random weeks or the Monitor will be forced to produce those calculations on the County's behalf for assessing the County's compliance with the Court's orders.

[44] This information is also relevant to Provisions 79 and 80.

Health Subject Matter Expert, therefore, share the following assessment of the mix of therapeutic features in the Stepdown units and HOH dorms.

Therapeutic features of the FIP Stepdown units include enhancements to the physical environment, greater freedom of movement, the presence of Inmate Mental Health Assistants ("MHAs"), and the support of the custody Sergeant and Deputies assigned to these units. The physical environment is distinguished by soft furniture and traditional tables rather than the metal spider tables in other units. There are murals, artwork, and plants to create a more comfortable and less austere living space. Other amenities, such as books and a coffee machine, contribute to the livability of the environment. Inmates are not cuffed when out of their cells.

Inmate MHAs in the TTCF FIP Stepdown units have received intensive training for their therapeutic role, reside in the units, and provide a consistent, supportive presence in addition to the regular structured programming they deliver. They are involved in an incentive-based program to reinforce positive behavior and daily self-care habits. This includes providing access to amenities, such as hot coffee, as a reward for meaningful engagement in group programming and maintaining cells and the common dayroom in a clean and orderly condition. They also serve as mediators to prevent and de-escalate conflict in the unit. In interviews with inmates in these units, the presence of inmate MHAs has been described as essential for preventing the gang politics of threat, coercion, and intimidation that are pervasive in other dorm-style housing areas, which supports the ability of patients to engage in mental health programming without fear or distraction. The Custody staff are also a consistent and supportive presence. They do not rotate and thus build positive, empathetic relationships with patients in the FIP Stepdown units.

HOH dorms also allow enhanced freedom of movement (compared to traditional HOH housing pods) in that inmates are not cuffed to tables during out-of-cell time. A distinction between FIP Stepdown and HOH dorm units involves the referral process. According to information provided by the County, referrals to FIP Stepdown are initiated by clinicians based on the health history, need, and clinical presentation of the patient. Referrals to HOH dorms are initiated by Custody based on observations of the patient's behavior and ability to program unrestrained. HOH dorms do not appear to include other distinguishing therapeutic features as described for the TTCF FIP Stepdown units.

Differences were noted between the FIP Stepdown units at CRDF and those at TTCF. Interviews revealed that the female MHAs were not providing the same regularity or depth of group programming as the male MHAs at TTCF. Their training consisted primarily of self-study from various texts, with testing to demonstrate understanding, but without the hands-on modeling and mentoring that appears to take place with male MHAs. The female MHAs are responsible for documenting the inmates' daily compliance in areas like taking medications, showering, brushing teeth, and cleaning activities as part of a token economy with food reinforcers referred to as the "Five Star Program." Beyond this, programming appeared to be limited to one hour in the morning and one hour in the afternoon, when the patients were out of their cells uncuffed. Overall, the women's program seemed less richly resourced than the men's program,

with less programming and supportive services and less out-of-cell time.  At this time, the physical environment was also less distinctive (in the ways described above) from other HOH housing units than appears to be the case with the men's FIP Stepdown units.

64.    Within six months of the Effective Date, the County and the Sheriff will develop a short-term plan addressing the following 12-month period, and within 12 months of the Effective Date, the County and the Sheriff will develop a long-term plan addressing the following five-year period, to reasonably ensure the availability of licensed inpatient mental health care for prisoners in the Jails.  The County and the Sheriff will begin implementation of each plan within 90 days of plan completion.  These plans will describe the projected capacity required, strategies that will be used to obtain additional capacity if it is needed, and identify the resources necessary for implementation.  Thereafter, the County and the Sheriff will review, and if necessary revise, these plans every 12 months.

**STATUS:    PARTIAL COMPLIANCE**

The parties agreed on Revised Compliance Measures in 2021.  Substantial Compliance requires the Department to develop a long-term plan that will address the availability of licensed inpatient mental health care for prisoners in the following five-year period; and provide an annual report describing the long-term plan and the steps taken to implement it, which must be deemed reasonable by the Monitor.

On December 27, 2022, and on April 20, 2023, the Court issued Orders Setting Deadlines for Substantial Compliance, ECF No. 234 and 248, respectively, which established specific deadlines for Defendants to "improve compliance with provisions 63, 64, and 80."  With respect to Provision 64, the December 2022 Order established deadlines for Defendants to take a series of "agreed-upon actions to improve compliance," while the April 2023 Order established incremental targets for the Defendants' overall compliance with the provision by specific quarters.  Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed to modify those incremental targets, and that the County's compliance deadline would be extended to June 30, 2025, which does not fall within the period covered by this Report.  The revised incremental targets are shown in the figure below.

*Figure 5:  Quarterly Court-Ordered Targets for Provision 64 Compliance*

| | Difference Between # of P4s and # of Patients Receiving Inpatient Care |
|---|---|
| **1Q2025** | ≤10 |
| **2Q2025** | ≤5[45] |

Beginning in the Sixteenth Reporting Period, and extending into the Nineteenth Reporting Period, the County achieved several encouraging successes in its efforts to comply with Provision 64.  This included opening the Jail Inpatient Unit/Acute Intervention Module ("JIU/AIM") and beginning to treat P4 patients therein to stabilize them and potentially move them to a lower level of care, which continues to have a

---

[45] Pursuant to the Joint Stipulation to Modify Deadlines, in the Second Quarter of 2025, "none of those individuals should wait longer than is clinically appropriate for inpatient placement."

notable impact on the overall P4 population and the number of patients waiting for
inpatient care on the FIP waitlist.  The County reports that at the end of the Third Quarter
of 2024, there were 82 P4 patients in the LACJ, an increase from the 69 such patients
reported for the end of the First Quarter of 2024.[46]

While the number of P4 patients has decreased since the beginning of 2023, the
total number of inpatient beds available to treat them has risen.  The County reports that
"[b]y the onset of the 19th Reporting Period (the start of the second quarter of 2024), the
number of functional FIP beds increased to approximately 58 with the addition of 10 new
inpatient beds that were added to the LACJ's inventory when the Jail Inpatient
Unit/Acute Intervention Module ('JIU/AIM') discussed below opened with five inpatient
beds during the Second Quarter of 2023 and expanded to 10 inpatient beds during the
Third Quarter of 2023."

Thus, the County reports that "(1) the difference between the number of P4
inmates and the number of P4 inmates receiving FIP services at the end of the Second
Quarter of 2024 was 18 (because the P4 population was slightly higher than average that
week), but that difference fell to only 4 inmates by July 15, 2024; and (2) the difference
between the number of P4 inmates and the number of P4 inmates receiving FIP services
at the end of the Third Quarter of 2024 was 24 (because the P4 population was
significantly higher than average that week as well)."  To close the remaining gap, the
County reports on its efforts to raise the total number of inpatient beds to 77 across
several units.  The County reports

> In 2024, CHS took significant steps towards a plan to bring online a total
> of approximately 77 functional inpatient beds across the FIP Unit, MHTU,
> and AIM, by seeking state licensing approval to reallocate FIP Unit
> licenses for mental health inpatient treatment that were attached to four-
> person rooms that could functionally only house one P4 patient to single
> cell rooms in other areas of the Correctional Treatment Center (CTC) and
> repurposing the four-person rooms for other types of inpatient care. The
> first critical hurdle was approval from relevant state licensing authorities,
> which required multiple steps, applications, and inspections. After several
> months of effort and renovations to some inpatient areas, this plan was
> approved by the relevant state licensing agencies in late 2024.

> CHS and LASD are now collaborating to add and reallocate staffing to
> make a total of approximately 77 inpatient beds across the various units
> operational for inpatient mental health treatment. That process has just
> begun, with approximately 65 beds in the LACJ currently operational for
> inpatient mental health treatment, consisting of a combination of
> functional beds in the FIP Unit, the MHTU, [and] the JIU/AIM Unit. The
> County is currently working towards full rollout of the plan, which
> contemplates approximately 77 total functional beds for inpatient mental

---

[46] The County reports that this number fell to an average of 65.9 such patients over 11 days sampled in the
Fourth Quarter of 2024.

health treatment by the end of June 2025.[47]

The County also reports on the efforts of the IRC psychiatric staff to ensure that inmates with mental illness who are newly booked into the jails do not decompensate to a P4 status.  The IRC unit consists of "2.75 psychiatrists, and 8.25 psychiatric nurse practitioners" and currently "provide[s] 24/7 psychiatric coverage in the IRC from Tuesday through Friday, 10-17 hours of coverage on Saturdays, 14 hours on Sundays, and 21 hours on Monday."  The County further reports that

> the psychiatric team embedded in the IRC continued to see the vast majority of the patients referred for a psychiatric medication evaluation face-to-face before those patients were assigned to permanent housing and left the IRC. The County provides the balance of those individuals who are not seen by the IRC psychiatric team with treatment in line with CHS' Bridge Medication Policy; and, for those individuals who meet that policy's criteria, 100% receive orders for the continuation of their medications. The ultimate goal of this enhanced psychiatric staff embedded in the IRC is to ensure, to the greatest extent possible, that individuals entering the LACJ receive a psychiatric assessment for medication before transferring to permanent housing.

The County also reports that it has continued to expedite the transfer of inmates facing felony charges found incompetent to stand trial to state hospitals, noting that "between March 20, 2023, and August 5, 2024, the County transferred 2,070 FIST inmates to state hospitals for restoration services and, in the process, reduced the number of pending FIST state hospital transfers from 506 to approximately 100 patients."

Similarly, it has continued to transfer inmates to state prison, noting that "between March 6, 2023, and August 5, 2024, the LASD transferred 10,058 LACJ inmates to state prison, and the daily average of inmates awaiting transfer to a state prison to serve their sentences has fallen from approximately 1,600 inmates to an average daily population of approximately 600 inmates, a 62.5% reduction."[48] The County also reports on various initiatives to build community-based bed capacity through the Office of Diversion and Reentry and the Department of State Hospitals.

Given the County's efforts to raise the total number of inpatient beds to 77, as well as the other efforts described above, the Monitor and Dr. Johnson find

---

[47] Elsewhere, the County indicates that the total number of inpatient beds will be 78.  *See* Augmented Nineteenth Self-Assessment at pp. 122 ("on December 11, 2024, the County received approval from the state to bring the total number of inpatient mental health treatment beds in the LACJ to 78 functional beds").

[48] In the Eighteenth Reporting Period, there were approximately 526 inmates awaiting transfer to state prison, so the reported number of inmates awaiting such transfer has increased in the Nineteenth Reporting Period.  *See* Eighteenth Monitoring Report at pp. 103.

that the plan articulated by the County to achieve Substantial Compliance with Provision 64 is reasonable.  *See* Compliance Measure 64-3(b).  Successfully executing these steps within the articulated timelines should allow the County to achieve Substantial Compliance with Provision 64.

65 (**Revised**).  Consistent with existing Sheriff's Department policies, the County and the Sheriff will ensure that psychotropic medications are administered in a clinically appropriate manner to prevent misuse, hoarding, and overdose.  The County will maintain electronic mental health alerts in prisoners' electronic medical records that notify medical and mental health staff of a prisoner's risk for hoarding medications.

STATUS:       **PARTIAL COMPLIANCE**

On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provision 65 ("Revised Paragraph 65") as set forth above.  They also agreed on Revised Compliance Measures.  Under the Revised Compliance Measures, (1) the County's Self-Assessments must set forth the (a) results of weekly medication audits documenting the visual observation of the administration of medication during the quarter; (b) unauthorized medications found as a result of cell searches during the reporting period; and (c) incidents involving confirmed prescription drug overdoses.  Further, the Monitor must conclude, after consulting with the Subject Matter Expert, that "psychotropic medications are administered in a clinically appropriate manner 85% of the time."  Finally, "85% of the electronic medical records [must] contain the required alerts."

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required Defendants to achieve Substantial Compliance with Provision 65 by March 31, 2024, which fell within the period covered by the Eighteenth Report.  Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed that the County's Substantial Compliance deadline would be extended to June 30, 2025, which does not fall within the period covered by this Report.  Given the issues with the County's self-audit process discussed in the Eighteenth Monitoring Report, the Monitor also agreed to increase the number of on-site observations of pill calls by the Monitoring Team.

The Settlement Agreement requires the County to administer medication to patients in a clinically appropriate manner.  This means, among other things, ensuring that when medication is administered, it is taken by the patient while under observation by the nurse and assigned Deputy, to ensure that the medication is not hoarded, later traded as jail currency, or used for self-harm or overdose.  In the Nineteenth Reporting Period, the results of the County's self-audit process continued to reflect extremely high rates of reported compliance.[49]

---

[49] As set forth in this discussion and in previous Monitoring Reports, the self-audit results continue to diverge from the actual practice in the jails.  For example, the posted documents reflect that for the Third Quarter of 2024, nursing supervisors observed medication administration for 170 patients taking psychiatric medications housed in MCJ.  Of those observations, nursing supervisors identified zero errors, and 170 out of 170 were deemed to be compliant with all applicable pill call procedures.  Yet, just months later, the Monitor observed pill call in multiple dorms, conducted by multiple staff members, on the fifth floor of MCJ (where MOH patients are housed), and virtually none of the relevant procedures were being followed.  Moreover, when questioned, nursing staff indicated that it was customary practice to not have water available at the site of medication administration or to require patients to ingest medication in view of staff.

*Figure 6:  Quarterly Reported Pill Call Audit Results*

| Quarter | Instances of Psychotropic Medication Administration Observed | Percentage Reported Compliant with Pill Call Procedures |
|---------|---------------------------------------------------------------|----------------------------------------------------------|
| 4Q2022 | 1,415 | 92.72% |
| 1Q2023 | 1,005 | 99.40% |
| 2Q2023 | 912 | 92.11% |
| 3Q2023 | 1,080 | 99.81% |
| 4Q2023 | 1,644 | 97.32% |
| 1Q2024 | 1,493 | 97.39% |
| 2Q2024 | 1,349 | 98.37% |
| 3Q2024 | 1,447 | 97.72% |

The Monitoring Team made on-site observations of pill calls in November 2024, December 2024, and January 2025.  During these visits, the Monitoring Team observed pill calls in multiple housing pods, often on different floors, to ascertain whether medication was being administered in a clinically appropriate manner.  The Monitoring Team conducted at least two, and up to four such observations at each jail that houses patients with serious mental illness on the following dates: TTCF (12/9/24, 1/3/25, and 1/13/25), CRDF (1/7/25 and 1/16/25), MCJ (11/19/24, 12/10/24, 1/8/25, and 1/24/25), and PDC North (1/21/25, 1/30/25, and 2/4/25).

There was an improvement in the pill calls observed by the Monitoring Team during the Nineteenth Reporting Period.  However, elementary features of a clinically adequate pill call process were still missing on certain dates at certain jails, such as routinely permitting patients to walk into their dorms to get water to take their medications, which necessarily means they are taking those medications outside the staff's view.  Given the high level of scrutiny these issues have received in recent Monitoring Reports, it is puzzling that the County has not moved with greater alacrity to address these repeatedly-identified deficiencies, like ensuring universal water availability for pill calls at all jails.[50]

At TTCF, the pill calls observed by the Monitoring Team were generally

---

The County's reporting on Provision 65 would be greatly improved by it grappling with these inconsistencies in its self-audit process.  For example, it could speak with the nursing supervisors who performed those self-audits to determine how they could have identified zero errors with pill call on MCJ's fifth floor while these obvious issues persisted.  It could provide all nursing supervisors with training on accurately documenting issues with pill call.  Absent a description of such efforts by the County, the Monitor will continue to be unable to credit the compliance percentages generated through the County's Provision 65 self-audit process.

[50] *See* Sixteenth Monitoring Report at pp. 106, Seventeenth Monitoring Report at pp. 105-107, and Eighteenth Monitoring Report at pp. 104-108.

satisfactory and compliant with the requirements of Provision 65.  Nursing and Custody personnel were observed to be working collaboratively, water was made available at the site of medication administration, patients were taking their medications in view of staff, and patient mouths were checked to ensure that medication was not being "cheeked."

At CRDF, Custody and Nursing staff were observed working collaboratively, water was made available, and patients were generally required to ingest their medications in front of staff.  However, while some Nursing and Custody staff checked patients' mouths to ensure ingestion, others did not.  Nursing and Custody leaders should work to correct this inconsistency and report on these efforts in the County's next self-assessment.

At MCJ, the pill calls observed by the Monitoring Team in November 2024 were Non-Compliant.  Water was not made available, and patients were allowed to walk into their assigned dorms holding their medications without ingesting them in front of staff.  Moreover, when questioned about this, both Nursing and Custody personnel indicated that this was the customary practice on the fifth floor of MCJ.  Following these observations by the Monitoring Team, the County took certain positive steps to correct these deficiencies, and notable improvement in the pill calls was observed at MCJ in December 2024 and January 2025 by the Monitoring Team.  New procedures had been implemented and Custody was bringing water to the site of medication administration.  However, in several dorms, patients continued to be allowed to take their medication back into the dorm without observed ingestion.  The County should take steps to ensure that all Nursing and Custody personnel at MCJ are ensuring ingestion, and report on those efforts in the next self-assessment.

At PDC North, the pill calls were generally unsatisfactory and Non-Compliant with the requirements of Provision 65.  At the time of the Monitoring Team's observations, the general practice was for patients to receive their medications at the dorm window and then walk back into the pod to take their medication in the restroom where water is available.[51]  This is not a "clinically appropriate" administration of psychotropic medication, and it must change.  The County notes that it has

> carefully reviewed the criticisms of medication administration at LACJ
> and held several meetings with LASD and CHS leadership to explore
> additional means of assuring that psychotropic medications are
> administered in a clinically appropriate fashion. CHS and LASD have

---

[51] The posted documents reflect that for the Third Quarter of 2024, nursing supervisors observed medication administration for 510 patients housed in PDC North.  Of that number, 510 out of 510 were found to be compliant with all applicable pill call procedures for an error rate of zero patients.  Yet, the routine practice of allowing patients to walk away with psychotropic medication in hand is inconsistent with Provision 65, which requires such medications to be administered "in a clinically appropriate manner to prevent misuse, hoarding, and overdose."  These self-audit results cannot be reconciled with the observable reality of pill call in PDC North.  Again, the County has not described any efforts to grapple with these obvious deficiencies in its self-audit process, and it will not demonstrate compliance with Provision 65 based on a self-audit process that continues to reflect these significant inconsistencies with jail practice.

undertaken significant efforts to address the Monitor's concerns about psychotropic medication administration and are implementing a plan to ensure improved communication and closer collaboration between Nursing and Custody to better administer medications in the LACJ. This plan includes implementing joint Nursing-Custody pill call trainings; modifications to CHS pill-call policy and custody unit orders to incorporate a reciprocal escalation policy for employee noncompliance; modifications to Custody unit orders to specify that Custody is responsible for providing, filling, and replenishing water jugs for pill calls (or otherwise ensuring patients have water at the time of dispensation; Custody and CHS joint development of a post-administration protocol for patients who refuse to show proof of ingestion; and consideration of the addition of a medication administration module to the Jail Ops curriculum for Custody employees to address pill call protocols and communication and collaboration with Nursing (or the addition of facility-specific training for new deputies and Custody Assistants).

Regarding other Provision 65 Compliance Measures, the County's Augmented Nineteenth Self-Assessment reports that for the Second Quarter of 2024, 66%—less than the required 85%—of the 60 electronic medical records of patients identified as being at risk of hoarding medicine contained the required mental health alerts pursuant to Compliance Measure 65-5(d).  For the Third Quarter of 2024, the County reports 66%—less than the required 85%—of the 60 electronic medical records of patients identified as being at risk of hoarding medicine contained the required mental health alerts.  The County rightly notes that "[i]n the Third Quarter of 2024, the Joint Quality Improvement Committee (JQIC) initiated a project to enhance patient safety by reducing medication hoarding at CRDF and ensuring proper alerts are entered into the electronic medical record," and the early results appear to be quite positive.

The County's posted results reflect that in the Second Quarter of 2024, 58 unannounced searches were conducted at TTCF.  Staff identified unauthorized medications in 7 of these searches.  The numbers at the other facilities were CRDF (2 of 119 searches resulting in the seizure of medication), MCJ (0 of 161 searches resulting in the seizure of medication), NCCF (1 of 590 searches resulting in the seizure of medication), PDC North (4 of 96 searches resulting in the seizure of medication), and PDC South (0 of 145 searches resulting in the seizure of medication).

The County's posted results for the Third Quarter of 2024 reflect similar trends. There were 71 unannounced searches at TTCF, and three resulted in the seizure of unauthorized medications.  The numbers at the other facilities were CRDF (3 of 149 searches resulting in the seizure of medication), MCJ (0 of 172 searches resulting in the seizure of medication), NCCF (3 of 339 searches resulting in the seizure of medication), PDC North (1 of 128 searches resulting in the seizure of medication), and PDC South (0 of 160 searches resulting in the seizure of medications).

The County also reported zero confirmed overdoses and three unconfirmed in the

Second Quarter of 2024.  The County reported zero confirmed overdoses and one
unconfirmed in the Third Quarter of 2024.

66 (**Revised**).  Consistent with existing Correctional Health Services policies, prisoners with a serious mental illness who reside outside of mental health housing, will remain on an active mental health caseload regardless of whether they refuse medications. The County and the Sheriff will provide prisoners with a serious mental illness who reside outside of mental health housing with therapeutically appropriate individual monthly visits with a QMHP whether or not the prisoners are receiving or refusing psychotropic medications.  The County and the Sheriff will provide medication support services to prisoners who (i) have a mental illness, (ii) reside outside of mental health housing and (iii) are prescribed psychotropic medications.

        **STATUS:        PARTIAL COMPLIANCE**

        On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provision 66 ("Revised Paragraph 66") as set forth above.  They also agreed on Revised Compliance Measures.  Under the Revised Compliance Measures, Substantial Compliance requires that a) 85% of prisoners with a serious mental illness who resided outside of mental health housing were on an active mental health caseload; b) 85% of prisoners with a serious mental illness who resided outside of mental health housing are offered therapeutically appropriate structured mental health treatment and are seen by a QMHP at least once a month; and c) 85% of prisoners who resided outside of mental health housing and were prescribed psychotropic medications were offered medication support services.

        On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required Defendants to achieve Substantial Compliance with Provision 66 by March 31, 2023.  On March 11, 2024, the Court issued an Order Modifying Deadlines for Substantial Compliance, which extended the deadline for Substantial Compliance to June 30, 2024.  Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed to extend the compliance deadline for Provision 66 to June 30, 2025, which does not fall within the period covered by this Report.

        The County's Augmented Nineteenth Self-Assessment again reports that "there were no records to assess for Compliance Measures 66-5(a) and 66-5(b) because there were no patients who met the criteria for severe mental illness housed in general population areas" in the Second and Third Quarters of 2024.  Given the County's commitment to moving prisoners with serious mental illness out of general population and into mental health housing, the results being evaluated for this provision are narrowed and largely focus on medication support services for prisoners receiving psychotropic medication and living outside of mental health housing under Compliance Measures 66-3 and 66-5(c).

        Regarding those compliance measures, the County reports that 70% of patients residing outside of mental health housing who were prescribed psychotropic medications during the randomly selected week in the Second Quarter of 2024 were offered medication support services.  In the Third Quarter of 2024, 76% of relevant patients were offered medication support services.  These are improved from the last Reporting Period,

but remain lower than the 85% threshold.  Regarding these results, the County indicates that the fix to the ORCHID software (discussed in the Seventeenth Monitoring Report at pp. 110):

> was intended to make scheduling more efficient and to ensure that patients receive timely medication support services. The ORCHID enhancement was initially implemented in the summer of 2024, but it caused unforeseen complications in scheduling that were discovered during testing. . . .[T]he County has found other ways to streamline schedules, including by running reports that allow staff to do some of the schedule-streamlining and order-entering that the ORCHID enhancement was supposed to achieve. A new, simpler ORCHID enhancement is in development that will create an alert when there is an existing appointment for a patient, which will further help improve scheduling challenges.

The Eighteenth Monitoring Report noted that the County previously reported that "CHS Compliance also will provide comprehensive scheduling training for psychiatrists and nurse practitioners on Provision 66's requirements" and called on the County to "provide specific information about whether or not that has been accomplished for all relevant staff (including registry workers)."  While the Augmented Nineteenth Self-Assessment indicates that "system-wide improvement measures" have been taken, "includ[ing] ongoing efforts to ensure supervising psychiatrists more intensively manage their staffs' schedules to ensure they are filled with current, non-duplicative orders, and comprehensive scheduling training was provided to psychiatrists and nurse practitioners on the requirements of Provision 66," the County should be more specific.

Further, in the Seventeenth Self-Assessment, the County also reported that it "recently tasked supervising psychiatrists to more intensively manage their staffs' schedules to ensure that they are filled with current, non-duplicative orders. This has involved scrubbing duplicative referrals that can clog schedules such that other patients are not scheduled for medication support services. Supervisors have also directed clinicians to backfill their schedule openings (including those caused by eliminating duplicative referrals) to visit inmates who need to be seen for medication management support."  The Eighteenth Monitoring Report called on the County to provide detailed information about whether or not this has been accomplished and if so, how.  This information does not appear in the Augmented Nineteenth Self-Assessment, but it would be useful in assessing the County's progress in implementing the steps necessary to achieve Substantial Compliance.

67 (**Revised**).  The County and the Sheriff will implement policies for patients housed in High Observation Housing and Moderate Observation Housing that require:

(a)    For patients with a Mental Health Level of Care ("MHLOC") of P2:

(i)  documentation of a patient's refusal of psychotropic medication in the patient's electronic medical record;

(ii)  the use of clinically appropriate interventions with such patients to encourage medication adherence; and

(iii) consideration of the need to transfer non-adherent patients to higher levels of mental health housing.

(b)    For patients with an MHLOC of P3 or P4:

(i) documentation of a patient's refusal of psychotropic medication in the patient's electronic medical record;

(ii) the use of clinically appropriate interventions with such patients to encourage medication adherence;

(iii) consideration of the need to transfer non-adherent patients to higher levels of care;

(iv) discussion in treatment team meetings of non-adherent patients who are under consideration for admission to the forensic in-patient unit (i.e., individuals with an MHLOC of P4 as well as individuals referred for consideration of an increase to P4); and

(v) individualized consideration of the appropriateness of seeking orders for involuntary medication pursuant to the provisions of California Welfare and Institutions Code sections 5332-5336 and/or California Penal Code section 2603(a).

**STATUS:     PARTIAL COMPLIANCE**

On December 27, 2022, the Court issued an Order Setting Deadlines for
Substantial Compliance, ECF No. 234, which required Defendants to achieve Substantial
Compliance with Provision 67 by June 30, 2023.  On March 11, 2024, the Court issued
an Order Modifying Deadlines for Substantial Compliance, which extended the deadline
for Substantial Compliance to March 31, 2024, which falls within the period covered by
this Report.  On April 22, 2024, the Parties filed a Joint Stipulation to Modify Provision
67 of the Settlement Agreement, ECF. No. 267, as set forth above.

Substantial Compliance requires the County to "review the electronic medical
records of 25% of the prisoners in HOH and MOH who refused psychotropic medication
during the quarter to verify that the records [of 85% of the prisoners] reflect the
documentation and consideration of the matters required by the terms of Paragraph 67."

The County's Augmented Nineteenth Self-Assessment reports that for the Second
and Third Quarters of 2024, "97% of inmates who refused psychotropic medications
received the appropriate consideration and documentation."  These exceed the 85%
threshold for Substantial Compliance.  These results were unable to be verified by the
Monitor's auditors and the County is rated in Partial Compliance.[52]

---

[52] The Eighteenth Report referenced the need for the Monitoring Team to discuss Provision 67 with the
County, which occurred on March 10, 2025.  During the meeting, an agreement was reached that the
County's methodology for excluding selected records from its audit was generally appropriate.  However,
the Monitor's auditors highlighted certain pervasive qualitative issues with the documentation provided.
The County indicated that it was aware of some of the issues discussed and had already taken corrective
actions prior to the discussion.  The Monitor is encouraged by the County's proactive steps to improve the
quality of the clinical notes.  Due to the pervasiveness of the issues in the Second and Third Quarters of
2024, the Monitor finds the County to be in Partial Compliance.  The Monitoring Team is available for
further discussions with the County to provide additional examples of the pervasive issues with the
documentation provided under Provision 67, such that the issues can be corrected.

68.    Within six months of the Effective Date, the County and the Sheriff will develop and implement a procedure for contraband searches on a regular, but staggered basis in all housing units.  High Observation Housing cells will be visually inspected prior to initial housing of inmates with mental health issues.

**STATUS:**    **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at MCJ, NCCF, PDC East, PDC South, and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2017, through December 31, 2017 (verified) at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2022, through December 31, 2022 (verified) at CRDF)**

Substantial Compliance requires that "85% of the housing units are searched for contraband at least once in the previous quarter; and 95% of the HOH units visually inspected prior to housing prisoners in these units."  Self-Assessments are to include a summary of searches conducted and a review of 25 randomly selected Checklist forms for HOH units to confirm that the units were visually inspected prior to initial housing of prisoners in these units.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 68 by June 30, 2024.

The County previously maintained Substantial Compliance for twelve consecutive months at TTCF, MCJ, NCCF, PDC East, PDC South, CRDF, and PDC North.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring at those facilities for Substantial Compliance with Paragraph 68 in the Nineteenth Reporting Period.

69.    Consistent with existing DMH policies regarding use of clinical restraints, the County and the Sheriff will use clinical restraints only in the Correctional Treatment Center and only with the approval of a licensed psychiatrist who has performed an individualized assessment and an appropriate Forensic Inpatient order.  Use of clinical restraints in CTC will be documented in the prisoner's electronic medical record.  The documentation will include the basis for and duration of the use of clinical restraints and the performance and results of the medical welfare checks on restrained prisoners.  When applying clinical restraints, custody staff will ensure a QMHP is present to document and monitor the condition of the prisoner being placed in clinical restraints.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of July 1, 2018, through June 30, 2019 (verified))**

Substantial Compliance requires the Department to review the electronic medical records of all prisoners placed in clinical restraints to verify that the restraints were used, approved, and documented, and that the results of medical welfare checks on restrained prisoners were also documented.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring at those facilities for Substantial Compliance with Paragraph 69 in the Nineteenth Reporting Period.

70.    Within three months of the Effective Date, the County and the Sheriff will have policies and procedures regarding the use of Security Restraints in HOH and MOH. Such policies will provide that:

(a)    Security Restraints in these areas will not be used as an alternative to mental health treatment and will be used only when necessary to insure safety;

(b)    Security Restraints will not be used to punish prisoners, but will be used only when there is a threat or potential threat of physical harm, destruction of property, or escape;

(c)    Custody staff in HOH and MOH will consider a range of security restraint devices and utilize the least restrictive option, for the least amount of time, necessary to provide safety in these areas; and

(d)    Whenever a prisoner is recalcitrant, as defined by Sheriff's Department policy, and appears to be in a mental health crisis, Custody staff will request a sergeant and immediately refer the prisoner to a QMHP.

**STATUS:    PARTIAL COMPLIANCE**

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required Defendants to achieve Substantial Compliance with Provision 70 by June 30, 2024.  Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed to extend the compliance deadline for Provision 70 to June 30, 2025, which does not fall within the period covered by this Report.

This discussion recapitulates prior evaluations of Provision 70 in recent Monitoring Reports.  To begin, it is important to note that the County's efforts to comply with Provision 70 have been very successful insofar as they go.  The Monitoring reports have repeatedly praised the County for taking "significant steps forward" in lessening "the pervasive isolation and reflexive use of restraints experienced by patients assigned to HOH housing and dramatically improved the conditions of their detention."[53]  Indeed, the County has expanded the number of FIP Stepdown pods and HOH Dorms in which HOH patients program together without restraints *beyond* the requirements of the Court's March 2024 order, which is worthy of praise.[54]

---

[53] *See* Eighteenth Monitoring Report at pp. 117-118.

[54] The Court's March 2024 Order required the County to have 30 FIP Stepdown Pods and/or HOH dorms by June 2025.  The County reports that as of the end of the Nineteenth Reporting Period, there were 33 such pods across TTCF and CRDF (16 FIP Stepdown pods and 13 HOH dorms at TTCF and three FIP Stepdown pods and one HOH dorm at CRDF).

Yet, Provision 70, by its very terms, requires that restraints "will not be used as an alternative to mental health treatment and will be used only when necessary to insure safety."  Provision 70(a).  Thus, the relevant questions have been, and continue to be, for the hundreds of HOH patients who remain in restraints during their out-of-cell time, whether the County is indeed not using restraints as an alternative to mental health treatment, or if they are truly being used "only when necessary to insure safety."

Given the range of symptoms and behaviors across the HOH patient caseload, this is necessarily an individualized determination.  To support the County's own assertions that it is in Substantial Compliance with Provision 70, it provides various descriptions of the processes it uses to evaluate HOH patients for potential transfer to unrestrained HOH units.  For example, at CRDF

> LASD and CHS gather each morning at 9:30 with tank sheets and discuss the suitability of moving HOH patients from traditional HOH into unrestrained pods. These discussions are informed by the observations of custody staff who interact personally and in close physical proximity to the patients all day, including asking them to come out for structured and unstructured programming and documenting their responses. Nearly 100% of HOH patients in LASD custody are offered 10 hours of unstructured time per week, and these offers are personal and proximate interactions. In addition to the daily observations of custody staff, the LASD and CHS meetings are informed by the judgment of CHS clinicians who interact individually with patients on a weekly basis as part of their treatment. The CHS clinicians also engage with the patients, or observe their refusals, with respect to their participation in therapeutic groups. All these observations are considered in the daily meetings in which every patient is evaluated for potential movement into unrestrained programming if such a transition can be safely made.

> A similar process is in use at TTCF

> To achieve constant movement into unrestrained pods from housing units where restraints are common due to safety concerns, the George deputies work with assigned deputies, module booth officers, and SMY staff at the beginning of each shift to identify individuals who are safe to program unrestrained and make assessments to verify that those who are in restrained pods are only there because it is reasonable and necessary to depart from the formal objective of unrestrained out of cell time (see Unit Order p.4). These assessments take into account the iMatch system and are also based on the routine and extensive intimate interactions between custody staff and inmates as they offer out of cell time, provide meals and other activities of daily living, and document inmate responses and comportment. The George deputies also document and review when and why some patients are unable to cohabitate so that no patient remains in a single-man cell by default.

116

In addition to the daily review by custody staff, CHS clinicians visit with patients once per week. In each of these visits, the QMHP observes and assesses all treatment factors, including whether a patient's referral to a FIP Stepdown pod is appropriate. Both the CHS and LASD reviews are part of the evaluation process, which means that each patient is routinely assessed and considered for an appropriate level of restraint at least eight times per week.

These descriptions, which have been stated in various forms in several recent County self-assessments, are illuminating as to the processes by which patients are evaluated for the unrestrained HOH pods. But Provision 70 does not merely require the County to develop *processes* for identifying such patients. It requires the County to actually demonstrate, and the Monitor and Court-appointed Subject Matter Experts to confirm, that restraints are not being used as an alternative to mental health treatment, and "only when necessary to insure safety." That is, these processes should result in documentation within the County records as to the reasons why restraints are necessary for these patients "to ensure safety."

In several recent Monitoring Reports and other correspondence with County personnel, the Monitor has invited the County to provide documents to demonstrate its compliance. This includes suggestions that the County provide:

- Records memorializing that these evaluations are being conducted under set timeframes in a timely fashion. *See* Sixteenth Monitoring Report at pp. 120.

- Summary documents recording a brief note of the individualized reasons why HOH patients are remaining in restrained HOH housing. *See* Eighteenth Monitoring Report at pp. 119, Fn. 42.

- Records analogous to the "Unable to-Co-Habitate" lists already maintained by TTCF (for inmates who have been assessed as unsuitable for placement into double-man cells) with a brief note documenting the reasons that HOH patients cannot be moved into HOH pods in which they can program without restraints. *See* email from N. Mitchell dated Dec. 11, 2024 (on file with author).

The County has, thus far, declined to accept these invitations. Instead, it believes that it is in Substantial Compliance on the basis of the processes it has developed, coupled with the expansion in the number of unrestrained HOH pods pursuant to the Court orders. For the avoidance of doubt, to confirm the County's compliance with Provision 70, the Monitor and Subject Matter Experts will require documentary proof of

the individualized assessments that reflect the reason(s) why HOH patients are not permitted to program without restraints during out-of-cell time.[55]

The Monitoring Team reiterates that these need not be lengthy discussions, nor must the process for creating them be unduly burdensome.  The County has asserted that these assessments are happening on a daily basis.  It would be enough for a scribe to be present once or twice a week to document, in summary form, the individualized reasons why these patients cannot be moved into housing assignments that permit them to program without restraints.[56]  Articulated criteria for when restrained HOH pods are necessary would also be of use, and because behavior can improve once patients are receiving mental health treatment in the County's care, a written standard for how often these assessments are to be conducted and revisited should also be developed.

The County has made significant and praiseworthy progress in complying with Provision 70.  Given its descriptions of the assessment processes already in place, Substantial Compliance should be within reach.  The Monitor invites the County to seize this opportunity to attain Substantial Compliance by providing the documentary proof of compliance required by Provision 70.[57]

---

[55] While the County's obligations in this case are embodied in the Agreement, it can be instructive to examine prevailing standards of care, which reflect the importance of documenting the need for use of restraints on inmate patients with mental illness.  *See, e.g.*, Gerard G. Gagne, *Use of Restraint and Emergency Medication*, Oxford Textbook of Correctional Psychiatry, 2015, at pp. 137 (The decision to initiate restraints "requires the careful consideration of factors that reflect the unique characteristics of each patient.  Carefully formulating a treatment plan and consistently following that plan likely will lead to reduced reliance on seclusion or restraint or may eliminate its use altogether."  "Clear documentation of each seclusion or restraint episode provides an opportunity for rigorous review, ensuring policy compliance and providing meaningful feedback for potential policy modification").  *See also Psychiatric Services in Correctional Facilities*, American Psychiatric Association, Third Edition, 2016 ("Restraints should be used as a last resort in managing acutely agitated or suicidal inmates."  "Provisions should be made for regular <u>documented</u> review by a QMHP" (emphasis added)).

[56] For examples in an analogous context, *see* TTCF Unable to Cohabitate list dated Dec. 05, 2024 (providing short, individualized reasons why patients cannot be moved into double-man cells, e.g., "Previous Double Man Breakup, Threatened to Fight Previous Cellmate," or "Vet. Extremely Hostile.  Kicks Door/Threatened to Fight During Groups.  Not Eligible for Open Dorm") (on file with author).

[57] In response to a draft of this Report, the County raised various concerns about this discussion including that requiring such documentation could, in fact, be "burdensome," would "drive resources away from other critical needs," and questions about how success would be measured.  The Monitor is open to hearing the County's views and suggests, as has been done successfully with other provisions, that the Parties work together with the Monitor to problem-solve the County's concerns.

71.    The County and the Sheriff will ensure that any prisoner subjected to clinical restraints in response to a mental health crisis receives therapeutic services to remediate any effects from the episode(s) of restraint.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017 (verified))**

Substantial Compliance requires the Department to review the electronic medical records of all prisoners placed in clinical restraints to verify that the prisoners received therapeutic services as required by Paragraph 71.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 71 in the Nineteenth Reporting Period.

72.     The County and the Sheriff will develop and implement policies and procedures that ensure that incidents involving suicide and serious self-injurious behavior are reported and reviewed to determine:  (a) whether staff engaged in any violations of policies, rules, or laws; and (b) whether any improvements to policy, training, operations, treatment programs, or facilities are warranted.  These policies and procedures will define terms clearly and consistently to ensure that incidents are reported and tracked accurately by DMH and the Sheriff's Department.

**STATUS:        SUBSTANTIAL COMPLIANCE (as of January 1, 2017, through December 31, 2017)**

Substantial Compliance requires the Self-Assessments to report on (a) suicide review meetings and (b) CIRC meetings that review incidents of serious self-injurious behavior in the reporting period.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 72 in the Nineteenth Reporting Period.

73.     Depending on the level of severity of an incident involving a prisoner who threatens or exhibits self-injurious behavior, a custody staff member will prepare a detailed report (Behavioral Observation and Mental Health Referral Form, Inmate Injury Report, and/or Incident Report) that includes information from individuals who were involved in or witnessed the incident as soon as practicable, but no later than the end of shift.  The report will include a description of the events surrounding the incident and the steps taken in response to the incident.  The report will also include the date and time that the report was completed and the names of any witnesses.  The Sheriff's Department will immediately notify the County Office of Inspector General of all apparent or suspected suicides occurring at the Jails.

**STATUS:       SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified))**

Substantial Compliance requires the Department to review quarterly a random sample of reports of any threats or exhibitions of self-injurious behavior to verify that the reports have the information required by Paragraph 73; and to provide the Monitor with the notifications to the Inspector General of all incidents involving an apparent or suspected suicide during the reporting period.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 73 in the Nineteenth Reporting Period.

74.     The Sheriff's Department will ensure that there is a timely, thorough, and
objective law enforcement investigation of any suicide that occurs in the Jails.
Investigations shall include recorded interviews of persons involved in, or who
witnessed, the incident, including other prisoners.  Sheriff's Department personnel who
are investigating a prisoner suicide or suspected suicide at the Jails will ensure the
preservation of all evidence, including physical evidence, relevant witness statements,
reports, videos, and photographs.

**STATUS:        SUBSTANTIAL COMPLIANCE (as of September 1, 2016,
                  through December 31, 2017)**

Substantial Compliance requires the Department to provide the Monitor with an
Executive Suicide Death Review reflecting the results of the Department's investigation
of any suicide in the Jails within six months of the suicide.  The review must reflect steps
taken to preserve all of the evidence; and list the interviews of persons involved in, or
who witnessed, the incident, and whether the interviews were recorded.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not
subject to monitoring for Substantial Compliance with Paragraph 74 in the Nineteenth
Reporting Period.

75.     Within three months of the Effective Date, the County and the Sheriff will review every suicide attempt that occurs in the Jails as follows:

(a)     Within two working days, DMH staff will review the incident, the prisoner's mental health status known at the time of the incident, the need for immediate corrective action if any, and determine the level of suicide attempt pursuant to the Centers for Disease Control and Prevention's Risk Rating Scale;

(b)     Within 30 working days, and only for those incidents determined to be a serious suicide attempt by DMH staff after the review described in subsection (a) above, management and command-level personnel from DMH and the Sheriff's Department (including Custody Division and Medical Services Bureau) will meet to review relevant information known at that time, including the events preceding and following the incident, the prisoner's incarceration, mental health, and health history, the status of any corrective actions taken, and the need for additional corrective action if necessary;

(c)     The County and the Sheriff will document the findings that result from the review of serious suicide attempts described in subsection (b) above; and

(d)     The County and the Sheriff will ensure that information for all suicide attempts is input into a database for tracking and statistical analysis.

**STATUS (75):        SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified))**

Substantial Compliance requires (a) DMH to review documentation of randomly selected suicide attempts during the previous quarter to verify that the prisoner's mental health status and need for immediate corrective action were considered timely by the DMH staff and that the staff determined whether the suicide attempt was serious; (b) that the Department and DMH reviewed the relevant information known at that time and the status of any corrective actions taken, and they considered the need for additional corrective action if necessary; and (c) that the information is reflected in the Department's database for tracking and statistical analysis.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 75 in the Nineteenth Reporting Period.

76.    The County and the Sheriff will review every apparent or suspected suicide that occurs in the Jails as follows:

(a)    Within no more than two working days, management and command-level personnel from DMH and the Sheriff's Department (including Custody Division and Medical Services Bureau) will meet to review and discuss the suicide, the prisoner's mental health status known at the time of the suicide, and the need for immediate corrective or preventive action if any;

(b)    Within seven working days, and again within 30 working days, management and command-level personnel from DMH and the Sheriff's Department (including Custody Division and Medical Services Bureau) will meet to review relevant information known at that time, including the events preceding and following the suicide, the prisoner's incarceration, mental health, and health history, the status of any corrective or preventive actions taken, and the need for additional corrective or preventive action if necessary; and

(c)    Within six months of the suicide, the County and the Sheriff will prepare a final written report regarding the suicide.  The report will include:

(i)    time and dated incident reports and any supplemental reports with the same Uniform Reference Number (URN) from custody staff who were directly involved in and/or witnessed the incident;

(ii)    a timeline regarding the discovery of the prisoner and any responsive actions or medical interventions;

(iii)    copies of a representative sample of material video recordings or photographs, to the extent that inclusion of such items does not interfere with any criminal investigation;

(iv)    a reference to, or reports if available, from the Sheriff's Department Homicide Bureau;

(v)    reference to the Internal Affairs Bureau or other personnel investigations, if any, and findings, if any;

(vi)    a Coroner's report, if it is available at the time of the final report, and if it is not available, a summary of efforts made to obtain the report;

(vii)    a summary of relevant information discussed at the prior review meetings, or otherwise known at the time of the final report, including analysis of housing or classification issues if relevant;

(viii)    a clinical mortality review;

(ix)    a Psychological Autopsy utilizing the National Commission on Correctional Health Care's standards; and

(x)    a summary of corrective actions taken and recommendations regarding additional corrective actions if any are needed.

**STATUS (76):**          **SUBSTANTIAL COMPLIANCE (as of September 1, 2016, through December 31, 2017)**

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 76 in the Nineteenth Reporting Period. Nonetheless, the County continued to conduct the reviews required by Paragraph 76 for the suicides that occurred during this period and invited the Monitor to attend these meetings.

77.    The County and the Sheriff will create a specialized unit to oversee, monitor, and audit the County's jail suicide prevention program in coordination with the Department of Mental Health.  The Unit will be headed by a Captain, or another Sheriff's Department official of appropriate rank, who reports to the Assistant Sheriff for Custody Operations through the chain of command.  The Unit will be responsible for:

(a)    Ensuring the timely and thorough administrative review of suicides and serious suicide attempts in the Jails as described in this Agreement;

(b)    Identifying patterns and trends of suicides and serious suicide attempts in the Jails, keeping centralized records and inputting data into a unit database for statistical analysis, trends, and corrective action, if necessary;

(c)    Ensuring that corrective actions are taken to mitigate suicide risks at both the location of occurrence and throughout the concerned system by providing, or obtaining where appropriate, technical assistance to other administrative units within the Custody Division when such assistance is needed to address suicide-risk issues;

(d)    Analyzing staffing, personnel/disciplinary, prisoner classification, and mental health service delivery issues as they relate to suicides and serious suicide attempts to identify the need for corrective action where appropriate; and recommend remedial measures, including policy revisions, re-training, or staff discipline, to address the deficiencies and ensure implementation; and

(e)    Participating in meetings with DMH to develop, implement, and track corrective action plans addressing recommendations of the quality improvement program.

**STATUS (77):**          **SUBSTANTIAL COMPLIANCE (as of April 1, 2022, through March 31, 2023)**

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 77 in the Nineteenth Reporting Period.[58]

---

[58] The County has acknowledged that its ongoing Quality Improvement efforts will remain subject to monitoring under other provisions of the Settlement Agreement.

78.    The County and the Sheriff will maintain a county-level Suicide Prevention Advisory Committee that will be open to representatives from the Sheriff's Department Custody Division, Court Services, Custody Support Services, and Medical Services Bureau; the Department of Mental Health; the Public Defender's Office; County Counsel's Office; the Office of the Inspector General; and the Department of Mental Health Patients' Rights Office.  The Suicide Prevention Advisory Committee will meet twice per year and will serve as an advisory body to address system issues and recommend coordinated approaches to suicide prevention in the Jails.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of May 11, 2016, through May 18, 2017)**

Substantial Compliance requires (1) the Committee to meet twice per year and (2) "recommend coordinated approaches to suicide prevention in the Jails."

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 78 in the Nineteenth Reporting Period.  Nevertheless, the County has continued to hold Bi-Annual Suicide Prevention meetings through the last reporting period, which the Monitor endeavors to attend.

79 (**Revised**).  (a)  Unless clinically contraindicated, the County and the Sheriff will offer prisoners in mental health housing:

    (i)  therapeutically appropriate individual visits with a QMHP; and

    (ii)  therapeutically appropriate group programming conducted by a QMHP or other appropriate provider that does not exceed 90 minutes per session.

    (b)  The date, location, topic, attendees, and provider of programming or therapy sessions will be documented.  A clinical supervisor will review documentation of group sessions on a monthly basis.

**STATUS:    PARTIAL COMPLIANCE**

On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provision 79 ("Revised Paragraph 79") as set forth above.  They also agreed on Revised Compliance Measures.  Under the Revised Compliance Measures, Substantial Compliance requires the Department to maintain records of therapeutically appropriate individual visits and group programming, and the names of the clinical supervisors who reviewed such records and the conclusions of their reviews.  It also requires that 95% of the prisoners in HOH are offered therapeutically appropriate structured mental health treatment, including at least a weekly QMHP visit and group programming, and that 90% of prisoners in MOH are provided visits by a QMHP at least once a month as well as therapeutically appropriate structured mental health treatment.[59]  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required Defendants to achieve Substantial Compliance with Provision 79 by June 30, 2024.  Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed to extend the compliance deadline for Provision 79 to June 30, 2025, which does not fall within the period covered by this Report.

The County's Augmented Nineteenth Self-Assessment reports that in the Second Quarter of 2024, the "supervisor responsible for reviewing relevant documentation on a monthly basis did so at TTCF and CRDF, resulting in 100% compliance at both facilities."  "For Measure 79-4(b), which requires that 95% of HOH patients are offered an individual visit by a QMHP and weekly group programming, the County reported 35% compliance.  For Measure 79-4(c), which requires that 90% of patients in MOH are offered individual monthly visits by a QMHP and therapeutically appropriate structured treatment, the County reported 60% compliance."

_____

[59] A difference of opinion has arisen regarding whether or not structured group programming is required for MOH patients under Provision 79 and its associated Compliance Measures.  This issue should be discussed and negotiated among the Parties and the Monitor before the date of the County's next Self-Assessment.

The County's Augmented Nineteenth Self-Assessment reports that in the Third Quarter of 2024, for Compliance Measure 79-1(d), the County continued its 100% compliance at both TTCF and CRDF.   For Measure 79-4(b), which requires that 95% of HOH patients be offered an individual visit by a QMHP and weekly group programming, the County reported 71% compliance.  For Measure 79-4(c), which requires that 90% of patients in MOH are offered individual monthly visits by a QMHP and therapeutically appropriate structured treatment, the County reported 63% compliance.  Regarding these improved results, the County reports on various efforts underway to increase compliance.

CHS also changed the organization of mental health care for male MOH patients. Beginning in November 2024, Monica Lujan became the Mental Health Programmer for JMET and now supervises clinicians at both MCJ and PDC North. This is a new position which will increase clinical oversight of JMET and PDC North. One of her focus areas is appropriate therapeutic mental health care and timely clinical visits to meet the requirements of Provision 79. Having worked in JMET since 2021, Ms. Lujan has developed critical relationships with custody leadership and understands the unique challenges to providing care at MCJ. Moving the clinical team for MOH patients at MCJ onsite and under her supervisory team will improve access to care. As part of this effort, CHS and LASD are currently exploring options for improved space for clinical assessments on the 5000 floor of MCJ.

In the Third Quarter of 2024, the County clarified and updated its auditing of this provision with the Monitor, including clarifying documentation standards. This clarity will be extremely helpful to focus the County's efforts to close the remaining compliance gaps for Provision 79, including by creating more alignment between the auditing team's retrospective review for Provision 79 compliance, clinical supervisor's spot check and real-time guidance to staff, and the Monitoring Team's review.

Supervisors now use spot checks to determine and provide near real-time feedback to clinicians on whether individuals were seen timely by clinicians and whether the documentation reflects a therapeutically appropriate structured mental health treatment plan that includes target symptoms, short-term goals, and clinical interventions that are therapeutically appropriate. CHS mental health program leaders are also now meeting regularly to discuss Provision 79 and troubleshoot compliance on each component of Provision 79.

These spot checks may be very useful.  The Monitoring Team requests additional specificity about the frequency of these spot checks and the percentage of each clinician's caseload that is to be spot checked by supervisors.  As explained in the Eighteenth Monitoring Report, in the Eighteenth Reporting Period, the Monitoring Team identified deficits in the frequency with which therapeutically appropriate treatment was identified

in a treatment plan, and recommends that the spot checks should focus on determining whether or not this has improved.[60]

The County also reports that it provided trainings to staff in the Third Quarter of 2024 on Dialectical Behavioral Therapy for Clinicians, Psychiatrists, and Deputies.

---

[60] *See* Eighteenth Monitoring Report at pp. 132-135.

80.    (a)    The County and the Sheriff will continue to make best efforts to provide appropriate out-of-cell time to all prisoners with serious mental illness, absent exceptional circumstances, and unless individually clinically contraindicated and documented in the prisoner's electronic medical record.  To implement this requirement, the County and the Sheriff will follow the schedule below:

(i)    By no later than six months after the Effective Date, will offer 25% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week;

(ii)    By no later than 12 months after the Effective Date, will offer 50% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week; and

(iii)    By no later than 18 months after the Effective Date, will offer 100% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week.

(b)    No later than six months after the Effective Date, the County and the Sheriff will record at the end of each day which prisoners in HOH, if any, refused to leave their cells that day.  That data will be presented and discussed with DMH staff at the daily meeting on the following Normal business workday.  The data will also be provided to the specialized unit described in Paragraph 77 and to DMH's quality improvement program to analyze the data for any trends and to implement any corrective action(s) deemed necessary to maximize out-of-cell time opportunities and avoid unnecessary isolation.

STATUS (80):          NON-COMPLIANCE

Paragraph 80 requires that, "no later than 18 months after the Effective Date [July 1, 2015]," 100% of the prisoners in HOH receive "ten hours of unstructured out-of-cell recreational time *and* ten hours of structured therapeutic or programmatic time per week" (emphasis added). The parties have agreed that up to five hours of the structured time can consist of education or work programs, but at least five hours of the time must be therapeutic. In July 2024, the Parties amended the Compliance Measures to permit the County to exclude from the sampled records inmates who were not assigned to HOH for every day of the sampled week. However, the County "shall not cease providing offers to participate in meaningful opportunities for out-of-cell time to individuals based on their length of stay in HOH."

On December 27, 2022, and on April 20, 2023, the Court issued Orders Setting Deadlines for Substantial Compliance, ECF No. 234 and 248, respectively, which established specific deadlines for Defendants to "improve compliance with provisions 63, 64, and 80." With respect to Provision 80, the December 2022 Order established deadlines for Defendants to take a series of "agreed-upon actions to improve compliance," while the April 2023 Order established incremental targets for the Defendants' overall compliance with the provision by the end of then-upcoming quarters. Pursuant to the Joint Stipulation to Extend Deadlines, the Parties agreed to extend the County's compliance targets as set forth below.

*Figure 7:  Quarterly Court-Ordered Targets for Provision 80 Compliance for the General HOH Population*

| Targets by Quarter | % of HOH Inmates Receiving 10 Hours Unstructured Out-of-Cell Time | % of HOH Inmates Receiving Structured Out-of-Cell Time | Minimum Hours of Structured Out-of-Cell Time | # of Group Hours (of total Structured Out-of-Cell Time) |
|---|---|---|---|---|
| 1Q2025 | 100% | 85% | 9 | 4.5 (of 9) |
| 2Q2025 | 100% | 95% | 10 | 5 (of 10) |

Pursuant to the Joint Stipulation to Extend Deadlines, the Parties also agreed that out-of-cell time for the population of "high-risk individuals" (known by the County as the "Keep Away Population in Restrictive Housing," or those with security classifications of K10, K17, K18, K19, or K20) is to be measured separately in the following manner.

*Figure 8: Quarterly Court-Ordered Targets for Provision 80
Compliance in the "Keep Away" Population*

| Targets by Quarter | % of HOH Inmates Receiving 10 Hours <u>Unstructured</u> Out-of-Cell Time | % of HOH Inmates Receiving <u>Structured</u> Out-of-Cell Time | Minimum Hours of <u>Structured</u> Out-of-Cell Time | # of Group Hours (of total <u>Structured</u> Out-of-Cell Time) |
|---|---|---|---|---|
| 1Q2025 | 85% | 65% | 8 | 4 (of 8) |
| 2Q2025 | 90% | 75% | 9 | 4.5 (of 9) |
| 3Q2025 | 95% | 85% | 10 | 5 (of 10) |
| 4Q2025 | 100% | 95% | 10 | 5 (of 10) |

<u>Unstructured Out-of-Cell Time</u>

The County's Supplemental Self-Assessment reports that in the Second Quarter of 2024, 100% of the HOH inmates at CRDF and 95% at TTCF were offered "ten or more hours of unstructured out-of-cell time by Custody staff." It also reports that in the Third Quarter of 2024, 99% of HOH inmates were offered the requisite number of unstructured out-of-cell hours at CRDF, and 90% at TTCF. This is a commendable achievement in the County's efforts to comply with the Agreement.

<u>Structured Out-of-Cell Time</u>

The County also reports data for structured therapeutic or programmatic time. According to the County's Supplemental Self-Assessment, 0% of CRDF and 5% of TTCF HOH inmates were offered 10 hours of structured out-of-cell time during the Second Quarter of 2024. For the Third Quarter of 2024, the County's Supplemental Self-Assessment reports that 32% of TTCF inmates residing in HOH were offered ten or more hours of structured out-of-cell time. At CRDF, the County reported 6% compliance.

This reflects some improvement by the County, but a long way to go before the Substantial Compliance thresholds are met for structured out-of-cell time. The County has indicated that it is "optimistic that staffing levels are no longer the critical issue" to achieving Substantial Compliance with Provision 80. "Instead of the aggressive push to increase staffing by all available pathways, CHS will continue to focus on County hires and retaining critical mental health staff while optimizing schedules, the existing contracts for contracted group providers, and the deployment of staff to maximize their impact and efficiency."

The Monitor notes that CRDF appears to be more richly staffed, per capita, to provide structured programming than TTCF, yet CRDF has continued to lag behind TTCF. According to the County's Supplemental Self-Assessment, at CRDF, "[s]even County staff; two clinicians and one manager from Sistahfriends (with two additional

clinicians onboarding and a current clinician who will be promoted to supervisor)" are responsible for providing this programming, or eleven current total clinicians for a reported population of 147 total patients. This equates to approximately 13 patients per clinician. At TTCF, the total number of reported eligible HOH inmates was 734, with "14 County staff (with an additional two onboarding); 20 clinicians, two supervisors and one manager from McKinley (with five more clinicians onboarding); and seven graduate students" to provide that programming. Factoring in the onboarding clinicians, that translates into 41 clinicians (plus interns) to provide the requisite structured out-of-cell time for 734 patients, or approximately 18 patients per clinician. The Monitoring Team recommends that the County investigate why CRDF has lagged behind in providing structured programming, notwithstanding its comparatively richer staffing allocation for such programming than TTCF.[61]

The County reports that

A major part of the effort to maximize delivery of both unstructured and structured out-of-cell time is the expansion of unrestrained therapeutic housing units (FIP Stepdown and HOH Dorms), where patients are out of their cells most of the day and in which it is much easier to deliver larger, more frequent, and more varied group programming. . . .For Provision 80 compliance, these units are helpful because often group providers can hold much bigger groups and can make offers for out-of-cell time much more efficiently to an entire pod of patients. There is rarely a need to go cell-to-cell to make offers because group programming is provided on a daily schedule that helps inmates structure their day and is part of the therapeutic model of the program. Groups can be generally announced, and individuals are incentivized to participate, and participation is not constrained by the number of seats that have safety restraints or safety separation from other patients. It is also easier to deliver a wider variety of programming in these pods, and indeed the peer Mental Health Assistants who live and work in some of these pods have developed their own meaningful curriculum for patients.

The Monitoring Team agrees wholeheartedly and has seen the benefits of the unrestrained HOH units for the County's compliance with Provision 80 during site visits to the jails. To maximize those benefits, the Monitoring Team encourages the County to continue expanding the number of such units as is safe and appropriate.

The County also reports on its efforts to improve efficiency as to the delivery of structured group programming, including by replenishing missing tables and restraints in restrained HOH pods, improving collaboration between LASD and CHS in making offers of group time, and ensuring that there are sufficient custody staff in each pod to provide security during group time. The County also reports on its efforts to tackle data problems that have been a hindrance to the effective tracking of offers of out-of-cell time. This

---

[61] The Monitor's auditors have submitted an inquiry to the County for more specificity about its methodologies for identifying the total eligible patient population at each facility.

includes adjusting the e-UDAL and ORCHID systems and briefing staff on those adjustments. The County continues to troubleshoot problems integrating the data from those systems but reports

> To close the remaining compliance gaps for Provision 80, the County plans to build on its extensive efforts to date to aggregate e-UDAL and ORCHID data in a way that permits staff in the modules or supervising clinical providers to understand relatively contemporaneously what structured time an individual has been offered and whether it exceeds 10 hours for the week. The County and LASD also plan to build on efforts to optimize the reach of group provider resources, to refine logistical and communication issues to better and more efficiently deliver out-of-cell time, and to add additional compelling group programming. In addition, since the 19th Reporting Period, the County's QI program has undertaken JQIC project No. 4 to improve delivery of out-of-cell time to HOH patients at TTCF and JQIC project No. 6 to improve scheduling, content quality, and coordination for CRDF's HOH groups. The project teams met regularly to discuss issues and interventions and identified housing areas that needed additional support, as well as reasons why patients were not offered scheduled groups.

81.    Except as specifically set forth in Paragraphs 18-20 of this Agreement, and except as specifically identified below, the County and the Sheriff will implement the following paragraphs of the Implementation Plan in *Rosas* at all Jails facilities, including the Pitchess Detention Center and the Century Regional Detention Facility, by no later than the dates set forth in the Implementation Plan or as revised by the *Rosas* Monitoring Panel:  Paragraphs 2.2-2.13 (use of force policies and practices); 3.1-3.6 (training and professional development); 4.1-4.10 (use of force on mentally ill prisoners); 5.1-5.3 (data tracking and reporting of force); 6.1-6.20 (prisoner grievances and complaints); 7.1-7.3 (prisoner supervision); 8.1-8.3 (anti-retaliation provisions); 9.1-9.3 (security practices); 10.1-10.2 (management presence in housing units); 11.1 (management review of force); 12.1-12.5 (force investigations, with the training requirement of paragraph 12.1 to be completed by December 31, 2016); 13.1-13.2 (use of force reviews and staff discipline); 14.1-14.2 (criminal referrals and external review); 15.1-15.7 (documentation and recording of force); 16.1-16.3 (health care assessments); 17.1-17.10 (use of restraints); 18.1-18.2 (adequate staffing); 19.1-19.3 (early warning system); 20.1-20.3 (planned uses of force); and 21.1 (organizational culture).

**STATUS:    PARTIAL COMPLIANCE**

Because Paragraph 81 of the Settlement Agreement incorporates 100 provisions in the Implementation Plan adopted in the *Rosas* case, the parties agreed in the Compliance Measures adopted in this case that "Substantial Compliance with respect to the substance of the policies required by the *Rosas* Implementation Plan will be determined by the *Rosas* Monitors."  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required Defendants to achieve Substantial Compliance with Provision 81 by June 30, 2024.  Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed to extend the compliance deadline for Provision 81 to June 30, 2025.

The Compliance Measures in this case provide that "[o]nce the policies have been approved by the *Rosas* Monitors, the Monitor and Subject Matter Experts will confirm and assess the implementation of these policies in the [DOJ facilities]."  In assessing the Department's compliance with Paragraph 81, the Monitor has grouped the 100 provisions into seven categories and, with input from the Subject Matter Experts, has assessed the Department's compliance on a category-by-category basis.  With the exception of the Training category, which is assessed when certain percentages are reached, the Department will no longer be subject to monitoring for the provisions in a particular category once the Monitor has determined that it has achieved and maintained for twelve consecutive months Substantial Compliance with the intent and purpose of the overall category.  The Department will no longer be subject to monitoring for compliance with Paragraph 81 once it has achieved and maintained for twelve consecutive months Substantial Compliance with each of the categories.

**Training (Substantial Compliance)**

Paragraphs 3.1-3.6, 4.6-4.9, and 12.1 of the *Rosas* Implementation Plan reflect

training requirements on use of force, ethics, dealing with inmates with mental illness, and investigations of force incidents.  The curriculum and lesson plans to implement these training requirements have been approved by the *Rosas* Monitors.

In the Eighteenth Reporting Period, the County was in Substantial Compliance with the refresher training requirements of 3.1, 3.2, 4.6, 4.7, and 12.1-1 as of December 2023.  The County also maintained Substantial Compliance with the following Training provisions: 3.3, 3.5,[62] 3.6, 4.8, 4.9, and 12.1-2.  The reported Substantial Compliance results in the Eighteenth Reporting Period have been verified by the Monitor's auditors.

The County's Supplemental Self-Assessment reports that it maintained Substantial Compliance with the following Training provisions during the Nineteenth Reporting Period: 3.3, 3.5, 3.6,[63] 4.8, 4.9, and 12.1-2.[64]  The reported results have been verified by the Monitor's auditors.  The table below summarizes the County's reported compliance from the Eighteenth and Nineteenth Reporting Periods.

*Figure 9:  Summary of Rosas Training Provision Results*

| Training Provision | 18th Report | | 19th Report | |
|---|---|---|---|---|
| | Reported Results | Monitor's Auditors | Reported Results | Monitor's Auditors |
| 3.1 - UoF Refresher | SC | ✓ | N/A | N/A |
| 3.2 - Ethics Refresher | SC | ✓ | N/A | N/A |
| 3.3 - UoF & Ethics New Hires | SC | ✓ | SC | ✓ |
| 3.5 - Addt'l UoF | No Records | | No Records | |
| 3.6 - Probationary Review | SC | ✓ | SC | ✓ |
| 4.6 - DeVRT Refresher | SC | ✓ | N/A | N/A |
| 4.7 - DeVRT Refresher | SC | ✓ | N/A | N/A |
| 4.8 & 4.9 - DeVRT New Hires | SC | ✓ | SC | ✓ |
| 12.1-1 - Sgt. Refresher | SC | ✓ | N/A | N/A |
| 12.1-2 - New Sgts. | SC | ✓ | SC | ✓ |

**Use of Force (Partial Compliance)**

The Monitor reviewed 25 completed force packages for the DOJ facilities during the Nineteenth Reporting Period, some of which were also evaluated by Court-Appointed Use of Force Expert Susan McCampbell.  Force packages were not selected randomly or in proportion to the frequency with which various categories of force occur.  Rather, they were selected based on the severity of the force used and other criteria.  On January 15,

---

[62] The posted results for 3.5 indicate that "[t]here were no inmate grievances against staff investigations involving force with a finding of 'Appears the Employee Conduct Could Have Been Better.'"

[63] The County reported Substantial Compliance with 3.6 for the First Semester of 2024.

[64] The County's Supplemental Self-Assessment reports that it will submit its 2024 annual assessment for the refresher training requirements under 3.1, 3.2, 4.6, 4.7, and 121-1 in the Twentieth Reporting Period.

2025, the Monitor provided the County with a use of force matrix reflecting the ratings
for the 25 force packages reviewed.  On February 12, 2025, the Monitor and Use of Force
Subject Matter Expert met with Department executives to discuss the ratings assigned,
watch video of force incidents, review deputy reports and command memos, and discuss
the Monitoring Team's concerns about particular use of force packages—and the force
review process—with Department executives, and to listen to their feedback and respond
to their questions.

Of the 25 cases reviewed, four included some violation of the force prevention
principles of Section 2.2 of the Action Plan, which requires that force be used "as a last
resort," only the "minimal amount. . .necessary and objectively reasonable," "terminated
as soon as possible," and "de-escalated if resistance decreases."  This is an improvement
from the Eighteenth Reporting Period.

Also related to force prevention, four of 25 cases reviewed involved violations of
Section 17.5 of the Action Plan, requiring avoiding placing weight on an inmate's back in
a way that impairs their breathing, or failing to place them in the recovery position once
they are controlled.  While impermissible head strikes continue to be found in a relatively
higher percentage of cases reviewed by the *Rosas* Panel in the Downtown Basin
Facilities,[65] a smaller number, or two of 25 cases reviewed from the DOJ Facilities,
involved violations of Section 2.6 of the Action Plan, which includes prohibitions on the
use of impermissible head strikes.

*Figure 10:  Compliance Percentages on Use of Force Provisions*

| Provision | Description | Applicable Cases | Compliant Cases | Compliance Percentage |
|---|---|---|---|---|
| 2.2 | Force Prevention Principles | 25 | 21 | 84% |
| 2.3 | Inmate on Inmate Violence | 25 | 24 | 96% |
| 2.4 | Use of Force as Discipline | 25 | 25 | 100% |
| 2.5 | Force on Restrained Inmates | 17 | 16 | 94% |
| 2.6 | Head Strikes or Kicks | 25 | 23 | 92% |
| 2.7 | Supervisors Called to Scene | 25 | 24 | 96% |
| 2.8 | Prevent Excessive Force | 0 | 0 | NA |
| 2.9 | Armed Inmates | 0 | 0 | NA |
| 2.10 | Authorized Weapons | 8 | 8 | 100% |
| 2.11 | Planned Chemical Spray | 2 | 1 | 50% |
| 2.12 | Chemical Spray & Tasers | 8 | 8 | 100% |
| 2.13 | Check of Medical Records | 7 | 5 | 71% |
| 4.1 | Consult Mental Health Professionals | 4 | 2 | 50% |
| 4.3 | Spray on Mental Health Inmates | 2 | 1 | 50% |
| 4.4 | Cooling Off Periods | 1 | 1 | 100% |

[65] *See, e.g.*, *Rosas, et al., v. Leroy Baca*, No. CV 12-00428 DDP, Panel's Fourteenth Monitoring Report at
pp. 17, filed November 22, 2024.

| 4.5 | Medical or Mental Health Provider Order | 1 | 1 | 100% |
|---|---|---|---|---|
| 9.2 | Escorting of Inmates | 25 | 19 | 76% |
| 9.3 | Duty to Protect & Intervene in Inmate on Inmate Violence | 8 | 8 | 100% |
| 17.5 | No Impairment of Breathing and Use of Recovery Position | 25 | 21 | 84% |
| 20.3 | Planned Use of Force Procedures | 4 | 2 | 50% |

Regarding the total number of head strikes in the DOJ facilities during the Nineteenth Reporting Period, there was one head strike in the Second Quarter of 2024 and two in the Third Quarter of 2024. This was slightly less than the average of 3.3 uses of force involving head strikes by staff in the DOJ facilities between the First Quarter of 2021 and the Third Quarter of 2024. However, Figure 12 disaggregates these head strike data by facility, and all head strikes in the Second and Third Quarters of 2024 occurred at CRDF. There were no reported head strikes at NCCF, PDC North, or PDC South.

*Figure 11: Uses of Force with Head Strikes by Quarter*



*Figure 12: Uses of Force with Head Strikes by Facility, Q2-2024 and Q3-2024*

141



These incidents will be reviewed by the Monitor once all Departmental reviews and/or investigations have been completed. But the relatively greater frequency of head strikes at CRDF compared to the other DOJ facilities over the last two Reporting Periods merits scrutiny by Department leadership. In the Eighteenth Reporting Period, there were also three head strikes at CRDF, which was, again, greater than at any of the other DOJ facilities.[66]

Total uses of force rose at the DOJ facilities slightly in the Second Quarter of 2024 and again in the Third Quarter of 2024.

*Figure 13: Total Use of Force by Quarter*



---

[66] *See* Eighteenth Monitoring Report at pp. 145. In contrast, in the Seventeenth Reporting Period, there were no reported head strikes at CRDF, and in the Sixteenth Reporting Period, there was only one reported head strike at CRDF. *See* Seventeenth Monitoring Report at pp. 149, and Sixteenth Monitoring Report at pp. 147. The other DOJ facilities have been more successful at reducing head strikes than CRDF, and a corrective action plan should be developed to assist CRDF in also reducing the use of head strikes by its staff.

These fluctuations do not appear to be driven by changes in the facilities' average daily populations.  Figure 14 presents the total use of force incidents per 100 inmates, based on average daily population, between the First Quarter of 2020 and the Third Quarter of 2024.  The 1.76 uses of force per 100 inmates in the Third Quarter of 2024 was slightly higher than recent quarters and those prior to peaks in 2021 and 2022.

*Figure 14:  Uses of Force Per 100 Inmates by Quarter*



As in prior Reporting Periods, CRDF continued to have a significantly higher frequency of force incidents per inmate during the Nineteenth Reporting Period.  Figure 15 presents the number of use of force incidents per 100 inmates in the Second Quarter of 2024 and Third Quarter of 2024 by facility.  CRDF averaged the highest number of force incidents at 7.76 uses of force per 100 inmates.  NCCF averaged just over a third of that number at 2.76.  PDC South and PDC North were substantially lower, with 1.54 and 0.98 averages, respectively.

*Figure 15:  Uses of Force Per 100 Inmates by Facility, Q2-2024 and Q3-2024*



The Sixteenth Monitoring Report called on the County to "expeditiously investigate the causes of this proportionally higher number of uses of force at CRDF and take appropriate corrective action." In the County's Supplemental Self-Assessment, the Department reports that

> [t]he Department collected data from CRDF regarding force incidents by population which offer a more detailed view of this issue. This has allowed the Department to identify some trends that will be explored in greater depth in the months ahead.
>
> Of the 101 force incidents at CRDF during the Second and Third Quarters of 2024, a total of 38, or 37%, occurred at intake and booking. One explanation for the significant percentage of force incidents in these areas is the daily influx of inmates through intake whenever there is movement within and outside the institution. All inmates traveling to and from court pass through intake, as do all hospital returnees. The volatility of new arrivals who have not had a chance to detox or stabilize in longer term housing impacts force incidents as well. That said, the Department acknowledges this use of force rate is higher than it is at men's IRC, and, as discussed below, will be doing a case-by-case analysis in an attempt to determine the cause of this variance and to identify corrective actions that can be taken to close this gap. Setting aside the significant percentage of incidents which occur at intake and booking, the force rate at CRDF per 100 inmates is more consistent with force rates at the men's downtown facilities, indicating that this issue is confined to these discrete locations at CRDF.
>
> Significantly, force incidents at CRDF during the Second and Third Quarters of 2024 involved lower levels of force than at the men's facilities, with nearly 95% consisting of NCI or Category 1 incidents. Nearly 25% of force incidents at CRDF consisted of NCI incidents, compared to approximately 12% at the other facilities.
>
> To better understand CRDF's uses of force, the Department has committed to a comprehensive review of all force incidents at CRDF in 2024 to assess any common challenges that could be addressed through focused training and supervision. The Department has tasked a CFIT Lieutenant with reviewing these incidents and hopes to have the review completed by the Third Quarter of 2025. Leadership at CRDF is committed to this process and intends to place emphasis on review and individualized training with staff.

The Monitor and Use of Force Subject Matter Expert look forward to reviewing this analysis and assisting the Department in developing a plan to reduce the frequency of use of force incidents at CRDF.

Figure 16 presents the total uses of force by category and quarter. As usual, Category 1 Force was the most common force type. Category 1 Force increased by 54% in the Third Quarter of 2024 compared to the Fourth Quarter of 2023.

*Figure 16: Total Use of Force by Category and Quarter*



Figures 17 through 20 break out these data by facility. There were twice as many Category 1 Force incidents at CRDF in the Third Quarter of 2024 than in the Fourth Quarter of 2023 and an increase of 37% at NCCF in the Third Quarter of 2024 compared to the Fourth Quarter of 2023. Category 1 Force incidents at PDC North and PDC South were relatively consistent over the last four quarters. The Department should seek to determine whether these increases in Category 1 force incidents at CRDF and NCCF relate to methodological changes, such as differences in how force incidents are being categorized, operational changes, or variations in inmate or staff conduct that can be addressed by jail leaders.

*Figures 17-20: Total Use of Force by Category, Quarter, and Facility*







**Reporting and Investigation of Force (Partial Compliance)**

At the outset, we note some improvement in the quality of investigations performed by the Custody Force Investigation Team ("CFIT") compared to investigations performed by line supervisors at the facilities.  The CFIT force investigations reviewed during the Nineteenth Reporting Period generally included more depth and detail, which should also, theoretically, improve the quality of subsequent force reviews by command personnel.  The CFIT investigations were also generally completed in a timely fashion, which is encouraging.  Given the continuing delays in the command review of force incidents, the greatest opportunities for shortening the time for completing force packages are in the command review processes.

The timely investigation of force incidents is essential to ensuring the thoroughness of those investigations and accountability in the Department.  Department data reflect that the delays in the process of investigating and reviewing use of force incidents at the DOJ facilities have not been remedied.  LASD provided information about the status of force investigations into incidents in the First Quarter of 2023 through the Third Quarter of 2024.  Figure 21 presents the percentage of these investigations that were still in progress at the time the data were provided.  Among the investigations into force incidents that occurred in the First Quarter of 2023, 39% were still in progress as of January 8, 2025—more than a year and a half later.  Among those still in progress, the average age of investigations into force incidents from the First Quarter of 2023 through the Third Quarter of 2024 was 382 days.

*Figure 21:  Percentage of Force Investigations In Progress as of Jan. 8, 2025, Q1-2023 through Q3-2024*



Figure 22 presents the overall percentage of investigations into use of force incidents occurring in the First Quarter of 2023 through the Third Quarter of 2024 that were still in progress by facility. Of the 255 investigations into uses of force at CRDF during this time period, 89% were still in progress as of January 8, 2025. PDC North had far fewer investigations to complete, only 39, and 46% were still in progress. NCCF had a total of 214 investigations, and 40% were still in progress.

*Figure 22:  Percentage of Force Investigations In Progress as of Jan. 8, 2025, by Facility, Q1-2023 through Q3-2024*



As the Monitoring Reports have expressed in the past, these delays are not acceptable. The failure to timely complete the investigation and review of use of force incidents compromises the ability of command personnel to hold staff accountable, provide timely retraining, and quickly respond to trends and patterns in force that should be corrected. We incorporate by reference the comments made by Use of Force Subject Matter Expert Susan McCampbell in the Eighteenth Monitoring Report, and recommend

that the Department present a corrective action plan for remedying this long-standing issue.[67]

On January 15, 2025, the Monitor provided the County with a use of force matrix reflecting the ratings for the 25 force packages reviewed.  On February 12, 2025, the Monitor and Use of Force Subject Matter Expert met with Department executives to discuss the ratings assigned, watch video of force incidents, review deputy reports and command memos, and discuss the Monitoring Team's concerns about particular use of force packages—and the force review process—with Department executives, and to listen to their feedback and respond to their questions.

As set forth above, while head strikes are thankfully rare in the DOJ facilities, the analyses of these cases caused concern, particularly related to the application of the three-prong test set forth in Provision 2.6.  In one of the cases involving Provision 2.6, a female inmate was chained to a metal spider table awaiting a mental health evaluation due to suicidal behavior.  During the wait, she began banging her head on the table.  Deputies approached, a deputy attempted to grab her free arm, and she attempted to strike that deputy in the face.  The deputy responded by striking her in the face.

Pursuant to Provision 2.6, head strikes are prohibited "unless the inmate is assaultive and presents an imminent danger of serious injury to a Department member or another person and there are no other more reasonable means to avoid serious physical injury."  As to the latter portion of this test, which is sometimes called the "third prong," whether "there were no other more reasonable means to avoid serious physical injury," the CFIT evaluation found that

> the option of retreat would have given [Suspect] additional opportunities to continue her assault on staff and herself.  Although personnel have been continually briefed and encouraged to take evasive maneuvers when possible, and to make the best effort in mitigating the use of force, especially against a restrained inmate, personnel are not taught to, nor do I expect them to, willingly endure additional harm/assault as a force mitigation or de-escalation effort.
>
> There is a clear distinction between 'no other reasonable means' and no other 'possible' means.  Without the benefit of hindsight and unlimited video replay, [Deputy]'s split-second reaction to the suspect's assault was spontaneous, and the force ended when the resistance decreased.  Even when facing such a dynamic and complex situation, [Deputy]'s actions quickly brought the incident to a safe conclusion with minimal injuries to anyone involved.  After all, that is the ultimate end goal in any use of force incident.[68]

---

[67] *See* Eighteenth Monitoring Report at pp. 151-154.
[68] CRDF 023-02353-5700-457.

This evaluation substantially dilutes the meaning and import of the third prong of Provision 2.6.  When an inmate is chained to a fixed object, like a metal spider table, and becomes assaultive, an "other more reasonable means to avoid serious physical injury" is stepping out of their reach and creating a plan to further restrain them without the use of head strikes.  The Monitor and Use of Force Subject Matter Expert recommend that the Department provide further guidance to staff, including personnel in CFIT, regarding the correct interpretation and application of the third prong of the Provision 2.6 test.

Of the 25 cases reviewed, 13 included some violation of Section 12.2 of the Action Plan, which requires that inmate witnesses be asked to be interviewed, and interviewed, away from other inmates.  Nine of 25 included some violation of Section 15.1 of the Action Plan, which requires Department members to complete a separate and independent report before going off duty.  10 of 25 included some violation of Section 15.6 of the Action Plan, which requires Department members to be separated until they have completed their use of force reports.

*Figure 23:  Compliance Percentages on Use of Force Investigation and Review Provisions*

| Provision | Description | Applicable Cases | Compliant Cases | Compliance Percentage |
|---|---|---|---|---|
| 4.2 | Interviewing Mental Health Professionals | 1 | 1 | 100% |
| 5.2 | Commander's Reviews | 25 | 25 | 100% |
| 5.3 | Unexplained Discrepancies Sent for Additional Investigation | 25 | 24 | 96% |
| 12.2 | Location of Inmate Interviews | 19 | 6 | 32% |
| 12.3 | Involved Deputies not Present for Inmate Interviews | 24 | 21 | 88% |
| 12.4 | Uninvolved Supervisors | 25 | 25 | 100% |
| 12.5 | Standard Order & Format | 25 | 25 | 100% |
| 15.1 | Independent Staff Reports Before Going off Duty | 25 | 16 | 64% |
| 15.2 | All Department Witnesses Wrote Reports | 25 | 23 | 92% |
| 15.3 | Force by Other Members Reported | 25 | 22 | 88% |
| 15.4 | Description of Injuries | 25 | 22 | 88% |
| 15.5 | Clarification After Video | 2 | 2 | 100% |
| 15.6 | Separation of Deputies | 25 | 15 | 60% |
| 15.7 | Individual Perceptions | 25 | 25 | 100% |
| 16.1 | Medical Assessment | 25 | 25 | 100% |
| 16.2 | Photograph of Staff Injuries | 15 | 8 | 53% |
| 16.3 | Medical Report of Injuries | 25 | 25 | 100% |

Regarding the Department's quantitative results on the specific provisions, for the

Nineteenth Reporting Period, the County's Supplemental Self-Assessment reports Substantial Compliance with the following provisions: 4.2 (Supervisor interviews with Mental Health professionals who witnessed force incidents); 5.1 (timely database entry of force incidents); 5.2 (Unit Commander review of force incidents); 5.3 (unexplained discrepancies sent for additional investigation); 12.4 (force investigations conducted by uninvolved Supervisors); 12.5 (investigation package standard order and format); 15.2 (independent reports by Department witnesses); 15.7 (individual perceptions in force reports); 16.1 (medical assessment of inmates upon whom force is used); and 16.3 (medical reports of injuries related to use of force).

### Grievances (Partial Compliance)

The County's Supplemental Self-Assessment reports that in the Second Quarter of 2024, the Department achieved Substantial Compliance with the following grievance provisions at the DOJ facilities: 6.4 (proper handling of force-related grievances); 6.5 proper handling of harassment and retaliation grievances); 6.7 (appropriate handling of grievances marked "emergency"); 6.8 (inmate notification of downgraded grievances); 6.9 (proper handling of emergency grievances); 6.10 (timely collection of inmate grievances); 6.11 (review of complaints re: inmate grievance process); 6.12 (proper database entry of inmate grievances); 6.13 (proper tracking of handling of inmate grievances); 6.14 (monthly reports of grievance tracking); 6.15 (monthly evaluation of trends in inmate grievance handling); 6.17 (time limit for filing force-related grievances); 6.18 (proper handling of PREA grievances); 6.20 (proper handling of inmate appeals); 7.1 (conflict resolution for inmate grievances); 7.2 (timely notification of grievance investigation results); 7.3 (town hall meetings); and 8.1 (reporting of retaliation grievances). The County reported that the Department achieved Partial Compliance with 6.19 (timely responses to inmate grievances).

The County's Supplemental Self-Assessment reports that in the Third Quarter of 2024, the Department achieved Substantial Compliance with the following grievance provisions at the DOJ facilities: 6.4 (proper handling of force-related grievances); 6.5 (proper handling of harassment and retaliation grievances); 6.7 (appropriate handling of grievances marked "emergency"); 6.8 (inmate notification of downgraded grievances); 6.9 (proper handling of emergency grievances); 6.10 (timely collection of inmate grievances); 6.11 (review of complaints re: inmate grievance process); 6.12 (proper database entry of inmate grievances); 6.13 (proper tracking of handling of inmate grievances); 6.14 (monthly reports of grievance tracking); 6.15 (monthly evaluation of trends in inmate grievance handling); 6.17 (time limit for filing force-related grievances); 6.18 (proper handling of PREA grievances); 6.20 (proper handling of inmate appeals); 7.1 (conflict resolution for inmate grievances); 7.2 (timely notification of grievance investigation results); 7.3 (town hall meetings); and 8.1 (reporting of retaliation grievances). The County reported that the Department achieved Partial Compliance with 6.19 (timely responses to inmate grievances).

### Management and Administration (Substantial Compliance as of October 1, 2020, through September 30, 2021)

The Department achieved Substantial Compliance with the Management and Administration Provisions at the DOJ facilities as of September 30, 2021, and these provisions were not subject to Monitoring during the Nineteenth Reporting Period.

**Security Restraints (Partial Compliance)**

Security Restraints are subject to the provisions in Section 17 of the *Rosas* Plan. It is the Monitor's understanding that the County and the Department do not use "multi-point restraints," which are subject to Paragraphs 17.6 through 17.9 of the *Rosas* Plan, at any of the County's jail facilities. The Monitor's auditors are reviewing the Safety Chair Logs and Fixed Restraint Logs for both quarters, which include 31 uses of the safety chair and three uses of fixed restraints in the Second Quarter of 2024 and 24 and six, respectively, in the Third Quarter of 2024. The Monitor's Auditors note that the Safety Chair Logs reflect no uses of force to place the inmate in the safety chair in the Nineteenth Reporting Period.[69]

While safety checks generally occur within the 20-minute requirement of Section 17.4,[70] compliance with this requirement remains a barrier to achieving Substantial Compliance. However, as discussed in the Eighteenth Monitoring Report, incomplete documentation oftentimes results in non-compliant safety checks.

The Monitor's auditors note that vitals checks are not occurring as required by Section 17.3 and Fixed Restraint Logs do not explicitly document whether the inmate was in undue pain or that the restraints were not causing injury, as required by Section 17.4. Therefore, the County is in Partial Compliance with Paragraphs 17.3 and 17.4 of the *Rosas* Plan.

The Department posted logs of all involuntary medications administered in the Second and Third Quarters of 2024. The records reflect that all of the medications were administered per court orders to restore the competency of those deemed incompetent to stand trial and none were solely for security purposes in compliance with Paragraph 17.10 of the *Rosas* Plan.

**Early Warning System          (Substantial Compliance as of September 30, 2019, through September 30, 2020)**

The Department implemented an Employee Review System that was approved by the *Rosas* Monitors as a pilot program at the Downtown Jail Facilities on July 27, 2018, and expanded it to the DOJ facilities on October 25, 2018. The Department achieved Substantial Compliance with the Early Warning Provisions at the DOJ facilities as of

---

[69] In the Second Quarter of 2024, four of 31 safety chair logs did not indicate whether or not there was a use of force. In the Third Quarter of 2024, two out of 24 safety chair logs did not indicate whether or not there was a use of force.

[70] Safety checks are not required for the use of safety chairs for inmate movement (e.g., to/from court).

September 30, 2020, and these provisions were not subject to Monitoring during the Nineteenth Reporting Period.

82.    With respect to paragraph 6.16 of the *Rosas* Implementation Plan, the County and the Sheriff will ensure that Sheriff's Department personnel responsible for collecting prisoners' grievances as set forth in that paragraph are also co-located in the Century Regional Detention Facility.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of July 15, 2016, through December 31, 2017)**

Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring for Substantial Compliance with Paragraph 82 in the Nineteenth Reporting Period.

83.    The County and the Sheriff will install closed circuit security cameras throughout all Jails facilities' common areas where prisoners engage in programming, treatment, recreation, visitation, and intra-facility movement ("Common Areas"), including in the Common Areas at the Pitchess Detention Center and the Century Regional Detention Facility.  The County and the Sheriff will install a sufficient number of cameras in Jails facilities that do not currently have cameras to ensure that all Common Areas of these facilities have security-camera coverage.  The installation of these cameras will be completed no later than June 30, 2018, with TTCF, MCJ, and IRC completed by the Effective Date; CRDF completed by March 1, 2016; and the remaining facilities completed by June 30, 2018.  The County and the Sheriff will also ensure that all video recordings of force incidents are adequately stored and retained for a period of at least one year after the force incident occurs or until all investigations and proceedings related to the use of force are concluded.

**STATUS:**    **SUBSTANTIAL COMPLIANCE (as of July 1, 2015, through June 30, 2016 at MCJ and IRC)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2015, through September 30, 2016 at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 at NCCF and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2018, through June 30, 2019 at PDC South)**

Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring for Substantial Compliance with Paragraph 83 in the Nineteenth Reporting Period.

84.    The Sheriff will continue to maintain and implement policies for the timely and thorough investigation of alleged staff misconduct related to use of force and for timely disciplinary action arising from such investigations.  Specifically:

(a)    Sworn custody staff subject to the provisions of California Government Code section 3304 will be notified of the completion of the investigation and the proposed discipline arising from force incidents in accordance with the requirements of that Code section; and

(b)    All non-sworn Sheriff's Department staff will be notified of the proposed discipline arising from force incidents in time to allow for the imposition of that discipline.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of July 1, 2017, through June 30, 2018 (verified))**

Substantial Compliance under the Compliance Measures requires the Department to demonstrate that 95% of the investigations of force incidents in which sworn custody staff and non-sworn custody staff were found to have violated Department policy or engaged in misconduct were completed and administrative action, which could include discipline, was taken within the time frames provided for in Government Code Section 3304 and relevant Department policies.

Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring for Substantial Compliance with Paragraph 84 in the Nineteenth Reporting Period.

85.     The County and the Sheriff will ensure that Internal Affairs Bureau management and staff receive adequate specialized training in conducting investigations of misconduct.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of April 1, 2021, through March 31, 2022 (verified))**

The Parties agreed on Revised Compliance Measures in 2021.  Substantial Compliance requires the Department to provide the Monitor with (1) the curriculum/syllabus for the two specialized courses, Internal Affair Investigations and Interview and Interrogation, given to IAB management, and (2) a list of the sworn personnel assigned to IAB and proof that such personnel successfully completed the training.  Substantial Compliance requires the Department to demonstrate that 90% of the personnel assigned to IAB have successfully completed one course of the required training within 3 months of their start date, and the second course within 6 months of their start date.

Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring for Substantial Compliance with Paragraph 85 in the Nineteenth Reporting Period.

86.    Within three months of the Effective Date, the County and the Sheriff will develop and implement policies and procedures for the effective and accurate maintenance, inventory, and assignment of chemical agents and other security equipment. The County and the Sheriff will develop and maintain an adequate inventory control system for all weapons, including OC spray.

**STATUS:**    **SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 at MCJ and CRDF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2016, through December 31, 2017 at PDC North)**

**SUBSTANTIAL COMPLIANCE (as of February 1, 2017, through March 31, 2018 at PDC South and PDC East)**

**SUBSTANTIAL COMPLIANCE (as of March 1, 2017, through March 31, 2018 at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 at IRC)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 at TTCF)**

CDM 7-08/080 ACCOUNTABILITY OF SPECIAL WEAPONS, effective October 14, 2016, requires each facility to have unit orders that "establish procedures for the storage, issuance, reissuance, accountability, maintenance, and periodic inventory of all weapons. . .stored at, or issued from, the facility," which includes detailed requirements for the "Inventory, Control, and Accountability of Aerosol Chemical Agents."

In addition to providing written policies and procedures, Substantial Compliance requires the Department to provide up-to-date Unit Orders for each jail requiring the inventory and inspection of special weapons, and armory audit logs documenting the inventory and control of armory-level weapons.  The Department previously maintained Substantial Compliance with Paragraph 86 for twelve consecutive months at all of the facilities, and it was not subject to monitoring with this provision in the Nineteenth Reporting Period.

### APPENDIX A

| NO. | PROVISION | STATUS | SUBSTANTIAL COMPLIANCE DATES |
|---|---|---|---|
| 18 | Suicide Prevention Training | Substantial Compliance | **(10/1/17 at MCJ & PDC South)[1] (9/1/17 at NCCF) (12/1/17 at PDC East) (4/1/18 at TTCF, IRC, & PDC North) (8/1/18 at CRDF)** |
| 19 | Crisis Intervention & Conflict Resolution Training | Substantial Compliance | **(4/1/18 at MCJ, NCCF, & IRC) (7/1/18 at TTCF) (12/1/18 at CRDF, PDC East, & PDC North) (3/1/19 at PDC South)** |
| 20 | Training at NCCF, PDC and CRDF | Substantial Compliance | **(8/1/17 at PDC East, PDC North, NCCF, & CRDF) (10/1/17 at PDC South)** |
| 21 | CPR Certification | Substantial Compliance | **(10/1/15 – 9/30/16 at PDC East & PDC South) (1/1/16 – 12/31/16 at NCCF, PDC North, & IRC) (4/1/16 – 3/31/17 at TTCF) (10/1/17 – 9/30/18 at MCJ) (7/1/18 – 6/30/19 at CRDF)** |

---

[1] Substantial Compliance Dates in **bold** reflect that the Department has achieved Substantial Compliance with the training requirements or maintained Substantial Compliance for twelve consecutive months with the other requirements; the results were verified by the Monitor's auditors when required; and the County or designated facilities are no longer subject to monitoring of this provision pursuant to Paragraph 111 of the Settlement Agreement.

**APPENDIX A**

| | | | |
|---|---|---|---|
| 22 | Use of Arresting and Booking Documents | Substantial Compliance | **(7/1/16 – 6/30/17)** |
| 23 | Suicide Hazard Mitigation Plans | Substantial Compliance | **(7/12/18)** |
| 24 | Suicide Hazard Inspection | Substantial Compliance | **(10/1/17 – 9/30/18)** |
| 25 | Transportation of Suicidal Inmates (station jails) | Partial Compliance | |
| 26 | Identification and Evaluation of Suicidal Inmates | Substantial Compliance | **(4/1/23 – 3/31/24)** |
| 27 | Screening for Mental Health Care and Suicide Risk | Substantial Compliance | **(10/1/19 – 3/31/20, 10/1/20 – 3/31/21)** |
| 28 | Expedited Booking of Suicidal Inmates | Substantial Compliance | **(4/1/17 – 3/31/18 at IRC)** (4/1/24 – 9/30/24 at CRDF) |
| 29 | Mental Health Assessments (of non-emergent mental health needs) | Substantial Compliance | **(4/1/17 – 3/31/18)** |
| 30 | Initial Mental Health Assessments & Treatment Plans | Substantial Compliance | **(1/1/19 – 12/31/19)** |
| 31 | Electronic Medical Records Alerts | Partial Compliance (CRDF & TTCF) | |
| 32 | Electronic Medical Records – Suicide Attempts | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 33 | Supervisor Reviews of Electronic Medical Records | Substantial Compliance | **(7/1/16 – 6/30/17)** |
| 34 | Discharge Planning | Partial Compliance | |
| 35 | Referral for Mental Health Care | Substantial Compliance | **(11/1/17 – 12/31/18)** |
| 36 | Assessments After Triggering Events | Partial Compliance (TTCF & CRDF) | |

## APPENDIX A

| 37 | Court Services Division Referrals | Partial Compliance | |
|----|-----------------------------------|--------------------|---|
| 38 | Weekly Rounds in Restricted Housing Modules | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 39 | Confidential Self-Referral | Substantial Compliance (NCCF & CRDF)<br>Partial Compliance (TTCF, PDC North, & MCJ)<br>Not Rated (PDC East & PDC South) | **(7/1/17 – 6/30/18 at NCCF)**<br>(7/1/24 – 9/30/24 at CRDF) |
| 40 | Availability of QMHPs | Substantial Compliance | (4/1/24 – 9/30/24) |
| 41 | FIP Step-Down Protocols | Substantial Compliance | **(7/1/22 – 6/30/23)** |
| 42 | HOH Step-Down Protocols | Substantial Compliance | (7/1/24 – 9/30/24 at CRDF & TTCF) |
| 43 | Disciplinary Policies | Substantial Compliance (NCCF & PDC North)<br>Partial Compliance | **(10/1/17 – 9/30/18 at NCCF & PDC North)** |
| 44 | Protective Barriers | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 45 | Suicide Intervention and First Aid Kits | Substantial Compliance | **(10/1/15 – 9/30/16 at CRDF, NCCF, TTCF, PDC East, & PDC South)**<br>**(1/1/16 – 12/31/16 at MCJ & PDC North)** |
| 46 | Interruption of Self-Injurious Behavior | Substantial Compliance | **(7/1/20 – 6/30/21)** |
| 47 | Staffing Requirements | Partial Compliance | |
| 48 | Housekeeping and Sanitation | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 49 | Maintenance Plans | Substantial Compliance | **(3/1/16 – 2/28/17)** |

**APPENDIX A**

| | | | |
|---|---|---|---|
| 50 | Pest Control | Substantial Compliance | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC North, TTCF, & CRDF)**<br>**(4/1/16 – 3/31/17 at PDC South & PDC East)** |
| 51 | Personal Care & Supplies | Substantial Compliance | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC East, PDC North, PDC South, & TTCF)**<br>**(7/1/16 – 6/30/17 at CRDF)** |
| 52 | HOH Property Restrictions | Partial Compliance (CRDF & TTCF) | |
| 53 | Eligibility for Education, Work and Programs | Substantial Compliance | (4/1/24 – 9/30/24) |
| 54 | Privileges and Programs | Substantial Compliance | **(1/1/23 – 6/30/23)** |
| 55 | Staff Meetings | Substantial Compliance | **(10/1/16 – 9/30/17 at CRDF)**<br>**(4/1/17 – 3/31/18 at PDC North)**<br>**(4/1/18 – 3/31/19 at MCJ)**<br>**(7/1/19 – 6/30/20 at TTCF)** |
| 56 | Changes in Housing Assignments | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 57 | Inmate Safety Checks in Mental Housing | Substantial Compliance (MCJ & PDC North)<br>Partial Compliance (TTCF & CRDF) | **(4/1/17 – 3/31/18 at MCJ)**<br>**(7/1/21 – 6/30/22 at PDC North)** |

### APPENDIX A

| 58 | Inmate Safety Checks in Non-Mental Housing | Substantial Compliance | **(1/1/16 – 12/31/16 at PDC South, PDC North, & PDC East) (7/1/17 – 6/30/18 at CRDF) (10/1/17 – 9/30/18 at IRC)** (10/1/23 – 9/30/24 at TTCF) (1/1/24 – 9/30/24 at NCCF & MCJ) |
| --- | --- | --- | --- |
| 59 | Supervisor Rounds | Substantial Compliance | **(1/1/17 – 12/31/17 at PDC East & MCJ) (4/1/17 – 3/31/18 at NCCF) (10/1/17 – 9/30/18 at CRDF) (1/1/18 – 12/31/18 at PDC North & PDC South) (4/1/18 – 3/31/19 at TTCF)** |
| 60 | Implementation of Quality Improvement Program | Substantial Compliance | **(4/1/19 – 3/31/20)** |
| 61 | Requirements of Quality Improvement Program | Partial Compliance | |
| 62 | Tracking of Corrective Action Plans | Substantial Compliance | (4/1/24 – 9/30/24) |
| 63 | Sufficient HOH and MOH Housing | Substantial Compliance | (10/1/23 – 6/30/24 & 9/30/24 at CRDF) (7/1/24 – 9/30/24 at TTCF) |
| 64 | Plans for Availability of Inpatient Health Care | Partial Compliance | |
| 65 | Administration of Psychotropic Medication | Partial Compliance | |
| 66 | Active Mental Health Caseloads | Partial Compliance | |

## APPENDIX A

| | | | |
|---|---|---|---|
| 67 | Prisoner Refusals of Medication | Partial Compliance | |
| 68 | Contraband Searches | Substantial Compliance | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC East, PDC South, & PDC North) (1/1/17 – 12/31/17 at TTCF) (1/1/22 – 12/31/22 at CRDF)** |
| 69 | Clinical Restraints in CTC | Substantial Compliance | **(7/1/18 – 6/30/19)** |
| 70 | Security Restraints in HOH and MOH | Partial Compliance | |
| 71 | Therapeutic Services for Inmates in Clinical Restraints | Substantial Compliance | **(7/1/16 – 6/30/17)** |
| 72 | Administrative Reviews | Substantial Compliance | **(1/1/17 – 12/31/17)** |
| 73 | Reporting of Self-Injurious Behavior and Threats | Substantial Compliance | **(10/1/17 – 9/30/18)** |
| 74 | Law Enforcement Investigations of Suicides | Substantial Compliance | **(9/1/16 – 12/31/17)** |
| 75 | Management Reviews of Suicide Attempts | Substantial Compliance | **(10/1/17 – 9/30/18)** |
| 76 | Management Reviews of Suicides | Substantial Compliance | **(9/1/16 – 12/31/17)** |
| 77 | Custody Compliance and Sustainability Bureau | Substantial Compliance | **(4/1/22 – 3/31/23)** |
| 78 | Suicide Prevention Advisory Committee | Substantial Compliance | **(5/11/16 – 5/18/17)** |
| 79 | Therapeutic Services in Mental Health Housing | Partial Compliance | |
| 80 | Out-of-Cell Time in HOH | Non-Compliance | |

## APPENDIX A

| 81 | Implementation of *Rosas* Recommendations | Partial Compliance | |
| | Training | Substantial Compliance | |
| | Use of Force | Partial Compliance | |
| | Reporting and Investigation of Force | Partial Compliance | |
| | Grievances | Partial Compliance | |
| | Management and Administration | Substantial Compliance | **(10/1/20 – 9/30/21)** |
| | Security Restraints | Partial Compliance | |
| | Early Warning System | Substantial Compliance | **(9/30/19 – 9/30/20)** |
| 82 | Grievances at CRDF | Substantial Compliance | **(7/15/16 – 12/31/17)** |
| 83 | Closed Circuit Cameras | Substantial Compliance | **(7/1/15 – 6/30/16 at MCJ & IRC)** **(10/1/15 – 9/30/16 at TTCF)** **(4/1/16 – 3/31/17 at CRDF)** **(4/1/18 – 3/31/19 at NCCF & PDC North)** **(7/1/18 –6/30/19 at PDC South)** |
| 84 | Investigation of Staff Misconduct | Substantial Compliance | **(7/1/17 – 6/30/18)** |
| 85 | Internal Affairs Bureau Training | Substantial Compliance | **(4/1/21 – 3/31/22)** |

<u>**APPENDIX A**</u>

| 86 | Maintenance and Inventory of Security Equipment | Substantial Compliance | **(4/1/16 – 3/31/17 at MCJ & CRDF)** **(10/1/16 – 12/31/17 at PDC North)** **(2/1/17 – 3/31/18 at PDC South & PDC East**) **(3/1/17 – 3/31/18 at NCCF)** **(4/1/17 – 3/31/18 at IRC**) **(4/1/18 – 3/31/19 at TTCF)** |

## APPENDIX B

| | Substantial Compliance (Provisions) | Partial Compliance[1] | Non-Compliance | Suspended | Substantial Compliance (Facilities)[2] | No Longer Subject To Monitoring[3] |
|---|---|---|---|---|---|---|
| **First**[4] | 5 | 16 | | | 10 | |
| **Second** | 14 | 30 | 13 | | 24 | |
| **Third** | 22 | 27(1) | 10 | | 29 | 4(2) |
| **Fourth** | 24 | 26(1) | 10 | | 29 | 10(2) |
| **Fifth** | 23 | 24(2) | 7 | | 34 | 15(5) |
| **Sixth** | 32 | 22 | 7 | | 38 | 18(9) |
| **Seventh** | 30 | 23 | 7 | | 39 | 21(10) |
| **Eighth** | 35 | 20 | 6 | | 42 | 27(9) |
| **Ninth** | 36 | 22 | 4 | | 43 | 31(8) |
| **Tenth** | 39 | 21 | 3 | | 45 | 32(8) |
| **Eleventh** | 38 | 18 | 5 | 2 | 44 | 34(7) |
| **Twelfth** | 38 | 18 | 6 | 1 | 44 | 36(6) |
| **Thirteenth** | 42 | 14(1) | 6 | 1 | 47 | 36(6) |
| **Fourteenth** | 40 | 17 | 7 | 0 | 45 | 38(6) |
| **Fifteenth** | 42 | 13(1) | 9 | 0 | 46 | 38(6) |
| **Sixteenth** | 43 | 12(2) | 4 | 0 | 49 | 39(5) |
| **Seventeenth** | 43 | 16 | 3 | 0 | 50 | 40(5) |
| **Eighteenth** | 45 | 15 | 3 | 0 | 51 | 42(5) |
| **Nineteenth** | 50 | 15 | 1 | 0 | 53 | 43(5) |

[1] The figure in parenthesis under Partial Compliance is the number of additional provisions where some facilities were in Partial Compliance and other facilities were in Non-Compliance.

[2] This represents the number of provisions where the Department is in Substantial Compliance at all or some of the facilities.

[3] The figure in parenthesis under No Longer Subject to Monitoring is the number of additional provisions where some facilities are no longer subject to monitoring.

[4] During the First Reporting Period, 43 provisions were not subject to monitoring.