Nicholas E. Mitchell
nmitchell@independentmonitor.com

**Monitor**

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

UNITED STATES OF AMERICA,

v.

COUNTY OF LOS ANGELES et al.,

CV No. 15-05903 MWF-E

**MONITOR'S TWENTIETH REPORT**

Pursuant to Paragraph 109 of the Joint Settlement Agreement Regarding Los Angeles County Jails, the Monitor appointed by this Court hereby submits the attached Report "describing the steps taken" by the County of Los Angeles and the Los Angeles County Sheriff Department ("Department") during the six-month period from January 1, 2025, through June 30, 2025, "to implement the Agreement and evaluating the extent to which they have complied with this Agreement." This Report takes into consideration the advice and assistance I have received from the Subject Matter Experts appointed by this Court and the comments from the Parties in accordance with Paragraph 110 of the Agreement. I am available to answer any questions the Court may have regarding my Report at such times as are convenient for the Court and the Parties.

DATED: January 7, 2026          Respectfully submitted,


By:  /s/ Nicholas E. Mitchell
     Nicholas E. Mitchell
     Monitor

Case No. CV No. 15-05903 MWF-E

MONITOR'S TWENTIETH REPORT

## MONITOR'S TWENTIETH REPORT

This Twentieth Report sets forth the Monitor's assessments of the implementation of the Settlement Agreement (the "Agreement" or "DOJ Agreement") between the County of Los Angeles (the "County") and the United States Department of Justice ("DOJ") for the treatment of inmates with mental illness in the County's jail facilities by the Los Angeles Sheriff's Department (the "Department" or "LASD") and the County's Correctional Health Services ("CHS").  It also reports on the Department's compliance with the provisions of the Implementation Plan in the settlement of *Alex Rosas, et al., v. Leroy Baca,* No. CV 12-00428 DDP, that were extended under the terms of the DOJ Agreement to the facilities not covered by the *Rosas* case.[1]  This Report includes results reported by the County from January 1, 2025, through June 30, 2025, for the Fourth Quarter of 2024 and First Quarter of 2025 (the "Twentieth Reporting Period").

This Twentieth Report is based upon the Monitor's review of the policies, procedures, and directives proposed and/or implemented by the Department and CHS in the Twentieth Reporting Period, and assessments and observations of the Mental Health and Use of Force Subject Matter Experts, and mental health clinicians and auditors retained by the Monitor.  It takes into consideration the County's Self-Assessment Status Report ("Twentieth Self-Assessment"); Correctional Health Services and Custody Compliance and Sustainability Bureau ("CCSB") Combined Semi-Annual Report on Quality Improvement and Suicide Prevention Efforts – Quarter 4 2025 & Quarter 1 2025; and the County's Augmented Self-Assessment Status Report ("Augmented Twentieth Self-Assessment").  It also incorporates observations of the Monitoring Team during jail site visits in January, February, and July 2025.

Susan W. McCampbell has served ably as the Court-Appointed Use of Force Subject Matter Expert in this case since 2018.  In that capacity, she has reviewed countless use of force incidents and investigations and provided expert analysis to the Monitor and guidance to the Parties.  Ms. McCampbell has stepped down from her role, and the Monitor is working with the Parties to identify a replacement Use of Force Expert.  The Monitor thanks Ms. McCampbell for her years of hard work and dedication to improving compliance with the use of force requirements of Provision 81 of the Agreement.

### Progress in the Twentieth Reporting Period

The County continued to make significant progress in its compliance with the Agreement during the Twentieth Reporting Period.  This Report includes a discussion of a number of Provisions that the County has brought into Substantial Compliance since the Nineteenth Report was filed.  This includes Provision 25 (arrestees exhibiting suicidal intent under unobstructed visual observation pending transport), Provision 36 (QMHP assessments within four hours of adverse triggering events), Provision 37 (prisoners with

---

[1] The *Rosas* case involved allegations of excessive force in Men's Central Jail (MCJ), the Twin Towers Correctional Facility (TTCF), and the Inmate Reception Center (IRC) (collectively the "Downtown Jail Complex").  The DOJ Agreement extends provisions of the Implementation Plan to the Century Regional Detention Facility (CRDF), the North County Correctional Facility (NCCF), and the Pitchess Detention Center (PDC).

indications of suicidal intent or crisis under unobstructed visual observation pending transport), Provision 43 (development and implementation of policies for the discipline of prisoners with serious mental health illnesses), Provisions 61 and 62 (development of a competent Quality Improvement program and the tracking of its corrective action plans), and Provision 64 (implementation of short- and long-term plans for adequate inpatient care).

Moreover, though not yet in Substantial Compliance at all facilities, the County's results under various other Provisions, such as Provisions 31 (mental health alerts of suicide risk), 39 (confidential self-referral system for requesting mental health care), 42 (QMHP assessments of inmates placed on risk precautions in HOH and determination of step-down procedures), and 79 (therapeutically appropriate treatment for inmates in mental health housing) improved significantly in the Twentieth Reporting Period. The County has also continued its trajectory of successfully implementing Provision 63, one of the Agreement's most complicated requirements given the scarcity of mental health beds, which is now no longer subject to monitoring at CRDF and in Substantial Compliance at TTCF. These are commendable achievements.

In total, there are 69 provisions in the Agreement that are subject to monitoring by the Monitor and Subject Matter Experts. As of the date of this Report, the County and the Department are in Substantial Compliance with 56 provisions and in Partial Compliance with nine provisions. In addition, there are four provisions where the County is in different compliance ratings at different facilities. This is a marked improvement from the County's results for recent Reporting Periods.

*Figure 1: The County's Cumulative Substantial Compliance with All Provisions by Reporting Period*



2

Beyond the improved results under these key provisions, the County also took proactive steps to address several other long-standing issues under the Agreement.  First, as discussed in previous Monitoring Reports, there continue to be hundreds of MOH patients detained in MCJ in deplorable conditions.  There have been no private areas within which they can meet with clinicians regarding their mental health symptoms, nor common spaces for them to receive group mental health programming.  Lines of sight from Deputy workstations are poor, creating dangerous conditions for staff and inmates.  Recent Monitoring Reports have called on the County to develop and present a plan to move these inmate patients, some of whom are quite symptomatic, into housing that is safer and more clinically appropriate.

The County has responded with several new initiatives.  To begin, it has created a mental health clinic space in the rear of a large chapel on the fifth floor of MCJ that is adjacent to the housing units where MOH patients are housed.  The Monitor has inspected the clinic space and finds that it does, indeed, provide a more therapeutically appropriate environment for mental health treatment.  It is composed of six fixed workstations, with privacy barriers, where clinicians can and do meet with MOH patients.

Moreover, one of the persistent problems in MCJ's MOH dorms is the pervasive sense of danger that many MOH patients report therein.  They describe an environment in which a small number of inmates (who they indicate may not actually be suffering from mental illness) wield and exert tremendous power over other MOH patients.  This includes the alleged "taxation" of desirable food and commissary items, domination of the communal television, and control over access to grievance and health service request forms, with punishment for disobedience meted out in the form of forced exercise and/or physical violence.  Some patients have described remaining on their bunks as much as possible to avoid attracting the attention of these individuals.

On site visits to MCJ, the Monitor frequently visits MCJ's disciplinary row for MOH patients that should, theoretically, be used to house patients for disciplinary infractions.  Instead, the Monitor invariably finds that a majority of the MOH patients on discipline report being there to escape the MOH pods because of the perception that those pods are unsafe.  That is, these patients would prefer to be held in segregated disciplinary housing, without access to customary jail amenities, rather than in MCJ's designated MOH pods, which are supposed to be therapeutic.

Members of Custody leadership have described a plan to tackle this issue by working with CHS to more carefully screen patients in MCJ's MOH dorms for mental illness, and to move those who are victimizing others onto a separate row outside the dorm environment.  In addition, the County has also described a plan to retrofit PDC South such that MOH patients can eventually be transferred from MCJ to PDC South.  While the timeline for completing this retrofit is elongated, the need to improve the conditions for the MOH patients in MCJ remains urgent.

Second, the County has begun the rollout of body-worn cameras ("BWCs") for Deputies and Custody Assistants working in the jails.  BWCs are an important innovation in policing and corrections that can help to accurately record use of force incidents, which

3

should enhance the review of those incidents.  The rollout of BWCs began on October 1, 2025, at TTCF, CRDF, MCJ, and IRC, and will eventually reach the other facilities covered by Provision 81.  If properly operationalized, BWCs can significantly enhance the quality and thoroughness of the County's use of force reviews and facilitate the County's compliance with Provision 81.

Notwithstanding these improvements and others discussed elsewhere in this Report, there are obstacles and headwinds that the County must still overcome.

- The County has continued to struggle to provide the required amount of structured out-of-cell group programming necessitated by Provision 80.  While the County saw some gains in compliance at TTCF in the Twentieth Reporting Period, CRDF did not keep pace, and both facilities remain far from the Substantial Compliance thresholds.  The County has acknowledged that its creation of unrestrained housing pods for HOH inmates has facilitated its compliance with the structured out-of-cell requirements of Provision 80, but it has not described a plan to further expand the number of such pods, or to increase the number of staff members providing structured out-of-cell programming.  It is thus difficult to foresee, at this time, how the County will close the significant gap between its current results and the Substantial Compliance thresholds to meet the compliance deadline set by this Court.[2]

- The ability to socialize, exercise, and recreate within a housing area is essential to maintaining both mental and physical health during a period of incarceration, particularly for inmates with mental illness.  The County has long disagreed with the Partial Compliance rating assigned by the Monitor for Provision 70, which requires that restraints "will not be used as an alternative to mental health treatment and will be used *only when necessary to [e]nsure safety.*"  Provision 70(a) (emphasis added).  Yet, for years during the pendency of this Agreement, the County reflexively kept all HOH prisoners chained to fixed metal tables during all out-of-cell time without any individualized determination that it was necessary for safety.

  Thankfully, today, nearly half of HOH patients are in housing pods in which they come out of their cells to socialize, make phone calls, exercise, and recreate without being chained to these fixed tables.  Yet, just over half of the HOH patients remain chained during all of their out-of-cell time.  While the County indicates that it is now completing assessments of these patients to ensure that restraints are truly necessary for safety, it maintains that there are no reviewable records that memorialize these assessments.  Given that proof of practice is required for the

---

[2] The County has recently suggested that the number of hours of structured out-of-cell time mandated by Provision 80 should be renegotiated downward by the Parties.  *See* County's Augmented Twentieth Self-Assessment at pp. 105-106.

Monitor to verify the County's compliance with the provisions of the Agreement, the County remains in Partial Compliance with Provision 70, and it is difficult to see a path, given its current trajectory, for the County to meet the compliance deadline in the Court's orders regarding Provision 70.[3]

- As explained in previous Monitoring Reports, the County's self-audit process for assessing its compliance with Provision 65 remains unreliable, and the County has yet to describe efforts to reconcile its near-perfect results with the observable realities of pill call in the jails.  The Monitoring Team increased the number of its site visits in the Twentieth Reporting Period (and thereafter) to make in-person observations of pill calls, which resulted in useful insight into both ongoing deficiencies in the pill call process, and improvements made by the County in the Twentieth Reporting Period.  Yet, the test for Substantial Compliance with Provision 65 requires the County to calculate a compliance percentage through a self-audit process that neither the Monitor nor the Court can now credit.  To achieve compliance with the Agreement and the Court's Orders, the County will need to address the continuing deficiencies in its Provision 65 self-audit process that have been repeatedly raised in the Monitoring Reports.

- On December 18, 2024, California's Proposition 36 went into effect, increasing penalties for certain theft and drug crimes.  According to data provided by the LASD, in December 2024, the LASD had 12 individuals in custody on two charges addressed by Proposition 36.[4]  By January 21, 2025, that number had grown to 155 and, as of August 2025, eight months later, there were 858 such persons in LA's jails, 333 of whom required mental health beds.  This represents a significant new burden on mental health housing stock that is already stretched thin.  This may become an obstacle to the County's efforts to meet the Court-ordered compliance deadlines for several provisions in this case.

**Court-Ordered Compliance Deadlines**

As set forth in the Eighteenth Monitoring Report, in May 2024, the DOJ initiated the meet and confer process under Provision 117 of the Agreement related to Provisions 34, 36, 40, 63, and 80.  From May 2024 through January 2025, the DOJ, County, and the Intervenors (as to Provision 34) participated in meetings with the Monitor regarding these provisions, among others, to discuss potential cure plans to address any non-compliance.  In March 2025, the Parties reached a final agreement on two stipulations and associated proposed orders.  *See* Joint Stipulation to Modify Court Orders Setting Deadlines for Substantial Compliance ("Joint Stipulation to Modify Deadlines") and Joint Stipulation to Modify December 27, 2022, Court Order Setting Deadline for Substantial Compliance ("Joint Stipulation to Modify Provision 34 Compliance Deadlines").[5]  The Court issued

---

[3] For further discussion of this issue, *see* pp. 110-115 *infra*.
[4] Cal. Penal. Code § 666.1(A)1PC and Cal. Health and Safety Code § 11395HS.
[5] Dkts. 273 and 272, respectively.

corresponding orders on March 10, 2025.[6]  A bulk of the upcoming compliance deadlines are in June 2025, which will be covered in the Twenty-First Monitoring Report.  The status of the County's compliance with the deadlines is visualized below.

*Figure 2: Past and Upcoming Court-Ordered Compliance Deadlines, by Provision*



Nicholas E. Mitchell, Monitor
January 7, 2026

---

**EXECUTIVE SUMMARY**

There are 69 provisions in the Settlement Agreement that are subject to monitoring by the Monitor and Subject Matter Experts. As of the date of this Report, the County and the Department are in Substantial Compliance with 56 provisions and in Partial Compliance with nine provisions. There are two provisions (Paragraphs 52 and 57) for which the Department is in Substantial Compliance at certain facilities and Partial Compliance at other facilities. There is one provision (Paragraph 28) for which the Department is in Substantial Compliance at certain facilities and Not Rated at other facilities. There is one provision (Paragraph 39) for which the Department is in Substantial Compliance at certain facilities, Partial Compliance at other facilities, and Not Rated at other facilities. There are 60 provisions for which the County and the Department are in Substantial Compliance at some or all facilities.[7]

The Monitor's determination of the County's compliance is based upon the quantitative thresholds in the Compliance Measures (and any other applicable requirements in the Compliance Measures) for achieving Substantial Compliance, unless the quality of the County's performance as determined by the qualitative assessment is plainly inadequate or the results reported by the Monitor's Mental Health Team vary significantly from the results reported by the Department.[8] As used herein, "Substantial Compliance" means that the County has "achieved compliance with the material components of the relevant provisions of this Agreement in accordance with the [agreed-upon Compliance Measures for assessing Substantial Compliance]," which it must maintain for twelve-consecutive months; "Partial Compliance" means that the County has achieved "compliance on some, but not all, of the material components of the relevant provision of this Agreement;" and "Non-Compliance" means that the County has not met "most or all of the material components of the relevant provisions of this Agreement."

Appendix A to this Twentieth Report shows the status of each of the 69 provisions of the Agreement that are subject to monitoring and the twelve-month triggering dates where the County is deemed to be in Substantial Compliance. Appendix B shows the County's progress from the Initial Reporting Period through the Twentieth Reporting Period in achieving Substantial Compliance and in maintaining Substantial Compliance for twelve consecutive months on provisions that are no longer subject to monitoring.

---

[7] Under Paragraph 111 of the Agreement, the twelve-month period for which the County is required to maintain Substantial Compliance can be determined on a facility-by-facility basis.

[8] As in prior reports, this Twentieth Report also reflects the results of audits by the Monitor's auditors to verify results reported by the County. The Monitor has deemed the County to be in Substantial Compliance "as of" the beginning of the quarter reported by the County if the auditors have verified that the County has met the thresholds in the Compliance Measures. If the auditors were not able to verify the results reported by the County, the twelve-month period for maintaining Substantial Compliance will commence in a future period when the County's reported results are verified by the auditors. If the County maintains Substantial Compliance with a provision for twelve consecutive months, pursuant to Paragraph 111 of the Agreement, the Monitor and Subject Matter Expert will "no longer. . .assess or report on that provision" in future reporting periods. Some of the Substantial Compliance results reported by the County in the Twentieth Reporting Period have not been audited by the Monitor's auditors and cannot be considered final until verified by the auditors. The County will not be deemed to be in Substantial Compliance as of the County's reported date for purposes of determining the twelve-month compliance period if the results are not verified by the auditors.

There are 46 provisions that are no longer subject to monitoring because the County and Department maintained Substantial Compliance for twelve consecutive months as required by Paragraph 111 of the Settlement Agreement and verified by the Monitor's auditors as required.[9]  There are another six provisions for which some facilities are no longer subject to monitoring because those facilities maintained Substantial Compliance for the required twelve consecutive months.[10]

As of the date of this Report, and subject to verification by the Monitor's auditors and qualitative assessments in some cases, the County and the Department are in Substantial Compliance at some or all of the facilities with the following provisions of the Settlement Agreement:

The County has achieved Substantial Compliance with Paragraph 18, which requires the (initial) training of Deputy Sheriffs and Custody Assistants on suicide prevention as follows: at Men's Central Jail ("MCJ") and Pitchess Detention Center ("PDC") South as of October 1, 2017; at North County Correctional Facility ("NCCF") as of September 1, 2017; at PDC East as of December 1, 2017; at Twin Towers Correctional Facility ("TTCF"), the Inmate Reception Center ("IRC"), and PDC North as of April 1, 2018; and at Century Regional Detention Facility ("CRDF") as of August 1, 2018.  The County maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) and 4.7(b) as of December 2024.

The County has achieved Substantial Compliance at NCCF, MCJ, and IRC as of April 1, 2018; at TTCF as of July 1, 2018; at CRDF, PDC East, and PDC North as of December 1, 2018; and at PDC South as of March 1, 2019, with Paragraph 19, which requires the (initial) training of Deputy Sheriffs on Crisis Intervention and Conflict Resolution and the training of Deputy Sheriffs and Custody Assistants in working with mentally ill prisoners.  The Department has achieved Substantial Compliance at CRDF, IRC, NCCF, MCJ, PDC East, PDC North, PDC South, and TTCF as of December 2019 with the refresher training requirements of Paragraph 19.  The County maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) and 4.7(b) as of December 2024.

The County has achieved Substantial Compliance at PDC East, PDC North, NCCF, and CRDF as of August 1, 2017, and at PDC South as of October 1, 2017, with Paragraph 20, which requires the (initial) training of additional Deputy Sheriffs on Crisis Intervention and Conflict Resolution and on working with mentally ill prisoners.  The County maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) and 4.7(b) as of December 2024.

---

[9] This includes the initial training required by Paragraphs 18, 19, and 20, which have been completed and are no longer subject to monitoring.  The refresher training requirements for each of these provisions are, however, still subject to monitoring under Provision 81 Rosas 4.6(b) and 4.7(b).

[10] The provisions that are no longer subject to monitoring at some or all of the facilities are highlighted in bold in Appendix A.

The County has maintained Substantial Compliance for twelve consecutive months at PDC East, PDC South, PDC North, NCCF, IRC, TTCF, CRDF, and MCJ with Paragraph 21, which requires Custody personnel to maintain CPR certifications.

The County has maintained Substantial Compliance for twelve consecutive months with Paragraph 22, which requires the County and the Sheriff to provide instructional material on the use of arresting and booking documents to ensure the sharing of known relevant and available information on prisoners' mental health status and suicide risk.

The County has maintained Substantial Compliance for twelve consecutive months as of July 12, 2018, with Paragraph 23, which requires that the Department conduct a systematic review of prisoner housing to reduce the risk of self-harm and to identify and address suicide hazards, and to develop plans to reasonably mitigate suicide hazards identified in the review.

The County has maintained Substantial Compliance for twelve consecutive months as of September 30, 2018, with Paragraph 24, which requires the Department to conduct annual reviews and inspections of prisoner housing to identify suicide hazards.

The County has achieved Substantial Compliance as of October 1, 2024, through March 31, 2025, with Paragraph 25, which requires that any arrestee in a station jail who verbalizes or exhibits suicidal intent will be under unobstructed visual observation, or in a suicide resistant location with safety checks every 15 minutes until they are transported to IRC, CRDF, or a medical facility as soon as practicable.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2024, with Paragraph 26, which requires the Department to identify inmates with emergent or urgent mental health needs based on intake screenings and to expedite such inmates for a mental health screening by a QMHP within four hours.

The County has maintained Substantial Compliance for twelve months as of March 31, 2021, with Paragraph 27, which requires that all prisoners are individually and privately screened within 12 hours of their arrival at the jails.

The County has maintained Substantial Compliance for twelve consecutive months at IRC as of March 31, 2018, with Paragraph 28, which requires the Department to expedite inmates having urgent or emergent mental health needs through the booking process. The County has also achieved Substantial Compliance as of April 1, 2024, through September 30, 2024, at CRDF.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2018, with Paragraph 29, which requires mental health assessments of prisoners with non-emergent mental health needs within 24 hours of the intake nursing assessment.

The County has maintained Substantial Compliance for twelve consecutive months

9

as of December 31, 2019, with Paragraph 30, which requires the County to provide an initial mental health assessment that includes a brief initial treatment plan that addresses "housing recommendations and preliminary discharge information."

The County has achieved Substantial Compliance as of October 1, 2024, through March 31, 2025, at TTCF, with Paragraph 31, which requires the County to maintain electronic mental health alerts for inmates who report suicidal thoughts during the intake process, or who were removed from risk precautions in the prior quarter. The County has also provided documentation reflecting that it has achieved Substantial Compliance at CRDF as of January 1, 2025, through March 31, 2025. These results are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 32, which requires that a serious suicide attempt be entered in the prisoner's electronic medical record in a timely manner.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2017, with Paragraph 33, which requires mental health supervisors to review electronic medical records on a quarterly basis to assess their accuracy.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2018, with Paragraph 35, which requires the Department to ensure that custody staff refer prisoners who are demonstrating a potential need for routine mental health care to a QMHP or a Jail Mental Evaluation Team.

The County has achieved Substantial Compliance as of October 1, 2024, through December 31, 2024, at TTCF and CRDF, with Paragraph 36, which requires that QMHP assessments be conducted within four hours following the notification of adverse triggering events. The County has also provided documentation reflecting that it has maintained Substantial Compliance at CRDF and TTCF as of January 1, 2025, through March 31, 2025. These results are subject to verification by the Monitor's auditors.

The County has provided documentation reflecting that it has achieved Substantial Compliance as of January 1, 2025, through March 31, 2025, with Paragraph 37, which requires that Court Services Division staff forward Behavioral Observation and Mental Health Referral ("BOMHR") Forms to the Jail's mental health and/or medical staff when a prisoner has displayed obvious suicidal ideation, behavior that clearly manifests self-injurious behavior, or other clear indication of mental health crisis, and that the prisoner be under unobstructed visual observation or subject to safety checks every 15 minutes pending transport. The reported results are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 38, which requires mental health staff or JMET to make weekly cell-by-cell rounds in restricted non-mental health housing modules to identify prisoners with mental illnesses and grant prisoner's requests for out-of-cell interviews.

10

The County has maintained Substantial Compliance at NCCF for twelve consecutive months as of June 30, 2018, with Paragraph 39, which requires the County to use a confidential self-referral system for prisoners to request mental health care. The County has also achieved Substantial Compliance as of January 1, 2025, through March 31, 2025, at PDC North.

The County has maintained Substantial Compliance for twelve consecutive months as of April 1, 2024, through March 31, 2025, with Paragraph 40, which requires the County to ensure a QMHP will be available seven days per week to provide clinically appropriate mental health crisis intervention services.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2023, with Paragraph 41, which requires CHS to review the medical records of all prisoners on suicide watch in FIP for one randomly selected month each quarter, and submit a report regarding the implementation of the step-down protocols and the results of its review of the medical records.

The County has achieved Substantial Compliance as of July 1, 2024, through September 30, 2024, at TTCF, with Paragraph 42, which requires the County to perform QMHP assessments of inmates placed on risk precautions in HOH and for step-down procedures to be determined on an individualized basis by the QMHP and implemented by the Department. The County has also provided documentation reflecting that it has achieved Substantial Compliance as of October 1, 2024, through March 31, 2025, at CRDF and TTCF. These results are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance at NCCF and PDC North for twelve consecutive months as of September 30, 2018, with Paragraph 43, which requires the Department to develop and implement policies for the discipline of prisoners with serious mental illnesses. The County has achieved Substantial Compliance as of October 1, 2024, through December 31, 2024, at CRDF and TTCF. These results have been verified by the Monitor's auditors. The County has also provided documentation reflecting that it has maintained Substantial Compliance, at CRDF and TTCF, and achieved Substantial Compliance at MCJ, as of January 1, 2025, through March 31, 2025. These results are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 44, which requires the Department to install protective barriers in High Observation Housing and other mental health housing.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 45, which requires Suicide Prevention Kits and first-aid kits in control booths in all facilities.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2021, with Paragraph 46, which requires the Department to interrupt and, if

11

necessary, provide appropriate aid to any prisoner who threatens or exhibits self-injurious behavior.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 48, which requires the Department to have written housekeeping, sanitation, and inspection plans to ensure proper cleaning.

The County has maintained Substantial Compliance for twelve consecutive months as of February 28, 2017, with Paragraph 49, which requires the Department to have maintenance plans to respond to routine and emergency maintenance needs.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2017, with Paragraph 50, which requires pest control in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2017, with Paragraph 51, which requires the Department to ensure that all prisoners have access to basic hygiene supplies in accordance with state regulations.

The County has achieved Substantial Compliance as of October 1, 2024, through March 31, 2025, at CRDF, with Paragraph 52, which requires that property restrictions for inmates placed in HOH (except from FIP) be based upon an individual clinical assessment.

The County has maintained Substantial Compliance for twelve consecutive months as of April 1, 2024, through March 31, 2025, with Paragraph 53, which requires the Department to ensure that an inmate's mental health diagnosis or prescription for medication alone does not preclude an inmate from participating in education, work, or similar programs.

The County has maintained Substantial Compliance as of January 1, 2023, through June 30, 2023, with Paragraph 54, which requires the County to ensure that prisoners not in mental health housing are "not denied privileges and programming based solely on their mental health status or prescription for psychotropic medication."

The County has maintained Substantial Compliance at CRDF, PDC North, MCJ, and TTCF for twelve consecutive months as of June 30, 2020, with Paragraph 55, which requires custody, medical, and mental health staff to meet daily in High Observation Housing and weekly in Moderate Observation Housing.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2016, with Paragraph 56, which requires custody, medical, and mental health staff to communicate regarding any change in a housing assignment following a suicide attempt or serious change in mental health condition.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2018, at MCJ with Paragraph 57, which requires safety checks in mental health housing. The County has also maintained Substantial Compliance for twelve

12

consecutive months at PDC North as of June 30, 2022.

The County has maintained Substantial Compliance for twelve consecutive months at PDC South, PDC North, and PDC East as of December 31, 2016, at CRDF as of June 30, 2018, at IRC as of September 30, 2018, and at NCCF as of December 31, 2024, with Paragraph 58, which requires safety checks in non-mental health housing.  The County has also provided documentation reflecting that it has achieved Substantial Compliance as of October 1, 2024, through March 31, 2025, at MCJ, and as of January 1, 2025, through March 31, 2025, at TTCF.  These results are subject to verification by the Monitor's auditors.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2019, with Paragraph 59, which requires unannounced daily supervisory rounds to verify safety checks.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2020, with Paragraph 60, which requires the implementation of a quality improvement plan.

The County has achieved Substantial Compliance as of October 1, 2024, through March 31, 2025, with Paragraph 61, which requires the County to develop, implement, and assess the effectiveness of corrective action plans addressing recommendations of quality improvements in semi-annual reports.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2025, with Paragraph 62, which requires the County to develop, implement, and track corrective action plans addressing recommendations of the quality improvement program.

The County has maintained Substantial Compliance for twelve consecutive months as of September 30, 2024, at CRDF, with Paragraph 63, which requires adequate space in High and Moderate Observation Housing for inmates with mental illness.  The County has also achieved Substantial Compliance at TTCF as of July 1, 2024, through March 31, 2025.

The County has achieved Substantial Compliance as of October 31, 2024, through March 31, 2025, with Paragraph 64, which requires that the Department implement plans within 90 days of plan completion, and these plans will describe the projected capacity required, strategies that will be used to obtain additional capacity if it is needed, and identify the resources necessary for implementation.

The County has maintained Substantial Compliance for twelve consecutive months at MCJ, NCCF, PDC East, PDC North, and PDC South as of December 31, 2016, and at TTCF as of December 31, 2017, with Paragraph 68, which requires staggered contraband searches in housing units.  The County has also maintained Substantial Compliance for twelve consecutive months at CRDF as of January 1, 2022, through December 31, 2022.

13

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2019, with Paragraph 69, which requires the County and the Sheriff to use clinical restraints only in the Correctional Treatment Center with the approval of a licensed psychiatrist who performed an individualized assessment.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2017, with Paragraph 71, which requires the County and the Sheriff to ensure that any prisoner subjected to clinical restraints in response to a mental health crisis receives therapeutic services to remediate any effects from the restraints.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 72, which requires the Department and the County to report on meetings to review suicides and incidents of serious self-injurious behavior.

The County has maintained Substantial Compliance for twelve consecutive months as of September 30, 2018, with Paragraph 73, which requires the Department to prepare detailed reports of prisoners who threaten or exhibit self-injurious behavior.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 74, which requires the Department to have an objective law enforcement investigation of every suicide that occurs in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of September 30, 2018, with Paragraph 75, which requires the Department and the County to review every serious suicide attempt that occurs in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 76, which requires the Department to follow certain procedures whenever there is an apparent or suspected suicide.

The County has maintained Substantial Compliance as of March 31, 2023, with Paragraph 77, which requires, among other things, identifying patterns and trends of suicides and suicide attempts and ensuring corrective actions are taken to mitigate suicide risks.

The County has maintained Substantial Compliance for twelve consecutive months as of May 18, 2017, with Paragraph 78, which requires the Suicide Prevention Advisory Committee to meet twice a year.

The County has maintained Substantial Compliance for twelve consecutive months as of December 31, 2017, with Paragraph 82, which requires the Department to co-locate personnel responsible for collecting prisoners' grievances at CRDF.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2019, with Paragraph 83, which requires it to install closed circuit security

14

cameras throughout all of the common areas in the jails.

The County has maintained Substantial Compliance for twelve consecutive months as of June 30, 2018, with Paragraph 84, which requires investigations of force incidents and administrative actions to be completed timely.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2022, with Paragraph 85, which requires Internal Affairs Bureau personnel to receive adequate specialized training in conducting investigations of misconduct.

The County has maintained Substantial Compliance for twelve consecutive months as of March 31, 2019, with Paragraph 86, which requires inventory and control of weapons.

**TWENTIETH REPORT**

18.    Within three months of the Effective Date, the County and the Sheriff will develop, and within six months of the Effective Date will commence providing:  (1) a four-hour custody-specific, scenario-based, skill development training on suicide prevention, which can be part of the eight-hour training described in paragraph 4.8 of the Implementation Plan in *Rosas* to all new Deputies as part of the Jail Operations Continuum and to all new Custody Assistants at the Custody Assistants academy; and (2) a two-hour custody-specific, scenario-based, skill development training on suicide prevention to all existing Deputies and Custody Assistants at their respective facilities, which can be part of the eight-hour training described in paragraph 4.7 of the Implementation Plan in *Rosas*, through in-service Intensified Formatted Training, which training will be completed by December 31, 2016.

These trainings will include the following topics:

(a)    suicide prevention policies and procedures, including observation and supervision of prisoners at risk for suicide or self-injurious behavior;

(b)    discussion of facility environments and staff interactions and why they may contribute to suicidal behavior;

(c)    potential predisposing factors to suicide;

(d)    high-risk suicide periods and settings;

(e)    warning signs and symptoms of suicidal behavior;

(f)    case studies of recent suicides and serious suicide attempts;

(g)    emergency notification procedures;

(h)    mock demonstrations regarding the proper response to a suicide attempt, including a hands-on simulation experience that incorporates the challenges that often accompany a jail suicide, such as cell doors being blocked by a hanging body and delays in securing back-up assistance;

(i)    differentiating between suicidal and self-injurious behavior; and

(j)    the proper use of emergency equipment.

16

**STATUS (18):**   **SUBSTANTIAL COMPLIANCE (as of October 1, 2017 (verified) at MCJ and PDC South)**

**SUBSTANTIAL COMPLIANCE (as of September 1, 2017 (verified) at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of December 1, 2017 (verified) at PDC East)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018 (verified) at TTCF, IRC, and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of August 1, 2018 (verified) at CRDF)**

The Department was not subject to monitoring during the Twentieth Reporting Period for the initial training of existing Deputy Sheriffs or Custody Assistants or of new Deputies in the Jail Operations Continuum and new Custody Assistants in the Custody Assistant Academy as required by Paragraph 18. Virtually all of the Deputy Sheriffs and Custody Assistants in the custody facilities received the initial training because they were assigned to the jails as of the Existing Date of the Settlement Agreement or they received the training as new Deputies or new Custody Assistants.

The Department is still subject to monitoring in future periods for Substantial Compliance with the refresher course requirements under Provision 81 Rosas 4.6(b) and 4.7(b). The County previously reported compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) and Rosas 4.7(b) as of December 2023. The Monitor's auditors verified the previously reported results. The County has posted results reflecting that it maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) and Rosas 4.7(b) as of December 2024. These results have been verified by the Monitor's auditors.

17

19.     Commencing July 1, 2015, the County and the Sheriff will provide:

(a)     Custody-specific, scenario-based, skill development training to new Deputies during their Jail Operations training, and to existing Deputies assigned to Twin Towers Correctional Facility, Inmate Reception Center, Men's Central Jail, the Mental Health Housing Units at Century Regional Detention Facility, and the Jail Mental Evaluation Teams ("JMET") at North County Correctional Facility as follows:

(i)     32 hours of Crisis Intervention and Conflict Resolution as described in paragraphs 4.6 and 4.9 of the Implementation Plan in *Rosas* to be completed within the time frames established in that case (currently December 31, 2016).  Deputies at these facilities will receive an eight-hour refresher course consistent with paragraph 4.6 of the Implementation Plan in *Rosas* every other year until termination of court jurisdiction in that case and then a four-hour refresher course every other year thereafter.

(ii)    Eight hours identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas* to be completed by December 31, 2016.  This training requirement may be a part of the 32-hour training described in the previous subsection. Deputies at these facilities will receive a four-hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

(b)     Commencing July 1, 2015, the County and the Sheriff will ensure that new Custody Assistants receive eight hours of training in the Custody Assistant academy, and that all existing Custody Assistants receive eight hours of training related to identifying and working with mentally ill prisoners as described in paragraph 4.7 of the Implementation Plan in *Rosas*.  This training will be completed by December 31, 2016.  Custody Assistants will receive a four-hour refresher course consistent with paragraph 4.7 of the Implementation Plan in *Rosas* every other year thereafter.

18

**STATUS (19):**      **SUBSTANTIAL COMPLIANCE (as of April 1, 2018, (verified) at NCCF, MCJ, and IRC)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2018, (verified) at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of December 1, 2018 (verified) at CRDF, PDC East, and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of March 1, 2019 (verified) at PDC South)**

The Department was not subject to monitoring during the Twentieth Reporting Period for the training of existing and new Deputy Sheriffs and Custody Assistants required by Paragraph 19.

The Department is still subject to monitoring in future periods for Substantial Compliance with the refresher course requirements under Provision 81 Rosas 4.6(b) and 4.7(b). The County previously reported compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) and Rosas 4.7(b) as of December 2023. The Monitor's auditors verified the previously reported results. The County has posted results reflecting that it maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) and Rosas 4.7(b) as of December 2024. These results have been verified by the Monitor's auditors.

20.     Commencing no later than July 1, 2017, the County and the Sheriff will
        provide:

(a)     Custody-specific, scenario-based, skill development training to existing
        Deputies assigned to North County Correctional Facility, Pitchess Detention
        Center, and the non-Mental Health Housing Units in Century Regional
        Detention Facility as follows:

        (i)     32 hours of Crisis Intervention and Conflict Resolution as described
                in paragraphs 4.6 and 4.9 of the Implementation Plan in *Rosas* to be
                completed by December 31, 2019.  Deputies at these facilities will
                receive an eight-hour refresher course consistent with paragraph 4.6
                of the Implementation Plan in *Rosas* every other year until
                termination of court jurisdiction in that case and then a four-hour
                refresher course every other year thereafter.

        (ii)    Eight hours identifying and working with mentally ill prisoners as
                described in paragraph 4.7 of the Implementation Plan in *Rosas* to be
                completed by December 31, 2019.  This training requirement may be
                a part of the 32-hour training described in the previous subsection.
                Deputies at these facilities will receive a four-hour refresher course
                consistent with paragraph 4.7 of the Implementation Plan in *Rosas*
                every other year thereafter.

20

**STATUS (20):**          **SUBSTANTIAL COMPLIANCE (as of August 1, 2017 (verified) at CRDF, PDC East, PDC North, and NCCF)**

                          **SUBSTANTIAL COMPLIANCE (as of October 1, 2017 (verified) at PDC South)**

The Department was not subject to monitoring for the initial training for existing Deputies as required by Paragraph 20 during the Twentieth Reporting Period.

The Department is still subject to monitoring in future periods for Substantial Compliance with the refresher course requirements under Provision 81 Rosas 4.6(b) and 4.7(b). The County previously reported compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) and Rosas 4.7(b) as of December 2023. The Monitor's auditors verified the previously reported results. The County has posted results reflecting that it maintained compliance with the refresher training requirements under Provision 81 Rosas 4.6(b) and Rosas 4.7(b) as of December 2024. These results have been verified by the Monitor's auditors.

21.     Consistent with existing Sheriff's Department policies regarding training requirements for sworn personnel, the County and the Sheriff will ensure that existing custody staff that have contact with prisoners maintain active certification in cardiopulmonary resuscitation and first aid.

STATUS:     **SUBSTANTIAL COMPLIANCE (as of October 1, 2015, through September 30, 2016 (verified) at PDC East and South)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at NCCF, PDC North, and IRC)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 (verified) at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at MCJ)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2018, through June 30, 2019 (verified) at CRDF)**

The Compliance Measures provide that the Department will demonstrate Substantial Compliance when 95% of the designated custody staff have the required CPR and first aid certifications for twelve consecutive months.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 21 in the Twentieth Reporting Period.

22

22.    Within six months of the Effective Date and at least annually thereafter, the County and the Sheriff will provide instructional material to all Sheriff station personnel, Sheriff court personnel, custody booking personnel, and outside law enforcement agencies on the use of arresting and booking documents, including the Arrestee Medical Screening Form, to ensure the sharing of known relevant and available information on prisoners' mental health status and suicide risk.  Such instructional material will be in addition to the training provided to all custody booking personnel regarding intake.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017)**

The Justice Data Interface Controller ("JDIC") message the Department has been using since June 29, 2016, is sufficient to establish Substantial Compliance with Paragraph 22, and the County maintained Substantial Compliance for twelve consecutive months through June 30, 2017.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 22 in the Twentieth Reporting Period.

23

23.    Within three months of the Effective Date, the County and the Sheriff will commence a systematic review of all prisoner housing, beginning with the Mental Health Unit of the Correctional Treatment Center, all High Observation Housing areas, all Moderate Observation Housing areas, single-person discipline, and areas in which safety precautions are implemented, to reduce the risk of self-harm and to identify and address suicide hazards.  The County and the Sheriff will utilize a nationally-recognized audit tool for the review.  From this tool, the County and the Sheriff will:

(a)    develop short and long term plans to reasonably mitigate suicide hazards identified by this review; and

(b)    prioritize planning and mitigation in areas where suicide precautions are implemented and seek reasonable mitigation efforts in those areas.

**STATUS:    SUBSTANTIAL COMPLIANCE**

The Monitor has verified, with the advice of the Subject Matter Expert, that the Department's Suicide Hazard Inspection Check List tool is a nationally recognized audit tool for this review.  The Department provided the Monitor with completed checklists documenting inspections of all housing units by January 14, 2016.

The Department submitted updated Suicide Hazard Mitigation plans to the Monitor on January 18, 2018 and July 12, 2018.  After consultations with the Mental Health Subject Matter Expert, the Monitor concluded that the plans satisfied the requirements of Paragraph 23 and that the Department had achieved and maintained Substantial Compliance with the provision.  Accordingly, pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Paragraph 23 in the Twentieth Reporting Period.

24

24.     The County and the Sheriff will review and inspect housing areas on at least an annual basis to identify suicide hazards.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018)**

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 24 in the Twentieth Reporting Period.  As the Monitor has noted, however, implementation and tracking of corrective actions must be addressed by the Custody Compliance and Sustainability Bureau ("CCSB") under Paragraph 77(c), which requires CCSB to "ensur[e] that corrective actions are taken to mitigate suicide risk. . .obtaining where appropriate, technical assistance. . .when such assistance is needed to address suicide-risk issues."

25.     The County and the Sheriff will ensure that any prisoner in a Sheriff's Department station jail who verbalizes or who exhibits a clear and obvious indication of current suicidal intent will be transported to IRC, CRDF, or a medical facility as soon as practicable.  Pending transport, such prisoners will be under unobstructed visual observation, or in a suicide resistant location with safety checks every 15 minutes.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of October 1, 2024, through March 31, 2025 (verified))**

A provision of the Station Jail Manual adopted in March 2018 requires that any arrestee who "displays obvious suicidal ideation or exhibits unusual behavior that clearly manifest[s] self-injurious behavior or other clear indication of mental health crisis shall be transported to the Inmate Reception Center (IRC), Century Regional Detention Facility (CRDF), or a medical facility as soon as practicable.  Pending transport, such inmates. . .shall be under unobstructed visual observation or in a suicidal restraint location with safety checks every 15 minutes."  Under the revised Compliance Measures, which were updated in 2021, the Department must randomly select and analyze Arrestee Medical Screening Forms from station jails identifying prisoners who verbalize or exhibit a clear and obvious indication of current suicidal intent to determine compliance with Paragraph 25.  Pursuant to the Joint Stipulation to Modify Deadlines, beginning in the Third Quarter of 2024, compliance is to be measured by combining the results across all Patrol Divisions.  Substantial Compliance requires that 90% of the selected records meet the requirements of Paragraph 25.

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required the County to achieve Substantial Compliance with Provision 25 by June 30, 2023, or the end of the Second Quarter of 2023.  On March 11, 2024, the Court issued an Order Modifying Deadlines for Substantial Compliance, which extended the deadline for Substantial Compliance to March 31, 2024.  Pursuant to the Joint Stipulation to Modify Deadlines, the County's compliance date for this Provision was extended to March 31, 2025, which falls within the period covered by this Report.

For the Fourth Quarter of 2024, the County reports 66% compliance for the Central Patrol Division, 100% for the East Patrol Division, 100% for the North Patrol Division, and 100% for the South Patrol Division.  The aggregate reported compliance percentage was 92%.  These results have been verified by the Monitor's auditors.

For the First Quarter of 2025, the County posted results reflecting 100% compliance for the Central Patrol Division, 100% compliance for the East Patrol Division, 78% for the North Patrol Division, and 100% compliance for the South Patrol Division.  The aggregate

26

reported compliance percentage was 91.3%.[11]  These results have been verified by the Monitor's auditors.

[11] Included as compliant records, as noted in the County's Twentieth Self-Assessment and posted results, were six records (In the Fourth Quarter of 2024, there was one at CRDF Booking, one at Lancaster Station, one at Carson Station, and one at Lakewood Station.  In the First Quarter of 2025, there was one at East Los Angeles Station and one at Temple Station.) where a limited number of safety checks exceeded the 15-minute threshold contemplated by Provision 25 by one to four minutes.  The Monitor has reviewed these records and, given the goals of Provision 25, exercises his discretion to find them compliant.  The lateness of the safety checks was *de minimis*, and appropriate context was provided by the County to explain the minor delays.  The County's request is therefore granted as to the six records identified in the discussion of Provision 25 in the Twentieth Self-Assessment.

26.    Consistent with existing Sheriff's Department policies, the County and the Sheriff will follow established screening procedures to identify prisoners with emergent or urgent mental health needs based upon information contained in the Arrestee Medical Screening Form (SH-R-422) or its equivalent and the Medical/Mental Health Screening Questionnaire and to expedite such prisoners for mental health evaluation upon arrival at the Jail Reception Centers and prior to routine screening.  Prisoners who are identified as having emergent or urgent mental health needs, including the need for emergent psychotropic medication, will be evaluated by a QMHP as soon as possible but no later than four hours from the time of identification.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of April 1, 2023, through March 31, 2024 (verified))**

The Compliance Measures require the Department to "review Arrestee Medical Screening Forms (SH-R-422) (or its equivalent) and the Medical/Mental Health Screening Questionnaires of 100 randomly selected prisoners during one randomly selected week per quarter at CRDF and at IRC."  Substantial Compliance requires that (1) 95% of the forms "include the required mental health information" and (2) 90% of the prisoners having urgent or emergent needs were "seen by a QMHP within four hours."

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 26 in the Twentieth Reporting Period.

28

27.     Consistent with existing Sheriff's Department policies, the County and the Sheriff will ensure that all prisoners are individually and privately screened by Qualified Medical Staff or trained custody personnel as soon as possible upon arrival to the Jails, but no later than 12 hours, barring an extraordinary circumstance, to identify a prisoner's need for mental health care and risk for suicide or self-injurious behavior. The County and the Sheriff will ensure that the Medical/Mental Health Screening Questionnaire, the Arrestee Medical Screening Form (SH-R-422), or its equivalent, and/or the Confidential Medical Mental Health Transfer Form are in the prisoner's electronic medical record or otherwise available at the time the prisoner is initially assessed by a QMHP.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of October 1, 2019, through March 31, 2020, and October 1, 2020, through March 31, 2021 (verified))**

The Compliance Measures require the Department to review the records of "randomly selected prisoners who were processed for intake during one randomly selected week at CRDF and at IRC" to determine compliance with this provision. Substantial Compliance requires that 90% of the records reviewed reflected that the prisoners were screened for mental health needs within 12 hours and that the required documentation was available to the QMHP for 90% of the mental health assessments conducted by the QMHP.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 27 in the Twentieth Reporting Period.

29

28.     The County and the Sheriff will ensure that any prisoner who has been identified during the intake process as having emergent or urgent mental health needs as described in Paragraph 26 of this Agreement will be expedited through the booking process.  While the prisoner awaits evaluation, the County and the Sheriff will maintain unobstructed visual observation of the prisoner when necessary to protect his or her safety, and will conduct 15-minute safety checks if the prisoner is in a cell.

STATUS:     **SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at IRC)**

**NOT RATED (at CRDF)**

The Compliance Measures require the Department to review the records of randomly selected prisoners at CRDF and IRC who have urgent or emergent mental health needs to determine whether they were expedited through the booking process and under visual observation or checked every 15 minutes.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required the County to achieve Substantial Compliance with Provision 28 by June 30, 2024.  Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed to extend the compliance deadline for Provision 28 to March 31, 2025, which falls within the period covered by this Report.

The County's Twentieth Self-Assessment reflects that in the Fourth Quarter of 2024, 96% of the inmates with urgent or emergent mental health needs were expedited through the booking process at CRDF in the randomly selected week, as required by the applicable Compliance Measures, and 100% of the inmates were observed or checked as required.  The County's Twentieth Self-Assessment also reported that in the First Quarter of 2025, 100% of the inmates with urgent or emergent mental health needs were expedited through the booking process at CRDF in the randomly selected week, as is required.  However, only 60% of the inmates were observed or checked, less than the required 95%.[12]

The number of records sampled to determine if inmates were observed or checked was small, totaling only five, which introduces the risk of error.  Following guidance provided in the Seventeenth Monitoring Report,[13] the County reports that it therefore

_____

[12] The County posted additional results reflecting 100% compliance with five additional records for inmates under observation or safety checks.  No context was initially provided for the additional results, as they were not provided based on a request from the Monitor or his auditors.  The County's Augmented Twentieth Self-Assessment clarifies that the County conducted an audit of a second randomly selected sample under Compliance Measure 28-5(b) to support its request for a discretionary finding of Substantial Compliance for the First Quarter of 2025.

[13] *See* Seventeenth Monitoring Report at pp. 26, note 13 ("The Monitor may choose to exercise his discretion to consider such requests where the County has a demonstrated track record of successfully meeting the quantitative targets in the compliance measures for a provision and the failure to meet them is truly an anomaly. Where, as here, the County was in Partial Compliance or Non-Compliance in the prior monitoring period, such requests will generally be denied. Where the County has sampled a small number of records from a larger universe, the County may choose to submit a second randomly selected sample (clearly identified as such and provided to supplement its first random sample) to support its position that the results are anomalous, which the Monitor may, in his discretion, consider.").

30

reviewed a second random sample of five records and found 100% compliance.  The County, therefore, requests that the Monitor exercise his discretion to find the County in Substantial Compliance for the First Quarter of 2025.

The Monitor, however, declines to make that finding given that in the initial sample, two of the sampled records were highly problematic.  In one of the cases, the patient to be expedited was identified in the medical and mental health screening as having active depression and psychosis.  She reported hearing voices that no one else could hear.  She had a history of prior suicide attempts, with prior self-harm and cutting.  She was undergoing withdrawal from methamphetamine with body aches and chills.  In short, she was precisely the kind of patient contemplated by Provision 28.  She was not placed under unobstructed visual observation but was instead put on 15-minute safety checks.  Between 11:23am and 11:50am, no safety check was performed, which was 12 minutes late, and 27 minutes when the patient was unmonitored and could have engaged in self-harm.

In the other case, the patient was identified in the custody transfer forms as having a mental health condition, with risks for self-harm and suicide.  She self-reported hitting her head while in custody at the police station, and suicidal ideation since her arrest.  She had a history of alcohol or street drug abuse or being on medication for addiction treatment.  She reported the recent loss of a family member.  She was not placed on constant, unobstructed monitoring.  Between 10:03pm and 10:27pm, no safety check was performed, which was nine minutes late, and 24 minutes when the patient was unmonitored and could have engaged in self-harm.

The County rightly points out that the sample size of five randomly selected cases is small.  The sample was previously expanded from three cases to five in 2018.[14]  Given the issues presented by 40% of the cases in the initial sample, the Monitor cannot exercise discretion to find the County in Substantial Compliance on these records.

However, given the County's overall history of strong performance at CRDF in recent quarters, the Monitor will exercise his discretion in another, related way.  No rating is being assigned to CRDF for the Twentieth Reporting Period, and the six months of Substantial Compliance at CRDF in the Nineteenth Reporting Period are uninterrupted.  If the County achieves Substantial Compliance with Provision 28 at CRDF for two additional quarters in the Twenty-First Reporting Period, the County will be deemed to have achieved 12 months of sustained Substantial Compliance at CRDF and will no longer be subject to monitoring with Provision 28 at CRDF in future Reporting Periods.

The County reports on other efforts it has taken to improve compliance at CRDF:

As soon as the issue was detected in the audit process, CCSB met with
CRDF command to pinpoint the area of noncompliance and discuss potential

---

[14] In August 2017, the Monitor agreed that the County could review three (later five) randomly selected videos in lieu of unannounced visits because inmates with urgent or emergent mental health needs were rarely in the CRDF reception center during the visits.  *See* Tenth Monitoring Report at pp. 24, note 9.  The County's posted results starting in the Third Quarter of 2018 adopted the sample size of five cases.

solutions. In response, CRDF operations briefed all Reception area sergeants, directing that Provision 28 patients remain under unobstructed visual observation in the Reception area as much as is practicable to ensure patient safety and to eliminate the timeliness of safety checks as a variable in terms of compliance.

The County also notes other steps it has recently taken to improve its compliance with Provision 28:

In January of 2024, CRDF revamped its staffing of Module 1400 by assigning a designated team of experienced deputies, custody assistants, and sergeants to each shift, including early mornings. Each staff member is hand-selected and trained extensively on DOJ provisions governing intake. Furthermore, the CRDF Captain directed Module 1400 to be fully staffed at all times on all shifts; therefore, Module 1400 staffers are not pulled away from the unit to address extraordinary circumstances. As outlined above, the two late safety checks in the First Quarter of 2025 did not arise in Module 1400.

In November of 2024, CRDF instituted a telepsych option to ensure prompt QMHP evaluations on early morning shifts when mental health staffing is leaner.

Staff in Module 1400 continue to prioritize keeping expedites on the front bench where they are under unobstructed visual observation, as opposed to moving them to a cell while they wait for an evaluation from a QMHP.

Finally, CRDF has continued weekly spot checks related to Provision 28 and its intake module to ensure any issues are uncovered and addressed in real time.

The County previously maintained Substantial Compliance with Paragraph 28 at IRC for twelve consecutive months, and IRC was not subject to monitoring for Substantial Compliance with Paragraph 28 in the Twentieth Reporting Period.

32

29.     The County and the Sheriff will ensure that a QMHP conducts a mental health assessment of prisoners who have non-emergent mental health needs within 24 hours (or within 72 hours on weekends and legal holidays) of a registered nurse conducting an intake nursing assessment at IRC or CRDF.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified))**

The Compliance Measures require the Department to review randomly selected records of the prisoners identified in the intake nursing assessment as having non-emergent mental health needs to determine if the Department completed mental health assessments for 85% of the prisoners within the required time periods.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 29 in the Twentieth Reporting Period.

33

30.    Consistent with existing DMH policies, the initial mental health assessment will include a brief initial treatment plan.  The initial treatment plan will address housing recommendations and preliminary discharge information.  During the initial assessment, a referral will be made for a more comprehensive mental health assessment if clinically indicated.  The initial assessment will identify any immediate issues and determine whether a more comprehensive mental health evaluation is indicated.  The Monitor and SMEs will monitor whether the housing recommendations in the initial treatment plan have been followed.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of January 1, 2019, through December 31, 2019 (verified))**

The Compliance Measures require the Department to review randomly selected initial mental health assessments and report on (1) the percentage of assessments that have (i) included an initial treatment plan that addresses housing recommendations and preliminary discharge information and (ii) identified any immediate issues and whether a more comprehensive evaluation was indicated; and (2) whether the housing recommendations were followed.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 30 in the Twentieth Reporting Period.

34

31 (**Revised**).  Consistent with existing Correctional Health Services and Sheriff's Department policies, the County and the Sheriff will maintain electronic mental health alerts in prisoners' electronic medical records that notify medical and mental health staff of a prisoner's risk for suicide or self-injurious behavior.  The alerts will be for the following risk factors:

    (a)    current suicide risk; and

    (b)    prior suicide attempts.

**STATUS:**    **SUBSTANTIAL COMPLIANCE (as of October 1, 2024, through March 31, 2025 (verified) at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2025, through March 31, 2025 (unverified) at CRDF)[15]**

On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provision 31 ("Revised Paragraph 31") as set forth above.  They also agreed on Revised Compliance Measures.  The Revised Compliance Measures require the Department to review randomly selected electronic medical records for prisoners in certain at-risk groups to determine if the required mental health alerts are in 85% of the records reviewed, which is the threshold for Substantial Compliance, for prisoners who report suicidal thoughts during the intake process; or were removed from risk precautions in the prior quarter.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required the County to achieve Substantial Compliance with Provision 31 by June 30, 2024.  Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed to extend the compliance deadline for Provision 31 to June 30, 2025, which does not fall within the period covered by this Report.

The County's amended posted results reflect that in the Fourth Quarter of 2024, at CRDF, 80% of the records reviewed contained the mental health alerts required by 31-1(a), less than the required 85%.  For Compliance Measure 31-1(b), the County's posted results report 24 responsive patients, and 100% were compliant.  At TTCF, the posted results reflect that 100% of the records reviewed contained the mental health alerts required by 31-

---

[15] The County initially self-reported results reflecting that CRDF was in Substantial Compliance in the Fourth Quarter of 2024 and First Quarter of 2025.  After inquiries by the Monitor's auditors, the County posted amended results on July 2, 2025, and July 24, 2025, reflecting that CRDF was in Partial Compliance during those quarters.  In its Augmented Twentieth Self-Assessment, the County submitted that three cases marked as non-compliant in the amended posted results for Compliance Measure 31-1(a) for the First Quarter of 2025, at CRDF, should be found in compliance.  Per the County, "nurse[s] in all three cases did enter an expedited order for mental health assessment and did alert the mental health team to the risk. In all three cases the mental health team responded quickly to the expedited order."  Further, the County submitted that it should not be found out of compliance due to "not having the specific type of electronic alert entered immediately in the system when, for all intents and purposes, appropriate alerts were raised and acted upon."  The Monitor has reviewed those three cases and grants the County's request as to two of the cases, where the risk to the patients was minimal and the cases appeared to be anomalous.

35

1(a).  For Compliance Measure 31-1(b), there were 25 responsive patients, all of which contained the required alerts, "resulting in 100% compliance."  The reported results at TTCF have been verified by the Monitor's auditors.

The County's amended posted results reflect that in the First Quarter of 2025, at CRDF, 80% of the records reviewed contained the mental health alerts required by 31-1(a), less than the required 85%.  However, the County has requested that the Monitor exercise his discretion to find the County Substantially Compliant with three records marked as non-compliant.  The Monitor grants the County's request as to two of those records.  The County's revised compliance percentage is 88%, which exceeds the Substantial Compliance threshold.  Regarding 31-1(b), 100% of the 13 relevant records contained the required alerts.  The reported results at CRDF are subject to verification by the Monitor's auditors.  At TTCF, the posted results reflect that 100% of the records reviewed contained the mental health alerts required by 31-1(a).  Regarding 31-1(b), 100% of the 26 responsive records contained the required alerts.  The reported results at TTCF have been verified by the Monitor's auditors.

The County attributes these improved results, in part, to its ORCHID enhancements that have been described in previous Monitoring Reports.  Specifically, the County reports that

> an ORCHID enhancement was implemented in spring 2024 for the baseline and follow-up assessment forms that are completed by QMHPs, wherein whenever a QMHP indicated a risk for suicide, an alert was automatically created by ORCHID. This enhancement, once fully effective, greatly improved the compliance rate for 31-1(b), as further described below. In the spring of 2025, the same ORCHID enhancement was implemented for the intake forms used by nursing for 31-1(a), so whenever a nurse indicates a history of suicide risk or present risk based on the intake process, the required mental health alert is automatically generated. The County is confident this will only further increase compliance levels and ensure consistency in remaining compliant in future quarters.

36

32.      Information regarding a serious suicide attempt will be entered in the prisoner's electronic medical record in a timely manner.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified))**

The Compliance Measures require that 95% of the electronic medical records of prisoners who had a serious suicide attempt reflect information regarding the attempt, and 85% of the records reflect that the information was entered into the record within one day of the attempt.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 32 in the Twentieth Reporting Period.

37

33.    The County will require mental health supervisors in the Jails to review electronic medical records on a quarterly basis to assess their accuracy as follows:

(a)    Supervisors will randomly select two prisoners from each clinician's caseload in the prior quarter;

(b)    Supervisors will compare records for those prisoners to corroborate clinician attendance, units of service, and any unusual trends, including appropriate time spent with prisoners, recording more units of service than hours worked, and to determine whether contacts with those prisoners are inconsistent with their clinical needs;

(c)    Where supervisors identify discrepancies through these reviews, they will conduct a more thorough review using a DMH-developed standardized tool and will consider detailed information contained in the electronic medical record and progress notes; and

(d)    Serious concerns remaining after the secondary review will be elevated for administrative action in consultation with DMH's centralized Human Resources.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017 (verified))**

The Compliance Measures require the County to provide the Monitor and the Subject Matter Experts with the DMH-developed standardized tool required by Paragraph 33(c), and to report the results of its analysis of the electronic medical records of two randomly selected prisoners from each clinician's caseload.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 33 in the Twentieth Reporting Period.

38

34 **(Revised).**  Consistent with existing Correctional Health Services policy, the County and the Sheriff will conduct clinically appropriate release planning for all prisoners who are being released to the community and who have been identified by a QMHP as having a mental illness and needing mental health treatment, or as having a DSM-5 major neuro-cognitive disorder that caused them to be housed in the Correctional Treatment Center at any time during their current incarceration.  For prisoners with mental illness and needing mental health treatment, the release planning services will be guided by the prisoner's level of care.  Specifically, prisoners who at any time during their incarceration meet mental health level of P3 or P4 will be presumptively referred for release planning services, and prisoners who meet mental health level of care P2 will receive release planning services upon referral by a clinician or upon their request. Prisoners who have a DSM-5 major neuro-cognitive disorder that caused them to be housed in the Correctional Treatment Center will also be referred for release planning services consistent with the Correctional Health Services policy applying to prisoners with mental illness.

(a) Release planning will consider the need of the prisoner for housing; transportation to the prisoner's community-based provider, residence, or shelter within the County; bridge psychotropic medications; medical/mental health/substance abuse services; income/benefits establishment; and family/community/social supports ("Release Planning Areas").

(b) Release planning will be based on an individualized assessment of the prisoner's needs and, unless the prisoner is unable or unwilling to participate, will be undertaken in collaboration with the prisoner.  For prisoners referred for release planning services, those services will include:

(i) An Initial Release Plan that will be created at intake or no later than ten days after the referral for release planning, which referral shall normally occur at the time of intake.  The Initial Release Plan will include preliminary identification of needs in each of the Release Planning Areas and preliminary recommendations for services to address those needs, and a referral for assistance in obtaining California identification when needed and when the prisoner is eligible; and/or

(ii) A Comprehensive Release Plan that will be initiated no later than thirty days after the referral for release planning.  The Comprehensive Release Plan will include (A) collecting information regarding the prisoner's needs; (B) coordinating with community-based providers to identify available services that meet the prisoner's needs; (C) facilitating the transition of care to community-based providers, and (D) assisting in obtaining identification and/or benefits when needed, when the prisoner is eligible, and as offered by the Sheriff's Community Transition Unit.

(c) The County will maintain a re-entry resource center with staff supervised by a QMHP.  The re-entry resource center will:

39

(i) Provide information appropriate to the released prisoner about available housing, transportation, medical/mental health/substance abuse services, income/benefits establishment, community/social supports, and other community resources; and

(ii) Provide released prisoners with copies of their release plans, as available.

(d) All prisoners who are receiving and continue to require psychotropic medications will be offered a clinically appropriate supply of those medications upon their release from incarceration.  Unless contraindicated, this will be presumed to be a 14-day supply or a supply with a prescription sufficient so that the prisoner has the psychotropic medication available during the period of time reasonably necessary to permit the prisoner to consult with a doctor and obtain a new supply.

(e) Nothing in Paragraph 34 will require prisoners to accept or participate in any of the services provided under this Paragraph.

(f) Neither the County nor the Sheriff shall be in violation of this paragraph if after reasonable efforts as set forth in Correctional Health Services Policy M380.01, Release Planners are unable to identify available post-release services.

40

**STATUS (34):**        **PARTIAL COMPLIANCE**

During the Seventh Reporting Period, the parties and the Intervenors reached an agreement on the provisions of revised Paragraph 34 ("Revised Paragraph 34") set forth above. They also agreed on revised Compliance Measures and a revised policy to implement Revised Paragraph 34. On December 10, 2018, the Court issued an order pursuant to the parties' joint stipulation revising Paragraph 34. On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234. That Order required Defendants to achieve Substantial Compliance with Provision 34 by December 31, 2022, which was missed during the Fifteenth Reporting Period.

In the Nineteenth Reporting Period, the Parties continued meeting with the Monitor to revise the Compliance Measures and agree upon corrective actions. In November 2024, the Parties convened a productive meeting of Community-Based Organizations ("CBOs") to discuss obstacles to providing release planning services, particularly for those with severe mental illness without predicted release dates ("PRDs"). The Parties thereafter agreed upon a Joint Stipulation to Modify the December 27, 2022 Court Order Setting Deadline for Substantial Compliance ("Joint Stipulation to Modify Provision 34 Compliance Deadlines"). As set forth more fully below, pursuant to that Joint Stipulation, the Parties agreed upon a series of cure measures and revisions to the existing Compliance Measures.[16] Further, the Parties agreed to extend the County's compliance deadline to June 30, 2025, which does not fall within the period covered by this Report.

For the Twentieth Reporting Period, the County's Twentieth Self-Assessment reports that for Compliance Measure 34-13(c)(1), which relates to referrals for release planning, 97% of inmates in the Fourth Quarter of 2024 and 98% of inmates in the First Quarter of 2025 received a referral for release planning, greater than the required 85%.

For Compliance Measure 34-13(c)(2), which concerns Initial Release Plans ("IRPs"), the County reports that 89% of inmates in the Fourth Quarter of 2024 who should have received an Initial Release Plan were compliant, greater than the required 85%. In the First Quarter of 2025, 84% of inmates who should have received an Initial Release Plan were compliant, less than the required 85%.

For Compliance Measure 34-13(c)(3), which requires certain services and documentation relating to inmates receiving comprehensive release planning, the County reports that 86% of inmates in the Fourth Quarter of 2024 were compliant. In the First Quarter of 2025, 69% were compliant, less than the required 85%.

For Compliance Measure 34-13(c)(4), which pertains generally to the release

---

[16] These revisions bifurcate the measurement of release planning services for those with and without PRDs. For those without PRDs, the County will pilot for an initial six-month period a program to offer such inmates an opt-in to a meeting with a CHS release planner prior to their release (to the extent that it does not violate the County's obligations under state law, a court order, or deadlines established under Rutherford v. County of Los Angeles, Case No. 2:75-cv-04111-DDP). The County has also agreed to provide quarterly reporting regarding the utilization of this option during the pilot period, and the Parties have agreed to reconvene to discuss these data and collectively evaluate whether the pilot should continue after the six-month pilot period.

41

planning process, the County reports that the records of 80% of inmates in the Fourth Quarter of 2024 and 58% of inmates in the First Quarter of 2025 were compliant, less than the required 85%.  Finally, the County reports 86% compliance for the Fourth Quarter of 2024 and 86% compliance for the First Quarter of 2025 with Compliance Measure 34-13(c)(5), which requires documentation relating to inmates requiring psychotropic medications, less than the 90% requirement.  The County reports that

> The 20th Reporting Period revealed a regression in some areas from the Fourth Quarter of 2024 to the First Quarter of 2025. Nonetheless, the improvements implemented by PRCM in the Summer of 2024 to address the areas where improvement was most needed have been a veritable success year-over-year and the County has made significant leaps, particularly with respect to comprehensive release planning. As first explained in the 19th Augmented Self-Assessment, the County is experiencing a slight retreat in the metric for providing a clinically appropriate supply of psychotropic medications, a traditional area of strength in its Provision 34 compliance. A data connectivity issue between the platforms used by those involved in an inmate's release has occasionally delayed transmittal of inmate medication information to the LASD Pharmacy in time for their release. Working with custody and others, PRCM identified and worked to resolve this issue in the First Quarter of 2025 and expects its compliance reporting to reflect that beginning with the Second Quarter of 2025.

More specifically, the County reports

> PRCM discovered it was not receiving all referrals of clients for the IRPs from the IRC because staff were not issuing a formal order as required. Without an official order in place, PRCM was entirely unaware of the client's need for an IRP and only learned of it when conducting a later audit. After identifying this issue, PRCM alerted the IRC staff and enacted an ORCHID fix in late May 2025 that automatically issues a formal order to PRCM after IRC staff indicate that a referral should be made for IRP services. The data capture issue involved a failure of completed IRPs to be uploaded to ORCHID where they could be counted for auditing purposes. After troubleshooting, PRCM believes the issue has been fixed but is nonetheless in the process of adding an additional step that would require staff to confirm that IRPs have been uploaded for every patient proactively. Because of the data capture issue, PRCM achieved even greater success in IRPs than is reflected in the results of this Reporting Period, but it is unable to credit itself without following its supporting documentation protocols.

These efforts are amplified by commitments made by the County in the Joint Stipulation to Modify Provision 34 Compliance Deadlines, which requires the County to pilot new measures allowing incarcerated persons without a PRD to voluntarily opt-in to a release planning meeting prior to the point of exit and to provide release planning services at an exit window.  The County reports

42

the County has taken steps to provide release planning services specifically for those who do not have a PRD and are unexpectedly released. In addition to the exit window program, which began in November 2024, the County has enacted an opt-in meeting for Provision-34 eligible inmates with a PRCM release planner inside the jail on the day of the inmate's release. To maximize the utility of both programs, PRCM staff notify all inmates of the exit window and opt-in meeting opportunities during all their release planning encounters, well in advance of the day of release. As shown below (see Figure 2), the exit window has seen 862 clients since it opened in November 2024 and has provided more than 906 resources, including services aligning with critical Provision 34 domains such as transportation and connections to housing. As of the date this filing, no inmate has opted-in for a voluntary meeting with a release planner on the day of their release.[17]

The County has also helpfully produced data associated with the exit window that reflects an increasing number of stops at the window, particularly in the Second Quarter of 2025 for PRCM clients, which is encouraging.  The number of resources provided at the window did not appear to increase at a corresponding rate.  Moreover, given the needs of the release planning population, there are certain subcategories where we would expect to see significant inmate need and interest, but where the number of resources provided remained relatively small.  This includes Transportation, MH [Mental Health] Provider, PCP or Medical, Housing, and Benefits.  It would be helpful for the County to provide further analysis of the resources available and provided at the window for these subcategories to ensure that they are adequate to meet the needs of the population.

| Overall Count of Provided Resources to Clients | 908 |
| --- | --- |
| Unique Count of Clients | 862 |

| CHS WINDOW | 24-Nov | 24-Dec | 25-Jan | 25-Feb | 25-Mar | 25-Apr | 25-May | 25-Jun | 25-Jul |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| How many stopped at the CHS window | 80 | 122 | 54 | 52 | 87 | 163 | 163 | 163 | 29 |
| How many of those stopped at CHS window were PRCM | 19 | 67 | 34 | 37 | 71 | 111 | 63 | 58 | 9 |

| Provided Resources | 24-Nov | 24-Dec | 25-Jan | 25-Feb | 25-Mar | 25-Apr | 25-May | 25-Jun | 25-Jul |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Delayed Release | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| PCP or Medical | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| SUD | 8 | 4 | 4 | 5 | 8 | 2 | 2 | 8 | 1 |
| Transportation | 23 | 22 | 15 | 9 | 31 | 12 | 9 | 51 | 2 |
| Family or support system | 3 | 28 | 13 | 20 | 13 | 13 | 5 | 4 | 1 |
| Veterans | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 |
| Directed to J-COD | 4 | 15 | 8 | 4 | 6 | 2 | 14 | 2 | 2 |
| MH Provider | 4 | 2 | 3 | 4 | 3 | 1 | 5 | 3 | 1 |
| Housing | 27 | 25 | 5 | 10 | 16 | 11 | 12 | 4 | 1 |
| Benefits | 14 | 16 | 11 | 5 | 14 | 10 | 23 | 4 | 1 |
| General Jail Information | 47 | 95 | 46 | 28 | 29 | 42 | 29 | 12 | 4 |
| Work release/Ankle program | 0 | 1 | 1 | 3 | 0 | 1 | 1 | 0 | 0 |
| Meds | 9 | 24 | 10 | 3 | 7 | 16 | 80 | 50 | 13 |
| Pink Flyer Given | 0 | 0 | 1 | 2 | 0 | 0 | 7 | 0 | 1 |
| Directed by CA or RP | 1 | 3 | 7 | 2 | 0 | 4 | 1 | 0 | 1 |
| Total | 140 | 235 | 124 | 95 | 127 | 115 | 189 | 138 | 28 |

---

[17] The County rightly notes that once an inmate is ordered released, the County must release them forthwith. It is obviously true that inmates on the cusp of a release from jail will not want to consent to the creation of any roadblocks that would slow their release from custody.  However, it is also true that the way in which this voluntary meeting is offered to inmates will impact their willingness to participate.  If inmates continue to reflexively decline the offered final release planning meeting, the Monitor recommends that the County evaluate, in consultation with the Monitor, DOJ, and Intervenors, whether there are opportunities to refine the manner in which the offer is being made in a way that maximizes the chances of acceptance without running afoul of the County's legal obligations related to inmate releases.

43

The Joint Stipulation to Modify Provision 34 Compliance Deadlines also requires the County to provide quarterly reporting, beginning in the First Quarter of 2025, about the phased implementation of the Warm Landings Place ("WLP") program operated by the Justice Care and Opportunities Department.  The County reports

> the County continues to implement the voluntary, post-release Warm Landing Place ("WLP") program through the Justice Care and Opportunities Department provides additional opportunities for community linkages. One year ago, Phase I of WLP launched with the establishment of a welcome table in the public lobby of the Inmate Reception Center that is fully staffed during the jail's release hours. WLP is currently finalizing arrangements to place a trailer outside the IRC, which will be located along the exit pathway for individuals leaving the IRC. Services are anticipated to begin by the close of the fiscal year. As part of Phase II, WLP is preparing an interim housing site within 1.5 miles of the IRC, which will serve as the temporary WLP headquarters and provide temporary housing for up to 29 individuals. Phase III, a permanent site at 955 Vignes Street, is currently in the conceptual design phase with a target completion for that phase at the end of the fiscal year.

The Joint Stipulation to Modify Provision 34 Compliance Deadlines also requires the County to convene, beginning in the First Quarter of 2025, a regular working group focused on improving the County's release planning processes, composed of release planning staff, and representatives from the Department, the Los Angeles County Public Defender's Office, and CBOs that provide release planning services.  Since that time, the County has convened several productive meetings among these stakeholder entities to problem-solve challenges with the release planning system, with a specific focus on inmates who are released without a predicted release date.

44

35.     Consistent with existing DMH and Sheriff's Department policies, the County and the Sheriff will ensure that custody staff, before the end of shift, refer prisoners in general or special populations who are demonstrating a potential need for routine mental health care to a QMHP or a Jail Mental Evaluation Team ("JMET") member for evaluation, and document such referrals.  Custody staff will utilize the Behavior Observation and Referral Form.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of November 1, 2017, through December 31, 2018 (verified))**

The Compliance Measures require the Department to review, for a randomly selected month each quarter, the Behavior Observation and Mental Health Referral ("BOMHR") records for prisoners referred by custody staff to a QMHP or JMET member for "routine" mental health care to determine the timeliness of the referrals, and that 85% of the referrals "occurred before the end of the shift in which the potential need for mental health care is identified."

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 35 in the Twentieth Reporting Period.

36.    Consistent with existing DMH policies, the County and the Sheriff will ensure that a QMHP performs a mental health assessment after any adverse triggering event, such as a suicide attempt, suicide threat, self-injurious behavior, or any clear de-compensation of mental health status.  For those prisoners who repeatedly engage in such self-injurious behavior, the County will perform such a mental health assessment only when clinically indicated, and will, when clinically indicated, develop an individualized treatment plan to reduce, and minimize reinforcement of, such behavior.  The County and the Sheriff will maintain an on-call system to ensure that mental health assessments are conducted within four hours following the notification of the adverse triggering event or upon notification that the prisoner has returned from a medical assessment related to the adverse triggering event.  The prisoner will remain under unobstructed visual observation by custody staff until a QMHP has completed his or her evaluation.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of October 1, 2024, through December 31, 2024 (verified), and through March 31, 2025 (unverified) at TTCF and CRDF)**

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required Defendants to achieve Substantial Compliance with Provision 36 by September 30, 2023, which was missed during the Seventeenth Reporting Period.  Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed that the County's revised compliance deadline for Provision 36 would be June 30, 2025, which does not fall within the period covered by this Report.

The Compliance Measures require the Department to develop a staffing schedule to provide on-call services, and the County's Twentieth Self-Assessment reported that it complied with this requirement for the Fourth Quarter of 2024.  The Compliance Measures also require the Department to review randomly selected records of prisoners newly admitted to mental health housing from a lower level of care due to an adverse triggering event during two randomly selected weeks per quarter.  The County's results reflect that during the Fourth Quarter of 2024, 98% of inmates identified in the two randomly selected weeks received an assessment by a QMHP within four hours, greater than the 95% required by Compliance Measure 36-4(a).  The County further reports that 100% of the selected prisoners at TTCF and CRDF were seen on videos under unobstructed visual observation pending assessment, exceeding the 95% required by Compliance Measure 36-4(b).  These results at TTCF and CRDF have been verified by the Monitor's auditors.

The County's Twentieth Self-Assessment reports that for the First Quarter of 2025, the Department complied with the staffing schedule requirement.  Further, during the First Quarter of 2025, 96% of inmates identified in the two randomly selected weeks received an assessment by a QMHP within four hours, greater than the 95% required by Compliance

46

Measure 36-4(a).[18]  The County further reports that 100% of the selected prisoners at CRDF and TTCF were under unobstructed visual observation pending assessment, greater than the 95% required by Compliance Measure 36-4(b).  The reported results are subject to verification by the Monitor's auditors.

The County reports

The County continued to build upon its efforts in the 19th Reporting Period to improve compliance with this provision. In the First Quarter of 2025, staffing coverage shifted, as overnight coverage was receiving less than one call per week. Overnight calls are now routed to the IRC. To improve telehealth usage, the IRC supervisor instructed custody staff to call the IRC deputy booth if they encounter any issues using the IVVS machines for telehealth. CHS staff also updated their out-of-office contacts to include the IRC deputy booth. After an initial adjustment period, these processes are operating more effectively.

Several improvements were made at the North facilities in the latter half of the First Quarter of 2025 to increase telehealth usage. CHS's IRC supervisor sends a weekly report of telehealth calls received and documents any delays or issues with telehealth usage. Custody staff follow up to investigate any untimely or problematic cases and appropriately re-briefs staff to address any issues. Additionally, CHS Compliance, CCSB, and CITU are working to enhance the BOMHR form to make it clearer to staff and so that any untimely cases can be more thoroughly investigated if they occur. Due to developer shortages, CITU was delayed in starting on these enhancements.

By the Second Quarter of 2025, NCCF implemented a robust process that requires a safety check senior deputy to review and monitor BOMHRs to ensure no one in crisis experiences a delay and that BOMHRs are submitted timely. This ensures inmates with BOMHRs go straight to telehealth without delay. The clinic staff then calls North or IRC to ensure the inmate is seen as quickly as possible. Command staff and supervisors have instructed

---

[18] The County's Twentieth Self-Assessment included a compliance percentage of 94%, less than the 95% required.  However, the County also requested that the Monitor exercise discretion to find it compliant under Compliance Measure 36-4(a), as it was only non-compliant with three cases.  The Monitor has reviewed those three cases and grants the County's request as to one of the cases, where the patient was experiencing symptoms of depression but was not suicidal.  While the BOHMR was delayed by Custody, the risk to the patient was minimal.  The County's revised compliance percentage is 96%, which exceeds the Substantial Compliance threshold.

The County also suggests that a "discretionary finding of substantial compliance for this measure is warranted because of remedial actions NCCF has taken in the wake of the two cases where QMHP evaluation was delayed." *See* County's Twentieth Self-Assessment at pp. 48.  While the Monitor appreciates the County's proactive steps to address the non-compliance, which serve to demonstrate the County's good-faith efforts, taking remedial steps to implement the terms of the Agreement is a requirement of the Agreement and the Court's orders, and is not a sufficient basis for the requested exercise of discretion.  In any event, the request is granted based upon the Monitor's review of the relevant records.

personnel that inmates are to be taken immediately to the clinic after a qualifying incident. As a result of these process enhancements, telehealth usage and crisis timeliness have markedly improved at NCCF by the Second Quarter of 2025.

37.    Sheriff's Court Services Division staff will complete a Behavioral Observation and Mental Health Referral ("BOMHR") Form and forward it to the Jail's mental health and/or medical staff when the Court Services Division staff obtains information that indicates a prisoner has displayed obvious suicidal ideation or when the prisoner exhibits unusual behavior that clearly manifests self-injurious behavior, or other clear indication of mental health crisis.  Pending transport, such prisoner will be under unobstructed visual observation or subject to 15-minute safety checks.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of January 1, 2025, through March 31, 2025 (unverified))**

The Compliance Measures require the Department to randomly select nine courts from among the three Court Divisions each quarter, review written communications and orders that refer to a suicide risk or serious mental health crisis for a prisoner and incident reports for self-injurious behavior by prisoners appearing in the selected courts, and determine if these incidents are reflected in BOMHR forms completed by the Court Services Division staff in the selected courts.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required Defendants to achieve Substantial Compliance with Provision 37 by March 31, 2024.  Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed that the County's revised compliance deadline for Provision 37 would be March 31, 2025, which falls within the period covered by this Report.  The Parties also agreed that the County's compliance would be measured by increasing the number of courthouses audited by the County from six to 12 each quarter.

In the County's Twentieth Self-Assessment, it reported that for the Fourth Quarter of 2024, in all three qualifying incidents, Court Division staff completed BOHMRs for the patient and forwarded them to CHS.  However, in one case, staff documented the safety checks but failed to perform them in a timely manner, resulting in a compliance percentage of 66% under Compliance Measure 37-4(b).[19]  In the First Quarter of 2025, the County reported that for all 11 qualifying incidents, Court Division staff completed BOHMRs and forwarded them to CHS.  Staff documented the safety checks, and the checks were done in a timely manner in all 11 cases, resulting in 100% compliance.  The reported results for the First Quarter of 2025 are subject to verification by the Monitor's auditors.

The County reports

In prior periods, achieving compliance with Compliance Measure 37-4(b) has been the primary difficulty. To achieve substantial compliance with this measure, CSD Training continues to send out quarterly emails regarding Provision 37 with instructions on the proper procedure to follow once a BOMHR is completed to ensure that: 1) safety checks are completed in a

---

[19] The County has requested that the Monitor exercise his discretion to find the single non-compliant record compliant.  The Monitor has reviewed the record and declines to do so.  The patient expressed active suicidal ideation and the safety check was delayed by nine minutes, which is not *de minimis* given the risk to patient safety.

timely manner; and 2) that they are logged and that a copy of the log is retained. The email includes a reminder to scan records of safety checks or unobstructed visual observation into a shared drive accessible by CCSB. In the 20th Reporting Period, there were no instances of missing safety check logs. This critical improvement likely is related to the regular reminders from CSD Training, which have helped remediate one of the other challenges presented by the small number of cases—the (thankfully) rare opportunities to practice and execute Provision 37's requirements.

As the County has previously reported, since December 2024, each courthouse has conducted a weekly spot check to ensure that safety checks are completed in a timely manner and that this timeliness is documented in a preserved record. If there were to be a missed or late safety check, or if records were unavailable, staff can receive near-real-time training. As part of the launch of this weekly spot check process, courthouse staff were also retrained on Provision 37 and its key components.

50

38.    Consistent with existing DMH policies and National Commission on Correctional Health Care standards for jails, the County and the Sheriff will ensure that mental health staff or JMET teams make weekly cell-by-cell rounds in restricted non-mental health housing modules (e.g., administrative segregation, disciplinary segregation) at the Jails to identify prisoners with mental illness who may have been missed during screening or who have decompensated while in the Jails.  In conducting the rounds, either the clinician, the JMET Deputy, or the prisoner may request an out-of-cell interview.  This request will be granted unless there is a clear and documented security concern that would prohibit such an interview or the prisoner has a documented history of repeated, unjustified requests for such out-of-cell interviews.

**STATUS:**    **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified))**

The Compliance Measures require the Department to review the documentation of the weekly cell-by-cell rounds and the JMET Logs for a randomly selected week each quarter to confirm that the required cell-by-cell checks were conducted and out-of-cell interviews were handled in accordance with this provision.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 38 in the Twentieth Reporting Period.

51

39.     The County and the Sheriff will continue to use a confidential self-referral system by which all prisoners can request mental health care without revealing the substance of their requests to custody staff or other prisoners.

**STATUS     SUBSTANTIAL COMPLIANCE (as of July 1, 2017, through June 30, 2018 (verified) at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2025, through March 31, 2025 (verified) at PDC North)**

**PARTIAL COMPLIANCE (at CRDF, MCJ, and TTCF)**

**NOT RATED (at PDC East and PDC South)**

Substantial Compliance requires the Department to (a) verify that housing areas have the required forms and (b) review randomly selected self-referrals for mental health care from prisoners to confirm that (i) the referrals "were forwarded to DMH" by the Department, and (ii) that "DMH documented the timeliness and nature of DMH's response to the self-referrals[.]"  The thresholds for Substantial Compliance are that (i) 85% of the housing areas have the required forms; (ii) 90% of the self-referrals must be forwarded by the Department to the Department of Health Services – Custody Health Services (DHS-CHS); and (iii) 90% must contain the required documentation of DHS-CHS's response.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required Defendants to achieve Substantial Compliance with Provision 39 by June 30, 2024.  Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed to extend the compliance deadline for Provision 39 to June 30, 2025, which does not fall within the period covered by this Report.

The County's Augmented Twentieth Self-Assessment reports that it achieved 100% compliance with Compliance Measure 39-4(a) in the Fourth Quarter of 2024 at all monitored facilities.  Regarding Compliance Measures 39-4(b) and 4(c), the County's Augmented Twentieth Self-Assessment reports that 100% of the self-referrals from PDC North, CRDF, TTCF, and MCJ were forwarded by the Department to CHS in the Fourth Quarter of 2024.  The County further reports that CHS documented the timeliness and nature of its response in 75% of the PDC North referrals, 92% of the CRDF referrals, 100% of the TTCF referrals, and 78% of the MCJ referrals.  The County reports no relevant referrals from PDC South and PDC East during the Fourth Quarter of 2024.

For the First Quarter of 2025, the County reports that it achieved Substantial Compliance with Compliance Measure 39-4(a) at all applicable facilities.  The reported results were 100% at MCJ, CRDF, PDC North, PDC South, and PDC East, and 96% at TTCF.  Regarding Compliance Measures 39-4(b) and 4(c), the County's Augmented Twentieth Self-Assessment reports that 100% of the self-referrals from PDC North, CRDF, TTCF, and MCJ were forwarded by the Department to CHS in the First Quarter of 2025, and there were no relevant referrals from PDC South and PDC East.  The County further reports that CHS documented the timeliness and nature of its response in 100% of the PDC

52

North referrals, 90%[20] of the CRDF referrals, 95% of the TTCF referrals, and 100% of the MCJ referrals.  The reported results at PDC North for the First Quarter of 2025 have been verified by the Monitor's auditors.

The Monitor's auditors, with guidance from the Mental Health Team, performed audits for the Fourth Quarter of 2024 at CRDF and TTCF, and First Quarter of 2025 at CRDF, MCJ, and TTCF, and found that an insufficient number of records reflected adequate responses to self-referrals within the seven-day requirement for compliance.  The Third Monitoring Report established that "[a]bsent extenuating circumstances, which must be documented, the Monitor believes that DMH must respond to self-referrals within seven days of DMH's receipt from the Department."[21]  Shortly thereafter, the County adopted the seven-day standard in its posted results.  However, starting in the Fourth Quarter of 2024, the County's posted results assert that 30 days is the applicable response time standard for certain self-referrals, such as requests for medication and psychiatric appointments when no explicit mental health symptoms are indicated by the inmate on the self-referral form.  Specifically, the County contends

> the clinical reality [is] that not all mental health care requests need to be addressed in the same manner and within the same time frame. . . .As stated above, the responses to most HSRs must be within seven days. This includes all HSRs in which the patient expresses a mental health symptom, such as anxiety, sleeplessness, grief, auditory or visual hallucinations, or stress. However, for HSRs in which the patient does not describe any symptoms, but only requests a psychiatric appointment, medication initiation, or medication adjustment without noting any symptoms or other mental health concerns, the County assesses timeliness of response—and its compliance with 39-4(c)—by a 30-day standard.

The Mental Health Team disagrees.  It is well-known that confined patients experiencing significant mental health symptoms often submit mental health requests that are ambiguous for a variety of reasons, including decompensation, the lack of privacy, and fear of stigma inherent in self-reporting private mental health information on a written form.  Indeed, the National Commission on Correctional Health Care ("NCCHC") recognizes this phenomenon and, in its *2026 Standards for Mental Health Services in Correctional Facilities*, advises

> When reviewing nonemergent mental health care requests [personnel] should identify within 24 hours of receipt those who require a face-to-face encounter. . . .Relying on patients to accurately describe their written mental health care concern(s) in order to determine whether they need a face-to-face visit can be challenging. . . .While some patients may report obvious clinical

---

[20] The County posted amended results on December 15, 2025, reflecting that CRDF was 90% compliant during the First Quarter of 2025.

[21] *See* Third Monitoring Report at pp. 35.  The seven-day response standard was also discussed in the Fourth Monitoring Report at pp. 35, Fifth Monitoring Report at pp. 35, Sixth Monitoring Report at pp. 40, Seventh Monitoring Report at pp. 38, note 16, and Eighth Monitoring Report at pp. 41.

symptoms or request to see mental health staff to receive mental health care, there are many who do not, but that does not mean it is not a mental health care request.  When written requests are ambiguous or the nature of the patient's request/concern is not clearly described, or if the actual request or concern is unknown, the patient should be seen face-to-face within 24 hours.[22]

The Mental Health Team has also raised concerns regarding the mental health qualifications of the nursing staff triaging the self-referrals.  Additionally, in many cases, the County relies on a chart review or scheduled future psychiatric visit as its response to inmate self-referrals.

Notwithstanding the above, the Mental Health Team found, through its qualitative review of Provision 39 in the Twentieth Reporting Period, certain evidence of commendable progress in the County's compliance.  The Mental Health Team reviewed 55 qualifying cases (15 from TTCF; 15 from CRDF; 22 from MCJ; 3 from PDC North) and found some form of QMHP response in 53/54 or 98% of cases (one was indeterminate).  This compares to 78% of cases for July 2021, 86% for September 2020, and 89% for November 2019.

In 45/55, or 82% of cases, the response was deemed timely, defined as within seven days.  This is higher than the 64% reported for July 2021, 64% of cases from the September 2020 review, and 65% from the November 2019 review.  Two of the cases rated as noncompliant on this requirement were seen eight days after the HSR was timestamped; the remaining untimely responses occurred 11 or more days after the timestamp.  The response was found to be clinically adequate in 47/51, or 92% of cases (one case was N/A and three were indeterminate).  This compares to 73% of cases for July 2021, 71% reported in September 2020, and lower than the 83% reported in November 2019.

---

[22] While the County's obligations are memorialized in the Agreement, prevailing standards for corrections can be instructive.  *See* NCCHC *2026 Standards for Mental Health Services in Correctional Facilities*, § MH-E-05, Interpretive Guidance ("Urgency of symptoms must be based on the patient's perceptions. . . .A QMHP's response must include performing an assessment in a clinically appropriate time frame; it is counterproductive for staff to tell a patient to sign up for sick call."  "Facilities that receive numerous mental health care requests every day may need to allocate [sufficient] staffing to address the number of patients who need a face-to-face visit."  "Because better disposition decisions are likely to result, QMHPs and QHCPs with the most experience should complete the review and prioritization of written requests").

Moreover, the thirty-day standard presented clinical risks to patients in the County's custody in the Twentieth Reporting Period.  For example, in one record submitted as compliant, a CRDF patient submitted an HSR form dated January 5, 2025, requesting to speak with a doctor about lowering her medication dosages due to side effects and writing "urgent" at the top of the form.  This HSR was triaged as a routine mental health request on January 6, 2025.  The County's self-audit relies on a chart review dated January 13, 2025, as its response seven days later, even though the patient was not seen face-to-face.  The chart review referenced patient visit information from October 2024, and an upcoming visit scheduled for January 14, 2025, eight days after the HSR was triaged, which was deemed an appropriate time frame.  However, based on source documentation provided, the scheduled visit for January 14, 2025, did not occur.  A telehealth assessment performed on January 22, 2025, 16 days after the HSR was triaged, reflects that the patient presented worsening auditory hallucinations and Extrapyramidal Symptoms, which could have been ameliorated if addressed by the County closer in time to the patient's HSR.

54

Where there was a clinically inadequate response, it was primarily due to

the lack of specificity in the clinical notes in relation to the issues identified in the self-referral. The current review again included some cases where it appeared that self-referrals were triaged by staff who decided that, since an inmate had been seen prior to the self-referral by mental health staff (e.g. by psychiatry in relation to a medication request), no further action was needed, and the next clinical contact was a regularly scheduled appointment, which did not always occur within the required timeframe.  Clarification was sought regarding the qualifications of the Mental Health Services Coordinator who does some of the triage for HSRs.  Although the posting for this position lists a variety of degrees and credentials (including a Master's degree in mental health-related fields, although licensure is not required), the person doing the triage does not appear to be a QMHP (it was reported that the person does not see patients).  Some concern, therefore, remains that the person conducting the triage may not be clinically qualified to determine that a response to the HSR is not necessary prior to the next scheduled QMHP appointment, or that a recent contact has addressed the patient's request.  This included cases where requests for medications or changes to prescribed medications were determined to be within an adequate timeframe if addressed at the next scheduled psychiatry appointment.

These results reflect notable improvement in the documented responses to mental health HSRs.  The County can and should build on this progress to attain Substantial Compliance with Provision 39.  However, for the Twentieth Reporting Period, CRDF, MCJ, and TTCF are in Partial Compliance.

The County previously reported Substantial Compliance at NCCF for twelve consecutive months from July 1, 2017, through June 30, 2018.  These results were verified by the Monitor's auditors and NCCF is no longer subject to monitoring for compliance with Paragraph 39.

55

40.     The County and the Sheriff will ensure a QMHP will be available on-site, by transportation of the prisoner, or through tele-psych 24 hours per day, seven days per week (24/7) to provide clinically appropriate mental health crisis intervention services.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of April 1, 2024, through March 31, 2025 (verified))**

Substantial Compliance requires the County (1) to provide the Monitor with on-call schedules for two randomly selected weeks reflecting that a QMHP was assigned 24 hours a day, seven days per week, and (2) to randomly select referrals for mental health crisis intervention received by a QMHP per quarter to verify (i) that a QMHP responded to all referrals, and (ii) responses to 90% of the referrals were within four hours.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234.  That Order required Defendants to achieve Substantial Compliance with Provision 40 by September 30, 2023.  Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed to extend the County's compliance deadline to June 30, 2025, which does not fall within the period covered by this Report.

The County's Twentieth Self-Assessment reports that in the Fourth Quarter of 2024, a QMHP responded to 100% of the referrals for mental health crisis intervention services, which equals the 100% threshold for Substantial Compliance, and that 100% of the responses were within four hours, exceeding the 90% threshold for Substantial Compliance. The County's Twentieth Self-Assessment reports that in the First Quarter of 2025, a QMHP responded to 100% of the referrals for mental health crisis intervention services, which equals the 100% threshold for Substantial Compliance, and that 99% of the responses were within four hours, which is above the 90% threshold.

The reported results have been verified by the Monitor's auditors and pursuant to Paragraph 111 of the Settlement Agreement, the Department is no longer subject to monitoring for Substantial Compliance with Paragraph 40.

56

41.      Consistent with existing DMH policies, the County and the Sheriff will implement step-down protocols that provide clinically appropriate transition when prisoners are discharged from FIP after being the subject of suicide watch.  The protocols will provide:

(a)      intermediate steps between highly restrictive suicide measures (e.g., clinical restraints and direct constant observation) and the discontinuation of suicide watch;

(b)      an evaluation by a QMHP before a prisoner is removed from suicide watch;

(c)      every prisoner discharged from FIP following a period of suicide watch will be housed upon release in the least restrictive setting deemed clinically appropriate unless exceptional circumstances affecting the facility exist; and

(d)      all FIP discharges following a period of suicide watch will be seen by a QMHP within 72 hours of FIP release, or sooner if indicated, unless exceptional circumstances affecting the facility exist.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of July 1, 2022, through June 30, 2023 (verified))**

Substantial Compliance requires CHS to review the medical records of all prisoners on suicide watch in FIP for one randomly selected month each quarter, and submit a report regarding the implementation of the step-down protocols and the results of its review of the medical records.  During the Fifth Reporting Period, the parties agreed to revise the Compliance Measures to increase the number of inmates subject to the step-down protocols of Paragraph 41 and ensure that the implementation of step-down protocols for FIP patients on suicide watch "ameliorate the impact of the restrictions" and have the necessary "level of precautions based upon individual assessment[s]" of the patients.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 41 in the Twentieth Reporting Period.

57

42.    Consistent with existing DMH policies, the County and the Sheriff will implement step-down protocols to ensure that prisoners admitted to HOH and placed on risk precautions are assessed by a QMHP.  As part of the assessment, the QMHP will determine on an individualized basis whether to implement "step-down" procedures for that prisoner as follows:

(a)    the prisoner will be assessed by a QMHP within three Normal business work days, but not to exceed four days, following discontinuance of risk precautions;

(b)    the prisoner is counseled to ameliorate the negative psychological impact that any restrictions may have had and in ways of dealing with this impact;

(c)    the prisoner will remain in HOH or be transferred to MOH, as determined on a case-by-case basis, until such assessment and counseling is completed, unless exceptional circumstances affecting the facility exist; and

(d)    the prisoner is subsequently placed in a level of care/housing as determined by a QMHP.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of July 1, 2024, through September 30, 2024 (verified), and through March 31, 2025 (unverified) at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2024, through March 31, 2025 (unverified) at CRDF)[23]**

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required Defendants to achieve Substantial Compliance with Provision 42 by June 30, 2024.  Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed to extend the compliance deadline for Provision 42 to June 30, 2025, which does not fall within the period covered by this Report.  The thresholds for Substantial Compliance are that 95% of prisoners in HOH and placed on risk precautions are assessed by a QMHP; 90% of the assessments reflect that a QMHP determined on an individualized basis whether to implement step-down procedures; and 85% of the QMHP assessments that provide for step-down procedures are implemented by the Department.

The County's Twentieth Self-Assessment assesses the County's compliance using the revised methodology discussed in the Monitor's Fourteenth Report.  It reports that in the Fourth Quarter of 2024 at TTCF, "100% of patients with High or Imminent Risk Level on their RAS [Risk Assessment for Suicide] were assessed by a QMHP pursuant to Measure 42-4(a)" and "100% of patients had records documenting that a QMHP determined on an individualized basis whether to implement step-down procedures, as

---

[23] The County initially self-reported results reflecting that CRDF was in Substantial Compliance in the Third Quarter of 2024.  After inquiries by the Monitor's auditors, the County posted amended results on September 17, 2025, reflecting that CRDF was in Partial Compliance during the Third Quarter of 2024.

required by Measure 42-4(b)." For Measure 42-4(c), 100% of cases where assessments called for step-down procedures had documentation reflecting implementation.

In the First Quarter of 2025 at TTCF, "100% of patients with High or Imminent Risk Level on their RAS [Risk Assessment for Suicide] were assessed by a QMHP pursuant to Measure 42-4(a)," and "100% of patients had records documenting that a QMHP determined on an individualized basis whether to implement step-down procedures." For Measure 42-4(c), 100% of cases where assessments called for step-down procedures had documentation reflecting implementation. These results are subject to verification by the Monitor's auditors.

In the Fourth Quarter of 2024 at CRDF, the County reported that "100% of patients with High or Imminent Risk Level on their Risk Assessment for Suicide (RAS) were assessed by a QMHP pursuant to Measure 42-4(a)" and "100% of patients had records documenting that a QMHP determined on an individualized basis whether to implement step-down procedures, as required by Measure 42-4(b)." For Measure 42-4(c), 100% of cases where assessments called for step-down procedures had documentation reflecting implementation.

In the First Quarter of 2025 at CRDF, "100% of patients with High or Imminent Risk Level on their RAS [Risk Assessment for Suicide] were assessed by a QMHP pursuant to Measure 42-4(a)." The County reported that 100% of responsive patients "had records documenting that a QMHP determined on an individualized basis whether to implement step-down procedures, as required by Measure 42-4(b)." No patients had assessments that called for step-down procedures, so there were no records to assess compliance with Measure 42-4(c). These results are subject to verification by the Monitor's auditors.

The Monitoring Team conducted a qualitative review of the County's performance under Provision 42 in the Twentieth Reporting Period. The Team sought to review a sample of 30 male and 30 female patients, but ended up with a sample of 20 male and 10 female patients. The Team determined that in 65% of cases, "the patients were seen by a QMHP within three business days of their risk rating being lowered to medium or low risk."[24] This was a substantial improvement from the 25% found when this measure was last reviewed in the Sixteenth Reporting Period. In some cases, the assessed risk level was lowered from high to medium or low risk, but precautions such as safety gowns were not changed. In some cases, a clinical determination was made to discontinue the suicide gown and return the inmate to jail clothing, but the inmate appeared to remain in a gown for various periods of time after that date.[25]

---

[24] Six cases were indeterminate as to when risk precautions were eased, and two were N/A due to the nature of the event leading to restrictions, e.g., to manipulate housing.

[25] Clinical documentation should clearly and consistently reflect that when the risk level is lowered from High or Imminent risk, there are corresponding changes to precautions, e.g., return to jail clothing, unless there is a documented clinical justification regarding why such precautions are still needed. These changes should be completed promptly, and there should be documentation showing completion of the reduction in precautions.

In 83% of cases, "the clinical documentation indicated that the prisoner was counseled to ameliorate the negative psychological impact of any restrictions, or was it clear that such counseling was not necessary." This was a substantial improvement from the 0% shown in the last qualitative review of Provision 42. In 92% of cases, "the clinical documentation addressed the level of care required following release from risk precautions." This, too, was substantially improved from the 27% shown in the prior review. In 96% of cases, "if the QMHP addressed the level of care required, the specified level of care was deemed to be clinically reasonable." This, too, is improved from the 75% in the prior review. The County is in Substantial Compliance with Provision 42 for the Twentieth Reporting Period.

Regarding these results, the County reports

The ORCHID enhancement that went live in May 2024 prompts clinicians to make a step-down determination when they lower a patient's suicide risk. If step-down is recommended, ORCHID places the patient on a Step-down Multi-Patient Task List (MPTL), which clinicians monitor to ensure assessments are completed within three days. An additional technological improvement was made to the Mental Health Follow-Up Note, which prompts QMHPs to assess and address each protocol requirement within the step-down assessment, facilitating more comprehensive assessments on a more consistent basis and guiding clinicians to improve their step-down documentation. Additionally, a JQIC project focused on step-down processes from the Second to the Fourth Quarters of 2024. This project accelerated the County into substantial compliance and improved the County's use of step-down practices. Trainings and supervisor mini audits commenced in 2024 and provided reinforcement and regular monitoring of step-down practices. Programs now provide training on step-down practices as part of their new staff training.

60

43.     Within six months of the Effective Date, the County and the Sheriff will develop and implement written policies for formal discipline of prisoners with serious mental illness incorporating the following:

(a)     Prior to transfer, custody staff will consult with a QMHP to determine whether assignment of a prisoner in mental health housing to disciplinary housing is clinically contraindicated and whether placement in a higher level of mental health housing is clinically indicated, and will thereafter follow the QMHP's recommendation;

(b)     If a prisoner is receiving psychotropic medication and is placed in disciplinary housing from an area other than mental health housing, a QMHP will meet with that prisoner within 24 hours of such placement to determine whether maintenance of the prisoner in such placement is clinically contraindicated and whether transfer of the prisoner to mental health housing is clinically appropriate, and custody staff will thereafter follow the QMHP's recommendation;

(c)     A QMHP will participate in weekly walks, as specified in paragraph 38, in disciplinary housing areas to observe prisoners in those areas and to identify those prisoners with mental health needs; and

(d)     Prior to a prisoner in mental health housing losing behavioral credits for disciplinary reasons, the disciplinary decision-maker will receive and take into consideration information from a QMHP regarding the prisoner's underlying mental illness, the potential effects of the discipline being considered, and whether transfer of the prisoner to a higher level of mental health housing is clinically indicated.

61

**STATUS (43):**          **SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at NCCF and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2024, through December 31, 2024 (verified), and through March 31, 2025 (unverified) at CRDF and TTCF)** [26]

**SUBSTANTIAL COMPLIANCE (as of January 1, 2025, through March 31, 2025 (unverified) at MCJ)**

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required Defendants to achieve Substantial Compliance with Provision 43 by March 31, 2024.  Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed to modify the applicable compliance deadline to March 31, 2025, which falls within the period covered by this Report, and to assess all facilities together (as to Compliance Measures 9(b), 9(c), and 9(e)), assuming that no facility reports less than 50% compliance.

For the Fourth Quarter of 2024, regarding Compliance Measures 43-6 and 43-9(e), the Department submitted a memorandum indicating that no individuals with mental illness lost behavioral credits for disciplinary reasons.  The County's Self-Assessment for the Twentieth Reporting Period reports that in the Fourth Quarter of 2024, no patients required consultations at CRDF prior to transfers from mental health housing.  The County further reports that 100%, more than the required 90%, of the meetings required pursuant to Compliance Measure 43-9(c) occurred when transferring individuals to disciplinary housing from areas other than mental health housing.  The County also reports that 100% of the weekly row walks through disciplinary units pursuant to Compliance Measure 43-9(d) occurred at CRDF.  The results for MCJ were 84%, 94%, and 80%,[27] respectively.

At TTCF, 100% of the required consultations pursuant to Compliance Measure 43-9(b) occurred prior to transfers from mental health housing, and there were no patients to assess for Measure 43-9(c) during the Fourth Quarter of 2024, since "TTCF does not have non-mental health housing nor disciplinary housing units."  Similarly, the County reports that regarding Compliance Measure 43-9(d), "no patients received any disciplinary action."  Combining these facility-level metrics, the County's consolidated compliance percentages for the Fourth Quarter of 2024 were 98% (43-9(b)), 97% (43-9(c)), and 90% (43-9(d)).  The consolidated compliance percentages for 43-9(b) and 43-9(c) exceeded the Substantial Compliance thresholds.  These results have been verified by the Monitor's auditors.

---

[26] The Compliance Measures, as revised in June 2025, state that "[c]ompliance with measures 9(b), (c), and (e) will [be] measured by aggregating the Department's performance across facilities."  Compliance Measure 43-9(d) is not included in this revised language, and has been measured and assessed separately in determining whether each facility is in Substantial Compliance for the relevant quarter.

[27] The County posted amended results reflecting 80% compliance with Compliance Measure 43-9(d) at MCJ, indicating Partial Compliance for the Fourth Quarter of 2024.

62

For the First Quarter of 2025, regarding Compliance Measures 43-6 and 43-9(e), the Department submitted a memorandum indicating that no individuals with mental illness lost behavioral credits for disciplinary reasons. The County's Twentieth Self-Assessment reports that no patients required consultations at CRDF prior to transfers from mental health housing. 100% of the required consultations at CRDF occurred when transferring inmates from areas other than mental health housing. The County also reports that 100% of the weekly row walks through disciplinary units occurred at CRDF.

The results for TTCF were 100% (consultations before transfer), but there were no results to report for Compliance Measures 43-9(c) or 43-9(d) due to TTCF not having non-mental health housing, disciplinary housing units, or any patients that received disciplinary action. For MCJ, the results were 81%, 100%, and 100%, respectively, in the First Quarter of 2025. Combining these facility-level metrics, the County's consolidated compliance percentages for the First Quarter of 2025 were 92% (43-9(b)), 100% (43-9(c)), and 100% (43-9(d)), which fell short of the Substantial Compliance threshold as to Compliance Measure 43-9(b).

The County has requested that the Monitor exercise his discretion to find the County Substantially Compliant in the First Quarter of 2025, given the small total number of non-compliant records (3), and the fact that the non-compliance as to two of the records was very minor and reflected a failure by clinicians to note a proposed discipline duration. The Monitor has reviewed the relevant records and finds that no exercise of discretion is necessary. The two records are compliant, and the County's revised compliance percentage with Compliance Measure 43-9(b) for the First Quarter of 2025 is thus 98%.[28] The reported results are subject to verification by the Monitor's auditors.

The County maintained Substantial Compliance at NCCF and PDC North for twelve consecutive months as of September 30, 2018, and these facilities were not subject to monitoring for compliance with Paragraph 43 during the Twentieth Reporting Period.

---

[28] The Monitor notes that neither Provision 43 itself, nor the relevant Compliance Measures, require the notation of the duration of the proposed discipline. While including that information is to be encouraged, as it enhances the ability of the clinician to make an informed judgment about whether or not the proposed discipline is clinically contraindicated, the failure to include that information is not a basis for a finding of Non-Compliance under Provision 43.

44.    Within six months of the Effective Date, the County and the Sheriff will install protective barriers that do not prevent line-of-sight supervision on the second floor tier of all High Observation Housing areas to prevent prisoners from jumping off of the second floor tier.  Within six months of the Effective Date, the County and the Sheriff will also develop a plan that identifies any other areas in mental health housing where such protective barriers should be installed.

**STATUS:**    **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016)**

The County has maintained Substantial Compliance with Paragraph 44 of the Agreement since January 1, 2016.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 44 in the Twentieth Reporting Period.

64

45.    Consistent with existing Sheriff's Department policies, the County and the Sheriff will provide both a Suicide Intervention Kit that contains an emergency cut-down tool and a first-aid kit in the control booth or officer's station of each housing unit.  All custody staff who have contact with prisoners will know the location of the Suicide Intervention Kit and first-aid kit and be trained to use their contents.

**STATUS:**    **SUBSTANTIAL COMPLIANCE (as of October 1, 2015, through September 30, 2016 (verified) at CRDF, NCCF, PDC East, PDC South, and TTCF)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at MCJ and PDC North)**

The County maintained Substantial Compliance with Paragraph 45 for twelve consecutive months at all facilities as of December 31, 2016.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 45 in the Twentieth Reporting Period.

65

46.	The County and the Sheriff will immediately interrupt, and if necessary, provide appropriate aid to, any prisoner who threatens or exhibits self-injurious behavior.

**STATUS:	SUBSTANTIAL COMPLIANCE (as of July 1, 2020, through June 30, 2021 (verified))**

The parties agreed on Revised Compliance Measures in 2021.  Substantial Compliance requires the Department to review the documentation from randomly selected incidents involving prisoners who threaten or exhibit self-injurious behavior, and include an assessment of the timeliness and appropriateness of the Department's responses to these incidents in its semi-annual Self-Assessment.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 46 in the Twentieth Reporting Period.

47.     The County and the Sheriff will ensure there are sufficient custodial, medical, and mental health staff at the Jails to fulfill the terms of this Agreement.  Within six months of the Effective Date, and on a semi-annual basis thereafter, the County and the Sheriff will, in conjunction with the requirements of Paragraph 92 of this Agreement, provide to the Monitor and DOJ a report identifying the steps taken by the County and the Sheriff during the review period to implement the terms of this Agreement and any barriers to implementation, such as insufficient staffing levels at the Jails, if any.  The County and the Sheriff will retain staffing records for two years to ensure that for any critical incident or non-compliance with this Agreement, the Monitor and DOJ can obtain those records to determine whether staffing levels were a factor in that critical incident and/or non-compliance.

### STATUS:     PARTIAL COMPLIANCE

Under Provision 47 and its associated Compliance Measures, Substantial Compliance requires the County to: a) submit a self-assessment that: i) identifies the steps taken by the County and the Sheriff to implement the terms of the Agreement, and ii) assesses whether staffing levels were a factor in any non-compliance with the Agreement, any Critical Incident, or the Department's handling of the Critical Incident.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required Defendants to achieve Substantial Compliance with Provision 47 by June 30, 2024.  Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed to extend the compliance deadline for Provision 47 to June 30, 2025, which does not fall within the period covered by this Report.

Regarding critical incidents, the County's posted results for Provision 47 reflect the County's assessment of whether staffing levels were a factor in "any Critical Incident, or the Department's handling of the Critical Incident," as Compliance Measures 47-1 and 47-2 require.  The County's posted results report that 22 critical incidents[29] occurred during the Second Semester of 2024, and the County concluded that staffing was not a factor in any of those incidents.

Regarding "whether staffing levels were a factor in any non-compliance with the Agreement" pursuant to Compliance Measure 47-4(a)(ii), the County contends in its Augmented Twentieth Self-Assessment that staffing is no longer a key barrier to compliance.  Specifically

> The County as a whole is facing very difficult budget constraints this fiscal year, and CHS is not immune from this issue. This has made it challenging to add any additional staffing, but CHS has been able to maintain its staffing levels and the jail-based bonuses continue to be funded. Because so many positions have been added in recent years and vacancies have been filled so aggressively at CHS, there is enough capacity to provide the necessary services and tasks required under the Settlement Agreement. Broadly, the

---

[29] 17 deaths of people in custody, 1 serious suicide attempts, 2 qualifying inmate assaults on staff, and 2 Category 3 Uses of Force.

significant improvements made in staffing levels, which have been
maintained in the past year despite budget constraints, have enabled the
County to comply with the majority of provisions, allowing the County to
claim substantial compliance in over ten new provisions for the first time
this reporting period. Challenges in staffing have presented themselves for
some of the provisions, but because of the sufficient levels of staffing and
the flexibility and efficacy of tools and processes accessible to CHS, the
challenges have been overcome.

In support of these assertions, the County provided two documents (titled "Mental
Health Staff Analysis for 20th Augmented Self Assessment" and "CHS Staffing Analysis
07-01-2025") that are compilations of data about CHS' budgeted and vacant positions.
They reflect that CHS had 376 total budgeted mental health worker positions,[30] and 229
were filled, or 61% of the total (19 positions had candidates who had accepted offers and
were in the process of onboarding).  These are slight reductions from the number of
positions filled in the Nineteenth Reporting Period.  The County also included data
reflecting that on mental health teams, four of the vacancies were filled with registry
workers and 26 with contracted agency clinicians.  Regarding vacancies in psychiatry, the
County reported that 33.15 were filled by registry workers.  The County has also produced
useful staffing analyses related to several provisions in its self-assessments.

As set forth in the Nineteenth Monitoring Report, the County's staffing gains for
mental health worker positions have been impressive in recent years.  Yet, Provision 80
remains far from Substantial Compliance related to structured out-of-cell time, and the
County's still-deficient performance appears to result from, *inter alia*, the number of
patients who require such programming relative to the number of staff who are treating
them.[31]  While the County indicates that CHS is optimistic that staffing levels are no longer
the critical issue to compliance with Provision 80, it has not sufficiently articulated how its
cadre of group providers will be able to dramatically increase the number of patients
receiving structured treatment without an increase in the number of staff providing such
treatment.  Pending such an articulation, the County remains in Partial Compliance with
Provision 47.

---

[30] Broken down into 76 psychiatry positions and 300 positions associated with mental health treatment teams.
[31] In its Augmented Twentieth Self-Assessment, the County does, however, provide a persuasive discussion
of the other non-staffing barriers to its full compliance with Provision 80.

48.    Within three months of the Effective Date, the County and the Sheriff will have written housekeeping, sanitation, and inspection plans to ensure the proper cleaning of, and trash collection and removal in, housing, shower, and medical areas, in accordance with California Code of Regulations ("CCR") Title 15 § 1280: Facility Sanitation, Safety, and Maintenance.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016)**

The County maintained Substantial Compliance with Paragraph 48 of the Agreement at all facilities for twelve consecutive months as of December 31, 2016. Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 48 in the Twentieth Reporting Period.

49.    Within three months of the Effective Date, the County and the Sheriff will have a maintenance plan to respond to routine and emergency maintenance needs, including ensuring that shower, toilet, sink, and lighting units, and heating, ventilation, and cooling system are adequately maintained and installed.  The plan will also include steps to treat large mold infestations.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of March 1, 2016, through February 28, 2017)**

The County maintained Substantial Compliance with Paragraph 49 of the Agreement at all facilities for twelve consecutive months as of February 28, 2017. Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 49 in the Twentieth Reporting Period.

70

50.     Consistent with existing Sheriff's Department policies regarding control of vermin, the County and the Sheriff will provide pest control throughout the housing units, medical units, kitchen, and food storage areas.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at all facilities other than PDC South and PDC East)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 (verified) at PDC South and PDC East)**

The County maintained Substantial Compliance with Paragraph 50 of the Agreement at all facilities for twelve consecutive months as of March 31, 2017.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 50 in the Twentieth Reporting Period.

71

51.    Consistent with existing Sheriff's Department policies regarding personal care items and supplies for inmates, the County and the Sheriff will ensure that all prisoners have access to basic hygiene supplies, in accordance with CCR Title 15 § 1265: Issue of Personal Care Items.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) for all facilities other than CRDF)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017 (verified) at CRDF)**

The County maintained Substantial Compliance with Paragraph 51 of the Agreement at all facilities for twelve consecutive months as of June 30, 2017.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 51 in the Twentieth Reporting Period.

72

52.    The County and the Sheriff will implement policies governing property restrictions in High Observation Housing that provide:

(a)    Except when transferred directly from FIP, upon initial placement in HOH:

(i)    Suicide-resistant blankets, gowns, and mattresses will be provided until the assessment set forth in section (a)(ii) below is conducted, unless clinically contraindicated as determined and documented by a QMHP.

(ii)    Within 24 hours, a QMHP will make recommendations regarding allowable property based upon an individual clinical assessment.

(b)    Property restrictions in HOH beyond 24 hours will be based on clinical judgment and assessment by a QMHP as necessary to ensure the safety and well-being of the prisoner and documented in the electronic medical record.

**STATUS:**    **SUBSTANTIAL COMPLIANCE (as of October 1, 2024, through March 31, 2025 (verified) at CRDF)**

**PARTIAL COMPLIANCE (at TTCF)**

Substantial Compliance requires the Department to (1) randomly inspect the cells of prisoners placed in HOH (except from FIP) within the previous 24 hours to confirm that they have been provided with suicide-resistant blankets, gowns, and mattresses unless clinically contraindicated, and document the results of the inspection; (2) randomly inspect the cells of prisoners placed in HOH (except from FIP) for more than 24 hours to confirm that they have been provided with allowable property as recommended by a QMHP; and (3) review the electronic medical records of prisoners assigned to HOH on the days of those inspections to verify compliance with the provisions of Paragraph 52. All the Compliance Measures have a 95% threshold for Substantial Compliance. On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required Defendants to achieve Substantial Compliance with Provision 52 by December 31, 2023. Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed that the applicable compliance deadline would be extended to March 31, 2025, which falls within the period covered by this Report.

In its Twentieth Self-Assessment, the County reports that at CRDF in the Fourth Quarter of 2024, there was 100% compliance with Compliance Measure 52-5(b). Regarding Compliance Measure 52-5(c), 100% of the electronic medical records for patients assigned to HOH reflected a recommendation by a QMHP regarding allowable property. Additionally, 100% of electronic medical records for patients assigned to HOH reflect that property restrictions were based upon the clinical judgment of a QMHP pursuant to Compliance Measure 52-5(d). The County also reported that 95%—meeting the threshold for substantial compliance—of patients analyzed pursuant to Compliance Measure 52-5(e) had allowable property as recommended by a QMHP (unless refused by

73

the patient).  The reported results at CRDF have been verified by the Monitor's auditors.[32]

The County also reports that at TTCF in the Fourth Quarter of 2024, 100% of inmates analyzed pursuant to Compliance Measure 52-5(b) were provided suicide-resistant blankets, gowns, and mattresses as required by this Provision.  Regarding Compliance Measure 52-5(c), 78%—less than the required 95%—of the electronic medical records for patients assigned to HOH reflected a recommendation by a QMHP regarding allowable property pursuant to Compliance Measure 52-5(c).  The County reports that 100% of electronic medical records for patients assigned to HOH reflect that property restrictions were based upon the clinical judgment of a QMHP pursuant to Compliance Measure 52-5(d).  Additionally, 98%—exceeding the threshold for substantial compliance—of patients analyzed pursuant to Compliance Measure 52-5(e) had allowable property as recommended by a QMHP (unless refused by the patient).

The County also reports 100% compliance with Compliance Measure 52-5(b) at CRDF in the First Quarter of 2025.  Regarding Compliance Measure 52-5(c), 100% of the electronic medical records for patients assigned to HOH reflected a recommendation by a QMHP regarding allowable property.[33]  Additionally, 100% of electronic medical records for patients assigned to HOH reflect that property restrictions were based upon the clinical judgment of a QMHP pursuant to Compliance Measure 52-5(d).  The County also reports that 95%—meeting the threshold for substantial compliance—of inmates analyzed pursuant to Compliance Measure 52-5(e) had allowable property as recommended by a QMHP (unless refused by the patient).  The reported results at CRDF have been verified by the Monitor's auditors.

---

[32] During a meeting with the Monitor's auditors on August 7, 2025, the County explained its self-audit methodology for Compliance Measures 52-5(b) and 52-5(e).  The County's self-audit team randomly selects a visitation date for each of the three months within the relevant quarter and notifies facilities of their planned visit.  During visits, the team assesses the property restrictions of inmates housed in HOH locations and reports on their findings pursuant to Compliance Measures 52-5(b) and 52-5(e).  These assessments are performed specifically for Compliance Measures 52-5(b) and 52-5(e) and are not supported by documentation created in the normal operations of the jails.  Due to the lack of contemporaneous supporting documentation to audit the County's reported results, the Monitor's auditors did not independently verify the reported results for Compliance Measures 52-5(b) and 52-5(e).

[33] The County reported a compliance percentage of 93% and requested that the Monitor make a discretionary finding that the County achieved Substantial Compliance at CRDF in the First Quarter of 2025, as 15 of the 16 relevant records were compliant, and the single untimely follow-up QMHP assessment was due to a holiday weekend.  The Monitor has reviewed the relevant records, which related to a patient who was initially assessed by a QMHP shortly after her arrest and transfer to CRDF.  She had a history of self-injurious behavior and was hearing voices instructing her to kill herself.  She reported a recent suicide attempt by walking into traffic.  She was placed on suicide watch as a medium risk with a suicide gown and classified as HOH.  Two days later, a clinician evaluated the patient and, given her presentation at that time, removed her from suicide precautions.

The Monitor grants the County's request.  While the follow-up assessment was a day late, the risk to the patient was minimal, as she was placed on property restrictions on the day of her booking to mitigate the immediate suicide risks.  Moreover, the County has made significant progress in its compliance efforts, which suggests that this result is anomalous.  If the County's results in future quarters indicate that this record was not an anomaly, future requests for discretion will not be considered.  The County's revised compliance percentage for CRDF in the First Quarter of 2025 is 100%.

74

The County reports that at TTCF in the First Quarter of 2025, 96%—exceeding the required 95%—of patients analyzed pursuant to Compliance Measure 52-5(b) were provided suicide-resistant blankets, gowns, and mattresses.  Further, 76%—less than the required 95%—of the electronic medical records for patients assigned to HOH reflected a recommendation by a QMHP regarding allowable property pursuant to Compliance Measure 52-5(c).  The County also reports that 100% of electronic medical records for patients assigned to HOH reflect that property restrictions were based upon the clinical judgment of a QMHP pursuant to Compliance Measure 52-5(d).  Regarding Compliance Measure 52-5(e), 97%—exceeding the required 95%—of inmates analyzed had allowable property as recommended by a QMHP (unless refused by the patient).

Regarding its results at TTCF, the County reports

Focused efforts at TTCF to improve both timeliness and clinical documentation occurred during the First Quarter of 2025. Deeper discussions led to the determination that a focus on the MHIT list for accurate and functional data made more sense than an ORCHID enhancement to create a new MPTL list, which only reflects when a patient is classified for HOH, not when the movement actually occurs, so the previously considered ORCHID enhancement was not pursued. Instead, CHS Compliance has worked closely with TTCF clinical supervisors to improve timeliness in clinical process and workflow. In the Second Quarter of 2025, custody began sending the MHIT list twice a day to CHS clinicians to ensure patients are assigned timely and thus can be seen by the deadline. This aims to reduce untimely cases by ensuring patients can be assigned to be seen twice per day, on both morning and afternoon shifts, rather than only once in the morning shift. Additional technological interventions with the MHIT list will be explored in the Third Quarter of 2025 to further improve and streamline case assignments.

53.    If otherwise eligible for an education, work, or similar program, a prisoner's mental health diagnosis or prescription for medication alone will not preclude that prisoner from participating in said programming.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of April 1, 2024, through March 31, 2025 (verified))**

Substantial Compliance requires the Department to audit the records of prisoners who were eligible, but rejected or disqualified, for education and work programs to confirm that they were not rejected or disqualified because of a mental health diagnosis or prescription for medication alone.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required Defendants to achieve Substantial Compliance with Provision 53 by June 30, 2024.  Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed to extend the compliance deadline for Provision 53 to March 31, 2025, which falls within the Period covered by this Report.

The County's Twentieth Self-Assessment reports that 92% of the eligible mentally ill prisoners who were denied education or work in the Fourth Quarter of 2024 and 97% in the First Quarter of 2025 were denied for reasons other than a mental health diagnosis or a medication prescription, exceeding the 90% required for substantial compliance.  The reported results have been verified by the Monitor's auditors and pursuant to Paragraph 111 of the Settlement Agreement, the Department is no longer subject to monitoring for Substantial Compliance with Paragraph 53.

76

54.    Prisoners who are not in Mental Health Housing will not be denied privileges and programming based solely on their mental health status or prescription for psychotropic medication.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of January 1, 2023, through June 30, 2023 (verified))**

Substantial Compliance under the revised Compliance Measures for Paragraph 54, effective January 1, 2018, requires the Department to audit the records of a maximum of 100 randomly selected prisoners identified on the Wednesday Pharmacy List as having received psychotropic medication to confirm that no more than 10% were rejected or disqualified because of a mental health diagnosis or prescription for psychotropic medication alone.  Because the Monitor's auditors had verified that the County had maintained Substantial Compliance under the original Compliance Measures, the parties agreed that the County will only be required to maintain Substantial Compliance under the revised Compliance Measures for two additional quarters.

The Monitor's auditors verified the reported results for the First and Second Quarters of 2023 and pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 54 in the Twentieth Reporting Period.

55.    Relevant custody, medical, and mental health staff in all High Observation Housing units will meet on normal business work days and such staff in all Moderate Observation Housing units will meet at least weekly to ensure coordination and communication regarding the needs of prisoners in mental health housing units as outlined in Custody Services Division Directive(s) regarding coordination of mental health treatment and housing.  When a custody staff member is serving as a member of a treatment team, he or she is subject to the same confidentiality rules and regulations as any other member of the treatment team, and will be trained in those rules and regulations.

**STATUS:**    **SUBSTANTIAL COMPLIANCE (as of October 1, 2016, through September 30, 2017 (verified) at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at PDC North)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 (verified) at MCJ)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2019, through June 30, 2020 (verified) at TTCF)**

The Department maintained Substantial Compliance for twelve consecutive months at all facilities as of June 30, 2020.  These results were verified by the Monitor's auditors. Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 55 in the Twentieth Reporting Period.

56.     Consistent with existing DMH and Sheriff's Department policies, the County and the Sheriff will ensure that custody, medical, and mental health staff communicate regarding any change in a prisoner's housing assignment following a suicide threat, gesture, or attempt, or other indication of an obvious and serious change in mental health condition.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified))**

Substantial Compliance requires the Department to review in randomly selected periods the electronic medical records of (1) prisoners admitted to HOH following a suicide threat, gesture, or attempt, or other indication of an obvious and serious change in mental health condition to determine if the medical and/or mental health staff approved the placement of the prisoner in HOH; and (2) prisoners who were the subject of a suicide attempt notification to determine if the prisoners were clinically assessed and that clinical staff approved the post-incident housing.

The County's Substantial Compliance results for the twelve months from January 1, 2016, through December 31, 2016, were verified by the Monitor's auditors.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 56 in the Twentieth Reporting Period.

79

57 (**Revised**).  Within three months of the Effective Date, the County and the Sheriff will revise and implement their policies on safety checks to ensure a range of supervision for prisoners housed in Mental Health Housing.  The County and the Sheriff will ensure that safety checks in Mental Health Housing are completed and documented in accordance with policy and regulatory requirements as set forth below:

(a)     Custody staff will conduct safety checks in a manner that allows staff to view the prisoner to assure his or her well-being and security.  Safety checks involve visual observation and, if necessary to determine the prisoner's well-being, verbal interaction with the prisoner;

(b)     Custody staff will document their checks in a format that does not have pre-printed times;

(c)     Custody staff will stagger checks to minimize prisoners' ability to plan around anticipated checks;

(d)     Video surveillance may not be used to replace rounds and supervision by custodial staff unless new construction is built specifically with constant video surveillance enhancements and could only be used to replace the required safety checks in non-FIP housing, subject to approval by the Monitor;

(e)     A QMHP, in coordination with custody (and medical staff if necessary), will determine mental health housing assignments; and

(f)     Supervision of prisoners in mental health housing will be conducted at the following intervals:

(i)     FIP:  Custody staff will perform safety checks every 15 minutes. DMH staff will perform direct constant observation or one-to-one observation when determined to be clinically appropriate;

(ii)    High Observation Housing:  Every 15 minutes; and

(iii)   Moderate Observation Housing:  Every 30 minutes.

80

| STATUS (57): | **SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at MCJ)** |
| --- | --- |
| | **SUBSTANTIAL COMPLIANCE (as of July 1, 2021, through June 30, 2022 (verified) at PDC North)** |
| | **PARTIAL COMPLIANCE (at TTCF and CRDF)** |

On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provision 57 ("Revised Paragraph 57") as set forth above. The Parties also agreed on Revised Compliance Measures. Substantial Compliance requires the Department to audit the Title 15 Dashboard records (or e-UDAL records if the Title 15 scanner was not working) for all shifts for each module in each mental health housing unit in two randomly selected weeks to determine if the safety checks were staggered and conducted as required by Paragraph 57 of the Agreement, and to audit the housing records for each mental health housing unit for a randomly selected week to determine if QMHPs approved the new mental health housing assignments as required by Paragraph 57(e). On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required Defendants to achieve Substantial Compliance with Provision 57 by June 30, 2024. Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed to extend the compliance deadline for Provision 57 to June 30, 2025, which does not fall within the period covered by this Report.

The County's Twentieth Self-Assessment reports that 90.88% of the safety checks were in compliance with Compliance Measure 57-5(b) (safety checks in FIP) in the Fourth Quarter of 2024 at TTCF. It also reports that 95.53% of the safety checks were in compliance with Compliance Measure 57-5(c) (safety checks in HOH) at TTCF. The County also reports that 95.15% of the safety checks complied with Compliance Measure 57-5(d) (safety checks in MOH) at TTCF. Regarding Compliance Measure 57-5(e), 100% of the new mental health housing assignments at TTCF were approved by a QMHP in the Fourth Quarter of 2024.

The County's Twentieth Self-Assessment does not include a compliance percentage for Compliance Measure 57-5(b) for CRDF because it does not have FIP housing. It reports that 91.97% of the safety checks were in compliance with Compliance Measure 57-5(c) (safety checks in HOH) in the Fourth Quarter of 2024 at CRDF. The County also reports that 90.36% of the safety checks complied with Compliance Measure 57-5(d) (safety checks in MOH) at CRDF. Regarding Compliance Measure 57-5(e), 100% of the new mental health housing assignments at CRDF were approved by a QMHP in the Fourth Quarter of 2024.

The County's Twentieth Self-Assessment reports that 96.0% of the safety checks were in compliance with Compliance Measure 57-5(c) (safety checks in HOH) in the First Quarter of 2025 at CRDF. The County also reports 92.06% of the safety checks complied with Compliance Measure 57-5(d) (safety checks in MOH) at CRDF. A QMHP approved 100% of the new mental health housing assignments at CRDF in the First Quarter of 2025.

The County's Twentieth Self-Assessment also reports that 93.08% of the safety checks were in compliance with Compliance Measure 57-5(b) (safety checks in FIP) in the First Quarter of 2025 at TTCF. It also reports that 95.56% of the safety checks were in compliance with Compliance Measure 57-5(c) (safety checks in HOH) at TTCF. The County also reports that 96.19% of the safety checks complied with Compliance Measure 57-5(d) (safety checks in MOH) at TTCF. Regarding Compliance Measure 57-5(e), the posted results reflect that a QMHP approved 98% of the new mental health housing assignments at TTCF in the First Quarter of 2025. The County reports

> During the 20th Reporting Period, minor refinements were made to BREAVA 2.0 to fine tune its reporting and staff management capabilities. The most significant upgrade was the creation of a mandatory video auditing tool, which supplements already-occurring weekly spot checks and allows supervisors to go into the system and review a random sample of safety check videos to rate the quality of each safety check and leave notes. Each Title 15 Safety Check Sergeant is required to do this weekly, and the video and audit log are then reviewed by CCSB staff for another layer of checks and feedback. This has enabled the sergeants to provide both immediate and visual feedback to deputies, helping them to see what could have been done differently to ensure both timely and quality safety checks. Sergeants at both CRDF and TTCF have said that this tool significantly increases their ability to manage and monitor safety checks and the deputies' ability to process and implement feedback. The audit tool launched in March 2025 as a pilot program, with full facility adoption by the end of April.
>
> The Title 15 Workgroup, consisting of representatives from each facility, CCSB, the County's DOJ Compliance Office, CITU, and DSB, continues to meet monthly to share data, best practices, and work through any ongoing issues involving Title 15 safety checks.

The County's Sixth Self-Assessment reported that it maintained Substantial Compliance with Compliance Measure 57-5(b) in the Fourth Quarter of 2017 and the First Quarter of 2018 in the MOH unit at MCJ (the "Hope Dorm"). It also reported that all of the inmates at MCJ "analyzed pursuant to Compliance Measure 57-5(c) had received QMHP approval for their housing assignments" in both quarters. The results were verified by the Monitor's auditors and MCJ was not subject to monitoring for compliance with Paragraph 57 in the Twentieth Reporting Period. The County maintained Substantial Compliance with Paragraph 57 for twelve consecutive months at PDC North as of June 30, 2022. These results were verified by the Monitor's auditors. Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring at PDC North for Substantial Compliance with Paragraph 57 in the Twentieth Reporting Period.

82

58.    Within three months of the Effective Date, the County and the Sheriff will revise and implement their policies on safety checks.  The County and the Sheriff will ensure that safety checks in non-mental health housing units are completed and documented in accordance with policy and regulatory requirements as set forth below:

(a)    At least every 30 minutes in housing areas with cells;

(b)    At least every 30 minutes in dormitory-style housing units where the unit does not provide for unobstructed direct supervision of prisoners from a security control room;

(c)    Where a dormitory-style housing unit does provide for unobstructed direct supervision of prisoners, safety checks must be completed inside the unit at least every 60 minutes;

(d)    At least every 60 minutes in designated minimum security dormitory housing at PDC South, or other similar campus-style unlocked dormitory housing;

(e)    Custody staff will conduct safety checks in a manner that allows staff to view the prisoner to assure his or her well-being and security.  Safety checks involve visual observation and, if necessary to determine the prisoner's well-being, verbal interaction with the prisoner;

(f)    Custody staff will document their checks in a format that does not have pre-printed times;

(g)    Custody staff will stagger checks to minimize prisoners' ability to plan around anticipated checks; and

(h)    Video surveillance may not be used to replace rounds and supervision by custodial staff.

83

**STATUS (58):**            **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at PDC South, PDC North, and PDC East)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2017, through June 30, 2018 (verified) at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at IRC)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2024, through December 31, 2024 (verified) at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2024, through March 31, 2025 (unverified) at MCJ)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2025, through March 31, 2025 (unverified) at TTCF)**

Substantial Compliance requires the Department to audit the Title 15 Dashboard records (or e-UDAL records) for all shifts for each module in each housing unit to determine if the safety checks were staggered and conducted as required by Paragraph 58. The threshold for achieving Substantial Compliance with each of the Compliance Measures is 90%. On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 58 by June 30, 2024, which fell within the period covered by the Nineteenth Report.

The County's Twentieth Self-Assessment reports that for the Fourth Quarter of 2024 and First Quarter of 2025, the following percentages of safety checks were in compliance with Paragraph 58: at TTCF (99.19% and 99.46%), at MCJ (96.39% and 96.07%), and at NCCF (96.47% and 97.72%).

As set forth in the Nineteenth Report, for the Nineteenth Monitoring Period, the Monitoring Team requested and reviewed a sample of CCTV footage for a sample of safety checks from multiple modules across three jails for the Fourth Quarter of 2023 through the Second Quarter of 2024, and found issues with safety check quality that "will need to be addressed before the County's reported Substantial Compliance can be verified." Again, in the Twentieth Reporting Period, the Monitoring Team requested and reviewed a sample of videos from MCJ, NCCF, and TTCF to assess whether safety checks were being performed in conformity with the requirements of Provision 58, including 58(e) ("Custody staff will conduct safety checks in a manner that allows staff to view the prisoner to assure his or her well-being and security. Safety checks involve visual observation and, if necessary to determine the prisoner's well-being, verbal interaction with the prisoner").

The footage was often composed of multiple videos based on different pods, angles,

84

and/or hallways.  Some videos were clear, while others were grainy or involved technical issues, such as frozen video frames.  The Team's assessment considered the following factors:

- The speed at which Custody staff walked through inmate housing areas during their safety check rounds;
- Whether Custody personnel appeared to be looking (including the potential use of peripheral vision) into the cells or not; and
- The time of day and level of inmate activity at the time of the safety checks.

The quality of the safety checks, as determinable from the produced videos, varied significantly.  On some dates in some modules, Custody staff were obviously looking into the cells while they performed their safety checks.  In others, Custody staff walked through housing areas quickly without appearing to look directly into the cells at all.  The Team initially assessed each video as "Good," "Adequate," "Not Satisfactory," "Unable to Assess (UTA)" due to video quality issues, or "Not Applicable (N/A)" due to the camera angle being of non-housing areas.  On February 21, 2025, the Monitor provided a list of safety checks identified as Not Satisfactory to the County, which has indicated that it has relevant context for why apparent deficiencies in safety check quality in some videos may not actually indicate non-compliance.[34]  On March 20, 2025, the Monitoring Team met with County personnel to discuss these issues.[35]  On August 21, 2025, the Monitoring Team provided an additional list of potentially Not Satisfactory safety checks at TTCF to the County.  The Monitor's auditors met with the County and toured TTCF Module 211 on September 24, 2025.[36]

Taking into consideration the extensive CCTV footage received, occupancy data, and discussions with the County, the Team's qualitative audit resulted in the following percentage of Not Satisfactory safety checks for the First Quarter of 2024 through the Fourth Quarter of 2024:

|  | 1Q2024 | 2Q2024 | 3Q2024 | 4Q2024 |
|---|---|---|---|---|
| NCCF | 8% | 13% | 16% | 17% |
| MCJ | 11% | 14% | *N/A* | *TBD* |
| TTCF | 67% | 28% | 29% | 27% |

---

[34] For example, the County has indicated that some of the cells may not have been occupied at the times of the safety checks that appear on video to have been improperly conducted.  In response, the County has provided the Monitoring Team with housing occupancy data for TTCF reflecting which cells housed inmates during the applicable weeks.

[35] Moreover, as noted by the DOJ and confirmed by the Monitor, various recent death reviews in the relevant facilities have revealed significant concerns about the quality and adequacy of the safety checks performed before the inmate deaths, in some cases resulting in the initiation of staff conduct investigations.

[36] As a result of the Team's discussion with the County, the walkthrough of TTCF Module 211, and the Monitor's auditors' reassessment of certain videos, several safety checks initially rated as "Not Satisfactory" were amended to "Adequate."

Based on the results of the qualitative audit, in conjunction with the Monitor's auditors' quantitative audits, the results at NCCF have been verified by the Monitor's auditors, and pursuant to Paragraph 111 of the Settlement Agreement, the County is no longer subject to monitoring at NCCF.  The reported results at MCJ through June 30, 2024, have been verified by the Monitor's auditors.  The results at TTCF through December 31, 2024, were unable to be verified by the Monitor's auditors.[37]

The County maintained Substantial Compliance with Paragraph 58 for twelve consecutive months at PDC South, PDC North, and PDC East as of December 31, 2016, at CRDF as of June 30, 2018, and at IRC as of September 30, 2018.  These results were been verified by the Monitor's auditors.  Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring at those facilities for Substantial Compliance with Paragraph 58 in the Twentieth Reporting Period.

---

[37] While the meeting and tour of TTCF Module 211 on September 24, 2025, was productive and addressed some of the Monitor's auditors' concerns, the Monitoring Team's assessment reflects that many safety checks were performed at too fast a pace, and in some cases, Deputies did not actually look towards and/or into cells.

59.     Consistent with existing Sheriff's Department policies regarding uniform daily activity logs, the County and the Sheriff will ensure that a custodial supervisor conducts unannounced daily rounds on each shift in the prisoner housing units to ensure custodial staff conduct necessary safety checks and document their rounds.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of January 1, 2017, through December 31, 2017 (verified) at PDC East and MCJ)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 (verified) at NCCF)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified) at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2018, through December 31, 2018 (verified) at PDC North and PDC South)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 (verified) at TTCF)**

Substantial Compliance requires the Department to audit e-UDAL records for housing units in each facility to determine if supervisors are conducting unannounced daily rounds in accordance with Paragraph 59. In response to the Monitor's comments, the Department's e-UDAL forms were modified to include a specific notation that the Supervisor verified that the safety checks were conducted. The threshold for achieving and maintaining Substantial Compliance is that 90% of the supervisor daily rounds were in compliance with the requirements of Paragraph 59.

The County's Substantial Compliance results were verified by the Monitor's auditors. Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 59 in the Twentieth Reporting Period.

87

60.      Within six months of the Effective Date, the Department of Mental Health, in cooperation with the Sheriff's Unit described in Paragraph 77 of this Agreement, will implement a quality improvement program to identify and address clinical issues that place prisoners at significant risk of suicide or self-injurious behavior.

**STATUS:      SUBSTANTIAL COMPLIANCE  (as of April 1, 2019
                  through March 31, 2020)**

Paragraph 60 requires the County to "implement a quality improvement program to identify and address clinical issues that place prisoners at significant risk of suicide or self-injurious behavior."  The Compliance Measures for Paragraph 60 require the County to "identify and address clinical issues. . .in the areas identified in [P]aragraph 61 of the Agreement" and corrective actions are taken to address "such issues."  See Compliance Measures 60.1, 60.2(a), and 60.3(b).

The Monitor and the Mental Health Subject Matter previously agreed that the Department had demonstrated "a sound quality improvement process and the ability to demonstrate that process through specific quality improvement projects directed by management," and the Monitor finds that the County had demonstrated that it maintained Substantial Compliance with Paragraph 60.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 60 in the Twentieth Reporting Period.[38]

---

[38] The County has acknowledged that its ongoing Quality Improvement efforts will remain subject to monitoring under other provisions of the Settlement Agreement.

88

61.     The quality improvement program will review, collect, and aggregate data in the following areas and recommend corrective actions and systemic improvements:

(a)     Suicides and serious suicide attempts:

(i)     Prior suicide attempts or other serious self-injurious behavior
(ii)    Locations
(iii)   Method
(iv)    Lethality
(v)     Demographic information
(vi)    Proximity to court date;

(b)     Use of clinical restraints;

(c)     Psychotropic medications;

(d)     Access to care, timeliness of service, and utilization of the Forensic In-patient Unit; and

(e)     Elements of documentation and use of medical records.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of October 1, 2024, through March 31, 2025)**

Substantial Compliance requires the County's semi-annual reports to (a) review, collect, and aggregate data in the areas set forth in Paragraph 61; (b) recommend corrective actions and systemic improvements in those areas; and (c) assess the effectiveness of actions and improvements in prior reporting periods.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required Defendants to achieve Substantial Compliance with Provision 61 by June 30, 2024.  Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed to extend the compliance deadline for Provision 61 to June 30, 2025, which does not fall within the period covered by this Report.

On September 12, 2025, the County submitted its Semi-Annual Report on Quality Improvement and Suicide Prevention Efforts (the "QI Report"), which relates to Paragraphs 61 and 62.  The QI Report sets forth aggregate data for the 26 suicides and 28 critical incidents that occurred between 2021 and the end of the Second Quarter of 2025, broken down by the subparts of Paragraph 61(a).

The scope and quality of the County's QI and Suicide Prevention efforts continued to develop over the current review period (Q4 2024 and Q1 2025).  The descriptions provided in the QI Report are more thorough and more sophisticated than in previous Reporting Periods.  The QI Report now describes a larger body of substantive work in the areas of QI and Suicide Prevention than the Monitoring Team has seen before.  There appears to be a solid structure to support the QI process, with regular meetings,

89

presentations based on data, assignment and tracking of CAPs, and communication across committees and with line staff.  These aspects of QI and Suicide Prevention are well developed and largely adequate to the requirements of Provision 61.

The recurring feedback in recent Monitoring Reports has focused on the need for the County to more adequately identify "corrective actions and systemic improvements" based upon the data collected about completed suicide and self-harm.  *See, e.g.*, Fifteenth Monitoring Report ("the data continue to reveal troubling trends in suicide attempt and self-directed violence ('SDV') that are not yet being analyzed to drive corrective actions in the Department"); Sixteenth Monitoring Report ("while the Combined Suicide Prevention Report often notes trends in inmate suicide and self-harm, it often does not identify corresponding corrective actions and systemic improvements").  Moreover, the County has been asked to more closely examine rates of suicide and self-directed violence across various demographic and other variables. In the Twentieth Reporting Period, the County has taken that feedback and meaningfully incorporated it into its QI program.

The QI Report includes evaluations of suicide and self-harm data to look for associations between various patient- and incident-level variables and acts of suicide or self-harm.  This includes time in custody, race, ethnicity, and gender, history of prior self-harm, proximity to court, location, risk rating, and others.  While not always explicitly stated, these evaluations appear to be significant drivers of the ongoing quality improvement projects now underway or recently completed by the County.  The County's Annual Suicide Prevention Meeting, held in August 2025, was also rich in terms of specific analysis and interventions aimed at reducing suicide risk in the jails.  The QI Report also now includes more detailed and sophisticated CAPs related to the self-harm data identified through the QI program, or where no CAPs are readily identifiable in the data, a discussion of why not.  This aspect of the QI program is also now satisfactory given the dictates of Provision 61.

The County has now demonstrated a satisfactory QI program that has adequately responded to the dictates of the Agreement and the specific feedback in the Monitoring Reports.  It is in Substantial Compliance with Provision 61 for the Twentieth Reporting Period.

90

62.    The County and the Sheriff's Unit described in Paragraph 77 of this Agreement will develop, implement, and track corrective action plans addressing recommendations of the quality improvement program.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of April 1, 2024, through March 31, 2025)**

Substantial Compliance requires the County's semi-annual Self-Assessments to set forth (a) the "development of corrective action plans to address the most recent recommendations of the quality improvement program;" and (b) the "implementation and tracking of corrective action plans to address recommendations of the program in prior quarters." On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required Defendants to achieve Substantial Compliance with Provision 62 by June 30, 2024. Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed to extend the compliance deadline for Provision 62 to June 30, 2025, which does not fall within the period covered by this Report.

On September 12, 2025, the County submitted its Semi-Annual Report on Quality Improvement and Suicide Prevention Efforts (the "QI Report"), which relates to Paragraphs 61 and 62. The QI Report sets forth aggregate data for the 26 suicides and 28 critical incidents that occurred between 2021 and the end of the Second Quarter of 2025, broken down by the subparts of Paragraph 61(a). Regarding Provision 62, the County's Supplemental Self-Assessment describes a bi-furcated system for tracking CAPs, in which CAPs that flow from critical incidents and death reviews are captured in a "CAP Tracker" and CAPs that result from the QI process are tracked in an online SharePoint site.

The Nineteenth Monitoring Report found that in the Nineteenth Reporting Period, this framework, and the data contained therein, "adequately satisf[ies] the requirements of Provision 62." This has continued in the Twentieth Reporting Period. The County is now adequately developing, implementing, and tracking corrective action plans addressing recommendations of the quality improvement program and is in Substantial Compliance with Provision 62 for the Twentieth Reporting Period. Pursuant to Paragraph 111 of the Settlement Agreement, the County is no longer subject to monitoring for Provision 62.

91

63.     The County and the Sheriff will maintain adequate High Observation Housing and Moderate Observation Housing sufficient to meet the needs of the jail population with mental illness, as assessed by the County and the Sheriff on an ongoing basis.  The County will continue its practice of placing prisoners with mental illness in the least restrictive setting consistent with their clinical needs.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of October 1, 2023, through September 30, 2024 (verified) at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2024, through March 31, 2025 (verified) at TTCF)**

The Parties agreed on Revised Compliance Measures in 2021.  The Revised Compliance Measures require that 90% of inmates wait for permanent HOH and MOH housing for no more than seven days, and that 100% of inmates wait for permanent HOH and MOH housing for no more than 30 days.

On December 27, 2022, and on April 20, 2023, the Court issued Orders Setting Deadlines for Substantial Compliance, ECF No. 234 and 248, respectively, which established specific deadlines for Defendants to "improve compliance with provisions 63, 64, and 80."  With respect to Provision 63, the December 2022 Order established deadlines for Defendants to take a series of "agreed-upon actions to improve compliance," while the April 2023 Order established incremental targets for the Defendants' overall compliance with Provision 63 by the end of each quarter.  Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed to extend the County's Substantial Compliance deadline to March 31, 2025, which falls within the period covered by this Report, and to modify the interim compliance targets as follows.

*Figure 4:  Quarterly Court-Ordered Targets for Provision 63 Compliance*

| | **% of Inmates Waiting ≤ 7 Days in MH Housing Intake Areas Before Transfer to Permanent MH Housing** | **Average Wait Time** |
|---|---|---|
| **2Q2024** | 80% | 7 days |
| **3Q2024** | 80% | 7 days |
| **4Q2024** | 85% | 7 days |
| **1Q2025** | 90% | 7 days |

The County reports that in the random weeks of the Fourth Quarter of 2024, "98.57% of the inmates at TTCF waited no more than seven days in mental health housing intake areas before being transferred to permanent mental health housing, and there were no inmates who waited longer than 30 days to receive permanent mental health housing."  The County's posted results reflect that the average wait time was 4.7 days for the two random weeks.  This met the incremental targets in the Court's April 2023 Order, as modified.  In

92

the random weeks of the First Quarter of 2025, "90.04% of the inmates at TTCF waited no more than seven days in mental health housing intake areas before being transferred to permanent mental health housing, and 100% waited fewer than 30 days to receive permanent mental health housing." The average wait time was 5.4 days. This met the incremental targets in the Court's April 2023 Order, as modified. The reported results at TTCF have been verified by the Monitor's auditors.

The previously reported results at CRDF for the Third Quarter of 2024 have been verified by the Monitor's auditors, and CRDF is no longer subject to monitoring for compliance with Paragraph 63. Regarding these results, the County reports

the Department began to achieve consistently better compliance with Provision 63's requirements after taking a number of steps, beginning in the 18th Reporting Period (such as initiating use of the MHIT system to track the length of inmate stays in SAT housing and the expansion of HOH dorm and FIP Stepdown housing units to levels beyond required by the orders in place in this case) and continuing into the 19th Reporting Period (such as putting in place formal, written protocols to best ensure that Department personnel act with urgency to find an appropriate mental health housing anytime an inmate in SAT is approaching the seven-day limit set forth in Provision 63), to ensure compliance with Provision 63.

<u>Assessment of the Mix of Therapeutic Features in FIP Stepdown Units and HOH Dorms</u>[39]

On March 11, 2024, the Court issued an Order Modifying Deadlines for Substantial Compliance, ECF 266, which extended several deadlines pending in this case. As part of that Order, the Court also instructed that "the Monitor and the Mental Health Subject Matter Expert will assess as part of the Monitor's semi-annual reports the mix of therapeutic features in the Stepdown units and HOH dorms." The Monitor and Mental Health Subject Matter Expert, therefore, share the following updated assessment of the mix of therapeutic features in the Stepdown units and HOH dorms.

Therapeutic features of the FIP Stepdown units include enhancements to the physical environment, which is distinguished by soft furniture and traditional tables rather than the metal spider tables in other units. There are colorful murals, artwork, and plants dispersed throughout the pods to create a more comfortable and less austere living space. Other amenities, such as carts of freely available books, coffee machines, and playing cards and board games, contribute to the livability of the environment and help to reduce inmate idleness. Inmates are not cuffed when out of their cells. In some FIP Stepdown pods, there are aquariums with turtles for patients to interact with and care for. Barbering equipment is available, enabling patients to better maintain their grooming and hygiene.

FIP Stepdown patients also have significant freedom of movement, which enables them to consistently interact with one another, and clinical and custody staff, throughout the day. They come out of their cells for long blocks of time each day, uncuffed, and the

---

[39] This information is also relevant to Provisions 79 and 80.

clinicians maintain a notable presence on the units, which allows them to identify patients who are struggling and make timely interventions.

Interviews with FIP Stepdown patients reflect that the presence of Inmate Mental Health Assistants ("MHAs") is among the most therapeutic features of these units. Inmate MHAs in the TTCF FIP Stepdown units have received intensive training for their therapeutic role, reside in the units, and provide a consistent, supportive presence in addition to the regular structured programming they deliver. They are involved in an incentive-based program to reinforce positive behavior and daily self-care habits. This includes providing access to amenities as a reward for meaningful engagement in group programming and maintaining cells and the common dayroom in a clean and orderly condition. They also serve as mediators to prevent and de-escalate conflict in the unit. Patients describe MHAs as essential for preventing the gang politics of threat, coercion, and intimidation that are pervasive in other dorm-style housing areas, which supports the ability of patients to engage in mental health programming without fear or distraction. Moreover, patients often self-report that they had been homeless and disconnected from community and family supports on the street, and their assigned MHA helps to create a feeling of safety and community while they are undergoing treatment in jail. The Custody staff are also described as a consistent and supportive presence. They do not rotate and thus build positive, empathetic relationships with patients in the FIP Stepdown units.

HOH dorms also allow enhanced freedom of movement (compared to traditional HOH housing pods) in that inmates are not cuffed to tables during out-of-cell time. However, inmates in HOH dorms consistently report receiving less out-of-cell time than inmates in FIP Stepdown pods. This includes reports of no out-of-cell time on weekends and, in some dorms, reports of limited out-of-cell time during weekday afternoons. The physical appearance of many of the HOH dorms remains very similar to traditional HOH housing, with the exception of the soft furniture that has been distributed to HOH dorms. The HOH dorms have generally not been repainted with brighter colors or murals, nor do they have MHAs, or some of the other amenities available in FIP Stepdown pods, such as plants, coffee, movies, board games, or turtle tanks. The presence of books was noted in many of the HOH dorms.

A distinction between FIP Stepdown and HOH dorm units involves the referral process. According to information provided by the County, referrals to FIP Stepdown are initiated by clinicians based on the health history, need, and clinical presentation of the patient. Referrals to HOH dorms are initiated by Custody based on observations of the patient's behavior and ability to program unrestrained. HOH dorms do not appear to include other distinguishing therapeutic features as described for the TTCF FIP Stepdown units.

Differences were noted between the FIP Stepdown units at CRDF and those at TTCF. Interviews revealed that the female MHAs were not providing the same regularity or depth of group programming as the male MHAs at TTCF. Their training consisted primarily of self-study from various texts, with testing to demonstrate understanding, but without the hands-on modeling and mentoring that appears to take place with male MHAs.

94

The female MHAs are responsible for documenting the inmates' daily compliance in areas like taking medications, showering, brushing teeth, and cleaning activities as part of a token economy with food reinforcers referred to as the "Five Star Program."  Beyond this, programming appeared to be limited to one hour in the morning and one hour in the afternoon, when the patients were out of their cells uncuffed.  Overall, the women's program seemed less richly resourced than the men's program, with less programming and supportive services and less out-of-cell time.  At this time, the physical environment was also less distinctive (in the ways described above) from other HOH housing units than appears to be the case with the men's FIP Stepdown units.

64.      Within six months of the Effective Date, the County and the Sheriff will develop a short-term plan addressing the following 12-month period, and within 12 months of the Effective Date, the County and the Sheriff will develop a long-term plan addressing the following five-year period, to reasonably ensure the availability of licensed inpatient mental health care for prisoners in the Jails.  The County and the Sheriff will begin implementation of each plan within 90 days of plan completion.  These plans will describe the projected capacity required, strategies that will be used to obtain additional capacity if it is needed, and identify the resources necessary for implementation.  Thereafter, the County and the Sheriff will review, and if necessary revise, these plans every 12 months.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of October 1, 2024, through March 31, 2025)**

The parties agreed on Revised Compliance Measures in 2021.  Substantial Compliance requires the Department to develop a long-term plan that will address the availability of licensed inpatient mental health care for prisoners in the following five-year period; and provide an annual report describing the long-term plan and the steps taken to implement it, which must be deemed reasonable by the Monitor.

On December 27, 2022, and on April 20, 2023, the Court issued Orders Setting Deadlines for Substantial Compliance, ECF No. 234 and 248, respectively, which established specific deadlines for Defendants to "improve compliance with provisions 63, 64, and 80."  With respect to Provision 64, the December 2022 Order established deadlines for Defendants to take a series of "agreed-upon actions to improve compliance," while the April 2023 Order established incremental targets for the Defendants' overall compliance with the provision by specific quarters.  Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed to modify those incremental targets, and that the County's compliance deadline would be extended to June 30, 2025, which does not fall within the period covered by this Report.  The revised incremental targets are shown in the figure below.

*Figure 5:  Quarterly Court-Ordered Targets for Provision 64 Compliance*

| | **Difference Between # of P4s and # of Patients Receiving Inpatient Care** |
|---|---|
| **1Q2025** | $\leq 10$ |
| **2Q2025** | $\leq 5$ [40] |

Beginning in the Sixteenth Reporting Period, and extending into the Twentieth Reporting Period, the County achieved several encouraging successes in its efforts to comply with Provision 64.  This included opening the Jail Inpatient Unit/Acute Intervention

---

[40] Pursuant to the Joint Stipulation to Modify Deadlines, in the Second Quarter of 2025, "none of those individuals should wait longer than is clinically appropriate for inpatient placement."  As such, for the Twenty-First Reporting Period, the County should report on the wait times for patients awaiting inpatient placement, and post supporting documents for review by the Monitoring Team.

Module ("JIU/AIM") and beginning to treat P4 patients therein to stabilize them and potentially move them to a lower level of care, which continues to have a notable impact on the overall P4 population and the number of patients waiting for inpatient care on the FIP waitlist.  The County reports that at the end of the First Quarter of 2025, there were 52 P4 patients in the LACJ, a decrease from the 82 such patients reported for the end of the Third Quarter of 2024.  The County also reports that it has

> increased the number of inpatient beds for mental health treatment in the LACJ to close, and now eliminate, the gap between the number of P4 inmates in the LACJ and the number of functional inpatient mental health treatment beds that can be used to care for that population. Until the middle of 2023, the LASD only had 48 such beds, consisting of 33 functional in-patient beds in the FIP Unit and 15 in-patient beds in the MHTU. By the end of the reporting period—due to the addition of inpatient beds in the Jail Inpatient Unit/Acute Intervention Module ("JIU/AIM") that occurred in the latter half of 2023, as well as the reconfiguration and relicensing of new inpatient beds in
> the MHTU—there were (and continue to be) 65 licensed, functional, and fully-staffed inpatient beds for mental health treatment in the LACJ.

> As a result of the foregoing, the County had more inpatient mental health beds by the end of the First Quarter of 2025 (65) than P4 inmates who required such beds (52 as of April 1. 2025).

> [T]he County underwent a reconfiguration and relicensing of its inpatient treatment beds to make more functional beds available for inpatient mental health treatment. As a result of this effort and relicensing by the relevant state agencies, the County is currently licensed to go up to 77 functional inpatient mental health beds if the need arises in the future. Currently, this does not seem to be necessary, and thus the County has chosen not to "turn on" 12 beds as inpatient mental health treatment beds, which would require higher staffing levels and which could also make these beds unavailable for other types of care, including for the treatment of inmates diagnosed with COVID or other inpatient medical conditions. As a result of the reconfiguration and relicensing effort, however, the County now has the flexibility to pivot to "turn on" additional inpatient beds for mental health treatment if circumstances change in the future.

Given the County's work to raise the total number of inpatient beds available to treat P4 patients, as its efforts to reduce the total P4 population, the Monitor and Dr. Johnson find that the plan articulated by the County to achieve Substantial Compliance with Provision 64 is reasonable.  *See* Compliance Measure 64-3(b).  The County is, for the first time, in Substantial Compliance with Provision 64.

97

65 (**Revised**).  Consistent with existing Sheriff's Department policies, the County and the Sheriff will ensure that psychotropic medications are administered in a clinically appropriate manner to prevent misuse, hoarding, and overdose.  The County will maintain electronic mental health alerts in prisoners' electronic medical records that notify medical and mental health staff of a prisoner's risk for hoarding medications.

**STATUS:     PARTIAL COMPLIANCE**

On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provision 65 ("Revised Paragraph 65") as set forth above.  They also agreed on Revised Compliance Measures.  Under the Revised Compliance Measures, (1) the County's Self-Assessments must set forth the (a) results of weekly medication audits documenting the visual observation of the administration of medication during the quarter; (b) unauthorized medications found as a result of cell searches during the reporting period; and (c) incidents involving confirmed prescription drug overdoses.  Further, the Monitor must conclude, after consulting with the Subject Matter Expert, that "psychotropic medications are administered in a clinically appropriate manner 85% of the time."  Finally, "85% of the electronic medical records [must] contain the required alerts."

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required Defendants to achieve Substantial Compliance with Provision 65 by March 31, 2024, which fell within the period covered by the Eighteenth Report.  Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed that the County's Substantial Compliance deadline would be extended to June 30, 2025, which does not fall within the period covered by this Report.  Given the issues with the County's self-audit process discussed in the Eighteenth Monitoring Report, the Monitor also agreed to increase the number of on-site observations of pill calls by the Monitoring Team.

The Settlement Agreement requires the County to administer medication to patients in a clinically appropriate manner.  This means, among other things, ensuring that when medication is administered, it is taken by the patient while under observation by the nurse and assigned Deputy, to ensure that the medication is not hoarded, later traded as jail currency, or used for self-harm or overdose.  In the Twentieth Reporting Period, the results of the County's self-audit process continued to reflect extremely high rates of reported compliance.[41]

---

[41] As set forth in this discussion and in previous Monitoring Reports, the self-audit results continue to diverge from the actual practice in the jails.  For example, the posted documents reflect that for the First Quarter of 2025, nursing supervisors observed medication administration for 177 patients taking psychiatric medications housed in MCJ, and 175 were compliant with all pill call procedures.  Similarly, nursing supervisors observed medication administration for 480 patients taking psychiatric medications housed in PDC North, and 477 were compliant.  The Monitoring Team made several unannounced visits to observe pill call in MCJ and PDC North during the First Quarter of 2025, however, and found significant divergences from CHS policy and the requirements of Provision 65.  This includes nurses who were not checking patients' mouths and permitting patients to walk into their housing environments with medications in hand.  The County has yet to sufficiently address the gap between the results of its self-audit process and the Monitoring Team's observations.

*Figure 6:  Quarterly Reported Pill Call Audit Results*

| Quarter | Instances of Psychotropic Medication Administration Observed | Percentage Reported Compliant with Pill Call Procedures |
|---|---|---|
| 4Q2022 | 1,415 | 92.72% |
| 1Q2023 | 1,005 | 99.40% |
| 2Q2023 | 912 | 92.11% |
| 3Q2023 | 1,080 | 99.81% |
| 4Q2023 | 1,644 | 97.32% |
| 1Q2024 | 1,493 | 97.39% |
| 2Q2024 | 1,349 | 98.37% |
| 3Q2024 | 1,447 | 97.72% |
| 4Q2024 | 1,300 | 97.92% |
| 1Q2025 | 1,662 | 99.58% |

The Monitoring Team made on-site observations of pill calls in May, June, July, August, September, and October 2025.  During these visits, the Monitoring Team observed pill calls in multiple housing pods, often on different floors, to ascertain whether medication was being administered in a clinically appropriate manner.  The Monitoring Team conducted between four and six such observations at each jail that houses patients with serious mental illness on the following dates: TTCF (5/27/25, 6/13/25, 7/10/25, 8/19/25, and 10/15/25), CRDF (5/29/25, 6/9/25, 8/8/25, and 9/9/25), MCJ (5/12/25, 6/12/25, 6/20/25, 7/15/25, 9/4/25, and 10/7/25), and PDC North (5/22/25, 6/2/25, 7/28/25, 9/11/25, and 10/29/25).

There were further improvements in the pill calls observed by the Monitoring Team during the Twentieth Reporting Period.  Across all facilities, staff consistently verified patient identity and, in many, but not all, cases, ensured that water was accessible during medication administration.  Documentation of medication refusals and psychoeducation efforts were also noted.  While nursing personnel frequently prompted patients to open their mouths or observed patients voluntarily open their mouths to verify ingestion, inconsistent enforcement of ingestion verification protocols was observed.  There were several instances where patients were permitted to walk into their dorms with medications in hand and occasions where staff did not intervene or were distracted, resulting in unsupervised ingestions.  These issues, which have been identified in numerous Monitoring Reports, require additional attention from the County.[42]

At TTCF, the pill calls observed by the Monitoring Team were generally satisfactory and compliant with the requirements of Provision 65.  Nursing and Custody personnel were observed to be working collaboratively, water was made available at the

---

[42] *See* Sixteenth Monitoring Report at pp. 106, Seventeenth Monitoring Report at pp. 105-107, Eighteenth Monitoring Report at pp. 104-108, and Nineteenth Monitoring Report at pp. 104-107.

site of medication administration, and patients were taking their medications in view of staff.  However, while patient mouths were checked to ensure that medication was not being "cheeked," not all patients opened their mouths sufficiently for verification, which limited the ability to fully confirm ingestion.

At CRDF, Custody and Nursing staff were observed working collaboratively, water was made available, and patients were generally required to ingest their medications in front of staff.  In cases where medication refusal initially occurred, nursing staff made concerted efforts to encourage compliance, resulting in successful medication administration.  However, while some Nursing and Custody staff checked patients' mouths to ensure ingestion, others did not.  Further, there were occasions where Nursing staff distractions led to unobserved ingestions that were not remedied by Custody staff interventions.  Nursing and Custody leaders should work to correct this inconsistency and report on these efforts in the County's next self-assessment.

At MCJ, the pill calls were Non-Compliant.  While water was made accessible to most patients through the provision of water jugs or allowance of personal bottles, water was still absent in specific modules, necessitating that patients obtain water elsewhere, resulting in unsupervised ingestion outside the view of staff.  Patients continued to be allowed to walk into their assigned dorms with medications in their hands or mouths without ingesting them in front of staff.  Further, there were occasions when staff did not intervene as patients attempted to leave with medications, and verification of ingestion was often contingent upon patient initiative rather than systematic enforcement.  The County should take steps to ensure that all Nursing and Custody personnel at MCJ are ensuring ingestion, and report on those efforts in the next self-assessment.

At PDC North, the pill calls were generally unsatisfactory and Non-Compliant with the requirements of Provision 65.  New procedures had been implemented, and the provision of paper sleeves for water during both group and cell-to-cell medication administration reflected appropriate adaptation to the facility's logistical requirements.  However, verification of medication ingestion was not applied uniformly, and staff did not consistently instruct patients to open their mouths to ensure medication ingestion.  The County should take steps to ensure that all Nursing and Custody personnel at PDC North are ensuring ingestion, and report on those efforts in the next self-assessment.

The County notes that it has "made many improvements to enhance the quality and consistency of medication administration at LACJ," noting, in particular, only a single case of confirmed medication overdose during the Twentieth Reporting Period.  However, it reports

> despite the overall success of appropriate medication administration in reducing or preventing overdose incidents, there continues to be incongruity between the reported success of pill call administration in the LACJ in the County's audits and the observations made by Monitor's team. Although progress has been noted, there have been observations of deficient pill call administration as recently as May 2025.

100

The County recognizes that it has yet to prove that it consistently conducts compliant medication administration across all facilities, and it continues to make improvements to increase this consistency.

The County specifically notes that it has taken the following steps in response to the observations of deficiencies with clinically-appropriate pill call shared by the Monitoring Team

| Observation | Actions Taken |
|---|---|
| Unclear announcements | • Training for deputies<br>• Continued reminders at briefings<br>• Discipline for non-compliance |
| Lack of water at PDC North | • Policy changes to ensure medication is given only when an inmate has water ready<br>• Training for deputies and nurses<br>• Discipline for non-compliance |
| Lack of water at MCJ | • Process changes to have water jugs available for pill calls<br>• Policy changes to not commence pill call without water present<br>• Training for deputies and nurses<br>• Discipline for non-compliance |
| Loose or missing wristbands, or failure to check wristbands | • Clear, consistent announcements to inmates<br>• Utilization of scanners |
| Failure to check for ingestion | • Training for deputies and nurses<br>• Continued reminders at briefings<br>• Discipline for non-compliance |
| Allowing inmates to walk away without completing ingestion | • Training for deputies and nurses<br>• Continued reminders at briefings<br>• Discipline for non-compliance |

Further, the County reports that

both LASD and CHS have also been working diligently to improve the reliability of their audits. Staff are regularly trained and briefed on performing accurate audits, and there are several levels of review and auditing that analyze the direct audits of pill calls. These high levels of review are also limited because they often rely on CCTV footage that does not show all aspects of a pill call clearly, particularly in MCJ. Additional audits are performed by different units within both CHS and the LASD to provide more perspectives and feedback. These audits are not used for

101

official reporting but are used to assess both pill calls and audits of pill calls. Regular huddles are held where CHS and LASD communicate directly, report on any challenges, and coordinate solutions. The County has also instituted a working group comprised of management and executives from the LASD and CHS that meets regularly to report on any improvements or challenges and ensure continued coordination and focus on achieving consistently compliant pill calls.

The County should report on these efforts with greater specificity. Moreover, if these efforts are successful, the Monitoring Team would expect that the gap between the County's reported results and the observations of the Monitoring Team would begin to narrow, which has not yet happened.

Regarding other Provision 65 Compliance Measures, the County's Augmented Twentieth Self-Assessment reports that for the Fourth Quarter of 2024, 81%—slightly less than the required 85%—of the electronic medical records of patients identified as being at risk of hoarding medicine contained the required mental health alerts pursuant to Compliance Measure 65-5(d).  This was a notable improvement.  However, for the First Quarter of 2025, the County reports that the rate returned to 66%—less than the required 85%.

Much of the drop was due to more noncompliant cases at PDC North, which has some of the newest staff as it has only recently overcome persistent staffing challenges. In the past six months, numerous actions have been taken to address the high number of noncompliant cases at that facility, including documenting an improved workflow, developing and implementing corrective action plans for noncompliant staff, and providing additional training for all nurses. These efforts showed signs of good results in a recent mini audit in June 2025 that showed 92% of the records audited had the necessary hoarding alerts in place.

The County's posted results reflect that in the Fourth Quarter of 2024, 72 unannounced searches were conducted at TTCF.  Staff identified unauthorized medications in 6 of these searches.  The numbers at the other facilities were CRDF (4 of 167 searches resulting in the seizure of medication), MCJ (2 of 119 searches resulting in the seizure of medication), NCCF (3 of 148 searches resulting in the seizure of medication), PDC North (1 of 95 searches resulting in the seizure of medication), and PDC South (0 of 159 searches resulting in the seizure of medication).

The County's posted results for the First Quarter of 2025 reflect similar trends. There were 251 unannounced searches at TTCF, and 14 resulted in the seizure of unauthorized medications.  The numbers at the other facilities were CRDF (6 of 162 searches resulting in the seizure of medication), MCJ (2 of 99 searches resulting in the seizure of medication), NCCF (2 of 217 searches resulting in the seizure of medication), PDC North (2 of 80 searches resulting in the seizure of medication), and PDC South (0 of 148 searches resulting in the seizure of medications).

102

The County also reported three acts of self-directed violence through the ingestion of medication, none of which were confirmed as overdoses in the Fourth Quarter of 2024. In the First Quarter of 2025, the County reported one incident of self-directed violence involving ingestion of medication, which was confirmed to be an overdose.

66 (**Revised**).  Consistent with existing Correctional Health Services policies, prisoners with a serious mental illness who reside outside of mental health housing, will remain on an active mental health caseload regardless of whether they refuse medications. The County and the Sheriff will provide prisoners with a serious mental illness who reside outside of mental health housing with therapeutically appropriate individual monthly visits with a QMHP whether or not the prisoners are receiving or refusing psychotropic medications.  The County and the Sheriff will provide medication support services to prisoners who (i) have a mental illness, (ii) reside outside of mental health housing and (iii) are prescribed psychotropic medications.

**STATUS:      PARTIAL COMPLIANCE**

On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provision 66 ("Revised Paragraph 66") as set forth above.  They also agreed on Revised Compliance Measures.  Under the Revised Compliance Measures, Substantial Compliance requires that a) 85% of prisoners with a serious mental illness who resided outside of mental health housing were on an active mental health caseload; b) 85% of prisoners with a serious mental illness who resided outside of mental health housing are offered therapeutically appropriate structured mental health treatment and are seen by a QMHP at least once a month; and c) 85% of prisoners who resided outside of mental health housing and were prescribed psychotropic medications were offered medication support services.

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required Defendants to achieve Substantial Compliance with Provision 66 by March 31, 2023.  On March 11, 2024, the Court issued an Order Modifying Deadlines for Substantial Compliance, which extended the deadline for Substantial Compliance to June 30, 2024.  Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed to extend the compliance deadline for Provision 66 to June 30, 2025, which does not fall within the period covered by this Report.

The County's Twentieth Self-Assessment again reports that "there were no records to assess for Compliance Measures 66-5(a) and 66-5(b) because there were no patients who met the criteria for severe mental illness housed in general population areas" in the Fourth Quarter of 2024 and First Quarter of 2025.  Given the County's commitment to moving prisoners with serious mental illness out of general population and into mental health housing, the results being evaluated for this provision are narrowed and largely focus on medication support services for prisoners receiving psychotropic medication and living outside of mental health housing under Compliance Measures 66-3 and 66-5(c).

Regarding those compliance measures, the County reports that 81% of patients residing outside of mental health housing who were prescribed psychotropic medications during the randomly selected week in the Fourth Quarter of 2024 were offered medication support services.  In the First Quarter of 2025, 65% of relevant patients were offered

104

medication support services.[43]  These remain lower than the 85% threshold.  Regarding these results, the County indicates the following regarding the fix to the ORCHID software (discussed in the Seventeenth Monitoring Report at pp. 110):

> the ORCHID enhancements are now in the final stages of testing. In the interim, psychiatry supervisors continue to review the schedules to remove duplicative referrals, which then creates schedule opening that can be backfilled. Psychiatry supervisors are also monitoring the schedule for appointment "no shows" so the patients can be rescheduled timely. Additionally, psychiatry supervisors continue to review the inmate renewal medication list for patients who have transferred facilities to identify patients on psychotropic medications who do not have an appointment scheduled within the next 90 days, and then schedule the appointments accordingly. Finally, to address the issue with appointment referrals not being entered into ORCHID to ensure that they will be scheduled for the earlier available appointment days, the Central Scheduling Unit (CSU) continues to train psychiatrists to enter the referral for the earliest available appointment day for a period no more than 75 days from the last appointment to ensure that CSU can schedule the next appointment to occur within 90 days. Notwithstanding the issue leading the County's decreased compliance rate in the First Quarter of 2025, which is addressed below, the County has continued to apply its best efforts to manage staff and provide additional training to improve the scheduling process.

---

[43] Regarding this decline in compliance results for the First Quarter of 2025, the County reports that "the majority of non-compliance in the First Quarter of 2025 was attributed to scheduling delays for MCJ and NCCF patients. The Compliance Team conducted a thorough analysis and has taken the appropriate corrective measures to address the scheduling issue. On April 3, 2025, the CSU met with the Supervising Psychiatrists for MCJ and NCCF and determined that the scheduling delays were the result of differing interpretations of the 'Requested Start Date/Time' field in the Psychiatry Referral orders. To resolve this discrepancy, it was agreed that this field would be interpreted as the Preferred Appointment Date/Time, and the schedulers would make every effort to meet this date. Additionally, on April 17, 2025, the Compliance Team requested an ORCHID enhancement to remove the 'Requested Start Date/Time' label and replace it with 'Preferred Appointment Date/Time.'"

67 (**Revised**).  The County and the Sheriff will implement policies for patients housed in High Observation Housing and Moderate Observation Housing that require:

(a)    For patients with a Mental Health Level of Care ("MHLOC") of P2:

(i)  documentation of a patient's refusal of psychotropic medication in the patient's electronic medical record;

(ii)  the use of clinically appropriate interventions with such patients to encourage medication adherence; and

(iii) consideration of the need to transfer non-adherent patients to higher levels of mental health housing.

(b)    For patients with an MHLOC of P3 or P4:

(i) documentation of a patient's refusal of psychotropic medication in the patient's electronic medical record;

(ii) the use of clinically appropriate interventions with such patients to encourage medication adherence;

(iii) consideration of the need to transfer non-adherent patients to higher levels of care;

(iv) discussion in treatment team meetings of non-adherent patients who are under consideration for admission to the forensic in-patient unit (i.e., individuals with an MHLOC of P4 as well as individuals referred for consideration of an increase to P4); and

(v) individualized consideration of the appropriateness of seeking orders for involuntary medication pursuant to the provisions of California Welfare and Institutions Code sections 5332-5336 and/or California Penal Code section 2603(a).

106

**STATUS:    PARTIAL COMPLIANCE**

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required Defendants to achieve Substantial Compliance with Provision 67 by June 30, 2023.  On March 11, 2024, the Court issued an Order Modifying Deadlines for Substantial Compliance, which extended the deadline for Substantial Compliance to March 31, 2024, which fell within the period covered by the Nineteenth Report.  On April 22, 2024, the Parties filed a Joint Stipulation to Modify Provision 67 of the Settlement Agreement, ECF. No. 267, as set forth above.

Substantial Compliance requires the County to "review the electronic medical records of 25% of [the] prisoners in HOH and MOH who refused psychotropic medication during the quarter to verify that the records [of 85% of the prisoners] reflect the documentation and consideration of the matters required by the terms of paragraph 67."

The County's Augmented Twentieth Self-Assessment reports that for the Fourth Quarter of 2024, "89% of inmates who refused psychotropic medications received the appropriate consideration and documentation."  For the First Quarter of 2025, the County reported 88% compliance.  These exceed the 85% threshold for Substantial Compliance.  However, these results were unable to be verified by the Monitor's auditors and the County is rated in Partial Compliance.[44]

Although documentation issues prevented a finding of Substantial Compliance, a qualitative review conducted by the Monitoring Team did reveal certain improvements in performance in the Twentieth Reporting Period.  The Monitoring Team reviewed a total of 52 qualifying cases; 37 males and 15 females.  Of these, 29 were from MOH and 23 were from HOH.  Cases were identified by selecting a random sample of prisoners identified by the County as refusing medications at least two weeks prior to review (to provide enough time for clinical intervention to take place).  The Monitoring Team then evaluated

- Whether there was consideration of transfer to a higher level of care;
- Whether any measures taken to secure compliance were clinically appropriate; and
- Whether there was consideration of FIP placement and involuntary medication if there was evidence of dangerousness or grave disability

The Team also evaluated the adequacy of the consideration of transfer to higher

---

[44] The Eighteenth Report referenced the need for the Monitoring Team to discuss Provision 67 with the County, which occurred on March 10, 2025.  During the meeting, it was determined that the County's methodology for excluding selected records from its audit was generally appropriate.  However, the Monitor's auditors highlighted certain pervasive qualitative issues with the documentation provided.  The County indicated that it was aware of some of the issues discussed and had already taken corrective actions prior to the discussion.  The Monitor was encouraged by the County's proactive steps to improve the quality of the clinical notes.  However, while certain corrective actions were taken, many records that were counted as compliant by the County appear to contain similar issues to those identified during the Eighteenth Reporting Period.  Therefore, the County is in Partial Compliance for the Twentieth Reporting Period.  The Monitoring Team is available for further discussions with the County to provide additional examples of the issues with the documentation provided under Provision 67 such that the issues can be corrected.

107

level of care and of transfer to FIP or involuntary medication.  In 36/48, or 75%, of cases, a QMHP considered whether placement at a higher level of care was indicated.  This compares to 55% reported in the November 2021 qualitative review, 90% reported for the February 2021, 86% in September 2020, and 50% reported for the December 2019 review.  In the current review, there was a somewhat higher level of compliance for male cases vs. female cases.  In 27/28, or 96%, of cases for which a higher level of care was considered, the determination was reasonable.  This is similar to the 100% reported in November 2021, 98% reported for the February 2021 review, and 100% reported from the September 2020 review.

Appropriate measures to secure medication compliance were undertaken in 42/49, or 86%, of cases (two were N/A and one was indeterminate).  This compares to 80% in November 2021, 76% in May 2021, and 77% reported for December 2019, and 88% reported for the September 2020 review.  The Monitoring Team found consideration of FIP or involuntary medication was present in 11/11, or 100%, of cases where there was evidence of possible dangerousness or grave disability.  This compares to 76% reported in November 2021, 94% in May 2021, 73% for September 2020, and 67% in December 2019.  The assessments of this element were reasonable in all cases (100%) where an assessment was done, compared to 100% in February 2021, 88% for February 2021, 64% for September 2020, and 100% reported in December 2019.

68.     Within six months of the Effective Date, the County and the Sheriff will develop and implement a procedure for contraband searches on a regular, but staggered basis in all housing units.  High Observation Housing cells will be visually inspected prior to initial housing of inmates with mental health issues.

**STATUS:**     **SUBSTANTIAL COMPLIANCE (as of January 1, 2016, through December 31, 2016 (verified) at MCJ, NCCF, PDC East, PDC South, and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2017, through December 31, 2017 (verified) at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of January 1, 2022, through December 31, 2022 (verified) at CRDF)**

Substantial Compliance requires that "85% of the housing units are searched for contraband at least once in the previous quarter; and 95% of the HOH units visually inspected prior to housing prisoners in these units."  Self-Assessments are to include a summary of searches conducted and a review of 25 randomly selected Checklist forms for HOH units to confirm that the units were visually inspected prior to initial housing of prisoners in these units.  On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which requires Defendants to achieve Substantial Compliance with Provision 68 by June 30, 2024.

The County previously maintained Substantial Compliance for twelve consecutive months at TTCF, MCJ, NCCF, PDC East, PDC South, CRDF, and PDC North.  Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring at those facilities for Substantial Compliance with Paragraph 68 in the Twentieth Reporting Period.

69.     Consistent with existing DMH policies regarding use of clinical restraints, the County and the Sheriff will use clinical restraints only in the Correctional Treatment Center and only with the approval of a licensed psychiatrist who has performed an individualized assessment and an appropriate Forensic Inpatient order.  Use of clinical restraints in CTC will be documented in the prisoner's electronic medical record.  The documentation will include the basis for and duration of the use of clinical restraints and the performance and results of the medical welfare checks on restrained prisoners.  When applying clinical restraints, custody staff will ensure a QMHP is present to document and monitor the condition of the prisoner being placed in clinical restraints.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of July 1, 2018, through June 30, 2019 (verified))**

Substantial Compliance requires the Department to review the electronic medical records of all prisoners placed in clinical restraints to verify that the restraints were used, approved, and documented, and that the results of medical welfare checks on restrained prisoners were also documented.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring at those facilities for Substantial Compliance with Paragraph 69 in the Twentieth Reporting Period.

110

70.      Within three months of the Effective Date, the County and the Sheriff will have policies and procedures regarding the use of Security Restraints in HOH and MOH. Such policies will provide that:

    (a)     Security Restraints in these areas will not be used as an alternative to mental health treatment and will be used only when necessary to insure safety;

    (b)     Security Restraints will not be used to punish prisoners, but will be used only when there is a threat or potential threat of physical harm, destruction of property, or escape;

    (c)     Custody staff in HOH and MOH will consider a range of security restraint devices and utilize the least restrictive option, for the least amount of time, necessary to provide safety in these areas; and

    (d)     Whenever a prisoner is recalcitrant, as defined by Sheriff's Department policy, and appears to be in a mental health crisis, Custody staff will request a sergeant and immediately refer the prisoner to a QMHP.

**STATUS:      PARTIAL COMPLIANCE**

On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required Defendants to achieve Substantial Compliance with Provision 70 by June 30, 2024. Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed to extend the compliance deadline for Provision 70 to June 30, 2025, which does not fall within the period covered by this Report.

At its core, the Agreement requires the County and LASD to create a more therapeutic environment for inmate/patients experiencing serious mental illness. This purpose is evident from the Agreement's very first pages, which note its intent to "enhance the treatment and care of prisoners with mental illness." *See* Agreement at § 3. Moreover, the Agreement is "designed to protect prisoners from conditions in custody that place them at unreasonable risk of harm from suicide [and] self-injurious behavior." *Id.* at § 4. The Agreement also recognizes, as it must, that the County and Department must balance this need with an obligation to maximize security for both inmates and staff. *Id.* at § 1 (noting the County's obligation to provide "safe" custodial care). Balancing these core purposes—enhancing treatment and care without compromising safety and security—has been, and continues to be, one of the most difficult challenges associated with the County's compliance with the Agreement.

Some inmate/patients with serious mental illness, particularly those who are actively psychotic and have a history of fighting or violence, may need to be restrained during their out-of-cell time for the safety of other inmates and staff. Many others are able

111

to safely leave their cells to socialize with others in a common day room without increasing risks to staff or other inmates.  From a clinical perspective, it is far preferable for inmate/patients to socialize without restraints, when that is safe, because a lack of social support and isolation are key drivers of decompensation, self-harm, and suicide in jail.[45]

Deciding which inmates can safely leave their cells to socialize (which is sometimes called "programming" in jail parlance) without restraints necessarily involves making an individualized assessment and determination about each inmate/patient.  Provision 70 contemplates the necessity of these individualized determinations, as it requires that restraints "will not be used as an alternative to mental health treatment and will be used *only when necessary to [e]nsure safety*."  Provision 70(a) (emphasis added).  Making a determination that restraints are "necessary to [e]nsure safety" necessarily involves an individualized assessment of the type discussed above.  This approach is consistent with modern approaches in corrections, which have moved away from archaic and discredited views that all inmates with serious mental illness can be presumed dangerous, and must be kept in seclusion or restraints as a result of their diagnosis alone.

In the early days of this Monitor's appointment in 2020, in the LA Jails, inmate/patients with serious mental illness were, in fact, kept in restraints during all out-of-cell programming time purely as a result of their serious mental illness.  At that time, all HOH inmate/patients were only permitted to leave their cells to socialize or engage in therapeutic activities when they were chained to metal spider tables in common day rooms.  This was made clear during the Monitor's site visits, interviews with patients, and discussions with clinical and security staff.  No individualized assessments were being performed to determine who could safely program without restraints.  Reflecting concern about this practice, one of this Monitor's first reports noted:

> During almost every one of these [site] visits, all [HOH] inmates were in single-person cells, where they generally remain locked down until permitted out for their limited allotment of out-of-cell time. Most patients were sleeping, some were pacing back and forth in their cells, and few were responsive to us or able to answer, or even acknowledge, questions posed at their cell front windows. We observed no therapeutic group programming being offered during these visits to HOH pods. According to Mental Health Subject Matter Expert Dr. Johnson, prolonged isolation for acutely mentally ill inmates can aggravate the severity of their illness, deepen their social isolation, and even result in medical complications and worsened recidivism rates.

> The out-of-cell time that we observed in these HOH pods was also concerning. During out-of-cell time, a small number of inmates, often 3–5, were handcuffed to individual metal "spider tables" in the shared dayroom while all other inmates remained locked in their cells. The out-of-cell

---

[45] *See generally*, Sean M. Mitchell, *Managing Suicide Risk and Nonsuicidal Self-Injury in Jails*, in *Handbook of Mental Health Assessment and Treatment in Jails* at 60-61 (Virginia Barber-Rioja and Bipin Subedi eds., 2023).

inmates generally watched TV or sat at their tables doing nothing. They were not able to engage in the activities that generally characterize out-of-cell time in jail environments, such as moving around the dayroom, exercising, reading, using the telephone, showering, engaging in group activities, or interacting with other inmates. Conversations with custody and mental health staff reflected that there is no individualized risk assessment to determine whether inmates in HOH pods must be cuffed to these tables during out-of-cell time for safety reasons; they are all locked down as a matter of course given their status as acutely ill HOH patients.[46]

When the Monitor contemporaneously raised concerns about these practices with LASD personnel, LASD executives quite openly admitted to this framework—all HOH inmate/patients were presumed dangerous and were not permitted out of their cells without restraints because of their mental illness.  Although this practice was in conflict with Provision 70, the County maintained in 2020 that it was actually in Substantial Compliance with Provision 70 merely because it had adopted written policies that conformed to the provision.  *See, e.g.,* County's Augmented Eleventh Self-Assessment, dated January 15, 2021 ("the County appreciates the Monitor and Mental Health SME's thoughtful feedback and shares their goal of trying to include as many mentally ill inmates as possible in progressive housing concepts and programs."  However, "[t]he Department believes it has satisfied all of the requirements of this Provision, and is therefore no longer subject to monitoring.").  *See also* County's Augmented Self-Assessments for the Twelfth, Thirteenth, Fourteenth, Fifteenth, and Sixteenth Reporting Periods.

The Monitor and Mental Health Subject Matter Expert continually disagreed with this notion, both in meetings with LASD and County personnel across multiple years, and in these Monitoring Reports.  *See* Twelfth Monitoring Report at pp. 103-04 ("security restraints continue to be routinely applied based upon prisoners' mental health classifications and housing assignments, rather than individual assessments of particular risks that they might pose. . . .To attain Substantial Compliance, the County will need to demonstrate that it is using security restraints based upon individualized assessments, 'only when necessary to ensure safety,' rather than based upon housing assignments or mental health classifications alone"); *see* Fifteenth Monitoring Report at pp. 105 ("The Department will not comply with Provision 70 by adopting written policies that adhere to its dictates, and informal rules, practices, or unit orders that implicitly amend those policies in violation of the Provision's language and intent.").  We have continually viewed the adoption of compliant policies as a useful step towards compliance, but not a finish line in and of itself.[47]

Thankfully, since at least 2023, the County has been engaged in an "ambitious plan" to expand the number of unrestrained housing units for HOH inmate/patients.  *See* Fifteenth Monitoring Report at pp. 105.  And today, the County can rightfully boast that it has

---

[46] *See* Twelfth Monitoring Report at pp. 13-14.

[47] The County has not challenged this proposition with respect to other provisions of the Agreement which, like Provision 70, require the County to adopt new policies, but where compliance is demonstrated through proof of practice that the new policies are actually being implemented in the jails.  *See, e.g.,* Provision 67.

113

created no less than 33 pods in which HOH patients can program without restraints, which exceeds the number required by the Court's March 2024 order.[48]  As of September 2025, this number was sufficient to house 49% of all HOH inmate/patients in unrestrained housing pods, which is a substantial achievement.[49]  Moreover, as the Nineteenth Monitoring Report made clear, the County has also developed processes for conducting individualized reviews of HOH inmate/patients to determine whether they can safely move into unrestrained housing environments.  *See* Nineteenth Monitoring Report at pp. 116-117.  This, too, is worthy of praise.

However, what the County has not done—and what it in fact maintains that it cannot do—is to create any reviewable records reflecting that these assessments have actually been completed for the 51% of HOH patients who remain in traditional HOH pods in which they are not permitted to program without restraints.  And now, as in 2020, the County suggests that it is in Substantial Compliance with Provision 70 despite the absence of this necessary proof.  The Monitor and Mental Health Subject Matter Expert, again, disagree.

<u>Proof of Practice is Required to Verify the County's Compliance with the Agreement, Including Provision 70</u>

In the Augmented Twentieth Self-Assessment, the County suggested that no documentary evidence of individualized assessments is required to demonstrate that it is in Substantial Compliance with Provision 70.  *See* Augmented Twentieth Self-Assessment at 72-73 ("There is no dispute that the policies adopted by the Department regarding physical restraints comply with the enumerated requirements of Provision 70 set forth above. The remaining dispute is only whether there is an additional quantitative or documentary metric hidden behind the plain wording of Provision 70 that the County must meet to obtain substantial compliance with that provision. There is not."  "[T]he Department contends it has satisfied all the requirements of this provision and is therefore in substantial compliance.").  The Monitor suggests that this is an inaccurate reading of the County's obligations under the Agreement.

The arrangement for demonstrating and verifying compliance is articulated within the Agreement itself.  The County is required to "maintain sufficient records to document that the requirements of this Agreement are being properly implemented."  *See* Agreement at § 91(b).  It must provide "any documents requested by the Monitor or DOJ concerning implementation of this Agreement."  *Id.* at § 91(c).  The Monitor is required to "report on the implementation of this Agreement and whether the implementation is having the intended beneficial impact on conditions at the Jails."  *Id.* at § 93.  More specifically, the Monitor is to file public reports "evaluating the extent to which the County and the Sheriff have complied with this Agreement."  *Id.* at § 109.

The Monitor is to base these reports, in part, on self-assessments generated by the

---

[48] Dkt. 266.

[49] Moreover, contrary to the views expressed by County personnel early on, these unrestrained pods have not resulted in large increases in the number of inmate fights and assaults on staff.

County.  Every six months, the County is to produce to the Monitor a "Self-Assessment Status Report" that includes the "actions taken by the County and the Sheriff during the review period to implement [the] Agreement" as well as the County's assessment of its own compliance.  *See* Agreement at § 92(a)(1).

Yet, the compliance ratings in the Monitoring Reports do not flow directly from the County's own self-assessments.  Instead, the Monitor must examine and weigh supporting evidence to determine whether or not the County is in Substantial Compliance.  Specifically, "[i]n order to assess compliance," the Monitor is to "review a sufficient number of pertinent documents to accurately assess current conditions."  *Id.* at § 109.  Further, "[t]he Monitor, the SMEs, and their staff will be responsible for *independently verifying representations* from the County or the Sheriff regarding progress toward compliance, *and examining supporting documentation.*"  *Id* (emphasis added).

This framework is reinforced as to Provision 70 in the Compliance Measures themselves, which the Parties have iteratively negotiated, including as recently as in 2024.  The Compliance Measures expressly require that to achieve Substantial Compliance, the Monitor must be able to confirm that Department policies regarding Provision 70 have actually been implemented in the jails.  Under Compliance Measure 70-2, "Substantial Compliance will require approval by the Monitor, after consultation with the Subject Matter Experts, of the Department's written policies and procedures regarding the use of security devices in HOH and MOH units, *and confirmation that the policies and procedures have been implemented.*"  Compliance Measure 70-2 (emphasis added).

<u>Half of the HOH Patient Population Remains Chained to Fixed Tables During all Out-of-Cell Time and the County has not Produced Individualized Assessments of the Reasons Why</u>

As of September 2025, 51% of the total HOH population of 1,727 inmates/patients remain in traditional (restrained) HOH pods.  Thus, approximately 880 HOH inmate/patients remain in housing environments in which they are unable to leave their cells without restraints or socialize with others without being chained to fixed metal spider tables.  Construing the terms in the Agreement, the Monitor believes that to verify the County's compliance, proof that these patients have been individually evaluated to determine whether restraints are "necessary to [e]nsure safety" is required.

The distinction between programming with or without restraints is not a mere technicality; it has a material impact on how therapeutic the environment is for a substantial number of inmate/patients with serious mental illness.  According to the Monitor's Mental Health Team, while chaining patients to fixed objects and restricting their participation in traditional jail out-of-cell activities (such as moving around the dayroom, exercising, using the telephone, playing games, showering, engaging in group activities, or interacting with other inmates) may be necessary in limited circumstances, it increases patient isolation, makes it more difficult to engage in treatment, and increases their risk of decompensation and engaging in acts of self-harm.  As such, given the expressed goals of the Agreement as well as the terms of Provision 70, the County must demonstrate that a considered judgment

115

has been made to determine that restraints are required for these 51% of HOH patients.

The County has helpfully described a screening process it has developed that involves daily morning meetings involving custody and clinical staff, at CRDF and TTCF, to discuss whether any patients are ready to move to unrestrained units.  The Monitoring Team observed such a meeting at TTCF on November 18, 2025, and thereafter met with the TTCF staff members who were running it.[50]  The County has suggested that it would be unduly burdensome to periodically take notes at these meetings reflecting the reasons why it would be unsafe to move each patient to unrestrained dorms.  However, as the Monitoring Team has made clear, these notes need not be voluminous or unduly detailed – they need to simply reflect that the County has made a considered judgment that restraints during out-of-cell time are necessary for these patients to ensure safety.[51]  The Monitoring Team has offered, and remains available, to meet with the County to address any concerns about how to operationalize this requirement.

The County has made strides towards compliance with Provision 70, of which it should be justifiably proud.  But in the absence of the proof of compliance that is required by the Agreement, it remains in Partial Compliance with Provision 70 for the Twentieth Reporting Period.

---

[50] In this discussion, and in the Monitoring Team's related discussions with clinical personnel, the staff we spoke with uniformly shared the view that there is an inmate-specific security-based rationale for using restraints during all out-of-cell time for just a fraction of the total HOH population—far lower than 50%.

[51] *See* Nineteenth Monitoring Report at pp. 117-118 (These individualized assessments "need not be lengthy discussions, nor must the process for creating them be unduly burdensome. The County has asserted that these assessments are happening on a daily basis. It would be enough for a scribe to be present once or twice a week to document, in summary form, the individualized reasons why these patients cannot be moved into housing assignments that permit them to program without restraints.  Articulated criteria for when restrained HOH pods are necessary would also be of use, and because behavior can improve once patients are receiving mental health treatment in the County's care, a written standard for how often these assessments are to be conducted and revisited should also be developed").

116

71.     The County and the Sheriff will ensure that any prisoner subjected to clinical restraints in response to a mental health crisis receives therapeutic services to remediate any effects from the episode(s) of restraint.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of July 1, 2016, through June 30, 2017 (verified))**

Substantial Compliance requires the Department to review the electronic medical records of all prisoners placed in clinical restraints to verify that the prisoners received therapeutic services as required by Paragraph 71.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 71 in the Twentieth Reporting Period.

72.    The County and the Sheriff will develop and implement policies and procedures that ensure that incidents involving suicide and serious self-injurious behavior are reported and reviewed to determine:  (a) whether staff engaged in any violations of policies, rules, or laws; and (b) whether any improvements to policy, training, operations, treatment programs, or facilities are warranted.  These policies and procedures will define terms clearly and consistently to ensure that incidents are reported and tracked accurately by DMH and the Sheriff's Department.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of January 1, 2017, through December 31, 2017)**

Substantial Compliance requires the Self-Assessments to report on (a) suicide review meetings and (b) CIRC meetings that review incidents of serious self-injurious behavior in the reporting period.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 72 in the Twentieth Reporting Period.

118

73.     Depending on the level of severity of an incident involving a prisoner who threatens or exhibits self-injurious behavior, a custody staff member will prepare a detailed report (Behavioral Observation and Mental Health Referral Form, Inmate Injury Report, and/or Incident Report) that includes information from individuals who were involved in or witnessed the incident as soon as practicable, but no later than the end of shift.  The report will include a description of the events surrounding the incident and the steps taken in response to the incident.  The report will also include the date and time that the report was completed and the names of any witnesses.  The Sheriff's Department will immediately notify the County Office of Inspector General of all apparent or suspected suicides occurring at the Jails.

**STATUS:      SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified))**

Substantial Compliance requires the Department to review quarterly a random sample of reports of any threats or exhibitions of self-injurious behavior to verify that the reports have the information required by Paragraph 73; and to provide the Monitor with the notifications to the Inspector General of all incidents involving an apparent or suspected suicide during the reporting period.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 73 in the Twentieth Reporting Period.

119

74.     The Sheriff's Department will ensure that there is a timely, thorough, and objective law enforcement investigation of any suicide that occurs in the Jails. Investigations shall include recorded interviews of persons involved in, or who witnessed, the incident, including other prisoners.  Sheriff's Department personnel who are investigating a prisoner suicide or suspected suicide at the Jails will ensure the preservation of all evidence, including physical evidence, relevant witness statements, reports, videos, and photographs.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of September 1, 2016, through December 31, 2017)**

Substantial Compliance requires the Department to provide the Monitor with an Executive Suicide Death Review reflecting the results of the Department's investigation of any suicide in the Jails within six months of the suicide.  The review must reflect steps taken to preserve all of the evidence; and list the interviews of persons involved in, or who witnessed, the incident, and whether the interviews were recorded.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 74 in the Twentieth Reporting Period.

120

75.     Within three months of the Effective Date, the County and the Sheriff will review every suicide attempt that occurs in the Jails as follows:

(a)     Within two working days, DMH staff will review the incident, the prisoner's mental health status known at the time of the incident, the need for immediate corrective action if any, and determine the level of suicide attempt pursuant to the Centers for Disease Control and Prevention's Risk Rating Scale;

(b)     Within 30 working days, and only for those incidents determined to be a serious suicide attempt by DMH staff after the review described in subsection (a) above, management and command-level personnel from DMH and the Sheriff's Department (including Custody Division and Medical Services Bureau) will meet to review relevant information known at that time, including the events preceding and following the incident, the prisoner's incarceration, mental health, and health history, the status of any corrective actions taken, and the need for additional corrective action if necessary;

(c)     The County and the Sheriff will document the findings that result from the review of serious suicide attempts described in subsection (b) above; and

(d)     The County and the Sheriff will ensure that information for all suicide attempts is input into a database for tracking and statistical analysis.

121

**STATUS (75):**  **SUBSTANTIAL COMPLIANCE (as of October 1, 2017, through September 30, 2018 (verified))**

Substantial Compliance requires (a) DMH to review documentation of randomly selected suicide attempts during the previous quarter to verify that the prisoner's mental health status and need for immediate corrective action were considered timely by the DMH staff and that the staff determined whether the suicide attempt was serious; (b) that the Department and DMH reviewed the relevant information known at that time and the status of any corrective actions taken, and they considered the need for additional corrective action if necessary; and (c) that the information is reflected in the Department's database for tracking and statistical analysis.

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 75 in the Twentieth Reporting Period.

76.    The County and the Sheriff will review every apparent or suspected suicide that occurs in the Jails as follows:

(a)    Within no more than two working days, management and command-level personnel from DMH and the Sheriff's Department (including Custody Division and Medical Services Bureau) will meet to review and discuss the suicide, the prisoner's mental health status known at the time of the suicide, and the need for immediate corrective or preventive action if any;

(b)    Within seven working days, and again within 30 working days, management and command-level personnel from DMH and the Sheriff's Department (including Custody Division and Medical Services Bureau) will meet to review relevant information known at that time, including the events preceding and following the suicide, the prisoner's incarceration, mental health, and health history, the status of any corrective or preventive actions taken, and the need for additional corrective or preventive action if necessary; and

(c)    Within six months of the suicide, the County and the Sheriff will prepare a final written report regarding the suicide.  The report will include:

(i)     time and dated incident reports and any supplemental reports with the same Uniform Reference Number (URN) from custody staff who were directly involved in and/or witnessed the incident;

(ii)    a timeline regarding the discovery of the prisoner and any responsive actions or medical interventions;

(iii)   copies of a representative sample of material video recordings or photographs, to the extent that inclusion of such items does not interfere with any criminal investigation;

(iv)    a reference to, or reports if available, from the Sheriff's Department Homicide Bureau;

(v)     reference to the Internal Affairs Bureau or other personnel investigations, if any, and findings, if any;

(vi)    a Coroner's report, if it is available at the time of the final report, and if it is not available, a summary of efforts made to obtain the report;

(vii)   a summary of relevant information discussed at the prior review meetings, or otherwise known at the time of the final report, including analysis of housing or classification issues if relevant;

(viii)  a clinical mortality review;

(ix)    a Psychological Autopsy utilizing the National Commission on Correctional Health Care's standards; and

(x)     a summary of corrective actions taken and recommendations regarding additional corrective actions if any are needed.

123

**STATUS (76):**     **SUBSTANTIAL COMPLIANCE (as of**
                      **September 1, 2016, through December 31, 2017)**

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 76 in the Twentieth Reporting Period.  Nonetheless, the County continued to conduct the reviews required by Paragraph 76 for the suicides that occurred during this period and invited the Monitor to attend these meetings.

124

77.    The County and the Sheriff will create a specialized unit to oversee, monitor, and audit the County's jail suicide prevention program in coordination with the Department of Mental Health.  The Unit will be headed by a Captain, or another Sheriff's Department official of appropriate rank, who reports to the Assistant Sheriff for Custody Operations through the chain of command.  The Unit will be responsible for:

(a)    Ensuring the timely and thorough administrative review of suicides and serious suicide attempts in the Jails as described in this Agreement;

(b)    Identifying patterns and trends of suicides and serious suicide attempts in the Jails, keeping centralized records and inputting data into a unit database for statistical analysis, trends, and corrective action, if necessary;

(c)    Ensuring that corrective actions are taken to mitigate suicide risks at both the location of occurrence and throughout the concerned system by providing, or obtaining where appropriate, technical assistance to other administrative units within the Custody Division when such assistance is needed to address suicide-risk issues;

(d)    Analyzing staffing, personnel/disciplinary, prisoner classification, and mental health service delivery issues as they relate to suicides and serious suicide attempts to identify the need for corrective action where appropriate; and recommend remedial measures, including policy revisions, re-training, or staff discipline, to address the deficiencies and ensure implementation; and

(e)    Participating in meetings with DMH to develop, implement, and track corrective action plans addressing recommendations of the quality improvement program.

**STATUS (77):**          **SUBSTANTIAL COMPLIANCE (as of April 1, 2022, through March 31, 2023)**

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 77 in the Twentieth Reporting Period.[52]

---

[52] The County has acknowledged that its ongoing Quality Improvement efforts will remain subject to monitoring under other provisions of the Settlement Agreement.

126

78.     The County and the Sheriff will maintain a county-level Suicide Prevention Advisory Committee that will be open to representatives from the Sheriff's Department Custody Division, Court Services, Custody Support Services, and Medical Services Bureau; the Department of Mental Health; the Public Defender's Office; County Counsel's Office; the Office of the Inspector General; and the Department of Mental Health Patients' Rights Office.  The Suicide Prevention Advisory Committee will meet twice per year and will serve as an advisory body to address system issues and recommend coordinated approaches to suicide prevention in the Jails.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of May 11, 2016, through May 18, 2017)**

Substantial Compliance requires (1) the Committee to meet twice per year and (2) "recommend coordinated approaches to suicide prevention in the Jails."

Pursuant to Paragraph 111 of the Settlement Agreement, the Department was not subject to monitoring for Substantial Compliance with Paragraph 78 in the Twentieth Reporting Period.  Nevertheless, the County has continued to hold Bi-Annual Suicide Prevention meetings through the last reporting period, which the Monitor endeavors to attend.

79 (**Revised**).  (a)     Unless clinically contraindicated, the County and the Sheriff will offer prisoners in mental health housing:

(i)      therapeutically appropriate individual visits with a QMHP; and

(ii)     therapeutically appropriate group programming conducted by a QMHP or other appropriate provider that does not exceed 90 minutes per session.

(b)     The date, location, topic, attendees, and provider of programming or therapy sessions will be documented.  A clinical supervisor will review documentation of group sessions on a monthly basis.

**STATUS:     PARTIAL COMPLIANCE**

On June 25, 2021, the parties filed a Joint Stipulation to Modify Settlement Agreement that amended the language of Provision 79 ("Revised Paragraph 79") as set forth above.  They also agreed on Revised Compliance Measures.  Under the Revised Compliance Measures, Substantial Compliance requires the Department to maintain records of therapeutically appropriate individual visits and group programming, and the names of the clinical supervisors who reviewed such records and the conclusions of their reviews.  It also requires that 95% of the prisoners in HOH are offered therapeutically appropriate structured mental health treatment, including at least a weekly QMHP visit and group programming, and that 90% of prisoners in MOH are provided visits by a QMHP at least once a month as well as therapeutically appropriate structured mental health treatment.[53] On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required Defendants to achieve Substantial Compliance with Provision 79 by June 30, 2024.  Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed to extend the compliance deadline for Provision 79 to June 30, 2025, which does not fall within the period covered by this Report.

The County's Augmented Twentieth Self-Assessment reports that in the Fourth Quarter of 2024, the "supervisor responsible for reviewing relevant documentation [on a] monthly [basis] did so at TTCF and CRDF, resulting in 100% compliance at both facilities."  "For Measure 79-4(b), which requires that 95% of HOH patients are offered an individual visit by a QMHP and weekly group programming, the County reported 65% compliance.  For Measure 79-4(c), which requires that 90% of patients in MOH are offered individual monthly visits by a QMHP and therapeutically appropriate structured treatment,

---

[53] The Nineteenth Monitoring Report noted, "[a] difference of opinion has arisen regarding whether or not structured group programming is required for MOH patients under Provision 79 and its associated Compliance Measures.  This issue should be discussed and negotiated among the Parties and the Monitor before the date of the County's next Self-Assessment."  By way of update, the Augmented Twentieth Self-Assessment states, "[t]he County expects that this meeting will take place shortly, in the Third Quarter of 2025."

the County reported 81% compliance."

The County's Augmented Twentieth Self-Assessment reports that in the First Quarter of 2025, for Compliance Measure 79-1(d), the County continued its 100% compliance at both TTCF and CRDF. For Measure 79-4(b), which requires that 95% of HOH patients be offered an individual visit by a QMHP and weekly group programming, the County reported 66% compliance. For Measure 79-4(c), which requires that 90% of patients in MOH are offered individual monthly visits by a QMHP and therapeutically appropriate structured treatment, the County reported 75% compliance.

These results were tested by a qualitative review conducted by the Monitoring Team. The Monitoring Team reviewed 25 cases from MOH and 25 cases from HOH, with 15 males and 10 females from each level of care. Male cases were from TTCF for the HOH sample, and a mixture of TTCF, PDC North, and MCJ for the MOH sample. All female cases were from CRDF. Overall, 44/50, or 88% of cases, were offered individual treatment. "There were differences noted between males vs. females and between MOH vs. HOH: four of the six cases rated as not receiving individual treatment were MOH females; one was a male in MOH; and one was a male in HOH. Three of the MOH females were seen individually by clinicians, but these contacts were essentially check-ins, whereby the progress notes did not reflect any particular treatment. The fourth noncompliant MOH female case was only seen by a psychiatric technician, and the notes did not reflect specific treatment."

Significantly, in 40/44, or 91% of the cases, the treatment was specified in a treatment plan. This is a continued substantial improvement from the 41% reported in June 2024. Moreover, compared to prior reviews, the quality of the treatment plans was consistently and notably better in the current review.

The Monitoring Team found that in 38/41, or 93% of cases, the treatment was "therapeutically appropriate." This is a substantial improvement from the 29% reported in June 2024. More cases had documentation with specific interventions appropriate to the patient's clinical presentation. There was sufficient alignment between the identified patient needs, goals, and the focus of sessions. Treatment was typically appropriate to the patient's clinical presentation. In noncompliant cases, the notes were typically "too vague, lacking in specifics or sufficient description, or the interventions listed were actually evaluations. Some clinicians could benefit from further coaching in this area." However, "the positive effects of training and supervision to date were apparent in the current case reviews."

Group therapy was offered in 26/50, or 52% of cases, for the entire sample. This compares to 37% in June 2024. There was an even greater difference between HOH and MOH for this item in the current review, whereby 25/25, or 100%, of HOH inmates were offered group treatment, vs. 1/25, or 4%, of MOH patients. This compares to 60% of HOH patients offered group treatment vs. 14% of MOH patients in June 2024, and 83% of HOH patients and 10% of MOH patients in August 2023. Thus, there was a substantial increase in the number of HOH patients being offered group treatment, and a decrease in the number

129

of MOH patients being offered group treatment in the current sample compared to the Monitoring Team's most recent prior reviews.

In 2/22, or 9% of cases, the group therapy was delivered according to a treatment plan, although these two cases provided minimal information regarding the alignment of the group content to assess the needs of the patient.  In 15/25, or 60% of cases, the group treatment was considered evidence-based, best practice, or accepted practice, whereas prior reviews found that none of the group therapy was considered evidence-based.

In 15/18, or 83% of cases, the group therapy was considered therapeutically appropriate, whereas the June 2024 review reported 9%, and prior reviews found no such cases.  Cases were counted as compliant on this item if the group content/focus was "adequately described and at least some of the groups were appropriate for identified areas of need for the patient."  The Monitoring Team found that substantial improvement for this item reflects

> improvement in documentation and the content of groups offered.  The nature of the group descriptions included in the healthcare records were more informative and more frequently based on recognized treatment frameworks.  A number of groups were more clearly aligned with the needs of the patient than we have seen in prior reviews.  Some groups are essentially leisure and recreation or socialization-oriented activities, but these also have clinical value.  Groups are not specifically referenced in the treatment plans.  The pattern of practice noted in earlier qualitative reviews continues, in which patients are not assigned or selected for group participation according to assessed need and individualized treatment planning.  With sufficient attention to the content of the groups and the relevance of this content for the known needs of the jails' patient population, groups may be considered therapeutically appropriate without specific reference in the treatment plan, as long as they address a therapeutic need for the patient.  This would represent a viable approach to providing therapeutically appropriate group treatment in the LA County Jail system.

Regarding these improved results, the County reports on various efforts underway to increase compliance.  This includes efforts "to ensure all vacant permanent items are filled as quickly as possible.  For all mental health programs, both program managers and CHS Compliance review caseload size to determine if clinicians' caseloads are too large and whether additional staff are needed to reduce caseload size, therefore ensuring patients can be seen timely."  Further, as described in previous reports, it also includes a continuing focus on conducting "spot checks focused on the quality of clinical documentation, including treatment plans and follow-up notes, based on clarified expectations with the monitoring team from the Third Quarter of 2024."

The County also reports on its efforts to improve treatment plan quality, implement fixes to the ORCHID database, evaluate treatment plans at PDC North through a relevant JQIC project, and provide various additional treatment plan trainings during the First and

130

Second Quarters of 2025.

**Group Treatment in MOH Mental Health Housing**

The Nineteenth Report stated, "[a] difference of opinion has arisen regarding whether or not structured group programming is required for MOH patients under Provision 79 and its associated Compliance Measures. This issue should be discussed and negotiated among the Parties and the Monitor before the date of the County's next Self-Assessment." *See* Nineteenth Monitoring Report at pp. 130, note 59.

The County has expressed the view that while Provision 79 requires group programming for HOH patients, it does not require group programming for MOH patients.[54]  The County specifically points to the Compliance Measures and Implementation Plan negotiated for Provision 79, which it interprets as supporting that position.  The Monitor understands and appreciates the County's views.  The Monitor is also mindful of the fact that Provision 79 itself, which is controlling regarding the County's obligations in this case, indicates that group programming is to be provided to "prisoners in mental health housing" unless it is clinically contraindicated.  *See* Provision 79(a).  MOH housing is "mental health housing."  As such, although the County and the DOJ have conferred about this issue to some extent, the Parties must do further work alongside the Monitor to come to a meeting of the minds about the intent of Provision 79 as it relates to group programming for MOH inmates under Provision 79.

---

[54] *See* County's Augmented Twentieth Self-Assessment at pp. 86 ("The Settlement Agreement does not require the County to provide group programming to MOH patients. This is clear from the original compliance measures for the provision, the revised compliance measures for the provision, and the exhaustively negotiated implementation plan designed to achieve substantial compliance with Provision 79. *Not one* of (1) the original compliance measures, (2) the revised compliance measures, or (3) the implementation plan for Provision 79 requires MOH group programming. Moreover, the revised compliance measures specifically required group programming for HOH patients, *but not* MOH patients. And the implementation plan for Provision 79 specifically stated that group programming *was not* part of the provisional assessment for MOH patients. In short, there is no basis in the negotiated agreements between the parties that MOH groups *must be assessed* in determining Provision 79 compliance.").

80.    (a)    The County and the Sheriff will continue to make best efforts to provide appropriate out-of-cell time to all prisoners with serious mental illness, absent exceptional circumstances, and unless individually clinically contraindicated and documented in the prisoner's electronic medical record.  To implement this requirement, the County and the Sheriff will follow the schedule below:

(i)    By no later than six months after the Effective Date, will offer 25% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week;

(ii)    By no later than 12 months after the Effective Date, will offer 50% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week; and

(iii)    By no later than 18 months after the Effective Date, will offer 100% of the prisoners in HOH ten hours of unstructured out-of-cell recreational time and ten hours of structured therapeutic or programmatic time per week.

(b)    No later than six months after the Effective Date, the County and the Sheriff will record at the end of each day which prisoners in HOH, if any, refused to leave their cells that day.  That data will be presented and discussed with DMH staff at the daily meeting on the following Normal business workday.  The data will also be provided to the specialized unit described in Paragraph 77 and to DMH's quality improvement program to analyze the data for any trends and to implement any corrective action(s) deemed necessary to maximize out-of-cell time opportunities and avoid unnecessary isolation.

**STATUS (80):**       **PARTIAL COMPLIANCE**

Paragraph 80 requires that, "no later than 18 months after the Effective Date [July 1, 2015]," 100% of the prisoners in HOH receive "ten hours of unstructured out-of-cell recreational time *and* ten hours of structured therapeutic or programmatic time per week" (emphasis added). The parties have agreed that up to five hours of the structured time can consist of education or work programs, but at least five hours of the time must be therapeutic. In July 2024, the Parties amended the Compliance Measures to permit the County to exclude from the sampled records inmates who were not assigned to HOH for every day of the sampled week. However, the County "shall not cease providing offers to participate in meaningful opportunities for out-of-cell time to individuals based on their length of stay in HOH."

On December 27, 2022, and on April 20, 2023, the Court issued Orders Setting Deadlines for Substantial Compliance, ECF No. 234 and 248, respectively, which established specific deadlines for Defendants to "improve compliance with provisions 63, 64, and 80." With respect to Provision 80, the December 2022 Order established deadlines for Defendants to take a series of "agreed-upon actions to improve compliance," while the April 2023 Order established incremental targets for the Defendants' overall compliance with the provision by the end of then-upcoming quarters. Pursuant to the Joint Stipulation to Extend Deadlines, the Parties agreed to extend the County's compliance targets as set forth below.

*Figure 7: Quarterly Court-Ordered Targets for Provision 80*
*Compliance for the General HOH Population*

| Targets by Quarter | % of HOH Inmates Receiving 10 Hours Unstructured Out-of-Cell Time | % of HOH Inmates Receiving Structured Out-of-Cell Time | Minimum Hours of Structured Out-of-Cell Time | # of Group Hours (of total Structured Out-of-Cell Time) |
|---|---|---|---|---|
| 1Q2025 | 100% | 85% | 9 | 4.5 (of 9) |
| 2Q2025 | 100% | 95% | 10 | 5 (of 10) |

Pursuant to the Joint Stipulation to Extend Deadlines, the Parties also agreed that out-of-cell time for the population of "high-risk individuals" (known by the County as the "Keep Away Population in Restrictive Housing," or those with security classifications of K10, K17, K18, K19, or K20) is to be measured separately in the following manner.

133

*Figure 8: Quarterly Court-Ordered Targets for Provision 80*
*Compliance in the "Keep Away" Population*

| Targets by Quarter | % of HOH Inmates Receiving 10 Hours Unstructured Out-of-Cell Time | % of HOH Inmates Receiving Structured Out-of-Cell Time | Minimum Hours of Structured Out-of-Cell Time | # of Group Hours (of total Structured Out-of-Cell Time) |
|---|---|---|---|---|
| 1Q2025 | 85% | 65% | 8 | 4 (of 8) |
| 2Q2025 | 90% | 75% | 9 | 4.5 (of 9) |
| 3Q2025 | 95% | 85% | 10 | 5 (of 10) |
| 4Q2025 | 100% | 95% | 10 | 5 (of 10) |

Unstructured Out-of-Cell Time

The County's Augmented Twentieth Self-Assessment reports that in the Fourth Quarter of 2024, 100% of the HOH inmates at CRDF and 99% at TTCF were offered "ten or more hours of unstructured out-of-cell time by Custody staff." It also reports that in the First Quarter of 2025, 100% of HOH inmates were offered the requisite number of unstructured out-of-cell hours at CRDF, and 86% at TTCF. This met the interim targets set by the Court order at CRDF but not at TTCF.

Structured Out-of-Cell Time

The County also reports data for structured therapeutic or programmatic time. According to the County's Augmented Twentieth Self-Assessment, 4.6% of CRDF and 60.4% of TTCF HOH inmates were offered 8.5 hours of structured out-of-cell time during the Fourth Quarter of 2024. For the First Quarter of 2025, the County's Augmented Self-Assessment reports that 39.6% of TTCF inmates residing in HOH were offered nine or more hours of structured out-of-cell time. At CRDF, the County reported 41.9% compliance. This did not meet the benchmarks in the Court order at either facility.

"Keep Away" Population

The County also reports data for structured, therapeutic out-of-cell time for the "Keep Away Population" for the First Quarter of 2025. According to the County's Augmented Twentieth Self-Assessment, 8.4% of K-10 inmates were offered nine or more hours of structured, therapeutic out-of-cell time in the First Quarter of 2025 at TTCF. At CRDF, the County reports 0% of K-10 inmates were offered that amount. This did not meet the benchmarks in the Court order at either facility.

Regarding its results, the County's Augmented Twentieth Self-Assessment rightly notes that

134

the consistent and reliable offer of unstructured out-of-cell time in the HOH modules across both facilities remains a notable bright spot, and it has ended the default isolation of the County's sickest patients and fostered an environment where HOH individuals are routinely offered out of cell time and take advantage of numerous opportunities for recreation and other unstructured activity.

Indeed, the County has made notable and observable progress in its compliance efforts with respect to unstructured out-of-cell time.  Regarding the continuing deficits for structured, therapeutic out-of-cell time, the County points to reporting deficits that it has identified for certain modules during particular weeks in which "deputies and providers did not record refusals—instances in which structured time was offered, but the inmate refused to participate."  The County also points to other obstacles to greater compliance, such as the variability of inmate schedules and movement, frequent staff rotations, the need for consistent coding by group providers, the need for deputies to consistently code unavailability due to court appearances, and security-related disruptions, such as facility lockdowns.  The County raises the possibility that it is these issues, rather than staffing deficits, that may be at the root of its challenges with providing sufficient structured out-of-cell time

> In the 19th Monitor's Report, the Monitor continued to raise concerns about staffing, and specifically the number of CHS providers, as the root cause for lagging compliance performance with Provision 80's structured time metrics.

> But the volatility of the reported numbers at both facilities within a relatively short time emphasizes the fact that compliance with Provision 80 is not, as has been suggested, simply a function of the number of group programming staff or programmatic offerings. Were that the case, as has been suggested, one would expect the results to correlate in a rising or falling pattern purely based on the number of group providers or scheduled programs.

The Monitor credits that the volatility across audited weeks does suggest that there may be multiple root causes of the County's compliance challenges with structured out-of-cell time.  However, given the size of the HOH population, and the number of sessions that each provider can reasonably offer during a given shift, the Monitor does believe that staffing remains too low for the County to achieve compliance at present with existing providers.[55]  Further, the HOH population rose during the Twentieth Reporting Period, and if it continues to rise, staffing will need to keep pace.

---

[55] The County reports that at TTCF, group programming is provided by 15 County staff and 24 contract providers, which is a smaller number than was reported in the Supplemental Nineteenth Self-Assessment ("14 County staff (with an additional two onboarding); 20 clinicians, two supervisors and one manager from McKinley (with five more clinicians onboarding); and seven graduate students").  The County should explain this reduction, particularly in light of the growing HOH population.  At CRDF, the County reports that group programming is provided by nine full time County staff (with one on leave) and four contractors.

135

81.    Except as specifically set forth in Paragraphs 18-20 of this Agreement, and except as specifically identified below, the County and the Sheriff will implement the following paragraphs of the Implementation Plan in *Rosas* at all Jails facilities, including the Pitchess Detention Center and the Century Regional Detention Facility, by no later than the dates set forth in the Implementation Plan or as revised by the *Rosas* Monitoring Panel: Paragraphs 2.2-2.13 (use of force policies and practices); 3.1-3.6 (training and professional development); 4.1-4.10 (use of force on mentally ill prisoners); 5.1-5.3 (data tracking and reporting of force); 6.1-6.20 (prisoner grievances and complaints); 7.1-7.3 (prisoner supervision); 8.1-8.3 (anti-retaliation provisions); 9.1-9.3 (security practices); 10.1-10.2 (management presence in housing units); 11.1 (management review of force); 12.1-12.5 (force investigations, with the training requirement of paragraph 12.1 to be completed by December 31, 2016); 13.1-13.2 (use of force reviews and staff discipline); 14.1-14.2 (criminal referrals and external review); 15.1-15.7 (documentation and recording of force); 16.1-16.3 (health care assessments); 17.1-17.10 (use of restraints); 18.1-18.2 (adequate staffing); 19.1-19.3 (early warning system); 20.1-20.3 (planned uses of force); and 21.1 (organizational culture).

**STATUS:    PARTIAL COMPLIANCE**

Because Paragraph 81 of the Settlement Agreement incorporates 100 provisions in the Implementation Plan adopted in the *Rosas* case, the parties agreed in the Compliance Measures adopted in this case that "Substantial Compliance with respect to the substance of the policies required by the *Rosas* Implementation Plan will be determined by the *Rosas* Monitors." On December 27, 2022, the Court issued an Order Setting Deadlines for Substantial Compliance, ECF No. 234, which required Defendants to achieve Substantial Compliance with Provision 81 by June 30, 2024. Pursuant to the Joint Stipulation to Modify Deadlines, the Parties agreed to extend the compliance deadline for Provision 81 to June 30, 2025.

The Compliance Measures in this case provide that "[o]nce the policies have been approved by the *Rosas* Monitors, the Monitor and Subject Matter Experts will confirm and assess the implementation of these policies in the [DOJ facilities]." In assessing the Department's compliance with Paragraph 81, the Monitor has grouped the 100 provisions into seven categories and, with input from the Subject Matter Experts, has assessed the Department's compliance on a category-by-category basis. With the exception of the Training category, which is assessed when certain percentages are reached, the Department will no longer be subject to monitoring for the provisions in a particular category once the Monitor has determined that it has achieved and maintained for twelve consecutive months Substantial Compliance with the intent and purpose of the overall category. The Department will no longer be subject to monitoring for compliance with Paragraph 81 once it has achieved and maintained for twelve consecutive months Substantial Compliance with each of the categories.

136

**Training (Partial Compliance)**

Paragraphs 3.1-3.6, 4.6-4.9, and 12.1 of the *Rosas* Implementation Plan reflect training requirements on use of force, ethics, dealing with inmates with mental illness, and investigations of force incidents.  The curriculum and lesson plans to implement these training requirements have been approved by the *Rosas* Monitors.

In the Eighteenth Reporting Period, the County was in Substantial Compliance with the refresher training requirements of 3.1, 3.2, 4.6, 4.7, and 12.1-1 as of December 2023.  In the Nineteenth Reporting Period, the County maintained Substantial Compliance with the following Training provisions: 3.3, 3.5,[56] 3.6, 4.8, 4.9, and 12.1-2.  The results for 3.3, 3.6, 4.8, 4.9, and 12.1-2 were verified by the Monitor's auditors.

The County's Augmented Twentieth Self-Assessment reports that it maintained Substantial Compliance with the following Training provisions during the Twentieth Reporting Period: 3.1, 3.2, 3.3, 3.5, 4.6, 4.7, 4.8, 4.9, and 12.1-2.  The reported results for 3.1, 3.2, 3.3, 4.6, 4.7, 4.8, 4.9, and 12.1-2 have been verified by the Monitor's auditors.  The County reported Non-Compliance with 3.6 for the Second Semester of 2024 and 12.1-1 for 2024.  The table below summarizes the County's reported compliance from the Eighteenth through the Twentieth Reporting Periods.

*Figure 9:  Summary of Rosas Training Provision Results*

| Training Provision | 18th Report | | 19th Report | | 20th Report | |
|---|---|---|---|---|---|---|
| | Reported Results | Monitor's Auditors | Reported Results | Monitor's Auditors | Reported Results | Monitor's Auditors |
| 3.1 - UoF Refresher | SC | ✓ | N/A | N/A | SC | ✓ |
| 3.2 - Ethics Refresher | SC | ✓ | N/A | N/A | SC | ✓ |
| 3.3 - UoF & Ethics New Hires | SC | ✓ | SC | ✓ | SC | ✓ |
| 3.5 - Addt'l UoF | No Records | | No Records | | No Records | |
| 3.6 - Probationary Review | SC | ✓ | SC | ✓ | PC | N/A |
| 4.6 - DeVRT Refresher | SC | ✓ | N/A | N/A | SC | ✓ |
| 4.7 - DeVRT Refresher | SC | ✓ | N/A | N/A | SC | ✓ |
| 4.8 & 4.9 - DeVRT New Hires | SC | ✓ | SC | ✓ | SC | ✓ |
| 12.1-1 - Sgt. Refresher | SC | ✓ | N/A | N/A | PC | N/A |
| 12.1-2 - New Sgts. | SC | ✓ | SC | ✓ | SC | ✓ |

**Use of Force (Partial Compliance)**

The Monitor reviewed 25 completed force packages for the DOJ facilities during the Twentieth Reporting Period.  Force packages were not selected randomly or in proportion to the frequency with which various categories of force occur.  Rather, they were selected based on the severity of the force used and other criteria.  On August 5, 2025,

---

[56] The posted results for 3.5 indicate that "[t]here were no inmate grievances against staff investigations involving force with a finding of 'Appears the Employee Conduct Could Have Been Better.'"

the Monitor provided the County with a use of force matrix reflecting the ratings for the 25 force packages reviewed.  On August 26, 2025, the Monitor met with Department executives to discuss the ratings assigned, watch video of force incidents, review deputy reports and command memos, and discuss the Monitoring Team's concerns about particular use of force packages—and the force review process—with Department executives, and to listen to their feedback and respond to their questions.

Of the 25 cases reviewed, seven included some violation of the force prevention principles of Section 2.2 of the Action Plan, which requires that force be used "as a last resort," only the "minimal amount. . .necessary and objectively reasonable," "terminated as soon as possible," and "de-escalated if resistance decreases."  18 of 25 were compliant, which is a reduction from the Nineteenth Reporting Period.

Also related to force prevention, four of 25 cases reviewed involved violations of Section 17.5 of the Action Plan, requiring avoiding placing weight on an inmate's back in a way that impairs their breathing, or failing to place them in the recovery position once they are controlled.  While impermissible head strikes continue to be found in a relatively higher percentage of cases reviewed by the *Rosas* Panel in the Downtown Basin Facilities,[57] a smaller number, or two of 25 cases reviewed from the DOJ Facilities, involved violations of Section 2.6 of the Action Plan, which includes prohibitions on the use of impermissible head strikes.

*Figure 10:  Compliance Percentages on Use of Force Provisions*

| Provision | Description | Applicable Cases | Compliant Cases | Compliance Percentage |
|---|---|---|---|---|
| 2.2 | Force Prevention Principles | 25 | 18 | 72% |
| 2.3 | Inmate on Inmate Violence | 25 | 24 | 96% |
| 2.4 | Use of Force as Discipline | 25 | 25 | 100% |
| 2.5 | Force on Restrained Inmates | 25 | 24 | 96% |
| 2.6 | Head Strikes or Kicks | 25 | 23 | 92% |
| 2.7 | Supervisors Called to Scene | 25 | 19 | 76% |
| 2.8 | Prevent Excessive Force | 0 | 0 | NA |
| 2.9 | Armed Inmates | 1 | 1 | 100% |
| 2.10 | Authorized Weapons | 5 | 5 | 100% |
| 2.11 | Planned Chemical Spray | 0 | 0 | NA |
| 2.12 | Chemical Spray & Tasers | 6 | 6 | 100% |
| 2.13 | Check of Medical Records | 5 | 5 | 100% |
| 4.1 | Consult Mental Health Professionals | 4 | 1 | 25% |
| 4.3 | Spray on Mental Health Inmates | 2 | 2 | 100% |
| 4.4 | Cooling Off Periods | 0 | 0 | NA |

---

[57] *See, e.g.*, *Rosas, et al., v. Leroy Baca*, No. CV 12-00428 MWF, Panel's Fifteenth Monitoring Report at pp. 21, filed October 15, 2025.

| 4.5 | Medical or Mental Health Provider Order | 1 | 0 | 0% |
|---|---|---|---|---|
| 9.2 | Escorting of Inmates | 25 | 19 | 76% |
| 9.3 | Duty to Protect & Intervene | 7 | 6 | 86% |
| 17.5 | Minimize Medical Distress | 25 | 21 | 84% |
| 20.3 | Planned Use of Force | 2 | 1 | 50% |

Regarding the total number of head strikes in the DOJ facilities during the Twentieth Reporting Period, there was one head strike in the Fourth Quarter of 2024 and one in the First Quarter of 2025.  This was less than the average of 3.1 uses of force per quarter involving head strikes by staff in the DOJ facilities between the First Quarter of 2021 and the First Quarter of 2025.

*Figure 11:  Uses of Force with Head Strikes by Quarter*

Figure 12 disaggregates these head strike data by facility, and both head strikes in the Fourth Quarter of 2024 and First Quarter of 2025 occurred at NCCF.  There were no reported head strikes at CRDF, PDC North, or PDC South.  This was a notable change at CRDF.

*Figure 12:  Uses of Force with Head Strikes by Facility, Q4-2024 and Q1-2025*

139



Figure 13 presents the total uses of force between the First Quarter of 2020 and the First Quarter of 2025.  Total uses of force held constant at the DOJ facilities in the Fourth Quarter of 2024 and declined in the First Quarter of 2025.

*Figure 13:  Total Use of Force by Quarter*

These fluctuations do not appear to be driven by changes in the facilities' average daily populations.  Figure 14 presents the total use of force incidents per 100 inmates, based on average daily population, between the First Quarter of 2020 and the First Quarter of 2025.  The 1.4 uses of force per 100 inmates in the First Quarter of 2025 was lower than recent quarters and those prior to peaks in 2021 and 2022.

*Figure 14:  Uses of Force Per 100 Inmates by Quarter*

140



As in prior Reporting Periods, CRDF continued to have a significantly higher frequency of force incidents per inmate during the Twentieth Reporting Period.  Figure 15 presents the number of use of force incidents per 100 inmates in the Fourth Quarter of 2024 and First Quarter of 2025 by facility.  CRDF had the highest number of force incidents at 8.2 uses of force per 100 inmates.  NCCF had just over a quarter of that number at 2.2.  PDC North and PDC South were substantially lower, with 1.2 and 0.8 per 100 inmates, respectively.

*Figure 15:  Uses of Force Per 100 Inmates by Facility, Q4-2024 and Q1-2025*



The Sixteenth Monitoring Report called on the County to "expeditiously investigate the causes of this proportionally higher number of uses of force at CRDF and take

141

appropriate corrective action."[58]  In the County's Augmented Twentieth Self-Assessment, the Department reports that

> One of the key findings reported in the 19th Augmented Self-Assessment was that CRDF's total use-of-force numbers are higher due to higher rates of force in intake (also known as Reception) and booking. . . .In response to this finding, the Department has done the following:
>
> CRDF installed wall padding in the Reception area on April 2, 2025. This padding allows deputies to restrain an inmate against a soft wall rather than having to perform a take-down. This improvement represents one strategy for ensuring the lowest-possible level of force is used.
>
> On June 9, 2025, the Captain at CRDF, after recognizing a higher incidence of force in Reception on weekdays from 3:00 p.m. to 5:00 p.m., designated an additional sergeant to be present during these peak hours. This decision followed a detailed review of force done by CRDF's new leadership, who assumed command at the facility in May 2025. The Captain's review identified concerns with incidents occurring when inmates return from court, specifically in the two-hour period mentioned above. By ensuring another sergeant is present to assist and guide staff during this critical time frame, CRDF is already starting to see a reduction in force incidents in Reception.
>
> CFIT facilitated training for all sergeants in March 2025. During the same period, all deputies began taking a Deputy Empathy and Awareness Training (DEAT) offered by the Center for Health Justice, a community-based organization. The DEAT sessions are facilitated by trainers with lived experience in the justice system and provide staff with greater insight into the factors that lead to incarceration. This training is ongoing, with another training scheduled for September 2025. Going forward, this training will be incorporated into the orientation period for all new custody assistants and deputies at CRDF.

The County also reports on other efforts to address use of force issues at CRDF, including use of a "detailed use-of-force report that breaks down force by key factors such as location, classification, time of day, force method, and force category. The CRDF Captain now meets with the Risk Management Sergeant every Monday to review the previous week's force incidents, or immediately after a force incident if warranted. This allows for a real-time understanding of force trends and

---

[58] The County's Augmented Twentieth Self-Assessment reports, "As discussed in the 19th Augmented Self-Assessment, the LASD prioritized the review of all use-of-force cases at CRDF in 2024. The comprehensive review, conducted by a former CFIT lieutenant with expert understanding of uses of force and Department policies, was completed in August 2025. The review identified challenges in handling recalcitrant inmates and recommended additional training in this area.  As a result of this analysis, the CRDF Captain will be working with the Training Unit to develop scenario-based training related to the recalcitrant inmate policy, as well as potential training opportunities for improved communication with the mental health population, especially in HOH areas."

enables the Captain to identify issues proactively." The Monitor met with the CRDF captain during a recent site visit and was impressed by this new use of data to proactively identify and manage potentially problematic trends in use of force. Further, the County reports that CRDF is now "closely monitoring the documentation of Performance Log Entries," and also now doing "tactical debriefings with personnel involved in force incidents that do not result in administrative investigations." These are promising practices.

Figure 16 presents the total uses of force by category and quarter. As usual, Category 1 Force was the most common force type. Category 1 Force decreased by 11% in the First Quarter of 2025 compared to the Second Quarter of 2024.

*Figure 16:  Total Use of Force by Category and Quarter*



Figures 17 through 20 break out these data by facility. There were 47% more Category 1 Force incidents at CRDF in the Fourth Quarter of 2024 than in the Second Quarter of 2024, but the number of Category 1 Force incidents decreased substantially in the First Quarter of 2025. The Department should seek to determine whether these fluctuations in Category 1 Force incidents at CRDF relate to methodological changes, such as differences in how force incidents are being categorized, operational changes, or variations in inmate or staff conduct that can be addressed by jail leaders.

*Figures 17-20: Total Use of Force by Category, Quarter, and Facility*

143

 

 

**Reporting and Investigation of Force (Partial Compliance)**

The timely investigation of force incidents is essential to ensuring the thoroughness of those investigations and accountability in the Department.  Department data reflect that some of the delays in the process of investigating and reviewing use of force incidents at the DOJ facilities discussed in previous Monitoring Reports have begun to be addressed. LASD provided information about the status of force investigations into incidents in the First Quarter of 2024 through the First Quarter of 2025.  Figure 21 presents the percentage of these investigations that were still in progress at the time the data were provided. Among the investigations into force incidents that occurred in the First Quarter of 2024, more than a year ago, only 10% were still in progress as of July 8, 2025.  Among those still in progress, the average age of investigations into force incidents from the First Quarter of 2024 through the First Quarter of 2025 was 243 days.  This is a meaningful, but still preliminary step, towards improving the timeliness of force investigations and reviews.

*Figure 21:  Percentage of Force Investigations In Progress as of July 8, 2025, Q1-2024 through Q1-2025*

144



Figure 22 presents the overall percentage of investigations into use of force incidents occurring in the First Quarter of 2024 through the First Quarter of 2025 that were still in progress by facility. Of the 138 investigations into uses of force at NCCF during this time period, 59% were still in progress as of July 8, 2025. CRDF had a total of 193 investigations, and 36% were still in progress. This is a substantial improvement compared to the Nineteenth Reporting Period, when 89% of investigations were still in progress.

*Figure 22:  Percentage of Force Investigations In Progress as of July 8, 2025, by Facility, Q1-2024 through Q1-2025*



On August 5, 2025, the Monitor provided the County with a use of force matrix reflecting the ratings for the 25 force packages reviewed. On August 26, 2025, the Monitor met with Department executives to discuss the ratings assigned, watch videos of force incidents, review deputy reports and command memos, and discuss the Monitoring Team's concerns about particular use of force packages—and the force review process—with Department executives, and to listen to their feedback and respond to their questions.

*Figure 23:  Compliance Percentages on Use of Force*

*Investigation and Review Provisions*

| Provision | Description | Applicable Cases | Compliant Cases | Compliance Percentage |
|---|---|---|---|---|
| 4.2 | Interviewing Mental Health Professionals | 1 | 1 | 100% |
| 5.2 | Commander's Reviews | 25 | 25 | 100% |
| 5.3 | Unexplained Discrepancies Sent for Additional Investigation | 13 | 11 | 85% |
| 12.2 | Location of Inmate Interviews | 17 | 8 | 47% |
| 12.3 | Involved Deputies not Present for Inmate Interviews | 24 | 21 | 88% |
| 12.4 | Uninvolved Supervisors | 25 | 22 | 88% |
| 12.5 | Standard Order & Format | 25 | 25 | 100% |
| 15.1 | Independent Staff Reports Before Going off Duty | 25 | 21 | 84% |
| 15.2 | All Department Witnesses Wrote Reports | 25 | 23 | 92% |
| 15.3 | Force by Other Members Reported | 24 | 20 | 83% |
| 15.4 | Description of Injuries | 25 | 19 | 76% |
| 15.5 | Clarification After Video | 5 | 5 | 100% |
| 15.6 | Separation of Deputies | 25 | 22 | 88% |
| 15.7 | Individual Perceptions | 25 | 25 | 100% |
| 16.1 | Medical Assessment | 25 | 24 | 96% |
| 16.2 | Photograph of Staff Injuries | 10 | 5 | 50% |
| 16.3 | Medical Report of Injuries | 25 | 24 | 96% |

Regarding the Department's quantitative results on the specific provisions, for the Twentieth Reporting Period, the County's Augmented Twentieth Self-Assessment reports Substantial Compliance with the following provisions: 4.2 (Supervisor interviews with Mental Health professionals who witnessed force incidents); 5.1 (timely database entry of force incidents);[59] 5.2 (Unit Commander review of force incidents); 12.5 (investigation package standard order and format); 15.5 (clarification of force incidents after video review); 15.7 (individual perceptions in force reports); 16.1 (medical assessment of inmates upon whom force is used); and 16.3 (medical reports of injuries related to use of force).

**Grievances (Partial Compliance)**

The County's Augmented Twentieth Self-Assessment reports that in the Fourth Quarter of 2024, the Department achieved Substantial Compliance with the following grievance provisions at the DOJ facilities: 6.4 (proper handling of force-related grievances); 6.5 proper handling of harassment and retaliation grievances); 6.7 (appropriate handling of

---

[59] The Department has requested to evaluate 5.1-4(a) separately from sections (b) and (c), and the Monitor grants that request.

146

grievances marked "emergency"); 6.8 (inmate notification of downgraded grievances); 6.9 (proper handling of emergency grievances); 6.10 (timely collection of inmate grievances); 6.11 (review of complaints re: inmate grievance process); 6.12 (proper database entry of inmate grievances); 6.13 (proper tracking of handling of inmate grievances); 6.14 (monthly reports of grievance tracking); 6.15 (monthly evaluation of trends in inmate grievance handling); 6.17 (time limit for filing force-related grievances); 6.18 (proper handling of PREA grievances); 6.20 (proper handling of inmate appeals); 7.1 (conflict resolution for inmate grievances); 7.2 (timely notification of grievance investigation results); 7.3 (town hall meetings); and 8.1 (reporting of retaliation grievances).  The County reported that the Department achieved Partial Compliance with 6.19 (timely responses to inmate grievances).

The County's Augmented Twentieth Self-Assessment reports that in the First Quarter of 2025, the Department achieved Substantial Compliance with the following grievance provisions at the DOJ facilities: 6.4 (proper handling of force-related grievances); 6.5 (proper handling of harassment and retaliation grievances); 6.7 (appropriate handling of grievances marked "emergency"); 6.8 (inmate notification of downgraded grievances); 6.9 (proper handling of emergency grievances); 6.10 (timely collection of inmate grievances); 6.11 (review of complaints re: inmate grievance process); 6.12 (proper database entry of inmate grievances); 6.13 (proper tracking of handling of inmate grievances); 6.14 (monthly reports of grievance tracking); 6.15 (monthly evaluation of trends in inmate grievance handling); 6.17 (time limit for filing force-related grievances); 6.18 (proper handling of PREA grievances); 6.20 (proper handling of inmate appeals); 7.1 (conflict resolution for inmate grievances); 7.2 (timely notification of grievance investigation results); 7.3 (town hall meetings); and 8.1 (reporting of retaliation grievances).  The County reported that the Department achieved Partial Compliance with 6.19 (timely responses to inmate grievances).

## Management and Administration (Substantial Compliance as of October 1, 2020, through September 30, 2021)

The Department achieved Substantial Compliance with the Management and Administration Provisions at the DOJ facilities as of September 30, 2021, and these provisions were not subject to Monitoring during the Twentieth Reporting Period.

## Security Restraints (Partial Compliance)

Security Restraints are subject to the provisions in Section 17 of the *Rosas* Plan.  It is the Monitor's understanding that the County and the Department do not use "multi-point restraints," which are subject to Paragraphs 17.6 through 17.9 of the *Rosas* Plan, at any of the County's jail facilities.  The Monitor's auditors are reviewing the Safety Chair Logs and Fixed Restraint Logs for both quarters, which include 20 uses of the safety chair and five uses of fixed restraints in the Fourth Quarter of 2024 and 30 and one, respectively, in the First Quarter of 2025.  The Monitor's Auditors note that the Safety Chair Logs reflect one

147

use of force to place the inmate in the safety chair in the Twentieth Reporting Period.[60]

While safety checks generally occur within the 20-minute requirement of Section 17.4,[61] compliance with this requirement remains a barrier to achieving Substantial Compliance.  However, as discussed in the Eighteenth Monitoring Report, incomplete documentation often results in non-compliant safety checks.

The Monitor's auditors note that vitals checks are not occurring as required by Section 17.3 and Fixed Restraint Logs generally do not explicitly document whether the inmate was in undue pain or that the restraints were not causing injury, as required by Section 17.4.  No Fixed Restraint Logs for cases in the Fourth Quarter of 2024 explicitly documented information required by Section 17.4.  However, the single Fixed Restraint Log for the one case in the First Quarter of 2025 reflected a safety check explicitly documenting that there were "no complaints of injury/pain."  Therefore, the County is in Partial Compliance with Paragraphs 17.3 and 17.4 of the *Rosas* Plan.

The Department posted logs of all involuntary medications administered in the Fourth Quarter of 2024 and the First Quarter of 2025.  The records reflect that all of the medications were administered per court orders to restore the competency of those deemed incompetent to stand trial and none were solely for security purposes in compliance with Paragraph 17.10 of the *Rosas* Plan.

**Early Warning System          (Substantial Compliance as of September 30, 2019, through September 30, 2020)**

The Department implemented an Employee Review System that was approved by the *Rosas* Monitors as a pilot program at the Downtown Jail Facilities on July 27, 2018, and expanded it to the DOJ facilities on October 25, 2018.  The Department achieved Substantial Compliance with the Early Warning Provisions at the DOJ facilities as of September 30, 2020, and these provisions were not subject to Monitoring during the Twentieth Reporting Period.

---

[60] In the Fourth Quarter of 2024, four out of 20 safety chair logs did not indicate whether or not there was a use of force.  After inquiries by the Monitor's auditors, the County provided responses related to the incidents.  Per the County, safety chair logs for three incidents did not list a Uniform Report Number, and therefore, indicated that no use of force occurred.  The safety chair log for one incident reflected a Uniform Report Number.  The Watch Commander's analysis generated in response to the incident indicated that a Uniform Report Number associated with use of force was listed incorrectly.  Further, "[t]he suspect did not appear to be resisting at the time.  No involved personnel documented the utilization of force while securing the suspect into the safety chair."  In the First Quarter of 2025, one out of 30 safety chair logs indicated a use of force (CRDF Count 5, Ref. No. 5700-2025-0116-213).  Source documentation reflects that the required medical evaluation did not occur until approximately two hours after the inmate was placed in the safety chair.

[61] Safety checks are not required for the use of safety chairs for inmate movement (e.g., to/from court).

148

82.    With respect to paragraph 6.16 of the *Rosas* Implementation Plan, the County and the Sheriff will ensure that Sheriff's Department personnel responsible for collecting prisoners' grievances as set forth in that paragraph are also co-located in the Century Regional Detention Facility.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of July 15, 2016, through December 31, 2017)**

Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring for Substantial Compliance with Paragraph 82 in the Twentieth Reporting Period.

149

83.     The County and the Sheriff will install closed circuit security cameras throughout all Jails facilities' common areas where prisoners engage in programming, treatment, recreation, visitation, and intra-facility movement ("Common Areas"), including in the Common Areas at the Pitchess Detention Center and the Century Regional Detention Facility.  The County and the Sheriff will install a sufficient number of cameras in Jails facilities that do not currently have cameras to ensure that all Common Areas of these facilities have security-camera coverage.  The installation of these cameras will be completed no later than June 30, 2018, with TTCF, MCJ, and IRC completed by the Effective Date; CRDF completed by March 1, 2016; and the remaining facilities completed by June 30, 2018.  The County and the Sheriff will also ensure that all video recordings of force incidents are adequately stored and retained for a period of at least one year after the force incident occurs or until all investigations and proceedings related to the use of force are concluded.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of July 1, 2015, through June 30, 2016 at MCJ and IRC)**

**SUBSTANTIAL COMPLIANCE (as of October 1, 2015, through September 30, 2016 at TTCF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 at CRDF)**

**SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 at NCCF and PDC North)**

**SUBSTANTIAL COMPLIANCE (as of July 1, 2018, through June 30, 2019 at PDC South)**

Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring for Substantial Compliance with Paragraph 83 in the Twentieth Reporting Period.

150

84.     The Sheriff will continue to maintain and implement policies for the timely and thorough investigation of alleged staff misconduct related to use of force and for timely disciplinary action arising from such investigations.  Specifically:

   (a)     Sworn custody staff subject to the provisions of California Government Code section 3304 will be notified of the completion of the investigation and the proposed discipline arising from force incidents in accordance with the requirements of that Code section; and

   (b)     All non-sworn Sheriff's Department staff will be notified of the proposed discipline arising from force incidents in time to allow for the imposition of that discipline.

**STATUS:     SUBSTANTIAL COMPLIANCE (as of July 1, 2017, through June 30, 2018 (verified))**

Substantial Compliance under the Compliance Measures requires the Department to demonstrate that 95% of the investigations of force incidents in which sworn custody staff and non-sworn custody staff were found to have violated Department policy or engaged in misconduct were completed and administrative action, which could include discipline, was taken within the time frames provided for in Government Code Section 3304 and relevant Department policies.

Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring for Substantial Compliance with Paragraph 84 in the Twentieth Reporting Period.

151

85.    The County and the Sheriff will ensure that Internal Affairs Bureau management and staff receive adequate specialized training in conducting investigations of misconduct.

**STATUS:    SUBSTANTIAL COMPLIANCE (as of April 1, 2021, through March 31, 2022 (verified))**

The Parties agreed on Revised Compliance Measures in 2021.  Substantial Compliance requires the Department to provide the Monitor with (1) the curriculum/syllabus for the two specialized courses, Internal Affair Investigations and Interview and Interrogation, given to IAB management, and (2) a list of the sworn personnel assigned to IAB and proof that such personnel successfully completed the training.  Substantial Compliance requires the Department to demonstrate that 90% of the personnel assigned to IAB have successfully completed one course of the required training within 3 months of their start date, and the second course within 6 months of their start date.

Pursuant to Paragraph 111 of the Settlement Agreement, the County was not subject to monitoring for Substantial Compliance with Paragraph 85 in the Twentieth Reporting Period.

86.    Within three months of the Effective Date, the County and the Sheriff will develop and implement policies and procedures for the effective and accurate maintenance, inventory, and assignment of chemical agents and other security equipment.  The County and the Sheriff will develop and maintain an adequate inventory control system for all weapons, including OC spray.

> **STATUS:    SUBSTANTIAL COMPLIANCE (as of April 1, 2016, through March 31, 2017 at MCJ and CRDF)**
>
> **SUBSTANTIAL COMPLIANCE (as of October 1, 2016, through December 31, 2017 at PDC North)**
>
> **SUBSTANTIAL COMPLIANCE (as of February 1, 2017, through March 31, 2018 at PDC South and PDC East)**
>
> **SUBSTANTIAL COMPLIANCE (as of March 1, 2017, through March 31, 2018 at NCCF)**
>
> **SUBSTANTIAL COMPLIANCE (as of April 1, 2017, through March 31, 2018 at IRC)**
>
> **SUBSTANTIAL COMPLIANCE (as of April 1, 2018, through March 31, 2019 at TTCF)**

CDM 7-08/080 ACCOUNTABILITY OF SPECIAL WEAPONS, effective October 14, 2016, requires each facility to have unit orders that "establish procedures for the storage, issuance, reissuance, accountability, maintenance, and periodic inventory of all weapons. . .stored at, or issued from, the facility," which includes detailed requirements for the "Inventory, Control, and Accountability of Aerosol Chemical Agents."

In addition to providing written policies and procedures, Substantial Compliance requires the Department to provide up-to-date Unit Orders for each jail requiring the inventory and inspection of special weapons, and armory audit logs documenting the inventory and control of armory-level weapons.  The Department previously maintained Substantial Compliance with Paragraph 86 for twelve consecutive months at all of the facilities, and it was not subject to monitoring with this provision in the Twentieth Reporting Period.

153

**APPENDIX A**

| NO. | PROVISION | STATUS | SUBSTANTIAL COMPLIANCE DATES |
|---|---|---|---|
| 18 | Suicide Prevention Training | Substantial Compliance | **(10/1/17 at MCJ & PDC South)[1]** **(9/1/17 at NCCF)** **(12/1/17 at PDC East)** **(4/1/18 at TTCF, IRC, & PDC North)** **(8/1/18 at CRDF)** |
| 19 | Crisis Intervention & Conflict Resolution Training | Substantial Compliance | **(4/1/18 at MCJ, NCCF, & IRC)** **(7/1/18 at TTCF)** **(12/1/18 at CRDF, PDC East, & PDC North)** **(3/1/19 at PDC South)** |
| 20 | Training at NCCF, PDC and CRDF | Substantial Compliance | **(8/1/17 at PDC East, PDC North, NCCF, & CRDF)** **(10/1/17 at PDC South)** |
| 21 | CPR Certification | Substantial Compliance | **(10/1/15 – 9/30/16 at PDC East & PDC South)** **(1/1/16 – 12/31/16 at NCCF, PDC North, & IRC)** **(4/1/16 – 3/31/17 at TTCF)** **(10/1/17 – 9/30/18 at MCJ)** **(7/1/18 – 6/30/19 at CRDF)** |

---

[1] Substantial Compliance Dates in **bold** reflect that the Department has achieved Substantial Compliance with the training requirements or maintained Substantial Compliance for twelve consecutive months with the other requirements; the results were verified by the Monitor's auditors when required; and the County or designated facilities are no longer subject to monitoring of this provision pursuant to Paragraph 111 of the Settlement Agreement.

**APPENDIX A**

| | | | |
|---|---|---|---|
| 22 | Use of Arresting and Booking Documents | Substantial Compliance | **(7/1/16 – 6/30/17)** |
| 23 | Suicide Hazard Mitigation Plans | Substantial Compliance | **(7/12/18)** |
| 24 | Suicide Hazard Inspection | Substantial Compliance | **(10/1/17 – 9/30/18)** |
| 25 | Transportation of Suicidal Inmates (station jails) | Substantial Compliance | (10/1/24 – 3/31/25) |
| 26 | Identification and Evaluation of Suicidal Inmates | Substantial Compliance | **(4/1/23 – 3/31/24)** |
| 27 | Screening for Mental Health Care and Suicide Risk | Substantial Compliance | **(10/1/19 – 3/31/20, 10/1/20 – 3/31/21)** |
| 28 | Expedited Booking of Suicidal Inmates | Substantial Compliance (IRC) Not Rated (CRDF) | **(4/1/17 – 3/31/18 at IRC)** (4/1/24 – 9/30/24 at CRDF) |
| 29 | Mental Health Assessments (of non-emergent mental health needs) | Substantial Compliance | **(4/1/17 – 3/31/18)** |
| 30 | Initial Mental Health Assessments & Treatment Plans | Substantial Compliance | **(1/1/19 – 12/31/19)** |
| 31 | Electronic Medical Records Alerts | Substantial Compliance | (10/1/24 – 3/31/25 at TTCF) (1/1/25 – 3/31/25 at CRDF) |
| 32 | Electronic Medical Records – Suicide Attempts | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 33 | Supervisor Reviews of Electronic Medical Records | Substantial Compliance | **(7/1/16 – 6/30/17)** |
| 34 | Discharge Planning | Partial Compliance | |
| 35 | Referral for Mental Health Care | Substantial Compliance | **(11/1/17 – 12/31/18)** |

**APPENDIX A**

| | | | |
|---|---|---|---|
| 36 | Assessments After Triggering Events | Substantial Compliance | (10/1/24 – 3/31/25 at TTCF & CRDF) |
| 37 | Court Services Division Referrals | Substantial Compliance | (1/1/25 – 3/31/25) |
| 38 | Weekly Rounds in Restricted Housing Modules | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 39 | Confidential Self-Referral | Substantial Compliance (NCCF & PDC North) Partial Compliance (CRDF, MCJ, & TTCF) Not Rated (PDC East & PDC South) | **(7/1/17 – 6/30/18 at NCCF)** (1/1/25 – 3/31/25 at PDC North) |
| 40 | Availability of QMHPs | Substantial Compliance | **(4/1/24 – 3/31/25)** |
| 41 | FIP Step-Down Protocols | Substantial Compliance | **(7/1/22 – 6/30/23)** |
| 42 | HOH Step-Down Protocols | Substantial Compliance | (7/1/24 – 3/31/25 at TTCF) (10/1/24 – 3/31/25 at CRDF) |
| 43 | Disciplinary Policies | Substantial Compliance | **(10/1/17 – 9/30/18 at NCCF & PDC North)** (10/1/24 – 3/31/25 at CRDF & TTCF) (1/1/25 – 3/31/25 at MCJ) |
| 44 | Protective Barriers | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 45 | Suicide Intervention and First Aid Kits | Substantial Compliance | **(10/1/15 – 9/30/16 at CRDF, NCCF, TTCF, PDC East, & PDC South) (1/1/16 – 12/31/16 at MCJ & PDC North)** |
| 46 | Interruption of Self-Injurious Behavior | Substantial Compliance | **(7/1/20 – 6/30/21)** |

**APPENDIX A**

| 47 | Staffing Requirements | Partial Compliance | |
|----|----|----|----|
| 48 | Housekeeping and Sanitation | Substantial Compliance | **(1/1/16 – 12/31/16)** |
| 49 | Maintenance Plans | Substantial Compliance | **(3/1/16 – 2/28/17)** |
| 50 | Pest Control | Substantial Compliance | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC North, TTCF, & CRDF)** <br> **(4/1/16 – 3/31/17 at PDC South & PDC East)** |
| 51 | Personal Care & Supplies | Substantial Compliance | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC East, PDC North, PDC South, & TTCF)** <br> **(7/1/16 – 6/30/17 at CRDF)** |
| 52 | HOH Property Restrictions | Substantial Compliance (CRDF) <br> Partial Compliance (TTCF) | (10/1/24 – 3/31/25 at CRDF) |
| 53 | Eligibility for Education, Work and Programs | Substantial Compliance | **(4/1/24 – 3/31/25)** |
| 54 | Privileges and Programs | Substantial Compliance | **(1/1/23 – 6/30/23)** |
| 55 | Staff Meetings | Substantial Compliance | **(10/1/16 – 9/30/17 at CRDF)** <br> **(4/1/17 – 3/31/18 at PDC North)** <br> **(4/1/18 – 3/31/19 at MCJ)** <br> **(7/1/19 – 6/30/20 at TTCF)** |
| 56 | Changes in Housing Assignments | Substantial Compliance | **(1/1/16 – 12/31/16)** |

**APPENDIX A**

| | | | |
|---|---|---|---|
| 57 | Inmate Safety Checks in Mental Housing | Substantial Compliance (MCJ & PDC North) Partial Compliance (TTCF & CRDF) | **(4/1/17 – 3/31/18 at MCJ)** **(7/1/21 – 6/30/22 at PDC North)** |
| 58 | Inmate Safety Checks in Non-Mental Housing | Substantial Compliance | **(1/1/16 – 12/31/16 at PDC South, PDC North, & PDC East)** **(7/1/17 – 6/30/18 at CRDF)** **(10/1/17 – 9/30/18 at IRC)** **(1/1/24 – 12/31/24 at NCCF)** (10/1/24 – 3/31/25 at MCJ) (1/1/25 – 3/31/25 at TTCF) |
| 59 | Supervisor Rounds | Substantial Compliance | **(1/1/17 – 12/31/17 at PDC East & MCJ)** **(4/1/17 – 3/31/18 at NCCF)** **(10/1/17 – 9/30/18 at CRDF)** **(1/1/18 – 12/31/18 at PDC North & PDC South)** **(4/1/18 – 3/31/19 at TTCF)** |
| 60 | Implementation of Quality Improvement Program | Substantial Compliance | **(4/1/19 – 3/31/20)** |
| 61 | Requirements of Quality Improvement Program | Substantial Compliance | (10/1/24 – 3/31/25) |
| 62 | Tracking of Corrective Action Plans | Substantial Compliance | **(4/1/24 – 3/31/25)** |
| 63 | Sufficient HOH and MOH Housing | Substantial Compliance | **(10/1/23 – 6/30/24 & 9/30/24 at CRDF)** (7/1/24 – 3/31/25 at TTCF) |

## <u>APPENDIX A</u>

| | | | |
|---|---|---|---|
| 64 | Plans for Availability of Inpatient Health Care | Substantial Compliance | (10/1/24 – 3/31/25) |
| 65 | Administration of Psychotropic Medication | Partial Compliance | |
| 66 | Active Mental Health Caseloads | Partial Compliance | |
| 67 | Prisoner Refusals of Medication | Partial Compliance | |
| 68 | Contraband Searches | Substantial Compliance | **(1/1/16 – 12/31/16 at MCJ, NCCF, PDC East, PDC South, & PDC North) (1/1/17 – 12/31/17 at TTCF) (1/1/22 – 12/31/22 at CRDF)** |
| 69 | Clinical Restraints in CTC | Substantial Compliance | **(7/1/18 – 6/30/19)** |
| 70 | Security Restraints in HOH and MOH | Partial Compliance | |
| 71 | Therapeutic Services for Inmates in Clinical Restraints | Substantial Compliance | **(7/1/16 – 6/30/17)** |
| 72 | Administrative Reviews | Substantial Compliance | **(1/1/17 – 12/31/17)** |
| 73 | Reporting of Self-Injurious Behavior and Threats | Substantial Compliance | **(10/1/17 – 9/30/18)** |
| 74 | Law Enforcement Investigations of Suicides | Substantial Compliance | **(9/1/16 – 12/31/17)** |
| 75 | Management Reviews of Suicide Attempts | Substantial Compliance | **(10/1/17 – 9/30/18)** |
| 76 | Management Reviews of Suicides | Substantial Compliance | **(9/1/16 – 12/31/17)** |
| 77 | Custody Compliance and Sustainability Bureau | Substantial Compliance | **(4/1/22 – 3/31/23)** |

**APPENDIX A**

| | | | |
|---|---|---|---|
| 78 | Suicide Prevention Advisory Committee | Substantial Compliance | **(5/11/16 – 5/18/17)** |
| 79 | Therapeutic Services in Mental Health Housing | Partial Compliance | |
| 80 | Out-of-Cell Time in HOH | Partial Compliance | |
| 81 | Implementation of *Rosas* Recommendations | Partial Compliance | |
| | Training | Partial Compliance | |
| | Use of Force | Partial Compliance | |
| | Reporting and Investigation of Force | Partial Compliance | |
| | Grievances | Partial Compliance | |
| | Management and Administration | Substantial Compliance | **(10/1/20 – 9/30/21)** |
| | Security Restraints | Partial Compliance | |
| | Early Warning System | Substantial Compliance | **(9/30/19 – 9/30/20)** |
| 82 | Grievances at CRDF | Substantial Compliance | **(7/15/16 – 12/31/17)** |
| 83 | Closed Circuit Cameras | Substantial Compliance | **(7/1/15 – 6/30/16 at MCJ & IRC)** **(10/1/15 – 9/30/16 at TTCF)** **(4/1/16 – 3/31/17 at CRDF)** **(4/1/18 – 3/31/19 at NCCF & PDC North)** **(7/1/18 –6/30/19 at PDC South)** |
| 84 | Investigation of Staff Misconduct | Substantial Compliance | **(7/1/17 – 6/30/18)** |

**APPENDIX A**

| 85 | Internal Affairs Bureau Training | Substantial Compliance | **(4/1/21 – 3/31/22)** |
|---|---|---|---|
| 86 | Maintenance and Inventory of Security Equipment | Substantial Compliance | **(4/1/16 – 3/31/17 at MCJ & CRDF)** **(10/1/16 – 12/31/17 at PDC North)** **(2/1/17 – 3/31/18 at PDC South & PDC East)** **(3/1/17 – 3/31/18 at NCCF)** **(4/1/17 – 3/31/18 at IRC)** **(4/1/18 – 3/31/19 at TTCF)** |

## APPENDIX B

| | Substantial Compliance (Provisions)[1] | Partial Compliance[2] | Non-Compliance | Suspended | Substantial Compliance (Facilities)[3] | No Longer Subject To Monitoring[4] |
|---|---|---|---|---|---|---|
| **First[5]** | 5 | 16 | | | 10 | |
| **Second** | 14 | 30 | 13 | | 24 | |
| **Third** | 22 | 27(1) | 10 | | 29 | 4(2) |
| **Fourth** | 24 | 26(1) | 10 | | 29 | 10(2) |
| **Fifth** | 23 | 24(2) | 7 | | 34 | 15(5) |
| **Sixth** | 32 | 22 | 7 | | 38 | 18(9) |
| **Seventh** | 30 | 23 | 7 | | 39 | 21(10) |
| **Eighth** | 35 | 20 | 6 | | 42 | 27(9) |
| **Ninth** | 36 | 22 | 4 | | 43 | 31(8) |
| **Tenth** | 39 | 21 | 3 | | 45 | 32(8) |
| **Eleventh** | 38 | 18 | 5 | 2 | 44 | 34(7) |
| **Twelfth** | 38 | 18 | 6 | 1 | 44 | 36(6) |
| **Thirteenth** | 42 | 14(1) | 6 | 1 | 47 | 36(6) |
| **Fourteenth** | 40 | 17 | 7 | 0 | 45 | 38(6) |
| **Fifteenth** | 42 | 13(1) | 9 | 0 | 46 | 38(6) |
| **Sixteenth** | 43 | 12(2) | 4 | 0 | 49 | 39(5) |
| **Seventeenth** | 43 | 16 | 3 | 0 | 50 | 40(5) |
| **Eighteenth** | 45 | 15 | 3 | 0 | 51 | 42(5) |
| **Nineteenth** | 50 | 14 | 1 | 0 | 54 | 43(5) |
| **Twentieth** | 56(1) | 9 | 0 | 0 | 60 | 46(6) |

---

[1] The figure in parenthesis under Substantial Compliance is the number of additional provisions where some facilities were in Substantial Compliance and other facilities were Not Rated.

[2] The figure in parenthesis under Partial Compliance is the number of additional provisions where some facilities were in Partial Compliance and other facilities were in Non-Compliance.

[3] This represents the number of provisions where the Department is in Substantial Compliance at all or some of the facilities.

[4] The figure in parenthesis under No Longer Subject to Monitoring is the number of additional provisions where some facilities are no longer subject to monitoring.

[5] During the First Reporting Period, 43 provisions were not subject to monitoring.